**Exhibit 2**

Contains Highly Confidential Portions

Page 1

1

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4     ---------------------x

5     In Re:

6                              Chapter 11

7     LEHMAN BROTHERS          Case No. 08-13555(JMP)

8     HOLDINGS, INC., et al.,    (Jointly Administered)

9

                 Debtors.

10

      ---------------------x

11

12          PARTIALLY HIGHLY CONFIDENTIAL

13     VIDEOTAPED DEPOSITION OF DANIEL McISAAC

14              New York, New York

15              April 6, 2010

16     * * *(Pages 12-23 have been designated highly

17     confidential.)* * *

18

19

20

21

22

23     Reported by:

24     KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25     JOB NO. 29428

Contains Highly Confidential Portions

Page 2

1
2          April 6, 2010
3
4          VIDEOTAPED deposition of DANIEL
5     McISAAC, held at offices of Boies
6     Schiller & Flexner, LLP, 575 Lexington
7     Avenue, New York, New York, before Kathy S.
8     Klepfer, a Registered Professional
9     Reporter, Registered Merit Reporter,
10    Certified Realtime Reporter, Certified
11    Livenote Reporter, and Notary Public
12    of the State of New York.
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1
2
3          A P P E A R A N C E S :
4
5     JONES DAY, LLP
6     Attorneys for Lehman Brothers, Inc.
7       222 East 41st Street
8       New York, New York  10017
9     BY:  BART GREEN, ESQ.
10
11    BOIES, SCHILLER & FLEXNER, LLP
12    Attorneys for Barclays
13      10 North Pearl Street
14      Albany, New YOrk  12207
15    BY:  TRICIA J. BLOOMER, ESQ.
16      AMY L. NEUHARDT, ESQ.
17      LOUIS SMITH, ESQ.
18      HEATHER KING, ESQ.
19      - AND -
20    CLEARY GOTTLIEB STEEN & HAMILTON LLP
21    Attorneys for Barclays
22      One Liberty Plaza
23      New York, New York  10006
24    BY:  DAVID AMAN, ESQ.
25

Page 4

1
2          A P P E A R A N C E S :  (Cont'd.)
3
4     QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
5     Attorneys for the Creditors Committee
6       51 Madison Avenue
7       22nd Floor
8       New York, New York  10010
9     BY:  ERIC M. KAY, ESQ.
10
11    HUGHES, HUBBARD & REED, LLP
12    Attorneys for the SIPA Trustee
13      One Battery Park Plaza
14      New York, New York  10004
15    BY:  NEIL J. OXFORD, ESQ.
16      AMINA HASSAN, ESQ.
17      FARA TABATABAI, ESQ.
18
19
20
21
22
23
24
25

Page 5

1          D. McIsaac
2          THE VIDEOGRAPHER:  This is the start
3     of the tape labeled number 1 of the
4     videotaped deposition of Daniel McIsaac in
5     the matter In re:  Lehman.  Today is April
6     6, 2010.  The time is approximately 9:37.
7          My name is Michael Pineiro from TSG
8     Reporting, Inc. and I'm the legal video
9     specialist.  The court reporter is Kathy
10    Klepfer, in association with TSG Reporting.
11         Will the court reporter please swear
12    in the witness.
13              * * *
14    DANIEL McISAAC, called as a
15      witness, having been duly sworn by a Notary
16      Public, was examined and testified as
17      follows:
18    EXAMINATION BY
19    MS. BLOOMER:
20      Q.   Good morning, Mr. McIsaac.
21      A.   Good morning.
22      Q.   My name is Tricia Bloomer.  I'm with
23    Boies, Schiller & Flexner and we represent
24    Barclays Capital in this matter.
25      A.   Uh-huh.

Contains Highly Confidential Portions

D. McIsaac

1
2    Q.   Have you ever been deposed before?
3    A.   No, I have not.
4    Q.   Okay.  Just to go over a few kind of
5    ground rules that will help the day go a little
6    bit more smoothly.  I'll try to ask my questions
7    clearly, and if you could allow me to finish a
8    question before you begin your answer, and I'll
9    try to do the same for you so that Kathy can
10   take down everything that we say more easily.
11   A.   Okay.
12   Q.   If you can answer with verbal
13   responses as opposed to, you know, nods or
14   anything like that, that will help things.
15   A.   As opposed to (nods)--
16   Q.   And if you need a break at any point,
17   please let me know and I'll try to accommodate
18   you as soon as we can wrap up whatever topic
19   we're on.  Okay?
20       If you don't understand any of my
21   questions, please let me know and I'm happy to
22   try to rephrase it for you.
23       Okay.  I'm going to show you the first
24   exhibit, 684.
25       (Exhibit 684, Expert Report of Daniel

D. McIsaac

1
2    McIsaac, marked for identification, as of
3    this date.)
4    Q.   Exhibit 684 is a copy of the expert
5    report that you submitted on exchange-traded
6    derivatives issues; is that right?
7    A.   Yes, it is.
8    Q.   Okay.  Do you have any opinions that
9    you didn't express in this report that relate to
10   the issues --
11   A.   No, I don't believe so.
12   Q.   -- on exchange-traded derivatives?
13   Okay.
14       And what did you do today to prepare
15   for your deposition?
16   A.   I reread my reports, I spoke to the
17   trustees, and did have a slight conversation
18   with the financial advisors for the Trustee.
19   Q.   Okay.  And what financial advisors?
20   A.   Deloitte.
21   Q.   Okay.  Anyone else that you spoke with
22   in preparation?
23   A.   No.
24   Q.   Okay.  Did you review any documents in
25   preparation other than your report?

D. McIsaac

1
2    A.   The reports and some of the
3    information that I would have relied on for my
4    reports.
5    Q.   Do you remember any of the specific
6    documents that you reviewed?
7    A.   I just glanced at everything that was
8    there or looked at whatever was in my reliance
9    material, would have been affidavits and the
10   like in his report.
11   Q.   Okay.  When were you retained by the
12   Trustee's counsel to provide expert testimony
13   concerning exchange-traded derivatives issues?
14   A.   Sometime in February, I believe.
15   Q.   In February.  Do you remember whether
16   it was -- so February would have been after Mr.
17   Leitner submitted his expert report; is that
18   correct, to your knowledge?
19   A.   I think it was, yes.
20   Q.   Okay.  Can you describe generally for
21   me what your background is that qualifies you to
22   give expert testimony on exchange-traded
23   derivatives issues?
24   A.   I was responsible for the preparation
25   of seg and secured reports for the

D. McIsaac

1
2    exchange-traded futures for approximately 20
3    years.  I worked closely with the regulators,
4    the FTC, CME, on the issues regarding that, as
5    well as the SEC on issues regarding the futures
6    business.
7        I did some reviews of acquisitions
8    that one of my firms worked for -- that I worked
9    for did as far as futures-related.  As far as
10   options, I was responsible for the preparation
11   of the reserve formula for 15c3 for
12   approximately 20 years, worked closely with our
13   people in the areas regarding margin
14   requirements at the OCC as they relate to the
15   firm and the impact on the firm's calculations,
16   and was the liaison for my firms with the
17   regulators, both the OCC, CME, SEC, on all
18   financial matters.
19   Q.   Okay.  The first thing that you
20   mentioned was segregated and secured reports.
21   Can you describe those reports?
22   A.   Yes, that's the customer protection
23   portion of the futures rules, CFTC, and it
24   basically requires you or requires the firm to
25   maintain all the customers' assets in a secure

Contains Highly Confidential Portions

Page 10

1              D. McIsaac
2  place with no liens on them.
3         Calculation is done every day.  You
4  start out by reviewing what the -- you owe the
5  customers, your liabilities to the customers,
6  and then determine where the assets are.  And
7  you do a report every day and make sure you're
8  in compliance with the rules.
9     Q.   Okay.  Is that similar to the reports
10  that are required under the SEC's rules?
11        MR. OXFORD:  Object to the form.
12     A.    Similar in some respects because
13  they're both required to protect customers.
14  Different from the fact that, futures world, all
15  of the assets that the customers give you should
16  be locked up from day one.  They're supposed to
17  be sent into a seg. account and kept in
18  segregation at all times.
19        The reserve requirement requires you
20  to do a calculation Mondays as of Friday based
21  on information that as of the close of business
22  Friday.  So there is a difference in the way
23  it's done, but it has the same basic qualities
24  attached.
25     Q.   Okay.  You mentioned that you worked

Page 11

1              D. McIsaac
2  on reviews of acquisitions?
3     A.   Uh-huh.
4     Q.   Can you -- and you said that was
5  futures-related acquisitions, I believe?
6     A.   Yes.
7        (Pages 12 through 22 have been
8     designated highly confidential and will
9     continue on the next page.)

Page 12

1      HIGHLY CONFIDENTIAL - D. McISAAC
2     Q.   Can you describe how many acquisitions
3  did you review?
4     A.   When I was at        we acquired the
5  futures and options business of
6        MR. OXFORD:  And Trish, if I can just
7     note for the record that, given some
8     confidentiality concerns about this
9     information, we would like for the moment to
10     designate this section of the testimony as
11     highly confidential.
12        MS. BLOOMER:  Absolutely.
13     A.    Just not sure what -- what's public
14  knowledge, what's not public knowledge.
15     Q.   Fair enough.  Sure.
16        So, I'm sorry, I --
17     A.   We acquired the --
18  futures business from .   [REDACTED]     futures
19  business.  I worked on the due diligence.  I
20  worked on the preparation of our bid, although I
21  didn't work on the financial information, more
22  of a review, quick review of the aspects of it,
23  how it would have impacted our firm.  Worked on
24  the due diligence, supervised the due diligence
25  in some respects of our financial professionals.

Page 13

1      HIGHLY CONFIDENTIAL - D. McISAAC
2     Q.   Uh-huh.
3     A.   And was responsible for the worldwide
4  implementation from the finance standpoint of
5  bringing them onto our books and records.
6     Q.   When did this transaction take place?
7     A.   Dates are fuzzy.  2006, I believe.
8  Maybe 2005.
9     Q.   Okay.  Were there any other
10  transactions that you -- or, acquisitions that
11  you reviewed?
12     A.   We also at one point in time bought
13  the prime broker business of  [REDACTED] also,
14  which included, you know, the options business
15  that they did for their customers, but it was
16  primarily a purchase of the customer business.
17     Q.   Did it include proprietary options?
18     A.   No.  No sense in buying proprietary
19  options.  You book your own.
20     Q.   Any other transactions that you were
21  involved in reviewing?
22     A.   We also bought -- this goes a little
23  bit further back, a little bit more fuzzy on
24  it -- the capital markets business of
25  [REDACTED] which included their market-making

Contains Highly Confidential Portions

| | Page 14 |
|---|---|

1          HIGHLY CONFIDENTIAL - D. McISAAC
2    business in -- in equities and, in some
3    respects, options.
4        Q.    And that would have been an
5    acquisition of the proprietary portfolio as
6    opposed to a customer?
7        A.    It would have been an actual entity as
8    well as certain businesses that were bought into
9    a different entity.  We bought a whole entity
10   that did some business as a clearer for some
11   prime brokers as well as trading for them,
12   market-making for them, and we bought in some
13   market-making information into the firm
14   separately.
15       Q.    Okay.  Why is it that in that context
16   it made sense to buy proprietary positions
17   whereas it wouldn't make sense to buy them in
18   the case of the prime brokerage acquisitions?
19       A.    We bought a whole entity.
20           MR. OXFORD:  Objection to the form.
21           If you could just slow down a little a
22   little bit to make sure that Trish gets her
23   question finished before you answer and so
24   that I have an opportunity to object.
25           THE WITNESS:  Sorry about that.

| | Page 15 |
|---|---|

1          HIGHLY CONFIDENTIAL - D. McISAAC
2           We bought a whole entity at the time.
3        Q.    Which time?
4        A.    With      [REDACTED]        So the
5    entity had proprietary -- mıght have had options
6    positions in it when we bought it.
7        Q.    Okay.  Do you know whether it had
8    options positions?
9        A.    I don't remember if it did or not at
10   this point in time.  It wouldn't have been a
11   significant portion of it.
12       Q.    Do you remember the terms of the
13   acquisition of the proprietary book?
14       A.    We bought the entity at a price, at a
15   bid price, and whatever the net asset value of
16   the entity would have been.
17       Q.    What year was the      [REDACTED]
18   transaction?
19       A.    Maybe 2004, 2005.
20       Q.    And the acquisition of the prime
21   brokerage business of            ?
22       A.    I want to say around 2003, 2004,
23   somewhere around there.
24       Q.    With respect to the  [R] acquisition of
25   [REDACTED] in 2006, the first one that you

| | Page 16 |
|---|---|

1          HIGHLY CONFIDENTIAL - D. McISAAC
2    testified about?
3        A.    Uh-huh.
4        Q.    How long did it take to negotiate that
5    deal from the day it was first conceived to the
6    day it closed?
7           MR. OXFORD:  Object to the form.
8        A.    It probably took a couple of months.
9    I don't remember exactly.
10       Q.    And you said that you were involved in
11   the due diligence on that transaction?
12       A.    Yes.
13       Q.    Okay.  Can you describe for me what
14   the due diligence consisted of?
15       A.    We reviewed the financial information
16   of their business, reviewed their models.  I
17   didn't review the models per se to determine the
18   revenue streams.  That was done by other groups.
19           I reviewed from a financial standpoint
20   and from a regulatory standpoint for both the
21   assets we were buying from one entity as well as
22   multiple other entities we were buying, I think
23   I want to say 13 or 14 different assets and/or
24   entities at -- purchased assets from different
25   companies and/or entities and reviewed that and

| | Page 17 |
|---|---|

1          HIGHLY CONFIDENTIAL - D. McISAAC
2    directed our professionals that did a little bit
3    deeper dive on due diligence.
4        Q.    Can you give me a sense of the
5    relative size of the business that was acquired
6    relative to the LBI transaction that you're
7    testifying about in this case?
8        A.    Well, at the time of the acquisition,
9    I believe [R] , with what [R]  had at the time,
10   made us probably [REDACTED]  in the country.
11       Q.    Okay.  And in 2008 where did Lehman
12   Brothers' business rank?
13           MR. OXFORD:  Object to the form.
14       A.    I don't know exactly where it was.  I
15   don't, looking at the numbers, I don't think it
16   was very high.
17       Q.    You don't think it was very high.
18   Okay.
19       A.    As far as, you know, seg and secured
20   accounts.  Seg and secured balances, that's how
21   you usually rate it.
22       Q.    Other than reviewing models, what else
23   did your due diligence consist of?
24           MR. OXFORD:  Object to the form.
25   Misstates his testimony.

Contains Highly Confidential Portions

Page 18

HIGHLY CONFIDENTIAL - D. McISAAC

1    You can answer.
2    A.    I didn't review the models.  Somebody
3 else reviewed the models.  I reviewed the
4 financial information, the regulatory aspects,
5 the impact that it would have on the firm, the
6 controls, the system they were using, they were
7 using a different system, to make sure we were
8 familiar with it.
9    Q.    Did you review the accounts, the
10 customer accounts of the companies you were
11 acquired?
12    A.    No, the businesspeople along with some
13 of their professionals reviewed the actual
14 customer accounts to determine which customers
15 they may not -- they wanted to take and which
16 customers they didn't want to take.
17    Q.    Do you know how long they spent
18 conducting that exercise?
19    A.    I think a lot of it was done prior to
20 the final bid as far as, you know, first blush,
21 on the larger clients.  They probably spent a
22 little extra time on the smaller clients.
23    Q.    Okay.  And when you say a little extra
24 time, you said that the entire process took a

Page 19

HIGHLY CONFIDENTIAL - D. McISAAC

1 couple of months --
2    A.    Some of the customers -- I'm sorry.
3    Q.    That's okay.
4    You said that the entire process took
5 a couple of months.  How long would you say was
6 spent on analyzing the customer base?
7    A.    I don't know how much time in
8 particular.  The main review for the customer
9 base was that they cleared for some market
10 makers and it wasn't a business, I think, that
11 we wanted to be in, so it was carving out which
12 ones you wanted to take and which ones you
13 didn't want to take.
14    Q.    Okay.  Did you do a -- were you
15 involved in any type of credit check of the
16 customers that you were -- that were in the --
17    A.    No.
18    Q.    -- accounts?  Okay.
19    And did you say that the [R] - this
20 first acquisition from 2006 that we discussed
21 was an acquisition of just a customer business,
22 or did it also include proprietary portfolio?
23    A.    It was just the customer business.  We
24 took over [R]    proprietary business to clear it

Page 20

HIGHLY CONFIDENTIAL - D. McISAAC

1 for them, so we didn't buy the positions.  They
2 maintained the positions and we were the
3 clearing agent for them.
4    Q.    Okay.  Were there any other
5 transactions other than the three that we
6 discussed so far that you were involved in
7 reviewing?
8    A.    Just along the way we did some mergers
9 and I was involved in the [REDACTED]
10 acquisition.  I was involved in the merger we
11 did with [R] but more for maintaining the
12 regulatory atmosphere, making sure we were
13 complying with that.
14    Q.    Did you have any role in negotiating
15 the terms of any of those transactions?
16    A.    I -- we had a separate group that did
17 the negotiation that determined how much to pay
18 for them.  I was consulted by them for various
19 issues but didn't negotiate the price.
20    Q.    Do you have any experience with
21 proprietary options or futures trading
22 strategies?
23    A.    I ran the regulatory group at [R]  for
24     [R] , so in doing the regulatory reports,

Page 21

HIGHLY CONFIDENTIAL - D. McISAAC

1 you had to understand what we were doing.  As we
2 went into a new business or a new process or new
3 product, I had sign-off authority over it to
4 make sure we were doing it accurately.
5    Q.    And what type of information would you
6 require in that role about the trading strategy?
7    MR. OXFORD:  Object to the form.
8    You can answer.
9    A.    We need to know what the desk was
10 doing so that we could allocate it properly for
11 capital purposes and for haircut purposes as
12 well as to make sure we were producing it
13 properly on our financial statements.
14    At one point in time we started doing
15 volatility trading and wanted to make sure that
16 we had all the right information and that it was
17 recorded properly, at the end of the day we had
18 all the correct information.
19    Q.    Was there a particular name of the
20 volatility trading positions that were acquired,
21 do you know?
22    A.    No, we didn't acquire them.  They were
23 a new business that we instituted within the
24 firm.

Contains Highly Confidential Portions

---

Page 22

1    HIGHLY CONFIDENTIAL - D. McISAAC
2        (The non-highly confidential portion
3    will continue on the next page.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 23

1                D. McIsaac
2        Q.    Are you familiar with the term "VIX"?
3        A.    VIX is a -- it's an index that's
4    traded over the -- I'm not sure if it's
5    over-the-counter or exchange-traded.  I think
6    it's exchange-traded, but it's, if I remember
7    correctly, it's the volatility index of the
8    market.  You're trading the volatility index.
9        Q.    What's your understanding of the risk
10    profile of a VIX position in a volatile market?
11            MR. OXFORD:  Object to the form.
12    Vague.
13            You can answer if you're able.
14        A.    I'm not a risk man so I don't know.  I
15    wouldn't venture to guess what the risk profile
16    is.  We would normally use quants and people
17    like that to determine that information.
18        Q.    Do you have an understanding of the
19    risk profile of any other types of
20    exchange-traded derivatives?
21            MR. OXFORD:  Object to the form.
22    Vague.
23        A.    Just from the standpoint of dealing
24    with them and understanding how the market
25    moves, not from a risk standpoint or a value at

---

Page 24

1                D. McIsaac
2    risk standpoint.  We would have other people
3    that were responsible for that.
4        Q.    Is it fair to say that you're not an
5    expert on risk management in terms of
6    proprietary trading?
7            MR. OXFORD:  Object to the form.
8            You can answer.
9        A.    I'm not an expert on risk trading, on
10    risk management.  Again, in our firms we would
11    have separate people that were responsible for
12    risk management processes and procedures.
13        Q.    What types of risks would you be
14    knowledgeable about when analyzing an
15    exchange-traded derivatives acquisition?
16        A.    Reputational risk, and, you know, if
17    we were taking on something, the impact it would
18    have on the firm's reputation; capital risk,
19    from a standpoint of how much capital would be
20    used and how it would impact the firm's capital
21    position; financial statement disclosure and
22    understanding that, and in general, the terms --
23    general understanding of the business.  So, in
24    such when we took over our futures and clearance
25    business, again, it's a customer-related

---

Page 25

1                D. McIsaac
2    business, really not much risk involved.
3        Q.    If there's not much risk involved,
4    what is -- why is it generally the case that a
5    transaction of this type would take two months
6    to negotiate?
7            MR. OXFORD:  Object to the form.
8        A.    It would take two months to finalize,
9    to set up the systems because you're going to
10    convert their information onto your systems, and
11    to, you know, finalize all the information you
12    need to finalize on it to do your due diligence
13    and to, you know, to finalize everything around
14    the purchase.
15        Q.    And would that give you enough time to
16    analyze any problems with the books and records
17    of the selling entity?
18            MR. OXFORD:  Object to the form.
19            You can answer.
20        A.    It would, although, you know, your
21    first review would come up with anything
22    significant usually.
23        Q.    Okay.  And how long would the first
24    review take?
25            MR. OXFORD:  Same objection.

---

Contains Highly Confidential Portions

Page 26

D. McIsaac

1
2      A.    Sometimes it could take a weekend.
3      Q.    And what's the longest that it could
4  take?
5      A.    It may be a couple weeks, possibly.
6  It's according to what you're doing and how --
7  what other things you have to do at that point
8  in time.
9      Q.    One of the things that you mentioned
10  when you were describing your general areas of
11  expertise was margin requirements at the OCC.
12  Can you describe for me what your background and
13  familiarity is in that regard?
14      A.    Well, from the firm's financial
15  standpoint, you know, we needed to know what the
16  margin requirements were, how they impacted the
17  customer reserve formula, how they impacted the
18  firm in general to know what margin was being
19  called; the rules and regulations of the OCC,
20  how it impacts additional margin requirements at
21  points in time for firms, an understanding of
22  that. I worked for a firm that was -- I don't
23  think it's a secret -- was having some financial
24  difficulties, so we did have a lot of
25  conversations with the regulators over the

Page 27

D. McIsaac

1
2  margin requirements.
3      Q.    Okay. Can you describe generally what
4  the problems were with the firm that you just
5  described?
6      A.    We lost a lot of money. UBS lost a
7  lot of money.
8      Q.    Lost a lot of money on what?
9      A.    On various trading strategies.
10      Q.    Would that include their trading
11  strategies at the OCC?
12      A.    I do not believe so.
13      Q.    Okay. What was the context of your
14  involvement with the OCC?
15      A.    As a regulator, a regulated entity, as
16  our clearing org., they had a concern on our
17  capital position and our ability to fulfill our
18  obligations to it. I interfaced with them to
19  keep abreast of what the firm was doing, how we
20  were doing, and what we were -- what we were
21  taking to maintain our capital base and keep
22  them comfortable from a financial perspective.
23      Q.    Were you able to keep them
24  comfortable?
25      A.    I believe so.

Page 28

D. McIsaac

1
2      Q.    Did they ever threaten to liquidate
3  the account?
4      A.    Not to my knowledge.
5      Q.    Did they ever increase the margin
6  requirements because of the financial situation
7  of the company?
8          MR. OXFORD: Object to the form.
9      A.    As long as this is confidential, yes.
10      Q.    Do you know the extent to which they
11  did that?
12      A.    30 percent requirement, additional
13  requirement. I think it was called Phase 3 or
14  Level 3.
15      Q.    Did they ever refuse to allow the
16  company to withdraw excess that happened to be
17  in an account on any given day?
18          MR. OXFORD: Object to the form.
19      A.    Not that I'm aware of.
20      Q.    Did you deal with the OCC in this
21  regard with respect to customer accounts, firm
22  or market maker accounts, or both?
23      A.    It was the overall relationship we had
24  with the OCC.
25      Q.    So they were both?

Page 29

D. McIsaac

1
2      A.    So it was firm and customer.
3      Q.    Do you have an understanding of what
4  the OCC's rights are vis-a-vis clearing members
5  when they have insecurities about
6  creditworthiness?
7          MR. OXFORD: Object to the form.
8      A.    I understand I think they have four
9  levels for firms. Level 1 being no concerns; I
10  believe Level 2 is an alert status, where
11  they pay a little bit more attention to how the
12  firm is doing; Level 3 is where they raise the
13  margin requirements by 30 percent; and I believe
14  Level 4 is even more severe, where they raise it
15  to 50 percent.
16      Q.    At what level do they start
17  threatening to liquidate accounts?
18          MR. OXFORD: Object to the form.
19      A.    I don't know.
20      Q.    You've never experienced that?
21      A.    I've never experienced that.
22      Q.    Do you know what level LBI was at in
23  September of 2008?
24      A.    No, I do not.
25      Q.    Did you ask anyone that?

Contains Highly Confidential Portions

Page 30

D. McIsaac

1   A.   I may have asked, and I don't know if
2   I ever got -- I don't believe I ever got an
3   answer.
4       Q.   Do you have a sense of which level
5   they would be at given what you have learned
6   under the course of your studies in this case?
7           MR. OXFORD:  I'll object to the form
8   of the question.
9           MR. GREEN:  Objection also.
10          MR. KAY:  Objection.
11      A.   I don't know.
12      Q.   What are the OCC's -- withdrawn.  Do
13  you have an understanding of how the OCC
14  computes margin requirements as it relates to
15  volatility?
16          MR. OXFORD:  Object to the form.
17      A.   Again, I'm not an expert in that area.
18  I have somewhat of a knowledge that they are
19  looking at the potential movement in the assets
20  and look for margin to satisfy a market movement
21  of a one- or two-day market swing based on some
22  kind of theoretical pricing models.
23      Q.   Okay.  You just said that you're not
24  an expert in the area.  What area were you

Page 31

D. McIsaac

1   referring to?
2       A.   In how they calculate the margin
3   requirements.
4       Q.   Are the -- is the OCC's formula
5   guaranteed to ensure that in the event of a
6   liquidation there would not be a deficit in the
7   margin account?
8           MR. OXFORD:  Object to the form.
9       A.   I don't think any calculation can
10  ensure anything.  I think their calculation is
11  there for whatever they feel they need to
12  address as far as the volatility of the firm
13  and/or the marketplace.
14      Q.   Is it possible that a firm, a
15  broker-dealer could have an excess in an account
16  and nevertheless, upon a liquidation the
17  following day, incur a cost that exceeds the
18  amount that they had posted?
19          MR. OXFORD:  Objection to the form.
20      A.   I don't have a relevance to look at to
21  determine that.  I don't know.  I've never seen
22  it happen.  I don't know.
23      Q.   You don't know if it's possible for
24  the liquidation to cost more than the

Page 32

D. McIsaac

1   margin posted?
2       A.   I would assume anything is possible.
3   I don't know if it's ever happened or there's
4   any, you know, history of it happening.
5       Q.   Would it be more or less likely to
6   happen in a particularly volatile market based
7   on what you know about how the OCC generally
8   formulates their margin requirements?
9           MR. OXFORD:  Objection to the form.
10      A.   I guess in a volatile market anything
11  is more possible to happen.  It would be based
12  on what their positions were at the time, were
13  they long or short, were they short calls, short
14  puts.  It's, I guess, it's according to what the
15  relevance is of their -- of their book.
16      Q.   You have your report there with you?
17      A.   Yes.
18      Q.   Could you turn to page 14, please, and
19  could you review footnote 9?
20      A.   Yes.
21      Q.   Footnote 9 references an OCC Rule
22  601(c), do you see that?
23      A.   Uh-huh.  Yes, I do.
24      Q.   How long have you been familiar with

Page 33

D. McIsaac

1   this particular rule?
2       A.   In general terms, probably, you know,
3   understanding how the OCC works, probably, in
4   general terms, forever.
5       Q.   Okay.
6       A.   You know, but not specifically.  I've
7   never had to deal with it in specifics.
8       Q.   The rule states that the margin
9   requirement shall be the amount of margin assets
10  that must be held in the account such that the
11  minimum expected liquidation value of the
12  account after excluding positions covered by
13  deposits in lieu of margin, measured at
14  confidence levels as may be selected by the
15  corporation from time to time, will not be less
16  than zero.
17          Do you have an understanding of what
18  the phrase "minimum expected liquidating value"
19  means?
20          MR. OXFORD:  Objection to the form.
21  Misstates the document.
22      A.   "Minimum expected liquidating value" I
23  believe is the minimum value of the account
24  after it liquidates.

Contains Highly Confidential Portions

| Page 34 | Page 35 |
|---|---|

**Page 34**

D. McIsaac

1
2    Q.   Is it the minimum value or the minimum
3    expected value?
4    A.   Minimum expected value upon
5    liquidation.
6    Q.   Okay.  And expected by whom?
7    A.   I'm assuming this is an OCC rule, so
8    it's expected by them.
9    Q.   Okay.
10   A.   Based on the confidence level they
11   select.
12   Q.   Do you have any understanding of what
13   their confidence level would be based on?
14   A.   No, I do not.
15   Q.   In a market in which there's more than
16   average volatility, would you agree that it's
17   more likely that their margin requirement will
18   be insufficient to cover the liquidating cost of
19   an account?
20       MR. OXFORD:  Object to the form.
21   A.   Based on the fact that I have never
22   heard of them liquidating anybody and making a
23   call to the rest of the members, I don't know if
24   it's ever been proven that that's the case.
25   Q.   Do you agree that there's more of a

**Page 35**

D. McIsaac

1
2    risk of that being the case in a particularly
3    volatile market?
4        MR. OXFORD:  Object to the form.
5    A.   Could you repeat your question?because
6    it was sort of one question, then another?
7    Could you --
8    Q.   Sure.  In a market in which there's
9    more than average volatility, would you agree
10   that it's more likely that their margin
11   requirement will be insufficient to cover the
12   liquidating cost of an account?
13       MR. OXFORD:  Same objection.
14   A.   More likely than what?
15   Q.   Than in an average -- than in a market
16   with average volatility.
17   A.   Okay, so if you're saying in a market
18   that has extreme volatility, could their
19   calculations be more likely to -- to not be
20   correct than in a market that has average
21   volatility?  I guess the answer would be yes.
22   Q.   Okay.  Are you aware that on Friday,
23   September 19, 2008, the OCC refused to allow LBI
24   to withdraw margin from its account that was in
25   excess of the requirements it had published that

**Page 36**

D. McIsaac

1
2    morning?
3    A.   I have heard inferences to that.  I
4    might have seen an e-mail to that.
5    Q.   Have you -- in your experience, has
6    the OCC ever, to your knowledge, refused a
7    clearing member the ability to withdraw excess
8    from its account?
9    A.   To my knowledge, I don't think so that
10   I'm aware of, but I'm sure if they were
11   concerned with other firms, they might have done
12   the same with other firms.  It was a time and
13   place in the marketplace.
14   Q.   Is it possible that the OCC made that
15   decision because it was concerned that the
16   market may move away from the positions to the
17   extent that the margin requirements were not
18   going to be sufficient to cover the cost of a
19   liquidation?
20   A.   I can't determine what OCC's thought
21   process was.  Maybe they knew there was an
22   impending sale.  I don't know what the rationale
23   was on their part.
24   Q.   What is the OCC's overall goal in
25   setting a margin requirement?

**Page 37**

D. McIsaac

1
2        MR. OXFORD:  Object to the form.
3    A.   Again, I'm not there, but I believe
4    their overall goal is to make sure that there's
5    adequate margin so that the entities that
6    they're clearing for can be or could be
7    liquidated at no cost to the rest of the
8    members.
9    Q.   Can you turn to page 29 of your
10   report.  In paragraph 70, you say here that
11   "Barclays' acquisition balance sheet recognizes
12   a day one gain of $1.19 billion relating to
13   options."  Do you see that?
14   A.   Yes.
15   Q.   And in the next sentence, you say that
16   "this appears to be comprised of approximately
17   $2.29 billion of margin at the OCC less $1.1
18   billion of liabilities at the OCC."  Do you see
19   that?
20   A.   Yes.
21   Q.   Would you agree that if Barclays had
22   not received the $2.29 billion of margin at the
23   OCC, Barclays would have recorded a loss of $1.1
24   billion on these options on its acquisition
25   balance sheet?

Contains Highly Confidential Portions

Page 38

D. McIsaac

1
2    A.   I'm not sure. From my understanding
3    the proprietary assets, proprietary options at
4    OCC were positive by about 300 million. I
5    believe the short side was an affiliate that
6    cleared through the OCC through -- that was a
7    subordinated affiliate. So I believe the assets
8    they were buying were positive or net asset
9    value of about 300 million as well as they were
10   part of a larger portfolio of assets that they
11   were buying.
12        So they might have -- I don't see
13   where the loss came from because I believe it
14   was affiliates positions, but even if there was,
15   it would be offset by possibly gains in other
16   areas.
17   Q.   Can you describe the larger portfolio
18   of assets that Barclays was buying?
19   A.   I believe there was a repo that had
20   significant value of assets for which they
21   forgave a liability of Lehman's in lieu of the
22   assets.
23   Q.   Okay. Were they long positions or
24   short positions?
25   A.   Long positions.

Page 39

D. McIsaac

1
2    Q.   Were there any short positions
3    undertaken on the fixed equity side?
4    A.   I don't believe so.
5    Q.   Were there short equity positions at
6    Lehman outside of that repo?
7         MR. OXFORD:  Object to the form.
8    A.   I don't know. I would assume there
9    might have been, but I don't know.
10   Q.   Do you recall reviewing the Asset
11   Purchase Agreement that the parties signed on
12   September 16?
13   A.   Yes.
14   Q.   Do you recall what the amount of long
15   and short positions was that was described in
16   that document?
17   A.   I believe it was 70 billion long, 69
18   billion short.
19   Q.   Do you have any reason to believe that
20   the 69 billion short didn't still exist by
21   Monday, the 22nd of September, 2008?
22   A.   I have no reason to know what the
23   number was at that point in time.
24   Q.   Is it fair to say that those ceased
25   being part of the transaction?

Page 40

D. McIsaac

1
2    A.   Those short positions, yes.
3    Q.   Okay. And the long positions still
4    were coming over?
5         MR. OXFORD:  Object to the form.
6    Q.   Is that correct?
7    A.   My understanding of the Clarification
8    Letter and the APA, yes.
9    Q.   And do you understand, generally, the
10   nature of the agreement with respect to the
11   assets that were pledged under the Fed repo?
12   A.   Could you be a little more specific?
13   I'm not sure what your question is.
14   Q.   Sure. Was there a give and take with
15   respect to the long positions that were pledged
16   at the Fed repo?
17        MR. OXFORD:  Object to the form.
18        MR. KAY:  Same objections.
19   A.   What's give and take? I just don't
20   know what you mean by that. If you could --
21   Q.   Sure. What is your understanding of
22   the -- of the transaction as it related to the
23   assets in the Fed repo?
24        MR. OXFORD:  Object to the form.
25   A.   My understanding is that the Fed was

Page 41

D. McIsaac

1
2    providing Lehman with liquidity, somewhere 45,
3    50 billion dollars, I don't remember exactly,
4    and that was secured by assets of I think I read
5    somewhere about 4 to 5 billion dollars extra in
6    assets.
7         I believe Barclays assumed that repo.
8    I believe they took over most of the assets,
9    possibly, not all of them, and those were long
10   assets that they -- that was part of the
11   purchase agreement at the end.
12   Q.   Do you have any -- did you study the
13   pleadings in this case that related to the Fed
14   repo transaction?
15        MR. OXFORD:  Object to the form.
16   A.   I don't believe so. I don't think I
17   did.
18   Q.   Okay. Are you aware that Barclays had
19   expressed concern over the value of the assets
20   in the Fed repo relative to the amount of cash
21   it was advancing?
22   A.   No. If I didn't read the pleadings, I
23   probably don't know that.
24   Q.   You mentioned that there were
25   affiliate positions that you believe were part

Contains Highly Confidential Portions

Page 42

D. McIsaac

1
2  of the account that you referenced liabilities
3  for in paragraph 70 of your report?
4      A.   Uh-huh.
5      Q.   Can you describe generally what your
6  understanding was with respect to the transfer
7  of those positions to Barclays?
8          MR. OXFORD:  Object to the form.
9  Misstates his testimony.
10     A.   There was an affiliate that signed a
11 subordination agreement between them and LBI,
12 and I believe the OCC is a party to that,
13 whereby they would allow their securities to be
14 commingled with the firm's securities.  It's an
15 advantage usually for the firm because it gets
16 them better margin rates, possibly.  And it was
17 my understanding it was short positions of the
18 affiliate.
19         From my understanding of reading most
20 of the stuff I've read, I didn't -- I do not
21 believe that Barclays was taking over any
22 affiliates accounts.
23     Q.   Okay.  I'm showing you an exhibit
24 that's been marked as Exhibit 51.  Do you
25 recognize this document?

Page 43

D. McIsaac

1
2      A.   Yes, it's the Transfer and Assumption
3  Agreement.
4      Q.   And did you review this in connection
5  with preparing your report?
6      A.   Yes.
7      Q.   Do you see in the first "whereas"
8  clause on the first page where it says, "Lehman
9  is a clearing member of OCC and carries one or
10 more accounts (nos. 74, 84 and 273)"?
11     A.   Yes, I do.
12     Q.   And it defines that as "Account," with
13 a capital A?
14     A.   Yes.
15     Q.   Okay.  Is it your understanding that
16 the term "account" there encompasses the
17 accounts that you referenced in relation to
18 paragraph 70 of your report?
19     A.   I believe they use the same accounts,
20 yes.
21     Q.   If you go down to paragraph 1(b) on
22 that same page, do you see where it says,
23 "Barclays hereby accepts such sale, assignment,
24 and transfer of the Account, agrees to be bound
25 by and receive the benefits of maintaining such

Page 44

D. McIsaac

1
2  Account, and assumes and agrees to perform each
3  obligation arising out of or to be performed
4  with respect to the activity in the Account"?
5      A.   Yes.
6      Q.   Do you understand that to mean that
7  Barclays assumed settlement responsibility for
8  all of the positions in all of the Lehman's
9  accounts at the OCC?
10     A.   Yes.  I think Barclays assumed
11 clearance and settlement of all the accounts
12 there.
13     Q.   Okay.  And what is the basis for your
14 understanding that Barclays -- withdrawn.
15         Is it fair to say that Barclays was
16 responsible for settling and clearing the
17 positions in the 074F and 074M accounts
18 regardless of whether they were held on the firm
19 account on behalf of an affiliate?
20     A.   Yes, they would have been responsible
21 for settling and clearing and liquidating if
22 need be.
23     Q.   Does that mean that on short positions
24 that were held on behalf of affiliates Barclays
25 would have to advance any securities that were

Page 45

D. McIsaac

1
2  owed or advance any cash that was owed on an
3  exercise or an assignment of one of those
4  positions?
5          MR. OXFORD:  Object to the form.
6      A.   It means they would have either
7  settled the transactions if they were called or
8  closed them out.
9      Q.   You say in your report that Barclays
10 charged back the LBI estate for the cost of
11 closing out affiliate positions.  Let me give
12 you the page reference.
13         If you turn to pages 26 and 27 of your
14 report, paragraph 66 on page 26, you say,
15 "Barclays did not assume any risk with respect
16 to LBI affiliate customers' futures positions."
17         Oh, wait.  I'm sorry.  Let me get to
18 the options positions because that's what we're
19 talking about now.
20         MR. OXFORD:  I think it's probably
21 page 21, Trish, you're looking for.
22         MS. BLOOMER:  Thank you.
23     Q.   You say in paragraph 51 that Barclays
24 has charged back the LBI estate for the cost of
25 maintaining and closing out those positions.

Contains Highly Confidential Portions

Page 46

D. McIsaac

1    D. McIsaac
2    You see that?
3        A.    Yes.
4        Q.    What is -- is the Dziemian declaration
5    that you cite here the only factual basis for
6    that statement?
7        A.    I believe there's a schedule that I
8    saw that had those amounts in it. I'm not sure
9    if it came from Dziemian's declaration or where
10   else it might have come from, but his
11   declaration did say they were charging them
12   back.
13           MS. BLOOMER:  I think maybe this is a
14       good time to take a first break and that way
15       I can pull an extra document that I missed.
16           MR. OXFORD:  Okay. That would be
17       great. Thanks.
18           THE VIDEOGRAPHER:  The time is 10:25.
19       We're going off the record.
20           (Recess.)
21           THE VIDEOGRAPHER:  This is the start
22       of tape number 2. The time is 10:43. We
23       are back on the record.
24   BY MS. BLOOMER:
25       Q.    Welcome back, Mr. McIsaac.

Page 47

D. McIsaac

1    D. McIsaac
2        A.    Thank you.
3        Q.    I want to show you a document -- I
4    think we're going to have to mark this. It's
5    already been marked, but I don't have the marked
6    copy. So, Exhibit 685.
7           (Exhibit 685, Declaration of Daniel
8       Dziemian, marked for identification, as of
9       this date.)
10       Q.    I'm showing you a document that's
11   marked as Exhibit 685, Mr. McIsaac. We were
12   looking before the break at paragraph 51 of your
13   expert report in which you state that Barclays
14   has charged back the LBI estate for the cost of
15   maintaining and closing out those positions.
16           You see that?
17       A.    Yes.
18       Q.    Okay. And which positions precisely
19   were you referring to in this statement?
20       A.    Let me just see. I guess it would be
21   non-PIM customer transactions.
22       Q.    Okay. Would that include affiliates?
23       A.    Yes.
24       Q.    And you cite the Dziemian declaration
25   at paragraphs 12 and 14 through 16 as the

Page 48

D. McIsaac

1    D. McIsaac
2    support for that statement.
3           Can you review those paragraphs and
4    tell me where in this declaration it suggests
5    that Barclays charged back the LBI estate for
6    the cost of maintaining and closing out the
7    affiliate positions?
8        A.    I presume it's in paragraph 14.
9        Q.    And what portion of the paragraph?
10       A.    The fourth or fifth line down, "The
11   net effect of the close-out and liquidation of
12   all positions and equities relating to the 074C
13   LBI Affiliate Options on the LBI Bridge Account
14   is a net receivable from LBI to Barclays in the
15   amount of $80 million."
16       Q.    And are you assuming in that statement
17   that a net receivable on the LBI Bridge Account
18   is the equivalent of charging back the estate
19   for the cost of closing out those options?
20           MR. OXFORD:  Objection to the form.
21       A.    If you record a receivable, I assume
22   you think somebody's going to pay you for that,
23   yes.
24       Q.    Do you understand what the purpose of
25   the LBI Bridge Account was?

Page 49

D. McIsaac

1    D. McIsaac
2        A.    I'm -- by the words there, I assume
3    it's a bridge account between two entities or
4    between two systems. On one side you book --
5    you may book the receivables. On the other side
6    you book the payables.
7        Q.    Okay. If you look at paragraph 13, it
8    says, "The bridge accounts were necessary to
9    account for the fact that the settlement bank
10   and the settlement depository as of
11   approximately September 23, 2008, were switched
12   to Barclays while the accounts of these
13   customers and affiliates remained with LBI."
14   You see that?
15       A.    Yes.
16       Q.    Is it possible that the bridge account
17   was necessitated by accounting concerns and the
18   need to process trades on both sides on a system
19   as opposed to because Barclays was charging back
20   the estate for any of those costs?
21       A.    Could you repeat --
22           MR. OXFORD:  Object to the form.
23       A.    Sorry.
24           Could you repeat the last part?
25   Because I don't understand the part where you

Contains Highly Confidential Portions

Page 50

D. McIsaac
1  talked about charge back, the way you said it.
2  Q.   Okay.  Is it possible that the bridge
3  account was necessitated by accounting concerns
4  and the need to process trades on both sides on
5  a system as opposed to because Barclays was
6  charging back the estate for any of those costs?
7  MR. OXFORD:  Same objection.
8  MR. GREEN:  Objection.
9  A.   If they were booking them on both
10  sides, then wouldn't they be charging them back?
11  If they were taking responsibility for them,
12  then they would have written them off to an
13  expense, not a receivable.
14  Q.   Okay.  Did you review Gary Romain's
15  deposition testimony in preparing your report?
16  A.   I believe I read it, yes.
17  Q.   Okay.  I'm going to mark this exhibit
18  as Exhibit 686.
19  (Exhibit 686, Deposition of Gary
20  Romain, marked for identification, as of
21  this date.)
22  Q.   You have in front of you Gary Romain's
23  deposition testimony.  Can you turn to page 141,
24  please?

Page 51

D. McIsaac
1  A.   Do you want your copy back?
2  Q.   Pardon?  I realize it's yellow.
3  A.   That's fine.
4  Q.   I wanted to direct you to that portion
5  of it, so it's fine.  Thank you.
6  Do you see the portion that's boxed in
7  that deposition transcript?
8  A.   Yes.
9  Q.   And do you see where Gary Romain says
10  that "we had written off 100 percent of it and
11  in the acquisition accounting, but it's been
12  recorded as an expense, an expense being a
13  deduction from the negative goodwill on the
14  acquisition"?
15  A.   Let me read it, please.
16  MR. OXFORD:  And Mr. McIsaac, to the
17  extent you feel necessary to answer the
18  question, you should read as much as you
19  need of Mr. Romain's testimony.
20  Q.   In fact, perhaps it would be better
21  for you to start on page 139 at the bottom of
22  the page, line 22, when Mr. Romain starts
23  describing --
24  A.   Uh-huh.

Page 52

D. McIsaac
1  Q.   -- the accounting treatment on the
2  affiliate options that we've been discussing.
3  MR. OXFORD:  Thank you, Trish.
4  A.   Okay.  I've read it.  Can you repeat
5  your question?  I'm sorry.
6  Q.   Sure.  Do you see in on page 140 in
7  the answer provided on line 7 through 15 Gary
8  Romain says, "So if you look at the payments
9  made to close out positions and for some OCC
10  related-costs, the total payment made by
11  Barclays was $104 million and the receivable,
12  which might otherwise have been recognized, has
13  been written off"?
14  A.   Yes.
15  Q.   Did you read that in preparing your
16  report?
17  A.   I probably read this, this deposition,
18  so yes, I probably read this, right.
19  Q.   Is this inconsistent with your
20  understanding that Barclays charged back the LBI
21  estate for the cost of closing out affiliate
22  positions?
23  A.   My understanding, and even from
24  reading here, it looks like they recorded a

Page 53

D. McIsaac
1  receivable which was charging them back, they
2  didn't take them to P&L directly, and eventually
3  wrote them off.  Maybe they deemed them
4  uncollectable, I'm not sure why, but I don't
5  know why you would set them up as a receivable
6  if you were going to write them off if you
7  didn't -- if you were taking responsibility from
8  the start.  So Mr. Dziemian basically said that
9  they were being set up as receivables.
10  Q.   Would you agree that Barclays incurred
11  a cost of $104 million according to the record
12  facts that you've seen in this case on the
13  affiliate options positions in the 074C account?
14  MR. OXFORD:  Object to the form.
15  A.   I agree that's what Mr. Romain
16  says in his deposition.  I have not seen
17  anything to show me what the numbers are or had
18  anybody provide information, but that's what he
19  says here.
20  Q.   Do you have any reason to dispute or
21  doubt the fact that Barclays incurred costs in
22  closing out these positions?
23  A.   No, I do not.
24  Q.   Do you have any reason to believe that

Contains Highly Confidential Portions

---

Page 54

D. McIsaac

1  D. McIsaac
2  Barclays collected the amounts that it incurred
3  in closing out affiliate positions from the LBI
4  estate?
5      A.   No, I do not.
6      Q.   Do you believe that Barclays did
7  collect the costs from the LBI estate that it
8  incurred in closing out --
9      A.   I don't know if they did or didn't.
10     Q.   -- the LBI affiliate positions?
11         Please allow me to finish the
12 question.
13         -- in closing out the LBI affiliate
14 positions?
15     A.   I don't know if they collected or not
16 or presented a bill or not.
17     Q.   Is it your general understanding that
18 entities write off amounts that they were able
19 to collect?
20         MR. OXFORD:  Object to the form.
21     A.   No.  You usually write them off when
22 you think there might be a -- you may not be
23 able to collect them.
24     Q.   Do you have a general understanding of
25 the priorities in a SIPC liquidation with

---

Page 55

D. McIsaac

1  D. McIsaac
2  respect to creditor claims?
3      A.   I'm not a SIPC expert.  I have a
4  general understanding of the SIPC claims.
5      Q.   Are you an expert in Customer
6  Protection Rules?
7      A.   Yes.
8      Q.   What's your understanding of where
9  customers fall in terms of priority when they
10 have claims against a SIPC Trustee or an estate
11 and bank in SIPC proceedings relative to general
12 Creditors?
13         MR. OXFORD:  Object to the form.
14     A.   I believe SIPC customers have first
15 priority to the assets in the customer estate
16 and then share rateably with the general
17 Creditors if there's not enough -- not enough
18 moneys in the general estate to satisfy them.
19     Q.   Is it your understanding that the LBI
20 estate has sufficient assets currently to cover
21 all customer claims?
22         MR. OXFORD:  Object to the form.
23     A.   I don't know if they have or don't
24 have.  I think that's still being assessed.
25     Q.   Is it possible that the reason

---

Page 56

D. McIsaac

1  D. McIsaac
2  Barclays wrote these expenses off is because
3  Barclays didn't expect it would ever be able to
4  recover these costs from the Lehman estate?
5      A.   I can't determine why Barclays wrote
6  them off.
7      Q.   Do you generally consider a
8  broker-dealer who is in SIPC proceedings to be a
9  good credit risk?
10     A.   No, I would not consider them a good
11 credit risk.
12     Q.   Would you extend credit to a
13 broker-dealer in SIPC liquidation?
14     A.   Would I extend credit to them after
15 they were in liquidation?
16         MR. OXFORD:  Object to the form.
17     A.   Sorry.
18         Probably if it was court-approved, I
19 think there's some way where the court can
20 approve you providing credit to a liquidated
21 estate, but no, in general terms, I wouldn't.
22     Q.   Why not?
23     A.   Because you have a bankrupt estate
24 that you don't know the creditworthiness of
25 whether or not you'll be paid.

---

Page 57

D. McIsaac

1  D. McIsaac
2      Q.   Do you think -- do you have any reason
3  to believe that Barclays thought it would be
4  paid by the LBI estate for losses it incurred on
5  affiliate positions that it took clearance
6  responsibility for?
7          MR. OXFORD:  Object to the form.
8          MR. GREEN:  Objection.
9      A.   Again, I don't know what was in
10 Barclays' mind and what they thought when they
11 wrote off the receivables.  I'm not sure what
12 the basis was.
13     Q.   Would you agree that your report
14 characterizes the level of risk associated with
15 affiliate positions to be minimal, if it existed
16 at all?
17         MR. OXFORD:  Object to the form.
18     A.   Yes, I think it says it's less risky
19 because the credit is borne by the affiliates,
20 the market risk is borne by the affiliates, and
21 that I believe Barclays was not taking
22 responsibility for any affiliates' positions.
23     Q.   But you agree that Barclays was taking
24 settlement responsibility for those positions?
25     A.   It appears that in the TAA that they

---

Contains Highly Confidential Portions

Page 58

D. McIsaac

1 took settlement responsibility for them.
2
3    Q.    And are you aware of the financial
4 state of the LBI affiliates themselves during
5 the month of September 2008?
6        MR. OXFORD: Object to the form.
7    A.    I believe some of them were in
8 liquidation and some of them may not have been.
9    Q.    Would you consider them a credit risk
10 at that time?
11        MR. OXFORD: Object to the form. You
12 mean any time in September?
13    Q.    Sure. We'll start with any time in
14 September.
15    A.    I don't know what the credit risk
16 would have been in September prior to anybody
17 going into liquidation, what the analysis would
18 have been, and people will take risk based on
19 what the rewards they think they will receive.
20    Q.    What reward was Barclays receiving by
21 agreeing to take over settlement responsibility
22 for the affiliate positions?
23    A.    Maybe the business that was there and
24 maybe they were willing to take on an additional
25 risk to -- to get the customer business and

Page 59

D. McIsaac

1 whatever other business was there.
2
3    Q.    Were they going to see any profit from
4 taking over the affiliate positions themselves?
5    A.    When you take over a business, not
6 every piece of it may be profitable. So you may
7 accept some risk to get the profitable pieces of
8 it. I don't know why they assumed the
9 responsibility for the affiliates if they didn't
10 want them.
11    Q.    Earlier you were describing
12 transactions in which you conducted due
13 diligence in one of your prior companies, and
14 you explained that the acquirer spent a week to
15 several weeks reviewing the customer base to
16 determine which customers it wanted and which
17 customers it didn't?
18    A.    Uh-huh.
19    Q.    Do you believe that Barclays had
20 adequate time during the week of September 15,
21 2008 to review all of the customers that it was
22 acquiring or not acquiring from LBI?
23        MR. OXFORD: Object to the form.
24    A.    It possibly didn't have time to review
25 all the customers, but it certainly had time to

Page 60

D. McIsaac

1 review the affiliates and could have determined
2 that they didn't want to take the affiliate
3 accounts if that was the case.
4    Q.    What is your understanding of what
5 would have happened in the event that Barclays
6 had refused to take responsibility for the
7 affiliate positions?
8    A.    I don't know what would have happened
9 if they refused to take responsibility for it.
10    Q.    Is it your understanding that the
11 affiliate positions were commingled at the OCC
12 with firm positions and also with customer
13 positions?
14    A.    Yes.
15    Q.    Is it your understanding that there
16 were both affiliate and firm positions in the
17 074F account at the OCC?
18    A.    Yes.
19    Q.    And is it your understanding that
20 there were affiliate positions commingled with
21 customer positions in the 074C account at the
22 OCC?
23    A.    Yes.
24    Q.    What is your understanding of the

Page 61

D. McIsaac

1 position that the OCC took during the week of
2 September 15 with respect to Lehman Brothers as
3 a clearing member?
4        MR. OXFORD: Object to the form.
5 Vague.
6    A.    I'm not sure what position the OCC
7 took with regard to them. You know, I thought
8 they were going on as business as usual. They
9 looked like they were clearing their trades and
10 assigning their trades, so I don't see any -- I
11 haven't seen anything that says what the OCC did
12 or didn't do.
13    Q.    Do you have any basis to say what
14 would have happened to LBI's accounts with the
15 OCC if Barclays had refused to take over
16 settlement responsibility for those accounts?
17    A.    I don't have a basis, but I assume the
18 OCC would have liquidated the accounts.
19    Q.    Why do you assume that?
20    A.    Because Lehman was bankrupt at the
21 time or was entering into SIPC liquidation, so I
22 think the OCC as a first move would liquidate
23 the accounts. It doesn't mean that various
24 positions in those accounts couldn't be

Contains Highly Confidential Portions

Page 62

D. McIsaac

1 transferred to another broker-dealer.
2    Q.   Do you know how much time Barclays and
3 Lehman had to negotiate the terms of this
4 transaction before they entered into the APA?
5    A.   No, I do not.
6    Q.   Would it surprise you to hear that it
7 was less than 24 hours?
8       MR. OXFORD:  Object to the form.  You
9 can answer.
10    A.   It would -- wouldn't surprise me or
11 not surprise me.  Lehman was in financial
12 difficulty at that time and there were reports
13 in the papers that a lot of people were looking
14 at Lehman from time to time.  So I have no idea
15 when Barclays started to look at it and
16 determined what they wanted to do.
17    Q.   You didn't review that in connection
18 with this report?
19    A.   Review?  What would I have reviewed to
20 say that?  I'm asking what -- what would I have
21 reviewed?
22    Q.   I understand that you're asking that,
23 but I'm asking you what did you review in order
24 to understand the circumstances in which this

Page 63

D. McIsaac

1 deal was negotiated?
2    A.   I read the Asset Purchase Agreement.
3 I read the Clarification Letter.  I read the
4 TAA.  You know, I read some e-mails that went
5 around.  As a general knowledge of what was
6 happening in 2008, you know, I lived it.
7    Q.   Okay.  So is it fair to say that you
8 prepared your report without knowing the amount
9 of time that it took Lehman -- that Barclays and
10 Lehman had to negotiate the APA?
11    A.   I didn't specifically find out how
12 much time they took to negotiate it and I don't
13 know what that has to do with what we're talking
14 about.  I'm not sure what the timing, you know,
15 has to do with what they decided or what they
16 didn't decide to do.  They certainly didn't have
17 to do it, I don't think, at any point in time.
18 There was not a gun held to their head, I don't
19 believe.  I mean, unless I didn't -- there's
20 more information than I know.
21    Q.   Uh-huh.  So when you prepared your
22 opinions in your report, did you believe it was
23 possible that the parties had spent more than a
24 week negotiating the terms of the APA?

Page 64

D. McIsaac

1       MR. OXFORD:  Object to the form.
2    A.   I don't think I gave much thought to
3 how much time they spent negotiating it.  I
4 understand the timing of what was happening
5 around then.  I don't know how long they were
6 talking about the APA, what conversations they
7 may have had during the time period.  I don't
8 believe that's public information.
9    Q.   Were you allowed to ask questions of
10 fact witnesses during your investigation?
11    A.   I --
12       MR. OXFORD:  I'll object to the form
13 of the question.
14    Q.   Okay.  Go ahead.  You can answer.
15       MR. OXFORD:  I'm not sure in terms
16 of --
17    Q.   Did you talk to anybody -- let me
18 rephrase the question.
19       MS. BLOOMER:  Thanks, Neil.
20    Q.   Did you talk to anybody who was
21 involved in the negotiation of the transaction?
22    A.   No, I did not.
23    Q.   Did you speak with the advisors who
24 were present at the time?

Page 65

D. McIsaac

1    A.   No, I did not.
2       MR. OXFORD:  Sorry.  If you can slow
3 down, Mr. McIsaac, to let me get my
4 objection.
5       I'll object to the form of the
6 question and particularly to the vagueness
7 of the term "advisors."
8    Q.   Okay.  When did you speak with
9 Deloitte?
10       MR. OXFORD:  Object to the form.
11    A.   Regarding?  Excuse me, regarding what?
12    Q.   You said earlier today that in
13 preparing for your deposition today you spoke
14 with Deloitte.  Was that the first time that you
15 spoke with them?
16    A.   Deloitte is the financial advisors for
17 the Trustee.  In working on the original work I
18 did with the motion, I spoke to Deloitte, if
19 that's what you mean, but not in relation to
20 this.
21    Q.   Okay.  Was Deloitte present, to your
22 understanding, during the negotiations of this
23 deal?
24    A.   I don't believe they were, but I don't

Contains Highly Confidential Portions

Page 66

1              D. McIsaac
2   know.
3        Q.   Did you ask them?
4        A.   No, I did not.
5        Q.   Did you ask them any of the
6   circumstances under which the deal was
7   negotiated?
8        A.   No, I did not.
9        Q.   Did you ask anyone what the
10  circumstances were of the deal at the time it
11  was negotiated?
12       A.   I think I understand what was going on
13  in the environment at that time.  I don't think
14  I had to ask specifically what was happening in
15  the environment at that time.  It was a rough,
16  you know, a difficult time and I don't know if
17  Barclays had one day or five days or how long
18  they were reviewing the transaction.
19       Q.   You don't know if it was ten days?
20       A.   I don't know if it was ten days.
21       Q.   And you don't know if it was a month
22  that Barclays had to review the transaction?
23       A.   That's right.
24       Q.   Okay.
25       A.   But that doesn't change my thoughts on

Page 67

1              D. McIsaac
2   it because whether or not you had one day or
3   ten, you could still decide to buy something or
4   not buy something.  You can decide what you want
5   to buy and what you don't want to buy.
6        Q.   Can you remind me, if you haven't
7   testified to this already -- strike that.
8             What is the shortest amount of time
9   that you've ever seen an acquisition of a
10  broker-dealer business consummated in?
11            MR. OXFORD:  Object to the form.
12       A.   I believe Bank of America bought
13  Lehman Brothers over a weekend.
14       Q.   Do you know how long -- did they spend
15  any time negotiating that transaction prior to
16  that weekend?
17       A.   All I know is what I read in the
18  papers, and I thought Bank of America was
19  thinking of buying Lehman and instead bought
20  Merrill at that point in time.  I thought the
21  negotiations happened over a weekend.
22       Q.   Do you know whether they had done due
23  diligence prior to that weekend?
24       A.   I don't know.
25       Q.   Do you have any knowledge at all of

Page 68

1              D. McIsaac
2   the negotiations that took place during the
3   structuring of that deal?
4        A.   No, I do not.
5        Q.   With respect to the deals that you
6   have personal knowledge of, what's the shortest
7   amount of time that you know of in which an
8   acquisition of a broker-dealer business took
9   place?
10            MR. OXFORD:  Object to the form.
11  Vague.
12       A.   I -- I've been involved in some
13  acquisitions and mergers that I don't know how
14  much time was spent in doing the negotiation.
15  When UBS and Swiss Bank merged, I have no idea
16  how long it took for them to do the due
17  diligence and decide on the merger.
18       Q.   What's the shortest amount of time
19  with respect to a transaction that you do have
20  an idea of how long it took?
21       A.   Probably a month or so.
22       Q.   You say in your report that the
23  circumstances of this transaction don't affect
24  your opinion.  Do you recall saying that in your
25  report?

Page 69

1              D. McIsaac
2        A.   I believe so.
3        Q.   Okay.  The fact that this transaction
4   closed in 24 -- was negotiated in 24 hours
5   doesn't have any impact on your opinion as to
6   what was rational under those circumstances in
7   terms of structuring the terms of the deal?
8            MR. OXFORD:  Objection.
9        Q.   Is that your opinion?
10            MR. OXFORD:  Object to the form.
11  Assumes facts not in evidence.
12       A.   I believe it was negotiated.  It
13  didn't have to close, and until such time as it
14  closed, there was still negotiations and I
15  assume due diligence going on.
16       Q.   Is it your understanding that an
17  agreement can be negotiated after it's executed?
18       A.   An agreement can be -- I don't -- I'm
19  sorry, I'm not sure where you're going on that.
20  "After it's executed," I'm not sure.
21       Q.   Sure.  Do you agree that the parties
22  would have negotiated the terms of the deal
23  before they signed a binding agreement that
24  expressed and set forth the terms of that deal?
25            MR. OXFORD:  Object to the form.

Contains Highly Confidential Portions

Page 70

D. McIsaac

1
2       You can answer.
3       A.   I'm sorry.  I believe firms negotiate
4   a shell of a deal and then usually negotiate the
5   specifics.  Until a final contract is signed and
6   it's consummated, that is not, you know, it's
7   not a closed deal.
8       Q.   Showing you a document that's been
9   premarked as Exhibit 630.
10      Can you take the time to review this
11  e-mail and let me know when you're ready?
12      (Document review.)
13      A.   Yes.
14      Q.   Did you review this document in
15  preparing for your deposition today?
16      A.   I believe I might have seen this.  I
17  don't remember exactly, but I might have seen
18  this e-mail trail.
19      Q.   And had you reviewed this document at
20  the time you prepared your expert report on
21  exchange-traded derivatives?
22      A.   I thought I just answered that.  I
23  think I might have reviewed this when I -- when
24  I prepared it.
25      Q.   Oh, I was asking you whether you

Page 71

D. McIsaac

1
2   reviewed it when you prepared for the deposition
3   today --
4       A.   Oh, no.
5       Q.   -- was my first question.
6       A.   No, no, I did not review it before
7   today, for preparation today.  I might have
8   reviewed it in preparing my report.
9       Q.   You're not sure?  You might --
10      A.   I believe I've seen this.  I know I've
11  seen the top of it.  I don't know if I've seen
12  the whole other trail.
13      Q.   Okay.  If you turn to the second page,
14  will you look at the paragraph that's
15  denominated paragraph 3?
16      A.   Uh-huh.
17      Q.   It says, "If the transaction does not
18  close tonight, OCC would need to immediately
19  liquidate and close out the LBI accounts and is
20  preparing to do so."  Do you see that?
21      A.   Yes.
22      Q.   You see that this is an e-mail from
23  James McDaniel of Sidley?
24      A.   Uh-huh.
25      Q.   And it's to Ed Rosen of Cleary

Page 72

D. McIsaac

1
2   Gottlieb.  Do you know who Ed Rosen is?
3       A.   Yes.  He's a lawyer for Cleary
4   Gottlieb.
5       Q.   And do you know who Cleary Gottlieb
6   was representing in this transaction?
7       A.   I believe they were representing
8   Barclays.
9       Q.   And you see Hughes Hubbard is also
10  copied on these e-mails, Giddens and Kobak?
11      A.   Uh-huh.
12      Q.   Do you know who they are?
13      A.   Mr. Giddens is the Trustee and Mr.
14  Kobak is his legal counsel, I believe.
15      Q.   Okay.  And you see that the SPIC
16  organization, Steve Harbeck, was also copied?
17      A.   Yes.
18      Q.   You said earlier in your testimony
19  that you don't think the parties had to do the
20  deal in any particular amount of time, and I
21  believe you said they didn't have a gun to their
22  head.  Do you recall that testimony?
23      A.   Yes.
24      Q.   Do you agree that this e-mail suggests
25  that there was some urgency to the parties in

Page 73

D. McIsaac

1
2   closing the deal in the timeframe that they did?
3       MR. OXFORD:  Object to the form.
4       A.   I believe the e-mail from the -- Mr.
5   McDaniel at Sidley Austin was relaying that to
6   Mr. Rosen.  Barclays still did not have to go
7   through with the deal if they didn't want to go
8   through with the deal.  I mean, again, nobody
9   was holding a gun to their head saying if you
10  don't do this, I'm going to shoot you.  They
11  could have walked away from it, I assume, at
12  that point in time or they could have postponed
13  the closing.  I don't know if they could have
14  done that, but --
15      Q.   Do you think they could have postponed
16  the closing and avoided liquidation of the OCC
17  account?
18      A.   I think you could have negotiated
19  anything with the OCC if they wanted to talk to
20  them about it.  I don't know what negotiations
21  were going on.  I don't know why this was being
22  pushed at this point in time.
23      I mean, Barclays, when I said they
24  didn't have a gun to their head, they could have
25  walked away from the deal at any point in time.

Contains Highly Confidential Portions

Page 74

D. McIsaac

1
2  If they didn't think they had enough time to do
3  the due diligence and to understand what they
4  were buying, they didn't have to buy it I guess.
5      Q.   And they didn't have to buy it if they
6  didn't like the terms of the deal either, right?
7      A.   Right.
8      Q.   You agree that the parties were aware
9  that the OCC was at least threatening to
10  liquidate the accounts on the 22nd if the deal
11  didn't close that morning?
12      A.   Yes.
13      Q.   Do you have any experience that would
14  allow you to surmise on what an OCC
15  liquidation -- how an OCC liquidation would have
16  proceeded?
17          MR. OXFORD:  Object to the form.
18      A.   I would assume they would either
19  auction the positions off or, you know, closed
20  them out.  I'm not sure how they would have
21  proceeded.  I'm not -- I have not seen one in my
22  past experience.
23      Q.   Any liquidation or any auction have
24  you seen?
25      A.   I have not seen a liquidation at the

Page 75

D. McIsaac

1
2  OCC.  I have not been involved in a liquidation
3  at the OCC.
4      Q.   Have you been involved in a
5  liquidation at any other clearing organization?
6      A.   I have not personally been involved,
7  no.
8      Q.   What is your understanding of what the
9  OCC's rights are in the event of a liquidation?
10          MR. OXFORD:  Object to the form.
11      A.   I believe they have the right to
12  liquidate the positions and charge back to the
13  clearing firm any losses they incur that's not
14  covered by the margin that they have available,
15  and if they don't, I assume -- I believe they
16  have the right to charge back to other members
17  of the clearing org.
18      Q.   Okay.  So you would agree then that
19  any margin that was posted at the OCC was
20  accessible to the OCC in order to cover the
21  costs of a liquidation?
22      A.   Yes.
23      Q.   And would you agree that all of the
24  margin posted at the OCC was accessible to the
25  OCC in the event that they wanted to auction off

Page 76

D. McIsaac

1
2  the positions instead of liquidating them?
3      A.   Yes.
4      Q.   Do you have any knowledge of any other
5  clearing organizations liquidating or auctioning
6  off positions?
7      A.   I believe that during the week I've
8  been informed that the CME auctioned off LBI's
9  positions.
10      Q.   Do you have any understanding of the
11  approach that the CME took to auctioning off the
12  positions?
13      A.   I haven't reviewed anything firsthand,
14  but I believe they took the various positions
15  and would have gone to other firms and asked
16  them to assume them.
17      Q.   And do you know what the CME was
18  offering in exchange for other members assuming
19  those obligations?
20      A.   No, I'm not, I'm not sure of the
21  negotiations that occurred with them.
22      Q.   Do you have an understanding of the
23  amount of money that was consumed in the auction
24  of the CME -- in the CME's auction of LBI's
25  proprietary positions?

Page 77

D. McIsaac

1
2          MR. OXFORD:  Object to the form.
3      A.   I have heard a number maybe a billion
4  dollars, but I don't know if I've seen the
5  actual documents.
6      Q.   I'm showing you a document that's
7  marked as Exhibit 442.  I certainly don't expect
8  you to read the whole document.
9      A.   Okay, good.  I was going to say can I
10  please get a brief recess if that's the case.
11      Q.   This is a copy of the hearing that
12  took place before Judge Peck in the bankruptcy
13  proceeding on September 19, 2008.  Have you had
14  occasion to review any portion of the sale
15  hearing transcript?
16      A.   I have reviewed this maybe six months
17  ago.
18      Q.   Can you turn to page 61, the full
19  paragraph on page 61 starting "Since the hearing
20  last Wednesday," and it continues, "and in the
21  space of roughly 24 hours, your Honor, there
22  have been a number of significant events.
23  Yesterday the Chicago Mercantile Exchange
24  unilaterally decided to close out all of
25  Lehman's positions on that exchange.  That

Contains Highly Confidential Portions

Page 78

D. McIsaac

1
2  closeout resulted in a loss to Lehman of
3  approximately $1.6 billion." Do you see that?
4      A.   Yes, I do.
5      Q.   Do you recall, does this refresh your
6  recollection --
7      A.   Yes, I think this is probably where I
8  saw it.
9      Q.   Do you have any reason to doubt the
10  accuracy of the statement that's made on this
11  page?
12      A.   No, I do not.
13      Q.   So you'd agree that the Chicago
14  Mercantile Exchange closed out Lehman's
15  positions at a cost of $1.6 billion?
16          MR. OXFORD: Object to the form.
17      A.   That's what it says here.
18      Q.   And that's what you believe happened?
19      A.   That's what I believe happened.
20          MR. OXFORD: Object to the form.
21      Q.   What's your understanding of what a
22  SIPC trustee's objectives are when analyzing the
23  terms of a proposed bankruptcy sale?
24          MR. OXFORD: I'll object to the form.
25      A.   I assume that they -- any sale is

Page 79

D. McIsaac

1
2  going to occur of any assets, they would have to
3  make sure that they are protecting the customers
4  and receive, you know, value for the assets
5  they're selling.
6      Q.   And is the customer -- is the
7  preservation of value for customers the sole
8  objective of a trustee, do you know?
9          MR. OXFORD: I'll object to the form
10  of the question.
11      A.   No, I don't think so. I think they're
12  supposed to preserve the whole estate.
13      Q.   Are trustees also interested in
14  maximizing the number of customer accounts that
15  can be preserved and transferred to a solvent
16  broker-dealer?
17          MR. OXFORD: Objection to the form.
18      A.   I believe both transfers are a
19  priority of SIPC.
20      Q.   Have you ever advised the SIPC trustee
21  in analyzing the terms of a proposed bankruptcy
22  sale?
23      A.   No, I have not.
24      Q.   Do you have any expertise in advising
25  on what the proper objectives are of a trustee

Page 80

D. McIsaac

1
2  in that circumstance?
3          MR. OXFORD: Objection to the form.
4      A.   No, I do not.
5      Q.   Is it your understanding that the
6  proprietary positions in Lehman's OCC account as
7  of the week of September 15 carried exposure?
8          MR. OXFORD: Object to the form.
9      A.   All positions carry exposure. I'm not
10  sure if I'm answering the question, your
11  question, but all positions, as far as I'm
12  concerned, carry exposure.
13      Q.   By transferring positions do you agree
14  that you're eliminating that exposure?
15          MR. OXFORD: I object to the form.
16      A.   By the person transferring them?
17      Q.   Uh-huh.
18      A.   Yes, they would limit their exposure.
19      Q.   So you would agree that LBI and the
20  Trustee, by agreeing to transfer the proprietary
21  positions to Barclays, was eliminating any
22  exposure that it had on those positions?
23      A.   They would no longer have exposure on
24  those positions, I assume, after they have
25  transferred them.

Page 81

D. McIsaac

1
2      Q.   And would that be to the benefit of
3  customers, to eliminate exposure to the -- to a
4  SIPC trustee's estate?
5          MR. OXFORD: Objection to the form.
6      A.   It would benefit customers if you were
7  paid properly for them, yes. So if you took
8  exposure off and received consideration, then it
9  would be good. If you just took exposure off
10  and received no consideration, I don't know if
11  it would be good. You'd have to analyze each
12  one separately.
13      Q.   That would depend on the value of the
14  positions at any given point in time, is that
15  fair to say?
16          MR. OXFORD: Objection to the form.
17      A.   It would depend on the value of the
18  positions, the marketplace, you know, what --
19  what the impact of disposing of those positions
20  would have or the downside it could have.
21      Q.   If there's net exposure on a set of
22  positions that you transfer, would it be
23  irrational to do that for no consideration?
24          MR. OXFORD: Objection to the form.
25      A.   When you say "net exposure," there's

Contains Highly Confidential Portions

---

Page 82

D. McIsaac

1          D. McIsaac
2  exposure, so would it be rational to transfer
3  them for no consideration?  I don't know at the
4  point in time.  I don't know -- the worst case
5  you could be is zero if you're long.  So not
6  getting anything for them, if you liquidate
7  them, gave them away for nothing or had them
8  liquidated, you would be at the same place, and
9  if the margin would cover any potential losses,
10  you might be better off having the OCC liquidate
11  them than give them away for free.
12      Q.    You testified earlier that you could
13  never guarantee that the margin would be
14  sufficient to cover exposures in a liquidation;
15  is that right?
16          MR. OXFORD:  Objection.  Misstates
17      testimony.
18      A.    Yes, I believe I said something to
19  that effect.
20      Q.    So would you agree that if you have
21  short positions, there's exposure that can't be
22  eliminated entirely unless you transfer the
23  positions?
24          MR. OXFORD:  Object to the form.
25      Misstates his testimony.

---

Page 83

D. McIsaac

1          D. McIsaac
2      A.    They could be liquidated the next day
3  and you would relieve your exposure.
4      Q.    I'm showing you an exhibit that's been
5  marked 676A.  Do you recognize this document?
6      A.    Yes, I believe I've seen this before.
7      Q.    Did you review it in preparing for
8  today's deposition?
9      A.    No, I don't believe so.
10      Q.    Did you review it at the time that you
11  prepared your report?
12      A.    Yes.
13      Q.    If you could turn to Exhibit 1 of this
14  document.  You see that Exhibit 1 shows the
15  margin requirements on dates from 9/15/2008
16  through 9/19/2008?
17      A.    Yes.
18      Q.    Okay.  And just so that I don't force
19  you to take this out of context, you should read
20  the paragraph where he describes what the
21  margin -- which margin requirements he's
22  referring to.  So if you look at --
23          MR. OXFORD:  Paragraph 6, I think.
24      Q.    -- paragraph 6 of Mr. Jones'
25  declaration, he says, "Exhibit 1 hereto shows

---

Page 84

D. McIsaac

1          D. McIsaac
2  for each day from September 15 through September
3  19, 2008, the total requirement at the open of
4  business for each day across all of LBI's OCC
5  accounts, the total value of collateral of the
6  open business of each day across all of LBI's
7  OCC accounts, and the excess or deficit at the
8  open of business on each day across all of LBI's
9  OCC accounts."  Do you see that?
10      A.    Yes.
11      Q.    Do you see that on between September
12  15 and September 16 the margin requirement for
13  the OCC accounts went from $789,583,205 to
14  $1,359,001,075?
15      A.    Yes, I see that.
16      Q.    Would you agree with me that's an
17  increase of over $500 million in a single day?
18      A.    Yes.
19      Q.    If you look two lines down from
20  September 17, 2008 to September 18, 2008, do you
21  see that the margin requirement went from
22  $1,400,000,000 and change to $2 billion, over $2
23  billion, do you see that?
24      A.    Yes, I see that.
25      Q.    Would you agree that that's over a

---

Page 85

D. McIsaac

1          D. McIsaac
2  $600 million increase in a single day?
3      A.    Yes.
4      Q.    You said a moment ago that the -- that
5  LBI could have liquidated the following day and
6  eliminated their exposure on their OCC accounts.
7  Do you recall that testimony?
8      A.    Yes.
9      Q.    Would LBI have been able to know for
10  certain that it would not -- strike that.  Would
11  LBI know for certain what the cost of
12  liquidating the account on the following day
13  would have been by looking at that day's margin
14  requirements?
15          MR. OXFORD:  Object to the form.
16      A.    Let me make sure I have your question
17  clear.  You're asking me as of the close of
18  business the 19th, would LBI have known what the
19  cost would be to close out their positions on
20  top day the 22nd?
21      Q.    Yes.
22      A.    They would know what the closing price
23  was on the 19th and use that as I guess a proxy
24  for what, you know, for what they could possibly
25  close it out and do some kind of an

---

Contains Highly Confidential Portions

Page 86

D. McIsaac

1 extrapolation on how they might impact the
2 market.
3      Q.   Okay.  And if the margin requirement
4 is a proxy for exposure and increased by $500
5 million, as it had on two other days this week,
6 would you agree that using Friday's close of
7 business number may not be an accurate way to
8 determine what the cost would be on Monday of
9 closing out the positions?
10       MR. OXFORD:  Objection.  Form.
11      A.   It's very difficult to determine that
12 because I believe the 19th was a triple-witching
13 day, so a lot of the exposures that were sitting
14 there would have been closed out close of
15 business.  I don't know if this margin
16 requirement is at the end of the day or the -- I
17 believe this is the beginning of the day on the
18 19th.
19      Q.   Uh-huh.
20      A.   So when all the options that they --
21 that were in their account were called, anything
22 that was expiring on the 19th would have had an
23 impact on this amount.  I don't know the balance
24 or the size of the positions they had that were

Page 87

D. McIsaac

1 expiring on the 19th, but again, I believe if I
2 remember Mr. Leitner's testimony, he looked at
3 the margin as being a proxy for the most they
4 could lose or the most that would cover
5 Barclays' exposure.
6       So, by looking at that, my guess this
7 would be the worst place LBI would be in if they
8 exposed.  So if they were looking to transfer
9 their assets, this might be a starting point for
10 negotiations but not necessarily the ending
11 point.
12      Q.   Okay.  Whose responsibility do you
13 understand it was to settle the trades that
14 occurred over the expiration weekend, Barclays
15 or Lehman's?
16      A.   I believe it was Lehman's.
17      Q.   You believe it was Lehman's?
18      A.   Barclays didn't sign the agreement
19 until the 22nd.  I believe they all settle over
20 the weekend.
21      Q.   And when would the pays and collects
22 from a weekend expiration be due?
23      A.   Monday morning, I believe, because you
24 can't pay anything on the weekend.

Page 88

D. McIsaac

1      Q.   And it's your understanding that
2 Lehman is the party that settled those weekend
3 expirations?
4      A.   I believe any settlements would have
5 had to occur because Barclays didn't own them at
6 that point in time.  So all of the settlement
7 transactions would have had to go through
8 Lehman, and I believe Lehman settled them all.
9 To my knowledge, I think that's what happened.
10      Q.   If that's inaccurate, would that
11 affect your opinion in any way?
12       MR. OXFORD:  Object to the form.
13      A.   Not necessarily, because I don't know
14 the size of it, although I thought I -- I
15 believe I saw some information that showed the
16 pay/collects being a significant pay-back to
17 Lehman on the 22nd or pay-back to the -- to the
18 holder of the account on the 22nd.
19      Q.   Would it be rational for Barclays to
20 accept the obligations on options expiring over
21 the weekend of September 20th and 21st for short
22 positions and yet not acquire the rights for any
23 profit and loss on long positions?
24       MR. OXFORD:  Object to the form.

Page 89

D. McIsaac

1      A.   I'm not sure -- please rephrase it.
2 I'm not sure where -- what the question is
3 asking.
4      Q.   Sure.  There were long positions and
5 short positions both in LBI's --
6      A.   Right.
7      Q.   -- OCC accounts; is that right?
8      A.   Right.  Okay.  Yes.
9      Q.   And any short positions that were
10 exercised over the weekend of September 22 --
11 20th and 21st would have resulted in a loss to
12 the clearing member; is that right?
13       MR. OXFORD:  Objection to form.
14      A.   Not necessarily.  If they had the
15 assets to deliver against the ex -- the
16 exercise, there would be no loss.
17      Q.   And if they didn't have the assets to
18 deliver and they had to acquire them at the then
19 market rates?
20      A.   If they had marked them --
21       MR. OXFORD:  Wait.  I'm sorry.  Can
22 you just let me get my objection in?
23       THE WITNESS:  I'm sorry.
24       MR. OXFORD:  I'll object to the form.

Contains Highly Confidential Portions

Page 90

D. McIsaac

1
2     You can answer.  Thank you.
3     A.   If they would have been marking their
4  positions to market, they would have, I assume
5  already, recorded those losses.
6     Q.   When do you think that Lehman recorded
7  the losses that occurred over the weekend of
8  September 20th and 21st?
9     A.   I believe you would record those
10  effective the 19th because that's the option
11  expiration date.  At that point in time, you
12  know what your locked-in is on your gains and
13  losses.  You would do that on a daily basis --
14     Q.   And when --
15     A.   -- of the market movement.
16     Q.   I apologize for interrupting you.
17        And when would Lehman make the payment
18  on those trades?
19     A.   I would assume the next business day.
20     Q.   And so you're assuming that Lehman
21  paid any amounts due to settle short options
22  that were in its account over the weekend of
23  September 20th and -- 20th and 21st?
24        MR. OXFORD:  I'll object to the form.
25     A.   I assumed that not everything is cash

Page 91

D. McIsaac

1
2  settled so they might have delivered securities
3  against those exercised calls or puts, and on
4  the cash settle piece, that the pay/collect
5  would occur on Monday morning.  And if they
6  didn't have securities to deliver, they would
7  have to go out and buy the securities and make a
8  delivery.
9        MR. OXFORD:  Trish, we've been going
10  about another hour.  I don't know if this is
11  a good time to take a five-minute break.
12        MS. BLOOMER:  This is actually a good
13  time.  That would be fine.  Off the record.
14        THE VIDEOGRAPHER:  The time is 11:36.
15  This is the end of the tape labeled number
16  2.  We're going off the record.
17        (Recess.)
18        THE VIDEOGRAPHER:  This is the start
19  of the tape labeled number 3.  The time is
20  11:57.  We are back on the record.
21  BY MS. BLOOMER:
22     Q.   Mr. McIsaac, could you turn in your
23  report to page 7, please.  The first full
24  sentence at the top of the page --
25     A.   Give me one second.  One second.

Page 92

D. McIsaac

1
2     Q.   Sure.
3     A.   Okay.
4     Q.   The first full sentence at the top of
5  the page, you say, "The circumstances of the
6  transaction between Lehman and Barclays do not
7  change my opinions in this matter."
8        What circumstances were you referring
9  to in that sentence?
10     A.   The timing of everything happening,
11  the -- I think Mr. Leitner was talking about how
12  much time, you know, it took the quickness of
13  the negotiations.
14     Q.   Any other circumstances that you
15  were --
16     A.   No.  I mean, the marketplace, you
17  know, everything that was happening at the time.
18     Q.   Anything other than the timing and the
19  marketplace that you were -- that you had in
20  mind when you said the circumstances of --
21     A.   No, I think just the market, what was
22  happening in the market at the time --
23        I'm sorry.
24     Q.   Are there any circumstances other than
25  the timing and the marketplace that you had in

Page 93

D. McIsaac

1
2  mind when you said "the circumstances of the
3  transaction between Lehman and Barclays do not
4  change my opinions in this matter"?
5     A.   No.  Basically that was it.
6     Q.   With respect to the timing, what was
7  your understanding of the circumstances?
8     A.   I believe that it was negotiated in
9  a -- it didn't have, you know, three or four
10  months of negotiations, as far as I know.  It
11  was done fairly quickly, although I don't know
12  how much time and how much due diligence was
13  done along the way.
14        Lehman had been in trouble for a
15  while, so I'm assuming a lot of firms were doing
16  some things, reviewing it to determine, you
17  know, if there was a, you know, a good place to
18  go in and buy and, you know, there possibly was
19  the Lehman executives might have been shopping
20  the firms.  I don't know what happened, but I do
21  know that a lot of things happened fairly
22  quickly.
23     Q.   Were you assuming that Barclays had
24  plenty of time to do due diligence before
25  settling on the terms of the transaction it was

Contains Highly Confidential Portions

Page 94

D. McIsaac

1       D. McIsaac
2    willing to enter into?
3         MR. OXFORD:  Objection to the form.
4       A.   I don't know how much time Barclays
5    had to do due diligence.  I don't know how long
6    they were talking to Lehman and what information
7    they had.
8         And they were buying pretty much the
9    whole entity, so, you know, it's not like they
10   had to do due diligence on certain things.  It
11   was a viable entity.  It wasn't capital -- it
12   had adequate capital.  You know, it didn't
13   appear that they were buying the broker-dealer,
14   that there was that much of a concern around it.
15   The customers were the customers.  I don't know
16   if there was any major concern on the customers
17   they had.
18      Q.   Do you have an understanding of what
19   the value of the entity was that Barclays was
20   acquiring?
21        MR. OXFORD:  Objection to the form.
22      A.   I believe if I looked at the August
23   Focus that was not filed, it showed a net -- a
24   net equity of I want to say 3 to 5 billion, if I
25   remember properly, correctly.

Page 95

D. McIsaac

1       D. McIsaac
2       Q.   What was that number?
3       A.   3 to 5 billion.
4       Q.   What, in your opinion, would be a
5    typical amount of time for an entity to take
6    doing due diligence on an acquisition the size
7    of this one?
8         MR. OXFORD:  Objection to the form.
9       A.   I don't know how much time it would
10   take.  They ended up buying certain businesses,
11   the customers' businesses, they bought assets
12   like the buildings, things of that nature, and
13   they bought some positions.  How much time, I
14   don't know.  I don't know how much time they
15   spent knowing what was going on.
16        In the Lehman case, you know, Lehman
17   was not in, from what I understand, capital,
18   severe capital -- it was a liquidity crunch, and
19   Lehman was having problems getting the
20   information, getting the money they needed to
21   support their assets.  It didn't mean they
22   didn't have good assets, it didn't mean the
23   business was crumbling, it just meant they were
24   having a liquidity crunch.
25        I worked at Drexel.  I saw what

Page 96

D. McIsaac

1       D. McIsaac
2    happened to Drexel.  It didn't necessarily mean
3    the broker-dealer had a problem.  There was
4    illiquidity at the parent company, and that
5    trickles down.
6       Q.   Do you mean to suggest that there was
7    not a significant amount of risk that Barclays
8    was encountering in acquiring this business?
9         MR. OXFORD:  Object to the form.
10      A.   I didn't say there wasn't a
11   significant amount of risk.  I think there was a
12   discernible amount of risk.  I think that buying
13   customer positions, customer business, not that
14   risky a business.  Looks like they didn't buy
15   the prime broker, which would have been the more
16   risky of the customer businesses.
17        Futures clearing is not what I would
18   consider a very risky business.  They bought
19   certain assets, again, not everything that was
20   what I consider ultimately, you know, extremely
21   risky.
22      Q.   You're not an expert in risk
23   management or risk assessment; is that right?
24        MR. OXFORD:  Objection to the form.
25      A.   General knowledge of risk I have.  I'm

Page 97

D. McIsaac

1       D. McIsaac
2    not a quant.  I don't, you know, determine the
3    value what risk for a firm.  I understand what
4    assets are risky, what assets are not risky at a
5    firm, what businesses are risky, what businesses
6    are not risky, and I think, you know, in a firm
7    of this size, it was a top, you know, three or
8    four broker-dealer in the country for a long
9    period of time.  So, yes, there were risks
10   there, but I think they were quantifiable.
11      Q.   Do you know how long it would take to
12   assess the risk profile in a set of equities
13   positions and options positions that was $70
14   billion on the long side and $69 billion on the
15   short side?
16        MR. OXFORD:  Object to the form.
17      A.   I don't think equities were the total
18   70 and 69.  I think there were a portion of
19   that.  I think a large portion of that inventory
20   was government securities.
21      Q.   Do you know how much government
22   securities were in that versus equities versus
23   exchange-traded derivatives?
24      A.   I believe at one point in time I saw
25   something that sort of broke it down, but I

Contains Highly Confidential Portions

Page 98

D. McIsaac

1
2  don't remember exactly, but I believe equities
3  were probably maybe 10 billion range.
4      Q.    Would you have experience that would
5  qualify you to assess the risk profile
6  associated with a set of positions of that size?
7          MR. OXFORD: Object to the form.
8      A.    On a daily basis they are required to
9  maintain capital.  They have to assess their
10  capital every day.  Part of their capital is
11  assessing the risk.  They were on a daily basis
12  assessing the risk of their capital.  You could
13  have easily used that information to determine
14  where the risk was and, you know, from that
15  standpoint, yes, determine the risk.  When I
16  file reports, I'm looking at the risk of the
17  firm.
18      Q.    When you described the circumstances
19  of the transaction between Lehman and Barclays
20  on page 7 of your report, did you consider among
21  those circumstances the options that Lehman had
22  to the deal with Barclays?
23          MR. OXFORD: Object to the form.
24      A.    The options that Lehman had?  I guess
25  Lehman could have decided to sell or not sell.

Page 99

D. McIsaac

1
2      Q.    Could they have decided to sell to a
3  different entity?
4      A.    I'm sure they could have.
5      Q.    Could you pull Exhibit 442 out.
6  That's the sale hearing transcript.
7      A.    Uh-huh.
8      Q.    And turn to page 101.
9      A.    Yes.
10      Q.    If you read the first three paragraphs
11  or, you know, if you need to read a little bit
12  more to get context.
13          (Document review.)
14      A.    Okay.
15      Q.    In the second paragraph, it says,
16  "And, yet, he would say nobody has expressed an
17  interest to step into the shoes of -- excuse me,
18  step into the shoes of Barclays, your Honor."
19  The next paragraph says, "Lehman has not
20  received any other interest since the
21  commencement of the Chapter 11 cases."  And it
22  goes on to say, "If Lehman was approached by
23  another potential buyer that he would consider
24  the offer, provided that the company had
25  sufficient liquidity to operate the business

Page 100

D. McIsaac

1
2  without jeopardizing customer accounts.  That
3  has not happened, your Honor.  So it is almost
4  academic."  Do you see that?
5      A.    Yes, I do.
6      Q.    Had you read this testimony in
7  preparing for your -- or, in preparing your
8  expert report?
9      A.    I read this report in the -- when I
10  first started working with the Trustee regarding
11  the motion, the motion on the 3-3.
12      Q.    You testified a moment ago that you
13  were sure Lehman could have sold the assets to a
14  different buyer.  Does this refresh your
15  recollection at all on the circumstances that
16  Lehman was facing at the time?
17      A.    This says they have no buyers.  It's
18  Chapter 11.  The Fed was providing them with
19  liquidity earlier in the week before Barclays
20  stepped into the shoes.  The Fed could have
21  continued to provide liquidity while they were
22  looking for another purchaser.
23          That has happened before.  If they
24  stepped in the shoes once before, I assume
25  things could have been done, still been done in

Page 101

D. McIsaac

1
2  that fashion.
3      Q.    Do you agree that the court is being
4  told at the September 19th sale hearing that it
5  is almost academic for Lehman to find another
6  potential buyer at that point?
7      A.    That's what it looks like here, yes,
8  but I --
9      Q.    And if you --
10      A.    Excuse me.  But it also says they
11  weren't marketing the firm in the first
12  paragraph on that page.  So maybe if they did,
13  they might have been able to find other buyers.
14      Q.    Okay.  Can you read the second
15  paragraph for me?  "That notwithstanding the
16  lack of a specific program for marketing, the
17  sale of Lehman's broker-dealer business has been
18  known worldwide.  And, yet, he would say nobody
19  has expressed an interest to step into the shoes
20  of -- excuse me, step into the shoes of
21  Barclays, your Honor."
22      A.    Uh-huh.
23      Q.    Do you see that?
24      A.    Yes.
25      Q.    Do you agree that the speaker in this

Contains Highly Confidential Portions

---

Page 102

D. McIsaac

1
2  testimony is suggesting that they were not able
3  to find another buyer for the business?
4      A.    No, I believe he's saying that it was
5  known that the business might be for sale and
6  nobody else has stepped up, but I believe the
7  first paragraph says that they were not going
8  out and marketing the sale of the business.
9      Q.    Do you have any understanding of why
10  they weren't going out and marketing the
11  business?
12     A.    No, I do not.
13     Q.    Could it be because they didn't have
14  time to market the business because the
15  transaction needed to close by the following
16  Monday?
17     A.    This says the business has been known
18  worldwide, so I don't know why it had to
19  close -- I don't know what happened that made it
20  have to close within a week's period.
21     Q.    Okay.
22     A.    If I looked at the financial
23  statements that were not filed but prepared, it
24  looked like they had adequate capital for the
25  broker-dealer.

---

Page 103

D. McIsaac

1
2      Q.    Okay.  Can you turn to page 73.  If
3  you review where the court asks a question in
4  the middle of the page, "In order for this
5  transaction to be optimally closed from the
6  perspective of SIPC, when should it close?  Does
7  it need to close this weekend before the markets
8  open on Monday?"
9      A.    I'm sorry, I lost where you're
10  reading.
11     Q.    Page 73.
12     A.    Yes, I'm on 73.  I see, "The Court:
13  Let me ask a question."
14     Q.    Oh, the next statement.
15     A.    I'm sorry.
16         (Document review.)
17     A.    Uh-huh.  Okay.
18     Q.    So you see where Mr. Caputo says to
19  the court, in response to the court's question,
20  "As soon as possible it needs to close.  The
21  sooner the better."  Do you see that?
22     A.    Yes.
23     Q.    On the following page, the court asks,
24  "Would it be your position on behalf of your
25  client that, assuming the transaction, the sale

---

Page 104

D. McIsaac

1
2  transaction that has been proposed to me today
3  is approved, that the approval should happen
4  before the close of today's hearing?  In other
5  words, we should stay here as late as we need to
6  in order to get this done?"  And Mr. Caputo
7  says, "Yes, your Honor.  That would be our
8  recommendation."  Do you see that?
9      A.    Yes.
10     Q.    Does this suggest to you that the
11  transaction under contemplation did not need to
12  close by Monday, September 22, 2008?
13     A.    I believe in the prior response by Mr.
14  Caputo he said as soon as possible, and nothing
15  was forcing Barclays to close this agreement.
16  They did not have to do it if they didn't think
17  they had done sufficient due diligence to -- to
18  mandate a purchase of an asset like this.
19     Q.    Would you agree that at this sale
20  hearing, which you read the transcript of, the
21  parties were telling the court that it was
22  critical to get this deal done within a matter
23  of days?
24         MR. OXFORD:  Object to the form.
25     A.    I believe that's what was said here.

---

Page 105

D. McIsaac

1
2  I don't -- I haven't read anything here, or I'd
3  have to go back and read the whole thing, of
4  what Barclays was saying why it would be
5  critical for Barclays to get it done.
6      Q.    Do you believe that you are in a
7  better position than the parties who were
8  negotiating this deal and representing it to the
9  court to determine the urgency of the closing of
10  this transaction?
11         MR. OXFORD:  Object to the form.
12     A.    No, I think the urgency was on
13  Lehman's side, not necessarily on Barclays'
14  side.  Barclays, if they didn't feel they had
15  done enough due diligence and didn't feel they
16  had adequate time to review it, didn't have to
17  go through with it at that point in time.
18     Q.    Would you agree that in a transaction
19  where one party has an urgency to complete a
20  deal and another party doesn't, that there is a
21  disparity in bargaining power as between those
22  two entities?
23         MR. OXFORD:  Objection.
24     A.    Yes, but I'm not sure which way.  If I
25  don't sell it, what happens?  I'm out of

---

Contains Highly Confidential Portions

Page 106

D. McIsaac

1  business.  If I sell it, I'm still out of
2  business.  If I sell it, I'm still out of
3  business.
4       So if the parent company is selling
5  the business or if the broker-dealer, they're
6  selling the business, they have a decision to
7  whether or not they sell it or not sell it.  You
8  know, this isn't a sale where I'm trying to sell
9  something and, you know, just get rid of some
10 bad assets and go on.
11      Q.   And we saw earlier that the OCC had
12 threatened to liquidate LBI's accounts if it
13 didn't close this transaction by the 22nd of
14 September; is that right?  Do you recall that?
15      A.   Yes, but the one thing the OCC said
16 they would liquidate was that the customer and
17 proprietary or just the customer -- just
18 proprietary accounts?
19      Q.   Sure, we can look at the exhibit
20 together.  It was Exhibit 630.
21      A.   Uh-huh.
22      Q.   And it was on the second page under
23 paragraph 3, and it says, "OCC would need to
24 immediately liquidate and close out the LBI
25 accounts, and is preparing to do so."

Page 107

D. McIsaac

1
2       A.   Right, but I, after -- I don't
3  remember which -- I think you showed me this and
4  then you showed me something from the CME, and
5  the CME just liquidated the proprietary
6  accounts.  It didn't liquidate the customers.
7       Q.   The OCC wasn't drawing a distinction
8  in that, do you see that?
9       A.   Well, I don't know if they were -- it
10 says "the accounts," so I'm assuming they meant
11 all, but it looks like, you know, they could
12 have drawn the same distinction that the CME did
13 and just liquidate the proprietary business if
14 they were concerned.
15      Q.   They could have?
16      A.   Yes.
17      Q.   But that's not what they're indicating
18 in this paragraph, would you agree?
19      A.   That's not what it looks like the
20 counsel was stating.
21      Q.   If the Lehman Trustee believed that a
22 liquidation of the OCC accounts would result in
23 a depletion of all of the posted margin, would
24 it have been rational for the LBI Trustee to
25 agree to transfer those accounts to Barclays in

Page 108

D. McIsaac

1
2  exchange for the posted margin?
3       MR. OXFORD:  Objection to the form.
4       Assumes facts not in evidence.
5       A.   If they looked at it and I guess
6  assumed that they would lose whatever the number
7  was, let's say $2 billion, or transferred
8  something like $2 billion, yes, it would make, I
9  guess, sense to do it or, you know, if there was
10 a better good to be had by it, but I don't know
11 if that analysis was done.  You said it was a
12 very short time, so I'm not sure if they had
13 time to analyze that.
14      Q.   If you turn in your report to page 6,
15 you say in paragraph 18 that, "In addition to
16 the net asset value, I would expect a purchaser
17 to pay a premium based on the anticipated
18 earnings of the clearing business."  Do you see
19 that?
20      A.   Uh-huh.
21      Q.   Would you continue to have that
22 expectation in a circumstance in which there was
23 only one purchaser willing to acquire a
24 business?
25      A.   I would guess their negotiating powers

Page 109

D. McIsaac

1
2  would not be the same, but I would still expect
3  some payment for an ongoing business that was
4  going to reap benefits for the purchaser.
5  Certainly the purchaser would want to get it for
6  nothing.  I think the seller would want to get
7  some value for the assets they were selling.
8       Q.   But as you said, if the seller
9  believed that it wasn't going to get value in
10 the alternative, then it would have been
11 rational to sell it for nothing in order to
12 preserve the customer positions; is that right?
13      MR. OXFORD:  Object to the form.
14      A.   I don't think I said that.
15      I'm sorry, could you read back my -- I
16 don't think I said that.
17      Q.   Earlier I asked you the question:  "If
18 the Lehman Trustee believed that a liquidation
19 of the OCC accounts would result in a depletion
20 of all of the posted margin, would it have been
21 rational for the LBI Trustee to agree to
22 transfer those accounts to Barclays in exchange
23 for the posted margin?"  And you said, "If they
24 looked at it and I guess assumed that they would
25 lose whatever the number was, let's say $2

Contains Highly Confidential Portions

Page 110

D. McIsaac

1
2 billion, or transferred something like $2
3 billion, yes, it would make, I guess, sense to
4 do it or, you know, if there was a better good
5 to be had by it, but I don't know if that
6 analysis was done."
7     A.   Yes.
8     Q.   You also said, just for the sake of
9 completeness, you said it was a very short time
10 so I'm not sure if they had time to analyze
11 that.
12     A.   The Trustee in that case.
13     Q.   Yes.
14     A.   Yes.
15     Q.   So the question and answer that I just
16 asked you was, earlier I asked you the question,
17 if the Lehman Trustee believed that a
18 liquidation of the OCC accounts would result in
19 a depletion of all of the posted margin, would
20 it have been rational for the LBI Trustee to
21 agree to transfer those accounts to Barclays in
22 exchange for the posted margin, and you said
23 that if they looked at it and, I guess, assumed
24 that they would loose whatever the number was
25 and so on.

Page 111

D. McIsaac

1
2     A.   Right.
3         MR. OXFORD:  Hold on.  Hold on.  Is
4 there a question?  You just have been
5 reading from the record, Trish, which you're
6 free to do, but if you could ask Mr. McIsaac
7 a question, then he could answer it.  I
8 think that's the traditional way to go.
9     Q.   If the Lehman Trustee believed that a
10 liquidation of the OCC account would result in a
11 depletion of all of the posted margin, would it
12 have been rational for the LBI Trustee to agree
13 to transfer those accounts to Barclays in
14 exchange for that margin?
15         MR. OXFORD:  Objection.  Asked and
16 answered.
17         You can answer it again.
18     A.   I think I answered that question.  You
19 posed another question when you went back to
20 read that.
21     Q.   Unfortunately, I'm not able to find it
22 online.
23     A.   Okay.  That's the question you asked
24 that I didn't think was the same as that
25 question.

Page 112

D. McIsaac

1
2     Q.   Are acquirers, in your experience,
3 generally willing to pay a premium if they are
4 the only potential acquirer for a business and
5 they know that going into a negotiation?
6         MR. OXFORD:  Objection to the form.
7     A.   I haven't been in negotiations where
8 that would be the case, but you still would
9 expect to pay some value for getting value.  I
10 would think the seller would want some value.
11     Q.   But a premium is valued -- what do you
12 define a premium to mean?
13         MR. OXFORD:  Object to the form.
14     A.   In my experience, you bought
15 businesses and paid a premium based on how much
16 you believe that that business will earn for you
17 over the next few years, and then that's the
18 base price plus you pay the net asset value of
19 the business you're buying if you're just buying
20 bits and pieces of the business.
21         So you pay a premium based on you,
22 know, potential benefits to your firm.  I
23 believe in some of the pages I was reading
24 through here in the futures world, I think
25 people doing the due diligence believed that

Page 113

D. McIsaac

1
2 they would make $250 million in revenues over
3 the next year.  So there's a lot of value there,
4 so maybe they saw value where other people
5 didn't.
6     Q.   And would a reasonable -- would a
7 rational acquirer be willing to pay premium if
8 it believed paying a premium wasn't necessary to
9 close the deal?
10         MR. OXFORD:  Object to the form.
11     A.   I would assume they would try to get
12 value for nothing if they could.  So if you're
13 saying would they pay a premium if they didn't
14 have to, that would be negotiated and whether or
15 not the seller would be willing to sell it for
16 that price.
17     Q.   Can you turn to page 23 of your
18 report, please?  Actually, if you could start at
19 page 22.  I'd like to ask you some questions
20 about paragraphs 44 -- 54 and 55.
21         (Document review.)
22     A.   Okay.
23     Q.   In these two paragraphs you're talking
24 about the proprietary options positions that LBI
25 held in accounts at the OCC; is that right?

Contains Highly Confidential Portions

Page 114

1              D. McIsaac
2      A.    Yes.
3      Q.    At the end of paragraph 55, you say,
4   "Certainly a rational seller would not include
5   margin in a deal unless it was being compensated
6   dollar for dollar."  Do you see that?
7      A.    Uh-huh.
8      Q.    Can you explain what you mean by
9   "compensated dollar for dollar"?
10     A.    They were giving other assets and I
11  would assume they would be compensated for the
12  assets.  So if the value of the assets they were
13  giving was $100, I would expect them to be
14  compensated $100.
15          The deal was to buy the portfolio of
16  assets, not the margin that's posted to make
17  sure that the firm complies with its obligations
18  to the OCC.
19     Q.    So if there was, for example, a
20  billion dollars in the proprietary options
21  account posted as margin in the OCC, you
22  believe that it would have been irrational for
23  the Trustee to agree to transfer that account to
24  Barclays for anything less than that same
25  amount?

Page 115

1              D. McIsaac
2         MR. OXFORD:  Object to the form of the
3   question.
4      A.    I would expect the seller to look at
5   the portfolio of assets that they were selling
6   and to get the value for the portfolio of
7   assets.  So if they were selling long positions
8   and short positions, I would expect them to get
9   the net asset value for that, and if the buyer
10  wanted the margin that was posted in addition, I
11  would expect them to get the net asset value for
12  the margin.
13     Q.    Just so that I understand your
14  opinion, so if the positions in an account are
15  worth negative a billion dollars on net, and the
16  margin posted in an account were a billion
17  dollars, are you suggesting that it would have
18  been rational for the Trustee to transfer the
19  account with the margin because they were
20  offsetting positives and negatives?
21         MR. OXFORD:  Object to the form.
22  Misstates the witness's testimony.
23          You can answer again.
24     A.    I think what I said is there was a
25  portfolio of assets, and you would look at the

Page 116

1              D. McIsaac
2   net asset value of the portfolio of assets,
3   which was the long positions and the short
4   positions.  And I don't look at it just as the
5   options positions, I'd look at it as the whole
6   inventory positions that they were purchasing,
7   and they would pay value for what they were
8   buying.  If you were to include the posted
9   margin, I would expect to pay extra value for
10  that.
11     Q.    Dollar-for-dollar extra value?
12     A.    That's where I would start at least,
13  yes.
14     Q.    Would it be irrational to accept
15  anything less than dollar-for-dollar
16  compensation for the posted margin?
17         MR. OXFORD:  Object to the form.
18     A.    That would be at the point in time you
19  would negotiate what you want to sell it for.  I
20  would think it would be a negotiating point and
21  it would be expressed in the contracts what you
22  were buying and what you were receiving and how
23  much you were paying for it.
24     Q.    Would it be rational for LBI to
25  negotiate for compensation less than

Page 117

1              D. McIsaac
2   dollar-for-dollar compensation for the posted
3   margin?
4         MR. OXFORD:  Objection to the form.
5      A.    I don't think so, because if they were
6   getting net asset value, then you'd be almost
7   providing the downside protection for the
8   acquirer.
9      Q.    And the net asset value in the terms
10  of this transaction was what?
11         MR. OXFORD:  Object to the form.
12     A.    I believe there was 40 something
13  billion dollars of assets, less than that in a
14  repo liability that was assumed by Barclays, I
15  guess, and the long option value that I thought
16  was about $300 million.
17     Q.    So you are excluding from your
18  equation the negative value of the LBI affiliate
19  positions that were in the firm account at the
20  OCC?
21     A.    I believe they weren't buying the
22  affiliates business.  That's what I've seen.  So
23  I thought they were negotiating to buy LBI's
24  business and not the affiliates positions.
25     Q.    They were taking settlement

Contains Highly Confidential Portions

Page 118

D. McIsaac

1  D. McIsaac
2  responsibility for the affiliate positions as
3  well, you agree with that?
4      A.    From the TAA, yes.
5      Q.    Where do you think Barclays was going
6  to turn to recover the losses on the short
7  affiliate positions in that account?
8      MR. OXFORD:  Object to the form.
9      A.    I don't know where they would turn.
10  I'm not sure why they would have assumed them.
11      Q.    You saw that they assumed settlement
12  responsibility for all of the positions at the
13  OCC, correct?
14      A.    I see that they assumed it, yes.
15      Q.    Okay.  Would it have been rational for
16  Barclays to assume settlement responsibility for
17  those positions knowing that LBI was in SIPC
18  proceedings and would not be able to reimburse
19  it for the costs of liquidating those positions?
20      MR. OXFORD:  Object to the form.
21      A.    I think it would have been rational to
22  negotiate what you were doing with those
23  positions and, if you had to take over clearance
24  and settlement of them, negotiate how you were
25  going to be remunerated for that.

Page 119

1  D. McIsaac
2      Q.    Would it be rational for the Trustee
3  to agree to transfer the posted margin that
4  secured those positions in exchange for Barclays
5  taking on the exposure for those positions?
6      MR. OXFORD:  Objection to the form.
7      Asked and answered.
8      You can answer again.
9      A.    I don't think it would have been to
10  transfer $2 billion of margin to cover a
11  billion-dollar loss.  I don't think you would
12  transfer that much, no.
13      Q.    How about 1 billion, would that have
14  been rational for the Trustee to transfer?
15      A.    It might have been.
16      MR. OXFORD:  Object to the form.
17      THE WITNESS:  Sorry.
18      Q.    It might have been?
19      A.    It might have been.  At that point in
20  time, if they negotiated it and -- and, you
21  know, that's what the parties decided.
22      Q.    So it's not your opinion that it would
23  have been irrational under any circumstances for
24  Lehman or the LBI Trustee to transfer posted
25  margin to Barclays in exchange for taking

Page 120

1  D. McIsaac
2  settlement responsibility for the affiliate
3  positions; is that right?
4      MR. OXFORD:  Object to the form.
5      A.    I believe in my report I talked about
6  the proprietary positions.  If they're assuming
7  affiliate clearance and settlement of affiliates
8  positions, that would be something they should
9  negotiate.  You know, the parties there would
10  negotiate it and whatever they thought was valid
11  would be valid.
12      Would it be out of the realm to say,
13  yes, give me the market value of that?  No.
14      Q.    Would that be a rational resolution,
15  to give them the market value of that?
16      MR. OXFORD:  Object to the form.
17      A.    It would be rational to say this is
18  the cost of it, sure, or, you know, we'll
19  liquidate it, leave it in -- don't take those
20  positions, don't take that account.
21      I'm sure it could have been negotiated
22  with the OCC to transfer the customer accounts
23  separate from the proprietary accounts if that
24  was -- if that was everybody's desire.
25      Q.    If you could turn -- I'm showing you

Page 121

1  D. McIsaac
2  what has been marked as Exhibit 687.
3      (Exhibit 687, Trustee's Memorandum in
4  Further Support of His Motion for Relief
5  Pursuant to the Sale Orders or,
6  Alternatively, For Certain Limited Relief
7  under Rule 60(B) and in Opposition to the
8  Motion of Barclays Capital Inc. to Enforce
9  the Sale Orders and Secure Delivery of all
10  Undelivered Assets, marked for
11  identification, as of this date.)
12      Q.    If you could turn to page 60.  In
13  paragraph 136, the last two sentences, the
14  Trustee says in his brief, "For example, LBI
15  could have agreed to transfer to Barclays the
16  minimum margin assets that the OCC required to
17  secure LBI's liabilities to the OCC for LBI's
18  proprietary positions.  Such a transfer arguably
19  would have cost LBI little because, in any
20  event, LBI could not have withdrawn the minimum
21  margin assets required by the OCC to secure
22  LBI's open positions."  Do you see that?
23      A.    Yes, I do.
24      Q.    Do you agree with that statement?
25      A.    Can I read the whole two paragraphs?

Contains Highly Confidential Portions

Page 122

D. McIsaac

1
2      Q.   Uh-huh.
3           (Document review.)
4           MR. OXFORD:  Okay.  And Mr. McIsaac,
5      you should feel free, of course, not to just
6      read those paragraphs, but the whole of the
7      section to which Ms. Bloomer directs you.
8           (Document review continues.)
9      A.   Okay.  Now, I'm sorry, I've read it
10     now, so ...
11     Q.   Okay.  Directing you again to the last
12     two sentences of paragraph 136, do you agree
13     with the statement that, "LBI could have agreed
14     to transfer the minimum margin assets that OCC
15     required to secure all of the liabilities to the
16     OCC for LBI's proprietary positions"?
17     A.   In context, it says, for example, they
18     could have done it.  They have also said that it
19     could have been negotiated, so this was just one
20     example of things that could have occurred.
21     Q.   And in the next sentence, it says,
22     "Such a transfer arguably would have cost LBI
23     little because, in any event, LBI could not have
24     withdrawn the minimum margin assets required by
25     the OCC to secure LBI's open positions."  Do you

Page 123

D. McIsaac

1
2      see that?
3      A.   Yes.
4      Q.   Do you agree with that?
5      A.   In the context here, yes.
6      Q.   What do you mean in the context here?
7      A.   There's four paragraphs here
8      explaining things they could have been done if
9      it was negotiated.  All I've said all along is
10     this was something that should have been
11     negotiated and decided upon by the parties prior
12     to consummating the trade of the sale.
13     Q.   You said that the Trustee would have
14     been irrational to agree to transfer the posted
15     margin for anything less than dollar for dollar,
16     isn't that right?
17     A.   For the proprietary --
18          MR. OXFORD:  Object to the form.
19     Misstates the witness's testimony.
20          You can answer.
21     A.   I was talking about proprietary
22     assets.  I don't know if this was talking about
23     all the proprietary assets.  The proprietary
24     assets at the OCC, my understanding, were net
25     long positions.

Page 124

D. McIsaac

1
2      Q.   This says that the transfer would have
3      cost -- would arguably have cost LBI little
4      because LBI could not have withdrawn the minimum
5      margin assets required by the OCC to secure
6      LBI's open positions.
7           Could the Trustee have withdrawn the
8      minimum margin requirements required by the OCC
9      to secure the affiliate positions in the firm
10     account?
11     A.   No, I do not believe so.  Because
12     they're in the account, they could not withdraw
13     any of the minimum margin requirements.
14     Q.   Could LBI have withdrawn the minimum
15     margin assets required by the OCC to secure
16     LBI's customer accounts?
17          MR. OXFORD:  Object to the form.  Do
18     you have a specific timeframe in mind,
19     Trish?
20          MS. BLOOMER:  No, I don't.
21     A.   I don't think they could have
22     withdrawn any of the minimum margin requirements
23     at that point in time.
24     Q.   For the customer accounts either?
25     A.   For the customer accounts or the

Page 125

D. McIsaac

1
2      proprietary accounts.
3      Q.   Outside of the OCC, could LBI have
4      withdrawn the minimum margin assets required by
5      other clearing organizations or clearing brokers
6      to secure LBI's open positions?
7      A.   When you say "outside the OCC," what
8      are you referring to?  A little bit -- it's a
9      very broad statement outside --
10     Q.   Sure.  I'll give an example.  Your
11     understanding -- do you understand that LBI had
12     a customer account open at the CME at the time
13     the transaction closed?
14     A.   Yes.
15     Q.   Okay.  Could LBI have withdrawn the
16     minimum margin assets required by the CME to
17     secure LBI's customer accounts?
18     A.   No.
19          I'm sorry.
20          MR. OXFORD:  Sorry.  Withdrawn.
21     A.   No.
22     Q.   And at any other place where there
23     were open customer or proprietary accounts could
24     LBI have withdrawn the minimum margin assets
25     required to secure those open positions?

Contains Highly Confidential Portions

Page 126

D. McIsaac

1
2    A.   I don't believe they could have.
3    You're making it broad, so I don't want to make
4    a general statement, but my understanding, no,
5    they could not have.  But it didn't mean they
6    had to give them away either.
7        Q.   Okay.  The sentence says that "a
8    transfer arguably would have cost little because
9    LBI could not have withdrawn the minimum margin
10   assets required to secure the positions."
11       Would you agree that that same
12   sentence applies not just to proprietary, but to
13   any accounts for which LBI could not withdraw
14   the minimum margin assets required?
15       MR. OXFORD:  Object to the form.
16       You can answer.
17       A.   I would say the minimum margin
18   requirements as it relates to the exposure of
19   the positions would be transferred as long as
20   they were not -- did not get adequate protection
21   elsewhere.  So in the second part where they
22   talk about the customers' margin positions,
23   the -- Barclays in the transfer of the
24   customers' accounts I believe had adequate
25   protection against the customers fulfilling

Page 127

D. McIsaac

1
2    their obligations.  So, transferring those, they
3    already got the margin that was provided by the
4    customers to support that.
5        Q.   I'm showing you what has been marked
6    as Exhibit 659A.  If you could review the e-mail
7    and the first attachment to the e-mail.
8    Specifically, I would direct your attention to
9    the first full paragraph on page 2 of the
10   letter.
11       (Document review.)
12       A.   You said the first two paragraphs,
13   right?
14       Q.   I said the first full paragraph.
15       A.   I'm sorry, I read the first two, okay.
16       Q.   On page 2.
17       A.   Oh, on page 2.  Okay.  Sorry.
18       (Document review.)
19       A.   Yes, okay, I've read those paragraphs
20   that start "pursuant to."
21       Q.   Okay.  Now, in this paragraph
22   Barclays' counsel is writing to the CFTC about
23   the customer accounts that LBI is going to be
24   transferring.  Do you understand that reference
25   in the context of this letter to be referring to

Page 128

D. McIsaac

1
2    the futures customer accounts?
3        A.   Yes.
4        Q.   The second sentence of that paragraph
5    says, "Some of these accounts are accounts that
6    contain no open commodity positions and accounts
7    that are in deficit, within the meaning of
8    Regulations 190.06(e)(1)(iv) and (v)," and then
9    "17 C.F.R. Section 190.06(e)(1)(iv) and (v),
10   respectively."  Do you see that?
11       A.   Yes.
12       Q.   What do you understand this to mean
13   when it says that "some of these accounts are
14   accounts that are in deficit"?
15       A.   That would be accounts that had -- you
16   had a receivable from the customer that exceeded
17   any assets he had on deposit with you as the
18   firm.
19       Q.   Okay.  And you said in the answer to
20   the last question that Barclays had adequate
21   protection against the customers fulfilling
22   their obligations.  Were you assuming that the
23   customer margin accounts were not in deficit?
24       A.   Are we talking about in the futures
25   sense?

Page 129

D. McIsaac

1
2        Q.   Uh-huh.
3        A.   In the futures sense, even if you're
4    in deficit, the firm -- the FCM is required to
5    make up that deficit to protect all the
6    customers that are not in deficit.  So they
7    would have to lock up additional collateral.
8    They're responsible for all the customers that
9    they owe -- they have an obligation to where
10   they owe them money or owe them net equity to
11   cover them in their lockup.  The deficits -- the
12   customers or deficits, they would be required to
13   top them off in the second secured calculation.
14       Q.   The customers would be required to --
15       A.   No, the firm would be required to top
16   them off.
17       Q.   And if the firm was required to top
18   off any deficits, is it your understanding that
19   that would constitute customer property to which
20   Barclays was entitled under the terms of this
21   transaction even though it wasn't property
22   deposited by any customer?
23       MR. OXFORD:  Object to the form.
24       A.   The way the seg and secured
25   calculation works, you have a requirement on the

Contains Highly Confidential Portions

Page 130

D. McIsaac

1
2 top and you have where the assets are on the
3 bottom. The requirement would add back to your
4 requirement that deficit. So you'd be required
5 to lock up all moneys owed to all customers.
6    Q.   Including money that the customers had
7 not deposited?
8    A.   They would add it back.
9       MR. OXFORD:  Object to the form.
10    Q.   And when Barclays took over
11 responsibility for these accounts, did it
12 inherit those requirements?
13       MR. OXFORD:  I object to the form.
14    A.   Yes.
15    Q.   And if there were margin deficits in
16 the customer accounts, what protection did
17 Barclays receive in this transaction if it
18 didn't receive any of the LBI assets that were
19 held in those accounts, that were held in the
20 customer's segregated and secured accounts?
21       MR. OXFORD:  Object to the form.
22       Misstates his testimony.  Assumes facts not
23       in evidence.
24       THE WITNESS:  I'm sorry, can I answer
25       or --

Page 131

D. McIsaac

1
2       MR. OXFORD:  Yes.
3       THE WITNESS:  I'm sorry.
4          Two things could have happened:  They
5       could have decided not to take the customers
6       that were in deficit and had them
7       liquidated, liquidated them on the spot, and
8       they would have been topped up for that
9       potential loss by the firm making sure that
10       they covered the requirement which would
11       have been all the obligations to customers.
12    Q.   I'm sorry, can you -- what was the
13 second option?  You said two things could have
14 happened.  I don't understand your answer.  Can
15 you --
16    A.   They could have decided not to take
17 those customers.
18    Q.   Okay.
19    A.   Or, if they did take them, could have
20 liquidated their positions and closed them out.
21    Q.   If there was a margin deficit, were
22 they protected in the event of a liquidation to
23 the full extent of the exposure on the
24 positions?
25    A.   They would have --

Page 132

D. McIsaac

1
2       MR. OXFORD:  Object.  Object to the
3       form.
4    A.   Sorry.  They would have had some
5 minimal exposure from the time that the market
6 closed on one day to the market opened on the
7 next to liquidate the positions.
8    Q.   How do you know that the exposure is
9 minimal if you don't know the size of the margin
10 deficit?
11    A.   The positions are marked to market
12 every day.  You have protected all of the
13 clients who have -- that you owe money to.  You
14 have locked up -- all of that money has been
15 locked up.  Then you go and you would liquidate
16 those accounts.
17       Whatever the cost is, because it's
18 marked to market every day, you only have that
19 fraction of from the time the market closed to
20 the time the market opened and you were able to
21 liquidate to lose any money on the liquidation.
22 And you could make money on the liquidation.
23    Q.   But as the acquiring broker-dealer,
24 isn't it true that you're only, in your opinion,
25 under the structure of this transaction,

Page 133

D. McIsaac

1
2 entitled to the customer property that was held
3 by LBI to secure those customer positions?
4    A.   And that customer property is what it
5 would be locked up as assets pertaining to the
6 customer.  That's for the obligations of the
7 customer.  So you start out with your net
8 customer balances, you add back any deficits
9 that aren't fully secured, and that's your
10 obligations to your customers.  And that's what
11 they would get in a transfer.
12    Q.   Okay.  So they would get property in a
13 customer's seg and secured account that wasn't
14 necessarily a customer's property; is that
15 right?
16    A.   No, it would be the customer's
17 property.  The customers gave you $100.  You'll
18 return -- they -- you have to set aside that
19 $100 for the customers.
20    Q.   If the customer account is in a margin
21 deficit, does that mean you have a receivable as
22 opposed to actual cash in that account?
23    A.   Yes.  And but for the customers that
24 you owe moneys to, you have to lock up all of
25 that money.  So if a customer gives you $100 and

Contains Highly Confidential Portions

Page 134

D. McIsaac

1        D. McIsaac
2   another customer is in deficit for $50, you have
3   to lock up $100.  So you would be transferring
4   all the assets that belong to the customers.
5        You would then liquidate -- you would
6   also transfer whatever assets the customer's in
7   deficit because he may have securities -- he may
8   have a receivable of $20 and secured for $10.
9   You would have some security against it, but
10  your exposure is only between the time of
11  liquidation, from the close of the market to the
12  open of the market to liquidate that account.
13      Q.   And that size of that exposure would
14  depend on the quantity and size of the customer
15  positions as well as the market volatility; is
16  that right?
17      A.   It would depend on a lot of things.
18  It also may be a very good receivable because
19  maybe the customer went in deficit for a market
20  move and he'll make -- he'll meet his call
21  tomorrow morning.
22      Q.   If the customer positions were to, on
23  net, drop in value between the day of the
24  closing and the following day, is it fair to say
25  that Barclays was exposed to the full risk of

Page 135

1   the amount of drop in value and did not receive
2   protection against that risk from the customer
3   property that it received?
4        MR. OXFORD:  Object to the form.
5        Assumes facts not in evidence.
6      A.   Are we talking about just the customer
7   who's in deficit or are we talking about the
8   whole customer?
9      Q.   Any customer.
10     A.   No, there would be no difference for
11  the other customers because you have market
12  movement and you make market calls.  Customers
13  are required to meet their margin calls every
14  day.  Usually, a firm will have excess margin
15  there to cover themselves.  If they lose money,
16  they bring in money and you -- you use that
17  money to pay the exchanges.
18     Q.   And that assumes that the customers
19  are creditworthy and pay their margin calls; is
20  that right?
21     A.   That assumes that the customers meet
22  their margins calls.  If they don't meet their
23  margin call, you liquidate them.
24     Q.   Would you agree that credit risk is

Page 136

1        D. McIsaac
2   more substantial in a volatile market?
3        MR. OXFORD:  Object to the form.
4      A.   I think credit risk is dependent on
5   who your counterparties are.  I believe, from
6   what I saw in the due diligence done by the
7   Barclays people, that it was mainly
8   institutional customers that were in their
9   futures business.  Based on that, I would tend
10  to think that they would be viable
11  counterparties to meet their obligations.
12     Q.   Is credit risk greater in a recession
13  than it is in a -- under stable market
14  conditions?
15        MR. OXFORD:  Object to the form.
16     A.   The credit risk is dependent on the
17  customer and the positions they have.  They
18  could be betting that the market goes down and
19  making a ton of money.
20        So I don't know what the positions
21  that the customers had, in what markets they
22  were trading, and what effect that was happening
23  at September 19 that would have affected
24  individual customers' positions, you know, so
25  there was I don't believe a recession on

Page 137

1        D. McIsaac
2   September 19, but I don't know.
3      Q.   Do you -- did you base your opinion on
4   the understanding that there was not a recession
5   as of September 19, 2008?
6      A.   It doesn't matter to me if there was
7   or wasn't or if we were or were not in a
8   recession.  People pay their bills when they're
9   in a recession and when there's not a recession.
10  These are not individual customers, primarily.
11  These are institutions, from what I've
12  understood.
13     Q.   So it has no bearing on your opinion
14  that the country was in a recession -- if the
15  country were in fact in a recession at the time
16  this transaction was negotiated?
17     A.   It would matter what the customers had
18  and the positions they had and who the customers
19  were.
20     Q.   Would it matter at all to your
21  opinion, at all to your opinion, whether or not
22  there was a recession at the time that this deal
23  was negotiated in terms of assessing the risks
24  associated with the transaction?
25     A.   You assess the risk of the customers

Contains Highly Confidential Portions

Page 138

1                D. McIsaac
2    and the market environment at that point in time
3    and the customer's position. I don't know if a
4    recession has anything to do with the viability
5    of a futures customer paying their margin
6    requirements.
7        Q.   You just said you assess the risk of
8    the customers and the market environment at that
9    point in time. Are you agreeing that the market
10   environment at that point in time is relevant to
11   an assessment of the risks associated with a
12   transaction of the type that Barclays
13   consummated with Lehman Brothers in September of
14   2008?
15           MR. OXFORD: Object to the form.
16       A.   The market environment in relation to
17   the positions that the customers had on. If the
18   market's going down and the customers were
19   betting that the market is going to go down,
20   they're not a credit risk. So you have to
21   analyze the customers, the types of positions
22   they are, their familiarity with the market, and
23   your belief on where the market goes and whether
24   or not you have adequate collateral.
25       Q.   Okay. I'm going to try to ask the

Page 139

1                D. McIsaac
2    question one more time, and if you could just
3    answer the question that I'm asking.
4            Would it matter at all to your opinion
5    whether or not there was a recession at the time
6    that this deal was negotiated in terms of
7    assessing the risks associated with the
8    transaction? Would that matter to your opinion?
9            MR. OXFORD: Object to the form. It's
10   been asked and answered a number of times.
11           You can answer it again.
12       A.   I would not care if there was a
13   recession in analyzing individual customer's
14   ability to meet their obligations.
15       Q.   Thank you.
16           MR. OXFORD: Trish, if you can let me
17   know when you think it's a good time to
18   break for lunch? It's 1.
19           MS. BLOOMER: Just like five more
20   minutes, if that's okay with everyone.
21           MR. OXFORD: If it's okay with Mr.
22   McIsaac, it's okay with me.
23           MS. BLOOMER: Okay. Thanks.
24       Q.   Could you turn back in your expert
25   report to page -- oh, I'm sorry. Could you turn

Page 140

1                D. McIsaac
2    in the Trustee's brief, which was Exhibit --
3            MR. OXFORD: 687.
4        Q.   687.
5            MS. BLOOMER: Thanks, Neil.
6        Q.   To page 60.
7        A.   Page 60.
8        Q.   We were talking earlier about the
9    sentence in the Trustee's brief in which they
10   say that a transfer to Barclays of the minimum
11   margin assets required by the OCC to secure
12   LBI's open positions would arguably have cost
13   LBI little. Do you recall earlier discussing
14   that?
15       A.   Yes.
16       Q.   Are you aware that the margin
17   requirements at the OCC were shifting by $500
18   million a day during the week of September 15 on
19   multiple days?
20           MR. OXFORD: Objection to form.
21   Misstates --
22       A.   I believe --
23           MR. OXFORD: -- the record.
24       A.   Sorry.
25           I believe you showed me a document

Page 141

1                D. McIsaac
2    that showed it going up and then drastically
3    down on the 19th.
4        Q.   Perhaps we can look at that document.
5    I believe it was the declaration of Craig Jones.
6        A.   Right, Exhibit 1.
7        Q.   In Exhibit 1.
8            Do you recall that between the 15th
9    and the 16th the margin requirement went up by
10   over $500 million, do you see that?
11       A.   Yes, I do.
12       Q.   And then between the 17th and 18th --
13   well, between the 16th and the 17th it went up
14   another 45 million or so dollars, do you see
15   that?
16       A.   Uh-huh. Yes.
17       Q.   And then it goes up over $600 million
18   between the 17th and the 18th?
19       A.   Yes.
20       Q.   So between the 15th and the 18th, you
21   see that the margin requirement increased by
22   over $1.2 billion?
23       A.   Yes, I see that.
24       Q.   Okay. And then it dropped by
25   approximately $400 million on that last day of

Contains Highly Confidential Portions

Page 142

D. McIsaac

1  the week, do you see that?
2      A.   Yes.
3      Q.   Would it have been rational for the
4  Trustee, assuming he was aware of the swings in
5  the margin requirements, to believe that it
6  would have arguably cost LBI little to transfer
7  even more than the minimum margin assets given
8  the risk that those margin requirements could
9  increase dramatically over the following day
10  after the transaction?
11          MR. OXFORD:  Object to the form.
12      Assumes facts not in evidence.
13      A.   I believe you would have to assess
14  what your exposure was there, assess whether or
15  not the margin requirements might have been
16  inflated by the OCC for whatever reason, and
17  determine what your potential risk or what you
18  think the risk is and negotiate from there.
19      Q.   Regardless of whether the OCC's margin
20  requirements were inflated or what the reason
21  for them was, you agree that LBI couldn't
22  withdraw anything beyond -- anything that would
23  bring the posted margin below the minimum margin
24  assets required, right?

Page 143

D. McIsaac

1      A.   Correct.
2      Q.   And you see that the margin
3  requirements increased by $1.2 billion in a
4  matter of four days during the week of September
5  15, correct?
6      A.   I see that they increased and then
7  decreased.
8      Q.   Would it be rational for a seller, in
9  light of these margin requirement movements,
10  during the week of September 15, 2008, to
11  believe that there was a risk that the margin
12  requirements would increase again substantially
13  on September 22 and September 23?
14          MR. OXFORD:  Object to the form.
15      Assumes facts not in evidence.
16      A.   In light of triple-witching day, I
17  don't know if -- if LBI was putting on
18  additional positions during the week or the
19  positions that would close out on Friday would
20  have -- what impact they would have on the
21  margin requirement.
22          I can't answer a question of where I
23  think the margin requirement is going to go
24  without having any idea what the positions were

Page 144

D. McIsaac

1  and how they had them already covered.  Maybe
2  the margin requirement was on shorts that we had
3  long positions already sitting in the account
4  and they would have been covered.
5      Q.   Do you know how many positions were in
6  the proprietary accounts at the OCC?
7          MR. OXFORD:  Object to the form.  Do
8      you have a particular day?
9          MS. BLOOMER:  On the 19th of
10      September.
11      A.   I believe there were tens of thousands
12  of positions in there that date that included
13  the affiliates, subordinated affiliates
14  accounts.
15      Q.   So if a Trustee were to want to
16  assess -- or, if LBI, I apologize, were to want
17  to assess the impact that the expiration weekend
18  would have on the margin requirements, how long
19  would it take the LBI -- LBI to conduct that
20  analysis?
21          MR. OXFORD:  Object to the form.
22      A.   I would assume LBI, if their systems
23  were like any other systems on the street, would
24  have been able to analyze that fairly quickly.

Page 145

D. McIsaac

1  They -- they have risk systems that would
2  quantify this and they would know what their
3  exposure was as of close of business.
4          MS. BLOOMER:  I think this is probably
5      a good time to take our break for lunch.
6          MR. OXFORD:  Okay.  Thanks.
7          THE VIDEOGRAPHER:  The time is 1:05.
8      This is the tape labeled number 3.  We're
9      going off the record.
10          (Luncheon recess.)

Contains Highly Confidential Portions

---

Page 146

```
 1              D. McIsaac
 2          AFTERNOON SESSION
 3   DANIEL McISAAC, resumed and
 4      testified further as follows:
 5          THE VIDEOGRAPHER:  This is the start
 6      of tape labeled number 4.  The time is 2:05.
 7      We're back on the record.
 8   EXAMINATION BY (Cont'd.)
 9   MS. BLOOMER:
10      Q.   Good afternoon.
11      A.   Good afternoon.
12      Q.   I'm showing you a document that's been
13   marked as Exhibit 648.  This is a declaration
14   that was submitted by Eric Clark.  Are you
15   familiar with this declaration?
16      A.   I believe I've seen it, yes.
17      Q.   And did you see it preparing for your
18   deposition today?
19      A.   I think I might have seen it, but I
20   don't recall if it was in preparing or not.  But
21   I know I've seen the declaration.
22      Q.   Do you believe you saw it -- do you
23   believe you saw it prior to when you submitted
24   your expert report?
25      A.   Yes.
```

---

Page 147

```
 1              D. McIsaac
 2      Q.   On exchange-traded derivatives issues?
 3      A.   Yes.
 4      Q.   Yes?
 5      A.   Yes.
 6      Q.   If you could turn to the second page,
 7   paragraph 6, and review that and let me know
 8   when you've had a chance to look at it.
 9          (Document review.)
10      A.   Yes.
11      Q.   Okay.  In this paragraph, Mr. Clark
12   says that the OCC options were not immediately
13   brought onto Barclays' systems, as the systems
14   were not capable of incorporating the LBI OCC
15   options.  Do you see that?
16      A.   Yes.
17      Q.   Do you have any reason to doubt the
18   accuracy of that statement?
19      A.   No, I do not.
20      Q.   In the next sentence he says, "The
21   delay in moving the options on the Barclays'
22   systems created difficulties for Barclays' Risk
23   Management Team in terms of their ability to
24   manage the risk associated with these positions
25   effectively during the interim period."
```

---

Page 148

```
 1              D. McIsaac
 2      Do you see that?
 3      A.   Yes.
 4      Q.   Do you have any reason to doubt the
 5   accuracy of that statement?
 6      A.   No, I do not.
 7      Q.   Have you seen anything in the record
 8   that suggests that Barclays did have the ability
 9   to manage the risk associated with these
10   positions prior to the time it was able to
11   incorporate them onto its system?
12          MR. OXFORD:  Object to the form.
13      A.   I believe I did see something where
14   they were trying to risk-manage the positions
15   for a period of time and then turned them back
16   to the Lehman traders to manage the risk.
17      Q.   Okay.  And do you believe that what
18   you saw led you to conclude that that risk
19   management during that period of time was
20   effective?
21          MR. OXFORD:  Object to the form.
22      A.   I don't know if I saw enough within
23   that to determine if it was totally effective.
24      Q.   What would you consider to be an
25   effective hedge program in terms of the
```

---

Page 149

```
 1              D. McIsaac
 2   relationship between losses on underlying
 3   positions, for example, and gains onto hedge
 4   positions?
 5          MR. OXFORD:  Object to the form.
 6      A.   I would assume, having them roll up
 7   into a system, that you would be able to monitor
 8   both sides of the positions, be able to monitor
 9   the options as well as the equity into one
10   straight -- one flow-through system, for lack of
11   better words.
12      Q.   If Barclays were attempting to hedge a
13   set of options positions, and those options
14   positions lost $500 million in value over a
15   discrete period of time, would you consider an
16   effective hedge if the hedge positions that
17   Barclays placed only gained $150 million during
18   that same time?
19      A.   I don't know if their objective was to
20   fully hedge the position.  Most trading books do
21   not fully hedge because then there would be no
22   gain or loss unless you were just trying to play
23   the -- the gain or loss when you put on the
24   contract.  So most traders don't fully hedge
25   their positions.
```

---

Contains Highly Confidential Portions

Page 150

D. McIsaac

1
2     But I don't know if that was
3     effective.  Their goal might have been to only
4     hedge a portion of it.
5         Q.    Assuming their goal was to fully hedge
6     the position, would you agree that a hedge that
7     only gained $150 million against underlying that
8     lost $500 million was an ineffective hedge?
9         MR. OXFORD:  Object to the form.
10    Assumes facts not in evidence.
11        A.    If you were trying to hedge the entire
12    portfolio and you put on hedges that didn't
13    replicate it, that would have been an
14    ineffective hedge.
15        Q.    If you would turn in your report to
16    page 3 -- I'm sorry, page 4, sub-bullet 3 at the
17    top of the page.  It says there that, "Any
18    ongoing market risk associated with the
19    proprietary exchange-traded derivatives that
20    Barclays acquired could be and was mitigated by
21    Barclays by hedging these positions."  Do you
22    see that?
23        A.    Yes.
24        Q.    And then if you turn to page 7,
25    paragraph 22, you say, "I would assume that the

Page 151

D. McIsaac

1
2     purchaser would have anticipated that the short
3     exchange-traded derivatives positions would be
4     hedged by certain long equity positions in LBI's
5     total portfolio."  Do you see that?
6         A.    Yes.
7         Q.    Are you familiar with the various
8     trading strategies that a broker-dealer could
9     undertake for a proprietary portfolio?
10        MR. OXFORD:  Object to the form.
11        A.    Somewhat, yes, sure.
12        Q.    Are long equity positions the only
13    positions that would interact with
14    exchange-traded derivatives positions in terms
15    of the full portfolio?
16        MR. OXFORD:  I'll object to the form
17    of the question.
18        A.    Yes, I'm not sure really what the
19    question is.  I'm not sure what you're --
20        Q.    Is it possible that short
21    exchange-traded derivatives positions would be
22    hedged by anything other than long equity
23    positions in a broker-dealer's portfolio?
24        A.    Yes.
25        Q.    Can you give me an example?

Page 152

D. McIsaac

1
2         A.    A short put might be hedged by a short
3     position in a portfolio.  A short option could
4     be hedged by a long option.  An index could
5     hedge a portfolio of a basket of other options.
6         Q.    And could over-the-counter positions
7     also be used to hedge exchange-traded
8     derivatives positions?
9         A.    I would tend to think normal course
10    would be to use exchange-traded derivatives to
11    hedge over-the-counter derivatives.
12        Q.    Okay.  And if you were to have
13    purchased an exchange-traded derivatives
14    position in order to hedge an over-the-counter
15    position, would the acquirer of the
16    exchange-traded derivatives position be
17    considered to have a naked position in the event
18    it didn't also acquire the corresponding
19    over-the-counter derivative?
20        MR. OXFORD:  Object to the form.
21        A.    I think if the question you're asking
22    is if there was an over-the -- exchange-traded
23    option hedging an over-the-counter position,
24    that if you didn't assume the over-the-counter
25    position, would that single exchange-traded

Page 153

D. McIsaac

1
2     option be naked?  Unless you had something else
3     in your portfolio that was hedging it or could
4     be considered a hedge to it, yes.
5         Q.    Is it your understanding that Barclays
6     was acquiring the over-the-counter derivatives
7     of LBI in the September 2008 transaction?
8         A.    I do not believe they were.
9         Q.    Is it fair to say, then, that Barclays
10    would have been reasonable in assuming that
11    there may be unhedged exchange-traded
12    derivatives positions in the portfolio it was
13    acquiring?
14        MR. OXFORD:  Object to the form of the
15    question.  Assumes facts not in evidence.
16        A.    I don't know if there were
17    over-the-counter derivatives in the -- in LBI's
18    portfolio, nor do I know if they hedged them
19    with exchange-traded derivatives.  The --
20        Q.    Is it possible that they did?
21        MR. OXFORD:  Object to the form.
22        A.    Yes, it's possible that could have
23    happened.
24        Q.    And if that was the case, would that
25    position then not be fully hedged if you were

Contains Highly Confidential Portions

Page 154

D. McIsaac

1
2 taking the exchange-traded portfolio and not the
3 over-the-counter portfolio?
4        MR. OXFORD:  Object to the form.
5    Asked and answered.
6        You can answer again.
7    A.   Unless there was another security or
8 another transaction out there that that was
9 hedging.
10   Q.   Okay.  My question assumes that the
11 position is hedging the over-the-counter
12 position.  Do you understand?
13   A.   Yes, but there could be another
14 position that that would also act as a hedge
15 for.
16   Q.   Do you -- does a broker-dealer
17 typically put duplicative hedges on its
18 portfolio?
19   A.   No.  What I meant is they could be
20 hedging this transaction.  You take that
21 transaction off, it may be now a hedge for a
22 different security out there.  All I'm saying
23 is, in the realm things, it could be hedging
24 another exposure.
25   Q.   Is it fair to say that you wouldn't

Page 155

D. McIsaac

1
2 assume as an acquirer that you were getting a
3 fully hedged portfolio if you were taking
4 exchange-traded derivatives and not
5 over-the-counter derivatives?
6        MR. OXFORD:  Object to the form.  That
7    assumes facts not in evidence.
8    A.   I wouldn't assume anything.  I would
9 inquire as to what I was purchasing and what the
10 various books were, and if I had exchange-traded
11 derivatives hedging an, you know, an
12 over-the-counter derivative book, I would assume
13 I'd find that out before I decided to buy the
14 unhedged exchange-traded derivatives.
15   Q.   Okay.  When you're -- if you were
16 considering an acquisition of tens of thousands
17 of exchange-traded derivatives positions, how
18 would you go about determining whether or not
19 those positions were hedged in full or in part
20 by over-the-counter derivatives or vice-versa?
21   A.   I guess I'd ask the people who were
22 managing the over-the-counter derivative book if
23 they had exchange-traded derivatives in their
24 portfolio.
25   Q.   And if the answer was yes, what would

Page 156

D. McIsaac

1
2 you do in order to determine the extent of the
3 naked exposure on those exchange-traded
4 derivatives in the event you weren't acquiring
5 the over-the-counter derivatives?
6        MR. OXFORD:  Object to the form.
7    Assumes facts not in evidence.
8        You can answer.
9    A.   I would ask them what their portfolio
10 of exchange-traded derivatives was that was
11 hedging it, specific portfolio.
12   Q.   And would that require you to obtain
13 information not only about the positions that
14 were open in an exchange-traded derivatives
15 account, but also the relationship between those
16 positions and any over-the-counter positions?
17   A.   No, I would just ask for a list of the
18 exchange-traded derivatives in his trading
19 portfolio book.
20   Q.   And what would you do with that list?
21   A.   I would, I guess, determine if I want
22 to buy those assets without the
23 over-the-counters positions that they may or may
24 not be hedging.
25   Q.   Would you also try to determine at the

Page 157

D. McIsaac

1
2 same time whether there were equities positions
3 that were hedging those positions?
4        MR. OXFORD:  Object to the form.
5    Which positions are you talking about?
6    Q.   The exchange-traded derivatives
7 positions that you were -- would be acquiring?
8        MR. OXFORD:  Okay.  Same objection.
9        You can answer.
10   A.   I thought we started this by saying if
11 we had exchange-traded derivatives hedging an
12 over-the-counter book, well, how would I
13 determine that?  And I think I said I would talk
14 to the people managing that book.  I would
15 assume, and maybe that's a bad thing, I would
16 probably ask them also what other positions do
17 they have that's exchange-traded that is in the
18 portfolio that I might be acquiring.
19   Q.   Okay.  And you would want to analyze
20 the relationships between the exchange-traded
21 derivatives, the over-the-counter derivatives,
22 and the other long and short positions in the
23 portfolio that you were acquiring in order to
24 understand the relationships between the various
25 trades, is that fair?

Contains Highly Confidential Portions

Page 158

D. McIsaac

1
2     MR. OXFORD: Object to the form.
3     A.   If I was not obtaining the
4  over-the-counter derivatives and had no reason
5  to know about them, I would try to assess the
6  exchange-traded derivatives and the equity
7  positions on the risk that it was -- that it
8  would give me perhaps to take over those
9  positions.  I don't care what they did with the
10  over-the-counter if I'm not assuming that.
11     Q.   Do you care what they did with the
12  over-the-counter if the over-the-counter
13  derivatives were related to the exchange-traded
14  derivatives or the fixed equity positions that
15  you were acquiring in terms of a hedge
16  relationship?
17     MR. OXFORD: Object to the form.
18     A.   Again, if I'm not acquiring the
19  over-the-counter, why would I care their
20  relationship to the exchange-traded that I was
21  acquiring?  I wouldn't care if it was a good
22  hedge or not because I wasn't acquiring the
23  over-the-counter.
24     Unless you're saying that I, in the
25  realm of possibility, I may decide to take over

Page 159

D. McIsaac

1
2  the over-the-counter positions.
3     Q.   Would you care if it was naked hedge
4  that you were acquiring, a naked position -- I'm
5  sorry.
6     Would you care if it was a naked
7  position that you were acquiring because you
8  weren't getting the over-the-counter position?
9     MR. OXFORD: Object to the form.
10     A.   I would analyze that just as any other
11  position I was acquiring I would analyze.
12     Q.   You say on the top of page 8 in your
13  expert report that, "Mr. Leitner appears to
14  assume that Barclays was, at least at the start
15  of the week, purchasing a book of business that
16  was at least partly hedged."
17     Is it your understanding that Barclays
18  was acquiring a book of business that was partly
19  hedged or that was fully hedged as of the
20  beginning of the week?
21     A.   I don't know if I have an
22  understanding one way or the other.  I don't
23  think anybody's business would be fully hedged,
24  because if you're fully hedged, then you don't
25  make money.  So you would determine what hedges

Page 160

D. McIsaac

1
2  you wanted based on the risk that you wanted in
3  that book and where you thought your rewards
4  were.  You wouldn't, for every long position,
5  have a corresponding short because then you
6  wouldn't make any money.
7     Q.   Would you be qualified to do that
8  assessment yourself if you were advising on a
9  transaction of the type that Lehman and Barclays
10  entered into in September of 2008?
11     MR. OXFORD: Object to the form.  I'm
12  not sure it's clear what assessment you're
13  asking about.
14     MS. BLOOMER:  He can ask me to clarify
15  if he needs me to clarify, Neil.
16     A.   I don't know, when you say "assess,"
17  what you mean by it.
18     Q.   You said you wouldn't for every long
19  position have a corresponding short because you
20  wouldn't make any money.  You said you would
21  determine what hedges you wanted based on the
22  risk that you wanted in that book and where you
23  thought your rewards were.
24     Were you qualified -- are you
25  qualified, do you consider yourself qualified to

Page 161

D. McIsaac

1
2  make those types of assessments in the
3  connection with a transaction of this type?
4     MR. OXFORD: Objection to the form.
5     A.   What I was referring there is the
6  trader who's trading that book would make that
7  assessment.  Firms have various people that
8  monitor what the traders are doing and there are
9  different risk managers that look at different
10  risk.
11     If you're asking me if I was long IBM
12  and short a call on AT&T, could I assess the
13  total risk on that, I would know that I have
14  exposure on two sides and I'm not hedged.  Could
15  I tell you how much I could lose on each?  No,
16  but firms will have systems that do that.
17     Lehman certainly had a system that did
18  that because they were on -- they were a CSE
19  firm so they certainly had value at risk and
20  they did -- they did analysis of what their
21  gains and losses were, and I'm -- what their
22  gains and losses could be based on the value at
23  risk, and I'm assuming that they had the
24  wherewithal to determine that.
25     Q.   Do you have knowledge of how the

Contains Highly Confidential Portions

Page 162

D. McIsaac

1    process of assessing this risk and determining
2    what positions you are taking over would consist
3    of?
4         MR. OXFORD:  Object to the form.
5        A.   Again, you normally have a
6    businessperson determine what risk appetite he
7    had for his business and determine if the book
8    of business that they were selling he wished to
9    buy and it fit into his risk model.
10        Q.   Do you know how long it would take
11   that person to do an analysis of the risk
12   profile of a portfolio of exchange-traded
13   derivatives and equities positions the size that
14   Barclays was acquiring in September of 2008?
15        A.   I do not know how long it would take,
16   but I would assume that the systems already in
17   place at LBI would have spit that information
18   out.
19        Q.   You think that you could hit a button
20   and print that information out; is that your
21   testimony?
22        MR. OXFORD:  Object to the form.
23        Mischaracterizes the witness's testimony.
24        You can answer.

Page 163

D. McIsaac

1        A.   I believe Lehman had systems that
2    provided them with value at risk on a daily
3    basis.
4        Q.   And do those systems that provide
5    value at risk on a daily basis tell you which
6    positions are hedging which positions so that if
7    you're not taking all of the positions, you know
8    what's at risk?
9         MR. OXFORD:  Objection to the form.
10        A.   I don't believe it will earmark every
11   naked position that's in the portfolio.  It will
12   tell you the portfolio and what the anticipated
13   market movement could be in that portfolio.
14        Q.   And if there are multiple portfolios,
15   and you're not taking all of them, would you
16   agree that it's not as simple as pressing a
17   button in order to determine the risk profile of
18   the portfolio that you're taking over?
19        MR. OXFORD:  Object to the form.
20        Mischaracterizes the witness's testimony.
21        MS. BLOOMER:  I'm asking him a
22        question.  I'm not characterizing anything.
23        A.   I would believe that the systems would
24   enable the management of Lehman to assess the

Page 164

D. McIsaac

1    risk at various levels, possibly down to the
2    individual trader, but at a minimum probably
3    down to the individual desk.
4        Q.   Was it -- maybe I misunderstood your
5    testimony.  Was it your testimony that the
6    systems wouldn't have information other than the
7    aggregate risk of a particular portfolio?  So,
8    in other words, wasn't it your testimony that
9    the system wouldn't generate information that
10   would tell you which positions are hedged by
11   which other positions?
12        A.   I believe what I said, and if I said
13   that, it's not what I meant to say, the system
14   would analyze your risk on a portfolio basis.
15   It may not at a top level spit out this position
16   is not hedged.  In the makeup of the risk
17   matrix, it would give you information that you
18   need to see.
19        Q.   What do you mean when you say "on a
20   portfolio basis"?
21        A.   Well, on a trader level, on a desk
22   level, whatever the firm prescribes to be a
23   portfolio.
24        Q.   And could any one portfolio include

Page 165

D. McIsaac

1    both exchange-traded positions and
2    over-the-counter positions?
3        A.   Sure.
4        Q.   And if the system were to spit out a
5    report that showed the risk profile of a
6    portfolio that contained both exchange-traded
7    and over-the-counter derivatives, would that
8    report tell you which of those positions were
9    going to be naked in the event that the
10   over-the-counter derivatives were not to be
11   transferred with the exchange-traded positions?
12        A.   There would probably be reports in the
13   system that would indicate all the individual
14   securities that are in that system.  It may not
15   assess them separately as to the risk of that
16   one position that's hedged because it may be
17   looking to hedge on the total desk position, but
18   you would have the analysis of what was owned
19   and what the exposure was on that security.
20        Q.   Do you know that or you -- you said
21   "probably."  I would like to confirm.  Do you
22   know that or not?
23        A.   I would assume most risk systems would
24   have that information.  I did not look at

Contains Highly Confidential Portions

---

Page 166

D. McIsaac

1  Lehman's system and I can't determine whether or
2  not they did, but I'm assuming that during the
3  due diligence somebody would have looked at
4  that.
5  Q.   During what due diligence?
6  A.   Barclays' due diligence.
7  Q.   And how long did Barclays have to do
8  that due diligence?
9        MR. OXFORD:  Object to the form.
10  Asked and answered.
11       You can answer again.
12  A.   I don't know how long Barclays had to
13  do the due diligence.  I assume they had enough
14  time to do it or else they would not have
15  entered into the transaction.
16       Somebody, I'm assuming, made an
17  assessment of the risk of what they were buying
18  and determining whether or not it fit into what
19  they were looking for and they could afford to
20  take on that risk.
21  Q.   Could it be that they agreed to take
22  on the risk because they believed they were
23  getting protection of the posted margin at the
24  clearing corporations, is that possible?

---

Page 167

D. McIsaac

1        MR. OXFORD:  Object to the form.
2  A.   I can't go into what they thought they
3  were getting and weren't getting.  I cannot tell
4  you what is in their mind and what they were
5  getting and what they weren't getting.
6  Q.   Is it possible that the reason they
7  agreed to take on these positions was not
8  necessarily because they had the time to do all
9  of the due diligence, but because they believed
10  they were getting posted margin as protection
11  against some portion of those risks?
12        MR. OXFORD:  Objection to the form.
13  Q.   Is that possible?
14  A.   Which positions?  We've talked about
15  the portfolio.  We've talked about cash
16  positions and exchange-traded derivatives.
17       What positions are we looking for
18  margin to protect?
19  Q.   Is it possible that Barclays agreed to
20  take over Lehman's exchange-traded derivatives
21  portfolio because it believed that it was
22  getting the margin that was posted to secure
23  those positions as protection against any risk
24  that may exist due to the fact that those

---

Page 168

D. McIsaac

1  positions may or may not be naked exposures?
2        MR. OXFORD:  Objection.  Asked and
3  answered.
4  A.   I don't know if I could assess what
5  was in their mind on negotiating the deal and
6  what they thought they were getting and weren't
7  getting.
8  Q.   I'm asking you if it's possible that
9  that's the reason that they agreed to go forward
10  with the transaction --
11  A.   It is possible --
12  Q.   -- despite having not done the due
13  diligence that they requested.
14  A.   It is possible that that was in their
15  mind and they thought of that, yes.
16  Q.   Okay.  In your review of the evidence
17  in this case, did you see any indication that
18  Barclays was arranging to post margin to the OCC
19  or the various other clearing brokers and
20  clearing organizations such that the margin
21  requirements come Monday, September 22, would be
22  satisfied in order to avoid a liquidation?
23  A.   I didn't see anything to the effect
24  that they were preparing to do that, but I

---

Page 169

D. McIsaac

1  haven't reviewed all the documents that Barclays
2  has in their possession as to the transaction.
3  Q.   If you were advising a company who was
4  acquiring an exchange-traded derivatives
5  portfolio, and you knew the closing was going to
6  take place in a matter of days, would you be
7  advising that company to start making
8  arrangements to post the collateral if you
9  didn't believe you were getting the collateral
10  that had already been posted by the selling
11  entity?
12  A.   Where would I advise them to post the
13  collateral if they didn't buy anything as yet?
14  I'm not sure what the question is.  How would I
15  advise them to post collateral?  Post collateral
16  where?
17  Q.   To arrange.  Would you advise them to
18  start arranging to post that collateral if you
19  believed you weren't going to be getting the
20  collateral that was already posted by the
21  selling entity?
22  A.   How much time would I -- I don't think
23  they would need a lot of time to arrange for
24  collateral to post if they were a broker-dealer.

---

Contains Highly Confidential Portions

Page 170

1            D. McIsaac
2    They had plenty of collateral that could have
3    been posted if they needed to.
4        Q.    Are you aware of how many different
5    clearing organizations and clearing brokers LBI
6    traded in exchange-traded derivatives through?
7        A.    I believe they traded through the OCC,
8    the CME in the U.S.  I believe they cleared
9    through other brokers for some of the other
10   foreign businesses.  I don't know what
11   arrangements Barclays had with those entities
12   already.
13       Q.    What is the typical practice of a
14   clearing organization at the open of business on
15   a given day if collateral is not posted
16   sufficient to satisfy the margin requirements?
17           MR. OXFORD:  Objection.  Form.
18       A.    I'm not sure what the question --
19   could you sort of rephrase it so I understand
20   what the question is?
21       Q.    Sure.  If the OCC woke up on Monday
22   morning and realized that there was no
23   collateral posted in the OCC accounts that were
24   held on behalf of LBI, what would the OCC have
25   done?

Page 171

1            D. McIsaac
2        A.    Well, I don't know how that could
3    happen because I don't know how the collateral
4    could come out.  So I assume when they were
5    taking over the positions, however they decided
6    to move those positions into their
7    infrastructure into their position, that they
8    would make arrangements with the OCC to have the
9    adequate collateral there.
10           Sometimes you may transfer the
11   collateral that's in the accounts already and
12   then pay it back to the -- to the seller just as
13   a means to do it efficiently.
14       Q.    And if you were advising an entity, a
15   seller, to enter into that type of an
16   arrangement, would you have something written
17   into an agreement somewhere to provide for a
18   true-up of that money?
19       A.    I would have something that explained
20   what I was purchasing, and if I wasn't
21   purchasing those assets, I might have something
22   in there saying I'll return them or else.  If
23   I'm not paying for them, I'd be obliged to
24   return them.  I've done a deal before, we have
25   moved those assets over and then paid them back

Page 172

1            D. McIsaac
2    the next day.  It was just the ease of moving it
3    into the -- into the process of moving the
4    exchange-traded derivatives over.
5        Q.    Would it be prudent as an advisor to a
6    seller in that circumstance to have a
7    documentation of the agreement that you would be
8    getting back billions of dollars in collateral?
9            MR. OXFORD:  Objection to the form.
10   Assumes facts not in evidence.
11           You can answer.
12       A.    I would assume that as well as what
13   you were purchasing would be in the agreement.
14       Q.    I'm showing you what has been marked
15   as Exhibit 51.  Oh, you already have a document
16   that's Exhibit 51.
17           If you look at paragraph 1(a), it says
18   here, "For good and valuable consideration, the
19   receipt and sufficiency of which are hereby
20   acknowledged, Lehman hereby sells, assigns,
21   transfers and sets over to Barclays, without
22   recourse or without representation or warranty,
23   all of Lehman's rights, title, interests,
24   powers, privileges, remedies, obligations, and
25   duties in, to, under, and in respect of the

Page 173

1            D. McIsaac
2    Account, as of the Effective Date including with
3    respect to (i) the Clearing Fund deposit; (ii)
4    all margin deposits held by OCC with respect to
5    the account; (iii) all settlement obligations
6    with regard to transactions in cleared accounts;
7    and (iv) all rights and obligations in respect
8    of exercises of options contracts and
9    assignments of such exercises."
10           Do you see that?
11       A.    Yes.
12       Q.    Do you agree that under this agreement
13   the Trustee agreed -- authorized Lehman's sale
14   of Lehman's rights in the margin deposits that
15   were held at the OCC without recourse or
16   representation of warranty?
17           MR. OXFORD:  I'll object to the form
18   of the question.  Calls for a legal
19   conclusion.
20       A.    I don't think -- I'm not a lawyer, so
21   I don't want to talk about it, but I don't think
22   this is selling -- this is the sale agreement.
23   This is an agreement just to transfer at the
24   OCC, and I assume when they say hereby
25   acknowledge for, you know, sufficiency, without

Contains Highly Confidential Portions

Page 174

1          D. McIsaac
2  recourse, representation, whatever has happened,
3  is in another agreement. This is not the
4  binding sale agreement, I don't think.
5      Q.   This is a binding agreement, you
6  realize that, right?
7          MR. OXFORD: Objection to form. Calls
8      for a legal conclusion.
9      A.   I think what I said is this is not a
10 sale agreement.
11     Q.   Do you think that it's -- do you think
12 that the language of this provision that we just
13 looked at together suggests that Lehman was
14 going to transfer the margin deposits held by
15 the OCC to Barclays? Is that what you
16 understand this language to mean?
17     A.   Yes.
18         MR. OXFORD: Objection to form.
19     Q.   Do you think that -- do you think that
20 that language is clear or do you think it's
21 ambiguous in some way?
22         MR. OXFORD: Objection to form.
23     A.   I think the language is clear as far
24 as the OCC goes as to what is happening with the
25 assets at the OCC.

Page 175

1          D. McIsaac
2      Q.   Okay.
3      A.   It is not determining what
4  compensation was paid or how the arrangements
5  were made. All this is between two
6  counterparties who are at the clearing org.
7  transferring their obligations from one to
8  another.
9      Q.   So you assume that the sale agreement,
10 for example, that was approved by the court
11 suggests that the posted margin would be
12 transferred and then this agreement would make
13 sense to you; is that what you're saying?
14         MR. OXFORD: Objection to form.
15     Misstates the witness's testimony.
16         You can answer.
17     A.   I think the sale agreement would
18 denote what was being paid for the assets, not
19 how they were being transferred.
20     Q.   And this would denote how it's being
21 transferred?
22         MR. OXFORD: Objection. Form.
23     A.   This would denote the authority for
24 OCC to transfer it. You have a sale agreement
25 and you may have another agreement on how you're

Page 176

1          D. McIsaac
2  going to effectually move moneys back and forth.
3  Usually you convert, do a conversion, and you'll
4  have some documents that talk about how you're
5  going to do that.
6      Q.   But the fact that it was going to be
7  transferred, that is denoted in the TAA; is that
8  right?
9          MR. OXFORD: Objection. Form.
10     A.   This is a vehicle to move the Lehman
11 option boxes at OCC into Barclays' name.
12     Q.   And that would include the margin
13 deposits?
14     A.   I believe it includes everything
15 that's denoted here, which is the margin
16 deposits is part of it.
17     Q.   Okay. What do you understand "without
18 recourse" to mean?
19         MR. OXFORD: Objection. Form. Calls
20     for a legal conclusion.
21         You can answer.
22     A.   I'm not sure what it means in this
23 case.
24     Q.   What do you generally understand the
25 term "without recourse" to mean?

Page 177

1          D. McIsaac
2      A.   I would guess there's no recourse to
3  the OCC if something went wrong.
4      Q.   You don't think it may mean without
5  recourse to Barclays for any of the money that
6  Lehman is transferring to Barclays?
7          MR. OXFORD: Objection. Form. Asked
8      and answered. Calls for a legal conclusion.
9          You can answer again.
10     A.   As I said, I think this means recourse
11 to the OCC.
12     Q.   Is it possible that it means without
13 recourse to anyone?
14         MR. OXFORD: Objection. Calls for a
15     legal conclusion.
16     A.   It's a legal document. I'll let the
17 lawyers decide.
18     Q.   Okay. I'd like to go back in your
19 report to page 23 again where you say that "a
20 rational seller would not include margin in the
21 deal unless it was being compensated dollar for
22 dollar," do you see that?
23     A.   Could you point out what paragraph?
24 I'm sorry.
25     Q.   Page 23 at the last --

Contains Highly Confidential Portions

Page 178

D. McIsaac

1
2    A.   Got it.  Sorry.
3    Q.   You see that language?
4    A.   Uh-huh.
5    Q.   I'm handing you -- I'm going to mark
6  it as an exhibit -- Exhibit 688.
7         (Exhibit 688, Deposition of Bart
8    McDade, marked for identification, as of
9    this date.)
10   Q.   If you could turn with me to page 275.
11  This is testimony of Bart McDade.  Are you
12  familiar with that name?  Do you know who he is?
13   A.   I believe he might have been the
14  president at Lehman Brothers, Inc.
15   Q.   Is it your understanding that he was
16  involved in the negotiations of the transaction
17  in September of 2008 between Lehman and
18  Barclays?
19   A.   I believe he was, but I don't know if
20  I've ever seen anything that said what his role
21  was in it.
22   Q.   Okay.  On page 275, starting at line
23  3, Mr. McDade was asked:  "Did you understand
24  that, in addition to the long positions that Lehman had at OCC, it also
25  short positions that Lehman had at OCC, it also

Page 179

D. McIsaac

1
2  had additional cash and assets that were
3  deposited as margin and also clearing funds
4  deposited at the OCC?"  Do you see that
5  question?
6    A.   Yes.
7    Q.   Mr. McDade responds, "Yes, I did, but
8  keep in mind the context that we had had assets
9  like that, for example, at the CME and they lost
10  those assets over the course of the week.  So we
11  had no confidence that those were potentially
12  our assets given what had been transpiring."
13        Do you see that?
14   A.   Yes.
15   Q.   What do you understand Mr. McDade to
16  be suggesting in this testimony?
17        MR. OXFORD:  Objection.  Form.  Calls
18  for speculation.
19   A.   I wouldn't want to try to guess what
20  he's thinking.
21   Q.   Do you have any idea what he means
22  when he's referring to the CME losing assets
23  over the course of the week?
24   A.   I'm assuming based on what we said
25  before that maybe he liquidated some of their

Page 180

D. McIsaac

1
2  assets.  But this is a paragraph taken out of
3  this page 275, so I don't know where it is in
4  relation to what this question is referring to
5  or where the background for it is.
6    Q.   You said the CME could have liquidated
7  positions.  Aren't you aware that the CME in
8  fact did liquidate or auction off positions in
9  LBI's account during the week of September 15?
10   A.   I said this could have been referring
11  to that.  I don't know if this is referring to
12  that.  I don't know what it's referring to.
13   Q.   Do you know of any other actions by
14  the CME during that week that involved
15  liquidation of positions?
16   A.   He doesn't say anything here about
17  liquidation of positions.  He just is referring
18  to they lost assets.
19   Q.   Do you know of any instance other than
20  the auction in which LBI lost assets in relation
21  to the CME account?
22   A.   I don't know of any other reference
23  anyplace else of them losing assets at the CME.
24   Q.   Mr. McDade says, "We had no confidence
25  that those were potentially our assets given

Page 181

D. McIsaac

1
2  what had been transpiring," and he was saying in
3  response to a question about assets, cash and
4  assets, that were deposited as margin in its
5  clearing funds deposited at the OCC.
6        Do you understand Mr. McDade to be
7  suggesting that the assets posted at the OCC
8  were at risk?
9        MR. OXFORD:  Objection.  Asked and
10  answered.
11   A.   Again, I don't know if I can determine
12  what Mr. McDade meant.  There were a lot of
13  assets mentioned above that.  I'm not sure what
14  he's referring to there.  He might have been
15  referring to long positions.  I don't know.
16   Q.   Do you agree that Mr. McDade seemed to
17  think that there were some assets at the OCC
18  that were potentially not going to be available
19  to Lehman and that he thought the CME example
20  was evidence of that?
21   A.   I don't want to speculate what he
22  meant by these words.  I don't know really what
23  he meant by these words.
24   Q.   Assuming Mr. McDade was referring to
25  the loss of $1.6 billion in assets at the CME on

Page 182

D. McIsaac

1. September 18, and assuming for purposes of this
2. question that Mr. McDade was talking about the
3. margin and clearing funds deposited at the OCC
4. when he says they had no confidence that those
5. were potentially our assets, would you consider
6. it irrational for Mr. McDade to lack that
7. confidence?
8. 
9. MR. OXFORD: Objection to form.
10. MR. GREEN: Objection.
11. A. Again, I'm not sure what his lacking
12. of confidence is. The question is did you
13. understand that, in addition to the long
14. positions and short positions that Lehman had at
15. the OCC, it also had additional cash assets that
16. were deposited as margin, so the answer is --
17. Q. And my question assumed that the
18. assets in the answer that he gave was the assets
19. that were deposited as margin and clearing funds
20. at the OCC. So assuming that that's what the
21. assets were referring to, was it irrational for
22. Mr. McDade to lack confidence that those were
23. going to be available to Lehman?
24. MR. OXFORD: Objection. Form.
25. Assumes facts not in evidence.

Page 183

D. McIsaac

1. 
2. A. I mean, I -- I'm having a problem
3. answering the question only because I don't know
4. what he said in reference to and what the time
5. period was that this was talking -- even talking
6. about. I don't know if this is talking about
7. the sale or anything else. I'm reading one
8. paragraph.
9. It seems somehow that he's concerned
10. about that there was confidence in that
11. potential assets -- what is he saying? "So we
12. had no confidence that those were potentially
13. our assets given to what was transpiring." I
14. don't know what he means by that. Maybe he
15. thought he sold them already. I don't know.
16. Q. Okay. If you were involved in the
17. negotiations of this transaction on behalf of
18. Lehman and you had just seen the CME auction off
19. all of your proprietary positions and transfer
20. the margin that was posted at the CME to the
21. bidders who were willing to take those positions
22. over, and then the OCC started threatening to
23. liquidate your account, would you be concerned
24. that the same thing might happen?
25. MR. OXFORD: Objection. Form.

Page 184

D. McIsaac

1. 
2. A. I would take action if I thought they
3. were going to liquidate them for me and probably
4. direct my people to liquidate them before the
5. OCC had a chance to liquidate them. So I would
6. be at my best possible advantage.
7. Q. Let's assume you had tens of thousands
8. of positions, and if you tried to liquidate them
9. all in a matter of a day, you would lose a
10. substantial amount of money on that liquidation.
11. A. Again --
12. MR. OXFORD: Hold on. Is there a
13. question?
14. MS. BLOOMER: Yes, there is, if I
15. could finish.
16. MR. OXFORD: Sure.
17. Q. Would it be rational for you to fear
18. that the OCC might liquidate those positions
19. before you would get a chance to?
20. MR. OXFORD: Okay. Can we just make
21. sure we have that question in mind before --
22. THE WITNESS: Sorry.
23. MR. OXFORD: -- Mr. McIsaac answers?
24. A. Could you just read back the whole --
25. Q. Let's assume you had tens of thousands

Page 185

D. McIsaac

1. of positions, and if you tried to liquid them
2. all in a matter of day, you would lose a
3. substantial amount of money on that liquidation.
4. Would it be rational for you to fear
5. that the OCC would liquidate those positions
6. before you would get a chance to?
7. MR. OXFORD: Objection. Form.
8. MR. KAY: Objection.
9. A. I don't know why you would fear that
10. they would be able to liquidate them before you
11. could liquidate them. I don't know why you
12. would have that fear. If you were afraid that
13. they were going to liquidate them, I would think
14. you would start liquidating your portfolio.
15. Q. If you thought the liquidation would
16. happen all in one day, would you be concerned
17. that that liquidation may cost you a substantial
18. amount of the margin you had posted in those
19. accounts?
20. MR. OXFORD: Objection. Form.
21. A. If I liquidated, it would cost me none
22. of the margin. It may cost me -- I may have
23. gains and losses in the liquidation, but at the
24. end of the day, if I liquidated everything, I

Contains Highly Confidential Portions

Page 186

D. McIsaac

1
2 would have no margin requirement.
3      Q.   And the margin that was posted to
4 secure those positions in the event of a
5 liquidation would be accessible to the OCC,
6 correct, to cover any losses on that
7 liquidation?
8          MR. OXFORD:  Objection.  Form.
9      A.   I thought you asked me if I was
10 liquidating them.  If I was liquidating them,
11 no, they would give me back my margin.
12     Q.   They would give you back your margin
13 after you had liquidated the positions and
14 settled any costs associated with that
15 liquidation, right?
16     A.   Correct, any costs associated with the
17 OCC on the liquidation.
18     Q.   Would they give you back your margin
19 before the positions were closed out and before
20 they had gotten protected themselves?
21     A.   No, that's why I would be liquidating
22 them so that I could close out my account with
23 the OCC.
24     Q.   Okay.  And is there a risk that you
25 liquidated those positions and the cost of

Page 187

D. McIsaac

1
2 liquidating the positions exceeds the margin
3 that you had posted to secure those positions?
4          MR. OXFORD:  Objection.  Asked and
5 answered.
6      A.   I believe somebody would assess that
7 risk and determine what to do, and if they
8 thought the cost was going to exceed it, then if
9 it was liquidated, wouldn't they come back and
10 charge me for it anyway?
11     Q.   How long would it take you to
12 liquidate tens of thousands of positions, do you
13 think?  A day?
14         MR. OXFORD:  Objection to form.
15     A.   I have no idea.
16     Q.   You have no idea?
17     A.   I have no idea.
18     Q.   Do you think it's likely that you
19 could liquidate tens of thousands of positions,
20 equities options positions in a day, without
21 substantially moving the market?
22         MR. OXFORD:  Objection.  Form.  Asked
23 and answered.  Assumes facts not evidence.
24         You can answer.
25     A.   I don't know what the difference is if

Page 188

D. McIsaac

1
2 you move the market whether or not you could
3 liquidate them.
4      Q.   Do you understand that there could be
5 a difference in the cost of liquidating them if
6 the market price changes throughout the course
7 of the day that you're conducting your
8 liquidation?
9      A.   Yes.  But what does that have to do
10 with me, my ability to liquidate them?  You
11 asked me could I liquidate them?  I said yes.
12     Q.   And the cost of liquidating them would
13 be dependent upon the impact that the sales
14 would have on the market price of what you're
15 liquidating, isn't that right?
16     A.   Yes.
17     Q.   CME liquidated the positions when it
18 liquidated the proprietary account on September
19 18th in a single day.
20         Do you have any reason to think that
21 the OCC would not have taken the same approach?
22         MR. OXFORD:  Objection.  Form.
23     A.   I'm not -- I don't understand what the
24 question is.  We started out my saying that the
25 firm should liquidate.  Now you're asking me

Page 189

D. McIsaac

1
2 would the OCC liquidate.
3      Q.   That's right.  I'm asking you a
4 different question now.
5      A.   Okay.
6      Q.   Which is:  If the OCC were to
7 liquidate, do you have any reason to think that
8 they wouldn't have conducted that liquidation in
9 the same manner in which the CME did?
10         MR. OXFORD:  Same objection.
11     A.   I don't know their procedures for
12 liquidating accounts.  I would assume it could
13 be similar to the CME, but in light of the CME
14 doing that, if I was Lehman, I would take -- I
15 would be proactive and do my own liquidation
16 before they liquidated me and I could lose $1.6
17 billion.
18     Q.   If you thought you couldn't avoid the
19 loss of $1.6 billion either way, might you just
20 decide to transfer the accounts to an acquirer
21 instead of liquidating them yourself?
22         MR. OXFORD:  Objection.  Asked and
23 answered.  Assumes facts not in evidence.
24     A.   Again, I think I've said I would
25 assess the risk of doing the business, but if I

Contains Highly Confidential Portions

Page 190

D. McIsaac

1  was negotiating transferring the margin, that
2  would be a part to start my negotiating. If
3  they were liquidated, that would be the amount;
4  I would negotiate from there.
5  Q.    And if you assume that the liquidation
6  would cost you all of the margin, would it be
7  rational to agree to transfer the accounts and
8  transfer the margin with the accounts?
9  A.    For what reason?  Why would I have to
10 do that?  What benefit do I get by doing that?
11 Q.    Do you preserve customer positions by
12 doing that?
13 A.    Are we talking about customer
14 positions or proprietary?  I'm not sure what
15 we're talking about here.  I thought we were
16 talking proprietary positions.  That's what the
17 CME --
18 Q.    Would it preserve customer positions
19 by doing that?  Let's talk about the customer
20 account.  If you moved -- if you knew that you
21 were going to lose the posted margin in a
22 liquidation either way, would it be rational to
23 transfer that margin to an acquirer in order to
24 preserve the customer positions for the benefit

Page 191

D. McIsaac

1  of those customers?
2  MR. OXFORD:  Objection.  Asked and
3  answered.  Assumes facts not in evidence.
4  You can answer.
5  A.    I would assume you would take all that
6  into account.  The main thing I would look at is
7  that the CME liquidated the proprietary
8  positions and not the customer positions.
9  There is some, I guess some goal in
10 preserving the customer positions even from the
11 clearing orgs., so I would assume Lehman would
12 talk to the OCC and said if we liquidated all of
13 our proprietary positions, maybe they would not
14 liquidate the customer positions.  That would be
15 something you would negotiate when that is
16 happening.  You would discuss it when that is
17 happening.
18 Q.    Assuming the parties didn't agree to
19 just transfer all of the accounts with all of
20 the margin to Barclays?
21 A.    I would think you would look at all
22 your options before you decided on doing
23 something.
24 Q.    Okay.  And how long does it take to

Page 192

D. McIsaac

1  analyze all of your options in the circumstances
2  that we're talking about here?
3  MR. OXFORD:  Objection.  Form.
4  MR. GREEN:  Same objection.
5  A.    I don't know how long they had to
6  prepare for these options and how long -- how
7  long it would take to call the OCC and ask them
8  the question.  I'm sure you could ask them the
9  question and go from there and see what they
10 said.
11 Q.    And what question would you propose
12 asking the OCC?
13 A.    Well, you're -- you seem to be
14 concerned about them liquidating the account.  I
15 would talk to the OCC and say, "The CME just
16 liquidated my accounts.  What are your plans?"
17 Q.    And --
18 A.    Or I'm sure maybe they were having
19 discussions with the OCC at the time.
20 Q.    Didn't we look at an e-mail earlier
21 that showed that -- that had the discussion with
22 the OCC and the OCC told Lehman and the Trustee
23 that it was going to liquidate their accounts?
24 A.    That was after the 19th.

Page 193

D. McIsaac

1  Q.    Okay.
2  A.    The sale agreement was the 16th.
3  Q.    Let's assume the threats to liquidate
4  started on the 15th.  Does that change your
5  opinion?
6  MR. OXFORD:  Object to the form.  It
7  assumes facts not in evidence.
8  You can answer if you're able.
9  A.    I don't know what happened at the time
10 and I don't know -- we're assuming if the OCC
11 came in on the 15th and said unless you
12 liquidated, if that was the case, then why on
13 the 20th were they threatening to liquidate it
14 if they already threatened to liquidate it and
15 didn't do it?  I'm not sure --
16 Q.    I understand, but I want you to
17 understand that I'm trying to ask you questions
18 because you are providing an expert opinion
19 about what would have been rational under these
20 circumstances, and I'm probing that by
21 describing to you circumstances that may or
22 may not affect your opinion.
23 So I would like you to answer my
24 questions as opposed to posing questions each

Contains Highly Confidential Portions

---

Page 194

D. McIsaac

1  time.
2      A.   Sorry about that.
3      Q.   That's okay.
4      A.   I -- would it be rational?  It would
5  be rational to do many things.  It might be
6  rational to transfer the margin.  It might be
7  rational to liquidate your accounts.  It may be
8  rational to find another buyer.  There's a lot
9  of rational things that could be done at that
10  point in time.
11     Q.   And is it fair to say that you can't
12  really say what would be truly rational if you
13  didn't understand the circumstances?
14         MR. OXFORD: Objection. Form.
15     A.   I can say that based -- and I was not
16  there, I don't know what was negotiated and what
17  was discussed.  I think what I laid out was
18  rational things you could do.
19     Q.   How can you say that it wouldn't have
20  been rational for the Trustee to make a decision
21  under the specific circumstances that it was
22  facing at the time if you don't know the
23  specific circumstances that the Trustee was
24  facing at the time?

---

Page 195

D. McIsaac

1          MR. OXFORD: Objection. Form.
2      A.   We talked about the 15th is what I
3  asked the question -- answered a question on,
4  and the Trustee wasn't involved then.  So I'm
5  not sure, this question now, what's the basis of
6  it.  I'm sorry.
7      Q.   Right.  Each question I ask is a new
8  question, so I would appreciate it if you would
9  not assume for every question I ask that I'm
10  building on a prior question.
11     A.   No.  No.  That's why I'm asking what's
12  the basis for this question, because I don't
13  know.
14     Q.   I'm asking you how you can give an
15  expert opinion about what it would have been
16  rational for the Trustee to do under a specific
17  set of facts when you don't know the
18  circumstances that the Trustee was facing at the
19  time?
20         MR. OXFORD: Objection. Form.
21  Misstates -- misstates the witness's
22  testimony.
23         But you can answer.
24     A.   I don't know what went through the

---

Page 196

D. McIsaac

1  Trustee's mind and what his determination was
2  and what he believed to be a rational approach
3  at that time.  What I've given an opinion on is
4  what I think a rational seller would do in my
5  opinion at that point in time, how they would
6  react to what was going on.
7      Q.   Doesn't that opinion require you to
8  know what was going on at that time?
9          MR. OXFORD: Objection. Form.
10     A.   I believe I've stated that a rational
11  seller would negotiate the sale of the margin
12  assets.  No matter what was going on at the time
13  you would do that negotiation.
14     Q.   Is it fair to say that it is not your
15  opinion that a rational seller would have
16  required dollar-for-dollar compensation for
17  every dollar's worth of margin that it agreed to
18  transfer in this situation facing this Trustee
19  in September of 2008, or --
20         MR. OXFORD: Objection.
21     Q.   -- is it not your opinion?
22         MR. OXFORD: Objection. Form. Asked
23  and answered.
24         You can answer it again.

---

Page 197

D. McIsaac

1      A.   My opinion is a rational seller would
2  look for dollar for dollar, they would negotiate
3  from there, and at this point in time if there
4  were things that needed to be adjusted, people
5  negotiating the sale and the purchase would come
6  to an agreement on what was being sold and what
7  was being purchased.
8      Q.   Okay.  So when you say in your report
9  a rational seller would not include margin in
10  the deal unless it was being compensated dollar
11  for dollar, do you mean what you say in that
12  sentence or are you modifying it here today?
13         MR. OXFORD: Objection. Form. Asked
14  and answered.
15         You can answer it again.
16     A.   You are giving me facts that were not
17  part of my opinion.  What I said in my opinion
18  was a rational purchaser would want to quantify
19  the risk to determine what additional assets it
20  needed, and a rational seller would include
21  margin on dollar-for-dollar basis.
22         As you negotiate that, you may change
23  your mind.  You may decide I'll take 50 cents on
24  the dollar, I may take 25 cents on the dollar, I

Contains Highly Confidential Portions

Page 198

D. McIsaac

1
2  may want a dollar and a half on a dollar because
3  I think the assets are worth more.  That's a
4  negotiation that would occur at that time.
5      Q.   You might want zero --
6      A.   But the starting fact would be I would
7  want dollar for dollar and I would negotiate
8  from there.  I would assume I would not give
9  away assets for nothing.
10     Q.   Would you agree that there could be
11  circumstances in which it was rational to agree
12  to transfer the accounts in exchange for the
13  margin that was posted to secure those accounts?
14         MR. OXFORD:  Objection.  Form.
15     A.   I would agree that the seller could
16  make a rational decision to transfer the
17  accounts with no compensation, if that's what
18  they wanted, based on facts and circumstances at
19  that point in time if that's what they
20  negotiated, but I would anticipate that that
21  would be somehow brought into -- into the
22  contract that that was being done and probably
23  brought in front of the judge if he was selling
24  assets above and beyond what was in the
25  Clarification Letter.

Page 199

D. McIsaac

1
2      Q.   Okay.
3          MR. OXFORD:  Trish, that's about
4  another hour.  I don't know if this is a
5  good time to take five minutes.
6          MS. BLOOMER:  Yes, it's fine.
7          THE VIDEOGRAPHER:  The time is 3:03.
8  This is the end of the tape labeled number
9  4.  We're going off the record.
10         (Recess.)
11         THE VIDEOGRAPHER:  This is the start
12  of the tape labeled number 5.  The time is
13  3:19.  We're back on the record.
14  BY MS. BLOOMER:
15     Q.   Good afternoon again.
16     A.   Good afternoon.
17     Q.   Would you consider assets that were
18  posted as margin at a clearing organization with
19  respect to an exchange-traded derivatives
20  account to be an asset that's used in the
21  business of the exchange-traded derivatives?
22         MR. OXFORD:  Objection.  Form.
23     A.   It would be an asset that at that
24  point in time was being used to secure the
25  obligations.  Assets used in the business may

Page 200

D. McIsaac

1
2  have a lot of different terms.
3      Q.   Do you agree that posted margin is
4  associated with the exchange-traded derivatives
5  business that it secures?
6      A.   It's associated with the
7  exchange-traded derivatives that it's securing.
8  I don't know what business it would be part of.
9      Q.   Can you operate an exchange-traded
10  derivatives business without posting margin to
11  satisfy the requirements of a clearing
12  organization?
13     A.   I don't believe so.
14     Q.   I'm showing you Exhibit 1, which is
15  the Asset Purchase Agreement.  If you could turn
16  to page 2 at the bottom, meaning the number on
17  the bottom.  The term "business" is defined, do
18  you see that?  It's the second full definition
19  on page 2.
20     A.   You're saying -- oh, I'm sorry.
21  Business, yes, I'm sorry.  I was looking at the
22  bottom, actually.
23          Yes.
24     Q.   Would exchange-traded derivatives in
25  your experience fall under any of the categories

Page 201

D. McIsaac

1
2  of LBI's businesses that are described in this
3  definition?
4          MR. OXFORD:  Objection.  Form.
5      A.   The concept of exchange-traded
6  derivatives -- there are different parts of the
7  business.  You have futures that are clearing
8  and execution business.  You have equity options
9  that are just -- that are transpiring for
10  customers that are just part of the customer
11  business as well as selling bonds, you know,
12  stocks and bonds, and then you have trading of
13  exchange-traded derivatives that could be part
14  of a portfolio of assets or you could possibly
15  just be trading them by themselves.
16     Q.   Okay.  And one of the businesses
17  that's listed here of the seller that are
18  encompassed within the term "business" is the
19  trading and advisory businesses.  Do you see
20  that?
21     A.   Uh-huh.  I see fixed income and
22  equities cash trading.
23     Q.   And then in the next line do you see
24  trading and advisory businesses?
25     A.   Yes.

Contains Highly Confidential Portions

---

Page 202

D. McIsaac

1
2    Q.    Would exchange-traded derivatives that
3    were proprietary to LBI be considered part of
4    the trading business of LBI?
5    A.    I'm a little confused why trading
6    would be used in two places.  I'm not sure
7    what -- what the differentiation is between the
8    two of them.  Fixed income and equities cash
9    trading and trading and advisory business, I
10   just don't know why it would be referenced
11   twice.
12   Q.    Is it your understanding that the
13   exchange-traded derivatives were a portion of
14   the trading business that Barclays acquired?
15          MR. OXFORD: Objection. Form.
16   A.    The proprietary part of it would have
17   been part of the exchange -- the trading
18   businesses that they acquired.
19   Q.    And would you agree that the customer
20   futures business that Barclays acquired from
21   Lehman was -- I'm sorry.  Would you agree that
22   the customer futures business that LBI conducted
23   prior to September 22, 2008 would fall within
24   the definition of LBI's business as a futures
25   commission merchant?

---

Page 203

D. McIsaac

1
2    A.    Yes.
3    Q.    Okay.  If you turn to page 4 -- I'm
4    sorry, page 10.  I'm sorry, 6.
5          If you turn to page 6 of the Asset
6    Purchase Agreement, do you see the definition of
7    "purchased assets" that begins around the middle
8    of that page?
9    A.    Uh-huh.
10   Q.    It says, "Purchased Assets means all
11   of the assets of seller and its subsidiaries
12   used in connection with the business, excluding
13   the excluded assets," and then the word
14   "including," do you see that?
15   A.    Yes.
16   Q.    And the term "business" that's
17   capitalized there, do you understand that to be
18   referring to the business definition that we
19   just looked at on the prior page?
20   A.    I believe so.
21   Q.    Okay.  If you look at page 10, there's
22   a word "including" that's defined.  Do you see
23   that?
24   A.    Yes.
25   Q.    And do you see that it says, "The word

---

Page 204

D. McIsaac

1
2    'including' or any variation thereof means
3    including, without limitation, and shall not be
4    construed to limit any general statement that it
5    follows to the specific or similar terms or
6    matters immediately following it."
7    A.    Yes.
8    Q.    Turning back to page 6, the definition
9    of "purchased assets," given the definition we
10   just looked at of the term "including," is it
11   fair to say that the "purchased assets"
12   definition is not limited by the subparagraphs
13   that follow the word "including"?
14          MR. OXFORD: Objection. Form. Calls
15      for a legal conclusion.
16   A.    Yeah, I'm not a lawyer, so this is --
17   I'm not sure what it means and if you had before
18   businesses, why you needed additional, but I
19   don't know.  I'm not -- I don't want to -- I
20   don't want to give an opinion on a legal
21   document.
22   Q.    Okay.  You understand what the term
23   "including without limitation" means?
24   A.    I believe so.
25   Q.    What does that mean?

---

Page 205

D. McIsaac

1
2    A.    It means including without limitation.
3    Q.    And you understand what that means,
4    the common usage of that term means?
5    A.    I -- "including without limitation"
6    means including, we're not limiting it to what
7    it means, what follows it.
8    Q.    Okay.  Thank you.  Is it your opinion
9    that the margin that was posted in LBI's
10   accounts at the OCC were not assets of LBI used
11   in connection with the business, as that term is
12   defined in this agreement?
13          MR. OXFORD: Objection. Form.
14      Misstates the document.  Calls for a legal
15      conclusion.
16          You can answer.
17   A.    Could you re-read that question?
18   Q.    Is it your opinion that the margin
19   that was posted in LBI's accounts at the OCC
20   were not assets of LBI used in connection with
21   the business as that term is defined in this
22   agreement?
23          MR. OXFORD: Objection. Form. Again,
24      misstates the document.  Calls for a legal
25      conclusion.

---

Contains Highly Confidential Portions

Page 206

D. McIsaac

1
2    A.    There was a negative in there and I'm
3  not sure -- I mean, I don't know what that term
4  means in a legal document.
5    Q.    Are the assets posted as margin at the
6  OCC assets of LBI?
7    A.    They may or may not be assets of LBI.
8    Q.    Do you know in the context of the
9  assets at the OCC as of September 19, 2008
10 whether they were assets of LBI or assets of
11 someone else?
12   A.    The assets posted there could have
13 been derived from many factions.  If they put
14 Treasury bills up, it could have been Treasury
15 bills owned by LBI.  It could have been Treasury
16 bills that were accepted as collateral against a
17 receivable for a reverse repo or a stock borrow.
18 It could be customers or non-customers assets.
19   Q.    Do you understand the Trustee's
20 position in this case to be the assets at the
21 OCC were not LBI proprietary assets?
22   A.    I don't know if I have seen that -- I
23 don't recall seeing that specific phrase, that
24 they were not proprietary assets.
25   Q.    You reviewed this agreement when you

Page 207

D. McIsaac

1
2  provided your opinion; is that right?
3    A.    Yes.  Uh-huh.
4    Q.    And is it your opinion that this
5  agreement does not encompass the margin assets
6  that were posted at the OCC?
7    A.    I don't believe I've seen anything in
8  here that references margin assets, and it
9  appeared to be a very substantial asset class.
10 I would have thought they would have been broken
11 out in the agreement as to what was happening
12 with the assets that were posted at various
13 exchanges.
14   Q.    You said earlier when we looked at the
15 Transfer and Assumption Agreement that you would
16 have assumed that the purchase agreement would
17 document the agreement to transfer margin to
18 Barclays if that were the parties' agreement,
19 correct?
20   A.    Right.
21   Q.    Do you think this purchase agreement
22 accomplishes that when it says "all assets of
23 seller used in connection with the business,
24 excluding the excluded assets, are purchased
25 assets"?

Page 208

D. McIsaac

1
2      MR. OXFORD:  Objection.  Form.  Asked
3  and answered.  You can answer.
4    A.    At points in time you may use assets
5  to secure your obligations.  I don't know if
6  they would be considered assets of the business.
7  If they were $700 million today and $200 million
8  tomorrow, what would they be?  So I would think
9  if you were trying to transfer or somehow
10 include those margin assets, you would define
11 them and what the value was because that value
12 could have changed drastically from day one to
13 whenever you're consummating the deal.  As you
14 saw, the margin requirements go significantly up
15 and then down.
16   Q.    Is it your understanding that the
17 parties agreed that they would include specific
18 references to every asset that Barclays was to
19 acquire in this transaction?
20      MR. OXFORD:  Objection.  Form.
21   A.    I don't know if they did or not.  I
22 would think significant assets such as margin
23 would be noted and what was happening with it.
24   Q.    The agreement says that all of the
25 assets used in connection with the business are

Page 209

D. McIsaac

1
2  purchased assets, excluding the excluded assets.
3      Would you expect that since margin was
4  such a significant asset, as you say, that it
5  would have, therefore, had to have been -- that
6  it would, therefore, have been logical to
7  reference it in the excluded assets section if
8  indeed the parties intended to exclude it?
9      MR. OXFORD:  Objection.  Form.
10   A.    I don't know if you -- I would always
11 include what you're buying, not necessarily
12 exclude what you're not buying.  I think to make
13 something really understandable, you would say
14 include this, include that.
15      Like I said, the margin at the point
16 in time when this was done might have been a
17 billion dollars.  On the 19th, it might have
18 been $100 million.  I think you would define
19 that at the time you were agreeing to the
20 contract so that you made sure both parties came
21 to what their -- with what they agreed to.
22      So if it was on the 15th or something,
23 it was one item, one balance, later on it's a
24 different balance.  I don't think an asset like
25 that would be included without some kind of

Contains Highly Confidential Portions

| Page 210 |
| --- |

1        D. McIsaac
2    reference.
3        Q.   So you would assume the parties to a
4    transaction would specifically identify the
5    included assets as opposed to saying we're
6    getting everything except the excluded assets;
7    is that your testimony?
8        A.   I would expect if it's an asset like
9    margin, that would go up and down in value on a
10   daily basis.  If you were negotiating to buy
11   that asset, you would want to put into the
12   contract what the value of that asset is, what
13   that asset is that you're receiving.
14        Open-ended margin could be, again, it
15   could have been a dollar.  Would they have
16   accepted it if it was only a dollar?  I don't
17   know.  So I think for any ambiguity, you would
18   include the assets and you would either state at
19   the time of the transaction or put a dollar
20   amount at that point in time so that if they
21   were used at one point in time, they weren't
22   sold out, you know, five days later.
23        Q.   If you were advising LBI on this deal,
24   and you saw that the agreement was structured so
25   that all of the assets were purchased assets

| Page 211 |
| --- |

1        D. McIsaac
2    except what was excluded, would you advise them
3    that to avoid ambiguity they should reference
4    margin in the excluded assets section?
5        MR. OXFORD:  Objection to form.
6        A.   I would probably advise the seller --
7    the buyer to make sure that they put in all the
8    assets that they wanted to make sure they got in
9    the agreement, not --
10       Q.   I'm not asking you what you would do
11   for the buyer.  I'm asking you if you were
12   advising the seller and their agreement stated
13   "purchased assets means all of the assets of
14   seller used in connection with the business,
15   excluding the excluded assets, would you advise
16   him that it was prudent to reference margin as
17   an excluded asset given how substantial the
18   value was.
19       A.   I would advise them to reference it
20   either as excluded or included.
21       Q.   Included if it was included and
22   excluded if it was excluded?
23       A.   Right.
24       Q.   Okay.  Is it your understanding that
25   Barclays knew on September 16, 2008 what the

| Page 212 |
| --- |

1        D. McIsaac
2    margin was worth at the OCC and at the other
3    clearing organizations to which LBI traded in
4    exchange-traded derivatives?
5        A.   I believe I've seen some e-mail
6    traffic that noted that the legal counsel for
7    Barclays had been discussing margin requirements
8    of various exchanges.  I think Mr. Leitner
9    pointed out that Barclays was monitoring their
10   exposure by knowing what the margin values were.
11   So I assume they knew something that was going
12   on at the exchanges.
13       Q.   Is it your opinion that you would have
14   advised the acquirer to reference margin
15   specifically because it was so substantial in
16   value assumes that Barclays knew on September 16
17   what the value of the margin was; is that
18   correct?
19       A.   I would think they would know what
20   assets they were buying.
21       Q.   And does your opinion assume that they
22   knew what assets, what the value of the margin
23   was that they were buying on April -- on
24   September 16, 2008 when they entered into this
25   Asset Purchase Agreement?

| Page 213 |
| --- |

1        D. McIsaac
2        MR. OXFORD:  Objection.  Form.
3        A.   I would have to assume somebody
4    purchasing assets would know the value of the
5    assets they were purchasing, if not what they
6    thought the value was, at least what the value
7    was on the seller's records.
8        Q.   I'm not trying to be argumentative.
9    You've given an opinion in your report, and we
10   can look at the opinion if you don't recall it.
11        You've given an opinion in your report
12   that, given how much this margin was worth, you
13   would have expected the acquirer to reference it
14   specifically as a purchased asset --
15       A.   Yes.
16       Q.   -- if indeed they thought it was being
17   purchased.
18        I'm asking you whether that opinion
19   assumes that Barclays knew on September 16, 2008
20   what the value of the margin was that LBI held
21   or that LBI had posted to secure the
22   exchange-traded derivatives?
23       A.   Again, I would assume they knew the
24   value of what they were purchasing.  So I --
25       Q.   Does your opinion --

Contains Highly Confidential Portions

Page 214

D. McIsaac

1
2    A.   My opinion assumes that they would
3  know the value they were purchasing.  I would
4  assume most people wouldn't buy something that
5  they didn't know what they were buying.
6    Q.   Would you assume that most people
7  wouldn't buy an entire broker-dealer business
8  based on 48 hours of negotiations as well?
9    MR. OXFORD: Objection.  Form.
10  Assumes facts not in evidence.
11    A.   From what I understand, Bank of
12  America bought Lehman, more than just the
13  brokerage business, over a weekend.  So I think
14  you can buy anything you want in any time period
15  you want.  I don't know how much due diligence
16  was done in July, in August, in June.
17    People have an understanding of the
18  various competitors and what they do and how
19  they manage it.  There are reports out there.
20  There's information out there.  So I don't know
21  what Barclays knew when they negotiated the
22  deal.
23    I don't know how much time they took
24  to write this versus how much time it took to
25  determine what they were buying.

Page 215

D. McIsaac

1
2    Q.   And again, you think it's possible
3  that they executed this agreement before they
4  knew what they were buying?
5    MR. OXFORD: Objection.  Form.
6  Misstates the witness's testimony.
7    You can answer.
8    A.   I believe I said I assume when they
9  execute an agreement they knew what they were
10  buying.
11    Q.   Is that assumption based on any
12  preliminary assumptions about how much time
13  Barclays had to do the due diligence prior to
14  the time it entered into this transaction?
15    A.   I can't fathom why anybody would buy
16  anything without knowing what they were buying.
17  So if they took 48 hours and thought that was
18  enough to assess what they were buying and put a
19  value on it, then that's what they did.
20    I don't know -- I can't be in Barclays
21  shoes to figure out what was in their mind when
22  they bought this.  Evidently, they thought they
23  were getting valuable assets.  How much they
24  were getting and what they were willing to pay
25  for it they had to make an assessment, and I

Page 216

D. McIsaac

1
2  assume they took whatever time it needed to take
3  to do that assessment.
4    And I'm assuming that this transaction
5  had to be approved by the board of directors.
6  They had to provide some information to their
7  board of directors on a purchase of this size.
8    I don't think they went to
9  the board -- would have gone to the board of
10  directors and said we're going to buy this, but
11  we don't know what we're buying.  So I would
12  think they would have had a clear understanding
13  of what they were buying.
14    Q.   Might they have had a clear
15  understanding of what they were buying but not
16  necessarily a clear understanding of what all of
17  those assets were worth?
18    A.   Then what were they buying if they
19  didn't know what they were buying, what the
20  worth -- how could you put a price on something
21  unless you assessed it?
22    Q.   I would appreciate it if you would
23  answer my question.
24    A.   I'm sorry.  I'm asking you, I don't
25  believe a purchaser would enter into an

Page 217

D. McIsaac

1
2  agreement to purchase something without
3  assessing what the value is that they were
4  purchasing.
5    Q.   Okay.  If you could take the Sale
6  Order transcript that we had looked at earlier,
7  it's Exhibit 442, and if you could turn to
8  page -- if you could turn to page 60.
9    At the bottom of page 60, the hearing
10  transcript reads: "We cannot take the risk of
11  rejecting this transaction because of
12  ambiguities, the lack of a piece of paper to
13  support every element of the assets to be
14  transferred, the lack of a definition as to
15  particular items."
16    Do you see that?
17    A.   Yes.
18    Q.   Is it possible that in this
19  circumstance the parties agreed, due to the
20  extraordinary circumstances at the time, to
21  structure a deal in a way that they wouldn't
22  structure under normal circumstances?
23    MR. OXFORD: Objection.  Form.
24    A.   I believe that they might structure a
25  deal differently than they would under different

Contains Highly Confidential Portions

Page 218

D. McIsaac

1  circumstances, yes.
2  Q.    And is it your understanding that the
3  circumstances that existed in 2000 -- in
4  September of 2008 made it such that the parties
5  in fact conducted their negotiations and
6  structured this transaction in a manner
7  differently than they would have under normal
8  market situations, circumstances?
9       MR. OXFORD:  Objection.  Asked and
10      answered.
11      A.    I believe I answered that saying yes,
12  I believe this was a different time and they
13  negotiated this differently than they would have
14  at other times.
15      Q.    Is it possible that Lehman was willing
16  to offer terms to Barclays that a typical seller
17  wouldn't necessarily offer because of the
18  exigencies that made this transaction important
19  to Lehman?
20      MR. OXFORD:  Objection.  Form.
21      A.    I'm not sure how -- why a firm would
22  do certain things at times.  It couldn't make
23  agreements that it normally wouldn't make.  I'm
24  not sure what was in Lehman's mind or Barclays'

Page 219

D. McIsaac

1  mind at the time of selling this and what
2  decisions they thought they were doing and for
3  what reasons.
4       Q.    I'm showing you a document marked as
5  Exhibit 689.
6           (Exhibit 689, Deposition of James
7       Kobak, marked for identification, as of this
8       date.)
9       Q.    This is deposition testimony that was
10  provided on behalf of the Trustee by Mr. Kobak.
11      Are you familiar with this deposition
12  testimony?
13      A.    I don't know if I've read it and
14  relied upon it.  I know Mr. Kobak made
15  declarations and depositions.  I don't know if
16  this was something that was in my reliance
17  materials, but I know he made the depositions.
18      Q.    Okay.  So you haven't necessarily --
19  do you remember reading this deposition
20  transcript?
21      A.    I don't remember, but I might have
22  read it.  I don't remember.  I read a few of
23  them and -- I don't know if I read this one.  I
24  think I might have.  I'm not sure if it was this

Page 220

D. McIsaac

1  or the declaration.
2       Q.    Fast forwarding to the time that the
3  SIPC Trustee was introduced into this matter on
4  Friday, September 19, you said that you don't
5  know what was in the minds of the parties at the
6  time that they were considering this
7  transaction; is that right?
8       A.    Uh-huh.
9       Q.    If you could turn to page 282 of Mr.
10  Kobak's deposition testimony, starting on line
11  14, the question says, and this is, for context,
12  talking about a Collateral Agreement that the
13  Trustee signed on Friday, September 19, either
14  at or shortly after the sale hearing:
15      It says, "LBI has assigned to Barclays
16  all rights and securities, cash, and other
17  property defined as collateral pledged by LBI to
18  the Options Clearing Corporation and held for
19  OCC's benefit at JPMorgan Chase.  Did you see
20  that?"  The answer is, "Yes."
21      The next question:  "And was it your
22  understanding that that's what the Trustee was
23  authorizing when you signed this?"  And the
24  answer is, "Yes, consistent with the overall

Page 221

D. McIsaac

1  deal that there be no cash excess that would go
2  to Barclays, because that would be inconsistent
3  with the no cash and that this wouldn't make the
4  deal so rich that it would be way beyond the
5  parameters that we discussed earlier."
6       Do you see that testimony?
7       A.    Yes.
8       Q.    Okay.  The next question says:  "Did
9  you tell anyone this?  When you say you signed
10  this consistent with the idea that there would
11  be no cash, this says cash.  This says cash will
12  be transferred to Barclays."  And the answer,
13  "Yeah, but cash would be transferred against the
14  liabilities.  What I'm saying is nobody told us
15  there might be in excess of a billion dollars of
16  cash or something like that that would end up at
17  Barclays when the deal was no cash and when
18  there was an economic parameter to the deal."
19      Question:  "So to the extent the cash
20  was simply needed to cover the liabilities, you
21  thought it was possible to be included in the
22  deal; is that correct?"
23      Answer:  "Yes."
24      Do you recall having ever seen this

Contains Highly Confidential Portions

Page 222

1          D. McIsaac
2    testimony before?
3        A.   I don't recall, but I might have seen
4    it, yes. I don't recall right now, but it seems
5    something I might have heard or seen.
6        Q.   Would you agree that this testimony is
7    speaking to the understanding that the Trustee
8    and Mr. Kobak had at the time on September 19,
9    2008?
10           MR. OXFORD: Objection. Form.
11       A.   I mean, it's taken out of context.
12   I'm reading two pages of a 300-and-some-page
13   document. It looks like Mr. Kobak is stating
14   that he was transferring or willing to transfer
15   assets that he thought was part of the deal.
16       Q.   And those assets included collateral
17   pledged by LBI to the Options Clearing
18   Corporation and held for OCC's benefit at
19   JPMorgan Chase, right?
20       A.   That's what it says, yes.
21       Q.   That --
22       A.   That's what the question says.
23       Q.   You understand that to be different
24   from property, customer property held by LBI to
25   secure customer positions?

Page 223

1          D. McIsaac
2           MR. OXFORD: Objection. Form.
3        A.   I'm not sure of what assets were being
4    held at JPMorgan Chase. It looks like he's
5    saying cash in this reference and it looks like
6    he's assuming it was part of the liabilities.
7    So it might have been the cash that was payable
8    to the customers who put up margin for the OCC
9    trades, and he thought he was just transferring
10   the cash against those liabilities.
11       Q.   Would that be cash held by LBI or cash
12   held by JPMorgan under your interpretation of
13   what this may be referring to?
14       A.   It would be cash held by LBI at
15   JPMorgan.
16       Q.   For whose benefit?
17       A.   LBI's.
18       Q.   Okay. This seems to be talking about
19   cash that was held for the OCC's benefit at
20   JPMorgan Chase, do you see that?
21       A.   It looks like it's being pledged to
22   the OCC for the benefit of LBI and it's held at
23   Chase.
24       Q.   And you agree that this is property
25   held at Chase, not at LBI?

Page 224

1          D. McIsaac
2           MR. OXFORD: Objection. Form.
3        A.   It's property held at LBI on deposit
4    at Chase.
5        Q.   I'm showing you what has been marked
6    as Exhibit 25. Do you recognize this document?
7        A.   I believe this is what's considered
8    the Clarification Letter.
9        Q.   Did you rely on this in forming your
10   opinions in this case?
11       A.   I reviewed this, yes.
12       Q.   And is it your opinion that this
13   agreement does not encompass property held in
14   respect of OCC accounts to secure proprietary
15   positions of LBI as of September 19, 2008?
16           MR. OXFORD: Objection. Form.
17       A.   I believe this does not indicate the
18   transfer or sale of LBI assets put up as margin
19   at the OCC.
20       Q.   If you look at the top of page 2,
21   capital letter C in that first paragraph. And
22   this is a definition of the purchased assets.
23   It says, "Exchange-traded derivatives and any
24   property that may be held to secure obligations
25   under such derivatives." Do you see that?

Page 225

1          D. McIsaac
2        A.   Yes, I do.
3        Q.   Do you agree with me that this
4    language is not limited to customer property?
5           MR. OXFORD: Objection. Form.
6        A.   I don't know what the parenthetical
7    really means. I think in my report, if that's
8    what you're asking me, I think the
9    parenthetical, to be clear, if this was margin
10   posted, it would say -- it would say assets
11   posted to secure LBI's obligations. It doesn't
12   say that, so it's kind of ambiguous on what I'm
13   holding and what this clause means.
14           To me it means I'm holding it, which
15   means probably customers have given it to me to
16   secure their assets -- their transactions.
17       Q.   It doesn't strike you as ambiguous
18   that it doesn't say customer property and you're
19   willing to assume that any property is
20   customer -- strike that. Do you agree with me
21   that the language here nowhere references
22   customer property?
23       A.   Yes.
24       Q.   Do you see the reference to any
25   property?

57

Contains Highly Confidential Portions

---

Page 226

```
1              D. McIsaac
2      A.   No. I see a reference to any
3  property.
4      Q.   No reference to customer property
5  appears on the face of this document; is that
6  right?
7          MR. OXFORD: Objection. Form.
8      A.   I believe that's correct. I haven't
9  read the rest of it, but in that clause there's
10 nothing there. I don't know if in -- if
11 anything in paragraph C says anything to -- you
12 said the whole page. I don't know if anything
13 in paragraph C says anything. I'm just looking
14 at this clause you're talking about.
15     Q.   Uh-huh.
16         MR. OXFORD: Just so we're clear,
17 Trish's question was about the whole
18 document.
19         MS. BLOOMER:  No, my question is about
20 this parenthetical.
21         MR. OXFORD: Okay. Then you might
22 want to clear up the record.
23     Q.   Does this parenthetical reference the
24 term "customer property" or does it say "any
25 property"?
```

Page 227

```
1              D. McIsaac
2          MR. OXFORD: Objection. Form.
3      A.   It says "any property."
4      Q.   You said that you thought it would be
5  ambiguous to say "property that may be held" if
6  what you really meant was "property posted,"
7  correct?
8      A.   Yes, that's correct.
9      Q.   Is it also ambiguous to say "any
10 property" if what you mean is "customer
11 property"?
12     A.   I'm looking at the whole phrase and it
13 says "any property that may be held to secure."
14 I'm looking at the whole phrase, not just the
15 two little words. I'm looking at the whole
16 phrase and the way it's written.
17     Q.   And does the whole phrase reference
18 customer property?
19         MR. OXFORD: Objection. Form. Asked
20 and answered.
21     A.   I believe to me, my opinion, this
22 would refer to assets held by LBI, and the only
23 assets they would have to secure obligations on
24 the derivatives would be with customers or for
25 counterparties.
```

Page 228

```
1              D. McIsaac
2      Q.   Does the language say "any property
3  that may be held by LBI"?
4      A.   No, but to me, my opinion held to
5  secure, if I'm writing this, if I'm part of this
6  agreement, I would have to be holding it, not
7  anybody else; and holding it, I mean and I have
8  the obligation to return it to somebody.
9      Q.   Do you think the parties could have
10 written "it may be held by or on behalf of LBI"
11 if that's what they intended?
12         MR. OXFORD: Objection. Form.
13     A.   I believe they could have written "and
14 any property posted by LBI to secure their
15 obligations."
16     Q.   Okay. If you look with me at
17 paragraph 8 on page 4, the third line down
18 reads, "Any and all property of any customer,
19 including any held by or on behalf of LBI, to
20 secure the obligations of any customer whose
21 accounts are being transferred to purchaser as
22 part of the business." Do you see that?
23     A.   Yes.
24     Q.   And it says "purchaser shall receive
25 for the account of the customer any and all
```

Page 229

```
1              D. McIsaac
2  property of any customer, including any held by
3  or on behalf of LBI to secure the obligations of
4  any customer." Do you see that?
5      A.   Just let me read it again, please.
6  "Shall receive ..."
7          Yes.
8      Q.   So would you agree that in this
9  paragraph when the parties intended to limit a
10 phrase to "customer property held by or on
11 behalf of LBI," they said "property of any
12 customer held by or on behalf of LBI"?
13         MR. OXFORD: Objection to form.
14     Q.   Would you agree with that?
15     A.   What -- excuse me. What was the
16 question?
17     Q.   Would you agree that in this paragraph
18 when the parties intended to limit a phrase to
19 "customer property held by or on behalf of LBI,"
20 they said "property of any customer held by or
21 on behalf of LBI"?
22     A.   It says here "held by or on behalf of
23 LBI." So I'm assuming that's what they wanted
24 it to mean, but yes, I can't read into their
25 mind what they said because I think you were
```

Contains Highly Confidential Portions

| Page 230 |
|---|

1           D. McIsaac
2    referring is this what they meant to say, and I
3    don't know if this is what they meant to say.
4    This is what they said.
5        Q.   And back to page 2, they didn't say
6    "any property of any customer," did they?
7        A.   No, they did not.
8        Q.   And they didn't say "by or on behalf
9    of LBI," did they?
10       A.   No, they did not.
11       Q.   Okay.
12       A.   But they --
13       Q.   But you would read this language --
14           MR. OXFORD:  Excuse me, Trish.  Mr.
15    McIsaac wasn't finished with his last
16    sentence.
17       A.   But as clearly as they defined it
18    here, why wouldn't they have clearly defined it
19    over here?
20       Q.   Perhaps because -- could it be because
21    they were referring to two different categories
22    of assets.
23       A.   I don't know, but they clearly --
24       Q.   Is that possible?
25       A.   I guess anything is possible.  I don't

| Page 231 |
|---|

1           D. McIsaac
2    know why they would have been so clear in a
3    definition here and not so clear in the
4    definition over here.
5        Q.   Did you consider that they were being
6    perfectly clear and that they were referring to
7    two different sets of assets and that's why they
8    described them differently?
9           MR. OXFORD:  Objection.  Form.  Asked
10    and answered.
11       A.   To me, it wasn't clear.  So, no, it
12    wouldn't have been clear to me because to me if
13    I was transferring the margin that I had posted
14    at exchanges, that would be the clear
15    definition.
16           I think over here, where they talk
17    about -- they're talking about held by and on
18    the behalf of LBI, that means LBI is holding it,
19    but it may be at JPMorgan or someplace else.  So
20    I think this is fairly clear.  I don't think the
21    first clause is that clear as to what they meant
22    by it.
23       Q.   Do you agree that exchanges and
24    clearing corporations hold property to secure
25    obligations of derivatives that their clearing

| Page 232 |
|---|

1           D. McIsaac
2    members hold?
3        A.   Clearing organizations require margin
4    to be held for the obligations of the clearing
5    member.  I believe that was your question.
6        Q.   So the OCC holds property just as LBI
7    holds property; is that right?
8        A.   That's correct, and the OCC's
9    responsibility would be to return to me the
10    property because I posted it with them and my
11    responsibility no matter where it is to return
12    that property to whoever gave it to me no matter
13    where I posted it.
14       Q.   In your opinion does paragraph 8
15    encompass anything that is not encompassed by
16    the parenthetical on page 2?
17           MR. OXFORD:  Objection.  Form.  You
18    mean the whole of paragraph 8 or to specific
19    subsections you referred him to earlier?
20           MS. BLOOMER:  I mean the sentence that
21    we've been focusing on, which starts "in
22    connection therewith" and reads through
23    "whose accounts are being transferred to
24    purchaser as part of the business."
25       Q.   Do you see the language that I refer

| Page 233 |
|---|

1           D. McIsaac
2    you to?  Does this encompass anything, in your
3    opinion, that's not already encompassed by
4    paragraph C on page 2 and the parenthetical?
5           MR. OXFORD:  Objection.  Form.  Calls
6    for a legal conclusion, but you can answer.
7        A.   Yeah, I mean, it's a legal document.
8    My assumption is that on this is this is not
9    just referring to exchange-traded derivatives,
10    this is referring to the entire account of a
11    customer that would be transferred to Barclays.
12    So if they were holding equity securities at DTC
13    for the customer, we would transfer them to
14    Barclays.
15       Q.   And in your opinion, the parenthetical
16    on page 2 -- do you believe that the
17    parenthetical on page 2 is unambiguous in terms
18    of the property that it's referring to?
19           MR. OXFORD:  Objection.  Asked and
20    answered.
21       A.   It doesn't define the property.  It
22    just defines any property that may be held to
23    secure obligations under such derivatives.
24    Again, I believe that's any property held by
25    LBI, not posted by LBI, because if it was

Contains Highly Confidential Portions

Page 234

D. McIsaac

1  posted, I think the words would have been used
2  "posted" or "held by" or someplace else further
3  clarification I think would be included.
4       Q.   Are assets posted at the OCC by LBI as
5  of September 19, 2008 property held by the OCC
6  to secure obligations under the derivatives held
7  in the OCC accounts?
8       A.   I just want to make sure I have your
9  question clear.  I believe the question was, is
10  the property held at OCC there to secure the
11  obligations in the accounts at OCC?
12      Q.   No, that wasn't my question.
13      A.   Okay.
14      Q.   Are assets posted at the OCC by LBI
15  property that is held by the OCC to secure
16  obligations under the derivatives in the OCC
17  accounts?
18         MR. OXFORD:  Objection.  Form.
19      A.   It's property held by OCC.  It may be
20  excess, but it's in the accounts to secure it.
21  Some of it may be used to secure obligations.
22  Some of it may be excess collateral.
23      Q.   Okay.  I'm showing you a document
24  that's marked as Exhibit 690.

Page 235

D. McIsaac

1         (Exhibit 690, a document bearing Bates
2  Nos. CGSH33921 through 922, marked for
3  identification, as of this date.)
4       Q.   Could you take a moment to review this
5  e-mail.
6         (Document review.)
7       Q.   Have you had a chance to review the
8  document?
9       A.   Yes.  Yes.
10      Q.   The first sentence of the e-mail from
11  James McDaniel at Sidley --
12         Do you know who James McDaniel at
13  Sidley is?
14      A.   I believe he's one of their counsels.
15      Q.   One of whose counsel?
16      A.   Sidley's counsels for the OCC.
17      Q.   For the OCC.  Okay.
18         And on September 20, this e-mail is
19  sent.  You see that it's copied to several
20  individuals from Weil?  Do you understand that
21  to be Weil Gotshal?
22      A.   Yes.
23      Q.   And you understand that that is the
24  law firm that represented LBHI in this

Page 236

D. McIsaac

1  transaction?
2       A.   Uh-huh.
3       Q.   Okay.  And then you see that Mr. Kobak
4  and Mr. Giddens are also copied on this e-mail?
5       A.   Yes.
6       Q.   And that's the Trustee and his
7  counsel, correct?
8       A.   That's correct.
9       Q.   The first sentence of the e-mail says,
10  "To the group:  OCC is seeking to confirm its
11  understanding that the LBI accounts and all
12  positions, cash and securities collateral that
13  are held by OCC in respect of those accounts are
14  intended to be transferred to Barclays and that
15  Barclays is assuming all obligations with
16  respect to those accounts."  Do you see that?
17      A.   Yes.
18      Q.   Do you believe -- are you aware of any
19  recipient of this e-mail responding to this and
20  telling the OCC that Barclays was not to receive
21  the cash and securities collateral held by the
22  OCC in respect of the OCC accounts?
23      A.   I am not aware of anybody sending an
24  e-mail back saying that.

Page 237

D. McIsaac

1       Q.   You said earlier that the margin at
2  the OCC was of significant value, did you not?
3       A.   Yes.
4       Q.   Would you have expected any recipient
5  of this e-mail to raise an objection to the
6  OCC's stated intent if they were not of the same
7  understanding as to who would be entitled to the
8  cash and securities collateral held by OCC in
9  respect of the OCC accounts?
10         MR. OXFORD:  Objection.  Form.
11      A.   I believe this is advising the
12  individuals that the OCC is assuming that the
13  assets are being transferred, and in the second
14  paragraph it is saying, "It is our understanding
15  that certain parts of the APA are still being
16  negotiated."
17         So I'm assuming in the interim while
18  they're negotiating the final documents that the
19  OCC wants the -- I'm guessing this is the Asset
20  and Assumption Agreement -- Transfer and
21  Assumption Agreement to be signed.
22      Q.   You see at the very beginning of the
23  e-mail it says, "OCC is seeking to confirm its
24  understanding that all cash and securities

Contains Highly Confidential Portions

Page 238

1           D. McIsaac
2  collateral are intended to be transferred to
3  Barclays"; Do you see that?
4       A.   Yes.
5       Q.   If it's true, as you suggest it may
6  be, that the Purchase Agreement is still being
7  negotiated --
8       A.   I didn't say that. I'm sorry.  Mr.
9  McDaniel is saying that.
10      Q.   Would you expect when the terms of
11 this transaction were confirmed, that if indeed
12 it was the case that Barclays was not to receive
13 the cash and securities collateral held at the
14 OCC, the Trustee and LBI would have been prudent
15 to inform the OCC of that fact?
16      A.   Yes.
17           MR. OXFORD:  Objection.  Asked and
18 answered.
19      Q.   Have you seen any evidence in the
20 record that either the Trustee or LBI's
21 attorneys informed the OCC that Barclays was not
22 intended to receive the cash and securities
23 collateral at the OCC?
24      A.   No.  I think, as I've discussed
25 before, the Transfer and Assumption Agreement is

Page 239

1           D. McIsaac
2  a means to allow Barclays to start trading the
3  next day and protecting the OCC.  Whatever the
4  agreement was regarding those assets that are
5  being transferred and what payment had to be
6  made for them or not be made for them would I
7  expect to be part of an agreement.
8       Q.   Do you agree that if the parties
9  hadn't intended for these assets at the OCC to
10 be transferred to Barclays, it would have been
11 prudent for them to inform the OCC of that?
12           MR. OXFORD:  Objection.  Form.
13      A.   Yes.  As I said, it would have been
14 prudent, if they didn't think that all the
15 assets should have been transferred, it would
16 have been prudent to tell the OCC that they were
17 not agreeing to that.
18      Q.   And have you seen any evidence in the
19 record in which any party told the OCC that they
20 did not intend that?
21      A.   No, I have not seen anything in the
22 record that states that.
23           MS. BLOOMER:  I think if you'll give
24 me a few minutes, I might be wrapped up and
25 we can have Amy come in and start the second

Page 240

1           D. McIsaac
2  part of the deposition.
3           MR. OXFORD:  Okay.  Let's go off the
4  record.
5           THE VIDEOGRAPHER:  The time is 4:13.
6  This is the end of the tape labeled number
7  4.  We're going off the record.
8           (Recess.)
9           (Exhibit 691, Affidavit of Daniel
10 McIsaac, marked for identification, as of
11 this date.)
12           (Exhibit 692, Supplemental Affidavit
13 of Daniel McIsaac, marked for
14 identification, as of this date.)
15           (Exhibit 693, Rebuttal Report of
16 Daniel McIsaac, marked for identification,
17 as of this date.)
18           THE VIDEOGRAPHER:  This is the start
19 of tape labeled number 6.  The time is 4:45.
20 We're back on the record.
21 EXAMINATION BY
22 MS. NEUHARDT:
23      Q.   Good afternoon, Mr. McIsaac.  My name
24 is Amy Neuhardt and I'm representing Barclays
25 and I'm here to discuss with you the reports

Page 241

1           D. McIsaac
2  that I have put in front of you as Exhibits 691,
3  692 and 693.  And could you identify those for
4  the record for me?
5       A.   691 is my affidavit that was filed
6  with the original motion.  69 --
7       Q.   Do you mean the original allocation
8  motion?
9       A.   Allocation motion.  I'm sorry.
10      692 is the Supplemental Affidavit
11 filed with the court on or about February 27,
12 and 693 is the Rebuttal Report.
13      Q.   Okay.  Very good.  Now, in 691 if you
14 could turn to paragraph 5, and in that you say,
15 "Based on my experience in the public and
16 private sectors, I am fully familiar with the
17 SEC rules governing financial responsibility of
18 SEC registered broker-dealers and the protection
19 of customer property and with industry practices
20 regarding the handling of customer property and
21 compliance with SEC Customer Protection Rules."
22           And unless I'm mistaken, which you may
23 take a look, paragraph 2 of your Rebuttal Report
24 contains a very similar statement.  Can you just
25 confirm that?  It's the last sentence.

Contains Highly Confidential Portions

---

Page 242

D. McIsaac

1
2     A.   Uh-huh.
3     Q.   So are you offering opinions as an
4  expert in any substantive area other than what
5  you're describing in this sentence that appears
6  in 691 and 693?
7     A.   When you say -- I'm -- if you can
8  clarify what that means.  I'm not sure what you
9  mean by that.
10    Q.   Sure.  Absolutely.  In particular, are
11 you putting yourself forth as an expert in SIPA
12 statutory or regulatory requirements?
13    A.   No.
14    Q.   Okay.  Are you putting yourself
15 forward as an expert on the practices of SIPC
16 trustees?
17    A.   No.
18    Q.   Okay.  Are you putting yourself
19 forward as an expert on the Bankruptcy Code?
20    A.   No.
21    Q.   All right.  Now, when you say you were
22 familiar with the SEC rules governing financial
23 responsibility of SEC registered broker-dealers
24 and the protection of customer property, are you
25 purporting to be an expert in the legal

---

Page 243

D. McIsaac

1
2  interpretation of those rules?
3     A.   I have spent a good part of 30 years
4  in the industry working on the last 20 years of
5  the preparation of the -- my two firms weekly.
6  I have monthly 3-3 calculations.  I'm a licensed
7  Fin. Op., Series 27, so I interpret -- I would
8  have to review and interpret the rules and the
9  interpretations of those rules.
10    Q.   Okay.  Are you a lawyer?
11    A.   No, I am not.
12    Q.   So your testimony is based on your
13 practice in interpreting 15c3-3, but not based
14 on experience as a lawyer doing legal analysis;
15 is that correct?
16    A.   I am -- sorry.
17         MR. OXFORD:  Objection.  Form.  You
18 can answer.
19    A.   I'm not a lawyer and most people who
20 work on the reserve formula I believe are not
21 lawyers.
22    Q.   Okay.  Now, when you say you are
23 familiar with industry practices regarding the
24 handling of customer property and compliance
25 with SEC Customer Protection Rules, are you

---

Page 244

D. McIsaac

1
2  purporting to be an expert in the operations and
3  processing systems used by Lehman that were fed
4  into the reserve calculation?
5         MR. OXFORD:  Hold on.  Objection to
6  form.  Sorry.
7     Q.   By reserve calculation, I am referring
8  to the calculation required under SEC Rule
9  15c3-3.  Will you understand that that's what I
10 mean when I say "reserve calculation" throughout
11 the deposition?
12    A.   The allocation formula?
13    Q.   Yes.
14    A.   Yes.
15         MR. OXFORD:  Same objection.  Do you
16 have the question in mind?
17    A.   No, maybe --
18    Q.   So when you say you were familiar with
19 industry practices regarding the handling of
20 customer property and compliance with SEC
21 customer rules, are you purporting to be an
22 expert in the operations and processing systems
23 used by Lehman that were fed into the reserve
24 calculation?
25    A.   When you say an expert in the systems,

---

Page 245

D. McIsaac

1
2  I am not a systems analyst.  I am not a systems
3  programmer.  I --
4     Q.   Okay.  So you are not familiar with --
5         MR. OXFORD:  Let him --
6     Q.   I apologize.
7     A.   That's all right.
8     Q.   I realize you weren't through.
9     A.   I am very familiar with the allocation
10 process and what people preparing the report
11 will look to see out of the allocation process.
12    Q.   Okay.  So are you familiar with the
13 ADP system?
14    A.   Yes, I am.
15    Q.   Okay.  The ITS system?
16    A.   No, not necessarily.
17    Q.   Okay.  NTS?
18    A.   I am familiar with fixed income
19 systems.
20    Q.   Okay.  And the RISC, R-I-S-C, system?
21    A.   I am not intimately familiar with it.
22    Q.   Okay.  Have you ever had any prior
23 experience in forensic accounting?
24    A.   No.
25    Q.   Okay.  Now, are you aware that the

---

Contains Highly Confidential Portions

Page 246

D. McIsaac

1  Trustee and Barclays are currently in a dispute
2  regarding the interpretation of a contract under
3  which Barclays purchased assets from the former
4  Lehman Brothers estate?
5       A.   Yes, I am.  I sat here through four
6  hours of a deposition on that.
7       Q.   Yes.  I just don't want a foundation
8  objection from Neil over there.
9            Okay.  Are you purporting to offer any
10 opinion on the interpretation of the language in
11 that contract?
12           MR. OXFORD:  Objection.  Form.
13      A.   I don't know if you're going to ask me
14 a question on it, but I don't -- I don't think
15 this allocation motion was part of -- looked
16 at -- I might have reviewed that, but it wasn't
17 part of reliance.
18      Q.   Have you been asked by anybody to
19 analyze the contract?
20           MR. OXFORD:  Is your question, because
21 as Mr. McIsaac says, we have sat through
22 almost five hours of questioning --
23           MS. NEUHARDT:  A lot.
24           MR. OXFORD:  -- from your colleague in

Page 247

D. McIsaac

1  connection with the Asset Purchase Agreement
2  and various other documents.  It would be
3  clearer for me and perhaps also for the
4  witness it will make things a little quicker
5  if you could clarify if your questions are
6  relating solely to the three affidavits and
7  reports that you have premarked.
8            MS. NEUHARDT:  Yes, they are.
9       Q.   I am purely asking whether you have
10 been asked to interpret the contract as it
11 relates to assets in the reserve accounts or
12 substitute assets for what would be in the
13 reserve account?  That doesn't help --
14           MR. OXFORD:  I still have an objection
15 to form, but you can answer if you're able.
16      A.   I'm not sure where you're going.  I
17 thought there was only one thing in the
18 allocation motion that talked to the contract
19 with Barclays, and that's the OCC deposit.
20      Q.   Okay.  Have you examined any other
21 part of the contracts other than the portion
22 that relates to the OCC margin other than in
23 this morning's portion of the deposition?
24      A.   In relation to?

Page 248

D. McIsaac

1       Q.   To your opinion as set forth in the
2  three exhibits sitting in front of you?
3       A.   I don't think I placed reliance on the
4  APA to review whether or not the 3-3 was in
5  compliance with the rules.
6       Q.   Okay.  Did you place any reliance on
7  the Clarification Letter?
8       A.   Again, I don't know, in relation to
9  this, if I placed any reliance on it.
10      Q.   You don't know if you placed reliance
11 on it?
12      A.   I don't think I placed any reliance on
13 that.  I was asked to review the 3-3 allocation
14 and what could be or compliance issues thereto.
15      Q.   Okay.  If you could turn to the first
16 exhibit in -- the first exhibit in the first
17 exhibit, which is your resumé, and it should be
18 tagged with a purple tag.
19      A.   Yes.
20      Q.   This is your resumé, correct?
21      A.   Yes, it is.
22      Q.   It says you have a bachelor of science
23 in accounting from Lehman College; is that
24 correct?

Page 249

D. McIsaac

1       A.   Yes.
2       Q.   Okay.  Do you have any other formal
3  education?
4       A.   No postgraduate.  No postgraduate
5  education.
6       Q.   So you did no work toward a degree
7  that you then did not receive?
8       A.   No.
9       Q.   So you've taken the courses in law?
10      A.   I've taken the courses that were
11 required for my CPA certification.
12      Q.   Did that include any courses in law?
13      A.   Yes.  Business law I think was a
14 requirement.
15      Q.   Business law, okay.  All right, that's
16 all I have about your education.
17           Now, this shows the most recent
18 position as you being at UBS Securities.  You do
19 not still work at UBS, do you?
20      A.   No, I left UBS in June.
21      Q.   In June of 2009?
22      A.   9.
23      Q.   Okay.  And why did you leave?
24      A.   There was downsizing at UBS.

Contains Highly Confidential Portions

---

Page 250

D. McIsaac

1
2  Q.  And where do you currently work?
3  A.  Currently today I work for KPMG.
4  Q.  And how long have you been at KPMG?
5  A.  Three weeks.
6  Q.  Three weeks?  Okay.  What's your
7  position there?
8  A.  Director of Regulatory Advisory.
9  Q.  Okay.  And did you hold any position
10 between UBS and KPMG?
11 A.  Between then I was acting as an
12 independent consultant.
13 Q.  And was that as independent consultant
14 to the Trustee on this matter?
15 A.  That, and I had other clients I was
16 doing work for.
17 Q.  Can you tell me the other clients?
18 A.  It's confidential, I would think.
19 Q.  It's confidential.  All right.
20     When did you first begin doing
21 consulting work for the Trustee?
22 A.  On or about the middle of July.
23 Q.  Did you perform any work for Lehman
24 Brothers Holdings, Inc. as an independent
25 consultant?

---

Page 251

D. McIsaac

1
2  A.  No.
3  Q.  Okay.  Did you serve any function for
4  the Trustee other than as an expert witness for
5  this matter in your independent consulting?
6  A.  I provided an expert report on the
7  derivatives, and I provided two other -- I think
8  they're called affidavits for other issues
9  regarding customer property.
10 Q.  Do you know if those affidavits were
11 filed in the public record?
12 A.  I believe they were, but I don't know.
13 I can't say for sure.
14 Q.  Okay.  And did you perform any other
15 services for the Trustee?
16 A.  From time to time.
17     MR. OXFORD:  I'll let you answer that
18     question yes or no, Mr. McIsaac.
19 A.  Yes.
20 Q.  Okay.  I think I know what's coming.
21     Can you describe for me the nature of
22 the services you performed for the Trustee?
23     MR. OXFORD:  I'm going to object to
24     the form of that question and instruct you
25     not to answer.

---

Page 252

D. McIsaac

1
2     MS. NEUHARDT:  And what's the basis of
3     your instruction?
4     MR. OXFORD:  It's privileged.
5     MS. NEUHARDT:  Can you describe for me
6     the basis of the privilege?
7     MR. OXFORD:  Yes.  Mr. McIsaac has
8     been retained as a consultant by the Trustee
9     to provide professional advice.
10    MS. NEUHARDT:  Are you representing
11    that none of the other services that he
12    performed for the Trustee relate in any way
13    to his opinions that have been proffered in
14    these three exhibits?
15    MR. OXFORD:  That is my understanding.
16    MS. NEUHARDT:  That's your
17    representation on the record?
18    MR. OXFORD:  That's my best
19    understanding.
20 Q.  Okay.  Now, other than the positions
21 with KPMG and your independent consulting that
22 we have discussed, are there any other
23 professional positions that you have held in the
24 last 20 years that are not reflected on this
25 resumé?

---

Page 253

D. McIsaac

1
2  A.  I've been a chair -- well, it's in the
3  resumé.  So, no, everything's in the resumé.
4  Q.  Now, in your work as an independent
5  consultant, and I'm referring specifically to
6  your work on the expert reports that are in
7  front of you, did you have any staff assisting
8  you?
9  A.  No, I did not.
10 Q.  Okay.  All right.  I'm going to start
11 with at UBS, could you explain to me how your
12 position at UBS gave you experience with
13 industry practices regarding the handling of
14 customer property and compliance with SEC
15 customer rules?
16 A.  Yes.  I was the Fin. Op. for UBS
17 Securities Financial Operational Principal.  I
18 signed the Focus Reports.  I took all
19 responsibility on the financial information
20 filed with the regulators.  I supervised the
21 reserve formula calculation, the net capital
22 calculations, the seg and secured calculations,
23 as well as the filing of the Focus Reports.
24 Q.  Okay.  And did you ever personally do
25 the reserve calculation?

---

Contains Highly Confidential Portions

Page 254

D. McIsaac

1      A.   I worked on it as a more junior
2 person.
3      Q.   When you were at UBS?
4      A.   No. No.
5      Q.   Was that in one of your prior
6 positions?
7      A.   At Dean Witter I managed a group.  I
8 also did some work on it from time to time when
9 somebody was out.
10     Q.   At Dean Witter that was not a part of
11 your regular duties?  You worked on it if
12 someone was out?
13     A.   I supervised it.  It came under my --
14 I managed a group that did it, the people that
15 did it.
16     Q.   Okay.  You mentioned that you hold a
17 Series 27 license.  Do you hold any other
18 professional licenses?
19     A.   No.
20     Q.   Have you in the past?
21     A.   Oh, sorry.  I take that back.  A CPA
22 license.
23     Q.   I was just going to ask you.
24     A.   No.  I was thinking when you say that

Page 255

D. McIsaac

1 along the lines of other series, but, yes, CPA.
2      Q.   Are you in any professional
3 organizations?
4      A.   I'm a member of the AICPA, the New
5 York State Society of CPAs.  I'm a member of the
6 Financial Management Division of SIFMA, the
7 Securities Industry and Financial Markets
8 Association.  I'm past president of the
9 Financial Markets Division, the Financial
10 Management Division I think it's called, and up
11 until three weeks ago when I took the job at KPM
12 I chaired the SIFMA Capital Committee.
13     Q.   Did the AICPA study in any way SEC
14 Rule 15c3-3?
15     A.   The AICPA has issued an audit guide
16 for the auditing of securities broker-dealers.
17     Q.   Did you have any involvement in that?
18     A.   I might have had some involvement of
19 it when I was at Deloitte in a past life of
20 reviewing it possibly, but that was many
21 editions ago.
22     Q.   Okay.  And did the New York State
23 Society for CPAs have any involvement in
24 interpreting Rule 15c3-3?

Page 256

D. McIsaac

1      A.   No.
2      Q.   Okay.  And the same question for
3 SIFMA?
4      A.   Yes, the capital committee is
5 intimately involved in the capital rules and
6 Customer Protection Rules.
7      Q.   Okay.  Have you ever served as an
8 expert witness before?
9      A.   No.  Four hours ago.
10     Q.   Other than in this matter?
11     A.   No.
12     Q.   Very good.  Okay.  Now, as an expert
13 relating to the reports that are in front of you
14 right now, not what you discussed with Ms.
15 Bloomer this morning, how many hours of time
16 have you billed to the Trustee in putting
17 together your opinions here?
18     A.   On the two of these?
19     Q.   Uh-huh.
20     A.   I'd have to go back, but it was
21 hundreds.
22     Q.   Can you give me a range?
23     A.   Maybe three to four hundred.
24     Q.   Do you know how much you have billed?

Page 257

D. McIsaac

1      A.   No, I don't.
2      Q.   Have you ever written any
3 publications?
4      A.   No.
5      Q.   Okay.  In the -- you say you've spent
6 hundreds of hours on these two reports.  Do you
7 have a sense of how much was devoted to the
8 original affidavit of October 5?
9           MR. OXFORD:  Objection.  Form.
10          You can answer if you're able.
11     A.   Maybe a couple hundred.  I don't -- I
12 don't recall how much exactly.  Probably a
13 little bit more than 200, but I don't remember.
14          MS. NEUHARDT:  I think under the
15 stipulation we're entitled to that
16 information, so perhaps you can provide that
17 to us later today or tomorrow.
18          MR. OXFORD:  I don't think I can get
19 it to you later today, but I will certainly
20 take your request under advisement.
21          MS. NEUHARDT:  Okay.
22     Q.   Have you ever been involved in a SIPC
23 liquidation before?
24     A.   No.

Contains Highly Confidential Portions

Page 258

D. McIsaac

1
2    Q.   Have you ever been involved in
3 performing 15c3-3 calculations at the time of a
4 merger or an acquisition?
5    A.   Yes.
6    Q.   Okay.  Could you tell me when that
7 would be?
8    A.   UBS merged with SBC on or about June
9 29, 1998.  There was a merger with various
10 acquisitions of various assets of PaineWebber
11 that were included as part of the acquisition of
12 UBS Securities acquired some of the assets, and
13 that was somewhere around November of 2000.
14    Q.   Okay.
15    A.   We at UBS purchased the prime
16 brokerage business from ABN Amro I want to say
17 it's around 2003, but I'm fuzzy on the time.
18       We purchased a futures business, but
19 that didn't have anything to do with 3-3, and
20 probably some other asset purchases or smaller
21 type purchase of assets or businesses along the
22 way.
23    Q.   Okay.  All right.  Now we're going to
24 get into the substance of your opinions.  Under
25 SEC Rule 15c3-3, prior to filing for

Page 259

D. McIsaac

1
2 liquidation, are the assets in a reserve account
3 considered the property of the broker-dealer or
4 the property of customers?
5    A.   The assets have to be the property of
6 the broker-dealer because they're their assets.
7    Q.   Okay.  So would customer property as
8 defined under SEC Rule 15c3-3 ever be put in the
9 reserve account?
10       MR. OXFORD:  Objection.  Form.
11       You can answer.
12    A.   Customer's property that they own,
13 such as securities, would be included in the
14 reserve formula based on an allocation of those
15 assets and the use of those assets.
16    Q.   But would the securities be placed in
17 the reserve account?
18    A.   In the 15c3 reserve account?
19    Q.   Correct.
20    A.   No.
21    Q.   Okay.  Do you know how many accounts
22 LBI had that comprised its reserve account under
23 SEC Rule 15c3?
24    A.   You'll have to define what you mean by
25 "accounts."  I don't --

Page 260

D. McIsaac

1
2    Q.   Well, they -- are you aware that there
3 was a bank account at Wells Fargo that was used
4 for part of the reserve account?
5    A.   There was a, I believe, a reserve
6 formula account, an account for the benefit of
7 customers at Wells Fargo.
8    Q.   Correct.  Do you know how many such
9 accounts LBI held?
10    A.   If my memory is correct, it was three
11 or four, I believe.
12    Q.   Okay.  And do you remember what banks
13 those were at other than Wells Fargo, which we
14 have discussed?
15    A.   I believe there might have been
16 something at JPMorgan, but I don't remember
17 exactly, and I don't remember the other two.
18    Q.   What was the total amount as of
19 September 19, 2008 that was in LBI's reserve
20 accounts?
21    A.   I'd have to look in my report for the
22 exact number, but I believe it was about a
23 billion-17 -- a billion-760 million, something
24 on that nature.
25    Q.   Could you show me in your report where

Page 261

D. McIsaac

1
2 you got that number?
3       MR. OXFORD:  Amy, are you asking a
4 question where he got it or where it is in
5 the report?
6       MS. NEUHARDT:  It's the source, what
7 his source is for the -- his testimony that
8 that is the total amount that was locked up
9 as of that date.
10       MR. OXFORD:  Okay.
11    A.   So not where it is in here?
12    Q.   Hum?
13    A.   Not where --
14    Q.   Well --
15    A.   I'm confused.
16    Q.   -- if it's not in there, I would like
17 to know what it is that you did rely upon.  And
18 we do have materials that your counsel -- LBI's
19 counsel produced that you purported to rely on.
20 And you can check in there if you want, but if
21 it's attached to your report, that would be
22 easier.
23    A.   You'll have to give me a minute to go
24 through it.  I don't know if it's ...
25    Q.   While you're looking, I can ask the

Contains Highly Confidential Portions

Page 262

D. McIsaac
1  question, did you look at the bank account
2  statements for each of the three or four
3  accounts that we discussed earlier?
4      A.  No.  The Trustee's financial
5  professionals provided me with the schedule of
6  what was in the accounts.
7      Q.  And by "financial professionals," who
8  are you referring to?
9      A.  I believe it came from legal counsel.
10     Q.  From legal counsel.  It didn't come
11  from Deloitte?
12     A.  It might come from Deloitte
13  eventually, but it was given to me by legal
14  counsel.
15     Q.  And did you do any independent
16  investigation of the correctness of the
17  materials supplied to you by legal counsel?
18     A.  No.
19     Q.  You know what, why don't we have you
20  look for that on a break and go on in an effort
21  to --
22     A.  Sure.
23     Q.  -- save time.
24        Under SEC Rule 15c3-3, if there is an

Page 263

D. McIsaac
1  excess in the reserve account, is that held for
2  the exclusive benefit of customers?
3      A.  Everything in that account is held for
4  the exclusive benefit of customers.
5      Q.  So is it your testimony that even
6  amounts that are not required to be held there
7  are for the benefit of customers?
8        MR. OXFORD:  Objection.  Asked and
9  answered.  You can answer again.
10     A.  If it's held in there, it's for the
11  exclusive benefit of customers.
12     Q.  Okay.  Is a broker-dealer allowed to
13  withdraw excess?
14        MR. OXFORD:  Objection.  You can
15  answer.
16     A.  A broker-dealer can make withdrawals
17  and deposits based on calculations.
18     Q.  Okay.  And is there any requirement
19  that a broker-dealer receive SEC approval before
20  making a withdrawal of excess?
21     A.  I do not believe there's any
22  requirement to get the approval of the SEC in
23  the normal course.
24     Q.  Okay.  Now, you qualified your last

Page 264

D. McIsaac
1  answer by saying you did not believe there was a
2  requirement to get SEC approval in the normal
3  course?
4      A.  Correct.
5      Q.  Do you believe there's a requirement
6  to get SEC approval at any other time?
7      A.  Well, I would assume if you're in
8  liquidation, you can't move moneys out of the
9  account without the approval of the S.E.C., but
10  I don't know that for a fact.
11     Q.  Okay.  Are you basing your assumption
12  on anything in SEC Rule 15c3-3?
13     A.  I don't believe anything I've seen
14  there.  What I've seen in the rules is basically
15  you have to do a withdrawal -- a calculation
16  before you can do a withdrawal.
17     Q.  Okay.  In your rebuttal report,
18  paragraph 13, you state that the -- I'll give
19  you a moment to get to that.  In the second
20  sentence you state, "The only relevant point in
21  time" --
22     A.  Excuse me.  Excuse me.  What
23  paragraph?
24     Q.  13.  I'm sorry.

Page 265

D. McIsaac
1      A.  Page 13.
2      Q.  No, paragraph 13, page 6.
3      A.  Oh, I'm sorry.  I thought you said
4  page 13.
5      Q.  No, my apologies.
6      A.  Okay.
7      Q.  Okay.  Second sentence says, "The only
8  relevant point in time for the purpose of
9  determining the accuracy of LBI's reserve
10  calculation as of September 19, 2008, is
11  September 19, 2008."
12        Why -- why do you believe that
13  September 19, 2008 is the relevant date?
14     A.  That's the -- that's when the
15  calculation is as of.  So anything that has
16  happened as of that date or known as of that
17  date is what goes into the formula.
18     Q.  Why -- well, were you told to do a
19  calculation as of September 19, 2008, or did you
20  independently decide that that was the relevant
21  date for a calculation?
22        MR. OXFORD:  Objection to the form.
23  That misstates the facts and the evidence,
24  and I think you're misreading his reports.

Contains Highly Confidential Portions

Page 266

D. McIsaac

1
2    You can answer if you can.
3    A.   I believe the 19th of September 2008
4    was the last reserve requirement prepared by
5    Lehman prior to entering into SIPC protection.
6    Q.   Okay.  Do you know the date that LBI
7    entered into SIPC protection?
8    A.   I believe it was sometime on or about
9    the 19th of September.
10    Q.   Okay.  Do you know if they had
11    performed a calculation on that date prior to
12    entering into SIPC liquidation?
13         MR. OXFORD:  Objection to form.
14    A.   I have not seen any as of September
15    18, I don't believe.
16    Q.   Have you seen any as of the morning of
17    September 19?
18    A.   I'm sorry, as of the morning of
19    September 19th?  As of what period of time?
20    Q.   Prior to entering into liquidation on
21    the day of the 19th?
22    A.   Based on what period?  Based on what
23    ending period?
24    Q.   Any ending period.
25    A.   You can only do it at the end of a

Page 267

D. McIsaac

1
2    day.  You can't do it in the middle of a day.
3    Q.   Okay.  So then wasn't the last
4    calculation actually performed by LBI prior to
5    entering into liquidation done on the 17th?
6    A.   I don't think so.  I thought they were
7    required to do a calculation as of the close of
8    business on the 19th.
9    Q.   Even if they were no longer in
10    business?
11    A.   I don't know what the whole rule is
12    around SIPC, but I believe they were required to
13    do a calculation as of the close of business the
14    19th because that was the last day of business.
15    Q.   Could you show me in -- we can get you
16    Rule 15c3-3.  We're going to mark that as
17    Exhibit 694.
18         (Exhibit 694, Rule 15c3-3, marked for
19    identification, as of this date.)
20    Q.   I've put before you SEC Rule 15c3-3.
21    Could you tell me where in Rule 15c3-3 LBI would
22    have been required to do a reserve calculation
23    on the 19th despite entering into liquidation on
24    that day?
25         MR. OXFORD:  Objection.  Form.

Page 268

D. McIsaac

1
2    Misstates the witness's testimony.
3         You can answer.
4    A.   I don't think there's anything in Rule
5    15c3-3 that says when anybody is supposed to do
6    a calculation as opposed to the 19th.  I believe
7    it says that you do calculations as of Friday
8    and the last business day of the month.
9    Q.   Okay.
10    A.   That was their last business day.
11    Q.   Is it your position that 15c3-3
12    continues to apply after entering into SIPC
13    liquidation?
14    A.   I would think you would have to do a
15    final calc if it was a Friday close of business
16    to account for all your assets in this process.
17    Q.   And the basis for that belief is?
18    A.   The last day of business was a Friday.
19    I don't know if you would have to do it if the
20    last day of business was a Wednesday, but their
21    last day of business was a Friday.
22    Q.   So it's your position that even though
23    at the end of the day of business on that Friday
24    they were in liquidation, they still would have
25    had to do a 15c3-3 calculation?

Page 269

D. McIsaac

1
2    A.   I believe so.  That's my opinion.
3    Q.   Okay.  And that is based on?
4    A.   You're supposed to do calculations as
5    of Friday or month end, and that was a Friday of
6    business.
7    Q.   So you have no other basis for your
8    opinion that a 15c3-3 calculation would have
9    been required even though they had entered into
10    liquidation on that day?
11    A.   I believe the SEC required a 3-3
12    calculation to be done, but I don't know if I
13    can point to anything that says that.
14    Q.   When you say the SEC required it, do
15    you mean by rule or are you talking about events
16    as of that day, communications that day?
17    A.   I thought by rule they required it as
18    of the close of business on Friday.  I think
19    they -- did they go into -- I believe they went
20    into liquidation after the markets closed, which
21    would be the close of their business day.
22    Q.   And if that were not the case, would
23    that change your opinion in any way?
24    A.   Then I would leave it up to the
25    regulators to determine if a calculation had to

Contains Highly Confidential Portions

Page 270

D. McIsaac

1
2  be done at that point in time.
3      Q.   So you don't have an opinion, then, if
4  the liquidation started prior to the close of
5  business on Friday?
6      A.   If the --
7          MR. OXFORD: Objection. Form.
8      You can answer.
9      A.   If the liquidation was at 1 o'clock --
10  9 o'clock in the morning, I might have a
11  different opinion, but it was I believe after
12  the close of business. I think it was finally
13  approved sometime Saturday morning.
14      Q.   Okay.
15      A.   And I'm assuming --
16      Q.   I'm trying to make sure you've
17  answered my question. I don't think we've
18  established what time it was.
19          If it did happen prior to the close of
20  business, does that change your opinion?
21          MR. OXFORD: Objection. Form.
22      You can answer.
23      A.   I don't know. I don't have an opinion
24  on it.
25      Q.   Okay. Now, under -- for a moment

Page 271

D. McIsaac

1
2  we'll assume that the 19th is the appropriate
3  date, and I believe you said that under the
4  SEC -- well, rather than recharacterize your
5  testimony, how often does an operating
6  broker-dealer have to do its reserve
7  calculation?
8      A.   It's based on what type of
9  broker-dealer it is. One of Lehman's stature
10  had to do one weekly and as of month end.
11      Q.   And you said normally it was done on
12  Friday afternoons, correct?
13      A.   As of close of business Friday and as
14  of month end.
15      Q.   Okay. Now, if a calculation done on
16  the -- done as of the close of business on
17  Friday showed a shortfall, at what time would
18  the broker-dealer be required to make up the
19  shortfall?
20      A.   10 A.M. the second business day
21  following the day of closing. So on a Friday,
22  as long as Monday was a business day, 10 o'clock
23  Tuesday.
24      Q.   Okay. And that's under Rule 15c3-3 as
25  well?

Page 272

D. McIsaac

1
2      A.   Yes.
3      Q.   Now, in this case, Lehman was no
4  longer operating as of 10 A.M. the following
5  Tuesday morning, correct?
6      A.   I believe that's the case.
7      Q.   So as of Friday, the 19th, it would
8  not have had an obligation to actually deposit a
9  shortfall into the account?
10      A.   I believe --
11          MR. OXFORD: Objection to form.
12      You can answer.
13      A.   I believe Lehman was still a
14  broker-dealer and had not issued a BDW as of
15  that point in time.
16      Q.   I'm sorry, what is a BDW?
17      A.   Withdrawal as a broker-dealer.
18      Q.   Okay. So is it your testimony that
19  even after filing for liquidation LBI was an
20  operating broker-dealer?
21      A.   No. I'm saying they didn't file a BDW
22  and still would have been, I think, required to
23  make a deposit on Tuesday morning if they had to
24  add to their deposit.
25      Q.   Despite the fact that a Trustee had

Page 273

D. McIsaac

1
2  been appointed and was running the operations?
3      A.   (Witness nods.)
4          Yes, I'm sorry.
5      Q.   You do need to answer.
6      A.   I know that.
7      Q.   Could you show me or could you tell me
8  what the source of your opinion on that is?
9      A.   I don't think there's anything in the
10  literature that says that. I don't think
11  there's anything in the literature that points
12  to a broker-dealer going out of business on a
13  Friday and whether or not it has to make its
14  deposit on Tuesday.
15      Q.   So you're not basing your opinion on
16  anything?
17      A.   Just --
18          MR. OXFORD: Objection. Form. It's
19      not what the witness said.
20          But you can answer.
21      A.   Practice, common practice, and I would
22  think they would do their last computation.
23      Q.   You say common practice. How often
24  have you been involved in a broker-dealer that
25  has gone into liquidation?

Contains Highly Confidential Portions

Page 274

D. McIsaac

1
2   A.   Never.
3   Q.   Okay.  Let's turn to the discussion of
4  FID accounts, and in your original report that
5  was at paragraphs -- I didn't put it down
6  here -- it starts on page 13 of your original
7  report.  It's relating to Fixed Income Division
8  prime broker clients that are being referred to
9  as FID accounts?
10   A.   That's correct.
11   Q.   In your original report you stated
12  that securities had been liquidated by Chase, is
13  that correct?
14   A.   That's correct.
15   Q.   And you decided that was an error for
16  your rebuttal report; is that correct?
17   A.   No, for my additional affidavit that
18  was put in.
19   Q.   Okay.  I apologize.  But your opinion
20  on that has changed?
21   A.   That's correct.
22   Q.   Okay.  Now, from where did you get the
23  number of 891 million as being the -- yes, as
24  being the relevant number?  And for reference,
25  that would be in paragraph 35 of your original

Page 275

D. McIsaac

1
2  affidavit.
3   A.   That's a combination of the 630
4  million of assets and the 281 million -- $258
5  million of the cash.
6   Q.   Okay.  Well, I'm not seeing citations
7  for either the 630 million number or the 258
8  million number.  So where did you get those
9  numbers?
10   A.   They were provided to me by the
11  Trustee's financial advisor.
12   Q.   Did you do any independent
13  investigation of the accuracy of those numbers?
14   A.   I reviewed some documents that would
15  have shown the numbers there, would have shown
16  the accounts with the balances in them and the
17  asset value.
18   Q.   Are those documents attached to your
19  affidavit?
20   A.   I don't know if they are or not.  I
21  don't think so.
22   Q.   Did you speak to anybody about the
23  accuracy of those numbers?
24   A.   The Trustee and their financial
25  advisors.

Page 276

D. McIsaac

1
2   Q.   By "financial advisors" are you
3  referring to legal counsel again?
4   A.   It would have been legal counsel
5  and/or their financial advisors, Deloitte.
6   Q.   Deloitte.  Can you tell me who you
7  spoke to at Deloitte?
8   A.   Chris Harris and Marlo Karp.
9       I'm sorry, I didn't know if that was
10  privileged.
11       MR. OXFORD:  If I might, let me
12  perhaps make this go a little more smoothly.
13  To the extent, Mr. McIsaac, you relied upon
14  advice from Deloitte -- or, not advice, you
15  relied on information as a source of the
16  facts upon which you base your opinion
17  whether in your original affidavit or
18  supplemental affidavit or your rebuttal
19  report, then I think it's fine for you to
20  answer those questions.
21       To the extent Ms. Neuhardt's questions
22  call for discussions with Deloitte or any
23  other person that you did not rely on as a
24  source of information for the opinions
25  expressed in these affidavits and reports,

Page 277

D. McIsaac

1
2  then I will instruct you not to answer that
3  question.
4       THE WITNESS:  Okay.  Thank you.
5   Q.   I'm trying to find out the underlying
6  source of the facts underneath your report.
7   A.   It would have been either Chris Harris
8  or Marlo Karp.
9   Q.   Did you speak to any employees of the
10  Trustee?
11   A.   No, I did not.  Well, employees of the
12  Trustee?  Legal counsel?
13   Q.   No.
14       MR. OXFORD:  Maybe we can clear things
15  up.  Does your question, Amy, go to the --
16       MS. NEUHARDT:  I'm going to the TSA
17  employees, basically.
18       MR. OXFORD:  Okay.  Because that's
19  different than they're not employees of the
20  trustee.
21       MS. NEUHARDT:  But they're performing
22  services for him.
23       MR. OXFORD:  Sure.  Maybe we can ask
24  this again and make sure Mr. McIsaac
25  understands the question.

Contains Highly Confidential Portions

Page 278

D. McIsaac

1
2     Q.   Are you aware that there are persons
3  who are normally employed by Barclays who work
4  entirely at the direction of the Trustee?
5        MR. OXFORD:  Objection.
6     A.   I'm aware that there are employees of
7  Barclays doing work under a TSA. I don't know
8  what they're doing or who they are.
9     Q.   When you say "TSA," what are you
10 referring to?
11    A.   Some kind of transfer services
12 agreement I believe is what it's call in the
13 industry.
14    Q.   Do you understand that those employees
15 are working for the Trustee?
16    A.   I don't know who they're working for.
17    Q.   Okay. Did you speak to any of those
18 individuals in relation to the FID accounts?
19    A.   No.
20    Q.   Did you speak to any of those
21 individuals in relation to anything in your
22 reports?
23    A.   No.
24    Q.   How did you determine that the $891
25 million were customer assets?

Page 279

D. McIsaac

1
2     A.   They were assets in the customer
3  accounts that went -- that went into a -- an
4  account at Chase designated for the benefit of
5  customers.
6     Q.   What I'm trying to understand is what
7  the source is for your statement that they were
8  assets in the customer accounts.
9     A.   I received a document that listed the
10 accounts and the account -- the accounts and the
11 money, monetary value and the security market
12 value in those accounts.
13    Q.   Did you do any independent
14 investigation of the accuracy of that document?
15    A.   No, I did not. I believe I reviewed
16 the stipulation agreement that might have also
17 included information on those accounts.
18    Q.   Is that stipulation agreement attached
19 to your report?
20    A.   I don't believe it is.
21    Q.   Sorry?
22    A.   No. No.
23       MR. OXFORD:  Just to move this along,
24    Amy, are you referring to any report or a
25    specific report?

Page 280

D. McIsaac

1
2       MS. NEUHARDT:  He said that there's a
3    document he looked at that helped him
4    determine whether or not the assets that he
5    described in his report as FID assets --
6    that he describes as customer assets, he
7    said he looked at a document and that told
8    him they were customer assets. And then I
9    asked if he did any independent
10   investigation, and he first said no, but
11   then he said he may have looked at a
12   stipulation, and I asked whether or not he
13   attached that in his report.
14       MR. OXFORD:  Okay. Just for ease, I
15   can represent that it's been produced to you
16   and I believe it actually may be attached to
17   his report, but I'll --
18    A.   Yes, you say reports. I'm not sure
19 which report. I don't think it's in the --
20    Q.   When I say report, either any of the
21 three reports sitting in front of you -- I guess
22 it's two reports and one supplemental affidavit.
23       And what was your source for stating
24 that these particular assets were seized?
25    A.   Chase took control of the assets and

Page 281

D. McIsaac

1
2  did not return them to the Trustee.
3     Q.   What's your source for that?
4     A.   The documents that were provided to me
5  by the financial.
6     Q.   On this one I'm going to need you to
7  show me which documents. If you could look at
8  your report and show me which documents you're
9  using to rely on for the prospect that they were
10 seized. I understand, but I need you to
11 identify what you're relying on for that. So --
12    A.   I have a list of assets. I don't
13 believe I have any -- anything -- I don't think
14 it's in my documents. I can look for you to see
15 in the extra documents if we provided anything
16 from Chase showing that they were moved out of
17 Chase's account. I believe somewhere in here we
18 have the accounts showing zero balances in them.
19    Q.   Do you know what day they were seized
20 if in fact they were seized?
21    A.   Chase, from my understanding, on or
22 about the 18th of September --
23    Q.   On the 18th?
24    A.   I'm not finished.
25       -- shut off access to Lehman to have

Contains Highly Confidential Portions

Page 282

D. McIsaac

1         D. McIsaac
2  access to the accounts.  Somewhere along that
3  period of time, the assets were taken out of the
4  accounts of Lehman.
5      Q.   So when you say shut off access,
6  you're referring to shutting off electronic
7  ability to monitor --
8      A.   Yes.
9      Q.   -- the accounts?
10     A.   The screens were shut off.
11     Q.   Are you equating that to seizure?
12     A.   No.  I'm just saying that at that
13  point in time, LBI was not aware of what was in
14  the accounts.
15     Q.   Okay.  But do you know when the assets
16  were actually seized?
17     A.   I believe the reports that came from
18  Chase, and I'm looking for them in here because
19  I believe they're in here, showed that, as of
20  the 19th, they were removed from the accounts.
21     Q.   Do you know if it was before or after
22  LBI filed for liquidation -- sorry, filed for
23  SIPC protection?
24     A.   I don't believe Chase put a time stamp
25  on when they removed them out of the accounts.

Page 283

1         D. McIsaac
2      Q.   So you don't know one way or the
3  other?
4      A.   I'm not sure what the relevance would
5  be of that if they had no access to those assets
6  as of the 19th.
7      Q.   Well, again, are you equating the
8  inability to monitor the accounts with seizure?
9      A.   No, I'm saying that they didn't know
10  if they had them or not had them at the 19th
11  because they had no access to their accounts.
12     Q.   Are you saying that the inability to
13  monitor alone would make it no longer a good
14  control location?
15     A.   No, I just said that they wouldn't
16  have known at that point in time if they were in
17  the accounts or not.
18     Q.   So the mere fact that they could not
19  monitor would not have turned those accounts
20  into a -- strike that.
21         MR. OXFORD:  And Amy, just on the
22  seize question, maybe we could add that to
23  the list of things you want Mr. McIsaac to
24  look at at a break and it'll speed things up
25  a little bit.

Page 284

1         D. McIsaac
2         MS. NEUHARDT:  Uh-huh.
3      Q.   Is electronic access required to be a
4  good control location under 15c3-3?
5      A.   No.
6      Q.   Okay.  So it's the seizure that is
7  critical to your opinion on this?
8      A.   Yes.
9      Q.   But you do not know at what time on
10  the 19th these assets were seized?
11     A.   No, I do not.
12     Q.   Okay.  Now, what are the requirements
13  of a good control location under 15c3-3?
14     A.   You should have a letter from the
15  bank.
16     Q.   A "no lien letter"?
17     A.   Stating they have no liens on those
18  assets.
19     Q.   Are there any other requirements?
20     A.   I believe that the language in the
21  letter talks to no lien, except for payment of
22  certain fees and that.
23     Q.   Now, do you know if there was a "no
24  lien letter" from Chase with regards to these
25  accounts?

Page 285

1         D. McIsaac
2      A.   I believe there were "no lien letters"
3  from Chase with these accounts.
4      Q.   Were they revoked on or before the
5  19th?
6      A.   I believe there was certain ambiguity
7  on whether or not those accounts were being used
8  by Chase for credit purposes or reviewing the
9  equity of LBI at points in time throughout the
10  year.
11     Q.   I don't think that answers my
12  question.  Do you know if the "no lien letters"
13  were revoked on or before the 19th?
14     A.   I do not know if they were revoked
15  before.
16     Q.   Okay.  Now, you refer in your report
17  regarding the FID assets to an overdraft notice;
18  is that correct?
19     A.   Which report are we talking about now?
20     Q.   Both of them, actually.  I'm still
21  just talking about the FID reports.
22     A.   Uh-huh.
23     Q.   Did you -- did you review the
24  overdraft notice?
25     A.   I've seen documentation that showed

Contains Highly Confidential Portions

Page 286

D. McIsaac

1    that it was an overdraft at Chase.
2    Q.    Did you do any investigation into --
3    did you do any investigation into whether or not
4    the notice was properly issued?
5    A.    No.
6    Q.    Okay.  And did you inquire --
7    A.    I --
8    Q.    Sorry?
9    A.    I said, no, I don't know what notice
10   of properly issued would be in an overdraft
11   account.  Usually you would get a statement from
12   the bank or you would see it online.  I don't
13   know if that constitutes a notice.
14   Q.    Did you do any investigation into
15   whether or not Chase had acknowledged to Lehman
16   on the 19th that the notice was improperly
17   issued?
18   A.    What notice now?
19   Q.    You told me you reviewed an overdraft
20   notice.
21   A.    And did Chase say that it was
22   improperly issued?  No.
23   Q.    I'm asking if you investigated whether
24   or not that occurred?

Page 287

D. McIsaac

1    A.    I did not.
2    Q.    Okay.  If that in fact occurred, would
3    that change your opinion in any way?
4    MR. OXFORD:  Objection to the form.
5    Assumes facts not in evidence.
6    MS. NEUHARDT:  I'm sorry, I couldn't
7    hear you.
8    MR. OXFORD:  You can answer.
9    A.    If Chase sent another report to Lehman
10   at that time saying we originally told you you
11   had an overdraft of 20 billion, we were wrong,
12   you have cash of 10 billion, yes, that would
13   have an impact on what I thought.  If that's
14   what your question was.
15   Q.    That's not my question.  My question
16   is whether if Chase informed people at Lehman
17   that the notice was issued as a mistake, would
18   that change your opinion?
19   MR. OXFORD:  Same objection.
20   A.    If they said that -- if they gave
21   notice that there was no overdraft and the
22   assets weren't used to secure the overdraft,
23   yes, it would change my opinion.
24   Q.    Did you make any effort to determine

Page 288

D. McIsaac

1    whether or not LBI actually attempted to
2    withdraw any money from the Chase account on
3    Friday, September 19?
4    A.    No, I did not.
5    Q.    Did you make any efforts to determine
6    whether or not LBI actually attempted to
7    withdraw any securities from the Chase account
8    as of September 19?
9    A.    As I'm aware, the screens were shut
10   down, so I don't know how they would have done
11   that without electronically notifying, unless
12   they would have done it via overnight letting
13   Chase know what deliveries and receipts to make,
14   but I did not do any inquiries into that.
15   Q.    Are you saying that telephone
16   communications no longer work?
17   A.    I don't know if anybody made a
18   telephone communication to them.  I know the
19   screens were down and that's the normal mode of
20   moving securities.
21   Q.    So you don't actually know whether or
22   not LBI could have had access to that -- to the
23   cash and securities in the Chase accounts on
24   September 19, 2008?

Page 289

D. McIsaac

1    MR. OXFORD:  Objection to form.
2    A.    I've been informed that the screens
3    were shut down.  So having access to it other
4    than via the screens, I'm not sure how they
5    would have it other than maybe verbal
6    discussions with Chase.
7    Q.    The mere fact that the screens were
8    shut down would not substantively affect their
9    ability to withdraw money; is that correct?
10   MR. OXFORD:  Objection.  Form.
11   A.    I assume they could send instructions
12   to Chase to do it, and if Chase so desired, they
13   could follow that.
14   Q.    Okay.  If Chase in fact actually
15   seized assets on the 19th, would that have
16   affected the reserve calculation done by LBI on
17   the 17th?
18   A.    If there was ambiguity or if the "no
19   lien" language for those accounts was not in
20   force, then yes, that would have affected any
21   other calculation done at that point in time.
22   Q.    Have you seen any evidence that the
23   "no lien letter" was not enforced as of the
24   17th?

Contains Highly Confidential Portions

| Page 290 |
| --- |

D. McIsaac

1     D. McIsaac
2    A.   I have seen nothing that said they --
3  it was not enforced at that time.
4    Q.   Would your answer be the same as of
5  the 12th?
6    A.   The same.  I have seen nothing before
7  that time.
8    Q.   Okay.  Now, if there were -- if these
9  assets were seized on the 19th and it did cause
10  a need to adjust the amount in the reserve
11  account, at what time -- when would that deposit
12  be required?
13    A.   I believe I answered that before.  10
14  A.M. Tuesday morning, if that deposit was
15  required.
16    Q.   Okay.  Could you just tell me which
17  regulation it is that would require a credit in
18  the reserve formula for the seizure of assets on
19  the 19th?
20    A.   I believe the credit goes into the
21  reserve formula because you would have customer
22  assets allocating to a loan.
23    Q.   Okay.
24    A.   A bank loan.
25    Q.   Is that in 15c3-3?

| Page 291 |
| --- |

D. McIsaac

1     D. McIsaac
2    A.   Yes, it is.
3    Q.   Could you show me where in this
4  exhibit?
5    A.   Could you give me the interpretation
6  memos?  It would be a lot easier to find it.
7    Q.   Absolutely.  Yes.  That would be in
8  Exhibit 695.
9     (Exhibit 695, Customer Protection -
10  Reserves and Custody of Securities SEA Rule
11  15c3-3, marked for identification, as of
12  this date.)
13    A.   I believe it's on page 2625 of the
14  FINRA Interpretation Handbook.
15    Q.   Okay.  What portion of this on page
16  2625?
17    A.   It says "Proprietary Bank Loans versus
18  Customer Account Long."
19    Q.   Okay.  Do you rely on anything else
20  for your opinion that if there were assets
21  seized, there would have to be a credit to the
22  reserve calculation?
23    A.   I believe there are other portions
24  within here that talk about the same thing --
25    Q.   This is the proprietary source?

| Page 292 |
| --- |

D. McIsaac

1     D. McIsaac
2    A.   Customer property allocating to
3  proprietary bank loan.
4    Q.   Okay.  Now, I'm going to move on to
5  coding errors.  Your rebuttal report discusses
6  two alleged coding errors:  One regarding the
7  classification of Woodlands Bank as a customer
8  or non-customer?
9    A.   Right.
10    Q.   And another relating to an error in
11  the ADP system; is that correct?
12    A.   Correct.
13    Q.   Are you aware of any other alleged
14  coding errors that would have affected the
15  credit side of LBI's reserve calculation as of
16  September 19, 2008?
17    A.   The ADP -- there were two instances of
18  a ADP.  It was certain accounts were not -- were
19  picked up as customers.  They should have been
20  non-customer, as well as the allocation.  But
21  they're both this here.
22    Q.   So there's nothing other than what is
23  discussed in your reports in the way of coding
24  errors that you have identified?
25    A.   That I am aware of at this time, no.

| Page 293 |
| --- |

D. McIsaac

1     D. McIsaac
2    Q.   Were you asked by the Trustee to
3  identify transactions or events that might have
4  required adjustments on the debit side of the
5  reserve calculation?
6    A.   All issues brought to my attention by
7  the Trustee would have been reviewed.  There was
8  no indication of only reviewing the credit side.
9  In fact, the coding errors did have an impact on
10  both the debit and credit side.
11    Q.   Okay.  Did you make any independent
12  effort to look for transactions or events that
13  would have required an adjustment to the reserve
14  calculation other than what was identified by
15  the Trustee for you?
16    A.   Nothing else was brought to my
17  attention that would have required that.
18    Q.   I understand.  Did you make any
19  independent effort to look for additional
20  transactions or events?
21    A.   I did not.
22    Q.   Do you know if the Trustee looked for
23  errors that would have caused an adjustment on
24  the debit side of the reserve formula?
25    A.   I believe the Trustee and their

Contains Highly Confidential Portions

Page 294

D. McIsaac

1    advisors looked for all and any adjustments that
2    would have impacted the 9/19 calculation.
3        Q.    Do you know if the Trustee and its
4    advisors have completed its -- their analysis of
5    any and all adjustments that would have impacted
6    the 9/19 calculation?
7        A.    I believe the Trustee and their
8    advisors are still researching facts and figures
9    as of the 19th of September, and if anything was
10   to come to their attention, I believe they would
11   bring it up at that point in time.  It was my
12   understanding as of the time I filed the
13   rebuttal report that no additional items have
14   been found.
15       Q.    So you believe the analysis is still
16   ongoing?
17       A.    I believe it's still in process, yes.
18       Q.    But you do believe that the Trustee
19   and its financial advisors have engaged in the
20   process?
21           MR. OXFORD:  Objection.  Form.
22       Q.    Do you understand the question?
23       A.    I don't know what process you're
24   talking about they engaged in.

Page 295

D. McIsaac

1        Q.    The process of identifying -- the
2    process of identifying any and all adjustments
3    that would have impacted the 9/19 calculation?
4        A.    I believe they're still doing work as
5    it relates to 9/19, and as I said in my rebuttal
6    report, I don't think anything came to their
7    attention by the time I filed that report.
8        Q.    Okay.  In paragraph 16 of your
9    rebuttal report, you say that the Woodland
10   assets had actually been seized.  What did you
11   base that on?
12       A.    They were part of the assets that were
13   in the free box that was taken by Chase.
14       Q.    So it's the same Chase matter as we've
15   already discussed?
16       A.    No.  These were never locked up in a
17   seg account because the account was coded as a
18   non-customer, not a customer.
19       Q.    On what day do you believe these were
20   seized?
21       A.    When Chase seized all the assets
22   versus the bank loan, which I assume was the
23   19th.
24       Q.    Which you assume was the 19th?

Page 296

D. McIsaac

1        A.    Yes.
2        Q.    Okay.  In rebuttal paragraph 18, this
3    is referring to I believe the ADP Broadridge
4    issue?
5        A.    Uh-huh.
6        Q.    You say that, "As part of a review
7    performed by Barclays," and you emphasize "by
8    Barclays," "at the request of the S.E.C.,
9    Barclays performed a partial recalculation of
10   the reserve formula to adjust for these known
11   discrepancies which revealed, as a result of the
12   coding errors, a $213 million shortfall."
13           And I -- you can turn to Exhibit 8 if
14   you want, that's what you cite, but I'd like to
15   know what your basis is for saying that Barclays
16   did a recalculation --
17       A.    I believe Barclays employees were the
18   ones sending the information to ADP and
19   requesting that a recalculation was done.
20       Q.    Okay.  And do you know whether those
21   Barclays employees were Barclays employees
22   performing work for the Trustee under the TSA?
23       A.    I don't know in what capacity, but the
24   letterhead on the note to ADP at Broadridge was

Page 297

D. McIsaac

1    Barclays.
2        Q.    I'm going to mark as Exhibit 696 a
3    declaration of Robert Martini dated April 5,
4    2010, and after she hands it to you my first
5    question will be have you seen it before.
6           (Exhibit 696, Declaration of Robert
7        Martini, marked for identification, as of
8        this date.)
9        A.    No, I have not.
10       Q.    Would you read paragraphs 5 through 7?
11   Let me know when you're through.
12           (Document review.)
13       A.    I've read it.  I'm sorry, 5 through 7?
14       Okay.
15       Q.    Okay.  Assuming that what Mr. Martini
16   says in his declaration is true, would that
17   change your opinion that Barclays performed a
18   recalculation of the reserve formula as set
19   forth in paragraph 18 of your rebuttal report?
20       A.    I saw a letter going from Barclays to
21   Broadridge directing them to make the changes.
22   They did all the research and directed them to
23   make the changes.  Whether the employees who
24   actually did the calculation were TSA employees

Contains Highly Confidential Portions

| Page 298 | Page 299 |
|---|---|
| D. McIsaac | D. McIsaac |

**Page 298**

D. McIsaac

1  or Barclays employees I do not know.  I don't
2  have the name of the employee who did it.
3     Q.   Okay.  Did you speak to any of the
4  employees on that letter?
5     A.   No, I did not.
6     Q.   Okay.  Do you know if the
7  recalculation that is discussed in paragraph 18
8  of your Rebuttal Report was a complete
9  recalculation of the 15c3-3 requirement as of
10  9/19 or just an adjustment for the ADP
11  Broadridge issue?
12     A.   I believe I said in here it was just
13  an adjustment for the ADP Broadridge as well as
14  the clarification of the 944 accounts.
15     Q.   By the 944 accounts, you're referring
16  to the Woodland Bank?
17     A.   No.
18     Q.   No.  What are you referring to?
19     A.   944 accounts were other accounts
20  classified as customers that should have been
21  reclassified as non-customer.
22     MS. NEUHARDT:  I'm probably at a
23  halfway point if you want to take a short
24  break.

**Page 299**

D. McIsaac

1     MR. OXFORD:  Okay.  That would be
2  great.
3     MS. NEUHARDT:  There were two
4  things we wanted him to look for.
5     Let's go off the record.
6     THE VIDEOGRAPHER:  The time is 5:54.
7  This is the end of the tape labeled number
8  6. We're going off the record.
9     (Recess.)
10     THE VIDEOGRAPHER:  This is the start
11  of tape labeled number 7.  The time is 6:23.
12  We are back on the record.
13     MS. NEUHARDT:  Mr. Oxford, based on
14  our conversation off the record, you have
15  some statements to put on the record about
16  what Mr. McIsaac found during the break?
17     MR. OXFORD:  Yes.  Mr. McIsaac, you
18  had referenced a stipulation in response to
19  some questions that Amy asked you in
20  connection with the FID issue?
21     THE WITNESS:  Right.
22     MR. OXFORD:  Could you turn to your
23  Rebuttal Report, Exhibit 1, please.
24     THE WITNESS:  Right.

**Page 300**

D. McIsaac

1     MR. OXFORD:  Can you identify what
2  Exhibit 1, please?
3     THE WITNESS:  The substitution
4  agreement.  I apologize for calling it a
5  stipulation.  Agreement.
6     MR. OXFORD:  Is that the document you
7  referred to when you were talking about the
8  stipulation?
9     THE WITNESS:  Yes, it was.
10     MR. OXFORD:  And can you also identify
11  for me what Exhibit 2 is to your Rebuttal
12  Report?
13     THE WITNESS:  Exhibit 2 is the summary
14  by account of all of the FID accounts and
15  the assets that they had in their accounts
16  as of the 19th of September.
17     MR. OXFORD:  Okay.  Thank you.  And
18  then the other issue that I just wanted to
19  clear up, if you could turn to your original
20  affidavit, which is Exhibit 691.
21     THE WITNESS:  Right, those were in
22  693.
23     MR. OXFORD:  Yes.  And these are not
24  tabbed, but I'd like you to find Exhibit 28,

**Page 301**

D. McIsaac

1  if you could.
2     THE WITNESS:  So much easier if it was
3  tabbed.
4     MS. NEUHARDT:  It's been discussed.
5     THE WITNESS:  Okay, yes.
6     MR. OXFORD:  Do you have Exhibit 28 in
7  front of you, sir?
8     THE WITNESS:  Yes, I do.
9     MR. OXFORD:  Was that the memorandum
10  you referred to in your earlier testimony
11  that was from Barclays Capital to
12  Broadridge?
13     THE WITNESS:  Right.  This was the
14  memo that went from Barclays to Broadridge
15  Capital.
16     MR. OXFORD:  Is it your understanding
17  this was an analysis or review that was
18  conducted by these individuals on behalf of
19  LBI or Barclays Capital?
20     THE WITNESS:  I believe they were
21  Barclays Capital employees.  They reviewed
22  LBI and I think at the same time they
23  conducted a similar review of Barclays
24  Capital reports to determine whether or not

Contains Highly Confidential Portions

| Page 302 | Page 303 |
|---|---|
| D. McIsaac | D. McIsaac |

**Page 302**

1          D. McIsaac
2    they were the same issue in the ADP or
3    Broadridge allocation matrix.
4          MR. OXFORD:  Okay.  Thank you.
5          MS. NEUHARDT:  Neil, I believe you
6    also said that you would provide for us --
7    you would review and identify for us the
8    materials on which you relied for his
9    testimony that the total amount of cash and
10   securities in the reserve account as of 9/19
11   was roughly 1.769 billion; is that correct?
12         MR. OXFORD:  Yes, we will undertake to
13   do that.
14         MS. NEUHARDT:  And that you would do
15   the same for Mr. McIsaac's testimony that
16   the assets at Chase were seized on September
17   19, 2008?
18         MR. OXFORD:  Yes.  Again, we'll
19   undertake to review the reliance materials
20   that were produced to you.
21   BY MS. NEUHARDT:
22         Q.   Do you still have your report opened
23   to Exhibit 28, which we were just discussing?
24         A.   I found it very quick.
25         Q.   Is it your testimony that this is

**Page 303**

1          D. McIsaac
2    your -- is the basis for your statement in
3    paragraph 18 of your rebuttal that Barclays
4    performed a partial recalculation of the reserve
5    formula to adjust for the discrepancies
6    discussed in this portion of your rebuttal
7    report?
8          A.   Yes, I believe on or about January
9    2009, the allocation report was rerun and the
10   adjustments were made to it.
11         Q.   But your basis for that statement,
12   that it was rerun in January, is not this
13   memorandum, is it?
14         A.   This is the memorandum I believe to
15   Broadridge pointing out the issues and
16   requesting I thought to be rerun.
17         Q.   But this does not state that Barclays
18   actually reran the calculation, does it?
19         A.   I don't believe it does, no.
20         Q.   Okay.
21         MR. OXFORD:  Amy, not to interrupt,
22   but it occurs to me that there was a
23   document I marked at Mr. Vinella's
24   deposition that might be the one your
25   looking for.

| Page 304 | Page 305 |
|---|---|
| D. McIsaac | D. McIsaac |

**Page 304**

1          D. McIsaac
2          MS. NEUHARDT:  We can talk about that
3    off the record, but that's --
4          MR. OXFORD:  Okay.
5          MS. NEUHARDT:  If he -- are you saying
6    that he relied on that document?
7          MR. OXFORD:  That may be the document
8    he relied upon.  I don't have it with me
9    today, but -- but I'm happy to review it and
10   let you know if that was what he relied
11   upon.
12         Q.   Okay.  And then you also referred to
13   Exhibit 2 to your original -- no, I'm sorry,
14   your rebuttal?
15         A.   Rebuttal.
16         Q.   Yes.  And can you tell me what Exhibit
17   2 is?
18         A.   Exhibit 2 is a schedule of all the FID
19   accounts and the assets in their accounts on
20   9/19, and these were the assets that were at
21   Chase.
22         Q.   And from whom did you receive this?
23         A.   From the financial advisors of the
24   Trustee.
25         Q.   And did you rely upon a non-redacted

**Page 305**

1          D. McIsaac
2    version of this document?
3          A.   I believe I did.  I believe it had the
4    names of the customers in there.
5          MS. NEUHARDT:  We would like that
6    document, Neil.
7          MR. OXFORD:  I'll take your request
8    under advisement.
9          Q.   And from this document you believe you
10   were able to determine that these were customer
11   assets?
12         A.   These are the account numbers for the
13   customers and they showed the ranges of where
14   the accounts were in the customer range.
15         Q.   Can you show me what on here is
16   telling you that?
17         A.   The redacted portion doesn't have the
18   account numbers.
19         Q.   The redacted portions.
20         We definitely need the unredacted
21   version.
22         Did you do any research to confirm
23   that there were no subordination agreements
24   associated with these accounts?
25         A.   These accounts were all listed as

Contains Highly Confidential Portions

Page 306

D. McIsaac

1       customers.  So, no, I did not do any
2       subordination -- review to see if any customers
3       in the FID subordinated their accounts to the
4       Trustee.  But if they did, then I don't know why
5       they would be locked up in a separate account at
6       Chase to the benefit of customers.
7              MS. NEUHARDT:  Strike the last part of
8       his answer as nonresponsive.  Okay.
9       Q.    I think we've followed up on
10      everything from the break.  I would like to turn
11      to your discussion of -- in your rebuttal
12      report, it's paragraphs 19 through 21; in your
13      original report, it is paragraphs 39 and 40; and
14      you refer to it as "Assets Subject to LBI
15      Administration."
16             What is your basis for stating that
17      the 439 million in assets that you have
18      identified are customers assets?
19      A.    These were assets in a box listed as
20      customer box, customer security -- customer no
21      lien account at LBIE for the benefit of LBI
22      customers.
23      Q.    Did you do any independent
24      investigation of that?
25

Page 307

D. McIsaac

1
2       A.    I reviewed the LBIE agreement that
3       said that they were holding account free of
4       lien.
5       Q.    When say LBIE you're referring to
6       L-B-I-E, right?
7       A.    Yes.
8              They give control location memos to
9       the SEC.
10      Q.    Okay.  Were you -- were you aware of a
11      general policy at LBI that they would include
12      LBIE customers assets -- I'm sorry, LBI customer
13      assets that were held by LBIE in their lockup
14      requirement calculation?
15      A.    I don't understand the question.  I'm
16      sorry.
17      Q.    Okay.  Well, do you know whether as a
18      matter of course LBI would in fact include in
19      its reserve calculation an adjustment for the
20      LBI customer assets that were held by LBIE?
21      A.    I saw nothing in the calculations that
22      led me to believe that they were not -- that
23      they were not considered them in a good control
24      location and, therefore, putting a credit in the
25      reserve formula.

Page 308

D. McIsaac

1       Q.    Did you ask -- did you speak to
2       anybody about this issue?
3       A.    I did not speak to any Lehman or
4       Barclays employees.
5       Q.    Okay.  If in fact there was an
6       adjustment as a matter of course at LBI -- for
7       LBI customer assets held at LBIE, would that
8       change your opinion in any way?
9              MR. OXFORD:  Objection to form.
10      A.    If the 439 that I believe allocated to
11      a good control location and, therefore, was not
12      put into the formula, if somebody could show me
13      the adjustment putting that $439 million into
14      the formula, I guess I would change my opinion,
15      but I'm not sure why they would get a good
16      control letter and then do that, but ...
17      Q.    Your testimony is, though, that you
18      don't know one way or the other, correct?
19      A.    I did not see anything to that.
20      Q.    All right.  Let's turn to your
21      discussion of the OCC deposit, which is in your
22      rebuttal report, paragraphs 24 and 25 on pages
23      11 and 12, and in your original report it is
24      paragraph 45 on page 17.
25

Page 309

D. McIsaac

1
2              Now, is a broker-dealer able to
3       withdraw and transfer margin at the OCC without
4       funding the reserve account at the time of the
5       withdrawal?
6       A.    Yes.
7       Q.    Okay.  Let's go, earlier today we
8       talked about the statement in paragraph 13 of
9       your rebuttal affidavit that the only relevant
10      point in time for the purpose of determining the
11      accuracy of LBI's reserve calculation is
12      September 19, 2008?
13      A.    That's correct.
14      Q.    Do you believe that that principle
15      applies to your opinion about the OCC deposit?
16             MR. OXFORD:  Objection.  Form.
17      A.    I believe that opinion applies to it.
18      Q.    Okay.  Had the OCC margin deposit that
19      you refer to in your reports been withdrawn as
20      of September 19?
21      A.    No, but in previous discussions
22      earlier this morning on my expert report, the
23      Barclays lawyers were assuming that the margin
24      was being transferred to LBI as of the 17th, so
25      if -- if to -- I'm sorry, to Barclays as of the

Contains Highly Confidential Portions

Page 310

1                    D. McIsaac
2    17th.
3            If LBI had agreed to transfer that
4    money, then I would assume that it was not a
5    good debit in the formula because it was
6    impaired.
7        Q.   Well, by that logic, as of the 17th,
8    hadn't LBI agreed to transfer, for example, all
9    of its private investment management accounts to
10   Barclays as of a later date?
11           MR. OXFORD:  Objection.  Form.
12       A.   I believe they determined what they
13   were going to transfer.  Until you transfer the
14   customers' assets and the customer accounts,
15   they're still included in the reserve formula
16   until such time as you can transfer them.
17           If you have impeded an asset, then I
18   don't think you could put it into the formula,
19   just as if I had a customer receivable that
20   wasn't fully secured, I wouldn't put it in the
21   formula.
22           So if this deposit was sold to
23   somebody else prior to the 19th, then I think it
24   probably doesn't belong in the formula as of the
25   19th.

Page 311

1                    D. McIsaac
2        Q.   Now, do you know whether the contract
3    had been approved by the court prior to -- well,
4    you said the 17th.  Do you know if that contract
5    had been approved by the court as of the 17th?
6        A.   I don't know when the contract was
7    approved.  I believe it was sometime after the
8    fact, but if, as of the 17th, you agreed to sell
9    it and gave up your rights to that deposit, then
10   I don't know if that would be a good debit in
11   the formula.  And I'm just going by what
12   everybody was saying, that the -- they agreed to
13   sell the margin prior to that and that thought
14   process.
15       Q.   Could you show me -- well, are you
16   basing your opinion on anything in Rule 15c3-3?
17       A.   I believe there are many parts of 3-3
18   that would talk about unsecured receivables and
19   how they would not go into the formula.  This is
20   allowed in the formula because it's coming from
21   a clearing org. receivable.  If you have given
22   up your rights to that receivable, then I don't
23   think you would include it in the formula.
24       Q.   And is your position that LBI had
25   given up its rights as of the 17th prior to

Page 312

1                    D. McIsaac
2    court approval?
3            MR. OXFORD:  Objection.  Form.
4    Misstates the witness's testimony.
5            You can answer the question again.
6        A.   No, my opinion is if it's determined
7    that margin was sold prior to the 19th, or
8    as of the 19th, then it does not belong as a
9    debit in the formula.
10       Q.   Is your opinion that a contract that
11   has not yet been closed nonetheless affects the
12   15c3-3 calculation?
13       A.   My opinion is if you tell me you have
14   impeded that asset and you -- you have
15   effectively given up your right to that asset, I
16   would say that asset's not a good asset in the
17   formula.  And that's all I'm saying.  I'm not --
18   I don't know when the contract was sold.
19           I'm being told, and people are
20   negotiating that -- and I think this would be
21   decided by the court eventually -- that the
22   agreement sold the margin to Barclays as of the
23   17th if that's the date of the agreement and
24   that's when that account -- that's when that
25   asset stopped becoming I believe a good asset

Page 313

1                    D. McIsaac
2    for LBI for reserve formula purposes.
3            They have given up their right to
4    receive that asset.  I don't think they can put
5    a debit in there.  The same as if I told a stock
6    borrow counterparty don't give me your money
7    back, I don't care.  It wouldn't go in the
8    formula.
9        Q.   If it were to turn out that the --
10   they had not given up their rights until such
11   time as the court approved of the contract,
12   would that change your opinion?
13           MR. OXFORD:  Objection.  Form.
14       A.   I don't know what the date would be
15   that they agreed to the contract.  I -- this --
16   I think this will be going in front of the court
17   eventually and the court will decide whether or
18   not the contract stays -- states that that was
19   being sold as at that point in time.
20           If that's the point in time I believe
21   the contract was effective or signed
22   theoretically agreed to as of the 19th, I don't
23   know if it matters when it's signed.  If I have
24   agreed to impede an asset at any point in time,
25   it doesn't matter when I sign it.  I think I

Page 314

1              D. McIsaac
2  would not include that debit in the reserve
3  formula.
4      Q.   So even if a court were to determine
5  that the contract was not effective until it
6  were approved, it's nonetheless your opinion
7  that the asset would be impeded as of the time
8  they signed?
9      A.   As of the time that somebody agreed
10 that that asset was not an asset of theirs, that
11 they have sold -- they have given that asset
12 away, they sold that asset, I can't see how that
13 asset would be good for the -- as a debit in the
14 reserve formula.
15     Q.   Do you believe LBIE -- sorry, LBI
16 continued to be able to withdraw from that OCC
17 account after the 17th?
18     A.   I believe there were some restrictions
19 at the OCC on the 19th that they could not
20 withdraw moneys out of there on the 19th.
21     Q.   The restrictions were imposed by the
22 OCC, correct?
23     A.   Yes, they were.
24     Q.   They were not imposed by Barclays?
25     A.   I don't think Barclays imposed them,

Page 315

1              D. McIsaac
2  no.
3      Q.   So it's not the contract that was
4  preventing them from withdrawing assets after
5  the 17th?
6      A.   As I stated earlier today, you weren't
7  here, that I would have anticipated the purchase
8  agreement to have some indication that they were
9  selling margin and at that point in time to talk
10 about the amount of margin that was being sold.
11         But once you've given up that right,
12 whether it be 500 million for a billion, I don't
13 think you can put it in the formula anymore.
14     Q.   But they could withdraw it from the
15 OCC account?
16     A.   And if it wasn't in the OCC account,
17 it wouldn't be a debit in the formula either.
18     Q.   I understand, but I'm trying to
19 understand.  Essentially you're saying that the
20 asset was impaired as of the date the contract
21 was signed; is that correct?
22     A.   I'm saying if the -- if the court
23 determines that that is what happened on the --
24 as of the Asset Purchase Agreement and that the
25 margin was being sold by Lehman to Barclays,

Page 316

1              D. McIsaac
2  that that debit should not be in the formula
3  because they have given up their right to
4  receive that debit and it is no longer there for
5  the protection of customers.
6      Q.   Yet you're also saying they
7  nonetheless had the right to withdraw those
8  funds prior to the -- or after the 17th from the
9  OCC?
10     A.   And had they withdrawn those funds,
11 they wouldn't be in the formula.
12     Q.   But they wouldn't be in the formula
13 for a different reason, correct?  Because they
14 had been withdrawn?
15     A.   That's right, and I don't --
16     Q.   And not because --
17     A.   And I don't know if the agreement -- I
18 didn't see anything in the agreement stipulated
19 that the amount that was there as of the 17th is
20 what was being sold, if the amount was there at
21 the end of the day is what was being sold or if
22 anything was being sold.
23         If, if it's determined that that $507
24 million was being sold and that it was impaired
25 by the 19th by the thought process of selling

Page 317

1              D. McIsaac
2  it, I don't think the debit should have been in
3  the formula.
4      Q.   And yet you nonetheless believe that
5  if they also contracted to transfer tens of
6  thousands of customer accounts in that same
7  contract, that that transfer of customer
8  accounts should not be included in the 15c3-3
9  calculation?
10         MR. OXFORD:  Objection.
11     A.   No, I said the --
12         MR. OXFORD:  Objection to form.
13     A.   The customer accounts should be
14 included in the calculation until such time as
15 they're transferred.  If you're putting a debit
16 in the formula, effectively reducing your lockup
17 requirement because you have a good asset,
18 that's what I'm saying, if that was impeded, I
19 don't believe there should have been a debit in
20 the formula.
21     Q.   If there's no adjustment to the debit
22 after withdrawal, is an adjustment by an
23 agreement to withdraw on a later date required?
24     A.   As far as I'm concerned, the agreement
25 should have stipulated if there was an asset to

Contains Highly Confidential Portions

| Page 318 | Page 319 |
|---|---|

**Page 318**

D. McIsaac

1  be sold, what amount was to be sold, or what
2  amount at what point in time should have been
3  sold.
4      What I am saying if, if in fact the
5  court determines that that was a valid
6  transaction and that LBI gave up its rights to
7  this debit, that it should not have been in the
8  formula as of the 19th.
9      Q.   And do you know whether the contract
10  stipulated an amount to be sold or at what point
11  in time to determine the amount to be sold?
12      A.   No, I did not.
13      Q.   So if in fact the amount was not
14  limited to $507 million or the date as of which
15  the transfer would be made was later than 9/19,
16  does your opinion change in any way?
17          MR. OXFORD:  Objection.
18      A.   If at any point --
19          MR. OXFORD:  Objection to the form.
20      A.   Sorry.
21      If at any point in time that was
22  determined that they had given up their rights
23  to that asset, any calculation done from that
24  point in time I do not believe should have

**Page 319**

D. McIsaac

1  included that asset as a debit in the formula.
2      Q.   Can you show me where in the either
3  FINRA or SEC Rule 15c3-3 it requires an
4  adjustment prior to the delivery of the assets
5  to another party.
6      A.   I don't believe there's anything in
7  3-3 that talks to this.  This is my opinion that
8  if you put a debit in the formula, it needs to
9  be realizable.  It has to be secured.  The
10  security for this would be that it's at the OCC
11  and they will return it to you when not needed.
12      Q.   Okay.  So you do not believe there's
13  anything in 3-3 that would require that?
14      A.   I don't think there's anything in 3-3
15  that talks to an OCC deposit being sold
16  during -- prior to a calculation being finalized
17  and how it should be accounted for in the
18  formula.
19      Q.   Okay.  Is there anything in the FINRA
20  interpretations of 3-3 that would cover this
21  issue?
22      A.   There's nothing that will cover this
23  issue.  There are -- there are issues within 3-3
24  and I will gladly dig them out eventually, we

| Page 320 | Page 321 |
|---|---|

**Page 320**

D. McIsaac

1  don't have time now, to show you that debits
2  have to be secured.  I can't put a debit in for
3  a stock borrow if it's not secured.  I can't put
4  any amount in that's not secured.
5      Q.   Have you heard of a Transfer and
6  Assumption Agreement, TAA?
7      A.   Yes.
8      Q.   Let me go back.  Until such time as
9  the account would have actually been transferred
10  to Barclays, wouldn't OCC still owe margin to
11  LBIE -- to LBI?  My apologies.
12      A.   LBI would have been the -- the
13  clearing firm at the OCC.  If at any point in
14  time I've given up my rights to that, all I'm
15  saying is I don't think it's a good debit in the
16  formula.  Whether or not OCC would give it back
17  to us or not, or give it back to LBI or not, at
18  any point in time when that sale was
19  consummated, they wouldn't get it back.
20      So putting a debit in the formula,
21  knowing that you cannot collect it, I think is
22  not in compliance with the rules.
23      Q.   And yet you acknowledge that LBI could
24  have withdrawn that money after the 17th from

**Page 321**

D. McIsaac

1  the OCC account?
2      A.   I --
3          MR. OXFORD:  Objection.  Form.
4      A.   Yes, I acknowledge they could have
5  done that.
6      Q.   Then how is that money less secured?
7      A.   Because as of the 19th -- you have one
8  agreement that you're telling me that they --
9  that they get the margin, and all I'm saying is
10  if Barclays believes that that agreement means
11  that they get the margin and the judge says,
12  yes, that was a binding agreement at that point
13  in time and they get the margin, all I'm saying
14  is that then that debit was impeded and I can't
15  believe that you would put a debit in the
16  formula that is impeded.  And that's all.  If
17  you don't have -- if you cannot have the right
18  to collect it, you shouldn't put the debit in
19  there.
20      Q.   I believe I had asked if you were
21  familiar, if you had heard of the TAA?
22      A.   Yes.
23      Q.   Okay.  Now, were you shown that
24  earlier today?

Page 322

D. McIsaac

1
2     A.    Yes, I was.
3     Q.    Do you recall whether or not that
4  agreement was signed before or after September
5  19?
6     A.    I believe it was signed on -- either
7  by some people on the 20th and some people
8  possibly on the 22nd.
9     Q.    If the court were to hold that it was
10  the TAA -- if the court were to hold that it was
11  the TAA that effected Barclays' right to the
12  margin deposits, would it still be your opinion
13  that the calculation as of the 19th should have
14  been adjusted?
15         MR. OXFORD:  Object to the form.
16  Assumes facts not in evidence.
17         MS. NEUHARDT:  I believe as an expert
18  I'm entitled to ask him hypotheticals.
19         THE WITNESS:  Is it okay to answer?
20         MR. OXFORD:  You can answer.
21     A.    I understand it might not have been
22  signed at a point in time.  I believe the OCC
23  was looking for it to be signed as of the 19th.
24  There was all kinds of e-mails that I was shown
25  before stating that they were looking for it to

Page 323

D. McIsaac

1
2  be signed to transfer it over effectively on the
3  morning of the 22nd to Barclays.
4         Again, that TAA is not a contract.
5  That TAA I believe is an agreement between
6  Barclays, Lehman, and the OCC to transfer
7  Lehman's contract and in the Lehman name to
8  Barclays.  It's not the sale agreement for
9  determining when that agreement was done or
10  signed.  It's a vehicle used to transfer -- for
11  the OCC to transfer the account name from Lehman
12  to Barclays.
13     Q.    That entire answer was nonresponsive.
14  I move to strike it.
15         Please answer my question, which is
16  that if the court were to hold that it was the
17  TAA that effected Barclays' right to the margin
18  deposits, would it still be your opinion that
19  the calculation as of the 19th should have been
20  adjusted?
21     A.    I would have to determine or review
22  what the court's reasoning why the TAA was the,
23  in fact, the agreement between LBI and Barclays
24  that sold that asset.  Just -- I don't -- it's a
25  hypothetical and I don't know.  I don't consider

Page 324

D. McIsaac

1
2  that a sale agreement.
3     Q.    If the court held that that was the
4  agreement that impaired the asset, and it was
5  not signed until the 20th or perhaps the 22nd,
6  would it change your opinion that the
7  calculation --
8     A.    No, it would not.
9     Q.    Let me finish my question.
10         -- that the calculation as of the 19th
11  should have been adjusted?
12     A.    No, it would not.
13     Q.    And why?
14     A.    Because it was negotiated, started
15  negotiating it on the 19th, and I don't think
16  you should put an asset -- a debit in the
17  formula that you have impeded, whether or not
18  you do it on Saturday or Sunday.
19     Q.    So it is your testimony that the mere
20  start of negotiations impairs the asset?
21     A.    That it is impaired because prior to
22  the next business day, I don't have that, I'm
23  not allowed to have that asset anymore.
24     Q.    Because you started the negotiations?
25     A.    Because it was finalized by the next

Page 325

D. McIsaac

1
2  business day, by the morning of the next
3  business day, which effectively, to me, it was
4  done as of the close of business the 19th.
5     Q.    So you're saying that even though --
6  even if an agreement is reached after the close
7  of business, it would affect the calculation of
8  that day rather than the calculation of the next
9  business day?
10         MR. OXFORD:  Objection.  Form.
11     A.    I believe that if you've sold the
12  asset prior to you needing to make your lockup,
13  the requirement, and you have impeded that asset
14  in any way, shape or form, that you should not
15  include it in the formula.
16         If that asset -- if that agreement, if
17  the court finds that that agreement is what sold
18  the asset and that was signed as of the 21st or
19  22nd, it was signed before the opening of
20  business the next day, so as effectively on the
21  19th they would not have had a receivable.
22     Q.    Well, perhaps I misunderstand your
23  earlier testimony, but I thought you said that
24  the calculation would be done on Friday, the
25  19th, and in the ordinary course of business,

Contains Highly Confidential Portions

Page 326

D. McIsaac

1  this would be done every Friday?
2
3      A.   Uh-huh.
4      Q.   So how would an event that happened
5  after the calculation have to be retroactively
6  included in the prior calculation?
7      A.   Because I'm only saying -- because
8  it's being done and agreed to prior to the time
9  that the calculation is finalized that it should
10  be -- should be reviewed in that respect.
11      Q.   What portion of SEC Rule 15c3-3 are
12  you relying on for that opinion?
13      A.   SEC Rule 3-3 talks about secured
14  assets, and you cannot put a customer debit in
15  the formula unless it's fully secured.
16      Q.   I just want to make very clear that it
17  is your position that a contract that was only
18  being negotiated prior to the close of business
19  on Friday, nonetheless if it reached agreement
20  prior to the opening of business the next
21  business day, it should -- it would result in a
22  retroactive recalculation of the requirement --
23  of the calculation done on Friday?
24      MR. OXFORD:   Is that -- that's a
25  statement, Amy.  Do you have a question?

Page 327

D. McIsaac

1
2      Q.   Sorry.  I did put the "it" before the
3  "is."
4      Is it your position that a contract
5  that is only being negotiated prior to the close
6  of business on Friday but that is closed prior
7  to the opening of business on Monday would
8  require a retroactive recalculation of the
9  calculation done Friday?
10      A.   My opinion is that I don't believe the
11  TAA is -- is the contract.
12      Q.   I'm not asking you whether or not the
13  TAA is the contract.  I'm asking you whether or
14  not --
15      A.   I'm trying to finish my thought.
16      MR. OXFORD:   Amy, we're all trying to
17  get out of here.  If you could let Mr.
18  McIsaac finish his answer --
19      MS. NEUHARDT:   I'm going to ask it
20  again because he's clearly not answering the
21  question.
22      MR. OXFORD:   Well, it's very hard for
23  you to reach that conclusion if you don't
24  let him finish his answer.
25      Q.   But if you're going to tell me that

Page 328

D. McIsaac

1      the TAA is not the contract, I'll ask it again.
2
3      A.   I believe that the TAA impedes the
4  asset as of the 19th.
5      Q.   Please show me what portion of 15c3-3
6  justifies that conclusion.
7      A.   I -- I don't believe you'll find
8  anything in 3-3 that will say that, but I
9  believe that the asset is impeded as of the 19th
10  if you have agreed to sell it and not receive
11  any money back in return for it that you can put
12  into the customer debit, and that's all I'm
13  saying.
14      Q.   Is there anything in FINRA that
15  supports that?
16      A.   I don't believe there's anything other
17  than talking about secured assets.
18      Q.   Let's move on to what was in your
19  original affidavit as paragraphs 46 to 49 and
20  you refer to as customer property seizure during
21  the transfer process.
22      A.   Uh-huh.
23      Q.   Now, as I understand your opinion in
24  your original affidavit, your basis for
25  identifying this 82 million was that LBI's RISC

Page 329

D. McIsaac

1
2  system did not feed into LBI's Rule 15c3-3
3  calculation; is that correct?  And I'm looking
4  at paragraph 47.
5      MR. OXFORD:   Object to the form.
6      A.   Yes, I think I say here that the RISC
7  system doesn't automatically feed the 3-3
8  calculation.
9      Q.   Have you since learned that that is
10  incorrect?
11      A.   No, I've been told and informed that
12  the RISC system is reviewed by personnel who
13  supply the preparers the debit and credit
14  balances for customer accounts to be included in
15  the formula.
16      Q.   Who did you speak to that informed you
17  of that?
18      A.   The Trustee's financial advisors.
19      Q.   Is that Deloitte?
20      A.   Yes, it is.
21      Q.   Did you speak to anyone who had been
22  an LBI employee to confirm that to be true?
23      A.   No, I have not.
24      Q.   Did you ever speak to Peter Tennyson?
25      A.   No.

Contains Highly Confidential Portions

Page 330

D. McIsaac

1
2    Q.    While she gets this document, in your
3    rebuttal affidavit, paragraphs 22 to 23, you
4    discuss the same issue.  You do not mention the
5    RISC system as a basis for your report in the
6    rebuttal affidavit.
7    A.    Uh-huh.
8    Q.    Why is that?
9    A.    I think we tried to further clarify
10    that these were moneys that were -- the accounts
11    were debited as if the customers were paid.  The
12    customers were never paid, so an adjustment had
13    to be made to -- to, in the normal course of
14    business, you reconcile your bank accounts, you
15    look at items that you thought were paid that
16    weren't paid, and you would make the adjustments
17    for those.
18         These moneys were never paid to the
19    customers so you effectively still have a
20    payable to the customer.
21    Q.    Okay.  And now, what is your basis for
22    saying these moneys were never paid to the --
23    paid to the customers?
24    A.    What I have seen is that the debits,
25    they debited their accounts, and there was no

Page 331

D. McIsaac

1
2    adjustment coming from the RISC system that I
3    was shown adjusting for this $82 million.
4    Q.    Do you have any other basis for saying
5    the moneys were never paid out?
6    A.    No, that is it.  I think the customers
7    actually made claims, possibly to the estate,
8    that they weren't paid their moneys.
9    Q.    If it turns out that the RISC system
10    did in fact feed into the 15c3-3 calculation,
11    would that change your opinion in any way?
12    A.    Not if these amounts were not included
13    as payables to the customers at that point in
14    time.
15    Q.    Did you do any investigation of
16    whether or not items within the RISC system
17    would or would not have been fed into the 15c3-3
18    calculation?
19    A.    I was informed that the debits and
20    credits to be included in the reserve formula
21    off of the RISC system were provided by
22    personnel responsible for the RISC system
23    independent of anything else.
24    Q.    Okay.
25    A.    They provided the adjustments to the

Page 332

D. McIsaac

1
2    formula for that day.
3    Q.    And this was Deloitte that informed
4    you of that?
5    A.    Yes.
6    Q.    We may have to come back to that when
7    she comes back.
8         Okay.  Now, your original affidavit
9    discusses a proposed adjustment of 2.3 billion
10    allegedly owed to LBIE's customers, correct?
11    A.    Uh-huh.
12    Q.    You do not discuss that in your
13    rebuttal report, correct?
14    A.    That's correct.
15    Q.    Okay.  Why is that?
16    A.    I believe the Trustee's advisor -- the
17    Trustee has removed that and put that as under
18    investigation until such time as it can be
19    concluded whether or not it is a viable
20    liability to the customers.
21    Q.    Okay.  Do you continue to have an
22    opinion on whether or not the adjustment is
23    necessary?
24    A.    If it's determined that there is a
25    liability to the omnibus customer account, yes,

Page 333

D. McIsaac

1
2    it should then go in the formula.  It was in the
3    records at that point in time as a payable and
4    was removed from the formula.
5    Q.    Okay.  But you do not know as of today
6    whether or not there was in fact a liability to
7    the omnibus customer account?
8    A.    No, that's why it's still under
9    investigation.
10    Q.    Did you believe that it was not still
11    under investigation at the time of your October
12    5 affidavit?
13    A.    I believe we -- I'll have to look at
14    my affidavit, but I believe we sort of alluded
15    to the fact that it's still being investigated,
16    and if such time it was found not to be true, we
17    wouldn't require it, but I'll have to look.
18         If you look at item -- at paragraph
19    44, I basically say I was not able to see any
20    documents to make this adjustment, and until
21    such time as we saw it, that it should be held
22    until we can determine if it should actually be
23    owed.
24    Q.    Well, your October 5 report appears to
25    be divided into, starting on page 13, items --

Contains Highly Confidential Portions

Page 334

D. McIsaac

1    D. McIsaac
2  you phrase it as items omitted or incorrectly
3  reported in the reserve formula, and that goes
4  through the top of page 19, and then on 19,
5  number 2, is items currently under
6  investigation, and then you list a number of
7  other items?
8      A.    Uh-huh.
9      Q.    Why did you put the 2.3 billion in
10 your first category of items discussed in your
11 original affidavit as opposed to the category of
12 items under investigation?
13     A.    Because at this point in time we had
14 shown -- been shown no documents that would
15 prove that this credit should be -- should come
16 out.  Subsequent to that, I believe the Trustee
17 has had some discussions with people and have
18 decided to remove it until such time as I've
19 seen those documents.  I'm just not putting it
20 in my affidavit until I can see something that
21 proves it or that the claim is -- the claim as I
22 believe is still out there from LBIE and until
23 such time as it can be proven incorrect.
24     Q.    So in October when you did your
25 initial affidavit, you assumed as true what the

Page 335

D. McIsaac

1    D. McIsaac
2  Trustee gave you?
3      A.    I saw the -- the credit coming out of
4  the formula, an adjustment to the formula for
5  the $2.3 billion.  There was no support for that
6  credit coming out of the formula.
7           Subsequent to that, I believe the
8  Trustee and his advisors may have additional
9  information that they are investigating and they
10 decided to take it out of their motion.
11     Q.    In October did you investigate whether
12 or not the amount at issue was related to an
13 LBIE customer account or proprietary account?
14     A.    It was sitting in the LBIE omnibus
15 customer account as a payable.
16     Q.    If it was in the customer account, did
17 you investigate whether or not the obligation of
18 the customer had been satisfied prior to LBIE
19 filing for administration?
20     A.    There was an -- I don't know if that
21 has anything to do with it.  What does LBIE --
22 this is owed to LBIE for its customers.
23     Q.    All right.  Then if it was a customer
24 account, did you investigate whether or not the
25 obligation to the customer was satisfied prior

Page 336

D. McIsaac

1    D. McIsaac
2  to 9/19?
3      A.    We saw no proof that that
4  adjustment -- there was no proof behind that
5  adjustment that we could see at that point in
6  time that I was shown or could be found
7  supporting taking the credit out of the formula.
8      Q.    Did you investigate whether or not the
9  obligation to the customer was satisfied prior
10 to 9/19?
11     A.    I don't -- the customer is LBIE.
12     Q.    The underlying customer?
13     A.    The underlying customer is LBIE's
14 responsibility.  I don't think it's LBI's
15 responsibility.
16     Q.    So is your answer no?
17     A.    No.
18     Q.    Have you conducted any further
19 analysis on this issue since the time of your
20 October 5 affidavit?
21     A.    No.
22     Q.    Now, we referred, actually, to Section
23 2 of your original affidavit as items currently
24 under investigation?
25     A.    Uh-huh.

Page 337

D. McIsaac

1    D. McIsaac
2      Q.    The first one you identify on page 19
3  starting with paragraph 51 is a Chase Bank
4  overdraft.  Have you done any
5  investigation on this matter since your October
6  5 report?
7      A.    No.
8      Q.    Have you done any further
9  investigation on any of the other --
10     A.    No.
11     Q.    -- issues identified?
12     A.    No.
13     Q.    Do you know of any SEC regulation that
14 would prevent Lehman Brothers Holding Company
15 from paying an amount to Barclays that was equal
16 to the amount held in the reserve account?
17         MR. OXFORD:  Objection.  Vague.
18     A.    I -- I am not fluent in all SEC rules
19 as they affect holding companies.
20     Q.    Okay.  Have you done any investigation
21 as to the propriety of the amount of customer
22 claims that have been filed against the estate?
23     A.    No, I have not reviewed the customer
24 claim process.
25     Q.    So you have no opinion on how much the

Contains Highly Confidential Portions

Page 338

D. McIsaac

1 
2 estate will eventually have to pay out?
3    A.    No, I have not seen that number at
4 this point in time.
5       MS. NEUHARDT:  Okay.  Let's take a
6 five-minute break.  I may be through.
7       THE VIDEOGRAPHER:  The time is 7:09.
8 We are going off the record.
9       (Recess.)
10      THE VIDEOGRAPHER:  The time is 7:19.
11 We're back on the record.
12 BY MS. NEUHARDT:
13    Q.    Mr. McIsaac, right before we broke,
14 you informed me that you have not conducted any
15 further investigation relating to the items
16 listed in Section 2 of your original affidavit
17 as items currently under investigation?
18    A.    That's correct.
19    Q.    Have you been informed of any progress
20 or findings of the financial advisors relating
21 to those items under consideration?
22    A.    I believe in my rebuttal report I make
23 a statement to the fact that they have to date
24 have found nothing else that would impact the
25 formula.

Page 339

D. McIsaac

1 
2    Q.    And do you know -- did they inform you
3 whether or not they have completed their
4 investigation as to any of those matters?
5    A.    I don't believe they have finished it.
6    Q.    Okay.  And we discussed earlier that
7 if a calculation is done on a Friday in the
8 ordinary course of business and an additional
9 deposit is required, that deposit would be done
10 the following Tuesday at 10 A.M.; is that
11 correct?
12    A.    By the following Tuesday at 10 A.M.
13    Q.    No later?
14    A.    Yes.
15    Q.    Okay.  In that situation, is a
16 broker-dealer in violation of SEC rules at any
17 time prior to 10 A.M. on the following Tuesday?
18    A.    In violation of SEC rules regarding
19 what?  They could be --
20    Q.    Are they in violation of any aspect of
21 SEC Rule 15c3-3?
22    A.    As it pertains to that deposit, no.
23 There could be other reasons that they're in
24 violation of rules.
25    Q.    But as it pertains to that deposit,

Page 340

D. McIsaac

1 
2 they would not be in violation as of that
3 Friday?
4    A.    Correct.
5    Q.    Okay.
6       MS. NEUHARDT:  I have no further
7 questions.  None from anybody else?
8       THE VIDEOGRAPHER:  The time is 7:20.
9 This is the end of today's deposition.
10 We're going off the record.
11          oOo
12 
13 
14 
15 
16 
17 
18    _____
19          DANIEL McISAAC
20 Subscribed and sworn to
   before me this     day
21 of      2010.
22 
   _____
23 
24 
25 

Page 341

1 
2       CERTIFICATE
3 STATE OF NEW YORK )
            : ss
4 COUNTY OF NEW YORK)
5    I, Kathy S. Klepfer, a Registered
6 Merit Reporter and Notary Public within and
7 for the State of New York, do hereby
8 certify:
9    That DANIEL McISAAC, the witness whose
10 deposition is herein before set forth, was
11 duly sworn by me and that such deposition is
12 a true record of the testimony given by such
13 witness.
14    I further certify that I am not
15 related to any of the parties to this action
16 by blood or marriage and that I am in no way
17 interested in the outcome of this matter.
18    I further certify that neither the
19 deponent nor a party requested a review of
20 the transcript pursuant to Federal Rule of
21 Civil Procedure 30(e) before the deposition
22 was completed.
23    In witness whereof, I have hereunto
24 set my hand this 7th day of April, 2010.
25    -------------------------------

Contains Highly Confidential Portions

| | Page 342 |
|---|---|

1
2                    INDEX
3    TESTIMONY OF D. McISAAC:              PAGE
4    Examination by Ms. Bloomer  ................    5
5    Examination by Ms. Neuhardt ...............   241
6
7    EXHIBITS:                      PAGE
8    Exhibit 684, Expert Report of Daniel McIsaac      6
9    Exhibit 685, Declaration of Daniel Dziemian      47
10   Exhibit 686, Deposition of Gary Romain        50
11   Exhibit 687, Trustee's Memorandum in Further   121
12   Support of His Motion for Relief
13   Exhibit 688, Deposition of Bart McDade       178
14   Exhibit 689, Deposition of James Kobak       219
15   Exhibit 690, a document bearing Bates Nos.     235
16   CGSH33921 through 922
17   Exhibit 691, Affidavit of Daniel McIsaac       240
18   Exhibit 692, Supplemental Affidavit of Daniel   240
19   McIsaac
20   Exhibit 693, Rebuttal Report of Daniel McIsaac   240
21   Exhibit 694, Rule 15c3-3               267
22   Exhibit 695, Customer Protection - Reserves    291
23   and Custody of Securities SEA Rule 15c3-3
24   Exhibit 696, Declaration of Robert Martini     297
25

| | Page 343 |
|---|---|

1
2                 INDEX (Cont'd.)
3    REQUESTS FOR PRODUCTION:
4    Page 257, Line 15
5    Page 302, Line 5
6    Page 302, Line 14
7    Page 305, Line 5

| | Page 344 |
|---|---|

1
2    NAME OF CASE:  In re Lehman Brothers
3    DATE OF DEPOSITION:  April 6, 2010
4    NAME OF WITNESS:  Daniel McIsaac
5    Reason Codes:
6        1. To clarify the record.
         2. To conform to the facts.
7        3. To correct transcription errors.
8    Page _____ Line _____ Reason _____
     From _____ to _____
9
     Page _____ Line _____ Reason _____
10   From _____ to _____
11   Page _____ Line _____ Reason _____
     From _____ to _____
12
     Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
     From _____ to _____
15
     Page _____ Line _____ Reason _____
16   From _____ to _____
17   Page _____ Line _____ Reason _____
     From _____ to _____
18
     Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
     From _____ to _____
21
     Page _____ Line _____ Reason _____
22   From _____ to _____
23   Page _____ Line _____ Reason _____
     From _____ to _____
24
25        _____

Contains Highly Confidential Portions

**A**

**ability (8)**
27:17 36:7 139:14
147:23 148:8
188:10 282:7
289:10
**able (23)**
23:13 27:23 54:18,23
56:3 85:9 101:13
102:2 111:21
118:18 132:20
144:25 148:10
149:7,8 185:11
193:9 247:16
257:11 305:10
309:2 314:16
333:19
**ABN (7)**
12:5,18 13:13 15:21
15:25 17:9 258:16
**ABN's (1)**
19:25
**abreast (1)**
27:19
**Absolutely (3)**
12:12 242:10 291:7
**academic (2)**
100:4 101:5
**accept (3)**
59:7 88:21 116:14
**accepted (2)**
206:16 210:16
**accepts (1)**
43:23
**access (8)**
281:25 282:2,5 283:5
283:11 284:3
288:23 289:4
**accessible (3)**
75:20,24 186:5
**accommodate (1)**
6:17
**accomplishes (1)**
207:22
**account (115)**
10:17 28:3,17 31:8,16
33:11,13,24 34:19
35:12,24 36:8 42:2
43:12,16,24 44:2,4
44:19 48:13,17,25
49:3,9,16 50:4
53:14 60:18,22
73:17 80:6 85:12
86:22 88:19 90:22

111:10 114:21,23
115:14,16,19
117:19 118:7
120:20 124:10,12
125:12 133:13,20
133:22 134:12
144:4 156:15 173:2
173:5 180:9,21
183:23 186:22
188:18 190:21
191:7 192:15
199:20 228:25
233:10 247:14
259:2,9,17,18,22
260:3,4,6,6 262:2
263:2,4 264:10
268:16 272:9 279:4
279:10 281:17
286:12 288:3,8
290:11 291:18
295:18,18 300:15
302:10 305:12,18
306:6,22 307:3
309:4 312:24
314:17 315:15,16
320:10 321:2
323:11 332:25
333:7 335:13,13,15
335:16,24 337:16
**accounted (1)**
319:18
**accounting (6)**
49:17 50:4 51:12 52:2
245:23 248:24
**accounts (156)**
17:20 18:10,11,15
19:19 28:21,22
29:17 42:22 43:10
43:17,19 44:9,11,17
49:8,12 60:4 61:15
61:17,19,24,25
71:19 74:10 79:14
84:5,7,9,13 85:6
89:8 100:2 106:12
106:18,25 107:6,10
107:22,25 109:19
109:22 110:18,21
111:13 113:25
120:22,23 124:16
124:24,25 125:2,17
125:23 126:13,24
127:23 128:2,5,5,6
128:13,14,15,23
130:11,16,19,20

132:16 144:7,15
170:23 171:11
173:6 185:20
189:12,20 190:8,9
191:20 192:17,24
194:8 198:12,13,17
205:10,19 224:14
228:21 232:23
234:8,12,18,21
236:12,14,17,23
237:10 247:12
259:21,25 260:9,20
262:4,7 274:4,9
275:16 278:18
279:3,8,10,10,12,17
281:18 282:2,4,9,14
282:20,25 283:8,11
283:17,19 284:25
285:3,7 288:24
289:20 292:18
298:15,16,20,20
300:15,16 304:19
304:19 305:14,24
305:25 306:4 310:9
310:14 317:6,8,13
329:14 330:10,14
330:25
**accuracy (8)**
78:10 147:18 148:5
265:10 275:13,23
279:14 309:11
**accurate (1)**
86:8
**accurately (1)**
21:5
**acknowledge (3)**
173:25 320:24 321:5
**acknowledged (2)**
172:20 286:16
**acquire (6)**
21:23 88:23 89:19
108:23 152:18
208:19
**acquired (11)**
12:4,17,17 17:5 18:12
21:21 150:20
202:14,18,20
258:12
**acquirer (10)**
59:14 112:4 113:7
117:8 152:15 155:2
189:20 190:24
212:14 213:13
**acquirers (1)**

112:2
**acquiring (21)**
59:22,22 94:20 96:8
132:23 153:6,13
156:4 157:7,18,23
158:15,18,21,22
159:4,7,11,18
162:15 169:5
**acquisition (19)**
14:15 15:13,20,24 17:8
19:21,22 20:11
24:15 37:11,24
51:12,15 67:9 68:8
95:6 155:16 258:4
258:11
**acquisitions (8)**
9:7 11:2,5 12:2 13:10
14:18 68:13 258:10
**act (1)**
154:14
**acting (1)**
250:11
**action (2)**
184:2 341:15
**actions (1)**
180:13
**activity (1)**
44:4
**actual (4)**
14:7 18:14 77:5
133:22
**add (5)**
130:3,8 133:8 272:24
283:22
**addition (4)**
108:15 115:10 178:24
182:13
**additional (14)**
26:20 28:12 58:24
129:7 143:19 179:2
182:15 197:20
204:18 274:17
293:19 294:14
335:8 339:8
**address (1)**
31:13
**adequate (10)**
37:5 59:20 94:12
102:24 105:16
126:20,24 128:20
138:24 171:9
**adjust (3)**
290:10 296:11 303:5
**adjusted (4)**

197:5 322:14 323:20
324:11
**adjusting (1)**
331:3
**adjustment (18)**
293:13,23 298:11,14
307:19 308:7,14
317:21,22 319:5
330:12 331:2 332:9
332:22 333:20
335:4 336:4,5
**adjustments (7)**
293:4 294:2,6 295:3
303:10 330:16
331:25
**Administered (1)**
1:8
**administration (2)**
306:16 335:19
**ADP (10)**
245:13 292:11,17,18
296:4,19,25 298:11
298:14 302:2
**advance (2)**
44:25 45:2
**advancing (1)**
41:21
**advantage (2)**
42:15 184:6
**advice (3)**
252:9 276:14,14
**advise (7)**
169:13,16,18 211:2,6
211:15,19
**advised (2)**
79:20 212:14
**advisement (2)**
257:21 305:8
**advising (8)**
79:24 160:8 169:4,8
171:14 210:23
211:12 237:12
**advisor (3)**
172:5 275:11 332:16
**advisors (16)**
7:18,19 64:24 65:8,17
275:25 276:2,5
294:2,5,9,20 304:23
329:18 335:8
338:20
**advisory (4)**
201:19,24 202:9
250:8
**affect (6)**

Contains Highly Confidential Portions

68:23 88:12 193:23
289:9 325:7 337:19
**affidavit (28)**
240:9,12 241:5,10
257:9 274:17 275:2
275:19 276:17,18
280:22 300:21
309:9 328:19,24
330:3,6 332:8
333:12,14 334:11
334:20,25 336:20
336:23 338:16
342:17,18
**affidavits (5)**
8:9 247:7 251:8,10
276:25
**affiliate (31)**
38:5,7 41:25 42:10,18
44:19 45:11,16 48:7
48:13 52:3,22 53:14
54:3,10,13 57:5,15
58:22 59:4 60:3,8
60:12,17,21 117:18
118:2,7 120:2,7
124:9
**affiliates (16)**
38:14 42:22 44:24
47:22 49:13 57:19
57:20,22 58:4 59:9
60:2 117:22,24
120:7 144:14,14
**afford (1)**
166:20
**afraid (1)**
185:13
**afternoon (6)**
146:2,10,11 199:15
199:16 240:23
**afternoons (1)**
271:12
**agent (1)**
20:4
**aggregate (1)**
164:8
**ago (6)**
77:17 85:4 100:12
255:12,22 256:10
**agree (60)**
34:16,25 35:9 37:21
53:11,16 57:13,23
69:21 72:24 74:8
75:18,23 78:13
80:13,19 82:20
84:16,25 86:7 101:3

101:25 104:19
105:18 107:18,25
109:21 110:21
111:12 114:23
118:3 119:3 121:24
122:12 123:4,14
126:11 135:25
142:22 150:6
163:17 173:12
181:16 190:8
191:19 198:10,11
198:15 200:3
202:19,21 222:6
223:24 225:3,20
229:8,14,17 231:23
239:8
**agreed (21)**
121:15 122:13 166:22
167:8,20 168:10
173:13 196:18
208:17 209:21
217:19 310:3,8
311:8,12 313:15,22
313:24 314:9 326:8
328:10
**agreeing (5)**
58:21 80:20 138:9
209:19 239:17
**agreement (87)**
39:11 40:10 41:11
42:11 43:3 63:3
69:17,18,23 87:19
104:15 171:17
172:7,13 173:12,22
173:23 174:3,4,5,10
175:9,12,17,24,25
193:3 197:7 200:15
203:6 205:12,22
206:25 207:5,11,15
207:16,17,18,21
208:24 210:24
211:9,12 212:25
215:3,9 217:2
220:13 224:13
228:6 237:21,22
238:6,25 239:4,7
247:2 278:12
279:16,18 300:5,6
307:2 312:22,23
315:8,24 316:17,18
317:23,24 320:7
321:9,11,13 322:4
323:5,8,9,23 324:2
324:4 325:6,16,17

326:19
**agreements (2)**
218:24 305:23
**agrees (2)**
43:24 44:2
**ahead (1)**
64:15
**AICPA (3)**
255:5,14,16
**al (1)**
1:8
**Albany (1)**
3:14
**alert (1)**
29:10
**alleged (2)**
292:6,13
**allegedly (1)**
332:10
**allocate (1)**
21:11
**allocated (1)**
308:11
**allocating (2)**
290:22 292:2
**allocation (2)**
241:7,9 244:12 245:9
245:11 246:16
247:19 248:14
259:14 292:20
302:3 303:9
**allow (7)**
6:7 28:15 35:23 42:13
54:11 74:14 239:2
**allowed (4)**
64:10 263:13 311:20
324:23
**alluded (1)**
333:14
**alternative (1)**
109:10
**Alternatively (1)**
121:6
**AMAN (1)**
3:24
**ambiguities (1)**
217:12
**ambiguity (4)**
210:17 211:3 285:6
289:19
**ambiguous (5)**
174:21 225:12,17
227:5,9
**America (3)**

67:12,18 214:12
**AMINA (1)**
4:16
**amount (40)**
31:19 33:10 39:14
41:20 48:15 63:9
67:8 68:7,18 72:20
76:23 86:24 95:5
96:7,11,12 114:25
135:2 184:10 185:4
185:19 190:4
210:20 260:18
261:8 290:10 302:9
315:10 316:19,20
318:2,3,11,12,14
320:5 335:12
337:15,16,21
**amounts (6)**
46:8 54:2,18 90:21
263:7 331:12
**Amro (6)**
12:5,18 13:13 15:21
15:25 258:16
**Amy (11)**
3:16 239:25 240:24
261:3 277:15
279:24 283:21
299:20 303:21
326:25 327:16
**analysis (12)**
58:17 108:11 110:6
144:21 161:20
162:12 165:19
243:14 294:5,16
301:18 336:19
**analyst (1)**
245:2
**analyze (12)**
25:16 81:11 108:13
110:10 138:21
144:25 157:19
159:10,11 164:15
192:2 246:20
**analyzing (5)**
19:7 24:14 78:22
79:21 139:13
**and/or (4)**
16:23,25 31:14 276:5
**answer (85)**
6:8,12 14:23 18:2
21:9 23:13 24:8
25:19 30:4 35:21
51:18 52:8 62:10
64:15 70:2 90:2

110:15 111:7,17
115:23 119:8
123:20 126:16
128:19 130:24
131:14 139:3,11
143:23 154:6
155:25 156:8 157:9
162:25 166:12
172:11 175:16
176:21 177:9
182:16,18 187:24
191:5 193:9,24
195:24 196:25
197:16 205:16
208:3 215:7 216:23
220:21,25 221:13
221:24 233:6
243:18 247:16
251:17,25 257:11
259:11 263:10,16
264:2 266:2 268:3
270:8,22 272:12
273:20 276:20
277:2 287:9 290:4
306:9 312:5 322:19
322:20 323:13,15
327:18,24 336:16
**answered (27)**
70:22 111:16,18
119:7 139:10 154:5
166:11 168:4 177:8
181:10 187:5,23
189:23 191:4 195:4
196:24 197:15
208:3 218:11,12
227:20 231:10
233:20 238:18
263:10 270:17
290:13
**answering (3)**
80:10 183:3 327:20
**answers (2)**
184:23 285:11
**anticipate (1)**
198:20
**anticipated (4)**
108:17 151:2 163:13
315:7
**anybody (14)**
34:22 53:19 58:16
64:18,21 215:15
228:7 236:24
246:19 268:5
275:22 288:18

Contains Highly Confidential Portions

308:3 340:7
**anybody's (1)**
159:23
**anymore (2)**
315:13 324:23
**anyplace (1)**
180:23
**anyway (1)**
187:10
**APA (7)**
40:8 62:5 63:11,25
64:7 237:16 248:5
**apologies (2)**
265:6 320:12
**apologize (5)**
90:16 144:17 245:6
274:19 300:5
**appear (1)**
94:13
**appeared (1)**
207:9
**appears (6)**
37:16 57:25 159:13
226:5 242:5 333:24
**appetite (1)**
162:7
**applies (3)**
126:12 309:15,17
**apply (1)**
268:12
**appointed (1)**
273:2
**appreciate (2)**
195:9 216:22
**approach (3)**
76:11 188:21 196:3
**approached (1)**
99:22
**appropriate (1)**
271:2
**approval (7)**
104:3 263:20,23
264:3,7,10 312:2
**approve (1)**
56:20
**approved (9)**
104:3 175:10 216:5
270:13 311:3,5,7
313:11 314:6
**approximately (7)**
5:6 9:2,12 37:16
49:11 78:3 141:25
**April (7)**
1:15 2:2 5:5 212:23

297:4 341:24 344:3
**area (4)**
30:18,25,25 242:4
**areas (3)**
9:13 26:10 38:16
**arguably (6)**
121:18 122:22 124:3
126:8 140:12 142:7
**argumentative (1)**
213:8
**arising (1)**
44:3
**arrange (2)**
169:18,24
**arrangement (1)**
171:16
**arrangements (4)**
169:9 170:11 171:8
175:4
**arranging (2)**
168:19 169:19
**aside (1)**
133:18
**asked (39)**
30:2 76:15 109:17
110:16,16 111:15
111:23 119:7
139:10 154:5
166:11 168:3 177:7
178:23 181:9 186:9
187:4,22 188:11
189:22 191:3 195:4
196:23 197:14
208:2 218:10
227:19 231:9
233:19 238:17
246:19 247:11
248:14 263:9 280:9
280:12 293:2
299:20 321:21
**asking (27)**
62:21,23,24 70:25
85:17 89:4 139:3
152:21 160:13
161:11 163:22
168:9 188:25 189:3
192:13 195:12,15
211:10,11 213:18
216:24 225:8
247:10 261:3
286:24 327:12,13
**asks (2)**
103:3,23
**aspect (1)**

339:20
**aspects (2)**
12:22 18:5
**assess (18)**
97:12 98:5,9 137:25
138:7 142:14,15
144:17,18 158:5
160:16 161:12
163:25 165:16
168:5 187:6 189:25
215:18
**assessed (2)**
55:24 216:21
**assessing (6)**
98:11,12 137:23
139:7 162:2 217:3
**assessment (8)**
96:23 138:11 160:8
160:12 161:7
166:18 215:25
216:3
**assessments (1)**
161:2
**asset (62)**
15:15 38:8 39:10 63:3
104:18 108:16
112:18 115:9,11
116:2 117:6,9
199:20,23 200:15
203:5 207:9 208:18
209:4,24 210:8,11
210:12,13 211:17
212:25 213:14
237:20 247:2
258:20 275:17
310:17 312:14,15
312:16,25,25 313:4
313:24 314:7,10,10
314:11,12,13
315:20,24 317:17
317:25 318:24
319:2 323:24 324:4
324:16,20,23
325:12,13,16,18
328:4,9
**assets (229)**
9:25 10:6,15 16:21,23
16:24 30:20 33:10
38:3,7,10,18,20,22
40:11,23 41:4,6,8
41:10,19 55:15,20
79:2,4 87:10 89:16
89:18 95:11,21,22
96:19 97:4,4 100:13

106:10 109:7
114:10,12,12,16
115:5,7,25 116:2
117:13 121:10,16
121:21 122:14,24
123:22,23,24 124:5
124:15 125:4,16,24
126:10,14 128:17
130:2,18 133:5
134:4,6 140:11
142:8,25 156:22
171:21,25 174:25
175:18 179:2,8,10
179:12,22 180:2,18
180:20,23,25 181:3
181:4,7,13,17,25
182:6,15,18,18,21
183:11,13 196:13
197:20 198:3,9,24
199:17,25 201:14
203:7,10,11,13
204:9,11 205:10,20
206:5,6,7,9,10,10
206:12,18,20,21,24
207:5,8,12,22,24,25
208:4,6,10,22,25
209:2,2,7 210:5,6
210:18,25,25 211:4
211:8,13,13,15
212:20,22 213:4,5
215:23 216:17
217:13 222:15,16
223:3 224:18,22
225:10,16 227:22
227:23 230:22
231:7 234:5,15
237:14 239:4,9,15
246:4 247:12,13
258:10,12,21 259:2
259:5,6,15,15
268:16 275:4
278:25 279:2,8
280:4,5,6,8,24,25
281:12 282:3,15
283:5 284:10,18
285:17 287:23
289:16 290:9,18,22
291:20 295:11,13
295:22 300:16
302:16 304:19,20
305:11 306:15,18
306:19,20 307:12
307:13,20 308:8
310:14 315:4 319:5

326:14 328:17
**asset's (1)**
312:16
**assigned (1)**
220:16
**assigning (1)**
61:11
**assignment (2)**
43:23 45:3
**assignments (1)**
173:9
**assigns (1)**
172:20
**assisting (1)**
253:7
**associated (13)**
57:14 98:6 137:24
138:11 139:7
147:24 148:9
150:18 186:14,16
200:4,6 305:24
**association (2)**
5:10 255:9
**assume (61)**
32:3 39:8 45:15 48:21
49:2 61:18,20 69:15
73:11 74:18 75:15
76:16 78:25 80:24
90:4,19 100:24
113:11 114:11
118:16 144:23
149:6 150:25
152:24 155:2,8,12
157:15 159:14
162:17 165:24
166:14 171:4
172:12 173:24
175:9 184:7,25
189:12 190:6 191:6
191:12 193:4
195:10 198:8 210:3
212:11,21 213:3,23
214:4,6 215:8 216:2
225:19 264:8 271:2
289:12 295:23,25
310:4
**assumed (15)**
41:7 44:7,10 59:8
90:25 108:6 109:24
110:23 117:14
118:10,11,14
182:17 207:16
334:25
**assumes (26)**

TSG Reporting - Worldwide    877-702-9580

Contains Highly Confidential Portions

44:2 69:11 108:4
130:22 135:6,19,22
142:13 143:16
150:10 153:15
154:10 155:7 156:7
172:10 182:25
187:23 189:23
191:4 193:8 212:16
213:19 214:2,10
287:6 322:16
**assuming (32)**
34:7 48:16 76:18
90:20 93:15,23
103:25 107:10
120:6 128:22 142:5
150:5 153:10
158:10 161:23
166:3,17 179:24
181:24 182:2,20
191:19 193:11
216:4 223:6 229:23
236:16 237:13,18
270:15 297:16
309:23
**assumption (9)**
43:2 207:15 215:11
233:8 237:21,22
238:25 264:12
320:7
**assumptions (1)**
215:12
**atmosphere (1)**
20:13
**attached (6)**
10:24 261:21 275:18
279:18 280:13,16
**attachment (1)**
127:7
**attempted (2)**
288:2,7
**attempting (1)**
149:12
**attention (6)**
29:11 127:8 293:6,17
294:11 295:8
**attorneys (6)**
3:6,12,21 4:5,12
238:21
**AT&T (1)**
161:12
**auction (8)**
74:19,23 75:25 76:23
76:24 180:8,20
183:18

**auctioned (1)**
76:8
**auctioning (2)**
76:5,11
**audit (1)**
255:16
**auditing (1)**
255:17
**August (2)**
94:22 214:16
**Austin (1)**
73:5
**authority (2)**
21:4 175:23
**authorized (1)**
173:13
**authorizing (1)**
220:24
**automatically (1)**
329:7
**available (3)**
75:14 181:18 182:23
**Avenue (2)**
2:7 4:6
**average (5)**
34:16 35:9,15,16,20
**avoid (3)**
168:23 189:18 211:3
**avoided (1)**
73:16
**aware (21)**
28:19 35:22 36:10
41:18 58:3 74:8
140:16 142:5 170:4
180:7 236:19,24
245:25 260:2 278:2
278:6 282:13
288:10 292:13,25
307:10
**A.M (6)**
271:20 272:4 290:14
339:10,12,17

--------
**B**
--------
**bachelor (1)**
248:23
**back (55)**
13:23 45:10,24 46:12
46:23,25 47:14 48:5
48:18 49:19 50:2,7
50:11 51:2 52:21
53:2 75:12,16 91:20
105:3 109:15
111:19 130:3,8

133:8 139:24 146:7
148:15 171:12,25
172:8 176:2 177:18
184:24 186:11,12
186:18 187:9
199:13 204:8 230:5
236:25 240:20
254:22 256:21
299:13 313:7 320:9
320:17,18,20
328:11 332:6,7
338:11
**background (3)**
8:21 26:12 180:5
**bad (2)**
106:10 157:15
**balance (5)**
37:11,15 86:24
209:23,24
**balances (5)**
17:20 133:8 275:16
281:18 329:14
**bank (18)**
49:9 55:11 67:12,18
68:15 214:11 260:3
262:2 284:15
286:13 290:24
291:17 292:3,7
295:23 298:17
330:14 337:3
**bankrupt (2)**
56:23 61:21
**bankruptcy (5)**
1:2 77:12 78:23 79:21
242:19
**banks (1)**
260:12
**Barclays (193)**
3:12,21 5:24 37:11,21
37:23 38:18 41:7,18
42:7,21 43:23 44:7
44:10,14,15,24 45:9
45:15,23 47:13 48:5
48:14 49:12,19 50:6
52:12,21 53:11,22
54:2,6 56:2,3,5 57:3
57:10,21,23 58:20
59:19 60:6 61:16
62:3,16 63:10 66:17
66:22 72:8 73:6,23
80:21 87:6,15,19
88:6,20 92:6 93:3
93:23 94:4,19 96:7
98:19,22 99:18

100:19 101:21
104:15 105:4,5,13
105:14 107:25
109:22 110:21
111:13 114:24
117:14 118:5,16
119:4,25 121:8,15
126:23 127:22
128:20 129:20
130:10,17 134:25
136:7 138:12
140:10 147:13,21
147:22 148:8
149:12,17 150:20
150:21 153:5,9
159:14,17 160:9
162:15 166:7,8,13
167:20 168:19
169:2 170:11
172:21 174:15
176:11 177:5,6
178:18 191:21
202:14,20 207:18
208:18 211:25
212:7,9,16 213:19
214:21 215:13,20
218:17,25 220:16
221:3,13,18 233:11
233:14 236:15,16
236:21 238:3,12,21
239:2,10 240:24
246:2,4 247:20
278:3,7 296:8,9,10
296:16,18,22,22
297:2,18,21 298:2
301:12,15,20,22,24
303:3,17 308:5
309:23,25 310:10
312:22 314:24,25
315:25 320:11
321:11 322:11
323:3,6,8,12,17,23
337:15
**bargaining (1)**
105:21
**Bart (4)**
3:9 178:7,11 342:13
**base (8)**
19:7,10 27:21 59:15
112:18 137:3
276:16 295:12
**based (30)**
10:20 30:22 32:7,12
34:10,13,21 58:18

108:17 112:15,21
136:9 160:2,21
161:22 179:24
194:16 198:18
214:8 215:11
241:15 243:12,13
259:14 263:18
266:22,22 269:3
271:8 299:14
**basic (1)**
10:23
**basically (6)**
9:24 53:9 93:5 264:15
277:17 333:19
**basing (3)**
264:12 273:15 311:16
**basis (28)**
44:13 46:5 57:12
61:14,18 90:13 98:8
98:11 163:4,6
164:15,21 195:6,13
197:22 210:10
252:2,6 268:17
269:7 296:16 303:2
303:11 306:17
328:24 330:5,21
331:4
**basket (1)**
152:5
**Bates (2)**
235:2 342:15
**Battery (1)**
4:13
**BDW (3)**
272:14,16,21
**bearing (3)**
137:13 235:2 342:15
**becoming (1)**
312:25
**beginning (3)**
86:18 159:20 237:23
**begins (1)**
203:7
**behalf (17)**
44:19,24 103:24
170:24 183:17
219:11 228:10,19
229:3,11,12,19,21
229:22 230:8
231:18 301:19
**belief (2)**
138:23 268:17
**believe (234)**
7:11 8:14 11:5 13:7

Contains Highly Confidential Portions

17:9 27:12,25 29:10
29:13 30:3 33:24
37:3 38:5,7,13,19
39:4,17,19 41:7,8
41:16,25 42:12,21
43:19 46:7 50:17
53:25 54:6 55:14
57:3,21 58:7 59:19
63:20,23 64:9 65:25
67:12 69:2,12 70:3
70:16 71:10 72:7,14
72:21 73:4 75:11,15
76:7,14 78:18,19
79:18 82:18 83:6,9
86:13,18 87:2,17,18
87:20,24 88:5,9,16
90:9 93:8 94:22
97:24 98:2 102:4,6
104:13,25 105:6
112:16,23 114:22
117:12,21 120:5
124:11 126:2,24
136:5,25 140:22,25
141:5 142:6,14
143:12 144:12
146:16,22,23
148:13,17 153:8
163:2,11,24 164:13
169:10 170:7,8
176:14 178:13,19
187:6 196:11
200:13 203:20
204:24 207:7 212:5
215:8 216:25
217:24 218:12,13
224:7,17 226:8
227:21 228:13
232:5 233:16,24
234:10 235:15
236:19 237:12
243:20 251:12
260:5,11,15,22
262:10 263:22
264:2,6,14 265:13
266:3,8,15 267:12
268:6 269:2,11,19
270:11 271:3 272:6
272:10,13 278:12
279:15,20 280:16
281:13,17 282:17
282:19,24 284:20
285:2,6 290:13,20
291:13,23 293:25
294:8,11,16,18,19

295:5,20 296:4,18
298:13 301:21
302:5 303:8,14,19
305:3,3,9 307:22
308:11 309:14,17
310:12 311:7,17
312:25 313:20
314:15,18 317:4,19
318:25 319:7,13
321:16,21 322:6,17
322:22 323:5
325:11 327:10
328:3,7,9,16 332:16
333:10,13,14
334:16,22 335:7
338:22 339:5
**believed (12)**
107:21 109:9,18
110:17 111:9
112:25 113:8
166:23 167:10,22
169:20 196:3
**believes (1)**
321:11
**belong (3)**
134:4 310:24 312:8
**benefit (17)**
81:2,6 190:11,25
220:20 222:18
223:16,19,22 260:6
263:3,5,8,12 279:4
306:7,22
**benefits (3)**
43:25 109:4 112:22
**best (2)**
184:6 252:18
**better (8)**
42:16 51:21 82:10
103:21 105:7
108:10 110:4
149:11
**betting (2)**
136:18 138:19
**beyond (3)**
142:23 198:24 221:5
**bid (3)**
12:20 15:15 18:21
**bidders (1)**
183:21
**bill (1)**
54:16
**billed (2)**
256:17,25
**billion (44)**

37:12,17,18,22,24
39:17,18,20 41:3,5
77:3 78:3,15 84:22
84:23 94:24 95:3
97:14,14 98:3 108:7
108:8 110:2,3
114:20 115:15,16
117:13 119:10,13
141:22 143:4
181:25 189:17,19
209:17 221:16
287:12,13 302:11
315:12 332:9 334:9
335:5
**billions (1)**
172:8
**billion-dollar (1)**
119:11
**billion-17 (1)**
260:23
**billion-760 (1)**
260:23
**bills (4)**
137:8 206:14,15,16
**binding (4)**
69:23 174:4,5 321:13
**bit (10)**
6:6 13:23,23 14:22
17:2 29:11 99:11
125:8 257:14
283:25
**bits (1)**
112:20
**blood (1)**
341:16
**Bloomer (28)**
3:15 5:19,22 12:12
45:22 46:13,24
64:20 91:12,21
122:7 124:20
139:19,23 140:5
144:10 145:5 146:9
160:14 163:22
184:14 199:6,14
226:19 232:20
239:23 256:16
342:4
**blush (1)**
18:21
**board (4)**
216:5,7,9,9
**Boies (3)**
2:5 3:11 5:23
**bonds (2)**

201:11,12
**book (17)**
13:19 15:13 32:16
49:4,5,6 155:12,22
156:19 157:12,14
159:15,18 160:3,22
161:6 162:8
**booking (1)**
50:10
**books (4)**
13:5 25:16 149:20
155:10
**borne (2)**
57:19,20
**borrow (3)**
206:17 313:6 320:4
**bottom (6)**
51:22 130:3 200:16
200:17,22 217:9
**bought (17)**
13:12,22 14:8,9,12,19
15:2,6,14 67:12,19
95:11,13 96:18
112:14 214:12
215:22
**bound (1)**
43:24
**box (3)**
295:14 306:20,21
**boxed (1)**
51:7
**boxes (1)**
176:11
**break (12)**
6:16 46:14 47:12
91:11 139:18 145:6
262:21 283:24
298:25 299:17
306:11 338:6
**bridge (7)**
48:13,17,25 49:3,8,16
50:3
**brief (4)**
77:10 121:14 140:2,9
**bring (3)**
135:17 142:24 294:12
**bringing (1)**
13:5
**broad (2)**
125:9 126:3
**Broadridge (9)**
296:4,25 297:22
298:12,14 301:13
301:15 302:3

303:15
**broke (2)**
97:25 338:13
**broken (1)**
207:10
**broker (3)**
13:13 96:15 274:8
**brokerage (4)**
14:18 15:21 214:13
258:16
**brokers (5)**
14:11 125:5 168:20
170:5,9
**broker-dealer (33)**
31:16 56:8,13 62:2
67:10 68:8 79:16
94:13 96:3 97:8
101:17 102:25
106:5 132:23 151:8
154:16 169:25
214:7 259:3,6
263:13,17,20 271:6
271:9,18 272:14,17
272:20 273:12,24
309:2 339:16
**broker-dealers (3)**
241:18 242:23 255:17
**broker-dealer's (1)**
151:23
**Brothers (11)**
1:7 3:6 17:12 61:3
67:13 138:13
178:14 246:5
250:24 337:14
344:2
**brought (3)**
147:13 198:21,23
293:6,16
**building (1)**
195:11
**buildings (1)**
95:12
**business (145)**
9:6 10:21 12:5,18,19
13:13,14,16,24 14:2
14:10 15:21 16:16
17:5,12 19:11,22,24
19:25 21:3,24 24:23
24:25 25:2 58:23,25
59:2,5 61:9 67:10
68:8 84:4,6,8 85:18
86:8,16 90:19 95:23
96:8,13,14,18 99:25
101:17 102:3,5,8,11

Contains Highly Confidential Portions

102:14,17 106:2,3,5
106:6 107:13
108:18,24 109:3
112:4,16,19,20
117:22,24 136:9
145:4 159:15,18,23
162:8,9 170:14
189:25 199:21,25
200:5,8,10,17,21
201:7,8,11,18 202:4
202:9,14,20,22,24
203:12,16,18
205:11,21 207:23
208:6,25 211:14
214:7,13 228:22
232:24 249:14,16
258:16,18 267:8,10
267:13,14 268:8,10
268:15,18,20,21,23
269:6,18,21 270:5
270:12,20 271:13
271:16,20,22
273:12 324:22
325:2,3,4,7,9,20,25
326:18,20,21 327:6
327:7 330:14 339:8
**businesses (15)**
14:8 95:10,11 96:16
97:5,5 112:15
170:10 201:2,16,19
201:24 202:18
204:18 258:21
**businesspeople (1)**
18:13
**businessperson (1)**
162:7
**button (2)**
162:20 163:18
**buy (24)**
14:16,17 20:2 67:3,4
67:5,5 74:4,5 91:7
93:18 96:14 114:15
117:23 155:13
156:22 162:10
169:14 210:10
214:4,7,14 215:15
216:10
**buyer (8)**
99:23 100:14 101:6
102:3 115:9 194:9
211:7,11
**buyers (2)**
100:17 101:13
**buying (33)**

13:18 16:21,22 38:8
38:11,18 67:19 74:4
94:8,13 95:10 96:12
112:19,19 116:8,22
117:21 166:18
209:11,12 212:20
212:23 214:5,25
215:4,10,16,18
216:11,13,15,18,19

——————————
**C**
——————————

**C (6)**
3:3 4:2 224:21 226:11
226:13 233:4
**calc (1)**
268:15
**calculate (1)**
31:3
**calculation (66)**
10:3,20 31:10,11
129:13,25 244:4,7,8
244:10,24 253:21
253:25 264:16
265:11,16,20,22
266:11 267:4,7,13
267:22 268:6,25
269:8,12,25 271:7
271:15 289:17,22
291:22 292:15
293:5,14 294:3,7
295:4 297:25
303:18 307:14,19
309:11 312:12
317:9,14 318:24
319:17 322:13
323:19 324:7,10
325:7,8,24 326:5,6
326:9,23 327:9
329:3,8 331:10,18
339:7
**calculations (10)**
9:15 35:19 243:6
253:22,22 258:3
263:18 268:7 269:4
307:21
**call (7)**
34:23 134:20 135:24
161:12 192:8
276:22 278:12
**called (7)**
5:14 26:19 28:13 45:7
86:22 251:8 255:11
**calling (1)**
300:5

**calls (16)**
32:14 91:3 135:13,14
135:20,23 173:18
174:7 176:19 177:8
177:14 179:17
204:14 205:14,24
233:5
**capable (1)**
147:14
**capacity (1)**
296:24
**capital (29)**
5:24 13:24 21:12
24:18,19,20 27:17
27:21 43:13 94:11
94:12 95:17,18 98:9
98:10,10,12 102:24
121:8 224:21
253:21 255:13
256:5,6 301:12,16
301:20,22,25
**capitalized (1)**
203:17
**Caputo (3)**
103:18 104:6,14
**care (8)**
139:12 158:9,11,19
158:21 159:3,6
313:7
**carried (1)**
80:7
**carries (1)**
43:9
**carry (2)**
80:9,12
**carving (1)**
19:12
**case (26)**
1:7 14:18 17:7 25:4
30:7 34:24 35:2
41:13 53:13 60:4
77:10 82:4 95:16
110:12 112:8
153:24 168:18
176:23 193:13
206:20 224:10
238:12 269:22
272:3,6 344:2
**cases (1)**
99:21
**cash (38)**
41:20 45:2 90:25 91:4
133:22 167:16
179:2 181:3 182:15

201:22 202:8
220:17 221:2,4,12
221:12,12,14,17,18
221:20 223:5,7,10
223:11,11,14,19
236:13,22 237:9,25
238:13,22 275:5
287:13 288:24
302:9
**categories (2)**
200:25 230:21
**category (2)**
334:10,11
**cause (1)**
290:9
**caused (1)**
293:23
**ceased (1)**
39:24
**cents (2)**
197:24,25
**certain (13)**
14:8 85:10,11 94:10
95:10 96:19 121:6
151:4 218:23
237:16 284:22
285:6 292:18
**certainly (8)**
59:25 63:17 77:7
109:5 114:4 161:17
161:19 257:20
**CERTIFICATE (1)**
341:2
**certification (1)**
249:12
**Certified (2)**
2:10,10
**certify (3)**
341:8,14,18
**CFTC (2)**
9:23 127:22
**CGSH33921 (2)**
235:3 342:16
**chair (1)**
253:2
**chaired (1)**
255:13
**chance (5)**
147:8 184:5,19 185:7
235:8
**change (18)**
66:25 84:22 92:7 93:4
193:5 197:23
269:23 270:20

287:4,19,24 297:18
308:9,15 313:12
318:17 324:6
331:11
**changed (2)**
208:12 274:20
**changes (3)**
188:6 297:22,24
**Chapter (3)**
1:6 99:21 100:18
**characterizes (1)**
57:14
**characterizing (1)**
163:23
**charge (4)**
50:2 75:12,16 187:10
**charged (5)**
45:10,24 47:14 48:5
52:21
**charging (6)**
46:11 48:18 49:19
50:7,11 53:2
**Charles (3)**
13:24 15:4,17
**Chase (37)**
220:20 222:19 223:4
223:20,23,25 224:4
274:12 279:4
280:25 281:16,21
282:18,24 284:24
285:3,8 286:2,16,22
287:10,17 288:3,8
288:14,24 289:7,13
289:13,15 295:14
295:15,22 302:16
304:21 306:7 337:3
**Chase's (1)**
281:17
**check (2)**
19:16 261:20
**Chicago (2)**
77:23 78:13
**Chris (2)**
276:8 277:7
**circumstance (4)**
80:2 108:22 172:6
217:19
**circumstances (30)**
62:25 66:6,10 68:23
69:6 92:5,8,14,20
92:24 93:2,7 98:18
98:21 100:15
119:23 192:2
193:21,22 194:14

Contains Highly Confidential Portions

194:22,24 195:19
198:11,18 217:20
217:22 218:2,4,9
**citations (1)**
275:6
**cite (3)**
46:5 47:24 296:15
**Civil (1)**
341:21
**claim (3)**
334:21,21 337:24
**claims (6)**
55:2,4,10,21 331:7
337:22
**clarification (7)**
40:7 63:4 198:25
224:8 234:4 248:8
298:15
**clarify (6)**
160:14,15 242:8
247:6 330:9 344:6
**Clark (2)**
146:14 147:11
**class (1)**
207:9
**classification (1)**
292:7
**classified (1)**
298:21
**clause (5)**
43:8 225:13 226:9,14
231:21
**clear (23)**
19:25 85:17 160:12
174:20,23 216:12
216:14,16 225:9
226:16,22 231:2,3,6
231:11,12,14,20,21
234:10 277:14
300:20 326:16
**clearance (5)**
24:24 44:11 57:5
118:23 120:7
**cleared (4)**
19:10 38:6 170:8
173:6
**clearer (2)**
14:10 247:4
**clearing (44)**
20:4 27:16 29:4 36:7
37:6 43:9 44:16,21
61:4,10 75:5,13,17
76:5 89:13 96:17
108:18 125:5,5

166:25 168:20,21
170:5,5,14 173:3
175:6 179:3 181:5
182:4,19 191:12
199:18 200:11
201:7 212:3 220:19
222:17 231:24,25
232:3,4 311:21
320:14
**clearly (5)**
6:7 230:17,18,23
327:20
**Cleary (4)**
3:20 71:25 72:3,5
**client (1)**
103:25
**clients (6)**
18:22,23 132:13
250:15,17 274:8
**close (42)**
10:21 52:10 69:13
71:18,19 74:11
77:24 85:17,19,25
86:7,15 102:15,19
102:20 103:6,7,20
104:4,12,15 106:13
106:24 113:9
134:11 143:20
145:4 186:22 267:7
267:13 268:15
269:18,21 270:4,12
270:19 271:13,16
325:4,6 326:18
327:5
**closed (17)**
16:6 45:8 69:4,14
70:7 74:19 78:14
86:15 103:5 125:13
131:20 132:6,19
186:19 269:20
312:11 327:6
**closely (2)**
9:3,12
**closeout (1)**
78:2
**close-out (1)**
48:11
**closing (19)**
45:11,25 47:15 48:6
48:19 52:22 53:23
54:3,8,13 73:2,13
73:16 85:22 86:10
105:9 134:24 169:6
271:21

**CLR (1)**
1:24
**CME (30)**
9:4,17 76:8,11,17,24
107:4,5,12 125:12
125:16 170:8 179:9
179:22 180:6,7,14
180:21,23 181:19
181:25 183:18,20
188:17 189:9,13,13
190:18 191:8
192:16
**CME's (1)**
76:24
**Code (1)**
242:19
**coded (1)**
295:18
**Codes (1)**
344:5
**coding (6)**
292:5,6,14,23 293:9
296:13
**collateral (29)**
84:5 129:7 138:24
169:9,10,14,16,16
169:19,21,25 170:2
170:15,23 171:3,9
171:11 172:8
206:16 220:13,18
222:16 234:23
236:13,22 237:9
238:2,13,23
**colleague (1)**
246:25
**collect (5)**
54:7,19,23 320:22
321:19
**collected (2)**
54:2,15
**collects (1)**
87:22
**College (1)**
248:24
**combination (1)**
275:3
**come (12)**
25:21 46:10 168:22
171:4 187:9 197:6
239:25 262:11,13
294:11 332:6
334:15
**comes (1)**
332:7

**comfortable (2)**
27:22,24
**coming (6)**
40:4 251:20 311:20
331:2 335:3,6
**commencement (1)**
99:21
**commingled (3)**
42:14 60:12,21
**commission (1)**
202:25
**committee (3)**
4:5 255:13 256:5
**commodity (1)**
128:6
**common (3)**
205:4 273:21,23
**communication (1)**
288:19
**communications (2)**
269:16 288:17
**companies (4)**
16:25 18:11 59:13
337:19
**company (8)**
28:7,16 96:4 99:24
106:4 169:4,8
337:14
**compensated (6)**
114:5,9,11,14 177:21
197:11
**compensation (6)**
116:16,25 117:2
175:4 196:17
198:17
**competitors (1)**
214:18
**complete (2)**
105:19 298:9
**completed (3)**
294:5 339:3 341:22
**completeness (1)**
110:9
**compliance (8)**
10:8 241:21 243:24
244:20 248:6,15
253:14 320:23
**complies (1)**
114:17
**complying (1)**
20:14
**comprised (2)**
37:16 259:22
**computation (1)**

273:22
**computes (1)**
30:15
**conceived (1)**
16:5
**concept (1)**
201:5
**concern (4)**
27:16 41:19 94:14,16
**concerned (9)**
36:11,15 80:12
107:14 183:9,23
185:17 192:15
317:24
**concerning (1)**
8:13
**concerns (4)**
12:8 29:9 49:17 50:4
**conclude (1)**
148:18
**concluded (1)**
332:19
**conclusion (11)**
173:19 174:8 176:20
177:8,15 204:15
205:15,25 233:6
327:23 328:6
**conditions (1)**
136:14
**conduct (1)**
144:20
**conducted (8)**
59:12 189:8 202:22
218:6 301:19,24
336:18 338:14
**conducting (2)**
18:19 188:7
**confidence (11)**
33:15 34:10,13
179:11 180:24
182:5,8,12,22
183:10,12
**confidential (19)**
1:12,17 11:8 12:1,11
13:1 14:11 15:1 16:1
17:1 18:1 19:1 20:1
21:1 22:1,2 28:9
250:18,19
**confidentiality (1)**
12:8
**confirm (6)**
165:22 236:11 237:24
241:25 305:22
329:22

Contains Highly Confidential Portions

**confirmed (1)**
238:11
**conform (1)**
344:6
**confused (2)**
202:5 261:15
**connection (12)**
43:4 62:18 161:3
203:12 205:11,20
207:23 208:25
211:14 232:22
247:2 299:21
**consider (14)**
56:7,10 58:9 96:18,20
98:20 99:23 148:24
149:15 160:25
182:6 199:17 231:5
323:25
**consideration (6)**
81:8,10,23 82:3
172:18 338:21
**considered (7)**
152:17 153:4 202:3
208:6 224:7 259:3
307:23
**considering (2)**
155:16 220:7
**consist (2)**
17:23 162:3
**consisted (1)**
16:14
**consistent (2)**
220:25 221:11
**constitute (1)**
129:19
**constitutes (1)**
286:14
**construed (1)**
204:4
**consultant (5)**
250:12,13,25 252:8
253:5
**consulted (1)**
20:19
**consulting (3)**
250:21 251:5 252:21
**consumed (1)**
76:23
**consummated (4)**
67:10 70:6 138:13
320:20
**consummating (2)**
123:12 208:13
**contain (1)**

128:6
**contained (1)**
165:7
**contains (1)**
241:24
**contemplation (1)**
104:11
**context (12)**
14:15 27:13 83:19
99:12 122:17 123:5
123:6 127:25 179:8
206:8 220:12
222:11
**continue (4)**
11:9 22:3 108:21
332:21
**continued (2)**
100:21 314:16
**continues (3)**
77:20 122:8 268:12
**contract (31)**
70:5 149:24 198:22
209:20 210:12
246:3,12,20 247:11
247:19 311:2,4,6
312:10,18 313:11
313:15,18,21 314:5
315:3,20 317:7
318:10 323:4,7
326:17 327:4,11,13
328:2
**contracted (1)**
317:5
**contracts (3)**
116:21 173:8 247:22
**control (8)**
280:25 283:14 284:4
284:13 307:8,23
308:12,17
**controls (1)**
18:7
**Cont'd (3)**
4:2 146:8 343:2
**conversation (2)**
7:17 299:15
**conversations (2)**
26:25 64:7
**conversion (1)**
176:3
**convert (2)**
25:10 176:3
**copied (4)**
72:10,16 235:20
236:5

**copy (4)**
7:4 47:6 51:2 77:11
**corporation (3)**
33:16 220:19 222:18
**corporations (2)**
166:25 231:24
**correct (50)**
8:18 21:19 35:20 40:6
118:13 143:2,6
186:6,16 207:19
212:18 221:23
226:8 227:7,8 232:8
236:8,9 243:15
248:21,25 259:19
260:8,10 264:5
271:12 272:5
274:10,13,14,16,21
285:18 289:10
292:11,12 302:11
308:19 309:13
314:22 315:21
316:13 329:3
332:10,13,14
338:18 339:11
340:4 344:7
**correctly (2)**
23:7 94:25
**correctness (1)**
262:17
**corresponding (3)**
152:18 160:5,19
**cost (34)**
31:18,25 34:18 35:12
36:18 37:7 44:10,24
47:14 48:6,19 52:22
53:12 78:15 85:11
85:19 86:9 120:18
121:19 122:22
124:3,3 126:8
132:17 140:12
142:7 185:18,22,23
186:25 187:8 188:5
188:12 190:7
**costs (9)**
49:20 50:7 53:22 54:7
56:4 75:21 118:19
186:14,16
**counsel (16)**
8:12 72:14 107:20
127:22 212:6
235:16 236:8
261:18,19 262:10
262:11,15,18 276:3
276:4 277:12

**counsels (2)**
235:15,17
**counterparties (2)**
136:5,11 175:6
227:25
**counterparty (1)**
313:6
**country (4)**
17:10 97:8 137:14,15
**COUNTY (1)**
341:4
**couple (5)**
16:8 19:2,6 26:5
257:12
**course (13)**
30:7 122:5 152:9
179:10,23 188:6
263:24 264:4
307:18 308:7
325:25 330:13
339:8
**courses (3)**
249:10,11,13
**court (28)**
1:2 5:9,11 56:19
101:3 103:3,12,19
103:23 104:21
105:9 175:10
241:11 311:3,5
312:2,21 313:11,16
313:17 314:4
315:22 318:6 322:9
322:10 323:16
324:3 325:17
**court's (2)**
103:19 323:22
**court-approved (1)**
56:18
**cover (15)**
34:18 35:11 36:18
55:20 75:20 82:9,14
87:5 119:10 129:11
135:16 186:6
221:21 319:21,23
**covered (5)**
33:13 75:14 131:10
144:2,5
**CPA (3)**
249:12 254:22 255:2
**CPAs (2)**
255:6,24
**Craig (1)**
141:5
**created (1)**

147:22
**credit (27)**
19:16 56:9,11,12,14
56:20 57:19 58:9,15
135:25 136:4,12,16
138:20 285:8
290:17,20 291:21
292:15 293:8,10
307:24 329:13
334:15 335:3,6
336:7
**creditor (1)**
55:2
**Creditors (3)**
4:5 55:12,17
**credits (1)**
331:20
**creditworthiness (2)**
29:6 56:24
**creditworthy (1)**
135:20
**critical (3)**
104:22 105:5 284:7
**CRR (1)**
1:24
**crumbling (1)**
95:23
**crunch (2)**
95:18,24
**CSE (1)**
161:18
**currently (7)**
55:20 246:2 250:2,3
334:5 336:23
338:17
**Custody (2)**
291:10 342:23
**customer (151)**
9:22 13:16 14:6 18:11
18:15 19:7,9,22,24
26:17 28:21 29:2
47:21 55:5,15,21
58:25 59:15 60:13
60:22 79:6,14 96:13
96:13,16 100:2
106:16,17 109:12
120:22 124:16,24
124:25 125:12,17
125:23 127:23
128:2,16,23 129:19
129:22 130:16
133:2,3,4,6,7,8,20
133:25 134:2,14,19
134:22 135:3,7,9,10

Contains Highly Confidential Portions

136:17 138:5
190:12,14,19,20,25
191:9,11,15 201:10
202:19,22 222:24
222:25 225:4,18,20
225:22 226:4,24
227:10,18 228:18
228:20,25 229:2,4
229:10,12,19,20
230:6 233:11,13
241:19,20,21
242:24 243:24,25
244:20,21 251:9
253:14,15 256:7
259:7 278:25 279:2
279:8 280:6,8
290:21 291:9,18
292:2,7 295:19
305:10,14 306:21
306:21,21 307:12
307:20 308:8
310:14,19 317:6,7
317:13 326:14
328:12,20 329:14
330:20 332:25
333:7 335:13,15,16
335:18,23,25 336:9
336:11,12,13
337:21,23 342:22
**customers (95)**
9:25 10:5,5,13,15
13:15 18:15,17 19:3
19:17 45:16 49:13
55:9,14 59:16,17,21
59:25 79:3,7 81:3,6
94:15,15,16 95:11
107:6 126:22,24,25
127:4 128:21 129:6
129:8,12,14 130:5,6
131:5,11,17 133:10
133:17,19,23 134:4
135:12,13,19,22
136:8,21,24 137:10
137:17,18,25 138:8
138:17,18,21 191:2
201:10 206:18
223:8 225:15
227:24 259:4 260:7
263:3,5,8,12 279:5
292:19 298:21
305:4,13 306:2,3,7
306:19,23 307:12
310:14 316:5
330:11,12,19,23

331:6,13 332:10,20
335:22
**customer's (8)**
130:20 133:13,14,16
134:6 138:3 139:13
259:12
**customer-related (1)**
24:25
**C.F.R (1)**
128:9

**D**

**D (337)**
5:1 6:1 7:1 8:1 9:1
10:1 11:1 12:1 13:1
14:1 15:1 16:1 17:1
18:1 19:1 20:1 21:1
22:1 23:1 24:1 25:1
26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1
38:1 39:1 40:1 41:1
42:1 43:1 44:1 45:1
46:1 47:1 48:1 49:1
50:1 51:1 52:1 53:1
54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1
74:1 75:1 76:1 77:1
78:1 79:1 80:1 81:1
82:1 83:1 84:1 85:1
86:1 87:1 88:1 89:1
90:1 91:1 92:1 93:1
94:1 95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1

152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
185:1 186:1 187:1
188:1 189:1 190:1
191:1 192:1 193:1
194:1 195:1 196:1
197:1 198:1 199:1
200:1 201:1 202:1
203:1 204:1 205:1
206:1 207:1 208:1
209:1 210:1 211:1
212:1 213:1 214:1
215:1 216:1 217:1
218:1 219:1 220:1
221:1 222:1 223:1
224:1 225:1 226:1
227:1 228:1 229:1
230:1 231:1 232:1
233:1 234:1 235:1
236:1 237:1 238:1
239:1 240:1 241:1
242:1 243:1 244:1
245:1 246:1 247:1
248:1 249:1 250:1
251:1 252:1 253:1
254:1 255:1 256:1
257:1 258:1 259:1
260:1 261:1 262:1
263:1 264:1 265:1
266:1 267:1 268:1
269:1 270:1 271:1
272:1 273:1 274:1
275:1 276:1 277:1
278:1 279:1 280:1
281:1 282:1 283:1
284:1 285:1 286:1
287:1 288:1 289:1
290:1 291:1 292:1
293:1 294:1 295:1
296:1 297:1 298:1
299:1 300:1 301:1
302:1 303:1 304:1
305:1 306:1 307:1
308:1 309:1 310:1
311:1 312:1 313:1

314:1 315:1 316:1
317:1 318:1 319:1
320:1 321:1 322:1
323:1 324:1 325:1
326:1 327:1 328:1
329:1 330:1 331:1
332:1 333:1 334:1
335:1 336:1 337:1
338:1 339:1 340:1
342:3
**daily (6)**
90:13 98:8,11 163:3,6
210:10
**Daniel (18)**
1:13 2:4 5:4,14 6:25
47:7 146:3 240:9,13
240:16 340:18
341:9 342:8,9,17,18
342:20 344:4
**date (32)**
7:3 47:9 50:22 90:11
121:11 144:13
173:2 178:9 219:9
235:4 240:11,14,17
261:9 265:14,17,18
265:22 266:6,11
267:19 271:3
291:12 297:9
310:10 312:23
313:14 315:20
317:23 318:15
338:23 344:3
**dated (1)**
297:4
**dates (2)**
13:7 83:15
**DAVID (1)**
3:24
**day (82)**
3:5 6:5 10:3,7,16 16:5
16:6 21:18 28:17
31:18 37:12 66:17
67:2 83:2 84:2,4,6,8
84:17 85:2,5,12,20
86:14,17,18 90:19
98:10 132:6,12,18
134:23,24 135:15
140:18 141:25
142:10 143:17
144:9 170:15 172:2
184:9 185:3,17,25
187:13,20 188:7,19
208:12 239:3
266:21 267:2,2,14

267:24 268:8,10,18
268:20,21,23
269:10,16,16,21
271:20,21,22
281:19 295:20
316:21 324:22
325:2,3,8,9,20
326:21 332:2
340:20 341:24
**days (9)**
66:17,19,20 86:6
104:23 140:19
143:5 169:7 210:22
**day's (1)**
85:13
**deal (44)**
16:5 28:20 33:8 63:2
65:24 66:6,10 68:3
69:7,22,24 70:4,7
72:20 73:2,7,8,25
74:6,10 98:22
104:22 105:8,20
113:9 114:5,15
137:22 139:6 168:6
171:24 177:21
197:11 208:13
210:23 214:22
217:21,25 221:2,5
221:18,19,23
222:15
**dealing (1)**
23:23
**deals (1)**
68:5
**Dean (2)**
254:8,11
**debit (29)**
293:4,10,24 310:5
311:10 312:9 313:5
314:2,13 315:17
316:2,4 317:2,15,19
317:21 318:8 319:2
319:9 320:3,16,21
321:15,16,19
324:16 326:14
328:12 329:13
**debited (2)**
330:11,25
**debits (3)**
320:2 330:24 331:19
**Debtors (1)**
1:9
**decide (10)**
63:17 67:3,4 68:17

Contains Highly Confidential Portions

158:25 177:17
189:20 197:24
265:21 313:17
**decided (15)**
63:16 77:24 98:25
99:2 119:21 123:11
131:5,16 155:13
171:5 191:23
274:15 312:21
334:18 335:10
**decision (4)**
36:15 106:6 194:21
198:16
**decisions (1)**
219:3
**declaration (17)**
46:4,9,11 47:7,24
48:4 83:25 141:5
146:13,15,21 220:2
297:4,7,17 342:9,24
**declarations (1)**
219:16
**decreased (1)**
143:8
**deduction (1)**
51:14
**deemed (1)**
53:4
**deeper (1)**
17:3
**deficit (17)**
31:7 84:7 128:7,14,23
129:4,5,6 130:4
131:6,21 132:10
133:21 134:2,7,19
135:8
**deficits (5)**
129:11,12,18 130:15
133:8
**define (5)**
112:12 208:10 209:18
233:21 259:24
**defined (8)**
200:17 203:22 205:12
205:21 220:18
230:17,18 259:8
**defines (2)**
43:12 233:22
**definitely (1)**
305:20
**definition (13)**
200:18 201:3 202:24
203:6,18 204:8,9,12
217:14 224:22

231:3,4,15
**degree (1)**
249:7
**delay (1)**
147:21
**deliver (3)**
89:16,19 91:6
**delivered (1)**
91:2
**deliveries (1)**
288:14
**delivery (3)**
91:8 121:9 319:5
**Deloitte (16)**
7:20 65:10,15,17,19
65:22 255:20
262:12,13 276:5,6,7
276:14,22 329:19
332:3
**denominated (1)**
71:15
**denote (3)**
175:18,20,23
**denoted (2)**
176:7,15
**depend (4)**
81:13,17 134:14,17
**dependent (3)**
136:4,16 188:13
**depletion (4)**
107:23 109:19 110:19
111:11
**deponent (1)**
341:19
**deposed (1)**
6:2
**deposit (20)**
128:17 173:3 224:3
247:20 272:8,23,24
273:14 290:11,14
308:22 309:15,18
310:22 311:9
319:16 339:9,9,22
339:25
**deposited (9)**
129:22 130:7 179:3,4
181:4,5 182:4,16,19
**deposition (34)**
1:13 2:4 5:4 7:15
50:16,20,24 51:8
52:18 53:17 65:14
70:15 71:2 83:8
146:18 178:7 219:7
219:10,12,20

220:11 240:2
244:11 246:7
247:24 303:24
340:9 341:10,11,21
342:10,13,14 344:3
**depositions (2)**
219:16,18
**depository (1)**
49:10
**deposits (9)**
33:14 173:4,14
174:14 176:13,16
263:18 322:12
323:18
**derivative (3)**
152:19 155:12,22
**derivatives (71)**
7:6,12 8:13,23 23:20
24:15 70:21 97:23
147:2 150:19 151:3
151:14,21 152:8,10
152:11,13,16 153:6
153:12,17,19 155:4
155:5,11,14,17,20
155:23 156:4,5,10
156:14,18 157:6,11
157:21,21 158:4,6
158:13,14 162:14
165:8,11 167:17,21
169:5 170:6 172:4
199:19,21 200:4,7
200:10,24 201:6,13
202:2,13 212:4
213:22 224:23,25
227:24 231:25
233:9,23 234:7,17
251:7
**derived (1)**
206:13
**describe (10)**
8:20 9:21 12:2 16:13
26:12 27:3 38:17
42:5 251:21 252:5
**described (6)**
27:5 39:15 98:18
201:2 231:8 280:5
**describes (2)**
83:20 280:6
**describing (5)**
26:10 51:24 59:11
193:22 242:5
**designate (1)**
12:10
**designated (3)**

1:16 11:8 279:4
**desire (1)**
120:24
**desired (1)**
289:13
**desk (4)**
21:10 164:4,22
165:18
**despite (3)**
168:13 267:23 272:25
**determination (1)**
196:2
**determine (43)**
10:6 16:17 18:15
23:17 31:22 36:20
56:5 59:16 86:9,12
93:16 97:2 98:13,15
105:9 142:18
148:23 156:2,21,25
157:13 159:25
160:21 161:24
162:7,8 163:18
166:2 181:11 187:7
197:20 214:25
269:25 278:24
280:4 287:25 288:6
301:25 305:10
314:4 318:12
323:21 333:22
**determined (8)**
20:18 60:2 62:17
310:12 312:6
316:23 318:23
332:24
**determines (2)**
315:23 318:6
**determining (7)**
155:18 162:2 166:19
175:3 265:10
309:10 323:9
**devoted (1)**
257:8
**difference (4)**
10:22 135:11 187:25
188:5
**different (23)**
10:14 14:9 16:23,24
18:8 99:3 100:14
154:22 161:9,9
170:4 189:4 200:2
201:6 209:24
217:25 218:13
222:23 230:21
231:7 270:11

277:19 316:13
**differentiation (1)**
202:7
**differently (4)**
217:25 218:8,14
231:8
**difficult (2)**
66:16 86:12
**difficulties (2)**
26:24 147:22
**difficulty (1)**
62:13
**dig (1)**
319:25
**diligence (31)**
12:19,24,24 16:11,14
17:3,23 25:12 59:13
67:23 68:17 69:15
74:3 93:12,24 94:5
94:10 95:6 104:17
105:15 112:25
136:6 166:4,6,7,9
166:14 167:10
168:14 214:15
215:13
**direct (3)**
51:5 127:8 184:4
**directed (2)**
17:2 297:23
**directing (2)**
122:11 297:22
**direction (1)**
278:4
**directly (1)**
53:3
**Director (1)**
250:8
**directors (3)**
216:5,7,10
**directs (1)**
122:7
**discernible (1)**
96:12
**disclosure (1)**
24:21
**discrepancies (2)**
296:12 303:5
**discrete (1)**
149:15
**discuss (4)**
191:17 240:25 330:4
332:12
**discussed (16)**
19:21 20:7 194:18

Contains Highly Confidential Portions

221:6 238:24
252:22 256:15
260:14 262:4
292:23 295:16
298:8 301:5 303:6
334:10 339:6
**discusses (2)**
292:5 332:9
**discussing (4)**
52:3 140:13 212:7
302:23
**discussion (4)**
192:22 274:3 306:12
308:22
**discussions (5)**
192:20 276:22 289:7
309:21 334:17
**disparity (1)**
105:21
**disposing (1)**
81:19
**dispute (2)**
53:21 246:2
**distinction (2)**
107:7,12
**DISTRICT (1)**
1:3
**dive (1)**
17:3
**divided (1)**
333:25
**Division (4)**
255:7,10,11 274:7
**document (56)**
33:22 39:16 42:25
46:15 47:3,10 70:8
70:12,14,19 77:6,8
83:5,14 99:13
103:16 113:21
122:3,8 127:11,18
140:25 141:4
146:12 147:9
172:15 177:16
204:21 205:14,24
206:4 207:17 219:5
222:13 224:6 226:5
226:18 233:7
234:24 235:2,7,9
279:9,14 280:3,7
297:13 300:7
303:23 304:6,7
305:2,6,9 330:2
342:15
**documentation (2)**

172:7 285:25
**documents (17)**
7:24 8:6 77:5 169:2
176:4 237:19 247:3
275:14,18 281:4,7,8
281:14,15 333:20
334:14,19
**doing (28)**
20:25 21:2,5,11,15
26:6 27:19,20 29:12
68:14 93:15 95:6
112:25 118:22
161:8 189:14,25
190:11,13,20
191:23 219:3
243:14 250:16,20
278:7,8 295:5
**dollar (21)**
114:6,6,9,9 123:15,15
177:21,22 197:3,3
197:11,12,25,25
198:2,2,7,7 210:15
210:16,19
**dollars (11)**
41:3,5 77:4 114:20
115:15,17 117:13
141:14 172:8
209:17 221:16
**dollar's (1)**
196:18
**dollar-for-dollar (5)**
116:11,15 117:2
196:17 197:22
**doubt (4)**
53:22 78:9 147:17
148:4
**downside (2)**
81:20 117:7
**downsizing (1)**
249:25
**dramatically (1)**
142:10
**drastically (2)**
141:2 208:12
**drawing (1)**
107:7
**drawn (1)**
107:12
**Drexel (2)**
95:25 96:2
**drop (2)**
134:23 135:2
**dropped (1)**
141:24

**DTC (1)**
233:12
**due (35)**
12:19,24,24 16:11,14
17:3,23 25:12 59:12
67:22 68:16 69:15
74:3 87:23 90:21
93:12,24 94:5,10
95:6 104:17 105:15
112:25 136:6 166:4
166:6,7,9,14 167:10
167:25 168:13
214:15 215:13
217:19
**duly (2)**
5:15 341:11
**duplicative (1)**
154:17
**duties (2)**
172:25 254:12
**Dziemian (5)**
46:4 47:8,24 53:9
342:9
**Dziemian's (1)**
46:9

————————
**E**
**E (4)**
3:3,3 4:2,2
**earlier (24)**
59:11 65:13 72:18
82:12 100:19
106:11 109:17
110:16 140:8,13
192:21 207:14
217:6 221:6 232:19
237:2 262:4 301:11
309:7,22 315:6
321:25 325:23
339:6
**earmark (1)**
163:11
**earn (1)**
112:16
**earnings (1)**
108:18
**ease (1)**
172:2 280:14
**easier (3)**
261:22 291:6 301:3
**easily (2)**
6:10 98:13
**East (1)**
3:7

**economic (1)**
221:19
**Ed (2)**
71:25 72:2
**editions (1)**
255:22
**education (3)**
249:4,6,17
**effect (4)**
48:11 82:19 136:22
168:24
**effected (2)**
322:11 323:17
**effective (9)**
90:10 148:20,23,25
149:16 150:3 173:2
313:21 314:5
**effectively (7)**
147:25 312:15 317:16
323:2 325:3,20
330:19
**effectually (1)**
176:2
**efficiently (1)**
171:13
**effort (4)**
262:21 287:25 293:12
293:19
**efforts (1)**
288:6
**either (17)**
45:6 74:6,18 124:24
126:6 189:19
190:23 210:18
211:20 220:14
238:20 275:7 277:7
280:20 315:17
319:3 322:6
**electronic (2)**
282:6 284:3
**electronically (1)**
288:12
**element (1)**
217:13
**eliminate (1)**
81:3
**eliminated (2)**
82:22 85:6
**eliminating (2)**
80:14,21
**EMANUEL (1)**
4:4
**emphasize (1)**
296:8

**employed (1)**
278:3
**employee (2)**
298:3 329:22
**employees (15)**
277:9,11,17,19 278:6
278:14 296:18,22
296:22 297:24,25
298:2,5 301:22
308:5
**enable (1)**
163:25
**encompass (4)**
207:5 224:13 232:15
233:2
**encompassed (3)**
201:18 232:15 233:3
**encompasses (1)**
43:16
**encountering (1)**
96:8
**ended (1)**
95:10
**Enforce (1)**
121:8
**enforced (2)**
289:24 290:3
**engaged (2)**
294:20,25
**ensure (2)**
31:6,11
**enter (3)**
94:2 171:15 216:25
**entered (7)**
62:5 160:10 166:16
212:24 215:14
266:7 269:9
**entering (7)**
61:22 266:5,12,20
267:5,23 268:12
**entire (6)**
18:25 19:5 150:11
214:7 233:10
323:13
**entirely (2)**
82:22 278:4
**entities (8)**
16:22,24,25 37:5 49:3
54:18 105:22
170:11
**entitled (5)**
129:20 133:2 237:8
257:16 322:18
**entity (19)**

Contains Highly Confidential Portions

14:7,9,9,19 15:2,5
15:14,16 16:21
25:17 27:15 94:9,11
94:19 95:5 99:3
169:12,22 171:14
**environment (6)**
66:13,15 138:2,8,10
138:16
**equal (1)**
337:15
**equating (2)**
282:11 283:7
**equation (1)**
117:18
**equities (11)**
14:2 48:12 97:12,17
97:22 98:2 157:2
162:14 187:20
201:22 202:8
**equity (13)**
39:3,5 94:24 129:10
149:9 151:4,12,22
158:6,14 201:8
233:12 285:9
**equivalent (1)**
48:18
**Eric (2)**
4:9 146:14
**error (2)**
274:15 292:10
**errors (8)**
292:5,6,14,24 293:9
293:23 296:13
344:7
**ESQ (10)**
3:9,15,16,17,18,24
4:9,15,16,17
**Essentially (1)**
315:19
**established (1)**
270:18
**estate (24)**
45:10,24 47:14 48:5
48:18 49:20 50:7
52:22 54:4,7 55:10
55:15,18,20 56:4,21
56:23 57:4 79:12
81:4 246:5 331:7
337:22 338:2
**et (1)**
1:8
**event (12)**
31:6 60:6 75:9,25
121:20 122:23

131:22 152:17
156:4 165:10 186:4
326:4
**events (5)**
77:22 269:15 293:3
293:12,20
**eventually (6)**
53:3 262:14 312:21
313:17 319:25
338:2
**everybody (1)**
311:12
**everybody's (1)**
120:24
**everything's (1)**
253:3
**evidence (25)**
69:11 108:4 130:23
135:6 142:13
143:16 150:10
153:15 155:7 156:7
168:17 172:10
181:20 182:25
187:23 189:23
191:4 193:8 214:10
238:19 239:18
265:24 287:6
289:23 322:16
**Evidently (1)**
215:22
**ex (1)**
89:16
**exact (1)**
260:22
**exactly (7)**
16:9 17:14 41:3 70:17
98:2 257:13 260:17
**Examination (5)**
5:18 146:8 240:21
342:4,5
**examined (2)**
5:16 247:21
**example (11)**
114:19 121:14 122:17
122:20 125:10
149:3 151:25
175:10 179:9
181:19 310:8
**exceed (1)**
187:8
**exceeded (1)**
128:16
**exceeds (2)**
31:18 187:2

**excess (13)**
28:16 31:16 35:25
36:7 84:7 135:15
221:2,16 234:21,23
263:2,14,21
**exchange (12)**
76:18 77:23,25 78:14
108:2 109:22
110:22 111:14
119:4,25 198:12
202:17
**exchanges (6)**
135:18 207:13 212:8
212:12 231:14,23
**exchange-traded (64)**
7:5,12 8:13,22 9:2
23:5,6,20 24:15
70:21 97:23 147:2
150:19 151:3,14,21
152:7,10,13,16,22
152:25 153:11,19
154:2 155:4,10,14
155:17,23 156:3,10
156:14,18 157:6,11
157:17,20 158:6,13
158:20 162:13
165:2,7,12 167:17
167:21 169:5 170:6
172:4 199:19,21
200:4,7,9,24 201:5
201:13 202:2,13
212:4 213:22
224:23 233:9
**exclude (2)**
209:8,12
**excluded (12)**
203:13 207:24 209:2
209:7 210:6 211:2,4
211:15,17,20,22,22
**excluding (6)**
33:13 117:17 203:12
207:24 209:2
211:15
**exclusive (3)**
263:3,5,12
**excuse (8)**
65:12 99:17 101:10
101:20 229:15
230:14 264:23,23
**execute (1)**
215:9
**executed (2)**
69:17,20 215:3
**execution (1)**

201:8
**executives (1)**
93:19
**exercise (3)**
18:19 45:3 89:17
**exercised (2)**
89:11 91:3
**exercises (2)**
173:8,9
**exhibit (77)**
6:24,25 7:4 42:23,24
47:6,7,11 50:18,19
50:20 70:9 77:7
83:4,13,14,25 99:5
106:19,20 121:2,3
127:6 140:2 141:6,7
146:13 172:15,16
178:6,6,7 200:14
217:7 219:6,7 224:6
234:25 235:2 240:9
240:12,15 248:17
248:17,18 267:17
267:18 291:4,8,9
296:14 297:3,7
299:24 300:3,12,14
300:21,25 301:7
302:23 304:13,16
304:18 342:8,9,10
342:11,13,14,15,17
342:18,20,21,22,24
**exhibits (4)**
241:2 248:3 252:14
342:7
**exigencies (1)**
218:19
**exist (2)**
39:20 167:25
**existed (2)**
57:15 218:4
**expect (14)**
56:3 77:7 108:16
109:2 112:9 114:13
115:4,8,11 116:9
209:3 210:8 238:10
239:7
**expectation (1)**
108:22
**expected (9)**
33:12,19,23 34:3,4,6
34:8 213:13 237:5
**expense (3)**
50:14 51:13,13
**expenses (1)**
56:2

**experience (12)**
20:21 36:5 74:13,22
98:4 112:2,14
200:25 241:15
243:14 245:23
253:12
**experienced (2)**
29:20,21
**expert (36)**
6:25 7:4 8:12,17,22
24:5,9 30:18,25
47:13 55:3,5 70:20
96:22 100:8 139:24
146:24 159:13
193:19 195:16
242:4,11,15,19,25
244:2,22,25 251:4,6
253:6 256:9,13
309:22 322:17
342:8
**expertise (2)**
26:11 79:24
**expiration (4)**
87:15,23 90:11
144:18
**expirations (1)**
88:4
**expiring (3)**
86:23 87:2 88:21
**explain (2)**
114:8 253:11
**explained (2)**
59:14 171:19
**explaining (1)**
123:8
**exposed (2)**
87:9 134:25
**exposure (32)**
80:7,9,12,14,18,22,23
81:3,8,9,21,25 82:2
82:21 83:3 85:6
86:5 87:6 119:5
126:18 131:23
132:5,8 134:10,13
142:15 145:4
154:24 156:3
161:14 165:20
212:10
**exposures (3)**
82:14 86:14 168:2
**express (1)**
7:9
**expressed (6)**
41:19 69:24 99:16

Contains Highly Confidential Portions

101:19 116:21
276:25
**extend (2)**
56:12,14
**extent (8)**
28:10 36:17 51:18
131:23 156:2
221:20 276:13,21
**extra (7)**
18:23,24 41:5 46:15
116:9,11 281:15
**extraordinary (1)**
217:20
**extrapolation (1)**
86:2
**extreme (1)**
35:18
**extremely (1)**
96:20
**e-mail (19)**
36:4 70:11,18 71:22
72:24 73:4 127:6,7
192:21 212:5 235:6
235:11,19 236:5,10
236:20,25 237:6,24
**e-mails (3)**
63:5 72:10 322:24

**F**

**face (1)**
226:5
**facing (5)**
100:16 194:23,25
195:19 196:19
**fact (32)**
10:14 34:21 49:9
51:21 53:22 64:11
69:3 137:15 167:25
176:6 180:8 198:6
218:6 238:15
264:11 272:25
281:20 283:18
287:3 289:8,15
293:9 307:18 308:6
311:8 318:5,14
323:23 331:10
333:6,15 338:23
**factions (1)**
206:13
**facts (28)**
53:13 69:11 108:4
130:22 135:6
142:13 143:16
150:10 153:15

155:7 156:7 172:10
182:25 187:23
189:23 191:4 193:8
195:18 197:17
198:18 214:10
265:24 276:16
277:6 287:6 294:9
322:16 344:6
**factual (1)**
46:5
**fair (13)**
12:15 24:4 39:24
44:15 63:8 81:15
134:24 153:9
154:25 157:25
194:12 196:15
204:11
**fairly (4)**
93:11,21 144:25
231:20
**fall (3)**
55:9 200:25 202:23
**familiar (13)**
18:9 23:2 32:25
146:15 151:7
178:12 219:12
241:16 242:22
243:23 244:18
245:4,9,12,18,21
321:22
**familiarity (2)**
26:13 138:22
**far (10)**
9:9,9 17:19 18:21
20:7 31:13 80:11
93:10 174:23
317:24
**FARA (1)**
4:17
**Fargo (3)**
260:3,7,13
**fashion (1)**
101:2
**Fast (1)**
220:3
**fathom (1)**
215:15
**FCM (2)**
17:10 129:4
**fear (4)**
184:17 185:5,10,13
**February (4)**
8:14,15,16 241:11
**fed (11)**

40:11,16,23,25 41:13
41:20 100:18,20
244:3,23 331:17
**Federal (1)**
341:20
**feed (3)**
329:2,7 331:10
**feel (5)**
31:12 51:18 105:14
105:15 122:5
**fees (1)**
284:22
**FID (10)**
274:4,9 278:18 280:5
285:17,21 299:21
300:15 304:18
306:4
**fifth (1)**
48:10
**figure (1)**
215:21
**figures (1)**
294:9
**file (1)**
98:16 272:21
**filed (11)**
94:23 102:23 241:5
241:11 251:11
253:20 282:22,22
294:13 295:8
337:22
**filing (4)**
253:23 258:25 272:19
335:19
**Fin (2)**
243:7 253:16
**final (4)**
18:21 70:5 237:19
268:15
**finalize (4)**
25:8,11,12,13
**finalized (3)**
319:17 324:25 326:9
**finally (1)**
270:12
**finance (1)**
13:4
**financial (37)**
7:18,19 9:18 12:21,25
16:15,19 18:5 21:14
24:21 26:14,23
27:22 28:6 58:3
62:12 65:17 102:22
241:17 242:22

253:17,19 255:7,8
255:10,10 262:5,8
275:11,24 276:2,5
281:5 294:20
304:23 329:18
338:20
**find (11)**
63:12 101:5,13 102:3
111:21 155:13
194:9 277:5 291:6
300:25 328:7
**findings (1)**
338:20
**finds (1)**
325:17
**fine (5)**
51:4,6 91:13 199:6
276:19
**finish (7)**
6:7 54:11 184:15
324:9 327:15,18,24
**finished (4)**
14:23 230:15 281:24
339:5
**FINRA (4)**
291:14 319:4,20
328:14
**firm (41)**
9:15,24 12:23 14:13
18:6 21:25 26:18,22
27:4,19 28:21 29:2
29:12 31:13,15
42:15 44:18 60:13
60:17 75:13 97:3,5
97:6 98:17 101:11
112:22 114:17
117:19 124:9
128:18 129:4,15,17
131:9 135:15
161:19 164:23
188:25 218:22
235:25 320:14
**firms (14)**
9:8,16 24:10 26:21
29:9 36:11,12 70:3
76:15 93:15,20
161:7,16 243:5
**firm's (5)**
9:15 24:18,20 26:14
42:14
**first (38)**
6:23 9:19 15:25 16:5
18:21 19:21 25:21
25:23 43:7,8 46:14

55:14 61:23 65:15
71:5 91:23 92:4
99:10 100:10
101:11 102:7 127:7
127:9,12,14,15
224:21 231:21
235:11 236:10
248:16,17,17
250:20 280:10
297:5 334:10 337:2
**firsthand (1)**
76:13
**fit (2)**
162:10 166:19
**five (5)**
66:17 139:19 199:5
210:22 246:23
**five-minute (2)**
91:11 338:6
**fixed (6)**
39:3 158:14 201:21
202:8 245:18 274:7
**Flexner (3)**
2:6 3:11 5:23
**Floor (1)**
4:7
**flow-through (1)**
149:10
**fluent (1)**
337:18
**Focus (3)**
94:23 253:18,23
**focusing (1)**
232:21
**follow (2)**
204:13 289:14
**followed (1)**
306:10
**following (13)**
31:18 85:5,12 102:15
103:23 134:24
142:10 204:6
271:21 272:4
339:10,12,17
**follows (4)**
5:17 146:4 204:5
205:7
**footnote (2)**
32:20,22
**force (2)**
83:18 289:21
**forcing (1)**
104:15
**foreign (1)**

Contains Highly Confidential Portions

170:10
**forensic (1)**
245:23
**forever (1)**
33:5
**forgave (1)**
38:21
**form (236)**
10:11 14:20 16:7
17:13,24 21:8 23:11
23:21 24:7 25:7,18
28:8,18 29:7,18
30:8,17 31:9,20
32:10 33:21 34:20
35:4 37:2 39:7 40:5
40:17,24 41:15 42:8
45:5 48:20 49:22
53:15 54:20 55:13
55:22 56:16 57:7,17
58:6,11 59:23 61:5
62:9 64:2,13 65:6
65:11 67:11 68:10
69:10,25 73:3 74:17
75:10 77:2 78:16,20
78:24 79:9,17 80:3
80:8,15 81:5,16,24
82:24 85:15 86:11
88:13,25 89:14,25
90:24 94:3,21 95:8
96:9,24 97:16 98:7
98:23 104:24
105:11 108:3
109:13 112:6,13
113:10 115:2,21
116:17 117:4,11
118:8,20 119:6,16
120:4,16 123:18
124:17 126:15
129:23 130:9,13,21
132:3 135:5 136:3
136:15 138:15
139:9 140:20
142:12 143:15
144:8,22 148:12,21
149:5 150:9 151:10
151:16 152:20
153:14,21 154:4
155:6 156:6 157:4
158:2,17 159:9
160:11 161:4 162:5
162:23 163:10,20
166:10 167:2,13
170:17 172:9
173:17 174:7,18,22

175:14,22 176:9,19
177:7 179:17 182:9
182:24 183:25
185:8,21 186:8
187:14,22 188:22
192:4 193:7 194:15
195:2,21 196:10,23
197:14 198:14
199:22 201:4
202:15 204:14
205:13,23 208:2,20
209:9 211:5 213:2
214:9 215:5 217:23
218:21 222:10
223:2 224:2,16
225:5 226:7 227:2
227:19 228:12
229:13 231:9
232:17 233:5
234:19 237:11
239:12 243:17
244:6 246:13
247:16 251:24
257:10 259:10
265:23 266:13
267:25 270:7,21
272:11 273:18
287:5 289:2,11
294:22 308:10
309:16 310:11
312:3 313:13
317:12 318:20
321:4 322:15
325:10,14 329:5
**formal (1)**
249:3
**former (1)**
246:4
**forming (1)**
224:9
**formula (62)**
9:11 26:17 31:5
243:20 244:12
253:21 259:14
260:6 265:18
290:18,21 293:24
296:11 297:19
303:5 307:25
308:13,15 310:5,15
310:18,21,24
311:11,19,20,23
312:9,17 313:2,8
314:3,14 315:13,17
316:2,11,12 317:3

317:16,20 318:9
319:2,9,19 320:17
320:21 321:17
324:17 325:15
326:15 329:15
331:20 332:2 333:2
333:4 334:3 335:4,4
335:6 336:7 338:25
**formulates (1)**
32:9
**forth (6)**
69:24 176:2 242:11
248:2 297:20
341:10
**forward (3)**
168:10 242:15,19
**forwarding (1)**
220:3
**found (6)**
294:15 299:17 302:24
333:16 336:6
338:24
**foundation (1)**
246:8
**four (10)**
29:8 93:9 97:8 123:7
143:5 246:6 256:10
256:24 260:11
262:3
**fourth (1)**
48:10
**fraction (1)**
132:19
**free (5)**
82:11 111:6 122:5
295:14 307:3
**Friday (30)**
10:20,22 35:22
143:20 220:5,14
268:7,15,18,21,23
269:5,5,18 270:5
271:12,13,17,21
272:7 273:13 288:4
325:24 326:2,19,23
327:6,9 339:7 340:3
**Friday's (1)**
86:7
**front (9)**
50:23 198:23 241:2
248:3 253:7 256:14
280:21 301:8
313:16
**FTC (1)**
9:4

**fulfill (1)**
27:17
**fulfilling (2)**
126:25 128:21
**full (10)**
77:18 91:23 92:4
127:9,14 131:23
134:25 151:15
155:19 200:18
**fully (13)**
133:9 149:20,21,24
150:5 153:25 155:3
159:19,23,24
241:16 310:20
326:15
**function (1)**
251:3
**Fund (1)**
173:3
**funding (1)**
309:4
**funds (6)**
179:3 181:5 182:4,19
316:8,10
**further (13)**
13:23 121:4 146:4
234:3 330:9 336:18
337:4,8 338:15
340:6 341:14,18
342:11
**futures (22)**
9:2,5,23 10:14 12:5
12:18,18 20:22
24:24 45:16 96:17
112:24 128:2,24
129:3 136:9 138:5
201:7 202:20,22,24
258:18
**futures-related (2)**
9:9 11:5
**fuzzy (3)**
13:7,23 258:17

**G**

**gain (3)**
37:12 149:22,23
**gained (2)**
149:17 150:7
**gains (6)**
38:15 90:12 149:3
161:21,22 185:24
**Gary (6)**
50:15,20,23 51:10
52:8 342:10

**general (18)**
24:22,23 26:10,18
33:3,5 54:17,24
55:4,11,16,18 56:21
63:6 96:25 126:4
204:4 307:11
**generally (9)**
8:20 25:4 27:3 32:8
40:9 42:5 56:7
112:3 176:24
**generate (1)**
164:10
**getting (22)**
82:6 95:19,20 112:9
117:6 155:2 159:8
166:24 167:4,4,6,6
167:11,23 168:7,8
169:10,20 172:8
210:6 215:23,24
**Giddens (3)**
72:10,13 236:5
**give (31)**
8:22 10:15 17:4 25:15
40:14,19 45:11
82:11 91:25 120:13
120:15 125:10
126:6 151:25 158:8
164:18 186:11,12
186:18 195:15
198:8 204:20
239:23 256:23
261:23 264:19
291:5 307:8 313:6
320:17,18
**given (28)**
12:7 28:17 30:6 81:14
142:8 170:15
179:12 180:25
183:13 196:4 204:9
211:17 213:9,11,12
225:15 262:14
311:21,25 312:15
313:3,10 314:11
315:11 316:3
318:23 320:15
341:12
**gives (1)**
133:25
**giving (3)**
114:10,13 197:17
**gladly (1)**
319:25
**glanced (1)**
8:7

Contains Highly Confidential Portions

**go (37)**
6:4,5 43:21 64:15
73:6,7 88:8 91:7
93:18 105:3,17
106:10 111:8
132:15 138:19
143:24 155:18
167:3 168:10
177:18 192:10
208:14 210:9 221:2
240:3 256:21
261:23 262:21
269:19 276:12
277:15 299:6 309:7
311:19 313:7 320:9
333:2
**goal (5)**
36:24 37:4 150:3,5
191:10
**goes (9)**
13:22 99:22 136:18
138:23 141:19
174:24 265:18
290:20 334:3
**going (78)**
6:23 25:9 36:18 46:19
47:4 48:22 50:18
53:7 58:17 59:3
61:9 66:12 69:15,19
73:10,21 77:9 79:2
91:9,16 95:15 102:7
102:10 109:4,9
112:5 118:5,25
127:23 138:18,19
138:25 141:2
143:24 145:10
165:10 169:6,20
174:14 176:2,5,6
178:5 181:18
182:23 184:3
185:14 187:8
190:22 192:24
196:7,9,13 199:9
212:11 216:10
240:7 246:14
247:17 251:23
253:10 254:24
258:23 267:16
273:12 277:16
281:6 292:4 297:3
297:21 299:9
310:13 311:11
313:16 327:19,25
338:8 340:10

**good (41)**
5:20,21 46:14 56:9,10
77:9 81:9,11 91:11
91:12 93:17 95:22
108:10 110:4
134:18 139:17
145:6 146:10,11
158:21 172:18
199:5,15,16 240:23
241:13 243:3
256:13 283:13
284:4,13 307:23
308:12,16 310:5
311:10 312:16,25
314:13 317:17
320:16
**goodwill (1)**
51:14
**Gotshal (1)**
235:22
**gotten (1)**
186:20
**Gottlieb (4)**
3:20 72:2,4,5
**governing (2)**
241:17 242:22
**government (2)**
97:20,21
**great (2)**
46:17 299:3
**greater (1)**
136:12
**GREEN (6)**
3:9 30:10 50:9 57:8
182:10 192:5
**ground (1)**
6:5
**group (5)**
20:17,24 236:11
254:8,15
**groups (1)**
16:18
**guarantee (1)**
82:13
**guaranteed (1)**
31:6
**guess (24)**
23:15 32:11,15 35:21
47:20 74:4 85:23
87:7 98:24 108:5,9
108:25 109:24
110:3,23 117:15
155:21 156:21
177:2 179:19

191:10 230:25
280:21 308:15
**guessing (1)**
237:20
**guide (1)**
255:16
**gun (4)**
63:19 72:21 73:9,24

---

**H**

**haircut (1)**
21:12
**half (1)**
198:2
**halfway (1)**
298:24
**HAMILTON (1)**
3:20
**hand (1)**
341:24
**Handbook (1)**
291:14
**handing (1)**
178:5
**handling (4)**
241:20 243:24 244:19
253:13
**hands (1)**
297:5
**happen (8)**
31:23 32:7,12 104:3
171:3 183:24
185:17 270:19
**happened (23)**
28:16 32:4 60:6,9
61:15 67:21 78:18
78:19 88:10 93:20
93:21 96:2 100:3,23
102:19 131:4,14
153:23 174:2
193:10 265:17
315:23 326:4
**happening (13)**
32:5 63:7 64:5 66:14
92:10,17,22 136:22
174:24 191:17,18
207:11 208:23
**happens (1)**
105:25
**happy (2)**
6:21 304:9
**Harbeck (1)**
72:16
**hard (1)**

327:22
**Harris (2)**
276:8 277:7
**HASSAN (1)**
4:16
**head (4)**
63:19 72:22 73:9,24
**hear (2)**
62:7 287:8
**heard (6)**
34:22 36:3 77:3 222:5
320:6 321:22
**hearing (9)**
77:11,15,19 99:6
101:4 104:4,20
217:9 220:15
**HEATHER (1)**
3:18
**hedge (25)**
148:25 149:3,12,16
149:16,20,21,24
150:4,5,6,8,11,14
152:5,7,11,14 153:4
154:14,21 158:15
158:22 159:3
165:18
**hedged (17)**
151:4,22 152:2,4
153:18,25 155:3,19
159:16,19,19,23,24
161:14 164:11,17
165:17
**hedges (5)**
4:4 150:12 154:17
159:25 160:21
**hedging (13)**
150:21 152:23 153:3
154:9,11,20,23
155:11 156:11,24
157:3,11 163:7
**held (66)**
2:5 33:11 44:18,24
63:19 113:25
130:19,19 133:2
170:24 173:4,15
174:14 213:20
220:19 222:18,24
223:4,11,12,14,19
223:22,25 224:3,13
224:24 227:5,13,22
228:3,4,10,19 229:2
229:10,12,19,20,22
231:17 232:4
233:22,24 234:3,6,7

234:11,16,20
236:14,22 237:9
238:13 252:23
260:9 263:2,4,7,11
307:13,20 308:8
324:3 333:21
337:16
**help (3)**
6:5,14 247:14
**helped (1)**
280:3
**hereto (1)**
83:25
**hereunto (1)**
341:23
**he'll (2)**
134:20,20
**high (2)**
17:16,17
**highly (15)**
1:12,16 11:8 12:1,11
13:1 14:1 15:1 16:1
17:1 18:1 19:1 20:1
21:1 22:1
**history (1)**
32:5
**hit (1)**
162:20
**hold (12)**
111:3,3 184:12
231:24 232:2 244:5
250:9 254:17,18
322:9,10 323:16
**holder (1)**
88:19
**holding (10)**
73:9 225:13,14 228:6
228:7 231:18
233:12 307:3
337:14,19
**Holdings (2)**
1:8 250:24
**holds (2)**
232:6,7
**Honor (5)**
77:21 99:18 100:3
101:21 104:7
**hour (2)**
91:10 199:4
**hours (10)**
62:8 69:4 77:21 214:8
215:17 246:7,23
256:10,16 257:7
**Hubbard (2)**

Contains Highly Confidential Portions

4:11 72:9
**Hughes (2)**
4:11 72:9
**Hum (1)**
261:12
**hundred (2)**
256:24 257:12
**hundreds (2)**
256:22 257:7
**hypothetical (1)**
323:25
**hypotheticals (1)**
322:18

_____
**I**
**IBM (1)**
161:11
**idea (9)**
62:15 68:15,20
143:25 179:21
187:15,16,17
221:11
**identification (13)**
7:2 47:8 50:21 121:11
178:8 219:8 235:4
240:10,14,16
267:19 291:11
297:8
**identified (4)**
292:24 293:14 306:19
337:11
**identify (8)**
210:4 241:3 281:11
293:3 300:2,11
302:7 337:2
**identifying (3)**
295:2,3 328:25
**ii (1)**
173:3
**iii (1)**
173:5
**illiquidity (1)**
96:4
**immediately (4)**
71:18 106:24 147:12
204:6
**impact (14)**
9:15 18:6 24:17,20
69:5 81:19 86:2,24
143:21 144:18
188:13 287:14
293:9 338:24
**impacted (6)**
12:23 26:16,17 294:3

294:6 295:4
**impacts (1)**
26:20
**impaired (5)**
310:6 315:20 316:24
324:4,21
**impairs (1)**
324:20
**impede (1)**
313:24
**impeded (9)**
310:17 312:14 314:7
317:18 321:15,17
324:17 325:13
328:9
**impedes (1)**
328:3
**impending (1)**
36:22
**implementation (1)**
13:4
**important (1)**
218:19
**imposed (3)**
314:21,24,25
**improperly (2)**
286:17,23
**inability (2)**
283:8,12
**inaccurate (1)**
88:11
**include (23)**
13:17 19:23 27:10
47:22 114:4 116:8
164:25 176:12
177:20 197:10,21
208:10,17 209:11
209:14,14 210:18
249:13 307:11,18
311:23 314:2
325:15
**included (22)**
13:14,25 144:13
209:25 210:5
211:20,21,21
221:22 222:16
234:4 258:11
259:13 279:17
310:15 317:8,14
319:2 326:6 329:14
331:12,20
**includes (1)**
176:14
**including (14)**

130:6 173:2 203:14
203:22 204:2,3,10
204:13,23 205:2,5,6
228:19 229:2
**income (4)**
201:21 202:8 245:18
274:7
**inconsistent (2)**
52:20 221:3
**incorporate (1)**
148:11
**incorporating (1)**
147:14
**incorrect (2)**
329:10 334:23
**incorrectly (1)**
334:2
**increase (5)**
28:5 84:17 85:2
142:10 143:13
**increased (4)**
86:5 141:21 143:4,7
**incur (2)**
31:18 75:13
**incurred (5)**
53:11,22 54:2,8 57:4
**independent (14)**
250:12,13,24 251:5
252:21 253:4
262:16 275:12
279:13 280:9
293:11,19 306:24
331:23
**independently (1)**
265:21
**index (6)**
23:3,7,8 152:4 342:2
343:2
**indicate (2)**
165:14 224:17
**indicating (1)**
107:17
**indication (3)**
168:18 293:8 315:8
**individual (6)**
136:24 137:10 139:13
164:3,4 165:14
**individuals (5)**
235:21 237:13 278:18
278:21 301:19
**industry (7)**
241:19 243:4,23
244:19 253:13
255:8 278:13

**ineffective (2)**
150:8,14
**inferences (1)**
36:3
**inflated (2)**
142:17,21
**inform (3)**
238:15 239:11 339:2
**information (36)**
8:3 10:21 12:9,21
14:13 16:15 18:5
21:6,17,19 23:17
25:10,11 53:19
63:21 64:9 88:16
94:6 95:20 98:13
156:13 162:18,21
164:7,10,18 165:25
214:20 216:6
253:19 257:17
276:15,24 279:17
296:19 335:9
**informed (10)**
76:8 238:21 287:17
289:3 329:11,16
331:19 332:3
338:14,19
**infrastructure (1)**
171:7
**inherit (1)**
130:12
**initial (1)**
334:25
**inquire (2)**
155:9 286:7
**inquiries (1)**
288:15
**insecurities (1)**
29:5
**instance (1)**
180:19
**instances (1)**
292:17
**instituted (1)**
21:24
**institutional (1)**
136:8
**institutions (1)**
137:11
**instruct (2)**
251:24 277:2
**instruction (1)**
252:3
**instructions (1)**
289:12

**insufficient (2)**
34:18 35:11
**intend (1)**
239:20
**intended (8)**
209:8 228:11 229:9
229:18 236:15
238:2,22 239:9
**intent (1)**
237:7
**interact (1)**
151:13
**interest (3)**
99:17,20 101:19
**interested (2)**
79:13 341:17
**interests (1)**
172:23
**interfaced (1)**
27:18
**interim (2)**
147:25 237:18
**interpret (3)**
243:7,8 247:11
**interpretation (6)**
223:12 243:2 246:3
246:11 291:5,14
**interpretations (2)**
243:9 319:21
**interpreting (2)**
243:13 255:25
**interrupt (1)**
303:21
**interrupting (1)**
90:16
**intimately (2)**
245:21 256:6
**introduced (1)**
220:4
**inventory (2)**
97:19 116:6
**investigate (4)**
335:11,17,24 336:8
**investigated (2)**
286:24 333:15
**investigating (1)**
335:9
**investigation (22)**
64:11 262:17 275:13
279:14 280:10
286:3,4,15 306:25
331:15 332:18
333:9,11 334:6,12
336:24 337:5,9,20

Contains Highly Confidential Portions

338:15,17 339:4
**investment (1)**
310:9
**involved (21)**
13:21 16:10 19:16
20:7,10,11 25:2,3
64:22 68:12 75:2,4
75:6 178:16 180:14
183:16 195:5 256:6
257:23 258:2
273:24
**involvement (4)**
27:14 255:18,19,24
**irrational (7)**
81:23 114:22 116:14
119:23 123:14
182:7,21
**issue (11)**
296:5 298:12 299:21
300:19 302:2 308:3
319:22,24 330:4
335:12 336:19
**issued (7)**
255:16 272:14 286:5
286:11,18,23
287:18
**issues (14)**
7:6,10 8:13,23 9:4,5
20:20 147:2 248:15
251:8 293:6 303:15
319:24 337:11
**item (2)**
209:23 333:18
**items (14)**
217:15 294:14 330:15
331:16 333:25
334:2,5,7,10,12
336:23 338:15,17
338:21
**it'll (1)**
283:24
**iv (1)**
173:7

**J**

**J (2)**
3:15 4:15
**James (5)**
71:23 219:7 235:12
235:13 342:14
**January (2)**
303:8,12
**jeopardizing (1)**
100:2

**job (2)**
1:25 255:12
**Jointly (1)**
1:8
**Jones (3)**
3:5 83:24 141:5
**JPMorgan (8)**
220:20 222:19 223:4
223:12,15,20
231:19 260:16
**judge (3)**
77:12 198:23 321:12
**July (2)**
214:16 250:22
**June (4)**
214:16 249:21,22
258:8
**junior (1)**
254:2
**justifies (1)**
328:6

**K**

**Karp (2)**
276:8 277:8
**Kathy (5)**
1:24 2:7 5:9 6:9 341:5
**KAY (4)**
4:9 30:11 40:18 185:9
**keep (4)**
27:19,21,23 179:8
**kept (1)**
10:17
**kind (6)**
6:4 30:23 85:25
209:25 225:12
278:11
**kinds (1)**
322:24
**KING (1)**
3:18
**Klepfer (4)**
1:24 2:8 5:10 341:5
**knew (12)**
36:21 169:6 190:21
211:25 212:11,16
212:22 213:19,23
214:21 215:4,9
**know (305)**
6:13,17,21 13:14 15:7
17:14,19 18:18,21
19:8 21:10,22 23:14
24:16 25:11,13,20
26:15,15,18 28:10

29:19,22 30:2,12
31:22,23,24 32:4,5
32:8 33:3,7 34:23
36:22 39:8,9,22
40:20 41:23 53:6
54:9,15 55:23 56:24
57:9 58:15 59:8
60:9 61:8 62:3 63:5
63:7,14,15,21 64:6
66:2,16,19,20,21
67:14,17,22,24 68:7
68:13 70:6,11 71:10
71:11 72:2,5,12
73:13,20,21 74:19
76:17 77:4 79:4,8
81:10,18 82:3,4
85:9,11,22,24 86:16
86:24 88:14 90:12
91:10 92:12,17 93:9
93:10,11,17,17,18
93:20,21 94:4,5,9
94:12,15 95:9,14,14
95:16 96:20 97:2,6
97:7,11,21 98:14
99:11 102:18,19
106:8,9 107:9,11
108:9,10 110:4,5
112:5,22 118:9
119:21 120:9,18
123:22 132:8,9
136:20,24 137:2
138:3 139:17
143:18 144:6 145:3
146:21 147:7
148:22 149:19
150:2 153:16,18
155:11 158:5
159:21 160:16
161:13 162:11,16
163:8 165:21,23
166:13 168:5
170:10 171:2,3
173:25 178:12,19
180:3,11,12,13,19
180:22 181:11,15
181:22 183:3,6,14
183:15 185:10,12
187:25 189:11
192:6 193:10,11
194:17,23 195:14
195:18,25 196:9
199:4 200:8 201:11
202:10 204:19
206:3,8,22 208:5,21

209:10 210:17,22
212:19 213:4 214:3
214:5,15,20,23
215:20 216:11,19
219:14,15,16,18,24
220:6 225:6 226:10
226:12 230:3,23
231:2 235:13
246:14 248:9,11
251:10,12,20
256:25 259:21
260:8 261:17,24
262:20 264:11
266:6,10 267:11
268:19 269:12
270:23 273:6
275:20 276:9 278:7
278:16 281:19
282:15,21 283:2,9
284:9,23 285:12,14
286:10,14 288:11
288:14,18,19,22
293:22 294:4,24
296:16,21,24
297:12 298:2,7
304:10 306:5
307:17 308:19
311:2,4,6,10 312:18
313:14,23 316:17
318:10 323:25
333:5 335:20
337:13 339:2
**knowing (6)**
63:9 95:15 118:17
212:10 215:16
320:22
**knowledge (14)**
8:18 12:14,14 28:4
30:19 36:6,9 63:6
67:25 68:6 76:4
88:10 96:25 161:25
**knowledgeable (1)**
24:14
**known (7)**
85:18 101:18 102:5
102:17 265:17
283:16 296:11
**Kobak (9)**
72:10,14 219:8,11,15
222:8,13 236:4
342:14
**Kobak's (1)**
220:11
**KPM (1)**

255:12
**KPMG (4)**
250:3,4,10 252:21

**L**

**L (1)**
3:16
**labeled (11)**
5:3 91:15,19 145:9
146:6 199:8,12
240:6,19 299:8,12
**lack (6)**
101:16 149:10 182:7
182:22 217:12,14
**lacking (1)**
182:11
**laid (1)**
194:18
**language (13)**
174:12,16,20,23
178:3 225:4,21
228:2 230:13
232:25 246:11
284:20 289:20
**large (1)**
97:19
**larger (3)**
18:22 38:10,17
**largest (1)**
17:10
**late (1)**
104:5
**law (5)**
235:25 249:10,13,14
249:16
**lawyer (6)**
72:3 173:20 204:16
243:10,14,19
**lawyers (3)**
177:17 243:21 309:23
**LBHI (1)**
235:25
**LBI (155)**
17:6 29:22 35:23
42:11 45:10,16,24
47:14 48:5,13,13,14
48:17,25 49:13
52:21 54:3,7,10,13
55:19 57:4 58:4
59:22 71:19 80:19
85:5,9,11,18 87:8
106:24 107:24
109:21 110:20
111:12 113:24

Contains Highly Confidential Portions

116:24 117:18
118:17 119:24
121:14,19,20
122:13,22,23 124:3
124:4,14 125:3,11
125:15,24 126:9,13
127:23 130:18
133:3 140:13 142:7
142:22 143:18
144:17,20,20,23
147:14 153:7
162:18 170:5,24
180:20 202:3,4,22
205:10,20 206:6,7
206:10,15,21
210:23 212:3
213:20,21 220:16
220:18 222:17,24
223:11,14,22,25
224:3,15,18 227:22
228:3,10,14,19
229:3,11,12,19,21
229:23 230:9
231:18,18 232:6
233:25,25 234:5,15
236:12 238:14
259:22 260:9 266:6
267:4,21 272:19
282:13,22 285:9
288:2,7,23 289:17
301:20,23 306:15
306:22 307:11,12
307:18,20 308:7,8
309:24 310:3,8
311:24 313:2
314:15 318:7
320:12,13,18,24
323:23 329:22
**LBIE (16)**
306:22 307:2,5,12,13
307:20 308:8
314:15 320:12
334:22 335:13,14
335:18,21,22
336:11
**LBIE's (2)**
332:10 336:13
**LBI's (37)**
61:15 76:8,24 84:4,6
84:8 89:6 106:12
117:23 121:17,17
121:22 122:16,25
124:6,16 125:6,17
140:12 151:4

153:17 180:9 201:2
202:24 205:9,19
223:17 225:11
238:20 260:19
261:18 265:10
292:15 309:11
328:25 329:2
336:14
**learned (2)**
30:6 329:9
**leave (3)**
120:19 249:24 269:24
**led (2)**
148:18 307:22
**left (1)**
249:21
**legal (25)**
5:8 72:14 173:18
174:8 176:20 177:8
177:15,16 204:15
204:20 205:14,24
206:4 212:6 233:6,7
242:25 243:14
262:10,11,14,18
276:3,4 277:12
**Lehman (91)**
1:7 3:6 5:5 17:11 39:6
41:2 43:8 56:4 61:3
61:21 62:4,12,15
63:10,11 67:13,19
78:2 88:3,9,9,18
90:6,17,20 92:6
93:3,14,19 94:6
95:16,16,19 98:19
98:21,24,25 99:19
99:22 100:13,16
101:5 107:21
109:18 110:17
111:9 119:24
138:13 148:16
160:9 161:17 163:2
163:25 172:20
174:13 176:10
177:6 178:14,17,25
181:19 182:14,23
183:18 189:14
191:12 192:23
202:21 214:12
218:16,20 244:3,23
246:5 248:24
250:23 266:5 272:3
272:13 281:25
282:4 286:16
287:10,17 308:4

315:25 323:6,7,11
337:14 344:2
**Lehman's (18)**
38:21 44:8 77:25
78:14 80:6 87:16,17
87:18 101:17
105:13 166:2
167:21 172:23
173:13,14 218:25
271:9 323:7
**Leitner (4)**
8:17 92:11 159:13
212:8
**Leitner's (1)**
87:3
**letter (16)**
40:8 63:4 127:10,25
198:25 224:8,21
248:8 284:14,16,21
284:24 289:24
297:21 298:5
308:17
**letterhead (1)**
296:25
**letters (2)**
285:2,12
**letting (1)**
288:13
**let's (13)**
108:7 109:25 184:7
184:25 190:20
193:4 240:3 274:3
299:6 308:21 309:7
328:18 338:5
**level (14)**
28:14 29:9,10,12,14
29:16,22 30:5 34:10
34:13 57:14 164:16
164:22,23
**levels (3)**
29:9 33:15 164:2
**Lexington (1)**
2:6
**liabilities (9)**
10:5 37:18 42:2
121:17 122:15
221:15,21 223:6,10
**liability (5)**
38:21 117:14 332:20
332:25 333:6
**liaison (1)**
9:16
**Liberty (1)**
3:22

**license (2)**
254:18,23
**licensed (1)**
243:6
**licenses (1)**
254:19
**lien (9)**
284:16,21,24 285:2
285:12 289:20,24
306:22 307:4
**liens (2)**
10:2 284:17
**lieu (2)**
33:14 38:21
**life (1)**
255:20
**light (3)**
143:10,17 189:13
**limit (4)**
80:18 204:4 229:9,18
**limitation (4)**
204:3,23 205:2,5
**limited (4)**
121:6 204:12 225:4
318:15
**limiting (1)**
205:6
**line (22)**
48:10 51:23 52:8
178:22 201:23
220:11 228:17
343:4,5,6,7 344:8,9
344:11,12,14,15,17
344:18,20,21,23
**lines (2)**
84:19 255:2
**liquid (1)**
185:2
**liquidate (45)**
28:2 29:17 61:23
71:19 74:10 75:12
82:6,10 106:12,16
106:24 107:6,13
120:19 132:7,15,21
134:5,12 135:24
180:8 183:23 184:3
184:4,5,8,18 185:6
185:11,12,14
187:12,19 188:3,10
188:11,25 189:2,7
191:15 192:24
193:4,14,15 194:8
**liquidated (26)**
37:7 56:20 61:19 82:8

83:2 85:5 107:5
131:7,7,20 179:25
180:6 185:22,25
186:13,25 187:9
188:17,18 189:16
190:4 191:8,13
192:17 193:13
274:12
**liquidates (1)**
33:25
**liquidating (21)**
33:19,23 34:18,22
35:12 44:21 76:2,5
85:12 118:19
185:15 186:10,10
186:21 187:2 188:5
188:12,15 189:12
189:21 192:15
**liquidation (64)**
31:7,17,25 33:12 34:5
36:19 48:11 54:25
56:13,15 58:8,17
61:22 73:16 74:15
74:15,23,25 75:2,5
75:9,21 82:14
107:22 109:18
110:18 111:10
131:22 132:21,22
134:11 168:23
180:15,17 184:10
185:4,16,18,24
186:5,7,15,17 188:8
189:8,15 190:6,23
257:24 259:2 264:9
266:12,20 267:5,23
268:13,24 269:10
269:20 270:4,9
272:19 273:25
282:22
**liquidity (6)**
41:2 95:18,24 99:25
100:19,21
**list (5)**
156:17,20 281:12
283:23 334:6
**listed (5)**
201:17 279:9 305:25
306:20 338:16
**literature (2)**
273:10,11
**little (24)**
6:5 13:22,23 14:21,22
17:2 18:23,24 29:11
40:12 99:11 121:19

Contains Highly Confidential Portions

122:23 124:3 125:8
126:8 140:13 142:7
202:5 227:15 247:5
257:14 276:12
283:25
**lived (1)**
63:7
**Livenote (1)**
2:11
**LLP (6)**
2:6 3:5,11,20 4:4,11
**loan (4)**
290:22,24 292:3
295:23
**Loans (1)**
291:17
**location (6)**
283:14 284:4,13
307:8,24 308:12
**lock (4)**
129:7 130:5 133:24
134:3
**locked (7)**
10:16 132:14,15
133:5 261:8 295:17
306:6
**locked-in (1)**
90:12
**lockup (4)**
129:11 307:13 317:16
325:12
**logic (1)**
310:7
**logical (1)**
209:6
**long (56)**
16:4 18:18 19:6 25:23
28:9 32:14,25 38:23
38:25 39:14,17 40:3
40:15 41:9 64:6
66:17 67:14 68:16
68:20 82:5 88:24
89:5 94:5 97:8,11
97:14 115:7 116:3
117:15 123:25
126:19 144:4,19
151:4,12,22 152:4
157:22 160:4,18
161:11 162:11,16
166:8,13 178:24
181:15 182:13
187:11 191:25
192:6,7,8 250:4
271:22 291:18

**longer (6)**
80:23 267:9 272:4
283:13 288:17
316:4
**longest (1)**
26:3
**look (41)**
30:21 31:21 49:7 52:9
62:16 71:14 83:22
84:19 106:19 115:4
115:25 116:4,5
141:4 147:8 161:9
165:25 172:17
191:7,22 192:21
197:3 203:21
213:10 224:20
228:16 241:23
245:11 260:21
262:2,21 281:7,14
283:24 293:12,19
299:5 330:15
333:13,17,18
**looked (21)**
8:8 61:10 87:3 94:22
102:22,24 108:5
109:24 110:23
166:4 174:13
203:19 204:10
207:14 217:6
246:16 280:3,7,11
293:22 294:2
**looking (24)**
17:15 30:20 45:21
47:12 62:14 85:13
87:7,9 98:16 100:22
165:18 166:20
167:18 200:21
226:13 227:12,14
227:15 261:25
282:18 303:25
322:23,25 329:3
**looks (9)**
52:25 96:14 101:7
107:11,19 222:13
223:4,5,21
**loose (1)**
110:24
**lose (10)**
87:5 108:6 109:25
132:21 135:16
161:15 184:9 185:3
189:16 190:22
**losing (2)**
179:22 180:23

**loss (12)**
37:23 38:13 78:2
88:24 89:12,17
119:11 131:9
149:22,23 181:25
189:19
**losses (12)**
57:4 75:13 82:9 90:5
90:7,13 118:6 149:2
161:21,22 185:24
186:6
**lost (9)**
27:6,6,8 103:9 149:14
150:8 179:9 180:18
180:20
**lot (17)**
18:20 26:24 27:6,7,8
62:14 86:14 93:15
93:21 113:3 134:17
169:24 181:12
194:9 200:2 246:24
291:6
**LOUIS (1)**
3:17
**lunch (2)**
139:18 145:6
**Luncheon (1)**
145:11
**L-B-I-E (1)**
307:6

_____

**M**

**M (1)**
4:9
**Madison (1)**
4:6
**main (2)**
19:9 191:7
**maintain (3)**
9:25 27:21 98:9
**maintained (1)**
20:3
**maintaining (5)**
20:12 43:25 45:25
47:15 48:6
**major (1)**
94:16
**maker (1)**
28:22
**makers (1)**
19:11
**makeup (1)**
164:17
**making (7)**

20:13 34:22 126:3
131:9 136:19 169:8
263:21
**man (1)**
23:14
**manage (4)**
147:24 148:9,16
214:19
**managed (2)**
254:8,15
**management (10)**
24:5,10,12 96:23
147:23 148:19
163:25 255:7,11
310:9
**managers (1)**
161:9
**managing (2)**
155:22 157:14
**mandate (1)**
104:18
**manner (2)**
189:9 218:7
**margin (195)**
9:13 26:11,16,18,20
27:2 28:5 29:13
30:15,21 31:3,8
32:2,9 33:9,10,14
34:17 35:10,24
36:17,25 37:5,17,22
42:16 75:14,19,24
82:9,13 83:15,21,21
84:12,21 85:13 86:4
86:16 87:4 107:23
108:2 109:20,23
110:19,22 111:11
111:14 114:5,16,21
115:10,12,16,19
116:9,16 117:3
119:3,10,25 121:16
121:21 122:14,24
123:15 124:5,8,13
124:15,22 125:4,16
125:24 126:9,14,17
126:22 127:3
128:23 130:15
131:21 132:9
133:20 135:14,15
135:20,24 138:5
140:11,16 141:9,21
142:6,8,9,16,20,24
142:24 143:3,10,12
143:22,24 144:3,19
166:24 167:11,19

167:23 168:19,21
170:16 173:4,14
174:14 175:11
176:12,15 177:20
179:3 181:4 182:4
182:16,19 183:20
185:19,23 186:2,3
186:11,12,18 187:2
190:2,7,9,22,24
191:21 194:7
196:12,18 197:10
197:22 198:13
199:18 200:3,10
205:9,18 206:5
207:5,8,17 208:10
208:14,22 209:3,15
210:9,14 211:4,16
212:2,7,10,14,17,22
213:12,20 223:8
224:18 225:9
231:13 232:3 237:2
247:23 309:3,18,23
311:13 312:7,22
315:9,10,25 320:11
321:10,12,14
322:12 323:17
**margins (1)**
135:23
**mark (5)**
47:4 50:18 178:5
267:16 297:3
**marked (30)**
7:2 42:24 47:5,5,8,11
50:21 77:7 83:5
89:21 121:2,10
127:5 132:11,18
146:13 172:14
178:8 219:5,8 224:5
234:25 235:3
240:10,13,16
267:18 291:11
297:8 303:23
**market (56)**
19:10 23:8,10,24
28:22 30:21,22 32:7
32:11 34:15 35:3,8
35:15,17,20 36:16
57:20 86:3 89:20
90:4,15 92:21,22
102:14 120:13,15
132:5,6,11,18,19,20
134:11,12,15,19
135:12,13 136:2,13
136:18 138:2,8,9,16

Contains Highly Confidential Portions

138:19,22,23
150:18 163:14
187:21 188:2,6,14
218:9 279:11
**marketing (4)**
101:11,16 102:8,10
**marketplace (6)**
31:14 36:13 81:18
92:16,19,25
**markets (6)**
13:24 103:7 136:21
255:8,10 269:20
**market's (1)**
138:18
**market-making (3)**
13:25 14:12,13
**marking (1)**
90:3
**Marlo (2)**
276:8 277:8
**marriage (1)**
341:16
**Martini (4)**
297:4,8,16 342:24
**material (1)**
8:9
**materials (5)**
219:18 261:18 262:18
302:8,19
**matrix (2)**
164:18 302:3
**matter (27)**
5:5,24 92:7 93:4
104:22 137:6,17,20
139:4,8 143:5 169:7
184:9 185:3 196:13
220:4 232:11,12
250:14 251:5
256:11 295:15
307:18 308:7
313:25 337:5
341:17
**matters (4)**
9:18 204:6 313:23
339:4
**maximizing (1)**
79:14
**McDade (14)**
178:8,11,23 179:7,15
180:24 181:6,12,16
181:24 182:3,7,22
342:13
**McDaniel (5)**
71:23 73:5 235:12,13

238:9
**McISAAC (375)**
1:13 2:5 5:1,4,14,20
6:1 7:1,2 8:1 9:1
10:1 11:1 12:1 13:1
14:1 15:1 16:1 17:1
18:1 19:1 20:1 21:1
22:1 23:1 24:1 25:1
26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1
38:1 39:1 40:1 41:1
42:1 43:1 44:1 45:1
46:1,25 47:1,11
48:1 49:1 50:1 51:1
51:17 52:1 53:1
54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1
65:4 66:1 67:1 68:1
69:1 70:1 71:1 72:1
73:1 74:1 75:1 76:1
77:1 78:1 79:1 80:1
81:1 82:1 83:1 84:1
85:1 86:1 87:1 88:1
89:1 90:1 91:1,22
92:1 93:1 94:1 95:1
96:1 97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1,6
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1,4 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1,22 140:1
141:1 142:1 143:1
144:1 145:1 146:1,3
147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1
156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1

177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1,23
185:1 186:1 187:1
188:1 189:1 190:1
191:1 192:1 193:1
194:1 195:1 196:1
197:1 198:1 199:1
200:1 201:1 202:1
203:1 204:1 205:1
206:1 207:1 208:1
209:1 210:1 211:1
212:1 213:1 214:1
215:1 216:1 217:1
218:1 219:1 220:1
221:1 222:1 223:1
224:1 225:1 226:1
227:1 228:1 229:1
230:1,15 231:1
232:1 233:1 234:1
235:1 236:1 237:1
238:1 239:1 240:1
240:10,13,16,23
241:1 242:1 243:1
244:1 245:1 246:1
246:22 247:1 248:1
249:1 250:1 251:1
251:18 252:1,7
253:1 254:1 255:1
256:1 257:1 258:1
259:1 260:1 261:1
262:1 263:1 264:1
265:1 266:1 267:1
268:1 269:1 270:1
271:1 272:1 273:1
274:1 275:1 276:1
276:13 277:1,24
278:1 279:1 280:1
281:1 282:1 283:1
283:23 284:1 285:1
286:1 287:1 288:1
289:1 290:1 291:1
292:1 293:1 294:1
295:1 296:1 297:1
298:1 299:1,17,18
300:1 301:1 302:1
303:1 304:1 305:1
306:1 307:1 308:1
309:1 310:1 311:1
312:1 313:1 314:1
315:1 316:1 317:1
318:1 319:1 320:1
321:1 322:1 323:1
324:1 325:1 326:1

327:1,18 328:1
329:1 330:1 331:1
332:1 333:1 334:1
335:1 336:1 337:1
338:1,13 339:1
340:1,18 341:9
342:3,8,17,19,20
344:4
**McIsaac's (1)**
302:15
**mean (42)**
40:20 44:6,23 58:12
61:24 63:20 65:20
73:8,23 92:16 95:21
95:22 96:2,6 112:12
114:8 123:6 126:5
128:12 133:21
160:17 164:20
174:16 176:18,25
177:4 183:2 197:12
204:25 206:3
222:11 227:10
228:7 229:24
232:18,20 233:7
241:7 242:9 244:10
259:24 269:15
**meaning (2)**
128:7 200:16
**means (27)**
33:20 45:6 171:13
176:22 177:10,12
179:21 183:14
203:10 204:2,17,23
205:2,3,4,6,7 206:4
211:13 225:7,13,14
225:15 231:18
239:2 242:8 321:11
**meant (11)**
95:23 107:10 154:19
164:14 181:12,22
181:23 227:6 230:2
230:3 231:21
**measured (1)**
33:14
**meet (6)**
134:20 135:14,22,23
136:11 139:14
**member (7)**
36:7 43:9 61:4 89:13
232:5 255:5,6
**members (6)**
29:4 34:23 37:8 75:16
76:18 232:2
**memo (1)**

301:15
**memorandum (5)**
121:3 301:10 303:13
303:14 342:11
**memory (1)**
260:10
**memos (2)**
291:6 307:8
**mention (1)**
330:4
**mentioned (6)**
9:20 10:25 26:9 41:24
181:13 254:17
**Mercantile (2)**
77:23 78:14
**merchant (1)**
202:25
**mere (3)**
283:18 289:8 324:19
**merged (2)**
68:15 258:8
**merger (4)**
20:11 68:17 258:4,9
**mergers (2)**
20:9 68:13
**Merit (2)**
2:9 341:6
**Merrill (1)**
67:20
**Michael (1)**
5:7
**middle (4)**
103:4 203:7 250:22
267:2
**million (38)**
38:4,9 48:15 52:12
53:12 84:17 85:2
86:6 113:2 117:16
140:18 141:10,14
141:17,25 149:14
149:17 150:7,8
208:7,7 209:18
260:23 274:23
275:4,4,5,7,8
278:25 296:13
306:18 308:14
315:12 316:24
318:15 328:25
331:3
**mind (16)**
57:10 92:20 93:2
124:18 167:5 168:6
168:16 179:8
184:21 196:2

Contains Highly Confidential Portions

197:24 215:21
218:25 219:2
229:25 244:16
**minds (1)**
220:6
**minimal (3)**
57:15 132:5,9
**minimum (26)**
33:12,19,23,24 34:2,2
34:4 121:16,20
122:14,24 124:4,8
124:13,14,22 125:4
125:16,24 126:9,14
126:17 140:10
142:8,24 164:3
**minute (1)**
261:23
**minutes (3)**
139:20 199:5 239:24
**Mischaracterizes (2)**
162:24 163:21
**misreading (1)**
265:25
**missed (1)**
46:15
**misstates (18)**
17:25 33:22 42:9
82:16,25 115:22
123:19 130:22
140:21 175:15
195:22,22 205:14
205:24 215:6
265:24 268:2 312:4
**mistake (1)**
287:18
**mistaken (1)**
241:22
**misunderstand (1)**
325:22
**misunderstood (1)**
164:5
**mitigated (1)**
150:20
**mode (1)**
288:20
**model (1)**
162:10
**models (6)**
16:16,17 17:22 18:3,4
30:23
**modifying (1)**
197:13
**moment (6)**
12:9 85:4 100:12

235:5 264:20
270:25
**Monday (11)**
39:21 86:9 87:24 91:5
102:16 103:8
104:12 168:22
170:21 271:22
327:7
**Mondays (1)**
10:20
**monetary (1)**
279:11
**money (31)**
27:6,7,8 76:23 95:20
129:10 130:6
132:13,14,21,22
133:25 135:16,17
135:18 136:19
159:25 160:6,20
171:18 177:5
184:10 185:4
279:11 288:3
289:10 310:4 313:6
320:25 321:7
328:11
**moneys (11)**
55:18 130:5 133:24
176:2 264:9 314:20
330:10,18,22 331:5
331:8
**monitor (7)**
149:7,8 161:8 282:7
283:8,13,19
**monitoring (1)**
212:9
**month (7)**
58:5 66:21 68:21
268:8 269:5 271:10
271:14
**monthly (1)**
243:6
**months (7)**
16:8 19:2,6 25:5,8
77:16 93:10
**morning (19)**
5:20,21 36:2 74:11
87:24 91:5 134:21
170:22 256:16
266:16,18 270:10
270:13 272:5,23
290:14 309:22
323:3 325:2
**morning's (1)**
247:24

**motion (12)**
65:19 100:11,11
121:4,8 241:6,8,9
246:16 247:19
335:10 342:12
**move (12)**
36:16 61:23 134:20
171:6 176:2,10
188:2 264:9 279:23
292:4 323:14
328:18
**moved (3)**
171:25 190:21 281:16
**movement (5)**
30:20,21 90:15
135:13 163:14
**movements (1)**
143:10
**moves (1)**
23:25
**moving (5)**
147:21 172:2,3
187:21 288:21
**multiple (3)**
16:22 140:19 163:15

———————————
**N**
**N (2)**
3:3 4:2
**naked (9)**
152:17 153:2 156:3
159:3,4,6 163:12
165:10 168:2
**name (11)**
5:7,22 21:20 176:11
178:12 240:23
298:3 323:7,11
344:2,4
**names (1)**
305:4
**nature (4)**
40:10 95:12 251:21
260:24
**necessarily (12)**
87:11 88:14 89:15
96:2 105:13 133:14
167:9 209:11
216:16 218:18
219:19 245:16
**necessary (4)**
49:8 51:18 113:8
332:23
**necessitated (2)**
49:17 50:4

**need (21)**
6:16 21:10 25:12
31:12 44:22 49:18
50:5 51:20 71:18
99:11 103:7 104:5
104:11 106:23
164:19 169:24
273:5 281:6,10
290:10 305:20
**needed (10)**
26:15 95:20 102:15
170:3 197:5,21
204:18 216:2
221:21 319:12
**needing (1)**
325:12
**needs (3)**
103:20 160:15 319:9
**negative (4)**
51:14 115:15 117:18
206:2
**negatives (1)**
115:20
**negotiate (21)**
16:4 20:20 25:6 62:4
63:11,13 70:3,4
116:19,25 118:22
118:24 120:9,10
142:19 190:5
191:16 196:12
197:3,3 198:7
**negotiated (27)**
63:2 66:7,11 69:4,12
69:17,22 73:18 93:8
113:14 119:20
120:21 122:19
123:9,11 137:16,23
139:6 194:17
198:20 214:21
218:14 237:17
238:7 324:14
326:18 327:5
**negotiating (16)**
20:15 63:25 64:4
67:15 105:8 108:25
116:20 117:23
168:6 190:2,3 197:6
210:10 237:19
312:20 324:15
**negotiation (6)**
20:18 64:22 68:14
112:5 196:14 198:4
**negotiations (16)**
65:23 67:21 68:2

69:14 73:20 76:21
87:11 92:13 93:10
112:7 178:16
183:17 214:8 218:6
324:20,24
**Neil (7)**
4:15 46:20 140:5
160:15 246:9 302:5
305:6
**neither (1)**
341:18
**net (22)**
15:15 38:8 48:11,14
48:17 81:21,25
94:23,24 108:16
112:18 115:9,11,15
116:2 117:6,9
123:24 129:10
133:7 134:23
253:21
**Neuhardt (34)**
3:16 240:22,24
246:24 247:9 252:2
252:5,10,16 257:15
257:22 261:6
277:16,21 280:2
284:2 287:7 298:23
299:4,14 301:5
302:5,14,21 304:2,5
305:5 306:8 322:17
327:19 338:5,12
340:6 342:5
**Neuhardt's (1)**
276:21
**never (12)**
29:20,21 31:22 33:8
34:21 82:13 274:2
295:17 330:12,18
330:22 331:5
**nevertheless (1)**
31:17
**new (25)**
1:3,14,14 2:7,7,12 3:8
3:8,14,23,23 4:8,8
4:14,14 21:3,3,3,24
195:8 255:5,23
341:3,4,7
**nods (3)**
6:13,15 273:3
**nonresponsive (2)**
306:9 323:13
**non-customer (4)**
292:8,20 295:19
298:22

Contains Highly Confidential Portions

**non-customers (1)**
206:18
**non-highly (1)**
22:2
**non-PIM (1)**
47:21
**non-redacted (1)**
304:25
**normal (7)**
152:9 217:22 218:8
263:24 264:3
288:20 330:13
**normally (5)**
23:16 162:6 218:24
271:11 278:3
**North (1)**
3:13
**nos (3)**
43:10 235:3 342:15
**Notary (3)**
2:11 5:15 341:6
**note (2)**
12:7 296:25
**noted (2)**
208:23 212:6
**notice (10)**
285:17,24 286:5,10
286:14,17,19,21
287:18,22
**notifying (1)**
288:12
**notwithstanding (1)**
101:15
**November (1)**
258:13
**NTS (1)**
245:17
**number (32)**
5:3 39:23 46:22 77:3
77:22 79:14 86:8
91:15,19 95:2 108:6
109:25 110:24
139:10 145:9 146:6
199:8,12 200:16
240:6,19 260:22
261:2 274:23,24
275:7,8 299:8,12
334:5,6 338:3
**numbers (8)**
17:15 53:18 275:9,13
275:15,23 305:12
305:18

**O**

**object (128)**
10:11 14:24 16:7
17:13,24 21:8 23:11
23:21 24:7 25:7,18
28:8,18 29:7,18
30:8,17 31:9 34:20
35:4 37:2 39:7 40:5
40:17,24 41:15 42:8
45:5 49:22 53:15
54:20 55:13,22
56:16 57:7,17 58:6
58:11 59:23 61:5
62:9 64:2,13 65:6
65:11 67:11 68:10
69:10,25 73:3 74:17
75:10 77:2 78:16,20
78:24 79:9 80:8,15
82:24 85:15 88:13
88:25 89:25 90:24
96:9 97:16 98:7,23
104:24 105:11
109:13 112:13
113:10 115:2,21
116:17 117:11
118:8,20 119:16
120:4,16 123:18
124:17 126:15
129:23 130:9,13,21
132:2,2 135:5 136:3
136:15 138:15
139:9 142:12
143:15 144:8,22
148:12,21 149:5
150:9 151:10,16
152:20 153:14,21
154:4 155:6 156:6
157:4 158:2,17
159:9 160:11 162:5
162:23 163:20
166:10 167:2
173:17 193:7
251:23 322:15
329:5
**objection (147)**
14:20 25:25 30:10,11
31:20 32:10 33:21
35:13 48:20 50:8,9
57:8 65:5 69:8
79:17 80:3 81:5,16
81:24 82:16 86:11
89:14,23 94:3,21
95:8 96:24 105:23
108:3 111:15 112:6
117:4 119:6 140:20

157:8 161:4 163:10
167:13 168:3
170:17 172:9 174:7
174:18,22 175:14
175:22 176:9,19
177:7,14 179:17
181:9 182:9,10,24
183:25 185:8,9,21
186:8 187:4,14,22
188:22 189:10,22
191:3 192:4,5
194:15 195:2,21
196:10,21,23
197:14 198:14
199:22 201:4
202:15 204:14
205:15,23 208:2,20
209:9 211:5 213:2
214:9 215:5 217:23
218:10,21 222:10
223:2 224:2,16
225:5 226:7 227:2
227:19 228:12
229:13 231:9
232:17 233:5,19
234:19 237:6,11
238:17 239:12
243:17 244:5,15
246:9,13 247:15
257:10 259:10
263:9,15 265:23
266:13 267:25
270:7,21 272:11
273:18 278:5 287:5
287:20 289:2,11
294:22 308:10
309:16 310:11
312:3 313:13
317:10,12 318:18
318:20 321:4
325:10 337:17
**objections (1)**
40:18
**objective (2)**
79:8 149:19
**objectives (2)**
78:22 79:25
**obligation (7)**
44:3 129:9 228:8
272:8 335:17,25
336:9
**obligations (31)**
27:18 76:19 88:21
114:17 127:2

128:22 131:11
133:6,10 136:11
139:14 172:24
173:5,7 175:7
199:25 208:5
224:24 225:11
227:23 228:15,20
229:3 231:25 232:4
233:23 234:7,12,17
234:22 236:16
**obliged (1)**
171:23
**obtain (1)**
156:12
**obtaining (1)**
158:3
**OCC (192)**
9:14,17 26:11,19
27:11,14 28:20,24
30:14 32:8,22 33:4
34:7 35:23 36:6,14
37:17,18,23 38:4,6
42:12 43:9 44:9
52:10 60:12,18,23
61:2,7,12,16,19,23
71:18 73:16,19 74:9
74:14,15 75:2,3,19
75:20,24,25 80:6
82:10 84:4,7,9,13
85:6 89:8 106:11,15
106:23 107:7,22
109:19 110:18
111:10 113:25
114:18,21 117:20
118:13 120:22
121:16,17,21
122:14,16,25
123:24 124:5,8,15
125:3,7 140:11,17
142:17 144:7
147:12,14 168:19
170:7,21,23,24
171:8 173:4,15,24
174:15,24,25
175:24 176:11
177:3,11 178:25
179:4 181:5,7,17
182:4,15,20 183:22
184:5,18 185:6
186:5,17,23 188:21
189:2,6 191:13
192:8,13,16,20,23
192:23 193:11
205:10,19 206:6,9

206:21 207:6 212:2
223:8,22 224:14,19
232:6 234:5,6,8,11
234:12,15,16,17,20
235:17,18 236:11
236:14,21,23,23
237:3,9,10,13,20,24
238:14,15,21,23
239:3,9,11,16,19
247:20,23 308:22
309:3,15,18 314:16
314:19,22 315:15
315:16 316:9
319:11,16 320:11
320:14,17 321:2
322:22 323:6,11
**occasion (1)**
77:14
**occur (4)**
79:2 88:6 91:5 198:4
**occurred (6)**
76:21 87:15 90:7
122:20 286:25
287:3
**occurs (1)**
303:22
**OCC's (12)**
29:4 30:13 31:5 36:20
36:24 75:9 142:20
220:20 222:18
223:19 232:8 237:7
**October (7)**
257:9 333:11,24
334:24 335:11
336:20 337:5
**offer (4)**
99:24 218:17,18
246:10
**offering (2)**
76:18 242:3
**offices (1)**
2:5
**offset (1)**
38:15
**offsetting (1)**
115:20
**oh (10)**
45:17 70:25 71:4
103:14 127:17
139:25 172:15
200:20 254:22
265:4
**okay (244)**
6:4,11,19,23 7:8,13

Contains Highly Confidential Portions

7:19,21,24 8:11,20
9:19 10:9,25 13:9
14:15 15:7 16:13
17:11,18 18:24 19:4
19:15,19 20:5 25:23
27:3,13 30:24 33:6
34:6,9 35:17,22
38:23 40:3 41:18
42:23 43:15 44:13
46:16 47:18,22 49:7
50:3,15,18 52:5
63:8 64:15 65:9,22
66:24 69:3 71:13
72:15 75:18 77:9
83:18 86:4 87:13
89:9 92:3 99:14
101:14 102:21
103:2,17 111:23
113:22 118:15
122:4,9,11 125:15
126:7 127:15,17,19
127:21 128:19
131:18 133:12
138:25 139:20,21
139:22,23 141:24
145:7 147:11
148:17 152:12
154:10 155:15
157:8,19 168:17
175:2 176:17
177:18 178:22
183:16 184:20
186:24 189:5
191:25 193:2 194:4
197:9 199:2 201:16
203:3,21 204:22
205:8 211:24 217:5
219:19 221:9
223:18 226:21
228:16 230:11
234:14,24 235:18
236:4 240:3 241:13
242:14,18 243:10
243:22 245:4,12,15
245:17,20,22,25
246:10 247:21
248:7,16 249:3,16
249:24 250:6,9
251:3,14,20 252:20
253:10,24 254:17
255:23 256:3,8,13
257:6,22 258:6,14
258:23 259:7,21
260:12 261:10

263:13,19,25
264:12,18 265:7,8
266:6,10 267:3
268:9 269:3 270:14
270:25 271:15,24
272:18 274:3,19,22
275:6 277:4,18
278:17 280:14
282:15 284:6,12
285:16 286:7 287:3
289:15 290:8,16,23
291:15,19 292:4
293:11 295:9 296:3
296:21 297:15,16
298:4,7 299:2
300:18 301:6 302:4
303:20 304:4,12
306:9 307:10,17
308:6 309:7,18
319:13,20 321:24
322:19 330:21
331:24 332:8,15,21
333:5 337:20 338:5
339:6,15 340:5
**OLIVER (1)**
4:4
**omitted (1)**
334:2
**omnibus (3)**
332:25 333:7 335:14
**once (2)**
100:24 315:11
**ones (3)**
19:13,13 296:19
**ongoing (3)**
109:3 150:18 294:17
**online (2)**
111:22 286:13
**oOo (1)**
340:11
**Op (2)**
243:7 253:16
**open (16)**
84:3,6,8 103:8 121:22
122:25 124:6 125:6
125:12,23,25 128:6
134:12 140:12
156:14 170:14
**opened (3)**
132:6,20 302:22
**opening (3)**
325:19 326:20 327:7
**Open-ended (1)**
210:14

**operate (2)**
99:25 200:9
**operating (3)**
271:5 272:4,20
**Operational (1)**
253:17
**operations (3)**
244:2,22 273:2
**opinion (85)**
68:24 69:5,9 88:12
95:4 115:14 119:22
132:24 137:3,13,21
137:21 139:4,8
193:6,19,23 195:16
196:4,6,8,16,22
197:2,18,18 204:20
205:8,18 207:2,4
212:13,21 213:9,10
213:11,18,25 214:2
224:12 227:21
228:4 232:14 233:3
233:15 246:11
248:2 269:2,8,23
270:3,11,20,23
273:8,15 274:19
276:16 284:7 287:4
287:19,24 291:20
297:18 308:9,15
309:15,17 311:16
312:6,10,13 313:12
314:6 318:17 319:8
322:12 323:18
324:6 326:12
327:10 328:23
331:11 332:22
337:25
**opinions (10)**
7:8 63:23 92:7 93:4
224:10 242:3
252:13 256:18
258:24 276:24
**opportunity (1)**
14:24
**opposed (10)**
6:13,15 14:6 49:19
50:6 133:22 193:25
210:5 268:6 334:11
**Opposition (1)**
121:7
**optimally (1)**
103:5
**option (8)**
90:10 117:15 131:13
152:3,4,23 153:2

176:11
**options (41)**
9:10 12:5 13:14,17,19
14:3 15:5,8 20:22
37:13,24 38:3 45:18
48:13,19 52:3 53:14
86:21 88:21 90:21
97:13 98:21,24
113:24 114:20
116:5 147:12,15,21
149:9,13,13 152:5
173:8 187:20
191:23 192:2,7
201:8 220:19
222:17
**order (12)**
62:24 75:20 103:4
104:6 109:11
152:14 156:2
157:23 163:18
168:23 190:24
217:6
**Orders (2)**
121:5,9
**ordinary (2)**
325:25 339:8
**org (4)**
27:16 75:17 175:6
311:21
**organization (5)**
72:16 75:5 170:14
199:18 200:12
**organizations (7)**
76:5 125:5 168:21
170:5 212:3 232:3
255:4
**orgs (1)**
191:12
**original (19)**
65:18 241:6,7 257:9
274:4,6,11,25
276:17 300:20
304:13 306:14
308:24 328:19,24
332:8 334:11
336:23 338:16
**originally (1)**
287:11
**outcome (1)**
341:17
**outside (4)**
39:6 125:3,7,9
**overall (4)**
28:23 36:24 37:4

220:25
**overdraft (9)**
285:17,24 286:2,11
286:20 287:12,22
287:23 337:4
**overnight (1)**
288:13
**over-the (1)**
152:22
**over-the-counter (30)**
23:5 152:6,11,14,19
152:23,24 153:6,17
154:3,11 155:5,12
155:20,22 156:5,16
157:12,21 158:4,10
158:12,12,19,23
159:2,8 165:3,8,11
**over-the-counters (1)**
156:23
**owe (7)**
10:4 129:9,10,10
132:13 133:24
320:11
**owed (6)**
45:2,2 130:5 332:10
333:23 335:22
**owned (2)**
165:19 206:15
**Oxford (332)**
4:15 10:11 12:6 14:20
16:7 17:13,24 21:8
23:11,21 24:7 25:7
25:18,25 28:8,18
29:7,18 30:8,17
31:9,20 32:10 33:21
34:20 35:4,13 37:2
39:7 40:5,17,24
41:15 42:8 45:5,20
46:16 48:20 49:22
50:8 51:17 52:4
53:15 54:20 55:13
55:22 56:16 57:7,17
58:6,11 59:23 61:5
62:9 64:2,13,16
65:3,11 67:11 68:10
69:8,10,25 73:3
74:17 75:10 77:2
78:16,20,24 79:9,17
80:3,8,15 81:5,16
81:24 82:16,24
83:23 85:15 86:11
88:13,25 89:14,22
89:25 90:24 91:9
94:3,21 95:8 96:9

Contains Highly Confidential Portions

96:24 97:16 98:7,23
104:24 105:11,23
108:3 109:13 111:3
111:15 112:6,13
113:10 115:2,21
116:17 117:4,11
118:8,20 119:6,16
120:4,16 122:4
123:18 124:17
125:20 126:15
129:23 130:9,13,21
131:2 132:2 135:5
136:3,15 138:15
139:9,16,21 140:3
140:20,23 142:12
143:15 144:8,22
145:7 148:12,21
149:5 150:9 151:10
151:16 152:20
153:14,21 154:4
155:6 156:6 157:4,8
158:2,17 159:9
160:11 161:4 162:5
162:23 163:10,20
166:10 167:2,13
168:3 170:17 172:9
173:17 174:7,18,22
175:14,22 176:9,19
177:7,14 179:17
181:9 182:9,24
183:25 184:12,16
184:20,23 185:8,21
186:8 187:4,14,22
188:22 189:10,22
191:3 192:4 193:7
194:15 195:2,21
196:10,21,23
197:14 198:14
199:3,22 201:4
202:15 204:14
205:13,23 208:2,20
209:9 211:5 213:2
214:9 215:5 217:23
218:10,21 222:10
223:2 224:2,16
225:5 226:7,16,21
227:2,19 228:12
229:13 230:14
231:9 232:17 233:5
233:19 234:19
237:11 238:17
239:12 240:3
243:17 244:5,15
245:5 246:13,21,25

247:15 251:17,23
252:4,7,15,18
257:10,19 259:10
261:3,10 263:9,15
265:23 266:13
267:25 270:7,21
272:11 273:18
276:11 277:14,18
277:23 278:5
279:23 280:14
283:21 287:5,9,20
289:2,11 294:22
299:2,14,18,23
300:2,7,11,18,24
301:7,10,17 302:4
302:12,18 303:21
304:4,7 305:7
308:10 309:16
310:11 312:3
313:13 317:10,12
318:18,20 321:4
322:15,20 325:10
326:24 327:16,22
329:5 337:17
**o'clock (3)**
270:9,10 271:22

---

**P**

---

**P (4)**
3:3,3 4:2,2
**page (97)**
11:9 22:3 32:19 37:9
43:8,22 45:12,14,21
50:24 51:22,23 52:7
71:13 77:18,19
78:11 91:23,24 92:5
98:20 99:8 101:12
103:2,4,11,23
106:22 108:14
113:17,19 121:12
127:9,16,17 139:25
140:6,7 147:6
150:16,16,17,24
159:12 177:19,25
178:10,22 180:3
200:16,19 203:3,4,5
203:8,19,21 204:8
217:8,8,9 220:10
224:20 226:12
228:17 230:5
232:16 233:4,16,17
265:2,3,5 274:6
291:13,15 308:25
333:25 334:4 337:2

342:3,7 343:4,5,6,7
344:8,9,11,12,14,15
344:17,18,20,21,23
**pages (6)**
1:16 11:7 45:13
112:23 222:12
308:23
**paid (17)**
56:25 57:4 81:7 90:21
112:15 171:25
175:4,18 330:11,12
330:15,16,18,22,23
331:5,8
**PaineWebber (2)**
20:10 258:10
**paper (1)**
217:12
**papers (2)**
62:14 67:18
**paragraph (64)**
37:10 42:3 43:18,21
45:14,23 47:12 48:8
48:9 49:7 71:14,15
77:19 83:20,23,24
99:15,19 101:12,15
102:7 106:23
107:18 108:15
114:3 121:13
122:12 127:9,14,21
128:4 147:7,11
150:25 172:17
177:23 180:2 183:8
224:21 226:11,13
228:17 229:9,17
232:14,18 233:4
237:15 241:14,23
264:19,24 265:3
274:25 295:9 296:3
297:20 298:8 303:3
308:25 309:8 329:4
333:18 337:3
**paragraphs (17)**
47:25 48:3 99:10
113:20,23 121:25
122:6 123:7 127:12
127:19 274:5
297:11 306:13,14
308:23 328:19
330:3
**parameter (1)**
221:19
**parameters (1)**
221:6
**Pardon (1)**

51:3
**parent (2)**
96:4 106:4
**parenthetical (8)**
225:6,9 226:20,23
232:16 233:4,15,17
**Park (1)**
4:13
**part (36)**
36:23 38:10 39:25
41:10,25 49:24,25
98:10 126:21
155:19 176:16
190:3 197:18 200:8
201:10,13 202:3,16
202:17 222:15
223:6 228:5,22
232:24 239:7 240:2
243:3 246:16,18
247:22 254:11
258:11 260:4
295:13 296:7 306:8
**partial (2)**
296:10 303:4
**PARTIALLY (1)**
1:12
**particular (9)**
19:9 21:20 33:2 72:20
144:9 164:8 217:15
242:10 280:24
**particularly (3)**
32:7 35:2 65:7
**parties (25)**
39:11 63:24 69:21
72:19,25 74:8
104:21 105:7
119:21 120:9
123:11 191:19
207:18 208:17
209:8,20 210:3
217:19 218:5 220:6
228:9 229:9,18
239:8 341:15
**partly (2)**
159:16,18
**parts (3)**
201:6 237:16 311:17
**party (7)**
42:12 88:3 105:19,20
239:19 319:6
341:19
**pay (19)**
20:18 29:11 48:22
87:25 108:17 112:3

112:9,18,21 113:7
113:13 116:7,9
135:18,20 137:8
171:12 215:24
338:2
**payable (4)**
223:7 330:20 333:3
335:15
**payables (2)**
49:6 331:13
**paying (5)**
113:8 116:23 138:5
171:23 337:15
**payment (5)**
52:11 90:17 109:3
239:5 284:21
**payments (1)**
52:9
**pays (1)**
87:22
**pay-back (2)**
88:17,18
**pay/collect (1)**
91:4
**pay/collects (1)**
88:17
**Pearl (1)**
3:13
**Peck (1)**
77:12
**people (26)**
9:13 23:16 24:2,11
58:18 62:14 112:25
113:4 136:7 137:8
155:21 157:14
161:7 184:4 197:5
214:4,6,17 243:19
245:10 254:15
287:17 312:19
322:7,7 334:17
**percent (4)**
28:12 29:13,15 51:11
**perfectly (1)**
231:6
**perform (3)**
44:2 250:23 251:14
**performed (9)**
44:3 251:22 252:12
266:11 267:4 296:8
296:10 297:18
303:4
**performing (3)**
258:3 277:21 296:23
**period (14)**

Contains Highly Confidential Portions

64:8 97:9 102:20
147:25 148:15,19
149:15 183:5
214:14 266:19,22
266:23,24 282:3
**person (4)**
80:16 162:12 254:3
276:23
**personal (1)**
68:6
**personally (2)**
75:6 253:24
**personnel (2)**
329:12 331:22
**persons (1)**
278:2
**perspective (2)**
27:22 103:6
**pertaining (1)**
133:5
**pertains (2)**
339:22,25
**Peter (1)**
329:24
**Phase (1)**
28:13
**phrase (9)**
33:19 206:23 227:12
227:14,16,17
229:10,18 334:2
**picked (1)**
292:19
**piece (3)**
59:6 91:4 217:12
**pieces (2)**
59:7 112:20
**Pineiro (1)**
5:7
**place (13)**
10:2 13:6 36:13 68:2
68:9 77:12 82:8
87:8 93:17 125:22
162:18 169:7 248:7
**placed (6)**
149:17 248:4,10,11
248:13 259:16
**places (1)**
202:6
**plans (1)**
192:17
**play (1)**
149:22
**Plaza (2)**
3:22 4:13

**pleadings (2)**
41:13,22
**please (16)**
5:11 6:17,21 32:19
50:25 51:16 54:11
77:10 89:2 91:23
113:18 229:5
299:24 300:3
323:15 328:5
**pledged (5)**
40:11,15 220:18
222:17 223:21
**plenty (2)**
93:24 170:2
**plus (1)**
112:18
**point (65)**
6:16 13:12 15:10
21:15 26:7 39:23
63:18 67:20 73:12
73:22,25 81:14 82:4
87:10,12 88:7 90:11
97:24 101:6 105:17
116:18,20 119:19
124:23 138:2,9,10
177:23 194:11
196:6 197:4 198:19
199:24 209:15
210:20,21 264:21
265:9 269:13 270:2
272:15 282:13
283:16 289:22
294:12 298:24
309:10 313:19,20
313:24 315:9 318:3
318:11,19,22,25
320:14,19 321:13
322:22 331:13
333:3 334:13 336:5
338:4
**pointed (1)**
212:9
**pointing (1)**
303:15
**points (4)**
26:21 208:4 273:11
285:9
**policy (1)**
307:11
**portfolio (45)**
14:5 19:23 38:10,17
114:15 115:5,6,25
116:2 150:12 151:5
151:9,15,23 152:3,5

153:3,12,18 154:2,3
154:18 155:3,24
156:9,11,19 157:18
157:23 162:13
163:12,13,14,19
164:8,15,21,24,25
165:7 167:16,22
169:6 185:15
201:14
**portfolios (1)**
163:15
**portion (19)**
9:23 15:11 22:2 48:9
51:5,7 77:14 97:18
97:19 150:4 167:12
202:13 247:22,24
291:15 303:6
305:17 326:11
328:5
**portions (2)**
291:23 305:19
**posed (1)**
111:19
**posing (1)**
193:25
**position (42)**
23:10 24:21 27:17
61:2,7 103:24 105:7
138:3 149:20 150:6
152:3,14,15,16,17
152:23,25 153:25
154:11,12,14 159:4
159:7,8,11 160:4,19
163:12 164:16
165:17,18 171:7
206:20 249:19
250:7,9 253:12
268:11,22 311:24
326:17 327:4
**positions (245)**
14:16 15:6,8 20:2,3
21:21 32:13 33:13
36:16 38:14,23,24
38:25 39:2,5,15
40:2,3,15 41:25
42:7,17 44:8,17,23
45:4,11,16,18,25
47:15,18 48:7,12
52:10,23 53:14,23
54:3,10,14 57:5,15
57:22,24 58:22 59:4
60:8,12,13,14,17,21
60:22 61:25 74:19
75:12 76:2,6,9,12

76:14,25 77:25
78:15 80:6,9,11,13
80:21,22,24 81:14
81:18,19,22 82:21
82:23 85:19 86:10
86:25 88:23,24 89:5
89:6,10 90:4 95:13
96:13 97:13,13 98:6
109:12 113:24
115:7,8,14 116:3,4
116:5,6 117:19,24
118:2,7,12,17,19,23
119:4,5 120:3,6,8
120:20 121:18,22
122:16,25 123:25
124:6,9 125:6,25
126:10,19,22 128:6
131:20,24 132:7,11
133:3 134:15,22
136:17,20,24
137:18 138:17,21
140:12 143:19,20
143:25 144:4,6,13
147:24 148:10,14
149:3,4,8,13,14,16
149:25 150:21
151:3,4,12,13,14,21
151:23 152:6,8
153:12 155:17,19
156:13,16,16,23
157:2,3,5,7,16,22
158:7,9,14 159:2
162:3,14 163:7,7,8
164:11,12 165:2,3,9
165:12 167:8,15,17
167:18,24 168:2
171:5,6 178:24,25
180:7,8,15,17
181:15 182:14,14
183:19,21 184:8,18
185:2,6 186:4,13,19
186:25 187:2,3,12
187:19,20 188:17
190:12,15,17,19,25
191:9,9,11,14,15
222:25 224:15
236:13 252:20,23
254:7
**positive (2)**
38:4,8
**positives (1)**
115:20
**possession (1)**
169:3

76:14,25 77:25
**possibility (1)**
158:25
**possible (29)**
31:15,24 32:3,12
36:14 49:16 50:3
55:25 63:24 103:20
104:14 151:20
153:20,22 166:25
167:7,14,20 168:9
168:12,15 177:12
184:6 215:2 217:18
218:16 221:22
230:24,25
**possibly (12)**
26:5 38:15 41:9 42:16
59:24 85:24 93:18
164:2 201:14
255:21 322:8 331:7
**post (7)**
168:19 169:9,13,16
169:16,19,25
**posted (59)**
31:19 32:2 75:19,24
107:23 108:2
109:20,23 110:19
110:22 111:11
114:16,21 115:10
115:16 116:8,16
117:2 119:3,24
123:14 142:24
166:24 167:11,23
169:11,21 170:3,15
170:23 175:11
181:7 183:20
185:19 186:3 187:3
190:22 198:13
199:18 200:3 205:9
205:19 206:5,12
207:6,12 213:21
225:10,11 227:6
228:14 231:13
232:10,13 233:25
234:2,3,5,15
**postgraduate (2)**
249:5,5
**posting (1)**
200:10
**postponed (2)**
73:12,15
**potential (9)**
30:20 82:9 99:23
101:6 112:4,22
131:9 142:18
183:11

Contains Highly Confidential Portions

**potentially (5)**
179:11 180:25 181:18
182:6 183:12
**power (1)**
105:21
**powers (2)**
108:25 172:24
**practice (5)**
170:13 243:13 273:21
273:21,23
**practices (5)**
241:19 242:15 243:23
244:19 253:13
**precisely (1)**
47:18
**preliminary (1)**
215:12
**premarked (2)**
70:9 247:8
**premium (9)**
108:17 112:3,11,12
112:15,21 113:7,8
113:13
**preparation (7)**
7:22,25 8:24 9:10
12:20 71:7 243:5
**prepare (2)**
7:14 192:7
**prepared (8)**
63:9,22 70:20,24 71:2
83:11 102:23 266:4
**preparers (1)**
329:13
**preparing (15)**
43:5 50:16 52:16
65:14 70:15 71:8,20
83:7 100:7,7 106:25
146:17,20 168:25
245:10
**prescribes (1)**
164:23
**present (2)**
64:25 65:22
**presented (1)**
54:16
**preservation (1)**
79:7
**preserve (5)**
79:12 109:12 190:12
190:19,25
**preserved (1)**
79:15
**preserving (1)**
191:11

**president (2)**
178:14 255:9
**pressing (1)**
163:17
**presume (1)**
48:8
**pretty (1)**
94:8
**prevent (1)**
337:14
**preventing (1)**
315:4
**previous (1)**
309:21
**price (9)**
15:14,15 20:20 85:22
112:18 113:16
188:6,14 216:20
**pricing (1)**
30:23
**primarily (2)**
13:16 137:10
**prime (7)**
13:13 14:11,18 15:20
96:15 258:15 274:8
**Principal (1)**
253:17
**principle (1)**
309:14
**print (1)**
162:21
**prior (42)**
18:20 58:16 59:13
67:15,23 104:13
123:11 146:23
148:10 195:11
202:23 203:19
215:13 245:22
254:6 258:25 266:5
266:11,20 267:4
270:4,19 310:23
311:3,13,25 312:7
316:8 319:5,17
324:21 325:12
326:6,8,18,20 327:5
327:6 335:18,25
336:9 339:17
**priorities (1)**
54:25
**priority (3)**
55:9,15 79:19
**private (2)**
241:16 310:9
**privilege (1)**

252:6
**privileged (2)**
252:4 276:10
**privileges (1)**
172:24
**proactive (1)**
189:15
**probably (26)**
16:8 17:10 18:22 33:3
33:4 41:23 45:20
52:18,19 56:18
68:21 78:7 98:3
145:5 157:16 164:3
165:13,22 184:3
198:22 211:6
225:15 257:13
258:20 298:23
310:24
**probing (1)**
193:21
**problem (2)**
96:3 183:2
**problems (3)**
25:16 27:4 95:19
**Procedure (1)**
341:21
**procedures (2)**
24:12 189:11
**proceeded (2)**
74:16,21
**proceeding (1)**
77:13
**proceedings (3)**
55:11 56:8 118:18
**process (20)**
18:25 19:5 21:3 36:21
49:18 50:5 162:2
172:3 245:10,11
268:16 294:18,21
294:24 295:2,3
311:14 316:25
337:3 337:24
**processes (1)**
24:12
**processing (2)**
244:3,22
**produced (3)**
261:19 280:15 302:20
**producing (1)**
21:13
**product (1)**
21:4
**PRODUCTION (1)**
343:3

**professional (5)**
2:8 252:9,23 254:19
255:3
**professionals (5)**
12:25 17:2 18:14
262:6,8
**proffered (1)**
252:13
**profile (8)**
23:10,15,19 97:12
98:5 162:13 163:18
165:6
**profit (2)**
59:3 88:24
**profitable (2)**
59:6,7
**program (2)**
101:16 148:25
**programmer (1)**
245:3
**progress (1)**
338:19
**proof (2)**
336:3,4
**proper (1)**
79:25
**properly (7)**
21:11,14,18 81:7
94:25 286:5,11
**property (66)**
129:19,21 133:2,4,12
133:14,17 135:4
220:18 222:24,24
223:24 224:3,13,24
225:4,18,19,22,25
226:3,4,24,25 227:3
227:5,6,10,11,13,18
228:2,14,18 229:2
229:10,11,19,20
230:6 231:24 232:6
232:7,10,12 233:18
233:21,22,24 234:6
234:11,16,20
241:19,20 242:24
243:24 244:20
253:14 259:3,4,5,7
259:12 292:2
328:20
**propose (1)**
192:12
**proposed (4)**
78:23 79:21 104:2
332:9
**proprietary (50)**

13:17,18 14:5,16 15:5
15:13 19:23,25
20:22 24:6 38:3,3
76:25 80:6,20
106:17,18 107:5,13
113:24 114:20
120:6,23 121:18
122:16 123:17,21
123:23,23 125:2,23
126:12 144:7
150:19 151:9
183:19 188:18
190:15,17 191:8,14
202:3,16 206:21,24
224:14 291:17,25
292:3 335:13
**propriety (1)**
337:21
**prospect (1)**
281:9
**protect (3)**
10:13 129:5 167:19
**protected (3)**
131:22 132:12 186:20
**protecting (2)**
79:3 239:3
**protection (23)**
9:22 55:6 117:7
126:20,25 128:21
130:16 135:3
166:24 167:11,24
241:18,21 242:24
243:25 251:9 256:7
266:5,7 282:23
291:9 316:5 342:22
**prove (1)**
334:15
**proven (2)**
34:24 334:23
**proves (1)**
334:21
**provide (9)**
8:12 53:19 100:21
163:5 171:17 216:6
252:9 257:17 302:6
**provided (14)**
52:8 99:24 127:3
163:3 207:2 219:11
251:6,7 262:6
275:10 281:4,15
331:21,25
**providing (5)**
41:2 56:20 100:18
117:7 193:19

Contains Highly Confidential Portions

**provision (1)**
174:12
**proxy (3)**
85:23 86:5 87:4
**prudent (6)**
172:5 211:16 238:14
239:11,14,16
**public (8)**
2:11 5:16 12:13,14
64:9 241:15 251:11
341:6
**publications (1)**
257:4
**published (1)**
35:25
**pull (2)**
46:15 99:5
**purchase (19)**
13:16 25:14 39:11
41:11 63:3 104:18
197:6 200:15 203:6
207:16,21 212:25
216:7 217:2 238:6
247:2 258:21 315:7
315:24
**purchased (17)**
16:24 152:13 197:8
203:7,10 204:9,11
207:24 209:2
210:25 211:13
213:14,17 224:22
246:4 258:15,18
**purchaser (11)**
100:22 108:16,23
109:4,5 151:2
197:19 216:25
228:21,24 232:24
**purchases (1)**
258:20
**purchasing (11)**
116:6 155:9 159:15
171:20,21 172:13
213:4,5,24 214:3
217:4
**purely (1)**
247:10
**purple (1)**
248:19
**purported (1)**
261:19
**purporting (4)**
242:25 244:2,21
246:10
**purpose (3)**

48:24 265:9 309:10
**purposes (5)**
21:12,12 182:2 285:8
313:2
**pursuant (3)**
121:5 127:20 341:20
**pushed (1)**
73:22
**put (35)**
149:23 150:12 152:2
154:17 206:13
210:11,19 211:7
215:18 216:20
223:8 224:18 241:2
259:8 267:20 274:5
274:18 282:24
299:16 308:13
310:18,20 313:4
315:13 319:9 320:3
320:4 321:16,19
324:16 326:14
327:2 328:11
332:17 334:9
**puts (2)**
32:15 91:3
**putting (10)**
143:18 242:11,14,18
256:17 307:24
308:14 317:15
320:21 334:19
**P&L (1)**
53:3

_____
**Q**

**qualified (5)**
160:7,24,25,25
263:25
**qualifies (1)**
8:21
**qualify (1)**
98:5
**qualities (1)**
10:23
**quant (1)**
97:2
**quantifiable (1)**
97:10
**quantify (2)**
145:3 197:19
**quantity (1)**
134:14
**quants (1)**
23:16
**question (105)**

6:8 14:23 30:9 35:6
40:13 51:19 52:6
54:12 64:14,19 65:7
71:5 79:10 80:10,11
85:16 89:3 103:3,13
103:19 109:17
110:15,16 111:4,7
111:18,19,23,25
115:3 128:20 139:2
139:3 143:23
151:17,19 152:21
153:15 154:10
163:23 169:15
170:18,20 173:18
179:5 180:4 181:3
182:3,12,17 183:3
184:13,21 188:24
189:4 192:9,10,12
195:4,4,6,8,9,10,11
195:13 205:17
216:23 220:12,22
221:9,20 222:22
226:17,19 229:16
232:5 234:10,10,13
244:16 246:15,21
251:18,24 256:3
261:4 262:2 270:17
277:3,15,25 283:22
285:12 287:15,16
287:16 294:23
297:6 307:15 312:5
323:15 324:9
326:25 327:21
**questioning (1)**
246:23
**questions (12)**
6:6,21 64:10 113:19
193:18,25,25 247:6
276:20,21 299:20
340:7
**question?because (1)**
35:5
**quick (2)**
12:22 302:24
**quicker (1)**
247:5
**quickly (3)**
93:11,22 144:25
**quickness (1)**
92:12
**QUINN (1)**
4:4

_____
**R**

**R (2)**
3:3 4:2
**raise (3)**
29:12,14 237:6
**ran (1)**
20:24
**range (3)**
98:3 256:23 305:14
**ranges (1)**
305:13
**rank (1)**
17:12
**rate (1)**
17:21
**rateably (1)**
55:16
**rates (2)**
42:16 89:20
**rational (46)**
69:6 82:2 88:20
107:24 109:11,21
110:20 111:12
113:7 114:4 115:18
116:24 118:15,21
119:2,14 120:14,17
142:4 143:9 177:20
184:17 185:5 190:8
190:23 193:20
194:5,6,7,8,9,10,13
194:19,21 195:17
196:3,5,11,16 197:2
197:10,19,21
198:11,16
**rationale (1)**
36:22
**reach (1)**
327:23
**reached (2)**
325:6 326:19
**react (1)**
196:7
**read (43)**
41:4,22 42:20 50:17
51:16,19 52:5,16,18
52:19 63:3,4,4,5
67:17 77:8 83:19
99:10,11 100:6,9
101:14 104:20
105:2,3 109:15
111:20 121:25
122:6,9 127:15,19
184:24 219:14,23
219:23,24 226:9
229:5,24 230:13

297:11,14
**reading (5)**
42:19 52:25 103:10
111:5 112:23 183:7
219:20 222:12
**reads (3)**
217:10 228:18 232:22
**ready (1)**
70:11
**realizable (1)**
319:10
**realize (3)**
51:3 174:6 245:8
**realized (1)**
170:22
**really (7)**
25:2 151:18 181:22
194:13 209:13
225:7 227:6
**realm (3)**
120:12 154:23 158:25
**Realtime (1)**
2:10
**reap (1)**
109:4
**reason (30)**
39:19,22 53:21,25
55:25 57:2 78:9
142:17,21 147:17
148:4 158:4 167:7
168:10 188:20
189:7 190:10
316:13 344:5,8,9,11
344:12,14,15,17,18
344:20,21,23
**reasonable (2)**
113:6 153:10
**reasoning (1)**
323:22
**reasons (2)**
219:4 339:23
**rebuttal (27)**
240:15 241:12,23
264:18 274:16
276:18 292:5
294:14 295:6,10
296:3 297:20 298:9
299:24 300:12
303:3,6 304:14,15
306:12 308:23
309:9 330:3,6
332:13 338:22
342:20
**recalculation (9)**

Contains Highly Confidential Portions

296:10,17,20
297:19 298:8,10
303:4 326:22 327:8
**recall (17)**
39:10,14 68:24 72:22
78:5 85:7 106:14
140:13 141:8
146:20 206:23
213:10 221:25
222:3,4 257:13
322:3
**receipt (1)**
172:19
**receipts (1)**
288:14
**receivable (16)**
48:14,17,21 50:14
52:12 53:2,6 128:16
133:21 134:8,18
206:17 310:19
311:21,22 325:21
**receivables (4)**
49:5 53:10 57:11
311:18
**receive (17)**
43:25 58:19 79:4
130:17,18 135:2
228:24 229:6
236:21 238:12,22
249:8 263:20
304:22 313:4 316:4
328:10
**received (6)**
37:22 81:8,10 99:20
135:4 279:9
**receiving (3)**
58:20 116:22 210:13
**recess (8)**
46:20 77:10 91:17
145:11 199:10
240:8 299:10 338:9
**recession (12)**
136:12,25 137:4,8,9,9
137:14,15,22 138:4
139:5,13
**recharacterize (1)**
271:4
**recipient (2)**
236:20 237:5
**reclassified (1)**
298:22
**recognize (3)**
42:25 83:5 224:6
**recognized (1)**

52:13
**recognizes (1)**
37:11
**recollection (2)**
78:6 100:15
**recommendation (1)**
104:8
**reconcile (1)**
330:14
**record (37)**
12:7 46:19,23 48:21
53:12 90:9 91:13,16
91:20 111:5 140:23
145:10 146:7 148:7
199:9,13 226:22
238:20 239:19,22
240:4,7,20 241:4
251:11 252:17
299:6,9,13,15,16
304:3 338:8,11
340:10 341:12
344:6
**recorded (6)**
21:18 37:23 51:13
52:25 90:5,6
**records (4)**
13:5 25:16 213:7
333:3
**recourse (9)**
172:22 173:15 174:2
176:18,25 177:2,5
177:10,13
**recover (2)**
56:4 118:6
**redacted (2)**
305:17,19
**reducing (1)**
317:16
**REED (1)**
4:11
**refer (6)**
227:22 232:25 285:16
306:15 309:19
328:20
**reference (18)**
45:12 127:24 180:22
183:4 209:7 210:2
211:3,16,19 212:14
213:13 223:5
225:24 226:2,4,23
227:17 274:24
**referenced (4)**
42:2 43:17 202:10
299:19

**references (4)**
32:22 207:8 208:18
225:21
**referred (6)**
232:19 274:8 300:8
301:11 304:12
336:22
**referring (36)**
31:2 47:19 83:22 92:8
125:8 127:25 161:5
179:22 180:4,10,11
180:12,17 181:14
181:15,24 182:21
203:18 223:13
230:2,21 231:6
233:9,10,18 244:7
253:5 262:9 276:3
278:10 279:24
282:6 296:4 298:16
298:19 307:5
**reflected (1)**
252:24
**refresh (2)**
78:5 100:14
**refuse (1)**
28:15
**refused (5)**
35:23 36:6 60:7,10
61:16
**regard (4)**
26:13 28:21 61:8
173:6
**regarding (16)**
9:4,5,13 65:12,12
100:10 239:4
241:20 243:23
244:19 246:3 251:9
253:13 285:17
292:6 339:18
**regardless (2)**
44:18 142:20
**regards (1)**
284:24
**registered (5)**
2:8,9 241:18 242:23
341:5
**regular (1)**
254:12
**regulated (1)**
27:15
**regulation (2)**
290:17 337:13
**regulations (2)**
26:19 128:8

**regulator (1)**
27:15
**regulators (5)**
9:3,17 26:25 253:20
269:25
**regulatory (7)**
16:20 18:5 20:13,24
20:25 242:12 250:8
**reimburse (1)**
118:18
**rejecting (1)**
217:11
**relate (3)**
7:9 9:14 252:12
**related (5)**
40:22 41:13 158:13
335:12 341:15
**related-costs (1)**
52:11
**relates (5)**
30:15 126:18 247:12
247:23 295:6
**relating (8)**
37:12 48:12 247:7
256:14 274:7
292:10 338:15,20
**relation (9)**
43:17 65:20 138:16
180:4,20 247:25
248:9 278:18,21
**relationship (5)**
28:23 149:2 156:15
158:16,20
**relationships (2)**
157:20,24
**relative (4)**
17:5,6 41:20 55:11
**relaying (1)**
73:5
**relevance (3)**
31:21 32:16 283:4
**relevant (7)**
138:10 264:21 265:9
265:14,21 274:24
309:9
**reliance (9)**
8:8 219:17 246:18
248:4,7,10,11,13
302:19
**relied (8)**
8:3 219:15 276:13,15
302:8 304:6,8,10
**Relief (3)**
121:4,6 342:12

**relieve (1)**
83:3
**rely (7)**
224:9 261:17,19
276:23 281:9
291:19 304:25
**relying (2)**
281:11 326:12
**remained (1)**
49:13
**remedies (1)**
172:24
**remember (19)**
8:5,15 15:9,12 16:9
23:6 41:3 70:17
87:3 94:25 98:2
107:3 219:20,22,23
257:14 260:12,16
260:17
**remind (1)**
67:6
**remove (1)**
334:18
**removed (4)**
282:20,25 332:17
333:4
**remunerated (1)**
118:25
**repeat (4)**
35:5 49:21,24 52:5
**rephrase (4)**
6:22 64:19 89:2
170:19
**replicate (1)**
150:13
**repo (10)**
38:19 39:6 40:11,16
40:23 41:7,14,20
117:14 206:17
**report (96)**
6:25 7:5,9,25 8:10,17
10:7 32:17 37:10
42:3 43:5,18 45:9
45:14 47:13 50:16
52:17 57:13 62:19
63:9,23 68:22,25
70:20 71:8 83:11
91:23 98:20 100:8,9
108:14 113:18
120:5 139:25
146:24 150:15
159:13 165:6,9
177:19 197:9 213:9
213:11 225:7

Contains Highly Confidential Portions

240:15 241:12,23
245:10 251:6
260:21,25 261:5,21
264:18 274:4,7,11
274:16 276:19
277:6 279:19,24,25
280:5,13,17,19,20
281:8 285:16,19
287:10 292:5
294:14 295:7,8,10
297:20 298:9
299:24 300:13
302:22 303:7,9
306:13,14 308:23
308:24 309:22
330:5 332:13
333:24 337:6
338:22 342:8,20
**reported (2)**
1:23 334:3
**reporter (7)**
2:9,9,10,11 5:9,11
341:6
**Reporting (2)**
5:8,10
**reports (30)**
7:16 8:2,4,25 9:20,21
10:9 20:25 62:13
98:16 165:13
214:19 240:25
247:8 253:6,18,23
256:14 257:7
265:25 276:25
278:22 280:18,21
280:22 282:17
285:21 292:23
301:25 309:19
**represent (2)**
5:23 280:15
**representation (4)**
172:22 173:16 174:2
252:17
**represented (1)**
235:25
**representing (5)**
72:6,7 105:8 240:24
252:10
**reputation (1)**
24:18
**Reputational (1)**
24:16
**request (3)**
257:21 296:9 305:7
**requested (2)**

168:14 341:19
**requesting (2)**
296:20 303:16
**REQUESTS (1)**
343:3
**require (8)**
21:7 156:12 196:8
232:3 290:17
319:14 327:8
333:17
**required (45)**
10:10,13 98:8 121:16
121:21 122:15,24
124:5,8,15 125:4,16
125:25 126:10,14
129:4,12,14,15,17
130:4 135:14
140:11 142:25
196:17 244:8
249:12 263:7 267:7
267:12,22 269:9,11
269:14,17 271:18
272:22 284:3
290:12,15 293:4,13
293:17 317:23
339:9
**requirement (34)**
10:19 28:12,13 33:10
34:17 35:11 36:25
84:3,12,21 86:4,17
129:25 130:3,4
131:10 141:9,21
143:10,22,24 144:3
186:2 249:15
263:19,23 264:3,6
266:4 298:10
307:14 317:17
325:13 326:22
**requirements (37)**
9:14 26:11,16,20 27:2
28:6 29:13 30:15
31:4 32:9 35:25
36:17 83:15,21
85:14 124:8,13,22
126:18 130:12
138:6 140:17 142:6
142:9,16,21 143:4
143:13 144:19
168:22 170:16
200:11 208:14
212:7 242:12
284:12,19
**requires (4)**
9:24,24 10:19 319:4

**reran (1)**
303:18
**reread (1)**
7:16
**rerun (3)**
303:9,12,16
**research (2)**
297:23 305:22
**researching (1)**
294:9
**reserve (50)**
9:11 10:19 26:17
243:20 244:4,7,10
244:23 247:12,14
253:21,25 259:2,9
259:14,17,18,22
260:4,5,19 263:2
265:10 266:4
267:22 271:6
289:17 290:10,18
290:21 291:22
292:15 293:5,13,24
296:11 297:19
302:10 303:4
307:19,25 309:4,11
310:15 313:2 314:2
314:14 331:20
334:3 337:16
**Reserves (2)**
291:10 342:22
**resolution (1)**
120:14
**respect (23)**
15:24 28:21 40:10,15
42:6 44:4 45:15
55:2 61:3 68:5,19
93:6 172:25 173:3,4
173:7 199:19
224:14 236:14,17
236:23 237:10
326:10
**respectively (1)**
128:10
**respects (3)**
10:12 12:25 14:3
**responding (1)**
236:20
**responds (1)**
179:7
**response (4)**
103:19 104:13 181:3
299:19
**responses (1)**
6:13

**responsibility (25)**
44:7 50:12 53:8 57:6
57:22,24 58:2,21
59:9 60:7,10 61:17
87:13 118:2,12,16
120:2 130:11 232:9
232:11 241:17
242:23 253:19
336:14,15
**responsible (9)**
8:24 9:10 13:3 24:3
24:11 44:16,20
129:8 331:22
**rest (3)**
34:23 37:7 226:9
**restrictions (2)**
314:18,21
**result (6)**
107:22 109:19 110:18
111:10 296:12
326:21
**resulted (2)**
78:2 89:12
**resumed (1)**
146:3
**resumé (5)**
248:18,21 252:25
253:3,3
**retained (2)**
8:11 252:8
**retroactive (2)**
326:22 327:8
**retroactively (1)**
326:5
**return (9)**
133:18 171:22,24
228:8 232:9,11
281:2 319:12
328:11
**revealed (1)**
296:12
**revenue (1)**
16:18
**revenues (1)**
113:2
**reverse (1)**
206:17
**review (58)**
7:24 12:3,22,22 16:17
18:3,10 19:9 25:21
25:24 32:20 43:4
48:3 50:15 59:21,24
60:2 62:18,20,24
66:22 70:10,12,14

71:6 77:14 83:7,10
99:13 103:3,16
105:16 113:21
122:3,8 127:6,11,18
147:7,9 168:17
235:5,7,8 243:8
248:5,14 285:23
296:7 297:13
301:18,24 302:7,19
304:9 306:3 323:21
341:19
**reviewed (30)**
8:6 13:11 16:15,16,19
16:25 18:4,4,14
62:20,22 70:19,23
71:2,8 76:13 77:16
169:2 206:25
224:11 246:17
275:14 279:15
286:20 293:7
301:22 307:2
326:10 329:12
337:23
**reviewing (11)**
10:4 13:21 17:22 20:8
39:10 59:15 66:18
93:16 255:21 285:8
293:8
**reviews (2)**
9:7 11:2
**revoked (3)**
285:4,13,14
**reward (1)**
58:20
**rewards (3)**
58:19 160:3,23
**re-read (1)**
205:17
**rich (1)**
221:5
**rid (1)**
106:9
**right (66)**
7:6 21:17 52:19 66:23
74:6,7 75:11,16
82:15 89:7,8,9,13
96:23 106:14 107:2
109:12 111:2
113:25 120:3
123:16 127:13
133:15 134:16
135:21 141:6
142:25 174:6 176:8
186:15 188:15

Contains Highly Confidential Portions

189:3 195:8 207:2
207:20 211:23
220:8 222:4,19
226:6 232:7 242:21
245:7 249:16
250:19 253:10
256:15 258:23
292:9 299:22,25
300:22 301:14
307:6 308:21
312:15 313:3
315:11 316:3,7,15
321:18 322:11
323:17 335:23
338:13
**rights (14)**
29:4 75:9 88:23
172:23 173:7,14
220:17 311:9,22,25
313:10 318:7,23
320:15
**RISC (10)**
245:20 328:25 329:6
329:12 330:5 331:2
331:9,16,21,22
**risk (92)**
23:9,14,15,19,25 24:2
24:5,9,10,12,16,18
25:2,3 35:2 45:15
56:9,11 57:14,20
58:9,15,18,25 59:7
96:7,11,12,22,23,25
97:3,12 98:5,11,12
98:14,15,16 134:25
135:3,25 136:4,12
136:16 137:25
138:7,20 142:9,18
142:19 143:12
145:2 147:22,24
148:9,16,18 150:18
158:7 160:2,22
161:9,10,13,19,23
162:2,7,10,12 163:3
163:6,9,18 164:2,8
164:15,17 165:6,16
165:24 166:18,21
166:23 167:24
181:8 186:24 187:7
189:25 197:20
217:10
**risks (6)**
24:13 97:9 137:23
138:11 139:7
167:12

**risky (9)**
57:18 96:14,16,18,21
97:4,4,5,6
**risk-manage (1)**
148:14
**RMR (1)**
1:24
**Robert (3)**
297:4,7 342:24
**role (3)**
20:15 21:7 178:20
**roll (1)**
149:6
**Romain (6)**
50:21 51:10,23 52:9
53:16 342:10
**Romain's (3)**
50:15,23 51:20
**Rosen (3)**
71:25 72:2 73:6
**rough (1)**
66:15
**roughly (4)**
77:21 302:11
**RPR (1)**
1:24
**rule (32)**
32:22 33:2,9 34:7
121:7 244:8 255:15
255:25 258:25
259:8,23 262:25
264:13 267:11,16
267:18,20,21 268:4
269:15,17 271:24
291:10 311:16
319:4 326:11,13
329:2 339:21
341:20 342:21,23
**rules (24)**
6:5 9:23 10:8,10
26:19 55:6 241:17
241:21 242:22
243:2,8,9,25 244:21
248:6 253:15 256:6
256:7 264:15
320:23 337:18
339:16,18,24
**running (1)**
273:2
**R-I-S-C (1)**
245:20

————————
S
————————

**S (5)**

1:24 2:7 3:3 4:2 341:5
**sake (1)**
110:8
**sale (34)**
36:22 43:23 77:14
78:23,25 79:22 99:6
101:4,17 102:5,8
103:25 104:19
106:8 121:5,9
123:12 173:13,22
174:4,10 175:9,17
175:24 183:7 193:3
196:12 197:6 217:5
220:15 224:18
320:19 323:8 324:2
**sales (1)**
188:13
**sat (2)**
246:6,22
**satisfied (4)**
168:23 335:18,25
336:9
**satisfy (4)**
30:21 55:18 170:16
200:11
**Saturday (2)**
270:13 324:18
**save (1)**
262:24
**saw (20)**
46:8 78:8 88:16 95:25
97:24 106:11 113:4
118:11 136:6
146:22,23 148:18
148:22 208:14
210:24 297:21
307:21 333:21
335:3 336:3
**saying (46)**
35:17 68:24 73:9
102:4 105:4 113:13
154:22 157:10
158:24 171:22
175:13 181:2
183:11 188:24
200:20 210:5
218:12 221:15
223:5 236:25
237:15 238:9 264:2
272:21 282:12
283:9,12 287:11
288:16 296:16
304:5 311:12
312:17 315:19,22

316:6 317:18 318:5
320:16 321:10,14
325:5 326:7 328:13
330:22 331:4
**says (65)**
43:8,22 49:8 51:10
52:9 53:17,20 57:18
61:12 71:17 78:17
83:25 99:15,19
100:17 101:10
102:7,17 103:18
104:7 106:23
107:10 121:14
122:17,21 124:2
126:7 128:5,13
147:12,20 150:17
172:17 180:24
182:5 203:10,25
207:22 208:24
220:12,16 221:9,12
221:12 222:20,22
224:23 226:11,13
227:3,13 228:24
229:22 236:10
237:24 246:22
248:23 265:8 268:5
268:7 269:13
273:10 291:17
297:17 321:12
**SBC (2)**
20:12 258:8
**schedule (3)**
46:7 262:6 304:18
**Schiller (3)**
2:6 3:11 5:23
**Schwab (3)**
13:25 15:4,17
**science (1)**
248:23
**screens (6)**
282:10 288:10,20
289:3,5,8
**se (1)**
16:17
**SEA (2)**
291:10 342:23
**SEC (34)**
9:5,17 241:17,18,21
242:22,23 243:25
244:8,20 253:14
255:14 258:25
259:8,23 262:25
263:20,23 264:3,7
264:13 267:20

269:11,14 271:4
307:9 319:4 326:11
326:13 337:13,18
339:16,18,21
**second (17)**
71:13 91:25,25 99:15
101:14 106:22
126:21 128:4
129:13 131:13
147:6 200:18
237:14 239:25
264:20 265:8
271:20
**secret (1)**
26:23
**section (7)**
12:10 122:7 128:9
209:7 211:4 336:22
338:16
**sectors (1)**
241:16
**secure (41)**
9:25 121:9,17,21
122:15,25 124:5,9
124:15 125:6,17,25
126:10 133:3
140:11 167:23
186:4 187:3 198:13
199:24 208:5
213:21 222:25
224:14,24 225:11
225:16 227:13,23
228:5,14,20 229:3
231:24 233:23
234:7,11,16,21,22
287:23
**secured (22)**
8:25 9:20 17:19,20
41:4 119:4 129:13
129:24 130:20
133:9,13 134:8
253:22 310:20
319:10 320:3,4,5
321:7 326:13,15
328:17
**secures (1)**
200:5
**securing (1)**
200:7
**securities (32)**
42:13,14 44:25 91:2,6
91:7 97:20,22 134:7
165:15 220:17
233:12 236:13,22

Contains Highly Confidential Portions

237:9,25 238:13,22
249:19 253:17
255:8,17 258:12
259:13,16 274:12
288:8,21,24 291:10
302:10 342:23
**security (7)**
134:9 154:7,22
165:20 279:11
306:21 319:11
**SEC's (1)**
10:10
**see (96)**
32:23 37:13,18 38:12
43:7,22 46:2 47:16
47:20 49:14 51:7,10
52:7 53:13 59:3
61:11 71:20,22 72:9
72:15 78:3 83:14
84:9,11,15,21,23,24
100:4 101:23
103:12,18,21 104:8
107:8 108:18 114:6
118:14 121:22
123:2 128:10
141:10,14,21,23
142:2 143:3,7
146:17 147:15
148:2,13 150:22
151:5 164:19
168:18,24 173:10
177:22 178:3 179:4
179:13 192:10
200:18 201:19,21
201:23 203:6,14,22
203:25 217:16
220:20 221:7
223:20 224:25
225:24 226:2
228:22 229:4
232:25 235:20
236:4,17 237:23
238:3 245:11
281:14 286:13
306:3 308:20
314:12 316:18
333:19 334:20
336:5
**seeing (2)**
206:23 275:6
**seeking (2)**
236:11 237:24
**seen (43)**
31:22 36:4 53:17

61:12 67:9 70:16,17
71:10,11,11 74:21
74:24,25 77:4 83:6
117:22 146:16,19
146:21 148:7
178:20 183:18
206:22 207:7 212:5
221:25 222:3,5
238:19 239:18,21
264:14,15 266:14
266:16 285:25
289:23 290:2,6
297:6 330:24
334:19 338:3
**seg (8)**
8:25 10:17 17:19,20
129:24 133:13
253:22 295:18
**segregated (2)**
9:20 130:20
**segregation (1)**
10:18
**seize (1)**
283:22
**seized (13)**
280:24 281:10,19,20
282:16 284:10
289:16 290:9
291:21 295:11,21
295:22 302:16
**seizure (5)**
282:11 283:8 284:6
290:18 328:20
**select (1)**
34:11
**selected (1)**
33:15
**sell (14)**
98:25,25 99:2 105:25
106:2,7,7,8 109:11
113:15 116:19
311:8,13 328:10
**seller (25)**
109:6,8 112:10
113:15 114:4 115:4
143:9 171:12,15
172:6 177:20 196:5
196:12,16 197:2,10
197:21 198:15
201:17 203:11
207:23 211:6,12,14
218:17
**seller's (1)**
213:7

**selling (16)**
25:17 79:5 106:4,6
109:7 115:5,7 162:9
169:11,22 173:22
198:23 201:11
219:2 315:9 316:25
**sells (1)**
172:20
**send (1)**
289:12
**sending (2)**
236:24 296:19
**sense (11)**
13:18 14:16,17 17:4
30:5 108:9 110:3
128:25 129:3
175:13 257:8
**sent (3)**
10:17 235:20 287:10
**sentence (19)**
37:15 91:24 92:4,9
122:21 126:7,12
128:4 140:19 147:20
197:13 230:16
232:20 235:11
236:10 241:25
242:5 264:21 265:8
**sentences (2)**
121:13 122:12
**separate (4)**
20:17 24:11 120:23
306:6
**separately (3)**
14:14 81:12 165:16
**September (79)**
29:23 35:23 39:12,21
49:11 58:5,12,14,16
59:20 61:3 77:13
80:7 84:2,2,11,12
84:20,20 88:22
89:11 90:8,23 101:4
104:12 106:14
136:23 137:2,5
138:13 140:18
143:5,11,14,14
144:11 153:7
160:10 162:15
168:22 178:17
180:9 182:2 188:18
196:20 202:23
206:9 211:25
212:16,24 213:19
218:5 220:5,14
222:8 224:15 234:6

235:19 260:19
265:11,12,14,20
266:3,9,14,17,19
281:22 288:4,9,25
292:16 294:10
300:17 302:16
309:12,20 322:4
**series (3)**
243:7 254:18 255:2
**serve (1)**
251:3
**served (1)**
256:8
**services (5)**
251:15,22 252:11
277:22 278:11
**SESSION (1)**
146:2
**set (14)**
25:9 53:6,10 69:24
81:21 97:12 98:6
133:18 149:13
195:18 248:2
297:19 341:10,24
**sets (2)**
172:21 231:7
**setting (1)**
36:25
**settle (4)**
87:14,20 90:21 91:4
**settled (5)**
45:7 88:3,9 91:2
186:14
**settlement (16)**
44:7,11 49:9,10 57:24
58:2,21 61:17 88:7
117:25 118:11,16
118:24 120:2,7
173:5
**settlements (1)**
88:5
**settling (3)**
44:16,21 93:25
**severe (2)**
29:14 95:18
**shape (1)**
325:14
**share (1)**
55:16
**sheet (2)**
37:11,25
**shell (1)**
70:4
**shifting (1)**

140:17
**shoes (7)**
99:17,18 100:20,24
101:19,20 215:21
**shoot (1)**
73:10
**shopping (1)**
93:19
**short (36)**
32:14,14,14 38:5,24
39:2,5,15,18,20
40:2 42:17 44:23
82:21 88:22 89:6,10
90:21 97:15 108:12
110:9 115:8 116:3
118:6 151:2,20
152:2,2,3 157:22
160:5,19 161:12
178:25 182:14
298:24
**shortest (3)**
67:8 68:6,18
**shortfall (4)**
271:17,19 272:9
296:13
**shortly (1)**
220:15
**shorts (1)**
144:3
**show (15)**
6:23 47:3 53:18
260:25 267:15
273:7 281:7,8 291:3
305:15 308:13
311:15 319:3 320:2
328:5
**showed (12)**
88:16 94:23 107:3,4
140:25 141:2 165:6
192:22 271:17
282:19 285:25
305:13
**showing (15)**
42:23 47:10 70:8 77:6
83:4 120:25 127:5
146:12 172:14
200:14 219:5 224:5
234:24 281:16,18
**shown (8)**
275:15,15 321:24
322:24 331:3
334:14,14 336:6
**shows (3)**
83:14,25 249:18

Contains Highly Confidential Portions

shut (6)
281:25 282:5,10
288:10 289:4,9
shutting (1)
282:6
side (13)
38:5 39:3 49:4,5
97:14,15 105:13,14
292:15 293:4,8,10
293:24
sides (5)
49:18 50:5,11 149:8
161:14
Sidley (4)
71:23 73:5 235:12,14
Sidley's (1)
235:17
SIFMA (3)
255:7,13 256:4
sign (2)
87:19 313:25
signed (22)
39:11 42:10 69:23
70:5 220:14,24
221:10 237:22
253:18 313:21,23
314:8 315:21 322:4
322:6,22,23 323:2
323:10 324:5
325:18,19
significant (10)
15:11 25:22 38:20
77:22 88:17 96:7,11
208:22 209:4 237:3
significantly (1)
208:14
sign-off (1)
21:4
similar (6)
10:9,12 189:13 204:5
241:24 301:24
simple (1)
163:17
simply (1)
221:21
single (4)
84:17 85:2 152:25
188:19
SIPA (2)
4:12 242:11
SIPC (24)
54:25 55:3,4,10,11,14
56:8,13 61:22 78:22
79:19,20 81:4 103:6

118:17 220:4
242:15 257:23
266:5,7,12 267:12
268:12 282:23
sir (1)
301:8
sitting (5)
86:14 144:4 248:3
280:21 335:14
situation (3)
28:6 196:19 339:15
situations (1)
218:9
six (1)
77:16
size (11)
17:5 86:25 88:15 95:6
97:7 98:6 132:9
134:13,14 162:14
216:7
slight (1)
7:17
slow (2)
14:21 65:3
smaller (2)
18:23 258:20
SMITH (1)
3:17
smoothly (2)
6:6 276:12
Society (2)
255:6,24
sold (26)
100:13 183:15 197:7
210:22 310:22
312:7,18,22 313:19
314:11,12 315:10
315:25 316:20,21
316:22,24 318:2,2,4
318:11,12 319:16
323:24 325:11,17
sole (1)
79:7
solely (1)
247:7
solvent (1)
79:15
somebody (10)
18:3 166:4,17 187:6
213:3 228:8 254:10
308:13 310:23
314:9
somebody's (1)
48:22

someplace (2)
231:19 234:3
somewhat (2)
30:19 151:11
soon (3)
6:18 103:20 104:14
sooner (1)
103:21
sorry (64)
12:16 14:25 19:3
45:17 49:23 52:6
56:17 65:3 69:19
70:3 89:22,24 92:23
103:9,15 109:15
119:17 122:9
125:19,20 127:15
127:17 130:24
131:3,12 132:4
139:25 140:24
150:16 159:5
177:24 178:2
184:22 194:3 195:7
200:20,21 202:21
203:4,4 216:24
238:8 241:9 243:16
244:6 254:22
264:25 265:4
266:18 272:16
273:4 276:9 279:21
282:22 286:9 287:7
297:14 304:13
307:12,16 309:25
314:15 318:21
327:2
sort (4)
35:6 97:25 170:19
333:14
source (10)
261:6,7 273:8 276:15
276:24 277:6 279:7
280:23 281:3
291:25
SOUTHERN (1)
1:3
space (1)
77:21
speak (12)
64:24 65:9 275:22
277:9 278:17,20
298:4 308:2,4
329:16,21,24
speaker (1)
101:25
speaking (1)

222:7
specialist (1)
5:9
specific (13)
8:5 40:12 101:16
124:18 156:11
194:22,24 195:17
204:5 206:23
208:17 232:18
279:25
specifically (8)
33:7 63:12 66:14
127:8 210:4 212:15
213:14 253:5
specifics (2)
33:8 70:5
speculate (1)
181:21
speculation (1)
179:18
speed (1)
283:24
spend (1)
67:14
spent (10)
18:18,22 19:7 59:14
63:24 64:4 68:14
95:15 243:3 257:6
SPIC (1)
72:15
spit (3)
162:18 164:16 165:5
spoke (6)
7:16,21 65:14,16,19
276:7
spot (1)
131:7
ss (1)
341:3
stable (1)
136:13
staff (1)
253:7
stamp (1)
282:24
standpoint (9)
13:4 16:19,20 23:23
23:25 24:2,19 26:15
98:15
start (25)
5:2 10:4 29:16 46:21
51:22 53:9 58:13
91:18 113:18
116:12 127:20

133:7 146:5 159:14
169:8,19 185:15
190:3 199:11 239:2
239:25 240:18
253:10 299:11
324:20
started (10)
21:15 62:16 100:10
157:10 183:22
188:24 193:5 270:4
324:14,24
starting (7)
77:19 87:10 178:22
198:6 220:11
333:25 337:3
starts (3)
51:23 232:21 274:6
state (11)
2:12 47:13 58:4
210:18 255:6,23
264:19,21 303:17
341:3,7
stated (5)
196:11 211:12 237:7
274:11 315:6
statement (22)
24:21 46:6 47:19 48:2
48:16 78:10 103:14
121:24 122:13
125:9 126:4 147:18
148:5 204:4 241:24
279:7 286:12 303:2
303:11 309:8
326:25 338:23
statements (4)
21:14 102:23 262:3
299:16
states (4)
1:2 33:9 239:22
313:18
stating (6)
107:20 222:13 280:23
284:17 306:17
322:25
stature (1)
271:9
status (1)
29:10
statutory (1)
242:12
stay (1)
104:5
stays (1)
313:18

TSG Reporting - Worldwide    877-702-9580

Contains Highly Confidential Portions

**STEEN (1)**
3:20
**step (4)**
99:17,18 101:19,20
**stepped (3)**
100:20,24 102:6
**Steve (1)**
72:16
**stipulated (3)**
316:18 317:25 318:11
**stipulation (7)**
257:16 279:16,18
280:12 299:19
300:6,9
**stock (3)**
206:17 313:5 320:4
**stocks (1)**
201:12
**stopped (1)**
312:25
**straight (3)**
149:10
**strategies (4)**
20:23 27:9,11 151:8
**strategy (1)**
21:7
**streams (1)**
16:18
**street (3)**
3:7,13 144:24
**strike (7)**
67:7 85:10 225:17,20
283:20 306:8
323:14
**structure (4)**
132:25 217:21,22,24
**structured (2)**
210:24 218:7
**structuring (2)**
68:3 69:7
**studies (1)**
30:7
**study (2)**
41:12 255:14
**stuff (1)**
42:20
**Subject (1)**
306:15
**submitted (4)**
7:5 8:17 146:14,23
**subordinated (3)**
38:7 144:14 306:4
**subordination (3)**
42:11 305:23 306:3

**subparagraphs (1)**
204:12
**Subscribed (1)**
340:20
**subsections (1)**
232:19
**Subsequent (2)**
334:16 335:7
**subsidiaries (1)**
203:11
**substance (1)**
258:24
**substantial (7)**
136:2 184:10 185:4
185:18 207:9
211:17 212:15
**substantially (2)**
143:13 187:21
**substantive (1)**
242:4
**substantively (1)**
289:9
**substitute (1)**
247:13
**substitution (1)**
300:4
**sub-bullet (1)**
150:16
**sufficiency (2)**
172:19 173:25
**sufficient (6)**
36:18 55:20 82:14
99:25 104:17
170:16
**suggest (3)**
96:6 104:10 238:5
**suggesting (4)**
102:2 115:17 179:16
181:7
**suggests (5)**
48:4 72:24 148:8
174:13 175:11
**summary (1)**
300:14
**Sunday (1)**
324:18
**supervised (3)**
12:24 253:20 254:14
**supplemental (5)**
240:12 241:10 276:18
280:22 342:18
**supplied (1)**
262:18
**supply (1)**

329:13
**support (7)**
48:2 95:21 121:4
127:4 217:13 335:5
342:12
**supporting (1)**
336:7
**supports (1)**
328:15
**supposed (4)**
10:16 79:12 268:5
269:4
**sure (91)**
10:7 12:13,15 14:22
18:8 20:13 21:5,13
21:16 23:4 35:8
36:10 37:4 38:2
40:13,14,21 46:8
52:7 53:5 57:11
58:13 61:7 63:15
64:16 69:19,20,21
71:9 74:20 76:20
79:3 80:10 85:16
89:2,3,5 92:2 99:4
100:13 105:24
106:19 108:12
110:10 114:17
118:10 120:18,21
125:10 131:9
151:11,18,19
160:12 165:4
169:15 170:18,21
176:22 181:13
182:11 184:16,21
190:15 192:9,19
193:16 195:6 202:6
204:17 206:3
209:20 211:7,8
218:22,25 219:25
223:3 234:9 242:8
242:10 247:17
251:13 262:23
270:16 277:23,24
280:18 283:4 289:5
308:16
**surmise (1)**
74:14
**surprise (3)**
62:7,11,12
**swear (1)**
5:11
**swing (1)**
30:22
**swings (1)**
429:1

142:5
**Swiss (1)**
68:15
**switched (1)**
49:11
**sworn (3)**
5:15 340:20 341:11
**system (27)**
18:7,8 49:18 50:6
148:11 149:7,10
161:17 164:10,14
165:5,14,15 166:2
245:13,15,20
292:11 329:2,7,12
330:5 331:2,9,16,21
331:22
**systems (22)**
25:9,10 49:4 144:23
144:24 145:2
147:13,13,22
161:16 162:17
163:2,5,24 164:7
165:24 244:3,22,25
245:2,2,19
**S.E.C (2)**
264:10 296:9

---
**T**

**TAA (16)**
57:25 63:5 118:4
176:7 320:7 321:22
322:10,11 323:4,5
323:17,22 327:11
327:13 328:2,3
**TABATABAI (1)**
4:17
**tabbed (2)**
300:25 301:4
**tag (1)**
248:19
**tagged (1)**
248:19
**take (69)**
6:10 13:6 16:4 18:16
18:17 19:13,14 25:5
25:8,24 26:2,4
40:14,19 46:14 53:3
58:18,21,24 59:5
60:3,7,10 61:16
70:10 83:19 91:11
95:5,10 97:11
118:23 120:19,20
131:5,16,19 144:20
145:6 154:20 158:8

158:25 162:11,16
166:21,22 167:8,21
169:7 183:21 184:2
187:11 189:14
191:6,25 192:8
197:24,25 199:5
216:2 217:5,10
235:5 241:23
254:22 257:21
298:24 305:7
335:10 338:5
**taken (7)**
180:2 188:21 222:11
249:10,11 282:3
295:14
**talk (15)**
64:18,21 73:19
126:22 157:13
173:21 176:4
190:20 191:13
192:16 231:16
291:24 304:2
311:18 315:9
**talked (7)**
50:2 120:5 167:15,16
195:3 247:19 309:8
**talking (31)**
45:19 63:14 64:7
92:11 94:6 113:23
123:21,22 128:24
135:7,8 140:8 157:5
182:3 183:5,5,6
190:14,16,17 192:3
220:13 223:18
226:14 231:17
269:15 285:19,21
294:25 300:8
328:17
**talks (4)**
284:21 319:8,16
326:13
**tape (12)**
5:3 46:22 91:15,19
145:9 146:6 199:8
199:12 240:6,19
299:8,12
**Team (1)**
147:23
**telephone (2)**
288:16,19
**tell (18)**
48:4 161:15 163:6,13
164:11 165:9 167:4
221:10 239:16

Contains Highly Confidential Portions

250:17 258:6
267:21 273:7 276:6
290:16 304:16
312:13 327:25
**telling (4)**
104:21 236:21 305:15
321:9
**ten (3)**
66:19,20 67:3
**tend (2)**
136:9 152:9
**Tennyson (1)**
329:24
**tens (7)**
144:12 155:16 184:7
184:25 187:12,19
317:5
**term (14)**
23:2 43:16 65:8
176:25 200:17
201:18 203:16
204:10,22 205:4,11
205:21 206:3
226:24
**terms (32)**
15:12 20:16 24:5,22
33:3,5 55:9 56:21
62:4 63:25 64:16
69:7,7,22,24 74:6
78:23 79:21 93:25
117:9 129:20
137:23 139:6
147:23 148:25
151:14 158:15
200:2 204:5 218:17
233:17 238:10
**testified (6)**
5:16 16:2 67:7 82:12
100:12 146:4
**testifying (1)**
17:7
**testimony (53)**
8:12,22 12:10 17:25
42:9 50:16,24 51:20
72:18,22 82:17,25
85:7 87:3 100:6
102:2 115:22
123:19 130:25
162:22,24 163:21
164:6,6,9 175:15
178:11 179:16
195:23 210:7 215:6
219:10,13 220:11
221:7 222:2,6

243:12 261:7 263:6
268:2 271:5 272:18
301:11 302:9,15,25
308:18 312:4
324:19 325:23
341:12 342:3
**Thank (10)**
45:22 47:2 51:6 52:4
90:2 139:15 205:8
277:4 300:18 302:4
**Thanks (5)**
46:17 64:20 139:23
140:5 145:7
**theirs (1)**
314:10
**theoretical (1)**
30:23
**theoretically (1)**
313:22
**thereof (1)**
204:2
**thereto (1)**
248:15
**therewith (1)**
232:22
**thing (8)**
9:19 105:3 106:15
157:15 183:24
191:7 247:18
291:24
**things (24)**
6:14 26:7,9 93:16,21
94:10 95:12 100:25
122:20 123:8 131:4
131:13 134:17
154:23 194:6,10,19
197:5 218:23 247:5
277:14 283:23,24
299:5
**think (180)**
8:19 16:22 17:15,17
18:20 19:11 23:5
26:23 28:13 29:8
31:10,11 36:9 41:4
41:16 44:10 45:20
46:13 47:4 48:22
54:22 55:24 56:19
57:2,18 58:19 61:23
63:18 64:3 66:12,13
70:23 72:19 73:15
73:18 74:2 78:7
79:11,11 83:23
88:10 90:6 92:11,21
96:11,12 97:6,10,17

97:18,19 104:16
105:12 107:3 109:6
109:14,16 111:8,18
111:24 112:10,24
115:24 116:20
117:5 118:5,21
119:9,11 124:21
136:4,10 139:17
142:19 143:24
145:5 146:19 152:9
152:21 157:13
159:23 162:20
169:23 173:20,21
174:4,9,11,11,19,19
174:20,23 175:17
177:4,10 181:17
185:14 187:13,18
188:20 189:7,24
191:22 194:18
196:5 198:3 207:21
208:8,22 209:12,18
209:24 210:17
212:8,19 214:13
215:2 216:8,12
219:25 225:7,8
228:9 229:25
231:16,20,20 234:2
234:4 238:24
239:14,23 246:15
248:4,13 249:14
250:18 251:7,20
255:11 257:15,19
265:25 267:6 268:4
268:14 269:18
270:12,17 272:22
273:9,10,22 275:21
276:19 280:19
281:13 285:11
295:7 301:23
306:10 310:18,23
311:23 312:20
313:4,16,25 314:25
315:13 317:2
319:15 320:16,22
324:15 329:6 330:9
331:6 336:14
**thinking (3)**
67:19 179:20 254:25
**third (1)**
228:17
**thought (47)**
36:20 57:3,10 61:8
64:3 67:18,20 70:22
88:15 117:15,23

120:10 157:10
160:3,23 167:3
168:7,16 181:19
183:15 184:2
185:16 186:9 187:8
189:18 190:16
207:10 213:6,16
215:17,22 219:3
221:22 222:15
223:9 227:4 247:18
265:4 267:6 269:17
287:14 303:16
311:13 316:25
325:23 327:15
330:15
**thoughts (1)**
66:25
**thousands (7)**
144:12 155:16 184:7
184:25 187:12,19
317:6
**threaten (1)**
28:2
**threatened (2)**
106:12 193:15
**threatening (4)**
29:17 74:9 183:22
193:14
**threats (1)**
193:4
**three (14)**
20:6 93:9 97:7 99:10
247:7 248:3 250:5,6
252:14 255:12
256:24 260:10
262:3 280:21
**time (227)**
5:6 13:12 15:2,3,10
17:8,9 18:23,25
19:8 21:15 25:15
26:8,21 32:13 33:16
33:16 36:12 39:23
46:14,18,22 58:10
58:12,13 59:20,24
59:25 61:22 62:3,13
62:15,15 63:10,13
63:18 64:4,8,25
65:15 66:10,13,15
66:16 67:8,15,20
68:7,14,18 69:13
70:10,20 72:20
73:12,22,25 74:2
81:14 82:4 83:10
88:7 90:11 91:11,13

91:14,19 92:12,17
92:22 93:12,24 94:4
95:5,9,13,14 97:9
97:24 100:16
102:14 105:16,17
108:12,13 110:9,10
116:18 119:20
124:23 125:12
132:5,19,20 134:10
137:15,22 138:2,9
138:10 139:2,5,17
145:6,8 146:6
148:10,15,19
149:15,18 157:2
166:15 167:9
169:23,24 183:4
192:20 193:10
194:2,11,23,25
195:20 196:4,6,9,13
197:4 198:4,19
199:5,7,12,24 208:4
209:16,19 210:19
210:20,21 214:14
214:23,24 215:12
215:14 216:2
217:20 218:13
219:2 220:3,7 222:8
240:5,19 251:16,16
254:9,9 256:16
258:3,17 262:24
264:7,22 265:9
266:19 270:2,18
271:17 272:15
282:3,13,24 283:16
284:9 285:9 287:11
289:22 290:3,7,11
292:25 294:12,13
295:8 299:7,12
301:23 309:4,10
310:16 313:11,19
313:20,24 314:7,9
315:9 317:14 318:3
318:12,22,25 320:2
320:9,15,19 321:14
322:22 326:8
331:14 332:18
333:3,11,16,21
334:13,18,23 336:6
336:19 338:4,7,10
339:17 340:8
**timeframe (2)**
73:2 124:18
**times (4)**
10:18 139:10 218:15

Contains Highly Confidential Portions

218:23
timing (6)
63:15 64:5 92:10,18
92:25 93:6
title (1)
172:23
today (20)
5:5 7:14 65:13,14
70:15 71:3,7,7
104:2 146:18
197:13 208:7 250:3
257:18,20 304:9
309:7 315:6 321:25
333:5
today's (3)
83:8 104:4 340:9
told (11)
101:4 192:23 221:15
239:19 265:19
280:7 286:20
287:11 312:19
313:5 329:11
tomorrow (3)
134:21 208:8 257:18
ton (1)
136:19
tonight (1)
71:18
top (14)
71:11 85:20 91:24
92:4 97:7 129:13,15
129:17 130:2
150:17 159:12
164:16 224:20
334:4
topic (1)
6:18
topped (1)
131:8
total (10)
52:11 84:3,5 97:17
151:5 161:13
165:18 260:18
261:8 302:9
totally (1)
148:23
to-answer (1)
273:5
trade (1)
123:12
traded (4)
23:4 170:6,7 212:3
trader (3)
161:6 164:3,22

traders (3)
148:16 149:24 161:8
trades (8)
49:18 50:5 61:10,11
87:14 90:18 157:25
223:9
trading (27)
14:11 20:22 21:7,16
21:21 23:8 24:6,9
27:9,10 136:22
149:20 151:8
156:18 161:6
201:12,15,19,22,24
202:4,5,9,9,14,17
239:2
traditional (1)
111:8
traffic (1)
212:6
trail (2)
70:18 71:12
transaction (63)
13:6 15:18 16:11 17:6
25:5 39:25 40:22
41:14 62:5 64:22
66:18,22 67:15
68:19,23 69:3 71:17
72:6 92:6 93:3,25
98:19 102:15 103:5
103:25 104:2,11
105:10,18 106:13
117:10 125:13
129:21 130:17
132:25 137:16,24
138:12 139:8
142:11 153:7 154:8
154:20,21 160:9
161:3 166:16
168:11 169:3
178:16 183:17
208:19 210:4,19
215:14 216:4
217:11 218:7,19
220:8 236:2 238:11
318:7
transactions (13)
13:10,20 20:6,16 45:7
47:21 59:12 88:8
173:6 225:16 293:3
293:12,20
transcript (8)
51:8 77:15 99:6
104:20 217:6,10
219:21 341:20

transcription (1)
344:7
transfer (70)
42:6 43:2,24 80:20
81:22 82:2,22 87:9
107:25 109:22
110:21 111:13
114:23 115:18
119:3,10,12,14,24
120:22 121:15,18
122:14,22 123:14
124:2 126:8,23
133:11 134:6
140:10 142:7
171:10 173:23
174:14 175:24
183:19 189:20
190:8,9,24 191:20
194:7 196:19
198:12,16 207:15
207:17 208:9
222:14 224:18
233:13 237:21
238:25 278:11
309:3 310:3,8,13,13
310:16 317:5,7
318:16 320:6 323:2
323:6,10,11 328:21
transferred (26)
62:2 79:15 80:25
108:7 110:2 126:19
165:12 175:12,19
175:21 176:7
217:14 221:13,14
228:21 232:23
233:11 236:15
237:14 238:2 239:5
239:10,15 309:24
317:15 320:10
transferring (11)
80:13,16 127:2,24
134:3 175:7 177:6
190:2 222:14 223:9
231:13
transfers (2)
79:18 172:21
transpiring (4)
179:12 181:2 183:13
201:9
Treasury (3)
206:14,14,15
treatment (1)
52:2
Tricia (2)

3:15 5:22
trickles (1)
96:5
tried (3)
184:8 185:2 330:9
triple-witching (2)
86:13 143:17
Trish (10)
12:6 14:22 45:21 52:4
91:9 111:5 124:19
139:16 199:3
230:14
Trish's (1)
226:17
trouble (1)
93:14
true (7)
132:24 238:5 297:17
329:22 333:16
334:25 341:12
true-up (1)
171:18
truly (1)
194:13
trustee (77)
4:12 7:18 55:10 65:18
72:13 79:8,20,25
80:20 100:10
107:21,24 109:18
109:21 110:12,17
110:20 111:9,12
114:23 115:18
119:2,14,24 121:14
123:13 124:7 142:5
144:16 173:13
192:23 194:21,24
195:5,17,19 196:19
219:11 220:4,14,23
222:7 236:7 238:14
238:20 246:2
250:14,21 251:4,15
251:22 252:8,12
256:17 272:25
275:24 277:10,12
277:20 278:4,15
281:2 293:2,7,15,22
293:25 294:4,8,19
296:23 304:24
306:5 332:17
334:16 335:2,8
trustees (3)
7:17 79:13 242:16
trustee's (13)
8:12 78:22 81:4 121:3

140:2,9 196:2
206:19 262:5
275:11 329:18
332:16 342:11
try (9)
6:6,9,17,22 113:11
138:25 156:25
158:5 179:19
trying (13)
106:8 148:14 149:22
150:11 193:18
208:9 213:8 270:16
277:5 279:6 315:18
327:15,16
TSA (5)
277:16 278:7,9
296:23 297:25
TSG (2)
5:7,10
Tuesday (8)
271:23 272:5,23
273:14 290:14
339:10,12,17
turn (37)
32:19 37:9 45:13
50:24 71:13 77:18
83:13 91:22 99:8
103:2 108:14
113:17 118:6,9
120:25 121:12
139:24,25 147:6
150:15,24 178:10
200:15 203:3,5
217:7,8 220:10
241:14 248:16
274:3 296:14
299:23 300:20
306:11 308:21
313:9
turned (2)
148:15 283:19
Turning (1)
204:8
turns (1)
331:9
twice (1)
202:11
two (32)
25:5,8 49:3,4 84:19
86:6 105:22 113:23
121:13,25 122:12
127:12,15 131:4,13
161:14 175:5 202:6
202:8 222:12

Contains Highly Confidential Portions

227:15 230:21
231:7 243:5 251:7
256:19 257:7
260:17 280:22
292:6,17 299:4
**two-day (1)**
30:22
**type (9)**
19:16 21:6 25:5
138:12 160:9 161:3
171:15 258:21
271:8
**types (4)**
23:19 24:13 138:21
161:2
**typical (3)**
95:5 170:13 218:17
**typically (1)**
154:17

_____
U

**UBS (20)**
12:4,17 15:24 17:9
19:20 20:24 27:6
68:15 249:19,20,21
249:25 250:10
253:11,12,16 254:4
258:8,12,15
**Uh-huh (41)**
5:25 11:3 13:2 16:3
32:24 42:4 51:25
59:18 63:22 71:16
71:24 72:11 80:17
86:20 99:7 101:22
103:17 106:21
108:20 114:7 122:2
129:2 141:16 178:4
201:21 203:9 207:3
220:9 226:15 236:3
242:2 256:20 284:2
285:22 296:6 326:3
328:22 330:7
332:11 334:8
336:25
**ultimately (1)**
96:20
**unambiguous (1)**
233:17
**uncollectable (1)**
53:5
**Undelivered (1)**
121:10
**underlying (5)**
149:2 150:7 277:5

336:12,13
**underneath (1)**
277:6
**understand (54)**
6:20 21:2 29:8 40:9
44:6 48:24 49:25
62:23,25 64:5 66:12
74:3 87:14 95:17
97:3 115:13 125:11
127:24 128:12
131:14 154:12
157:24 170:19
174:16 176:17,24
178:23 179:15
181:6 182:13 188:4
188:23 193:17,18
194:14 203:17
204:22 205:3
206:19 214:11
222:23 235:21,24
244:9 278:14 279:6
281:10 293:18
294:23 307:15
315:18,19 322:21
328:23
**understandable (1)**
209:13
**understanding (71)**
23:9,18,24 24:22,23
26:21 29:3 30:14
33:4,18 34:12 38:2
40:7,21,25 42:6,17
42:19 43:15 44:14
52:21,24 54:17,24
55:4,8,19 60:5,11
60:16,20,25 65:23
69:16 75:8 76:10,22
78:21 80:5 88:2
93:7 94:18 102:9
123:24 125:11
126:4 129:18 137:4
153:5 159:17,22
178:15 202:12
208:16 211:24
214:17 216:12,15
216:16 218:3
220:23 222:7
236:12 237:8,15,25
252:15,19 281:21
294:13 301:17
**understands (1)**
277:25
**understood (1)**
137:12

**undertake (3)**
151:9 302:12,19
**undertaken (1)**
39:3
**Unfortunately (1)**
111:21
**unhedged (2)**
153:11 155:14
**unilaterally (1)**
77:24
**UNITED (1)**
1:2
**unredacted (1)**
305:20
**unsecured (1)**
311:18
**urgency (4)**
72:25 105:9,12,19
**URQUHART (1)**
4:4
**usage (1)**
205:4
**use (7)**
23:16 43:19 85:23
135:17 152:10
208:4 259:15
**usual (1)**
61:9
**usually (8)**
17:21 25:22 42:15
54:21 70:4 135:15
176:3 286:12
**U.S (1)**
170:8

_____
V

**v (2)**
128:8,9
**Vague (5)**
23:12,22 61:6 68:11
337:17
**vagueness (1)**
65:7
**valid (3)**
120:10,11 318:6
**valuable (2)**
172:18 215:23
**value (70)**
15:15 23:25 33:12,19
33:23,24 34:2,3,4
38:9,20 41:19 79:4
79:7 81:13,17 84:5
94:19 97:3 108:16
109:7,9 112:9,9,10

112:18 113:3,4,12
114:12 115:6,9,11
116:2,7,9,11 117:6
117:9,15,18 120:13
120:15 134:23
135:2 149:14
161:19,22 163:3,6
208:11,11 210:9,12
211:18 212:16,17
212:22 213:4,6,6,20
213:24 214:3
215:19 217:3 237:3
275:17 279:11,12
**valued (1)**
112:11
**values (1)**
212:10
**variation (1)**
204:2
**various (16)**
20:19 27:9 61:24
76:14 151:7 155:10
157:24 161:7 164:2
168:20 207:12
212:8 214:18 247:3
258:9,10
**vehicle (2)**
176:10 323:10
**venture (1)**
23:15
**verbal (2)**
6:12 289:6
**version (2)**
305:2,21
**versus (5)**
97:22,22 214:24
291:17 295:23
**viability (1)**
138:4
**viable (3)**
94:11 136:10 332:19
**vice-versa (1)**
155:20
**video (1)**
5:8
**VIDEOGRAPHER...**
5:2 46:18,21 91:14,18
145:8 146:5 199:7
199:11 240:5,18
299:7,11 338:7,10
340:8
**videotaped (3)**
1:13 2:4 5:4
**Vinella's (1)**

303:23
**violation (5)**
339:16,18,20,24
340:2
**vis-a-vis (1)**
29:4
**VIX (3)**
23:2,3,10
**volatile (5)**
23:10 32:7,11 35:3
136:2
**volatility (12)**
21:16,21 23:7,8 30:16
31:13 34:16 35:9,16
35:18,21 134:15

_____
W

**wait (2)**
45:17 89:22
**walked (2)**
73:11,25
**want (43)**
15:22 16:23 18:17
19:14 47:3 51:2
59:10 60:3 67:4,5
73:7 94:24 109:5,6
112:10 116:19
126:3 144:16,17
156:21 157:19
173:21 179:19
181:21 193:17
197:19 198:2,5,7
204:19,20 210:11
214:14,15 226:22
234:9 246:8 258:16
261:20 283:23
296:15 298:24
326:16
**wanted (19)**
18:16 19:12,13 21:16
51:5 59:16 62:17
73:19 75:25 115:10
160:2,2,21,22
198:18 211:8
229:23 299:5
300:19
**wants (1)**
237:20
**warranty (2)**
172:22 173:16
**wasn't (20)**
19:11 94:11 96:10
107:7 109:9 113:8
129:21 133:13

Contains Highly Confidential Portions

137:7 158:22 164:9
171:20 195:5
230:15 231:11
234:13 246:17
267:3 310:20
315:16
**way (31)**
10:22 20:9 46:14 50:2
56:19 86:8 88:12
93:13 105:24 111:8
129:24 159:22
174:21 189:19
190:23 217:21
221:5 227:16
252:12 255:14
258:22 269:23
283:2 287:4 292:23
308:9,19 318:17
325:14 331:11
341:16
**Wednesday (2)**
77:20 268:20
**week (19)**
59:14,20 61:2 63:25
76:7 80:7 86:6
100:19 140:18
142:2 143:5,11,19
159:15,20 179:10
179:23 180:9,14
**weekend (17)**
26:2 67:13,16,21,23
87:15,21,23,25 88:3
88:22 89:11 90:7,22
103:7 144:18
214:13
**weekly (2)**
243:5 271:10
**weeks (5)**
26:5 59:15 250:5,6
255:12
**week's (1)**
102:20
**Weil (2)**
235:21,22
**Welcome (1)**
46:25
**Wells (3)**
260:3,7,13
**went (15)**
21:3 63:5 84:13,21
111:19 134:19
141:9,13 177:3
195:25 216:8
269:19 279:3,3

301:15
**weren't (15)**
101:11 102:10 117:21
156:4 159:8 167:4,6
168:7 169:20
210:21 245:8
287:23 315:6
330:16 331:8
**we'll (4)**
58:13 120:18 271:2
302:18
**we're (27)**
6:19 45:18 46:19 47:4
63:14 91:16 145:9
146:7 190:16 192:3
193:11 199:9,13
205:6 210:5 216:10
216:11 226:16
240:7,20 257:16
258:23 267:16
299:9 327:16
338:11 340:10
**we've (8)**
52:3 91:9 167:15,16
232:21 270:17
295:15 306:10
**whereof (1)**
341:23
**wherewithal (1)**
161:24
**willing (11)**
58:24 94:2 108:23
112:3 113:7,15
183:21 215:24
218:16 222:14
225:19
**wished (1)**
162:9
**withdraw (16)**
28:16 35:24 36:7
124:12 126:13
142:23 263:14
288:3,8 289:10
309:3 314:16,20
315:14 316:7
317:23
**withdrawal (6)**
263:21 264:16,17
272:17 309:5
317:22
**withdrawals (1)**
263:17
**withdrawing (1)**
315:4

**withdrawn (17)**
30:13 44:14 121:20
122:24 124:4,7,14
124:22 125:4,15,20
125:24 126:9
309:19 316:10,14
320:25
**witness (30)**
5:12,15 14:25 89:24
119:17 130:24
131:3 184:22 247:5
251:4 256:9 273:3
273:19 277:4
299:22,25 300:4,10
300:14,22 301:3,6,9
301:14,21 322:19
341:9,13,23 344:4
**witnesses (1)**
64:11
**witness's (9)**
115:22 123:19 162:24
163:21 175:15
195:22 215:6 268:2
312:4
**Witter (2)**
254:8,11
**woke (1)**
170:21
**Woodland (2)**
295:10 298:17
**Woodlands (1)**
292:7
**word (4)**
203:13,22,25 204:13
**words (8)**
49:2 104:5 149:11
164:9 181:22,23
227:15 234:2
**work (18)**
12:21 65:18 243:20
249:7,20 250:2,3,16
250:21,23 253:4,6
254:9 278:3,7
288:17 295:5
296:23
**worked (12)**
9:3,8,8,12 10:25
12:19,20,23 26:22
95:25 254:2,12
**working (5)**
65:18 100:10 243:4
278:15,16
**works (2)**
33:4 129:25

**world (2)**
10:14 112:24
**worldwide (4)**
12:18 13:3 101:18
102:18
**worst (2)**
82:4 87:8
**worth (7)**
115:15 196:18 198:3
212:2 213:12
216:17,20
**wouldn't (36)**
14:17 15:10 23:15
50:11 56:21 62:11
154:25 155:8
158:21 160:4,6,18
160:20 164:7,10
179:19 187:9 189:8
194:20 214:4,7
217:21 218:18,24
221:4 230:18
231:12 283:15
310:20 313:7
315:17 316:11,12
320:11,20 333:17
**wrap (1)**
6:18
**wrapped (1)**
239:24
**write (4)**
53:7 54:18,21 214:24
**writing (2)**
127:22 228:5
**written (8)**
50:13 51:11 52:14
171:16 227:16
228:10,13 257:3
**wrong (2)**
177:3 287:12
**wrote (4)**
53:4 56:2,5 57:11

———————————
**X**
———————————
**x (2)**
1:4,10

———————————
**Y**
———————————
**Yeah (3)**
204:16 221:14 233:7
**year (3)**
15:17 113:3 285:10
**years (7)**
9:3,12 20:25 112:17
243:3,4 252:24

**yellow (1)**
51:3
**Yesterday (1)**
77:23
**York (20)**
1:3,14,14 2:7,7,12 3:8
3:8,14,23,23 4:8,8
4:14,14 255:6,23
341:3,4,7

———————————
**Z**
———————————
**zero (4)**
33:17 82:5 198:5
281:18

———————————
**$**
———————————
**$1,359,001,075 (1)**
84:14
**$1,400,000,000 (1)**
84:22
**$1.1 (2)**
37:17,23
**$1.19 (1)**
37:12
**$1.2 (2)**
141:22 143:4
**$1.6 (5)**
78:3,15 181:25
189:16,19
**$10 (1)**
134:8
**$100 (7)**
114:13,14 133:17,19
133:25 134:3
209:18
**$104 (2)**
52:12 53:12
**$150 (2)**
149:17 150:7
**$2 (7)**
84:22,22 108:7,8
109:25 110:2
119:10
**$2.29 (2)**
37:17,22
**$2.3 (1)**
335:5
**$20 (1)**
134:8
**$200 (1)**
208:7
**$213 (1)**
296:13
**$250 (1)**

Contains Highly Confidential Portions

Page  38

113:2
**$258 (1)**
275:4
**$300 (1)**
117:16
**$400 (1)**
141:25
**$439 (1)**
308:14
**$50 (1)**
134:2
**$500 (6)**
84:17 86:5 140:17
  141:10 149:14
  150:8
**$507 (2)**
316:23 318:15
**$600 (2)**
85:2 141:17
**$69 (1)**
97:14
**$70 (1)**
97:13
**$700 (1)**
208:7
**$789,583,205 (1)**
84:13
**$80 (1)**
48:15
**$82 (1)**
331:3
**$891 (1)**
278:24

**0**

**074C (3)**
48:12 53:14 60:22
**074F (2)**
44:17 60:18
**074M (1)**
44:17
**08-13555(JMP) (1)**
1:7

**1**

**1 (14)**
5:3 29:9 83:13,14,25
  119:13 139:18
  141:6,7 200:14
  270:9 299:24 300:3
  344:6
**1(a) (1)**
172:17
**1(b) (1)**

43:21
**1.769 (1)**
302:11
**1:05 (1)**
145:8
**10 (12)**
3:13 98:3 203:4,21
  271:20,22 272:4
  287:13 290:13
  339:10,12,17
**10:25 (1)**
46:18
**10:43 (1)**
46:22
**100 (1)**
51:11
**10004 (1)**
4:14
**10006 (1)**
3:23
**10010 (1)**
4:8
**10017 (1)**
3:8
**101 (1)**
99:8
**11 (4)**
1:6 99:21 100:18
  308:24
**11:36 (1)**
91:14
**11:57 (1)**
91:20
**12 (3)**
11:7 47:25 308:24
**12th (1)**
290:5
**12-23 (1)**
1:16
**121 (1)**
342:11
**12207 (1)**
3:14
**13 (10)**
16:23 49:7 264:19,25
  265:2,3,5 274:6
  309:8 333:25
**136 (2)**
121:13 122:12
**139 (1)**
51:22
**14 (6)**
16:23 32:19 47:25
  48:8 220:12 343:6

**140 (1)**
52:7
**141 (1)**
50:24
**15 (12)**
20:25 52:8 59:20 61:3
  80:7 84:2,12 140:18
  143:6,11 180:9
  343:4
**15c3 (3)**
9:11 259:18,23
**15c3-3 (35)**
243:13 244:9 255:15
  255:25 258:3,25
  259:8 262:25
  264:13 267:16,18
  267:20,21 268:5,11
  268:25 269:8
  271:24 284:4,13
  290:25 291:11
  298:10 311:16
  312:12 317:8 319:4
  326:11 328:5 329:2
  331:10,17 339:21
  342:21,23
**15th (6)**
141:8,20 193:5,12
  195:3 209:22
**16 (8)**
39:12 47:25 84:12
  211:25 212:16,24
  213:19 295:9
**16th (3)**
141:9,13 193:3
**17 (3)**
84:20 128:9 308:25
**17th (19)**
141:12,13,18 267:5
  289:18,25 309:24
  310:2,7 311:4,5,8
  311:25 312:23
  314:17 315:5 316:8
  316:19 320:25
**178 (1)**
342:13
**18 (8)**
84:20 108:15 182:2
  266:15 296:3
  297:20 298:8 303:3
**18th (6)**
141:12,18,20 188:19
  281:22,23
**19 (30)**
35:23 77:13 84:3

136:23 137:2,5
  206:9 220:5,14
  222:8 224:15 234:6
  260:19 265:11,12
  265:14,20 266:17
  288:4,9,25 292:16
  302:17 306:13
  309:12,20 322:5
  334:4,4 337:2
**19th (56)**
85:18,23 86:13,19,23
  87:2 90:10 101:4
  141:3 144:10
  192:25 209:17
  266:3,9,19,21 267:8
  267:14,23 268:6
  271:2 272:7 282:20
  283:6,10 284:10
  285:5,13 286:17
  289:16 290:9,19
  294:10 295:24,25
  300:17 310:23,25
  312:7,8 313:22
  314:19,20 316:25
  318:9 321:8 322:13
  322:23 323:19
  324:10,15 325:4,21
  325:25 328:4,9
**190.06(e)(1)(iv) (2)**
128:8,9
**1998 (1)**
258:9

**2**

**2 (24)**
29:10 46:22 91:16
  127:9,16,17 200:16
  200:19 224:20
  230:5 232:16 233:4
  233:16,17 241:23
  300:12,14 304:13
  304:17,18 334:5
  336:23 338:16
  344:6
**2.3 (2)**
332:9 334:9
**2:05 (1)**
146:6
**20 (6)**
9:2,12 235:19 243:4
  252:24 287:12
**20th (8)**
88:22 89:12 90:8,23
  90:23 193:14 322:7

324:5
**200 (1)**
257:14
**2000 (2)**
218:4 258:13
**2003 (2)**
15:22 258:17
**2004 (2)**
15:19,22
**2005 (2)**
13:8 15:19
**2006 (3)**
13:7 15:25 19:21
**2008 (40)**
17:11 29:23 35:23
  39:21 49:11 58:5
  59:21 63:7 77:13
  84:3,20,20 104:12
  137:5 138:14
  143:11 153:7
  160:10 162:15
  178:17 196:20
  202:23 206:9
  211:25 212:24
  213:19 218:5 222:9
  224:15 234:6
  260:19 265:11,12
  265:14,20 266:3
  288:25 292:16
  302:17 309:12
**2009 (2)**
249:22 303:9
**2010 (7)**
1:15 2:2 5:6 297:5
  340:21 341:24
  344:3
**21 (2)**
45:21 306:13
**21st (5)**
88:22 89:12 90:8,23
  325:18
**219 (1)**
342:14
**22 (10)**
11:7 51:23 89:11
  104:12 113:19
  143:14 150:25
  168:22 202:23
  330:3
**22nd (12)**
4:7 39:21 74:10 85:20
  87:20 88:18,19
  106:13 322:8 323:3
  324:5 325:19

Contains Highly Confidential Portions

**222 (1)**
3:7
**23 (6)**
49:11 113:17 143:14
177:19,25 330:3
**235 (1)**
342:15
**24 (5)**
62:8 69:4,4 77:21
308:23
**240 (3)**
342:17,18,20
**241 (1)**
342:5
**25 (3)**
197:25 224:6 308:23
**257 (1)**
343:4
**258 (1)**
275:7
**26 (2)**
45:13,14
**2625 (2)**
291:13,16
**267 (1)**
342:21
**27 (4)**
45:13 241:11 243:7
254:18
**273 (1)**
43:10
**275 (3)**
178:10,22 180:3
**28 (3)**
300:25 301:7 302:23
**281 (1)**
275:4
**282 (1)**
220:10
**29 (2)**
37:9 258:9
**291 (1)**
342:22
**29428 (1)**
1:25
**297 (1)**
342:24

---
**3**
---

**3 (13)**
28:13,14 29:12 71:15
91:19 94:24 95:3
106:23 145:9
150:16,16 178:23

344:7
**3-3 (15)**
100:11 243:6 248:5
248:14 258:19
269:11 311:17
319:8,14,15,21,24
326:13 328:8 329:7
**3:03 (1)**
199:7
**3:19 (1)**
199:13
**30 (3)**
28:12 29:13 243:3
**30(e) (1)**
341:21
**300 (2)**
38:4,9
**300-and-some-page...**
222:12
**302 (2)**
343:5,6
**305 (1)**
343:7
**35 (1)**
274:25
**39 (1)**
306:14

---
**4**
---

**4 (8)**
29:14 41:5 146:6
150:16 199:9 203:3
228:17 240:7
**4:13 (1)**
240:5
**4:45 (1)**
240:19
**40 (2)**
117:12 306:14
**41st (1)**
3:7
**439 (2)**
306:18 308:11
**44 (2)**
113:20 333:19
**442 (3)**
77:7 99:5 217:7
**45 (3)**
41:2 141:14 308:25
**46 (1)**
328:19
**47 (2)**
329:4 342:9
**48 (2)**

214:8 215:17
**49 (1)**
328:19

---
**5**
---

**5 (16)**
41:5 94:24 95:3
199:12 241:14
257:9 297:4,11,14
333:12,24 336:20
337:6 342:4 343:5,7
**5:54 (1)**
299:7
**50 (4)**
29:15 41:3 197:24
342:10
**500 (1)**
315:12
**51 (7)**
4:6 42:24 45:23 47:12
172:15,16 337:3
**54 (1)**
113:20
**55 (2)**
113:20 114:3
**575 (1)**
2:6

---
**6**
---

**6 (15)**
1:15 2:2 5:6 83:23,24
108:14 147:7 203:4
203:5 204:8 240:19
265:3 299:9 342:8
344:3
**6:23 (1)**
299:12
**60 (5)**
121:12 140:6,7 217:8
217:9
**60(B) (1)**
121:7
**601(c) (1)**
32:23
**61 (2)**
77:18,19
**630 (4)**
70:9 106:20 275:3,7
**648 (1)**
146:13
**659A (1)**
127:6
**66 (1)**
45:14

**676A (1)**
83:5
**684 (4)**
6:24,25 7:4 342:8
**685 (4)**
47:6,7,11 342:9
**686 (3)**
50:19,20 342:10
**687 (5)**
121:2,3 140:3,4
342:11
**688 (3)**
178:6,7 342:13
**689 (3)**
219:6,7 342:14
**69 (4)**
39:17,20 97:18 241:6
**690 (3)**
234:25 235:2 342:15
**691 (7)**
240:9 241:2,5,13
242:6 300:21
342:17
**692 (4)**
240:12 241:3,10
342:18
**693 (6)**
240:15 241:3,12
242:6 300:23
342:20
**694 (3)**
267:17,18 342:21
**695 (3)**
291:8,9 342:22
**696 (3)**
297:3,7 342:24

---
**7**
---

**7 (7)**
52:8 91:23 98:20
150:24 297:11,14
299:12
**7th (1)**
341:24
**7:09 (1)**
338:7
**7:19 (1)**
338:10
**7:20 (1)**
340:8
**70 (5)**
37:10 39:17 42:3
43:18 97:18
**73 (3)**

103:2,11,12
**74 (1)**
43:10

---
**8**
---

**8 (5)**
159:12 228:17 232:14
232:18 296:14
**82 (1)**
328:25
**84 (1)**
43:10
**891 (1)**
274:23

---
**9**
---

**9 (4)**
32:20,22 249:23
270:10
**9/15/2008 (1)**
83:15
**9/19 (10)**
294:3,7 295:4,6
298:11 302:10
304:20 318:16
336:2,10
**9/19/2008 (1)**
83:16
**9:37 (1)**
5:6
**922 (2)**
235:3 342:16
**944 (3)**
298:15,16,20