1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555(JMP)

Case No. 08-01420(JMP)(SIPA)

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS HOLDINGS INC., et al.,

                    Debtors.

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS INC.,

                    Debtor.

- - - - - - - - - - - - - - - - - - - -x


            U.S. Bankruptcy Court

            One Bowling Green

            New York, New York


            April 9, 2010

            10:03 AM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

2

1

2   HEARING re Motion of Debtor to Modify the September 20, 2008

3   Sale Order and Granting Other Relief [Case No. 08-13555, Docket

4   No. 5148]

5

6   HEARING re Motion of the Trustee for Relief Pursuant to the

7   Sale Orders or, Alternatively, for Certain Limited Relief Under

8   Rule 60(b) [Case No. 08-01420, Docket No. 1682]

9

10  HEARING re Motion of Official Committee of Unsecured Creditors

11  of Lehman Brothers Holdings Inc., Authorizing and Approving (A)

12  Sale of Purchased Assets Free and Clear of Liens and Other

13  Interests and (B) Assumption and Assignment of Executory

14  Contracts and Unexpired Leases, Dated September 20, 2008 (and

15  Related SIPA Sale Order) and Joinder in Debtors and SIPA

16  Trustees' Motions for an Order Under Rule 60(b) to Modify Sale

17  Order [Case No. 08-13555, Docket No. 5169; Case No. 08-01420,

18  Docket No. 1686]

19

20  HEARING re Motion of Barclays Capital Inc. to Enforce the Sale

21  Order and Secure Delivery of All Undelivered Assets [Case No.

22  08-13555, Docket No. 6814; Case No. 08-1420, Docket No. 2581]

23

24  HEARING re Trustee's Adversary Complaint [Adv. No. 09-01732,

25  Docket No. 1]

3

1

2   HEARING re LBHI's Adversary Complaint [Adv. No. 09-01731,

3   Docket No. 1]

4

5   HEARING re Creditors' Committee Complaint for Declaratory

6   Relief Pursuant to 11 U.S.C. Section 105(a) and 28 U.S.C.

7   Sections 2201, 2202 and for an Accounting [Adv. No. 09-01733,

8   Docket No. 1]

9

10  HEARING re Debtors' Motion in Limine for an Order, Pursuant to

11  this Court's October 27, 2009 Scheduling Order, Deeming Certain

12  Facts to be Admitted [Case No. 08-13555, Docket No. 7502; Case

13  No. 08-01420, Docket Nos. 2795, 2812]

14

15

16

17

18

19

20

21

22

23

24  Transcribed by:  Clara Rubin and Esther Accardi

25

4

```
 1
 2    A P P E A R A N C E S :
 3    JONES DAY
 4         Special Counsel to Lehman Brothers Special Financing Inc.
 5         222 East 41st Street
 6         New York, NY 10017
 7
 8    BY:   ROBERT W. GAFFEY, ESQ.
 9          JAYANT W. TAMBE, ESQ.
10
11    BOIES, SCHILLER & FLEXNER LLP
12         Attorneys for Barclays PLC
13         575 Lexington Avenue
14         7th Floor
15         New York, NY 10022
16
17    BY:   JONATHAN D. SCHILLER, ESQ.
18
19    BOIES, SCHILLER & FLEXNER LLP
20         Attorneys for Barclays PLC
21         333 Main Street
22         Armonk, NY 10504
23
24    BY:   DAVID BOIES, ESQ.
25
```

5

1

2    BOIES, SCHILLER & FLEXNER LLP

3           Attorneys for Barclays PLC

4           5301 Wisconsin Avenue, N.W.

5           Washington, DC 20015

6

7    BY:   HAMISH P.M. HUME, ESQ.

8

9

10   HUGHES HUBBARD & REED LLP

11          Attorneys for the James W. Giddens, SIPA Trustee

12          One Battery Park Plaza

13          New York, NY 10004

14

15   BY:   WILLIAM R. MAGUIRE, ESQ.

16

17

18   LOWENSTEIN SANDLER PC

19          Attorneys for LibertyView

20          65 Livingston Avenue

21          Roseland, NJ 07068

22

23   BY:   SCOTT CARGILL, ESQ.

24

25

6

1

2    QUINN EMMANUEL URQUHART OLIVER & HEDGES, LLP

3         Special Counsel to the Official Committee of Unsecured

4          Creditors

5         51 Madison Avenue

6         22nd Floor

7         New York, NY 10010

8

9    BY:    SUSHEEL KIRPALANI, ESQ.

10          JAMES C. TECCE, ESQ.

11          ROBERT K. DAKIS, ESQ.

12

13

14    QUINN EMMANUEL URQUHART OLIVER & HEDGES, LLP

15         Special Counsel to the Official Committee of Unsecured

16          Creditors

17         865 S. Figueroa Street

18         10th Floor

19         Los Angeles, CA 90017

20

21    BY:    ERICA P. TAGGART, ESQ. (TELEPHONICALLY)

22

23

24

25

7

1

2   CHAPMAN & CUTLER

3        Attorneys for Creditor, US Bank

4        111 West Monroe Street

5        Chicago, IL 60603

6

7   BY:   JAMES HEISER, ESQ. (TELEPHONICALLY)

8        FRANKLIN H. TOP III, ESQ. (TELEPHONICALLY)

9

10   DEWEY & LEBOEUF LLP

11        Attorneys for Creditor, CAPCO

12        1301 Avenue of the Americas

13        New York, NY 10019

14

15   BY:   ELIZABETH PAGE SMITH, ESQ. (TELEPHONICALLY)

16

17   FRASER MILNER CASGRAIN LLP

18        Attorneys for Creditor, Linden Advisors

19        1 First Canadian Place

20        39th Floor

21        100 King Street West

22        Toronto, Ontario

23        M5X 1B2

24

25   BY:   RYAN JACOBS, ESQ. (TELEPHONICALLY)

8

1

2    STUTMAN TREISTER & GLATT

3         Attorneys for Interested Party, Elliott Company

4         1901 Avenue of the Stars

5         12th Floor

6         Los Angeles, CA 90067

7

8    BY:   JEFFREY H. DAVIDSON, ESQ. (TELEPHONICALLY)

9          WHITMAN L. HOLT, ESQ. (TELEPHONICALLY)

10

11

12   STUTMAN TREISTER & GLATT

13        Attorneys for Creditor, Perry Capital

14        1901 Avenue of the Stars

15        12th Floor

16        Los Angeles, CA 90067

17

18   BY:   MARINA FINEMAN, ESQ. (TELEPHONICALLY)

19

20

21   AURELIUS CAPITAL MANAGEMENT

22        Interested Party

23

24   BY:   DAVID TIOMKIN (TELEPHONICALLY)

25

9

1

2    THE BAUPOST GROUP

3         Interested Party

4

5    BY:   MEGHAN S. SHERWOOD (TELEPHONICALLY)

6

7

8    FARALLON CAPITAL MANAGEMENT

9         Creditor

10

11   BY:   ANATOLY BUSHLER (TELEPHONICALLY)

12

13

14   TRICADIA CAPITAL

15        Interested Party

16

17   BY:   STEPHEN GRISANTI (TELEPHONICALLY)

18

19

20   DAN BULLOCK, IN PROPRIA PERSONA (TELEPHONICALLY)

21

22

23

24

25

10

1              P R O C E E D I N G S

2           THE COURT:  Be seated, please.  Good morning.  This is

3      the much-awaited 60(b) argument.  Before we start, this is the

4      first major hearing that we've had since the Court changed its

5      policy with regard to the use of cell phones, and so as happens

6      in the movies before a show starts, please make sure that your

7      cell phones are off.  Even a vibration is probably not a good

8      idea.

9           I know that there has been some discussion among the

10     lawyers about dividing up time, and based upon what I have been

11     told through chambers, that means we probably go till 6 o'clock

12     if everybody is scrupulous about keeping to the time.  I'm

13     going to actually enforce the time today in the sense that I

14     think it's a bad idea to go later than, I'm going to say,

15     7 o'clock, which gives some time for breaks and dealing with

16     the elevators.

17          But I'm going to hold everybody to their estimates.  I

18     don't have lights to tell you when you're coming toward the end

19     of your argument.  This isn't an appellate argument; it's, at

20     least in my judgment, something that I deem effectively the

21     opening argument for the evidentiary hearing.  In saying that,

22     I take nothing away from the arguments that have been made by

23     Barclays that this can be decided on the papers.  I've read the

24     papers; I don't believe it can be decided on the papers.

25          So you should assume that this is the start of a long

11

1   slog here with respect to these issues.  You'll have plenty of

2   time to make your arguments; if not today, another day.

3          So let's proceed.

4          MR. GAFFEY:  Good morning, Your Honor.  Robert Gaffey

5   from Jones Day, special counsel to the debtor.  And I'm with my

6   partner Jay Tambe, who, depending on the issues Your Honor may

7   have questions about, may also address the Court, if that's all

8   right.

9          THE COURT:  That's fine.

10         MR. GAFFEY:  I'll be referring this morning to some

11  materials, and I have a paper version to hand up to Your Honor

12  if it would be helpful to the Court, or we can wait and see if

13  the screen doesn't work and I can give it to you then.

14         THE COURT:  I'm old-fashioned enough to actually like

15  paper, so --

16         MR. GAFFEY:  Okay, well --

17         THE COURT:  -- you can hand that up.

18         MR. GAFFEY:  If I can approach, Your Honor, I'll

19  just --

20         THE COURT:  Please.  Thank you.

21         MR. GAFFEY:  Your Honor, as you know, these Rule 60

22  motions arise because, in the view of the movants and in the

23  view of the debtor, when this Court considered the sale

24  transaction that was proposed for approval by the Court

25  September of 2008, it was not told about billions of dollars in

12

1    unauthorized and undisclosed changes to the sale transaction

2    that had been given to the Court for approval.

3         The Court was presented with an asset purchase

4    agreement on the 17th of September, 2008 that described a sale

5    of approximately seventy billion dollars book value of

6    securities and offsetting liabilities of approximately sixty-

7    nine billion dollars in connection with those securities, plus

8    assumed liabilities for bonuses and contract cure, totaling

9    between three and a half and four billion dollars.  In addition

10   to that, there was 250 million dollars cash goodwill.

11        Now, on the record above the line, on the record that

12   was given to the Court, that indicated either a balance

13   exchange of assets and liabilities or a net benefit to the

14   estate.  By our calculation on the numbers that were shown to

15   the Court on the 17th, the net benefit to the estate should

16   have been in the range of about four billion dollars, assuming

17   the truth of the representations made with regard to assumed

18   liabilities.

19        By the 19th of September, the Court was informed that

20   the deal had changed in the ensuing two days, and some

21   representations were made to the Court about the nature of the

22   changes.  And as we believe we've shown in our papers, those

23   representations, flowing from the misrepresentations made

24   earlier in the week, also misrepresented the deal.  But, in any

25   event, on the numbers that were presented to the Court at the

13

1    sale hearing on the 19th, if the deal wasn't a wash, an

2    exchange of relatively equal exchange of assets and

3    liabilities, it should have produced a net benefit to the

4    estate of about 1.85 billion dollars.  In fact, on the 22nd of

5    September, after the sale hearing, and after further changes,

6    which the Court never saw, were embodied in a clarification

7    letter that was finalized over the weekend, the deal that the

8    parties actually closed resulted not in a net benefit to the

9    estate, not in a wash, but in a windfall first-day gain for

10   Barclays of upwards of eleven billion dollars.

11          Now, up front and -- I should say, as we've said

12   throughout our papers, we think one of the main reasons that

13   the Court was not given accurate information about the nature

14   of the transaction and about the terms of the transaction is

15   that the lawyers were not told.  The lawyers were not told in

16   particular about an embedded five billion dollar discount that

17   was built into the deal from the very beginning.  The lawyers

18   were not involved in the negotiation of the economics of the

19   transaction, and they were not clued into the fact that that

20   seventy billion dollar number that the Court was given

21   representing the so-called long position as Lehman's book value

22   was in fact not Lehman's book value, was a negotiated price

23   deliberately set at five billion dollars below Lehman's book

24   value.

25          So that gain's embedded from the very beginning.  And

14

1    through the use of a repurchase transaction, which arose later

2    in a very tumultuous week, the five billion dollar discount

3    ultimately was delivered to Barclays through the mechanism of

4    taking the assets and the repo and reducing them to liquidation

5    value, a phrase this Court never heard in a sale motion or in

6    either of the two hearings that were held before it.

7           In addition to that, Your Honor, based on the excuse

8    that the repo collateral was undervalued, Barclays' position,

9    when in fact it had been artificially lowered to liquidation

10   value, Barclays used that as an excuse, just before the sale

11   hearing began, to demand even more assets on the threat that it

12   would not close, when its negotiating leverage was highest.

13   And what happened then on the morning of Friday the 19th, the

14   day of the sale hearing, is certain Lehman executives who knew

15   about the discount, although all did not know about the

16   discount, scrambled around looking for additional assets to add

17   to the deal, and the end result was adding, by Barclays'

18   calculation, if you include what it claims a right to,

19   approximately five billion dollars more, about which the Court

20   was never told.

21          Now, with respect to the discount and with respect to

22   the assumed liabilities, which also were grossly inflated,

23   Barclays knew, as they've sat through these hearings, that

24   those numbers were false.  One of the things we've

25   demonstrated, and I'll talk about a bit today, is the fact that

15

1    even before anyone set foot in this courtroom, even before the

2    sale motion was submitted, even before the first hearing on the

3    17th or the sale hearing on the 19th, Barclays was already

4    calculating the gain that it would draw, about which the Court

5    had never been told, from the difference between the estimates

6    of assumed liabilities it had been given and the truth.  For

7    example, the Court was given an estimate of 1.5 billion dollars

8    for contract cures.  It was told that in the sale motion, it

9    was told that on the 17th, and it was told that on the 19th.

10            Beginning as early as September 16th, Barclays was

11   already deciding it was never going to pay more than about 200

12   million dollars in contract cures.  It knew about a 1.3 billion

13   dollar spread and did nothing to correct the record.  The

14   lawyers who were delivering those estimates to the Court did

15   not know that those estimates were inflated; no one told them.

16   So if you don't tell your lawyers, you can't tell the Court.

17   If Mr. Miller doesn't know, this Court can't know.  And as a

18   result, these disabled -- these lawyers were, as an

19   informational matter, disabled from being able to make

20   representations to Your Honor about the deal.

21            Now, the discount has been the subject of a lot of

22   discoveries since the summer and a lot of the massive papers

23   that the parties have submitted, Your Honor, but at this point

24   it hardly needs proving.  It's been admitted by a variety of

25   people who were involved in its implementation.  It was

16

1    admitted by Martin Kelly who at the time was Lehman's global

2    financial comptroller, who was involved in calculating the

3    numbers that were ultimately delivered to the Court.  It was

4    admitted by Paolo Tonucci, a co-worker of his.  It was admitted

5    by Ian Lowitt, the CFO of the corporation.  And on the Barclays

6    side, it was admitted by John Varley, the group chief executive

7    of Barclays, and Rich Ricci, one of its primary negotiators.

8         Now, the admissions are not -- these are not

9    admissions we're seeking to infer from the record; these are

10    admissions in their depositions.  And that, for example, is the

11    defini -- it's the testimony of Mr. Tonucci, who talks about

12    how the repo was used to deliver the discount.  This is what

13    Mr. Kelly said from the very beginning.  My understanding was

14    that the negotiated sale price across all those asset

15    portfolios resulted in a five billion -- approximately five

16    billion dollar loss to Lehman relative to its marks at the

17    time.

18         Now, Barclays has said in connection with this

19    discount, Your Honor, that it really wasn't a discount, it

20    wasn't really a misstatement, that it was nothing more than an

21    adjustment of Lehman's marks to Barclays' view of what should

22    have been the book value.  This is what Barclays says in its

23    papers.  Barclays says that, by the week of September 15th, the

24    Lehman marks for many of its financial assets were stale.

25    Barclays did not agree with those marks and did not want to

17

1    accept those marks and then have to take an immediate write-

2    down after the sale.  Thus, Barclays says, the discount

3    ascribed throughout movants' Rule 60 motions is not a discount

4    from fair market value but rather an attempt to adjust from

5    stale Lehman marks to fair market value.

6         Well, Your Honor fairly read, this admits the

7    discount.  It's an attempt to explain why they did it, but it

8    doesn't explain the following:  It doesn't explain that when

9    the asset purchase agreement was submitted to the Court, it

10   expressly described the value of the long position as seventy

11   billion dollars book value as of the date hereof.

12        Now, Barclays will tell you they thought Lehman's book

13   values were aggressive, they were too high, and that they were

14   on record with regard to that, and that the world at large

15   thought that.  Well, if that's true, then the representation in

16   the asset purchase agreement that this was Lehman's seventy

17   billion dollar book value, if it indicated anything, indicated

18   a benefit to the estate.  It indicated to the Court that that's

19   the price that was agreed, when in fact, as Barclays now

20   admits, it was not the price that was agreed.  An embedded five

21   billion dollar discount was in the deal and the Court was never

22   told about it.

23        Now, there were at least three occasions -- well, just

24   one more point on the discount.  I mentioned that not everybody

25   knew it, and I've told you that not the lawyers knew it, and

18

1    Your Honor has seen in the record the testimony of Mr. Miller

2    that neither he nor anyone else at Weil Gotshal knew about a

3    discount or inflated liabilities.  And Your Honor has seen in

4    the record the testimony of Mr. Lewkow, testifying on behalf of

5    Cleary, that they were not involved in the economics of the

6    deal either.

7            So the discount was unknown to any of the lawyers, but

8    it also wasn't known to other Lehman executives.  This was a

9    small group of Lehman executives, all headed toward new careers

10   at Barclays as soon as this deal closed.  In fact, Mr. Lowitt,

11   who was involved in calculating the discount, by September

12   18th, the day before the sale hearing, was already under

13   contract to Barclays.  So when he's involved in the Friday

14   asset scramble, he's already got an irreconcilable conflict.

15           But other executives who were also at the center of

16   the action didn't know.  For example, Mark Shapiro, who was

17   head of restructuring at Lehman and is now head of

18   restructuring at Barclays, described himself as a quarterback

19   of the deal, in e-mails that are in the record before Your

20   Honor.  Well, we asked the quarterback of the deal what he knew

21   about a discount, and this is what he said.  I asked, "Well,

22   the seventy billion is based, as you said, on Lehman's marks,"

23   which was Mr. Shapiro's understanding.  "Do you know whether or

24   not, in selling the securities to Barclays, whether different

25   marks were used?"

19

1          This is Mr. Shapiro's answer:  "No.  These -- again,

2    as I recall, this seventy billion was a rough approximation of

3    the aggregate book value, you know, based on Lehman's marks on

4    the asset side of the deal, right?  So I would say no, there

5    was no discount, because obviously it was a book value."

6          And we've put in the record before Your Honor a

7    variety of depositions from a range of Lehman employees at the

8    time, all of whom say "I didn't know about a discount."

9          As I said, there were about -- there were three

10   different occasions to tell the Court the truth about the deal:

11   the filing of the sale motion on the morning of the 17th, the

12   written sale motion; the hearing that was held on the afternoon

13   of the 17th at which the debtor asked the Court to approve

14   truncated sale proceedings and the approval on the 17th of a

15   breakup fee; and the sale hearing on the 19th.

16         Excuse me, Your Honor.

17         But because disclosure was made impossible for the

18   Court, the lawyers not having been told, there was no

19   disclosure to the Court of these features of the deal at any

20   point.

21         Now, a chronology of what happens starting on the

22   15th, the 16th and the 17th I think is helpful here.  Before

23   the bankruptcy filing, Lehman and Barclays had had discussions

24   about a transaction, as Your Honor knows, and the scope of that

25   deal was a global purchase of the Lehman business.  That came

20

1    to a halt on Saturday for a variety of reasons not really

2    relevant here.

3           Lehman files in the early morning hours of the 15th,

4    and Mr. Diamond, the president of Barclays, testified at his

5    deposition about phone calls he had with Lehman personnel,

6    including Bart McDade and, I believe, Mark Shapiro, which led

7    to the resumption of talks between Lehman and Barclays, except

8    this time they were talking about a smaller deal where Barclays

9    would pick assets that it was willing to purchase and they

10   would take it to the Court for approval on a 363 sale.

11          By the -- the parties meet; they negotiate on the

12   night of the 15th.  By the morning of the 16th, there is a --

13   there's a deal; there are terms.  There's no written agreement

14   yet, but there is a deal.  That deal was described by Martin

15   Kelly, one of the people involved in putting together the

16   numbers for the deal, and this is what Mr. Kelly said to Mr.

17   Lowitt and to Mr. Tonucci:  "Well, it took all night and lots

18   of back-and-forth, but the deal is done and ready for the

19   board.  Final price did not change meaningfully:  approximately

20   a 5 billion, all-in economic loss versus our marks, and 3.6

21   billion of resi assets left behind."  Further in, he says,

22   "Also, an extra one billion of comp beyond our accrual, an

23   assumption of all trade payables in LBI and LBHI."

24          Further, Bart reviewed all of it before final

25   agreement; that's Mr. McDade:  "I'm going to try to get some

21

1   sleep and it will be in in the mid-morning."  In this e-mail

2   written at 5:10 in the morning on September 16th, Mr. Kelly

3   tells Mr. Lowitt and Mr. Tonucci about the discount.  And this

4   group of inside -- insiders knew about it.

5          In less than an hour, the misrepresentations about

6   that deal began, because at about 6 o'clock that morning the

7   boards of Lehman Brothers Holdings Inc. and Lehman Brothers

8   Inc. had a joint meeting by telephone.  Now, at that meeting,

9   which was attended by the board members, obviously, and also by

10  advisors from Weil Gotshal, Tom Roberts, Lori Fife, David

11  Lefkowitz, and advisors from Lazard, Barry Ridings, the board

12  was told the deal was a wash, was a wash, was an equivalent

13  exchange of assets and liabilities.  This is what the minutes

14  of the board reflect.

15         (Pause)

16         I'll get better at this, Your Honor.

17         Mr. Russo, the chief legal officer of Lehman at the

18  time, asked the board for comments, and the minutes reflect

19  that the directors summarized the consideration as follows:

20  Approximately 1 billion to the corporation for 745 7th Avenue,

21  250 million to LBI for the Lehman Brothers name, and

22  approximately 450 million to the corporation for the data

23  centers; those are two other buildings that were sold.

24         For LBI, the transaction was described as a wash, with

25  Barclays assuming liabilities, including employee liabilities

1    and contract cure amounts, basically equivalent to the assets.

2    That's what the board was told.  And based on what the board

3    was told at that meeting, it authorized the companies to enter

4    into the deal.  So off the lawyers went to draft the deal that

5    the board had authorized them to draft.

6          I should point out, Your Honor, that the minutes of

7    that meeting reflect that Ian Lowitt was present, and the

8    minutes of that meeting reflect that Ian Lowitt urged the board

9    to authorize this today, expressing concern that the broker

10   would not survive the day if they didn't do the deal.  But

11   while Mr. Lowitt was speaking, he said not a word about the

12   discount he'd read about less than an hour before in the e-mail

13   that he got from Mr. Kelly or the write-up of the employ -- of

14   the employee accruals upon which the numbers were based.

15         Now, the misrepresentations continue throughout the

16   morning.  Between the time of the board meeting at about

17   6 o'clock and about 11 a.m., a balance sheet was put together

18   upon which the deal was based.  This, Your Honor, if you read

19   the deposition transcripts, is the famous deposition Exhibit

20   19.  You will see answers from witness after witness that refer

21   to 19, Exhibit 19.  It became the souvenir of the case.  We

22   asked everybody about this balance sheet.  The reason we asked

23   everybody about this balance sheet is that Mr. McDade, the COO

24   of the company, described it as having a significant

25   relation -- those are his words, "a significant relation" -- to

23

1    the deal.  He testified the deal contemplated an assumption of

2    liabilities and the acquiring of assets, and this, referring to

3    Deposition Exhibit 19, represents the summation of those two

4    components of the transaction.  Mr. Birkenfeld, who was head of

5    legal, audit and compliance, and who actually signed the asset

6    purchase agreement for Lehman, described it as guidance as to

7    the assets of the deal.

8         So this is the balance sheet on which the deal

9    ultimately was based.  And it balances.  It shows a wash.  But

10   the reason that it shows a wash, Your Honor, is those cure and

11   comp numbers on the lower right-hand corer of the liabilities

12   column are inflated.  They were inflated by Martin Kelly and

13   they were inflated by people who worked for Martin Kelly, and

14   Barclays knew they were inflated.  And on the left-hand side,

15   the assets of the debtor that are going to be transferred to

16   Barclays are undervalued.  Witness after witness who was shown

17   and had knowledge about that balance sheet admitted that it

18   incorporated the five billion dollar discount.  This, for

19   example, is what Mr. Kelly said.

20        I asked him about Deposition Exhibit 19.  As far as he

21   knows, "sir, for these asset classes, exclusive of cash, were

22   they shown on Lehman books at an amount higher than sixty-two

23   billion or at about the time the schedule was prepared?"  His

24   answer was, "My understanding is yes, they were, in aggregate.

25   "Were they five billion higher?  Is that your understanding?"

24

1    And he answered, "Approximately five billion dollars higher."

2         Mr. Tonucci, who was also involved in preparing that,

3    gave an answer to the same effect:

4    "Q.   About five billion?

5    "A.   Five billion."

6         And Mr. Lowitt, the CFO of the company, gave this

7    answer.  When we showed him Exhibit 19, he said it wasn't -- he

8    quibbled with the word "recognized" when I asked him if the

9    discount was recognized in that schedule, but then said that

10   "the amount they were on Lehman's books for and the amount less

11   is probably the five billion that you referenced."

12        All three of these men admitted that that balance

13   sheet incorporated the discount.

14        Now, I've mentioned a couple of times that the lawyers

15   didn't know.  One of the lawyers who didn't know, Your Honor,

16   was Mr. Birkenfeld.  Mr. Birkenfeld, who, as I said, was head

17   of legal, audit and compliance and the signatory to the

18   agreement that was submitted to this Court, said he thought

19   that the balance sheet, Exhibit 19, was based on Lehman's

20   marks; that was his testimony.  And he got that information

21   from Martin and Paolo; that's Martin Kelly and Paolo Tonucci.

22        And when I asked him if there was a discount involved

23   in that, he said he had no knowledge of a bulk discount being

24   contemplated by the deal.  And when I asked him if he wanted go

25   know if a discount had been calculated, he would -- he said he

1   would ask Mr. Tonucci and Mr. Kelly.  "I would ask Mr. Kelly

2   and Mr. Tonucci."

3         Now, Mr. Birkenfeld also described himself, and this

4   is his verb, as lawyering the deal.  He was involved in

5   drafting; he was working with the lawyers who were drafting the

6   agreement; he was working alongside the Weil Gotshal folks who

7   documented the deal and brought it to the Court.  Mr.

8   Birkenfeld didn't know about any discount; Mr. Birkenfeld

9   didn't know about inflated liabilities; neither did Mr. Miller;

10  neither did the lead counsel or anybody on his team for the

11  debtor.  We asked Mr. Miller if he knew about a discount, and

12  this is what he said:

13  "Q.  Did it come to your attention in any way, sir, prior to

14  the time that you described the transaction to Judge Peck on

15  the 17th, one way or the other, that there was a negotiated

16  agreement for Lehman to give Barclays a five billion dollar

17  discount from the Lehman marks as part of this transaction?"

18        Mr. Miller's answer was unequivocal:  "No."

19        To be sure that we ran the board, with respect to Weil

20  Gotshal I also asked him -- because he was testifying as a

21  30(b)(6) witness on behalf of his firm and had investigative

22  issues concerning the transaction -- whether anybody at Weil

23  Gotshal knew:

24  "Q.  And were you or anyone else at Weil Gotshal privy to any

25  discussions concerning a negotiated" -- "a negotiation of an

26

1   overall five billion dollar loss versus Lehman's marks?

2   "A.  I don't believe so."

3          Now, that phrase, Your Honor, "overall five billion

4   dollar loss versus Lehman's marks", you'll recall, comes out of

5   Mr. Kelly's 5:10 a.m. e-mail.  Elsewhere in his deposition, Mr.

6   Miller told us he'd never spoken to Mr. Kelly, he'd never seen

7   that document, the lawyers weren't told.

8          Now, from a Rule 60(b) perspective, Your Honor, Rule

9   60(b) relief is warranted whether there is a mistake, or

10  whether there's an innocent misrepresent, or whether there's an

11  intentional misrepresentation, or, at its worst then, if

12  there's been a fraud on the Court, and any one of those will

13  work.

14         Your Honor recalls, and the record makes absolutely

15  clear, this was a tumultuous week.  Mr. Miller at his

16  deposition, in a twenty to twenty-five minute answer to the

17  very first question he was asked by Mr. Boise, described a

18  process by which lawyers were running around an enormous

19  conference room floor at Weil Gotshal, sleeping on the floor,

20  getting up, trying to negotiate, trying to get the information

21  they needed, trying to put together the information that they

22  needed to give to the Court.  It may well be that this failure

23  to transmit the five billion dollar discount information to the

24  lawyers who are going to stand in front of Your Honor was not

25  intentional, but from a 60(b) point of view it makes no

27

1    difference.  The proceedings were infected by a lack of

2    information on the part of the lawyers who were asked to make

3    disclosure to the Court.

4            I asked Mr. Birkenfeld, the drafter and signer of the

5    APA, about that very topic:

6    "Q.  To your knowledge, sir, were any of the people responsible

7    for making disclosures to the bankruptcy court told that there

8    would be some kind of bulk discount given to Barclays?

9    "A.  Not to my knowledge."

10           And Mr. Birkenfeld made clear that he did not have any

11   knowledge of a discount.

12           So the next thing that happens during the day, Your

13   Honor, is uninformed lawyers go ahead and draft the asset

14   purchase agreement and submit it to the Court as part of the

15   sale motion on the 17th.  And the asset purchase agreement

16   that's submitted to the Court on the 17th refers to a seventy

17   billion dollar long-position book value as of the date hereof.

18   It was a false representa -- it was a -- it was false; it was

19   not so.  And it was not so because the lawyers involved in the

20   drafting and the man who signed the agreement had no knowledge

21   of the difference between the seventy-five billion that was at

22   play and the seventy billion that was described.

23           In that same sale motion, Your Honor, the estimates

24   for contract cure and for employee liabilities that Lehman --

25   that Barclays was going to assume were put at 1.5 billion for

28

1    cure and 2 billion, and at times 2.5 billion, for compensation.

2    The lawyers did not know that those numbers were inflated.

3         Mr. Miller, by the way, offered at his deposition with

4    regard to a discount, and this won't surprise Your Honor, if

5    he'd known about a discount he would have told the Court, he

6    would have told the Court, but he wasn't in a position to tell

7    the Court.

8         Now, the next opportunity to bring accurate

9    information to the Court comes at the sale hearing on the

10   afternoon of September 17th.  The lawyers have come in; the

11   sale motion's been delivered to the Court; things are being

12   done in an incredible hurry.  The Court sees the parties and

13   hears an application for setting procedures that will result in

14   the sale hearing on as early as Friday, and is asked to approve

15   a breakup fee in the amount of 125 million dollars balanced

16   against the value of the deal.

17        Now, Barclays now says in their opposition papers,

18   Your Honor, that the discount's irrelevant, the written-up

19   liabilities are irrelevant, because in essence this was

20   supposed to be a deal where all assets were transferred

21   irrespective of what their value was, irrespective of what

22   their value was.  In other words, it didn't matter what the

23   values were worth, so it didn't matter what was said about them

24   to the Court.  Well, respectfully, Your Honor, we disagree.

25        It would have been an easy thing to say.  It would

29

1    have been an easy thing to say in the sale motion "Here's the

2    deal:  All the assets of Lehman are being transferred

3    irrespective of what their value was," but nobody said anything

4    like that.  And on the afternoon of the 17th, Your Honor asked,

5    Your Honor asked, "How do I value the overall value of the

6    transaction?"  And Mr. Miller gave you an answer, and this is

7    the answer that Mr. Miller gave you.

8            Now, as background to this, Your Honor, it should be

9    understood, of course, that the sale motion has been submitted,

10   the APA is already before the Court; so that's the piece that

11   tells Your Honor about the seventy billion dollar long

12   position.  What Mr. Miller describes here is the cash component

13   and exposure for 2.5 billion dollars in connection with the

14   retention of employees, and then says in addition to that, Your

15   Honor, in connection with the assumption and assignment of

16   contracts, the cure amounts and other payments in connection

17   with the contracts are estimated to be 1,500,000,000 dollars.

18   So we have four billion dollars right there, Your Honor.  He

19   then mentions the cash and brings the Court to a total of four

20   and a quarter billion dollars.

21           Elsewhere in that hearing, Mr. Miller said that the

22   deal would net 1.7 billion for the estate, but I think he was

23   there talking about the dollars that would be produced by the

24   sale of the real estate.  The point here, though, is he's

25   giving the Court valuation on the consideration that Barclays

30

1   is going to give for these assets:  1.5 billion for cure, 2.5

2   billion for employees; 4 billion dollars.  That's what the sale

3   motion had said.  This was consistent with what the sale motion

4   had said.  And except for one difference, it's roughly

5   equivalent to the balance sheet that had been developed that

6   morning, except that in the balance sheet, for reasons I don't

7   think anyone, anyone, in this room has ever been able to

8   explain, the cure estimate is put at that balance sheet earlier

9   in the day at 2-1/4, as opposed to 1.5.  Either number, though,

10  Your Honor, stands in stark different to what Barclays was

11  planning with respect to those assumptions of liabilities.

12       Barclays knew as Mr. Miller uttered those words to

13  this Court; Barclays knew when the sale motion was being

14  submitted.  Barclays knew throughout the week.  They had no

15  intention of paying anything close to those numbers; anything

16  close.  It also knew about the discount, because it had

17  insisted on the discount.

18       When we took the testimony of Barclays' executives

19  about this, they let us know that they had insisted on the

20  discount.  Mr. Varley, the chief group executive, told us he

21  was fixated on it; he was fixated on having a substantial

22  discount.  In a file that Mr. Varley keeps in his office, his

23  own file reflecting the documents he kept concerning the

24  transaction, there's a record of the five billion discount:

25  less negotiated discount, five billion.  That's a summary of

31

1    the transaction in Mr. Varley's files.

2          The Barclays board, on the 16th of September, the same

3    day the Lehman boards are being told this deal is a wash, is

4    told about the seventy-five billion dollar value that it's

5    going to receive:  forty-five billion of liquid assets and

6    thirty billion of less liquid assets.  And in a deal that was

7    described as a wash and where the numbers put to the Court

8    added up to a net benefit to the estate, Barclays' board is

9    told it can expect a three billion dollar gain from the deal.

10   That's before anybody sets foot in this courtroom.  And

11   Barclays, as I showed Your Honor before, now admits, with a

12   different reasoning, that the discount existed, and offers to

13   justify it but not to deny it.

14         Now, we took the deposition too of Jonathan Hughes,

15   Your Honor, the general counsel of Barclays, and he was

16   designated by Barclays as their 30(b)(6) witness on the gain

17   and on the negotiations and on the disclosures to the Court.

18   Mr. Hughes tells us, in what is a new version of Barclays'

19   story, that it was imperative to Barclays, it was always an

20   imperative to Barclays, it was -- I'm sorry -- always an

21   imperative that a gain be in existence on the first day.

22   Barclays insisted on a first-day gain.  And Your Honor has seen

23   in the record the testimony of Bob Diamond, the president of

24   Barclays, who says that it was a condition of the deal that

25   there be an asset/liability mismatch in Barclays' favor or he

32

1   had no authority to make the deal.  There had to be what he

2   referred to repeatedly throughout his deposition as capital

3   accretion.

4         This is what Mr. Diamond said:  "So when I say

5   capital-accretive, accretive to the capital ratios, which means

6   that the asset/liability mismatch had to have a mismatch in

7   favor of a positive capital accretion or we weren't authorized

8   to do a deal."  The Court never heard a word about that.  And

9   in the asset purchase agreement where there were conditions to

10  closing in section 4, that wasn't one of them.  This was

11  embedded in the deal from the very beginning.

12        We asked Mr. Hughes about disclosure to the Court of

13  this imperative.  This is what Mr. Hughes says:

14  "Q.  As a matter of fact, was the Court told it was imperative

15  for Barclays to make a first-day gain?

16  "A.  Not that I'm aware."

17        So what's their explanation for the Barclays windfall

18  that was never disclosed to the Court?  Mr. Hughes gives us one

19  version of the explanation:  "It shouldn't have been a matter

20  of concern to the Court if, without it being disclosed,

21  Barclays walked away with a windfall."  This is what Mr. Hughes

22  said.

23        I believe also that the Court felt that it was not

24  relevant whether or not that windfall profit did or did not

25  exist.  Even if it did, I think that the judge explained there

33

1    was a greater need in light of the turmoil in the markets at

2    that point in time.  Well, we've scoured the record for that

3    explanation, Your Honor, from the Court and it's not there, and

4    it couldn't have been.  If you don't tell Mr. Miller, he can't

5    tell the Court.  And if you don't tell the Court, the Court

6    can't balance a one-day windfall profit for Barclays against

7    the greater good.  And if the Court is told it's a wash or a

8    net benefit to Lehman, it certainly can't engage in that

9    balance, and it's -- the information available to it is skewed

10   to the point where the Court is disabled from doing its job on

11   a 363 transaction like this one.

12        Now, with respect to the assumed liabilities, Barclays

13   planned on them.  They insisted on a discount and they planned

14   on the liability numbers being inflated.

15        These, Your Honor, are handwritten notes made by

16   Archibald Cox Jr., one of Barclays' chief negotiators, on the

17   September 16th, '08 balance sheet.  This is the same balance

18   sheet that throughout its papers Barclays says doesn't matter.

19   Mr. Cox is making this note, and we've typed it in the top:

20   "No" -- "We need these contracts.  No one knows where the 800

21   million comes from.  The 200 million is for 3,000 contracts.

22   Mission critical.  How big will this number be?  200 million

23   estimated for 3,000 contracts.  Martin Kelly.  Lehman."

24        Now, what that indicates is that it was Barclays' plan

25   to pay in the range of 200 million for assumed contracts, not

34

1    1.5 billion as the Court had been told, and that they knew this

2    on the 16th.  As it turned out, they were about right.  Through

3    July of 2009, based on the filings before the Court, Barclays

4    took on cure payments in a range of 238 million dollars,

5    nowhere close to the estimate given to the Court for assumed

6    liabilities.

7           And it doesn't stop with Mr. Cox's notes.  These are

8    e-mails sent on the 16th of September, again, before anybody

9    sets foot in court, and it's Barclays referring to the Long

10   Island balance sheet.  Long Island was the internal term they

11   used for the Lehman deal, Your Honor.  And here in an e-mail

12   which is copied to Mr. Clackson, the CFO of the company, of

13   Barclays, they're calculating where they're going to get their

14   three billion gain, their three billion negative goodwill.  And

15   these numbers are in that exhibit, which is found in full at

16   page A-174 of our papers.  1.3 billion for bonus accrual.  Not

17   2 billion; 700 million less than that:  1.3 billion.  And for

18   external funding, that is, contract cure:  200 million dollars.

19   And the same Barclays that says "Now that that balance sheet I

20   showed you before had nothing to do with the deal" was actually

21   calculating its gain off of that balance sheet.

22          This is the e-mail from Mr. Clackson, the CFO, to Bill

23   Castell, and I'm going to spend a little time on this document,

24   Your Honor.  He writes, "Bill, this is the completion balance

25   sheet from the draft docs."  That, when Your Honor sees the

35

```
1    entire exhibit, and unfortunately from this I can't blow it
2    out, but at A-179, Your Honor, A-179, is a version of the
3    September 16th balance sheet that's been retyped onto a
4    spreadsheet.  And they're referring to it here as the balance
5    sheet from the draft documents, Long Island side, not bar cap.
6    This is Lehman's balance sheet.  And it gives the final asset
7    split.  And this is what Mr. Clackson writes:  "Negative
8    goodwill from this method is the sum of 2.25 plus 2, which
9    comes to 4.25, minus 1.35," that's the amount Barclays's
10   planning to spend, "generating 2.9 billion dollars gain."  And
11   all of this arithmetic is done before the sale motion is even
12   filed.  Barclays was laying in wait on those inflated
13   liabilities.
14        Now, the next day Mr. Clackson, the CFO, took a look
15   at the agreement that Barclays had signed and he realized it
16   actually expressly mandatorily makes Barclays responsible to
17   pay two billion dollars for bonuses.  Your Honor has seen that
18   in our papers, and I won't burden you with our argument with
19   respect to what 1.9(c) is.  That's our view of it too.
20        This is what Mr. Clackson writes on the 17th.  In an
21   e-mail he entitles "650 Million Dollar Problem", he writes to
22   Michael Evans, head of HR, and Rich Ricci, one of Barclays'
23   negotiators on the transaction, and says "This is a problem.
24   They have two billion in the agreement.  I was relying on you
25   guys telling me I needed 1.35 billion, which gave me 650
```

36

1    million of the goodwill."  But the paragraph below says "We

2    have to pay it to them.  We can't use it."

3          Now, look at the timing of this, Your Honor.  It may

4    well be that this is getting sent at exactly the same time the

5    hearing's being held on the 17th at which you're being told

6    four billion dollars total in assumed liabilities.  Barclays

7    knew it.  Barclays knew those numbers were false.

8          Mr. Clackson later in the week, coincidentally on the

9    same day as the sale hearing, is asked by people who appear to

10   be subordinates about that e-mail.

11   (Pause)

12         There's one in particular I want to find here, Your

13   Honor.  Here we go.

14         James Trevelyan (ph.) is writing to Patrick Clackson

15   on the 19th of September, and they're talking about some

16   uncertainty around the negative goodwill, and he says, "I think

17   it boils down to one point, which it seems is not well-

18   understood.  We understand broadly that the negative goodwill

19   arises because the 2.25 cure payment and 2.0 comp provision

20   won't be valued at that amount, but instead C 1.3," circa 1.3,

21   "the difference, 2.95 billion, giving rise to net assets for

22   which we pay .25," that's the 250 million, "leading to negative

23   goodwill of 2.7," Barclays' gain.

24         What is not understood is why we are not recognizing

25   either the cure or the comp at their full amount.  It would

37

1    really be valuable to get an understanding of how this works.

2    And Mr. Clackson responds to Mr. Trevelyan with the official

3    line.  The official line is that some of the compensation

4    relates to deferred plans, so it'll be accounted for over the

5    deferral period, and cure payments are optional.

6         Now, let me address that point very briefly, Your

7    Honor.  In the asset purchase agreement, it is so that Barclays

8    has the option of selecting contracts that it will cure.  No

9    dispute about the language of the APA.  But that begs the

10   question as to what the Court was told was the parties'

11   estimate, the parties' estimate, and those are the words from

12   the sale motion at page 5, the parties' estimate of what that

13   amount would be.  No one ever said to this Court it could be

14   zero.  If that was the intent, then putting any valuation on it

15   at all would have made no sense.  So the Court was told 1.5.

16   They're planning on spending -- they're planning on treating it

17   as optional and spending no more than 200 million dollars.

18        So, ultimately, what's the truth behind the balance

19   sheet upon which the deal was based?  This is the truth:  The

20   assets were discounted by five billion dollars, the cure

21   payment was inflated by approximately a billion dollars,

22   Barclays planned to pay between 140 and 200 million only, and

23   the compensation number was inflated by a billion as well.

24   Barclays never planned to pay more than 1.4 billion dollars.

25        Now, also in the record, Your Honor, and I commend

38

1    them to your reading, are transaction adjustment sheets which

2    were prepared by Mr. Kelly or people under Mr. Kelly's

3    supervision, which basically broke the number up till it got

4    where it was supposed to be.

5            So at the end of the day, the deal was based on a

6    false premise.  It wasn't the amount of assets the Court was

7    told; it wasn't the amount of liabilities the Court was told;

8    it was not the wash described to the board; it was not the net

9    benefit described to the estate when it came to this Court.  It

10   was built-in windfall gain for Barclays, which Barclays'

11   general counsel, as its 30(b)(6) witness, admits was never

12   revealed to this Court, and which the proof shows, we believe,

13   irrefutably, couldn't have been disclosed to the Court because

14   the lawyers didn't know about it.

15           So what happens next during the week?  Your Honor

16   knows there's been a lot of discussion of the repurchase

17   agreement and its role in the transaction.  Well, Your Honor

18   will recall that the Fed was supplying repurchasing agreement

19   financing to LBI at the beginning of the week and that it

20   allowed, once the transaction with Barclays was announced, that

21   it wanted out and Barclays should -- the phrase that's been

22   used is "step into its shoes".  As a matter of fact, that

23   phrase is not quite accurate, because Barclays didn't assume

24   the existing repo; it entered into a tri-party repurchase

25   agreement with Lehman of its own, and what it did is Barclays

39

1    extended to Lehman forty-five billion dollars, which forty-five

2    billion was used to cancel the Fed repo, and in return Barclays

3    got approximately fifty billion dollars of collateral to

4    support the repurchase advance; not uncommon, in fact routine,

5    in a repurchase agreement for the lender, the purchaser, to

6    take a haircut -- to take excess collateral to protect it in

7    the event that the borrower, the repurchaser, doesn't come

8    through on his obligations to repurchase.  In a normal

9    commercial context, that would entitle the lender to keep -- a

10   default like that would entitle a lender to keep the entire

11   amount.  In bankruptcy, however, that's not so.  In bankruptcy,

12   it would be viewed -- there was a safe harbor that protects the

13   lender; that's Section 559 of the Bankruptcy Code.  But the

14   safe harbor only extends up to letting the lender keep the

15   amount it advanced, and the excess collateral needs to be paid

16   back into the estate.  That becomes relevant two days later,

17   but that fact needs to be borne in mind with regard to the

18   repo.

19       So Barclays advances forty-five million.  Lehman's

20   supposed to deliver about fifty billion in collateral.  Your

21   Honor knows from the papers there were some operational

22   difficulties with respect to the delivery of the entire corpus

23   of roughly fifty billion dollars.  So Lehman went out and

24   borrowed 7 billion from Chase and delivered approximately 42.9

25   billion in actual collateral and put 7 billion on top of it,

40

1    bringing it into that 50 billion dollar range.

2          There's more discussion both in our papers and in the

3    papers to the creditors' committee, Your Honor, of the actual

4    valuation to the repo, but suffice it to say for our purposes,

5    the repo collateral is in the range of fifty to fifty-two

6    billion; this is what Barclays valued it at on Friday the 19th,

7    the day of the sale hearing.  Martin Malloy based -- he

8    analyzed the collateral that had come in and the cash that had

9    come in, and valued it at 52.19, giving Barclays a 7.19 billion

10   dollar cushion of excess collateral, a 14 percent margin over

11   the amount advanced.  Those numbers, Your Honor, are based on

12   the valuation applied to the collateral by Bank of New York.

13   Bank of New York is the collateral agent, and it's an agent for

14   Barclays.

15         In their papers, Your Honor -- and when I took the --

16   and in the declaration of Mr. Malloy that Barclays has

17   submitted, they suggest that Bank of New York wasn't able to do

18   an accurate valuation because it had to move too quickly.  What

19   they ignore -- well, when I took Mr. Malloy's deposition, he

20   had made -- he'd never spoken to Bank of New York about this;

21   he was just sort of assuming that was so.  And what they ignore

22   with respect to the Bank of New York valuations that were put

23   onto Barclays' books on the first day is that Bank of New

24   York's the largest collateral agent in the country; they value

25   over a trillion dollars a year in collateral.  They know what

41

1    they're doing.  And they put approximately a 52 billion

2    dollar -- well, 45 billion dollar on the collateral, topped up

3    with 7 billion in cash, bringing us to Mr. Malloy's number of

4    52.19.

5          Now we have to go back to the discount.  Your Honor

6    will remember that when the discount was first agreed, and Your

7    Honor will know from the testimony we put in our papers, the

8    original plan had been to write-down Lehman's books to reflect

9    the agreed price, not Lehman's book value but the agreed price,

10   embedding the discount in Lehman's books.

11         This is what Mr. Lowitt said:  "On the 17th, we were

12   believing that what we needed to do was mark the positions to a

13   level that was consistent with what Barclays were willing to

14   purchase them at."  Enter the repo; that doesn't have to happen

15   anymore.  The next proposal that's made is using a default on

16   the repo as a means of delivering the bulk discount to

17   Barclays.  This is evidenced in an e-mail sent by Gerard Reilly

18   to Messrs. Lowitt, Gelb and Tonucci and Kelly, where he says,

19   and we've highlighted it in paragraph 3, "Not clear on the

20   amount of block discount or how we make it happen.  Defaulting

21   on the repo could be best, as the discount could be taken from

22   haircut.  If not that, then we need to give business an

23   allocation of block discounts so they can mark down the books

24   tonight.  Does that create a problem, as it could tip the

25   broker early?  Would we rather have that be in the sale process

42

1    tomorrow?"   "Tomorrow" is the sale hearing, Your Honor.   This

2    is written on the 18th.

3           And in a slightly different form, this is ultimately

4    what happened:   On the morning of the 19th, on the morning of

5    the 19th, Barclays began to complain to Lehman about its view

6    of the value of the collateral in the repo; several witnesses

7    have testified about that.   Mr. Kirk, Mr. Seery, Mr. Keegan

8    from Barclays, have all said they looked into the repo.   And

9    Barclays said we don't like what this is worth, we're

10   uncomfortable with the collateral that we're getting.

11          Now, Mr. Seery also said that the repo collateral was

12   carried on Lehman's books on the 19th at approximately fifty

13   billion dollars.   And the repo collateral in the JPMorgan

14   repo -- in the original repo, the Fed repo, had been in the

15   same range:   50.6.   Now, that's not an exact comparison,

16   because the collateral base is not identical, but we're still

17   in that fifty billion dollar range.

18          Mr. Seery testified -- and we only found this out on

19   March 3rd of this year; we found this out after our original

20   motion was filed.   Mr. Seery tells us that after Barclays

21   complained about the market -- about the value at which Lehman

22   was carrying the repo collateral on its books and disagreed

23   with it, although it never showed its own analysis of what it

24   was worth, it demanded, and then Lehman agreed; Mr. Seery

25   pulled some traders together and they marked down the value of

43

1   the repo to liquidation value; liquidation value, a term this

2   Court never heard on the 17th or the 19th or at any other time.

3   So they marked the repo down from its roughly 50.6 billion

4   dollar value on the sheet that Mr. Seery was using, to 45.5

5   billion dollars.

6        These are Mr. Seery's notes.  And there's the 45.5.

7   That 1.9 comes into play later; that's part of the Friday

8   morning asset grab.  Those are the so-called unencumbered box

9   and those two are added together.  But this reflects the write-

10  down from 50.6.  And just to have a sense of the number under

11  Mr. Seery's cross-out, there it is:  50.64, written down to

12  45.5.  They write-down the value of the repo collateral to

13  liquidation value.

14        Mr. Miller, when he describes the deal is being done,

15  talks about avoiding a liquidation value sale because they're

16  trying to price this at the value of an ongoing business.  No

17  one tells the Court about this liquidation write-down, which by

18  a remarkable coincidence is in the range of five billion

19  dollars.  There's the discount.  There's the discount embedded

20  in the repo, delivered through the repo, except this time it's

21  worse:  It's five billion over fifty; it's not five billion

22  over seventy.  Their take is getting bigger.  Their percentage

23  is getting bigger.

24        And once again, it needs to be reiterated, the lawyers

25  don't know about the repo.  We asked Mr. Miller what was Weil

44

1    Gotshal's role:

2    "Q.  Weil Gotshal played no role in negotiating that repurchase

3    agreement, is that correct?

4    "A.  That's correct.

5    "Q.  And Weil Gotshal played no role in structuring the

6    repurchase agreement in any way, is that correct?

7    "A.  I don't believe so.

8    "Q.  And Weil Gotshal had no role as to determining the value

9    of the collateral that was put in that repo, is that correct?

10   "A.  Absolutely not.  Weil Gotshal has nothing to do with the

11   repo."

12          By the way, we also have testimony from Mr. Lewkow

13   that they were not involved, his phrase, "at all" in the repo.

14   The fact of the matter is, the lawyers knew there was a repo;

15   you'll know that by looking at the transcript of the sale

16   hearing and on the 17th, Your Honor, where there are stray

17   references to a repurchase agreement as a means of overnight

18   financing.  But nobody tells Your Honor what had actually

19   happened.  The repo had become the deal.  The deal by Thursday

20   the 18th was we're going to turn over to Barclays the assets in

21   the repo.  Mr. Seery tells us those assets were marked down to

22   liquidation value, and neither of those two facts is even

23   mentioned as part of the sale approval process that led to the

24   sale order.  And Mr. Miller had no role in it.

25          So let's talk a bit now, Your Honor, about what we

45

1  referred to as the Friday asset grab.  This is Friday morning.

2  As Mr. Seery tells us, as Mr. Kirk tells us in his testimony,

3  Barclays complained about the value of the assets it was

4  getting:  We don't like what we're getting, there's not enough

5  value here.

6          Let me stop at that point, because this is a point we

7  make in our reply papers, Your Honor.  The same Barclays that

8  tells the Court now that this was supposed to be a transfer of

9  assets, without regard to what their actual value was -- value

10 was irrelevant -- would also ask the Court to justify Barclays'

11 behavior here by saying, well, Barclays wasn't getting the

12 value it thought it was getting.  That left hand and right hand

13 can't clap, Your Honor.  They don't match.  Either Barclays is

14 right it was a value-based deal, in which case the obligation

15 was to tell the Court the truth, or Barclays is right about

16 there's no asset value and they had no right to complain.

17 Those two positions cannot be reconciled.

18         But in any event, on Friday morning they did complain.

19 They complained mightily.  They threatened not to close.  And

20 they sent people back.  They sent the negotiators back in to

21 demand more assets.

22         Michael Klein, one of the chief negotiators for

23 Barclays -- he's not a Barclays employee; he's an advisor, Your

24 Honor -- told us in his deposition that he was instructed by

25 his client to go back to Lehman and say they needed more

46

1   assets.  This is what he said:

2   "Q.  So did you make that request?  Did you come in and say --

3   did you, in sum or substance -- did you make it known to Lehman

4   that you needed more value?

5   "A.  Well, I made it know to the parties that were involved

6   that there needed to be more assets, because if there weren't

7   more assets, the transaction couldn't take place," just before

8   the sale hearing starts, according to Barclays.

9        Barclays tells us in their opposition papers that this

10  whole deal about additional assets was completed before the

11  hearing began, which to me, Your Honor, provides only more

12  reason it should have been told to the Court.

13       But Mr. Klein is sent back and he's to tell them --

14  he's to tell Lowitt and he tells McDade -- we need more assets,

15  and they go and try and find it.  And what follows, we describe

16  in much more detail than I can give you here, Your Honor, is

17  the Friday asset grab, a mad -- what Mr. Diamond, the president

18  at Barclays, called a scramble, a scramble for more assets.

19  And these are the assets that ultimately -- after Lehman's

20  looking in every nook and cranny to add more to the deal, this

21  is what gets added:  1.9 billion dollars in the so-called

22  unencumbered box, unencumbered assets they were able to find,

23  and approximately 800 million -- I think the number is actually

24  closer to 769 million -- of so-called 15(c)(3)(iii) assets.

25  15(c)(3) assets are assets that are to be held aside to protect

47

1    against liabilities to customers.  But as customer account

2    levels vary, 15(c)(3) assets can become available, can become

3    unencumbered.  And at least the view of the parties by the 19th

4    was that Lehman committed to give -- Mr. Lowitt committed to

5    put another 769 on the table.

6         Now, Barclays' claim in this case is also taken into

7    account, that is, where it lays claim to the so-called OCC

8    margin, which is valued at 2.3 billion.  We dispute that.  But

9    if their claim were also valued -- what that means is, on top

10    of the five billion dollar discount, five billion more was

11    added on the pile on Friday.  And, again, not a word breathed

12    to the Court about that.

13         This is what Mr. Klein wrote back to his client at the

14    end of the day:  "Great day."  This is addressed to Bob

15    Diamond, the president of Barclays Capital.  "Great Day.  We

16    clawed back 3 billion more of value in the transaction and cut

17    the building prices by 160 million tonight."  That latter is a

18    reference to a new appraisal that had come in on the 19th.  The

19    point here is that here Mr. Klein gloats that three billion

20    more, at least, has been added.  As it turned out, his

21    expectations were modest.  If you take the 2.3 into account,

22    it's even much more than that.

23         There appears to have been no limit to how much

24    Barclays demanded on that Friday morning.  Mr. Lowitt

25    recollected that he was given instructions by Mr. McDade to

48

1    find more assets in the three to four billion dollar range.

2    But the fact of the matter is, if you look at the testimony of

3    Mr. Kirk and the testimony of Mr. Ricci, one of Mr. Barclays'

4    negotiators, and their documents, you'll see that it really was

5    without limit; it was until Barclays said to stop.

6          At one point, Mr. Kirk wrote to Mr. McDade, "Rich

7    Ricci," one of Barclays' chief negotiators, "just told me he

8    won't blow up this trade by being a pig."  We asked Mr. Ricci

9    about that at his deposition.  This is what he said:

10   "Q.  At any point, did anybody at Lehman suggest that Barclays

11   was being piggish?

12   "A.  I remember having a conversation with Alex Kirk after we

13   had tried to seek more assets, and I expressed some discomfort

14   to Alex that I still didn't think we had enough assets, and he

15   said there's nothing left.  And I said something to him like,

16   well, fine, we're not going to be -- we're not going to be pigs

17   and go after every last nickel, we'll try to get comfortable

18   with what you've given us, and if that's the case we're done."

19         So that's the Barclays that on Friday morning said

20   unless you add more to our satisfaction, we're not going to

21   close.  That's the same Barclays that sat silent while

22   representations were made to the Court in the afternoon about

23   the value of the deal.

24         So let's talk now about what happens later that day at

25   the sale hearing on the 19th.  This is the third opportunity to

49

1    tell the Court the truth about the transaction.  No one did.

2    Those who knew didn't speak, and those who spoke didn't know.

3         Ms. Fife stood up and explained to the Court that

4    there had been changes in the deal; Your Honor will recall

5    that.  But she, like Mr. Miller, was not in on the economics;

6    she didn't know about the use of the repo; she didn't know

7    about the liquidation of the repo assets -- been used as an

8    excuse to add still more assets to the deal.

9         So when Ms. Fife explained the changes, she

10   unknowingly, unknowingly, gave the Court false information.

11   This is what she said; Ms. Fife said to the Court:  "In terms

12   of the economic changes, they result largely because of the

13   markets, unfortunately.  And from the time that the transaction

14   was actually entered till now, the markets dropped."  The

15   markets dropped, she said.  "And the value of the securities

16   dropped as well."

17        Well, Your Honor knows from Mr. Seery's testimony in

18   the record it's not because the markets dropped, it's because

19   the Lehman traders, at the instructions -- at the demand of

20   Barclays, reduced it to liquidation value.  It had nothing to

21   do with market value.

22        "So, originally we were selling assets that had a

23   value of 70 -- approximately 70 billion dollars, and today,

24   Your Honor, we're selling assets that have a value of 47.4

25   billion dollars."  That's what the Court is told on the 19th at

50

1     the sale hearing.

2           Ms. Fife continues to talk about the 45.5 in related

3     liabilities in connection with those assets, and goes on to

4     confirm that the same employee compensation agreements and the

5     same cure amounts on leases are in place.  So the 1.5 billion

6     dollar number the Court was given hasn't come down; the 2.5

7     billion dollar number the Court has been given hasn't come

8     down; only the value of the deal -- the supposed market of the

9     deal.

10          So where did that 47.4 number come from?  Witnesses,

11    throughout their testimony, were not able to tell us.  We asked

12    people; nobody was able to tell us.  And then when Mr. Seery

13    testified, we could see the number.  When Mr. Seery testified

14    about the markdown in the repo assets, he got to 45.5 billion

15    liquidation value.  The 1.9 billion of unencumbered assets is

16    added, and that adds to 47.4.  That's the number put in Ms.

17    Fife's hands to give the Court.  She describes it as a drop in

18    market value, and, unbeknownst to Ms. Fife, that's just false.

19    That's just false.  It's just not right.  So the Court was not

20    told this, and the lawyer -- because the lawyers didn't know.

21          So this is where things stood by the end of the 19th,

22    Your Honor.

23          I'm going to -- we have a -- this relates only to the

24    first two columns, Your Honor.  This adds up the numbers that

25    were given to the Court on the 17th and the 19th, and I'll come

51

1   later to the calculation of Barclays' windfall.  But if you add

2   what the Court's told on the 17th both in the motion papers and

3   at the hearing that afternoon, there's a long position of 70;

4   the real estate is at 1.45, which brings a total of 71.45.

5   When the 69 billion in related short positions are taken into

6   account, the 2.5 the Court was told would be paid for comp, the

7   1.5 the Court was told would be paid for cure, the 250 million

8   to be paid in cash, and the price of the real estate, is taken

9   into account, along with a potential 750 million dollar true-up

10  that at that point was in the deal.  You had that total, and

11  the net benefit to the estate from those calculations is four

12  billion dollars.  The numbers given to the Court on the 17th

13  said the estate benefited by four billion.

14          On the 19th, after the Court's been told the deal

15  changed, according to -- allegedly because of market value, the

16  financial assets have dropped to 47.4; the real estate's

17  dropped a bit to 1.3, the total there is 48.7; the repo

18  liability, that's based on Mr. Seery's calculation, is 45.5;

19  comp at 2; cure at 1.5; cash at 250 million; the real estate

20  again balancing out; brings a total of 50.55, which leads to a

21  net benefit to the estate of 1.85 billion dollars.  Two days

22  later, the deal is -- the Court is told in essence this deal

23  got a bit smaller because of the drop in the markets, so there

24  is a smaller benefit to the estate.  If you were to stop at

25  that point with those two columns, Your Honor, not a word has

52

1    been mentioned about what ultimately happens here:  an eleven

2    billion dollar profit to Barclays.

3          And that brings me, Your Honor, to the next phase in

4    the chronology, and that is the so-called clarification letter.

5    Your Honor knows, because we've written about it several times

6    in our papers, and it's been referred to in other proceedings,

7    that on Friday the 19th Ms. Fife told the Court -- not in

8    connection with the major changes when she was describing them;

9    when she was describing some other changes to the deal, which

10   were, relatively speaking, relatively insignificant to the

11   major changes she described -- she said that "there was some

12   confusion about whether some subsidiaries were being sold.  And

13   we've clarified in a clarification letter which we're hoping to

14   finalize and actually present to Your Honor whenever it comes

15   down there; in that letter, we're going to clarify that the

16   only subs that are being purchased by Barclays or Lehman

17   Brothers," et cetera, et cetera, and she names them.  That's

18   all the Court is ever told about the clarification letter.

19         As Your Honor knows, the clarification letter was not

20   shown to the Court on the 19th; it was not shown to the Court

21   at the sale hearing.  As it turns out, it may be that a draft

22   of the clarification letter had actually made its way into the

23   Court.  Mr. Lewkow, in his declaration submitted by Barclays,

24   says so in paragraph 11.  We asked him about it at his

25   deposition and he said it had been e-mailed and maybe the

53

1    lawyers could see it on their BlackBerries.

2            But he also said, when they looked at it when they got

3    back to the office, it wasn't a clarification letter that

4    reflected the amendments to the deal that it was supposed to.

5    It was -- they didn't agree with it; it had to be redone.

6            But if you were to look at that draft, Your Honor --

7    it's the draft that existed in the early evening of the 19th --

8    it actually bears a resemblance to what Ms. Fife was describing

9    with regard to the long position.  The strikeouts show seventy

10   billion dollar long position and an acknowledgment is no longer

11   worth that.  By the time the parties sign the clarification

12   letter, it bore no relation to what the Court had been told.

13           One of the things -- well, let me do this; let me show

14   you that draft I was just talking about.  This is the 9 -- this

15   is -- actually, this is the final; this is what happens to the

16   final clarification letter.  One of the things that's done

17   after the sale hearing is over, and after the sale order is

18   issued, is they change the definition of purchased assets in an

19   asset purchase agreement, a change that Barclays will now tell

20   you was immaterial.  They change the definition of asset --

21   purchased assets in an asset purchase agreement, and the

22   changes reflect that now the deal is to transfer the repo

23   assets and the so-called clearance boxes.  And the 15(c)(3) is

24   also referred to in that new section.  The Court hadn't heard

25   anything about those assets.  Barclays will say, well, this

54

1    clarification letter didn't change anything, because everything

2    was always in the deal, so it doesn't matter.  Again, strikes

3    me as a terrifically circular, definitely illogical, argument.

4    If that were so, you wouldn't have needed a clarification

5    letter at all.  It would be easy to say all the assets,

6    irrespective of what their value is.  You don't need a

7    clarification letter if that's true.  You certainly don't need

8    to clarify that you switched over to the repo as the asset's

9    being transferred.

10          Another change that was made in the clarification

11   letter, Your Honor, about which we've written a lot in our

12   papers, is in paragraph 13.  Let me give you -- give the Court

13   a little background on paragraph 13.  This paragraph has the

14   net effect of the parties agreeing retroactively to rescind the

15   notice terminating the repo on the 19th.  Let me unwind that a

16   little bit.

17          As it turned out, and we know this from the

18   declaration of Mr. Kaplan, the deputy general counsel of

19   Barclays, which is submitted in their opposition papers,

20   inadvertently somebody, probably from a Barclays back office,

21   issued a notice of termination of the LBI repo when the LBI

22   SIPA filing happened.

23          Now, that created a problem, and this paragraph is

24   what's supposed to fix that problem.  Here's the problem that

25   it created:  As of the sale hearing on the Friday, the lawyers

55

1    don't know the role the repo's playing in the transaction, and

2    none of them learn about the termination of the repo.  We know

3    this because Mr. Lewkow from Cleary told us in his deposition

4    the lawyers didn't find out about the termination until

5    Saturday, after the sale hearing was over.

6         Here's the problem it creates:  The termination of a

7    repo under Section 559 requires the excess collateral to be

8    paid back into the estate.  Now, by rights, if it really -- if

9    that was the deal, Barclays's supposed to get everything,

10   including the excess collateral; you're going to need the

11   Court's approval to work around the requirements of 559.  But

12   here's the real problem:  If you go back to the Court and you

13   ask for that approval, you've got to now tell the Court what

14   we're doing is exchanging fifty billion dollars in collateral

15   for forty-five billion dollars in cash.  In other words, the

16   discount's going to surface.  The built-in gain for Barclays is

17   going to be shown.

18        So the sequence of events through the clarification

19   letter is the emergence of paragraph 13 over the weekend.  And

20   that language, actually, Your Honor -- give me one second --

21   that language comes from Barclays.

22        One of the firms working with Barclays was Sullivan &

23   Cromwell, and Sullivan & Cromwell on Sunday, on Sunday, sends

24   in this language for the unwinding of the Barclays repurchase.

25   And if you were to compare this exhibit, A-183, with the final

56

1    clarification letter, which is -- I think it's Exhibit 32 --

2    you'll see that that, word for word, this is what winds up to

3    be paragraph 13.

4         Now, Mr. Lewkow and his partner Mr. Rosen both told

5    us, with regard to the repurchase agreement and with regard to

6    paragraph 13 and with regard to implications of the termination

7    of the repo under the Bankruptcy Code, there was no discussion

8    between the folks on the Lehman side of the table and the folks

9    on the Barclays side of the table.  There was no discussion

10   between Cleary and Weil about the implications.  But at the

11   same time, from the Barclays side of the table comes this

12   unwinding language, which has the net effect of avoiding coming

13   back to court to talk about the unequal exchange of fifty for

14   forty-five.

15        Your Honor knows from the papers that we have filed

16   that we consider it a significant basis of the movants'

17   application for Rule 60(b) relief that the clarification letter

18   was never shown to the Court.  That basis is made stronger by

19   the fact that the Court said on Friday night, during a hearing

20   that went past midnight, and not surprisingly, given the

21   magnitude of this deal, the Court will be here on Saturday.  "I

22   will be here in case there needs to be further hearings

23   regarding the sale order," Your Honor said, "and anybody who

24   wants to can show up."  Nobody came back to talk about the

25   changes in the clarification letter, because the parties had

57

1    determined the changes -- the change in the definition of

2    purchased assets, and the unwinding of the repo to evade 559,

3    were not material.

4         Let me go back to a theme that I think -- I hope I

5    have embedded in my argument by now.  The decision not to come

6    back to the Court is testified -- two lawyers testified about

7    it in their depositions.  Mr. Miller testified that he had a

8    conversation with his partners Mr. Roberts and Ms. Fife where

9    they determine that there were -- that it was not necessary to

10   bring the clarification letter back to the Court, because it

11   was in accordance with the deal as it had been approved.  Mr.

12   Lewkow has a different -- well, it's not a contrary memory, but

13   Mr. Lewkow remembers a conversation that took place at the

14   beginning of the closing on the 22nd, on Monday the 22nd, where

15   he says Mr. Miller looked at the assembled people and asked

16   does anybody here think we need to go back to the Court.

17   Nobody said anything.  They didn't.  The clarification letter

18   never came back here.

19        I need to stress this:  This is a decision made by

20   lawyers uninformed of the facts.  If you don't know the

21   economics and you don't know about the repo and you don't know

22   its use in the case -- in the transaction, and you don't know

23   about the markdown to liquidation value, the best lawyer in the

24   city is not going to be able to see the economic implications

25   of that and is not going to be able to see that there are in

58

1    fact material changes.  But the fact remains:  Not bringing the

2    clarification letter back to court is a mistake and an

3    egregious one.  It skewed this deal.

4         This letter, the clarification letter, amended the

5    deal.  Barclays contends it didn't amend the deal.  Barclays

6    says that it was consistent with the deal all along.  Well,

7    Your Honor has seen what we filed in our papers where, back in

8    June when we were asking for discovery, Barclays filed a brief

9    that described it as an amendment to the deal that was made

10   necessary because of the need for more assets.  They've

11   abandoned that position now.  We asked Mr. Hughes about that at

12   his deposition.  I read him -- I questioned him using, word for

13   word, the words from that memo, and he just said they're not

14   true.  They've just jettisoned that position, instead trying to

15   make the clarification letter disappear.  It won't disappear,

16   and it was never brought back here for approval, and it should

17   have been.

18        So what does Barclays say about that?  This deal had

19   to open before the markets opened on Monday.  It was critical

20   that the deal open before Monday, before the markets opened.

21   The asset purchase agreement actually said that the closing

22   agreement -- the closing needed to take place on the 22nd

23   unless otherwise agreed by the parties.  So they could have

24   moved it.

25        And with regard to the closing having to happen on

59

1    Monday or financial Armageddon happening, these were difficult

2    times, but even Barclays' own proffered expert, Dr. Saunders,

3    agreed this closing could have happened just as late as

4    Wednesday.  Mr. Rosen, the Cleary partner that we deposed,

5    conceded it could have happened on Tuesday.  And even if it was

6    supposed to happen on Monday, none of this excuses a failure to

7    contact the Court over the weekend and say there's been an

8    amendment to the deal, unless there's any doubt that it amends

9    the deal.  It says on its face it amends the deal.  And that

10   change, by the way, Your Honor, from "clarify" to "amend" was

11   made on the 19th.  And Mr. Lewkow, when I asked him about that,

12   testified that they changed it to an amendment as things got

13   more complicated.  All of that are arrows pointing toward the

14   conclusion the Court should have been told.  It wasn't, and it

15   was yet another missed opportunity to tell the Court what the

16   terms were.

17        So what are Barclays' various explanations for this

18   day?  And I've alluded to some of them.  The deal was

19   structured from the outset to give Barclays an enormous gain.

20   Barclays has offered several different explanations.  Their

21   first explanation they offered, Your Honor, was to mislead the

22   Court.

23        Your Honor will recall we came here in June of 2009

24   asking for Rule 2004 discovery, saying that, on the basis of

25   the very limited documents that we've been able to see, it

60

1    appears to us that there may have been a discount in the deal.

2           Now, two things are telling; one is what Barclays

3    didn't say back then.  Barclays didn't come into this Court and

4    say you don't need discovery because it doesn't matter, this

5    was a transfer of the assets regardless of what their value

6    was.  Would have been easy to say, but they didn't say it.

7    Instead what they said was that the gain which they had

8    announced in February was the result of successful post-closing

9    operation.  That's what they said.  The fact that thus far the

10   acquired businesses have performed well and have generated an

11   accounting gain has no bearing on the adequacy of consideration

12   when the transaction closed.  Had those businesses performed

13   poorly, or if they perform poorly in the future, Barclays would

14   not be entitled to a purchase price adjustment.  LBI is not

15   entitled to a purchase price adjustment, based on the positive

16   performance of those businesses thus far under Barclays'

17   management.  That statement's just not true.  The gain was on

18   acquisition; it was not the result of post-closing performance.

19   At the time, we showed it wasn't true, because we could --

20   Barclays' gain announcement, which came out in February of

21   2009, the excess -- which attributed the gain to the excess of

22   the fair value of net assets, acquired over consideration paid,

23   resulting in a 2.62 billion pound gain on acquisition.  That

24   translates to 4.2 billion dollars.  And then when they were

25   first asked to explain it, they said it was successful

61

1    operation of the company, and that's not so.

2         So where have they gone now?  What they say now in

3    their opposition papers is, well, it was no secret, everybody

4    knew there would be a gain, we announced it in a press release

5    and we mentioned it in an analyst call.  Now, the analyst call

6    took place in London on the 17th.  Even the transcript of it

7    was never submitted to the Court.  And when Your Honor looks at

8    the transcript of the analyst call which Barclays puts in its

9    papers and may show you today, look for a reference to the

10   assumed liabilities.  There isn't one.  It doesn't describe the

11   deal.  Same is true of the press release.  There is reference

12   in both of those documents to a spread between a long and a

13   short position, but there's absolutely no reference to the

14   consideration to be paid.  And when I asked Mr. Hughes about

15   the press -- and Mr. Hughes, by the way, conceded in his

16   deposition that's the sum total of their -- of the world-new

17   case; that's the sum total of their so-called disclosure.

18        When I asked him about the press release, and when I

19   asked him about the analyst call, even Mr. Hughes said, well,

20   they describe a very, very different deal than it was by the

21   end of the week.  So even if they had been shown to the Court,

22   they didn't reflect the deal that actually was done.

23        They say everybody knew there was a Barclays gain.

24   Let's just review again who didn't know.  Mr. Birkenfeld didn't

25   know, and he signed the agreement.  I asked Mr. McDade his view

1    about an embedded gain for Barclays; this is what he said:

2    "Q.  And the deal, as you understood it, both on the Tuesday,

3    September 16th and as it closed on the 22nd, in between those

4    two times, in your view, was there any embedded gain for

5    Barclays contemplated in that deal on day one?

6    "A.  No, there was not."

7         No, there was not.  There was no gain for Barclays

8    built into the deal that Mr. McDade made.

9         So to the extent Barclays returns to this mantra of,

10   well, everybody knew it was a transfer of assets regardless of

11   their value, and to the extent they attempt to take that mantra

12   and attribute it to Lehman's lawyers, it will ignore two

13   things:  It will ignore the fact that Mr. Miller testified he

14   was not involved in the economics, he was not aware of a

15   discount, he was not aware of inflated liabilities, and if

16   there was a discount he would have told the Court; and just as

17   importantly, Your Honor, it ignores the fact that if indeed

18   that were Mr. Miller's view of the deal at the time, it's not

19   what he said.  The transcript says what he said, and it's not

20   what his client thought.  His client thought there was no

21   embedded gain in the deal.

22        I don't -- I think it's -- it flows all from the

23   fundamental failure to tell the lawyers the material facts.

24   But the client knew what deal they made.  There was no embedded

25   gain for Barclays.  And Mr. McDade even conceded -- didn't

63

1    concede; he said, when I asked him:

2    "Q.  And given what you heard in the bankruptcy hearing on the

3    19th of September where you heard the deal described to the

4    judge as essentially a balance --

5    "A.  Right," he says.

6    "Q.  -- it would have been important in your view, sir, to tell

7    the judge if it was not in fact in balance, because that's a

8    different deal, is it not?"

9           There's Mr. McDade's answer:

10   "A.  Most definitely, yes, sir."

11          But nobody told the judge it was a different deal.

12          I may be bumping up against the time limits Your Honor

13   wants to strictly observe or -- but if I could just take two

14   minutes to just review very quickly where I think we are on

15   60(b) relief and some of Barclays' defenses?

16          THE COURT:  Fine.  Finish your argument.

17          MR. GAFFEY:  Rule 60(b), Your Honor, allows for relief

18   on a variety of grounds:  under (b)(1), mistake; under (b)(2),

19   newly discovered evidence; under (b)(3) and (b)(6), intentional

20   misrepresentation or innocent misrepresentation; and under

21   (b)(3)(6) and (d), fraud on the Court by an adverse party, or

22   fraud on the Court itself, which can be committed by any party.

23          We have argued each of these grounds for 60(b) relief.

24   We have urged the Court that if it needed to reach out as far

25   as whether intentional misrepresentations were made to the

64

1    Court, we believe the basis is there for a scienter finding.

2         We have shown the Court in our papers that the Lowitts

3    and the Kellys and the Tonuccis of the world were conflicted.

4    They were on their way to new careers; they were serving their

5    new master.  Tonucci -- Lowitt, for example, testified that

6    when he got involved in the Friday asset grab, he was

7    instructed both by Mr. McDade, who would be his current boss,

8    and Mr. Ricci, who by the way would be his future boss, to go

9    look for more assets.  He doesn't even know who he's -- whose

10   instructions he's supposed to be following, and at that point

11   he's under contract to Barclays already.  Barclays offered

12   employment to virtually all of the negotiators.

13        If the Court needs to reach it, the evidence is there

14   to support scienter.  But the Court doesn't really need to

15   reach it; innocent misrepresentation is enough.  The fact of

16   the matter is, without characterizing who's the one who decided

17   to give the Court false information, false information was

18   given to the Court and material information was not disclosed.

19   One main reason it was not disclosed is the lawyers weren't

20   told.

21        And let me briefly address some of Barclays'

22   preclusion-based defenses.  One of the things that Barclays

23   says is that the movants' motions are not timely.  And that

24   leads to a variety of different defenses.  Not timely --

25   because they'll tell you, they'll say, they'll argue, everybody

VERITEXT REPORTING COMPANY

212-267-6868                                        516-608-2400

65

1    knew about the gain.  They took depositions of some folks at

2    Alvarez & Marsal, the firm that was brought in to run Lehman

3    after the bankruptcy, and they show them occasionally a

4    paper -- or a slide; there's a slide that refers to a discount

5    on October 8th.  And they'll tell you every -- we should have

6    been running into court by the 7th, by the 10th, by the 11th of

7    October.  I won't dwell on it.  We've put in a detailed record

8    on this.  Let me review the big pieces of that.

9         Every single employee with knowledge of how the

10   company operated, bar one or two, went over to Barclays.  The

11   accounting systems went over to Barclays; the computer systems

12   went over to Barclays.  The people who were left with the

13   company to run had no clue it was in chaos.  Both Mr. Marsal

14   and Mr. Kruse testified for Alvarez & Marsal that what they had

15   to do was first wrap themselves around the project that they

16   had been assigned to do, and figure out the data, hold the

17   data, and then move.

18        It wasn't until the early part of the year that

19   Barclays even announced a gain.  The creditors' committee will

20   tell you they were banging on the door trying to get

21   information, getting told no.  In the early part of the year,

22   Alvarez & Marsal asked for information as it appears that -- as

23   it appeared that the compensation amounts weren't footing when

24   they preparing the year-end accounts.  Barclays rejected it.

25   Barclays said no.  Barclays produced no useful information.  We

66

1    had to come to the Court to get an order that Barclays produced

2    the information under compulsion.  That same Barclays says we

3    should have moved earlier.

4         What actually happened here, Your Honor, is, once we

5    got the Court's imprimatur on getting the information that we'd

6    been asking for for months, we ran through the summer.  We took

7    dozens of depositions.  We weren't even able to get the

8    deposition of Mr. Klein, a principal negotiator for Barclays,

9    until September 12th, owing to the fact that that's when we

10   finally were able to get him in a room.  And we moved three

11   days later.  We met the deadlines for 60(b).  So the motion is

12   timely.

13        The other estoppel-based defenses, Your Honor, their

14   reference to the so-called mandate rule, are off-kilter and

15   off-point.  The mandate-rule argument, as I understand it, is

16   essentially because another creditor concerned about another

17   issue, that is, the so-called defalcated funds, brought in an

18   appeal from the sale order, which was -- and the sale order in

19   that context was affirmed by Judge Coate (ph.).  The mandate

20   rule, which is an offshoot of the law of the case doctrine,

21   somehow precludes the Court from considering this new evidence.

22        Well, quite apart from anything else, new evidence is

23   an exception to the mandate rule.  But at its more basic level,

24   the mandate rule, as an offshoot of the law of the case

25   doctrine, only bars those things which were necessarily decided

67

1    expressly or by implication.

2          Nothing about the Bay Harbour appeal had anything to

3    do with the representations made to this Court about the nature

4    of the transaction.  It was a creditor complaining about the

5    process.  We don't contest that the process was the best the

6    Court could do under the circumstances that it had and based on

7    the information it was given.  It's apples and oranges.  They

8    just don't compare.

9          So at bottom, Your Honor, the facts were hidden, or at

10   least they were not disclosed to the Court.  The issuance of

11   the sale order was skewed -- was based on a skewed and a

12   distorted record.  The sale order's reference to the

13   clarification letter was a reference to a document that the

14   Court had not been shown.  The clarification letter that was

15   executed went beyond the bounds the Court had set.  It made

16   material changes which would have required court approval; no

17   one came back and asked for that approval.  And the fundamental

18   aspects of the deal, an embedded five billion dollar gain for

19   Barclays and five billion more added on top, put into a phony

20   hole, was added onto the deal, resulting in this finally being

21   the deal that they closed.

22         As of Friday afternoon, it's supposed to be a 1.85

23   benefit to the estate.  The deal that actually closes when you

24   take Barclays' valuation of the financial assets, adjust them

25   for what was really the value -- and that Your Honor will see

68

1    in our expert reports Barclays' accounting for the intangibles,

2    two billion dollars right there -- totals to fifty-nine

3    billion.  What it actually paid, with adjustments for the cure

4    that it did pay and for the bonuses that it did pay, you have a

5    profit to Barclays of 11.2 billion dollars.

6           Now, that number grows even further when you consider

7    it against the spread.  When Your Honor leaves the court on

8    Fri -- in the early morning hours of September 20th, the

9    estate's supposed to benefit by 1.85.  Barclays in fact gets

10   11.2.  That's a thirteen billion dollar spread.  Rule 60(b)

11   relief is warranted here, Your Honor, whether it be by mistake,

12   by innocent misrepresentation, by intentional

13   misrepresentation, or by fraud on the Court.  Material

14   information was withheld from the Court, and the information

15   given to the Court was in material part incorrect and false.

16   And Barclays knew it and never did anything to correct it.

17          So unless Your Honor has any questions, I'm happy to

18   rest on our papers with regard to the rest.

19          THE COURT:  That's fine.

20          MR. GAFFEY:  Thank you, Your Honor.

21      (Recess from 11:33 a.m. until 11:43 a.m.)

22          THE COURT:  Be seated, please.  I'm sorry that turned

23   out to be a much longer break than planned, and it's a good

24   thing we took the break, because we had technical difficulties.

25          Let's proceed.

69

1          MR. KIRPALANI:  Thank you, Your Honor.  I took the

2     liberty, Your Honor, during the break, of just handing up the

3     written version of our presentation to the Court --

4          THE COURT:  Thank you.  I have it.

5          MR. KIRPALANI:  -- and to the clerks.

6          Your Honor, this is not a case about seller's remorse,

7     nor is it a case that threatens to undermine what every

8     bankruptcy lawyer knows is a bedrock principle of sale orders.

9     They are final.  Indeed, that very finality is what garners the

10    highest possible price and maximizes value.  That's the public

11    policy underlying the principle; that's the ultimate aim of a

12    bankruptcy estate.  No one can quarrel with that.  But Barclays

13    reads that principle so myopically that it does not see the

14    even greater public policy at play, one that not only supports

15    finality but provides the roadmap for how to achieve it.  That

16    is transparency.

17         Why, Your Honor, is there judicial oversight in

18    bankruptcy cases?  Why is there an examiner statute?  Why is

19    there a statute providing for the public's access to papers?

20    The answer is simple:  because what this Court does each day

21    matters well beyond any particular case; what this Court says

22    each day shapes the behavior of those coming before you and

23    other courts.  And just as this Court may be more closely

24    watched than a court in a small town somewhere, this case is

25    more closely watched than any other in the history of

70

1    bankruptcy, and this Your Honor already knows.

2         We take issue, Your Honor, with Barclays' position

3    that Rule 60(b) is somehow less available in the context of a

4    Section 363 sale and that, even if it were available, the

5    committee was dilatory in how long it took to bring it to the

6    Court's attention.  Honestly, I find both positions almost as

7    shocking as the facts we have unearthed in support of our

8    motion.

9         First, with respect to the question of whether Rule

10   60(b) is disfavored more in the bankruptcy context than in

11   other civil contexts, the committee would say Rule 60(b) is

12   always disfavored.  In fact, it is often the last resort when

13   parties learn something went very wrong and the Court needs to

14   know about it.  These motions are not brought lightly; they

15   aren't for the faint-of-heart.

16        So whether we used Barclays' citations to cases saying

17   Rule 60(b) is, quote, "very limited", or there needs to be a,

18   quote, "fundamental defect which would shock the conscience",

19   or there needs to be, quote, "compelling equities", the

20   committee feels what happened in this case meets all of the

21   above.

22        What happened here isn't about whether specific words

23   from cases that attempt to enunciate a legal standard can be

24   met.  No one in this world knows better than Your Honor whether

25   you were told everything you feel you needed to be told as the

71

1    judicial guardian of this estate.  It does not matter what

2    phrase Barclays wants to try and limit the Court to as the

3    applicable standard.  Your Honor knows it when it sees it.

4         We do take serious legal debate with Barclays' claim

5    that Section 363(m) somehow insulates them from Rule 60(b),

6    because this Court's sale order specifically found that

7    Barclays is, quote, "entitled to all of the benefits and

8    protections afforded by Bankruptcy Code Section 363(m)".  This

9    is perhaps the greatest circular argument ever presented to a

10   bankruptcy court in the context of a case where disclosure was

11   lacking, and it also happens to be wrong under the law.  This

12   is not about an unsecured creditor that did not receive the

13   auction notice; that's the lone case from Vermont cited as

14   authority for that proposition.  Although Barclays cites two

15   Second Circuit cases, Gucci and Salerno, in the same breath as

16   Rule 60(b), Your Honor knows neither of those cases involve

17   60(b) at all.  They were direct-appeal cases where the Court

18   was applying Section 363(m) as written.  Your Honor should do

19   the same with the rule, which is expressly incorporated into

20   bankruptcy proceedings by Bankruptcy Rule 9024.

21        And although there are federal appellate courts that

22   have made it crystal clear that Rule 60(b) is as applicable to

23   sale orders under Section 363 as any other civil proceeding,

24   the district court in the American Freight System case hit

25   Barclays' public policy argument squarely on the head.  It

72

1   held, and I quote, "The Court is similarly unpersuaded by

2   Appellant's argument that the bankruptcy court's decision to

3   set aside a sale order undermines public policy interests.  As

4   the debtor appellee points out, the purpose of the finality

5   rule is to obtain the highest price for the debtor's assets for

6   the benefit of the debtor's estates and ultimately the

7   creditors.  If defects in notice result in the debtor's assets

8   being sold for an inadequate price, strict adherence to the

9   finality rule would require a result contrary to the rule's

10  underlying purpose of achieving the highest possible price,"

11  end quote.  And the cite for that is 126 B.R. 805, at note 2.

12      That case is particularly instructive for us here,

13  Your Honor, even though there are no billion dollar figures in

14  it.  There, the bankruptcy court oversaw the sale of attractive

15  real property, which was advertised in the notice to creditors

16  as being seventy percent of the appraised value.  Although many

17  bits of information were arguably available from which a

18  diligent creditor could have deciphered this to be untrue, the

19  Court subsequently learned that in fact the price was only

20  fifty-five percent of the appraised value.  The Court noted

21  that while "inadequacy of price alone is insufficient to set

22  aside a sale, inadequacy of price, coupled with a lack of

23  notice or other unfairness or impropriety, may cumulatively be

24  sufficient to set aside a sale."

25      The Court went on to say, "The Court concludes that

73

1    the inadequacy of price may be sufficient in this case to

2    require setting aside of the sale, and that the inadequacy,

3    coupled with the misleading, if not erroneous, notice sent to

4    creditors, is sufficient under the law of this circuit to cause

5    the sale to be set aside.  Neither the creditors nor the Court

6    should be required to read the notice and the enclosures, seek

7    the backup documents, read the legal description and then

8    extrapolate from it that the description in the bid may contain

9    more acres than that recited in the appraisal summary.  This

10   the Court finds to be an unreasonable amount of sleuthing,

11   particularly given the language of the notice and the actual

12   knowledge possessed by both the debtor and the prospective

13   purchaser."

14         Why, Your Honor, is sleuthing an unreasonable task for

15   bright judges and creditors?  Why is the onus on the parties to

16   the transaction to come forward and explain the real

17   transaction or to correct statements that leave creditors and

18   the Court with the wrong impression of the deal?  Why does it

19   matter if the sale was not as advertised?  Why couldn't the

20   purchaser in American Freight simply rely on the cobbling

21   together of the operative legal documents and hold onto their

22   windfall?  The answer to any bankruptcy lawyer is self-evident,

23   but we appreciate that self-evidence is not binding precedent

24   on this Court.

25         So we look to statements by our court of appeals.  In

1   the landmark decision by the Second Circuit in Lionel

2   Corporation, the court of appeals had occasion to outline under

3   what circumstances a substantial asset sale could occur in

4   bankruptcy outside of a Chapter 11 plan.  While they do not

5   take issue with this Court's finding that the broker-dealer

6   business was rapidly deteriorating, the Lionel decision stands

7   for much more than that.  The Court cautioned why significant

8   bankruptcy sales under the Code should normally be done under a

9   plan.  The reason, as this Court knows, is disclosure.

10      Reciting the report of the committee on the judiciary

11  that accompanied the 1978 Code, the Court noted the key to the

12  reorganization chapter is disclosure.  It further cautioned,

13  citing United States Supreme Court, "The need for expedition is

14  not a justification for abandoning proper standards."

15      So how does that inform what we are alleging in our

16  motion, Your Honor?  Nothing has ever, and in all likelihood

17  nothing will ever, resemble the extraordinary need for

18  expedition that Your Honor faced on September 19th, 2008.

19      The asset purchase agreement had been filed just a few

20  days prior and needed to be amended on the record by tens of

21  billions of dollars.  The actual plumbing pipes of the most

22  significant and complex bankruptcy sale in history were still

23  being ordered and not even available for delivery to the Court

24  for Your Honor's review, even though Your Honor wanted them.

25  And you said you would wait all weekend.

1      Preeminent counsel were present in the courtroom

2    explaining in real time exactly what changes and clarifications

3    needed to be made and why these changes needed to be made, and

4    virtually every relevant regulator stood before you begging

5    this Court's indulgence to approve this massive transaction

6    even in the absence of finalized agreements or fulsome

7    disclosure of every little detail.

8      So what burdens come with that ask?  The burdens are

9    fundamental to Chapter 11.  The burdens are that every person

10   in the courtroom, with you listening to the record, must come

11   forward and ensure the Court has a proper understanding of the

12   transaction it is about to approve, in large part on faith in

13   this process.  To borrow from the Book of Common Prayers, the

14   faith this Court had in the process of September 19th called

15   out for a speak-now-or-forever-hold-your-peace level of

16   disclosure.  The sanctity and finality of that particular sale

17   order required it under the circumstances, and every single

18   person here knew it as they sat here.  Despite Barclays sitting

19   in the courtroom, they adopted the position that silence is

20   golden, especially, Your Honor, when we're talking about more

21   than five billion dollars of gold.

22      So, Your Honor, how we reconcile the needs of Chapter

23   11 with Section 363 is just that:  disclosure.  And that's how

24   we feel about Rule 60(b)'s place in the most historic

25   bankruptcy sale of all time.

1          Now, Barclays had another objection to our motion,

2     suggesting that even if the Court did not have everything

3     before it to fully understand the transaction, the committee

4     certainly did.  And we laid in the weeds, Your Honor, until

5     just before the one-year period expired.  That's their

6     allegation.  According to Barclays, we did not move, consistent

7     with the rule, within a reasonable time.

8          The committee needs the Court to see what we saw

9     before we obtained the Rule 2004 discovery.  Although Barclays

10    would have this Court believe that the committee had the

11    complete picture, the facts belie that assertion.

12         As Your Honor may recall, the committee was appointed

13    on Wednesday, September 17th.  Forty minutes later, my former

14    partner from Milbank came to this Court and asked for a brief

15    adjournment of the bid procedures hearing.  On Thursday,

16    September 18th, the committee's professionals marched over to

17    Weil Gotshal to learn what this transaction really was and why

18    was it the best alternative for the creditors.  So with that,

19    let's see what we saw.

20         On September 18th, the day before the sale hearing,

21    Lehman gave this balance sheet to us as the description of the

22    transaction.  As Your Honor can see, when asked to understand

23    this transaction, we were told total assets equals total

24    liabilities at 72.65 billion dollars.

25         The next, Your Honor, when deposed under oath, the

77

1    committee's financial advisor testified that his understanding

2    of the transaction was it was, quote, "essentially an even

3    exchange".

4         The next slide, Your Honor, here's what we're told

5    next:  Lehman's senior management was rattling off numbers in a

6    deal-frenzied conference call, starting with 50.64 billion

7    dollars in assets, and then they told us to forget all that,

8    scratch it.  Then they said, "Saul," referring to Mr. Burian,

9    "let me tell you what's really going on."  And this is not even

10   in dispute, Your Honor.  When Mr. Seery was asked at his

11   deposition whether he told Mr. Burian, the committee's

12   financial advisor, to forget what he said about values being

13   fifty billion dollars, he agreed; he said it would be along

14   those lines.

15        Now, Mr. Burian took contemporaneous notes of this

16   conversation on that morning of the sale hearing, and here's

17   what he wrote, verbatim what Mr. Seery told him, and then he

18   crossed it all out with a big X when Mr. Seery -- or Mr.

19   Shapiro told him to forget it.

20        So Mr. Burian then wrote down what his understanding

21   was of the transaction, just before coming down here to court

22   for the sale hearing.  This completely fitted with what was

23   told to the Court by the debtors' counsel:  47.4 billion

24   dollars in assets in exchange for assuming 45.5 billion dollars

25   in liabilities associated with the book, plus some other

78

1    liabilities that Mr. Gaffey went through.

2          And Mr. Seery himself had been preparing his own

3    private notes at the same time, notes that supported the 47.4

4    billion dollar number he had given to the committee, that is,

5    the 45.5 billion dollars in long positions under the book, plus

6    1.9 billion dollars of something else.  We later learned this

7    was the unencumbered box.

8          And then everyone came to court, and Your Honor was

9    told what was going on by Ms. Lori Fife of Weil Gotshal.  She

10   explained, quite consistently with what Mr. Seery told Mr.

11   Burian, she said, quote, "Let me try to summarize the changes

12   that were made to the transaction.  In terms of the economic

13   changes, they result largely because of the markets,

14   unfortunately.  And from the time that the transaction was

15   actually entered into until now, the markets dropped in value

16   and the value of the securities dropped as well.  So,

17   originally we were selling assets that had a value of 70 --

18   approximately 70 billion dollars, and today, Your Honor, we're

19   only selling assets that have a value of 47.4 billion dollars."

20         But what does that mean, Your Honor, when Ms. Fife

21   said we went from 70 billion dollars in assets to 47.4 billion?

22   Well, we know Ms. Fife said this reduction was, quote, "because

23   of the markets, unfortunately," end quote.  We also know that

24   the APA said the seventy billion dollars was the, quote, "book

25   value", which Your Honor knows, in the context of a broker-

79

1    dealer, book value equals mark-to-market value.  So we were

2    always talking about the market value of the book, always.

3          Other comments by the debtors' counsel support this

4    understanding.  Mr. Miller addressed the Court in stressing why

5    this sale needed to go through.  Aside from the human issue of

6    employee jobs, he said, quote, "The volatility and distress of

7    the liquidation of collateral positions will be unmatched in

8    history," end quote.  That was of course if the sale, as a

9    going concern, was not approved.

10         Mr. Miller then went on to say what an extraordinarily

11   exceptional case this is.  He stressed that, quote, "If we miss

12   this opportunity," referencing the sale to Barclays, "we are

13   talking about a wholesale liquidation with all the consequences

14   that come out of that liquidation," end quote.

15         So, Your Honor, we got it:  Sell this thing as a going

16   concern or else liquidation will ensue, billions will be lost.

17   Even Your Honor understood this point quite clearly that was

18   being driven home by everyone that came before it on that

19   Friday to Saturday.  Your Honor noted at the hearing, quote,

20   "Substantially all of the going-concern value that exists

21   within these assets is to be preserved."  Exactly.  That's

22   exactly what the committee thought as well, Your Honor.

23         And then came the evidentiary record, the testimony of

24   Mr. Ridings on behalf of Lehman.  Through his proffer, he

25   testified "These assets have substantially greater value if

80

1    they are sold as a going concern.  Without Barclays, Lehman

2    would be forced to sell discrete assets for a fraction of the

3    value that will be realized from this transaction," "this

4    transaction" obviously referencing, stressing for the Court,

5    going concern, exactly what courts in Chapter 11 believe is

6    their mission in life.

7          Next, Your Honor, completely unbeknownst to the Court

8    and to the committee, at the very same time, something else was

9    going on between a few senior members of Lehman and the entire

10   Barclays team.  Mr. Seery testified that, as of September 19th,

11   Lehman had marked its book-to-market, and he said he believed

12   it was worth about fifty billion dollars according to Lehman's

13   books and that he had confidence in those books.  What Your

14   Honor was never told, and neither was the committee, is that

15   Barclays had been insisting that Friday that Lehman come up

16   with, quote, "liquidation bids" for the collateral underlying

17   the Barclays repo.  Barclays did not agree to use the market

18   value on Lehman's books, despite what the APA said, despite

19   what Ms. Fife had said.  They wanted a liquidation bid, despite

20   everyone's understanding, including Your Honor's.  That's the

21   whole point was to avoid value destruction from a liquidation

22   and to preserve the going-concern values.

23         And in case there's any doubt as to what Barclays

24   meant when it insisted on Lehman coming up with a liquidation

25   bid, they defined it for Mr. Seery.  They said, quote -- this

1    is Mr. Seery's testimony -- "If you had to sell the full size

2    in a short period of time, what kind of discount would you need

3    to give to buyers in order to move that full size?"  Your Honor

4    knows what that means.

5            So was that really how Lehman came up with the 45.5

6    billion value out of the 47.4 billion?  We saw Mr. Seery's

7    notes earlier, but we had to ask the question point-blank, and

8    here's what he said, quote, in his deposition, in the response

9    to the question:

10   "Q.  And so you're talking about the total estimated value once

11   you apply the haircut that your Lehman traders had used to

12   estimate the discount that would be given to a buyer if they

13   sold all of those securities at once, and at a liquidated

14   value, at a short amount of time.  Is that correct?

15   "A.  That's a little too scientific."

16           So then we pressed:

17   "Q.  And when you say it is not exact, you mean you can't

18   exactly find out the calculation of the 45.5 because the

19   haircut that appears on here is 6.04, is that right?

20   "A.  Right, right.  That's correct."

21           Wait a minute, Your Honor; liquidation bids?  Haircuts

22   to Lehman's mark-to-market value?  We know that is not what

23   Your Honor was told.  But is that what the committee was told?

24   Not even close.

25           Mr. Burian submitted a declaration making clear that,

82

1    quote, "At no time during the sale process did any

2    representative of Barclays or the Lehman sellers advise

3    Houlihan that either party was valuing the assets being

4    transferred to Barclays on a liquidation basis.  Up until

5    recently, it was Houlihan's understanding that the assets would

6    be valued using only book value or mark-to-market value."

7            And even Your Honor felt a little bit concerned during

8    the sale hearing that the Court did not fully understand,

9    quote, "how the deal has moved in terms of material changes",

10   even though you found Ms. Fife's oral presentation helpful.

11   And then Your Honor expressed a desire to learn more as the

12   evening progressed.

13           Now, Barclays would have us believe that it would not

14   have mattered one iota to the Court whether assets were being

15   valued at market value or at some notional liquidation value

16   that was five billion to six billion dollars less.  They assert

17   that this Court would have the sale, regardless of the market

18   value.  The committee does not believe that for a minute.  Lest

19   Barclays forgets, Your Honor had even said in the context of

20   the real estate component that 500 million dollars was

21   material.  How could they sit there in court and think Your

22   Honor would not think five billion dollars is material.  Nor

23   would Your Honor have been comforted by the testimony, had

24   there been any, that the billions of dollars in discounts was

25   part of a private negotiated deal overnight.  Barclays was

83

 1    right here in the courtroom when Your Honor expressed real

 2    concern about the fact that you knew nothing about the

 3    appraisal process of real property and how you can be assured

 4    it represents "fair value".  Your Honor said, "I know nothing

 5    about this appraisal.  I don't know who commissioned it.  I

 6    don't know who the appraiser is."  Your Honor said you're

 7    "hearing it only now that there is this negative variance in

 8    the assumed value of the real estate, and I find that

 9    troublesome."  If Your Honor found an assumed negative variance

10    of a few hundred million dollars troublesome, didn't Barclays

11    think you would have found five billion to six billion dollars

12    in an assumed negative variance worthy of mention?  And yet

13    they just sat there and said nothing.

14          But let's go back to the evidentiary record.  Mr.

15    McDade was asked on cross, and the committee firmly believes he

16    said what he thought was accurate at the time, but he didn't

17    know the truth.  He testified, "In the absence of a closing" --

18    the question was, "In the absence of a closing balance sheet

19    having been prepared, can you please describe for the Court how

20    it is that the debtor determined that fair value was being

21    realized for the sale of these assets?"  What was his answer?

22    "The individual assets on the balance sheet, the trading

23    inventory was bottoms up, meaning individual line item detail

24    process through all of our individual risk business units, in

25    coordination with the normal finance professionals who are

84

1    incorporated into the valuation process."  Then he was asked,

2    "Does Lehman have any valuations -- internal valuations of any

3    of the assets that are being transferred to Barclays?"  Answer:

4    "Absolutely.  There are many complex securities involved, many

5    different models that we use to evaluate those securities."

6    There's no mention at all about a bulk five billion dollar

7    across-the-board discount; whether the book was seventy billion

8    or fifty billion, five billion needs to come off.  Mr. McDade

9    even went on to testify to give the Court comfort, "This

10   valuation was done line by line."

11           So then this Court approved the sale hearing early

12   Saturday morning.  What did the committee do next?  The

13   committee reached out later that morning and asked that Lehman

14   please include the committee's lawyers on all aspects of

15   documentation in closing the transaction.  Meanwhile, the

16   committee was attempting to verify what it had been told the

17   day before.  But as Mr. Burian testified, cooperation was

18   limited.  Cooperation by Barclays and Lehman was limited.  When

19   pressed for whether he actually made specific requests for

20   information regarding Lehman's marks, Mr. Burian testified at

21   his deposition.  Here's what he said:  "To be clear, we made

22   specific requests of anyone and everyone who would listen to

23   us.  Sort of like the old testament prophet screaming out in

24   the wild, and no one listening, saying could we please have

25   some understanding, a list of what assets are moving, to whom

85

1    they are moving, and how they are marked?  Finally, on

2    September 21st, we got a summary schedule of mark to market

3    values, only it didn't show a 47.4 billion dollar number.  It

4    didn't show the number that Lehman told us about or that

5    Lehman's counsel told the Court about.  It showed a 49.9

6    billion dollar number.  But where did that come from?  How did

7    it tie to the 47.4 billion dollar number?"  Houlihan

8    immediately tried to reconcile this on Sunday, the night before

9    the closing was to occur.  Mr. Burian testified that the

10    committee understood that these numbers came off the Lehman

11    system.

12            So what was the committee's perspective just hours

13    before the closing?  Mr. Burian summed it up.  He testified at

14    his deposition as follows:  "So pressure is building throughout

15    the night and it is now morning.  We are hearing things about

16    the clarification letter; things changing.  My guys are telling

17    me that there is this list of assets that doesn't match what we

18    had been told was going to be the deal in the court.  We are

19    getting anxious and upset, and finally, I turn to Harvey and

20    say we are tired and we are being ignored, and we are not doing

21    anything, or something to that effect.  We need to know what is

22    going on.  What is the deal?  Do we have a problem?  Is there a

23    problem?  Harvey, we can't delay anymore.  We need to know.  He

24    turned, like, said, where -- wait, wait there a second, and he

25    basically grabbed Michael" -- referring to Michael Klein,

86

1    Barclays' chief negotiator -- "and I wasn't part of the

2    conversation, but the implication from the body language was, I

3    know you're busy.  There was a separate room where Archie Cox

4    was, a lot of other important people, and my impression, he

5    said this is something that you have to make time for, and I

6    won't say in an exasperated way, because he" -- meaning

7    Harvey -- "is very polite, but in a time-sensitive way.  He

8    came into the room, and it wasn't like, hey, wait for me, I'm

9    going to go bring other people.  It was like, now is your

10   opportunity to get information."  And then came the most

11   important of disclosure to the committee.  "Mike," who was

12   Michael Klein of Barclays, "launched into what purported to be

13   the final negotiated deals.  Now, 1:30 to 2:30 in the morning,

14   and he, you know, there has been a lot of confusion.  And he

15   said this is what happened and this is what's going on, and

16   this is why you should be comfortable.  Then he took out a

17   blank manila folder, and he began to write on it.  Mr. Klein

18   explained that he knows we were given a schedule showing 49.9

19   billion dollars in asset values.  He was going to show us how

20   it all fits together.  He explained that was pre-mark.  That

21   was not today's value; it was pre-mark.  Then he said post-

22   mark, which means -- which was -- we have lost four to five

23   billion dollars over the last period of time.  Markets have

24   been a lot of illiquids.  We said, what time period did it

25   happen?  Saturday?  You know, it was like, listen, you want an

1    explanation of the deal?  Here's the deal.  Fifty billion

2    dollars of assets, they have dropped in value.  And they are

3    now -- we agree with Lehman that these assets are worth forty-

4    four to forty-five, and therefore, you know, we are short.  We

5    are adding 1.9 billion dollars of assets that are unencumbered

6    that were not part of the repo to get a total of what Barclays

7    is getting of 47."  That's the uncontroverted testimony of Mr.

8    Burian, Your Honor.

9            So what about the liability side?  Houlihan testified

10    that Mr. Burian thought 45.5 billion dollar number "was as

11    consistent as a number gets throughout this whole thing".  He

12    was told that was the "balance of a loan".  The 4.25 billion

13    dollar on top of that was told to us to be the severance and

14    accrued comp which Houlihan was told came right off Lehman's

15    books and records.  These aren't estimated unliquidated damages

16    claims by contract parties, Your Honor.  So going back to the

17    1.9 billion dollars in the so-called unencumbered box, Barclays

18    advised Houlihan in the presence of Mr. Miller that "in order

19    to match up with the right side of the manila folder, Barclays

20    needed to be paid additional securities to balance the

21    transaction."  Mr. Burian testified "they had to find

22    securities that were not originally part of the fed loan in

23    order to make up for the liabilities being assumed and the

24    deterioration in value."  So finally, at that wee hour of the

25    morning, Mr. Burian turned to Mr. Miller, quote, from his

88

1    deposition, "Harvey, are you comfortable with this?  Is this

2    what's going on?  And he said yeah, or something to that

3    effect."  And then Mr. Burian stated the obvious at 2 o'clock

4    in the morning.  He said, "If this is what's going on, this is

5    an explanation, I got it.  I understand it.  You know I can't

6    diligence this.  I have to trust you and what you're telling me

7    is going on."  He went on to say, "You know, we don't

8    understand why those values would have dropped, but if that's

9    where Lehman and you guys are, and the values dropped, we will

10   get a reconciliation and it is what it is."

11        And Your Honor, what about post-closing?  What did

12   Milbank do to follow up?  Well, on Thursday, September 25th,

13   Mr. Despins e-mailed Mr. Miller and Ms. Fife and reiterated

14   that the committee's corporate lawyers have made several

15   requests for the asset schedules used for the closing and we

16   have received no response.  Mr. Miller responded that he was

17   sure the schedules would be furnished ASAP.  And indeed, they

18   were.  That same night, Ms. Fife sent over to Milbank the asset

19   schedules of what had been transferred.  She cautioned,

20   however, that they may not necessarily be the final schedules.

21   So what did those schedules show?  Low and behold, Your Honor,

22   they were the very same market value schedules that the

23   committee received on Sunday showing 49.9 billion dollars in

24   market value.  This solved nothing.  Amidst everything else

25   that was going on, now, when Barclays had assumed total control

89

 1    over Lehman's books and records, and even though Barclays was

 2    in violation of the transition services agreement at that time,

 3    the TSA, and withholding that information from Mr. Marsal, the

 4    committee kept on pressing.

 5           On October 15th, Ms. Fife wrote to Mr. Despins and

 6    expressed some confusion.  "I'm really at a loss to figure out

 7    why you and the other committee professionals are spending so

 8    much time on the Barclays sale.  What could you, or anyone for

 9    that matter, do, even if it did turn out the assets turned out

10    to be greater?  As you know, the sale has been consummated

11    which effectively moots out any relief you might be seeking.  I

12    would really appreciate it if you would enlighten me as to the

13    potential actions, vis-a-vis Barclays, other than in connection

14    with the TSA."  So the committee realized it could not get any

15    information from Lehman.  Lehman itself didn't even have the

16    information.

17           Everyone was focused on getting Barclays first into

18    compliance with the TSA.  That was Mr. Marsal's mantra.  We

19    assumed that once that happened, we would get our

20    reconciliation, and all would be fine.  Houlihan could check a

21    box, write a memo to the committee, this is what happened; this

22    is why the values did drop.

23           But then, in December of 2008, the SIPC trustee filed

24    a motion supported by the declaration of Shari Leventhal of the

25    Federal Reserve that recited what had transpired at the closing

90

1    of the Barclays sale.  In it, Ms. Leventhal testified, "LBI was

2    to provide Barclays with approximately 49.7 billion dollars in

3    securities in return for the 45 billion dollars in cash funded

4    by Barclays."  This number made absolutely no sense.  It was

5    neither the 49.9 billion that we had been shown before and

6    after the closing, nor was it consistent with what Barclays had

7    told us late Sunday night and which Mr. Miller confirmed.

8    Although we still had not had access to Lehman's books and

9    records because Barclays now owned them and had not been

10   cooperating under the TSA, we finally decided, to coin a phrase

11   used by Mr. Burian, to run into court with our hair on fire.

12        We filed an objection to the LBI settlement.  We

13   attached the manila folder we had been given.  And we asked the

14   Court to require Barclays to deliver to us an accounting and a

15   reconciliation, the one we had been waiting for since that

16   Sunday.  I came to you, Your Honor, and I prosecuted that

17   objection.  I explained that we had been unable to review the

18   facts, even though the urgency has now ended.  And we were

19   concerned that any factual findings might be used against us if

20   we learned otherwise eventually.  Your Honor indicated to us

21   and to Barclays that you hoped we would not need to resort to

22   Rule 2004 to get the information we needed, but that even Your

23   Honor felt getting clarity was certainly in the interest of

24   this court and this historic transaction.

25        Well, Your Honor, what happened later is after a

91

1   series of letters and meetings, the committee still did not get

2   satisfaction, let alone the reconciliation of what was

3   transferred and what its market value was at the time.  After

4   discussing this with Mr. Marsal, he ultimately decided to

5   retain conflicts counsel to give the transaction a fresh look.

6   Jones Day came in, filed a formal Rule 2004 examination.

7   Barclays opposed it, and we joined in Lehman's request.  Now,

8   Barclays says, having gone through the laborious process of

9   Rule 2004 discovery all summer that we relaxed, that we were

10  dilatory in moving under Rule 60(b).

11        So let me recap, Your Honor, what the committee knew

12  and when.  Here's the final recap.  Thursday -- first we're

13  going to talk about what we knew before Rule 2004 so that Your

14  Honor can determine -- don't take my word for it -- whether or

15  not we had the complete picture.  Thursday, September 18th, the

16  committee was provided with the 9/16 balance sheet describing

17  an even exchange:  seventy-two for seventy-two.

18        As of Friday, 9/19, Lehman advised the committee of

19  the decline in the value of the long positions.  They did not

20  use the word "liquidation values".  Friday, September 19th,

21  Lehman advised the Court that the change in the deal is the

22  reduction of assets to 47.4 because of the markets.  Friday,

23  September 19th, the Lehman sellers testify the books were

24  marked line by line as of the sale hearing.

25        On Friday -- that should probably say Saturday,

92

1    September 20th, the Court issues the sale order.

2        On Sunday the 21st, the committee receives the

3    September 21st schedules showing assets worth 49.9 billion

4    dollars.  In the wee hours between Sunday and Monday, the

5    committee demands an explanation of asset values.  Klein writes

6    up figures consistent with the sale hearing description on the

7    manila folder and explains the marked value of securities has

8    declined by five billion dollars.  Klein actually even stated

9    that the deal as modified is better for the estate by two

10   billion dollars.

11       On Thursday September 25th, the committee receives the

12   post-closing schedules it was promised, but it contains the

13   same stale marks as the September 21st schedules.

14       Then, Your Honor, we embarked on the Rule 2004

15   discovery.  That's it.  That's all we knew prior to Ms.

16   Leventhal's declaration when I came in with my hair on fire.

17       After the Rule 2004 discovery, what did we learn?

18   First, as of September 16th, five billion dollar haircut was

19   part of the deal from day one with Lehman internally reporting

20   a price of five billion dollars off of its own marks.  What

21   else did we learn?  We learned Barclays insisted on a day one

22   gain.  What else?  On Tuesday, September 16th, the Barclays

23   board of directs approved a sale transaction described as

24   involving seventy-five billion dollars of assets.  That's when

25   it was seventy under the book value presented to this Court.

93

1    Also that same day, the LBHI and LBI boards of directors

2    approved a sale transaction; it was described as a wash.

3        On Friday, Jim Seery testified he believed -- Lehman

4    believed in its marks at 50.6 billion dollars in book value.

5    That same day, in response to Barclays' threats not to close,

6    Lehman was forced to ascribe liquidation values, wholesale bulk

7    liquidation value.  Lehman had no choice but to mark this

8    negotiated value down to provide Barclays what it wanted:  the

9    day one gain.  The marks were never stale.  Also on Friday, the

10   Bank of New York, Barclays' own collateral agents, had been

11   marking that package of securities at 52.19 billion dollars

12   that was recognized by Barclays at the time.  But, as Mr.

13   Gaffey explained, that same day as the sale hearing, Barclays

14   demands more collateral because there was an alleged shortfall

15   in the value of the repo collateral.  And as Your Honor now

16   knows, I do think this diagram does represent the complete

17   picture.  Barclays' repo was the vehicle to provide the hidden

18   discount.  Liquidation value was used and negotiated to

19   eliminate Section 559's application to this transaction.

20       So at bottom, Your Honor, the committee comes before

21   you today, asking you to find that the transaction that was

22   consummated by Barclays and Lehman just simply was not the

23   transaction as advertised.  Despite Barclays' hyperbole, this

24   is not about a buyer taking risks in an uncertain transaction,

25   realizing the legitimate rewards for that risk, and creditors

1    feeling jilted and wanting to re-trade the deal.  What Your

2    Honor was told on September 19th bears very little resemblance

3    to what was known to Barclays and to a select few within Lehman

4    at the time.  The committee was told a very intricate detailed

5    story that Sunday night, but all of it was designed from the

6    beginning to fit with what the Court was told, and all of it

7    was designed to hide the truth of the transaction from

8    scrutiny.  That is, frankly, Your Honor, extremely troublesome

9    and offensive to this Court and everything it stands for.

10         With that, Your Honor, the official committee of

11    unsecured creditors of Lehman Brothers respectfully requests

12    that this Court grant our motion under Rule 60(b), holding in

13    particular that the clarification agreement was not approved to

14    the extent it materially modified the sale transaction

15    disclosed to and approved by this Court.  That transaction was

16    disclosed as involving the transfer of 47.4 billion dollars of

17    assets at market value or going concern value; certainly not

18    liquidation value -- that was the very evil to be sought to be

19    avoided -- in exchange for the assumption of the same amount of

20    liabilities.  So we want a return to the estates of the assets

21    transferred to Barclays in excess of 47.4 billion dollars at

22    fair value unless Barclays can demonstrate that it assumed

23    liabilities greater than 47.4 billion and they were justified

24    in taking more to be true to the deal as disclosed, which we

25    know it's impossible to reconcile with that undisclosed demand

1    for a day one gain of five billion.

2          To be clear, in response to Barclays' accusations, the

3    committee does not seek to rewrite the terms of the sale

4    transaction as Barclays says or require Barclays to proceed

5    with the transaction which they never agreed to.  We ask only

6    that the consummated transaction conform with the transaction

7    disclosed to and approved by Your Honor.  That's the hallmark

8    of Section 363's finality of sale orders.  That's the legal

9    principle we ask the Court to uphold.  Why?  Because it fosters

10   the most important policy underlying our bankruptcy law:

11   proper disclosure is the only way to be protected by this great

12   court of equity.  This case, more than any other, should be

13   remembered for that principle.  Thank you, Your Honor.

14         My partner, Mr. Tecce would like to address the Court

15   on a few discrete legal issues in response to things like the

16   mandate rule, if that's okay.

17         THE COURT:  That's fine.  I'm recognizing that we are

18   over time, which means I can impose time limits on anybody.

19         MR. KIRPALANI:  I think it's a matter of five or seven

20   minutes, Your Honor.

21         THE COURT:  Five or seven minutes I can deal with.

22         MR. KIRPALANI:  Okay, thank you very much.

23         MR. TECCE:  Your Honor, it will be five or seven

24   minutes.  For the record, James Tecce of Quinn Emanuel Urquhart

25   & Sullivan on behalf of the committee.  Just briefly to touch

96

1    on four points not covered specifically in Mr. Kirpalani's

2    presentation that we think require brief but specific mention.

3    First, specifically why the committee has established

4    entitlement to relief from the sale order pursuant to Rule

5    60(b)(1) from mistake, Rule 60(b)(3) from misrepresentation,

6    and Rule 60(b)(6) under equitable grounds.  Second, by

7    Barclays' argument that the committee's evidence is not "new

8    evidence" and why the committee's motion was not filed timely

9    fail.  Third, why the so-called mandate rule has no application

10   to the committee's motion and why Barclays has failed to

11   satisfy its burden of establishing waiver and estoppel defenses

12   with respect to the committee, and lastly, why the issue of

13   committee consent, while bandied about Barclays' brief, is not

14   only presented with citations to record evidence that are not

15   placed entirely in context, but a bottom is simply irrelevant

16   because committee consent is no substitute for judicial review

17   and approval of material modifications to the sale transaction.

18          As my partner noted, the committee does not dispute

19   that Rule 60 motions are disfavored.  Nonetheless, even

20   Barclays cannot deny that Rule 60 provides a basis for relief

21   from sale orders notwithstanding the finality typically

22   attendant to them.  For example, Rule 60 provided basis for

23   relief from sale orders when the transaction approved differed

24   from the consummated transaction on a significant issue such as

25   whether the purchaser had assumed environmental liabilities in

97

1    connection with the acquisition of property, as was the case in

2    BCD Corp, a Tenth Circuit case reported at 119 F.3d. 852.  The

3    Court determined that because the transaction it approved

4    involved the acquisition -- the purchaser's acquisition of the

5    responsibil --

6              COURT REPORTER:  I'm sorry.  Could you just -- the

7    Court determined that --

8              MR. TECCE:  Sure.  The BCD --

9              COURT REPORTER:  Tenth Circuit case.  If you could

10   just go from there --

11             MR. TECCE:  Sure.

12             COURT REPORTER:  -- and if you could just slow down

13   just a touch.

14             MR. TECCE:  The Tenth Circuit case, BCD Corp.,

15   reported at 119 F.3d. 852 determined that a term represented to

16   and approved by the Court, i.e., that the buyer would assume

17   environmental costs did not mirror the actual consummated

18   transaction which had the estates bearing those costs, and

19   found Rule 60(b)(1) relief appropriate.  Rule 60(b) relief also

20   has been found appropriate when significant facts, such as the

21   identify of the purchaser as an insider of the seller who

22   possessed significant inside information about the estates

23   being -- about the assets being acquired were simply omitted

24   from disclosure as was the case in In re Lawrence, a Second

25   Circuit decision reported at 293 F.3d 615.  And the American

98

1    Freight Systems case referred to by my partner where the

2    transaction, as represented, was materially different from the

3    transaction as consummated where seventy percent of the

4    appraised value was approved, but the consummated transaction

5    involved only fifty-five percent of the appraised value.  Here,

6    Your Honor, the facts given --

7              THE COURT:  I don't mean to break in, but is there

8    anything in this legal argument that's different from what I've

9    already seen in your papers?

10             MR. TECCE:  There --

11             THE COURT:  Is there something you want to highlight,

12   because --

13             MR. TECCE:  There is, Your Honor.  There is --

14             THE COURT:  -- it's a --

15             MR. TECCE:  -- there is one point that I --

16             THE COURT:  -- not to --

17             MR. TECCE:  -- think I would --

18             THE COURT:  -- not to tell you that it's ponderous,

19   but it really is.

20             MR. TECCE:  Fair enough, Your Honor.  There is one

21   point that I think I would like to highlight, which is the

22   discussion about committee consent to the material

23   modifications to the transaction that were consummated

24   following the hearing.  Barclays relies on the testimony of Mr.

25   Miller who states, quote, that he was told by Mr. Burian in the

1     final hours after the Klein conversation that if the

2     transaction is okay with you, then it's okay with us.  I just

3     want to highlight for the Court the context in which that

4     statement was made.  Mr. Burian told Mr. Miller the obvious,

5     which is that at this hour, I have no choice but to rely on the

6     representations that have been made to you.  He even asked Mr.

7     Miller if Mr. Klein's representations were okay with Mr.

8     Miller.  But he was very clear.  He said that they insisted --

9     the committee would insist on receiving a reconciliation of the

10    transaction, and it then promptly proceeded to pursue that

11    reconciliation with vigor in the days and months following the

12    closing of the transaction.  So while Barclays argues that the

13    committee consented to those modifications, it did not consent

14    to those modifications.

15         But the most important point about committee consent,

16    Your Honor, that I want to make is that in the end, it's really

17    not relevant because the committee's consent could not sanctify

18    or approve material modifications to the transaction.  The

19    committee is not a judicial body.  It did not have the ability

20    to cleanse Barclays of its failures to disclose to the Court

21    the material terms of the transaction and of its failures to

22    obtain Court approval of material modifications to the

23    transaction.  The committee consent simply could not excuse

24    Barclays from having to do that, even if it was present, which

25    it was not.  In the end, those modifications required Court

100

1    approval.  And Barclays may be looking to section 3 and 25 of

2    the sale order which do contemplate that non-material

3    modifications that do not have negative impact on the estates

4    may be approved with committee consent, but those sections

5    aren't relevant because that's not what happened here.  Here,

6    material modifications were made to the transaction, and the

7    committee, whether it consented to them or not, was powerless

8    to sanction them and to give them an imprimatur that only the

9    Court could give them.

10            That's really the only other point that I would want

11   to make.

12            THE COURT:  Okay.

13            MR. TECCE:  Thank you very much.

14            THE COURT:  Thank you.

15            MR. MAGUIRE:  Your Honor, may I provide you with a

16   binder?  Some documents I may refer to.

17            THE COURT:  Absolutely.  Thank you very much.  And

18   just as a housekeeping matter, I don't remember how much time

19   you had reserved.  I thought it was forty-five minutes.

20            MR. MAGUIRE:  It was one hour, Your Honor.

21            THE COURT:  It was one hour?

22            MR. MAGUIRE:  Yeah.

23            THE COURT:  Okay.

24            MR. MAGUIRE:  I'll do my best.  Would it be better to

25   take a lunch break now?

101

1          THE COURT:  I'm just thinking out loud whether or not

2     it might be better to take a lunch break rather than to have

3     stomachs growling during your argument.  And I think the Boies-

4     Schiller time was two and a half hours?

5          MR. BOIES:  Two hours and forty-five minutes.

6          THE COURT:  Two hours and forty-five minutes.  So we

7     can certainly do that in the afternoon.  I thought that there

8     was a fifteen-minute reservation by LBHI.  So that's three

9     hours.  Four hours with your one hour, assuming that these time

10    estimates are close to right.  Which means that if we come back

11    at, say, let's give ourselves fifteen minutes of buffer.  Let's

12    say we come back from lunch at 1:45 with the hope that we can

13    start before 2, that'll allow us to finish this afternoon at

14    some reasonable hour.  So why don't we take a lunch break now.

15         Mr. Boies, do you wish to say something?

16         MR. BOIES:  Your Honor, we also have fifteen minutes.

17    I don't know if it makes any difference in your scheduling.

18         THE COURT:  It doesn't make any difference to the

19    estimate or to my decision to break for lunch.  So we're going

20    to break for lunch, and I'll see you at 1:45.

21    (Recess from 12:37 p.m. until 1:49 p.m.)

22         THE COURT:  Be seated, please.  You've had lunch and

23    we're ready to go.

24         MR. MAGUIRE:  If it please the Court.  William Maguire

25    for the SIPA trustee, James Giddens.

102

1           Your Honor, the trustee appeared here at the sale

2      hearing to support this transaction, and today he asks the

3      Court to enforce that transaction.  That transaction does not

4      give Barclays any right to 769 million dollars of government

5      securities inside the customer reserve account or from outside

6      that account where there is a deficiency in the assets that are

7      supposed to be locked up to protect customers.  That

8      transaction does not give Barclays any right to Lehman margin

9      assets, which are all cash and cash equivalents that were

10     expressly excluded from this transaction.

11          The transaction did initially include assets at DTCC,

12     the Depository Trust Clearing Corporation, but Barclays later

13     decided in a separate agreement with the DTCC and the trustee

14     to exclude those assets, and entered into an express

15     unambiguous contract confirming that those assets were excluded

16     assets.

17          So when the Court has the opportunity to look at the

18     business decisions that were made and the underlying business

19     agreements that were entered into, the contractual terms that

20     the parties agreed upon and, of course, the disclosures that

21     were made to this Court, in each case Barclays does not have a

22     contractual right to any of these disputed assets.

23          In the first case, there are the 769 million dollars

24     in the customer lockup account.  Lehman had those and other

25     assets in the lockup account pursuant to a rule of the

103

1    Securities and Exchange Commission, the customer protection

2    rule, and that rules requires a broker-dealer to lock up assets

3    that are sufficient to make sure that all customers will be

4    paid all of their property.  And a broker-dealer is required to

5    maintain at all times that required amount in the lockup

6    account.

7            Clause 8 of the clarification letter gives Barclays a

8    right to that 769 million to the extent permitted by applicable

9    law.  And the rule, the customer protection rule, does allow a

10   broker-dealer to withdraw excess funds from a customer

11   protection account.  The question here is not whether Barclays

12   is entitled to the excess.  If there were an excess, that is

13   not the question here.  The question today is what happens when

14   there is no excess; what happens when there is a deficiency?

15   There is insufficient funds set aside in the customer

16   protection account to ensure that the broker-dealer will be

17   able to pay all customers all their property.

18           Now, Barclays claims that it has an absolute

19   unconditional right even if there is no excess, even if there

20   is a deficiency, even if the transfer would violate subpart (g)

21   of the customer protection rule.  And Barclays claims that that

22   rule should not apply when a broker-dealer fails.  Of course,

23   the time when customers most need the protection of a rule is

24   when a broker-dealer fails.

25           Barclays has a fallback argument that, well, even if

1    there is a legal problem with getting these assets from inside

2    the customer account, then Lehman can just go and get it from

3    outside.   The problem with that argument is that it disregards

4    the nature of this asset and it disregards the parties'

5    knowledge.   They knew there was nothing outside this account.

6    They knew that every nook and cranny had been searched for

7    assets to give to Barclays.   And you saw some of that testimony

8    this morning concerning the Friday asset grab in which the top

9    Barclays negotiator, Rich Ricci, testified that at the end of

10   the day Friday he spoke with the Lehman executives who had gone

11   off on this mad scramble, and was told there was nothing left.

12   Barclays knew there was nothing left.   Barclays knew that if it

13   couldn't get the 769 million from inside the account that was

14   supposed to be locked up from customers, then there was nothing

15   left from where Barclays could get those funds.   There was, of

16   course, the corpus of property set aside for customers,

17   customer property and property needed to pay customers their

18   claims.

19        But the entire point of this provision of the

20   clarification law, clause 8, and the entire point of the

21   parties putting in the words "to the extent permitted by

22   applicable law" was to protect customers.   If Barclays had said

23   then what it is saying now, if it had said we are entitled to

24   this money and the price of our coming to the rescue here is

25   that, even if there is a deficiency, even if there is a

1   shortfall in customer property, you, Lehman, must pay Barclays

2   unconditionally 769 million dollars, even if you have to invade

3   the corpus of property that is needed to pay Lehman's public

4   customers their property, if Barclays had made such a demand,

5   Lehman of course could not have entered into any such contract,

6   and certainly a trustee appointed under the Investor Protection

7   Act could not have agreed to any such term.  And how could

8   regulators have supported a transaction in that case?

9          And, indeed, even if such an agreement had been made,

10   and even, and it seems unthinkable, people had asked for court

11   approval for such a deal, at an absolute minimum there would

12   have to be full notice to Lehman's public customers to tell

13   them that what is at stake here is this transaction requires

14   your property to finance Barclays' profits, and if you're not

15   prepared to do that, and if that is not acceptable, then this

16   deal does not go forward, and therefore your corpus of property

17   is, in the last resort, going to be used to finance Barclays'

18   gain.  Of course, the parties agreed to no such thing.  There

19   never was any unconditional agreement to give Barclays 769

20   million from inside or outside this account.

21          In this clause, section 8 of the clarification letter,

22   which is set forth in the first tab of the binder we provided

23   Your Honor, the parties used special words, words that do not

24   appear elsewhere in the agreement.  They used the words "to the

25   extent permitted by applicable law", and they did that to make

106

1    sure that customers would be protected.  Barclays claims that

2    there really was no legal prohibition, no applicable

3    prohibition, that applied here.  Under Barclays'

4    interpretation, these words are mere surplusage.

5        Your Honor, the parties used the term "769 million",

6    and that was not coincidental; that was the total amount of

7    government securities in the account.  The parties believed

8    there was a substantial excess at the time; they were wrong,

9    but that's what they believed.  But they also believed that no

10   cash could go to Barclays, because the Court had been told

11   there was no cash being transferred to Barclays.  So the most

12   that could go to Barclays was the government securities, and

13   the government securities, they said, were 769 million; that's

14   how they came up with that number.  So that number is in there.

15       If -- as Barclays maintains, this didn't need to come

16   from the account at all.  Why?  In that case, it might just as

17   easily have been 770 million or 800 million.  The parties used

18   the specific words "as of the date hereof", and those words,

19   again, have significance, because a broker-dealer measures its

20   compliance with the customer protection rule on a weekly basis.

21   And Friday the 19th was a measurement date at Lehman.  And "as

22   of the date hereof" was the next day, Saturday.  So the same

23   calculation applied.  So all of this was keyed to compliance

24   with the rule.

25       Now, if there were an excess it would have to be

1    verified and, as a practical matter, the trustee would have to

2    advise the regulators before making a transfer.  And so the

3    parties used the words "as soon as practicable".  If, as

4    Barclays maintains, this was an absolute and unconditional

5    right, then this payment could have been due at closing or, if

6    Barclays wanted to give the estate some grace, in six months or

7    on the first anniversary.  That's not what the parties said.

8    They said "as soon as practicable."

9         And as times goes by, and it can take time to verify a

10   calculation and then to make sure that regulators are fully

11   informed, that can take an uncertain amount of time.  That

12   creates another issue when we're talking about government

13   securities, because government securities have maturities.  As

14   time goes by, securities mature.

15        So if enough time went by, Lehman could find itself in

16   a situation where it was unable to actually deliver the exact

17   securities that existed in the account as of the date hereof.

18   And therefore there was a simple fix to make sure the Lehman

19   could substitute similar securities.  And that's where the

20   parties added the words "or securities substantially similar in

21   nature and value".

22        And that's how those words were put into the clause.

23   And we have submitted the testimony of the Weil Gotshal lawyer,

24   the draftsman, Robert Messineo -- and it's in tab 2 of your

25   binder, Your Honor -- describing that that's the purpose of

108

1    those words.  And all of this is entirely consistent with the

2    unequivocal testimony of all of the Lehman witnesses and all of

3    the Weil Gotshal witnesses, that this obligation to pay

4    Barclays was at all times conditional on their being an excess,

5    and at no time ever became unconditional.

6           As against all this, Barclays offers only the most

7    equivocal and ambiguous testimony of two of its legal

8    representatives.  And all that they offer is their recollection

9    of what happened in a hallway conversation in the conference

10   center of Weil Gotshal, in which they acknowledge a whole bunch

11   of things were discussed, and in which they admit there was no

12   discussion of what would happen if there was a deficiency, or

13   of what would happen if there was a shortfall in customer

14   property.

15          Barclays' claim that it had an unconditional right

16   here is also flatly contradicted by what it told its own audit

17   committee the month after this transaction closed.  In

18   reporting to its own audit committee, Barclays management

19   reported that the recovery of this asset was conditional, that

20   it was "subject to SEC approval."  And that, Your Honor, is in

21   an audit committee report in tab 3 of your binder.

22          So we respectfully submit that where the Court looks

23   at the nature of the asset, these proceeds, these securities,

24   in the customer lockup account, when it considers Barclays'

25   knowledge, when one looks at the words that the parties chose

1    to use here -- not some simple sentence with an unconditional

2    obligation, but very carefully worded language, and when one

3    sees the disclosure, and frankly the lack of disclosure to

4    Lehman's public customers or to anyone, of an unconditional

5    deal, all of these points confirm that Barclays does not have

6    an unconditional right.  And its right to the 769 was and

7    remains at all times conditional.

8           Your Honor, Barclays and the trustee are also

9    disputing some four billion dollars of Lehman margin assets.

10   Those assets are all cash or cash equivalents, like highly

11   liquid government securities.  Lehman had a total of about six

12   billion dollars that it was -- related to derivatives.  Some

13   two billion dollars of that was customer property.  And we have

14   already transferred that to Barclays in connection with the

15   transfer of customer accounts and the transfer of customer

16   property.  What remains is four billion dollars of cash or cash

17   equivalents that Lehman owned.  That includes some 1.4 billion

18   dollars in cash at the Options Clearing Corporation; another 1

19   billion dollars of highly liquid government securities at the

20   OCC; an additional more than 1 billion dollars deposited at the

21   Chase Bank and other locations; and additional cash and

22   securities at foreign firms around the world.

23          Of course, this transaction was not a purchase of

24   cash, it was an asset purchase agreement.  In such an

25   agreement, a party may, of course, decide to buy cash.  And if

1    they do, one would expect them to pay for it.  Here, Barclays

2    did not pay for the cash.  In fact, it expressly said this was

3    not going to be a cash deal.  And in fact, the Court was told

4    it was not a cash deal.  And there were unequivocal,

5    unambiguous exclusions in the agreement from the very

6    beginning.

7          The original asset purchase agreement is in tab 5 of

8    the Court's binder.  And at page 2 of that agreement, excluded

9    assets are defined.  And item B specifically says "all cash,

10   cash equivalents, bank deposits or similar cash items of Lehman

11   and its subsidiaries."  And the only exception was the retained

12   cash.  And it too subsequently was taken out of the deal.

13          In addition to that, if Your Honor might turn to page

14   4, you'll see an additional -- again, unqualified exception.

15   And this, again, is another excluded asset.  It's clause M.

16   And it is, "All assets, primarily related to the IMD business

17   and derivatives contracts."  Now, margin, of course, is an

18   asset related to derivatives contracts.  Barclays claims that

19   this exclusion does not apply.  They say it applies to margin,

20   but only margin related to over-the-counter derivatives, not to

21   exchange-traded derivatives.  Of course, that is not what the

22   parties' contract says.  There is no such distinction in clause

23   M.  On its face, this exclusion clearly applies to all cash, to

24   all assets related to all derivatives contracts, both over-the-

25   counter contracts and exchange-traded derivatives contracts.

111

1    And Barclays fails to show any ambiguity about this exclusion.

2         The excluded asset definitions were carried over into

3    the clarification letter.  And that is at tab 4 of the Court's

4    binder.  In clause 1(c) the contract provides that, "Except

5    where otherwise provided in the definition of purchased assets,

6    excluded assets shall include any cash, cash equivalents, bank

7    deposits or similar cash items."  Clause 1(b) had a similar

8    exclusion for government securities.  And clause 1(c) also

9    carried over various exclusions from the original asset

10   purchase agreement, including clause M:  "All assets primarily

11   related to derivatives contracts."

12        All of these contractual provisions reflect an

13   underlying business reality.  There was no agreement to

14   transfer cash or margin to Barclays.  We asked all of the

15   witnesses:  Was there a deal to sell cash or margin to

16   Barclays?  We heard from every one, and not just the Lehman

17   witnesses, but also the Barclays witnesses, including all of

18   their 30(b)(6) corporate representatives.  No one could tell us

19   about any agreement to transfer margin.  Nobody could tell us

20   about any negotiation to transfer margin or even any discussion

21   about transferring margin.  We list that testimony at pages 31

22   to 32 of our reply brief, and we include in tab 6, the

23   testimony of Lehman's president, Bart McDade, on that subject.

24        The asset purchase agreement itself showed that

25   Barclays was supposed to be getting both assets -- the long

112

1    assets -- and assuming liabilities, including short exchange-

2    traded options derivatives.  Seventy billion dollars of long,

3    and assuming liabilities of sixty-nine billion dollars.  If one

4    were to add four billion dollars of margin into that, then

5    those numbers all change.  It would have to be seventy-four

6    billion to sixty-nine.  And of course, Barclays could not

7    assume sixty-nine billion dollars of liabilities, including

8    short options and derivatives and say, but with respect to the

9    derivatives, we need four billion dollars of cash to cover

10   those liabilities.  That's not assuming a liability.

11         Of course there was no disclosure to this Court that

12   any margin was being transferred to Barclays.  And if one looks

13   at the representations that were made, transferring four

14   billion dollars in margin in Lehman's cash to Barclays would be

15   completely inconsistent with that.  The Court was told that

16   Barclays was taking 47.4 billion dollars of financial assets.

17   Adding four billion dollars to that would completely blow

18   through what the Court had been told.

19         The Court was also told that there was supposed to be

20   twenty billion dollars in assets left behind in the estate.  Of

21   course, taking four billion dollars of Lehman's cash and cash

22   securities -- cash equivalents, would completely eviscerate

23   that representation.  And of course, the Court was told that

24   there was no cash being transferred to Barclays.  That is

25   certainly inconsistent with transferring four billion dollars

113

1    of Lehman cash and government securities.

2         The extrinsic evidence also confirms that there was no

3    margin transferred to Barclays.  Over the clarification

4    weekend, Barclays' lawyers drafted some very clear language to

5    add margin to the deal, and they put it in a draft of the

6    clarification letter that was circulated around.  Weil Gotshal

7    rejected that language.  And that, at tab 7 of your binder,

8    Your Honor, is the draft that shows the language that had been

9    added by Barclays' lawyers, and its rejection by Weil Gotshal.

10   That language was exceedingly clear.  It specifically mentioned

11   Lehman's cash margin.  It was rejected.

12        When that happened, Barclays did not call a meeting or

13   go see anybody or protest.  In fact, an hour and a half later

14   it circulated another draft, another Weil draft -- Barclays

15   circulated it, and that's at tab 8, in which there is no

16   reference to margin.

17        Then, just before the closing, one of Barclays'

18   lawyers drafts a parenthetical that goes into clause 1(c) of

19   the clarification letter.  That parenthetical says:  "And any

20   property that may be held to secure obligations under such

21   derivatives."  He gives it to a colleague who brings it to the

22   Weil Gotshal typist who has control of the document, and asks

23   him to insert it.  It gets inserted into the execution version,

24   after the trustee had already signed the execution page for

25   this transaction.  The trustee was not told that there was a

1   change.  There was no red-line circulated.  He was not shown

2   the handwritten change.  And his signature page was then

3   affixed to the execution version containing this new addition,

4   this parenthetical.

5       The language of the parenthetical is, of course,

6   dramatically different from the very clear language that had

7   previously been provided by Cleary Gottlieb and rejected by

8   Weil Gotshal.  The word "cash" is not used.  The word "margin"

9   is not used.  What appears instead are some fairly innocuous

10  words, "held to secure."

11      We asked the lawyer who drafted that language why he

12  did not use the previous language, which expressly referred to

13  Lehman's cash margin.  And he told us that he did not want to

14  resurrect the prior language, because that would mean getting

15  embroiled in extensive negotiations.  And he's certainly right

16  about that.

17      If the parties were adding four billion dollars of

18  margin at the very end, right before closing, there would have

19  been all kinds of issues that the parties would have had to

20  negotiate.  One obvious one is the disclosure issue.  How do

21  you add four billion dollars of cash to the transaction right

22  before closing without coming back to the Court?  Another huge

23  issue is a compliance issue.  Of this four billion, a full half

24  billion dollars of that was sitting in a special account at the

25  OCC, being used to secure customer trading.  Now, the

115

1   significance of that is that under the customer protection

2   rule, when you do that, you are allowed to count that money

3   against what you need to lock up for customers.  So Lehman did

4   count it.  It counted that money as a debit item in its

5   customer reserve formula.  And that meant that Lehman was able

6   to lock up for customers, half a billion dollars less than it

7   otherwise would have.

8        Now, of course, it would cause huge compliance

9   problems, if on the one hand, Lehman reduces its reserve

10  formula by 500 billion based on this money being at the OCC,

11  and then transfers this, not to customers, but to Barclays; and

12  not for Barclays' customers, but for Barclays' own account.

13  All of these issues, the compliance issues, the disclosure

14  issues, and many other issues, would have had to have been

15  negotiated if this had been clearly brought to the attention of

16  the parties concerned.  As I say, the trustee did not see this

17  parenthetical prior to the closing.

18       Now, one can ask, what does the parenthetical mean?

19  Obviously, the trustee has no contractual intent, because he

20  didn't see it.  Barclays maintains that it covers all of

21  Lehman's cash margin.  On its face, we suggested that a plain

22  reading is an innocuous reference, a sort of belt-and-

23  suspenders reference to customer property, because it talks

24  about "held", and Lehman is a seller.  So one would naturally

25  read that as being Lehman holding its customers' property.  And

1    as I say, we have transferred some two billion dollars of

2    customer property to Barclays.

3         Barclays insists in its reply brief, it could not

4    possibly refer to customer property.  The one thing it

5    absolutely cannot refer to is customer property.  Well, we

6    deposed its lawyer who drafted this parenthetical and we asked

7    him:  what was the parenthetical supposed to pick up?  And he

8    gave us a long answer.  The very first thing he mentioned was

9    customer property.

10        At the end of the day, it may not matter what the

11   parenthetical itself means.  Because if Barclays is right, and

12   this parenthetical is really doing nothing more than clarifying

13   a transfer of margin, of Lehman's cash and cash equivalents, in

14   the asset purchase agreement, then we don't need this

15   parenthetical.  We can go straight back to the asset purchase

16   agreement.  And if Barclays is wrong, and the asset purchase

17   agreement did not transfer margin, and Barclays' only claim to

18   four billion dollars of Lehman's cash and cash equivalents is

19   this parenthetical, then it doesn't matter how clear or

20   unequivocal this parenthetical is.  Barclays can have no

21   contractual right, based on a parenthetical that the trustee

22   never saw.  And Barclays cannot possibly have any right under

23   the bankruptcy law to four billion dollars of cash, when that

24   was never disclosed to the Court and was inserted in a

25   parenthetical right before the closing.

1        So we respectfully submit, Your Honor, that if you

2    look at the nature of this asset, Lehman's cash and cash

3    equivalents, when you look at the express contractual terms

4    that the parties agreed upon, specifically excluding cash, cash

5    equivalents and all assets primarily related to exchange-traded

6    derivatives, and when you consider the fact that there was no

7    disclosure to this Court of any margin assets being

8    transferred, much less four billion dollars of margin assets

9    being transferred to Barclays, and in fact, the affirmative

10   representation to the Court that there was no cash being

11   transferred to Barclays, then all of these parts of the record

12   lead to the same clear conclusion:  that there was no deal to

13   transfer Lehman's cash to Barclays; and Barclays has no right

14   to Lehman's margin assets.

15       Now, before I leave the subject of margin entirely, I

16   do want to address one subsidiary agreement, not the

17   clarification letter, but an additional agreement called the

18   transfer and assumption agreement.  That is an agreement that

19   has never been provided to this Court and the Court has never

20   approved.  It's a subsidiary agreement; an additional

21   agreement.  And the trustee entered into that agreement at the

22   request of the OCC.  The Options Clearing Corporation wanted

23   this agreement, and it has significance here because it does

24   include a term transferring margin.  And Barclays relies on

25   this agreement to suggest that there must have been some kind

118

1    of agreement or deal with Lehman executives and Lehman

2    management to transfer margin.

3          That is absolutely not the case.  Lehman executives

4    and Lehman management were not involved in the transfer and

5    assumption agreement.  They never saw it.  That agreement was

6    presented to the trustee's lawyer at the sale hearing.  And the

7    trustee's lawyer signed it at the sale hearing.  And it

8    provided that Barclays would step into the shoes of Lehman at

9    the OCC.  The trustee's representative signed that in order to

10   facilitate the orderly transfer of customer accounts and

11   customer property to Barclays.  He did not know that this

12   agreement would fundamentally change the economics of the deal.

13   Barclays did.

14         We now know that Lehman had some two and a half

15   billion dollars of cash and cash equivalents at the OCC, in the

16   Lehman accounts at the OCC.  And we now know that all of that

17   was not customer property, all of that was owned by Lehman.  It

18   was all Lehman cash.

19         Where that leaves us, we respectfully argue that this

20   agreement, the transfer and assumption agreement, cannot be

21   enforced against the trustee, because Barclays had superior

22   knowledge.  Barclays knew that this transaction, if fully

23   effectuated, would fundamentally change the economics of the

24   transaction.  And Barclays knew, or certainly should have

25   known, that the trustee was necessarily relying on the

119

1    presentation and the representations that had been made to the

2    Court at the sale hearing.

3            There was, of course, no disclosure to the Court at

4    the sale hearing that this two and a half billion dollars of

5    Lehman cash was to be transferred to Barclays.  There was no

6    disclosure to the creditors' committee; no disclosure to the

7    Court.  And this was a transaction that fundamentally changes

8    the deal.  A second point on this transfer and assumption

9    agreement, the so-called TAA, is that it has not -- and we

10   respectfully submit should not -- be approved by the Court, to

11   the extent that it materially changes the transaction.

12           Now, Barclays takes the position that the Court has

13   already approved the transfer and assumption agreement and the

14   transfer of that two and a half billion dollars.  In footnote

15   39 of Barclays' reply, Barclays says that in the sale order --

16   and it actually quotes the sale order -- Barclays says,

17   "Paragraph 3 of the sale order explicitly approved 'any

18   additional instruments or documents that may be reasonably

19   necessary or appropriate to implement the purchase agreement',"

20   of which the TAA is a perfect example.  The quote from the sale

21   order stops right before the following words:  "provided that

22   such additional documents do not materially change its terms."

23           We respectfully submit that the transfer of two and a

24   half billion dollars of Lehman cash, which was supposed to be

25   excluded from the deal, materially changes the sale, and

120

1        therefore this agreement should not be approved by the Court.

2             Your Honor, the assets that were at the Depository

3        Trust Corporation were initially in the deal.  Those were a

4        part of the assets that you heard about this morning that were

5        scooped up in the Friday asset grab, the scramble through

6        Lehman's balance sheet and treasury, through every nook and

7        cranny to find what could be found.  There were some assets at

8        DTCC.  They were added to the deal on Friday.  But then later,

9        Barclays decided to exclude them.  When the assets were added,

10       they were put into the clarification letter over the weekend,

11       into a draft.  But then Barclays cut a second deal with the

12       Depository Trust Clearing Corporation and with the trustee, in

13       which it agreed to exclude these assets.

14            The only problem was, no one conformed the first deal,

15       the clarification letter, to the second deal, the side

16       agreement with DTCC and the trustee.  And the reason the

17       agreements were not conformed is that the party who was most

18       informed and best in a position to control the clarification

19       letter from the perspective of Lehman's interests was Weil

20       Gotshal; and Weil Gotshal was a stranger to the DTC letter

21       agreement.  Weil Gotshal was not involved in any of those

22       negotiations, had no role in them, and knew nothing beyond the

23       fact that there was an agreement.

24            The sequence of events starts with the Friday asset

25       grab and the addition of these assets.  As soon as they came

121

1    in, they were recognized by Barclays as assets about which

2    there was a very serious question as to whether they had any

3    value at all.  In Barclays' reply brief, Barclays says --

4    dismisses the entire trustee's argument and says, it makes no

5    sense because these are extraordinarily valuable assets.  And

6    it is true that today, we recognize that these assets have

7    value.  But that is not what Barclays believed at the time.  In

8    fact, in Barclays' opposition brief, Barclays affirmatively

9    asserts that it did not know whether these assets had any

10   positive value.

11        At page 60 of Barclays' opposition brief, they have a

12   lengthy section, excerpted from the testimony of a witness, Mr.

13   Kirk, in which he describes what he was told by a top Barclays

14   operation person, Mr. Keegan, who was responsible for

15   determining the value of these assets.  And at the bottom of

16   page 60, the testimony is:

17   "Q.  And apart from saying it was hard to value, did Keegan

18   have anything to say about that?

19   "A.  He said, I don't know how I'm going to put a value on this

20   of any positive number."

21        And on page 61 of Barclays' opposition brief, it goes

22   on to describe Mr. Keegan having a discussion with Rich Ricci

23   and Bob Diamond, two top Barclays executives.  And in that Mr.

24   Kirk quotes his colleague, Mr. Keegan, as saying:  "I can't

25   value these.  I would be very nervous about putting a positive

122

1    value on them."

2         So from the very beginning, Barclays had serious

3    doubts whether these assets were worth anything at all.

4    Nonetheless, they are put in a Saturday draft of the

5    clarification letter.  In the meantime, the parties have been

6    dealing with DTCC all week.  And DTCC is much more than a

7    custodian.  Through its affiliates, mainly including the

8    National Securities Clearing Corporation, or NSCC, DTCC was

9    responsible for clearing all of Lehman's trades.

10        Now, this week there was some 500 billion dollars of

11   open Lehman trades that needed to be processed.  And DTCC was

12   very concerned about its exposure to Lehman.  It determined to

13   protect its rights, including what rights it had over the

14   assets at DTCC.  It was perfectly willing to allow Barclays to

15   have those assets, so long as Barclays stepped into the shoes

16   of Lehman and assumed responsibility for Lehman's obligations

17   to DTCC.

18        With 500 billion dollars of open trades, Barclays was

19   not about to do that.  So Barclays refused.  Instead it offered

20   a limited guarantee of 250 million, which was going to come

21   from the purchase price that was supposed to go to the trustee.

22   DTCC rejected that as wholly insufficient.  Not that they

23   didn't want 250 million, they just said it's totally

24   insufficient.

25        Now the parties patched up a deal right before the

123

1   sale hearing.  And that was that in addition to recourse to the

2   250 million, DTCC would also have recourse to certain

3   residential mortgage-backed securities.  And the Court may

4   recall that DTCC attended the sale hearing and addressed the

5   Court and explained how it was responsible for all the plumbing

6   for Lehman's trades, and that without that, there would be no

7   business to sell.

8        Well, that agreement fell apart over the weekend.  The

9   residential mortgage securities, it turned out, were not

10  available for DTCC.  That left -- and this is at a very late

11  stage -- that left Barclays with a need to cut a deal with DTCC

12  or find that it had no business to buy.  This was absolutely

13  critical to the entire transaction.

14       In the meantime, Barclays had its own due diligence

15  team at DTCC's offices on Water Street, crawling through, doing

16  due diligence investigation of the assets.  And they could

17  provide no assurance that these assets had positive value.  So

18  Barclays made a decision to clear the impasse and clear the way

19  for this deal by agreeing not to take these assets, and leave

20  them with DTC, where DTC could continue to use those assets to

21  protect its own rights.

22       There was a series of conference calls on the Sunday

23  night about what assets Barclays was taking.  Was it taking all

24  of the assets?  Was it taking some of the assets?  Was it

25  taking none of the assets?  Very late on Sunday night or early

124

1    into Monday morning, finally Barclays made a decision -- and

2    there was a conference call.  And that conference call included

3    various operations people at Barclays plus Gerard LaRocca, top

4    Barclays executive, and various representative of DTCC.  And on

5    that call -- and we have the testimony of the DTCC corporate

6    representative, which is in your binder at tab 13.  And he

7    testified that DTCC was told by Barclays, we're not taking

8    anything.

9         Now, that worked for DTCC, because DTCC's assets --

10   the assets at DTCC would remain subject to DTCC's rights.  They

11   still had the 250 million recourse.  And on that basis, they

12   were prepared to go forward with the deal.  Barclays now had a

13   business to buy.

14        But DTCC insisted that this must be written up in a

15   written contract and executed before closing.  And that's what

16   the parties did.  And that agreement, Your Honor, is in tab 14

17   of your binder.  The critical provision is on page 2, "Winding

18   down of accounts."  It provides:  "Barclays has indicated and

19   hereby agrees that all of the accounts of LBI maintained at the

20   clearing agency's subsidiaries, constitute excluded assets

21   within the meaning of the APA."  This was the agreement that

22   cleared the way to get DTCC's support so the sale transaction

23   could go ahead.

24        Now, Barclays has argued that this agreement does not

25   mean what it appears to mean.  And in fact, there is an

125

1    extraordinary distinction that Barclays draws between the

2    accounts and the contents of those accounts.  And it says this

3    agreement gave all the liabilities and left them with DTCC and

4    allowed Barclays, in the clarification letter, to take all of

5    Lehman's assets; which of course is the exact opposite of what

6    the contractual intent was here, which was to protect DTCC.

7           We asked DTCC if Barclays explained that there was

8    this extraordinary distinction between the accounts and the

9    contents of the accounts.  DTCC said no.  They never made any

10   such explanation.  They never explained that to us at all.

11          Barclays' argument is flatly contradicted by the last

12   sentence of paragraph 1.  That sentence provides that:  "As

13   part of this closeout process, the trustee," not Barclays, "the

14   trustee hereby authorizes DTC to accept and act upon

15   instructions from NSCC to deliver securities from the DTC LBI

16   account to NSCC's account, in order to reduce or eliminate

17   LBI's outstanding delivery obligations to NSCC."

18          Now, under Barclay's interpretation, these assets all

19   belong to Barclays.  Well then, what business does the trustee

20   have in touching these assets or instructing DTCC to do

21   anything with them?  This sentence does not refer just to the

22   accounts, it refers specifically to the contents of the

23   accounts and specifically authorizes DTCC to use those assets

24   to protect itself and its affiliate, NSCC.

25          Now, of course the clarification letter was never

1    conformed.  And the reason it was never conformed is as I

2    explained.  Weil Gotshal was a stranger to this agreement.  Of

3    course Weil Gotshal knew that there was an agreement.  Weil

4    Gotshal knew that there was a limited recourse to the 250

5    million that had been discussed in the sale hearing.  That had

6    also been provided for in the first amendment which had been

7    done on Friday.  But it had no role at all in the DTCC letter

8    agreement, and Weil Gotshal never saw that agreement and did

9    not know that Barclays had entered into an agreement and

10   confirmed that the assets of DTCC were to be excluded assets

11   under the APA.

12          Now, of course, Barclays wants the Court to enforce

13   the clarification letter which was not conformed.

14   Respectfully, as a matter of law, it's not appropriate.  The

15   clarification letter deals with many assets.  The DTCC letter

16   agreement, that contractual commitment by Barclays, deals with

17   only one asset, and that asset is this asset, the assets at

18   DTCC.  That is the only agreement here concerning these assets

19   that was executed by DTCC, the party for which this whole

20   agreement was entered into.  The contract is specific.

21   Barclays' agreement is unambiguous.  And therefore, we submit,

22   it should be enforced.

23          So again, Your Honor, we respectfully submit that if

24   you look at the nature of the asset and what doubtful value it

25   had, according to Barclays at the time, when one considers the

127

1    overriding business need that Barclays had for a deal with the

2    DTCC, and when one considers the specific contractual language

3    in which Barclays agreed that these assets would be excluded

4    assets, and that the trustee would exercise authority over the

5    assets, and the trustee would be the one to instruct the DTCC

6    on their use, then the only conclusion here is that Barclays'

7    agreement, confirmed in this contract, should be enforced, and

8    the DTCC assets should be considered and held to be excluded

9    assets.

10            Your Honor, in the case of each of the disputed

11    assets, we believe the record concerning the nature of the

12    asset itself, the contractual terms that the parties agreed to,

13    and the disclosures that were made and were not made to this

14    Court, all confirm that Barclays has no right to any of these

15    assets.  These assets are, however, critical to the estate.

16    They are critical to the mission of the trustee to pay to all

17    Lehman customers, all of their property.  And accordingly, the

18    trustee respectfully requests that the Court enforce the

19    transaction that the Court approved at the sale hearing.  Thank

20    you, Your Honor.

21            THE COURT:  Thank you, Mr. Maguire.

22            Now, I suppose I have a question about what happens

23    next.  During the lunch break I learned that there are some

24    parties who are interested in saying a few words, who are not

25    principal advocates for the -- either the movants under the

1    60(b) motion or Barclays.  And while I am interested in open

2    communication, I'm not inclined to hear from any of those

3    people today.

4         I've read the various papers that either support,

5    oppose or reserve rights.  And I doubt that anybody has

6    anything to say that will be influential today in terms of the

7    main issues that are before the Court.  That doesn't mean that

8    I'm not interested in hearing what people have to say.  It's

9    just not going to be today.  So there will be another

10   opportunity for those parties who wish to be heard, to the

11   extent that they believe their papers are insufficient to speak

12   for themselves.  But given the day of the week and the time in

13   the day, I think it is more pertinent to stay with the

14   principals themselves.  If there's anybody who has a major

15   problem with that ruling, I'll hear from you another day about

16   it.  I just have to manage the calendar.

17        Now, I think that applies to SIPC as well.  So to the

18   extent that SIPC has a position, I've put you in the same boat

19   with everybody else.  Mr. Boies, I think that means it's your

20   turn.

21        MR. BOIES:  Thank you, Your Honor. May it please the

22   Court, my name is David Boies.  I represent Barclays.  And with

23   the Court's permission, we will hand up a binder that I'm going

24   to use initially to respond to the argument that was just made

25   with respect to the so-called disputed assets.  And what I'm

129

1    going to do is I'm going to deal first with the argument that

2    was just made with respect to the three categories of disputed

3    assets, and then I'm going to move on to the so-called secret

4    discount problem.

5              THE COURT:  Okay.

6              MR. BOIES:  Hopefully, I can do this quite quickly,

7    because I do believe the issue is relatively simple.

8              THE COURT:  You're the only one, then.

9              MR. BOIES:  Well, I don't believe all these things are

10   simple, Your Honor, but I think these three disputed assets

11   issues, the language of the clarification letter is quite

12   plain.  And the question is, is the clarification letter going

13   to be enforced or not?  So I'm going to try to show the Court

14   why it's plain and show the Court why I think it ought to be

15   enforced.

16             And let me begin with the so-called clearance box

17   assets, which was the last issue that counsel was talking

18   about.  And in that connection, I'll put up chart 131, just to

19   remind everybody of the plain text of the purchase agreement

20   which expressly includes all of LBI's clearance box assets as

21   purchased assets.  It specifically says it.  The -- there was a

22   suggestion that there was a DTCC letter that then somehow

23   changed this and somehow the clarification letter simply was

24   not conformed because Weil Gotshal didn't know anything about

25   it.

1          That is not quite accurate, Your Honor.  If you look

2     at chart 133, what you see is that within the clarification

3     letter, it was actually conformed to discuss the DTC letter.

4     You'll see right at the beginning, it talks about section 3 and

5     4 of the first amendment being deleted.  And then it goes on at

6     the bottom to say, "Such collateral account shall be maintained

7     in accordance with the agreement among LBI, purchaser and DTC,

8     entered into in connection with the closing."

9          So it simply is not true, Your Honor, that Weil

10    Gotshal was ignorant about this DTCC letter.  It's not true

11    that there wasn't an opportunity to conform it.  They conformed

12    it when they thought it was appropriate.  The reason they left

13    the portion that I showed you before, was because there was no

14    intention to change that aspect of the clarification letter.

15         And indeed, if you look at chart 135, this is BCI

16    Exhibit 309, and what you see, Your Honor, is that immediately

17    after the closing, Weil Gotshal confirmed to Barclays that the

18    assets held in LBI's DTCC clearance boxes were included as

19    purchased assets.  You recall the clarification letter says

20    these are going to be listed on Schedule B.  This is what

21    they're talking about here, where they say, "Attached is an

22    electronic version of Schedule B," that was on the closing

23    table.  And that excerpt right there shows you the listing of

24    the DTC clearance boxes and shows the market value of those

25    boxes and shows that they are intended to be and known to be

131

1    purchased assets.

2           Now, it wasn't just to Barclays that this was done.

3    If you go to chart 136, what you see is, also immediately after

4    the closing, Weil Gotshal confirmed to LBHI the same thing:

5    Securities and other assets held in Lehman Brothers Inc.'s

6    clearance boxes at time of closing, ninety-eight percent of

7    which were the DTCC clearance boxes.

8           If you go to chart 137, you see that immediately after

9    the closing, the debtors' financial advisor, Alvarez & Marsal,

10   made a report to the unsecured creditors' committee, and they

11   listed the 1.9 billion dollars of clearance box assets as the

12   assets purchased by Barclays.  There simply can't be any

13   dispute, I respectfully suggest, that not only is the

14   clarification letter clear, but everybody knew about it at the

15   time.  That's what the documentary evidence demonstrates.

16          Let me go on to the second disputed asset, which are

17   the exchange-traded derivative obligations, and go to chart

18   139.  Again, I respectfully suggest that the clarification

19   letter is extremely clear.  "Purchased assets shall include

20   exchange-traded derivatives and any property that may be held

21   to secure obligations under such derivatives."  Now the

22   trustee's lawyer says this was drafted late, it somehow got

23   slipped in, nobody knew about it.  You know, Your Honor, I

24   respectfully suggest that they got a copy of the clarification

25   letter.  They knew what it said.  They didn't say, oh, this got

132

1    slipped in, imagine our surprise when we saw this

2    parenthetical.  What are you talking about?

3           Everybody accepted it because that was the deal, and

4    at the time, they know that that was the deal.  Yes, things

5    were changing at the last minute.  Yes, people were scrambling

6    around.  But once the clarification letter was put in its final

7    version, everybody had a copy of it.  Everybody knew what it

8    said.  There wasn't any dispute about this.  Even counsel for

9    the movants concedes that this language is exceedingly clear as

10   to what it means.  If anybody had a problem with it, they had

11   an opportunity to bring it up, and they didn't.

12          I said some things are simple and some things are not

13   so simple.  Let me give you something that's a little

14   complicated on this, but I think it's worth taking a look at,

15   and that's Chart 143.  Now, this is Finding N of the sale

16   order.  And one of the things that it provides is that from and

17   after the closing date, all securities, cash, collateral and

18   other property transferred to accounts of the purchaser at OCC,

19   shall be subject to all rights of OCC therein, in accordance

20   with OCC's bylaws.

21          Now, this language would have no meaning and would be

22   unnecessary, and the parties would not have had any reason to

23   include it if LBI was to keep all of that collateral.  This

24   language is only necessary and only makes any sense at all if

25   you recognize that that collateral had, pursuant to the

1    clarification letter and the asset purchase agreement, been

2    transferred to Barclays.

3          THE COURT:  Mr. Boies, let me ask you a question,

4    because this bothers me.  One of the highlighted terms in red

5    is "cash".  Is it your position that Barclays is entitled to

6    cash in this transaction?  Because that is directly contrary to

7    representations made in open court that I relied on.

8          MR. BOIES:  Right.  And, Your Honor, it is our

9    contention that we are entitled to what's in here, which would

10   include cash.  It's not a general proposition.  As a general

11   proposition, there was no cash in the deal.  But the

12   clarification letter specifically talks about securities and

13   other property, which everybody at the time understood,

14   included to some extent, cash.  And that --

15         THE COURT:  Well, the clarification letter, which I

16   never approved, can't possibly override a court order or

17   representations that were made to me.

18         MR. BOIES:  Well, Your Honor, if this were back in

19   September of -- or October or maybe November of 2008, I would

20   agree with the Court completely.  But rightly or wrongly, Weil

21   Gotshal and the other parties believed that it was not

22   necessary to bring back the clarification letter for express

23   court approval.  After that decision was made, after everybody

24   knew that decision was made, after everybody knew what the

25   clarification letter said, everybody supported this

134

1    transaction; supported it on appeal to the district court over

2    objections; supported it throughout the period of time while

3    the financial crisis continued.  It was only after the

4    financial crisis abated that people began to go back and try to

5    frankly re-trade this deal.

6              And this is a situation in which it could not have

7    been clearer what was happening.  And to say, after the fact,

8    after market conditions have changed, after this has been

9    appealed and the parties sitting here -- around here supported

10   the approval of the sale transaction and the clarification

11   letter on appeal, Your Honor, I suggest, not only is there no

12   legal support for it, but it's simply, basically wrong to come

13   back in, after the fact, and try to say oh, but this wasn't

14   brought back to the Court.  They knew it wasn't brought back to

15   the Court.  They knew it at the time.  Nobody tried to do that,

16   because everybody at the time wanted this deal and knew it was

17   the only deal that was available to save Lehman Brothers.

18             THE COURT:  Mr. Boies, you haven't entirely responded

19   to what I said --

20             MR. BOIES:  I'm sorry, Your Honor.

21             THE COURT:  -- although I appreciate that you're being

22   an advocate for your client in saying what you've just said.

23   The point is this.  You're focused on at least one highlighted

24   provision of the sale order as it relates to OCC, but I'm

25   focused on something else, which is an overriding premise of

1    the sale, and which you've acknowledged is, in fact, correct on

2    your client's behalf, which is that cash is not part of the

3    transaction.

4         There was very clear representation made on September

5    19, 2008, when there were some objections raised about cash,

6    that there would be no cash transferred to Barclays as

7    purchaser in connection with the sale.  One of the concerns I

8    have about the clarification letter and the position you're now

9    advocating in reference to it is that you're seeking cash.  To

10   the extent the clarification letter is your justification for

11   obtaining that cash, you're on week footing.

12        MR. BOIES:  Your Honor, I appreciate the Court's

13   candor.  And the only thing I would ask the Court to consider

14   as this progresses is that while it's absolutely clear that

15   this was not a cash transaction -- Lehman Brothers was not

16   acquiring in general -- transferring in general, cash to

17   Barclays, there were a variety of very specific provisions that

18   inevitably could include some cash.

19        I mean, just an example.  Take the repo assets

20   involving tens of billions of dollars of securities, some of

21   which could, at any given point in time, mature into cash, for

22   all sorts of reasons.  I do not believe that it was the intent,

23   and could not have been the intent under the APA to say that

24   that cash would somehow be carved out of the repo assets, that

25   Barclays would not get the entire repo assets because a portion

136

1     of them had matured into cash.

2          The same way with respect to these clearance box

3     assets or the exchange-traded derivative collateral.  In

4     general, those are not cash.  I frankly don't know how much, if

5     any, cash is there.  I think the amount of cash that was there

6     at the time the transaction was done, which I think is the

7     relevant issue, is something that I believe, and I'll try to

8     check this, would have been very small, if anything.  I hope

9     the Court would agree that if you had exchange-traded

10    derivative collateral, if it was all securities at the time it

11    was transferred, and then matured into cash afterwards,

12    Barclays would be entitled to that cash.

13         And I think that the amount of actual cash that's

14    going to be at issue here is, I believe, not going to be large.

15    But I think the principle that the Court is focusing on is an

16    important principle.  And that is the question of whether the

17    representation that this was not going to involve cash

18    inevitably means that where you have a specific set of assets

19    that are transferred that happen to include some cash, whether

20    the cash in those specifically identified assets gets broken

21    out or not. And that was -- that was the only point I was

22    trying to make to the Court.

23         THE COURT:  All right.

24         MR. BOIES:  Now, it's quite clear how the parties at

25    the time looked at this, and not just Barclays.  Within five

137

1    days -- if we go to chart 147 -- within five days of the

2    closing, Weil Gotshal confirmed with LBHI that Barclays had

3    acquired all of the exchange-traded derivative collateral.

4    They didn't say all the collateral except the cash.  They said

5    all the collateral.  And that's BCI Exhibit 320.

6            Now, if you go to chart 148, you'll see a further

7    confirmation of what I just said, but also something that I

8    think bears on the point that we were discussing a moment ago

9    in terms of cash.  Less than ten days after the closing, LBI's

10   trustee authorized the transfer of collateral at LBI's OCC

11   account to Barclays.  And it says, "We'd like SIPC to instruct

12   the OCC to release the Treasuries back to Chase, and then have

13   SIPC advise Chase to pay the redemption proceeds to Barclays'

14   account."  And here is an instruction to pay nineteen million

15   dollars in cash -- a transfer of cash.

16           And I respectfully suggest, Your Honor, that this is

17   not inconsistent in any way with the general representations

18   that were made to the Court.  And indeed, certainly neither

19   Weil Gotshal nor LBI's trustee, or anybody else thought it was

20   at the time, even though it did involve a transfer of some

21   cash, because what had happened is the Treasuries had been

22   redeemed.

23           If you look at chart 149, this indicates that two

24   weeks after the closing the trustee again agreed with the OCC

25   that all collateral, including cash collateral -- because it's

138

1    all the collateral -- everything that's in those accounts -- if

2    there's any cash in those accounts, it's included -- was

3    transferred to Barclays and was not subject to trustee control.

4    And this is an e-mail chain in which OCC is saying we

5    understand this has all been transferred to Barclays, we don't

6    think we need your consent anymore.  And the answer from the

7    trustee's counsel comes back, "I think we're okay with the

8    below."  And it refers to a letter of credit issue that they

9    want to take up after the transfers of collateral are

10   effected -- after the transfers of collateral are effected;

11   again recognizing that those transfers of collateral had been

12   provided for, and everybody accepted it.

13        Let me turn to the 15(c)(3) issue and go to chart 152.

14   The clarification letter says that Barclays gets 769 million of

15   securities, to the extent they can.  And then it says "or

16   securities of substantially the same nature and value."  Now,

17   you heard counsel for the movants suggest that that didn't mean

18   that if we didn't get the 769 from the 15(c)(3)(3) accounts, we

19   didn't get anything, because that last language was just

20   designed to make sure that we got what was in the 15(c)(3)(3)

21   accounts, if the securities changed.  There's no support for

22   that, Your Honor, either in the language or in the legislative

23   history.  And it is contrary to the way that everybody

24   approached this issue at the time.

25        The -- at the time, this was something -- if you go to

139

1    chart 156 -- this was something that -- and you even heard this

2    from some of the movants' counsel today, that this was part of

3    what was happening, the last couple of days when they were

4    trying to identify assets that could be provided to Barclays to

5    give Barclays the assurance that they were getting enough

6    assets to do the deal.  And one of these assets were the

7    15(c)(3)(3) account assets.  You would not ever have been able

8    to use these if these were not something that provided value.

9    That is, if it all just belonged to the customers, and couldn't

10   be taken out, and the language "or securities of comparable

11   value" was meaningless, then it wouldn't have accomplished the

12   purpose that everybody on both sides of this courtroom agreed

13   was the purpose of this aspect of the clarification letter,

14   which was to identify those assets that could be used to make

15   sure that you could give Barclays the assurance that they were

16   going to get the assets that they needed in order to convince

17   Barclays to do this deal.

18        Those are the three disputed assets.  And I'd like to

19   now turn, with the Court's permission, to the broader question

20   that is raised in terms of whether there was some secret

21   discount that was concealed from Weil, Gotshal and Lazard and

22   the Court.  And that connection, I've got another book that I

23   think was the first one handed out.  Yes, thank you.

24        Now, there were some pretty dramatic things said this

25   morning about how Barclays was telling its board that the

1    assets were worth seventy-five million dollars at the same time

2    that the Court was being told that the assets were only worth

3    seventy-billion dollars.  There was discussion about how the

4    Lehman board was supposedly told that this was a wash, that the

5    assets and liabilities were equivalent.  There was testimony

6    about a document that came from Mr. Seery's files that talked

7    about the value of certain repo collateral being reduced.

8            Before I get into the substantive points, I want to

9    deal with some of those statements, which to use counsel's

10   words from this morning, I think are really quite troubling in

11   the way they are presented to the Court.

12           First, that document from Mr. Seery's files that was

13   shown to you two or three times, the one that has different

14   values, and it comes down to a lower value because they're

15   being reduced, I believe when you see the evidence, there will

16   be no dispute on the record that that document refers to

17   collateral that includes collateral that Barclays never got.

18   Remember it added up to fifty million dollars?  That was

19   collateral that was, at one point, on deposit with the fed, but

20   it includes collateral that Barclays never received.  And we

21   believe when you see the evidence, including Barclays Exhibit

22   593, you will see that that document itself does not correlate

23   with what Barclays received.  It was not the case that Barclays

24   was actually receiving fifty million dollars of repo

25   collateral, which is what that added up to.

141

1          Second, and I want to spend some time on the second

2     point because I think it's quite important that the Court

3     understand this.  And I'm going to begin by showing you the

4     Barclays board presentation that counsel was talking about.

5     Counsel didn't show you the actual board presentation; he just

6     said that they talked about seventy-five million dollars.  And

7     that's right.  And I want to show you that exact page and walk

8     you through what that seventy-five million dollars represents.

9     And if I can, I want to put up a page from the BCI Exhibit 185.

10    I think it's -- yes.

11         Now, you'll see it says total assets and new

12    transaction are seventy-five billion dollars.  That's what the

13    Court was told this morning.  The Court remembers that on the

14    16th, the Court was told that the long value was approximately

15    seventy billion dollars.   The seventy billion dollar number

16    comes from the APA.  And the suggestion was they were telling

17    the Court, putting in -- that there were seventy billion

18    dollars; and yet here's Barclays, and they're telling their

19    board they're going to get seventy-five billion dollars.  I'd

20    like the Court to just keep that in mind for a moment.  I'm

21    going to come back to it.

22         But I'd like the Court to look next at the APA, which

23    is BCI Exhibit 1, and I think it's page 6.  And here it talks

24    about the purchased assets.  And Your Honor, here is the

25    seventy billion dollars, right, in paragraph D.  That's the

142

1    seventy billion dollar figure the Court was talked about.  E

2    says, in addition, there's going to be fifty percent of each

3    position in the residential real estate mortgage securities.

4    So the APA is talking about seventy billion dollars, the so-

5    called long positions, and fifty percent of each position in

6    the mortgage securities.  Now, let me go back to the board

7    presentation.  If you look at the numbers that add up to the

8    75.3, you will see, up at the top, one of those is mortgages,

9    6.5.  If you subtract that from the 75.3, you come up to pretty

10   close to 70 -- I think it's about 69.  This is an illustration,

11   Your Honor, of the importance of paying attention to the actual

12   evidence that's going to come in, because I think when the

13   Court sees the actual evidence that comes in, the Court is

14   going to understand that there wasn't any double set of books,

15   there wasn't any situation where Barclays or anybody else was

16   saying one thing to the Court and another thing internally.

17   Last, let me ask the Court to look at Lehman -- BCI Exhibit

18   103.  Now, these are the Lehman Brothers board minutes, and

19   this is actually a draft of those minutes.  And I'm using a

20   draft, Your Honor, because there is some information in this

21   draft about what the board was told that is not apparent from

22   the final version of the minutes.  And I want to go to page 3

23   of these minutes.  And I hope I've got the right page.  Yes.

24   You'll see, where it says for BD operations, it's a wash.  But

25   if you go down further, you see that there'll be seventy

143

1    billion dollars of assets at LBI, sixty-four billion dollars of

2    liabilities, so paying the BD ninety-four percent of assets.

3    The liabilities and the assets did not match; they knew it

4    didn't match.  And, as I'm now going to show you, the APA, on

5    its face, shows that it doesn't match.

6          And in that connection, I want to look at chart 17.

7    The trading assets in the APA are long positions -- and this

8    goes back to the original APA -- long positions of seventy

9    billion dollars, retained cash, 1.3 billion dollars, and fifty

10   percent of the residential mortgage securities.  Now, no value

11   is provided in the APA for that.  So the total that is provided

12   on the face of the APA is 71.3 billion dollars plus fifty

13   percent of the value of the residential mortgage securities.

14   Now, if you ignored the fifty percent of the residential

15   value -- the value of the residential mortgage securities for

16   the moment, what you would see is that trading liabilities are

17   sixty-nine billion dollars, and that leaves a difference of 2.3

18   billion dollars, which, as I will come to, is sometimes

19   referred to as a buffer, sometimes referred to as a discount,

20   but it's a difference.  But counsel for the debtor told the

21   Court that the residential value -- value of the residential

22   mortgages were for a hundred percent, six billion dollars,

23   estimated, which would mean three billion dollars would be

24   half.  So that under the way the original APA was set up, there

25   would be a difference of 5.3 billion dollars between the

1    trading assets and the trading liabilities.  That would have

2    been the so-called buffer.  And now there are other aspects of

3    what was being bought and sold.  There were obligations being

4    taken on for comp and cure.  There were intangible assets being

5    acquired and like.  But if you look at what they have been

6    telling you, which is that there was this big discount on the

7    assets that nobody knew about and that we were taking less

8    liabilities than we were getting assets.  The concept of the

9    buffer, which is what the Barclays representative talks about

10   with respect to the discount, was there from the beginning.  In

11   fact, if you look at the testimony, and the evidence will show

12   this, I think, quite clearly at the evidentiary hearing, all of

13   the Barclay representatives said that what they were focused on

14   over the days that followed September 16th was not changing the

15   economics of the deal but maintaining this buffer, this

16   protection, that was provided and obvious on the face of the

17   APA.  If you listened just this morning, you would have thought

18   that this was a very simple case that what was believed by

19   Weil, Gotshal and Lazard was a deal was really a balance sheet

20   deal where assets and liabilities were going to match and there

21   wasn't going to be any difference, and there wasn't going to be

22   any gain for Barclays, and indeed, if you listened what was

23   said, really, it was going to be a gain for the estate.

24   Barclays was going to come in to this very distressed situation

25   at the nadir of the credit crisis when nobody knew what was

145

1   going to happen in the future, and they were going to buy

2   assets above book value.  They were going to give a gain to the

3   estate, if you listen to what was suggested today.  Now, in

4   fact, the evidence, we think, is quite clear that there is --

5   there was no intent to match -- there was -- this was not a

6   balance sheet deal, it was not conceived of as a balance sheet

7   deal by Weil, Gotshal or Lazard, the counsel and the financial

8   advisor for the estate.  Counsel for the movants suggest these

9   people were kept in the dark.  They didn't understand what was

10  going on.  They thought it was a balance sheet deal; they just

11  didn't understand that there was a secret discount.

12          Let me show you just some of the evidence that we're

13  going to rely on.  And in that connection, let me show you some

14  of the testimony that we've had from both Weil, Gotshal and

15  from Lazard already about whether this was a balance sheet

16  transaction or a wash.  Let me start with HM-10.

17      (Video playback begins)

18  "Q.  You said a number of times this was the purchase of the

19  LBI business.  Why was it the purchase of the business as

20  opposed to a balance sheet transaction?

21  "A.  Well, we never had a, what I would call an accurate

22  balance sheet, and it was never a balance sheet transaction

23  from my perspective.  It was always in the -- it was always

24  characterized as a purchase of the North American business,

25  which was basically the LBI business.  And the 10,000

146

1   employees, I think the estimate was 10 to 12,000 employees who

2   were involved in the transaction which Barclays wanted for all

3   or basically all LBI employees."

4        (Video playback ends)

5            Let me go to another excerpt from Mr. Miller, HM-4.

6        (Video playback begins)

7   "Q.   Now, in this agreement, there are no values specified for

8   any of the assets that are being transferred or the liabilities

9   that are being assumed, correct?

10   "A.   I believe that's correct.

11   "Q.   Why is that?

12   "A.   It was a purchase of the business, and the assets that

13   went with that business to the extent not excluded.

14   "Q.   And those assets that were being purchased were being

15   purchased irrespective of what their value was, correct?

16   "A.   Essentially, yes."

17        (Video playback ends)

18            Let me emphasize the importance of that, Your Honor.

19   This is the counsel for LBHI saying that the values was not a

20   balance sheet transaction; the values were essentially

21   irrelevant.  Now, that was his perspective.  This was not

22   something where something kept him in the dark.  This is not

23   something where somebody said to him this is a balance sheet

24   transaction, the assets are going to be the same, it's

25   critically important the values be equivalent.  He says exactly

147

1    the contrary.  And it's not just him.  That's what everybody

2    understood when this thing was being negotiated.

3           Let me go to HM-7.

4       (Video playback begins)

5    "Q.  Did Weil, Gotshal ever tell to the Court or represent to

6    the Court directly or indirectly that the deal was going to be

7    a wash?

8    "A.  I don't believe so.  I did not, certainly.

9    "Q.  Good, did you, in fact, believe that the deal was going to

10   be a wash?

11   "A.  I did not hear the expression "wash" until very recently."

12      (Video playback ends)

13          Let me go to Lazard, LBHI's independent financial

14   advisor.  And start with BR-3b.

15      (Video playback begins)

16   "Q.  Do you recall that the agreement between the parties

17   provided for no representations or warranties concerning the

18   values of the assets and the liabilities in the transaction?

19   "A.  I think that's generally correct.

20   "Q.  Was it also your understanding that the purchase agreement

21   as of -- the one before you contained, as of September 19th,

22   contained no true-up or profit-sharing mechanism?

23   "A.  In this time, in the APA that was signed, that's correct.

24   "Q.  And was that -- as a result of that, is it fair to say

25   that the parties provided no contractual mechanism to make sure

148

1    that the assets and the liabilities involved in the transaction

2    ultimately matched?

3    "A.  I don't think it was part of the transaction that there

4    was to be a match."

5        (Video playback ends)

6            So Lazard, also, did not think it was part of the

7    transaction to be a match.  Now, we will show you, Your Honor,

8    that the gain that is realized by Barclays, a gain,

9    incidentally, that we'll also show you was known by everybody

10   at the time and expected, came not from any so-called discount

11   on the value of these assets.  But if there had been such a

12   gain, that would not have been in any way inconsistent with the

13   deal that Weil, Gotshal and Lazard believed that they were

14   presenting to the Court and that they were negotiating.

15           Let me go one more to -- did I do BR-4?  Let's do

16   BR-4.

17       (Video playback begins)

18   "Q.  To your knowledge, there was no limitation on whether

19   Barclays could profit from this trade, correct?

20   "A.  That's correct.

21   "Q.  Just to be clear, if Barclays lost money on this

22   transaction, it would have been the end of the U.S. capital

23   markets."

24       (Video playback ends)

25           So again, you have the independent financial advisor

149

1    for LBHI saying there's no limit to how much Barclays can make

2    in this transaction.  It's not designed to match liabilities

3    with assets.  It's intended to be a sale of the business and

4    one in which Barclays can make a profit.

5           Now, in addition to that, everybody knew at the time

6    this was going on that the LBI assets, the value of those

7    assets, was volatile and eroding and that Barclays was

8    constantly saying that LBI's marks were too high.  And -- let

9    me go again to Harvey Miller, HM-3.

10   (Video playback begins)

11   "Q.  Did you have an understanding, one way or the other, as to

12   whether there were any reliable estimates of the actual value

13   of the assets or liabilities that were involved here?

14   "A.  I don't quite know what you mean by reliable.  As I said,

15   the -- it was fluid.  The markets were in terrible shape.

16   There was a persistent theme that -- and this was a theme that

17   predated this transaction -- that Lehman was always aggressive

18   on its marks.  So from my perspective and I think my team's

19   perspective, Lehman and Barclays were trying to work that out

20   in this room -- I had these huge computer printouts and

21   stuff -- that went on for hours and hours and hours."

22   (Video playback ends)

23         And BR-6.  This is Lazard.

24   (Video playback begins)

25   "Q.  And in the course of doing that diligence, did you become

150

1    aware of the process in which Barclays and Lehman engaged

2    concerning Lehman's marks?

3    "A.  Again, it was my understanding that we were out to meet

4    Barclays; they said that the marks were not appropriate, that

5    they were too high because they were no longer market or

6    stale."

7         (Video playback ends)

8         And one more from Mr. Ridings, BR-3a.  Again, what

9    you're saying -- hold on, just one sec -- what you're seeing

10   here is the independent financial advisor and the counsel for

11   LBHI repeatedly saying they understood these marks were

12   deteriorating.  The understood they were uncertain.  No one

13   could figure out what those values were, and it was not a

14   balance sheet transaction.

15        (Video playback begins)

16   "Q.  Do you know whether there was disagreement between

17   Barclays and Lehman over the actual values of assets and

18   liabilities involved in the transaction?

19   "A.  Yes.

20   "Q.  What was your understanding, generally, of such

21   disagreement?

22   "A.  My understanding was that, to put it in context, the

23   tumultuous week where the market was extremely volatile and

24   generally on a downward trend, and that throughout that week,

25   Barclays had made the point that Lehman's marks were not -- not

1    market or stale, and that there was a disagreement as to what

2    the market value of those securities actually were.

3    "Q.  To your knowledge, was there uncertainty that week over

4    the values of the assets or liabilities that were involved in

5    the transaction?

6    "A.  Absolutely."

7        (Video playback ends)

8        And again, recognition that Barclays and Lehman were

9    discussing the marks, that Barclays thought the marks were too

10   high; they were negotiating over those.  And -- were you able

11   to do that?  There's one more I want to show, Your Honor.  And

12   you heard counsel tell you that Mr. Harvey Miller testified

13   that if he'd known there was a discount, he would have wanted

14   to tell the Court about it, and that's all true.  What I want

15   to do is I want to play what Mr. Miller said right after he

16   made that statement.

17        THE COURT:  Are you going to play the statement, too?

18        MR. BOIES:  Can we do that?

19        THE COURT:  Because I think we should have context.

20        MR. BOIES:  Yeah, well, they read the statement, and

21   what it was --

22        THE COURT:  But it's much more dramatic --

23        MR. BOIES:  Well, sure.

24        THE COURT:  -- to see Mr. Miller --

25        MR. BOIES:  Okay.  It is.

152

1        THE COURT:  -- on video tape.

2        MR. BOIES:  Let me try to see if our technology is

3  such that we can --

4        THE COURT:  I bet they can do anything you ask.

5        MR. BOIES:  I'll tell you what.  Let me just -- can I

6  have just one moment, Your Honor?

7        THE COURT:  Sure.

8        MR. BOIES:  Your Honor, the tape is just a -- we're

9  able to do it, Your Honor.

10        THE COURT:  I've been through a few trials like this

11  before.  I know what it's like.

12    (Video playback begins)

13  "A.  And we had to arrange for a hearing in the bankruptcy

14  court to approve the sale procedures.  So we had to draft" --

15    (Video playback ends)

16    (Video playback begins)

17  "A.  -- of the Court.

18  **Q.  And this is the bulk discount --**

19  **A.  Yes.**

20  **Q.  -- in front of you?**

21  **A.  I'm not sure what it means, but if there was a**

22  **discount" --**

23    **(Video playback ends)**

24        THE COURT:  Should we take a five-minute break?

25        MR. BOIES:  Your Honor, I don't mean to keep the Court

153

1    here.

2                    THE COURT:  No, I --

3                    MR. BOIES:  I think we do have it.

4                    THE COURT:  Well, if you're ready, fine.

5        (Video playback begins)

6    "Q.  Now, is there anything that I've shown you in Exhibit 516,

7    509, 507 or 460a that is in anyway inconsistent with the

8    understanding you had at the time Weil, Gotshal made the

9    motions to approve the sale on September the 19th, 2008?

10                   UNIDENTIFIED SPEAKER:   "Objection to the form of the

11   question.

12   "A.  That's ex -- just can you repeat the exhibit numbers,

13   please?

14   "Q.  Sure.  Exhibit 516, 507, 509 --

15   "A.  Okay, let's say this -- I'm sorry.  It's one last time, I

16   promise.  507, okay.

17   "Q.  509.

18   "A.  Okay.

19   "Q.  516.

20   "A.  Okay.

21   "Q.  And 460a.

22   "A.  The only reservation I would have is if we were apprised

23   of a "discount", whatever that means in 50 -- 460a, we would

24   have brought that to the attention of the Court.

25   "Q.  And this is the bought discount in front of you?

154

1    "A.  Yes.

2    "Q.  -- in front of you?

3    "A.  I'm not sure what it means, but if there was a discount,

4    we would have to know more about it."

5         MR. BOIES:  Now, just stop for one second.  That is

6    the -- that's the testimony that I think they were referring to

7    this morning.  And the portion that I want to direct the

8    Court's attention to, for context, is what immediately follows

9    that testimony.  Now.

10   "Q.  Did you understand at the time that there were discussions

11   between Barclays and Lazard that the marks on the securities

12   that were involved were uncertain, and different people had

13   different views as to it?

14   "A.  I wouldn't call that a discount.

15   "Q.  If the Lehman marks were reduced because Barclays thought

16   either that they were stale or that conditions had changed,

17   would you call that a discount?

18   "A.  No.

19   "Q.  If the Lehman marks were reduced because Barclays

20   prevailed in its view that they numbers should be lower, would

21   you consider that a discount?

22   "A.  No."

23        (Video playback ends)

24        Now, we also asked Mr. Miller and Mr. Ridings from

25   Weil, Gotshal and Lazard whether, having looked at Rule 60

155

1    motion and all the arguments being made, they continued to

2    stand by the proffer and the testimony that they had given to

3    this Court because we expected the argument that was made today

4    which was that, somehow, Harvey Miller and Lazard were kept in

5    the dark.  They had the wool pulled over them.  They didn't

6    really know what was going on.  They were ignorant.  While it's

7    a little hard to think of those characterizations and Harvey

8    Miller and Lazard in the same paragraph, that is the argument

9    that the Court's hearing.  And so we wanted to go back to them

10   and say okay, now, having looked at what has been presented,

11   does that change your mind?  Does that change what you told the

12   Court?  And first, let me go to Mr. Miller, HM-6.

13           (Video playback begins)

14   "Q.  Based on everything that you know as of today, do you

15   agree that your presentation to the Court on September 19th was

16   fair and accurate and appropriate?

17   "A.  I believe that it was fair and accurate and appropriate

18   based upon the information which we were given and the

19   assumption that everyone at Lehman was operating in good faith.

20   "Q.  And have you found anything since then that has led you to

21   believe that the information that you were given was inaccurate

22   or that the people at Lehman were not operating in good faith?

23   "A.  No."

24           (Video playback ends)

25           Let me also ask, HM-12 for the Court to look at which

156

1    is another statement by Mr. Miller.

2         (Video playback begins)

3    "Q.  Did you believe that the information which you were

4    receiving from Lehman was information which you could rely on

5    by making representations to the Court?

6    "A.  I assumed that the people at Lehman were operating in good

7    faith, and I had no reason to doubt them.

8    "Q.  Have you ever had any reason to doubt them based on

9    anything that you have come across since September 2008?

10   "A.  No."

11        (Video playback ends)

12         Let me ask the Court also to look, just briefly, at

13   some testimony that Lazard gave on this issue, BR-5.

14        (Video playback begins)

15   "Q.  Are you generally familiar with the Rule 60 motion that

16   was filed by Lehman in this proceeding?

17   "A.  At a very high level fashion, yes.

18   "Q.  Based on everything that you know as of today, do you

19   believe your proffer and testimony to the Court on September 19

20   was accurate and fair and appropriate?

21   "A.  I do."

22        (Video playback ends)

23         And one more selection of testimony from Mr. Ridings,

24   BR-8.

25        (Video playback begins)

157

"Q.   Barclays received a five or ten percent discount off of

Lehman's marks at the time.  That would not have changed your

recommendation to the Court to approve the sale, correct?

"A.   Just a couple of comments to answer your question.  It

needs put in context of the week that we're in, the markets are

extraordinarily volatile.  Things are changing literally by the

minute, and generally things were trending down, not up.  There

was continued disagreement between Barclays and Lehman as to

what the appropriate marks were, and if you're saying a five or

ten percent discount off of the Lehman marks, which are what

Barclays always said -- they didn't use percentages, but they

said your marks are stale and they're not reflective of what's

happening in the market -- the order of magnitude you've just

discussed with me, that would not change my opinion that this

was better than liquidation, it was the highest and best and

only alternative we had.

"Q.   What order of magnitude would have affected you?

"A.   Let me try and describe it this way.  What -- these

securities or some of them were very liquid securities.  So if

we go to some financial literature, for example, like Shannon

Pratt who's a well-known author who writes about value and

securities and liquidity discounts, what he writes is that

illiquidity discounts on securities -- and that means

securities that cannot readily be sold -- average is thirty-

five to forty percent.  Now, okay, everything is fact-specific,

158

1    but what you and I have just discussed isn't close to -- I

2    don't think it's close to thirty-five or forty percent, sort

3    of, illiquidity discount."

4        (Video playback ends)

5            And the reason, obviously, that I asked him those

6    questions was to bring out not only the fact that the markets

7    were volatile, that the values were trending downward, there

8    was continued disagreement between Barclays and Lehman about

9    the marks -- Barclays thought the marks were too high -- but

10   his statement that a five or ten percent discount, even if

11   there had been an additional five or ten percent discount,

12   would not have been something that would have been material in

13   evaluating the nature of this transaction.  Now, that's not our

14   view; we've never advocated that to the Court.  That's the view

15   of LBHI's independent financial advisor.

16           Let me go to chart 48 because I want to emphasize

17   something that both Mr. Miller, I believe, and Mr. Ridings

18   said, and that was they said there was no upside sharing

19   agreement and they said as this indicates that the APA

20   contained no representation or warranty regarding the values of

21   the assets and liabilities in the transaction, no requirement

22   of any definite relationship between assets and liabilities, no

23   requirements of a wash, no provision of any kind regarding the

24   ultimate impact on the Barclays or Lehman balance sheet.  No

25   requirement for any appraisal or final valuation of financial

159

1    inventory or any other asset other than the real estate.

2         Now, the Court may recall that there was one provision

3    in the APA originally that provided for a limited upside

4    sharing.  It wasn't a complete true-up, but there was something

5    that provided for upside sharing.  And the Court will recall

6    that on September 19th, the Court was told that that provision

7    had been removed, that that provision, the limited provision

8    for upside sharing had been taken out of the APA so that even

9    that limited provision, the quote from the hearing on September

10   19th from Weil, Gotshal was, "There was an upside sharing in

11   the original transaction.  There was going to be a true-up

12   twelve months later on, and that has been eliminated from this

13   transaction."  So once again, one of the things that they are

14   saying is that this is not a balance sheet transaction; there's

15   no true-up; there's not even any upside sharing.

16        Now, when you think about the context of what's going

17   on, I do ask the Court to think about it not in terms of May

18   and June 2010, but in terms of September of 2008.  And in that

19   connection, I'd like to go to BR-25, which is a description by

20   the Lazard representative of what the nature of the markets

21   were and the kinds of risks that Barclays was undertaking in

22   order to do this transaction.

23        (Video playback begins)

24   "Q.  Early in your testimony, you made reference to

25   consequences of any loss on the part of Barclays as a result of

160

1   this purchase of this business.  Can you describe to me what

2   you meant in your response earlier?

3   "A.   Sure.  That didn't go into the consideration of whether I

4   felt this was a good or bad deal, Barclays was taking a risk.

5   I was making a comment kind of as a U.S. citizen.  If Barclays

6   had expended this money and the capital markets continued to

7   fall, there was a chance that Barclays would then subsequently

8   fail, which would have meant that Goldman, Morgan Stanley, the

9   list goes on and on of firms that may make up -- it literally,

10  we were talking about the end of the capital markets as we knew

11  them that week.  It was that bad.  A year and a half later, you

12  may say, oh, you were overreacting, but I've done this for

13  thirty-five years.  I can't stress to you the unbelievable

14  nature of that week.  So Barclays took a huge risk.  And if

15  this transaction failed for Barclays, it was a bet-the-ranch

16  transaction for Barclays.  But that had nothing to do with my

17  opinion as to whether this was the best price and deal for me.

18  "Q.   And it was your opinion that it was, correct?

19  "A.   What I said in my proffer and on the stand, this was the

20  highest and best that we had, and it was clearly better than

21  liquidation."

22         As Lazard says, this was a venture company investment

23  for Barclays.  Enormous risks.  It was something where Barclays

24  was the only bidder.  There wasn't anybody else who had an

25  alternative.  When objectors objected on the grounds that there

1   was a discount, that this was a fire sale, Weil, Gotshal,

2   Lazard, other people who are now the movants, did not get up

3   and say oh, no, this is a great deal.  This is not a fire sale;

4   this is not a distress sale.  They said, instead, we have no

5   other alternative.  That was the condition of what went on at

6   the time of this transaction.  Now, after the fact, the credit

7   markets have recovered; it's a different world, as Lazard says

8   in that testimony.  What you hear is that allegations that

9   maybe Barclays was being piggish, was the word this morning,

10  that they were using their leverage.  I think the record shows

11  that what happened here was a situation in which the credit

12  markets were in freefall, there were no other bidders for

13  Lehman brothers, there were no -- very few other bidders for

14  any financial assets at that point in time.  Anybody with

15  assets and the willingness to commit them had a wide variety of

16  opportunities of what to invest in.  Investments which, if --

17  and it was a very big if -- the markets turned around would

18  prove to be highly valuable.  That investment that was made was

19  welcomed at the time and it was welcomed for months afterwards

20  by the very movants who, today, want to recut the deal.  For

21  months afterwards, after all of the things that are talked

22  about here were known -- all of the documents, all of the

23  snippets, all of the e-mails were known, all of the terms of

24  the clarification were known -- people continued to welcome

25  this deal and, indeed, fight for it when it was objected to and

162

1    when those objections -- the denial of those objections was

2    appealed.

3              And one of the things that the lawyer for the

4    creditors' committee said is, we need the Court to see what we

5    saw at the time.  And I'd like to show you some of the things

6    they saw at the time but that they didn't show you this

7    morning.  And I want to begin with chart 33, which is testimony

8    that is being given by Alvarez & Marsal about an October 2008

9    report to the creditors' committee.  And let me see if I can

10   find that document.  Let me go to that document first just so

11   that the Court has the context for what we're talking about.

12   Go to number --

13             Now, this is a document that was presented by Alvarez

14   & Marsal to the creditors' committee -- Weil, Gotshal was

15   there -- early October 2008.  And what you see is that they're

16   talking about a negotiated five billion dollar reduction from

17   what are referred to there as the Lehman stale marks.  Now, to

18   be certain -- and if I go to chart 32, this is a somewhat

19   clearer version of that -- October 8, 2008, Alvarez & Marsal

20   talking to the creditors' committee, talking to Weil, Gotshal,

21   talking about a negotiated five billion dollar reduction from

22   the Lehman book value.  And at deposition, we asked them

23   whether this is the same five billion dollars that was involved

24   in their Rule 60(b) motion, and they said yes.  And that's at

25   chart 33.  And this is Mr. Kruse's testimony.  And after being

163

1    shown that same page:

2    "Q.  And you recall there being a discount talked about in that

3    motion referring to the 60(b) motion?

4    "A.  Yes.

5    "Q.  Is that the same discount that's referred to on page 28 of

6    the October 8, 2008 Alvarez & Marsal report, the five billion

7    reduction?

8    "A.  I believe it applies to the same pool of securities.

9    "Q.  Is it different in any way?

10   "A.  Well, no."

11          So the same so-called five billion dollar so-called

12   secret discount was something that the creditors' committee,

13   the financial advisor, Weil, Gotshal, everybody knew about the

14   first week in October.  Now, not just the first week of

15   October; they knew about it before then, too, and I'm going to

16   come to those.  But I want the Court to focus on this one

17   because this is where we have one of the clearest statements

18   that this five billion dollar so-called discount, reduction,

19   however you want to characterize it, buffer, however you want

20   to characterize it -- different people have used different

21   words -- was known about.  And after this, did anybody come and

22   say we're going to oppose the affirmance of this sale order on

23   appeal?  Quite the contrary.  They fought for it on appeal.

24   Did anybody come in and say we now want to reexamine it; we

25   want to reopen it?  Nobody did that.  And the reason, because

164

1    in October, things were already still terrible.  The market was

2    still down.  This was still desperately needed.  Nothing had

3    turned around in October.  And everybody was not only accepting

4    but seriously desiring the continuation of the Barclays

5    transaction.

6         Now, I'm going to go through a series of documents

7    that are designed to do what counsel for the creditors'

8    committee said that we needed to do with the Court, which is to

9    show you what they saw at the time.  They saw this.  What else

10   did they say?

11        Well, let's go to chart 23.  Now, this is the document

12   that I showed to Mr. Miller and that Mr. Miller had not seen.

13   And it talks about a fixed discount.  Now, this is a document

14   that counsel for the movants talked about with you, but they

15   didn't really show it to you.  And I think there's all right

16   reason for that.  And that is, when you look at the document,

17   it's interesting to see who it's to.  It's to Lazard.  It's to

18   the financial advisors to LBHI.  Remember them suggesting that

19   somehow Lazard and Weil, Gotshal didn't know what was going on;

20   the discount had been kept from them.  It wasn't that they were

21   misleading the Court intentionally; they were doing so because

22   they just didn't know the facts.  Here, what you see is not

23   only were these facts known on October 8th, ten days or two

24   weeks after the closing, but they were known on September 18th,

25   before there even was a hearing on the 19th, and before the

1    negotiations the 19th and the 20th.

2         And if you go to chart 24, what you see is this e-mail

3    was then passed on and discussed with other people at Lazard so

4    that this was not something that just went to somebody and it

5    ended up not being read.  It was read, it was paid attention

6    to, it was focused on.  It was something that was known at the

7    time by the very people that are representing LBHI.  And again,

8    of course, it was the LBHI lawyers and financial advisors that

9    were talking to the Court.  It was not Barclays.  Barclays was

10   not making this presentation.  Now, that's on September 17th.

11        Now let me go to September 18th, and let me start with

12   Exhibit 43.  And the reason I do this is there was a suggestion

13   that the comp and cure numbers were somehow changed and Weil,

14   Gotshal and Lazard didn't know anything about it and it was all

15   done, somehow, surreptitiously by Lehman Brothers who wanted to

16   make nice to Barclays.  In fact, what this document, which is

17   dated September 18th, shows is that Lehman shared with Weil,

18   Gotshal the transaction adjustments that were made to the

19   balance sheet in estimating the potential exposure for cure and

20   comp liabilities.  Going directly to Weil, Gotshal.  And if you

21   go to chart 44, you also see the same information being shared

22   by the Lehman people with Lazard, the independent financial

23   advisor who's testifying to the Court.  Again, this is not some

24   group of, somehow, rogue Lehman people who are doing things and

25   keeping the lawyers and the financial advisors in the dark.

1    This is all something that's part of the normal process that's

2    going on, and that Weil, Gotshal and Lazard were fully apprised

3    of.  And if you go to chart 45, you'll see that bonuses payable

4    and cure payments are being shared with Alvarez & Marsal as

5    well.  The same transaction adjustments.  And this was also on

6    September 18, before the hearing before Your Honor, before the

7    final negotiations.  So the idea that these cure and comp

8    numbers were somehow hidden from Weil, Gotshal or kept from

9    Lazard simply has no basis in fact.

10          Now, jumping ahead a little bit in the chronology, if

11   you go to chart 66, this is an excerpt from Barclays' web site

12   that showed that as of November 22, the actual cure payments

13   were going to be estimated to be 109 million as opposed to 1.5

14   billion.

15       Now, in fact, the cure payments estimate changed again and

16   it more than doubled.  So this was a moving target.  But what

17   this shows is that there was no effort to conceal, there wasn't

18   my people didn't know that these cure and comp numbers were

19   very contingent, very much determined by the circumstances, and

20   very much within to a very large extent Barclays' discretion.

21   This was known, it was public.  And yet nobody in November came

22   in and said this is so inconsistent with the terms of the deal

23   that we want to re-trade the deal.  And, again, the reason they

24   didn't is very simple; because if the Court will recall, in

25   November the securities markets were still internal.

1          Now, as to what was known about how contingent and

2     uncertain these cure and comp payments were, let me ask the

3     Court to listen to some testimony from Mr. Miller, HMP.

4          (Audio playback begins)

5     "Q.  Was it communicated to you or anyone else at Weil Gotshal,

6     sir, prior to the time you described the transaction to Judge

7     Peck on the 17th that there had been a write-up of the amounts

8     shown on Lehman's books approved for compensation for the

9     purposes of the transaction?

10    "A.  No, I never heard anybody talking about a write-up.  The

11    figures on comp and also the figure on my assumption of

12    executory contracts was always a very contingent figure,

13    because nobody knew what contracts were going to be assumed and

14    how many employees Barclays would ultimately keep."

15         (Audio playback begins)

16         MR. BOIES:  And, of course, what Barclays chose to do

17    in that case enabled it to very much control comp and cure

18    liabilities that it took on.  And one of the things that they

19    showed you were some documents that showed what those

20    liabilities would have been on Lehman's books.  There's a

21    substantial difference, as the Court is aware, between what the

22    cost of something is to one party and what the cost is to

23    another party.  It may be a substantial liability to somebody

24    who does not have a going concern business, but somebody who

25    does have a going concern business may be able to work those

VERITEXT REPORTING COMPANY
212-267-6868                                    516-608-2400

1    off at a much reduced rate.  So the fact that Lehman carried it

2    at one number and Barclays was able, through negotiation and

3    selection of employees and determining how it went forward to

4    bring that number down, nothing inconsistent with that, and

5    nothing that anybody was ever told wouldn't happen.  And,

6    indeed, they recognized that these were very contingent

7    numbers.  And Barclays put it on their website as the numbers

8    went up and down.

9         Let me go back to what did the movants know and when

10   did they know it.  Let me go next to Chart 54.

11        Now, you heard the committee counsel tell you that

12   maybe they knew that there was something about a discount out

13   there, but they didn't have any idea what the magnitude of it

14   was or that it was a discount from fair market value.

15        This is what the committee, committee's counsel was

16   told by Goldman Sachs before the sale on September 19.  "The

17   proposed sale goes way beyond this in that it allows Barclays

18   to cherry pick owned inventory, investment and other assets at

19   a windfall discount to fair market value, the discount is at

20   least several billion dollars."

21        This is what the creditors' committee knew on

22   September 19th.  Now, did that cause them to come into Court

23   and say when people objected that this was a fire sale and too

24   great a discount?  Yes, those objectors are right, it is a

25   windfall discount in fair market value.  You didn't hear the

169

1    creditors' committee, you didn't hear any of the movants saying

2    anything like that to Your Honor because they realized that

3    this was a great deal for Lehman Brothers at the time.  And

4    this was the only deal for Lehman Brothers at the time.  And so

5    although they knew exactly what was going on they didn't say

6    anything, they didn't object.  And not only did they not object

7    but they continued to support this transaction in this Court

8    and on appeal.

9          Let me go next to Chart 31.  And this is Mr.

10   O'Donnell's deposition.  When he's asked "When is the first

11   point in time that Milbank or Houlihan communicated to Weil

12   this concern about a five million dollar mismatch?"

13   "A.  On September 22nd or at the end, Sunday and Monday the

14   21st and the 22nd."

15         So this was not something that Weil Gotshal didn't

16   know about, that Milbank didn't know about, that Houlihan

17   didn't know about.  The creditors' committee knew about it, the

18   trustee knew about it, counsel knew about it, the independent

19   financial advisors knew about it.  They didn't think that this

20   was any reason to object.  They thought that this was the best

21   deal, the only deal available at the time.  They grabbed it,

22   they supported it in this Court and on appeal.

23         And then, jumping ahead, we come to October 8th.

24   There's one document I would also just draw the Court's

25   attention to.  I don't have a copy of it available.  But it's

170

1    BCI Exhibit 144, which is September 29th and 30th.  It refers

2    to Alvarez & Marsal meeting with Lehman executives to discuss

3    the 5 -- what is referred to as a 5.1 billion dollar haircut in

4    the Barclays REPO.  That's at the end of September.  And then

5    I've already shown the Court the October 8th Alvarez report to

6    the creditors' committee and Weil.

7         THE COURT:  Mr. Boies, I'm just going to break in for

8    one second to ask a question about --

9         MR. BOIES:  Sure.

10        THE COURT:  -- a logical place in your presentation to

11   take a ten-minute break?

12        MR. BOIES:  Right now would be great.

13        THE COURT:  If now is great, then let's break to 4:15.

14        MR. BOIES:  Thank you, Your Honor.

15        THE COURT:  It's about a ten-minute break.

16   (Recess from 4:04 p.m. until 4:23 p.m.)

17        THE COURT:  Be seated please.

18        MR. BOIES:  Thank you, Your Honor.

19        THE COURT:  Please continue, Mr. Boies.

20        MR. BOIES:  Let me return to a question that the Court

21   asked me earlier about cash and about the cash in the various

22   collateral accounts.

23        And I said at the time that I didn't know how much

24   cash was in there and whether it was large amount or not.  Over

25   the break I have been able to ascertain at least some

171

1    information on that.  And I'm told that at least in the OCC

2    accounts there was a substantial amount of cash that had built

3    up in the ten days immediately prior to this transaction.  So

4    that at the time of this transaction there would have been

5    approximately a billion dollars of cash in the OCC accounts.  I

6    think there were probably cash in some other accounts as well.

7    But that had been built up almost entirely as far as the OCC

8    was concerned in the week or ten days immediately proceeding

9    this transaction that was approved by the Court, and was a

10   consequence of the financial condition that LBI was in at the

11   time.

12           I also want in this connection to go back to a couple

13   of the charts that I have in my thin book, the book that I

14   began with.  And, in particular, I'd like the Court to look at

15   144, which we'll put up on the screen.

16           And the Court will recall that the night of the sale

17   hearing the trustee signed two different agreements.  And in

18   these agreements the trustee unambiguously transfers the cash

19   that's in the so-called margin or collateral accounts.  And the

20   distinction that I was trying to draw between unencumbered cash

21   that belonged to Lehman and cash that was part of collateral

22   accounts was a distinction obviously the trustee had

23   contemporaneously.  Otherwise, the trustee never would have

24   signed these documents.

25           You'll see that in the collateral agreement it says,

172

1     "In connection with such transfer LBI has assigned to Barclays

2     all rights in securities, cash, and other property, collateral

3     pledged by LBI to the Options Clearing Corporation and held for

4     OCC's benefit."

5          If you go to Chart 145 you'll see testimony from the

6     debtors' law firm, Simpson Thacher, referring to the

7     clarification letter.  And it refers to any property that may

8     be held to secure obligations under such derivatives, referring

9     to the exchange trade or derivatives.  And it says, "Do you

10    understand that to be referring to collateral associated with

11    the exchange trade or derivatives?"

12    "A.   Yes.

13    "Q.   And that would be referring to all collateral, whether it

14    were securities or cash or some other type of collateral?

15    "A.   I would read the words 'any property' referring back to

16    such derivatives, yes, collateral for such derivatives.

17    "Q.   Which would include securities and cash in any other type

18    of property?

19    "A.   Any property.

20    "Q.   I'm sorry, was that yes?

21    "A.   I would read property to include cash.

22    "Q.   And is that consistent with your reading of it at the

23    time?

24    "A.   Yes.

25    "Q.   And is that consistent with your reading of it at the

1    time?

2    "A.  Yes."

3         So, again, you had not only the trustee but LBH's

4    lawyers making the same distinction that I was urging upon the

5    Court.

6         If you go to Chart 146 you'll see that the day before

7    the closing the OCC confirmed with LBI's trustee and SIPC that

8    Barclays was acquiring all EDT collateral held by OCC,

9    including cash.  And you'll see rights to the Sidley lawyer --

10   or the Sidley lawyer writes to Hughes Hubbard and to the

11   trustee's counsel, "Having heard nothing further from you with

12   respect to cash held by OCC in respect of the LBI accounts and

13   in accordance with the terms of the transfer and purchase

14   agreement, all such cash in the accounts would be transferred

15   to Barclays assuming that the transaction closes this evening."

16        So that if you go back to the time the distinction

17   between the unencumbered cash and the cash that is specifically

18   related to particular collateral was a distinction that at

19   least the other parties, including the movants, were making at

20   the time.

21        I would also just ask the Court to consider that if

22   Barclays had not gotten this collateral the evidence will show

23   that Barclays would have taken an immediate loss, perhaps as

24   much as a billion dollars, in terms of if it assumes the

25   exchange trade in derivatives at that point in time, and had

174

1    done so without having the collateral associated with those

2    exchange traded derivatives.

3         Let me turn next to the question of Barclays' gain on

4    this transaction.  In that connection I want to make two

5    points.

6         First, the fact that Barclays was going to have a gain

7    was not something that was obscure or not understood.

8    Everybody understood that at the time.

9         Second, I believe the evidence will show that that

10   gain came from factors other than a purported discount from

11   market value of the assets of LBI.  So that I think that it may

12   be irrelevant where it came from, but if the Court is -- if

13   that's important to the Court, I think we'll be able to

14   demonstrate that it comes from sources other than this reported

15   discount.

16        But the most important point I think is to have in

17   mind that this was something that was known about at the time,

18   and nobody took issue with it, nobody complained about it until

19   after the fact.

20        If I could begin at Chart 49.  This is a announcement

21   by Barclays on Wednesday, September 17th, when Barclays was

22   announcing its agreement to acquire LBI.  And it says, "That

23   the transaction is capital ratio accretive."  Which I guess is

24   English for they're going to book a gain, "Without additional

25   equity issuance."  And it says, "The source of that accretion

175

1    is the negative goodwill from the transaction which amounts to

2    about two billion U.S. dollars post-tax."

3         I think the Court has already seen Chart 50, or a

4    version of that, in which Barclays announced that they're

5    requiring trading in assets with the current estimated value of

6    seventy-two billion dollars in trading liabilities with a

7    current estimated value of sixty-eight billion dollars for a

8    cash consideration of 250 million dollars.  Again, this is

9    their -- a public announcement at the time.

10         On Wednesday, September 17th Barclays in analysts

11    calls, and this is Chart 51, made the same point.  That there

12    was a buffer of about four billion dollars between the trading

13    assets and the liabilities.  And you'll recall that the chart

14    that I had gone over -- and let's go back to Chart 17 for a

15    minute.  And I want you to see how the APA fits into what

16    Barclays is saying here.  If you take the long positions that

17    seventy billion and the 1.3 billion dollars, plus fifty percent

18    of the mortgages, you come up with approximately 5.3 billion

19    dollars.  And that -- you'll see that sometimes you see a four

20    number and sometimes you see a five number.  But it all comes

21    out of the same context.  So that what Barclays is saying

22    publicly here was not a surprise to anybody; the fact that

23    there was going to be a booked gain.

24         The Financial Press, if you look at page 52 -- at

25    Chart 52, Financial Times report, "The deal makes very good

176

1    sense financially.  Barclays will book some 3.6 billion dollars

2    in negative goodwill."

3         Now, one of the things that you see here is that the

4    numbers are, if not all over the map, at least all over a very

5    large neighborhood.  This is a situation in which people are

6    trying to figure out with the markets constantly changing, and

7    estimate to the value constantly changing, the gain constantly

8    changes, that's being predicted or estimated.  But in each case

9    its multi-billion dollar gains that are being announced.

10        And it wasn't just that they did this in the press and

11   nobody saw it, if you look at Chart 189 this is a distribution

12   of this analyst call within Lehman.  There was a suggestion

13   that somehow maybe people didn't see this analyst call because

14   it was in the United Kingdom.  It was obviously distributed

15   here in the United States.

16        I've already covered the point in a different context

17   that's Chart 54, which is the Goldman Sachs' estimate of a

18   windfall discount to fair market value of at least several

19   billion dollars resulting from the transaction.  But that's

20   relevant not only to the fact that they knew it but they knew

21   that there was going to be this gain.

22        Now, despite knowing that, everybody; the movants

23   here, the debtor or the trustee, all supported this transaction

24   because even though Barclays was going to make a gain on the

25   transaction it was a transaction, it was absolutely essential

177

1    to LBI and essential to Lehman Brothers.  This was a

2    transaction everybody recognized that -- how much would be left

3    if there was a delay, was questionable.  But everybody knew it

4    would be a fraction of what they were going to be able to get

5    from Barclays.  And that Barclays leverage in that context was

6    going to be very -- was going to be very significant.

7         Now, as the Court is aware, there were objections to

8    this on the grounds that it was a discount, it was a fire sale.

9    That the price did not represent fair value.  All of those

10   arguments, all the arguments that are being made here today

11   were made in front of Your Honor by objectors.  And the movants

12   did not say no, you're right, or no, we need more information

13   on that, they supported it.  And not only did they support it

14   in front of Your Honor, but when this was put on appeal, the

15   movants went in and supported affirmants of the sale order

16   against some of the same arguments that they're now trying to

17   make.

18        Before I go into that, though, there's one quote from

19   Mr. Miller that I can't resist emphasizing.  It's at Chart 64.

20   And he's talking about the need for expedition.  And the fact

21   that the assets being sold were falling in value and the

22   alternative was liquidation, that would be far worse.  And he

23   says, "I don't want to use the melting ice cube analogy, it's

24   already half melted.  And that's exactly what was happening to

25   Lehman's assets.  And he says at the beginning, if the

178

1    alternative happens there will be very little to distribute to

2    creditors, if anything.  And that was the reason why the

3    movants at the time strongly supported this transaction knowing

4    what they knew.

5              And I said earlier that if this hearing had been held

6    in October or November of 2008 I think the arguments would be

7    somewhat different.  I think the arguments would end up being

8    the same and I think the Court would -- I would hope the Court

9    would come out exactly the same way.  But I don't think that

10   the Court can ignore the different circumstances that exist

11   having had them for not just days but weeks, months support

12   this transaction with full knowledge of all the things that

13   they are complaining about.  After they knew about the supposed

14   windfall, and the gains, and the discount, and the buffer,

15   after they knew all of those things they asked the district

16   court to affirm the sale orders in all respects.

17             And if you'd go to tab 67 both the debtors and the

18   trustee asked the district court to affirm the sale orders.

19             Now, what did the committee do?  The committee, who by

20   this time knows all the facts that we have gone through, not

21   only did not appeal, itself, it submitted a counterstatement of

22   issues on appeal.  And in that counterstatement, and this goes

23   to Chart 68, the committee's counterstatement -- this is the

24   committee that's in here today saying the things that you heard

25   them say this morning.  At that point on October 20th, 2008,

179

1    they told the district court, "Barclays purchased the property

2    covered by the appealed orders in good faith."  At that point

3    they knew that there was going to be a gain.  They knew that

4    there was this purported discount.  They knew that there was a

5    supposed several billion dollar windfall.  They knew all of

6    those things.  And they knew that the Lehman people were going

7    to go to work for Barclays, and by that time largely had.  They

8    knew that the clarification letter had all of its terms.  And

9    yet what they say is Barclays purchased the property in good

10   faith.  And they didn't go on to say, "The appealed orders

11   contained detailed findings of fact with respect to the arm's

12   length nature of negotiations among the debtors and Barclays

13   and where no conclusion has been found."  That's what they said

14   to the United States District Court for the Southern District

15   of New York on an appeal after they knew the very things that

16   I've shown you they knew this afternoon.

17          Now, Bay Harbour, who had brought the appeal argued

18   that the sale hearing was held without actual notice and

19   material terms, and that there was a discount, and that there

20   had not been transparency.  The movant disagreed.  I go to

21   Chart 70.

22          The Lehman movants in the district court relied upon

23   the clarification letter.  This clarification letter that they

24   say they didn't know anything about, they didn't have anything

25   to do with, it got signed without their knowledge, it got

180

1      negotiated without their knowledge, things got slipped in

2      without them knowing about it, should have come back to the

3      Court for approval.

4            In October, November, December in the federal district

5      court what they're saying is that we rely on the clarification

6      letter.  They say that the original APA, first amendment and

7      clarification letter collectively constitute the APA.  That's

8      LBHI in the federal district court.

9            And talking about some of the concerns that had arisen

10     they say, "To address these concerns LBHI and Barclays made

11     clear at the sale hearing and in the clarification letter that

12     none of the assets of the subsidiaries of LBHI, other than the

13     assets of LBI, would be included in the definition of purchased

14     assets.  And then you'll see on this chart they again and again

15     rely on the clarification letter.  This clarification letter

16     that they now say is not really part of the transaction.

17           If we go to chart 71, what you find is, as at late as

18     December of 2008, again, after all this information was

19     available to them, they are arguing to the Federal District

20     Court -- they are representing to the Federal District Court,

21     "All relevant facts regarding the sale were disclosed to the

22     bankruptcy court."  This was months after they had the

23     clarification letter.  This was months after they knew about

24     the so-called discount and revision of the marks.  This was

25     months after they knew about the gain.  This was months after

181

1    they knew that cure and comp numbers were very different.

2    Months after they knew all of those things that they now come

3    in and say to Your Honor there's a reason to try and undo this

4    transaction or reform it or re-trade it.  They told the Federal

5    District Court, "All relevant facts regarding the sale were

6    disclosed to the bankruptcy court."

7         And if we go to chart 72, this reminds us that Bay

8    Harbour was arguing that Barclays had not acted in good faith.

9    And what do the movants do in the Federal District Court last

10   December -- or not last December, December of 2008?  They said,

11   "Contrary to Bay Harbour's contentions, the record demonstrates

12   that Barclays acted in good faith."  Again, after they knew the

13   very things that I've shown you they knew for months and which

14   they now try to say is grounds for trying to re-trade the deal.

15        Now, in defending the sales orders -- and this at

16   chart 73, the Lehman movants successfully emphasize that the

17   Barclays sale was the only available transaction.  They said,

18   "For all and intents and purposes, Barclays was the only

19   serious bidder."  And they talk about how it was extremely

20   small universe, maybe one or two people, who even had the

21   capacity to get a deal done in the time that we're required.

22   the number -- they say, "The number that met the requirements

23   and terms of financial capability and regulatory

24   qualifications" -- we're not talking twenties, tens even.

25   We're talking one or two.  And they went on to say that for all

182

1    intents and purposes, it was only one; it was only Barclays.

2         And if you go to chart 74, they told the court -- the

3    trustee told the district court, "The bankruptcy court

4    ultimately approved the APA because it was the only available

5    transaction and the objector's position that if approval of the

6    APA were delayed, another, better transaction might be realized

7    or discovered was preposterous."  That's what the trustee told

8    the Federal District Court in December.

9         THE COURT:  Actually, that's not right.  That's a

10   quote from what I said.

11        MR. BOIES:  No, but it's also what they -- it's what

12   they said to the --

13        THE COURT:  So, they reported the public record of

14   what I said.

15        MR. BOIES:  Yes, Your Honor, they do.  But when you

16   quote from the public record what a court has said in an appeal

17   brief, ordinarily, you are saying to the Appellate Court that

18   you believe that that is right, I think.  I think it would be

19   unusual for them to have quoted this if they thought it was

20   wrong, without at least saying they thought it was wrong.

21        THE COURT:  There's no question it was right.  I said

22   it and it was confirmed on appeal.

23        (Laughter)

24        MR. BOIES:  Yes.  Yes, Your Honor.

25        THE COURT:  It's right.

183

1          MR. BOIES:  Yeah, it's right.  And I guess the only --

2     I agree with that a hundred percent.

3          THE COURT:  I figured you would.

4          MR. BOIES:  And I guess the only point I would add for

5     emphasis is that they continued to realize that you were right

6     after they knew all of the things that they now say is a reason

7     for you to reconsider whether or not you were right.

8          (Pause)

9          May I have just a moment, Your Honor?

10         THE COURT:  Sure.

11         MR. BOIES:  If you go to chart 77, you heard the

12    movants this morning say that they thought that the most that

13    Barclays would receive in the repo was -- there were different

14    numbers but the highest was 47.4 billion, I believe and that

15    they were not aware that Barclays was going to get 49.7 billion

16    in securities in exchange for forty-five billion in cash.

17         Now, there are two things that I want to emphasize

18    about that.  First, as shown on chart 77, the trustee's motion

19    for entry of an order approving a settlement agreement in

20    December -- the December settlement agreement, repeated, "LBI

21    was to provide Barclays with 49.7 billion in securities in

22    exchange for forty-five billion dollars in cash."  That was the

23    trustee's motion.  The -- and the trustee also, as indicated in

24    the next paragraph, relies on that -- relies on the

25    clarification letter.  The -- again, the letter that the

184

1    movants are now saying really wasn't approved, really wasn't

2    part of the transaction.  Both -- they rely on it to the

3    Federal District Court on appeal and they come back and they

4    rely on it in your court, to Your Honor, in December of 2008,

5    again, after they knew everything.

6          And if you go to chart 78, they say -- and this is the

7    trustee's lawyers and again, from the December 22, 2008

8    hearing, "At the time of the purchase agreement, Barclays had

9    loaned LBI forty-five billion dollars and Barclays was to

10   receive securities valued at over forty-nine billion dollars to

11   cancel the loan."  So you have forty-five billion dollars cash,

12   forty-nine billion dollars in securities to cancel each other

13   out.  If there is a discount, if there is a buffer, if there is

14   a mismatch, if there is any of the kinds of things that the

15   movants suggest to your Court that there were, I suggest that

16   this statement right here is an illustration that they knew

17   exactly what existed.

18         Now, in fact -- the second thing that I'm going to say

19   to the Court and I know that this is something that's going to

20   have to await the evidentiary hearing but I believe that the

21   evidence will show that, in fact, what Barclays actually got

22   from the repo was not worth forty-nine billion dollars and was

23   never carried on Barclays' books at that number.  But for

24   present purposes, what is important is that they knew, in

25   December, at the same time that they are affirming the sale,

185

1    they're affirming the clarification letter, they're affirming

2    Your Honor's rulings, they knew that there was this, whatever

3    you want to call it, difference.  I call it a difference.

4    They've called it a mismatch, a discount, a buffer but whatever

5    it is, they knew that that existed.

6           On December 22nd, 2008 -- and this is chart 80 -- the

7    trustee also gave Barclays a release.  And it says, "The

8    trustee, on behalf of LBI and the LBI estate, hereby does and

9    shall be deemed forever release, waive and discharge" -- and

10   then it's got that boilerplate language, all claims, known or

11   unknown, et cetera, in LAR equity or otherwise, "relating to

12   subject funds, the replacement transaction or the delivered

13   securities."  The replacement transaction was defined as the

14   reverse repurchase transaction, in which Barclays funded the

15   forty-five billion dollars for the repo.  And the subject funds

16   were defined as the seven billion dollars that was transferred

17   by LBI to an account at JPMorgan Chase early in the morning of

18   September 19.  And the delivered securities were defined as the

19   securities listed on Schedule A to the clarification letter.

20          What they now come in and say is that no, we were

21   misled.  The -- we didn't know that the -- you were paying out

22   cash and getting repo assets that were valued at a higher

23   amount.  I've just showed you they did know it back then but

24   whether they knew it back then or didn't know it back then,

25   they released it.  And significantly, they released it after

186

1    knowing about the forty-nine difference -- the forty-nine,

2    forty-five difference because this release is executed

3    contemporaneously with the trustee's statement to the Court

4    that Barclays was to receive securities valued at forty-nine

5    billion dollar to cancel the forty-five million -- billion

6    dollar loan so that those two things were happening at exactly

7    the same time.  They were giving the release at the very same

8    time that they were reflecting on what was that four or five

9    billion dollar difference.

10          Your Honor, how much time do I have?

11          THE COURT:  I think it expired.  You have as much time

12    as you need.

13          MR. BOIES:  Your Honor, may I have just a moment?

14          THE COURT:  Sure.

15          MR. BOIES:  I will try to be very brief, Your Honor.

16    And I want really just to deal with the rationale for some of

17    the legal principles that we are advancing.  I'm not going to

18    read you the cases; we've done all that in our briefs.  But the

19    dual rationales are that parties should not be able to

20    participate in a judicial process and then come back and reopen

21    that after the fact and after circumstances have changed.  The

22    Lazard representative testified how eighteen months later, it's

23    hard to remember what things were really like in September of

24    2008 but that it's important to keep in mind that in September

25    of 2008, what you had was a transaction that everybody

187

1    recognized was vitally important to LBI and LBHI and their

2    creditors.  No one else was able or willing to step up, other

3    than Barclays.

4        The deal that Barclays struck could be viewed as a

5    tough or not a tough deal under all the circumstances but I

6    think it is conceded by everybody it was the only deal that was

7    available and everybody backed it.  And this is not a situation

8    in which they have discovered something that is new although,

9    even in that circumstance, there is no case that I am aware of,

10   in which the Court has the power to go back and reform a

11   contract under these circumstances.  There may be other

12   remedies, there may be -- there are tort remedies.  There are a

13   variety of other remedies if somebody engages in fraud or

14   misconduct of some kind but I'm not aware of any case in which

15   after a sale has been completed, after the terms of that sale

16   have been applied and the terms were known by everybody because

17   they were written down and except for the three disputed assets

18   that we're talking about, everybody agrees that we've complied

19   with the terms of the sale.  The question is whether or not in

20   advocating for approval for the sale, the Court was told what

21   they say the Court should have been told.

22       Now, we have said if they thought the Court ought to

23   be told that, they had an opportunity to do that.  They knew

24   these facts.  In fact, they knew some of these better than we

25   did.  They keep saying, "we sat silently", "we didn't have a

188

1   speaking part in this play".  They didn't just sit silently;

2   they participated.  They affirmatively advocated for this sale

3   transaction and continued to for months and months after they

4   knew the very facts that they now say ought to give rise to

5   these extraordinary remedies.

6           THE COURT:  Well, Mr. Boies, I was there; you were

7   not.

8           MR. BOIES:  That is true, Your Honor.

9           THE COURT:  And counsel for Barclays, Cleary Gottlieb,

10  was in court the entire time and at various times, stood up and

11  spoke.  So, Barclays was not just silent; Barclays was an

12  active participant in the hearing and said what was said at the

13  time.  The record obviously speaks for itself.

14          MR. BOIES:  It does, Your Honor.  And I did not mean

15  to say that they did not do anything but what I meant to say

16  was, with respect to the issues that we are talking about here,

17  I don't think that you will find anything in the record that

18  Barclays said that is in any way suspect or subject to any kind

19  of attack, even under the movants' theory.  The -- what you

20  have is a series of presentations, both within this court and

21  the Federal District Court, by the movants and by the -- their

22  lawyers and financial advisors at the time and you've got

23  Barclays, who is the purchaser.  And this is not a situation in

24  which Barclays came into court and made representations that

25  are later challenged.  This is a situation in which other

189

1    people made representations and Barclays is attempted to be

2    tagged with that because they were at the scene of the

3    accident.  Now, the movants tried to do that by saying to Your

4    Honor, "Well, Barclays was the only person that knew this.  We

5    didn't know this, Weil Gotshal didn't know it, Lazard didn't

6    know it.  No one knew it, except Barclays and these supposedly

7    rogue Lehman employees."

8           Now, they knew all the facts about the Lehman

9    employees at the time that they were telling the Federal

10   District Court that everybody operated in good faith and with

11   arms' length.  So that argument, we think, is actually

12   foreclosed by a variety of grounds, including judicial estoppel

13   in the mandate rule.  But even if they could make that

14   argument, it is inconsistent with what they knew because if

15   I've done anything today, I hope I've shown you that the kinds

16   of facts that the movants knew at the time, in the period from

17   September to December, were the -- were exactly the facts that

18   they now come in to this court and say ought to be the basis

19   for this relief.  And what I'm saying is that under those

20   circumstances, even if they had an ability to try to tag

21   Barclays for things that they and other people were saying,

22   they couldn't under those circumstances.  That's all I'm trying

23   to say.

24          THE COURT:  But you don't deal with what I think I

25   heard this morning, which is they didn't know anything

190

1    different at the time of the appeal.  That was really as a

2    result of the 2004 discovery that was taken last year that

3    detailed information concerning what Barclays knew, what the

4    Lehman employees knew, when they knew it, who they told, what

5    they really meant by "discount", all that stuff which,

6    presumably, will be embellished as we get into the evidentiary

7    hearing, came into full view.

8         MR. BOIES:  Right.

9         THE COURT:  So, while I hear your argument, you're not

10   dealing with their argument.

11        MR. BOIES:  Well, Your Honor, with respect, I've got

12   to disagree with the Court.  I'm trying -- at least, I'm trying

13   to deal with their argument.  Maybe I'm not doing a good job of

14   it but I'm trying to deal with their argument.  I was trying to

15   do that, you know, when I went through, laboriously today, the

16   various exhibits that showed that on September 17th, Lazard was

17   given the discount e-mail.  On September 18th, they were given

18   the comp and cure numbers -- to Weil Gotshal, Lazard and

19   Alvarez, as well.  That on September 19th, the creditors'

20   committee and others got the Goldman Sachs report that there

21   was a several billion dollar windfall discount to fair market

22   value.  That on September 21 and 22, the creditors' committee

23   raised with Weil Gotshal, the so-called five billion dollar

24   mismatch.  That on September 29th and 30th, Alvarez met with

25   Lehman executives to discuss a supposed 5.1 billion dollar

191

1    haircut in the Barclays repo.  That on October 8th of 2008,

2    Alvarez presents to the creditors' committee and to Weil

3    Gotshal the document that I went through in detail about the

4    five billion dollar reduction, which Alvarez and the financial

5    advisors to the very -- to these movants testifies in this case

6    was exactly the same discount that they're now complaining

7    about.

8            Now, I've tried to say that whatever they may say that

9    they only found this out in 2004, the documents are there.

10   This is not something that is -- these documents weren't made

11   up.  These aren't fabricated documents.  These are documents

12   that everybody agrees are authentic.  They may or may not be

13   admissible for the truth of the matters asserted but they are

14   admissible for the -- what they knew and what the notice was

15   that they were on at the time.  And with respect to the

16   documents -- one of the documents that I just went through,

17   where you had a statement from the trustee to the -- to this

18   Court in December, the same time that they're giving a release

19   and the same time that they're supporting the sale order in the

20   district court, they tell this Court about the forty-nine

21   billion dollar securities cancelling out the forty-five billion

22   dollar loan.

23           Now, I say to the Court that in light of those kinds

24   of things and in light of the fact that they knew on September

25   17th, 18th, 19th and 20th about the gain that Barclays was

192

1    going to realize, I say in light of all of that, for them to

2    come in at this stage and say, "we didn't know anything about

3    this", "didn't have any reason to act", "couldn't have known

4    what was going on", "totally didn't know anything more in

5    December than we knew in September", "only found out about this

6    in 2004" is not credible.  I mean, it's not even possible, I

7    think, to credit those kinds of statements in view of the

8    documentary evidence.

9         And I would just ask the Court to look at the

10   documentary evidence, look not at what people are saying now,

11   not what people are trying to explain but look at the

12   contemporaneous documents.  Look at what was exchanged at the

13   time, look at what was said at the time, look at what these

14   people knew at the time, not what they now say, in which they

15   say "well, yes, we knew about it but we didn't really know

16   about it".  They knew about it and the documents show that.

17   And all I can do is -- and do it again at the hearing, is to

18   ask the Court to look at the contemporaneous documents and

19   weigh those, maybe more heavily, than you do self-serving

20   statements by people, long after the fact, who are coming back

21   to re-trade a deal.

22        THE COURT:  Well, at the moment, nothing is in

23   evidence.  We're just having an argument in connection --

24        MR. BOIES:  Exactly.

25        THE COURT:  -- with motion practice, which is really,

VERITEXT REPORTING COMPANY

212-267-6868                                          516-608-2400

193

1   in my view, opening statements for the evidentiary hearing, as

2   I said earlier.  And obviously, when the evidence is in, I will

3   review it.

4          MR. BOIES:  Thank you very much, Your Honor.

5          THE COURT:  It's rebuttal time.

6          MR. MAGUIRE:  If it pleases the Court, Your Honor,

7   William Maguire for the trustee.  I'll just make two very brief

8   points.

9          First, is with respect to the argument you heard about

10  judicial estoppel against the trustee and the other movants,

11  arising out of the proceedings involving the settlement in

12  September.  And the theory of judicial estoppel, as I

13  understand it, is that a party is estopped because they take an

14  inconsistent position before the Court than a position that

15  they previously took before the same or a different court.

16         And that raises the question, frankly, who is being

17  inconsistent here?  Is it the movants or is it Barclays?

18  Because with respect to the hearing on the settlement in

19  December, the Court -- the Court's order and the order that was

20  offered to the Court expressly provided, at page 2, that

21  nothing in this order shall bind, be collateral estoppel or

22  otherwise prejudice any other matter in this case.  And the

23  Court expressly adopted that because there had been questions

24  raised about how the numbers that were provided to the Court

25  fit with what had earlier been disclosed at the sale hearing.

194

1    And those questions were not resolved and it was recognized

2    that additional information needed to be obtained.  And that

3    was raised specifically by the creditors' committee.  And all

4    of the parties decided that whatever questions that were about

5    the sale, would be put aside, frankly, as an accommodation to

6    Barclays so that that would not derail what was considered, at

7    the time, to be an important settlement.

8            And it is strange to hear today that the trustee and

9    the movants should be judicially estopped from raising

10   questions about the sale when at the December hearing, Barclays

11   counsel, Mr. Schiller, said to the Court, at page 41 of the

12   transcript, starting at line 7, "We regard the creditor

13   committee objection, Your Honor, as not germane to your

14   decision whether to accept this motion and approve the

15   settlement.  They want to exhume information related back to

16   the sale.  That is not pertinent and does not bear upon the

17   question before you today."  I believe it was fully understood

18   by everyone who participated in the December settlement that

19   all questions concerning the sale were being put to one side.

20   And that is what led us to further investigation and

21   ultimately, to the 2004 process.

22           Your Honor, the one other point I would like to

23   briefly revisit is the question of cash.  Mr. Boies clarified

24   that at the OCC, there is cash and it is a substantial amount.

25   The number he gave was approximately one billion dollars.  A

195

1      couple of points to raise.

2            First of all, Lehman was a big organization.  It had a

3      lot of customers.  Its customers did a lot of trading.  It was

4      no surprise to anyone that there would be collateral, including

5      a lot of customer collateral.  And, as I said earlier, we have

6      transferred some two billion dollars of customer property to

7      Barclays in connection with that.  This cash, however, is not

8      customer cash.  The cash at the OCC that we're now talking

9      about, it turns out, is not customer cash.  It is all Lehman

10     cash and it was claimed or transferred to Barclays, not for

11     customers.  Barclays kept it and wants it and demands more of

12     it for its own account.  And this is not incidental results of

13     redemptions and maturities; these are very substantial sums.

14           If we can put up for you, I'd like to show you a

15     document that was marked in the depositions as Exhibit 399-A.

16     It was a document that was prepared by a chief technical

17     accountant of Barclays, the man who is responsible for

18     preparing its purchase acquisition accounting balance sheet for

19     the sale transaction.  And we have been trying for quite some

20     time to understand exactly what the situation was with all of

21     the cash and with all of the cash equivalents.  And he

22     prepared -- we ultimately tried to get the information served

23     to 30(b)(6) and asked him to provide us with specific

24     information.

25           What you see here, Your Honor, are his handwritten

196

1    notes.  He testified as Barclays' 30(b)(6) corporate

2    representative and he put this together to respond to the

3    topics that we had asked him to address at the deposition.  And

4    here, he laid out the cash and cash equivalents position at the

5    OCC -- the Options Clearing Corporation.  And that includes

6    1.375 billion dollars of cash and an additional form of one

7    billion dollars of cash equivalents, government securities, an

8    additional quarter of a billion dollars of proceeds of letters

9    of credit, all totaling around two and a half billion dollars,

10   just at the OCC alone.

11        We may also, if we can, try to show Your Honor an

12   additional document which is an Exhibit 1 to a declaration

13   filed in this proceeding by a Barclays' employee, Elizabeth

14   James.  What she shows here is the undelivered margin.  This is

15   additional property that Barclays is claiming from the estate.

16   And this is from proprietary Lehman's futures accounts and

17   valued as the account closeout.  And you will see in the third

18   column it recites exactly what the type that this is:  "T-bill,

19   cash, cash, cash, cash, T-bill, cash", and so on.  And that's

20   because these accounts were collateralized either by cash or by

21   cash equivalents, highly liquid securities that could be

22   readily converted into cash in order to secure a position.

23        So the total there, again, all Lehman cash or cash

24   equivalents, is another 457 million dollars in addition to the

25   2 and a half billion that we just saw.  And so I just wanted

197

1    to -- that's not the full record, but I just wanted to

2    emphasize that we are not talking about incidental amounts of

3    Lehman cash.

4            Thank you, Your Honor.

5            THE COURT:    Thank you.

6            MR. GAFFEY:    I'll try to be just as brief, Your Honor.

7    In no particular order, Your Honor, where Barclays' counsel

8    suggests that Barclays had a right to sit quietly, watch the

9    proceedings, and enjoy the result however it came out, Your

10   Honor correctly notes that Barclays' counsel spoke up in the

11   proceedings and the record reflects that they spoke up often.

12           I would also just note -- and I don't have the page

13   cite at hand, but at his deposition, Mr. Lewkow said, and no

14   surprise, that as an officer of the court he understood that if

15   there was anything he knew that had to be corrected he would

16   correct it.  And that goes to a point that I made this morning.

17   To the extent the lawyers don't know, the ability to have the

18   record corrected by lawyers who understand their duty to speak

19   is disabled.

20           With respect to the supposedly widespread evidence

21   that everyone knew about the gain, this disregards the evidence

22   we've showed you about how the fact that the discount was known

23   only to a subset of Lehman employees and the fact of the

24   inflated liabilities known no further.  Certainly one knows

25   that had the gain been widely known, Mr. Miller surely would

198

1    have said so here in this courtroom on the 17th, but of course

2    he didn't because nobody told him about it because the deal had

3    been described to him as a wash.

4         With regard to the balance sheets that Mr. Boies

5    showed you that disclosed a gap of seventy-two to sixty-eight

6    and then relying on those, saying that the discount was

7    disclosed, well, that gap is shown in this as well.  If you

8    look at the seventy-two dollar total -- seventy-two billion

9    total adjusted assets, up above the cure and comp numbers it

10   goes to sixty-eight.  That's the disclosed differential between

11   assets and liabilities, and the plug numbers are the inflated

12   cure and comp.  Were Your Honor to look at the press release

13   that Mr. Boies refers to or the analyst call to which he

14   refers, you would see a reference to that spread of seventy-two

15   to sixty-eight, but you will not see a word about the assumed

16   liabilities.  That is the plug number.  So one doesn't directly

17   relate to the other.  It's a mix and match sort of argument.

18        With respect to the transaction adjustments that -- if

19   I could just back up one second to the alleged public

20   announcement of the gain, if we could take a look --

21        Steve, could I have B6, please?  B6.

22        Your Honor, I'll move past the technical difficulty.

23   If Your Honor were to look at Mr. Hughes' testimony about the

24   press release, which I have put in the record, he describes it

25   as a very, very different deal.

1        There was some talk -- Mr. Boies also referred to the

2    allegedly huge risk that Barclays took here.  In the analyst

3    call and in Mr. Varley's statements to the analyst, he refers

4    to the fact that the deal has been de-risked.  That's the term

5    that he used.  And he also says that one of the reasons it's

6    been de-risked is that the quality of the assets that they are

7    obtaining is very, very high, obtaining only a very small

8    amount of mortgages.  So I commend that to the Court's reading

9    as well.

10        With regard to the bulk discount and Mr. Boies'

11    contention that that was the subject of wide discussion, I take

12    heed of his advice to look at the documents and consider that's

13    important.  But the testimony about the documents is just as

14    important.  The document that Mr. Boies put up on the screen,

15    concerning the e-mail of the bulk discount being sent directly

16    to Lazard, was the subject of some testimony by Mr. Ridings.

17    And Your Honor will find this testimony at tab 92 of the

18    Barclays' exhibits.  It's BCI Exhibit 92.  And I'm reading from

19    page 42, line 22 through 43, line 18:

20    "Q.  Is there anything in Exhibit 21 that is inconsistent with

21    your support for the sale on September 19, 2008?"

22        Exhibit 21 is the document that refers to the bulk

23    discount.  And this is what Mr. Ridings said:

24    "A.  There are things in here I actually don't understand.

25    This is not a document I'm familiar with.  But I don't

200

1  understand what he says could create a problem as it could tip

2  the broker early.  I just don't know what that means.  And

3  again, my understanding about this is essentially what we

4  talked about.  I don't recall negotiations where people said I

5  want a block bulk sale discount.  And there's nothing here with

6  those provisos that would cause my testimony to the Court to be

7  any different.  This is the only alternative we had.  It's

8  better than liquidation."

9        Well, Mr. Ridings tells us there with regard to

10  what -- when you see the document without the highlights, Your

11  Honor, it's a straight e-mail forwarded into Lazard it's --

12  there's no communication with Lazard about a bulk discount, and

13  Mr. Ridings said he never heard anybody talk about that topic,

14  he never heard negotiations about a bulk discount.  So I agree,

15  we ought to look at the documents along with the testimony

16  about them.

17        And the same goes, Your Honor, with regard to the

18  Alvarez & Marsal slide that Barclays' counsel shows you.  To

19  that end, Your Honor, I would commend to your reading our reply

20  brief at page 116 where we collect the testimony of Mr.

21  Fogarty, the author of that slide, who makes clear time and

22  again in his deposition that he didn't understand the

23  transaction.

24        What this is, what Barclays is attempting to do here

25  is to gather a scrap of information and a hint of a fragment of

201

1    information and combine it somehow into full knowledge of the

2    terms of the deal as early as October.  These are men and women

3    who came into work in the Lehman estate after the bankruptcy,

4    had no experience with the firm, had no access to the employees

5    of Lehman, had no computer records.  And the people with real

6    time knowledge of the deal had gone to work for their new

7    employer, Barclays.

8            So if a hint or a trace of what later turns out to be

9    the truth is recorded in a document or a slide, that does not

10   indicate there was disclosure.  What would indicate there was

11   disclosure is something said in this court to this court.  The

12   record, the transcript of what was said then, makes no mention

13   of any gain, and it makes no mention of any discount, and it

14   most certainly makes no mention of any adjustment to Lehman's

15   book value.  Quite the opposite.  Lehman's book value is what

16   this Court was told was the valuation measure.  It was told

17   that on Wednesday.  Market valuation is what this Court was

18   told on Friday was the measure when Ms. Fife said the market

19   value had dropped.  Unaware of the pertinent facts, she was

20   unable to tell you the truth.  So as I said before, the people

21   who knew the truth didn't speak, and the people who spoke did

22   not know the truth.

23           If Your Honor has any other questions I'm happy to

24   address them, but I'm prepared to sit at this point as well.

25           THE COURT:  That seems like a good idea.

202

1          MR. GAFFEY:  Okay, thank you, Your Honor.

2          MR. KIRPALANI:  Your Honor, again for the record,

3    Susheel Kirpalani from Quinn Emanuel on behalf of the

4    creditors' committee.  Just want to touch on a very few points,

5    and I'll be briefer than the last two.

6          First, this notion that Mr. Boies makes that this gain

7    was known, everyone knew that Barclays was in this to make

8    money.  Of course the committee understood that Barclays was

9    doing a deal that made sense for it.  To buy the fourth largest

10   broker-dealer in the world for 250 million dollars is a great

11   deal.  It was great to have bundles of cash in September of

12   2008.  Nobody quarrels with that at all.

13         But it doesn't give you the right, Your Honor -- it

14   doesn't give you the right to hide facts from this Court at a

15   time where the Court was taking an enormous leap of faith in

16   the process and the professionals and the people in this room

17   that stayed with you until the wee hours that Saturday morning.

18   That's our point, Your Honor.

19         Mr. Ridings says Barclays had been complaining all

20   week that they disagreed with what Lehman had mark to market.

21   They disagreed and it was always very aggressive.  Really?  Was

22   the Court told that?  The committee wasn't told that.  Was the

23   Court told how that dispute was resolved?  Was the Court told

24   that Barclays said to Mr. Seery -- which by the way, Your

25   Honor, we couldn't find out until this second that position of

203

1    Mr. Seery after we finally got those notes that showed these

2    haircuts, 45.5 plus 1.9; everyone said, "What's this?  Explain

3    this to us."  And he said Barclays told me how to resolve the

4    dispute.  He said -- they said, imag -- I'm paraphrasing --

5    imagine a world where we didn't save Lehman; imagine a world

6    where you had to sell it all in a short period of time.  Was

7    that disclosed to Your Honor?  I don't believe so.

8            A note on the Goldman Sachs financial advisor, the

9    bondholder group.  This was Danny Golden's client, Your Honor.

10   Mr. Burian testified about this at his deposition, and we'll

11   hear it live for Your Honor at the appropriate time.  Financial

12   advisors to creditors' committees, like Your Honor knows,

13   lawyers to creditors' committees get calls from creditors

14   screaming all the time.  Why do you not often listen to what

15   they're saying on the eve of a big hearing?  It's because you

16   as a professional are in the know.  You're in the room.  You're

17   not just reading and hearing noise and trying to advocate for

18   your client.  You're trying to get to the bottom of things.

19   That's your job, is to sift through it.  And we were in the

20   room.  Mr. Burian was in the room.  And we believe what we were

21   told in that room.  That was our only mistake, Your Honor.

22           Were we concerned on that Sunday?  Of course we were

23   concerned.  Were we concerned on October 8th when Alvarez &

24   Marsal sent a PowerPoint presentation to us?  Of course we were

25   concerned.  But Mr. Boies focuses on the word "negotiated

204

1    discount five billion".  What about the words "stale marks"?

2    It's false -- false.  We're concerned, Your Honor.

3          The one thing I want to finally leave you with; any

4    notion whatsoever that my client, the official committee, laid

5    in the weeds for this whole process is completely false.  We

6    came into court at the first appropriate time -- appropriate

7    time, and that was when we saw the Shari Leventhal declaration.

8    We didn't lay in the weeds, Your Honor.  We plowed through them

9    with a machete known as Rule 2004.  And when we finally go

10   through it, what we found was quite alarming, what I would

11   call, Your Honor, shocks the conscience.

12         THE COURT:  Mr. Boies, your turn.

13         MR. BOIES:  I will follow their very laudable examples

14   and stay brief, Your Honor.

15         THE COURT:  Good.

16         MR. BOIES:  You were told just now that there was this

17   one e-mail that came in about the fixed discount and it didn't

18   get transmitted within Lazard.  Your Honor, let me just ask you

19   very briefly and remind you what that e-mail was, it was chart

20   23.  This did not just go in there and stop.  It went on, as

21   you see from the e-mail chain, it went to Arthur Bruhmuller and

22   Barry Ridings.  They got it.  And then go to chart 24.  They

23   reacted to it, followed it up.

24         Can we bring up 1 -- 309?

25         This is not in your book, Your Honor, but this is

205

1    another e-mail in the same chain, showing that it is being

2    followed up.  The counsel for the committee tries to distance

3    themselves from the October 8th, saying this is a different

4    thing.  That's not what the people testified to.  That's not

5    what the author of the report testified to.  I showed you where

6    Mr. Marsal testified this is the same discount that we're

7    talking about here.

8          And then lastly, counsel says to you, Harvey Miller

9    thought this was a wash because it was described to him as a

10   wash.  Do you remember saying that to you just a moment ago?

11         Could you play HM7, please?

12      (Begin audio playback)

13   "Q.  Did Weil, Gotshal ever tell the Court or represent to the

14   Court, directly or indirectly, that the deal was going to be a

15   wash?

16   "A.  I don't believe so; I did not, certainly.

17   "Q.  Okay.  Did you in fact believe that the deal was going to

18   be a wash?

19   "A.  I hadn't -- I did not hear the expression "wash" until

20   very recently."

21      (End audio playback)

22         MR. BOIES:  Thank you, Your Honor.

23         THE COURT:  Well, thank you for an excellent and

24   stimulating argument that brings me back to that other Friday

25   afternoon when I was here.

206

1        Mr. Boies, in his argument, was suggesting that some

2   people have forgotten what it was like that week.  Let me

3   assure everybody I have not forgotten what it was like that

4   week and I never will.

5        As it relates to what happens next, I note that LBHI

6   filed a motion in limine which has been, in part, contested by

7   Barclays.  It occurs to me that that frames the issues that are

8   not in dispute as well as the issues that are, and I don't know

9   to what extent counsel, at least to this point, have endeavored

10  to reconcile their differences and perhaps develop a

11  stipulation of uncontested facts, or with a little bit of

12  effort, maybe getting some of the nuanced tone concerns of

13  Barclays resolved so that we can have an even longer list of

14  uncontested facts.  That's a question that I have that I'd like

15  addressed now if possible.

16       MR. GAFFEY:  Robert Gaffey again, Your Honor.  The

17  purpose of the motion was it was an effort to do that.  I've

18  had some discussions over the last couple of days with my

19  friend Mr. Stern from Boies, Schiller to see if at least where

20  I thought we had reached a point within the motion where we had

21  agreed we could see if we could do something.  We're not quite

22  there yet because we still have to iron out what is meant by a

23  particular part of their response.

24       With regard to a larger stipulation that goes beyond

25  the procedure that was set out in the Court's October order,

207

1    you know, where we would propose undisputed facts and they

2    would respond, but then that led to this motion.  We haven't

3    done that at this point.  I would say that we are scheduled to

4    start the evidentiary hearing on the 26th.

5        THE COURT:  Right.

6        MR. GAFFEY:  I agree with Your Honor that as much

7    framing of the factual issues before then is useful and would

8    inform such things as who we should bring.  You know, if we

9    know an issue's not disputed we won't need witnesses on it or

10   have to burden the Court with documents on it.

11       To be perfectly honest, though, I think with two weeks

12   to go and the other work to do to prepare for the hearing, I'm

13   not sure how much more progress we would be able to make other

14   than in the context of our motion on undisputed facts, you

15   know, as to that body of undisputed facts.

16       THE COURT:  Well, I encourage you to do what can be

17   done.

18       MR. GAFFEY:  I don't mean to suggest it will be for

19   want of trying, Your Honor.  I think, you know, I'm just being

20   realistic about where I think we can get on the current

21   schedule.

22       THE COURT:  Okay.  Any comment from Mr. Boies on that?

23       MR. BOIES:  No, Your Honor.  We'd be happy to sit down

24   them and to do that this weekend and spend a day and see what

25   progress we can make because I do think it would be

208

1    advantageous.  There's got to be some facts that we can agree

2    to and that will narrow things down.

3          MR. GAFFEY:  Not to negotiate this with you, Your

4    Honor, but if I had a proposal to work off of I'd do that.  I

5    think it's a fruitless exercise to sit and try and think up

6    facts together over the weekend.  If we're working off of the

7    motion then what I suggest is we adjourn the motion and see if

8    we can reach a resolution of that and expand our efforts beyond

9    that.

10          THE COURT:  Okay.  The motion is adjourned to April

11    26.

12          MR. GAFFEY:  Thank you, Your Honor.

13          THE COURT:  And --

14          MR. BOIES:  And we'll get them something to work off

15    of, Your Honor.

16          THE COURT:  Fine.  Just a question for counsel, it's

17    obvious that a great deal of preparation went into today's

18    argument, and we have a lot of high tech gear which is in the

19    courtroom which I gather will remain here for the duration.  If

20    counsel think it would be useful to have a pre-hearing

21    conference to talk about such things as the order that

22    witnesses will be called, various procedures to be followed

23    during the course of the hearings, I'm certainly willing to

24    make myself available for such a conference if the parties

25    think that would be useful.

209

1          MR. BOIES:  We do, Your Honor.

2          MR. GAFFEY:  I'd agree, Your Honor.

3          THE COURT:  Okay.  The reason I bring this up is that,

4     as some of you may know, I have some recent relevant experience

5     in a case, which while different from this, involves similar

6     high tech use of documents and video depositions and the like,

7     and we found the use of those depositions to be facilitated by

8     virtue of having had a pretrial conference in advance.

9          It would also be useful for me to know, if you can

10    tell me, those witnesses who will be appearing live, those who

11    will be appearing by video, and whether or not you're able to

12    work out objections as it relates to the video deposition

13    testimony in advance, things of that sort.

14         MR. GAFFEY:  I think -- excuse me, Your Honor.  I

15    think I can tell you that we've made some significant progress

16    on that.  So here's what we all have done so far.  We have

17    exchanged proposed witness lists.  As of last night we

18    exchanged proposed objection -- you know, proffered objections

19    as to documents.  We have scheduled to exchange deposition

20    designations shortly, and witness lists I think are also in the

21    early part of next week.  We've had discussions where we all

22    know that one thing will inform the other.  You know, depending

23    on the number of documents, we may have to move into evidence

24    that will inform the number of witnesses.  And I believe we

25    also have an agreement that deposition testimony can be

210

1    utilized by either side regardless of whether the witness is

2    available live.  So that may help us to make some decisions as

3    to witnesses we think it would be useful for Your Honor to see

4    but to put in testimony by deposition to make it more efficient

5    that way.

6            THE COURT:  That sounds fine.  In terms of the

7    scheduling of any pretrial conference that you may decide is

8    desirable, I leave it to you to determine where in the process

9    of getting ready for this hearing you think that would be most

10   useful.  My guess is it would be most useful at some point

11   during the week before the trial, as opposed to next week.  But

12   I leave it to you to decide if you have a preference to have it

13   earlier.

14           MR. GAFFEY:  I have no strong preference, Your Honor;

15   I think that sounds fine.

16           THE COURT:  Okay.  And my notion would be that the

17   pretrial conference would be, unless parties want it to be on

18   the record, it would be off the record.

19           Now, I know that I said at the outset that it occurred

20   to me that this was a matter that was difficult to resolve

21   without having an evidentiary hearing.  Obviously everything

22   that I've said to this point is consistent with having such a

23   hearing, and everything that took place today served to confirm

24   my earlier view that an evidentiary hearing is necessary.  It

25   is apparent that there are very different  perceptions of the

1    facts, although the facts themselves may not be controverted

2    when we get right down to the underlying who said what to whom

3    when.

4         I note that there are experts that have been

5    identified by the parties.  I've seen references to various

6    expert reports and to certain witnesses who I assume will be

7    testifying as experts live.  To the extent that there are any

8    special issues involving the use of experts, I would suggest

9    that you talk about that in advance of the pretrial conference

10   during the week before the hearing.

11        If it would be useful for you to know more about my

12   schedule during that week, I'm going to take a brief recess,

13   check with my courtroom deputy, and provide you with some

14   suggested times that would work for me so that you can use your

15   own electronic devices and figure out what days are best for

16   you.  We don't have to decide that now, but I figured since

17   we're all together that would be a useful thing.

18        Obviously, people who are in the courtroom who are

19   watching all of this who aren't going to be involved in that

20   pretrial conference are free to go and enjoy their weekend and

21   I won't be offended if you leave during our recess.

22        We'll take a five-minute break.

23        MR. BOIES:  Your Honor, could we approach for just

24   thirty seconds?

25        THE COURT:  Excuse me?

212

1          MR. BOIES:  Can we just approach, just, the bench?

2          THE COURT:  Oh.

3      (Recess from 5:40 p.m. until 5:47 p.m.)

4          THE COURT:  Be seated, please.  The only day that

5  seems to work well for me -- I hope it works well for the

6  parties -- is April 21st, Wednesday.  And it can be anytime in

7  the afternoon starting at 2 o'clock -- 2 o'clock, 3 o'clock,

8  might as well be at 2 o'clock to give us more time.

9          One of the things that we'll be talking about during

10  the conference, things as mundane as whether we start at 9:30

11  or 10:00.  When I've had trials, I've typically started at

12  9:30, but these are things we'll discuss.  How late to go in

13  order to deal with the needs of particular witnesses, and at

14  one point is it simply a point of diminishing returns because I

15  have to listen and I may be tired, things like that.

16          The issue has also come up in a chambers discussion

17  about the parties who expressed a desire to speak to the

18  pending motions.  And my thought is -- and I'll just make this

19  statement now, not as part of the pretrial -- that it may make

20  sense for them put on the record what they want to put on the

21  record immediately before the commencement of the evidentiary

22  portion of the trial on the 26th.  And it may be for that

23  reason that we have a very early start that day.  And again, to

24  be determined once we get into the pretrial phase on the 21st,

25  but we might have a 9 o'clock start that day to give everybody

213

1    who wishes to speak an opportunity to do so and then still have

2    a full trial day.

3            Those are my thoughts with regard to those general

4    housekeeping matters.  And while we're still on the record, if

5    anybody else wishes to say anything, this is a good time to do

6    it.  Otherwise we'll just wish everybody well and say

7    goodnight.

8            MR. BOIES:  Good night.  Thank you, Your Honor.

9            MR. GAFFEY:  Thank you, Your Honor.

10           THE COURT:  Good night.

11       (Proceedings concluded at 5:50 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

214

1

2                          I N D E X

3

4                        R U L I N G S

5    DESCRIPTION                          PAGE      LINE

6    Debtors' Motion in Limine for an Order,    208        10

7    Pursuant to this Court's October 27, 2009

8    Scheduling Order, Deeming Certain Facts

9    to be Admitted, adjourned

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

215

```
 1

 2                    C E R T I F I C A T I O N

 3

 4      I, Clara Rubin, certify that the foregoing transcript is a true

 5      and accurate record of the proceedings.

 6

 7      _____

 8      Clara Rubin

 9      AAERT Certified Electronic Transcriber (CET**D-491)

10      Also transcribed by:     Esther Accardi (CET**D-485)

11

12      Veritext

13      200 Old Country Road

14      Suite 580

15      Mineola, NY 11501

16

17      Date:  April 13, 2010

18

19

20

21

22

23

24

25
```

VERITEXT REPORTING COMPANY

212-267-6868                                          516-608-2400