1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555(JMP)

Adv. Case No. 08-01420(JMP)(SIPA)

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS HOLDINGS INC., et al.,

                    Debtors.

- - - - - - - - - - - - - - - - - - - -x

SECURITIES INVESTOR PROTECTION CORPORATION,

                    Plaintiff,

         -against-

LEHMAN BROTHERS INC.,

                    Debtor.

- - - - - - - - - - - - - - - - - - - -x

                  U.S. Bankruptcy Court

                  One Bowling Green

                  New York, New York

                  April 14, 2010

                  10:03 AM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

2

1

2   HEARING re Order to Establish a Procedure to Unseal the

3   Examiner's Report, to Establish a Briefing Schedule to Resolve

4   Remaining Confidentiality Issues, and to Establish a Procedure

5   to Provide Access to Documents Cited in the Examiner's Report

6   [Docket No. 7530]

7

8   CLAIMS STATUS CONFERENCE

9

10  HEARING re Motion of LSF6 Mercury REO Investments Trust Series

11  2008-1 for Relief from the Automatic Stay [Docket No. 7832]

12

13  HEARING re Motion of Lehman Brothers Holdings Inc. for

14  Authorization and Approval of Certain Settlements with the

15  Internal Revenue Service [Docket No. 7734]

16

17  HEARING re Debtors' Motion for Approval of a Settlement

18  Agreement with Metavante Corporation [Docket No. 7780]

19

20  HEARING re Motion of Mizuho Corporate Bank, Ltd., as Agent, on

21  Behalf of Itself and Certain Lenders, Seeking Authority to

22  Assign Certain Interests in a Credit Agreement [Docket No.

23  7903]

24

25

3

1

2  HEARING re Debtors' Motion for an Order Enforcing the Automatic

3  Stay Against and Compelling Payment of Post-Petition Funds by

4  Swedbank AB [Docket No. 6734]

5

6  HEARING re Debtors' Objection to Proof of Claim filed by

7  Latshaw Drilling Company, LLC [Docket No. 6729]

8

9  HEARING re Debtors' Motion Authorizing the Debtors to Implement

10  Claims Hearing Procedures and Alternative Dispute Resolution

11  Procedures [Docket No. 7581]

12

13

14

15

16

17

18

19

20

21

22

23

24  Transcribed by:  Clara Rubin

25

4

1

2    A P P E A R A N C E S :

3    WEIL, GOTSHAL & MANGES, LLP

4         Attorneys for the Debtors and Debtors-in-Possession

5         767 Fifth Avenue

6         New York, NY 10153

7

8    BY:   SHAI Y. WAISMAN, ESQ.

9          RICHARD W. SLACK, ESQ.

10         RICHARD P. KRASNOW, ESQ.

11         JACQUELINE MARCUS, ESQ.

12         GARRETT AVERY FAIL, ESQ.

13

14

15   BAKER BOTTS L.L.P.

16        Attorneys for LINN Energy

17        30 Rockefeller Plaza

18        New York, NY 10112

19

20   BY:   MAUREEN REID, ESQ.

21

22

23

24

25

5

1

2    BAKER & HOSTETLER LLP

3          Attorneys for Metavante Corporation and Fidelity National

4           Information Services

5          45 Rockefeller Plaza

6          11th Floor

7          New York, NY 10111

8

9    BY:   RICHARD J. BERNARD, ESQ.

10

11   HUGHES HUBBARD & REED LLP

12          Attorneys for the James W. Giddens, SIPA Trustee

13          One Battery Park Plaza

14          New York, NY 10004

15

16   BY:   JAMES B. KOBAK JR., ESQ.

17          JEFFREY S. MARGOLIN, ESQ.

18

19   JENNER & BLOCK LLP

20          Attorneys for the Examiner

21          330 N. Wabash Avenue

22          Chicago, IL 60611

23

24   BY:   ROBERT L. BYMAN, ESQ.

25

6

 1

 2     JENNER & BLOCK LLP

 3           Attorneys for the Examiner

 4           353 N. Clark Street

 5           Chicago, IL 60654

 6

 7     BY:   ANTON R. VALUKAS, ESQ.

 8

 9

10     KRAMER LEVIN NAFTALIS & FRANKEL LLP

11           Attorneys for CME Group

12           1177 Avenue of the Americas

13           New York, NY 10036

14

15     BY:   ELISE SCHERR FREJKA, ESQ.

16

17

18     LINKLATERS LLP

19           Attorneys for the Joint Administrators of the UK

20            Administration Companies

21           1345 Avenue of the Americas

22           New York, NY 10105

23

24     BY:   MARTIN N. FLICS, ESQ.

25

7

1

2    MAYER BROWN LLP

3         Attorneys for Edward Middleton, Hong Kong Agent

4          Liquidators

5         1675 Broadway

6         New York, NY 10019

7

8    BY:   ANDREW D. SHAFFER, ESQ.

9

10

11   MILBANK, TWEED, HADLEY & MCCLOY LLP

12        Attorneys for the Official Committee of Unsecured

13         Creditors

14        One Chase Manhattan Plaza

15        New York, NY 10005

16

17   BY:   EVAN R. FLECK, ESQ.

18        DENNIS F. DUNNE, ESQ.

19

20

21

22

23

24

25

8

 1

 2   NIXON PEABODY LLP

 3        Attorneys for Deutsche Bank Trust Company Americas as

 4         Trustee; Deutsche Bank National Trust Company as

 5         Trustee; County of San Mateo; County of Monterey; Bryant

 6         University; The Metropolitan Transportation Authority

 7        437 Madison Avenue

 8        New York, NY 10022

 9

10   BY:   ROBERT N. H. CHRISTMAS, ESQ.

11

12   SALANS

13        Attorneys for Swedbank AB (publ)

14        Rockefeller Center

15        620 Fifth Avenue

16        New York, NY 10020

17

18   BY:   CLAUDE D. MONTGOMERY, ESQ.

19

20   SATTERLEE STEPHENS BURKE & BURKE LLP

21        Attorneys for Latshaw Drilling

22        230 Park Avenue

23        New York, NY 10169

24

25   BY:   CHRISTOPHER R. BELMONTE, ESQ.

9

1

2    STROOCK & STROOCK & LAVAN LLP

3         Attorneys for Certain Derivative Counterparties

4         180 Maiden Lane

5         New York, NY 10038

6

7    BY:   KENNETH PASQUALE, ESQ.

8          CLAUDE SZYFER, ESQ.

9

10

11   U.S. DEPARTMENT OF JUSTICE

12        Office of the United States Trustee

13        33 Whitehall Street

14        21st Floor

15        New York, NY 10004

16

17   BY:   ANDREW D. VELEZ-RIVERA, ESQ.

18

19

20   CME GROUP

21        20 South Wacker Drive

22        Chicago, IL 60606

23

24   BY:   LISA DUNSKY, ESQ.

25

10

1

2    STONEHILL CAPITAL MANAGEMENT LLC

3         885 Third Avenue

4         30th Floor

5         New York, NY 10022

6

7    BY:   PAUL D. MALEK, ESQ.

8

9

10   ALSTON & BIRD LLP

11        Attorneys for Creditor, Azora Bank

12        One Atlantic Center

13        1201 West Peachtree Street

14        Atlanta, GA 30309

15

16   BY:   WILLIAM S. SUGDEN, ESQ. (TELEPHONICALLY)

17

18

19   ANDREWS KURTH LLP

20        Attorneys for Creditor, Enterprise Products

21        600 Travis

22        Suite 4200

23        Houston, TX 77002

24

25   BY:   ROBIN RUSSELL, ESQ. (TELEPHONICALLY)

11

1

2    BROWN RUDNICK LLP

3         Attorneys for the Ad Hoc Committee of Lehman Brothers

4          Treasury Bondholders

5         One Financial Center

6         Boston, MA 02111

7

8    BY:   R. BENJAMIN CHAPMAN, ESQ. (TELEPHONICALLY)

9          ANGELO THALASSINOS, ESQ. (TELEPHONICALLY)

10

11   CHAPMAN & CUTLER

12        Attorneys for Creditor, US Bank

13        111 West Monroe Street

14        Chicago, IL 60603

15

16   BY:   JAMES HEISER, ESQ. (TELEPHONICALLY)

17         FRANKLIN H. TOP III, ESQ. (TELEPHONICALLY)

18

19   KLEE, TUCHIN, BOGDANOFF & STERN LLP

20        Attorneys for Creditor, Ableco Finance

21        1999 Avenue of the Stars

22        39th Floor

23        Los Angeles, CA 90067

24

25   BY:   LEE R. BOGDANOFF, ESQ. (TELEPHONICALLY)

12

1

2  LEO & WEBER, P.C.

3       Attorneys for Creditor, Liberty Mutual

4       One N. LaSalle Street, Suite 3600

5       Chicago, IL 60602

6

7  BY:   T. SCOTT LEO, ESQ. (TELEPHONICALLY)

8

9  MILLER BARONDESS LLP

10      Attorneys for SunCal

11      1999 Avenue of the Stars

12      Suite 1000

13      Los Angeles, CA 90067

14

15  BY:   LOUIS R. MILLER, ESQ. (TELEPHONICALLY)

16        MARTIN H. PRITIKIN, ESQ. (TELEPHONICALLY)

17

18  STUTMAN TREISTER & GLATT

19      Attorneys for Interested Party, Elliott Company

20      1901 Avenue of the Stars, 12th Floor

21      Los Angeles, CA 90067

22

23  BY:   JEFFREY H. DAVIDSON, ESQ. (TELEPHONICALLY)

24        WHITMAN L. HOLT, ESQ. (TELEPHONICALLY)

25        ISAAC PACULSKI, ESQ. (TELEPHONICALLY)

13

1

2    STUTMAN TREISTER & GLATT

3         Attorneys for Creditor, Perry Capital

4         1901 Avenue of the Stars, 12th Floor

5         Los Angeles, CA 90067

6

7    BY:   MARINA FINEMAN, ESQ. (TELEPHONICALLY)

8

9

10   THE LOBEL FIRM

11        Attorneys for SunCal

12        840 Newport Center Drive

13        Suite 750

14        Newport Beach, CA 92660

15

16   BY:   WILLIAM N. LOBEL, ESQ. (TELEPHONICALLY)

17

18

19   WINTHROP COUCHOT P.C.

20        Attorneys for SunCal

21        660 Newport Center, Fourth Floor

22        Newport Beach, CA 92660

23

24   BY:   PAUL J. COUCHOT, ESQ. (TELEPHONICALLY)

25

14

1

2    CITIGROUP

3         Interested Party

4

5    BY:   ARIEL BARZIDEH (TELEPHONICALLY)

6

7

8    CREDIT SUISSE FIRST BOSTON

9         Creditor

10

11   BY:   BRYAN M. SIMPSON (TELEPHONICALLY)

12

13

14   FARALLON CAPITAL MANAGEMENT

15        Creditor

16

17   BY:   ANATOLY BUSHLER (TELEPHONICALLY)

18

19

20   KING STREET CAPITAL MANAGEMENT LLC

21        Creditor

22

23   BY:   MITCHELL SOCKETT (TELEPHONICALLY)

24

25

15

1

2      OCH-ZIFF CAPITAL MANAGEMENT GROUP

3            Creditor

4

5    BY:   NOAH CHARNEY (TELEPHONICALLY)

6

7

8      RBS GREENWICH CAPITAL

9            Creditor

10

11   BY:   JEFFREY FARKAS (TELEPHONICALLY)

12

13

14   DAN BULLOCK, IN PROPRIA PERSONA (TELEPHONICALLY)

15

16

17

18

19

20

21

22

23

24

25

16

P R O C E E D I N G S

1                             P R O C E E D I N G S

2          THE COURT:  Be seated, please.

3          Mr. Waisman, good morning.

4          MR. WAISMAN:  Good morning, Your Honor.  Shai Waisman,

5   Weil, Gotshal & Manges, for the debtors.  Your Honor, a lengthy

6   agenda which was updated by an amended -- a second amended

7   agenda that was filed on the docket this morning, although, I

8   think, a relatively short hearing.

9          We would start on page 2 of the agenda, and the first

10  matter on the agenda relates to the examiner.  And I believe

11  the examiner and his counsel are present in court today, and I

12  think they would address this matter.

13         THE COURT:  Okay.  Fine.

14         MR. BYMAN:  Good morning, Your Honor.  We are here for

15  what I hope is -- excuse me, a frog in my throat -- what he

16  hope is the last logistic obstacle to having our report finally

17  and fully open.  We've had one objection from the CME.  CME's

18  counsel is here.  And before I respond, perhaps you'd like to

19  speak to them, or I can just tell you what our view is.

20         THE COURT:  Well, I guess I'd like to hear more about

21  the waiver issue from counsel for CME and whether or not this

22  isn't a game-ender issue and, if it's not, why not.

23         MR. BYMAN:  I don't mean to speak for the CME, but I

24  can tell you that I did have a conversation with them

25  yesterday.  They concur that the waiver issue means that we can

17

1      disclose the parties.  It's the link between the parties and

2      the specific bids that they still object to.

3              And I don't mean to step on your argument, so if you

4      want to do that directly.

5              THE COURT:  Why don't I hear from counsel for the --

6              MR. BYMAN:  I'll be back.

7              THE COURT:  -- CME.

8              MS. DUNSKY:  Good morning, Your Honor.  My name's Lisa

9      Dunsky.  I'm in-house counsel at CME Group, which is the parent

10     company for Chicago Mercantile Exchange.

11              With respect to the waiver issue, the basis -- I think

12     there were two bases in the examiner's response to our

13     objection that -- where he asserted waiver, and the first was

14     an interview of a CME employee named Tim Door.  Mr. Door's

15     interview occurred in October of 2009, before we had produced

16     any documents to the examiner.  And during his interview, Mr.

17     Door told the examiner which firms CME had invited to bid in

18     the auction of LBI's house portfolio.  We don't have any

19     objection to the examiner making public the names of the firms

20     that were invited to bid.

21              Mr. Door did not recall any specifics about the bids

22     that were actually submitted, and for that reason, after his

23     interview, the examiner asked us to produce documents with that

24     information, which we did.  And it's three of those documents

25     that are the subject of our request to maintain

18

1      confidentiality.

2            So while we do not object to the examiner disclosing

3      the names of the firms that we invited to bid, it's the

4      combination of an actual bid with the name of the firm that

5      submitted the bid that is the basis for our objection.  And

6      those documents were produced after Mr. Door's interview.

7            THE COURT:  Why should that be confidential?

8            MS. DUNSKY:  Well, Your Honor, that type of

9      information, which is, you know, not only a bid and offer but

10     who submitted the bid is -- the U.S. futures markets operate on

11     a basis of anonymity with respect to bids and offers and

12     nondisclosure of market participants' positions.  That's

13     reflected in sections of the Commodity Exchange Act; it's

14     reflected in CFTC regulations, including CFTC Regulation 1.59

15     which requires self-regulatory organizations, including CME, to

16     have rules and procedures in place to keep that type of

17     nonpublic information from being disclosed, with some very

18     limited exceptions.

19           So it's fundamental to the way the futures markets

20     operate that that type of information not be publicly

21     disclosed.  But on top of that, and I think this is where you

22     really get to the crux of the harm that we're asserting, this

23     was the first time that CME had to conduct an auction of any

24     clearing members' house or proprietary portfolio.  You know,

25     and the examiner in his response says that's not likely to ever

19

1    happen again, and we hope that it doesn't, but if it does,

2    whether it's CME or any other clearinghouse or SRO that might

3    need to conduct an auction, it is critical to have multiple

4    qualified bidders who are willing to participate in the

5    auction.   That's critical to the auction process itself and its

6    success.

7            And we're concerned.   And the National Futures

8    Association and the Futures Industry Association, in the

9    letters that they submitted to Your Honor, also expressed their

10   grave concerns that disclosing bidder names combined with their

11   actual bids, in addition to being contrary to the nondisclosure

12   provisions that we operate under, also would prevent or

13   discourage at least some potential bidders from participating

14   in an auction in the future if they know that their bids and

15   offers are going to be publicly disclosed at some point in

16   time.

17           THE COURT:   Isn't that pure speculation, though, and

18   the examiner's position is basically that market forces,

19   whatever they may be at the time, will bring parties to the

20   table because of the traditional profit motive; if there is

21   money to be made, people will show up?

22           MS. DUNSKY:   Well, we can't say for sure, you know,

23   what any bidder would or would not do.   I can tell you, from

24   our discussions with the bidders at hand here, more than one of

25   them have expressed to us directly that they would not

20

1    participate in future auctions if what happens here is that

2    their names in conjunction with their bids are revealed.  And

3    the Futures Industry Association, Your Honor, which represents

4    about eighty percent of the participants in our markets, they

5    have stated their belief based on their experience, and this is

6    stated in their letter to you, that it's very likely that

7    revealing this information would discourage at least some

8    bidders from participating.  And the NFA, the National Futures

9    Association, which is the SRO for everyone that's registered

10   with the CFTC, they've also expressed the same concern.

11          So I can't say what will or won't happen in any future

12   auction, but I think there's a high enough likelihood.  You

13   know, we believe it, the NFA believes it and the FIA believes

14   it; you combine that with what's the potential benefit of

15   disclosing the information.

16          The examiner had stated that it's important that the

17   parties know who the bidders were so if they want to file suit

18   they can.  We don't disagree with that, which is one of the

19   reasons why we made the examiner's -- these documents available

20   to the examiner but under a confidentiality agreement.  All of

21   these documents have also been produced to counsel for Lehman

22   Brothers Inc.'s trustee on a nonredacted basis under a

23   confidentiality agreement.  If there are other parties with

24   standing, they can approach us, ask for the documents to be

25   produced, and if they're willing to enter into an appropriate

21

1   confidentiality order we'll produce them.  But it's the idea of

2   making this information public, including making it available

3   to the bidders' competitors, that we don't see any benefit to,

4   whereas there is potential significant harm not only to CME

5   Group but to the futures markets in general.

6            THE COURT:  Okay.  I understand your argument.  And I

7   think I should hear from anyone that wishes to support your

8   argument before hearing from the examiner.  I have the letters

9   from National Futures Association and from Futures Industry

10  Association; I've read those letters.  I don't know if anybody

11  is here to represent the positions of what I'll call industry

12  friends of your position.

13           Is there anybody here?

14           MS. DUNSKY:  My understanding, Your Honor, is they

15  were not sending representatives today.

16           THE COURT:  Okay.  Well, it was a very efficient

17  letter, then, because I read both and I understand their

18  position, and you've also conveyed it today.  I'll hear from

19  the examiner.

20           MS. DUNSKY:  Thank you.

21           MR. BYMAN:  Your Honor, the one point on which we have

22  no disagreement is that if there were any competitive sensitive

23  information involved, we would have gladly redacted it and kept

24  it from public view so long as there could be some commercial

25  harm that might befall somebody.

22

1    The regulations, the concerns that the FIA, that the

2    NFA and the CME have addressed all go to positions that some

3    trader or market participant might currently have and the

4    disclosure of the fact that they had a position might make it

5    difficult for them to unwind that position.  That's not what

6    we're talking about here.  We're talking about eighteen months

7    after the fact, long after, presumably, these positions have

8    been unwound, identifying for the public the facts.  That's all

9    we're trying to do:  Let the sun shine on all of the facts.

10    And the only facts the public will learn is, for

11    example, the sum, the block sum, of 240 million dollars was

12    paid for some block of interest-rate derivatives.  We won't

13    know whether it was a long or a short position; we won't know

14    if it was T-bills or T-bonds or S&Ps; we won't know if it was

15    spreads or futures or options.  We won't know anything about

16    the position, based upon what we're planning to do.  It's

17    inconceivable that there could be any competitive harm.

18    And, frankly, in all of our conversations, trying to

19    seek compromise, and there have been many conversations, I

20    repeatedly asked counsel for the CME, explain what the

21    competitive harm is, let me talk to some of these people, the

22    people whose names apparently now we can disclose, we just

23    can't link them to the individual bids, have them explain why

24    this would be of any competitive harm to them, and the answer

25    was that there was no answer.  We have not gotten an answer to

23

1    that question.  And I respectfully submit that, in the absence

2    of that answer being affirmatively provided to you, these

3    documents should be released to the public in their entirety.

4         THE COURT:  Okay.  Is there anything that anyone else

5    wishes to say on this subject?

6         MR. KOBAK:  Yes, Your Honor.  James Kobak, Hughes

7    Hubbard & Reed, on behalf of the SIPA trustee.  The property

8    that's involved here was LBI property.  I didn't put -- we

9    didn't put in a paper on this because this isn't a dispute

10   that's ripened yet in our case.  But we do -- one of the things

11   we have to report on is whether there are causes of action

12   available to the estate.  There certainly is an issue here,

13   even if it's not the CME, as to whether the participants

14   involved who seem to get discounts or payments for taking these

15   positions may be subject to suit by the estate.

16        I know the examiner tentatively concludes that there

17   may be qualified immunity; we're taking a hard look at that.

18   But at some point we're going to have to issue a report that

19   says we looked at this and we concluded -- if we conclude there

20   is no cause of action, we concluded that because this is what

21   happened and this is the basis for our conclusion.  I'm not

22   sure -- and, again, this hasn't really ripened in our case.  We

23   did receive documents under confidentiality obligations, but I

24   don't see how we can meaningfully report without identifying

25   what happened and who the recipient was.  It's certainly of

24

1    interest to people because some of these recipients had other

2    dealings with Lehman.  Certainly if we do decide there's a

3    lawsuit, at that point we're going -- the identity of the

4    people who made the bids and what the amounts of the bids were

5    are going to have to be disclosed.

6         THE COURT:  Do I correctly conclude from those remarks

7    that the trustee has not independently investigated the subject

8    of this auction conducted by CME?

9         MR. KOBAK:  No, we are invest -- we're continuing to

10   investigate it.  We've actually, I think, gotten documents

11   additional to what the examiner might have had.  I think there

12   are interviews that are being conducted now.  But we haven't

13   yet taken a position on whether there's a cause of action, but

14   at some point we will be doing that.  It is a matter of concern

15   to us.  There was quite a lot of LBI money that was involved

16   and securities that were involved in these transactions.

17        THE COURT:  So just to cut to your bottom-line

18   position, you support the examiner's request that these

19   documents be fully released?

20        MR. KOBAK:  Basically, yes, Your Honor.  And I wanted

21   to make Your Honor aware that this is also an issue that is

22   almost certain to come up in our case, although it's not ripe

23   right now.

24        THE COURT:  To come up in the sense that whatever I

25   do, these documents may ultimately become public in your case,

25

1       or --

2               MR. KOBAK:  Well, we may need -- feel the need to make

3       them public, or at least to make some of the information in the

4       documents public.

5               THE COURT:  Okay.  I understand.

6               MR. KOBAK:  Thank you, Your Honor.

7               THE COURT:  Anything more from CME?

8               MS. DUNSKY:  I know you've got a real busy day, and I

9       would just urge the Court to wait until it's ripe.  You know,

10      let's see if it's an issue in that case or not.  We're

11      certainly doing everything we can to cooperate with LBI's

12      trustee, just as we did with the examiner, but we would make

13      the same objection under the confidentiality agreement that we

14      have with LBI's trustee as we're making here, and we'd like to

15      take the opportunity to do that if that issue becomes ripened

16      in that other case.

17              THE COURT:  Okay.  Thank you.

18              I've looked at the response of the CME Group, the two

19      letters from the National Futures Association and the Futures

20      Industry Association in support of the CME position, and I've

21      considered the papers filed by the examiner and the arguments

22      made today, including the arguments made by the trustee in the

23      SIPA liquidation case.  From the Court's perspective, the

24      claims of confidentiality are weak relative to the public's

25      right to know, and the arguments concerning the potential

26

1   future harm to events that may never occur involving comparable

2   auctions are so speculative as to be discounted close to zero.

3   The documents should be fully disclosed.  The fact that the

4   identity of the bidders has already been disclosed makes this

5   last step in the process a relatively simple one for the Court.

6        The arguments have all been considered, and disclosure

7   will ensue immediately.

8        MR. BYMAN:  Your Honor, with the Court's permission,

9   we have a draft order on a disk.  May I hand it to the clerk?

10        THE COURT:  Please.

11        MR. BYMAN:  And, Your Honor, if I may, could I explain

12  what the logistics will now be?  As soon as we can make a phone

13  call, we can begin uploading the unredacted version of the --

14  of volume 5, which was the only one that currently is redacted.

15  We will also begin the upload of a hyperlinked version of the

16  entire report.  I'm told by our technical geeks that it will

17  take five to eight hours to do that, but once that happens, at

18  the same Web site where everybody has been able to access the

19  report now, they will be able to hyperlink to all of the

20  documents.

21        There will also be a -- on the Web site there will be

22  a link to our outside vendor who will, on request, at cost --

23  by the way, that's our cost; I think the vendor has some profit

24  built into it.  But anybody who wants a hard copy of the report

25  or a disk -- a drive that has the hyperlinked version will be

1    able to order it directly from them.

2          But within eight hours at that site, and I can give

3    the URL if somebody wants to hear it now, they will be able to

4    get the full report.

5          THE COURT:  I think on March 11th I described this as

6    a best seller, and apparently you're making it happen.

7          MR. BYMAN:  Hope so.

8          THE COURT:  Okay.

9          Is there any --

10          MR. BYMAN:  Your Honor, I think the examiner would

11    like to say a few things, if that's all right.

12          THE COURT:  Okay.

13          MR. VALUKAS:  Your Honor, one last item --

14    housekeeping item.  Early on when I was first appointed, we

15    talked about best practices in a discussion here, and I

16    indicated to the Court that we had been requested by the

17    trustee to provide an overview of what we consider to be best

18    practices once the report was concluded.  We had a meeting with

19    the trustee and others in Washington last week and provided to

20    them a report in a written form, describing what we perceived

21    to be the best practices growing out of our experience in this

22    matter.

23          In my understanding, the trustee has been in contact

24    with chambers to see whether the Court wishes to receive that

25    through them; if not, we're prepared to file that with the

28

1    Court if the Court still wants to receive the report on what we

2    perceive to be best practices growing out of this experience.

3            THE COURT:  Well, I don't have any personal need to

4    see that, but it occurs to me that it would be of value to the

5    bankruptcy community generally to have access to your

6    conclusions on that subject, and so I encourage you to file it.

7            MR. VALUKAS:  Thank you, Your Honor.  We'll follow

8    through.

9            THE COURT:  I do have one question that's potentially

10   out of line, but I'm going to ask it anyway.  I was surprised

11   to see a front-page story in yesterday's New York Times about

12   an entity called the Hudson Castle.  Candidly, I had never

13   heard of Hudson Castle and knew nothing about its possible

14   connection to the Lehman insolvency.  To what extent, if at

15   all, did the examiner consider the role of Hudson Castle?  I

16   don't know whether or not that newspaper story is simply

17   designed to sell more newspapers or if it in fact is something

18   that you took into consideration in developing your report.

19           MR. VALUKAS:  Well, we did take into consideration

20   things involving Hudson Capital, including Fenway, which later

21   became important as part of the report.  Hudson Capital, to our

22   knowledge, based on our review at that time, had become, as we

23   understood it, independent of Lehman as of 2004; so we did not

24   go back to the history of Hudson Capital to see who or what was

25   involved with Hudson Capital pre-2004.  And in looking at where

29

1   we were looking at, which is from approximately 2006 forward,

2   we did not consider Hudson Cap -- we viewed it as a separate

3   entity at that point and therefore did not look at it in any

4   particular depth.

5          THE COURT:  Okay.

6          MR. VALUKAS:  We looked at the Fenway situation.

7          THE COURT:  All right.  Thank you very much.

8          MR. VALUKAS:  Okay.

9          THE COURT:  Oh, incidentally, the examiner and his

10  counsel are free to stay and they're also free to go.

11         MR. VALUKAS:  Thank you, but I think we'll leave.

12  Thank you, Your Honor.

13         THE COURT:  And that's true for CME as well.

14         MR. WAISMAN:  Apparently there'll be many geeks back

15  at Jenner & Block getting to work momentarily.

16         THE COURT:  I don't think he was saying there were

17  many geeks at Jenner & Block.

18         MR. BYMAN:  As a geek, I took it as a compliment.

19         MR. WAISMAN:  Your Honor, the next item on the agenda

20  is a case conference.  In keeping with the loose tradition of

21  the debtors providing updates for the Court on distinct areas

22  of the case on a regular basis, and in the context of the fact

23  that we now have, I think, eight omnibus claims objections on

24  file to procedural motions relating to -- dealing with claims,

25  and the fact that the debtors filed an 8-K on March 29th

30

1       relating to claims, to just take a moment, no more than five

2       minutes, updating the Court on where we stand in the population

3       of claims generally, and at least some view as to how the

4       debtors plan on dealing with that claims population going

5       forward at a very high level.

6               To take Your Honor through that, if I may hand up a

7       copy of the 8-K that was filed, just for the Court's

8       information -- I'm not going to spend any time on that -- as

9       well as -- I think it's three slides that will walk the Court

10      through our approach to claims.

11              THE COURT:  That's fine.  Thank you.

12              MR. WAISMAN:  Actually, Your Honor, if I could swap

13      that one out.  I think I gave you mine with a few notes.

14              THE COURT:  Well, then there's no need for a report;

15      I'll just read this.

16              MR. WAISMAN:  Thank you.

17              THE COURT:  Thank you.

18              MR. WAISMAN:  So, Your Honor, turning to the first

19      page of the report, past the title page, as Your Honor is aware

20      and has heard, there have been over 66,000 claims filed against

21      the estates, asserting, in face value, over 899 billion dollars

22      of claims.  It's important to note that, of these 66,000

23      claims, over 21,000 of them are unliquidated in their entirety

24      or include unliquidated components.  And as I indicated on

25      March 29th, the debtors filed an 8-K to provide further

31

1    information to the public regarding the claims that have been

2    asserted.

3         This presentation, Your Honor, is -- for those that

4    follow the cases closely and compare information that is

5    released, is not going to tie to any information that's

6    currently available or has been previously disclosed.  Each

7    report is as of a date certain.  This report is as the claims

8    population stood and our best thinking as of about 4:30 this

9    morning.  And we continue -- as Your Honor knows, we continue

10   to evaluate the claims to assess the character of claims, the

11   basis for objection.  And even this report, as it's being

12   provided to Your Honor, the information on it will continue to

13   change and will certainly change as we become smarter, as we

14   have a greater opportunity to review claims, understand the

15   basis of the asserted claim, and overlay the legal analysis.

16   So those points just by way of caveat.

17        Turning to page 3 of the report, Your Honor, what we

18   did here is provide a broad categorization of the claims that

19   have been filed and then parsed them out by our review and

20   current approach.  So as Your Honor will see, of the 66,000

21   claims, approximately 300 have already been withdrawn.

22   Pursuant to the 4 omnibus claim objection orders Your Honor has

23   entered, over 1,600 of those claims have already been

24   disallowed.  Of the additional 4 omnibus objections that have

25   been filed, another approximately 1,500 claims are subject to

32

1    pending objections.  And when you take all that into account,

2    we're still left with roughly 63,000 claims asserted against

3    the estate.

4         On first pass, and, again, very preliminary and

5    definitely going to change as we get smarter and have

6    additional time to review, we believe and have already

7    identified over 10,000 claims for additional objection.  And at

8    that time we'd still be left with 52,000 claims against the

9    estate.  These numbers will change, as I indicated, and the 52-

10   will be further reduced.  As we become smarter, as we have

11   additional objections filed, as we negotiate with

12   counterparties and reach resolution, we will see a decline in

13   the number; the question is what is the scope of the decline.

14        On page 4, just to give Your Honor a view as to the

15   claims that are currently being reviewed for objection and how

16   they break out in terms of the omnibus objection that would be

17   asserted, amended claims, duplicate claims, insufficient claims

18   and the like, again, we expect -- or our current view is that

19   we have identified over 10,000 additional claims subject to

20   omnibus types of objections.

21        THE COURT:  Okay.

22        MR. WAISMAN:  Finally, Your Honor, on page 5, to give

23   the Court a view towards how we plan on dealing with claims

24   going forward, first and foremost, we have already started the

25   process of engaging claimants in dialogue over their claims.

1    And the effort here would be to resolve as many claims as we

2    can, subject to the settlement authority granted by this Court,

3    without the need for a claim objection, without the need for

4    ADR, and certainly without the need for litigation.

5         From there, we will also continue to pursue omnibus

6    objections to claims -- those are the most efficient way to

7    resolve claims -- in particular duplicate claims, amended

8    claims and claims that we believe have no basis for liability,

9    and expunge those without taking up too much of the Court's

10   very busy docket.

11        Subject to a motion to be heard later on the docket,

12   we would also seek to employ ADR where omnibus objections don't

13   expunge a claim, where we haven't been able to settle a claim,

14   and when we believe we have an objection to a claim but perhaps

15   there's an opportunity to mediate the differences, resolve the

16   differences without great expense to the debtors, the

17   counterparty or the Court's time, and reach resolution through

18   the ADR procedures.

19        Then there are what I call the outliers, and these are

20   individual claims with unique circumstances that don't --

21   aren't easily susceptible to an omnibus objection or ADR and

22   where the debtors are required to file a one-off objection to

23   such claim.  And I think that the Court has already seen a few

24   of those on the docket, in particular the Latshaw claim which

25   is also on the docket today, and the Schwartzman claim.

34

1          And in addition, I think, just to alert Your Honor, we

2     do expect there to be more of the one-off objections; in

3     particular, and I think this has been presented to the Court by

4     way of status conference previously, there are a handful of

5     large derivative claims, very large derivative claims, asserted

6     by big banks.  We believe that those claims are highly

7     inflated, to say the least.  Efforts to engage those

8     counterparties through work through some common ground and

9     reduce those claims on a mutual basis we don't think have been

10    met with a fair reception, and the debtors intend to shortly

11    file objections to those claims in this court and seek

12    resolution.

13         In terms of quantity and timing, I think it's fair to

14    say that one of those objections will likely be coming within

15    the next two to three weeks, with another following shortly

16    thereafter, perhaps another two to three weeks, and we believe

17    there'll be a lull in those for some time but perhaps another

18    four to six to follow thereafter.  And those are the one-off

19    objections that we know are coming down the pike that we wanted

20    to alert the Court to.

21         THE COURT:  Now, will the ADR procedures that we will

22    be discussing later this morning be applicable to these one-off

23    inflated derivative claim objections that you've just alluded

24    to?

25         MR. WAISMAN:  The ADR procedures, if approved, are

35

1        applicable to all claims asserted against the debtors.

2              THE COURT:  Including these, but are you treating

3        these in a different category?

4              MR. WAISMAN:  As they relate to the ADR procedures,

5        we're not treating them in a different category.  But I think

6        it's fair to say that these are -- these particular claims are

7        ones where, given the nature of the efforts to engage in

8        meaningful dialogue, which has been, in our view, rebuffed and

9        not met in good faith, these particular small handful of claims

10       are not ones where we believe ADR would be fruitful.

11             THE COURT:  Okay.

12             MR. WAISMAN:  So with that background and the approach

13       to claims, as Your Honor sees, we expect there to be a fair

14       amount activity -- claims activity on the docket, but hopefully

15       not many claims objections requiring the Court's intervention

16       and time for several months to come.  Obviously, we'll have to

17       revisit that in a few months as claims activity picks up and

18       work on the plan and confirmation continue.

19             Happy to answer any questions the Court may have.  We

20       just wanted to provide that update.

21             THE COURT:  Thank you.  I have no questions.

22             MR. WAISMAN:  On to the uncontested matters on the

23       agenda, Your Honor, agenda item 3 is a motion of LSF6 Mercury

24       REO Investments for relief from the automatic stay, a motion

25       for relief filed against the debtors.  It is unopposed by the

36

1    debtors.  I think we simply ran out of time to stipulate and

2    reach an agreement, but I believe we have an order to hand up

3    to the Court resolving that matter.

4         THE COURT:  Fine.

5         MR. WAISMAN:  Your Honor, the next uncontested matter

6    is the motion Lehman Brothers Holdings for authorization and

7    approval of certain settlements with the Internal Revenue

8    Service.  Spend just a moment on this, Your Honor.  The motion

9    was filed; objections were due on April 7th.  No objections

10   have been filed.

11        Your Honor, as the motion indicates, LBHI, as the

12   parent of the controlled group, claimed a refund from the IRS

13   for taxes, penalties and deficiency interest for eight disputed

14   tax issues for consolidated returns filed between 1997 and

15   2008.  The amount paid by LBHI previously for these disputes

16   exceeded 374 million in taxes and over 227 million dollars in

17   interest.

18        As I think the motion makes clear, the facts and

19   issues surrounding the disputes are voluminous, highly complex

20   and technical.  As a result, the IRS and the debtors determined

21   some time ago to engage in an administrative process that

22   really is a mediation, and the parties engaged in that

23   mediation over a period of six months.  The debtors' team in

24   this regard was led by Jeff Singoli (ph.), who's the managing

25   director of LBHI and director of global tax services for LBHI,

37

1    who is the declarant on this motion and is here today in court

2    to answer any questions the Court or parties may have on the

3    issue.

4         Jeff's team was assisted by their tax counsel, which

5    was led by McKee Nelson, which has since become, through

6    merger, Bingham McCutchen, and in particular the partner

7    leading the engagement, Raj Madan, who is also here in court

8    this morning.

9         In addition, the debtors had assisting them the firm

10   of Sutherland Asbill, and Sutherland's role was to advise the

11   debtors on the likely outcome of litigation on each of these

12   disputes, as experts in the area, so that it could help guide

13   the debtors in terms of the negotiations and the parameters of

14   settlement.

15        As part of the mediation, or even in advance of the

16   mediation, and then as part of the mediation, Jeff, his team

17   and Bingham regularly consulted with the creditors' committee

18   and their tax professionals to advise them of the status of the

19   disputes, the nature of the disputes, the possibility for

20   settlement, and then, as the mediation progressed, the status

21   and the give-and-take and ultimately the settlement.

22        As a result of the mediation and the reason we're here

23   today with this motion is the debtors and the IRS reached

24   agreement on six of the eight disputes.  Those settlements are

25   subject to two approvals:  Your Honor's approval and the

38

1       approval of the U.S. Congress Joint Committee on Taxation.

2               The issues that have been resolved are, as outlined in

3       the motion:  the interest deduction issue; LBIE foreign tax

4       credit issue; Sweet River foreign tax credit issue; the Brazil

5       foreign tax credit issue; the lease buyout issue; and the mark-

6       to-market issue.

7               Out of the 364 million dollars in tax payments that I

8       alluded to earlier, the disputes we're talking about here

9       relate to approximately 199 million dollars of those payments.

10      Of the 199 that LBHI paid as a result of the settlement of the

11      6 issues, the estate will receive recovery for 125 million of

12      that 199 million; so a settlement in excess of, I think, 64

13      percent of the asserted amount.

14              That leaves two issues of disagreement between the

15      debtors and the Service; one of those issues the parties agreed

16      to continue to mediate on, and the other the parties agreed to

17      discontinue mediation and proceed to litigation.

18              The debtors, together with their professionals, and

19      with the assistance of the creditors' committee, believe --

20      have received all of the issues, the settlement, the risk and

21      reward of litigation, and believe these settlements are fair,

22      equitable and in the best interests of these estates.

23              Happy to answer any questions the Court may have.

24      Otherwise, we would ask that the settlements be approved.

25              THE COURT:  I think I would like to hear from the

1     creditors' committee in connection with its statement in

2     support of the settlement.

3          MR. FLECK:  Good morning, Your Honor.  Evan Fleck of

4     Milbank, Tweed, Hadley & McCloy, on behalf of the official

5     committee.

6          Your Honor, as set forth in the committee's statement

7     in support of the motion, the committee has given the

8     importance of the tax issues that relate to these estates.  The

9     committee has formed a tax subcommittee to focus on the matters

10    in dispute that Mr. Waisman alluded to and that are set forth

11    in detail in the debtors' motion.  The subjects that are the

12    subject of the motion and that have been resolved were, in

13    particular, the focus of many discussions among the creditors'

14    committee, members that are on the subcommittee, along with the

15    advisors to the committee, and then in sessions together with

16    the debtors.  As a result of those discussions, the committee

17    is comfortable that the proposed settlement of the issues that

18    are the subject of the motion are in the best interests of the

19    estate, reflect a fair resolution of the disputes, and for

20    those reasons the committee supports the debtors' motion to

21    approve the settlement.

22         THE COURT:  Fine.

23         MR. FLECK:  Thank you.

24         THE COURT:  I'll approve the settlement.  And I'll

25    resist the urge to have someone from the bench of experts

40

1    who've come here to talk about it answer questions or offer

2    anything, because I'm confident I would not understand it.

3         MR. WAISMAN:  I think that applies to the large

4    majority of us in the room today, Your Honor.

5         Item 5 on the agenda is the Metavante settlement, to

6    be handled by my partner Richard Slack.

7         MR. KOBAK:  Your Honor, if there's nothing further,

8    one other matter on the LBI calendar involving LBI was

9    withdrawn, so I wondered if I might be excused.

10        THE COURT:  Yes, you may be excused.

11        MR. KOBAK:  Thank you, Your Honor.

12    (Pause)

13        MR. SLACK:  Good morning, Your Honor.  Richard Slack

14    from Weil Gotshal, for the debtors.

15        The motion is one to approve the settlement agreement

16    between LBSF and Metavante Corporation pursuant to Rule 9019.

17    It's been a while since we've had this matter in front of Your

18    Honor.  As you know, this -- your opinion was appealed, and

19    during the pendency of the appeal the parties reached a

20    settlement.  The matter was remanded by the district court for

21    Your Honor's consideration in the 9019.  We filed a 9019; there

22    have been no objections that have been filed in connection with

23    the proposed approval of the settlement.

24        Typically, Your Honor, we might have filed a

25    certificate of no objection, but here, because of the district

1    court's order which directed the debtors to have this matter

2    heard at this hearing, just in case Your Honor had any

3    questions about the settlement, we thought it prudent to go

4    forward today instead of filing the certificate.

5         The debtor believes this is an excellent result for

6    the estate, and we're ready to rest on the papers, unless Your

7    Honor has any questions about the settlement.

8         THE COURT:  I have no questions about the settlement.

9    I've reviewed the papers and am pleased that the parties were

10   able to reach a compromise of their respective positions.

11        Does Metavante's counsel wish to say anything?

12        MR. BERNARD:  Your Honor, just to make -- for -- just

13   to say thank you for your time.  Richard Bernard of Baker

14   Hostetler, on behalf of Metavante and Fidelity National

15   Information Services.

16        THE COURT:  All right.

17        MR. BERNARD:  Thank you, Your Honor.

18        THE COURT:  It's approved.

19        MR. SLACK:  Thank you very much, Your Honor.

20        THE COURT:  And I will advise Judge Rakoff.

21        (Pause)

22        MR. WAISMAN:  From there, Your Honor, we move to the

23   contested portion of the agenda.  The first matter under

24   contested matters is the motion of Mizuho.

25        (Pause)

42

1          MR. PASQUALE:  Good morning, Your Honor.  Ken Pasquale

2     from Stroock & Stroock & Lavan, for Mizuho Corporate Bank.

3          Actually, Your Honor, this is a matter that is

4     uncontested as I stand here before you this morning.  Mizuho is

5     the agent on a thirty-five billion yen credit facility.  The

6     motion that we filed was simply, as an administrative matter,

7     to permit assignments of claims in interest under the credit

8     facility, without the need to go to the debtors for prior

9     consent, which the debtors, under the agreement, are required

10     to give, not to be withheld unreasonably.

11          We have agreed to some changes in the order to address

12     the debtors' concern.  The two changes, and I have a blackline

13     for the Court, are just to make clear that all orders pending

14     in this case apply, in particular the NOL order, and that the

15     debtors reserve their right to object to any claim.

16          And with that, Your Honor, unless you have questions,

17     I'd ask that the order be entered.  I'm happy to present it.

18          THE COURT:  I don't have any questions and I will

19     enter the order.

20          MR. PASQUALE:  Thank you, Your Honor.

21          THE COURT:  Thank you.

22          MR. PASQUALE:  May I approach?

23          THE COURT:  Yes -- well, no, why don't you just give

24     it to debtors' counsel.

25          MR. PASQUALE:  Okay.  Will do.

43

1          THE COURT:  We collect all the orders at the end of

2     the hearing.

3          MR. PASQUALE:  Thank you, Your Honor.

4          MR. KRASNOW:  Good morning, Your Honor.  Richard

5     Krasnow, Weil, Gotshal & Manges, for the Chapter 11 debtors.

6          The next matter on the calendar relates to the

7     debtors' motion concerning Swedbank.  Your Honor, by this

8     motion, the debtors are requesting that the Court direct

9     Swedbank to cease and desist from continuing to engage in

10    contumacious conduct which started over a year ago when it

11    withheld post-petition funds aggregating, in Swedish kronor,

12    almost 83 million Swedish kronor, which translates to

13    approximately 11.7 million dollars, which it was improperly

14    seeking to apply against certain pre-petition obligations which

15    it -- or claims, which it asserted it had against LBHI.  And we

16    are requesting, therefore, that the Court direct that they pay

17    those monies to LBHI, as they are required to, in our view,

18    under the bankruptcy laws.

19         Your Honor, the facts relevant to this particular

20    proceeding are limited in number, rather simple and are

21    unrebutted and, thus, conceded by Swedbank.  They are as

22    follows, Your Honor.  LBHI maintained with Swedbank, prior to

23    the commencement of these Chapter 11 cases, a general deposit

24    account; that account continues in existence subsequent to the

25    commencement of the Chapter 11 cases.  There is -- there was

44

1    deposited and there is deposited in this account, and I'll use

2    U.S. dollars if I may, Your Honor, in excess of 12 million

3    dollars, of which approximately 11.7 million dollars was

4    deposited post-petition.  Your Honor, this is not disputed.  It

5    is indeed conceded by Swedbank.

6         Swedbank is a party to a number of swap agreements

7    with various Lehman affiliates.  In connection with those swap

8    agreements, Swedbank asserts that LBHI issued and is -- and

9    guaranteed the obligations of those affiliates.  While we

10   reserve our rights with respect to challenging that guarantee,

11   Your Honor, for purposes of today's hearing, we're prepared to

12   acknowledge the existence of the guarantee as a possibility, at

13   a minimum, that LBHI may be indebted to Swedbank in respect of

14   that guarantee.

15        The claims that Swedbank have asserted against LBHI,

16   in respect of those guarantees relating to the swaps, are in

17   excess of the post-petition funds on deposit in the account.

18   There is no challenge or dispute by Swedbank that if the usual

19   law that applies with respect to setoffs -- as set forth in

20   Section 553, and as Your Honor has ruled in this case in

21   connection with the DnB NOR dispute -- applies, then Swedbank

22   cannot, may not, set off or seek to set off, refuse to return

23   to LBHI the post-petition funds that it holds.

24        Those, Your Honor, are the facts; they are not

25   disputed by Swedbank.

1          So what is their rationale for failing to pay over the

2     funds?  They contend, Your Honor, that, based upon the safe

3     harbor provisions of the Bankruptcy Code, not only do they have

4     the extraordinary rights that are provided for in the safe

5     harbor provisions with respect to the inapplicability of the

6     automatic stay to effectuate setoffs, to terminate agreements

7     as they relate to the swaps of derivatives which are covered by

8     the safe harbor provisions of the Code, but they are indeed

9     entitled to exercise rights with respect to the general

10    depository account and need not concern themselves with the

11    distinctions long recognized by the courts and by this Court

12    with respect to mutuality and post-petition funds and pre-

13    petition funds.

14         Your Honor, they cite no cases whatsoever to support

15    their position; they rely solely on what they claim to be the

16    language of Sections 560 and 561 of the Code to support their

17    position.  It's unclear to us why they rely on 561, since the

18    transactions at issue are swap agreements and thus 560 would

19    apply, but in fact the language that they quote and that's

20    relevant here, Your Honor, is the same in Section 560 and 561.

21         And they argue, Your Honor, that those safe harbor

22    provisions not only excuse their failure to have sought any

23    relief from this Court over the past sixteen months or so, as

24    it froze the funds at issue here, but also eliminated any

25    requirements of mutuality that would otherwise apply.

46

1          So, Your Honor, we should turn therefore to the

2     applicable language of Section 560.  And I'm going to quote,

3     Your Honor, selectively the words that are applicable here, but

4     I'm selecting only those words that in fact apply, because

5     there are many words in those sections.  And so what this

6     Section 560 said, it states, quote, "The exercise of any

7     contractual right of any swap participant ... to offset or net

8     out any termination values or payment amounts arising under or

9     in connection with the termination, liquidation, or

10    acceleration of one or more swap agreements shall not be

11    stayed, avoided," et cetera.

12          Your Honor, we submit that that plain language, clear

13    unambiguous language, means that if there is a payment

14    obligation that the debtor has to a counterparty, or vice

15    versa, which payment amounts or obligations arise or are in

16    connection with the swap agreement itself, then the automatic

17    stay would not apply and the nondebtor party could exercise its

18    setoff rights.  We do not dispute that, Your Honor.  The

19    problem for Swedbank, however, is that the payment obligation

20    that it has to LBHI that is at issue here has nothing to do

21    with the swap agreements; it has everything to do with the

22    general deposit account, which is totally unrelated to the swap

23    agreements.

24          If one were to look to Section 561, while it doesn't

25    refer specifically to the swap agreements, although it lists a

1    number of potential derivative-related transactions, the

2    applicable language that I've just quoted is stated there as

3    well.

4         So it allows for setoffs, it allows for netting, so

5    long as the obligations of both sides arise under or relate to

6    the derivative contracts with the swaps in question.

7         Your Honor, we submit that the plain reading of the

8    statute does not support their position.  And while they make

9    reference to legislative history, which, we would submit, one

10   need not look to given the plain language of the statute, we

11   submit, as set forth in our responsive papers, that that

12   legislative history similarly simply doesn't support their

13   contention that the safe harbor provisions of the statute, by

14   their words or by Congress' intention, were intended to address

15   this type of situation and allow a counterparty to glom onto,

16   if you will, assets and monies that are property of the debtor-

17   in-possession.

18        Moreover, Your Honor, even if Section 560 were to

19   apply such that the automatic stay would not apply, the next

20   question is does that mean that safe harbor provisions

21   eliminated/eviscerated the concept of mutuality.  There

22   certainly is nothing in Section 560 or 561 that would support

23   that contention.

24        And indeed Swedbank doesn't argue that those

25   particular provisions directly address the issue.  Rather, they

1    contend that one should look to the 2005 amendments that were

2    made to Section 553, the setoff provision of the Code, and

3    there they say there is support for the argument that mutuality

4    no longer applies as a requirement for setoff when dealing with

5    safe harbor transactions, because of the amendments that were

6    made in Section 553, which has a carve-out as to its

7    applicability with respect to safe harbor transactions.  The

8    problem with that argument, Your Honor, is that while Section

9    553 was indeed amended to provide a carve-out, it was a very

10   limited amendment; it applied with respect to Section to

11   553(b), which is a section of that statute, that provision,

12   that in all other respects is an avoidance provision, if you

13   will; it allows a debtor-in-possession or trustee to avoid pre-

14   petition setoffs that come within the description of the types

15   of pre-petition setoffs that can be avoided under 553(b).  And

16   Congress, without question, amended that section to exclude

17   from the types of pre-petition setoffs that can be avoided

18   those types of setoffs that would otherwise come within the

19   safe harbor provisions.

20        Well, Your Honor, it is undisputed, it is conceded,

21   that we are not dealing with a pre-petition setoff here.  We

22   are dealing with an attempted setoff of post-petition funds.

23   And I would argue, Your Honor, that the fact that Congress only

24   amended Section 553(b) reflects a Congressional intent that in

25   all other respects the rules that apply to setoffs, the

1    requirement of mutuality, apply to all types of transactions,

2    including those that come within the scope of safe harbor

3    provisions of the statute.

4          For these reasons, Your Honor, and for the reasons set

5    forth in our reply, we submit that there simply is no

6    foundation whatsoever to the defenses that Swedbank has

7    belatedly put into play in support of its argument that it

8    could withhold the ten million dollars currently due and owing

9    to LBHI.  We would request, therefore, that the Court grant the

10    motion and direct that those monies be paid over to us

11    forthwith.  Thank you, Your Honor.

12          THE COURT:  Thank you.

13          Mr. Montgomery, good morning.

14          MR. MONTGOMERY:  Good morning, Your Honor.  The debtor

15    is correct about one thing:  that the facts in the Teng

16    declarations and the facts in the Stenberg declaration match.

17    There was a small computational difference, and we have advised

18    the debtors that the Teng declaration is correct even as to

19    those computational differences.

20          It's also not disputed that, from the inception of the

21    case, Swedbank has done everything consistent with its view of

22    how to exercise its rights under the safe harbor rules.  It is

23    also unquestioned that we are dealing with both pre- and post-

24    petition deposits in connection with this setoff dispute.  It

25    is undisputed that LBHI is a party in two ways with respect to

50

1    these agreements:  One, LBHI (UK Branch) was a derivative

2    counterparty under one of the swap agreements; and LBHI is a

3    guarantor of all four swap agreements.  The four swap

4    agreements involved LBCC, LBFSA and LBSFI, as well as LBHI

5    itself.  Those agreements go back to 1996.

6         This is the result of a very long history in which the

7    parties reached an agreement on how to handle swap transactions

8    using the 1992 master ISDA agreement form; it was used by all

9    four parties.  And importantly, in that document the term

10   "setoff" is defined as a specific -- having a specific meaning.

11   And if you may -- if I may, Your Honor, I'm going to quote from

12   the setoff definition contained in the ISDA agreement, which is

13   attached to the Stenberg declaration:  "'Set-off' means set-

14   off, offset, combination of accounts, right of retention or

15   withholding or similar right or requirement to which the payer

16   of an amount under Section 6 is entitled or subject (whether

17   arising under this Agreement, another contract, applicable law

18   or otherwise) that is exercised by, or imposed on, such payer."

19        THE COURT:  You're not suggesting, are you, that

20   parties can contractually override applicable provisions of the

21   Bankruptcy Code, are you?

22        MR. MONTGOMERY:  Oh, quite the contrary.  I believe

23   the Bankruptcy Code here authorizes what the parties agreed to.

24   And what I'm informing the Court of is what the parties agreed

25   to.  The parties agreed that the term "setoff" would allow it,

51

1      that is, the party who had a net obligation due it, the right

2      to go after not only what was in the specific trades, called

3      swaps, but in the other accounts of the parties.  The general

4      deposit account to which the debtor has made reference, which

5      has existed for some number of years between Swedbank and LBHI

6      (UK Branch), is such another contract entitlement between the

7      parties.  It is a general liability of Swedbank to provide UK

8      SEKs on demand for the debtor.  That demand deposit account is

9      what was set off.

10          Now, why am I so confident that the Court should

11     adhere to our view of the reading of 560 and 561?  And, by the

12     way, the reason we refer to 561 is these are both master

13     agreements and we are going across contracts, so we thought

14     that 561 was a relevant provision.  561, of necessity, is

15     relevant because we're talking about swaps.

16          Our starting point for this view might be well-

17     codified by looking at the Enron decision cited by the debtor.

18     In there, Judge Gonzalez says Section 560 simply permits the

19     exercise of termination rights by a nondefaulting swap

20     participant so long as the enforcement of those rights is first

21     triggered by a condition of the kind specified in 365(e)(1).

22     There is no dispute here that the triggering event here was a

23     365(e)(1) or ipso facto clause provision.  There is therefore

24     no disagreement that the dispute here arises under or in

25     connection with a swap agreement.  There is no dispute that we

52

1    are exercising a contractual right, as defined in that swap

2    agreement or master netting agreement.  And it is also true

3    that the debtor is pointing to a constraint on the exercise of

4    our rights, or the bank's rights, by virtue of 553.  But it is

5    also undisputed by the parties that the operation of any

6    provision of this title or by any order -- or a court -- excuse

7    me, let me start that again -- by operation of any provision of

8    this title or by any order of a court or administrative agency

9    in any proceeding under this title, cannot constrain the

10   exercise of rights protected by 560 and 561.

11        So where does this take us, Your Honor?  We think

12   Congress said fairly clearly that if an offset arises in

13   connection with a swap agreement whose termination was

14   triggered by an ipso facto clause, the enforcement of the

15   rights under that agreement can be, must be, enforced, and no

16   provision of the Code, no order of the Court, can stop the

17   exercise of those rights.

18        This is not a situation, as this Court has seen

19   before, in which the parties equivocated as to what their

20   rights were, that they may have engaged in some sort of waiver

21   as to whether or not they did or did not think that they had to

22   come to the Court first.  November 27 of 2008, Swedbank advised

23   the debtor that they were going to take a setoff as of December

24   1 for at least the contract amounts that were owed under the

25   LBHI swap agreement; that is, not going across contracts, but a

1    straightforward 560 setoff of LBHI's obligations due to

2    Swedbank against Swedbank's obligations to LBHI.

3        The right to freeze, we believe, is a retention.  It

4    is specifically preserved by 560 and 561.  It's specifically

5    preserved by the contract.

6        Now, the debtor says somehow we've missed the issue of

7    mutuality.  Well, there's no dispute that Swedbank and LBHI are

8    parties to the swap agreements, there's no dispute that LBHI

9    and Swedbank are parties to the guarantee agreement, and

10   there's no dispute that Swedbank and LBHI are parties to a

11   general deposit agreement.

12       Therefore, the only reason mutuality comes up is

13   because of the well-established fiction that the debtor changes

14   on the petition date; that is, that the party that comes into

15   existence post-petition is not the same as the party that

16   existed prior to the filing.  That's why mutuality doesn't

17   exist when the automatic stay kicks in; that's why there are

18   limitations under 53.

19       But I say to you, Your Honor, that the mutuality that

20   existed immediately before the filing date continues to exist

21   the minute after the filing date because of 560 and 561,

22   because no provision of the Bankruptcy Code can operate to stay

23   or otherwise impair the enforcement of the rights under that

24   swap agreement.  And all of the rights being exercised here are

25   rights coming out of the termination process.  This is not a

54

1    case where one side went to a state court and tried to

2    adjudicate whether or not there should or should not be a

3    termination.   This is not a case in which the parties

4    hesitated, waited two years to decide what their relative

5    positions were, after having engaged in months of settlement

6    with each other.   None of these things are the circumstance

7    here.   Instead, we have a classic, well-defined, agreed swap

8    agreement whose termination resulted from an ipso facto clause

9    relating to LBHI, the guarantor, and that the rights or setoff,

10    or offset, are codified in the agreement and recognized by the

11    statute.

12         Your Honor, I think -- we respectfully request that

13    you deny the debtor's request stated in its papers for an order

14    directing us to turn over the frozen funds.   We respectively

15    (sic) request that you deny the request to turn over the setoff

16    funds identified in the Teng declaration.   And just so the

17    Court is absolutely clear about this, it's the 371,000 dollars

18    that was owed by LBHI under the LBHI swap agreement, not the

19    guarantee, that was asserted against the general deposit

20    account.

21         Your Honor, I think, for the reasons that I have

22    explained to you, you should deny their request for relief.

23         THE COURT:   I hear you, but I disagree with you.   How

24    can you say, with no governing precedent to support your

25    position, that the provisions of 560 and 561 somehow override a

55

1    lifetime of jurisprudence on the issue of mutuality under

2    Section 553 of the Bankruptcy Code?  You grew up in this; so

3    did I.  Mutuality is the holy grail of setoff when it comes to

4    bankruptcy.  And you're suggesting without any authority, other

5    than printed language in a form ISDA agreement, that I should

6    disregard that.  I need more than just your impassioned

7    argument, Mr. Montgomery.

8         MR. MONTGOMERY:  Well, of course Your Honor does, but

9    the plain meaning of the statute is where we reside our

10   argument and where we ask the Court to look.  As the Supreme

11   Court in the Pair case said, the plain meaning of legislation

12   should be conclusive, except in rare cases in which the literal

13   application of a statute will produce a result demonstrably at

14   odds with the intentions of the drafters.

15        THE COURT:  It is conclusive.  In fact, if you look at

16   Section 553, it says, "Except as otherwise provided in this

17   section and in sections 362 and 363 of this title, this title

18   does not affect any right of a creditor to offset a mutual debt

19   owing by such creditor to the debtor that arose before the

20   commencement of the case under this title against a claim of

21   such creditor against the debtor that arose before the

22   commencement of this case" -- or "the case, except to the

23   extent that," and there are a bunch of exceptions.

24        The rule is mutuality.  Where does the exception

25   override that rule?

56

1          MR. MONTGOMERY:  Your Honor, we point to 561(a),

2     because it is a specific provision governing a specific type of

3     contract that says "shall not be stayed, avoided or otherwise

4     limited by operation of any provision of this title", and we

5     read that to include 56 -- 553 --

6          THE COURT:  We're not talking --

7          MR. MONTGOMERY:  -- or by any order of a court.

8          THE COURT:  But, Mr. Montgomery, we're not talking

9     about the stay; we're talking about the right.  We're talking

10    about the right to exercise offset.  You can't exercise that

11    right with respect to post-petition receipts.  It's as simple

12    as that.

13         MR. MONTGOMERY:  But, Your Honor, I have to disagree

14    with you, because why is -- why is, in bankruptcy

15    jurisprudence, there a difference between what the debtor can

16    be subject to immediately before the filing date and

17    immediately after the filing date?  And the issue is the

18    automatic stay.  The bankruptcy courts and thirty years of

19    jurisprudence have said that the debtor that exists after the

20    filing date is not the same entity that existed before the

21    filing date, because if it were, mutuality would be a prima

22    facie established fact.

23         So what's happening here?  The debtor is saying we are

24    relying upon the distinction between the pre- and post-petition

25    debtor.  We are saying that it's the same entity, because 560

57

1    and 561 tell us it can be the same entity, because no operation

2    of the Bankruptcy Code can prevent the enforcement of the

3    termination rights that arise under the swap agreement.  And

4    the parties explicitly agreed eighteen years -- actually

5    fourteen years ago now -- under a -- using a master form

6    agreement that was developed eighteen years ago, that setoff

7    include the right of retention across other accounts.  And,

8    Your Honor, for us, it's a very straightforward and simple

9    reading that is not contravened by any specific case law cited

10   by the debtor.  And to the extent 553 is the source of

11   challenge, we say to the Court that the plain meaning of 560

12   and 561 precludes 553 from being used to achieve an adverse

13   result.

14        THE COURT:  Okay.

15        MR. MONTGOMERY:  Thank you, Your Honor.

16        MR. KRASNOW:  Richard Krasnow, Your Honor, on behalf

17   of the debtors.  I will be brief.  First, what Mr. Montgomery

18   referred to as a fiction is in fact the legal reality.  There

19   is a distinction between a debtor and a debtor-in-possession.

20   There is a distinction between pre-petition funds and funds

21   received by the post -- by the debtor-in-possession post-

22   petition.

23        Secondly, just a factual correction:  The setoff that

24   Swedbank effectuated during those initial months of the chaotic

25   Chapter 11 that was Lehman was 300-some-odd thousand kronor;

58

1    that translates to approximately 50,000 dollars.  That's really

2    what's not at issue here.

3         Your Honor, what we should look to in the con -- with

4    regards to the mutuality issue is Section 553 and what did

5    Congress do with respect to Section 553.  If Mr. Montgomery is

6    right and Sections 560 and 561 wrote out of the statute Section

7    553 in its entirety as it relates to safe harbor transactions,

8    why is it that in 2005 Congress felt it was necessary to amend

9    Section 553(b) so as to exclude from the avoidance provisions

10   of Section 553 certain pre-petition setoffs that a counterparty

11   may have exercised with respect to a safe harbor transaction?

12   They did it because Section 560 and 561 didn't write out

13   Section 553.  It is a very limited carve-out of 553; it is

14   limited to Section 553(b), not 553(a).  There is simply no

15   merit whatsoever to Swedbank's contention that they as a

16   counterparty, or any other counterparty, can simply glom onto

17   and take away from an estate any and all post-petition assets

18   that it may realize.

19        Your Honor, again, we request that the motion be

20   granted.  Thank you.

21        THE COURT:  Since Mr. Montgomery is no longer in front

22   of the bar of the Court, I assume that he has nothing more to

23   say.

24        MR. MONTGOMERY:  That is correct, Your Honor.

25        THE COURT:  The motion is granted.  There are

59

1    principally two arguments being made here, although I haven't

2    heard anything about argument number 2, except in passing.

3    Argument number 2 is that it's inappropriate to exercise a

4    right of setoff with respect to funds in a general deposit

5    account that wasn't identified as arising under, in this case,

6    a swap agreement.  I'm not going to deal with that issue,

7    largely because the parties, except in their papers, have dealt

8    with it, but appear not to be focused on it for purposes of

9    today's argument.

10        Additionally, there is another matter currently before

11   the Court involving disputes between Lehman and Bank of America

12   in which this issue is fully briefed, and there is a full

13   record as a result.  I will defer any consideration of that

14   question to an adjudication of that separate dispute.

15        I believe that the issue is actually answered in the

16   Court's decision in the DnB NOR case, which, while it did not

17   deal with Section 560 or 561 of the Bankruptcy Code, dealt

18   explicitly with setoff as it applies to post-petition funds

19   deposited in an account, just like this account.  The DnB NOR

20   account was a general deposit account involving Norwegian

21   krona.  This is a general deposit account involving Swedish

22   krona.  The question decided in the DnB NOR case had to do with

23   the timing of receipt of a wire transfer.  This is much less

24   subtle.  This is money that is indisputably post-petition funds

25   received after the petition date.  And Swedbank somehow argues

60

1    that the traditional distinction between pre- and post-petition

2    funds for purposes of construing mutuality under Section 553

3    should be disregarded simply because they exist, a fourteen-

4    year old ISDA agreement relating to swaps between Lehman and

5    Swedbank.  I do not read Section 560 and 561 as overriding so

6    fundamental a precept of U.S. bankruptcy law as the requirement

7    that there may be mutuality for purposes of setoff.  I do not

8    believe that Section 560 and 561 can be read to override such a

9    fundamental part of our law.  And if Congress actually intended

10   to do what Mr. Montgomery is today arguing, Congress would have

11   said in clear, understandable and plain language that Section

12   553, to the extent it relates to mutuality, does not apply in

13   circumstances of netting permitted under Section 560 and 561.

14       The strained argument made by Swedbank is

15   unpersuasive, no case law or other authority has been cited to

16   support the position being advanced here, and the Court grants

17   the motion.  To the extent that Swedbank should choose to seek

18   further review of this bench decision, the Court reserves the

19   right to prepare a more complete rendition of its determination

20   for purposes of helping the district court consider the issue

21   on appeal, should that be necessary.

22       We'll take the next matter, and I'll take an order at

23   the end of the hearing.

24       MR. KRASNOW:  Your Honor, we did not bring in the form

25   of order with us, but we will submit one later this week.

61

1          THE COURT:  Fine.  In the form of order, please make

2     reference to the fact that I reserve the right to file written

3     findings and conclusions in connection with this in the event

4     that any appeal should be taken.

5          MR. KRASNOW:  We will do so, Your Honor.

6          THE COURT:  Thank you.

7          MR. MONTGOMERY:  Your Honor, if I may, because it

8     relates -- in the event that the client seeks the appeal of

9     this, we would request a stay of the order directing -- if the

10    Court enters the order at the debtors' request and which is a

11    direction to turn over funds, we ask that the Court consider a

12    stay so that we may appeal Your Honor's decision.

13         THE COURT:  There'll be a further proceeding with

14    respect to the request for the stay.  I'm not going to grant it

15    based on your oral motion.

16         MR. MONTGOMERY:  Thank you, Your Honor.

17       (Pause)

18         MS. MARCUS:  Good morning, Your Honor.  Jacqueline

19    Marcus, Weil, Gotshal & Manges, for the Lehman debtors,

20    including LCPI.

21         Item number 8 on the agenda, Your Honor, is the

22    objection of LCPI to the proofs of claim filed by Latshaw

23    Drilling Company, claim number 18346, in the amount of

24    approximately eighteen million dollars.

25         LCPI's objection to the claim was dated January 22nd,

1    2010 and is docket number 6729 on the docket.

2        As the Court is no doubt aware from having read the

3    pleadings, Latshaw Drilling Company and its affiliate are the

4    subject of Chapter 11 cases that were commenced in the Northern

5    District of Oklahoma in November 2009.  Thus, this matter

6    presents an issue which the Court has faced before of competing

7    Chapter 11 cases.

8        LCPI's objection to Latshaw's claim had previously

9    been scheduled for an earlier hearing but was adjourned to

10   provide time for the parties to attempt to negotiate a global

11   resolution of the issues.  Unfortunately, that effort was not

12   successful, so we're here today to discuss the objection.

13       The facts regarding the Latshaw credit agreement and

14   LCPI's alleged failure to fund are set forth in our objection.

15   Obviously, LCPI as the lender in this case, and Latshaw as the

16   borrower, disagree about the facts and the impact that the

17   facts have on their respective rights.  However, both parties

18   agree that Latshaw borrowed in excess of forty-five million

19   dollars from LCPI.

20       For purposes of today's hearing, there are essentially

21   four issues in dispute, all of which are legal issues:  The

22   first one is that this Court, as the court in which LCPI's

23   Chapter 11 case was commenced, have jurisdiction to hear and

24   determine claims filed against LCPI; second, did Latshaw waive

25   its right to recoupment under the terms of the credit

63

1    agreement; third, did Latshaw waive its right to recover

2    consequential or special damages under the credit agreement;

3    and fourth, do the alleged damages suffered by Latshaw as a

4    result of LCPI's failure to fund constitute consequential

5    damages?

6              Turning first, Your Honor, to the Court's

7    jurisdiction.  28 U.S.C. Section 157(b)(2)(B) makes it

8    abundantly clear that the allowance or disallowance of claims

9    against the estate is a core proceeding.  Thus, this Court

10   undoubtedly has jurisdiction to deal with the Latshaw claim.

11   Latshaw argues repeatedly that it is not seeking affirmative

12   relief against LCPI in this case, but only filed its claim as a

13   defensive measure.  Latshaw fails to note, however, that the

14   relief it seeks is actually more costly to this estate than the

15   allowance of a claim, because the effect of recoupment would be

16   to provide recovery to Latshaw in one hundred cent dollars

17   rather than in bankruptcy dollars.  On the contrary, the

18   outcome of this dispute would have less impact on the estate if

19   the issue were merely the allowance of an unsecured claim

20   against LCPI.

21             In any event, this Court, as the home court for LCPI's

22   case, has the preeminent interest in the resolution of this

23   dispute.  Moreover, it is only this Court and not the Oklahoma

24   court that is charged with exercising due care to ensure the

25   equitable distribution to all creditors of the LCPI estate.

64

1          The case cited by Latshaw in support if its statement

2     that the bankruptcy court should not act as a collection

3     agency, couldn't be further from the facts at issue in LCPI's

4     case.  In In re Mountain Dairies, 372 B.R. 623, the case

5     involved a single creditor attempting to file an involuntary

6     Chapter 7 case against the debtor.  In that context, Judge

7     Morris determined that the court should not act as a collection

8     agency for one creditor.  If anyone is seeking to use the

9     bankruptcy court as the collection agent, LCPI submits that is

10    exactly what Latshaw was trying to do when it commenced its

11    case in Oklahoma.

12          Indeed, Latshaw recently filed a Chapter 11 plan that

13    purportedly would provide for payment in full with interest of

14    all creditors with the exception of LCPI, whose claim Latshaw

15    has sought to expunge in its entirety.  Thus, Latshaw's Chapter

16    11 case, like the case in Mountain Dairies, is essentially a

17    two-party dispute.

18          Latshaw argues and cites Judge Drain's decision in the

19    Metiom case, that the determination of the LCPI claim and the

20    amount of damages that Latshaw may recoup is properly a

21    decision for the Oklahoma court.  The Metiom decision, however,

22    does not stand for that proposition.  Rather in that case, the

23    Court allowed the trustee for the first of three sequential

24    debtors to litigate a claim objection in the court in which the

25    first bankruptcy was filed.  That case turned primarily on

65

1    whether the automatic stay was applicable to bar the claim

2    objection, and the Court held that it was not.

3        Latshaw next argues that the true contest revolves

4    around LCPI's claim against Latshaw, which, it submits, should

5    be decided in Oklahoma.  However, as referenced in LCPI's

6    objection, there can be no right to recoupment if there is no

7    underlying claim.  The decision of a District Court for the

8    Southern District of New York in In re Kings Terrace Nursing

9    Home and Health Related Facility, 184 B.R. 200, is instructive.

10       In that case, the Court held as follows:  "One thing

11   is crystal clear.  Whatever its foundations, there can be no

12   recoupment unless there is an underlying right."  The Court

13   went on to note, "The broad definition of claim in Section 1015

14   performs a vital role in the reorganization process by

15   requiring, in connection with -- in conjunction," excuse me,

16   "with the bar date, that all those with a potential call on the

17   debtor's assets come before the reorganization court, so that

18   those demands can be allowed or disallowed, and their priority

19   and their dischargeability determined."

20       Moreover, as indicated by the creditors' committee in

21   its support of LCPI's objection, judicial economy would be

22   promoted if this Court determines Latshaw's claim.  If this

23   Court determines that there is no claim against which Latshaw

24   may recoup, then it's res judicata, and will be determinative

25   when the Oklahoma court denies the allowance of LCPI --

66

1    decides, excuse me -- decides the allowance of LCPI's claim

2    against Latshaw.  If the Court determines that there is a claim

3    against which Latshaw may recoup, then that would also be

4    helpful to the Oklahoma court in allowing the LCPI claim.  But

5    if Judge Rasure in Oklahoma determines that recoupment is not

6    appropriate, then the parties would be back here litigating

7    over the amount of the Latshaw claim against LCPI.

8         As to the second issue, Latshaw's waiver of its right

9    of recoupment, the key provisions of the credit agreement are

10   set forth in our papers.  There's Section 2.4(a), which sets

11   forth Latshaw's unconditional promise to pay LCPI when amounts

12   are due, and Section 2.9(d), which provides that all payments

13   are to be made by Latshaw, without setoff or counterclaim.  In

14   both the LCPI objection and our reply, we have cited many cases

15   that hold that recoupment is a form of counterclaim.

16   Therefore, Latshaw's recoupment claim was waived as a result of

17   Section 2.9(d) of the credit agreement.  Latshaw does not offer

18   any contrary authority.  Instead it erroneously relies on the

19   fact that Section 2.9(d) does not specifically use the word

20   "recoupment."

21        Latshaw also argues that Section 9.18 of the credit

22   agreement's waiver of jury trial makes it clear that

23   counterclaims are to be allowed.  However, Latshaw overlooks

24   the distinction between having a counterclaim and being able to

25   apply that counterclaim to reduce a repayment obligation under

1    the credit agreement.

2         In the unlikely event that the Court determines that

3    Latshaw's alleged recoupment claim has not been waived, then

4    LCPI reserves its right to claim that Latshaw's claim is not

5    appropriate for recoupment.  Indeed, the Second Circuit's

6    decision in Malinowski, which is cited by Latshaw, indicates

7    that it's not only a question of whether the claim arises from

8    the same agreement, but the question is whether the obligations

9    were independent of one another.  The debtors submit that the

10   language of Section 2.9(d) reflects that the obligations were,

11   indeed, independent of one another and should not be subject to

12   recoupment.

13        The third issue, Your Honor, is the waiver of

14   consequential damages.  Section 912 of the credit agreement

15   includes a waiver of special or consequential damages.  Latshaw

16   has confirmed in both the affidavit of Trent Latshaw, filed on

17   the first day of the Latshaw bankruptcy, and in its response to

18   the LCPI objection, that indeed, consequential damages have

19   been waived.

20        The fourth issue, Your Honor, then, is the nature of

21   the damages asserted by Latshaw.  The damages claimed by

22   Latshaw are consequential or special damages, and they were,

23   therefore, waived under the unambiguous terms of the credit

24   agreement.  Latshaw has confirmed the general rule cited by

25   LCPI that nominal damages in the case of a breach of a contract

68

1    to loan money, consists of the cost of obtaining replacement

2    financing.  But that is not what Latshaw seeks here.  Instead,

3    it seeks to recover primarily expenses it allegedly incurred

4    for equipment ordered for the construction of two new rigs.

5        The only dispute here seems to be how to characterize

6    the damages that underlie the Latshaw claim and whether Latshaw

7    has established that it is entitled to more than general

8    damages.  LCPI submits that Latshaw has not met that burden.

9        The case law does indicate that in certain

10   circumstances parties would be entitled to additional damages

11   in the event of a failure to fund, if those damages were

12   foreseeable at the time that a credit agreement was entered

13   into.  Latshaw has not proven, nor could it, that the total

14   shutdown of the credit markets that occurred following LBHI's

15   bankruptcy was reasonably foreseeable, either at the time when

16   the original credit agreement was executed in 2005 or in July

17   2008 when the amended credit agreement was executed.  Thus,

18   even under the cases cited by Latshaw, LCPI could not be

19   charged with the consequential damages that Latshaw seeks to

20   recover.

21       With respect to Latshaw's request that the Court allow

22   it to withdraw its claim, as set forth in LCPI's reply,

23   analysis of the four relevant factors courts look to in

24   deciding whether to permit such withdrawal demonstrates that

25   Latshaw should not be permitted to withdraw the claim.  Those

69

1    factors are:  the adequacy of the claimant's explanation for

2    the need to withdraw; the extent to which the claim has

3    progressed; the duplicative expenses of re-litigation; and

4    undue vexatiousness on the claimant's part.  I won't belabor

5    LCPI's position on these points.  They're all set forth in our

6    reply.

7            Finally, Your Honor, with respect to those arguments

8    made in Latshaw's surresponse, which was filed last night, we'd

9    like to briefly note the following.  Latshaw continues to

10   perpetuate the myth that LCPI has admitted that it breached the

11   credit agreement.  This is a mischaracterization of paragraph

12   13 of LCPI's claim objection in which LCPI acknowledged that it

13   failed to fund, but did not acknowledge that it breached the

14   credit agreement.

15           THE COURT:  But wasn't the failure to fund a breach of

16   the credit agreement?

17           MS. MARCUS:  Arguably, it was, Your Honor.  However,

18   we believe that there might be defenses available.  For

19   example, the previous pattern of draw requests by Latshaw was

20   that amounts were requested as needed in two- or three-million

21   dollar increments.  On the day immediately following the LBHI

22   bankruptcy, Latshaw made a request for the full thirty-seven

23   million dollars.  And we believe that LCPI may have a defense

24   based on that.

25           Finally, Your Honor, last point.  Latshaw seeks to

70

1    take unfair advantage of the examiner's report to argue that it

2    should have the right to rescind the credit agreement on the

3    basis that LCPI allegedly was insolvent in August 2008.  Two

4    points with respect to that.  If Latshaw's going to attempt to

5    rely on anything in the examiner's report, we believe that the

6    correct court in which to do that is here in New York.  And

7    secondly, the solvency statements in the examiner's report

8    aren't quite as straightforward as indicated in this

9    surresponse.

10         Finally, Your Honor, LCPI submits that permitting

11   Latshaw to recoup or indeed to totally avoid any repayment

12   obligation to LCPI would provide an unfair windfall to Latshaw,

13   and the Court should not entertain that.

14         For all of the foregoing reasons, LCPI requests that

15   the Court determine that Latshaw has waived the right to recoup

16   any alleged damages; that the damages represent consequential

17   or special damages that have be waived; and disallow and

18   expunge the claim.

19         THE COURT:  Okay.  I'll hear from counsel for Latshaw.

20         MR. BELMONTE:  Does Your Honor want to hear from the

21   creditors' committee counsel first, because they filed a

22   statement in support of this.

23         THE COURT:  Sure, I can hear from the committee first.

24   Although --

25         MR. DUNNE:  I'll make it quick.  We rest on our

1    pleadings and --

2            THE COURT:  That's great.

3            MR. DUNNE:  -- your work here is done, Your Honor.

4            THE COURT:  Thank you.  Okay, we've heard from

5    committee counsel.

6            MR. BELMONTE:  Good morning, Your Honor.  It's

7    Christopher Belmonte from Satterlee Stephens on behalf of

8    Latshaw Drilling.

9            I agree with quite a bit of what Ms. Marcus said,

10   believe it or not.  This does, in fact, bring up the

11   unfortunate circumstance of competing bankruptcies, the Lehman

12   bankruptcy here in New York, versus the Latshaw Drilling

13   bankruptcy in the Northern District of Oklahoma.  This alleged

14   failure to fund, I think Your Honor put your finger right on

15   it.  It really isn't admitted.  There's no defense been

16   alleged.  This is the first I've heard of anything even close

17   to it.  And in fact, at the time the funding request was made,

18   Lehman -- and there was a response due from Lehman in three

19   days, Lehman's participant funded its portion.  Lehman remained

20   silent -- absolutely silent for three months.  So I think

21   that's a canard, Your Honor, it's really not an issue.

22           I agree with what Ms. Marcus said about this Court

23   having core jurisdiction.  There's no doubt about it.  This

24   Court has core jurisdiction.  I think the unfortunate situation

25   here is that so does the court in Tulsa.

72

1        There's no question that LCPI failed to fund some

2    twenty-eight million dollars, pursuant to a request.  The issue

3    is, who gets to decide the consequence of that failure to fund:

4    Your Honor or the court in Tulsa?  Lehman filed a forty-six

5    million dollar claim in the Tulsa bankruptcy case.  And, Your

6    Honor, essentially what Lehman is asking Your Honor to do is to

7    rule on its proof of claim in the Tulsa bankruptcy and to take

8    that away -- in a sense to encroach upon the jurisdiction of

9    the Tulsa bankruptcy court, when it's the largest single claim

10    in that bankruptcy.

11        Your Honor, there are so many things that have to be

12    administered in the Tulsa bankruptcy at any rate.  For example,

13    that forty-six million dollar claims includes an estimate of

14    500,000 dollars for attorneys' fees.  The Tulsa court has to

15    rule on the reasonability of that.  Your Honor can't do that.

16    It's not before Your Honor.  It will before that court.

17    600,000 dollars in commitment fees for a commitment that was

18    never funded is an issue that's going to be before Judge Rasure

19    in Oklahoma, and not before Your Honor.

20        Therefore, Your Honor, we sought to withdraw this

21    proof of claim without prejudice, because it was solely filed

22    as a protective and informative matter.  Your Honor heard

23    earlier a setoff argument.  This is a recoupment argument,

24    which, as we all recognize, is different from a setoff.

25    Recoupment arising out of the same transaction, does not

1        require a leave of bankruptcy court to be permitted.  It does

2        not require mutuality.  This is pretty basic precepts that

3        nobody can deny.  And while I recognize that there's 66,000

4        claims, there could be 55,999, if Your Honor grants our request

5        to withdraw it and to have this heard in the bankruptcy court

6        in Tulsa, where we think it better belongs.

7                We don't believe that recoupment was waived, Your

8        Honor, turning to the merits of this, if Your Honor decides to

9        address this on the merits.  The loan agreement is very lender-

10       friendly, as most loan agreements are.  Your Honor, will not

11       find the word recoupment -- we searched for it -- anywhere

12       among that -- among the recondite pages of that loan agreement.

13       And with all the waivers -- and by the way, we concede -- it's

14       not an issue before the Court -- we concede that we waived

15       consequential damages.  No issue about that.  But what Your

16       Honor is essentially being asked to do is rewrite the agreement

17       to include something that the draftsman didn't, which was a

18       waiver of recoupment.  And this clearly falls within that

19       recoupment issue, Your Honor.

20               Since we concede consequential and special damages

21       were waived, the real issue is whether or not the damages that

22       we allege -- and we're not alleging lost profits, which is

23       consequential, and we say there's some forty-six million.

24       That's not on the table.  It's not been alleged here; it's not

25       been alleged in Tulsa.  Our point is that when the plug was

1     pulled on the funding, there were drilling rigs that were in

2     the middle of construction, and they were left in media res,

3     just like that.  And they're sitting out in the field right

4     now.  And there's eighteen million dollars'-worth of that sort

5     of equipment and expenses for that equipment, Your Honor.

6          We submitted evidence of that, hundreds of pages of

7     invoices, that support that.  If Your Honor is disposed to go

8     through that and have that issue determined by Your Honor as

9     opposed to Tulsa, we submit, Your Honor, that there's a

10    disagreement as to whether these are consequential or

11    incidental damages.  We believe they're incidental damages.

12    They claim that they are consequential damages.

13         And on that basis, Your Honor, we would oppose, on the

14    merits, the objection to the claim.  But our first request to

15    Your Honor is that it be permitted to be withdrawn so that the

16    court in Tulsa will not have an encroachment, if you will, on

17    its jurisdiction in administering the plan of reorganization

18    that Latshaw has filed.  Thank you, Your Honor.

19         THE COURT:  Thank you.  Anything more?

20         MS. MARCUS:  Just very quickly, Your Honor.  The only

21    point I'd like to make, Your Honor, is that we certainly are

22    not seeking to encroach on the jurisdiction of the Oklahoma

23    court.  Latshaw filed a claim in this court, and apparently now

24    has changed its mind as to that strategy.  Our request is that

25    the Court determine whether there is a valid recoupment claim

75

1    and whether the damages that LCPI asserted in its proof of

2    claim filed here are the type that have been waived under the

3    credit agreement.

4            If at the conclusion of the Court's ruling we need to

5    go to Oklahoma to deal with the LCPI claim, as I believe that

6    we will, then we are happy to do that.  We are not suggesting

7    that the Court rule here that Latshaw owes LCPI forty-five

8    million dollars.

9            THE COURT:  Okay.  I don't think I have anything to

10   ask you.

11           MS. MARCUS:  Okay.  Thank you.

12           THE COURT:  I've looked at the papers in connection

13   with this dispute, but this is not the first that I've heard of

14   it.  And I'm going to just mention this publicly that, believe

15   it or not, bankruptcy judges, wherever located, often know one

16   another.  And I happen to know the bankruptcy judge in Tulsa

17   who is responsible for this case, and we spoke about this case

18   privately some time ago.  It had to do with an unrelated

19   matter, the use of cash collateral.  And she called me and we

20   spoke, because she was concerned about encroaching on my

21   jurisdiction.  None of that has anything to do with the matters

22   presently before the Court today.

23           But of one thing I am absolutely certain, the Tulsa

24   bankruptcy court is a very competent court to decide issues

25   with respect to the loan agreement which is in dispute here,

76

1    and I believe is the proper forum for resolving disputes as

2    between Lehman and this Chapter 11 debtor.  There have been

3    lots of nuanced legal arguments made as to whether this court

4    or that court is the right court to decide questions regarding

5    proofs of claim, but there's no dispute that there are two

6    essentially parallel proceedings going on at the same time,

7    with respect to either Latshaw Drilling's claim against Lehman

8    or Lehman's claim against Latshaw Drilling.  They are opposite

9    sides of the same coin.

10        I, for one, believe that the proper forum is in

11   Oklahoma.  That court already is familiar with the issues

12   relating to the loan agreement.  That court already has at

13   least one version of a plan of reorganization to consider.

14   That court is perfectly capable of considering questions of

15   waiver and recoupment and consequential damages, at least as

16   capable of considering those questions as I am.

17        There's certainly no inconvenience involved to the

18   parties.  The parties are already represented in the Oklahoma

19   proceeding.  I can see no prejudice to Lehman in permitting the

20   withdrawal of the proof of claim here, particularly in light of

21   the fact that, as I understand from the papers, although it was

22   at the time it was filed a bare proof of claim, as a result of

23   document requests, the proof of claim was supplemented with

24   additional information.

25        Furthermore, as to the underlying facts that give rise

1    to the recoupment claim itself, we've already talked about

2    those facts here.  There may be different legal consequences

3    that flow from the facts, but it is acknowledged that a funding

4    request made post-petition as to Lehman, was not honored.

5    Whether or not there was an obligation to honor that request is

6    a matter that's not presently before me; although this is one

7    of those situations in which the facts, at least, appear to

8    speak for themselves.

9          For the reasons stated, I consider this an appropriate

10   matter to be resolved either by agreement or following

11   litigation in the Tulsa bankruptcy court.  And I will permit

12   the Latshaw Drilling Company proof of claim to be withdrawn

13   without prejudice, without prejudice both to Latshaw and

14   without prejudice to Lehman.  In effect, I am mooting debtors'

15   objection to the proof of claim by permitting withdrawal by

16   Latshaw without prejudice of its proof of claim.  And I'll

17   entertain an order that's consistent with those remarks.

18          UNIDENTIFIED SPEAKER:  We'll settle one on counsel.

19          THE COURT:  Okay, thank you.

20          MR. WAISMAN:  Shai Waisman, Your Honor.  The final

21   matter on this morning's agenda is the debtors' motion for ADR

22   procedures.  I think most everyone involved in the case knows

23   that these procedures are long coming.  They were referenced as

24   early as Bryan Marsal's state of the estate address on November

25   18th of last year, as well as again at the January 13th hearing

78

1    before Your Honor on claims procedures.

2         The motion itself was filed on March 15th, nearly a

3    month ago, with an objection deadline of March 31st.  I can say

4    that almost immediately upon filing and the ECF notice going

5    out, we received any number of telephone calls from parties-in-

6    interest with questions, with requests, with language changes.

7    And in addition to those numerous parties that contacted us, we

8    also had twenty-eight objections filed on the docket in

9    response to the motion.

10        Our general approach, Your Honor -- I'll spend a few

11   minutes on this ,because I think it's important.  Our general

12   approach was to meet with all of those that wanted to meet;

13   speak to everyone that wanted to speak; provide drafts as we

14   were revising the procedures to all those that requested drafts

15   and had filed objections.  The parties we engaged are numerous.

16   They're listed in our -- the reply that we filed in long form.

17   But they included a working group of LBSF creditors.  They

18   included Citibank in its various capacities in this case;

19   Barclays in its capacities in this case; the government, in the

20   form of the IRS and the U.S. Attorney's Office; Fannie Mae;

21   Freddie Mac; and the numerous objectors.

22        And as I indicated, we've been negotiating with these

23   parties since the filing of the motion and up through the

24   commencement of this hearing, both in the hallway and during

25   the hearing by BlackBerry, thanks to the Court's new rules on

79

1    BlackBerry usage in the court.

2           THE COURT:  That's an unintended consequence.

3           MR. WAISMAN:  But a beneficial one, I assure you, in

4    this context, Your Honor.

5           Nobody got everything they wanted by way of these

6    procedures, and that includes the debtors.  But I think, at the

7    end of the day, nearly everybody was comfortable with the final

8    draft form that was filed on the docket last night.  And to

9    borrow Your Honor's phrase, perhaps this is the sequel to the

10   coalition of the willing.

11          Twenty-eight objections were filed, and numerous

12   informal objections were received with extensions of deadlines.

13   The informal objections have all been resolved.  None of those

14   parties felt the need to file an objection.  Of the twenty-

15   eight objections that were filed, I think this morning's

16   amended agenda reflected that we had resolved nineteen of those

17   objections.  In fact, as we stand here, I believe we have

18   resolved no fewer than twenty-one, perhaps twenty-two.  And

19   just to reference the agenda itself, under item 9, "Responses

20   received", C and D, the objections of Standard Chartered Bank

21   and of BRE Bank have been resolved.  And depending on how well

22   I do in the rest of my presentation, I think we hope that H,

23   the objection of the LBIE administrators is resolved.  And with

24   that, perhaps one or two others.  But again, it will depend on

25   some of my comments to follow.

80

1           A few statements --

2           THE COURT:  How many --

3           MR. WAISMAN:  -- on the record --

4           THE COURT:  -- just one question.  How many live

5     objections do we have at this point?

6           MR. WAISMAN:  I believe we have six.  I'm not sure

7     that those six are all pressing their objections or intending

8     to speak.  Certainly a few of them are here and intending to

9     speak.  I think there are a number of parties who have

10    requested some clarifying statements.  And as I indicated,

11    depending on what I say, they may or may not want to supplement

12    the record.

13          THE COURT:  All right.

14          MR. WAISMAN:  So a few statements on the record.

15    First, nothing -- as is clear in the motion and the order and

16    the procedures, nothing in the order or the ADR procedures

17    state or imply or intended to imply that ISDA agreements have

18    no force and effect.  It goes without saying, and certainly

19    Your Honor states it repeatedly, but to the extent a mediation

20    is not successful, all parties' rights in connection with the

21    claims objections and the hearing on claims objections are

22    fully preserved -- the claimants' rights and the debtors'

23    rights, fully preserved without prejudice.

24          As to the mediation itself -- and we've inserted a

25    provision that the parties can agree that mediation, where

81

1    appropriate, will occur by telephone.  Anyone involved in

2    mediation knows that there's a strong preference for mediation

3    to occur face-to-face, around a table, where folks can roll up

4    their sleeves and actually have an honest dialogue, and that

5    becomes much harder on the telephone.  We have told parties,

6    and we will state again here today, that we will not deny

7    requests for telephone mediations in any punitive manner, where

8    it makes sense for a mediation to occur by phone.  For example,

9    where the claim is small and the party is located a far

10   distance, we will entertain those requests in good faith.

11        Again, the preference is always to have mediations

12   face to face, but certainly the circumstances have to be taken

13   into account when a request to have a telephonic mediation is

14   received.  And the debtors assure parties that those requests

15   will be taken into account in light of the circumstances.

16        Finally, as to the LBIE administrators.  The ADR

17   procedures, as Your Honor is undoubtedly aware, include a

18   temporary litigation injunction.  The relationship with the

19   LBIE administrators, despite some of the back-and-forth that

20   Your Honor is aware of, has been very, very productive, and

21   continue to work together very, very closely.  There is nothing

22   in the ADR procedures or in the temporary litigation injunction

23   that was intended to or designed to put a halt or otherwise

24   impact the administration of those cases.

25        Certainly the LBIE administrators made a decision to

82

1    file claims in this case.  And I think they're well aware of

2    the jurisdictional implications of filing those claims and the

3    fact that they are subject to the jurisdiction of this Court

4    and the claims resolution process.  And I don't think there's

5    any dispute there.  The overlay of ADR and the temporary

6    litigation injunction is not intended to disrupt the

7    administration of those cases.  It is a limited injunction that

8    deals with discovery related to the subject of the proof of

9    claim that is being objected to, and therefore is the subject

10   of the ADR procedures.

11        I think the LBIE administrators, as best as I can

12   explain to the Court, are concerned with -- while I may be able

13   to state this in black and white terms, are concerned about the

14   gray; and that when rubber hits the road and there is -- needs

15   to be an objection, and an ADR notice is filed, that there may

16   be questions as to what exactly is or is not implicated by the

17   temporary litigation injunction as it relates to the

18   administration of the cases.  And we have assured the LBIE

19   administrators that if and when that happens, we will work with

20   them -- we could agree to the scope of the injunction so as to

21   not unnecessarily burden the administration of those cases,

22   while permitting us to stay discovery and litigation on the

23   very claims that are the subject of the proof of claim, and

24   advance an ADR.

25        And of course, to the extent we cannot agree, and

83

1   there is an issue that requires the Court's intervention, the

2   Court has certainly made itself available, both in mediation-

3   style chambers conferences as well as on the record, to assist

4   parties in resolving those disputes.  And we would be amenable

5   to coming to Your Honor, should there be an impasse.

6          That's how we would approach the LBEI administrators'

7   concerns.  Counsel is here.  And to the extent that wasn't

8   sufficient or additional information should be shared, I'm sure

9   he'll speak up.

10          That leaves, Your Honor, as I indicated, roughly four

11   to six objections.  I think they fall into two categories.

12   One, that claimants should be able to take discovery in some

13   formal discovery protocol prior to and in connection with

14   mediation.  And two, as to the foreign administrators -- and

15   here the Hong Kong administrators and the LBIE

16   administrators -- that the temporary -- that the ADR procedures

17   either shouldn't apply to them at all, or that the temporary

18   litigation injunction shouldn't apply.

19          As to the first, being discovery, and the request here

20   is one that we spent a lot of time on with all of the parties

21   that we spoke to and all of the parties that we ultimately

22   reached agreement with as to the form of procedures that do not

23   include any compulsory discovery on either party's side, go to

24   the essence of why we have ADR and mediation in particular, to

25   begin with.  Mediation is not litigation.  It is meant to avoid

84

1     the time, the expense, the adversarial nature of litigation.

2     And it is a process where both parties have to be interested

3     and willing to mediate.  And by that, I mean, there has to be

4     buy-in to the process.

5            If a party is asked to settle a claim and it does not

6     believe that it has been provided information or adequate

7     information to enable it to assess that claim, there is no

8     binding nature to the mediation.  It is free to walk away.  So

9     both parties are incented to share information as required to

10    make the other comfortable that the mediation is level and the

11    process fair and the settlement right.  And if either party is

12    not made comfortable, the answer is clear.  Mediation fails and

13    the claims dispute process before this Court proceeds.

14           In this case, more than any other, mediation, we

15    believe to be a necessity.  With the range of magnitude of

16    claims that I outlined for the Court at the beginning of the

17    hearing, an inability to resolve many claims and many claims

18    quickly, will likely lead possibly to delayed distributions to

19    many, many claimants, and perhaps delayed distributions to all

20    claimants, for a very long time.  There's only so much time

21    that this Court has to entertain one-off litigations as to

22    66,000 claims.

23           So we, the debtors, reject any notion that compulsory

24    discovery plays any part in mediation -- that is reserved for

25    claims litigation -- and remind the parties that there has to

85

1      be buy-in, and both parties need to work together to make the

2      other comfortable that the necessary information is available

3      and is shared so that settlement can be reached.

4            As to the administrators' objections.  I'm hopeful

5      that my statements have resolved or gone a long way to resolve

6      the LBIE administrators' concerns.  And as to the Hong Kong

7      administrators, I'll start off by saying what I think most

8      involved with the case know:  the relationship with the Hong

9      Kong administrators is excellent.  The parties work together

10     very closely, have had an excellent working relationship on the

11     global protocol.  And there's every indication that that

12     relationship will continue.

13           That said, I think the administrators' objection goes

14     to great length to suggest that these procedures are somehow

15     the entitlement to interpose a claims objection and that the

16     administrators shouldn't be subject to any claims objection.

17     Of course it's not these procedures, it is the Bankruptcy Code,

18     the Bankruptcy Rules, that give the debtors the right to

19     interpose claims objections.  And all we seek to do here is

20     overlay a nonbinding mediation process, should the parties fail

21     to agree as to issues under the global protocol or otherwise,

22     and prior to commencing any litigation.  And should the Hong

23     Kong administrators not believe in that process, they are free

24     to attend and express an interest to proceed straight to

25     litigation.

1          The other portion of the objection, I think, is spent

2     explaining that certainly nothing in this court or in the ADR

3     will resolve the claims that the debtors here have interposed

4     in the Hong Kong administration.  And that's absolutely true.

5     Nothing in these procedures is meant to encroach on the

6     jurisdiction of the Hong Kong court.  Of course, one of the

7     results of the great relationship, the working relationship and

8     the conversations taking place now, or the ADR itself, the

9     mediation itself, is that the parties could agree as to both

10     claims, and that would be a very beneficial result.  And

11     there's nothing to preclude that from happening.

12          So all we see here is a nonbinding process to

13     encourage the parties to talk, share information, and resolve

14     their disputes, without the intervention of this Court.  And

15     that is, in many ways, the essence of the global protocol

16     itself, and not at all in contradiction with the global

17     protocol.  So we see no reason to carve anyone out of these ADR

18     procedures, and certainly hope there's no reason to employ

19     them.  But they should be available should we not be able to

20     reach resolution.

21          With that, we filed our reply yesterday evening.  I

22     think many of the objections we addressed in there have been

23     mooted.  But certainly some of them remain and we'll hear from

24     the objectors.  The black-line that we filed with the motion

25     remains the black-line.  No further revisions have been made.

87

1    And that black-line, as indicated in the papers, was shared in

2    its various iterations, over time, with any number of the

3    parties.

4         I, on behalf of the debtors, express great, great

5    appreciation for the manner in which this was approached.  And

6    this was a lesson, perhaps, off of the bar date motion, but one

7    which I think we were all well-served to adhere to.  And I

8    think the result is a good one that will be for the benefit of

9    these cases.  And of course, the creditors' committee sort of

10   had the first go at the procedures in terms of comments and

11   suggested modifications, and from there was involved and

12   updated throughout the process.  And we thank them for their

13   help on this.

14        I don't think there's any reason to go chapter and

15   verse through the various changes.  I'm happy to answer any

16   questions Your Honor may have.  Otherwise I would cede the

17   podium to see where we are in terms of remaining objections.

18        THE COURT:  Okay.  That's a very helpful summary.  And

19   I appreciate the response that was submitted late yesterday

20   along with a chart providing an update on the status of the

21   various objections.

22        Before hearing from the objectors who still wish to

23   press their points today, I want to be really clear on

24   something.  We are going to have alternative dispute resolution

25   procedures.  And the objections, to the extent that they are

88

1    going to the applicability of these procedures to a particular

2    party, those objections are overruled.  You are not going to

3    get any special carve-outs.  There won't be any.  These will be

4    universal procedures.

5          To the extent that there is still some value in

6    tweaking what's here, I think that everybody's time would be

7    better spent in the tweaking process as opposed to trying to

8    make noise that I'm not inclined to listen to.  That doesn't

9    mean you won't get a fair hearing.  I'm telling you now that

10   you're going to lose.  But you'll have a fair hearing and then

11   lose.

12         So this is one of those situations in which the

13   problem sort of mandates the outcome.  This is, as noted in the

14   Lehman claims summary presentation that Mr. Waisman made

15   earlier today, this is an administrative problem of quite

16   literally global proportions.  The claims that are to be

17   resolved are not only massive in number, many of them are

18   extraordinary in size and complexity.  And we need a process

19   that allows for a winnowing down of those claims to manageable

20   numbers, particularly as it relates to any objections that

21   truly can be resolved through a consensual process.

22         What happens after that process has run its course is

23   something else to be addressed at another time.  And to state

24   the obvious, I'm already in my sixties.  And as a result,

25   you're not dealing with somebody who is likely to survive the

89

1    final resolution of every one of these objections, if they're

2    all litigated.  It is demographically impossible.  So we need a

3    process; one that works, one that's fair, one that has been

4    produced to the greatest extent possible, with the input of

5    those who are fairly representative of those adversely

6    affected, to the extent there's any adverse effect, so that, to

7    paraphrase Mr. Waisman's words both in his papers and made

8    today, this is a bit of a camel.  It's the product of a

9    committee.  It is, as a result, probably imperfect in multiple

10   ways.  But it's more perfect than not having procedures.  And

11   so we're going to have them.

12       I'll listen now to any of the objectors who wish to be

13   heard.  But I truly believe that everybody's time would be

14   better spent in some attempt to accommodate one another,

15   perhaps over the lunch hour.  And if accommodation is not

16   possible, I'll hear why.  So I'll start now by hearing anybody

17   who still wants to press their objections and provide some good

18   reason why --

19       MR. SHAFFER: Good morning, Your Honor.

20       THE COURT:  -- you think you're so exceptional.

21       MR. SHAFFER:  Andrew Shaffer from Mayer Brown

22   representing Edward Middleton, the Hong Kong agent liquidators.

23   I understand you've ruled on the essence of our objection.  I

24   just wanted to rise to echo virtually everything we heard from

25   the debtors that the relationship is ongoing, and we look

90

1    forward to working productively to resolve the disputes in

2    various claims and assets, and hopefully not in the context of

3    these ADR procedures.

4            THE COURT:  Okay.

5            MR. SHAFFER:  Thank you.

6            MR. SZYFER:  Your Honor, Claude Szyfer from Stroock &

7    Stroock & Lavan, on behalf of certain derivative

8    counterparties.  We don't oppose mediation, and we support it.

9    And our suggestion was, we thought, something that would make

10   the mediation proceedings a bit more fair; and which was to try

11   and equalize the information between the parties.  We

12   derivative counterparties have uploaded our transaction

13   information through the derivative questionnaire process, and

14   debtors have all of our calculations.  We don't have the

15   debtors' calculations.  If the mediation is going to be

16   meaningful, and we support meaningful mediation, and if the

17   mediation is going to have an opportunity to really succeed and

18   winnow down so many of these derivative claims, it's going to

19   make it a lot easier for the claimants if they know what the

20   amounts are that the debtors think are in dispute.

21           And we had discussions with the debtors.  And our

22   suggestion was, where there are transactions where there are

23   disputes, let the debtor provide us with their calculations for

24   those transactions.  I have many clients that have already

25   engaged with the debtors and have been providing, voluntarily,

1    information with the debtors.  We have not gotten any

2    individual transaction detailed information from the debtors

3    with respect to those claims.

4        Our suggestion is really simple.  If the mediation has

5    a chance to succeed, if the parties are going to engage in a

6    four-month process where they're going to go over the number --

7    because that's what these mediations are about, and Mr.

8    Waisman's papers specifically set forth that the calculations

9    are central to the mediation -- then we should have an

10   opportunity to at least see those numbers where the debtors

11   dispute our calculations.  Thank you.

12        THE COURT:  Okay.

13        MR. FLICS:  Your Honor, Martin Flics of Linklaters

14   LLP, for the joint administrators of LBIE and the other UK

15   administration companies.  I will be brief.

16        I appreciate Mr. Waisman's remarks.  We had a

17   productive discussion, and several discussions, I believe.  Our

18   concerns do not and did not go to the core and the merits of

19   this procedure, which we think are laudable.  Whether or not

20   they apply to particular cases or not, is not an issue for

21   today.  We think they're appropriate.  Our concern was really

22   the law of unintended consequences, I believe.

23        We have, in fact, been able to have two very

24   complicated cases in different jurisdictions run pretty

25   smoothly without conflict for jurisdiction.  Our concerns were

92

1    that by adding another injunction in addition to the automatic

2    stay -- and of course, we are aware that we filed claims that

3    have certain consequences, that that might have some additional

4    meaning and upset that balance.

5         And therefore our suggestion in the papers was that

6    we, with respect to those foreign proceedings, be carved out

7    not to be carved out from the idea of discovery or from the

8    procedures, but just recognizing that the existing stay and our

9    claims have -- are what they are, and those are principles that

10   we understand, not to introduce another element.

11        Mr. Waisman's comments are helpful.  I think, in fact,

12   from our perspective, I don't believe the temporary injunction

13   really adds anything from that perspective.  There is the stay.

14   We understand that.  We know there are limits on that.  Your

15   Honor heard the Shinsei Bank application months ago.  They're

16   very complex.  They are very fact-specific.  And we're prepared

17   to rely on that.

18        We would have preferred that there be a specific

19   carve-out, but we think at this point, based on your comments,

20   based on Mr. Waisman's comments, it's probably a distinction

21   without a difference, and we respect and we appreciate Mr.

22   Waisman's remarks about the intent of these provisions, which

23   in fact had no intent to impact negatively our ability to

24   pursue our proceedings in the UK.  Thank you.

25        THE COURT:  Okay.

93

1          MR. MALEK:  Good afternoon, Your Honor.  My name is

2     Paul Malek.  I'm the general counsel of Stonehill Capital

3     Management.  We have filed derivatives claims arising under

4     pre-petition derivatives contracts between our funds and

5     Lehman.

6          I echo what's been said before.  We appreciate the

7     changes that the debtors have made and we think they go a long

8     way towards addressing our concerns.  There's one very specific

9     issue that hasn't been addressed and really hasn't been

10    modified in the order that I just wanted to raise, and that is

11    that the proposed procedures provide basically for the debtors

12    to select a list without limit chosen from the register of

13    mediators and present that to the claimant, and the only input

14    of the claimant in that process in the selection of a mediator

15    is the ability to strike three of the proposed mediators.

16         And we believe that it's very important in this

17    process, given the complexity of the derivatives claims that

18    there be at least some more substantive input from the claimant

19    in the selection of the mediator.  And the complexity of the

20    claims is not necessarily tied to the size of the claims.  I

21    know there's a distinction made between large, complex

22    derivatives claims and other claims.

23         And just to echo what Mr. Waisman said, we agree that

24    it's important for both the claimant and the debtor to buy into

25    the process.  And we think that that would be facilitated by --

94

1   we would prefer to have the selection of the mediator

2   consistent with what's in the ADR -- standing ADR procedures

3   order, on mutual consent, or at a minimum, have the list of

4   mediators that the debtors can propose be limited -- obviously

5   taken from the fifty or so mediators that are attached, but

6   have that be limited.  We think that would enhance the process

7   and be fair and make it more productive.  Thank you, Your

8   Honor.

9           THE COURT:  Okay.  Thank you.

10          MS. REID:  Good afternoon, Your Honor.  Maureen Reid

11  from Baker Botts, on behalf of LINN Energy.

12          We join in Mr. Szyfer's comments with regard to

13  getting towards a more meaningful mediation process by the

14  sharing of information.  And so we'd ask for some limited

15  discovery that we don't think would burden the debtor in any

16  overwhelming way, by third-party subpoenas, very limited, going

17  towards market and pricing information and compulsory document

18  production between claimants and debtors.  Thank you.

19          THE COURT:  Okay.  We seem to have exhausted the

20  supply of objectors.

21          MR. WAISMAN:  Your Honor, Shai Waisman.  Let me maybe

22  address those briefly.  I -- just going down the responses

23  received and still outstanding on page 5 of the agenda.  The

24  first one was the Hong Kong administrators.  And we appreciate

25  their comments and we look forward to continuing the very good,

95

1       productive relationship.  And I think that is largely resolved.

2              B is the objection of the derivative counterparties.

3       And that's the suggestions interposed by Mr. Szyfer and the

4       attorney for LINN Energy just now as to discovery in connection

5       with mediation -- limited discovery, but it should include

6       document discovery and third-party subpoenas.  I don't know the

7       basis for third-party subpoenas in -- I don't know the basis

8       for discovery in connection with any mediation.  If we think

9       about the practical reality and how this is going to play

10      out --

11             THE COURT:  You don't need to belabor the point.

12             MR. WAISMAN:  I won't belabor the point.

13             THE COURT:  There's not going to be any discovery.

14      However, in order for the mediation to work, the mediator needs

15      to have the capacity to request that there be a sufficient

16      sharing of information so that the mediation has a chance of

17      succeeding.  And it goes without saying that without good-faith

18      sharing of information, it's impossible to reach a compromise.

19             MR. WAISMAN:  And we will have wasted our time and our

20      resources.  And right to Your Honor's comments, the changes

21      that we worked and arrived at, together with the help of many

22      of the counterparties, are reflected in the black-line in

23      paragraph D on page 7 of the revised procedures in the black-

24      line that was filed.

25             We didn't hear from -- C and D on the "Responses

96

1    received" were resolved prior to the hearing.  E and F, Wells

2    Fargo and ABC Assicura, I'm not sure we heard of, so I'm not

3    going to address -- heard from.  We're not going to address

4    those.  I think Mr. Flics and I are in a meeting of the minds.

5        And that leaves, finally, the joinder of Stonehill.

6    The joinder of Stonehill was a joinder -- a one-page joinder to

7    the objection of Optim.  We worked with the attorneys for Optim

8    to resolve their objections, and they withdrew the objections,

9    so I'm not sure what is being joined.  I will say, the

10   mediators are all nationally-recognized mediators that we

11   collected with the input of many of those experienced in

12   mediation.  We received input from not only the creditors'

13   committee but a number of the other parties we were working

14   with in devising that list.

15       The reason for a large list is a large number of

16   claims as well as there are only so many matters that any one

17   mediator can handle in the Lehman cases in addition to their

18   other workload, and leaving room for conflicts.  Many of these

19   are large institutions that we would be mediating against, and

20   we see the possibility of many conflict situations.

21       So I think the mediator list is fair.  It is a list of

22   nationally-recognized mediators.  I think if folks go back to

23   their colleagues that mediate on a regular basis, they will

24   recognize virtually every name on that list.  And the procedure

25   for selecting mediators was, again, negotiated and vetted with

1      the various working groups, and enables parties to strike

2      mediators that they're not comfortable with, while leaving room

3      for the debtors to find mediators who have the time and are

4      conflict-free.

5            I have nothing further.

6            MR. SZYFER:  One quick point, Your Honor.  Mr. Waisman

7      mentions the changes that were made, in particular, to Section

8      D of the procedures, which does allow a party to request

9      information.  The problem with it is that the party who's being

10     requested doesn't have to provide it.  And that, to me, is the

11     problem here.

12           THE COURT:  Let me make myself as clear as I can make

13     myself.  When I said there's going to be no discovery, there's

14     going to be no discovery.  There will, however, be a good-faith

15     sharing of information.  The discovery that you request is

16     completely inconsistent with what amounts to a litigation stay.

17     This is not a form of litigation.  This is a form of

18     alternative dispute resolution that is intended to work and is

19     predicated upon the good faith of all parties participating in

20     it.

21           I can't order parties to act in good faith, but there

22     will be consequences for those parties who don't.  We're

23     adjourned till two.  The order is entered as modified.

24           (Proceedings concluded at 12:25 PM)

25

98

1

2                                I N D E X

3

4                               R U L I N G S

5    DESCRIPTION                                    PAGE      LINE

6    Order to Establish a Procedure to Unseal        26        7

7    the Examiner's Report, to Establish a

8    Briefing Schedule to Resolve Remaining

9    Confidentiality Issues, and to Establish

10   a Procedure to Provide Access to Documents

11   Cited in the Examiner's Report, granted

12

13   Motion of LSF6 Mercury REO Investments          36        4

14   Trust Series 2008-1 for Relief from the

15   Automatic Stay, granted

16

17   Motion of Lehman Brothers Holdings Inc.         39        24

18   for Authorization and Approval of Certain

19   Settlements with the Internal Revenue

20   Service, granted

21

22   Debtors' Motion for Approval of a               41        18

23   Settlement Agreement with Metavante

24   Corporation, granted

25

99

I N D E X (cont'd.)


R U L I N G S (cont'd.)

DESCRIPTION        PAGE LINE

Motion of Mizuho Corporate Bank, Ltd.,        42        19

as Agent, on Behalf of Itself and

Certain Lenders, Seeking Authority

to Assign Certain Interests in a

Credit Agreement, granted


Debtors' Motion for an Order Enforcing        58        25

the Automatic Stay Against and

Compelling Payment of Post-Petition

Funds by Swedbank AB, granted


Debtors' Objection to Proof of Claim        77        11

filed by Latshaw Drilling Company, LLC,

mooted, and Latshaw Drilling may

withdraw proof of claim without prejudice


Debtors' Motion Authorizing the Debtors        97        23

to Implement Claims Hearing Procedures

and Alternative Dispute Resolution

Procedures, granted, as modified

100

1

2                    C E R T I F I C A T I O N

3

4     I, Clara Rubin, certify that the foregoing transcript is a true

5     and accurate record of the proceedings.

6

7     _____

8     Clara Rubin

9     AAERT Certified Electronic Transcriber (CET**D-491)

10

11    Veritext

12    200 Old Country Road

13    Suite 580

14    Mineola, NY 11501

15

16    Date:  April 16, 2010

17

18

19

20

21

22

23

24

25