**Hearing Date: May 3, 2010**
**Objections Date:  April 26, 2010**

BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, NY 10022
Telephone:  (212) 446-2300
Facsimile:  (212) 446-2350
Jonathan D. Schiller
Hamish P. M. Hume
Jack G. Stern

Attorneys for Barclays Capital Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>                    Debtors. | Chapter 11 Case No.<br>08-13555 (JMP)<br>(Jointly Administered) |
| In re<br><br>LEHMAN BROTHERS INC.,<br><br>                    Debtor. | Case No. 08-01420 (JMP) |

**MOTION *IN LIMINE* OF BARCLAYS CAPITAL INC. FOR AN ORDER EXCLUDING THE EXPERT TESTIMONY OF JOHN P. GARVEY, MARK E. SLATTERY, JOSEPH SCHWABA, JOHN J. SCHNEIDER, JOHN J. OLVANY, HARRISON J. GOLDIN, AND PROFESSOR MARK E. ZMIJEWSKI**

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

April 20, 2010

Barclays Capital Inc. ("Barclays"), by and through its undersigned counsel, hereby moves the

Court for the entry of an order, pursuant to Federal Rule of Evidence 702, excluding the

proposed expert testimony of Movants'[1] experts John P. Garvey, Mark E. Slattery, Joseph

Schwaba, John J. Schneider, John J. Olvany, Harrison J. Goldin, and. Professor Mark E.

Zmijewski.

## **INTRODUCTION**

1.      Barclays files this motion seeking an order excluding the testimony of the

valuation experts identified by the Movants.  Collectively, these proffered experts purport to

provide support for the Movants' contention that the "Repo Collateral"[2] transferred to Barclays

as Purchased Assets in the Sale Transaction—including all of the assets transferred to Barclays

in the December 2008 settlement—was worth approximately $50 billion, rather than the $45.5

billion valuation that Barclays ascribed to those assets on its public financial statements, which

were audited by PricewaterhouseCoopers ("PWC"), and filed with the Securities and Exchange

Commission ("SEC").

2.      As this Court was told by the Trustee when the Trustee requested approval for the

December 2008 Settlement, the Repo Collateral Barclays was *entitled* to receive under the Fed

Replacement Transaction was *supposed* to be worth $49.7 billion and to consist of liquid

securities that had been pledged to the Fed.  (*See* BCI Ex. 30 [Leventhal Decl.] at ¶ 12; *In re*

---

[1] "Movants" refers to Debtor Lehman Brothers Holdings Inc. ("LBHI"), the Trustee for the SIPA Liquidation of Lehman Brothers Inc. ("LBI"), and the Official Committee of Unsecured Creditors ("Creditors' Committee").

[2] The "Repo Collateral" refers to all of the assets transferred to Barclays on September 18, 2008 as part of the "repurchase agreement" (or "repo") transaction in which Barclays replaced the New York Fed's repo lending position with respect to Lehman ("Fed Replacement Transaction") – *plus* all of the assets Barclays received in the Court-approved December 22, 2008 settlement with the LBI Trustee and JPMorgan, which provided Barclays with assets in exchange for settlement of its claim that it was owed an additional $7 billion of Repo Collateral.  As explained in Barclays' January 29 Opposition Brief, the Purchase Agreement (both the APA and the Clarification Letter) plainly provided that Barclays was entitled to acquire all of the Repo Collateral as a Purchased Asset, irrespective of its final valuation.  Barclays' Opp'n at pp. 288-295.

*Lehman Bros., Inc.*, No. 08-1420, Trustee's Motion for Approval of December Settlement at ¶ 10

(Bankr. S.D.N.Y. Dec. 5, 2008) (Docket No. 387).)  However, the *actual* Repo Collateral

transferred to Barclays was worth substantially less and included many securities that differed

from those pledged to the Fed.  The Repo Collateral actually transferred contained a significant

proportion of illiquid securities; approximately 40% of the securities by number, and

approximately 25% by value, were of the kind that could not be valued by looking at observable

pricing data (from a Standard & Poors, Bloomberg, or similar terminal).  These securities

included collateralized debt obligations ("CDOs"), collateralized loan obligations ("CLOs"),

collateralized mortgage obligations ("CMOs"), and other asset-backed securities and structured

financial products that were exceptionally difficult to value at any time, but especially in the

middle of the September 2008 financial crisis, when many of them were considered "toxic" and

highly risky.  (*See* BCI Ex. 341 [Expert Report of Professor Paul Pfleiderer] at ¶¶ 92-108.)

These securities carried "marks" that Barclays believed were higher than their actual value.

      3.      At the time of the Sale, Barclays told Lehman and the Committee that it was very

skeptical of the "marks" on the assets in the Repo Collateral.  (*See* Barclays' Opp'n to Rule 60(b)

Motions at ¶¶ 272-277.)  There was clearly no ability in the three days between the receipt of the

Repo Collateral and the Closing to arrive at a definite and final valuation of all of these assets.

Moreover, there were additional complications caused by a shortfall of $7 billion of Repo

Collateral that Lehman was unable to deliver—a problem that was not ultimately resolved until

this Court approved the December 2008 settlement.[3]  In any event, the transaction closed on

September 22, 2008 with all parties understanding this uncertainty over the value of the Repo

---

[3]  At the time the transaction closed, the parties had agreed that JPMorgan would deliver to Barclays $7 billion in cash to make up for the shortfall.  After the closing, it turned out that this cash was not delivered, which led to the dispute that was ultimately resolved in the December 2008 Settlement this Court approved.

Collateral (as well as most other assets and liabilities), with particular uncertainty over the valuations of the illiquid securities in the Repo Collateral.

4.        The Movants claim that in their Rule 2004 discovery they "discovered" that Barclays received a $5 billion windfall through the Repo Collateral, because that collateral was worth approximately $50 billion.  But that is *false*:  in fact, what Movants discovered in the Rule 2004 discovery was that Barclays valued the assets it received in the Repo Collateral at far *less* than $50 billion.  In discovery, Barclays produced all of the valuations underlying its public financial statements, which were audited by PWC, and which show that Barclays valued *all assets* it received as Repo Collateral, including what it received in the December 2008 Settlement, as worth a total of *$45.5 billion*.

5.        Thus, the Movants base their Repo Collateral claims not on anything discovered in the Rule 2004 discovery, but upon the "*marks*" from Lehman and the custodian banks that Movants had *before the Closing*.  (*See* BCI Ex. 237 [Sept. 20, 2008 1:26 pm email from R. Miller to R. Messineo, et al.]; BCI Ex. 258 [Sept. 21, 2008 12:46 pm email from D. Murgio to B. Kelly, et al.].)  Other than the Lehman and custodian bank "marks" that were known to be inaccurate at the time of the Sale, there is literally *no evidence* from the Rule 2004 discovery supporting the proposition that the Repo Collateral is worth more than the values ascribed by Barclays.

6.        Faced with this lack of evidence, the Movants have recruited a raft of experts to support their (incredible) claim that when Barclays valued the assets in the Repo Collateral on its public financial statements, audited by PWC and filed with the SEC, Barclays *materially understated* the value of those assets.  But the experts do *not* support that claim, and have *not* performed any reliable analyses that could possibly provide the basis for admissible expert

testimony.  First, the experts are actually *unwilling* to testify that Barclays materially understated the values of the assets on its publicly filed Acquisition Balance Sheet:  when asked if they were willing to give that opinion in deposition, both the Movants' lead valuation expert and their lead accounting expert unequivocally stated that they were *not* giving that opinion and had not been asked even to consider it.  Second, the experts have not performed a reliable analysis:

- Mr. Garvey opines that Barclays committed a series of accounting errors and valuation methodology errors in determining the values of assets on its Acquisition Balance Sheet, but has *no opinion* on whether the Acquisition Balance Sheet materially understates the values of the assets Barclays acquired in the Sale Transaction, and bases most of his criticism on the factually erroneous assertion that the assets were required to be valued as of September 19, 2008 – which he mistakenly testified in deposition was the date the transaction closed (he subsequently sought to correct this testimony after conferring with counsel for the Debtor);

- Mr. Slattery concocted a novel valuation methodology that he admitted has never been tested or endorsed by any academic or professional organization, or even used by any other valuation professional;

- Mr. Schwaba opines that Barclays was required to value certain "auction rate securities" that had *failed* at auction at *par* or *above par*, even though he admitted in his report that auction rate securities that failed at auction should be valued *below* par;

- Mr. Schneider opines generally that BoNY and JPMorgan had the ability to value *anything* accurately in their role of providing "marks" as repo

custodians, including the most illiquid and toxic structured financial products that were in the Repo Collateral, even though he admitted that he made no effort to analyze any of the *actual securities* in the Repo Collateral or how those banks valued them;

- Mr. Olvany opines (without any factual or logical support) that Barclays had the ability as of September 19, 2008 (in the worst week of the worst financial crisis in half a century) to offer the failed Giants Stadium auction-rate securities for sale and thereby "redeem" them for their full principal amount despite the fact the markets for such securities were frozen with few if any willing buyers, and absent any evidence that there were willing buyers for these particular bonds—a conclusion that Mr. Olvany uses to justify more than 90% of the difference in valuations he purports to identify;

- Mr. Goldin offers no expert testimony at all, simply providing his interpretation of the Sale Hearing transcript and then arithmetically calculating a supposed windfall;

- Movants' lead expert, Mark Zmijewski, relies on all of the foregoing experts to opine that Barclays received a $13 billion windfall, and that Barclays was not entitled to *any* of the assets specifically itemized in the APA, including even intangible assets, customer lists, furniture, software – anything – if those assets were not included in Lori Fife's $47.4 billion number (a number she used in describing what had happened to the $70 billion of Long Positions referenced in subsection (d) of the APA – *not* as

6

describing a valuation of *all* Purchased Assets combined, for which even

the Trustee admits no appraisal was ever performed). *Cf.* BCI Ex. 80

[Kobak Dep. Tr., Dec. 7, 2009] at 90:6-17 (admitting Barclays was entitled

to acquire any assets in the Business, irrespective of the 47.4 billion

estimate of the long positions), 54:9-22 (admitting that the Purchased

Assets in the Business were not appraised before the closing).

7.        As explained below, these witnesses offer no reliable expert testimony.  While

Barclays recognizes that there is a generally permissive standard for admitting experts and

allowing alleged failures in methodology to go to weight, the Movants' experts have offered

opinions that contradict the record, fail to consider the actual securities at issue, are based on

unreliable methodology, and are internally inconsistent.  Under controlling law, their opinions

should not be admitted.

## **ARGUMENT**

8.        The admissibility of expert testimony is controlled by Federal Rule of Evidence

702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact
> to understand the evidence or to determine a fact in issue, a witness qualified as
> an expert by knowledge, skill, experience, training, or education, may testify
> thereto in the form of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and methods reliably to
> the facts of the case.

Fed. R. Evid. 702 (West 2010).

9.        "[T]he Federal Rules of Evidence 'assign to the trial judge the task of ensuring

that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'

In carrying out this task, a trial judge is 'to make certain that an expert, whether basing testimony

upon professional studies or personal experience, employs in the courtroom the same level of

intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Lippe v. Bairnco Corp.*, 99 Fed. Appx. 274, 278 (2d Cir. 2004) (citations omitted). "The trial court must have the same kind of latitude in deciding how to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides whether . . . that expert's relevant testimony is reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002). Movants' experts fail to meet the standard required by this Circuit for the admission of expert testimony.

## A.      All Of Movants' Valuation Experts Should Be Excluded As A Matter Of Law Because Their Testimony Is Legally Irrelevant.

10.      As a threshold matter, any expert testimony concerning the valuation of the Repo Collateral should be excluded because it is legally irrelevant for at least two reasons. First, as shown in Section V.A. of Barclays' Opposition to Movants' Rule 60 Motions, the Purchase Agreement conveys to Barclays the full measure of collateral received in connection with the Fed Replacement Repo regardless of its value. Barclays Opp'n at pp. 288-291. Second, as shown in Section V.C. of Barclays' Opposition to Movants' Rule 60 Motions, the Trustee released all claims relating to the Fed Replacement Repo transaction or the collateral received in connection with that transaction; that release bars not just the Trustee's claims, but also *all* claims of both the Estate and the Creditors' Committee that relate to the Repo Collateral, since their claims to the Repo Collateral are entirely derivative of the Trustee's. *See generally id.* at pp. 293-295. Barclays incorporates both arguments herein by reference.

8

**B.**     **John P. Garvey's Proposed Expert Testimony Should Be Excluded Because it Is Inconsistent, Contradicts Undisputed Facts, and Ignores Critical Facts.**

**1.**     **Mr. Garvey's Testimony Should Be Excluded Because It Is Illogical And Internally Inconsistent.**

11.     Mr. Garvey's testimony should be excluded because his deposition testimony is internally inconsistent, illogical, and self-contradictory.

12.     Mr. Garvey's expert report states that "The [Barclays] Acquisition Balance Sheet is not representative of the values Barclays received in the acquisition and had a claim on as of September 19, 2008."  (Expert Report of John P. Garvey at ¶ 7 ("Garvey Report") (attached hereto as Exhibit A).).  In his deposition, however, Mr. Garvey was shown the Barclays Acquisition Balance Sheet, which was published in its Form 6-K filed with the SEC on February 9, 2009, and was asked whether he believed that Acquisition Balance Sheet understated the values of the assets acquired in the Sale Transaction:

> Q.     And you see on page 83 Barclays provides an Acquisition Balance Sheet for its acquisition of the Lehman Brothers North American business, do you see that?
>
> A.     Yes.
>
> Q.     *Is it your opinion, Mr. Garvey, that Barclays materially misstated the value of the assets on this SEC filing?*
>
> . . .
>
> A.     *I didn't undertake to study that opinion.*
>
> Q.     Just so the question is clear, *my question is do you have an opinion, Mr. Garvey, as to whether Barclays materially misstated the value of the assets acquired in the Lehman Brothers acquisition on its Form 6-K filed with the SEC in February 2009*?
>
> A.     My opinions are in my report. *I don't have that opinion*.

(Garvey Dep. Tr. at 5:25-6:20 (objection omitted) (emphasis added) (attached hereto as Exhibit B).)

13.     Indeed, even when asked whether he had an opinion on whether the Acquisition Balance Sheet Barclays filed with the SEC understated the values of the assets acquired in the Sale by *any* amount, whether material or not, Mr. Garvey replied "I did not undertake to have an opinion on the accuracy of this filing."  (Garvey Dep. Tr. at 98:20-99:19.)  Thus, he directly contradicted his "Opinion 2" set forth in his report, which states that "The Acquisition Balance Sheet is not representative of the values Barclays received in the acquisition and had a claim on as of September 19, 2008."  (Garvey Report at p. 7.)  That Acquisition Balance Sheet was the Acquisition Balance Sheet filed with the SEC, which Mr. Garvey testified in depositions he "did not undertake to have an opinion on the accuracy of".  This makes no sense, and is so illogical and self-contradictory as to require exclusion under Federal Rule of Evidence 702.

14.     Mr. Garvey suggests in his report that Barclays may have understated the values of the assets acquired in the Sale Transaction because Barclays marked the securities at the "bid price" or "exit price."  (Garvey Report at ¶¶ 33-35.)  But Mr Garvey admits that the accounting rules *required* Barclays to mark the securities at the "bid price" or "exit price," rendering his opinion legally irrelevant.  In deposition, Mr. Garvey was asked "is it your professional opinion that you're going to offer in this case that Barclays had the discretion to value the assets it received in this transaction on its financial statement at something other than the bid price?" and answered "I am not going to offer that opinion."  (Garvey Dep. Tr. at 48:19-49:2.).  His testimony regarding whether "exit prices" either "understate" or provide "conservative" valuations should therefore be excluded:  the marking of securities by Barclays at exit (or "bid") prices was *required*.  BCI Ex. 94 [Romain Dep. Tr., Sept. 10, 2009] at 100:21-101:8 ("So under accounting standards we're required to measure assets at bid so our best estimate of exit price.").)

15.     In his report, Mr. Garvey criticizes Barclays for using "inconsistent" and "subjective" methods for valuing the illiquid securities it acquired in the Sale Transaction. (Garvey Report at ¶¶ 41-54).  In deposition, however, Mr. Garvey *admitted* that it is appropriate under certain facts and circumstances to use different methods to value illiquid securities, but refused to explain what those facts and circumstances are, and therefore could not explain whether they existed with respect to the securities acquired by Barclays:

> Q.     In terms of inconsistencies, do you believe there should be one method used, and only one method used, for adjusting to bid prices on the assets Barclays received in the transaction?
>
> A.     No.
>
> . . .
>
> A.     My point is that they had methods within asset classes and policies and they were inconsistent in applying those policies.
>
> Q.     Do you believe that within each asset class there should be only one methodology for adjusting to bid prices?
>
> A.     As a hypothetical matter, no.
>
> Q.     Why not?
>
> A.     Well, because there may be good reasons to do it several ways, as a hypothetical matter.
>
> Q.     Can you give me an example?
>
> A.     No.

(Garvey Dep. Tr. at 56:18-57:14 (objection omitted).)

16.     Mr. Garvey likewise admitted that in valuing illiquid securities, there is inevitably an element of subjective judgment involved, thereby contradicting his criticism that Barclays erred by using "subjective" methods:

Q.      I guess my question is if a security is not -- if there is no observable price
        for a security, and if the objective data suggests there may be a reason to
        doubt the ability of the payor to pay or the value of the collateral, isn't it
        necessary to make some form of subjective judgment in determining the
        value of the asset?

        . . .

A.      I think judgment is involved in these valuation decisions.

Q.      And that judgment necessarily involves some subjectivity, correct?

        . . .

A.      Yes, embodied in judgment there's a certain element of subjectivity.

(Garvey Dep. Tr. at 61:9-62:2 (objections omitted).)

17.     Mr. Garvey opines that Barclays was required to record the value of the securities

it received in the December 2008 settlement based upon the value those securities had in

September 2008.  His opinion is based upon the illogical assertion that *no matter* how much

those securities had declined in value by the time Barclays actually received them, Barclays was

required to book them at the value they had before Barclays received them.  His testimony is that

even if the Trustee had used securities completely unrelated to the Repo Transaction to settle the

dispute in December 2008, and even if those securities had declined threefold since September

2008, Barclays would be required to value them at three times their actual value on the date of

receipt.

Q.      So Barclays received securities worth $5 billion in December 2008, but
        those securities were worth $15 billion as of the closing date.  Am I
        correct that it is your opinion that Barclays should be required on its
        Acquisition Balance Sheet to book the securities it received in the
        JPMorgan settlement at $15 billion even though they only were worth $5
        billion when received in December?

A.      Yes.

(Garvey Dep. Tr. at 44:10-44:19; *see also Id.* at 42-44.)

2.      **Mr. Garvey's Testimony Should Be Excluded Because His Testimony
Contradicts Undisputed Facts.**

18.      It is well-established that where an expert's testimony directly contradicts

undisputed facts, it should be excluded.  *See, e.g., Davidov v. Louisville Ladder Group, LLC*, No. 02

Civ. 6652, 2005 WL 486734, at *2 (S.D.N.Y. Mar. 1, 2005) (excluding expert testimony that was

inconsistent with the facts of the case), *aff'd* 169 Fed. Appx. 661 (2d Cir. Mar. 10, 2006).

19.      Mr. Garvey criticizes Barclays for not using September 19, 2008 as the valuation

date for all securities acquired in the Sale Transaction.  (Garvey Report at ¶¶ 60-63.)  In

deposition, Mr. Garvey unequivocally explained this criticism as being based upon his

understanding that the Closing of the Sale Transaction *actually occurred* on September 19, 2008:

Q.      In terms of an actual calendar day, I believe you said a moment ago that
your understanding of the closing date was September 19; is that correct?

A.      That's my understanding, yes.

. . .

Q.      Well, but I'm not -- I'm asking you for your understanding of what the
closing is in order to understand what the closing date is.

A.      September 19.

Q.      The closing date is September 19?

A.      Yes.

Q.      What is the basis for your understanding of that?

A.      Everything I reviewed and the things I've outlined in this report.

Q.      And is it therefore your opinion that the assets Barclays acquired should
be valued as of September 19, 2008?

A.      I believe that's the correct closing date, measurement date and valuation
date, yes.

Q.      And is that opinion based on the understanding that September 19, 2008
was the date of closing?

A.    It's based on my understanding that that was the date of the closing, yes.

(Garvey Dep. Tr. at 17:21-18:3, 18:18-19:16.)

20.    Of course, the actual and undisputed fact is that the Sale Transaction closed on September 22, 2008.  (*See, e.g.*, Movants' Statement of Undisputed Material Facts at ¶¶ 242, 512 (Dec. 15, 2009) (attached to docket no. 7502, Case No. 08-13555 (Bankr. S.D.N.Y. Mar. 10, 2010).)  After Mr. Garvey blatantly contradicted that reality by claiming at his deposition that the closing date of the sale transaction was September 19, not September 22—while admitting that one of his key opinions was based on this incorrect understanding—his lawyer called for a break.  (*See* Garvey Dep. Tr. at 18:18-24 (stating that the closing date was September 19).)  Mr. Garvey's lawyer called for a break in the deposition, and conferred with Mr, Garvey off the record.  (*Id.* at 19:21-20:21.)  After coming back on the record, Mr Garvey was asked:  "And would you now like to correct any of your testimony, Mr. Garvey?" and answered "No."  (Garvey Dep. Tr. at 21:3-5.)

21.    Later in the deposition, after a lengthier break, special counsel for the Debtor stated that Mr. Garvey wanted to "clarify" his earlier testimony, and Mr. Garvey attempted to explain away his earlier testimony by distinguishing the "closing date" from the "measurement date."  (Garvey Dep. Tr. at 62-65.)  However, he was unable to explain how anything in the record or the accounting rules would call for the "closing date" and the "measurement date" to be two different dates.  (*Id.* at 65-68.)  He likewise was unable to explain why his report refers to "closing date" when he meant to refer to "measurement date" or even to explain whether he consistently used the term "closing date" in this manner:

Q.    So when you wrote "closing date" in paragraph 18, did you mean
      measurement date or did you mean closing date?

A.    As I sit here today I probably meant measurement date and could have
      been a little bit more accurate.

14

> Q.    So throughout your report when you talk about the closing date, should we understand you to be referring to measurement date?
>
> . . .
>
> A.    Not necessarily.
>
> Q.    So sometimes in your report when you say "closing date" you mean closing date and sometimes in your report when you say "closing date" you mean measurement date?
>
> A.    Well, I haven't gone through it to make that determination, but that could be the case.

(Garvey Dep. Tr. at 69:21-70:16 (objection omitted).)  And, of course, this explanation is flatly irreconcilable with his earlier answer that "I believe that [September 19 is] the correct closing date, measurement date *and* valuation date . . . ."  (Garvey Dep. Tr. at 19:5-9 (emphasis added).)

### 3.    Mr. Garvey's Testimony Should Be Excluded Because He Failed To Consider The Facts And Circumstances Relevant To His Testimony.

22.    Where an expert fails to consider the facts and circumstances relevant to his opinion, his testimony should be excluded.  *See, e.g.*, *Point Prods. A.G. v. Sony Music Entm't, Inc.*, 2004 U.S. Dist. LEXIS 2676, at *24 (S.D.N.Y. Feb. 20, 2004) (excluding expert testimony that contained "gaping omissions of real world events that were highly material").

23.    In his report, Mr. Garvey criticizes Barclays for using sales data during the week immediately following the Closing to value certain securities.  (Garvey Report at ¶¶ 18-22, 60-63.)  In deposition, however, he admitted that it was appropriate in certain circumstances to use a sales price from the week immediately after the Closing to value illiquid securities for which there was no observable trading price as of the time of the Closing:

> Q.    If there's no observable price in the market on the closing date, but you have an external sale to an outside party within  the week immediately following the closing, isn't that sale price the best indicia of the value of that asset on the closing date?
>
> . . .

A.    It would be one indicia.  It would depend on other facts and circumstances.

Q.    Do you agree that under certain circumstances it may be the best indicia of the value of an asset as of the closing?

A.    As a hypothetical matter?

Q.    Yes.

A.    It would depend on all the facts -- other facts and circumstances, but it could -- that's a possibility.

(Garvey Dep. Tr. at 30:23-31:16.)

24.    Despite acknowledging that it *may have been* appropriate to do what Barclays did in valuing the illiquid securities it received, Mr. Garvey essentially admitted that he did not actually *study* the specific securities at issue to determine—one way or another—whether it *was* in fact appropriate:

Q.    Putting aside Professor Pfleiderer, I just want to know whether you have reviewed CUSIP-by-CUSIP the securities for which Barclays valued as of the closing based upon a sale to an outside party between the closing and September 30, have you reviewed them to determine whether, under the circumstances of those CUSIPs, that was an appropriate methodology?

. . .

A.    I did not do a CUSIP-by-CUSIP review.

Q.    Did you review any of the CUSIPs that Barclays valued by looking at sales data to outside parties before September 30, 2008?

A.    I reviewed some of the values of the CUSIPs.  I can't recall which ones.

Q.    Do you recall right now whether you reviewed any CUSIP that was valued by Barclays using sales data to outside parties before September 30, 2008?

A.    I recall looking at them generally.  I can't recall as I sit here today a CUSIP.

(Garvey Dep. Tr. at 32:22-33:21.)

16

25.     Similarly, Mr. Garvey admitted that it *may have been* appropriate for Barclays to use the bid-ask information for securities that actually had such information available in attempting to value securities *for which no such information was available*.  (*See* Garvey Dep. Tr. at 59:4-60:9.)  However, Mr. Garvey did not study the extent to which the securities Barclays acquired in the Sale Transaction were ones for which bid-ask information was unavailable.  (*See Id.* at 72:15-73:4.)  Mr Garvey also admitted that he did not have an opinion on how Barclays should have valued such securities—only that he did not like what they actually did.

**C.      Mark Slattery's Proposed Valuation Testimony Concerning Treasury and Agency Securities and Residential Mortgage Backed Securities Should Be Excluded Because His Novel Valuation Methodology Is Unreliable and Untested.**

26.     Movants also proffer the testimony of Mark Slattery, who asserts that Barclays' valuations of certain of the securities received in the Fed Replacement Repo transaction were unreliable and understated by approximately $2.38 billion.  (Expert Report of Mark E. Slattery, at p. 6, Table 2 ("Slattery Report") (attached hereto as Exhibit C).)  Mr. Slattery's opinions concerning the valuation of Treasury and Agency and residential mortgage-backed securities are unreliable and inadmissible at trial under controlling law.

27.     One of the key sources of difference between Mr. Slattery's valuations of those classes of fixed-income securities and Barclays' valuations is the method used to adjust mid-prices to bid or exit prices.  (Declaration of Paul Pfleiderer, Apr. 19, 2010, at ¶ 26 ("Pfleiderer Decl.") (attached hereto as Exhibit D).)  Mr. Slattery agrees that such an adjustment was appropriate, but contends that the adjustments used by the Barclays valuation personnel—who were actively involved in the market for those securities in September of 2008 and used adjustments they deemed appropriate based on contemporaneous data—were too large.  Not having had any significant personal involvement in those markets in September 2008, Mr. Slattery estimates his mid-to-bid adjustments by concocting an unorthodox and untested

technique solely for litigation purposes.  (Slattery Dep. Tr. at 228-230 (attached hereto as Exhibit

E).)  Mr. Slattery's technique has never been validated by any academic researcher or any

organization that sets standards for valuation professionals or approved by any auditor.  (*Id.* at

228:11-229:11.)  Mr. Slattery himself had never used this technique before this case.  (*Id.* at

227:21-25.)  Nor, so far as Mr. Slattery knows, has *any other valuation professional in history*,

apart from one of his support staffers.  (*Id.* at 229:12-230:5.)

        28.     There is good reason why Mr. Slattery's novel technique is not used on Wall

Street and has never been validated by academic or other testing:  it is unscientific, inherently

unreliable, and not in any way suited to produce an appropriate liquidity discount for any given

market—much less for an unprecedented chapter of financial history like September 2008.

(Pfleiderer Decl. at ¶¶ 26-28.)

        29.     Mr. Slattery attempts to derive an adjustment that would reflect the degree of

illiquidity prevailing in the markets for those classes of fixed-income securities in September

2008.  The approach he invented uses two components.  First, he attempts to calculate an

appropriate multiplier by which to adjust bid-ask spreads prevailing in a "typical" market to bid-

ask spreads one would expect in a "distressed" market.  To calculate that multiplier, Mr. Slattery

starts not with current data, but rather with a chapter in a 1997 book:  Robert I. Gerber, "A

User's Guide to Buy-Side Bond Trading" contained in *Selected Topics in Bond Portfolio

Management*, edited by Frank J. Fabozzi (John Wiley and Sons 1997) (attached hereto as Exhibit

F).  Exhibit 1 in that chapter contains what the author describes as "indicators of market liquidity

for a cross-section of the fixed-income universe.  Bid-ask spreads are estimated for typical and

distressed conditions, because the liquidity of a particular market can fluctuate."  (Ex. F at 198

(emphasis supplied).)

30.    It bears emphasis that what Mr. Slattery relies on are estimates, not data.  And other than a footnote identifying the source of those estimates as "Salomon Brothers, Lehman Brothers, and Sanford C. Bernstein estimates," there is no indication in the article of when those estimates were gathered, what market conditions were deemed to be "typical" or "distressed," or whether such "distressed" conditions were in any way comparable to the market conditions prevailing in September 2008.  Mr. Slattery converted those estimates to his multiplier by dividing the "typical" discount by the "distressed" discount for a given class of securities.[4]  Thus Mr. Slattery's typical-to-distressed multiples are based on vaguely sourced estimates of bid-ask spreads that prevailed during an undefined time period, and which cannot be determined to be similar to the conditions prevailing in September 2008.

31.    The second part of Mr. Slattery's technique involved the use of his multiple to convert "typical" bid-ask spreads to "distressed" bid-ask spreads.  Here, too, Mr. Slattery's technique was defective because the sources of his "typical" bid-ask spreads were likewise outdated.  For Treasury and Agency securities, Mr. Slattery relied on data concerning prevailing liquidity discounts during the 1992-2002 period.  (Slattery Dep. Tr. at 39:4-9; Slattery Bid-Ask Spreads Table (attached hereto as Exhibit G).)  And for residential mortgage-backed securities he used some figures that one of his support staff had gathered in some unspecified fashion while at Bank of America in 2001.  (Slattery Dep. Tr. at 122:19-123:14; Slattery Bid-Ask Spreads Table (attached hereto as Exhibit H).)  Mr. Slattery did not properly test whether these stale bid-ask data were an appropriate proxy for bid-ask spreads prevailing in mid-2008.  (Pfleiderer Decl. at ¶¶ 26-28.)

---

[4] Thus, for example, a "typical" discount of 0.5% and a "distressed" discount of 1.5% would produce a multiplier of 3.

32.     Mr. Slattery's novel technique is untested, unscientific, and relies on outdated data of dubious relevance.  (Pfleiderer Decl. at ¶¶ 26-28.)  No reputable valuation professional has ever used Mr. Slattery's novel technique, yet it accounts for approximately $1 billion of the supposed Barclays windfall.  This Court should not permit Mr. Slattery to offer valuation testimony based on an unproven methodology cobbled together for litigation purposes.  *See* Fed. R. Evid. 702 (allowing admission of expert testimony only where "the testimony is based upon sufficient facts or data" and "the testimony is the product of reliable principles and methods").  His methodology does not satisfy any of the *Daubert* factors, as it has not been "empirically tested" for false results and its "error rate" is thus unknown, it has not "been subjected to peer review and publication," there are no professional "standards controlling the technique's operation," and the methodology has not achieved *any* degree of acceptance, let alone "general" or "widespread" acceptance, in the professional community.  509 U.S. at 594.

33.     Nor should Mr. Slattery be permitted to testify concerning supposed fire-sale prices that he admitted at deposition he had no factual basis for testifying about.  Mr. Slattery criticizes certain of Barclays' valuations based on his assertion that Barclays disposed of assets at fire-sale prices and thus that the prices obtained for those assets provide no reliable information concerning the value of those securities at the time.  He acknowledged at deposition, however, that his opinion that Barclays sold non-Agency Residential Mortgage-Backed Securities at a "fire sale" discount, (Slattery Report at ¶ 47), is not supported by the sources he relied on and that he is aware of no other support for that proposition.  (Slattery Dep. Tr. at 249:5-250:10.)  Similarly, Mr. Slattery was unable to explain at deposition the basis for his more general statements to the effect that Barclays disposed of assets at "fire sale" or "deeply discounted prices."  (Slattery Dep. Tr. at 181:14-184:7; Slattery Report at ¶ 48.)  Accordingly, Mr. Slattery should not be permitted

to testify concerning his unfounded assertions that Barclays disposed of collateral at "fire sale"

prices.

**D.    Joseph Schwaba's Testimony Should Be Excluded Due to His Failure to Consider the Most Fundamental Aspects of the Securities He Purports to Value.**

34.    Movants offer the testimony of Joseph Schwaba for the proposition that Barclays

undervalued 26 securities by approximately $150 million.  Twenty of those 26 securities were

auction-rate securities that Mr. Schwaba valued *close to*, *at, or above* par.  Mr. Schwaba's

methodology for valuing those securities was flawed in that it utterly failed to take into account

the fact that he was valuing auction-rate securities that had failed at auction, even though he

acknowledged in his report that failed auction-rate securities "would trade *below* par."  With

respect to the remaining 6 securities that he valued using models—securities that BoNY and

Barclays both concluded were essentially worthless but that Mr. Schwaba valued at tens of

millions of dollars—Mr. Schwaba admitted at deposition that he was not familiar with how his

models worked, and that he had not even personally examined them.  Indeed, at deposition he

failed to even recognize one of the models produced as backup for his valuations.

35.    At his deposition, Mr. Schwaba identified 20 of the 26 securities he valued as

auction-rate securities,[5] a class of securities that he could not recall ever having previously traded

or valued and certainly was not valuing during September of 2008.  (Schwaba Dep. Tr. at 20:22-

21:2; 33:20-34:23; 72:22-25 (attached hereto as Exhibit I).)  An auction-rate security is an

adjustable rate security whose interest rate is determined through an auction process.  (*Id.* at

31:3-7; Expert Report of Joseph Schwaba, Appendix III at 27-30 ("Schwaba Report") (attached

hereto as Exhibit J).)  Where, due to insufficient investor interest in a given auction-rate security,

---

[5] Because two of these securities were valued twice, there were actually 18 unique auction-rate securities discussed in his report.

an auction "cannot set a coupon rate at a level where investors are willing to accept all of the bonds being auctioned . . . . [t]his is called a failed auction." (Schwaba Report, Appendix III at 30.)

36.    Critically, Mr. Schwaba admits in his report that "[f]ailed [auction-rate securities] *would trade below par* and may be subject to restricted liquidity." (*Id.* (emphasis added).) He also confirmed that he would expect a security with a history of repeated failed auctions to be even more likely to trade below par than one that had only one failed auction because "[i]t would strike me as there would be less demand for the bond." (Schwaba Dep. Tr. at 36:19-37:4.) Acknowledging that in September of 2008 the market for auction-rate securities was "frozen," Mr. Schwaba explained that this meant that "there was little or no movement in terms of auction-rate securities markets in terms of basically a number or a large number of failed auctions and relatively little activity from an investment in the auction-rate market." (*Id.* at 66:8-16.) And he further admitted that he was unable to identify *any* transaction in which a failed auction-rate security had traded at or above par. (*Id.* at 24:17-25:2.)

37.    Yet at deposition he conceded that he was unable to say which of the auction-rate securities that he valued *at or above par* for purposes of this litigation had failed at auction. *Id.* at 92:8-16. Had Mr. Schwaba checked this, he would have learned that he was, in fact, valuing a population of failed auction-rate securities, many of which had failed at auction continuously for more than six months. (Declaration of Paul Pfleiderer, Apr. 19, 2010 ("Pfleiderer Decl.") at ¶ 23.)

38.    Moreover, Mr. Schwaba derived his valuations for these securities by looking at 152 transactions involving purportedly comparable securities that he selected. (Schwaba Report at ¶¶ 16, 23-24.) But Mr. Schwaba was unable to identify which of his comparables were

22

auction-rate securities and had no idea which, if any, were failed auction-rate securities.[6] (Schwaba Tr. at 38:4-39:15; 40:8-16; 92:20-94:9; 96:23-97:11; 99:8-18.)  As a result, in selecting the comparables that he used to value failed auction-rate securities at or above par, Mr. Schwaba completely failed to consider a key factor that he himself admitted (correctly) would have caused those securities to trade below par.

39.    Mr. Schwaba's failure to take into account such an important factor in the valuation of auction-rate securities renders his testimony on this issue unreliable and inadmissible.  *See Lippe*, 99 Fed. Appx. at 279 (affirming exclusion of expert where "among the indicia of unreliability were [the expert's] inability to explain a number of variables and assumptions used in his analysis, such as price/earnings multipliers, income projections, and which companies were comparable to those being valued").

40.    Mr. Schwaba's litigation-driven valuations of six other securities—securities that both Barclays and BoNY contemporaneously valued as essentially worthless—are likewise unreliable and inadmissible.  Mr. Schwaba purports to have used models to derive these valuations, but admitted at deposition that he did not personally examine the models and was not familiar with how the models he used worked.  (Schwaba Tr. at 140:10-15.)  Indeed, Mr. Schwaba entirely failed to even recognize one of the models produced as backup for one or more of his valuations.  (*Id.* at 139:2-13.)

---

[6] Even if any of the transactions that Mr. Schwaba used as comparables actually involved a failed auction-rate security, that would still not make it a valid indicator of the value of the failed auction-rate securities that he was valuing because Mr. Schwaba also made no effort to screen out non-arm's length transactions in which financial institutions repurchased failed auction-rate securities from their own retail customers for relationship reasons or in response to regulatory or litigation pressure.  (Pfleiderer Decl. at ¶ 24; Schwaba Tr. at 58:10-60:20; 94:12-21; 99:9-21.)  Such a non-arm's length transaction in one failed auction-rate security provides little information about what a different failed auction-rate security would have traded for in an arm's-length transaction.

**E.      John Schneider's Proposed Testimony Should Be Excluded Because His Opinions Are Not Based on Any Analysis Whatsoever of the Repo Collateral.**

41.      Movants offer the testimony of John Schneider who proposes to testify that, as large clearing banks, BoNY and JPMorgan Chase value many kinds of repo collateral and have procedures and policies that make them capable of doing so competently.  But Mr. Schneider admitted at deposition that he made no effort to apply his general opinions to the facts of this case, as controlling law requires an expert to do if his testimony is to be admissible.  *See* Fed. R. Civ. P. 702 (requiring that "the witness has applied the principles and methods reliably to the facts of the case"); *Amorigianos*, 303 F.3d at 267 ("In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods *to the case at hand*.") (emphasis supplied).

42.      Specifically, Mr. Schneider admitted that he had no idea if any of the collateral in the Fed Replacement Repo transaction was collateral that BoNY had never previously valued. (Schneider Dep. Tr. at 32:25-33:7 (attached hereto as Exhibit K).)[7]  He conducted no analysis or review of the actual collateral in that transaction whatsoever.  (*Id.* at 33:8-25 ("I've seen a list of assets, but I did not analyze it in any way. . . .  I did not do anything other than see a list of assets."); 46:6-10 ("Q: And you know nothing about what sort of collateral was actually in the Fed replacement repo; is that correct?  A: Other than your question previously where I did look at a list of collateral.").)  Nor is he opining that BoNY or JPMorgan correctly marked the collateral at issue in this case.  (*Id.* at 22:8-20 ("Q: Just so I'm clear, I take it you also did not in any way attempt to validate the marks that BoNY placed on any of the securities that were in the Fed replacement repo?  A: When you say 'validate,' in what capacity?  Q: You didn't check in

---

[7] Mr. Schneider's report (John J. Schneider Expert Report) is attached hereto as Exhibit L.

any way to see whether those were in fact correct?  A: I did not value the marks.  Q: And the same holds true for JPMorgan, I take it? A: That is true."), 47:12-14 ("Q: And I take it you're not testifying that none of the BoNY marks could be imprecise?  A: I am not opining on that.").)

43.     Thus, by his own admission, Mr. Schneider made no effort to fit his opinions to the facts of this case.  Just as a court in a medical malpractice case would not allow an expert who had not reviewed any evidence concerning an operation to opine that the surgeon was competent (and would not admit an opinion stating merely that surgeons are generally competent), so this Court should not permit Mr. Schneider to validate BoNY and JPMorgan without having examined in any way the actual valuations at issue here.  *See Li v. Aponte*, No. 05 Civ. 6237, 2009 WL 1285928, at *6 (S.D.N.Y. May 5, 2009) (excluding expert who had not reviewed medical records of patient before opining on cause of plaintiff's injury).

**F.     The Proposed Testimony of John J. Olvany Is Unreliable.**

44.     In the expert report of John Olvany, over 90% of the valuation difference Mr. Olvany calculates from Barclays valuations comes from just four CUSIPS, all associated with the 2007 issuance of auction rate securities, specifically the Giants Stadium LLC Project Revenue Bonds.[8]  (Expert Report of John J. Olvany at Section IV.A. ("Olvany Report") (attached hereto as Exhibit M.)  On these four securities, he computes a precise valuation difference from Barclays of $349,329,865.  (*Id.*)  Unlike Barclays, which agreed with the prices provided by Bank of New York, Olvany rejects the BoNY marks and revalues these four securities at par (a price of $100).

45.     Even though these Giants securities had repeatedly failed at auction, one of Mr. Olvany's key valuation assumptions is that on September 19, 2008, "a reasonable market

---

[8] Barclays has not yet had the opportunity to depose Mr. Olvany.  Barclays therefore reserves its right to further contest Mr. Olvany's proposed testimony.

participant would have expected the Giants Stadium Bonds to be refinanced and repaid at par, and I have valued them accordingly." (*Id.* at ¶ 25.) Mr. Olvany's assumption is sheer, wholly unsupported speculation. He furnishes no support or evidence of how *any* market participant valued these securities. His conclusion is contradicted by how two major market participants — BoNY and Barclays — valued these securities, and by the testimony by Movants' own other expert, who correctly admitted that "[f]ailed [auction-rate securities] ***would trade below par*** and may be subject to restricted liquidity," and even more so if (like the Giants bonds) the securities had a history of repeated failed auctions. (Schwaba Report, Appendix III at 30 (emphasis added); Schwaba Dep. Tr. at 36:19-37:4.) Accordingly, his opinion is far too unreliable to be admitted.

### G.    Mr. Goldin's Report And All Testimony By Mr. Goldin Should Be Excluded As Improper Expert Testimony.

46.    Mr. Goldin claims expertise in "managing, investigating and advising in connection with failed financial services companies and the disposition of their assets." (Expert Report of Harrison J. Goldin at 4 ("Goldin Report") (attached hereto as Exhibit N); *see also* Goldin Dep. Tr. at 9:9-24 (attached hereto as Exhibit O).) Mr. Goldin offers an expert opinion comparing: 1) "the disclosure to the Bankruptcy Court about the Lehman assets to be transferred to Barclays pursuant to the Sale Order the Court entered on September 22, 2008," and 2) "the acquisition gains Barclays reported to the United States Securities and Exchange Commission (the 'SEC') in a regulatory filing that included its acquisition balance sheet." (Goldin Report at 3.) As a result of his comparison of these two matters, Mr. Goldin opines:

a.    The transaction disclosed to this Court had a negative net value to Barclays of $1.85 billion (Goldin Report at 7, 8, 17);

26

b.      That there is a "delta" of $6 billion between that $1.85 billion negative net value transaction purportedly described to this Court and the gain recorded on the transaction in Barclays' Acquisition Balance Sheet as reported to the SEC. (Goldin Report at 8-9).

c.      That there is "delta" of $4.85 billion between that $1.85 billion negative net value transaction purportedly described to this Court and the gain recorded on the transaction in Barclays' Acquisition Balance Sheet as adjusted in the Report of Professor Pfliederer. (*Id.*)

These proposed opinions must be excluded as they are not the result of expert analysis.

**1.    Mr. Goldin's Determination Of The Baseline Of His "Deltas" Consists Of No More Than Netting Only Those Assets And Liabilities For Which Specific Values Were Stated On The Record During The September 19, 2008 Sale Hearing.**

47.    First, with respect to Mr. Goldin's opinion that the transaction "disclosed" to this Court had a negative net value to Barclays of $1.85 billion, i.e., the baseline of both "deltas" testified to by Mr. Goldin, his opinion should be excluded because the calculation of that value involves no special expertise necessary to assist this Court and ignores entirely the written materials provided to the Court at the time. The entirety of Mr. Goldin's calculation of a $1.85 billion net negative value of the transaction purportedly "disclosed" to this Court consists of nothing more than netting only those assets and liabilities specifically mentioned in the transcript of the Sale Hearing held on September 19, 2008, while completely ignoring others in the papers submitted to the Court.

48.    Thus, Mr. Goldin admits that he did not attempt to analyze which assets and liabilities should have been transferred to Barclays in the Sale Transaction. (Goldin Dep. Tr. at pp. 63-65). Nor did he undertake any effort to determine the accuracy of those asset values

27

specifically mentioned to the Court during the September 19, 2008 Sale Hearing.  (Goldin Dep.

Tr. at 42:5-9 ("Q. . . . Did you do anything to ensure that the valuations told to the court were

accurate and reliable? A. No.").)

49.     Mr. Goldin further admits that in his calculation of assets and liabilities as

"disclosed" to the Court, he did not include separate line items for assets and liabilities that he

acknowledges were transferred but that he did not deem "principal" or "material" to the

transaction.  (*Id.* at 188:13:-189:5; 189:17-191:10.)  When pressed on how he determined what

was or was not "material" to the transaction as disclosed to the Court however, Mr. Goldin

acknowledges that he made no effort to independently determine the actual materiality of any

element of the transaction.  (Id. 200:16-21 (Q. Did you do any independent determination of

whether or not the elements described to the court on the 19th were, in fact, all of the material

elements that were changed?  A.  No.").)  Rather, Mr. Goldin relied solely on what the attorneys

for LBHI chose to highlight for the Court during the Sale Hearing on September 19, 2008.

(Goldin Dep. Tr. 189:6-16 ("Q: How did you determine what was material for purposes of

creating the chart?  . . . A.  It was not I who determined what was material.  It was counsel which

determined what was material.  Q. Well, you created the chart, correct? A. Yes, based on the

disclosures to the court.") (objection omitted)).

50.     Thus, Mr. Goldin's $1.85 billion negative net value calculation is no more than a

compilation of Mr. Goldin's view of the record before this Court.  As Mr. Goldin himself

acknowledges, he has no special expertise that would assist this Court in determining what was

or was not disclosed to it.  (Goldin Dep. Tr. at 61:18-21 ("Well, the record the judge had before

him when he signed the sale order on September 20, 2008 is one that I don't need to help the

judge to understand.").)  He also acknowledges that he has no special expertise that would assist

this Court in determining which elements of the transaction were or were not "material" to the

transaction. (Goldin Dep. Tr. at 72:18-73:5 ("Q: What I want to know if there was any -- what I

want to know is whether there is any special skill that you have that makes you better at

reviewing the record and the elements that comprise the principal aspects of the transaction that

were described to the court [than the judge]?" A. Better than the judge, no.") (emphasis added).)

51.    Indeed, when asked specifically about the expertise he purported to bring to his

opinion, Mr. Goldin acknowledged that his expertise did not relate to the calculation of the $1.85

billion baseline of his deltas, but rather asserts that it relates to his analysis of Barclays' reported

gain:

> **Well, I am not directing your attention as an expert to anything other than
> my analysis of the Acquisition Balance Sheet and what it reflects on an
> adjusted basis** by way of the delta between the liabilities that Barclays said it
> assumed on the 22nd and the assets that it received and said it was entitled to and
> the delta between assets and liabilities that was reported to the court previously.

(Goldin Dep. Tr. 70:8-17 (emphasis added).)

52.    Mr. Goldin used no special skills or analysis in calculating his $1.85 billion net

negative value baseline, and therefore it is not the proper subject of expert testimony.

### 2.    Mr. Goldin Acknowledges That The Calculation Of His "Deltas" Was "Simple Arithmetic."

53.    Mr. Goldin's calculations of the supposed "deltas" between the transaction

purportedly "disclosed" to this Court — as Mr. Goldin reads the record — and the gain reported

on Barclays' Acquisition Balance Sheet are not the product of expert analysis. Mr. Goldin

himself acknowledges that each of the "deltas" he opines on is the result of no more than "simple

arithmetic":

> A.    . . . I think I understand the point, and the point is, yes, the delta between
> the unadjusted Acquisition Balance Sheet reflection of disparities between
> asset and liabilities and the disparity that was reported to the court
> between assets and liabilities is approximately $6 billion.

Q.     Okay. And that's just a function of subtracting one figure from the other?

A.     It's a function of simple arithmetic.

Q.     Okay. Is the same true for the comparison that leads to the $4.85 billion delta?

A.     Well, for that I accepted Professor Pfliederer's, Pfliederer's, assertion respecting the appropriate basis for calculating the difference between assets and liabilities to which Barclays claims it was entitled without agreeing or disagreeing with them, as I've told you, and comparing that delta to the delta that derives from what was reported to the court.

Q.     And that's also simple arithmetic?

A.     Simple arithmetic.

(Goldin Dep. Tr. at 215:20-216:21 (emphasis added).)

54.     In sum, regardless of what Mr. Goldin's qualifications may be, the ultimate opinions he offers regarding "deltas" between the transaction "as disclosed" to the Court and the transaction as reported by Barclays are not an appropriate subject for expert testimony.[9]

**H.    The Proposed Testimony of Mark Zmijewski Should Be Excluded Because it Rests on False and Unjustifiable Assumptions Derived Solely from Other Proffered Experts.**

55.     Movants offer the testimony of Mark Zmijewski for the proposition that Barclays undervalued securities that it received by $5 billion and received a $13 billion "windfall" as compared to the "Court-approved transaction," under which, Dr. Zmijewski says, "Barclays would have paid $1.85 billion in consideration above the value of the assets received." For the purpose of calculating the purported value of the securities received by Barclays, Dr. Zmijewski mostly just relies on values provided to him by Olvany, Slattery, and Schwaba; Dr. Zmijewski

---

[9] Mr. Goldin's testimony also should be excluded for the simple reason that he purports to calculate a delta based on non-comparable figures that he lacks the expertise to interpret. Thus, Mr. Goldin acknowledges that the values reported to this Court were a "presentation of values," not an "accounting presentation." (Goldin Dep. Tr. at 75:6-8.) He further acknowledges that, in contrast, the Barclays' Acquisition Balance represented an "accounting presentation" prepared under international accounting standards. (*Id.* at 74:7-10.) Mr. Goldin disclaimed expertise in either International Financial Reporting Standards ("IFRS") or ("GAAP") and thus lacked the expertise to analyze the differences between the valuations at either end of his deltas. (*Id.* at 38:17-39:2.)

only calculated valuations of two sets of securities: "Equities" received by Barclays on

September 18, 2008 as part of the Repurchase Agreement (here, "Equities"), and the securities

received by Barclays as part of the December Settlement involving JPM, which Dr. Zmijewski

refers to as the "JPM inventory." (*See* Expert Report of Mark E. Zmijewski, at Exhibit A-2

("Zmijewski Report") (attached hereto as Exhibit P).) In his "windfall" calculation, Dr.

Zmijewski also incorporates the values provided to him by Olvany, Slattery, and Schwaba, along

with the $1.85 billion number (provided by Mr. Goldin) as the starting point for his calculation.

(*See* Zmijewski Report, at Exhibit B-1.)

56.    Thus, Dr. Zmijewski's opinions as to a purported understatement of values by

Barclays and a "windfall" are principally based on numbers supplied by others and not tested in

any way by Dr. Zmijewski. For instance, Dr. Zmijewski admits that he is simply relying on the

calculations provided to him by Olvany, Slattery, and Schwaba. (Zmijewski Dep. Tr. 37:17-38:4

(attached hereto as Exhibit Q).) Dr. Zmijewski further admits with respect to the numbers

provided by Olvany, Slattery, and Schwaba that "I did not do any calculations. I was not a

participant in the execution of the methodologies." (*Id.* at 38:5-13.) He also admits that if their

valuations are incorrect, the conclusions in his report are incorrect. (*Id.* at 38:14-24.)

Accordingly, because the valuations provided by Olvany, Slattery, and Schwaba are unreliable

for the reasons set forth herein, Dr. Zmijewski's valuations and conclusions are necessarily

unreliable.

57.    The same is true for the $1.85 billion foundation for his "windfall" calculation,

which Dr. Zmijewski describes as "Mr. Goldin's number." (Zmijewski  Dep. Tr. at 178:6.)

When asked how that number was calculated, Dr. Zmijewski stated: "That comes from Mr.

Goldin's report, and you would have to read his report.  It's entirely his analysis."  (Zmijewski Dep. Tr. at 181:21-24.)

58.     With respect to the valuations Dr. Zmijewski actually purports to have calculated himself, the Equities and the "JPM Inventory," he is required by Rule 702 to base his testimony "upon sufficient facts or data" and to use "reliable principles and methods."  Fed. R. Evid. 702. With respect to the JPM inventory securities, Dr. Zmijewski  (1) takes the position that these securities should be valued at what he says was the time of closing (12:01am September 22, 2008), (2) assumes that the securities' value on September 19 would be the best estimate or proxy for September 22 value, (3) takes JPM "collateral value" marks of the securities on September 17, (4) attempts to adjust the September 17 JPM marks to September 19 values by relying on GFS data, and (5) for securities he could not find in the GFS system, assumes that the change from September 17 to September 19 experienced by a different set securities (according to the GFS system) would have been identical for the JPM inventory securities.  Each of these assumptions is unreliable or invalid.

59.     First, there is no basis for valuing securities that Barclays received pursuant to a settlement on December 22, 2008, at the value those securities supposedly had three months before Barclays received them.  Lehman had an obligation under the parties' Repurchase Agreement to deliver securities to Barclays free and clear, but these securities were not delivered until the December Settlement.

60.     Second, Dr. Zmijewski simply accepted the JPM marks on September 17 as an accurate measure of market value, but did not perform any reliable testing of those marks.  The only bases Dr. Zmijewski cites for believing the JPM marks were accurate are (1) his reliance on

Mr. Schneider's expert report and (2) his belief that JPM's marks on September 17 and BONY's

marks on September 19 were "similar":

> Q.    And what efforts did you make, if any, to establish whether the JPM
>        marks as of the 17th were in fact accurate for those JPM inventory
>        equities?
>
> A.    Well, first I am relying on the testimony of Mr. Schneider with respect to
>        the type of organization JPMorgan is, although I know JPMorgan well, but
>        also the role of a custodian in this case in this situation.  So I rely on his
>        testimony.  In addition, I looked at, when I started this assignment, looked
>        at, well, how does JPMorgan compare on the 17th to BoNY on the 19th --
>        I think BoNY on the 19th -- and looked at a comparison to see if they were
>        similar, and adjusting for the days, and it seemed like it was similar for --
>        this is not of course for the JPM Annex A inventory, but it's for the initial
>        inventory.
>
> Q.    Okay. So, for the -- did you do anything other than rely on Mr. Schneider
>        to determine the accuracy of the JPM marks of the JPM inventory
>        securities as of September 17th?
>
>        . . .
>
> A.    I have done nothing more than I just explained.

(Zmijewski Dep. Tr. at 125:21-23 (objection omitted).)

61.    However, Mr. Schneider admitted that he did not study the composition of the

Repo Collateral and did not attempt to independently value or test the JPM marks, so relying on

his opinions is not a valid basis for establishing the accuracy of the JPM marks.  Nor is his

observation that BoNY marks two days later "seemed like [they] were similar," especially when

he was not even looking at the JPM inventory securities at issue (which did not have BoNY

marks because they were not received).  This is particularly true when JPM itself specifically

cautioned against using those precise September 17 "collateral value" marks as estimates of

market value.  JPM's counsel wrote on October 31, 2008:

> I attached a spreadsheet with 'collateral values' as of September 17th, which was
> the last evening on which the fed provided financing. I understand that these

'collateral values' were furnished principally by third-party pricing sources, *and we caution against using those values as reliable indicators of realizable value*.

BCI Ex. 443 [E-mail from H. Novikoff to J. Giddens et al., Oct. 31, 2008, 3:28 p.m.] (emphasis added).  JPM's counsel repeated this explicit caution in a November 3, 2008 email and attached JPM's estimate of actual "market value" of those securities as of November 3, 2008, which was approximately half the September 17, 2008 "collateral values" that JPM was cautioning about and that Dr. Zmijewski relied upon without any testing.  BCI Ex. 444 [E-mail from H. Novikoff to S. Levinson et al., Nov. 3, 2008, 4:30 p.m.].  Dr. Zmijewski does not know how JPM calculated values for securities for which third-party pricing was not available.  Dr. Zmijewski did not review and was not aware of these documents cautioning against using the September 17 JPM marks as "reliable indicators of realizable value."  However, when asked if he would have liked to have considered this information, Dr. Zmijewski responded that "This document doesn't change my opinion, so, at this point it's not relevant."  (Zmijewski Dep. Tr. at 147:11-17.)

62.     Third, Dr. Zmijewski's reliance on the GFS system to accurately show changes in the JPM inventory securities between September 17 and September 19 is unsupported.  As the Examiner's report noted, it is highly questionable whether marks in the GFS system were being accurately updated in that time period and there is evidence in this case that it was not.  Report of Anton R. Valukas at 2006-07 (Mar. 11, 2010) (noting the "common concern" of Lehman and A&M staff "that standard daily protocols were not consistently followed during the week ending September 19, 2008 as a consequence of the atypical market conditions and the extraordinary business disruption that occurred during that week" and concluding that "[t]here was sufficient concern about the quality of the September 19, 2008 dataset to justify the selection of the September 12, 2008 dataset as the basis for the Examiner's analysis").  Dr. Zmijewski's chart showing some changes in some marks over the period of September 12-19 fails to show regular

34

updating of marks in the period of September 17 to September 19, which is the relevant time period. Dr. Zmijewski admitted that his analysis of the GFS system did not show that the JPM inventory securities were being updated between September 17 and September 19, but rather just that "it does indicate generally that there was updating in GFS." (Zmijewski Dep.Tr. at 130:8-15.)

63.     Fourth, even if it were appropriate to measure the value of securities received by Barclays three months before Barclays received them, and if the September 17 JPM "collateral value" marks were accurate, and the GFS system was fully and accurately updated between September 17 and September 19, and the change in value of the JPM inventory securities which Dr. Zmijewski could not track by CUSIP in the subset of the GFS system that he looked at (approximately 40% of the securities) matched the change in value of the proxy class of securities which Dr. Zmijewski measured, Dr. Zmijewski's assumption that September 19 values would offer the best estimate of the value of those securities on September 22 fails to take into account the facts of this case. Market values were being heavily affected by macroeconomic events, so the fact that there may not have been trading in the JPM inventory securities over the weekend (to the extent such securities were ever traded) does not mean that their realizable values did not shift significantly between September 19 and September 22. Dr. Zmijewski did not attempt to calculate or examine any such changes.

64.     With respect to the Equities, Dr. Zmijewski does not conduct his own valuation of those securities. Rather, he accepts and uses Barclays' valuation of the Equities; however, he takes Barclays' marks as of September 19 (instead of September 22) and uses a smaller percentage adjustment in moving from mid to bid prices. Each of those changes increases the valuation of the Equities. As noted above, even if the operative time to value the Equities was

12:01a.m. on September 22—when title was contractually deemed to pass, although the actual

Closing took place more than eight hours later—there simply is no basis for concluding that

September 19 marks are accurate estimates of September 22 value. Dr. Zmijewski refused to

consider any valuation information as of September 22, 2008, saying even trades in these very

same securities as of 12:05 a.m. on September 22 should not be considered because they were

after the closing time. This makes no sense, and his failure to consider valuation information

available on September 22 makes his use of September 19 marks as proxies for September 22

market values unreliable. Dr. Zmijewski cites no support in the accounting or valuation

literature for such a principle, and his use of a September 19 valuation date accounts for much of

the $541 million difference between his litigation-driven estimate of the value of the equities and

Barclays' valuation in its audited financial reports ($9.343 billion v. $9.884 billion). (*Id.* at

93:13-94:4.)

65.    Finally, although Dr. Zmijewski admits that marks are just estimates and subject

to a margin of error, (Zmijewski Dep. Tr. at 70:19-71:9), and that the distribution of estimates

was particularly high around September 19-22, (*Id.* at 152:21-154:8), he did nothing to quantify

the margin of error around his estimates or to compute a confidence interval for his estimates,

(*Id.* at 154:14-155:9).   Consequently, Dr. Zmijewski has no basis to conclude that different

valuation estimates that he offers—based on sample sets and calculations as opposed to any

independent "valuations"—are statistically significant, or whether they are simply matter of

chance or randomness in the valuation process.

## CONCLUSION

66.     For the foregoing reasons, Barclays respectfully requests that the Court exclude

the proposed testimony of John P. Garvey**,** Mark E. Slattery, Joseph Schwaba, John J. Schneider,

John J. Olvany**,** Harrison J. Goldin, and. Professor Mark E. Zmijewski.

Dated: New York, New York
      April 20, 2010

                    Respectfully submitted,

                    BOIES, SCHILLER & FLEXNER LLP

                    By:      /s/ Jonathan D. Schiller
                              Jonathan D. Schiller
                              Jack G. Stern
                              575 Lexington Avenue
                              New York, New York 10022
                              Tel: (212) 446-2300
                              Fax: (212) 446-2350
                              Email: JSchiller@bsfllp.com
                                    JStern@bsfllp.com

                              Hamish P. M. Hume
                              5301 Wisconsin Avenue, N.W.
                              Washington, D.C. 20015
                              Tel: (202) 237-2727
                              Fax: (202) 237-6131
                              Email: HHume@bsfllp.com

                              *Attorneys for Barclays Capital Inc.*