# Exhibit A

**Contains Highly Confidential Information**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS, INC., *et al.,* | Case No. 08-13555 |
| Debtors | (Jointly Administered) |

**EXPERT REPORT OF**

**JOHN P. GARVEY**

**MARCH 15, 2010**

**Contains Highly Confidential Information**

# Table of Contents

List of Appendices……………….………………………………………………iii

I.  Introduction……………….……………………………………………………..1

II.  Summary of Qualifications……………………………..…………………………2

III. Summary of Opinions...…………………….…………………………………………2

IV. Opinions and Bases Thereof…………………………….……………………......3

Opinion 1: Professor Pfleiderer's Opinions Regarding
Book Value are Flawed………………………………………………........3

Opinion 2: The Acquisition Balance Sheet is Not Representative
of the Values Barclays Received in the Acquisition and Had a
Claim on as of September 19, 2008………………………………………….7

A.  Schedules A and B……….………...…………………………....7

B.  Annex A………………….………...…………………………10

C.  Valuation Adjustments and "Haircuts"..…………………………11

Opinion 2(a): The Practice of Marking Securities from Mid to Bid
is Driven by Fair Value Accounting Rules and Results in a
Conservative Valuation of the Securities...………………….…………...12

Opinion 2(b): Barclays Inconsistently and Subjectively Applied
the Methods Used to Mark Securities from Mid to Bid
in the Acquisition Balance Sheet…………………………...……………14

A.  General Inconsistencies and Subjectivity in Barclays'
Mid to Bid Adjustments in the Acquisition Balance Sheet...……15

B.  Barclays Inconsistently and Subjectively Applied
the Methods Used to Mark Lehman's Equity Positions
from Mid to Bid in the Acquisition Balance Sheet………………16

C.  Barclays Inconsistently and Subjectively Applied
the Methods Used to Mark the Exchange Traded
Options (ETO) Portfolio from Mid to Bid in the
Acquisition Balance Sheet………………………………………17

**Contains Highly Confidential Information**

D. Barclays Inconsistently and Subjectively Applied the Methods Used to Mark its Agency CMO Portfolio from Mid to Bid in the Acquisition Balance Sheet………………18

E. Professor Pfleiderer either Ignores the Inconsistencies and Subjectivity in Barclays' Mid to Bid Adjustments in the Acquisition Balance Sheet in His Analysis or Accepts These Flaws and Inconsistencies without Any Analysis or Consideration of the Effects of such Information on His Opinions…...………………………..……19

Opinion 2(c): Barclays' Use of Valuation Dates after September 22, 2008 Is Not Supported by the Accounting Literature and Results in Understated Values for Certain Securities in the Acquisition Balance Sheet…………………………….....…..……20

A. There Is No Support in IAS or U.S. GAAP……………………...20

B. The Valuation Dates Chosen by Barclays are Inconsistent and Unsupported………..………………………21

C. The Opinions Offered by Professor Pfleiderer Regarding the Use of Subsequent Measurement Dates Are Flawed………..22

Opinion 3: Professor Pfleiderer's Evaluation and Reliance on PwC's "Extensive" Testing of Barclays' Exit Price Marks are Flawed………...23

A. Professor Pfleiderer Did Not Evaluate PwC's Testing Procedures………………………...………………24

B. Professor Pfleiderer's Reliance on PwC's "Extensive" Testing of Barclays' Exit Price Marks is Unsupported………………………………………………...…..24

C. Review of the PwC Workpapers Professor Pfleiderer Relied Upon………………………………25

D. Review of the PwC Workpapers Produced after Professor Pfleiderer Filed His Report………………….……...26

Opinion 4: Professor Pfleiderer is Misguided in His Analysis of the Negative Goodwill Barclays Recorded…………………………..31

**Contains Highly Confidential Information**

## List of Appendices

Appendix I      Curriculum Vitae

Appendix II     List of Documents Considered

Appendix III    Summary of Relevant Accounting Principles

Appendix IV     Fair Value Considerations

Appendix V      Overview of the Audit Process

Appendix VI     Auditing Fair Value Measurements and Disclosures

**Contains Highly Confidential Information**

## I.   <u>INTRODUCTION</u>

1.       This report is submitted by John P. Garvey.  I am a Managing Director at Navigant Economics, a subsidiary of Navigant Consulting, Inc., a consulting firm that specializes in accounting, economic and financial analyses.  I discuss my qualifications in more detail in Section II and present my curriculum vitae in Appendix I.

2.       I have prepared this report at the request of Counsel for Movants to set forth the subject matters on which I expect to testify, the substance of the facts and opinions on which I expect to testify, and a summary of the foundations for each such opinion.[1, 2]  In preparing this report, I have reviewed various documents related to this issue, as cited in the text and footnotes in this report and exhibits and/or Appendix II.

3.       Navigant Economics (Chicago Partners) charges an hourly rate of $580 for my time.  Other Navigant Economics (Chicago Partners) professionals, working under my direction and supervision, assisted in my analyses and Navigant Economics (Chicago Partners) was or will be compensated for their work at their customary hourly rates.  This compensation is not contingent upon the substance of my testimony or the outcome of this matter.

4.       The remainder of the report is organized as follows.  Section III summarizes my opinions.  Section IV provides the bases for my opinions.

---

[1] This report concerns three motions before the Court:
   1)  Motion of Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc. for Relief from Order Under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, Dated September 20, 2008 (and Related SIPA Sale Order) and Joinder in Debtors' and SIPA Trustee's Motions for an Order Under Rule 60(b) to Modify Sale Order, September 15, 2009;
   2)  The Trustee's Motion for Relief Pursuant to the Sale Orders or, Alternatively, for Certain Limited Relief Under Rule 60(b), September 15, 2009; and
   3)  Debtor's Motion for an Order Modifying the September 20, 2008 Sale Order and Granting Other Relief, September 15, 2009.

[2] If I receive additional data, facts, or information, I will review, evaluate, and analyze these additional data, facts, or information as they become available, including, but not limited to, the report(s) of experts in this matter.  I may modify or supplement my report as necessary in response to any newly produced evidence or in rebuttal to any further opinions offered by Barclays' witnesses.

---

**Contains Highly Confidential Information**

## II.    SUMMARY OF QUALIFICATIONS

5.      My present position is Managing Director at Navigant Economics (Chicago Partners), a subsidiary of Navigant Consulting, Inc.  Navigant Economics (Chicago Partners) specializes in consulting in the areas of accounting, economics, and finance.  I am a CPA licensed in Illinois and my areas of expertise include accounting and auditing, finance and business valuation.

6.      Prior to rejoining Chicago Partners in 2001, I was Market Team Leader for Business Fraud and Investigation Services at Arthur Andersen, specializing in forensic accounting, board-directed investigations and accounting irregularities.  Prior to joining Chicago Partners initially, I was Vice President with Fort Dearborn Partners, Inc., specializing in business valuation, mergers and acquisitions, turnaround consulting, and litigation consulting.  Prior to joining Fort Dearborn Partners, I was a Partner with Deloitte & Touche, where I spent fourteen years in the audit group.

## III.    SUMMARY OF OPINIONS

7.      This section of my report summarizes my opinions.  In the remaining sections of the report, I provide the substance of the facts and opinions on which I expect to testify, and the bases for each such opinion.  If I receive additional data, facts or information, I will review, evaluate, and analyze these additional data, facts or information as they become available, including, but not limited to, the report(s) of experts in this matter.  I may modify or supplement my report as necessary to reflect any additional information that I receive.

> **Opinion 1:**    Professor Pfleiderer's opinions regarding book value are flawed.[3]

---

[3] Professor Paul Pfleiderer was retained by Counsel for Barclays and submitted a report dated January 8, 2010 (the "Pfleiderer Report") "to analyze certain economic, financial, accounting, and valuation issues arising in this matter." Pfleiderer Report, ¶2.

Contains Highly Confidential Information

**Opinion 2:**    The Acquisition Balance Sheet is not representative of the values Barclays received in the acquisition and had a claim on as of September 19, 2008.

**Opinion 2(a):** The practice of marking securities from mid to bid is driven by fair value accounting rules and results in a conservative valuation of the securities.

**Opinion 2(b):** Barclays inconsistently and subjectively applied the methods used to mark securities from mid to bid in the Acquisition Balance Sheet.

**Opinion 2(c):** Barclays' use of valuation dates after September 22, 2008 is not supported by the accounting literature and results in understated values for certain securities in the Acquisition Balance Sheet.

**Opinion 3**:    Professor Pfleiderer's evaluation and reliance on PriceWaterhouseCoopers' ("PwC") "extensive" testing of Barclays' exit price marks are flawed.

**Opinion 4:**    Professor Pfleiderer is misguided in his analysis of the negative goodwill Barclays recorded.

## IV.    OPINIONS AND BASES THEREOF

8.    This section discusses my opinions and the bases of my opinions.

### Opinion 1:  Professor Pfleiderer's Opinions Regarding Book Value are Flawed

9.    Professor Pfleiderer's opinions regarding the definition of *book value* are flawed. Paragraph 82 in the Pfleiderer Report states: "[f]urthermore, to the best of my knowledge, 'book value' does not have a definite meaning in this context, such that a financial professional would understand it, as the Movants apparently do, to be synonymous with the 'marked' value of the assets and liabilities on Lehman's books as of any arbitrary date and without regard to the quality and timeliness of Lehman's marks on such date."

**Contains Highly Confidential Information**

10.     However, the term *book value* is not an obscure term as Professor Pfleiderer indicates. Financial professionals have many sources to gain an understanding of the term *book value*.[4]  A generic search of web-based dictionaries and encyclopedias provides the following definitions of *book value*:

- The monetary amount by which an asset is valued in business records, a figure not necessarily identical to the amount the asset could bring on the open market.[5]

- [T]he value of a business, property, etc., as stated in a book of accounts (distinguished from market value).[6]

- The value at which an asset is carried on a balance sheet. . . .[7]

- In accounting, book value or carrying value is the value of an asset according to its balance sheet account balance. . . .[8]

11.     In addition, the term *book value*, as commonly used in commerce and industry, does not contemplate any of the restrictions Professor Pfleiderer mentions in paragraph 82 of his report.  As illustrated above, the term *book value* denotes the value of an asset (or a liability) recorded in the books at any point in time.  The term *book value* makes no reference to the specific date an asset or a liability is recorded in the accounting records nor does the term *book value* embody the concept of timely review or update of the value of an asset or liability to ensure that the account reflects the latest information.

12.     Professor Pfleiderer's assertions in paragraph 82 of his report are inconsistent with how the term *book value* is used in the Asset Purchase Agreement ("APA") to describe components of the Purchased Assets and Assumed Liabilities:

"Purchased Assets" means all of the assets of Seller and its Subsidiaries used in connection with the Business (excluding the Excluded Assets), including;

* * *

---

[4] *See* Appendix III.
[5] http://www.thefreedictionary.com/book+value, based on <u>The American Heritage Dictionary of the English Language</u>, 4th edition, last visited on March 10, 2010.
[6] http://dictionary.reference.com/browse/book+value, based on <u>The Random House Dictionary</u>, last visited on March 10, 2010.
[7] http://www.investopedia.com/terms/b/bookvalue.asp, last visited on March 10, 2010.
[8] http://en.wikipedia.org/wiki/Book_value, last visited on March 10, 2010.

**Contains Highly Confidential Information**

(d) government securities, commercial paper, corporate debt, corporate equity, exchange traded derivatives and collateralized short-term agreements with a book value as of the date hereof of approximately $70 billion.

\* \* \*

On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall assume, effective as of the Closing, and shall timely perform and discharge in accordance with their respective terms, the following Liabilities of Seller and its Subsidiaries (collectively, the "Assumed Liabilities"):

\* \* \*

(i) all short positions and "repos" relating to any securities or interests of the types included in the definition of "Long Positions" with a book value as of the date hereof of approximately $69 billion[9]

13.    Moreover, the APA used the term *book value* interchangeably with the term *Lehman (LBI's) marks*.[10]   The source of Lehman's marks is a central database system for pricing and other data called Lehman Global Funding System ("GFS").[11]   GFS tracked financial assets at their fair value marks and updated these marks on a periodic basis. GFS gathered pricing data from the trading desks each evening; therefore, GFS contained the most recent information from the previous trading day.[12]   Marks, however, were updated at various intervals, depending on the type of security, as explained by Steven Berkenfeld in his deposition:

> [N]ot all types of securities were marked every day.  We did not mark our entire book of securities on a daily basis.  We owned lots of level 3 securities, esoteric securities, and so we didn't go through a daily process of marking those.  Some of those positions would be marked on a monthly or even a quarterly basis.[13]

---

[9] Asset Purchase Agreement, September 16, 2008, page 6, and pages 11-12.

[10] Section 3.3 of the APA, "Adjustment to Cash Amount", states: "Promptly following the first anniversary of the Closing Date, Purchaser shall determine with respect to each Position (long or short, including repos), that was part of the Purchased Assets and was sold on or prior to such first anniversary, the profit or loss realized from such sale (such profit or loss determined by reference to LBI's mark (book value) for such Position as of the date hereof)."  (APA, Section 3.3).
However this provision was removed by the Sale Hearing on September 19, 2008, Lori Fife told the court: "There was an upside sharing in the original transaction.  There was going to be a true-up twelve months later on and that has been eliminated from this transaction."  (9/19/08 Hearing Tr. 47:7-10)
Further, Paragraph 9 of the Clarification Letter removed this provision from the APA.

[11] "GFS" is Lehman's Global Funding System, "a global data warehouse that provides strategic and flexible reporting capabilities related to the Firm's financial resources." (BCI-EX-(S)-00213941 and BCI-EX-(S)-00213939)  It is also sometimes referred to as Global Finance System, Global Financing System, or Global Financial System.

[12] Paolo Tonucci stated in his deposition:  "Market data is received from other systems.  GFS is just an aggregation tool, so would source data from settlement systems or from other pricing sources and apply that to the inventory positions or collateral positions. . . . It runs on an overnight basis so it should pick up all of the most current information."  (Deposition of Paolo Tonucci, August 14, 2009, 95:5 – 96:3)

[13] Deposition of Steve Berkenfeld, August 6, 2009, 299:14-21.

---

14.     Both Lehman and Barclays use the term *book value* in their respective annual
reports and regulatory filings.  In its Annual Report for the fiscal year ended December
31, 2008, Barclays PLC offered a table analyzing "the book value of securities which are
carried at fair value."[14]  In this table, Barclays PLC clearly distinguished "the book value
of securities which are carried at fair value" from the "amortized cost" of the securities.
Similarly, in its Form 10-K for the fiscal year ended December 31, 2007, Lehman
Brothers Holdings Inc. stated: "Lehman Brothers Bank disposed of a leasing subsidiary,
Dolphin Capital Corp., acquired in the acquisition of Capital Crossing. The transaction
was an asset sale and amounts were transferred at approximately book value."[15]

15.     In addition, Professor Pfleiderer contradicts himself regarding *book value* in his
report.  Professor Pfleiderer asserts that the term *book value* has no definite meaning, yet
in Footnote 61 to his report, he quotes the APA to describe the "approximate valuation of
the trading assets it [Barclays] would be acquiring" as having a "book value as of the date
hereof or approximately $70 billion."[16]  Further, Exhibit 8 to the Pfleiderer Report, uses
"book value of target's net assets" as a basis for computing goodwill in seven bank
acquisitions.  The regulatory filings of financial institutions in Exhibit 8 define the
meaning of *book value* as the amount at which an asset or a liability is reflected in
accounting records.[17]

---

[14] Barclays PLC, Annual Report for the fiscal year ended Dec-31-2008 at 34, 26, 88.

[15] Lehman Brothers Holdings Inc., Annual Report (Form 10-K) for the fiscal year ended Nov-30-2007 at
46.

[16] Footnote 61, to ¶73, in the Pfleiderer Report states:  "First, even though there was no reason do to so,
Barclays allowed to be included in the Asset Purchase Agreement a description and **approximate
valuation of the trading assets it would be acquiring**: 'government securities, commercial paper,
corporate debt, corporate equities, exchange traded derivatives, and collateralized short term agreements
**with a book value as of the date hereof of approximately $70 billion**.'" (emphasis added).

[17] "Book Value' means, with respect to any Asset and any Liability Assumed, the dollar amount thereof
stated on the Accounting Records of the Failed Bank. The Book Value of any item shall be determined as
of Bank Closing after adjustments made by the Receiver for differences in accounts, suspense items,
unposted debits and credits, and other similar adjustments or corrections and for setoffs, whether voluntary
or involuntary." (WestAmerica, (Form 8-K) (2/6/2009) at 2).
*See also* JP Morgan (Form 10-K) for the fiscal year ended Dec-31-2008 at 140: "The gain represents the
amount by which the fair value of the net assets acquired (predominantly intangible assets and goodwill)
exceeded JPMorgan Chase's book basis in the net assets transferred to First Data Corporation."
*See also* JP Morgan (Form 10-K) for the fiscal year ended Dec-31-2008 at 220: "Derivative guarantees also
include contracts such as stable value derivatives that require the Firm to make a payment of the difference
between the market value and the book value of a counterparty's reference portfolio of assets in the event
that market value is less than book value and certain other conditions have been met." (JP Morgan, Form
10-K for the fiscal year ended Dec-31-2008, page 220).

---

**Contains Highly Confidential Information**

**Opinion 2:    The Acquisition Balance Sheet is not Representative of the Values Barclays Received in the Acquisition and had a Claim on as of September 19, 2008.**

16.    This section highlights several flaws and inconsistencies in the valuation methods Barclays employed to determine the "exit price marks" included in the Acquisition Balance Sheet.[18]  Professor Pfleiderer either ignores these flaws and inconsistencies in his analysis or accepts them without any analysis or consideration of the effects of such information in his opinions.

17.    Barclays' Product Control Group ("PCG") was responsible for independently verifying the valuations developed by Barclays' business teams.[19]  The record contains conflicting information regarding the valuation methods Barclays used to value the acquired assets on the Acquisition Balance Sheet.  The securities acquired comprise of several components described below.

A.  SCHEDULES A AND B

18.    Not valuing the securities on Schedules A and B on the Closing Date of the Sale Transaction is incorrect.  Schedules A and B contain lists of securities that were transferred to Barclays in September 2008.  Schedule A contains securities that were part of the repurchase agreement collateral, and Schedule B contains assets in the "clearance boxes."[20]  According to the Romain Declaration, the Schedule A securities were valued as of September 22, 2008.[21]  The Romain Declaration is not clear regarding the valuation date for the Schedule B securities, but the underlying data indicate that the Schedule B securities were valued as of various dates discussed below.

19.    In addition, the data used to develop the Acquisition Balance Sheet contradicts the Romain Declaration and indicates that not all Schedule A and B securities were valued as

---

[18] Barclays' opening balance sheet for its acquisition of Lehman Brothers North American businesses is contained in Barclays' 2008 Form 20-F and Annual Report (footnote 39(a) on page 235).  In depositions, Exhibit 377A is commonly referred to as the opening balance sheet.  The net assets acquired shown in Exhibit 377A match those in Barclays' 2008 Form 20-F.  There are, however, some differences in several individual line items.
[19] Declaration of Gary Romain, January 26, 2010 ("Romain Declaration"), ¶5.
[20] Romain Declaration, ¶17 and ¶18.
[21] Romain Declaration, ¶18.

**Contains Highly Confidential Information**

of September 22, 2008.  A Barclays' spreadsheet with CUSIP-level price detail[22] that supports the Acquisition Balance Sheet indicates that Principal Mortgage Trading Group ("PMTG")[23] securities were valued using September 30, 2008 price data if the securities were still held at that date.  PMTG securities that were sold between the Closing Date[24] and September 30 were valued at the sale price.

20.     Barclays' rationale for using a September 30 valuation date appears to be based in part on or supported by a statement by Romain in an email dated December 11, 2008, in which he states:  "we [Barclays] got control of /access to the assets on that day (possibly the day before)."[25]

---

[22] BCI-EX-00099519 - 108699.xls (a file in MS Excel native format).

[23] Declaration of Stephen King, January 27, 2010, ¶2.

[24] Documents in the record refer to September 19 (Friday at market closing), September 20 (Saturday – a non-trading day), September 21 (Sunday – a non-trading day) or September 22 (Monday –opening) as the Closing Date.  For example, Romain states "[t]he measurement date is the acquisition date (Sunday 21 September – practically 19 September close)" at BCI-EX-00218500-501.
The facts are:

- The Sale Hearing occurred on September 19, 2008.  (Hearing Transcript, September 19, 2008.)
- The Sale Order was approved in the early hours of September 20, 2008.  (Hearing Transcript, September 19, 2008.)
- Paragraph 4.1 of the APA states:  "Unless otherwise agreed by the parties in writing, the Closing shall be deemed effective and all right, title and interest of Seller to be acquired by Purchaser hereunder shall be considered to have passed to Purchaser as of 12:01 a.m. (New York time) on the Closing Date."  (APA, ¶4.1.)

[25] BCI-EX-00218500-501.  In the same e-mail (e-mail to Jon Holloway (of PwC) et. al. (including Patrick Clackson), titled, "Valuation of Securities," and dated Dec-11-2008, Romain continues:

> I believe that is also the argument just presented to Patrick [Clackson] as acceptable from your [PwC] perspective…  [happy to view the balance as a receivable for the intervening 10 days if that helps, as per JP portfolio]
>
> The mid-prices that have been used to date are for 19 Sep. However, that's not too relevant – we could replace these prices with mid-prices for the 30th instead – the valuation adjustment necessary to get to 30th Sep bid would then be a different balancing number.  However there is no point conducting that exercise since the net fair value number will be the same (i.e. 30th Sep bid).

In a subsequent e-mail (e-mail to Jon Holloway et. al. (including Clackson), dated Dec-14-2008 (also at BCI-EX-00218500), Romain enclosed the Dec-11-2008 e-mail cited above and added:

> The measurement date is the acquisition date (Sunday 21 September – practically 19 September close).  However, our objective is to measure an appropriate bid level for the acquired securities.  By bid we mean a genuinely attainable exit price for Barclays taking into account the way in which securities were acquired and the pattern of events in the days following the completion.  In my mail below, by "control" I do not refer to legal ownership, which was established immediately upon completion of the acquisition, but rather practical control and the substantive ability to transact.
> 
>                                          * * *
> 
> We believe this to be the most representative way we look at the transaction for valuation purposes.  The opposing view is that we must use a market /model bid price on the date of legal ownership and the identified circumstances cannot be taken into account.  I [Gary

---

**Contains Highly Confidential Information**

21.    The use of September 30, 2008 as the "measurement date" for certain securities is confirmed by a Barclays document entitled "Lehman Opening Balance Sheet – Barclays Capital Valuation Methodology"[26] ("Barclays' Valuation Memo"), which describes the use of different valuation dates for certain types of securities.  According to Barclays' Valuation Memo, security types perceived as liquid (agency mortgages, corporate bonds, emerging markets, equities, and Treasuries/agencies) were valued using market data as of September 22, 2008.  Exceptions to this rule include corporate bonds, which were valued using "min of available 3rd party data (much of it Trace)."[27]

22.    A Barclays' valuation memo also describes the process for valuing securities perceived as illiquid (municipal bonds, and structured and securitized products of the PMTG).[28]  Municipal bonds were valued as of September 19, 2008, net of an "imbedded haircut."[29]  For PMTG assets sold between the Closing Date and September 30, 2008, the traded price was used to value the asset.  For PMTG assets that were still on hand at September 30, 2008, "the PTMG desk was utilized with liquidity haircut applied to desk mark to bring it to a fair value under the extenuating market conditions."[30]

23.    In his deposition, Professor Pfleiderer testified that the PMTG spreadsheet had many CUSIPs valued at sale price.  He stated:

> And whenever Barclays in those cases had an initial mark as they oftentimes did, and then a sale transaction that occurred very shortly thereafter, they took the initial mark with the liquidity adjustment as the – as the value to be assigned for that particular CUSIP.[31]

24.    Professor Pfleiderer opined further:

> And so it would be rather presumptuous for me to say that Barclays who is marking this at the actual sale that they realized is wrong and that there's a better

---

Romain] hope we can reach some common ground here [between Barclays and PwC] – happy to discuss further.

[26] BCI-EX-(S)-00213991-92.

[27] BCI-EX-(S)-00213991.

[28] BCI-EX-(S)-00213991.

[29] This may refer to a "liquidity haircut," as this asset class was described as "extremely illiquid at the time" in Barclays' Valuation Memo.  See discussion of Barclays' use of the terms "haircut" and "liquidity haircut" below.

[30] BCI-EX-(S)-00213991.

[31] Deposition of Professor Paul Pfleiderer, February 23, 2010, 110:20-111:12.

Contains Highly Confidential Information

indication of what value they could have realized than what they actually realized immediately after the transaction.[32]

25.    Professor Pfleiderer fails to acknowledge that the majority of the purported sales Barclays "realized" were internal transfers from one Barclays' book of accounts to another Barclays' book of accounts.  Specifically, Exhibit 533A distinguishes between $37.2 billion of assets transferred internally from the central book to a Barclays trading desk and $7.2 billion of assets that were sold externally to the market.[33]

26.    In addition, Professor Pfleiderer fails to define what sale constitutes a sale occurring "immediately after the transaction" and what sale constitutes a sale occurring "very shortly after the transaction."  He does not define how far out into the future a date ceases to meet his notion of "very shortly" or "immediately" after the September 30, 2008 transaction.  Professor Pfleiderer's notions of "very shortly after" and "immediately after" are vague and unscientific.  Moreover, any choice of a valuation date other than the Closing Date is incorrect and does not comply with relevant accounting principles.  (See Section 2(c) below).

    B.    ANNEX A

27.    Not valuing the securities on Annex A on the Closing Date of the Sale Transaction is incorrect.  Annex A is a list of securities delivered to Barclays in December 2008 under the Settlement Agreement between JPMorgan Chase Bank, N.A. ("JPMorgan"), Barclays Capital Inc., and James W. Giddens, as Trustee in the Securities Investor Protection Act Liquidation of Lehman Brothers Inc. dated December 5, 2008 ("Settlement Agreement").[34]  The Annex A securities were intended to be transferred to Barclays on the Closing Date as part of the Sale Transaction.[35]  The securities were held by JPMorgan and were not transferred to Barclays on the Closing Date due to various operational issues.[36]

---

[32] Pfleiderer Dep., 110:7-16.
[33] Exhibit 533A (BCI-EX-00295932-33, at BCI-EX-00295932)
[34] Settlement Agreement from SIPA.
[35] Declaration of Shari D. Leventhal, Federal Reserve Bank of New York, ¶22.
[36] Leventhal Declaration, ¶14.

**Contains Highly Confidential Information**

28.    The Annex A securities were valued as of December 22, 2008, the date of receipt by Barclays.[37]  Barclays' accounting/valuation rationale for using this valuation date appears to relate to a theory posited by Romain that they did not have "practical control and the substantive ability to transact".[38]  An email from Romain to Barclays' independent auditors, PwC, dated October 24, 2008, written in anticipation of delivery of the Annex A securities, states:

> Re the securities that JPM are (finally…) going to deliver to us – we need to value these on the date we receive them.  To go back to 19/9 would be inappropriate since we had no control over these securities between close date and delivery date.  The negotiation with JPM was over what value of cash/securities they were going to deliver to us – that value is determined by reference to the valuation on delivery date.[39]

29.    The documents and analyses supporting the Acquisition Balance Sheet also indicate that Annex A assets were valued as of December 22, 2008.[40]  Professor Pfleiderer concurred with Barclays' choice of December 22, 2008 (and not the Closing Date) as the measurement date for Annex A:

> [I]t was appropriate to judge, or value, I should say – again as an upper bound – the repo capital that was received as of December as of a December and not as of a September date.  So because of the complexity of what actually occurred, there is not a single date involved here.[41]

30.    Barclays' choice of a valuation date other than the Closing Date is incorrect and does not comply with relevant accounting principles.  (See Section 2(c) below).

C.  <u>VALUATION ADJUSTMENTS AND "HAIRCUTS"</u>

31.    Barclays used the terms "haircut," "liquidity haircut," and "liquidity discount" in its valuation analyses to describe different types of adjustments Barclays made to the value of securities included in the Acquisition Balance Sheet.  Barclays vested these terms with multiple meanings and the related Barclays adjustments include various components as described below.

---

[37] Romain Declaration, ¶19.
[38] BCI-EX-00218500-501.
[39] BCI-EX-(S)-00110050.
[40] BCI-EX-00108700.xls.
[41] Pfleiderer Dep., 131:8-16.

32.     The values in the Schedule A and Schedule B spreadsheets (Exhibit 86A and 641A) and the Annex A spreadsheets (Exhibit 87B and 641A), which support the amounts in the Acquisition Balance Sheet, contain a "market value w/ liquidity" table which is used to adjust the values reported in the Acquisition Balance Sheet.[42]  The "market value w/ liquidity" table is often net of various adjustments in addition to the typical "haircut" applied to repo collateral.  For example, the "market value w/ liquidity" table typically reflects a bid-offer adjustment (described below), but may also reflect an adjustment designed to result in an exit price mark as of a subsequent valuation date.  Below I discuss how Barclays used different valuation adjustments and related terminology to systematically understate the value of securities included in the Acquisition Balance Sheet.

### Opinion 2(a): The Practice of Marking Securities from Mid to Bid is Driven by Fair Value Accounting Rules and Results in a Conservative Valuation of the Securities.

33.     Barclays intended to record the securities acquired from Lehman at "exit price marks".

34.     Gary Romain, Head of Technical Accounting and Private Equity Finance for Barclays Capital, stated Barclays' objective was "to measure an appropriate bid level for the acquired securities."[43]  Patrick Clackson, Chief Financial Officer of Barclays Capital, further described Barclays' rationale for why positions were valued at bid level "under IFRS accounting rules":

> All trading positions, where you have a long position you value it at the bid and short position you value at the offer price.  The specific accounting rules around acquisitions are you have to fair value all the assets and liabilities when you acquire, when you do the acquisition, and in terms of fair valuing financial instruments you have to value long at bid and short at offer.[44]

35.     International accounting standards (i.e. IAS 39, ¶AG70) use the terms *bid-price*, *asking price*, and *current-offer price* but do not reference the term *exit price*.  Fair value

---

[42] Deposition Exhibits 86B (BCI-EX-00099519-521), 87B (BCI-EX-00108700), and 641A (BCI-EX-(S)-00213990-993).
[43] BCI-EX-00218500-1.
[44] Deposition of Patrick Clackson, September 4, 2009, 142:16-24.

**Contains Highly Confidential Information**

accounting rules under U.S. GAAP allow the practice of marking from mid to bid in an effort to approximate an "exit price."[45]  The practice of marking from mid to bid yields a conservative measure of fair value.  Such conservative measures of fair value recorded by Barclays on the Acquisition Balance Sheet serve to understate the value of Barclays' Windfall rather than overstate the value of Barclays' Windfall as Professor Pfleiderer states in his report.

36.    Professor Pfleiderer incorrectly opined that:

> Because the applicable accounting standards do not permit recognition of some economically important factors such as the sheer size (and consequent illiquidity) of the positions, which in this case would have made the "fair value" of many positions difficult or impossible to realize in an actual sale, these **"fair values" likely overstate the actual economic value of the acquired trading assets** and should be viewed as stating an upper bound on the range of actual economic value.[46]

37.    Professor Pfleiderer further stated:

> Importantly, there are additional factors that may be relevant to understanding the economics of the Transaction that are not reflected in exit/bid prices developed by Barclays. These are not "fire sale" prices, nor are these "bulk" prices that take into account either the size of individual positions or the overall size of the transaction. (As I mentioned before, it is my understanding that applicable accounting rules do not allow these factors to be taken into account for purposes of developing "fair value" estimates of asset values of the type set forth in Barclays' acquisition accounting statement.) These factors, had they been taken into account, would have led to lower marks and to a lower assessment of the value of the trading assets acquired by Barclays. Importantly, these considerations would be relevant to an economic assessment of what Barclays received. Thus, the "fair value" valuation of the securities and assets Barclays received from Lehman in the Fed Replacement Repo at Barclays exit price marks is an upper bound on the reasonably estimated value of those assets.[47]

38.    Professor Pfleiderer's opinions appear to ignore the relevant accounting rules, such as IFRS 39 ¶48A, which explicitly states: "The chosen valuation technique makes maximum use of market inputs and relies as little as possible on entity-specific inputs.  It

---

[45] SFAS 157 *Fair Value Measurements,* ¶7.  For similar references to exit price see SFAS 157 Summary and SFAS 157 ¶16, 17, 30, A2, A8, A27, C13, C16, C21, C23, C26, C29, C52, C63, C84.
[46] Pfleiderer Report, Footnote 40 (emphasis added).
[47] Pfleiderer Report, ¶59.

**Contains Highly Confidential Information**

incorporates all factors that market participants would consider in setting a price and is consistent with accepted economic methodologies for pricing financial instruments."[48]

39.    Fair value measurement methods do not stipulate that exit price marks establish the upper bound on the economic values.  To the contrary, relevant accounting principles require the preparer to incorporate all factors that market participants would consider when measuring the exit price marks.

40.    In addition to the understatement to the Barclays Windfall caused by the fair value methods used in the Acquisition Balance Sheet, Barclays' inconsistent and subjective use of its methods intended to establish exit price marks further understates the value of Barclays' Windfall.


### Opinion 2(b): Barclays Inconsistently and Subjectively Applied the Methods Used to Mark Securities from Mid to Bid in the Acquisition Balance Sheet.

41.    This opinion describes various inconsistencies and flaws in the methods Barclays employed in measuring the securities included in the Acquisition Balance Sheet.  In addition, I alert the court that Professor Pfleiderer either ignores these flaws and inconsistencies in his analysis or accepts them without any analysis or consideration of the effects of such information on his opinions.

42.    In some cases, Barclays computed exit price marks by adjusting the mid-value (the midpoint between bid and ask prices) by what it called a "bid-offer adjustment," which was computed as half of the spread between the bid and ask prices.  Subtracting the bid-offer adjustment from the mid-value results in a hypothetical price Barclays would receive if it sold the asset.  Patrick Clackson described how Barclays determined bid prices in the Acquisition Balance Sheet:

> So for some things you would be able to see bid offer quotes on things for those markets at that point in time, and where those are available those are what we used.  For more illiquid markets you would have to try and look at trades or trades near that date to try and work out what the right bid price for those assets were.

---

[48] IAS 39, ¶48A (emphasis added.) (cited in Appendix III of this report).

**Contains Highly Confidential Information**

As I said, it was a lot of work done, which is partly why it took a lot of time to complete the acquisition balance sheet.[49]

## A. GENERAL INCONSISTENCIES AND SUBJECTIVITY IN BARCLAYS' MID TO BID ADJUSTMENTS IN THE ACQUISITION BALANCE SHEET.

43.    This section documents how Barclays deviated without any explanation, reason or support from its own alleged mid to bid adjustment policy and procedure.

44.    In an e-mail to PwC, Mark Washtell of Barclays claims: "The methodology is consistent with the firms [*sic*] provisioning policy statement which states we can apply bid-offer [discount] at portfolio level rather than instrument by instrument."[50]  In the same e-mail Mr. Washtell admits Barclays' subjective application of the purportedly compliant method: "**Most of what we do is subjective to some degree**, this is not the only example, and **we regularly use our experience to recommend the most appropriate approach in such circumstances**, this is no different."[51]

45.    Similarly, Mr. Clackson described the process for updating the asset valuations once the assets were recorded:

> We do different things for different portfolios.  So for some portfolios we revalue them daily at midmarket, and then we have a bid offer adjustment across the whole portfolio.  For other portfolios we may value individual positions on bid and offer.  More normally I think for the bigger portfolios we have a bid offer adjustment across the portfolio and we use a similar mechanism to work out what that should be.[52]

46.    Exhibits 86B, 87B and 641A (which support the Acquisition Balance Sheet amounts for Schedules A and B, and for Annex A, respectively) each include a tab called "liquidity" which contains a table of "haircuts" for various asset classes.  These tables represent Barclays' purported bid-offer adjustments for each asset class and security type.  However, Barclays did not apply the liquidity haircuts uniformly to each asset class.[53]

---

[49] Deposition of Patrick Clackson, September 4, 2009, 144:17 – 145:2.
[50] BCI-EX-00248365-79, at BCI-EX-00248368 (underline in the original).
[51] BCI-EX-00248365-79, at BCI-EX-00248368 (emphasis added).
[52] Clackson Dep., 145:11-19.
[53] *See* Clackson's testimony related to Barclays' determination of bid prices in the Acquisition Balance Sheet. (Clackson Dep., 145:11-19).  A review of Exhibits 86B and 87B confirms Clackson's statement and Barclays' inconsistent valuation adjustments within asset classes.  For example, regardless of asset class, Barclays applied no liquidity discount to Annex A securities with unit price lower than $10.00.  (*See* if-

47.    In several instances the "market value w/ liquidity" table comingles the liquidity discount on a position with a price adjustment Barclays arbitrarily applied by choosing a valuation date other than September 19 or September 22, 2008.[54]  Professor Pfleiderer's testimony is relevant:

> And whenever Barclays in those cases had an initial mark as they oftentimes did, and then a sale transaction that occurred very shortly thereafter, they took the sale transaction rather than the initial mark with the liquidity adjustment as the -- as the value to be assigned for that particular CUSIP.[55]

### B.  BARCLAYS INCONSISTENTLY AND SUBJECTIVELY APPLIED THE METHODS USED TO MARK LEHMAN'S EQUITY POSITIONS FROM MID TO BID IN THE ACQUISITION BALANCE SHEET.

48.    In an email to PwC dated December 12, 2008, Barclays described a purported 1.32% bid-mid spread adjustment to Lehman's equity positions:

> The values that we receive for the Equity prices are based on last traded.  For simplicity we have assumed that these are mids and so we need to make an adjustment to move these to the bid side of the market.  A more conservative assumption would be that the prices are offers (which is [*sic*] a rapidly falling market is probably more realistic) which would obviously lead to a larger adjustment.
> Based on an analysis of the securities we were able to obtain bid/offer spreads for about 2100 of the 3700 securities which had an average bid/offer of 2.64%.  This again would be a conservative estimate as the securities with a quoted bid offer would most likely be the most liquid and hence trading at the tightest spreads. The mid to bid spread would then be 1.32% leading to a mid-bid adjustment of $132 mm or an offer to bid adjustment of $264mm.[56]

49.    In practice, Barclays applied arbitrary bid-offer adjustments.  Specifically, Barclays applied a 4.32% (and not the 1.32%) bid-offer adjustment to the value of equities.[57]  This 4.32% bid-offer adjustment Barclays applied is incorrectly computed.

---

statement formula in column W, tab "Portfolio 3" in the native file format of Exhibit 87B (BCI-EX-00108700.xls).

[54] My Opinion 2(c) (below) addresses Barclays' non-compliant and arbitrary choice of alternative valuation dates.

[55] Deposition of Professor Paul Pfleiderer, February 23, 2010, 111:3-12. (emphasis added)

[56] BCI-EX-00218502-503, at BCI-EX-00218503.

[57] This was derived by computing the spread as of December 18, 2008 and deriving the implied spread as of September 22, 2008.  The implied spread was based on the change in spread over that time frame for securities for which spread data was available on both dates (0922 Equities Bid-Offer (BCI-EX-00255172).xls).

**Contains Highly Confidential Information**

C. BARCLAYS INCONSISTENTLY AND SUBJECTIVELY APPLIED THE
METHODS USED TO MARK THE EXCHANGE TRADED OPTIONS
(ETO) PORTFOLIO FROM MID TO BID IN THE ACQUISITION
<u>BALANCE SHEET.</u>

50.    Barclays intended to apply the following method to adjust the valuation of

exchange traded options ("ETO"):

> In principle, we [Barclays] value long positions at bid and value short
> positions at ask.  In practice, we [Barclays] value a position in the following
> formula:
>> Net Valuation    = mid-value + bid-value
>> = position*(bid+ask)/2*100 – abs[position*(ask-bid)/2*100]
>> where position is positive (negative) if long (short, resp.).
> Please note that the formula exactly reflects the principle.  The advantage of
> this formula provides us a way to better estimate the bid-mid value in order
> to minimize the data noise in the market.[58]

51.    In practice, Barclays employed multiple valuation methods to ETOs leading to

exceptions and inconsistencies when calculating the mid-to-bid adjustments in the

Acquisition Balance Sheet.  Specifically:

- For positions with no independent pricing data, Barclays used the ADP

    prices[59] as ask and generated a bid based on the formula:[60]

$$Bid = Max [ask*(1-95\%), \$6]$$

    Barclays' choice of ADP prices as a proxy for ask prices is unsupported.  The

    record is unclear whether the ADP prices were *bid*, *ask* or *daily closing* prices

    and how frequently the ADP prices were updated.  In addition, Barclay's

    choice of $6 as a parameter in the formula is subjective and unsupported.

- When applying its net valuation adjustment for ETOs, Barclays used different

    dates for the bid-mid value and mid-value inputs for the same computation.

    Specifically, Barclays used mid-value ($509 million) as of end-of-day

    ("EOD") on September 22, 2008 and bid-mid value ($531 million) as of EOD

    on September 19, 2008 in the same net valuation.[61]  Regardless of whether

    September 19th or September 22nd is the proper measurement date, if Barclays

---

[58] BCI-EX-(S)-00110233-38, at BCI-EX-(S)-00110237.
[59] I understand that Automatic Data Processing, Inc. (ADP) served as pricing-data repository for Barclays.
[60] BCI-EX-(S)-00110233-38, at BCI-EX-(S)-00110237.
[61] BCI-EX-(S)-00110233-38, at BCI-EX-(S)-00110237-38.

performed the same net valuation and used both the mid-value ($509 million)
and the bid-mid value ($352 million)[62] as of EOD on September 22, 2008, the
net valuation of Barclays exchange traded option portfolio would have been
$861 million rather than $1,040 billion.  This inconsistency again understates
Barclays Windfall.

### D. BARCLAYS INCONSISTENTLY AND SUBJECTIVELY APPLIED THE METHODS USED TO MARK ITS AGENCY CMO PORTFOLIO FROM MID TO BID IN THE ACQUISITION BALANCE SHEET.

52.     Barclays' PCG applied a ten percent bid-offer discount to Agency Collateralized
Mortgage Obligations ("Agency CMO") "to appropriately measure the market
uncertainty and potential valuation adjustments resulting from more observable data."[63]
PCG rationalized the ten percent discount to PwC (i) by comparing differences in
observable pricing indicators from "various sources" at the bond level, and (ii) by
analyzing a trade sample of 39 agency bonds that had a buy and a sell on the same day.[64]

53.     The PCG rationalization for the ten percent discount on Agency CMOs is
subjective and unsupported.  PCG incorrectly used an intra-day trading range (i.e. the
spread between "a buy and a sell on the same day")[65] as a proxy for bid-ask spread,
which is measured using trading prices as of the exact same instant in time.  Using
intraday trading ranges instead of bid-ask spreads introduces bias in PCG's measure of
the bid-offer discount for Agency CMOs.

54.     PCG incorrectly applied the same 10% liquidity discount to the whole Agency
CMO portfolio.  A review of the limited sample of 39 CUSIPs that Barclays used proves
that the Agency CMOs have significantly different risk profiles and daily trading
patterns.  One half of the sample had intraday trading ranges of 15.92% to 23.93%.  The
second half of the sample had intraday trading ranges of 0.03% to 1.48%.[66]  Barclays had
no basis in applying the same 10% across the whole Agency CMO portfolio, without
further investigating the risk characteristics and the trading profiles of the Agency CMO
securities.

---

[62] BCI-EX-(S)-00110233-38, at BCI-EX-(S)-00110238.
[63] BCI-EX-00248415-58, at BCI-EX-00248415.
[64] BCI-EX-00248415-58, at BCI-EX-00248415.
[65] BCI-EX-00248415-58, at BCI-EX-00248415.
[66] BCI-EX-00248415-58, at BCI-EX-00248416 (see column "B/O %").

**Contains Highly Confidential Information**

E.   PROFESSOR PFLEIDERER EITHER IGNORES THE INCONSISTENCIES
AND SUBJECTIVITY IN BARCLAYS' MID TO BID ADJUSTMENTS IN
THE ACQUISITION BALANCE SHEET IN HIS ANALYSIS OR
ACCEPTS THESE FLAWS AND INCONSISTENCIES WITHOUT ANY
ANALYSIS OR CONSIDERATION OF THE EFFECTS OF SUCH
<u>INFORMATION ON HIS OPINIONS.</u>

55.    In his report Professor Pfleiderer stated:

Adjustments of mid-point marks to bid-quote levels was intended to assure that
the valuations used in Barclays' financial statements were computed at "exit
prices" that reflected what Barclays likely would receive in an orderly sale of the
assets in question, as I understand is required by applicable accounting
standards.[67]

56.    Professor Pfleiderer further stated:

Barclays typically reduced mid-point prices for ALT-A mortgage backed
securities by 10% or 15% to adjust them to exit prices, with the size of the
adjustment varying across different types of ALT-A products. [68]

57.    At his deposition, Professor Pfleiderer acknowledged the exceptions,

inconsistencies and subjectivity Barclays applied when making the mid to bid

adjustments:

It was not the case that the haircut was uniformly applied to securities based upon
type. And one example where that's not true are [*sic*] the corporate securities, ones
that are labeled "corporate".
                              * * *
[N]o liquidity discount is being taken off of that on the spreadsheets that are
related to liquidity discounts. Rather what is done is keying off of the minimum of
the various quotations that were obtained.
So what that means, of course, is that within the class of corporate securities, it is
not the case that a uniform treatment is being applied in terms of a percentage
reduction because it's based upon actual quotations that are coming from the
market.
                              * * *
[A]nd there were asset classes where it was generally the case that a haircut,
liquidity haircut is what I believed they called it at time, was applied generally
across CUSIPs.  But there were exceptions to that. So I would have to go back
and look to see if there were any asset classes for which all of the CUSIPs within
that class -- and that would include the initial inventory and the J.P. Morgan

---

[67] Pfleiderer Report, ¶51(9).
[68] Pfleiderer Report, Footnote 100.

**Contains Highly Confidential Information**

inventory. It was uniform across all of those because there were some exceptions.[69]

58.    Professor Pfleiderer failed to analyze the impact of the incorrect and subjective mid to bid adjustments Barclays made.

### Opinion 2(c): Barclays' Use of Valuation Dates after September 22, 2008 is not Supported by the Accounting Literature and Results in Understated Values for Certain Securities in the Acquisition Balance Sheet.

59.    This opinion describes the flaws in the valuation date methods employed by Barclays in the Acquisition Balance Sheet and how Professor Pfleiderer accepted the flaws and inconsistencies with no discussion or analysis in his report.

### A.    THERE IS NO SUPPORT IN IAS OR U.S. GAAP.

60.    IAS and U.S. GAAP instruct the acquirer to use the acquisition date as the measurement date when accounting for assets acquired in a business combination.[70] Gary Romain was fully aware of this reporting requirement: "[t]he measurement date is the acquisition date (Sunday 21 September – practically 19 September close)".[71] Yet, in the same email, Romain develops and applies his alternative theories of "practical control" and "substantive ability to transact," both of which are not referenced anywhere in US GAAP or IFRS.[72]

61.    Barclays' use of alternate valuation dates other than the acquisition or measurement date (September 19, 2008) is unsupported and results in a lower valuation of assets in the Acquisition Balance Sheet and serves to increase Barclays' Windfall.

62.    Paradoxically, Barclays applied judgment in choosing several different measurement dates to value the assets acquired, yet as of September 19, 2008, Barclays recognized the obligation for and began servicing liabilities related to the financial assets Barclays acquired from Lehman.  For example, in a letter to the Commodity Futures

---

[69] Pfleiderer Dep., 27:5 – 29:23.
[70] IFRS 3, ¶24 (cited in Appendix III).
[71] BCI-EX-00218500-501.
[72] BCI-EX-00218500-501.

**Contains Highly Confidential Information**

Trading Commission dated September 19, 2008, Archibald Cox, Chairman of Barclays Americas stated:

> [B]arclays will be responsible for any variation margin or other payment obligations due to derivatives clearing organizations on Monday, September 22, 2008, arising from positions in futures or options on futures carried in the accounts of LBI customers that are transferred to Barclays pursuant to the Agreement[73]

63.    Similarly, the Transfer and Assumption Agreement between Barclays and the Options Clearing Corporation ("OCC") indicates that Barclays assumed the obligations related to the margin accounts at the OCC as of the acquisition date.[74]

### B.  THE VALUATION DATES CHOSEN BY BARCLAYS ARE INCONSISTENT AND UNSUPPORTED.

64.    Barclays chose inconsistently and selectively and without regard to the accounting rules the dates on which to value certain securities.  The dates chosen and the rationale used to support the decision are not well developed and lead to an understatement of Barclays' Windfall.  Such subjectivity in Barclays' choice of measurement dates introduces managerial bias.  It is unclear when in the minds of Barclays' management a subsequent sale loses its probative value with respect to the Acquisition Balance Sheet – is it 10 days, 30 days, 90 days, 180 days, or 365 days.  Taken to an extreme, Barclays' choice of subsequent valuation dates could have extended to measurement dates as far as twelve months after the acquisition date which is not the spirit of the business combination accounting standards.

65.    The Giants Stadium Bonds illustrate the effects of the arbitrary nature of Barclays' choice of valuation dates.  Professor Pfleiderer describes the bonds issued by The New York Giants in Item 6 on Appendix Four to his report: "[a]ccording to Barclays' position detail spreadsheets, Barclays valued the Giants auction rate securities it acquired, for accounting purposes, at their indicated values using BoNY's marks (which ranged from about $10 per $100 of face value to about $44 per $100 of face value), without further downward adjustment."[75]  Subsequently, on various dates from

---

[73] BCI-EX-00258394.
[74] Exhibit 51.
[75] Pfleiderer Report, Appendix Four, Item 6, *Giants Stadium Bonds*, page 112.

April 28 through May 19, 2009, Barclays sold the Giants Stadium Bond positions and realized a cumulative gain of at least US$349,329,865.[76]  Barclays chose not to use the subsequent sales price in this case to value the Giants Stadium Bonds in the Acquisition Balance Sheet but to use the lower BoNY mark to value the bonds in the Acquisition Balance Sheet.[77]

### C.  THE OPINIONS OFFERED BY PROFESSOR PFLEIDERER REGARDING THE USE OF SUBSEQUENT MEASUREMENT DATES ARE FLAWED.

66.    Professor Pfleiderer appears to understand how subsequent events and market movements affect the fair value of an asset.  Discussing his hypothetical example at paragraph 66 of his report, Professor Pfleiderer correctly concludes that the $200,000 price a classic automobile attains in an auction "says little or nothing" about "whether the buyer in the original transaction paid fair value for the car six months ago."[78]

67.    However, Professor Pfleiderer fails to consider the effects of subsequent events or market movements on the trading portfolio assets Barclays acquired from Lehman from the acquisition date to the subsequent date of sale.  For example, when discussing how Barclays recorded the "125 different CMOs" with "aggregate indicated value of $237.7 million" (at BoNY marks), Professor Pfleiderer states: "Because these positions were sold off quickly, Barclays did not finalize September 22 exit price marks for these positions, but **instead valued them for financial accounting purposes at their actual sales value**."[79]  Professor Pfleiderer accepts Barclays' choice of valuation date without any analysis or discussion of the accounting rules.  He does not examine how the subsequent sale prices for the collateralized Alt-A securities differ from their respective fair values as of the acquisition date.

68.    Similarly, in his deposition testimony Professor Pfleiderer acknowledged Barclays' choice of alternative valuation dates for PMTG assets as follows:

---

[76] BCI-EX-00297320 (a native format document produced by Defendants in support of Exhibit 533-A).
[77] BCI-EX-00297320 (a native format document produced by Defendants in support of Exhibit 533-A) and BCI-EX-00295932-33 (Dep. Ex. 533A), (showing a reduction of the four Giants Stadium Bonds held by Dec-31-2008 of $102,000,000 and a gain of $349,329,865).  The actual transactions between Sep-19-2008 and Dec-31-2008 that resulted in these gains were not produced in discovery.
[78] Pfleiderer Report, ¶66.
[79] Pfleiderer Report, Appendix Four, Item 1, *Collateralized ALT-A mortgage obligations issued by Structured Adjustable Rate Mortgage Loan Trust*, at 107.

**Contains Highly Confidential Information**

> [W]henever Barclays in those cases had an initial mark as they oftentimes did, and then a sale transaction that occurred very shortly thereafter, they took the sale transaction rather than the initial mark with the liquidity adjustment as the value to be assigned for that particular CUSIP.  And if we open up that spreadsheet, I can show you numerous examples.[80]

69.    Moreover, Professor Pfleiderer appears to ignore the fact that many of the sale prices were realized from internal transfers that may not represent arms-length transactions.  In fact, many of the alleged "subsequent sales" represent internal transfer prices among Barclays' related trading entities at prices influenced by Barclays' management.  Such internal transfer prices warrant additional testing and verification before serving as proxies for fair value.

70.    Professor Pfleiderer also repeatedly stated in his report and deposition that he is not a Certified Public Accountant ("CPA") and that he was not qualified to interpret accounting rules.  Yet in his deposition, Professor Pfleiderer indicated that the use of the subsequent sale price as a proxy for an exit price in the Acquisition Balance Sheet was correct.[81]  Professor Pfleiderer's statements in his deposition are logically inconsistent with the assertions in his report.  In addition, Professor Pfleiderer provides insufficient foundation and insufficient evidence to support his testimony.  Professor Pfleiderer admits that he is not a CPA and not qualified to interpret the rules while at the same time he opines that the methods and judgments made by Barclays are correct from a financial accounting perspective.


**Opinion 3:   Professor Pfleiderer's Evaluation and Reliance on PwC's "Extensive" Testing of Barclays' Exit Price Marks are Flawed.**

71.    This section analyzes the flaws in Professor Pfleiderer's reliance on the "extensive investigation and testing of Barclays exit price marks by PwC."  As highlighted below, Professor Pfleiderer's assumptions and assertions regarding PwC's procedures lack foundation and appear to be predicated on an incomplete analysis and insufficient understanding of the facts.

---

[80] Pfleiderer Dep., 111:3-12.
[81] Pfleiderer Dep., 89:13-90:17, 110:7-113:23, 131:3-133:9

**Contains Highly Confidential Information**

### A.  PROFESSOR PFLEIDERER DID NOT EVALUATE PWC'S TESTING PROCEDURES.

72.      In Paragraph 51(12) to his report, Professor Pfleiderer concludes that "PriceWaterhouseCoopers conducted an extensive audit of Barclays' final summary of the Acquisition, which included extensive investigation and testing of Barclays exit price marks."  Similarly, in his deposition Professor Pfleiderer includes several references describing his reliance on the PwC reviews.[82]

73.      In his report, Professor Pfleiderer does not provide the basis for his opinion regarding the extensiveness and reliability of PwC audit procedures.  He does not provide any evaluation of the procedures PwC performed and does not assess nor identify which PwC procedures meet his definition of "extensive audit."  In addition, in his deposition, Professor Pfleiderer admitted that his understanding of the "thorough review" PwC performed of Barclays' procedures is based on hearsay or perhaps on a telephonic conversation.[83]

### B.  PROFESSOR PFLEIDERER'S RELIANCE ON PWC'S "EXTENSIVE" TESTING OF BARCLAYS' EXIT PRICE MARKS IS UNSUPPORTED.

74.      Professor Pfleiderer does not provide any analysis of his understanding of the professional responsibilities of PwC regarding its audit of Barclays' Acquisition Balance Sheet.  He does not analyze the audit assertions PwC is making in its engagement for Barclays nor does he provide any analysis or explanation for many of the misstatements and aggressive judgments utilized by Barclays in the Acquisition Balance Sheet.

75.      Professor Pfleiderer's opinion regarding the "extensive investigation and testing of Barclays exit price marks by PwC" is not supported by a review of the procedures documented in the PwC work papers and made available to Professor Pfleiderer at the time he included this opinion in his Pfleiderer Report.

76.      Appendix V presents an overview of the audit process.  Appendix VI summarizes the relevant standards and guidance auditors should consider when auditing fair value measurements and disclosures.

---

[82] Pfleiderer Dep., 253:25-254:8, 260:3-10, 322:5-11.
[83] Pfleiderer Dep., 260:11-24.

### C. REVIEW OF THE PWC WORKPAPERS PROFESSOR PFLEIDERER RELIED UPON.

77.     Counsel for Defendant Barclays identified that Professor Pfleiderer relied on data and documents in BCI-EX-00247453 – BCI-EX-00295654 to arrive at his conclusion regarding the "extensive audit" PwC performed.[84]

78.     I reviewed the PwC production Professor Pfleiderer relied upon (BCI-EX-00247453 – BCI-EX-00295654) and noted that PwC performed extremely limited tests of Barclays exit price marks recorded on Barclays Acquisition Balance Sheet.[85]  PwC testing of Barclays' exit price marks, as documented in BCI-EX-00247453 – BCI-EX-00295654, was limited to:

- Collecting emails that documented Barclays' procedures;

- Collecting from PCG price changes of JPM securities from December 22 to December 30, 2008;

- Checking for arithmetic accuracy;

- Annotating a draft acquisition balance sheet;[86]

- Confirming par values (and not fair values) for small samples of securities or positions;[87]

- Verifying with Bloomberg the imputed interest on a small-sample (15 out of 8,839 positions) of acquired securities;

---

[84] Letter from Jonathan W. Davenport, dated February 6, 2010, ¶3(k).  The range BCI-EX-00247453 – BCI-EX-00295654, specified in Davenport's letter, corresponds to data and documents produced on two disks (Disk 9 and 10) as part of a larger production by Defendants in January 2010.

[85] PwC workpapers document other testing procedures not related to testing the valuation of the financial assets acquired. Some of these unrelated procedures, PwC performed include:
- Cash balance and bank reconciliations,
- E&Y workpapers testing the cash-flow based valuations of real estate,
- PwC testing of fixed assets and E&Y schedules of Fixed Asset contributory charges,
- PwC cash reconciliation, E&Y assembled workforce workpapers and PwC bonus testing,
- Customer relationship valuation tests,
- Testing internal controls and account balances over PIM and 15c3 customer accounts,
- Testing system capabilities, data transfers and functionality for Lehman's legacy information technology systems, and
- Testing of FTD (failed-to-deliver) and FTR (failed-to-receive) trade exceptions

[86] BCI-EX-00248592

[87] BCI-EX-00249452.xls (*PwC Testing-Additional Securities* produced in native file format).

---

**Contains Highly Confidential Information**

- Testing the 12/31/2008 prices of 886 CUSIPS of additional unencumbered assets: equities, corporate bonds, municipal bonds and one CMO (DLJ Mortgage Acceptance);[88] and

- Testing a sample at 12/31/2008 (40 out of 161) PL1 Municipals America GQE positions – PwC tested price versus S&P, FTID, MSRB, SCPG, GFS.[89]

79.    All of the tests above used Bloomberg and S&P as pricing benchmarks.  I was not able to find any independent valuation model or logarithm that PwC used to test Barclays' exit price marks.

80.    The documents Professor Pfleiderer alleges he reviewed while preparing his report do not seem to support his conclusion that PwC undertook an "extensive investigation and testing of Barclays' exit price marks".  Professor Pfleiderer's assertions in his report are flawed and lack sufficient foundation as illustrated by his understanding of audit work undertaken by PwC and his conclusion regarding PwC's "extensive investigation and testing of Barclays exit price marks".

### D.  REVIEW OF THE PWC WORKPAPERS PRODUCED AFTER PROFESSOR PFLEIDERER FILED HIS REPORT

81.    On February 12, 2010, PwC produced additional documents, hereafter referenced as "the February 12, 2010 PwC production."[90]

82.    While PwC performed certain procedures, it is not clear whether an extensive investigation and testing was performed.  "An extensive investigation and testing of Barclays exit price marks" includes

- Examination of evidence regarding the existence of a right on an asset;

---

[88] BCI-EX-00255181.xls (*New LBI Firm Asset List A 12312008 FINAL* produced in native file format).
[89] BCI-EX-00258590.xls (*Lehman Cash Muni Price Testing 20081231 PwC* produced in native file format)
[90] *See* Letter from Martine M. Beamon (Davis Polk & Wardwell LLP) to William J. Hine, dated February 12, 2010, describing the PwC production to include documents bearing production numbers PwC-BarCapWP 000000001 – 00128004.  The documents produced in the February 12, 2010 production "include (1) documents from the section of the electronic PwC LLP audit workpaper database related to the work performed in connection with the Lehman acquisition, (2) external workpaper documents corresponding to those electronic workpapers, and (3) emails collected from seven custodians for the time period between September 12, 2008 and March 31, 2009."  Footnote one to this letter lists the seven custodians: Michael Guarnuccio, Paul Lameo, Robert MacGoey, Jalen Tan, Eric McGuinn, Lissette Palacios and Norbert Porlein.

- Inspection of the facilities, such as the Giants Stadium or architectural drawings, building site thereto;

- Documentation of the reasonableness of management assumptions and models used for deriving Barclays measures of fair value and independent assessments of the fair values Barclays derived;

- Selection and testing of a sample of appropriate size and characteristics from the eleven thousand securities Barclays acquired from Lehman (evaluate additional sampling requirements for Level II and Level III securities which represent greater audit risks);

- Analysis of the contractual documents for each security valued to understand its characteristics such as: (1) structure of the security and it tranches, (2) the priority of cashflow distributions, (3) the events triggering default of additional margin requirements;

- Construction of cash flow scenarios and alternative scenarios based on varying market inputs (e.g. prepayment rates, default rates, mortality rates; interest rates and expected interest rate; political risk for government bonds).

83.    Based on my review of the PwC procedures performed on Barclays' exit price marks (as documented in the February 12, 2010 PwC production), PwC most likely did not perform an extensive investigation and testing in light of the following deficiencies in the valuations included in Barclays' Acquisition Balance Sheet:

- Pine CLO:

    o  Without reviewing the underlying deal documents and without testing or investigation, PwC accepted Barclays' incorrect valuation of the Pine CLO.  In deriving its valuation, Barclays failed to recognize the inverted structure of the CLO and its own senior position within that structure. This means that Barclays itself failed to recognized that in the Pine structure, Barclays' senior Class A-1 position was fully funded and not responsible for any additional cash contributions that could arise from additional funding requests from the underlying borrowers.

**Contains Highly Confidential Information**

- o Barclays incorrectly assumed a 70% probability that Barclays, as the holder of the Class A-1 tranche, would be obligated to fund the entire amount of the remaining balance available to be drawn upon by the underlying borrowers. Barclays also failed to recognize, as provided in the deal documents, that Lehman, a bankrupt entity, would be responsible for providing any additional funding. Barclays incorrectly assigned a "ZERO" probability to the most likely outcome that the Pine Trustee or the Lehman Bankruptcy Trustee or both, post Lehman bankruptcy, would prevent the funding of any additional advances due to the Lehman bankruptcy.

- o Barclays, as the holder of the class A-1 tranche, would have first claim on the assets of the CLO, which according to Barclays, included $367 million of cash investments and $697 million of funded loans. Barclays valued this cash and loans totaling $1,064 million at $428.6 million (or at a price of 40.3 cents on the dollar). Had Barclays properly recognized the structure of Pine, and left all of Barclays' other valuation assumptions, probabilities and scenarios the same, Barclays' valuation would have been significantly higher.[91]

- Barclays' PCG applied a ten percent bid-offer discount to Agency Collateralized Mortgage Obligations ("Agency CMO") "to appropriately measure the market uncertainty and potential valuation adjustments resulting from more observable data."[92] PCG rationalized the ten percent discount to PwC (i) by comparing differences in observable pricing indicators from "various sources" at the bond level, and (ii) by analyzing a trade sample of 39 agency bonds that had a buy and a sell on the same day.[93] The PCG rationalization for the ten percent discount on Agency CMOs is subjective and supported by an incomplete analysis. Certain buy and sell quotations for the select securities appear to be from different periods of the day and not from

---

[91] Expert Report of Mark E. Slattery, CFA filed in this litigation on March 15, 2010, at 22.
[92] BCI-EX-00248415-418
[93] BCI-EX-00248415-418

**Contains Highly Confidential Information**

the same trading instant.  Such buy and sell quotations serve to approximate the intraday trading range for a security and not the bid-ask spread.

- Barclays applied a five percent "liquidity discount" to notes that were maturing within days of the acquisition date or exhibited risk profiles inconsistent with Barclays discounting.  Such unwarranted liquidity discounts resulted in exorbitant yields on specific Barclays' discount notes.  For example, CUSIP RTD019828 resulted in an implied yield of 643.4% on a $50 million bond three days prior to the bond's maturity.  Similarly, CUSIP RTD019885 resulted in an implied yield of 276.8% seven days prior to its maturity.  Cumulatively, the yield analysis of the discount notes resulted in approximately $140 million understatement of Barclays Acquisition Balance Sheet.[94]

- Barclays relied on aggressive and unsupported concepts of control by using Romain's theories of "practical control" and "substantive ability to transact" as a premise to support subsequent valuation dates for the securities Barclays acquired from Lehman.  The valuations resulting from the subsequent valuation dates serve to understate Barclays Windfall.

- Barclays PCG used proxies (Lehman CDS) for an actively traded instrument (Lehman commercial paper) with recorded prices (on the TRACE system).[95] Specifically, on September 22, 2008, Barclays PCG remarked $2.2 million of Lehman commercial paper "positions at 9.5%, using Lehman CDS as a proxy for senior unsecured recoveries."  Lehman senior unsecured bonds were actively trading with recorded prices on the TRACE database.  The TRACE database was developed by FINRA and dealer adherence to timely reporting is regulated by the SEC.  Barclays PCG approach to approximate Lehman bond prices with Lehman CDS was unwarranted and allowed Barclays PCG to apply managerial judgment and introduce bias in valuing an instrument with an observable price.

---

[94] Expert Report of Mark E. Slattery, CFA filed in this litigation on March 15, 2010, Table 4 "Yield Analysis of Discount Notes".
[95] PwC-BarCapWP_00022935-48, at PwC-BarCapWP_00022943.

- Barclays asserted that "Utilizing vendor pricing including BONY, Bloomberg or other sources provides a reasonable basis for the Company's estimation of fair value." [96] The record indicates that Barclays inconsistently and subjectively applied this pricing procedure in estimating fair value. For example, Barclays recorded CUSIP 656533AA4 and CUSIP 458204AD6 in the Acquisition Balance Sheet at prices different from the BoNY marks. Specifically, Barclays recorded CUSIP 656533AA4 (with nominal principal value of $62,346,775 and BoNY mark of $55,319,670) in the Acquisition Balance Sheet at $49,715,318. [97] Similarly, Barclays recorded CUSIP 458204AD6 (with nominal principal value of $15,000,000 and BoNY mark of $12,825,000) in the Acquisition Balance Sheet at zero. [98] These are just two examples of securities that were recorded in the Acquisition Balance Sheet using procedures that deviated from Barclays' stated policy.

- Barclays PCG appears to have made an aggressive valuation of the Giants Stadium Bonds in the Acquisition Balance Sheet. [99] PwC wrote: "Utilizing vendor pricing including BONY, Bloomberg or other sources provides a reasonable basis for the Company's estimation of fair value." Barclays PCG subjectively chose to use BONY prices for the Giants Stadium bonds despite e-mails, attached to the Summary indicating that Barclays substantially moved the price marks in October – one month following the transfer of the bonds to Barclays. Further, in its price testing, PwC seems to indicate a non-investment grade rating for Giants Stadium LLC resulting in a deeply discounted price. For example, the memo [100] states that the monoline insurance provider for the securities transferred to Barclays is rated CC (i.e. non-investment grade) but Moody's provided an independent "stand-alone" rating of Baa3 to these Giants Stadium LLC bonds on September 17, 2008 and no longer rated the series of notes held by Barclays at the non-investment grade rating of the

---

[96] PwC-BarCapWP_00022935-48, at PwC-BarCapWP_00022943.
[97] BCI-EX-00099519.xls – produced in native file format, see tab [Corps], row 326.
[98] BCI-EX-00099519.xls – produced in native file format, see tab [Corps], row 202.
[99] PwC-BarCapWP_00022935-48, at PwC-BarCapWP_00022943.
[100] PwC-BarCapWP_00022935-48, memo "Giants Stadium – Description of Movem" embedded at PwC-BarCapWP_00022943.

monoline insurer.  It is hard to understand how PwC accepted the deeply discounted price and the non-investment grade rating in light of all the information available at the time the Giants Stadium valuation was made.

- PwC accepted without further investigation Barclays' inconsistent accounting treatment of assets with similar economic characteristics.  PwC agreed with Barclays' incorrect recoding of a redeemed bond at par while at the same time recording a matured bond at zero or no value.  Specifically, PwC agreed that Barclays reasonably priced a bond CUSIP 74256AA1 – that was called (i.e. redeemed by the issuer) – at Par or full principal value.[101]  Yet, PwC also agreed that Barclays reasonably price three investment-grade bonds[102] and four high-yield bonds[103] that matured at zero or no value.  The economic impact to the holder of the bond is the same in both cases (redemption by issuer or maturity) in that the holder received prior to 12/22/2008 all of the principal and interest due from the investment.

- PwC concluded, with respect to a high-yield bond that "The fifth position, CUSIP 8265Q0YD8, is in default, therefore, a price of zero does not appear unreasonable."[104]  In general, however, a bond that has defaults still has a recovery value and should be valued to reflect such recovery value.  Yet, PwC accepted the price of zero without performing additional tests of the potential recovery value of CUSIP 8265Q0YD8.


### Opinion 4:    Professor Pfleiderer is Misguided in His Analysis of the Negative Goodwill Barclays Recorded.

84.    Professor Pfleiderer's analysis of Barclays reported negative goodwill "of approximately $2 billion, post tax"[105] is misguided and flawed for several reasons.

85.    Professor Pfleiderer argues that there is only $0.5 billion of the negative goodwill(gain) on financial assets and this calculation results in  "very close to a

---

[101] PwC-BarCapWP_00023570-76, at PwC-BarCapWP_00023575.
[102] PwC-BarCapWP_00023570-76, at PwC-BarCapWP_00023575.
[103] PwC-BarCapWP_00023570-76, at PwC-BarCapWP_00023576.
[104] PwC-BarCapWP_00023570-76, at PwC-BarCapWP_00023576.
[105] Pfleiderer Report, ¶5(c).

**Contains Highly Confidential Information**

mathematical wash"[106] when excluding any gains associated with the exchange and non-financial assets.  That is, Professor Pfleiderer contends that the repo transaction was a wash as consummated.  This analysis is misguided for several reasons.

86.     The accounting model for business combinations looks at the transaction in total when valuing assets and liabilities acquired [107]  Pfleiderer's arbitrary exclusion of gains on non-financial assets is flawed and not a proper determination of negative goodwill in this transaction.

87.     In addition, Professor Pfleiderer contradicts his own calculation in his report when he states:  "It is an important fact that Barclays did not acquire the Repo Collateral in a separate, standalone transaction, but instead acquired these assets as part of a larger bundle of assets and liabilities associated with LBI's North American broker-dealer businesses. This means, first, that there was no separate identifiable 'price' paid by Barclays for the trading portfolio securities and, second and more specifically, that the $45 billion that Barclays lent to LBI in the Fed Replacement Repo should not be viewed as the 'price' Barclays paid for the Repo Collateral."[108]

88.     Second, Professor Pfleiderer concludes that it is appropriate to exclude the $2.1 billion gain on positions at exchanges from his negative goodwill analysis because Barclays "neither knew *nor could have known or even roughly estimated* the net value of these accounts at the time of the Sale Hearing."[109]  This determination again is misguided.  Barclays' inability to assess the value of an asset at the precise moment of the Sale Transaction has no bearing in either U.S. GAAP or IFRS[110] nor does it comport with the fact that Barclays determined and reported in their financial statements that they recognized a $2.1 billion pre-tax gain on these same assets.  The accounting rules contemplate that this type of risk, perceived or otherwise, could arise and directs the financial statement preparer to assess both the value of the collateral and the value of the associated liabilities rather than ignore the value of the assets and liabilities.  The

---

[106] Pfleiderer Report, ¶116.
[107] IFRS 3, ¶IN7(c) (cited in Appendix III of this report).
[108] Pfleiderer Report, ¶10.
[109] Pfleiderer Report, ¶117 (emphasis as shown).
[110] IFRS 3, ¶44.

**Contains Highly Confidential Information**

associated risk is one more item that must be evaluated in making a determination of the fair value of the assets and liabilities acquired in a business combination.[111]

89.     Finally, Professor Pfleiderer also attempts to exclude the negative goodwill (gain) associated with other categories of assets acquired, including intangibles in his attempt to demonstrate that the sale as consummated was a wash.[112]  Excluding the real property[113] Barclays acquired additional assets of approximately $2.08 billion comprised primarily of intangibles, furniture and other assets.[114]  Intangibles included the use of Lehman's name for two years, customer lists, relationships, and a variety of other assets.[115]  However, total consideration for all these non-financial assets was $250 million.  This results in a negative goodwill (gain) of $1.83 billion ($2.08 - $0.25).  This calculation is improper because these assets, like the other enumerated assets, were contemplated in the APA and representations made to the Court.  They should not be considered separately when determining the amount of negative goodwill associated with the Sale transaction.[116]  In any event, and as demonstrated in Professor Zmijewski's Report, Barclays' negative goodwill on the transaction as consummated was far greater – Barclays' Windfall was at least $13.051 billion.[117]


Submitted by:

_____

John P. Garvey
March 15, 2010

---

[111] IAS 39, ¶48A.

[112] Pfleiderer Report, ¶116.

[113] Each of the three buildings Barclays acquired from Lehman was valued by at least one independent appraiser.  Specifically, CB Richard Ellis ("CBRE", PwC-BarCapWP_00042693-808) and Cushman & Wakefield (PwC-BarCapWP_00042671-692) independent of each other appraised the *745 Seventh Avenue* building.  Barclays recorded that property at the average of the two valuations (PwC-BarCapWP_00042499-502).  CBRE independently appraised the value of the *40 Corporate (Piscataway)* property (PwC-BarCapWP_00042583-670) and the *27 Commerce (Cranford)* property (PwC-BarCapWP_00042504-82).   Barclays recorded these properties at their appraised values in the Acquisition Balance Sheet (PwC-BarCapWP_00042499-502).

[114] Exhibit 377A.

[115] Report by Ernst & Young LLP, dated January 30, 2009, titled "Valuation advisory services related to the acquisition of certain assets of Lehman Brothers Holdings, Inc." (BCI-EX-00292153 – 2237).

[116] IFRS 3, ¶51 and ¶52.

[117] Expert Report of Mark E. Zmijewski, Ph. D. filed in this litigation on March 15, 2010, at 9.

**Contains Highly Confidential Information**

**Appendix I**

**Curriculum Vitae**

**JOHN P. GARVEY**


Principal
Chicago Partners (A Subsidiary of Navigant Consulting)
30 South Wacker Drive, Suite 3100
Chicago, Illinois 60606
Telephone: (312) 251-4571
Facsimile: (312) 251-5201

## CURRENT EMPLOYMENT

CHICAGO PARTNERS (A Subsidiary of Navigant Consulting)

<u>Principal</u>, (Present; 1996 – 1999)

## EDUCATION

M.B.A.    (Finance), The University of Chicago, 1988

B.B.    (Accounting), Western Illinois University, 1978

Certified Public Accountant, Licensed in Illinois


## PROFESSIONAL EXPERIENCE

CHICAGO PARTNERS (A Subsidiary of Navigant Consulting)

John Garvey, *Principal*, is a CPA. He is the former President of Chicago
Partners and currently serves as the Segment Leader of the Economics
Practice of Navigant Consulting, Inc. He has testified or directed complex
litigation matters regarding fraud and forensic accounting, securities fraud,
accounting irregularities, merger and acquisition disputes, derivative
disputes, professional liability, bankruptcy and solvency, business
valuation and general damages issues. Mr. Garvey has represented
numerous companies and individuals before regulatory bodies including
the Securities and Exchange Commission and the CFTC. Mr. Garvey has
also assisted counsel in many high profile board directed investigations of
allegations of fraud and accounting irregularities. He has appeared as an
expert in Delaware Chancery Court, Bankruptcy Court, State and Federal
courts and in various administrative forums. Mr. Garvey has also served
as an independent arbitrator.

**Contains Highly Confidential Information**

### PROFESSIONAL EXPERIENCE (con't.)

ARTHUR ANDERSEN LLP

<u>Partner and Market Team Leader for Business Fraud and Investigation
Services</u>, (1999-2001)

Assisted in house or special counsel in conducting internal corporate
investigations into alleged fraud and/or illegal acts perpetrated by
employees and/or officers of publicly held and privately owned
enterprises.

Assisted outside counsel in the investigation of liability and damages
issues in numerous large class action Federal securities suits and the
defense of several "Big Five" accounting firms regarding the
interpretation and application of GAAP, GAAS and public disclosure
issues.

Assisted special counsel to the audit committees of the board of directors
of numerous Fortune 500 companies in the investigation and resolution of
alleged accounting irregularities.

Have participated in over 30 board directed investigations into alleged
accounting irregularities.

Represented various companies in front of regulatory bodies including the
Securities and Exchange Commission and the Commodity Futures Trading
Commission.

Represented both buyers and sellers in post-acquisition disputes regarding
the analysis of and interpretation of contractual and GAAP issues and
related valuation questions.  Served as an independent arbitrator for
several post-acquisition disputes.


FORT DEARBORN PARTNERS, INC.

<u>Vice President</u>, (June, 1994 - December, 1995)

Vice President in a financial and management consulting firm specializing
in mergers and acquisitions and related financing transactions.

Represented buyers and sellers of middle market companies in mergers
and acquisitions and financing transactions.

**Contains Highly Confidential Information**

**PROFESSIONAL EXPERIENCE (con't.)**

Provided business valuation, merger and acquisition analysis and general damage analysis consulting in litigation matters related to fraud, securities, mergers and acquisitions, professional liability, business valuation and general damages issues.

DELOITTE & TOUCHE

Partner, (1980 - June, 1994)

Partner with fourteen years of general audit and consulting experience servicing a variety of publicly and privately held companies, with an emphasis in manufacturing and distribution and financial services.  Clients served included Beatrice Companies, Borg-Warner Corporation, the Chicago Board of Trade, Hollister, Inc., ICM Industries, Inc., the Keebler Company and Navistar International Corporation.

Other specialized experience included:

Special Acquisition Services

Supervised numerous due diligence engagements in a broad spectrum of transactions, including leveraged buyouts, acquisitions, dispositions, mergers, joint ventures, refinancings and restructurings.  Engagements ranged in size from several of the largest leveraged buyouts to transactions in the $50 to $100 million ranges. Financial buyers served included KKR, The Blackstone Group, Merrill Lynch Capital Partners and ICM Industries, Inc.

Participated in several financial and operational restructurings for a Fortune 100 Company providing technical consulting in the areas of recapitalizations and debt restructurings, disposition strategies, strategic cost management and financial and regulatory reporting.

Litigation Services

Provided financial and damage analyses to attorneys in connection with lawsuits related to patent infringement, fraud and misappropriation of assets, accounting malpractice and negligence, mergers and acquisition disputes, securities fraud, breach of contract, lost profits, business valuation, market analysis, and other matters in the commodities and securities industries, professional service industry, retailing and manufacturing and distribution industries.  Also provided consulting

**Contains Highly Confidential Information**

## PROFESSIONAL EXPERIENCE (con't.)

assistance to attorneys on technical accounting, auditing and corporate finance issues. Personally directed or involved in approximately 20 cases. Served as Arbitrator in binding arbitration.

Member of Deloitte & Touche National Litigation Steering Committee.

## PROFESSIONAL AFFILIATIONS

Association of Certified Fraud Examiners
American Institute of Certified Public Accountants
Illinois CPA Society
Boys & Girls Clubs of Chicago - Corporate Board Member

## SELECTED LITIGATION ENGAGEMENTS

Securities and Exchange Commission v. Delphi Corp., et al. United States District Court – Eastern District of Michigan. Securities Fraud. Testified on behalf of plaintiff at deposition.

Delphi Corporation v. Appaloosa Management L.P., et. al. United States Bankruptcy Court – Southern District of New York. Breach of Contract. Testified on behalf of defendants at deposition.

Dr. Anthony Cerami v. Novartis Vaccines and Diagnostics, Inc. United States District Court – Southern District of New York. Breach of Contract. Testified on behalf of defendant at deposition.

Banco Espirito Santo International, Ltd., ESB Finance, Ltd. and Banco Espirito Santo S.A. v. BDO Seidman, LLP and BDO International B.V. Circuit Court – Miami Dade County, Florida. Professional Negligence/Malpractice. Testified on behalf of defendants at deposition and trial.

Appleton Papers Inc. v. Andritz BMB AG. Circuit Court - State of Wisconsin. Breach of Contract and Fraud. Testified on behalf of plaintiff at deposition.

United States of America v. Gregory L. Reyes. United States District Court – Northern District of California – San Francisco Division. Securities Fraud. Testified on behalf of plaintiff at trial.

Marsulex, Inc., Claimant v. Trelleborg Corporation, et al., Respondents. AAA Arbitration. Fraud and breach of contract. Testified on behalf of Claimant at deposition and arbitration.

**Contains Highly Confidential Information**

## SELECTED LITIGATION ENGAGEMENTS (con't.)

In re Parmalat Securities Litigation. MDL 1653. United States District Court - Southern District of New York. Securities Fraud. Testified on behalf of defendant, Grant Thornton International, at deposition.

Parmalat Capital Finance Limited v. Grant Thornton International, et al. Circuit Court of Cook County Illinois - Law Division. Securities Fraud. Testified on behalf of defendant at deposition.

Securities and Exchange Commission v. Gregory L. Reyes, et al. United States District Court – Northern District of California. Securities Fraud. Testified on behalf of plaintiff at deposition.

Securities and Exchange Commission v. Jeffrey P. Jorissen, Gary A. Shipman and Mary A. Perella. United States District Court – Eastern District of Michigan. Testified on behalf of defendant, Jeffrey P. Jorissen at deposition.

American Farm Bureau, Inc. Claimant v. IBFA Acquisition Company, LLC; Respondent. AAA Arbitration – Central Case Management Center. Fraud and breach of contract. Testified on behalf of Claimant at deposition.

Panolam Industries International, Inc. and Pioneer Plastics Corporation v. Neste Resins Corporation, Neste Resins Canada and Dynea U.S.A., Inc. United States District Court - District of Connecticut. Breach of contract. Testified on behalf of defendants at deposition.

Joseph White v. Heartland High-Yield Municipal Bond Fund, et al. United States District Court - Eastern District of Wisconsin. Testified on behalf of defendant, PricewaterhouseCoopers at deposition.

The State of Oregon, By and Through the Oregon Public Employees Retirement Board v. McKesson HBOC, Inc. , et al. Superior Court of California. Securities fraud. Testified on behalf of defendants at deposition.

## SERVED AS INDEPENDENT ARBITRATOR IN SEVERAL POST ACQUISTION CONTRACT AND BREACH OF CONTRACT DISPUTES

## BOARD AND REGULATORY (SEC) INVESTIGATIONS

Waste Management, Inc.
Sunbeam Corporation
Kmart Corporation
OfficeMax, Inc.
Hanover Compressor
Flowserve Corporation

**Contains Highly Confidential Information**

## BOARD AND REGULATORY (SEC) INVESTIGATIONS (con't.)

Dana Corporation
General Mills

---

# Appendix II

## Documents Relied Upon

| Documents in the Record | | |
|---|---|---|
| | | |
| Depositions | | |
| | | |
| Deponent | Date | |
| Steven Berkenfeld | 8/6/2009 | |
| Paolo Tonucci | 8/14/2009 | |
| Bart McDade | 9/2/2009 | |
| John Varley | 9/3/2009 | |
| Patrick Clackson | 9/4/2009 | |
| Stephen King | 9/10/2009 | |
| Gary Romain | 9/10/2009 | |
| John Varley | 9/11/2009 | |
| Gary Romain | 1/13/2010 | |
| Paul Pfleiderer | 2/23/2010 | |
| James Seery | 3/3/2010 | |
| | | |
| Deposition Exhibits | | |
| | | |
| Exhibit | Beginning Bates | Ending Bates |
| 1 - Asset Purchase Agreement | | |
| 24 - First Amendment to the Asset Purchase Agreement | | |
| 25 - Clarification Letter | | |
| 51- Transfer and Assumption Agreement, dated Sept. 22, 2008 | | |
| 86B - Summary of the numbers for Schedules A and B provided to auditors | BCI-EX 00099519 | BCI-EX 00099521 |
| 87B - JPM Inventory, Annex A Assets | BCI-EX-00108700 | |
| 88B - Barclays' Acquisition Balance Sheet | BCI-EX-00109154 | BCI-EX-00109161 |
| 205 - Settlement Agreement between JPM, Barclays and Giddens, dated Dec. 5, 2008 | | |
| 377A - Barclays' Opening Balance Sheet | BCI-EX-00115843 | BCI-EX-00115846 |
| 444- Declaration of Shari D. Leventhal, in Support of Trustee's Motion For Entry of an Order Approving a Settlement Agreement | | |
| 495 - Debtor's Motion for an Order, Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024, Modifying the September 20, 2008 Sale Order and Granting Other Relief, Sept. 15, 2009 | | |
| 533A - Lehman Acquisition Assets Summary | BCI-EX-00295932 | BCI-EX-00295933 |
| 591 - Report of Peter Vinella, dated Jan. 1, 2010 | | |
| 600 - Report of Anthony Saunders, dated Jan. 1, 2010 | | |
| 633A - Expert Report of Prof. Paul Pfleiderer, Volume 1 | | |
| 634A - Expert Report of Prof. Paul Pfleiderer, Volume 2 | | |
| 641A - Email from Sean Teague to Tal Litvin, et al., Feb. 12, 2009, re: "Acquisition Balance Sheet," (with attachments). | BCI-EX-(S)-00213990 | BCI-EX-(S)-00213996 |
| 652 - Report of Anthony J. Leitner, dated Jan. 1, 2010 | | |
| | | |
| **BCI Opposition Brief Exhibits** | | |
| 146 - Romain's Handwritten Notes | | |
| 147 - Romain's Typed Notes | | |
| 357 - Declaration of Romain, dated Jan. 26, 2010 | | |
| 363 - Declaration of Stephen King, dated Jan. 27, 2010 | | |
| | | |
| **Other Documents** | | |
| | | |
| Description | Beginning Bates | Ending Bates |
| Summary of the numbers for Schedules A and B provided to auditors (native file) | BCI-EX 00099519 | |
| Email from Romain to PwC, dated Oct. 24, 2008, Re: JPM securities | BCI-EX-(S)-00110050 | |
| Email chain between PwC and Barclays, dated Feb. 1, 2009, Re: Opening BS Valuation Work | BCI-EX-(S)-00110233 | BCI-EX-(S)-00110238 |
| Balance Sheet Close – Inventory, ITS Close Narrative | BCI-EX-(S)-00213939 | BCI-EX-(S)-00213940 |
| Balance Sheet Close – Inventory, MTS Close Narrative | BCI-EX-(S)-00213941 | BCI-EX-(S)-00213945 |
| Barclays Capital Valuation Methodology | BCI-EX-(S)-00213991 | BCI-EX-(S)-00213992 |
| Email from Romain to Clackson, et. al., dated Dec. 14, 2008, Re: Valuation of securities | BCI-EX-00218500 | BCI-EX-00218501 |
| Email from Morton to Holloway, dated Dec. 12, 2008 | BCI-EX-00218502 | BCI-EX-00218503 |
| Email from Romain, dated Jan. 27, 2009, Opening Balance Sheet attached | BCI-EX-00247453 | BCI-EX-00247454 |
| Email chain between Mark Washtell and PwC, dated Oct. 20, 2008 - Jan. 13, 2009, Re: Bid offer calculation | BCI-EX-00248365 | BCI-EX-00248379 |
| Memorandum dated February 2, 2009 from Richard Landreman to PwC, subject "RMBS Portfolio Acquired from Lehman - Bid/Offer Reserve Agency CMOs" | BCI-EX-00248415 | BCI-EX-00248418 |
| Long Island - Gross Acquisition Balance Sheet (draft) with Romain's notes | BCI-EX-00248592 | |
| PwC Testing-Additional Securities | BCI-EX-00249452 | |

| | | |
|---|---|---|
| Equity Bid-Offer Calculation, dated Sept. 22, 2008 | BCI-EX-00255172 | |
| New LBI Firm Asset List A 12312008 FINAL | BCI-EX-00255181 | |
| Letter from Ananda K. Radhakrishnan, dated Sept. 19, 2008 | BCI-EX-00258394 | |
| Lehman Cash Muni Price Testing 20081231 PwC.xls | BCI-EX-00258590 | |
| Barclays Lehman Report and Exhibits | BCI-EX-00292153 | BCI-EX-00292237 |
| Sched B LehOBS 5 | BCI-EX-00295934 | |
| Support for Exhibit 533-A (produced in native format) | BCI-EX-00297320 | |
| Bloomberg screen shots, Giants Stadium Bonds | BCI-EX-00297526 | BCI-EX-00297541 |
| Barclays Capital NA - FMV of Investments Testing | PwC-BarCapWP_00021945 | PwC-BarCapWP_00021952 |
| Final- BarCap - Lehman Acquisition Memo Revised 2/08/09 Draft | PwC-BarCapWP_00022935 | PwC-BarCapWP_00022948 |
| Review of JPM Acquisition Valuation (12/22/08) for CDOs and Corporate Bonds | PwC-BarCapWP_00023570 | PwC-BarCapWP_00023576 |
| Barclays JPM Draft Memo v13 | PwC-BarCapWP_00023595 | PwC-BarCapWP_00023604 |
| Summary Meeting_Unencumbered Assets | PwC-BarCapWP_00027533 | |
| Valuation of Buildings | PwC-BarCapWP_00042499 | PwC-BarCapWP_00042502 |
| CBRE - 27 Commerce (Cranford) Appraisal | PwC-BarCapWP_00042504 | PwC-BarCapWP_00042582 |
| CBRE - 40 Corporate (Piscataway) Appraisal | PwC-BarCapWP_00042583 | PwC-BarCapWP_00042670 |
| 745 Seventh Avenue Appraisal | PwC-BarCapWP_00042671 | PwC-BarCapWP_00042692 |
| 745 Seventh Ave - CBRE Appraisal | PwC-BarCapWP_00042693 | PwC-BarCapWP_00042808 |
| BCI Rule 60 Opposition and Undelivered Assets Brief, dated Jan. 29, 2010 | | |
| Debtors' Adversary Complaint, dated Nov. 16, 2009 | | |
| Expert Report of Harrison J. Goldin, dated Mar. 15, 2010 | | |
| Expert Report of John J. Schneider, dated Mar. 15, 2010 | | |
| Expert Report of John Olvany, dated Mar. 15, 2010 | | |
| Expert Report of Joseph Schwaba, dated Mar. 15, 2010 | | |
| Expert Report of Mark E. Slattery, dated Mar. 15, 2010 | | |
| Expert Report of Mark E. Zmijewski, dated Mar. 15, 2010 | | |
| Hearing Transcript, dated Sept. 19, 2008 | | |
| Hearing Transcript, dated Dec. 22, 2008 | | |
| Letter from Davenport to Carrero, dated Feb. 6, 2010 | | |
| Letter from Jonathan W. Davenport, dated Feb. 6, 2010 | | |
| Letter from Martine M. Beamon (Davis Polk & Wardwell LLP; counsel for PwC) to William J. Hine, dated Feb. 12, 2010 | | |
| Motion of Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al., Pursuant to 11 U.S.C. § 105(a), Fed. R. Civ. P. 60(b), and Fed. R. Bankr. P. 9024, for Relief from Order Under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006, dated Sept. 15, 2009 | | |
| Official Committee of Unsecured Creditors' Adversary Complaint, dated Nov. 16, 2009 | | |
| Report of Anton R. Valukas, Examiner in re Lehman Brothers Holdings, Inc. et al, Chapter 11 Case No. 08-13555 (JMP), Volume 7, Appendix 3, Key Individuals | | |
| The Trustee's Adversary Complaint, Nov. 16, 2009 | | |
| The Trustee's Motion for Relief Pursuant to the Sale Orders or, Alternatively, for Certain Limited Relief Under Rule 60(b), Sept. 15, 2009 | | |
| | | |
| **Documents that are Publicly Available** | | |
| Accounting Terminology Bulletin 3 *Book Value* | | |
| AU Section 328 *Auditing Fair Value Measurements and Disclosures* | | |
| Barclays Annual Report, year ended Dec. 31, 2008 | | |
| Barclays PLC, Form 20-F, year ended Dec. 31, 2008 | | |
| David N. Ricchiute, *Auditing* , 8th edition (United States: Thomson / South-Western, 2006 (ISBN: 0-324-22629-2)) | | |
| http://dictionary.reference.com/browse/book+value | | |
| http://en.wikipedia.org/wiki/Book_value | | |
| http://www.fasb.org/intl/convergence_iasb.shtml | | |
| http://www.fasb.org/jsp/FASB/Page/SectionPage&cid=1176154526495&pf=true | | |
| http://www.fasb.org/jsp/FASB/Page/SectionPage&cid=1176154526571&pf=true | | |
| http://www.iasb.org/The+organisation/IASCF+and+IASB.htm | | |
| http://www.investopedia.com/terms/b/bookvalue.asp | | |
| http://www.thefreedictionary.com/book+value | | |
| IAS 39 *Financial Instruments Recognition and Measurement* | | |
| IASB *Information for Observers*  (IASB Board Meeting, London, Dec. 12, 2007) | | |
| IFRIC 1 *Changes in Existing Decommissioning, Restoration and Similar Liabilities* | | |
| IFRS 3 *Business Combinations* | | |
| JP Morgan, Form 10-K, year ended Dec. 31, 2008 | | |
| Lehman Brothers Holdings Inc., Form 10-K, year ended Nov. 30, 2007 | | |
| SEC Regulation S-K, *Non Financial Statement Requirements* | | |
| SEC Regulation S-X, *Financial Statement Requirements* | | |
| SFAS 157 *Fair Value Measurements* | | |
| WestAmerica Bancorporation, Form 8-K, filed Feb. 6, 2009 | | |

**Contains Highly Confidential Information**

# Appendix III

## Summary of Relevant Accounting Principles

1.      This Appendix presents a summary of relevant accounting principles.

2.      The management of Barclays PLC and Barclays Bank PLC is responsible for "the preparation of financial statements for external reporting purposes in accordance with International Financial Reporting Standards (IFRS) as adopted by the European Union and the International Accounting Standards Board (IASB)."[118]

3.      This assertion is stated clearly in the financial statements (Annual Report and Form 20-F) issued by Barclays for the fiscal year ended December 31, 2008.[119]

4.      Lehman Brothers Holdings Inc. and its subsidiaries prepared their financial statements in accordance with U.S. generally accepted accounting principles ("U.S. GAAP").[120]  U.S. GAAP and IFRS standards are developed using similar processes.[121] "In October 2002, the FASB and the International Accounting Standards Board (IASB) announced the issuance of a memorandum of understanding ("Norwalk Agreement"), marking a significant step toward formalizing their commitment to the convergence of U.S. and international accounting standards."[122]  When discussing relevant generally accepted accounting principles, I focus on IFRS (the standards governing Barclays's external financial reporting), and highlight commonalities and differences between IFRS and U.S. GAAP.

---

[118] Barclays PLC and Barclays Bank PLC Form 20-F for the fiscal year ended December 31, 2008, page 173.  *Identical disclosure in* Barclays PLC Annual Report 2008, page 187.
*See also* Barclays PLC and Barclays Bank PLC Form 20-F for the fiscal year ended December 31, 2008, page 176.  *Identical disclosure in* Barclays PLC Annual Report 2008, page 190.
[119] Barclays PLC and Barclays Bank PLC Form 20-F for the fiscal year ended December 31, 2008, page 173.  *Identical disclosure in* Barclays PLC Annual Report 2008, page 187.
*See also* Barclays PLC and Barclays Bank PLC Form 20-F for the fiscal year ended December 31, 2008, page 176.  *Identical disclosure in* Barclays PLC Annual Report 2008, page 190.
[120] Lehman Brothers Holding, Inc., Form 10-K for the fiscal year ended November 30, 2007, page 84.
[121] http://www.iasb.org/The+organisation/IASCF+and+IASB.htm, last visited March 10, 2010, http://www.fasb.org/jsp/FASB/Page/SectionPage&cid=1176154526571&pf=true last visited March 10, 2010, http://www.fasb.org/jsp/FASB/Page/SectionPage&cid=1176154526495&pf=true last visited March 10, 2010.
[122] http://www.fasb.org/intl/convergence_iasb.shtml, last visited March 10, 2010.

---

**Contains Highly Confidential Information**

A. BOOK VALUE

5.　　"The term *book value* is one of several widely used expressions in which the word value appears with a particular qualifying adjective to denote a particular concept of value. Book value is to be distinguished from such terms as fair or market value or liquidating value, in that it refers to amounts reflected on accounting records and in financial statements."[123]

6.　　In reference to individual items in books of accounts or in financial statements, the term *book value* "signifies the amount at which an item is stated in accordance with the accounting principles related to the item."[124]  The United States Securities and Exchange Commission ("SEC") uses the term *book value* to denote the "book value of the securities as carried by the registrant."[125]  Such interpretation of the term *book value* is in line with the implicit meaning of *book value* as used by the IASB.[126]  The IASB made a distinction between "pre-combination book values" and "fair values at the date of the combination."[127]  The IASB recognizes that there is a difference between the pre-combination book value and the fair value an acquirer may assign in a transaction.

B. FAIR VALUE

7.　　This section presents an overview relevant accounting principles for measuring fair value.  Appendix IV discusses fair value hierarchy and related fair value measurement considerations.

8.　　IAS 39 *Financial Instruments: Recognition and Measurement,* (IAS 39) was originally issued in March 1999.  In December 2003 IASB issued a revised IAS 39 which "applied for annual periods beginning on or after 1 January 2005."[128]  The discussion below focuses on the revised IAS 39, including amendments up to December 2008.

---

[123] Accounting Terminology Bulletin 3, *Book Value* (ATB 3), ¶1.
[124] Accounting Terminology Bulletin 3, *Book Value* (ATB 3), ¶5.
[125] SEC Regulation S-X, *Financial Statement Requirements*, SEC RegS-X.T.Rule3-16.
*Also see* SEC RegS-X.I.Rule3-05.Determining Significance – Asset Test [5].
*Also see* SEC Regulation S-K, *Non Financial Statement Requirements*, RegS-K.T.Item914.
[126] *See* IFRIC 1 *Changes in Existing Decommissioning, Restoration and Similar Liabilities*, ¶IE8, Note (3).
[127] IFRS 3, ¶BC51: "…[b]ecause the assets and liabilities of all the combining entities would be recognised at their pre-combination book values rather than at their fair values at the date of the combination, users of the combined entity's financial statements would be unable to assess reasonably the nature, timing and extent of future cash flows expected to arise from the combined entity as a result of a combination..."
[128] IAS 39, ¶IN1.

---

**Contains Highly Confidential Information**

9.        IAS 39 establishes "principles for recognising and measuring financial assets, financial liabilities and some contracts to buy or sell non-financial items."[129]  IAS 39 requires that "[w]hen a financial asset or financial liability is recognised initially, an entity shall measure it at its fair value."[130]

10.       IAS 39 defines fair value as "the amount for which an asset could be exchanged, or a liability settled, between knowledgeable, willing parties in an arm's length transaction."[131]  IAS 39 uses the terms *bid-price*, *asking price*, and *current-offer price* but does not reference the term *exit price*.[132]  U.S. GAAP explicitly references *exit price* – "the objective of a fair value measurement is to **determine the price that would be received to sell the asset or paid to transfer the liability at the measurement date (an exit price)**."[133]  In an effort to align the interpretations of exit price in international accounting standards and U.S. GAAP:

> The [IASB] Board confirmed its plan to complete a standard-by-standard review of fair value measurements currently required or permitted in IFRSs to assess whether each standard's measurement basis was intended to be an exit price.  For situations in which the measurement basis was not intended to be an exit price, the Board plans to assess whether it should develop additional measurement guidance.[134]

11.       IAS 39 lists fair-value measurement considerations:

> The best evidence of fair value is quoted prices in an active market. If the market for a financial instrument is not active, an entity establishes fair value by using a valuation technique. The objective of using a valuation technique is to establish what the transaction price would have been on the measurement date in an arm's length exchange motivated by normal business considerations. Valuation techniques include using recent arm's length market transactions between knowledgeable, willing parties, if available, reference to the current fair value of another instrument that is substantially the same, discounted cash flow analysis and option pricing models. If there is a valuation technique commonly used by market participants to price the instrument and that technique has been demonstrated to provide reliable estimates of prices obtained in actual

---

[129] IAS 39, ¶1.
[130] IAS 39, ¶43.
[131] IAS 39, Definitions, ¶9 (footnote omitted)
[132] IAS 39, ¶AG70
[133] SFAS 157 *Fair Value Measurements,* ¶7 (emphasis added).  For similar references to exit price, see SFAS 157 Summary, and SFAS 157 ¶16, 17, 30, A2, A8, A27, C13, C16, C21, C23, C26, C29, C52, C63, C84.
[134] IASB *Information for Observers* (IASB Board Meeting, London, December 11, 2007, in re: Project *Fair Value Measurement*, Subject Cover Note (*Agenda Paper 2A*), ¶4).

**Contains Highly Confidential Information**

market transactions, the entity uses that technique. The chosen valuation
technique makes maximum use of market inputs and relies as little as
possible on entity-specific inputs. It incorporates all factors that market
participants would consider in setting a price and is consistent with
accepted economic methodologies for pricing financial instruments.
Periodically, an entity calibrates the valuation technique and tests it for
validity using prices from any observable current market transactions in the
same instrument (ie without modification or repackaging) or based on any
available observable market data.[135]

12.    IAS 39 provides additional guidance about how to determine fair values using
valuation techniques:

- The objective is to establish what the transaction price would have been on
  the measurement date in an arm's length exchange motivated by normal
  business considerations.

- A valuation technique (a) incorporates all factors that market participants
  would consider in setting a price and (b) is consistent with accepted
  economic methodologies for pricing financial instruments.

- In applying valuation techniques, an entity uses estimates and assumptions
  that are consistent with available information about the estimates and
  assumptions that market participants would use in setting a price for the
  financial instrument.

- The best estimate of fair value at initial recognition of a financial
  instrument that is not quoted in an active market is the transaction price
  unless the fair value of the instrument is evidenced by other observable
  market transactions or is based on a valuation technique whose variables
  include only data from observable markets.[136]

### C.  BUSINESS COMBINATIONS

13.    IFRS 3 *Business Combinations,* issued in March 2004, applied "to the accounting
for business combinations for which the *agreement date* is on or after 31 March 2004."[137]
"The objective of this IFRS [IFRS 3 *Business Combinations*] is to specify the financial

---

[135] IAS 39, ¶48A.
[136] IAS 39, ¶IN18.
[137] IFRS 3, ¶78.

**Contains Highly Confidential Information**

reporting by an entity when it undertakes a *business combination*. In particular, it specifies that all business combinations should be accounted for by applying the purchase method. Therefore, the acquirer recognises the acquiree's identifiable assets, liabilities and *contingent liabilities* at their *fair values* at the *acquisition date*, and also recognises *goodwill*, which is subsequently tested for impairment rather than amortised." [138]

14.    IFRS 3 *Business Combinations* requires:

- all business combinations within its scope to be accounted for by applying the purchase method.[139]

- an acquirer to measure the cost of a business combination as the aggregate of: the fair values, at the date of exchange, of assets given, liabilities incurred or assumed, and equity instruments issued by the acquirer, in exchange for control of the acquiree; plus any costs directly attributable to the combination.[140]

- **an acquirer to recognise separately, at the acquisition date**, the acquiree's identifiable assets, liabilities and contingent liabilities that satisfy the following recognition criteria at that date, regardless of whether they had been previously recognised in the acquiree's financial statements:

  (i) in the case of an asset other than an intangible asset, it is probable that any associated future economic benefits will flow to the acquirer, and its fair value can be measured reliably;

  (ii) in the case of a liability other than a contingent liability, it is probable that an outflow of resources embodying economic benefits will be required to settle the obligation, and its fair value can be measured reliably; and

  (iii) in the case of an intangible asset or a contingent liability, its fair value can be measured reliably.[141]

---

[138] IFRS 3, ¶1 (italics in the original)
[139] IFRS 3, ¶IN7(a).  IAS 22, the predecessor to IFRS 3, "permitted business combinations to be accounted for using one of two methods: the pooling of interests method for combinations classified as unitings of interests and the purchase method for combinations classified as acquisitions." (IFRS 3, ¶IN9)
[140] IFRS 3, ¶IN7(c).
[141] IFRS 3, ¶IN7(d) (emphasis added).

**Contains Highly Confidential Information**

- the identifiable assets, liabilities and contingent liabilities that satisfy the above recognition criteria **to be measured initially by the acquirer at their fair values at the acquisition date**, irrespective of the extent of any minority interest.[142]

- goodwill acquired in a business combination to be recognised by the acquirer as an asset from the acquisition date, initially measured as the excess of the cost of the business combination over the acquirer's interest in the net fair value of the acquiree's identifiable assets, liabilities and contingent liabilities recognised in accordance with IFRS 3, ¶IN7(d).[143]

- the acquirer to reassess the identification and measurement of the acquiree's identifiable assets, liabilities and contingent liabilities and the measurement of the cost of the business combination if the acquirer's interest in the net fair value of the items recognised in accordance with IFRS 3, ¶IN7(d) exceeds the cost of the combination.  Any excess remaining after that reassessment must be recognised by the acquirer immediately in profit or loss.[144]

### 1. Measurement Date

15.     IFRS 3 *Business Combinations* requires the acquirer to "**measure the cost of a business combination as the aggregate of: (a) the fair values, at the date of exchange, of assets given, liabilities incurred or assumed, and equity instruments issued by the acquirer, in exchange for control of the acquiree; plus (b) any costs directly attributable to the business combination.**"[145]

### 2. Acquisition Date Fair Value

16.     IFRS 3 states:

**The acquirer shall measure the cost of a business combination as the aggregate of:**

---

[142] IFRS 3, ¶IN7(e) (emphasis added).
[143] IFRS 3, ¶IN7(f).  *See* IFRS 3, ¶IN7(d) cited above.
[144] IFRS 3, ¶IN7(h).  *See* IFRS 3, ¶IN7(d) cited above
[145] IFRS 3, ¶24 (bold-face type in the original).  IFRS 3 states: "All the paragraphs have equal authority. Paragraphs in bold type state the main principles."

**(a) the fair values, at the date of exchange, of assets given, liabilities incurred or assumed, and equity instruments issued by the acquirer, in exchange for control of the acquiree; plus**
**(b) any costs directly attributable to the business combination.**[146]

17.    Paragraph 27 elevates the published price of a quoted instrument as the best evidence of the instrument's fair value:

> **The published price at the date of exchange of a quoted equity instrument provides the best evidence of the instrument's fair value and shall be used, except in rare circumstances.** Other evidence and valuation methods shall be considered only in the rare circumstances when the acquirer can demonstrate that the published price at the date of exchange is an unreliable indicator of fair value, and that the other evidence and valuation methods provide a more reliable measure of the equity instrument's fair value. The published price at the date of exchange is an unreliable indicator only when it has been affected by the thinness of the market. If the published price at the date of exchange is an unreliable indicator or if a published price does not exist for equity instruments issued by the acquirer, the fair value of those instruments could, for example, be estimated by reference to their proportional interest in the fair value of the acquirer or by reference to the proportional interest in the fair value of the acquiree obtained, whichever is the more clearly evident. The fair value at the date of exchange of monetary assets given to equity holders of the acquiree as an alternative to equity instruments may also provide evidence of the total fair value given by the acquirer in exchange for control of the acquiree. In any event, all aspects of the combination, including significant factors influencing the negotiations, shall be considered. Further guidance on determining the fair value of equity instruments is set out in IAS 39 *Financial Instruments: Recognition and Measurement.*[147]

### 3.   Negative Goodwill (a.k.a. Bargain Purchase)

18.    According to IFRS, "Goodwill acquired in a business combination represents a payment made by the acquirer in anticipation of future economic benefits from assets that are not capable of being individually identified and separately recognised."[148]

19.    Negative goodwill arises in business combinations when the net fair value of identifiable assets, liabilities and contingent liabilities acquired exceeds the purchase price (hence, *bargain purchases*) and yields a gain to the acquirer:

---

[146] IFRS 3, ¶24 (bold-face type in the original.)  IFRS 3 states: "All the paragraphs have equal authority. Paragraphs in bold type state the main principles."
[147] IFRS 3, ¶27. (emphasis added)
[148] IFRS 3, ¶52.

Contains Highly Confidential Information

**If the acquirer's interest in the net fair value of the identifiable assets,
liabilities and contingent liabilities recognised in accordance with
paragraph 36 exceeds the cost of the business combination, the acquirer
shall:**

**(a) reassess the identification and measurement of the acquiree's
identifiable assets, liabilities and contingent liabilities and the
measurement of the cost of the combination; and**

**(b) recognise immediately in profit or loss any excess remaining after that
reassessment.**[149]

---

[149] IFRS 3, ¶56. (bold-face type in the original)

**Contains Highly Confidential Information**

**Appendix IV**

**Fair Value Considerations**

1.      This Appendix presents an overview of relevant accounting principles for measuring fair value.  This Appendix summarizes specific guidance provided by international accounting standards (such as IAS 39 *Financial Instruments: Recognition and Measurement*, ("IAS 39")) and generally accepted accounting principles (such as SFAS 157, *Fair Value Measurements* ("SFAS 157")).

2.      IAS 39 ¶48A states:

> The best evidence of fair value is quoted prices in an active market. If the market for a financial instrument is not active, an entity establishes fair value by using a valuation technique. The objective of using a valuation technique is to establish what the transaction price would have been on the measurement date in an arm's length exchange motivated by normal business considerations. Valuation techniques include using recent arm's length market transactions between knowledgeable, willing parties, if available, reference to the current fair value of another instrument that is substantially the same, discounted cash flow analysis and option pricing models. If there is a valuation technique commonly used by market participants to price the instrument and that technique has been demonstrated to provide reliable estimates of prices obtained in actual market transactions, the entity uses that technique. The chosen valuation technique makes maximum use of market inputs and relies as little as possible on entity-specific inputs. It incorporates all factors that market participants would consider in setting a price and is consistent with accepted economic methodologies for pricing financial instruments. Periodically, an entity calibrates the valuation technique and tests it for validity using prices from any observable current market transactions in the same instrument (ie without modification or repackaging) or based on any available observable market data.[150]

3.      IAS 39 ¶AG69 through ¶AG82 offer additional fair value measurement considerations:

- AG69: Underlying the definition of fair value is a presumption that an entity is a going concern without any intention or need to liquidate, to curtail materially the scale of its operations or to undertake a transaction on adverse

---

[150] IAS 39 ¶48A.

terms. **Fair value is not, therefore, the amount that an entity would receive or pay in a forced transaction, involuntary liquidation or distress sale. However, fair value reflects the credit quality of the instrument**.[151]

- AG70: **This Standard** [IAS 39] **uses the terms 'bid price' and 'asking price' (sometimes referred to as 'current offer price') in the context of quoted market prices, and the term 'the bid-ask spread' to include only transaction costs. Other adjustments to arrive at fair value (e.g. for counterparty credit risk) are not included in the term 'bid-ask spread'**.[152]

### *Active market: quoted price*

- AG71: A financial instrument is regarded as quoted in an active market if quoted prices are readily and regularly available from an exchange, dealer, broker, industry group, pricing service or regulatory agency, and those prices represent actual and regularly occurring market transactions on an arm's length basis. **Fair value is defined in terms of a price agreed by a willing buyer and a willing seller in an arm's length transaction**. **The objective of determining fair value for a financial instrument that is traded in an active market is to arrive at the price at which a transaction would occur at the end of the reporting period in that instrument (i.e. without modifying or repackaging the instrument) in the most advantageous active market to which the entity has immediate access.** However, the entity adjusts the price in the more advantageous market to reflect any differences in counterparty credit risk between instruments traded in that market and the one being valued. The existence of published price quotations in an active market is the best evidence of fair value and when they exist they are used to measure the financial asset or financial liability.[153]

- AG72: **The appropriate quoted market price for an asset held or liability to be issued is usually the current bid price and, for an asset to be acquired or liability held, the asking price. When an entity has assets and**

---

[151] IAS 39 ¶AG69 (emphasis added).
[152] IAS 39 ¶AG70 (emphasis added).
[153] IAS 39 ¶AG71 (emphasis added).

**Contains Highly Confidential Information**

**liabilities with offsetting market risks, it may use mid-market prices as a basis for establishing fair values for the offsetting risk positions and apply the bid or asking price to the net open position as appropriate.** When current bid and asking prices are unavailable, the price of the most recent transaction provides evidence of the current fair value as long as there has not been a significant change in economic circumstances since the time of the transaction. If conditions have changed since the time of the transaction (e.g. a change in the risk-free interest rate following the most recent price quote for a corporate bond), the fair value reflects the change in conditions by reference to current prices or rates for similar financial instruments, as appropriate. Similarly, if the entity can demonstrate that the last transaction price is not fair value (e.g. because it reflected the amount that an entity would receive or pay in a forced transaction, involuntary liquidation or distress sale), that price is adjusted. **The fair value of a portfolio of financial instruments is the product of the number of units of the instrument and its quoted market price. If a published price quotation in an active market does not exist for a financial instrument in its entirety, but active markets exist for its component parts, fair value is determined on the basis of the relevant market prices for the component parts.**[154]

*No active market: valuation technique*

- AG73: **If a rate (rather than a price) is quoted in an active market, the entity uses that market-quoted rate as an input into a valuation technique to determine fair value. If the market-quoted rate does not include credit risk or other factors that market participants would include in valuing the instrument, the entity adjusts for those factors.**[155]

- AG74: **If the market for a financial instrument is not active, an entity establishes fair value by using a valuation technique. Valuation techniques include using recent arm's length market transactions**

---

[154] IAS 39 ¶AG72 (emphasis added).
[155] IAS 39 ¶AG73 (emphasis added).

Contains Highly Confidential Information

**between knowledgeable, willing parties, if available, reference to the current fair value of another instrument that is substantially the same, discounted cash flow analysis and option pricing models.**

**If there is a valuation technique commonly used by market participants to price the instrument and that technique has been demonstrated to provide reliable estimates of prices obtained in actual market transactions, the entity uses that technique.**[156]

- AG75: The objective of using a valuation technique is to establish what the transaction price would have been on the measurement date in an arm's length exchange motivated by normal business considerations. **Fair value is estimated on the basis of the results of a valuation technique that makes maximum use of market inputs, and relies as little as possible on entity-specific inputs. A valuation technique would be expected to arrive at a realistic estimate of the fair value if (a) it reasonably reflects how the market could be expected to price the instrument and (b) the inputs to the valuation technique reasonably represent market expectations and measures of the risk-return factors inherent in the financial instrument.**[157]

- AG76: Therefore, a valuation technique (a) incorporates all factors that market participants would consider in setting a price and (b) is consistent with accepted economic methodologies for pricing financial instruments. Periodically, an entity calibrates the valuation technique and tests it for validity using prices from any observable current market transactions in the same instrument (i.e. without modification or repackaging) or based on any available observable market data. An entity obtains market data consistently in the same market where the instrument was originated or purchased. The best evidence of the fair value of a financial instrument at initial recognition is the transaction price (i.e. the fair value of the consideration given or received)

---

[156] IAS 39 ¶AG74 (emphasis added).
[157] IAS 39 ¶AG75 (emphasis added).

**Contains Highly Confidential Information**

unless the fair value of that instrument is evidenced by comparison with other observable current market transactions in the same instrument (i.e. without modification or repackaging) or based on a valuation technique whose variables include only data from observable markets.[158]

- AG76A: The subsequent measurement of the financial asset or financial liability and the subsequent recognition of gains and losses shall be consistent with the requirements of this Standard. The application of paragraph AG76 may result in no gain or loss being recognised on the initial recognition of a financial asset or financial liability. In such a case, IAS 39 requires that a gain or loss shall be recognised after initial recognition only to the extent that it arises from a change in a factor (including time) that market participants would consider in setting a price.[159]

- AG77: The initial acquisition or origination of a financial asset or incurrence of a financial liability is a market transaction that provides a foundation for estimating the fair value of the financial instrument. In particular, if the financial instrument is a debt instrument (such as a loan), its fair value can be determined by reference to the market conditions that existed at its acquisition or origination date and current market conditions or interest rates currently charged by the entity or by others for similar debt instruments (ie similar remaining maturity, cash flow pattern, currency, credit risk, collateral and interest basis). Alternatively, provided there is no change in the credit risk of the debtor and applicable credit spreads after the origination of the debt instrument, an estimate of the current market interest rate may be derived by using a benchmark interest rate reflecting a better credit quality than the underlying debt instrument, holding the credit spread constant, and adjusting for the change in the benchmark interest rate from the origination date. If conditions have changed since the most recent market transaction, the corresponding change in the fair value of the financial instrument being valued is determined by reference to current prices or rates for similar

---

[158] IAS 39 ¶AG76.
[159] IAS 39 ¶AG76A.

**Contains Highly Confidential Information**

financial instruments, adjusted as appropriate, for any differences from the instrument being valued.[160]

- AG78: The same information may not be available at each measurement date. For example, at the date that an entity makes a loan or acquires a debt instrument that is not actively traded, the entity has a transaction price that is also a market price. However, no new transaction information may be available at the next measurement date and, although the entity can determine the general level of market interest rates, it may not know what level of credit or other risk market participants would consider in pricing the instrument on that date. An entity may not have information from recent transactions to determine the appropriate credit spread over the basic interest rate to use in determining a discount rate for a present value computation. It would be reasonable to assume, in the absence of evidence to the contrary, that no changes have taken place in the spread that existed at the date the loan was made. However, the entity would be expected to make reasonable efforts to determine whether there is evidence that there has been a change in such factors. When evidence of a change exists, the entity would consider the effects of the change in determining the fair value of the financial instrument.[161]

- AG79: In applying discounted cash flow analysis, an entity uses one or more discount rates equal to the prevailing rates of return for financial instruments having substantially the same terms and characteristics, including the credit quality of the instrument, the remaining term over which the contractual interest rate is fixed, the remaining term to repayment of the principal and the currency in which payments are to be made. Short-term receivables and payables with no stated interest rate may be measured at the original invoice amount if the effect of discounting is immaterial.[162]

---

[160] IAS 39 ¶AG77.
[161] IAS 39 ¶AG78.
[162] IAS 39 ¶AG80.

Contains Highly Confidential Information

## *No active market: equity instruments*

- AG80: The fair value of investments in equity instruments that do not have a quoted market price in an active market and derivatives that are linked to and must be settled by delivery of such an unquoted equity instrument (see IAS 39 paragraphs 46(c) and 47) is reliably measurable if (a) the variability in the range of reasonable fair value estimates is not significant for that instrument or (b) the probabilities of the various estimates within the range can be reasonably assessed and used in estimating fair value.[163]

- AG81: There are many situations in which the variability in the range of reasonable fair value estimates of investments in equity instruments that do not have a quoted market price and derivatives that are linked to and must be settled by delivery of such an unquoted equity instrument (see paragraphs 46(c) and 47) is likely not to be significant. Normally it is possible to estimate the fair value of a financial asset that an entity has acquired from an outside party. However, if the range of reasonable fair value estimates is significant and the probabilities of the various estimates cannot be reasonably assessed, an entity is precluded from measuring the instrument at fair value.[164]

## *Inputs to valuation techniques*

- AG82: An appropriate technique for estimating the fair value of a particular financial instrument would incorporate observable market data about the market conditions and other factors that are likely to affect the instrument's fair value. The fair value of a financial instrument will be based on one or more of the following factors (and perhaps others).[165]

  (a) *The time value of money (ie interest at the basic or risk-free rate)*. Basic interest rates can usually be derived from observable government bond prices and are often quoted in financial publications. These rates typically vary with the expected dates of the projected cash flows

---

[163] IAS 39 ¶AG80.
[164] IAS 39 ¶AG81.
[165] IAS 39 ¶AG82.

Contains Highly Confidential Information

along a yield curve of interest rates for different time horizons. For practical reasons, an entity may use a well-accepted and readily observable general rate, such as LIBOR or a swap rate, as the benchmark rate. (Because a rate such as LIBOR is not the risk-free interest rate, the credit risk adjustment appropriate to the particular financial instrument is determined on the basis of its credit risk in relation to the credit risk in this benchmark rate.) In some countries, the central government's bonds may carry a significant credit risk and may not provide a stable benchmark basic interest rate for instruments denominated in that currency. Some entities in these countries may have a better credit standing and a lower borrowing rate than the central government. In such a case, basic interest rates may be more appropriately determined by reference to interest rates for the highest rated corporate bonds issued in the currency of that jurisdiction.

(b) *Credit risk*. The effect on fair value of credit risk (ie the premium over the basic interest rate for credit risk) may be derived from observable market prices for traded instruments of different credit quality or from observable interest rates charged by lenders for loans of various credit ratings.

(c) *Foreign currency exchange prices*. Active currency exchange markets exist for most major currencies, and prices are quoted daily in financial publications.

(d) *Commodity prices*. There are observable market prices for many commodities.

(e) *Equity prices*. Prices (and indexes of prices) of traded equity instruments are readily observable in some markets. Present value based techniques may be used to estimate the current market price of equity instruments for which there are no observable prices.

(f) *Volatility (ie magnitude of future changes in price of the financial instrument or other item)*. Measures of the volatility of actively traded

**Contains Highly Confidential Information**

items can normally be reasonably estimated on the basis of historical market data or by using volatilities implied in current market prices.

(g) *Prepayment risk and surrender risk.* Expected prepayment patterns for financial assets and expected surrender patterns for financial liabilities can be estimated on the basis of historical data. (The fair value of a financial liability that can be surrendered by the counterparty cannot be less than the present value of the surrender amount—see IAS 39 paragraph 49.)

(h) *Servicing costs for a financial asset or a financial liability.* Costs of servicing can be estimated using comparisons with current fees charged by other market participants. If the costs of servicing a financial asset or financial liability are significant and other market participants would face comparable costs, the issuer would consider them in determining the fair value of that financial asset or financial liability. It is likely that the fair value at inception of a contractual right to future fees equals the origination costs paid for them, unless future fees and related costs are out of line with market comparables

4.      SFAS 157 defines and discusses the Fair Value Hierarchy as follows:

*Fair Value Hierarchy*

- 22. To increase consistency and comparability in fair value measurements and related disclosures, the fair value hierarchy prioritizes the inputs to valuation techniques used to measure fair value into three broad levels. The fair value hierarchy gives the highest priority to quoted prices (unadjusted) in active markets for identical assets or liabilities (Level 1) and the lowest priority to unobservable inputs (Level 3). In some cases, the inputs used to measure fair value might fall in different levels of the fair value hierarchy. The level in the fair value hierarchy within which the fair value measurement in its entirety falls shall be determined based on the lowest level input that is significant to

the fair value measurement in its entirety. Assessing the significance of a particular input to the fair value measurement in its entirety requires judgment, considering factors specific to the asset or liability.[166]

- 23. The availability of inputs relevant to the asset or liability and the relative reliability of the inputs might affect the selection of appropriate valuation techniques. However, the fair value hierarchy prioritizes the inputs to valuation techniques, not the valuation techniques. For example, a fair value measurement using a present value technique might fall within Level 2 or Level 3, depending on the inputs that are significant to the measurement in its entirety and the level in the fair value hierarchy within which those inputs fall.[167]

### *Level 1 inputs*

- 24. Level 1 inputs are quoted prices (unadjusted) in active markets for identical assets or liabilities that the reporting entity has the ability to access at the measurement date. An active market for the asset or liability is a market in which transactions for the asset or liability occur with sufficient frequency and volume to provide pricing information on an ongoing basis. **A quoted price in an active market provides the most reliable evidence of fair value and shall be used to measure fair value whenever available,** except as discussed in SFAS 157 paragraphs 25 and 26.[168]

- 25. If the reporting entity holds a large number of similar assets or liabilities (for example, debt securities) that are required to be measured at fair value, a quoted price in an active market might be available but not readily accessible for each of those assets or liabilities individually. In that case, fair value may be measured using an alternative pricing method that does not rely exclusively on quoted prices (for example, matrix pricing) as a practical expedient.

---

[166] SFAS 157 ¶22.
[167] SFAS 157 ¶23.
[168] SFAS 157 ¶24 (emphasis added).

**Contains Highly Confidential Information**

However, the use of an alternative pricing method renders the fair value measurement a lower level measurement.[169]

- 26. In some situations, a quoted price in an active market might not represent fair value at the measurement date. That might be the case if, for example, significant events (principal-to-principal transactions, brokered trades, or announcements) occur after the close of a market but before the measurement date. The reporting entity should establish and consistently apply a policy for identifying those events that might affect fair value measurements. However, if the quoted price is adjusted for new information, the adjustment renders the fair value measurement a lower level measurement.[170]

- 27. **If the reporting entity holds a position in a single financial instrument (including a block) and the instrument is traded in an active market, the fair value of the position shall be measured within Level 1 as the product of the quoted price for the individual instrument times the quantity held. The quoted price shall not be adjusted because of the size of the position relative to trading volume (blockage factor). The use of a blockage factor is prohibited, even if a market's normal daily trading volume is not sufficient to absorb the quantity held and placing orders to sell the position in a single transaction might affect the quoted price.[171]**

### _Level 2 inputs_

- 28. Level 2 inputs are inputs other than quoted prices included within Level 1 that are observable for the asset or liability, either directly or indirectly. If the asset or liability has a specified (contractual) term, a Level 2 input must be observable for substantially the full term of the asset or liability. Level 2 inputs include the following:[172]

    a. Quoted prices for similar assets or liabilities in active markets

---

[169] SFAS 157 ¶25.
[170] SFAS 157 ¶26.
[171] SFAS 157 ¶27 (emphasis added, footnote omitted).
[172] SFAS 157 ¶28.

**Contains Highly Confidential Information**

b. Quoted prices for identical or similar assets or liabilities in markets that are not active, that is, markets in which there are few transactions for the asset or liability, the prices are not current, or price quotations vary substantially either over time or among market makers (for example, some brokered markets), or in which little information is released publicly (for example, a principal-to-principal market)

c. Inputs other than quoted prices that are observable for the asset or liability (for example, interest rates and yield curves observable at commonly quoted intervals, volatilities, prepayment speeds, loss severities, credit risks, and default rates)

d. Inputs that are derived principally from or corroborated by observable market data by correlation or other means (market-corroborated inputs).

- 29. Adjustments to Level 2 inputs will vary depending on factors specific to the asset or liability. Those factors include the condition and/or location of the asset or liability, the extent to which the inputs relate to items that are comparable to the asset or liability, and the volume and level of activity in the markets within which the inputs are observed. **An adjustment that is significant to the fair value measurement in its entirety might render the measurement a Level 3 measurement, depending on the level in the fair value hierarchy within which the inputs used to determine the adjustment fall.**[173]

### *Level 3 inputs*

- 30. Level 3 inputs are unobservable inputs for the asset or liability. **Unobservable inputs shall be used to measure fair value to the extent that observable inputs are not available, thereby allowing for situations in which there is little, if any, market activity for the asset or liability at the**

---

[173] SFAS 157 ¶29 (emphasis added).

Contains Highly Confidential Information

measurement date. However, the fair value measurement objective **remains the same, that is, an exit price from the perspective of a market participant that holds the asset or owes the liability. Therefore, unobservable inputs shall reflect the reporting entity's own assumptions about the assumptions that market participants would use in pricing the asset or liability (including assumptions about risk). Unobservable inputs shall be developed based on the best information available in the circumstances**, which might include the reporting entity's own data. In developing unobservable inputs, the reporting entity need not undertake all possible efforts to obtain information about market participant assumptions. However, the reporting entity shall not ignore information about market participant assumptions that is reasonably available without undue cost and effort. Therefore, the reporting entity's own data used to develop unobservable inputs shall be adjusted if information is reasonably available without undue cost and effort that indicates that market participants would use different assumptions.[174]

### *Inputs based on bid and ask prices*

- 31. **If an input used to measure fair value is based on bid and ask prices (for example, in a dealer market), the price within the bid-ask spread that is most representative of fair value in the circumstances shall be used to measure fair value, regardless of where in the fair value hierarchy the input falls** (Level 1, 2, or 3). **This Statement does not preclude the use of midmarket pricing or other pricing conventions as a practical expedient for fair value measurements within a bid-ask spread.**[175]

---

[174] SFAS 157 ¶30 (emphasis added).
[175] SFAS 157 ¶31 (emphasis added).

**Contains Highly Confidential Information**

## Appendix V

## Overview of the Audit Process

1.      "To minimize the risk of materially misstated financial statements, users demand that an unbiased auditor monitor (an independent auditor) report on whether the assertions embodied within management's financial statements are reliable."[176] "Financial statements are audited by independent auditors, but the statements are the representations and responsibility of management, not the auditor.  An independent auditor is responsible for expressing an opinion on management's financial statements, but management is responsible for the assertions embodied within the financial statements.  For example, management, not the auditor, is responsible that all recorded assets and liabilities exist, that all recorded transactions occurred, that no transactions are omitted, that assets are the rights and liabilities are the obligations of the entity, that all disclosed amounts are appropriate, and that the financial statements are properly classified and disclosed."[177]

2.      "If an 'absolute' basis were necessary to form an [audit] opinion, then auditors would have to examine entire populations rather than samples, thereby rendering financial statement audits far too costly.  Furthermore, audit risk cannot be totally eliminated by 100 percent testing, because audit risks not related to sampling, such as human error, would still exist." [178]

3.      "There is neither sufficient time nor, given the laws of probability, sufficient reason to test all of the transactions underlying an entity's account balances or classes of transactions.  As a result, many if not most of the conclusions auditors reach about controls, balances and classes of transactions are based on testing samples rather than entire populations."[179]

---

[176] David N. Ricchiute, *Auditing*, 8th edition (United States: Thomson / South-Western, 2006 (ISBN: 0-324-22629-2)), 6.
[177] David N. Ricchiute, *Auditing*, 8th edition (United States: Thomson / South-Western, 2006 (ISBN: 0-324-22629-2)), 6.
[178] David N. Ricchiute, *Auditing*, 8th edition (United States: Thomson / South-Western, 2006 (ISBN: 0-324-22629-2)), 357.
[179] David N. Ricchiute, *Auditing*, 8th edition (United States: Thomson / South-Western, 2006 (ISBN: 0-324-22629-2)), 355.

## Appendix VI

## Auditing Fair Value Measurements and Disclosures

1.      PwC conducted its audits of Barclays in accordance with the standards of the Public Accounting Oversight Board (United States).[180]

2.      The Public Accounting Oversight Board codified Statement on Auditing Standards ("SAS") 101, *Auditing Fair Value Measurements and Disclosures*, into Auditing Section 328 (AU 328), *Auditing Fair Value Measurements and Disclosures.* AU 328 establishes standards and provides guidance on auditing fair value measurements and disclosures contained in financial statements:

- 2.   The auditor should obtain sufficient competent audit evidence to provide reasonable assurance that fair value measurements and disclosures are in conformity with GAAP. GAAP requires that certain items be measured at fair value.[181]

- 4.   Management is responsible for making the fair value measurements and disclosures included in the financial statements.  As part of fulfilling its responsibility, management needs to establish an accounting and financial reporting process for determining the fair value measurements and disclosures, select appropriate valuation methods, identify and adequately support any significant assumptions used, prepare the valuation, and ensure that the presentation and disclosure of the fair value measurements are in accordance with GAAP.[182]

- 8.   The measurement of fair value may be relatively simple for certain assets or liabilities, for example, investments that are bought and sold in active markets that provide readily available and reliable information on the prices at

---

[180] Report of the Independent Registered Public Accounting Firm (PriceWaterhouseCoopers LLP – Chartered Accountants and Registered Auditors) to the Board of Directors and Shareholders of Barclays PLC (Barclays PLC and Barclays Bank PLC Form 20-F for the fiscal year ended December 31, 2008, page 177).

[181] AU Section 328, ¶2.

[182] AU Section 328, ¶4.

Contains Highly Confidential Information

which actual exchanges occur. For those items, the existence of published price quotations in an active market is the best evidence of fair value. The measurement of fair value for other assets or liabilities may be more complex. A specific asset may not have an observable market price or may possess such characteristics that it becomes necessary for management to estimate its fair value based on the best information available in the circumstances (for example, a complex derivative financial instrument). The estimation of fair value may be achieved through the use of a valuation method (for example, a model premised on discounting of estimated future cash flows).[183]

- 8.– 9.    The auditor should obtain an understanding of the entity's process for determining fair value measurements and disclosures and of the relevant controls sufficient to develop an effective audit approach.[184] When obtaining an understanding of the entity's process for determining fair value measurements and disclosures, the auditor considers, for example:[185]

  o Controls over the process used to determine fair value measurements, including, for example, controls over data and the segregation of duties between those committing the entity to the underlying transactions and those responsible for undertaking the valuations.

  o The expertise and experience of those persons determining the fair value measurements.

  o The role that information technology has in the process.

  o The types of accounts or transactions requiring fair value measurements or disclosures (for example, whether the accounts arise from the recording of routine and recurring transactions or whether they arise from nonroutine or unusual transactions).

  o The extent to which the entity engages or employs specialists in determining fair value measurements and disclosures.

---

[183] AU Section 328, ¶8.
[184] AU Section 328, ¶9.
[185] AU Section 328, ¶12.

**Contains Highly Confidential Information**

- o The significant management assumptions used in determining fair value.

- o The documentation supporting management's assumptions.

- o The process used to develop and apply management assumptions, including whether management used available market information to develop the assumptions.

- o The process used to monitor changes in management's assumptions.

- o The integrity of change controls and security procedures for valuation models and relevant information systems, including approval processes.

- o The controls over the consistency, timeliness, and reliability of the data used in valuation models.

- 13.   The auditor uses his or her understanding of the entity's process, including its complexity, and of the controls when assessing the risk of material misstatement. Based on that risk assessment, the auditor determines the nature, timing, and extent of the audit procedures. The risk of material misstatement may increase as the accounting and financial reporting requirements for fair value measurements become more complex.[186]

- 18.   When there are no observable market prices and the entity estimates fair value using a valuation method, the auditor should evaluate whether the entity's method of measurement is appropriate in the circumstances. That evaluation requires the use of professional judgment. It also involves obtaining an understanding of management's rationale for selecting a particular method by discussing with management its reasons for selecting the valuation method. The auditor considers whether:[187]

     a.) Management has sufficiently evaluated and appropriately applied the criteria, if any, provided by GAAP to support the selected method.

---

[186] AU Section 328, ¶13.
[187] AU Section 328, ¶18.

**Contains Highly Confidential Information**

b.) The valuation method is appropriate in the circumstances given the nature of the item being valued.

c.) The valuation method is appropriate in relation to the business, industry, and environment in which the entity operates.

- 23.   Based on the auditor's assessment of the risk of material misstatement, the auditor should test the entity's fair value measurements and disclosures. Because of the wide range of possible fair value measurements, from relatively simple to complex, and the varying levels of risk of material misstatement associated with the process for determining fair values, the auditor's planned audit procedures can vary significantly in nature, timing, and extent.[188]

- 24.   Some fair value measurements are inherently more complex than others. This complexity arises either because of the nature of the item being measured at fair value or because of the valuation method used to determine fair value. For example, in the absence of quoted prices in an active market, an estimate of a security's fair value may be based on valuation methods such as the discounted cash flow method or the transactions method. Complex fair value measurements normally are characterized by greater uncertainty regarding the reliability of the measurement process. This greater uncertainty may be a result of:[189]

  o   The length of the forecast period

  o   The number of significant and complex assumptions associated with the process

  o   A higher degree of subjectivity associated with the assumptions and factors used in the process

  o   A higher degree of uncertainty associated with the future occurrence or outcome of events underlying the assumptions used

---

[188] AU Section 328, ¶23.
[189] AU Section 328, ¶24.

**Contains Highly Confidential Information**

   o   Lack of objective data when highly subjective factors are used

- 25.   The auditor uses both the understanding of management's process for determining fair value measurements and his or her assessment of the risk of material misstatement to determine the nature, timing, and extent of the audit procedures. The following are examples of considerations in the development of audit procedures:[190]

   o   The fair value measurement (for example, a valuation by an independent appraiser) may be made at a date that does not coincide with the date at which the entity is required to measure and report that information in its financial statements. In such cases, the auditor obtains evidence that management has taken into account the effect of events, transactions, and changes in circumstances occurring between the date of the fair value measurement and the reporting date.

   o   Collateral often is assigned for certain types of investments in debt instruments that either are required to be measured at fair value or are evaluated for possible impairment. If the collateral is an important factor in measuring the fair value of the investment or evaluating its carrying amount, the auditor obtains sufficient competent audit evidence regarding the existence, value, rights, and access to or transferability of such collateral, including consideration of whether all appropriate liens have been filed, and considers whether appropriate disclosures about the collateral have been made.

   o   In some situations, additional procedures, such as the inspection of an asset by the auditor, may be necessary to obtain sufficient competent audit evidence about the appropriateness of a fair value measurement. For example, inspection of the asset may be necessary to obtain information about the current physical condition of the asset relevant to its fair value, or inspection of a security may reveal a restriction on its marketability that may affect its value.

---

[190] AU Section 328, ¶25.

- 26.    The auditor's understanding of the reliability of the process used by management to determine fair value is an important element in support of the resulting amounts and therefore affects the nature, timing, and extent of audit procedures. When testing the entity's fair value measurements and disclosures, the auditor evaluates whether:[191]

    a.) Management's assumptions are reasonable and reflect, or are not inconsistent with, market information.

    b.) The fair value measurement was determined using an appropriate model, if applicable.

    c.) Management used relevant information that was reasonably available at the time.

- 32.    Audit procedures dealing with management's assumptions are performed in the context of the audit of the entity's financial statements. The objective of the audit procedures is therefore not intended to obtain sufficient competent audit evidence to provide an opinion on the assumptions themselves. Rather, the auditor performs procedures to evaluate whether the assumptions provide a reasonable basis for measuring fair values in the context of an audit of the financial statements taken as a whole.[192]

- 34.    The auditor considers the sensitivity of the valuation to changes in significant assumptions, including market conditions that may affect the value. Where applicable, the auditor encourages management to use techniques such as sensitivity analysis to help identify particularly sensitive assumptions. If management has not identified particularly sensitive assumptions, the auditor considers whether to employ techniques to identify those assumptions.[193]

- 36.    To be reasonable, the assumptions on which the fair value measurements are based (for example, the discount rate used in calculating the present value

---

[191] AU Section 328, ¶26.
[192] AU Section 328, ¶32.
[193] AU Section 328, ¶34.

**Contains Highly Confidential Information**

of future cash flows), individually and taken as a whole, need to be realistic
and consistent with:[194]

    a.) The general economic environment, the economic environment of the
specific industry, and the entity's economic circumstances;

    b.) Existing market information;

    c.) The plans of the entity, including what management expects will be
the outcome of specific objectives and strategies;

    d.) Assumptions made in prior periods, if appropriate;

    e.) Past experience of, or previous conditions experienced by, the entity to
the extent currently applicable;

    f.) Other matters relating to the financial statements, for example,
assumptions used by management in accounting estimates for financial
statement accounts other than those relating to fair value
measurements and disclosures; and

    g.) The risk associated with cash flows, if applicable, including the
potential variability in the amount and timing of the cash flows and the
related effect on the discount rate.

- 39.  The auditor should test the data used to develop the fair value
  measurements and disclosures and evaluate whether the fair value
  measurements have been properly determined from such data and
  management's assumptions. Specifically, the auditor evaluates whether the
  data on which the fair value measurements are based, including the data used
  in the work of a specialist, is accurate, complete, and relevant; and whether
  fair value measurements have been properly determined using such data and
  management's assumptions. The auditor's tests also may include, for example,
  procedures such as verifying the source of the data, mathematical
  recomputation of inputs, and reviewing of information for internal
  consistency, including whether such information is consistent with

---

[194] AU Section 328, ¶36.

Contains Highly Confidential Information

management's intent and ability to carry out specific courses of action discussed in paragraph 17.[195]

- 40.   The auditor may make an independent estimate of fair value (for example, by using an auditor developed model) to corroborate the entity's fair value measurement.  When developing an independent estimate using management's assumptions, the auditor evaluates those assumptions as discussed in paragraphs 28 to 37. Instead of using management's assumptions, the auditor may develop his or her own assumptions to make a comparison with management's fair value measurements. In that situation, the auditor nevertheless understands management's assumptions. The auditor uses that understanding to ensure that his or her independent estimate takes into consideration all significant variables and to evaluate any significant difference from management's estimate. The auditor also should test the data used to develop the fair value measurements and disclosures as discussed in paragraph 39.[196]

---

[195] AU Section 328, ¶39.
[196] AU Section 328, ¶40.

# Exhibit B

Page 1

1

2              UNITED STATES BANKRUPTCY COURT

3              SOUTHERN DISTRICT OF NEW YORK

4       ----------------------x

5       In Re:

6                            Chapter 11

7       LEHMAN BROTHERS        Case No. 08-13555(JMP)

8       HOLDINGS, INC., et al.,    (Jointly Administered)

9

10                  Debtors.

11      ----------------------x

12

13           DEPOSITION OF JOHN P. GARVEY

14              New York, New York

15               April 13, 2010

16

17

18

19

20

21

22

23      Reported by:

24      KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25      JOB NO. 29651

Page 2

```
 1
 2              April 13, 2010
 3              9:50 A.M.
 4
 5        Deposition of JOHN P. GARVEY, held
 6   at the law offices of Boies Schiller &
 7   Flexner, LLP, 575 Lexington Avenue, New
 8   York, New York, before Kathy S. Klepfer,
 9   a Registered Professional Reporter,
10   Registered Merit Reporter, Certified
11   Realtime Reporter, Certified Livenote
12   Reporter, and Notary Public of the State
13   of New York.
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2
 3         A P P E A R A N C E S:
 4
 5   JONES DAY, LLP
 6   Attorneys for Lehman Brothers, Inc.
 7      222 East 41st Street
 8      New York, New York  10017-6702
 9   BY:  KELLY A. CARRERO, ESQ.
10        BART GREEN, ESQ.
11
12   BOIES, SCHILLER & FLEXNER, LLP
13   Attorneys for Barclays
14      5301 Wisconsin Avenue, N.W.
15      Washington, D.C.  20015
16   BY:  HAMISH HUME, ESQ.
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1
 2       A P P E A R A N C E S: (Cont'd.)
 3
 4   QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
 5   Attorneys for the Creditors Committee
 6      51 Madison Avenue
 7      22nd Floor
 8      New York, New York  10010
 9   BY:  ERIC M. KAY, ESQ.
10
11   HUGHES, HUBBARD & REED, LLP
12   Attorneys for the SIPA Trustee
13      1775 I Street, N.W.
14      Washington, D.C.  20006-2410
15   BY:  JOHN F. WOOD, ESQ.
16
17
18
19   ALSO PRESENT:
20      MARC VELLRATH, FSG
21
22
23
24
25
```

Page 5

```
 1              J. Garvey
 2   JOHN P. GARVEY, called as a
 3      witness, having been duly sworn by a Notary
 4      Public, was examined and testified as
 5      follows:
 6   EXAMINATION BY
 7   MR. HUME:
 8      Q.   Good morning, Mr. Garvey.
 9      A.   Good morning.
10      Q.   I would like to begin by handing you
11   what's been marked previously as Deposition
12   Exhibit 445.
13           Mr. Garvey, Exhibit 445 is the cover
14   page and an excerpt from SEC filing Form 6-K
15   that Barclays PLC and Barclays Bank PLC filed
16   with the SEC on February 9, 2009.  Do you see
17   that?
18      A.   Yes.
19      Q.   And have you seen this document
20   before?
21      A.   Yes.
22      Q.   The excerpted page is page 83 of that
23   SEC filing.  Do you see that?
24      A.   Yes.
25      Q.   And you see on page 83 Barclays
```

2 (Pages 2 to 5)

1          J. Garvey
2  provides an Acquisition Balance Sheet for its
3  acquisition of the Lehman Brothers North
4  American business, do you see that?
5      A.   Yes.
6      Q.   Is it your opinion, Mr. Garvey, that
7  Barclays materially misstated the value of the
8  assets on this SEC filing?
9          MS. CARRERO:  Objection to the form of
10 the question.
11     A.   I didn't undertake to study that
12 opinion.
13     Q.   Just so the question is clear, my
14 question is do you have an opinion, Mr. Garvey,
15 as to whether Barclays materially misstated the
16 value of the assets acquired in the Lehman
17 Brothers acquisition on its Form 6-K filed with
18 the SEC in February 2009?
19     A.   My opinions are in my report.  I don't
20 have that opinion.
21     Q.   You do not have that opinion?
22     A.   No.  My opinions are outlined in my
23 report.
24     Q.   Okay.  Do you have an opinion, Mr.
25 Garvey, as to whether or not

1          J. Garvey
2  PricewaterhouseCoopers failed to conduct a
3  competent audit of Barclays when it audited the
4  Acquisition Balance Sheet Barclays prepared for
5  the Lehman Brothers acquisition?
6      A.   My opinions are in my report.  I don't
7  know what you mean by "competent audit."  I
8  don't have an opinion on the -- I didn't
9  undertake to study what PwC did in its audit of
10 the opening balance sheet in total.
11     Q.   Well, my question is do you have an
12 opinion as to whether PwC properly exercised
13 proper professional -- let me try to rephrase
14 that.
15         When you say you don't know what I
16 mean by competent audit, you are a qualified
17 CPA, correct?
18     A.   I am a CPA, yes.
19     Q.   And you are putting yourself out as an
20 expert in auditing and accounting?
21     A.   Correct.
22     Q.   Both auditing and accounting?
23     A.   Correct.
24     Q.   Have you reviewed PwC's auditing of
25 the Barclays Acquisition Balance Sheet relating

1          J. Garvey
2  to the Lehman Brothers acquisition?
3      A.   I don't know what you mean by reviewed
4  their auditing.  I reviewed some of the PwC work
5  papers, yes.
6      Q.   Do you feel that you have conducted a
7  sufficient review to have an opinion one way or
8  another as to whether PwC committed any form of
9  professional malpractice in its auditing of the
10 Barclays Acquisition Balance Sheet for the
11 Lehman Brothers acquisition?
12         MS. CARRERO:  Object to the form of
13 the question.
14     A.   I didn't undertake to do that and I
15 don't have any opinion about PwC's conduct in
16 this audit.
17     Q.   Do you have any opinion about whether
18 PwC made any professional errors in its auditing
19 of the Barclays Acquisition Balance Sheet for
20 the Lehman Brothers acquisition?
21     A.   I have an opinion about whether
22 PwC made professional errors.
23     Q.   Can I hand you, please, what has been
24 marked as your report as Exhibit 705.
25         (Exhibit 705, Expert Report of John P.

1          J. Garvey
2  Garvey dated March 15, 2010, marked for
3  identification, as of this date.)
4      Q.   I would like to refer you first, Mr.
5  Garvey, to paragraph 13 of your report where you
6  talk about the term "book value" being used
7  interchangeably with Lehman's marks.  Do you see
8  that paragraph?
9      A.   I do.
10     Q.   And you then say, "The source of
11 Lehman's marks is a central database system for
12 pricing and other data called Lehman Global
13 Funding System," do you see that?
14     A.   Yes.
15     Q.   Where did you learn that information?
16     A.   I learned that from studying the
17 record.
18     Q.   What do you mean by that?
19     A.   Well, I learned that from many of the
20 documents that I reviewed as well as the
21 depositions that I read.
22     Q.   Can you be more specific?  Can you
23 remember anything specifically that alerted you
24 to the GFS system?
25     A.   I think I have a footnote that says

Page 10

```
 1              J. Garvey
 2    "GFS is Lehman's Global Funding System, a global
 3    data warehouse."  You can read it, but -- and
 4    there's a document cited there.
 5        Q.   Did you discuss the GFS system with
 6    anybody in preparing your report?
 7        A.   I discussed it with my colleagues,
 8    discussed it with counsel.
 9        Q.   Other than counsel, when you say your
10    colleagues, what do you mean by that?
11        A.   Well, we had many people working on
12    this case.
13        Q.   And remind me, where are your
14    colleagues?  What's the name of your firm?
15             MS. CARRERO:  Objection to form.
16        A.   What is the name of our --
17        Q.   When you say "colleagues," do you mean
18    at Chicago Partners?
19        A.   At Navigant Economics, formerly known
20    as Chicago Partners, yes.
21        Q.   Other than your colleagues there or
22    counsel, did you discuss the GFS system with
23    anybody else?
24        A.   I don't think so.
25        Q.   In other words, did you discuss it
```

Page 11

```
 1              J. Garvey
 2    with anyone currently employed by either of the
 3    Lehman estates?
 4        A.   I did not personally.
 5        Q.   Do you know whether any of your
 6    colleagues did?
 7        A.   I don't know the answer to that.  They
 8    may have.
 9        Q.   And do you know whether you or any of
10    your colleagues discussed it with anyone working
11    in the Transition Services Agreement?  Are you
12    familiar with what that is?
13        A.   I'm familiar with what that is, yes.
14        Q.   And just the same question:  Do you
15    know whether you or any of your colleagues
16    discussed the GFS system with anyone working
17    under this TSA arrangement?
18        A.   I did not.  Some of my colleagues may,
19    but I don't know any of the specifics.
20        Q.   Do you know, regardless of the
21    specifics of the conversation, did you learn
22    from your colleagues anything about how the GFS
23    system works?
24        A.   Anything about how the GFS system
25    works?  I understand it.  It works according to
```

Page 12

```
 1              J. Garvey
 2    what I have in this report.  It was the central
 3    database pricing system.
 4        Q.   And it's your understanding that it
 5    was the system that you would look to to learn
 6    what Lehman's marks were on any given day?
 7             MS. CARRERO:  Objection to the form of
 8        the question.
 9        A.   As a general premise, yes.
10        Q.   And did you understand that it -- that
11    there were different components of the GFS
12    system, a component for the Fixed Income
13    Division and a component for the Equities
14    Division, are you familiar with that?
15        A.   I don't know what you mean by
16    "component."  I know there were different asset
17    classes being valued by the system.
18        Q.   Yes, the word "component" may be the
19    wrong word.  Just that did you know that there
20    were different parts of the system for different
21    divisions within the company?
22             MS. CARRERO:  Objection to the form of
23        the question.
24        A.   Yes, I don't know the distinction
25    between "component" or "part."  I know that
```

Page 13

```
 1              J. Garvey
 2    there were different asset classes.
 3        Q.   Do you have any opinion, Mr. Garvey,
 4    as to whether the GFS system was accurate,
 5    materially accurate, as of September 12, 2008?
 6             MS. CARRERO:  Objection to the form of
 7        the question.
 8        A.   Yes, I'm not sure what your definition
 9    of "material" is.
10        Q.   I'm simply trying to ask you whether
11    it's your understanding that the GFS system was
12    the most accurate source for Lehman's marks on
13    its inventory of financial assets as of
14    September 12, 2008?
15             MS. CARRERO:  Objection.
16        A.   I didn't study the GFS system at
17    length.  My opinion would be if you wanted to
18    figure out what Lehman's marks were, the GFS
19    system was the best place to find that out.
20        Q.   Let me refer you to paragraph 14, and
21    you're referring here again to the term "book
22    value"?
23        A.   Right.
24        Q.   Do you have an opinion as to whether
25    or not the term "book value" is a more
```

4 (Pages 10 to 13)

Page 14

1           J. Garvey
2  accurate -- strike that.
3           Does the term "book value" in your
4  professional opinion have the same meaning as
5  "carrying value"?
6     A.   Not necessarily.  And I don't know
7  what your definition of "carrying value" is,
8  but...
9     Q.   Can you tell me what, if any,
10 difference might exist between the term "book
11 value" and the term "carrying value"?
12    A.   I don't know.
13    Q.   Can you tell me what your
14 understanding is of the term "carrying value"?
15    A.   I have no understanding of the term
16 "carrying value" as you used it.
17    Q.   Do you have an opinion as to whether
18 the term "carrying value" is a defined term of
19 art within GAAP to refer to the marks on an
20 institution's balance sheet?
21         MS. CARRERO:  Objection to the form of
22 the question.
23    A.   I didn't understand your question.
24    Q.   Can you define your understanding of
25 the term "book value"?

Page 15

1           J. Garvey
2     A.   My understanding of the term "book
3  value" is defined in my report.  It's the value
4  reported in the books at any point in time,
5  books and records.
6     Q.   Let me refer you to paragraph 16 of
7  your report.
8     A.   Yes.
9     Q.   You say there that, "This section
10 highlights several flaws and inconsistencies in
11 the valuation methods Barclays employed."
12    A.   Yes.
13    Q.   Do you consider yourself an expert in
14 valuation?
15    A.   I have been qualified and have
16 testified in certain matters related to
17 valuation.
18    Q.   Are you a valuation expert or are you
19 an accounting expert?
20    A.   I believe I'm -- my report states that
21 I'm an expert in accounting, auditing and
22 valuation.  I did not attempt for purposes of
23 this report to value any of the securities, if
24 that's what you're asking me.
25    Q.   Paragraph 18, you make a reference to

Page 16

1           J. Garvey
2  not valuing securities on Schedule A and B on
3  the closing date.
4     A.   Yes.
5     Q.   I, at least, could not find a
6  definition of the term "closing date" in your
7  report.  Do you know if you have one?
8     A.   I don't know if I've defined it, but I
9  have certain references to the closing date in
10 this report.
11    Q.   And what is your definition of
12 "closing date" as used in your report?
13    A.   The closing date is defined in my
14 report according to -- I don't have the
15 reference, but it's 12:01 A.M. after the
16 closing, which I think is September 19 or over
17 the weekend.  The 20th -- I think the deal
18 closed on September 19th, and I believe that the
19 closing date is defined in this report in
20 footnote 24.
21    Q.   Where in footnote 24 does it define
22 the closing date?
23    A.   Last bullet.
24    Q.   It uses the term "closing date," but
25 it doesn't define closing date?

Page 17

1           J. Garvey
2         MS. CARRERO:  Is there a question in
3  there?
4         MR. HUME:  That's a fair point.
5     Q.   Can you tell me how the last bullet
6  point defines the phrase "closing date"?
7     A.   Well, it speaks for itself.  It says,
8  "Unless" -- do you want to read it?
9     Q.   I would like you to tell me what the
10 definition of the closing date is that you
11 believe the last bullet point provides.
12    A.   "Unless otherwise agreed by the
13 parties in writing, the closing shall be deemed
14 effective, and all right, title and interest of
15 seller to be acquired by purchaser hereunder
16 shall be considered to have passed to purchaser
17 as of 12:01 A.M. New York time on the closing
18 date."
19    Q.   And that references the closing date,
20 but I don't believe it defines closing date.
21         In terms of an actual calendar day, I
22 believe you said a moment ago that your
23 understanding of the closing date was September
24 19; is that correct?
25         MS. CARRERO:  Objection to the form of

5 (Pages 14 to 17)

Page 18

J. Garvey

1    the question.
2    A.    That's my understanding, yes.
3    Q.    And what is your understanding of the
4    closing?
5        MS. CARRERO:  Objection to the form of
6    the question.
7    Q.    What does it mean to say the deal
8    closed?
9    A.    I think it's defined in the bullet I
10   just read.
11   Q.    Can the deal close before all the
12   documents are finished and signed?
13       MS. CARRERO:  Objection to the form of
14   the question.
15   A.    I'm not a lawyer.  That requires a
16   legal conclusion.
17   Q.    Well, but I'm not -- I'm asking you
18   for your understanding of what the closing is in
19   order to understand what the closing date is.
20       MS. CARRERO:  Objection.
21   A.    September 19.
22   Q.    The closing date is September 19?
23   A.    Yes.
24   Q.    What is the basis for your

Page 19

J. Garvey

1    understanding of that?
2    A.    Everything I reviewed and the things
3    I've outlined in this report.
4    Q.    And is it therefore your opinion that
5    the assets Barclays acquired should be valued as
6    of September 19, 2008?
7    A.    I believe that's the correct closing
8    date, measurement date and valuation date, yes.
9    Q.    And is that opinion based on the
10   understanding that September 19, 2008 was the
11   date of closing?
12       MS. CARRERO:  Objection to the form of
13   the question.
14   A.    It's based on my understanding that
15   that was the date of the closing, yes.
16   Q.    And is it your understanding that the
17   assets should be valued as of the open of the
18   business on September 19, 2008 or the close of
19   business on September 19, 2008?
20       MS. CARRERO:  Objection to the form of
21   the question.  If we can take a break for a
22   second to clarify something because I think
23   this line of questioning is --
24       If we can do this off the record.

Page 20

J. Garvey

1    COURT REPORTER:  Do you want to go off
2    the record?
3        MR. HUME:  No.
4        MS. CARRERO:  I think that this line
5    of questioning is misleading because I think
6    that there is just an error in the closing
7    date issue that --
8        MR. HUME:  I think your witness has
9    made an error in his testimony.  There's
10   nothing misleading about my questioning.
11       MS. CARRERO:  Well, I think it's
12   misleading in that my witness has testified
13   that the measurement date is September 19,
14   and I think that we're going down a road
15   where I'd like to just talk to my witness
16   first and ask him a question to make sure
17   that he understands the question.
18       MR. HUME:  Okay.
19       (Ms. Carrero confers with the
20   witness.)
21       MR. HUME:  Back on the record.  Okay.
22   Let the record reflect that the witness has
23   conferred with his counsel here in the
24   deposition.

Page 21

J. Garvey

1    BY MR. HUME:
2    Q.    And would you now like to correct any
3    of your testimony, Mr. Garvey?
4    A.    No.
5    Q.    Let me move on to paragraph 25 of your
6    report.  In paragraph 25, you say that, "A
7    majority of the" -- well, perhaps it would be
8    easier if we back up to paragraph 22.  You
9    understand that certain assets that Barclays was
10   valuing were valued based upon sales information
11   based upon sales that occurred shortly after
12   closing, correct?
13       MS. CARRERO:  Objection to the form of
14   the question.
15   A.    Yes, I don't know what you mean by
16   "shortly," but I am aware that certain assets
17   were valued after the 19th based on sales,
18   purported sales prices, yes.
19   Q.    In paragraph 21 you say that, "The use
20   of September 30, 2008 is the measurement date
21   for certain securities is confirmed by a
22   Barclays document."  Do you see that?
23   A.    Yes.
24   Q.    Was September 30, 2008 used as a

6 (Pages 18 to 21)

1        J. Garvey
2   measurement date or was it used as a cut-off
3   date for determining whether sales information
4   would be used?
5        MS. CARRERO:  Objection to the form of
6   the question.
7        A.   I think it was used in certain
8   instances as a measurement date and in certain
9   instances as a cut-off date.
10       Q.   And is the basis for that opinion the
11  documents cited in the footnotes in paragraph 21
12  of your report?
13       A.   I think that and there may be other
14  documents, but that is the one we cited.
15       Q.   Now, have you reviewed, even at a
16  summary level the nature of the assets, the type
17  of assets Barclays acquired in this transaction?
18       A.   At a summary level, yes.
19       Q.   Would you agree with me that some of
20  those assets were illiquid, by which I mean they
21  did not have a daily trading price that could be
22  observed?
23       MS. CARRERO:  Objection to the form of
24  the question.
25       A.   I agree that there were certain

1        J. Garvey
2   securities that may not have a -- may not have
3   had a daily price that could be observed.
4        Q.   And for terminology sake, it may be
5   helpful if I can -- if we can agree that when I
6   ask you whether an asset is illiquid, by that I
7   mean, obviously there are degrees of liquidity,
8   but if an asset did not have a daily observable
9   trading price during the week of the sale, that
10  you literally could not look up any price, would
11  you agree that that kind of asset would be
12  illiquid?
13       A.   The fact that you couldn't see the
14  price may be an indicia of it not being liquid.
15       Q.   Let's put aside that definition, then,
16  and let me ask the question this way:  For an
17  asset that did not have an observable trading
18  price on the date of closing, would you agree
19  that the best information about the value of
20  that asset is the actual sales price of that
21  asset if it sold within one week of closing?
22       MS. CARRERO:  Objection to the form of
23  the question.
24       A.   I, as a hypothetical matter, if that's
25  what you're asking me, I'm not sure I would

1        J. Garvey
2   agree with that.  It would depend on other facts
3   and circumstances.
4        Q.   Okay.  Well, I'd like to understand
5   exactly what facts and circumstances you think
6   would maybe make that not true or true in some
7   circumstances.
8        A.   Well, it would depend on, for
9   starters, who you sold it to, whether you sold
10  it to an external party or an internal party.
11  It would depend on how long it was, the time
12  period.  It would depend on whether or not
13  anything fundamentally changed with respect to
14  that security in the time from closing to this
15  hypothetical one week -- I think you used one
16  week later.
17       Q.   Yes.
18       A.   Those are things I can think of.
19       Q.   So let's break that down and just make
20  sure I understand.  For a structured financial
21  product which is not traded on a public exchange
22  and does not have an observable price in the
23  market, what in your opinion is the methodology
24  that should be used to value that product as of
25  the closing?

1        J. Garvey
2        MS. CARRERO:  Objection to the form of
3   the question.
4        A.   You know, I'm not -- I relied on other
5   experts to actually do the valuation, but I
6   can -- I could tell you that for a structured
7   product you'd have to look at the product and
8   understand the structure and build a model and
9   try to value -- you could value the product as
10  of the closing date based on building a model
11  that understood the structure or the structured
12  product.
13       Q.   What if the structured product
14  entitles the holder to receive a thousand
15  dollars a year for ten years, to simplify it,
16  but right now there's no observable trading
17  price for that product, should you simply take
18  the thousand dollars a year for the next ten
19  years and discount it to present value to
20  determine its value or should you also look at
21  the strength of the collateral, the likelihood
22  of the payor to actually be liquid and be able
23  to pay?
24       MS. CARRERO:  Objection to the form of
25  the question.

Page 26

J. Garvey

1
2     A.   I'm not a valuation expert in
3  structured products, but I would -- I would
4  think that you, at a very high level, would look
5  at the cash flows, the correct discount rate,
6  and then the collateral and the ability to pay,
7  the other risks related to it.  But that's not
8  my area of expertise.
9     Q.   Do you have an opinion one way or the
10 other as to whether the ability of the payor to
11 pay was relevant to the effort by Barclays to
12 value the different kinds of structured
13 financial products it received in this
14 transaction?
15        MS. CARRERO:  Object to the form of
16 the question.
17     A.   I don't understand the question.
18     Q.   Well, do you believe factors such as
19 the strength of the collateral and the ability
20 of the payor to pay on a structured financial
21 product was relevant to the Barclays valuation
22 of the structured financial products it received
23 in this transaction?
24     A.   I didn't undertake to study that.  I
25 know other people did.  I don't have an opinion

Page 27

J. Garvey

1
2  on that because I didn't -- that's not what I
3  was asked to do.
4     Q.   Do you have an opinion one way or the
5  other as to whether different kinds of
6  structured financial products received by
7  Barclays in this transaction would need to be
8  valued differently based upon the nature of the
9  collateral and the nature of the parties
10 responsible for making payment under that
11 product?
12        MS. CARRERO:  Objection to the form of
13 the question.
14     A.   I didn't study that.  I don't have an
15 opinion on that.
16     Q.   What is your understanding, going now
17 back to paragraph 25, what is your understanding
18 of the internal transfers that Barclays relied
19 upon to determine the sales that were relevant
20 to determining values for some of the products
21 it acquired?
22        MS. CARRERO:  Objection to the form of
23 the question.
24     A.   My understanding is outlined in
25 paragraph 25; that a majority of the sales were

Page 28

J. Garvey

1
2  realized from internal sales and that that
3  understanding is driven by the document that's
4  footnote 33, Exhibit 533A.
5     Q.   Do you have any understanding whether
6  those internal transfers are -- strike that.
7  What is your basis for believing that those
8  internal transfers are not an accurate source
9  for determining the value of the securities
10 being transferred?
11        MS. CARRERO:  Objection to the form of
12 the question.
13     A.   I'm not sure that's my testimony.  My
14 testimony is that Professor Pfleiderer failed to
15 acknowledge that in his report and in his
16 deposition testimony, and the GAAP would tell
17 you, 157 specifically, that if you are doing
18 internal transfers, that is an indicia that they
19 might not be arm's length and someone should
20 study that and try to figure that out.
21     Q.   But you haven't studied it to
22 determine whether or not they are arm's length
23 or not?
24        MS. CARRERO:  Objection to the form of
25 the question.

Page 29

J. Garvey

1
2     A.   I have not undertaken that study, no.
3     Q.   I just want to make sure I understand
4  your opinion on the relevance of sales that are
5  not internal sales but to external parties and
6  that occurred before September 30, 2008.  So let
7  me --
8        MS. CARRERO:  Objection.
9     Q.   -- just try to make sure the
10 questioning is clear.
11        Is it your understanding that Barclays
12 valued some of the securities it received in
13 this transaction by looking to sales data when
14 it sold the securities in question before
15 September 30, 2008?
16        MS. CARRERO:  Objection to the form of
17 the question.
18     A.   I have a general understanding that
19 certain securities were valued at the sales
20 value before or on September 30, between the
21 closing date and September 30.
22     Q.   And is it your understanding that
23 Barclays only used that sales price when the
24 sale occurred on or before September 30, 2008?
25     A.   That's my general understanding, yes.

8 (Pages 26 to 29)

Page 30

```
 1              J. Garvey
 2      Q.    And do you think that is
 3   inappropriate?
 4      A.    Yes.
 5      Q.    And why do you think that?
 6      A.    Because you have to value the
 7   securities on the measurement date.
 8      Q.    And --
 9      A.    Which is the closing date.
10      Q.    And if there is no observable pricing
11   data on the closing date, isn't the best source
12   of information the sale price that you actually
13   realized within a week after the closing?
14          MS. CARRERO:  Objection to the form of
15      the question.
16      A.    I already answered this question.  Not
17   necessarily.
18      Q.    And one of your reasons not
19   necessarily was the sale might have been
20   internal, which we've talked about.  So now let
21   me limit my question to sales that are not
22   internal.
23          If there's no observable price in the
24   market on the closing date, but you have an
25   external sale to an outside party within the
```

Page 31

```
 1              J. Garvey
 2   week immediately following the closing, isn't
 3   that sale price the best indicia of the value of
 4   that asset on the closing date?
 5          MS. CARRERO:  Objection to the form of
 6      the question.
 7      A.    It would be one indicia.  It would
 8   depend on other facts and circumstances.
 9      Q.    Do you agree that under certain
10   circumstances it may be the best indicia of the
11   value of an asset as of the closing?
12      A.    As a hypothetical matter?
13      Q.    Yes.
14      A.    It would depend on all the facts --
15   other facts and circumstances, but it could --
16   that's a possibility.
17      Q.    In other words, if you had a security
18   where there was significant doubt about its
19   value because of the value of its collateral,
20   the ability of a payor to pay, the complexity of
21   the product and the fact that no one was trading
22   in it, would you agree under those circumstances
23   that the actual sale realized within a week
24   after closing is the best indicia of the value
25   of that product as of the closing?
```

Page 32

```
 1              J. Garvey
 2          MS. CARRERO:  Objection to the form of
 3      the question.
 4      A.    Yes, I mean, under your hypothetical,
 5   that is a possibility.  It would depend on
 6   whether there are other facts and circumstances
 7   that changed in the intervening period.
 8      Q.    For the population of securities that
 9   Barclays decided to value based upon sales to
10   external parties that occurred before September
11   30, 2008, do you have an opinion whether the
12   facts and circumstances relating to those
13   securities make it appropriate to use the sales
14   data as the best indicia.
15          MS. CARRERO:  Objection to the form of
16      the question.
17      A.    My opinion is that it's not -- it's
18   not -- that's not necessarily what you should
19   do, and Professor Pfleiderer just sort of
20   accepts that without any study of it.  That's my
21   opinion.
22      Q.    Putting aside Professor Pfleiderer, I
23   just want to know whether you have reviewed
24   CUSIP-by-CUSIP the securities for which Barclays
25   valued as of the closing based upon a sale to an
```

Page 33

```
 1              J. Garvey
 2   outside party between the closing and September
 3   30, have you reviewed them to determine whether,
 4   under the circumstances of those CUSIPs, that
 5   was an appropriate methodology?
 6          MS. CARRERO:  Objection to the form of
 7      the question, and I believe this has been
 8      asked and answered several times.
 9      Q.    You can answer.
10      A.    I did not do a CUSIP-by-CUSIP review.
11      Q.    Did you review any of the CUSIPs that
12   Barclays valued by looking at sales data to
13   outside parties before September 30, 2008?
14      A.    I reviewed some of the values of the
15   CUSIPs.  I can't recall which ones.
16      Q.    Do you recall right now whether you
17   reviewed any CUSIP that was valued by Barclays
18   using sales data to outside parties before
19   September 30, 2008?
20      A.    I recall looking at them generally.  I
21   can't recall as I sit here today a CUSIP.
22      Q.    Did you form an opinion of whether or
23   not under the facts and circumstances of the
24   specific CUSIPs involved whether Barclays
25   correctly decided to value certain CUSIPs by
```

9 (Pages 30 to 33)

Page 34

1              J. Garvey
2    looking at sales data to outside parties before
3    September 30, 2008?
4         MS. CARRERO:  Objection to the form of
5      the question.
6      A.   I didn't understand that question.
7    It's way too long.
8      Q.   I just want to know whether you looked
9    at the actual CUSIPs Barclays valued using this
10   methodology by looking at sales data to outside
11   parties before September 30, 2008 and reached a
12   conclusion one way or another as to whether,
13   under the facts and circumstances of those
14   CUSIPs, doing so was appropriate?
15        MS. CARRERO:  Objection to the form of
16     the question.
17     A.   I think that was the last three
18   questions just in one, and my answer stands.
19     Q.   What is your answer?
20     A.   That I looked at some CUSIPs, I don't
21   recall which CUSIPs I looked at, but I don't
22   have a CUSIP-by-CUSIP opinion related to the
23   question you just asked me, which is too long to
24   restate.
25     Q.   Do you know whether, going back to the

Page 35

1              J. Garvey
2    internal transfers within Barclays, do you know
3    what Paul Pfleiderer did to analyze whether it
4    was appropriate to look at those internal
5    transfers as an indicia of the value of the
6    securities?
7         MS. CARRERO:  Objection to the form of
8      the question.
9      A.   I only know what he said in his
10   deposition, which, as I recall, he didn't look
11   at them.
12     Q.   Turning to your discussion of Annex A,
13   you understand Annex A to be the list of
14   securities Barclays received in its settlement
15   with JPMorgan and the Lehman Trustee in December
16   2008?
17        MS. CARRERO:  Objection to the form of
18     the question.
19     A.   My understanding is what I wrote here,
20   but that's a general summarization.
21     Q.   Is it your understanding that Barclays
22   on its Acquisition Balance Sheet should have
23   recorded the full value of everything it
24   believed it was entitled to as of the closing --
25        MS. CARRERO:  Objection to the form of

Page 36

1              J. Garvey
2    the question.
3      Q.   -- from JPMorgan?
4         MS. CARRERO:  Objection.
5      A.   It should have valued the JPMorgan's
6    securities as of the closing date, which is the
7    measurement date, yes.
8      Q.   And what are the JPMorgan securities?
9      A.   What are they?
10     Q.   Well, how would Barclays have done
11   that as of the closing?  Did it know what they
12   were?
13     A.   As of what date?
14     Q.   As of the closing date.
15     A.   I believe that they -- I don't know
16   specifically the timeline, but I believe that
17   they had a general understanding and they knew
18   what they were as of December 22.
19     Q.   Okay.  So on December 22, 2008,
20   Barclays received what we're calling the
21   JPMorgan securities; is that the --
22     A.   I thought we were calling them Annex
23   A.
24     Q.   As of December 22, 2008, Barclays
25   knows the identity of the securities on Annex A,

Page 37

1              J. Garvey
2    correct?
3         MS. CARRERO:  Objection to the form of
4      the question.
5      A.   I think they knew before that, but
6    they get them for sure on the 22nd.
7      Q.   What's your basis for believing they
8    knew them before then?
9      A.   What's in the record.
10     Q.   Where in the record?
11     A.   Well, I can't recall specifically, but
12   I know there's been testimony that said that
13   they knew what they got at the closing, but
14   there were just operational concerns related to
15   getting them to -- from JPM to Barclays.
16     Q.   Okay.  Well, let's talk about that.
17   So is your understanding that, as of the
18   closing, Barclays expected to receive the
19   securities on Annex A as part of the
20   acquisition?
21        MS. CARRERO:  Objection to the form of
22     the question.
23     A.   I don't know if it was as of the
24   closing, but it was before December 22 because
25   there were negotiations going on.

10  (Pages 34 to 37)

Page 38

```
 1              J. Garvey
 2    Q.   Well, but let me ask you very
 3 precisely so I understand what your opinion is.
 4 As of the closing, did Barclays believe it was
 5 entitled to receive the securities listed on
 6 Annex A?
 7         MS. CARRERO:  Objection to the form of
 8    the question.
 9    A.   I think you'd have to ask Barclays.  I
10 don't know what --
11    Q.   Is it relevant to your opinion of what
12 Barclays should have booked on its Acquisition
13 Balance Sheet whether Barclays believed as of
14 the closing that it was entitled to the
15 securities on Annex A?
16    A.   Whether -- you have to repeat that
17 question.
18    Q.   Is it relevant to your opinion of what
19 Barclays should have booked on its Acquisition
20 Balance Sheet whether Barclays believed it was
21 entitled to all securities listed on Annex A as
22 of the time of closing?
23    A.   No.
24    Q.   Is it relevant to your opinion as to
25 what Barclays should book on its Acquisition
```

Page 39

```
 1              J. Garvey
 2 Balance Sheet what Barclays believed it was
 3 entitled to generally as of the closing?
 4         MS. CARRERO:  Objection to the form of
 5    the question.
 6    A.   Generally, not necessarily, no.
 7    Q.   Do you have an understanding one way
 8 or the other of whether Barclays believed at the
 9 time of closing that it was entitled to receive
10 Annex A securities or $7 billion in cash?
11         MS. CARRERO:  Object to the form of
12    the question.
13    A.   Yes, I believe that the record is a
14 little bit confusing there, so I don't have a
15 belief either way as to what Barclays believed.
16    Q.   And your opinion is it doesn't matter,
17 it doesn't impact your opinion either way
18 whatever they believed?
19    A.   My opinion with respect to the correct
20 valuation date for the Annex A securities stands
21 as it is, that --
22    Q.   And it stands irrespective of whether
23 Barclays believed it was entitled to receive
24 those securities as of the closing versus
25 something else?
```

Page 40

```
 1              J. Garvey
 2    A.   Yes.
 3         MS. CARRERO:  Object to the question.
 4    Q.   And your opinion is based upon the
 5 fact that the Annex A securities are what
 6 Barclays ultimately did receive in December,
 7 correct?
 8         MS. CARRERO:  Objection to the form of
 9    the question.
10    A.   It's just a fact.  My opinion is my
11 opinion.
12    Q.   Your opinion is based upon the fact
13 that in December 2008 Barclays did in fact
14 receive the securities on Annex A?
15         MS. CARRERO:  Objection to the form of
16    the question.
17    A.   That's part of -- that's a fact that
18 was considered in my opinion, yes.
19    Q.   And then you take that fact, and your
20 opinion is because Barclays actually received
21 those securities, it should take the value of
22 those securities as of the closing date and book
23 that value on its Acquisition Balance Sheet; is
24 that correct?
25         MS. CARRERO:  Object to the form of
```

Page 41

```
 1              J. Garvey
 2 the question.
 3    A.   That's a summarization.  My opinion is
 4 that December 22 was not the correct measurement
 5 date and valuation date; that September 19 was
 6 the correct measurement date.
 7    Q.   Now, I just want to make sure I
 8 understand this so I'm going to ask you a
 9 hypothetical.
10    A.   Okay.
11    Q.   If Barclays believed as of the closing
12 that it was entitled to $7 billion in cash from
13 JPMorgan, and there was then a dispute about
14 that that was resolved in December through the
15 transfer of securities to Barclays, is it your
16 opinion that Barclays should be required on its
17 Acquisition Balance Sheet to book the value of
18 those securities as they were on September -- on
19 the date of the closing?
20         MS. CARRERO:  Objection to the form of
21    the question.
22    A.   The measurement date is the date of
23 the closing, so you would value them then, yes.
24    Q.   And so if, for example, JPMorgan had
25 taken not the securities on Annex A but
```

Page 42

1            J. Garvey
2  securities that were worth -- this is a
3  hypothetical question.  If JPMorgan had settled
4  the $7 billion dispute in December 2008 by
5  taking securities that were worth a thousand
6  times more than they were worth in December
7  2008 -- let me try to get the question stated
8  properly.
9            If in December 2008 JPMorgan had
10 settled the $7 billion dispute by taking
11 securities that in September 2008, as of the
12 closing, were worth a thousand times more than
13 they were worth in December 2008, is it your
14 opinion, Mr. Garvey, that Barclays would be
15 required to book on its Acquisition Balance
16 Sheet the value of those securities in
17 September, which were a thousand times greater
18 than what it actually received in December?
19           MS. CARRERO:  Objection to the form of
20    the question.
21    A.    Recognizing that this is a
22 hypothetical matter and, at least in my opinion,
23 a very silly hypothetical, my answer is they
24 should value them as of September 19.
25    Q.    Does it become less of a silly

Page 43

1            J. Garvey
2  hypothetical if I change the thousand to triple?
3  So I say JPMorgan takes securities to settle a
4  claim.  Let's say they take a Russian Equity
5  Index that had dropped 70 percent from September
6  as of the closing date to December, and they
7  used those securities to settle the $7 billion
8  claim.
9            Would Barclays be required to book on
10 its Acquisition Balance Sheet triple the value
11 of what it received in December because that's
12 the value those securities had in September 2008
13 as of the closing?
14           MS. CARRERO:  Objection to the form of
15    the question.
16    A.    Yes, recognizing that it's a
17 hypothetical, and I still think it's silly, the
18 answer is yes, you would book them as of
19 September 19.
20    Q.    Why do you think it's silly?
21    A.    Well, because you don't -- commercial
22 transactions don't get settled at 3X, generally,
23 or a thousand X.  But it's a hypothetical, so
24 I'll accept it.
25    Q.    I didn't say the settlement was at 3X.

Page 44

1            J. Garvey
2  I said settlement had the exact value it did,
3  which Barclays believes was basically $5 billion
4  to settle a $7 billion claim.  In my
5  hypothetical that is still the case.  The value
6  of what Barclays received in the settlement was
7  $5 billion.  Let me make that clearly part of
8  the hypothetical.
9    A.    Okay.
10    Q.    So Barclays received securities worth
11 $5 billion in December 2008, but those
12 securities were worth $15 billion as of the
13 closing date.  Am I correct that it is your
14 opinion that Barclays should be required on its
15 Acquisition Balance Sheet to book the securities
16 it received in the JPMorgan settlement at $15
17 billion even though they only were worth $5
18 billion when received in December?
19    A.    Yes.
20           MS. CARRERO:  Objection to the form of
21    the question.
22    Q.    Let's turn to the part of your report
23 that deals with valuation adjustments and
24 haircut.
25    A.    Okay.

Page 45

1            J. Garvey
2    Q.    You state in paragraph 33 that
3  Barclays intended to record the securities
4  acquired from Lehman at exit price marks, do you
5  see that?
6    A.    Yes.
7    Q.    And you state in paragraph 35 in the
8  sentence that carries over to the top of page
9  13, "Fair value accounting rules under U.S. GAAP
10 allow the practice of marking from mid to bid in
11 an effort to approximate an exit price."  Do you
12 see that?
13    A.    Yes.
14    Q.    Isn't it in fact the case that U.S.
15 GAAP requires a broker-dealer to mark the
16 securities it receives at the bid price, and
17 does not allow them to mark it at the mid price?
18           MS. CARRERO:  Object to the form of
19    the question.
20    A.    I think, as a general rule, you're
21 supposed to mark long positions at the bid
22 price, yes.
23    Q.    And is it your understanding that that
24 general rule applied to the securities that
25 Barclays acquired in this transaction?

Page 46

J. Garvey

1
2      A.   Well, it's not as explicit under the
3  IAS rules, but I think that's what Barclays
4  intended to do when it did its valuation.
5      Q.   When you say they intended to do it,
6  is it your understanding that Barclays was
7  required to do that under the accounting rules?
8      A.   They would be required if they were a
9  U.S. reporter.  Under the IAS rules, it's not as
10 specific.
11     Q.   Is it your opinion that under -- you
12 say IAS.  Is that the same as IFRS?
13     A.   Yes, the international standards.
14     Q.   Is it your opinion that under those
15 International Accounting Standards that apply to
16 Barclays, that Barclays was not required to mark
17 the securities it received in this transaction
18 at the bid price?
19         MS. CARRERO:  Object to the form of
20 the question.
21     A.   It's my opinion that it's not as
22 explicit.
23     Q.   However it's framed in the actual
24 rule, I just want to know whether you have a
25 professional opinion that you're going to offer

Page 47

J. Garvey

1
2  as an expert in this case as to whether Barclays
3  had the discretion to value the assets it
4  received in this transaction on its financial
5  statements at something other than the bid
6  price?
7      A.   I don't have that opinion.
8      Q.   So when you say that the accounting
9  rules allow this practice, wouldn't it be more
10 accurate to say that the accounting rules
11 require this practice?
12         MS. CARRERO:  Object to the form of
13 the question.
14     A.   I don't think the international
15 accounting rules require it.  If you can point
16 me to where it requires it, I'm happy to change
17 my opinion.
18     Q.   So you don't think the accounting
19 rules require it, so does that mean you do think
20 Barclays had discretion to mark it at something
21 other than the bid price?
22         MS. CARRERO:  Object to the form of
23 the question.
24     A.   I answered -- I answered the first
25 opinion, and that stands.  The second opinion is

Page 48

J. Garvey

1
2  I know -- my answer is I know nothing in the IAS
3  rules that require marking to bid.
4      Q.   Okay.
5      A.   And that's my only -- I mean, that's
6  my opinion.
7      Q.   You don't know of a specific
8  requirement, but you're not offering an expert
9  opinion that Barclays had the discretion to do
10 something other than bid price?
11         MS. CARRERO:  Object to the form of
12 the question.  I think this is asked and
13 answered.
14     Q.   I just want to make sure it's clear.
15     A.   Well, you have to ask that question
16 again because that's a different question.
17     Q.   Maybe not.  I just want to make sure
18 I'm giving you an opportunity to change what you
19 said earlier, which is, is it your professional
20 opinion that you're going to offer as an expert
21 in this case that Barclays had the discretion to
22 value the assets it received in this transaction
23 on its financial statement at something other
24 than the bid price?
25         MS. CARRERO:  Same objection.

Page 49

J. Garvey

1
2      A.   I am not going to offer that opinion.
3      Q.   You then go on to say at the top of
4  page 13 that, "The practice of marking from mid
5  to bid yields a conservative measure of fair
6  value."  Do you see that?
7      A.   Yes.
8      Q.   You go on to say, "Such conservative
9  measures of fair value recorded by Barclays on
10 the Acquisition Balance Sheet serve to
11 understate the value of Barclays' windfall
12 rather than overstate the value of Barclays'
13 windfall," do you see that?
14     A.   Yes.
15     Q.   Before we get to what Professor
16 Pfleiderer says, let me make sure I'm clear on
17 this.  Is it your testimony, sir, that United
18 States GAAP causes all United States
19 broker-dealers to understate the value of the
20 inventory they carry on their balance sheets?
21         MS. CARRERO:  Object to the form of
22 the question.
23     A.   That's not an opinion that is in my
24 report and I don't have that opinion.
25     Q.   And therefore, isn't it the case that,

13 (Pages 46 to 49)

Page 50

1           J. Garvey
2   by marking to bid, Barclays is not understating
3   the value of the assets it received in this
4   transaction?
5          MS. CARRERO:  Object to the form of
6      the question.
7      A.   My opinion is that it's a conservative
8   measure that could understate the windfall that
9   they received by marking from mid to bid, that's
10  my opinion.
11     Q.   When you say could understate the
12  windfall?
13     A.   Right.
14     Q.   It can't understate the windfall
15  unless it understates the value of the assets
16  themselves, correct?
17         MS. CARRERO:  Object to the form of
18     the question.
19     A.   If it -- it cannot understate -- no, I
20  mean, they can understate the windfall by having
21  this conservative valuation, and this is a
22  comparison to Mr. Pfleiderer, who says that the
23  value of the assets at bid overstate the value
24  and the windfall's overstated.
25     Q.   I'm going to ask you and give you an

Page 51

1           J. Garvey
2   opportunity to talk about what Professor
3   Pfleiderer says, but first I want to make sure I
4   understand this "understate the value" point.
5          Given that the accounting rules
6   require the marking of assets to bid, is it
7   really your opinion that by applying that
8   adjustment to bid pricing, Barclays is
9   understating the value of the assets it
10  received?
11         MS. CARRERO:  Object to the form of
12     the question.
13     A.   That is not my -- my opinion doesn't
14  say that.  I'm happy to read it into the record
15  again so there's no confusion.
16     Q.   Okay.  So your opinion is in
17  comparison to what Professor Pfleiderer says?
18     A.   Yes.
19     Q.   Okay.  And your understanding is
20  Professor Pfleiderer says that the accounting
21  rules overstate the value of Barclays' windfall?
22     A.   Yes.
23     Q.   Now, you then quote Professor
24  Pfleiderer in paragraph 36 and 37.
25     A.   Yes.

Page 52

1           J. Garvey
2      Q.   So let me make sure I understand your
3   opinion on that.  If a broker-dealer carries a
4   portfolio of financial securities -- let me ask
5   it in the form of a hypothetical to make sure
6   that I understand what you're saying.
7          Let's assume a broker-dealer has $50
8   billion exactly of a range of different
9   financial securities on its financial
10  statements.  Let's assume they are accurately
11  valued at their bid or exit price.  Does that
12  make sense?
13     A.   As a hypothetical matter?
14     Q.   Yes.
15         And let's assume those securities
16  range from government Treasuries to illiquid
17  structured financial products.
18     A.   Okay.
19     Q.   In the same manner as the inventory
20  that Barclays received in this transaction.
21     A.   Okay.
22     Q.   Would you agree that if that
23  broker-dealer is required or forced by
24  circumstances to sell that entire portfolio in a
25  very short amount of time of a week or less in

Page 53

1           J. Garvey
2   the middle of a financial crisis, it is likely
3   to receive substantially less than $50 billion
4   for that portfolio?
5          MS. CARRERO:  Object to the form of
6      the question.
7      A.   I don't know.
8      Q.   You don't have an opinion on that?
9      A.   No.
10     Q.   So let me add to the hypothetical
11  assumption.  Let me ask you to assume that it is
12  the case that if the broker-dealer has to
13  liquidate the entire portfolio by selling it
14  within a matter of days, it will receive cash of
15  less than $50 billion because it is selling it
16  all at once in a financially distressed market.
17         If that is true, even if that
18  assumption I just asked you to assume is true,
19  am I correct that the accounting rules do not
20  allow you to mark down the portfolio to reflect
21  that liquidation risk?
22         MS. CARRERO:  Object to the form of
23     the question.
24     A.   Your hypothetical is hard to follow,
25  but the accounting rules don't allow you to

14 (Pages 50 to 53)

Page 54

J. Garvey

1    record block discounts, which I think you're
2    trying to talk about.
3        Q.   That's correct.
4        A.   Okay.
5        Q.   So you agree with that, that the
6    accounting rules don't allow you to record block
7    discounts?
8        A.   Yes, I would agree with that, yes.
9        Q.   Do you understand Professor Pfleiderer
10    to be saying anything other than that?
11        A.   Anything other than your hypothetical?
12        Q.   Well, anything other than the fact
13    that the amount booked on the Barclays balance
14    sheets does not reflect a block discount?
15        MS. CARRERO:  Object to the form of
16    the question.
17        A.   I don't -- I think his testimony and
18    his report speak for themselves.  He said a lot
19    of things.  I don't, you know, you'd have to
20    read it to -- I mean, I think he said a lot of
21    things.  He talked about block discount,
22    liquidity, crisis in the marketplace.  I mean,
23    he said all kinds of things.
24        Q.   To the extent that Professor
25

Page 55

J. Garvey

1    Pfleiderer is saying that the bid prices on the
2    inventory Barclays received is not reflective of
3    the risk of having to sell the entire portfolio
4    in bulk and, therefore, may state a higher value
5    than if the portfolio had to be sold in bulk, do
6    you disagree with that?
7        MS. CARRERO:  Object to the form of
8    the question.
9        A.   As a hypothetical matter, no, I mean,
10    I don't disagree with that.  The question is
11    whether or not you actually had to, but ...
12        Q.   Can you describe for me how you went
13    about analyzing the way in which Barclays made
14    the bid/offer adjustments to the assets it
15    received in this transaction?
16        MS. CARRERO:  Object to the form of
17    the question.
18        A.   I think it's in my report.
19        Q.   Just the general process you underwent
20    to try to understand what happened.
21        A.   We looked at all the documents that
22    are noted in this report and analyzed their
23    bid/offer and other, you know, haircuts and
24    liquidity adjustments.
25

Page 56

J. Garvey

1        Q.   You understand that, in principal,
2    what Barclays tried to do was determine a mid
3    price for each asset and then adjust to a bid
4    price or an exit price?
5        MS. CARRERO:  Object to the form of
6    the question.
7        Q.   Is that your understanding?
8        A.   At a very high and general level, yes.
9        Q.   And you don't disagree conceptually
10    with adjusting to a bid price, but you do
11    disagree with some of what Barclays did in terms
12    of how it adjusted to bid price, is that fair?
13        A.   I don't agree -- disagree with the
14    principle, but there were lots of
15    inconsistencies and things that were done wrong,
16    yes.  That's what my report says.
17        Q.   In terms of inconsistencies, do you
18    believe there should be one method used, and
19    only one method used, for adjusting to bid
20    prices on the assets Barclays received in the
21    transaction?
22        A.   No.
23        MS. CARRERO:  Object to the form of
24    the question.
25

Page 57

J. Garvey

1        A.   My point is that they had methods
2    within asset classes and policies and they were
3    inconsistent in applying those policies.
4        Q.   Do you believe that within each asset
5    class there should be only one methodology for
6    adjusting to bid prices?
7        A.   As a hypothetical matter, no.
8        Q.   Why not?
9        A.   Well, because there may be good
10    reasons to do it several ways, as a hypothetical
11    matter.
12        Q.   Can you give me an example?
13        A.   No.
14        Q.   You can't or you won't?
15        A.   I just don't know.  I mean, I don't --
16    I don't know what you're trying to -- I mean, I
17    just answered your question.  I don't have any
18    specifics, but ...
19        Q.   Would one reason be, if within an
20    asset class there are some CUSIPs for which
21    there is observable data with bid and ask data
22    and there are other CUSIPs for which there is no
23    observable data providing bid and ask
24    information, in that situation would it make
25

15  (Pages 54 to 57)

Page 58

J. Garvey

1  sense to determine the bid price differently
2  within the same asset class?
3       MS. CARRERO:  Object to the form of
4    the question.
5    A.    As a hypothetical matter, yes.
6    Q.    In other words, for CUSIPs where there
7  is actual bid/ask information available, would
8  you agree that the actual bid information should
9  be used to determine the bid price for those
10 CUSIPs?
11       MS. CARRERO:  Object to the form of
12   the question.
13   A.    As a general matter, yes.
14   Q.    And for CUSIPs for which there is no
15 bid/ask information available, would you agree
16 that you might have to use some other
17 methodology to determine the bid price?
18       MS. CARRERO:  Object to the form of
19   the question.
20   A.    As a general matter, yes.
21   Q.    Is it your understanding that that's
22 what Barclays did?
23       MS. CARRERO:  Object to the form of
24   the question.

Page 59

J. Garvey

1    A.    That question isn't clear.  You're
2  asking me did with respect to what?
3    Q.    Well, you understand with respect to
4  corporate debt, corporate obligations, there was
5  bid information available and, therefore,
6  Barclays used that information?  Are you aware
7  of that or not?
8       MS. CARRERO:  Object to the form of
9    the question.
10   A.    Am I aware that for certain corporates
11 there may have been bid information available?
12   Q.    Yes.
13   A.    I think that's true.
14   Q.    And you don't have a problem with
15 Barclays using that bid information?
16       MS. CARRERO:  Object to the form of
17   the question.
18   A.    To the extent bid information was
19 available and it was reliable, I don't have any
20 problem with that.
21   Q.    And if there were other securities
22 within the same asset class for which there was
23 no reliable bid information, you would have to
24 use a different methodology to adjust a bid,

Page 60

J. Garvey

1  correct?
2       MS. CARRERO:  Object to the form of
3    the question.
4    A.    So same asset class, corporates?  If
5  there were no bids available, you would have to
6  try to figure it out some other way, yes.
7    Q.    Would that be an inconsistency?
8    A.    Not necessarily.
9    Q.    You also criticized the Barclays
10 valuation methods for being subjective; is that
11 correct?
12   A.    I believe I said that, yes.
13   Q.    Do you believe it is always incorrect
14 to use subjective judgment in valuing securities
15 of the type Barclays acquired?
16       MS. CARRERO:  Object to the form of
17   the question.
18   A.    I'm not sure my subjectivity relates
19 to judgment, but I don't -- I believe judgment's
20 involved in the valuation process, if that's
21 what you're asking.
22   Q.    Yes.  How do you distinguish -- I'm
23 not sure I understand the difference between
24 subjectivity and judgment.

Page 61

J. Garvey

1       MS. CARRERO:  Object to the form of
2    the question.
3    A.    The distinction I was making is that I
4  think they use subjectivity in certain instances
5  where, you know, that didn't necessarily involve
6  judgment as much as just using a method that,
7  you know, a different method.
8    Q.    I guess my question is if a security
9  is not -- if there is no observable price for a
10 security, and if the objective data suggests
11 there may be a reason to doubt the ability of
12 the payor to pay or the value of the collateral,
13 isn't it necessary to make some form of
14 subjective judgment in determining the value of
15 the asset?
16       MS. CARRERO:  Objection to the form of
17   the question.
18   A.    I think judgment is involved in these
19 valuation decisions.
20   Q.    And that judgment necessarily involves
21 some subjectivity, correct?
22       MS. CARRERO:  Object to the form of
23   the question.
24   A.    Yes, embodied in judgment there's a

16  (Pages 58 to 61)

Page 62

J. Garvey

1
2    certain element of subjectivity.
3        Q.    In paragraph 48 and 49 --
4            (Discussion off the record.)
5            (Recess; Time Noted:  10:54 A.M.)
6            (Time Noted:  11:06 A.M.)
7        MS. CARRERO:  I think the witness has
8    one answer that he wanted to clarify.
9        THE WITNESS:  Yes, I guess there
10    was -- there may have been -- the record may
11    be confused.  So back when we first started,
12    and there's a distinction between the
13    closing date and the measurement date for
14    accounting purposes, and I think we might
15    have been mixing those two concepts.
16        So while the closing date was 12:01
17    A.M. on the 22nd, which was a Monday, the
18    measurement date for accounting purposes is
19    the 19th, which is what I was trying to say.
20    BY MR. HUME:
21        Q.    Is it your testimony that that's what
22    you were trying to say earlier?
23        A.    Yes.
24        Q.    Is it your testimony that your lawyer
25    did not tell you to say that during the break?

Page 63

J. Garvey

1
2        A.    My testimony is that my lawyer did not
3    tell me to say that.
4        Q.    Your lawyer did not tell you to say
5    what you just said?  You believe you were trying
6    to say the closing date was the 22nd but the
7    measurement date was the 19th?
8        A.    Yes.
9        Q.    Is that correct?
10        A.    Yes.
11        Q.    Did your lawyer bring this to your
12    attention during the break?
13        A.    We discussed it.
14        Q.    Did she tell you that the closing was
15    on the 22nd?
16        A.    No.
17        Q.    So you understood the closing was on
18    the 22nd?
19        A.    I understood that I was -- that the
20    closing was on the 22nd and that my answer
21    wasn't clear.
22        Q.    If the closing is on the 22nd, why is
23    the closing date the 19th?
24        A.    The closing date is not the 19th.  The
25    measurement date for accounting purposes is the

Page 64

J. Garvey

1
2    19th, and that's the distinction I was trying to
3    make and I hadn't made clear.
4        Q.    When you said earlier in this
5    deposition that the closing date was the 19th,
6    you meant to say the 22nd?
7        A.    I meant to say the measurement date
8    was the 19th for accounting purposes.
9        Q.    If the closing date is the 22nd, why
10    is the measurement date the 19th?
11        A.    Because the measurement date is the --
12    the measurement date is the 19th, according to
13    the record.
14        Q.    The record?
15        A.    Yes.
16        Q.    What in the record says that the
17    closing date is different from the measurement
18    date?
19        A.    The record doesn't say that.  That's
20    my opinion, that the measurement date for
21    accounting purposes would be the end of business
22    Friday, the 19th.
23        Q.    What do you base your opinion on that
24    the measurement date is different from the
25    closing date?

Page 65

J. Garvey

1
2        A.    I didn't -- my opinion is that the
3    closing date is the closing date, and that's
4    12:01 on the 22nd, and the measurement date for
5    accounting purposes is the 19th.
6        Q.    And what is it in the record that you
7    base your opinion on that the measurement date
8    is different from the closing date?
9        MS. CARRERO:  Objection to the form of
10    the question.
11        A.    It's based upon my understanding of
12    the rules and my understanding of the record.
13    That's my opinion.
14        Q.    When you say your understanding of the
15    rules, what rules are you referring to?
16        A.    The accounting rules for business
17    combinations.
18        Q.    And what specific rules are you
19    relying on?
20        A.    It's based on my experience and my
21    understanding of the accounting rules and my
22    understanding of the record.  I mean, there was
23    a lot of discussion on the record about this.
24        Q.    Let's do the rules first and then
25    we'll do the record.

17 (Pages 62 to 65)

1           J. Garvey
2      What is it in the rules that requires
3 a measurement date to be different from a
4 closing date?
5      A.   The rules don't state that.
6      Q.   Do they state anything that would
7 support the conclusion that the measurement date
8 should be different from the closing date?
9      A.   I don't believe the rules are specific
10 to these facts and circumstances.
11      Q.   Do the rules say anything relevant at
12 all to why the measurement date should be
13 different from the closing date?
14      A.   The rules talk about the measurement
15 date and how that's defined.
16      Q.   And isn't it normally the case that
17 the measurement date is the same as the closing
18 date?
19           MS. CARRERO:  Objection to the form of
20      the question.
21      A.   I don't know if it's normally the same
22 or not.  It depends on the facts and
23 circumstances.
24      Q.   Don't the accounting rules generally
25 require that a purchaser measure the value of

1           J. Garvey
2 the assets it receives as of the closing of the
3 transaction?
4      A.   Yes.
5      Q.   And so normally the rules require the
6 closing date to be the same as the measurement
7 date?
8           MS. CARRERO:  Objection to the form of
9      the question.
10      A.   I don't think there's anything in the
11 rules that say that.
12      Q.   Well, isn't that what the rules
13 generally -- isn't that how the rules generally
14 work?
15           MS. CARRERO:  Objection to the form of
16      the question.
17      A.   The rules say what they say.
18      Q.   Other than the rules that say you
19 should value assets as of the time of the
20 closing, are there any other rules relevant to
21 why the measurement date should be different
22 from the closing date?
23      A.   Any other rules relevant?  I'm not
24 aware of any rules.
25      Q.   What in the record supports your

1           J. Garvey
2 understanding that the measurement date should
3 be different from the closing date?
4      A.   I can't recall specifically anything
5 in the record other than what I have in my
6 opinion.
7      Q.   What do you have in your opinion from
8 the record that supports the closing date being
9 different from the measurement date?
10      A.   Nothing in the record says that
11 exactly.  My opinion is that the closing date is
12 12:01 A.M. on the 22nd and that the measurement
13 date for accounting purposes is the 19th.
14      Q.   Where do you say that in your report?
15      A.   I didn't say that exactly as I just
16 said it in my report.
17      Q.   Do you say anything like that in your
18 report?  Do you say anywhere in your report that
19 the measurement date is different from the
20 closing date?
21      A.   I don't believe those words are in my
22 report.
23      Q.   Doesn't your report say that the
24 measurement date should be closing date?
25           MS. CARRERO:  Objection to the form of

1           J. Garvey
2 the question.
3      Q.   Let me refer you to paragraph 18.
4 Paragraph 18 says, "Not valuing the securities
5 on Schedules A and B on the closing date of the
6 sale transaction is incorrect."
7           Aren't you saying there that you
8 should value the securities on Schedules A and B
9 as of the closing date?
10           MS. CARRERO:  Objection to the form of
11      the question.
12      A.   I'm saying that the securities should
13 have been valued on the -- on A and B should
14 have been valued as of the measurement date,
15 which is -- and the fact that they were measured
16 after the measurement date is incorrect.
17      Q.   Why do you not refer to the
18 measurement date in paragraph 18?
19      A.   I don't know why I didn't as I sit
20 here today, but that's what I meant.
21      Q.   So when you wrote "closing date" in
22 paragraph 18, did you mean measurement date or
23 did you mean closing date?
24      A.   As I sit here today I probably meant
25 measurement date and could have been a little

Page 70

```
1              J. Garvey
2   bit more accurate.
3       Q.   So throughout your report when you
4   talk about the closing date, should we
5   understand you to be referring to measurement
6   date?
7          MS. CARRERO:  Objection to the form of
8     the question.
9       A.   Not necessarily.
10      Q.   So sometimes in your report when you
11  say "closing date" you mean closing date and
12  sometimes in your report when you say "closing
13  date" you mean measurement date?
14      A.   Well, I haven't gone through it to
15  make that determination, but that could be the
16  case.
17      Q.   Let's go to paragraph 49.
18      A.   All right.
19      Q.   You address here the bid/offer
20  adjustments made to the Lehman equity positions
21  acquired by Barclays, correct?
22      A.   Yes.
23      Q.   What is your understanding, generally,
24  of the nature of the assets in these equity
25  positions?
```

Page 71

```
1              J. Garvey
2       A.   In which equity positions?
3       Q.   All of them, all of the equity
4   positions that were subject to the bid/offer
5   adjustments you address in paragraphs 48 and 49
6   of your report.
7       A.   Okay.
8          MS. CARRERO:  Object to the form.
9       A.   What is my understanding of them?
10      Q.   Yes.  Do you understand that they were
11  all publicly traded S&P 500 equities?
12      A.   I don't have that understanding.
13      Q.   Do you have an understanding of
14  whether many of them were different from that,
15  or do you not have an understanding one way or
16  the other?
17         MS. CARRERO:  Object to the form.
18      A.   I don't have a complete understanding,
19  but I don't think they were all publicly traded
20  S&P 500 equities.
21      Q.   Do you understand that some of them
22  were not publicly traded?
23      A.   I have an understanding that prices
24  weren't available for some of the equities.
25      Q.   Is it your understanding that that is
```

Page 72

```
1              J. Garvey
2   because some of them were also not traded?
3          MS. CARRERO:  Object to the form of
4     the question.
5       Q.   Is it the same thing?
6       A.   I don't know if it's the same thing or
7   not and I don't have a complete understanding of
8   that.
9       Q.   Do you have an understanding whether
10  there was know convertible debt included in
11  these equity positions?
12      A.   I do believe there were convertible --
13  there were some convertibles, yes, I have that
14  understanding.
15      Q.   Is it your understanding that for
16  these equity positions many of them did not have
17  bid/ask pricing information available as of
18  either the closing date or the measurement date?
19         MS. CARRERO:  Object to the form of
20    the question.
21      A.   I have an understanding that certain
22  prices weren't available.
23      Q.   Do you have any idea for how many of
24  these equity positions that Barclays acquired
25  there was no pricing information available as of
```

Page 73

```
1              J. Garvey
2   the closing?
3       A.   I have no complete -- I don't have a
4   complete understanding of that.
5       Q.   For those securities and the equity
6   positions for which there was no bid/offer
7   pricing information available as of the closing,
8   what is your opinion as to how Barclays should
9   have determined the bid/offer adjustment?
10         MS. CARRERO:  Object to the form of
11    the question.
12      A.   I don't have an opinion on it.  My
13  opinion is what they did is wrong.  That's my
14  opinion.
15      Q.   Do you have any opinion on what they
16  should have done to make a bid/offer adjustment?
17      A.   I don't have an opinion on what they
18  should have done.  My opinion is what they did
19  was incorrect.
20      Q.   And what they did -- let's make sure
21  we agree on the facts of what they did.  In
22  paragraph 49, in footnote 57, am I correct that
23  your understanding of what Barclays did is to
24  take the securities for which there was
25  bid/offer adjustment -- sorry, excuse me.
```

19 (Pages 70 to 73)

Page 74

1          J. Garvey
2          Is it your understanding that what
3  Barclays did is to look at the securities for
4  which there was bid/ask information in both
5  December and September and compare the
6  difference between that bid/ask information?
7          MS. CARRERO:  Object to the form of
8     the question.
9     A.   I think that's part of what they did.
10    Q.   Maybe it's easier if you explain your
11 understanding of what Barclays did.
12    A.   I think they -- they took a look at,
13 from what I understand and from recollection of
14 the documents, is they took a look at bid/asks
15 in September, bid/asks in December, applied some
16 ratio of the differences between September and
17 December, and then said that -- and then tried
18 to calculate what the relative spread would be
19 the September for all the differences in
20 December, but they used sort of this average,
21 which didn't make any sense because there were
22 some securities in there that had some big
23 differences.  Had they used the median or
24 something a little bit more relevant, they would
25 have gotten a much smaller number.  That's what

Page 75

1          J. Garvey
2  I recall.
3     Q.   Is it your testimony that they should
4  have used the median rather than the average?
5          MS. CARRERO:  Object to the form.
6     A.   It's my testimony that using the
7  average gets you a very -- a large bid/offer
8  adjustment and it was not representative of the
9  September bid/ask -- bid/offer spread, and had
10 they used the median, they would have gotten a
11 much smaller number.
12    Q.   You're saying that the average leads
13 to a larger adjustment -- well, let me strike
14 that.  Let me make sure I understand.
15         For the population of securities for
16 which there is no bid/ask information, would you
17 agree that those securities are, by definition,
18 more illiquid than the securities for which
19 there is bid/ask information?
20    A.   I would agree that that's one indicia
21 of illiquidity.
22    Q.   Would you agree that securities which
23 are illiquid are more likely to have a wide
24 variation in bid/ask pricing as a general matter
25 than securities which are widely and publicly

Page 76

1          J. Garvey
2  traded?
3          MS. CARRERO:  Object to the form of
4     the question.
5     A.   As a general matter, yes.  It's
6  getting a little bit far afoot of what my
7  testimony's about, but what I know I would agree
8  with that.
9     Q.   So my question is, if you're trying to
10 determine a bid/offer adjustment for the entire
11 population of equity positions Barclays
12 received, isn't the bid/ask information for the
13 securities for which there actually is bid/ask
14 information available the conservative measure
15 when applied to illiquid securities for which
16 there is no bid/ask information available?
17         MS. CARRERO:  Object to the form of
18    the question.
19    A.   I didn't understand that question and
20 I'm not sure it's relevant to what I've said
21 here, but I -- basically, the way they did this
22 calculation was not correct.
23    Q.   But you don't have an opinion on how
24 they should have made this bid/offer adjustment?
25    A.   I think they should have used the

Page 77

1          J. Garvey
2  median in the calculation that they used.
3     Q.   Are you revising your earlier
4  testimony that you do have an opinion on how
5  they should do bid/offer adjustments for these
6  equity positions?
7          MS. CARRERO:  Objection.
8     A.   No, that's a different opinion.  You
9  asked me if I had -- you asked me whether or not
10 I would do something different.  The answer is I
11 don't think this is right, and if they used the
12 median, it would have been more -- a more
13 correct calculation.
14    Q.   But your earlier opinion stands that
15 you don't -- you're not giving an opinion in
16 this case about how Barclays should have done
17 bid/offer adjustments for these equity
18 positions, generally?
19    A.   As a general principle, no, that
20 stands.
21    Q.   And maybe just to make sure I
22 understand what I was trying to get out of my
23 question, if you have two -- a hypothetical
24 again.  This is complicated.  I think the
25 hypotheticals may help clarify it.

20  (Pages 74 to 77)

Page 78

```
 1              J. Garvey
 2      If you have two equity positions that
 3  Barclays received, one is an S&P 500 stock,
 4  let's just say IBM, publicly traded, heavily
 5  traded every day, observable prices and bid/ask
 6  prices available.
 7      A.   Right.
 8      Q.   The second security is a totally
 9  illiquid convertible debt instrument that no one
10  was trading and for which there is no bid/ask
11  information available.
12      A.   Okay.
13      Q.   My question is, if Barclays looks at
14  the IBM bid/ask spread in December and looks at
15  its bid/ask spread in September and sees that it
16  was much wider in September because of the
17  volatility, isn't it fair for Barclays and
18  accurate for Barclays to use that information
19  and apply it to the convertible debt instrument
20  to try to determine its bid/ask adjustment?
21      MS. CARRERO:  Object to the form of
22  the question.
23      A.   As a hypothetical matter, that could
24  be what you do.  What they did I don't believe
25  was correct because they used an average, a
```

Page 79

```
 1              J. Garvey
 2  relative average, and they should have used the
 3  median because it was all -- there was a lot of
 4  information that is sort of the left tail of the
 5  distribution that drilled that number way up --
 6  or right tail of the distribution.
 7      Q.   Have you calculated the amount by
 8  which using average rather than median impacted
 9  the valuation adjustment to bid price in these
10  equity positions?
11      A.   I did not.  I believe Professor
12  Zmijewski did, and I relied on what he did.
13      Q.   Professor Zmijewski?
14      A.   Zmijewski.
15      Q.   Same person, different pronunciation.
16      A.   Right.  "Z Man" for short.
17      Q.   Do you know the number?
18      A.   No.
19      Q.   But he does?
20      A.   I hope so.
21      Q.   Let's go over to the next page of your
22  report where you address exchange-traded options
23  portfolio.  This is very complicated.  Do you
24  agree with that?
25      A.   Yes.
```

Page 80

```
 1              J. Garvey
 2      Q.   Let me just ask you whether you know
 3  how much of a difference it would have made if
 4  Barclays did not use the ADP prices, as you
 5  explain in paragraph 51, but instead used the
 6  method you think they should have used.
 7      MS. CARRERO:  Object to the form of
 8  the question.
 9      A.   I don't know the relative difference
10  there.  I didn't make that calculation.
11      Q.   Do you know whether anyone did?
12      A.   I don't know if anyone made that
13  calculation.  I know that Professor Zmijewski
14  made the second calculation using the same dates
15  for the mid value and then the mid to bid value,
16  and I think that difference is in his report and
17  it's a couple hundred or $150 million.  Then I
18  made a calculation also of 861 by just using the
19  same dates.
20      Q.   Page 61?
21      A.   No, 861 on page 18.
22      Q.   Can you explain to me -- this is the
23  point in your second bullet point on paragraph
24  51.
25      A.   Right.
```

Page 81

```
 1              J. Garvey
 2      Q.   Can you explain to me what it is
 3  you're criticizing there?
 4      A.   Well, when they did their valuation
 5  adjustment, they used different dates.  They
 6  used the end of date December -- September 22
 7  for the bid/mid -- or, the mid value, I'm sorry,
 8  and then they used the 19th date for the bid/mid
 9  value, and then I said if you just used the same
10  date, let's say the 22nd, you would get 861
11  versus a billion-40.  So it's just inconsistent
12  use of dates.
13      Q.   Is this for all of the exchange-traded
14  options?
15      A.   I don't know the answer to that.  What
16  do you mean if this -- this date convention?
17      Q.   Are the numbers in this bullet point
18  capturing all exchange-traded options?
19      A.   I don't know the answer to that.
20  There were other exchange-traded options I
21  believe that may have been calculated
22  differently.
23      Q.   When you say in your calculation the
24  net valuation would have been 861 million rather
25  than a billion-40?
```

Page 82

J. Garvey

1
2    A.    Okay.
3    Q.    Are those negative valuations?
4        MS. CARRERO:  Object to the form of
5    the question.
6    A.    What do you mean by "negative
7    valuations"?
8    Q.    Well, let me ask it this way:  Are you
9    saying that the Barclays method -- okay, you're
10   saying the Barclays method led to a --
11   A.    These are liabilities.
12   Q.    That's --
13   A.    They overstated liability.
14   Q.    That's the question.
15   A.    If that's what you're asking.
16   Q.    So there was a negative number on the
17   balance sheet is what I meant because it's a
18   liability, and you're saying that the valuation
19   method led to a liability of $1.04 billion
20   instead of $861 million?
21   A.    If you just use the same dates, yes.
22   Q.    And what would the number be -- your
23   861 is the number if you use September 22,
24   correct?
25   A.    Correct.

Page 83

J. Garvey

1
2    Q.    What would it be if you used September
3    19?
4    A.    I don't know.
5    Q.    Does the information in this bullet
6    not tell us?
7    A.    No.
8    Q.    Do you have the information that would
9    tell you that?
10   A.    I don't know the answer to that.
11   Q.    Have you asked anyone to do that
12   calculation?
13   A.    Not that I recall.
14   Q.    Is it your understanding these
15   numbers, whether it's the 19th or the 22nd, are
16   the values of the exchange-traded option
17   positions themselves?
18       MS. CARRERO:  Object to the form of
19   the question.
20   A.    As opposed to?  I don't know the
21   distinction you're making.
22   Q.    I'm really not making a distinction.
23   I just want to know are we talking about a
24   population of exchange-traded options that are
25   being valued here?

Page 84

J. Garvey

1
2    A.    We're talking about the short
3    positions of these options, I believe, short
4    side of the option portfolio.
5    Q.    So again I just need to ask you a
6    hypothetical.  If the options that are being
7    valued here are trading within some range for a
8    period of days and then have an outlier day
9    where they are vastly different, is it in that
10   circumstance appropriate to look at an average
11   over the days or to not use only the outlier
12   valuation in trying to determine the value?
13       MS. CARRERO:  Object to the form of
14   the question.
15   A.    I mean, that seems to be an incomplete
16   hypothetical to me.  It would depend on lots of
17   facts and circumstances.  I'm not sure what
18   average you're talking about or number of days
19   or what happened, but -- so it's just a little
20   too incomplete to answer.
21   Q.    You're saying they took the mid value
22   from one day but the bid value from another day?
23   A.    Yes.
24   Q.    And you're saying the bid value on the
25   22nd was 352 million, whereas the bid value on

Page 85

J. Garvey

1
2    September 22 (sic) was 531 million?
3        MS. CARRERO:  Object to the form of
4    the question.
5    A.    I think that's correct, yes.
6    Q.    Are the bid values from the open of
7    business or the close of business?
8    A.    I don't know the answer.
9    Q.    Are the mid values from open of
10   business or close of business?
11   A.    I don't know the answer.
12   Q.    You have a footnote to documents which
13   we have, I assume, but do you rely upon any of
14   the other experts in this case to perform the
15   underlying valuation analysis assembly of the
16   numbers here in this bullet point, second bullet
17   point of paragraph 51?
18       MS. CARRERO:  Objection to the form of
19   the question.
20   A.    I think the numbers would be in the
21   document referenced.  I believe Professor
22   Zmijewski again may have something in his report
23   about this.
24   Q.    Are you relying on any other expert in
25   giving the opinion you give in the second bullet

22 (Pages 82 to 85)

Page 86

1        J. Garvey
2  point of paragraph 51?
3     A.   No.
4     Q.   Okay.  Let's move on to the CMO
5  portfolio, agency CMO portfolio.
6     A.   Okay.
7     Q.   Is it your understanding that bid/ask
8  information was available for all of the
9  securities within this portfolio?
10       MS. CARRERO:  Object to the form of
11    the question.
12    A.   I don't have a complete understanding,
13 but I think the answer is generally that they
14 were not available for all of the securities in
15 this portfolio.
16    Q.   Do you know whether bid/ask
17 information was unavailable for most of the
18 securities in this agency CMO portfolio?
19    A.   I don't know whether it was
20 unavailable for most or not.
21    Q.   Did you or your staff study what
22 percentage of the overall portfolio did not have
23 bid/ask information available?
24    A.   My staff may have studied that and
25 have an understanding of the percentage.  I

Page 87

1        J. Garvey
2  don't.
3     Q.   Is it your understanding that Barclays
4  took a sample of securities from the agency CMO
5  portfolio?
6     A.   Yes.
7     Q.   And from that sample determined that
8  there was a 10 percent bid/ask difference at the
9  relevant time?
10       MS. CARRERO:  Object to the form of
11    the question.
12    A.   My understanding is that they had two
13 methods that they applied to get to this 10
14 percent, yes, that we talk about here at
15 paragraphs 53 and 54.
16    Q.   I just want to make sure, is the 10
17 percent that is arrived at for the sample as far
18 as you know accurate for the sample?
19       MS. CARRERO:  Object to the form of
20    the question.
21    A.   I didn't understand the question.
22    Q.   I just want to know whether you -- I
23 understand that you have a problem with them
24 applying what they learned from the sample to
25 all of the securities across the portfolio, at

Page 88

1        J. Garvey
2  least I think I understand that.
3     A.   Yes.
4     Q.   Do you have a problem with the 10
5  percent that they arrive at for the sample
6  itself?
7     A.   Well, with respect to paragraph 54,
8  where they calculated the 39 percent -- or,
9  where they calculated the 39 CUSIPs, I think
10 that was arithmetically correct what they did,
11 if that's what you're asking.
12    Q.   For those 39 CUSIPs there's an actual
13 range of intraday trading bid/ask information,
14 correct?
15    A.   Correct.
16    Q.   And some of it -- half of the sample
17 had ranges from 15.9 percent to 23.9 percent,
18 correct?
19    A.   Correct.
20    Q.   And the other half was much lower,
21 down to .03 percent to 1.84 percent?
22    A.   Correct.
23    Q.   And do you understand how Barclays
24 took that information and arrived at a 10
25 percent number?

Page 89

1        J. Garvey
2     A.   They did an average is what I recall.
3     Q.   They did an average?
4     A.   They calculated an average is what I
5  recall.
6     Q.   For the securities in the agency CMO
7  portfolio for which there was no bid/ask
8  information, wouldn't those securities be more
9  likely to have a larger bid/ask spread than the
10 securities for which there was bid/ask
11 information available?
12       MS. CARRERO:  Object to the form of
13    the question.
14    A.   I don't know the answer to that.
15    Q.   If I ask you to assume that what I
16 just said were true, that the securities for
17 which there was no bid/ask information available
18 would have -- be likely to have a larger bid/ask
19 spread given their illiquidity than the
20 securities for which there was bid/ask
21 information available, wouldn't it be fair and
22 appropriate and conservative --
23       MS. CARRERO:  Object to the form.
24    Q.   -- to apply the average bid/ask
25 adjustment to all of those securities?

23 (Pages 86 to 89)

J. Garvey
1
2        MS. CARRERO:  Object to the form of
3    the question.
4        A.    I relied on some of the work done by
5    some of the valuation experts here on this, but
6    I don't -- it depends on what average you're
7    talking about, the top end average or the lower
8    end average, and that's the problem.  That some
9    of the -- half of the average is only .03
10   percent to 1.48 percent.  So you're averaging,
11   you know, you're averaging numbers that are --
12   appear to be distinct, distinctly different
13   populations.
14       Q.    Let me ask you more simply then.  What
15   would you -- do you have an opinion on what
16   should have been done to calculate an adjustment
17   to bid prices for the securities in the agency
18   CMO portfolio for which there was no bid/ask
19   information available?
20       MS. CARRERO:  Object to the form of
21   the question.
22       A.    I would have tried to get a larger
23   sample of bid/ask spreads.
24       Q.    A larger sample from where?
25       A.    I believe that there were other CUSIPs

J. Garvey
1
2    available in that population and they just
3    didn't look at the pricing.
4        Q.    Do you have any basis for saying that
5    if they had taken a larger sample it would have
6    led to a lower bid/ask adjustment across the
7    whole portfolio?
8        A.    I don't know the answer to that
9    question without looking at it.
10       Q.    You and your staff haven't done that
11   work, have you?
12       A.    They may have done it with respect to
13   some of the other work they did, not with
14   respect to what I did.
15       Q.    Do you plan to give any opinion in
16   this case about whether -- about an alternative
17   bid/ask adjustment or bid/offer -- bid/bid price
18   adjustment for the CMO portfolio?
19       MS. CARRERO:  Object to the form of
20   the question.
21       A.    I don't have a further opinion.  I
22   believe some of the other experts in this case
23   may.
24       Q.    Which ones?
25       A.    I don't know.  Some of the valuation

J. Garvey
1
2    guys.
3        Q.    I just want to know whether you were
4    planning to come forward with an opinion on what
5    you believe more appropriate or accurate mid to
6    bid adjustment would result in for Barclays
7    agency CMO portfolio?
8        MS. CARRERO:  Object to the form of
9    the question.
10       A.    As I sit here today, I have not been
11   asked to do that and I don't believe I will do
12   that.
13       Q.    And you haven't studied nor analyzed
14   the nature of the securities in the agency CMO
15   portfolio for which there was no bid/ask
16   information available, have you?
17       MS. CARRERO:  Object to the form of
18   the question.
19       A.    I have not done a study that, no.
20       Q.    You don't know how many of them were
21   interest-only securities or other types of
22   securities?
23       A.    I looked at some summarizations where
24   I saw IOs and other things in there, but I don't
25   have a complete understanding.

J. Garvey
1
2        Q.    Moving over to the next page of your
3    report, you have a -- you quote Professor
4    Pfleiderer in paragraph 55 and 56.  Let's look
5    at 55 first.
6        Can you read what you quote there and
7    tell me if there's something in that quote that
8    you're criticizing or whether you're just
9    setting up background for what you go on to
10   discuss.
11       MS. CARRERO:  Object to form.
12       A.    I think it was just the latter, as you
13   have phrased it.
14       Q.    And is the same true of paragraph 56?
15       A.    Yes.
16       Q.    In paragraph 64, the fourth line down,
17   you have a statement that, "Such subjectivity in
18   Barclays' choice of measurement dates introduces
19   managerial bias."  Do you see that?
20       A.    Yes.
21       Q.    Do you have an opinion, Mr. Garvey, as
22   to whether or not there in fact was managerial
23   bias on behalf of Barclays in its valuation of
24   the securities acquired in the Lehman
25   acquisition?

Page 94

1           J. Garvey
2       A.   My opinion stands as written.  I
3   believe if you look at some of the other
4   experts' work and what they did, they -- and you
5   look at the array of how things were valued,
6   they would also conclude that it appears that
7   there is certain managerial bias in coming to
8   some of these valuations, but I didn't undertake
9   to study that completely.
10      Q.   Do you have an opinion, forgetting
11  about the other experts, as to whether there was
12  managerial bias?
13      A.   My opinion stands as written, which is
14  it introduces the concept.  I haven't done a
15  complete analysis to come to that conclusion,
16  but it would appear from some of the valuations
17  that there is -- there was a bias in some of the
18  methodologies and dates chosen for valuing
19  certain securities.
20      Q.   And by a bias, is your opinion simply
21  that the concept of using subjectivity and
22  different methodologies allows for bias?
23          MS. CARRERO:  Object to the form of
24      the question.
25      Q.   Or is your testimony an opinion that

Page 95

1           J. Garvey
2   you've seen evidence, concretely, of bias?
3          MS. CARRERO:  Object to the form of
4      the question.
5      A.   My opinion is it allows for bias, and
6   if you look at the -- if you look at the
7   valuations, it appears that they all go in the
8   same direction, which is understating windfall.
9      Q.   And then I have to go back to my
10  initial question --
11      A.   Okay.
12      Q.   -- in this deposition.  Is it your
13  testimony in this case that Barclays has
14  deliberately understated the value of the assets
15  it received in this transaction in its publicly
16  filed SEC reports?
17      A.   My opinion stands as stated before.
18      Q.   Does your testimony stand that you are
19  not giving an opinion as to whether Barclays
20  materially understated the value of the assets
21  it acquired in the Lehman acquisition when it
22  filed SEC Form 6-K in February 2009?
23          MS. CARRERO:  Object to the form of
24      the question and asked and answered.
25      A.   Yes, my opinion is the same as before.

Page 96

1           J. Garvey
2      Q.   Is it the same as before that you are
3   not giving an opinion in this case that Barclays
4   materially understated the value of its assets
5   on SEC Form 6-K filed in February 2009?
6          MS. CARRERO:  Again, object to the
7      form of the question and asked and answered.
8      A.   I think my opinion at the time, and
9   I'll try to restate or we could read it, was
10  that I didn't undertake to study that and I
11  don't have that opinion.
12      Q.   Do you have an understanding of what
13  materiality is in that context?  You understand
14  as an accountant what I mean by "materially"?
15          MS. CARRERO:  Object to the form of
16      the question.
17      A.   I have a general understanding of the
18  concept of materiality as an accountant and
19  auditor, yes.
20      Q.   Would you agree with me that if the
21  assets are understated by 5 percent of their
22  total value, that would be a material
23  understatement on the Acquisition Balance Sheet?
24          MS. CARRERO:  Object to the form of
25      the question.

Page 97

1           J. Garvey
2      A.   As a hypothetical matter?
3      Q.   Yes.
4      A.   It's a matter of judgment whether
5   it -- that would be viewed by someone as a
6   material misstatement.
7      Q.   I'm asking -- and you haven't made
8   that judgment?
9      A.   I haven't made -- that's my point -- I
10  haven't made that judgment.
11      Q.   You haven't made a judgment as to
12  materiality?
13      A.   I haven't made a judgment as to
14  materiality nor the judgment of whether the
15  financial statements in total were materially
16  misstated.
17      Q.   Have you made a judgment as to whether
18  the specific aspect -- I didn't ask you about
19  the financial statements in total.  I have asked
20  you, back on the first exhibit I showed you,
21  about the assets acquired in the Lehman
22  acquisition as reported on SEC Form 6-K that
23  Barclays filed.
24          MS. CARRERO:  Object to the form of
25      the question.

25 (Pages 94 to 97)

J. Garvey
1
2    Q.   Which is Exhibit 445 that I showed you
3  at the beginning of the deposition.
4         MS. CARRERO:  Same objection.
5    Q.   My question is, you say you haven't
6  studied materiality.  I want to know whether it
7  is your opinion in this case that Barclays
8  materially understated the value of the assets
9  acquired from Lehman in this SEC Form 6-K filed
10  in February 2009?
11        MS. CARRERO:  Objection to the form
12  and asked and answered.
13    A.   I'll answer it again, and my answer is
14  I didn't make -- didn't undertake to make a
15  determination of what materiality would be in
16  the context of the question you asked me, nor
17  did I undertake to understand whether or not
18  this column in Form 6-S was materially
19  understated.
20    Q.   Did you undertake an analysis of
21  whether or not the asset values listed on SEC
22  Form 6-K that Barclays filed in February 2009
23  understated the value of the assets that
24  Barclays acquired from Lehman?
25        MS. CARRERO:  Objection to the form.

1              J. Garvey
2         MR. KAY:  Objection, asked and
3  answered.
4    Q.   I asked it that time without the word
5  "materially" if that's what you're relying on.
6         I'm asking you are you giving an
7  opinion that Barclays filed Form 6-K with the
8  SEC in a manner that understated the value of
9  the assets it acquired from Lehman?
10    A.   So let me understand it.  So
11  whether -- whether or not it's off by 1 dollar,
12  is that what you're asking me?
13    Q.   Do you know, do you have an opinion
14  whether it's off, whether it's inaccurate, the
15  SEC form that was filed by Barclays?
16        MS. CARRERO:  Objection to the form of
17  the question.
18    A.   I did not undertake to have an opinion
19  on the accuracy of this filing.
20    Q.   Let's go back to page 21.  You talk in
21  paragraph 65 about the Giants Stadium Bonds?
22    A.   Yes.
23    Q.   And you're saying, as I understand it,
24  that information from April and May 2009 showed
25  that those bonds were worth more than the amount

1              J. Garvey
2  booked on the Acquisition Balance Sheet,
3  correct?
4    A.   Correct.
5    Q.   Is it your opinion that information
6  from April or May 2009 should have been used to
7  determine the value of the Giants Stadium Bonds
8  on the Acquisition Balance Sheet?
9         MS. CARRERO:  Objection to form.
10    A.   No.
11    Q.   What is the relevance of your point in
12  paragraph 65?
13    A.   Well, the relevance is that if you get
14  to choose dates subsequent to the measurement
15  date, you can get sort of highly unusual answers
16  and that the Giants auction rate securities are
17  an example of securities that were valued at, if
18  I recall right, like 10, 10 and 44 in the
19  opening balance sheet, but by April -- actually,
20  by December, they were valued at par and the
21  value of those securities went up approximately
22  $350 million in that time period.
23    Q.   Do you recognize any difference
24  between using information from the day
25  immediately after the closing for an illiquid

1              J. Garvey
2  security and using information from six months
3  later?
4         MS. CARRERO:  Object to the form of
5  the question.
6    A.   There's a difference as to time.
7    Q.   Is it relevant to whether or not that
8  subsequent post-closing information should be
9  used as an indicia of the value as of the date
10  of closing?
11    A.   It's only an example of what happens
12  when you don't value things or what could happen
13  when you don't value things as of the date of
14  the acquisition or the measurement date.
15    Q.   You're not giving testimony, are you,
16  that a sale price to an outside party after the
17  closing date can never, under any circumstances,
18  be relevant to determine the value that should
19  be booked on the Acquisition Balance Sheet?
20        MS. CARRERO:  Objection to the form of
21  the question.
22    A.   I believe we spent a lot of time on
23  that and my answers are the same, which is it
24  could be relevant, yes.
25        (Recess; Time Noted:  11:50 A.M.)

26 (Pages 98 to 101)

1          J. Garvey
2          (Time Noted: 11:59 A.M.)
3   BY MR. HUME:
4      Q.   Mr. Garvey, back on the record, can
5   you tell me what -- you have a section of your
6   report that discusses Professor Pfleiderer's
7   discussion of PwC.
8      A.   Okay.
9          MS. CARRERO:  Objection.
10     Q.   Can you just tell me first, putting
11  aside your assessment of Professor Pfleiderer's
12  report and testimony, can you tell me what PwC
13  information you have reviewed and analyzed?
14     A.   It's in my report.  I can't tell you
15  without looking, you know, reciting what's in
16  there.
17     Q.   Have you reviewed the documents that
18  PwC itself produced?
19     A.   My understanding is PwC produced a lot
20  of stuff, so when you say have I reviewed the
21  documents, I have reviewed, most likely, some of
22  those documents.  And I can tell you what I
23  reviewed if you look at the Documents Relied On.
24  We could go through those and then I could tell
25  you specifically, but I'm not sure I reviewed

1          J. Garvey
2   all the documents, but I reviewed some of the
3   documents.
4      Q.   If there was a PwC document you
5   reviewed, it would be in the list of things you
6   reviewed and relied on in your report?
7          MS. CARRERO:  Object to the form of
8      the question.
9      A.   As a general matter, yes.
10     Q.   Have you reviewed any PwC information
11  since filing your report that hasn't been listed
12  in the report?  That's the question.
13         MS. CARRERO:  Object to the form of
14     the question.
15     A.   I think there may have been subsequent
16  productions of PwC documents that I may have
17  looked at, yes, that aren't in here.
18     Q.   I would ask that anything you have
19  looked at from PwC that isn't listed in your
20  report be identified and produced to us.
21         MS. CARRERO:  We'll get you a list of
22     that.
23     Q.   Has anything that you have reviewed
24  from PwC since filing your report caused you to
25  change or modify or refine any of the opinions

1          J. Garvey
2   in the report?
3      A.   I don't believe so.
4      Q.   What is your understanding of the
5   nature of PwC's auditing of the Barclays
6   Acquisition Balance Sheet?
7          MS. CARRERO:  Object to the form of
8      the question.
9      A.   I'm not sure I understand your
10  question.
11     Q.   How would you describe it?  What's
12  your -- do you have an opinion, a professional
13  opinion, one way or the other, as to PwC's
14  auditing of Barclays' Acquisition Balance Sheet?
15         MS. CARRERO:  Object to the form of
16     the question.
17     A.   I don't have an opinion on PwC's
18  auditing, generally.  My opinions are in this
19  section that you just referenced to my report as
20  relates to Professor Pfleiderer's reliance on
21  PwC and PwC.
22     Q.   So, again, for the moment, putting
23  aside Professor Pfleiderer, what I want to know
24  is, you have a number of criticisms of what
25  Barclays did in its valuation of assets on the

1          J. Garvey
2   Acquisition Balance Sheet.  Do you think PwC
3   failed to identify those criticisms or those
4   errors in its audit of Barclays and its
5   Acquisition Balance Sheet?
6          MS. CARRERO:  Objection to the form of
7      the question.
8      A.   I don't know, there's a lot of them,
9   and I don't know on case-by-case basis whether
10  or not they identified each one and then whether
11  or not, upon identifying them, what they said
12  about them.
13     Q.   Do you think PwC should have
14  identified and recognized what you consider to
15  have been valuation methodology errors
16  underlying the Acquisition Balance Sheet?
17         MS. CARRERO:  Objection to the form of
18     the question.
19     A.   Do I think they should have?
20     Q.   Yes.
21     A.   I think that they could have and
22  identified those --
23     Q.   If they --
24         I'm sorry.  Go ahead.
25     A.   I think some of those things they did

Page 106

J. Garvey

1
2 identify because I did review. They identified
3 the subsequent dating issues. They identified
4 the valuation -- the December 22nd valuation
5 date. I'm aware that they identified those
6 issues.
7     Q.   So for the issues they did identify,
8 why is it that PwC ultimately accepted the
9 Barclays methodology?
10    A.   I don't know.
11    Q.   Do you believe that PwC made a mistake
12 in accepting the Barclays methodology?
13    A.   I don't know if they did or they
14 didn't. I don't have enough information to
15 understand what they understood and how they
16 made their judgments. So I don't know the
17 answer to that.
18    Q.   What information would you need in
19 order to make that judgment?
20    A.   Everything they considered with
21 respect to each judgment.
22    Q.   Which would be all of the documents
23 that PwC had generated or reviewed in their
24 audit of the Acquisition Balance Sheet, correct?
25        MS. CARRERO: Object to the form of

Page 107

J. Garvey

1
2 the question.
3    A.   All the information that they
4 generated, all the conversations, the
5 memorialization of those conversations,
6 everything they did.
7    Q.   Do you feel you haven't had access to
8 that?
9    A.   Access to what?
10    Q.   All that information.
11    A.   I had access to some of the work
12 papers. It's not clear whether I had access to
13 all their work papers. Clearly didn't have
14 access to everything they did, based on my
15 review.
16    Q.   With respect to the issues you
17 identified in the Barclays valuation
18 methodologies that you are not sure whether PwC
19 identified them or not, do you believe PwC
20 should have identified them?
21        MS. CARRERO: Objection to the form of
22 the question.
23    A.   Should have identified them? I'm not
24 sure by issue whether they should have or should
25 not have, I just don't know.

Page 108

J. Garvey

1
2    Q.   You don't have an opinion one way or
3 the other?
4    A.   With respect to whether they should
5 have identified every inconsistency that I
6 mentioned? I'm not sure.
7    Q.   In other words, are they important
8 enough that PwC should have identified them?
9        MS. CARRERO: Objection to the form of
10 the question.
11    A.   Some were important and were
12 identified. Some may not have been important.
13 I didn't make that determination.
14    Q.   Do you have any understanding of what
15 Professor Pfleiderer did to learn about what PwC
16 did in its audit?
17    A.   My only understanding is what he said
18 in his deposition and in his report. He said in
19 his report, if I recall, "I relied on their
20 extensive procedures." He didn't elaborate.
21 And in his deposition I think he said -- he gave
22 testimony regarding what he did, and I can't
23 recall without reading it, but ...
24    Q.   Do you have any understanding of
25 whether Professor Pfleiderer spoke with any

Page 109

J. Garvey

1
2 Barclays employees about the PwC audit?
3        MS. CARRERO: Objection to the form of
4 the question.
5    A.   I don't have an understanding about
6 that. He may have testified to that, but I
7 don't recall if he did or he didn't.
8    Q.   Do you know whether Professor
9 Pfleiderer and his staff reviewed all the
10 documents produced by PwC?
11        MS. CARRERO: Objection to form.
12    A.   I don't know the answer to that. I
13 believe that the documents that Professor
14 Pfleiderer testified that he reviewed with
15 respect to price testing are the ones we talk
16 about in this report, and they were very limited
17 at the time. That's the point.
18    Q.   Do you know whether more documents
19 have been produced since that time by PwC?
20    A.   I believe there have been, yes.
21    Q.   And do those documents show a more
22 extensive investigation and analysis of Barclays
23 valuation methodologies than the initial set of
24 documents showed?
25        MS. CARRERO: Objection to the form.

28 (Pages 106 to 109)

Page 110

```
1            J. Garvey
2     A.  As a general matter, yes.
3     Q.  And do those documents, therefore,
4  cause you to change your view that Barclays --
5  excuse me, that PwC did not conduct an extensive
6  negotiation -- investigation?
7          MS. CARRERO:  Objection to form.
8     A.  I never had that opinion.
9     Q.  You're not giving an opinion in this
10 case as to whether PwC conducted an extensive
11 investigation into the Barclays valuation
12 methodologies?
13    A.  My opinions are as stated in my
14 report, and I believe if you want to go through
15 those, we can, but ...
16    Q.  Yes, I want to know whether -- it's
17 not clear to me from your report if you're
18 giving an independent opinion on what PwC did or
19 simply giving an opinion on what -- whether
20 Professor Pfleiderer had a basis as of the time
21 of his report to conclude that PwC did in fact
22 perform an extensive investigation.
23         MS. CARRERO:  Objection to the form.
24    A.  My opinions are as stated and I'm
25 happy to go through those.  I'm not sure what
```

Page 111

```
1            J. Garvey
2  you're trying to get me to say, but ...
3     Q.  In paragraph 83 of your report --
4     A.  Right.
5     Q.  -- you say, "Based on my review of the
6  PwC procedures performed on Barclays exit price
7  marks (as documented in the February 12, 2010
8  PwC production), PwC most likely did not perform
9  an extensive investigation and testing in light
10 of the following deficiencies in the valuations
11 included in the Barclays' Acquisition Balance
12 Sheet." You see that sentence?
13    A.  Yes.
14    Q.  And you stand by that?
15    A.  Yes.
16    Q.  Has the production from PwC subsequent
17 to February 12, 2010 in any way caused you to
18 modify your conclusion that PwC most likely did
19 not perform an extensive investigation and
20 testing?
21         MS. CARRERO:  Objection to the form.
22    A.  In light of these following
23 deficiencies and the deficiencies as outlined
24 here still stand.
25    Q.  And so the following deficiencies that
```

Page 112

```
1            J. Garvey
2  you set forth in paragraph 83 are deficiencies
3  that you believe PwC should have identified but
4  failed to; is that correct?
5     A.  These are deficiencies that were not
6  identified by PwC.
7     Q.  And do you believe that PwC should
8  have identified them?
9     A.  As a general matter, yes.
10    Q.  And why do you think PwC failed to
11 identify them?
12         MS. CARRERO:  Objection to the form.
13    A.  Well, because they -- I saw no
14 evidence of them identifying them and correcting
15 for them or concluding as to them.
16    Q.  But my question is do you believe PwC
17 failed to identify them because they did not
18 conduct an extensive investigation?
19         MS. CARRERO:  Objection to form.
20    A.  I don't -- I don't know if they failed
21 to identify them -- I don't know the reason that
22 they failed to identify them, but they, as
23 listed, are here.
24    Q.  Is it possible in your mind and in
25 your opinion that PwC failed to identify them
```

Page 113

```
1            J. Garvey
2  because they didn't agree with your assessment
3  that they were deficiencies?
4          MS. CARRERO:  Objection to the form.
5     A.  I don't know if they agreed or, you
6  know, I don't know if they would agree or
7  disagree with my --
8     Q.  Putting aside the deficiencies, your
9  assertion of deficiencies, based on the
10 production from PwC after February 12, 2010, do
11 you believe that PwC did in fact perform an
12 extensive investigation of the Barclays'
13 Acquisition Balance Sheet?
14         MS. CARRERO:  Objection to form and I
15 believe this is asked and answered.
16    A.  Yes, I believe that, in light of these
17 deficiencies, it is hard to -- it would be hard
18 for Mr. Pfleiderer's -- or, hard to understand
19 Mr. Pfleiderer's assertion that there was an
20 extensive investigation.
21    Q.  I'm not talking about Mr. Pfleiderer
22 now. I'm talking about PwC.
23    A.  Right.
24    Q.  And you say you don't know why they
25 didn't identify these deficiencies.
```

29 (Pages 110 to 113)

Page 114

J. Garvey

1
2    A.    Right.
3          MS. CARRERO:  Objection to form.
4    Q.    And so I'm saying, putting the
5    deficiencies aside, based on their production,
6    including their production after February 12,
7    2010, do you believe they conducted an extensive
8    investigation?
9          MS. CARRERO:  Objection to form and
10   asked and answered.
11   A.    I don't believe, based on these
12   deficiencies, that they conducted an extensive
13   investigation.
14   Q.    So is it your testimony that they
15   failed to conduct a proper audit of the
16   Acquisition Balance Sheet?
17   A.    That is not my testimony.
18   Q.    Is it your testimony that they failed
19   to conduct an audit of the kind that you believe
20   they should have conducted?
21         MS. CARRERO:  Objection to form.
22   A.    I didn't make that determination.
23   Q.    Let me ask you about the series of
24   bullet points in paragraph 82.
25   A.    82?

Page 115

J. Garvey

1
2    Q.    You're saying these are the things
3    that they should have done if they were to have
4    conducted an extensive investigation, correct?
5    A.    I'm saying --
6          MS. CARRERO:  Object to form.
7    A.    -- an extensive investigation would
8    have included some of these -- or these things.
9    It may have included other things.
10   Q.    And what is the basis for that
11   testimony?
12   A.    My understanding of the rules for
13   auditing securities.  I think I included those
14   in Auditing Fair Value Measurements and
15   Disclosures.
16   Q.    So your understanding of the rules is
17   that the rules would require the things that you
18   outline in the bullet points in paragraph 82 of
19   your report?
20   A.    As a general matter, yes.  Well, yes,
21   I'm sorry, they may not all be listed in the
22   appendix, but as a general principle, yes.
23   Q.    What rules, because I don't see any
24   rules cited here, what rules require these
25   bullet points?

Page 116

J. Garvey

1
2          MS. CARRERO:  Objection to the form of
3    the question.
4    A.    Well, there are rules for auditing
5    fair value measurements, and we summarize some
6    of those in Appendix IV -- I'm sorry, Appendix
7    VI of my report.
8    Q.    And those rules in that appendix
9    require the things that you outline in paragraph
10   82?
11   A.    Those rules are highlights.  The rules
12   in general require the things I outlined in
13   paragraph 82.  I'm being careful here because
14   I'm not sure every bullet point here is in the
15   rules that we summarized.
16   Q.    Okay.  But the bullet point summarized
17   your understanding in general of the types of
18   things the rules require?
19         MS. CARRERO:  Object to the form.
20   A.    At a very general -- at a high general
21   level, yes.
22   Q.    And do they also summarize the types
23   of things that you believe PwC failed to do?
24         MS. CARRERO:  Objection to the form of
25   the question.

Page 117

J. Garvey

1
2    A.    I did not necessarily make that
3    determination, that they failed to do all this.
4    Q.    You say you did not necessarily make
5    that determination.  Did you make that
6    determination?
7    A.    I think with respect to certain
8    securities they may have failed certain of these
9    requirements, yes.  I can't make a sweeping
10   "all" comment is my point.
11   Q.    They failed to do some of them, at
12   least, in your opinion; is that correct?
13   A.    Yes.  Yes.
14   Q.    Does that mean PwC failed to comply
15   with the auditing rules you reference in your
16   appendix in its auditing of the Barclays'
17   Acquisition Balance Sheet?
18         MS. CARRERO:  Objection to the form of
19   the question.
20   A.    I have not undertaken to make that
21   determination.  That's not my opinion.
22   Q.    Let's go through the bullet points.
23   A.    Okay.
24   Q.    The first one is, "Examination of
25   evidence regarding the existence of a right on

Page 118

J. Garvey

1
2  an asset."
3      A.   Right.
4      Q.   What do you mean by that?
5      A.   Understanding the existence and the
6  rights related to the securities, the cash flow
7  rights, you know, the rights in the structure.
8      Q.   In order to do that, do you need to
9  have the original documentation of the security
10 in question?
11     A.   As a general matter, yes.
12     Q.   What if you don't have access to that
13 documentation?
14     A.   Then you haven't done it.
15     Q.   What are you supposed to do if you
16 can't get access to that information?
17     A.   Depends on, you know, lots of facts
18 and circumstances.
19     Q.   I don't mean -- I'm not just talking
20 about PwC.  What if Barclays doesn't have that
21 information?
22          MS. CARRERO:  Object to the form of
23     the question.
24     A.   As a hypothetical matter?
25     Q.   Yes.

Page 119

J. Garvey

1
2      A.   They should get it.
3      Q.   Is it your understanding they had
4  access to all the accurate information for all
5  the securities that they acquired?
6          MS. CARRERO:  Objection to the form of
7     the question.
8      A.   I don't have that.  I don't know.
9      Q.   Your second bullet point refers to an
10 "inspection of the facility, such as the Giants
11 Stadium or architectural drawings, building site
12 thereto," do you see that?
13     A.   Yes.
14     Q.   Is it your testimony that in order to
15 value the Giants Stadium Bonds properly, you
16 need to do a physical inspection of Giants
17 Stadium?
18     A.   It's my testimony that the audit
19 requirements rules would ask you to do that in
20 certain circumstances, yes.
21     Q.   Well, what about in these
22 circumstances?
23     A.   With respect to Giants Stadium?
24     Q.   Yes.
25     A.   Yes, I've used it as an example.  I

Page 120

J. Garvey

1
2  think the rules say that you're supposed to
3  inspect the facility when you have a structure
4  like that or the, you know, you're supposed to
5  gain an understanding of the structure.
6      Q.   So is it your testimony that both the
7  Barclays valuation personnel and the PwC
8  auditors should have done a physical inspection
9  of Giants Stadium in order to properly value the
10 Giants Stadium Bonds under these circumstances?
11          MS. CARRERO:  Objection to the form of
12     the question.
13     A.   Not necessarily.  It's just an
14 example.
15     Q.   Well, is it an example that applies?
16 Is it an example of something they should have
17 done?
18     A.   GAAS would tell you that in certain
19 circumstances you're supposed to -- GAAS being
20 Generally Accepted Auditing Standards -- examine
21 the facilities.
22     Q.   Right.  And I'm saying, under these
23 circumstances, should they have done it?
24     A.   Which circumstances?
25     Q.   The circumstances of this transaction

Page 121

J. Garvey

1
2  and the attempt to value all the assets acquired
3  from Lehman Brothers in this transaction, should
4  Barclays and PwC have physically inspected
5  Giants Stadium?
6          MS. CARRERO:  Objection to form.
7      A.   With respect to Giants Stadium, I just
8  used that as an example.  Not necessarily.
9      Q.   Okay.  It's an example that may not
10 apply?
11     A.   Yes.
12     Q.   Are there any examples you can think
13 of that do apply where they failed to do a
14 physical inspection?
15     A.   I saw no indication that there were
16 any physical inspections done --
17     Q.   Well, are there --
18     A.   -- visiting the problem.
19     Q.   -- any examples where you think there
20 should have been a physical inspection and there
21 wasn't one?
22     A.   I don't have any specific examples.
23 The point here is if you're doing an extensive
24 examination, one of the things that GAAS
25 requires is to visit the facilities.  I saw no

31 (Pages 118 to 121)

Page 122

J. Garvey

1 indications that any of that was done.
2 Q.  Okay.  When I asked you of a specific
3 example, you can't give me one.  I want to
4 know -- do you think they should have flown out
5 to look at every physical facility of every
6 physical plant, building, real estate that
7 collateralized every single security in the tens
8 of billions of dollars of structured financial
9 products that they received in this transaction?
10 MS. CARRERO:  Objection to the form of
11 the question.
12 A.  That's not my testimony.
13 Q.  I would assume not.
14 Is there any physical place or
15 structure or real estate that you believe was so
16 important that both Barclays and PwC should have
17 conducted a physical inspection if they were to
18 comply with GAAS?
19 MS. CARRERO:  Objection to the form of
20 the question.
21 A.  My opinion is that GAAS requires you
22 to do this.  I saw no evidence of this being
23 done for any facility.
24 Q.  And you think that's a deficiency in
25

Page 123

J. Garvey

1 both the Barclays valuations and the PwC audit;
2 is that correct?
3 MS. CARRERO:  Objection to the form of
4 the question.
5 A.  That wasn't my opinion.  My opinion is
6 as stands, which is, as a general principle, an
7 extensive audit would have indicators of these
8 particular steps that I listed.
9 Q.  Well, it's either a deficiency or it
10 isn't.  So are you saying the failure to conduct
11 a physical inspection of physical facilities was
12 a deficiency in the PwC audit?
13 MS. CARRERO:  Objection to the form of
14 the question.
15 A.  I didn't use the word "deficiency" in
16 this opinion.  What I said was an extensive
17 investigation would have included the following
18 things.  It didn't include -- I saw no evidence
19 that this was done.
20 Q.  Your next bullet is, "Documentation of
21 the reasonableness of management assumptions and
22 models used for deriving Barclays' measures of
23 fair value and independent assessments of the
24 fair values Barclays derived."
25

Page 124

J. Garvey

1 Can you explain what that means?
2 A.  It means what it says.  I'm not sure I
3 understand your question.
4 Q.  Well, an independent assessment of the
5 fair values, are you saying that PwC should have
6 independently valued every security that
7 Barclays acquired?
8 MS. CARRERO:  Objection to the form of
9 the question.
10 A.  That's not what this says, no.
11 Q.  What does it say?  They should do a
12 sample?
13 MS. CARRERO:  Objection to form.
14 A.  There should be documentation of the
15 reasonableness of management assumptions and
16 models used deriving the measures of fair value
17 and independent assessments of the value.
18 Q.  Do you know whether PwC did any of
19 that?
20 A.  I believe they did some of it.
21 Q.  Did they do enough, in your view?
22 A.  I think with respect to some of the
23 securities that we list later it doesn't appear
24 that they did enough.
25

Page 125

J. Garvey

1 Q.  And can you give me an example of
2 where they failed to do that?
3 A.  I think the Pine CLO is an example.
4 Q.  Any other example?
5 A.  Not that as I sit here today.
6 Q.  The next bullet point talks about a
7 selection and testing of a sample from the
8 11,000 securities Barclays acquired.  Do you
9 know whether PwC did any such sampling?
10 A.  I believe they did some sampling.
11 Q.  Do you believe they did a sufficient
12 sampling?
13 MS. CARRERO:  Objection to form.
14 A.  I believe that they did some sampling.
15 I think there are areas where there were no
16 samples done if you look at the work paper.
17 Q.  Do you think that GAAS required them
18 to do more sampling than they did?
19 A.  I haven't made that determination.
20 Q.  And just generally, have you made a
21 determination that GAAS required PwC to do
22 anything that they failed to do?
23 MS. CARRERO:  Objection to form.
24 A.  I have not -- I do not have any
25

32 (Pages 122 to 125)

1             J. Garvey
2  opinion with respect to anything that PwC failed
3  to do in this report.
4      Q.   The next bullet point says -- when you
5  say "in this report," you mean in your opinion
6  in this case --
7      A.   Yes.
8      Q.   -- correct?
9           The next bullet point says, "Analysis
10 of the contractual documents for each security,"
11 do you know whether PwC did any of that?
12     A.   They may have done some.
13     Q.   Have you reviewed what they did?
14     A.   Some of what they did, yes.
15     Q.   Did you see any flaws in what they
16 did?
17          MS. CARRERO:  Objection to form.
18     A.   With respect to this bullet point?
19     Q.   Yes.
20     A.   I think, again, with respect to the
21 Pine CLO they didn't understand the structure
22 and the tranches and the cash flow
23 distributions.
24     Q.   Anything other than Pine?  Any other
25 examples?

1             J. Garvey
2      A.   I think there were other examples, but
3  I can't recall what they are as I sit here
4  today.
5      Q.   Next bullet point, "Construction of
6  cash flow scenarios and alternative scenarios."
7           Do you know whether PwC did that?
8      A.   I think they did some of that, not
9  much.  I think most of it was done by the client
10 and they may have -- there may have been some
11 testing done of these, of these things, of the
12 inputs.
13     Q.   Does GAAS permit the auditor, the
14 independent auditor, to review the client's cash
15 flow scenarios rather than do it -- or does it
16 require that it be done independently?
17          MS. CARRERO:  Objection to the form of
18     the question.
19     A.   GAAS doesn't require that you do it
20 independently.
21     Q.   Let's go over quickly to page 28.
22     A.   Okay.
23     Q.   Are you, Mr. Garvey, are you giving an
24 independent expert opinion on the value of the
25 Pine security?

1             J. Garvey
2      A.   No, I am relying on the other experts.
3      Q.   How many other experts do you rely on
4  in your report?  Is it just Mr. Slattery or are
5  there others?
6      A.   I believe I have relied on some of the
7  work that Mr. Slattery has done, some of the
8  work that Professor Zmijewski has done, some of
9  the work that the other experts, Mr. Olvany and
10 Mr. Schwaba have done.
11     Q.   And how did you rely on that work when
12 you constructed your report?
13     A.   I'm not sure I understand your
14 question.
15     Q.   Well, they served their reports on the
16 same day you served your report.
17     A.   Okay.
18          MS. CARRERO:  Objection to the form.
19     Q.   So how did you get access to their
20 work before they filed their report?
21          MS. CARRERO:  Objection to the form of
22     the question.
23     A.   They work at the same firm.
24     Q.   They work at Navigant?
25     A.   Yes.

1             J. Garvey
2      Q.   Did they give you their draft reports
3  to review?
4      A.   We had access to draft reports, and
5  some of the people working with me also worked
6  with them.
7      Q.   Did you review any of their draft
8  reports?
9      A.   Did I personally?  I reviewed some
10 draft information of some of the experts,
11 primarily Mr. Zmijewski and Slattery, and people
12 under my supervision did for sure.
13     Q.   Did you review draft reports for
14 Schwaba?
15     A.   I don't recall reviewing a draft
16 report necessarily for Schwaba, although
17 somebody under my supervision may have.
18     Q.   But you reviewed draft reports of
19 Slattery and Zmijewski?
20     A.   I think I may have seen portions of
21 their draft reports, yes.
22     Q.   Any others that you can recall?
23     A.   I believe those are the ones that I
24 may have reviewed in draft, although people
25 under my supervision I think may have reviewed

1          J. Garvey
2   other people.
3      Q.   In the bullet point on the top of page
4   29 you refer to Barclays applying a 5 percent
5   liquidity discount to the notes that were
6   maturing within days of the acquisition.  You
7   see that?
8      A.   Yes.
9      Q.   And you say that resulted in a very
10  large implied yield?
11     A.   Yes.
12     Q.   Are you aware of whether or not that 5
13  percent liquidity discount ever resulted --
14  strike that.  Are you aware of any situations
15  within the same portfolio of notes in which the
16  5 percent liquidity discount was insufficient
17  because the notes ended up not maturing or
18  defaulting subsequent to the closing?
19         MS. CARRERO:  Objection to the form of
20     the question.
21     A.   I don't have any awareness of that.
22     Q.   You understand that the portfolio of
23  notes to which the 5 percent discount was
24  applied included some that were maturing very
25  soon after closing and many that were maturing

1          J. Garvey
2   long after the closing; is that correct?
3         MS. CARRERO:  Objection to the form of
4     the question.
5      A.   I understand that there were different
6   maturity dates, yes.
7      Q.   And is it your understanding that some
8   of those notes carried a risk that they would
9   default before they matured?
10     A.   As a general matter, I understand that
11  principle, yes.
12     Q.   And so isn't it true that in some
13  cases the 5 percent liquidity discount will be
14  insufficient to reflect the actual yield that
15  would be realized on a security that defaults
16  instead of maturing after the closing?
17         MS. CARRERO:  Objection to the form of
18     the question.
19     A.   I don't have any understanding of
20  that.
21     Q.   You don't have any understanding of
22  that?
23     A.   Not as you --
24     Q.   Let me just ask you:  Have you studied
25  whether or not the notes within this portfolio

1          J. Garvey
2   have defaulted, whether any of them have
3   defaulted?
4      A.   I have not studied that.
5      Q.   Have you studied whether the 5 percent
6   liquidity discount on average over the whole
7   population of notes proved to be inaccurate
8   adjustment to bid pricing for the entire
9   portfolio as opposed to just a few select
10  assets?
11         MS. CARRERO:  Objection to the form of
12     the question.
13     A.   I have not studied that issue with
14  respect to this bullet point and these assets.
15     Q.   The next bullet point talks about the
16  concept of practical control and substantive
17  ability to transact.  Do you believe those
18  concepts are irrelevant to the valuation of the
19  assets Barclays believed it was entitled to
20  receive in the Lehman Brothers acquisition?
21         MS. CARRERO:  Objection to the form of
22     the question.
23     A.   I don't -- I have never -- I don't
24  believe those concepts exist in the rules and I
25  don't know what they mean.

1          J. Garvey
2      Q.   Do you therefore think they are
3   irrelevant to the valuation of the assets
4   Barclays received in the transaction?
5      A.   I don't know whether they're relevant
6   or not.  I know that they don't exist in the
7   rules that drive accounting for fair value
8   accounting in the context of a business purchase
9   acquisition.
10     Q.   Can you tell me what the TRACE
11  database is?
12     A.   That is a I think a third-party
13  database used to price actively traded
14  securities, and I can't tell which securities.
15  I think bonds.  That's my understanding of
16  trace.
17     Q.   What is your criticism in this last
18  bullet point on page 29?
19         MS. CARRERO:  Objection to the form of
20     the question.
21     A.   The criticism, to summarize -- I mean,
22  it speaks for itself -- is that they had values
23  in the TRACE system, but they used this proxy,
24  the Lehman CDS as a proxy when they had the
25  values in the system.

34  (Pages 130 to 133)

Page 134

J. Garvey

1            J. Garvey
2    Q.    In the bullet point on the top of page
3 30 you refer to the fact that Barclays sometimes
4 used BoNY, Bloomberg, or other sources for
5 estimation of fair value, do you see that?
6    A.    Yes.
7    Q.    You say that is inconsistent in
8 applying that to some assets, but not others; is
9 that right?
10    MS. CARRERO:  Objection to the form of
11 the question.
12    A.    I think as a general principle this
13 issue goes to there were inconsistencies with
14 respect to their pricing procedure, yes.
15    Q.    Doesn't that inconsistency simply
16 reflect the fact that some assets had observable
17 prices such that BoNY or Bloomberg or another
18 source for those observable prices is reliable,
19 whereas other assets were not traded at all and
20 therefore the BoNY mark would not be reliable?
21    MS. CARRERO:  Objection to the form of
22 the question.
23    A.    I don't know -- I think their policy
24 was to use these services.  In certain
25 circumstances, these services had values and

Page 135

J. Garvey

1            J. Garvey
2 they didn't use them.  That's the point.
3    Q.    Under what circumstances, when you say
4 "these services," under what circumstances did
5 Barclays not use these services when they were
6 available?
7    A.    The ones we write about right in this
8 bullet point.
9    Q.    Do you have an independent opinion as
10 to whether for the circumstances in which these
11 services had prices for certain CUSIPs, whether
12 those prices were reliable?
13    MS. CARRERO:  Objection to the form of
14 the question.
15    A.    I don't know if they're reliable or
16 not.
17    Q.    Have you studied the values of the
18 CUSIPS referenced in this first bullet point on
19 the top of page 30 of your report?
20    A.    Studied the values?
21    Q.    Do you have an independent judgment as
22 to the fair values of the assets discussed in
23 the first bullet point on the top of page 30?
24    A.    I did not attempt to value them
25 independently.

Page 136

J. Garvey

1            J. Garvey
2    Q.    Did you attempt to value independently
3 any of the assets Barclays acquired from Lehman
4 in this case?
5    A.    No.  Me personally, no.
6    Q.    You or your staff?
7    MS. CARRERO:  Objection to the form
8 and asked and answered.
9    Q.    Are you giving any opinion in this
10 case about the values of any of the assets
11 Barclays acquired from Lehman?
12    MS. CARRERO:  Same objection and asked
13 and answered.
14    A.    My opinion is not about the values.
15    Q.    You're not giving a valuation opinion
16 is all I'm asking?
17    A.    Correct.
18    MR. HUME:  Let's take a quick break so
19 I can try to finish up.
20    (Recess; Time Noted:  12:34 P.M.)
21    (Time Noted:  12:50 P.M.)
22 BY MR. HUME:
23    Q.    Mr. Garvey, I have handed you what has
24 been previously marked as Deposition Exhibit
25 343A.  It is a transcript from a Barclays Bank

Page 137

J. Garvey

1            J. Garvey
2 announcement from September 17, 2008.  Do you
3 see that?
4    A.    Yes.
5    Q.    Have you seen this document before?
6    A.    Yes.
7    Q.    Are you familiar with its contents,
8 generally?
9    A.    I think it's an analyst call.
10    Q.    That's right.
11    A.    Yes.
12    Q.    And in the call on page 2 of this
13 document in the fifth paragraph, there is a
14 statement by Barclays that, "We also mentioned
15 in our announcement today that certain of our
16 shareholders have expressed support for the
17 transaction and an interest increasing their
18 shareholdings in Barclays."  It goes on to say,
19 "In fact, the transaction is capital ratio
20 accretive without additional equity issuance.
21 And the source of that accretion is the negative
22 goodwill from the transaction, which amounts to
23 about 2 billion U.S. dollars post tax."
24    Do you see that?
25    A.    Yes.

Page 138

1              J. Garvey
2     Q.   And do you understand that to mean
3  that Barclays was announcing before the deal was
4  approved that it expected to have an acquisition
5  gain of about $2 billion post tax?
6         MS. CARRERO:  Objection to the form of
7     the question.
8     A.   I have no understanding other than
9  what this says, and I think it speaks for
10 itself.
11    Q.   Well, as an accountant, would you have
12 understood the negative goodwill as an
13 acquisition gain?
14        MS. CARRERO:  Object to the form of
15    the question.
16    A.   As an accountant, I understand that
17 negative goodwill would mean gain, yes,
18 generally speaking.
19    Q.   And can I ask you to turn to page 5 of
20 the document, where there's a question and
21 answer between an analyst from Citigroup and the
22 Barclays executives.
23    A.   Okay.
24    Q.   Question at the top from the Citigroup
25 analyst, he says -- he has a couple of questions

Page 139

1              J. Garvey
2  and says, "One just following up on your
3  comments on the capital and the 15 billion" --
4        Maybe we need to just show you what he
5  says what the 15 billion is, which I believe
6  refers to what they thought their risk-weighted
7  assets were.
8         MS. CARRERO:  Objection to form.  I
9     don't think there's a question here.
10        MR. HUME:  There is not a question
11    right now.
12    Q.   Okay.  It's in the answer.  The
13 question is -- he asks is:  "Am I right, I have
14 just done this very quickly, but you would need
15 to increase equity by about a billion dollars,
16 given the extra 15.  You have a buffer between
17 the trading assets and liabilities of four.  And
18 you are indicating you're accretive, even
19 without the new equity being raised.  Are you
20 assuming, though, that the 4 billion buffer is
21 likely to come down?  Because I guess it could
22 come down from four all the way to one and still
23 be accretive for capital at the end of the day.
24 Or is that very much, this mark to market as of
25 last night, all the toxic stuff is outside of

Page 140

1              J. Garvey
2  this portfolio.  We are expecting if anything
3  maybe to run profits from these positions?"
4        The answer from John Varley is, "The
5  'or is it' piece of your analysis, Tom, is the
6  right way of looking at it.  So we absolutely
7  expect to preserve that buffer and in the way
8  that Chris has described we have marked, and the
9  capital derived from the negative goodwill that
10 arises from the transaction is actually more
11 than is needed to support the 15 billion dollars
12 of risk-weighted assets.  It is just the
13 combination of that part of the transaction
14 gives them an enhancement to the Tier 1 capital
15 and equity Tier 1."
16        Do you see all that?
17    A.   Yes.
18    Q.   Do you understand what risk-weighted
19 assets are?
20        MS. CARRERO:  Objection to the form of
21    the question.
22    A.   I don't really have a complete
23 understanding of what they're talking about
24 here.
25    Q.   My question is do you understand what

Page 141

1              J. Garvey
2  risk-weighted assets are as a general conceptual
3  point?
4         MS. CARRERO:  Object to the form of
5     the question.
6     A.   I don't really know what risk-weighted
7  assets means in that context, no.
8     Q.   Do you understand what Tier 1 capital
9  is?
10    A.   No.
11    Q.   Or equity Tier 1?
12    A.   No.
13    Q.   Do you understand that banks have
14 regulatory capital requirements?
15    A.   I do understand that as a general
16 principle, yes.
17    Q.   Do you understand that banks have
18 regulatory capital requirements that vary
19 depending on the nature of the assets they have
20 and how risky those assets are?
21        MS. CARRERO:  Objection to the form of
22    the question.
23    A.   I don't have -- I have a general
24 understanding but not a complete understanding
25 of that.

Page 142

1          J. Garvey
2     Q.   Would the information in this investor
3  teleconference transcript indicate to you that
4  Barclays was expecting $2 billion of gain from
5  regulatory capital or from intangibles?
6          MS. CARRERO:  Objection to the form of
7     the question.
8     A.   I have no idea.
9     Q.   Let me go back to the last part of
10  your report where you talk about negative
11  goodwill, and let me ask you, would you agree
12  that negative goodwill is an accounting term
13  that arises in distressed transactions where the
14  acquirer takes on assets in excess of
15  liabilities?
16          MS. CARRERO:  Objection to the form of
17     the question.
18     A.   I think -- I'm not sure about
19  distressed.  Negative goodwill is defined in the
20  literature and it's generally driven by the fair
21  value of net assets and net liabilities versus
22  the consideration paid, yes.
23     Q.   Is it most commonly seen in distressed
24  transactions?
25     A.   I don't know what you mean by

Page 143

1          J. Garvey
2  "distressed transactions."
3     Q.   Transactions that occur because the
4  seller is either insolvent or about to be
5  insolvent or in a financially distressed state.
6          MS. CARRERO:  Objection to the form.
7     A.   I don't know the answer.  I haven't
8  studied that.
9     Q.   You have in paragraph 89, you state
10  that, "Excluding the real property, Barclays
11  acquired additional assets of approximately
12  $2.08 billion comprised primarily of
13  intangibles, furniture, and other assets."
14        Do you know how that $2.08 billion
15  number was calculated?
16          MS. CARRERO:  Objection to the form of
17     the question.
18     A.   Do I know how it was calculated?  I
19  don't know the components of it, no.
20     Q.   You cite to Exhibit 377A.  If I show
21  you that, will you be able to figure it out?
22          MS. CARRERO:  Objection to the form of
23     the question.
24     A.   I have to look at it.
25     Q.   Here's a copy of Deposition Exhibit

Page 144

1          J. Garvey
2  377A.  I believe the page that shows the backup
3  is the third page.  Let me just see if I can
4  work this out with you.
5        If you go to the third page of Exhibit
6  377A.
7     A.   Okay.
8     Q.   It has fixtures, fittings and software
9  of .53, do you see that?
10     A.   Not yet.
11     Q.   Line 36.
12     A.   I do see that.
13     Q.   That's 530 million.  And on line 34 it
14  has intangibles -- intangible assets, operating
15  leases of 1.45 billion, do you see that?
16     A.   Yes.
17     Q.   Those two add up to 1.98.
18          MS. CARRERO:  Objection to the form of
19     the question.
20          MR. HUME:  That wasn't a question.
21     That was just math.
22     Q.   Do you agree that that lines up --
23  those two added up to 1.98?
24     A.   1.98, I would agree.
25     Q.   Do you know how you get from that to

Page 145

1          J. Garvey
2  2.08?
3     A.   No.
4     Q.   Do you think it could be including the
5  prepayment obligations of 70 million?
6          MS. CARRERO:  Objection to the form of
7     the question.
8     A.   It could.  I'm not sure.
9     Q.   Okay.  If you are able to determine
10  the answer to that, I would just like to state
11  for the record that we would like to know the
12  answer.  You can just let us know through
13  counsel.
14     A.   Okay.
15          MS. CARRERO:  Okay.
16     Q.   You have at the end of your report a
17  big number of 13 billion that you say, as
18  demonstrated in Professor Zmijewski's report,
19  that Barclays' negative goodwill was at least 13
20  billion, do you see that?
21     A.   I see that, but that's not exactly
22  what it says.
23     Q.   What does it say?
24     A.   It says, "In any event, and as
25  demonstrated in Professor Zmijewski's report,

J. Garvey

1      J. Garvey
2  Barclays' negative goodwill on the transaction
3  as consummated was far greater -- Barclays'
4  windfall was at least $13.051 billion."
5      Q.   Is that your opinion or Professor
6  Zmijewski's opinion?
7      A.   That's Professor Zmijewski's opinion,
8  and he has a schedule in there that shows you,
9  in his report, I'm sorry, that shows you how you
10  get to that number, but --
11      Q.   All I'm trying to establish is that
12  you're not the expert who's going to be
13  explaining and testifying to the court why it is
14  that the movants believe the total windfall was
15  at least 13 billion, that's going to be
16  Professor Zmijewski, correct?
17      MS. CARRERO:  Objection to the form of
18  the question.
19      A.   That would be Professor Zmijewski,
20  yes.
21      Q.   Not you?
22      A.   Not me.
23      Q.   That's good, because otherwise we
24  would have to keep going.
25      You're not giving an opinion one way

J. Garvey

1      J. Garvey
2  or the other, are you, Mr. Garvey, as to whether
3  it was appropriate or inappropriate for Barclays
4  to record negative goodwill in this transaction?
5      MS. CARRERO:  Objection to the form of
6  the question.
7      A.   I don't have that opinion, no.
8      Q.   And you don't have any opinion about
9  the extent to which Barclays' negative goodwill
10  does or does not correspond with the amount of
11  increased regulatory capital that Barclays was
12  able to record?
13      MS. CARRERO:  Objection to the form of
14  the question.
15      A.   I didn't study that, how they
16  interact.
17      Q.   Mr. Garvey, have you ever been the
18  partner responsible for signing the audit of a
19  major financial institution?
20      MS. CARRERO:  Objection to the form of
21  the question.
22      A.   I was an auditor.  I signed many audit
23  opinions.  I'm not sure I would say that I
24  signed an opinion of a major financial
25  institution, although I don't know what you mean

J. Garvey

1      J. Garvey
2  by "major financial institution."
3      Q.   Did you ever sign the audit of any
4  institution?
5      A.   I signed audit opinions when I was an
6  audit partner at Deloitte & Touche, yes.
7      Q.   Including for publicly traded
8  institutions?
9      A.   Yes.
10      Q.   Can you name any publicly traded
11  institutions for which you signed the audit at
12  any point in your career?
13      A.   I don't recall, but I signed audit
14  opinions for SEC registrants, I recall.  I was
15  an audit partner for four years.
16      Q.   So there's a typo in your resumé that
17  says you were a partner at Deloitte from 1980 to
18  '94.  Should it be 1990?
19      A.   No, '08 to '94, but I was there for 14
20  years, but I didn't become an audit partner
21  until 1990 and you can't sign opinions until
22  you're an audit partner.  I was there 14 years.
23  I started out as a new guy, then a not so new
24  guy, more --
25      Q.   The resumé, I'm sure this is

J. Garvey

1      J. Garvey
2  accidental, but on page 36 of your resumé it
3  says you were a partner from 1980 to June '94?
4      MS. CARRERO:  Objection to form.
5      A.   I'm not sure that's -- ultimately,
6  when I left I was a partner, and I was there
7  from 1980 --
8      Where is it?  I'm sorry.  What page,
9  thirty --
10      Q.   Six.
11      A.   Yes, I mean, I was -- I was a partner
12  when I left, but I was not a partner for that
13  entire period.  I was a partner for four years.
14  I mean, that's -- 1980 to '94 refers to the
15  entire time I was at Deloitte & Touche.
16      Q.   Okay.
17      A.   Similar, you know, similar to all the
18  other places.
19      Q.   When you're the partner who signs the
20  audit, does that mean you're also the engagement
21  partner with overall responsibility for the
22  audit?
23      A.   As a general matter, yes.
24      Q.   Since leaving Deloitte & Touche, have
25  you performed -- have you had a role like being

Page 150

1             J. Garvey
2    an engagement partner for any -- in any audit?
3    Did you do any auditing at Arthur Andersen, for
4    example?
5       A.   No.
6       Q.   What about at Dearborn Partners?
7       A.   I haven't been an auditor in the
8    context of what you're -- the question you're
9    asking me since I left Deloitte & Touche.
10            MR. HUME:  Let's take a two-minute
11    break.
12         (Continued on the next page to include
13    the jurat.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 151

1             J. Garvey
2         (Recess; Time Noted:  1:06 P.M.)
3         (Time Noted:  1:07 P.M.)
4            MR. HUME:  I don't have any more
5    questions.  I assume no one else has.
6            MR. KAY:  No questions.
7            MR. WOOD:  Nothing.
8            THE WITNESS:  Thank you.
9            MR. HUME:  Thank you for your time,
10    Mr. Garvey.
11            THE WITNESS:  Thank you.
12         (Time Noted:  1:07 P.M.)
13            oOo
14
15
16
17
18    _____
19            JOHN P. GARVEY
20    Subscribed and sworn to
     before me this     day
21    of        2010.
22
     _____
23
24
25

Page 152

1             J. Garvey
2          CERTIFICATE
3    STATE OF NEW YORK )
            : ss
4    COUNTY OF NEW YORK)
5       I, Kathy S. Klepfer, a Registered
6    Merit Reporter and Notary Public within and
7    for the State of New York, do hereby
8    certify:
9         That JOHN P. GARVEY, the witness whose
10    deposition is herein before set forth, was
11    duly sworn by me and that such deposition is
12    a true record of the testimony given by such
13    witness.
14         I further certify that I am not
15    related to any of the parties to this action
16    by blood or marriage and that I am in no way
17    interested in the outcome of this matter.
18         I further certify that neither the
19    deponent nor a party requested a review of
20    the transcript pursuant to Federal Rule of
21    Civil Procedure 30(e) before the deposition
22    was completed.
23         In witness whereof, I have hereunto
24    set my hand this 13th day of April, 2010.
25         --------------------------------

Page 153

1             J. Garvey
2             INDEX
3    TESTIMONY OF J. GARVEY:              PAGE
4    Examination by Mr. Hume          5
5
6    EXHIBITS:                 PAGE
7    Exhibit 705, Expert Report of John P. Garvey    8
8    dated March 15, 2010
9
10
11    REQUESTS FOR PRODUCTION:
12    Page 103, Line 18
13    Page 145, Line 9
14
15
16
17
18
19
20
21
22
23
24
25

Page 154

```
1          J. Garvey
2    NAME OF CASE:  In re Lehman Brothers
3    DATE OF DEPOSITION:  April 13, 2010
4    NAME OF WITNESS:  John P. Garvey
5    Reason Codes:
6       1.  To clarify the record.
        2.  To conform to the facts.
7       3.  To correct transcription errors.
8    Page _____ Line _____ Reason _____
     From _____ to _____
9
     Page _____ Line _____ Reason _____
10   From _____ to _____
11   Page _____ Line _____ Reason _____
     From _____ to _____
12
     Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
     From _____ to _____
15
     Page _____ Line _____ Reason _____
16   From _____ to _____
17   Page _____ Line _____ Reason _____
     From _____ to _____
18
     Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
     From _____ to _____
21
     Page _____ Line _____ Reason _____
22   From _____ to _____
23   Page _____ Line _____ Reason _____
     From _____ to _____
24
25        _____
```

40 (Page 154)

# Exhibit C

**Contains Highly Confidential Information**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.,* | Case No. 08-013555 |
| Debtors. | (Jointly Administered) |

**Expert Report of**

**Mark E. Slattery, CFA**

**March 15, 2010**

**Contains Highly Confidential Information**

# Table of Contents

I.      Introduction ................................................................................................ 1

II.     Scope of Analysis Performed ..................................................................... 1

III.    Summary of Qualifications ........................................................................ 3

IV.     Summary of Opinion .................................................................................. 4

V.      Opinion and Basis Thereof ........................................................................ 5

   A.    Barclays undervalued 125 U.S. Treasury and Agency debt Securities by $424
      million ....................................................................................................... 6

      1)    Barclays took a 5% across-the-board liquidity discount on
         U.S. Agency debt securities without considering the
         maturity of each individual instrument; this resulted in
         implicit and indefensible annualized yields as high as
         643.4% ............................................................................................. 6

      2)    In contrast to Barclays' generic approach, I valued U.S.
         Treasury and Agency securities using either actual,
         observable price quotes or by discounting each security-
         specific structured cash flow by actual, observable
         comparable market yields ................................................................. 9

   B.    Barclays undervalued 308 Agency RMBS by $728 million ................................. 10

      1)    Neither Barclays, nor its expert Professor Pfleiderer,
         provided any detailed model documentation or analysis to
         support the values they ascribe to these securities. ................................ 11

      2)    Barclays apparently calculated liquidity discounts using
         differences between purchase and sales prices, which
         provided no description as to the source, the time of day
         for which they were provided, or whether the prices were
         actual traded prices, bids, offers, or price indications. ........................... 11

      3)    In contrast to Barclays' modeling approach, I valued these
         securities   using a pricing framework that accounted for
         the variability of potential outcomes by incorporating
         prepayments under multiple interest rate scenarios to
         capture the value associated with embedded options. ............................ 14

   C.    Barclays undervalued 162 non-Agency RMBS by $387 million. ........................ 14

      1)    Barclays did not provide detail or support for its valuation
         of non-Agency RMBS ..................................................................... 15

      2)    The Pfleiderer report accepts Barclays' use of sales prices
         obtained after September 22, 2008 in valuing non-Agency
         RMBS despite Professor Pfleiderer's acknowledgement

**Contains Highly Confidential Information**

that "as a general matter, one must use ex post outcomes
with considerable care." .......................................................................... 15

3)    Contrary to Barclays' ad hoc approach, my approach for
valuing credit sensitive non-Agency RMBS was consistent
with industry practice. ............................................................ 17

D.    Barclays undervalued 6 CLOs (excluding the Pine CLO) by $12 million. .......... 18

1)    Barclays' values as of September 19, 2008, were very
similar to the values that I calculated; however, Barclays
failed to demonstrate any basis or analytical justification
for taking a 21% discount to arrive at their exit value. ........................... 19

E.    Barclays undervalued the Pine CCS CLO by $389 million................................. 19

1)    Barclays materially misunderstood the structure of Pine,
apparently concluding that Pine had the typical structure
of a "revolver" CLO. ............................................................... 19

2)    In deriving its valuation, Barclays failed to recognize the
inverted structure of the CLO and its own senior position
within that structure.................................................................. 21

3)    Barclays inappropriately applied a 20% "participation"
discount when valuing the underlying collateral..................................... 21

4)    Professor Pfleiderer performed little to no due diligence
when reviewing Barclays' valuation of Pine.......................................... 22

F.    Barclays undervalued 30 CDOs and CMBS by $22 million. .............................. 23

G.    Barclays undervalued 6,035 other CUSIPs by over $400 million. ....................... 24

---

**Contains Highly Confidential Information**

## List of Appendices

Appendix I      Curriculum Vitae

Appendix II      Documents Relied Upon

Appendix III      Description of Dynamic Pricing of Agency RMBS and Related Model Components

Appendix IV      Description of Valuation of Credit Sensitive non-Agency RMBS

**Contains Highly Confidential Information**

## I.    INTRODUCTION

1.    This report is submitted by Mark E. Slattery.  I am an independent consultant with Navigant Economics (Chicago Partners), a subsidiary of Navigant Consulting, Inc., which specializes in applying accounting, economics, and finance to business consulting, legal, and regulatory issues.  My qualifications are detailed in Section III and my Curriculum Vitae is included in Appendix I.

2.    I have prepared this report at the request of Movants' Counsel.  In this report, I set forth subject matter on which I expect to testify, including the substance of the facts and opinions on which I expect to testify, and summarize the foundations for each opinion.[1] As cited within the text and footnotes of this report and/or Appendix II to this report, I have reviewed various documents to prepare this analysis.

## II.    SCOPE OF ANALYSIS PERFORMED

3.    I have been asked by counsel to value certain securities in connection with Barclays' acquisition ("the Acquisition") of certain Lehman Brothers Holdings Inc. ("LBHI") and Lehman Brothers Inc. ("LBI") assets.

4.    As an initial matter, in my evaluation of the information available to value the securities Barclays acquired, I observed certain valuation issues highlighted by

---

[1] Motion of Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al., Pursuant to 11 U.S.C. § 105(a), Fed. R. Civ. P. 60(b), and Fed. R. Bankr. P. 9024, for Relief from Order Under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, Dated September 20, 2008 (and Related SIPA Sale Order) and Joinder in Debtors' and SIPA Trustee's Motions for an Order Under Rule 60(b) to Modify Sale Order.  In re Lehman Brothers Holdings Inc., et al., Debtors Case No. 08-13555 (JMP) (Bankr. S.D. N.Y. Sept. 15, 2009).
The Trustee's Motion for Relief Pursuant to the Sale Orders or, Alternatively, for Certain Limited Relief Under Rule 60(b), (Bankr. S.D. N.Y. Sept. 15, 2009).
Debtor's Motion for an Order, Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024, Modifying the September 20, 2008 Sale Order and Granting Other Relief (Bankr. S.D. N.Y. Sept. 15, 2009).

**Contains Highly Confidential Information**

substantial divergences between Barclays' acquisition price and that of Barclays' custodial bank, the Bank of New York ("BoNY"). BoNY is a premier custodian in the U.S. marketplace and is subject to extensive regulations and contractual obligations.[2] As such and in light of the substantial divergences, I have identified securities where the absolute value of the difference between Barclays' valuation for any given security and BoNY's valuation exceeded $1 million. In my experience, a valuation difference this significant should have triggered further investigation. These pricing differences included 632 securities, for which I performed an in-depth analysis and valuation. I present valuations based on third party pricing sources for approximately 6,035[3] securities acquired by Barclays in addition to the 632 security valuations.

5.      I calculated the fair value of a total of 6,667 securities acquired by Barclays in the Acquisition. My independently calculated values are based on a robust valuation framework, state of the art models and data libraries customarily used by market participants, including Barclays itself, and are supported by currently available empirical research of the actual market conditions and pricing information that was available to Barclays at the time of its valuations. For the securities that were not part of my independent value calculations, I assigned unbiased prices collected from independent third party market pricing sources.

6.      Barclays' estimated values were based on arbitrary and indefensible discounts taken by Barclays. Indeed, Barclays employed certain valuation techniques in the Acquisition that massively undervalued acquired assets. As a result of this flawed

---

[2] See Expert Report of John Schneider.
[3] In the case of 40 securities, where Barclays failed to provide information related to the particular security, and where I was able to obtain third party pricing information but unable to obtain information other than third party pricing, I performed valuations based on third party pricing.

**Contains Highly Confidential Information**

process, Barclays significantly undervalued the aforementioned securities by at least

$2.38 billion.[4]

7.      Navigant Economics (Chicago Partners) charges an hourly rate of $500 for my

time.  Other Navigant Economics (Chicago Partners) professionals, working under my

direction and supervision, assisted in my analysis and they will be compensated for their

work at their customary hourly rates.  Our compensation is not contingent in any way on

the outcome of this matter.

8.      The remainder of the report is organized as follows:  Section III summarizes my

qualifications and the qualifications of my team; Section IV summarizes my opinion;

Section V details my opinion and provides the bases thereof.

## III.     <u>SUMMARY OF QUALIFICATIONS</u>

9.      My present position is Independent Consultant at Navigant Economics (Chicago

Partners), a subsidiary of Navigant Consulting, Inc.  Navigant Economics (Chicago

Partners) specializes in consulting in the areas of accounting, economics, and finance.  I

am a Chartered Financial Analyst and my areas of expertise include residential mortgage

investments, financial modeling and risk management.

10.     Prior to joining Navigant Economics (Chicago Partners), I was a Senior Vice

President in the Asset/Liability Management & Economics Group at LaSalle Bank

Corporation (a member of the ABN AMRO Group), specializing in residential mortgage

analytics and investment portfolio activities.  Before joining LaSalle Bank, I spent 8

years as the Co-Managing Director of the Subject Matter Consultants at Quantitative

---

[4] I have reviewed the available data regarding market conditions from the close of business in the United States on Friday, September 19, 2008 to the opening of business in the United States on Monday, September 22, 2008 and have concluded that my valuations that are based on closing prices on September 19, 2008 would not change materially if rolled forward to September 22, 2008.

**Contains Highly Confidential Information**

Risk Management, specializing in consulting on the modeling and valuation of a wide array of fixed income securities and related hedge vehicles.  Previous to joining QRM, I worked as a Thrift Regulator and Senior Financial Analyst for the Federal Home Loan Bank of Chicago, specializing in the oversight of capital markets activities of member institutions.

11.      The team that has supported me includes fixed income and mortgage securities valuation professionals with extensive experience at major financial institutions.  My team has significant experience in trading fixed income securities and valuing them for financial reporting purposes.  I have worked with these team members previously to analyze and value other similar products.

## IV.    <u>SUMMARY OF OPINION</u>

12.      In this section of my report, I summarize my opinion.  In the remaining sections of the report, I provide the substance of the facts and opinion of which I expect to testify, and the bases for this opinion.  I reserve the right to supplement my analysis in response to any newly produced evidence or in rebuttal to any further opinions offered by Barclays' witnesses.  I also reserve the right to do a more comprehensive CUSIP-by-CUSIP valuation, if necessary, of those securities I did not independently value for purposes of my report.

**Opinion 1: Barclays undervalued 6,667 securities acquired by Barclays from LBHI and LBI by at least $2.38 billion.**

13.      As detailed in Table 1 below, I have replicated the results from Professor Pfleiderer's Table 1 analysis[5] by comparing my own valuation results with Barclays' valuation results.

---

[5] Expert Report of Professor Pfleiderer, ¶53.

---

**Contains Highly Confidential Information**

| Table 1: Summary of Valuation Differences for All Valuations (amounts in millions of dollars) | | | | |
|---|---|---|---|---|
| Replication of Professor Pfleiderer Table 1 Report Category | Number of CUSIPs | Barclays' Opening Balance Sheet Valuation | 9/19/2008 Valuation (at Exit Marks) | Valuation Difference (Barclays' Undervaluation) |
| Residential Mortgage Backed Securities | 3,834 | $12,620 | $13,561 | $941 |
| Corporate Bonds | 501 | $1,119 | $1,111 | -$7 |
| Emerging Markets Equities | 69 | $225 | $224 | $0 |
| Rates | 1,154 | $14,507 | $14,983 | $476 |
| Principal Mortgage Trading Group | 1,109 | $2,064 | $3,036 | $972 |
| Total | 6,667 | $30,534 | $32,915 | $2,380 |

## V.   OPINION AND BASIS THEREOF

14.    This section discusses my opinion and the bases of my opinion.

**Opinion 1: Barclays undervalued 6,667 securities acquired by Barclays from LBHI and LBI by at least $2.38 billion.**

15.    Barclays undervalued U.S. Treasury and Agency debt securities, Agency and non-Agency Residential Mortgage-Backed Securities ("RMBS"), Collateralized Loan Obligations ("CLOs"), Collateralized Debt Obligations ("CDOs"), Commercial Mortgage-Backed Securities ("CMBS") and other securities acquired from LBHI & LBI by an amount of at least $2.38 billion.  As detailed in Table 1 above, I have replicated the results from Professor Pfleiderer's Table 1 analysis[6] by comparing my own valuation results with Barclays' valuation results.

16.    In the following section of the report, I describe the valuation results from each of the categories identified in Table 2, below.  These descriptions correspond to the order in which the securities are described in Table 2.  The total undervaluation described in my Table 2 equals the total undervaluation in Table 1.

---

[6] Expert Report of Professor Pfleiderer, ¶53.

**Contains Highly Confidential Information**

| Table 2: Summary of Valuation Differences for All Valuations (amounts in millions of dollars) | | | | |
| --- | --- | --- | --- | --- |
| Expert Report Valuation Summary by Individual Asset Class | Number of CUSIPs | Barclays' Opening Balance Sheet Valuation | 9/19/2008 Valuation (at Exit Marks) | Valuation Difference (Barclays' Undervaluation) |
| A. U.S. Treasury and Agency Debt Securities | 125 | $12,778 | $13,203 | $424 |
| B. Agency RMBS | 308 | $5,821 | $6,549 | $728 |
| C. Non-Agency RMBS | 162 | $512 | $898 | $387 |
| D. Collateralized Loan Obligations excl. Pine | 6 | $46 | $58 | $12 |
| E. Pine CLO | 1 | $429 | $817 | $389 |
| F. CDOs and CMBS | 30 | $192 | $213 | $22 |
| G. Third Party Valuations | 6,035 | $10,757 | $11,176 | $419 |
| Total | 6,667 | $30,534 | $32,915 | $2,380 |

A.    BARCLAYS UNDERVALUED 125 U.S. TREASURY AND AGENCY DEBT SECURITIES BY $424 MILLION.

17.    I independently valued 125 distinct U.S. Treasury and Agency securities. I valued those securities at $13,202,512,065, as of September 19, 2008.  Barclays' values were very similar to those that I calculated before Barclays' liquidity discounts were applied that were, based upon my research and analysis, unjustified and excessive for those securities at that point in time.  Table 3 below summarizes the difference between my valuations and those of Barclays.

| Table 3: Summary of Valuation Differences for US Treasury and Agency Debt Securities (amounts in millions of dollars) | | | |
| --- | --- | --- | --- |
| Number of CUSIPs | Barclays' Opening Balance Sheet Valuation | 9/19/2008 Valuation (at Exit Marks) | Valuation Difference (Barclays' Undervaluation) |
| 125 | $12,778 | $13,203 | $424 |

18.    Several reasons for Barclays' undervaluation of these securities are identified below.

1)    **Barclays took a 5% across-the-board liquidity discount on U.S. Agency debt securities without considering the maturity of each**

**Contains Highly Confidential Information**

**individual instrument; this resulted in implicit and indefensible annualized yields as high as 643.4%.**

19.     Barclays' valuation of the security listed as the first security in Table 4 below was a $50 million discount note that Barclays initially valued at $99.99 for a note maturing on September 22, 2008.  Barclays took a 5% discount from the $99.99 value to revalue that note at acquisition.  The result of this was a discount of the note's value by $2.5 million.  This note would have provided the holder a payment of $100.00, or its par value, providing a total return of principal to the holder three days after the September 19, 2008 acquisition.  Based on a $99.99 price, this $100.00 payment reflected an approximate 1.2% yield.  In stark contrast, Barclays' adjusted price of $94.99 implied a "yield" or return of 643.4%.  Furthermore, Barclays' valuation is more suspect because this security would have settled at par and payment would actually have been received by Barclays long before Barclays' acquisition balance sheet was prepared.

20.     This example highlights the deficiencies in Barclays' valuation methodology.  Barclays' approach was indiscriminate, unsupported by market data and excessive in light of prevailing market conditions.  Table 4 below exemplifies the deficiencies in Barclays' valuation.

Contains Highly Confidential Information

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Table 4: Yield Analysis of Discount Notes** | | | | | | | | | | |
| Settlement Date: | 9/19/2008 | | | | | **Fair Value ($ millions)** | | | | **Yield** |
| | CUSIP | Description | Face Amount ($ millions) | Maturity Date | | Barclays | | Chicago Partners | Difference | Barclays |
| 1 | RTD019828 | USD Fmcdn 0.0 22 Sep 2008 Rg | $   50.0 | 09/22/08 | $ | 47.5 | $ | 49.9 | $   2.4 | 643.4% |
| 2 | RTD019885 | USD FHLBDN 0.0 26 Sep 2008 Rg | $   28.8 | 09/26/08 | $ | 27.4 | $ | 28.8 | $   1.4 | 276.8% |
| 3 | 313396H89 | USD Fmcdn 0.0 30 Sep 2008 Rg | $   926.9 | 09/30/08 | $ | 880.2 | $ | 925.1 | $   44.9 | 176.2% |
| 4 | RTD019971 | USD Fmcdn 0.0 01 Oct 2008 Rg | $   50.0 | 10/01/08 | $ | 47.5 | $ | 49.9 | $   2.4 | 162.8% |
| 5 | 313588K79 | USD Fndn 0.0 15 Oct 2008 Rg | $   400.0 | 10/15/08 | $ | 379.5 | $ | 399.0 | $   19.4 | 76.0% |
| 6 | 313384M71 | USD FHLBDN 0.0 31 Oct 2008 Rg | $   100.0 | 10/31/08 | $ | 94.8 | $ | 99.7 | $   4.9 | 48.0% |
| 7 | 313384P52 | USD FHLBDN 0.0 14 Nov 2008 Rg | $   61.8 | 11/14/08 | $ | 58.5 | $ | 61.5 | $   3.0 | 36.7% |
| 8 | 313396Q71 | USD Fmcdn 0.0 24 Nov 2008 Rg | $   250.0 | 11/24/08 | $ | 236.6 | $ | 248.8 | $   12.3 | 31.5% |
| 9 | 313588R31 | USD Fndn 0.0 28 Nov 2008 Rg | $   100.0 | 11/28/08 | $ | 94.6 | $ | 99.5 | $   4.9 | 29.9% |
| 10 | 313384T41 | USD FHLBDN 0.0 15 Dec 2008 Rg | $   44.8 | 12/15/08 | $ | 42.4 | $ | 44.6 | $   2.2 | 24.5% |
| 11 | 313588T62 | USD Fndn 0.0 17 Dec 2008 Rg | $   100.0 | 12/17/08 | $ | 94.5 | $ | 99.4 | $   4.9 | 24.0% |
| 12 | 313396V34 | USD Fmcdn 0.0 30 Dec 2008 Rg | $   150.0 | 12/30/08 | $ | 141.6 | $ | 149.0 | $   7.4 | 21.3% |
| 13 | 313396V42 | USD Fmcdn 0.0 31 Dec 2008 Rg | $   150.0 | 12/31/08 | $ | 141.6 | $ | 149.0 | $   7.4 | 21.1% |
| 14 | 313588V44 | USD Fndn 0.0 31 Dec 2008 Rg | $   150.0 | 12/31/08 | $ | 141.6 | $ | 149.0 | $   7.4 | 21.1% |
| 15 | 313397DS7 | USD Fmcdn 0.0 30 Mar 2009 Rg | $   150.0 | 03/30/09 | $ | 140.5 | $ | 147.8 | $   7.3 | 12.9% |
| 16 | 313589GE7 | USD Fndn 0.0 29 May 2009 Rg | $   150.0 | 05/29/09 | $ | 139.8 | $ | 147.1 | $   7.4 | 10.6% |
| | **Total/Weighted Average** | | $   2,862.2 | | $ | 2,708.3 | $ | 2,848.2 | $   139.9 | 96.6% |

21.    I applied discounts on U.S. Agency debt securities based on actual market data for comparable instruments taking into account the maturity of the bond and prevailing bid-offer spreads on a bond-by-bond basis.  These discounts ranged from 0.14% to 1.22% of midpoint values, significantly smaller than Barclays' 5.0% discount.

22.    Barclays' liquidity discount was particularly excessive given that the U.S. government acted to provide additional liquidity prior to September 22, 2008 to the U.S. Agency securities market. For example, on September 7, 2008, the U.S. Treasury entered into senior preferred stock purchase agreements with Fannie Mae and Freddie Mac, which effectively provided protection to holders of senior debt, subordinated debt, and MBS issued or guaranteed by these entities.  As an additional measure to support the financial markets, the Federal Reserve announced on September 19, 2008 that it would begin purchasing short term debt obligations issued by Fannie Mae, Freddie Mac, and

**Contains Highly Confidential Information**

the Federal Home Loan Banks in the secondary market. These facts further undermine the validity of the approach taken by Barclays.

23.     Barclays did not differentiate between asset types and their inherent risk characteristics when applying the 5% liquidity discount. For example, Barclays applied a 5% liquidity discount to both covered bonds and U.S. Agency debt. Covered bonds are foreign bank debt instruments secured by mortgage loans. In the U.S. market, covered bonds are much less liquid than U.S. Agency debentures. Nevertheless, Barclays applied the same high 5% discount to U.S. Agency debt securities that it applied to covered bonds.

24.     Barclays' universal application of a 5% liquidity discount on all U.S Agency securities resulted in an excessive $462.7 million discount in the valuation. For Agency securities, as reflected on Schedules A and B,[7] Barclays listed an aggregate value of $9.255 billion prior to assigning the liquidity discount and an aggregate value of $8.792 billion after universally integrating the 5% discount, a reduction of $462.7 million.[8]

> 2)     **In contrast to Barclays' generic approach, I valued U.S. Treasury and Agency securities using either actual, observable price quotes or by discounting each security-specific structured cash flow by actual, observable comparable market yields.**

25.     U.S. Treasury securities are AAA rated and are essentially credit-risk free. U.S. Treasury securities are, in fact, the most liquid instruments in the capital markets universe, and typically trade at prices where the difference between the "bid," meaning the price at which such a security could be purchased and the "offer," meaning the price at which such a security could be sold, i.e., the "bid-offer spread," are as small as 0.00 to

---

[7] BCI-EX-00099159 (Dep. Ex. 86B); BCI-EX-(S)-00213995 (Dep. Ex. 641A).
[8] BCI-EX-00099159 (Dep. Ex. 86B); BCI-EX-(S)-00213995 (Dep. Ex. 641A).

**Contains Highly Confidential Information**

0.03%. Based on my research and analysis of observed actual market data for the "bid-offer spread," I incorporated a liquidity discount on U.S. Treasury securities ranging from 0.03% to 0.06% of the price.

26.     Unlike U.S. Treasury securities, U.S. Agency securities do have some credit risk. For U.S. Agency securities with no available market quotes, I valued them by discounting their associated cash flows while taking into account the credit risk component by applying actual observable market yields from comparable Agency securities.

27.     Finally, I calculated fair values for each U.S. Treasury and Agency security by reducing their midpoint values by an applicable and supportable liquidity discount as evidenced by actual market data.

B.      <u>BARCLAYS UNDERVALUED 308 AGENCY RMBS BY $728 MILLION.</u>

28.     I independently valued 308 distinct Agency RMBS. I valued those securities at $6,549,047,039 as of September 19, 2008. These results are summarized below in Table 5.

| Table 5: Summary of Valuation Differences Agency RMBS (amounts in millions of dollars) | | | |
|---|---|---|---|
| Number of CUSIPs | Barclays' Opening Balance Sheet Valuation | 9/19/2008 Valuation (at Exit Marks) | Valuation Difference (Barclays' Undervaluation) |
| 308 | $5,821 | $6,549 | $728 |

29.     Barclays' value of $5,821,257,372 is understated for a number of distinct reasons set forth below.

**Contains Highly Confidential Information**

> 1)    **Neither Barclays, nor its expert Professor Pfleiderer, provided any
> detailed model documentation or analysis to support the values they
> ascribe to these securities.**

30.    Professor Pfleiderer did not, in fact, independently value any of these securities.

Instead, he simply accepted Barclays' methodology for deriving an "exit price" for these

securities by taking a flat, across-the-board 10% discount from the value of these

securities.[9]

31.    Professor Pfleiderer opined that Barclays valued Agency Collateralized Mortgage

Obligations ("CMOs"), specifically complex floaters, interest only ("IO")[10] and inverse

IO securities, using midpoint marks that were subsequently reduced by a 10% liquidity

discount to establish exit price marks.  According to Professor Pfleiderer, Barclays' "exit

price marks were reasonable and appropriate given the relevant risks and liquidity issues

associated with these securities."[11]

32.    Barclays used two approaches to estimate the liquidity discount for Agency

CMOs.  In the first approach, Barclays took price observations from various unnamed

sources and noted that the average variance was 10%.  The second approach involved

reviews of observed buys and sells of 39 Agency CMOs that occurred on the same date.

The weighted average difference between these prices was noted as 10.5%.[12]  Barclays

incorrectly used this data as a proxy for its liquidity discount.

> 2)    **Barclays apparently calculated liquidity discounts using differences
> between purchase and sales prices, which provided no description as
> to the source,  the time of day for which they were provided, or**

---

[9] Expert Report of Professor Pfleiderer,  Appendix Four, Section Four, P. 110.
[10] An Interest Only mortgage security pays a coupon based only on a notional principal; it receives no
principal payments from amortization or prepayments.  An Inverse Interest Only mortgage security pays a
coupon that moves opposite to its index based only on a notional principal.
[11] Expert Report of Professor Pfleiderer, Appendix Four, Section Four, P. 110.
[12] PwC-BarCapWP_00023327.

**Contains Highly Confidential Information**

**whether the prices were actual traded prices, bids, offers, or price indications.**

33.    Prices were simply given by Barclays to PwC over a given day, as if they represented the simultaneous bid-offer spread, justifying its determination of the liquidity discounts.  A review of a listing of combined bid and offer prices, without regard to whether they occur at the same or a different time of day, and with no information as to the source, is not representative of the bid-offer spread.  The commonly used definition of a bid-offer spread is the difference between the price at which a dealer is willing to purchase or sell a given security simultaneously at a particular moment in time.  Barclays neither provided nor incorporated such an analysis in its valuation.

34.    In contrast to Barclays' flawed methodology, I used empirical bid-offer spreads to derive liquidity discounts.  I did not use trading ranges for various securities as proxies for bid-offer spreads.

35.    Although Professor Pfleiderer did not conduct any independent analysis, he reviewed documentation from PwC and stated that Barclays used an "average" for the liquidity discount and that this "average" was a fair representation of the population of securities.[13]  These are not accurate statements.

36.    First, the percentage composition of the portfolio Barclays used for deriving the average was not the same as the percentage composition of the Lehman portfolio of securities that is the subject of the valuation.  For example, Inverse IO securities comprised 51% of Barclays' benchmark portfolio.  However, Inverse IO securities only comprised 13% of the Agency MBS portfolio subject to valuation.  This means that the

---

[13] PwC-BarCapWP_00023327.

**Contains Highly Confidential Information**

average liquidity discount used by Barclays is significantly skewed towards one type of

security and is not representative of the population subject to valuation.

37.     Second, the Inverse IOs had a much higher bid-offer spread, as defined by

Barclays, than the other types of securities in Barclays' benchmark portfolio.  For

example, Barclays claims that the bid-offer spread was approximately 16% for Inverse

IOs.  The majority of the other types of securities in Barclays' own benchmark portfolio

had a bid-offer spread of approximately 0.03%.  Therefore, the "average" liquidity

discount applied by Barclays was not only skewed on a "frequency" basis, but also a

"magnitude" basis.

38.     Lastly, Barclays incorrectly assessed a 10% liquidity discount across a broad and

diverse set of asset types within the Agency RMBS category.  In contrast, I applied

liquidity discounts by product type and did not use an average to generalize across all

the various types of tranches of a CMO deal.  I did so because each tranche has a

different level of liquidity in the marketplace as the liquidity of a particular type of CMO

tranche is directly related to its complexity, hedging difficulty, and term-to-maturity.

39.     Barclays made other fundamental errors in its valuation of the Agency RMBS.

According to Barclays' accountants, certain RMBS were valued by Barclays using a

discounted cash flow approach incorporating the BlackRock prepayment model and an

estimate of required market yields.  Based on my understanding of this analytical

configuration, Barclays used a valuation methodology that did not take into account the

variability of outcomes given different market conditions.  This means that Barclays

assumed a single set of cash flows and assigned a single discount rate to value each

security.  As a result, the variability of potential outcomes, e.g., differences in mortgage

**Contains Highly Confidential Information**

prepayment rates by borrowers leading to variable valuation outcomes, was not accurately factored into Barclays' valuation.[14]

> 3)    **In contrast to Barclays' modeling approach, I valued these securities using a pricing framework that accounted for the variability of potential outcomes by incorporating prepayments under multiple interest rate scenarios to capture the value associated with embedded options.**

40.    Further discussion regarding dynamic pricing of Agency RMBS and each of the related model components is provided in Appendix III of this report.

41.    For a subset of the Agency RMBS that I valued, specifically 24 CUSIPs, I obtained actual price quotes from multiple broker/dealers.

42.    For the remaining Agency RMBS that I valued, I used an industry standard and widely recognized valuation technique to establish "mid" prices, i.e., prices midway between prevailing bids and offers.[15]    I applied liquidity discounts to midpoint prices to reflect varying levels of liquidity for different mortgage product types in order to derive market values.  The liquidity discounts I used are based on empirical research and market intelligence related to bid-offer spreads for various mortgage product types in both "normal" and "stressed" market environments.  I calculated market values for each Agency RMBS by reducing midpoint prices by their liquidity discounts in a "stressed" market environment.

C.    BARCLAYS UNDERVALUED 162 NON-AGENCY RMBS
      BY $387 MILLION.

---

[14] Although appropriate for non-contingent cash flow instruments, including corporate debt instruments that contain no option-like features (e.g., call/put provisions), the pricing approach used by Barclays is insufficient for purposes of valuing Agency RMBS.  Barclays' approach does not accurately capture the value associated with options embedded in the underlying collateral and it led to a substantial undervaluation of this collateral.

[15] This standard methodology is referred to as "breakeven analysis."  Barclays Capital, Securitization Research, January 8, 2010; Bank of America RMBS Trading Desk Strategy, October 23, 2006.

**Contains Highly Confidential Information**

43.    I independently valued 162 distinct non-Agency RMBS.  I valued those securities at $898,447,679, as of September 19, 2008.  The results are summarized below in Table 6.

| | Table 6: Summary of Valuation Differences for Non-Agency RMBS (amounts in millions of dollars) | | |
|---|---|---|---|
| Number of CUSIPs | Barclays' Opening Balance Sheet Valuation | 9/19/2008 Valuation (at Exit Marks) | Valuation Difference (Barclays' Undervaluation) |
| 162 | $512 | $898 | $387 |

> 1)    **Barclays did not provide detail or support for its valuation of non-Agency RMBS.**
>
> 2)    **The Pfleiderer report accepts Barclays' use of sales prices obtained after September 22, 2008 in valuing non-Agency RMBS despite Professor Pfleiderer's acknowledgement that "as a general matter, one must use ex post outcomes with considerable care."[16]**

44.    For analytical purposes, the non-Agency RMBS that I valued were segregated into two categories:  stripped non-Agency RMBS, i.e., private label IOs and POs and non-Agency RMBS.  The segregation was warranted due to key valuation drivers.  For non-Agency IOs and POs, voluntary prepayments represent the key value driver.  For the other non-Agency RMBS that I valued, credit-related events, i.e., defaults and losses, represent the key value drivers.

45.    The approach I took to value private label RMBS IOs and POs was very similar to the one used to value Agency RMBS.  In particular, the valuation framework included a standard state of the art term structure model,[17] a current coupon model,[18] a prepayment

---

[16] Expert Report of Professor Pfleiderer, ¶66.
[17] The Brace Gatarek Musiela model (See Appendix III).

**Contains Highly Confidential Information**

model,[19] and a deal cash flow library.[20]  I applied specific liquidity discounts on an individual bond-to-bond basis to midpoint prices to reflect the appropriate level of additional credit and liquidity risk.  The amount of the liquidity discount in percentage terms was based on the difference between the price of select non-Agency RMBS and Agency RMBS with similar characteristics as of the valuation date.

46.     Material public information exists for an overwhelming majority of these credit sensitive non-Agency RMBS.  One such source of this material public information is known as the 'remittance report.'  A remittance report contains updated information on payments and collateral performance and it is issued in accordance with the pay date of the given security, which is, in the majority of cases, the 25th of each month.[21]  The vast majority of the credit sensitive non-Agency RMBS that I valued make monthly payments on or after the 25th of the month.  Monthly remittance reports contain substantial information on the status of the deal and, therefore, could easily change the market's assessment of the performance of the bond.  Given the material change in market information after September 25, 2008, Barclays' use of post-September 25, 2008 prices was inappropriate for valuing the assets' market values as of September 19, 2008.

47.     The use of ex-post pricing is inappropriate as market conditions change over time, as market conditions impact the value of any particular security.  In addition, Barclays sold a significant amount of the acquired non-Agency RMBS portfolio during a short

---

[18] See Appendix III for details of the current coupon model (See Appendix III).
[19] The Andrew Davidson & Co, model (See Appendix III).
[20] Intex (See Appendix III).
[21] Or the first business day following if the 25th lands on a weekend.  The 25th of September 2008 was a Thursday.

---

**Contains Highly Confidential Information**

time frame.  Therefore, the sale prices do not reflect an orderly disposition of these
assets, but a "fire sale."[22]

48.    Barclays' valuation does not represent the "fair value" of the credit sensitive non-
Agency RMBS that I valued, and therefore, should be disregarded.  It remains unclear
how many of these "sales" were transfers within Barclays to internal trading desks and
how many were legitimate third party sales.  In any event, Barclays' use of post-
transaction prices was inappropriate.  All of the sales occurred after the assets had been
transferred to Barclays and are irrelevant for purposes of this valuation.  In addition,
when measured against Barclays own internal marks, the resulting loss on these
securities signifies a "fire sale" and/or sales to internal trading desks at deeply
discounted prices.  Since the "fair value" of any asset should reflect an orderly
disposition of the asset, Barclays' reliance on such "sale prices" to value these securities
is clearly inappropriate.[23]

    3)    **Contrary to Barclays' ad hoc approach, my approach for valuing
    credit sensitive non-Agency RMBS was consistent with industry
    practice.**

49.    In my valuation of these securities, I used the Intex deal library to obtain
information regarding the structure of the bonds as well as the characteristics and
delinquency status of the underlying mortgages as of September 19, 2008.  I also used
contemporaneous research to develop an appropriate loss curve and industry standard
ABX[24] indices to derive an appropriate discount rate.  After determining an appropriate

---

[22] Expert Report of Professor Pfleiderer, Appendix Four, Section Six, P. 110.
[23] Expert Report of Professor Pfleiderer, Appendix Four, Section Three, P. 109.
[24] As stated on Markit's website the ABX is "A barometer of the conditions in the subprime mortgage
market throughout the financial crisis has been the ABX.HE indices administered by Markit.  There are
four Markit ABX.HE indices, each a synthetic tradeable index referencing a basket of 20 subprime
mortgage-backed securities from a particular vintage by period of issuance.  Each ABX.HE index covers a

**Contains Highly Confidential Information**

loss curve, i.e., calculation of default expectation based on detailed analysis of underlying mortgage collateral data,[25] prepayment input and discount rate, I used the Intex modeling platform to value each of these securities. Finally, to be conservative, I applied an additional liquidity discount to derive my final values.

D.    BARCLAYS UNDERVALUED 6 CLOS (EXCLUDING THE PINE CLO)
       <u>BY $12 MILLION.</u>

50.    I independently valued 6 distinct CLO securities, other than the Pine CLO, which is discussed on pp. 19, below. My independent valuation of these securities was $57,834,688 as of September 19, 2008. The results are summarized below in Table 7.

| Table 7: Summary of Valuation Differences for Collateralized Loan Obligations (amounts in millions of dollars) | | | |
|---|---|---|---|
| Number of CUSIPs | Barclays' Opening Balance Sheet Valuation | 9/19/2008 Valuation (at Exit Marks) | Valuation Difference (Barclays' Undervaluation) |
| 6 | $46 | $58 | $12 |

51.    Barclays did not provide details or analysis to support its modeling of CLO securities.

52.    In my independent valuation of the 6 non-Pine CLOs, I applied industry accepted valuation techniques and developed market based inputs for reinvestment rates, loss rates and prepayments.

---

six-month period of subprime MBS originations from the second half of 2006 through the first half of 2007. Each ABX.HE index consists of six tranches corresponding to different ratings and positions in the capital structure. ABX.HE has become a benchmark for the performance of subprime RMBS. Its liquidity and standardization allows investors to accurately gauge market sentiment around the asset-class, and to take short or long positions accordingly."
[25] See Appendix IV.

53.     These inputs were then loaded into the Intex cash flow model.  I discounted these cash flows based on a discount rate[26] determined from broker/dealer research as of September 19, 2008 based on each CLOs credit rating and capital structure. I then applied an additional liquidity discount to derive my final CLO values.

> 1)     **Barclays' values as of September 19, 2008, were very similar to the values that I calculated; however, Barclays failed to demonstrate any basis or analytical justification for taking a 21% discount to arrive at their exit value.**

E.     <u>BARCLAYS UNDERVALUED THE PINE CCS CLO BY $389 MILLION.</u>

54.     Barclays misunderstood the structure of and materially undervalued the Pine[27] CCS CLO ("Pine") by $388.7 million.  The value of the Class A-1 tranche of Pine that I valued independently was $817,297,291 as of September 19, 2008.  The results are summarized below in Table 8.

| | Table 8: Summary of Valuation Differences for the Pine CLO (amounts in millions of dollars) | | |
|---|---|---|---|
| Number of CUSIPs | Barclays' Opening Balance Sheet Valuation | 9/19/2008 Valuation (at Exit Marks) | Valuation Difference (Barclays' Undervaluation) |
| 1 | $429 | $817 | $389 |

> 1)     **Barclays materially misunderstood the structure of Pine, apparently concluding that Pine had the typical structure of a "revolver" CLO.**

55.     Barclays' assumption that the unfunded obligations accrue to the senior tranche was erroneous.  More typically with CLOs, but not in the case of Pine, when an underlying borrower requests an additional draw on its credit line, the holder of the

---

[26] DM (discount margin).

[27] Pine is a collateralized loan obligation backed by revolving lines of credit to 55 corporations from different industry sectors.  The loans were originated by Lehman who then established a Trust to issue the CLO.  Only the senior Class A-1 tranche was acquired by Barclays as a result of the Acquisition.  All of the junior tranches continue to be held by Lehman.

**Contains Highly Confidential Information**

senior tranche is usually responsible for providing the additional funds. However, Pine had an "inverted" structure—i.e., any additional funding came from the holder(s) of the junior tranche, which in this case was a bankrupt entity as of the closing date.

56.    At the time that Barclays acquired the Class A-1 tranche, information in Barclays' possession indicated that Pine had $367 million in cash, $697 million in funded loans, and another $1,140 million in unfunded commitments, i.e., the additional funding required if borrowers went to their full credit limits.[28] The Class A-1 tranche had an initial notional value of $1,025 million, representing the initial funding of the CLO. The Pine structure is pictured in Table 9 below.



---

[28] Information available from the Trustee for the Pine CLO on September 19, 2008, shows that the CLO has cash of $307 million, funded loans of $864 million, and unfunded commitments of $968 million. Included in the 307 million of cash is the variable funding account of approximately $265 million. I have reviewed several trustee reports for the months before and after September 2008 and have been unable to find the source of Barclays amounts reflected in this paragraph.

**Contains Highly Confidential Information**

> 2)      **In deriving its valuation, Barclays failed to recognize the inverted
> structure of the CLO and its own senior position within that
> structure.**

57.      Barclays itself failed to recognize that in the Pine structure, Barclays' senior Class

A-1 position was fully funded and not responsible for any additional cash contributions

that could arise from additional funding requests from the underlying borrowers.

58.      Instead, Barclays incorrectly assumed a 70% probability that Barclays, as the

holder of the Class A-1 tranche, would be obligated to fund the entire amount of the

remaining balance available to be drawn upon by the underlying borrowers.  Barclays

also failed to recognize that the deal documents provided that Lehman, a bankrupt entity,

would be responsible for providing any additional funding.

59.      Barclays incorrectly valued cash and loans totaling $1,064 million at $428.6

million (or at a price of 40.3 cents on the dollar).  Barclays, as the holder of the class A-

1 tranche, would have first claim on the assets of the CLO, which according to Barclays,

included $367 million of cash investments and $697 million of funded loans, totaling to

over $1 billion.

60.      Had Barclays properly recognized the structure of Pine, and left all of their other

valuation assumptions, probabilities and scenarios the same, Barclays' valuation would

have been significantly higher.  Correcting Barclays' analysis only for the fact that its A-

1 tranche is fully funded and completely protected from any funding risk, Barclays'

model would have valued Pine at $883 million.

> 3)      **Barclays inappropriately applied a 20% "participation" discount
> when valuing the underlying collateral.**

61.      Given that the collateral is owned by the CLO trust and not Lehman, the security

interest in the loans is not at risk.  I have researched this issue and have found no

**Contains Highly Confidential Information**

instance where a master participation agreement in a CLO was not enforced in a bankruptcy.

62.     The security Barclays received is the highest and only funded tranche of the CLO. Since Barclays is in the first loss position and has no additional funding liabilities, any hypothetical funding by subordinate tranches would accrue to Barclays benefit.  As a result, Barclays is not subject to the funding risks that would convert additional capital in the form of cash advanced to a borrower to funds worth 80 cents, or less, on the dollar.  This risk belongs solely to the subordinate tranches.

4)    **Professor Pfleiderer performed little to no due diligence when reviewing Barclays' valuation of Pine.**

63.     Professor Pfleiderer and his team, or those under his direction, failed to consider important variables of the Pine deal that are integral to valuation of such securities. Aside from an "extensive search on -- on Google,"[29] Professor Pfleiderer, or those working at his direction, apparently did not review offering documents, trustee remittance reports, or any other relevant deal documents.

64.     Appendix IV to Professor Pfleiderer's report incorrectly attempts to support Barclays' value for Pine.  One comment in Professor Pfleiderer's report focuses on the alleged credit quality and concentration risks of the underlying portfolio of loans.[30]  In reviewing LoanX,[31] I observed that on September 19, 2008, 20 of the 55 underlying loans making up approximately 50% of the value of the underlying collateral reflected a weighted average price of 90.2.  Both Barclays internal valuation memo prepared by

---

[29] Professor Pfleiderer Deposition, page 219.
[30] Expert Report of Professor Pfleiderer, Appendix Four, Section 8, P. 116.
[31] LoanX is provided by Markit.  Markit is the leading provider of independent loan market data and loan portfolio management software and is currently used by over 400 financial institutions to manage over $1 trillion in assets.

**Contains Highly Confidential Information**

Barclays' Product Control Group and the Pfleiderer Report ignore readily available market data for the underlying loans and fail to properly interpret relevant Trustee reports and the September 16, 2008 S&P downgrade.[32]

65.    The Pfleiderer Report provided no relevant analysis of any kind and simply accepted the material errors in Barclays' exit values.

### F.    BARCLAYS UNDERVALUED 30 CDOS AND CMBS BY $22 MILLION.

66.    I independently valued 30 CDO and CMBS.   My independent valuation of those securities was $213,394,108 as of September 19, 2008. The results are summarized in Table 10, below.

| | Table 10: Summary of Valuation Differences for Collateralized Debt Obligations and Commercial Mortgage-Backed Securities (amounts in millions of dollars) | | |
|---|---|---|---|
| Number of CUSIPs | Barclays' Opening Balance Sheet Valuation | 9/19/2008 Valuation (at Exit Marks) | Valuation Difference (Barclays' Undervaluation) |
| 30 | $192 | $213 | $22 |

67.    CDO valuations were conducted using market indices and market research based on the Intex cash flow modeling platform.   These market based inputs included both collateral and cash flow timing and discount rates.   The collateral inputs and discount rates were input into the Intex cash flow model to arrive at a price; an additional liquidity discount was then applied to derive my final CDO values.

---

[32] S&P's downgrade of Barclays' A-1 tranche was purely technical and due to Lehman's bankruptcy and is not related to the value or performance of the underlying collateral. The A-1 tranche receives all of the cash flow from the underlying loans post-Lehman bankruptcy regardless of the credit downgrade.  As noted above, the underlying loans were reflected slightly above 90 in the market on September 19, 2008.

**Contains Highly Confidential Information**

68.     I independently valued CMBS using market research to determine the appropriate

Constant Default Rate ("CDR"), severity rate, and prepayment rate of the underlying

commercial mortgages.  Each CMBS was then categorized by rating, seniority, and

security type.   Using published research, a discount rate was determined for each

category and assigned to the CMBS.  The collateral inputs and discount rate were input

into the Intex cash flow model to arrive at a price; an additional liquidity discount was

applied to derive my final CMBS values.

G.     BARCLAYS UNDERVALUED 6,035 OTHER CUSIPS BY
       OVER $400 MILLION.

69.     As summarized in Table 11 below, Barclays undervalued 6,035 securities by $419

million.

| | Table 11: Summary of Valuation Differences for for Third Party Valuations (amounts in millions of dollars) | | |
| --- | --- | --- | --- |
| Number of CUSIPs | Barclays' Opening Balance Sheet Valuation | 9/19/2008 Valuation (at Exit Marks) | Valuation Difference (Barclays' Undervaluation) |
| 6,035 | $10,757 | $11,176 | $419 |

70.     For these securities, including duplicates, I extracted prices from multiple sources:

Bloomberg ("BVal" 2,933 CUSIPs; "BGN" 3,059 CUSIPs), Capital IQ (1,005 CUSIPs),

FactSet (863 CUSIPs), and Interactive Data (749 CUSIPs).  The total count of CUSIPs

with at least one third party price was 4,608 (76.4%).  No prices were available for 1,427

securities (23.6%).  The gathered prices represented closing or bid prices on September

19, 2008, and were treated as midpoint prices for purposes of this analysis.  For 31

CUSIPs, the prices were thrown out as inconsistent with the underlying security (credit, scaling issues, etc.). [33]

71.    For the remaining 4,577 securities with prices, an average price was then computed by CUSIP. [34]  The average prices generated were then screened for compatibility with BoNY and Barclays prices (i.e., scaling issues, outlier observations, etc.).  To facilitate this, all 6,035 securities in the third party universe were classified into 8 categories (including Other/Unknown) across the various groups (Rates, PMTG, Corps, etc.).  When third party prices were available, percentage differences were calculated from both BoNY and Barclays' prices in each of the 8 categories.  Where price percentage differences were outside two standard deviations from both BoNY and Barclays, the third party prices were discarded as outside of range.  An additional 62 prices were thus discarded, leaving a total of 4,515 securities for which third party pricing was used.

72.    To facilitate the application of liquidity discounts, sub-categories were then created in the Agency RMBS section.  Liquidity discounts that were derived through empirical research were then applied to the average prices by asset sub-category.  Agency debentures were separated into maturity buckets before liquidity discounts were

---

[33] Interactive prices are excluded on 6 CUSIPs (31396X6J8, 31397T4K5, 3837H13L3, 50177AAP4, 86361JAE0, and 94983KAJ8) based on scaling issues on notional IO products. Interactive price for CUSIP 31395WA31 is excluded due to incompatibility with inverse floater pricing. For 24 CUSIPs of Lehman structured notes (5249083B4, 5249083H1, 5249087D6, 5249087K0, 524908L73, 524908MB3, 524908MG2, 524908N30, 524908UK4, 524935BE2, 524935BG7, 524935CX9, 524935DK6, 52517P4M0, 52517P6Z9, 5252M0AW7, 5252M0BG1, 5252M0BQ9, 5252M0CJ4, 5252M0CX3, 5252M0DT1, 5252M0FB8, 5252M0FR3, 5252M0FV4), prices from FactSet and Capital IQ are excluded due to inconsistency with prices observed for Lehman underlying credit exposure.
[34] For 13 CUSIPs (912795K75, 912795K59, 912795J77, 912795S28, 313384J83, 313588L86, 313588M77, 313384M30, 313384Q44, 313384Q77, 313589CF8, 313589CN1, and 912795J28), Bloomberg data pulled was expressed in terms of yields and conversion was made to prices.  For 3 CUSIPs, (76116EFH8, 76116EBZ2, and 31771JKU3) Bloomberg data pulled was inconsistent with observed prices and thus discarded. Prices from FactSet and/or Capital IQ were available and used on these 16 CUSIPs.

---

**Contains Highly Confidential Information**

applied.  For corporate debentures, emerging markets, corporate asset-backed securities,

private label mortgage securities and municipals, Barclays' discounts were used.

73.    For securities where no third-party pricing information was available, I applied

liquidity discounts (following the aforementioned logic) to the BoNY prices as of

September 19, 2008.

Submitted by

*Mark E. Slattery*

Mark E. Slattery, CFA

March 15, 2010

**Contains Highly Confidential Information**

## Appendix I

## Curriculum Vitae

### MARK E. SLATTERY, CFA

30 South Wacker Drive, Chicago IL 60606
Phone:  (312) 251-5200      Email:  Mark.Slattery@naviganteconomics.com

**EXPERIENCE**

| | |
|---|---|
| **NAVIGANT ECONOMICS** | **Chicago, IL** |
| **Independent Consultant** | **January 2010 – Current** |

- Manage a team of professionals dedicated to valuing a multi-billion dollar portfolio, consisting of a broad range of securities.

- Lead all aspects of related effort ranging from implementing requisite analytical configuration to writing papers intended to describe model specifications.

| | |
|---|---|
| **FLAGSTAR BANK** | **Troy, MI** |
| **Internal Consultant** | **March 2009 – January 2010** |

- Served as an internal asset/liability management consultant; participated in a wide array of projects covering all aspects of the on- and off-balance sheet positions.

- Directed the Bank's market valuation and risk measurement efforts related to its $52 billion mortgage servicing rights portfolio.

- Developed and maintained an analytical framework designed to capture the structural risks associated with the Bank's consolidated residential mortgage operations.

| | |
|---|---|
| **JMN CONSULTING** | **Chicago, IL** |
| **Senior Consultant** | **October 2006 – November 2008** |

- Functioned as the Assistant Portfolio Manager of non-discretionary funds dedicated to the purchase of non-Agency RMBS primarily backed by pay-option adjustable rate mortgages and subprime mortgages.

- Measured market value and related risk metrics for a credit default swap ("CDS") portfolio backed by non-Agency RMBS on a bi-weekly basis.

- Provided monthly fair market valuations and sensitivity profiles for the 2006-1, 2006-2, 2007-1 and 2007-2 ABX Indices.

- Evaluated an extensive portfolio of CDOs on behalf of an investment syndicate.

- Led consulting engagements culminating in physical deliverables written with respect to applicable regulatory guidance.

| | |
|---|---|
| **LASALLE BANK CORPORATION** | **Chicago, IL** |
| **Senior Vice President** | **October 2005 – October 2006** |

- Managed a team of professionals dedicated to Asset-Liability research; key initiatives included quantifying the Interest Rate Risk component of the Bank's Economic Capital position and enhancing the Bank's market valuation and risk measurement frameworks.

**Contains Highly Confidential Information**

- Co-chair of the Mortgage Advisory Council, which was dedicated to ensuring that the Bank's mortgage analytical models and processes provided the most accurate estimate of the Bank's exposure to mortgage assets and related lines of business.
- Participated as a voting member on two of the Bank's senior committees: the Mortgage Asset-Liability Committee and the Investment Portfolio Committee.
- Ran the Bank's Asset/Liability Consulting Services practice, which was dedicated to enhancing the balance sheet management policies and practices of financial institutions of varying asset size and business focus.

**First Vice President**                                    **February 2003 – September 2005**

**SLATTERY ENTERPRISES**                                    **Orland Park, IL**
**Principal**                                    **January 2002 – January 2003**
- Operated an organization dedicated to the financial services industry, specializing in the disciplines of Asset-Liability Management and Risk Management.
- Acted as Project Manager responsible for the implementation of a commercially available Asset-Liability Management application for a newly formed financial services holding company of a major international corporation.
- Designed a framework to integrate and support analytical routines ranging from the basic (e.g., contractual cash flow generation) to the advanced (e.g., capital optimization).

**QUANTITATIVE RISK MANAGEMENT**                                    **Chicago, IL**
**Vice President, Consultant**                                    **February 1994 – December 2001**
- Managed a team of Subject Matter Consultants dedicated to the implementation and on-going support of QRM Asset-Liability clients.
- Provided subject matter consulting on issues related to the QRM Asset-Liability System and the QRM Mortgage Servicing Evaluation System.
  - Modeled financial instruments including MBS, CMOs, callable/puttable notes/bonds, leases, indeterminate deposits, mortgage servicing, cap/floor agreements, swaps, swaptions, futures, futures options.
  - Quantified risk profiles of static balance sheets using subjective rate and volatility shock analysis and objective Monte Carlo VaR Analysis.
  - Derived earnings sensitivity measures using deterministic as well as stochastic analysis; analyzed portfolios using total return analysis.
  - Assisted clients to formulate and execute hedging strategies.
- Wrote and presented materials at industry conferences (Bank Administration Institute), QRM user conferences, and QRM client training sessions.

**COOPERS & LYBRAND**                                    **Chicago, IL**
**Senior Associate**                                    **May 1992 – January 1994**

**FEDERAL HOME LOAN BANK OF CHICAGO**                                    **Chicago, IL**
**Senior Financial Analyst**                                    **January 1990 – April 1992**

Contains Highly Confidential Information

**Federal Thrift Regulator**                                    **August 1986 – December 1989**

---

**EDUCATION**

**KELLOGG SCHOOL OF MANAGEMENT,**                              **Evanston, IL**
**NORTHWESTERN UNIVERSITY**                                         **June 1992**
**MBA, Finance/Accounting**


**NORTHWESTERN UNIVERSITY**                                   **Evanston, IL**
**BA, Economics**                                                 **June 1986**


**CERTIFICATION**
**Chartered Financial Analyst**                                    **June 1992**

**Contains Highly Confidential Information**

# Appendix II

# Documents Relied Upon

## Documents in the Record

### Depositions

| Deponents | Date |
|---|---|
| Paul Pfleiderer | 2/23/2010 |

### Deposition Exhibits

| Exhibit | Beginning Bates | Ending Bates |
|---|---|---|
| 86B - Initial Inventory, Schedule A and B Assets | BCI-EX-00099519 | |
| 87B - JPM Inventory, Annex A Assets | BCI-EX-00108700 | |
| 495 - Debtor's Motion for an Order, Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024, Modifying the September 20, 2008 Sale Order and Granting Other Relief (Bankr. S.D. N.Y. Sept. 15, 2009). | | |
| 641A - Email from Sean Teague to Tal Litvin | BCI-EX-(S)-00213990 | BCI-EX-(S)-00213996 |

### Other Documents

| Description | Beginning Bates | Ending Bates |
|---|---|---|
| Initial Inventory, Schedule A and Schedule B Assets | BCI-EX-00099519 | |
| Debtors' Adversary Complaint 11-16-2009 | | |
| Expert Report of John J. Schneider 3-15-2010 | | |
| Expert Report of Mark Zmijewski 3-15-2010 | | |
| The Trustee's Motion for Relief Pursuant to the Sale Orders or, Alternatively, for Certain Limited Relief Under Rule 60(b), (Bankr. S.D. N.Y. Sept. 15, 2009). | | |
| Motion of Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al., Pursuant to 11 U.S.C. § 105(a), Fed. R. Civ. P. 60(b), and Fed. R. Bankr. P. 9024, for Relief from Order Under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, Dated September 20, 2008 (and Related SIPA Sale Order) and Joinder in Debtors' and SIPA Trustee's Motions for an Order Under Rule 60(b) to Modify Sale Order. In re Lehman Brothers Holdings Inc., et al., Debtors Case No. 08-13555 (JMP) (Bankr. S.D. N.Y. Sept. 15, 2009). | | |
| Report of Paul Pfleiderer, Volumes 1 & 2, 1-8-2010 | | |
| Review of Barclays JP Morgan Portfolio Price Testing Methodology and Framework | PwC-BarCapWP_00023595 | |
| Review of Barclays Capital Price Testing Methodology and Framework for Lehman Acquired as of September 19, 2008 | PwC-BarCapWP_00022935 | |
| Summary of Barclays Desk Prices and Third Party Prices | IE5_JX9ESSE9PwC_BarCapWP_00022935 | |
| Bid-Offer Reserve Agency CMOs | PwC-BarCapWP_00023327 | |

## Documents that are Publicly Available

Bloomberg.com

WallStreetJournal.com

## Other Documents Not Cited in the Record and Not Publicly Available

Bloomberg LP Data

Capital IQ Data

Interactive Data

ADCo

Polypaths Fixed Income System

Intex

Barclays Capital Live

Markit Group Limited

Morgan Stanley US Liquid Rates Tracker

Citigroup Capital Markets - Mortgage Key Issue Package MB275

Credit Suisse Mortgage Daily Report

Goldman Sachs Mortgage Strategies TBA Pass-Through Performance Summary - GS2006

Lehman Brothers Lehman Live - Pass Through Summary

Barclays Capital, Securitization Research, January 8, 2010

Bank of America RMBS Trading Desk Strategy, October 23, 2006

Formal Consultation Memo (PwC-BarCapWP_00000047)

PINE CCS, Ltd. Trustee Report - Measurement Date: 10/06/2008

**Contains Highly Confidential Information**

## Appendix III

## Description of Dynamic Pricing of Agency RMBS and Related Model Components

74.     The holder of a mortgage-backed security can be viewed as having a long position in a straight bond and a short position in an American call option.  In this case, the American call option is the prepayment option embedded in the security that gives the homeowner the right to prepay all (prepayment) or some of their principal (curtailment) at any time prior to maturity.

75.     Mortgage cash flows include scheduled and unscheduled principal payments (prepayments) and interest.  Prepayments depend on the path of future interest rates and non-rate related factors.  Path-dependent options, such as the prepayment option embedded in mortgage securities, are typically valued using a dynamic pricing approach via Monte Carlo simulation.

76.     Mortgage pass-throughs and sequential CMO tranches are relatively straight-forward to value within the Option Adjusted Spread ("OAS") framework.  IOs are securities that only pay investors interest cash flows.  On the other hand, POs are securities that only pay investors principal cash flows.  IOs and POs are labeled as either "Trust" securities if they are stripped from a mortgage pass-through or "Structured" securities if they are tranches within a CMO.

77.     There are two general approaches that can be used to value MBS:  static pricing and dynamic pricing.  Static pricing assumes one future path of rates and one corresponding set of cash flows.  The single set of cash flows is discounted using the London Interbank Offered Rate ("LIBOR") or U.S. Treasury rates plus a static spread.

A key disadvantage arising from this method is that the actual spread or yield earned by the investor can vary significantly due to future rate and cash flow uncertainty.

78.    In the dynamic pricing framework, a large number of random rate paths and corresponding mortgage cash flows are generated.  Each set of cash flows are discounted back to the present using underlying LIBOR rates.  The model price is the average of the present value ("PV") of cash flows calculated for each random rate path.  In order to equate the MBS price generated by the model (model price) to the MBS price observed in the marketplace (market price), a single interest rate spread is added to LIBOR.  This spread is known as the OAS.

79.    I used a dynamic pricing framework, i.e., an OAS approach, to value Agency MBS.  The valuation framework is comprised of three major components:  1) the term structure model; 2) the current coupon model; 3) and the prepayment model.  In the case of CMOs and structured product, a deal cash flow model is also utilized.  A description of each component of the valuation framework follows.

*Term Structure Model*

80.    An OAS approach to pricing MBS requires the use of a term structure model.  A term structure model describes the progression of interest rates through time.  The starting point for a term structure model is the initial term structure of interest rates, i.e., various maturity term points and zero coupon bond rates.  The term structure is based on U.S. Treasury or LIBOR/Swap rates.

81.    The LIBOR market model, also known as the BGM Model (Brace Gatarek Musiela Model), is a financial model of interest rates.  The quantities that are modeled

**Contains Highly Confidential Information**

are a set of forward rates that have the advantage of being directly observable in the market, with volatilities that are naturally linked to traded contracts.

*Current Coupon Model*

82.    A term structure model is used to create a tree of LIBOR short rates or forward rate paths.  However, mortgage prepayments are primarily driven by movements in the primary market mortgage rate, i.e., the current coupon rate.  Therefore, a current coupon model is needed to derive prospective mortgage rates.  The 30 year mortgage rate is customarily expressed as a premium over the 10 year U.S. Treasury or Swap/LIBOR rate.  The ten year underlying rate can be derived from the term structure model.

83.    One approach to modeling the mortgage rate is to assign a constant spread, i.e., interest rate premium, to the underlying rate or weighted average rate.  More advanced modeling approaches take into account that the spread varies over time and/or as a function of rate volatility.  Theoretically, the spread varies directly with the level of volatility, due to the fact that a portion of the spread reflects the cost of the prepayment option.  Assuming a constant OAS, higher volatility increases the cost of the option and the mortgage rate.  I used the OAS current coupon model, which is the more appropriate approach since it allows the spread to vary based on volatility.

*Prepayment Model*

84.    The purpose of a prepayment model is to quantify prospective mortgage prepayments or curtailments.  Prepayments can be voluntary or involuntary, as in the case of default.  Prepayment models are a critical component of the OAS valuation

**Contains Highly Confidential Information**

framework.  Prepayment models must be able to capture the variation of prepayments on a given mortgage pool in different interest rate environments.

85.    There are two general types of prepayment models: 1) Market-implied and 2) Econometric.  The market-implied prepayment model is derived by holding the OAS constant and backing into the prepayment model that results in the observed MBS prices.  The econometric prepayment model is derived by applying statistical techniques, e.g., multiple regression analysis, to actual historical prepayments (dependent variable) and known predictor variables.  I used both a market implied and an econometric prepayment model in the MBS valuation process.

86.    The econometric prepayment model I used for valuation purposes was the ADCo Model.  Based on my own experience, I am aware of the substantial extent to which the ADCo model is used by market participants.  The ADCo Model was developed by Andrew Davidson & Company, a highly-regarded firm that provides mortgage analytics solutions to the financial services industry.

*Deal Cash Flow Model*

87.    The modeling and valuation of CMOs require the use of a deal cash flow model. The deal cash flow model includes the rules for how the mortgage principal and interest in a CMO will be disbursed to holders of various tranches.  Each CMO is unique and may include numerous tranches with different levels of prepayment sensitivity.  To value CMO tranches, I used the market standard Intex model as the Deal Cash Flow Model.  Based on my own experience, I am aware of the substantial extent to which the Intex model is used by market participants.

**Contains Highly Confidential Information**

## Appendix IV

### Valuation of Credit Sensitive Non-Agency RMBS

88.     The first step in my valuation process was to quantify the timing and magnitude of prospective losses, which was done by first classifying the underlying loans in the pool according to current delinquency status, (e.g., current, 30 days past due, 60 days past due, etc.), and then applying "roll rates" to quantify the timing and number of future defaults, measured in dollar volume.

89.     Next, I used average loss severity rates based on the underlying collateral's vintage, type, and payment characteristics [i.e., fixed vs. adjustable rate mortgages ("ARMs")] to translate defaults into future losses.  Roll rates and loss severity rates were obtained from broker/dealer research reports which were available on September 19, 2008. After I derived a loss curve and deal-specific prepayment rates, I calculated each security's future cash flows using the Intex platform.  Intex is widely accepted in the industry and commonly used for the valuation of non-Agency RMBS.

90.     The next step in my valuation process was to derive an appropriate discount rate to apply to the security cash flows.  I conducted a separate analysis of the discount rates implied by ABX indices for comparable non-Agency RMBS and used these implied rates to discount the cash flows in the Intex model.  To be conservative, I applied an additional liquidity discount to derive my final values.

---

# Exhibit D

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X

                                  :

In re:                                                          Chapter 11
LEHMAN BROTHERS HOLDINGS INC, et al.,         :       Case No. 08-13555 (JMP)
                                                         (Jointly Administered)
                  Debtor.                       :

                                  :

------------------------------------------------------------------- X

                                  :

In re: LEHMAN BROTHERS INC.,             :
                  Debtor.                       :       Case No. 08-01420 (JMP)

                                  :

------------------------------------------------------------------- X

**DECLARATION OF PAUL PFLEIDERER**

        I, PAUL PFLEIDERER, declare as follows:

        1.       I am the C.O.G. Miller Distinguished Professor of Finance at the Graduate School of Business of Stanford University, a Professor of Law (by courtesy) at Stanford Law School, Stanford Graduate School of Business Trust Faculty Fellow for 2009-2010, and Co-Director of the Wealth Management Executive Program at Stanford.  I have been retained by Barclays Capital Inc. ("Barclays") as an expert in these cases.  I base this Declaration on my personal knowledge and upon review of pertinent documents.

        2.       On January 8, 2010, I submitted my expert report in this matter, a document entitled the "Expert Report of Professor Paul Pfleiderer," which accurately sets forth my

opinions in this matter.   On February 23, I provided deposition testimony.   In response to questions from Counsel during that examination, I further elaborated upon my opinions and the extensive investigation and analysis that I performed, with assistance from staff at Finance Scholars Group ("FSG"), in the course of developing my opinions and preparing my report.

3.      I understand that Debtor Lehman Brothers Holdings Inc., the Trustee for the SIPA Liquidation of Lehman Brothers Inc., and the Official Committee of Unsecured Creditors (collectively, the "Movants") have asked the Court to exclude my prospective testimony from the upcoming evidentiary hearing in this matter.   Counsel for Barclays has asked me to review the Movants' Motion *In Limine* for an Order Excluding the Expert Testimony of Professor Paul Pfleiderer (the "Motion to Exclude" or "Motion") to ascertain whether the Motion properly characterizes my opinions, the bases for my opinions, and the work that I and others working at my direction performed as I developed my opinions and prepared my report.[1]   Counsel for Barclays also asked me to examine whether Movants' experts based the opinions they expressed in their reports and depositions[2] on reliable data, whether Movants' experts employed sound principles and methods in their investigations, and whether Movants' experts applied such principles and methods in appropriate ways likely to generate reliable findings and conclusions. I was not asked to opine, and I do not opine, on any legal issues raised in the Motion to Exclude.

4.      Upon review of the Movants' Motion to Exclude, I have determined that the Motion contains numerous erroneous and misleading assertions about my opinions, the bases for my opinions, and the work that I did or directed in the course of developing my opinions and preparing my report.   Furthermore, the Motion (a) omits any reference to many analyses

---

[1] Motion *In Limine* for an Order Excluding the Expert Testimony of Professor Paul Pfleiderer, *In re: Lehman Brothers Holding Inc., et al*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Apr. 2, 2010) (hereinafter "Motion to Exclude").

[2] Movants' expert John Olvany has not been deposed as of the date of this declaration.

summarized in my report that flatly contradict the Movants' assertion that my opinions lack rigor and reliability and (b) fails to cite testimony I gave at deposition that directly refutes many of the erroneous and misleading assertions contained in the Motion.   As a result, the Motion fundamentally mischaracterizes my opinions, the bases for my opinions, and the work that I did or directed in the course of developing my opinions and preparing my report.

5.      Movants claim that, instead of "conducting [my] own valuation of the Repo Collateral," I "merely accepted Barclays' valuation on faith."[3]  They also claim that I conducted my work with "an utter lack of the independence essential to admissible expert testimony."[4] These statements are false, and they fundamentally mischaracterize how I approached this engagement and how I did my work.  I did not accept Barclays' valuations on faith, but instead conducted a comprehensive, rigorous, detailed, and probing review, including investigation and analysis, both to "test" Barclays' valuations and to identify the most reliable basis for valuing the securities that transferred to Barclays in this transaction.

6.      That my review, investigation, and analysis were comprehensive cannot be disputed.  I personally examined and evaluated the full portfolios of positions that transferred to Barclays in both the initial inventory and in the JP Morgan Chase ("JPM") settlement inventory, as also did staff working at my direction.  In many cases, we examined and evaluated individual positions (i.e., holdings in individual CUSIPs); in other cases, we examined and evaluated groups of positions in similar securities (e.g., Lehman equity-linked notes, municipal auction rate securities).  While I did not conduct an *individualized* valuation of *every* CUSIP represented in the Repo Collateral, large portfolios of securities are seldom, if ever, valued on the basis of

---

[3] Motion to Exclude at ¶ 13.

[4] Motion to Exclude at ¶ 18.

individualized valuations.  Movants' own experts implicitly confirm that such individualized valuations are not necessary to address the valuation issues in this matter.  As I discuss further below, with the exception of a relatively few "cherry-picked" CUSIPs, Movants' experts themselves do not perform individualized valuations, but instead purport to perform the same kind of "portfolio valuations" that I perform (though I believe they actually failed to do that properly, and instead simply second-guessed reasonable methodologies and judgments made at the time, in ways that inflate their valuations of the securities Barclays acquired).[5]

7.     My investigative and analytical work in this case also was extensive, rigorous, and detailed.  I personally spent many hours examining and analyzing many different aspects of Barclays' valuations, often on a line-by-line, CUSIP-by-CUSIP basis.  Among other things, I examined and analyzed, for every class of securities, the extent to which Barclays relied on well-known sources of third-party data on prices and quotations; how Barclays used these data to estimate mid-point prices as of the valuation date; what method Barclays used to adjust mid-point prices to exit prices (as they were required to under the relevant accounting rules); and what kinds of data and analyses Barclays used to estimate the size of an appropriate "mid to bid" adjustment.[6]  In many instances, I worked through and essentially replicated the methods

---

[5] Moreover, a close examination of the methods of the Movants' experts in the instances in which they do perform individualized valuations reveals numerous flaws and inconsistencies that in my opinion significantly bias their conclusions as to value.  Their individualized valuations demonstrate exactly the problems I had in mind when I wrote in my report (at page 36) that "it is highly unlikely that such a procedure [developing entirely new marks, in litigation, more than a year after the events at issue] would lead to better marks than the marks developed by Barclays.  Rather, such a procedure could in the end produce *less* reliable marks for several reasons."

[6] Movants' experts assert that Barclays' methods were flawed and inconsistent in numerous ways, that Barclays' independent auditor, PricewaterhouseCoopers, either did not find these flaws and inconsistencies or simply accepted them, and that I either did not find them or simply ignored them.  In fact, most of what Movants' experts call flaws and inconsistencies are nothing of the sort.  They typically are either (a) appropriate and justifiable differences in methods required by the varying quality and quantity of available information across different types of assets or (b) differences of opinion and judgment as to methods of the sort that typically arise between different analysts examining complex securities.  This is demonstrated by the fact that Movants' experts' own valuation analyses themselves exhibit numerous "flaws and inconsistencies," many of which are far more problematic than the flaws

Barclays used on a CUSIP-by-CUSIP basis—again, for a sample of CUSIPs and not for every individual CUSIP—to make sure I had a complete and intimate understanding of Barclays' methods.[7]

8.      My investigative and analytical work in this case was entirely independent and deeply probing.  As a starting point, I personally read the transcripts of a large number of depositions of percipient witnesses, and staff working at my direction further scrutinized the transcripts of the depositions I read and of others for relevant information.  While these depositions provided useful insight into many of the valuation issues at the center of this matter—especially the complexity of many of the securities that transferred over to Barclays, and the conditions in relevant financial markets at the time of the transfer—I and staff working at my direction requested the opportunity to interview, and in fact did interview, a long list of former Lehman and/or Barclays professionals with detailed knowledge of the securities at issue, the conditions in markets at the time of the transfer, valuation methods employed by both Lehman and Barclays in the normal course of business, the types and sources of data that Lehman and Barclays relied upon in valuing securities of the type at issue in this case, and similar topics.[8] Where I and my staff felt it would be helpful, we sometimes requested follow-up interviews,

---

and inconsistencies these experts purport to have identified in Barclays' valuations.  I provide examples of serious flaws and inconsistencies in the analyses conducted by Movants' experts below.

[7] As I stated in my deposition, I did not as a general matter "audit" the raw third-party data reported or referenced in Barclays's spreadsheets to ensure, for example, that data that Barclays identified as Markit data was in fact Markit data.  In part, this was because, in working with Barclays' third-party data, I saw no indication whatsoever that any of the third-party data used by Barclays had been manipulated or misstated in any way.  Furthermore, so far as I know, Movants have never asserted that the third-party data Barclays used was inaccurate in any way.  In fact, when one of the Movants' experts (Dr. Zmijewski) searched for material differences between Barclays' data and the third-party source data, he found none.  *See, e.g.*, Videotape Deposition of Mark Zmijewski, *In re:  Lehman Brothers Holding Inc., et al*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Apr. 14, 2010), at 46:3-11, 83:14-24, 136:16-20 (hereinafter "Zmijewski Deposition") ("I looked at the Bloomberg prices and compared the Bloomberg last prices to Barclays and verified that they were reasonable representations of the Bloomberg last prices").

[8] Movants mistakenly assert that I chose not to interview Martin Kelly.  In fact, staff working at my direction interviewed Mr. Kelly and reported back to me on the communication.

which were arranged as requested in every instance.  In the course of these interviews, I and my staff were given access to trading desk managers, product control professionals, accounting personnel, and other senior executives, and we spent many hours asking probing and detailed questions without limitation or restriction.  Examples of the kinds of topics we covered include the following:  whether any of the Barclays professionals involved in valuing the Repo Collateral had any personal or institutional incentive to understate or overstate the values of these securities (they did not); the extent to which the methods used to value the Repo Collateral were consistent with valuation methods used by Barclays in the normal course of business (they were consistent); and the extent to which Barclays' valuation methods were subject to regulatory review (such reviews were rigorous and intensive).  Of course, we also had access to and examined a very extensive set of documents, data, spreadsheets, and analyses related to (a) Barclays' valuation procedures and methods, and (b) the manner in which Barclays implemented such procedures and methods in valuing the inventory of trading securities it acquired from Lehman.

9.    Any reasonable review and characterization of the work I did would find nothing like Movants' claim that I was "casual at best, . . . often assuming something was correct instead of verifying it, or relying solely on staff without bothering to learn or check the details of their work."[9]  To the contrary, I personally spent many hours studying, examining, and testing different aspects of the matters about which I testified.  I also spent many hours meeting with the senior professionals at Finance Scholars Group who were providing investigative and analytical support to me in the course of my work on this matter.  We discussed all aspects of their support work in detail and at length, and I was regularly and fully apprised of the work they were doing at my direction.

---

[9] Motion to Exclude at ¶ 16.

10.    Movants purport to support their assertion that my work was not sufficiently "independent" with a single quotation from my deposition, when I said, "it would be rather presumptuous for me to say that Barclays[,] who is marking this at the actual sale that they realized[,] is wrong."[10]  This statement is taken out of context.  In fact, as originally presented during my deposition, it relates to an important point of difference between my own professional judgments views and those of at least some of the Movants' experts.  Most, if not all, of the valuation experts in this case (by which I mean Mssrs. Zmijewski, Schwaba, Olvany, Slattery, and myself) appear to agree that marks necessarily are estimates and that our objective as valuation analysts should be to identify, adopt, and implement procedures, methods, and data that are likely to produce unbiased estimates of value.  In this regard, it is widely accepted by accounting and valuation professionals and in the relevant literature that a price observed in an actual transaction, when available, is an important piece of information that should be given considerable weight in reaching a value determination.  At least two of Movants' experts reject this widely accepted general principle.  Specifically, Professor Zmijewski contends that a valuation analyst should consider only transactions that occur before the valuation date, hour, and minute, and should ignore an observed price that occurs even *five minutes* after this cut-off.[11] I believe that is an insupportable view, and is simply wrong.  Mr. Schwaba takes an even more extreme and unusual position, stating that he would reject an actual price from an actual transaction close in time to the valuation date simply for the sake of consistency.[12]  In sharp contrast to Professor Zmijewski and Mr. Schwaba, I believe (as I said in my deposition) that it is

---

[10] Motion to Exclude at ¶ 18 (citing the deposition of Paul Pfleiderer at 107:11 – 110:16).

[11] *See* Zmijewski Deposition at 56:3 – 57:16.

[12] *See* Deposition of Joseph Schwaba, *In re: Lehman Brothers Holding Inc., et al*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Apr. 12, 2010), at 50:17-23.

"presumptuous" of an analyst to reject a sale price from an actual transaction without good reason for doubting that that price was an accurate indicator of value at the time, and instead claim that his or her own models and assumptions provide a better indication of value than an actual transaction at the time.

11.    Movants claim to demonstrate my supposed lack of independence by citing my review of a small group of securities identified as Lehman-issued warrants and Lehman-issued equity-linked notes — securities that depended for their value on Lehman's ability to pay the underlying obligations, which after the bankruptcy was obviously substantially impaired. Specifically, Movants cite my statement that, based on my analysis of the risk characteristics and likelihood of payment of these particular securities, "I certainly agree [with Barclays] that they should be significantly marked down. Whether you mark them down to zero or two cents [on the dollar] or five cents [on the dollar] is not something that I would offer an opinion about without doing more due diligence."[13] I stand by that statement and note two relevant facts: First, the total amount of value at issue here, for a price difference of two to five cents, for all of the Lehman equity-linked notes and all of the Lehman-issued warrants is at most approximately $10 million.[14] Second, Prof. Zmijewski, who purports to have performed a careful valuation of the equities in this case, does not contest Barclays' decision to write these securities down to zero. Thus, a valuation judgment on my part that Movants' Counsel claim illustrates my refusal "even to entertain that [any] Barclays' valuation was wrong" does not even merit a footnote in the

---

[13] Motion to Exclude at ¶ 20 (citing the deposition of Paul Pfleiderer at 320:16 – 320:3).

[14] According to information presented in Barclays acquisition detail, two percent of the total Sept. 18, 2008 Bank of New York ("BoNY") valuation of untested Lehman-issued equity-linked notes and Lehman-issued warrants is $4.06 million, while five percent is $10.15 million.

report of Prof. Zmijewski (who was Movants' expert assigned to value the "equities" portfolio).[15]

12.     Movants claim that I "did not, and could not, provide any analysis or opinion concerning Barclays' valuation of any specific CUSIP."[16]  This is simply not true.  In fact, I included an Appendix in my report in which I presented my analysis of and conclusions regarding the valuation of a broad variety of securities.   As it happens, among the specific securities I analyzed were the Lehman-issued warrants and the Lehman equity-linked notes discussed above.   Other specific securities I analyzed included certain high-risk varieties of collateralized mortgage obligations (namely, interest-only CMOs and inverse interest-only CMOs), Giants Stadium notes (which were auction rate securities), and certain insurance-related notes (also auction rate securities).

13.     Another security that I analyzed individually in the course of preparing my report, with the assistance of FSG staff, was Pine CCS, a collateralized loan obligation ("CLO").  With respect to Pine, Movants assert that all I did "was review what Barclays had written about Pine in its own files [and] perhaps review Pine data on a Lehman database . . .."[17]  They assert that I "did not speak with anyone at Barclays to determine what might be causing" the "disparity" perceived between the price Barclays determined for Pine and the price determined by custodian firm Bank of New York ("BoNY").   Movants further assert that I "did not review the terms of the Pine security" and "did not consider the creditworthiness of the credits underlying the CLO."[18]  Here, as elsewhere, Movants are simply wrong.  I or staff working at my direction had several

---

[15] Motion to Exclude at ¶ 19.

[16] Motion to Exclude at ¶ 7.

[17] Motion to Exclude at ¶ 28.

[18] Motion to Exclude at ¶ 28.

conversations with the professionals at Barclays most knowledgeable about Pine, reviewed virtually all of the information that was publicly available about Pine or available in the extensive document production in this matter, evaluated the history and trading record for Pine CCS, and investigated the creditworthiness of the loans packaged in this CLO.

14.    Movants correctly note that I attach significant weight to the fact that PricewaterhouseCoopers ("PwC") conducted a comprehensive audit of Barclays' 2008 financial statements that included an extensive, detailed, and thorough audit of the valuations and accounting decisions that went into the preparation of the acquisition balance sheet.  They assert, however, that I "did not speak with anyone at PwC" when preparing my report.[19]  This is true, as far as it goes.  But what Movants do not acknowledge is that I and staff working at my direction confirmed the depth and thoroughness of PwC's audit with Barclays' accounting professionals and that we reviewed a large sample of documents developed in the course of this audit that support a conclusion that the PwC audit was careful and thorough.[20]  Movants also note that in my deposition I could not confirm "whether PwC checked Barclays' prices for each CUSIP" in the inventory of trading assets that Barclays acquired from Lehman.[21]  On this point, it is important to understand the specific data about which the deposing attorney was asking.  In asking about "Barclays' prices" here, he was asking not about Barclays' marks, but about market data provided by well-known and highly-reputable vendors (such as Bloomberg, Standard & Poor's Capital IQ, and similar data providers) of the type routinely used and relied upon by both investment analysts and academic researchers.  The deposing attorney's question was whether I

---

[19] Motion to Exclude at ¶ 27.

[20] Since the completion of my report, more PwC documents have become available to me, and those documents confirm the understanding that I had at the time I prepared my report.

[21] Motion to Exclude at ¶ 27.

had determined whether PwC had, in the course of its audit, checked each and every data point against the original source for that data.  Of course, auditors typically do not fully authenticate or replicate every single data point on which their clients rely, but instead use sampling methods and materiality considerations to focus their efforts.  Furthermore, in the course of my own work that involved the price data identified by Barclays as vendor data, I saw no evidence that these data were not what Barclays indicated they were, and have no reason to believe that PwC saw any such evidence either.[22]  Thus, while I could not rule out that PwC had in fact verified and authenticated every single data point Barclays had pulled from a vendor, I was (and remain) unwilling to confirm that PwC had in fact checked Barclays' prices for every CUSIP.

15.    At various points, Movants assert that I ignored relevant sources of information or otherwise exclude "pieces of evidence," that I discount deposition testimony, and that I chose not to talk to key people in the course of my investigation.  None of these statements is accurate.  In fact, I considered and analyzed all of the relevant information available to me.  As a financial economist and valuation analyst, however, I did attach significant weight to hard data and numerical facts, and to the results of my analysis of these data and facts, especially where these helped to resolve or reconcile the sometimes conflicting and confused testimony and email traffic related to the issues I examined.

16.    Finally, Movants claim that I "did not analyze the transaction that was disclosed to and approved by the Court."[23]  This is false.  I reviewed the documents that I understand constitute the agreement between the parties that was presented to the Court for approval, and I also read the transcript of the Sale Hearing on September 19, 2008.  Furthermore, I studied the transaction as implemented in great detail.  In my opinion, the "transaction that actually

---

[22] Nor have any of the Movants' experts cited any such evidence, to the best of my knowledge.
[23] Motion to Exclude at ¶ 8.

occurred" (to use the Movants' phrase) was, in all essential respects, the transaction that was described in the key documents presented to the Court and in the presentation made to the Court in the Sale Hearing.[24]

17.    Movants' experts assert that Barclays' methods were flawed and inconsistent in numerous ways.  In fact, the "flaws and inconsistencies" that Movants claim to have identified are nothing of the sort.  Rather, the "flaws and inconsistencies" claimed by the Movants relate to either (a) appropriate and justifiable differences in valuation methods for widely different kinds of securities, for which there was a varying quality and quantity of available information, or (b) differences of opinion and judgment as to the best methods for valuing illiquid securities – where Movants' experts are trying to second-guess the judgments Barclays made at the time in ways that inflate the valuations of the securities Barclays acquired (through methods that I believe are unreliable and unsupported).

18.    As I now demonstrate through a non-exhaustive set of examples, Movants' experts' valuation analyses suffer from serious data issues and a number of outright methodological errors that are far more problematic than any of the supposed flaws and inconsistencies Movants purport to have identified in Barclays' analyses.

19.    Professor Zmijewski is Movants' expert on the valuation of equities in the initial inventory and also on the valuation of all of the securities in the JPM inventory—which together constitute approximately 30% of the aggregate value of the Repo Collateral based on Barclays' marks.  (Prof. Zmijewski also accumulates the valuation conclusions of Movants' other experts and offers an opinion as to the alleged aggregate or total overvaluation of the Repo Collateral. As I show below, Prof. Zmijewski did not sufficiently assess the reliability of the findings and

---

[24] Motion to Exclude at ¶ 8.

opinions of these other experts to justify his reliance on them.).  It is important to note that, as is

not disputed by the Movants' experts, the "equities" portfolio included many assets that were not

publicly traded, liquid stocks; instead, it included many over-the-counter, thinly traded, or

illiquid securities, including convertible debt securities.  Thus, the valuation of this portfolio

could not be done simply by looking up observable pricing data.

20.     As an initial observation, it is significant and telling, in light of Movants'

criticism of me for not valuing positions individually, that Prof. Zmijewski valued both the

equities in the initial portfolio and the entire JPM inventory on a *portfolio basis*, not by

individual valuation of each CUSIP.   These were not insignificant components of the Repo

Collateral:  The equities valued by Prof. Zmijewski on a portfolio basis included 4,028 CUSIPs

and had an aggregate value, at Barclays' marks, of $9.343 billion.  The JPM inventory valued by

Prof. Zmijewski on a portfolio basis included 1,195 CUSIPs and had an aggregate value, at

Barclays' marks, of $3.740 billion.

21.     More important, Professor Zmijewski's valuations of both the equities in the

initial portfolio and the JPM portfolio are seriously flawed.  With respect to the JPM inventory,

Prof. Zmijewski relied on JPM marks for *September 17, 2008* (two days *before* his own preferred

valuation date.)   However, he did nothing to verify or check the reliability of the JPM marks as

of that date.[25]   Moreover, even if the JPM marks were reliable, which they are not, Prof.

---

[25] In this regard, Prof. Zmijewski relies on the opinion of Movants' expert, John Schneider, that JPM had the
capability to value the Repo Collateral.  However, Mr. Schneider did not study the composition of the Repo
Collateral and did not know what specific securities were included in the Repo Collateral, and so had no basis for his
opinion that JPM had the capability to value the Repo Collateral.  *See* Deposition of John J. Schneider, *In re:
Lehman Brothers Holding Inc., et al*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Apr. 12, 2010), at 33:12-25
("Quoting Mr. Schneider's deposition testimony: "I've seen a list of assets, but I did not analyze it in any way. . . .  I
did not do anything other than see a list of assets." [Schneider transcript, 46:6-10]  "Q: And you know nothing about
what sort of collateral was actually in the Fed replacement repo; is that correct?  A: Other than your question
previously where I did look at a list of collateral.)

Zmijewski did not have JPM marks for his valuation date, which is September 19, 2008.[26]  Prof. Zmijewski recognized that he had to adjust the September 17th JPM marks to September 19th, but the data he uses as the basis for this necessary adjustment is the Lehman GFS system for September 17, 2008, through September 19, 2008 — a time period when Lehman's President, Mr. McDade, and others have testified that the marks from the Lehman trading desks that fed into that system were not being updated comprehensively due to the fact that Lehman's traders and employees were not all actively working, due to the dislocation and uncertainty caused by the September 15 bankruptcy filing.[27]  Indeed, the Lehman Examiner studied the GFS system and concluded that it was acceptably reliable through September 12, 2008, but was not reliable thereafter.[28]  Thus, because his adjustment of JPM marks from September 17 to September 19 is flawed, the September 19 mid-point marks that are the starting point for Prof. Zmijewski's valuation of $3.74 billion of securities in the Repo Collateral are unreliable.  Moreover, to the extent that securities prices generally were falling during the week of September 15, 2008, the GFS system failed to capture the full extent of the decline; this means that the error in Prof.

---

[26] To be clear, I disagree with Movants' experts' use of a September 19, 2008 valuation date — that is, a full three days before the Sale Transaction closed and title to the assets passed to Barclays — which substantially inflates their valuations.  In my view, Barclays' use of of September 22 and, to the extent relevant, dates during the following week (selected in consultation with its auditors at PwC) is more appropriate.  The use of a December 22 valuation date for cash and securities ultimately received from JPMorgan was also, in my opinion, a more reasonable estimate of the fair value of Barclays claim as at September 22 than using September 19 values of those assets.

[27] To support his claim that GFS data provide a suitable basis for adjusting the September 17 JPM marks to September 19, Prof. Zmijewski cites a table in his report showing the percentage of GFS prices that changed one or more days during the span from September 12 through September 19.  (A high percentage of the GFS prices change once or twice or even three times during this span.)  But the relevant question is whether GFS prices changed between September 17 and September 19 (which they often do not); Prof. Zmijewski does not report data for this particular time period.  In fact, it is likely, based on my analysis of daily GFS reports on the relevant days, that the changes Prof. Zmijewski cites for his five-trading-day span in fact occur mostly early in that span and not between September 17 and September 19.

[28] *See*, *e.g.*, Report of Anton R. Valukas, Examiner, *In re:  Lehman Brothers Holding Inc., et al*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Mar. 11, 2010), at 1595-1596, 1604, 2007-2010.

Zmijewski's mid-to-bid adjustment method and data clearly bias his valuations in favor of Movants, i.e., towards artificially higher valuations compared to Barclays' marks.

22.    Movants' expert Joseph Schwaba examined and claims to have independently valued a small subset of the more than 500 municipal securities that Barclays acquired from Lehman.   Mr. Schwaba states that 20 of the 26 municipal securities that he examined were auction-rate securities, a subclass of municipal securities that was particularly troubled in 2008— indeed, many analysts described the market for these securities as "frozen" during much of 2008, and the market remains dormant, at best, today.   Despite this, Mr. Schwaba valued the auction rate securities he examined either *very close to, at, or above par*.   This is inconsistent with his own observation in his report that "[f]ailed [auction-rate securities] would trade below par and may be subject to restricted liquidity."

23.    Mr. Schwaba's method for valuing the auction rate securities he examined was flawed, unreliable, and biased in favor of Movants, i.e., designed to generate high values for securities that were not trading or tradable in September 2008.   Specifically, his valuation method did not take into account the fact that he was valuing auction-rate securities that had failed at auction, often continuously for months.   At his deposition, Mr. Schwaba could not recall ever having previously traded or valued auction rate securities; indeed, his experience with municipal securities generally has been extremely limited.

24.    Mr. Schwaba's lack of experience with or understanding of auction rate securities led him to adopt a fundamentally unsound approach to valuing these securities.   Specifically, he based his valuations of the auction rate securities he examined on 152 transactions involving supposedly "comparable" securities, all of which traded at or very near par.   But Mr. Schwaba was unable to identify which of his comparable securities were auction-rate securities and had no

idea which, if any, were failed auction-rate securities.[29]  As a result, in selecting the comparables that he used to value failed auction-rate securities, Mr. Schwaba failed to check whether his comparables had the one characteristic essential to establishing comparability, namely, whether they were auction-rate securities with a similar auction history.  This is the equivalent of valuing houses adjacent to toxic waste sites with "comparables" that are adjacent to other municipal properties—parks, golf courses, schools, and the like.  Needless to say, the resulting valuations are unreliable and biased upwards.  Mr. Schwaba's failure to take into account such an important factor in the valuation of auction-rate securities renders his testimony on this issue unreliable.

25.    Movants' expert Mark E. Slattery claims that he "calculated the fair value of a total of 6,667 securities acquired by Barclays in the Acquisition."[30]  These securities fall into six different asset classes:  U.S. Treasury and agency debt securities; agency residential mortgage-backed securities ("RMBS"); non-agency RMBS; collateralized loan obligations ("CLOs"), including the Pine CCS CLO, collateralized debt obligations ("CDOs"); and commercial mortgage backed securities ("CMBS").

26.    One major difference between Mr. Slattery's valuations and Barclays' valuations is the method used to adjust mid-prices to bid or exit prices for certain classes of assets.  Mr. Slattery agreed that such an adjustment was appropriate, but contends that the adjustments used by the Barclays valuation personnel were too large.  As an alternative to Barclays' mid-to-bid adjustments, Mr. Slattery constructs his own mid-to-bid adjustments in an unorthodox way using data that are outdated, do not reflect of the market conditions prevailing in September 2008, and

---

[29] Even if any of the transactions that Mr. Schwaba used as comparables actually involved a failed auction-rate security, that would still not make it a valid indicator of the value of the failed auction-rate securities that he was valuing because Mr. Schwaba also made no effort to screen out non-arm's length transactions in which financial institutions repurchased failed auction-rate securities from their own retail customers for relationship reasons or in response to regulatory or litigation pressure.  Such a non-arm's length transactions in one failed auction-rate security provides little information about what a different failed auction-rate security would have traded for in an arm's-length transaction.

[30] Expert report of Mark Slattery, paragraph 5.

whose reliability is not known and cannot be tested.  So far as I am aware, Mr. Slattery's technique has never been used in the relevant academic literature and has never been endorsed by any other valuation professional; moreover, Mr. Slattery was unable to cite any use of this technique in the academic literature or any support for his approach by any standard setting organization of valuation professionals.

27.    Mr. Slattery's approach was to attempt to derive a mid-to-bid adjustment that reflects the degree of illiquidity prevailing in September 2008 in the markets for the fixed-income securities he examined.  As a first step, he attempts to calculate a "multiplier" that captures the relationship between bid-ask spreads in a "typical" market to bid-ask spreads in a "distressed" market.  To estimate that multiplier, Mr. Slattery uses information from a chapter entitled "A User's Guide to Buy-Side Bond Trading," contained in 1997 book on bond portfolio management.  Exhibit 1 in that chapter reports what the author describes as "indicators of market liquidity for a cross-section of the fixed-income universe."   However, the information Mr. Slattery relies on is not verifiable data, but rather "Salomon Brothers, Lehman Brothers, and Sanford C. Bernstein estimates."   Beyond this reference, the article does not specify when the estimates were gathered (although it must have been at least 13 years ago) or what market conditions were deemed by the author or those providing the estimates to be "typical" and "distressed."   Whatever "distressed" market conditions were deemed to be in 1997, it is highly unlikely that the phrase brought to mind conditions in any way comparable to the tumultuous market conditions that prevailed in September 2008.   Nonetheless, Mr. Slattery computed his multiplier by dividing the "distressed" discount for a given class of securities by the "typical" discount for that same class.[31]   In sum, Mr. Slattery's distressed-to-typical multipliers are based on vaguely-sourced and out-of-date estimates of bid-ask spreads that prevailed during unknown

---

[31] For example, a "typical" spread of 0.5% and a "distressed" spread of 1.5% would produce a multiplier of 3.

time periods, under ill-defined conditions which are not comparable to the conditions that prevailed in September 2008 (or least whose comparability cannot be reliably determined).

28.    Mr. Slattery's second step is to use his multipliers to convert "typical" bid-ask spreads to "distressed" bid-ask spreads.  Here, too, Mr. Slattery's technique was flawed, because the sources of his "typical" bid-ask spreads were likewise out of date.  For Treasury and agency securities, Mr. Slattery relied on data about liquidity discounts during the period from 1992 through 2002.  For residential mortgage-backed securities, he used figures that one of his support staff had gathered in some unspecified fashion while employed at Bank of America in *2001*.  Mr. Slattery did not properly test, and has no way of knowing, whether this stale bid-ask data was an appropriate starting point for computing bid-ask spreads that prevailed in *mid-2008*.  Thus, both components of Mr. Slattery's novel "technique" are flawed.  As a result, his calculations are fundamentally unreliable and do not provide a sound basis for adjusting mid-point marks to bid prices.

29.    As I established in my report in this matter, Barclays' valuations were developed not for litigation purposes, but in the normal course of business over several months following the transaction, primarily for the purpose of preparing financial statements to meet stringent filing requirements in accordance with government regulations.  Barclays' personnel gathered the kinds of information that they typically relied on and applied valuation methods that they typically relied on in the normal course of business, and the data Barclays relied on, the valuation methods Barclays employed, and conclusions as to value Barclays reached all were tested and accepted by PricewaterhouseCoopers.

30.    As I said in my report, "I also considered the feasibility of developing an entirely new set of marks, completely independent of any of the available sources.  I determined that it is

highly unlikely that such a procedure would lead to better marks than the marks developed by Barclays.  Rather, such a procedure could in the end produce *less* reliable marks . . ."[32]  The many flaws in the work of Movants' experts and the defects in the marks they developed show that the concerns I expressed were well founded and justified.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Palo Alto, California on April 19, 2010.

_____
Paul Pfleiderer

# Exhibit E

1

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4      ----------------------x

5      In Re:

6                           Chapter 11

7      LEHMAN BROTHERS          Case No. 08-13555(JMP)

8      HOLDINGS, INC., et al.,   (Jointly Administered)

9

              Debtors.

10

       ----------------------x

11

12

13       VIDEOTAPED DEPOSITION OF MARK SLATTERY

14              New York, New York

15              April 16, 2010

16

17

18

19

20

21

22

23     Reported by:

24     KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25     JOB NO. 29654

Page 2

```
1
2          April 16, 2010
3
4      Videotaped deposition of MARK
5  SLATTERY, held at the law offices of
6  Boies Schiller & Flexner, LLP, 575
7  Lexington Avenue, New York, New York,
8  before Kathy S. Klepfer, a Registered
9  Professional Reporter, Registered Merit
10  Reporter, Certified Realtime Reporter,
11  Certified Livenote Reporter, and Notary
12  Public of the State of New York.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1
2         A P P E A R A N C E S :
3
4  JONES DAY, LLP
5  Attorneys for Lehman Brothers, Inc.
6     222 East 41st Street
7     New York, New York  10017
8  BY:  JAYANT W. TAMBE, ESQ.
9       XOCHITL S. STROHBEHN, ESQ.
10
11
12  BOIES, SCHILLER & FLEXNER, LLP
13  Attorneys for Barclays
14     5301 Wisconsin Avenue, N.W.
15     Washington, D.C.  20015
16  BY:  JONATHAN M. SHAW, ESQ.
17
18
19
20
21
22
23
24
25
```

Page 4

```
1
2     A P P E A R A N C E S :  (Cont'd.)
3
4  QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
5  Attorneys for the Creditors Committee
6     51 Madison Avenue
7     22nd Floor
8     New York, New York  10010
9  BY:  OLGA M. URBIETA, ESQ.
10
11  HUGHES, HUBBARD & REED, LLP
12  Attorneys for the SIPA Trustee
13     One Battery Park Plaza
14     New York, New York  10004
15  BY:  AMINA HASSAN, ESQ.
16
17
18
19  ALSO PRESENT:
20     ELIZABETH DAVIS, Finance Scholars Group
21     MATTHEW SMITH, Legal Video Specialist
22
23
24
25
```

Page 5

```
1              M. Slattery
2         THE VIDEOGRAPHER:  This begins tape
3  labeled number 1 of the videotaped
4  deposition of Mark Slattery in the matter of
5  In re Lehman Brothers Holdings,
6  Incorporated, et al. in the United States
7  Bankruptcy Court, Southern District of New
8  York, Case Number 08-13555.  This deposition
9  is being held at 575 Lexington Avenue, in
10  New York, New York, on April 16, 2010 at
11  approximately 9:32 A.M.
12         My name is Matthew Smith for TSG
13  Reporting, Incorporated and I am the legal
14  video specialist.  The court reporter is
15  Kathy Klepfer, in association with TSG
16  Reporting.
17         Will counsel please introduce yourself
18  for the record.
19         MR. SHAW:  Jonathan Shaw, Boies,
20  Schiller & Flexner, on behalf of Barclays
21  Capital, Inc.
22         MR. TAMBE:  Jay Tambe from Jones Day
23  on behalf of the Debtor, Lehman Brothers
24  Holdings, Inc.  I will be joined later today
25  by my colleague Xochitl Strohbehn.  She
```

Page 6

1          M. Slattery
2   should be here shortly.
3          MS. URBIETA:  Olga Urbieta on behalf
4   of Quinn Emanuel and the Unsecured Creditors
5   Committee.
6          MR. SHAW:  And I have with me
7   Elizabeth Davis of Finance Scholars Group.
8          THE VIDEOGRAPHER:  And will the court
9   reporter please swear in the witness.
10                 *  *  *
11  MARK SLATTERY, called as a
12     witness, having been duly sworn by a Notary
13     Public, was examined and testified as
14     follows:
15  EXAMINATION BY
16  MR. SHAW:
17     Q.   Sir, would you please state your name
18  for the record?
19     A.   My name is Mark Slattery.
20     Q.   Mr. Slattery, have you ever been
21  deposed before?
22     A.   No.
23     Q.   Okay.  Let me then spend a couple
24  minutes just explaining what will happen and the
25  like.

Page 7

1          M. Slattery
2          I will ask you questions.  If at any
3   point you don't understand my question, just let
4   me know and I will try and do a better job of
5   phrasing it.
6          If at any point today you want to take
7   a break, let me know, and I may ask you to
8   answer one or two more questions just because
9   I'm on a particular line, but we'll take a
10  break.
11         Have you ever served as an expert
12  witness before?
13     A.   No.
14     Q.   When were you retained to work on this
15  matter?
16     A.   Beginning of this year, so January
17  2010.
18     Q.   Who approached you about serving as an
19  expert on this matter?
20     A.   Nick Weir contacted me.
21     Q.   And Mr. Weir is at what used to be
22  Chicago Partners, now Navigant?
23     A.   I believe he's a principal of Chicago
24  Partners and which I believe is being rebranded
25  as Navigant Economics.

Page 8

1          M. Slattery
2     Q.   Had you ever previously worked with
3   Mr. Weir or any of his colleagues at Chicago
4   Partners?
5     A.   I've worked with Mr. Weir in the past.
6     Q.   In what context did you work with Mr.
7   Weir in the past?
8     A.   I spent approximately two years at
9   Coopers & Lybrand in the early '90s, and during
10  that time I spent part of my tenure there with
11  Nick Weir working on his behalf.
12     Q.   What were you doing before you joined
13  or before you were retained to work on this
14  matter?
15     A.   Immediately prior?
16     Q.   Yes.
17     A.   I was with Flagstar Bank out of
18  Detroit, Michigan.
19     Q.   And in what capacity were you with
20  Flagstar Bank?
21     A.   My responsibilities were twofold:  I
22  acted as a consultant within a Capital Markets
23  Group to help provide expertise as it relates to
24  the asset/liability management work that was
25  part of their domain, and also, I was

Page 9

1          M. Slattery
2   responsible for enhancing the mortgage servicing
3   rights valuation framework at Flagstar Bank.
4     Q.   What do you mean by the mortgage
5   servicing rights valuation framework?
6     A.   Flagstar had at the time, during my
7   approximate one year there, a mortgage servicing
8   rights portfolio that totaled about 52 billion
9   of unpaid principal balance.  They were valuing
10  it using two different applications.  I was
11  asked to offer recommendations, suggestions,
12  identify any inherent weaknesses in the process
13  that they used to value this particular asset.
14     Q.   Who are you currently employed by?
15     A.   I am an independent contractor
16  currently being retained by Navigant Economics.
17     Q.   Is this the only matter in which you
18  are doing work with Navigant Economics?
19     A.   Yes.
20     Q.   When you were contacted in January of
21  this year, what did you understand your
22  assignment to be?
23     A.   Let me back up.  I was contacted in
24  late November.  I started with Navigant in
25  January.

Page 10

1        M. Slattery
2        **Q.   Did you do any work between late**
3   **November and your start in early January?**
4        A.   I was still with Flagstar Bank.
5        **Q.   So the answer is no, you did not do**
6   **any work on this project prior to joining**
7   **Navigant in January?**
8        A.   Correct.
9        **Q.   And what did you understand your**
10  **assignment to be?**
11       A.   I was asked to value mortgage
12  securities, but also, I was asked to, if
13  possible, to put together a valuation team
14  specifically designed to value mortgage-backed
15  securities.
16       **Q.   And who were the members of that team?**
17       A.   The team members in Chicago include a
18  gentleman by the name of Roderick Powell and
19  also Jeff Dykstra.
20            There's one other colleague that was
21  not part of specifically the valuation team but
22  included as part of our resources for running
23  down information off of applications such as
24  Bloomberg.
25       **Q.   And that's an employee of Chicago**

Page 11

1            **M. Slattery**
2   **Partners who's been --**
3        A.   I believe he's also an independent
4   contractor, but he was not part of the team that
5   I compiled.
6        **Q.   And what is that person's name?**
7        A.   Lincoln Baker.
8        **Q.   What is Mr. Powell's background?**
9        A.   His background includes time at Bank
10  of America.  I'm not sure whether it was Nations
11  Bank when he was there, but it goes back a
12  number of years.  He also was, I believe, with
13  an equity entity or equity shop for a period of
14  time.  I also spent time with him earlier this
15  decade at LaSalle Bank, so he worked with a
16  group that I was part of at LaSalle Bank.
17       **Q.   And has Mr. Powell ever traded any**
18  **sort of securities?**
19            MR. TAMBE:  Object to the form of that
20  question.
21            You can answer.
22       **Q.   Other than on his own account, for**
23  **example?**
24       A.   I don't know the answer to that
25  question.

Page 12

1        M. Slattery
2        **Q.   Does Mr. Powell have a background in**
3   **valuing securities?**
4        A.   Yes, he does.
5        **Q.   And what is his background in valuing**
6   **securities?**
7        A.   At Bank of America, he spent his time
8   with I believe an Enterprise Risk Management
9   Group.  He worked for a particular part of Bank
10  of America or group within Bank of America that
11  was specifically chartered with the valuation
12  analytics that supported the trading activity as
13  well as the balance sheet management activities
14  of Bank of America.  So he was part of an
15  Enterprise Risk Group.
16       **Q.   Did he have at any point in his**
17  **career, to your knowledge, responsibility for**
18  **actually affixing marks to particular**
19  **securities?**
20            MR. TAMBE:  Object to the form of that
21  question.
22            You can answer.
23       A.   I don't know the answer to that
24  question.
25       **Q.   Who is the other gentleman you added**

Page 13

1            **M. Slattery**
2   **to the team?  I just don't recall the name.**
3        A.   Jeff Dykstra.
4        **Q.   What is Mr. Dykstra's background, sir?**
5        A.   He was, as far as I understand, he
6   started his career at Flagstar Bank.  I then
7   hired him to be part of my team at LaSalle Bank
8   earlier this year, and then after LaSalle, I
9   believe he went to an energy trading firm.  I
10  don't know how long he stayed at that particular
11  firm.
12       **Q.   Has he ever been a trader of**
13  **securities other than for his own account?**
14            MR. TAMBE:  Object to the form.
15       A.   I don't know the answer to that
16  question.
17       **Q.   Has he ever had responsibility for**
18  **valuation of securities?**
19       A.   Yes.
20       **Q.   And tell me about that, please.**
21       A.   At LaSalle Bank, I co-chaired a group
22  known as the Mortgage Advisory Council.  Our
23  responsibilities were -- included valuing
24  securities and providing the most robust
25  valuation framework for mortgage assets and

Page 14

1          M. Slattery
2    mortgage-related lines of businesses at the
3    bank.  Jeff was part of that effort.
4        Q.    Did he have any particular line of
5    responsibility there for any particular type of
6    securities?
7        A.    Not a particular type.  It ran the
8    gambit from whole loan unsecuritized mortgages
9    to securitized mortgages.
10       Q.    Were there any non-mortgage securities
11   that he worked on valuing there?
12            MR. TAMBE:  Objection to form.
13       A.    We also were asked to value
14   indeterminate deposits, so we looked at the
15   other side of the balance sheet, if you will, so
16   we looked at liabilities of the bank.
17       Q.    Have you yourself in your career ever
18   traded any -- any form of securities other than
19   for your own account?
20       A.    Traded securities, no.  I did spend
21   time as an investor of non-agency residential
22   mortgage-backed securities, yes.  I'm not a
23   trader per se.
24       Q.    When was that?
25       A.    From 2006 to approximately 2008.

Page 15

1          M. Slattery
2        Q.    Tell me about your responsibilities
3    and role in that position.
4        A.    I provided the analytics underlying
5    the security selection.  Another gentleman,
6    through his relationship with various investors,
7    made the decisions as it related to the actual
8    securities that were purchased to be part of a
9    portfolio.
10       Q.    And you said that was from roughly
11   2006 through some point in 2008; is that
12   correct?
13       A.    Approximately, yes.
14       Q.    When in 2008 did that engagement or
15   did you stop having that responsibility?
16       A.    The end of November 2008.
17       Q.    And that was with which institution?
18       A.    It was a group by the known -- known
19   by the name of JMN Financial.
20       Q.    And what did JMN Financial do?
21       A.    As far as my understanding of the
22   related lines or the lines of business at JMN,
23   there were mortgage funds, non-discretionary
24   mortgage funds, which meant that we attracted
25   investors to work with them to create mortgage

Page 16

1          M. Slattery
2    funds, funds dedicated to mortgage investments.
3        The other line of business that I was
4    directly involved in was a consulting line of
5    business, so I provided various -- I
6    participated in a variety of consulting
7    engagements while with JMN.
8        Q.    Did JMN trade securities on its own
9    account?
10            MR. TAMBE:  Objection to the form of
11   the question.
12       A.    Not that I'm aware.  I don't know.
13       Q.    Did JMN trade securities on behalf of
14   customers?
15       A.    I think trade, in my opinion, unless
16   I'm misinterpreting the question, would
17   represent an active purchase and sale of said
18   securities that -- securities that were
19   purchased were more for a portfolio, so it was
20   more of a build-out approach.
21        To my knowledge, none of the
22   securities that were purchased were sold within
23   the context of the funds that were created.
24       Q.    So if I'm understanding your answer
25   correctly, this portfolio that JMN ran would

Page 17

1          M. Slattery
2    invest in mortgage securities and hold them, is
3    that basically correct?
4        A.    Yes.  And during my time there, there
5    were two such funds.
6        Q.    Okay.  So there were two separate
7    funds.  How did they differ, if at all?
8        A.    Just from the standpoint of the
9    investor.
10       Q.    Did either of the funds, to your
11   knowledge, purchase or sell mortgage securities
12   in September of 2008?
13       A.    There was a fund that was active in
14   the sense that there were securities, and the
15   second fund, I don't recall if there were actual
16   securities that were purchased during September
17   2008.  However, we actively monitored the
18   securities that were in the portfolio on a
19   frequent basis, including September 2008.
20       Q.    What do you mean by you actively
21   monitored the securities that were in the
22   portfolio?
23       A.    Well, the securities -- there is a
24   monthly cash flow, and with that cash flow
25   there's typically reports that come out as it

M. Slattery

1 relates to the performance of the security and
2 the underlying collateral. So myself and
3 another analyst, if you will, we actively
4 managed the information flow and dissected it,
5 the CD impact or try to quantify the impact on
6 holdings in the particular portfolio.
7 **Q. What was the size of the portfolio**
8 **that was active?**
9 A. As of September 2008?
10 **Q. In September 2008.**
11 MR. TAMBE: Objection to the form of
12 the question.
13 You can answer.
14 A. I'm sorry, as of September 2008?
15 **Q. As of September 2008, yes, sir.**
16 A. Based on my recollection, I believe
17 that it was approximately $80 million in
18 principal.
19 **Q. Why did you leave JMN -- I'm sorry, I**
20 **forget the rest of the name of the entity.**
21 A. The second investor, which supported
22 and provided the capital for the second fund,
23 decided to end his relationship with JMN.
24 **Q. Why did that person decide to end its**

M. Slattery

1 **relationship with JMN, do you know?**
2 A. I don't know exactly, no.
3 **Q. Is JMN still solvent?**
4 MR. TAMBE: Objection to form.
5 A. I don't know.
6 **Q. You were with Flagstar Bank at what**
7 **period of time?**
8 A. March of 2009 through the end of 2009,
9 approximately ten months.
10 **Q. And you were -- and your position**
11 **there was what?**
12 A. I believe my title was First Vice
13 President, and again, I had two areas of
14 responsibilities.
15 **Q. What were those two areas?**
16 A. Act as an internal consultant for the
17 asset/liability management efforts of the
18 Capital Markets Group of which I was a part, and
19 also review the mortgage servicing rights
20 portfolio valuation framework.
21 **Q. And why did you leave Flagstar Bank?**
22 A. I'm sorry, when or why?
23 **Q. Why?**
24 A. Why? The opportunity that Navigant

M. Slattery

1 Economics/Chicago Partners presented allowed me
2 to stay in Chicago. With Flagstar, I was
3 commuting back and forth to Detroit.
4 **Q. How many hours have you worked on this**
5 **matter?**
6 A. I don't know the exact number.
7 **Q. Rough estimate?**
8 A. 700 hours.
9 **Q. So basically it's been what you've**
10 **done full-time for two months?**
11 A. Close to --
12 **Q. Or three months, I guess?**
13 A. Right. Maybe more like 12 weeks,
14 whatever it's been since the beginning of the
15 year.
16 **Q. Apart from the work that you've done**
17 **in this case, have you ever had responsibility**
18 **for valuing Treasury and agency debt securities?**
19 A. Yes, as -- yes.
20 **Q. In what capacity?**
21 A. My last three years at the Federal
22 Home Loan Bank, which takes us back to the late
23 '80s and the beginning early '90s, I was one of
24 two senior financial analysts that was charged

M. Slattery

1 with the valuation and ongoing monitoring of the
2 bank's investment portfolio, including Treasury
3 and agency debt.
4 **Q. Any other such experience throughout**
5 **your career?**
6 A. I have valued securities throughout my
7 career almost at every stop, and that would
8 include Treasuries, U.S. agency debt securities,
9 residential mortgage-backed securities, whole
10 loans, more complicated instruments as well.
11 **Q. Would it be fair to say that in**
12 **September 2008, apart from whatever monitoring**
13 **you were doing in connection with this still**
14 **extant portfolio at JMN, you were not actively**
15 **involved in the -- in the market?**
16 MR. TAMBE: Objection to the form of
17 the question.
18 A. I would disagree with that.
19 **Q. Okay. Tell me how you were actively**
20 **involved in the market at the time.**
21 A. We were responsible for a sizable
22 multi-million-dollar position. As a result, we
23 would be remiss in our duties as analysts, as
24 assistant portfolio managers if we did not

Page 22

1          M. Slattery
2   maintain an active awareness of the marketplace,
3   September 2008, March 2008, whatever.
4       Q.   Okay.  What did you do to maintain an
5   active awareness of the marketplace in September
6   2008?
7       A.   On a daily basis we were examining,
8   reviewing opportunities for additional placement
9   of capital.  We were again managing and
10  measuring the portfolio that we had in place at
11  the time, looking at the overall tone of the
12  marketplace, et cetera.
13      Q.   What can you tell me about your
14  understanding of -- first of all, let's start
15  with general market conditions in September of
16  2008.
17          MR. TAMBE:  Objection to the form of
18  the question.
19          MS. HASSAN:  Same objection.
20      Q.   You can answer.
21      A.   In a general way, the market
22  conditions represented potential for stress,
23  reflected stress in the marketplace.
24      Q.   What was the market for CLOs like in
25  September of 2008?

Page 23

1          M. Slattery
2          MR. TAMBE:  Objection to the form of
3   the question.
4       A.   The CLO market at the time, based on
5   my work in this engagement, is -- I would
6   suggest that the CLO market, because of the
7   complications of the instruments, maybe took on
8   a degree of stress, and they were part of that
9   stress.
10      Q.   And when you say "a degree of stress,"
11  what do you mean?
12      A.   The market, I believe, was concerned
13  about performance based on my understanding, and
14  I think the more complicated the instrument the
15  greater the potential for placement of stress.
16      Q.   And when you say "placement of
17  stress," what do you mean?
18      A.   The CLO market may have reflected less
19  liquidity than the other less complicated
20  segments of the fixed income market.
21      Q.   Did other segments of the fixed income
22  market also reflect stress at this time?
23          MR. TAMBE:  Objection to form of the
24  question.
25      Q.   Or, rather, at that time?

Page 24

1          M. Slattery
2          MR. TAMBE:  Objection to the form of
3   the question.
4       A.   Certain segments may have reflected
5   more stress than others.
6       Q.   And which segments do you believe
7   reflected more stress than others at that time?
8       A.   The more complicated the structure the
9   more likely that the market was stressed.
10      Q.   I take it from your answer that, from
11  your earlier answer about your knowledge of the
12  CLO market, that the knowledge that you have
13  comes from studies you have done since you began
14  working on this project in January, is that
15  fair?
16      A.   I would not completely agree to the
17  extent that I had an extensive experience with
18  the CDO market.  At the end of the day, the
19  collateralized debt obligation versus the
20  collateralized loan obligation market are very
21  similar but for specifics as it relates to the
22  underlying collateral, but the dimensions of the
23  structures and the way in which one would go
24  about valuing those instruments are on par with
25  one another to a great extent.

Page 25

1          M. Slattery
2       Q.   And in September of 2008 what work
3   were you doing in terms of valuing CDOs?
4       A.   As part of my work at JMN, we were
5   engaged by an investment syndicate, I believe is
6   the way to represent the firm, out of New York
7   and they were asking us to look at a CDO
8   portfolio.
9       Q.   And how large was that portfolio?
10      A.   Hundreds, if my memory is accurate,
11  hundreds of CDOs.
12      Q.   And in terms of dollar value, how
13  large was that portfolio?
14      A.   Based on my recollection, I believe
15  that the position represented, in aggregate, 4
16  billion.
17      Q.   What can you tell me about the
18  prevailing bid-offer spreads in the fixed income
19  securities market in September of 2008?
20          MR. TAMBE:  Objection to the form of
21  the question.
22      A.   Which particular market?  Which
23  particular segment of the market?
24      Q.   CLOs we'll start with.
25          MR. TAMBE:  Objection to the form of

Page 26

M. Slattery

1  the question.
2     A.   I don't know the bid-ask spread
3  dimension for CLOs at that time.
4     **Q.   What about Treasuries?**
5     A.   Treasuries, based on empirical
6  research, it looked as though the bid-ask spread
7  was behaving consistent with historical levels;
8  in other words, it was somewhere between 1 and
9  2/32s.
10    **Q.   What about for agency securities?**
11    A.   Agency securities, again, based on
12 observations, they were trading from a bid-ask
13 perspective a little bit to the upside relative
14 to normal, but not in any way, shape or form to
15 the extreme levels.  In other words, based on
16 research, the bid-ask spread for the U.S. agency
17 debt market would trade in the 4 to 10 tick,
18 4/32 to 10/32 level.  Based on tracking five
19 specific securities from August, September and
20 October of 2008, it did not look as though that
21 they deviated significantly from those levels.
22    **Q.   What research are you referring to**
23 **when you say "based on research"?**
24    A.   We examined five securities within

Page 27

M. Slattery

1  the, in great detail, of the 125 U.S. Treasury
2  and agency debt securities that we valued, and
3  we tracked them on a daily basis from August
4  through October of 2008.
5     **Q.   And which five securities were those?**
6     A.   I'd have to go back to my spreadsheet.
7  I believe it was a mix of a Freddie Mac
8  security, a Federal Home Loan Bank security, a
9  Federal Farm Credit Bureau security, a TVA
10 security, and I'm not sure if my memory serves
11 me in terms of the fifth.
12    **Q.   And apart from tracking these five**
13 **securities, was there any other research that**
14 **you did on this issue?**
15    A.   Yes.
16    MR. TAMBE:  Objection to the form of
17 the question.
18    You can answer.
19    **Q.   And what was that research?**
20    A.   We started evaluating the liquidity
21 issue for the U.S. Treasury and agency debt
22 securities by doing research that put us prior
23 to 2008.  We obtained information out of a
24 resource, which I believe is highlighted in the

Page 28

M. Slattery

1  report, Fabozzi, Frank Fabozzi, who is a market
2  presence.
3     We used one of the citations from a
4  book, one of his several books on liquidity for
5  U.S. Treasury and agency debt securities, and
6  then we used a normal versus stressed approach
7  for the agency debt securities to identify
8  liquidity adjustments on a maturity-specific
9  basis as opposed to a flat percentage basis.
10    (Exhibit 710B, a document bearing
11    Bates Nos. LEH-NAVIGANT 026434 through
12    026436, marked for identification, as of
13    this date.)
14    **Q.   Showing you what has been marked as**
15 **Exhibit 710B, and I apologize for the odd way**
16 **that it's been printed out with two words**
17 **appearing on the first page and nothing**
18 **appearing on the second.  Can you tell me what**
19 **this document is?**
20    MR. TAMBE:  Objection to the form of
21 the question.  I just, I don't know where it
22 comes from and the printing problem because
23 the words on the last page are cut off.  So
24 it's apparently from a spreadsheet of some

Page 29

M. Slattery

1  type, but --
2     MR. SHAW:  It's from his production.
3  A spreadsheet with Lehman-Navigant 026434.
4     MR. TAMBE:  Okay.  Was it printed in
5  this format or was it provided in native?
6     MR. SHAW:  I believe it was in native.
7     MR. TAMBE:  Okay.  I'll just have an
8  objection to the extent, when you
9  transferred it from native to print, if
10 anything is lost.  Okay.
11    Go ahead.
12 BY MR. SHAW:
13    **Q.   Can you tell me what this document is,**
14 **sir?**
15    A.   This represents the work that we
16 performed in order to quantify bid-ask spread
17 adjustments for distressed purposes for agency
18 debt securities.
19    **Q.   And this is the Fabozzi document you**
20 **mentioned earlier?**
21    MR. TAMBE:  Objection to form.
22    **Q.   Fabozzi data, rather, that you**
23 **mentioned earlier?**
24    MR. TAMBE:  Objection to form.

Page 30

M. Slattery

1  A.   The Fabozzi information is at the top
2  that creates for the normal versus distressed
3  and it allows us to identify or quantify a
4  multiple.
5     Q.   And was Mr. Fabozzi himself the source
6  of this information?
7     A.   To the best of my knowledge, I believe
8  he surveyed traders during this time to identify
9  these normal versus distressed.
10    Q.   And when you say "during this time,"
11  what time period are you talking about?
12    A.   I believe 1997.
13    Q.   Did you do anything -- do you know how
14  the terms "normal" and "distressed" are defined
15  for this purpose?
16    A.   No, I do not.
17    Q.   Is the multiple in the third column we
18  see there something that Mr. Fabozzi provided or
19  something that you calculated?
20    A.   We calculated that number.
21    Q.   Can you tell me how you calculated
22  that number?
23    A.   I believe it's the distressed number
24  divided by the normal number.

Page 31

M. Slattery

1     Q.   How were you defining "distressed"
2  when you made use of these, these numbers?
3     A.   Distressed would be an example of a
4  market period where the bid-ask spreads widen to
5  reflect additional demand in the marketplace
6  from a stress standpoint.
7     Q.   And this is data you believe from
8  1997?
9     A.   Yes.
10    Q.   Are you sure about that?
11    A.   To the best of my knowledge.
12    Q.   And you believe this is data provided
13  by Frank Fabozzi?
14    A.   It's in his book.  I believe, again,
15  that the source, I believe, is from surveys with
16  traders.
17    Q.   And this would have concerned
18  conditions, obviously, as you say, in 1997.
19       Did you make any effort to determine
20  whether bid-ask spreads that were prevailing in
21  1997, or whenever this data was gathered, were
22  still prevailing in September of 2008?
23    A.   We did.  Like I said, we evaluated a
24  segment of the securities specifically on a

Page 32

M. Slattery

1  daily basis in 2008 and related those findings
2  to these to see if there was a reconciliation or
3  calibration.
4     Q.   And that's you looked at five
5  securities; is that correct?
6     A.   In detail, yes.
7     Q.   Was that work produced to us, do you
8  know, as part of your work papers?
9     A.   I'm not aware.
10       MR. TAMBE:  Objection to the form of
11  the question.
12    Q.   Was that recorded anywhere, the work
13  that you did in tracking those five securities?
14    A.   Yes.
15       MR. SHAW:  If that hasn't been
16  produced to us, I would appreciate your
17  doing so; and if it has been, I would
18  appreciate you identifying it when you get a
19  chance.
20       MR. TAMBE:  We'll take a look at it
21  and we'll also take a look at the
22  stipulation we have on expert materials.
23    Q.   What do you mean by on-the-run
24  Treasuries?

Page 33

M. Slattery

1     A.   Recently issued.
2     Q.   And what are off-the-run Treasuries?
3     A.   Those that reflect a certain amount of
4  seasoning in the marketplace.
5     Q.   How much seasoning?
6     A.   It depends.  The on-the-run Treasury
7  market reflects a variety of -- a variety of
8  tenors, varying maturity points.
9     Q.   In the work that you did by looking at
10  those five securities to test whether the
11  Fabozzi numbers were still valid and reliable,
12  tell me how you went about testing that.
13    A.   The Fabozzi article again provides us
14  with a multiple for distressed estimation.  We
15  evaluated the securities on a daily basis in
16  terms of their price and yield performance in
17  the market to identify if there was any
18  significant deviation from any of the stress
19  indicators that we have on this sheet.
20    Q.   Did you do any statistical testing to
21  determine the validity and robustness of your
22  results?
23    A.   Not specifically, no.
24    Q.   Did you do it in any non-specific

Page 34

**M. Slattery**

1    **M. Slattery**
2    manner?
3        A.    What did you mean by "statistically"
4    then?
5        **Q.    Did you do any statistical testing of**
6    **the results of your examination of those five**
7    **securities?**
8            MR. TAMBE:  Object to the form.
9        A.    We mathematically calculated
10   performance of the instruments under extensive
11   detailed consideration and reconciled those
12   results to this information.
13       **Q.    And what I'm asking you is, in the**
14   **course of doing that math, did you do any**
15   **statistical testing to determine the robustness**
16   **of the results you were coming up with?**
17           MR. TAMBE:  Objection to the form.
18       A.    Again, we evaluated things
19   mathematically, if I'm misinterpreting the
20   statistical implication or the implication of
21   the statistical element of your question, but we
22   definitely mathematically evaluated them on a
23   daily change basis and compared the price and
24   yield performance to this specific set of data
25   points.

Page 35

1        M. Slattery
2        **Q.    And what mathematical evaluation did**
3    **you do?**
4        A.    Variants.  We used variants.
5        **Q.    And what do you mean by you used**
6    **variants?**
7        A.    We calculated the change on a daily
8    basis.
9        **Q.    With respect to the five securities**
10   **that you looked at relative to historical**
11   **levels, were the spreads widening or narrowing**
12   **on those securities throughout the period of --**
13   **the period that you examined them?**
14           MR. TAMBE:  Objection to the form of
15       the question.
16       A.    From beginning to end, or particular
17   like period within the three months?
18       **Q.    Tell me, did you observe any trends of**
19   **widening and narrowing?**
20       A.    The market moved up and down during
21   that period.  So, yes, there was movement up and
22   down with respect to price and, correspondingly,
23   yield.
24       **Q.    Were the five securities that you**
25   **examined on- or off-the-run securities?**

Page 36

1        **M. Slattery**
2        A.    They were U.S. agency debt securities,
3    so they were not -- in terms I would not
4    describe them as off-the-run Treasuries in that
5    sense or on-the-run Treasuries.
6        **Q.    So they weren't Treasuries at all?**
7        A.    Correct.
8        **Q.    And I take it none of them were**
9    **corporates either?**
10       A.    Correct.
11       **Q.    And you didn't look at how spreads**
12   **moved during that period on any Treasuries,**
13   **whether on- or off-the-run?**
14           MR. TAMBE:  Objection to the form of
15       the question.
16       A.    We did look at the Treasury market in
17   terms of yields, but not a particular set of
18   securities other than those that we priced.
19       **Q.    And you didn't look at corporates to**
20   **determine how spreads were moving on those**
21   **during that period either, did you?**
22           MR. TAMBE:  Objection to form.
23       A.    Corporates was not part of my report.
24       **Q.    So in attempting to calibrate these**
25   **Fabozzi -- strike that.  In attempting to**

Page 37

1        **M. Slattery**
2    **determine whether the Fabozzi results reported**
3    **for on-the-run, off-the-run Treasuries and**
4    **corporates still held true, you did not actually**
5    **examine spreads in on-the-run Treasuries,**
6    **off-the-run Treasuries or corporates; is that**
7    **right?**
8            MR. TAMBE:  Objection to form.
9        A.    These multiples, again, were used as a
10   indication of stress.  For example, the actual
11   normal versus distressed allocation across the
12   maturity spectrum for the U.S. agency debt
13   securities that's indicated in the second half
14   of this spreadsheet, we used off-the-run
15   Treasuries and corporates as a proxy.
16           Corporates would be, in our opinion,
17   conservative for U.S. agency debt securities.
18   So we used an off-the-run Treasuries indication
19   and corporates (intermediate) as indications of
20   stress for the U.S. agency debt market.
21       **Q.    Did any of the models you used in**
22   **preparing the valuations that you -- that you**
23   **came forward with rely on the Fabozzi spreads**
24   **themselves?**
25       A.    No.

Page 38

M. Slattery

1
2    Q.   You simply used the Fabozzi spreads to
3    calculate your multiples?
4         MR. TAMBE:  Objection to form.
5    A.   I'm not sure what you mean by "Fabozzi
6    spreads."  I don't --
7    Q.   These Fabozzi bid-ask spreads that
8    were reported on the top half of Exhibit 710B.
9    A.   So could you go back to your question?
10   Q.   Sure.  In the modeling work that you
11   did, I take it you did not actually use the
12   spreads that are reported in the Fabozzi data
13   that appears on the top half of Exhibit 710B?
14        MR. TAMBE:  Object to form.
15   Q.   Other than as a basis for calculating
16   the multiples that are reported in the third
17   column on the top half?
18   A.   For the Treasuries, which again,
19   within our report, there was a combination of
20   U.S. Treasury and U.S. agency debt securities,
21   for the Treasury securities, I believe our
22   adjustments, liquidity factor adjustments, if
23   you will, were incorporated in the report, they
24   were incorporated or very similar to the numbers
25   here.  For the U.S. agency debt securities, it

Page 39

M. Slattery

1
2    is the distressed continuum that's indicated on
3    the second half of that page.
4    Q.   And the way you arrived at the -- at
5    the distressed numbers on the second half of
6    that page was that you took data concerning
7    off-the-run Treasuries from January 1992 to
8    December 2002; is that correct?
9    A.   For the normal, yes.
10   Q.   And you then multiplied them by the
11   multiple you calculated on the basis of the
12   Fabozzi numbers?
13   A.   Yes.
14   Q.   Did you make any effort to determine
15   whether the data from 1992 to 2002 that you
16   relied on accurately represented conditions in
17   the market in September 2008?
18        MR. TAMBE:  Objection to the form of
19        the question.
20   A.   The market in December 2002 -- or, let
21   me go back.  From January 1992 to December 2002,
22   the timeframe we evaluated, that rate period or
23   rate history compared to the way the market
24   was -- the market as of September 2008, from
25   that standpoint, we did, from a level to level,

Page 40

M. Slattery

1
2    but the market was different.
3    Q.   I'm not sure I understand what you
4    mean.  When you say that "from January 1992 to
5    December 2002, the timeframe we evaluated, that
6    rate period or rate history compared to the way
7    the market was, the market as of September 2008,
8    from that standpoint, we did," what do you mean?
9    A.   In terms of levels.  The level of
10   rates, the absolute level of rates.
11   Q.   When you say "the level of rates,"
12   what are you referring to specifically?
13   A.   September 2008, the Treasury market
14   and the agency yields were at a certain level.
15   We compared that, those levels, to the ten-year
16   timeframe.
17   Q.   Did you compare the bid-ask spreads
18   for that timeframe to those prevailing in
19   September 2008?
20   A.   We attempted to do so, yes.
21   Q.   And how did you attempt to do so?
22   A.   We identified a random sample of five
23   securities that we looked at in detail.
24   Q.   And those are the five -- same five
25   securities we talked about previously?

Page 41

M. Slattery

1
2    A.   Yes.
3    Q.   And you believe that somewhere there's
4    a document showing that -- showing the results
5    of that analysis that you performed?
6    A.   For price and yield performance from
7    August 2008 through October 2008, yes.
8    Q.   And you're relying on that information
9    for the opinions you're offering in this
10   litigation?
11        MR. TAMBE:  Objection to the form of
12        the question.
13   A.   We're relying on a significant amount
14   of data.  Not only that particular segment of
15   our work, but also we evaluated the market tone
16   I think that was suggested earlier and the,
17   again, the performance of the agency securities
18   specifically in September 2008, the implications
19   of the liquidity of September 2008, and the
20   impact that that liquidity would have on bid-ask
21   spreads.
22   Q.   What do you mean you evaluated the
23   market tone?
24   A.   I believe we identify government
25   actions that were taken earlier in the month of

Page 42

M. Slattery

1  September by the government, specifically as it
2  related to Freddie Mac and Fannie Mae.  The
3  government took ownership of those particular
4  private entities, publicly chartered
5  enterprises, and provided a $200 billion
6  backstop I believe of capital that allowed the
7  market and any potential for disruption or
8  continued stress to be placated.
9
10        In other words, attempts were made by
11  the government intervention to quell any growing
12  anxiety in the marketplace specifically related
13  to U.S. agency debt, specifically more related
14  to Freddie Mac and Fannie Mae debentures.
15    Q.  For the Treasury securities that you
16  revalued, what bid-ask spread did you use in
17  your revaluations?
18    A.   I believe it's in the report.  I
19  believe it's one to two ticks.
20    Q.   What do you mean by one to two ticks?
21    A.   1/32 to 2/32.
22    Q.   Where would that be in your report?
23    A.   I'd have to see the report.
24        (Exhibit 711B, Expert Report of Mark
25  E. Slattery, CFA, dated March 15, 2010,

Page 43

M. Slattery

1  marked for identification, as of this date.)
2    Q.   Showing you what has been marked as
3  Exhibit 711.  Do you recognize this as your
4  report in this matter?
5    A.   Yes.
6    Q.   Can you tell me where it would show in
7  your report what bid-ask spread you used in your
8  revaluation of the Treasury securities?
9    A.   I would point to paragraph 25.
10    Q.   And specifically, I take it you are
11  pointing to the last sentence of paragraph 25?
12    A.   Yes.
13    Q.   And that says, "Based on my research
14  and analysis of observed actual market data for
15  bid-offer spread."  What exactly are you
16  referring to when you talk about your research
17  and analysis?
18    A.   We looked at prevailing market
19  information from one source, I believe it was
20  The Wall Street Journal, another source, I
21  believe it was the JPMorgan U.S. Treasury and
22  Agency Report, and evaluated the bid-ask spread
23  dynamic for Treasuries during that time.
24    Q.   And what JPMorgan source were you

Page 44

M. Slattery

1  looking at?
2    A.   I'm sorry, it's Morgan Stanley U.S.
3  Liquid Rates Tracker."
4    Q.   And did you record the information
5  that you derived from the Morgan Stanley U.S.
6  Liquid Rates Tracker somewhere?
7    A.   Record to the extent that I
8  transferred the data to a spreadsheet, perhaps?
9    Q.   Record in any way.  If I wanted to see
10  exactly what data you were looking at --
11    A.   No, not that I'm aware.
12    Q.   And what about The Wall Street
13  Journal, did you in any way record that such
14  that I could -- you could tell me exactly what
15  to go look at?
16    A.   That, again, I believe was just pulled
17  directly from their Wall Street Journal Website.
18  I believe it's encased in a spreadsheet.
19    Q.   Did you rely at all on the -- on the
20  Fabozzi spreads that you have identified here in
21  coming up with a .03 and .06 range?
22    A.   No.  As I indicated before, those
23  numbers I believe are similar to what we found
24  during our September 2008 research.

Page 45

M. Slattery

1
2    Q.   Were you looking at on- or off-the-run
3  Treasury spreads?
4        MR. TAMBE:  Objection to the form of
5  the question.
6    Q.   Were you looking at spreads for on- or
7  off-the-run Treasury securities?
8    A.   For the Treasury securities that we
9  valued, which are part of the 125, we used
10  observed prices.  So, by implication, the
11  spreads that came out of those prices were
12  consistent with market conditions at the time.
13    Q.   You can put your report aside and
14  we'll come back to it in a few minutes.
15        In your work on this case, to what
16  extent did you collaborate with other experts
17  who have offered opinions in this case?
18        MR. TAMBE:  Object to the form.
19    A.   We had conference calls throughout the
20  process.  There were interactions.
21    Q.   Were any of the models you used
22  mutually developed?
23    A.   I'm not sure what you mean by
24  "mutually developed."
25    Q.   In developing the models that you used

Page 46

1 **M. Slattery**
2 **in your valuations, did you have input from any**
3 **of the other experts?**
4     A.    For our report?  For my report?  No.
5     **Q.    You used the valuation date, September**
6 **19, 2008; is that correct?**
7     A.    Yes.
8     **Q.    And why did you select that as the**
9 **appropriate valuation date?**
10     A.    Based on my understanding, the assets
11 were transferred, i.e., the risk of loss was
12 transferred as of 12:01 A.M. on the 22nd.  As
13 such, with the securities that I was valuing,
14 prior to the 22nd at 12:01 A.M., the 21st and
15 20th represented a weekend.  Not significant
16 market inputs or variables changed during that
17 time.  As a result, the most pragmatic approach
18 that I felt comfortable with, in my opinion, was
19 to value them as of the end of day on the 19th.
20     **Q.    What market inputs or variables would**
21 **you consider to be significant market inputs or**
22 **variables for purposes of determining whether**
23 **conditions between close of business on the 19th**
24 **and 12:01 A.M. on the 21st --**
25     MR. TAMBE:  22nd.

Page 47

1     M. Slattery
2     **Q.    You're right.  Let me strike that**
3 **question.  It was getting a little complicated**
4 **anyway.**
5     MR. TAMBE:  I wouldn't have objected
6     to the form.
7     **Q.    When you determined, as you stated you**
8 **did a moment ago, that no significant market**
9 **inputs or variables changed between close of**
10 **business on the 19th and 12:01 A.M. on the 22nd,**
11 **what market inputs and variables were you**
12 **talking about?**
13     MR. TAMBE:  Object to form.
14     A.    I would rephrase it by saying that the
15 variables, significant variables, for
16 consideration within, you know, the context of
17 our report, my report, would be interest rates
18 and levels of volatility.
19     **Q.    Apart from the fact that interest**
20 **rates and levels of market volatility, in your**
21 **view, did not change between close of business**
22 **on the 19th and 12:01 A.M. on the 22nd, did you**
23 **do anything else to determine whether market**
24 **conditions had changed significantly between**
25 **those two periods of time?**

Page 48

1     **M. Slattery**
2     A.    Between the 19th end of day and 12:01
3 A.M. specifically?
4     **Q.    Yes.**
5     MR. TAMBE:  Objection to form.
6     A.    We did look at other markets if there
7 was any impact or significant deterioration in
8 the two inputs that I highlighted by evaluating
9 overseas markets.  We did that to be
10 conservative, to ensure that we didn't miss
11 anything in the process.
12     **Q.    And when you say the only significant**
13 **factors from your perspective were the**
14 **volatility and the interest rates, are you**
15 **talking just about with respect to the**
16 **Treasuries or to all of the securities you**
17 **valued?**
18     A.    Well, I just -- point of
19 clarification.  I wouldn't say those are the
20 only inputs that have influence on the value.
21 However, those are the two main catalysts or
22 drivers to the value of the securities that are
23 within the context of my report.  And as far as
24 their impact, volatility is not a part of the
25 modeling effort as it relates to Treasuries or

Page 49

1     M. Slattery
2 the majority of the U.S. agency debt securities.
3     **Q.    Did you do any analysis to determine**
4 **whether conditions at the end of the day on the**
5 **19th as compared to 12:01 A.M. on the 22nd were**
6 **more similar in comparison with conditions**
7 **between 12:01 A.M. on the 22nd and end of day on**
8 **the 22nd?**
9     MR. TAMBE:  Objection to form.
10     A.    From a pragmatic standpoint, it's very
11 difficult to ascertain levels of yields and
12 volatilities at one minute past midnight on the
13 22nd.
14     **Q.    What about general market conditions,**
15 **did you look at that aspect of it?**
16     A.    We looked at end of day on the 19th
17 compared to the end of day on the 22nd, which
18 would then include the full vagaries of the
19 market place for the 22nd, and we quantified the
20 impact of that change in the marketplace for the
21 majority of the securities that we valued, again
22 to be conservative and to put a numerical
23 boundary around the impact of the changes
24 experienced during the market on the 22nd.
25 However, if the transfer of risk of loss

Page 50

M. Slattery

1  happened at 12:01 A.M. on the 22nd, the vagaries
2  of the marketplace on the 22nd are really
3  outside the scope.
4  **Q.   What did you quantify the difference**
5  **between looking at the close of business on the**
6  **19th and close of business on the 22nd to be?**
7    A.   It was --
8      MR. TAMBE: Objection to form.
9      You can answer.
10   A.   The quantification of the end of the
11  19th to the end of 22nd?
12  **Q.   Yes.**
13   A.   For the majority of the securities, we
14  quantified the impact of the changes in the
15  market to be approximately 51 basis points, so
16  less than 1 percent in terms of the impact on
17  total value.
18  **Q.   When you say for the majority of the**
19  **securities, what do you mean?  How are you**
20  **defining that group?**
21   A.   I did not revalue the credit component
22  or the credit segment of the non-agency RMBS
23  through the 22nd, but for -- and also, the CLOs
24  and the CDOs, CMBS.  However, for the U.S.

Page 51

M. Slattery

1  Treasury and agency debt securities -- excuse
2  me, the agency RMBS, we revalued that portfolio
3  as of the close of business on the 22nd and
4  compared those results to the close of business
5  on the 19th to quantify or to determine the 51
6  basis points.
7  **Q.   And is that something you relied on in**
8  **reaching the opinions that you have reached**
9  **today --**
10     MR. TAMBE: Objection.
11  **Q.   -- or in this case?**
12     MR. TAMBE: Objection to the form of
13   the question.
14   A.   Again, it's outside the scope of what
15  I was asked to do and what I think pragmatically
16  was the point of the valuation efforts
17  associated with my work, so I don't have an
18  opinion as it relates to that.  I'm just telling
19  you what the amount was.
20  **Q.   And is that something that you find --**
21  **strike that.**
22     MR. SHAW: We've been going about an
23   hour.  Why don't we take a short break.
24     THE VIDEOGRAPHER: The time is 10:30

Page 52

M. Slattery

1  A.M.  We are now off the record.
2     (Recess.)
3     THE VIDEOGRAPHER: The time is 10:41
4  A.M.  We are now on the record.
5  BY MR. SHAW:
6  **Q.   Mr. Slattery, I would like you to take**
7  **a look again at your report, which I think has**
8  **been marked as Exhibit 711-B, and specifically,**
9  **if you'd go to page 2 of your report.  Looking**
10 **at the last sentence of paragraph 4, where you**
11 **state, "I present valuations based on third**
12 **party pricing sources."**
13   **What third party pricing sources**
14 **specifically are you referring to?**
15   A.   We have them listed in the latter
16  stages, FactSet, Cap IQ, Interactive Data and
17  Bloomberg, I believe, two different Bloomberg
18  values.
19  **Q.   Did those third party pricing sources**
20 **present actual trade prices or indicative**
21 **levels?**
22     MR. TAMBE: Object to form.
23   A.   I'm not sure if they gave actual trade
24  or indicative levels.  My understanding would be

Page 53

M. Slattery

1  that they gave prices that were consistent with
2  market expectations at the time.  Interpretation
3  and definition of those prices, I guess, would
4  be subject to debate.
5  **Q.   Did you do any analysis to determine**
6  **whether there were reliability issues with the**
7  **prices reported by these services in volatile**
8  **markets for complex assets?**
9      MR. TAMBE: Objection to the form of
10   the question.
11   A.   Could you repeat that question?
12  **Q.   Sure.  Did you do any analysis to**
13 **determine whether there are reliability issues**
14 **with the prices reported by these services in**
15 **volatile markets for more complex assets?**
16   A.   For all --
17     MR. TAMBE: Objection to form.
18     Object to form.  Sorry.
19   A.   For all the third party pricing
20  sources including BoNY?
21  **Q.   For any of the third party pricing**
22 **services that you relied on.**
23   A.   I did not.
24  **Q.   If your experience showed such**

Page 54

```
1            M. Slattery
2  reliability issues, is that something you would
3  have wanted to consider?
4         MR. TAMBE:  Objection to form.
5      A.   If you're asking me if there are
6  reliability issues with any source of valuation,
7  be it within the context of this or any other,
8  probably are reasons to evaluate further, yes.
9      Q.   So if you had an analysis that showed
10 there were reliability issues with any of the
11 pricing sources that you used, that would be an
12 appropriate thing to consider in arriving at the
13 valuations; is that correct?
14        MR. TAMBE:  Objection to form.
15     A.   I'm not sure that I necessarily have a
16 reliability issue or issues with the reliability
17 of the sources that we did use.
18     Q.   I understand you're not sure one way
19 or the other whether that's the case, but I'm
20 saying if you assume that there -- that you had
21 experience showing there were reliability issues
22 in volatile markets with these sources, is that
23 something that would be appropriate to consider
24 when analyzing the valuation of these assets?
25     A.   The pursuit should be the valuation,
```

Page 55

```
1            M. Slattery
2  the best valuation or the best value that you
3  can assign.  Therefore, if you had grounds for
4  reliability or concerns, the assumption would
5  probably have merit.
6      Q.   Looking at the first -- sorry, the
7  second sentence of paragraph 5, you state that,
8  "My independently calculated values are based on
9  a robust valuation framework, state of the art
10 models and data libraries customarily used by
11 market participants, including Barclays itself."
12        Do you see that?
13     A.   Yes, sir.
14     Q.   Which models specifically are you
15 referring to in that sentence?
16     A.   The data libraries.
17     Q.   No, the models.
18     A.   No, I'm referring to the data
19 libraries.
20     Q.   I see.  Which data libraries
21 specifically are you referring to?
22     A.   Intex would be a deal library that I
23 believe is commonly used throughout the market
24 both by street firms such as Barclays as well as
25 people like myself.  It's possible that the
```

Page 56

```
1            M. Slattery
2  state of the art models in some form are also
3  being used by entities such as Barclays.
4      Q.   On what date did you set up the
5  portfolio on your system?
6      A.   What date?
7      Q.   On what date or dates did you do your
8  modeling activity?
9         MR. TAMBE:  Objection to the form of
10     the question.
11     A.   I don't know the exact date, but
12 you're not -- you're not referring to the "as
13 of" date of the valuation or the analytical
14 date, you're talking about the specific date
15 during the course of the 12 weeks when we --
16     Q.   Yes, sir.
17     A.   It varied because we created segments
18 along the way, so I don't have a specific date.
19 It was a series of dates.
20     Q.   Those series of dates obviously were
21 in 2010, is that fair?
22     A.   Yes.
23     Q.   Do you know if the models that you
24 relied on or the data libraries that you relied
25 on are the same as they would have been if you
```

Page 57

```
1            M. Slattery
2  had pulled them up on or around September 19,
3  2008?
4      A.   We took extreme diligence as it
5  relates to creating a framework that would have
6  been in place as of September 2008.  In other
7  words, Intex, as an example, you can pass the
8  "as of" date to that tool and obtain information
9  that was only available as of that date as
10 opposed to going forward and benefiting from a
11 prospective look or based on actual performance.
12        So you can create a framework, which
13 is what we did, which is reflective of all the
14 attributes of the environment, analytically
15 speaking, as of September 2008.
16     Q.   And by that do you mean that you
17 simply don't look at any data following the date
18 for which you set as your valuation date?
19        MR. TAMBE:  Objection to the form of
20     the question.
21     A.   I'm not sure what you mean by "you
22 don't look at any data."
23     Q.   For example, do you know if the
24 prepayment assumptions in those models for the
25 period of time -- strike that.
```

M. Slattery

1
2     **Do you know if the prepayment**
3  **assumptions in the models that you looked for**
4  **the periods of time that you looked at were the**
5  **same then as they would have been closer to**
6  **September 22?**
7         MR. TAMBE: Objection to form.
8     A.   Same then versus -- you mean September
9  19 versus September 22?
10    **Q.   No.  No.  Let me do it a little**
11 **differently.**
12        **Do you know whether Intex, for**
13 **example, updates its historical prepayment**
14 **assumptions retrospectively?**
15    A.   Well, Intex doesn't necessarily update
16 its prepayment assumptions.  So Intex is not the
17 prepayment tool that we used.
18    **Q.   What was the prepayment tool that you**
19 **used?**
20    A.   The Andrew Davidson & Company model,
21 known as AdCo.
22    **Q.   Do you know if the AdCo database**
23 **updates its prepayment assumptions**
24 **retrospectively?**
25    A.   I believe that they -- the models such

M. Slattery

1
2  as AdCo are subject to constant evolution.
3  However, again, we made a painstaking effort to
4  only use the version of the AdCo model that was
5  available to market participants as of September
6  2008.
7         In other words, we integrated a
8  valuation framework as if it was September 19 on
9  that Friday, 2008, we did not benefit or
10 influence the results by blindly integrating the
11 current AdCo model, if that's the question.
12        If AdCo, as a tool, as its competitors
13 and contemporaries, they are again subject to
14 constant evolutions.  So you probably would see
15 a different prepayment model offered by Andrew
16 Davidson for an individual that was looking to
17 put together a valuation framework as of April
18 2010.
19    **Q.   That's not quite what I was asking,**
20 **though.**
21    A.   Okay.
22    **Q.   Whatever the model is, there's a set**
23 **of prepayment assumptions that feed into it; is**
24 **that correct?**
25    A.   Yes.

M. Slattery

1
2     **Q.   And so my question is, did you do**
3  **anything to assure that the prepayment**
4  **assumptions which fed into the model that you**
5  **were using were the same set of prepayment**
6  **assumptions for the valuation date you were**
7  **looking at as would have been in the system**
8  **closer to that valuation date?**
9         MR. TAMBE: Objection to form and
10 asked and answered.
11        You can answer.
12    A.   Yes, I apologize if I wasn't
13 articulating my answer.  But we put together a
14 framework, including the AdCo component, as if
15 it was September 19, 2008.  So we used the
16 version of that prepayment model that was
17 available as of September 2008.  We definitively
18 chose not to use the current AdCo version.
19    **Q.   And so is it your understanding that**
20 **it's possible today to get, for example,**
21 **precisely the same prepayment assumptions that**
22 **were in the AdCo model on 9/19/08?**
23    A.   Based on my understanding of the --
24        MR. TAMBE: Objection.
25    A.   -- again, the way in which we designed

M. Slattery

1
2  the analytical configuration -- and people,
3  market practitioners like myself, we have to do
4  this all the time, we have to value things after
5  the fact.  This just so happened that it was a
6  15- or 16-month date in the past.  But again, we
7  made a conscious decision to make sure that the
8  framework in totality reflected only the
9  analytics and the embedded assumptions that
10 would be available to participants as of
11 September 2008.
12    **Q.   And how did you go about ensuring that**
13 **all of the model inputs were precisely those**
14 **that would have been available to the**
15 **participants in September of 2008?**
16    A.   Because I've done this a number of
17 times before in my professional life.  We made
18 sure that the vendors that supplied key inputs,
19 specifically, AdCo, provided us with the
20 prevailing prepayment model as if it was
21 September 2008 as opposed to just accepting
22 software that would be provided to a new user as
23 of April or January 2010 or whenever those "as
24 of" dates were that I integrated or started to
25 value the portfolio.

M. Slattery

1  **Q.  Is it your understanding that they**
2  **archived the entire set of assumptions as they**
3  **stood on any particular day?**
4  A.  Again, they don't archive specific
5  dates.  What they do is they archive software,
6  code, if you will, and usually that code holds
7  up for a period of time.  And then at some
8  point, based on advancements in the marketplace
9  and additional empirical observations and latest
10  and greatest techniques, statistically, let's
11  say, they might come out and present the market
12  with a new, enhanced, polished version.
13       So we put in place the version that
14  was available to market participants as of
15  September 2008.  We chose specifically not to
16  take the more current version.  Because there
17  are different versions of AdCo.  Now, whether
18  they archived their program since inception, I
19  don't know.  I would assume they have it
20  somewhere, but that's outside our scope.
21  **Q.  Okay.  And I understand that you were**
22  **asking them to give you a historical version of**
23  **the models.  What I'm trying to determine is**
24  **whether the inputs that fed into the models were**

M. Slattery

1  **as they stood on the valuation date or reflected**
2  **corrections and updated data as they -- that may**
3  **have been entered into them at some subsequent**
4  **point?**
5       MR. TAMBE:  Objection to the form of
6  the question.
7  A.  I can't specifically answer what each
8  one of the software vendors do with respect to
9  their software.  If they make a representation
10  in the marketplace that this is the package that
11  was available as of that date, but yet we stand
12  here 15 months in the future, if they have
13  integrated enhancements or upgrades because of
14  bug fixes, I don't know of the exact history of
15  the softwares.  But again...
16  **Q.  Yes, and just so I'm clear, I'm not --**
17  **I understand that they are continually upgrading**
18  **the models themselves.  My point is that -- the**
19  **data that feeds into those models.**
20  A.  Uh-huh.
21  **Q.  And that's what I want to focus on.**
22  A.  Okay.
23  **Q.  What did you do to ensure that the**
24  **data that fed into those models, the inputs, had**

M. Slattery

1  **not been corrected or changed since September of**
2  **2008?**
3       MR. TAMBE:  Objection to the form of
4  the question.
5  A.  Again, for example, if you want to get
6  into some detail with respect to AdCo and the
7  integration within a software application that
8  we used for the rate engine, in the valuation
9  engine, you integrate AdCo, you pass to the
10  Andrew Davidson & Company model an analytical
11  "as of" date which is supplied through the rate
12  engine.
13       Internal to that interface or that
14  application program interface is the exchange of
15  date and then, correspondingly, information
16  that's only relevant as of that date.  So I
17  relied on the software, and I don't have -- I do
18  not possess intimate knowledge if Andrew
19  Davidson or Intex went back and revised and
20  updated information after the fact.
21       We specifically asked for and put in
22  place the market inputs that were only available
23  as of September 19, 2008.  The expectation was
24  that we were driving valuations as of that date

M. Slattery

1  in totality, so ...
2  **Q.  And why did you undertake that effort,**
3  **to try and ensure that that was the case?**
4  A.  I wanted to derive a value that was as
5  of September 19, 2008.  So it's important to
6  include what the market would have had available
7  to it in terms of a tool kit and a tool set.
8  It's disingenuous to value things with an
9  upgraded model, let's say.
10  **Q.  Last sentence, paragraph 5, you state**
11  **that you assigned unbiased prices.  Do you see**
12  **that?**
13  A.  Yes.
14  **Q.  What do you mean by "unbiased" in that**
15  **context?**
16  A.  We had no particular designs on or
17  emphasis of a particular set of third party
18  pricing suppliers.  To the best of our
19  knowledge, the best of my knowledge, they were
20  collected in a completely unbiased and
21  unemphatic way to create an independent and
22  autonomous value set.
23  **Q.  Are you making any contention in this**
24  **case that the people who performed valuations**

M. Slattery

1  for Barclays shaded their valuations in any way
2  out of bias?
3
4      A.   No, I don't have an opinion about that
5  particular aspect, no.
6      Q.   First sentence of paragraph 6, you
7  state that, "Barclays' estimated values were
8  based on arbitrary and indefensible discounts
9  taken by Barclays."  Do you see that?
10     A.   Yes.
11     Q.   What do you mean by "arbitrary"?
12     A.   Repeated attempts throughout the
13  process, as far as I know, we asked for
14  indications or support for varying liquidity
15  discounts or liquidity discounts across a broad
16  spectrum of securities that were part and parcel
17  of my report.  To the best of my knowledge, I
18  have yet to receive anything that supports, say,
19  for example, a 5 percent blanket discount on
20  Treasury and agency securities.  I don't know.
21  Methodology-wise, it's probable that there is
22  information available.  I just have not seen it.
23     Q.   When you say a "5 percent blanket
24  discount on Treasury and agency securities," is
25  it your understanding that Barclays applied a 5

M. Slattery

1
2  percent liquidity discount to all the Treasury
3  and agency securities it valued?
4          MR. TAMBE:  Objection to form.
5      A.   Based on my review, based on ones that
6  I specifically looked at, it appears as though
7  the liquidity discount on the agency securities,
8  specifically, the 5 percent, is the number that
9  we saw being used throughout.
10     Q.   What about the Treasury securities?
11     A.   The Treasuries I'd have to go back and
12  check exactly what the number was.
13     Q.   Footnote 3, you state "in the case of
14  40 securities," you see that?
15     A.   Yes, sir.
16     Q.   What 40 securities are you talking
17  about?
18     A.   What we did in terms of identifying
19  the securities that would be subject to detailed
20  ground-up valuation efforts, we established a
21  million-dollar threshold.  The million-dollar
22  threshold represented the difference between the
23  Barclays liquidity adjusted value and the BoNY
24  value.  It was a straightforward A-minus-B
25  exercise.

M. Slattery

1
2      These 40 securities that are
3  referenced here fell into that threshold or they
4  exceeded the million-dollar threshold.  However,
5  to the best of my knowledge, we were unable to
6  accumulate meaningful information to derive a
7  ground-up valuation for each one.
8      An example -- off the top of my head,
9  I don't know the 40 securities.  I can give you
10  an example of one.  I believe it's a Tanzanite
11  Series 2005 Class 2 security.  We have a CUSIP,
12  we have the identifier, but beyond that, I could
13  not secure information that was meaningful for a
14  ground-up valuation.
15     Q.   And if I wanted to see a list of those
16  40 securities that you're talking about here,
17  where would I go in your work papers to look for
18  it?
19     A.   They are part of the third party
20  pricing.  I don't know if I have specifically
21  earmarked them or not.
22     Q.   When you say a third party pricing,
23  you're talking about the bucket of 6,000-plus --
24     A.   Yes.
25     Q.   -- securities?

M. Slattery

1
2      And then you say "where Barclays
3  failed to provide information related to
4  particular securities," you see that?
5      A.   Yes.
6      Q.   What information specifically are you
7  referring to?
8      A.   Again, the example would be or the
9  answer would relate to meaningful information
10  for which we can actually calculate cash flows,
11  apply discount rates to do a true valuation from
12  the ground-up.
13     So, again, in terms of the Tanzanite
14  Bond, and I may be mispronouncing that word, but
15  I just could not obtain specific information as
16  it related to the dynamics or the cash flow
17  rules or anything related to that security.
18     Q.   So, for that reason, you put it in the
19  general bucket of 6,000 or so that you valued
20  using third party pricing?
21     A.   Yes.
22     Q.   Going back up a moment to this line
23  about unbiased prices, when you say you assigned
24  unbiased prices, you did that only with respect
25  to the population that you identified based on

**M. Slattery**
1
2 this million-dollar variance from the BoNY
3 numbers; is that correct?
4        MR. TAMBE:  Objection to the form of
5    the question.
6    A.   Please repeat that one.  I didn't
7 think it's --
8    Q.   I just want to be clear.  When you say
9 that for securities that were -- strike that.
10 Strike that.
11       Turning to page 6 of your report,
12 specifically, Section A, where you looked at 125
13 U.S. Treasury and agency debt securities?
14    A.   Yes.
15    Q.   Is there a list in your production of
16 the 125 specific securities that you revalued?
17    A.   Yes.
18       (Exhibit 712B, an excerpt from
19    LEHMAN-NAVIGANT 026180, marked for
20    identification, as of this date.)
21    Q.   Showing you what has been marked as
22 Exhibit 712B.  Is this document that list?
23       MR. TAMBE:  I have the same objection
24    with respect to printouts from spreadsheets.
25    Object to the form of the question.

1        M. Slattery
2    And if you could identify the file
3 that it comes from, that would be really
4 helpful.  There's no identifier on this
5 document.
6        MR. SHAW:  Yes.  It is LEHMAN-NAVIGANT
7 026180.
8        MR. TAMBE:  And is it the entire
9 spreadsheet?  Do you know?
10       THE WITNESS:  It doesn't seem like
11 it's the entire spreadsheet.
12       MR. SHAW:  It is all the tabs on the
13 entire spreadsheet is what I'm told.
14       THE WITNESS:  But in terms of the
15 print, it looks like the print range was not
16 in the total --
17       MR. SHAW:  It's all the tabs but not
18 all the rows.
19 BY MR. SHAW:
20    Q.   Do you understand that document to be
21 your list of 125 assets?
22    A.   Let me -- it's cut off, but --
23    Q.   Right.  I understand that it's not a
24 complete list.
25    A.   Right.  This is a segment of that 125.

1        M. Slattery
2        MR. TAMBE:  Just to be clear, because
3    it's not clear to me, is it the first page
4    of that?  I don't know if there's different
5    things on different pages.
6        MR. SHAW:  It's each of the tabs in
7    the spreadsheet.
8        MR. TAMBE:  Yes.
9        MR. SHAW:  But not the full tab of the
10   spreadsheet because it got long without any
11   purpose.
12       MR. TAMBE:  Okay.  The only reason I
13   ask is because you're asking about 125
14   entries.
15       MR. SHAW:  This doesn't have that.
16       MR. TAMBE:  This doesn't have that.
17       MR. SHAW:  It is a subset of the
18   printout.
19       MR. TAMBE:  Okay.
20       MR. SHAW:  Yes.
21    Q.   Looking at the first page, sir, can
22 you go across the columns and tell me what each
23 column represents?
24    A.   "CUSIP" would be the security
25 identifier, so I believe the acronym is

1        M. Slattery
2 Committee for Uniform Security Identifications
3 Procedures.  The "Mid," the next column, would
4 represent the mid value prior --
5    Q.   That's the mid value that you
6 calculated?
7    A.   Yes, sir.
8    Q.   Okay.
9    A.   -- prior to a liquidity factor, which
10 is the next column.  The "Bid" corresponds to a
11 mid times liquidity factor calculation.  The
12 "Priced/Spread Mapped" column represents for
13 those instruments or securities where we had
14 observed prices, we indicate priced, and you see
15 a couple examples.  Because this was cut off,
16 the actual Treasury securities, which I know
17 have a different CUSIP than the ones represented
18 here, would be predominantly priced as opposed
19 to spread mapped.
20       And then the spread to the U.S.
21 Treasury is indicated.  That spread is defined
22 in terms of basis points.  So, for example, if
23 the underlying rate was somewhere in the 4
24 percent level.  The 180 in the first row would
25 represent a 180-basis-point premium to that 4

Page 74

1          M. Slattery
2  percent rate, just as an example.
3          And then the "Underlying Curve," we
4  obtained the appropriate market inputs from
5  Bloomberg.  This is, again, maybe dovetails back
6  to the previous discussion about "as of" So we
7  took the information from Bloomberg as of the
8  end of business on the 19th, 2008, and the model
9  we ran these through was Polypaths.
10     Q.   Tell me what the source of your mid
11  prices were.
12     A.   It depends on whether, again, it was
13  priced or spread.
14     Q.   Okay.  So tell me what the source of a
15  spread mid price would be.
16     A.   We calculated spreads based on those
17  instruments that we had prices for and we
18  allocated indicative spread levels to the rest
19  of the universe.  On a mid-value-to-mid-value
20  basis across the entire 125, as I indicate in
21  page 6 of my report, paragraph 17, that there
22  was minimal value differences between the
23  Barclays value, assuming the use of the word
24  "mid" is relevant, versus our mid value
25  calculation.  So...

Page 75

1          M. Slattery
2     Q.   So what you're saying, if I understand
3  you correctly, is that the majority of the
4  difference between your valuation and Barclays'
5  valuation of these securities comes in in the
6  liquidity discount?
7     A.   Yes, sir.
8     Q.   And what was the source of the
9  liquidity factor that you applied to each of
10  these securities?
11     A.   This goes back to the early morning
12  discussion with respect to the derivation of the
13  liquidity factor.  We used the Fabozzi
14  information as a basis to identify the multiple
15  for a distressed market, and then we used
16  information from '92 to 2002 to identify an
17  off-the-run Treasury series and then multiplied
18  the normal bid-ask spread levels times the
19  stress percentage or multiple or factor to
20  identify a liquidity factor that is a
21  maturity-specific liquidity factor.
22          So we took attempts to introduce a
23  methodology that would give us a range of
24  liquidity factors and used maturity as the key
25  driver for that.

Page 76

1          M. Slattery
2     Q.   How would you go about determining
3  what the appropriate liquidity factor was for a
4  Treasury security?
5          MR. TAMBE:  Objection to form.  Asked
6  and answered.
7     Q.   As distinct from an agency?
8          MR. TAMBE:  Same objections.
9     A.   We would look at historical
10  information.
11     Q.   When you say "spread mapped," can you
12  define that for me, please?
13     A.   The value in the "Spread/UST" field
14  again would be an adjustment.  In this case,
15  since they're all positive, they would be an
16  increase to the underlying discount rate.  Since
17  this is expressed in basis points, it would be,
18  for the first row, it would be 180 basis points
19  increase on the discount rate.
20          And again, based on the allocation of
21  these spreads for those instruments that were
22  spread mapped, the mid values almost across
23  the -- literally across the entire 125
24  securities set matched up to the Barclays values
25  with minimal difference.

Page 77

1          M. Slattery
2     Q.   So if I wanted to determine which of
3  the 125 securities were valued or revalued based
4  on identifiable prices for that security, I
5  would look for the ones in the column
6  "Price/Spread Mapped" that reads "priced"?
7     A.   Yes.
8     Q.   And the rest were valued based on
9  comparables; is that correct?
10     A.   Yes.
11     Q.   And how did you select and ensure the
12  appropriateness of the comparables you selected?
13     A.   For those that we actually had prices
14  for, we leveraged that information.  So we made
15  sure that we attempted to identify the same
16  agency and, to a lesser extent in this universe,
17  maturity consistency.  So, in other words, we
18  didn't want to match up a ten-year debenture
19  with a thirty-year debenture or vice-versa.
20          But to reiterate again, the spreads
21  that are here for the mid value determination
22  match up to the Barclays values.
23     Q.   Did you consider the BoNY prices for
24  any of these 125 securities that you revalued?
25     A.   No, I did not.

Page 78

M. Slattery

1
2       **Q.    Why not?**
3       A.    I had enough information available to
4    me.  These instruments were part of the security
5    set that exceeded the million-dollar threshold,
6    so they allowed me to derive from a ground floor
7    level a ground-up valuation and assign a value.
8       **Q.    What was the distribution of
9    on-the-run versus off-the-run securities in the
10   portfolio of agency and Treasury securities that
11   Barclays acquired?**
12      A.    I don't know that answer.
13      **Q.    Which -- so how, then, did you know
14   which factor to apply of the bid-ask spreads
15   from the Fabozzi data to any given security if
16   you didn't know if it was on-the-run or
17   off-the-run?**
18      A.    The Fabozzi data represented the
19   multiples to the normal bid continuum.  So
20   Fabozzi provided us with a factor estimate of
21   the distance or the movement from a normal to a
22   distressed market.
23         We used a combination of the
24   off-the-run and corporates for the U.S. agency
25   liquidity factor determination.  The reason we

Page 79

M. Slattery

1
2    did so is because we felt that the U.S. agency
3    market was more in line with an off-the-run
4    Treasury or maybe even more conservatively so a
5    corporate market than a true on-the-run
6    security, on-the-run Treasury security.
7         So we tried to introduce a very
8    conservative adjustment on a maturity-specific
9    basis for the normal bid levels to derive the
10   distressed bid-ask spread levels.
11      **Q.    Now, as I understand it, you tested
12   the yields on individual securities among the
13   125 that you identified.  Did you analyze the
14   yield on the entire portfolio of Treasury and
15   agency securities that Barclays acquired?**
16      A.    In what sense?
17      **Q.    In any sense.**
18      A.    We calculated the yields in the
19   function of the pricing exercise and compared
20   those to the information that we had available
21   to us as far as the yield levels in the
22   marketplace during that period.  So on a
23   mid-to-mid basis the yields were very
24   consistent.
25         After adjusting or, let's say, for

Page 80

M. Slattery

1
2    example, using the 5 percent liquidity factor,
3    the Barclays yields on the U.S. agency debt
4    securities were significantly higher than the
5    marketplace yields for that period.
6       **Q.    Is that across the entire population
7    of securities that Barclays acquired or is that
8    across the population of 125 that you looked at?**
9       A.    Well, the 125, again, include
10   Treasuries and agencies.
11      **Q.    Right.**
12      A.    So the Treasuries, we'll put that to
13   the side.
14      **Q.    Yes.**
15      A.    The U.S. agency debt securities, it
16   was -- the yield levels that were calculated
17   based on my introduction of the 5 percent
18   adjustment to take the mid down to a bid, again,
19   using a factor of point -- or, 95 as opposed to
20   .98, the yields that were then generated were
21   significantly higher than what the marketplace
22   was expecting.
23         So, in other words, using the 5
24   percent liquidity adjustment, I was able to
25   generate yields that were significantly higher

Page 81

M. Slattery

1
2    than the marketplace.
3       **Q.    And my question, though, is did you
4    calculate the yields on only the agency
5    Treasuries or, sorry, the agency securities
6    within the population of the 125 that you looked
7    at specifically or did you calculate the yields
8    across the entire population of agency
9    securities that Barclays acquired?**
10      A.    I see.
11         Just the population that I examined in
12   detail.
13      **Q.    Did you find any -- any agency
14   securities within the population you examined
15   where the yields were less than you would have
16   expected to see based on your analysis, the
17   yields, the yields given by Barclays'
18   calculations?**
19      A.    Did I see, just to rephrase it -- let
20   me make sure -- did I see any yields that were
21   implied by the 5 percent adjustment, the
22   integration of the 5 percent adjustment that
23   were below the market returns at that time?
24      **Q.    Yes.**
25      A.    I don't know exactly if I -- I did not

Page 82

M. Slattery

1  go individually row-by-row-by-row, but across a
2  check, to the extent that I did, especially on
3  the money market instruments, the yields were
4  significantly higher, money market being those
5  that have maturities within one year.
6      **Q.   And what about those that have longer**
7  **maturities, did you check those?**
8      A.   I did run the analysis.  I can't
9  recall exactly what those yields looked like at
10  this point.
11     **Q.   When you say you ran the analysis, is**
12  **that something that would be reflected in your**
13  **work papers?**
14     A.   I don't -- it was not part of the work
15  papers that were provided, and I don't know if I
16  captured that, if I memorialized that.
17     **Q.   In the population of 125 securities**
18  **that you actually looked at specifically, what**
19  **was the breakdown of time and maturity?**
20     A.   I don't recall exactly what that
21  breakdown was at this point.  I would have to
22  look at my work to make that determination.
23     **Q.   What yields did you -- strike that.**
24  **Did you examine any agency securities that had**

Page 83

M. Slattery

1  **maturities in the range of 30 to 50 years?**
2      A.   Again, I'd have to look at my work to
3  exactly identify the terms of the maturity on
4  the securities.
5      **Q.   Where would you go to look, where in**
6  **your work papers would you go to look for that?**
7      A.   Spreadsheets.
8      **Q.   Would that appear on Exhibit 712B?**
9  **Would I be able to derive that by looking at**
10  **Exhibit 712B?**
11     A.   No.  However, if we took a CUSIP and
12  ran it through Bloomberg, we would be able to
13  quickly identify the maturity.
14     **Q.   If we could go to page 3 of --**
15     A.   Are these -- sorry.
16     **Q.   Let's strike that.  We'll come back to**
17  **this exhibit later, but for now we'll ...**
18     A.   Okay.
19     **Q.   And your understanding is that**
20  **Barclays used a 5 percent liquidity discount**
21  **across the population of agencies; is that**
22  **correct?**
23     A.   Based on my understanding of 86B, yes.
24     **Q.   What do you mean by "86B"?**

Page 84

M. Slattery

1      A.   I believe that's a spreadsheet that we
2  used as an initial basis for the CUSIP universe.
3      **Q.   Are you able to tell me your table**
4  **of materials relied upon which document you're**
5  **referring to as 86B?**
6      A.   I think it's under the deposition
7  exhibits.  It's an exhibit that's indicated in
8  the first --
9      **Q.   Initial Inventory of Schedule A and B**
10  **Assets?**
11     A.   I believe that's the spreadsheet, yes.
12     **Q.   And as you sit here today, are you**
13  **able to tell me what liquidity factor or**
14  **liquidity discount Barclays applied to the**
15  **Treasury securities?**
16     A.   I cannot recall off the top of my
17  head.  I don't think after even the mid to bid
18  adjustment that there was a significant
19  deviation.  I think within the 125, the majority
20  of this indicated valuation difference is U.S.
21  agency debt security related.
22     **Q.   Of the 632 Treasury or agency**
23  **securities that Barclays acquired of which your**
24  **125 are a subset, are you aware of any instances**

Page 85

M. Slattery

1  **where pricing data was not available to that**
2  **security?**
3      MR. TAMBE:  Objection to the form of
4  the question.
5      A.   What do you mean by "pricing data"?
6      **Q.   Data that you would require to**
7  **calculate specific bid-ask spreads for that**
8  **security?**
9      MR. TAMBE:  Objection to the form of
10  the question.
11     A.   Yeah, I apologize, I -- what exactly
12  is the information that you seek?
13     We had information that allowed us to
14  value these 125.  These 125 represented those
15  instruments based on the delta threshold or the
16  difference between Barclays' liquidity
17  adjustment and BoNY's custodial values that
18  created their -- you know, identified them, if
19  you will.
20     **Q.   Why did you use comparables when**
21  **constructing your bids?**
22     A.   For the mids?
23     **Q.   Yes.**
24     MR. TAMBE:  Objection.  Asked and

Page 86

1     M. Slattery
2     answered.
3        Q.  I'm sorry.  The bid-offer spreads, why
4     did you use comparables when constructing your
5     bid-offer spreads?
6        A.   We used the information that we've
7     discussed with respect to the bid-offer spreads.
8        Q.   And when you say "the information
9     we've discussed," you're referring to Exhibit --
10       A.   710B.
11       Q.   Paragraph 25 of your report, sir, you
12    state that "U.S. Treasury securities are, in
13    fact, the most liquid instruments in the capital
14    markets universe, and typically trade at prices
15    where the difference between the bid and the
16    offer are as small as 0 to .03 percent."  Do you
17    see that?
18       A.   Yes.
19       Q.   Was September of 2008 a typical
20    market?
21          MR. TAMBE:  Objection to the form of
22    the question.
23       A.   Relative to other markets, it was
24    unique, but it was --
25       Q.   In what way was it unique relative to

Page 87

1        **M. Slattery**
2     other markets?
3        A.   The events that were happening to
4     firms such as Lehman during that period.
5        Q.   And apart from looking at the five
6     securities we discussed earlier today, did you
7     do anything to see what bid-offer spreads were
8     during this time for Treasuries?
9        A.   For Treasuries, again, we identified
10    information that we gleaned from different
11    sources to identify what the bid-ask or what the
12    spread dimensions were for Treasuries at that
13    time, yes.
14       Q.   And that was The Wall Street Journal
15    data you referred to earlier?
16       A.   Right.
17       Q.   And what specifically Wall Street
18    Journal data were you referring to?
19       A.   Price information, bid-ask price
20    information.
21       Q.   On these particular securities or on
22    other securities?
23       A.   On -- I think there was a couple that
24    were part of the 125, again, probably on that
25    second page because of the cut-off, and as well

Page 88

1        M. Slattery
2     as other Treasury securities.
3        Q.   How did you select the other Treasury
4     securities that you looked at?
5        A.   They were just part of the dataset
6     that was obtained from The Wall Street Journal.
7     There was no particular reason one way or the
8     other.
9        Q.   Do you know whether spreads in
10    Treasury securities were widening throughout
11    September of 2008?
12          MR. TAMBE:  Object to the form.
13       A.   I don't know exactly at a particular
14    point.  You know, we would have to go
15    day-by-day.  I would have to examine it
16    day-by-day.
17       Q.   What about agency securities, what
18    were spreads doing throughout the month of
19    September 2008 on those?
20          MR. TAMBE:  Objection to form.
21       A.   I cannot sit here today and give you
22    exactly day-by-day description over that period.
23    I do recall that there was movement obviously
24    throughout the period that we reviewed in great
25    detail, i.e., that between August of 2008 and

Page 89

1        M. Slattery
2     October 2008, there was movement, but there was
3     never a spike that created an abnormal market to
4     the extent that the yields went through some
5     arbitrary roof, if you will.
6        Q.   Were agency securities during this --
7     what was happening with the trade volume of
8     agency securities during September of 2008?
9        A.   In terms of outstandings, they were in
10    trillions as far as debt outstanding.  In terms
11    of the trading activity, I believe on a daily
12    trading volume basis across the entire year of
13    2008, it was in the hundreds of billions a day.
14    I don't know specifically exactly what was
15    transpiring during that particular window, but
16    the outstandings held up, as did the daily
17    trading volume throughout the year.
18       Q.   Paragraph 26, first sentence,
19    referring to your report, you state that -- or,
20    I should say second sentence, "For U.S. Agency
21    securities with no available market quotes," and
22    those would be the ones that are listed as or
23    identified as spread mapped rather than priced?
24       A.   Yes.
25       Q.   On Exhibit 712B?

**M. Slattery**

1
2    A.   Yes.
3    **Q.   Did you collect available market**
4    **quotations for other U.S. agency securities?**
5    A.   Others?
6    **Q.   Other than the ones with no available**
7    **market quotes or the ones that -- outside of the**
8    **125 that you revalued?**
9    A.   There was information available like
10   that, yes.  So, in other words, securities,
11   agency debt securities with price information
12   that did not match up in terms of the individual
13   CUSIPs listed here, yes.
14   **Q.   And at the -- in the last sentence of**
15   **that paragraph, when you talk about comparable**
16   **agency securities, the criteria by which you**
17   **measured comparability were what?**
18   A.   Was the --
19        MR. TAMBE:  Objection.  Asked and
20   answered.
21        You can answer.
22   **Q.   You can answer.**
23   A.   Was the entity.  So matched up Freddie
24   Mac debentures to Freddie Mac debentures, and
25   tried to take strides in terms of maturity as

M. Slattery

1
2    well so that we didn't inadvertently assign a
3    spread for a ten-year instrument and assign and
4    map that to a thirty-year instrument.
5    **Q.   In selecting your comparables, did you**
6    **consider whether the particular security was**
7    **on-the-run or off-the-run?**
8    A.   No, I did not.
9    **Q.   Why not?**
10   A.   For on-the-run versus off-the-run for
11   agency or freshly minted or, I mean, what is the
12   criteria that you're alluding to, just for
13   clarification sake?
14   **Q.   For the agencies.**
15   A.   Why I did not?
16   **Q.   Yes.**
17   A.   That's not the way I created or that's
18   not the framework that I followed.
19   **Q.   Did you, in the course of valuing**
20   **these securities, discount cash flows?**
21   A.   Yes.
22   **Q.   And what assumptions did you use in**
23   **discounting the cash flows?**
24   A.   There were no assumptions.
25   **Q.   What inputs did you use?**

**M. Slattery**

1
2    A.   The security description such that you
3    would glean from that state of maturity, coupon,
4    where appropriate, pay frequency.  So those are
5    all spelled out based on the issuance, and then
6    the other input would be the underlying curves
7    that were used for valuation.  So a Treasury as
8    of the 19th and the LIBOR rates as of the 19th.
9    **Q.   What time horizons did you use for**
10   **purposes of discounting the cash flows?**
11   A.   Time horizons?
12   **Q.   Yes.**
13   A.   Can you clarify that, please?
14   **Q.   The yield curve you used, was that for**
15   **9/19/2008 only, or did you look at other yield**
16   **curves?**
17        MR. TAMBE:  Objection to the form of
18   the question.
19   A.   For purposes of the report, 9/19/2008.
20   **Q.   What discount rate did you use in**
21   **conducting your discounted cash flow analysis?**
22   A.   The discount rate that falls out is a
23   series of rates based on the bootstrapping and
24   the underlying curve, which is a function of the
25   model.  So it's an array of rates that I don't

M. Slattery

1
2    have the ability to articulate and recap at this
3    point.
4    **Q.   Did you produce or did you record the**
5    **bootstrapped data such that if I wanted to**
6    **determine what you used, I could go and look at**
7    **some portion of your work papers?**
8    A.   No.  That is encapsulated in the
9    software program.  I did not choose to extract
10   that or examine that.
11   **Q.   And which particular software program**
12   **are we talking about?**
13   A.   Polypaths.
14   **Q.   Is Polypaths a multiple models or**
15   **databases available?**
16   A.   Multiple versions of the software?
17   **Q.   No.  Where in Polypaths would I go to**
18   **look to find that information?**
19   A.   It might be a rates extract field or
20   utility.  I didn't examine it.
21        MR. SHAW:  Why don't we go off and
22   have him change his tape.
23        THE VIDEOGRAPHER:  This concludes tape
24   number 1 of the videotaped deposition of
25   Mark Slattery.  The time is 11:37 A.M.  We

1          M. Slattery
2     are now off the record.
3          (Recess.)
4          THE VIDEOGRAPHER:  This begins tape
5     number 2 of the videotaped deposition of
6     Mark Slattery.  The time is 11:46 A.M.  We
7     are now on the record.
8          (Exhibit 713B, excerpt from
9     LEH-NAVIGANT 026162, marked for
10    identification, as of this date.)
11    BY MR. SHAW:
12    **Q.    Showing you a document that's been**
13    **marked as Exhibit 713B, which I will represent**
14    **to you is a printout, or at least a partial**
15    **printout in that some of the rows may have been**
16    **truncated, of the document produced as**
17    **LEH-NAVIGANT 026162.**
18         **I'll ask you if you recognize what**
19    **this document is.**
20    A.    Yes.
21    **Q.    Okay.  What is it?**
22    A.    This, I believe, is the information
23    that we obtained from The Wall Street Journal
24    extract for the 19th of September.
25    **Q.    And this is The Wall Street Journal**

1          M. Slattery
2     data that you referred to earlier today in your
3     testimony?
4     A.    Yes.
5          MR. TAMBE:  Objection to the form of
6     the question.
7     **Q.    You can put that aside.**
8         **Turning to page 10 of your report,**
9     **sir, and looking at the section on Agency RMBS,**
10    **now you valued 308 distinct Agency RMBSs; isn't**
11    **that correct?**
12    A.    Yes.
13    **Q.    And were there any Agency RMBSs**
14    **included in the 6,000 or so CUSIPs in the bucket**
15    **which you used third party prices for?**
16    A.    To the best of my knowledge, yes.
17    **Q.    So you really, in a sense, valued --**
18    **well, 30 is a subset of the ones that you**
19    **valued, is that fair?**
20         MR. TAMBE:  Objection to the form of
21    the question.
22    A.    308 represent the instruments that we
23    valued from, again, the ground floor up.  There
24    are other securities that we valued through
25    third party pricing means.

1          M. Slattery
2     **Q.    And how did you select those 308?**
3     A.    This goes back to the filtering
4     process or the selection process, which was
5     simply the establishment of a million-dollar
6     threshold between the Barclays liquidity
7     adjusted values and the custodial values of
8     BoNY, so ...
9     **Q.    And so did you do a -- this is not**
10    **just related to the Agency RMBS, but across the**
11    **entire population of securities that you looked**
12    **at is it fair to say that you did a specific**
13    **from-the-ground-up valuation of each one in**
14    **which you identified a difference of a million**
15    **dollars or more between the Barclays and the**
16    **BoNY valuations?**
17         MR. TAMBE:  Objection to the form of
18    the question.
19    A.    Except for I believe the footnote 3,
20    which indicates again there is a group of
21    securities that met the million-dollar threshold
22    criteria, but because of the information or the
23    lack of information, they fell into the third
24    party pricing.
25    **Q.    Paragraph 30, I just want to make sure**

1          **M. Slattery**
2     **I understand what you're saying.  Second**
3     **sentence, you state that Barclays' methodology**
4     **for deriving an exit price for these securities**
5     **by taking a flat, across-the-board 10 percent**
6     **discount.  You see that?**
7     A.    Yes.
8     **Q.    And your understanding is that's true**
9     **with respect to all Agency RMBS that Barclays**
10    **valued?**
11    A.    I'd have to check specifically in
12    terms of each one, but from my understanding, I
13    believe 10 percent was the dominant discount
14    that was taken.
15    **Q.    What do you mean by the "dominant**
16    **discount"?**
17    A.    I'd have to double-check to make sure
18    that it was across the board, as you suggest,
19    but it was definitely applied in the 308
20    securities that we looked at in detail.
21    **Q.    Every one of them?**
22    A.    I probably should hesitate and just
23    make sure that I look at each CUSIP, but I don't
24    have that knowledge at this point or memory
25    fails me to the extent that I don't know on a

Page 98

M. Slattery

1  CUSIP-by-CUSIP basis if it was exactly 10
2  percent at each turn.
3      **Q.   In the population of 308 that you**
4  **valued, were there any agency pooled securities?**
5      A.   Agency pool, straight pools, no.  We
6  had a combination of trust IOs and POs,
7  interest-only securities and principal-only
8  securities, and then we had structured Agency
9  RMBS, and there -- there actually may have been
10  a handful of agency pools, so I'd have to
11  double-check again in my notes and look at each
12  CUSIP in terms of the definition, but there may
13  have been a handful.
14      **Q.   Go to paragraph 41 of your report, if**
15  **you would, please.  So am I correct that of the**
16  **308 securities population, there were 24 for**
17  **which you obtained actual price quotes from**
18  **multiple broker-dealers?**
19      A.   Yes.
20      **Q.   Okay.  And you valued those**
21  **differently from the 284 remaining of the 308**
22  **group?**
23      A.   Differently to the extent that the
24  determination of price on these 24 was directly

Page 99

M. Slattery

1  extracted from market information.  The other
2  remaining dataset within the 308 we used
3  information that we gleaned from a broader mix
4  of similar CUSIPs to the 24 that are indicated
5  here and applied at the end of the day the same
6  valuation techniques.
7      **Q.   So if I'm understanding this**
8  **correctly, what you're saying is that for 24 of**
9  **the 308 securities you were able to get multiple**
10  **prices and you used those to determine your --**
11  **the price preliquidity discount with respect to**
12  **those securities; is that correct?**
13      A.   Yes.
14      **Q.   And then for the other 284 in your**
15  **population of 308 you used what you determined**
16  **to be comparable securities to determine an**
17  **appropriate price preliquidity discount; is that**
18  **correct?**
19      A.   That's fair to say, yes.
20      **Q.   And how did you select the comparable**
21  **securities that you were going to look at for**
22  **purposes of valuing the 284?**
23      A.   Again, bearing in mind there may be
24  some pools in the remaining 284, but the

Page 100

M. Slattery

1  majority of those, I know that there were at
2  least 237 structured agency interest-only and
3  principal-only securities.  In other words,
4  these securities sat within the confines of a
5  structured deal such that their payment rules
6  were a function of other components of a deal,
7  as opposed to the trust interest-only and
8  principal-only securities highlighted in
9  paragraph 41.
10      What we did was we expanded the
11  universe of trust interest-only and
12  principal-only securities to where I believe we
13  had something on the order of almost 300 pairs
14  of trust interest-only and principal-only
15  securities.  We valued them and then gleaned
16  from that valuation exercise indications for a
17  determination of the value of the other
18  securities.
19      **Q.   And the reason you used comparables**
20  **for the 284 was because you could not find**
21  **prices for those securities; is that correct?**
22      MR. TAMBE:  Objection to the form of
23  the question.
24      A.   I determined prices for those 284 by

Page 101

M. Slattery

1  following the exercise that I just articulated.
2      **Q.   Right, but you couldn't find a traded**
3  **price for those securities; is that right?**
4      MR. TAMBE:  Objection to form.
5      A.   Based on my discovery, I did not find
6  a traded price for those securities.
7      **Q.   And to the extent that there were**
8  **Agency RMBS in the bucket of 6,000-plus**
9  **securities that you valued based on third party**
10  **prices, what technique did you use to value**
11  **these?**
12      A.   Within the third party pricing?
13      **Q.   That is, any Agency RMBS that were not**
14  **within the group of 308 we previously talked**
15  **about.**
16      A.   That was one of two things.  It was
17  either the average of obtained third party
18  prices, or if there was a deviation in the sense
19  that there were no third party pricing prices
20  available, or if the average of the third party
21  price was outside of two standard deviation when
22  compared to the Barclays' value and the BoNY's
23  custodial value, we would use the BoNY price and
24  then we would adjust it predominantly based on

Page 102

1              M. Slattery
2   the Barclays liquidity factor.  So it could be
3   one or the other of those two methods.
4       Q.    So of the entire population of RMBS
5   securities that you valued, either in or outside
6   the 308, what percentage were you unable to find
7   any price for?
8              MR. TAMBE:  Objection to the form of
9   the question.
10      A.    Percentage on a CUSIP basis?  On a
11  value basis?  What --
12      Q.    Let's take it both ways.  What
13  percentage on a CUSIP basis?
14      A.    I don't know.
15      Q.    What percentage on a value basis?
16      A.    I don't know.
17      Q.    And when you use comparables to derive
18  a price, did the process that you used or the
19  model that you used differ depending on whether
20  the RMBS in question was an agency pool, a
21  sequential CMO, a PO or an IO?
22      A.    I'm just going to rephrase it.  The
23  process that we followed for the 284, again,
24  acknowledging that there are probably pools in
25  that 284, the structured agency IOs and POs that

Page 103

1              M. Slattery
2   are in the 284, we followed a process where we
3   valued almost 300 trust IOs and POs, calculated
4   spreads from those 300 instruments, so actually
5   600 in total, and then we assigned those spreads
6   to the structured agency CUSIPs based on a
7   consistency for underlying collateral
8   considerations.  So we matched up the underlying
9   gross coupon and the underlying weighted average
10  maturity.  So we built a matrix.
11      Q.    And has that matrix been produced?
12      A.    Yes.
13      Q.    Do you know whether -- you're aware,
14  strike that.
15            Are you aware that in December of 2008
16  an additional population of securities was
17  transferred to Barclays pursuant to the
18  settlement?
19      A.    I believe I heard conversations as it
20  relates to transfers of such securities, but I
21  don't know any intimate details in terms of the
22  specific dataset and what they represented
23  value-wise and what they represented in terms of
24  pay types, et cetera.
25      Q.    You don't know, for example, if there

Page 104

1              M. Slattery
2   are any RMBS securities in that population?
3       A.    Again, I don't know intimate details
4   of that population.
5             (Exhibit 714B, a document produced as
6   LEH-NAVIGANT 015949, marked for
7   identification, as of this date.)
8       Q.    Showing you now what has been marked
9   as Exhibit 714B, sir.  Can you tell me what this
10  document is?
11            MR. TAMBE:  I have an objection to the
12  spreadsheet printout, a standing objection.
13            MR. SHAW:  I actually think this one
14  is a complete printout.
15            MR. TAMBE:  Okay, it's a complete
16  spreadsheet.
17      Q.    And just so it's clear, I should tell
18  you this is a document that was produced as
19  LEH-NAVIGANT 015949.
20            MR. TAMBE:  Thank you.
21      A.    This is, I agree, in total.  So you
22  have the 24 securities that are referenced in
23  paragraph 41.  These are -- it's a combination
24  of trust interest-only and principal-only
25  securities.

Page 105

1              M. Slattery
2             So the identifier would be the first
3   column, Freddie or Fannie, and then the
4   respective series number.  The CUSIP again.
5   Then a series of prices based on different
6   street firm price information that we were able
7   to glean.  Conversion of the prices based on
8   expression to decimal form, and then an average
9   in the far right-hand column.
10      Q.    Let me see if we can take it a little
11  more slowly so I can be more precise.
12            So the first column, the one with
13  designators like FHLS231, those are designating
14  whether it's Fannie or Freddie or the like?
15      A.    Yes.
16      Q.    Okay.  And then the second column is
17  the CUSIP?
18      A.    Correct.
19      Q.    And then I take it the third, fourth,
20  fifth and sixth columns are prices?
21      A.    Yes.
22      Q.    Is that what you said?
23            Now, what is the source of the prices
24  in the first column, do you know?
25      A.    I'd have to double-check in terms

1         M. Slattery
2  of -- we have four broker firms.  I'd have to
3  double-check which column relates to which firm.
4      Q.   What are the four firms?
5      A.   Goldman, Citi, Credit Suisse and
6  Lehman.
7      Q.   And while you can't tell me which
8  column is Goldman and which is Lehman, those
9  four columns would be representing each of those
10 four entities; is that right?
11     A.   Correct.  Correct.  And then some
12 instruments as listed, we only had observed
13 prices from two or three of the four as opposed
14 to all four.
15     Q.   And that would account for any blanks
16 that you see?
17     A.   Correct.  Correct.
18     Q.   And then we have these decimal numbers
19 in the next four columns?
20     A.   Yes.
21     Q.   Okay.  And would the -- and what do
22 those decimals represent?
23     A.   Converting the price convention that's
24 listed in, I guess, again, identified as columns
25 3, 4, 5 and 6, two decimal forms.  So, for

1         M. Slattery
2  example, row 1:  Freddie 231.  The CUSIP
3  31282YDR7.  Price of 21 and 26/32.  So it would
4  take the 21 plus 26 divided by 32 to come up
5  with 21.8125.
6      Q.   And then the final column "Price -
7  9/19/2008"?
8      A.   Yes.
9      Q.   What does that represent?
10     A.   That's an average of the observed
11 decimal form prices.
12     Q.   It's a simple average, no weighting or
13 anything like that?
14     A.   No weighting.  Weighting would suggest
15 that we had a bias in terms of one particular
16 street firm source versus another.  So, in this
17 case, averaging was appropriate because we had
18 no particular bias one way or the other.
19     Q.   All right.  You can put that aside.
20        Actually, let me --
21        (Exhibit 715B, a document produced as
22 LEH-NAVIGANT 026178, marked for
23 identification, as of this date.)
24     Q.   Showing you what has been marked as
25 Exhibit 715B.  And I will represent to you that

1         M. Slattery
2  that is the document produced as LEH-NAVIGANT
3  026178.  And just so we're clear, this is an
4  excerpt or a truncated version?
5      A.   Right.
6      Q.   It should have all of the columns but
7  does not have all of the rows.
8         Do you recognize this document?
9      A.   I believe this is the, as I indicate
10 at the top underneath the column called "User
11 Description," this is the pair sort that we did
12 to set the foundation for the spread
13 determination on the majority of the 284
14 securities.
15        So I think the truncation of the rows,
16 I would have a hard time adding or eyeballing
17 how many rows are represented here, but at the
18 end of the day, there was a few hundred.
19     Q.   And what do you mean by "pair sort"?
20     A.   What we're determining was the
21 break-even what they call prepayment multiplier
22 and break-even option adjusted spread.  So we
23 grouped instruments according to security types.
24        So, for example, the first two rows
25 that are indicated, it's the same instrument,

1         M. Slattery
2  okay?  It's the same CUSIP, same deal name, same
3  additional tranche name in column 3, but in this
4  case, we had -- I had scripted in an additional
5  identifier such that the first one was actually
6  sourced from Goldman, the second one was sourced
7  from Lehman.
8         So the prices that are indicated in
9  the one, two, three, four, five, six -- eighth
10 column for this particular PO on the 19th of
11 September, Goldman had a price of 73 and 14/32
12 and Lehman had a price of 73 and 15/32.
13     Q.   Okay.  And what does -- what does the
14 "OAS" column signify?
15     A.   That's the option adjusted spread.
16     Q.   And what was the source of that?
17     A.   That was determined based on the
18 introduction of these prices.  So, for example,
19 again, using row 1 as the basis for the example.
20     Q.   Uh-huh.
21     A.   At a price of 73 and 14/32, given all
22 the elements of the analytical configuration
23 that we had in place, the option adjusted spread
24 that was generated based on Polypaths, using
25 Polypaths as the tool, was 57.9 given all the

1          M. Slattery
2   other attributes of this particular security.
3       Q.   And just so I'm clear, the securities
4   listed on this document, these were not in the
5   population of securities that Barclays acquired;
6   is that correct?
7          MR. TAMBE:  Objection to form.
8       A.   That -- some may have been.  I mean,
9   this was the master universe of our trust
10  interest-only and trust principal-only security
11  price set that we had.  So, rather than limit
12  our spread determination for creating proxy
13  relationships to the other 284 majority of
14  which, we felt that it was more appropriate to
15  get as many prices as we could, expand the
16  universe.
17         So there may be some direct
18  relationship between what we have here and the
19  broader extract, the entire extract, as opposed
20  to this.  I just can't see.
21      Q.   Sure.  Let me see if I'm understanding
22  it correctly.  You're saying that some or all of
23  the 24 securities within the Barclays portfolio
24  that you were able to identify prices for may
25  show up on Exhibit 715B, but that it will also

1          M. Slattery
2   include a variety of other securities that are
3   not within the Barclays portfolio?
4       A.   To the best of my knowledge, yes.
5       Q.   All right.  And the column headed "OA
6   Dur," do you see that?
7       A.   Yes.
8       Q.   What does that signify?
9       A.   This is the duration measure or the
10  risk sensitivity of that price given all the
11  other elements of the value process.  So, in
12  other words, there -- "option adjusted duration"
13  would suggest that there is a potential for a 12
14  percent change in value for a particular
15  movement in rates given all the other fixed
16  elements of the valuation process.  That is what
17  people would consider a risk metric, which was
18  not part of the exercise, but allows the
19  practitioner like myself to gain insights in
20  terms of whether or not the production, the
21  valuation engine is producing results in line
22  with expectations.
23      Q.   And what would be the source of the OA
24  Dur entries that appear in that column?
25      A.   They're not entries.  They're

1          M. Slattery
2   analytical outputs.
3       Q.   And in terms of -- you said that
4   that's a risk metric; is that correct?
5       A.   Yes.  Some people may call it a risk
6   metric.
7       Q.   Would you?
8       A.   Yes.  Or exposure derivative.
9       Q.   Okay.  And what would you consider to
10  be a high figure as opposed to a low figure,
11  indicating more risk as opposed to less risk?
12         MR. TAMBE:  Objection to form.
13      A.   That would depend on the instrument,
14  because the number could appear to be a negative
15  as well as a positive.
16      Q.   And so would a -- would a negative be
17  associated with a higher degree of risk or --
18      A.   Not necessarily, no.  It would just --
19  a negative OA duration would relate to the
20  underlying pay type.  What we have on this
21  extract, based on my limited time with it, it's
22  all the principal-only -- or, not all, but it
23  represents just an extract of principal-only
24  securities.  So I would expect the "Duration"
25  column to be positive numbers.

1          M. Slattery
2       Q.   So you think that these are positive
3   numbers and not absolute values?
4          MR. TAMBE:  Objection to the form of
5   the question.
6       A.   I'm not sure I understand.
7       Q.   Whether the number's negative or
8   positive, would a higher number indicate greater
9   risk -- would, if you look at the absolute value
10  of the number, so 12, negative 12, either way,
11  would that indicate a higher risk than a 6 or
12  negative 6, respectively?
13         MR. TAMBE:  Object to form.
14      A.   Within just simply the context of what
15  this number represents, which is the price
16  change for a given yield change or a price
17  change for a given rate shock, a higher number
18  would indicate that, yes, there is greater risk
19  for a particular security and susceptibility to
20  rate movements.
21         However, that's not the only dimension
22  that one would look at in terms of determining
23  whether or not it is a, ultimately a riskier
24  security than some other security.
25      Q.   What does the next column "OA Sprd

Page 114

M. Slattery

1     M. Slattery
2  Dur" indicate?
3     A.    That -- option adjusted duration, the
4  "OA Dur" column, again reflects changes to the
5  underlying rate, discount rate. The "OA Spread
6  Dur," for duration, represents changes to the
7  OAS number, which is two columns to the left.
8  So it's a measure of sensitivity to changes in
9  the option adjusted spread.
10    Q.    Going back to the "OAS" column, what
11  are the units which those values are given?
12    A.    Basis points.
13    Q.    And the "OA Dur" column, what are the
14  units those are given?
15    A.    That would be typically interpreted as
16  a percentage. So 12 percent. Same thing with
17  the "Spread Dur."
18    Q.    And the "Prepay Dur" column, what does
19  that indicate?
20    A.    That would be a exposure derivative or
21  a risk metric that identifies the change in
22  value for a given change to the prepayment
23  model.
24    Q.    And is that a calculated output rather
25  than an input?

Page 115

M. Slattery

1     M. Slattery
2     A.    Yes.
3     Q.    And is the "OA Spread Dur" also a
4  calculated output?
5     A.    Yes. Yes.
6     Q.    And the next column "LT. CPR"?
7     A.    Yes.
8     Q.    What is that column?
9     A.    That represents the prepayment, the
10  prospective prepayment number across the series
11  of paths that are generated. So, for example,
12  for the first line, 11 represents an 11 percent
13  constant prepayment rate.
14    Q.    And the source for that is what?
15    A.    It's calculated by Polypaths. It's
16  another calculation.
17    Q.    And the next column, "ZVol Oas"?
18    A.    If, internal to the system, if
19  volatility is shut off or if volatility is
20  reduced to zero, what is the quote/unquote
21  option adjusted spread in that environment. And
22  that's again in basis points.
23    Q.    Is that a calculated value?
24    A.    Calculated.
25    Q.    Again through Polypaths?

Page 116

M. Slattery

1     M. Slattery
2     A.    Yes.
3     Q.    And "ZVol CPR"?
4     A.    Similar to the "ZVol OAS" in that if
5  volatility is shut off or brought down to zero,
6  that would be the prepayment speed prospectively
7  in that environment.
8     Q.    Now, a minute ago I believe you said
9  that the "OA Dur" column is not something you
10  actually used in your -- in your calculation of
11  values here; is that right?
12    A.    Correct. These are byproducts of the
13  valuation routines. It was used to the extent
14  that we gained a sense of comfort with the model
15  outputs based on the numbers as depicted in this
16  one example.
17    Q.    And would the same be true with
18  respect to the next columns coming up, going up
19  to "ZVol Oas"?
20    A.    Correct. Beyond "ZVol CPR" is "AL,"
21  or average life. That would be, again, an
22  indication of the average life of the cash
23  flows, and that's typically interpreted in terms
24  of years. So you can interpret that as 6.71
25  years. That's a calculated field as well.

Page 117

M. Slattery

1     M. Slattery
2     The next three would be underlying
3  collateral descriptors that are grabbed from
4  instrument, let's say in this first example,
5  Freddie 234. So it has an underlying gross
6  coupon of 5.361, an underlying weighted average
7  life of 37 months, and a weighted average
8  maturity of 317 months.
9     Q.    And the final column?
10    A.    The prepay multiplier is what the
11  system is calculating based on generating
12  spreads for this instrument consistent with its
13  interest-only counterpart. So the order is
14  custom designed. In other words, the layout is
15  the way I laid it out. You can lay it out and
16  order it any way you want.
17    Q.    Uh-huh.
18    A.    But there is a commingling of inputs,
19  generated outputs, information descriptors, and
20  then another generated output. So ...
21    Q.    Okay. And you used the Polypaths
22  model; is that correct?
23    A.    Yes.
24    Q.    Are there other models that are
25  commonly used by banks in valuing these types of

Page 118

M. Slattery

1  securities?
2  securities?
3        MR. TAMBE:  Objection to form.
4     A.   To the best of my knowledge, there are
5  other models that are used, yes.
6     Q.   And would it be fair to say you would
7  expect some variability between the outputs from
8  the various models?
9     A.   I don't know if I would agree with
10 that.  If I put everything the same, in other
11 words, if I align the inputs between model A and
12 model B, the expectation would be that the
13 variability would be minimized to a great
14 extent, if not completely offset.  There are
15 subtleties within each model, each program that
16 might create a difference, but if I align the
17 inputs, I would expect that my variability
18 between model A and model B would be, again,
19 practically offset to zero.
20    Q.   Go back to Exhibit 714B, please.  Now,
21 the prices that are shown on here, are these bid
22 prices or ask prices or what?
23    A.   We interpreted these as indicative
24 prices, so we used them as mids.
25    Q.   Are these all the prices on that date

Page 119

M. Slattery

1  or some particular moment in time or what?
2  or some particular moment in time or what?
3     A.   Based on our -- my understanding would
4  be end of day for the 19th.
5     Q.   And the --
6     A.   I'm sorry.  We used these as bids.  We
7  used these as bids.
8     Q.   Bids.
9        Do you know what percentage of the
10 entire population of RMBS Securities that
11 Barclays acquired consisted of agency pools?
12    A.   Straight agency pools?  I don't know.
13    Q.   When you say "straight agency pools,"
14 what are you differentiating them from?
15    A.   Well, if I'm looking at a Freddie Mac
16 5 percent, without any other complications, I
17 would consider that, just in a generic way, an
18 agency pool.  I don't know the answer.  I don't
19 know the breakout even more specifically than
20 that either.
21    Q.   Do you know what -- what discount rate
22 Barclays -- what liquidity discount Barclays
23 applied to the agency pools?
24    A.   I don't know specifically.  I'd have
25 to double-check.

Page 120

M. Slattery

1     Q.   What about agency CMOs?
2     Q.   What about agency CMOs?
3     A.   I believe they integrated a 10 percent
4  liquidity discount.
5     Q.   If you'll look at the section on the
6  materials you relied on in the back of your
7  report, so page 30 of your report, there are I
8  think three, maybe four documents that are
9  identified here as having been produced by PwC,
10 do you see that?  They're in the other documents
11 category right at the end.
12    A.   Yes.
13    Q.   Okay.  Aside from those three or four
14 documents, did you review any documents relating
15 to the PwC review of Barclays' valuation
16 efforts?
17       MR. TAMBE:  Objection to form of the
18 question.
19    A.   Did I review PwC's review of Barclays'
20 valuation outside the scope of these four?
21    Q.   Outside these, setting to one side
22 these four documents that you say you relied on,
23 did you look at any other documents concerning
24 what PwC did in the course of reviewing
25 Barclays' pricing or Barclays' valuation

Page 121

M. Slattery

1  process?
2  process?
3     A.   Based on my recollection, I and my
4  team looked at other potentially documents that
5  were sourced from PwC, but in terms of material
6  information, we obviously chose not to cite them
7  because didn't use them.
8     Q.   Can you tell me anything about the
9  process that PwC went through to audit or test
10 Barclays' pricing -- strike that.
11       Can you tell me whether you're aware
12 if PwC's Structured Finance Group examined the
13 Barclays valuation process for these -- for the
14 securities that you valued?
15    A.   I can't speak to it in a comprehensive
16 way.  I can only give you what we saw based on
17 some of the documents cited.  Again, I believe
18 it's highlighted in the report.
19       I believe one of the PwC source
20 documents indicated, as paragraph 39 suggests in
21 my report, a description of the Barclays
22 process.
23    Q.   Are you referring to the second
24 sentence of paragraph 39 where you say
25 "according to Barclays' accountants"?

Page 122

M. Slattery

1
2    A.   Yes.
3    Q.   What can you tell me about the process
4  that PwC undertook to test the validity of
5  Barclays' pricing or Barclays' valuation of the
6  securities it received?
7    A.   As I sit here I cannot offer any
8  direct response to that.  I don't know exactly
9  what they followed and what the standards would
10  be for that group.  All I know is what we read
11  based on some of the documents.
12    Q.   When you say "based on some of the
13  documents," you're referring to the four
14  documents that are listed on your --
15    A.   Yes.
16    Q.   -- index of documents relied on; is
17  that right?
18    A.   Yes.
19    Q.   In paragraph 34 of your report you
20  state that you used empirical bid-offer spreads
21  to derive liquidity discounts?
22    A.   Yes.
23    Q.   What do you mean by that?
24    A.   We -- sorry.
25    Q.   I was going to say, can you describe

Page 123

M. Slattery

1
2  the process you went through?
3    A.   We looked for and found, again,
4  information based on normal versus stressed
5  market conditions for mortgage-backed
6  securities, agency mortgage-backed securities.
7    We, once again, used Fabozzi
8  information for that, and based on direct
9  information that one of my team members had
10  during his time as an enterprise risk manager
11  for Bank of America, we were able to create a
12  more granular assessment of those implied
13  liquidity haircuts on a pay-type-by-pay-type
14  basis.
15    So, in contrast to a 10 percent level,
16  which I believe was established by Barclays in
17  the process, we had some pay types based on our
18  findings that actually were more than 10 percent
19  and then we had some that fell below 10 percent,
20  so -- and I believe, on average, for the 308
21  securities, I believe at the end of the process
22  on a weighted average basis, our liquidated
23  discount approached 8 percent versus Barclays'
24  10 percent.
25    We, however, just had a more granular

Page 124

M. Slattery

1
2  allocation of the liquidity discount based on
3  pay type.
4    Q.   While you're doing that, let me ask
5  you, you said something about direct information
6  that one of my team members had during his time
7  as enterprise manager at Bank of America.  What
8  are you talking about?
9    A.   In 2001, part of his responsibilities
10  was to determine what the traders were -- felt
11  comfortable with in terms of identifying stress
12  levels for a variety of pay types, as more and
13  more pay types were coming out in terms of the
14  street and production and so forth and so on.
15  So he memorialized that information at the time
16  and then we continued to use that in our
17  valuation.
18    Now, the distinction between 2001 and
19  2008, the liquidity for the market actually
20  improved significantly between 2001 and 2008.
21  So the stress levels that were obtained through
22  that method in 2001 were probably, in my
23  estimation, based on my opinion, would be more
24  conservative than what traders would have
25  expected during the mid part of this decade.

Page 125

M. Slattery

1
2    And the other, in terms of Fabozzi, it
3  was sourced back to 1997.  But the information
4  that we gleaned from that process, we understand
5  it to be from the 1994 mortgage crisis, the
6  Orange County bankruptcy.  So we had that
7  information, which represented a stress
8  environment.
9    We had information gleaned from the
10  Bank of America traders.  We had an improving
11  market for at least the first few years, earlier
12  part of this decade, and then we allocated them
13  across pay types, so ...
14    Q.   And if I understood correctly what you
15  said a minute ago, it's your opinion that
16  liquidity in September of 2008 was better than
17  in 2001?
18    A.   No.  What I said was the liquidity
19  throughout from 2001 to 2008 was improving.  So
20  there was a greater issuance.  The daily trading
21  volumes had gone up at some point in 2008.  I
22  didn't reference a particular period.
23    Q.   Okay.  Well, do you have an opinion as
24  to how liquidity in September of 2008 in this
25  market compared to the earlier period 2001 that

Page 126

1          M. Slattery
2 you were referring to?
3     A.   Sure.  2008 for Agency RMBS, the
4 liquidity was up.  So the daily trading volumes
5 were higher than --
6     Q.   And just so I'm clear, I don't want to
7 talk about 2008 as a whole.
8     A.   Right.
9     Q.   Right now I want to focus on September
10 of 2008.
11    A.   Right.
12    Q.   Do you have an opinion as to how
13 liquidity in September of 2008 compared to
14 liquidity in 2001?
15    A.   Yes, I do.  The amount outstanding as
16 of the end of the third quarter 2008, September
17 2008, was greater than what it was earlier in
18 the decade, and the daily trading volumes for
19 Agency RMBS and, correspondingly, Agency CMOs
20 was higher.
21    Q.   And that's just on an absolute dollar
22 amount when you talk about volume?
23    A.   Yes.
24    Q.   And did you analyze it as a percentage
25 of outstanding Agency RMBS securities trading in

Page 127

1          M. Slattery
2 any given day?
3     A.   On a unit basis, no.  This is absolute
4 dollar amounts.
5     Q.   No, I didn't mean to distinguish
6 between on a unit basis and dollar.  What I
7 meant was, if there's, just for illustrative
8 purposes, a billion dollars of outstanding or
9 $100 billion of outstanding Agency RMBS paper
10 and 10 billion is trading daily in 2001, you've
11 got 10 percent of outstanding volume being
12 traded on a daily basis.
13        Do you have any idea how the percent,
14 that percentage figure compared to, for 2001,
15 compared to September 2008?
16    A.   That metric I don't have off the top
17 of my head.  However, the outstandings grew
18 during that period.  Daily trading volume went
19 up.  I would have to double -- I would have to
20 look at that metric to determine it.  My guess
21 is that the outstandings outpaced the daily
22 trading volume, in other words, it was faster on
23 the pure volume side than it was on the daily
24 trading side.  But on an absolute dollar basis,
25 the daily trading was up.

Page 128

1          M. Slattery
2        (Exhibit 716B, a document produced as
3 LEH-NAVIGANT 026179, marked for
4 identification, as of this date.)
5     Q.   Showing you what has been marked as
6 Exhibit 716B, and I will represent to you that
7 that is a document produced as LEH-NAVIGANT
8 026179.  I believe that is a complete document.
9        MR. TAMBE:  A what document?
10        MR. SHAW:  I believe it is the
11 complete document.
12    Q.   I ask you to tell me what this
13 document is.
14    A.   I don't know what this first page is.
15 It just seems like it's a laundry list of agency
16 debenture CUSIPs.
17    Q.   What about the second page?
18    A.   The second page represents various
19 categories within the agency mortgage world,
20 Treasuries and agency debenture world, and then,
21 correspondingly, the liquidity discounts that we
22 used in our work.
23    Q.   Look at the first line under the --
24 under the headings.
25    A.   Okay.

Page 129

1          M. Slattery
2     Q.   So looking at the asset subcategory
3 ARM, you have a liquidity discount of .52
4 percent; is that correct?
5     A.   Yes.
6     Q.   What is the source for that .52
7 percent?
8     A.   I would have to refer back to other
9 working papers that I believe have been produced
10 to walk you through that.
11    Q.   Are these documents we've already
12 looked at today?
13    A.   No.
14    Q.   Okay.  Which document would that --
15 how would I go about determining which document
16 we're talking about?
17    A.   There was a, similar to the liquidity
18 adjustment for the Treasury agency -- let me
19 see.  Maybe it's on the second page.  No.  It
20 looks similar to this.
21        MR. TAMBE:  What is "this"?  Just tell
22 the exhibit number.
23        THE WITNESS:  Sorry.  710B.  It's
24 similar to 710B.
25        MR. SHAW:  Well, that might then be an

1          M. Slattery
2    opportune time for us to take a lunch break
3    and we'll see if we can find it over the
4    lunch break.
5          All right.  Why don't we go off the
6    record and break for lunch.
7          THE VIDEOGRAPHER:  The time is 12:34
8    P.M.  We are now off the record.
9          (Luncheon recess.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1          M. Slattery
2          AFTERNOON SESSION
3          THE VIDEOGRAPHER:  The time is 1:20
4    P.M.  We're now on the record.
5          (Exhibit 717B, a document bearing
6    Bates Nos. LEH-NAVIGANT 026433, marked for
7    identification, as of this date.)
8    MARK SLATTERY, resumed and
9       testified further as follows:
10    EXAMINATION BY (Cont'd.)
11    MR. SHAW:
12       Q.   Mr. Slattery, you recall before lunch
13    we were looking for a document, and I would ask
14    you whether document 717B is it.
15       A.   Yes.
16       Q.   Okay.  So if you have, then, 717B and
17    716B out in front of you, specifically, the
18    second page of 716B, let me ask you if you can
19    explain to me how you calculated a .52 percent
20    liquidity discount for ARMs.
21       A.   On the ARM I don't see an immediate
22    reconciliation between 716B and 717B, so I would
23    have to do additional reconciliation work to
24    figure out exactly why there's a couple basis
25    point difference because the floaters in the

1          M. Slattery
2    ARMs in terms of pay dynamics, they're virtually
3    the same, adjustable rate mortgages versus
4    floaters.  But if you want to use the next
5    example, the inverse floaters as the derivation
6    example, is that all right?
7       Q.   Sure.
8       A.   So 717B contains multiples obtained
9    from a Fabozzi article again dovetailing back to
10    1997.  These represent normal versus distressed
11    market indications of bid-ask spreads.  Based on
12    my understanding of that article, it represented
13    surveys of traders, again, Salomon Smith Barney
14    and one other entity I don't remember off the
15    top of my head, asking them for indications of
16    normal versus distressed bid-ask spreads across
17    a handful of mortgage products.
18          The 1994 Orange County bankruptcy,
19    which was directly related to mortgage security
20    investment, set the tone for the distressed
21    market.  So that was the history.
22       Q.   Let me interrupt you there for a
23    second, if you don't mind, just for
24    clarification.  Is your -- are you saying that
25    the Fabozzi article used the 1994 Orange County

1          M. Slattery
2    problem as its example of a stressed market?
3       A.   No.  From what I understand, the --
4          MR. TAMBE:  Object to form.
5       A.   Sorry.  From what I understand, the
6    derivation of these numbers in conversations and
7    surveys with the traders, their experience
8    between a normal and a distressed market was
9    highlighted by the 1994 Orange County mortgage
10    event.
11       Q.   All right.  Continue with your answer
12    then.
13       A.   No problem.  Okay.
14          The multiples in terms of the top
15    series of rows are calculated by relaying
16    distressed and dividing that number by normal.
17    So in pass-through, a distressed bid-ask spread
18    was represented to be .25 percent or, in terms
19    of ticks, it would be 8/32.  Dividing that by
20    the normal of .06, you would end up with a
21    multiple of 4.17.
22          And then you see there's an indication
23    of other instrument types, adjustable rate
24    mortgage, companion CMO or interest-only strip.
25    To be conservative, we used the multiple that's

1        M. Slattery
2   represented by the interest-only strip
3   comparison between a distressed market and a
4   normal market.  In other words, that 7.94
5   multiple was used to scale a variety of
6   instrument-type bid-ask normal spreads to,
7   correspondingly, bid-ask distressed levels.
8        Because we're going from mid to bid in
9   our work, we took the bid-ask distressed level
10  and divided it by two.  So, for example, the
11  inverse -- let's go back to the inverse floater
12  on the previous example is listed as 4.21
13  percent, and you can see that for a bid-ask
14  normal inverse floater, it was 1.06, the bid-ask
15  distressed is 8.41.  Dividing that by 2, you end
16  up with 4.21 and there's some rounding in there.
17  **Q.   So let me make sure I understand what**
18  **you're saying.  You're saying that the Bank of**
19  **America July 2001 figures indicated a bid-ask**
20  **normal of 1.06 for inverse floaters?**
21  A.   Yes.
22  **Q.   And that you then multiplied that by**
23  **the 7.94 number that you calculated using the**
24  **Fabozzi numbers and then divided the result of**
25  **that by 2 to reflect the fact that it was bid to**

1        **M. Slattery**
2   mid rather than bid to ask?
3   A.   Yes.
4   **Q.   Okay.**
5   A.   Yes.  And as we discussed prior to the
6   break, you can see that three instrument types
7   actually generated based on this approach, bid
8   to mid, distressed, liquidity factor adjustments
9   of greater than 10 percent.  So the inverse IO
10  was 16.7 percent, which actually I believe,
11  ironically, reconciles to the work that was
12  indicated on one of the PwC documents.
13       So our inverse IO bid to mid
14  distressed liquidity factor of 16.7 was very
15  similar to the number that was indicated by PwC.
16  The difference was that we've taken time to
17  segregate pay types and create a more granular
18  approach to the allocation of the mid to bid or
19  bid to mid distressed adjustments.
20       So structured POs, for example, is
21  5.16 percent, where, compared to the work that
22  was done, as far as we could tell, there was a
23  10 percent adjustment integrated in the Barclays
24  work, so -- and when I weight these across the
25  entire sample set of the instruments that are

1        M. Slattery
2   part of the report that we generated, the total
3   bid to mid distressed on a weighted average
4   basis adjustment was approximately 8 percent
5   versus Barclays' 10 percent.
6   **Q.   And when you say a weighted average,**
7   **how are you weighting the average?**
8   A.   Based on the face amounts.  So the
9   position weighting, we use dollar amounts.
10  Because in the sample set of our 308 minus the
11  24 trust IOs and POs, for principal-only
12  securities, structured POs, represented
13  approximately a third, and then there was
14  inverse IOs and inverse floaters and structured
15  IOs.  I think those four accounted for almost 80
16  percent of our 284 subset.
17  **Q.   And if you had included the 24 in**
18  **that?**
19  A.   The 24, as indicated at the bottom
20  portion of this exhibit, 717B, trust IOs we
21  adjusted by 1.94 percent, trust POs at 1.35
22  percent.  So when we compared the bid prices to
23  bid and then actually mid to mid, the difference
24  was primarily captured by a liquidity factor,
25  liquidity factor differential.

1        M. Slattery
2   **Q.   So if I -- if I compare -- if I look**
3   **at 716B, page 2, what you're telling me is if**
4   **there's a -- if the same asset subcategory**
5   **appears on 716B, page 2, as appears on the**
6   **second part of the table on 717B, that's the**
7   **source of the bid to mid or the liquidity**
8   **discount; is that correct?**
9   A.   But for the caveat, I'm not familiar
10  with the 716B.  This is not necessarily work
11  that I generated firsthand.  This may have come
12  out of the work and the support that was done on
13  the third party pricing so that's why I can't
14  reconcile the ARM 52 basis point liquidity
15  discount, for example.
16       But the other ones where there's a
17  direct relationship between the naming
18  conventions and so forth, you're going to get a
19  one-for-one comparison.  Inverse floaters, the
20  bid to mid distressed adjustment was 4.211
21  percent on 717, as is the case on 716.
22  **Q.   Can you tell me what accounts for the**
23  **difference between the pass-through numbers on**
24  **the two documents?  On 717B the pass-throughs**
25  **are at .12 and on 716B they're at .25.**

Page 138

1          **M. Slattery**
2      A.   Again, there may have been a more
3   conservative approach taken.  I'm under the
4   impression that this relates to the third party
5   pricing.
6      Q.   "This" being which one?
7      A.   The 716.  I apologize.
8          So I'd have to go back and foot every
9   number to make sure exactly where the -- the
10   derivation.  But for the most part, 717B sets
11   and establishes the foundation for 716B.
12      **Q.   And for pass-throughs do you know**
13   **whether you used the .25 number that appears on**
14   **716B or the .12 number that appears on 717B as**
15   **your liquidity discount?**
16      A.   I would have to double-check and get
17   back to you.  I don't know right off the top of
18   my head.
19      **Q.   And if you see on 716B, there is a**
20   **number that says "Treasuries, .09 percent."**
21   **Tell me how that number was derived.**
22      A.   Again, I believe 716B is being sourced
23   from the third party pricing work.  I would have
24   to examine exactly the derivation of that .09.
25   That represents, in my estimation, 3/32,

Page 139

1          M. Slattery
2   approximately.
3      **Q.   And are you able to tell me how the**
4   **liquidity discounts shown on 716B for the agency**
5   **debentures of various maturity or time**
6   **and maturity -- times to maturity were**
7   **calculated?**
8      A.   Yes.  They go back to 710B.
9      **Q.   710B being the other document that**
10   **contains the Fabozzi numbers on it?**
11      A.   Correct.  Two different markets, two
12   different sets of data points.
13      **Q.   Okay.  Can you explain to me why the**
14   **liquidity discounts on 716B, from what you**
15   **believe to be third party sources, would differ**
16   **from those that you calculated on 717B?**
17      A.   Can you explain that one?  I'm not
18   sure where the comparison is.
19      **Q.   Well, for example, we just looked at**
20   **pass-throughs.  We have different numbers, and**
21   **so my question is if these -- if the 716B**
22   **numbers came from third party sources, why would**
23   **they be different from what you have calculated**
24   **on 717B?**
25          MR. TAMBE:  Object to form.

Page 140

1          M. Slattery
2      A.   Where we did not have a specific
3   liquidity discount to be allocated within the
4   third party pricing universe of approximately
5   6,000 CUSIPs, we used the Barclays liquidity
6   discount.  So we might source it back to
7   Barclays.
8      **Q.   And that would appear where on 716B?**
9      A.   Again, without a hundred percent
10   familiarity with 716B, I can only assume at this
11   juncture that this is a third party pricing
12   listing.
13      **Q.   How would you go finding out for sure**
14   **what this is, 716B?**
15      A.   I would, if we had access to our data
16   warehouse, which we don't, I would look at the
17   data warehouse to figure out exactly what was
18   allocated for these specific instrument types.
19   So I would have to do more research directly
20   within the database that we set up to handle
21   this process.
22      **Q.   And do you know whether your data**
23   **warehouse has been produced to us in this**
24   **action?**
25      A.   I believe a meaningful extract was

Page 141

1          M. Slattery
2   produced.  I believe that was the production as
3   of last night.
4      **Q.   That would be that spreadsheet that**
5   **Mr. Tambe e-mailed to me last night, as you**
6   **understand it?**
7      A.   As I understand it.  I'm not a hundred
8   percent sure that it would contain exactly this
9   delineation, but I believe that represents the
10   third party pricing extract or a spreadsheet
11   that was derived from the data warehouse
12   containing all the third party pricing marks.
13      **Q.   Are you saying that an RMBS price**
14   **derived from third party pricing would have a**
15   **liquidity discount different than the RMBS price**
16   **in your sample?**
17      A.   If it was not represented by the
18   laundry list here but was captured by a Barclays
19   number, it's possible, yes.  We wanted to be
20   conservative in the estimation of that liquidity
21   adjustment, so ...
22      **Q.   Under what circumstances exactly would**
23   **you source from Barclays -- from Barclays'**
24   **analysis for liquidity discounts?**
25      A.   In the 6,000 securities, it runs the

Page 142

M. Slattery

1 gambit, not a complete gambit, but there are
2 various instrument types represented in terms of
3 categorization. So you might have Agency RMBS.
4 You might have Treasuries. You might have
5 agency debt securities. You might have other
6 things like the Tanzanite Series 2005 Class 2
7 bond.
8        If we didn't have a specific liquidity
9 discount as captured by one of these two
10 documents, being 710B and 717B, we defaulted to
11 the use or the integration of the Barclays
12 liquidity discount. So if the example is the
13 pass-through, the higher the liquidity discount
14 the lower the value. So it would be a more
15 conservative estimate, but ...
16    **Q.   Would you agree that IOs, POs and
17 inverse IOs are relatively risky tranches of the
18 CMBS -- rather, the RMBS universe?**
19        MR. TAMBE: Objection to form.
20    A.   No, I wouldn't necessarily outright
21 agree. I would have to examine each case. If
22 you're talking about trust IOs, interest-only
23 securities, and principal-only securities versus
24 structured interest-only and principal-only

Page 143

M. Slattery

1 securities, again, it depends on the type of
2 structured PO. For example, if it is a planned
3 amortization class PO, then, actually, the
4 prepayment risk represented by that instrument
5 is less than the trust principal-only security.
6    **Q.   If an RMBS was on -- was in the
7 population of securities that Barclays acquired
8 in the December 22 settlement, do you know what
9 liquidity discount sheet was used to value it?**
10    A.   Did you say December 22?
11    **Q.   I did.**
12    A.   The December dataset I don't have
13 intimate knowledge and a depth of knowledge that
14 would be even worth considering or offering at
15 this point.
16    **Q.   Paragraph 36 of your report, sir.
17 Now, you're referring here to -- and you might
18 want to look at paragraph 35 as well.**
19    A.   Okay.
20    **Q.   You're referring to documentation from
21 PwC. You see that?**
22    A.   Yes.
23    **Q.   Showing you what has previously been
24 marked as Exhibit 643A in this case. Do you**

Page 144

M. Slattery

1 **recognize this document as the PwC document
2 you're referring to?**
3    A.   Yes, I believe that is the case.
4    **Q.   I'll note that you have a footnote
5 cite to it which appears to have the same Bates
6 number that the document I just handed you does.
7 You see that?**
8    A.   Yes.
9    **Q.   Now, you say that -- you criticize
10 Barclays for the method by which it compiled or
11 concluded that there was an average of 10.55
12 percent; is that correct?**
13    A.   According to the document, that was
14 the average.
15    **Q.   Well, taking a look at the second page
16 of the document, of Exhibit 643A, you see that
17 there are 39 samples and that -- I'm not asking
18 you to redo the math, but that there's a
19 calculated average of 10.55 percent bid-offer
20 spread for agency CMOs, do you see that?**
21    A.   Yes, sir.
22    **Q.   And you say -- give me a moment.
23 Sorry. Okay.**
24    **Paragraph 36, you state, "For example,**

Page 145

M. Slattery

1 **Inverse IO securities comprised 51 percent of
2 Barclays' benchmark portfolio." Do you see
3 that?**
4    A.   Yes.
5    **Q.   When you talk about the benchmark
6 portfolio, you're talking about the document you
7 have in -- the 39 securities listed on Exhibit
8 643A, page 2; is that correct?**
9    A.   Yes.
10    **Q.   And if I understand correctly what
11 you've done here, have you simply counted up the
12 39 and confirmed that 20 of them are inverse IOs
13 and that's how you got to 51 percent?**
14    A.   I believe that's how we did the math,
15 yes.
16    **Q.   Okay. Can you tell me what percentage
17 on a -- what percentage of the total face value
18 of the Agency CMOs that Barclays acquired in
19 this transaction were inverse IOs?**
20    A.   I don't have a number or a list of
21 percentages across the entire spectrum of Agency
22 RMBS and the decomposition of that portfolio.
23 So, therefore, I wouldn't be able to answer that
24 question.

1              M. Slattery
2      Q.   And I take it your answer would be the
3  same with respect to IOs and POs?
4      A.   Correct.
5      Q.   Assume that more than 80 percent of
6  the face value of the agency CMOs that Barclays
7  acquired were in the IO -- inverse IO and PO
8  categories.  Would it, from your perspective,
9  make sense to weight the average liquidity
10 discount to take into account the fact that the
11 overwhelming majority of the value is in the --
12 is in those categories?
13          MR. TAMBE:  Objection to the form of
14      the question.
15      A.   I don't know if it is 80 percent.  I
16 would have to do the leg work again to derive
17 those percentages, but I do not disagree that it
18 would make sense, if you're looking to create a
19 weighted average, that it should be sized by the
20 position if you do not have a more granular take
21 on the liquidity discounts across pay types.
22      Q.   And are you offering the opinion that
23 it is always inappropriate to, when valuing a
24 large portfolio of securities, to look at them
25 on a portfolio-wide basis rather than on a

1              M. Slattery
2  CUSIP-by-CUSIP basis?
3      A.   Can you repeat that question?
4      Q.   Sure.  Are you offering the opinion
5  that it is always inappropriate, when valuing a
6  large portfolio of securities similar to the
7  ones Barclays acquired here, to look at them on
8  a portfolio-wide basis for purposes of valuation
9  rather than on a CUSIP-by-CUSIP basis?
10     A.   No.  If there's a strong degree of
11 homogeneity within the portfolio, no matter the
12 size, a hundred dollars or a hundred billion
13 dollars, if they are the same across the board,
14 no matter how big the position is, then a
15 portfolio level approach, in my opinion, would
16 be appropriate, it would not be unreasonable.
17          However, within a context of a hundred
18 securities, but there is a tremendous amount of
19 variance within that hundred universe set, a
20 hundred security universe, pay types, asset
21 types, et cetera, I think it behooves the
22 analyst or the valuator to dig deeper.
23     Q.   And if I understand your criticism
24 correctly, you criticize Barclays because, in
25 your view, they should not have applied a 10

1              M. Slattery
2  percent liquidity discount to all of the Agency
3  RMBS that they valued; is that correct?
4      A.   Again, assuming for the moment that I
5  am accurate in the assertion that 10 percent was
6  across the board, I believe that the criticism
7  deals directly with the idea that you do have
8  enough of a distinction within the Agency RMBS
9  world, pay types, for example, IOs versus POs,
10 structured IOs versus trust IOs, support bonds,
11 et cetera, that, in the optimal situation, you
12 would -- I would recommend that you be more
13 granular in the approach.
14     Q.   Is the appropriate liquidity discount
15 for any given CUSIP in any way impacted by the
16 size of the position that one holds?
17          MR. TAMBE:  Objection to the form.
18     A.   Again, dealing with a hypothetical, if
19 the position represents a significant percentage
20 of the outstanding marketplace, it probably
21 seems reasonable.  However, say, for example,
22 the Agency RMBS daily trading volumes of
23 300-plus-billion dollars, you would have to have
24 a position that approaches that in order to
25 effectively justify, in my opinion, such an

1              M. Slattery
2  approach.
3      Q.   What about -- well, if I understood
4  you correctly, you said if the entire
5  marketplace is 300 billion.  What if you have a
6  very large percentage of any given CUSIP?
7          MR. TAMBE:  Objection to form.
8      A.   I don't -- I would not necessarily
9  tend to think that it would, by default, be
10 appropriate.  It depends on the other market
11 participants and their willingness.  Maybe
12 your -- maybe you have cornered the market in a
13 particular commodity, let's say, to take it
14 outside the bandwidth of Agency RMBS.
15     Q.   Let's stay in the bandwidth of Agency
16 RMBS?
17     A.   Okay.  If it's a particular CUSIP?
18     Q.   Yes.
19     A.   Let's say it's a principal-only
20 mortgage-backed security.  If you are Flagstar,
21 for example, and you have a multi-billion-dollar
22 servicing portfolio, it could be appropriate
23 that that principal-only strip represents the
24 best hedging vehicle.  Therefore, they would
25 probably pay up to the individual that may have

Page 150

1           M. Slattery
2  cornered that particular CUSIP, as an example.
3      Q.   Is the liquidity discount for a single
4  given CUSIP in any way impacted by the
5  concentration of the position?
6      A.   What do you mean by "concentration"?
7      Q.   Percentage of market ownership.
8      A.   Correct me if I'm wrong.  I thought
9  that's where we just came from in terms of like
10 if, say, for example, the total outstanding
11 represented by a particular CUSIP is $100
12 million and market participant A or investor A
13 owns $98 million of that CUSIP.  It depends on
14 the CUSIP, it depends on the market's appetite
15 for that particular product.
16     Q.   Meaning that -- strike that.  Take a
17 look at paragraph 40, if you would, sir.
18 Actually, that's not the right one.  Actually,
19 let's look at paragraph 39.
20          You refer to the BlackRock prepayment
21 model.  Do you see that?
22     A.   Yes.
23     Q.   Okay.  And then you say "based on my
24 understanding of this analytical configuration."
25 What's the source of your understanding?

Page 151

1           M. Slattery
2      A.   Well, my understanding of the sentence
3  that I cite in the previous -- in, I guess, the
4  second sentence of paragraph 39 would be my
5  professional experience.  If someone were to
6  represent to me, another mortgage market
7  participant, the same sentiment, I would
8  interpret that as being a single-path approach,
9  i.e., a static pricing approach.
10     Q.   So I'm clear, then, are you saying
11 that you know the BlackRock prepayment model to
12 be a static model, or are you saying you think
13 that it is?
14     A.   In this case, it would be a thought.
15 I don't know specific details.  Again, it's
16 based on my reaction or impression of that
17 representation.
18     Q.   So your understanding is that Barclays
19 did not use a dynamic pricing model in valuing
20 these securities, is that correct?
21     A.   Based on my understanding of all the
22 information that we've gathered to date, yes,
23 that would be my understanding.
24     Q.   Go to paragraph 37, if you would.  You
25 say that, "For example, Barclays claims that the

Page 152

1           M. Slattery
2  bid-offer spread was approximately 16 percent
3  for inverse IOs."  Do you see that?
4      A.   Yes.
5      Q.   Are you contesting that claim?
6          MR. TAMBE:  Objection to the form of
7  the question.
8      A.   In terms of contesting?
9      Q.   Are you suggesting that approximately
10 16 percent is an inappropriate bid-offer spread
11 for inverse IOs in that market?
12     A.   No.  In fact, I think if you will
13 compare to 717B, that's exact -- well, I
14 wouldn't say exact.  As I mentioned earlier, the
15 16.2 percent as seemingly represented on the
16 second page of 643A was very similar to our
17 16.67.
18     Q.   Then the next sentence you say, "The
19 majority of the other types of securities in
20 Barclays' own benchmark portfolio had a
21 bid-offer spread of approximately .03 percent."
22          How are you calculating that number,
23 the majority?
24     A.   The majority of the other types in
25 this benchmark portfolio?

Page 153

1           M. Slattery
2      Q.   Yes, sir.
3      A.   So let's say the other types are
4  represented by maybe 18 or 19 securities.  Based
5  on a quick count, 13 of the other securities
6  have a .03 percent bid-offer spread.
7      Q.   So that's just a majority by counting
8  up the number of CUSIPs?
9      A.   Right.
10     Q.   Correct?  And it doesn't take into
11 account the size of the position or the face
12 value?
13     A.   No.  But one point to, for example, on
14 the face amount on an interest-only security may
15 not necessarily be the best proxy for weighting.
16 The face amount of $70 million in the first
17 example that's listed may be the more
18 appropriate way but would be based on an actual
19 value.
20          So the face amount of 70 represents --
21 maybe my impression is incorrect, but that would
22 represent a nominal face amount.  The value of
23 an inverse IO might be significantly less.  So
24 that's just a point of clarification.
25     Q.   Did you make any effort to break down

Page 154

M. Slattery

1    the portfolio by value to determine how the --
2    determine the composition of different types of
3    Agency RMBS?
4        A.    No.
5            MR. TAMBE:  Objection to form.
6        A.    I broke down the 308, but in terms of
7    the aggregate RMBS universe, no.
8        Q.    Now, in paragraph 39, your last
9    sentence says -- actually, last two sentences
10    you say, "This means that Barclays assumed a
11    single set of cash flows and assigned a single
12    discount rate to value each security."
13            How do you know that, sir?
14        A.    Again, I would go back to my
15    understanding of what I take from the analytical
16    configuration as represented by the statement
17    regarding Barclays using a discounted cash flow
18    approach, incorporating the BlackRock prepayment
19    model and an estimate of required market deals.
20        Q.    And do you -- do you know what -- what
21    other models Barclays may have used in the
22    valuation process for these assets?
23        A.    No --
24            MR. TAMBE:  Objection to the form of

Page 155

M. Slattery

1    the question.
2        A.    No, I do not.
3        Q.    Did you at any point ask anyone to get
4    you additional information like, for example,
5    taking the deposition of any of the Barclays
6    valuation professionals who worked on the
7    valuation?
8        A.    Did I request the deposition?
9        Q.    Yes.
10        A.    No.  I requested on more than one
11    occasion, just without having an exact number, I
12    would say at least three or four times, for
13    detailed analytical information to support or
14    refute conclusions that I was drawing based on
15    information that was available to me.
16        Q.    And when you say you requested it, you
17    mean you requested it of the counsel you were
18    working for; is that correct?
19        A.    That would be fair.
20        Q.    Did you request that any information
21    be gathered about PwC by taking the deposition
22    of any of the people who audited the valuation
23    process?
24        A.    No, I didn't request any depositions

Page 156

M. Slattery

1    be taken.
2        Q.    Did you ask for more information about
3    the PwC auditing process?
4        A.    I did not ask for more information of
5    the PwC auditing process, no.
6            MR. TAMBE:  Do you have more to
7    produce?
8            MR. SHAW:  I have auditors.
9        Q.    Paragraph 42, you say, "For the
10    remaining Agency RMBS that I valued, I used an
11    industry standard and widely recognized
12    valuation techniques to establish mid prices,
13    i.e., prices midway between prevailing bids and
14    offers."  Do you see that?
15        A.    Yes.
16        Q.    And would it be fair to say that the
17    mid prices you arrived at using that technique
18    were not significantly different from the mid
19    prices that Barclays arrived at in its valuation
20    process?
21        A.    I don't off the top of my head know
22    that comparison.  I would have to double-check.
23        Q.    Did you look into how many of the
24    agency securities fully performed by year-end?

Page 157

M. Slattery

1            MR. TAMBE:  Objection to the form of
2    the question.
3        A.    "Year-end" you mean December of 2008?
4        Q.    Yes, sir.
5        A.    I did not look at performance
6    prospectively except for one security.
7        Q.    Which one was that?
8        A.    I'd have to double-check my notes, but
9    there was a significant difference in value
10    between my value and that of Barclays,
11    significant in the sense that I believe it was
12    more than $50 million.  So, from the standpoint
13    of conservatism, I wanted to make sure that
14    there wasn't something that I was
15    misinterpreting in terms of the implications of
16    the payments or the structure or anything
17    dealing with the collateral of a particular
18    CUSIP.
19            So I prospectively looked at the
20    performance of that one CUSIP all the way
21    through, up to and including January of 2010,
22    and based on my findings, it looked as though
23    the performance supported the value that I
24    derived in September of 2008.

Page 158

M. Slattery

1
2    Q.   If I wanted to identify that
3    particular CUSIP, how would I go about it?
4        A.   I would look through my work papers,
5    my support.
6        Q.   Can you tell me specifically which
7    document you would want to look at?
8        A.   I would have to double-check.  It's a
9    spreadsheet.
10       Q.   I'm going to show you now the exhibit
11   that was marked earlier today as Exhibit 712B.
12           Actually, I'm sorry, that may not be
13   the right exhibit.  Yes, it is 712B, but it's
14   not the first page.
15           I'd like you to take a look at the
16   third page of this document, and as I understand
17   it, we are now on a different tab of the
18   spreadsheet that this entire document
19   constitutes?
20       A.   Yes.
21       Q.   And again, this is one of the ones
22   that has all of the -- all of the columns but
23   not all of the rows.
24       A.   Yes.
25       Q.   Can you tell me whether this is the

Page 159

M. Slattery

1
2    portion of that spreadsheet that would deal with
3    your Agency RMBS valuations?
4        A.   Not in its entirety.  Again, the trust
5    IOs and POs that are represented by the previous
6    page in this handout, so those 24 reconciled at
7    paragraph 41 of my report.
8        Q.   Okay.
9        A.   This --
10       Q.   Let me ask my question, then.
11       A.   Okay.
12       Q.   What appears on the third page would
13   be the backup for your valuation of the 284
14   RMBS, Agency RMBS?
15       A.   I think for the overwhelming majority,
16   yes.
17       Q.   First column obviously is just CUSIP.
18           THE WITNESS:  I'm sorry.
19           MR. SHAW:  Are you all right?
20           THE WITNESS:  Yes.
21           MR. SHAW:  Do you need to take a
22   break?
23           THE WITNESS:  Do you mind for a
24   second?
25           MR. SHAW:  No, not at all.

Page 160

M. Slattery

1
2        THE VIDEOGRAPHER:  The time is 2:02.
3    We are now off the record.
4        (Recess.)
5        THE VIDEOGRAPHER:  This begins tape
6    number 3 of the videotaped deposition of
7    Mark Slattery.  The time is 2:09 P.M.  We're
8    now on the record.
9        MR. SHAW:  And just to clarify, we've
10   been off the break.  The witness has had
11   reconstructive surgery on his knee three
12   years ago, just felt a pain in his knee.
13   That was the reason for the short break, but
14   we're back on.
15       Thank you.
16   BY MR. SHAW:
17       Q.   And you're feeling fine now, sir?
18       A.   I appreciate it.  Yes.
19       Q.   So we were looking at Exhibit 712B,
20   and specifically the third page, and I think we
21   agreed the first column was just the CUSIPs.
22           The second column is the mid price?
23       A.   Yes.
24       Q.   Okay.  And the source of the mid price
25   there is what?

Page 161

M. Slattery

1
2        A.   We derived break-even spreads and
3    prepayment multipliers, which are part of the
4    spreadsheets that are indicated, I guess in
5    technically columns 7 and 8 or 6 and 7 here.
6        MR. TAMBE:  Which document?
7        THE WITNESS:  In the same document
8    that we're looking at.
9        MR. TAMBE:  Okay.
10       A.   So there are two spreadsheets
11   identified.  Those spreadsheets house spreads
12   that were generated running a break-even
13   analysis across a spectrum of hundreds of trust
14   IOs and POs.
15           The spreads that were derived in that
16   exercise were then allocated, based on a
17   collateral consistency, to the underlying
18   collateral for these CUSIPs.  We then calculated
19   the mid prices based on that combination of
20   prepayment multiplier and break-even OAS.
21           We then introduced a liquidity factor
22   to take the mid down to bid and reran the
23   analysis to generate the OAS that's indicated in
24   the far right-hand column, second one in from
25   the left -- or right, the OAS bid.  And these

Page 162

M. Slattery

1            M. Slattery
2  liquidity factors will go back to Exhibit 717B.
3     Q.   And the two spreadsheets, do you know
4  if those have been produced to us?
5     A.   Yes.
6     Q.   Yes, you know, or yes, they have been
7  produced, or both?
8     A.   "Yes" to both.
9     Q.   And then you've got a column here
10  "Prepayment Multiplier"; is that right?
11     A.   Yes.
12     Q.   And what was that used for?
13     A.   That's, again, part of the break-even
14  analysis.  So we generated those from the trust
15  IO and PO analysis and held that constant for
16  both the mid and the bid calculations.
17     Q.   And the source of that was?
18     A.   They were derived with the analysis
19  that's included in these two spreadsheets that
20  you have been provided.
21     Q.   If you look at the next page, just so
22  that we can see that it was a complete -- it's a
23  continuation horizontally, if we put the CUSIP
24  column back in, you can see it's the same CUSIP
25  that's at the top of each page?

Page 163

M. Slattery

1            M. Slattery
2     A.   Yes.
3     Q.   So the "Underlying Curve" column
4  there?
5     A.   Yes.
6     Q.   That would be something you've gotten
7  from Bloomberg?
8     A.   Yes.
9     Q.   And specifically what Bloomberg
10  database did you get that from?
11     A.   It was Bloomberg curve information,
12  LIBOR curve, Treasury curve, futures prices, all
13  as of the 19th of September 2008.  We have a
14  particular set of Bloomberg tickers that are
15  used to extract the data, but it's the same
16  curve information that you would otherwise use
17  in virtually any system.
18     Q.   And the next column, "Underlying
19  Volatility," and again, that lists Bloomberg as
20  the source.  What Bloomberg database or item of
21  information is that?
22     A.   Two sets of volatility datasets there.
23  Swaption volatilities and cap volatilities.
24     Q.   Okay.
25     A.   As of the 19th of September.

Page 164

M. Slattery

1            M. Slattery
2     Q.   And then the final column is headed
3  "Model Components" and it lists three models, I
4  take it, Polypaths, AdCo and Intex?
5     A.   Yes.
6     Q.   And what was the Polypaths, what was
7  the Polypaths model used for?
8     A.   Polypaths was the rate engine.  So,
9  given the inputs in terms of the base yield
10  curve and the volatilities, Polypaths presents
11  us with an opportunity to run their rate engine,
12  use their interface to load CUSIP level
13  information, integrate a prepayment model like
14  AdCo, also augment that by introducing the exact
15  deal library information from Intex, and in
16  combination, those three components produced the
17  results.
18     Q.   We can put that one aside for the
19  moment.
20       Turning to paragraph 43 of your
21  report, sir, and we've now entered into the
22  world of non-Agency RMBS, I note that you say,
23  "I independently valued 162 distinct non-Agency
24  RMBS."
25       And would I be correct in surmising

Page 165

M. Slattery

1            M. Slattery
2  that those are the 162 that met your
3  million-dollar variance between BoNY and
4  Barclays' prices?
5     A.   Yes.
6     Q.   Now, in this report category, is this
7  just CMOs or does it also include other home
8  equity ABS?
9     A.   No, these are just non-Agency RMBS.
10     Q.   In paragraph 44 you note that you
11  segregated these into two categories, stripped
12  and non-stripped; is that correct?
13     A.   Yes.
14     Q.   And why did you do that?
15     A.   As I indicate in the report, the main
16  driver for the stripped non-Agency RMBS, in
17  light of all the credit concerns, was still
18  going to be the prepayment driver because these
19  are interest-only and principal-only.
20       We did evaluate the underlying credits
21  and ascertained that, across the vast majority
22  of the 37 securities that are private label
23  interest-only and principal-only securities that
24  we valued, virtually all of them were triple-A
25  at as of September 19, 2008.  They also

M. Slattery

1  contained average FICO scores, which reflect the
2  credit quality of the underlying borrower, in
3  excess of 700. So they were not sub-prime.
4      So we chose to take those because of
5  their prepayment characteristics, and that being
6  a main valuation driver, and we segregated those
7  from the remaining 125, which dealt more with
8  the credit components and the credit valuation
9  work attributed to the valuation.
10     **Q.** Now, there were interest-only and
11 **principal-only securities in the population of**
12 **Agency RMBS, right?**
13     A. Yes.
14     **Q.** Why did you not perform the same sort
15 **of allocation with respect to those?**
16     MR. TAMBE: Object to the form.
17     Go ahead.
18     **Q.** As between stripped and non-stripped?
19     A. Everything was stripped but for,
20 again, a handful of the Agency RMBS that we
21 valued. The overwhelming majority would be IOs
22 and POs in some form. The delineation was not
23 warranted.
24     **Q.** If you can pull back Exhibit 712B,

M. Slattery

1      **please, and this time we're going to turn to the**
2      **page that begins with the CUSIP 02150NAY9.**
3      A. Yes.
4      **Q.** You see that?
5      A. Yes.
6      **Q.** And this is a group of 37 securities;
7  **is that correct?**
8      A. Yes.
9      **Q.** And do you understand that to be the
10 **category of the stripped non-Agency RMBS?**
11     A. Yes.
12     **Q.** If you could tell me, sir, the first
13 **column is just the CUSIP. The second column is**
14 **the mid price?**
15     A. Uh-huh.
16     **Q.** And how did you derive that?
17     A. The mid was established in the same
18 way that the Agency RMBS mid prices were in that
19 we allocated break-even spreads from an
20 extensive examination of trust IOs and POs based
21 on a collateral consistency to the individual
22 collateral types underlying these CUSIPs. So...
23     **Q.** And when you say "collateral
24 **consistency," you're talking about what?**

M. Slattery

1      A. Weighted average coupon and weighted
2  average maturity. Since we did examine the
3  creditworthiness of these particular bonds,
4  these securities, and we were able to ascertain
5  that, as of September 2008, the overwhelming
6  majority was triple-A, and also, as of September
7  2008, the overwhelming majority had a FICO or a
8  credit component score of in excess of 700.
9      **Q.** And the next column is headed
10 **"Liquidity Factor." Is that your liquidity**
11 **discount?**
12     A. Yes.
13     **Q.** And how did you derive those?
14     A. This was based on a comparison of --
15 I'm just going to look for the -- the paragraph
16 was 45, the last sentence. We looked at jumbo
17 RMBS, which, by default, are categorized as
18 non-Agency RMBS versus prime conventional
19 conforming Agency RMBS, with similar
20 characteristics as of September 2008 to arrive
21 at a liquidity factor that ranged between 15 and
22 20 percent.
23     **Q.** Okay. And is there a detailed backup
24 **for that analysis anywhere in your work papers?**

M. Slattery

1      A. I would have to double-check on that.
2      **Q.** Okay.
3      MR. SHAW: If there is such an
4      analysis, we would appreciate it if you
5      would identify it to us.
6      **Q.** Is there a detailed backup for the mid
7  **price calculation that you have --**
8      A. Yes.
9      **Q.** -- that you give on this sheet?
10     And where would that be?
11     A. The approach that you would have to
12 take, again, that all the spread information
13 supporting the mids would be part of the two
14 spreadsheets that have already been produced.
15     **Q.** And those are the two spreadsheets
16 **that are identified on the column headed**
17 **"Spreadsheets" here on this page?**
18     A. Yes, column 6 and 7. Again, it's --
19 the same foundation was laid for these, despite
20 the fact that they were non-agency, that they,
21 again, passed two critical tests in our mind in
22 terms of rating and FICO score as of the
23 valuation date.
24     So after applying the liquidity

Page 170

1            M. Slattery
2  factor, simply taking the mid times the factor
3  to arrive at a bid, we reran the analysis, and
4  then you're going to have the same outcome in
5  the sense that the option adjusted spread bid
6  column, which is to the far right, one column
7  in, would be related to the bid.
8       Q.   And is it your understanding that the
9  two spreadsheets would preserve your
10 calculations with respect to each of the CUSIPs
11 you valued here?
12      A.   It would be --
13           MR. TAMBE:  Objection to the form of
14 the question.
15           You can answer.
16      A.   Can you repeat the question?
17      Q.   Sure.  Is it your understanding that
18 between the two spreadsheets identified on the
19 spreadsheet columns on this page of Exhibit
20 712B, that the calculation work that you did to
21 derive midpoint prices would be preserved for
22 each CUSIP?
23      A.   Yes, I believe that is the case.
24 Within the spreadsheets you may not see a
25 laundry list of CUSIPs.  You would see

Page 171

1            M. Slattery
2  collateral.  So there is a matrix of collateral
3  which would then tie back to the individual
4  CUSIPs.
5       Q.   Okay.  So if I understand correctly,
6  the spreadsheets are the nature of models that
7  rely on this matrix of information; is that
8  correct?
9       A.   Let me just clarify in terms of
10 response.
11      Q.   Sure.
12      A.   These two break-even spreadsheets as
13 highlighted around the agency and non-agency
14 sheets in this particular exhibit, they include
15 all the spreads that were calculated across a
16 varied matrix of weighted average coupon and
17 weighted average maturity.
18           That information is assigned based on
19 a combination of weighted average coupon and
20 weighted average maturity.  Analytically, there
21 may be another spreadsheet that shows the
22 results from Polypaths that reconciled the mid
23 based on the spreads, but ultimate derivation of
24 the OAS bids are supported by these two
25 spreadsheets.  In other words, there's nothing

Page 172

1            M. Slattery
2  lacking other than additional Polypaths output.
3       Q.   And how would I go about tying back
4  the results that are contained on either of
5  those spreadsheets to a particular CUSIP?
6       A.   Identify the weighted average coupon
7  and the weighted average maturity, as an
8  example, at 715B.  You would have those two
9  identifiers on a CUSIP-level-basis and you would
10 be able to allocate the spreads contained on
11 these two spreadsheets to that CUSIP based on
12 the intersection again of coupon and maturity.
13      Q.   And did you anywhere preserve the
14 outputs for each of the CUSIPs as opposed to the
15 means by which those outputs were derived?
16      A.   Yes, I did.
17      Q.   And where would that be found?
18      A.   In my -- on my laptop.
19      Q.   Okay.  Has that information been
20 produced?
21      A.   No.
22           MR. SHAW:  Okay.  We would ask that
23 that be produced to us.
24      Q.   What else is on your laptop that you
25 relied on in reaching the opinions you express

Page 173

1            M. Slattery
2  here that has not been produced to us yet?
3           MR. TAMBE:  Objection to the form of
4  the question.
5       A.   There are other spreadsheets and
6  documents, research material that supported my
7  work, but in terms of deriving these spreads,
8  nothing directly.
9       Q.   Well, when you say it supported your
10 work, you mean it's material that you relied on
11 in reaching the opinions that you are expressing
12 in this litigation?
13           MR. TAMBE:  Objection to the form of
14 the question.
15      A.   No.  Other than the requested
16 spreadsheets through the course of this
17 deposition and these spreadsheets, you would
18 have everything that I relied on.
19      Q.   Will you turn for a second to the
20 resumé portion, the curriculum vitae portion of
21 your -- of your report.
22           I believe you testified earlier today
23 that the only work you've done while at Navigant
24 Economics is work on this case; is that correct?
25      A.   Yes.

Page 174

1          M. Slattery
2      Q.   Okay.  And if you look at the second
3  bullet point, you say, "Lead all aspects of
4  related effort ranging from implementing
5  requisite analytical configuration to writing
6  papers intended to describe model
7  specifications."  You see that?
8      A.   Yes.
9      Q.   What do you mean by "writing papers
10  intended to describe model specifications"?
11      A.   Papers that were used as an initial
12  description of the model components that were
13  part of our analytical configuration.
14      Q.   And when did you prepare those papers?
15      A.   During the course of the 12 or so
16  weeks.
17      Q.   Do you know whether those papers have
18  been produced?
19      A.   I'm not aware.
20      MR. SHAW:  Well, we would ask that
21  those be produced to us as well.
22      MR. TAMBE:  If that is consistent with
23  the stipulation we have entered into, we
24  will produce them.  Otherwise, we won't.
25      Q.   Looking at paragraph 45, the last

Page 175

1          M. Slattery
2  sentence, you write, "The amount of the
3  liquidity discount in percentage terms was based
4  on the difference between the price of select
5  non-Agency RMBS and Agency RMBS with similar
6  characteristics as of the valuation date."  Do
7  you see that?
8      A.   Yes.
9      Q.   What do you mean by that?
10      A.   This refers back to the jumbo
11  mortgages versus the prime convention conforming
12  mortgage-backed securities to support the
13  liquidity factor of 15 to 20 percent.
14      Q.   Moving to the first sentence of
15  paragraph 46, you say, "Material public
16  information exists for an overwhelming majority
17  of these credit-sensitive non-Agency RMBS."  You
18  see that?
19      A.   Yes.
20      Q.   What are you -- what constitutes an
21  overwhelming majority?
22      A.   Percentage-wise?
23      Q.   Yes.
24      A.   Almost a hundred percent.
25      Q.   And what do you mean by "material

Page 176

1          M. Slattery
2  public information"?
3      A.   I think we highlight it in the
4  remaining sentences within the paragraph,
5  specifically, the remittance report, which comes
6  out monthly.
7      Q.   And when you talk about these
8  credit-sensitive non-Agency RMBS, you're talking
9  about IOs and POs?
10      A.   No.
11      Q.   Which ones are you talking about?
12      A.   We're talking about non-interest-only
13  and principal-only strips.  We're talking
14  about --
15      Q.   So the non-stripped?
16      A.   Yes.
17      Q.   In determining the liquidity discounts
18  that you applied to these securities, and by
19  that I mean the non-Agency RMBS that you valued,
20  did you take into account the fact that, with
21  respect to some them, the issuer was Lehman or
22  Lehman-related?
23      MR. TAMBE:  Objection to the form of
24  the question.
25      A.   For which segment of the non-agency?

Page 177

1          M. Slattery
2  All of them or --
3      Q.   For any of the non-agency, yes.
4      A.   We did not specifically adjust
5  liquidity factor based on Lehman being, let's
6  say, the shelf or the originator of the mortgage
7  product.  For the 125 credit-sensitive
8  non-Agency RMBS we used Barclays' liquidity
9  factor.  So if that factor included a Lehman
10  adjustment, then, by implication, we did.
11      Q.   In the paragraph 46, you talk about
12  the remittance reports, and if I'm reading this
13  correctly, you are -- you're saying you did not
14  look at the September 2008 remittance reports
15  because they came out after the date you paid
16  for the valuation date; is that correct?
17      A.   For the majority of the instruments in
18  this 125 security set, yes, because the pay date
19  and the remittance report date would be the
20  25th.  So approximately one week after.
21      Q.   Do you know how many of them you --
22  strike that.  So would that mean that the last
23  remittance report you looked at for those would
24  have been the 8/25 remittance report?
25      A.   For the majority of those that do pay

Page 178

```
 1              M. Slattery
 2  out on the 25th, yes.
 3      Q.   And when did you look at those?
 4      A.   When in terms of throughout the
 5  process?
 6      Q.   Yes.
 7      A.   During the course of January and
 8  February would be an approximate guess.
 9      Q.   And it's your understanding that the
10  data on those reports is the same as it would
11  have been had you looked at versions pulled in
12  September of 2008?
13      A.   Are you asking if the August 25, 2008
14  remittance reports that we looked at this winter
15  would be the same as those that would be
16  presented on August 25 of 2008?
17      Q.   Yes.
18      A.   Unless the Trustee indicated that
19  there was some reason or causation for a change,
20  yes, it would be the same.
21      Q.   Is it your understanding that the most
22  current information regarding the payment and
23  collateral performance available to the market
24  on either September 19 or September 22 would
25  have been the August 25 reports that you looked
```

Page 179

```
 1              M. Slattery
 2  at?
 3      A.   For the majority of these securities
 4  that would be the case, yes.
 5      Q.   And so you assumed that the market was
 6  not pricing into these securities any
 7  information concerning payments or collateral
 8  performance that postdated the August 25
 9  reports, is that correct?
10          MR. TAMBE:  Objection to the form of
11      the question.
12      A.   I don't know what the rest of the
13  market participants were doing.
14      Q.   Now, in the next paragraph you talk
15  about the use of ex-post pricing, which you
16  characterize as inappropriate, as market
17  conditions change over time.
18          If you got a particular trade price at
19  12:02 A.M. on the 22nd, would you view that as
20  information that you should or should not
21  consider in pricing the securities that you
22  priced?
23          MR. TAMBE:  Objection to the form of
24      the question.
25      A.   Based on my understanding of the scope
```

Page 180

```
 1              M. Slattery
 2  of the work and based on my understanding of the
 3  transaction, the 12:02 A.M. price would be
 4  outside the scope.
 5      Q.   That would be true, in your opinion,
 6  whether or not you had a September 19 price for
 7  a particular security?
 8      A.   Can you rephrase that question?
 9      Q.   Sure.  Some of the securities that you
10  looked at traded on September 19, others did
11  not, correct?
12      A.   I'm not sure if they traded on the
13  19th or not.
14      Q.   Well, you were unable to find prices
15  for some of them on the 19th, is that fair?
16      A.   Yes.
17      Q.   And so if you had no price information
18  for a particular security on the 19th and you
19  got price information at 12:02 A.M. on the 22nd,
20  if I understand you correctly, you're saying
21  that you would not consider the 12:02 9/22
22  information in the valuation of that security;
23  is that correct?
24          MR. TAMBE:  Objection to the form of
25      the question.
```

Page 181

```
 1              M. Slattery
 2      A.   Yes, I would not consider it.
 3      Q.   Are you an accountant, sir?
 4      A.   No.
 5      Q.   Are you an expert on fair value
 6  valuation?
 7          MR. TAMBE:  Objection to the form of
 8      the question.
 9      A.   If the fair value within the context
10  of accounting, I'm not an accountant, as I just
11  stated.  In terms of arriving at fair value
12  based on my understanding of the definition, I
13  feel as though I am an expert, yes.
14      Q.   Paragraph 48, sir, there's a sentence
15  that begins, "In addition, when measured against
16  Barclays' only internal marks, the resulting
17  loss on these securities signifies a fire sale
18  and/or sales to internal trading desks at deeply
19  discounted prices."  Do you see that?
20      A.   Yes.
21      Q.   What are you referring to when you say
22  "the resulting loss"?
23      A.   I think the -- the difference between
24  the acquisition price and the sales price.
25      Q.   And how are you defining the
```

Page 182

M. Slattery

1  acquisition price?
2     A.  I'd have to double-check exactly the
3  comparisons that we're making there, but --
4     Q.  Well, that's what I'm asking, is what
5  comparison are you making there?
6     A.  Well, the comparison between the sales
7  price and the Barclays internal marks is the
8  comparison.
9     Q.  Which Barclays internal marks?
10    A.  I'd have to double-check my work.
11    Q.  What is your basis for asserting that
12 there were sales to internal trading desks at
13 deeply discounted prices?
14    A.  Based on the difference, it's an
15 assertion. I don't know exactly, we could not
16 determine exactly who was the buyer of those
17 securities.
18    Q.  Setting to one side who precisely the
19 buyer is, what is your basis for asserting that
20 there were deeply discounted prices received by
21 Barclays on the sale of -- of securities?
22    A.  I think you're referencing the
23 comparison between Barclays' marks and the
24 actual sales prices. That represented the deep

---

Page 183

M. Slattery

1  discount.
2     Q.  Okay. And what I'm trying to
3  understand is what Barclays marks are you
4  looking at to reach that determination?
5     A.  Again, I'd have to double-check my
6  work.
7     Q.  Where would you go to look?
8     A.  Go back to the work on my PC.
9     Q.  So, again, this is -- this is more
10 information that's on your personal computer
11 that has not been produced?
12    A.  It's just a reference to the internal
13 marks. I would --
14    MR. TAMBE: Objection to the form of
15 the question.
16    You can answer.
17    Q.  Well, which set of internal marks are
18 you referring to? That's what I'm trying to
19 understand.
20    A.  Again, I would have to double-check.
21 At this point, as I sit here, I don't have the
22 exact recollection.
23    Q.  How are you distinguishing between a
24 fire sale and a sale at a deeply discounted

---

Page 184

M. Slattery

1  price in that sentence, if you are in fact
2  distinguishing between the two?
3     A.  I don't think there is necessarily a
4  distinguishing. I think the -- we said
5  "and/or." I don't think there is a
6  distinguishing element to that.
7     Q.  I take it you couldn't tell me what --
8  what precisely you're referring to when you talk
9  about a fire sale price either?
10    A.  As I sit here, a fire sale in this
11 context, no.
12    Q.  Paragraph 49, first sentence, sir, you
13 say you used the Intex deal library. Can you
14 tell me when you looked at the Intex deal
15 library and pulled up the data that you looked
16 at?
17    A.  Over the course of the 12 weeks or
18 whatever it's been during this period.
19    Q.  So at some point in 2010?
20    A.  Yes.
21    Q.  And do you know if the Intex reports
22 you looked at were identical to the Intex
23 reports you would have seen had you pulled them
24 on September 19, 2008?

---

Page 185

M. Slattery

1     A.  I expect that they would be the same.
2  If there were updates that were included in the
3  Intex deal library, then I wouldn't necessarily
4  see those.
5     Q.  Okay. And then in the next sentence
6  you talk about -- about -- or, you reference
7  "contemporaneous research to develop an
8  appropriate loss curve and industry standard ABX
9  indices to arrive at an appropriate discount
10 rate."
11    A.  Uh-huh.
12    Q.  When did you look at those materials?
13 Again in 2010?
14    A.  In 2010. As of September 19, yes.
15    Q.  And I take it, again, you're not able
16 to tell me whether those would be identical to
17 what you would have pulled, or had you pulled
18 them, on September 19, 2008?
19    MR. TAMBE: Object to form.
20    A.  I don't necessarily agree with you on
21 that particular statement to the extent -- or
22 question to the extent the ABX index prices
23 were what they were as of the 19th.
24    Q.  Last sentence of paragraph 49, sir, it

Page 186

1            **M. Slattery**
2    says, "Finally, to be conservative, I applied an
3    additional liquidity discount to derive my final
4    values."
5            How did you calculate that additional
6    liquidity discount?
7        A.    That was the Barclays liquidity
8    discount.
9        Q.    Why did you use the Barclays liquidity
10   discount rather than the 15 to 20 percent
11   discount you used on other non-Agency RMBS
12   securities?
13       A.    Distinguishing between
14   credit-sensitive and interest-rate-sensitive, we
15   wanted to be conservative and use the Barclays
16   liquidity discount for the credit-sensitive
17   piece.  We just didn't feel that we had research
18   that would support a difference or a
19   distinguishing factor.
20       Q.    How are you defining
21   "credit-sensitive" in that context?
22       A.    Credit-sensitive would be those 125
23   securities that were not part of the
24   interest-only and principal-only non-Agency
25   RMBS.  So we viewed those within the context of

Page 187

1            M. Slattery
2    more of a delinquency loss or roll rate
3    valuation framework as opposed to a stochastic
4    process that is prepayment-driven.
5        Q.    What is a reperforming RMBS.
6        A.    A reperforming?
7        Q.    Yes.
8        A.    Based on my understanding, that would
9    be -- you have performing and then reperforming.
10   My assumption would be that it's an instrument
11   that has been cured in some sense.
12       Q.    Are reperform RMBSs more or less
13   liquid than other RMBSs?
14       A.    I don't know the answer to that
15   question.
16       Q.    In performing the valuations that you
17   have outlined in your report, did you in any way
18   take into account the fact that some of the
19   securities were reperforming RMBSs?
20       A.    I don't know that answer.
21       Q.    Do you even know if there were any
22   reperforming RMBSs in the collateral that
23   Barclays received?
24       A.    As I sit here today, I don't know.
25   Especially within the 125 securities.  Maybe

Page 188

1            M. Slattery
2    within the broader universe.
3        Q.    Just so I'm clear, you don't know one
4    way or the other whether there were reperforming
5    RMBSs in either the 125 or the broader universe;
6    is that correct?
7        A.    Correct.
8        Q.    In the context of a reperforming RMBS,
9    would it make any difference if the issuer were
10   a Lehman-related entity?
11       A.    I'd have to do the research to
12   determine that conclusively.  I don't know as I
13   sit here.
14       MR. SHAW:  Why don't we take five
15   minutes.
16       MR. TAMBE:  Do you have any sense
17   generally of time?
18       MR. SHAW:  I'm thinking wind up by
19   5-ish.
20       MR. TAMBE:  Okay.
21       MR. SHAW:  I don't see us being here
22   at 8 o'clock tonight or anything like that.
23       THE VIDEOGRAPHER:  The time is 2:48
24   P.M.  We're now off the record.
25       (Recess.)

Page 189

1            M. Slattery
2        THE VIDEOGRAPHER:  The time is 2:57
3    P.M.  We're now on the record.
4    BY MR. SHAW:
5        Q.    Mr. Slattery, I just wanted to go back
6    for a minute to a sentence at the end of
7    paragraph 45, and I just want to clarify, is
8    there somewhere in your work papers that you
9    believe I would be able to find the backup for
10   the calculations of the liquidity discounts that
11   you refer to in that sentence?
12       A.    Yes.
13       Q.    And where would that be?
14       A.    They would be still -- I don't believe
15   those have been provided.
16       (Exhibit 718B, a document produced as
17   LEH-NAVIGANT 026203, marked for
18   identification, as of this date.)
19       Q.    Showing you, sir, what has been marked
20   as Exhibit 718B.  And I'll represent to you that
21   that is what was produced with the Bates number
22   LEH-NAVIGANT 026203.  I'll ask you if you can
23   tell me what this document is, sir.
24       A.    This is in its entirety?
25       Q.    I believe that it is, yes.

1        **M. Slattery**
2      A.   I believe it's only a segment of the
3   non-Agency RMBS CUSIPs, so -- and there's --
4      **Q.   I could be wrong about whether this is**
5   **a complete document.**
6        MS. DAVIS:  There's supposed to be 125
7   CUSIPs.
8        THE WITNESS:  Right.
9      **Q.   So, yes, this would have all of the --**
10  **all of the columns, but perhaps not all of the**
11  **rows.**
12     A.   Okay.  Then "CUSIP," "CP Price,"
13  Chicago Partners, "Intex Factor," based on the
14  corresponding factor date, so the August 25
15  date, variety of different bond types, and the
16  underlying collateral for each one would be a
17  prime, sub-prime, Alt A.  "Location," I believe
18  that relates back to the 86B spreadsheet.  So,
19  again, this is only a segment or a portion of
20  the 125 securities.
21     **Q.   Okay.  And when you say the 125**
22  **securities, you're talking about the 125**
23  **non-Agency RMBS securities?**
24     A.   The credit-sensitive non-Agency RMBS.
25     **Q.   And the column that is headed "CP**

1        **M. Slattery**
2   **Price," Chicago Partners price, is that your**
3   **derived valuation?**
4      A.   Mid, yes.
5      **Q.   Mid price.  And what is meant by**
6   **"Intex Factor"?**
7      A.   That would be the outstanding pool
8   factor for the particular bond.  If you see a 1,
9   that means the original principal balance at
10  issuance is the same as the current principal
11  balance, i.e., there's been no amortization or
12  reduction.  Anything less than 1, and it runs
13  the gamut here, at least on this one, all the
14  way down to -- I can't see what the lowest --
15  maybe a .39.
16        There are also some, due to negative
17  amortization, that the factor actually exceeds
18  1.
19     **Q.   And what date was the Intex factor**
20  **looked at?  Strike that.**
21        **The Intex factor that's reported here,**
22  **is that as of the date listed in the "Factor**
23  **Date" column?**
24     A.   No, if I understand your question
25  correctly.  We looked at this during the course

1        M. Slattery
2   of the work, the 12 weeks,2010.  The "Intex
3   Factor" corresponds to the factor date that's
4   listed, but the work was done during 2008.
5      **Q.   Right.  I actually was not asking when**
6   **you looked at it.**
7      A.   Okay.
8      **Q.   I was asking the other part of that**
9   **question, which was, this is the Intex factor as**
10  **reported as of August 25, 2008 for each of these**
11  **securities?**
12     A.   Yes, and then it would be the same
13  factor as of 9/19/2008 because you're in
14  between -- you're inside a remittance cycle.  So
15  the factor would presumably change maybe, maybe
16  not, once the 9/25 date rolls around.
17        (Exhibit 719B, a document headed
18     LehBar_RMBS_111, marked for identification,
19     as of this date.)
20     **Q.   Showing you what has been marked as**
21  **Exhibit 719B, sir, can you tell me what this**
22  **document is?**
23     A.   This is work product from us.  Did it
24  get truncated again as far as the --
25     **Q.   Yes.**

1        **M. Slattery**
2      A.   This is a more detailed look at each
3   one of the CUSIPs that were just represented or
4   reviewed on 718B, so additional information and
5   observed metrics such as prepayments, loss,
6   delinquency, cumulative loss, loss last period.
7        I'm just going across the columns.
8      **Q.   Uh-huh.**
9      A.   And I think, in aggregate, you're
10  looking at four sheets that would represent all
11  the columns, maybe five, reading from left to
12  right.
13     **Q.   Okay.  I don't think we need to go**
14  **through each of those columns.  Right after the**
15  **four or five sheets with the columns on it,**
16  **there's a page that's got a title "September 19,**
17  **2008 Roll Rates"?**
18     A.   Uh-huh.
19     **Q.   What is that page showing us?**
20     A.   This is segregating various types of
21  collateral and various vintages.  As you see on
22  the far left-hand column there's a different
23  collateral, prime versus Alt A versus sub-prime,
24  also high LTV, loan to value, scratched and
25  dented, second lien.

Page 194

```
 1              M. Slattery
 2        Then the third column is the vintage,
 3   in other words, that would be the origination
 4   year.  So, based on information in the first
 5   block -- you can see we sort of blocked it
 6   off -- there's information about calculated
 7   defaults versus projected cum. losses from
 8   JPMorgan securitized product weekly.  Then we
 9   have average calculations for other sort of
10   subcategories in this spreadsheet.
11        We're trying to segregate between
12   collateral types and vintages the projected
13   default rates.
14      Q.   And why were you looking to do that?
15      A.   Because we needed to introduce a
16   default rate component for these
17   credit-sensitive instruments, and that is
18   captured in a single rate based on the third
19   page.  So you have to go back, and there's a
20   column called "aggMDR Curve."  That would be the
21   monthly default rate.  And if you go to that
22   particular cell in the spreadsheet itself and
23   click on it, it actually is a memo field.  So
24   you actually have an entire array of calculated
25   numbers, not just -- the number that's shown
```

Page 195

```
 1              M. Slattery
 2   here is just based on the printout, but inside
 3   each cell depends on the expected life of the
 4   instrument, it may be 80 numbers, there may be
 5   120, there may be 300, but you would have to
 6   click on each one of those fields to identify
 7   the monthly default rate curve, which was loaded
 8   into Intex to perform the calculations.
 9      Q.   Going back to the page with the
10   "September 19, 2008 Roll Rates" at the top of
11   it?
12      A.   Uh-huh.
13      Q.   There's a column marked "Current" or
14   headed "Current."  What does that indicate?
15      A.   That would be performing percentage
16   that would roll to the next category.  So, for
17   example, the first -- let's take the second row,
18   the prime fixed 2005 vintage.
19      Q.   Uh-huh.
20      A.   You have a current 3 percent number.
21   It's expected that for the next month 3 percent
22   of that current population would roll into a
23   delinquency status and then you would have the
24   delinquency statuses rolling forward.  30, 60,
25   90 represents the days delinquent.  So you would
```

Page 196

```
 1              M. Slattery
 2   have one month, two months, three months.
 3        The "F/C" column represents
 4   foreclosure, so that would be after the
 5   instrument is clearly identified as part of the
 6   seriously delinquent, non-performing category,
 7   and then "Real Estate Owned" would be after the
 8   home was reposed by the lender.
 9      Q.   And the "-20% HPA Severity" column?
10      A.   Okay.  We assumed, based on
11   information from JPMorgan, that the projected
12   housing price appreciation, that is, the
13   increase in home values or decrease in home
14   values, we accepted their number at -20 percent.
15   So as -- as of September 19, 2008, the
16   projection was that the housing prices would go
17   down 20 percent perfect annum.
18        The severity represents, once the home
19   is actually in REO, how much loss would be
20   attributed to the disposition of the underlying
21   collateral.  So if you had a $100,000
22   outstanding loan on a property and the severity
23   was 10 percent, you would experience a $10,000
24   loss.
25      Q.   So if we move down to the bottom of
```

Page 197

```
 1              M. Slattery
 2   the section where they're boxed in under
 3   "Current" and look at the Alt A option ARM 2007
 4   vintage, do you see that?
 5      A.   (Witness nods.)
 6      Q.   Where the "Current" column is 50
 7   percent, does that mean that over the next month
 8   it's expected that 50 percent of the borrowers
 9   will be delinquent?
10      A.   Would come -- would emerge as at least
11   one month delinquent.  And then the ultimate
12   number, as far as what impact the collateral
13   performance has on the structure that represents
14   the home of the security, would be in the "Cum.
15   Loss" column.  So for that Alt A option ARM 2007
16   vintage, the loss would be 25 percent.
17        So if the underlying collateral was
18   $100 million, at the end, you would only have
19   $75 million of collateral.  Depending on the
20   bonds and the position held within the
21   structure, that would be your pay-off.
22      Q.   Let's go back to our old friend
23   Exhibit 712B, sir.
24      A.   Okay.
25      Q.   Actually, we've already covered that
```

| Page 198 | Page 199 |
|---|---|

Page 198

M. Slattery

1 section of that so let's leave that alone.
2       Looking at -- let's move now to the
3 Section D of your report on page 18. Paragraph
4 51, sir, you state that, "Barclays did not
5 provide details or analysis in support its
6 modeling of CLO securities." Where did you
7 look?
8    A.   We looked across a massive dataset
9 that was provided.
10    Q.   Did you request at any point that
11 anyone from Barclays be deposed or interviewed
12 to determine how they had done their analysis or
13 done their modeling of CLO securities?
14    A.   I did not.
15    Q.   Paragraph 53, you talk about a
16 discount rate that you applied. What was that
17 discount rate?
18    A.   It was actually a margin. I'd have to
19 look at each one of the CUSIPs, each one of the
20 deals to identify the exact discount margin.
21    Q.   And where would I go to look at that
22 on each of those?
23    A.   I believe that's been provided. I
24 just, off the top of my head, I'm not exactly --

Page 199

M. Slattery

1 I don't remember exactly which sheet.
2       MR. SHAW: We would ask that if you
3 can identify for us, Jay, the -- the
4 document where that information is provided.
5       MS. STROHBEHN: I think it is either
6 LEH-NAVIGANT 017229 or 017269.
7       MR. SHAW: Thank you.
8    Q.   You then say, "I then applied an
9 additional liquidity discount to provide my
10 final CLO values." Do you see that?
11    A.   Yes.
12    Q.   What was the source of that additional
13 liquidity discount?
14    A.   We used your discount.
15    Q.   And when you say mine, you mean
16 Barclays' discount?
17    A.   Barclays' discount. I apologize.
18    Q.   Then there is what appears in my copy
19 of your report as -- looks like a heading, but
20 it appears to have been intended to be a
21 paragraph of text, perhaps. "Barclays values as
22 of September 19, 2008, were very similar to the
23 values that I calculated; however, Barclays
24 failed to demonstrate any basis or analytical

| Page 200 | Page 201 |
|---|---|

Page 200

M. Slattery

1 justification for taking a 21 percent discount
2 to arrive at their exit value."
3       Are we still talking about the six
4 CLOs that were valuing here?
5    A.   Yes.
6    Q.   Did you attempt to calculate an
7 appropriate liquidity discount for those
8 securities?
9    A.   No, we used yours. We used Barclays'.
10    Q.   So do you disagree with the 21 percent
11 discount rate that Barclays used?
12    A.   We did not determine our own. We
13 didn't have justification to support the
14 Barclays discount value, but we chose to use it
15 for conservatism.
16       MR. TAMBE: I'm not sure that that
17 paragraph's in the right place, frankly. It
18 doesn't make any sense. 53 and that
19 paragraph don't fit together. You can ask
20 him, but I think it's a typo. I'm not sure,
21 but I --
22       MR. SHAW: I guess that's what I'm
23 asking.
24       MR. TAMBE: Yes.

Page 201

M. Slattery

1    Q.   Do you know where that paragraph is
2 supposed to fit in your report?
3    A.   It's in this section. We wanted to
4 note that we could not find support for the 21
5 percent discount, but we did use it.
6    Q.   And so you don't -- while you don't,
7 perhaps, endorse that 21 percent, you also do
8 not have any basis to contest it, I take it?
9    A.   That would be fair.
10    Q.   Let's skip to paragraph 66 of your
11 report and we'll come back to the Pine CLO.
12       It says here you independently valued
13 30 CDO and CMBS. Were those the 30 CDO and CMBS
14 that match your $1 million variation between
15 Barclays and BoNY valuations?
16    A.   Yes.
17    Q.   And where would I find your backup for
18 the work that you did on those?
19       MS. STROHBEHN: It's also among the
20 produced documents as Bates numbers, I
21 believe, LEH-NAVIGANT, this is, I believe,
22 26181 and 26182, is my understanding.
23       MR. SHAW: Let's confirm that
24 understanding.

Page 202

1          M. Slattery
2          (Exhibit 720B, a document produced as
3    LEH-NAVIGANT 026181, marked for
4    identification, as of this date.)
5        Q.   Showing you what has been marked as
6    Exhibit 720B. I'll represent to you that that
7    is what was produced as LEH-NAVIGANT 026181, and
8    can you tell me what this document is, sir?
9        A.   This document contains the non-Pine --
10   I'm sorry, this is the CDO portfolio that we
11   valued.
12       Q.   Looking at the first page of this
13   document, sir, and looking at CUSIP number
14   056166AC5, you see that appears a couple places?
15       A.   Yes.
16       Q.   Okay.  Looking at the second instance
17   where that appears, do you see that BoNY appears
18   to have valued that at 35.08?
19       A.   Yes.
20       Q.   And Barclays at 26.31, and you valued
21   it at 77.1395, do you see that?
22       A.   Yes.
23       Q.   Did you investigate the reasons for
24   the fairly wide disparity between both --
25   between your mark and both BoNY's marks and

Page 203

1          M. Slattery
2    Barclays' marks?
3        A.   This particular series of instruments
4    I relied on my staff to value.  So, in direct
5    answer to your question, I did not personally.
6        Q.   Well, do you know if your staff looked
7    into that?
8        A.   I would have to check.
9        Q.   And I see that there are a couple of
10   others where you come to substantially different
11   results than BoNY does.  Do you see that?
12       A.   (Witness nods.)
13          MR. TAMBE:  Objection to the form.
14       Q.   You nodded, I think, but you didn't
15   say yes or no.
16       A.   Yes, I can see that there are
17   differences between the series of marks and BoNY
18   and CP.
19       Q.   I take it with respect to those you
20   wouldn't be able to, as you sit here today,
21   explain the discrepancy?
22       A.   Yes.
23       Q.   Can you describe for us the process
24   that your staff used to value these CDOs?
25       A.   They used Intex in their cash flow

Page 204

1          M. Slattery
2    discovery process, and in terms of the discount
3    rate, I believe they used market discount rates,
4    where appropriate, to value the cash flows that
5    were used -- Intex was used to generate.
6        Q.   And do you know where they got those
7    discount rates?
8        A.   I do not at this point.
9        Q.   Do you know what discount factor they
10   used?
11       A.   Since they used Intex, the discount
12   factor would represent a flat rate, so
13   therefore, it decreases over time, but what
14   exactly it was at various points along the
15   curve, I don't know the answer.
16       Q.   If you look at the page headed "Ares
17   12, Capital Structure," do you see that?
18       A.   Yes.
19       Q.   It's got a section headed
20   Trigger/Tests Summary.  Generally, what is that
21   discussing?
22       A.   Well, there are a variety of triggers
23   that accelerate payments based on loss, based on
24   deterioration in the over-collateralization of
25   the underlying.  So, based on what I can gather

Page 205

1          M. Slattery
2    from the various trigger tests in this
3    particular example, they all seem to pass.  For
4    example, the what they call the
5    over-collateralization test is currently
6    indicated to be at 129.67, where the trigger was
7    at 116.90.  Typically, if you fail a trigger,
8    there is going to be an acceleration of payment.
9        Q.   Look at paragraph 68.  It states at
10   the end, "...an additional liquidity discount
11   was applied to derive my final CMBS value."  Do
12   you see that?
13       A.   Uh-huh.
14       Q.   Can you tell me how that liquidity
15   discount was calculated?
16       A.   It was Barclays' discount.
17       Q.   Before we get to 721B, did you make
18   any effort to derive your own liquidity discount
19   on that for use in that calculation?
20       A.   Not that I'm aware.
21       Q.   And so fair to say that you, while you
22   perhaps may not endorse the Barclays liquidity
23   discount, you have no basis for disputing it?
24       A.   At present, that would be fair.
25          (Exhibit 721B, a document produced as

Page 206

1          M. Slattery
2     LEH-NAVIGANT 026182, marked for
3     identification, as of this date.)
4          Q.   Showing you what has been marked as
5     721B, sir, and I'll represent to you that this
6     is the document that was produced as
7     LEH-NAVIGANT 026182, and I'll ask you if you can
8     tell me what this document is.
9          A.   This outlines the model inputs on a
10    CUSIP-by-CUSIP basis for the commercial
11    mortgage-backed securities.
12         Q.   That were part of this group of 30?
13         A.   Yes.
14         Q.   Discussed in Section F?
15         A.   Yes.  So the combination of 721 and
16    720 would be the 30 securities.
17         MR. TAMBE:  I'll just note that there
18    are sort of printing issues with it, but...
19    You see the words truncated or the columns
20    aren't wide enough, so you wind up with a
21    bunch of pound signs.
22         MR. SHAW:  Fair enough.
23         Q.   If you will look, sir, at -- if you
24    would look at the last page of that exhibit,
25    sir, and there's a column headed "Price," can

Page 207

1          M. Slattery
2     you tell me what's in that column?
3          A.   That would be the output associated
4     with the market inputs, the discount margin, or
5     the spreads.
6          Q.   And how were those derived?
7          A.   The discount margins?
8          Q.   Yes.
9          A.   Those were based on market research.
10         Q.   What market research, specifically?
11         A.   I'll double-check.  I'll have to check
12    with my staff to determine which research they
13    used.
14         Q.   The "Price" column, is that the
15    Chicago Partners price?
16         A.   The mid.
17         Q.   The mid price.  All right.  We'll put
18    that one aside.
19         Let's move to Section G of your
20    report, sir.  How was this -- this reflects a
21    valuation of slightly over 6,000 CUSIPs; is that
22    correct?
23         A.   6,035.
24         Q.   How was that population selected?
25         A.   For the overwhelming majority, these

Page 208

1          M. Slattery
2     instruments represent those that fell below the
3     million-dollar threshold between the Barclays
4     liquidity adjusted value and the BoNY's
5     custodial value.
6          Q.   Okay.  And let me ask you how the
7     entire population of CUSIPs to which you applied
8     the million-dollar test was selected, that is,
9     the ones that there was a million-dollar or more
10    difference and the residual 6,035, what was the
11    selection criteria for your viewing those
12    roughly 6700 CUSIPs?
13         A.   I believe --
14         MR. TAMBE:  Objection to form.
15    Go ahead.
16         A.   I believe all the CUSIPs were
17    contained in the Exhibit 86B, so we used that
18    list.
19         Q.   Okay.  But it was -- is it your
20    understanding that that is all of the CUSIPs on
21    86B, or is it your understanding that that's a
22    subset of the CUSIPs on 86B?
23         A.   Which number are we referring to?
24         Q.   This roughly 6700 in total that you
25    valued.

Page 209

1          M. Slattery
2          A.   The ones that are part of this report
3     would be a subset.
4          Q.   Okay.  And so my question is, how was
5     the particular subset that you, as opposed to
6     some other expert or no expert, focused on
7     selected, if you know?
8          A.   Are we talking about the allocation of
9     the work for the million dollars?
10         Q.   Why was that particular 6700 selected
11    for you?  Was it by product categories or -- or
12    what?
13         A.   Product categories would be a fair
14    depiction.
15         Q.   And so how would you describe the
16    product categories for which you had
17    responsibility?
18         A.   I had responsibility for mortgage
19    securities, Treasury and agency securities.  A
20    description would be the fixed income securities
21    set and the -- there were some instruments that
22    fell to other experts, say, for example,
23    municipals and there was other securities that
24    were part of another expert's report, but I
25    ended up with the majority of the fixed income

Page 210

M. Slattery

1  securities, inclusive of a wide or broad
2
3  categorization within that fixed income
4  universe.
5       Q.   Did you have any auction rate
6  securities in your -- your portfolio that you
7  looked at?
8       A.   Not that I'm aware.  It's possible
9  that within the 6,000 there were.  I did not go
10 line-by-line or CUSIP-by-CUSIP in the 6,000.
11      Q.   Was the work on the 6,000 primarily
12 done by your staff?
13      A.   It was done with predominantly with my
14 staff and myself, and basically, it was a data
15 mining exercise more so than a ground-up
16 valuation effort.
17      Q.   Have you reviewed Mr. Schwaba's
18 report?
19      A.   I have not personally reviewed his
20 report, no.
21      Q.   So you don't know how he valued the
22 auction rate securities that he looked at?
23      A.   I do not.
24      Q.   Have you looked at Mr. Olvany's
25 report?

Page 211

M. Slattery

1
2       A.   Excuse me?
3       Q.   Mr. Olvany, have you looked at his
4  report?
5       A.   I have not.
6       Q.   Have you looked at the reports of any
7  other experts in this case --
8       A.   I have --
9       Q.   -- besides Pfleiderer?
10      A.   I have reviewed other expert reports
11 in a cursory way, and I relied on my staff to
12 create notes for myself.
13      Q.   Did you review corporate bonds in your
14 population of 6,035?
15      A.   There may be corporates in there, but
16 I'm not a hundred percent sure.  I don't think
17 so, but I'm not a hundred percent.
18      Q.   What about emerging markets, did you
19 ever review any of those?
20      A.   I'm going to refer back to a table.  I
21 don't think emerging markets is part of my
22 universe.
23           We had 69 CUSIPs that fell into the
24 third party pricing exercise, but the valuation
25 difference was zero for emerging markets.

Page 212

M. Slattery

1
2       Q.   So the answer, then, is you did value
3  some emerging markets securities?
4       A.   They were included in the 6,000.
5       Q.   And do you know how, if at all, your
6  methodology for valuing differed from Mr.
7  Olvany's?
8       A.   I do not know.
9       Q.   Did you value any rates?
10      A.   Rates?  What do you mean by "rates"?
11      Q.   Is the term "rates" as a designator
12 for a type of fixed income security not one of
13 which you're familiar?
14      A.   I believe I saw that as a tab on an
15 exhibit, maybe 86B.  But rates, are we talking
16 about Treasury securities and U.S. agency debt
17 securities?  Then the answer would be yes.
18      Q.   If you take a look at footnote 33 to
19 your report, sir, and you state that, with
20 respect to a group of CUSIPs -- this is at the
21 end of the footnote -- you excluded prices from
22 FactSet and Capital IQ due to inconsistency with
23 prices observed for Lehman underlying credit
24 exposure.  Do you see that?
25      A.   Yes.

Page 213

M. Slattery

1
2       Q.   What do you mean by that?
3       A.   I'd have to go back and look at those
4  particular CUSIPs to identify the meaning behind
5  that footnote.
6       Q.   Can you tell me why you decided it was
7  appropriate to exclude those prices with respect
8  to these 24 CUSIPs of Lehman structured notes
9  but presumably not to exclude market prices with
10 respect to other Lehman structured notes that
11 appear in the portfolio that you were valuing?
12      MR. TAMBE:  Objection to the form of
13  the question.
14      A.   I'd have to check my notes to see if
15 there is an inconsistency there.
16      Q.   Do you know how many Lehman structured
17 notes there are in the population you valued?
18      A.   I do not.
19      Q.   The first sentence -- I'm sorry, in
20 paragraph 70 of your report, in the last
21 sentence you say, "For 31 CUSIPs, the prices
22 were thrown out as inconsistent with the
23 underlying security (credit, scaling issues, et
24 cetera)."  Do you see that?
25      A.   Uh-huh.

Page 214

M. Slattery

1
2    Q.   What are you talking about there?
3    A.   I think that relates directly to
4    footnote 33 that I would need to go back and run
5    additional research on.
6    Q.   And the other part of footnote 33 are
7    the six CUSIPs in the first sentence which talk
8    about scaling issues and notional IO products,
9    interactive prices, et cetera.  Are you able to
10   explain to me without going back what you meant
11   by that sentence?
12   A.   No, I would need to go back.
13   Q.   Paragraph 70, again, you state, "The
14   gathered prices represented closing or bid
15   prices on September 19, 2008 and were treated as
16   midpoint prices for purposes of this analysis."
17   Why did you move bid prices to
18   midpoint prices for purposes of this analysis?
19   A.   For conservatism, because then they
20   were then subjected to an additional liquidity
21   discount factor to arrive at the newly
22   established bid.
23   Q.   For how many of the prices -- of the
24   securities that you valued in this group of
25   6,035 were you able to find only a single price

Page 215

M. Slattery

1
2    observation?
3    A.   I don't know the answer in terms of
4    that.  I believe that would be contained in the
5    information that was provided last night.
6    Q.   Do you know if it was more than half?
7    A.   I don't know.  I think the average
8    number of prices that were obtained were
9    approximately two.
10   Q.   Do you know how many times --
11   (Exhibit 722B, shortened form of the
12   spreadsheet bearing Bates No.
13   LEHMAN-NAVIGANT 026437, marked for
14   identification, as of this date.)
15   Q.   Showing you what has been marked as
16   Exhibit 722B.  I will represent to you that this
17   is a very much shortened form of the spreadsheet
18   produced last night with a Bates number
19   LEHMAN-NAVIGANT 026437.  It should have all of
20   the columns, but not all of the rows.
21   Do you recognize it as that?
22   A.   Yes.
23   Q.   Obviously, the first column is CUSIPs.
24   The second is the asset category at issue.
25   You then have what called "Barclays

Page 216

M. Slattery

1
2    Opening Balance Sheet Valuation."  What's the
3    source of that?
4    A.   86B.
5    Q.   And then you have the "9/19/2008
6    Valuation (at Exit Marks)."  And what is the
7    source of that?
8    A.   In that particular case, that would be
9    the monetization of the average third party
10   price for that particular CUSIP, which in this
11   case I believe is a function of taking the
12   "BVal" or Bloomberg valuation price of 128.68
13   plus the Cap IQ price of 122.52, dividing by 2,
14   and arriving at the 125.60, and then monetizing
15   that based on the position.
16   Q.   Now, is it your understanding that the
17   BVal -- well, when you were calculating a third
18   party price for the column headed "Third Party
19   Price," I take it what you were doing was you
20   were taking however many third party price
21   sources that gave you a price for that security
22   on that day and then adding them together and
23   dividing by the number of prices you observed in
24   order to come up with an average price?
25   A.   That would be accurate.

Page 217

M. Slattery

1
2    Q.   And if you had no third party price
3    available, I take it you would use the BoNY
4    price?
5    A.   Yes.
6    Q.   Why would you use the BoNY price
7    rather than the Barclays price?
8    A.   We were asked to independently or
9    arrive at values independent of Barclays.  In
10   that case, BoNY would be the option available to
11   us, and BoNY for that matter, at least as my
12   opinion goes, is a premiere custodian in the
13   marketplace, subject to their own regulation,
14   and that this is their business.  As a result, I
15   don't necessarily have a reason to refute or
16   contradict the use of the BoNY price in this
17   exercise.
18   Q.   Just so we're clear, are you offering
19   any opinion that the valuation professionals of
20   Barclays were less experienced, qualified, or
21   skilled than their counterparts at BoNY?
22   A.   I am not opining as it relates to
23   Barclays' abilities across their personnel or
24   staff.  What I am offering an opinion on is the
25   use of the BoNY price in the absence of third

M. Slattery

1  party prices when they weren't available, and to
2  us BoNY represented the independent value that
3  was available given the choice between the two,
4  namely, Barclays versus BoNY.
5     Q.   And what do you mean by "independent
6  value"?
7     A.   The use of BoNY's allowed us to be
8  independent to Barclays, but then we integrated
9  the Barclays liquidity factor, in the majority
10 of cases to be conservative, thus allowing us to
11 gain comfort and confidence in the use of BoNY
12 price, which again, by definition, would be
13 independent of the Barclays price.
14      The other issue to raise in terms of
15 the use of the BoNY price, of the 6,000
16 securities we used the BoNY price approximately
17 1500 times. These instruments on a value
18 differential basis at inception, for the most --
19 in most cases, fell below the million-dollar
20 threshold. So the total valuation difference
21 attributable to these is a smaller dollar amount
22 on a transaction-by-transaction basis.
23      When aggregated across 1500, there is
24 an identifiable or quantifiable delta. However,

M. Slattery

1  the 1500 BoNY-priced securities in this dataset,
2  in aggregate, represent about a $250 million
3  delta, which is less than 10 percent of the
4  total delta in my report.
5     Q.   So if I followed what you just said,
6  of the 6,000 securities that you valued in this
7  bucket, approximately one-quarter of them you
8  were unable to find any third party price for on
9  9/19, is that correct?
10    A.   Yes.
11    Q.   And in those instances, you uniformly
12 used the BoNY price?
13    A.   Correct, adjusted with the use of the
14 Barclays liquidity factor. There are some
15 securities that are in that population that were
16 arrived at based on the fact that the third
17 party pricing averaging represented a greater
18 than two standard deviation when compared to
19 BoNY's or Barclays', so there are some
20 securities of that ilk in this particular 1500.
21    Q.   And do you know how many securities
22 fall into that category?
23    A.   We identify it in paragraph 71. 62.
24    Q.   And in the remaining 4500 or so

M. Slattery

1
2  securities that you valued here, you were
3  essentially rejecting the BoNY price in favor of
4  what you term a third party price; is that
5  correct?
6     A.   "Rejection" is not the term that I
7  would use. We, if we had third party prices
8  available, we would use them. If not, then the
9  next best alternative, in my opinion, in our
10 opinion, was to use the BoNY price, adjusted for
11 the Barclays liquidity factor.
12    Q.   And so I'm clear, when you make that
13 distinction or, rather, when you decide that the
14 next best alternative is to use the BoNY price,
15 that's simply on the basis of the fact that you
16 view BoNY as a -- was it a premier custodian?
17    A.   That's part of it.
18    Q.   What else is involved in that?
19    A.   Well, as a premier custodian, this,
20 again, this is their business. If anything, our
21 expectation would be they would side on the
22 conservative price orientation as opposed to an
23 aggressively or overpriced orientation given the
24 fact that they do represent a custodian of great
25 repute and subject to regulation and extensive

M. Slattery

1  audits.
2     Q.   So is it your understanding that
3  Barclays is not subject to regulation and
4  extensive audits in its valuation of securities
5  that it deals with?
6         MR. TAMBE:  Objection to form.
7     A.   That's not what I'm saying, no.
8     Q.   Is it your opinion that the Barclays'
9  prices are less -- or, that Barclays' valuations
10 of securities are less reliable than BoNY's
11 valuations of securities?
12    A.   No. The way I would describe it would
13 be they would be less independent. BoNY
14 represents an independent alternative, an
15 autonomous alternative to Barclays.
16    Q.   So is it your suggestion, then, that
17 the people who were doing the valuations at
18 Barclays were biased?
19    A.   I have no ability to offer an opinion
20 as to their motivations one way or the other.
21    Q.   So when you say that they're less
22 independent, what do you mean?
23    A.   Well, these positions were part of
24 Barclays' portfolio at a point. Therefore,

Page 222

M. Slattery

1  independence would have to be taken outside the
2  walls of Barclays in order to achieve the
3  objective that I was -- or, the mandate that I
4  was given, which was to independently value
5  them.
6     Q.   So the fact that Barclays'
7  professional valuation experts, people who were
8  active in this market, who were valuing
9  securities in this market, reached conclusions
10  about a valuation is something that you did not
11  take into consideration at all in determining
12  what the appropriate valuation should be?
13     MR. TAMBE:  Objection to the form of
14  the question.
15     A.   We took into account their liquidity
16  factor, which contributed or was at least an
17  element of their pricing framework.
18     Q.   Why did you chose their liquidity
19  factor as opposed to any other liquidity factor?
20     A.   In that sense, again, in the majority
21  of cases, by using theirs we felt it was a more
22  conservative approach.
23     Q.   What about the PwC auditors who
24  reviewed Barclays' valuations, were they
25

Page 223

M. Slattery

1  an independent source of validation for
2  Barclays' valuations?
3     MR. TAMBE:  Objection to the form of
4  the question.
5     A.   I'm not here to offer an opinion on
6  what PwC represented in the process as it
7  relates to that.
8     Q.   Well, did you consider the fact -- do
9  you know if the BoNY valuations at issue here
10  were ever audited?
11     A.   I do not know.
12     Q.   You know that the valuations that
13  Barclays put on this portfolio were in fact
14  audited, correct?
15     A.   I do not know that.
16     Q.   You don't know that one way or the
17  other?
18     A.   Correct.
19     Q.   And with respect to the -- the 600 or
20  so securities for which you did -- which you
21  term your ground-up or bottom-up, whatever the
22  phrase was, valuation process, if there were no
23  third party prices available, you did not see
24  fit to accept the BoNY marks.  Why was that?
25

Page 224

M. Slattery

1     A.   Can you rephrase that question?
2     Q.   Sure.  With respect to the 600 or so
3  securities that met your million-dollar variance
4  test, some of those there were no available
5  third party prices for; is that correct?
6     A.   I don't know that to be a hundred
7  percent truth.  I don't know.
8     Q.   I'm not saying that all the 600, but
9  there were certainly some within that population
10  of 600 for which you were unable to find a third
11  party price on 9/19; is that correct?
12     A.   Correct.
13     Q.   With respect to those, you did not
14  just accept the BoNY price; is that right?
15     A.   Correct.
16     Q.   Okay.  And did your valuations on any
17  of those instances differ from BoNY's?
18     A.   I would have to check and draw a
19  comparison between our results and BoNY's for
20  the 600 that I did value.
21     Q.   You have not looked at that issue at
22  all?
23     A.   I have not.
24     Q.   Now, you've said that with respect to
25

Page 225

M. Slattery

1  these 6,000 CUSIPs, you used Barclays' liquidity
2  discounts?
3     A.   In the majority of cases.  Where we
4  had the liquidity discounts that we calculated,
5  then they were applied for specific instrument
6  types.  So if there were agency debt securities
7  that fell into a particular maturity bucket, we
8  used the ones that we calculated, but for, say,
9  for example, in the extract that you provided,
10  these corporate debentures, we used Barclays',
11  and I guess there's one muni on here, so we used
12  Barclays.
13     Q.   So of the 6,035 CUSIPs in this bucket,
14  for how many did you use a Barclays liquidity
15  discount?
16     A.   I don't know that answer.
17     Q.   And in order to determine whether any
18  given liquidity discount was a Barclays discount
19  or a -- or one that you derived, how would I go
20  about that?
21     A.   Probably filter based on asset
22  category.
23     Q.   And where would I have a comprehensive
24  list of the asset categories in which you are
25

M. Slattery

1  **M. Slattery**
2  **providing your own liquidity discounts?**
3  A.  Go back to an exhibit that was
4  provided earlier.  It's the two-page exhibit.
5  **Q.  Number 716B?**
6  A.  Correct.  But for the few that
7  warrant, you know, further investigation or
8  retracing the steps.
9  **Q.  Taking a look at 716B, sir, did you --**
10  **the liquidity discounts you have given here are**
11  **what I'll call point estimates, in other words,**
12  **they're not ranges, but it's a specific number;**
13  **is that correct?**
14  A.  Correct.
15  **Q.  Did you -- did you estimate any sort**
16  **of a or calculate any sort of a confidence**
17  **interval around those estimates?**
18  A.  No.
19  **Q.  With respect to any given liquidity**
20  **discount here, would it be fair to say that**
21  **there's a range of reasonable liquidity**
22  **discounts that a reasonable valuation**
23  **professional could arrive at?**
24  A.  It is possible that another valuation
25  professional could arrive at a different

M. Slattery

1  M. Slattery
2  liquidity discount depending on perspective.
3  However, it's equally likely that they could end
4  up in the exact same data point series.
5  **Q.  In order to end up in the exact same**
6  **data point series, sir, wouldn't they have to**
7  **find the Fabozzi 1997 numbers and use that to**
8  **calculate a multiple the way that you did?**
9  MR. TAMBE:  Objection to the form of
10  the question.
11  **Q.  That would be a "yes"?**
12  A.  That would be a starting point to end
13  up at the exact same point, yes.
14  **Q.  Where did you get the idea to use the**
15  **Fabozzi multiple to estimate the multiple for**
16  **moving from normal to distressed conditions or,**
17  **rather, stressed conditions?**
18  A.  I was aware that he had written about
19  that very issue in one of his books.  We located
20  it and we used it.
21  **Q.  Are you aware of any -- have you ever**
22  **performed that same calculation of a stressed**
23  **liquidity discount using the Fabozzi data to**
24  **derive a multiple in any other valuation?**
25  A.  I have not, no.

M. Slattery

1  M. Slattery
2  **Q.  Have you ever heard of anyone doing**
3  **that?**
4  A.  Members of my team have, yes.
5  **Q.  Who specifically?**
6  A.  Roderick Powell.
7  **Q.  And under what circumstances did Mr.**
8  **Powell do that?**
9  A.  As part of his work at Bank of America
10  as an enterprise risk professional.
11  **Q.  Are you aware of any -- of any studies**
12  **or academic literature suggesting that that is**
13  **an appropriate method for performing such a**
14  **calculation?**
15  A.  Am I aware of any academic literature?
16  **Q.  Yes.**
17  A.  Not that I'm aware.
18  **Q.  Are you aware if that's been accepted**
19  **by any valuation standards organization?**
20  A.  Such as.
21  MR. TAMBE:  Objection to the form.
22  **Q.  Such as any professional organization**
23  **that promulgates standards for valuation.**
24  A.  I can't offer an example of one, no.
25  **Q.  Are you aware if that technique is --**

M. Slattery

1  **M. Slattery**
2  **has been subject to an audit by any reputable**
3  **accounting firm?**
4  A.  The work that we did in the derivation
5  of liquidity factor?
6  **Q.  That type of a technique, yes, sir.**
7  A.  Again, if I can't point to the
8  technique in terms of academic literature, I
9  don't know of a particular audit firm that has
10  gone down that path either in terms of their
11  work.
12  **Q.  So, aside from your experience in this**
13  **case and Mr. Powell's experience on some**
14  **valuation he did internally at Bank of America,**
15  **you're not aware of any valuation professional**
16  **in history ever using the approach that you have**
17  **used?**
18  A.  I don't know if I can answer that
19  question.
20  **Q.  Well, either you're aware of it or**
21  **you're not.**
22  A.  In the history, because I'm not aware
23  of it doesn't mean that a similar effort has not
24  been undertaken in terms of valuation
25  professionals.

M. Slattery

1    Q.   Well, all things in this world are
2    possible, sir.  The question is, as you sit here
3    today, you're not aware of any example of that?
4    A.   That is correct.
5    Q.   Did you attempt to calculate a
6    confidence interval around any of the valuations
7    that are stated in your report?
8    
9    A.   No.
10   Q.   Turn, if you would, to section or,
11   rather, to paragraph 56 of your report, sir.
12   MR. SHAW:  Actually, why don't we take
13   a short break now.  Make sense?
14   MR. TAMBE:  Yes.  Are you still on
15   track for the 5?
16   MR. SHAW:  Yes.  I'm about to move
17   into a new area, so it probably makes sense.
18   THE VIDEOGRAPHER:  This concludes tape
19   number 3 in the videotaped deposition of
20   Mark Slattery.  The time is 4:02 P.M.  We're
21   now off the record.
22   (Recess.)
23   THE VIDEOGRAPHER:  This begins tape
24   number 4 in the videotaped deposition of
25   Mark Slattery.  The time is 4:11 P.M.  We're

M. Slattery

1    now on the record.
2    BY MR. SHAW:
3    Q.   Sir, in paragraph 56 of your report,
4    you use the phrase "information in Barclays'
5    possession at the time that Barclays acquired
6    the Class A-1 tranche."  Do you see that?
7    A.   Yes.
8    Q.   What do you understand the information
9    available to Barclays at the time it acquired
10   this position to have been?
11   A.   Based on my understanding, it would
12   have been analogous to an investor report.
13   Q.   And what's the basis for your
14   understanding of that?
15   A.   Just my -- my understanding, my
16   impression.  I don't know if I have a basis in
17   fact for it.
18   Q.   Do you know when the Pine CLO was
19   created, origination date?
20   A.   No, I do not.
21   Q.   Do you know for what purpose the Pine
22   CLO was created?
23   A.   I do not.
24   MR. TAMBE:  Objection to form.
25

M. Slattery

1    Q.   Do you know whether the Pine CLO was
2    created with the intent that it would be
3    marketed to investors?
4    MR. TAMBE:  Objection to form.
5    A.   I do not have that knowledge, no.
6    Q.   Do you know if, apart from the sale of
7    a portion of the Pine CLO to Barclays, any
8    portion of the Pine CLO was ever sold to any
9    entity outside of Lehman?
10   A.   My understanding is that, no, no
11   portion outside of the A-1 has been sold.
12   Q.   At any time?
13   A.   Based on my knowledge, no.
14   Q.   Do you know whether, prior to the
15   bankruptcy of Lehman in mid September, any major
16   investment banks had offered any opinions on the
17   value, proper valuation of Pine?
18   A.   Not that I'm aware.
19   Q.   Would it be something you would want
20   to consider in valuing the Pine CLO if Citibank
21   personnel had looked at Pine and placed -- and
22   attempted to value it in late summer of 2008?
23   MR. TAMBE:  Objection to the form of
24   the question.
25

M. Slattery

1    A.   I'm sorry, what -- the question as it
2    relates to would it be useful to integrate that
3    or examine --
4    Q.   Is that something -- in attempting to
5    value Pine as of either the 19th or the 22nd of
6    September, 2008, would information concerning
7    the assessment of the -- Pine's value from
8    Citibank personnel be something that you would
9    want to take into account?
10   MR. TAMBE:  Objection to the form of
11   the question.
12   A.   In valuing the Pine CLO as of the 19th
13   of September?
14   Q.   Yes, sir.
15   A.   It would be advisable to integrate
16   such research.  However, I would have to, based
17   on the extensive -- based on an extensive read
18   of that research, I would have to conclude
19   whether or not that had inconsistent -- a
20   consistent perspective or consistent
21   understanding of the Pine CLO and did it in fact
22   integrate all the issues that we've identified.
23   So it would be worth reviewing.
24   Q.   In your view, does the Pine CLO have a

1          M. Slattery
2  value for purposes of appropriate valuation as
3  of either 9/19 or 9/22/08 that is distinct from
4  what it could be sold for to a willing buyer in
5  the market?
6       A.  I am not sure I understand the
7  question.
8       Q.  Yes.  My question, sir, is in valuing
9  the Pine CLO, did you attempt to determine what
10  a willing buyer would pay for that CLO as of the
11  valuation date?
12      A.  We valued the Pine CLO, specifically,
13  the A-1 piece, based on a ground-up valuation
14  exercise, tantamount to what we would expect a
15  potential willing buyer to pay for that
16  particular security.
17      Q.  So your view is that the valuation
18  exercise you performed was intended to predict
19  what a willing buyer at that time in that market
20  would have paid for the Pine CLO A-1 tranche?
21      A.  I don't know if I'd use the word
22  "predict."  We intended to quantify the price,
23  the value of the A-1 tranche of the Pine CLO as
24  of the 19th, yes.
25      Q.  And my question, just so we're clear,

1          M. Slattery
2  is, in your mind, is there a difference between
3  the value of the A-1 tranche of Pine CLO and
4  what a willing buyer would pay for it on that
5  date?
6          MR. TAMBE:  Objection to form.
7       A.  I would be willing to concede that
8  it's possible.
9       Q.  Do you know whether JPMorgan personnel
10  had valued the Pine CLO, specifically, the A-1
11  tranche of the Pine CLO, in September of 2008?
12      A.  I am not personally aware, no.
13      Q.  Is that something that you would want
14  to take into account in your valuation of the
15  Pine CLO?
16      A.  The extent to which I would take into
17  account such research, be it Citi or JPMorgan,
18  would be a clear and more extensive
19  understanding of what they actually did to value
20  that particular position.  If I fundamentally
21  disagreed with the manner with which they
22  approached the valuation exercise, then I would,
23  by default, not agree with the value that they
24  assigned.
25      Q.  What was the market for CLOs like in

1          M. Slattery
2  September of 2008?
3          MR. TAMBE:  Objection.  Form.
4  Objection.  Asked and answered.
5       A.  I don't have an opinion in terms of
6  the market for CLOs as of September 2008.
7       Q.  And I take it you were not in any way
8  involved in the -- in the market for CLOs of the
9  type represented by the Pine tranche A-1 in
10  September of 2008?
11      A.  Specifically, that segment of the
12  market, I was not.
13      Q.  Were any members of your team?
14      A.  Not that I'm aware.
15      Q.  In paragraph 61 of your report you
16  say, "I have researched" -- well, let me back
17  up.  You say, "Given that the collateral is
18  owned by the CLO trust and not Lehman, the
19  security interest in the loans is not at risk.
20  I have researched this issue and have found no
21  instance where a master participation agreement
22  in a CLO was not enforced in a bankruptcy."  Do
23  you see that?
24      A.  Yes.
25      Q.  What did you do to research that

1          M. Slattery
2  issue?
3       A.  Worked with a colleague out of the New
4  York office who had extensive experience in this
5  particular market.
6       Q.  And who was that colleague?
7       A.  Chi Lee.
8       Q.  And what experience did he have --
9  first of all, when you say "this particular
10  market," which particular market are you talking
11  about?
12      A.  CLO, CDO market.
13      Q.  And what was his extensive experience
14  in that market?
15      A.  He was at UBS on the securitization
16  side, deals similar to this one.
17      Q.  And what did he do to research the
18  question of what had happened in bankruptcies?
19      A.  It was more or less me using his
20  experience as a means to arrive at the
21  conclusion that I did.
22      Q.  So when you say you researched it, you
23  mean you asked one of your colleagues at Chicago
24  Partners?
25      A.  Who had extensive experience in the

Page 238

1          M. Slattery
2    appropriate marketplace, yes.
3        Q.   Do you know if he did anything other
4    than just think about it?
5        A.   I don't know.
6        Q.   Did he -- was this a telephone
7    conversation?
8        A.   A series of conversations.
9        Q.   Over how long a period of time?
10       A.   Weeks.
11       Q.   Do you know if he undertook any
12   research whatsoever into this question?
13       A.   I do not know the answer to that
14   question.
15       Q.   Do you know whether he identified any
16   instances where a bankruptcy court had in fact
17   enforced such a provision?
18       A.   Not that I'm aware.
19       Q.   So in -- in providing your valuation
20   of the Pine CLO, one of the things you're
21   relying on is the information that your
22   colleague -- was it Mr. Lee? -- provided to you;
23   is that correct?
24       A.   Yes.
25       Q.   He provided that to you in writing; is

Page 239

1          M. Slattery
2    that correct?
3        A.   No.
4        Q.   So it was oral?
5        A.   Yes.
6        Q.   Is it your view that the fact that the
7    holders of the junior tranches had filed for
8    bankruptcy would have no adverse impact on the
9    valuation of the A-1 tranche?
10       A.   Is it my opinion?
11       Q.   Yes.
12       A.   That the event of default would not
13   have any adverse effect other than the technical
14   implications of the default, yes.
15       Q.   What's the basis for that opinion?
16       A.   Based on my understanding of the
17   trigger, an event of default in this case, the
18   A-1 has the ability to obtain or secure all the
19   assets underlying the deal.
20       Q.   And what's the basis for that
21   understanding?
22       A.   Based on my understanding of the --
23   the Pine CLO description documents.
24       Q.   Does Pine hold the loans to which it
25   looks for funding -- or, strike that.  The CLO

Page 240

1          M. Slattery
2    consists of interests in various loans, correct?
3        A.   Uh-huh.  Yes.
4        Q.   Does Pine hold any of those loans
5    directly?
6        A.   I believe it's held by the Trustee.
7        Q.   And who is the Trustee?
8        A.   I believe Lehman.
9        Q.   Is it, therefore, dependent on -- when
10   I say "it," is Pine, the Pine CLO, therefore
11   dependent on a bankrupt Lehman subsidiary to
12   pass on all interest and principal payments
13   received from the obligors on the underlying
14   loans?
15           MR. TAMBE:  Objection to the form of
16       the question.
17       A.   I don't know the implications of their
18   legal status as it relates to Pine.
19       Q.   Do you know whether in fact, for any
20   period of time, the bankrupt Lehman entities
21   declined to pass on the -- the interest and
22   principal payments to the Pine CLO?
23           MR. TAMBE:  Object to the form of the
24       question.
25       A.   I am not aware if they did that.

Page 241

1          M. Slattery
2        Q.   Do you know whether -- do you have any
3    opinion on whether it would have been reasonable
4    to be concerned that the bankrupt Lehman
5    entities would in fact not pass on principal and
6    interest payments on the loans to the Pine
7    entity?
8            MR. TAMBE:  Objection to the form of
9        the question.
10       A.   Can you restate that question?
11       Q.   Sure.  Do you have any opinion on
12   whether it would have been reasonable as of
13   September 19th or 22nd, 2008 to be concerned
14   that the bankrupt Lehman entities would not pass
15   along or pass through to the Pine entity the
16   principal and interest payments that they
17   received from obligors on the underlying loans?
18           MR. TAMBE:  Object to the form of the
19       question.
20       A.   In this case, I'm not sure if it's
21   reasonable to assume that.  I'm not sure.
22       Q.   Do you have an opinion that there was
23   no legal risk to the holders of the A-1 tranche
24   of the Pine CLO that they would not in the
25   bankruptcy or as a result of the bankruptcy

Page 242

1                    M. Slattery
2    receive all of the payments or funds that they
3    would otherwise anticipate?
4            MR. TAMBE:  Objection to the form.
5        A.   I'm not an attorney, so I can't offer
6    an opinion as to the legal risk.
7        Q.   Do you have any opinion on whether a
8    legal risk would have an impact on the
9    appropriate valuation of Pine?
10           MR. TAMBE:  Same objection.
11       A.   I don't have an opinion as to the
12   legal risk.  However, I think all risk mentioned
13   should be incorporated in a value.
14       Q.   If you would look at paragraph 64 of
15   your report, sir.  I want to be clear about what
16   you're saying.  You state, "In reviewing LoanX,
17   I observed that on September 19, 2008, 20 of the
18   55 underlying loans making up approximately 50
19   percent of the value of the underlying
20   collateral reflected a weighted average price of
21   90.2."  Do you see that?
22       A.   Yes.
23       Q.   I think I know what you're trying to
24   say here, but there is a little bit of a textual
25   ambiguity.  I want to clear it up.

Page 243

1                    M. Slattery
2            Are you saying that 20 loans made up
3    50 percent of the value or are you saying that
4    55 underlying loans made up 50 percent of the
5    value?
6        A.   20 of the loans making up or
7    representing 50 percent of the value.
8        Q.   So you're saying of the total of 55
9    underlying loans --
10       A.   Less than 40 percent.
11       Q.   Right, 20 of them made up
12   approximately 50 percent of the value?
13       A.   Correct.
14       Q.   Did you look at the other 50 percent?
15   What was their weighted average price?
16       A.   I don't recall that number off the top
17   of my head.
18       Q.   Was it higher or lower than the 90.2?
19       A.   I don't recall.
20       Q.   Did you look at the average -- the
21   weighted average price for all of the
22   collateral, all of the underlying loans?
23       A.   I don't recall.
24       Q.   Why not?
25           MR. TAMBE:  Objection to form.

Page 244

1                    M. Slattery
2        Q.   Why did you not look at that?
3            MR. TAMBE:  Objection to form.
4        A.   We didn't have LoanX prices for all of
5    the 55 credits.
6        Q.   Of the 20 -- the 20 loans that you
7    have identified here, is there a place in your
8    work papers I can go to see which 20 those are?
9        A.   I believe so.
10           MR. TAMBE:  Do you want to know?
11           MR. SHAW:  Yes.
12           MS. STROHBEHN:  I believe it would be
13   LEHMAN-NAVIGANT 026183.
14           (Exhibit 723B, a document produced as
15   LEHMAN-NAVIGANT 026183, marked for
16   identification, as of this date.)
17   BY MR. SHAW:
18       Q.   Showing you what has been marked as
19   Exhibit 723B, sir, is that the document that
20   would tell you which 20 loans, 20 of the
21   underlying loans you were talking about?
22       A.   I believe this is the spreadsheet.
23   I'm just trying to find the location.
24           It's the very last page.
25       Q.   And are the 20 the ones that are

Page 245

1                    M. Slattery
2    shaded?
3        A.   Yes.
4        Q.   And the source of that is the LoanX
5    database?
6        A.   Yes.
7        Q.   Were you able to find ratings for all
8    of the loans?
9        A.   I don't think we were able to do that,
10   no.
11       Q.   Were you able to find ratings for any
12   of the loans?
13       A.   I think we identified a subset of
14   loans that we actually had ratings for, yes.
15       Q.   And where would I find that, sir?
16       A.   I don't think that's captured in this
17   spreadsheet.
18       Q.   Do you know how many of the loans were
19   junk, rated junk, or non-investment grade, if
20   you prefer?
21           MR. TAMBE:  Objection to the form of
22   the question.
23       A.   I do not know the number or percentage
24   of the loans that were deemed to be below
25   investment grade.  We did evaluate the

Page 246

```
 1            M. Slattery
 2   performance of the loans that were part of the
 3   Pine CLO as of September.  It didn't include all
 4   55 and some were unfunded, as it were.  39 of
 5   the 45 that were funded were performing loans.
 6       Q.   Of the performing loans, is one of
 7   them the Archstone Smith 1007 Revolver.
 8       A.   I don't remember exactly the 39 versus
 9   the 6 versus the remaining.
10       Q.   Now, in Note 32 to your report, sir,
11   you note that S&P's downgrade of Barclays A-1
12   tranche was purely technical.  What do you mean
13   by that?
14       A.   It did not affect the underlying
15   credits.  It did not impair the underlying
16   collateral.
17       Q.   Well, is it your assertion that the
18   S&P downgrade of the A-1 tranche would have no
19   impact on the price that one could obtain by
20   selling the A-1 tranche?
21       A.   That's not what I'm suggesting.  It's
22   possible that the downgrade from a certain
23   segment of potential buyers would affect their
24   view of the value of the A-1.
25       Q.   Do you know whether -- did you look at
```

Page 247

```
 1            M. Slattery
 2   any subsequent rating agency reports on the Pine
 3   security?
 4       A.   Subsequent?
 5       Q.   Subsequent to September 19, 2008.
 6       A.   I did not personally, no.
 7       Q.   In determining the value of Pine, did
 8   your work result in any range of price estimates
 9   for a single point estimate?
10       A.   During the course of the work, there
11   were different scenarios evaluated.  At the end,
12   it was a single point estimate of value.
13       Q.   And what was the range of different --
14   different estimates that were reached in the
15   course of your work?
16            MR. TAMBE:  Objection to the form of
17   the question.
18       A.   Dollar amounts of the range I don't
19   remember off the top of my head.
20       Q.   Was it -- can you give me an order of
21   magnitude of the size of the range?
22            MR. TAMBE:  Object to the line of
23   questioning.  This is contrary to the
24   stipulation between the parties.  He's
25   provided the reliance materials that his
```

Page 248

```
 1            M. Slattery
 2   report is based on, his opinions are based
 3   on.  I think draft opinions, draft
 4   conclusions of any type we have not asked
 5   you to produce.  It goes outside the scope
 6   of the stipulation.
 7       Q.   Did any of the other valuations that
 8   you came up with for the Pine CLO exceed the
 9   price that you ultimately put on it?
10            MR. TAMBE:  Same objection.  It's
11   outside the scope of the stipulation on
12   experts, on expert discovery.
13       Q.   Did you calculate a confidence
14   interval around the price you put on the Pine
15   CLO?
16       A.   No.
17       Q.   Do you have any -- strike that.
18            MR. SHAW:  Tell you what, let me take
19   five minutes.  I think I'm pretty close to
20   done, and that way we don't have to do this
21   on the record while I look for an exhibit
22   that's missing.
23            THE VIDEOGRAPHER:  The time is now
24   4:42 P.M.  We're now off the record.
25            (Recess.)
```

Page 249

```
 1            M. Slattery
 2            THE VIDEOGRAPHER:  The time is 4:48
 3   P.M.  We're now on the record.
 4   BY MR. SHAW:
 5       Q.   Mr. Slattery, I would refer you to
 6   paragraph 47 of your report, sir, and that says,
 7   "In addition, Barclays sold a significant amount
 8   of the acquired non-Agency RMBS portfolio during
 9   a short timeframe.  Therefore, the sale prices
10   do not reflect an orderly disposition of these
11   assets, but a fire sale."  Do you see that?
12       A.   Yes.
13       Q.   And the citation you have for that in
14   the footnote is "Expert Report of Mr.
15   Pfleiderer, Appendix Four, Section Six, page
16   110."  Do you see that?
17       A.   Yes.
18       Q.   Footnote 22.  And is footnote 22
19   intended to be the support for the final two
20   sentences of paragraph 47 or the final sentence
21   of paragraph 47?
22       A.   The final two sentences.
23       Q.   Okay.  And are you aware of any other
24   support or anything else you are relying on to
25   support that statement?
```

Page 250

```
 1              M. Slattery
 2      A.   No.
 3      Q.   I'm going to show you, and I,
 4  unfortunately, don't have multiple copies, but
 5  I'm going to show you Appendix 4 from Professor
 6  Pfleiderer's report, and I'm just going to ask
 7  you to take a look at the page you cited and let
 8  me know where you find the support for that
 9  proposition on that page.
10      A.   I don't see it.
11           MR. SHAW:  Thank you.  I have no
12  further questions for you.
13           THE WITNESS:  Thank you.
14           THE VIDEOGRAPHER:  This concludes tape
15  number 4 of 4 of the videotaped deposition
16  of Mr. Slattery.  The time is 4:50 P.M.  We
17  are now off the record.
18              oOo
19      _____
              MARK SLATTERY
20
21  Subscribed and sworn to
    before me this    day
22  of      2010.
23
    _____
24
25
```

Page 251

```
 1              M. Slattery
 2           CERTIFICATE
 3  STATE OF NEW YORK )
                      : ss
 4  COUNTY OF NEW YORK)
 5      I, Kathy S. Klepfer, a Registered
 6  Merit Reporter and Notary Public within and
 7  for the State of New York, do hereby
 8  certify:
 9      That MARK SLATTERY, the witness whose
10  deposition is herein before set forth, was
11  duly sworn by me and that such deposition is
12  a true record of the testimony given by such
13  witness.
14      I further certify that I am not
15  related to any of the parties to this action
16  by blood or marriage and that I am in no way
17  interested in the outcome of this matter.
18      I further certify that neither the
19  deponent nor a party requested a review of
20  the transcript pursuant to Federal Rule of
21  Civil Procedure 30(e) before the deposition
22  was completed.
23      In witness whereof, I have hereunto
24  set my hand this 16th day of April, 2010.
25      -------------------------------
```

Page 252

```
 1              M. Slattery
 2              INDEX
 3  TESTIMONY OF M. SLATTERY:          PAGE
 4  Examination by Mr. Shaw                6
 5  EXHIBITS:                  PAGE
 6  Exhibit 710B, a document bearing Bates Nos.   28
 7  LEH-NAVIGANT 026434 through 026436,
 8  Exhibit 711B, Expert Report of Mark E. Slattery,  40
 9  CFA, dated March 15, 2010
10  Exhibit 712B, an excerpt from LEHMAN-NAVIGANT   70
11  026180
12  Exhibit 713B, excerpt from LEH-NAVIGANT 026162  94
13  Exhibit 714B, a document produced as      104
14  LEH-NAVIGANT 015949
15  Exhibit 715B, a document produced as      107
16  LEH-NAVIGANT 026178
17  Exhibit 716B, a document produced as      128
18  LEH-NAVIGANT 026179
19  Exhibit 717B, a document bearing Bates Nos.    131
20  LEH-NAVIGANT 026433
21  Exhibit 718B, a document produced as      189
22  LEH-NAVIGANT 026203
23  Exhibit 719B, a document headed LehBar_RMBS_111  192
24  Exhibit 720B, a document produced as      202
25  LEH-NAVIGANT 026181
```

Page 253

```
 1              M. Slattery
 2           INDEX (Cont'd.)
 3  EXHIBITS:                  PAGE
 4  Exhibit 721B, a document produced as      205
 5  LEH-NAVIGANT 026182
 6  Exhibit 722B, shortened form of the       215
 7  spreadsheet bearing Bates No.
 8  LEHMAN-NAVIGANT 026437
 9  Exhibit 723B, a document produced as      244
10  LEHMAN-NAVIGANT 026183
11
12  REQUESTS FOR PRODUCTION:
13  Page 32, Line 16
14  Page 169, Line 4
15  Page 172, Line 22
16  Page 174, Line 20
```

Page 254

```
 1              M. Slattery
 2     NAME OF CASE:  In re Lehman Brothers
 3     DATE OF DEPOSITION:  April 16, 2010
 4     NAME OF WITNESS:  Mark Slattery
 5     Reason Codes:
 6         1. To clarify the record.
           2. To conform to the facts.
 7         3. To correct transcription errors.
 8     Page _____ Line _____ Reason _____
       From _____ to _____
 9
       Page _____ Line _____ Reason _____
10     From _____ to _____
11     Page _____ Line _____ Reason _____
       From _____ to _____
12
       Page _____ Line _____ Reason _____
13     From _____ to _____
14     Page _____ Line _____ Reason _____
       From _____ to _____
15
       Page _____ Line _____ Reason _____
16     From _____ to _____
17     Page _____ Line _____ Reason _____
       From _____ to _____
18
       Page _____ Line _____ Reason _____
19     From _____ to _____
20     Page _____ Line _____ Reason _____
       From _____ to _____
21
       Page _____ Line _____ Reason _____
22     From _____ to _____
23     Page _____ Line _____ Reason _____
       From _____ to _____
24
25
```