# Exhibit F

# Managing
# Fixed Income
# Portfolios

*Edited By* **Frank J. Fabozzi**

Copyrighted Material



© 1997 By Frank J. Fabozzi Associates
New Hope, Pennsylvania

ALL RIGHTS RESERVED. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise without the prior written permission of the publisher and the copyright holder.

This publication is designed to provide accurate and authoritative information in regard to the subject matter covered. It is sold with the understanding that the publisher is not engaged in rendering legal, accounting, or other professional services.

ISBN: 1-883249-27-9

Printed in the United States of America

# Table of Contents

| | | |
|---|---|---:|
| | **Preface** | $v$ |

*Section I: Interest Rate Risk Measures*

| | | |
|---|---|---:|
| 1. | **Fixed Income Risk** | 1 |
| | Ronald N. Kahn | |
| 2. | **Measuring and Managing Interest-Rate Risk** | 19 |
| | Scott F. Richard and Benjamin J. Gord | |
| 3. | **Value Measures for Managing Interest-Rate Risk** | 31 |
| | Michele A. Kreisler and Richard B. Worley | |
| 4. | **Dissecting Yield Curve Risk** | 43 |
| | Wesley Phoa | |
| 5. | **Bond Convexity: Hidden Risk, Hidden Value** | 59 |
| | Kevin Edward Grant | |
| 6. | **Measuring Plausibility of Hypothetical Interest Rate Shocks** | 73 |
| | Bennett W. Golub and Leo M. Tilman | |
| 7. | **Valuation and Interest Rate Risk Management Using the Arbitrage-Free Bond Canonical Decomposition Methodology** | 87 |
| | Thomas S. Y. Ho and Michael Z. H. Chen | |

*Section II: Generating Expectational Inputs*

| | | |
|---|---|---:|
| 8. | **Fixed Income Portfolio Investing: The Art of Decision Making** | 103 |
| | Chris P. Dialynas and Ellen Rachlin | |
| 9. | **Forecasting Interest Rates** | 133 |
| | W. David Woolford | |
| 10. | **A Predictive Modeling Framework for Anticipating Long-Term Interest Rates** | 149 |
| | Greg Boal and Erin J. Plowden | |

*Section III: Portfolio Strategies: Active and Structured*

| | | |
|---|---|---:|
| 11. | **Active Bond Portfolio Management: An Expected Return Approach** | 165 |
| | Francis H. Trainer Jr. | |
| 12. | **Managing Indexed and Enhanced Indexed Bond Portfolios** | 191 |
| | Kenneth E. Volpert | |
| 13. | **Managing a Fixed Income Portfolio Versus a Liability Objective** | 213 |
| | Ronald J. Ryan | |
| 14. | **Managing Market Risk at Long-Term Investment Funds** | 227 |
| | Langhorne Gibson III | |
| 15. | **Managing Synthetic GIC Portfolios** | 253 |
| | Karl Tourville and John Caswell | |

16. **A User's Guide to Buy-Side Bond Trading**                          277
  Robert I. Gerber

17. **Fixed Income Arbitrage Strategies**                                291
  James L. Berens and Robert Friend

18. **The Persistence of Fixed Income Style Performance:**
  **Evidence from Mutual Fund Data**                                     299
  Ronald N. Kahn and Andrew Rudd

19. **Consideration of Risk-Based Capital in**
  **Daily Portfolio Decisions for Life Insurers**                        309
  John C. Saf

*Section IV: Management By Product*

20. **Management of a High-Yield Bond Portfolio**                         321
  J. Thomas Madden and Joseph Balestrino

21. **Managing Municipal Bond Portfolios**                               333
  Jeffrey D. Slater

22. **Using Busted Convertibles to Enhance Performance**                 349
  William R. Leach

23. **A Practical Guide to Relative Value for Mortgages**                357
  Wesley Phoa

24. **Commercial Mortgage-Backed Securities:**
  **Real Estate Exposure with Managed Risk**                             377
  Joseph F. DeMichele and William J. Adams

25. **Corporate Loan Portfolio Management**                              397
  Elliot Asarnow and Michael McAdams

*Section V: International Fixed Income Investing*

26. **International Bond Portfolio Management**                           407
  Christopher B. Steward and J. Hank Lynch

27. **International Fixed Income Investment: Philosophy and Process**     451
  Anthony L. Faillace and Lee R. Thomas

*Section VI: Performance Evaluation*

28. **Fixed Income Attribution Analysis**                                471
  Frank J. Jones and Leonard J. Peltzman

29. **Measuring Performance of the Insurance Company Portfolio**          493
  Gregory J. Hahn and John C. Saf

  **Index**                                                              527

# Preface

*Managing Fixed Income Portfolios* provides comprehensive coverage of the key elements involved in the management of fixed income portfolios. The majority of the contributors to the book are bond portfolio managers. The book assumes the reader has a fundamental understanding of the features of fixed income securities and the various products.

The book is divided into four sections. Section I covers various interest rate risk measures. At one time managers focused only on level risk. Today, measures focus on the exposure to changes in the yield curve. Several of the chapters discuss the importance of this risk and alternative approaches to measuring yield curve risk. Section II explains how the inputs needed to construct a portfolio are generated. Section III describes the various active and structured portfolio strategies, as well as strategies between these two extremes. Management of high-yield corporate bonds, municipal bonds, mortgage-backed securities (residential and commercial), and corporate loans is covered in Section IV. The two chapters in Section VI provide comprehensive coverage of the management of international bond portfolios. The two chapters in Section VII discuss performance evaluation.

The insights provided by the contributors to *Managing Fixed Income Portfolios* will help you more effectively manage your bond portfolios.

*Frank J. Fabozzi*

# A User's Guide to Buy-Side Bond Trading

**Robert I. Gerber, Ph.D.**
*Senior Portfolio Manager*
*Sanford C. Bernstein & Co., Inc.*

## INTRODUCTION

The mythic trader, living by his wits and betting vast sums on market fluctuations, does not work for an investment management firm (buy-side).[1] Although he may flourish at a broker-dealer (sell-side), the odds are stacked against him on the buy-side.[2] On the sell-side he is a market-maker, earning, rather than paying, the bid-ask spread on each transaction. Moreover, greater (limited) access to information about investor preferences creates opportunities (barriers) for the sell-side (buy-side) trader to exploit short-term market technicals.

The natural question is, what is buy-side trading? There is no simple answer, because traders do different things at different firms, and the distinction between research, portfolio management, trading, risk management, and compliance is often blurred. A common thread, however, does exist — traders gather and interpret market information, and execute transactions.

Upon learning this, a sell-side trader once commented to me, "Oh, you mean they're *just* order takers." To which I responded, "Yes, in the same sense that a golfer *just* hits the ball in the cup." Both are highly specialized and highly skilled, and both face complex challenges not easily understood by laymen.

The main purpose of this chapter is to discuss some of the complexities of buy-side trading.[3] What are the relative advantages of an instantaneous auction, a bid list and a sale order? Does market liquidity or volatility matter? What

---

[1] The terms "buy-side trader" and "investor" are used interchangeably, as are the terms "sell-side trader" and "broker-dealer."

[2] Certainly, buy-side traders also have some advantages, such as partial access to dealer inventories. A detailed comparison, however, of the relative advantages of buy- and sell-side traders is beyond the scope of these discussions.

[3] In the language of a strategic game, how should you construct the game, what are the optimal strategies of the players, and what is the game's solution?

I would like to thank Fred Cohen, Sloane Lamb, Elaine Mintzer, Walter Prahl, and Frank Trainer for their insightful comments on an earlier draft. This chapter is dedicated to the memory of William S. Vickrey — a gentleman and a scholar whose ideas inspired generations of his students.

should you expect from sell-side traders? What is your optimal strategy? How much can you hope to gain from a job well done?

## MARKET CONDITIONS

Selecting the best buy-side trading strategy is very difficult. It depends on numerous factors, many of which are intangible. Although there is no adequate substitute for an experienced trader, one axiom certainly applies — market conditions matter a great deal, and often in a predictable way. In this context, it is useful to consider two market extremes: liquid and illiquid.

Although liquidity is somewhat in the eye of the beholder, a liquid market can generally be defined by *small bid-ask spreads which do not materially increase* for large transactions. These conditions make liquidity the financial-market equivalent of perfect competition in the goods economy. In a perfectly competitive market, consumers and producers have no individual influence on price. Likewise, the sell-side trader's influence over price declines with financial-market liquidity. Nonetheless, complications — such as imperfect information and real-time execution — make trading skills valuable even in a very liquid market. A good buy-side trader might add a couple of basis points in return by choosing the optimal bidding process and closing the transaction.[4]

Illiquid markets pose somewhat different challenges. Acquiring reliable information becomes much more difficult because securities are typically less homogeneous and are infrequently traded. Moreover, the cost of ignorance can be great, as the notion of a market clearing price is not well defined. Executing a transaction might take days, rather than seconds, and can resemble the mating ritual of a praying mantis. Under some circumstances, enhanced information and negotiating skill can add a few percentage points to a transaction.

Exhibit 1 provides indicators of market liquidity for a cross-section of the fixed-income universe. Bid-ask spreads are estimated for typical and distressed conditions, because the liquidity of a particular market can fluctuate. For example, the bid-ask spreads on Fannie Mae Trust Interest-Only Strips (IOs) have ranged from less than 0.5% to more than 5%. In light of this variability, identifying the determinants of liquidity becomes important.

## FACTORS INFLUENCING LIQUIDITY

Market liquidity is defined in terms of bid-ask spreads. The exact meaning of "bid-ask spread," however, is open to interpretation. For the sake of exposition,

---

[4] A couple of basis points per trade can add up; if annual turnover were high on liquid investments (say, 2½ times), this would translate into 5 basis points in performance. Although this figure seems small, it is significant in light of the fact that a bond manager need outperform the market by only about 75 basis points a year in order to be ranked in the top quartile.

suppose that on November 27, 1996, four broker-dealers simultaneously bid (to buy) and offer (to sell) $100 million Freddie Mac 7.0% Gold PCs for delivery on December 11, 1996 (Exhibit 2).

Prices are quoted in terms of points ($ per bond with $100 face value) and 32nds of a point (called ticks), where + denotes one-half of one 32nd. Dealer 1 is willing to buy the bonds at a price of 99 points and $4/32$, and sell them for a price of 99-06. The dealer might view this two-tick difference in his bid-to-offer price as the bid-ask spread. From a market perspective, however, the bid-ask spread is one tick: the difference between the highest bid (99-05, by Dealer 4) and the lowest offer (99-06, by Dealers 1 and 3).[5] In this example — one from a very liquid market — the two measures of bid-ask spread arrive at almost the same value. For an illiquid market, the result can be quite different.

### Exhibit 1: Indicators of Market Liquidity

| | Market Size ($ billions) | Bid-Ask Spreads (% price) | |
|---|---|---|---|
| | | Typical | Distressed |
| **Mortgage-Backed Securities (MBS)** | | | |
| Fixed-Rate Generic | 1,500 | 0.06 | 0.25 |
| ARM | 150 | 0.13 | 0.38 |
| Companion CMO | 260 | 0.50 | 1.50 |
| IO Strip | 70 | 0.63 | 5.00 |
| **Treasuries** | | | |
| Bills | 760 | 0.002 | 0.005 |
| On-the-Run Notes and Bonds | 70 | 0.03 | 0.06 |
| Off-the-Run Notes and Bonds | 2,760 | 0.06 | 0.09 |
| **Corporates (Intermediate)** | | | |
| A Finance | 130 | 0.12 | 0.50 |
| B Industrials | 80 | 0.50 | 5.00 |
| **Municipals (Long)** | | | |
| Aa/Aaa | 1,300 | 0.25 | 0.75 |

Source: Salomon Brothers, Lehman Brothers, and Sanford C. Bernstein estimates

### Exhibit 2: Identifying Bid-Ask Spreads

| Price | Dealer 1 | Dealer 2 | Dealer 3 | Dealer 4 |
|---|---|---|---|---|
| Bid | 99-04 | 99-04+ | 99-04+ | 99-05 |
| Offer | 99-06 | 99-06+ | 99-06 | 99-07+ |

---

[5] Although the market bid-ask spread is theoretically well defined (best bid minus best offer), in practice it can be somewhat ambiguous. As discussed later, it may be desirable to limit the number of potential counterparties in a transaction. Absolute certainty that the best bidder or offerer has been included is therefore not possible.

Dealer competition is a requisite for a liquid market. Without it, dealers can usually widen their bid-to-offer price in the natural pursuit of profits.[6] The lure of stable trading profits — large markets, modest entry costs, and low security volatility (good hedging vehicles) — serves as a magnet for dealer competition. Markets for complex, heterogeneous securities tend to violate all three conditions. These securities are often volatile and difficult to hedge and therefore have very high research and distribution costs. Some mortgage derivatives — such as IOs and inverse floaters — fall into this category. Researchers, elaborate databases, computer systems, and a knowledgeable sales force are all necessary to success-fully compete in this arena. Not all derivatives, however, are illiquid. For example, many interest rate derivatives, such as futures, swaps and caps, are much easier to hedge[7] and require neither a significant research commitment nor a large scale distribution network. In fact, although some interest rate derivatives appear to be complex, they can often be reduced to a bundle of simpler instruments.

Markets for heterogeneous, complex securities tend to be illiquid for another reason as well. By their very nature, these markets cannot have a single price to signal aggregate investor preferences. Information is therefore much more diffuse and must be imprecisely inferred via recent trades of similar securities and conversa-tions with potential investors. As a result of this uncertainty, rational sell-side traders will widen their bid-to-offer spread in order to avoid the "winner's curse."[8]

The "winner's curse" describes the tendency for a competitive auction — a public sale of any security to the highest bidder[9] — to produce sale prices in excess of an asset's value. Understanding an auction's impact on the behavior of sell-side traders is the first step in selecting optimal buy-side trading strategies.

## WINNERS, COVERS, AND BID-ASK SPREADS

Traders try to avoid the winner's curse. Suppose five sell-side traders are bidding on a bond worth 95-00, but because their information is imperfect they don't know its true value. They do know, however, that winning the auction is tantamount to ten-dering the highest bid. Moreover, because professional traders' expectations are unbiased (over many auctions, they average close to the true value),[10] the winners' subjective valuation will tend to exceed the true value. Sell-side traders therefore know that they must shave (raise) their bid (offer) or risk overpaying (underselling)

---

[6] As illustrated in Exhibit 2, increased dealer participation (certainly in excess of one) also tends to reduce bid-ask spreads by increasing the chance that the best bid or offer will improve.

[7] Interest rate volatility, which is relatively easy to quantify and hedge, is the dominant source of risk.

[8] For a detailed discussion of the winner's curse, see Richard H. Thaler (ed.), *The Winner's Curse: Para-doxes and Anomalies of Economic Life* (Princeton, NJ: Princeton University Press, 1992).

[9] Due to its importance to the fixed-income markets, the Treasury Auction — the sale of newly issued gov-ernment securities — is sometimes referred to as "The Auction." In all the following discussions, the more general usage is intended.

[10] Otherwise, they would go out of business, because they would consistently lose money by overpaying for securities or miss trades by underbidding.

for the security. The larger the number of participants and the greater the uncertainty surrounding the true value, the more hazardous the auction.[11]

Exhibit 3 provides the results from a series of simulations in which security valuations are drawn from a normal distribution centered around the true value (95-00). Each entry — based on 1,000 simulations — differs only by the number of participants in the auction and the standard deviation perceived by the traders. For example, the entry in the first row and column states that, in two-participant auctions in which trader opinions have a standard deviation of 0.25 points, the average high valuation is 0.14 points above the true value.

The marginal impact of additional participants is at first large, but diminishes rapidly. For example, the probability of the tenth participant's valuation exceeding the first nine is much lower than that of the third participant's exceeding the first two. However, the marginal impact of market uncertainty — as we move from left to right — does not taper off. Intuitively, the probability of a high valuation (expressed in terms of standard deviations) is constant. As a result, high valuations (expressed as absolute increases over the true value) increase proportionally with uncertainty. For example, the entries in the fourth column — 1 point standard deviation — are about four times the magnitude of those in the first column — ¼ point standard deviation.

The rational sell-side trader will cheapen (richen) his bid (offer) by at least the expected difference between the mean high (low) valuation and true value.[12] Otherwise, he can expect to lose money trading. For instance, in a three-person auction where the perceived standard deviation is 0.25 points, the high valuation tends to exceed the true value by 0.21 points. Trader rationality therefore requires bid reduction by at least this amount. The larger the auction, therefore, the more traders will tend to cut their bids. In this regard, increasing competition may seem to have no impact on sale price, because each time the number of bidders grows, the individual bids are further reduced to neutralize the heightened danger of the winner's curse.[13]

### Exhibit 3: The Winner's Curse

| Participants (#) | Standard Deviation (points) | | | | |
|---|---|---|---|---|---|
| | 0.25 | 0.50 | 0.75 | 1.00 | 1.50 |
| 2 | 0.14 | 0.28 | 0.42 | 0.56 | 0.85 |
| 3 | 0.21 | 0.42 | 0.63 | 0.84 | 1.26 |
| 4 | 0.26 | 0.53 | 0.76 | 1.03 | 1.56 |
| 5 | 0.30 | 0.58 | 0.85 | 1.15 | 1.72 |
| 6 | 0.31 | 0.63 | 0.95 | 1.25 | 1.89 |
| 8 | 0.36 | 0.71 | 1.07 | 1.41 | 2.11 |
| 10 | 0.38 | 0.80 | 1.13 | 1.55 | 2.31 |
| 15 | 0.44 | 0.86 | 1.34 | 1.74 | 2.62 |

[11] In fact, sell-side traders routinely ask the buy-side trader to reveal the number of participants in the auction.
[12] In statistical terms we can think of the winning bid as the highest order statistic of independent draws of a random variable. The expected value of the highest (winner) and second highest (cover) order statistic and the random variable (true value) refers to the values being discussed.
[13] Unless, of course, bidders are consistently and successfully deceived about the number of other participants — an unlikely possibility.

**Exhibit 4: Uncertainty, Auction Size, and Anticipated Cover**

| Participants (#) | Standard Deviation (points) | | | | |
|---|---|---|---|---|---|
| | 0.25 | 0.50 | 0.75 | 1.00 | 1.50 |
| 2 | 0.28 | 0.56 | 0.84 | 1.12 | 1.70 |
| 3 | 0.21 | 0.42 | 0.63 | 0.84 | 1.26 |
| 4 | 0.17 | 0.37 | 0.56 | 0.73 | 1.10 |
| 5 | 0.17 | 0.33 | 0.48 | 0.67 | 1.00 |
| 6 | 0.15 | 0.31 | 0.46 | 0.60 | 0.94 |
| 8 | 0.14 | 0.27 | 0.43 | 0.58 | 0.90 |
| 10 | 0.13 | 0.29 | 0.40 | 0.56 | 0.79 |
| 15 | 0.12 | 0.24 | 0.38 | 0.49 | 0.78 |

Competition, however, can systematically raise bids because it reduces the bargaining leverage of individual broker-dealers. "Bargaining leverage" refers to the amount by which the winner *believes* he can lower his bid (after compensating for the winner's curse) and still win the auction. After the auction has taken place, the *realized* difference between the winner and the second highest bidder is called the "cover." Bargaining leverage is the a priori analog of the (ex post) cover and is, therefore, sometimes referred to as "anticipated cover."

The anticipated cover is shown in Exhibit 4 to be decreasing with the number of participants and increasing with the asset's perceived volatility. Intuitively, the greater the number of participants with similar opinions, the less likely that the winner's valuation will significantly exceed the second most aggressive bidder. A profit-maximizing trader trying to just outbid the second highest bid will lower his bids as his bargaining leverage increases. Taking into account rational sell-side trader behavior, the process by which auction size and uncertainty determine market liquidity (bid-ask spread) is illustrated in Exhibit 5.

Step 1 of Exhibit 5 provides a distribution of valuations for two environments. Column A describes a very liquid market — many participants with similar opinions (represented by dots along the line). Column B depicts an illiquid market. In Step 2 all the valuations are adjusted downward (translated to the left) by the amount by which traders expect the average high valuation to exceed the true valuation, over many identical auctions. Note that in both auctions (Columns A and B) the true value and high adjusted valuation are equal to 95-00. Although this result will certainly not occur in all circumstances, it should hold *on average* as traders alter their valuations to the auction's characteristics. As illustrated in Step 3, bids will be reduced below the adjusted valuations, in relation to the trader's bargaining leverage — the greater the anticipated cover, the lower the ultimate bid. The expected difference between the true value and the winning offer price in a purchase auction can likewise be derived. In Step 4, the equilibrium bid-ask spread results from combining the expected winning bids and offers.

## Exhibit 5: Equilibrium Bid-Ask Spreads



**Step 1**
Valuations distributed
about true mean of 95-00

**Step 2**
Bids reduced by expected
difference between high valuation
and true value (see Exhibit 3)

**Step 3**
Bids reduced in proportion to
bargaining leverage

**Step 4**
Adding symmetric results for
offers determines bid-ask spreads

| | Large Auction/ Low Volatility (A) | Small Auction/ High Volatility (B) |
|---|---|---|
| Auction Size | 10 | 2 |
| Volatility | 0.25 | 1.00 |

The missing piece in determining equilibrium bid-ask spreads is the amount of the surplus (due to bargaining leverage) that sell-side traders will systematically attempt to extract.[14] In theory, traders might try to extract anywhere from a small fraction to a multiple of the surplus. Traders would limit their attempts to extract the surplus if they believed that these attempts significantly increased the odds of losing the trade. Alternatively, traders would attempt to extract a large multiple of the surplus if they believed that all other traders were doing likewise and that, therefore, the bid necessary to win the trade was actually much lower than rational valuations would indicate. Absent other compelling reasons (such as the need to cover a short position), neither of these are frequent occurrences. From the trader's vantage point, there is little to lose in attempting to extract some surplus, because it is not (yet) a profitable trade. As the trader extracts greater amounts of the surplus, the trade becomes increasingly profitable, and further attempts are increasingly risky. In practice, it seems as though traders often attempt to extract the entire surplus, but not much more. As shown in the appendix, extracting the entire surplus is the optimal strategy under certain mathematical conditions.

---

[14] In the common vernacular, they will attempt to leave as little money on the table as possible.

## AUCTION DESIGN FOR A LIQUID MARKET

The results of the preceding section argue that increasing the auction size improves buy-side execution by reducing the temptation for the broker-dealer to shave his bid. Although there is no disputing this conclusion, the potential benefit from increasing the auction beyond a handful of participants is often quite small. For instance, consider a generic par-priced mortgage passthrough (with a standard deviation of about 0.25 points). As shown in Exhibit 4, adding the third bidder reduces the anticipated cover by 0.07 points to 0.21 points. Adding the next 5 bidders reduces the anticipated cover by an additional 0.07 points. Moreover, even for a liquid security there are rarely more than a half dozen or so contending counterparties. It is the job of the buy-side trader to know their identity.

Large auctions do have their disadvantages. As the number of competitors increases, the time required to gather the bids (or offers) increases; in turn, this raises exposure to market volatility, which introduces uncertainty about best price. Transactions are not final until a bid is accepted and confirmed. The greater the time between bid and acceptance, the less certain the confirmation. There are a variety of potential solutions to this problem (e.g., multiple traders, spread trades versus a reference Treasury benchmark, hedging), but these solutions have associated costs that must be weighed against the benefits.

Our experience suggests that the optimal auction for a liquid security is usually three to five participants. It provides a good balance between timely execution and a small cover. Real time execution, however, creates another opportunity for the highest bidder to lower his price: trade confirmation.

Once bids have been tendered, the buy-side trader identifies and accepts the highest price. It is then up to the bidder to confirm the price. Even in the absence of any market movements, the bidder has an immediate incentive to lower his bid, because he knows that it must have been the highest. If real time frictions were not an issue, and if bonds traded in infinitely small price units, there would be only a small incentive for the sell-side trader to lower his bid price, because he has already selected his optimal bid and lowering the price further would increase the probability that the trade would fall through. These complications, however, provide the would-be winner an opportunity to lower his bid by the minimum amount in which the particular bonds trade. For instance, mortgage passthroughs trade in units of a + ($\frac{1}{64}$). As a result, the winner has the incentive to lower his bid by that amount. Theoretically, although this type of behavior (opportunistic re-bidding) doesn't necessarily affect execution,[15] it can in practice.

---

[15] If traders raise their initial bid by a +, realizing that they will lower their bid by a + at confirmation, there is no net effect. Due to the conventions of trade confirmation, however, this type of behavior is somewhat unlikely. If the last bid to arrive is the best, the buy-side trader can immediately accept it, with confirmation essentially guaranteed. Sell-side traders are reluctant to admit to opportunistic re-bidding, and it is difficult to attribute a bid change to external factors when acceptance is immediate.

Only a minority of sell-side traders seem to display this sort of behavior. It complicates the trade and jeopardizes its completion, all for a modest and uncertain gain — on the order of a + for mortgage passthroughs ($15,625 on a $100 million transaction). Moreover, buy-side traders can discourage re-bidding by reducing its profit potential. For example, bids can be sequentially requested with habitual re-bidders put last in the queue, thereby increasing the odds of an instantaneous acceptance (confirmation virtually assured) when the best price is tendered. In addition, buy-side traders can declare that ties will not be awarded to opportunistic re-bidders. Nonetheless, opportunistic re-bidding cannot be completely eliminated.

## AUCTION DESIGN FOR AN ILLIQUID MARKET

The main goal of the buy-side trader is to achieve best execution. With liquid (homogeneous) securities, this amounts to encouraging competition without unduly increasing transaction time. There is no fundamental difference between a purchase and a sale. Bids or offers are tendered for essentially identical securities. Illiquid[16] securities, however, are often heterogeneous and, although this does not affect sale mechanics (you can still request competitive bids for the particular security), it does affect purchases because only one dealer will typically be able to offer any particular security. Although the basic conclusion about the desirability of competition still holds, other considerations are also important, and sales and purchases must be separately examined.

Sales can be conducted, much like those for liquid securities, as an instantaneous auction. A much larger standard deviation of the true asset value, say on the order of 1.5 points, would suggest a very large auction size. As shown in Exhibit 4, bargaining leverage doesn't really level off until the auction reaches a size of about 10 bidders — a seemingly unwieldy number. The benefits and costs of a large auction, however, are not as great as is indicated by a liquid market.

Competition does not increase commensurately with auction size because, in most cases, there are only a few genuine competitors in these markets. As a result, the level of competition in an instantaneous auction is limited. Sell-side traders understand market conditions and act accordingly — they attempt to exploit their bargaining leverage.

Although an experienced buy-side trader will have a good notion of the best competitors' identities, a larger auction sometimes produces a surprising winner due to a special interest in a particular bond.[17] Fortunately, the problems associated with a large auction do not usually increase much with illiquid securities — as long as they are hedged. Transaction time may increase and execution might erode somewhat with uncertainties concerning best price. The possible loss

---

[16] "Illiquid" refers to the entire continuum of bonds that are not classified as liquid.

[17] In the municipal market, it is not always possible to identify the best competitors in advance, and so it is often desirable to cast a wide net.

of a couple of 32nds, however, is dominated by the possible gain from a surprise winner — sometimes on the order of a half point or more. Of course, common sense argues for avoiding times of heightened market volatility, such as the release of economic news.

The greatest expected gain in an illiquid transaction may be achieved not by increasing auction size, but by decreasing trader risk (asset value uncertainty). As shown in Exhibit 4, lowering risk reduces bargaining leverage by concentrating security valuations. Moreover, risk reduction also lowers the return requirements (raises the bids) of traders. These are not material considerations for liquid markets in which traders have timely and accurate information and a very short holding period — risk is already close to a minimum. Quite the opposite is true for an illiquid market.

Allowing bidders the opportunity to broker the bonds can essentially eliminate their risk. There are two common ways of brokering bonds — a sale order and a bid list. A *sale order* is an exclusive agreement in which the investor will sell a bond to the dealer at or above some reservation (minimally acceptable) level. A *bid list* is a delayed (rather than instantaneous) auction. Both provide dealers the opportunity to collect bids from potential investors, and thereby shift risk to the ultimate purchaser. The beneficiary of the risk transfer, however, differs by method.

There are two advantages of a bid list — risk reduction and competition. Bid-ask spreads can, at times, be reduced to those of a liquid market. A sale order, however, lacks the advantage of direct competition; as a result, transaction prices rarely exceed the reservation level, because brokers extract the surplus. In order to achieve a good execution level, the buy-side trader must have exceptionally accurate information when setting the reservation level and selecting the broker. Heroic information requirements, together with broker incentives to extract some surplus, make sale orders a much less effective sale mechanism than bid lists for most MBS and municipal bond sales.

Why would a sale order ever be the preferred course of action? It can be argued that in some instances the inclusion of several brokers, as in a bid list, can erode execution. Dealers will approach their clients, the ultimate investors, with suggested bid levels based upon their (possibly unique) read of the market. Most institutional investors will be contacted by several dealers. Some investors will select the dealer (and the bid) with a low suggested bid level, even though they might be willing to pay more for the security — a practice that can reduce transaction price — in order to avoid the winner's curse. Including only well informed participants on the bid list is one way to limit this sort of price erosion. For these reasons, as well as for the fact that they comprise a much less diverse universe (information is more readily available), making it easier to ascertain the level at which they should trade, a sale order is often the preferred course for corporate bonds. In general, however, it is probably better to err on the side of including too many than too few participants.[18]

---

[18] Hybrid strategies such as bid lists with a reservation level can be used to mitigate the potential hazards of a bid list.

One exception to the "more is better" rule about bid lists versus sale orders does exist. Very complicated securities sometimes require a significant amount of time and effort to sell. A sale order might be necessary to attract the appropriate effort from a broker. In these circumstances market knowledge and negotiating skill determine execution price.

The perception of competition is also valuable when *buying* illiquid securities. Because the available supply of similar securities is often limited, dealers need not necessarily offer the best price to sell their bonds. It is therefore usually not in the buyer's best interest to shatter the illusion of competition by revealing a large demand. As with a very illiquid sale, purchase price may be most sensitive to negotiating skill and the quality of information.

Benefiting from the reduction in dealer risk is much less likely when buying illiquid bonds. Once the dealer owns the bonds, he has already placed his capital at risk and is therefore reluctant to sell them at razor thin margins. Moreover, when buying off a bid list, you are much more likely to suffer from the winner's curse than benefit from the lower bid-ask spreads. The optimal strategy, in that case, mirrors that described for the rational trader of a liquid product.

## THE LONG-TERM RELATIONSHIP

Individual transactions are part of a long-term relationship. Trades must therefore be viewed in a broader context. As with any other relationship, people get to know some of each other's behavior patterns pretty well. For competitive auctions, the import of this knowledge is limited. With negotiations, however, long-term credibility becomes important. Tactics such as bluffs and threats must be used prudently and with the understanding that misuse may have consequences for future transactions and the relationship at large.

A satisfactory relationship serves both dealer and investor. The investor can benefit from a combination of liquidity, research, and other information (e.g., security pricing). Incremental competition is particularly valuable for trading illiquid securities. Dealers profit by making bid-ask spreads, which increase with their participation in transactions. As a general guideline, dealers have a strong incentive to encourage the relationship, especially because the marginal cost of providing research and other information is usually very low.

Incentives to the contrary, conflict can arise because each trade is a zero-sum game. Moreover, dealers are populated by many specialists — trading different securities — who are focused on their individual profitability. Some specialists at the same dealer may be much less interested in sustaining the long-term relationship than their colleagues. As a result, dealers provide investors a firm-wide representative (salesperson) who serves as the intermediary between the buy-side and sell-side traders.

The goal of the salesperson is to maximize dealer long-term profits by increasing participation in transactions, making terms more favorable to them

(e.g., sale orders), and minimizing disputes. It should be realized that the sales-person represents the dealer, not the investor. Although the two parties' interests sometimes coincide, trade execution may not be the place.

## SUMMARY

Competition holds the promise of enhanced buy-side trade execution, especially for volatile securities. In order for that promise to be fulfilled, the competition must be genuine. Unfortunately, increasing the number of broker-dealers in an auction does not necessarily elevate the level of competition — incremental bene-fits diminish with increased auction size, and not all broker-dealers have equally informed traders.

Excessive auction size can have deleterious effects, such as execution delays and adverse price selection by the ultimate investors. Adverse selection occurs when several broker-dealers solicit interest from the same client, and that client chooses to tender the lower price. On the other hand, allowing broker-deal-ers to shift risk to their clients can enhance execution, because the broker-dealers are not placing their firms' capital at risk, and therefore they require lower expected profits from the trade. The objective of the buy-side trader is to balance these considerations. In practice, the optimal trade-off differs by market.

## APPENDIX

An optimal bidding strategy is derived for an auction with two bidders (called 1 and 2). Both have an unbiased opinion ($X_i$) of the bond's value, uniformly distrib-uted over an interval of unit length. Moreover, both bidders know that there is one other participant with an identically distributed opinion. As a result, trader $i$ believes the other trader's opinion is uniformly distributed over the interval $X_i \pm 0.5$.

Each trader will select an optimal amount ($S_i$) by which he will reduce $X_i$ in deriving his optimal bid ($B_i$). Optimality is defined by the strategy that maxi-mizes the expected profits ($\pi_i$). Profits only materialize when a bidder wins, and are thereby diminished by the winner's curse. Expressed in mathematical terms, the expected profit (gross of winner's curse) for bidder $i$ is:

$$\pi_i = \max_{S_1} \int_{X_1-\frac{1}{2}}^{X_1-S_1+S_2} S_1 dX_2 \qquad (1)$$

The profit maximizing conditions solves the normal equation,

$$\frac{d}{dS_1}(S_1 \times (S_2 - S_1 + \frac{1}{2})) = 0 \qquad (2)$$

The optimal strategy is therefore,

$$S_1^* = \frac{S_2}{2} + \frac{1}{4} \tag{3}$$

As shown in equation (3), the optimal strategy for trader 1 depends upon the optimal choice of trader 2, $S_2$. An equilibrium[19] occurs when both traders are simultaneously satisfied with their strategy, given the other's strategy. Because these traders are essentially identical, this occurs when $S_1 = S_2 = 0.5$. The optimal strategy can be decomposed into two parts: (1) the expected cost of the winner's curse and (2) the use of bargaining leverage.

The expected cost of the winner's curse can be calculated as the difference between the expected valuation by the winner (second order statistic) and the expected true value of the security ($\mu$). These are:

$$\mu = \int_0^1 x \ dx = \frac{1}{2}$$

$$E(\max(X_1, X_2)) = \int_0^1 2x^2 \ dx = \frac{2}{3} \tag{4}$$

The expected value of the winner's curse is therefore $\frac{1}{6} = (\frac{2}{3} - \frac{1}{2})$, and the use of bargaining leverage is equal to $\frac{1}{3} = (S_1 - \frac{1}{6}) = (\frac{1}{2} - \frac{1}{6})$ — the entire amount of anticipated cover because

$$E(\min(X_1, X_2)) = E(X_1 + X_2) - E(\max(X_1, X_2)) = 1 - \frac{2}{3} = \frac{1}{3} \tag{5}$$

---

[19] Called a Nash equilibrium in the economics literature.

# Exhibit G

### Bid-Ask Spreads (% of Price) - Fabozzi June 1997

|  | Normal | Distressed | Multiple |
|---|---|---|---|
| On-the-Run Treasuries | 0.03 | 0.06 | 2.00 |
| Off-the-Run Treasuries | 0.06 | 0.09 | 1.50 |
| Corporates (Intermediate) | 0.12 | 0.50 | 4.17 |

### Bid-Ask Spreads (% of Price) to Use for US Agency Del

| Remaining Maturity | Normal * | Distressed ** |
|---|---|---|
| 0-6 mos | 0.06 | 0.14 |
| 6 - 12 mos | 0.13 | 0.33 |
| 1 - 2 yrs | 0.21 | 0.52 |
| 2 - 5 yrs | 0.34 | 0.85 |
| 5 -10 yrs | 0.49 | 1.22 |
| 10 - 30 yrs | 0.45 | 1.13 |

\* Average Bid-Ask Spread of Off-the-Run Treasuries from January 1992 to December 2002

\*\*  Fabozzi Multiple (estimate between Treasuries and Corporates)  x Normal Bid-Ask Spread

Δ π EXHIBIT 410 B
Deponent Slattery
Date 4/16/10 Rptr. KK
WWW.DEPOBOOK.COM

LEH-NAVIGANT 026434

**LEH-NAVIGANT 026435**

bt Haircuts

LEH-NAVIGANT 026436

# Exhibit H

### Bid-Ask Spreads (% of Price) - Fabozzi June 1997

|  | Normal | Distressed | Multiple |
|---|---|---|---|
| Pass-through | 0.06 | 0.25 | 4.17 |
| ARM | 0.13 | 0.38 | 2.92 |
| Companion CMO | 0.50 | 1.50 | 3.00 |
| IO Strip | 0.63 | 5.00 | 7.94 |

### Bid-Ask Spreads (% of Price)- Bank of America July 2001

|  | Bid - Ask Normal | Bid - Ask Distressed * | Bid - Mid Distressed ** |
|---|---|---|---|
| Inverse IO | 4.2000 | 33.33 | 16.67 |
| Structured IO | 3.2900 | 26.11 | 13.06 |
| WAC IO | 3.2900 | 26.11 | 13.06 |
| Structured PO | 1.3000 | 10.32 | 5.16 |
| Inverse Floaters | 1.0600 | 8.41 | 4.21 |
| Trust IO | 0.4900 | 3.89 | 1.94 |
| Trust PO | 0.3400 | 2.70 | 1.35 |
| Floaters | 0.1250 | 0.99 | 0.50 |
| Pass-through | 0.0313 | 0.25 | 0.12 |

*  Fabozzi Multiple x B of A Bid-Ask Normal
** Bid-Ask Distressed /2



Δ π EXHIBIT 77 B
Deponent: Slattery
Date 4/14/10  Rptr KK
WWW.DEPOBOOK.COM

LEH-NAVIGANT 026433

# Exhibit I

Page 1

1

2        UNITED STATES BANKRUPTCY COURT

3        SOUTHERN DISTRICT OF NEW YORK

4    ----------------------x

5    In Re:

6                              Chapter 11

7    LEHMAN BROTHERS          Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,   (Jointly Administered)

9

             Debtors.

10

    -----------------------x

11

12

13        DEPOSITION OF JOSEPH SCHWABA

14            New York, New York

15            April 12, 2010

16

17

18

19

20

21

22

23    Reported by:

24    KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25    JOB NO. 29650A

## Page 2

```
1
2              April 12, 2010
3               9:28 A.M.
4
5         Deposition of JOSEPH SCHWABA,
6    held at the law offices of Boies
7    Schiller & Flexner, LLP, 575 Lexington
8    Avenue, New York, New York, before Kathy S.
9    Klepfer, a Registered Professional
10   Reporter, Registered Merit Reporter,
11   Certified Realtime Reporter, Certified
12   Livenote Reporter, and Notary Public
13   of the State of New York.
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
1
2
3          A P P E A R A N C E S :
4
5   JONES DAY, LLP
6   Attorneys for Lehman Brothers, Inc.
7      222 East 41st Street
8      New York, New York  10017-6702
9   BY:  JAYANT W. TAMBE, ESQ.
10       GEORGE E. SPENCER, ESQ.
11
12   BOIES, SCHILLER & FLEXNER, LLP
13   Attorneys for Barclays
14      5301 Wisconsin Avenue, N.W.
15      Washington, D.C.  20015
16   BY:  JONATHAN M. SHAW, ESQ.
17
18
19
20
21
22
23
24
25
```

## Page 4

```
1
2      A P P E A R A N C E S :  (Cont'd.)
3
4    QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
5    Attorneys for the Creditors Committee
6       51 Madison Avenue
7       22nd Floor
8       New York, New York  10010
9    BY:  ROBERT K. DAKIS, ESQ.
10
11   HUGHES, HUBBARD & REED, LLP
12   Attorneys for the SIPA Trustee
13      One Battery Park Plaza
14      New York, New York  10004-1482
15   BY:  SAMUEL C. McCOUBREY, ESQ.
16
17
18   ALSO PRESENT:
19      MARC VELLRATH, FSG
20
21
22
23
24
25
```

## Page 5

```
1             J. Schwaba
2    JOSEPH SCHWABA, called as a
3       witness, having been duly sworn by a Notary
4       Public, was examined and testified as
5       follows:
6    EXAMINATION BY
7    MR. SHAW:
8        Q.   Please state your name for the record,
9    sir.
10       A.   Joseph Schwaba.
11       Q.   Mr. Schwaba, we introduced ourselves
12   off the record, but my name is Jonathan Shaw.
13   I'm representing Barclays Capital, Inc.
14            Have you ever been deposed before,
15   sir?
16       A.   I think I was deposed before once.
17       Q.   In what context?
18       A.   As a witness.
19       Q.   An expert witness?
20       A.   No.
21       Q.   Fact witness?
22       A.   Yes.
23       Q.   What kind of case was that?
24       A.   It was a long time ago.  Must have
25   been, oh, I'm guessing 20 years or so in regard
```

Page 6

1        J. Schwaba
2  to a employee, somebody who used to report to
3  me.
4        Q.   Okay.  I'm going to ask you questions.
5  If any of my questions are unclear to you,
6  please let me know and I'll try and do a better
7  job of phrasing them.  If at some point today
8  you want to take a break, just let me know, and
9  I may ask that we finish up a question or two,
10  but, you know, obviously I'm happy to let you do
11  that.
12        A.   Sure.
13        Q.   Have you ever testified as an expert
14  before in any context?
15        A.   I was in a couple of cases, must be
16  eight-plus, nine years ago, where I gave some
17  expert testimony, but it was an arbitration, as
18  I recollect.
19        Q.   What kind of arbitration was it?
20        A.   I don't even -- I think it had
21  something to do with a fixed income portfolio
22  valuation, but I don't even remember the
23  specifics and it didn't get very far.
24        Q.   Did you actually testify in either of
25  the actual arbitration or in deposition?

Page 7

1        J. Schwaba
2        A.   I was there and gave a minimal amount
3  of testimony, as I recollect, but nothing more
4  than that.
5        Q.   How many hours have you worked on this
6  matter so far?
7        A.   I don't have a specific number, but
8  I've put in easily a hundred-plus.
9        Q.   Over what period of time?
10        A.   Over the last couple of months.  Let's
11  see, where are we now?  April?
12        Q.   Yes.
13        A.   I would recollect probably two, two
14  and a half months.
15        Q.   When were you engaged to begin work on
16  this matter?
17        MR. TAMBE:  Object to the form of the
18  question.
19        You can answer.
20        THE WITNESS:  I'm sorry?  Say again.
21        MR. TAMBE:  I just object to the form
22  of the question, but you can answer if you
23  understand his question.
24        A.   Repeat the question, please.
25        Q.   Sure.  Do you know when -- you work

Page 8

1        J. Schwaba
2  for Chicago Partners; is that correct?  Navigant
3  Consulting?
4        Let me start again.  For whom do you
5  work?
6        A.   I'm an independent contractor.
7        Q.   Okay.  And were you retained in this
8  matter, in this litigation at some point?
9        A.   I was asked to provide -- to be an
10  expert with regard to this matter.
11        Q.   And who asked you to be an expert in
12  regard to this matter?
13        A.   Nick Weir.
14        Q.   And who is Mr. Weir?
15        A.   He is a principal of Chicago
16  Partners/Navigant.
17        Q.   And approximately when did Mr. Weir
18  ask you to serve as an expert consultant in this
19  matter?
20        A.   I don't recollect.
21        Q.   Was it in 2009 or 2010?
22        A.   The best I can recall is we started
23  having some discussions of a general nature in
24  2009, fall, and ...
25        Q.   Have you ever at any point in your

Page 9

1        J. Schwaba
2  career been a trader of municipal securities?
3        MR. TAMBE:  Object to the form of the
4  question.
5        Q.   You can answer.
6        A.   I have been -- I have managed trading
7  operations of which municipal securities were a
8  part.
9        Q.   When did you manage trading
10  operations?
11        A.   One would be in when I worked for
12  Continental Bank.
13        Q.   And when was that?
14        A.   That was approximately 1986 through
15  1990.
16        Q.   Are there any other times that you
17  managed traders in municipal securities?
18        A.   I have managed portfolios at the
19  Federal Home Loan Bank of Pittsburgh, which
20  included some municipal securities as well.
21        Q.   And when was that?
22        A.   That was 19 -- or, excuse me, 2003
23  through 2009.
24        Q.   What portfolio --
25        A.   I should also, excuse me, during

Page 10

J. Schwaba

1  Prudential Bache, 1982 through 1986, there were
2  some municipal positions, or we dealt with
3  strategy development with regard to some
4  municipal positions.
5
6      **Q.  In your work at the Federal Home Loan**
7  **Bank of Pittsburgh what were your specific**
8  **responsibilities?**
9      A.  I was a Director of Corporate Risk
10  Management.
11      **Q.  What do you mean by that?**
12      A.  I was responsible for managing market
13  risk which had two or three different functions.
14      **Q.  And what were those functions?**
15      A.  One was the actual management of
16  market risk on the balance sheet and the
17  components of that; second was income simulation
18  and forecasting; and third was optimizing
19  capital management.
20      **Q.  What do you mean by "optimizing**
21  **capital management"?**
22      A.  Well, incorporating into our analysis
23  the amount of capital that would be allocated to
24  particular -- an amount of capital we were
25  using.  The preservation and expansion of that

Page 11

J. Schwaba

1
2  capital ideally as well.
3      **Q.  And what do you mean by "income**
4  **simulation and forecasting"?**
5      A.  Basically in income simulation
6  forecasting you're looking at a variety of
7  different scenarios, potentially.  Interest
8  rates go up.  Interest rates go down.  Yield
9  curve shifts.  Goes flat.  Yield curve goes
10  steep.  How will that impact your income both on
11  a current basis and projecting out in a
12  particular period of time.
13      **Q.  And what do you mean when you say**
14  **"management of market risk"?**
15      A.  The securities that you have in your
16  position will either go up in value or down in
17  value based on market dynamics.
18      **Q.  How many portfolios were you**
19  **responsible for managing while you were at the**
20  **Home Loan Bank in Pittsburgh?**
21      MR. TAMBE:  Objection to the form of
22  the question.
23      **Q.  You can answer the question.**
24      A.  I was one of -- there were -- I'm not
25  sure I can understand the question.  There was a

Page 12

J. Schwaba

1
2  balance sheet and there are components of the
3  balance sheet, and part of my responsibility and
4  my group's responsibility was to measure that
5  risk, and the measurement of that risk entailed
6  both analysis of individual securities as well
7  as analysis of portfolios or subsets of those
8  portfolios.
9      **Q.  What percentage of the portfolios that**
10  **you managed consisted of municipal securities?**
11      MR. DAKIS:  I'm going to object to the
12  form of the question.
13      **Q.  You can answer.**
14      A.  Municipals were not a large part of
15  our portfolio, as I recollect.
16      **Q.  What do you mean by "not a large**
17  **part"?**
18      A.  I don't have specific numbers on them,
19  but they were, you know, small percentage.
20      **Q.  Under 5 percent?**
21      A.  I would, as the best I can recollect,
22  I would say they were definitely under 5
23  percent.
24      **Q.  Under 1 percent?**
25      A.  I couldn't say.

Page 13

J. Schwaba

1
2      **Q.  Did you actually have any**
3  **responsibility for directing trading decisions**
4  **in the portfolio that you were responsible for**
5  **as a risk manager?**
6      A.  At where?
7      **Q.  At Pittsburgh.**
8      A.  No direct trading decisions, no.
9  However, I was on the Asset/Liability Committee,
10  I should amend that, and we made major strategic
11  decisions in the Asset/Liability Committee.
12      **Q.  What percentage of the portfolios you**
13  **were involved with at Pittsburgh consisted of**
14  **adjustable rate municipals?**
15      A.  I don't -- I couldn't recollect.
16      **Q.  Presumably it's a subset of the**
17  **municipals in their entirety, right?**
18      A.  If we had them in there, presumably.
19      **Q.  And you don't know if you had any in**
20  **there?**
21      A.  I don't know.
22      **Q.  What about auction rate securities?**
23      A.  I don't know for sure on that as well.
24      **Q.  Did you have any responsibility for**
25  **valuation of municipal securities at Pittsburgh?**

Page 14

J. Schwaba

1
2    A.    Part of our -- a big part of our
3    responsibility was to measure the risk in our
4    asset/liability book, and municipals were a part
5    of that, and so given the asset/liability system
6    that we were using and employing, there would be
7    a value that would be derived from that.  So we
8    had a hand in coming up with a valuation,
9    therefore, for those securities.
10    Q.    When you say you had a hand in coming
11    up with a valuation, what precisely do you mean?
12    A.    Calculating what the risk of that
13    particular element of the portfolio as well as
14    other elements of the portfolios were.
15    Q.    Did you have any responsibility for
16    providing marks for those securities?
17        MR. TAMBE:  Objection to the form of
18    the question.
19    A.    We did not have, the best I can
20    recollect, we did not have direct responsibility
21    for input of marks.  However, we would check
22    those marks with other business units that were
23    providing.  So we had input and oversight or
24    some -- some, not oversight, but some input
25    responsibility as a check.

Page 15

J. Schwaba

1
2    Q.    I'm not quite sure I understand what
3    you mean.  What do you mean you would check, who
4    would provide you the marks that you were
5    checking?
6    A.    Typically, we would get them from the
7    Capital Markets Department and from the -- they
8    would get them from the street.
9    Q.    Okay.  And so you would then do what
10    to check marks you received from the Capital
11    Markets Department?
12    A.    We would run -- we would, given what
13    they gave us, we would run our models, and
14    sometimes there are outliers.  There could be a
15    mistake, you know, the price, if a trade price
16    looked like something was askew or, you know, a
17    part of our responsibility was to make sure we
18    caught that and to make sure, you know, if
19    something was input wrong or there was an
20    individual security that was -- whose price
21    was -- looked different other than what, you
22    know, some type of reasonable range, given the
23    situation, it could be different, it was part of
24    our responsibility, I thought, to check that.
25    Q.    What's the source of the models that

Page 16

J. Schwaba

1
2    were used to check these marks?
3    A.    We had a -- we had a highly reputable
4    model that was used in the street, an
5    asset/liability model.
6    Q.    Was that a proprietary model for your
7    employer or was it something you had --
8    A.    No, it was a -- it was a model that we
9    contracted with an entity for.
10    Q.    And what entity was that?
11        MR. TAMBE:  Can I just consult with
12    the witness?
13        (The witness confers with Mr. Tambe.)
14        MR. TAMBE:  I think there's just a
15    concern about the confidentiality of who the
16    vendor might have been.  We'll --
17        MR. SHAW:  It's not something I feel
18    strongly about so let's skip that one.
19        MR. TAMBE:  Okay.  He just doesn't
20    know whether he's at liberty to divulge the
21    name of that.
22        MR. SHAW:  I understand.  I
23    understand.
24    Q.    And you described that model as an
25    asset/liability model; is that correct?

Page 17

J. Schwaba

1
2    A.    That is correct.
3    Q.    And is an asset/liability model a
4    valuation model?
5        MR. TAMBE:  Object to the form of the
6    question.
7        MR. DAKIS:  Join in that objection.
8    A.    I believe that an asset/liability
9    model has a component of valuation in it.
10    Q.    Is an asset/liability model, the type
11    that you use, the type of model one would use to
12    value a municipal security?
13        MR. TAMBE:  Object to the form of the
14    question.
15        MR. DAKIS:  Same objection.
16    A.    Could you repeat the question again,
17    please?
18    Q.    Sure.  Is an asset/liability model of
19    the type that you used the type of model one
20    would use to value a municipal security?
21        MR. TAMBE:  I repeat the objection.
22        MR. DAKIS:  Same objection.
23    A.    If I understand you correctly, our --
24    there were -- there were values obtained for the
25    municipal component of our asset and liabilities

Page 18

1         J. Schwaba
2 through use of the model.
3     **Q.   When you found what you described as**
4 **an outlier, what would you do to investigate the**
5 **difference between the values that had been**
6 **provided to you by your Capital Management Group**
7 **and those that would be coming up on your model?**
8     A.   Typically, what we would do is go back
9 and check, first of all, with our Capital
10 Markets folks that gave us -- through whom we
11 got the quote or the number, and then we would
12 either talk with them directly or in some cases
13 we might go back to the ultimate source of that
14 where we got our -- our street counterpart.
15     **Q.   Would it be fair to say the reason you**
16 **would talk to the Capital Markets folks is that,**
17 **as people who were actively trading in that**
18 **market, they had a feel for the market and**
19 **perhaps information about why a particular trade**
20 **had occurred at a particular price?**
21         MR. TAMBE:  Object to the form of the
22 question.
23         MR. DAKIS:  Same objection.
24     A.   Well, if I understand you, I mean, it
25 could be.  I don't, you know, there could be a

Page 19

1         J. Schwaba
2 number of reasons, but --
3     **Q.   What other reasons would you have for**
4 **talking to them about -- talking to them in the**
5 **process of investigating why you found an**
6 **outlier?**
7     A.   Well, as I said before, to see what,
8 you know, why that number is what it is.
9     **Q.   And the reason you would expect them**
10 **to know why that number is what it is is because**
11 **they were, at least in part, is because they**
12 **were actively participating in the market; is**
13 **that correct?**
14         MR. TAMBE:  Object to the form of the
15 question.
16     A.   I'm not going to presume to know what
17 their role is in great detail.  However, other
18 things being equal, they should know, you know,
19 why the value of their positions are where they
20 are.  I think, you know, my experience, that's
21 part of the job.
22     **Q.   In September of 2008, what involvement**
23 **did you have with the market for municipal**
24 **securities?**
25     A.   Well, as you know and as we just have

Page 20

1         J. Schwaba
2 been discussing, that was part of my
3 responsibility -- I was at the Federal Home Loan
4 Bank and my responsibilities that I have just --
5 we've just talked about.
6     **Q.   What percentage of your time when you**
7 **were working for the Federal Home Loan Bank**
8 **would you say you spent working on issues**
9 **relating to municipal securities?**
10     A.   Very low percentage.
11     **Q.   Under 5 percent?**
12     A.   Probably under 5 percent.
13     **Q.   Do you know if you spent any of your**
14 **time working on issues relating to adjustable**
15 **municipal securities?**
16     A.   I do not recollect working on
17 adjustable rate securities.
18     **Q.   At any point in your career have you**
19 **done work on adjustable rate municipal**
20 **securities?**
21     A.   I don't recollect that.
22     **Q.   Just so it's clear, at any point in**
23 **your career have you done any work on auction**
24 **rate municipal securities?**
25     A.   I may have on some occasions, but I

Page 21

1         J. Schwaba
2 don't recollect direct involvement in that.
3     **Q.   To the best of your knowledge, at any**
4 **point in your career have you had any**
5 **involvement with the valuation of adjustable**
6 **rate municipal securities?**
7     A.   To the extent that auction rate or
8 adjustable, as you described it, were involved
9 in some of the portfolios that I was responsible
10 for overseeing, there could have been some
11 involve -- indirect involvement.
12     **Q.   I think it's probably worth spending a**
13 **minute just defining some terms.  What is your**
14 **understanding of what an adjustable rate**
15 **municipal security is?**
16     A.   My understanding is the rate on the
17 security varies.  We -- it can be an adjustable
18 rate based on an auction rate, it can be an
19 adjustable rate based on how it's priced in the
20 marketplace, and that rate can vary through
21 certain defined conditions.
22     **Q.   So if I'm understanding you correctly,**
23 **in your view, an auction rate security or**
24 **auction rate securities -- strike that.**
25         **If I'm understanding you correctly, in**

Page 22

```
 1              J. Schwaba
 2   your view, auction rate municipal securities are
 3   a subset of the larger group of adjustable rate
 4   securities, is that fair?
 5       A.   They could be construed that way.
 6       Q.   Well, is that how you construed them
 7   when you used the term in your report?
 8       A.   I wouldn't characterize it that way.
 9   I think we were defining what each specific
10   security was.
11       Q.   In the context of auction rate
12   securities, what is a failed auction?
13       A.   That is when there are not enough
14   bidders for the particular security that's being
15   auctioned off and so that they're, given that
16   there are not enough bidders for the auction,
17   the auction literally doesn't -- doesn't take
18   place because there's not enough interest.
19       Q.   So a failed auction indicates a lack
20   of market interest in a security?
21            MR. TAMBE:  Objection to the form of
22   the question.
23            MR. DAKIS:  Same objection.
24       A.   I would not -- I am not sure I would
25   characterize it that way.
```

Page 23

```
 1              J. Schwaba
 2       Q.   In what way is that characterization,
 3   in your view, inaccurate?
 4       A.   If you could repeat the question?
 5       Q.   Sure.  Does a failed auction in an
 6   auction rate municipal security indicate to you
 7   a lack of market interest in that security?
 8       A.   It could be that the rate is not high
 9   enough.  I mean, given market conditions at that
10   time, perhaps one could construe that.
11       Q.   When you say the rate is not high
12   enough, you mean the rate is not high enough to
13   interest people in purchasing the security?
14       A.   That's right.
15       Q.   Would it be fair to say that auction
16   rate securities that have failed at auction
17   would trade below par?
18       A.   They could trade below par, but not
19   necessarily.
20       Q.   Would you expect such a security to
21   trade below par?
22       A.   That's an interesting question because
23   one of the things that was interesting to me was
24   that there were a large number, a relatively
25   large number of securities that did not trade
```

Page 24

```
 1              J. Schwaba
 2   below par even though there have been failed
 3   auctions.
 4       Q.   Failed auctions in those particular
 5   securities?
 6       A.   Yes, or like securities.
 7       Q.   Or like securities?  Well, which is
 8   it?  Have you identified particular transactions
 9   where there were trades at or above par in a
10   security that had failed at auction?
11            MR. TAMBE:  Object to the form of the
12   question.
13            MR. DAKIS:  Objection.  Same
14   objection.
15            MR. McCOUBREY:  Same objection.
16       A.   I'm sorry, repeat the question again.
17       Q.   Sure.  Have you identified particular
18   transactions where there were trades at or above
19   par in an auction rate security that had failed
20   at auction?
21            MR. TAMBE:  Same objection.
22            MR. DAKIS:  Same objection.
23            MR. McCOUBREY:  Same.
24       A.   There was some definite analysis going
25   on, but I couldn't give you specifics of that as
```

Page 25

```
 1              J. Schwaba
 2   I recollect.
 3       Q.   What do you mean there was some
 4   definite analysis going on?  Does that mean you
 5   were looking for such examples?
 6       A.   In our -- in our review of the market
 7   and the dynamics that were going on, I recollect
 8   that obviously there were failed or some failed
 9   auctions.  It was a phenomenon going on in that
10   time and place, and it was immediately -- it was
11   very interesting to look at the prices, the
12   market prices of those, and but I didn't -- I
13   can't recollect at this time specific
14   recommendations or specific points about those.
15       Q.   So as you sit here today you're unable
16   to identify for me any particular transaction of
17   which you're aware where an auction rate
18   security that had failed at auction sold at or
19   above par?
20            MR. TAMBE:  Objection to form.
21       Q.   Is that accurate?
22            MR. DAKIS:  Same objection.
23            MR. McCOUBREY:  Same objection.
24       A.   I can't answer that with regard to a
25   specific security, to the best of my
```

Page 26

J. Schwaba

1  recollection.
2     Q.    Did you find examples of auction rate
3  securities that failed at auction that traded
4  below par?
5     A.   To the best of my recollection, I can
6  recall auction rate securities that were trading
7  at par or below par in the best of my
8  recollection. I couldn't answer one
9  specifically right now.
10    Q.    So we're clear, you said, "I can
11  recall auction rate securities were trading at
12  par or below par." Did you mean auction rate
13  securities that had failed at their auctions?
14    A.   Both ones that had failed and ones
15  that had not failed.
16    Q.    How far below par did the ones that
17  had failed -- strike that. When you observed
18  auction rate securities had failed at auction or
19  were trading below par, what was the range of
20  discount to par that you observed?
21    A.   I don't -- I don't recall the
22  specifics of that.
23    Q.    And just so I'm clear, you do not
24  recall finding any examples of an auction rate

Page 27

J. Schwaba

1  security that had failed at auction that traded
2  above par; is that correct?
3     A.   No, I would not say that either.
4     Q.    Well, do you recall such an example?
5     A.   Of what?
6     Q.    Of an auction rate security that had
7  failed at auction that traded above par?
8     A.   I can't recall the specifics of that
9  at this particular point in time.
10    Q.    Well, sitting here today, you have no
11  idea whether you can come up with an example of
12  an auction rate security that failed at auction
13  that traded above par, is that accurate?
14       MR. TAMBE:  Objection to the form of
15    the question.
16       MR. DAKIS:  Same objection.
17       MR. McCOUBREY:  Same objection.
18    A.   I don't recall -- I can't recall for
19  you the specifics at this particular point in
20  time.
21    Q.    Do you have work papers that you could
22  check to determine that?
23    A.   There could be work papers that we
24  have available or that would -- could show that

Page 28

J. Schwaba

1  possibly.
2     Q.    And what would those work papers be?
3     A.   I'd have to go back and look at some
4  of the specifics, but did we look at the
5  municipal market? Absolutely, in terms of the
6  dynamics of the auction rate market and what the
7  market prices were.
8     Q.    So I'm clear, your testimony is that
9  you looked specifically to determine what the
10  market prices for auction rate securities that
11  had failed their auctions were; is that correct?
12       MR. TAMBE:  Objection to the form of
13    the question.
14       MR. DAKIS:  Same objection.
15    A.   That would be part of our analysis.
16    Q.    In your opinion, what factors would
17  influence whether a particular auction rate
18  security that had failed at auction would trade
19  at, above, or below par?
20    A.   Say the question again, please.
21    Q.    In your opinion, what factors would
22  influence whether a particular auction rate
23  security that had failed at auction would trade
24  at, above, or below par?

Page 29

J. Schwaba

1     A.   There were a number of factors we
2  looked at in terms of municipal auction rate
3  securities, but basically the demand, we were
4  very -- we were driven by market traded prices,
5  and that was our chief consideration.
6     Q.    The market traded prices that you
7  used, are you referring to the 152 comparables
8  that you selected?
9     A.   Primarily.
10    Q.    What else are you referring to?
11    A.   Well, those were primary
12  consideration, but there were also were the
13  actual securities, we had any indication on
14  those as well.
15    Q.    Do you know whether any of the 152
16  comparable transactions that you selected
17  involved auction rate securities?
18    A.   Yes, a substantial -- a substantial
19  portion of that 152, as I recollect, were
20  auction rate securities.
21    Q.    Is there anywhere in your work papers
22  that identifies which are auction rate
23  securities as opposed to other types of
24  securities?

Page 30

J. Schwaba

1    A.   As I recollect, they do.
2    Q.   Where would I find that in your work
3    papers?
4    A.   I couldn't tell you where you would
5    find it right as we speak, but I believe they --
6    I can't recall exactly, but I believe they were
7    as part of the information given out.
8    Q.   Are you sure that these transactions
9    were auction rate securities as opposed to
10   adjustable rate securities?
11   MR. TAMBE:  Objection to the form of
12   the question.
13   MR. DAKIS:  Same objection.
14   MR. McCOUBREY:  Same objection.
15   A.   I think we would have to define our
16   terms.
17   Q.   Sure, let's define our terms.  Would
18   it be fair to define an adjustable rate security
19   as one where the interest rate is adjusted by
20   some mechanism over time?
21   A.   I would agree with that.
22   Q.   And one of the potential mechanisms
23   for adjusting interest rates is an auction
24   process; is that correct?

Page 31

J. Schwaba

1    A.   I would agree with that.
2    Q.   So can we agree on a definition of
3    "auction rate securities" as adjustable rate
4    securities whose adjustable rate is determined
5    through an auction process?
6    A.   I would accept that.
7    Q.   Okay.  So then using those
8    definitions, my question for you, sir, is of
9    your 152 examples, how many were auction rate
10   securities?
11   A.   My understanding is that they were
12   virtually all, or close to being all, were
13   auction rate securities.
14   Q.   And what's the basis for that
15   understanding?
16   A.   The source of information that we got
17   on those securities.
18   Q.   What was the source of information you
19   got on those securities?
20   A.   The MSRB data.
21   Q.   Is it your understanding the MSRB data
22   identifies whether a particular transaction
23   involved an auction rate security?
24   A.   I can't recall exactly.  I believe it

Page 32

J. Schwaba

1    did, but ...
2    Q.   If you're wrong about whether the
3    transactions that you used as comparables
4    included auction rate securities, what
5    implications would that have for your opinions
6    in this case?
7    MR. DAKIS:  Objection to the form of
8    the question.
9    MR. TAMBE:  Same objection.
10   MR. McCOUBREY:  Same objection.
11   A.   I'm not sure I understand that
12   question and how to answer it.
13   Q.   Well, would you have any concern if
14   the transactions you picked are not
15   comparable -- strike that.  Would you have any
16   concern that the transactions you were using as
17   comparables for valuing auction rate securities
18   in the group of securities that you looked at
19   were not appropriate comparables if the
20   comparables you used were not auction rate
21   securities?
22   A.   Say that again, please.
23   Q.   If the comparables that you used were
24   not auction rate securities, would it concern

Page 33

J. Schwaba

1    you that they might not be appropriate
2    comparables for the actual securities you were
3    valuing, some of which were auction rate
4    securities?
5    A.   So are you saying that the securities
6    that we're valuing are auction rate or not
7    auction rate?  Are they adjustable or -- could
8    you please --
9    Q.   Let me back up.  You valued a group of
10   26 CUSIPS; is that correct?
11   A.   That's correct.
12   Q.   In fact, it's really 24 distinct
13   CUSIPS because two of them are valued twice,
14   right?
15   A.   Right.
16   Q.   Do you know whether any of those were
17   auction rate securities?
18   A.   Yes.
19   Q.   How many of them were auction rate
20   securities?
21   A.   My understanding is that there were 20
22   auction rate, or we refer to them as adjustable,
23   but 20 were of that type, except there was one
24   that was an OID adjustable or auction rate as

J. Schwaba
1  well and the dynamics of pricing for that were
2  kind of a combination.  But that's -- but
3  basically what I'm saying is that my
4  understanding is that the 19 were what you would
5  term auction rate securities.
7      Q.   Well, just so I'm clear, your
8  testimony is that 19 of the securities you
9  looked --
10     A.   Twenty were labeled as adjustable rate
11 securities, okay?
12     Q.   Okay.
13     A.   And that would be how many.
14     Q.   And your testimony is that of those 20
15 that were labeled adjustable rate securities, 19
16 of them were auction rate securities or 20 were
17 auction rate securities?
18     A.   My understanding is actually that 20
19 were labeled as auction rate securities.  The
20 dynamics of how one, in my opinion, was priced
21 would -- would make it a little bit unique in
22 that respect, but definitely 19, and then 20
23 were labeled.
24     Q.   When you say "labeled," where would
25 they be labeled?

J. Schwaba
1
2      A.   The source of our information.
3      Q.   So that would be in your work papers?
4      A.   I believe, I believe it would be
5  located there.
6      Q.   And if I understand you correctly, if
7  I look at your work papers and I see that
8  something is labeled is an adjustable rate
9  municipal security, I should understand that to
10 mean that it's an auction rate?
11         MR. TAMBE:  Objection to the form of
12 the question.
13     Q.   Is that correct?
14         MR. DAKIS:  Same objection.
15     A.   You can draw your own conclusions.
16 You know, I'm not sure --
17     Q.   I don't want to draw my own
18 conclusions.  I want to know what your
19 understanding is.  You're the one who prepared
20 the work papers or had them prepared for you,
21 right?
22     A.   That's correct.
23     Q.   So when in your work papers a security
24 is labeled adjustable rate, does that mean it's
25 an auction rate security or you're not sure

J. Schwaba
1
2  whether it means it's an auction rate security?
3         MR. TAMBE:  Objection to the form.
4  Which pool are you talking about?  The
5  ones that he valued or the --
6         MR. SHAW:  The ones he valued.
7      A.   My understanding is it is most -- the
8  adjustable rate securities and auction rate
9  securities were used somewhat interchangeably
10 there.
11     Q.   Well, if I put the list of 24 CUSIPS
12 in front of you, sir, would you be able to tell
13 me which ones are auction rate and which ones
14 are adjustable rate?
15     A.   I would be able to tell you which ones
16 I believe to be auction rate, yes.
17     Q.   We'll have a chance to do that a
18 little later.
19         Would you expect a security with a
20 history of repeated failed auctions to be more
21 likely to trade below par than one that had only
22 one failed auction?
23     A.   If you're asking for my professional
24 opinion, I would say other things being equal, I
25 would agree with that.

J. Schwaba
1
2      Q.   And why is that?
3      A.   It would strike me as there would be
4  less demand for the bond.
5      Q.   Would you expect there to be a
6  correlation between the length of time since the
7  security was subject to a successful auction and
8  the likelihood that such a security would trade
9  below par?
10         MR. TAMBE:  Object to the form of the
11 question.
12         MR. DAKIS:  Same objection.
13         MR. McCOUBREY:  Same objection.
14     A.   Say that again, please.
15     Q.   Would you expect there to be a
16 correlation between the length of time since a
17 security was subject to a successful auction and
18 the likelihood that such a security would trade
19 below par?
20     A.   Not necessarily.
21     Q.   Why not?
22     A.   Because of the, in our analysis and
23 what we saw, in terms of valuing these
24 securities, and especially through the use of
25 the comparables and proxies, as we termed them,

Page 38

1            J. Schwaba
2  there were a large, fairly large number of
3  securities that were trading at or around par.
4      **Q.   How many of those comparables were**
5  **auction rate securities that had failed at their**
6  **auctions?**
7      A.   I don't have that specific answer.
8      **Q.   Is that something you looked at?**
9      A.   We looked at what had failed and what
10  hadn't. We were aware of the failed auctions.
11      **Q.   When you say you were aware of the**
12  **failed auctions, what do you mean?**
13      A.   When we were doing our analysis of a
14  particular security, and I believe even in many
15  of the comparables we were aware of auctions
16  that were failed and those that didn't.
17      **Q.   So if I understand you correctly, when**
18  **you were looking at possible comparables, you**
19  **tried to determine whether they had been the**
20  **subject of a failed auction?**
21      A.   I can't give you specifics on that. I
22  do know we were primarily concerned with the
23  price, the traded price in the marketplace.
24      **Q.   So as you sit here today, you cannot**
25  **tell me whether you made any effort to determine**

Page 39

1            **J. Schwaba**
2  **if any particular comparable had been subject to**
3  **a failed auction?**
4          MR. TAMBE:  Objection to the form.
5          MR. DAKIS:  Objection to the form.
6      **Q.   Is that correct?**
7      A.   I can't say that, no.
8      **Q.   So, just so I'm clear, you cannot say**
9  **that you made any efforts to determine if any**
10  **particular comparable had been subject to a**
11  **failed auction; is that correct?**
12          MR. TAMBE:  Objection to the form of
13      the question.
14          MR. DAKIS:  Same objection.
15      A.   No, I can't say that.
16      **Q.   Would you expect there to be any**
17  **correlation between the length of time since a**
18  **security was subject to a successful auction and**
19  **the amount below par at which that security**
20  **would trade?**
21      A.   Say that again, please.
22      **Q.   Would you expect there to be a**
23  **correlation between the length of time since a**
24  **security was subject to a successful auction and**
25  **the amount below par at which that security**

Page 40

1            **J. Schwaba**
2  **would trade?**
3      A.   Not necessarily. I -- one of the
4  things that struck me, as I've said before, was
5  the price of the security, the failed ones even,
6  trading -- having traded prices at or around
7  par.
8      **Q.   But you can't identify for me any**
9  **particular comparable transaction that was the**
10  **sale of a failed auction rate security; is that**
11  **right?**
12          MR. TAMBE:  Objection. Asked and
13      answered any number of times now.
14          MR. DAKIS:  Same objection.
15      A.   I can't give you that, but I'm not
16  going to say that that didn't occur.
17      **Q.   But you also can't say that it did**
18  **occur, can you?**
19      A.   (Witness nods.)
20          MR. TAMBE:  Objection.
21          MR. McCOUBREY:  Objection.
22          MR. DAKIS:  Same objection.
23      **Q.   You need to answer orally, please.**
24      A.   Exactly, yes, I can't say it did or I
25  can't say it didn't.

Page 41

1            J. Schwaba
2      **Q.   Would it be fair to say that auction**
3  **rate securities that failed at auction may be**
4  **subject to restricted liquidity?**
5          MR. TAMBE:  Objection to form.
6      A.   Would it be fair -- is your question
7  would it be fair to say that they could be?
8      **Q.   No. Would it be fair to say that**
9  **auction rate securities that failed at auction**
10  **may be subject to restricted liquidity?**
11          MR. TAMBE:  Objection to form.
12          MR. DAKIS:  Same objection.
13      A.   That's a possibility, yes. It may --
14  that may happen. It could happen.
15      **Q.   Would you expect it to happen?**
16      A.   I would -- not necessarily based on
17  our analysis.
18      **Q.   And what analysis precisely is that,**
19  **sir?**
20      A.   The prices of market traded securities
21  as it relates to auction rate securities who
22  both -- both failed and didn't fail.
23      **Q.   For any given failed auction security**
24  **what information would you look at to determine**
25  **whether it was subject to restricted liquidity?**

Page 42

1              J. Schwaba
2         MR. TAMBE: Objection to the form of
3    the question.
4         MR. DAKIS: Objection.
5         MR. McCOUBREY: Objection.
6         A.    Say that again, please.
7         Q.    Yes. For any given example of a
8    failed auction rate security, what information
9    would you look at to determine whether it was
10   subject to restricted liquidity?
11        A.    Well, in our analysis of securities,
12   we would look both at the information contained
13   in Bloomberg and we would look at information
14   contained in the official statements to
15   determine what some of those conditions were, if
16   they applied or not.
17        Q.    What do you mean by "some of those
18   conditions were"?
19        A.    I'm sorry, repeat that again in terms
20   of your original question because --
21        Q.    You said, "Well, in our analysis of
22   securities, we would look both at the
23   information contained in Bloomberg and we would
24   look at the information contained in the
25   official statements to determine what some of

Page 43

1              J. Schwaba
2    those conditions were, if they applied or not,"
3    and what I'm asking is what are the conditions
4    you're talking about?
5         A.    As they relate to the manner in which
6    those securities would be auctioned and as it
7    relates -- as it potentially could relate to
8    some of the conditions affecting liquidity.
9         Q.    And did you draw any conclusions based
10   on that analysis of the factors that would
11   influence the extent or likelihood which the
12   liquidity of such a security would be
13   restricted?
14        A.    To the best of my recollection, it was
15   so individual. I mean, I'd like to be able to
16   say that this, okay, they're all securities like
17   this, but that they were -- had different
18   characteristics, different -- different aspects
19   about it.
20        Q.    Would a period of time following a
21   failed auction during which a security did not
22   trade at all be an indicator that it was -- that
23   that security was subject to restricted
24   liquidity?
25        MR. DAKIS: Objection to form.

Page 44

1              J. Schwaba
2         MR. TAMBE: Same objection.
3         A.    Say that again, please.
4         Q.    Would a period of time following a
5    failed auction, during which the failed auction
6    rate security did not trade at all, be an
7    indicator to you that it was subject to
8    restricted liquidity?
9         MR. DAKIS: Objection to form.
10        A.    I would say, based on the way you
11   phrased that question, that could be that.
12        Q.    How would you go about determining --
13   strike that.
14             Will you please tell me what the
15   market for auction rate securities was like in
16   September of 2008?
17        MR. TAMBE: Object to the form of the
18   question.
19        MR. DAKIS: Same objection.
20        A.    Say that question again, please.
21        Q.    Sure. Would you please describe the
22   market for auction rate securities in September
23   of 2008?
24        MR. TAMBE: Same objection.
25        A.    Did you want my general commentary or

Page 45

1              J. Schwaba
2    is it this is my opinion?
3         Q.    You said you extensively researched
4    what the market conditions were like in
5    September of 2008 for auction rate securities,
6    so I would like to hear your general views on
7    that topic.
8         A.    My general view was there was -- there
9    was -- we were operating in a general market
10   crisis at that time. There were a lot -- there
11   was a lot of concern, a lot of nervousness in
12   the markets. I think that what was interesting
13   about it was, though, that there were still
14   appeared to be -- there were certainly questions
15   about some liquidity and questions about
16   nervousness.
17             At the same time, there were -- not
18   all securities were reacting to it the same way.
19   There was even potentially some evidence among
20   some people that there was -- there was a flight
21   to quality of certain investors going into
22   Treasuries and even some investors for a period
23   of time going into some municipals. I
24   remember -- I kind of recall that as being a
25   particular element as well.

Page 46

1    J. Schwaba
2    So there was a lot of nervousness in
3  the market, I do recollect that very well, and
4  there was at the same time, as I recollect, a
5  fair amount of trading going on so that
6  liquidity was a concern, but there were in some
7  markets there was also a fair amount of activity
8  going on in terms of trading activity.
9    **Q.   Just so I'm clear, when you say there**
10  **was a fair amount of trading activity going on,**
11  **are you talking specifically about auction rate**
12  **securities?**
13    A.   I'm talking about what we're talking
14  about being an auction rate or adjustable rate
15  securities, that's right.
16    **Q.   Well, I'm asking specifically about**
17  **auction rate securities now.  What was your**
18  **understanding of the conditions in the market**
19  **for auction rate securities in September of**
20  **2008?**
21    A.   There was a fair amount of activity
22  going on in terms of trading, as I recollect.  I
23  can tell you, based on our information, that on
24  September 19, based on the information we have,
25  there were 12,416 municipal securities traded,

Page 47

1    J. Schwaba
2  of which 1,664 were labeled as auction rate
3  securities.
4    **Q.   1,66 --**
5    A.   Based on the -- based on the
6  information that we had.
7    **Q.   They were labeled as auction rate**
8  **securities or adjustable rate securities?**
9    A.   I don't -- I thought they were, but I
10  could be -- I don't -- I believe they were -- we
11  would label them adjustable rate securities, of
12  which we believed they were mostly auction rate
13  securities.
14    **Q.   And what's the basis for your belief**
15  **they were mostly auction rate securities?**
16    A.   Based on the information that we
17  derived from our sources.
18    **Q.   And what sources would those be?**
19    A.   The MSRB database, Access, Bloomberg
20  rating systems.
21    **Q.   And were any records created of your**
22  **determinations as to whether these were auction**
23  **rate or adjustable rate or some other type of**
24  **securities?**
25    MR. TAMBE:  Objection to the form of

Page 48

1    J. Schwaba
2  the question.
3    MR. DAKIS:  Same objection.
4    MR. McCOUBREY:  Same objection.
5    A.   We documented the evidence or the
6  information that we got from those sources.
7    **Q.   And where would I find the**
8  **documentation of that information, sir?**
9    A.   Well, what I'm saying is that we were
10  verifying -- well, we got the information from
11  those sources, as I said, and I don't recall
12  specific documentation with regard to that,
13  however, the analysis that we did accounted for
14  our large -- the 152 that we used as proxies.
15  So we were analyzing those 1,664, if you will,
16  or out of that universe, and comparing different
17  aspects of the bonds, of those municipal bonds
18  to our 20, 19 to 20 ARS, if you will, to
19  determine the commonalities between those and,
20  on a qualitative basis, the correlative factors.
21    **Q.   Have you ever heard anyone describe**
22  **the auction rate securities market in September**
23  **of 2008 as essentially frozen?**
24    A.   I have heard that.
25    **Q.   Do you believe that's an accurate**

Page 49

1    J. Schwaba
2  **statement concerning the auction rate securities**
3  **market at that time?**
4    MR. TAMBE:  Objection to the form of
5  the question.
6    MR. DAKIS:  Same objection.
7    MR. McCOUBREY:  Same objection.
8    A.   I believe that it could have applied
9  towards -- I mean that term is used.  I believe
10  it could have been applied to certain
11  securities.
12    **Q.   Which securities could it have been**
13  **applied to?**
14    A.   I couldn't give you specifics.
15    **Q.   Could it have applied to the 24**
16  **securities that you valued in your report?**
17    MR. TAMBE:  Objection to the form of
18  the question.
19    A.   I couldn't give you a specific answer
20  on that.
21    **Q.   Well, one thing we know is that you**
22  **did not find prices for any of those 24**
23  **securities; is that correct?**
24    MR. TAMBE:  Objection to the form of
25  the question.

Page 50

1              J. Schwaba
2     A.   Actually, that's not quite correct.
3  There were two securities, one of which I
4  believe was an auction rate security, the other
5  was a zero coupon that did trade on September
6  19.
7     Q.   What auction rate security traded on
8  September 19, sir?
9     A.   I don't recall the specific one.
10     Q.   Okay.  I'll try and remember to ask
11  you about that one when we pull out the list.
12     A.   The source for that was
13  investinginbonds.com.
14     Q.   And when you valued that one, did you
15  use that market price or did you use a proxy?
16     A.   We used a proxy.
17     Q.   Why did you use a proxy rather than
18  the market price?
19     A.   Because we wanted to be consistent in
20  our application.  We didn't want it to be
21  construed as cherrypicking or we wanted a -- I
22  wanted to use a methodology that I felt was to
23  be consistently applied.
24     Q.   And was the actual price of the
25  transaction of that security on 9/19 higher or

Page 51

1              J. Schwaba
2  lower than the price that you arrived at through
3  your use of proxies?
4     A.   I don't recall.  I think -- I don't
5  recall exactly.  As I recollect, the actual
6  price was at par, if I remember correctly, and I
7  may not be remembering correctly, but if I did,
8  I believe it was at par, and I can't recall
9  specifically what the proxy price was.
10     Q.   You stated at one point a few minutes
11  ago that you noticed that there was a flight to
12  quality.  Do you remember that?
13     A.   General market conditions in September
14  of 2008, that would be correct.
15     Q.   Did that flight to quality involve
16  investors flying to auction rate securities?
17     A.   I could not draw that specific
18  conclusion, but my recollection is that some
19  security -- some investors were moving to
20  municipals, which theoretically could have
21  included some auction rate.
22          (Recess; Time Noted:  10:36 A.M.)
23          (Time Noted:  10:47 A.M.)
24  BY MR. SHAW:
25     Q.   Mr. Schwaba, I believe you said

Page 52

1              J. Schwaba
2  earlier that you had observed a, quote, fair
3  amount of trading in the adjustable rate
4  municipal securities market in September of
5  2008, is that --
6     A.   I think I --
7          MR. TAMBE:  Objection to the form of
8  the question.
9          You can answer.
10          MR. DAKIS:  Same objection.
11          MR. McCOUBREY:  Same objection.
12     A.   I think I, as I recollect, and I'm --
13  I think there was a fair amount of trading going
14  on in the municipal market.
15     Q.   So are you saying then you did not
16  observe a fair amount of trading in the
17  adjustable rate market?
18          MR. TAMBE:  Objection to form.
19          MR. DAKIS:  Objection to form.
20          MR. McCOUBREY:  Form objection.
21     A.   I can't say that definitively.  I
22  believe that there was -- my interpretation was
23  that there was a fair amount of trading going on
24  in the ARS market as well.
25     Q.   And when you use the term "ARS," do

Page 53

1              J. Schwaba
2  you mean adjustable rate or do you mean auction
3  rate?
4     A.   We use adjustable rate, incorporating
5  auction rate as well.
6     Q.   And the evidence --
7     A.   I do that.  Excuse me.
8     Q.   And the evidence that you have -- I'm
9  sorry.  Strike that.
10          And the basis for your statement that
11  there was a fair amount of trading in the ARS
12  market is that on the 19th you observed trading
13  in a little less than 1700 ARS securities; is
14  that right?
15     A.   We did observe trading in the ARS
16  market and we -- what I also heard anecdotally
17  was that there was a fair amount of trading
18  going on.  In other words, the volume on that
19  particular day was not necessarily all that
20  different from, in terms of total volume, in the
21  weeks and months previous and the weeks and
22  months after, but I don't have -- I couldn't
23  give you specifics on that at this particular
24  point in time.
25     Q.   So you wouldn't be able to tell me,

Page 54

J. Schwaba

1           **J. Schwaba**
2  **for example, how the volume on September 19,**
3  **2008 compared to the average ARS trading volume**
4  **in, say, December of 2007?**
5     A.  I could not give you that, no.
6     **Q.  Or how it compares to trading today?**
7     A.  I could not give you that at this
8  time.
9     **Q.  In fact, you have no idea how --**
10  **whether looking at it in historical terms, the**
11  **volume of trading on September 19 was high or**
12  **low?**
13     MR. TAMBE:  Objection to the form of
14  the question.
15     MR. McCOUBREY:  Objection to the form.
16     **Q.  Is that right?**
17     MR. DAKIS:  Same objection.
18     A.  I could not give you that information
19  at this time.  I have had discussions about
20  that, but I do not have -- I could not give you
21  that at this time.
22     **Q.  With whom have you had discussions**
23  **about that?**
24     A.  My counterparts.
25     **Q.  Your counterparts, meaning who?**

Page 55

J. Schwaba

1           **J. Schwaba**
2     A.  My -- the staff that I've been working
3  with.
4     **Q.  And who are the staff you've been**
5  **working with?**
6     A.  I've used some resources, as I've
7  indicated in my report, of Chicago Partners.
8     **Q.  And that was in place before you were**
9  **retained to work on this matter; is that right?**
10     MR. TAMBE:  Objection to the form of
11  the question.
12     MR. DAKIS:  Same objection.
13     **Q.  They were already working on this**
14  **matter before you were retained; is that**
15  **correct?**
16     A.  I couldn't give you that information.
17  I don't have that information.
18     **Q.  Had you previously worked with Chicago**
19  **Partners?**
20     A.  I've worked with Mr. Nick Weir on a
21  discussion basis prior to this.
22     **Q.  Have you worked with any of the**
23  **individuals who have been providing you support**
24  **services at Chicago Partners before this**
25  **engagement?**

Page 56

J. Schwaba

1           **J. Schwaba**
2     A.  No.
3     **Q.  Were you given the option of retaining**
4  **other support personnel?**
5     A.  Say that question again, please.
6     **Q.  Yes.  When you were retained to work**
7  **on this, were you given an option to use people**
8  **other than persons at Chicago Partners if you so**
9  **preferred?**
10     A.  That's a hypothetical question because
11  I understood the resources available and chose
12  to employ them as outlined, but my
13  interpretation would be if I want -- this is my
14  project, this is my opinion.  If I want to use
15  an outside source, I have that option.  That's
16  the way I interpret that.
17     **Q.  And you think that's an appropriate**
18  **arrangement for an expert, is that correct?**
19     MR. DAKIS:  Objection to form.
20     A.  I'm being -- my role here is to
21  provide an independent valuation, and I would --
22  I characterize that as doing whatever is in the
23  spirit of that to carry that out.
24     **Q.  Are you aware -- well, actually,**
25  **strike that.  Did there come a point in time in**

Page 57

J. Schwaba

1           **J. Schwaba**
2  **2008 when auction rate security auctions started**
3  **to fail fairly regularly?**
4     A.  Based on the information that I saw,
5  it appeared that failed auctions did start to
6  increase, you know, in the time period you were
7  talking about, in 2008, maybe even a little
8  before that, as I recollect.
9     **Q.  So as far back as 2007 your**
10  **recollection is that auctions started to fail at**
11  **an increasing rate?**
12     A.  As I recollect, it was -- it was
13  sometime in the period of time late 2007,
14  definitely in 2008.  I can't give a specific
15  timeframe, but I do recollect that.
16     **Q.  By September of 2008, what percentage**
17  **of auctions were failing?**
18     MR. TAMBE:  Objection to form of the
19  question.
20     MR. DAKIS:  Same objection.
21     MR. McCOUBREY:  Same objection.
22     A.  I don't have a specific number on
23  that.
24     **Q.  More than 20 percent?**
25     A.  I would not be surprised if it were

Page 58

1          J. Schwaba
2 more than 20 percent.
3     **Q.   More than 40 percent?**
4     A.   It could be.
5     **Q.   More than 60 percent?**
6     A.   I don't know.
7     **Q.   As much as 80 percent?**
8     A.   I don't -- I don't have a specific
9 number on that.
10    **Q.   Are you aware that by September 2008**
11 **some investors in auction rate securities**
12 **contended that they had been misled by the**
13 **financial institutions from whom they had**
14 **purchased such securities?**
15    A.   I do not have that specific
16 information.
17    **Q.   Do you know whether any financial**
18 **institutions faced lawsuits relating to their**
19 **sales of auction rate securities to investors?**
20    A.   I don't have any specific information
21 about that.
22    **Q.   Do you know whether there were any**
23 **government or regulatory investigations ongoing**
24 **into the practices of financial institutions**
25 **that sold auction rate securities to investors?**

Page 59

1          **J. Schwaba**
2     A.   I don't have specific information on
3 that.
4     **Q.   Do you know whether any financial**
5 **institutions responding to either relationship**
6 **pressures or legal or regulatory pressures were**
7 **buying back auction rate securities from**
8 **investors at or near par?**
9     A.   I have public information to that
10 effect. I had heard that.
11    **Q.   And that was true as of September**
12 **2008?**
13    A.   I don't recall the specific time, but
14 it could have been on or around then.
15    **Q.   Do you know if such transactions would**
16 **have been reported on MSRB?**
17    A.   I do not. I do not know that.
18    **Q.   Would you agree that a transaction**
19 **where a financial institution is repurchasing**
20 **auction rate securities from investors for a**
21 **relationship or in response to legal or**
22 **regulatory pressures are not arm's length**
23 **transactions?**
24          MR. TAMBE:  Objection to the form of
25 the question.

Page 60

1          J. Schwaba
2          MR. DAKIS:  Objection to form.
3          MR. McCOUBREY:  Objection to form.
4     A.   I believe that's an interpretation
5 which I can't speak with authority about.
6     **Q.   Would you be at all concerned with**
7 **using such a transaction as a comparable for**
8 **purposes of valuing the securities that you in**
9 **fact valued in this case?**
10         MR. TAMBE:  Objection to the form of
11 the question.
12         MR. DAKIS:  Same objection.
13         MR. McCOUBREY:  Same objection.
14    A.   I potentially could be concerned, but
15 I'm not sure it would change the conclusions,
16 any conclusion that I necessarily would have.
17    **Q.   But you're also not sure that it**
18 **wouldn't; is that correct?**
19    A.   I'm not going to say that it would or
20 it wouldn't.
21    **Q.   I'd like you to set aside for the**
22 **moment securities that traded deep in active**
23 **markets with frequent purchases and sales, okay?**
24    A.   With what?  Excuse me.
25    **Q.   Securities that trade in deep and**

Page 61

1          **J. Schwaba**
2 **active markets with frequent purchases and**
3 **sales. So --**
4     A.   You'd like me to set that aside?
5     **Q.   For purposes of the next couple of**
6 **questions. So we're not talking about**
7 **Treasuries and we're not talking about equities**
8 **issued by large Fortune 500 companies, okay?  I**
9 **want to focus on less liquid securities.  Do you**
10 **understand that?**
11    A.   (Witness nods.)
12    **Q.   You need to answer orally.**
13    A.   Yes, I do understand.
14    **Q.   Would you agree that for such less**
15 **liquid securities a mark is an estimate of the**
16 **value as of some date and time?**
17         MR. TAMBE:  Object to the form of the
18 question.
19    A.   It could represent that.
20    **Q.   If you don't have an actual**
21 **transaction price for that security, would the**
22 **mark necessarily be an estimate of its value?**
23    A.   If you don't have a -- if you don't
24 have an actual trade for the security, a mark --
25 a mark could be construed as an estimate.

Page 62

1           J. Schwaba
2      **Q.   Under what circumstances would it not**
3  **be an estimate?**
4           MR. TAMBE:  Objection to the form of
5      the question.
6           MR. DAKIS:  Same objection.
7      A.   It depends.  Theoretically, it could
8  depend on what the person or the entity or the
9  institution putting out the mark was going to
10 use it -- what it wanted to indicate.
11     **Q.   What is a mark?**
12     A.   Excuse me.
13     **Q.   What is your understanding of the term**
14 **"mark"?**
15     A.   I guess I'd have to ask you that.
16 What do you mean by "mark" in this instance?
17     **Q.   Didn't you define a "mark" in your**
18 **report?**
19     A.   We've -- we defined actual traded
20 prices.  A transaction -- there was originally a
21 bid and there was originally an offer and
22 there's a transaction.
23     **Q.   And what is a mark in a circumstance**
24 **where you do not have an actual transaction in**
25 **that particular security?**

Page 63

1           J. Schwaba
2      A.   It could be construed as an estimate
3  of value of that security.
4      **Q.   Isn't it necessarily an estimate of**
5  **the value of that security?**
6      A.   Excuse me?
7      **Q.   Isn't it necessarily an estimate of**
8  **the value of that security as of a given date**
9  **and time?**
10     A.   It could be construed as that.
11     **Q.   Was there any way to construe that**
12 **it's not that?**
13     A.   It depends on what you want to use
14 that mark for.
15     **Q.   How does it depend on what you want to**
16 **use that mark for?**
17     A.   In my mind, a mark is an estimate of
18 the value.  It's an estimate.
19     **Q.   Okay.  Have you ever taken a**
20 **statistics course or an econometrics course?**
21     A.   Yes.
22     **Q.   Would it be fair to say that, speaking**
23 **statistically, an estimate is virtually always**
24 **subject to some degree of uncertainty?**
25     A.   I would agree with that.

Page 64

1           J. Schwaba
2      **Q.   And so there's necessarily some margin**
3  **for error; is that correct?**
4      A.   From a statistical perspective, I
5  would agree with that.
6      **Q.   Have you done anything to quantify the**
7  **degree of uncertainty surrounding any of the**
8  **marks that you estimated in your work on this**
9  **case?**
10          MR. TAMBE:  Objection to the form of
11     the question.
12     A.   Say that again, please.
13     **Q.   Have you done anything to quantify the**
14 **degree of uncertainty surrounding any of the**
15 **marks that you estimated in your work on this**
16 **case?**
17          MR. TAMBE:  Same objection.
18     A.   No, we have not.
19     **Q.   Are you familiar with the concept of**
20 **confidence interval?**
21     A.   I am familiar with that.
22     **Q.   Are you able to quantify for me a 95**
23 **percent confidence interval around your**
24 **estimates?**
25     A.   I cannot do that or haven't done that.

Page 65

1           J. Schwaba
2      **Q.   Why not?**
3      A.   My choice was to use traded prices.
4  It's not -- traded prices indicates to me an
5  actual trade took place, and that's where the
6  value of that particular security was.
7      **Q.   But just so we're clear, with the**
8  **exception of perhaps 2 of the 24 securities you**
9  **looked at, you did not observe any traded price**
10 **for that security; is that correct?**
11     A.   I observed traded prices for proxies.
12     **Q.   And your selection of proxies required**
13 **you to use judgment, is that fair?**
14     A.   That would be accurate.
15     **Q.   And would you agree that a reasonable**
16 **valuation expert could disagree with some of**
17 **your choices of proxies?**
18     A.   I would accept that that could happen.
19     **Q.   We've talked previously about how at**
20 **least some people would describe in the auction**
21 **rate securities market as essentially frozen**
22 **around September of 2008; is that correct?**
23     A.   Yes, we did.
24     **Q.   It's not clear to me, do you agree**
25 **that the market was essentially frozen at that**

Page 66

J. Schwaba

1   time?
2
3   A.   Given the use of the term "frozen" and
4   what it means in the auction rate securities, I
5   could accept that there was some degree of --
6   that that condition could be used to describe
7   the market.
8   Q.   Well, just so we're clear, then, what
9   do you understand the term "frozen" to mean in
10  that context?
11  A.   That basically there was little or no
12  movement in terms of the auction rate securities
13  markets in terms of basically a number or a
14  large number of failed auctions and relatively
15  little activity from an investment in the
16  auction rate market.
17  Q.   And would it be fair to say that, as a
18  result of that, the quantity and quality of
19  available information about prices for auction
20  rate securities was thin?
21     MR. TAMBE:  Object to the form of the
22  question.
23     MR. DAKIS:  Same objection.
24     MR. McCOUBREY:  Same objection.
25  A.   That could be an interpretation, but

Page 67

J. Schwaba

1
2   there -- it would depend also from a larger
3   perspective on the number of trades going on in
4   the marketplace as well.
5   Q.   In other words, you would determine
6   whether the quantity and quality of information
7   available was thin by reference to the number of
8   trades going on in the marketplace?
9   A.   Well, there are different aspects of
10  the marketplace and should be weighed and
11  evaluated.
12  Q.   Are there any aspects in your
13  opinion -- strike that.  In your opinion, were
14  there any aspects of the auction rate securities
15  marketplace where the quality and quantity of
16  available information about price was not thin
17  in September of 2008?
18     MR. TAMBE:  Objection to the form of
19  the question.
20     MR. DAKIS:  Same objection.
21     MR. McCOUBREY:  Same objection.
22  A.   I'm not sure I understand that
23  question.
24  Q.   In your opinion, were there any
25  aspects of the auction rate securities

Page 68

J. Schwaba

1
2   marketplace where there was a deep and active
3   market during September of 2008?
4   A.   Say that one more time, please.
5   Q.   In your opinion, were there any
6   aspects of the auction rate securities
7   marketplace where there was a deep and active
8   market during September of 2008?
9      MR. TAMBE:  Objection to the form of
10  the question.
11     MR. McCOUBREY:  Same objection.
12  A.   One could interpret the number of
13  trades going on during that period of time as
14  indicating more -- a fair amount of value and
15  depth of the market than one would have
16  originally suspected.
17  Q.   And when you say that, you're
18  referring specifically to the 1,664 trades and
19  adjustable rate securities that you identified
20  in your report?
21  A.   And the 12,460 municipal securities
22  traded on September 19.
23  Q.   Do you have any idea of how the volume
24  of municipal securities traded on September 19
25  compared to those trades historically over, say,

Page 69

J. Schwaba

1
2   the preceding three years?
3      MR. TAMBE:  Objection to the form of
4   the question.  Objection.  Asked and
5   answered.
6   Q.   You can answer.
7   A.   I could not -- I do not have that
8   information given the way you phrased that
9   question.
10  Q.   Do you know how the volume traded on
11  September 19, 2008 compared to, say, the average
12  daily volume in 2007?
13  A.   I do not.
14  Q.   Would it surprise you if it was
15  reduced by between two-thirds and
16  three-quarters?
17     MR. TAMBE:  Objection to the form of
18  the question.
19  A.   Of what?  The volume -- are you saying
20  the volume in 2007 would be less than 2008?
21  Q.   No, I'm saying that the volume in
22  September of 2008 would be between one-quarter
23  and one-third of the volume in 2007.
24     MR. TAMBE:  Objection.
25  A.   I don't know whether I'd be surprised

Page 70

1                J. Schwaba
2   or not.
3       Q.   Would that have any implications for
4   your analysis in this case?
5            MR. DAKIS:  Objection to the form.
6       A.   I couldn't necessarily say that.  I
7   think we would have to look at, you know, what
8   the composition of that was as well, but...
9       Q.   What do you mean, you would have to
10  look at what the composition of that was?
11      A.   Well, I'd like -- I would personally
12  like to see more specifics with regard to that.
13  I don't have that information.
14      Q.   Would it be fair to say that valuation
15  of auction rate securities was relatively
16  difficult in September of 2008?
17           MR. TAMBE:  Objection to the form.
18           MR. DAKIS:  Same objection.
19      A.   I'm not sure that I would necessarily
20  come to that conclusion given the traded prices
21  that we saw.
22      Q.   So because you took a look at --
23  strike that.
24           When you say the traded prices that
25  you saw, you're referring to the 1,664

Page 71

1                J. Schwaba
2   adjustable rate securities that you observed
3   being traded on September 19; is that correct?
4       A.   That would be right.
5       Q.   Okay.  And you're not referring to
6   anything else when you say that, right?
7            MR. TAMBE:  Objection to the form of
8   the question.
9            MR. DAKIS:  Same objection.
10           MR. McCOUBREY:  Same objection.
11      A.   That is what I'm -- that was what my
12  primary focus was.
13      Q.   Is there a secondary focus?
14      A.   Market conditions.
15      Q.   And what were the market conditions?
16      A.   General overall market conditions.
17      Q.   So you would not agree that valuation
18  of financial assets was particularly difficult
19  in September of 2008?
20           MR. TAMBE:  Object to the form.
21      A.   I wouldn't say that at all.
22      Q.   You would not -- that was a badly
23  phrased question so let me make sure.
24           When you say you wouldn't say that at
25  all, you mean you would not say that valuation

Page 72

1                J. Schwaba
2   of many financial assets was particularly
3   difficult during September of 2008?
4            MR. DAKIS:  Objection to form.
5       Q.   Is that correct?
6       A.   Say that again, please.
7       Q.   Sure.  Is the following statement
8   correct:  Valuation of many financial assets was
9   particularly difficult in September of 2008?
10           MR. DAKIS:  Objection to form.
11      Q.   In your opinion?
12           MR. DAKIS:  Objection to form.
13      A.   I'm not going to -- I'm not going to
14  draw that necessarily conclusion.
15      Q.   I'm focusing specifically on auction
16  rate securities.  Was that a particularly
17  difficult time to value them?
18           MR. TAMBE:  Objection to form.
19           MR. DAKIS:  Same objection.
20      A.   There were challenges with regard to
21  going on in that market.  I do know that.
22      Q.   You yourself were not engaged in
23  valuing auction rate securities in September of
24  2008; is that correct?
25      A.   That's correct.

Page 73

1                J. Schwaba
2       Q.   And you yourself were not involved in
3   valuing adjustable rate securities in September
4   of 2008; is that correct?
5       A.   That would be correct, except to the
6   extent that we may have had them in our
7   portfolio at the Federal Home Loan Bank, as we
8   have discussed.
9       Q.   You valued the securities that you
10  valued as of September 19, 2008; is that
11  correct?
12      A.   Based on traded prices.
13      Q.   I'm just asking about the valuation
14  date.  So you valued as of September 19, 2008;
15  is that correct?
16      A.   I'm sorry, I don't understand.  Are
17  you saying what did I value back in September
18  19, 2008?
19      Q.   No, I'm not.  I'm sorry.  Let me try
20  and be clearer.
21           The valuations that you reached were
22  what you understood or what you have determined
23  the values to have been as of September 19,
24  2008; is that correct?
25      A.   Based on traded prices.

Page 74

J. Schwaba

1
2     Q.    Based on whatever methodology, the
3  valuation date --
4     A.    Was as of September 19.
5     Q.    Okay.  Why did you not value them as
6  of September 22?
7     A.    September 19, as I -- September 19, as
8  I understood it, as I do understand it, is when
9  the September 22 dated as of September -- or as
10  of market as of September 19 was when this
11  transaction occurred.
12     Q.    When did the transaction close?
13        Before you answer that, when you say
14  "this transaction," you're talking about the
15  sale transaction between Barclays and the Lehman
16  estate?
17     A.    That's correct.
18     Q.    Do you have any understanding of when
19  that transaction closed?
20     A.    My understanding is it closed on or
21  about midnight on the 22nd, but I could be wrong
22  on that.
23     Q.    Do you know when title to the
24  financial assets passed to Barclays?
25     A.    I do not know that exactly.

Page 75

J. Schwaba

1
2     Q.    Do you know when it was on the 19th?
3     A.    I do not know it specifically.
4     Q.    Do you know whether it was on the
5  22nd?
6     A.    I answered that before.  I think that
7  was my understanding, but again, I don't know.
8     Q.    Are you offering an independent expert
9  view that the proper valuation date is September
10  19?
11     A.    Yes.
12     Q.    What is the basis for that view?
13     A.    My understanding of the -- my
14  understanding of the transaction.
15     Q.    What does that mean, your
16  understanding of the transaction?  What about
17  the transaction leads you to believe that the
18  19th was the proper valuation date?
19        MR. DAKIS:  Objection to form.
20     A.    This is my understanding of when the
21  sale occurred, as I indicated before.  I think I
22  answered that before.
23     Q.    So your expert opinion that the 19th
24  is the appropriate valuation date is based on
25  your understanding that the sale occurred on the

Page 76

J. Schwaba

1
2  19th?
3        MR. TAMBE:  Objection to the form of
4  the question.
5     Q.    Is that right?
6        MR. DAKIS:  Objection to form.
7        MR. McCOUBREY:  Same objection.
8     A.    My valuation has to do with the
9  valuation of a select number of municipal
10  securities as of a given date, and that date is
11  September 19.
12     Q.    And were you asked to assume September
13  19 was the appropriate valuation date or did you
14  select that yourself?
15        MR. DAKIS:  Objection to form.
16     A.    Say that again, please.
17     Q.    Yes.  Did you yourself independently
18  select September 19 as your appropriate
19  valuation date, or were you asked to assume that
20  was the appropriate valuation date?
21     A.    My assumption was that that was the
22  appropriate valuation -- valuation date.
23     Q.    Well, was that an assumption that you
24  independently arrived at or were you asked to
25  assume that?

Page 77

J. Schwaba

1
2     A.    Part of my analysis I derived that
3  that was the -- that September 19 was the
4  appropriate date.
5     Q.    And the basis for your decision that
6  that was the case was the fact that you believed
7  the transaction took place on the 19th?
8        MR. TAMBE:  Objection to the form of
9  the question.
10        MR. DAKIS:  Same objection.
11     A.    The transaction -- if we were going to
12  provide a reasonable market value as it relates
13  to the transaction, where would you go to find a
14  reasonable market valuation, and the market --
15  the closest time of that market valuation would
16  have been as of the close of September 19.
17     Q.    When you say "closest," you mean
18  closest time?
19     A.    To a real market functioning.
20     Q.    Wouldn't, by definition, close of
21  market on September 22 be closer to midnight
22  September 22 than the previous Friday?
23     A.    Well, you could interpret it that way,
24  but no market -- nothing ever -- nothing ever
25  really happened.  In my opinion, anyway,

Page 78

1              J. Schwaba
2    professional opinion, it's better to take actual
3    market data because you know exactly what
4    happened.  You don't know what happened after
5    midnight on the 22nd.
6         If the deal closed -- if the deal did
7    close on midnight on the 22nd, to say you were
8    going to close as of the close of business on
9    the 22nd, in my opinion, wouldn't be as
10   appropriate as saying -- as taking the close on
11   the previous trading day, which would be the
12   close of the 19th.
13        I'll acknowledge that markets trade 24
14   hours, 24/7, but how much volume or liquidity
15   are you going to get over a weekend and how much
16   volume are you going to get in terms of overseas
17   markets as well.
18     Q.   Why does the amount of volume that you
19   get matter to your opinion on that?
20     A.    In my opinion, it's a better
21   indication of the depth and breadth of the
22   market, the volume traded, in my professional
23   opinion.
24     Q.   Did you make any effort to quantify
25   the difference that valuation as of the 19th as

Page 79

1              J. Schwaba
2    opposed to valuation as of the 22nd makes to the
3    valuation of the particular securities you
4    looked at?
5     A.    No, I did not do that specifically.
6     Q.   Did you examine the Lehman marks for
7    the particular securities that you looked at?
8     A.    The Lehman marks?  I don't believe we
9    did.
10    Q.   What's your understanding of the
11   meaning of the term "bid price"?
12    A.    My understanding of the bid price
13   would be the price at which buyers will be
14   willing to pay for a particular security.
15    Q.   Are the terms "bid price" and "exit
16   price" essentially synonymous, as you understand
17   them?
18    A.    Not necessarily the same to me.
19    Q.   In what way do they differ?
20    A.    Well, I think it's, in my mind, an
21   exit price is going to end up being part of a
22   net transaction, theoretically.  A bid price is
23   what are you willing to pay for something.  An
24   exit price is the price at which -- what you
25   would need to do to exit or to get out of the

Page 80

1              J. Schwaba
2    market, and I think that they're all -- they're
3    both -- I mean, I think there are some different
4    interpretations there for those, those two
5    terms.  The most ascertainable aspect of value
6    is where prices trade or traded prices are.
7     Q.   Would a bid price ever be higher than
8    exit price?
9         MR. TAMBE:  Objection to the form of
10   the question.
11        MR. DAKIS:  Same objection.
12    A.    I don't know.  That's -- I couldn't
13   answer that.
14    Q.   Do you agree that it's appropriate for
15   purposes of valuing these securities to focus on
16   valuations at bid prices?
17        MR. TAMBE:  Objection to the form of
18   the question.
19        MR. DAKIS:  Same objection.
20        MR. McCOUBREY:  Objection.
21    A.    Again, I say, you know, traded prices
22   are the best indication, in my opinion.  The bid
23   price can become the traded price.  You know,
24   when the security trades, it's when a bid and
25   offer come together.

Page 81

1              J. Schwaba
2     Q.   Would you agree that it's appropriate
3    for purposes of the analysis of the value of the
4    securities to focus on valuations at exit
5    prices?
6         MR. TAMBE:  Objection to the form of
7    the question.
8     A.    I don't -- I'm still -- I don't
9    understand exactly what -- I have a problem with
10   exit prices as a definition.  I mean, I don't --
11   I guess I don't understand exactly what that
12   means.
13    Q.   So you're not able to define for me
14   the term "exit price"?
15    A.    I can attempt to define it, but I'm
16   not sure -- it doesn't have the same certainty
17   associated with it as a traded price.
18    Q.   Okay.  What do you understand an exit
19   price to be?
20    A.    To me an exit price would be the price
21   at which I would get out of an existing
22   security, and that could be my interpretation of
23   what that price would be.  It wouldn't be a
24   traded price where an actual transaction took
25   place.

Page 82

1        J. Schwaba
2     Q.   Are the values that you provide mid
3  price values or bid or exit price values?
4     A.   They're actual traded prices and they
5  probably embody a combined bid and offer, bid
6  price and offer price.  That's where buyer and
7  seller come together and agree on what the value
8  of a particular security is through the
9  mechanism of a traded price.
10     Q.   Valuing a portfolio of securities for
11  purposes of marking one's books pursuant to
12  applicable accounting standards, is it necessary
13  to mark them to exit prices?
14        MR. TAMBE:  Objection to the form of
15     the question.
16     A.   I couldn't answer that question.
17     Q.   Is it appropriate to value using exit
18  prices?
19        MR. TAMBE:  Same objection.
20     A.   Again, I couldn't answer that
21  question.
22     Q.   In valuing assets, in valuing
23  financial assets, is it necessary to adjust from
24  mid to bid prices?
25        MR. TAMBE:  Objection to the form of

Page 83

1        J. Schwaba
2  the question.
3     A.   Again, I couldn't answer that.
4     Q.   Do you know how traders use the term
5  "mid price"?
6     A.   My understanding of "mid price" is
7  it's the midway point or halfway point, if you
8  will, between a bid and offer.
9     Q.   And what is your understanding of how
10  traders use the term "bid price"?
11     A.   It's the price at which they would be
12  willing to bid for a particular security or buy
13  a security, a price at which they were going to
14  pay or buy a security.
15     Q.   And what's your understanding of what
16  traders use as how traders use the term "ask
17  price"?
18     A.   Ask price or offer price is the price
19  at which they would be willing to sell that
20  which they already have in their position.
21     Q.   And do you know whether your
22  valuations are mid or bid?
23     A.   My valuations are based on traded
24  prices, and whether that was a mid price or a
25  bid price, it's kind of hard to say because at

Page 84

1        J. Schwaba
2  the point at which it's done, let's say the
3  bid/offer is 5 bid at 7 or 5 bid at 8, I'm
4  buying -- willing to bid at 5 and offer at 8,
5  okay?  Or let's say 5 -- 5 bid at 7.  There's a
6  market there, a bid/offer spread of 2 points.
7  The midway point would be halfway between that,
8  but I may as a trader decide you know what, I'm
9  going to hit the bid, I got to get out of my
10  position, so I might have talked about a mid
11  price being, you know, 6 between 5 and 7, but I
12  end up doing the trade at 5, okay?  So was it --
13  is 5 -- 5 was at a midpoint.
14     Q.   Is it possible that actual prices
15  could have been at ask?
16     A.   An actual price could, could end up
17  being what the original bid price was or the
18  offered price was.  Could be.
19     Q.   In valuing these securities, you did
20  not make any adjustment from mid to bid?
21        MR. TAMBE:  Objection to the form of
22     the question.
23     Q.   Is that right?
24     A.   We ended up using the -- we ended up
25  using the bid -- we called that the bid price,

Page 85

1        J. Schwaba
2  basically, but it was basically the traded
3  price.
4     Q.   So the answer to my question is no?
5        MR. TAMBE:  Objection to form.
6     Q.   You did not make any adjustment from
7  mid price to bid price?
8        MR. TAMBE:  Objection to form.
9        MR. DAKIS:  Objection to form.
10        MR. McCOUBREY:  Same objection.
11     Q.   Is that correct?
12        MR. TAMBE:  Same objection.
13     A.   I'm not sure I can answer that.
14     Q.   What's your understanding of the
15  implications of a failed auction for the
16  interest rate coupon rate that the borrower must
17  pay in the context of an auction rate security?
18     A.   My understanding is that it could,
19  depending on the individual security, the
20  security could be auctioned at the maximum rate
21  set.
22     Q.   Is it your view that a high penalty
23  rate on an auction rate security makes
24  refinancing of that security attractive to the
25  issuer?

Page 86

1              J. Schwaba
2      A.  I can't answer that, but based on what
3  you say, I would not -- theoretically, I would
4  say I agree with that.
5      **Q.  Do you know what portion of auction**
6  **rate securities have experienced failed auctions**
7  **have been redeemed voluntarily?**
8      A.  I don't have that information.
9      **Q.  In order to redeem an auction rate**
10  **security, the issuer would need to have**
11  **alternative financing in place; is that correct?**
12          MR. TAMBE:  Objection to the form of
13  the question.
14      A.  I could not necessarily make that
15  assumption.
16          (Exhibit 697, Expert Report of Joseph
17  Schwaba, marked for identification, as of
18  this date.)
19          (Exhibit 698, Expert Report of Joseph
20  Schwaba Errata, marked for identification,
21  as of this date.)
22          (Recess; Time Noted:  11:33 A.M.)
23          (Time Noted:  11:38 A.M.)
24  BY MR. SHAW:
25      **Q.  Mr. Schwaba, showing you what has been**

Page 87

1              J. Schwaba
2  **marked as Exhibit 697, do you recognize that as**
3  **a copy of your expert report in this matter?**
4      A.  I do.
5      **Q.  Showing you what has been marked as**
6  **Exhibit 698, immediately behind it, do you**
7  **recognize that as a copy of the errata sheet**
8  **prepared by you?**
9      A.  Yes.
10      **Q.  Looking at paragraph 8 of your report,**
11  **page 2?**
12      A.  Yes.
13      **Q.  Do you see in the second bullet point**
14  **you use the phrase "adjustable rate securities**
15  **(hereafter 'ARS')"?**
16      A.  Yes.
17      **Q.  And I just want to confirm that you're**
18  **using "ARS" to encompass all adjustable rate**
19  **securities, including auction rate securities;**
20  **is that correct?**
21      A.  (Witness nods.)
22      **Q.  You need to answer orally.**
23      A.  Yes.
24      **Q.  Now, in that bullet point you state**
25  that, **"Barclays applied an arbitrary excessive**

Page 88

1              J. Schwaba
2  **20 percent liquidity discount in determining the**
3  **exit values of all but five municipal adjustable**
4  **rate securities (hereafter, 'ARS')."  Do you see**
5  **that?**
6      A.  Yes.
7      **Q.  What do you mean by "arbitrary"?**
8      A.  Arbitrary would be a choice made in
9  not necessarily related to the facts of the
10  situation.
11      **Q.  Do you know how Barclays selected the**
12  **liquidity discount that applied to municipal**
13  **securities in this instance?**
14      A.  Do I know how Barclays did it?
15      **Q.  Yes.**
16      A.  I do not.
17      **Q.  So how do you know it was arbitrary?**
18      A.  It appeared -- it appeared to me to be
19  arbitrary.  Why, you know, why 20 percent?  I'm
20  not sure where that number came from.
21      **Q.  Turn to the next page, if you would,**
22  **paragraph 9.  Now, you define something you**
23  **called the municipal portfolio as consisting of**
24  **26 securities with a principal value of 382**
25  **million and change; is that correct?**

Page 89

1              J. Schwaba
2      A.  That's right.
3      **Q.  When you did your work in this case,**
4  **did you look at only those 26 or did you attempt**
5  **to value any other securities?**
6          MR. TAMBE:  Objection to the form of
7  the question.
8      **Q.  Let me back up.  Is it your**
9  **understanding that those 26 securities are all**
10  **of the municipal securities that Barclays**
11  **acquired in this transaction?**
12      A.  No.
13      **Q.  So it's a subset?**
14      A.  It's a subset.
15      **Q.  And my question is the work you've**
16  **done was valuing that subset, not the entire**
17  **population of municipal securities Barclays**
18  **acquired; is that correct?**
19      A.  There was an analysis done to
20  initially delineate the 19 securities where
21  there was a difference in custodial marks versus
22  Barclays' marks of greater than a million
23  dollars.  Subsequent to that, I noticed that
24  there were seven securities that were valued at
25  one-tenth of a cent and that ended up comprising

Page 90

J. Schwaba

1
2 the 26, if you will.
3    Q.   So aside from identifying the 26 you
4 were going to focus on, you did not analyze any
5 of the other municipal securities that Barclays
6 acquired; is that right?
7    A.   I have not, no.
8    Q.   Did anyone working for you do that?
9    A.   No.
10    Q.   Now, in the second sentence of
11 paragraph 9, you state that, "These municipal
12 securities consisted of 20 adjustable rate
13 bonds." Do you see that?
14    A.   Yes.
15    Q.   And just so we're clear, you believe
16 that all of those bonds were auction rate
17 securities; is that correct?
18    A.   I believe that to be true.  The -- one
19 of those 20, the adjustable rate OID, I would
20 character -- almost characterize as kind of a
21 hybrid because of the way it was structured.
22    Q.   The adjustable rate OID security
23 aside, the other 19 you believe were all auction
24 rate securities?
25    A.   I believe that to be the case.

Page 91

J. Schwaba

1
2    Q.   If you would turn to the Exhibit 2 to
3 your report, please.  Is that a listing of the
4 26 securities that you valued?
5    A.   Yes.
6    Q.   And as we previously discussed, there
7 are in fact 24 distinct securities, but 2 were
8 repeated, right?
9    A.   That's right.
10    Q.   Of these 26 securities, which are the
11 4 that you believe are not auction rate
12 securities?
13    A.   Well, there are three zero coupons,
14 two fixed coupons, and there's a floating rate
15 note, so that's six, and then there's -- so
16 those would be the non-ARS.  You've got -- I've
17 got three in there and I can't match the CUSIP
18 number up there, but three zero coupon bonds,
19 two fixed coupon bonds, one floating rate bond.
20 Okay?
21    Q.   So that you've just identified six of
22 them, correct?  So what -- so when you say there
23 are 20, you're essentially double-counting the 2
24 that were duplicates; is that right?
25    A.   That's right, yes, that would be

Page 92

J. Schwaba

1
2 correct, yes.
3    Q.   So you think there are 18 distinct
4 auction rate securities?
5    A.   I think there's actually 17, I
6 believe.  Well, 18 including -- if you want to
7 include the OID ARS.
8    Q.   All right.  Can you tell me which of
9 those auction rate securities had failed
10 auctions?
11    A.   I cannot tell you that right now.
12    Q.   Is there anything in your work papers
13 that would enable you to do so?
14    A.   I don't believe so.  In our analysis
15 we did look through them, but I don't believe I
16 have that immediately available.
17       (Exhibit 699, a document bearing Bates
18    Nos. LEH-NAVIGANT 026173 Purdue through IL,
19    marked for identification, as of this date.)
20    Q.   Showing you what has been marked as
21 Exhibit 699, can you tell me what this document
22 is, sir?
23    A.   Yes, this is the document that shows
24 how the number of proxies that were used for
25 each particular adjustable rate security to

Page 93

J. Schwaba

1
2 derive a value for that.
3    Q.   Okay.  So there would be in a
4 listing -- there should only be then 18 pages to
5 this document?  In other words, it should
6 exclude the ones that are non-adjustable rate
7 securities; is that correct?
8    A.   I believe so, yes.
9    Q.   Let's look at the first page of this
10 document.  Looking at the first entry, is that
11 one of the securities that you were actually
12 valuing here?
13    A.   That would be correct.
14    Q.   And that's CUSIP 746189HG7; is that
15 correct?
16    A.   That's correct.
17    Q.   Do you know whether that was an
18 auction rate security?
19    A.   I do not.  I cannot tell exactly from
20 here, but it's an adjustable, split adjustable.
21    Q.   Okay.  And therefore, you don't know
22 whether that was a failed auction rate security?
23    A.   I couldn't tell you that.
24    Q.   Looking at your five comps here, are
25 those the five CUSIPS that appear in the next

Page 94

J. Schwaba

1 tier down on this sheet?
2 A.   Yes.
3 Q.   Can you tell me which of those were
4 auction rate securities?
5 A.   I cannot.
6 Q.   Can you tell me which of those were
7 failed auction rate securities?
8 A.   I cannot.
9 Q.   Can you tell me whether any of those
10 transactions -- let me back up for a second.
11 You remember that we discussed earlier
12 today that certain financial institutions were
13 buying back auction rate securities from their
14 customers for relationship or legal or
15 regulatory reasons?
16 A.   I recall you saying that.
17 Q.   Are you able to tell me with respect
18 to any of the five comparables that you selected
19 whether it was such a transaction?
20 A.   I cannot tell you that.
21 Q.   Turning to page 2.
22 A.   I would say it's interesting that they
23 each are trading on or around par.
24 Q.   You've got a column here, second

Page 95

J. Schwaba

1 column here ---
2 A.   I'm sorry, where you are you?
3 Q.   Still first page, second column, "PX
4 Last," do you see that?
5 A.   Last price.
6 Q.   Yes.  And would that be a 9/19 price?
7 A.   That is correct.
8 Q.   Do you know for certain that there was
9 in fact a transaction that took place on
10 September 19, 2008 with respect to each of these
11 securities?
12 A.   My understanding is that those --
13 those were five traded prices on September 19,
14 2008.
15 Q.   And that would have been drawn from
16 the MSRB data?
17 A.   That's right.
18 Q.   Looking at the next page, if you
19 would, and this shows CUSIP 7178182U1; is that
20 correct?
21 A.   That's right.
22 Q.   And that's one of the securities you
23 valued?
24 A.   Yes.

Page 96

J. Schwaba

1 Q.   And you were not able to find an
2 actual transaction price for that security, were
3 you?
4 MR. TAMBE:  Object to the form of the
5 question.
6 Q.   On the 19th?
7 A.   We, as I indicated before, I wanted to
8 stick to the methodology I created.  After -- I
9 don't recollect this is one of the bonds where
10 there was an actual trade traded on 9/19, but
11 apart from that, we wanted to stick to the
12 methodology; I wanted to stick to the
13 methodology that I created.
14 Q.   You thought -- if I remember
15 correctly, you think there was one of the
16 auction rates or one of the adjustable rate --
17 A.   I believe there was one, and if I see
18 it, it might jog my memory here.
19 Q.   If you see it --
20 A.   This is not, to the best of my
21 recollection, this was not one of them.
22 Q.   Can you say for sure that this CUSIP
23 was an auction rate security?
24 A.   I cannot say for sure.

Page 97

J. Schwaba

1 Q.   Do you know whether it was a failed
2 auction rate security?
3 A.   I can't say that as well.
4 Q.   And of the eight comparables you
5 selected, can you tell me whether any of those
6 were auction rate securities?
7 A.   No.
8 Q.   And you can't tell me whether any of
9 them were failed auction rate securities?
10 A.   That's correct.  I will, if I may --
11 Q.   Yes.
12 A.   -- add the additional factor that the
13 last price traded there was, again, on or above
14 par.
15 Q.   And you're referring to the entry
16 99.644 on the first line, or what?
17 A.   I'm referring to the eight CUSIPS
18 there.
19 Q.   On the eight CUSIPS on the second
20 tier, they're comparables, those are 9/19
21 prices, as far as you know?
22 A.   That's right.
23 Q.   In selecting your comparables, what
24 criteria did you apply to determine what was an

J. Schwaba

1  appropriate comparable for any given security
2  you were valuing?
3      A.   You can basically get an indication if
4  you look across there in terms of the type, the
5  rating, both by S&P and Moody's, whether the
6  callable and puttable features were -- existed,
7  the purpose for which the bond, and of course,
8  the basic type, whether it was revenue or GO,
9  and I think we added geography in there as well
10  as another factor.
11      Q.   Did you examine the ratings of the
12  comps?
13      A.   We looked at the ratings of the comps.
14  That was a factor.
15      Q.   But you don't report the rates of the
16  comps in your work papers, do you?
17      A.   I'm sorry?
18      Q.   You don't report any of those ratings
19  in this spreadsheet, do you?
20      A.   I don't believe we do, but we did look
21  at it, but I don't -- I don't -- it's not in
22  here.
23      Q.   And then with respect to these eight
24  comps, I take it you are also not able to tell

J. Schwaba

1  me how many of these were a result of non-arm's
2  length transactions?
3      A.   Were a result of what?
4      Q.   Non-arm's length transactions?  Where,
5  for example, a --
6      A.   I could not tell you that.
7      Q.   And I take it the same thing would be
8  true with respect to each of the other
9  securities for which you got a security and then
10  a list of comps on this document?
11      A.   Yes.
12      Q.   You can't tell me which ones are
13  auction rate securities?
14      A.   No.
15      Q.   Can't tell me which are failed auction
16  rate securities?
17      A.   No.
18      Q.   And you can't tell me which are
19  non-arm's length transactions?
20      A.   No.
21      Q.   Looking at the seventh page of this
22  document, sir, it's the one with really small
23  type --
24      A.   Oh.

J. Schwaba

1      Q.   -- which is CUSIP 196479ME6, I
2  believe.
3      A.   Yes, it's the Colorado Housing &
4  Finance Authority.
5      Q.   Yes.  And my question for you, if you
6  look under "Product Name," it says 2007 B2
7  weekly FLT RT VRDN.  What does the VRDN mean?
8      A.   I believe it's variable rate demand
9  note.
10      Q.   Again, you don't know whether that was
11  an auction rate security; is that correct?
12      A.   No, although I would surmise that it
13  probably is not based on the fact that it's a
14  variable rate demand note.  I could be wrong.
15      Q.   Let's put Exhibit 699 to one side for
16  the moment.  Now, one distinction between each
17  of your comps and, with possibly one or two
18  exceptions, the securities you were actually
19  valuing is that securities you were actually
20  valuing were not trading, is that correct,
21  whereas the comps, by definition, were?
22      A.   With the exceptions that you and I
23  were citing.
24      Q.   Are you able to tell me with respect

J. Schwaba

1  to any of the securities you valued what the
2  most recent trade date prior to September 19
3  was?
4      A.   I cannot.
5      Q.   Are you able to tell me with respect
6  to any of the comp -- any of the securities that
7  you valued what the next trade date after
8  September 19 was?
9      A.   I cannot.
10      Q.   For any of the auction rate securities
11  you examined did you analyze the fail rate
12  formula?
13      A.   I did not.
14      Q.   Did you analyze any relevant caps,
15  maximums or exclusions?
16      A.   We did analyze --
17      I'm sorry, could you repeat that
18  question previous again?  I want to make sure I
19  answered that correctly.
20      Q.   Sure.  For any of the auction rate
21  securities that you examined did you analyze the
22  fail rate formulas?
23      A.   Actually, we did look at some of the
24  fail rate formulas on an anecdotal when we saw

Page 102

1          J. Schwaba
2    them in the screen shot analysis that we were
3    using and/or the official statements that we
4    had, and but they are not -- again, this was
5    just general information we were taking in.
6        Q.   So they're nothing you relied on in
7    valuing these bonds -- or, these securities,
8    rather?
9        A.   Not based on the methodology you see
10   here, that's correct.
11       Q.   And did you analyze any relevant caps,
12   maximums or exclusions?
13       A.   We definitely analyzed or took note of
14   what they were and were definitely tried to be
15   as aware as possible of the caps and maximum
16   rates for each of the securities.
17       Q.   Did you analyze any of the look-back
18   provisions?
19       A.   As I recollect, no.
20       Q.   Now, if you would take a look at
21   Exhibit 697, which is your expert report, and
22   again look at the section or, rather, Appendix
23   II -- Exhibit 2, and there are seven securities
24   here for which the value was 1/10 of a cent; is
25   that correct?

Page 103

1          J. Schwaba
2        A.   That is correct.
3        Q.   And is it your understanding that the
4    way that Barclays arrived at those values was it
5    accepted the BoNY valuations of those
6    securities?
7        A.   My understanding is that that is what
8    I -- that is what was happening.
9        Q.   So not just Barclays, but also Bank of
10   New York valued each of those securities at that
11   price; is that correct?
12       A.   That's right.
13       Q.   And I take it you disagree with the
14   BoNY marks of those securities?
15       A.   Yes.
16       Q.   And you don't know whether Lehman
17   valued any of those securities; is that right?
18       A.   I do not know that.
19       Q.   Are any of those securities
20   Lehman-related, do you know?
21       A.   I wouldn't know.
22       Q.   So for 7 of the 24 bonds you examined
23   you determined that BoNY had the wrong marks; is
24   that correct?
25           MR. TAMBE:  Objection to the form of

Page 104

1          J. Schwaba
2    the question.
3        MR. DAKIS:  Same objection.
4        MR. McCOUBREY:  Same objection.
5        A.   My response is that I looked at those
6    and we came up -- we valued each of these
7    securities.  I valued each of these securities
8    the way I thought was the most appropriate
9    value, and that's what we did.
10       Q.   And it's fair to say that the value
11   you arrived at was substantially different from
12   the values that BoNY arrived at for each of
13   those seven securities, is that fair?
14       A.   That would be correct.
15       Q.   And does that give you any concern
16   about the reliability of BoNY's marks for the
17   securities that it valued?
18           MR. TAMBE:  Objection to the form of
19   the question.
20       A.   That's to me, you know, given my
21   expert opinion, that's -- what I'm concerned
22   about is what the value should be on those
23   particular securities.
24       Q.   Okay.  And by your estimation of the
25   24 securities that you valued, BoNY was wrong in

Page 105

1          J. Schwaba
2    about 30 percent of them; is that right?
3        A.   If you look at the seven securities, I
4    would conclude that -- I would conclude that my
5    marks -- excuse me, my value based on traded
6    prices is a better value, is a correct value.
7        Q.   And therefore, BoNY's valuation was
8    incorrect; that's your conclusion?
9        A.   I would conclude that my values are
10   correct.
11       Q.   So you wouldn't draw any conclusion
12   about the BoNY valuations for the same
13   securities that you valued at substantially
14   more?
15       A.   I'm not going to draw any conclusions
16   on that.
17       Q.   Why not?
18       A.   Because I'm being -- I'm focusing on
19   what I think the value of these securities are.
20       Q.   So, in your view, the BoNY valuations
21   could be completely correct; is that what you're
22   saying?
23       A.   No.
24       Q.   And therefore, in your view, those
25   values are incorrect, right?

Page 106

J. Schwaba

1
2    A.   I guess that would be correct then.
3    Q.   **Is there a range of appropriate**
4    **valuations for these securities?**
5    A.   We tried to apply the same methodology
6    with some appropriate modifications and then on
7    the non-ARS securities, but these were based
8    again on a number of factors we've talked about
9    and these are the values that we -- that I think
10   are correct.
11   Q.   **You're saying they're correct to the**
12   **penny?**
13   A.   I would stand by it.  I think
14   they're -- I believe that they're correct.
15   Q.   **So what you're saying is when you**
16   **valued the one with the CUSIP 841513LJ1 at**
17   **3,093,446 dollars and zero cents, that is**
18   **exactly correct?**
19   A.   That is what I believe to be the value
20   of that security.
21   Q.   **And if someone reached a different**
22   **valuation, in your view, that would be**
23   **necessarily wrong; is that what you're saying?**
24   A.   I believe that my values are correct.
25   Q.   **And you believe that your values are**

Page 107

J. Schwaba

1
2    the only correct values?
3        MR. TAMBE:  Objection to the form of
4    the question.
5    A.   I would not say that.
6    Q.   **And that's in part because your values**
7    **depend on your selection of certain proxies,**
8    **right?**
9        MR. DAKIS:  Objection to the form of
10   the question.
11       MR. McCOUBREY:  Same objection.
12   A.   I have a methodology that I employ
13   here.
14   Q.   **And your methodology relies upon the**
15   **selection of appropriate proxies for valuation?**
16   A.   Proxies and/or comparables.
17   Q.   **How are you distinguishing between a**
18   **proxy and a comparable?**
19   A.   A comparable in the calculation of the
20   fixed and zero coupon and the floating rate
21   note, we use conventional bond calculations, and
22   the comparables are also factored in as well in
23   terms of coming up with the valuations.  So
24   I'm -- you know, but those are the values.
25   Q.   **Let's just focus on the auction rates**

Page 108

J. Schwaba

1
2    for a moment.  **You didn't use any sort of model**
3    **to value those, right?**
4    A.   No.  We used the methodology as
5    defined.
6    Q.   **And the methodology as defined is you**
7    **selected what you believed to be comparable**
8    **securities?**
9    A.   Right.
10   Q.   **And you looked at what they had traded**
11   **at on the 19th?**
12   A.   Right.
13   Q.   **And you took an average of what those**
14   **had traded at; is that correct?**
15   A.   Exactly.
16   Q.   **You didn't weight the average at all?**
17   A.   No.
18   Q.   **Did you analyze it for statistical**
19   **significance?**
20   A.   No.
21   Q.   **Did you make any effort to determine**
22   **how sensitive your analysis was to particular**
23   **securities you selected?**
24   A.   I'm not sure I understand that
25   particular question.

Page 109

J. Schwaba

1
2    Q.   **If you changed any one comparable --**
3    **strike that.**
4        **And in selecting the comparable**
5    **securities that you used, you acknowledge that**
6    **you were using judgment; is that correct?**
7    A.   Yes.
8    Q.   **And would it be fair to say that a**
9    **reasonable valuation expert could reach a**
10   **different conclusion about the appropriateness**
11   **of any particular comparable that you selected?**
12   A.   It would be possible.
13       MR. TAMBE:  Objection to the form of
14   the question.
15       You can answer.
16       MR. DAKIS:  Objection to form.
17   Q.   **And if a -- and in selecting your**
18   **comparables, you did not focus on whether any**
19   **given comparable -- strike that.**
20       **In selecting your comparables, you did**
21   **not take into account whether a given comparable**
22   **was a failed auction rate security?**
23   A.   I did not.
24   Q.   **Don't you think it would be important**
25   **to do so if the security you're valuing is a**

Page 110

**J. Schwaba**

1  failed auction rate security?
2
3       MR. TAMBE:  Objection to the form of
4    the question.
5       A.   Well, we focused on traded prices,
6    okay?  So if you take a look at the traded
7    prices, you can see what the traded prices are,
8    and the marketplace was saying at that
9    particular point in time, on September 19, that
10   these traded prices, buyers and sellers were
11   willing to establish prices for those based on
12   actual transactions.
13       **Q.   Right, buyers and sellers were willing**
14   **to establish prices for the comparables, right?**
15       A.   For the comparables.
16       **Q.   Okay.  And in terms of looking at the**
17   **comparables to determine whether they are useful**
18   **indicators of what the security you're valuing**
19   **would trade at, you need to be sure those**
20   **comparables are in fact appropriate comparables,**
21   **right?**
22       A.   That would be correct.
23       **Q.   Okay.  And in determining whether**
24   **those were appropriate comparables, even though**
25   **you knew that some of the securities you valued**

Page 111

**J. Schwaba**

1    **valuing were failed auction rate securities, you**
2    **did not make any effort to ensure that the**
3    **comparables you were looking at were failed**
4    **auction rate securities?**
5
6       A.   Actually, I don't -- the first part of
7    your question I can't -- I don't know whether
8    they were failed securities or not, so I'm not
9    drawing a conclusion about that.
10       **Q.   Okay.  Well, I'd like you to assume**
11   **that some of them were failed auction rate**
12   **securities, sir.  If you assume that some of the**
13   **securities you valued were failed auction rate**
14   **securities, don't you think it would have been**
15   **more appropriate to have ensured that the**
16   **comparables you used for that security were also**
17   **failed auction rate securities?**
18       MR. TAMBE:  Objection to the form of
19    the question.
20       MR. McCOUBREY:  Same objection.
21       MR. DAKIS:  Same objection.
22       A.   I think it's good information to know,
23    but would I have differed from my conclusion?  I
24    can't necessarily say that.
25       **Q.   And you can't necessarily say that you**

Page 112

**J. Schwaba**

1
2    **wouldn't have?**
3       A.   That's true.
4       **Q.   So to the extent that Barclays relied**
5    **on BoNY marks, is it your view that that was**
6    **improper valuation technique?**
7       MR. TAMBE:  Objection to the form of
8    the question.
9       A.   I don't want to make -- I'm not sure I
10   would be -- I'm hesitant about making a
11   conclusion about that, but those numbers are
12   very suspect in terms of one-tenth of a cent
13   value.
14       **Q.   What if the securities in question**
15   **were Lehman-related securities?**
16       MR. TAMBE:  Objection to form.
17       **Q.   Would that have any impact in your**
18   **assessment of whether the valuation assigned**
19   **were appropriate?**
20       MR. TAMBE:  Same objection.
21       A.   Well --
22       MR. DAKIS:  Objection to form.
23       A.   -- a one-tenth of a cent value is --
24    no, that would not.  I would still be --
25    regardless of where these numbers came from, if

Page 113

**J. Schwaba**

1
2    it were one-tenth of a cent, you know, that
3    is -- that would -- that would capture my
4    interest and attention.
5       **Q.   If you have a Lehman-related security**
6    **and Lehman's just gone bankrupt, would that be**
7    **something you should take into account in**
8    **valuing that security?**
9       MR. TAMBE:  Objection to the form of
10    the question.
11       MR. DAKIS:  Same objection.
12       MR. McCOUBREY:  Same objection.
13       A.   My approach would be the same, I
14    believe.  I'd look at the security on its face
15    and employ whatever appropriate valuation
16    methodologies I felt were appropriate for that
17    security and come up with a value, which I
18    believe -- certainly I believe would be
19    different than the one-tenth of a cent value
20    placed on those securities.
21       **Q.   Might it also be different than the**
22   **essentially 100 cents on the dollar valuation**
23   **that you placed on many of those securities?**
24       A.   It could.
25       **Q.   But you didn't look to see whether any**

Page 114

J. Schwaba

1  J. Schwaba
2  of them were Lehman-related?
3      A.   I did not.
4      Q.   So you think that the appropriate
5  valuation methodology is that the person doing
6  the valuation should not just accept the BoNY
7  marks but should evaluate them independently; is
8  that your testimony?
9          MR. TAMBE:  Objection to the form of
10  the question.
11      A.   I believe there should be an
12  independent valuation.
13      Q.   And it would be improper technique or
14  improper methodology in your view simply to
15  accept the BoNY marks; is that what you're
16  saying?
17          MR. TAMBE:  Objection.  Objection to
18  the form of the question.
19          MR. McCOUBREY:  Same objection.
20          MR. DAKIS:  Same objection.
21      A.   I believe I was -- I am hired -- I am
22  here to give, provide an independent valuation,
23  and I would stick to that as close as possible.
24      Q.   In the course of performing an
25  independent valuation, your view is that it

Page 115

1  J. Schwaba
2  would be improper simply to accept the BoNY
3  marks; is that correct?
4          MR. TAMBE:  Objection to the form of
5  the question.
6          MR. McCOUBREY:  Same objection.
7          MR. DAKIS:  Same objection.
8      A.   I believe that I should stick to my
9  independent analysis, and if I see a mark or a
10  value there, a dollar value of one-tenth of one
11  percent, and I don't agree -- and obviously I
12  don't agree with it, I'm going to come up with
13  whatever my appropriate valuation is.
14          If somebody wants to interpret that
15  that I don't agree with that, then I suppose
16  that's their -- that's their right, I guess.
17      Q.   What is your understanding of the
18  process that Barclays used to value the
19  municipal securities that it acquired?
20      A.   Are you talking about these particular
21  26 securities?
22      Q.   No, I'm talking about the entire
23  portfolio of 562 of which these 26 are a part.
24      A.   I would defer to my other experts on
25  that.  I don't have specific knowledge of those

Page 116

1  J. Schwaba
2  particular securities.
3      Q.   I'm not asking about those securities.
4  I'm asking about the methodology that Barclays
5  used to value the municipal securities that it
6  acquired.
7          MR. TAMBE:  Objection to the form of
8  the question.
9      A.   I can't speak with -- with any
10  authority on those particular securities in
11  terms of methodology.
12      Q.   What about these 26, what methodology
13  did Barclays use to value these?
14      A.   I believe they were using the
15  liquidity haircuts.  I mean, they took a 20
16  percent haircut, uniform basis, applying it to
17  each of those adjustable rate securities.
18      Q.   Do you understand the concept of
19  adjusting midpoint prices to exit prices?
20          MR. TAMBE:  Objection.  Asked and
21  answered.  We spent some time on this.
22          MR. DAKIS:  Same objection.
23          MR. TAMBE:  You can answer.
24      A.   I guess I thought we discussed it
25  before, but I don't --

Page 117

1  J. Schwaba
2      Q.   I was really just bridging back into a
3  new topic.
4      A.   Okay.
5      Q.   So you recall we had a discussion
6  about that?
7      A.   Yes.
8      Q.   Now, when you criticized Barclays for
9  using a liquidity adjustment, do you reject the
10  basic concept of the adjustment from mid to bid,
11  or do you just reject the particular adjustment
12  that Barclays used?
13          MR. TAMBE:  Objection to the form of
14  the question.
15      Q.   Or both?
16          MR. McCOUBREY:  Same objection.
17          MR. DAKIS:  Same objection.
18      A.   You know, to me I think you have to
19  address each security in and of itself.  I mean,
20  you could -- even from a liquidity adjustment
21  factor alone, is 20 percent of liquidity factor
22  applicable or appropriate for all securities
23  there?
24      Q.   Well, do you understand that Barclays
25  mid to bid adjustment was applied across a broad

Page 118

J. Schwaba

1    J. Schwaba
2    portfolio of municipal securities, not just the
3    26 that you cherry-picked?
4        A.  Yeah, I --
5        MR. TAMBE:  Objection to the form of
6    the question.
7        MR. DAKIS:  Same objection.
8        MR. McCOUBREY:  Same objection.
9        A.  We didn't cherry -- we don't
10   cherrypick anything.
11       Q.  All right.  Let me change the phrasing
12   of that slightly.
13           Do you understand that Barclays' mid
14   to bid adjustment was applied across a broad
15   portfolio of municipal securities, not just the
16   26 that you valued?
17       A.  That is my understanding.
18       Q.  Do you have any understanding of
19   whether that adjustment was intended to reflect
20   an average across both higher quality and lower
21   quality munis?
22       A.  I did not.
23       MR. TAMBE:  Objection to form.
24       MR. DAKIS:  Same objection.
25       Q.  Do you have any understanding whether

Page 119

J. Schwaba

1    J. Schwaba
2    that was intended to be an average across more
3    liquid and less liquid munis?
4        MR. DAKIS:  Objection to form.
5        A.  I do not.
6        Q.  Did you consider the risk
7    characteristics of the entire portfolio of munis
8    that Barclays acquired in reaching your
9    conclusions?
10       A.  I did not.
11       Q.  Are you an expert in fair value
12   accounting?
13       A.  No.
14       Q.  Are you an expert in fair value
15   measurement?
16       A.  No.
17       Q.  Are you an expert -- strike that.
18           Take a look at paragraph 8 of your
19   report, if you would, please, sir.  In the fifth
20   bullet point you state that your values are
21   based on observed market prices.  Do you see
22   that?
23       A.  I'm sorry, where was that?  Is that on
24   page --
25       Q.  Page 3.

Page 120

J. Schwaba

1    J. Schwaba
2        A.  Page 3.
3        Q.  Second bullet point on that page.  Do
4    you see that?
5        A.  Yes.
6        Q.  And those are the prices that you
7    pulled off MSRB for the comparable securities
8    that you selected; is that right?
9        A.  That's right.
10       Q.  Are you aware that in 2008 there was a
11   small secondary market in which holders of
12   failed auction rate securities traded
13   over-the-counter?
14       A.  No, I'm not.
15       Q.  So you didn't investigate prices for
16   failed auction rate securities by looking at
17   trades in the secondary market?
18       MR. TAMBE:  Objection to the form.
19       MR. DAKIS:  Objection to form.
20       MR. McCOUBREY:  Same objection.
21       A.  I believe we discussed that.
22       Q.  I'm not sure we did, so could you
23   answer my question?
24       A.  I'm sorry, say the question again,
25   please.

Page 121

J. Schwaba

1    J. Schwaba
2        Q.  So you didn't investigate prices for
3    fail auction rate securities by looking at
4    trades in the secondary market?
5        MR. TAMBE:  Objection to form.
6        MR. DAKIS:  Same objection.
7        Q.  Correct?
8        MR. McCOUBREY:  Same objection.
9        A.  When we looked at analysis of the --
10   if we came across that, we did look at it, so I
11   can't say categorically that I didn't look at
12   it.
13       Q.  Well, when you say you -- if you came
14   across it, the only place you would have come
15   across it would have been in the MSRB; is that
16   correct?
17       A.  Yes, we did some analysis on some of
18   the Bloomberg in terms of information about
19   those.  So, I mean, I'm trying to -- I can't
20   recall specifically, but I'm saying we may have
21   come across that.
22       Q.  Do you know whether on the secondary
23   market failed auction rate securities were
24   trading at a discount to par?
25       MR. TAMBE:  Objection to the form of

Page 122

1           J. Schwaba
2    the question.
3           MR. DAKIS: Same objection.
4           MR. McCOUBREY: Same objection.
5     **Q.  In September of 2008.**
6           MR. TAMBE: Objection.
7     A.  Again, say that again, please.
8     **Q.  Do you know whether in September of**
9    **2008 failed auction rate securities were trading**
10   **on the secondary markets at a discount to par?**
11          MR. TAMBE: Objection to form.
12          MR. DAKIS: Same objection.
13    A.  I did not know that.
14          MR. McCOUBREY: Same objection.
15    **Q.  I take it you also do not know the**
16   **range of discounts to par that were prevailing**
17   **in those secondary markets?**
18    A.  That would be correct.
19          MR. TAMBE: Same objection.
20          MR. DAKIS: Same objection.
21          MR. McCOUBREY: Same objection.
22    **Q.  If there were reported trades of**
23   **auction rate securities at substantial discount**
24   **to par on the secondary markets at this time, is**
25   **that something you would have wanted to analyze?**

Page 123

1           **J. Schwaba**
2           MR. TAMBE: Objection to the form of
3    the question.
4           MR. DAKIS: Same objection.
5           MR. McCOUBREY: Same objection.
6     A.  I would want to do -- I would want to
7    have known the information. Would it have
8    altered my analysis? I don't believe so.
9     **Q.  How can you say that without knowing**
10   **what the information is?**
11    A.  I don't believe I would have.
12    **Q.  Why don't you believe you would have**
13   **altered your analysis without knowing what the**
14   **information is?**
15          MR. TAMBE: Objection to the form of
16    the question.
17          MR. DAKIS: Same objection.
18          MR. McCOUBREY: Same objection.
19    A.  My methodology had a lot -- had almost
20   everything to do with market traded prices. To
21   the extent it would have affected those market
22   traded prices, then it probably would have
23   affected it. But it would have expressed itself
24   in market traded prices, I believe.
25    **Q.  Well, what if there were trades in one**

Page 124

1           **J. Schwaba**
2    **of your 24 CUSIPS on a secondary market at say a**
3    **70 -- at 70 percent of par, would that have**
4    **influenced your opinions in this case?**
5           MR. TAMBE: Objection to the form of
6    the question.
7           MR. DAKIS: Same objection.
8           MR. McCOUBREY: Same objection.
9     A.  I can't say that definitively, but I
10   would have stuck to the methodology we embraced.
11    **Q.  So does that mean you would have**
12   **ignored an actual trade in the security you are**
13   **valuing and looked instead at securities that**
14   **might or might not have been failed auction rate**
15   **securities, trades in those?**
16          MR. DAKIS: Objection to form.
17    Mischaracterizes testimony.
18          MR. TAMBE: Same objection.
19          MR. McCOUBREY: Same objection.
20    A.  Well, I think it sounds like a
21   hypothetical situation you're suggesting, and so
22   hypothetically I might have factored that in or
23   perhaps not, but it sounds like this is a
24   hypothetical that you're asking me about.
25    **Q.  Go to paragraph 9 of your report, if**

Page 125

1           **J. Schwaba**
2    **you would, please. The last words there you say**
3    **that, "All these bonds had maturities in excess**
4    **of seven years and, based on the data I have**
5    **reviewed, were investment grade." Do you see**
6    **that?**
7     A.  Yes.
8     **Q.  Do you agree there's a range of credit**
9    **ratings that fall under the category generally**
10   **referred to as investment grade?**
11    A.  Yes, I understand that to be true.
12    **Q.  Were the securities you examined at**
13   **the high end or the low end of that range?**
14          MR. TAMBE: Objection to form.
15          MR. DAKIS: Same objection.
16          MR. McCOUBREY: Same objection.
17    A.  They had -- the municipal securities I
18   looked at were veering lower, but were still, as
19   I recollect them, to be still investment grade.
20    **Q.  So they were at the lower end of the**
21   **investment grade spectrum as you recall?**
22    A.  That's correct. Well, I wouldn't
23   necessarily characterize that on a universal
24   basis.
25    **Q.  That's your general impression?**

Page 126

**J. Schwaba**
1
2   A.   That was my general impression.
3   Q.   Okay.  And did you take that
4   information into account in your valuations?
5   A.   I believe based on the methodology
6   that we chose and we are using, yes.
7   Q.   And how did you take that into account
8   in your valuation?
9   A.   Well, we were looking at comparables
10  and we were looking at ratings.  The ratings
11  were one of the variables involved.
12  Q.   And what was your -- what selection
13  criterion did you apply in determining whether
14  the rating was too far off or too different for
15  it to be an appropriate comparable?
16  A.   It was a qualitative assessment per
17  individual security.  I mean, it depended.
18  Q.   So it was an exercise of your
19  judgment; is that correct?
20  A.   It was partly judgment, that's
21  correct.
22  Q.   And in exercising judgment on
23  questions like that, would you expect that
24  someone who was actively involved in either
25  trading or valuing assets in the market at the

Page 127

**J. Schwaba**
1
2   time would be in a better position to exercise
3   judgment than you are 18 months later?
4   MR. DAKIS:  Objection to form.
5   MR. TAMBE:  Objection.
6   A.   I don't know.
7   Q.   You concede that's a possibility?
8   A.   I would concede that's a possibility.
9   Q.   In paragraph 9 are you referring only
10  to the 24 CUSIPS that you actually examined and
11  not to the broader group of municipal securities
12  that Barclays acquired?
13  A.   Yes.
14  Q.   And so you don't know whether those
15  other municipal positions that Barclays acquired
16  were also investment grade?
17  A.   No.
18  Q.   In selecting comparable securities,
19  please tell me as precisely as you can the
20  procedures and rules you used to identify them.
21  A.   Say that again, please.
22  Q.   What I'm asking you is to describe in
23  as much detail as you can the process by which
24  you selected the comparable securities that you
25  used.

Page 128

**J. Schwaba**
1
2   A.   Well, I believe I indicated it in here
3   in the report, but and I think we talked when we
4   went over the variables that you saw on top in
5   terms of the Exhibit 699, these were a range of
6   variables that we -- that I viewed on a combined
7   basis and made a qualitative judgment about
8   whether these comparables applied and how they
9   matched up with the particular municipal
10  security selected.
11      I mean, whether they were the same
12  geography or same type of bond, same basic type
13  of bond, were their maturity structure, were
14  they callable and puttable, there were roughly
15  five to seven factors that went into the
16  decision.
17  Q.   Are there any other factors that went
18  into the decision besides the ones that you just
19  listed?
20  A.   Or the ones that I mentioned, no.
21  Q.   And when you say the ones you
22  mentioned, are you referring to paragraph 23 of
23  your report?
24  A.   Well, I didn't mention -- I think when
25  you see here it doesn't necessarily include

Page 129

**J. Schwaba**
1
2   geography, but that is -- that was a factor as
3   well.
4   Q.   Okay.  Well, if you look at paragraph
5   23 of your report, which is Exhibit 697, in the
6   second sentence you say, "I began by determining
7   the key characteristics of the bonds,
8   including," and you list maturity, credit
9   rating, geographic location, issue type and
10  revenue sources, do you see that?
11  A.   Yes.
12  Q.   Were there any other criteria that you
13  applied?
14  A.   No, I would say that this is pretty
15  much it.
16  Q.   Okay.  And did you have any fixed
17  rules about when, you know, a particular
18  security was too different in terms of
19  geography, or was it a qualitative judgmental
20  exercise?
21  A.   It was a qualitative assessment.
22  Q.   Why was it important to match the
23  issue type, general obligation versus revenue
24  bond?
25  A.   I just felt like that was a, you know,

Page 130

J. Schwaba

1  a good -- a prominent enough differentiation
2  between a general obligation bond and a revenue
3  bond.
4     Q.   So you wouldn't want to use general
5  obligation bonds as comparables for a revenue
6  bond or vice-versa, is that fair?
7     A.   Well, I don't recall, but there might
8  have been some exceptions to that when you look
9  through that. They could have been offset, but
10  I can't recall with specificity here, but it
11  could have been offset by other factors that
12  were -- that would argue on that. It was just
13  one of, as you can see, five or six or seven
14  factors.
15    Q.   All of which you threw into a hopper,
16  exercised your judgment on, and made a call
17  about which comps to use?
18    A.   That's right.
19       MR. TAMBE:  Objection to form.
20    A.   Well, that's right.
21    Q.   Paragraph 17 of your report, sir, you
22  state that you're able to observe prices on
23  12,416 municipal securities that traded on
24  September 19, do you see that?

Page 131

J. Schwaba

1     A.   Yes.
2     Q.   Is that the total number of trades or
3  is that the total number of unique municipal
4  CUSIPS that traded on that day?
5     A.   I believe that was -- I believe that
6  was a total number of trades.
7     Q.   And then in the next sentence you say,
8  "Some 1,664 were adjustable rate municipal
9  bonds"?
10    A.   Yes.
11    Q.   Do you see that? And that would be
12  the total number of trades of adjustable rate
13  municipal bonds that day?
14    A.   I believe so.
15    Q.   Paragraph 24 of your report, sir, you
16  state in the second sentence, "Once I had
17  determined that the proxy price was reasonable,"
18  you see that?
19    A.   Yes.
20    Q.   What do you mean by that?
21    A.   That, relating to what we had talked
22  about before, that the proxies were reasonable,
23  provided a reasonable comparison to the specific
24  security that we were valuing based on those

Page 132

J. Schwaba

1  factors that we talked about.
2     Q.   Did you take into account credit
3  enhancement in determining your -- the
4  comparability of --
5     A.   Actually, credit enhancement was a
6  factor that we valuated as well when and where
7  we saw that information.
8     Q.   How typical is it that an auction rate
9  or adjustable municipal bond offers credit
10  enhancement protection?
11       MR. TAMBE:  Objection to the form of
12  the question.
13       MR. DAKIS:  Same objection.
14       MR. McCOUBREY:  Same objection.
15    A.   I can't recall.
16    Q.   Did you ever know?
17       MR. TAMBE:  Objection to form.
18       MR. DAKIS:  Same objection.
19       MR. McCOUBREY:  Same objection.
20    A.   I can't recall that.
21    Q.   Well, would it be fair to say that
22  such securities are typically insured upon
23  issuance or not?
24       MR. TAMBE:  Objection to form.

Page 133

J. Schwaba

1       MR. DAKIS:  Same objection.
2       MR. McCOUBREY:  Same objection.
3     A.   Yeah, I -- I don't know.
4     Q.   Can you tell me who the -- who a
5  couple of the major insurers of auction rate
6  securities were in September of 2008?
7     A.   I can't say I know. AMBAC and MBIA.
8     Q.   Any others?
9     A.   I'm not ...
10    Q.   Do you have any understanding of what
11  the financial condition of AMBAC or MBIA were in
12  September of 2008?
13    A.   In terms of our analysis, we did read
14  some -- came across some concern about that, but
15  not -- nothing more than that.
16    Q.   And did you take that into account
17  when you were doing your valuations?
18    A.   Yes.
19    Q.   How did you take that into account
20  when doing your valuations?
21    A.   Well, I registered it as something to
22  be mindful of when I'm looking through.
23    Q.   So something that informed your
24  judgment --

Page 134

J. Schwaba

1
2   A.   Yes.
3   Q.   -- as to which comparables were
4   appropriate?
5   A.   That would be correct.
6        MR. SHAW:  Why don't we take a short
7   break.
8        (Luncheon Recess; Time Noted:  12:41
9   P.M.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 135

J. Schwaba

1
2        AFTERNOON SESSION
3        (Time Noted:  1:31 P.m.)
4   JOSEPH SCHWABA, resumed and
5        testified further as follows:
6   EXAMINATION BY (Cont'd.)
7   MR. SHAW:
8   Q.   Mr. Schwaba, if you would take a look
9   again at your report, which is Exhibit 697, and
10  specifically at Appendix II, Documents Relied
11  Upon.  If you look under the heading "Other
12  Documents" about the middle of the page?
13  A.   Uh-huh.
14  Q.   Do you see that?  You say you have
15  Barclays Capital valuation methodology and it's
16  got some Bates numbers associated with that, do
17  you see that?
18  A.   Yes.
19  Q.   Apart from that document, in the
20  course of doing your work on this matter did you
21  review any other documents prepared in
22  connection with Barclays' valuation of the
23  securities it received in this transaction?
24       MR. TAMBE:  Objection to the form of
25  the question.

Page 136

J. Schwaba

1
2        MR. DAKIS:  Objection.
3        MR. McCOUBREY:  Same objection.
4   A.   I don't recall.
5   Q.   The next item there is entitled
6   "Review of Barclays Capital Price Testing
7   Methodology and Framework" and it's got a Bates
8   number that begins with PWC, do you see that?
9   A.   Yes.
10  Q.   Did, in the course of your work in
11  this matter, did you review any documents
12  relating to PWC's review of Barclays' price
13  testing or its valuation of the securities it
14  received in this transaction?
15  A.   If it's the same document I think it
16  was, I did read through it.
17  Q.   Yes.  And aside from that document,
18  did you review any documents --
19  A.   No.
20  Q.   -- in reaching that decision?
21       The very last item on that page is
22  entitled Schwaba, Market Inputs.pdf, do you see
23  that?
24  A.   Yes.
25  Q.   Can you tell me what that document is?

Page 137

J. Schwaba

1
2   A.   My understanding is that's the
3   information, some of the information we've been
4   looking at today with regard to comparables, et
5   cetera, some of the exhibits.
6   Q.   Okay.  And what about
7   investinginbonds.com.xlsx, can you tell me what
8   that is?
9   A.   Yes, that's actually where we -- the
10  Website that keeps track of municipal trades
11  that were actually done in the marketplace,
12  among other things, and when you and I were
13  discussing -- we were talking about two trades
14  we saw, that's where we got that information.
15  Q.   Okay.  And I guess my question is, as
16  I understand it, the "xlsx" suffix indicates an
17  Excel spreadsheet.  Are you aware of an Excel
18  spreadsheet that was downloaded from or
19  populated with information from the
20  investinginbonds.com that you relied on?
21  A.   If I recollect clearly, I think that's
22  where we -- it was downloaded to an Excel
23  spreadsheet, I believe.
24  Q.   Do you know if that document has been
25  produced?

Page 138

1                J. Schwaba
2        MR. SHAW:  Do you know, Jay?
3        MR. TAMBE:  I don't know the answer.
4    We can check.
5        A.   I have it in my binder.
6        MR. SPENCER:  It has.
7        MR. TAMBE:  It has been produced.
8        MR. SHAW:  I would appreciate it if at
9    some point you can identify for me which
10   document that is and also which the Schwaba
11   market inputs document is.
12       MR. SPENCER:  Sure.
13       Q.   Put that so one side.  I show you --
14   if we could mark this as the next number.
15           Showing you a document -- showing you
16   what has been marked as Exhibit 670, sir.  Do
17   you recognize that document?
18       A.   I don't believe I do.
19           (Discussion off the record.)
20           (Exhibit 700, a document bearing Bates
21   Nos. LEH-NAVIGANT 026165 Sheet 1, marked for
22   identification, as of this date.)
23       Q.   Mr. Schwaba, while we were off the
24   record, we corrected the exhibit number so let
25   me ask my question again.

Page 139

1                J. Schwaba
2           Showing you what has been marked as
3    Exhibit 700, sir, do you recognize that
4    document?
5        A.   I do not believe I do.
6        Q.   Do you know if this is a document that
7    you used in the course of preparing your
8    opinions in this case?
9        A.   It is not.
10       Q.   Do you know if this is a document that
11   was used by someone working under your direction
12   in preparing your opinions in this case?
13       A.   It could have been.
14       Q.   Are you aware that if you used a model
15   in the course of preparing any of your opinions
16   in this case?
17       A.   Yes, we have used a couple of models
18   in terms of bonds.
19       Q.   And which of the securities did you
20   value the models?
21       A.   I believe we used, on the fixed and
22   zero coupon and OID, I think we used FINCAD and
23   I think we used -- I think we might have use
24   Polypath in terms of validating some of our
25   curve construction.

Page 140

1                J. Schwaba
2        Q.   I take it you do not know what Exhibit
3    700 was used for?
4        A.   That is correct.
5        Q.   And then you don't know where it was
6    obtained?
7        A.   That's right.
8        Q.   And you don't know how it works?
9        A.   That's right.
10       Q.   When you made use of models, did you
11   personally examine the models?
12       A.   No.
13       Q.   Were you personally familiar with how
14   the particular models you used worked?
15       A.   No.
16       Q.   Okay.
17           (Exhibit 701, a document bearing Bates
18   Nos. LEH-NAVIGANT 026176 Floater, marked for
19   identification, as of this date.)
20       Q.   Showing you what has been marked as
21   Exhibit 701, sir, tell me what this document is.
22       A.   This is actually a, as I recollect,
23   this is a valuation spreadsheet that we used,
24   and I believe that was the -- that was to value
25   the floating rate note, one of the CUSIPS we

Page 141

1                J. Schwaba
2    have been talking about.
3        Q.   And is this data that was input into a
4    model, sir?
5        A.   I think we -- I think there was
6    some -- we used a combination of a model, but
7    this was basically, I believe, our own work in
8    terms of coming up with a value on the, like I
9    said, one of the CUSIPS, which was the floating
10   rate bond, I believe.
11       Q.   How was the data that's listed on this
12   exhibit used?
13       A.   Well, it was used to construct the
14   price, ultimately the price of the bond based on
15   using the LIBOR forward curve.  As I recollect,
16   this particular security was -- I had a couple
17   different pricing components.  One was basically
18   taking 67 percent of, in effect, three-month
19   LIBOR plus adding in a spread of 57 basis points
20   to it.  So and that would be -- that would be
21   how the coupon was set on an amounts due a
22   periodic three-month basis.
23       Q.   What does the abbreviation "OAS" in
24   the second line stand for?
25       A.   Well, the convention is option adjust

Page 142

J. Schwaba

1    J. Schwaba
2    spread. We use it as kind of a term that
3    factors in not only potential optionality but
4    potentially credit, some type of credit spread
5    that the particular security would have, and
6    it's kind of an add-on feature that can account
7    for the additional marginal risk of a particular
8    security.
9        Q.    If you look at the columns on the
10    first page, you see "Date," "Years," "Spot"?
11        A.    Uh-huh.
12        Q.    And then something called "LIBOR PV,"
13    what does that stand for?
14        A.    I believe it's LIBOR present value, I
15    believe.
16        Q.    If you turn to the last page, sir, you
17    see up in the right-hand corner, upper
18    right-hand corner, there are entries saying
19    "Notes"?
20        A.    Yes.
21        Q.    It says, "These are continuously
22    compounded zero rates bootstrapped from LIBOR
23    and swap rates"?
24        A.    Right.
25        Q.    What does that mean?

Page 143

1        **J. Schwaba**
2        A.    This was a, is my understanding, this
3    is what we used to fit a particular date for the
4    security that you saw ahead of this, in terms of
5    its dates, customizing it to reflect a LIBOR
6    swap curve to fit that particular curve given
7    the dates. It's basically an interpolation
8    mechanism. It's a -- become a fairly
9    conventional bond valuation mechanism.
10        Q.    What is a LIBOR swap curve?
11        A.    That is the -- the LIBOR swap curve is
12    the term structure of interest rates not for
13    treasuries but for basically euro dollars or
14    London Interbank Offered -- LIBOR means London
15    Interbank Offered Rate, and the LIBOR swap curve
16    is basically a combination of the LIBOR curve
17    and the interest rate swap curve extended on out
18    from zero to basically 30 years. It's become a
19    benchmark for valuing different types of bonds.
20        So what you might see when you talk --
21    when we talked about OAS, or option-adjusted
22    spreads, you might see -- the benchmark might be
23    the LIBOR curve, but a particular bond may be
24    valued to yield let's say 15, as an example, 15
25    over the LIBOR benchmark or -- so it could be

Page 144

1        J. Schwaba
2    said to have an option-adjusted spread of 15
3    basis points, as an example. That's my
4    understanding of it.
5        Q.    In the course of calculating these
6    values, is there any application of judgment?
7        MR. TAMBE:  Objection to the form of
8    the question.
9        Q.    Is it purely a mechanical calculation
10    or is it something involves that --
11        A.    It's mostly a mechanical calculation,
12    except that one selection of an option-adjusted
13    spread, and that's where comparables can come
14    into play. So if you're looking at a bond that
15    has, other things being equal, some comparables,
16    you could make a judgment as to how much let's
17    say OAS to add to that. So that's where the
18    comparable effect. So there would be some
19    degree of judgment there.
20        Q.    And did you use comparables in
21    arriving at the OAS, the 15 that was used here?
22        A.    We did as more of a reference point
23    and then factored in other -- and I believe in
24    this we had -- we looked at comparables, and as
25    I recollect, because we did a, I think some

Page 145

1        J. Schwaba
2    FINCAD analysis in relation to this, and I
3    believe it came out to be 12 or 13 basis points
4    and so we factored in 15 basis points as an OAS,
5    erring slightly on the side of conservatism.
6        Q.    And would conservatism tend to make
7    the value higher or lower?
8        A.    I'm sorry, say again?
9        Q.    You said you were conservative in your
10    choice of --
11        A.    That would make -- a higher OAS would
12    make the price lower, yield higher.
13        Q.    I think earlier you referenced the
14    Polypass or Polypath model; is that correct?
15        A.    Yes.
16        Q.    Which is it, Polypass or Polypath?
17        A.    Polypath.
18        Q.    What is the Polypath model?
19        A.    It's a bond valuation model. I don't
20    know the intricacies of it. It's used to test
21    bond valuation in different interest rates.
22        Q.    Before your work on this particular
23    valuation project, had you ever used the
24    Polypath model?
25        A.    I had not.

Page 146

J. Schwaba
1
2    Q.    What did you do to verify the Polypath
3    model was an appropriate model to use for the
4    purposes you used it in this project?
5        MR. TAMBE:  Objection to the form of
6    the question.
7    A.    Polypath is one of the models that we
8    use to test some of the data that we have in
9    running through it, so I don't know if that
10    answers your question or not.
11    Q.    I think you also mentioned another
12    model.  It sounded like FINCAD to me.
13    A.    Yes.  FINCAD is a, again, another type
14    of bond valuation, but more of a kind of a
15    work -- interactive worksheet exercise that you
16    use.
17    Q.    Is that F-I-N-C-A-D?
18    A.    That's right.
19    Q.    And what's the source of the FINCAD
20    model?
21        MR. TAMBE:  Objection to the form of
22    the question.
23    A.    I'm not sure what the source of that
24    is.
25    Q.    Before this valuation exercise you've

Page 147

J. Schwaba
1
2    done in this case, had you ever worked with the
3    FINCAD model?
4    A.    No.
5    Q.    Did you do any of the work on the
6    FINCAD model yourself?
7    A.    No.
8    Q.    What about the Polypath model, did you
9    do any work yourself?
10    A.    No.
11    Q.    Did you review the work that was done
12    on the FINCAD model, or did you simply
13    incorporate it into your analysis?
14        MR. TAMBE:  Objection to the form of
15    the question.
16    A.    I reviewed the output from it, much as
17    like we're looking at here.
18    Q.    When you say you reviewed the output,
19    you mean you saw the value that it gave?
20    A.    Yes.
21    Q.    And did you in any way test whether
22    that was an appropriate value?
23    A.    We had done testing through the -- as
24    part of our analysis and viewed how it stood up
25    against, again, selected comparables.  There was

Page 148

J. Schwaba
1
2    a qualitative judgment there, though.
3        (Exhibit 702, a document bearing Bates
4    Nos. LEH-NAVIGANT 026175 Muni, marked for
5    identification, as of this date.)
6    Q.    Sir, showing you what has been marked
7    as Exhibit 702, can you tell me what this
8    document is?
9    A.    The cover page is -- the top four rows
10    there or let's say the top four sections running
11    horizontal are a set of comparables that we use
12    in terms of valuing our zero coupon and fixed
13    rate bonds.  Again, the CUSIP numbers you see
14    down below, the first three are zero coupons.
15        The next two -- well, the next one is
16    a fixed rate coupon.  The next one, the Park
17    Center one, is the ARS OID that I've been
18    talking about periodically, and Tennessee
19    Housing is the other fixed rate bond.
20        So when you look at -- the key column
21    to look at there is the CP Price.  That's the
22    Chicago Partners, that's our -- that's my price
23    in terms of valuation, and if you look at the
24    first one, for example, Dawson Ridge, Colorado
25    and you look up top, you can see three so-called

Page 149

J. Schwaba
1
2    comparables there.  Two had an OIS of 110.8 and
3    one of 6.2, respectively, and a third 54.9.
4    Q.    So, just so I understand what's going
5    on here, if we look at the bottom portion, in
6    other words, is says an analysis of fixed coupon
7    municipal bonds, do you see that?
8    A.    Right.
9    Q.    The first CUSIP there is number
10    239427AG2; is that correct?
11    A.    That is correct.
12    Q.    Dawson Ridge, Colorado.  And the
13    comparables you used for that are the three that
14    appear above the first horizontal line in the
15    upper section of this?
16    A.    That is correct.
17    Q.    So that would be E-470 Pub Highway
18    Auth Colorado and the next two?
19    A.    That's correct.
20    Q.    And if you look underneath that
21    horizontal line that we just looked at where you
22    have Savannah, Georgia and Washington, Georgia
23    bonds, do you see that?
24    A.    Yes.
25    Q.    Those would be comparable to the

Page 150

1                J. Schwaba
2    Richmond County, Georgia --
3        A.    That is correct.
4        Q.    -- on the two values; is that correct?
5            And then beneath those you have got
6    the two San Joaquin Hills bonds?
7        A.    That's correct.
8        Q.    And these would be your comparables
9    for the San Joaquin, California bond you've got
10   there?
11       A.    That's right.
12       Q.    And then below that you've got
13   Regional Transn Auth Ill and New York State Dorm
14   Auth Revs bonds, do you see those?
15       A.    That's right.
16       Q.    What were those the comparables for?
17       A.    Those would be comparable for the two
18   fixed rate bonds.
19       Q.    And that would be the Park Center and
20   Tennessee?
21       A.    No, that would be the Southeast Texas
22   Housing and Tennessee.
23       Q.    And what were your comparables for the
24   Park Center bonds?
25       A.    The Park Center bond, it may not be --

Page 151

1                J. Schwaba
2    there were four comparables as a reference point
3    that we used that were the same, as I recollect,
4    to the floating rate bond. And let's see, I
5    think the second page you see is the same type
6    of bootstrapping page that we saw for the
7    previous bond over here, and then --
8        Q.    I take it you're looking at a series
9    of pages that have "Southeast Texas Called" in
10   the bottom right-hand corner?
11       A.    Well, there's a Southeast Texas Called
12   and that's -- we valued it on a callable basis
13   and these are the numbers in support of that,
14   and we came up with a value of 103.77, which is
15   slightly different from 103.92, but not by much.
16           We decided to be more conservative in
17   that way and we -- the analysis is done -- it's
18   not quite in the format it is here. You see
19   "Southeast Texas Called," and after that you see
20   "Southeast Texas Non-call" after that.
21       Q.    Uh-huh.
22       A.    There's a pretty much appreciable
23   difference in price, and given, as I recollect,
24   the other aspects of the bond, we defaulted to
25   using the option adjusted spread on both the

Page 152

1                J. Schwaba
2    Southeast Texas bond and the Tennessee Housing
3    and two fixed, which was an average of those two
4    up here you see on the first page. Okay, you
5    see the 35 -- if you look at the OAS, the
6    Regional Transportation Auth Illinois and the
7    Illinois State Dorm, those were our comparables
8    to those two fixed. We decided to default to
9    using that average OAS for those two, so that
10   would apply to both Southeast Texas Housing and
11   Tennessee Housing, notwithstanding the analysis
12   we did for that.
13       Q.    Look at the last page of this
14   document.
15       A.    Okay, the last page of the document
16   refers to the Park Center, which was -- and I'm
17   glad the explanation got here -- Park
18   Development from a valuation perspective we
19   decided to treat as a bullet maturity. Right
20   now it pays a coupon of 1.863, which is well
21   below the LIBOR curve, but on April 14, 2014,
22   that coupon is going to jump to 6 percent, well
23   above the LIBOR forward of 459. On that basis,
24   we could justify it's probably a larger OAS to
25   that, and because it's callable at any time

Page 153

1                J. Schwaba
2    after 4/15/12, we decided to treat it
3    realistically as -- and plus, there's a sinking
4    fund that begins as well, but it's not
5    significant, but the -- we decided to treat it
6    as a bond maturing at 4/15/2014 with a current
7    coupon of 1863 and, therefore, I used a price of
8    86.98, which reflects that OAS 50 that you see
9    there.
10       Q.    What do you mean by a bulletin
11   maturity?
12       A.    Bullet maturity, a bullet maturity
13   means it's a three-year bullet maturity, meaning
14   it matures in three years. Everything stops
15   then. Principal is due. No more coupon
16   payments. And came up with, again, with a price
17   of 103 -- excuse me, 86.98 on that Park Center,
18   which was -- that was the OID ARS, okay.
19       Q.    Uh-huh.
20       A.    And what's interesting about that is
21   we actually had four, as I recollect, we had
22   three or four comparables, but they didn't seem
23   to have any overt bearing to how this -- how
24   this is priced, so we decided we wanted to take
25   the more conservative route and price it

Page 154

1          J. Schwaba
2 accordingly.
3     **Q.   Other --**
4     A.   What's interesting about it also is
5 that, well, if you -- you compare it to both
6 Barclays' and BoNY's as -- you can see that it's
7 not all that -- actually, it's not that really
8 different from what Barclays said here in terms
9 of their -- and BoNY, they're pricing it at 100,
10 so...
11     **Q.   I just want to confirm, that bond,**
12 **when you treat it as paying below LIBOR, is that**
13 **correct, throughout its expected lifespan?**
14     A.   Right.
15     **Q.   And yet you price it above par; is**
16 **that right?**
17     A.   No, Park Center wasn't -- no.  No,
18 that's -- Park Center was -- is below.
19     **Q.   Below par?**
20     A.   That's 86.98.
21     **Q.   I guess that's why I asked the**
22 **question.**
23     A.   The Southeast Texas Housing is at the
24 5.36 cent coupon and that's priced at 103.77.
25     **Q.   And if you take a look at Exhibit 699,**

Page 155

1          **J. Schwaba**
2 **which is your errata sheet, the first CUSIP for**
3 **which you change the values was the 700404AA4**
4 **CUSIP; is that correct?**
5     A.   I believe so, yes.
6     **Q.   And that is the Park Center bond?**
7     A.   That would be, right.
8     **Q.   Okay.  And that reflects that you**
9 **reduced your valuation of that bond by, if I**
10 **remember correctly, around $2 million; is that**
11 **correct?**
12     A.   There was a transposition error I
13 think between the Southeast Texas Housing -- I'm
14 trying to remember if that was the one -- and
15 this center --
16          MR. TAMBE:  Is there a question
17 pending?  I'm not sure.
18          MR. SHAW:  He seemed to be going
19 through --
20     A.   I'm sorry, so your question is again?
21     **Q.   I think you've answered my question.**
22     A.   Okay.
23     **Q.   It's just I thought you seemed to be**
24 **looking at something else.**
25          **Who is your current employer, sir?**

Page 156

1          **J. Schwaba**
2     A.   I'm self-employed.
3     **Q.   Are you not working for Schwaba &**
4 **Associates anymore?**
5     A.   Well, I'm not calling it Schwaba &
6 Associates.  Joseph Schwaba.
7     **Q.   Functionally, it's Schwaba &**
8 **Associates without the associates?**
9     A.   That's actually, yes, pretty true.
10          (Continued on the next page to include
11     the jurat.)

Page 157

1          J. Schwaba
2     **Q.   Why did you leave the Federal Home**
3 **Loan Bank of Pittsburgh?**
4     A.   There was a reorganization at Federal
5 Home Loan Bank and, you know, I got basically
6 reorged out, if you will, and so that was what
7 happened.
8          MR. SHAW:  Thank you very much for
9 your time, sir.
10          THE WITNESS:  Thank you.
11          (Time Noted:  2:03 P.M.)
12              oOo
13
14
15
16
17
18
          _____
          JOSEPH SCHWABA
19
20     Subscribed and sworn to
     before me this    day
21 of      2010.
22
          _____
23
24
25

Page 158

```
 1
 2              CERTIFICATE
 3    STATE OF NEW YORK )
               : ss
 4    COUNTY OF NEW YORK)
 5         I, Kathy S. Klepfer, a Registered
 6    Merit Reporter and Notary Public within and
 7    for the State of New York, do hereby
 8    certify:
 9         That JOSEPH SCHWABA, the witness whose
10    deposition is herein before set forth, was
11    duly sworn by me and that such deposition is
12    a true record of the testimony given by such
13    witness.
14         I further certify that I am not
15    related to any of the parties to this action
16    by blood or marriage and that I am in no way
17    interested in the outcome of this matter.
18         I further certify that neither the
19    deponent nor a party requested a review of
20    the transcript pursuant to Federal Rule of
21    Civil Procedure 30(e) before the deposition
22    was completed.
23         In witness whereof, I have hereunto
24    set my hand this 12th day of April, 2010.
25         -------------------------------
```

Page 159

```
 1
 2                   INDEX
 3    TESTIMONY OF J. SCHWABA:              PAGE
 4    Examination by Mr. Shaw          5
 5
 6    EXHIBITS:                    PAGE
 7    Exhibit 697, Expert Report of Joseph Schwaba   86
 8    Exhibit 698, Expert Report of Joseph Schwaba   86
 9    Errata
10    Exhibit 699, a document bearing Bates Nos.     92
11    LEH-NAVIGANT 026173 Purdue through IL
12    Exhibit 700, a document bearing Bates Nos.    138
13    LEH-NAVIGANT 026165 Sheet 1
14    Exhibit 701, a document bearing Bates Nos.    140
15    LEH-NAVIGANT 026176 Floater
16    Exhibit 702, a document bearing Bates Nos.    148
17    LEH-NAVIGANT 026175 Muni
18
19
20
21
22
23
24
25
```

Page 160

```
 1
 2    NAME OF CASE:  In re:  Lehman Brothers
 3    DATE OF DEPOSITION:  April 12, 2010
 4    NAME OF WITNESS:  Joseph Schwaba
 5    Reason Codes:
 6       1. To clarify the record.
         2. To conform to the facts.
 7       3. To correct transcription errors.
 8    Page _____ Line _____ Reason _____
      From _____ to _____
 9
      Page _____ Line _____ Reason _____
10    From _____ to _____
11    Page _____ Line _____ Reason _____
      From _____ to _____
12
      Page _____ Line _____ Reason _____
13    From _____ to _____
14    Page _____ Line _____ Reason _____
      From _____ to _____
15
      Page _____ Line _____ Reason _____
16    From _____ to _____
17    Page _____ Line _____ Reason _____
      From _____ to _____
18
      Page _____ Line _____ Reason _____
19    From _____ to _____
20    Page _____ Line _____ Reason _____
      From _____ to _____
21
      Page _____ Line _____ Reason _____
22    From _____ to _____
23    Page _____ Line _____ Reason _____
      From _____ to _____
24
25         _____
```

# Exhibit J

**Contains Highly Confidential Information**

**UNITED STATES BANKRUPTCY COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.,* | Case No. 08-013555 |
| Debtors. | (Jointly Administered) |

**Expert Report of**

**Joseph Schwaba**

**March 15, 2010**

**Contains Highly Confidential Information**

## Table of Contents

I.    Introduction…………………………………………………….………....1

II.    Summary of Qualifications……………………………..……………….….………1

III.    Summary of Opinions……………………………………………………….....2

IV.    Opinion and Bases Thereof…………………………………………..………..3

Opinion 1: Barclays' Exit Value Marks Are Incorrect and
Represent A Lack of Proper Analysis and Calculation…….………….....3

A.  Composition of the Municipal Portfolio
and Barclays' Exit Value………………………………..3

B.  Independent Valuation Of Municipal Portfolio…………… 4

Opinion 2: Professor Pfleiderer was Incorrect in Accepting
Barclays' Exit Price Marks………………..………………….....…..6

**Contains Highly Confidential Information**

# LIST OF EXHIBITS AND APPENDICES

**Exhibit I:**          **List of CUSIPs valued**

**Exhibit II:**         **Valuation Results**

**Appendix I:**         **Curriculum Vitae**

**Appendix II:**        **List of Documents Relied Upon**

**Appendix III:**       **Methodology**

**Contains Highly Confidential Information**

# I.      INTRODUCTION

1.      This report is submitted by Joseph Schwaba.  I am an independent consultant working with Navigant Economics (Chicago Partners), a subsidiary of Navigant Consulting, Inc., which specializes in the application of accounting, economics, and finance to business consulting, legal, and regulatory issues.

2.      I have been asked by counsel for the Movants to undertake a valuation of certain of the municipal securities Barclays' acquired as part of the Sale Transction.[1]  Relatedly, I also reviewed the methodologies, procedures, and data Barclays used to value these same municipal securities and  reviewed Barclays' expert Professor Paul Pfleiderer's report, dated January 8, 2010 (hereafter the "Pfleiderer Report"), which approves Barclays' methodologies, procedures, and data.


# II.     SUMMARY OF QUALIFICATIONS

3.      My main area of expertise is in fixed income capital markets, including expertise in municipal bonds.

4.      Before beginning my career in banking and fixed income capital markets, I graduated from the University of Notre Dame in 1967 with a degree in Economics.  After serving as an officer in the US Marine Corps, I received an MBA in Finance from the Kellogg Graduate School of Management at Northwestern University in Evanston, Illinois.

---

[1] I submit this report on behalf of (a) Lehman Brothers Holdings, Inc. (the "Debtor" or "LBHI"; (b) James W. Giddens, as Trustee for the Securities Investor Protection Act Liquidation of Lehman Brothers Inc. (the "Trustee"); and (c) the Official Committee of Unsecured Creditors of Lehman Brothers Holdings, Inc. and its affiliated debtors and debtors in possession (the "Creditors' Committee," together with LBHI and the Trustee, the "Movants") in connection with Movants' motions filed under Federal Rule of Civil Procedure 60(b) (the "Rule 60(b) Motions"). In the Rule 60(b) Motions, Movants' seek relief from the Order Under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) the Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, dated September 20, 2008 (the "Sale Order").  In the Sale Order, the Court approved the sale (the "Sale Transaction") of certain assets of LBHI, LB 745 LLC, and Lehman Brothers Inc. ("LBI," and together with LB 745 LLC and LBHI, the "Sellers," and together with LBHI's various other foreign and domestic affiliates, "Lehman") to Barclays Capital Inc. ("Barclays") in accordance with the terms set forth in an Asset Purchase Agreement, dated as of September 16, 2008 ("Asset Purchase Agreement") and related agreements, modifications and purported "clarification[s]" thereof.

**Contains Highly Confidential Information**

5.     After managing profitable businesses in the fixed income and derivative markets at firms such as AG Becker (since merged into Merrill Lynch), Prudential-Bache Securities (now Prudential Financial), and Continental Bank (since acquired by Bank of America), I started my own institutional advisory business which focused on market-based risk management in the fixed income capital markets, which included managing a wide range of projects related to fixed income and derivative products, as well as providing some expert testimony.  Most recently I was a Director of Corporate Risk Management at the Federal Home Loan Bank – Pittsburgh.

6.     Chicago Partners charges an hourly rate of $580 for my time.  Other Chicago Partners professionals, working under my direction and supervision, assisted in my analyses and Chicago Partners was or will be compensated for their work at their customary hourly rates.  Our compensation is not contingent in any way upon the outcome of this matter.

7.     My experience is described in more detail in my curriculum vitae, which is attached as Appendix I.


## III.    <u>SUMMARY OF OPINIONS</u>

8.     My analysis of Barclays' valuation of the municipal securities acquired in the Sale Transaction results in the following conclusions:

- Barclays undervalued the municipal bonds it acquired from Lehman by at least $152 million.

- Barclays applied an arbitrary and excessive twenty percent "liquidity discount" in determining the "exit values" of all but five municipal adjustable rate securities (hereafter "ARS").  The market for municipal bonds on September 19, 2008 did not support across-the-board haircuts of this magnitude.  In fact, many comparable municipal securities were trading at or close to par.

- Barclays priced the remaining five ARS, one fixed rate municipal bond and one $75 million floating rate bond at close to zero when, in fact, their market values were $43,295,720, $3,093,415 and $61,336,500 respectively.

---

**Contains Highly Confidential Information**

- Barclays' valuations are further flawed by their inappropriate use of September 22, 2008 as the valuation date.

- My valuations are based on observed market prices for comparable municipal bonds on September 19, 2008.  As a result, they are better measures because they are based on actual traded prices.

- The Pfleiderer Report erred by accepting Barclays' flawed exit values for municipal bonds, and its opinions should be disregarded.

IV.     **OPINION AND BASES THEREOF[2]**

**Opinion 1: Barclays' Exit Value Marks Are Incorrect And Represent A Lack Of
Proper Analysis And Calculation**

A.  COMPOSITION OF THE MUNICIPAL PORTFOLIO AND BARCLAYS' EXIT
VALUE

9.      Barclays acquired a municipal bond portfolio (hereafter the "Municipal Portfolio") of twenty-six securities with a principal value of $382,353,446.[3]  These municipal securities consisted of twenty adjustable rate bonds, one floating rate bond, three zero coupon bonds, and two fixed rate bonds.  All of these bonds had maturities in excess of seven years and, based on the data I have reviewed, were investment grade.

---

[2] My analysis in this matter is ongoing and I reserve the right to supplement my analysis in response to any newly produced evidence or in rebuttal to any further opinions offered by Barclays' witnesses.  I also reserve the right to do a more comprehensive CUSIP-by-CUSIP valuation, if necessary, of those securities I did not independently value for purposes of my report.  In reaching my opinions, I have conducted my valuation of the securities based on closing prices on September 19, 2008 for settlement on that date.  I have reviewed the available data regarding market conditions from the close of business in the United States on Friday, September 19, 2008 to the opening of business in the United States on Monday, September 22, 2008 and have concluded that any valuations which are based on closing prices on September 19, 2008 would not change materially.

[3] There are twenty-six municipal bonds that make up the "Municipal Portfolio".  Nineteen are municipal bonds that were a part of the Sale Transaction on September 22, 2008 that had a dollar value difference greater than $1,000,000 between the absolute value derived by BoNY and that of Barclays.  Seven represent an analogous grouping of municipal bonds that are all priced at one tenth of a cent and are attached to the bottom of the "Rates" tab of BCI-EX-0099519 (Dep. Ex. 86B). This analogous group drew my special attention in addition to the nineteen that exceeded the $1,000,000 threshold.

**Contains Highly Confidential Information**

10.     Barclays' value for the Municipal Portfolio (hereafter "Barclays' Exit Value") was $191,220,214.[4]

11.     Barclays applied a uniform twenty (20) percent liquidity discount to fifteen of the twenty ARS in the Municipal Portfolio, and valued the remaining five (5) ARS at close to zero (i.e., one tenth of a cent per $100 face value).  In addition, Barclays valued the Massachusetts Floating Rate Bond (hereafter the "floating rate bond")[5] at close to zero (i.e., $750, or one tenth of a cent per $100 face value).  However, despite the magnitude of these mark downs, I have not seen a basis, documentation, or any justification for this pricing approach.

12.     Given the number of municipal bonds traded on September 19, 2008, and after reviewing the related pricing data, I conclude that these haircuts were excessive and without proper justification, regardless of any perceived concerns regarding liquidity in the marketplace.

13.     Market conditions on and around September 19, 2008 undoubtedly affected the liquidity of municipal securities.  However, such concerns should have been reflected in their market prices.  As a result, I believe that the securities' actual market prices on September 19, 2008 are the best indicators for valuing the Municipal Portfolio.  In fact, many comparable municipal ARS were trading at or close to par, which does not support Barclays' twenty percent across-the-board haircut or a price of one tenth of a cent.

## B.  INDEPENDENT VALUATION OF MUNICIPAL PORTFOLIO

14.     I have conducted an independent valuation of each of these twenty-six municipal bonds.

15.     In my opinion, based on actual traded prices these bonds had a value of $343,303,233 on September 19, 2008.  Barclays' Exit Value for these bonds was $191,220,214, or $152,083,019 less than my independent valuation.[6]  This $152,083,019 difference represents the extent to which the Barclays' Exit Values underestimated the value of the Municipal Portfolio at the time of the Sale Transaction.

---

[4] The Barclays' Exit Price marks for the twenty-six CUSIPS comprising the Municipal Portfolio can be found in underlying spreadsheets rolling up to Barclays' Sale Transaction balance sheet.  BCI-EX-0099519 (Dep. Ex. 86B).
[5] See Appendix III for a breakdown of my methodology.
[6] The results of my valuation are summarized in Table 1 and are attached to this Report as Exhibit II.

---

**Contains Highly Confidential Information**

| Table 1 | | | | |
|---|---|---|---|---|
| **Bond Type** | **# of Bonds** | **Correct Valuation** | **Barclays' Exit Value** | **Valuation Difference** |
| **Municipal Bonds** | 26 | $ 343,303,233 | $191,220,214 | $152,083,019 |

16.     My prices, unlike Barclays', are based on observed market prices for comparable securities on September 19, 2008.  My use of actual market prices to value municipal bonds explains most of the differences between my valuations and Barclays' Exit Values for these same securities.

17.     Using data available from the Municipal Securities Rulemaking Board ("MSRB"), accessed by means of Bloomberg Research systems, I was able to observe prices on 12,416 municipal securities that traded on September 19, 2008.  These securities had an average price of 99.05.  Some 1,664 were adjustable rate municipal bonds, which traded at an average price of 99.89.  Many of these bonds had characteristics that were very similar to ARS that were part of the Municipal Portfolio, and thus served as appropriate proxies for my valuations.

18.     $83,631,151 of the difference between my valuations and Barclays' can be attributed to my use of market prices that were at or close to par for the ARS.  These market prices reflect the price of similar municipal ARS that traded on September 19, 2008.  While there were concerns regarding liquidity, the large number of trades on that day clearly demonstrates that markets were functioning and that buyers and sellers could find opportunities to trade at market prices.  Thus, market data provides the best and most accurate way to assess the value of the Municipal Portfolio under these market conditions.

19.     Based on my analysis of these comparable securities, I conclude that the ARS in the Municipal Portfolio had a value based on actual traded prices of $242,287,584 on September 19, 2008.

20.     Another $61,335,750 of the difference between my valuations and Barclays' can be attributed to my use of market data in my valuation of the floating rate bond.  This floating rate bond had a notional amount of $75,000,000, but was priced by Barclays at a level of one tenth of

a cent.  However, based on widely accepted bond valuation methods, benchmark interest rate
data, and market price data on comparable bonds that traded on September 19, 2008, I conclude
that this bond is accurately priced at a level of 81.78, given market conditions at that time.

21.    Barclays based its price for the floating rate note on the Bank of New York's (hereafter
"BoNY")[7] valuation ($750, or one tenth of a cent.)  However, based on the production
documents I have reviewed[8], Barclays seems to have obtained—but rejected—a separate, third-
party price of 71.56 made through Financial Times Interactive Data (hereafter "FTID") that
would have led to a valuation of $53,667,000, which is similar to my value of $61,336,500.  The
only instances in the Municipal Portfolio in which Barclays accepted BoNY's valuations were
for the seven municipal bonds (the floating rate bond, one fixed rate bond and five ARS) that
were priced by BoNY at one tenth of a cent. This once more reveals a lack of proper analysis and
calculation by Barclays, and is an example of Barclays' picking and choosing values
subjectively.

22.    Finally, $7,166,118 of the difference between my valuations and Barclays' can be
attributed to my use of market data to price the three zero coupon bonds and two fixed coupon
bonds.

23.    My valuation approach is fully consistent with industry practices.  I began by determining
the key characteristics of the bonds, including their maturity, credit rating (as of September 19,
2008), geographic location (defined by issuer and municipality), issue type (General Obligation
vs. Revenue Bond) and revenue sources.  I then used this data to identify bonds that could serve
as "proxies" for these securities.  Out of the 1,664 municipal ARS that traded on September 19,
2008 and had the requisite data, I selected one hundred fifty-four trades to use as proxies.  In
selecting these proxies, I attempted to find securities that matched the characteristics of the
bonds of the Municipal Portfolio as closely as possible.  The number of proxies that I used to
value a given security ranged from a low of three to a high of twenty-four, with an average of
eight and a half.

24.    Once I had constructed a proxy bond universe for each bond in the Municipal Portfolio, I
obtained the traded market prices of the underlying securities, and calculated the mean for each

---

[7]BoNY is the custodial bank of the Lehman Brothers assets held in repo.  The BoNY prices reflect the value
attributed to securities in the Municipal Portfolio by BoNY as of September 19, 2008.
[8] BCI-EX-0099519 (Dep. Ex. 86B).

**Contains Highly Confidential Information**

set of proxy bonds. Once I had determined that the proxy price was reasonable, I multiplied the derived market price by the notional principal to obtain a value based on market traded prices for each adjustable rate bond of the Municipal Portfolio. My approach was similar for the floating rate note, fixed, and zero coupon bonds in that, as part of the bond valuation process, I referenced market traded prices, spreads, and yields of comparable bonds to help establish a reasonable market price. Once I had determined that the market price was reasonable, I multiplied the market price by the notional principal to obtain a value based on market prices for these types of bonds.

### Opinion 2: Professor Pfleiderer Was Incorrect In Accepting Barclays' Exit Price Marks

25.    The Pfleiderer Report did not independently value any of the bonds in the Municipal Portfolio. To the contrary, the Pfleiderer Report failed to provide any documentation or supporting analysis to justify the values in the portfolio except to accept the exit values provided by Barclays. These exit prices imposed excessive liquidity haircuts on all of the ARS in the portfolio, and erroneously valued seven of the securities at one tenth of a cent on September 19, 2008.

26.    Reliance on actual market data explains most of the differences between my valuation and Barclays' Exit Values. Since my valuations were grounded in observable market data and Barclays' were not, the Pfleiderer Report's opinions on these securities should be disregarded.

Submitted by:

Joseph Schwaba
March 15, 2010

Contains Highly Confidential Information

**Appendix I**

**Curriculum Vitae**

**JOSEPH SCHWABA**

Residence:  412-220-7741

1305 Wellington Drive

Cell:  412-841-1925

Upper St. Clair, PA  15241

Email:  joeschwaba@yahoo.com

## SUMMARY

Senior financial markets executive with leadership and management experience in all aspects of trading, risk management, and marketing of securities and derivative products.  Extensive background in the successful management of capital markets and derivative businesses, with expertise in proprietary risk management, product development, and the successful execution of trading and marketing strategies.

## PROFESSIONAL EXPERIENCE

FEDERAL HOME LOAN BANK OF PITTSBURGH – Pittsburgh, PA                    2003 – 2009

*A Government Sponsored Enterprise chartered by Congress to assure the flow of liquidity through its member financial institutions into the American housing market.*

### Director, Corporate Risk Management

Managed the Corporate Risk Return Department: responsible for all aspects of interest rate risk management, including modeling, measurement, and reporting of market risk, earnings risk, and risk-based capital adequacy to senior bank management.

- Significantly expanded the quality and quantity of staffing to achieve business objectives.

Expert Report of Joseph Schwaba

Contains Highly Confidential Information

- Successfully oversaw the transition to a more complete, up-to-date asset liability modeling system that became the Bank's primary system for interest rate risk management and risk-based capital analysis, management, and reporting.
  - ➢ Coordinated the approval of the new asset liability modeling system with the Bank's regulator, the Federal Housing Finance Agency (FHFA).
  - ➢ Transition and subsequent system upgrades were done on time and within budget.
- Department was recognized as increasingly integral to the analytical process involved in management decisions regarding valuation, earnings, and capital management through expanded and more comprehensive risk analysis.
- Voting member of Bank's Asset Liability Committee, and member of the Pricing and Market Risk Advisory sub-committees.

SCHWABA & ASSOCIATES – Chicago, IL                                   2000 – 2003
*Trading & Risk Management Advisory Services*

<u>**President**</u>

Advised and trained clients on the use of derivative products to improve Treasury and Portfolio risk management.  Client business activity included:

- Providing expert testimony in four selected NYSE and NASD Arbitration cases.
- Trading advisor and manager in a Predictive Model joint venture with an established option/equity trading firm and an innovative software company, specializing in pattern recognition of publicly-traded stock prices.
- Advising major equity option trading and market making firm on trading OTC derivatives related to market volatility.
- Successfully locating a global financial institution to become equity investor and strategic business partner with this newly created firm specializing in origination and distribution of fixed income products to retail investors

Expert Report of Joseph Schwaba

Contains Highly Confidential Information

ABN AMRO NORTH AMERICA – Chicago, IL                              1996 – 1999

*Financial sector leader for large global bank enhancing its capital management and market presence in key strategic areas.*

### Senior Vice President

Developed new markets supporting business direction of Company.

- Started and managed over-the-counter derivatives collateralization as a key strategic business initiative, including effects on risk-based capital.  Represented Bank as one of ten charter members of the Chicago Mercantile Exchange (CME) Depository Trust Company.
- Developed structured investment products for Capital Markets and selected Commercial Banking Departments.

SCHWABA & ASSOCIATES – Chicago, IL                              1991 – 1995

*Trading & Risk Management Advisory Services.*

### President

Advised and trained clients on the use of derivative products to improve Treasury and Portfolio risk management.  Client business activity included:

- Developing a strategy-based business framework for building profitable relationships with financial institutions.  Participated in preliminary design of a global, multi-currency depository to collateralize OTC derivative transactions.
- Arranging and advising on prospective Sale Transaction related to over-the-counter (OTC) equity derivative market making.
- Advising a Chicago-based equity index/option market making firm regarding entry and participation in OTC equity derivatives market making.
- Training of personnel in Capital Markets financial products.

Expert Report of Joseph Schwaba

Contains Highly Confidential Information

- Development of proprietary fixed income risk management software for senior management.
- Development of a global derivatives products business plan for a major Asian bank.

BANK OF AMERICA (formerly Continental Bank) – Chicago, IL                    1986 – 1990

*Provider of banking and financial services to individuals, small businesses, and commercial, corporate, and institutional clients.*

### **Managing Director**

Established Continental as one of the pre-eminent firms in marketing risk management services to US corporate customers.

- Grew business from zero revenues in 1987 to revenues of $60mm in 1990.
- Drove business profitability to a net operating income of $30mm, and return on equity was in excess of 150%, one of Continental's most profitable businesses.
- Managed the training and education of over 200 relationship managers and support personnel for marketing derivative products by partnering with the Bank's corporate banking department.
- Managed Continental's Primary Dealer business involving the trading, underwriting, and distribution of US Treasury and US Government Agency securities.

## **EDUCATION**

*MBA (Finance)* – Northwestern University, Chicago, IL

*BA (Economics)* – University of Notre Dame, South Bend, IN

## **MILITARY**

First Lieutenant – US Marine Corps

Expert Report of Joseph Schwaba

Contains Highly Confidential Information

Air Traffic and Air Defense Control – South Vietnam


# **ADDENDUM**


### *Professional Registrations*


- Series 3; registered as an Associated Person of the Commodity Futures Trading Commission (CFTC) (1978-2001)
- Series 7, registered as a General Securities Representative of the National Association of Securities Dealers (NASD) (1978-1991) (1996-2001)
- Series 63, registered as a Uniform Securities Agent under the Uniform Securities Act (1996-2001)
- Registered with the Commodity Futures Trading Commission (CFTC) as a Commodity Trading Advisor (1992-1996) and Introducing Broker (1992-1994)
- Series 8, registered as a Limited Principal, General Securities Sale Supervisor (NASD) (1985-1991)


### *Professional Memberships*


- Member, International Monetary Market of the Chicago Mercantile Exchange (1983-1990), Interest Rate Options Committee (1985), Interest Rate Futures Committee (1986-1987)
- Associate Member, Chicago Board of Trade (1986-1990)
- Public Securities Association Primary Dealers Committee (1986-1988), Options Committee (1988)
- Member, New York Futures Exchange (1983-1985)


Expert Report of Joseph Schwaba

**Appendix II**
**Documents Relied Upon**

Contains Highly Confidential Information

**Documents in the Record**

Depositions

| Deponents | Date |
|---|---|
| Paul Pfleiderer | 2/23/2010 |

Deposition Exhibits

| Exhibit | Beginning Bates | Ending Bates |
|---|---|---|
| 86B - Initial Inventory, Schedule A and B Assets | BCI-EX-00099519 | BCI-EX-00099521 |
| 533A - Lehman Acquisition Assets Summary | BCI-EX-00295932 | BCI-EX-00295933 |
| 25 - Clarification Letter | | |
| 24 - First Amendment to the Asset Purchase Agreement | | |
| 495 - Debtor's Motion for an Order, Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024, Modifying the September 20, 2008 Sale Order and Granting Other Relief, September 15, 2009 | | |
| 633A Report of Paul Pfleiderer, Volume 1, dated Jan. 8, 2010 | | |
| 634A Report of Paul Pfleiderer, Volume 2, dated Jan. 8, 2010 | | |

Other Documents

| Description | Beginning Bates | Ending Bates |
|---|---|---|
| Barclays Capital Valuation Methodology | BCI-EX-(S)-00213991 | BCI-EX-(S)-00213992 |
| Review of Barclay's Capital Price Testing Methodology and Framework | PwC-BarCapWP- 00022935 | |
| Motion of Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al., Pursuant to 11 U.S.C. § 105(a), Fed. R. Civ. P. 60(b), and Fed. R. Bankr. P. 9024, for Relief from Order Under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006, dated Sept. 15, 2009 | | |
| Debtors' Adversary Complaint, dated Nov. 16, 2009 | | |
| Official Committee of Unsecured Creditors' Adversary Complaint, dated Nov. 16, 2009 | | |
| The Trustee's Adversary Complaint, Nov. 16, 2009 | | |
| The Trustee's Motion for Relief Pursuant to the Sale Orders or, Alternatively, for Certain Limited Relief Under Rule 60(b), September 15, 2009 | | |

**Documents that are Publicly Available**

Investinginbonds.com

**Other Documents Not Cited in the Record and Not Publicly Available**

Lehman Brothers Municipal Market Commentary, September 5, 2008
Barclays Capital Municipal Market Commentary, October 3, 2008
Bloomberg L.P. Data
Investinginbonds.com.xlsx
Schwaba_Market Inputs.pdf

Contains Highly Confidential Information

## Appendix III

## Methodology

## I.    Adjustable Rate Securities

27.    Regular auctions of ARS are designed to reset the coupon on the bonds to reflect current market conditions and the credit worthiness of the borrowers.  A dealer conducts an auction to set the rate.  Investors specify the lowest rate they will accept to hold the bonds until the next auction.  Typically, the broker conducting the auction begins with the customers submitting the lowest yields and accepts their commitment to invest.  The broker then accepts commitments from customers bidding successively higher rates until the amount of accepted bids equals the amount of bonds being auctioned.  Usually, the accepted investors all earn the highest accepted rate at the auction.

28.    Investors that held bonds at the time of the auction will retain their position if they are among the accepted bidders.  Investors that held bonds at the time of the auction but were not among the accepted bidders will transfer their bonds to new owners and receive $100 per $100 notional plus previously accrued income. The auction process sets the rate consistent with a price at par (100 percent of face value).

29.    The auction process makes the prices of many ARS close together and close to par.  However, the rates assigned by the auction process are not equal across companies and over time.  Instead, the rates reflect the specific credit risk of individual bonds and the market conditions.

30.    Some auctions cannot set a coupon rate at a level where investors are willing to accept all the bonds being auctioned.  This is called a failed auction.  Failed ARS would trade below par and may be subject to restricted liquidity.  There also is a maximum auction rate established for each bond.

31.    Given the lack of uniformity for securities with coupon rates set by auction process in the ARS market, I used a market-price approach to value the ARS in the Municipal Portfolio.  I first determined key characteristics of each bond in the portfolio, including auction history, on or around September 19, 2008.  I then used the MSRB data base to determine proxy bonds reflecting key characteristics of each Municipal Portfolio security on September 19, 2008.

Expert Report of Joseph Schwaba

Contains Highly Confidential Information

I then obtained traded market prices for each of these proxy bonds and calculated the mean for the prices of each set of proxy bonds. I then multiplied the derived market price by the notional principal to obtain a dollar market value for each ARS.

## II.    Zero Coupon Bonds

32.    The Municipal Portfolio includes three issues that pay no explicit coupon. Instead, the bonds are traded at a discount from par.  The investor expects to receive the face value of the bonds and the difference between the face value and the market price reflects the interest the investor expects to earn over the life of the investment.

33.    The positions were valued using market interest rates.  Specifically, the rate reflects LIBOR (the London Interbank Offered Rate) plus a spread reflecting the credit conditions of the issuing municipality.  The proper spread is determined by reviewing prices of comparable bonds that traded on September 19, 2008 to calibrate the pricing model used to price the zero coupon bonds.

## III.    Fixed Coupon Bonds

34.    Fixed coupon bonds are valued much like zero coupon bonds, except that the LIBOR curve provides inputs for pricing multiple cash flows (regular coupons and repayment of principal).  As with the zero coupon bonds, the bonds are priced at a spread above the LIBOR rates reflecting the credit conditions of the issuer.  The spread is determined by observing the prices of comparable issues and calibrating the model to accurately price the comparable bonds, and then apply the model to the fixed coupon bonds in the position.

## IV.    Floating Rate Notes

35.    The first step in valuing the floating rate bonds is to forecast all of the coupons up to maturity. The method used is commonly used in pricing floating rate notes and reflects the LIBOR curve. These projected coupons provide a basis for calculating cash flows. These projected cash flows and the principal payments are discounted at rates determined from the LIBOR curve and include a spread to reflect the credit conditions of the individual issuers. The

Expert Report of Joseph Schwaba

Contains Highly Confidential Information

spread is determined by applying the same method to value comparable bonds to calibrate the
floating rate pricing model.

Expert Report of Joseph Schwaba

| Asset Class | CUSIP |
|---|---|
| **Municipal Bonds** | 57582PJQ4 |
| | 254839J87 |
| | 373109BJ5 |
| | 196479ME6 |
| | 239427AG2 |
| | 764595AA2 |
| | 656178BE9 |
| | 798111AU4 |
| | 64986MUV5 |
| | 13033EKM4 |
| | 700404AA4 |
| | 917436CZ8 |
| | 517840D76 |
| | 649842AT8 |
| | 61213EFP4 |
| | 927781CQ5 |
| | 91754RLP0 |
| | 45200KZ35 |
| | 880459B35 |
| | 254839J87 |
| | 656178BE9 |
| | 841513LJ1 |
| | 574217JB2 |
| | 709223TC5 |
| | 7178182U1 |
| | 746189HG7 |
| **Total Sum** | **26** |

Expert Report of Joseph Schwaba

| Asset Class | CUSIP | Chicago Partners Bid Value 09/19/08 | Barclays Bid Value | Difference between Chicago Partners and Barclays Values (bid to bid) |
|---|---|---|---|---|
| Municipal Bonds | 57582PJQ4 | $61,336,500.00 | $750.00 | $61,335,750.00 |
| | 254839J87 | $42,290,904.78 | $33,780,000.00 | $8,510,904.78 |
| | 373109BJ5 | $32,782,493.70 | $26,120,000.00 | $6,662,493.70 |
| | 196479ME6 | $23,480,000.00 | $18,784,000.00 | $4,696,000.00 |
| | 239427AG2 | $9,813,504.30 | $8,604,300.00 | $1,209,204.30 |
| | 764595AA2 | $10,700,400.00 | $9,100,000.00 | $1,600,400.00 |
| | 656178BE9 | $19,450,000.00 | $15,560,000.00 | $3,890,000.00 |
| | 798111AU4 | $12,216,611.10 | $11,683,200.00 | $533,411.10 |
| | 64986MUV5 | $14,125,000.00 | $141.25 | $14,124,858.75 |
| | 13033EKM4 | $12,350,000.00 | $9,880,000.00 | $2,470,000.00 |
| | 700404AA4 | $12,834,120.00 | $9,880,000.00 | $2,954,120.00 |
| | 917436CZ8 | $11,970,000.00 | $9,576,000.00 | $2,394,000.00 |
| | 517840D76 | $10,000,000.00 | $8,000,000.00 | $2,000,000.00 |
| | 649842AT8 | $8,397,144.00 | $6,720,000.00 | $1,677,144.00 |
| | 61213EFP4 | $7,237,051.50 | $5,800,000.00 | $1,437,051.50 |
| | 927781CQ5 | $6,524,955.20 | $5,216,000.00 | $1,308,955.20 |
| | 91754RLP0 | $6,400,000.00 | $5,120,000.00 | $1,280,000.00 |
| | 45200KZ35 | $5,100,000.00 | $4,080,000.00 | $1,020,000.00 |
| | 880459B35 | $3,855,187.50 | $3,175,500.00 | $679,687.50 |
| | 254839J87 | $125,195.10 | $100,000.00 | $25,195.10 |
| | 656178BE9 | $50,000.00 | $40,000.00 | $10,000.00 |
| | 841513LJ1 | $3,093,446.00 | $30.93 | $3,093,415.07 |
| | 574217JB2 | $5,200,000.00 | $52.00 | $5,199,948.00 |
| | 709223TC5 | $8,000,000.00 | $80.00 | $7,999,920.00 |
| | 7178182U1 | $7,971,520.00 | $80.00 | $7,971,440.00 |
| | 746189HG7 | $7,999,200.00 | $80.00 | $7,999,120.00 |
| **Total Sum** | **26** | **$343,303,233.18** | **$191,220,214.18** | **$152,083,019.00** |

# Exhibit K

Page 1

1

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4     ----------------------x

5     In Re:

6                              Chapter 11

7     LEHMAN BROTHERS          Case No. 08-13555(JMP)

8     HOLDINGS, INC., et al.,   (Jointly Administered)

9

                 Debtors.

10

      -----------------------x

11

12

13          DEPOSITION OF JOHN J. SCHNEIDER

14               New York, New York

15                April 12, 2010

16

17

18

19

20

21

22

23    Reported by:

24    KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25    JOB NO. 29650B

## Page 2

```
 1
 2              April 12, 2010
 3              2:23 p.m.
 4
 5          Deposition of JOHN J. SCHNEIDER,
 6      held at the law offices of Boies
 7      Schiller & Flexner, LLP, 575 Lexington
 8      Avenue, New York, New York, before Kathy S.
 9      Klepfer, a Registered Professional
10      Reporter, Registered Merit Reporter,
11      Certified Realtime Reporter, Certified
12      Livenote Reporter, and Notary Public
13      of the State of New York.
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1
 2
 3              A P P E A R A N C E S:
 4
 5      JONES DAY, LLP
 6      Attorneys for Lehman Brothers, Inc.
 7          222 East 41st Street
 8          New York, New York  10017-6702
 9      BY:  JAYANT W. TAMBE, ESQ.
10          BART GREEN, ESQ.
11
12      BOIES, SCHILLER & FLEXNER, LLP
13      Attorneys for Barclays
14          5301 Wisconsin Avenue, N.W.
15          Washington, D.C.  20015
16      BY:  JONATHAN M. SHAW, ESQ.
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1
 2      A P P E A R A N C E S:  (Cont'd.)
 3
 4      QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
 5      Attorneys for the Creditors Committee
 6          51 Madison Avenue
 7          22nd Floor
 8          New York, New York  10010
 9      BY:  ROBERT K. DAKIS, ESQ.
10
11      HUGHES, HUBBARD & REED, LLP
12      Attorneys for the SIPA Trustee
13          One Battery Park Plaza
14          New York, New York  10004-1482
15      BY:  SAMUEL C. McCOUBREY, ESQ.
16
17
18      ALSO PRESENT:
19          MARC VELLRATH, FSG
20
21
22
23
24
25
```

## Page 5

```
 1                  J. Schneider
 2      JOHN J. SCHNEIDER, called as a
 3          witness, having been duly sworn by a Notary
 4          Public, was examined and testified as
 5          follows:
 6      EXAMINATION BY
 7      MR. SHAW:
 8          Q.  Please state your name, sir.
 9          A.  John Schneider.
10          Q.  Good afternoon, Mr. Schneider.  I'm
11      Jonathan Shaw.  We met off the record.  I
12      represent Barclays Capital in this matter.
13              Have you ever been deposed before,
14      sir?
15          A.  Just once.
16          Q.  And when was that?
17          A.  It was in December of 2007.
18          Q.  And that was in connection with what?
19          A.  It was the Man Financial against
20      Philadelphia Asset Management.
21          Q.  And that's the case which is reported
22      as expert witness experience --
23      Deposition/Testimony Experience on your resumé?
24          A.  That is correct.
25          Q.  What did that case involve?
```

Page 6

1          **J. Schneider**
2      A.   It involved a fraudulent activity of
3  an asset manager and the impact on -- that the
4  administrator, at least that was my position in
5  the matter, might have had in perpetrating
6  fraud.
7      **Q.   And so the area of your --**
8      A.   Expertise.
9      **Q.   -- expert testimony was what?**
10     A.   It was the responsibilities of an
11 administrator.
12     **Q.   When you say an administrator, you**
13 **mean?**
14     A.   In the context of a hedge fund, an
15 administrator typically does fund accounting and
16 custody, amongst other activities, potentially.
17     **Q.   As we go forward today, obviously I'm**
18 **going to ask you questions.  To the extent that**
19 **any of my questions aren't clear to you, please**
20 **let me know that and I'll try and do a better**
21 **job of formulating them.**
22          **Also, although I think this will be a**
23 **relatively short deposition, if at any point you**
24 **want to take a break, just let me know and we'll**
25 **take a break.**

Page 7

1          **J. Schneider**
2      A.   Thank you.
3      **Q.   What specific experience have you had**
4  **reviewing repo transactions?**
5      A.   Specifically in many of the activities
6  that I've performed currently at Navigant, for
7  example, I would be involved in the investment
8  of those -- in mutual funds' and hedge funds'
9  portfolio assets into a repo transaction.  Along
10 with that at Navigant I would pass that through
11 to the service provider and review the valuation
12 activities provided by those service providers.
13          MR. TAMBE:  Are you asking current
14     experience or just all experience.
15          MR. SHAW:  All experience.
16     **Q.   Anything else?**
17     A.   Certainly.  If you take that a step
18 further, while at Brown Brothers, we were a
19 service provider to both mutual funds and hedge
20 funds, and the same would apply there, where the
21 responsibilities in, particularly within the
22 fund accounting teams would be to value
23 portfolios, strike a net asset value.  Amongst
24 other things included in those activities would
25 be the marking of collateral, for example,

Page 8

1          J. Schneider
2  specifically to repo transactions and as well at
3  Brown Brothers they had a securities -- they
4  were a securities lending agent, and the same
5  types of responsibilities apply there.
6          And I could take it a step further to
7  Citibank.  Again, Citibank, as a service
8  provider, they would provide the same types of
9  service for all types of asset classes,
10 including securities loaning transactions and
11 repo transactions.  And that was the majority of
12 my experience throughout my 23 years of
13 experience, ex prior to Citibank, which was
14 scholastic, and Price Waterhouse.
15     **Q.   Have you ever done any work for a repo**
16 **custodian?**
17          MR. TAMBE:  Objection to the form of
18     the question.
19          You can answer.
20          MR. DAKIS:  Same objection.
21     A.   Can you be more specific?
22     **Q.   Yes.  Have you ever worked for any**
23 **financial entity that served as a repo custodian**
24 **either as an employee or as a consultant?**
25     A.   I'm not sure I'm clear on the question

Page 9

1          J. Schneider
2  still.
3      **Q.   Is it your understanding -- well, can**
4  **you identify for me the repo custodian's,**
5  **custodial banks that do business in the United**
6  **States?**
7      A.   There are several.
8      **Q.   Okay.**
9      A.   Two of which I have opined on include
10 Bank of New York and JPMorgan.
11     **Q.   Have you ever done any work for Bank**
12 **of New York in the repo area?**
13     A.   Bank of New York I did not do work in
14 the repo area.  However, I have done some work
15 in Bank of New York around the securities
16 lending activities that they conduct.
17     **Q.   What have you done for Bank of New**
18 **York on securities lending?**
19     A.   We're currently engaged and just
20 broadly speaking we're looking at the investment
21 restrictions associated with securities lending
22 activities.
23     **Q.   Okay.  And have you done any work for**
24 **JPMorgan in the repo area?**
25     A.   Yes, I would say yes, in that I was

Page 10

1          J. Schneider
2  engaged by JPMorgan to do a review of their
3  mutual fund, and as such, within their mutual
4  funds, they often invested in repo transactions.
5  Those repo transactions were typically serviced
6  through their affiliated service provider.
7      **Q.   Is a securitized lending transaction**
8  **the same as an overnight repo transaction?**
9          MR. DAKIS:  Objection to form.
10         MR. TAMBE:  Objection to form.
11     A.   Can you repeat the question?
12  Securitized lending?
13     **Q.   I'm sorry.  Is a security lending**
14  **transaction different from an overnight repo**
15  **transaction?**
16         MR. DAKIS:  Objection to the form.
17         MR. McCOUBREY:  Objection to the form.
18     A.   If the question is what are the
19  nuances of servicing a securities lending
20  transaction and how is that different than
21  servicing a repo transaction, there are very
22  subtle differences.  They are both designed to
23  take collateral, and the offset to that
24  collateral is to take on cash in the case of
25  securities lending.  In a repo transaction, it

Page 11

1          J. Schneider
2  is a loan that's being extended against
3  collateral.  In both cases the collateral is
4  being managed by a service provider, and
5  typically that's a custodial servicing agent.
6      **Q.   What specific experience have you had**
7  **reviewing processes in place to ensure that only**
8  **appropriate collateral is accepted on behalf of**
9  **tri-party repo custodians?**
10         MR. DAKIS:  Objection to form.
11     A.   Can you repeat the question?
12     **Q.   Sure.  What specific experience have**
13  **you had reviewing processes in place to ensure**
14  **that only appropriate collateral is accepted on**
15  **behalf of tri-party repo custodians?**
16         MR. DAKIS:  Same objection.
17     A.   I think the answer to the question is
18  what experience do I have in marking securities
19  or managing collateral pools, and I have
20  significant experiences.  Firstly, at Navigant,
21  where I just mentioned with Bank of New York.  I
22  have done that with Brown Brothers Harriman,
23  where I actually was responsible as the internal
24  audit head of their investor services business
25  line in helping to implement the securities

Page 12

1          J. Schneider
2  lending business line as a whole.  Part of that
3  would be looking at the relationships that they
4  formed to offer those services.
5          MR. SHAW:  Could you read my question
6  back?
7          (Record read.)
8          MR. TAMBE:  Objection to form.
9          MR. DAKIS:  Same objection.
10     A.   So the specific question is?
11     **Q.   Is what experience have you had**
12  **reviewing processes in place to ensure that only**
13  **appropriate collateral is accepted on behalf of**
14  **tri-party repo custodians?**
15     A.   Okay.  So if we can take tri-party
16  repo and address that first.  I have reviewed
17  processes at custodians that had to do with repo
18  transactions, broadly speaking.  The difference
19  between a tri-party repo and an RVP/DVP repo are
20  subtle differences, but both have a collateral
21  management component to it, and then the
22  collateral management component to looking at a
23  RVP/DVP repo transaction, I've had considerable
24  experience in looking at those processes, both
25  at a policy, procedure, and internal controls

Page 13

1          J. Schneider
2  standpoint.
3      **Q.   Have you reviewed the valuation**
4  **policies that Bank of New York uses in valuing**
5  **tri-party repo collateral?**
6      A.   I did not.
7      **Q.   Have you reviewed the valuation**
8  **policies that JPMorgan uses in valuing tri-party**
9  **repo collateral?**
10     A.   I did not.
11     **Q.   Have you reviewed any testimony or**
12  **documents concerning how BoNY valued the**
13  **collateral in the Fed replacement repo?**
14     A.   I have reviewed some testimony as it
15  relates to the fact that, for example, Bank of
16  New York was the tri-party agent as it related
17  to the Lehman/Barclays transaction, yes.
18     **Q.   Apart from reviewing testimony stating**
19  **that or that you interpret to mean that BoNY was**
20  **the tri-party agent in that repo transaction,**
21  **have you reviewed any testimony or documents**
22  **concerning how BoNY valued the collateral in the**
23  **fed replacement repo?**
24     A.   Just testimony is what you're speaking
25  to?

Page 14

1              J. Schneider
2       Q.   Testimony concerning how BoNY went
3  about valuing the particular collateral?
4       A.   The answer is that I've seen some
5  evidentiary indication within the deposition
6  that there were processes that were followed,
7  but they were not specific enough to determine
8  exactly what were the processes that were in
9  place.
10      Q.   Can you recall whose deposition
11 testimony you're thinking of?
12      A.   Well, the one that I cite within my
13 report is Hraska, and that is really, again,
14 citing the fact that Bank of New York was in
15 fact the tri-party repo agent.
16      Q.   Have you reviewed any testimony or
17 documents concerning how JPMorgan valued the
18 collateral in the Fed replacement repo?
19      A.   I believe you've already asked that.
20      Q.   I think I asked about BoNY.
21      A.   I thought you asked both, JPMorgan and
22 BoNY.
23      Q.   Well, I was intending to get to both.
24 So is the answer the same to both?
25      A.   Valuation, I have not.

Page 15

1              J. Schneider
2       Q.   Do you know whether the Fed
3  replacement repo was in fact the tri-party repo?
4       MR. TAMBE:  Objection to the form of
5  the question.
6       MR. DAKIS:  Same objection.
7       A.   And can you repeat the question
8  differently?
9       Q.   Was the Fed replacement repo a
10 tri-party repo?
11      MR. TAMBE:  Object to the form of the
12 question.
13      MR. DAKIS:  Object to the form.
14      MR. TAMBE:  You can answer if you
15 understand it.
16      A.   I'm not sure that I fully understand
17 it.
18      Q.   You're aware that on September 18,
19 2008 Barclays engaged in a repo -- in a
20 repurchase transaction with Lehman Brothers,
21 Inc.; is that correct?
22      A.   That is correct.
23      Q.   And if I call that the Fed replacement
24 repo, will you understand what I'm referring to?
25      A.   I do.

Page 16

1              J. Schneider
2       Q.   And I call it that because this
3  replaced an existing repo agreement between the
4  Fed and LBI, do you understand that?
5       A.   I do.
6       MR. DAKIS:  Objection to form.
7       Q.   My question for you was, was the Fed
8  replacement repo a tri-party repo?
9       A.   The indications that I've read in
10 terms of deposition and the Clarification Letter
11 would lead me to believe that it was a tri-party
12 repo transaction.
13      Q.   And when you say the indications in
14 deposition, you're referring specifically to Mr.
15 Hraska's deposition?
16      A.   That's correct.
17      Q.   Any other depositions?
18      A.   None that are coming to mind, but I
19 know that in other depositions it was also
20 mentioned.
21      Q.   Did you ever have occasion to review
22 the deposition of Alan Kaplan?
23      A.   I do not believe I did.
24      Q.   And you said something in the
25 Clarification Letter led you to believe that it

Page 17

1              J. Schneider
2  was a tri-party repo?
3       A.   That is correct.
4       Q.   What's your recollection of what in
5  the Clarification Letter led you to that belief?
6       A.   I believe it actually stated that
7  there was a tri-party repo transaction between
8  Lehman and Barclays.
9       Q.   Would it matter at all to any opinion
10 you have expressed in this case if the Fed
11 replacement repo transaction was not a tri-party
12 repo transaction?
13      MR. TAMBE:  Objection to the form of
14 the question.
15      MR. DAKIS:  Same objection.
16      MR. McCOUBREY:  Objection.
17      A.   So the question, if I understand it,
18 is would it change my opinion?  It would not
19 change my opinion or opinions.
20      (Exhibit 703, John J. Schneider Expert
21 Report, marked for identification, as of
22 this date.)
23      (Exhibit 704, John J. Schneider Expert
24 Report Errata, marked for identification, as
25 of this date.)

Page 18

1           J. Schneider
2       Q.   Sir, showing you what has been marked
3   as Exhibit 703, do you recognize that as a copy
4   of your report in this matter?
5       A.   I do.
6       Q.   And showing you what has been marked
7   as Exhibit 704, do you recognize that as a copy
8   of the errata to your report?
9       A.   I do recognize it as such.
10      Q.   How many hours have you billed to this
11  matter, sir?
12      A.   I couldn't tell you exactly, but I
13  would estimate 80 hours.
14      Q.   Take a look, if you would, at
15  paragraph 9 of your report.  You see in
16  paragraph 9 that you say, "If BoNY and JPM were
17  unable to accurately mark hard to value, complex
18  securities, they would be exposed to undue
19  business risk"?
20      A.   I do see that.
21      Q.   And do you believe that that
22  observation lends credibility to the BoNY and
23  JPMorgan marks of repo collateral?
24      MR. DAKIS:  Objection to form.
25      A.   The question is do I believe that this

Page 19

1                  J. Schneider
2   statement lends --
3       Q.   Credibility --
4       A.   -- credibility?
5       Q.   -- to the marks that they affix to
6   repo collateral?
7       A.   I do.
8       Q.   And that's because in your view they
9   would be exposed to business risk if they failed
10  to accurately mark repo collateral?
11      A.   Precisely.
12      Q.   And you understand that, as a
13  broker-dealer, Barclays is likewise required to
14  mark its trading assets on a regular basis?
15      MR. TAMBE:  Objection to the form of
16      the question.
17      MR. DAKIS:  Same objection.
18      A.   As a broker-dealer, Barclays has a
19  responsibility to value its assets.  I'm not
20  absolutely certain as to what their
21  responsibilities are as it relates to the
22  collateral.
23      Q.   Well, would it be fair to say that if
24  Barclays were unable to accurately mark hard to
25  value, complex securities, that would expose

Page 20

1               J. Schneider
2   Barclays to undue business risk?
3       A.   Can you be more specific in terms of
4   what type of business activity?
5       Q.   Do you understand that Barclays is in
6   the business of trading both for its own
7   account, for the account of its customers in
8   various complex, hard to mark or hard to value
9   securities; you understand that?
10      A.   I do.
11      Q.   And as part of its regular business
12  activities, Barclays is required to affix value
13  to the securities that it holds or that it
14  trades in, correct?
15      A.   I believe that it is looking at a
16  trade and understanding whether a trade is
17  economically viable for either itself in a prop
18  desk or its clients in the case that it's acting
19  in a discretionary capacity.
20      Q.   And just for purposes of preparing its
21  own books and records, it's required to mark to
22  market the securities that it holds, is it not?
23      A.   It's that which is in inventory,
24  that's correct.
25      Q.   And do you have any reason to believe

Page 21

1               J. Schneider
2   that Barclays does not have a solid capability
3   to accurately mark the inventory that it holds?
4       MR. DAKIS:  Objection to the form.
5       A.   So the question is do I -- I'm not
6   sure how that's relevant to what I've opined on.
7   I'm not trying to be argumentative.  I'm just
8   trying to understand how that has to do with the
9   responsibilities of Bank of New York and JPM.
10      Q.   The way a deposition works is I ask a
11  question and you either answer or tell me you
12  can't answer it.
13      A.   Okay.
14      Q.   Okay?
15      MR. TAMBE:  Or he asks you to clarify
16      the question if he doesn't understand the
17      question.
18      Q.   Obviously, if you don't understand the
19  question, but we're not going to get into my
20  purposes for asking questions.
21      A.   Okay.
22      Q.   Do you have any reason to believe that
23  Barclays is not fully capable of accurately
24  marking the inventory that it holds?
25      MR. TAMBE:  Objection to the form of

Page 22

1           J. Schneider
2   that question.
3           MR. DAKIS:  Same objection.
4           MR. McCOUBREY:  Same objection.
5       A.   Again, I'm struggling with -- I did
6   not do any work evaluating Barclays' valuation
7   activities.
8       Q.   Just so I'm clear, I take it you also
9   did not in any way attempt to validate the marks
10  that BoNY placed on any of the securities that
11  were in the Fed replacement repo?
12          MR. DAKIS:  Objection to the form.
13      A.   When you say "validate," in what
14  capacity?
15      Q.   You didn't check in any way to see
16  whether those were in fact correct?
17      A.   I did not value the marks.
18      Q.   And the same holds true for JPMorgan,
19  I take it?
20      A.   That is true.
21      Q.   At Bank of New York who establishes
22  the marks that Bank of New York uses in its role
23  as custodial agent?
24      A.   In the case of Bank of New York, Bank
25  of New York would determine what the mark is.

Page 23

1           J. Schneider
2       Q.   And I've asked an imprecise question,
3   so let me make it a little more precise.
4           What individuals -- and I'm not
5   looking for a name but, rather, a functional
6   category -- at Bank of New York are responsible
7   for doing that?
8       A.   It would typically be the Collateral
9   Management Team.
10      Q.   Do you know if any of the people on
11  the Collateral Management Team are active
12  traders of assets?
13      A.   I would have no understanding of that.
14      Q.   Do you have any idea whether they
15  regularly communicate with the bank's traders in
16  any of the assets they're valuing?
17          MR. TAMBE:  Object to form.
18          MR. DAKIS:  Same objection.
19      A.   If the question is do I know whether
20  they communicate with the trading desks at JPM?
21      Q.   Or BoNY, as the case may be.
22      A.   Or BoNY.  No, I don't know what type
23  of communication between the two units.
24      Q.   When you say that in a repo situation
25  BoNY sets the marks or sets the value, for what

Page 24

1           J. Schneider
2   purposes does BoNY set the value?
3       A.   It's setting the value of the marks to
4   determine if it has sufficient collateral based
5   on the contractual guidelines that have been
6   established to have that transaction -- have
7   enough collateral on hand to allow one of the
8   counterparties, the lender, to lend the dollar
9   amount that it's lending.
10      Q.   For any other purpose?
11      A.   Well, it also has to do with from it's
12  own -- from a service provider standpoint,
13  there's certainly some risk that presents itself
14  to that organization, so it's compelling for
15  them to get the value to be correct.
16      Q.   Are you expressing any opinion that
17  Barclays was required to accept BoNY marks for
18  any purpose other than determining if sufficient
19  collateral has been provided?
20          MR. TAMBE:  Objection to the form of
21  the question.
22          MR. DAKIS:  Same.
23      A.   If I understand the question, are you
24  asking if Barclays had a responsibility to
25  accept BoNY's marks for any other purposes than

Page 25

1           J. Schneider
2   the transaction?
3       Q.   Yes.
4       A.   And that is correct, there is no other
5   reason for Barclays, necessarily, to accept that
6   for any other purpose than the transaction, and
7   that's what my opinion is specific to.
8       Q.   And specifically when you say "for the
9   transaction," you're referring to the
10  determination of whether sufficient collateral
11  has been provided?
12      A.   As it relates to the tri-party repo.
13      Q.   Yes.
14      A.   Yes.
15      Q.   Have you read the report prepared by
16  the gentleman who was here a little earlier
17  today, Mr. Schwaba?
18      A.   I did not.
19      Q.   Turn to paragraph 38 of your report,
20  if you would, please.  It's on page 16.
21      A.   I am getting there.  Okay.
22      Q.   Let's take a look at the third bullet
23  point in there.  Is it your view that today
24  every CMO of whatever quality is eligible as
25  collateral for a private tri-party repo?

Page 26

1         **J. Schneider**
2         MR. TAMBE:  Objection to form.
3         MR. DAKIS:  Same objection.
4     A.   If the question is do I believe that
5  every CMO qualifies?
6     **Q.   Yes.**
7     A.   That's not what this paragraph is
8  saying.
9     **Q.   All right.  Are there types of CMOs
10  that you would not expect to constitute eligible
11  securities for private tri-party repos?**
12     A.   Again, I believe, if I understand the
13  question, are you asking whether this paragraph
14  states that certain CMOs are acceptable and
15  certain are not?  What this is intended to say,
16  or I intended it to say, is that there are
17  certain types of securities that are generally
18  acceptable, and CMOs being one of those asset
19  classes.
20     **Q.   Okay.  And my question is are all CMOs
21  eligible collateral or only a subset of CMOs
22  eligible collateral?**
23         MR. TAMBE:  Object to the form.
24         MR. DAKIS:  Same objection.
25         MR. McCOUBREY:  Same objection.

Page 27

1         J. Schneider
2     **Q.   I'm just trying to find out what your
3  opinion -- whatever opinion you're expressing on
4  that issue.**
5     A.   I do go back to what I said
6  previously, and that is that, generally
7  speaking, CMOs are an acceptable form of
8  collateral.  Now, I believe, maybe let me take
9  that a step further, and that is that typically
10  within the tri-party agreement there are
11  specifications to allowable collateral, and that
12  is typically determined by the lender as to
13  what's acceptable.  So in this particular
14  transaction you'd have to look to the contract
15  to define that.
16     **Q.   So if I understand you correctly, you
17  are not opining that there's a blanket rule that
18  all CMOs are eligible securities in a repo?**
19     A.   I am not giving that opinion.
20     **Q.   And the same would be true with
21  respect to CDOs; is that correct?**
22     A.   That would be correct.
23     **Q.   And CBOs?**
24     A.   Any of the asset classes.  We could
25  run down the list and that would generally be

Page 28

1         J. Schneider
2  true, although I would be hard pressed to think
3  that you would find a Treasury that is not
4  acceptable.
5     **Q.   Unfortunately, that may be changing
6  these days.**
7     A.   I understand.  New rules are coming.
8     **Q.   Looking at paragraph 41, sir, of your
9  report, do you see that you present what I
10  understand to be a definition of "less liquid"
11  collateral as that term is used in the
12  statistics that you report from the Fed?**
13     A.   That is correct.
14     **Q.   And would I be correct in
15  understanding you to be defining "less liquid
16  collateral" as corporate securities,
17  mortgage-backed securities, and asset-backed
18  securities?**
19         MR. TAMBE:  Objection to the form of
20  the question.
21         MR. DAKIS:  Same objection.
22     **Q.   For that purpose.**
23     A.   I didn't opine on the types of
24  collateral that are deemed less liquid.
25     **Q.   So you're just reporting something**

Page 29

1         J. Schneider
2  that you read somewhere?
3     A.   What I'm reporting is that, from
4  experience, there are certain asset classes and
5  certain assets within classes that are
6  considered less liquid, and they in fact have
7  been deemed acceptable forms of collateral for
8  purposes of tri-party repo transactions.
9     **Q.   So in paragraph 41 when you discuss
10  the percentage of non-traditional collateral
11  used in dealer repos, you're referring to the
12  percentage of collateral that falls into the
13  categories of corporate securities,
14  mortgage-backed securities, and asset-backed
15  securities; is that correct?**
16     A.   That is correct.
17     **Q.   Now, would it be fair to say that
18  corporate securities is a fairly broad asset
19  class?**
20     A.   And that's precisely why I said in
21  some cases it's, within that asset class, you're
22  going to find some that are less liquid.
23     **Q.   And some in fact are extremely
24  illiquid, esoteric, and hard to value, would
25  that be fair?**

Page 30

J. Schneider

1
2        MR. DAKIS: Objection to form.
3     A.   It's possible that there are
4  corporates that are -- I'm not sure extremely,
5  but ...
6     Q.   And then do you know in the statistics
7  that you cite in paragraph 41 how many -- what
8  percentage of the corporates that are going to
9  make up the figures you cite are of the
10  illiquid, esoteric variety as opposed to the
11  liquid and easy to value variety of corporates?
12        MR. TAMBE: Objection to form.
13        MR. DAKIS: Same objection.
14     A.   If I understand your question, if I
15  took the total population of corporates and
16  dissected it and came up with a stratification
17  as to what's considered, I did not go through
18  that analysis.
19     Q.   And the same, I take it, would be true
20  with respect to asset-backed and mortgage-backed
21  securities?
22     A.   That is correct.
23     Q.   So you're not able to tell me, of the
24  percentages that you give here in paragraph 41,
25  how much of that non-traditional collateral that

Page 31

J. Schneider

1
2  you refer to is actually illiquid and esoteric
3  as opposed to more liquid and straightforward
4  securities of those -- in those classes?
5        MR. DAKIS: Objection to the form of
6  the question.
7        MR. TAMBE: Objection.
8     A.   If I understand correctly, I think
9  what this is saying is of all the collateral
10  that's accepted within the industry relative to
11  tri-party repos, that the percentage that's been
12  accepted uniformly has gone up both times.
13     Q.   And you're not able to tell me of that
14  percentage how much of it is illiquid, esoteric
15  securities of those types?
16        MR. TAMBE: Objection to form.
17        MR. DAKIS: Same objection.
18        MR. McCOUBREY: Objection to form.
19     A.   I think it is saying that. I believe
20  the paragraph, as it's written, and we can go
21  through it, is saying that if all the collateral
22  that's being accepted, corporates, mortgage
23  backs and asset backed securities, in their
24  illiquid form, are being accepted as collateral.
25     Q.   So you're saying that the figures that

Page 32

J. Schneider

1
2  are given here, when you say, for example, "By
3  January 2006, that proportion reached around 48
4  percent," that 48 percent is composed entirely
5  of illiquid securities?
6     A.   What I'm saying is that's what the Fed
7  is stating in 2005, yes.
8     Q.   And that's how you're reading what the
9  Fed is stating?
10     A.   That's what I'm -- that's how I'm
11  reading it.
12     Q.   And I just want to make clear, because
13  I thought you were saying something different a
14  moment ago, that 48 percent, are you saying that
15  consists of all corporates, asset backs and
16  mortgage backs or a subset of illiquid
17  corporates, asset backs or mortgage backs?
18     A.   The way I understood the prior
19  question was that you were speaking to an asset
20  class, corporate securities, and if I took that
21  population, and let's say that was a million
22  dollars, and in corporate securities there were
23  60 percent that were liquid and 40 percent that
24  were illiquid, I don't know that answer.
25     Q.   In terms of the collateral that was in

Page 33

J. Schneider

1
2  the Fed replacement repo, was there any
3  collateral that BoNY had no experience
4  whatsoever in valuing?
5     A.   I have no basis to answer that.
6     Q.   You don't know one way or the other?
7     A.   I don't.
8     Q.   In the course of your work on this
9  matter, have you in any way examined the
10  specific collateral that was used in the Fed
11  replacement repo?
12     A.   Be more specific. I've seen a list of
13  assets, but I did not analyze it in any way.
14     Q.   Did you do anything besides seeing
15  that there was a list of assets?
16     A.   That's correct.
17     Q.   I think I may have phrased my question
18  incorrectly, but let me make sure that I
19  understand your answer.
20     A.   Maybe we can read it back.
21     Q.   When you say that's correct, you mean
22  you did not do anything besides seeing that
23  there was a list of assets?
24     A.   I did not do anything other than see a
25  list of assets.

Page 34

J. Schneider

1           J. Schneider
2       Q.   Turn to paragraph 10 of your report,
3   sir.  The first sentence you write the words,
4   "The requirements imposed on tri-party repo
5   agents by the Federal Reserve Bank of New York,"
6   do you see that?
7       A.   Yes.
8       Q.   What requirements specifically are you
9   referring to?
10      A.   Well, the Fed throughout my report has
11  given guidance as to what are the
12  responsibilities of the tri-party repo agent,
13  and those responsibilities include, amongst
14  others, is the onboarding of the collateral, the
15  valuation or marking of the collateral, and the
16  qualification of those assets that are brought
17  on as collateral.
18      Q.   So when you talk about requirements, I
19  take it what you are talking about is simply the
20  identification of functions that are to be
21  performed by the custodian; is that what you're
22  talking about?
23      A.   That is correct.
24      Q.   Given your prior answers, I take it
25  that it's fair to say that you do not know if

Page 35

J. Schneider

1           J. Schneider
2   all the collateral transferred to Barclays in
3   the Fed replacement repo transaction would have
4   been eligible for use as collateral in a Fed
5   repo transaction?
6       A.   The answer is I would not know if all
7   the collateral that was transferred qualified.
8       Q.   Are you expressing any opinion about
9   what constitutes a generally recognized source
10  for valuation of securities?
11      A.   When you say source, just so that I'm
12  clear, a service that is utilized by a tri-party
13  agent to price the security; is that what you're
14  asking?
15      Q.   That could be one.  Let me rephrase
16  the question.  I think I can make it a little
17  clearer.
18           Are you offering any opinion as to
19  what constitutes a generally recognized source
20  of prices for repo collateral?
21           MR. TAMBE:  Objection to the form of
22      the question.
23           MR. DAKIS:  Same objection.
24      A.   And maybe if I could just offer a
25  different way to potentially ask it and answer,

Page 36

J. Schneider

1           J. Schneider
2   and that is that what I am offering is that
3   there's a general process that a tri-party
4   collateral agent follows in terms of the types
5   of tools that it will use to price a security.
6       Q.   I think we're missing each other, but
7   I think I have a way to get us to where I'm
8   going.
9       A.   Okay.
10      Q.   So let me do that.
11           Showing you what's previously been
12  marked as Exhibit 117 in this case.
13      A.   Okay.
14      Q.   Do you recognize this as a Master
15  Repurchase Agreement?
16      A.   Yes, I do.
17      Q.   In the 1996 version, published by the
18  Bond Market Trade Association?
19      A.   (Witness nods.)
20      Q.   You need to answer orally.
21      A.   Oh, yes.
22      Q.   And if you turn to page 7, paragraph
23  11(d), and you'll see that there is an intro, a
24  Roman I, a Roman II, and then a continuation
25  paragraph, do you see that?

Page 37

J. Schneider

1           J. Schneider
2       A.   I do see that.
3       Q.   And if you look at number 2 in the
4   continuation paragraph, it says, "In the absence
5   of a generally recognized source for prices or
6   bid or offer quotations for any security"?
7       A.   You did say paragraph 2, (D)(ii)?
8       Q.   Not the little (ii), the continuation
9   paragraph.
10      A.   Okay.
11      Q.   Yes.  You see it's got Arabic numerals
12  1 and 2 and 3?
13      A.   Yes.
14      Q.   Okay.  And Arabic numeral 2 reads, "In
15  the absence of a generally recognized source for
16  prices or bid or offer quotations for any
17  security," do you see that?
18      A.   I do.
19      Q.   Okay.  And so my question is, are you
20  offering any opinion as to what constitutes a
21  generally recognized source for prices or bid or
22  offer quotations for any security?
23           MR. TAMBE:  Objection to the form of
24      the question.
25           MR. DAKIS:  Same objection.

Page 38

1        J. Schneider
2            MR. McCOUBREY:  Same objection.
3      A.   If you're asking the question that
4    does a tri-party repo agent use pricing sources
5    to accomplish what is referred to here, they do
6    in fact; and if I think the follow on was am I
7    offering that one source is better than another
8    in my report.  I am not.
9      **Q.   Neither of those are quite the**
10   **question I was asking.**
11     A.   Okay.  I'll get there.
12     **Q.   Let me see if I can get there.**
13   **Are you offering any opinion about**
14   **what constitutes a generally recognized source**
15   **for prices or bid or offer quotations for any**
16   **security?**
17           MR. TAMBE:  Object to the form.
18     A.   So if the question is does the pricing
19   source have a bid and ask price?
20     **Q.   No.  Not the question.**
21     A.   Okay.
22     **Q.   My question is, are you offering an**
23   **opinion about what constitutes a generally**
24   **recognized source for prices or bid or offer**
25   **quotations for any security used in a repo**

Page 39

1        **J. Schneider**
2    **transaction?**
3           MR. TAMBE:  Same objection to the
4    form.
5           MR. DAKIS:  Same objection.
6      A.   I remain unclear as to the question
7    being asked.
8      **Q.   Okay.  Let me keep trying then.  Are**
9    **you, for example, opining that the collateral**
10   **marks affixed by a tri-party repo agent, for**
11   **example, constitute a generally recognized**
12   **source for prices or bid or offer quotations for**
13   **any security?**
14     A.   Can I have you read that back, please?
15           (Record read.)
16     A.   So if I understand the way it was read
17   back, it's that when a tri-party agent provides
18   pricing that is based on an acceptable source,
19   is that something I'm opining on?
20     **Q.   No, that's not quite what I'm doing,**
21   **but I think we're getting closer.**
22   **Let me break it into pieces.  You**
23   **stated that for purposes of assessing whether**
24   **sufficient collateral has been provided a**
25   **tri-party agent will affix marks to securities;**

Page 40

1        **J. Schneider**
2    **is that correct?  Marks to the collateral?**
3      A.   That is correct.
4      **Q.   Okay.  And my question is, are you**
5    **offering any opinion that a tri-party agent's**
6    **marks constitute a generally recognized source**
7    **of -- source for prices or bid or offer**
8    **quotations for any such security?**
9           MR. TAMBE:  Objection to the form of
10   the question.
11           MR. DAKIS:  Same objection.
12           MR. McCOUBREY:  Same objection.
13     A.   And if I understand the agreement here
14   and what you're reading from, that's not the
15   intention.
16     **Q.   Okay.  You can put that aside.**
17           MR. SHAW:  Why don't we take a short
18   break.
19           (Recess; Time Noted:  3:11 P.M.)
20           (Time Noted:  3:24 P.M.)
21   BY MR. SHAW:
22     **Q.   Mr. Schneider, I think I already know**
23   **the answer to this based on your prior answer,**
24   **but I just want to make sure I have it cleanly.**
25   **You'll recall we discussed the**

Page 41

1        **J. Schneider**
2    **purposes for which parties to a repo are**
3    **required to accept the marks of the repo**
4    **custodian; do you recall we discussed that**
5    **earlier today?**
6      A.   We did, yes.
7      **Q.   And if I recall your testimony**
8    **correctly, you agreed that the only purposes for**
9    **which the parties to a repo transaction were**
10   **required to accept the custodian's marks were**
11   **for the purposes of assessing whether sufficient**
12   **collateral had been provided; is that correct?**
13           MR. TAMBE:  Objection to form.
14           MR. DAKIS:  Objection to form.
15   Misstates prior testimony.
16           MR. McCOUBREY:  Same objection.
17     A.   Can you repeat that?
18           MR. SHAW:  Can you read it back?
19           (Record read.)
20           MR. TAMBE:  Same objection.
21     A.   Can you give me more clarity on that
22   question, please?
23     **Q.   Okay.  Well, you've expressed the**
24   **opinion, I believe, that the parties to a repo**
25   **transaction agree to accept the custodian's**

Page 42

J. Schneider
1    marks; is that correct?
2    A.    That is correct.
3    Q.    And I believe earlier I asked you for
4    what purposes do they agree to accept the
5    custodian's marks, and so let me ask that again.
6    For what purposes do the parties to a
7    repo transaction agree to accept the custodian's
8    marks?
9    MR. DAKIS:  Objection to the form.
10    A.    For the transaction itself they're
11    accepting the mark to determine that there's
12    sufficient collateral.
13    Q.    And not for any other purposes?
14    MR. TAMBE:  Objection to the form of
15    the question.
16    MR. DAKIS:  Same objection.
17    A.    Not as it relates to the transaction.
18    Q.    For any purposes not relating to the
19    transaction that you can think of?
20    A.    I'm not aware of how else they use the
21    marks.
22    Q.    You're not testifying, for example,
23    that there's any requirement that the parties to
24    a repo use custodian's marks for their own --

Page 43

J. Schneider
1    for purposes of valuing assets on their own
2    books and records, are you?
3    A.    I don't believe there's a requirement.
4    Q.    If you would take a look at paragraph
5    14 of your report, sir, and in that you have a
6    long quote from Professor Pfleiderer's report;
7    is that correct?
8    A.    I do.
9    Q.    Okay.  The first sentence reads,
10    "There is every reason to believe that JPMorgan
11    Chase and BoNY, in their roles as custodians,
12    had no better insight and were no better
13    informed than (and more likely were not as well
14    informed as) Mr. King," and then you have a
15    footnote that I assume was also copied from
16    Professor Pfleiderer's report identifying who
17    Mr. King is, "and his team," do you see that?
18    A.    I do.
19    Q.    Do you disagree with anything in that
20    sentence?
21    A.    I disagree.  I mean, it was his
22    statement, and I don't agree that -- I don't
23    know where the validity of whether or not who is
24    more informed, I don't know.

Page 44

J. Schneider
1    A.    I did not opine on that.
2    Q.    So, one way or the other, you have no
3    personal opinion on that?
4    MR. TAMBE:  Objection to the form of
5    the question.
6    MR. DAKIS:  Same objection.
7    A.    Yes, my opinion, as you read below, is
8    what Professor Pfleiderer did or didn't do.
9    Q.    Okay.  But you have no basis for
10    offering an opinion on whether the Barclays team
11    or the BoNY or JPMorgan teams were better
12    qualified to assess the value of the particular
13    collateral you used in the federal repo?
14    A.    On half of the question I have an
15    opinion, which is that JPMorgan or Bank of New
16    York in this matter have a responsibility and
17    have sufficient knowledge to be able to price
18    the collateral.
19    Q.    Okay.  But you have no basis for
20    offering any opinion on whether the Barclays
21    team or the BoNY or JPMorgan teams were better
22    qualified to assess the value of the particular
23    collateral used in the Fed replacement repo?
24    MR. TAMBE:  Objection to form.
25    MR. DAKIS:  Objection to form.

Page 45

J. Schneider
1    A.    I did not opine on that.
2    Q.    In the next sentence you quote, "Thus,
3    it is virtually certain that both JPMorgan Chase
4    and Bank of New York encountered significant
5    problems in characterizing, understanding, and
6    marking at least some of the securities that
7    comprise the repo collateral."  Do you see that?
8    A.    I do.
9    Q.    Do you have any reason to dispute that
10    sentence?
11    A.    Dispute it in what context?
12    Q.    To suggest that that statement made by
13    Professor Pfleiderer there is incorrect?
14    A.    Yes.  Actually, when I read that, I'm
15    not sure how he makes that conclusion based on
16    the prior sentence.  He's saying because one
17    team is better informed than another, that -- I
18    think he concludes one is better than the other,
19    but I'm not certain, and then he says, "Thus, it
20    is virtually certain that both JPMorgan and Bank
21    of New York encountered significant problems."
22    I don't see anything that tells me he
23    had problems or that he was aware of problems
24    that JPMorgan or Bank of New York had

Page 46

1          J. Schneider
2    encountered.
3        Q.   I take it you have not read any of Mr.
4    King's testimony?
5        A.   I have not read King's testimony, no.
6        Q.   And you know nothing about what sort
7    of collateral was actually in the Fed
8    replacement repo; is that correct?
9        A.   Other than your question previously
10    where I did look at a list of collateral.
11        Q.   The third sentence of what Professor
12    Pfleiderer wrote and you quote reads, "Given
13    that JPMorgan Chase had just a few days to
14    understand and mark at least the positions
15    backing the Federal Reserve Bank of New York's
16    loans to LBI earlier in the week, and that BoNY
17    had just one day (at most) to understand and
18    mark the positions backing the Barclays Federal
19    replacement repo loan to LBI on Thursday, it is
20    highly likely that at least some of their marks
21    were, at a minimum, imprecise."
22        Do you have any basis for contesting
23    the conclusion stated by Professor Pfleiderer in
24    that sentence?
25        A.   I do.

Page 47

1          J. Schneider
2        Q.   What is your basis for contesting that
3    conclusion?
4        A.   The nature of a tri-party repo is that
5    it unwinds daily, so any tri-party repo, you
6    only have one day to value the collateral.
7        Q.   Do you know how long Barclays had to
8    value the collateral when it affixed values to
9    the collateral for purposes of its acquisition
10    accounting?
11        A.   I do not.
12        Q.   And I take it you're not testifying
13    that none of the BoNY marks could be imprecise?
14        A.   I am not opining on that.
15        Q.   Look at paragraph 11 of your report.
16    You write, "Therefore, BoNY and JPM collateral
17    marks should not be summarily dismissed as
18    unreliable."  Do you see that?
19        A.   I do.
20        Q.   Is it your opinion, are you offering
21    the opinion that Professor Pfleiderer summarily
22    dismissed the BoNY and JPM marks as unreliable?
23        A.   My opinion is Professor Pfleiderer had
24    language to suggest that the marking process
25    undertaken by JPMorgan and BoNY was not to be

Page 48

1          J. Schneider
2    relied upon, in summary.
3        Q.   Is it your understanding that that was
4    his opinion with respect to each and every
5    security that they marked or to a subset of
6    those securities?
7        A.   The testimony that I read did not get
8    specific or granular enough to get into which he
9    was speaking to.
10        Q.   So you just don't know?
11        A.   From his testimony, yes, I do not
12    know, nor in his expert report for that matter.
13        Q.   If you would look at paragraph 26 of
14    your report, sir, that again contains a quote
15    from Professor Pfleiderer's report, do you see
16    that?
17        A.   I do.
18        Q.   And do you see that Professor
19    Pfleiderer states that "both banks, JPM and
20    BoNY, had procedures and pricing groups that
21    enabled them to provide marking services quickly
22    and with the level of accuracy required by their
23    role in tri-party repos for the types of
24    securities typically eligible as collateral in
25    tri-party repos at least under normal

Page 49

1          J. Schneider
2    conditions, for normal commercial tri-party
3    repos," do you see that?
4        A.   I do.
5        Q.   Does that give you any information as
6    to whether Professor Pfleiderer was contesting
7    their marks wholesale or simply a subset?
8        A.   I believe, if I understand the
9    question -- can I have you repeat it one more
10    time?
11        Q.   Sure.  As you read that statement by
12    Professor Pfleiderer, do you understand him to
13    be saying that for the type of collateral that
14    is normally eligible, BoNY or JPMorgan was
15    perfectly well able to mark that collateral?
16        A.   The way I read it is he states that
17    there are policies and procedures that are
18    maintained to allow them to price securities.
19        Q.   I take it that you do not yourself
20    have any opinion as to which entity was better
21    qualified to provide accurate marks for the
22    collateral in the Fed replacement repo, BoNY on
23    the one hand or Barclays on the other?
24        A.   I do not provide that opinion in my
25    report.

Page 50

1           J. Schneider
2     **Q.   And I take it you're not providing any**
3  **opinion that Barclays was unqualified to provide**
4  **accurate marks for the securities it received in**
5  **this transaction?**
6     A.   I did not opine on Barclays'
7  capabilities.
8        (Continued on the next page to include
9   the jurat.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 51

1           J. Schneider
2     **Q.   And I take it you have no**
3  **understanding of what -- you have made no**
4  **investigation of what Barclays' capabilities are**
5  **for accurately evaluating securities?**
6     A.   I did not perform any level of
7  investigation as to what Barclays' capabilities
8  are.
9        MR. SHAW:  I think we're done.  Thank
10 you very much.
11       THE WITNESS:  Thank you.
12       MR. TAMBE:  Thank you.
13       (Time Noted:  3:40 P.M.)
14            oOo
15
16
17
                    _____
18                  JOHN J. SCHNEIDER
19  Subscribed and sworn to
    before me this     day
20  of       2010.
21
                 _____
22
23
24
25

Page 52

1           J. Schneider
2           CERTIFICATE
3     STATE OF NEW YORK )
               : ss
4     COUNTY OF NEW YORK)
5        I, Kathy S. Klepfer, a Registered
6     Merit Reporter and Notary Public within and
7     for the State of New York, do hereby
8     certify:
9        That JOHN J. SCHNEIDER, the witness
10    whose deposition is herein before set forth,
11    was duly sworn by me and that such
12    deposition is a true record of the testimony
13    given by such witness.
14       I further certify that I am not
15    related to any of the parties to this action
16    by blood or marriage and that I am in no way
17    interested in the outcome of this matter.
18       I further certify that neither the
19    deponent nor a party requested a review of
20    the transcript pursuant to Federal Rule of
21    Civil Procedure 30(e) before the deposition
22    was completed.
23       In witness whereof, I have hereunto
24    set my hand this 12th day of April, 2010.
25       --------------------------------

Page 53

1           J. Schneider
2              INDEX
3     TESTIMONY OF J. SCHNEIDER:          PAGE
4     Examination by Mr. Shaw              5
5
6     EXHIBITS:              PAGE
7     Exhibit 703, John J. Schneider Expert Report    17
8     Exhibit 704, John J. Schneider Expert Report    17
9     Errata
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 54

```
 1          J. Schneider
 2   NAME OF CASE:  In re:  Lehman Brothers
 3   DATE OF DEPOSITION:  April 12, 2010
 4   NAME OF WITNESS:  John J. Schneider
 5   Reason Codes:
 6      1. To clarify the record.
        2. To conform to the facts.
        3. To correct transcription errors.
 7
 8   Page _____ Line _____ Reason _____
     From _____ to _____
 9
     Page _____ Line _____ Reason _____
10   From _____ to _____
11   Page _____ Line _____ Reason _____
     From _____ to _____
12
     Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
     From _____ to _____
15
     Page _____ Line _____ Reason _____
16   From _____ to _____
17   Page _____ Line _____ Reason _____
     From _____ to _____
18
     Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
     From _____ to _____
21
     Page _____ Line _____ Reason _____
22   From _____ to _____
23   Page _____ Line _____ Reason _____
     From _____ to _____
24
25
```

# Exhibit L

Contains Highly Confidential Information

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| _____X | | |
| | : | Chapter 11 |
| In re: | : | |
| | : | Case No. 08-13555 (JMP) |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : | |
| | : | (Jointly Administered) |
| Debtors, | : | |
| _____X | | |

**JOHN J. SCHNEIDER EXPERT REPORT**

**March 15, 2010**

Contains Highly Confidential Information

## Table of Contents

I.    INTRODUCTION.................................................................................................................4

II.    SUMMARY OF QUALIFICATIONS........................................................................................4

III.    SUMMARY OF OPINIONS..................................................................................................5

IV.    OPINIONS......................................................................................................................7

V.    THE TRI-PARTY REPO MARKET IS BOTH EXTENSIVE AND WELL-DEVELOPED.....................13

   A.    Tri-party Repo Definition and Market History.......................................................13

   B.    Tri-party Repo Market Size and Participants..........................................................16

   C.    Tri-party Repo Collateral Types............................................................................16

   D.    The Accuracy of Custodial Marks Has Implications for Custodian Risk and Regulatory
Scrutiny ...................................................................................................................19

Contains Highly Confidential Information

List of Appendices

APPENDIX I: MATERIALS RELIED UPON ........................................................................................... 24

APPENDIX II: CURRICULUM VITAE ................................................................................................. 25

## I.    INTRODUCTION

1.    This report is submitted by John Schneider, a Managing Director at Navigant Consulting Inc.  I discuss my qualifications in more detail in section II and present my curriculum vitae in Appendix I.

2.    I have prepared this report at the request of Counsel for Movants to set forth the subject matters on which I expect to testify, the substance of the facts and opinions on which I expect to testify, and a summary of the foundations for each opinion.[1]

3.    Navigant Consulting Inc. charges an hourly rate of $580 for my time.  Other Navigant Consulting Inc. professionals working under my direction and supervision assisted in my analysis and were or will be compensated for their work at their customary hourly rates.  This compensation is not contingent upon the substance of my testimony or the outcome of this matter.

4.    The remainder of this report is organized as follows.  I summarize my opinions in Section III and in section IV, I provide basis for my opinions.


## II.    SUMMARY OF QUALIFICATIONS

---

[1] This report concerns three motions before the court: 1) Motion of Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al., Pursuant to 11 U.S.C. § 105(a), Fed. R. Civ. P. 60(b), and Fed. R. Bankr. P. 9024, for Relief from Order Under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, Dated September 20, 2008 (and Related SIPA Sale Order) and Joinder in Debtors' and SIPA Trustee's Motions for an Order Under Rule 60(b) to Modify Sale Order, September 15, 2009.
2) The Trustee's Motion for Relief Pursuant to the Sale Orders or, Alternatively, for Certain Limited Relief Under Rule 60(b), September 15, 2009.
3) Debtor's Motion for an Order, Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024, Modifying the September 20, 2008 Sale Order and Granting Other Relief, September 15, 2009.

Contains Highly Confidential Information

5.      My Present position is Managing Director at Navigant Consulting Inc.  I earned my B.S. in accounting from the University of Scranton and an Executive MBA degree from Boston University. I am a Certified Public Accountant licensed in the State of Pennsylvania.

6.      For over 23 years, I have worked with financial services companies designing and evaluating governance and control environments. I have been invited to speak at numerous industry events and I have published articles on developing compliance programs and various regulatory matters.

7.      My experience at Navigant Consulting Inc., Brown Brothers Harriman & Co. and Citibank focused on the custodial activities performed and the control environments designed to mitigate the inherent business risks.  Specifically, my work was performed in both an audit and compliance capacity, which provided me an opportunity to develop risk, governance, control and regulatory expertise.  I have had specific experience in reviewing securities lending and repo transactions and the related policies, processes and controls designed and implemented to mitigate the inherent risks associated with the contractual commitment to provide custodial and valuation services, including the documentation of eligible securities, the processes in place to ensure that only appropriate collateral is accepted on behalf of lenders and the adequacy of valuation processes and a firm's ability to mark collateral in accordance with contractual obligations and internal policies.  My experience is described in more detail in my curriculum vitae, which is attached as Appendix 1.


III.    SUMMARY OF OPINIONS

8.      Based on the information available to me, the following is a summary of my opinions with regards to the elements of this matter I was engaged to review. My work on this matter

Contains Highly Confidential Information

continues and I reserve the right revise the opinions set forth in this report based on additional relevant information that is made available.

9.      Bank of New York/Mellon ("BoNY") and JP Morgan Chase Bank, N.A. ("JPM"), control the vast majority of the tri-party repurchase custodial business in the U.S., and have developed the capacity to value all types of collateral received under tri-party arrangements on behalf of the parties to those arrangements.[2] If BoNY and JPM were unable to accurately mark hard to value complex securities, they would be exposed to undue business risk and would not be recognized as industry leading tri-party repo agents.

10.      Additionally, pursuant to their contractual obligations and the requirements imposed on tri-party repo agents by the Federal Reserve Bank of New York ("NY Fed"), BoNY and JPM had a duty to mark the collateral securing the repo Barclays plc (Barclays) assumed from the NY Fed. Furthermore, the parties to the Tri-Party Agreements clearly agreed to: (1) have BoNY and JPM act as custodians and Tri-Party Agents; and (2) accept BoNY's and JPM's collateral valuations under each Tri-Party Agreement.

11.      BoNY and JPM were capable of and in fact had a duty to determine collateral values. Therefore, BoNY and JPM collateral 'marks'[3] should not be summarily dismissed as unreliable.

---

[2] Federal Reserve Bank of New York, Repurchase and Reverse Repurchase Transactions [hereinafter *Repurchase and Reverse Repurchase Transactions*], *available at* http://www.newyorkfed.org/aboutthefed/fedpoint/fed04.html (last visited Mar. 15, 2010) ("In a tri-party repo, both parties to the repo must have cash and collateral accounts at the same tri-party agent, which is by definition also a clearing bank. The tri-party agent will ensure that collateral pledged is sufficient and meets eligibility requirements, and all parties agree to use collateral prices supplied by the tri-party agent").

[3] Report of Professor Paul Pfleiderer (Jan. 8, 2010) [hereinafter *Pfleiderer Report*] at 11, note 22. A 'mark' is a per-unit amount that is used to value a position. The mark used to value a specific security on a given day for a particular purpose may be based on or set equal to an observable price, if available, or based on or set equal to a bid price or an offer price or some point between the two, assuming quotes are available. Where reliable prices are not available and credible quotes are not forthcoming, a mark must be based on an estimate of value, generally derived from a model or some other analysis of value.

Contains Highly Confidential Information

12.    Prof. Pfleiderer's assertion that BoNY and JPM did not have the capability to accurately value the collateral, and therefore, their values should be dismissed as unreliable and is not supported by the facts.[4]

## IV.    OPINIONS

13.    In his expert report, Prof. Pfleiderer concludes that:

> "none of the three sets of marks discussed in this subsection — the marks in Lehman's GFS system; JP Morgan Chase's custodial marks; and BNY/Mellon's custodial marks — provides a reliable basis for valuing the positions comprising the Repo Collateral."[5]

14.    In support of his conclusion, Prof. Pfleiderer makes certain assumptions that BoNY and JPM did not have adequate insight into the collateral to be able to assign marks and accurately calculate values for the collateral:

> "***There is every reason to believe*** that JP Morgan Chase and BoNY, in their roles as custodians, had no better insight and were no better informed than (and more likely were not as well informed as) Mr. King[6] and his team. Thus, *it is virtually certain* that both JP Morgan Chase and Bank of New York encountered significant problems in characterizing, understanding, and marking at least some of the securities that comprised the Repo Collateral. Given that JP Morgan Chase had just a few days to understand and mark at least the positions backing the FRBNY's loans to LBI earlier in the week, and that BoNY had just one day (at most) to understand and mark the positions backing the Barclay's Fed Replacement Repo loan to LBI on Thursday, *it is highly likely* that at least some of their marks were, at a minimum, imprecise."[7]

15.    Prof. Pfleiderer did not perform any independent analysis of the custodian banks' pricing processes, specifically (i.e., policies, procedures, fair value models, market data vendors, ability to leverage internal market making activities and accompanying system and applications used to

---

[4] *Id.* at ¶46.
[5] *Id.*
[6] Stephen King, as head of Barclays' Principal Mortgage Trading Group ("PMTG"), was responsible for managing the "on-boarding" of most or all of the Repo Collateral positions, for valuing at least some of the positions that were transferred to Barclays, and, ultimately, for hedging, to the extent possible, the risks associated with the on-boarded positions.
[7] *Pfleiderer Report, supra,* at ¶ 43 (emphasis added).

Contains Highly Confidential Information

mark collateral) and BoNY and JPM's operations in particular to support his above opinion. Without at least some understanding of JPM's and BoNY's pricing processes, Prof. Pfleiderer cannot possibly know or have a basis for assuming whether these institutions had insight into the appropriate marks for collateral or the level of accuracy of the collateral marks.

16.    In fact, Prof. Pfleiderer did not even thoroughly read the contracts governing JPM's or BoNY's role as Tri-Party Repo agent:

> Q. Do you have any understanding with respect to JPMorgan Chase what the scope was of their contractual duties to value securities as custodial agent?
>
> A. Not in the basis of a thorough reading of a contract, no.
>
> Q. Same question for Bank of New York. Do you have an understanding as to what their contractual duties were to value securities as a custodial agent?
>
> A. Not on the basis of a thorough reading of the contract, no.
>
> Q. Did you ask for a copy of J.P. Morgan's securities pricing policies?
>
> A. I personally did not, and I don't know whether staff working in my direction did or did not.
>
> Q. How about Bank of New York, did you ask to see their pricing policies?
>
> A. Same answer as before.
>
> Q. You did not?
>
> A. I did not. And it may or may not be the case that staff working in my direction had looked at that.
>
> Q. In the course of your work, you don't recall ever seeing such policies from J.P. Morgan or Bank of New York for this assignment?
>
> A. I'm pretty sure I did not see any policies. I've looked at Barclays policies, but I don't believe I've seen either J.P. Morgan or Bank of New York policies.[8]

---

[8] Deposition of Professor Paul Pfleiderer (Feb. 23, 2010), 170:19-172:2.

Contains Highly Confidential Information

17.    It is clear is that Prof. Pfleiderer did not take the necessary steps to become sufficiently educated as to the duties of JPM and BoNY under the relevant contracts or their capabilities with respect to valuation of collateral securing Repo transactions. Accordingly, Prof. Pfleiderer could not have had enough information to make any determination as to JPM's or BoNY's valuation capabilities, and he was not in a position to form an opinion as to the reliability of their collateral marks.

18.    According to the contracts that govern the repurchase agreements, a Tri-Party Repurchase Agent has a duty to value the collateral and the parties to the Tri-Party Agreement agree to use collateral marks supplied by the tri-party repo agent. The NY Fed has set out the responsibilities of tri-party repo agents in each repo agreement:

> Fed repos are done via tri-party settlement, which means that the Fed and the primary dealers use a tri-party agent to manage the collateral. In a tri-party repo, both parties to the repo must have cash and collateral accounts at the same tri-party agent, which is by definition also a clearing bank. The *tri-party agent will ensure that collateral pledged is sufficient and meets eligibility requirements, and all parties agree to use collateral prices supplied by the tri-party agent.*[9] [emphasis added]

19.    Other authorities have described a tri-party repo agent's duties, as follows:

> "The triparty clearing bank provides cash and collateral custody accounts for parties to the repo deal and collateral management services. These services include ensuring that pledged collateral meets the cash lenders' requirements, pricing collateral, ensuring collateral sufficiency…[10]" [emphasis added]

---

[9] *Repurchase and Reverse Repurchase Transactions, supra.*

[10] Tobias Adrian, Christopher R. Burke  & James J. McAndrews, *The Federal Reserve's Primary Dealer Credit Facility*, Current Issues in Economics & Finance, Volume 15, No. 4, (Aug. 2009) [hereinafter *The Federal Reserve's Primary Dealer Credit Facility*] (emphasis added).

Contains Highly Confidential Information

20.    BoNY and JPM, as tri-party repo agents and custodians, had a contractual relationship with each party to the custody agreement.[11] Non-discretionary custodial activities are governed by such contractual relationships, according to the Office of the Comptroller of the Currency.[12]

21.    Repurchase and custodial agreements normally specify, but are not limited to, the following standardized terms important to regulatory views of proper process and procedures for review of repurchase contracts for propriety and completeness, including:

- Terms of transaction initiation, confirmation and termination;
- Provisions for payments and transfers of securities;
- Requirements for segregation of collateral securities;
- Acceptable types and maturities of collateral securities;
- Initial acceptable margin for collateral securities of various types and maturities;
- Margin maintenance and collateral repricing provisions;
- Provisions for collateral substitution;
- Rights to interest and principal payments;
- Events of default and the rights and obligations of the parties;
- Required disclosures for transactions in which the seller retains custody of purchased securities;
- Disclosures required by regulatory agencies; and
- Persons authorized to transact business for the depository institution and its counterparty.[13]

22.    In practice, since 1995, most repurchase agreements are based upon standardized contracts available at the Securities Industry and Financial Markets Association (SIFMA), formerly known as the Bond Market Association.[14] The Custodial Undertaking in Connection with Master Repurchase Agreement, by and among, Barclays Plc (buyer), Lehman Brothers Inc.

---

[11] Office of the Comptroller of the Currency, Administrator of National Banks, Comptroller's Handbook, Asset Management, Custody Services (2002) at 1-2 [hereinafter *Comptroller's Handbook*].

[12] *Id.*

[13] Federal Financial Institutions Examination Council, Repurchase Agreements of Depository Institutions With Securities Dealers and Others; Notice of Modification of Policy Statement, 63 Fed. Reg. 6935-38 (Feb. 11, 1998) [hereinafter *Repurchase Agreements of Depository Institutions*].

[14] The Bond Market Association & International Securities Market Association, TBMA/ISMA Global Master Repurchase Agreement (2000 Version) [hereinafter *TBMA/ISMA Global Master Repurchase Agreement*], *available at* http://archives1.sifma.org/agrees/global_master_repurchase_agreement.pdf (last visited Mar. 15, 2010).

Contains Highly Confidential Information

(seller) and The Bank of New York Mellon (custodian), generally reflects these standardized terms.

23.    Under the relevant agreement between BoNY, Barclays Plc and Lehman Brothers Inc., (the BoNY "Tri-Party Agreement")[15] BoNY had a duty to determine the market value of securities, and in accordance with the agreement, notify the buyer and seller of any margin deficit, or excess.[16]

24.    Additionally, each party to the BoNY tri-party agreement agreed that BoNY had the discretion to mark collateral and in the event that BoNY could not, "obtain the price of a particular Security from such pricing information services on any Business Day, the Market Value shall be as determined by Custodian [BoNY] in the reasonable exercise of its discretion…[17]".

25.    James Hraska, the Lehman executive in charge of transferring collateral, confirmed his understanding that BoNY was Barclay's agent and custodian under the repo:

> A. There were two tri-party agents involved. There was Chase, who was a tri-party agent, who held our collateral with the Fed that we had pledged to the Federal Reserve, and then, in effecting the transaction, according to the tri-party terms, there was Bank of New York, who was the agent for Barclays.
>
> Q. I see reference in some of the documents to BoNY tri-party?
>
> A. Uh-huh.
>
> Q. Is that the tri-party we're -- is that the transaction we're talking about?
>
> A. Yes, that's correct. We moved the assets from JPChase, who was our tri-party agent, to Bank of New York, who was, as I mentioned, Barclays' agent.[18]

26.    Prof. Pfleiderer agrees that BoNY had a duty to mark the collateral when he states that:

---

[15] Custodial Undertaking in Connection with Master Repurchase Agreement, By and Among, Barclays Plc (buyer), Lehman Brothers Inc. (seller) and The Bank of New York Mellon (custodian) [hereinafter *Tri-Party Agreement*].
[16] *Tri-Party Agreement*, § 6 (A)(i)-(ii).
[17] *Tri-Party Agreement*, §1, (K), "Market Value of Securities."
[18]  Deposition of James Hraska (Aug. 14, 2009), at 39: 9-24.

Contains Highly Confidential Information

> assigning marks is a necessary element of services these banks provide as tri-party repo custodians…that both banks [JPM and BoNY] maintain procedures and pricing groups that enable them to provide this marking service quickly and with the level of accuracy required by their roles in tri-party repos for the types of securities typically eligible as collateral in tri-party repos at least under normal conditions, for normal commercial tri-party repos.[19]

27.    BoNY and JPM are the two tri-party repo agents that control the vast majority of the tri-party repurchase custodial business in the United States and as discussed above, as tri-party Agents, they are responsible for marking collateral values each day (and sometimes intra-day) to ensure that the collateral is sufficient to secure the loans in accordance with their agreements and accompanying eligible securities schedules. As such, BoNY and JPM are required to have and maintain valuation capabilities to: (1) fulfill their contractual obligations; and (2) remain the dominant commercial tri-party repo agents serving the U.S. market.

28.    In March 2008, the overall US repo market was $4.5 trillion. At peak levels in 2008 tri-party repos represented a significant majority of the repo market, when over US$2.8 trillion in securities were being financed through tri-party repo transactions, many with very short maturities, and involving the daily transfer of nearly the full amount of associated cash and securities on the accounts of one or the other of the two tri-party "clearing banks": Bank of New York Mellon (BNY) and JPMorgan Chase (JPM)."[20] As of September 2007, the Bank of New York handled some $1.5 trillion in tri-party balances each day."[21]

---

[19] *Pfleiderer Report, supra,* at ¶41.
[20] Federal Reserve Bank of New York, Progress Report, Task Force on Tri-Party Repo Infrastructure Payments Risk Committee (Dec. 22, 2009) [hereinafter *Progress Report*], *available at* http://www.newyorkfed.org/prc/report_091222.pdf (last visited Mar. 15, 2010).
[21] The Bank of New York Mellon, Increasing Tri-Party Repo and Securitization Transparency: A Roundtable Discussion, (2008) [hereinafter *Increasing Tri-Party Repo and Securitization Transparency*], *available at* http://www.bankofny.com/CpTrust/data/Tri_Party_Roundtable_Brochure.pdf (last visited Mar. 15, 2010).

Contains Highly Confidential Information

## V. THE TRI-PARTY REPO MARKET IS BOTH EXTENSIVE AND WELL-DEVELOPED

### A. Tri-party Repo Definition and Market History

29.    According to the NY Fed, "…a tri-party repo transaction involves three parties: a cash lender (the investor), a borrower that will provide collateral against the loan, and a tri-party clearing bank. The tri-party clearing bank provides cash and collateral custody accounts for parties to the repo deal and collateral management services. These services include ensuring that pledged collateral meets the cash lenders' requirements, pricing collateral, ensuring collateral sufficiency, and moving cash and collateral between the parties' accounts."[22]

30.    In a repurchase, or "repo", transaction, an investor can borrow cash for a short period from another party, using securities as collateral for the loan. Investors with large portfolios of securities can thus lend these out and earn a return over time.[23]

31.    According to the NY Fed, "there are two main types of settlement methods for repos: tri-party and "delivery vs payment" or DVP. Fed repos are done via tri-party settlement, which means that the Fed and the primary dealers use a tri-party agent to manage the collateral. In a tri-party repo, both parties to the repo must have cash and collateral accounts at the same tri-party agent, which is by definition also a clearing bank. The tri-party agent will ensure that collateral pledged is sufficient and meets eligibility requirements, and all parties agree to use collateral prices supplied by the tri-party agent."[24]

---

[22] *Repurchase and Reverse Repurchase Transactions, supra.*

[23] Financial Times Lexicon, "repo," *available at* http://lexicon.ft.com/term.asp?t=tri-party-repo (last visited Mar. 15, 2010).

[24] *Repurchase and Reverse Repurchase Transactions, supra.*

Contains Highly Confidential Information

32.     The "tri-party repo has two important credit risk characteristics. First, it protects the creditor by taking margin from a borrower and lodging repo securities with a bank that has explicitly agreed to hold the securities for the benefit of the creditor. If the borrower fails to honor its repurchase commitment, the creditor can instruct the bank to sell the securities and apply the proceeds to satisfy its claim for repayment. Second, tri-party repo protects the borrower because the bank retains possession of the repo securities during the term of the repo, so the borrower can recover the securities promptly upon tender of the repurchase price. Thus, tri-party repo resolves the conflict inherent in conventional repos that borrowers and creditors cannot both be insulated from credit risk simultaneously."[25]

33.     One of the operational benefits of tri-party repos is that, regardless of the term of the loan, the clearing bank unwinds the transaction each morning, returning the cash to the investor's account and the collateral to the borrower's account. Then at the end of the day, the borrower pledges qualifying collateral back to the deal, which once priced in that day's marking process, determined as eligible, and deemed sufficient to meet the terms of the deal by the clearing bank, is moved to the investor's account while the cash is placed in the borrower's account. In this way, no specific collateral is committed for more than overnight. This arrangement allows borrowers to pledge whatever eligible collateral they have on hand each day, thus enabling them to manage their securities portfolios more effectively.[26]

34.     The securities loaned and the collateral provided are marked to market daily. When collateral exceeds the required margin the excess may be returned to the borrower. Alternatively, when the collateral value is less than the required margin, the borrower must provide additional

---

[25] Federal Reserve Bank of New York, *The Evolution of Repo Contracting Conventions in the 1980s*, 12 ECON. POL'Y REV. (May 2006), *available at* http://www.newyorkfed.org/research/epr/06v12n1/0605garb.html (last visited Mar. 15, 2010).
[26] *Repurchase and Reverse Repurchase Transactions, supra.*

Contains Highly Confidential Information

collateral. The parties will stipulate who is responsible for safekeeping the collateral; the lending agent bank is often selected for the job. Some borrowers may require that the collateral be kept with an independent third party. The party safekeeping the collateral may do that alone, or it may also be responsible for pricing the assets, making margin calls, and collecting income. Responsibilities should be clearly set out in the agency agreement.[27]

35.    An important implication of this daily unwinding, however, is that the counterparty risk for the investor shifts from its repo counterparty to the tri-party clearing bank, and the clearing bank becomes exposed to the borrower. Overnight, the cash investor has the borrower's collateral in its account and the borrower has the cash. If the borrower defaults overnight— say, by filing for bankruptcy—the lender has the collateral in its account and thus is covered and the clearing bank is not affected. Once the collateral and cash are returned in the morning, however, the clearing bank, which has extended credit to the borrower to finance the original collateral purchase, becomes exposed to the borrower. Consequently, the clearing bank needs to determine each morning if it is comfortable accepting the exposure to the borrower that the reversal of the transaction will create.[28]

36.    Thus, the importance of a tri-party repo agent's valuation capabilities are not simply to protect the repo borrower and lender as part a contractual obligation, but also to protect the Tri-Party Repurchase Agent's *own* balance sheet and regulatory capital while they are exposed to the borrower during the daily unwinding process.

---

[27] *Comptroller's Handbook, supra,* at 33.
[28] *Repurchase and Reverse Repurchase Transactions, supra.*

### B.  Tri-party Repo Market Size and Participants

37.    In September 2008, "outstanding tri-party repos [on US markets] totaled $2.5 trillion," of a total of roughly $4.4 trillion total US repo market.[29] Individual repo sellers (borrowers) routinely financed more than US$ 100 billion in securities via the tri-party mechanism. The largest single firm exposure peaked at more than US$ 400 billion.[30]

### C.  Tri-party Repo Collateral Types

38.    The "Eligible Security Schedules to the Custodial Undertaking in Connection with Master Open Market Agreement (PCDF), Schedule of Eligible Securities, Bank of New York Mellon"[31] (the "Schedules") govern the types of collateral available to the Lehman repo. In general, the Schedules list these types of securities, along with their corresponding haircuts (or margin percentage), as eligible:

- Direct Obligations of the U.S. Treasury;
- Direct Obligations of the Federally Related Entities (see schedule for further, detailed listing);
- Agency and Private Label Mortgage-Backed Securities Passthroughs and CMOS; and
- Municipal Securities, Corporate Securities, Asset Backed Securities (including CDOs, CBOs, CLOs), International Agencies, Money Market Instruments, Whole Loans, Equities and Equity Derivatives

39.    Such asset classes are common to tri-party repo markets. Tri-party repo was already a well accepted market a decade ago. As early as March 2000, the president of the then Bond Market Association ("BMA") wrote a letter to the NY Fed to maintain their participation in the market, begun as an emergency measure used to address financial crises in the late 1990s, noting: "The industry is increasingly moving toward tri-party repo as the preferred settlement

---

[29] *The Federal Reserve's Primary Dealer Credit Facility, supra.*
[30] *Progress Report, supra.*
[31] BCI-EX-00297249.

Contains Highly Confidential Information

method for its funding operations. This move is largely driven by the cost savings benefits inherent in tri-party repo (as opposed to Delivery versus Payment ("DVP") repo), the increased ease of execution of repo trades done on a tri-party basis, as well as the possession and control of collateral in a separate custodial account."[32]

40.      The BMA then recommended the NY Fed maintain its expansion of acceptable collateral. The BMA strongly supported the expansion in 2000 of the "securities eligible as collateral in the repurchase transactions undertaken by the FRBNY in the management of banking system reserves. In particular, the expansion of eligible collateral to encompass structured agency securities and adjustable rate mortgage pass-through securities was viewed by the dealer community as an extremely positive development." BMA urged the NY Fed to expand acceptable collateral to (i) agency securities; (ii) passthrough mortgage securities; (iii) commercial and multifamily mortgage-backed securities; (iv) REMICS; (v) corporate securities; and (vi) asset backed securities.[33]

41.      By 2005, "nontraditional" collateral had already become a substantial portion of primary dealers' repo transactions. According to economists at the NY Fed, by January 2005, "less liquid" collateral – consisting of corporate securities, as well as mortgage-backed and asset-backed securities – accounted for roughly 47 percent of primary dealers' repo transactions. By January 2006, that proportion reached around 48 percent; by January 2007, it was 50 percent; and by January 2008, it approached 55 percent. The market peaked at just below 60 percent

---

[32] Memorandum from the Bond Market Association regarding Continuation of FRBNY's Ability to Engage in Tri-party Repo, to Peter R. Fisher, Executive Vice President, Markets Group, Federal Reserve Bank of New York, (Mar. 14, 2000).
[33] *Id.*

Contains Highly Confidential Information

toward the end of 2008, falling after the Lehman crisis to a low of roughly 45 percent, but rebounding quickly to almost 50 percent.[34]

42.     Far from being new or esoteric, therefore, nontraditional or illiquid collateral had been commonly acceptable in tri-party repo arrangements both in private and Central Bank markets for well over a decade at the time of the Lehman bankruptcy, and comprised a substantial portion of the market in the US since at least 2005.

43.     A pillar of the repo and tri-party repo market is the concept that collateral must be at least equal to the amount loaned. In particular, the "acquisition of a repurchase agreement may be deemed to be an acquisition of the underlying securities, provided the obligation of the seller to repurchase the securities from the investment company is Collateralized Fully…"Collateralized fully" in the case of a repurchase agreement means, among other things, that the value of the securities collateralizing the repurchase agreement (reduced by the transaction costs (including loss of interest) that the investment company reasonably could expect to incur if the seller defaults) is, and during the entire term of the repurchase agreement remains, at least equal to the Resale Price provided in the agreement."[35] The definition put forth in the Investment Company Act demonstrates the foundation of the Repo transaction; namely, that collateral must equal the amount loaned. The tri-party repo agent must, therefore, ensure it has developed adequate processes to monitor the value of pledged collateral or risk the inability to conduct business as an agent.

---

[34] *The Federal Reserve's Primary Dealer Credit Facility, supra.*
[35] Investment Company Act of 1940 at Rule 5b-3.

Contains Highly Confidential Information

### D.  The Accuracy of Custodial Marks Has Implications for Custodian Risk and Regulatory Scrutiny

44.    For banking law purposes, the authority of national banks to engage in custody activities like those involved in tri-party repo derives from the general business of banking and incidental powers language in 12 U.S.C. § 24. The Supreme Court has recognized that this authority is a broad grant of power to engage in the business of banking and that the concept evolved over time as business practices developed and changed.[36]

45.    The custody activities of national banks developed from providing safekeeping and settlement services to customers for a fee, and historically were viewed as permissible incidental activities under 12 U.S.C. § 24 often were in conjunction with the delivery of fiduciary services.[37] The OCC has indicated that it does not treat non-discretionary custodial activities as fiduciary, and that those activities are authorized under 12 U.S.C. § 24.[38] Services traditionally provided include the settlement, safekeeping, and reporting of customers' marketable securities and cash. A custodian also may invest cash balances as directed, collect income, process corporate actions, price securities positions, and provide recordkeeping services.

46.    A custodian acts only as an agent of the related parties. A custodian typically does not have discretion to select the investment vehicles. Instead, standing instructions in the custody agreement usually direct that selection.[39] The OCC goes to great lengths to spell out specifically that the custodian is not a trustee, and "generally is not subject to the strict fiduciary standards

---

[36] See Nationsbank v. Variable Annuity Life Ins. Co., 513 U.S. 251 (1995).

[37] Comptroller's Handbook, supra, at 1-2.

[38] See, e.g., Office of the Comptroller of the Currency Interpretive Letter No. 769 from Julie L. Williams, Chief Counsel, to John H. Huffstutler, Senior Vice President and Chief Regulatory Counsel, Bank of America National Trust and Savings Association (Jan. 28, 1997), available at http://www.occ.treas.gov/interp/mar97/int769.pdf; 61 Fed. Reg. at 68545. [hereinafter OCC Interpretive Letter #769]

[39] See Nationsbank v. Variable Annuity Life Ins. Co., 513 U.S. 251 (1995).

Contains Highly Confidential Information

that govern the relationship between a trustee and beneficiary."[40] Nonetheless, "a custodian may perform functions that are fiduciary in nature. For example, a custodian exercising discretion in managing a securities lending cash collateral pool would be acting in a fiduciary capacity and must comply with the relevant provisions of 12 C.F.R. 9."[41]

47.    Custody relationships are, therefore primarily contractual in nature and are essentially directed agencies. The customer is the principal, and the custodian is the agent. The custody agreement, itself, therefore is important as a risk management tool. A well-specified custody agreement should "clearly establish the custodian's duties and responsibilities." Custody agreements should be "standardized when possible, and any deviations from the standardized agreement should be reviewed prior to acceptance."[42]

48.    As discussed previously, industry standard repurchase and custody agreements normally specify, but are not limited to:

- Terms of transaction initiation, confirmation and termination;
- Provisions for payments and transfers of securities;
- Requirements for segregation of collateral securities;
- Acceptable types and maturities of collateral securities;
- Initial acceptable margin [haircuts] for collateral securities of various types and maturities;
- Margin [haircut] maintenance and collateral repricing provisions;
- Provisions for collateral substitution;
- Rights to interest and principal payments;
- Events of default and the rights and obligations of the parties;
- Required disclosures for transactions in which the seller retains custody of purchased securities;
- Disclosures required by regulatory agencies; and
- Persons authorized to transact business for the depository institution and its counterparty.[43]

---

[40] *OCC Interpretive Letter #769, supra.*
[41] *Comptroller's Handbook, supra,* at 11.
[42] *Comptroller's Handbook, supra*, at 1-2, 8.
[43] *Repurchase Agreements of Depository Institutions*, *supra*.

Contains Highly Confidential Information

49.    In practice, most repurchase agreements since 1995 have been based upon standardized contracts available at the Securities Industry and Financial Markets Association (SIFMA), formerly known as the Bond Market Association.[44]

50.    As custody services are contractual in nature, a bank must ensure compliance with the provisions of all applicable agreements.[45] Typically, the custodian marks securities to market daily in both securities lending and tri-party repurchase agreements. Such marking is an integral part of the contractual arrangements that control the risk assumed by both lender and borrower.

> When collateral exceeds the required margin, the excess may be returned to the borrower. Alternatively, when the collateral value is less than the required margin, the borrower must provide additional collateral. The parties will stipulate who is responsible for safekeeping the collateral; the lending agent bank is often selected for the job. Some borrowers may require that the collateral be kept with an independent third party. The party safekeeping the collateral may do that alone, or it may also be responsible for pricing the assets, making margin calls, and collecting income. Responsibilities should be clearly set out in the agency agreement.[46]

51.    12 C.F.R. 12 establishes minimum recordkeeping and confirmation requirements for securities transactions handled by national banks. The regulation also requires that banks establish policies and procedures covering supervision of securities transactions.[47] Effective internal controls are essential to a bank's management of the risks found in custody services.[48] The rights and the obligations of a pledge of a certificated security or of a claimant to a security interest in a security or security entitlement are determined by Uniform Commercial Code

---

[44] *TBMA/ISMA Global Master Repurchase Agreement*, *supra.*
[45] *Comptroller's Handbook*, *supra,* at 4.
[46] *Comptroller's Handbook*, *supra,* at 33.
[47] *Comptroller's Handbook*, *supra,* at 10.
[48] *Comptroller's Handbook*, *supra,* at 6.

Contains Highly Confidential Information

("UCC") Articles 8 and 9. Although UCC Article 9 requires that "the secured party shall keep the collateral identifiable," fungible collateral may be commingled.[49]

52.    Still, the above are primarily compliance and reputational risk issues, not fundamental credit risk issues. Nonetheless, as discussed above, a custodian can expose itself to credit risk at various stages of the tri-party repurchase operational process.

53.    In particular, credit risk is taken on by the custodian when the tri-party repurchase agreement is unwound and recast each day. "Overnight, the cash investor has the borrower's collateral in its account and the borrower has the cash. If the borrower defaults overnight— say, by filing for bankruptcy—the lender has the collateral in its account and thus is covered and the clearing bank is not affected. Once the collateral and cash are returned in the morning, however, *the clearing bank, which has extended credit to the borrower to finance the original collateral purchase, becomes exposed to the borrower.* Consequently, the clearing bank needs to determine each morning if it is comfortable accepting the exposure to the borrower that the reversal of the transaction will create.[50]

54.    Credit risk also arises in custodial activities when a counterparty does not fulfill its contractual part of a transaction and the bank has to extend or commit its funds to complete the transaction.[51] "In several highly publicized cases in the mid-1990s banks absorbed significant losses from the management of cash collateral to protect customer relationships and their own reputations."[52]

55.    Sale and repurchase agreements where the credit risk remains with the bank receive a Basel Credit Conversion Factor (referred to in the industry as a CCF) of 100%. Hence, clearing

---

[49] UCC Article 9, *available at* http://www.law.cornell.edu/ucc/9/9-207.html (last visited Mar. 15, 2010).
[50] *The Federal Reserve's Primary Dealer Credit Facility, supra* [emphasis added].
[51] *Comptroller's Handbook, supra,* at 44.
[52] *Comptroller's Handbook, supra,* at 35.

Contains Highly Confidential Information

banks subject to Basel--Like requirements--such as BoNY and JPM--tend to have stringent policies and procedures regarding both investment credit risk and counterparty credit risk evaluation that figure into their assessment an implementation of valuation and haircut processes.

56.    Accordingly, BoNY describes its capabilities as follows: "The Bank of New York Mellon's underlying infrastructure… is based on a proprietary collateral management system designed to efficiently handle all asset types denominated in any currency and targeted toward a global customer base. It can process a wide array of transaction types, including tri-party repurchase agreements, portfolio swaps, *collateralized* loans, swap collateralization deals and more."[53]

57.    It is my conclusion therefore that both BoNY and JPM were well qualified to value the collateral at issue.  Moreover, they were obligated contractually and under applicable law and regulation to maintain adequate processes and safeguards to be able to do so under the time constraints that are present in this market.

Submitted by

John Schneider

March 15, 2010

---

[53] *Increasing Tri-Party Repo and Securitization Transparency, supra.*

Contains Highly Confidential Information

Appendix I

Documents Relied Upon

**Documents in the Record**

Depositions

| Deponent | Date |
|---|---|
| James Hraska | 8/14/2009 |
| Paul Pfleiderer | 2/23/2010 |

Deposition Exhibits

495 - Debtor's Motion for an Order, Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024, Modifying the September 20, 2008 Sale Order and Granting Other Relief, Sept. 15, 2009

633A - Expert Report of Prof. Paul Pfleiderer, Volume 1

634A - Expert Report of Prof. Paul Pfleiderer, Volume 2

**Other Documents**

| Description | Beginning Bates | Ending Bates |
|---|---|---|
| Eligible Security Schedules to the Custodial Undertaking in Connection with Master Open Market Agreement (PCDF), Schedule of Eligible Securities, Bank of New York Mellon, | BCI-EX-00297249 | |
| Motion of Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al., Pursuant to 11 U.S.C. § 105(a), Fed. R. Civ. P. 60(b), and Fed. R. Bankr. P. 9024, for Relief from Order Under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006, dated Sept. 15, 2009 | | |
| The Trustee's Motion for Relief Pursuant to the Sale Orders or, Alternatively, for Certain Limited Relief Under Rule 60(b), Sept. 15, 2009 | | |

**Documents that are Publicly Available**

61 Fed. Reg. at 68545.

Custodial Undertaking in Connection with Master Repurchase Agreement, By and Among, Barclays Plc (buyer), Lehman Brothers Inc. (seller) and The Bank of New York Mellon (custodian).

Federal Financial Institutions Examination Council, Repurchase Agreements of Depository Institutions With Securities Dealers and Others; Notice of Modification of Policy Statement, 63 Fed. Reg. 6935-38 (Feb. 11, 1998).

Federal Reserve Bank of New York, Progress Report, Task Force on Tri-Party Repo Infrastructure Payments Risk Committee (Dec. 22, 2009), *available at* http://www.newyorkfed.org/prc/report_091222.pdf (last visited Mar. 15, 2010).

Federal Reserve Bank of New York, Repurchase and Reverse Repurchase Transactions, *available at* http://www.newyorkfed.org/aboutthefed/fedpoint/fed04.html (last visited Mar. 15, 2010).

Federal Reserve Bank of New York, *The Evolution of Repo Contracting Conventions in the 1980s* , 12 Econ. Pol'y Rev. (May 2006), *available at* http://www.newyorkfed.org/research/epr/06v12n1/0605garb.html (last visited Mar. 15, 2010).

Financial Times Lexicon, "repo," *available at* http://lexicon.ft.com/term.asp?t=tri-party-repo (last visited Mar. 15, 2010).

Investment Company Act of 1940 at Rule 5b-3.

Memorandum from the Bond Market Association regarding Continuation of FRBNY's Ability to Engage in Tri-party Repo, to Peter R. Fisher, Executive Vice President, Markets Group, Federal Reserve Bank of New York, (Mar. 14, 2000).

Nationsbank v. Variable Annuity Life Ins. Co., 513 U.S. 251 (1995).

Office of the Comptroller of the Currency Interpretive Letter No. 769 from Julie L. Williams, Chief Counsel, to John H. Huffstutler, Senior Vice President and Chief Regulatory Counsel, Bank of America National Trust and Savings Association (Jan. 28, 1997), *available at* http://www.occ.treas.gov/interp/mar97/int769.pdf.

Office of the Comptroller of the Currency, Administrator of National Banks, Comptroller's Handbook, Custody Services (Jan. 2002).

The Bank of New York Mellon, Increasing Tri-Party Repo and Securitization Transparency: A Roundtable Discussion, (2008), *available at* http://www.bankofny.com/CpTrust/data/Tri_Party_Roundtable_Brochure.pdf (last visited Mar. 15, 2010).

The Bond Market Association & International Securities Market Association, TBMA/ISMA Global Master Repurchase Agreement (2000 Version, *available at* http://archives1.sifma.org/agrees/global_master_repurchase_agreement.pdf (last visited Mar. 15, 2010).

Tobias Adrian, Christopher R. Burke & James J. McAndrews, *The Federal Reserve's Primary Dealer Credit Facility* , 15 Current Issues in Econ. & Fin. 6 (Aug. 2009.

UCC Article 9, *available at* http://www.law.cornell.edu/ucc/9/9-207.html

John Schneider Expert Report

Contains Highly Confidential Information

APPENDIX II: CURRICULUM VITAE



**John J. Schneider, CPA**

**John J. Schneider, CPA**
Managing Director

**Navigant Consulting**
101 Federal Street
27th Floor
Boston, MA 02110

617-748-8317 Main
617-261-0268 Fax

jjschneider
@navigantconsulting.com

**Education**
B.S., Accounting
University of Scranton
Scranton, PA

M.B.A. – Executive Program,
Boston University
Boston, MA

**Current Position**

John J. Schneider is a Managing Director in the Boston office of Navigant Consulting.

Mr. Schneider is a financial service executive with 23 years of compliance, risk management, operational redesign and internal audit experience in investment management, capital markets, and banking.

**Professional Experience**

*Navigant Consulting, Inc., Boston, MA (2003-Present)*

Managing Director – Regulatory Advisory Services

Managing Director with Navigant Consulting with over 23 years of experience in investment management, banking, capital markets.

- Lead the Regulatory Advisory Services practice, which has required coordinating teams to service over 100 engagements for Mutual Funds, Hedge Funds, Private Equity, Broker Dealers, Banking, and Managed Accounts organizations.
- Provided oversight to teams responsible for evaluating the methodologies employed to distribute unrealized losses for certain impaired assets and process in-kind distributions of collateral maintained for Securities Lending clients.
- Lead a team responsible for evaluating and analyzing the efficacy of controls designed to comply with regulation SHO.
- Advised clients on establishing and refining governance structures to achieve the appropriate level of oversight and risk mitigation.
- Developed methodologies for risk assessing and testing AML programs in accordance with the requirements of the Patriot Act.

Contains Highly Confidential Information

- Created the methodologies for developing and implementing compliance programs for mutual fund complexes and investment advisors pursuant to 38a-1 and 206(4)-7.
- Managed teams responsible for performing Anti-Money Laundering reviews, providing management with advice to improve compliance policies, procedures and processes.
- Managed teams responsible for analyzing subscription and redemption activity for late trading and market timing.

Representative Clients
- JPMorgan Investment Advisors, Inc
- Janus Capital Management
- Prudential Investments with the Jennison Dryden Funds & Strategic Partners Funds
- Apollo Management with the Apollo Investment Corporation (a Business Development Company under the Investment Company Act of 1940)
- Apollo Capital Management with the Strategic Value Fund (onshore/offshore)
- Babson Capital Management, LLC.


*Brown Brothers Harriman & Co., Boston, MA (1998-2003)*

Vice President – Regional Audit Director

Managed professional teams in Boston and New York covering Investment Management and Investor Services, which represented 60% of the overall audit services. Specific responsibilities included:

- Developing and employing a risk-based financial, technology and operational audit plan for the US and Europe.
- Coordinating audit activities performed by the external auditors for SAS70 and year-end financial reviews.
- Ensuring the Firm's preparedness and coordinating external regulatory reviews conducted by the SEC, NYSE and State Bank examiners (New York, Massachusetts, and Pennsylvania).
- Evaluated the implementation of a Securities Lending program for custody clients.
- Member of several senior management oversight committees: Sarbanes-Oxley Committee, Know Your Customer Committee, Inter-Office Coordinating

Committee, and the BBH Funds Steering Committee. These committees were designed to monitor business model design and reengineering efforts, within the Firm.

- Advising the partnership on the cost versus benefits, compliance requirements and risks associated with the firm's products and services.

***Selected Achievements:***

- Gained 10% efficiency in completing the audit plan year over year during the first three years of managing the audit team.
- Partnered with management on several business initiatives including the development and implementation of Know Your Customer and credit polices, Sarbanes-Oxley, BBH Firm Authorities, self-assessments and risk management.
- Evaluated and developed policies, procedures and strategic systems initiatives for compliance with Know Your Customer, Anti-Money Laundering and Patriot Act requirements. Led an executive committee in the evaluation and approval of a firm-wide Anti-Money Laundering system, compliance resources, and business line oversight requirements. Active participation on the Firm-wide Compliance Committee and several subcommittees designed to provide recommendations and strategic solutions for compliance requirements.
- Developed and implemented a comprehensive quarterly certification process in response to Sarbanes-Oxley requirements. Developed policies and procedures for performing quarterly self-assessments, formed a Due Diligence Committee and standard certification letters for the different service levels provided to clients.
- Led a firm-wide initiative to analyze current practices, assess peer practices, and develop, present, and implement a global approach for the establishment, delegation and on-going support for monitoring and controlling internal and external authorities. Presentations and working groups were developed for information gathering, education, and communication of the philosophy, principles, and status of the project.
- Performed several consultative projects at the request of the partnership to provide recommendations for cost reduction, enhance control effectiveness, and improve operational efficiencies. In certain instances, the implemented recommendations resulted in cost reductions

Contains Highly Confidential Information

of $200K-300K. Other initiatives resulted in a reduction of independent audit fees ($10K-50K per engagement).

*Citibank, N.A., New York, NY (1989-1998)*
     *Vice President – Global Investments and Investment*

*Finance Products Compliance Manager*

- Created the compliance function for the monitoring and supervision of Investment products globally.
- Advised management on regulatory issues and coordinated the infrastructure development of new products and business initiatives.
- Established compliance procedures for a Section 20 broker/dealer.
- Coordinated the development and supervision of structured derivative products.
- Developed procedures for the risk management of derivative and complex structured products.
- Developed procedures for compliance with the Interagency guidelines (e.g., Know Your Customer, Anti-Money Laundering, Suitability, Investment Objective Setting).
- Created policies and procedures for various Investment Finance activities, including fair lending, global real estate and risk management.

Vice President – Audit Manager

- Promoted and rotated through business areas providing a significant product exposure: World Wide Security Services (1989-1991), Global Cash Management and Corporate Financial Control (1991-1992), Global Trade Finance (1993-1995), and Private Banking Group International Quality Delivery/Technology (1995-1996).
- Designed, planned, and coordinated financial, technology and operational audits.
- Prepared audit plans and programs setting forth scopes, objectives, and budgets.
- Evaluated business practices and controls resulting in appropriate recommendations to senior management.
- Managed 6-8 staff auditors.
- Chaired a committee (10 professionals) that performed testing and training of Audit Methodology and Corporate Audit Software for a region of 173 auditors.

*Scholastic Inc., Lyndhurst, NJ (1988-1989)*
<u>Senior Auditor</u>

Coordinated and participated on financial, operational, and technology reviews with the external auditors (Arthur Young). Performed weekly cash flow analyses for funding purposes.


*Price Waterhouse, Morristown, NJ (1987-1988)*
<u>Staff Auditor</u>


Responsible for audit and compilation assignments for diversified clientele with sales ranging from $3 to $70 million. Specifically, these responsibilities included the review and analysis of internal controls, balance sheet, profit and loss statements, and physical inventory observations.


*Deposition/Testifying Experience:*

C. Clark Hodgson, Jr., Receiver for Philadelphia Alternative Asset Management Company, LLC, and its partners, affiliates, subsidiaries
and related entities v. Man Financial Inc, Thomas Gilmartin, Sep Alavi, William Wambach, Timothy Braun, Jody Mcmillan, James Zamora and Monica Rodriguez

*Published Articles*:

Texas Hedge Fund Association Newsletter - Six Steps to Help Six Key Steps to Help Private Fund Advisors Prepare for Regulatory Change - November 11, 2009
Complinet - Six Steps to Help Private Fund Advisors Prepare for Regulatory Change - November 10, 2009
Compliance Week - Risk and Regulation Roundtable Discussion Summary - October 9, 2009
Risk Management Association Journal - How Increased Regulation Will Impact Market Participants - May 1, 2009
NCI Investigations Quarterly - The Risk Management Paradox - March 25, 2009
KYC360.com - Risk Management Paradox - April 13, 2009
Navigant Consulting - Due Diligence: Expectations in a Rapidly Changing World - April 1, 2009

08-13555-mg    Doc 8510-2    Filed 04/20/10    Entered 04/20/10 17:00:55    Exhibits F - L    Pg 136 of 136

Contains Highly Confidential Information

Complinet - Reputation is Everything: How to Protect Your Reputation and Shore up investor Confidence - March 13, 2009

US Banker - Impact of Regulation on Credit Default Swaps Editorial - November 15, 2008

Strategic Finance – Finding Your Compliance Sweet Spot – August 2007

Strategic Finance - Falling into Line - May 2006

MFA Reporter - Annual Compliance Reviews: Lessons Learned - May 2006

MFA Reporter - FAQs - Hedge Fund Advisor Compliance & New SEC registration Rule of April 2005