# Exhibit M

**Contains Highly Confidential Information**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.,*<br><br>Debtors. | Chapter 11<br><br>Case No. 08-013555<br><br>(Jointly Administered) |

**EXPERT REPORT OF JOHN J OLVANY**

**MARCH 15, 2010**

**Contains Highly Confidential Information**

# TABLE OF CONTENTS

**Page**

I.  Introduction…………………………….......................................................................1

II.  Summary of Qualifications………………….................................................................2

III. Summary of Opinion…………………….......................................................................3

IV. Opinion and Base Thereof……………………..................................................................3

   A.  BARCLAYS UNDERVALUED THE GIANTS STADIUM BONDS BY OVER $349 MILLION..........................................................................................................3

     1.  Description of the Giants Stadium Bonds ........................................................ 4

     2.  The Sale of the Giants Stadium Bonds to Barclays and Barclays' Alternatives as the Holder of the Giants Stadium Bonds........................................................ 5

     3.  The Correct Valuation of the Giants Stadium Bonds........................................ 8

     4.  Barclays' Errors in Valuing the Giants Stadium Bonds................................. 10

   B.  BARCLAYS UNDERVALUED THE CORPORATE BONDS BY NEARLY $29 MILLION........................................................................................................11

     1.  Background and Introduction to Analysis of Corporate Bond     Pricing ...... 12

     2.  Barclays Misapplied Third Party Pricing It Obtained.................................... 13

   C.  BARCLAYS UNDERVALUED THE COVERED BONDS BY OVER $3 MILLION……………………………………………………………..............16

**Contains Highly Confidential Information**

## LIST OF EXHIBITS AND APPENDICES

Exhibit I:        List of CUSIPs valued

Exhibit II:      Valuation Results by CUSIP

Exhibit III:     Valuation Results by Desk


Appendix I:    Curriculum Vitae

Appendix II:   Documents Considered

Appendix III: Methodology

**Contains Highly Confidential Information**

I.    **INTRODUCTION**

1.    This report is submitted by John J. Olvany, Senior Advisor with Navigant Economics (Chicago Partners), a subsidiary of Navigant Consulting, Inc., which specializes in applying accounting, economics, and finance to business consulting, legal, and regulatory issues.  I discuss my qualifications in more detail in Section II and present my curriculum vitae in Appendix I.

2.    I have been asked by Movant's counsel to value certain corporate securities Barclays' acquired as part of the Sale Transaction, including the Giants Stadium LLC Project Revenue Bonds Series 2007A (Auction Rate Securities) Subseries 2007A-4, 2007A-5,2007A-6, and 2007A-7 ("Giants Stadium Bonds"). [1]  As part of this analysis, I reviewed Barclays' methodologies, procedures, and data used to value these same corporate securities and reviewed Barclays' valuation expert Professor Paul Pfleiderer's January 8, 2010 report (the "Pfleiderer Report") which accepts Barclays' methodologies, procedures, and data in their entirety without independently valuing them. I reserve the right to supplement my analysis in response to any newly produced evidence or in rebuttal to any further opinions offered by Barclays' witnesses.  I also reserve the right to do a more comprehensive CUSIP-by-CUSIP valuation, if necessary, of those securities I did not independently value for purposes of my report.

3.    Navigant Economics (Chicago Partners) charges an hourly rate of $500 for my time.  Other Navigant Economics (Chicago Partners) professionals, working under my direction and supervision, assisted in my analyses and Navigant Economics (Chicago

---

[1] I submit this report on behalf of (a) Lehman Brothers Holdings, Inc. (the "Debtor" or "LBHI", (b) James W. Giddens, as Trustee for the Securities Investor Protection Act Liquidation of Lehman Brothers Inc. (the "Trustee"); and (c) the Official Committee of Unsecured Creditors of Lehman Brothers Holdings, Inc. and its affiliated debtors and debtors in possession (the "Creditors' Committee," together with LBHI and the Trustee, the "Movants") in connection with Movants' motions filed under. Federal Rule of Civil Procedure 60(b) (the "Rule 60(b) Motions").  In the Rule 60(b) Motions, Movants' seek relief from the Order Under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) the Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, dated September 20, 2008 (the "Sale Order").  In the Sale Order, the Court approved the sale (the "Sale Transaction") of certain assets of LBHI, LB 745 LLC, and Lehman Brothers Inc. ("LBI," and together with LB 745 LLC and LBHI, the "Sellers," and together with LBHI's various other foreign and domestic affiliates, "Lehman") to Barclays Capital Inc. ("Barclays") in accordance with the terms set forth in an Asset Purchase Agreement, dated September 16, 2008 ("Asset Purchase Agreement") and related agreements, modifications and purported "clarification[s]" thereof.

---

**Contains Highly Confidential Information**

Partners) was or will be compensated for their work at their customary hourly rates.  Our compensation is not contingent in any way upon the outcome of this matter.

4.    The remainder of the report is organized as follows.  In Section II, I summarize my qualifications. In Section III, I summarize my opinion. In Section IV, I provide the base for my opinion

## II.    <u>SUMMARY OF QUALIFICATIONS</u>

5.    After graduating from Williams College in 1982 with a degree in Political Science, I began my career in the fixed income markets.  For over 22 years, I was an active participant in the global credit markets in New York, Tokyo, and Chicago.   Most recently, I was a Managing Director and Senior Manager of the Institutional Sales and Trading Group for the Chicago Office of Morgan Stanley.  In that capacity, I managed all compliance matters for the fixed income division and supervised a team of sales professionals trading all classes of fixed income products with institutional investors, such as pension funds, banks, insurance companies, investment advisers, and hedge funds.  In the last 17 years of my career in finance, my work was concentrated in the global corporate credit markets trading bonds, loans, structured products, and derivatives.  As a credit salesperson, I bought and sold all credit products, including high yield corporate bonds, investment grade corporate bonds, and derivatives. More specifically, I have bought and sold corporate bonds similar to those I have valued in this matter.

6.     My present position is Senior Advisor at Navigant Economics (Chicago Partners), a subsidiary of Navigant Consulting Inc. Navigant Economics specializes in consulting in the areas of accounting, economics, and finance.  My main area of expertise is in the fixed income credit markets, especially corporate securities.  I have not authored any publications within the last ten years.  My curriculum vitae also lists the expert testimony I have given within the last four years.

**Contains Highly Confidential Information**

### III.  SUMMARY OF OPINION

7.      In this section of my report, I summarize my opinion.  In the remaining sections of the report, I provide the substance of the facts and opinion on which I expect to testify, and the basis for this opinion.  If I receive additional data, facts or information, I will review, evaluate, and analyze these additional data, facts or information as they become available, including, but not limited to, the report(s) of experts in this matter.  I may modify or supplement my report as necessary to reflect any additional information that I receive.

> **Opinion:**  Barclays has undervalued the Giants Stadium bonds as well as the corporate and covered bonds that it acquired from Lehman Brothers Holding, Inc. and Lehman Brothers, Inc. by at least $381,439,055.

### IV.   OPINION AND BASE THEREOF

8.      The following table summarizes the results of my valuation analysis.  The details of my valuations are discussed below in sections A, B, and C.

| TABLE 1 | | | | |
|---------|---|---|---|---|
| Value Difference for Corporate and Covered Bonds | | | | |
| Bond Type | Number of Bonds | Correct Valuation | Barclays Value | Valuation Difference |
| Giants Stadium LLC Project Revenue Bonds | 4 | $408,325,000 | $58,995,135 | $349,329,865 |
| Corporate Bonds (Exc. Giants Stadium LLC) | 16 | $298,058,457 | $269,092,447 | $28,966,009 |
| Covered Bonds | 2 | $296,626,594 | $293,483,414 | $3,143,180 |
| Total | 22 | $1,003,010,051 | $621,570,996 | $381,439,055 |

### A.   BARCLAYS UNDERVALUED THE GIANTS STADIUM BONDS BY OVER $349 MILLION

9.      I conducted an independent valuation of the four Giant Stadium Bonds.  Barclays' valuation of the Giants Stadium Bonds totaled $58,995,135, or $349,329,864 less than my independent valuation.[2]   This $349,329,864 difference represents the

---

[2] BCI-EX-00099519 (Dep. Ex. 86B); BCI-EX-(S)-00213995 (Dep. Ex. 641A).

---

**Contains Highly Confidential Information**

magnitude of Barclays' undervaluation of the Giant Stadium Bonds at the time of the Sale Transaction.

1.    <u>Description of the Giants Stadium Bonds</u>

10.    As part of the Sale Transaction, Barclays acquired four Giants Stadium Bonds with a total principal amount of $408,325,000 and a final maturity date of April 4, 2047. These four bonds were part of a $650,000,000 bond offering that included a total of seven different bonds or subseries ("Subseries" or "Tranche").[3]

11.    The Giants Stadium Bonds were issued by Giants Stadium LLC ("Giants") to finance the costs of developing and constructing a new open air stadium at the Meadowlands Sports Complex in New Jersey ("Stadium").[4] The Giants is a special purpose entity, separate from the New York Football Giants, Inc., formed to construct and operate the Stadium.

12.    The Giants Stadium Bonds are Auction Rate Securities ("ARS"). The coupon rate for each Sub-series or Tranche is determined by an auction process.[5] Until its bankruptcy filing, LBI conducted the auction which set the coupon rate for these bonds.[6] Following Lehman's bankruptcy filing, Goldman Sachs was appointed as broker-dealer for the Giants Stadium Bonds.[7] At the option of the Giants, the Giants Stadium

---

[3] Giants Stadium LLC Project Revenue Bonds, Series 2007A Offering Circular, Cover Page and p.6.

[4] Giants Stadium LLC Project Revenue Bonds, Series 2007A (Auction Rate Securities) Overview: "The Series 2007A Bonds (defined below) are being issued by Giants Stadium LLC, a New Jersey limited liability company (the "Issuer") in part to finance a portion of the costs of the design, development, construction and operation of a new, approximately 82,000 seat, open-air National Football League ("NFL") stadium, including related concession areas and other improvements (the "Stadium"), which will be used by New York Football Giants, Inc., owner and operator of the New York Giants professional football team (such entity and team each being referred to as the "Giants"), and New York Jets LLC, owner and operator of the New York Jets professional football team (such entity and team each being referred to as the "Jets"), for their Respective NFL home games."

[5] Giants Stadium LLC Project Revenue Bonds, Series 2007A Offering Circular, p. 51, "Auction Rate Securities- Interest."

[6] Giants Stadium LLC Project Revenue Bonds, Series 2007A Offering Circular, "Auction Rate Securities-Broker-Dealers; Broker-Dealer Agreements."

[7] "Goldman Sachs to act as broker dealer," November 14, 2008, available at, http://www.giants.com/news/giants_stadium_llc/story.asp?story_id=31900-.

---

**Contains Highly Confidential Information**

Bonds were subject to redemption at a redemption price equal to the principal amount plus accrued and unpaid interest on the Interest Payment Date at the end of every 28 day Auction Period.[8]

13.    At the time of the initial offering of Giants Stadium Bonds, Lehman Brothers entered into a fixed/floating interest rate swap with the Giants with a notional value of $408,325,000 and a termination date of April 4, 2047, set to coincide with the bond maturities.[9]  Under the terms of the swap, Lehman paid a floating rate set by the auctions every 28 days to Giants, while Giants paid a fixed rate of 6.1885% to a Lehman Brother subsidiary, Lehman Brothers Special Financing ("LBSF").[10]  As a result, the Giants fixed their interest cost on the financing at 6.1885% even though the Giants Stadium Bonds themselves would have a variable rate as determined by the auction process.

14.    As stated in the Offering Memorandum:

The Lehman Swap Agreements are intended to hedge the interest rate risk on the Series 2007 A-4 Bonds, Series 2007 A-5 Bonds, Series 2007 A-6 Bonds and the Series 2007 A-7 Bonds (the "Lehman Related Bonds") by providing for payments to the issuer based on the actual rate on the Lehman Related Bonds…[11]

2.    The Sale of the Giants Stadium Bonds to Barclays and Barclays' Alternatives as the Holder of the Giants Stadium Bonds

15.    An ARS auction is deemed to have failed when a sufficient amount of bidders do not participate in the periodic auction. In the case of the Giants Stadium

---

[8]  Giants Stadium LLC Project Revenue Bonds, Series 2007A Offering Circular, p. 11, "Optional Redemption."

[9]  Giants Stadium LLC Project Revenue Bonds, Series 2007A Offering Circular, p. 26 – 28, "The Swap Transactions : The Lehman Swap Agreements."

[10]  Giants Stadium LLC Project Revenue Bonds, Series 2007A Offering Circular, p. 28, "The Lehman Swap Agreements" and Amended and Restated Confirmation, August 16,2007 (Global ID 3286267).

[11]  Giants Stadium LLC Project Revenue Bonds, Series 2007A Offering Circular, p. 28, "The Lehman Swap Agreements."

**Contains Highly Confidential Information**

Bonds, auction failure triggers a reset of the coupon to a failed coupon rate, a rate set at 22% or the maximum allowable rate by law, whichever is lower.[12]

16.    Prior to filing bankruptcy, Lehman held $408,325,000 of Giants Stadium Bonds in the following four sub-series: 2007-A4, 2007-A5, 2007-A6 and 2007-A7.[13]  The coupon history of these bonds shows rate setting from 2.825% to 3.494% between February and September 2008.[14] During this period, both parties to the swap performed according to the agreed terms as the Giants paid Lehman the fixed rate of 6.1885% and Lehman paid the Giants the coupon rate received from the Giants Stadium Bonds each period.

17.    After closing of the Sale Transaction, Barclays took possession of the four Giants Stadium Bonds, but did not step into and assume Lehman's position in the swap agreement with Giants.  Giants had already terminated the swap agreement on September 18, 2008, but were obligated to continue paying the coupon rate set at each auction, regardless of the rate, without receiving that same rate from the swap with Lehman.[15]

18.    As the holder of the Giants Stadium Bonds, Barclays could either bid in the auction at any interest rate they were willing to receive each period or make their $408,325,000 principal amount of securities available for sale to other bidders.  It is well documented that there were few bidders for auction rate securities at this point in time.

---

[12] Giants Stadium LLC Project Revenue Bonds, Series 2007A Offering Circular, "(Bidding by Broker-Dealers…"*Auction Failure"* (which occurs if there are insufficient clearing bids and results in the auction rate being set at the Maximum Interest Rate))";  First Supplemental Indenture of Trust Dated as of August 1, 2007 to Indenture of Trust Dated as of August 1, 2007 Relating to Project Revenue Bonds, Series 2007A Offering Circular, Definitions and Other Provisions of General Application : "Maximum Interest Rate" shall mean the lesser of 22% per annum and the maximum rate of interest permitted by applicable law.

[13] See BCI-EX-00099519 (Dep. Ex. 86B)( providing inventory details); BCI-EX-(S)-00213995 (Dep. Ex. 641A) (same).

[14] Bloomberg: Giants Stadium Corporate Bond Description page (Floating Rate History).

[15] Giants Stadium LLC Proof of Claim, Court Claim Number 316, filed September 22, 2009). Letter from Giants Stadium LLC regarding Statement pursuant to Section 6(d) of ISDA Master Agreement (FGIC-insured) (October 2, 2008) ("Pursuant to our notice, September 18, 2008 (the "Notice") the Early Termination Date for the Transaction under the Agreement is September 18, 2008 and you are the Defaulting Party.").

---

Expert Report of John J Olvany        Page 6

**Contains Highly Confidential Information**

Nevertheless, as the holder, Barclays had a number of attractive alternatives at subsequent rate setting auctions, including:

   i.   Offering their securities for sale to another bidder at any rate lower than the maximum rate of 22%, thereby redeeming the full principal amount;

   ii.   Electing to bid to hold the entire position at any rate up to a maximum rate of 22%;

   iii.   Electing to bid for a portion of the position at any rate up to a maximum rate of 22% while offering the balance of their securities to any potential bidder willing to bid at any rate up to a maximum of 22%.

19.    Barclays could receive rates as high as 22% for each period those bonds were either not redeemed by Giants or other potential bidders did not submit bids lower than Barclays in the auctions. In either scenario where the bonds were redeemed, Barclays would receive the full principal value.

20.    It is also highly likely that Barclays was aware of the Giants willingness to redeem the bonds in the event of extremely high periodic coupon rate. According to Barclays' trading records and publically available sources, the Giants did in fact redeem many, and possibly all of the remaining notes held by Barclays at the full principal value between April 28, 2009 and May 21, 2009.[16] The Giants also had redeemed $100,000,000 of the bonds on April 15, 2008.[17] The Giants likely took these actions to avoid high interest costs resulting from the lack of sufficient bidders willing to hold these securities at these rates.[18] Additionally, Barclays reduced its holdings of Giants Stadium Bonds by $102,000,000 between September 19, 2008 and December 31, 2008 and recorded a gain of $349,329,865.[19]

---

[16] BCI-EX-00297526 (Barclays Trading Data); BCI-EX-00297526-00297541 (Bloomberg Security Descriptions and Corporate Actions).

[17] "NFL's Giants Redeeming $100 million in Auction Debt" by Aaron Kuriloff and Michael McDonald, Bloomberg.com, April 15, 2008.

[18] Bloomberg: Giants Stadium Corporate Bond Description page (Floating Rate History).

[19] BCI-EX-00297320 (supporting "Post Sale Transaction gains and losses for acquired inventory"); BCI-EX-00295932-BCI-EX-00295933(Dep. Ex 533A) (showing a reduction of the four Giants Stadium Bonds held by 12/31/2008 of $102,000,000 and a gain of $349,329,865). The actual

**Contains Highly Confidential Information**

3.    The Correct Valuation of the Giants Stadium Bonds

21.    In order to arrive at a proper valuation of the Giants Stadium Bonds, I assessed the financial condition of the Giants at the time of the Sale Transaction.  On September 17, 2008, just prior to Barclays' acquisition of the Giants Stadium Bonds on September 22, 2008, Moody's Investor Service published an investment grade rating for the Giants and deemed the outlook to be stable.[20]  In its assessment of Giants' financial condition, among other items, Moody's cited the investor protection of a 6 to 12 month debt service reserve fund and the significant amount of long-term contractually obligated revenue sources sufficient to pay approximately 80% of pledged project revenues.[21]  A debt service reserve fund requires that Giants maintain cash sufficient to make timely interest payments for the next 6 to 12 months.  Given the breakdown of the ARS market, investor protective measures are especially important because they permit bond holders to be certain of interest payments regardless of auction outcomes.  In addition to the long-term contractual revenue sources, and the debt service reserve fund, Moody's cited the additional benefit of "two major football teams with well-established franchises."[22]  In addition to Moody's assessment, the Giants themselves stated their "strong underlying credit" in the weeks immediately following the closing of the Sale Transaction.[23]

22.    Based on the Giants' option to redeem, incentive to refinance, and its financial condition, I determined that the Giants were able to pay high periodic coupon rates or redeem the Giants Stadium Bonds either in full or partially every period.

---

transactions between September 19, 2008 and December 31, 2008 that resulted in these gains were not produced in discovery.

[20] Moody's Investor Service Rating Action September 17, 2008, "Moody's Publishes Baa3 Underlying Rating of Giants Stadium LLC; Underlying Outlook is Stable."

[21] Ibid.

[22] Ibid.

[23] Giants Stadium LLC Proof of Claim, Court Claim Number 316, filed on October 22, 2008; stamped as Letter from Giants Stadium LLC regarding Statement pursuant to Section 6(d) of ISDA Master Agreement (FGIC-insured) October 2, 2008: "it is important to note that the stadium project is at this time on budget and a strong underlying credit…"

---

**Contains Highly Confidential Information**

23.    Establishing Barclays' ability to set a high periodic coupon rate up to 22% on all four Giants Stadium Bonds and Giants' ability to meet its financial obligation to pay the periodic interest payments is the first step toward valuation of these bonds. The remaining step for valuation is to determine how long the Giants would be willing to pay the high coupon or, alternatively, when would they refinance the Giants Stadium Bonds held by Barclays.

24.    Based on the Giants' previous actions with other failed auctions, I have valued the securities under various redemption scenarios.[24]  Given the Giants' prior actions, the investment grade credit rating and profile of the project, it is reasonable to conclude that the Giants would use their option to redeem the bonds now. As discussed above, the Giants did redeem the notes Barclays held at the full principal value between April 28, 2009 and May 21, 2009.[25]

25.    It is my opinion that a reasonable market participant would have expected the Giants Stadium Bonds to be refinanced and repaid at par, and I have valued them accordingly.  I priced the bonds at various rates from up to 16% with a variety of redemption timing scenarios.[26]  All the redemption and coupon rate scenarios resulted in valuations of *at least* the full principal value.

26.    It is plausible that market conditions for ARS could be expected to change, and that other potential buyers would be willing to bid for the Giants Stadium Bonds.   Under these conditions, Barclays would also receive full principal value if the new investor's bid was lower than Barclays' and the bids were sufficient to purchase all the bonds held by Barclays.[27]  In this scenario, the value of the bonds would be of equal value as if redeemed by the Giants.

---

[24] "NFL's Giants Redeeming $100 million in Auction Debt" by Aaron Kuriloff and Michael McDonald, Bloomberg.com, April 15, 2008.

[25] BCI-EX-00297526 (Barclays Trading Data); BCI-EX-00297526-00297541- (Bloomberg Security Descriptions and Corporate Actions).

[26] November 19, 2008, Email from Sean Teague to Paul Copson within document Bates- stamped PwC-BarCapWP_00022935.

[27] BCI-EX-00297320 (supporting "Post Sale Transaction gains and losses for acquired inventory"); BCI-EX-00295932-BCI-EX-00295933(Dep Ex 533A), (showing a reduction of the four Giants Stadium Bonds held by 12/31/2008 of $102,000,000 and a gain of $349,329,865). The actual

---

Expert Report of John J Olvany          Page 9

27.    Based on my thorough review of the Giants Stadium Bonds deal documentation and my experience in operating in the ARS market during 2008, I valued the four Giants Stadium Bonds at $408,325,000 on September 19, 2008.  Barclays valued these same securities at $58,995,135, or $349,329,864 less than my independent valuation.[28]  This $349,329,864 difference represents the extent to which the Barclays underestimated the value of the Giant Stadium Bonds at the time of the Sale Transaction.

### 4.    Barclays' Errors in Valuing the Giants Stadium Bonds

28.    In valuing the Giants Stadium Bonds, Barclays used the prices provided by its custodian, Bank of New York ("BoNY"), of $10.01, $10.04, $10.09 and $43.94 on a principal face amount of $100 each.[29]  Barclays utilized the custodial value based on BoNY prices in the absence of vendor pricing from any of its primary sources.[30]  It is understandable that vendor pricing was not available for these securities because none of them are public securities and it was well known in the financial markets that the auction rate securities market was not functioning as it had historically.   However, it was unreasonable for Barclays to accept these deeply discounted prices for a group of securities rated investment grade by Moody's on September 17, 2008, only a few days prior to Barclays' valuation date.  Moreover, the Giants had demonstrated their ability to pay debt service and willingness to redeem the securities at full principal face amount of $100.[31]  Prior to accepting a deeply discounted price of this magnitude, Barclays should have undertaken further due diligence and review to understand the various characteristics of the securities.  In fact, on October 31, 2008, Barclays increased its

---

transactions between September 19, 2008 and December 31, 2008 that resulted in these gains were not produced in discovery.

[28] BCI-EX-00099519 (Dep. Ex. 86B); BCI-EX-(S)-00213995 (Dep. Ex. 641A).

[29] Securities Listing and Pricing Sources.xls, embedded file within PwC-BarCapWP_00022935; BCI-EX-00099519 (Dep. Ex. 86B); BCI-EX-(S)-00213995 (Dep. Ex. 641A).

[30] BCI-EX-00099519 (Dep. Ex. 86B); BCI-EX-(S)-00213995 (Dep. Ex. 641A).

[31] Moody's Investor Service-Ratings Action (September 17, 2008), "Moody's Publishes Baa3 Underlying Rating of Giants Stadium LLC; Underlying Outlook is Stable";NFL's Giants Redeeming $100 million in Auction Debt," by Aaron Kuriloff and Michael McDonald, Bloomberg.com, April 15, 2008.

---

**Contains Highly Confidential Information**

marks from $10.01, $10.04, and $10.09 to $75 for three bonds and from $43.94 to $80 for an increase in valuation of $249,898,615.[32] On December 31, 2008, Barclays increased the valuation yet again to full value for all four bonds, an increase of $349,329,865.[33]

29.    In reaching his conclusion that Barclays' valuation of the Giants Stadium Bonds was reasonable in "an orderly sale under current conditions," Professor Pfleiderer has not provided sufficient reliance materials that would have been necessary to reach the conclusion that the prices provided by BoNY were reasonable.[34] It does not appear that Professor Pfleiderer reviewed any offering memoranda or any other documents specifically related to these securities, including the Moody's report which published an underlying investment grade rating for the Giants Stadium Bonds despite Moody's downgrade of the Financial Guaranty Insurance Company ("FGIC") to non-investment grade, which guaranteed the Giants Stadium Bonds.[35] The only documents produced by Professor Pfleiderer were articles in the financial press discussing the financing, which did not demonstrate adequate due diligence in reaching these conclusions.  Additionally, with regard to the Giants Stadium Bonds, Professor Pfleiderer stated that:

> I just can't remember the particular things that were done with respect to these as opposed to other sets of securities.[36]

B.    **BARCLAYS UNDERVALUED THE CORPORATE BONDS BY NEARLY $29 MILLION.**

30.    I conducted an independent valuation of 16 corporate bonds that were included in the Sale Transaction.  In my opinion, these bonds had a market value of $298,058,457 on September 19, 2008.  Barclays valued these securities at $269,092,447,

---

[32] PwC-BarCapWP_00022935; (Additional Assets- "Giants Stadium-Description of Movement").

[33] BCI-EX-00295932-BCI-EX-00295933, (Dep. Ex. 533A); BCI-EX-00297320.

[34] Expert Report of Paul Pfleiderer, January 8,2010, Volume 1. Appendix 4 at 114.

[35] Moody's Investor Service-Ratings Action September 17.2008 "Moody's Publishes Baa3 Underlying Rating of Giants Stadium LLC; Underlying Outlook is Stable."

[36] Professor Pfleiderer Deposition, February 23, 2010, at 316:23-25.

---

**Contains Highly Confidential Information**

$28,966,009 less than the correct valuation.[37]  This $28,966,009 difference represents Barclays' undervaluation of these securities at the time of the Sale Transaction.

31.    Barclays received a portfolio of corporate bonds as part of the Sale Transaction.  This portfolio included a wide variety of corporate bonds, including securities paying interest on a fixed schedule, securities paying interest on a floating schedule based on a pre-determined formula, and hybrid securities paying interest on a combination of both.  In addition, the portfolio included investment-grade[38] and non-investment-grade bonds issued by foreign and domestic companies.

1.    Background and Introduction to Analysis of Corporate Bond Pricing

32.    Corporate Bonds are traded in private transactions between a dealer and an investor or between two dealers.  Trades for many corporate bonds are reported within 15 minutes of the transaction and included in Trade Reporting and Compliance Engine ("TRACE") database which is supported by the Financial Industry Regulatory Authority ("FINRA") and regulated by the Securities and Exchange Commission ("SEC").  Details of actual transactions are available for many corporate bonds.  However, due to the infrequent trading of these securities, at times, alternative approaches must be considered in valuing corporate bonds.

33.    Using actual transaction data from the TRACE database, I initially researched whether there was actual September 19, 2008 transaction data for these 16 corporate bonds. My analysis of actual transaction data only considered comparable transactions for either the investment grade or non-investment grade corporate bonds.[39]

34.    Where actual transaction price data was unavailable, I valued these 16 corporate bonds using a discounted cash flow analysis, which determines the stream of cash flows due from a bond and discounts them to account for the time value of money,

---

[37] BCI-EX-00099519 (Dep. Ex. 86B); BCI-EX-(S)-00213995 (Dep. Ex. 641A).

[38] Issues rated BBB- (S&P/Fitch) or Baa3 (Moody's) or higher by major credit rating services are generally considered investment grade.

[39] My valuation of investment grade bonds only considered transactions greater than $3 million and for non-investment grade bonds transactions greater than $500,000.

Contains Highly Confidential Information

the risk of default, and other possible market factors. Barclays apparently did not attempt to value any bonds in the portfolio by any method other than external pricing sources.[40]

35.     Using available market sources to determine the risk-free interest rate term structure and default probability curve, I generated model bond prices for the relevant specified dates using a state of the art bond pricing model. This methodology assigns weights to each of the cash flows, which reflect the survival probability of receiving the expected cash flow from the issuer. In particular, the model determines the likelihood of timely repayment of principal and interest and the likelihood of default.

36.     Using my methodology of valuing the corporate bonds on September 19, 2008, I valued 16 corporate bonds at $298,058,457. Barclays' valuation for these securities is $28,966,009 less than my independent valuation.[41] This $28,966,009 difference represents the extent of Barclays' undervaluation of these securities. Consistent with Barclays' methodology described below, I did not reduce the valuation of the corporate bonds to reflect liquidity conditions in the market.

2.      Barclays Misapplied Third Party Pricing It Obtained

37.     In arriving at a valuation for the corporate securities, Barclays calculated its valuation using the ***lowest*** price provided to it by pricing sources. Barclays elected to follow this practice regardless of the number of prices provided by its sources.[42] In addition, Barclays did not evaluate the reliability of the low price in the context of the other prices provided for that security. The low price was used regardless of the range of prices between the highest and lowest price provided by its sources or its proximity to the average price that could have been calculated by Barclays. If only one price was provided for a security, that single price was utilized to value the entire position in that

---

[40] Barclays' valuation methodology resulted in mistakes that undervalued some bonds in the portfolio. For example, Barclays gave no value to a high yield bond issued by Intelsat Bermuda Ltd at the time of the Sale Transaction. Barclays increased the valued of its Intelsat Bermuda bond to $8,400,000 at December 31, 2008. I valued the bonds as of September 19, 2008, at $10,602,670. (BCI-EX-00099519) (Dep. Ex 86-B);(BCI-EX-(S)-00213995) (Dep-Ex-641A); (BCI-EX-00297320).

[41] BCI-EX-00099519 (Dep. Ex. 86B); BCI-EX-(S)-00213995 (Dep. Ex. 641A).

[42] BCI-EX-00099519 (Dep. Ex. 86B); BCI-EX-(S)-00213995 (Dep. Ex. 641A).

**Contains Highly Confidential Information**

security. Finally, Barclays did not adjust its valuations for liquidity or use a reliable actual transactional date from TRACE.

38.     Table 2, below, demonstrates that if Barclays used the average price provided by its third party pricing source instead of the lowest price, the value of the corporate bond portfolio would be higher by $20,289,948.

| TABLE 2<br>Third Party Valuation Differences | | | | | | | Bonds with at Least Two Prices | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Total CUSIPs Analyzed | Average Quantity of Prices per Bond | Bonds with Single Price | Bonds with No Price | Percent not in Sort | Bonds with at Least Two Prices | Total Market Value with Min | Market Value Difference, Min to Avg | Market Value Difference, Min to Max | Percent Change from Min to Avg | Percent Change from Min to Max |
| 517 | 2.69 | 54 | 83 | 26.50% | 380 | $1,179,308,003 | $20,289,948 | $21,790,857 | 1.72% | 1.85% |

39.     By utilizing the lowest price provided for each corporate bond, Barclays valued the entire corporate bond portfolio at the lowest price possible.  This method would seek out prices that are erroneous, defensive, or otherwise unreliable, but Barclays did not make any effort to eliminate prices that may have been reported by its sources that were unreasonable or unreliable in the context of the other prices provided to them. Where Barclays obtained multiple prices significantly above a single low price, Barclays ignored clear evidence that the lowest price was unreliable based on these other prices.

40.     Finally, while Barclays used third party pricing sources, it chose not to use the only actual transaction data available for corporate securities from the TRACE database.[43] Barclays did not use this data source which is based on actual market transactions and not on price information obtained from dealers' trading books or other third party sources.

---

[43] The reported trade volume is capped at $1 million for high yield and unrated bonds and at $5 million for investment grade bonds; Since the final implementation on July 1, 2005, reporting any transaction in qualifying corporate bonds is obligatory for broker-dealers and follows a set of rules approved by the Securities and Exchange Commission (SEC) where all transactions must be reported within 15 minutes of the transaction time. "SEC Approves Amendments to TRACE Rule 6230 to Reduce the Reporting Period to #0 minutes on October 1,2004, and to 15 minutes on July 1, 2005" available at http://www.finra.org/web/groups/industry/@ip/@reg/@notice/documents/notices/p006136.pdf.

---

**Contains Highly Confidential Information**

41.    In his report, Professor Pfleiderer acknowledges that Barclays generally used the minimum quoted price provided by third party sources to value corporate bonds.[44] Professor Pfleiderer apparently accepted this methodology, based on a general view obtained from his staff's conversations with Barclays' representatives regarding falling market prices.  Specifically Professor Pfleiderer states; "the notion was within the time period that they were looking at, prices were falling."[45]  In fact, Professor Pfleiderer acknowledges that discussions "about falling prices" may not have even related to corporate bonds where the valuations were based on minimum prices provided by third parties:

> But that may have been a discussion on corporate or it may have been a discussion on some other group of assets. But I do recall that there was justification for taking the minimum based upon the fact that markets were falling at the time.[46]

42.    In his deposition, Professor Pfleiderer admits that he did not review Barclays' policy for valuing corporate securities to determine whether using minimum prices to value securities was appropriate.[47]

43.    In accepting Barclays' valuation, Professor Pfleiderer accepts the lowest possible valuation for this entire portfolio of assets without any analysis of the portfolio on a CUSIP by CUSIP basis.  The general policy of utilizing the minimum price of third party provider is unreasonable because no market participant in the corporate bond market would attempt to exit his position at the minimum price available in the corporate bond or any other market.  A rational investor would not sell assets at the minimum price quoted in the market.  Instead, it is customary to get prices from multiple sources and sell to the highest bidder, not the lowest.

---

[44] Professor Pfleiderer Deposition, February 23, 2010, at 27: 20.

[45] Professor Pfleiderer Deposition, February 23, 2010, at 265:8-10, at 276:24, 277:1-25.

[46] Professor Pfleiderer Deposition, February 23, 2010, at 265:8-10, 265:13-18.

[47] Professor  Pfleiderer Deposition, February 23, 2010, at 264:16, 264-22.

**Contains Highly Confidential Information**

C.    **BARCLAYS UNDERVALUED THE COVERED BONDS BY OVER $3 MILLION**

44.    I conducted an independent valuation of two covered bonds included in the Transaction.  In my opinion, these bonds had a September 19, 2008 market value of $296,626,594.  Barclays valued these same securities at $293,483,413, $3,143,180 less than my valuation.    This difference represents Barclays' undervaluation of these securities at the time of the Sale Transaction.

45.    Some of the largest positions of corporate securities transferred to Barclays are a sub-category of bonds commonly referred to as Covered Bonds.  Covered Bonds are debt obligations of banks that offer investors two levels of protection from loss of principal.  Generally issued by European banks, they are backed by a special pool of collateral, typically high grade mortgages that remain on the bank's balance sheet, and the general credit of the issuer.  Though backed by mortgages, covered bonds are not subject to amortization or prepayment because the pools are managed, i.e. prepayments are replaced by comparable assets.  The dual protection offered by covered bonds distinguishes them from both senior unsecured debt and asset-backed securities.[48]

46.    Due to their additional protections, covered bonds are valued with significantly lower risk premiums than the senior unsecured obligations of the same issuer.  To value these instruments, I applied the pricing convention used for the deep and liquid U.S. Agency debenture market. This pricing convention is used for the U.S. debenture market because of the minimal default probability recognized by market participants.

47.    The U.S. agency debenture market is priced relative to the matched maturity U.S. dollar swap curve.  Similarly, I valued European bank issued U.S. dollar covered bonds based on secondary market spreads for comparable securities acquired from contemporaneous market research.    This methodology is consistent with the methodology followed by market participants in the U.S. agency, sovereign and supranational bond markets.

---

[48] BIS Quarterly Review (September 2007).

**Contains Highly Confidential Information**

48.     Using my methodology of valuing the covered bonds with contemporaneous data sources specific to this category of highly-rated corporate securities, I valued the two covered bonds at $296,626,594. Even after reducing this value by the same 5% discount that Barclays used to account for the liquidity conditions in the covered bond market, Barclays' valuation was $3,143,180 less, which reflects Barclays' undervaluation of these securities at the time of the Sale Transaction.

49.     In arriving at a valuation for the covered bonds, Barclays calculated an average of two pricing sources also used to provide prices for the U.S. Treasuries and Agency securities. After calculating the average of the prices received, Barclays reduced the valuation by 5%, presumably as a liquidity discount. Due to the depth of contemporaneous market information, my valuations are only 1.12% different from Barclays' after including the same reduction for liquidity.

50.     The total amount of covered bonds in the portfolio was $375,475,000, including a covered bond issued by a Spanish Bank, Banco Bilbao Vizcaya Argentari, S.A. (CUSIP 05946KAA9) that was the 12th largest position in the entire portfolio of 1,182 which included U.S. Government and Agency securities. Despite the size of this portfolio and particularly the size of one of the positions relative to the portfolio, the Pfleiderer Report did not analyze any of this asset group and instead viewed it as the same as the U.S. Agency Securities portfolio. The lack of discussion or analysis put toward valuing these securities in the Pfleiderer Report is indicative of the lack of review conducted for the Pfleiderer Report in arriving at an opinion on the reliability of the Barclays' valuation of the portfolio of securities included in the Sale Transaction.

**Contains Highly Confidential Information**

Submitted by

John J. Olvany

March 15, 2010

**Contains Highly Confidential Information**

**Appendix I**

**Curriculum Vitae**

## JOHN J. OLVANY

30 South Wacker Drive, Chicago IL 60606
john.olvany@naviganteconomics.com
(312) 251-5200

---

## CURRENT EMPLOYMENT

**NAVIGANT ECONOMICS, Chicago IL**                    **December 2008-Present**
**Senior Advisor**

## PROFESSIONAL EXPERIENCE

**CHILTON PARTNERS LLC, Wilmette, IL**                    **September 2008-Present**
**Founder and Managing Partner**
Provide consulting services for disputes and investigations in financial services sector. Primarily focused on litigation support regarding fixed income securities and derivatives including mortgage-backed securities, structured products, credit default swaps, corporate bonds, and collateralized debt obligations.

**MORGAN STANLEY, Chicago, IL**                    **2000-2008**
**Managing Director**, **Institutional Securities Group**
*Head of Chicago Institutional Fixed Income Distribution Office*
Managed and supervised team of thirteen sales professionals trading fixed income products with more than 100 investors including pension funds, banks, insurance companies, investment advisors, and hedge funds.

Products traded by team included residential mortgage backed securities, corporate bonds, structured products, CDOs, and government and agency securities

Monitored Legal and Compliance matters across all major product areas of fixed income including futures and derivatives.

Responsibilities included oversight of marketing materials and valuation distribution for all fixed income products to entire client base.

*Senior Credit Sales Professional*
Provided senior sales coverage for institutional client base of hedge funds, insurance companies, banks, and asset managers.

Traded all fixed income products with primary concentration in credit products including corporate bonds, credit default swaps, credit index and CDOs.

Developed and executed portfolio strategies and trade recommendations by utilizing firm's trading, research, and analytic resources.

Negotiated and executed complex distressed portfolio liquidations to maximize value for client and minimize firm's principal risk in turbulent market conditions.

**Contains Highly Confidential Information**

# PROFESSIONAL EXPERIENCE (CONTINUED)

*Senior Manager of Institutional Sales and Trading Group-Midwest Region*
Acted as Cross-Divisional Relationship Manager for Morgan Stanley with key Midwest institutional clients including Principal Financial, Allstate, Nationwide, and Aegon.

Coordinated with other business units in Chicago (Private Wealth Management, Investment Banking, Prime Brokerage, and Institutional Equity) in matters relating to Institutional Fixed Income Products and assisted with cross-selling of products and services.

**CREDIT SUISSE FIRST BOSTON**, **Chicago, IL**                                    **1996-2000**

**Executive Director**, **Fixed Income Sales**
Responsible for fixed income sales relationships with institutional client base of Insurance Companies, Pension Funds and Asset Managers located in the Midwest
Executed transactions in corporate bonds, derivatives, and securitized products including CMOs, ABS, CMBS, structured notes and CDOs.

**MORGAN STANLEY, Chicago, IL**            **1991-1996 Vice President, Fixed Income Sales**

Responsible for fixed income sales relationships with institutional client base of Insurance Companies, Pension Funds, Banks and Asset Managers.
Executed transactions in corporate bonds, derivatives, and securitized products including Index and Fund-linked notes, CMOs, ABS, CMBS, and CDOs.
Traded the first generation of collateralized debt obligations, including CBOs backed by high yield bonds.

**CONTINENTAL ILLINOIS BANK, Chicago, IL**                              **1989-1991**
**Vice President, Capital Markets Group**
Senior market maker for Long Intermediate Treasury Securities.
Traded with Central Banks, Asset Managers, Regional Banks and Arbitrage Funds.

**S.G. WARBURG, Tokyo, Japan**                                    **1986-1989**
**Vice President, U.S. Treasury Dealer Desk**
Tokyo Representative of U.S. Treasury Dealer

# TESTIMONIAL AND CONSULTING EXPERIENCE

- Authored three expert reports and testified before the London Court of International Arbitration in the matter between fixed income relative value hedge fund and its administrator.                          **September 2008-June 2009**
- Authored expert report for Grand Court of the Cayman Islands in the matter between Phoenix Meridian Equity Limited vs. Lyxor Asset Management S.A., a wholly owned subsidiary of Societe Generale and Scotiabank & Trust (Cayman) Limited
  Cause Number 311 of 2007                                    **June 2009**

**Contains Highly Confidential Information**

## TESTIMONIAL AND CONSULTING EXPERIENCE (CONTINUED)

- Consulted with Respondent's counsel prior to arbitration before Financial Industry Regulatory Authority (FINRA) in matter between several institutional investors and a global bank.                                  **March-April 2009**
- Authored expert report for United States District Court Southern District of New York in a matter between Securities and Exchange Commission v. Jon-Paul Rorech and Renato Negrin (Civil Action No. 09-CIV-4329)                     **February 2010**

## EDUCATION
**B.A., Political Science, Williams College, Williamstown, MA                     1982**

## REGISTRATIONS
Series 7, 9, 10 and 63

**Contains Highly Confidential Information**

**Appendix II**
**Documents Relied Upon**

## Documents in the Record

### Depositions

| Deponent | Date |
|---|---|
| Gary Romain | 9/10/2009 |
| Gary Romain | 1/13/2010 |
| Paul Pfleiderer | 2/23/2010 |

### Deposition Exhibits

| Exhibit | Beginning Bates | Ending Bates |
|---|---|---|
| 86B - Summary of the numbers for Schedules A and B provided to auditors | BCI-EX 00099519 | BCI-EX 00099521 |
| 495 - Debtor's Motion for an Order, Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024, Modifying the September 20, 2008 Sale Order and Granting Other Relief, dated Sept. 15, 2009 | | |
| 533A - Lehman Acquisition Assets Summary | BCI-EX-00295932 | BCI-EX-00295933 |
| 633A - Expert Report of Prof. Paul Pfleiderer, Volume 1 | | |
| 634A - Expert Report of Prof. Paul Pfleiderer, Volume 2 | | |
| 641A - Email from Sean Teague to Tal Litvin, et al., Feb. 12, 2009, re: "Acquisition Balance Sheet," (with attachments). | BCI-EX-(S)-00213990 | BCI-EX-(S)-00213996 |

## Other Documents

| Description | Beginning Bates | Ending Bates |
|---|---|---|
| Giants Stadium Contributing Pricing Factors | BCI-EX_00297331 | |
| Post Sale Transaction Gains & Losses for Acquired Inventory | BCI-EX-00297320 | |
| Bloomberg screen shots, Giants Stadium Bonds | BCI-EX-00297526 | BCI-EX-00297541 |
| Email from Sean Teague to Paul Copson | PwC-BarCapWP_00022935 | |
| Additional Assets -"Giants Stadium - Description of Movements" | PwC-BarCapWP_00023300 | |
| Giants Stadium LLC Project Revenue Bonds, Series 2007A Offering Circular | | |
| Giants Stadium LLC Proof of Claim, Court Claim Number 316, filed on Oct. 17, 2008 | | |
| Motion of Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al., Pursuant to 11 U.S.C. § 105(a), Fed. R. Civ. P. 60(b), and Fed. R. Bankr. P. 9024, for Relief from Order Under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006, dated Sept. 15, 2009 | | |
| Review of Barclay's Capital Price Testing Methodology and Framework | | |
| The Trustee's Motion for Relief Pursuant to the Sale Orders or, Alternatively, for Certain Limited Relief Under Rule 60(b), dated September 15, 2009 | | |
| The Trustee's Adversary Complaint, dated Nov. 16, 2009 | | |

## Documents that are Publicly Available

Bank of International Settlements (BIS) Quarterly Review (September 22, 2008)
Bloomberg LP Data
http://www.finra.org/web/groups/industry/@ip/@reg/@notice/documents/noticse/p006136.pdf
http://www.giants.com/news/giants_stadium_llc/story.asp?story_id=31900-
NFL's Giants Redeeming $100 million in Auction Debt
Port Authority Auction Bonds Reset at 8% After Surge, Bloomberg.com
The Port Authority of new York and New Jersey, Press Release No. 24-2008

## Other Documents Not Cited in the Record and Not Publicly Available

Barclay's Capital Live Data Pull
BT Bulk DD - MABondTicker 09 28 2009 (Spread)
CDS 19-09-2008+12-22-2008
Mabon Ticker 091908
Mabon Ticker 092208

**Contains Highly Confidential Information**

## Appendix III

## Methodology and Data Used

### <u>Giants Stadium</u>

1.       Due to the lack of a pricing model for securities with coupon rates set by an auction process and uncertainty of expected future cash flows based on the willingness and ability of Giants to fully redeem the securities at face value or extend the securities each period, I constructed a model to value the securities with the assistance of my staff working at my direction.

2.       To price the bonds, I used the default forecasts embedded in the Credit Default Swap ("CDS") spreads to discount the expected cash flows on each Giants Stadium Bond.  The actively traded CDS market is a recognized by market participants as a market based indicator of default and survival probability in the fixed income market. No published pricing of CDS spreads is available for Giants Stadium. However, CDS prices on comparable Baa3 credits provide a proxy for valuing the Giants Stadium bonds. Due to the lack of observable CDS pricing, I increased the comparable CDS spreads significantly.

3.        I then discounted each cash flow received from the Giants Stadium bonds using the LIBOR curve plus a spread obtained from the CDS market and added to the LIBOR rates. Although the scheduled timing of these cash flows is known, the number of payments is not because Giants can choose to redeem. Using a 16% coupon rate for the Giants Stadium Bonds, well below the maximum possible coupon of 22%, I discounted the monthly cash flow using a discount rate incorporating LIBOR and a survival

Expert Report of John J Olvany

**Contains Highly Confidential Information**

probability for each period.  I then calculated prices for each period over the next two years.  Finally, I analyzed the redemption scenario for each period using various discount rates and concluded that the Giants Stadium Bonds' value would never be less than the full principal amount.

4.       Alternatively, I analyzed scenarios where the bonds would default at the end of each period and the investor would either receive the cash flow of each coupon period or some recovery rate for their investment.  In each instance, this method provided similar valuations in excess of par.

### Corporate Bonds

5.       The heart of corporate bond valuation is discounted cash flow analysis: determining the stream of cash flows due and discounting them to account for the time value of money, the risk of default, and other possible market factors.  Discounts are applied using an interest rate term structure[1] and an adjustment for credit risk determined through appropriate survival probability, or equivalent default probability.

6.       Credit risk can be handled either by adjusting the cash flows or the discount factors.  I applied the more widely used method of adjusting the bond cash flows, using the survival probability to determine the bond's value.

7.       To determine the market based inputs for corporate bond cash flow survival probability, I observed the CDS prices across a range of maturities. CDS price data documents the way traders accounted for the risk that the issuer of a bond defaults,

---

[1] Per standard industry convention, I have used LIBOR rates to represent the interest rate term structure.

Expert Report of John J Olvany

**Contains Highly Confidential Information**

i.e. a company. CDS closing price data was obtained from Markit Group Ltd., Bloomberg and Barclays Capital Live.

8.      The interest rate data and bond cash flow descriptions for each individual bond were sourced from Bloomberg. Prices implied by default probabilities from the credit default swap market and actual bond prices are distinct; this difference is commonly referred to as the "basis."  In order to adjust for this basis, I relied on Morgan Stanley data from contemporaneously published research reports.[2]  When I did not have the basis for individual bonds, I relied upon the credit default swap basis provided by Morgan Stanley for the industry Bloomberg classified the bond within.

9.      If a specific corporate bond cash flow was dependent on optional redemption by the issuer or changes in the coupon rate based on a predetermined formula, I valued the optional features.

10.      I valued the corporate bonds using the CDS data and basis.  I checked my results by calculating an option adjusted spread for each security from the prices derived from the CDS data and basis pricing.  I found the results obtained from both methods to be consistent.

## Covered Bonds

11.      In addition to the interest rate data gathered from Bloomberg for the September, 19, 2008 valuation of the corporate bonds, I used contemporaneous market research available from Barclays Capital Live to determine primary and secondary market trading levels for the covered bond sector of the corporate bond market. The research provided

---

[2] The credit default swap basis defines the relationship in pricing between the corporate bond and credit derivatives market.

Expert Report of John J Olvany

**Contains Highly Confidential Information**

pricing information for covered bonds issued by numerous banks in North America and Europe.

12.     The bond description information available for each covered bond from Bloomberg was imported into the pricing model. Using contemporaneous pricing for interest rates and the market spreads observed, I calculated prices for these securities. To test these results, I compared the valuation of these securities to other highly rated securities such as U.S. agency debentures and sovereign bonds.  The results were consistent.

Expert Report of John J Olvany

**Exhibit I**                                                        **Contains Highly Confidential Information**

| Asset Class | CUSIP |
| --- | --- |
| **Corporate Bonds** | 413627AY6 |
| | 656533AA4 |
| | 962166BP8 |
| | 80927GAH9 |
| | 52517PK59 |
| | 00386SAE2 |
| | 026874BU0 |
| | 52517PA35 |
| | 52517PYN5 |
| | 458204AD6 |
| | 89354FAE1 |
| | G46715AD3 |
| | 00254ECN0 |
| | 026874BR7 |
| | 48121CA97 |
| | 06739GAD1 |
| **Covered Bonds** | 05946KAA9 |
| | 40411EAA6 |
| **Giants Stadium LLC** | 374593AL5 |
| | 374593AM3 |
| | 374593AN1 |
| | 374593AP6 |
| **Corporate Bond** | **16** |
| **Covered Bond** | **2** |
| **Giants Stadium LLC** | **4** |
| **Total Sum** | **22** |

Expert Report of John J Olvany

| Asset Class | CUSIP | Chicago Partners Bid Value 09/19/08 | Barclays Bid Value | Difference between Chicago Partners and Barclays Values (bid to bid) |
|---|---|---|---|---|
| **Corporate Bonds** | 413627AY6 | 50,964,636.617 | 45,126,579.375 | 5,838,057.242 |
| | 656533AA4 | 54,409,412.587 | 49,715,318.385 | 4,694,094.202 |
| | 962166BP8 | 57,115,313.390 | 56,719,949.955 | 395,363.435 |
| | 80927GAH9 | 28,920,783.211 | 26,244,893.237 | 2,675,889.974 |
| | 52517PK59 | 4,227,300.000 | 5,736,150.265 | (1,508,850.265) |
| | 00386SAE2 | 19,122,918.601 | 18,122,337.505 | 1,000,581.096 |
| | 026874BU0 | 10,747,241.000 | 10,865,932.838 | (118,691.838) |
| | 52517PA35 | 2,898,006.250 | 4,178,002.235 | (1,279,995.985) |
| | 52517PYN5 | 2,707,052.500 | 4,417,693.566 | (1,710,641.066) |
| | 458204AD6 | 10,602,669.702 | 0.000 | 10,602,669.702 |
| | 89354FAE1 | 13,789,751.526 | 11,829,659.250 | 1,960,092.276 |
| | G46715AD3 | 6,803,836.080 | 6,825,648.750 | (21,812.670) |
| | 00254ECN0 | 5,010,610.000 | 5,072,856.300 | (62,246.300) |
| | 026874BR7 | 8,404,635.942 | 4,216,784.850 | 4,187,851.092 |
| | 48121CA97 | 12,924,304.250 | 11,002,532.676 | 1,921,771.574 |
| | 06739GAD1 | 9,409,985.160 | 9,018,108.258 | 391,876.902 |
| **Covered Bonds** | 05946KAA9 | 260,281,000.000 | 258,337,209.750 | 1,943,790.250 |
| | 40411EAA6 | 36,345,594.000 | 35,146,203.753 | 1,199,390.248 |
| **Giants Stadium LLC** | 374593AL5 | 118,400,000.000 | 11,848,524.800 | 106,551,475.200 |
| | 374593AM3 | 118,400,000.000 | 11,892,688.000 | 106,507,312.000 |
| | 374593AN1 | 118,525,000.000 | 11,964,980.225 | 106,560,019.775 |
| | 374593AP6 | 53,000,000.000 | 23,288,942.000 | 29,711,058.000 |
| **Corporate Bond** | **16** | 298,058,456.816 | 269,092,447.445 | 28,966,009.372 |
| **Covered Bond** | **2** | 296,626,594.000 | 293,483,413.503 | 3,143,180.498 |
| **Giants Stadium LLC** | **4** | 408,325,000.000 | 58,995,135.025 | 349,329,864.975 |
| **Total Sum** | **22** | 1,003,010,050.816 | 621,570,995.972 | 381,439,054.844 |

## Summary of Valuation Differences for Corporates as Distinguished by Exhibit 86-B
### (amounts in millions of dollars)

| | Number of CUSIPs | Barclays' Opening Balance Sheet Valuation | Olvany 9/19/2008 Valuation (at Exit Marks) | Valuation Difference (Barclays' Undervaluation) |
|---|---|---|---|---|
| **Residential Mortgage Backed Securities** | | | | |
| **Corporate Bonds** | 16 | $280 | $654 | $373 |
| **Emerging Markets** | 3 | $37 | $40 | $3 |
| **Equities** | | | | |
| **Rates** | 2 | $293 | $297 | $3 |
| **Principal Mortgage Trading Group** | 1 | $11 | $13 | $2 |
| **Total** | **22** | **$622** | **$1,003** | **$381** |

Expert Report of John J Olvany

# Exhibit N

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                                  |

In re:                             |
                                  | Chapter 11

LEHMAN BROTHERS HOLDINGS INC., *et al.,* |
                                  | Case No. 08-13555

                    Debtors.   |
-------------------------------------------------------------x (Jointly Administered)
                                  |

In re:                             |
                                  |

LEHMAN BROTHERS INC.,          |
                                  | Case No. 08-01420 (JMP) SIPA

                    Debtor.   |
-------------------------------------------------------------x

EXPERT REPORT OF HARRISON J. GOLDIN
Senior Managing Director,
Goldin Associates, LLC

March 15, 2010

# TABLE OF CONTENTS

I.   Scope of Engagement ....................................................................................... 3

II.   Credentials .................................................................................................... 4

III.  Executive Summary ....................................................................................... 5

IV.  Background................................................................................................... 9

V.   Transaction Disclosed to Court..................................................................... 11

   A.   Asset Purchase Agreement and Hearing......................................... 11

   B.   Assets to be Acquired .................................................................. 14

   C.   Liabilities to be Assumed .............................................................. 15

   D.   Summation .................................................................................. 16

VI.  What Barclays Received or Claims the Right to Receive............................... 18

   A.   Barclays' Acquisition Balance Sheet ............................................ 18

   B.   Summation .................................................................................. 36

VII. Conclusion ................................................................................................. 36

## LIST OF EXHIBITS

Exhibit 1: Curriculum Vitae

Exhibit 2: Materials Relied Upon

I.  Scope of Engagement

The Securities Investor Protection Act ("SIPA") Trustee for Lehman Brothers Inc. ("Trustee") retained Goldin Associates, LLC ("Goldin") in the above-captioned SIPA proceeding ("Proceeding") to render this report and provide expert testimony in connection with The Trustee's Motion for Relief Pursuant to the Sale Orders or, Alternatively, for Certain Limited Relief Under Rule 60(b) filed by the Trustee in the Proceeding on September 15, 2009 (the "Motion").[1] The Trustee's Motion seeks an order interpreting the Bankruptcy Court's Sale Orders[2] entered in connection with the acquisition of certain assets and related business operations of Lehman Brothers Holdings Inc. ("LBHI") and affiliates, including Lehman Brothers Inc. ("LBI" and together, "Lehman") by Barclays Capital Inc. ("Barclays") on or about September 22, 2008.

This report addresses and rebuts a number of assertions, alleged facts and opinions proffered by Barclays and its retained experts in reports filed in this Proceeding, including, in particular, by Professor Paul Pfleiderer. I was asked to compare the disclosure to the Bankruptcy Court about the Lehman assets to be transferred to Barclays pursuant to the Sale Order the Court entered on September 22, 2008 with the acquisition gains Barclays reported to the United States Securities and Exchange Commission (the "SEC") in a regulatory filing that included its acquisition balance sheet. I was not asked to conduct an independent valuation of the elements of the transaction, for which, I understand, the Movants have retained other experts.

---

[1] Motions seeking similar relief have been filed by Lehman Brothers Holdings Inc. ("LBHI") and the Official Committee of Unsecured Creditors appointed in the bankruptcy proceeding of LBHI (the "Creditors Committee") (together with the Trustee, the "Movants").
[2] Or, alternatively, for certain limited relief from the Sale Orders.

II. <u>Credentials</u>

I am the senior managing director of Goldin, a financial advisory and consulting firm that specializes in distressed situations, including bankruptcies and financial restructurings.  I have over twenty years of experience acting as senior officer, trustee, examiner or financial advisor in large and complicated bankruptcies—including Enron, Rockefeller Center Properties, Loral Space & Communications, Coudert Brothers, Bruno's, PSINet Consulting Solutions and many others.  I am a Fellow of the American College of Bankruptcy.

I have extensive experience managing, investigating and advising in connection with failed financial services companies and the disposition of their assets. I was Chief Executive Officer of Refco, Inc., a multi-billion dollar commodities, futures and stock brokerage firm that was the largest U.S. bankruptcy filing of 2005, during its bankruptcy. I was financial advisor to the Official Committee of Unsecured Creditors of Drexel Burnham Lambert Trading Corporation in what was formerly the largest financial services bankruptcy in history. I was the court-appointed trustee for Monarch Capital, a diversified financial services company, and Granite Partners, one of the largest hedge funds to seek bankruptcy protection.  Additional financial services companies I have overseen, investigated or advised include Cityscape, First Interregional Advisors, Interbank Funding, District 65 Retirement Trust, Pharmacy Fund, MCorp, Mezzonen Fund, Circle T and Associated Capital Investors.

Before founding Goldin, I was for 16 years the elected Comptroller of The City of New York. As chief financial officer of New York City, I directed its financial and investigative audit units and managed its $40 billion pension fund. I was voted the best comptroller in the United States by a panel of more than 100 experts selected by Crain's Publications.  Before being elected

Comptroller, I worked in the brokerage industry (for Edwards & Hanley and James H. Oliphant & Co.) and was a licensed broker.

I was a founding Chair of the Council of Institutional Investors. For many years I was an Adjunct Professor of Accounting at the Stern Graduate School of Business at New York University. I have also taught finance at Columbia Law School and as an Adjunct Professor of Law at Cardozo and New York Law Schools. Annexed hereto as Exhibit 1 is a copy of my curriculum vitae.

I was assisted in the preparation of this report by consultants at Goldin with experience in corporate finance, financial services audit and investigation, securities valuation and other relevant subjects.

## III. Executive Summary

Lehman, a 150 year old leading investment bank and broker/dealer, succumbed to the deep recession that started in December, 2007 and filed for bankruptcy protection on Monday, September 15, 2008.[3] Over the ensuing week Lehman negotiated a transaction whereby Barclays would acquire certain assets of Lehman's North American lines of business, including certain financial assets.

At a hearing before the Bankruptcy Court on Friday, September 19, 2008 and into the early morning of September 20, 2008, the Court approved the sale to Barclays, which was consummated the following Monday morning, September 22, 2008, before the financial markets opened in the United States.

In a subsequent filing of its Form 20-F with the SEC on March 24, 2009 (the "SEC Disclosure") that included a summary of Barclays' acquisition balance sheet (referenced

---

[3] LBI, the broker/dealer, entered a SIPA proceeding on September 19, 2008.

elsewhere in this matter as Deposition Exhibits 88B or 377A), Barclays reported that it realized a $4.2 billion gain on its Lehman acquisition. Following this filing and significant discovery under Bankruptcy Rule 2004, the Movants filed an action against Barclays in the Bankruptcy Court, alleging that Barclays received and/or claims entitlement to far more Lehman assets than the Court authorized in approving the transaction. *Inter alia*, Barclays has proffered the opinions of various experts, including Professor Paul Pfleiderer.

I have reviewed, *inter alia*, the Movants' pleadings, the reply by Barclays, the report of Mr. Pfleiderer, other relevant material produced in discovery and the relevant transcripts of hearings before the Court.[4] I believe they demonstrate that Barclays has materially overstated the assets and values it was entitled to receive pursuant to the Sale Order and that Mr. Pfleiderer is wrong in his conclusions relating thereto. In this report I set forth my conclusions in rebuttal and the basis for those conclusions.

The table on the following page summarizes the results of my analysis. The first and second columns list the values of the assets and liabilities that are contained in the record the Court had before it on September 20, 2008, when it entered the order authorizing the sale of Lehman assets to Barclays. The third and fourth columns categorize the assets in the same way Barclays did in the Form 20-F it filed with the SEC in March, 2009.

At the hearing on September 19, 2008 the Court was told Barclays would receive certain assets worth $47.4 billion and real estate worth $1.29 billion, for a total of $48.69 billion; the attendant liabilities totaled $50.54 billion. Using accounting conventions, Barclays reported to the SEC that the value of the assets it acquired was $59.18 billion, while it assumed $55.01 billion of liabilities.

---

[4] See Exhibit 2 to this report for a list of materials I have relied on.

| Categories Reported to Court | As Reported to Court | | Acquisition Balance Sheet Categories | Original Acquisition Balance Sheet (Dep. Ex. 377A) | |
|---|---|---|---|---|---|
| | Assets | Liabs | | Assets | Liabs |
| Financial Assets | 47.40 | | Initial Inventory - PCG mid | 42.61 | |
| | | | JPM Inventory - PCG mid | 3.92 | |
| | | | Valuation adjustment | (2.09) | |
| | | | Cash receivable from JPM | 1.25 | |
| | | | Accrued interest | 0.35 | |
| | | | Cash collateral received | 0.30 | |
| | | | OCC margin against exchange traded options | 1.31 | |
| | | | OCC customer and clearing margin | 0.98 | |
| | | | Exchange traded options - derivative MtM | | 1.10 |
| | | | Futures assets | 3.78 | |
| | | | Futures customer payables | | 2.604 |
| | | | Additional unencumbered assets | 0.71 | |
| | | | 15c3 asset | 0.77 | |
| | | | PIM customer receivables | 1.59 | |
| | | | PIM deposit | 0.32 | |
| | | | PIM customer payables | | 1.93 |
| 7th Avenue | 0.96 | | 7th Avenue | 0.96 | |
| Data Centres | 0.33 | | Data Centres | 0.33 | |
| | | | Intangible assets/operating leases | 1.45 | |
| | | | Subsidiaries (3 overseas + Townsend) | 0.03 | |
| | | | Prepayments/deposits | 0.07 | |
| | | | Fixtures, fittings, software, etc | 0.53 | |
| Assumed Liabilities | | 45.50 | LBI repo liability | | 45.00 |
| Cure Payments | | 1.50 | Cure payment | | 0.22 |
| Bonuses | | 1.70 | Bonus - cash element | | 1.70 |
| | | 0.30 | Credit to equity - stock element of bonus | | 0.30 |
| **Consideration:** | | | **Consideration:** | | |
| Purchase Price | | 0.25 | Assets | | 0.25 |
| 7th Avenue | | 0.96 | 7th Avenue | | 0.96 |
| Data Centres | | 0.33 | Data Centres | | 0.33 |
| | | | Stamp Duty | | 0.03 |
| | | | Acquisition costs | | 0.04 |
| | | | Deferred tax liabilities | | 0.53 |
| **Total** | **48.69** | **50.54** | **Total** | **59.18** | **55.01** |
| **Net Gain/(Loss)** | **(1.85)** | | **Net Gain/(Loss)** | **4.17** | |

When the Court approved the transaction described at the hearing that began on
September 19, 2008, it authorized the parties to "clarify" in writing and subsequently file with
the Court a letter delineating the terms of the deal. Before the hearing on September 19 the Court

had been presented with an executed asset purchase agreement (filed on September 17, 2008, the

"Original APA"). At a preliminary hearing on September 17 the Court established a process for

its consideration and possible approval of the transaction. Hence, by the time the hearing

commenced on September 19 the parties had told the Court what assets of Lehman's North

American lines of business Barclays would acquire and the types of liabilities it would assume.

The Court was also given the values of certain financial assets, as well as those of certain

liabilities.

    At the hearing on September 19, 2008 the Court was told that various changes to the deal

had arisen in the previous hectic days of volatile and chaotic markets and that the transaction

being presented for approval now involved the sale of $47.4 billion of financial assets and $1.29

billion of real estate, with Barclays assuming $45.5 billion of liabilities relating to the financial

assets (as well as some $3.5 billion of other liabilities) and paying $1.54 billion in cash

(comprising $1.29 billion for certain real estate and an additional $250 million). That the net

transaction value to Barclays was negative $1.85 billion was hardly surprising, given that

Barclays was paying just $250 million for all the intangible property and certain other assets,

including specifically the going concern value of the businesses it was acquiring. Indeed,

Barclays subsequently valued those assets at $2.08 billion. On the basis of this record the Court

appropriately found that "[t]he consideration constitutes reasonably equivalent value" and

approved the transaction.

    As it affirmed in its report to the SEC, Barclays either received or seeks substantially

more Lehman assets than were delineated in the record before the Court and claims to have

assumed some additional liabilities, as well. Barclays claims it is entitled to the additional assets

primarily by virtue of the "clarification" to the Original APA that the parties negotiated after the

hearing on September 19. But given that the Court's approval of the transaction was conditioned on no material subsequent changes to the deal and that the Court indicated it would consider a $500 million change material, an increase of over $6 billion in Barclays' "take" from the transaction (from minus $1.85 billion to plus $4.17 billion) cannot be considered anything other than material. Even after making adjustments that remove the value of intangible assets and tax liabilities, as Mr. Pfleiderer does in his analysis, the gain reflected in the SEC Disclosure exceeds the gain disclosed to the Court by approximately $4.85 billion.[5] From my experience, this difference is far greater than an informed person would consider, as Mr. Pfleiderer put it, "not unusual, unexpected, or unreasonable."[6] Given these facts, I do not believe it can be said that "the consideration constitutes reasonably equivalent value."

IV. Background

In 2008 Lehman was the fourth largest investment bank in the United States. For over 150 years Lehman had been a leader in global financial markets, offering a full array of financial services in equity and fixed income sales, trading and research, investment banking, asset management, private investment management and private equity. As of May 31, 2008, Lehman's consolidated assets totaled approximately $639 billion and its consolidated liabilities totaled approximately $613 billion.[7]

As the recession deepened from December, 2007 forward, conditions in global financial markets deteriorated markedly; for most of 2008 Lehman operated in a highly unfavorable business environment. Relevant factors included a continuing lack of liquidity in credit markets,

---

[5] This increment excludes any adjustments for undervaluation and other issues addressed in reports submitted by the Movants' other experts.

[6] Pfleiderer ¶¶ 5.c.; ¶ 8 n.11; 119; 121.

[7] Lehman Brothers Holdings Inc. Form 10-Q for the quarter ended May 31, 2008, at 4-5.

significantly depressed volumes in most equity markets, a widening of fixed income spreads and declining asset values. Ultimately, instability in the financial and credit markets overall engendered severe liquidity problems for Lehman. Following a decision by its regulators and the heads of other major financial institutions not to provide emergency funding, on September 15, 2008 LBHI and certain of its affiliates (the "Debtors") filed for bankruptcy; on September 19, 2008 LBI entered into a SIPA proceeding.

For a period prior to the bankruptcy filing, various financial institutions and other investors reportedly considered the acquisition of Lehman; Barclays was among those institutions. Immediately after the bankruptcy filing, Barclays pursued a purchase of the majority of Lehman's North American assets and a take-over of its related investment banking and capital markets business operations. In an extraordinarily expedited process, the parties entered into such an agreement (subject to Bankruptcy Court approval) on September 16, 2008. The Bankruptcy Court approved applicable sale procedures on September 17, 2008 and the Court held a sale hearing on Friday, September 19, 2008 and into the early hours of the following day. The Court entered Sale Orders (in each of the bankruptcy and SIPA proceedings) on September 20, 2008. The transaction was consummated on Monday morning, September 22, 2008, before the opening of financial markets in the United States.

The transaction presented to LBHI's board for its approval on September 16, 2008— which it approved at a meeting that day—was described to the board as "a wash," that is, the consideration Lehman would receive would approximate the value of the assets it sold.[8] At the hearing on September 19, 2008 the Court was told that major changes to the deal had occurred

---

[8] Lehman Brothers Holdings Inc., Minutes of the Board of Directors, September 16, 2008, at 4 ("For LBI, the transaction was described as a wash – with Barclays assuming liabilities, including employee liabilities and contract cure amounts, basically equivalent to the assets.").

since September 16, 2008; the updated transaction described to the Court involved a purchase by Barclays of assets valued at approximately $1.85 billion less than the consideration it provided. On this record the Court entered the Sale Orders, finding, *inter alia*, that the consideration constituted "reasonably equivalent value."[9] Months later, when Barclays filed its 2008 Annual Form 20-F with the SEC, it reported a gain of £2.262 billion ($4.2 billion) on its acquisition of Lehman.[10]

## V.  Transaction Disclosed to Court

### A.  Asset Purchase Agreement and Hearing

On September 17, 2008 the Debtors filed a motion seeking authorization to enter into the transaction described in the Original APA, dated September 16, 2008. The Original APA described Barclays' acquisition of Lehman assets as follows:

- The acquisition of securities, consisting of "government securities, commercial paper, corporate debt, corporate equity, exchange traded derivatives and collateralized short-term agreements," with a Lehman book value[11] of approximately $70 billion[12]

---

[9] Order Under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) The Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, ¶ M.

[10] Barclays PLC, Barclays Bank PLC, Form 20-F, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, For the fiscal year ended December 31, 2008, at 235 (see also 3, 11, 32, 45).

[11] While "book value" is not a defined term in the Original APA, it clearly refers to the values of those securities on Lehman's books and records. Section 3.3 highlights that this interpretation is appropriate; it describes a process for determining post-closing profits and losses respecting the purchased securities "by reference to LBI's marks (book value)." The "values" cited in the Original APA and during the hearing on September 19, 2008 cannot reasonably be inferred to refer to anything other than Lehman book values. Lehman surely did not contemplate a transaction based on values derived from Barclays' unilateral valuation of the securities. For Lehman would thereby have ceded to Barclays unfettered discretion to assign arbitrarily low values to securities transferred to it. Had the transaction contemplated values derived in some

- The assumption of short positions with a Lehman book value of approximately $69 billion

- The purchase of certain real estate at prices to be determined through an appraisal process

- The acquisition of 50% of a portfolio of residential mortgage-backed securities (the "RMBSs")

- The assumption of liabilities for bonuses due to Lehman employees transferring to Barclays

- The assumption of liabilities for cure costs relating to contracts assumed by Barclays

- The payment of $250 million by Barclays to Lehman

- The acquisition of various intangible assets relating to portions of the businesses

- The transfer of some amount of cash to Barclays

- A provision whereby Lehman would share in a portion of any net gain Barclays might realize from the sale of the long and short positions it acquired

During the hearing on September 19, 2008 the Debtors informed the Court that the parties had modified the Original APA via an amendment (the First Amendment to the Asset Purchase Agreement, offered into evidence at the hearing on September 19, 2008, the "First Amendment"). The key terms of that document are as follows:

- Barclays to set aside $250 million of the purchase price to secure guarantees to the Depository Trust & Clearing Corporation (the "DTCC")

---

other way, say by mutual agreement between Lehman and Barclays, the Original APA would surely have so stated and adverted to an applicable process. Or had the transaction contemplated values from actual subsequent sales, the Original APA would have had to have included a true-up mechanism. Indeed, in my experience, it is not unusual for transactions involving financial institutions to reference the seller's book values.

[12] Original APA at 6.

- The portion of the RMBSs to be transferred to Barclays was changed from 50% to 100%

- 50% of the RMBSs transferred to Barclays would secure guarantees to the DTCC

- To the extent the $250 million set aside from the purchase price and 50% of the RMBSs was not needed to cover obligations to the DTCC, any portion remaining after satisfying such obligations would be returned to the seller

At the hearing, Debtors' counsel outlined several other meaningful modifications to the transaction not yet reflected in any written agreement between the parties. The significant modifications are as follows:[13]

- The value of the securities being sold by the Debtors changed, from $70 billion to $47.4 billion

- The value of the short positions being assumed changed, from $69 billion to $45.5 billion

- The provision in the Original APA whereby Lehman and Barclays would share post-closing gains on the acquired positions was removed

- The price for the real estate being acquired was reduced to match the appraised amount

- Two foreign subsidiaries were now identified as being acquired by Barclays as part of the transaction

- A business called Private Investment Management ("PIM") was added to the transaction

---

[13] 9/19/08 APA Hearing Tr. at 47:1-49:19.

- The provision in the Original APA that called for cash to be transferred to Barclays was eliminated

Debtors' counsel said the modifications to the deal described during the hearing would be memorialized in a letter that would be filed later. Debtors' counsel also noted that there were other, less material changes to the transaction that did not require discussion at the hearing. As to that, the Court said: "I still consider 500 million dollars material, though."[14] At the conclusion of the hearing, the Court approved the transaction.

B.  Assets to be Acquired

During the hearing on September 19, 2008 Debtors' counsel reported that the value of the financial assets being acquired by Barclays was $47.4 billion.[15] As part of the transaction, Barclays agreed to acquire Lehman's headquarters building in Manhattan and two data centers in New Jersey. The agreement called for an appraisal, with Barclays paying the appraised value for these real estate assets. The Original APA estimated the value of this real estate at $1.45 billion; but Debtors' counsel noted at the hearing on September 19, 2008 that the appraised values were lower than had been estimated—approximately $1.29 billion.[16]

In addition to the foregoing assets, for which values were provided either in the Original APA or at the hearing on September 19, 2008, the transaction called for Barclays to acquire a number of intangible assets. These included intellectual property, real property leases, customer

---

[14] 9/19/08 APA Hearing Tr. at 54:21-22.

[15] 9/19/08 APA Hearing Tr. at 47:1-4.
Debtors' counsel noted a potential transfer of residential mortgage securities from Lehman to Barclays, but did not say that the value of the securities would be incremental to the $47.4 billion value transfer cited. Indeed, when queried by the Court as to the value of these securities, counsel expressed uncertainty and provided no estimate of their value; rather, counsel explained that the securities were pledged to the DTCC and that the principal benefit of the pledge was that it allowed the estate to continue trading.

[16] 9/19/08 APA Hearing Tr. at 139:18-22.

lists, furniture, equipment, permits and licenses. The transaction also included the stock in several of the Debtors' foreign subsidiaries.

    C.  <u>Liabilities to be Assumed</u>

    After describing the change in the securities being acquired during the hearing on September 19, 2008, Debtors' counsel also noted that the amount of the liabilities Barclays would be assuming had changed to $45.5 billion.[17]

    An additional liability Barclays was to assume related to the cost of bonuses and severance for Lehman employees. Under Section 9.1(b) of the Original APA, Barclays was to pay severance to former Lehman employees terminated between the closing and December 31, 2008, in accordance with Lehman's past practices. Section 9.1(c) calls for Barclays to pay out incentive compensation for fiscal year 2008 in the amount accrued by Lehman. The Original APA indicates that the amount of this accrual is reflected on a schedule that was provided to Barclays and initialed by officers of Lehman and Barclays. Although this schedule was not attached to the Original APA, Exhibit 19 appears to be that document.[18] It contains a line item called "Comp," with an amount of $2 billion.

    The Original APA contains a section delineating a process whereby Barclays would assume executory contracts as part of the transaction. Barclays was given 60 days after the closing to identify the contracts it wished to assume; thereafter, Barclays would be obligated to make any cure payments due and owing in connection with those contracts. Although the Original APA offers no estimate as to the cost associated with the contracts, $2.25 billion was the amount referenced on the schedule cited in section 9.1(c) of the Original APA. During the

---

[17] 9/19/08 APA Hearing Tr. at 47:5-6.

[18] Although the APA describes a schedule initialed by officers of both firms, Exhibit 19 appears to have been initialed only by a Lehman officer.

hearing on September 19, 2008 Debtors' counsel indicated that the cure amount represented a potential exposure of $1.5 billion.[19]

The Original APA called for Barclays to pay LBI $250 million of cash consideration as part of the transaction. A provision in the First Amendment subjected this payment to a holdback, pending the resolution of DTCC claims.

As I have noted, the transaction obligated Barclays to purchase three key real estate assets: the Lehman headquarters building in Manhattan and two data centers in New Jersey. Based on appraisals, Barclays was required to pay approximately $1.29 billion in cash for those assets.

The Original APA also called for Barclays to assume several additional liabilities for which no values were cited. These liabilities included transfer taxes, obligations under real property leases acquired and certain ordinary course accounts payable.

D.  <u>Summation</u>

Based on the record presented to the Court, the transaction involved a transfer to Barclays of $48.69 billion of assets in exchange for $50.54 billion of liabilities and other consideration.

---

[19] 9/19/08 APA Hearing Tr. at 100:1-4.

## FINANCIAL ASSETS & PURCHASED REAL ESTATE
### (AMOUNTS NOTED ON THE RECORD)

| Item | Amount (mm) |
|------|------------:|
| Financial Assets | $ 47,400 |
| Lehman headquarters | 960 |
| Data Centers | 330 |
| **Total** | **$ 48,690** |

## LIABILITIES
### (AMOUNTS NOTED ON THE RECORD)

| Item | Amount  (mm) |
|------|------------:|
| Assumed Liabilities | $ 45,500 |
| Lehman headquarters | 960 |
| Data Centers | 330 |
| Cure Amounts | 1,500 |
| Compensation | 2,000 |
| Cash Amount | 250 |
| **Total** | **$ 50,540** |

**NET TRANSACTION VALUE**          **- $ 1,850**

According to Mr. Pfleiderer, the $4.2 billion gain Barclays reported in its Form 20-F for 2008 was "not unusual, unexpected, or unreasonable."[20] The evidence presented to the Court, however, indicated a negative of some $1.85 billion as the net value of the transaction to Barclays, which in the Court's view was consistent with a transaction representing "reasonably equivalent value."[21] The appropriateness of this conclusion is underscored by the fact that Barclays was acquiring substantial intangible assets of Lehman's North American business for no consideration other than a $250 million cash payment. Having been presented with these

---

[20] Pfleiderer ¶¶ 5.c.; ¶ 8 n.11; 119; 121.

[21] Order Under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) The Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, M.

elements of the transaction, the Court indicated clearly that it would consider "material" any incremental change benefitting Barclays by $500 million or more.[22]


VI. What Barclays Received or Claims the Right to Receive

A.  Barclays' Acquisition Balance Sheet

Subsequent to the close of the transaction, Barclays delineated the assets it believed it was supposed to receive and the liabilities it had assumed under the transaction. This post-hoc representation of the transaction by Barclays differs materially from the description in the Original APA and the First Amendment, as well as the description given to the Court during the hearing on September 19, 2008.

Barclays' view of the transaction is essentially summarized in a document, the "Acquisition Balance Sheet,"[23] included in its 2008 annual report. The Acquisition Balance Sheet, comprising a summary page and several supporting schedules containing additional details, divides the transaction into approximately 30 components, representing either assets acquired, liabilities assumed or cash consideration paid. With the Acquisition Balance Sheet having been prepared specifically to satisfy reporting requirements under International Financial Reporting Standards ("IFRS"), its components do not directly parallel the description of the transaction in the Original APA and the First Amendment or as provided at the hearing on September 19, 2008.

The following section of this report relates each of the items on the Acquisition Balance Sheet to assets to which Barclays claims it is entitled under the transaction. These sections also identify liabilities Barclays says it has assumed and, in many cases, has actually paid. The

---

[22] 9/19/08 APA Hearing Tr. at 54:21-22.
[23] Exhibit 377A.

sections also highlight the extent to which the benefits Barclays claims it is entitled to under the transaction differ from the description given to the Court.

### Initial Inventory – PCG mid

The largest single asset cited on the Acquisition Balance Sheet is styled "Initial Inventory – PCG mid," with an ascribed value of $42.61 billion. According to the testimony of Gary Romain, Barclays' Head of Technical Accounting and Private Equity Finance, this line item represents the securities Barclays received shortly before or after the closing.[24] Mr. Pfleiderer lists these securities in Exhibit 1, Part A and Exhibit 2 of his report (although he reduces their values to reflect a "valuation adjustment" on the Acquisition Balance Sheet). These securities comprise government agency instruments, corporate bonds, U.S. Treasury securities, municipal bonds and equities, among others. They correspond to many of the items noted in the definition of "Long Positions" in the Original APA, with the notable exception of "exchange-traded derivatives," which are referenced separately on the Acquisition Balance Sheet.

### JPM Inventory – PCG mid

Romain testified that in addition to the securities represented by the designation "Initial inventory – PCG mid," Barclays also received a group of securities represented on the Acquisition Balance Sheet by the designation "JPM Inventory – PCG mid." These were securities JP Morgan transferred to Barclays on December 22, 2008, some three months after the closing, following the resolution of a dispute as to their ownership. The securities Barclays received under that settlement are described in Exhibit 1, Part B of Mr. Pfleiderer's report; they are valued on the Acquisition Balance Sheet at $3.92 billion. Romain explained during his deposition on September 10, 2009 that "PCG mid" refers to prices selected by the product

---

[24] Romain 9/10/09 Tr. at 103:19-24, 109:21-110:2.

control group within Barclays,[25] representing the midpoints between the bid and asked prices for each security.[26] Romain said that the line item "Initial inventory – PCG mid" shows values as of September 22, 2008.[27] The line item for "JPM Inventory – PCG mid" shows values as of December 22, 2008.[28]

### Valuation adjustment[29]

Romain explained in his deposition that Barclays made an adjustment to the foregoing values, which are shown on the Acquisition Balance Sheet as reflecting both "Initial Inventory – PCG mid" and "JPM Inventory – PCG mid." That is, it adjusted the prices of the securities to reflect not the mid-point between "bid" and "asked" for each security, but just the "bid," resulting in a reduction from the mid-point values. The reductions, which are aggregated in the line item "Valuation adjustment," total $2.09 billion. According to exhibits presented at Romain's deposition, these adjustments reduce the value of the securities in the "Initial Inventory – PCG mid" by $1.89 billion[30] and the value of the securities in the "JPM Inventory – PCG mid" by $176.6 million.[31]

---

[25] Romain Tr. 9/10/09 at 99:7-18.

[26] As Mr. Pfleiderer notes in his report, "bid" represents "the price quotation in an expressed willingness to buy," while "asked" represents "the price quotation in an offer to sell." (Pfleiderer ¶ 17 n.22).

[27] Romain Tr. 9/10/09 at 97:23-98:3.

[28] Romain Tr. 9/10/09 at 97:15-22.

[29] This report does not address Barclays' valuation adjustment and any potential undervaluation of the securities it obtained in the transaction; they are addressed by the Movants' other experts.

[30] Exhibit 86B, cell F14.

[31] Exhibit 87B, cell G18.

**Cash receivable from JPM**

The settlement with JP Morgan referred to above resulted in a transfer of $1.25 billion in cash to Barclays, which is reflected on the Acquisition Balance Sheet as "Cash receivable from JPM."[32]

**Cash collateral received**

In connection with the transfer of assets in September, 2008, Barclays received $300 million of cash, representing the proceeds of collateral that matured on or about the day of transfer.[33]  This $300 million appears on the Acquisition Balance Sheet as "Cash collateral received."

**Accrued interest**

Another line item on the Acquisition Balance Sheet is "Accrued Interest" of $345 million. Romain said in his deposition that this represents estimated accrued interest related to the securities in the "Initial Inventory – PCG mid."[34]

**Assets and Liabilities Related to OCC and Futures (Exchange Traded Derivatives)**

As noted, the Original APA included "exchange-traded derivatives" among the securities being transferred to Barclays.[35] Five line items on the Acquisition Balance Sheet relate to exchange-traded derivatives (the "ETDs") and reflect a $2.37 billion gain for Barclays:

---

[32] Romain Tr. 1/13/10 at 38:14-16.
[33] Romain Tr. 1/13/10 at 38:14-19, 39:6-16.
[34] Romain Tr. 1/13/10 at 154:17-155:13; Exhibit 534A.
[35] Romain Declaration at ¶¶ 24-25.

|  | **Assets** | **Liabilities** |
|---|---|---|
| OCC margin against exchange traded options | $1.31 billion | |
| OCC customer and clearing margin | $0.98 billion | |
| Futures assets | $3.78 billion | |
| Exchange traded options - derivative MTM | | $1.1 billion |
| Futures customer payables | | $2.6 billion |
| **Acquisition B/S Gain from ETDs** | **$2.37 billion** | |

These ETD line items on the Acquisition Balance Sheet can be divided into two categories: OCC[36] and Futures. "OCC" includes equity options contracts and related assets and liabilities. "Futures" includes assets and liabilities relating to futures contracts, as well as options on futures.

*OCC-related Assets and Liabilities*

As to the OCC line items, Barclays reflected $2.29 billion of assets on the Acquisition Balance Sheet against $1.10 billion of liabilities.

|  | **Assets** | **Liabilities** |
|---|---|---|
| OCC margin against exchange traded options | $1.31 billion | |
| OCC customer and clearing margin | $0.98 billion | |
| Exchange traded options – derivative MTM | | $1.1 billion |
| *Net OCC Position* | **$1.19 billion** | |

OCC assets comprise three kinds of collateral: cash, U.S. Treasury instruments and letters of credit.  As of September 22, 2008, LBI's OCC assets consisted of $1.328 billion of cash and

---

[36] "OCC" refers to the Options Clearing Corporation, one of the world's largest derivative clearing platforms. The OCC assets and liabilities are located in various accounts at the Options Clearing Corporation.

$966 million in various Treasury instruments.[37] (Although some accounts were collateralized with letters of credit, the amounts drawn on them are not reflected on the Acquisition Balance Sheet.[38]) This collateral had been posted by LBI to support trading activity.

The $1.03 billion of OCC liabilities on the Acquisition Balance Sheet represents the mark-to-market value of proprietary and market-maker options positions.  Barclays determined this value by applying a methodology comparable to the process Romain described for the "Initial inventory – PCG mid" and "JPM Inventory – PCG mid" securities.[39]

Barclays also booked a series of payables and receivables to various LBI affiliates relating to the costs of closing out positions belonging to these affiliates.[40] Barclays claims a net receivable of $104.3 million in that connection and the OCC-related liabilities on the Acquisition Balance Sheet include a write-down of 75% of this receivable, or $78 million ($104 million x 75%).[41]

Based on the valuation Barclays reported on the Acquisition Balance Sheet, the OCC-related cash and other collateral it received exceeds by approximately $1.19 billion the liability of the OCC-related positions it assumed in the transaction.

*Futures-related Assets and Liabilities*

In connection with the futures-related line items, Barclays recognized $3.78 billion of assets on the Acquisition Balance Sheet, against $2.6 billion of liabilities.

---

[37] OCC0034798-OCC0034819, with a $40.6 million adjustment per BCI-EX-00292522.
[38] Exhibit 399A; Roman Tr. 9/10/09 at 156:8-25.
[39] Romain Tr. 1/13/10 at 118:2-19.
[40] Dziemian Declaration at ¶¶ 12-14.
[41] Exhibit 534A Q.26; Romain Tr. 1/13/10 at 119:13-21.

|  | **Assets** | **Liabilities** |
|---|---|---|
| Futures assets | $3.78 billion | |
| Futures customer payables | | $2.6 billion |
| ***Net Futures Position*** | **$1.18 billion** | |

The $3.78 billion of assets Barclays recorded as "Futures assets" on the Acquisition Balance Sheet comprise assets at various exchanges, clearing houses and other custodians relating to proprietary, affiliate and customer trading activity in futures contracts (and options on futures contracts). These assets approximate $811.7 million of cash, $1.385 billion in money market funds and $404.5 million in Treasury bills. Also included is $1.235 billion representing receivables from exchanges, foreign broker/dealers and other custodians and from customers relating to posted collateral or trading positions. In addition, Barclays netted out from futures-related assets $52.8 million that it says includes costs associated with closing out certain futures positions and receivables as to which the customer disputed the amount.[42]

As to liabilities, Barclays identified $2.6 billion on the Acquisition Balance Sheet as "Futures customer payables."  Of this amount, $2.335 billion comprises liabilities to customers for collateral placed with LBI or for the value of their open positions. An additional $135 million represents payables to exchanges on which Lehman or its customers conducted futures trading. Also included is a $128 million payable to a Lehman affiliate.[43]

### Additional unencumbered assets

The Acquisition Balance Sheet has a line item labeled "Additional unencumbered assets," accompanied by a notation, "$707 million." Neither the Original APA nor the First Amendment contain a reference to "Additional unencumbered assets," nor was the item discussed during the

---

[42] Exhibit 546A, Barclays' Supplemental Response to Notice, Exhibit 1.
[43] Exhibit 546A.

hearing on September 19, 2008. Testimony by a number of Lehman executives suggests what it represents. According to Alex Kirk, Global Head of Lehman's Principal Businesses, a search for "unencumbered assets" began on September 19, 2008 after Barclays assumed the Federal Reserve Bank's (the "Fed") position in providing funding to LBI through a reverse repurchase facility (the "Fed Repo Replacement Facility"). Barclays said that the value of the collateral in the facility was insufficient and asked Lehman to search for additional assets that could be transferred to Barclays.[44] Lowitt said in his deposition on August 20, 2009 that Bart McDade, Lehman's President, and Rich Ricci, Barclays' Chief Operating Officer, asked him to identify additional sources of value and gave him a target of "between 3 and 4 billion dollars."[45] According to Tonucci, "we were asked [by Ian Lowitt] on the morning of the 19th to find if there was additional collateral to include in the transaction."[46]

"Encumbered assets" relates to assets pledged to the Fed Repo Facility, pledged to other parties (other than Barclays) or owned by customers; "unencumbered assets" refers broadly to all other assets, those not pledged or owned by customers and that were, accordingly, available to be delivered to Barclays. As Lowitt put it, "To the extent that we discovered inventory that was unencumbered and could be delivered into the deal and wasn't part of the repo, then it would be available as unencumbered collateral to deliver into the transaction."[47]

The unencumbered assets comprise a variety of fixed income and equity securities, including corporate bonds, municipal bonds, common equity, preferred equity and residential

---

[44] Kirk Tr. at 100:18-24.
[45] Lowitt Tr. at 60:10-62:20.
[46] Tonucci Tr. at 55:4-10.
[47] Lowitt Tr. at 125:21-126:2.

mortgage-backed securities.[48]  The assets represented both firm inventory and customer assets, again, to the extent they were not fully paid for.[49]

By September 21, 2008 Lehman had identified as much as $2.3 billion of unencumbered assets.[50] By September 30, 2008 $1.466 billion of collateral appears to have been transferred to Barclays ("Transferred Unencumbered Assets"), including the $1 billion of collateral previously pledged to Barclays under the BONY Tri-Party Facility.[51]  According to Hraska, the $1.466 billion of value reflected "marks affixed by LBI or a custodial entity, which may not indicate what Barclays would determine to be the correct valuation, given the fact that many of the assets were illiquid and difficult to value."[52] Barclays assigned a market value of $786 million to the Transferred Unencumbered Assets.[53]  The securities comprising these assets are listed in Exhibit 2 to Mr. Pfleiderer's report and are included under "Initial Inventory – PCG mid" on the Acquisition Balance Sheet. According to Barclays, $707 million of unencumbered assets in LBI's clearance boxes,[54] representing approximately 800 different CUSIPS, have still not been delivered to it.[55] As Hraska said in his deposition, "6 to 7 hundred million" of securities that were not transferred to Barclays remain in Lehman's clearance boxes.[56] This $707 million appears on the Acquisition Balance Sheet as "Additional unencumbered assets."

---

[48] Exhibit 151B - "depot analysis 9-19-2008 5.xls."
[49] Exhibit 562D at 2-5 – Jim Hraska 30(b)(6) Deposition Notes.
[50] Exhibit 151B - "depot analysis 9-19-2008 5.xls."
[51] Hraska Declaration at ¶ 3.
[52] Id.
[53] Romain Declaration at ¶ 18.
[54] According to Hraska, "A clearance box can be a location at a depository institution, such as DTC, or it can be a clearance or -- a location at a clearing bank, such as a JPChase or Bank of New York." Hraska Tr. 8/14/09 at 34:22-35:9.
[55] Romain Declaration at ¶ 22.
[56] Hraska Tr. 8/14/09 at 145:5-8; 156:16-157:17.

**15c3 asset**

The Acquisition Balance Sheet has a line item labeled "15c3 asset," accompanied by a notation, "$770 million." Neither the Original APA nor the First Amendment contain a reference to a 15c3 asset, nor was reference to the item discussed during the hearing on September 19, 2008. This asset first appears in the letter filed with the Court after the transaction closed. Section 8(ii) of that letter states that Barclay shall receive, "to the extent permitted by applicable law, and as soon as practicable after the closing, $769 million of securities, as held by or on behalf of LBI on the date hereof pursuant to Rule 15c3-3 of the Securities and Exchange Act of 1934."[57] The testimony of various witnesses suggests that this category was added to the transaction under circumstances similar to those that led to the inclusion of the "unencumbered assets," described above.

SEC Rule 15c3-3 requires a broker/dealer to maintain a segregated reserve on behalf of customers.[58] Generally speaking, a 15c3-3 reserve reflects the amount a broker-dealer owes its customers, plus the amount of funds generated through the use of customer securities (called customer credits), less any amounts its customers owe it (called customer debits).  To the extent customer credits exceed customer debits, the broker/dealer must deposit the net amount in a reserve account.[59] A broker/dealer may make withdrawals from a 15c3-3 reserve account only to the extent the account holds excess funds above a minimum requirement.

Tonucci said in his deposition that there was "a great deal of uncertainty about the excess, but there was certainty about the actual deposits that had been made for 15c3, which included a cash deposit with Wells Fargo for a billion dollars and securities which in the calculation had

---

[57] Exhibit 25 at 8(ii).
[58] I understand that 15c3-3 issues are addressed in greater detail by Daniel McIsaac, another expert retained by the Movants.
[59] Motion for Order Approving Trustee's Allocation of Property of the Estate ¶ 40.

been valued at, I believe, $769 million."[60] In an email on September 22, 2008 as to the final 15c3 amount, Tonucci said, "Final agreement was limited to $769 mm of treasuries."[61] In his deposition, Lowitt agreed: "What I understood [the final agreement signed by BarCap] to mean was the amount of excess under the 15c3 that was in the contract was 769 rather than that billion seven that had been talked about earlier."[62]

Barclays has not received the $769 million of securities related to the 15c3 lockup.[63] But it recorded the asset on the Acquisition Balance Sheet. I understand Barclays maintains a claim to this asset.

**PIM**

The Acquisition Balance Sheet has three line items that relate to an entity called "PIM," identified during the hearing on September 19, 2008 as Private Investment Management, a brokerage business for high net worth individuals.[64] Two of these line items are assets: "PIM customer receivables," with a value of $1.59 billion and "PIM deposit," with a value of $320 million. The third PIM line item is a liability, described as "PIM customer payables," in the amount of $1.93 billion. These line items essentially net to zero. The transfer of the PIM business had scant impact on the Acquisition Balance Sheet; customer accounts were simply transferred from Lehman to Barclays without impacting Barclays' balance sheet. The securities in most of these accounts had been segregated and were transferred promptly to Barclays.[65]

---

[60] Tonucci Tr. at 57:8-16.

[61] Exhibit 227 at 2.

[62] Lowitt Tr. at 204:6-10.

[63] Barclays Response to Rule(60)(b) Motions at ¶ 417.

[64] 9/19/08 APA Hearing Tr. at 48:15-22.

[65] Motion Under SIPA Section 78M-2(1), 11 U.S.C. Sections 105(a) and 363(b) and Federal Rules of Bankruptcy Procedure 9019(a) for Approval of the Trustee's Implementation of the LBI Liquidation Order to Complete the Account Transfers for the Benefit of Customers, Including

Certain securities had not been segregated, however. They were located in accounts controlled by depository institutions that were creditors of LBI; those institutions refused to relinquish control over the securities.[66] Consequently, because Barclays had assumed control of all the PIM accounts, it had liabilities to customers whose property it had not received from LBI. Hence, the Acquisition Balance Sheet reflects PIM-related line items that represent the value of securities Barclays anticipated receiving from Lehman and the nearly identical amount it owed PIM customers. On November 20, 2009 the Trustee agreed to transfer cash and securities to Barclays in full and final settlement of these issues.

### 7th Avenue, Data centres

The Acquisition Balance Sheet reflects several real estate assets transferred as part of the transaction and the applicable amounts that were disclosed during the hearing on September 19, 2008. The Lehman headquarters building, described as "7th Avenue," carries a value of $960 million. The two New Jersey data centers, described as "Data centres," carry a value of $330 million.

### Intangible assets/operating leases; Fixtures, fittings, software, etc.; Subsidiaries; Prepayments/deposits

Among the assets on the Acquisition Balance Sheet are several that correspond to assets for which no values were estimated either in the Original APA or the First Amendment or at the hearing on September 19, 2008. The largest of these assets, called "Intangible assets/operating leases," carries a value of $1.45 billion. An internal Barclays accounting document produced in discovery[67] suggests that this asset consists primarily of customer lists and favorable leases acquired from Lehman. Another listed asset, "Fixtures, fittings, software, etc.," carries a value of

---

the Related Limited Settlement Agreement Completing the PIM Conversion for the Benefit of Private Investment Management Customers, and Terminating the Account Transfer Process.
[66] Id.
[67] BCI-EX-(s)-00110216.

$530 million. Notes to the Acquisition Balance Sheet explain that $188 million of this amount involves software acquired from Lehman (apparently valued at $326 million on Lehman's books and records).[68] No basis has emerged for identifying the other components of this line item. But they presumably comprise office furniture and fixtures acquired in the transaction. In a line item designated "Subsidiaries (3 overseas + Townsend)," a value of $30 million is ascribed to four subsidiaries Barclays acquired which are specifically mentioned either in the Original APA or at the hearing on September 19, 2008. Another line item designated "Prepayments/deposits" carries a value of $70 million.

### LBI repo liability

In addition to liabilities that are connected to the foregoing assets, the Acquisition Balance Sheet notes several other significant liabilities. Chief among these is the "LBI repo liability," in the amount of $45 billion. Debtors' counsel stated during the hearing on September 19, 2008 that Barclays would assume $45.5 billion of liabilities in connection with the securities it would be acquiring.[69] Although nothing in the Original APA or the First Amendment tied the transaction to a repurchase agreement, Debtors' counsel indicated at the hearing that Barclays had "basically stepped into the shoes of the Federal Reserve in connection with the Primary Dealer Credit Facility as to the 45.5 billion dollars Lehman borrowed last Monday…."[70] Ian Lowitt explained in his deposition that on September 19, 2008 the parties decided Barclays would keep the collateral from the repurchase agreement and that Lehman would not repay the

---

[68] 377A; BCI-EX-(s)-00110216.
[69] 9/19/08 APA Hearing Tr. at 47:5-6.
[70] 9/19/08 APA Hearing Tr. at 63:18-22.

amount "borrowed" under the facility.[71] That same day Barclays notified Lehman of its intention
to terminate the repurchase agreement.[72]

**Cure payment**

As noted, Section 2.5 of the Original APA addressed the assumption of cure payments.
Barclays had 60 days in which to identify the contracts it wished to assume (and for Lehman,
therefore, to assume on Barclays' behalf), as to which Barclays would make any necessary cure
payments. Although a schedule produced in connection with the Original APA reflected this
liability at $2.25 billion,[73] at the hearing on September 19, 2008 Debtors' counsel estimated it at
up to $1.5 billion.[74] The amount corresponding to the line item labeled "Cure payment" on the
Acquisition Balance Sheet is $220 million.

Ian Lowitt said in his deposition that the initial $2.25 billion estimate of cure payments
came from Martin Kelly, Lehman's Global Financial Controller: "2 and a quarter was the
estimate that Martin generated on that evening for what the cure payment items were going to
be."[75] However, no available schedules support the $2.25 billion estimate. In fact, as Kelly
indicated in his deposition: "My recollection is that the [cure] estimate reduced to approximately
a billion dollars."[76] When asked why the estimate was reduced, he said, "[Ian and I] observed
that the estimated liability appeared to be high relative to the expense run rate of the firm."[77]

---

[71] Lowitt Tr. at 47:9-16; Kirk Tr. At 73:2-9.
[72] BCI-EX-00109164.
[73] § 9.1(c), Exhibit 19.
[74] 9/19/08 APA Hearing Tr. at 100:1-4.
[75] Lowitt Tr. at 214:11-18.
[76] Kelly Tr. at 133:10-24.
[77] Kelly Tr. at 136:2-10.

When Lowitt and Kelly so advised Bart McDade, McDade responded with, "We just left a billion dollars on the table."[78]

Lehman likely recorded trade liabilities as do most companies. Accordingly, the parties should have been able to derive from the company's general ledger a reasonable estimate of potential cure payments. The total of trade liabilities ordinarily represents all amounts due and owing to vendors, based on invoices received or accruals booked. Since not all such payables usually relate to executory contracts, this figure should represent a reasonable approximation of the upper limit on potential cure payments. Lehman officials began their analysis of potential cure payments by looking at the general ledger.[79]

A version of an LBI balance sheet circulated at 5:32 P.M. on Thursday, September 18, 2008 showed $423 million of trade liabilities as of August 31, 2008 and $400 million as of September 17, 2008.[80] Application of a "Transaction Adjustment" of $383 million increased this figure to $783 million. Another balance sheet circulated at 7:33 P.M. that evening showed $1.0 billion for trade liabilities.[81] The following morning, September 19, 2008, an updated version of the spreadsheet showed $2.25 billion for trade liabilities.[82]

Subsequent to the closing of the transaction, an email exchange on September 25, 2008 between Jai Westwood at Barclays and Gary Romain reflected an estimated "$125m-$150m" in cure payments relating to "IT, non-IT and real estate" contracts, an amount obviously significantly lower than the $1.5 billion figure cited during the hearing on September 19.[83] Ultimately, as outlined in a letter from Barclays' counsel to Debtors' counsel, Barclays'

---

[78] Kelly Tr. at 134:5-12.
[79] Shapiro Tr. at 64:2-5.
[80] Exhibit 201.
[81] Debtors' Motion Exhibit – A. 64 / 10252963.
[82] Debtors' Motion Exhibit – A. 69 / 10283530.
[83] BCI-EX-(S)-00052834-5 (A. 125 of Debtors' Motion).

expenditure for contract cure payments was $238 million.[84] Barclays filed schedules on September 18 and 19, 2008 delineating the contracts it intended to assume and the cure amounts for each.  The filing comprises 133 pages, of which 39 pages contain numbers with no accompanying totals, making it difficult to calculate a total cure amount.

In opposing the Movants' Rule 60(b) motions, Barclays claims that the increase in potential cure exposure from the $400 million of trade liabilities cited as of September 17, 2008 to the $1.5 billion cited in the hearing on September 19 reflects reasonable estimates to account for the fact that "certain contracts involved payments that were not accrued by LBI."[85] In support of this statement, Barclays quotes Alex Kirk's deposition: "Certain, you know, liabilities only come up in the nature of a transaction like this, right? So you cancel contracts you have liabilities. So they would be contingent and necessarily not necessarily on your books prior to doing an acquisition like that. So … it wouldn't be completely what was actually recorded on the books. It would also be liabilities triggered by the transaction itself."[86] The contract-related liabilities to which Mr. Kirk seems to refer appear to be termination payments, which would be due and owing only were an executory contract rejected. However, under the transaction Barclays would be liable only for cure payments related to assumed contracts. The liabilities Mr. Kirk described would remain with Lehman.

### Bonus – cash element, Credit to equity – stock element of bonus

As noted, Section 9.1(c) of the Original APA, addressing the assumption of compensation liabilities, states that the "Purchaser shall, or shall cause its Subsidiaries to, pay

---

[84] Letter from Boise, Schiller & Flexner LLP dated July 16, 2009 (LBHI Motion Exhibit - A. 136). Certain *de minimis* payments were made after preparation of the Acquisition Balance Sheet and are not reflected therein.
[85] Barclays' reply, ¶293.
[86] Kirk Dep. Tr. at 210:16-211:2.

each Transferred Employee an annual bonus in respect of the 2008 Fiscal Year that, in the aggregate, are equal in amount to 100 percent of the bonus pool amounts accrued in respect of amounts payable for incentive compensation (but not base salary) and reflected on the financial schedule delivered to Purchaser on September 16, 2008."[87] Compensation liabilities are addressed on the Acquisition Balance Sheet in two line items: "Bonus – cash element," with a value of $1.7 billion, and "Credit to equity – stock element of bonus," with a value of $300 million.

Lowitt indicated that the $2.0 billion "comp number was the number that was agreed between the parties."[88] However, no available schedules show the calculation underlying the $2.0 billion estimate. A version of the LBI opening balance sheet circulated at 5:32 P.M. on September 18, 2008 included a $1.0 billion "Transaction Adjustment" to the "compensation payable" line item, indicating that a total of $1.52 billion in compensation payables was to be transferred to Barclays.[89]  At 7:33 P.M. that evening a balance sheet reflected a flat $1.5 billion for "bonus payable."[90]  The following morning, September 19, 2008, the bonus payable figure was changed from $1.5 billion to $2.0 billion.[91]

An email on September 17, 2008 from Patrick Clackson, Barclays' CFO, to Rich Ricci suggests Barclays believed there was only $1.35 billion of compensation-related liabilities: "This is a problem, they have $2bn in the agreement, I was relying on you guys telling me I needed $1.35bn which gave me $650m of the goodwill but the para below [from the APA] says we have

---

[87] § 9.1(c), Exhibit 19.
[88] Lowitt Tr. at 214:11-18.
[89] Exhibit 201.
[90] Debtors' Motion Exhibit – A. 64 / 10252963.
[91] Debtors' Motion Exhibit – A. 69 / 10283530; BCI-EX-00115129 (see A.47).

to pay it to them/can't use."[92] Indeed, a presentation circulated among Barclays executives on September 24, 2008 showed an estimated bonus total for Lehman employees of $1.4 billion.[93]

Ultimately, Barclays paid $1.529 billion in bonuses involving transferred employees, comprising $1.271 billion in cash and $258 million of equity.[94] The Acquisition Balance Sheet also reflects additional amounts relating to severance and other payroll costs.[95]

### Deferred tax liabilities

The Acquisition Balance Sheet reflects $531 million for "Deferred tax liabilities." This is a net number; Barclays' Form 20-F for fiscal year 2008 lists a "Deferred tax asset" of $422.2 million and "Deferred tax liabilities" of $953.1 million, which net to a liability of $530.9 million.

### Consideration

A section of the Acquisition Balance Sheet entitled "Consideration" includes three line items representing cash payments that were disclosed at the hearing on September 19, 2008: "Assets," the $250 million of cash consideration for the assets Barclays acquired; "7th Avenue," the $960 million Barclays paid on the appraised value of the Lehman headquarters building; and "Data Centres," the $330 million Barclays paid on the appraised value of the two data centers in New Jersey. This "Consideration" section includes two additional line items that were not addressed at the hearing: "Stamp Duty," in the amount of $30 million and "Acquisition costs," in the amount of $40 million. These two line items likely correspond to sections 2.3(e) and 13.1 of the Original APA, respectively.

---

[92] Exhibit 285B.
[93] Exhibit 288B.
[94] Letter from Boise, Schiller & Flexner LLP dated July 16, 2009 (LBHI Motion Exhibit - A. 136).
[95] Id. at BCI-EX-00077287.

B.  Summation

In aggregate, the items on Barclays' Acquisition Balance Sheet net to a gain from the transaction of $4.2 billion. Although noting that this is the case, Mr. Pfleiderer asserts that the transaction was nonetheless essentially a "wash," with assets roughly equaling liabilities. From his analysis of the Acquisition Balance Sheet he concludes that, the exchange-traded derivatives accounts aside, Barclays "paid" $47.2 billion for $47.8 billion worth of financial assets, indicating that the approximately 1.2% difference is closer to a wash than anyone could reasonably have expected. But crediting the exchange-traded derivatives accounts, he concludes that for the $47.2 billion it paid, Barclays received $50.2 billion of value—a gain of approximately $3 billion and a difference of nearly 6.4% between assets and liabilities. Mr. Pfleiderer concludes:

> … given the substantial uncertainty about the value, and even the identity, of the assets and certain of the liabilities, Barclays' reported gain is reasonable, unsurprising, and fair to the Sellers.
> (¶ 118)

I strongly disagree. A gain of $3 billion is materially different from the negative $1.85 billion net transaction value disclosed to the Court.[96]

VII.    Conclusion

In seeking to justify Barclays' gain from the transaction, Mr. Pfleiderer says that any "day-one" gain by Barclays could have been erased because of the risks inherent in the businesses it was acquiring.[97] This assertion, however, ignores substantial evidence of Barclays'

---

[96] Of course, this does not include any adjustments for undervaluation or other issues that are addressed in reports submitted by the Movants' other experts.
[97] Pfleiderer ¶ 108.

anticipation that the acquired businesses would be profitable. According to an analysis circulated within Barclays on September 19, 2008, the Lehman businesses would increase Barclays' pre-tax profits by $925 million in 2009 and $1.5 billion in 2010.[98] That this analysis was conservative is evidenced by the fact that projected revenue from the Lehman businesses is based on an average from 2005 to 2008, discounted by 50% and then subjected to a further reduction for "rev attrition." The analysis was reflected in public comments by Barclays officials prior to the sale. On Wednesday, September 17, 2008 Barclays' CEO John Varley told equity research analysts on a teleconference that the acquired businesses would be "accretive to earnings on an ongoing basis in the first year."[99]

In conclusion, Barclays appears to believe that it is entitled to net value approximating at least $3 billion.[100] I believe this is not consistent with the transaction the Court approved; the net gain Barclays realized or claims from its acquisition of Lehman's financial assets—using Barclays' own calculations— represents a value transfer involving financial assets that is nearly $4.85 billion more than was authorized by the Court. In addition to this gain on the financial assets that was not sanctioned by the Court, Barclays realized a further gain of $1.83 billion from the intangible assets it acquired—albeit with no specific value ascribed to these assets at the hearing on September 19, 2008—representing the $2.08 billion transfer noted on the Acquisition Balance Sheet, less the $250 million purchase price.

---

[98] BCI-EX-00077542.
[99] Exhibit 343A at 2.
[100] Pleiderer ¶ 118.

My work on this case is continuing and I reserve the right to revise or augment the findings and opinions set forth herein in the event additional information relevant to the issues I have examined becomes available, in response to questions raised in my deposition or for other reasons.

Harrison J. Goldin
Senior Managing Director

# Exhibit 1

**HARRISON J. GOLDIN**
**Goldin Associates, L.L.C.**
**350 Fifth Avenue**
**New York, New York  10118**
**(212) 593-2255**

*Harrison J. Goldin is senior managing director of Goldin Associates, L.L.C., which provides financial advisory, interim management, forensic investigation, strategic and risk management consulting and independent fiduciary services.  Mr. Goldin and his firm have often acted as examiner, trustee, independent investigator, special master, mediator or receiver in large and complicated bankruptcies and restructurings.*

EXPERIENCE:    Senior Managing Director, Goldin Associates, L.L.C., 1990 to Present
- Examiner:  Enron North America, Bruno's, Cityscape, Loral, Coudert Brothers
- Trustee: Granite Partners, Monarch Capital Corp., PSINet Consulting Solutions, First Interregional, Power Company of America, SmarTalk Teleservices, Gaston & Snow, District 65 Retirement Trustee, Pegasus Gold
- Chief Executive Officer: Refco Inc.
- Chief Restructuring Officer: Rockefeller Center Properties
- Financial Advisor: Drexel Burnham Lambert Trading Co. (creditors)

Comptroller, City of New York, 1974-1989
- Oversaw financial restructuring of New York City
- Directed financial and investigative audit units
- Managed $40 billion of investment assets
- *Voted "Best Comptroller in America" by a panel of over 100 expert judges selected by Crain's Publications.*

Securities business (Edwards & Hanley and James H. Oliphant & Co.), 1970-1973
Davis Polk & Wardwell, 1963-1969
U. S. Department of Justice, 1961-1963

Teaching (previously):

- Adjunct Professor of Law, New York Law School
- Adjunct Professor of Law, Cardozo Law School
- Adjunct Professor of Accounting, Stern Graduate School of Business, NYU
- Lecturer in Law, Columbia Law School

EDUCATION:    Princeton University, A.B. (summa cum laude, Phi Beta Kappa), 1957
Harvard Graduate School (Woodrow Wilson Fellow), 1957-1958
Yale Law School, LL.B. (Articles Editor, <u>Yale Law Journal</u>; Order of the Coif), 1961

OTHER:
- Founding Chair (now Chairman Emeritus), Council of Institutional Investors
- Fellow: American College of Bankruptcy
- Member: Pension Managers Advisory Committee to the Board of Directors of the New York Stock Exchange (past)
- New York State Senator (past)
- Former Member, Board of Directors: America West Airlines; Envirodyne Industries, Inc.;  International Specialty Products

# EXHIBIT 2

*In re LEHMAN BROTHERS HOLDINGS INC., et al.,* Case No. 08-13555

EXPERT REPORT OF HARRISON J. GOLDIN

**Exhibit 2: Reliance Material**

**Deposition Transcripts:**
Hraska Deposition - 8.14.09
Kelly Deposition - 8.18.09
Kirk Deposition - 8.31.09
Lowitt Deposition - 8.20.09
Romain Deposition - 1.13.10
Romain Deposition - 9.10.09
Tonucci Deposition - 8.14.09
Shapiro Deposition - 8.07.09
Seery Deposition - 9.3.09
Seery Deposition - 3.3.10
Miller Deposition - 1.7.10

**Declarations:**
Dziemian Declaration
Hraska Declaration
Romain Declaration

**Bates Numbered Documents/Files:**
BCI-EX-(S)-00110216
BCI-EX-00109164
OCC0034798-OCC0034819
BCI-EX-00292522
BCI-EX-00077542
BCI-EX-00295932

**Deposition Exhibits:**
Exhibit 1
Exhibit 19
Exhibit 25
Exhibit 86B
Exhibit 87B
Exhibit 151B
Exhibit 201
Exhibit 219
Exhibit 227
Exhibit 285B
Exhibit 288B
Exhibit 343A
Exhibit 377A

Exhibit 399A
Exhibit 472B
Exhibit 534A
Exhibit 546A
Exhibit 562D
Exhibit 666

**Motions:**
Creditor Committee's 60(b) Motion
Debtor's 60(b) Motion
Trustee's 60(b) Motion
Barclays Memorandum in Opposition to the Rule 60(b) Motions

**LBHI's Rule 60(b) Motion Exhibits:**
A. 39 - Lehman Brothers Holdings Inc., Minutes of the Board of Directors, September 16, 2008
A. 64 (Debtors' Motion)
A. 69 (Debtors' Motion)
A. 125 (Debtors' Motion)
A. 136

**SEC Filings:**
Lehman Brothers Holdings Inc. Form 10-Q for the quarter ended May 31, 2008

Barclays PLC, Barclays Bank PLC, Form 20-F, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, For the fiscal year ended December 31, 2008

**Court Filings & Transcripts:**
Order Under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) The Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases

Motion Under 11 U.S.C. §§ 105 and 363 and Federal Rules of Bankruptcy Procedure 9019(a) for entry of an Order Approving Settlement Agreement

Motion Under SIPA Section 78M-2(1), 11 U.S.C. Sections 105(a) and 363(b) and Federal Rules of Bankruptcy Procedure 9019(a) for Approval of the Trustee's Implementation of the LBI Liquidation Order to Complete the Account Transfers for the Benefit of Customers, Including the Related Limited Settlement Agreement Completing the PIM Conversion for the Benefit of Private Investment Management Customers, and Terminating the Account Transfer Process

Motion for Order Approving Trustee's Allocation of Property of the Estate

The First Amendment to the Asset Purchase Agreement dated September 19, 2008

Hearing Transcripts before Bankruptcy Court on September 17, 2008 and September 19, 2008

Affidavit of Ian Lowitt in support of First Day Motions

**<u>Other</u>:**
Expert Report of Professor Paul Pfleiderer
Barclays' Supplemental Response to Notice, Exhibit 1

# Exhibit O

Page 1

1

2                 UNITED STATES BANKRUPTCY COURT

3                 SOUTHERN DISTRICT OF NEW YORK

4

5    In re:                      )
                                 ) Chapter 11
6    LEHMAN BROTHERS             ) Case No. 08-13555(JMP)
                                 ) (Jointly Administered)
7    HOLDINGS, INC., et al.,     )
                                 )
8                 Debtors.       )
     -------------------------)

9

10

11

12

13

14               VIDEOTAPED DEPOSITION OF

15               HARRISON J. GOLDIN

16                New York, New York

17              Friday, April 16, 2010

18

19

20

21

22

     Reported by:
23

     KRISTIN KOCH, RPR, RMR, CRR, CLR
24

     JOB NO. 29655
25

Page 2

```
 1
 2
 3
 4                    April 16, 2010
 5                     9:46 a.m.
 6
 7          Videotaped Deposition of
 8    HARRISON J. GOLDIN, held at the
 9    offices of Boies, Schiller & Flexner,
10    LLP, 575 Lexington Avenue, New York,
11    New York, before Kristin Koch, a Registered
12    Professional Reporter, Registered Merit
13    Reporter, Certified Realtime Reporter,
14    Certified Livenote Reporter and Notary
15    Public of the State of New York.
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 3

```
 1
 2    A P P E A R A N C E S:
 3
 4
 5    JONES DAY, LLP
 6    Attorneys for Lehman Brothers, Inc.
 7        222 East 41st Street
 8        New York, New York 10017
 9    BY:  KELLY A. CARRERO, ESQ.
10
11
12
13    BOIES, SCHILLER & FLEXNER, LLP
14    Attorneys for Barclays
15        5301 Wisconsin Avenue, N.W.
16        Washington, D.C. 20015
17    BY:  AMY L. NEUHARDT, ESQ.
18
19
20    QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
21    Attorneys for Creditors Committee
22        51 Madison Avenue
23        New York, New York 10010
24    BY:  ERIC M. KAY, ESQ.
25
```

TSG Reporting - Worldwide    877-702-9580

Page 4

```
 1
 2    A P P E A R A N C E S:  (Continued)
 3
 4
 5
 6    HUGHES HUBBARD & REED LLP
 7    Attorneys for SIPA Trustee
 8        One Battery Park Plaza
 9        New York, New York 10004
10    BY:  NEIL J. OXFORD, ESQ.
11         CARL W. MILLS, ESQ.
12
13
14    ALSO PRESENT:
15
16        JIM ROBERTS, Legal Video Specialist
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 5

```
 1
 2          IT IS HEREBY STIPULATED AND AGREED
 3    by and between the attorneys for the
 4    respective parties herein, that filing and
 5    sealing be and the same are hereby waived.
 6          IT IS FURTHER STIPULATED AND AGREED
 7    that all objections, except as to the form
 8    of the question, shall be reserved to the
 9    time of the trial.
10          IT IS FURTHER STIPULATED AND AGREED
11    that the within deposition may be sworn to
12    and signed before any officer authorized
13    to administer an oath, with the same
14    force and effect as if signed and sworn
15    to before the Court.
16
17
18
19
20          - oOo -
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 6

1
2       (Exhibit 710A, Expert Report of
3  Harrison J. Goldin, March 15, 2010, marked
4  for identification.)
5           *   *   *
6       THE VIDEOGRAPHER:  Good morning.
7  This is the start of tape labeled number 1
8  of the videotaped deposition of Harrison J.
9  Goldin in re Lehman Brothers Holdings,
10  Incorporated, et al., in the U.S.
11  Bankruptcy Court, Southern District of
12  New York, case number 08-13555.
13       This deposition is being held at
14  Boies Schiller located at 575 Lexington
15  Avenue, New York City, New York on April
16  16th, 2010.  The time is approximately 9:46
17  a.m.
18       My name is James Roberts and I am
19  here with TSG Reporting, Incorporated and I
20  am the legal video specialist.  The court
21  reporter is Kristin Koch in association
22  with TSG Reporting.
23       Will counsel please state their
24  appearances for the record.
25       MS. NEUHARDT:  Amy Neuhardt, Boies

TSG Reporting - Worldwide    877-702-9580

Page 7

1
2  Schiller & Flexner, for Barclays Capital.
3       MR. OXFORD:  Neil Oxford, Hughes
4  Hubbard & Reed, for the SIPA trustee.  With
5  me is also Carl Mills from Hughes Hubbard &
6  Reed.
7       MS. CARRERO:  Kelly Carrero with
8  Jones Day for Lehman Brothers Holdings,
9  Inc.
10       MR. KAY:  Eric Kay, Quinn Emanuel
11  Urquhardt & Sullivan, for the Creditors
12  Committee.
13       THE VIDEOGRAPHER:  Will the court
14  reporter please swear in the witness.
15           *   *   *
16  H A R R I S O N   J.   G O L D I N,
17  called as a witness, having been duly sworn
18  by a Notary Public, was examined and
19  testified as follows:
20  EXAMINATION BY
21  MS. NEUHARDT:
22       Q.   Good morning, Mr. Goldin.
23       A.   Good morning, Ms. Neuhardt.
24       Q.   Have you been deposed before?
25       A.   Yes, ma'am.

TSG Reporting - Worldwide    877-702-9580

Page 8

1              Harrison Goldin
2       Q.   So you are familiar with the
3  procedure here.  I will ask you questions and
4  you will try to answer them to the best of your
5  ability.
6       If you don't understand a question I
7  am asking, will you please ask me for
8  clarification, because otherwise I will assume
9  you understand my question.
10       A.   Yes.
11       Q.   Okay.  And if you need a break,
12  please let me know.  I am happy to take breaks
13  at reasonable times.  I just ask that you
14  finish an answer to a question before you take
15  a break.
16       Okay.  I have put before you
17  Exhibit 710A.  Could you please identify that
18  for me.
19       (Document review.)
20       MS. NEUHARDT: He is thorough.
21       A.   Well, I am very familiar with the
22  report and I want to make sure that it has the
23  pages that are in my expert report.
24       Q.   That's fair.
25       A.   This is an expert report that I

TSG Reporting - Worldwide    877-702-9580

Page 9

1              Harrison Goldin
2  prepared and that I provided in connection with
3  this matter.
4       Q.   Okay.  And what subject matters do
5  you consider yourself to be an expert in that
6  you are opining on in that report?
7       MR. OXFORD:  Objection to form.
8       You can answer.
9       A.   For the purposes of my retention in
10  this transaction my expertise relates to the
11  many years that I have spent involved in large
12  and complicated financial transactions over
13  nearly forty years in which I have acted as an
14  advisor, as a fiduciary, as a principal.
15  Indeed for the last more than twenty years I
16  have been involved in such large and
17  complicated transactions in distress, and,
18  again, as a CEO, as a financial advisor, as a
19  trustee, as an examiner.  I think I have
20  probably been a trustee or an examiner in more
21  large and complicated financial cases than
22  anybody in America.  And many of the situations
23  in which I have been involved relate to 363
24  sales.
25       Q.   Okay.  Could you turn to Exhibit 1

TSG Reporting - Worldwide    877-702-9580

Page 10

Harrison Goldin

1  **Harrison Goldin**
2  to your report.
3      A.  What page, please?
4      **Q.  There is no page number actually.**
5      MR. OXFORD:  It's after page 38.
6      A.  Yes, sir.  Yes, ma'am.
7      **Q.  It's that bad, is it?**
8      **Is this your current curriculum**
9  **vitae?**
10     A.  Yes, ma'am, it is.
11     **Q.  Okay.  When was this last updated?**
12     A.  Oh, I don't know, but it would have
13 been presumably within the last several months.
14     **Q.  Looking down at your education, it**
15 **says you were at Harvard graduate school.**
16     A.  Yes, ma'am.
17     **Q.  What subject matter were you**
18 **studying?**
19     A.  I was a Ph.D. candidate in
20 government.
21     **Q.  And you did not complete that**
22 **degree?**
23     A.  That's right.  I left the graduate
24 program to go to law school.
25     **Q.  And at Princeton what was your major**

TSG Reporting - Worldwide    877-702-9580

Page 11

Harrison Goldin

1  **Harrison Goldin**
2  or concentration?
3      A.  Politics.
4      **Q.  Okay.  So have you taken any course**
5  **work in accounting?**
6      A.  I haven't specifically taken course
7  work in accounting, although obviously, as I
8  explained to you a minute or two ago, I have
9  been confronted with accounting issues often
10 over my years in business and in government.
11     **Q.  Now, you list a number of teaching**
12 **positions.  One of them is adjunct professor of**
13 **accounting at the Stern Graduate School of**
14 **Business.**
15     **What subject matter were you**
16 **teaching?**
17     A.  I was teaching public accounting,
18 government accounting, fund accounting.
19     **Q.  And in your positions as a professor**
20 **of law, what subject matters did you teach?**
21     A.  Public finance, and also
22 professional responsibility at Cardoza Law
23 School.
24     **Q.  Are you a CPA?**
25     A.  No, ma'am.

TSG Reporting - Worldwide    877-702-9580

Page 12

Harrison Goldin

1      Harrison Goldin
2      **Q.  Do you hold any other professional**
3  **licenses?**
4      A.  I am a licensed attorney, although I
5  have not practiced in many, many years, and I
6  formerly held certain licenses that I no longer
7  hold.
8      **Q.  What licenses do you no longer hold?**
9      A.  Well, at one point I was a
10 registered representative, securities
11 representative.  I don't remember whether it
12 was with the SEC or with the New York Stock
13 Exchange.
14     **Q.  And when were you last registered**
15 **with either the SEC or the New York Stock**
16 **Exchange?**
17     A.  That would have been a very long
18 time ago when I was in the investment business,
19 which was after I left the practice of law.
20     **Q.  Okay.  And when did you leave the**
21 **practice of law?**
22     A.  In 1969.
23     **Q.  Okay.  Have you authored any**
24 **publications in the last ten years?**
25     A.  No.  Other than some op-ed pieces

TSG Reporting - Worldwide    877-702-9580

Page 13

Harrison Goldin

1      Harrison Goldin
2  that I have had published in the New York
3  Times, I can't think of anything offhand.
4      **Q.  About how many op-ed pieces have you**
5  **published with the New York Times?**
6      A.  Oh, one or two.  I just don't
7  recollect.
8      **Q.  What was the subject matter of**
9  **those?**
10     A.  Well, one of them related to issues
11 involved in Sarbanes-Oxley.  Another
12 involved -- this may have been longer than ten
13 years ago -- issues relating to international
14 affairs.
15     **Q.  What aspect of international**
16 **affairs?**
17     A.  I had traveled widely in the Middle
18 East at one point in Yemen and Saudi Arabia and
19 Syria and Israel and Jordan and Egypt and when
20 I was on that trip I had the opportunity in
21 each of those countries to meet extensively
22 with young intellectuals, with academicians,
23 journalists, lawyers, physicians, engineers,
24 and I came back having formed an impression as
25 the result of those visits, which I described

TSG Reporting - Worldwide    877-702-9580

Page 14

Harrison Goldin

1
2 to the publisher of the New York Times, who
3 then urged me to write an op-ed piece, the
4 gravamen of which was that although virtually
5 every one of these young people had spent some
6 time studying in the United States and all had
7 happy memories of the experience, they were all
8 nonetheless hostile to American security
9 interests.
10    Q.   Okay.  Have you served as an expert
11 witness before?
12    A.   I believe I have.
13    Q.   I figured I knew the answer to that
14 one.
15        Approximately how many times have
16 you served as an expert witness?
17    A.   I don't recollect, but I have served
18 as an expert witness before.
19    Q.   More than ten times?
20    A.   I don't think so.
21    Q.   More than five?
22    A.   Perhaps.  I just don't remember.
23    Q.   How many of those five to ten would
24 have been in the last four years?
25    A.   There could have been a couple in

TSG Reporting - Worldwide    877-702-9580

Page 15

Harrison Goldin

1
2 the last four years.  I just don't remember.
3 RQ        MS. NEUHARDT:  Okay.  Neil, under
4    the stipulation we are entitled to have
5    disclosure of the matters in which he has
6    testified in the last four years, so if you
7    could get that to us, we would appreciate
8    it.
9        MR. OXFORD:  Okay.  I will look into
10    that.
11    Q.   What subject matters have you served
12 as an expert witness on?
13    A.   I don't recollect the specific
14 instances in which I have testified, other than
15 one that was fairly recent involving issues of
16 solvency and valuation.  It was a matter where
17 I was an expert witness less than a year ago.
18    Q.   And what matter was that?
19    A.   It was the Huntsman/Hexion
20 litigation in state court in Texas.
21    Q.   And which party were you serving as
22 an expert for?
23    A.   We were retained on behalf of Credit
24 Suisse and Deutsche Bank, as I said, to
25 consider valuation and solvency issues, and I

TSG Reporting - Worldwide    877-702-9580

Page 16

Harrison Goldin

1
2 testified as the expert witness.
3    Q.   How many other times have you
4 actually testified as an expert witness either
5 in deposition or in court?
6    A.   Well, you asked me that before and I
7 think I indicated to you that I just don't
8 recollect.
9    Q.   Okay.  What I was trying to ask
10 before was how many times you had served as an
11 expert, not necessarily testifying, so let me
12 try to break it down then.
13        Your answer before about five to ten
14 then would be times that you have testified as
15 an expert?
16    A.   Well, you said five to ten.  I
17 indicated to you --
18    Q.   That you weren't sure.
19    A.   -- I just don't have a specific
20 recollection, but there are occasions when I
21 have testified as an expert.
22    Q.   Okay.  Are there occasions when you
23 have been retained as an expert where you have
24 not testified?
25    A.   It's possible.  I just don't

TSG Reporting - Worldwide    877-702-9580

Page 17

Harrison Goldin

1
2 recollect at the moment.
3    Q.   Okay.  So you wouldn't be able to
4 estimate how many times you had written a
5 report as an expert but never testified?
6    A.   I couldn't do that without checking
7 and making sure that I hadn't missed anything.
8 I just don't recollect.
9    Q.   Okay.  Do you think it's more than
10 double the amount of times you testified?
11    A.   No.
12        MR. OXFORD:  Objection to form.
13        MS. NEUHARDT:  You need to give him
14    a chance to --
15        THE WITNESS:  I'm sorry.
16        MS. NEUHARDT:  That's quite all
17    right.
18        THE WITNESS:  I apologize.  I'm
19    stepping on your lines.
20        MS. NEUHARDT:  It's not my lines,
21    it's her lines.
22        THE WITNESS:  I understand.
23        MS. NEUHARDT:  She can't keep it all
24    in line.
25    Q.   In any of the matters where you have

TSG Reporting - Worldwide    877-702-9580

Page 18

Harrison Goldin

1      **Harrison Goldin**
2 **testified as an expert, have you interpreted**
3 **acquisition balance sheets?**
4      MR. OXFORD: Objection to form.
5      A. Not that I recollect.
6      **Q. Now, in previous cases when you have**
7 **served as an expert has your testimony ever**
8 **been excluded or limited?**
9      MR. OXFORD: Objection to form.
10      A. I testified in the Adelphia
11 confirmation hearing. I don't recall
12 specifically what the status of my testimony
13 was after it was -- I was permitted to
14 testimony.
15      **Q. So you do not recall whether or not**
16 **Judge Gerber excluded your testimony?**
17      A. My recollection is that Judge Gerber
18 referred to my testimony in his opinion, from
19 which I imagine one can confer that he credited
20 it at least to some extent.
21      **Q. Would you be surprised to hear that**
22 **he had excluded it?**
23      MR. OXFORD: Objection to form.
24      A. He might have and that's the reason
25 I referred to it when you asked the question.
     TSG Reporting - Worldwide    877-702-9580

Page 19

Harrison Goldin

1
2      **Q. Okay. Are there any other instances**
3 **in which your testimony was excluded or limited**
4 **in any way?**
5      A. Not that I recollect sitting here
6 today.
7      **Q. When were you first retained to work**
8 **in this matter?**
9      A. I believe that it was sometime
10 before Christmas of 2009.
11      **Q. Was it after Thanksgiving?**
12      A. I believe so.
13      **Q. And what did you understand your**
14 **initial assignment to be?**
15      A. Well, I was asked to consider and
16 review the Acquisition Balance Sheet to make
17 certain that I had an understanding of the
18 Acquisition Balance Sheet sufficient to enable
19 me to reach a conclusion respecting the gain
20 that Barclays asserted it either had received
21 or was entitled to at the closing on the 22nd
22 of September 2008, and to consider that
23 asserted gain in connection with the
24 transaction that was described to and approved
25 by the court on the 19th and 20th of September
     TSG Reporting - Worldwide    877-702-9580

Page 20

Harrison Goldin

1
2 2008.
3      **Q. I am going to hand you what's been**
4 **previously marked as Deposition Exhibit 377A.**
5      **In your response that you just gave**
6 **me you referred to an Acquisition Balance**
7 **Sheet. Is this document that I just handed you**
8 **the Acquisition Balance Sheet you were**
9 **referring to?**
10      A. Yes, it appears to be.
11      **Q. And you said your assignment was to**
12 **review that and consider the statements on that**
13 **in connection with the transaction described to**
14 **and approved by the court on the 19th and 20th**
15 **of September 2008; is that correct?**
16      MR. OXFORD: Object to the form.
17 Misstates the witness' testimony.
18      MS. NEUHARDT: Actually, I was
19 reading his testimony back.
20      A. Well, in substance that seems to
21 characterize what I said to you a minute ago.
22      **Q. Okay. Well can you then describe**
23 **again. I'm sorry.**
24      A. Yes. I was asked to review the
25 Acquisition Balance Sheet, because not all the
     TSG Reporting - Worldwide    877-702-9580

Page 21

Harrison Goldin

1
2 items on the Acquisition Balance Sheet are
3 self-evidently clear and need to be understood.
4 I was asked to make certain that I and the
5 people helping me had a sense of what these
6 entries comprised and to consider the gain to
7 which Barclays asserts it's entitled in the
8 context of the transaction that was presented
9 to and approved by the court.
10      **Q. Okay. Now, when you say you were**
11 **asked to consider the gain to which Barclays**
12 **asserts it's entitled in the context of the**
13 **transaction that was presented to and approved**
14 **by the court, what specifically were you asked**
15 **to do?**
16      A. I was asked in the first instance to
17 review the gain that Barclays says it's
18 entitled to on an adjusted basis and to satisfy
19 myself that whether I agreed or disagreed with
20 that gain, that it provided a basis on which I
21 could reach a conclusion, comparing that
22 asserted gain to what had been presented to the
23 court on the 19th and 20th of September.
24      **Q. Did your assignment evolve at any**
25 **time from that initial assignment?**
     TSG Reporting - Worldwide    877-702-9580

Page 22

**Harrison Goldin**

1
2     A.   Well, I don't know if you would call
3  it an evolution, but at some point I recall
4  that I received Professor Pfleiderer's report
5  and my assignment then included considering
6  Professor Pfleiderer's assertion that the gain
7  on an adjusted basis was, as he put it, not
8  unreasonable or unexpected or unrealistic.
9     **Q.   Okay.  Were you asked to examine any**
10 **other expert reports submitted by Barclays?**
11    A.   I was asked to consider whatever
12 materials I thought might be relevant to enable
13 me to discharge my responsibility and my staff
14 and I considered a large number of documents
15 and materials, many of which I reviewed myself.
16    **Q.   Okay.  I think there may have been a**
17 **misunderstanding about what I was asking.**
18       **Were you asked to opine in response**
19 **to -- as a specific response to any report**
20 **other than Mr. Pfleiderer's?**
21    A.   No.
22    **Q.   Now, why don't we look at Exhibit 2**
23 **to your report, which is labeled Reliance**
24 **Materials.**
25    A.   Yes, ma'am.

TSG Reporting - Worldwide    877-702-9580

Page 23

Harrison Goldin

1
2     **Q.   If you could take a moment to review**
3  **that.  My question -- my first question will be**
4  **is there anything else that you relied on that**
5  **is not listed on this exhibit?**
6       **(Document review.)**
7     A.   I assume you mean relied on in
8  connection with the preparation of the report?
9     **Q.   Yes.**
10    A.   No.
11    **Q.   Have you -- since you filed this**
12 **report and created this exhibit, have you done**
13 **any further analysis?**
14       MR. OXFORD:  Object to the form.
15       You can answer.
16    A.   No.
17    **Q.   Have you reviewed any additional**
18 **materials?**
19    A.   No.
20    **Q.   Okay.  So have you -- I take it then**
21 **you haven't reviewed the briefs filed by each**
22 **of the three Movants in March of 2010?**
23    A.   My recollection is that I may have
24 seen those briefs, but I would not include them
25 in the category of materials that I relied on.

TSG Reporting - Worldwide    877-702-9580

Page 24

Harrison Goldin

1
2     **Q.   Okay.  Had you reviewed them,**
3  **though?**
4     A.   I suspect I may have seen them.  I
5  saw so many materials, including legal papers,
6  that it's hard for me to remember sitting here
7  today specifically which ones I read.
8     **Q.   Okay.  So would they have changed**
9  **your opinion in any way?**
10    A.   No.
11       MR. OXFORD:  Object to the form.
12    **Q.   Have you reviewed Barclays' reply**
13 **brief filed in April of 2010?**
14    A.   I believe that I saw and read that
15 and, as a matter of fact, my recollection is
16 now refreshed when I see that it is
17 characterized in my reliance memorandum as
18 Barclays' Memorandum in Opposition to the Rule
19 60B motions, yes, I did read that.
20    **Q.   Okay.  I understood the Barclays**
21 **memorandum in opposition to the Rule 60B**
22 **motions to be a brief that we had filed in**
23 **January of 2010 that was about 200 pages.  Does**
24 **that ring a bell?**
25    A.   Yes.

TSG Reporting - Worldwide    877-702-9580

Page 25

Harrison Goldin

1
2     **Q.   Okay.  There was an additional brief**
3  **filed by Barclays a couple of weeks ago on**
4  **April -- I don't remember -- a couple of weeks**
5  **ago.**
6       MR. OXFORD:  I think it was April
7     5th or 6th.
8     **Q.   April 5th or 6th.**
9       MR. OXFORD:  And I think you are a
10    little light on the 200 pages as well, Amy.
11       MS. NEUHARDT:  I am trying to block
12    that out of my memory, the actual length of
13    it.
14       MR. OXFORD:  Yes.
15    **Q.   But our reply filed a couple of**
16 **weeks ago was slightly shorter.**
17       **Do you recall reading a second brief**
18 **filed by Barclays?**
19    A.   I may have.  I just don't recollect.
20    **Q.   Do you expect to testify at the**
21 **evidentiary hearing?**
22       MR. OXFORD:  Object to the form.
23    A.   If I'm called, I'm prepared to
24 testify.
25    **Q.   Do you plan to do any further**

TSG Reporting - Worldwide    877-702-9580

Page 26

Harrison Goldin

1  **Harrison Goldin**
2  **analysis between now and the evidentiary**
3  **hearing?**
4      MR. OXFORD: Object to the form.
5      A.   I had understood that the
6  evidentiary hearing was likely to begin the
7  week after next and I don't plan to do any
8  additional work.
9      **Q.   Did you have any input in selecting**
10 **Movants' other experts?**
11     A.   No.
12     **Q.   Were there any issues that you were**
13 **asked to examine that are not reflected in your**
14 **report?**
15     MR. OXFORD: Object to the form. I
16 think that's outside of the stip, Amy.
17     MS. NEUHARDT: I'm sorry, I can't
18 hear you.
19     MR. OXFORD: I think it's outside of
20 the stip.
21     MS. NEUHARDT: Well, that's not an
22 objection to form. Why do you think that
23 is outside of the stip?
24     MR. OXFORD: I think it's similar
25 to the -- it's the objection you made at

TSG Reporting - Worldwide    877-702-9580

Page 27

Harrison Goldin

1      Harrison Goldin
2  Peter Vinella's deposition.
3      MS. NEUHARDT: And I think he
4  nonetheless answered the question.
5      MR. OXFORD: What is your question,
6  Amy?
7      (Record read.)
8      MR. OXFORD: I don't think it's
9  permissible under the stip, but I will
10 allow you some latitude.
11     A.   Could you repeat the question,
12 please.
13     **Q.   Were you asked to examine any issues**
14 **that are not reflected in your report?**
15     A.   Not that I recollect.
16     **Q.   How many hours have you personally,**
17 **leaving aside any team members you may have,**
18 **spent on this retention?**
19     A.   Many.
20     **Q.   Can you please provide a better**
21 **estimate?**
22     A.   I would say hundreds of hours.
23     **Q.   Can you give me a range?**
24     A.   It's difficult for me to do that,
25 but it was a very considerable amount of time

TSG Reporting - Worldwide    877-702-9580

Page 28

Harrison Goldin

1      Harrison Goldin
2  and it ran, as I best recollect, into the
3  hundreds of hours.
4  RQ     MS. NEUHARDT: Neil, just as we
5  discussed in McIsaac, we are entitled to
6  that information, so if you could gather
7  that, please.
8      MR. OXFORD: Yes, I will look into
9  that request.
10     **Q.   And did you have people helping you**
11 **in your work on this matter?**
12     A.   I did.
13     **Q.   How many?**
14     A.   The team at one point or another may
15 have included seven or eight people.
16     **Q.   And can you describe what those --**
17 **well, were some of the seven or eight people**
18 **more involved than others?**
19     MR. OXFORD: Object to the form.
20     A.   Well --
21     MS. NEUHARDT: You don't want me to
22 go through all seven people, do you?
23     A.   If I should understand the question
24 to mean that some of the seven or eight people
25 spent more time on the matter than others, the

TSG Reporting - Worldwide    877-702-9580

Page 29

Harrison Goldin

1      Harrison Goldin
2  answer is yes.
3      **Q.   Okay.  The person who spent the most**
4  **time on this matter assisting you, who would**
5  **that be?**
6      A.   Well, there were several people who
7  I spent a lot of time with, so I assume that
8  they would have been the people who perhaps
9  might have spent the most time on the
10 engagement, and they included Seymour Preston
11 Jr., Adam Boyd.
12     **Q.   Boyd?**
13     A.   B-O-Y-D, and Robin Chiu.
14     **Q.   Chiu?**
15     A.   Uh-huh.
16     **Q.   Now, Mr. Preston, what is his**
17 **background?**
18     A.   Mr. Preston spent many years running
19 the distressed investment activities of the
20 Prudential Insurance Company -- no, of the
21 Equitable Life Insurance Company, I'm sorry,
22 The Equitable.  He also had responsibility for
23 a very large portfolio, as I recollect, running
24 into the billions of dollars, of Equitable's
25 investments.  Mr. Preston has been with Goldin

TSG Reporting - Worldwide    877-702-9580

Page 30

Harrison Goldin

1
2  Associates for at least fifteen years, so it's
3  hard for me to remember the specifics about his
4  background.  He is a chartered financial
5  analyst and an expert on issues of valuation
6  and solvency.
7      Q.   Okay.  And what did he -- what
8  services did he perform in connection with this
9  engagement?
10     A.   He helped to direct the team and we
11 worked together in reviewing materials,
12 considering issues that should be analyzed,
13 identifying areas for further consideration,
14 formulating ways in which I would make
15 presentation of my findings.
16     Q.   Is he an attorney?
17     A.   Yes, he is an attorney.
18     Q.   Adam Boyd, what is his background?
19     A.   Adam Boyd is a -- has a finance
20 degree, I believe, from the Wharton School at
21 the University of Pennsylvania.  His
22 credentials are readily available on our
23 website.  Again, he has been with me quite some
24 years and I don't recall specifically what his
25 background is.  He has worked with me on many

TSG Reporting - Worldwide    877-702-9580

Page 31

Harrison Goldin

1
2  matters over the years that involve complicated
3  financial transactions.  For example, he
4  assisted me during the two and a half years
5  that I spent involved in the Enron matter.  He
6  assisted me in connection with my duties as the
7  chief executive officer of Refco7 after it went
8  into bankruptcy, so he has extensive experience
9  in complicated financial transactions.
10     Q.   What was his role in this
11 engagement?
12     A.   His role was to work with
13 Mr. Preston and with me and the other members
14 of the team to identify materials that we
15 needed to review, to consider those materials,
16 to delineate issues that we should examine, to
17 work on formulations that would help me to
18 present my conclusions and opinion.
19     Q.   And Robin Chiu, is that a male or
20 female?
21     A.   It's a young woman.  She has an MBA,
22 I know, I think from the Wharton School of the
23 University of Pennsylvania.  She has
24 considerable experience working at, as I
25 recollect, a large commercial bank or maybe

TSG Reporting - Worldwide    877-702-9580

Page 32

Harrison Goldin

1
2  more than one commercial bank in financial
3  matters.  She has been with us a shorter time,
4  but she also reviewed a lot of the material
5  that we assembled in the matter.  Once again,
6  identified lines of inquiry and focus, helped
7  to understand elements of the situation that I
8  needed to focus on in connection with the
9  preparation of my report and the formulation of
10 my opinion.
11     Q.   I forgot to ask, is Mr. Boyd an
12 attorney?
13     A.   No.
14     Q.   Is Ms. Chiu an attorney?
15     A.   No.
16     Q.   Do you know how much you have billed
17 overall to date?
18     A.   I don't know specifically, but it
19 may be something on the order of a million
20 300,000 dollars, something in that
21 neighborhood.
22 RQ     MS. NEUHARDT:  Okay, Neil, if you
23     could get that information for me as well,
24     we are entitled to it under the stipulation.
25     MR. OXFORD:  Yes, I will look into

TSG Reporting - Worldwide    877-702-9580

Page 33

Harrison Goldin

1
2  that too.
3      A.   There were other members of the team
4  that worked in a senior way on this engagement.
5      Q.   In a senior way?
6      A.   Yes.
7      Q.   Okay.  Could you tell me who those
8  people are?
9      A.   One of them is Dorie Nagar,
10 N-A-G-A-R, the first name is spelled DORIE, who
11 has a background in financial institutions
12 audit.  He was a partner at KPMG and, as I
13 said, worked in their practice area in auditing
14 and reviewing the activities of large financial
15 institutions.
16     Q.   And what was his role in this
17 matter?
18     A.   His role was to help us identify and
19 make sure that we properly focused on a number
20 of the issues that were involved in the
21 analysis.
22     Q.   Okay.  Any other senior members of
23 your team?
24     A.   Well, I don't mean to slight
25 anybody, but I'm now getting a little thin on

TSG Reporting - Worldwide    877-702-9580

Page 34

1            Harrison Goldin
2   recollecting who the other members of the team
3   were, but I know there were others.
4        Q.   Who drafted your report?
5        A.   I did.
6        Q.   You personally?
7        A.   Yes.
8        Q.   You did the first draft?
9        A.    Well, I was assisted in formulations
10  of various concepts and putting together the
11  way in which we would offer the opinion.  I was
12  presented with suggestions which I incorporated
13  into my final report.  Again, the work was a
14  collaborative effort between me and my team
15  that I oversaw and directed and managed, but
16  the product is my product.
17       Q.   Okay.  Who presented you with these
18  suggestions?
19       A.    Members of the team presented me
20  with alternative formulations from time to time
21  as we were preparing the report.
22       Q.   Did counsel present you with any
23  formulations for your report?
24            MR. OXFORD:  I will object to the
25  form and I am going to instruct the witness

TSG Reporting - Worldwide    877-702-9580

Page 35

1            Harrison Goldin
2   not to answer with respect to any
3   communications he had with counsel.
4            MS. NEUHARDT:  I believe he is --
5   that I am entitled to inquire into anything
6   that he used as a basis for his report and
7   if you gave him specific language to put in
8   the report, I am entitled to ask that.
9            MR. OXFORD:  I think if you -- I
10  disagree with you on the scope of the stip.
11  Maybe we can take a break and look at the
12  stip.  What you asked -- what you just told
13  me is a different question to the one you
14  just asked the witness.
15            MS. NEUHARDT:  All right.  I'll ask
16  it again.
17       Q.   Did counsel provide you any specific
18  language to put in your report?
19            MR. OXFORD:  I object to the form of
20  the question and I will instruct the
21  witness not to answer on the basis of
22  privilege.
23            MS. NEUHARDT:  How do you think what
24  I just asked -- actually, you know what,
25  maybe we should just go off the record for

TSG Reporting - Worldwide    877-702-9580

Page 36

1            Harrison Goldin
2   a second and step outside.
3            THE VIDEOGRAPHER:  Off the record at
4   10:19 a.m.
5            (Recess was taken from 10:19 to
6   10:22.)
7            THE VIDEOGRAPHER:  Back on the
8   record.  10:22 a.m.
9   BY MS. NEUHARDT:
10       Q.   Okay.  Mr. Goldin, we may come back
11  to that line of questioning after we look at
12  the stip, but in the meantime we will move on.
13       I forgot to ask you when we were
14  looking at Exhibit 2 to your report, the
15  reliance materials --
16       A.   Yes, ma'am.
17       Q.   -- whether you reviewed any of the
18  other expert reports submitted by the Movants?
19            MR. OXFORD:  Object to the form.  I
20  think you did ask that question.
21            MS. NEUHARDT:  Well, I asked if he
22  read any other expert reports submitted by
23  Barclays.
24            MR. OXFORD:  You are right.  Sorry.
25       A.   I don't believe that I read the

TSG Reporting - Worldwide    877-702-9580

Page 37

1            Harrison Goldin
2   other expert reports, no.
3       Q.   Okay.  Did you speak to any of the
4   other experts that have been retained by
5   Movants in connection with your report?
6       A.   No.
7       Q.   Now, you have described what you
8   were asked to do.  I want to make clear -- I
9   want to understand what you purport to be doing
10  and what you are not doing.
11       Are you opining whether the values
12  described to the court in the sale hearing and
13  the motion papers are correct?
14            MR. OXFORD:  Object to the form of
15  the question.
16       A.   I don't understand the question.
17       Q.   Are you opining as to whether or not
18  the values provided by Lehman's counsel to
19  Judge Peck during the process that led to the
20  sale order are correct?
21            MR. OXFORD:  Same objection.
22       A.   My opinion is confined to what the
23  court was told and my recollection is that what
24  the court was told was that the value of the
25  financial assets was $47.4 billion.

TSG Reporting - Worldwide    877-702-9580

Page 38

Harrison Goldin

1
2     Q.   Okay.  But you are not opining as to
3  whether or not that figure is, in fact, the
4  correct figure?
5     A.   No.
6     Q.   Are you opining as to whether the
7  values as set forth in Exhibit 377A are
8  correct?
9     A.   No.
10    Q.   Okay.  Leaving aside the issue of
11 what was or was not disclosed to the court, are
12 you opining on interpretation of the contract
13 language?
14    A.   No.
15    MR. OXFORD:  Objection to the form.
16    You can answer.
17    Q.   Are you opining on differences
18 between GAAP financial standards and
19 international financial reporting standards?
20    A.   No.
21    Q.   Do you purport to be an expert in
22 international financial reporting standards?
23    A.   No.
24    Q.   Do you consider yourself an expert
25 in GAAP?

TSG Reporting - Worldwide    877-702-9580

Page 39

Harrison Goldin

1
2     A.   No.
3     Q.   Do you consider yourself an expert
4  in SEC Rule 15c3-3?
5     A.   No.
6     Q.   In SIPA, Securities and Investors
7  Protection Act?
8     A.   No.  I understand.  I have been
9  engaged by SIPA and have worked for SIPA in the
10 past, but I am not an expert on SIPA.
11    Q.   This was marked yesterday, I
12 believe.  It's 707A.  This document is an order
13 signed by Judge Peck titled Order Under 11
14 USC - Sections 105A, 363 and 365 and Federal
15 Rules of Bankruptcy Procedure 2002, 6004 and
16 6006 Authorizing and Approving (A) The Sale of
17 Purchased Assets Free and Clear of Liens and
18 Other Interests and (B) Assumption and
19 Assignment of Executory Contracts and Unexpired
20 Leases.
21    Have you seen this document before?
22    A.   Yes.
23    Q.   This is the sale order; correct?
24    A.   Yes.
25    Q.   If you turn to page 21 and look at

TSG Reporting - Worldwide    877-702-9580

Page 40

Harrison Goldin

1
2  paragraph 25, the court orders here that the
3  purchase agreement and any related documents --
4  sorry -- agreements, documents or other
5  instruments may be modified, amended or
6  supplemented by the parties thereto in a
7  writing signed by such parties in accordance
8  with the terms thereof without further order of
9  the court provided that any such modification,
10 amendment or supplement does not have a
11 material adverse effect on the Debtors' estates
12 and has been agreed to between the committee,
13 the Debtors and the purchaser.
14    Are you opining on whether or not
15 there has been a material adverse effect on the
16 Debtors' estates?
17    MR. OXFORD:  Objection to form.
18    MR. KAY:  Same objection.
19    A.   No.
20    Q.   Are you opining on what is
21 reasonably equivalent value or fair
22 consideration under the Uniform Fraudulent
23 Transfer Act, the Uniform Fraudulent
24 Conveyances Act or Section 548 of the
25 bankruptcy code?

TSG Reporting - Worldwide    877-702-9580

Page 41

Harrison Goldin

1
2     MR. OXFORD:  Object to the form.
3     MR. KAY:  Objection to form.
4     MS. CARRERO:  Objection to form.
5     A.   No.
6     Q.   Okay.  Back to your report, page 3.
7  The very last sentence on page 3 -- sorry.  I
8  will give you a moment to get settled.
9     A.   Yes, ma'am.
10    Q.   Okay.  The very last sentence you
11 say:  "I was not asked to conduct an
12 independent valuation of the elements of the
13 transaction for which I understand the Movants
14 have retained other experts."  Is that correct?
15    A.   Yes.
16    Q.   Okay.  Can you tell me exactly what
17 you relied on for the values that you set forth
18 in your report then?
19    A.   I relied on what the court was told
20 and I used as a basis for my analysis the
21 Acquisition Balance Sheet as adjusted by
22 Professor Pfleiderer without necessarily
23 agreeing or disagreeing with his analysis.
24    Q.   Okay.  Did you do anything to ensure
25 that the valuations told to the court were

TSG Reporting - Worldwide    877-702-9580

Page 42

Harrison Goldin

1    Harrison Goldin
2  accurate and reliable?
3         MR. OXFORD:  Object to form.
4    A.   Could you repeat the question.
5    Q.   Sure.  Did you do anything to ensure
6  that the valuations told to the court were
7  accurate and reliable?
8         MR. OXFORD:  Same objection.
9    A.   No.
10    Q.   Did you do anything to ensure that
11  the valuations in the Acquisition Balance Sheet
12  were accurate and reliable?
13    A.   No.
14    Q.   So to the extent that any of the
15  valuations given to the court are determined to
16  be erroneous, would you have to adjust your
17  opinions?
18         MR. OXFORD:  Object to the form.
19    A.   No.
20    Q.   Why not?
21    A.   Because my opinion is based on what
22  was reported to the court both as to the value
23  of assets and the value of liabilities and the
24  elements that were material involved in the
25  transaction, and my analysis is based further,

TSG Reporting - Worldwide    877-702-9580

Page 43

Harrison Goldin

1  as I told you a minute ago in reply to another
2  question, on Professor Pfleiderer's adjustment
3  to the Acquisition Balance Sheet without my
4  either agreeing or disagreeing with his
5  conclusions respecting the Acquisition Balance
6  Sheet.
7    Q.   Okay.  On that same page where you
8  describe what you were asked to do you say:  "I
9  was asked to compare the disclosure to the
10  bankruptcy court about the Lehman assets to be
11  transferred to Barclays pursuant to the sale
12  order the court entered on September 22nd with
13  the acquisition gains Barclays reported."
14    What do you -- what comprises the
15  disclosure to the bankruptcy court about the
16  Lehman assets to be transferred to Barclays
17  pursuant to the sale order the court entered on
18  September 22nd, 2008?
19    A.   Well, the components of the
20  disclosure comprise principally the Asset
21  Purchase Agreement of September 16th, 2008, the
22  hearing on sale procedures on September 17th,
23  2008, the First Amendment to the APA provided
24  to the court on the morning of the 19th of

TSG Reporting - Worldwide    877-702-9580

Page 44

Harrison Goldin

1  September, and the hearing that was held by the
2  court on the 19th and 20th of September 2008.
3    Q.   Okay.  Do you consider the motion to
4  approve the sale to be part of the disclosure
5  to the bankruptcy court?
6    A.   It certainly was something that the
7  court had before it.
8    Q.   And you reviewed that in connection
9  with your report?
10    A.   I remember looking at the motion.
11    Q.   Did you consider it part of the
12  disclosure to the bankruptcy court?
13    A.   It's part of the record.
14    Q.   Okay.  What about the Clarification
15  Letter?
16    A.   Well --
17         MR. OXFORD:  Object to form.
18         MR. KAY:  Same objection.
19         MS. CARRERO:  Same objection.
20    A.   The Clarification Letter, of course,
21  came after the hearing on the 19th and 20th of
22  September.  It was referred to in the hearing
23  on the 19th and 20th of September.  The court
24  indicated, after counsel for the debtor had

TSG Reporting - Worldwide    877-702-9580

Page 45

Harrison Goldin

1  represented what the material changes to the
2  major elements of the transaction were, that
3  they would be memorialized in a Clarification
4  Letter.  My recollection is that the court
5  indicated that it would look forward to getting
6  that and reviewing it if not in haec verba, in
7  substance.
8         THE COURT REPORTER:  I'm sorry, "not
9  in" --
10    A.   Haec verba.  I knew you would ask me
11  how to spell that.  I think it's spelled
12  H-A-E-C -- I have a Latin expert on my right --
13  V-E-R-B-A.
14    And, of course, as you referred to
15  the sale order a minute ago, the clarification
16  letter is inferentially reflected in that
17  paragraph in which the court said that -- I
18  will look at it again.  I said that -- the
19  court said the purchase agreement and any
20  related documents or instruments may be
21  modified provided they don't have a
22  material adverse effect on the Debtors' estates
23  and have been agreed to among the parties.
24    Q.   So you have knowledge that the

TSG Reporting - Worldwide    877-702-9580

Page 46

1          **Harrison Goldin**
2  **existence of the Clarification Letter was**
3  **disclosed to the court?**
4          A.    That there was going to be a
5  Clarification Letter was disclosed to the
6  court. I'm not aware that the court, in fact,
7  received the Clarification Letter before the
8  closing and the court indicates in the order
9  that it had not received the Clarification
10  Letter as of the time it signed the sale order.
11          **Q.    So is it your testimony then that**
12  **materials that were disclosed to the court**
13  **after the closing would not count as disclosure**
14  **to the court?**
15          MR. OXFORD: Object to the form.
16          MR. KAY: Same objection.
17          MS. CARRERO: Same objection.
18          A.    I think that question, in order not
19  to be misleading, needs to be parsed in the
20  following way: The sale order, which was
21  signed by the court on the 20th of September,
22  was predicated on the record that was before
23  the court on the 20th of September. Materials
24  that may have been disclosed to the court
25  thereafter were not part of the record on which

Page 47

1          Harrison Goldin
2  the court based the sale order that was issued
3  on the 20th of September. Obviously it is
4  always within the province of the court to
5  determine that subsequent events affect the
6  sale order that it signed one way or another.
7  That is discretion and prerogative of the
8  court.
9          **Q.    You are purporting to analyze what**
10  **was disclosed to the bankruptcy court.**
11          **Are you saying that a document that**
12  **was filed with the bankruptcy court is not**
13  **disclosed to the court?**
14          MR. OXFORD: Object to the --
15          MS. NEUHARDT: I am asking -- I am
16  asking what he is trying to tell me. I am
17  asking for clarification.
18          MR. OXFORD: And I am objecting to
19  the form of the question.
20          MS. NEUHARDT: Okay. What is the
21  form -- what is the problem with the form
22  of that question?
23          MR. OXFORD: Well, it misstates what
24  he is purporting to analyze, which is
25  clearly set forth in --

Page 48

1          Harrison Goldin
2          MS. NEUHARDT: All right. Let's
3  start with that.
4          **Q.    What are you purporting to analyze?**
5  **Your report says the disclosure to the**
6  **bankruptcy court; is that correct?**
7          A.    Yes.
8          MR. OXFORD: Object to the form as
9  being asked and answered.
10          You can answer it again, Mr. Goldin.
11          A.    Yes.
12          **Q.    Okay. So is it your testimony that**
13  **a document that was filed with the court was**
14  **not disclosed to the court?**
15          MR. OXFORD: I will object to the
16  form of the question.
17          MR. KAY: Same objection.
18          MS. CARRERO: Objection.
19          MS. NEUHARDT: And what is the
20  objection to the form? Just because you
21  don't like it is not an appropriate
22  objection to form.
23          MR. OXFORD: I think it's
24  inappropriate because it's vague, it's
25  unbounded by time, and Mr. Goldin has

Page 49

1          Harrison Goldin
2  already testified as to what he has
3  analyzed and his answers are bounded by
4  time and you are --
5          MS. NEUHARDT: Well, I disagree
6  and --
7          **Q.    Do you understand the question?**
8          A.    Can you repeat the question, please.
9          MS. NEUHARDT: Can you read it back.
10  (Record read.)
11          MR. KAY: Same objection.
12          MS. CARRERO: Same objection.
13          MR. OXFORD: My objection is on the
14  record.
15          A.    Well, a document that was filed with
16  the court subsequent to the execution of the
17  sale order was not part of the record on which
18  the court based the sale order.
19          **Q.    If the court reviewed the filing and**
20  **saw nothing alarming about it, wouldn't that**
21  **suggest that it was consistent with the record**
22  **prior to signing the sale order?**
23          MR. OXFORD: Object to the form.
24          MR. KAY: Same objection.
25          MS. CARRERO: Same objection.

Harrison Goldin
1
2      A.    If the court reviewed the filing
3  when?
4      Q.    The filing that was made Monday --
5  well, let's do a little foundation.
6      Do you know when the Clarification
7  Letter was filed with the court?
8      A.    I believe it was after the execution
9  of the sale order and my recollection sitting
10  here, although I'm not certain, is that it may
11  have been filed on the 22nd of September.
12      Q.    It was, indeed, filed on the 22nd of
13  December, so it's filed on --
14      A.    In September.
15      Q.    What did I say?
16      MR. OXFORD:  December.
17      Q.    Sure enough.  September.
18      Do you know whether or not the court
19  read the filing on September 22nd?
20      MR. OXFORD:  Object to the form of
21  the question.
22      A.    I have no idea.
23      Q.    So you have no idea whether he
24  considers that to have been disclosed to him?
25      A.    Well, the closing was before the

Harrison Goldin
1
2  opening of the financial markets on the 22nd of
3  September.  I don't know when the Clarification
4  Letter was filed with the court.  I do --
5      Q.    You know it was that day?
6      A.    It may have been after the closing.
7  I do know that the court's sale order executed
8  on Saturday, the 20th of September, was based
9  on the record theretofore which did not include
10  the Clarification Letter.  I know that the
11  hearing on the 19th of September, as I have
12  testified, included a reference to a
13  clarification order.  I know that the sale
14  order as executed included reference to
15  documents or --
16      Q.    My question is --
17      A.    May I finish?  May I finish my
18  answer, please?
19      Q.    Sure, but it's not responsive.
20      A.    Well, I am doing my best.
21      Q.    No, my question was whether you
22  know --
23      MR. OXFORD:  Amy, Amy, please, with
24  respect --
25      MS. NEUHARDT:  No, he is just -- he

Harrison Goldin
1
2  is trying to do his little direct testimony
3  here.
4      Q.    My question was do you know if the
5  court considers the Clarification Letter to
6  have been disclosed to him?
7      MR. OXFORD:  Okay.  I am going to
8  object to the form of the question and,
9  Amy, we are going to get along much better
10  if you would just have a little courtesy.
11      MS. NEUHARDT:  Well, if he would
12  just answer my question -- don't interrupt
13  me.  If he would answer the question --
14  it's a yes or no question.  It's very
15  simple.
16      MR. OXFORD:  Amy --
17      MS. NEUHARDT:  He has already said
18  what he thinks the record is.  I am asking
19  him if he knows what the court thinks was
20  disclosed to him.
21      MR. KAY:  He has asked and
22  answered --
23      MS. NEUHARDT:  He has not answered
24  that.
25      MR. KAY:  -- the question three

Harrison Goldin
1
2  times.
3      MS. NEUHARDT:  He has not answered
4  it.
5      MR. KAY:  Yes, he has.
6      MS. NEUHARDT:  He has not.
7      MR. OXFORD:  It is going to be
8  difficult for you to determine --
9      MS. NEUHARDT:  He has not, because
10  the fact is that he has no idea.
11      Q.    You have no idea what the judge
12  thinks was disclosed to you, do you?  Disclosed
13  to him.
14      MR. OXFORD:  Object to form.
15      Please don't answer that question,
16  Mr. Goldin.
17      Amy, it is going to be very
18  difficult for you to determine whether or
19  not Mr. Goldin has answered a question if
20  you do not give him the common decency and
21  courtesy of letting him answer the
22  question.
23      MS. NEUHARDT:  So far I see nothing
24  about what the judge knows here in his
25  answer, which is quite lengthy so far.

Page 54

1          Harrison Goldin
2      THE WITNESS:  Well, you interrupted
3  me.  I was --
4      MS. NEUHARDT:  Okay.
5      THE WITNESS:  -- in the middle of
6  giving my answer.
7      MS. NEUHARDT:  All right.
8      MR. OXFORD:  Perhaps we could go
9  back six or seven pages and find the
10  original question.
11      **Q.  I think I have repeated the question**
12  **several times in the past six or seven pages,**
13  **which is:  Do you know whether the court**
14  **considers the Clarification Letter to have been**
15  **disclosed to him?**
16      MR. OXFORD:  Same objection.  Asked
17  and answered.
18      MR. KAY:  Same objection.
19      MS. CARRERO:  Same objection.
20      MR. OXFORD:  You can answer it
21  again.
22      A.   The court refers in the sale order
23  in the paragraph that you referred me to,
24  paragraph 25 on page 21, to related agreements,
25  documents or other instruments that may

TSG Reporting - Worldwide    877-702-9580

Page 55

1  constitute modification, amendment or
2  supplementation that do not have a material
3  adverse effect on the Debtors' estates and that
4  have been agreed to.  That, I assume, refers to
5  the Clarification Letter, because at the
6  hearing on September 19th, as I testified,
7  there was reference to the Clarification Letter
8  both by Debtors' counsel and by the court.  I
9  also testified to you that to the best of my
10  knowledge there was no clarification presented,
11  no Clarification Letter presented to the court
12  before it executed the sale order, although to
13  the best of my recollection there was a
14  Clarification Letter that was executed and
15  filed on the 22nd of September.  I don't know
16  whether that was filed with the court before or
17  after the transaction closed, before the start
18  of the opening of the financial markets on that
19  date.
20      **Q.  You still have not answered my**
21  **question.**
22      **Do you know whether the judge**
23  **believes that the Clarification Letter that was**
24  **filed with the court on the 22nd was disclosed**

TSG Reporting - Worldwide    877-702-9580

Page 56

1          **Harrison Goldin**
2  **to him?**
3      MR. KAY:  Objection.  Asked and
4  answered.
5      MR. OXFORD:  Same objection.
6      MS. CARRERO:  Same objection.
7      A.   I don't know what the judge
8  believes.
9      **Q.  Thank you.**
10      **Do you consider the transcript of**
11  **proceedings or papers filed in connection**
12  **with -- actually, let me do a little back-up.**
13      **Do you know of a settlement relating**
14  **to some assets that were held at JPMorgan that**
15  **occurred in December 2008?**
16      MR. OXFORD:  I object.
17      A.   I think --
18      MS. NEUHARDT:  On what basis is your
19  objection?
20      MR. OXFORD:  Vague.
21      MS. NEUHARDT:  I am asking him if he
22  has heard of it.
23      **Q.  Have you heard of it?**
24      A.   Well, as a matter of fact, as you
25  well know, I refer to a settlement in my

TSG Reporting - Worldwide    877-702-9580

Page 57

1  report.
2      **Q.  Correct.  Okay.**
3      **Do you consider the transcript of**
4  **proceedings or papers filed in relation to that**
5  **settlement to be part of the disclosure to the**
6  **court?**
7      MR. OXFORD:  Object to the form.
8      A.   Well, the record that the court had
9  when it signed the sale order involved what had
10  transpired on or before the 20th of September,
11  2008.
12      **Q.  So your answer is no?**
13      A.   My answer is that the record that
14  the court had before it on which it based the
15  sale order involved what transpired on or
16  before the 20th of September, 2008, and my
17  understanding is that the settlement to which
18  you have referred did not occur until I think
19  it was December of 2008.
20      **Q.  So is your answer no?**
21      A.   My answer is that the --
22      MR. OXFORD:  Objection to form.
23      A.   -- court had what it had before it
24  when it executed the sale order that had

TSG Reporting - Worldwide    877-702-9580

Page 58

Harrison Goldin

1         Harrison Goldin
2  occurred either on or before the 20th of
3  September.
4      Q.   And I am asking do the transcript of
5  proceedings from the JPMorgan settlement in
6  December of 2008 and the papers related to that
7  settlement -- let me use your words so I don't
8  get an objection -- were those before --
9  actually, I can't do that -- were those before
10 the court?  Were those disclosed to the court?
11     MR. OXFORD:  Objection to the form.
12     MS. CARRERO:  Same objection.
13     MR. KAY:  Asked and answered.
14     MS. NEUHARDT:  Look, disclosure to
15 the court is his phrase.  It is on page 1
16 of his report.  I want to know what he
17 considers disclosed to the court.  It's a
18 yes or no question, were those materials
19 disclosed to the court.
20     MR. OXFORD:  I think he has answered
21 the question.  You guys are talking past
22 each other.
23     MS. NEUHARDT:  No, I think he is
24 deliberately evading my question.
25     MR. KAY:  What's the time frame?

TSG Reporting - Worldwide    877-702-9580

Page 59

Harrison Goldin

1         Harrison Goldin
2      MR. OXFORD:  Disclosure to the court
3  in what respect?  In respect of the sale
4  order?
5      MS. NEUHARDT:  In respect of what he
6  thinks he approved.  And you don't think
7  that when he --
8      MR. OXFORD:  Who is the "he"?
9      MS. NEUHARDT:  "He" is Peck.  Who
10 else would be approving other than
11 Judge Peck?
12     MR. OXFORD:  Well, you are asking
13 the question of the witness about what he
14 thinks, so I think "he" is very vague.
15     MS. NEUHARDT:  Well, he is
16 purporting to interpret what the judge
17 thought he approved and I want to know what
18 he thinks the judge was thinking about and
19 if in December -- this is getting exactly
20 to the problem with his report.  In
21 December of 2008 if they are discussing
22 what happened, don't you think that if the
23 judge thought something was completely
24 different from what he approved, he would
25 have said something?

TSG Reporting - Worldwide    877-702-9580

Page 60

Harrison Goldin

1         Harrison Goldin
2      MR. KAY:  Amy, this is the issue
3  before the court, you know.
4      MS. NEUHARDT:  There you go.  Thank
5  you for saying that.  That will be very
6  helpful.
7      MR. OXFORD:  Amy, can I just suggest
8  we take a five-minute break.  We have been
9  going about an hour.
10     MS. NEUHARDT:  Sure, and I will look
11 at the stip during that break.
12     THE VIDEOGRAPHER:  Off the record at
13 10:45 a.m.  This is the end of the disk 1
14 of the deposition of Harrison J. Goldin.
15     (Recess was taken from 10:45 to
16 10:57.)
17     THE VIDEOGRAPHER:  Going back on the
18 record at 10:57 a.m.  This is the beginning
19 of disk 2 of the deposition of Harrison J.
20 Goldin.
21 BY MS. NEUHARDT:
22     Q.   Mr. Goldin, I am going to try to
23 circumvent some of what we were talking about
24 before.
25     Do you know whether the motions at

TSG Reporting - Worldwide    877-702-9580

Page 61

Harrison Goldin

1         Harrison Goldin
2  issue in this case are going to be decided by a
3  judge or by a jury?
4      A.   I have no sense that there was a
5  jury involved in this matter.
6      Q.   Do you know whether it is Judge Peck
7  that will be deciding the motions in this
8  matter?
9      A.   He is the presiding judge in this
10 case, so I would assume so.
11     Q.   Is there any expertise that you have
12 that you believe will assist Judge Peck in
13 determining what was disclosed to him in
14 connection with the sale order?
15     MR. OXFORD:  Object to the form.
16 Asked and answered.
17     You can answer again.
18     A.   Well, the record that the judge had
19 before him when he signed the sale order on
20 September 20th, 2008 is one that I don't need
21 to help the judge to understand.  The judge had
22 the record before him and it was the basis on
23 which he executed the sale order.  There was,
24 however, an Acquisition Balance Sheet that
25 Barclays filed at the beginning of 2009 which

TSG Reporting - Worldwide    877-702-9580

Page 62

Harrison Goldin

1    reflects what Barclays acquired or believes it
2    was entitled to acquire on the 22nd of
3    September, 2008. As I testified earlier, it is
4    not a document whose full meaning is
5    self-evident on the face of it. So for the
6    purpose of analyzing that document, I required
7    the assistance of a team of people with highly
8    specialized knowledge and it formed the basis
9    for Professor Pfleiderer's conclusion as to
10   what the delta was between the assets that
11   Barclays assumed -- that Barclays acquired and
12   the liabilities that it assumed on the closing,
13   and became further the basis for me to analyze
14   and opine on the difference between that delta
15   and the delta between assets and liabilities
16   that was reported to the court.
17       Q.   Okay. Let's go to page 5 of your
18   **report. In the next to last paragraph you say**
19   **that the sale to Barclays was, quote,**
20   **consummated the Monday morning, September 22nd,**
21   **before the financial markets opened in the**
22   **United States.**
23       **What do you mean by "consummated"?**
24       A.   Closed.

TSG Reporting - Worldwide    877-702-9580

Page 63

Harrison Goldin

1       **Q.   So you see no difference between**
2    **closing and consummated?**
3       A.   In this context, no.
4       **Q.   Okay. Page 6, in the second**
5    **paragraph you state that you have reviewed**
6    **various materials, which I think we have**
7    **already discussed, and then you say: "Those**
8    **materials demonstrate that Barclays has**
9    **materially overstated the assets and values it**
10   **is entitled to receive pursuant to the sale**
11   **order" and that "Mr. Pfleiderer is wrong with**
12   **his conclusions relating thereto."**
13       **Is it your opinion that Barclays**
14   **received or claims entitlement to specific**
15   **assets or asset categories, the transfer of**
16   **which the court did not approve?**
17       MR. OXFORD:  Object to the form.
18       A.   Well, my opinion is focused on the
19   delta between what Barclays claims it received
20   and is entitled to and the liabilities it says
21   it assumed, particularly as adjusted by
22   Professor Pfleiderer on the Acquisition Balance
23   Sheet. I did not focus on the specific
24   components other than to understand the

TSG Reporting - Worldwide    877-702-9580

Page 64

Harrison Goldin

1    Acquisition Balance Sheet as indicated in my
2    report.
3       **Q.   Okay. I am trying to understand**
4    **what you are saying when you say that the**
5    **materials you reviewed demonstrate that**
6    **Barclays has materially overstated the assets**
7    **and values it was entitled to receive.**
8       **Are you saying then that the value**
9    **of the assets Barclays received is higher than**
10   **what the court approved?**
11       A.   The assets and liabilities as
12   reported to the court are different than the
13   assets and liabilities that Barclays claims it
14   is entitled to and assumed when the transaction
15   closed.
16       **Q.   Okay. I am trying to make a**
17   **distinction between assets and categories of**
18   **assets and the valuation of particular assets**
19   **and categories of assets.**
20       **Are you saying that there are actual**
21   **assets or categories of assets, leaving aside**
22   **value, that Barclays received that it should**
23   **not have received?**
24       MR. OXFORD:  Object to the form.

TSG Reporting - Worldwide    877-702-9580

Page 65

Harrison Goldin

1       A.   Well, the question is confusing,
2    because in the first part of the question you
3    said that you are referring to valuations. In
4    the second part of the question you said you
5    are not referring to valuations. Which is it?
6       **Q.   I said I was trying to distinguish**
7    **between the two. What I am trying to figure**
8    **out is whether when you say that the materials**
9    **demonstrate that Barclays has materially**
10   **overstated the assets and values it was**
11   **entitled to receive -- let's break it down by**
12   **assets and values. Start with assets.**
13       **Is it your opinion that Barclays**
14   **claimed rights to particular assets that the**
15   **court did not approve?**
16       A.   I did not focus in my analysis and
17   in formulating my opinion on the specific
18   categories and their appropriateness. What I
19   focused on was the totals which formed the
20   basis for Professor Pfleiderer's opinion.
21       **Q.   Okay. Okay. So then going back to**
22   **that same sentence in your report, assets and**
23   **values, we will look at values.**
24       **Are you opining that the value of**

TSG Reporting - Worldwide    877-702-9580

Page 66

Harrison Goldin

1
2  the assets Barclays received is higher than the
3  value that the court approved?
4      A.   I am opining --
5          MR. OXFORD:  Object to form.  Sorry.
6      A.   I am opining as to the difference
7  between the assets and liabilities and the
8  delta relating thereto that was reported to the
9  court and the assets and liabilities and the
10  delta relating thereto that Barclays indicated
11  it acquired or assumed at the time of the
12  closing on the 22nd.
13     Q.   Okay.  So if the court determines --
14  why don't we look at page 7 of your report.
15         As I understand this page, the left
16  two columns reflect what you consider to be the
17  assets and liabilities as disclosed to the
18  court.  Is that a correct interpretation?
19     A.   Well, they are what was reported to
20  the court.
21     Q.   Okay.  And then the right side, the
22  right two columns I understand to be your
23  interpretation of the Barclays Acquisition
24  Balance Sheet; is that correct?
25     A.   Yes.

TSG Reporting - Worldwide    877-702-9580

Page 67

Harrison Goldin

1
2      Q.   Okay.
3      A.   I should modify that by saying it is
4  a reflection of the Acquisition Balance Sheet,
5  of course, subject to the adjustments that were
6  made by Professor Pfleiderer.
7          THE WITNESS:  You pronounce his name
8  Pfleiderer.  Is that the correct
9  pronunciation?
10         MS. NEUHARDT:  That's what I have
11  heard other attorneys here call him, but I
12  have not spoken to him myself, so --
13         THE WITNESS:  Should I adopt that
14  pronunciation?
15         MS. NEUHARDT:  I don't know.
16         You were at Mr. Pfleiderer's
17  deposition.  How does he pronounce his
18  name?
19         MS. CARRERO:  I believe it's
20  Pfleiderer.
21         MS. NEUHARDT:  Okay.
22         THE WITNESS:  Okay.  Then I will try
23  and accommodation by calling him
24  Pfleiderer.
25     Q.   Okay.  So you were saying this is

TSG Reporting - Worldwide    877-702-9580

Page 68

Harrison Goldin

1
2  subject to Mr. Pfleiderer's adjustments.  All
3  right.
4          So if the court determines -- if the
5  court determines that what he approved is
6  different than what you have in the left two
7  columns, your delta will change; correct?
8          MR. OXFORD:  Object to the form.
9      A.   Well, this chart, this table, simply
10  reflects what the court was told and reflects
11  the difference between assets and liabilities
12  as they were reported to the court.
13     Q.   I understand, but I think we have
14  talked about the fact that it's the judge who
15  will ultimately determine what was disclosed to
16  him; correct?
17     A.   Well, what was disclosed to the
18  court is apparent in the record.
19     Q.   So if the judge decides that
20  something else was disclosed to him, are you
21  disagreeing with him?
22     A.   The judge has the prerogative to
23  decide whatever he wishes, but the record is
24  clear as to what was reported to the court.
25     Q.   Do you see a distinction between

TSG Reporting - Worldwide    877-702-9580

Page 69

Harrison Goldin

1
2  what was reported to the court and what was
3  approved by the court?
4      A.   Well, the sale order makes clear
5  that the court is rendering its conclusion as
6  reflected in the sale order based on the record
7  that the court had before it.
8      Q.   If the judge ends up determining
9  that the sale order approved a transfer of
10  assets or liabilities other than what is in --
11  what is reflected in the left two columns of
12  your chart on page 7, wouldn't that affect the
13  delta that you have been testifying about?
14         MR. OXFORD:  Object to the form.
15         MR. KAY:  Same objection.
16         MS. CARRERO:  Same objection.
17         MR. OXFORD:  Asked and answered.
18     A.   It's not for me to second-guess the
19  court.  My expert opinion relates to what is
20  reflected on the record as to what the court
21  was told relative to what Barclays asserts it
22  was entitled to and received at the time the
23  transaction closed on the 22nd of September.
24     Q.   You have discussed the skills that
25  you believe add to the interpretation of the

TSG Reporting - Worldwide    877-702-9580

Page 70

Harrison Goldin

1  **Acquisition Balance Sheet.**
2  **Are there special skills that you**
3  **have that you believe would assist the judge in**
4  **determining what was on the record before him?**
5       MR. OXFORD:  Objection.  Asked and
6  answered.
7       A.   Well, I am not directing your
8  attention as an expert to anything other than
9  my analysis of the Acquisition Balance Sheet
10  and what it reflects on an adjusted basis by
11  way of the delta between the liabilities that
12  Barclays said it assumed on the 22nd and the
13  assets that it received and said it was
14  entitled to and the delta between assets and
15  liabilities that was reported to the court
16  previously.
17       Q.   So you claim no special expertise in
18  determining what was reported to the court?
19       A.   Well, I testified --
20       MR. OXFORD:  Objection.  Asked and
21  answered.
22       A.   I have testified twice that the
23  Acquisition Balance Sheet is not self-evident
24  in terms of comprehending what it comprises and

TSG Reporting - Worldwide    877-702-9580

Page 71

Harrison Goldin

1  how it is to be understood.  It is a
2  complicated document that I undertook with the
3  assistance of the people helping me in this
4  project to understand and to master so that
5  there would be a basis for comparing the delta
6  between assets and liabilities as adjusted to
7  which Barclays claims entitlement or which it
8  assumes as of the closing to what was told to
9  the court prior to the execution of the sale
10  order.
11       Q.   I understand that, Mr. Goldin.  I
12  think we are talking past each other.  I
13  understand what you are saying your expertise
14  is in terms of the right two columns on page 7.
15       What I am asking is whether or not
16  the expertise that you have discussed in any
17  way contributed to the left two columns on
18  page 7.
19       A.   Well, the record makes clear what
20  the principal elements of the transaction are
21  and that is what is summarized on the left on
22  page 7 and it's summarized to the left on
23  page 7 in connection with and as part of my
24  analysis of Professor Pfleiderer's

TSG Reporting - Worldwide    877-702-9580

Page 72

Harrison Goldin

1  interpretation of the delta as a function of
2  the Acquisition Balance Sheet.  It is in
3  support of the analysis that I did respecting
4  Professor Pfleiderer's opinion.
5       Q.   I understand what you are saying
6  about your analysis of the connection and of
7  what's in the right two columns.
8       What I want to know is if there was
9  any special expertise in putting together the
10  left two columns, in reading the record or what
11  you considered to be the record?
12       A.   Well, I reviewed the record.  The
13  elements that comprise the principal aspects of
14  the transaction were described to the court and
15  they are simply reflected in the column on the
16  left.
17       Q.   I understand what you say you did.
18  What I want to know if there was any -- what I
19  want to know is whether there is any special
20  skill that you have that makes you better at
21  reviewing the record and the elements that
22  comprise the principal aspects of the
23  transaction that were described to the court.
24       A.   Than?

TSG Reporting - Worldwide    877-702-9580

Page 73

Harrison Goldin

1       Q.   Than --
2       A.   Better than --
3       Q.   -- the judge.
4       A.   Better than the judge, no.
5       Q.   Okay.  Let's go back to page 6.  In
6  the bottom paragraph, the last sentence, you
7  say:  "Using accounting conventions Barclays
8  reported to the SEC that the value of the
9  assets it acquired was 59.18 billion while it
10  assumed 55.01 billion of liabilities."
11       What accounting conventions were you
12  referring to there?
13       A.   International accounting standards.
14       Q.   Okay.  When you read the record
15  presented to the court, did you understand the
16  values that were being described to the court
17  to be consistent with IFRS?
18       A.   No.  The values that were reported
19  to the court were consistent with Lehman's
20  marks, Lehman's book values.
21       Q.   Okay.  Did you consider the values
22  to be described to the court -- did you believe
23  that they were being described as specific --
24  as using accounting conventions?

TSG Reporting - Worldwide    877-702-9580

**Harrison Goldin**

1
2    MR. OXFORD: Objection to form.
3    A.    Well, I want to help clarify for
4    you, because there may be some confusion as
5    reflected in the question, between an
6    accounting presentation and a non-accounting
7    presentation. The Acquisition Balance Sheet is
8    an accounting presentation. It happens to have
9    been prepared in connection with international
10   accounting standards, but Professor Pfleiderer
11   adjusted the Acquisition Balance Sheet to
12   provide a basis which he felt would then
13   appropriately enable him to compare the assets
14   that Barclays received or claimed it's entitled
15   to as of the 22nd of September with the
16   liabilities it assumed.
17        Without accepting or rejecting his
18   analysis I concluded that I could work with his
19   conclusion and use it as a basis for comparison
20   with what the court was told, so that was the
21   approach that I took in determining what I have
22   described was my opinion.
23   Q.    Okay. I understand that.
24        At the beginning you -- at the
25   beginning of your response you said there is a

**Harrison Goldin**

1
2    difference between an accounting presentation
3    and a non-accounting presentation; is that
4    correct?
5    A.    Yes.
6    Q.    Did you consider the disclosure to
7    the court to be an accounting presentation?
8    A.    No, it was a presentation of values.
9    Q.    We have already discussed that the
10   hearing -- well, there are two hearings, but
11   the later of the two hearings that led to the
12   sale order was on September 19th; correct?
13   A.    Yes.
14   Q.    And that the order was issued on the
15   20th; is that correct?
16   A.    Yes.
17   Q.    And that the closing or consummation
18   was on the 22nd of September; correct?
19   A.    Correct.
20   Q.    Okay. Do you know if the value of
21   any of the assets that were to be transferred
22   changed between the 19th and the 20th?
23        MR. OXFORD: Objection. Asked and
24   answered.
25   A.    The values that were reported to the

Harrison Goldin

1
2    court were reported to the court at the hearing
3    on the 19th and 20th of September, and you are
4    asking me what?
5    Q.    I am trying to ask whether or not
6    you know whether the values that were reported
7    and -- we will exclude the 20th as the example
8    then.
9        Do you know if the values that were
10   reported to the court on the 19th and early on
11   the 20th changed, if the value of the
12   underlying assets changed between then and
13   let's say September 22nd?
14        MR. OXFORD: Objection to the form.
15        MS. CARRERO: Same objection.
16   A.    The court was told the value of
17   the financial assets that was going to be
18   transferred to Barclays was $47.4 billion. To
19   my recollection there was no discussion
20   respecting the elements in the hearing on the
21   19th of September other than in connection with
22   a description of some of the significant
23   changes to the transaction.
24   Q.    I'm not sure you understand my
25   question then. I understand that what you are

**Harrison Goldin**

1
2    saying is that on the 19th you believe the
3    court was told that the value of assets being
4    transferred was 47.4 billion.
5        Did you understand that value to be
6    as of that day?
7    A.    I understood that the values were to
8    be values that the court could rely on in
9    determining whether reasonably equivalent value
10   was being transferred and whether fair
11   consideration was being paid.
12   Q.    Let's back up a little.
13        You understand that assets can
14   change value over time; right?
15   A.    Yes.
16   Q.    Okay. At what time did you think
17   the 47.4 billion valuation was being -- scratch
18   that.
19        The 47.4 billion valuation described
20   to the court, what date did you believe that
21   value was as of?
22   A.    Those were Lehman marks.
23   Q.    As of what date?
24   A.    The date was never discussed in the
25   record.

Harrison Goldin

1
2     Q.    So you have no idea?
3     A.    The date was not discussed in the
4  record and it was the record that provided the
5  basis for my formulating my opinion.
6     Q.    Well, would you -- do you know -- do
7  you know generally what was going on with the
8  financial markets during the week of September
9  15th, 2008?
10    A.    Yes.
11    Q.    And what was that?
12    A.    They were in turmoil.
13    Q.    Was the value of -- do you know what
14 long positions are?
15    A.    Yes.
16    Q.    Okay.  Was the value of long
17 positions generally going down over that
18 period?
19        MR. OXFORD:  Objection to the form.
20        MR. KAY:  Same objection.
21        MS. CARRERO:  Same objection.
22    A.    There was a lot of turmoil in
23 financial markets and I don't recollect
24 specifically how elements of that market were
25 performing in tandem with one another at that

Harrison Goldin

1
2  point, but it was clear and I have a clear
3  recollection that the markets were in turmoil.
4     Q.    Okay.  Do you know whether or not
5  Lehman's assets changed value over the course
6  of that week?
7     A.    Now you are referring me to the full
8  week?
9     Q.    I believe I was referring to the
10 whole week in all my prior questions.
11    A.    Well, you will remember that
12 Debtors' counsel told the court on the 19th
13 that there had been a change respecting the
14 value of the financial assets and that the
15 financial assets being transferred now had a
16 value of $47.4 billion as opposed to the value
17 that had been reflected in the Asset Purchase
18 Agreement executed on the 16th.
19    Q.    Okay.  So do you now have a better
20 sense of as of what date the 47.4 billion
21 valuation would have been provided?
22    A.    Well, the $47.4 billion figure I
23 have the same sense as I had before.  It was
24 reported to the court on the 19th of September.
25    Q.    So you don't think they are marks

Harrison Goldin

1
2  from September 12th?
3     A.    I don't know specifically what the
4  precise marks dates were because it was not
5  reported to the court, but was -- what was
6  reported to the court was that a figure that
7  had been $70 billion previously was now
8  $47.4 billion, and that was on the 19th of
9  September.
10    Q.    Okay.  You don't think that the
11 47.4 billion figure was intended to be the mark
12 for the 22nd, do you?
13    A.    Well, the court approved the sale on
14 the 20th of September based on the record that
15 was before it on the 20th of September.
16    Q.    Okay.
17    A.    And the record that was before it on
18 the 20th of September included reference to
19 values for financial assets at $47.4 billion.
20    Q.    I understand, but are you -- do you
21 believe that 47.4 billion figure was intended
22 to be a mark for September 22nd?
23        MR. OXFORD:  Objection to form.
24        MR. KAY:  Objection.
25        MR. OXFORD:  You mean when the

Harrison Goldin

1
2  markets opened or the markets closed?
3        MS. NEUHARDT:  At closing.
4     A.    I believe that the sale order was
5  the charter for the consummation of the
6  transaction before markets opened on the 22nd
7  of September, and the sale order was based on a
8  record that included a reference to the value
9  of financial assets at $47.4 billion.
10    Q.    I understand.  As of what date was
11 that 47.4 billion?
12    A.    Well, the reference to the court was
13 provided on the 19th of September.  The court
14 sale order was signed on the 20th of September.
15 The sale order referenced the record that was
16 before the court.  The record that was before
17 the court, I've testified to you several times,
18 related to what was available on the 20th of
19 September and before.
20    Q.    Okay.  So what I'm asking then,
21 although it's going back a little ways now, is
22 did you make any effort to compare or to
23 determine, sorry, whether there was any change
24 in the value of the assets between Friday and
25 Saturday, the 19th and 20th of September, and

Page 82

**Harrison Goldin**

1   **the 22nd of September?**
2
3        MR. OXFORD:  Object to the form of
4   the question.
5        MS. CARRERO:  Same objection.
6        MR. OXFORD:  You might want to put
7   some timings in there, Amy.
8        MS. NEUHARDT:  Some timings?
9        MR. OXFORD:  Yes.  You are -- it's a
10  vague question because it's compound
11  because you are asking about the 19th and
12  the 20th and, again, you ask about the
13  22nd.
14       MS. NEUHARDT:  I can break it to
15  19th and 22nd, if you want, but every time
16  I mention the 19th he points out correctly
17  that the sale process went overnight, so...
18       MR. OXFORD:  That's fine.  I was
19  just trying to explain my objection so we
20  can move forward.
21       **Q.   Do you understand the question?**
22       A.   Could you repeat the question,
23  please.
24       MS. NEUHARDT:  Can you read it back.
25       (Record read.)

TSG Reporting - Worldwide    877-702-9580

Page 83

Harrison Goldin

1
2        A.   As you have elicited from me on
3   several occasions during this deposition, I
4   have testified more than once now that my focus
5   was on what was reported to the court as to
6   assets and liabilities and what Barclays claims
7   it was entitled to when the transactions closed
8   on the 22nd of September as to assets and
9   liabilities.  So the judgement that I reached,
10  the opinion that I formed, is a function of the
11  delta between what was reported to the court
12  and what was reported by Barclays, and that
13  delta is at least $4,850,000,000, potentially
14  much higher than that based on the work of the
15  other experts, but that was not within my ken.
16       **Q.   What I am trying to understand is --**
17  **if we go back to the chart on page 7.  The**
18  **values reported to the court in the two columns**
19  **on the left you are saying were reported as of**
20  **the 19th; correct?**
21       A.   These are values that were reflected
22  in the record as late as the 19th of September.
23       **Q.   Okay.  Now, what date do you**
24  **understand the right two columns to be as of?**
25       A.   The Barclays claim as reflected in

TSG Reporting - Worldwide    877-702-9580

Page 84

Harrison Goldin

1
2   the Acquisition Balance Sheet relates to the
3   assets that it received at the closing before
4   the opening of the financial markets on the
5   22nd of September.
6        **Q.   Okay.  So you are comparing the 19th**
7   **to the 22nd?**
8        MR. OXFORD:  Object to the form.
9        MS. CARRERO:  Same objection.
10       A.   I'm not comparing -- I'm sorry.  I'm
11  not comparing the 19th to the 22nd.  I am
12  comparing rather what was reported to the court
13  as late as the 19th of September and what
14  Barclays subsequently reported were the values
15  of the assets that it received as of the
16  closing before the opening of financial markets
17  on the 22nd and the liabilities that it assumed
18  at the same time.
19       **Q.   Okay.**
20       A.   So I am comparing the deltas.
21       **Q.   But you made -- I believe you**
22  **testified you made no effort to determine**
23  **whether or not there was a change in value**
24  **between the 19th and the 22nd; correct?**
25       A.   You said that.  I never said that.

TSG Reporting - Worldwide    877-702-9580

Page 85

Harrison Goldin

1
2        **Q.   All right, well, then we need to**
3   **clarify that.  Hold on.**
4        **Do you believe that what was**
5   **represented to the court on the 19th was**
6   **intended to be a valuation as of two days**
7   **later?**
8        A.   I believe that what was represented
9   to the court on the 19th was the value of the
10  financial assets that were being transferred
11  from the Lehman estate to Barclays.
12       **Q.   As of that time?**
13       A.   It was the value that the court was
14  told.
15       **Q.   As of what time?**
16       A.   Well, the date was the 19th of
17  September which the report was made to the
18  court.
19       **Q.   But Barclays didn't get those assets**
20  **on the 19th of September, did it?**
21       A.   The closing was on the 22nd pursuant
22  to a court order issued shortly after the sale
23  order hearing ended on the 20th of September,
24  and the sale order, as I have testified
25  repeatedly now, was predicated on the record

TSG Reporting - Worldwide    877-702-9580

Page 86

1          Harrison Goldin
2  before the court that included what the court
3  had received as late as the 20th of September.
4       Q.   I think your testimony is what it
5  is.
6          You are purporting to opine on a
7  delta between valuations reported as of the
8  19th and assets received as of, at the
9  earliest, the 22nd?
10         MR. OXFORD:  Object to the form.
11         MS. CARRERO:  Same objection.
12     A.   I am not purporting to report on
13  that.  I am reporting, in fact, I am opining on
14  what the delta was between what the court was
15  told and what the record shows was represented
16  to the court respecting the values of the
17  transaction and what the acquirer represents
18  it, in fact, received by way of values on the
19  22nd of September and what the delta was
20  between them.
21     Q.   Right.  And we have established what
22  the court was told was on the 19th and 20th;
23  correct?
24     A.   That's correct.
25     Q.   Okay.  And what Barclays received

TSG Reporting - Worldwide    877-702-9580

Page 87

1          Harrison Goldin
2  was received no earlier than the 22nd; correct?
3         MR. OXFORD:  Objection to form.
4         MS. CARRERO:  Objection to form.
5         MR. KAY:  Same objection.
6     A.   The closing was on the 22nd.
7     Q.   Thank you.
8         MS. NEUHARDT:  We have actually
9  covered a fair amount of this.
10         MR. OXFORD:  I'm always encouraged
11  by page flipping.  Do you want to take two
12  minutes, Amy?
13         MS. NEUHARDT:  No, actually I think
14  I am at a place where we have not yet
15  covered.
16     Q.   In the original APA there was a
17  portfolio of assets that was valued at
18  $70 billion; correct?
19         MR. OXFORD:  Objection to form.
20     A.   There was a description of assets
21  comprising a value constituting $70 billion.
22     Q.   It would be helpful if we have the
23  APA here.  I am handing you the APA.  It was
24  originally marked as Deposition Exhibit 1.
25         If you turn to page 6, there is a

TSG Reporting - Worldwide    877-702-9580

Page 88

1          Harrison Goldin
2  definition of purchased assets.  So are you on
3  page 6?
4     A.   Yes, ma'am.
5     Q.   Okay.  And this is a document you
6  reviewed in your opinion; correct?
7     A.   Yes.
8     Q.   Okay.  The definition of purchased
9  assets, we will actually come back to the main
10  definition, but subsection D is government
11  securities, commercial paper, corporate debt,
12  corporate equity, exchange traded derivatives
13  and collateralized short-term agreements with a
14  book value as of the date hereof of
15  approximately 70 billion, collectively the long
16  positions.
17         Is this what you understood to have
18  been the asset described as $70 billion in the
19  original transaction?
20         MR. OXFORD:  Object to the form.
21     A.   Well, the APA to which you have
22  referred me ascribes a value of approximately
23  $70 billion to the elements that precede it.
24     Q.   Okay.  And later in the week on the
25  19th the court was informed that the deal

TSG Reporting - Worldwide    877-702-9580

Page 89

1          Harrison Goldin
2  changed; right?  And we have discussed how you
3  believe the court was told that the assets were
4  valued at 47.4 billion; correct?
5         MR. OXFORD:  Object to form.
6         MS. CARRERO:  Same objection.
7         MS. NEUHARDT:  Did I get the number
8  wrong?
9         MR. OXFORD:  You have got two
10  questions in there, Amy.  You might want to
11  break it up.
12         MS. NEUHARDT:  Well, he had nodded
13  is the problem, so I will ask the first
14  question again and if you can state your
15  response on the record.
16     Q.   Later in the week the court was
17  informed that the deal changed; correct?
18     A.   Yes.
19     Q.   Okay.  And we have discussed how you
20  believe the court was told that the assets were
21  then valued at 47.4 billion; correct?
22         MR. OXFORD:  Object to the form.
23         MS. CARRERO:  Same objection.
24     A.   Yes.  That's my recollection.  If we
25  are going to start talking about that

TSG Reporting - Worldwide    877-702-9580

Page 90

Harrison Goldin

1 transcript, I would be grateful if you could
2 give me the relevant pages of the transcript so
3 I have it in front of me so I don't misspeak.
4 **Q.   Sure.  My question is going to be**
5 **whether you believed that the 47.4 billion was**
6 **the same assets as those described in the APA**
7 **section D, and here is Deposition Exhibit 442,**
8 **which is the sale hearing transcript, if that**
9 **helps you.**
10    A.   And would you be good enough to
11 refer me to the page that you have in mind?
12 **Q.   As my partner, Todd Thomas, always**
13 **points out, the 47.4 shows up on page 47, line**
14 **4, of the transcript.**
15    MR. OXFORD:  I hadn't seen that
16    before I read that transcript.  I thought
17    that was well spotted.
18    MS. NEUHARDT:  You can play the
19    Twilight Zone music now.
20    MR. OXFORD:  And, Mr. Goldin,
21    obviously to the extent you would need to
22    do so to answer Miss Neuhardt's question,
23    you should feel free to refer to any part
24    of the transcript you need to, not just the

TSG Reporting - Worldwide    877-702-9580

Page 91

Harrison Goldin

1 specific line that she directed you to.
2    (Document review.)
3    A.   What is your question, please?
4 **Q.   My question is whether you**
5 **understood the assets that were being**
6 **transferred at a value of 47.4 billion were the**
7 **same assets that were valued at 70 billion in**
8 **the APA?**
9    MR. OXFORD:  I will object to the
10    form of that question.  I can tell you why,
11    if you wish.
12    MS. NEUHARDT:  Sure.
13    MR. OXFORD:  You are asking whether
14    it's exactly the same -- the assets to each
15    CUSIP have dropped in value from 70 to 47
16    or whether or not there is a different
17    category of -- there are different --
18    MS. NEUHARDT:  That's exactly what I
19    am asking.  I am asking whether he
20    understood those to be the same securities
21    or different securities.
22    MR. OXFORD:  Okay.
23    A.   If the question is whether the
24 CUSIPs were identical, I don't know.

TSG Reporting - Worldwide    877-702-9580

Page 92

Harrison Goldin

1 **Q.   Did you -- were you aware of a**
2 **transaction that occurred on the night of**
3 **September 18th where Barclays took over a**
4 **position held by the New York Fed in connection**
5 **with a repo transaction that it had with**
6 **Lehman?**
7    A.   I'm generally familiar with the fact
8 that Barclays substituted for the New York Fed
9 as counterparty on the repo that earlier in the
10 week had been entered into between Lehman and
11 the New York Fed.
12 **Q.   And did you understand that the**
13 **assets pledged as collateral to the Fed were**
14 **then made -- were then used as the value -- as**
15 **part of the value transferred to Barclays under**
16 **the agreement approved by the court?**
17    MR. OXFORD:  Object to the form.
18    MR. KAY:  Same objection.
19    MS. CARRERO:  Same objection.
20    A.   Well, the issue is not fully
21 clarified in the transcript, because, to my
22 recollection, the court was not told that, in
23 fact, the repo transaction was being subsumed
24 in the sale transaction and that there was no

TSG Reporting - Worldwide    877-702-9580

Page 93

Harrison Goldin

1 longer a repo transaction as part of the
2 overall sale.
3 **Q.   So you don't know one way or the**
4 **other?**
5    MR. OXFORD:  Objection to form.
6    A.   I don't know what one way or the
7 other?
8 **Q.   Whether the collateral that was**
9 **being held to secure the repo transaction with**
10 **the Fed became the securities that were**
11 **transferred with the agreement approved by the**
12 **court.**
13    MR. OXFORD:  Objection to the form.
14    MS. CARRERO:  Same objection.
15    A.   Well, my answer is in two parts.
16 The first is that I don't know whether the
17 CUSIPs involved in the two thrusts of your
18 question were the same and, secondly, as I
19 indicated a minute ago, so far as I recollect
20 the court was not apprised that there was no
21 longer a repo transaction and that the repo
22 transaction was now to be understood to be
23 subsumed in the overall sales transaction.
24 **Q.   Do you know if the court was ever**

TSG Reporting - Worldwide    877-702-9580

Page 94

Harrison Goldin

1
2  **apprised of that prior to the filing of Movants**
3  **Rule 60 motions?**
4          MR. OXFORD:  Objection to form.
5          MR. KAY:  Same objection.
6          MS. CARRERO:  Same objection.
7      A.  I don't recollect.
8      **Q.  Do you know whether Lehman's**
9  **third-party custodian in the repo, which was**
10 **JPMorgan, whether it had refused to return**
11 **certain assets to Lehman during the week**
12 **leading up to the sale order?**
13     A.  I remember coming across information
14 in connection with our analysis of the
15 Acquisition Balance Sheet respecting a dispute
16 having to do with moneys that Barclays thought
17 it had acquired but it turned out JPMorgan had
18 removed from the Barclays account.
19     **Q.  Did you review any materials related**
20 **to the December settlement relating to the**
21 **JPMorgan assets?**
22     A.  I remember seeing a letter that the
23 chairman of JPMorgan Chase sent to the chairman
24 of Barclays in connection with the dispute
25 between the parties.

TSG Reporting - Worldwide    877-702-9580

Page 95

Harrison Goldin

1
2      **Q.  Did you understand that certain**
3  **assets were transferred to Barclays in**
4  **connection with the settlement of that dispute?**
5      A.  Yes, and, to the best of my
6  recollection, there is some reference to that
7  on the Acquisition Balance Sheet.
8      **Q.  Did you understand that that**
9  **transfer occurred in December of 2008?**
10     A.  Yes, as I remember, the settlement
11 was in December 2008.
12     **Q.  So the Acquisition Balance Sheet, do**
13 **you understand -- page 7 of your report you**
14 **refer to the JPM inventory, PCG mid, in the**
15 **right column, your second entry.**
16     A.  Uh-huh.
17     **Q.  Are those the assets that were**
18 **transferred to Barclays in December of 2008?**
19     A.  Yes, but I want to remind you that
20 this Acquisition Balance Sheet purports to
21 reflect the values, the assets that Barclays
22 asserts it was entitled to or received, and I
23 emphasize either entitled to or received, on
24 the 22nd of September, even though it may not
25 have received, in fact, some of those assets

TSG Reporting - Worldwide    877-702-9580

Page 96

Harrison Goldin

1
2  until later, and that apparently includes the
3  second item, JPM inventory.
4      **Q.  So it's your understanding that this**
5  **valuation, the 3.92 -- this whole chart is in**
6  **billions; correct?**
7      A.  Yes.
8      **Q.  Okay.  That the 3.92 billion is --**
9  **it's valued as of September 22nd, not December**
10 **22nd?**
11         MR. OXFORD:  Object to the form.
12         THE COURT REPORTER:  Hold on.  "It's
13 valued as of" --
14     **Q.  December 22nd, not September 22nd.**
15         MR. OXFORD:  Object to the form.
16 Misstates the witness' testimony.
17         You can answer.
18         MR. KAY:  Same objection.
19         MS. CARRERO:  Same objection.
20     A.  The Acquisition Balance Sheet
21 reflects values to which Barclays claims it was
22 entitled as of the closing on the 22nd of
23 September.
24     **Q.  Do you know what date -- have you**
25 **reviewed any materials in which anybody from**

TSG Reporting - Worldwide    877-702-9580

Page 97

Harrison Goldin

1
2  **Barclays would have stated that this was valued**
3  **as of December 22nd?**
4          MR. OXFORD:  Object to the form.
5      A.  I seem to recall that there was some
6  discussion in Professor Pfleiderer's report on
7  that issue, Professor Pfleiderer, I beg your
8  pardon --
9      **Q.  It's not my issue.**
10     A.  We want to cover everybody's issues
11 if we can.  Professor Pfleiderer's report on
12 that matter and, indeed, there is some brief
13 reference to the issue in my report designed
14 simply enable the reader to understand that
15 entry.
16     **Q.  Well, did you do any investigation**
17 **to determine whether or not this value was as**
18 **of the 22nd of September or the 22nd of**
19 **December?**
20     A.  Well, again, the Acquisition Balance
21 Sheet purports to reflect the values to which
22 Barclays was entitled or which it received on
23 the 22nd of September.  It's clear that certain
24 transfers were not made until later, including
25 the result of a settlement with JPMorgan that

TSG Reporting - Worldwide    877-702-9580

Page 98

Harrison Goldin

1  Harrison Goldin
2  didn't occur until December 2008.
3      Q.   So you are assuming then that this
4  value was as of September 22nd, not December
5  22nd?
6      A.   I'm assuming nothing.  I am
7  reporting to you that the Acquisition Balance
8  Sheet which Barclays filed with the SEC in 2009
9  says that it reflects what Barclays acquired as
10  of the closing.
11      Q.   So you did no independent
12  investigation to determine whether or not this
13  value was as of September 22nd or December
14  22nd?
15      A.   Other than Barclays' assertion as to
16  the values on the Acquisition Balance Sheet and
17  the date that relates to those values, I
18  conducted no other investigation on this issue.
19      Q.   Okay.  Let's look at page 8 of your
20  report.  The second paragraph, first full
21  paragraph.  You say about halfway through:
22  "That the net transaction value to Barclays was
23  negative 1.85 billion was hardly surprising
24  given that Barclays was paying just 250 million
25  for all the intangible property and certain

TSG Reporting - Worldwide    877-702-9580

Page 99

1      Harrison Goldin
2  other assets including specifically the going
3  concern value of the business it was
4  acquiring."
5          Is it your belief that economic gain
6  and accounting gain are the same thing?
7      MR. OXFORD:  Object to form.
8      A.   An accounting gain is a very
9  specific kind of formulation governed by
10  accounting rules and conventions.
11      Q.   The delta that you discuss in your
12  opinion, is that an economic gain or an
13  accounting gain?
14      A.   It is the difference between the
15  value of assets reported to the court on the
16  19th of September and the value of the
17  liabilities being assumed by Barclays that was
18  reported to the court on the same day.
19      Q.   And you say there was a gain.  Is
20  that -- is the gain that you discuss in your
21  report -- and you don't need to look at the
22  sentence that I quoted on 7, just generally the
23  gain that you discuss to use as a portion of
24  your delta, the other portion is the negative
25  1.85, correct, is that an accounting gain or an

TSG Reporting - Worldwide    877-702-9580

Page 100

1      Harrison Goldin
2  economic gain?
3      MR. OXFORD:  Object to form.
4      A.   Well, I want to remind you that I
5  indicated to you earlier, as you know, that the
6  chart on page 7 on the right utilizes without
7  accepting or rejecting, but utilizes for
8  analytic purposes the approach taken by
9  Professor Pfleiderer and compares his
10  conclusion as to the delta between assets and
11  liabilities at the closing, which he says is
12  $3 billion, to what the court was told the
13  difference between assets and liabilities was
14  on the 19th, and that delta is 4.85 billion,
15  although, as I indicated to you earlier, based
16  on work done by other experts in the matter it
17  could be considerably greater, but that was
18  beyond my focus.
19      Q.   Is it your understanding that the
20  value of intangibles, goodwill, the going
21  concern of the business is accounted for on the
22  left side of your chart on page 7?
23      A.   The left side of the chart on page 7
24  reflects what the court was told.  The right
25  side of the chart on page 7 -- I should say the

TSG Reporting - Worldwide    877-702-9580

Page 101

1      Harrison Goldin
2  right column on the left side of the table on
3  page 7 reflects what the court was told.  This
4  is not a balance sheet.  It is a table.  It is
5  a chart designed to reflect what the court was
6  told in connection with Professor Pfleiderer's
7  analysis.
8      Q.   Do you believe the court was not
9  told that intangibles, goodwill and the going
10  concern value of the business would be
11  transferred to Barclays?
12      MR. OXFORD:  Object to the form.
13      A.   Yes.  As a matter of fact, at the
14  hearing on the 17th of September, the hearing
15  again on the 19th of September, in furtherance
16  of the APA the court was told that goodwill,
17  intangibles, going concern value was being
18  transferred to Barclays and that the price
19  Barclays was paying was $250 million.
20      Q.   For all of those assets?
21      A.   Yes.
22      Q.   Can you show me where you get that?
23      A.   Well, if you want to get the
24  transcript on the 17th, the transcript on the
25  19th --

TSG Reporting - Worldwide    877-702-9580

Page 102

Harrison Goldin

1
2    **Q. The 19th is right in front of you**
3    **and I can get the 17th.**
4    A.    You want me to go through the
5    transcript and find the reference to the
6    $250 million?
7    **Q.    Yes. Do you need the 17th as well?**
8    A.    We can start with the 19th.
9    MR. OXFORD: It's a
10    200-and-something page transcript.
11    THE WITNESS: It's up to Miss
12    Neuhardt. If she wants me to go through
13    it, I am glad to go through it.
14    MR. OXFORD: Actually, 259.
15    Do you want to do this off camera or
16    off the record?
17    MS. NEUHARDT: He can do it during
18    lunch if he wants.
19    MR. OXFORD: Okay. Why don't we do
20    that during lunch. Do you know if lunch is
21    here, Amy?
22    MS. NEUHARDT: It's not supposed to
23    be here until 12. It's only ten to 12
24    right now. Plus we need to give them a
25    little bit of time to set up.

TSG Reporting - Worldwide    877-702-9580

Page 103

Harrison Goldin

1
2    THE WITNESS: I am happy to do it if
3    you wish me do.
4    MS. NEUHARDT: If you can do it
5    during lunch.
6    THE WITNESS: Okay.
7    **Q.    Does the 1.85 billion figure you**
8    **calculate take into account assets or**
9    **liabilities associated with the exchange traded**
10    **derivatives business of LBHI -- of LBI? Sorry.**
11    MR. OXFORD: Object to the form.
12    A.    The 1.85 delta reflects the
13    difference between the assets that were
14    reported to the court, without differentiation
15    as to category, and the liabilities that were
16    reported to the court all on the 19th of
17    September.
18    **Q.    So can you show me where the assets**
19    **associated with the exchange traded derivatives**
20    **business would be incorporated on the left side**
21    **of your chart on page 7?**
22    A.    Well, again --
23    MR. OXFORD: Let me, Mr. Goldin, if
24    you wouldn't mind slowing down a little
25    bit.

TSG Reporting - Worldwide    877-702-9580

Page 104

Harrison Goldin

1
2    I object to the form of that
3    question.
4    A.    Again, to cut through this so we
5    don't waste time, I would note that on page 46
6    and 47 of the transcript of the 19th of
7    September, with particular emphasis at the top
8    of page 47, Debtors' counsel says: "So
9    originally we were selling assets that had a
10    value of 70 -- approximately $70 billion and
11    today, Your Honor, we are only selling assets
12    that have a value of $47.4 billion." What the
13    component elements of those assets was was not
14    discussed on the 19th.
15    **Q.    Please look at page 13 of your**
16    **report. You have -- the only full paragraph of**
17    **text reads: "At the hearing Debtors' counsel**
18    **outlined several other meaningful modifications**
19    **to the transaction not yet reflected in any**
20    **written agreement between the parties. The**
21    **significant modifications are as follows," and**
22    **there is a series of bullet points. The first**
23    **one says: "The value of the securities being**
24    **sold by the Debtors changed from 70 billion to**
25    **47.4 billion." Is that correct?**

TSG Reporting - Worldwide    877-702-9580

Page 105

1    Harrison Goldin
2    A.    Yes, ma'am.
3    **Q.    Okay. Are you saying that there are**
4    **no assets that were sold other than securities?**
5    MR. OXFORD: Object to form.
6    A.    No.
7    **Q.    So did you mean to -- so, okay. So**
8    **the value of the securities being sold by the**
9    **Debtors changed from 70 to 47.4 billion; right?**
10    **And that's reflected on page 7 of your chart as**
11    **the 47.4 billion for financial assets; right?**
12    MR. OXFORD: Objection. Compound.
13    A.    The $47.4 billion reflected on
14    page 7 -- in the table on page 7 of my report
15    at the top is as it is described, financial
16    assets.
17    **Q.    Okay. Did you understand that**
18    **Barclays was also acquiring the exchange traded**
19    **derivatives and assets and liabilities that**
20    **went with that?**
21    MR. OXFORD: Objection to form.
22    **Q.    Sorry, the exchange traded**
23    **derivatives business.**
24    A.    I think I testified --
25    MR. OXFORD: Same objection.

TSG Reporting - Worldwide    877-702-9580

Page 106

1          Harrison Goldin
2     I'm sorry, if you --
3     THE WITNESS:  Please.  Please.
4  Please.  I'm sorry.  I apologize.
5     MR. OXFORD:  It's not for my
6  benefit.  It's really for the benefit of
7  the court reporter.  Thank you.
8     Q.   You were -- you had started the
9  answer to the question.
10     A.   Do you want to repeat the question,
11  please.
12     Q.   Sure.  Did you understand that
13  Barclays was also acquiring the exchange traded
14  derivatives business and the assets and
15  liabilities that went with that?
16     A.   I understood that Barclays was
17  acquiring financial assets with an aggregate
18  value of $47.4 billion without regard to what
19  the component elements of those financial
20  assets might be.
21     Q.   A moment ago -- maybe I
22  misunderstood what you said.
23          Okay.  I asked you earlier whether
24  there were assets being sold other than
25  securities referenced in the first bullet point

TSG Reporting - Worldwide    877-702-9580

Page 107

1          Harrison Goldin
2  on page 13.
3     A.   And I said yes.
4     Q.   Correct, and I had phrased it as a
5  negative, so you said no, but yes, the answer
6  was basically yes.
7          What assets other than the
8  securities do you believe were transferred to
9  Barclays?
10     MR. OXFORD:  Object to the form.
11     A.   If you look at the chart on page 7,
12  it shows you that there was various real estate
13  being acquired with an aggregate value of
14  a billion 290 million dollars.
15     Q.   Okay.  So let's look at -- do you
16  still have the APA in front of you?
17     A.   Yes.
18     Q.   Okay.  And it's still open to the
19  definition of purchased assets?
20     A.   Yes, ma'am.
21     Q.   The purchased assets definition has
22  a number of subdivisions, A through S, which
23  none of us want me to read into the record, but
24  let's look, for example, at Q, which is on
25  page 8.  "All past and present goodwill and

TSG Reporting - Worldwide    877-702-9580

Page 108

1          Harrison Goldin
2  other intangible assets associated with or
3  symbolized by the business including customer
4  and supplier lists and the goodwill associated
5  with the purchased intellectual property."
6          Do you believe that was not
7  transferred with the deal?
8     A.   Of course it was transferred with
9  the deal.
10     Q.   Do you believe it is not an asset?
11     A.   Of course it's an asset.  That's why
12  when I answered earlier when you asked me
13  whether there were assets besides the
14  financial assets I said yes.
15     Q.   And I asked you what other assets --
16     A.   And I gave you an example.
17     Q.   Okay.  I want to know the full range
18  of what you believe were other assets
19  transferred in the transaction.
20     MR. OXFORD:  I object to the form of
21  the question.
22     MS. CARRERO:  Same objection.
23     MR. KAY:  Same objection.
24     MR. OXFORD:  That were actually
25  transferred?

TSG Reporting - Worldwide    877-702-9580

Page 109

1          Harrison Goldin
2     MS. NEUHARDT:  That the court
3  approved the transfer of.
4     Q.   We can go through the APA.
5     A.   No, it's up to you.  Whatever you
6  like.  The material assets that were described
7  to the court were the financial assets, the
8  real estate and the intangible assets, the
9  goodwill, the going concern value.
10     Q.   Where is the goodwill and intangible
11  value on your chart on page 7?
12     A.   Well, I think you are
13  misunderstanding my chart.  My chart is not a
14  balance sheet.  My chart is a reflection of
15  what was reported to the court.  And what was
16  reported to the court was that one of the
17  liabilities involved in the transaction was a
18  payment by Barclays of $250 million.
19     Q.   And what do you say that
20  $250 million purports to cover?
21     A.   Everything that was not covered by
22  other specific transfers.
23     Q.   Can you show me where in either the
24  sale order or the transcript of the 19th the
25  judge says that the 250 million covers all

TSG Reporting - Worldwide    877-702-9580

Page 110

**Harrison Goldin**

1           **Harrison Goldin**
2    **other assets transferred in the APA?**
3           MR. OXFORD:  Object to the form of
4    the question.
5       A.    I don't know that the judge says
6    that.  What I do know is what the statements
7    were that were made to the court as to the
8    material aspects of the transaction, and while
9    I don't recall the language with precision, if
10   you want me to go through the transcript on the
11   17th, I imagine that I'll be able to find the
12   reference to the $250 million payment.
13      **Q.    You are going to do that at lunch, I**
14   **believe.  But you acknowledge that the judge**
15   **never said that all -- the other assets could**
16   **be valued only at $250 million?**
17          MR. OXFORD:  Object to the form.
18          MR. KAY:  Same objection.
19          MS. CARRERO:  Same objection.
20      A.    My recollection is that the judge on
21   the 19th and also on the 17th of September
22   expressed a great interest in values and asked
23   questions to elicit information about values
24   and, as I have said to you, I recollect that
25   the court was told when the material aspects of

TSG Reporting - Worldwide     877-702-9580

Page 111

1            Harrison Goldin
2    the transaction were described to the court
3    that there was a $250 million payment being
4    made and that is what my chart on page 7
5    reflects.
6       **Q.    Did the judge ask what the value of**
7    **the customer and supplier was in section Q of**
8    **the APA were valued at?**
9       A.    Not to my recollection.
10      **Q.    Do you think he believed there was**
11   **no value?**
12      A.    You would have to ask the court what
13   he believed.
14      **Q.    Did he ask specifically the value of**
15   **goodwill?**
16      A.    Not to the best of my recollection.
17      **Q.    Do you think he believed it had no**
18   **value?**
19      A.    You would have to ask the judge what
20   he believed.
21      **Q.    And if I were to go through this**
22   **list one by one, would your answer be the same**
23   **for each of the assets?**
24          MR. OXFORD:  Object to form.
25          MS. NEUHARDT:  I am just trying to

TSG Reporting - Worldwide     877-702-9580

Page 112

1            Harrison Goldin
2    save time, Neil.
3           MR. OXFORD:  I understand.  You are
4    pointing to something that I can't see.
5           MS. NEUHARDT:  I am pointing at the
6    APA that we have been talking about, A
7    through S of purchased assets.
8       A.    My answer would be that the court
9    was told that Barclays was making a payment of
10   $250 million for which it was acquiring the
11   goodwill, the going concern value, the
12   intangible assets.
13      **Q.    Do you agree that the court had the**
14   **APA as part of the record before it?**
15      A.    Yes.
16      **Q.    Okay.  Did the court go through and**
17   **ask the value of each of the assets in the APA?**
18      A.    The court had represented to it that
19   there was going to be outlined for the court
20   the material elements of the transaction.  That
21   was on the 17th of September.  On the 19th of
22   September the court had represented to it that
23   there were going to be outlined for the major
24   changes to the material aspects of the
25   transaction, and one of the material aspects of

TSG Reporting - Worldwide     877-702-9580

Page 113

1            Harrison Goldin
2    the transaction was the $250 million payment
3    that was being made.
4       **Q.    Did he ask specifically what was**
5    **comprised -- what assets were being transferred**
6    **for 250 million?**
7       A.    I don't recollect that he asked
8    specific questions relating to the component
9    elements that might be said to comprise the
10   $250 million consideration.
11      **Q.    Earlier I had pointed you to a**
12   **statement on page 8 of your report where you**
13   **said it was -- the fact that the net**
14   **transaction value to Barclays was a negative**
15   **1.85 billion was not surprising.**
16          **Do you know of any other mergers or**
17   **acquisitions of financial institutions**
18   **occurring between the failure of Bear Stearns**
19   **in March of 2009 and today in which a purchaser**
20   **accepted a negative net transaction value?**
21          MR. OXFORD:  March of 2008.
22      **Q.    Sorry, 2008, correct.**
23          THE WITNESS:  May I answer?
24          MR. OXFORD:  Yes.  Just let me make
25   sure I get an objection if it's

TSG Reporting - Worldwide     877-702-9580

Page 114

1          Harrison Goldin
2    appropriate.
3          Yes, I object to form.
4          You can answer.
5       A.   I did not undertake to review or
6    analyze other transactions during that period.
7    I did note that Professor Pfleiderer included a
8    chart in which he purported to reflect certain
9    elements relating to financial transactions
10   during that period and had a misstatement as to
11   one of them which he, I think, tried to correct
12   in a footnote, but I did not independently
13   undertake to review other transactions during
14   that time frame.
15      Q.   We have already discussed that,
16   generally speaking, the markets were declining
17   during the week of September 15th, 2008?
18      A.   Well, you and I had a colloquy on
19   this issue earlier in the deposition in which I
20   said to you that markets were turbulent.
21      Q.   Do you agree that the value of the
22   New York stock market was declining during that
23   week?
24      MR. OXFORD:  Object to the form.
25   It's asked and answered.
         TSG Reporting - Worldwide    877-702-9580

Page 115

1          Harrison Goldin
2    You can answer again.
3       Q.   Well, turbulent could be upward.
4       A.   As relates to this transaction,
5    there was a representation to the court on the
6    19th of September that a value that had been
7    $70 billion earlier in the week was now 47.4
8    billion.
9       Q.   And do you know how much time
10   Barclays had to conduct due diligence on this
11   transaction?
12      MR. OXFORD:  Objection to form.
13      A.   Well, I don't know specifically
14   other than that Barclays emerged as a
15   definitive potential purchaser on or after the
16   time that Lehman filed for bankruptcy on the
17   15th of September.  I do know that it was
18   widely reported prior to that time that there
19   were other potential acquirers that were
20   interested in considering an acquisition of
21   Lehman, that Barclays was among them.  I don't
22   recall when that was reported.  I don't know
23   when Barclays first expressed an interest to
24   Lehman.  Therefore, I don't know the amount of
25   time that it had to review Lehman's situation.
         TSG Reporting - Worldwide    877-702-9580

Page 116

1          Harrison Goldin
2    I don't know the number of people that it had
3    involved in that process or how it went about
4    that process.  But I do know that the interval
5    between the filing for bankruptcy on the 15th
6    of September and the issuance of the sale order
7    on the 20th of September was five days.
8       Q.   And you know that during that time
9    at least a portion of the assets that were to
10   be transferred to Lehman dropped in value on
11   the order of roughly $25 billion?
12      A.   Well, the court had represented to
13   it as part of the record that assets which had
14   previously had a value of $70 billion ascribed
15   to them now had a value of $47.4 billion
16   ascribed to them or, to put it more accurately,
17   that the financial assets being transferred as
18   reported on the 19th of September were given a
19   value of $47.4 billion.
20      Q.   So Barclays was taking on a purchase
21   that had rapidly declining value?
22      MR. OXFORD:  Objection to form.
23      MS. CARRERO:  Objection to form.
24      MR. KAY:  Same objection.
25      A.   Well, I don't know that you can
         TSG Reporting - Worldwide    877-702-9580

Page 117

1          Harrison Goldin
2    reach that conclusion.
3       Q.   Would Barclays be unreasonable to be
4    concerned that it was acquiring an asset that
5    might have dropping values?
6       MR. OXFORD:  Objection to the form.
7    Any particular asset?
8       MS. NEUHARDT:  The assets that he
9    believes were transferred in the deal.
10      MR. OXFORD:  Okay.  Same objection.
11      A.   I believe that Barclays was
12   confident that the value of the transaction to
13   it was positive and highly accretive, as a
14   matter of fact, because, by way of example, the
15   chairman of Barclays indicated in a
16   teleconference to analysts that the transaction
17   would be accretive in the first year.  So it's
18   clear that at the very highest level Barclays
19   felt that this was a very attractive and
20   profitable transaction for it.
21      Q.   So do you believe Barclays did not
22   believe there was any risk in the transaction?
23      A.   I have no idea what Barclays
24   believed other than that it asserted through
25   its chairman that it felt that this transaction
         TSG Reporting - Worldwide    877-702-9580

Page 118

Harrison Goldin

1  Harrison Goldin
2  was going to be highly accretive to it right
3  away.
4      **Q.    Did you do any analysis of the risk**
5  **of the transaction?**
6      A.    No.
7      **Q.    And it's still your opinion that**
8  **under the circumstances of the week of**
9  **September 15th it's not surprising that**
10 **Barclays would have entered into transaction**
11 **giving rise to a net liability -- sorry -- a**
12 **negative net transaction of $1.85 billion?**
13     MR. OXFORD:  I object to the form of
14 the question.
15     MS. CARRERO:  Same objection.
16     MR. KAY:  Same objection.
17     A.    What I said -- I don't want you
18 inadvertently to mischaracterize what I said.
19 What I said was that a transaction involving a
20 delta between assets and liabilities of
21 $1.85 billion was hardly surprising given, as I
22 indicated in my report, that Barclays was
23 paying just $250 million for all the intangible
24 property and certain other assets, and what I
25 meant by that was those intangible assets for

TSG Reporting - Worldwide    877-702-9580

Page 119

Harrison Goldin

1  Harrison Goldin
2  which it was paying $250 million might very
3  well have had a substantially greater value in
4  connection with a going concern to Barclays
5  than they would have had if they had been left
6  behind in the Lehman estate to Lehman, and that
7  that appears to be true is substantiated by the
8  fact that on the Acquisition Balance Sheet
9  reflecting values that Barclays says it
10 received or was entitled to on the 22nd of
11 September, liabilities it assumed, there is a
12 reflection of $2,080,000,000 of intangibles
13 that the accountants indicated was the value of
14 those intangibles to Barclays when the
15 transaction closed.
16     MS. NEUHARDT:  This is actually a
17 good stopping point.
18     MR. OXFORD:  Okay.
19     THE VIDEOGRAPHER:  Off the record at
20 12:09 p.m.  This is the end of disk 2 in
21 the deposition of Harrison J. Goldin.
22     (Lunch recess was taken from 12:09
23 to 1:03.)
24     THE VIDEOGRAPHER:  Going back on
25 record at 1:03 p.m.  This is the beginning

TSG Reporting - Worldwide    877-702-9580

Page 120

Harrison Goldin

1  Harrison Goldin
2  of disk 3 in the deposition of Harrison J.
3  Goldin.
4  CONTINUED EXAMINATION BY
5  MS. NEUHARDT:
6      **Q.    Prior to the break, Mr. Goldin, in**
7  **one of your answers you had referred to the**
8  **fact that prior to the bankruptcy -- the**
9  **filings there were reports of other financial**
10 **institutions looking into buying Barclays; is**
11 **that correct?**
12     A.    Buying Lehman.
13     **Q.    Yes, my apologies, buying Lehman.**
14     A.    Including Barclays.
15     **Q.    Including Barclays.  And you also**
16 **refer to that on page 10 of your report;**
17 **correct?  It's the first sentence of the first**
18 **full paragraph.**
19     A.    Yes.
20     **Q.    Okay.  Does any aspect of the**
21 **opinion you are proffering in this report**
22 **depend on the existence of other potential**
23 **buyers for Lehman?**
24     A.    No.
25     **Q.    Okay.  Let's look at page 11.  You**

TSG Reporting - Worldwide    877-702-9580

Page 121

Harrison Goldin

1      **Harrison Goldin**
2  **have a footnote about book value.  Do you see**
3  **that?  It's footnote 11 on 11.**
4      A.    Yes.
5      **Q.    The book value that was referred to**
6  **in the APA was in connection with the 70**
7  **million in long positions that we looked at**
8  **earlier; correct?**
9      MR. OXFORD:  Object to form.  I
10 think you meant 70 billion.
11     MS. NEUHARDT:  Yes.
12     A.    That would have been the original
13 reference to book values in the transaction as
14 memorialized in a writing of which I am aware.
15     **Q.    Okay.  Now -- and you can pull out**
16 **the APA if you want.**
17     **Was there any other reference to**
18 **book value in connection with any of the other**
19 **purchased assets in the APA?**
20     A.    I don't recollect.  I seem to
21 remember that there was a provision in the
22 original APA which was later dropped which
23 referred to book value which were defined as
24 Lehman marks.
25     **Q.    Is that the true-up provision that**

TSG Reporting - Worldwide    877-702-9580

Page 122

Harrison Goldin

1
2  you are thinking of?
3      A.  Yes.
4      Q.  Other than the true-up provision, do
5  you recall if there was any other requirement
6  of book value in the APA?
7      A.  I don't remember any other specific
8  reference to the benchmark in the APA.
9      Q.  Okay.  And do you -- is it your
10  understanding that the language about book
11  value that was in subsection D of the
12  definition of purchased assets applies to the
13  portfolio that was described to the court as
14  being worth 47.4 billion on September 19th?
15      A.  They would have represented Lehman
16  marks.
17      Q.  And what is the basis for your
18  conclusion that the requirement of book value
19  applied?
20      A.  Well, first my recollection is that
21  Mr. McDade at some point during the hearing
22  testified to the currency of Lehman marks and
23  that would have been in connection with the
24  valuation of these assets.  In addition,
25  financial transactions are ordinarily a

TSG Reporting - Worldwide    877-702-9580

Page 123

Harrison Goldin

1
2  function of the seller's marks.  Analysts, for
3  example, when valuating financial transactions
4  usually use as the matrices for valuation the
5  seller's marks and, as I think I indicate in
6  this footnote, it would have been highly
7  anomalous for any other marks to have been
8  contemplated, because under those circumstances
9  a seller would be leaving it up to the
10  discretion of an acquirer to determine what the
11  values of the marks are.
12      Q.  So you believe the book value
13  provision that was applied to one of the many
14  subcategories of purchased assets also applied
15  to the portfolio that was valued at
16  47.4 billion on September 19th because that's
17  the ordinary pattern and practice?
18      A.  No.
19          MR. OXFORD:  Objection to the form.
20      You can answer.
21      A.  No.  I indicated to you first, you
22  will remember, in my answer that Mr. McDade
23  testified to that issue on the 19th.
24      Q.  Did he testify that that was a
25  contractual requirement?

TSG Reporting - Worldwide    877-702-9580

Page 124

Harrison Goldin

1
2      A.  I don't believe he did.  I believe
3  he referred to the Lehman marks and, as I said
4  to you, you would expect in financial
5  transactions that the marks that would be used
6  would be the seller's marks.
7      Q.  Okay.  So your conclusion on that is
8  based on the fact that Mr. McDade referred to
9  book value in his testimony --
10          MR. OXFORD:  Objection.
11      Q.  -- and pattern and practice?
12          MR. OXFORD:  Object to form.
13      A.  It's based on the three elements to
14  which I adverted in giving you my earlier
15  answer.
16      Q.  Which was Mr. McDade?
17      A.  Mr. McDade.
18      Q.  The ordinary pattern and practice?
19      A.  And the anomaly of having a
20  transaction, a financial transaction in which
21  the buyer's marks substitute for the sellers
22  marks instead would allow the buyer to
23  ascribe any marks it wished to the value of
24  assets.
25      Q.  Well, I didn't say that the buyer's

TSG Reporting - Worldwide    877-702-9580

Page 125

Harrison Goldin

1
2  marks were necessarily the substitute in my
3  question.
4          MR. OXFORD:  Is there a question?
5      Q.  Well, are you assuming in responding
6  to your question that if Lehman's marks were
7  not -- if book value of Lehman was not used,
8  that necessarily Barclays' book value would be
9  used?
10          MR. OXFORD:  Objection to form.
11      A.  I make no such assumption.
12      Q.  Okay.  So if that were not, in fact,
13  the case, there would not be an anomaly?
14      A.  In fact, if the buyer's marks were
15  to be used, that would be anomalous.
16      Q.  Okay.  But if --
17      A.  But I indicated that in this
18  instance the context makes clear that it is the
19  seller's marks that are being used.
20      Q.  On all assets?
21          MR. OXFORD:  Objection to form.
22          MR. KAY:  Same objection.
23      A.  You asked me about the financial
24  assets.
25      Q.  That's fair.  Okay.

TSG Reporting - Worldwide    877-702-9580

Page 126

1  **Harrison Goldin**
2  **What about other assets transferred?**
3      MR. OXFORD:  Objection to form.
4  What about them?
5      A.   In the case of other assets other
6  than financial assets, you could have a value
7  to an acquirer that is different from the value
8  to the seller.  For example, in this case we
9  have a whole variety of intangible assets and
10 those assets, if stranded at Lehman, if not
11 acquired as part of a transaction in which a
12 business that is ongoing, a going concern is
13 being acquired by a synergistic buyer, if those
14 assets were to be left behind, they might have
15 very little value, negligible value,
16 inconsequential value, but at the same time
17 those assets transferred as part of a going
18 concern, particularly to a synergistic buyer,
19 might have considerable value to the buyer.
20     **Q.   So there is no requirement that the**
21 **assets other than the portfolio be transferred**
22 **at Lehman's book value?**
23     MR. OXFORD:  Objection to form.
24     A.   Remember that you and I had
25 considerable discussion earlier in this

TSG Reporting - Worldwide   877-702-9580

Page 127

1      Harrison Goldin
2  deposition about the $250 million and the
3  $250 million was characterized as a payment
4  that was being made to the Lehman estate for a
5  variety of assets.
6      **Q.   Are you saying the $250 million was**
7  **the book value of those assets?**
8      A.   I never said such a thing.
9      **Q.   Okay.  Well, what I was asking is**
10 **whether or not you believe other assets were**
11 **required to be transferred or valued to the**
12 **court at book value.**
13     A.   The financial assets were being
14 transferred at book value, Lehman's marks.  The
15 intangible assets, the goodwill, the going
16 concern value was being transferred pursuant to
17 an arrangement in which the estate was being
18 compensated at a level that the court
19 considered to be fair consideration, reasonably
20 equivalent value.  I said to you that value of
21 those intangible assets could vary depending on
22 whether one looked at them from the perspective
23 of an acquirer, particularly a synergistic
24 acquirer, or whether one looked at them from
25 the standpoint of a dormant business which was

TSG Reporting - Worldwide   877-702-9580

Page 128

1      Harrison Goldin
2  left with those assets and which, therefore,
3  had a collection of old desks and chairs and
4  used machines and lots of wires and programs
5  which would have very little value, if any,
6  unless acquired by a buyer who could use them
7  synergistically in a going concern business.
8  This happens to be an issue with which I have
9  considerable familiarity.
10     **Q.   On the liability side was there any**
11 **requirement that the liabilities be valued at**
12 **book value?**
13     MR. OXFORD:  Objection to form.
14     A.   The liabilities were described to
15 the court as indicated on my table on page 7
16 and they are listed there.
17     **Q.   I understand, but my question was is**
18 **it your understanding that the liabilities were**
19 **being valued at book value?**
20     MR. OXFORD:  Objection to form.
21     A.   Well, the issue gets somewhat
22 complicated, because in the first instance the
23 assumed liabilities were characterized as part
24 of a repo in which Barclays substituted for the
25 Fed and, as we discussed earlier in the

TSG Reporting - Worldwide   877-702-9580

Page 129

1      Harrison Goldin
2  deposition, that repo got subsumed into a
3  purchase and sale in which it became apparent
4  that this $45 billion referred to what Lehman
5  had previously received from the Fed in a
6  transaction in which Barclays substituted for
7  the Fed.
8      **Q.   All I am asking is whether or not it**
9  **is required to be transferred at book value.**
10     MR. OXFORD:  Objection to form.
11     Required by whom?
12     MS. NEUHARDT:  Barclays.
13     A.   This $45.5 billion appears to refer
14 to cash that Lehman had received earlier in
15 connection with the Fed repo.  I don't know
16 how --
17     **Q.   Are you familiar with the Fed repo**
18 **transaction?**
19     A.   I have not familiarized myself with
20 it in detail, but I am aware that there was a
21 repo with the Fed that was done at the
22 beginning of the week of the 15th, that
23 Barclays was substituted for the Fed as a
24 counterparty to Lehman, that there were various
25 activities relating to Barclays substituting

TSG Reporting - Worldwide   877-702-9580

33 (Pages 126 to 129)

Page 130

Harrison Goldin

1  Harrison Goldin
2  for the Fed, and that at some point apparently
3  over the weekend, perhaps late on the 19th,
4  perhaps on the 20th, I'm not clear, the notion
5  of having a repo as part of the transaction was
6  abandoned and the transaction became a simple
7  purchase and sale transaction.
8      Q.   And what is it that you believe
9  Barclays purchased?
10         MR. OXFORD:  Objection to form.
11     A.   Well, the list of assets that it
12 acquired is on page 7 on my chart and the list
13 of liabilities assumed in connection with that
14 transaction is also listed in the table.
15     Q.   The assets relating to the repo, do
16 you believe that was cash?
17     A.   No.
18     Q.   Okay.  Well, I may have
19 misunderstood an answer you gave.
20     A.   Barclays -- Lehman had acquired
21 cash.
22     Q.   Right.
23     A.   That's what I said in response to
24 your earlier question.  Lehman had acquired
25 cash.  The Fed had acquired securities.

TSG Reporting - Worldwide    877-702-9580

Page 131

1  Harrison Goldin
2  Barclays was substituted for the Fed and,
3  therefore, there was -- from the Barclays side,
4  Barclays -- the Fed/Barclays side securities
5  and the character, the nature, of that
6  transaction changed at some point from a repo
7  transaction to a direct purchase and sale
8  transaction.
9      Q.   Okay.  So Barclays was purchasing
10 the collateral that had been held by the Fed in
11 exchange for cash that it had lended to LBI;
12 correct?
13     A.   I didn't say that.
14         MR. OXFORD:  Objection to form.
15     Q.   What do you -- what body of assets
16 was within the 47.4 billion that is on your
17 page 7?
18     A.   Whatever financial assets Barclays
19 acquired.
20     Q.   Okay.
21     A.   In various categories, categories
22 were what they were, but Barclays was limited
23 to $47.4 billion of such assets.
24     Q.   Calculated by book value?
25     A.   Determined by Lehman book values.

TSG Reporting - Worldwide    877-702-9580

Page 132

1  Harrison Goldin
2      Q.   As of what date?
3      A.   Well, you and I had that colloquy
4  earlier.  Mr. McDade, I think, indicated that
5  it was as of the 19th of September.
6      Q.   Okay.  And you say that the book
7  value requirement is contractual?
8          MR. OXFORD:  Object to the form.
9      A.   Remember we are talking about a
10 transaction whose components comprise a variety
11 of memorializations.  One of them is the APA.
12 Another is the First Amendment.  Another is the
13 representations made to the court on the 17th
14 of September.  Another is the representation of
15 the court -- made to the court on the 19th of
16 September.  All of those comprise the record of
17 the transaction.
18     Q.   You do not consider the
19 Clarification Letter to be a record of the
20 transaction?
21         MR. OXFORD:  Objection to form.
22         MR. KAY:  Same objection.
23     A.   Well, remember that we had a
24 discussion earlier in this deposition about the
25 Clarification Letter.  The court indicated at

TSG Reporting - Worldwide    877-702-9580

Page 133

1  Harrison Goldin
2  some point on the 19th that having found the
3  description of the material changes to the
4  transaction helpful, that it looked forward to
5  getting a writing which would memorialize those
6  changes, and counsel indicated that hopefully
7  such a writing would be forthcoming.  In the
8  court's sale order, as we discussed earlier in
9  the deposition, the court adverted to other
10 instruments that might be involved.  I don't
11 remember that there was any specific reference
12 to a Clarification Letter, but it referred to
13 other instruments which could very well have
14 included a Clarification Letter that was
15 apparently not before the court when it signed
16 the sale order, and you and I had a discussion
17 as to what time of day on the 22nd of September
18 the Clarification Letter was filed with the
19 court and I told you I have no idea when it was
20 filed.
21     Q.   We had a very lengthy discussion
22 earlier about what you considered to be in the
23 record of the disclosure to the court.  What I
24 just asked you was whether or not you
25 considered the clarification to be part of the

TSG Reporting - Worldwide    877-702-9580

Page 134

Harrison Goldin

1    Harrison Goldin
2    record of the transaction.
3        A.    Well, the Clarification Letter was
4    filed potentially subsequent to the closing of
5    the transaction and it was before the court at
6    a later date.
7        Q.    But do you consider it part of the
8    record of the transaction?
9        A.    The answer that I gave you earlier
10   applies, that the sale order is based on the
11   record that was before the court at the time it
12   signed the sale order and I enumerated for you
13   what the elements of that record were.
14       Q.    Okay.  So to you is the record of
15   the transaction the same as the record of
16   disclosure before the court?
17       A.    The record of the transaction is
18   what I based my analysis on and I have
19   enumerated for you what the elements of that
20   were.
21       Q.    I understand.  I am just trying to
22   understand if you see a distinction between
23   documents that were signed by all the parties
24   but that you do not consider to be part of the
25   record to the court.

TSG Reporting - Worldwide    877-702-9580

Page 135

1    Harrison Goldin
2        A.    Well, I have tried to make plain to
3    you as best I can that the sale order refers to
4    the record before the court and refers to a
5    document, one or more documents, that might be
6    executed later, and you will remember that we
7    focused earlier -- I have the sale order
8    somewhere here.  We focused earlier on that
9    critical language in the sale order in
10   paragraph 25 is it, on page 21, as best I
11   recollect, in which the court said that any
12   such modification, amendment or supplement does
13   not have a material adverse effect on the
14   Debtors' estates, so it is for the court to
15   determine how to characterize the Clarification
16   Letter, not for me to determine that.
17       Q.    In your mind, then, record of the
18   transaction is the same as the record of
19   disclosure to the court?
20       A.    I didn't say that.
21       Q.    Do you consider those to be two
22   different things?
23       A.    I didn't say that either.  What I
24   said was that there is a record on which the
25   sale order was based and that record comprises

TSG Reporting - Worldwide    877-702-9580

Page 136

1        Harrison Goldin
2    the elements that I described.
3        Q.    And that's the record of which you
4    consider to be disclosure to the court?
5        A.    That was the record on which the
6    court based the sale order.
7        Q.    Which you believe the court based
8    the sale order?
9        A.    Well, the court so stated in the
10   sale order.  I don't have to go beyond that.
11   The court indicated in the sale order that
12   based on the record before it.
13       Q.    Do you consider the record of the
14   transaction to be any different from that?
15       A.    Well, I assume that there were lots
16   of documents that were exchanged, that there
17   were all kinds of materials that circulated at
18   closing that comprise the memorialization of
19   the transaction, but insofar as the principal
20   elements of the transaction are concerned on
21   which the court based its sale order on the
22   20th of September we are talking clearly about
23   the elements that I adverted to earlier.
24       Q.    So you consider the documents signed
25   by all of the parties to be irrelevant?

TSG Reporting - Worldwide    877-702-9580

Page 137

1        Harrison Goldin
2        MR. OXFORD:  Objection to the form.
3        MR. KAY:  Objection.
4        MS. CARRERO:  Objection.
5        MS. NEUHARDT:  He is not answering
6    my question.
7        MR. KAY:  Mischaracterizes the
8    testimony.
9        A.    I am not aware that I ever used the
10   word "relevant" or "irrelevant."
11       Q.    Do you consider the document that
12   was signed by all of the parties on the morning
13   of the 22nd to be part of the record of the
14   transaction?
15       MR. OXFORD:  Objection.
16       MR. KAY:  Objection.
17       MS. CARRERO:  Objection.
18       A.    They are a reflection of what the
19   parties signed.
20       Q.    Okay.  Is there any requirement that
21   a seller in a transaction -- an accounting
22   requirement that a seller in a transaction use
23   the purchaser's book value in recording its own
24   statements?
25       MR. OXFORD:  Objection.

TSG Reporting - Worldwide    877-702-9580

Page 138

Harrison Goldin

1
2       A.    Remember, we are talking here about
3    a very particular context.  We are talking
4    about a 363 sale.  We are talking about
5    disclosures to a court.  We are talking about
6    an order that issues based on those
7    disclosures.  And it is on that solely that I
8    focused my attention, other than the
9    Acquisition Balance Sheet.
10      Q.    Do you know one way or another
11   whether there is any accounting requirement in
12   GAAP or otherwise that the purchaser in a
13   transaction reflect on its own balance sheet
14   the marks of the seller?
15      A.    I have never heard of such a
16   requirement.
17      Q.    Thank you.  Okay.  On -- actually I
18   don't know what page.  Footnote 15, which is
19   page 14.
20      A.    Of my report?
21      Q.    Of your report, yes.  You refer to
22   the transcript of the 19th and you say:
23   Debtors' counsel noted a potential transfer of
24   residential mortgage securities from Lehman to
25   Barclays but did not say the value of

TSG Reporting - Worldwide    877-702-9580

Page 139

Harrison Goldin

1
2    securities would be incremental to the
3    47.4 billion value transfer cited," and then
4    you go on to say "the court asked and counsel
5    said uncertainty and did not provide an
6    estimate."  Correct?
7       A.    Yes.
8       Q.    Okay.  So do you have knowledge that
9    the fact that Barclays could be receiving
10   residential mortgage securities was disclosed
11   to the court?
12      MR. OXFORD:  Objection to the form.
13      A.    Well, what was disclosed to the
14   court was that the residential mortgages, in
15   fact, were going to the DTC in order to
16   facilitate the continuation of trading activity
17   on the closing.
18      Q.    You don't interpret what the
19   Debtors' counsel said to allow for the
20   possibility that Barclays was going to receive
21   those?
22      A.    Well, I wouldn't preclude that
23   possibility.  I think the record is somewhat
24   unclear and ambiguous in that regard and I can
25   take you through the elements of the record

TSG Reporting - Worldwide    877-702-9580

Page 140

Harrison Goldin

1
2    which, in my judgement, give rise to the view
3    that the record is unclear.  I think the better
4    interpretation, from my standpoint based on
5    what I have seen, is that they were included in
6    the 47.4, but as I have said to you, I wouldn't
7    preclude the alternative.
8       Q.    Okay.  So it is possible that this
9    was -- that the residential mortgage securities
10   were going to be transferred to Barclays under
11   the record before the court?
12      MR. OXFORD:  Objection to form.
13      A.    That some of the residential
14   securities were going to be transferred to
15   Barclays was certainly a possibility under this
16   transaction.
17      Q.    Okay.  But you didn't put a value on
18   those on your page 7 chart, did you?
19      A.    That's correct.  Would you like to
20   know the reason?
21      Q.    Sure.
22      A.    Because the court was apprised that
23   those mortgages might have no value, that they
24   might have a value as high as $6 billion, that
25   they might have a value in between, and when

TSG Reporting - Worldwide    877-702-9580

Page 141

Harrison Goldin

1
2    counsel for the debtor was asked what the value
3    was, counsel said she didn't know.  When
4    Mr. Hershan representing the DTC was questioned
5    on the subject, he also told the court that
6    they might have a value of $6 billion, they
7    might have a value of zero, they might have a
8    value anything in between.
9       Q.    But no one represented to the court
10   that the value was zero; correct?
11      A.    The representation to the court was
12   that the value could not be known, that the
13   value might be anywhere from $6 billion down to
14   zero.
15      Q.    And so you chose to assume it was
16   zero for purposes of your chart on page 7?
17      MR. OXFORD:  Objection to the form.
18      A.    You will --
19      MR. OXFORD:  Just let me get my
20   objection on the record.
21      Misstates the witness' testimony.
22      You can answer again.
23      THE WITNESS:  Pardon?
24      MR. OXFORD:  You can answer.
25      A.    You will remember that my chart on

TSG Reporting - Worldwide    877-702-9580

Page 142

Harrison Goldin

1
2  page 7 is a reflection of what the court was
3  told as to asset values and as to liabilities
4  and I have just told you that the court was
5  given an indication respecting the resis, the
6  residential mortgages, which suggested that
7  they might have a value of zero or they might
8  have a value of anything else going up to
9  $6 billion, so they could have been worth
10 nothing.
11      **Q.   So but it was disclosed to the court**
12 **that it could have been worth $6 billion;**
13 **correct?**
14     MR. OXFORD:  Objection.
15     A.   It was disclosed to the court that
16 there was a range from $6 billion down to zero.
17     **Q.   So on page 7 couldn't your net**
18 **gain -- sorry -- net loss figure of**
19 **1.85 billion be off by $6 billion?**
20     A.   No.
21     MR. OXFORD:  Objection to the form.
22 Misstates the witness' testimony.
23     A.   The answer is no.  I told you in
24 answer to an earlier question of yours that
25 while the status of the resis was ambiguous, in

TSG Reporting - Worldwide    877-702-9580

Page 143

Harrison Goldin

1
2  my view the likelier inference is that they are
3  included in the $47.4 billion and I recited
4  some of the factors that led me to my
5  conclusion.  I was confirmed in the conclusion
6  being the better judgement because of the
7  series schedule, of course, that was not
8  produced until much later, but which indicated
9  that Lehman understood that the resis were
10 included in the 47.4.
11     **Q.   Earlier today you told me you were**
12 **not testifying as to any contractual**
13 **interpretation.  Are you now interpreting**
14 **exactly what -- whether or not Barclays was to**
15 **receive the residential mortgage assets?**
16     MR. OXFORD:  I object.
17     MR. KAY:  Same objection.
18     MS. CARRERO:  Same objection.
19     MR. OXFORD:  Object to the form.
20     A.   I am responding to your questions.
21 I could refuse to answer questions, if you wish
22 me to do that, asserting that I am not doing it
23 because I am not interpreting the contract, but
24 if you ask me a question, I do my best to try
25 and answer, and you asked me a question which I

TSG Reporting - Worldwide    877-702-9580

Page 144

Harrison Goldin

1
2  have tried to answer as best I can and now you
3  tell me I shouldn't have answered it because --
4      **Q.   No.  No.  Perhaps we are**
5  **misunderstanding each other.**
6          **I believe you told me you agree that**
7  **it was disclosed to the court that an asset of**
8  **possibly as much as 6 billion might be**
9  **transferred to Barclays; correct?**
10     MR. OXFORD:  Objection to the form.
11 That's not what the witness said.
12     MR. KAY:  Same objection.
13     MS. CARRERO:  Same objection.
14     MS. NEUHARDT:  He is welcome to
15 correct it then.
16     A.   I believe you have mischaracterized
17 my answer.
18     **Q.   What is -- let's go back and find**
19 **it.  We are going to be here more than two**
20 **hours, though.**
21     MR. OXFORD:  Well, if you keep
22 misrepresenting the witness's testimony --
23     MS. NEUHARDT:  Well, if he keeps
24 answering for two minutes on questions --
25 on answers that don't even answer the

TSG Reporting - Worldwide    877-702-9580

Page 145

Harrison Goldin

1
2  question, because then I know you get mad
3  if I interrupt and try to just
4  short-circuit it.
5      MR. OXFORD:  I do believe it is
6  inappropriate and unprofessional to
7  interrupt a witness.
8      MS. NEUHARDT:  Well, then I have to
9  let him go on for minutes at a time and
10 when he doesn't answer the question, then I
11 have to ask it again.
12     MR. OXFORD:  That's the way it
13 works, Amy.
14     MS. NEUHARDT:  And that's why it's
15 going to take more than two hours.
16     **Q.   Okay.  You testified that you did**
17 **not preclude the possibility that Debtors'**
18 **counsel was saying that Barclays could receive**
19 **the residential mortgage assets; correct?**
20     MR. OXFORD:  I will object to the
21 form.  You might want to clarify that
22 question.  It's a little vague as to what
23 the residential mortgage assets are.
24     **Q.   Are you confused about what**
25 **residential mortgage assets I am talking about?**

TSG Reporting - Worldwide    877-702-9580

Page 146

1          **Harrison Goldin**
2     A.   I don't think so.
3     Q.   **Thank you.  Okay.**
4          **Did you testify that based on the**
5     **transcript of the 19th you would not preclude**
6     **the possibility that Debtors' counsel was**
7     **telling the court that Barclays might receive**
8     **some of those mortgage securities?**
9     A.   I said that Barclays -- did you just
10    say Barclays when you meant Lehman?
11    Q.   **Possibly.**
12    A.   Could you repeat the question,
13    please.
14    Q.   **In your review of the September 19th**
15    **transcript did you -- would you preclude the**
16    **possibility that Debtors' counsel informed the**
17    **court that it was possible that Barclays would**
18    **receive some of the residential mortgage**
19    **securities?**
20         MR. OXFORD:  Objection to form.
21    A.   And I said I would not preclude that
22    possibility, although I thought the record was
23    ambiguous and I indicated the elements of the
24    ambiguity, and ultimately when you questioned
25    me on the subject I told you that I was
          TSG Reporting - Worldwide    877-702-9580

Page 147

1          Harrison Goldin
2     confirmed in my view as to what was likelier
3     than not, that the $47.4 billion included
4     whatever residential mortgages were transferred
5     to Barclays for the reason I told you.
6     Q.   **So the reason it is not on the left**
7     **side of the sheet is because you believe it was**
8     **within the 47.4; is that your testimony?**
9     A.   I said to you that there are two
10    elements that are responsive to that question.
11    First, what the values of the resis was was
12    totally unclear at the hearing for the reasons
13    that I described to you in answering an earlier
14    question.  And, secondly, I said to you that
15    although whether the resis were accretive to
16    the financial assets or included in the
17    financial assets was ambiguous, but that I
18    thought likely the better conclusion was that
19    they were included in the financial assets.
20    Q.   **Okay.  So you included them within**
21    **the 47.4?**
22    A.   Remember that I told you in earlier
23    testimony that I did not distinguish among the
24    component elements that in the aggregate
25    comprised the financial assets.  The
          TSG Reporting - Worldwide    877-702-9580

Page 148

1          Harrison Goldin
2     transaction that was disclosed to the court
3     included that the financial assets being
4     acquired by Barclays were $47.4 billion without
5     differentiation among the categories of assets.
6     Q.   **Didn't you just say that you -- you**
7     **would not preclude the possibility that what**
8     **Debtors' counsel told the court was that the**
9     **residential mortgage assets might also be**
10    **transferred to Barclays?**
11         MR. OXFORD:  Objection to the form.
12    A.   I indicated to you that I would not
13    preclude the possibility.
14    Q.   **Okay.  But when creating this chart,**
15    **you did not treat them as a separate asset that**
16    **was transferred to Barclays?**
17    A.   Because for the reasons that I told
18    you, I don't think that it is appropriate to
19    include them as a separate category because
20    it's not clear that they are accretive, and to
21    the extent that they were being transferred, in
22    my judgement it is likelier than not that they
23    were meant to be included in the financial
24    assets total.
25    Q.   **If you are incorrect on whether they**
          TSG Reporting - Worldwide    877-702-9580

Page 149

1          **Harrison Goldin**
2     **were supposed to be included, should there be a**
3     **value ascribed to them?**
4          MR. OXFORD:  Objection to form.
5     A.   If the value of the resis that's
6     being -- that was -- that might be transferred
7     to Barclays is accretive to the $47.4 billion,
8     then it would be an additional number.
9     Q.   **Okay.  And do you understand that**
10    **the court was told that the value of the**
11    **residential mortgage assets could be as high as**
12    **6 billion?**
13    A.   And as little as zero.
14    Q.   **Correct.**
15    A.   And, indeed, the court was told that
16    nobody knew what the value was.
17    Q.   **I understand.  But are you -- you**
18    **are not saying that the court was never**
19    **informed that those assets could be worth**
20    **$6 billion?**
21         MR. OXFORD:  Objection to the form.
22         MS. CARRERO:  Objection to form.
23         MR. KAY:  Objection.
24    A.   The court expressed repeatedly
25    during the various hearings, the two hearings,
          TSG Reporting - Worldwide    877-702-9580

Page 150

Harrison Goldin

1  interest in values, and one of the assets about
2  which it asked questions were the residential
3  mortgages, and in response to that inquiry the
4  court was told that the value of the
5  residential mortgages was uncertain, that the
6  value might be zero, that it was possible at
7  the end of the day the value of the residential
8  mortgages might be as high as $6 billion, but
9  that they might have no value at all.
10      Q.   And the court approved the
11  transaction without getting a firmer value on
12  that; correct?
13      MR. OXFORD:  Objection.
14      A.   The court approved the transaction
15  with that disclosure on the record in the
16  context in which I said to you.  I think the
17  better inference is that the $47.4 billion
18  would include the value of resis to the extent
19  that residential mortgages were available to be
20  transferred to Barclays.
21      Q.   And I asked you to assume that if
22  the court found that you were incorrect that
23  those assets were supposed to be included
24  within the 47.4 billion, wouldn't there have to
25

TSG Reporting - Worldwide    877-702-9580

Page 151

Harrison Goldin

1  be an adjustment on this side for that asset
2  and you said yes.
3      A.   I told you --
4      MR. OXFORD:  Objection to form.  Is
5  there a question?  You are just reciting
6  the record, Amy.
7      MS. NEUHARDT:  I am asking if that's
8  correctly characterizing his testimony.
9      A.   No, it is not, because I indicated
10  to you that to the extent that resis were not
11  included in the 47.4 and there were to be value
12  to the resis, then that value might be
13  accretive to the 47.4, but respecting those two
14  premises I indicated to you, first, that the
15  value might be zero and, secondly, that in my
16  view the likelier inference in a context which
17  is unclear is that to the extent that there is
18  value in the resis, that they are included in
19  the 47.4.
20      Q.   I want you to forget the likelier
21  view and assume that that view is wrong.
22      Was the fact that there was an
23  additional asset that could be worth as much as
24  $6 billion disclosed to the court?
25

TSG Reporting - Worldwide    877-702-9580

Page 152

Harrison Goldin

1      MR. OXFORD:  Objection to the form.
2      MS. CARRERO:  Same objection.
3      MR. KAY:  Same objection.
4      MR. OXFORD:  Misstates the record,
5  misstates the witness' testimony, it
6  misstates the sale transcript.
7      MS. NEUHARDT:  Well, we are going to
8  be here all day.  I think you know full
9  well what I am asking.
10      MR. OXFORD:  I think I know what you
11  are trying to ask.
12      MS. NEUHARDT:  Well, and I think he
13  is deliberately putting that condition back
14  in that I keep telling him not to put in.
15      Q.   It sounds to me like you are
16  unwilling to answer the question of whether or
17  not if those assets were not included in the
18  47.4 and the court was told that they could be
19  worth as much as 6 billion, they should be
20  reflected on your chart that says what was
21  disclosed to the court.
22      A.   What I --
23      MR. OXFORD:  Can I just -- just
24  maybe this will simplify things just a
25

TSG Reporting - Worldwide    877-702-9580

Page 153

Harrison Goldin

1  little bit, Amy.  You keep talking about
2  the 6 billion going to Barclays.  I don't
3  think there was ever --
4      MS. NEUHARDT:  I am not getting into
5  whether or not it did.  I am just trying to
6  figure out what he determined should be put
7  on here as disclosure to the court.  He
8  acknowledges that some or all of the resis
9  could have been disclosed to the court as
10  going to Barclays.
11      MR. OXFORD:  Well, I think that's
12  part of the problem.
13      Q.   Once again, you acknowledge that
14  Debtors' counsel disclosed to the court the
15  residential securities in a way such that they
16  might not be included in the 47.7 billion;
17  correct?
18      MR. OXFORD:  Objection.
19      MS. CARRERO:  Objection.
20      MR. KAY:  Objection.
21      A.   Remember, I want to make sure that I
22  don't mislead in my answer.  The testimony
23  before the court on the 19th was that the resis
24  were all going to DTC.  There might or might
25

TSG Reporting - Worldwide    877-702-9580

Page 154

Harrison Goldin

1         Harrison Goldin
2  not be any residual value that would be
3  available for Barclays.  The residual value
4  might be zero or the residual value conceivably
5  could be greater than zero.  That was what the
6  court was told.  I indicated to you, therefore,
7  that whether there was any incremental value
8  was unclear and if there was incremental value,
9  if it was additive to the 47.4 billion, then my
10 view is that the better interpretation is that
11 they were included in the 47.4 billion, but if
12 they were additive, then they may be in
13 addition to the 47.4 billion as a function of
14 what was left after DTC had made claims on
15 those assets in connection with trading
16 activity.
17     Q.   Okay.  And you understood that it
18 was disclosed to the court that those assets
19 could be worth as much as 6 billion?
20        MR. OXFORD:  Objection to the form.
21        MS. CARRERO:  Same objection.
22     A.   The assets that were being
23 transferred to the DTC apparently, from what
24 the DTC counsel told the court, had an initial
25 value of $6 billion.  What would be left after

TSG Reporting - Worldwide    877-702-9580

Page 155

Harrison Goldin

1         Harrison Goldin
2  DTC asserted its claims was wholly unclear and
3  the DTC's counsel said it might be as little as
4  zero.
5      Q.   And also said it could be as much as
6  6 billion?
7      A.   If there were no claims -- remember,
8  we are talking about $500 billion in trades at
9  the DTC to which this -- these $6 billion
10 apply.  $500 billion --
11     Q.   Did you do any analysis --
12        MR. OXFORD:  Please.  Please.
13     A.   May I finish my answer?
14        MR. OXFORD:  Amy, please.  I have
15 asked you --
16        MS. NEUHARDT:  We are going to be
17 here until 5.
18        MR. OXFORD:  That's fine, we can be
19 here for your seven hours on the record,
20 but I have asked you a number --
21        MS. NEUHARDT:  Well, I want more if
22 he continues to just ramble on.
23        MR. OXFORD:  I will ask you again,
24 please give the witness the courtesy of
25 letting him answer the question.  If you

TSG Reporting - Worldwide    877-702-9580

Page 156

Harrison Goldin

1         Harrison Goldin
2  don't like it, you can ask the question
3  again.
4      A.   I was saying to you that we had
5  $500 billion of transactions, it was testified
6  to, that were the subject of the $6 billion
7  that was being transferred to DTC to facilitate
8  trading activity.  So that nothing might be
9  left was an element that was introduced by
10 counsel for the DTC.
11     Q.   And the concept that some would be
12 left was also introduced as a concept to the
13 court; correct?
14     A.   The notion that there was
15 uncertainty as to what value would be left was
16 what Mr. Hershan testified to in connection
17 with the $6 billion of resis.
18     Q.   My question is very simple.  Was the
19 fact that there might be value left that would
20 go to Lehman disclosed to the court -- sorry,
21 to Barclays, disclosed to the court?
22     A.   Could you repeat the question.
23     Q.   Yes.  Was the fact that there might
24 be value left that would go to Barclays
25 disclosed to the court?

TSG Reporting - Worldwide    877-702-9580

Page 157

Harrison Goldin

1         Harrison Goldin
2      A.   Yes.
3      Q.   Okay.  And was the fact that that
4  value could be more than zero disclosed to the
5  court?
6      A.   Yes.
7      Q.   And yet you did not put it on your
8  chart?
9      A.   Well, I explained why to you.  Would
10 you like me to explain again why?
11     Q.   No.  I believe you have given two
12 reasons, but one of which is you believed it
13 should have been included in the 47.4; correct?
14     A.   I said that the better inference, in
15 my view, is that if there was additive
16 incremental value from the resis, that it was
17 included in the 47.4.
18     Q.   Okay.  Now, if you are incorrect on
19 that inference, should it be listed as a
20 separate asset on the left-hand side of page 7?
21        MR. OXFORD:  Objection.  Asked and
22 answered.
23     A.   No.
24     Q.   Why?
25     A.   Because the court was not given a

TSG Reporting - Worldwide    877-702-9580

Page 158

Harrison Goldin

1  value of that asset and the court was left with
2  an explanation that the resis might be worth
3  nothing or the resis might have value.
4      Q.   So you make no room in your
5  calculation of what was disclosed to the court
6  the fact that the court was informed that some
7  assets were of uncertain value?
8      MR. OXFORD:  Objection to form.
9      A.   Well, I don't have a column for
10 uncertain value and the reason, among others,
11 that I don't is the one that I told you, which
12 in my view is the better understanding of the
13 transcript on the 19th of September was that to
14 the extent that there might be value in
15 residential mortgages going to Barclays, they
16 would be included in the $47.4 billion of
17 financial assets.
18     Q.   And that's the only reason you don't
19 have a column for uncertain value?
20     A.   No.  Remember I have testified that
21 the description of the resis given to the court
22 was that those resis might be used by DTC to
23 satisfy its claims in connection with trading
24 activity and that it was uncertain in a context

Page 159

Harrison Goldin

1  in which you had $500 billion of trades as to
2  whether there would be any residual value left
3  at all.
4      Q.   So your chart -- the columns on the
5  left, are they just the lowest possible value
6  disclosed to the court?
7      MR. OXFORD:  Objection.
8      MR. KAY:  Objection.
9      A.   They are the values disclosed to the
10 court.  Not ranges.  They are the values.
11     Q.   You don't think the court understood
12 that the resis could have a value of up to
13 $6 billion on top of what was here?
14     MR. OXFORD:  Objection to form.
15 Asked and answered.  Misstates the record.
16 Misstates the witness' testimony.
17     You can answer again.
18     MS. CARRERO:  Same objection.
19     MR. KAY:  Same objection.
20     A.   You would have to ask the court what
21 it understood.  I deal with disclosures made to
22 the court.
23     Q.   You were purporting to put down here
24 what was disclosed to the court.  You have

Page 160

Harrison Goldin

1  agreed that it was disclosed to the court that
2  those resis could be worth as much as
3  $6 billion.
4      A.   Well, I know you are an optimist and
5  keep focusing on $6 billion.  I am a realist
6  and I know that we were dealing in turbulent
7  markets.  You addressed that with me earlier in
8  the deposition.  You emphasized the direction
9  in which, in your view, markets were headed.
10 You questioned me on where values were going.
11 There was a hearing on the 19th in that context
12 in that environment in which counsel for DTC
13 told the court that in the context of
14 $500 billion of trades there might be no value
15 to $6 billion of residential mortgages.  That's
16 what was said on the record.
17     Q.   It was also disclosed that there
18 might be value; correct?
19     A.   Well, there could have been value,
20 obviously, but the --
21     Q.   So it was disclosed to the court
22 that there could be value?
23     MR. OXFORD:  Objection.
24     MS. CARRERO:  Same objection.

Page 161

Harrison Goldin

1      A.   What was --
2      MS. NEUHARDT:  Look, he is
3  purporting to categorize what was disclosed
4  to the court, yet is refusing to put on
5  there things that he knows were disclosed
6  to the court purely because there was
7  uncertainty as to the value, and I am
8  wanting to find out whether or not he
9  thinks that the contract excludes anything
10 with an uncertain value.
11     MR. OXFORD:  Okay, well, why don't
12 you ask him that question instead of asking
13 him a different --
14     Q.   Is it your understanding that the
15 transaction approved by the court excludes any
16 assets of uncertain value?
17     A.   No.  My understanding is that what
18 was approved by the court was a transaction in
19 which the principal elements were told to the
20 court and values were given to the court
21 respecting those elements on the asset side and
22 on the liability side and that that was the
23 basis for the court's determination that there
24 was reasonably equivalent value exchanged and

Page 162

Harrison Goldin

1  that, as the court put it, there was fair
2  consideration.
3  **Q. Okay. And didn't -- wasn't the**
4  **court also informed of assets that might be**
5  **transferred that had uncertain value?**
6       MR. OXFORD: Objection to form.
7    A.   The court was informed that there
8  was going to be a payment made of $250 million
9  for a basket of assets which you characterized
10 earlier in the deposition as intangible,
11 goodwill, going concern value.
12      **Q. No, I did not make that**
13 **characterization. You did.**
14   A.   I beg your pardon. I was awake and
15 I heard you characterize it that way.
16      **Q. No.**
17   A.   But let's not dispute that. The
18 record will show whatever it is you said and
19 whatever it is I said. But I heard you to
20 characterize those intangible assets that way,
21 the assets for which $250 million was
22 exchanged, and we had a discussion earlier, you
23 and I, respecting what the value was for those
24 and I indicated to you that in my view the

TSG Reporting - Worldwide    877-702-9580

Page 163

Harrison Goldin

1  value could be quite different to the acquirer,
2  in this case to Barclays, a synergistic buyer,
3  than the value of those assets would be if left
4  behind stranded at a debtor that would not be a
5  going concern and that those values could be of
6  negligible value to the debtor while they might
7  be of considerable value to the acquirer. The
8  court's task in these kinds of situations is to
9  protect the debtor estate and the court
10 concluded that there was fair consideration,
11 reasonably equivalent value, in Barclays'
12 payment of $250 million for assets which if
13 left behind at Lehman would have negligible or
14 inconsequential value.
15      **Q. So would it be important to the**
16 **court what it was worth to Barclays, these**
17 **assets, or purely what they were worth to**
18 **Lehman?**
19   A.   Well, the court's focus is on
20 protecting the Lehman estate, making sure that
21 the Lehman estate is -- gets the consideration
22 that is appropriate for the values to it that
23 it is surrendering.
24      **Q. So the mere fact that these assets**

TSG Reporting - Worldwide    877-702-9580

Page 164

Harrison Goldin

1  **were of more value to Barclays, the**
2  **intangibles, let's leave aside the resis for**
3  **now, the intangibles were worth more to**
4  **Barclays than to Lehman does not mean that the**
5  **value of those were not properly disclosed to**
6  **the court; right?**
7       MR. OXFORD: Objection.
8       MS. CARRERO: Objection.
9    A.   I am not -- I did not focus on that
10 issue. What I focused on is what was disclosed
11 to the court and what was disclosed to the
12 court that there was a payment of $250 million
13 and that that $250 million comprehended the
14 elements that we have discussed.
15      **Q. Okay.**
16   A.   Those assets were determined at the
17 closing to have a value to Barclays by
18 Barclays' accountants which is reflected on the
19 Acquisition Balance Sheet and it is not
20 surprising to me that the value of those assets
21 would be greater to Barclays than they would
22 have been to the Lehman estate, and I told you
23 that I have some considerable personal
24 experience in this regard and so that is quite

TSG Reporting - Worldwide    877-702-9580

Page 165

Harrison Goldin

1  clear to me.
2       **Q. Okay. Do you believe that the**
3  **transaction that the court approved precluded**
4  **Barclays from valuing those assets higher than**
5  **250 million?**
6    A.   The way in which Barclays chose to
7  report to the SEC was determined by Barclays'
8  accountants consistent with the applicable
9  accounting standards and that happened, as you
10 know, in 2009.
11      **Q. Okay, but what I am asking is your**
12 **interpretation of what the court ordered, was**
13 **he ordering a transfer of assets and**
14 **liabilities, and we will just focus on the 250**
15 **million, but are you saying he was focusing on**
16 **what that 250 million would be worth to**
17 **Barclays or to Lehman?**
18      MR. OXFORD: Objection to form.
19   A.   I said to you I thought quite
20 clearly that the judge's focus was on
21 protecting the Lehman estate and assuring that
22 the Lehman estate was getting fair
23 consideration I think is the term the court
24 used, reasonably equivalent value for the

TSG Reporting - Worldwide    877-702-9580

Page 166

Harrison Goldin

1  assets it was transferring.
2      Q.   Okay.  So the fact that Barclays
3  then later valued those intangible assets at a
4  higher value, does that in any way affect the
5  court's determination that the Lehman estate
6  received fair consideration for that 250
7  million?
8
9      A.   Well, if you are asking me whether
10  somebody could take the view that Barclays had
11  an obligation to disclose what the value of
12  those assets were to it, that is not an issue
13  on which I focused.  Barclays' representative
14  was an officer of the court, sat through a
15  hearing, had heard the description of the major
16  elements of the transaction to the court.
17  One -- if you are asking me, as you often do,
18  to hypothesize, one could make an argument, I
19  imagine, that in the interests of full
20  disclosure to the court an officer of the court
21  would have been obliged to stand and say "we
22  have a different view of that value," but I
23  reach no conclusion on that issue.
24      Q.   Okay.  On page 6, and we have talked
25  about this sentence before --

TSG Reporting - Worldwide    877-702-9580

Page 167

Harrison Goldin

1      A.   You are talking about my report?
2      Q.   Yes.  You discuss some of the
3  materials you reviewed and then you say: "I
4  believe they demonstrate that Barclays has
5  materially overstated the assets and values
6  it's entitled to receive pursuant to the sale
7  order."
8
9      A.   Where are you?
10      Q.   I'm sorry, it's the last sentence of
11  the first full paragraph.  Actually, it's the
12  second sentence of the first full paragraph.
13      A.   Yes.
14      Q.   Okay.  Do I -- am I correct in
15  interpreting your last answer about the
16  difference in valuation on the intangibles that
17  you are not opining on whether or not that was
18  a material overstatement?
19          MR. OXFORD:  Objection to form.
20      A.   The answer is that I did not
21  consider, it was not within my purview to
22  consider the appropriateness of the elements on
23  the Acquisition Balance Sheet.  I reviewed the
24  Acquisition Balance Sheet and was satisfied
25  that Professor Pfleiderer's adjustment to the

TSG Reporting - Worldwide    877-702-9580

Page 168

Harrison Goldin

1  Acquisition Balance Sheet, which is not
2  reflected on page 7 -- page 7 of my report, as
3  you remember we discussed earlier as I
4  testified, shows the delta on the Acquisition
5  Balance Sheet unadjusted, but I satisfied
6  myself that the adjustment that Professor
7  Pfleiderer made to the Acquisition Balance
8  Sheet provided a basis on which I could do my
9  analysis, whether I agreed or disagreed with
10  Professor Pfleiderer's findings.
11      Q.   What is a mid point price?
12      A.   Can you refer me to what you have in
13  mind, please.
14      Q.   Yes.  It is -- you talk about --
15  it's either 19 or 20.  You talk about mid point
16  bid and ask prices.  It's on --
17      A.   Yes.
18      Q.   -- 19.
19      A.   Yes.
20      Q.   Okay.  I see your description of a
21  mid point price there.
22          Is there a difference between a mid
23  point and a bid price?
24      A.   Well, the witnesses who testified

TSG Reporting - Worldwide    877-702-9580

Page 169

Harrison Goldin

1  made the distinction.  They said that mid point
2  is the middle point between bid and asked.
3      Q.   So you understand that there are
4  three different -- there can be three different
5  values?
6
7      A.   Well, I understand the difference
8  between bid and asked and that the mid point is
9  between the bid and the asked, yes.
10      Q.   Do you have any opinion as to which
11  of these three types of valuations is
12  appropriate for use in valuing an asset
13  involved in a sale?
14          MR. OXFORD:  Objection to form.
15      A.   I formed no opinion on that issue.
16      Q.   Do you know whether or not Barclays'
17  PCG prices and adjustments were tested or
18  reviewed by outside auditors?
19      A.   I would assume that when Barclays
20  prepared the Acquisition Balance Sheet, as in
21  the ordinary course it would have been reviewed
22  by independent accountants.
23      Q.   Okay.  Do you know whether the value
24  of the portfolio as described to the court on
25  the 19th was described as mid point, bid or

TSG Reporting - Worldwide    877-702-9580

Page 170

Harrison Goldin

1 ask?
2     A.   Well, remember the discussion we had
3 earlier is applicable to this question.  The
4 values that were referred to on the 19th
5 relating to the financial assets were Lehman
6 book values.
7     **Q.   And were they at mid point, bid or**
8 **ask?**
9     A.   They were the book values.
10     **Q.   You don't know how Lehman did its**
11 **book values?**
12     A.   No, I don't know how they
13 ascertained those book values.
14     **Q.   Let's go to page 32 of your report.**
15 **The first full paragraph, first sentence, are**
16 **you there?**
17     A.   Yes, ma'am.
18     **Q.   Reads:  "Lehman likely recorded**
19 **trade liabilities as do most companies.**
20 **Accordingly, the parties should have been able**
21 **to derive from the company's general ledger a**
22 **reasonable estimate of potential cure**
23 **payments."**
24     **Do you, in fact, know whether Lehman**

TSG Reporting - Worldwide    877-702-9580

Page 171

Harrison Goldin

1 recorded trade liabilities in the same fashion
2 as most companies?
3     A.   Well, the reason I have the word
4 "likely" is because I don't know for a fact how
5 they recorded their trade liabilities.
6     **Q.   Now, did you understand that under**
7 **the terms of the acquisition Barclays would**
8 **only be taking essential contracts that didn't**
9 **duplicate its existing arrangements?**
10     A.   I don't remember that precise
11 formulation, but I understood that Barclays
12 would be assuming contracts that were useful to
13 it in connection with its conduct of the
14 ongoing business lines that it was acquiring.
15     **Q.   Would there be any way to determine**
16 **from Lehman's ledger which contracts would be**
17 **useful to Barclays in light of what contracts**
18 **Barclays already had?**
19     A.   Barclays had made quite a number of
20 bank acquisitions, as I recollect, prior to the
21 time of this acquisition, so I would assume
22 that the Barclays people involved had some
23 considerable familiarity from those other
24 transactions respecting what kinds of contracts

TSG Reporting - Worldwide    877-702-9580

Page 172

Harrison Goldin

1 they would assume, but I don't know that for a
2 fact.
3     **Q.   Do you believe that the potential**
4 **cure payment obligation to Barclays could have**
5 **been determined without looking at the**
6 **circumstances of the specific contracts?**
7     MR. OXFORD:  Objection to form.
8     A.   Well, you -- as you will note, I
9 have reference in my report and I can go
10 through it now, if you wish me to, if you think
11 that would be productive, to back-and-forth
12 communications as to what those amounts might
13 be, but if the question is would they know to
14 the dollar, the answer is they would not know
15 to the dollar, but I would imagine they could
16 have a fairly good sense of what the essential
17 order of magnitude would be.
18     **Q.   Without looking at the specific**
19 **contracts?**
20     A.   Well, I answered the question by
21 saying to you that I don't know.  I put
22 together here in this response a couple of
23 answers that I gave you previously, including
24 that I don't know what the extent of Barclays'

TSG Reporting - Worldwide    877-702-9580

Page 173

Harrison Goldin

1 review was prior to the 15th of September.  I
2 don't know how many people Barclays had on the
3 premises at Lehman and what they looked at.  So
4 adding that to the fact that Barclays had a lot
5 of experience doing these kinds of transactions
6 and presumably making these kind of
7 examinations of contracts, at the end of the
8 day it would appear to me that they would have
9 had some general idea of the essential order of
10 magnitude, but I don't know that for a fact.
11     **Q.   Okay.  I am actually not asking**
12 **specifically about Barclays, Lehman.**
13     **I am more asking you mentioned you**
14 **have served as a trustee, you have had a lot of**
15 **involvement in bankrupt entities; right?**
16     A.   Yes.
17     **Q.   Okay.  And so you have dealt with**
18 **the cure payment concept before?**
19     A.   I'm familiar with the cure payment
20 concept.
21     **Q.   Okay.  In your experience, is it**
22 **possible to determine an accurate cure payment**
23 **obligation without looking at the contracts?**
24     A.   Well, as I have said to you, if you

TSG Reporting - Worldwide    877-702-9580

Harrison Goldin

1 are in a situation in which you can use as a
2 frame of reference other transactions that are
3 essentially comparable and can look at a list
4 of contracts and have enough personnel to be
5 able to do that task and have people who can
6 tell you what the contracts represent and what
7 the uses of those contracts are, you can get
8 much closer than further away to what the range
9 of likely exposure is on the assumption of
10 those contracts.
11     Q.  Have you done any analysis of the
12 cure payments and estimates involved with
13 Barclays' other transactions?
14     A.  No, ma'am.
15     Q.  So you don't know how they would
16 compare to the estimates here?
17     A.  Well, I think I said to you that I
18 am without a lot of knowledge on this subject
19 and I went through some of the elements of
20 that, including how much time Barclays had had,
21 how many people that they utilized and related
22 issues that I spoke to in an earlier answer.
23     Q.  Let's go to page 35 of your
24 exhibit -- of your report.

TSG Reporting - Worldwide    877-702-9580

**Harrison Goldin**

1     **(Exhibit 711A, A.136, letter dated**
2 **July 16, 2009 with attached spread sheet,**
3 **Bates stamped BCI-EX-00077272 through**
4 **BCI-EX-00077287, marked for**
5 **identification.)**
6     MR. OXFORD:  Amy, we have been going
7 about a little over an hour.
8     MS. NEUHARDT:  This is a good time
9 for a break.
10     MR. OXFORD:  It's a good time?
11     MS. NEUHARDT:  Yes.
12     MR. OXFORD:  Just take five minutes.
13     THE VIDEOGRAPHER:  Off the record.
14 2:02 p.m.  This is the end of disk 3 of the
15 deposition of Harrison J. Goldin.
16     (Recess was taken from 2:02 to
17 2:18.)
18     THE VIDEOGRAPHER:  Back on the
19 record.  2:18 p.m.  This is the beginning
20 of disk 4 in the deposition of Harrison J.
21 Goldin.
22 BY MS. NEUHARDT:
23     Q.  Mr. Goldin, I understand from your
24 counsel that you want to clarify some of your

TSG Reporting - Worldwide    877-702-9580

**Harrison Goldin**

1 **prior testimony?**
2     A.  Just to assure that there is no
3 confusion, on reflection during the break I
4 realized that there might have been some
5 confusion respecting the hypothetical that you
6 asked me relating to the residential mortgages.
7 I indicated to you my view that the better
8 interpretation is that if there was any value
9 to the residential mortgages, they were likely
10 included in the $47.4 billion.  You pressed me
11 on the issue as to whether there might be value
12 that would be incremental to the 47.4 billion.
13 I told you that that was possible.  I did not
14 think that was the better view.  But what may
15 have been unclear was that in any event, if
16 there were to be an interpretation that there
17 was incremental value in the residential
18 mortgages to Barclays, I say incremental beyond
19 the 47.4 billion, that that value would be
20 limited to $3 billion because of the second
21 amendment -- first amendment, rather, and
22 because of the discussion that Mr. Hershan had
23 with the court when he explained the use of the
24 residential mortgages on the DTC transaction.

TSG Reporting - Worldwide    877-702-9580

Harrison Goldin

1 So on reflection I was concerned that in
2 answering the hypothetical I might
3 inadvertently have left you with the impression
4 that the incremental value could be as high as
5 $6 billion.  The incremental value to Barclays
6 under any circumstances would, in your
7 hypothetical, be limited to $3 billion.
8     Q.  Fair enough.  Is there anything else
9 about that testimony that you believe is
10 confusing?
11     A.  No.  I think that covers the point.
12     Q.  Okay.  Do you have in front of
13 you --
14     A.  I might just add, as long as you
15 invite me, if there is anything else I want to
16 add on that --
17     Q.  No.
18     A.  -- that I don't know -- I don't know
19 whether I referred in my testimony as I was
20 answering your questions to one of the reasons,
21 it just occurs to me, that leads me, among the
22 others that I recited, to conclude that it is
23 likelier than not that the $47.4 billion is
24 included -- includes any value that might be in

TSG Reporting - Worldwide    877-702-9580

Page 178

1                  Harrison Goldin
2    the residential mortgages, and the factor that
3    I have in mind that I might not have mentioned
4    is that Debtors' counsel at one point says that
5    there was a provision in the old agreement
6    pursuant to which the parties were sharing the
7    residential real estate mortgages.  There is no
8    longer that provision.  So that is just another
9    element that leads me to conclude that the
10   likelier inference is that whatever value there
11   might be in the residential mortgages that
12   would accrue to Barclays would be included in
13   the $47.4 billion, although, as I acknowledged
14   to you, it is not an issue entirely free from
15   doubt.
16        Q.    Would you please turn to page 35 of
17   your report.
18        A.    Yes.
19        Q.    The court reporter also has handed
20   you what has been marked as Exhibit 711A, which
21   the front page of which is actually 1184 and
22   then the first page of substance is a letter
23   from Jack Stern to Bob Gaffey dated July 16,
24   2009.
25             And my first question is on page 35
             TSG Reporting - Worldwide    877-702-9580

Page 179

1                  Harrison Goldin
2    of the report you refer to an Exhibit A136 in
3    footnote 94 and I want to know if this is, in
4    fact, what you are referring to?
5        A.    Which footnote is that, please?
6        Q.    It is footnote 94 and it is appended
7    to the end of a sentence that says:
8    "Ultimately Barclays paid 1.529 billion in
9    bonuses involving transferred employees
10   comprising 1.271 billion in cash and 258
11   million of equity."
12             And for that statement you cite a
13   letter from Boies Schiller dated July 16, 2009,
14   LBHI Motion Exhibit A136, and I have handed you
15   what I understand to be LBHI Motion
16   Exhibit A136, but I want to confirm that this
17   is, indeed, what you relied on.
18        A.    I believe it is.
19        Q.    Okay.  And if you turn to the last
20   page of that exhibit, and you are welcome to
21   look through the entire exhibit, but I believe
22   this is the relevant page, my question would be
23   is it this page of the exhibit that you relied
24   upon?
25        (Document review.)
             TSG Reporting - Worldwide    877-702-9580

Page 180

1                  Harrison Goldin
2        A.    Yes, it appears to be.
3        Q.    Okay.  And is it line 13 of the
4    chart on the last page of Exhibit 711A?
5        A.    It appears to be.
6        Q.    Okay.  Did you make any effort to
7    determine whether or not any of the other
8    entries on this spread sheet were, in fact,
9    considered to be a bonus by Barclays?
10       A.    I did not dissect the compensation
11   issue into component elements.  I simply dealt
12   with some of the compensation issues reflected
13   on the Acquisition Balance Sheet.
14       Q.    Okay.  And did you -- let's look at
15   page 7.  You have on both sides a liability for
16   bonuses.  On the left side it's not broken down
17   into cash and equity specifically, but I'm
18   assuming that that's what you have broken them
19   down into.
20       A.    Yes, and that's consistent with what
21   I just told you a minute ago in my last answer.
22       Q.    Okay.  Do you understand that
23   Barclays also -- Barclays took on
24   responsibility to pay severance payments to
25   Lehman employees that transferred over but then
             TSG Reporting - Worldwide    877-702-9580

Page 181

1                  Harrison Goldin
2    were terminated?
3        A.    Yes, I understood that Barclays was
4    assuming what I subsume under the rubric of
5    compensation costs and that there was a
6    cumulative total to those compensation costs,
7    some of which was in cash and some of which, as
8    I understood it, was in stock.
9        Q.    And so you include that then in the
10   1.70 plus 0.30 you have down for bonuses?
11       A.    Well, remember that this
12   presentation on page 7 incorporates both on
13   right the Barclays Acquisition Balance Sheet
14   and on the left what was reported to the court.
15       Q.    I understand, but do you consider
16   the liability for severance to be accounted for
17   on either side of this chart?
18       A.    Well, it's -- when you say "either
19   side," the liability for compensation is an
20   element in the Acquisition Balance Sheet.  The
21   compensation liability was disclosed to the
22   court.
23       Q.    As what adds up to $2 billion?
24       A.    That's correct.
25        MS. NEUHARDT:  I was complaining
             TSG Reporting - Worldwide    877-702-9580

Page 182

Harrison Goldin

2  about your long answers earlier, but they
3  actually answered questions I had intended
4  to ask later, so they may have ended up
5  helping to shorten the deposition in a
6  strange twist of fate.
7      MR. OXFORD: Apology accepted.
8      MS. NEUHARDT: No, it wasn't an
9  apology. You are misstating what I said.
10     Q. Do you still have the APA in front
11 of you? Actually, you know what, we don't need
12 that yet.
13     Your report acknowledges to the
14 court that some assets were described and with
15 each one I will just say it and you can tell me
16 whether you believe it was disclosed to the
17 court.
18     There was foreign subsidiaries. Was
19 it your understanding it was disclosed to the
20 court that the -- that Barclays would receive
21 the stock of certain foreign subsidiaries?
22     MR. OXFORD: I will object to the
23 form.
24     You can answer.
25     A. I seem to remember a reference to

TSG Reporting - Worldwide    877-702-9580

Page 183

Harrison Goldin

2  foreign subsidiaries. I don't recall which of
3  the elements of the record incorporated that.
4      Q. Let's see if I can point you to a
5  place in the report to make this go a little
6  easier.
7      Please turn to page 13. The second
8  set of bullet points, as I understand it, is
9  your summary of modifications to the
10 transaction that were described by Debtors'
11 counsel; is that correct?
12     A. Yes.
13     Q. Okay. The next to last bullet says:
14 "Two foreign subsidiaries were now identified
15 as being acquired by Barclays as part of the
16 transaction"; correct?
17     A. Yes.
18     Q. Okay. Did you ascribe any separate
19 value to that in your chart on page 7?
20     A. Well, I remember that there was
21 discussion with the court at which the court
22 asked specifically about the value of the next
23 bullet point and was, in effect, told that
24 there was no value ascribed to it. I don't
25 remember any colloquy with the court about what

TSG Reporting - Worldwide    877-702-9580

Page 184

Harrison Goldin

2  value might be ascribed to the foreign
3  subsidiaries. I would note that it was
4  represented to the court that the major
5  elements of the transaction were being
6  described to the court and that at one point,
7  and it was in connection with the PIM unit, as
8  I recall, that the judge indicated to counsel
9  that he would regard any change of $500 million
10 or more as material, so one has to assume that
11 where additional elements were introduced, that
12 they would not have violated the judge's
13 admonition as to materiality.
14     Q. So your answer is no, that you did
15 not put any separate value for the foreign
16 subsidiaries on your chart on page 7?
17     A. I don't believe that any specific
18 value was ascribed to the foreign subsidiaries
19 when the material elements of the transaction
20 were described to the court.
21     Q. You believe the court knew that
22 these assets were being transferred, though?
23     A. I don't know what the court knew. I
24 know what was disclosed.
25     Q. Okay. Do you believe that the court

TSG Reporting - Worldwide    877-702-9580

Page 185

Harrison Goldin

2  was told that these assets had no value? And
3  by "these assets" I am referring to the foreign
4  subsidiaries. We will talk about PIM in a
5  moment.
6      A. No. Remember I indicated to you
7  that the court reflected its view that -- of
8  what materiality constituted, and so the
9  assumption has to be that with counsel having
10 been invited, directed inferentially, to
11 disclose material elements of the transaction,
12 that these values, whatever they were, were not
13 material.
14     Q. On your chart you have a number of
15 values that are less than 500 million reflected
16 on the left side of your chart.
17     A. Yes.
18     Q. So I guess I still don't understand
19 why you didn't include it on the chart even
20 going with your assumption that it would not
21 have created a difference of more than 500
22 million?
23     A. Well, I --
24     MR. OXFORD: Let me object to the
25 form. I'm not -- if there is a question, I

TSG Reporting - Worldwide    877-702-9580

Page 186

1        Harrison Goldin
2    will object to the form of it.
3        A.    Do you want to repeat the question,
4    please.
5        **Q.    As I understand your testimony, you
6    did not include it on the chart because the
7    court admonished in connection with the PIM
8    assets that a change of more than 500 million
9    would be material; is that correct?**
10        A.    The operative word is "change."
11        **Q.    Do you view the foreign
12    assets going -- the foreign subsidiary assets
13    as a change?**
14        A.    It clearly did not represent a
15    change with a value of more than $500 million
16    for the reason that I described a minute ago,
17    because the court had admonished that it would
18    regard any change involving $500 million as
19    material and so counsel would have understood
20    clearly that any change of greater magnitude
21    needed to be disclosed to the court.
22        **Q.    Then what I am asking is -- you say
23    it clearly did not represent a change with a
24    value of more than 500 million.  I have not
25    interpreted your chart as only including values**

TSG Reporting - Worldwide    877-702-9580

Page 187

1        **Harrison Goldin**
2    of more than 500 million.
3        A.    My chart on page 7 delineates what
4    was described to the court and the court
5    admonished that if as to the material elements
6    of the transaction there were to be a change,
7    emphasis on the word "change," of $500 million,
8    the court would regard that as material.
9        **Q.    But you understood that the court
10    was being told that the foreign subsidiary
11    assets were going over; correct?  There was not
12    a specific value assigned during the hearing;
13    correct?**
14        A.    All that's correct so far.
15        **Q.    Okay.  You believe that the value
16    had to be less than 500 million based on the
17    judge's statement?**
18        A.    Well, the judge clearly required
19    that any change with a value of more than
20    $500 million, which he defined as material,
21    would thereby have to be disclosed to the
22    court.
23        **Q.    So the court would have understood
24    that this could have had a value anywhere
25    between zero and 500 million?**

TSG Reporting - Worldwide    877-702-9580

Page 188

1        **Harrison Goldin**
2        A.    No.
3        MR. OXFORD:  Objection.
4        You can answer.
5        A.    No, the court would have understood
6    that it was having described to it the material
7    aspects of the transaction, major changes to
8    the material aspects of the transaction, and
9    what this chart reflects is the material
10    aspects of the transaction, the material
11    aspects of the transaction as modified at the
12    hearing on the 19th of September.
13        **Q.    Do you believe that the foreign
14    subsidiary assets were transferred or were not?**
15        A.    Well, the court was told on the 19th
16    that they were being transferred, so I assume
17    they were being transferred.
18        **Q.    But you do not reflect any value for
19    that on page 7?**
20        A.    Well, I explained why to you.  That
21    this chart, as you and I have discussed on a
22    number of occasions during this deposition,
23    reflects what was disclosed to the court, and
24    the court had described for it the material
25    elements of the transaction.  This chart

TSG Reporting - Worldwide    877-702-9580

Page 189

1        Harrison Goldin
2    captures those material elements that were
3    disclosed to the court and captures what the
4    values were that were disclosed to the court as
5    modified at the hearing on September 19th.
6        **Q.    How did you determine what was
7    material for purposes of creating the chart?**
8        MR. OXFORD:  Object to the form.
9    Misstates the witness' testimony.
10        A.    It was not I who determined what was
11    material.  It was counsel which determined what
12    was material.
13        **Q.    Well, you created the chart;
14    correct?**
15        A.    Yes, based on the disclosures to the
16    court.
17        **Q.    You say the chart captures the
18    material elements that were disclosed to the
19    court.  How did you determine what was
20    material?**
21        A.    Well, if you are trying to focus me
22    on a specific issue in the transcript, perhaps
23    we can look at the language of the transcript.
24        **Q.    I am trying more to understand what
25    financial value you considered material, and**

TSG Reporting - Worldwide    877-702-9580

Page 190

Harrison Goldin

1    **the reason why is because you have, for**
2    **instance, on here a liability of 250 million,**
3    **which is clearly less than 500 million. You**
4    **have another one for 330 million. So I am**
5    **trying to understand if there is a cut-off that**
6    **you considered to be material or if what -- or**
7    **if you only included as material assets those**
8    **for which exact values were described to the**
9    **court.**
10    MR. OXFORD:  Objection to form.
11    You can answer.
12    A.   I'm afraid that, I know it's late in
13    the day, that you may be confusing what I
14    indicated were the material aspects of the
15    transaction that were disclosed to the court
16    and the judgement as to materiality was made by
17    counsel and the changes to those material
18    elements.  It was respecting the changes to
19    those material elements that the court
20    introduced the notion of materiality as a
21    benchmark represented by $500 million.  So the
22    material aspects of the transaction by the
23    determination of counsel included the
24    $250 million that was being paid for the

Page 191

Harrison Goldin

1    intangible assets, the goodwill and the going
2    concern value.  Clearly that was less than
3    $500 million.  The admonition of the court on
4    the 19th of September was that if that number
5    changed by $500 million, the court would regard
6    that as material.  So the $500 million
7    benchmark figure applies to changes made to the
8    material aspects of the transaction that had
9    been previously described to the court.
10    **Q.   Did you ever hear the transaction**
11    **described to the court as a wash?**
12    A.   Well, as you will note in my report,
13    I have a footnote in which I indicate that the
14    characterization of the transaction to the
15    board of directors of Lehman on the 16th of
16    September, as I remember, included a reference
17    to it as a wash.  I don't remember seeing that
18    term applied during either of the hearings on
19    the 17th or the 19th of September.
20    **Q.   Do you consider a negative net value**
21    **of 1.85 billion to be a wash?**
22    A.   I don't second-guess the court's
23    conclusion that it represented reasonably
24    equivalent value and that it represented fair

Page 192

Harrison Goldin

1    consideration.  That was the court's finding as
2    reflected in its order.
3    **Q.   So if it were, in fact, a net gain**
4    **of $1.85 million, that would be within the**
5    **range of what would be considered reasonably**
6    **equivalent value based on the court's decision**
7    **in your analysis?**
8    MR. OXFORD:  Object to the form of
9    the question.  Misstates the witness'
10    testimony.
11    MS. CARRERO:  Objection.
12    MR. KAY:  Same Objection.
13    A.   That's not what I testified to, and
14    the court's finding as to fair consideration
15    and reasonably equivalent value is based on the
16    record before it and the record before it shows
17    a delta of liabilities exceeding assets by
18    $1.85 billion, not assets exceeding liabilities
19    by $1.85 billion.
20    **Q.   Is there anything in the court's**
21    **order that requires there to be net negative**
22    **value to Barclays in the transaction?**
23    A.   The court specifically references in
24    its order, as best I recollect, the record that

Page 193

Harrison Goldin

1    was before it.  As best I recollect, the court
2    does not go through the elements, doesn't
3    recite what it had represented to it at the
4    various hearings, but it references the record
5    and the record makes clear what the assets were
6    that was -- the court was told were being
7    transferred and what the liabilities the court
8    was told were being assumed.
9    **Q.   If the assets and liabilities turned**
10    **out to cancel each other out, net gain of zero,**
11    **net loss of zero, would that be consistent with**
12    **the court's order?**
13    MR. OXFORD:  Object to the form.
14    A.   The court had a specific set of
15    facts before it when it issued the order.  If
16    you ask me what the court's decision would have
17    been on a different set of facts, the answer is
18    I do not know.
19    **Q.   So you don't know the range of**
20    **variation in value that the court considered to**
21    **be reasonably equivalent value?**
22    A.   The court did not address range.
23    The court addressed the record before it, and
24    the record before it in material respect is

Page 194

Harrison Goldin

1  Harrison Goldin
2  referenced on the left side of my chart on
3  page 7 of my report.
4      **Q.   Do you believe that based on the**
5  **record the court required a negative net value**
6  **to Barclays?**
7      A.   Again, I can't answer the question
8  any better than I have, which is that the court
9  considered the record, concluded that based on
10  that record there was reasonably equivalent
11  value, that there was fair consideration, and
12  that record shows a delta between assets and
13  liabilities of a billion 850 million dollars
14  and liabilities exceed assets.
15      **Q.   And in your view it was reasonable**
16  **for the judge to determine that that delta was**
17  **reasonably equivalent value?**
18      A.   I testified to you earlier in this
19  deposition I have no reason to question the
20  court's findings or conclusions.
21      **Q.   We talked briefly about the PIM**
22  **assets.  My understanding from your report is**
23  **that the PIM assets were described as having**
24  **assets that were very equal to liabilities;**
25  **correct?**
    TSG Reporting - Worldwide    877-702-9580

Page 195

1      **Harrison Goldin**
2      A.   Can you refer me to the page of the
3  report to which you are referring to.
4      **Q.   Sure.  Page 28.**
5      A.   Yes.  What is your question, please?
6      **Q.   My question is why did you not**
7  **include both the assets and the liabilities in**
8  **your chart on page 7?**
9      A.   Well, can we refer to the transcript
10  on the 19th of September in which there is a
11  discussion between counsel and the court
12  respecting the PIM element to this transaction?
13      **Q.   Sure.**
14      A.   And do you know what page that is,
15  please?
16      **Q.   I do not offhand.**
17      MR. MILLS:  I believe it's 47.
18      MS. NEUHARDT:  Thank you.  Of the
19  PIM?
20      A.   I don't think so.
21      MS. NEUHARDT:  47 is the --
22      MR. KAY:  48.  48, 14.
23      A.   Okay.  What is your question,
24  please?
25      **Q.   My question is why did you not**
    TSG Reporting - Worldwide    877-702-9580

Page 196

1      **Harrison Goldin**
2  **include on your chart on page 7 a line for the**
3  **assets being transferred with the PIM business**
4  **and a line for the liabilities being**
5  **transferred for the PIM business?**
6      A.   Well, I think the answer is
7  self-evident from the transcript.  Counsel
8  advises the court that there are two
9  subsidiaries that relate to a business called
10  PIM or private investment management business,
11  which is a business that was not part of the
12  original deal but is now being purchased by
13  Barclays.  The court then asks "for no
14  additional consideration?"  Ms. Fife:  "That's
15  correct, Your Honor."  The court then asks,
16  quite tellingly in my view, "and what's that
17  business worth?"  The court is very interested
18  in the value.  Miss Fife:  "It's essentially
19  just people, Your Honor.  It's the high net
20  worth individual brokerage business and it's
21  just really just the people who are in those
22  offices."  The court:  "And their Rolodexes."
23  Miss Fife:  "And their Rolodexes, exactly.  The
24  customer accounts were being transferred
25  anyway."  To me that connotes that there was an
    TSG Reporting - Worldwide    877-702-9580

Page 197

1      Harrison Goldin
2  indication that this asset was being
3  transferred but that its value was negligible.
4      **Q.   On page 28 when you talk about the**
5  **PIM assets you appear to acknowledge that the**
6  **customer receivables had a value of**
7  **1.59 billion and there was a PIM deposit with a**
8  **value of 320 million and then there is a**
9  **liability line of customer payments at 1.93**
10  **billion.  So there is value, it's just**
11  **cancelled out by liability; correct?**
12      A.   With respect, this discussion in my
13  report relates to the Acquisition Balance
14  Sheet.  The Acquisition Balance Sheet reflects
15  what Barclays asserts it acquired or was
16  entitled to on the day of the closing on the
17  22nd of September, 2008.  The left side of that
18  table on page 7 represents what was disclosed
19  to the court about assets and liabilities.  So
20  the discussion that I have on page 28 relates
21  to an explication of the Acquisition Balance
22  Sheet.  It does not relate to what was
23  disclosed to the court as reflected on the left
24  side of that table on page 7.
25      **Q.   So because Miss Fife didn't**
    TSG Reporting - Worldwide    877-702-9580

**Harrison Goldin**

1  **explicitly say the assets cancel out the**
2  **liabilities, you chose not to put it on the**
3  **chart?**
4      A.   Oh, no, no, no, no.  I don't think
5  that's a fair characterization of what --
6      **Q.   Okay.  I am just trying to**
7  **understand what you are saying.**
8      A.   It's a distortion of what I have
9  said.
10     **Q.   I am trying to understand what you**
11 **are saying.**
12     A.   Well, let me try to explain it to
13 you again.
14     **Q.   Okay.**
15     A.   I read you the colloquy between the
16 court and Miss Fife.  I could read it to you
17 again.  But let's assume that it's incorporated
18 in my answer at this point by reference.  Under
19 the circumstances what was communicated to the
20 court where changes that were material were
21 being described to the court that there was no
22 materiality to the description involving PIM,
23 and the court deliberately probed whether there
24 was materiality and received by way of reply an

Harrison Goldin

1  indication that there was no materiality.  So
2  it is not reflected in my table on page 7.  It
3  is reflected in the Acquisition Balance Sheet
4  on page 7 because the accountants who prepared
5  the Acquisition Balance Sheet for Barclays were
6  reflecting their view of the assets and
7  liabilities involved in the transaction to
8  Barclays at the time of the closing on the 22nd
9  of September.  There is a significant
10 difference between the two.
11     **Q.   Did you consider the change in the**
12 **real estate value that was described to the**
13 **court on the 19th to be material?**
14     A.   Well, it wasn't that I considered it
15 to be material.  Counsel considered it to be
16 material and so described it.
17     **Q.   So your basis of what was material**
18 **is purely based on what counsel described at**
19 **the hearing?**
20         MR. OXFORD:  Objection to form.
21     Misstates his testimony.
22     A.   You had two hearings; one on the
23 17th of September, one on the 19th of
24 September, at which the court asked in

Harrison Goldin

1  substance for a presentation on the material
2  elements of the transaction.  They were
3  described by counsel.  On the 19th of September
4  counsel volunteered what the changes to the
5  material elements of the transaction were.  So
6  my table on page 7 reflects what was reported
7  to the court.  The Acquisition Balance Sheet,
8  again I will remind you, relates to what
9  Barclays asserts were the elements that it
10 received on the 22nd of September or to which
11 it claims it was entitled, the liabilities that
12 it assumed, insofar as its accountants
13 determined those needed to be recorded for
14 accounting purposes to the SEC.
15     **Q.   Did you do any independent**
16 **determination of whether or not the elements**
17 **described to the court on the 19th were, in**
18 **fact, all of the material elements that were**
19 **changed?**
20     A.   No.
21     **Q.   Is it your understanding that**
22 **Barclays could have received assets that were**
23 **immaterial changes that added up to up to 500**
24 **million under the deal that was approved by the**

**Harrison Goldin**

1  **court?**
2      MR. OXFORD:  Objection to form.
3      MR. KAY:  Same objection.
4      A.   I don't really understand the
5  question.
6      **Q.   You said earlier that you did not**
7  **include items on here that were not disclosed**
8  **to the court as material; correct?**
9      A.   That's correct.
10     **Q.   Okay.  And you said that the court**
11 **admonished that he would consider anything over**
12 **500 million to be material; correct?**
13     A.   Any change.
14     **Q.   Any change.**
15     A.   Yes.  We have been over this several
16 times.  It's change.  It's important to
17 understand that.
18     **Q.   I understand.  I have been with this**
19 **transaction for way too long.**
20         **Is it your understanding that there**
21 **could have been immaterial changes in the**
22 **transaction that resulted in a gain of up to**
23 **500 million for Barclays that would not have**
24 **been considered inconsistent with what the**

Page 202

**Harrison Goldin**
**judge approved?**
     MR. OXFORD:  Objection to form.
     A.   I have no way of knowing that,
because what I do know is that the judge issued
an order based on the record and the record
reflects what the material elements of the
transaction were and what the values were and
the court admonished counsel at the hearing
that if there were changes of $500 million or
more, they were material.  Now, I don't think
there was any reasonable basis for presuming
that in a hearing at which all of the parties
were present that should not have been
understood by counsel to mean that if there are
changes that aggregate $500 million, I'd like
you to, please, tell me about them when you are
describing to me the material changes in the
major elements of the transaction.
     Q.   I understand.  But are you saying
that they were required to stand up and say
every change that was resulting in a gain if
they did not add up to less than -- to
$500 million?
     A.   Well, what they were required to do
TSG Reporting - Worldwide     877-702-9580

Page 203

Harrison Goldin
is not for me to say.  What the judge said I
can read and the judge said "I would regard" --
we can read the precise language.  "I regard
any change of $500 million or more as
material."
     Q.   You acknowledge that the court said
that modifications were acceptable as long as
there were no material changes?
     A.   I never said any such thing.
     MR. KAY:  Objection.
     Q.   Let's go back to the sale order,
paragraph 25.  You have read it to me a couple
of times.
     A.   Yes.
     Q.   "The purchase agreement and any
related agreements may be modified, amended or
supplemented by the parties thereto in a
writing signed by such parties in accordance
with the terms thereof without further order of
the court provided that any such modification,
amendment or supplement does not have a
material adverse effect on the Debtors' estates
and has been agreed to between the committee,
the Debtors and the purchaser."
TSG Reporting - Worldwide     877-702-9580

Page 204

**Harrison Goldin**
     A.   The court stated that.  Not I.
     Q.   I understand, but you are purporting
in your chart to put down what you believe was
the transaction disclosed to the court, and I
believe you testified that the sale order was
part of what you consider the disclosure.
     A.   No, I think you have it wrong.
     THE WITNESS:  Did you want to
object?
     MR. OXFORD:  I was objecting.
     A.   No, I think you have it wrong.  You
have mischaracterized my testimony.  I know you
didn't mean to, but you have.  I indicated that
the sale order reflects that it is founded on,
that it's based on the record that was before
the court.  The sale order is not the record.
What the sale order is based on is the record.
And my chart doesn't purport to do anything.
What my chart does is set forth what was
disclosed to the court as the major elements of
the transaction.  That's what it does.
     Q.   Okay.  Well, thank you for
clarifying that.
     So you were not taking into account
TSG Reporting - Worldwide     877-702-9580

Page 205

**Harrison Goldin**
**the contents of the sale order when creating**
**your chart on page 7?**
     A.   I understood and continue to
understand that the sale order reflects what
was represented to the court, and what was
represented to the court was that these were
the values of assets and liabilities involved
in the transaction.
     Q.   Doesn't the sale order also reflect
that modifications could occur without further
court approval?
     A.   It says if they don't have a
material adverse effect on the Debtors'
estates.
     Q.   I understand.  But doesn't that mean
that changes could happen that did not have a
material adverse change?
     A.   Well, I am not here as a lawyer.  I
have a license, but I haven't practiced in many
years and I don't consider myself qualified to
practice law and to interpret judicial orders,
but it says what it says and it says, in
effect, that the sale order is approved in
other places in the order based on the record
TSG Reporting - Worldwide     877-702-9580

Page 206

Harrison Goldin

1    Harrison Goldin
2    before the court and it says that related
3    documents, agreements or other instruments may
4    be modified, amended or supplemented by the
5    parties if they agree to them so long as they
6    don't have a material adverse effect on the
7    Debtors' estates.
8        **Q.  Okay.  And you have discussed that**
9    **the court admonished that he would consider 500**
10   **million to be material; correct?**
11       A.  Well, I think it's useful to go to
12   the transcript, and if you will permit me to, I
13   may be able to find you where the court invoked
14   the $500 million reference.  I seem to remember
15   that it was in connection with the discussion
16   of the PIM, but I may be mistaken.
17       (Document review.)
18       A.  Here it is.  I found it for you.
19       **Q.  What page are you on?**
20       A.  I found it for you.  I thought I had
21   found it for you.
22       MR. KAY: It's 54.
23       A.  Page 54.  Okay.  I wasn't far from
24   it, but -- close but no cigar, as they say.
25   Here it is.
    TSG Reporting - Worldwide    877-702-9580

Page 207

Harrison Goldin

1    Harrison Goldin
2    MR. KAY:  At the bottom.
3        A.  Yes.  Debtors' counsel says to the
4    court: "Those are the major changes to the
5    transaction.  There were some other
6    clarifications that we made, but I don't
7    consider them material, Your Honor."  The
8    court: "I still consider $500 million
9    material, though."  Miss Fife: "Yes."
10       **Q.  So having read that and looking at**
11   **paragraph 25 of the court order, do you believe**
12   **that the record before the court disclosed that**
13   **there could be modifications that would allow**
14   **Barclays to have additional value up to**
15   **$500 million?**
16       A.  I think one could so infer.
17       **Q.  Let's go to the APA and turn to page**
18   **14.**
19       A.  Yes, ma'am.
20       **Q.  Article 3 is entitled Consideration;**
21   **correct?**
22       A.  Yes.
23       **Q.  And you consider the APA to be part**
24   **of the record before the court; correct?**
25       A.  Yes.
    TSG Reporting - Worldwide    877-702-9580

Page 208

Harrison Goldin

1    Harrison Goldin
2        **Q.  On your chart on -- strike that.**
3        **The first section within that**
4    **article, 3.1, states that the aggregate**
5    **consideration for the purchased assets shall be**
6    **cash amount, which is then defined as the 250**
7    **million and a value based on the real estate**
8    **property and the assumption of the assumed**
9    **liabilities; correct?**
10       A.  Yes, I see that.
11       **Q.  Do you have an understanding of what**
12   **the assumed liabilities were?**
13       A.  Well, there is a section of the APA
14   which is styled Assumed Liabilities.  I believe
15   it's on page 11.
16       **Q.  Yes.  The definition of assumption**
17   **of liabilities has many subparts.  The first**
18   **one, however, is "all liabilities of seller**
19   **incurred after the closing in connection with**
20   **the business."**
21       **Did you understand that liability to**
22   **transfer to Barclays?**
23       A.  Well, I understood that this
24   document was supervised by an experienced
25   bankruptcy lawyer.  I seem to remember that
    TSG Reporting - Worldwide    877-702-9580

Page 209

Harrison Goldin

1    Harrison Goldin
2    Mark Shapiro of Lehman said that he, in his
3    word, quarterbacked the creation of this
4    document and what I assumed, therefore, was
5    that it reflected his understanding that in a
6    transaction of this kind the court needed to be
7    assured as to the finality of the obligations
8    of the Debtor estate, of the Lehman estate, and
9    what this confirms is that once this going
10   concern is transferred to Barclays and the
11   transaction consummates, closes, that all of
12   the ensuing liabilities thereafter are
13   apertinent to the ongoing -- apertinent to the
14   going concern and, therefore, assumed by
15   Barclays.
16       **Q.  So your answer is yes, that this**
17   **liability was transferred?**
18       A.  Well, we could read back my answer.
19       **Q.  It says you assumed that this**
20   **reflected his understanding that the court**
21   **needed to be assured as to the finality of the**
22   **obligations, and what this confirms is that**
23   **once the going concern is transferred to**
24   **Barclays and the transaction consummates, that**
25   **all the liabilities thereafter are apertinent**
    TSG Reporting - Worldwide    877-702-9580

Page 210

Harrison Goldin

1
2 to the going concern and, therefore, assumed by
3 Barclays.
4         Did you make any effort to value
5 this liability?
6    A.   No.
7    Q.   And it's not on your chart on
8 page 7?
9    A.   No, of course not.  I want to remind
10 you that the material elements of the
11 transaction were described to the court and it
12 was the officers of the court in making
13 representations to the court who assumed an
14 obligation to delineate the material aspects of
15 the transaction.
16    Q.   Your chart on page 7, the right
17 side, I just want to be sure, because I think
18 there was maybe a little confusing testimony.
19 Is this based on Mr. Pfleiderer's chart on or
20 Exhibit 377A in front of you?
21    A.   Well, the right side of the chart,
22 which says Acquisition Balance Sheet
23 Categories, is based on the Acquisition Balance
24 Sheet that was filed by Barclays.
25 Mr. Pfleiderer, or we assumed it was

TSG Reporting - Worldwide    877-702-9580

Page 211

Harrison Goldin

1 Pfleiderer, Mr. Pfleiderer then adjusted the
2 Acquisition Balance Sheet in ways that are not
3 reflected on page 7.
4    Q.   Okay.  So this is -- this does not
5 include Pfleiderer?
6    A.   This is the raw material, as it
7 were, with which Mr. Pfleiderer worked and he
8 then adjusted the Acquisition Balance Sheet,
9 and it was the Acquisition Balance Sheet as
10 adjusted by Mr. Pfleiderer, or Mr. Pfleiderer,
11 that formed the basis for my opinion.
12    Q.   Okay.  And did you make any
13 adjustments to the figures as entered on 377A?
14    A.   Which is 377A?  The Acquisition
15 Balance Sheet?
16    Q.   Yes, and you should have it in front
17 of you.
18    A.   No, I did not.
19    Q.   Okay.  Now, your delta, is that the
20 difference between the net gain and loss on
21 377A and your 1.85 million -- billion dollar
22 net loss that you have calculated on the left
23 side of the chart?
24    A.   Well, let's be --

TSG Reporting - Worldwide    877-702-9580

Page 212

Harrison Goldin

1
2    MR. OXFORD:  Object to form.  Asked
3 and answered.  It misstates his testimony.
4         But you can answer.
5    A.   Let's be sure we are clear.  We are
6 talking in this context, broadly speaking,
7 about more than one delta.  The delta to which
8 I think you have referenced is the delta
9 between assets and liabilities as reported to
10 the court and assets and liabilities as
11 reflected on the adjusted Acquisition Balance
12 Sheet, and that delta is $4,850,000,000, at
13 least.  Because I reported to you earlier that
14 other experts have done analyses which suggest
15 that the number may be much bigger, but I said
16 to you that that's beyond my purview.  My
17 purview relates to the professor's adjusted
18 Acquisition Balance Sheet in relation to what
19 was reported to the court.
20    Q.   Okay.  Let's go to page 9 of your
21 report, because maybe that will help clarify
22 the delta.
23    A.   Yes, ma'am.
24    Q.   Okay.  The first full sentence
25 says --

TSG Reporting - Worldwide    877-702-9580

Page 213

Harrison Goldin

1
2    A.   The first what, please?
3    Q.   Full sentence, so not the
4 carry-over.  "But given the court's approval of
5 the" -- "given that the court's approval of the
6 transaction was conditioned on no material
7 subsequent changes to the deal and that the
8 court indicated that it would consider a
9 $500 million change material, an increase of
10 over 6 billion in Barclays take from the
11 transaction (from minus 1.85 billion to plus
12 41.7 billion) cannot be considered anything
13 other than material," and then you go on to
14 describe the 4.85 billion, but that, as I
15 understand your report, is related to
16 Mr. Pfleiderer's analysis; correct?
17    A.   Yes.
18    Q.   Okay.  So what's on page 7 is where
19 you get the $6 billion figure?
20    A.   If you take the unadjusted
21 Acquisition Balance Sheet and relate that to
22 the delta respecting the disclosures that were
23 made to the court, you get to what I call in
24 the report in quotes Barclays' take of
25 $6 billion, but for purposes of my opinion, I

TSG Reporting - Worldwide    877-702-9580

Page 214

1            Harrison Goldin
2    accepted, without agreeing or disagreeing,
3    Professor Pfleiderer's adjusted Acquisition
4    Balance Sheet which gives rise to the delta of
5    $4,850,000,000.
6        Q.    Okay.  So let's break down the 6
7    billion and the 485 deltas.  The 6 billion
8    delta is the difference between Exhibit 377A
9    and your left two columns.
10        A.    Well, I don't want to introduce an
11    element of confusion here.  The $6 billion is
12    the difference between the delta that was
13    reported to the court --
14        Q.    The 1.85 billion?
15        A.    Correct, and the unadjusted
16    Acquisition Balance Sheet disparity between
17    assets and liabilities as reported, of course,
18    by Barclays.  That is a $6 billion figure.
19        Q.    Okay.
20        A.    That figure, as you will note from
21    my report, is then transmuted into the delta
22    that arises from my having analyzed and
23    accepted without agreeing or disagreeing with
24    the adjustments Professor Pfleiderer made to
25    the Acquisition Balance Sheet, and that's what
         TSG Reporting - Worldwide    877-702-9580

Page 215

1            Harrison Goldin
2    gives rise to the $4.85 billion delta, which,
3    as I said to you a couple of times already,
4    could conceivably be even much bigger.
5        Q.    Okay.  So I understand your answer
6    as to the 6 billion delta.  If you were to have
7    done a chart on page 7 where the right-hand
8    column was Pfleiderer instead of 377A, then the
9    delta between your 1.85 billion and the
10    right-hand charge would be 4.85 billion?
11        A.    That's one way of characterizing the
12    issue.
13        Q.    Is there any other calculation in
14    the 6 billion delta than subtracting 4.12 from
15    negative 1.85?
16        MR. OXFORD:  I think you mean 4.17.
17        A.    Yeah, but she is rounding it to 4.2,
18    aren't you?
19        Q.    We can use the exact number.
20        A.    Well, we can round it to 4.2, but I
21    think I understand the point, and the point is,
22    yes, the delta between the unadjusted
23    Acquisition Balance Sheet reflection of
24    disparities between asset and liabilities and
25    the disparity that was reported to the court
         TSG Reporting - Worldwide    877-702-9580

Page 216

1            Harrison Goldin
2    between assets and liabilities is approximately
3    $6 billion.
4        Q.    Okay.  And that's just a function of
5    subtracting one figure from the other?
6        A.    It's a function of simple
7    arithmetic.
8        Q.    Okay.  Is the same true for the
9    comparison that leads to the $4.85 billion
10    delta?
11        A.    Well, for that I accepted Professor
12    Pfleiderer's, Pfleiderer's, assertion
13    respecting the appropriate basis for
14    calculating the difference between assets and
15    liabilities to which Barclays claims it was
16    entitled without agreeing or disagreeing with
17    them, as I've told you, and comparing that
18    delta to the delta that derives from what was
19    reported to the court.
20        Q.    And that's also simple arithmetic?
21        A.    Simple arithmetic.
22        MS. NEUHARDT:  I might be close.  In
23    fact, let's take a five-minute break and we
24    might be able to just finish up.
25        THE VIDEOGRAPHER:  Off the record.
         TSG Reporting - Worldwide    877-702-9580

Page 217

1            Harrison Goldin
2    3:08 p.m.
3        (Recess was taken from 3:08 to
4    3:25.)
5        THE VIDEOGRAPHER:  Back on record.
6    3:25 p.m.
7        MS. NEUHARDT:  Thank you,
8    Mr. Goldin.  I have no further questions.
9        (Continued on next page to include
10    jurat.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
         TSG Reporting - Worldwide    877-702-9580

Page 218

1          Harrison Goldin
2          THE WITNESS:  Thank you.
3          MS. NEUHARDT:  Any questions from
4     other counsel?
5          MR. OXFORD:  No questions.
6          MS. CARRERO:  No questions.
7          MR. KAY:  No questions.
8          THE VIDEOGRAPHER:  Going off the
9     record.  3:25 p.m.  This is the end of
10    disk 4, concludes today's deposition of
11    Harrison J. Goldin.
12         (Time noted:  3:26 p.m.)
13
14
15         ---------------------
16         HARRISON J. GOLDIN
17
18    Subscribed and sworn to before me
19    this     day of          2010.
20
21    ---------------------------------------
22
23
24
25

TSG Reporting - Worldwide    877-702-9580

Page 219

1
2          C E R T I F I C A T E
3
4     STATE OF NEW YORK   )
5                       ) ss.:
6     COUNTY OF NASSAU   )
7
8          I, KRISTIN KOCH, a Notary Public
9     within and for the State of New York, do
10    hereby certify:
11         That HARRISON J. GOLDIN, the witness
12    whose deposition is hereinbefore set
13    forth, was duly sworn by me and that such
14    deposition is a true record of the
15    testimony given by such witness.
16         I further certify that I am not
17    related to any of the parties to this
18    action by blood or marriage; and that I am
19    in no way interested in the outcome of
20    this matter.
21         IN WITNESS WHEREOF, I have hereunto
22    set my hand this 16th day of April, 2010.
23    ------------------------
24         KRISTIN KOCH, RPR, RMR, CRR, CLR
25

TSG Reporting - Worldwide    877-702-9580

Page 220

1
2     ------------------I N D E X-----------------
3
   WITNESS          EXAMINATION BY      PAGE
4
5  HARRISON J. GOLDIN   MS. NEUHARDT      7
6
   -------------------EXHIBITS------------------
7
8  NUMBER                PAGE LINE
9
   Exhibit 710A
10 Expert Report of Harrison J.
   Goldin, March 15, 2010............... 6   2
11
   Exhibit 711A
12 A.136, letter dated July 16, 2009
   with attached spread sheet Bates
13 stamped BCI-EX-00077272 through
   BCI-EX-00077287..................... 175  2
14
15 ------------------REQUESTS-----------------
16
   Page 15   Matters of previous testimony in the
17         last four years
18    28   Number of hours spent on retention
19    32   Amount billed overall to date
20
21
22
23
24
25

TSG Reporting - Worldwide    877-702-9580

Page 221

1
2     ERRATA SHEET FOR THE TRANSCRIPT OF:
3     Case Name:    In re: Lehman Brothers
   Dep. Date:    April 16, 2010
4  Deponent:    Harrison J. Goldin
5          CORRECTIONS:
6  Pg. Ln. Now Reads    Should Read   Reason
7  ___ ___ _____   _____  _____
8  ___ ___ _____   _____  _____
9  ___ ___ _____   _____  _____
10 ___ ___ _____   _____  _____
11 ___ ___ _____   _____  _____
12 ___ ___ _____   _____  _____
13 ___ ___ _____   _____  _____
14 ___ ___ _____   _____  _____
15 ___ ___ _____   _____  _____
16 ___ ___ _____   _____  _____
17 ___ ___ _____   _____  _____
18
19         _____
20         Signature of Deponent
21 SUBSCRIBED AND SWORN BEFORE ME
22 THIS____DAY OF_____, 2010.
23
24 _____
25 (Notary Public)  MY COMMISSION EXPIRES:_____

TSG Reporting - Worldwide    877-702-9580

# Exhibit P

**Contains Highly Confidential Information**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

LEHMAN BROTHERS HOLDINGS, INC.*, et al.,*

Debtors.

Chapter 11

Case No. 08-13555

(Jointly Administered)

Expert Report of

Mark E. Zmijewski

March 15, 2010

**Contains Highly Confidential Information**

# TABLE OF CONTENTS

I.   Introduction ........................................................................................................... 1

II.  Summary of Qualifications .................................................................................. 2

III. Summary of Opinions .......................................................................................... 3

IV.  Opinions ............................................................................................................... 9

    A.   Results of Movants' Independent Valuations of Repurchase
    Agreement Securities Documenting Barclays' Undervaluation of
    These Securities .......................................................................................... 9

        1.  Valuation of Equities ...................................................................... 11

        2.  Valuations of Navigant Economics (Chicago Partners) Valuation
        Experts ............................................................................................. 13

    B.   The Pfleiderer Report's Failure to Compare the Court-Approved
    Transaction to the Transaction That Actually Occurred – The
    Barclays Windfall ...................................................................................... 13

    C.   Effect of Alternate Marks on the Value of Assets in the Initial
    Inventory and JPM Inventory and Specifically on the Value of the
    Repo Collateral .......................................................................................... 17

        1.  Effect of Using December 22, 2008 as the Date to Value Certain
        Assets Acquired in the Sale Transaction rather than the Date
        Barclays Had Ownership of Those Assets ...................................... 17

        2.  The Effect of Using Lehman, BoNY, and JPMorgan Price Marks
        to Value the Assets Received and Barclays Windfall as Calculated
        by the Pfleiderer Report .................................................................. 19

    D.   Analysis of Lehman's Mortgages Acquired by Barclays ......................... 22

    E.   Pfleiderer Report's Opinions (in Section II) Regarding the "Alleged
    $5 Billion Discount in the Fed Replacement Repo" Are Flawed and
    Unsupported ............................................................................................... 24

        1.  The Pfleiderer Report's Opinion Regarding the "Price" of the Repo
        Portfolio is Flawed and Incorrect .................................................. 25

        2.  The Pfleiderer Report Inappropriately Rejects Considering
        Contemporaneous Valuations of "the Repo Collateral" Contained
        in Email Communications, Email Attachments, and Deposition
        Testimony ........................................................................................ 26

        3.  The Pfleiderer Report's Rejection of the Lehman, BoNY, and
        JPMorgan Price Marks to Value the Repo Collateral Is Flawed and
        Unsupported .................................................................................... 27

        4.  The Pfleiderer Report's Ex-Post Analysis Is Flawed and
        Unsupported .................................................................................... 38

**Contains Highly Confidential Information**

## TABLE OF CONTENTS

5. The Pfleiderer Report's Analysis in Appendix Four Is Flawed and
   Unsupported ..................................................................................................... 41

6. Overall Conclusion Regarding the Opinions in Section II of the
   Pfleiderer Report ............................................................................................. 49

F. Pfleiderer Report's Opinions in Section III Related to the "Alleged $5
   Billion Discount at Inception" Are Flawed and Unsupported.................................. 50

G. Pfleiderer Report's Opinions in Section IV Related to "Risks Arising
   from the Acquisition" Are Flawed ........................................................................... 52

H. Pfleiderer Report's Opinions in Section V Related to "Barclays'
   Accounting Gain on the Acquisition" Are Flawed.................................................... 55

   1. Pfleiderer Report's Flawed Analysis in Exhibit 8 ........................................... 56

   2. The Pfleiderer Report is Flawed Regarding the Term *Book Value*................. 57

I. Pfleiderer Report's Opinions in Section VI Related to "Benefits of the
   Acquisition" Are Flawed .......................................................................................... 57

**Contains Highly Confidential Information**

## LIST OF EXHIBITS AND APPENDICES

### EXHIBITS

| | |
|---|---|
| Exhibit A-1: | Undervaluation of Equity by Barclays as of September 19, 2008 |
| Exhibit A-2: | Summary of Valuations of Experts |
| Exhibit B-1: | Calculation of Barclays Windfall |
| Exhibit B-2: | Calculation of Barclays Windfall – from Barclays' Acquisition Gain/Negative Goodwill, As Reported |
| Exhibit C-1: | Alternative Valuations of JPM Inventory Using Barclays 9-30 Exit Price Marks and JPM Custodial Price Marks |
| Exhibit C-2A: | Alternative Valuations of Initial Inventory Using Barclays 9-19 Exit Price Marks and BoNY Custodial Price Marks |
| Exhibit C-2B: | Alternative Valuations of Selected Securities in the Initial Inventory Using Barclays 9-19 Exit Price Marks and BoNY Custodial Price Marks |
| Exhibit C-3: | Excess of the "Fair Value of All Assets Received" over $45 Billion of the Federal Reserve/Barclays Repurchase Agreement Assets |
| Exhibit D-1: | Lehman "Mortgage and Mortgage Backed" Assets Acquired by Barclays |
| Exhibit E-1: | September 18, 19, and 20, 2008, Valuations of Federal Reserve/Barclays Repurchase Agreement Assets in Various Documents |
| Exhibit E-2: | Pricing coverage of Initial Inventory in Bloomberg, Capital IQ, and Interactive Data |
| Exhibit E-3: | Frequency of Price Changes in GFS from September 12 through September 19, 2008 |
| Exhibit E-4: | Sample of Securities Discussed in Pfleiderer Report Appendix 4 Represents Less than 9% of Assets in the Initial Inventory |
| Exhibit F-1: | Incomplete Coverage in GFS for Initial and JPM Inventory on September 12, 2008 |

### APPENDICES

| | |
|---|---|
| Appendix I: | Mark E. Zmijewski Curriculum Vitae |
| Appendix II: | Documents Relied Upon |

Contains Highly Confidential Information

## I.    INTRODUCTION

1.      This report is submitted by Mark E. Zmijewski, the Leon Carroll Marshall Professor of Accounting and Deputy Dean at The University of Chicago Booth Graduate School of Business. I am also a founder and principal of Navigant Economics (Chicago Partners), a subsidiary of Navigant Consulting, Inc., which is an economics consulting firm that specializes in the application of accounting, economics, and finance to business consulting, legal, and regulatory issues.  I discuss my qualifications in more detail in Section II and present my curriculum vitae in Appendix I.

2.      I have been asked by counsel for the Movants to review and respond to the report of Barclays' valuation expert, Professor Paul Pfleiderer, dated January 8, 2010 (the "Pfleiderer Report"), which does not independently value any of the securities at issue, but accepts Barclays' methodologies and procedures, and uses Barclays' data almost exclusively, and to render any opinions that I form about that report, and analyze certain other related issues.[1, 2]  In preparing this report, I have reviewed various documents related to this issue, as cited in the text and footnotes in this report and exhibits and/or Appendix II.[3]

---

[1] I submit this report on behalf of (a) Lehman Brothers Holdings, Inc. (the "Debtor" or "LBHI"); (b) James W. Giddens, as Trustee for the Securities Investor Protection Act Liquidation of Lehman Brothers Inc. (the "Trustee"); and (c) the Official Committee of Unsecured Creditors of Lehman Brothers Holdings, Inc. and its affiliated debtors and debtors in possession (the "Creditors' Committee," and together with LBHI and the Trustee, the "Movants") in connection with Movants' motions filed under Federal Rule of Civil Procedure 60(b) (the "Rule 60(b) Motions").  In the Rule 60(b) Motions, Movants seek relief from the Order Under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) the Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, dated September 19, 2008 and signed on September 20, 2008, (the "Sale Order").  In the Sale Order, the Court approved the sale (the "Sale Transaction") of certain assets of LBHI, LB 745 LLC, and Lehman Brothers Inc. ("LBI," and together with LB 745 LLC and LBHI, the "Sellers," and together with LBHI's various other foreign and domestic affiliates, "Lehman") to Barclays Capital Inc. ("Barclays") in accordance with the terms set forth in an Asset Purchase Agreement, dated as of September 16, 2008, ("Asset Purchase Agreement" or "APA", (Deposition Exhibit 1)) and related agreements, modifications and purported "clarification[s]" thereof.  I note that the Asset Purchase Agreement (Deposition Exhibit 1) was modified by the First Amendment to the Purchase Agreement (Deposition Exhibit 24) and the "Clarification Letter" (Deposition Exhibit 25).  The Debtor, the Trustee, and the Creditors' Committee each filed complaints against Barclays in November 2009.

[2] According to paragraph 2 of the Pfleiderer Report, he was asked to analyze:  (i) "issues related to the structure and pricing of the Acquisition"; (ii) "the risks associated with the Acquisition"; (iii) "the valuation of certain assets and liabilities transferred to Barclays as part of the Acquisition"; (iv) "the benefits of the Acquisition for the LBHI and LBI estates, for Lehman's creditors and customers, and for the general public"; and (v) "the accuracy and thoroughness of Barclays' accounting for the Transaction."

[3] If I receive additional data, facts, or information, I will review, evaluate, and analyze these additional data, facts, or information as they become available, including, but not limited to, the report(s) of experts in this matter.  I may modify or supplement my report as necessary in response to any newly produced evidence or in rebuttal to any

---

**Contains Highly Confidential Information**

## II.    <u>SUMMARY OF QUALIFICATIONS</u>

3.      I specialize in the areas of accounting, economics, and finance as they relate to financial analysis, security analysis, and valuation.  I have been on the faculty of The University of Chicago Booth School of Business since 1984.  Currently, I am the Leon Carroll Marshall Professor of Accounting (since 1999) and Deputy Dean (since 1996) at The University of Chicago Booth School of Business.  I am also a founder and principal of Chicago Partners, a subsidiary of Navigant Consulting, Inc., an economics consulting firm that specializes in the application of accounting, economics, and finance to business consulting, legal, and regulatory issues.

4.      I was awarded my B.S. in 1976, my M.B.A. in 1981, and my Ph.D. with a major in accounting and minors in economics and finance in 1983, all from the State University of New York at Buffalo.  In addition to my positions on the faculty of the University of Chicago, I have taught at the State University of New York at Buffalo and at York University in Toronto, Canada.  I am the former Associate Dean for Ph.D. Studies and former Executive Director of the Center for Research in Securities Prices at The University of Chicago Booth School of Business.

5.      I have been an Associate Editor of The Accounting Review, and I have been on the Editorial Boards of both the Journal of Accounting Research and The Accounting Review.  In my research, I focus on firm valuation and the ways in which various capital market participants use information to value firms.  I have published various articles in academic journals in the area of accounting as it relates to financial economics.  In my teaching and consulting activities, I focus on (among other things) financial accounting, financial analysis, security analysis, firm valuation, solvency, lost profits calculations, and other damages analyses.  In my analyses of such issues, I regularly review and assess a company's strategies, business models, business plans, tactical plans (such as marketing plans and production plans), and external data related to these strategies, models, and plans.

6.      I have worked – either as a consultant or an expert – on issues that include the following: measuring marginal costs and profits; revenue recognition; assessing bankruptcy and solvency; preparing and assessing business plans; measuring interest rates and rates of returns; valuing

---

further opinions offered by Barclays' witnesses.  I also reserve the right to do a more comprehensive CUSIP-by-CUSIP valuation, if necessary, of those securities I did not independently value in preparing my report.

Contains Highly Confidential Information

companies, parts of companies, synergies/efficiencies, and intangible assets – such as patents – using widely accepted valuation methodologies and capital market assessments; assessing the effect of information disclosures on security prices; and measuring damages using widely accepted valuation methodologies and capital market assessments, in a variety of litigation contexts and industries.

7.     Navigant Economics (Chicago Partners) charges an hourly rate of $940 for my time. Other Navigant Economics (Chicago Partners) professionals, working under my direction and supervision, assisted in my analyses and Navigant Economics (Chicago Partners) was or will be compensated for their work at their customary hourly rates.  Our compensation is not contingent in any way upon the outcome of this matter.

8.     My qualifications, including my publications and my testimonial experience within the last four years, are detailed in my curriculum vitae, which is attached to this report in Appendix I.

### III.    SUMMARY OF OPINIONS

9.     As detailed in Section IV of my report, the conclusions and opinions throughout the Pfleiderer Report are generally unsupported by appropriate and reasonable analyses based on accepted methodologies, scientific methods, and accepted principles, applied reliably and consistently.  The lack of appropriate and reasonable analyses, and the insufficient support and foundation, results in flawed and inappropriate conclusions and opinions.  Further, the Pfleiderer Report contains various conclusions and opinions that should not be considered in the economic analysis of the Movants' claims.

10.     This section contains my overall opinions, including (i) Barclays' undervaluation of certain assets transferred to it in the Sale Transaction; (ii) quantification of the mortgage securities Barclays acquired from Lehman; and (iii) opinions related to the Pfleiderer Report.

11.     My analysis of Barclays' valuation of certain securities acquired in the Sale Transaction and of the Pfleiderer Report results in the following conclusions:

Contains Highly Confidential Information

**Opinion 1:** Movants engaged valuation experts with expertise in valuing certain types of securities that are at issue in this matter.[4]  These securities are assets in the Initial Inventory and the JPM Inventory, but do not include other assets at issue in this matter. Based on my analyses and the analyses of Movants' valuation experts, I show that Barclays undervalued these securities by at least $5.112 billion as of September 19, 2008.[5, 6]  (*See* Section IV.A. and Exhibit A-2.)  I summarize Barclays' undervaluation below:

---

[4] *See* expert reports of Mr. John Olvany, Mr. Mark Slattery, and Mr. Joseph Schwaba, dated March 15, 2010.

[5] The securities valued are captured by the following specific line items in BCI-EX-00115843 (Deposition Exhibit 377A) and BCI-EX-00109154 (Deposition Exhibit 88B), hereinafter referred to as "Barclays Opening Balance Sheet": (i) "Initial Inventory – PCG mid", which is comprised of the securities listed by CUSIP in BCI-EX-00099519 (Deposition Exhibit 86B) and BCI-EX-(S)-00213995 (Deposition Exhibit 641A), hereinafter referred to as "Initial Inventory;" and (ii) "JPM Inventory – PCG mid" is comprised of the securities listed by CUSIP in Annex A BCI-EX-00108700 (Deposition Exhibit 87B) and BCI-EX-(S)-00213996 (Deposition Exhibit 641A), hereinafter referred to as "JPM Inventory."  These line items represent (a) the Repo Collateral, as defined in the Pfleiderer Report,  which includes (i)  the securities listed on Schedule A to the Clarification Letter ("Schedule A") transferred by Lehman to Barclays on September 18, 2008 (Pfleiderer Report ¶5. a.) through the repurchase agreement entered into between them on that same date (the "Repurchase Agreement" or "Fed Replacement Repo"), and (ii) the securities listed on Annex A ("Annex A") to the Settlement Agreement between JPMorgan Chase ("JPMorgan"), Barclays, and the Trustee, dated December 5, 2008 (the "Settlement Agreement" (Deposition Exhibit 205)); and, (b) some of the clearance box securities on Schedule B to the Clarification Letter ("Schedule B").

Within the data presented in Initial Inventory and JPM Inventory, there are 11,938 CUSIPs (11,845 unique CUSIPs) in the Initial and JPM Inventories.  There are 10,743 CUSIPs (10,704 unique CUSIPs) in the Initial Inventory and 1,195 CUSIPs (1,195 unique CUSIPs) in the JPM Inventory.

These files reference "PCG" marks.  "PCG" refers to Barclays' Product Control Group, which "focuses on determining marks used for purposes of preparing monthly financial statements and also monitors traders' daily marking to assure the integrity of these marks."  (Pfleiderer Report, ¶52 and footnote 51).

I use the term "Repo Collateral" as it is defined in the Pfleiderer Report:  " . . . inventory of trading portfolio securities [Barclays] acquired when it replaced the Federal Reserve Bank of New York as LBI's primary source of financing on Thursday, September 18, 2008 (the 'Repo Collateral')."  (Pfleiderer Report, ¶5. a.)  Table 2 of the Pfleiderer Report sets forth what is included within the term.  The Pfleiderer Report uses the term "Schedule B breakout analysis" to describe certain assets removed from its analysis of the Repo Collateral. (Pfleiderer Report, footnote 77).

[6] Movants' valuation experts utilized third-party pricing data (Bloomberg, FactSet, Capital IQ, and Interactive Data) to value 4,515 securities, and Bank of New York/Mellon ("BoNY") marks were used to value 1,520 of the 11,938 CUSIPs included in the Initial Inventory and JPM Inventory.

---

**Contains Highly Confidential Information**

| Summary of Barclays' Undervaluation of Initial and JPM Inventory (amounts in billions of dollars) | |
|---|---|
| Residential Mortgage Backed Securities | $0.941 |
| Corporate Bonds | $0.366 |
| Emerging Markets | $0.003 |
| Equities | $0.541 |
| Rates | $0.631 |
| Principal Mortgage Trading Group | $0.974 |
| JPM Inventory (Annex A Assets) | $1.657 |
| Total Barclays' Undervaluation | $5.112[7] |

**Opinion 2:**  In simple terms, in the Rule 60(b) Motions, Movants claim that, based on the Court-approved transaction, Barclays received more assets than were approved by the Court in the Sale Transaction, paid less for those assets than was represented to the Court, and thus, benefited from the Sale Transaction beyond what was approved by the Court (the "Barclays Windfall").[8]  The Pfleiderer Report fails to compare the Court-approved transaction to the transaction that actually occurred, and thus, should not be considered in the economic analysis of the Movants' overall claims.  Using the Movants' valuation experts to value the Lehman financial assets acquired by Barclays and assuming a Court-approved Sale Transaction that included a payment of $1.850 billion by Barclays to Lehman, the Barclays Windfall is at least $13.051 billion.  (*See* Section IV.B and Exhibit B-1.)  I summarize these calculations below:

---

[7] $0.186 billion of this amount results from undervaluation of CUSIPs contained in "Sched B LehOBS 5.xls," referred to as "Schedule B breakout analysis" in the Pfleiderer Report.  (Pfleiderer Report, footnote 77).

[8] *See* Movants' Rule 60(b) Motions.

**Contains Highly Confidential Information**

| Summary of Barclays Windfall | |
| --- | --- |
| | Value ($ Billions) |
| **Assets** | |
| Total Financial Assets on Barclays Opening Balance Sheet | 50.165 |
| Adjusted for: Unrecognized, Undelivered Assets | 0.775 |
| Adjustment to Valuation of OCC Assets (net of liabilities) | 0.103 |
| *Adjusted Barclays Opening Balance Sheet and Claimed Assets* | 51.043 |
| Adjustment for Barclays' Undervaluation | 5.112 |
| *Adjusted Total Financial Assets* | 56.155 |
| Non Financial Assets | 2.085 |
| *Adjusted Total Assets Acquired* | 58.239 |
| | |
| **Reported Cash Consideration and Liabilities Assumed** | |
| Total on Barclays Opening Balance Sheet | 47.474 |
| Adjusted Comp (severance subtracted) | (0.450) |
| Adjusted Cure | 0.014 |
| *Adjusted Cash Consideration and Liabilities Assumed* | 47.038 |
| | |
| **Adjusted Acquisition Gain/Negative Goodwill** | 11.201 |
| | |
| **Net Transaction Value to Barclays[9]** | (1.850) |
| | |
| **Barclays Windfall[10]** | 13.051 |

**Opinion 3:** In reviewing documents and testimony related to Barclays' acquisition accounting, I have determined Barclays used a December 22, 2008 closing price to account for the JPM Inventory. I calculate the effect of Barclays using December 22, 2008 closing prices to value the JPM Inventory instead of the time of the Sale Transaction.[11] My analyses document that Barclays' undervaluation is at least $1.657 billion. (*See* Section IV.C and Exhibit C-1.)

---

[9] See expert report of Harrison J. Goldin dated March 15, 2010 (the "Goldin Report") describing the net value of the transaction to Barclays.

[10] I am assuming that all of these amounts reflect the same concept of value.

[11] The majority of the Repo Collateral was transferred to Barclays on the evening of September 18, 2008. (Declaration of Shari D. Leventhal, Federal Reserve Bank of New York, ¶¶11-15 (Deposition Exhibit 444).) The Sale Hearing occurred on September 19, 2008. (Hearing Transcript, September 19, 2008.) The Sale Order was approved in the early hours of September 20, 2008. (Hearing Transcript, September 19, 2008 and Sale Order [Docket No. 258].) Paragraph 4.1 of the APA states: "Unless otherwise agreed by the parties in writing, the Closing shall be deemed effective and all right, title and interest of Seller to be acquired by Purchaser hereunder

**Contains Highly Confidential Information**

**Opinion 4:**  The Pfleiderer Report provides insufficient foundation to reject, for purposes of valuing the Repo Collateral, contemporaneous marks from JPMorgan and Bank of New York/Mellon ("BoNY"), who were the tri-party collateral agents in the Fed Repo and Fed Replacement Repo, respectively.[12, 13]  Using the BoNY and JPMorgan price marks to value these securities, Barclays underpaid for assets it acquired from Lehman in the Fed Replacement Repo by at least $4.418 billion.  (*See* Section IV.C and Exhibit C-3.)

**Opinion 5:**  Using Barclays' own calculations, Barclays underpaid for assets it acquired from Lehman in the Fed Replacement Repo by at least $545.8 million.[14]  (*See* Section VI.C and Exhibit C-3.)

**Opinion 6:**  A comparison of the mortgages in the Global Funding System ("GFS") as of September 16, 2008 totaling approximately $6 billion and the schedules setting forth the positions transferred to Barclays demonstrate that Barclays actually received more than two-thirds of the value of all Lehman mortgages in GFS.[15]  The custodial valuation as of September 19, 2008 of the Lehman mortgages acquired by Barclays is $4.034 billion,

---

shall be considered to have passed to Purchaser as of 12:01 a.m. (New York time) on the Closing Date." (Deposition Exhibit 1).  I was advised by Movants' Counsel to utilize September 19, 2008, ("Barclays Windfall Date") as the valuation date in this matter.

[12] I use the terms "marks," "quotes," and "prices" herein consistent with their definitions in footnote 22 of the Pfleiderer Report.

[13] "JPMorgan Chase is a leading global financial services firm with assets of $2 trillion and operations in more than 60 countries. The firm is a leader in investment banking, financial services for consumers, small business and commercial banking, financial transaction processing, asset management, and private equity." (http://www.jpmorganchase.com/corporate/About-JPMC/about-us.htm, last visited March 3, 2010.)

BoNY is the Bank of New York Mellon which ". . . is a leading asset management and securities services company, uniquely focused to help clients manage and move their financial assets and succeed in the rapidly changing global marketplace. Headquartered in New York, The Bank of New York Mellon has $22.3 trillion in assets under custody or administration and $1.1 trillion under management." (http://www.bnymellon.com/about/index.html, last visited March 3, 2010.)

[14] *See* Pfleiderer Report, Table 2.

[15] GFS "served as a central warehouse for pricing and other data from multiple special purpose database systems also used by LBI." (Pfleiderer Report, ¶32.)  It is also sometimes referred to as Global Finance System, Global Financing System, or Global Financial System.  Of the 11,938 CUSIPs transferred to Barclays, 8,468 were included in GFS.  (*See* Exhibit E-3.)

---

**Contains Highly Confidential Information**

which represents 67.1% of the $6.014 billion value of all Lehman mortgages in GFS as of September 16, 2008.  (*See* Section IV.D and Exhibit D-1.)

**Opinion 7:**  Section II of the Pfleiderer Report provides insufficient foundation and analyses and fails to use accepted and consistent methodologies to support the opinions that there was no $5 billion discount in the Fed Replacement Repo.  Barclays does not present its own independent expert valuation to substantiate the conclusion that ". . . the Repo Collateral was worth *at most* the approximately $45.5 billion at which Barclays accounted for it in its 2008 Results Announcement summary of the Acquisition."[16]  (*See* Section IV.E.)

**Opinion 8:**  The opinion in Section III of the Pfleiderer Report that ". . . the Movants' assertion of a secret $5 billion discount from inception is implausible" is flawed and lacks foundation.[17]  To the contrary, Movants' assertion of a $5 billion discount from inception is possible.  (*See* Section IV.F.)

**Opinion 9:**  The Pfleiderer Report argues in Section IV that Barclays' "… immense financial and business risks …" should be considered in an economic analysis of Movants' claims.[18]  As I explain and document below, and as acknowledged in the Pfleiderer Report, Barclays was aware of these risks when the Court approved the Sale Transaction; thus, such issues should not be considered in the economic analysis and quantification of the Barclays Windfall.[19]  (*See* Section IV-G.)

**Opinion 10:**  The Pfleiderer Report erroneously concludes in Section V that "[t]he fact that Barclays reported an accounting gain on the Acquisition does not indicate that Barclays received a secret or unfair discount on the Repo Collateral, nor does it imply

---

[16] Pfleiderer Report, ¶5. a.

[17] Pfleiderer Report, footnote 61, p. 45.

[18] Pfleiderer Report, ¶5. b.

[19] Deposition of Robert Edward Diamond, Jr., September 11, 2009, 52:22-53:8, 53:20-22, 54:4-6, 59:12-18.  Mr. Diamond is president of Barclays PLC and chief executive of the investment banking and investment management businesses.  (*Id*. at 7:14-20.)

Deposition of John Varley, September 3, 2009, 24:17-20.  Mr. Varley is Chief Executive Officer of Barclays.  (*Id*. at 5:14-15.)

that Barclays earned an unexpected or unreasonable profit from the Transaction."[20]  This
argument is not supported by appropriate and reasonable analyses.  Based on the Court
approved Sale Transaction as described in the Goldin Report, Barclays' accounting gain
on the Sale Transaction is consistent with and indicates a Barclays Windfall.  (*See*
Section IV-H.)

**Opinion 11:**  The Pfleiderer Report argues that certain potential benefits from the
transaction should be considered in an economic analysis of Movants' claims.[21]  As I
explain and document below, to the extent such benefits resulted from the transaction, the
Court and others attending the Sale Hearing acknowledged these types of benefits when
the Court approved the Sale Transaction; thus, such issues should not be considered in
the economic analysis and quantification of the Barclays Windfall.  (*See* Section IV-I.)

**Opinion 12:**  The Pfleiderer Report argues that without Barclays' acquisition of Lehman,
"… it is virtually certain that the LBHI and LBI estates, Lehman's creditors, Lehman's
customers, and public financial markets all would have been worse off."[22]  As I explain
and document below, to the extent there were benefits to the transaction, the Court and
others acknowledged them when the Court approved the Sale Transaction; thus, such
issues should not be considered in the economic analysis and quantification of the
Barclays Windfall.  (*See* Section IV-I.)

## IV.    OPINIONS

### A.  RESULTS OF MOVANTS' INDEPENDENT VALUATIONS OF REPURCHASE AGREEMENT SECURITIES DOCUMENTING BARCLAYS' UNDERVALUATION OF THESE SECURITIES

12.    In this section, I discuss the basis for the following opinion:

**Opinion 1:**  Movants engaged valuation experts with expertise in valuing certain types of
securities that are at issue in this matter.[23]  These securities are assets in the Initial

---

[20] Pfleiderer Report, ¶5. c.

[21] Pfleiderer Report, ¶5. d.

[22] Pfleiderer Report, ¶5. d.

[23] *See* expert reports of Mr. John Olvany, Mr. Mark Slattery, and Mr. Joseph Schwaba dated March 15, 2010.

**Contains Highly Confidential Information**

Inventory and the JPM Inventory, but do not include other assets at issue in this matter. Based on my analyses and the analyses of Movants' valuation experts, I show that Barclays undervalued these securities by at least $5.112 billion as of September 19, 2008.

13.     The Respondents did not engage any experts to independently value *any* of the securities at issue in this matter.  The Pfleiderer Report inappropriately argues in favor of such a decision by Respondents, concluding that other independent valuations are not useful to assess the valuation of these assets: "… it is highly unlikely that such a procedure would lead to better marks than the marks developed by Barclays.  Rather, such a procedure could in the end produce *less* reliable marks for several reasons."[24]  As I explain below, none of the reasons in the Pfleiderer Report should be considered in an economic analysis and quantification of the Barclays Windfall.  The Pfleiderer Report's reasoning is unsupported by the facts, and such a view eliminates an important process of economic discovery that occurs when experts engaged by each side in the litigation have an opportunity to present their views and comment on the views of the opposing side's experts.

14.     Movants chose to engage valuation experts with expertise in valuing specific types of securities.  I am the Movants' expert on equities.[25]  The Movants' other valuation experts are Mr. John Olvany, Mr. Mark Slattery, and Mr. Joseph Schwaba.[26]  Counsel for the Movants asked these experts, based on their individual expertise, to provide a valuation of securities in the Initial Inventory.  Together, Navigant Economics (Chicago Partners) experts valued all securities in the Initial Inventory.

15.     Consistent with the valuation approach used by Barclays to value securities in its Opening Balance Sheet, experts valued these securities to reflect "fair value" as defined by International Accounting Standard 39 and Statement of Financial Accounting Standards No.

---

[24] Pfleiderer Report, ¶60.

[25] In addition, for the value of the JPM (Annex A) Inventory, I calculate the JPMorgan value as of September 19, 2008, that I discuss below in Sections IV.C and IV.E of my report.

[26] *See* expert reports of John Olvany, Mark Slattery, and Joseph Schwaba dated March 15, 2010 for valuation.  *See also* expert report of Mr. John Garvey dated March 15, 2010 for discussion regarding adjustments of values from mid to bid.

157.[27, 28]  Movants assert that the appropriate valuation date is September 19, 2008, which is the valuation date used by the experts.[29]

### 1. Valuation of Equities

16.    In this section, I describe the valuation of the equities.  These securities consist of 4,028 CUSIPs, which Barclays valued at $9.343 billion, after adjusting the values to bid prices (exit price marks).[30, 31]  Barclays also valued these securities as of September 19, 2008 but did not make the bid price adjustment.  The Barclays September 19, 2008 value of these securities without the bid price adjustment is $10.015 billion, of which $1.163 billion (11.6%) of these securities are convertible securities and the remainder, $8.852 billion (88.4%) are non-convertible equities.[32]

17.    Barclays used its September 22, 2008 prices for its opening balance sheet valuation.[33]  Barclays used these prices for the convertible securities without any adjustment.  For the non-convertible equities, Barclays applied a factor to adjust these prices to bid prices (exit price marks).  Barclays explained its adjustment approach in an email to its auditor dated December 12, 2008:

---

[27] *See* expert report of John Garvey dated March 15, 2010 (discussing the valuation approach used by Barclays in its Opening Balance Sheet and the related accounting standards, PwC's audit of Barclays Opening Balance Sheet, and the opinions on book value and the analysis of negative goodwill contained in the Pfleiderer Report).

[28] International Accounting Standard 39 *Financial Instruments: Recognition and Measurement,* ("IAS 39").  *See* expert report of John Garvey, dated March 15, 2010.

Statement of Financial Accounting Standards No. 157 *Fair Value Measurements,* ("SFAS 157").  *See* expert report of John Garvey dated March 15, 2010.

[29] Based on instructions from Movants' Counsel, I have utilized September 19, 2008, as the valuation date in this matter.

[30] Pfleiderer Report, Table 1.

[31] "Committee on Uniform Securities Identification Procedures is a body which provides identifying numbers for U.S. and Canadian securities." (http://glossary.reuters.com/index.php/CUSIP_Numbers, last visited February 22, 2010).

[32] Initial Inventory.

[33] Initial Inventory.  *See* BCI-EX-00218503 (email from Marcus Morton of Barclays to Jon Holloway of PWC, dated December 12, 2008, and with subject line, "RE: Lehman Equity Portfolio").

---

**Contains Highly Confidential Information**

The values that we receive for the Equity prices are based on last traded. For simplicity we have assumed that these are mids and so we need to make an adjustment to move these to the bid side of the market. A more conservative assumption would be that the prices are offers (which is [sic] a rapidly falling market is probably more realistic) which would obviously lead to a larger adjustment. Based on an analysis of the securities we were able to obtain bid/offer spreads for about 2100 of the 3700 securities which had an average bid/offer of 2.64%. This again would be a conservative estimate as the securities with a quoted bid offer would most likely be the most liquid and hence trading at the tightest spreads.[34]

18.    I conservatively adopt the Barclays approach as described in this email. I use Barclays' valuation of the equities as of September 19, 2008, which are the end of day prices and not adjusted to bid prices (exit price marks). I adjust the Barclays September 19, 2008 valuation of the non-convertible equities to bid prices (by using a liquidity adjustment) in the following way. For 2,106 (56.4%) of the non-convertible equity CUSIPs, which represents 88% ($7.787 billion out of $8.852 billion) of the September 19, 2008 value of the non-convertible equities, I was able to obtain Bloomberg prices as of that date.[35, 36] I estimate the exit price using the simple average percentage bid-ask spread of the 2,106 non-convertible equity CUSIPs for which Bloomberg data are available on September 19, 2008.[37]

---

[34] *See* BCI-EX-00218503 (email from Marcus Morton of Barclays to Jon Holloway of PWC, dated December 12, 2008, and with subject line, "RE: Lehman Equity Portfolio"). Barclays also describes a similar approach to adjust its valuation of these securities to exit price marks based on the December 18, 2008, and September 22, 2008, pricing. (BCI-EX-00255172).

[35] Barclays classifies 4,028 CUSIPs as Equities. I restrict the sample for calculation in the following steps. First, I eliminate all convertible equities, which leaves 3,731 CUSIPs. Then, I select CUSIPs with non-negative bid price, ask price, and last price from Bloomberg, leaving 2,295 CUSIPs. Further restricting to CUSIPs with non-negative bid-ask spread, there are 2,253 CUSIPs. The final sample set is the 2,106 CUSIPs for which the ratio of the bid-ask spread to the PCG 9-19 price is $\leq$ 50%.

[36] My percentage coverage of 88% is similar to the percentage coverage of 86.1% that Barclays collected in December 18, 2008, for these securities. (*See* BCI-EX-00255172).

[37] I conservatively adopt the Barclays approach to measure the bid-ask spread percentage, which appears to be the difference between the ask price and bid price divided by last price. (BCI-EX-00255172). Barclays used the simple average bid-ask spread percentage. Because the distribution of this percentage has some large positive values and a skewed distribution (the minimum ratio is bounded by zero and the maximum ratio is not bounded), the median ratio is a more appropriate measure of central tendency. The median bid-ask spread percentage for September 19 is 0.24% versus the average of 1.48%. In addition, if the actual holdings (e.g., shares) differs based on the bid-ask spread percentage, the weighted average is the more appropriate measure. The weighted average bid-ask spread percentage for September 19 is 0.41%.

---

19.    I show the effect of using the Barclays September 19, 2008 valuation in Exhibit A-1. Barclays September 19, 2008 valuation of the equity securities is $10.015 billion.  My adjustment from last price to bid price is $0.131 billion, resulting in an adjusted September 19, 2008 valuation of $9.884 billion.  Barclays September 22 exit price market valuation is $9.343 billion, resulting in a difference of $0.541 billion.  This amount, $0.541 billion, represents an increase in the "fair value of all assets received" and thus the amount of the excess of the "fair value of all assets" received over $45.0 billion.[38]

### 2.  Valuations of Navigant Economics (Chicago Partners) Valuation Experts

20.    The other valuation experts conducted valuations of a subset of securities included in the Barclays inventory.  See the individual expert reports for further explanation of their selection process.  I show the results of the valuations from these experts in Exhibit A-2.  See Panel A of the exhibit for Movants' expert John Olvany's valuation results.  See Panel B of the exhibit for Movants' expert Mark Slattery's valuation results.  See Panel C of the exhibit for Movants' expert Joseph Schwaba's valuation results.  See Panel D of the exhibit for my valuation results for equities in the Initial Inventory and the JPM Inventory.  I aggregate the valuations of all valuation experts in Panel E of Exhibit A-2.

### B.  THE PFLEIDERER REPORT'S FAILURE TO COMPARE THE COURT-APPROVED TRANSACTION TO THE TRANSACTION THAT ACTUALLY OCCURRED – THE BARCLAYS WINDFALL

21.    In this section, I discuss the basis for the following opinion:

**Opinion 2:**  In simple terms, in the Rule 60(b) Motions, Movants claim that, based on the Court-approved transaction, Barclays received more assets than were approved by the Court in the Sale Transaction, paid less for those assets than was represented to the Court, and thus, benefited from the Sale Transaction beyond what was approved by the Court (the "Barclays Windfall").[39]  The Pfleiderer Report fails to compare the Court-approved transaction to the transaction that actually occurred, and thus, should not be considered in the economic analysis of the Movants' overall claims.  Using the Movants' valuation

---

[38] I use "fair value of assets received" consistent with its usage in the last line in Table 2 of the Pfleiderer Report.

[39] *See* Movants' Rule 60(b) Motions.

**Contains Highly Confidential Information**

experts to value the Lehman financial assets acquired by Barclays and assuming a Court-approved Sale Transaction that included a payment of $1.850 billion by Barclays to Lehman, the Barclays Windfall is at least $13.051 billion.

22.     In the Rule 60(b) motions, Movants claim that "(i) material components of the transaction were not disclosed to the Court before and at the Sale Hearing; and (ii) the transaction that purported to close on September 22, 2008 differed materially from the transaction explained to and approved by the Court at the Sale Hearing."[40]

23.     Thus, based on the Movants' allegations, the appropriate measurement of the Barclays Windfall for a particular type of asset is a comparison of the value disclosed to the Court to the value Barclays received.  The Pfleiderer Report does not analyze the Court-approved Sale Transaction – for example, what the Court approved with respect to the assets included in the acquisition and how those assets were to be valued.  Thus, no opinion or conclusion in the Pfleiderer Report addresses or rebuts or can rebut the Movants' overall claim that, based on the Court-approved transaction, Barclays acquired more assets than it should have acquired, paid less than it should have paid for those assets, and received a benefit from the Sale Transaction that was not known or approved by the Court ("Movants' Overall Claim").  As a result, the Pfleiderer Report should not be considered in the economic analysis of the Movants' Overall Claim.

24.     As I discuss above, Movants engaged valuation experts with expertise in valuing certain types of securities that are at issue in this matter.  These securities are assets in the Initial Inventory and the JPM Inventory, but do not include other assets at issue in this matter.  I have made a comparison of the fair value of total assets received by Barclays to the net value of the transaction to Barclays ("Net Transaction Value") as represented to the Court.[41]  As I show in Exhibit B-1, Barclays opening balance sheet shows that it acquired various Lehman financial assets with an opening balance sheet value of $50.165 billion.[42]  In addition, as I understand

---

[40] Debtor's Motion for an Order, Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024, Modifying the September 20, 2008 Sale Order and Granting Other Relief, September 15, 2009, ¶1.  (Deposition Exhibit 495).

[41] I understand that the Net Transaction Value presented at the Sale Hearing is $1.85 billion.  *See* expert report of Harrison J. Goldin dated March 15, 2010.

[42] Pfleiderer Report, ¶114 (without rounding).

---

**Contains Highly Confidential Information**

from Counsel for the Movants, Barclays is claiming $775 million in additional financial assets from Lehman.[43]  I have also adjusted the Options Clearing Corporation ("OCC") assets, shown net of liabilities, by $103 million which reflects an acquisition date of September 19, 2008.[44]  Moreover, based on my analyses and the analyses of these valuation experts, I show that Barclays' valuation of the Initial Inventory and JPM Inventory was undervalued by at least $5.112 billion (*see* Section IV-A).[45]  This results in a value of the financial assets acquired by Barclays of at least $56.155 billion as of September 19, 2008.[46]

25.    In addition, Barclays acquired certain non-financial assets from Lehman.  The opening balance sheet value of these assets is $2.085 billion (*see* Exhibit B-1).  I exclude the real estate value in this exhibit because the amount paid for those assets is not at issue in this matter and is assumed to be equal to the amount paid.[47]  However, Exhibit B-1 shows that other non-financial assets acquired from Lehman are valued at $2.085 billion.  Thus, even ignoring the real estate assets, adding in the $2.085 billion value of non-financial assets increases the value of the assets acquired by Barclays to at least $58.239 billion.

---

[43] Mr. Romain notes additional undelivered, unrecognized assets totaling $765 million in collateral related to Lehman affiliates' futures accounts ($460 milion), OCC margin ($80 million), and unencumbered clearance box assets ($162 million) and other principal and interest ($63 million) (Deposition Exhibit 549A, p. 4).  In his typewritten notes prior to his 2010 deposition, Mr. Romain updates the Lehman affiliate amount to $470 million (Deposition Exhibit 534A, p. 8).  After updating for this change, I calculate additional undelivered, unrecognized assets totaling $775 million (470+162+80+63).

[44] I have reviewed the memorandum regarding the valuation of the OCC trading liabilities (BCI-EX-(S)-00110233-8) and note the use of a mid value on September 22, 2008 and an adjustment to bid using data from September 19, 2008.  In order to be consistent, I have adjusted the mid value to September 19, 2008 using the associated native file (bci-ex-(s)-00110231.accdb).  The resulting difference lowers the mid value trading liability by $103 million.  I also reviewed the $2.3 billion of OCC related assets as presented on the Barclays Opening Balance Sheet.  I determined they reflect the balance on 9/19/08 by reviewing an email dated 9/21/2008 attaching a 9/18/08 OCC statement detailing cash of $1.082B, letters of credit of $0.252B and treasuries with a market value of $0.977B for a total 9/18/08 balance of just over $2.3B (BCI Exhibit 263 (BCI-EX-(S)-00131273-318 at 303 through 306)).

[45] I have applied a liquidity adjustment to the JPMorgan price marks; however, JPMorgan's price marks may already reflect exit prices and not need such an adjustment.  If the liquidity adjustment is not needed, this value would increase to $5.504 billion.   In addition, Movants' valuation experts have noted that Barclays was typically aggressive in its discounting; therefore, by using Barclays' liquidity adjustments, my estimates of the value of the financial assets acquired by Barclays is conservative.  (*See* expert reports of Mr. John Olvany, Mr. Mark Slattery, and Mr. Joseph Schwaba, dated March 15, 2010).

[46] *See* footnote 11.

[47] As outlined in paragraph 4 of the Clarification Letter between Barclays and Lehman dated September 20, 2008, consideration for 745 Seventh Avenue, the Cranford New Jersey Data Center and the Piscataway New Jersey Data Center was determined to be $1.29 billion after consideration of "available appraisal information." (Deposition Exhibit 25).

---

Contains Highly Confidential Information

26.    As I show in the exhibit, the consideration originally reported by Barclays for these assets (cash consideration and liabilities assumed) is $47.474 billion.  This consideration consists of the $45.0 billion Repo liability, a cure payment of $224 million, a compensation liability of $2.0 billion, and cash consideration of $250 million.[48]  I have adjusted the compensation liability to $1.55 billion and cure costs to $238 million.[49]  Thus, Barclays had, as of September 19, 2008, an excess value of assets acquired over consideration paid of at least $11.201 billion.

27.    I understand that, according to the Court-approved Sale Transaction, Barclays would have paid $1.85 billion in consideration above the value of the assets received.[50]  Thus, the Barclays Windfall is at least $13.051 billion (*see* the last line in Exhibit B-1).[51]

---

[48] As stated in the Barclays Opening Balance Sheet.

[49] Cure payment of $238 million provided by Counsel for Movants.  (BCI Exhibit 171 attaching BCI-EX-00077272-86).

Compensation liability of $1.55 billion provided by Counsel for Movants.  I have reviewed Deposition Exhibit 280B and the Deposition of Paul Exall.  I note several items that are not related to bonuses on Deposition Exhibit 280B including severance of $314 million (Deposition Exhibit 280B), "ISP" awards to compensate for loss of value during 2009 Barclays ownership and associated taxes of $58 million (Deposition Exhibit 280B; Deposition of Paul Exall, August 27, 2009, 141:20-144:12), an acquisition buyout linked to future service and performance with Barclays and associated taxes of $56 million (Deposition Exhibit 280B), and miscellaneous payroll items totaling $12 million (Deposition Exhibit 280B).  If the Court were to determine that these items were excluded from the compensation associated with the asset sale to Barclays, the compensation liability would be reduced from $2 billion to approximately $1.55 billion (2-0.314-0.058-0.056-0.012).

[50] *See* expert report of Harrison J. Goldin dated March 15, 2010.

[51] The estimated gain of $13.051 billion reflects the Barclays reported goodwill of $4.17 billion (Barclays Opening Balance Sheet)  adjusted for the exclusion of Barclays transaction costs including deferred taxes, stamp duty and acquisition costs totaling $0.605 billion ($0.531 + $0.032 + $0.042, respectively) (Barclays Opening Balance Sheet), the exclusion of certain compensation amounts as represented by Movants' Counsel ($0.45 billion), reduced by the slight increase in cure costs from $224 million (Barclays Opening Balance Sheet) to $238 million (BCI Exhibit 171 attaching BCI-EX-00077272-86.) or (-$0.014 billion), the addition of certain unrecognized, undelivered assets demanded by Barclays and as represented by Movants' counsel ($0.775 billion), the adjustment to the valuation of OCC assets (net of liabilities) discussed above ($0.103 billion), and the addition of the Barclays Undervaluation ($5.112 billion).  Considered together $13.051 = 4.17 + 0.605 + 0.45 - 0.014 + 0.775 + 0.103 + 5.112 – (1.850)).  (*See* Exhibit B-2).

C.  EFFECT OF ALTERNATE MARKS ON THE VALUE OF ASSETS IN THE INITIAL INVENTORY AND JPM INVENTORY AND SPECIFICALLY ON THE VALUE OF THE REPO COLLATERAL

28.     In this section, I discuss the basis for the following opinions:

**Opinion 3:**  In reviewing documents and testimony related to Barclays' acquisition accounting, I have determined Barclays used a December 22, 2008 closing price to account for the JPM Inventory.  I calculate the effect of Barclays using December 22, 2008 closing prices to value the JPM Inventory instead of the time of the Sale Transaction.[52]  My analyses document that Barclays' undervaluation is at least $1.657 billion.

**Opinion 4:**  The Pfleiderer Report provides insufficient foundation to reject, for purposes of valuing the Repo Collateral, contemporaneous marks from JPMorgan and BoNY, who were the tri-party collateral agents in the Fed Repo and Fed Replacement Repo, respectively.  Using the BoNY and JPMorgan price marks to value these securities, Barclays underpaid for assets it acquired from Lehman in the Fed Replacement Repo by at least $4.418 billion.

**Opinion 5:**  Using Barclays' own calculations, Barclays underpaid for assets it acquired from Lehman in the Fed Replacement Repo by at least $545.8 million.

1.  Effect of Using December 22, 2008 as the Date to Value Certain Assets Acquired in the Sale Transaction rather than the Date Barclays Had Ownership of Those Assets

29.     I understand that Barclays has taken the position that the appropriate date to value the JPMorgan Inventory (Annex A) is December 22, 2008.  According to the Pfleiderer Report, "The actual value of this claim became determinable only on or about December 22, 2008, more than three months after the initiation of the Fed Replacement Repo, upon consummation of the December settlement among Barclays, JP Morgan Chase, and LBI."[53]

---

[52] See footnote 11.

[53] Pfleiderer Report, ¶17.

**Contains Highly Confidential Information**

30.     Movants have taken the position that September 19, 2008 is the appropriate date to value these securities for the purpose of this matter.[54]  In Exhibit C-1, I present the value of the JPMorgan inventory based on certain price marks as of various dates from September 17 to December 22, 2008.  According to JPMorgan price marks on September 17, the JPM Inventory had a value of $5.994 billion (column [C] of Exhibit C-1).[55]  I do not have JPMorgan price marks for September 19, 2008.  I calculate JPMorgan values using the JPMorgan values for September 17, adjusted by the change in clean price marks in GFS from September 17 to September 19 (column [D] of Exhibit C-1).[56]  To be conservative, I adjust the calculated JPMorgan September 19 value to incorporate Barclays' liquidity adjustment, which results in a value for the JPM Inventory of $5.397 billion (column [E] of Exhibit C-1).[57]

31.     When compared with Barclays' $3.740 billion valuation of the assets in Annex A on December 22, 2008 (column [A] of Exhibit C-1), the analysis shown in Exhibit C-1 documents that Barclays' valuation for these assets is understated based on the alternative price marks.  The amount of the undervaluation is at least $1.657 billion.

---

[54] *See* footnote 11.

[55] The $5.99 billion represents the value for the securities listed in Annex A.  (JPM Inventory).  It is separate from and excludes the $1.25 billion in cash that was also transferred as part of the Settlement Agreement.  (Deposition Exhibit 205; Hearing Transcript, December 22, 2008, 42:10-12).

The JPMorgan price marks in JPM Inventory were labeled as JPMorgan price marks as of September 30, 2008.  However, after comparing these marks to the JPM files that Barclays received on September 18, 2008 with September 17, 2008 JPM Price Marks in an email from Ricky Policke of Lehman to John Haley of Barclays, I find the overall difference between the two marks is $2.04 out of $5.99 billion.  I conclude that the JPMorgan price marks in JPM Inventory must be the marks as of September 17, 2008 and not September 30, 2008.

[56] For CUSIPs overlapping between BCI-EX-(S)-00213996.xls and the GFS data, with positive trade date position and positive Clean Market Price on September 17 and September 19, I obtain the JPM 9-19 value by applying the percentage change in GFS prices from the 17th to the 19th to the JPM 9-17 value.

I also obtain an average price change by Barclays asset class using these CUSIPs, weighted by the JPM 9-17 value.  For CUSIPs in BCI-EX-(S)-00213996.xls but not in the GFS data sample, I calculate the JPM 9-19 value by applying the weighted average price change by asset class to the JPM 9-17 value.

[57] To adjust "JPM Calculated Custodial Price Marks 9-19-08" to "JPM Calculated Custodial Price Marks with Barclays Liquidity Adjustment 9-19-08", I take the liquidity adjustment from the "Liquidity" tab in BCI-EX-(S)-00213996.xls. I take the liquidity adjustment under the column heading "Liq Haircut", matching against each CUSIP by the column "Sub Type" in the "Liquidity" tab. I calculate the "JPM Calculated Custodial Price Marks with Barclays Liquidity Adjustment 9-19-08" by multiplying the liquidity adjustment by "JPM Calculated Custodial Price Marks 9-19-08".  For the Equity asset class, I take the liquidity adjustment provided in BCI-EX-00255172 (0922 Equities Bid-Offer) of 4.32% and multiply one minus this adjustment by the respective Custodial and Barclays Mid-Point Price Marks on the dates specified.

---

2.    The Effect of Using Lehman, BoNY, and JPMorgan Price Marks to Value the
      <u>Assets Received and Barclays Windfall as Calculated by the Pfleiderer Report</u>

32.    In Section IV.E of my report, I document that the Pfleiderer Report's rejection of the

Lehman, BoNY, and JPMorgan price marks lacks foundation and support of adequate analysis.

In this section of my report, I reproduce Table 1 and Table 2 in the Pfleiderer Report and

document the value of the Initial Inventory using these alternative price marks.  Since Movants

assert that the appropriate valuation date is September 19, 2008, I present my calculations for

September 19, 2008.[58]  This analysis shows that using these alternative price marks increases

Barclays Windfall by as much as $6.821 billion.

33.    In Exhibit C-2A, I present an exhibit similar to Table 1 in the Pfleiderer Report, which

presents the value of the Initial Inventory based on certain price marks.  I present this valuation

as of September 19, 2008.  In addition to reproducing the valuations in the Pfleiderer Report, I

present alternative valuations based on Barclays calculated exit prices marks on September 19,

2008 and BoNY custodial price marks with Barclays' liquidity adjustment.[59]  In Exhibit C-2B, I

present an exhibit similar to Exhibit 6 in the Pfleiderer Report, which presents the value of

certain selected securities.[60]

34.    Exhibit C-2A shows that as of September 19, the BoNY price marks with Barclays

liquidity adjustment value the Initial Inventory at roughly $43.0 billion (column [D]).  However,

Barclays calculated exit price marks value the same portfolio at $41.145 billion (column [B]).  In

addition, Barclays recorded the value of the portfolio in its Opening Balance Sheet at $40.690

billion (column [A]).  Exhibit C-2B documents that for the selected assets, Barclays' price marks

are lower than BoNY price marks on September 19, 2008.

---

[58] See footnote 11.

[59] To adjust "BoNY Custodial Price Marks 9-19-08" to "BoNY Custodial Price Marks with Barclays Liquidity Adjustment 9-19-08", I take the liquidity adjustment from the "Liquidity" tab in BCI-EX-(S)-00213995.xls.  I take the liquidity adjustment under the column heading "Liq Haircut", matching against each CUSIP by the column "Sub Type" in the "Liquidity" tab.  I calculate the "BoNY Custodial Price Marks with Barclays Liquidity Adjustment 9-19-08" by multiplying the liquidity adjustment by "BoNY Custodial Price Marks 9-19-08".  For the Equity asset class, I take the liquidity adjustment provided in BCI-EX-00255172 (0922 Equities Bid-Offer) of 4.32% and multiply one minus this adjustment by the respective Custodial and Barclays Mid-Point Price Marks on the dates specified.

[60] I used a series of filters to reproduce the figures in Pfleiderer Report Exhibit 6 and used the same filters for the analysis based on alternative price marks.

---

**Contains Highly Confidential Information**

35.    In Exhibit C-3, I present an exhibit similar to Table 2 in the Pfleiderer Report, which presents the calculation of the "fair value of transferred securities" and the "fair value of all assets received" based on certain price marks.  In addition to reproducing the calculation in the Pfleiderer Report using Barclays price marks, I present alternative calculations of this value based on Exhibits C-1 and C-2A.  I present the calculation of the value of transferred securities using the Barclays price marks as presented in Table 2 in the Pfleiderer Report, alternative Barclays price marks, BoNY price marks, and JPMorgan price marks.

36.    Table 2 of the Pfleiderer Report is entitled "Aggregate Value of Assets Received From the Fed Replacement Repo" and summarizes the components of the transferred positions and cash received.[61]  I have included the data from Pfleiderer Report Table 2 in the first column of Exhibit C-3.  Table 2, as represented in the Pfleiderer Report, relies upon Barclays' valuations prepared for financial reporting purposes.[62]  The fair value of transferred securities is derived by valuing the transferred inventory at Barclays' exit price/bid marks ($42,605M + 3,917.9M - 2,086.5M), adding accrued interest ($345M), and subtracting the clearance box assets included in the transferred inventory which are unrelated to the Repo ($778.9M + 6.7M of associated interest).[63, 64]  The Pfleiderer Report then adds the cash proceeds of securities liquidated prior to transfer that were not included in the transferred inventory outlined above ($300M + $1,250M).[65]

---

[61] Pfleiderer Report, ¶¶62-63.

[62] Pfleiderer Report, ¶61.

[63] Transferred inventory at Barclays' exit price/bid marks is computed as follows:  $42,605M is identified as "Initial Inventory – PCG Mid" in Barclays Opening Balance Sheet.  Initial Inventory identifies slightly different amounts, $42,579M in BCI-EX-00099519 (Deposition Exhibit 86B) and $42,566M in BCI-EX-(S)-00213995 (Deposition Exhibit 641A).  $3,917.9M is identified as "JPM Inventory – PCG Mid" in Barclays Opening Balance Sheet.  JPM Inventory identifies a slightly different amount, $3,916.3M.  Gary Romain also references these documents as support for Barclays Opening Balance Sheet in his declaration dated January 26, 2010.  The reduction of $2,086M reflects the adjustment to exit price marks for both the Initial Inventory and the JPM Inventory (Barclays Opening Balance Sheet).  This adjustment is also shown separately with each group of inventory in Initial and JPM Inventory.

Accrued interest and clearance box assets identified in Romain Declaration, January 26, 2010, ¶18 (BCI Exhibit 357).

[64] A clearance box is defined as ". . . an account at either a depository or a custodial bank into which securities can be moved into or out of." (Deposition of James Hraska, January 15, 2010, 7:10-15).

[65] Mr. Romain states that the $300 million reflects "matured securities within the repo collateral on Schedule A." (Romain Declaration, January 26, 2010, ¶18 (BCI Exhibit 357)).

---

Considered together, the result is total asset value of $45,545.8M.  In Exhibit C-3, I have added a comparison of this value to the repurchase agreement liability of $45B to determine excess collateral of $545.8M.[66]  In the Court proceedings on September 19, 2008, the Court stated that "I still consider 500 million dollars material . . ."[67]  Under this standard of materiality, the Barclays Windfall as calculated using Barclays' valuations and the Pfleiderer Report's methodology would be considered material.

37.      Exhibit C-3 shows that the aggregate value of assets received from the Fed Repo presented in the Pfleiderer Report is $45.546 billion, the lowest of the values.  I use calculated exit price marks with the conservative liquidity adjustment from BoNY and JPMorgan to value the Initial and JPM Inventory, respectively, resulting in an aggregate asset value of more than $49 billion and a $4.418 billion excess of the "Fair Value of All Assets Received" over $45 billion.[68]  Replacing the calculated exit price marks with custodial price marks from BoNY and

---

$1,250M cash proceeds from the December Settlement Agreement.  (Settlement Agreement, ¶1(a).  (Deposition Exhibit 205)).  *See also* Hearing Transcript, December 22, 2008, 42:10-12.

[66] I compare the fair value of all assets received to $45.0 billion, consistent with the Pfleiderer Report's comparison of the amounts in Table 2 to this amount in ¶8 of the Pfleiderer Report.

[67] Hearing Transcript, September 19, 2008, 54:21-22.

[68] I calculate the "Initial inventory at Barclays mid-price marks" by aggregating the Custodial or Barclays Mid-Point Price Marks at the respective dates based on the BoNY or Barclays MV columns from the asset type tabs in Initial Inventory.

I calculate the "JPM inventory at Barclays mid-price marks" by aggregating the Custodial or Barclays Mid-Point Price Marks at the respective dates based on the columns "JP MV" and "PCG MV 09-30" from the "Portfolio 3" tab in JPM Inventory.  Note that while JPM Inventory uses the "JP MV" to calculate the "30-Sep JP Value", these marks are equal to the JPM Price Marks as of 9-17; refer to footnote 55 for a detailed explanation. Also refer to footnote 56 for the calculation of the JPM 9-19 values.

I calculate the "Adjustment to Barclays exit-price/bid marks" by using the liquidity adjustments given for the respective Exit Price Marks in Initial Inventory and JPM Inventory.  When the liquidity adjustments are not provided in these excel files, I adjust the respective Custodial and Barclays Mid-Point Price Marks to Exit Price Marks by taking the liquidity adjustment from the "Liquidity" tab in Initial Inventory and JPM Inventory.  I take the liquidity adjustment under the column heading "Liq Haircut", matching against each CUSIP by the column "Sub Type" in the "Liquidity" tab.  I calculate the Exit Price Marks by multiplying the liquidity adjustment by the respective Custodial and Barclays Mid-Point Price Marks on the dates specified. The liquidity haircut value in Exhibit C-3 is given by subtracting the value based on the mid-point price marks from the calculated value based on the exit price marks.  For the Equity asset class, I take the liquidity adjustment provided in BCI-EX-00255172 (0922 Equities Bid-Offer) of 4.32% and multiply one minus this adjustment by the respective Custodial and Barclays Mid-Point Price Marks on the dates specified.

I calculate the "Schedule B assets included in the above" by using the file Sched B LehOBS 5 [BCI-EX-00295934].xls.  I follow the calculations in the Pfleiderer Report to calculate the assets in Schedule B that are not present in the Repo Collateral.  The value in column "MV 09-22 w. haircut" from the "Detail" tab of the file BCI-

---

**Contains Highly Confidential Information**

JPMorgan on September 19, the total asset value is $51.821 billion and a $6.821 billion excess of the "Fair Value of All Assets Received" over $45 billion.[69]  As shown in the exhibits in this section, the Pfleiderer Report consistently presents the lowest valuation across alternative marks.

### D.  ANALYSIS OF LEHMAN'S MORTGAGES ACQUIRED BY BARCLAYS

38.     In this section, I discuss the basis for the following opinion:

> **Opinion 6**:  A comparison of the mortgages in the Global Funding System ("GFS") as of September 16, 2008 totaling approximately $6 billion and the schedules setting forth the positions transferred to Barclays demonstrate that Barclays actually received more than two-thirds of the value of all Lehman mortgages in GFS.[70]  The custodial valuation as of September 19, 2008 of the Lehman mortgages acquired by Barclays is $4.034 billion, which represents 67.1% of the $6.014 billion value of all Lehman mortgages in GFS as of September 16, 2008.

39.     At the request of Movants' Counsel, I analyzed the Lehman mortgages and mortgage backed securities ("Mortgages") acquired by Barclays in the Sale Transaction.  I identified a series of three emails from Clement Bernard (Lehman – FID Chief Financial Officer) to Barclays employees including Stephen King (Barclays – Managing Director and head of PMTG) and Jasen Yang (Barclays – Director of PMTG).[71]  These emails include eight Excel file attachments.

---

EX-00295934.xls is the amount subtracted from the Repo Collateral.  Based on the analysis in BCI-EX-00295934.xls, for each CUSIP, I assign a "Non-Repo Collateral" percentage as the ratio of the amount subtracted from the Repo Collateral to the Barclays 9-22 Exit Price Marks (for non-Equities as classified by Barclays) and as the ratio of the amount subtracted to the Barclays 9-22 Mid-Point Price Marks (for Equities as classified by Barclays).  I calculate the "Schedule B assets included in the above" based on the "Non-Repo Collateral" percentage by multiplying this percentage, on a CUSIP level, by the respective Custodial and Mid-Point Price Marks on the dates specified to obtain the portion of the inventory not in the Repo Collateral.  To comport with the analysis in BCI-EX-00295934.xls, I make two further adjustments for the equity CUSIPs.  For all equities, I reduce the amount in "Schedule B assets included in the above" by a liquidity haircut of 1.084%.  For 28 equity CUSIPs, the amount subtracted from the Repo Collateral equals the CUSIP's notional value; for these CUSIPs, I calculate the "Schedule B assets included in the above" by reducing the original notional by the liquidity haircut of 1.084%.

[69] I note that both these values are consistent with the contemporaneous documents presented in Exhibit E-1.

[70] *See* footnote 15 (describing the role of GFS).

[71] Clement Bernard is identified in the report of Anton R. Valukas, Examiner in re Lehman Brothers Holdings, Inc. et al, Chapter 11 Case No. 08-13555 (JMP), Volume 7, Appendix 3, Key Individuals, page 2.  Stephen King's position is identified in the Deposition of Stephen King, September 10, 2009, 8:23-9:9.  Jasen Yang's position is identified in the Deposition of Gary Romain, September 10, 2009, 139:6-14.

---

Contains Highly Confidential Information

These files were grouped by asset type and state that they are the "9/16 Inventory."[72]  One of the emails attached a file that identified assets as "Mortgages and Mortgaged Backed."[73]  As I show in the first line in Exhibit D-1, this inventory list contains 3,913 CUSIPs and has a total "long inventory" value equal to $6.014 billion.[74]  The $6.0 billion amount is the same as the amount listed for mortgages on a number of Lehman balance sheets the week of September 15.[75, 76]

40.    To analyze the mortgages acquired by Barclays, I first aggregated the valuations at CUSIP level.[77]  I then searched for CUSIPs with a positive trading position in Barclays' Initial Inventory and JPM Inventory.  I identified 1,720 of the 3,913 Lehman CUSIPs in the Barclays' Initial and JPM Inventory.  Using the GFS valuation of Net Long Inventory in the Mortgages file, the value of the CUSIPs transferred was $4.226 billion (see the third line of Exhibit D-1).[78]  Since the number of securities for the CUSIPs acquired by Barclays may not be the same as the total number of securities in GFS, I used the BoNY September 19, 2008 valuation for securities in Schedules A and B and the JPMorgan adjusted September 19, 2008 valuation for securities in Annex A.  Using this valuation for the Mortgages, the value of the CUSIPs transferred was $4.034 billion, which is 67.1% of the total value of the Lehman Mortgages (4.034/6.014).  The Barclays Opening Balance Sheet valuation of the Mortgages it acquired from Lehman is $2.266 billion, which is 37.7% of the total value of the Lehman Mortgages (2.266/6.014).

---

[72] BCI-EX-(S)-00200952-BCI-EX-(S)-00200962 at 52 (includes 3 emails and 8 Excel files).

[73] BCI-EX-(S)-00200952-BCI-EX-(S)-00200962 at 54 and 57.

[74] To measure this value without accrued interest (i.e., "clean value,"), I include the CUSIPs with strictly positive trade date positions.  I adjust "Net Long" value to remove the impact of accrued interest by multiplying this value by a ratio of the clean price to the dirty price.  The "Net Long" field represents the sum of two data fields labeled "Gross Long Inventory TD @ MV" and "Long Intraco Netdown TD @MV."   These are identical names to the fields the Pfleiderer Report aggregates to determine Net Long Inventory Value as of 9/12/08 in Table IV of the Pfleiderer Report.

[75] In Barclays' Opposition to the Rule 60(b) Motions ("Barclays Opposition"), Barclays asserts that the value of 50% of Lehman's residential mortgage securities are estimated to be worth from $2.7 billion to $3.6 billion, notes in an associated footnote that court testimony placed the value of the entire portfolio at $6 billion, and notes in another footnote it may have received some with the Repo Collateral.  (Barclays Opposition, ¶69 and footnotes 46 and 209).

[76] Deposition Exhibit 509; Deposition Exhibit 200.

[77] In cases where real-world CUSIP was unavailable, I combined data with identical ISINs or product numbers.  For purposes of this analysis, I will use the term CUSIP to refer to any of these identifiers.

[78] Of the amount acquired, $1.91 billion appear in the Barclays Initial Inventory and $2.32 billion appear in the JPM Inventory (not shown in the exhibit).

---

**Contains Highly Confidential Information**

E. PFLEIDERER REPORT'S OPINIONS (IN SECTION II) REGARDING THE "ALLEGED $5 BILLION DISCOUNT IN THE FED REPLACEMENT REPO" ARE FLAWED AND UNSUPPORTED

41.    In this section, I discuss the basis for the following opinion:

**Opinion 7:** Section II of the Pfleiderer Report provides insufficient foundation and analyses and fails to use accepted and consistent methodologies to support the opinions that there was no $5 billion discount in the Fed Replacement Repo. Barclays does not present its own independent expert valuation to substantiate the conclusion that ". . . the Repo Collateral was worth *at most* the approximately $45.5 billion at which Barclays accounted for it in its 2008 Results Announcement summary of the Acquisition."[79]

42.    The Pfleiderer Report opines in Section II and Appendix Four on issues related to the "Alleged $5 Billion Discount in the Fed Replacement Repo."

43.    These opinions are, for reasons I explain below, unsupported by appropriate and reasonable analyses based on accepted methodologies, scientific methods, and accepted principles, applied reliably and consistently.

44.    In sum, the Pfleiderer report opines:

- Barclays did not receive a $5 billion discount, secret or otherwise, through the Fed Replacement Repo[;] . . . the Repo Collateral pledged to Barclays in the Fed Replacement Repo . . . was worth at most approximately $45.5 billion, or about 1% more than the $45 billion in cash that Barclays paid out as part of the Fed Replacement Repo.[80]

- [T]he value of the securities and cash Barclays received in the Fed Replacement Repo was not $50 billion, as the Movants assert, or even close to $50 billion. Instead, the fair value of the securities (and cash) Barclays received in the Fed Replacement Repo was, at most, approximately $500 million (or about one percent) more than $45 billion.[81]

---

[79] Pfleiderer Report, ¶5. a.

[80] Pfleiderer Report, ¶8 (". . . the Repo Collateral pledged to Barclays in the Fed Replacement Repo, including the securities and cash ultimately received in Barclays' December settlement with JP Morgan Chase and LBI, was worth at most approximately $45.5 billion . . .").

[81] Pfleiderer Report, ¶9.

**Contains Highly Confidential Information**

45.    Professor Pfleiderer arrives at these opinions after concluding:

- "[T]he Lehman marks, the JP Morgan Chase marks, and the BoNY marks, whether used separately or together, do not provide a reliable basis for valuing the Repo Collateral."[82]

- "Barclays normal marking policies and procedures" are "reasonable, appropriate, and likely to produce reliable results."[83]

- [I]t is highly unlikely that developing an entirely new set of marks, completely independent of any of the available sources "would lead to better marks than the marks developed by Barclays."[84]

    1.    The Pfleiderer Report's Opinion Regarding the "Price" of the Repo Portfolio is Flawed and Incorrect

46.    The Pfleiderer Report erroneously asserts:

It is an important fact that Barclays did not acquire the Repo Collateral in a separate, standalone transaction, but instead acquired these assets as part of a larger bundle of assets and liabilities associated with LBI's North American broker-dealer businesses. This means, first, that there was no separate identifiable "price" paid by Barclays for the trading portfolio securities and, second and more specifically, that the $45 billion that Barclays lent to LBI in the Fed Replacement Repo should not be viewed as the "price" Barclays paid for the Repo Collateral.[85]

47.    This opinion is not meaningful in evaluating or rebutting Movants' Overall Claim.  The Sale Transaction approved by the Court was based on certain representations of value for the assets being purchased and the liabilities being assumed by Barclays.  The Repo Collateral was part of the $47.4 billion of trading assets the Court was told Barclays was purchasing in the transaction.[86]  Thus, the Pfleiderer Report's illustration in footnote 13 is not analogous at all, and examining the Repo Collateral is appropriate in the context to evaluate Movants' Overall Claim.

---

[82]  Pfleiderer Report, ¶37.

[83]  Pfleiderer Report, ¶51.

[84]  Pfleiderer Report, ¶60.

[85]  Pfleiderer Report, ¶10.

[86]  Although I am not aware of anyone at the hearing on September 19, 2008 specifically referring to the Repo Collateral within the $47.4B of assets being transferred (Hearing Transcript, September 19, 2008, 47:1-4), there was a reference to the $45.5B of liabilities assumed "in connection with those assets" (*Id.* at 47:5-8).  During the hearing, the $45.5B liability is identified as the former amounts owed to the Federal Reserve Bank in connection with their Primary Dealer Credit Facility (*Id.* at 63:18-22).

---

2.    The Pfleiderer Report Inappropriately Rejects Considering Contemporaneous
Valuations of "the Repo Collateral" Contained in Email Communications,
Email Attachments, and Deposition Testimony

48.    The Pfleiderer Report inappropriately rejects considering contemporaneous documents
and subsequent deposition testimony to establish the value of the Repo Collateral.  The report
states:

> Messages in emails … among the participants on Thursday, September 18, and
> subsequent days contain a range of estimates of the aggregate value of the positions
> transferred to Barclays on that day.  In my view, none of these "email estimates" is a
> reliable indicator of the aggregate fair value of what Barclays received in the Fed
> Replacement Repo, … Such estimates of value expressed in the body of an email
> message are not the kind of data on which economists and accountants rely in their
> professional work, and particularly not when there is better evidence of value available.[87]

49.    The Pfleiderer Report offers no evidence to support this assertion.  Contrary to this view,
it is clearly acceptable, reasonable, and appropriate for experts to consider and use such
information when conducting an economic analysis and forming expert opinions.  Experts
naturally do not accept this information on face value but rather analyze it in various ways,
consider the source, the context, and compare the information to other information; however, it is
inappropriate to simply ignore this type of contemporaneous information without foundation.

50.    The Pfleiderer Report argues that the relevance of contemporaneous information and feel
for the market are reasons to rely on Barclays' exit price marks: "First, there is no reason to
believe that better information is available today than was available in the fall and winter of 2008
(and into 2009) when the Barclays' exit price marks were developed.  To the contrary, few
analysts today, if any, would have the data or the 'feel for the market' that Barclays was able to
tap a year ago as it developed its exit price marks."[88]  However, these same arguments could be
made to support using the Lehman, BoNY, JPMorgan, and contemporaneous sources of third
party prices instead of using Barclays' exit price marks.  The Pfleiderer Report offers no
evidence that the information used by Barclays was better or Barclays' analysts had a better feel
for the market relative to the information used by and analysts working at Lehman, BoNY,
JPMorgan at the date of the Sale Transaction.

---

[87] Pfleiderer Report, ¶19.

[88] Pfleiderer Report, ¶60.

**Contains Highly Confidential Information**

51.    The Pfleiderer Report similarly states that "Given the stressful conditions prevailing during the week of the Fed Replacement Repo and the passage of more than a year since the events at issue, it is probably to be expected that relevant deposition testimony, taken as a whole, does not provide a reliable indicator of the aggregate value of the transferred positions."[89]  The Pfleiderer Report provides no foundation for this conclusion other than purportedly "stressful conditions" in the fall of 2008 and "passage of more than a year," which is neither acceptable nor sufficient foundation to ignore the deposition statements of individuals involved in the specific issues and events under investigation.  Again, experts regularly consider such information.  Thus, such information should be considered.

52.    In Exhibit E-1, I have prepared a summary of observations made by various people at Lehman, Barclays, the Federal Reserve Bank and others regarding the asset value of the Federal Reserve/Barclays Repurchase Agreement Assets from September 18 through September 20, 2008.[90]  Estimates of the Federal Reserve/Barclays Repurchase Agreement Assets during this period range from $49.0 billion to $52.3 billion.  The values of Federal Reserve/Barclays Repurchase Agreement Assets in excess of $45.0 billion range from $4.0 billion to $7.3 billion.[91]

> 3.    The Pfleiderer Report's Rejection of the Lehman, BoNY, and JPMorgan Price Marks to Value the Repo Collateral Is Flawed and Unsupported

53.    After inappropriately rejecting any consideration of statements in contemporaneous emails and email attachments as well as deposition testimony of the individuals involved in the transaction, the Pfleiderer Report also inappropriately rejects four of the five alternative valuation sources that might be used to value these securities.  The Pfleiderer Report rejects the Lehman marks, the Bank of New York ("BoNY") marks, the JPMorgan marks, and any subsequent assessments made by anyone else thereafter, including experts testifying in this

---

[89] Pfleiderer Report, ¶21.

[90] "The Federal Reserve Bank of New York is one of 12 regional Reserve Banks which, together with the Board of Governors in Washington, D.C., make up the Federal Reserve System. The Fed, as the system is commonly called, is an independent governmental entity created by Congress in 1913 to serve as the central bank of the United States. It is responsible for formulating and executing monetary policy, supervising and regulating depository institutions, providing an elastic currency, assisting the federal government's financing operations, and serving as the banker for the U.S. government."  (http://www.newyorkfed.org/aboutthefed/whatwedo.html, last visited March 5, 2010).

[91] I compare the values of the repurchase agreement assets to $45.0 billion, consistent with the Pfleiderer Report's comparison of the amounts in Table 2 to this amount in ¶8.

**Contains Highly Confidential Information**

matter.  According to the Pfleiderer Report, only the "Barclays exit price marks" are reasonable to use to value these securities.  On this point, the Pfleiderer Report states:  ". . . the best available source for marks for valuing the assets Barclays received in the Fed Replacement Repo (and the Transaction as a whole) is the detailed worksheets prepared by Barclays to identify exit price marks." [92]

54.     As I explain below, these conclusions and opinions are unsupported by appropriate and reasonable analyses based on accepted methodologies, scientific methods, and accepted principles, applied reliably and consistently.

### a.   Incorrect Conclusion from the Analysis of Available Prices

55.     In an attempt to describe the complexity of the securities transferred to Barclays, the Pfleiderer Report examines the availability of prices on September 22, 2008.  The Report concludes that prices are available for more than three quarters of the Repo Collateral:  ". . . Bloomberg and Capital IQ report observed prices (which may be from just one trade) for just under 60% of the CUSIPs represented in the Repo Collateral . . . The value of positions for which no price is reported in either Bloomberg or Capital IQ for September 22, 2008, is more than 23% of the total fair value of the Repo Collateral . . ." [93]

56.     The fact that prices do not exist for 23% of the value of these securities (based on Barclays' exit price marks), however, affects Lehman, BoNY, JPMorgan, and Barclays equally. This analysis provides no support for rejecting the Lehman, BoNY and JPMorgan price marks in favor of the Barclays price marks.  Yet, the Pfleiderer Report states, "[t]hese results establish that determining appropriate marks for the securities transferred to Barclays was not and could not have been a simple mechanical process of pulling data from vendor price databases." [94]

57.     In Exhibit E-2, I present the results of my analysis of prices available on September 19, 2008 and September 22, 2008.  On September 19, 2008, prices were available for 7,165 (or 66.7%) of the 10,743 CUSIPs considered in the Pfleiderer Report that were associated with

---

[92] Pfleiderer Report, ¶58.

[93] Pfleiderer Report, ¶31.

[94] Pfleiderer Report, ¶32.

**Contains Highly Confidential Information**

positions transferred to Barclays in the Initial Inventory, representing $32.025 billion (or 78.7%) of the Initial Inventory at Barclays Opening Balance Sheet valuation (at exit price marks). Of these, 99.99% of the value of "emerging markets" assets, over 99% of "equity," over 97% of "rates," and over 85% of "corporate" bonds at Barclays Opening Balance Sheet valuation (at exit price marks) are represented within the Bloomberg or Capital IQ data.[95] On September 22, 2008, prices were available for 7,159 (or 66.6%) of the CUSIPs. The prices capture $31.963 billion (or 78.6%) of the Initial Inventory at Barclays Opening Balance Sheet valuation (at exit price marks), with 99.99% of emerging markets assets, over 98% of equity, over 97% of rates, and almost 85% of corporate bonds represented. The Pfleiderer Report dismissed vendor prices based on the fact that less than 23% of the initial inventory at Barclays Opening Balance Sheet value was not represented.

58.    Expanding the sample by including Interactive Data collected via Bloomberg along with the data available from Bloomberg and Capital IQ, on September 19, 2008, prices were available for 7,998 (or 74.4%) of the CUSIPs, representing $35.359 billion (or 86.9%) of the Initial Inventory at Barclays Opening Balance Sheet value (at exit price marks). Specifically, the data captures $9.291 billion (or 73.6%) and $0.792 billion (38.2%) of the Initial Inventory at Barclays Opening Balance Sheet valuation (at exit price marks) for RMBS and Principal Mortgage Trading Group, respectively.[96, 97]

### b.    Pfleiderer Report's Analysis Rejecting Lehman Price Marks is Flawed and Inadequate

59.    The first contemporaneous source of price marks rejected in the Pfleiderer Report is Lehman's own marks. The source of these marks is GFS. Most CUSIPs/contracts in GFS include an indicator for market/valuation classification. According to the Pfleiderer Report, most

---

[95] "Rates" refers to treasury and agency securities traded both by Lehman's fixed income group and Barclays Capital. (Deposition of Jasen Yang, September 4, 2009, 17:16-21; Deposition of Eric Felder, July 31, 2009, 12:22-13:5).

[96] A "Residential Mortgage Backed Security is a Mortgage Backed Securities that are backed by loans secured with residential rather than commercial property." (http://www.duke.edu/~charvey/Classes/wpg/bfglosr.htm#residential_mortgage_backed_securities, last visited February 22, 2010).

[97] Principal Mortgage Trading Group [PMTG] is an internal trading and risk management group at Barclays. (Deposition of Stephen King, September 10, 2009, 9:5-19, 10:18-23).

**Contains Highly Confidential Information**

of these assets were Level II (73%) category assets; however, approximately 21% of these assets were Level I assets (assets that can be valued based on quoted prices for the identical instruments traded in active markets).[98, 99]

60.    The Pfleiderer Report rejects using all of the Lehman price marks because of conflicting deposition testimony about whether or not Lehman updated its price marks after September 12, 2008 and an analysis of the "stickiness" of the prices (observed price changes) of the Level II and Level III assets.  While the Pfleiderer Report does not identify the conflicting testimony it relies on in rejecting Lehman's price marks, some conflicting testimony occurred at Mr. McDade's deposition.  Mr. McDade (Lehman – President) initially stated that he believed Lehman's price marks were stale on September 15, but then admitted that Mr. Kelly (Lehman – Global Financial Controller) and Mr. Lowitt (Lehman – Co-Global Chief Administrative Officer) would have better knowledge of that issue.[100, 101]  Ian Lowitt, Lehman's former Chief Financial Officer, stated in his deposition:

> The assets that were on Lehman's books were, particularly LBI, were securities, and securities are priced based on, you know, market sources, and our books and records were accurate.[102]
>
> . . .
>
> I think that it is important to reflect that the marks that we had on our books were accurate, which I believe was the case…[103]

---

[98] Pfleiderer Report, ¶32.

[99] Level II category assets are assets that can be valued based on quoted prices for similar instruments traded in active markets or prices for similar or identical instruments in markets that are not active or using model-based techniques for which all significant assumptions are observable in the market.  (Financial Accounting Standards Board, Statement of Financial Accounting Standards No. 157, "Fair Value Measurements" (September 2006, as amended 2008), at ¶22-31).

[100] Deposition of Bart McDade, September 2, 2009, 77:4-10.

[101] Bart McDade was President of Lehman Brothers, then employed by Barclays for three months to aid in the transition. (Deposition of Bart McDade, September 2, 2009, 7:18-8:12).

Martin Kelly was the Global Financial Controller for Lehman at the time of the acquisition. After the acquisition, Kelly became the Financial Controller for Barclays Capital and is now a Managing Director and Chief Financial Officer in the Americas for Barclays. (Deposition of Martin Kelly, August 18, 2009, 8:8-12:2).

Ian Lowitt was the Co-Global Chief Administrative Officer for Lehman before the acquisition, and Chief Operating Officer of Barclays Wealth Americas after the acquisition. (Deposition of Ian Lowitt, August 20, 2009, 8:18-11:7).

[102] Deposition of Ian Lowitt, August 20, 2009, 41:17-21.

---

**Contains Highly Confidential Information**

61.     As I show in Exhibit E-3, Lehman's price marks were not as "sticky" as the Pfleiderer Report claims.  Exhibits 4 and 5 of the Pfleiderer Report selected a subset of the Level II and Level III securities and show daily price marks for these securities.  While the Pfleiderer Report states, "My analysis of the prices recorded in GFS revealed significant 'stickiness' in the marks for Level II and Level III securities going forward from September 12, 2008," the Pfleiderer Report provides no scientific or statistical tests upon which to form that conclusion.[104]  In fact, Lehman continued to update many prices throughout the week.

62.     Exhibit E-3 shows the percentage of CUSIPs in the GFS system with price changes from September 12, 2008 – September 19, 2008, and the percentage of market value for CUSIPs for which a price change was observed during that period.[105]  8,468 CUSIPs in the Initial and JPM inventory exist on all days in GFS.  Throughout the week, clean market prices of 79% of the 8,468 CUSIPs changed at least once, which represents 79% of value based on Barclays Opening Balance Sheet valuation (at exit price marks).  Clean market prices of 52% of the 8,468 CUSIPs changed every day during this week, which represents 64% of the value based on Barclays Opening Balance Sheet valuation (at exit price marks).  Clean market prices of 77% of the 8,468 CUSIPs changed value at least twice during the week.  This implies that 23% of the CUSIPs changed value at most once.  The sample of CUSIPs in Pfleiderer Report Exhibit 4 and 5 includes only securities with at most one price change from September 12 to 22 of 2008, which are only 23% of the CUSIPs.

---

[103]Deposition of Ian Lowitt, August 20, 2009, 42:17-43:18.

[104] Pfleiderer Report, ¶39.

[105] A CUSIP is included if it is present in GFS on all days from September 12, 2008 to September 19, 2008.  A CUSIP is said to be present in GFS if it has a numeric or missing price on a given day.  All price change analysis in this table is based on the clean market price as given in GFS.  I calculate price changes for only those dates which have strictly positive prices.  If a CUSIP's price is missing on a given trading date, it is set to the previous day's price for the purposes of comparison.  When multiple prices are observed for a CUSIP on a given day, the price is taken to be the average of the observed prices.  If data is available from multiple source systems within the GFS, a price change observed in any of the source systems is considered a change on that day for the CUSIP.

The Total Inventory value for Barclays Opening Balance Sheet Valuation (at Exit Price Marks) is shown at $44,430 million. This value is $6 million lower than what is shown in Exhibit C-3 at $44,436 million ($46,522.9M - 2,086.5M) (Pfleiderer Report Table 2). This $6 million reflects the difference on Barclays Opening Balance Sheet at Exit Price Marks and what is provided in JPM Inventory.

**Contains Highly Confidential Information**

63.    The Pfleiderer Report fails to consider, much less analyze, this information in reaching the conclusion that Lehman's marks were sticky, and therefore provides insufficient foundation and insufficient and incomplete analyses to conclude that all of the information in the Lehman marks should be ignored.

### c.    Flawed and Inadequate Analysis Rejecting the JPMorgan and BoNY Price Marks

64.    The Pfleiderer Report also rejects two other contemporaneous sources of price marks: the JPMorgan price marks and the BoNY price marks.  JPMorgan was the custodian or collateral agent for the Federal Reserve Bank of New York and BoNY was the custodian or collateral agent for Barclays.[106]  The Pfleiderer Report rejects using all of the BoNY and all of the JPMorgan price marks even though these "…banks maintain procedures and pricing groups that enable them to provide this marking service quickly and with the level of accuracy required by their roles in tri-party repos, …" because these "…were not normal repurchase agreements, but instead were much larger and more complex, and a significant number of the securities … were not normally eligible to serve as collateral in commercial tri-party repos."[107]  The Pfleiderer Report also discusses the limited amount of time both BoNY and JPMorgan had to mark the assets.[108]  Lastly, the Pfleiderer Report states it has analyzed the JPMorgan and BoNY marks for many of the esoteric and illiquid securities and refers the reader to Appendix Four of that report.

65.    The Pfleiderer Report provides insufficient foundation and insufficient and incomplete analyses to conclude that all of the information in both the BoNY and JPMorgan marks should be ignored.[109]  First, JPMorgan's marks are not analyzed or even mentioned anywhere in

---

[106] *See* expert report of Joseph R. Mason, PhD. dated March 15, 2010.

[107] Pfleiderer Report, ¶41.  Further, at the Pfleiderer deposition, the deponent admits that he did not review any of the custodial agreements or the underlying policies for security valuations.  (Deposition of Paul Pfleiderer, February 23, 2010, 170:12-172:7).

[108] Pfleiderer Report, ¶42.  I make note of the testimony from Barclays personnel regarding the lack of accuracy of BoNY's price marks including remarks by Stephen King, Barclays Managing Director and Head of the Portfolio Mortgage Trading Group and Jasen Yang, Director of the Portfolio Mortgage Trading Group.  (Deposition of Stephen King, September 10, 2009, 111:16-112:9; Deposition of Jasen Yang, September 4, 2009, 31:16-32:17, 61:17-62:20).

[109] In the Pfleiderer deposition, the deponent does not recall a single CUSIP, or security, or class of securities for which the BoNY or JPMorgan price marks were inaccurate.  (Deposition of Paul Pfleiderer, February 23, 2010, 169:19-170:11).

**Contains Highly Confidential Information**

Appendix Four.[110]  Second, as I explain below, the analysis in Appendix Four is not systematic and it is unsupported by appropriate and reasonable analyses based on accepted methodologies, scientific methods, and accepted principles, applied reliably and consistently.

### d.  Flawed and Inadequate Analysis Supporting Barclays' Exit Price Marks

66.      The justification in the Pfleiderer Report for using Barclays "exit price marks" is similarly unfounded, unsupported, and contains no systematic analysis.  The Pfleiderer Report begins its justification for using Barclays' exit price marks by providing twelve "key aspects" of the Barclays process used to develop its exit price marks.[111]  The Pfleiderer Report makes an overall statement, "…I have examined Barclays normal marking policies and procedures and find them to be reasonable, appropriate, and likely to produce reliable results."[112]  However, the Pfleiderer Report provides no information or analysis of the key aspects of the process and the marking policies and procedures used at Lehman, BoNY, and JPMorgan, or that one bank used better procedures and processes than another bank.[113]  Further, while procedures and policies are naturally important, in the end, it is the execution of procedures and policies and not the procedures and policies themselves that results in the price.  Without appropriate execution, it is not possible for procedures and policies to be "likely to produce reliable results."  Thus, this conclusion and opinion lacks foundation.

---

[110] One of the CUSIPs in the JPM Inventory was included in Appendix Four.  *See* additional discussion below regarding Appendix Four.

[111] Pfleiderer Report, ¶51.

[112] Pfleiderer Report, ¶51. 3.

[113] For example, the Pfleiderer Report provides no reason to conclude that the quality of Barclays' professionals and its Product Control Group ("PCG") was higher than the quality of the professionals and valuation groups at Lehman, BoNY, and JPMorgan; further, the processes at all of these banks were subject to review by regulatory bodies.  At the Pfleiderer deposition, the deponent admits that he did not review any of the custodial agreements or the underlying policies for security valuations (Deposition of Paul Pfleiderer, February 23, 2010, 170:12-172:7).  At the Pfleiderer deposition, the deponent states that when he interviewed Barclays employees they "….seemed to have a quick answer to or they seemed to be able to address the level of detail of question that I was posing and other people were posing on the phone call.  So that in itself gave me additional comfort beyond what I could see in the spreadsheets and everything else that a lot of effort and thoughtful appraisal had gone into the – into the process." (Deposition of Paul Pfleiderer, February 23, 2010, 86:22-87:7).

**Contains Highly Confidential Information**

67.     On incentives, the Pfleiderer Report states, "… so far as I have been able to determine,
Barclays had no institutional incentive to set exit price marks high or low, although it is my
understanding that a valuation low enough to make the transaction dilutive could have had
adverse regulatory consequences."[114]  Although the Pfleiderer Report does not define
"institutional incentive," a gain on the acquisition (higher values) increases the amount of
Barclays' equity, which may be useful in financing the company or meeting regulatory capital
requirements; on the other hand, lower value results in higher earnings in future periods.[115]  Once
the company has sufficient capital, compensation contracts may provide incentives to understate
the value of the assets to enhance future performance.  I note that Barclays recently attributed its
improved 2009 performance in part to the Lehman acquisition:  "During 2009, we increased our
income substantially.  Barclays Capital had a very strong year across all global franchises, in
particular as its businesses in North America started to reap the benefits of the Lehman
acquisition and integration."[116, 117]

---

[114] Pfleiderer Report, ¶51. 11.

[115] At its conference call with analysts on September 17, 2008, Barclays announced that the Lehman acquisition
would improve its capital ratios:  ". . . the transaction is capital ratio accretive without additional equity issuance.
And the source of that accretion is the negative goodwill from the transaction, which amounts to about $2b post
tax."  (BCI Exhibit 112,Thomson StreetEvents Transcript of 9/17/08 Barclays Plc Analyst Call, p. 3.).  The
following day, several analyst reports commented on the impact of the acquisition on Barclays' capital requirements.
Analysts from Fox-Pitt Kelton issued a report that stated:

> . . . The deal would be capital ratio accretive even before the extra USD1bn  raising, as there is USD2bn
> negative goodwill post tax.  So the extra capital being raised of 'at least' USD1bn is to allow for Barclays'
> 'expansive' outlook.

> This is a positive development for Barclays and will lift the quoted 1H08 equity Tier 1 capital ratio to
> around 6.75% from 6.30% (after capital raising), which looks adequate in a UK sector context.

> The company raised GBP4.5bn in July, raising its 1H08 equity Tier 1 to a pro forma level of 6.3%.  At the
> time, the company said that half the capital raised would be used to expand the business and half to raise its
> capital ratios above its longer term target of 5.25%.  The company says there is no change to the 5.25%
> longer term target equity Tier 1 ratio but reiterates that it will run ahead of this for some time during the
> current period of financial market and economic uncertainty.  (BCI Exhibit 113).

Analysts from Societe Generale Cross Asset Research stated:

> Our initial work indicates . . . the bank's core Tier I capital ratio should be comfortably ahead of the bank's
> 5.25% target on the back of:  minimal additional RWAs of £15bn, negative goodwill ($3,750m) and the
> capital injection.  (BCI Exhibit 114).

[116] Barclays PLC 2009 Results Announcement, p. 4.

---

**Contains Highly Confidential Information**

68.     As discussed above, some of Barclays' exit price marks were set at the sale price for certain securities sold between September 22 and September 30, 2008.  While we do not have the details of the conditions under which each of these securities or blocks of securities were sold, it is possible that they were sold at either "fire sale" prices or with a "block or bulk" discount.  The Pfleiderer Report acknowledges that, to the extent the securities were sold at fire sale or block/bulk discount prices, the sale prices would have been lower than an orderly sale of these securities.[118]  Thus, Barclays' exit price marks would be lower (biased) relative to what I understand was approved by the Court in the Sales Order; and thus, Barclays' exit price marks would be inappropriate and biased to use to measure the difference between the value Barclays was to receive based on the Court approved Sale Transaction and the value Barclays received (Barclays Windfall).

69.     The Pfleiderer Report claims that "PriceWaterhouseCoopers [*sic*] conducted an extensive audit of Barclays' final summary of the Acquisition, which included extensive investigation and testing of Barclays exit price marks."[119]  The Report, however, provides no citations to documents or other evidence that PricewaterhouseCoopers ("PwC") used additional or special audit procedures that would result in an "extensive" audit, and it provides no citations to documents or other evidence that PwC tested Barclays' exit price marks.[120]  Review of the PwC documents that the Pfleiderer Report relies on indicates that PwC did not conduct extensive investigation or testing of Barclays' exit price marks.  In fact the PwC documents that the Pfleiderer Report relies upon indicate that PwC's testing of Barclays' exit price marks was limited and used Bloomberg and S&P as pricing benchmarks.  There was no evidence that PwC prepared any independent valuation models or algorithms to test Barclays' exit price marks.  The

---

[117] "Barclays Capital Inc. (BCI or BarCap) is the investment banking division of Barclays Bank PLC. . . . Barclays Capital provides large corporate, government and institutional clients with a full spectrum of solutions to their strategic advisory, financing and risk management needs." (http://www.barcap.com/About+Barclays+Capital/Our+Firm/Our+Firm, last visited March 3, 2010).

[118] Pfleiderer Report, ¶¶ 59, 51. 10, and 63.

[119] Pfleiderer Report, ¶51. 12.

[120] PwC was Barclays' external auditor.  (Barclays 2008 Form 20-F; p. 177).  PwC is defined as "Price Waterhouse Coopers International Limited (PwCIL) or any of its member firms, such as PwC LLP in the U.S. and PwC UK in the United Kingdom." (http://www.pwc.com/us/en/index.jhtml, last visited March 5, 2010)

---

**Contains Highly Confidential Information**

Pfleiderer Report's conclusion that PwC conducted an "extensive investigation and testing of Barclays exit price marks" is flawed and without foundation.[121]

70.     Numerous PwC documents were produced after the Pfleiderer Report was prepared. These documents include "(1) documents from the section of the electronic PwC LLP audit workpaper database related to the work performed in connection with the Lehman acquisition, (2) external workpaper documents corresponding to those electronic workpapers, and (3) emails collected from seven custodians for the time period between September 12, 2008 and March 31, 2009."[122]  While these additional documents indicate that PwC performed certain procedures, it is unclear whether performed extensive investigation and testing.[123]

71.     The Pfleiderer Report attempts to provide some empirical evidence supporting the use of Barclays' exit price marks.  In Table 1 and Exhibit 6, the Pfleiderer Report compares BoNY marks to Barclays' exit price marks.  First, if the Pfleiderer Report is correct and the BoNY marks are not a reliable basis for valuing these assets, then it is unclear how the BoNY marks can be useful to assess the reliability of Barclays' exit price marks.[124]  Ignoring that issue, the Pfleiderer Report considers it important that Barclays' exit price marks are not uniformly different from (a constant percentage of) the BoNY marks, that the Barclays exit price market for certain security classifications (corporate bonds and emerging markets) are, in aggregate, larger than the BoNY marks, and that the differences are larger for higher risk and less liquid assets. According to the Pfleiderer Report, this "is evidence of the integrity of the process that generated Barclays exit price marks" and "the overall pattern in the value differences … is consistent with a discriminating and diligent effort to assess what values Barclays was likely to realize upon disposing of the acquired positions in an orderly sale …"[125]

---

[121] *See* expert report of John Garvey dated March 15, 2010.

[122] Letter from Martine M. Beamon (Davis Polk & Wardwell LLP) to William J. Hine, dated February 12, 2010, describing the PwC production to include documents bearing production numbers PwC-BarCap 00000001 – 00128004.

[123] *See* expert report of John Garvey dated March 15, 2010.

[124] Pfleiderer Report, ¶54.

[125] Pfleiderer Report, ¶¶54 and 56.

**Contains Highly Confidential Information**

72.     The analysis uses data that, according to the Pfleiderer Report, is not reliable and ignores
actual prices for the subset of securities for which prices exist.  However, the absence of a
uniform difference across types of securities does not represent meaningful evidence.  Had
Barclays used a constant percentage adjustment within a type of security and increased that
percentage based on risk and liquidity, we would observe the same results.  Further, the
securities that are more difficult to value potentially have greater variability in the underlying
data inputs; thus, it is no surprise that the differences are larger for these securities.  This
evidence provides no information about the "integrity of the process" or the "discriminating and
diligent effort."

73.     The Pfleiderer Report again points to the analysis in Appendix Four for additional
support for Barclays' exit price marks; however, as I explain below, the analysis in Appendix
Four is not systematic and it is unsupported by appropriate and reasonable analyses based on
accepted methodologies, scientific methods, and accepted principles, applied reliably and
consistently.

### e.  Inadequate Support for Rejecting Additional Independent Price Marks

74.     The Pfleiderer Report attempts to argue that other independent valuations – such as
valuations performed by experts testifying in this matter – are not useful to assess the valuation
of these assets, "… it is highly unlikely that such a procedure would lead to better marks than the
marks developed by Barclays.  Rather, such a procedure could in the end produce *less* reliable
marks for several reasons."[126]  None of the "reasons" attempting to support this opinion should
be considered in an economic analysis and quantification of the Barclays Windfall.  The
Pfleiderer Report provides no evidence that the Barclays analysts' "feel for the market" was
unbiased and better than an analyst would have today for that time period.

75.     Further, the Pfleiderer Report ignores the detailed expert review process in a litigation –
that is, the experts on both sides – Respondents and Movants in this matter – must provide
complete documentation underpinning any opinions (for example, valuations) and each side's
expert has the opportunity to challenge the other side's expert – for example, challenge the other

---

[126] Pfleiderer Report, ¶60.

**Contains Highly Confidential Information**

side's models, data, inputs, and calculations. Barclays' exit price marks have not been subjected to such a detailed expert review process. Respondents chose to not have their experts participate in such a process; however, given that these assets were, according to the Pfleiderer Report, "extremely difficult to value," such a detailed expert review process can result in a more reliable valuation.[127]

76.     The Pfleiderer Report's opinion that ". . . it is highly unlikely that such a procedure [developing an independent valuation] would lead to better marks than the marks developed by Barclays" is unsupported by appropriate and reasonable analyses based on accepted methodologies, scientific methods, and accepted principles, applied reliably and consistently.[128]

### 4.     The Pfleiderer Report's Ex-Post Analysis Is Flawed and Unsupported

77.     The Pfleiderer Report uses a flawed and unsupported ex-post analysis of Barclays' alleged gains and losses (*see* Table 3 in that Report) – conducted by Barclays itself for the purpose of this matter – to conclude that as of the date of that analysis, Barclays did not have a gain that was "…meaningfully distinguishable from no gain at all." [129]   Generally, this type of ex-post analysis – evaluating a price or mark based on a subsequent sale of the security – is inappropriate. The Pfleiderer Report acknowledges that "ex-post" analysis should be used with care.[130]   Below, I show that the Barclays ex-post analysis is unsupported, flawed, and biased. I also show that the use of this ex-post analysis in the Pfleiderer Report is flawed and unsupported; thus the opinions and conclusions related to the ex-post analysis in the Pfleiderer Report are flawed and unsupported.

78.     By Barclays' own admission in statements made in its 20-F Report filed with the U.S. Securities and Exchange Commission, Barclays states that it integrated the Lehman assets with its other assets and the calculation of profits related to the Lehman assets is impracticable and not reliable:

---

[127] Pfleiderer Report, ¶60.

[128] Pfleiderer Report, ¶60.

[129] Pfleiderer Report, footnote 59.

[130] Pfleiderer Report, ¶¶65-66.

**Contains Highly Confidential Information**

> It is impracticable to disclose the profit or loss of the acquired Lehman Brothers North American businesses since the acquisition date. The acquired business has been integrated into the corresponding existing business lines and there is no reliable basis for allocating post-acquisition results between the acquirer and the acquiree.[131]

79.    While Barclays disclosed publicly that the calculation of profits related to the Lehman assets is impracticable and not reliable, it took a different view for the purposes of this matter. Barclays' prepared "a memo summarizing available information as to the results of sales (or in some cases re-valuations) of trading portfolio securities."[132]  The source of this memo is Exhibit 533A.[133]  Barclays submitted this exhibit in conjunction with the deposition of Mr. Romain taken on January 13, 2010.[134]  In his deposition, Mr. Romain revealed at least three flaws in the calculations in this exhibit:

- First, these calculations are based largely on internal transfers of these securities from the central trading desk to other trading desks: "The following list captures the available P&L information for the $37.2bn of assets that were transferred from the central book internally to a Barclays trading desk. The difference between the $37.2bn of assets transferred internally and the $44.3bn of assets noted above relates primarily to external sales of cash equity positions directly from the central book."[135]  Thus, the underpinnings of more than 80% of these calculations are Barclays' internal re-valuations and not third party arms-length transactions. Further, Barclays provided no information about the types, amounts, third parties, dates, and so forth of the specific securities sold.[136]

- Second, Barclays used estimates to prepare this exhibit:

---

[131]   Barclays PLC, Barclays Bank PLC 2008 20-F filing to the U.S. Securities and Exchange Commission, p. 236.

[132]  Pfleiderer Report, ¶65.

[133]  Letter dated February 6, 2010 from Mr. Davenport to Ms. Carrero.

[134]  Mr. Romain is a Barclays employee and the head of technical accounting and private equity finance. He was involved in the accounting for the Lehman acquisition, and preparing the acquisition balance sheet and related disclosure in SEC Form 6-K.  (Deposition of Gary Romain, September 10, 2009, 12:16-18, 17:10-24).

[135]BCI-EX-00295932, (Deposition Exhibit 533A).

[136]BCI-EX-00295932 (Deposition Exhibit 533A).

---

**Contains Highly Confidential Information**

> It is the results of an exercise which we performed.  To be clear, to try and do this is not easy and it does reflect quite a number of assumptions because all of this inventory was commingled in trading books. . . . I didn't do the detailed work, but there was some assumptions around . . . the allocation of hedges, the allocation of total P&L in a book between Lehman acquired and legacy where there are, you know, very similar assets which are in the same book.[137]

- Third, Barclays offset any gains and losses in this exhibit with its hedge positions. However, these hedge positions are not hedge positions taken for specific securities or CUSIPs.  For accounting purposes, Barclays follows a specific identification process of mapping its securities and hedged positions: "When a financial instrument is designated as a hedge, the Group formally documents the relationship between the hedging instrument and hedged item as well as its risk management objectives and its strategy for undertaking the various hedging transactions."[138]  Barclays provided no such documentation and it appears that it did not follow this process for the purposes of preparing this exhibit; rather, it allocated hedges on a book of securities.[139]

80.    The Pfleiderer Report acknowledges that it is only the degree to which Barclays' hedging was effective that allows one to even consider using such an ex-post analysis.[140]  However, later in the report when discussing the Barclays' market risk from the Sale Transaction, the Pfleiderer Report explains how difficult and expensive hedging was, particularly around the time of the Sale Transaction and when Barclays was receiving securities with which it was unfamiliar.[141]

81.    As I discuss above, it is my understanding that Barclays' exit price marks were set at the sale price for certain securities sold between September 22 and September 30, 2008.[142]  PMTG assets sold in that time frame were valued at the sale price.  By using sale prices in its acquisition

---

[137] Deposition of Gary Romain, January 13, 2010, 177: 17-178:8.

[138] Barclays PLC, Barclays Bank PLC 2008 20-F filing to the U.S. Securities and Exchange Commission, p. 183.

[139] Deposition of Gary Romain, January 13, 2010, 177:15-182:24.

[140] *See* Pfleiderer Report ¶¶67-68.

[141] *See* Pfleiderer Report ¶¶102-103.

[142] Initial Inventory.

---

**Contains Highly Confidential Information**

balance sheet, Barclays' net gains or losses would not be reported as gains or losses on its income statement. Instead, the net gains or losses would be included in the calculation of goodwill. This misstates the net gains in Barclays' ex-post analysis. This analysis is flawed and incomplete.

82.      Exhibit 533A, which is the basis of the ex-post analysis in the Pfleiderer Report, is mostly the result of internal transfers and internal revaluation (and not third-party transactions) and is based on unknown estimates and inputs. In addition, for such an analysis to be informative, the securities must be appropriately hedged and, according to the Pfleiderer Report, these hedges were imperfect. Thus, the ex-post analysis in the Pfleiderer Report is flawed and unsupported and, as a result, the opinions and conclusions related to the ex-post analysis in the Pfleiderer Report are flawed and unsupported.

5.      The Pfleiderer Report's Analysis in Appendix Four Is Flawed and Unsupported

83.      Appendix Four of the Pfleiderer Report purports to summarize available information about selected securities or groups of similar securities acquired by Barclays. Appendix Four acknowledges that the values of most of the securities based on Barclays' exit price marks for September 22, 2008 "differ significantly from indicated values based on BoNY's marks for September 19, 2008."[143] Neither Appendix Four nor other sections of the Pfleiderer Report, however, provide foundation and analysis to conclude that all of the BoNY marks should be rejected and Barclays' exit price marks should be used.

a.   Flawed and Inadequate Analysis

84.      Appendix Four analyzes "several sets of similar securities that Barclays sold shortly after closing the Transaction."[144] First, this type of analysis – evaluating a price or mark based on a subsequent sale of the security – is inappropriate (see my above discussion of the ex-post analysis in the Pfleiderer Report). The Pfleiderer Report acknowledges this point when

---

[143] Pfleiderer Report, p. 106.

[144] Pfleiderer Report, p. 107.

**Contains Highly Confidential Information**

discussing the use of "ex-post" analysis.[145]  Even ignoring this flawed type of analysis, however, the implementation of the analysis in the Pfleiderer Report is also flawed.

85.    In Appendix Four, section 1 to section 3, the Pfleiderer Report presents three examples of securities that were acquired in the Sale Transaction and subsequently sold by Barclays – the sale of 125 collateralized ALT-A mortgage obligations issued by Structured Adjustable Rate Mortgage Loan Trust, 67 asset backed securities backed by ALT-A HELOCs issued by Lehman XS Trust, and 65 U.S. agency collateralized mortgage obligations.[146]  In Exhibit E-4, I present the value of each of these types of securities using the BoNY price marks, the Barclays price marks (as discussed in Appendix Four), and the price at which these securities were sold.[147]  As

---

[145] Pfleiderer Report, ¶¶65-66.

[146] ALT-A is a ". . . classification of mortgages where the risk profile falls between prime and subprime. The borrowers behind these mortgages will typically have clean credit histories, but the mortgage itself will generally have some issues that increase its risk profile. These issues include higher loan-to-value and debt-to-income ratios or inadequate documentation of the borrower's income." (http://www.investopedia.com/terms/a/alt-a.asp, last visited March 14, 2010).  I understand "loan-to-value" to be "[a] lending risk assessment ratio that financial institutions and others lenders examine before approving a mortgage. Typically, assessments with high LTV ratios are generally seen as higher risk and, therefore, if the mortgage is accepted, the loan will generally cost the borrower more to borrow or he or she will need to purchase mortgage insurance." (http://www.investopedia.com/terms/l/loantovalue.asp, last visited March 14, 2010).

 "Asset-backed securities are debt instruments secured against assets or cash flows from items such as car loans, credit card debt, mortgage loans, aircraft leases or royalty payments. The assets are pooled or bundled together and used as collateral for the issue of debt instruments in a process known as securitization. A special purpose vehicle (SPV) is formed to carry out the securitization and pay back the company that owned the assets. The removal of the assets from a company's balance sheet and the money it receives for them may improve its credit rating and reduce the capital it needs."  (http://glossary.reuters.com/index.php/ABS, last visited February 23, 2010).

 HELOC refers to a Home Equity Line of Credit, which is defined as a ". . . line of credit extended to a homeowner that uses the borrower's home as collateral. Once a maximum loan balance is established, the homeowner may draw on the line of credit at his or her discretion. Interest is charged on a predetermined variable rate, which is usually based on prevailing prime rates."  (http://www.investopedia.com/terms/h/homeequitylineofcredit.asp, last visited February 22, 2010).

[147] The figures for the collateralized ALT-A mortgage obligations issued by Structured Adjustable Rate Mortgage Loan Trust were obtained via the PMTG tab from the Initial Inventory file using a filter on Issuer (column G) for text beginning with "Structured Adjustable Rate Mortgage Loan Trust".

The figures for the asset backed securities backed by ALT-A HELOCs issued by Lehman XS Trust were obtained via the PMTG tab from the Initial Inventory file using a filter on Issuer (column G) for "Lehman XS Trust" at the front of the field, then an additional filter on Asset Type (column I) for "US ABS Home Eq".

The figures for the U.S. agency collateralized mortgage obligations (sequentials, PACs, and VADMs) were obtained via the RMBS tab from the Initial Inventory file using a filter on Type (column D) for "US Agency CMO" and an additional filter on Subtype (column E) for "Sequentials, PACs, and VADMs" and an adjusted filter which ignores all items with zero in Sales Price Field (column Y).

---

**Contains Highly Confidential Information**

shown in Exhibit E-4, the securities discussed in the Pfleiderer Report account for a very small portion of the securities in Initial inventory.  There are a total of 257 securities in the Pfleiderer Report's examples, which account for 2.4% of the total number of securities in the Initial Inventory.  These securities have an aggregate value of $1.265 billion based on BoNY marks on September 19, 2008, which is only 2.8% of the total value of all securities in the Initial Inventory.

86.     In addition, the Pfleiderer Report's use of Barclays' exit price marks is biased.  Barclays' exit price marks used information that was not knowable as of September 22, 2008 to value at least some subset of the securities.  For the JPM Inventory, Barclays used its exit prices on December 22, 2008, which is three month after the September 22, 2008.[148]  It is my understanding that Barclays' exit price marks were set at the sale price for certain securities sold between September 22 and September 30, 2008.  The spreadsheets that contain the Barclays' exit price marks used in its Opening Balance Sheet indicate that 828 of 1,981 PMTG and PMTG II securities in the Initial Inventory that were sold between September 22 and September 30 were reported at sale values in the Opening Balance Sheet.[149]  While we do not have the details of the conditions under which each of these securities or blocks of securities were sold, it is possible that they were sold at either "fire sale" prices or with a "block or bulk" discount.  The Pfleiderer Report provides some, albeit limited, information to understand the potential effect of using sales prices from subsequent sales of securities for the value of the securities on Barclays's Opening Balance Sheet.  The Pfleiderer Report provides no foundation or support for using fire sale or block discounted prices or values for the purposes of a comparison to the Sale Transaction approved by the Court.

87.     The flawed implementation in this section of the Pfleiderer Report is the same flawed implementation that plagues much of the Report; that is, the Report selects a subset of data that

---

[148] Mr. Romain stated in his declaration that "[t]he assets transferred to Barclays in the December settlement with JP Morgan and LBI consisted of $1.25 billion in cash and securities that Barclays valued at $3,741 million measured as of the December 22,2008 date of receipt."  (Declaration of Gary Romain, January 26, 2010, ¶19 (BCI Exhibit 357)).

[149] Mr. Romain stated in his declaration that Barclays' ". . . total valuation of all inventory actually transferred in September 2008, which includes both the Schedule A repo collateral securities as well as the Schedule B clearance box assets (Bates number BCI-EX-00099519). . . . indicated that Barclays valued the total inventory of securities actually received in September 2008 at $40,690 million. The amount included in the acquisition balance sheet was $40,695m after adjusting for immaterial rounding items. . . "  (Declaration of Gary Romain, January 26, 2010, ¶18 (BCI Exhibit 357)).

**Contains Highly Confidential Information**

supports an opinion or conclusion and ignores the remaining data.  Thus, it does not provide a comprehensive and thorough analysis of an issue.  As discussed above, I show in Exhibit E-4, using Barclays' exit price marks, the value of these securities is only 2.2% of the value of the securities at issue.

### b. Flawed and Inadequate Analysis of Other Securities in Appendix Four

88.    The remainder of Appendix Four (sections 4.4-4.8) contains unsupported opinions about Barclays' exit price marks for five securities – (i) US Agency CMOs (Complex Floater, Interest Only and Inverse Interest Only), (ii) Lehman-issued warrants and Lehman-issued equity-linked notes, (iii) Giants Stadium Bonds, (iv) Insurance-Related asset backed securities, and (v) Pine CCS CLO.[150, 151]    The Pfleiderer Report concludes that the Barclays exit price mark is

---

[150] CMOs are Collateralized Mortgage Obligations and are defined as ". . . a type of mortgage-backed security (MBS). They are bonds with claims to cash flows from pools of residential mortgages. The payments of principal and interest on the mortgages are allocated to different tranches of the CMO by a complex structure. Each tranche may have different principals, coupon rates and maturity dates." (http://glossary.reuters.com/index.php/CMO, last visited February 23, 2010).

"A floater is a bond whose interest rate varies with the interest rate of another debt instrument, e.g., a bond that has the interest rate of the Treasury bill +.25%."  (http://www.bloomberg.com/invest/glossary/bfglosf.htm#floater, last visited February 22, 2010).

"Interest Only is a tranche of a CMO or similar instrument whose owner receives only the interest or some part of the interest paid on mortgages in the underlying pool." (http://www.amex.com/servlet/AmexFnDictionary?pageid=display&titleid=3425, last visited February 22, 2010).

"Inverse Floater is a derivative instrument whose coupon rate is linked to the market rate of interest in an inverse relationship." (http://www.bloomberg.com/invest/glossary/bfglosi.htm, last visited February 22, 2010).

A warrant is a "derivative security that gives the holder the right to purchase securities (usually equity) from the issuer at a specific price within a certain time frame." (http://www.investopedia.com/terms/w/warrant.asp, last visited March 3, 2010).

"Equity-Linked Note (ELN) is a security that combines the characteristics of a zero- or low-coupon bond or note with a return component based on the performance of a single equity security, a basket of equity securities, or an equity index. In the latter case, the security is typically called an equity index-linked note. Equity-linked notes come in a variety of styles. The minimum return may be zero with all of what would normally be an interest payment going to pay for upside equity participation. Alternatively, a low interest rate may be combined with a lower rate of equity participation. The participation rate in the underlying equity instrument may be more or less than dollar for dollar over any specific range of prices. The participation may be open ended (the holder of the note participates proportionately in the upside of the underlying security or index, no matter how high it goes), or the equity return component may be capped. Other things equal, a capped return is associated with a higher rate of participation up to the cap price." (http://www.amex.com/servlet/AmexFnDictionary?pageid=display&titleid=2397, last visited February 22, 2010).

---

**Contains Highly Confidential Information**

appropriate to use for each of these securities; however, as I explain above, each of these opinions is unsupported by appropriate and reasonable analyses based on accepted methodologies, scientific methods, and accepted principles, applied reliably and consistently.

89.    First, as I show in Exhibit E-4, using Barclays' exit price marks, the value of these securities is only 3.0% of the value of the securities at issue.  The analysis in the Pfleiderer Report concerning the US Agency CMOs (Complex Floater, Interest Only and Inverse Interest Only) securities entails an overview of this type of security and cites the riskiness of these types of securities.  An overview of this type of security is merely a description and, of course, provides no foundation to support the appropriateness of Barclays' exit price marks (in absolute terms or relative to other marks).  The relative riskiness of these securities also provides no foundation to support the appropriateness of Barclays' exit price marks (in absolute terms or relative to other marks) as long as the other marks (Lehman, BoNY) also included appropriate risk adjustments for the riskiness of this type of security.  The Pfleiderer Report cites U.S. Securities and Exchange Commission documents identifying the riskiness of these securities; thus, it appears that the riskiness was known to Barclays and to Lehman and BoNY.  The

---

A CLO is a Collateralized Loan Obligation, which is defined as ". . . a security backed by a pool of commercial or personal loans, structured so that there are several classes of bondholders with varying maturities, called tranches. Similar in structure to Collateralized Mortgage Obligations." (http://www.bloomberg.com/invest/glossary/bfglosc.htm#collateralized_loan_obligation, last visited February 23, 2010).

[151] The figures for U.S. agency CMOs (complex floater, interest only and inverse interest only) were obtained via the RMBS tab from the Initial Inventory file using a filter on Subtype (column E) for "Complex Floater", "IO", or "Inverse IO" and an adjusted filter which ignores all items with zero in the Sales Price Field (column Y) for only "Complex Floater."

The figures for Lehman-issued warrants and Lehman-issued equity-linked notes were obtained via the EQTY-930old tab from the Initial Inventory file using a filter on Tested? (column L) for "Lehman Issued Untested" and "Lehman Issued Warrants Untested".

The figures for Giants stadium bonds were obtained via the Corps tab from the Initial Inventory file from all line items with text "Giant" in column A.

The figures for insurance-related asset backed securities were obtained via the Corps tab from Initial Inventory for CUSIP 45805AAA7. These amounts are reported in Exhibit E-4 and are based on a $46 million notional amount. The other CUSIP in this category is CUSIP 45804VAA2 found in the Portfolio 3 tab of the JPM Inventory file. For this CUSIP, the JPM custodial mark for 9-17-08 was $53.0 million, Barclays (PCG) 12-22-08 mid-point mark was $14.5 million, and Barclays (PCG) 12-22-08 exit price mark was $14.4 million.

The figures for Pine CCS CLO were obtained via the PMTG II tab from the Initial Inventory file using a filter on Issuer (column F) for "Pine CCS" and a filter on Asset Type (column C) for "CLO".

---

**Contains Highly Confidential Information**

Pfleiderer Report does not review (and therefore did not test) the valuation model and inputs used by Barclays to value this type of security; it did not compare the valuation model and inputs used by BoNY or Lehman to the Barclays model and inputs.[152]  The Pfleiderer Report provides no foundation or support for the conclusion that, "[g]iven the relevant risks and liquidity issues, Barclays exit-price marks were reasonable and appropriate."[153]

90.     The analysis in the Pfleiderer Report concerning the Lehman-issued warrants and Lehman-issued equity-linked notes entails an overview of this type of security and an analysis for prices of "other direct obligations of LBHI immediately preceding and following LBHI's bankruptcy filing."[154]  The Pfleiderer Report provides no information that identified the specific securities examined in this analysis; how similar these securities were to the securities at issue; whether the analysis included all such securities or a selected subset, and, if a subset, how the subset was selected; the sources of the prices; the frequency of the prices; the volume traded; or any other information other than a broad observation that these securities "lost somewhere between 80% and 90% of their value immediately following LBHI's filing."[155]  Barclays' exit price marks assigned a zero value to these securities, apparently ignoring evidence employed in the Pfleiderer Report that these assets should be valued at 10% to 20%.  The Pfleiderer Report does not review (and therefore did not test) the valuation model and inputs used by Barclays to value this type of security; it did not compare the valuation model and inputs used by BoNY or Lehman to the Barclays model and inputs.[156]  Thus, the Pfleiderer Report has no foundation or support to conclude that, "this write off of the BoNY-marks indicated value of Lehman-issued equity linked notes and warrants was reasonable and appropriate."[157]

---

[152] In the Pfleiderer deposition, when asked about the liquidity discount applied to these securities, the deponent states that he cannot recall any specific analyses that were performed but notes that PwC has reviewed these calculations.  (Deposition of Paul Pfleiderer, February 23, 2010, 260:3-262:10).

[153] Pfleiderer Report, p. 110.

[154] Pfleiderer Report, p. 111.

[155] Pfleiderer Report, p. 111.

[156] In the Pfleiderer deposition, the deponent states that his recollections are also "a bit hazy" with regard to any discussion or regarding the valuation of these securities.  He agrees that the asset should be significantly marked down but cannot offer a more precise value without conducting additional due diligence.  (Deposition of Paul Pfleiderer, February 23, 2010, 317:15-321:3).

[157] Pfleiderer Report, p. 112.

---

**Contains Highly Confidential Information**

91.    The analysis in the Pfleiderer Report concerning the Giants Stadium Bonds entails an overview of this type of security and a discussion of the auction rate securities market.  The Pfleiderer Report states that such securities could have had more value for long-run investors, "… investors who could hold for the long term eventually would be paid in full; the crisis in auction rate markets was said to be an issue of lack of liquidity rather than deteriorating creditworthiness of the borrowers."[158]  The Pfleiderer Report rejects that view but provides no support for rejecting it, "But for Barclays purposes, the issue was not what the value of these securities might be in the long run assuming a return to normal conditions, but the value of the positions in an orderly sale under current conditions."[159]  The Pfleiderer Report does not review (and therefore did not test) the valuation model and inputs used by Barclays to value this type of security; it did not compare the valuation model and inputs used by BoNY or Lehman to the Barclays model and inputs.[160]  The Pfleiderer Report provides no foundation or support for the conclusion that, "Given conditions in the markets for auction rate securities, Barclays exit-price marks were reasonable and appropriate."[161]

92.    The analysis in the Pfleiderer Report concerning the insurance-related asset backed securities entails a discussion of the possible identification of these securities and the pricing of these securities in the GFS system.  The Pfleiderer Report speculates that some of these securities are auction rate securities and some might be related to certain insurance companies or types of insurance companies.  This speculation provides no foundation to support the appropriateness of Barclays' exit price marks (in absolute terms or relative to other marks) as long as the other marks (Lehman, BoNY) also had similar information to that of Barclays.  The Pfleiderer Report does not review (and therefore did not test) the valuation model and inputs used by Barclays to value this type of security; it did not compare the valuation model and inputs used by BoNY or Lehman to the Barclays model and inputs.  The Pfleiderer Report provides no

---

[158] Pfleiderer Report, pp. 112-113.

[159] Pfleiderer Report, p. 113.

[160] In the Pfleiderer deposition, the deponent admits there was "some focus on these bonds by people at Barclays" but cannot be certain that he is not confusing this security with Pine.  He does recall that his staff did a "fair amount of due diligence" and there were some discussions, none of which he could recall.  (Deposition of Paul Pfleiderer, February 23, 2010, 315:8-318:19.)

[161] Pfleiderer Report, p. 113.

foundation or support for the conclusion that, "[c]onsidering these factors, securities backed by Genworth and related entities — with or without credit enhancement by a troubled monoline insurer — were appropriately accorded a low valuation as of September 22, 2008."[162]

93.    The analysis in the Pfleiderer Report concerning the Pine CCS CLO entails an overview of this type of security, concluding that these securities were not traded, and a review of (and partially quoted) a Barclays' valuation memorandum.  The Pfleiderer Report does not review (and therefore did not test) the valuation model and inputs used by Barclays to value this type of security; it did not compare the valuation model and inputs used by BoNY or Lehman to the Barclays model and inputs.[163]  Further, the quotation from the Barclays valuation memorandum in the Pfleiderer Report itself indicates that Barclays gave a "haircut" of 75% to its own value without foundation from a model or empirical analysis:

> Overall view was that based on (a) the factors relating to the pool composition along with (b) the high concentration and (c) recent downgrade to CC, PCG PT determined a px of $56 was reasonable to which a haircut of 75% of MV should be applied for market and legal uncertainty.[164]

94.    The Pfleiderer Report provides no foundation or support for the conclusion that, "Barclays 'due diligence' [Pine CCS] in marking this unique asset appears thorough and appropriate and justifies Barclays' conclusion as to value at exit price marks."[165]

### c.  Conclusion

95.    Based on the analysis in Appendix Four of that report, the Pfleiderer Report claims to have "…examined a number of the specific positions and groups of positions … in more detail, to assess whether the specific characteristics of the positions explained and supported Barclays exit price marks as opposed to BoNY marks."[166]  As I document above, the securities examined represent only 5.2% of the Barclays Opening Balance Sheet value at issue.  Further, the opinions

---

[162] Pfleiderer Report, p. 116.

[163] *See* expert report of John Olvany dated March 15, 2010.

[164] Pfleiderer Report, p. 117.

[165] Pfleiderer Report, p. 117.

[166] Pfleiderer Report, ¶57.

and conclusions in this section of the Pfleiderer Report are not supported by an independent valuation of the securities at issue, nor are they supported by an acceptable empirical analysis and testing of the assumptions.

      6.   Overall Conclusion Regarding the Opinions in Section II of the Pfleiderer
          <u>Report</u>

96.     As I show above, the various opinions and conclusions in the Pfleiderer Report relating to rejecting the use of each and every valuation or price mark other than the Barclays' exit price marks are flawed and unsupported.  I begin by discussing the Pfleiderer Report's flawed opinion about the "price" of the Repo Collateral.  Next, I respond to the Pfleiderer Report's flawed and unsupported rejection of valuations of the Repo Collateral contained in contemporaneous emails, email attachments, and depositions.  Third, I evaluate the Pfleiderer Report's flawed and unsupported rejection of the Lehman, BoNY, and JPMorgan price marks to value the Repo Collateral.  Fourth, I examine the Pfleiderer Report's flawed and unsupported ex-post analysis.  Finally, I evaluate the Pfleiderer Report's flawed and unsupported analysis in Appendix Four.  These factors should not be considered in the economic analysis of the Movants' claims.

97.     Thus, the opinion in the Pfleiderer Report that "Based on the facts and analyses set forth in this section, I conclude that Barclays did not receive a $5 billion discount, secret or otherwise, through the Fed Replacement Repo"[167] is, for reasons I explain above, unsupported by appropriate and reasonable analyses based on accepted methodologies, scientific methods, and accepted principles, applied reliably and consistently.  The Pfleiderer Report admits that Barclays received a $500 million discount in stating that "… the Repo Collateral pledged to Barclays in the Fed Replacement Repo, including the securities and cash ultimately received in Barclays' December settlement with JP Morgan Chase and LBI, was worth at most approximately $45.5 billion..."[168]

---

[167] Pfleiderer Report, ¶8.

[168] Pfleiderer Report, ¶8.

**Contains Highly Confidential Information**

    F.  PFLEIDERER REPORT'S OPINIONS IN SECTION III RELATED TO THE "ALLEGED $5 BILLION DISCOUNT AT INCEPTION" ARE FLAWED AND UNSUPPORTED

98.    In this section, I discuss the basis for the following opinion:

**Opinion 8:** The opinion in Section III of the Pfleiderer Report that ". . . the Movants' assertion of a secret $5 billion discount from inception is implausible" is flawed and lacks foundation.[169] To the contrary, Movants' assertion of a $5 billion discount from inception is possible.

99.    Among the opinions expressed in Section III of the Pfleiderer Report is the following: ". . . in my opinion, the Movants' assertion of a secret $5 billion discount from inception is implausible."[170]

100.    To support its conclusion, the Pfleiderer Report analyzes GFS data as of September 12, 2008 and compares the Net Long Inventory values of LBI's holdings to the September 16, 2008 Balance Sheet.[171] (*See* Pfleiderer Report, Table 4). This analysis is flawed for the reasons described below. In addition, the Pfleiderer Report ignores the deposition testimony and other documents that contradict this conclusion.[172]

101.    Pfleiderer Report Table 4 relies on GFS data that does not identify the CUSIPs used to compute a total Net Long Inventory value of $65.16 billion.[173] Using the most complete CUSIP-level information available on September 12, 2008, I identify CUSIPs in GFS with a positive

---

[169] Pfleiderer Report, footnote 61, p. 45.

[170] Pfleiderer Report, footnote 61, p. 45.

[171] The "September 16, 2008 Balance Sheet" refers to Deposition Exhibit 19, which was referenced in the APA (Deposition Exhibit 1).

[172] Deposition Exhibit 20; Deposition of Martin Kelly, August 18, 2009, 46:11-17, 66:7-16; Deposition of Ian Lowitt, August 20, 2009, 41:8-42:16, 43:12-22, 138:18-139:3; Deposition of Paolo Tonucci, August 14, 2009, 27:18-29:14.

[173] The Pfleiderer Report relies on BCI-EX-(S)-00213951.xls, an excel file that contains a summary tab and a detail tab. The detail tab of this spreadsheet omits any references to CUSIPs or products. (*See* Pfleiderer Report, footnote 65).

---

trade position in Exhibit F-1.[174]  I then compare these CUSIPs to the CUSIPs included in Barclays Opening Balance Sheet.  7,893 out of the 11,938 CUSIPs, which is 66% of the CUSIPs, or $26.691 billion of the $44.430 billion, which is 60% of the value, in Barclays Opening Balance Sheet in the Initial and JPM Inventory on September 12, 2008 were present in GFS. Thus, the analysis in the Pfleiderer Report cannot be conclusive for the Lehman assets received by Barclays.

102.    Contrary to the Pfleiderer Report's conclusion, it is possible that a $5 billion discount existed at inception of the transaction.  As support for its conclusion, the Pfleiderer Report states:

> If these publicly-disclosed values really were understated by $5 billion, Barclays had set itself up, in a very public way, for an extraordinary problem, namely, what to do with the $5 billion gain it would realize, mostly in the fourth quarter, as it sold off these assets. How could Barclays not realize that a distortion of this magnitude, made in full public view, would come back to haunt it in a matter of months?[175]

103.    There are several flaws in the Pfleiderer Report's rationale.  First, it was not possible to identify the performance of Lehman, or the gains/losses Barclays would realize on the sale of Lehman's trading inventory, in Barclays' publicly disclosed financial statements.  As Barclays stated in its disclosure of the acquisition in its SEC Form 20-F:

> It is impracticable to disclose the profit or loss of the acquired Lehman Brothers North American businesses since the acquisition date.  The acquired business has been integrated into the corresponding existing business lines and there is no reliable basis for allocating post-acquisition results between the acquirer and the acquiree.[176]

104.    After the acquisition, Lehman's performance was therefore indistinct from that of Barclays' existing operations.  Second, a $5 billion gain would be recognized in the fourth quarter of 2008 only if the assets were perfectly hedged.  The Pfleiderer Report admits that

---

[174] *See* BCI-EX-00297253 (Detailed Exposure Report 9-12.xlsx).  The Net Long Inventory of the CUSIP level detail in this file sums to $62.36 billion.  The Net Long Inventory in the support materials from Table IV of the Pfleiderer Report uses a different aggregation than CUSIP ("2008-09-16_0723 – Here's the summary for the 12th.xls" (BCI-EX-(S)-00213951.xls)) and totaled $65.16 billion.  I further note that the Pfleiderer Report includes an additional file at the CUSIP level for September 12, 2008 (BCI-EX-00297155.xls) in which the Net Long Inventory value is $54.6 billion.

[175] Pfleiderer Report, footnote 61, p. 45.

[176] Barclays PLC, Barclays Bank PLC 2008 20-F filing to the U.S. Securities and Exchange Commission, p. 236.

---

**Contains Highly Confidential Information**

Barclays' hedging of the portfolio was "incomplete and imperfect."[177] Therefore, any gain or loss recognized in the fourth quarter would be affected by market movements after the acquisition date, resulting in recognition of a different gain or loss.[178] Finally, Barclays' analysis of its gains and losses on the sale of Lehman inventory through December 31, 2008 indicated that only $7 billion of assets were sold to external parties.[179] The remainder of the trading inventory was transferred internally to Barclays' trading desks. In addition, as discussed above, this analysis is flawed because Barclays recorded certain assets at their sale prices in the Opening Balance Sheet. By using sale prices in its acquisition balance sheet, Barclays' net gains would not be reported as gains on its income statement. Instead, the net gains would be included in goodwill. It is unclear if a $5 billion discount at inception would be revealed in this analysis.

105.    The Pfleiderer Report's opinions regarding the existence of a $5 billion discount at the inception of the Sale Transaction are flawed and unsupported.

### G.   PFLEIDERER REPORT'S OPINIONS IN SECTION IV RELATED TO "RISKS ARISING FROM THE ACQUISITION" ARE FLAWED

106.    In this section, I discuss the basis for the following opinion:

**Opinion 9:**  The Pfleiderer Report argues in Section IV that Barclays' "… immense financial and business risks …"[180] should be considered in an economic analysis of Movants' claims. As I explain and document below, and as acknowledged in the Pfleiderer Report, Barclays was aware of these risks when the Court approved the Sale Transaction; thus, such issues should not be considered in the economic analysis and quantification of the Barclays Windfall. [181]

---

[177] Pfleiderer Report, ¶¶68 and 102.

[178] Barclays' analysis of its gains and losses on the sale of Lehman inventory through December 31, 2008 indicated that not all assets were hedged. (Deposition Exhibit 533A (BCI-EX-00295932-BCI-EX-00295933)).

[179] Deposition Exhibit 533A (BCI-EX-00295932-BCI-EX-00295933).

[180] Pfleiderer Report, ¶5. b.

[181] Deposition of Robert Edward Diamond, Jr., September 11, 2009, 52:22-53:8, 53:20-22, 54:4-6, 59:12-18. Mr. Diamond is president of Barclays PLC and chief executive of the investment banking and investment management businesses. (*Id*. at 7:14-20.)

Deposition of John Varley, September 3, 2009, 24:17-20. Mr. Varley is Chief Executive Officer of Barclays. (*Id*. at 5:14-15.)

---

**Contains Highly Confidential Information**

107.    Section IV of the Pfleiderer Report includes the following among its opinions:

> The acquisition of LBI's North American broker-dealer businesses entailed enormous risks for Barclays, which can be grouped into three broad categories: (a) information risk, (b) market and price risk, and (b) [*sic*] business and strategic risk. . . . The set of assets transferred from LBI to Barclays on September 22, 2008, was among the largest, most complex, and most difficult to understand set of assets ever transferred from one financial institution to another. . . . There are reasons to doubt how well Lehman understood some of these securities, much less other investors and analysts (including Barclays prior to the Transaction). . . . [T]here can be no doubt that both Lehman and Barclays were working with imperfect and incomplete information as they negotiated and effected the Transaction. This imperfect and incomplete information exposed both parties to risk.[69] (footnote 69: "As I discuss in a later subsection, it is not hard to imagine scenarios in which the acquired Businesses simply dissipated into thin air."). . .[182]

108.    Information risk, market and price risk, and business and strategic risk generally arise in varying degrees in most acquisitions. The Pfleiderer Report itself acknowledges Barclays' knowledge of the business and strategic risks of the transaction:

> Barclays surely was keenly aware of the business and strategic risks of the Transaction. Indeed, just one year before the Transaction with LBI, Barclays had attempted, but failed, to acquire Dutch bank ABN AMRO, which in 2007 was one of the largest banks in Europe with operations in 63 countries. Barclays first announced its intention to acquire ABN AMRO in April 2007. After a consortium led by Royal Bank of Scotland ("RBS") submitted a higher competing bid, Barclays raised its offer in July 2007 to €67.5 billion. But Barclays' bid was still short of the RBS consortium's offer, and Barclays ultimately withdrew its bid for ABN AMRO in October 2007, clearing the way for the RBS-led consortium's bid to go through. The consortium then proceeded with its planned dismemberment of ABN AMRO, with Fortis acquiring ABN AMRO's Dutch and Belgian operations, Banco Santander acquiring ABN AMRO's banking operations in Brazil and Italy, and RBS acquiring ABN AMRO's wholesale division and all other operations, including those in Asia.

> Barclays "near miss" in the ABN AMRO bidding proved (ex post) to be fortunate and provided a vivid lesson in the business and strategic risk of a large acquisition in the financial services industry in perilous times. . . .[183, 184]

---

[182] Pfleiderer Report, ¶¶92 and 94.

[183] Pfleiderer Report, ¶¶105-106.

[184] "'EUR' or '€' is the ISO 4217 currency code for Euro." (http://www.bloomberg.com/invest/glossary/bfglose.htm, last visited March 5, 2010).

**Contains Highly Confidential Information**

109.    Michael Klein, a consultant working with Barclays involved in the negotiations, described Barclays' awareness of risks:

> …It was very clear that the Barclays organization hoped to be an acquirer of Lehman if that was an achievable event.  However, they were extremely mindful from the beginning that there was an enormous amount of asset problems within the Lehman balance sheet, that that grouping of assets would not be party to anything that they could purchase.  Secondly, they were incredibly mindful that they would be risking what they had built over the past decade, both reputationally and businesswise and that is kind of a transaction with this kind of integration that they hadn't done before.[185]

110.    Barclays' September 16, 2008 board discussion materials included the following description of "three primary risks outstanding:"

> ➤ If we do not get a fixed price from the major investors . . . before announcement, we take the risk that the share issuance raises less than the $3.4bn current market value of these shares.

> ➤ We have performed accelerated due diligence and there will be a number of loose ends upon separation from Long Island [Lehman] (e.g. continuation of Group Services)

> ➤ We will be subject to a US legal process which is unpredictable[186, 187]

111.    The Pfleiderer Report describes multiple risks arising to Barclays and Lehman as a result of the Sale Transaction.  However, the Pfleiderer Report's discussion of these risks is flawed.  Barclays was aware of these risks at the time of the Sale Hearing and Sale Transaction, and Barclays would have considered these risks when agreeing to the Court approved Sale Transaction.[188]  Such risks, however, do not provide justification for Barclays benefiting from the Lehman acquisition by receiving more assets than were approved by the Court or paying less for those assets than was represented to the Court.

---

[185] Deposition of Michael Klein, September 12, 2009, 18:16-19:6.

[186] Deposition Exhibit 378, p. 2.

[187] Project Long Island was Barclays' project name for Barclays acquisition of Lehman. (Deposition of Rich Ricci, September 8, 2009, 113:7-13).

[188] *See* BCI Exhibit 112 - Thomson StreetEvents transcript of 9/17/08 Barclays Plc analyst call, p. 3.

**Contains Highly Confidential Information**

### H.  PFLEIDERER REPORT'S OPINIONS IN SECTION V RELATED TO "BARCLAYS' ACCOUNTING GAIN ON THE ACQUISITION" ARE FLAWED

112.    In this section, I discuss the basis for the following opinion:

**Opinion 10:**  The Pfleiderer Report erroneously concludes in Section V that "[t]he fact that Barclays reported an accounting gain on the Acquisition does not indicate that Barclays received a secret or unfair discount on the Repo Collateral, nor does it imply that Barclays earned an unexpected or unreasonable profit from the Transaction."[189]  This argument is not supported by appropriate and reasonable analyses.  Based on the Court approved Sale Transaction as described in the Goldin Report, Barclays' accounting gain on the Sale Transaction is consistent with and indicates a Barclays Windfall.

113.    The Pfleiderer Report's opinions related to Barclays' accounting gain on the Sale Transaction include, but are not limited to:

> . . . Barclays' 2008 Results Announcement summary of the Acquisition and related work papers and files provide a thorough and detailed description of the Transaction. . . . Furthermore, these materials also provide sufficient data and analytical support to establish that the values Barclays assigned to the acquired assets and assumed liabilities approximated their "fair values" at the time of the Acquisition with reasonable precision.
>
> . . .
>
> . . . In my opinion, given the uncertainty surrounding the value of these accounts [exchange-traded derivatives] at the time, and given the risks Barclays took on by assuming all the liabilities and settlement obligations associated with these accounts, it was reasonable for Barclays to receive the benefit of the unknown value associated with these accounts. . . .
>
> . . . given the substantial uncertainty about the value, and even the identity, of the assets and certain of the liabilities, Barclays' reported gain is reasonable, unsurprising, and fair to the Sellers.[84] . . . [*See* footnote 84:  ". . . due to factors that the applicable accounting rules do not permit to be taken into account, the actual economic value of the Trading Portfolio Securities to Barclays was less than the reported accounting valuation."]
>
> . . . In fact, given the risks for Barclays, market conditions, and other relevant considerations, it was not unreasonable nor should it have been unexpected for Barclays to report an accounting gain on its acquisition of LBI's North American broker-dealer businesses.
>
> . . .

---

[189] Pfleiderer Report, ¶5. c.

**Contains Highly Confidential Information**

. . . Barclays' reported accounting gain on the Acquisition does not in any way imply that
Barclays paid less than Lehman would have received in a liquidation of the financial
assets acquired in the Transaction. [certain footnotes omitted][190]

The Pfleiderer Report's analysis of the accounting gain on the acquisition is flawed. In this
matter, the "reasonableness" and "fairness" of the gain should only be evaluated in the context of
the transaction approved by the Court.

114.    The Pfleiderer Report attempts to rationalize Barclays' accounting gain because of the
risk of the transaction to Barclays and the market conditions at the time. As discussed above, the
transaction approved by the Court reflected the risks inherent in the transaction. Likewise, the
Court-approved transaction reflected the market conditions at the time. Further, the comparison
of the terms of the Sale Transaction to the amount that Lehman would realize in a liquidation of
its assets (which typically is less than would be realized in the sale of a going concern such as the
Sale Transaction) is not meaningful. The Pfleiderer Report's justification for Barclays'
accounting gain is flawed.

### 1.    Pfleiderer Report's Flawed Analysis in Exhibit 8

115.    The Pfleiderer Report continues to divert attention from an economic analysis and
quantification of the Barclays Windfall with the opinion that " negative goodwill and an
accounting gain on acquisition were common . . . Exhibit 8 shows that similar results [were]
obtained in a number of transactions in the financial services industry in 2008 and 2009."[191]

116.    The fact that other transactions resulted in negative goodwill has nothing to do with
whether or not the Sale Transaction as executed comports with the transaction approved by the
Court. In addition, Exhibit 8 presents a narrow and undefined sample section process. Exhibit 8
contains data from seven selected transactions in the financial industry, all of which show zero or
negative goodwill. In two of these transactions (Suburban Federal Savings Bank and County
Bank), the targets were purchased from the FDIC out of receivership for no consideration.[192]

---

[190] Pfleiderer Report, ¶¶109, 117-119, and 121.

[191] Pfleiderer Report, ¶120.

[192] The FDIC is the Federal Deposit Insurance Corporation, which is defined as ". . . a federal institution that insures
bank deposits." (http://www.bloomberg.com/invest/glossary/bfglosf.htm#federal_deposit_insurance_corporation,
last visited February 23, 2010).

117.     Further, the Pfleiderer Report fails to mention that Exhibit 8 is not a systematic analysis.[193]  The Pfleiderer Report does not define "common" in its opinion above.  It doesn't analyze or evaluate the frequency of financial institution transactions with negative goodwill or accounting gains on acquisition.  While the Pfleiderer Report doesn't define what it means by "early 2009," I assume it means the first quarter of 2009.  A query of Thomson Reuters mergers and acquisitions database yielded 331 transactions involving 100% acquisitions of financial institutions during 2008 and the first quarter of 2009 where either the target or acquirer was located in the U.S. or the United Kingdom.[194]  The Pfleiderer Report does not describe how the seven transactions in Exhibit 8 were selected from among the 331 transactions.  This sample is not representative of financial institution acquisitions during the specified time period.

2.     The Pfleiderer Report is Flawed Regarding the Term *Book Value*

118.     In paragraph 82, the Pfleiderer Report states:  "[f]urthermore, to the best of my knowledge, 'book value' does not have a definite meaning in this context, such that a financial professional would understand it, as the Movants apparently do, to be synonymous with the 'marked' value of the assets and liabilities on Lehman's books as of any arbitrary date and without regard to the quality and timeliness of Lehman's marks on such date."  This statement is flawed.  Book value is a known term among financial professionals.  In fact, the Pfleiderer Report itself uses the term *book value* in its Exhibit 8, where it includes "Book Value of Target's Net Assets" in computing negative goodwill.  See the expert report of John Garvey for further discussion of the flaws in the Pfleiderer Report's opinions regarding the definition of *book value*.[195]

I.     PFLEIDERER REPORT'S OPINIONS IN SECTION VI RELATED TO "BENEFITS OF THE ACQUISITION" ARE FLAWED

119.     In this section, I discuss the basis for the following opinions:

---

[193] Aside from the methodological problems with this analysis, there are several flaws in the data contained in Exhibit 8 that render it unreliable.  For example, the data for the PNC Bank/National City transaction has been revised to reflect a $428 million gain.  (PNC Financial Services Group, Inc., SEC Form 10-Q, September 30, 2009, p. 68).

[194] Email from Anton Bisquera, Thomson Reuters On Demand, dated Thursday, March 11, 2010, 12:28 PM.

[195] *See* expert report of John Garvey dated March 15, 2010.

**Opinion 11:**  The Pfleiderer Report argues that certain potential benefits from the transaction should be considered in an economic analysis of Movants' claims.[196]  As I explain and document below, to the extent such benefits resulted from the transaction, the Court and others attending the Sale Hearing acknowledged these types of benefits when the Court approved the Sale Transaction; thus, such issues should not be considered in the economic analysis and quantification of the Barclays Windfall.

**Opinion 12:**  The Pfleiderer Report argues that without Barclays' acquisition of Lehman, "… it is virtually certain that the LBHI and LBI estates, Lehman's creditors, Lehman's customers, and public financial markets all would have been worse off."[197]  As I explain and document below, to the extent there were benefits to the transaction, the Court and others acknowledged them when the Court approved the Sale Transaction; thus, such issues should not be considered in the economic analysis and quantification of the Barclays Windfall.

120.    In Section VI, the Pfleiderer Report contains the following conclusions, among others:

> Barclays' acquisition of LBI's North American broker-dealer businesses was reasonably expected to benefit, and with high probability did benefit, the Estates, Lehman's creditors, and Lehman's customers.  The Acquisition also was reasonably expected to generate, and has in fact generated, significant public benefits. Had Barclays not acquired the Businesses, whether because no agreement could be struck or because approval of the Transaction had been withheld by the Court, it is virtually certain that the LBHI and LBI estates, Lehman's creditors, and Lehman's customer [*sic*] all would have been worse off. . . .[198]

121.    The Pfleiderer Report's opinions in Section VI are flawed and do not address an economic analysis and quantification of the Barclays Windfall.  To the extent there were benefits to Barclays, Lehman's customers and employees, and the global financial markets as a result of the transaction, the benefits were acknowledged by Barclays and the Court in advance of the Sale Order.  In a September 17, 2008 press release, Barclays described the transaction:

---

[196] Pfleiderer Report, ¶5. d.

[197] Pfleiderer Report, ¶5. d.

[198] Pfleiderer Report, ¶135.

**Contains Highly Confidential Information**

The Acquisition will combine two strong client franchises and product offerings, with the
potential to create significant value for Barclays shareholders. The Lehman Brothers
businesses are a highly complementary fit for Barclays investment banking business,
Barclays Capital. The combined business will be a premier global investment bank with
an increased presence in the US and an enhanced product offering. Among other
benefits, the combination of the two businesses will:

- confirm Barclays Capital as a leading debt capital markets house globally;

- have a top 3 position in the US capital markets, the largest in the world;

- extend Barclays Capital's range of investment banking products, with the addition
  of Lehman Brothers strong US M&A and equity capital markets franchises; and

- strengthen Barclays Capital's hedge fund franchise through the addition of prime
  brokerage and cash equity capabilities.[199]

122.    In its conference call with analysts on September 17, 2008, Barclays described the

benefits it expected to receive from the Sale Transaction:

The acquisition of these businesses and assets significantly enhances Barcap's position in
the United States, by a transaction that is de-risked by excluding the overwhelming
majority of Lehman risk assets. Before moving on this opportunity, we satisfied
ourselves as to the fit between the two capital markets businesses in terms of activities
and culture. And the enlarged business will, of course, be part of IBIM, reporting to Bob.

The transaction meets our financial tests with significant margin for error. We expect it
to be immediately economic profit positive. We expect it to be accretive to earnings on
an ongoing basis in the first year, including the impact of equity raising. And the return
on investment is very high.

. . . The acquisition transforms our position in the largest global capital market. . . .

. . . Within the US broker dealer, one of the most exciting businesses, which you will
appreciate, is the cash equities business. It's an absolute machine. It's extremely
profitable. Gerry Donini and the team that run it have been there for a long time, year
after year. It's got completely integrated research, sales, investment banking. It's
fantastic. . . .

. . . [T]his is a really unique, interesting opportunity. If you step back and look at the two
organizations, Barclays Capital, which has done extremely well over the last 11 years, it
has real scale and depth in UK, Europe, Middle East, Africa and into Asia. Lehman has
the same type of scale and depth even more in the US, but not in those areas. If you look
at it from a geographic point of view, it's a good balance. And their US heft and depth is
just what we're looking for.

. . .

---

[199] Barclays PLC and Barclays Bank PLC, SEC Form 6-K, September 17, 2008, pp. 4-5.

**Contains Highly Confidential Information**

. . . And it's no coincidence that we've chosen the businesses that we have chosen to grow in the United States through time because we feel we have competitive advantage in them. And in our Capital Markets business it's very clear to us that the competitive advantage of Barclays Capital will be significantly amplified by this deal.[200]

123. Barclays also described the public benefits expected to be achieved from the Sale Transaction:

. . . there is an opportunity here which we can execute on it, achieves a number of things. It achieves, potentially, good returns for our shareholders through time. It creates a level of certainty about a big business in the market, which I think is good for the system. It creates a much greater level of certainty for Lehman's clients in the United States. It creates a certainty for the people of Lehman's. And I very much hope that the Court will conclude that it's very much in the interest of creditors, but that is their deliberation and we respect it.[201]

124. In his deposition, John Varley (Barclays – Group Chief Executive and board member) described the goals of the Lehman acquisition:[202]

So there were two things we were seeking to do through the Lehman transaction. One was to increase significantly the size of the investment banking business in the biggest capital market in the world, and second to increase our exposure to the United States, because the United States is the biggest generator of economic profit in the financial services industry today.

Those two broad strategic thrusts caused us to identify this as an opportunity of strategic advancement.[203]

125. To the extent there were benefits of the transaction, the Court was fully aware of these benefits when it approved the Sale Order. As also acknowledged in the Pfleiderer Report, at the Sale Hearing, the Court described the benefits of the transaction as follows:

I am completely satisfied that I am fulfilling my duty as a United States bankruptcy judge in approving this transaction and in finding that there is no better or alternative transaction for these assets, that the consequences of not approving a transaction could prove to be truly disastrous. And those adverse consequences are meaningful to me as I

---

[200] BCI Exhibit 112 - Thomson StreetEvents transcript of 9/17/08 Barclays Plc analyst call, pp. 3, 7, 11, and 17.

[201] BCI Exhibit 112 - Thomson StreetEvents transcript of 9/17/08 Barclays Plc analyst call, p. 20.

[202] Deposition of John Varley, September 3, 2009, 5:13-15 and 7:10-25.

[203] Deposition of John Varley, September 3, 2009, 10:8-16.

**Contains Highly Confidential Information**

exercise this discretion.  The harm to the debtor, its estates, the customers, creditors, generally, the national economy and the global economy could prove to be incalculable.

Moreover, it's not just about avoiding harm.  Approving the transaction secures whether for ninety days or for a lifelong career employment for 9,000 employees at Lehman, and holds together an operation the value of which is really embedded in the talent of the employees, their knowledge, their relationship, their expertise and their ability to create value to the economy.[204]

126.    The Court and Barclays were aware of these benefits and considered them when the Court approved the Sale Transaction.  Such benefits, however, do not provide justification for Barclays benefiting from the Lehman acquisition by receiving more assets than were approved by the Court or paying less for those assets than was represented to the Court.

---

[204] Hearing Transcript, September 19, 2008, 250:13-251:3.

---

**Contains Highly Confidential Information**

Submitted by

_____

Mark E. Zmijewski

March 15, 2010

Contains Highly Confidential Information

# APPENDIX I

# MARK E. ZMIJEWSKI
# (ZME-YEV-SKI)

Principal                                                    Graduate School of Business
Chicago Partners (A Subsidiary of Navigant Consulting)      University of Chicago
30 S. Wacker Drive, Suite 3100                              450 N. Cityfront Plaza Drive
Chicago, Illinois  60606                                    Chicago, Illinois  60611
Telephone: (312) 251-5200                                   Telephone: (312) 464-8757
Facsimile: (312) 251-5201                                   Facsimile: (312) 464-8759

## ACADEMIC EMPLOYMENT

Graduate School Of Business, The University Of Chicago

*Leon Carroll Marshall Professor of Accounting*, (1999 – present)
*Deputy Dean*, (1996 - present)
*Professor of Accounting*, (1992 - 1999)
*Associate Dean for Ph.D. Studies*, (1995 - 1996)
*Executive Director, Center for Research in Securities Prices* (CRSP), (1992 - 1998)
*Associate Professor of Accounting*, (1988 - 1992)
*Assistant Professor of Accounting*, (1984 - 1988)

## EDUCATION

B.S.        (Concentration-Accounting), State University of New York at Buffalo,
            Management, 1976
M.B.A.      (Concentration-Accounting), State University of New York at Buffalo, 1981
Ph.D.       (Major – Accounting, Minors – Economics and Finance), State University of New
            York at Buffalo, 1983

## PREVIOUS ACADEMIC EMPLOYMENT

*Assistant Professor of Accounting*, State University of New York at Buffalo (1980 - 1984)
*Course Director*, York University (1979 - 1982)
*Teaching Assistant*, State University of New York at Buffalo (1977 - 1980)

## AWARDS AND HONORS

*Business Information Professional of the Year – Education,* Beta Alpha Psi - (2007)
*Hillel J. Einhorn Excellence in Teaching Award*, The Executive MBA Program, University
    of Chicago Graduate School of Business (1999)

Contains Highly Confidential Information

*Emory Williams Award for Excellence in Teaching*, The University of Chicago (1988)
*Competitive Manuscript Award*, American Accounting Association (1984)
Beta Alpha Psi, Honorary Accounting Society (1981)
Beta Gamma Sigma, Honorary Business Society (1980)

## GRANTS

Research Grant, SEC and Financial Reporting Institute, 1985
University Fellowship, State University of New York at Buffalo, 1979
Graduate Fellowship, State University of New York at Buffalo, 1976 - 1978

## RESEARCH PUBLICATIONS

"How Useful Are *Wall Street Week* Stock Recommendations?" with P. Griffin and J. Jones, *Journal of Financial Statement Analysis*, Fall, 1995.

"Contemporaneous Announcements of Dividends and Earnings," with R. Leftwich, *Journal of Accounting, Auditing, and Finance*, Autumn, 1994.

"The Relative Informativeness of Accounting Disclosures in Different Countries," with A. Alford, J. Jones, R. Leftwich, *Journal of Accounting Research*, Supplement, 1993.

"Extensions and Violations of the Statutory SEC Form 10-K Filing Requirements," with A. Alford and J. Jones, *Journal of Accounting and Economics*, 1993.

"SEC Form 10-K/10-Q Reports and Annual Reports to Shareholders:  Reporting Lags and Squared Market Model Prediction Errors," with P. Easton, 1993, *Journal of Accounting Research*, Winter, 1993.

"Cross-Sectional Variation in the Stock Market Response to the Announcement of Accounting Earnings," with P. Easton, *Journal of Accounting and Economics*, 1989.

"An Evaluation of Alternative Proxies for the Market's Expectation of Earnings," with L. Brown, P. Griffin, and R. L. Hagerman *Journal of Accounting and Economics*, 1987.

"Security Analyst Superiority Relative to Univariate Time-Series Models in Forecasting Quarterly Earnings," with L. Brown, P. Griffin, and R. Hagerman, *Journal of Accounting and Economics*, 1987.

"The Effect of Labor Strikes on Security Analysts' Forecast Superiority and on the Association between Risk-Adjusted Stock Returns and Unexpected Earnings," with L. Brown, *Contemporary Accounting Research*, 1987.

Contains Highly Confidential Information

"Estimating Models with Binary Dependent Variables: Some Theoretical and Empirical Observations," with G. Gessner, W. Kamakura, N. Malhotra, *Journal of Business Research*, 1987.

"Methodological Issues Related to the Estimation of Financial Distress Prediction Models," *Journal of Accounting Research*, 1984.

## RESEARCH PUBLICATIONS (con't)

"The Association Between the Magnitude of Quarterly Earnings Forecast Errors and Risk-Adjusted Stock Returns," with R. L. Hagerman and P. Shah, *Journal of Accounting Research*, 1984.

"An Income Strategy Approach to the Positive Theory of Accounting Policy Setting/Choice," with R. L. Hagerman, *Journal of Accounting and Economics*, 1981. Reprinted in, *The Economics of Accounting Policy Choice*, 1992, edited by Ray Ball and Clifford Smith, Jr., (McGraw Hill Corporation, New York, NY).

"A Test of Accounting Bias and Market Structure: Some Additional Evidence," with R. L. Hagerman, *Review of Business and Economic Research*, 1981.

"Some Economic Determinants of Accounting Policy Choice," with R. L. Hagerman, *Journal of Accounting and Economics*, 1979.

## TEACHING AND OTHER PUBLICATIONS

"Accounting and Disclosure Issues in Structured Finance," with Keith Bockus and W. Dana Northcut, in *Corporate Aftershock: The Public Policy Lessons from the Collapse of Enron and Other Major Corporations*, C.L. Culp and W.A. Niskanen, eds., 2003.

"Discovery and the Financial Analyst," with Roger Hickey, *Litigation Services Handbook*, January, 1995.

Comments on "Earnings Forecasting Research: Its Implications for Capital Markets Research," *International Journal of Forecasting*.

*The Phish Corporation: A Practice Case in Managerial Accounting*, with R. Derstine, R. Huefner, and S. Gunn, 1991, (McGraw-Hill Corporation, New York, NY).

"Predictive Value of Accounting Information," with P. Griffin, in *Usefulness to Investors and Creditors of Information Provided by Financial Reporting*, Second Edition, edited by P. Griffin (Financial Accounting Standards Board, 1987).

Contains Highly Confidential Information

**DISSERTATION COMMITTEES**

Sandip Madan, University of Chicago, current, Member
Keith Bockus, University of Chicago, 1998, Co-Chairperson
Beverly Walther, University of Chicago, 1995, Member
Howard Bunsis, University of Chicago, 1993, Co-Chairperson
Phillip Berger, University of Chicago, 1992, Member
Stuart Essig, University of Chicago, 1991, Member
Sherri Jarrell, University of Chicago, 1991, Member
Andrew Alford, University of Chicago, 1990, Chairperson

**DISSERTATION COMMITTEES (con't)**

Mark Lang, University of Chicago, 1990, Member
Laureen Maines, University of Chicago, 1990, Member
Walter Teets, University of Chicago, 1988, Member
Siew Teoh, University of Chicago, 1988, Member
Kirsten Ely, University of Chicago, 1988, Member
M. Daniel Beneish, University of Chicago, 1987, Member
Pat O'Brien, University of Chicago, 1986, Member
W. Forbes Cavanagh, State University of New York at Buffalo, 1985, Member

**COURSES TAUGHT**

Financial Accounting (SUNY/Buffalo, University of Chicago, U. S. Business School in
    Prague)
Managerial Accounting (SUNY/Buffalo, York University)
Corporate Finance (SUNY/Buffalo, York University)
Advanced Financial Accounting, Mergers and Acquisitions (SUNY/Buffalo, University of
    Chicago)
Chicago Approach to Portfolio Management (University of Chicago)
Security Market and Financial Statement Analysis (University of Chicago, Bocconi University)
Cases in Financial Strategy (University of Chicago)

**UNIVERSITY ACTIVITIES**

Accounting Advisory Counsel - State University of New York at Buffalo, 1993-1995
Faculty facilitator - Leadership, Education, and Development (LEAD) Program, University of
    Chicago, Graduate School of Business, 1989, 1991
Dean's Advisory Committee on MBA Students and Curriculum, University of Chicago, 1988
Executive Director, Management Development Council, State University of New York at
    Buffalo, 1981-1984
Advisor, Center for Management Development, State University of New York at Buffalo,
    1979-1980

**Contains Highly Confidential Information**

## EDITORIAL SERVICE AND BOARDS

*The Accounting Review*, Associate Editor, 1993 - 1997
*Journal of Accounting Research*, Editorial Board, 1988 - 1993
*The Accounting Review*, Editorial Board, 1985 - 1987

## AD HOC REFEREE

*Journal of Accounting, Auditing, and Finance*
*The Accounting Review*
*Contemporary Accounting Research*
*The Financial Review*
*Journal of Accounting and Economics*
*Journal of Accounting Research*
*Journal of Banking and Finance*
*Journal of Business*
*Journal of Forecasting*
*International Journal of Forecasting*
*Management Science*

## PROFESSIONAL ORGANIZATIONS

The American Accounting Association
The American Finance Association

## BUSINESS CONSULTING EXPERIENCE

Worked as consultant or expert on issues including:

- Measuring damages in a variety of litigation contexts and industries
- Measuring marginal, incremental, variable, direct costs and profits
- Revenue recognition
- Assessing bankruptcy and solvency
- Preparing and assessing business plans
- Measuring interest rates and rates of returns, and risk
- Valuing and assessing the valuation of companies and parts of companies, including valuing synergies/efficiencies and intangible assets
- Forecasting and assessing the forecasts of companies and parts of companies, including valuing synergies/efficiencies and intangible assets
- Assessing the effect of information disclosures on security prices and damages in securities litigation cases
- Assessing solvency likelihood in "ability-to-pay" cases

**Contains Highly Confidential Information**

Applied expertise in a broad range of industries including:

- Computer hardware and software
- Credit card and credit card security
- Banking
- Securities companies
- Cameras and film
- Retail (electronics, vitamins, bakery, software, pharmacy, lumber)
- Automobile
- Real estate investment funds
- Airline
- Steel
- Cosmetics
- Energy
- Railroad
- Online education
- Pharmaceutical
- Heavy industrial equipment
- Telecommunications
- Chemical
- Diapers

## DEPOSED OR TESTIFIED IN LAST FOUR YEARS

**Grupo Modelo, S.A.B. de C.V., Diblo, S.A. de C.V., and Controlling Shareholders Thereof (The United Mexican States and the Kingdom of Spain) Claimants v. Anheuser-Busch Companies, Inc., Anheuser-Busch International, Inc., and Anheuser-Busch International Holdings, Inc. (The United States of America) Respondents.** Arbitration under the Arbitration Rules of the United Nations Commission on International Trade Law. Report filed May 4, 2009; Rejoinder Report filed July 2, 2009; Arbitration testimony August 12, 2009.

**In Re American International Group, Inc. Securities Litigation.** United States District Court Southern District of New York, Master File No. 04 Civ. 8141 (JES) (AJP). Affidavit filed August 4, 2009; Deposition testimony August 9, 2009.

**County of Milwaukee, Employees' Retirement System of the Milwaukee, and Pension Board, Employees' Retirement System of the County of Milwaukee vs. Mercer Human Resources Consulting, Inc. f/k/a William M. Mercer Incorporated.** United States District Court Eastern District of Wisconsin, No. 06-0-0372. Report filed September 6, 2007; Deposition testimony November 9, 2007; trial testimony May 14, 2009.

Contains Highly Confidential Information

**Unionbancal Corporation and Subsidiaries vs United States of America.** United States Court of Federal Claims.  Case No. 06-587T. Report filed January 9, 2009; Deposition testimony March 17, 2009.

**Hexion Specialty Chemicals, Inc., Nimbus Merger Sub, Inc., Apollo Investment Fund Iv, L.P., Apollo Overseas Partners Iv, L.P., Apollo Advisors Iv, L.P., Apollo Management Iv, L.P., Apollo Investment Fund V, L.P., Apollo Overseas Partners V, L.P., Apollo Netherlands Partners V (A) L.P., Apollo Netherlands Partners V (B) L.P., Apollo German Partners V. Gmbh & Co. Kg, Apollo Advisors V, L.P., Apollo Management V, L.P., Apollo Investment Fund Vi, L.P., Apollo Overseas Partners Vi, L.P., Apollo Overseas Partners (Delaware) Vi, L.P., Apollo Overseas Partners (Delaware 892) Vi, L.P., Apollo Overseas Partners (Germany) Vi, L.P., Apollo Advisors Vi, L.P., Apollo Management Vi, L.P., Apollo Management, L.P., And Apollo Global Management, Llc., Plaintiffs, v. Huntsman Corp., Defendant.**  In the Court of Chancery of the State of Delaware.  Case No. 3841-VCL.  Deposition Testimony September 3, 2008; Trial Testimony September 12, 2008.

**International Garden Products, Inc. v. Langeveld International Holdings, Inc. No. 116001668.** Arbitration deposition testimony November 18, 2008; Arbitration testimony November 16 and 18, 2008.

**In Re: Tyco International, Ltd., Securities Litigation.**  United States District Court for the District Of New Hampshire, MDL Docket No. 02-1335-B.  Affidavit filed October 19, 2007.

**Calgon Carbon Corporation v. Potomac Capital Investment Corporation, a Delaware corporation; Potomac Electric Power Company, a District of Colombia and Virginia Corporation; Progress Capital Holdings, Inc., a Florida Corporation; and Florida Progress Corporation, a Florida corporation.**  United States District Court for the Western District of Pennsylvania.  No.  98CV72.  Rebuttal Report filed February 29, 2000; Deposition testimony May 25-26, 2000; Rebuttal Report filed August 17, 2006; Deposition testimony January 3, 2007; Deposition testimony used in trial January 19, 2007.

**Breed Technologies, Inc. v. AlliedSignal, Inc.** Tenth Judicial District of Polk County, Florida, Case No. G-99-2478.  Report filed May 31, 2005; deposition testimony July 26, 2005; trial testimony March 16, 2006.

**Torchmark Corporation v. KPMG Peat Marwick LLP.**  United States Circuit Court of Jefferson County, Alabama, Civil Action No. CV 03 3315.  Report filed March 1, 2005; deposition testimony October 11, 2005

**Contains Highly Confidential Information**

# APPENDIX II
# DOCUMENTS RELIED UPON

## Documents in the Record

### Depositions

| Deponents | Date |
|---|---|
| Eric Felder | 7/31/2009 |
| Steven Berkenfeld | 8/6/2009 |
| Paolo Tonucci | 8/14/2009 |
| Martin Kelly | 8/18/2009 |
| Ian Lowitt | 8/20/2009 |
| Paul Exall | 8/27/2009 |
| Bart McDade | 9/2/2009 |
| John Varley | 9/3/2009 |
| Jasen Yang | 9/4/2009 |
| Rich Ricci | 9/8/2009 |
| Gary Romain | 9/10/2009 |
| Stephen King | 9/10/2009 |
| Robert Diamond | 9/11/2009 |
| Michael Klein | 9/12/2009 |
| Gary Romain | 1/13/2010 |
| James Hraska | 1/15/2010 |
| Paul Pfleiderer | 2/23/2010 |

### Deposition Exhibits

| Exhibit | | Beginning Bates | Ending Bates |
|---|---|---|---|
| 1 | Asset Purchase Agreement, dated Sept. 16, 2008 | | |
| 19 | Transaction Balance Sheet | | |
| 20 | Email string including Martin Kelly, Ian Lowitt, and Paolo Tonucci | 132841 | |
| 24 | First Amendment to the Asset Purchase Agreement | | |
| 25 | Clarification Letter, dated Sept. 20, 2008 | | |
| 86B | Initial Inventory, Schedule A and B Assets | BCI-EX-00099519 | BCI-EX-00099521 |
| 87B | JPM Inventory, Annex A Assets | BCI-EX-00108700 | |
| 88B | Barclays' Acquisition Balance Sheet | BCI-EX-00109154 | BCI-EX-00109161 |
| 139B | Email from James Hraska to John Rodefeld and others | BCI-EX-00009798 | BCI-EX-00010368 |
| 144A | Email from Gerard LaRocca to Mike Keegan | BCI 000580 | |
| 151A | Email from Robert Azerad to Paolo Tonucci | | |
| 152A | Email from Brett Beltner to Martin Kelly | | |
| 177 | Email from Alastair Blackwell to Alex Crepeau and others | | |
| 200 | Interim Transaction Balance Sheet with Lowitt Handwritten Notes | BCI-EX-00115141 | |
| 203 | Email from Marty Malloy to Gerard LaRocca and Stephen King | BCI-EX-00000080 | |
| 204 | Email from Gerard LaRocca to Mike Keegan | BCI-EX-00000081 | |
| 205 | Order Approving Settlement Agreement, Case No. 08-01420, Settlement Agreement, dated Dec. 5, 2008 | | |
| 208 | Email from Robert Azerad to Gerard LaRocca | BCI 006119 | BCI 006646 |
| 215 | Email from John Rodefeld to Teri Scott and others | BCI-EX-(S)-00034528 | BCI-EX-(S)-00034529 |
| 224 | Email from Anthony Stucchio to Alastair Blackwell and others | | |
| 235 | Email from James Hraska to Paolo Tonnaci | | |
| 274 | Email from Teri Scott to Jonathon Stone and others | BCI-EX-(S)-00038010 | BCI-EX-(S)-00038013 |
| 280B | Spreadsheet outlining elements of $2.0B compensation expense | BCI-EX-00077287 | |
| 281A | Email from John Haley to Teri Scott and others | BCI-EX-(S)-00047924 | BCI-EX-(S)-00047926 |
| 349B | Email from Paolo Tonucci to Jason Yang and Stephen King (with attachments) | BCI-EX-00070958 | BCI-EX-00070961 |
| 377A | Barclays' Opening Balance Sheet | BCI-EX-00115843 | BCI-EX-00115846 |
| 378 | Email from Haworth to Clackson | BCI-EX-(S)-00023787 | BCI-EX-(S)-00023788 |
| 444 | Declaration of Shari D. Leventhal, in Support of Trustee's Motion For Entry of an Order Approving a Settlement Agreement | | |
| 495 | Debtor's Motion for an Order, Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024, Modifying the September 20, 2008 Sale Order and Granting Other Relief, dated Sept. 15, 2009 | | |
| 506 | Email from Miller to Messineo and others (with truncated attachment) | WGM-LEHMAN-E 00006125 | WGM-LEHMAN-E 00006127 |
| 509 | Email from Kelly to Krasnow, re: "LBI BS_917_V with adjustment.xls.," dated Sept. 18, 2009 | LBHI 013444 | |
| 516 | Email from Murgio to Kelly and Fazio (with attachments) | MTHM0000139 | MTHM0000147 |
| 533A | Lehman Acquisition Assets Summary | BCI-EX-00295932 | BCI-EX-00295933 |
| 534A | Romain Preparation Notes for January 13 Deposition | | |
| 537A | Email from Stephen King to Jerry del Missier and others (with attachment) | BCI-EX-(S)-00078976 | |
| 549A | Email from Romain to Guarnuccio | BCI-EX-00218489 | BCI-EX-00218492 |
| 633A | Expert Report of Prof. Paul Pfleiderer, Volume 1, dated Jan. 8, 2010 | | |
| 634A | Expert Report of Prof. Paul Pfleiderer, Volume 2, dated Jan. 8, 2010 | | |
| 641A | Email from Sean Teague to Tal Litvin | BCI-EX-(S)-00213990 | BCI-EX-(S)-00213996 |

---

Expert Report of Mark E. Zmijewski

**Contains Highly Confidential Information**

# APPENDIX II
# DOCUMENTS RELIED UPON

BCI Opposition Brief Exhibits

| Exhibit | | Beginning Bates | Ending Bates |
|---|---|---|---|
| 112 | Barclays Analyst Call, dated Sept. 17, 2008 | | |
| 113 | Fox-Pitt Kelton, "A lucky deal," dated Sept. 18, 2008 | | |
| 114 | Societe General Cross Asset Research, dated Sept. 18, 2008 | | |
| 171 | Letter to Jones Day regarding Compensation and Cure and attaching BCI-EX-00077272-286. | BCI-EX-00077272 | BCI-EX-00077286 |
| 263 | Email from Pearn to Stack, dated Sept. 21, 2008 (with attachment) | BCI-EX-(S)-00131273 | BCI-EX-(S)-00131318 |
| 357 | Declaration of Gary Romain, dated January 26, 2010 | | |

Other Documents

| Description | Beginning Bates | Ending Bates |
|---|---|---|
| Options Portfolio - Six Tables (prices and position) & | bci-ex-(s)-00110231 | |
| Two Queries (summarized market values and variances) | | |
| Email from MacGoey to Morton - Opening BS Valuation Work | BCI-EX-(S)-00110231 | BCI-EX-(S)-00110238 |
| Email from Clement to Walker, Morton, Yang, and King, dated Sept. 18, 2008 | BCI-EX-(S)-00200952 | |
| GFS - Corporate Stocks & Options | BCI-EX-(S)-00200953 | |
| Email from Clement to Walker, Morton, Yang, and King, dated Sept. 18, 2008 | BCI-EX-(S)-00200954 | |
| GFS - Corporate Obligations & Spot | BCI-EX-(S)-00200955 | |
| GFS - Corporate Stocks | BCI-EX-(S)-00200956 | |
| GFS - Mortgages and Mortgage Backed Securities | BCI-EX-(S)-00200957 | |
| Email from Clement to Walker, Morton, Yang, and King, dated Sept. 18, 2008 | BCI-EX-(S)-00200958 | |
| GFS - CD's & Other Money Market Instr. | BCI-EX-(S)-00200959 | |
| GFS - CD's & Other Money Market Instr. | BCI-EX-(S)-00200960 | |
| GFS - Corporate Obligations & Spot Commodities | BCI-EX-(S)-00200961 | |
| GFS - Governments & Agencies | BCI-EX-(S)-00200962 | |
| Lehman Brothers Inc., Balance Sheet by GAAP Asset Type, dated Sept. 12, 2008 | BCI-EX-(S)-00213951 | |
| JPM Inventory | BCI-EX-(S)-00213996 | |
| Email from James Hraska to Robert Azerad and Jasen Yang (with attachment) | BCI-EX-(S)-00214006 | BCI-EX-(S)-00214010 |
| Initial Inventory, Schedule A and Schedule B Assets | BCI-EX-00099519 | |
| JPM Inventory, Annex A Assets | BCI-EX-00108700 | |
| Native file version of Exhibit 377A or 88B | BCI-EX-00109154 | |
| Initial Inventory, Schedule A and B assets | BCI-EX-00213995 | |
| JPM Inventory, Annex A Assets | BCI-EX-00213996 | |
| Email from Morton to Holloway, dated Dec. 12, 2008 | BCI-EX-00218502 | BCI-EX-00218503 |
| Equity Bid-Offer Calculation, dated Sept. 22, 2008 | BCI-EX-00255172 | |
| Position and Price Data | BCI-EX-00255173 | |
| Sched B LehOBS 5 | BCI-EX-00295934 | |
| GFS - Detailed Exposure Report (Cross System), dated Sept. 12, 2008 | BCI-EX-00297155 | |
| GFS - Detailed Exposure Report (Cross System), dated Sept. 15, 2008 | BCI-EX-00297156 | |
| GFS - Detailed Exposure Report (Cross System), dated Sept. 16, 2008 | BCI-EX-00297157 | |
| GFS - Detailed Exposure Report (Cross System), dated Sept. 17, 2008 | BCI-EX-00297158 | |
| GFS - Detailed Exposure Report (Cross System), dated Sept. 18, 2008 | BCI-EX-00297159 | |
| GFS - Detailed Exposure Report (Cross System), dated Sept. 19, 2008 | BCI-EX-00297160 | |
| GFS - Detailed Exposure Report dated Sept. 12, 2008 | BCI-EX-00297253 | |
| Email from Ray Stancil to J. Hraska and others (with attachment) | JPM-BARCAP0003541 | JPM-BARCAP0003542 |
| BCI Rule 60 Opposition and Undelivered Assets Brief, dated Jan. 29, 2010 | | |
| Debtors' Adversary Complaint, dated Nov. 16, 2009 | | |
| Expert Report of Harrison J. Goldin, dated Mar. 15, 2010 | | |
| Expert Report of John J. Schneider, dated Mar. 15, 2010 | | |
| Expert Report of John Olvany, dated Mar. 15, 2010 | | |
| Expert Report of John P. Garvey, dated Mar. 15, 2010 | | |
| Expert Report of Joseph R. Mason, dated Mar. 15, 2010 | | |
| Expert Report of Joseph Schwaba, dated Mar. 15, 2010 | | |
| Expert Report of Mark Slattery, dated Mar. 15, 2010 | | |
| Hearing Transcript, dated Sept. 19, 2008 | | |
| Hearing Transcript, dated Dec. 22, 2008 | | |
| Letter from Beamon (Davis Polk) to Hine, dated Feb. 12, 2010 | | |
| Letter from Davenport to Carrero, dated Feb. 6, 2010 | | |
| Motion of Official Committee of Unsecured Creditors of Lehman Brothers | | |
| Holdings Inc., et al., Pursuant to 11 U.S.C. § 105(a), Fed. R. Civ. P. 60(b), | | |
| and Fed. R. Bankr. P. 9024, for Relief from Order Under 11 U.S.C. §§ 105(a), 363, | | |
| and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006, | | |
| dated Sept. 15, 2009 | | |
| Official Committee of Unsecured Creditors' Adversary Complaint, dated Nov. 16, 2009 | | |
| Report of Anton R. Valukas, Examiner in re Lehman Brothers Holdings, Inc. et al, | | |
| Chapter 11 Case No. 08-13555 (JMP), Volume 7, Appendix 3, Key Individuals | | |
| The Trustee's Adversary Complaint, dated Nov. 16, 2009 | | |
| The Trustee's Motion for Relief Pursuant to the Sale Orders or, Alternatively, for Certain | | |
| Limited Relief Under Rule 60(b), dated Sept. 15, 2009 | | |

Contains Highly Confidential Information

# APPENDIX II
# DOCUMENTS RELIED UPON

**Documents that are Publicly Available**

ABS - http://glossary.reuters.com/index.php/ABS
ALT-A - http://www.investopedia.com/terms/a/alt-a.asp
Barclays PLC - 2008 Annual Report
Barclays PLC - 2009 Results Announcement
Barclays PLC and Barclays Bank PLC - 2008 20-F
Barclays PLC and Barclays Bank PLC - 2008 6-K, filed on Sept. 17, 2008
BCI - http://www.barcap.com/About+Barclays+Capital/Our+Firm
BNY Mellon - http://www.bnymellon.com/about/index.html
CLO - http://www.bloomberg.com/invest/glossary/bfglosc.htm#collateralized_loan_obligation
CMO - http://glossary.reuters.com/index.php/CMO
CUSIP - http://glossary.reuters.com/index.php/CUSIP_Numbers
ELN - http://www.amex.com/servlet/AmexFnDictionary?pageid=display&titleid=2397
EUR - http://www.bloomberg.com/invest/glossary/bfglose.htm
FDIC - http://www.bloomberg.com/invest/glossary/bfglosf.htm#federal_deposit_insurance_corporation
FED - http://www.newyorkfed.org/aboutthefed/whatwedo.html
FLOATER - http://www.bloomberg.com/invest/glossary/bfglosf.htm#floater
HELOC - http://www.investopedia.com/terms/h/homeequitylineofcredit.asp
IAS 39 - "Financial Instruments: Recognition and Measurement"
Interest only - http://www.amex.com/servlet/AmexFnDictionary?pageid=display&titleid=3425
Invers Floater - http://www.bloomberg.com/invest/glossary/bfglosi.htm
JPMorgan Chase & Co. - 2008 10-K, filed on Mar. 2, 2009
JPMorgan Chase & Co. - http://www.jpmorganchase.com/corporate/About-JPMC/about-us.htm
Loan-to-value - http://www.investopedia.com/terms/l/loantovalue.asp
PNC Financial Services Group Inc. - 10-Q for the period ending Sept. 30, 2009, filed on Nov. 6, 2009
PwC - http://www.pwc.com/us/en/index.jhtml
RMBS - http://www.duke.edu/~charvey/Classes/wpg/bfglosr.htm#residential_mortgage_backed_securities
SFAS 157 - "Fair Value Measurements," September 2006
Warrant - http://www.investopedia.com/terms/w/warrant.asp
WestAmerica Bancorporation - 2008 8-K, filed on Feb. 6, 2009

**Other Documents Not Cited in the Record and Not Publicly Available**

Bloomberg LP Data
Capital IQ Data
Email from Antonio Bisquera to Erik Himan March 11, 2010
Email from Policke to Haley (with attachments) "RE Collateral file," dated Sept. 18, 2008
Interactive Data

Contains Highly Confidential Information

# Exhibit A-1
## Undervaluation of Equity by Barclays as of September 19, 2008

|  | ($ Billions) |  |
|---|---|---|
| Value of Equity Based on Barclays (PCG) 9-19 Mid-Point Price Marks | $10.015 | [A] |
| Liquidity Adjustment to Barclays (PCG) 9-19 Mid-Point Price Marks using Bloomberg Data | (0.131) | [B] |
| Value of Equity on 9-19 with Liquidity Adjustment Calculated using Bloomberg Data | 9.884 | [C]=[A]+[B] |
| Value of Equity Based on Barclays (PCG) 9-22 Exit Price Marks | 9.343 | [D] |
| Undervaluation of Equity by Barclays | **$0.541** | [E]=[C]-[D] |

Notes:
The liquidity discount factor is 1.48%.  It is a simple average of the ratio of the difference between Bloomberg ask and bid prices to PCG 9-19 prices.
The liquidity discount factor is only applied to the non-convertible equities, which is $8.852 billion for Barclays (PCG) 9-19 Mid-Point Valuation.

Sources:
BCI-EX-00099519 (Deposition Exhibit 86B) and BCI-EX-(S)-00213995 (Deposition Exhibit 641A) for Initial Inventory; BCI-EX-00255172 (0922 Equities Bid-Offer); BCI-EX-00255173 (0922 Position&PriceData).

Contains Highly Confidential Information

## Exhibit A-2
### Summary of Valuations of Experts

| ($ Millions) | Number of CUSIPs | Barclays Opening Balance Sheet Valuation | Chicago Partners' Valuation Experts' 9-19-2008 Valuation (At Exit Price Marks) | Valuation Difference (Barclays' Undervaluation) |
|---|---|---|---|---|
| | | [A] | [B] | [B] - [A] |
| **Panel A - Valuations of Expert John Olvany:** | | | | |
| Residential Mortgage Backed Securities | | | | |
| Corporate Bonds | 16 | $280.3 | $653.7 | $373.4 |
| Emerging Markets | 3 | 36.8 | 39.7 | 2.9 |
| Equities | | | | |
| Rates | 2 | 293.5 | 296.6 | 3.1 |
| Principal Mortgage Trading Group | 1 | 11.0 | 12.9 | 1.9 |
| Total | 22 | 621.6 | 1,003.0 | 381.4 |
| | | | | |
| **Panel B - Valuations of Expert Mark Slattery:** | | | | |
| Residential Mortgage Backed Securities | 3,834 | $12,620.0 | $13,560.8 | $940.8 |
| Corporate Bonds | 501 | 1,118.6 | 1,111.1 | (7.5) |
| Emerging Markets | 69 | 224.6 | 224.2 | (0.4) |
| Equities | | | | |
| Rates | 1,154 | 14,506.8 | 14,982.6 | 475.8 |
| Principal Mortgage Trading Group | 1,109 | 2,064.2 | 3,035.9 | 971.6 |
| Total | 6,667 | 30,534.2 | 32,914.6 | 2,380.4 |
| | | | | |
| **Panel C - Valuations of Expert Joseph Schwaba:** | | | | |
| Residential Mortgage Backed Securities | | | | |
| Corporate Bonds | | | | |
| Emerging Markets | | | | |
| Equities | | | | |
| Rates | 26 | $191.2 | $343.3 | $152.1 |
| Principal Mortgage Trading Group | | | | |
| Total | 26 | 191.2 | 343.3 | 152.1 |
| | | | | |
| **Panel D - Valuations of Expert Mark Zmijewski:** | | | | |
| Equities (Initial Inventory) | 4,028 | $9,343.3 | $9,884.0 | $540.7 |
| JPM Inventory | 1,195 | 3,739.7 | 5,397.1 | 1,657.3 |
| Total | 5,223 | 13,083.0 | 15,281.1 | 2,198.0 |
| | | | | |
| **Panel E - Summary of Valuations of Experts** | | | | |
| Initial Inventory | | | | |
| Residential Mortgage Backed Securities | 3,834 | $12,620.0 | $13,560.8 | $940.8 |
| Corporate Bonds | 517 | 1,398.9 | 1,764.9 | 366.0 |
| Emerging Markets | 72 | 261.4 | 263.9 | 2.5 |
| Equities | 4,028 | 9,343.3 | 9,884.0 | 540.7 |
| Rates | 1,182 | 14,991.5 | 15,622.6 | 631.1 |
| Principal Mortgage Trading Group | 1,110 | 2,075.2 | 3,048.8 | 973.6 |
| Subtotal for Initial Inventory | 10,743 | 40,690.3 | 44,144.9 | 3,454.6 |
| JPM Inventory | 1,195 | 3,739.7 | 5,397.1 | 1,657.3 |
| Total | 11,938 | 44,430.0 | 49,542.0 | 5,111.9 |

Sources:
Expert report of John Olvany dated March 15, 2010; Expert report of Mark Slattery dated March 15, 2010; Expert report of Joseph Schwaba dated March 15, 2010.

Contains Highly Confidential Information

# Exhibit B-1
## Calculation of Barclays Windfall

| | Value ($ Billions) |
|---|---:|
| **Assets** | |
| Total Financial Assets on Barclays Opening Balance Sheet[1] | $50.165 |
| Adjusted for: Unrecognized, Undelivered Assets[2] | 0.775 |
| Adjustment to Valuation of OCC Assets (net of liabilities)[3] | 0.103 |
| *Adjusted Barclays Opening Balance Sheet and Claimed Assets* | 51.043 |
| Adjustment for Barclays' Undervaluation (See Exhibit A-1) | 5.112 |
| *Adjusted Total Financial Assets* | 56.155 |
| Non Financial Assets | 2.085 |
| *Adjusted Total Assets Acquired* | 58.239 |
| **Reported Cash Consideration and Liabilities Assumed** | |
| Total on Barclays Opening Balance Sheet | 47.474 |
| Adjusted Comp (severance subtracted)[4] | (0.450) |
| Adjusted Cure[5] | 0.014 |
| *Adjusted Cash Consideration and Liabilities Assumed* | 47.038 |
| **Adjusted Acquisition Gain/Negative Goodwill** | 11.201 |
| **Net Transaction Value[6] to Barclays** | (1.850) |
| **Barclays Windfall** | $13.051 |

Notes:

[1] Reported in the Pfleiderer Report in Paragraph 114, without rounding.

[2] Mr. Romain notes additional undelivered, unrecognized assets totaling $765 million in collateral related to Lehman affilitates futures accounts ($460M), OCC margin ($80M), unencumbered clearance box assets ($162 million) and other principal and interest ($63 million) (Deposition Exhibit 549A, p. 4). In his typwritten notes prior to his 2010 deposition, Mr. Romain updates the Lehman affiliate amount to $470 million (Deposition Exhibit 534A, p. 18). After updating for this change, the additional undelivered, unrecognized assets total $775 million.

[3] Trading liabilities at the OCC were determined using mid-point price marks at 9-22-08 and an adjustment to bid price marks based on 9-19-08 (BCI-EX-(S)-00110233-8). I have adjusted the mid-point price mark to reflect a consistent 9-19-08 valuation date for both the mid-point and exit price marks using the native file (bci-ex-(s)-00110231.accdb).

[4] See report for details at Paragraph 26.

[5] BCI Exhibit 171 attaching BCI-EX-00077272 –BCI-EX-00077286 less Cure as represented on BCI-EX-00115843 (Deposition Exhibit 377A) and BCI-EX-00109154 (Deposition Exhibit 88B) for Barclays Opening Balance Sheet.

[6] Expert Report of Harrison J. Goldin, dated March 15, 2010.

All other items from BCI-EX-00115843 (Deposition Exhibit 377A) and BCI-EX-00109154 (Deposition Exhibit 88B) for Barclays Opening Balance Sheet.

Sources:

BCI-EX-00115843 (Deposition Exhibit 377A) and BCI-EX-00109154 (Deposition Exhibit 88B) for Barclays Opening Balance Sheet; BCI Exhibit 171 attaching BCI-EX-00077272-286 (July 16, 2009, Letter to Jones Day regarding Compensation and Cure); Pfleiderer Report (Paragraph 114); Deposition Exhibit 549A (Email from Romain to Guarnuccio at PWC); Deposition Exhibit 534A (Romain typewritten notes for January 13, 2010 deposition); BCI-EX-(S)-00110233-8 (Email from MacGoey at PWC to Marcus Morton, Barclays, attaching Valuation Memo for options (ETO) portfolio), bci-ex-(s)-00110231.accdb.

Contains Highly Confidential Information

Exhibit B-2

## Calculation of Barclays Windfall

## from Barclays' Acquisition Gain/Negative Goodwill, as Reported[1]

|  | Value ($ Billions) |
|---|---|
| Barclays' Negative Goodwill, as Reported[1] | $4.170 |
| Transaction Costs, including Deferred Taxes[1] | 0.605 |
| Difference in Compensation Expense[2] | 0.450 |
| Difference in Cure Costs[3] | (0.014) |
| Barclays' Negative Goodwill, as Adjusted | 5.211 |
| Unrecognized, Undelivered Assets[4] | 0.775 |
| Adjustment to Valuation of OCC Assets (net of Liabilities)[5] | 0.103 |
| Adjustment for Barclays' Undervaluation | 5.112 |
| Adjusted Acquisition Gain/Negative Goodwill | 11.201 |
| Net Transaction Value[6] to Barclays | (1.850) |
| Barclays Windfall | $13.051 |

Notes:

[1] As presented in BCI-EX-00115843 (Deposition Exhibit 377A) and BCI-EX-00109154 (Deposition Exhibit 88B) for Barclays Opening Balance Sheet.

[2] See report for details at Paragraph 26.

[3] Cure as represented on Barclays Opening Balance Sheet less BCI Exhibit 171 attaching BCI-EX-00077272 –BCI-EX-00077286.

[4] Mr. Romain notes additional undelivered, unrecognized assets totaling $765 million in collateral related to Lehman affilitates futures accounts ($460M), OCC margin ($80M), unencumbered clearance box assets ($162 million) and other principal and interest ($63 million) (Deposition Exhibit 549A, p. 4). In his typwritten notes prior to his 2010 deposition, Mr. Romain updates the Lehman affiliate amount to $470 million (Deposition Exhibit 534A, p. 18). After updating for this change, the additional undelivered, unrecognized assets total $775 million.

[5] Trading liabilities at the OCC were determined using mid-point price marks at 9-22-08 and an adjustment to bid price marks based on 9-19-08 (BCI-EX-(S)-00110233-8). I have adjusted the mid-point price mark to reflect a consistent 9-19-08 valuation date for both the mid-point and exit price marks using the native file (bci-ex-(s)-00110231.accdb).

[6] Expert Report of Harrison J. Goldin, dated March 15, 2010.

Sources:

BCI-EX-00115843 (Deposition Exhibit 377A) and BCI-EX-00109154 (Deposition Exhibit 88B) for Barclays Opening Balance Sheet; BCI Exhibit 171 attaching BCI-EX-00077272-286 (July 16, 2009, Letter to Jones Day regarding Compensation and Cure); Deposition Exhibit 549A (Email from Romain to Guarnuccio at PWC); Deposition Exhibit 534A (Romain typewritten notes for January 13, 2010 deposition); BCI-EX-(S)-00110233-8 (Email from MacGoey at PWC to Marcus Morton, Barclays, attaching Valuation Memo for options (ETO) portfolio), bci-ex-(s)-00110231.accdb.

Contains Highly Confidential Information

## Exhibit C-1

### Alternative Valuations of JPM Inventory Using Barclays 9-30 Exit Price Marks and JPM Custodial Price Marks

| Asset Class ($ Billions) | Original Notional Amount | Number of CUSIPs | Barclays Opening Balance Sheet Valuation (At Exit Price Marks) | Barclays (PCG) Exit Price Marks 9-30-08 | JPM Custodial Price Marks 9-17-08 | JPM Calculated Custodial Price Marks 9-19-08 | JPM Calculated Custodial Price Marks with Barclays Liquidity Adjustment 9-19-08 |
|---|---|---|---|---|---|---|---|
| RMBS | $1.242 | 37 | $0.027 | $0.023 | $0.027 | $0.027 | $0.026 |
| Corporate Bonds | 2.440 | 247 | 1.646 | 1.936 | 2.199 | 2.034 | 2.034 |
| Emerging Markets | 0.035 | 10 | 0.033 | 0.037 | 0.040 | 0.041 | 0.040 |
| Equities | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Rates | 0.030 | 14 | 0.023 | 0.030 | 0.030 | 0.030 | 0.030 |
| Principal Mortgage Trading Group | 16.153 | 887 | 1.815 | 1.988 | 3.697 | 3.658 | 3.268 |
| Principal (Matured deals) | | | 0.196 | | | | |
| **Total JPM Inventory** | **19.900** | **1,195** | **3.740** | **4.014** | **5.994** | **5.789** | **5.397** |
| | | | **[A]** | **[B]** | **[C]** | **[D]** | **[E]** |
| Difference between Barclays Opening Balance Sheet Valuation (at Exit Price Marks) and respective columns | | | | [B]-[A] 0.274 | [C]-[A] 2.255 | [D]-[A] 2.049 | [E]-[A] 1.657 |

Sources:
BCI-EX-00108700 (Deposition Exhibit 87B) and BCI-EX-(S)-00213996 (Deposition Exhibit 641A) for JPM Inventory; Policke, Ricky. "RE Collateral file." Email to John Haley of Barclays with attachments, 18 Sept. 2008; Lehman GFS system data (BCI-EX-00297158.xls and BCI-EX-00297160.xls).

Contains Highly Confidential Information

# Exhibit C-2A

## Alternative Valuations of Initial Inventory Using Barclays 9-19 Exit Price Marks and BoNY Custodial Price Marks

| Asset Class ($ Billions) | Original Notional Amount | Number of CUSIPs | Barclays Opening Balance Sheet Valuation (At Exit Price Marks) | Barclays (PCG) Calculated Exit Price Marks 9-19-08 | BoNY Custodial Price Marks 9-19-08 | BoNY Custodial Price Marks with Barclays Liquidity Adjustment 9-19-08 |
|---|---|---|---|---|---|---|
| RMBS | $42.170 | 3,834 | $12.620 | $12.620 | $13.906 | $13.379 |
| Corporate Bonds | 2.421 | 517 | 1.399 | 1.423 | 1.395 | 1.395 |
| Emerging Markets | 0.301 | 72 | 0.261 | 0.263 | 0.266 | 0.258 |
| Equities | 2.453 | 4,028 | 9.343 | 9.633 | 9.892 | 9.515 |
| Rates | 16.214 | 1,182 | 14.991 | 15.024 | 15.789 | 15.294 |
| Principal Mortgage Trading Group | 29.563 [1] | 1,110 | 2.075 | 2.183 | 3.789 | 3.145 |
| **Total Initial Inventory** | **93.124** | **10,743** | **40.690** | **41.145** | **45.037** | **42.985** |
| | | | [A] | [B] | [C] | [D] |
| Difference between Barclays Opening Balance Sheet Valuation (at Exit Price Marks) and respective columns | | | | [B]-[A] 0.455 | [C]-[A] 4.347 | [D]-[A] 2.295 |

Notes:
This discussion is related to Pfleiderer Report Table 1.
[1] BCI-EX-00099519 (Deposition Exhibit 86B) and BCI-EX-(S)-00213995 (Deposition Exhibit 641A) for Initial Inventory reports the Principal Mortgage Trading Group's Original Notional as $24.520 billion using the sum of the factored notional amount in the "Current Face" column in tab "PTMG" in BCI-EX-00099519.xls.  I use the sum of the original notional from the "Orig Notl" column in tab "PTMG" in BCI-EX-00099519.xls, which is $29.563 billion.

Sources:
BCI-EX-00099519 (Deposition Exhibit 86B) and BCI-EX-(S)-00213995 (Deposition Exhibit 641A) for Initial Inventory; BCI-EX-00255172 (0922 Equities Bid-Offer); BCI-EX-00255173 (0922 Position&PriceData).

Contains Highly Confidential Information

## Exhibit C-2B

### Alternative Valuations of Selected Securities in the Initial Inventory
### Using Barclays 9-19 Exit Price Marks and BoNY Custodial Price Marks

| Asset or Asset Type ($ Millions) | Number of CUSIPs | Barclays Opening Balance Sheet Valuation (At Exit Price Marks) | Barclays (PCG) Calculated Exit Price Marks 9-19-08[1] | BoNY Custodial Price Marks 9-19-08 | BoNY Custodial Price Marks with Barclays Liquidity Adjustment 9-19-08[1] |
|---|---|---|---|---|---|
| Agency Pools (FHLMC 30 yr) | 297 | $1,674.5 | $1,674.5 | $1,719.4 | $1,702.2 |
| Agency CMO (Interest Only) | 240 | 549.9 | 549.9 | 876.7 | 789.0 |
| Agency CMO (Inverse Interest Only) | 109 | 146.6 | 146.6 | 319.3 | 287.3 |
| FHA (SASC 07-3 2A2) | 1 | 18.2 | 18.2 | 20.2 | 18.2 |
| Agency (SASC 07-3 1A2) | 1 | 30.9 | 30.9 | 34.3 | 30.9 |
| Agencies - Tennessee Valley Authority | 11 | 959.8 | 966.5 | 1,046.5 | 994.2 |
| Treasuries – USD Ust Note | 8 | 4,363.9 | 4,370.8 | 4,454.1 | 4,449.6 |
| Agencies – USD FNMA | 88 | 1,784.7 | 1,791.9 | 1,921.3 | 1,825.3 |
| Agencies – USD FHLB | 113 | 1,989.4 | 1,981.0 | 2,107.6 | 2,002.2 |
| Munis – USD DISGEN | 7 | 52.1 | 52.1 | 61.1 | 61.1 |
| US Non-Agency CMO (SARM Loan Trust) | 125 | 80.2 | 168.3 | 237.7 | 203.6 |
| US ABS Home Equity – Lehman XS Trust | 67 | 86.9 | 122.6 | 171.1 | 150.4 |
| US Non-Agency CMO – Lehman XS Trust | 93 | 82.6 | 100.9 | 178.4 | 151.8 |
| CLO Mezz (Pine CCS) | 1 | 428.6 | 428.6 | 915.0 | 686.2 |
| **Total** | **1161** | **12,248.4** | **12,402.9** | **14,062.7** | **13,352.0** |

Notes:

This discussion is related to Pfleiderer Report Exhibit 6. All calculations in Exhibit C-2B follow the methodology in Pfleiderer Report Exhibit 6.

[1] See Exhibit C-2A for the details of the liquidity adjustment calculation.

Sources:

BCI-EX-00099519 (Deposition Exhibit 86B) and BCI-EX-(S)-00213995 (Deposition Exhibit 641A) for Initial Inventory.

Expert Report of Mark E. Zmijewski

Contains Highly Confidential Information

# Exhibit C-3

## Excess of the "Fair Value of All Assets Received" over $45 Billion
## of the Federal Reserve/Barclays Repurchase Agreement Assets

| Assets ($ Millions) | Pfleiderer Report Table 2 (Barclays Opening Balance Sheet Valuation) | Barclays (PCG) Exit Price Marks Initial Inventory: using 9-19-08 Price Marks JPM Inventory: using 9-30-08 Price Marks | Custodial Calculated Exit Price Marks Initial Inventory: using BoNY 9-19-08 Price Marks JPM Inventory: using JPM 9-19-08 Price Marks | Custodial Price Marks Initial Inventory: using BoNY 9-19-08 Price Marks JPM Inventory: using JPM 9-19-08 Price Marks |
|---|---|---|---|---|
| Initial inventory at Barclays mid-price marks | $42,605.0 | $42,927.5 | $45,037.1 | $45,037.1 |
| JPM inventory at Barclays mid-price marks | 3,917.9 | 4,317.0 | 5,788.7 | 5,788.7 |
| Subtotal at Barclays Mid-Price Marks | 46,522.9 | 47,244.5 | 50,825.7 | 50,825.7 |
| Adjustment to Barclays exit-price/bid marks | (2,086.5) | (2,085.1) | (2,443.4) | 0.0 |
| Accrued interest on trading portfolio assets | 345.0 | 345.0 | 345.0 | 345.0 |
| Subtotal: Fair Value of All Trading Portfolio Assets | 44,781.4 | 45,504.4 | 48,727.3 | 51,170.7 |
| Less:   Schedule B assets included in the above | (778.9) | (873.0) | (852.2) | (892.9) |
| Less:   Accrued interest on Schedule B assets included in the above | (6.7) | (6.7) | (6.7) | (6.7) |
| Subtotal: Fair Value of Transferred Securities | 43,995.8 | 44,624.7 | 47,868.4 | 50,271.2 |
| Cash received with initial inventory | 300.0 | 300.0 | 300.0 | 300.0 |
| Cash received in JPM settlement | 1,250.0 | 1,250.0 | 1,250.0 | 1,250.0 |
| **Total Assets: Fair Value of All Assets Received** | 45,545.8 | 46,174.7 | 49,418.4 | 51,821.2 |
| **Federal Reserve/Barclays Repurchase Agreement Liability** | 45,000.0 | 45,000.0 | 45,000.0 | 45,000.0 |
| **Excess of the "Fair Value of All Assets Received" over $45 Billion** | 545.8 | 1,174.7 | 4,418.4 | 6,821.2 |

Sources:
BCI-EX-00099519 (Deposition Exhibit 86B) and BCI-EX-(S)-00213995 (Deposition Exhibit 641A) for Initial Inventory, BCI-EX-00108700 (Deposition Exhibit 87B) and BCI-EX-(S)-00213996 (Deposition Exhibit 641A) for JPM Inventory; Policke, Ricky. "RE Collateral file." Email to John Haley of Barclays with attachments, 18 Sept. 2008; Lehman GFS system data (BCI-EX-00297158.xls and BCI-EX-00297160.xls); BCI-EX-00255172 (0922 Equities Bid-Offer); BCI-EX-00255173 (0922 Position&PriceData); BCI-EX-00297090 (Sched B Inventory LehOBS 6).

Contains Highly Confidential Information

# Exhibit D-1

## Lehman "Mortgage and Mortgage Backed" Assets Acquired by Barclays

| | Number of CUSIPs | Value ($ Billions) |
|---|---|---|
| Total CUSIPs and Valuation in GFS as of 9-16-08[1] | 3,913 | $6.014 |
| CUSIPs Not Acquired by Barclays | (2,193) | (1.788) |
| CUSIPs Acquired by Barclays | 1,720 | 4.226 |
| Percentage of CUSIPs and Value Acquired by Barclays | 44.0% | 70.3% |
| | | |
| Custodial Calculated Valuation at Exit Price Marks of Acquired Mortgages as of 9-19-08[2] | | 4.034 |
| As a Percentage of Above Valuation in GFS as of 9-16-08 | | 67.1% |
| Barclays Opening Balance Sheet Valuation at Exit Price Marks of Acquired Mortgages | | 2.266 |
| As a Percentage of Above Valuation in GFS as of 9-16-08 | | 37.7% |

Notes:

[1] I adjust the GFS Net Long Inventory value to remove the impact of interest by multiplying by a ratio of the clean price to the dirty price. The sum of Net Long inventory value in this file before this adjustment is $6.080 billion.

[2] I obtain the Custodial Calculated Exit Value by using BoNY 9-19-08 for assets in Schedule A and B, and JPM 9-19-08 adjusted for Annex A assets. See Exhibit C-1 for the calculation of the JPM 9-19 value.

Sources:

BCI-EX-(S)-00200957.xls; BCI-EX-00099519 (Deposition Exhibit 86B) and BCI-EX-(S)-00213995 (Deposition Exhibit 641A) for Initial Inventory, BCI-EX-00108700 (Deposition Exhibit 87B) and BCI-EX-(S)-00213996 (Deposition Exhibit 641A) for JPM Inventory; Lehman GFS system data (BCI-EX-00297158.xls and BCI-EX-00297160.xls).

Contains Highly Confidential Information

# Exhibit E-1

## September 18, 19, and 20, 2008, Valuations of
## Federal Reserve/Barclays Repurchase Agreement Assets in Various Documents

| Valuation Date | Asset Valuation ($ Billions) | Asset Value in Excess of $45 B ($ Billions) | Source | |
|---|---|---|---|---|
| 9/18/2008 | $49.77 | $4.77 | Email from Ray Stancil to J. Hraska and others (with attachment) | JPM-BARCAP0003541 |
| 9/18/2008 | 49.70 | 4.70 | Declaration of Shari Leventhal | Deposition Exhibit 444 |
| 9/18/2008 | 49.70 | 4.70 | December 22, 2008, Court Transcript at page 36 | |
| 9/18/2008 | 49.00 | 4.00 | December 22, 2008, Court Transcript at Page 19 | |
| 9/18/2008 | 52.32 | 7.32 | Email from Stephen King to Jerry del Missier and others (with attachment) | Deposition Exhibit 537-A, BCI-EX-(S)-00078976 |
| 9/19/2008 | 52.19 | 7.19 | Email from Marty Malloy to Gerard LaRocca and Stephen King [1] | Deposition Exhibit 203, BCI-EX-00000080 |
| 9/19/2008 | 49.90 | 4.90 | Email from Paolo Tonucci to Jason Yang and Stephen King (with attachment)[2] | Deposition Exhibit 349B, BCI-EX-00070958-961 |
| 9/19/2008 | 49.60 | 4.60 | Email from John Rodefeld to Teri Scott and others | Deposition Exhibit 215, BCI-EX-(S)-00034528-9 |
| 9/19/2008 | 49.60 | 4.60 | Email from John Haley to Teri Scott and others [3] | Deposition Exhibit 281A, BCI-EX-(S)-00047924-6 |
| 9/19/2008 | 49.09 | 4.09 | Email from Stephen King to Jerry del Missier and others (with attachment) | Deposition Exhibit 537-A, BCI-EX-(S)-00078976 |
| 9/20/2008 | 49.00 | 4.00 | Email from Robert Azerad to Paolo Tonucci, at message from Robert Azerad to Martin Kelly and others at 10:27 [4] | Deposition Exhibit 151A |

**Range of Asset Value in Excess of $45 B: $4 Billion to $7.32 Billion**

Notes:

[1] This estimate was then sent by Gerard LaRocca to Mike Keegan (Deposition Exhibit 144A - BCI 000580, Deposition Exhibit 204 - BCI-EX-00000081).

[2] This estimate was identified in multiple documents and has been consolidated into a single estimate for this exhibit. Several of these documents, including Deposition Exhibit 349B, attached listings of CUSIPs. (Deposition Exhibit 235, Deposition Exhibit 139B, Deposition Exhibit 506, Deposition Exhibit 516, BCI-EX-(S)-00214006).

[3] This estimate was also identified in Deposition Exhibit 274 - BCI-EX-(S)-00038010-3.

[4] The email from Robert Azerad to Martin Kelly and others at 10:27 on 9/20/08 was attached to other emails including Deposition Exhibit 177, Deposition Exhibit 224, and Deposition Exhibit 152A.

Contains Highly Confidential Information

## Exhibit E-2
### Pricing Coverage of Initial Inventory in Bloomberg, Capital IQ, and Interactive Data

> "…Bloomberg and Capital IQ report observed prices (which may be from just one trade) for just under 60% of the CUSIPs represented in the Repo Collateral, which means that, for more than 40% of those CUSIPs, no reported price is available from these two sources for September 22, 2008. The value of positions for which no price is reported in either Bloomberg or Capital IQ for September 22, 2008, is more than 23% of the total fair value of the Repo Collateral (again using Barclays' exit price marks)." (Pfleiderer Report ¶31)

| ($ Billions) | Number of CUSIPs | Barclays Opening Balance Sheet Valuation (at Exit Price Marks) | Data Available from Bloomberg and Capital IQ[1] | | | | Data Available from Bloomberg, Capital IQ, and Interactive Data[1] | | | |
| | | | By CUSIP | | By Barclays Opening Balance Sheet Valuation (at Exit Price Marks) | | By CUSIP | | By Barclays Opening Balance Sheet Valuation (at Exit Price Marks) | |
| | [1] | [2] | [3] | [3]/[1] | [4] | [4]/[2] | [5] | [5]/[1] | [6] | [6]/[2] |
|---|---|---|---|---|---|---|---|---|---|---|
| **September 19, 2008** | | | | | | | | | | |
| All Asset Classes | 10,743 | $40.690 | 7,165 | 66.7% | $32.025 | 78.7% | 7,998 | 74.4% | $35.359 | 86.9% |
| RMBS | 3,834 | 12.620 | 2,529 | 66.0% | 6.500 | 51.5% | 3,105 | 81.0% | 9.291 | 73.6% |
| Corporate Bonds | 517 | 1.399 | 423 | 81.8% | 1.191 | 85.1% | 423 | 81.8% | 1.191 | 85.1% |
| Emerging Markets | 72 | 0.261 | 70 | 97.2% | 0.261 | 100.0% | 70 | 97.2% | 0.261 | 100.0% |
| Equities | 4,028 | 9.343 | 3,043 | 75.5% | 9.268 | 99.2% | 3,043 | 75.5% | 9.268 | 99.2% |
| Rates | 1,182 | 14.991 | 970 | 82.1% | 14.556 | 97.1% | 970 | 82.1% | 14.556 | 97.1% |
| Principal Mortgage Trading Group | 1,110 | 2.075 | 130 | 11.7% | 0.249 | 12.0% | 387 | 34.9% | 0.792 | 38.2% |
| **September 22, 2008** | | | | | | | | | | |
| All Asset Classes | 10,743 | $40.690 | 7,159 | 66.6% | $31.963 | 78.6% | 7,991 | 74.4% | $35.296 | 86.7% |
| RMBS | 3,834 | 12.620 | 2,529 | 66.0% | 6.500 | 51.5% | 3,104 | 81.0% | 9.289 | 73.6% |
| Corporate Bonds | 517 | 1.399 | 422 | 81.6% | 1.180 | 84.3% | 422 | 81.6% | 1.180 | 84.3% |
| Emerging Markets | 72 | 0.261 | 70 | 97.2% | 0.261 | 100.0% | 70 | 97.2% | 0.261 | 100.0% |
| Equities | 4,028 | 9.343 | 3,039 | 75.4% | 9.220 | 98.7% | 3,039 | 75.4% | 9.220 | 98.7% |
| Rates | 1,182 | 14.991 | 970 | 82.1% | 14.556 | 97.1% | 970 | 82.1% | 14.556 | 97.1% |
| Principal Mortgage Trading Group | 1,110 | 2.075 | 129 | 11.6% | 0.246 | 11.8% | 386 | 34.8% | 0.789 | 38.0% |

Note:
[1] Data from Bloomberg, Capital IQ, and Interactive Data collected by Chicago Partners. A CUSIP's price is considered covered by Bloomberg if there exists a last price or bid price. A CUSIP's price is considered covered by Capital IQ if there exists a close price. A CUSIP's price is considered covered by Interactive Data if there exists a price. Interactive Data prices were collected via the Bloomberg interface.

Sources:
Barclays PCG market value from BCI-EX-00099519 (Deposition Exhibit 86B) and BCI-EX-(S)-00213995 (Deposition Exhibit 641A) for Initial Inventory; BCI-EX-00255172 (0922 Equities Bid-Offer); BCI-EX-00255173 (0922 Position&PriceData).

Expert Report of Mark E. Zmijewski

Contains Highly Confidential Information

## Exhibit E-3
### Frequency of Price Changes in GFS from September 12 through September 19, 2008

| | Total Number of CUSIPs | | Percentage of Total CUSIPs in GFS with Price Changes | | | | |
|---|---|---|---|---|---|---|---|
| | For the Initial and JPM Inventory | Present on All Trading Days in GFS | On At Least 1 Trading Day | On At Least 2 Trading Days | On At Least 3 Trading Days | On At Least 4 Trading Days | On All 5 Trading Days |
| All Asset Classes | 11,938 | 8,468 | 79% | 77% | 70% | 62% | 52% |
| RMBS | 3,871 | 3,854 | 80% | 79% | 70% | 66% | 51% |
| Corporate Bonds | 764 | 488 | 66% | 59% | 52% | 46% | 41% |
| Emerging Markets | 82 | 46 | 74% | 72% | 70% | 67% | 65% |
| Equities | 4,028 | 1,501 | 96% | 95% | 94% | 94% | 89% |
| Rates | 1,196 | 702 | 79% | 79% | 78% | 78% | 76% |
| Principal Mortgage Trading Group | 1,997 | 1,877 | 69% | 64% | 51% | 25% | 20% |

| | Total Barclays Opening Balance Sheet Valuation ($ Billions) (At Exit Price Marks) | | Percentage of Barclays Opening Balance Sheet Valuation (At Exit Price Marks) for CUSIPs in GFS with Price Changes | | | | |
|---|---|---|---|---|---|---|---|
| | For the Initial and JPM Inventory | Present on All Trading Days in GFS | On At Least 1 Trading Day | On At Least 2 Trading Days | On At Least 3 Trading Days | On At Least 4 Trading Days | On All 5 Trading Days |
| All Asset Classes | $44.430 | $37.155 | 79% | 77% | 75% | 73% | 64% |
| RMBS | 12.647 | 12.633 | 83% | 83% | 81% | 79% | 61% |
| Corporate Bonds | 3.045 | 1.906 | 62% | 56% | 52% | 43% | 39% |
| Emerging Markets | 0.295 | 0.114 | 80% | 76% | 76% | 74% | 71% |
| Equities | 9.343 | 4.900 | 100% | 100% | 99% | 99% | 94% |
| Rates | 15.015 | 14.609 | 75% | 75% | 74% | 73% | 71% |
| Principal Mortgage Trading Group | 3.890 | 2.992 | 58% | 40% | 30% | 18% | 12% |
| Principal (Matured Deals) | 0.196 | | | | | | |

Note:
The analysis in this table is related to the material in Pfleiderer Report Exhibits 4 and 5.

Sources:
Lehman GFS system data (BCI-EX-00297253.xls, BCI-EX-00297156.xls, BCI-EX-00297157.xls, BCI-EX-00297158.xls, BCI-EX-00297159.xls, BCI-EX-00297160.xls); BCI-EX-00099519 (Deposition Exhibit 86B) and BCI-EX-(S)-00213995 (Deposition Exhibit 641A) for Initial Inventory; BCI-EX-00108700 (Deposition Exhibit 87B) and BCI-EX-(S)-00213996 (Deposition Exhibit 641A) for JPM Inventory; BCI-EX-00255172 (0922 Equities Bid-Offer); BCI-EX-00255173 (0922 Position&PriceData).

Contains Highly Confidential Information

## Exhibit E-4

### Sample of Securities Discussed in Pfleiderer Report Appendix 4
### Represents Less than 9% of Assets in the Initial Inventory

| Securities ($ Millions) | | Number of CUSIPs | Indicated Value Using Various Price Marks | | | |
|---|---|---|---|---|---|---|
| | | | BoNY Custodial Price Marks 9-19-08 | Barclays (PCG) Mid-Point Price Marks 9-19-08 | Barclays Opening Balance Sheet Valuation (At Exit Price Marks) | Barclays (PCG) Sale Value 9-30-08 |
| **Securities from Pfleiderer Report Appendix 4.1 - 4.3** | | | | | | |
| Collateralized ALT-A Mortgage Obligations Issued by SARM Loan Trust | | 125 | $237.7 | $197.1 | $80.2 | $80.2 |
| Asset Backed Securities Backed by ALT-A HELOCs Issued by Lehman Trust | | 67 | 171.1 | 139.8 | 86.9 | 86.9 |
| US Agency Collateralized Mortgage Obligations (Sequentials, PACs, and VADMs) | | 65 | 856.1 | 810.8 | 729.8 | 798.1 |
| **Subtotal** | **[A]** | **257** | **1,264.8** | **1,147.7** | **896.8** | **965.2** |
| **Securities from Pfleiderer Report Appendix 4.4 - 4.8** | | | | | | |
| US Agency CMOs (Complex Floater, Interest Only and Inverse Interest Only) | | 350 | $1,208.6 | $781.7 | $703.5 | $761.9 |
| Lehman-Issued Warrants and Lehman-Issued Equity-linked Notes | | 135 | 203.0 | 0.0 | 0.0 | 0.0 |
| Giants Stadium Bonds | | 4 | 59.0 | 59.0 | 59.0 | N/A |
| Insurance-Related Asset Backed Securities | | 1 | 11.0 | 11.0 | 11.0 | N/A |
| Pine CCS CLO | | 1 | 915.0 | 571.5 | 428.6 | N/A |
| **Subtotal** | **[B]** | **491** | **2,396.6** | **1,423.1** | **1,202.1** | **761.9** |
| **All Securities from Pfleiderer Report Appendix 4.1 - 4.8** | **[C]** | **748** | **3,661.5** | **2,570.8** | **2,098.9** | |
| **All Securities from Initial Inventory** | **[D]** | **10,743** | **45,037.1** | **42,927.5** | **40,690.3** | |
| **Percentage of All Securities from Initial Inventory** | | | | | | |
| Securities from Pfleiderer Report Appendix 4.1 - 4.3 | [A]/[D] | 2.4% | 2.8% | 2.7% | 2.2% | |
| Securities from Pfleiderer Report Appendix 4.4 - 4.8 | [B]/[D] | 4.6% | 5.3% | 3.3% | 3.0% | |
| Securities from Pfleiderer Report Appendix 4.1 - 4.8 | [C]/[D] | 7.0% | 8.1% | 6.0% | 5.2% | |

Note:
The Pfleiderer Report identifies the amounts which are shaded gray. See report for details.

Sources:
All securities in this table are referenced in BCI-EX-00099519 (Deposition Exhibit 86B) and BCI-EX-(S)-00213995 (Deposition Exhibit 641A) for Initial Inventory. CUSIP 45804VAA2 (included in the Pfleiderer Report in Insurance-Related Asset Backed Securities) is also sourced in BCI-EX-00108700 (Deposition Exhibit 87B) and BCI-EX-(S)-00213996 (Deposition Exhibit 641A) for JPM Inventory.

Expert Report of Mark E. Zmijewski

Contains Highly Confidential Information

# Exhibit F-1

## Incomplete Coverage in GFS for Initial and JPM Inventory on September 12, 2008

| | CUSIPs From Barclays Opening Balance Sheet | | | CUSIPs from Barclays Opening Balance Sheet in GFS | | | |
|---|---|---|---|---|---|---|---|
| Asset Class ($ Billions) | Original Notional Amount | Number of CUSIPs | Barclays Opening Balance Sheet Valuation (at Exit Price Marks) | Number of CUSIPs in GFS | Long Inventory Value in GFS | Barclays Opening Balance Sheet Valuation (at Exit Price Marks) | Percentage of Total Barclays Opening Balance Sheet Valuation (at Exit Price Marks) |
| RMBS | $43.412 | 3,871 | $12.647 | 3,200 | $11.519 | $10.579 | 84% |
| Corporate Bonds | 4.861 | 764 | 3.045 | 358 | 1.998 | 1.293 | 42% |
| Emerging Markets | 0.336 | 82 | 0.295 | 29 | 0.055 | 0.073 | 25% |
| Equities | 2.453 | 4,028 | 9.343 | 1,940 | 6.692 | 5.670 | 61% |
| Rates | 16.244 | 1,196 | 15.015 | 526 | 8.271 | 6.630 | 44% |
| Principal Mortgage Trading Group | 45.717 | 1,997 | 3.890 | 1,840 | 5.683 | 2.447 | 63% |
| Principal (Matured deals) | | | 0.196 | | | | |
| **Total Inventory** | **113.024** | **11,938** | **44.430** | **7,893** | **34.219** | **26.691** | **60%** |

Sources:
BCI-EX-00099519 (Deposition Exhibit 86B) and BCI-EX-(S)-00213995 (Deposition Exhibit 641A) for Initial Inventory, BCI-EX-00108700 (Deposition Exhibit 87B) and BCI-EX-(S)-00213996 (Deposition Exhibit 641A) for JPM Inventory; BCI-EX-00297253 (Lehman GFS system data); BCI-EX-00255172 (0922 Equities Bid-Offer).

# Exhibit Q

Page 1

1

2          UNITED STATES BANKRUPTCY COURT

3            SOUTHERN DISTRICT OF NEW YORK

4    --------------------------------X

5    IN RE:

6                              Chapter 11

7    LEHMAN BROTHERS          Case No. 08-13555(JMP)

8    HOLDINGS, INC. et al.,

9          Debtors.

10   --------------------------------X

11

12              HIGHLY CONFIDENTIAL

13      VIDEOTAPE DEPOSITION OF MARK ZMIJEWSKI

14              New York, New York

15              April 14, 2010

16

17

18   Reported by:

     Bonnie Pruszynski, RMR

19   JOB NO. 29652

20

21

22

23

24

25

## Page 2

1
2         April 14, 2010
3         9:34 a.m.
4
5
6       Videotape deposition of MARK
7 ZMIJEWSKI, taken at BOIES, SCHILLER &
8 FLEXNER, LLP, 575 Lexington Avenue, New
9 York, New York, before Bonnie Pruszynski,
10 Registered Professional Reporter, Registered
11 Merit Reporter, Certified LiveNote Reporter,
12 and a Notary Public of the State of New
13 York.
14
15
16
17
18
19
20
21
22
23
24
25

## Page 3

1
2 A P P E A R A N C E S :
3 JONES DAY, LLP
4 Attorneys for Lehman Brothers, Inc.
5     222 East 41st Street
6     New York, New York
7 BY:     JAYANT W. TAMBE, ESQ.
8        KELLY A. CARRERO, ESQ.
9 BOIES, SCHILLER & FLEXNER, LLP
10 Attorneys for Barclays
11     401 East Las Olas Blvd. - Suite 1200
12     Fort Lauderdale, FL 33301
13 BY:     W. TODD THOMAS, ESQ.
14
15 HUGHES HUBBARD & REED, LLP
16 Attorneys for SIPA Trustee
17     One Battery Park Plaza
18     New York, New York 10004
19 BY:     FARA TABATABAI, ESQ.
20
21 QUINN EMANUEL URQUHART & SULLIVAN, LLP
22 Attorneys for the Creditors Committee
23     51 Madison Avenue
24     New York, New York 10010
25 BY:     ROBERT K. DAKIS, ESQ.

## Page 4

1
2 ALSO PRESENT:  STEVE SANPIETRO, Legal Video
3     Specialist
4     MARC VELLRATH, Ph.D., CFA
5     ELIZABETH DAVIS
6     Finance Scholars Group
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 5

1       M. Zmijewski
2     THE VIDEOGRAPHER:  This is the start
3 of the tape labeled number one of the
4 videotape deposition of Mark Zmijewski in
5 the matter of In Re: Lehman.
6     This deposition is being held at
7 575 Lexington Avenue, New York, on
8 Wednesday, April the 14th, 2010, at
9 approximately 9:34 a.m.
10     My name is Steve Sanpietro from TSG
11 Reporting, Inc.  I am the legal video
12 specialist.
13     The court reporter today is Bonnie
14 Pruszynski in association with TSG
15 Reporting.
16     Can I please have counsel introduce
17 themselves for the record.
18     MR. THOMAS:  Todd Thomas from Boies
19 Schiller & Flexner on behalf of Barclays.
20     MR. TAMBE:  Jay Tambe from Jones Day
21 on behalf of Lehman Brothers Holdings, Inc.
22     MR. DAKIS:  Robert Dakis from Quinn,
23 Emanuel, Urquhart & Sullivan for the
24 official committee of unsecured creditors.
25     MS. CARRERO:  Kelly Carrero with

Page 6

1                    M. Zmijewski
2        Jones Day also for Lehman Brothers Holdings,
3        Inc.
4            THE VIDEOGRAPHER:  Will the court
5        reporter please swear in the witness.
6    MARK ZMIJEWSKI,
7            called as a witness, having been first
8            duly sworn, was examined and testified
9            as follows:
10   EXAMINATION
11   BY MR. THOMAS:
12       Q    Good morning.
13       A    Good morning.
14       Q    Have you been deposed before?
15       A    I have.
16       Q    Approximately how many times?
17       A    Fifty.
18       Q    So you are very familiar with how the
19   process works.
20       A    Yes.
21       Q    If you have any questions or
22   uncertainty about what I am asking you, please ask
23   me to rephrase the question.  I am happy to do so.
24       A    Thank you.
25       Q    What areas, subject areas do you

Page 7

1                    M. Zmijewski
2    consider yourself an expert in?
3        A    Accounting, economics and finance, as
4    it relates to valuation issues, and security
5    analysis issues.
6        Q    Any others?
7        A    No.  Although I have a much more
8    detailed couple paragraphs on that background that
9    expands those words in my report, so.
10       Q    Have you ever spent any time on a
11   trading desk?
12       A    I have not.
13       Q    When did you first start doing any
14   work on this current project involving Lehman?
15       A    It was November or December of last
16   year.  Late November, December.  I'm not sure.
17       Q    And what was your initial assignment
18   or why were you asked to be involved?
19       A    I was asked to be involved initially
20   as a consultant to just become familiar with the
21   issues in the matter, and some data, and
22   everyone's position so that if, you know, there
23   was a need, I would be a witness.
24       Q    And what did you understand were the
25   issues at that time, when you came on board?

Page 8

1                    M. Zmijewski
2        A    The issues that were in the, I think
3    it's 60(b) motions, if I recall that correct.
4        Q    So you would have reviewed the
5    movants' Rule 60(b) motion?
6        A    Correct.  That was the first thing I
7    did.
8        Q    And was there any particular area or
9    aspects of the motion that you were looking at
10   or -- when you came on in the November or December
11   time frame?
12       A    The issues that are in my report.  It
13   was -- the issues were related to what I call the
14   Barclays windfall.
15       Q    Anything other than the Barclays
16   windfall or those issues that you analyzed or looked at or
17   your report that you analyzed or looked at or
18   considered?
19       A    I was asked to be prepared to rebut
20   witnesses who would be relevant to that particular
21   issue.
22       Q    The scope of your work was just
23   related to the issues that are reflected in your
24   final report?
25       A    Oh, yes.

Page 9

1                    M. Zmijewski
2        Q    So there is no other issues that you
3    looked up that ended up not being in your report?
4        A    Correct.
5        Q    And can you tell me approximately how
6    many hours did you spend on this project overall.
7        A    Ballpark, middle April -- somewhere
8    between three and four hundred, I would say.
9        Q    And did you do the work yourself or
10   did you have assistance in performing whatever
11   work you did?
12       A    I had a number of people at Chicago
13   Partners help me do work under my direction and
14   supervision.
15       Q    Are you referring to the individuals
16   who also gave expert reports in this matter?
17       A    No.  There is a staff at Chicago
18   Partners who help read documents, analyze data,
19   create datasets for me.  As you know, the number
20   of documents that were coming to us was many and
21   fast.
22       Q    Have you done any work on this matter
23   since your report was completed?
24           MR. TAMBE:  Objection to the form of
25   the question.

Page 10

M. Zmijewski

1
2    A    Other than prepare for my deposition,
3    no.
4    Q    You expect to testify at the
5    evidentiary hearing?
6    A    If asked to do so -- I don't know if
7    I will be asked to do so -- yes.
8    Q    Do you have any -- do you plan to do
9    any work on this project between now and then,
10   other than preparing for the testimony?
11   A    I -- I -- probably, yes. Yeah.
12   Q    Have you identified any other further
13   work in connection with your report that you plan
14   to do before the hearing?
15   A    Well, I am aware that since the date
16   of my report, we received some additional
17   documents and data, which I haven't had an
18   opportunity to analyze, so, we naturally would
19   look at that, and to the extent it was relevant,
20   we would, you know, revise my analysis and do
21   whatever is necessary, conditional on the data
22   that we receive.
23   Q    Can you describe what the --
24   generally what -- the documents and data that you
25   are referring to?

Page 11

M. Zmijewski

1
2    A    I believe we recently received some
3    equities pricing from GFS that we asked for before
4    and wasn't in the original production, but was
5    received -- I am just aware that it was received
6    recently. I haven't looked at it at all.
7    Q    When you say "we asked for before,"
8    who is the "we," and who did you ask?
9    A    "We" being Chicago, people at Chicago
10   Partners, and we asked the lawyers who I
11   understand asked you, who I assume asked
12   Barclay's, but there is conjecture in there --
13   Q    Right.
14   A    -- as to who asked whom what. But I
15   know that we asked our lawyers.
16   Q    Okay. But you asked your lawyers for
17   that information?
18   A    Yes.
19   Q    And was that, that information
20   relevant to your analysis, that you asked for but
21   didn't receive?
22   A    Certainly had we had it at the time,
23   we would have used it, and compared it to the
24   other types of equity prices that were available,
25   so it's something we would have used, but is it

Page 12

M. Zmijewski

1
2    relevant or not, you don't know until you analyze
3    it to know if it's important.
4    Q    So it may or may not have changed --
5    may or may not affect your opinions in your
6    report?
7    A    Correct.
8    Q    Other than those GFS documents and
9    data, is there any other work that you anticipate
10   doing between now and your testimony?
11   A    I don't know who else will be deposed
12   in this matter, so naturally, I know some of the
13   valuation experts have to be deposed yet.
14   Mr. Schwaba was deposed this week. I don't know
15   if there will be follow-up work there.
16   To the extent there is follow-up work
17   with them, I will be part of that work, and I will
18   change my report as necessary based on any changes
19   in their work.
20   And there might be other witnesses.
21   You know, I don't --
22   Q    So as you sit here today --
23   A    As I sit here today? I am not aware
24   of anything. I have no plans. But I have done
25   this before, so I understand as more information

Page 13

M. Zmijewski

1
2    and more witnesses are deposed, there is usually
3    follow-up work, so, I expect to do something, but
4    what, I don't know.
5    Q    Let me ask you your understanding of
6    certain terms that appear in a lot of these -- in
7    your report, and some other documents, and just so
8    we are on the same page.
9    What is your definition of the term
10   "discount"?
11   A    In what context?
12   Q    In the context that it's used in your
13   report when you refer to "discount."
14   MR. TAMBE: Objection to the form of
15   the question.
16   A    You know, if you give me a copy of my
17   report, I can look, so it would be helpful to have
18   a copy.
19   If you mean focused on liquidity
20   discount, if that is the context you are
21   talking -- I am not sure how --
22   Q    Let me just ask generally. When you
23   hear the word "discount" in your area or
24   profession, what does that term mean to you?
25   A    It means to reduce a value by some

Page 14

M. Zmijewski

1 amount, for some purpose, depending on what the
2 qualifier is for a discount. So, if it's a
3 discount factor, it could be for the time value of
4 money or for risk, or it could be a discount for
5 liquidity, which is something that is discussed in
6 my report.
7     Q    So it's a reduction.
8     A    It's a reduction in some value.
9     Q    And the reduction can be for a
10 variety of reasons?
11     A    You need a context to understand what
12 that reduction would be for, yes. There has to be
13 a qualifier on "discount." There is many ways one
14 uses the term "discount."
15     Q    For -- in the context of whether a
16 purchaser buying assets received a discount, in
17 that context, what would your understanding be of
18 what that would mean, to say that a purchaser
19 received a discount in buying assets?
20         MR. TAMBE: Object to the form of the
21 question.
22     A    The purchaser received a discount?
23 Well, if -- you know, again, it would have to be a
24 discount from what? So, the question is, well, a

Page 15

M. Zmijewski

1 discount from?
2     Q    That is my exact question to you. If
3 you just said a discount, what would it be, what
4 would that -- would it have any particular meaning
5 to you in terms of what it was from, a discount
6 from what?
7     A    You need a specific context, so,
8 liquidity discount could be -- have a certain
9 context, that because -- based on a calculation
10 using a certain framework to value the security,
11 that doesn't include a liquidity discount, you
12 have a value based on that framework, and from
13 that you could reduce that value for a liquidity
14 discount.
15         An example would be, let's assume you
16 are buying a company, and you used the discounted
17 cash flow valuation model. Now, the discount in
18 that is irrelevant to what I am talking about.
19 But you use a discounted cash flow valuation
20 model. Those valuation models typically do not
21 include a liquidity discount, sometimes called a
22 marketability discount. Well, you would calculate
23 the value based on the discounted cash flow
24 valuation model, and if the liquidity discount

Page 16

M. Zmijewski

1 were appropriate, you would reduce that value by a
2 marketability or liquidity discount.
3         You might also increase the value for
4 a premium because you are buying it and there are
5 synergies related to the -- you know, as a result
6 of the purchase, so you might actually increase
7 the value for synergies, so.
8         But there always has to be some type
9 of context, when you use the word "discount," you
10 know, in the way I use it in my report.
11     Q    So, in terms of a purchaser buying
12 assets, is it -- would the most likely context be,
13 in terms of whether it got a discount, would be
14 the -- compared to fair market value of the assets
15 being sold, or would it be how they valued them on
16 their balance sheet, or don't you know because you
17 really have to know the context and saying
18 "discount" doesn't mean any particular thing?
19     A    Well, the answer is, it depends on
20 how you calculated the value. You said fair
21 value. If that is a market value, where there is
22 a willing buyer and a willing seller for a -- in a
23 transaction, well, a discount should have already
24 been taken as in the calculation of that fair

Page 17

M. Zmijewski

1 value already, so you wouldn't discount a fair
2 value in that particular context because it should
3 have been included already in the way you
4 calculated the fair value.
5         So, again, it depends on what the
6 context is.
7     Q    So -- okay. What is a liquidity
8 discount?
9     A    A liquidity discount is a discount,
10 you know, you would apply to a value to account
11 for the illiquid nature of a security.
12     Q    Can you just describe how you would
13 go about doing that?
14         MR. TAMBE: Object to the form of the
15 question.
16     A    Well, it -- it -- if -- it depends on
17 what the security is.
18         MR. THOMAS: I'm sorry, just a
19 minute. Is there a way to make this work?
20         THE VIDEOGRAPHER: The time is
21 9:48 a.m. We are now off the record.
22         (Discussion off the record.)
23         THE VIDEOGRAPHER: The time is
24 9:49 a.m. We are now back on the record.

Page 18

1          M. Zmijewski
2   BY MR. THOMAS:
3      Q    I believe you said something, that
4   liquidity discount is -- let me just ask you --
5   you may have answered this.  Let me ask you to
6   restate it again, what a liquidity discount is.
7      A    It's the discount you would apply to
8   a price, assuming the price didn't include a
9   discount already, or a price or a value, because
10  of the illiquid nature of an asset.  The asset
11  that you are valuing.
12     Q    I think that type of discounting, you
13  are not trying to reduce the price below fair
14  market value, but rather you are trying to adjust
15  the price to fair market value; is that correct?
16         MR. TAMBE:  Object to the form.
17     A    My definition of fair market value
18  would include the price at which parties are
19  willing to transact.  So therefore, to the extent
20  there is a liquidity discount, it should be
21  included in that fair market value.
22     Q    So the fact that there is a discount
23  included in a particular price, doesn't mean that
24  that price is below fair market value; correct?
25     A    It depends.  It doesn't have to mean

Page 19

1          M. Zmijewski
2   that, but it can mean that.  The question is:  To
3   what was it applied?
4          So let's, let's start with there is a
5   fair market value.  When somebody gives me fair
6   market value, and someone takes a discount on the
7   appropriate market value, well, then, the
8   resulting discounted price would be below fair
9   market value because you already started with the
10  price that included fair market value.
11         I will give you an example relevant
12  to this case.  The -- you know, the accountants in
13  the U.S. discuss exit prices, so that the standard
14  is typically to take a market price, let's say
15  today I had -- right now, as soon as the market
16  closed, I observe a price, transactions happening
17  for a very liquid security, but there is still a
18  bid/ask range of that price, but I observe
19  something.  Well, the fair market value in my view
20  would be the price.
21         Accountants require through their
22  standards that you use exit prices, so you would
23  want to apply a discount to get a bid/ask spread
24  discount to get from what I would consider a fair
25  market value to an exit price.  So, that is

Page 20

1          M. Zmijewski
2   applying a discount, a big discount, and it
3   reduces it to a bid price, but I don't think the
4   bid price is the market value.
5      Q    And the situation you are referring
6   to is when you have a liquid market with actual
7   sales being transacted; correct?
8      A    I gave you a hypothetical, so there
9   wasn't an issue of timing during the day, when you
10  observed the last price.  So, I just eliminated
11  that issue by assumption.
12     Q    Do you disagree with the U.S.
13  accounting guidance on fair market value?
14     A    It's fair -- if you read the
15  standard, the fair market value is fair market
16  value at exit prices, so, they qualified the
17  definition of fair market value.  It's not fair
18  market value with respect to the expected value
19  one would get.  It's fair market value on an exit,
20  an immediate exit.
21         It's a different concept of fair
22  market value.  It's different than the economist's
23  concept of at what price is a willing buyer and a
24  willing seller going to transact if each party has
25  relevant information and no one is pressured to

Page 21

1          M. Zmijewski
2   sell.
3          Accountants aren't measuring that
4   value.  If you look at the accounting rules, they
5   are measuring something on conservative exit
6   value.  How you can exit immediately.  That is,
7   that is below market value.
8          Just look at prices, how prices
9   trade.  Prices don't trade at bid prices.  Prices
10  trade in between the bid/ask prices.  So we see
11  empirically over and over again that the
12  accountants are being conservative, and that is
13  not wrong.  That is how they are defining the
14  value for the financial statements.
15     Q    Is the accounting measure expected
16  receipt from sale?
17     A    I don't know if that is the
18  terminology they use, but it's the expected --
19  what can you exit at immediately.  What is a
20  reasonable amount to, to have as a value assuming
21  an immediate exit.
22     Q    In other words, is it what the seller
23  can actually get for the asset if they sell it?
24         MR. TAMBE:  Object to form.
25     A    If they sell it immediately.  I know

Page 22

M. Zmijewski

1 immediately if I see a bid, where I know there is
2 enough volume under, underpinning that bid, and I
3 want to sell less than that volume, then it's very
4 highly certain that I can actually sell at that
5 price.
6         That doesn't mean if I go into the
7 marketplace and put an auction out there with my
8 stock, that it's actually going to be trading at
9 that price. And the price at which it trades is
10 the market value, and market values are not exit
11 prices.
12     Q    So, what the market value might be
13 is -- can be dependent upon the volume of assets
14 you are selling, as well?
15     A    Of course, sure.
16     Q    What do you understand the term "bulk
17 discount" to mean?
18     A    Professor Pfleiderer has that in --
19 the Pfleiderer report contains that language. I
20 would characterize it as a block trade discount, a
21 large volume discount, if you want to dump a large
22 block of securities, sell them quickly.
23     Q    And what is your definition of exit
24 price?

Page 23

M. Zmijewski

1     MR. TAMBE: Objection, asked and
2 answered.
3     A    You know, the exit price is defined
4 by the accounting rules, so, if you give me
5 Mr. Garvey's report, he outlines that in detail.
6 That's the definition.
7     Q    Do you have an understanding of what
8 exit price is, in kind of layman's terms?
9     A    Well, I have read and taught, you
10 know, Statement 157, so, so I have it, but I don't
11 want to paraphrase it. When I teach, I have notes
12 in front of me. So, you are giving me a closed
13 book exam here. That is not the kind of exam I
14 prepared for.
15         And if you give me the documents, I
16 can go through and explain it to you in layman's
17 terms. But I prefer to have either FAS 157 or
18 Mr. Garvey's report, and the relevant parts are
19 contained in his report.
20     Q    As you sit here, there is no
21 particular meaning of exit price that you have in
22 mind?
23     MR. TAMBE: Objection to form.
24     MR. DAKIS: Objection, asked and

Page 24

M. Zmijewski

1 answered.
2     A    I don't believe I said that. If I
3 did, I misspoke.
4         What I said is, it's a precise term
5 defined by the accounting rules, and I am happy to
6 look at those accounting rules and explain those
7 accounting rules to you.
8     Q    How about the term "last price," can
9 you give me your definition of that?
10     A    The last price typically is the last
11 traded observed price in a marketplace.
12     Q    And the end-of-day price?
13     A    I -- I don't -- I don't know.
14 Different vendors might have different terminology
15 they use. I would have to look it up. I'd like
16 for me to go to a vendor and understand how a
17 vendor is using it.
18     Q    How about mid price?
19     A    Mid price is usually characterized as
20 a price between the bid and the ask price. It
21 could be the mid price. I'm sorry. It could be
22 the mid of the bid and the ask price, and that is
23 typically how it would be calculated.
24     Q    And the term "windfall"?

Page 25

M. Zmijewski

1     A    I defined that in my report.
2 Specifically for -- that has many meanings. I
3 don't think it's a term of art. It's something
4 that needs to be defined, and I defined it in my
5 report for the purposes of this litigation.
6     Q    Is that a term you used in other
7 reports that you recall.
8     A    I don't recall. I could have. In
9 this particular case, I didn't see -- I used that
10 phrase because there doesn't -- none of the
11 movants' 60(b) -- I always forgot -- 60(b) motions
12 I think they are, use the word "damage," so, I
13 would think of this as a damage calculation, but
14 since the motions never talked about damages, I
15 called it a windfall, so I defined it that way in
16 this particular case.
17     Q    And you sometimes used the term
18 "economic analysis." What precisely qualifies as
19 economic analysis in your mind?
20     A    Applying economic principles, data,
21 to a problem. And a question.
22     Q    Let me go ahead and give you a copy
23 of your report and start marching through it.
24         Let me show you an exhibit we will

Page 26

1       M. Zmijewski
2  mark as 706B.
3       A    Thank you.
4            MR. THOMAS:  Counsel, you have a copy
5  of the report.  Do you want another one?
6            (Discussion held off the record.)
7            (Exhibit 706B marked for
8  identification as of this date.)
9
10      Q    Pardon me.  Do you prefer doctor or
11 professor?
12      A    Anything other than doctor.
13      Q    Okay.  Professor or Mr.?
14      A    That's great.
15      Q    Okay.  Are you connected now?
16      A    May I rip these apart?  Is that okay?
17      Q    Yes.  She might be angry.
18           MR. TAMBE:  We can put them back
19 together.
20      Q    We can put them back together.
21      A    You have a stapler.
22      Q    In the same order.
23           MR. TAMBE:  Go ahead.
24      Q    Do you recognize Exhibit 706B?
25      A    I do.

Page 27

1       M. Zmijewski
2       Q    Can you describe what it is, please?
3       A    It's my expert report dated March 15,
4  2010.
5       Q    And would you go ahead and turn,
6  please, to Exhibit B-1.
7       A    I'm sorry, B?
8       Q    Exhibit B-1.
9            And would you describe what this
10 chart reflects, please.
11      A    It reflects the calculation of what I
12 call the Barclays windfall from the transaction.
13      Q    And I would like to just move through
14 these figures to make sure I understand what they
15 are, how they are calculated.
16      A    Okay.
17      Q    The first figure is what, the
18 50,165,000,000 figure?
19      A    Those are the financial assets on
20 Barclays' opening balance sheet as a result of
21 this transaction.
22      Q    And you went and looked at what to
23 come up with that number?
24      A    That number is taken off of the
25 Barclays opening balance sheet.  If I recall the

Page 28

1       M. Zmijewski
2  schedule, I can look it up, but I think it's -- or
3  the exhibit -- I think it is 88-B, as in boy.
4       Q    And the next line, 775 million, would
5  you describe what that is for us.
6       A    Those are, according to Mr. Romain's
7  testimony, I think there are two exhibits to
8  his -- I don't remember which deposition -- where
9  he outlines certain assets that are -- that
10 Barclays views as undelivered but they haven't
11 been recorded on Barclays' balance sheet.  So they
12 are claimed assets that Barclays did not yet put
13 on its balance sheet, based on Mr. Romain's
14 testimony.
15      Q    So this is under the assumption that
16 Barclays prevails and recovers those assets;
17 correct?
18      A    Correct.
19      Q    What is the next line, the
20 103 million?
21      A    There is a couple of lines on the
22 balance sheet that -- for OCC assets, and if -- I
23 merely updated that calculation so that it's based
24 on September 19th rather than September 19th and
25 September 22nd, so I moved it so that there is a

Page 29

1       M. Zmijewski
2  consistent calculation as of September 19th.
3       Q    And then what is the $5,112,000,000
4  number?
5       A    That is the undervaluation that I
6  explained in my discussion of Exhibit A-1.
7       Q    And it cites A-1 there, but did you
8  mean to say A-2?
9       A    I will check.
10           Yes.
11      Q    Thank you.
12      A    Correct.  The cite should be to
13 Exhibit A-2.  Thank you.
14      Q    And let's turn briefly to A-2.  Would
15 you describe what Exhibit A-2 reflects.
16      A    Yes.  As you know, there are
17 different valuation experts that have been engaged
18 by the movants, and those are Mr. Olvany,
19 Mr. Slattery, Mr. Schwaba and myself, and each of
20 these experts valued certain securities in
21 different appropriate ways, and this table
22 documents the number of CUSIPs that they valued;
23 Barclays' opening balance sheet valuation of those
24 values, and that would be column A.  Column B is
25 the valuation expert's opinion with respect to the

Page 30

1    M. Zmijewski
2  appropriate valuation of those CUSIPs.
3    And the last column is merely the
4  difference between columns A and columns B --
5  column A and column B.
6    Q    And the persons who is doing these
7  other valuations, Mr. Olvany, Mr. Slattery, Mr.
8  Schwaba, do they all work with the same company
9  that you work at?
10    A    Yes. We all work at Chicago
11  Partners.
12    Q    And do they work in the same office
13  that you work out of?
14    A    Well, I don't know that everybody
15  works -- I don't work out of any particular
16  office. I'm at the university, so, I work in
17  New York out of the New York office as much as the
18  Chicago office, so.
19    Mr. Olvany, Mr. Slattery are in
20  Chicago. I don't even know where Mr. Schwaba is
21  located. I have never -- I don't know where he's
22  working.
23    Q    Have you ever met Mr. Schwaba?
24    A    No, I have not. I have spoke to him
25  on the phone but have never met him in person.

Page 31

1    M. Zmijewski
2    Q    Mr. Olvany, Mr. Slattery -- do you
3  have an office at Chicago Partners?
4    A    I do have an office there. I have
5  seen them. They have been at Chicago Partners
6  longer than Mr. Schwaba. All three of these
7  gentlemen are -- I call them affiliates. They are
8  independent experts that work with Chicago
9  Partners.
10    Q    Are they paid by Chicago Partners?
11    A    Yes.
12    Q    So you are all part of Chicago
13  Partners?
14    A    Correct.
15    Q    Can you describe your level of
16  collaboration with these other individuals in
17  coming up with the values reflected in A-2?
18    A    We have had several conversations
19  starting from the first day they were each brought
20  into this matter to do valuation, and we discussed
21  the valuation approaches, the type of data that
22  was necessary, the type of valuation systems which
23  they discuss in the report, that was necessary,
24  for them to do valuations of this sort.
25    So, we discussed the inputs and how

Page 32

1    M. Zmijewski
2  they would measure the inputs, so, you know, we
3  essentially discussed how they were going to go
4  about valuing all the securities.
5    Q    And as I understand it from your
6  report, you are accepting their values on certain
7  assets and you have come up with values on, on
8  your own, for other assets; is that correct?
9    A    I am relying on their work, of
10  course. I believe their work is reliable, based
11  on my interactions with them and the discussions
12  that I have had with them, so, I believe their
13  work is reliable.
14    However, I did not do any of those
15  calculations, nor did I review the calculations
16  themselves. I just discussed the approach and
17  the -- and how they were going to measure things.
18  So it was a discussion on the approach
19  methodologies that they were going to use and how
20  they were going to execute those methodologies.
21    But I didn't check any of the work or
22  I wasn't part of the calc- -- you know, the
23  execution. I didn't partake in that. But I rely
24  on them, but I believe they are reliable.
25    Q    Can you describe Mr. Olvany's

Page 33

1    M. Zmijewski
2  approach and methodologies to the valuations he
3  calculated?
4    A    I could do it better if you gave me a
5  copy of his report. I assume you don't want to do
6  that.
7    So he used mostly corporate bonds,
8  and, and Giants Stadium revenue bonds he focused
9  on as well, because Professor Pfleiderer did that.
10  So he looked at corporate bonds. It's a
11  discounted cash flow methodology. Term structure
12  of interest rates, yield curves. We discussed how
13  he was going to use that.
14    He used a valuation software package
15  that we've had at Chicago Partners for some time
16  now called FINCAD that I have used in valuing
17  certain types of securities over the years.
18    I am not sure how much more. I mean,
19  you have to go to his report. I don't remember
20  all the details. I haven't talked about that with
21  him for a while now.
22    Q    How about the approach and
23  methodology of Mr. Slattery?
24    A    Back to Mr. Olvany. Of course, he
25  had price data he also -- one of the things you

Page 34

M. Zmijewski

1  do, which is -- I will just jump to Mr. Schwaba
2  and include him in this conversation -- if you can
3  find comparable types of securities, Mr. Olvany
4  used comparable pricing as part of his analysis as
5  well, which is primarily what Mr. Schwaba did.
6      So that I would characterize
7  Mr. Schwaba's methodology as using comparable
8  transactions, comparable pricing methodology,
9  comparable security methodology.
10     Mr. Slattery focused on mortgages
11 mostly, and Pine.  Again, focused on Pine because
12 Professor Pfleiderer did.  In his methodology, he
13 uses PolyPath to measure that methodology, and
14 it's a more sophisticated methodology than just
15 the discounted cash flow methodology, because it
16 will have dynamic programming of interest rate
17 series in it, and we discussed how he was going to
18 use those models, and in his report he identifies
19 the specific models within PolyPath that he uses.
20 We discussed those models, and we discussed how he
21 was going to measure the inputs for those models.
22     That is my recollection of the closed
23 book test.
24     Q     And how many conversations have you

Page 35

M. Zmijewski

1  had, did you have with Mr. Slattery prior to his
2  report?
3      A     You know, we had this series of
4  conversations.  I don't remember who was on the
5  phone.  Everyone was participating in the calls.
6  So we had -- I felt it was important, so, I was
7  first on the team, so, my goal, when we brought
8  other people into the -- other experts on board,
9  was to make sure we were all discussing what
10 methodologies are we using, what views do we have.
11 Let's make sure that we have the same view.  If we
12 don't have the same view, we better figure out
13 why.  Let's make sure we have the same inputs, so
14 that there is a consistency in the approach, and
15 the analysis.
16     Therefore, we had a series of calls,
17 Mr. Olvany and Mr. Slattery -- calls and
18 meetings -- and Mr. Schwaba, sometimes they were
19 on, sometimes they weren't on.  They had calls
20 with me and without me.
21     There was a long series of calls.
22     Q     What were the main issues that came
23 up in terms of approach that you recall?
24     A     The main issue was, what are good

Page 36

M. Zmijewski

1  software methodology, you know, methodologies that
2  are used, you know, in the marketplace.  So,
3  FINCAD was one of them, and everyone was
4  comfortable with FINCAD.  It's not good for the
5  mortgages, so, they talked about a lot -- I don't
6  have specific knowledge of what the different
7  trading desks were using at the time.  That's not
8  my area of expertise.  That was their area of
9  expertise, and they talked about it and concluded,
10 everyone concluded that PolyPath was a very good
11 program to use with dynamic interest rate
12 generation, and it would be valuable, so it's
13 something that we acquired for this particular
14 engagement.
15     Q     Were there any disagreements amongst
16 you in terms of approach and methodology?
17     A     None that I can recall.  It was -- if
18 you think about it, everybody has the basic
19 framework that there is expected cash flows from
20 these securities, and you have to get a present
21 value of those securities -- or cash flows.  So it
22 was a discussion of what is the best way to
23 measure this and make sure that we were consistent
24 with what the market was using as well.

Page 37

M. Zmijewski

1  software methodology, you know, methodologies that
2      Q     Did you review their draft reports?
3      A     I did not.
4      Q     So you didn't -- the first time you
5  saw the reports was their final reports?
6      A     I did not read the reports until
7  after they were issued.  I certainly had
8  conversations about what the reports would have in
9  them, so I was well aware, and I saw calculations,
10 but I never read the report until after it was
11 issued.
12     Q     Now, the valuations that A-2
13 describes you as being responsible for are
14 equities, the initial inventory, and the JPM
15 inventory; is that correct?
16     A     Yes.
17     Q     Now, the valuations that are shown to
18 be done by people other than yourself, again, just
19 to confirm, those are not valuations you did or
20 calculated or tested in any way, rather you are
21 accepting their valuations?
22     MR. TAMBE:  Objection to the form of
23 the question.
24     A     I am relying on their valuations.
25 However, I believe their valuations are reliable

Page 38

1  M. Zmijewski
2  based on fairly detailed discussions about how
3  they were going to conduct their valuations and
4  execute the methodologies.
5  Q  But again, you didn't actually do any
6  of the valuation work yourself on those assets;
7  correct?
8  A  I apologize if I --
9  MR. TAMBE: Objection to form.
10  A  I apologize if I didn't answer the
11  previous question clearly.  I did not do any
12  calculations.  I was not a participant in the
13  execution of the methodologies.
14  Q  Now, if their valuations you rely on
15  were incorrect, that would make your conclusions
16  in your report incorrect; correct?
17  A  If there is something that I identify
18  as or become aware of that is not the correct
19  number, of my own work or of their work, we would
20  make adjustments, and address any issues that were
21  outstanding and adjust the information so that it
22  was appropriate to give to the Court.
23  Q  Is that a yes?
24  A  I think it was a yes.
25  Q  So, turning back to the B-1, and the

Page 39

1  M. Zmijewski
2  5.112 number --
3  A  Yes.
4  Q  -- that comes from a summation on
5  A-2; is that correct?
6  A  Yes.
7  Q  And can you describe the equities
8  initial inventory, can you describe the universe
9  of assets that you looked at?
10  A  I'm sorry, in B-1?
11  Q  In A, back on A-2.
12  A  Oh, sorry.
13  It was the universe of equities used
14  by Professor Pfleiderer in the opening initial
15  inventory.
16  Q  Okay.  And where is the universe of
17  assets looked at on the next line down, JPM
18  inventory?
19  A  The JPM inventory is annex A or
20  exhibit 87-B, I think the exhibit is.  I can check
21  that if that -- to make sure I am right.  I'm sure
22  somebody will tell me if I am not right.
23  And maybe it's better to say the
24  equities are all the equities in the initial
25  inventory, which is 86-A -- 86-B, rather.  So, we

Page 40

1  M. Zmijewski
2  have on Barclays' opening balance sheet, their
3  detailed records, we have initial inventory, which
4  I think I am -- 86-B.  If I am wrong, we can look
5  it up.
6  And then we have the JPM inventory
7  that comes from 87-B, and the universe of equities
8  would be from 86-B, and JPM inventory is 87-B.
9  Q  Can you describe, by reference to
10  documents that are contained in the -- generally
11  what you understand to be those assets?
12  A  Of?
13  Q  Of the JPM inventory.
14  A  Of the JPM inventory?
15  Q  Yes.
16  A  Okay.  That was inventory that was
17  not initially transferred at the closing of the
18  sale transaction.
19  Q  When was the closing of the sales
20  transaction?
21  A  It's my understanding the close, the
22  exact closing was 12:01 a.m., on Monday,
23  September 22nd, 2008.
24  Q  Let's go ahead and look at, spend
25  some time going through the details of how you

Page 41

1  M. Zmijewski
2  calculated your valuation difference with respect
3  to equities.  And if you would like to go earlier
4  on in your report where that discussion is in some
5  detail.
6  Actually, on our way there, let me
7  just ask a question on page six.  On page six of
8  your report.
9  A  Go ahead.
10  Q  Footnote ten, it says, "I am assuming
11  that all of these amounts reflect the same concept
12  of value."
13  Can you explain what you mean there?
14  A  Yes.  There is a concept of value.
15  I'm assuming that there was an apples-to-apples
16  comparison of what Mr. Golden calculated as the
17  net transaction value to Barclays of a negative
18  1.85 billion, as well as all the other valuations,
19  I am assuming they would be measured on an
20  apples-to-apples basis.
21  Q  And how does that -- the footnote ten
22  comes after Barclays' windfall.  How does -- can
23  you just give me a -- be more concrete, explaining
24  what do you mean by apples-to-apples comparison?
25  A  I mean that all the measures of

Page 42

M. Zmijewski

1  values above it, every value above it is measured
2  in a reasonably consistent fashion with respect to
3  what value it represents.
4  Q    Do you know what fashion in fact it
5  is represented, or measured?
6  A    Generally it would be fair value
7  defined by the accounting principles in FAS 157.
8  Q    And is that the appropriate standard
9  of value for purposes of your calculation of
10  windfall?
11  A    Based on my understanding of the
12  court-approved sales transaction, yes.
13  Q    Let's go ahead and move to the
14  valuation of the equities in the report.
15      And then your opinion, opinion one,
16  starts at the bottom of page one.  The first
17  sentence in your opinion one says, "Movants
18  engaged valuation experts with expertise in
19  valuing certain types of securities."
20      Did you, did you yourself select the
21  other persons doing these other valuations?
22  A    I was part of the selection process.
23  Q    And are you familiar with -- did you
24  know these people before this project?

Page 42

M. Zmijewski

1  values above it, every value above it is measured
2  in a reasonably consistent fashion with respect to
3  what value it represents.
4  Q    Do you know what fashion in fact it
5  is represented, or measured?
6  A    Generally it would be fair value
7  defined by the accounting principles in FAS 157.
8  Q    And is that the appropriate standard
9  of value for purposes of your calculation of
10  windfall?
11  A    Based on my understanding of the
12  court-approved sales transaction, yes.
13  Q    Let's go ahead and move to the
14  valuation of the equities in the report.
15      And then your opinion, opinion one,
16  starts at the bottom of page one.  The first
17  sentence in your opinion one says, "Movants
18  engaged valuation experts with expertise in
19  valuing certain types of securities."
20      Did you, did you yourself select the
21  other persons doing these other valuations?
22  A    I was part of the selection process.
23  Q    And are you familiar with -- did you
24  know these people before this project?

Page 43

M. Zmijewski

1  A    I knew Mr. Olvany.  I did not know
2  Mr. Slattery or Mr. Schwaba.
3  Q    Can you describe generally how that
4  selection process was undertaken?
5  A    The partners at Chicago Partners
6  discussed potential experts for different --
7  for -- valuation experts for different types of
8  securities, and we identified some people, and we
9  reviewed their background.  Others had discussions
10  with them before I did, and they were selected --
11  I assume they were selected by counsel, but I
12  don't know who made the final decision, but I
13  assume it's counsel's decision.
14  Q    The next sentence says, "The
15  securities are assets in the initial inventory and
16  the JPM inventory, but do not include other assets
17  at issue in this matter."
18      So for purposes of your analysis, the
19  value of those other assets at issue, do you
20  accept Barclays' valuation of those other assets?
21  A    For the purposes of my calculation, I
22  am using those as appropriate.
23  Q    And can you describe what those other
24  assets are?

Page 44

M. Zmijewski

1  A    It would be all the line items -- if
2  you go back to Exhibit B-1, it would be all the
3  line items but for the 5,112,000,000.
4  Q    And can you describe the
5  adjustment -- first describe the universe of
6  equities that you made an adjustment to for
7  purposes of your windfall calculation.
8  A    I will.  It's probably useful to go
9  to, for this particular series of questions,
10  page 11.  The page you were at is at the summary
11  section of the report, so, the detail.
12  Q    I am on 11.
13  A    You are on 11.  Okay.  You are
14  referring to pumpkins.
15      So in paragraph 16, these are the
16  equities that were in the initial inventory.
17  Q    Can you describe what those
18  particular equities are, or why you chose those?
19  A    I didn't choose them.  They were
20  identified as equities in the database.
21  Q    When you say database, what database
22  is that?
23  A    The data that was in -- and I am sure
24  you read this, but in footnote five I explain all

Page 45

M. Zmijewski

1  the different documents, so if I incorrectly refer
2  to a document, footnote five has the correct
3  documents.
4      But this would be the native files
5  for Exhibit 86-B.
6  Q    So, for some set of equities, you
7  made an adjustment to the value calculated by
8  Barclays for those equities; is that correct?
9  A    Correct.  And the sum set is the set
10  of equities identified by Barclays as equities and
11  used by Professor Pfleiderer as equities.
12  Q    Then can you describe what
13  adjustments you made for purposes of your
14  calculation to Barclays' valuation?
15  A    In addition to what's in my report
16  or -- I mean, I laid it out step by step.  Do you
17  want me to just go through it?
18  Q    Can you just describe it.
19  A    Sure.  So, the Barclays has a 9/22,
20  2008 price Barclays used for its opening balance
21  sheet.  They also have September 19th prices.
22  These are Barclays' prices.  I used the
23  September 19th prices instead of the
24  September 22nd prices, so I used Barclays' same

Page 46

1              M. Zmijewski
2    prices.
3              I went to Bloomberg and collected
4    Bloomberg data for those securities to the extent
5    they existed, and collected Bloomberg's last price
6    and the bid/ask, and checked to make sure that
7    those September 19th prices were indeed close to
8    what the Bloomberg prices would be, and they were.
9    I don't believe Barclays uses Bloomberg, but the
10   prices would naturally be close, and they were, so
11   I was comfortable with that.
12             And then based on the September 19th
13   prices, I applied a liquidity discount, that is
14   called. It's really not a liquidity discount.
15   I'm sorry, I misspoke. It's reducing the last
16   price to what the accounting rules call is an exit
17   price, but it's in Barclays documents sometimes
18   exit price, sometimes it's called a price mark or
19   sometimes it's just called a bid price.
20   Q     Is this all part of an effort by you
21   to value what Barclays received in terms of assets
22   from the sale transaction?
23             MR. TAMBE: Objection to the form of
24      the question.
25      A    Yes.

Page 47

1              M. Zmijewski
2    Q     And if you're valuing what Barclays
3    received as assets in the sale transaction, why
4    wouldn't you value those as of the closing date of
5    the sale transaction when Barclays took title to
6    those?
7    A    I believe I did. Barclays took title
8    to the assets, based on my understanding, as of
9    12:00 a.m. on Monday, the 22nd. Therefore, what
10   is the price at that point in time, on that -- at
11   that, you know, exact point in time, 12:01, Monday
12   morning, and the only price that -- the most
13   recent price that existed is the price -- closing
14   price on Friday.
15   Q     So just to make sure I understand
16   this.
17             You agree that the appropriate date
18   by which to value the assets that Barclays
19   received is September 22nd; correct?
20             MR. TAMBE: Objection to the form of
21      the question.
22             MR. DAKIS: Objection to the form.
23   Mischaracterizes testimony.
24   A    I don't think there is a date that
25   one could use, because there is a point in time,

Page 48

1              M. Zmijewski
2    so the closing is at a point in time, which is
3    12:01 a.m. on Monday, the 22nd.
4    Q     Whatever time it is on Monday, the
5    22nd, it's -- Monday, the 22nd, would be the
6    relevant date by which to value the assets that
7    Barclays received; correct?
8    A    It's my understanding that that is
9    the closing date and time, and so you would value
10   the asset as of that moment.
11   Q     Is that a yes?
12             MR. TAMBE: Objection to the form of
13      the question.
14   A    That is a yes.
15   Q     Why isn't the end of the day on the
16   22nd a better estimate of the 12:01 a.m. value?
17   A    It didn't exist. You have to value
18   the assets as of that point in time. That price
19   didn't exist. You could not observe it. So if
20   you were sitting there and you were having to --
21   let's assume that there is a transaction at
22   12:01 a.m. where there was a check written for
23   assets and somebody said, okay, well, what is the
24   value of the assets. I don't think anybody is
25   going to say, well, let's wait until this

Page 49

1              M. Zmijewski
2    afternoon and the closing price and we will figure
3    it out and we'll just call that now. I'd say I
4    want my check right now.
5              So at the point the sale was closing,
6    risk was transferring, as far as I know, and the
7    asset, assets were transferring. Therefore, you
8    needed to value the assets at that point in time,
9    without using information after that point in
10   time.
11   Q     So, the September 19th valuation that
12   you calculated is essentially a proxy for the
13   September 22nd value of those assets; is that
14   fair?
15             MR. TAMBE: Objection to form.
16             MS. TABATABAI: Objection to form.
17   A    I didn't quite -- again, you say
18   September 22nd, and that could be confusing. I
19   think it needs to be clarified that when we say
20   the closing, it's 12:01 midnight. It's different
21   to say 12:01 midnight from noon or to 5 p.m. or
22   7 p.m. Those are different points in time.
23   Different information is available. So it's 12:01
24   just after midnight on Monday. That's the time.
25   Q     So you are saying very early on the

Page 50

M. Zmijewski

1  M. Zmijewski
2  22nd, but as I understand it, you are saying --
3  you are not saying the 19th is the appropriate day
4  to value these assets. You're saying that the
5  appropriate day is very early on the 22nd, but
6  that in your view, the best proxy for the value of
7  the assets 12:01 a.m. on the 22nd is the value of
8  the assets on September 19th; is that correct?
9       MR. TAMBE: Objection to the form.
10      MR. DAKIS: Objection to the form.
11      MS. TABATABAI: Join in the
12  objection.
13   A    To the best of my knowledge, it is
14  the last price that is available and known as of
15  12:01 on the 22nd. 12:01 a.m. on the 22nd.
16   Q    And is that -- the reason you used
17  your calculations of the September 19th price is
18  because it was the last price available?
19   A    Correct.
20   Q    And do you think that is the best
21  measure of market value as of 12:01 a.m. on
22  Monday?
23   A    Yes. Now, when I went through this
24  exercise, one of the things that I did was also
25  what other information do we have between the

Page 51

M. Zmijewski

1  close of the market on Friday, and 12:01 a.m.
2  Other information, I travel to Europe and Asia
3  quite often, so I know the Europe and Asia
4  exchanges, so I did take a look at what happened
5  in the early hours U.S. time in the Europe and
6  Asia markets, and on average that was a positive
7  return.
8       So I had no reason to think that
9  something was happening in the global security
10  markets, financial markets, that would have caused
11  that price to differ from the Friday close.
12   Q    What precisely do you look at on the
13  Asian markets?
14   A    I don't remember all the -- I did
15  this a while ago, early on. Off the top of my
16  head, it would have been the markets in China,
17  Hong Kong, Singapore, Japan, Australia, U.K,
18  Germany. I don't know where else I would have
19  looked. But it would have been the primary -- the
20  major exchanges in the financial markets.
21   Q    Okay. Now, Germany, I guess they are
22  six hours ahead, so they wouldn't have been open
23  at 12:01 a.m.
24   A    That's correct.

Page 52

M. Zmijewski

1  M. Zmijewski
2   Q    You still considered it relevant to
3  look at those; correct?
4   A    Correct.
5   Q    And when you looked at those markets,
6  do you recall what exactly you did? Did you do
7  some kind of analysis or look at the particular
8  issues or types of securities?
9   A    That's-- I looked at the index for
10  the exchange, at the New York Stock Exchange index
11  or the S&P 500 index. I looked at the index for
12  the exchange from the close of the market until
13  that point in time.
14   Q    Is this something you made a
15  systematic effort to look at or glanced at, or how
16  would you describe it?
17      MR. TAMBE: Objection to form.
18      MR. DAKIS: Same objection.
19   A    I looked at all of the exchanges and
20  saw that they were on average positive, and after
21  that, I didn't feel a need to do anything else
22  other than that.
23   Q    So the total amount of time you would
24  have spent looking at this, just roughly ballpark?
25   A    Well, my time was short, of course,

Page 53

M. Zmijewski

1  M. Zmijewski
2  because I asked staff at Chicago Partners to go
3  identify the different indices that were open at
4  12:01 midnight and collect the data. I don't know
5  how many hours they spent, but that would take a
6  substantial amount of time.
7       My role was short, of course, because
8  I just looked at the end result.
9   Q    And when did you do that exercise?
10   A    A long time, you know, a long time
11  ago, before -- as I was starting to do this
12  calculation.
13   Q    Have you done any analysis of how
14  sensitive your calculations are to differences
15  between market value of those assets on the 19th
16  versus market value of those assets on the 22nd?
17      MR. TAMBE: Objection to form of the
18  question.
19   A    I used Barclays' data because they
20  happened to have data, prices on the 19th and the
21  22nd, and the number that I calculate in the
22  exhibit in my report is based on the difference
23  between those two numbers adjusted for the exit
24  price adjustment, so I did, and -- because I used
25  both the 22nd and the 19th in my calculations of

Page 54

1        M. Zmijewski
2   the difference.
3        Q     In the time period roughly
4   September 15th to the 29th, the rough two-week
5   period, do you have any sense of whether
6   September 19th was an up or down day in the
7   markets?
8            MR. TAMBE:  Object to the form of the
9   question.
10           MR. DAKIS:  Same objection.
11       A     No.  I think it was an up day, but
12  I -- it was a volatile time.  There were some big
13  ups.  I don't know if the 19th was a big up or
14  not.
15       Q     If the assets that you are valuing in
16  your report, the equities, were worth more on
17  Friday, the 19th of September, than they were on
18  Monday, September 22nd, Then that would cause your
19  calculation to be off; correct?
20           MR. TAMBE:  Objection to the form of
21  the question.
22           MR. DAKIS:  Same objection.
23       A     No, that is my calculation.  My
24  calculation compares the value of Barclays on
25  September 22nd to the value on September 19th.

Page 55

1        M. Zmijewski
2   That is my calculation.
3        Q     You are saying there is a difference
4   between those two; correct?
5        A     Correct.
6        Q     And your ultimate goal was to
7   calculate the value of the assets, as you say, as
8   of 12:01 on September 22; correct?
9        A     Correct.
10       Q     So, if the September -- if the
11  equities, if the valuation of the equities on
12  September 19th is higher than the proper valuation
13  of those equities at 12:01 a.m. on September 22nd,
14  then your calculation would be incorrect; right?
15           MR. TAMBE:  Objection to the form of
16  the question.
17           MR. DAKIS:  Same objection.
18       A     Of course it would.  However, I don't
19  believe that is the case, and I believe the last
20  price that I am using is the last available price
21  that exists.
22       Q     I am just trying to make sure we
23  understand.
24           MR. TAMBE:  Whenever is a good time
25  to take a break.

Page 56

1        M. Zmijewski
2            MR. THOMAS:  Okay.
3        Q     Is it your view that no information
4   that became available after 12:01 a.m. on
5   September 22nd can be used to inform the estimate
6   of value at 12:01 a.m.?
7        A     If it's the -- if that information
8   was not known or knowable as of 12:01 a.m.,
9   then -- and we are measuring fair market value --
10  the answer is no.
11       Q     What if for some relevant security
12  there had been a trade at 12:05 a.m.; would that
13  be useful information?
14       A     If I were the buyer and the seller, I
15  would find it interesting, but the check was cut
16  and the parties parted.  Too bad.
17       Q     What if the check wasn't cut at that
18  point?
19           MR. TAMBE:  Objection to the form of
20  the question.
21           MR. DAKIS:  Same objection.
22           MS. TABATABAI:  Same objection.
23       A     I am using that metaphorically.  The
24  close happened.  The assets transferred.  The risk
25  transferred at that point in time.  So when there

Page 57

1        M. Zmijewski
2   was a new market price, somebody won and somebody
3   lost, but the game was over.
4        Q     If there was a trade at 12:05 a.m.
5   for one of the equities you valued, it would not
6   be okay to use that information, the trade
7   information in that valuation?
8            MR. TAMBE:  Objection.
9        Q     Is that your opinion?
10           MR. TAMBE:  Objection to form.
11       A     I believe I answered that before.  If
12  you are calculating a fair market value as of
13  12:01 a.m., the answer is yes.
14       Q     So I mean yes, it would not be okay
15  then to use it?
16       A     Correct.
17           MR. THOMAS:  It's up to you whether
18  we finish up the --
19           MR. TAMBE:  If you want to finish up.
20           THE WITNESS:  Just keep going.  I am
21  happy to go as long as you do.
22           MR. THOMAS:  Okay.
23       Q     Okay.  You quote an e-mail on the top
24  of page 12 of your report.  Do you see that?
25       A     I do.

Page 58

1          M. Zmijewski
2     Q     And you describe this as Barclays
3  explaining its adjustment approach.
4     A     Correct.
5     Q     The second sentence reads: "For
6  simplicity, we have assumed that these are mids
7  and so we need to make an adjustment to move these
8  to the bid side of the market."
9          And then the next sentence says: "A
10 more conservative assumption would be that the
11 prices are offers, which is a rapidly falling
12 market is probably more realistic," which I assume
13 that means "in a rapidly falling market is
14 probably more realistic," "which would obviously
15 lead to a larger adjustment.
16         Do you agree that that would be a
17 more conservative assumption?
18         MR. TAMBE:  Objection to the form of
19 the question.
20    A     I am pausing here just to try to
21 think of the context of this e-mail.
22    Q     Sure.
23    A     Because "conservative" needs a
24 context.  So I am just trying to think of the
25 context of how I am using "conservative."

Page 59

1          M. Zmijewski
2     I think so, based on the
3  correspondence to the auditors and what they are
4  attempting to do.  I think it would be more
5  conservative.
6     Q     And by more, the more conservative
7  assumption would result in a lower valuation of
8  those equities; correct?
9     A     Yes.
10    Q     So, do you understand this to be
11 indicating that one option would be to assume that
12 those equity prices are mids and adjust from the
13 mids down to the bid side?  That is one option;
14 correct?
15         MR. TAMBE:  Objection to the form of
16 the question.
17    A     Yes.
18    Q     And the other one, the more
19 conservative assumption would be that the prices
20 are offers, which would result in a larger
21 adjustment down to bid; is that correct?
22         MR. TAMBE:  Objection to the form of
23 the question.
24         MR. DAKIS:  Same objection.
25         MS. TABATABAI:  Join.

Page 60

1          M. Zmijewski
2     A     Correct.
3     Q     And that what Barclays is doing here
4  is doing the approach that results in a higher
5  valuation of the equities; correct?
6          MR. TAMBE:  Objection to the form of
7  the question.
8          MR. DAKIS:  Same objection.
9          MS. TABATABAI:  Join in the
10 objection.
11    A     You can't discern that from this
12 e-mail.  You don't know, and based on an analysis
13 of securities, the bid offer spreads of
14 2.64 percent, I have tried to think about how they
15 calculated that, and I can't -- I don't know what
16 data they used, so I couldn't reproduce the
17 calculation to know whether it referred to the
18 first sentence or the second sentence.  I don't
19 know which they did.
20    Q     Which do you mean, what are you
21 referring to, when you say what refers to the
22 first sentence or the second sentence?
23    A     The 2.64 percent.  It says based on
24 an analysis of securities, the bid offer spread of
25 2.64 percent.  This again would be a conservative

Page 61

1          M. Zmijewski
2  estimate of securities quoted.
3          You know, I don't know if that is --
4  from what I can tell, it's -- you know, it's not
5  clear what they are doing from this.  It's not
6  clear which one they used.
7     Q     So you're not sure which of those two
8  possibilities they used?
9     A     Based on this e-mail; correct.
10    Q     And putting that aside for the
11 moment, do you agree that the first one, assuming
12 they are mids, results in a higher valuation than
13 assuming they are offers, higher valuation of
14 those equities?
15         MR. TAMBE:  Objection to the form of
16 the question.
17    A     Yes.
18    Q     And then continuing on, to the last
19 sentence, it says: "This again would be a
20 conservative estimate, as the securities with a
21 quoted bid offer would most likely be the
22 liquid -- be the most liquid and hence trading at
23 the tightest spreads."
24         What do you understand that point to
25 be?

Page 62

1           M. Zmijewski
2         MR. TAMBE:  Object to the form of the
3     question.
4         A     The point they are making is they
5     have 2100 of 3700 securities, represents I think
6     86 percent or 80 plus percent of the market value,
7     but not 100 percent of the market value of course.
8     There is only 2100 of 3700 securities.  And the
9     average is 2.64 percent for that 2100.  The
10    question is -- which is 80 plus percent.
11         The question is, for the other ten to
12    20 percent of the securities, what is the bid/ask
13    spread for that group?  And it's not observed, so
14    the statement is the following, that given that we
15    can't observe for the other securities, roughly,
16    I'm going to call it 15 percent of the value,
17    use -- it's more likely that the unobserved
18    securities have a higher bid/ask spread than the
19    observed securities.  Therefore, it's conservative
20    to use the average bid/ask spread for the 2100
21    observed securities.
22         That is what I believe they are
23    saying.
24         Q     That is your understanding of that?
25         A     That is my understanding of it.

Page 63

1           M. Zmijewski
2         Q     Do you have an -- are they making the
3     point that they don't have a universe of all the
4     spreads and that the spreads that they don't have
5     are likely larger?
6         MR. TAMBE:  Objection to the form of
7     the question.
8         A     My question wasn't very good -- my
9     answer wasn't very good last time, because I
10    thought that is what I just said.  In my previous
11    question, that is what I thought I said.  Maybe I
12    misspoke.
13         Q     Do you understand this to be
14    indicating that if they had all of the CUSIPs, the
15    average bid offer of 2.64 would likely be higher?
16         A     Correct, that -- yes.
17         Q     So if they had all those, the
18    calculation, the value of those equities would
19    likely be lower?
20         A     No.  Because you -- if you had them
21    all, you would not use the simple average as it's
22    calculated there.  It would be completely
23    inappropriate to do that.
24         Q     And that's what your understanding of
25    this is, that they are using the simple average?

Page 64

1           M. Zmijewski
2         A     This combined with the spreadsheet
3     they cite, where they calculate for
4     September 22nd, their bid/ask spread adjustment,
5     yes, that is a simple average.  It's not a
6     weighted average.
7         Q     Now, when you -- going back to the
8     second and third sentences, you said you weren't
9     sure which approach that Barclays actually used?
10         A     Yes.
11         Q     Where it says, "For simplicity, we
12    have assumed these are mids, and so we need to
13    make an adjustment to move these to the bid side
14    of the market."  The next sentence says, "A more
15    conservative assumption would be."
16         Does that indicate to you that what
17    they did was they assumed they were mids?
18         MR. TAMBE:  Objection to the form of
19    the question.
20         MR. DAKIS:  Same objection.
21         MS. TABATABAI:  Same objection.
22         A     That is what is in this e-mail, but
23    if you look at the spreadsheet and look at the
24    calculation for September 22nd -- and this e-mail
25    is dated in December, sometime later.  It was a

Page 65

1           M. Zmijewski
2     correspondence to their auditors.  If you look at
3     the calculation that they made for September 22nd
4     bid adjustment, bid price adjustment, I don't
5     believe they followed this, exact followed this
6     approach for September 22nd.
7         So I agree with your interpretation
8     of the language, but if you combine it with
9     looking at the data, it is not clear how they
10    ended up.
11         Q     Does how they ended up impact your
12    analysis at all?
13         A     I don't think so, because what I do
14    is I follow -- I implement their opinion and -- or
15    their view here.  Plus in the spreadsheet, I
16    execute that.  So, my assumption is that they
17    would be in agreement with what I did.
18         Q     When you write at the beginning of
19    paragraph 18, I conservatively adopt the Barclays
20    approach as described in this e-mail, what
21    approach is that that you are referring to?
22         A     It's using the simple average of the
23    observed securities to apply to the entire
24    portfolio of securities.
25         Q     Average bid?  The average of what?

Page 66

M. Zmijewski

1          M. Zmijewski
2     A    The bid/ask spread.
3     Q    Do you assume whether they are mids
4 or offers?
5     A    I am attempting to recall, and I
6 don't recall exactly.  My recollection of what
7 they do is they take the entire bid/ask spread, as
8 a percent, and they apply it to the entire bid/ask
9 spread, not half of it.  It's not as if it's a
10 mid.  They take the entire bid/ask spread and
11 apply it to the price.
12          If my recollection is correct, then
13 it would be in that spreadsheet for
14 September 22nd.  The second sentence, not the
15 first.
16     Q    You mean the third sentence, not the
17 second?
18     A    Let me count.  No, I meant the third
19 sentence -- yes, correct.  I meant the third
20 sentence.
21     Q    You meant the third sentence.
22     A    Let me repeat it.  A more
23 conservative assumption would be that prices are
24 offers.
25     Q    Okay.  Is that what you did in your

Page 67

M. Zmijewski

1 calculation, to assume that the prices were
2 offers?
3     A    I applied the entire bid/ask spread
4 percentage to the price, so I didn't take half of
5 it, which would be the mid.  I took the entire
6 bid/ask, because that's what they did in their
7 spreadsheet on the 22nd.
8     Q    You did whatever Barclays did because
9 you just applied their spreadsheet?
10     A    Correct.
11          MR. THOMAS:  Why don't we go ahead
12 and take a short break now?
13          THE VIDEOGRAPHER:  This is the end of
14 tape number one.  The time is now 10:55 a.m.
15 We are now off the record.
16          (Recess taken.)
17          THE VIDEOGRAPHER:  This is the start
18 of tape number two.  The time is now
19 11:05 a.m.
20          We are now back on the record.
21 BY MR. THOMAS:
22     Q    Do you agree in valuing these
23 equities, in principle, that it is appropriate to
24 adjust bid point prices or offer prices to bid

Page 68

M. Zmijewski

1 prices?
2     A    The accounting rules require it.
3     Q    So --
4     A    So, therefore, it is appropriate to
5 meet the accounting definition of fair value.
6     Q    Did you independently value any of
7 these securities?
8          MR. TAMBE:  Objection to the form of
9 the question.
10     A    If by independently you mean identify
11 the security and use valuation methodologies,
12 collect data, and so forth, I did not.  I, as I
13 said before, used Barclays' own September 19th
14 valuations of them, as well as checked those
15 valuations, compared those valuations to Bloomberg
16 prices.
17     Q    Why do you say conservatively used
18 Barclays' valuations?  Do you believe there is any
19 basis for questioning those valuations?
20     A    I guess I was saying conservative
21 from the perspective of, I didn't think Barclays
22 would object to me using their data and their
23 approach, even though I don't necessarily agree
24 with the way they calculated the bid price

Page 69

M. Zmijewski

1 adjustment.
2     Q    And what way do you disagree with how
3 they calculated the bid price adjustment?
4     A    They used a simple average, and I
5 agree with the comment that for the ten or
6 12 percent -- for September 19th, my recollection
7 is, we were able to get Bloomberg prices for a
8 little over 2100 of the securities, which composed
9 88 percent of the market value.
10          So, the question is, for the ten,
11 12 percent for which we did not have market value,
12 we don't have an actual bid/ask spread.  There is
13 an issue as to what the appropriate bid/ask spread
14 would be for that group.
15          Barclays uses a simple average, which
16 is way too high for 88 percent to compensate for
17 the unknown 12 percent.  I use that approach.
18 However, if you use a median or a weighted average
19 bid price adjustment, you get a much lower
20 adjustment.  So I am -- I believe I am
21 conservative by using their simple average rather
22 than a weighted average or a median adjustment or
23 for the 2100 securities a security-by-security
24 adjustment.  All those, which is identical to the

Page 70

1           M. Zmijewski
2   weighted average -- it would be identical to the
3   weighted average.  Those would all give you
4   substantially lower bid price adjustments.
5       Q     Is there an industry standard in
6   terms of how to do this calculation?
7           MR. TAMBE:  Objection to the form of
8       the question.
9       A     I don't know.  Whether the auditors
10  might have some standard, I don't know.  I am not
11  aware.
12      Q     Do you have any knowledge of how
13  other companies other than Barclays might do this
14  same type of valuation?
15      A     I do not.  What I can tell you is,
16  let's assume you have all the securities,
17  100 percent, instead of 88 percent, and you apply
18  an average, you are going to get the wrong answer.
19      Q     Isn't that true in a lot of these
20  valuations, that you are making estimates and
21  can't always get the exact correct valuation?
22      A     You always have to make estimates.
23  You have to estimate inputs or measure inputs.
24  Therefore, the valuation is not exact unless you
25  see it transacted, and then you know the market

Page 71

1           M. Zmijewski
2   price because you observe it.
3           So there is always estimates that one
4   must make.  However, in our -- in your analysis,
5   your goal is to have unbiased estimates, not
6   biased estimates, and we know that the simple
7   average, if you used a -- if you had a 100 percent
8   sample observations, that using a simple average
9   is going to give you a biased number.
10      Q     In this valuation process, in trying
11  to come up with estimates, are there judgments
12  that need to be made?
13      A     Valuation work always requires the
14  measurement of unobserved variables, and you
15  typically would like some type of -- you typically
16  would like a model or other basis you would have
17  to inform you as to what the appropriate input
18  would be.
19      Q     In the valuation work that you did
20  and looked at, does it involve numerous judgments
21  as to how best to estimate value?
22          MR. TAMBE:  Object to the form.
23          MR. DAKIS:  Same objection.
24      A     It all requires inputs into some type
25  of valuation model and methodology.  Some of those

Page 72

1           M. Zmijewski
2   require estimates, some can be observed, some --
3   and -- but the estimates should be based on some
4   type of foundation, and it's -- it's not
5   uninformed judgment.
6       Q     But they're informed judgments?
7       A     Usually based on analysis, it's an
8   informed judgment, yes.
9       Q     And there is no blueprint or form
10  that says exactly how these valuations are done;
11  is that correct?  There has to be judgments as to
12  how to -- as to approach and methodology; is that
13  fair?
14          MR. TAMBE:  Objection to form.
15          MR. DAKIS:  Same objection.
16      A     The methodologies are fair -- many of
17  these methodologies are fairly rigorous, so there
18  isn't judgment there.  It's a methodology.
19          Measuring the inputs into -- for the
20  execution of that methodology requires an analysis
21  so that one can measure an input based on an
22  analysis, so from that perspective, there is
23  judgment as to what analysis to use and how to --
24  what input to actually get from the analysis.
25          That part has judgment, but the

Page 73

1           M. Zmijewski
2   methodologies -- for example, a discounted cash
3   flow methodology, it's a formula, no judgment.
4       Q     There's judgments in terms of which
5   methodology should be used; correct?
6       A     There can be judgments of when there
7   are alternative methodologies, yes.
8       Q     Can there be reasonable differences
9   in judgments as to which methodologies to use?
10      A     Sometimes.  Not always but sometimes
11  there could be.  Which is important.  That's why
12  it's important to have count and counterpoint.
13  There are two sides and people looking at each
14  other and reviewing each other's work so that all
15  views are expressed.
16      Q     You write, "I conservatively adopted
17  Barclays' approach as described in this e-mail."
18          You are saying you adopt the
19  approach, but not the actual Barclays numbers; is
20  that right?
21      A     Correct.
22      Q     And how you -- and by -- forgive me
23  if you answered this, but the approach, just so we
24  are clear, the approach that you adopt when you
25  say that is what precisely?

Page 74

M. Zmijewski

1  A    The approach is going to the
2  September 19th, and taking the bid/ask spreads on
3  September 19th, calculating the average and use --
4  applying that average to the entire portfolio of
5  equities.
6        This e-mail is in December of 2008,
7  not September.
8     Q    And assuming -- you assumed that
9  prices are mids?
10       MR. TAMBE:  Objection to the form of
11  the question.
12    A    That one I answered.
13       No, because that's what Barclays
14  says.  I take 100 percent of the bid/ask spread
15  and apply it to the price, not half.
16    Q    You write, "I used Barclays'
17  valuation of the equities as of September 19th,
18  which are the end-of-day prices and not adjusted
19  to bid prices (exit price marks)."
20       Are bid prices and exit prices the
21  same?
22    A    It -- in the documents that I have
23  seen for this litigation, sometimes people call
24  things bid prices, sometimes they call -- or bid

Page 75

M. Zmijewski

1  price adjustments, and sometimes they will call
2  them exit price -- I'm sorry, exit marks, exit
3  price marks.
4        I don't think all the documents
5  consistently use those terms.
6     Q    Sort of a -- be different meanings to
7  the terms depending on who is using the term?
8     A    That is my observation.
9     Q    Now, here you have "exit price
10  marks."  Is that different from exit prices?
11    A    Think of a price as being a
12  transaction, an observed transaction that
13  occurred.  These are not transactions.  So they
14  are price mark, mark signals, that they are not a
15  transaction.
16    Q    And what is a mark?
17       MR. TAMBE:  Objection to the form of
18  the question.
19       MR. DAKIS:  Same objection.
20    A    As I said earlier, I can look up the
21  footnote.  I don't want to define it differently
22  and use different words, but I adopt the same
23  definition of the mark Professor Pfleiderer uses.
24    Q    Can you tell me what a mark is, just

Page 76

M. Zmijewski

1  how you are using the term there?  Without looking
2  it up, can you tell me?
3     A    No.  I don't think that is useful to
4  do, you know.  You know, I am very specific.  I
5  say, I used the term marks, quotes and prices
6  according to footnote 22 of Professor Pfleiderer.
7  I use them exactly the same way.
8     Q    Do you have an understanding of how
9  he uses the term "marks"?
10    A    I don't have an exact recollection of
11  his language, but we can look at footnote 22 of
12  his report.
13    Q    You write, "I adjust the Barclays
14  September 19th valuation of the non-convertible
15  equities to bid prices by using a liquidity
16  adjustment in the following way."
17       What is the purpose of using a
18  liquidity adjustment?
19    A    Again, these terms aren't being used
20  consistently in this e-mail.  It's an exit price
21  adjustment or a bid price adjustment.  If you look
22  at the spreadsheets that they have, they sometimes
23  call the same adjustment a liquidity adjustment.
24  It's the same adjustment that I spoke of before.

Page 77

M. Zmijewski

1        It's the same calculation.  They use
2  those terms for equities interchangeably.
3        So this is not what we call the
4  liquidity discount in the context of our
5  conversation earlier.
6     Q    Are you trying to adjust something
7  you said earlier?
8        MR. TAMBE:  Objection to the form of
9  the question.
10    A    No, I am not.
11       MS. TABATABAI:  Objection.
12    A    Earlier I talked about a liquidity
13  adjustment in a specific context.  Here -- which
14  is why I say it has to have a specific context.
15  The liquidity adjustment is another term Barclays
16  uses in some of its spreadsheets, and in this
17  particular case, when it's applied to equities, it
18  means the adjustment to bid or the calculation
19  from my last price to an exit mark.  They are
20  using those all in the same way in these different
21  documents.
22    Q    Is this -- the way it's being used --
23  the way you use it here, liquidity adjustment,
24  what do you mean it to mean here, when you use it?

Page 78

1            M. Zmijewski
2      A    I mean it to mean what Barclays uses
3  it -- means it to mean in its spreadsheet, which
4  is described in the quotation above paragraph 17.
5      Q    Okay.  Is that the adjustment from
6  mid to bid prices?
7           MR. TAMBE:  Objection to the form of
8      the question, asked and answered.
9      A    Well, I will call it a bid price
10 adjustment.  Because the way Barclays calculates
11 that adjustment, it's not from the mid, it's using
12 100 percent of the bid/ask spread, multiplying it
13 by the last price.  So that is not a mid to bid
14 adjustment.  It's a last price to bid adjustment
15 using 100 percent of the bid/ask spread.
16           That is the calculation that they
17 use.  I use the same calculation.
18     Q    Is the --
19     A    And that's what I mean by the
20 liquidity adjustment in that context.
21     Q    Is that the same thing as a liquidity
22 discount?
23           MR. TAMBE:  Objection to the form of
24     the question.
25           MR. DAKIS:  Same objection.

Page 79

1            M. Zmijewski
2           MS. TABATABAI:  Same objection.
3      A    I don't recall if Barclays uses in
4  its spreadsheet liquidity discount.  I think they
5  might actually call it a liquidity discount for
6  the equities, and they might characterize it that
7  way in some of their product, their work product.
8      Q    In footnote 35, the second sentence,
9  you say:  "I restrict the sample for calculation
10 in the following steps.  First I eliminate all
11 convertible equities, which leaves 3731 CUSIPs out
12 of the 4,028 CUSIPs that Barclays valued."
13           Why do you eliminate those?
14     A    Because that's what Barclays does.
15 Barclays does not apply an adjustment to the
16 convertibles.  If you look at their spreadsheet
17 for September 22nd, they don't apply an adjustment
18 to the convertibles, and I follow that same
19 process.
20     Q    Then you write, "Then I select CUSIPs
21 with non-negative bid price, ask price and last
22 price from Bloomberg, leaving 2295 CUSIPs."
23           So what are you excluding there by
24 doing that?
25     A    There might be some, some negative

Page 80

1            M. Zmijewski
2  prices that are included in the database that I
3  exclude, because they are not last traded prices.
4  That is what they tell you.
5      Q    And have you calculated how many
6  there are?
7           MR. TAMBE:  How many of what?
8      A    Negative prices?
9      Q    Yes.
10     A    No.
11     Q    As a result of this restriction, you
12 exclude about between 1400 and 1500 CUSIPs?
13     A    No.  It's not just that restriction,
14 because I have to go to Bloomberg, and Bloomberg
15 first has to have data.  So the overwhelming
16 number of these aren't negative prices.  The
17 overwhelming number of these would be Bloomberg
18 doesn't have the CUSIP in it.
19     Q    What does that indicate to you when
20 Bloomberg doesn't have the CUSIP?
21     A    Bloomberg doesn't track that
22 particular security.
23     Q    Does that indicate anything to you
24 about that security?
25     A    It's not traded on a widely known

Page 81

1            M. Zmijewski
2  exchange.
3      Q    Do those tend to be illiquid, more
4  illiquid securities?
5           MR. TAMBE:  Objection to form.
6      A    I'm sorry.  I didn't hear if you said
7  liquid or illiquid.
8      Q    More illiquid.
9      A    They would be more illiquid
10 securities.
11     Q    And so you are saying when you go
12 down from 3700 to 2200, that 1400 or 1500
13 reduction in CUSIP samples, you are saying most of
14 them are because Bloomberg didn't have prices?
15     A    Correct.
16     Q    Do you have any sense, order of
17 magnitude of the numbers that were excluded for
18 reasons other than that?
19     A    I don't.  I'm sorry.  It will be
20 small relative to that total difference.
21     Q    Small in terms of number --
22     A    Number.
23     Q    -- in terms of CUSIPs and in
24 percentage of value?
25     A    Definitely quite small in percentage

Page 82

1           M. Zmijewski
2    of value.  And in percentage of CUSIPs.
3        Q     Have you done any analysis to see how
4    the exclusion of those CUSIPs impacts your
5    calculation?
6        A     You can't conduct my calculation with
7    a negative price, so.  Or negative bid price or
8    ask price.  It's nonsensible to include it.
9        Q     Does it concern that some of your
10   data seems to include nonsensible bid/ask?
11          MR. TAMBE:  Objection to the form of
12       the question.
13       A     I didn't say that.  I didn't say that
14   the data were nonsensible.  I said including them
15   in the analysis would be nonsensible.
16          Bloomberg identifies certain --
17   sometimes they have negative prices.  I forgot all
18   the reasons they will code something as a negative
19   price.  You can send them an e-mail, they'll tell
20   you.
21          So it's nonsensible to include them.
22       Q     Is there any significance to the fact
23   that some of the CUSIPs had negative prices, as
24   far as you know?
25          MR. TAMBE:  Object to the form of the

Page 83

1           M. Zmijewski
2    question.  That is not what he said.
3          MR. DAKIS:  Same objection.
4        A     If you look at this e-mail, and also
5    if you look at the spreadsheet, the e-mail
6    indicates that to calculate the bid/ask spread,
7    that Barclays was able to identify the bid/ask
8    spread for 2100 of 3700 securities.
9          So, notice, if you take a look, it's
10   not random chance that I was able to identify the
11   proper bid/ask spread for 2106 of 3731 securities.
12   These are the same securities at different points
13   in time.
14          My analysis is the same as their
15   analysis.  They have, from what I can tell,
16   alternative sources other than Bloomberg.  They
17   don't tell us what that is, but based on my
18   observation, I don't believe they are using
19   Bloomberg prices generally.  However, they do use
20   Bloomberg prices on September 22nd for some of
21   their securities, so they use the same source I do
22   for some of their securities, and they calculate
23   2100 of 3700 bid/ask spreads, and I calculate 2106
24   of 3731 bid/ask spreads.
25          So I'm following their process

Page 84

1           M. Zmijewski
2    detailed in their data.  They go through the same
3    process, and they have to have the same type of
4    exclusions.  It's not sensible to not have those
5    exclusions.
6        Q     Did you attempt to find out what
7    source Barclays used and why?
8        A     I did.  We read the record, and the
9    best I can tell, it's not in the record with
10   respect to their sources, other than one of their
11   spreadsheets is clearly labeled for
12   September 22nd, that they do use Bloomberg, but
13   it's not -- it's clear they don't use Bloomberg
14   prices all the time.
15       Q     So in the -- for the equities that
16   you are recalculating the value of, as you sit
17   here today, are you aware what source Barclays
18   used in its calculation of those values?
19       A     I am not.
20       Q     Are you aware of other viable sources
21   other than Bloomberg?
22       A     Of course.
23       Q     What are those?
24       A     Reuters has data.  That is probably
25   the widest.  Thompson.

Page 85

1           M. Zmijewski
2        Q     Why did you choose to use Bloomberg?
3        A     Bloomberg is a widely accessed source
4    of data.  It's the source that we use at Chicago
5    Partners.  It's well accepted.
6          But I have also used FactSet and used
7    Capital IQ.
8          Professor Pfleiderer also uses
9    Bloomberg prices, if I recall correctly.
10       Q     Did you see in the CUSIPs you looked
11   at, the data you looked at, were there any
12   negative bid/ask spreads?
13       A     I know there were some.
14       Q     And what is the significance to you
15   of a negative bid/ask spread?
16       A     It's -- the significance is that from
17   practicality, I don't include it, so I exclude it
18   from my analysis.
19       Q     Do those make sense, having negative
20   bid/ask spreads?
21       A     Not that I can think of, no.
22       Q     Do you have any idea why there were
23   negative bid/ask spreads in the data that you
24   looked at?
25       A     It would be conjecture to --

Page 86

1              M. Zmijewski
2     Q     Please go ahead and conjecture.
3     A     No, thank you.
4     Q     Do you have any idea of why that --
5 they might be there?
6     A     Of course there could be input data
7 problems; right? Every database has input
8 problems. A small error rate, but there is an
9 error rate. The number of bid/ask spreads is
10 small. So it could be that.
11    Q     Anything else you can think of?
12    A     Maybe they didn't measure the bid and
13 the ask at the same time, so there could be a
14 timing difference. That would be unusual for them
15 to do that, but that is possible.
16    Q     When you say it would be unusual for
17 them to do that, what is the basis of your
18 opinion?
19    A     It's unusual to see a negative
20 bid/ask spread.
21    Q     Did the presence of negative bid/ask
22 spreads in the data you looked at cause you any
23 concern about the data that you were looking at?
24    A     No. Barclays has their bid/ask
25 spreads for September 22nd, and -- or its

Page 87

1              M. Zmijewski
2 December -- I don't know if it's December 12,
3 December 18th. In the spreadsheet they have them.
4 They have negative bid/ask spreads.
5     Q     Continuing in footnote 35, you say,
6 "Further restricting to CUSIPs with non-negative
7 bid/ask spreads, there are 2253."
8          So, I guess does that indicate there
9 is 42 samples of negative bid/ask spreads --
10    A     It does.
11    Q     -- being encountered?
12          Did you consider or analyze any
13 impact the exclusion of those negative bid/ask
14 spreads had on your calculation?
15    A     Well, excluding -- excluding them is
16 appropriate, but excluding them increases the
17 average bid/ask spread. You are excluding a
18 negative number, so therefore the average would be
19 higher.
20    Q     Then you say, "The final sample set
21 is the 2106 CUSIPs for which the ratio of the
22 bid/ask spread to the PCG 9/19 price is less than
23 or equal to 50 percent."
24    A     Correct.
25    Q     So you are also excluding 147 CUSIPs

Page 88

1              M. Zmijewski
2 with a bid/ask spread that is greater than
3 50 percent; is that correct?
4     A     Yes.
5     Q     Why did you do that?
6     A     Because that's what Barclays does.
7 If you go back to their spreadsheet and look at
8 their calculations for December, and they have --
9 it's -- I think I indicate what document this is
10 in footnote 34, so it's one of -- I am pretty sure
11 it's one of those two documents, but it's a
12 spreadsheet.
13          In the spreadsheet there is a summary
14 tab, and in the summary tab they describe their
15 steps in calculating the average bid/ask spread,
16 and they exclude bid/ask spreads greater than
17 50 percent.
18    Q     Do you know why they do that?
19    A     Well, because -- I imagine why. They
20 don't say, but I think it's reasonable because
21 50 percent would be assumed to be something like
22 an outlier.
23          Keep in mind bid/ask spread
24 percentages are a skewed distribution, so you
25 can -- when you use an average, you can really

Page 89

1              M. Zmijewski
2 have a biased central tendency calculation by
3 using an average when you include outliers,
4 because you only have outliers in one direction.
5     Q     And why -- can you think of any
6 reason why there would be securities with such
7 large bid/ask spreads?
8     A     Again, there could be data input
9 errors. It could be a timing problem, or it could
10 be that it's just how the market at a point in
11 time -- how the market maker was viewing the
12 security.
13    Q     Could it be indicative of securities
14 that are illiquid?
15    A     It's possible, if -- what I would do
16 to assess that is look at a time series of the
17 bid/ask spreads and see if it's always that large
18 or if it's a day that happies to be so large,
19 because if it's a day that's large, it's
20 indicating that it's probably a different issue
21 than some illiquid asset. However, if it's that
22 large day after day, and that's what was observed
23 with the security, it would be consistent with
24 having something -- having a security that is
25 quite illiquid.

Page 90

1           M. Zmijewski
2      Q    Have you gone and looked at or
3  analyzed the particular securities that have been
4  excluded from your sample set?
5      A    I have not. I adopted Barclays'
6  methodology, which I assume they stand behind and
7  would be comfortable with. I didn't think there
8  was a need to go beyond using the approach that
9  they used.
10     Q    So, from the 4,028 CUSIPs, you
11 excluded CUSIPs with negative bid prices, with
12 negative ask prices and negative last prices; is
13 that correct?
14     A    Or. There is an "or" there. It's
15 not "and," it's an "or."
16     Q    Or negative last prices.
17     A    Yes, correct.
18     Q    Now, that accounts -- going back to
19 your sentence, the third sentence, do those three
20 exclusions add up to excluding about 1400 to 1500
21 CUSIPs?
22          MR. TAMBE: Objection to the form of
23     the question.
24     A    No. I believe what I said before is
25 the overwhelming majority of those is a lack of

Page 91

1           M. Zmijewski
2  data in Bloomberg.
3      Q    Okay. So you don't -- okay. You
4  don't say that in that sentence, but you are just
5  elaborating on that?
6          MR. TAMBE: Objection to the form of
7     the question.
8          MR. DAKIS: Same objection.
9      Q    Is there somewhere in here that you
10 say that a certain number didn't have data on
11 Bloomberg?
12     A    It should be in this footnote, if it
13 were there, so I believe not.
14     Q    And again, you have no, no idea how
15 many of these 1400 to 1500 CUSIPs that were
16 excluded actually lacked Bloomberg data as opposed
17 to having negative bid prices, negative ask prices
18 or negative last prices?
19     A    Correct. I don't know the specific
20 number, but I do know it's the overwhelming
21 number.
22     Q    Is there like a percentage that you
23 know that is on --
24     A    I don't.
25     Q    On footnote 37, you say, "I

Page 92

1           M. Zmijewski
2  conservatively adopt Barclays' approach to measure
3  the bid/ask spread percentage."
4      A    Yes.
5      Q    Which appears to be the difference
6  between the ask price and the bid price and
7  divided by the last price?
8      A    Correct.
9      Q    That is what we have been discussing
10 prior; right?
11     A    Yes.
12     Q    And you talk about the median ratio
13 and the average ratio. And I just want to make
14 sure I understand which one you used.
15     A    Are you waiting for me to answer a
16 question?
17     Q    Yes.
18     A    I'm sorry, I didn't know that. I
19 thought you stopped in the middle of a question.
20     Q    No, no. You refer to --
21     A    I'm with you. I have the question.
22     Q    Do you -- the one that you actually
23 used, is it the median ratio of .24 percent or the
24 average ratio of 1.48 percent?
25     A    If you look at Exhibit 81, the

Page 93

1           M. Zmijewski
2  foot -- first note in that exhibit explains that I
3  used the simple average of 1.48 percent, just so
4  you know it's there.
5      Q    Okay.
6      A    I apologize. I thought you were in
7  the middle of a question.
8      Q    No problem.
9          So, you end up calculating a
10 $541 million change to the valuation of these
11 equities that Barclays made; is that right?
12     A    Correct.
13     Q    How much of that $541 million results
14 from the change in date versus other factors?
15     A    That's not something I calculated.
16 Roughly, I think it's probably 400 million, using
17 the Barclays September 19th date, and probably the
18 rest of it is the difference in the liquidity
19 adjustment calculation. Instead of using the
20 calculation that they use for a different date, I
21 used the calculation on the 19th.
22     Q    Are there any other factors that go
23 into that $541 million difference other than your
24 use of September 19th values and your different
25 liquidity calculation?

Page 94

1           M. Zmijewski
2       A    No.
3       Q    In your next opinion, opinion two,
4   you say that -- you say that Barclays received
5   more assets than were approved by the Court in the
6   transaction, and paid less for those assets than
7   was represented to the Court, and thus benefited
8   from the sale transaction beyond what was approved
9   by the Court.
10          Actually, you are saying that's what
11  the movants say; correct?
12      A    Correct. That is, just so we have it
13  here, my definition of the Barclays windfall.
14      Q    And just to put it in your own words,
15  what is the definition of the Barclays windfall?
16  Are you just going to read that back to me?
17      A    These are my own words, so. If it's
18  not clear, I am happy to -- and the execution --
19  maybe I should say the execution of those words is
20  on Exhibit B-1, where I actually showed the
21  calculation.
22      Q    We are going to come back to this
23  after I go through one more painful economic
24  calculation.
25      A    Only one. That would be great.

Page 95

1           M. Zmijewski
2       Q    Well, two.
3       A    See, always holding back.
4       Q    Turning to the calculation of the JPM
5   inventory, that is the other major adjustment you
6   made to the Barclays calculation; is that correct?
7       A    Correct.
8       Q    Can you just describe what you did to
9   make that calculation?
10      A    It would be helpful if we at least go
11  to the exhibit --
12      Q    Sure.
13      A    -- where it shows that calculation.
14      Q    Sure.
15      A    Which is -- which it's somewhere I
16  can't find it. Exhibit C-1.
17      Q    Okay.
18      A    The second column of numbers is the
19  number of CUSIPs. If you look at the total, it's
20  1195, and that's the total number of CUSIPs in the
21  JPM inventory according to Exhibit 87-B, as well
22  as 641-A.
23      Q    Before -- I'm sorry. I didn't mean
24  to cut you off. But just generally describe the
25  universe of documents what we are talking about

Page 96

1           M. Zmijewski
2   here in the context of the sale transaction.
3       A    I am sorry, I didn't understand.
4       MR. TAMBE: Objection to form.
5       Q    What universe of assets are we
6   describing here?
7       A    I will see if this is an answer that
8   is responsive. This is the universe of assets
9   that was not transferred as of the closing date,
10  but was physically transferred by JPM, but held
11  back by JPM and later negotiated between JPM and
12  Barclays in December of that year.
13          Is that what you were looking for?
14      Q    Yes.
15      A    Okay.
16      Q    And what adjustment did you make to
17  Barclays' calculation of value of those assets?
18      A    Barclays, if you recall, used a
19  December date to value the assets. My valuation
20  date is the last price before the closing date as
21  of 12:01 a.m. on the -- on September 22nd, which
22  effectively becomes the closing of September 19th,
23  so, my goal was to value JPM inventory as of the
24  19th of September, 2008.
25      Q    Why not value the assets that

Page 97

1           M. Zmijewski
2   Barclays received on the day they actually
3   received them?
4       A    By that you mean the 22nd?
5       Q    Yes. Or -- no, December.
6       A    December?
7       Q    December.
8       A    What is the date in December? Is it
9   December 22nd also?
10      Q    We will stick with December.
11      A    Just say December? I think it's
12  December 22nd, too. I apologize for just
13  saying -- but December.
14          In December, there wasn't any
15  transfer, as far as I know, of assets from Lehman
16  to Barclays. That occurred on 12:01 a.m,
17  September 22nd. That is my understanding of how
18  it worked.
19          And they had a claim on those assets
20  as of that point in time. The reason they didn't
21  get them, to be candid, I haven't thought about,
22  investigated and read all the reasons, but I know
23  there was some dispute with JPMorgan, and JPMorgan
24  didn't give all those assets to Barclays, for
25  reasons I don't know, but that was an issue

Page 98

1           M. Zmijewski
2    between -- as I understand, an issue between
3    JPMorgan and Barclays, and Lehman did what it was
4    supposed to do as of 12:01 a.m., September 22nd,
5    so that would be the date and point in time you
6    would value the assets.
7        Q    So your understanding is that Lehman
8    did everything it was supposed to in terms of
9    fulfilling its requirements of the Barclays
10   repurchase agreement?
11       A    I don't have any information contrary
12   to that.
13       Q    Is that understanding relevant to
14   your opinions?
15       A    Well, you know, I need to get these
16   understandings from the lawyers of course, or the
17   Court, because it's a legal issue as to what the
18   closing date was, and was the closing time the
19   point in time at 12:01 a.m. September 22nd. I
20   understand that was the closing date, and that the
21   transaction was finalized on that date, point in
22   time, which means you measure at that point in
23   time the value of the assets.
24       Q    You made a statement to the effect
25   that Lehman did everything that it was supposed to

Page 99

1           M. Zmijewski
2    do in terms of delivering the assets.  Is that
3    understanding of yours that you stated relevant to
4    your opinions and conclusions?
5        A    I don't know if I stated it that way.
6    If I did, it was fairly loose language.
7            My understanding is the closing date
8    of the transaction, the closing point in time was
9    12:01 a.m., September 22nd, closed.  The
10   transaction completed, and there were
11   disagreements subsequent to that.
12           It's my understanding -- I might be
13   wrong -- the disagreement was between JPM and
14   Barclays, but I could be incorrect.  But it's a
15   legal issue, not an economic issue.  Is 12:01 a.m.
16   the closing where the transaction was finalized?
17   If it is, you value it at that point in time.
18       Q    So from your perspective, the proper
19   valuation point in time is the closing?
20       A    Yes.
21       Q    Is that true even if the assets
22   aren't received on the closing?
23       A    Yes.
24           MR. TAMBE:  Objection to the form of
25   the question.

Page 100

1           M. Zmijewski
2        A    Receipt of assets isn't relevant.
3    Ownership, transfer of -- I am not characterizing
4    this as legal talk.  Transfer of the ownership of
5    the assets and the risk of ownership, risk and
6    rewards of ownership of those assets at that point
7    in time, that's when you would measure the value.
8        Q    So, if the JPM securities that
9    Barclays eventually received in December, 2008,
10   had gone up in value between September 22nd and
11   December by $100 billion, you would then say that
12   Barclays got a $113 billion windfall on the
13   transaction?
14           MR. TAMBE:  Objection to the form of
15   the question.
16           MR. DAKIS:  Same objection.
17           MS. TABATABAI:  Objection.
18       A    If I could repeat that back.
19       Q    Sure.
20       A    Because I don't think I agree with
21   it, but I want to make sure, because it seems too
22   clear that I wouldn't agree with it.  So let me
23   ask.
24           You said on September 22nd, it was
25   worth, I will say X, and on December 22nd, it was

Page 101

1           M. Zmijewski
2    worth 100 billion plus X?  In December it was
3    worth 100 billion plus X?  Is that what you said?
4        Q    Yes.
5        A    There is -- that has nothing to do
6    with my windfall, because the windfall is
7    calculated based on X as of September --
8    12:01 a.m. on September 22nd.  So it's X that
9    matters.  What it's worth in December is
10   irrelevant.
11       Q    Okay.  Other than trying to calculate
12   it, calculate the value of those -- strike that.
13           You previously said in one of your
14   answers that they, presumably Barclays would have
15   a claim on those assets as of September 22nd; is
16   that correct?
17       A    As of the closing date, yes.
18       Q    Is it your understanding that they
19   would have a claim on those particular securities
20   or would have a claim on securities in a certain
21   amount or would have a claim for a certain amount
22   of money?
23       A    My assumption is that -- what I am
24   assuming here is it's a claim on a set of
25   securities in the JPM inventory.  That is my

Highly Confidential

Page 102

M. Zmijewski

1    M. Zmijewski
2    assumption in this calculation.  It's not an
3    amount.  It's a specific claim on those
4    securities.
5         Q    And is that assumption as part of
6    your calculation relevant to your calculation?
7         A    Yes.
8         Q    In what way?
9         A    Well, alternatively, there was a --
10   Professor Pfleiderer talked about a $7 billion
11   cash, supposed cash payment that might have
12   occurred and didn't occur, but securities were
13   given instead.
14             If someone said the claim was as you
15   just described, the potential claim for
16   $7 billion, and that was the expected value of the
17   claim, $7 billion, independent of securities, none
18   of this would be relevant.  I would have put
19   $7 billion down for the value of this claim.
20        Q    When you value a claim, a legal
21   claim, how do you value it?
22             MR. TAMBE:  Objection to the form of
23   the question.
24             MR. DAKIS:  Same objection.
25        A    You value it like any other asset.

Page 103

1    M. Zmijewski
2    You would make an assessment of what the cash
3    flows would be and what the risk of those cash
4    flows would be, when, the timing of the cash
5    flows, and discount it back to the point in time
6    you valuate it.
7         Q    When you said if Barclays had a claim
8    for $7 billion, you would have put down
9    $7 billion, would you have done any analysis
10   beyond just writing down the amount of the claimed
11   amount?
12        A    I don't think I said that.  I think I
13   said -- may I have my answer read back, just so I
14   understand what I said?
15             MR. TAMBE:  Your answer starts,
16   "well, alternatively."  "Well,
17   alternatively" is the answer.
18             (Record read.)
19        A    That's correct.
20        Q    So, by having a potential claim of
21   $7 billion, you would have valued that at
22   $7 billion for purposes of this valuation?
23        A    That's not what I said.  The
24   gentleman to your right is pointing at some
25   language.  Maybe that is the right language to

Page 104

1    M. Zmijewski
2    clarify the point.
3         Q    So, can you unpack expected value?
4         A    And that is -- you asked me how I
5    would value it, so the value would be what are the
6    expected cash flows from the transaction, and what
7    is the timing of those cash flows, what is the
8    risk of the cash flows, and that is the present
9    value.
10        Q    Okay.  What if the expected value was
11   $3 billion, what would you value it at?
12        A    If the expected value of that claim
13   was $3 billion?  Is that the question?
14        Q    Yes.
15        A    I would have used $3 billion.
16        Q    Do you know if Lehman delivered to
17   JPM these securities free and clear as of
18   September 22nd?
19        A    I don't know.
20        Q    So you weren't able to -- strike
21   that.
22             In addition to calculating the value
23   of these securities, or trying to identify the
24   value of these securities, as of September 22nd,
25   instead of the date they were actually received by

Page 105

1    M. Zmijewski
2    Barclays, did you do any other adjustments to
3    Barclays' calculation of value?
4         A    Just to be clear, September 19th is
5    the day.  You said September 22nd.  September 19th
6    is the date I am using, as the most recent
7    available price as of 12:01 a.m. on the 22nd.  So,
8    when I say September 19th, I mean the latest price
9    available, an appropriate price to use for
10   12:01 a.m. on September 22nd.
11             So if I could just from now on define
12   that as what I mean by September 19th, that I
13   valued it as of September 19th, these assets.
14        Q    Okay.  The ideal would be to value
15   it, in your view, as of 12:01 September 22nd, but
16   you used September 19th values because you didn't
17   have values for 12:01 September 22nd; right?
18             MR. DAKIS:  Objection to form.
19        A    Because those are the last available
20   prices.
21        Q    Okay.  And so how did you -- can you
22   describe how you calculated September -- 12:01
23   September 22nd values for these --
24        A    Of course.
25        Q    -- JPM inventory securities?

| Page 106 |
| --- |

M. Zmijewski

1
2     A     I used the JPM valuations as of
3  September 17th, because that is the day for which
4  we have a JPM valuation for those assets.  I then
5  went to the GFS database provided to us through
6  Processor Pfleiderer, and calculated the
7  percentage change in price on a CUSIP basis for
8  all the CUSIPs in the JPM inventory.
9           And I then applied that percentage
10  change in price in the GFS database to the JPM
11  valuation as of September 17th.  So I calculate
12  essentially the return between the 17th and the
13  19th using GFS, apply those returns to the JPM
14  custodial price point.
15     Q     Did you use the same -- in
16  calculating between the 17th and the 19th, did you
17  use the same CUSIPs that were trying to value, the
18  JPM CUSIPs, or did you use another set of CUSIPs
19  as a proxy and apply that to the JPM case?
20     A     Well, if you read -- maybe you are
21  not aware.  The GFS database is incomplete.  At
22  least the database that we were provided through
23  Professor Pfleiderer is incomplete.  It doesn't
24  cover all the universe of securities in the
25  initial inventory, in the JPM inventory, so

| Page 107 |
| --- |

M. Zmijewski

1
2  therefore we didn't have CUSIP-by-CUSIP matches.
3           For the securities for which we had a
4  CUSIP-by-CUSIP match, we applied the return on a
5  CUSIP-by-CUSIP basis.
6           For the securities for which we
7  didn't have a CUSIP-by-CUSIP match, we went to
8  Barclays' class -- asset classifications that
9  Barclays used, calculated the weighted average
10  percentage return in the GFS database for that
11  asset class, and applied it to the remaining
12  CUSIPs in the database.
13     Q     And roughly how much of it was CUSIP
14  by CUSIP?  I think this is described at page 30 of
15  your report.
16     A     Thank you.
17           I don't think so.  No.
18     Q     I'm sorry, I meant paragraph 30.
19     A     Oh, okay.  Thank you.
20     Q     Before I go on there, did you -- can
21  I just ask, in the last question you referred to
22  Barclays asset classes.
23     A     Yes.
24     Q     Did you mean Lehman asset classes?
25     A     No.  I meant Barclays asset classes.

| Page 108 |
| --- |

M. Zmijewski

1
2     Q     Okay.  Turning to, turning to page --
3  paragraph 30.
4     A     It will take me a minute or two to
5  read the footnotes.  It would be in the footnotes.
6     Q     Sure.
7     A     It doesn't state in the footnote what
8  percentage.  Based on Exhibit F-1, in Exhibit F-1
9  I show some of the holes in the GFS database.  I
10  illustrate that.  And on average it's 60 percent
11  of the value is in GFS and 40 percent is not.
12     Q     Do you know if those rough
13  percentages would apply to the question we were
14  discussing in terms of how much of this would have
15  been CUSIP by CUSIP as opposed to applying a
16  percentage change based upon observation of
17  changes in other securities?
18     A     I have no reason to believe that that
19  same average wouldn't be true.  I don't know that
20  factually, but 60 percent should be reasonable.
21     Q     Do you have -- and do you have any
22  reason to believe that the movement in the JPM
23  mark from the 17th to the 19th would mirror the
24  movement in price of the securities that you
25  looked at in GFS between the 17th and the 19th?

| Page 109 |
| --- |

M. Zmijewski

1
2     A     I just didn't catch the first phrase
3  of your question.  Do I have a reason to think
4  they are different or not different.  I just don't
5  know.
6     Q     To believe they are the same.
7     A     Are the same?  They are valuing the
8  same assets.  I have no reason to believe they are
9  different.
10     Q     The same asset category, not
11  literally the same securities?
12     A     Well, somewhere in the ballpark of
13  60 percent are identical securities.
14     Q     Okay.  And the other -- the other
15  40 percent, which you don't have identical
16  securities for, which you have -- you're taking
17  some type of -- some of the securities that you
18  are trying to value, JPM securities, you are
19  looking at the values for them as reported by JPM
20  on the 17th, and you are trying to estimate or
21  calculate what those values would be on the 19th;
22  right?
23     A     I am calculating the 19th values;
24  correct.
25     Q     Some of those you are saying you

Page 110

M. Zmijewski

1  would actually look at movements in GFS from the
2  17th to the 19th?
3      Q    On a CUSIP-by-CUSIP basis; correct.
4      Q    For those CUSIPs, you would just take
5  the value of the CUSIP of the 19th?
6      A    No. I would use the percentage
7  change in GFS and apply it to the 17th value in
8  JPM.
9      Q    For the same security?
10     A    For the same CUSIP, same security.
11     Q    Was there a difference in the GFS
12  value for that security on the 17th and the JPM
13  value?
14     A    Probably. I didn't look.
15     Q    Do you know why there would be a
16  difference?
17     A    Well, first, just because it's a
18  CUSIP-by-CUSIP analysis doesn't mean that the
19  volume is the same. So, we can look at the
20  percentage change in GFS and apply it to the value
21  in JPMorgan, but that doesn't mean that those
22  valuations will be the same, because the number of
23  securities could be different in the database.
24  The GFS database is just not complete.

*(Note: line numbering in original runs 1–25)*

Page 111

M. Zmijewski

1      Q    How would the number of securities
2  being, the volume being different affect the price
3  that you observed in GFS versus JPM?
4      A    Just to be clear, it's not the
5  volume, like a trading volume. It's the number of
6  securities.
7          So the number of bonds that could be
8  in GFS could only be part of what's in JPM, or in
9  GFS it could be more because it includes -- for
10  that CUSIP, because it includes inventory that was
11  in the initial inventory as well as in the JPM
12  inventory.
13         So it's not as if the amount, the
14  number of securities is going to be identical.
15     Q    When you say CUSIP by CUSIP, the
16  CUSIP -- it's not -- you are not necessarily
17  looking at the same securities?
18         MR. TAMBE: Objection to the form of
19     the question.
20         MR. DAKIS: Same objection.
21     A    It would be like shares of Barclays,
22  all right. Well, in JPM, because it's JPM, a
23  subset, there are 100 shares of Barclays in the
24  JPM inventory, but you look at GFS. GFS, because

Page 112

M. Zmijewski

1  it's incomplete, could have ten shares of
2  Barclays, or it could have 5,000 shares of
3  Barclays, because it could include inventory from
4  somewhere else, but it's all Barclays shares.
5          So what I did, so I didn't have to --
6  so I made sure I wasn't miscounting the number of
7  shares in the example I am giving, I just looked
8  at the percentage change of value in GFS and
9  applied that to the value in JPMorgan. Therefore,
10  I made sure that I wouldn't be adjusting volume --
11  not volume -- the quantity incorrectly.
12         There was no adjustment in quantity.
13  I was just moving it forward two days based on the
14  return on that security. It's at the security
15  level.
16     Q    For the ones where you didn't have
17  the same CUSIPs, you had to measure the reported
18  change in GFS from the 17th to the 19th and apply
19  that percentage change to the JPM securities that
20  you were calculating; correct?
21     A    For the securities for which I did
22  not have an exact CUSIP match in both databases, I
23  first calculated in the GFS database, and I took
24  the Barclays asset classifications, put all the

Page 113

M. Zmijewski

1  CUSIPs in the GFS database in those
2  calculations -- in those classifications. For
3  each classification calculated a weighted average
4  return for that asset class, for that period, and
5  applied that weighted average return to each CUSIP
6  for which I did not have an exact CUSIP match.
7      Q    Okay. Why wouldn't you simply use
8  the September 19th GFS price when available?
9      A    Because it was incomplete. We didn't
10  have a complete database for GFS.
11     Q    You didn't have available -- as I
12  understand it, what you are saying is you didn't
13  use -- you couldn't tell whether -- in GFS what
14  volume you were looking at of a CUSIP?
15         MR. TAMBE: Object to form.
16     A    Sometimes you can tell, sometimes you
17  can't tell. It depends on the nature of the
18  security. Sometimes if you have the notional
19  value, it's possible to take out the -- to
20  understand what the Q is. The total value is
21  price times quantity. So, sometimes you can
22  understand the Q, but not always.
23         However, we had the JPM database, and
24  it was the value on the 17th. We had to roll that

Page 114

1          M. Zmijewski
2   valuation forward two days, and we had a partial
3   database, sometimes too much of a security,
4   sometimes too little, sometimes none at all.  So
5   we -- you know, I followed an implementation of
6   what I think is a completely reasonable approach,
7   to roll forward the JPM valuations using the GFS
8   returns.
9        Q     Don't GFS reports give quantity and
10  pricing?
11       A     It gives notional value.  It
12  doesn't -- and from that, you can't always get the
13  exact quantity.
14       Q     You're attempting to get
15  September 19th prices for these JPM inventory
16  securities.  Did you at any point attempt to
17  calculate those prices based on the GFS system?
18       A     I did not.
19       Q     And why didn't you?
20            MR. TAMBE:  Objection as to form.
21       A     First, it was incomplete.  I don't
22  have -- I couldn't, because Barclays, as I
23  understand it, did not supply complete information
24  with respect to the GFS database.  It was a
25  partial snapshot, not a complete snapshot of all

Page 115

1   the inventory.  That is my understanding and that
2   is my observation, given what I examined in the
3   GFS database.
4             So, it's not possible to use the GFS
5   database to value all the Annex A or JPM
6   inventory.  It's not possible.  It doesn't exist.
7        Q     You said first it was incomplete.
8   Were there any other reasons other than your
9   belief the GFS data was incomplete?
10       A     That is the primary reason.
11       Q     Can you think off any other reasons?
12       A     Not as I sit here right now.
13       Q     Did you have concern about whether
14  the GFS data as of the 19th was being updated?
15       A     No, that was not a concern, although
16  I did not analyze -- had I planned to use the G --
17  I immediately -- not immediately.  Before I
18  started conducting calculations, I rejected using
19  GFS data because it was incomplete.  I originally
20  thought I would use GFS data, and you would have
21  had a column in these different exhibits with GFS
22  data.  And I found out that the -- Barclays did
23  not provide a complete dataset, so it's not
24  possible to do those calculations.

Page 116

1          M. Zmijewski
2             At that point, I just stopped using
3   GFS data, unless I needed it for a specific
4   purpose that I thought was reasonable and
5   appropriate.
6        Q     How did you know that the GFS data
7   wasn't complete?
8        A     GFS -- I think everybody knows that
9   if you go through and you have the Barclays
10  inventory, 86-B and 87-B, by CUSIP detailed, so
11  it's Barclays inventory from this sale
12  transaction, and you go to the GFS database, and
13  you match up the CUSIPs and you then try to match
14  up the values, you see there is big holes in the
15  GFS database relative to what Barclays said they
16  had.
17            So one of two things happened.
18  Either the GFS database is incomplete or Barclays
19  is including assets in its inventory that aren't
20  relevant to the sale transaction.  I don't think
21  the latter was correct.  I think the former was
22  correct.
23       Q     And you did that analysis you just
24  mentioned comparing the two and seeing that it was
25  incomplete?

Page 117

1          M. Zmijewski
2        A     I did.
3        Q     When did you do that?
4        A     Soon after we received the data and I
5   reviewed Professor Pfleiderer's report.
6        Q     Can you just put a date roughly when
7   that is?
8        A     It had to be -- I don't know.  What
9   is the date of Professor Pfleiderer's report?
10  Within 30 days.  If you give me the date that we
11  actually received the backup documentation, that
12  took a few weeks, so we didn't receive all of the
13  information immediately.
14            So, whenever -- you can look in your
15  records.  When you transferred the data, we
16  received it within a day.  We analyzed it right
17  away.  The first thing we did was of course
18  compare GFS to the Barclays database.
19       Q     Did you have any occasion to do any
20  calculations of the value of assets received prior
21  to Mr. Pfleiderer's report?
22            MR. TAMBE:  Objection to the form of
23  the question.
24       A     No, I don't -- I -- no, I don't
25  believe so.  I think the only -- what we were

Highly Confidential

Page 118

1          M. Zmijewski
2   trying to do then is just trying to understand the
3   flow of documents.  Until Professor Pfleiderer's
4   report came, I don't think we did any analysis
5   whatsoever.
6       Q     Did you have occasion to use --
7   request GFS data before receiving Professor
8   Pfleiderer's report?
9          MR. TAMBE:  Objection to the form of
10  the question.
11      A    I don't remember the -- yes.  I
12  believe so.  I believe Barclays supplied a
13  snapshot of the data back then.
14      Q    Did you look at the data back then?
15      A    In a preliminary way, yes, to try to
16  understand it, and make sure that as soon as we
17  received some reports, that we could start
18  analyzing, so we started created a database, and
19  some knowledge to understand what GFS contained in
20  it.
21      Q    And did you gain an understanding at
22  that time that the data you were looking at was
23  incomplete?
24      A    I don't remember doing that until
25  after Professor Pfleiderer gave us a report, but

Page 119

1          M. Zmijewski
2   you can check when counsel asked you for more
3   data, because that -- I assume that was queued up
4   by our indication that the data were incomplete.
5       Q     You are not --
6       A     And it's just now that we received,
7   just recently within the last week or two, that we
8   received the equities part of GFS.  Just received
9   it.
10      Q     You're not personally familiar with
11  what the actual requests were between lawyers in
12  terms of data; right?
13      A     I only know what I told the lawyers.
14      Q     You asked for the data, and what did
15  you -- what precisely did you ask for when you
16  asked for GFS data?
17      A     We want the complete GFS database
18  that is available, and I forgot what range of
19  dates I asked for, but it was the range of dates
20  from sometime after the close to before the close.
21      Q     And you didn't ask for that until
22  after the Pfleiderer report; correct?
23      A     I don't think that is true.  I think
24  that we asked for earlier.
25      Q     So you asked for --

Page 120

1          M. Zmijewski
2       A    Maybe -- I don't remember.
3       Q    You don't remember one way or the
4   other?
5       A    Look at -- counsel told us that they
6   are sending the request, so, I assume they did
7   that.  If they did that, you can look at the
8   request date, letter, e-mail, and you will know
9   when I asked.
10      Q    Do you understand to what extent
11  movants have access to the GFS system or have had
12  access since closing?
13         MR. TAMBE:  Since when?
14         MS. TABATABAI:  Objection.
15         MR. THOMAS:  Since closing.
16         MR. TAMBE:  Objection to the form of
17  the question.
18         MR. DAKIS:  Same objection.
19      A    I understand that maybe it's through
20  the auditor or through some third party that for
21  the ongoing work of the estate, it has access to
22  GFS data, but it's through a third party.  I think
23  a request -- this is my understanding.  It could
24  be wrong.  It's not a clear understanding.
25         So they need to make a request, and

Page 121

1          M. Zmijewski
2   the request goes and the data is given, but that
3   is for the ongoing activities of the estate and
4   not looking back previous to the closing.
5          That is my understanding.  It may be
6   wrong.  I don't have a clear understanding.
7       Q    When you say that GFS is incomplete,
8   are you saying that the GFS system is incomplete
9   or that the data received is incomplete?
10      A    I only know that the data that I
11  received is incomplete.  I don't know that it is
12  incomplete.  I have no knowledge from the record
13  indicating that GFS doesn't contain all the
14  securities that were in Barclays' inventory,
15  either the initial inventory or the JPM inventory.
16         Based on the record, it seems as
17  though GFS did include all that inventory, but
18  clearly Professor Pfleiderer didn't have all those
19  records.  That is clear because from his work you
20  can see that he didn't have it.
21      Q    So, for your calculation of the value
22  of the JPM inventory securities, in order for that
23  calculation that you made to incorporate into your
24  opinion and conclusions to be correct, it has to
25  be concluded that the appropriate valuation date

Page 122

M. Zmijewski

1 is, or valuation time is not when Barclays
2 received the securities, and entered the
3 settlement, but rather when -- at 12:01 a.m. on
4 September 22nd; correct?
5 Q I apologize. I missed the first part
6 of your question.
7 A For your calculation of the JPM
8 inventory securities to be correct, one of the
9 assumptions you make and one of the things that
10 has to be correct is that the appropriate time of
11 valuation is not when Barclays actually received
12 those securities or actually entered into a
13 settlement agreement, but rather at 12:01 a.m. on
14 September 22nd?
15 A Correct.
16 Q Another assumption that your
17 calculation is predicated on is that the value of
18 those securities on the 19th is equal to the value
19 of those securities on -- at 12:01 a.m. on
20 September 22nd; correct?
21 A It is reasonable to use for that
22 value.
23 Q Well, if it's not the same, then your
24 calculation isn't correct; right?

Page 123

M. Zmijewski

1 MR. TAMBE: Objection to form.
2 MS. TABATABAI: Objection.
3 MR. DAKIS: Same objection.
4 A Incorrect.
5 Q I mean the ultimate correct valuation
6 that you are looking for would be -- and when I
7 say valuation, do you understand me to talk about
8 fair market valuation?
9 A Yes.
10 Q And is that the appropriate valuation
11 that we should be looking at for these purposes?
12 A Yes.
13 Q In order for your calculation --
14 you're attempting to calculate the value of the
15 JPM inventory securities as of 12:01 a.m.
16 September 22nd, 2008; correct?
17 A Yes.
18 Q So if you are -- to do that, you are
19 trying to calculate the value of the JPM
20 securities as of September 19th; correct?
21 A Correct.
22 Q So if the value of the securities on
23 September 19th is not the same as the value of the
24 securities at 12:01 a.m. on September 22nd, then

Page 124

M. Zmijewski

1 your calculation is incorrect; right?
2 A No. I would disagree with that,
3 because there isn't an observed price on 12:01.
4 And I just disagree with -- you said same or you
5 said equal. We don't have an observed market
6 value as of 12:01 a.m. on the 22nd. It doesn't
7 exist. Therefore, you have to measure it using
8 something else.
9 And as long as that measurement is
10 reasonable and unbiased, then it's appropriate to
11 use for 12:01 a.m. We will never know what is
12 equal on that date. Equal doesn't exist because
13 the actual doesn't exist. So you don't know.
14 There is never a time to judge.
15 So it has to be a reasonable and
16 unbiased measure for that price.
17 Q Okay.
18 A Maybe that is subtle, but it seemed
19 important to me.
20 Q So your goal is not to -- is your
21 goal then not to calculate the actual value of the
22 JPM securities as of 12:01 a.m. September 22nd,
23 but rather just a reasonable and unbiased value?
24 MR. TAMBE: Objection to form.

Page 125

M. Zmijewski

1 MS. TABATABAI: Same objection.
2 MR. DAKIS: Same objection.
3 A Of the actual -- of what the price
4 would be had we been able to observe an actual
5 price. You can't measure the actual price. That
6 is an impossible goal to attain. Actual prices do
7 not exist.
8 Q Another assumption on which your
9 calculation is predicated is the accuracy of the
10 JPM marks on the JPM inventory equities as of
11 September 17th; correct?
12 A Yes.
13 Q If those marks are inaccurate or
14 wrong, your calculation will be inaccurate or
15 wrong?
16 A I don't know why you are using
17 inaccurate and wrong. I am not sure -- you know,
18 if it's, if it's not accurate, I would have to
19 adjust to a reasonable unbiased measurement.
20 Q And what efforts did you make, if
21 any, to establish whether the JPM marks as of the
22 17th were in fact accurate for those JPM inventory
23 equities?
24 A Well, first I am relying on the

Page 126

1           M. Zmijewski
2    testimony of Mr. Schneider with respect to the
3    type of organization JPMorgan is, although I know
4    JPMorgan well, but also the role of a custodian in
5    this case in this situation.  So I rely on his
6    testimony.
7           In addition, I looked at, when I
8    started this assignment, looked at, well, how does
9    JPMorgan compare on the 17th to BoNY on the
10   19th -- I think BoNY on the 19th -- and looked at
11   a comparison to see if they were similar, and
12   adjusting for the days, and it seemed like it was
13   similar for -- this is not of course for the JPM
14   Annex A inventory, but it's for the initial
15   inventory.
16       Q    Okay.  So, for the -- did you do
17   anything other than rely on Mr. Schneider to
18   determine the accuracy of the JPM marks of the JPM
19   inventory securities as of September 17th?
20           MR. TAMBE:  Object to the form of the
21   question.
22       A    I have done nothing more than I just
23   explained.
24       Q    And the part about observing the
25   relationship between JPM September 17th marks and

Page 127

1           M. Zmijewski
2    BoNY September 19th marks, did not relate to marks
3    for the JPM inventory; correct?
4        A    Correct.  BoNY didn't value the JPM
5    inventory.
6        Q    That was regarding some other set of
7    securities?
8        A    Well, the initial inventory, which is
9    fairly representative of the JPM inventory.
10       Q    Did you do any -- in connection with
11   looking, noticing the JPM valuation on the 17th
12   and the BoNY valuations on the 19th, did you do
13   any analysis of overall market changes between
14   those two days, that might have impacted the
15   valuations?
16       A    Well, I looked at the GFS database.
17   Other than the GFS database, no.
18       Q    In other words, you could have -- on
19   the 17th, you could have a JPM market security at
20   a hundred, and on the 19th you could have a BoNY
21   mark of that security at a hundred, and it would
22   not indicate that BoNY and JPM are marking the
23   securities in the same way or to the same values;
24   correct?
25           MR. TAMBE:  Objection to the form of

Page 128

1           M. Zmijewski
2    the question.
3        A    Incorrect.  Well, your statement is
4    correct.  But there is no relevance to what I was
5    doing, because you left out an examination of GFS.
6           So you compare the 17th to the 19th,
7    but also then making the adjustment for the GFS
8    percentage change over that two-day period, as I
9    did, as we explained in I think quite a bit of
10   detail earlier.
11       Q    Let's move on then to a fourth
12   assumption that your calculation is predicated on,
13   is that the percentage change that you had
14   calculated from non-JPM inventory securities using
15   GFS, would apply accurately to the percentage
16   change in JPM inventory for securities that you
17   couldn't line up CUSIP by CUSIP.
18       A    That's correct.
19       Q    And you said before your best
20   estimate is maybe there is 40 percent of the
21   CUSIPs you would have had to apply a percentage
22   change to based upon some other set of securities'
23   movement in GFS; is that correct?
24       A    As I sit here right now, based on, I
25   think it's Exhibit F-1, 60 percent of a match and

Page 129

1           M. Zmijewski
2    40 percent non-matches is the best I can do.
3        Q    Okay.  And a fifth assumption upon
4    which your calculation would be predicated is that
5    the GFS system was being fully and accurately
6    updated between September 17th and September 19th;
7    correct?
8        A    Yes.  For those securities, for that
9    subset of securities.
10       Q    Right.
11           Did you do any -- of course if it's
12   not being fully and accurately updated, would you
13   know if those securities were updated?
14       A    I'm sorry, I don't understand the
15   question.
16       Q    Strike that.
17           Did you do anything to confirm
18   whether the GFS system was being fully and I
19   accurately updated for those securities between
20   September 17th and September 19th?
21           MR. TAMBE:  Object to the form.
22       A    I didn't isolate those securities,
23   but I did conduct analysis that I have in my
24   report concerning the updating process, or the
25   frequency of updating is a better way to say that,

| Page 130 |
|---|

M. Zmijewski

1  so I have that information indicating that there
2  was updating.
3      Q      What specifically are you referring
4  to?
5      A      I never saw a sign like that before.
6      Exhibit E-3.
7      Q      And just so we are clear, did you --
8  nothing in E-3 indicates that the securities in
9  JPM inventory were being updated from September 17
10  through September 19th, does it?
11      A      That is incorrect.  It does indicate
12  that GFS was being updated.  It's not specific to
13  the JPM inventory, but it does indicate generally
14  that there was updating in GFS.
15      Q      Does it indicate there was updating
16  to the more illiquid securities as well as to the
17  securities which may be updated electronically?
18      A      It does indicate that there was
19  updating of all the securities.
20      Q      And in what way does it indicate
21  that?
22      A      If I recall, Professor Pfleiderer
23  characterized the principal mortgage trading
24  group, PMTG, as being less liquid, the less -- the

| Page 131 |
|---|

M. Zmijewski

1  least liquid of that set of categories, and
2  between September 12 through September 19th,
3  69 percent of the securities in GFS traded on at
4  least one -- changed its price on one day, and
5  64 percent on two days, and 51 percent on three
6  days, and 25 percent on four days, and 20 percent
7  on all five days.
8          It's the last line of the top panel.
9      Q      This is E --
10      A      E3, Edward 3.
11      Q      Okay.  And you believe that that
12  indicates that all the securities in GFS were
13  being updated between September 17th and
14  September 19th?
15      MR. TAMBE:  Object to the form.
16      A      I don't believe I said that.  I -- I
17  believe this is evidence that this system was
18  being updated, and naturally this is one piece of
19  evidence.
20          Look at the record from the CFO of
21  Lehman, and I forgot the other gentleman within
22  Lehman, who indicated that the prices were being
23  updated.  There was some contradictory evidence to
24  that.  We need to take it all together.

| Page 132 |
|---|

M. Zmijewski

1          There is evidence -- it's clearly --
2  contrary to Professor Pfleiderer, who looked at a
3  few securities, if you look at the whole database,
4  securities were being updated.
5      Q      Have you attempted to look at the
6  securities in question, the JPM inventory
7  securities, and whether they were updated?
8      A      I did not isolate just the JPM.  This
9  was the systematic analysis of all the securities.
10      Q      Have you reached the conclusion that
11  all the securities in the GFS database were being
12  updated between the 17th and the 19th?
13      MR. TAMBE:  Objection to the form of
14  the question, asked and answered.
15      MR. DAKIS:  Same objection.
16      A      I did not reach such a conclusion.
17      Q      What you are saying is that Exhibit E
18  shows that there was some updating of the GFS
19  system going on between the 17th and the 19th?
20      A      Correct.
21      THE VIDEOGRAPHER:  Counsel.
22      MR. THOMAS:  Go ahead.
23      THE VIDEOGRAPHER:  That is the end of
24  tape number two.  The time is now 12:33 p.m.

| Page 133 |
|---|

M. Zmijewski

1          We are now off the record.
2      (Recess taken.)
3      THE VIDEOGRAPHER:  This is the start
4  of tape number three.  The time is now
5  1:25 p.m.
6          We are now back on the record.
7  BY MR. THOMAS:
8      Q      Mr. Zmijewski, in footnote 106 you
9  have a reference to Joseph Mason's report.
10      A      Yes.
11      Q      Do you know, was there a report by
12  Joseph Mason that you reviewed?
13      A      No.  Since I wrote my report before I
14  read anyone else's report, I was in the incorrect
15  assumption that Professor Mason was going to write
16  a report.
17      Q      What did you think he was writing the
18  report on?
19      A      The initial conversations that I had
20  about the custodian marks were with Mr. Schneider
21  and Mr. Mason, and I assumed incorrectly that
22  Mr. Mason was writing the report rather than
23  Mr. Schneider, who ultimately wrote the report.
24      Q      So we just substitute Mr. Schneider

## Page 134

1          M. Zmijewski
2  in for Mr. Mason in that footnote?
3      A    Yes.  Thank you.
4      Q    Now, you said for purposes of
5  calculating certain values of Lehman securities on
6  September 19th, that the reason you didn't use the
7  GFS system, the values in the GFS system, is
8  because you believed they were not complete; is
9  that correct?
10     A    Yes.
11     Q    Was it or was it not also a reason
12 that you had concerns about whether the GFS data
13 had been updated the week of the bankruptcy?
14     A    That never entered any of my
15 decisions.
16     Q    You never discussed that with anyone?
17     A    No.
18     Q    You knew it was an issue in the case?
19     A    Once I read Professor Plfeiderer's
20 report, I knew it was an issue in the case.
21     Q    Prior to that, you didn't know?
22     A    I don't think so.
23     Q    Now, we talked about two sets of
24 securities for which you have provided a
25 calculation in your chart of the Barclays, what

## Page 135

1          M. Zmijewski
2  you call windfall, the equities and the JPM
3  inventory securities; correct?
4      A    Yes.
5      Q    And as I understand it, in neither
6  case did you attempt to independently try to value
7  any of those securities yourself?
8          MR. TAMBE:  Objection to the form of
9      the question.
10         MR. DAKIS:  Same objection.
11     A    In neither case did I actually on a
12 security-by-security basis use a valuation model
13 with inputs to value the security.  I valued them
14 in other ways, as I explained and as we
15 discussed -- in my report, and as we discussed
16 earlier.
17         So I valued them, but I did not
18 conduct an independent valuation with a specific
19 model with inputs into the model.  I did not do
20 that.
21     Q    In each case you relied on somebody
22 else's having done a valuation of the security?
23     A    No.  You know, for the equities, I
24 looked at the equity prices that Barclays was
25 using and compared them to the last prices in

## Page 136

1          M. Zmijewski
2  Bloomberg, so I understood that those were last
3  prices.  So I verified that they were prices, so
4  no one conducted a valuation.  They were prices,
5  observed prices.
6      Q    For the 19th on the inventory?
7      A    For the 19th equities.
8      Q    Okay.  Did -- on the JPM inventory,
9  you didn't -- those securities, you didn't
10 actually independently try to value those
11 securities; correct?
12     A    Correct.
13     Q    And on the inventory, initial
14 inventory equities, did you -- you accepted
15 Barclays' valuations; correct?
16     A    No.  I just explained that I looked
17 at the Bloomberg prices and compared the Bloomberg
18 last prices to Barclays and verified that they
19 were reasonable representations of the Bloomberg
20 last prices.
21     Q    Was there a set of documents in the
22 equities, set of equities -- strike that.
23         Was there a set of those equities for
24 which you couldn't do that?
25     A    Correct.

## Page 137

1          M. Zmijewski
2      Q    And for those, how did you determine
3  value?
4      A    I used Barclays' own value on
5  September 19th.
6      Q    So, you either used somebody else's
7  valuation or -- or you looked up the price in
8  Bloomberg; is that fair?
9      A    Yes, that is fair.
10     Q    Okay.  Let me go ahead and direct
11 your attention back to paragraph 30, and the last
12 sentence of that paragraph.  Specifically where
13 you say, "I adjusted the calculated JPMorgan
14 September 19th value to incorporate Barclays'
15 liquidity adjustment."
16         Do you see that?
17     A    Yes.
18     Q    Let me show you a document we will
19 mark as 707B, a two-page document, not attached.
20         (Exhibit 707B marked for
21     identification as of this date.)
22     Q    If you would take a moment to review
23 that, and let me know if you recognize that.
24     A    This appears to be the liquidity tab
25 of either 87-B or 86-B.

| Page 138 | Page 139 |
|---|---|

**Page 138**

1       M. Zmijewski
2      MR. TAMBE: Could you tell us, could
3  you tell us where this is from? It's got no
4  footer, no anything. It would just be
5  helpful to know, if it comes from a
6  spreadsheet, which one it comes from. There
7  is just a lot of spreadsheets out here. If
8  you can tell us, it would be helpful.
9      THE WITNESS: Well, I think they are
10  from one of those exhibits. It's obvious
11  you have qualified what it appears to be.
12     Q   So, if I can continue my examination,
13  what I would like to know is what or how you used
14  the spreadsheet in any way.
15      MR. TAMBE: Objection to the use of
16  the spreadsheet unless we know where it's
17  from. It could be misleading as to which
18  particular spreadsheet produced by Barclays
19  this comes from, unless the witness can tell
20  by just looking at the face of these two
21  pages, can link it to a particular
22  spreadsheet.
23      MR. THOMAS: Well, I think the
24  witness said it appears to be the
25  spreadsheet.

**Page 139**

1       M. Zmijewski
2      MR. TAMBE: That is all he said. Now
3  you are asking a specific question whether
4  he used these numbers.
5      MR. THOMAS: I have your objection.
6     Q   Mr. Zmijewski, I am trying to just
7  make sure we understand what you did to
8  incorporate Barclays' liquidity adjustment. Can
9  you just explain that, referencing or not
10  referencing document 707B.
11     A   Of course. That is explained in
12  footnote 57. So, if you read footnote 57, which
13  is on page 18, I explain how I take the liquidity
14  adjust -- I explain the documents, and this might
15  be from the same document, I don't know, but it's
16  a document like this. It says "liquidity haircut"
17  on the column.
18      And I multiply -- for the particular
19  type of security, I multiplied the liquidity
20  haircut times the valuation, and that is the bid
21  exit price adjusted valuation, which is what I
22  explained in the first part of the footnote.
23      In the last sentence of the footnote,
24  I explain that for the equities, I use the
25  liquidity adjustment that was used by Barclays for

| Page 140 | Page 141 |
|---|---|

**Page 140**

1       M. Zmijewski
2  equities of 4.32 percent.
3     Q   Do you know why calculating the value
4  of the JPM inventory was assigned to you as
5  opposed to one of your colleagues at Chicago
6  Partners?
7     A   I don't recall why. To the best of
8  my recollection, I just said, well, I will -- here
9  is what I can do, and I did it, and it's -- and it
10  was being used.
11      I can tell you that it's just a
12  function of time that we had since Mr. Pfleiderer
13  or Professor Plfeiderer wrote his report, that the
14  valuation experts couldn't value all the
15  securities in both the initial inventory and the
16  JPMorgan inventory.
17     Q   Let me ask another question. I'm
18  sure you are going to tell me if I asked this
19  before, but I am not sure.
20      On the -- in paragraph 30, the third
21  sentence, where it says, "According to JPM price
22  marks on September 17th, the JPM inventory had a
23  value of 5994."
24      Do you see that?
25     A   I do.

**Page 141**

1       M. Zmijewski
2     Q   Are you assuming that the JPM price
3  marks were mid prices?
4     A   If you look at Exhibit C-1, it
5  explains it, that I have -- for September 17th, I
6  have JPM price marks. I assume that those require
7  an adjustment, a liquidity adjustment, liquidity
8  haircut, depending on whatever phrase you would
9  like to use for that.
10      So I start with those. I roll those
11  forward two days to the 19th, and then after I
12  roll those forward two days to the 19th, I apply
13  the Barclays liquidity adjustments to those.
14     Q   Is that a yes to my prior question of
15  whether you assumed that JPM price marks were mid
16  prices?
17     A   In this calculation, it's a yes.
18     Q   Did you ever review any, any
19  documents that reflect analyses of the value of
20  assets received by Barclays done by Houlihan Lokey
21  or FTI or Deloitte or Alvarez?
22      MR. TAMBE: Objection to the form of
23  the question.
24     A   I may have reviewed documents. I
25  don't -- I don't recall anything specific.

Page 142

M. Zmijewski

1  Certainly I know those companies were involved.  I
2  don't -- and for the purpose of my Exhibit C-1, my
3  other calculations, I didn't, I don't -- I didn't
4  review it specifically and recall some number that
5  is comparable to any of these numbers.
6      Q    Okay.  Did you -- or do you recall
7  using any such documents or information from any
8  of those financial advisors for any purpose for
9  your report?
10     A    I just missed the first phrase.  I'm
11 sorry.
12     Q    Do you recall using any such
13 documents or information from any of those
14 financial advisors for any purpose of your report?
15         MR. DAKIS:  You objection to form.
16     A    No.
17     Q    Were you aware that Deloitte was
18 doing work on an opening balance sheet post-sales
19 transaction?
20         MS. TABATABAI:  Objection to form.
21         MR. DAKIS:  Same objection.
22     A    I don't recall that.
23     Q    Let me go ahead and show you a
24 document previously marked as 570, Exhibit 570.

Page 143

M. Zmijewski

1      Have you seen that document before?
2      A    Possibly.  I don't recall it.
3      Q    Let me ask you to look at the first
4  paragraph of the exhibit.  This is an October 31, 2008
5  e-mail from Attorney Wachtell, counsel for JPM, to
6  Hughes Hubbard and Deloitte and SIPC and a number
7  of other entities.
8      Do you see that?
9      A    I see it.
10     Q    It says, "I attached a spreadsheet
11 with 'collateral values' as of September 17th,
12 which was the last evening on which the fed
13 provided financing.  I understand that these
14 collateral values were furnished principally by
15 third-party pricing sources, and we caution
16 against using those values as reliable indicators
17 of realizable value."
18     Do you see that?
19     A    Yes.
20     Q    Were you aware that JPMorgan was
21 cautioning against the use of their collateral
22 values as realizable indicators of realizable
23 value?
24         MR. TAMBE:  Objection to the form.

Page 144

M. Zmijewski

1          MS. TABATABAI:  Object to the form.
2          MR. DAKIS:  Same objection.
3          MR. TAMBE:  Objection, asked and
4  answered.
5      A    I am just trying to find out, reading
6  the document, trying to identify how this was a
7  JPMorgan document.  Maybe I didn't hear you
8  correctly.  You said this was a JPMorgan document?
9      Q    You understand Wachtell is counsel
10 for J.P. Morgan?
11     A    I did not know that.
12     Q    My question to you is simply, were
13 you aware that JPMorgan was cautioning that its
14 collateral values could not be used as reliable
15 indicators of realizable value?
16         MR. TAMBE:  Objection, lack of
17 foundation.
18         MS. TABATABAI:  Objection to form.
19         MR. TAMBE:  Objection to form.
20 Objection, asked and answered.
21         MR. DAKIS:  Join in all those
22 objections.
23     A    I just want to take a minute just to
24 read the document.

Page 145

M. Zmijewski

1      Q    Sure.
2      A    Just so I understand.
3      Q    Sure.
4      A    I don't recall seeing this document.
5  I might have.  I don't recall seeing it.
6      Q    Apart from the --
7      A    The underpinning spreadsheet looks
8  familiar, but this e-mail does not.
9      Q    Do these in fact appear to be the
10 same JPM inventory securities that you included a
11 valuation of in your calculations in your report?
12     A    I can't tell from this.  I'm sorry.
13     Q    Putting aside whether you have seen
14 the document before, did anyone tell you that
15 JPMorgan, or were you aware that JPMorgan was
16 cautioning against using the -- its September 17th
17 collateral values as reliable indicators of
18 realizable value?
19     A    I was not.
20         MR. DAKIS:  Objection to form.
21     A    And that might mean because they
22 haven't applied any, what Barclays calls liquidity
23 haircut to it, to make them realizable values or
24 exit values.  I am not sure what that means.

Page 146

1          M. Zmijewski
2     Q     We will take a look in a minute.
3          Would this have been important to
4 your consideration of whether to accept JPMorgan's
5 September 17th collateral values?
6     A     This document doesn't change my
7 opinion, at least what I have read of it now.
8     Q     So, even if the values, the JPMorgan
9 September 17 values of those JPM inventory
10 securities were considered to be not reliable
11 indicators of realizable value, that wouldn't
12 change your opinions and conclusions about how you
13 calculated the values of those securities?
14          MR. DAKIS:  Objection to form.
15          MS. TABATABAI:  Same objection.
16     A     Unless I understand what is meant by
17 realizable value, and if what is -- they said they
18 used third-party pricing.  That it's reasonable to
19 use third-party pricing.
20          "We caution against using those
21 values as reliable indicators of realizable
22 value."  If that means you need to apply a
23 liquidity haircut to it, that's what I did, and I
24 did it using Barclays' own approach to adjusting
25 for liquidity haircuts.

Page 147

1          M. Zmijewski
2 So if that's what it means -- I don't
3 know what it means.  If that's what it means, then
4 I am very comfortable.  If it means something
5 else, I would have to think how it might affect my
6 analysis.
7     Q     Do you know how JPMorgan calculated
8 values on securities that were not available in
9 Bloomberg or by other third-party pricing?
10     A     I do not.
11     Q     Would you at least like to have
12 considered information like this concerning
13 reliability of the September 17th JPMorgan marks
14 in forming your opinions and conclusions about the
15 value of those securities?
16     A     This document doesn't change my
17 opinion, so, at this point it's not relevant.
18     Q     So even if -- assuming that it's not
19 just -- the difference -- the distinction that JPM
20 is drawing between collateral value and realizable
21 value, do you understand realizable value to mean
22 essentially fair market value?
23          MR. TAMBE:  Objection to the form of
24     the question.
25          MR. DAKIS:  Same objection.

Page 148

1          M. Zmijewski
2     A     I don't know in what context it's
3 being used.  If it's being used in the context of
4 a book value, then according to FAS 157,
5 realizable value would be based on exit prices
6 rather than fair market value.  Different concept,
7 so, I don't know what the context is of its use.
8     Q     So, the distinction between the,
9 quote, collateral values of September 17th and
10 realizable value, are you saying that it's
11 possible that that is explained by the need to
12 make the liquidity adjustment?
13          MR. DAKIS:  Objection to form,
14     mischaracterizes testimony.
15     Q     That's a question.
16     A     I understood.
17          It is possible the difference between
18 collateral value and realizable value requires the
19 adjustment for a liquidity discount or a haircut.
20 It's not necessarily just liquidity that was in
21 those, in these adjustment factors.  It's, you
22 know, they -- Barclays uses liquidity adjustment
23 or liquidity factor or liquidity haircut in a very
24 broad sense.  It's an adjustment of a price to get
25 to what they think is an exit value.

Page 149

1          M. Zmijewski
2     Q     So you don't think this information
3 is going to change your opinion?
4          MR. TAMBE:  Objection, asked and
5     answered.
6          MR. DAKIS:  Same objection.
7          MS. TABATABAI:  Same objection.
8     A     I don't -- I don't think I said that.
9 What I said is this, on the face of it, as I sit
10 here and read it, doesn't change my opinion.
11     Q     Do you think it's also -- strike
12 that.
13          If the point being made here were
14 that the collateral value of marks as of
15 September 17th were either stale or unreliable
16 because they are too difficult to value, would
17 that cause you to change the way you calculated
18 the value of the JPM inventory as of
19 September 19th?
20          MR. TAMBE:  Objection to the form of
21     the question.
22          MR. DAKIS:  Same objection.
23     A     This is a hypothetical?
24     Q     That's correct.
25     A     Hypothetically, if the interpretation

Page 150

M. Zmijewski

1  M. Zmijewski
2  of this document is that the values in the JPM
3  inventory on September 17th are inappropriate,
4  unreasonable -- I forgot what terms you used --
5  then would that change my opinion, the answer is,
6  well, yes. I would have to understand why they
7  are inappropriate, and how I can adjust it to make
8  them appropriate, and I would naturally adjust my
9  numbers accordingly so that they are appropriate.
10  Q    Let me go ahead and show you another
11  document we will mark as Exhibit -- it's been
12  previously marked -- strike that.
13  Let me show you a document that's
14  been previously marked as Exhibit 571. This is
15  another e-mail from JPM's counsel concerning the
16  settlement that involved the JPM inventory that
17  you presented calculations of.
18  And you see in the first sentence, it
19  says: "In accordance with your request, attached
20  is the spreadsheet showing, A, the collateral
21  value as of September 17th of the settlement
22  consideration, Fed portfolio securities, which are
23  the securities to be delivered to BarCap under the
24  proposed settlement agreement, and B, JPMorgan's
25  estimate of market value as of November 3."

Page 151

M. Zmijewski

1  M. Zmijewski
2  Do you see that?
3  A    Yes.
4  Q    And do you understand this to be
5  referring to the same universe of securities that
6  you valued as part of your expert report?
7  MR. TAMBE: Objection to the form of
8  the question.
9  MR. DAKIS: Same objection.
10  MS. TABATABAI: Same objection.
11  A    It appears to be, yes.
12  Q    Do you see that JPMorgan is careful
13  to use the term "collateral value," which it puts
14  in quotes, as something different than market
15  value?
16  MR. TAMBE: Objection to the form of
17  the question.
18  MR. DAKIS: Objection.
19  A    I see that they are different.
20  Q    And is that a surprise to you, that
21  the collateral value mark is not considered by JPM
22  to be the market value necessarily?
23  A    I see they are not using it in the
24  same way. And -- you know, they used "collateral
25  value" in a different context. Again, they repeat

Page 152

M. Zmijewski

1  M. Zmijewski
2  in the second paragraph, collateral value may not
3  be a reliable indicator of realizable value.
4  So we would have to know more about
5  how they define the term "collateral value,"
6  "realizable value," to really understand this
7  document, and how it differs from market value.
8  Q    Do you think that reliability of the
9  collateral value could be impacted by the fact
10  that Lehman is being bankrupt that week and the
11  incredible tumultuousness in the market that week,
12  and the fact that you are dealing with illiquid
13  securities?
14  MR. TAMBE: Objection to the form of
15  the question.
16  MR. DAKIS: Same objection.
17  MS. TABATABAI: Object to the form.
18  A    Just the first phrase, if you could
19  repeat it back.
20  Q    Sure.
21  Do you think that the reliability of
22  the collateral value could be impacted by the fact
23  that Lehman had just gone into bankruptcy, and the
24  incredible tumultuous times of the markets, and
25  the fact that there were relatively illiquid

Page 153

M. Zmijewski

1  M. Zmijewski
2  securities in those -- in that collection?
3  MR. TAMBE: Same objection.
4  MR. DAKIS: Same objection.
5  MS. TABATABAI: Same objection.
6  A    We know -- let me define what I am
7  going to use as my view of what reliability is in
8  this context, and that is, you have an estimate or
9  an assessment of price, and the question is, well,
10  what is your distribution of prices?
11  I don't know if you understand what I
12  mean. It's not as if, when you calculate a price,
13  there is the price. There is a distribution with
14  a central tendency, and typically we think that is
15  the appropriate price.
16  We know that during this time, the
17  distribution widened greatly on all securities.
18  It was a much more volatile market, so we know
19  that any assessment of value had a wider
20  distribution. So you can could say, well, if you
21  want to discuss in probability terms what the
22  likelihood is of a certain price, things change
23  during that period. Does that mean that the point
24  estimate is not a point estimate? Is it biased?
25  Is it inaccurate, and, you know, biased in some

Page 154

M. Zmijewski

1  way?
2          There is no evidence at that point in
3  time to think that any price estimate was a biased
4  estimate. It certainly would have a different
5  assessment of what the distribution is. That is
6  true of all of the prices during that period of
7  time.
8      Q    What do you mean by biased?
9      A    If there is a concept of -- if you
10  use a model that is either on average too high or
11  on average too low relative to what the actual
12  market value will be.
13      Q    Have you done anything to quantify
14  the degree of uncertainty surrounding any of the
15  marks you estimated in your work on this case?
16      A    No.
17      Q    Are you familiar with the concept of
18  confidence interval?
19      A    Of course.
20      Q    Can you quantify a 95 percent
21  confidence interval around your estimate?
22      A    I can -- I cannot, and that is --
23  this concept of a confidence interval, that is
24  essentially the same concept I was talking about

Page 155

M. Zmijewski

1  earlier, when I was talking about the distribution
2  of security prices widening, so we know the
3  confidence interval widens during this time. It
4  doesn't mean that it was biased. We just know
5  that it was widened at this time.
6      Q    Do you know how much it was widened
7  by?
8      A    I do not know.
9      Q    Looking back at 571, the last
10  sentence of the first paragraph says: "You will
11  note that there are a number of securities for
12  which JPMorgan did not provide such an estimate,
13  because there is insufficient information on which
14  it can base an estimate."
15          Was it difficult to value some of
16  these securities that were being conveyed to
17  Barclays?
18      A    These securities meaning these
19  particular securities in this inventory, or are
20  they just the sale transaction?
21      Q    I will say sale transaction
22  generally.
23      A    Of course.
24      Q    And in the -- these securities here

Page 156

M. Zmijewski

1  in particular, the JPM inventory securities for
2  which you provided a calculated value.
3      A    Well, as it states, there are a
4  number of securities. Is that the overwhelming
5  part of the market value? The answer is no. But
6  is there a part of the securities that were,
7  Professor Plfeiderer used the word "esoteric"?
8  The answer is yes.
9      Q    If you would turn to the first page
10  of the attachment, of Exhibit 571, and on the left
11  side, do you see as -- three columns under "Marked
12  by JPM"?
13      A    I see that.
14      Q    And do you see the middle column that
15  says "CV Remaining"?
16      A    Yes.
17      Q    And you understand that to be
18  referring to the collateral value remaining as
19  referred to in the attached e-mail?
20      MR. TAMBE: Object to the form of the
21  question.
22      MR. DAKIS: Same objection.
23      MS. TABATABAI: Same objection.
24      A    It says collateral value, yes.

Page 157

M. Zmijewski

1      Q    Fair enough.
2          Then you have eleven three JPM value.
3  Do you see that?
4      A    Yes.
5      Q    And you see the collateral value is
6  5.4 billion?
7      A    I see that.
8      Q    And you see the JPM value, which
9  is -- you understand the JPM value to be the
10  market value placed upon those by JPM?
11      A    Yes.
12      MR. TAMBE: Objection to form of the
13  question.
14      MR. DAKIS: Same objection.
15      MS. TABATABAI: Same objection.
16      Q    And do you see there that total value
17  being marked at 2.8 billion?
18      A    Yes.
19      Q    Now, the difference between 5.4 and
20  2.8 billion can't be explained by any liquidity
21  adjustment, can it?
22      MR. DAKIS: Objection to form.
23      MS. TABATABAI: Objection to form.
24      A    Of course not, but it can be

Page 158

1          M. Zmijewski
2  explained by September 17th versus November 3rd.
3  Different pricing dates.
4      Q    Have you done that analysis for these
5  securities?
6      A    I haven't.
7      Q    Do you have an opinion as to whether
8  or not the $5.4 billion, the $2.8 billion, is the
9  function of the time passage between
10  September 17th and November 3rd?
11     A    I don't have an opinion.  I didn't
12  state an opinion.  I just stated that they are at
13  different dates, and therefore there is not just
14  one factor that explains the difference in value.
15     Q    Could another factor be the
16  collateral value figures were completely
17  unreliable to begin with?
18         MR. DAKIS:  Objection to form.
19     A    That is a potential explanation.  Of
20  course that is a conjecture.  Of course it's a
21  possible conjecture.
22     Q    Just like the other examples you have
23  between change in value from September to
24  November, that is just possible conjecture also;
25  right?

Page 159

1          M. Zmijewski
2      A    No, I don't think so.  We know that
3  market prices were changing during this period,
4  so -- I don't recall the record, but if you look
5  in the record, I think the market prices were
6  going down during this period.
7      Q    Do you agree that this may be
8  evidence that the collateral values JPMorgan had
9  as of September 17th were not reliable as market
10  values?
11         MR. TAMBE:  Objection to the form of
12  the question.
13         MR. DAKIS:  Same objection.
14         MS. TABATABAI:  Same objection.
15     A    This is evidence that the
16  November 3rd market values differ from the
17  September 17th collateral values.  That is what it
18  is evidence of.
19     Q    One possible explanation is that the
20  collateral values as of September 17th were not
21  accurate or reliable as market values; right?
22         MR. DAKIS:  Objection to the form.
23         MR. TAMBE:  Objection to the form.
24     A    Assuming that prices -- that the
25  underlying value did not change between

Page 160

1          M. Zmijewski
2  September 17th and November 3rd, the answer is
3  yes.
4      Q    And assuming the underlying prices
5  didn't go down by 50 percent, the answer is yes;
6  right?
7         MR. TAMBE:  Object to the form of the
8  question.
9         MR. DAKIS:  Objection to the form.
10     A    No.  I think my previous qualifier is
11  the correct qualifier.  Assuming the price of
12  these securities didn't change between
13  September 17th and November 3rd, then the answer
14  to your question would be yes.
15     Q    What if the prices went down by
16  20 percent, would it also call in -- still call
17  into question the accuracy of the collateral value
18  marks as of September 17th?
19         MR. TAMBE:  Object to the form of the
20  question.
21         MR. DAKIS:  Same objection.
22         MS. TABATABAI:  Same objection.
23     A    If we assumed we knew truth and we
24  knew the market value decreased between that
25  period, then we could calculate what the market

Page 161

1          M. Zmijewski
2  value was on September 17th.
3         This is all hypothetical.  We don't
4  have those facts, and so it's conjecture and
5  hypothetical questions.
6      Q    You haven't explored the reason why
7  JPM's market value is half of what their
8  collateral value on the 17th was; correct?
9         MR. TAMBE:  Objection to the form of
10  the question.
11         MR. DAKIS:  Same objection.
12         MS. TABATABAI:  Objection.
13     A    Why JPMorgan -- just to be specific,
14  why JPMorgan's November 3rd value -- I have not
15  explored why their November 3rd value differs from
16  the JPM marks on the 17th of September.  I have
17  not explored that.
18     Q    Let's turn to your OCC adjustment at
19  paragraph 24, please.  And can you describe again
20  why you made this adjustment?
21     A    Yes.  Footnote 44 explains it, that
22  there was -- in the calculation, as you go --
23  refer to the document in footnote 44, the first
24  document you will see there is a September 22
25  value and a September 19th value for the two

Page 162

1         M. Zmijewski
2    different positions that compose -- the two
3    different components or positions that compose
4    this asset, and I was provided a database, which I
5    assume came from Barclays, that allowed me to
6    recalculate the difference between the 19th value,
7    September 19th value and the September 22nd value,
8    for that one component that was measured as of
9    September 22nd. I adjusted that value and the
10   difference is 103 million. So, in short --
11        Q     And did you use Barclays' marks for
12   purposes of this, that you just used their 9/19
13   marks instead of the 9/22 marks?
14        A     Correct. If you see in the fourth
15   line of that footnote, the database from which I
16   was able to calculate those numbers is indicated
17   in that citation. That is a Barclays database.
18        Q     Did you independently value any of
19   those assets?
20        A     I did not.
21        Q     And why did you use the value on the
22   19th instead of the 22nd?
23        MR. TAMBE: Objection, asked and
24   answered.
25        MS. TABATABAI: Same objection.

Page 163

1         M. Zmijewski
2        MR. DAKIS: Same objection.
3        A     For all the, for all the reasons that
4    I explained earlier, with respect to the date.
5    These were prices as of the closing date on the
6    19th, rather than the closing date on the 22nd.
7        Q     I'm sorry, when you say that the
8    closing -- the prices, which prices are you
9    referring to when you say --
10        A     The mid value in this calculation,
11   that is shown in the exhibit in the first lines
12   leading over to the second line, the value in that
13   exhibit is on September 22nd, is based on
14   September 22nd close of market prices.
15        And if you recalculate -- I did
16   recalculate that number for September 7 -- 19th,
17   excuse me, using the database that is on the
18   fourth line, Barclays' database, and the
19   difference between the value on September 22nd
20   versus the value on September 19th, again, all
21   using Barclays data, is 103 million.
22        Q     The reason -- the reason you wanted
23   to use the 19th instead of the 22nd, is that what
24   you have said before, you thought the 19th was a
25   better indicator?

Page 164

1         M. Zmijewski
2        A     Correct.
3        Q     And that is true of all assets in the
4    sale transaction?
5        A     All of my work. With respect to
6    anything that related to valuation on the 19th, as
7    I said before, means that it's the most
8    appropriate price that we have and reasonably
9    accurate for using a value -- for a value as of
10   September 22nd, 12:01 a.m.
11        Q     When you say, "I have adjusted the
12   mid value to September 19th using the associated
13   native file," how exactly did you do that?
14        A     It's a database that has both the
15   22nd -- it appears that Barclays was looking at
16   both the 19th and the 22nd, so many of its
17   databases have prices on the 19th or values on the
18   19th and values on the 22nd. So I merely
19   calculated the value on the 22nd, to calculate the
20   value on the 19th, from its own database, and took
21   the difference in the two numbers.
22        Q     And again, you think in this
23   situation also, as in other situations, you think
24   the best estimate of value, market value for those
25   assets as of 12:01 on September 22nd, is not

Page 165

1         M. Zmijewski
2    September 22nd, but on September 19th; correct?
3        A     Is not the closing price on
4    September 22nd, but the closing price on
5    September 19th; correct.
6        Q     At the end of that footnote 44, you
7    say, "I determined they reflect the balance on
8    9/19/08 by reviewing an e-mail dated
9    9/21 attaching a 9/18 OCC statement detailing cash
10   of 1 billion something, letters of credit of
11   250 million, and Treasuries with a market value of
12   almost a billion, for a total balance of just over
13   2.3 billion."
14        A     Yes.
15        Q     What is your point of that statement?
16        A     On the balance sheet they show an
17   asset and liability position, and they take the
18   net of that, and that is what they eventually
19   present in the balance sheet. I am merely stating
20   how I adjusted the liability position, how I
21   checked the asset position, and I made no change
22   to the asset position.
23        The last part of that, which is what
24   was just read, is the asset position, that I
25   looked at it, I verified it, it seems to be

Page 166

1          M. Zmijewski
2     correct based on the OCC statement.
3          And there is a typo here.  The typo,
4     there's in the third line from the bottom, to the
5     last date to the right, that should be "9/19/08
6     OCC statement."
7          That last sentence merely says that I
8     reviewed the asset valuation, and agree with it.
9          Q     Okay.  That is the only significance
10    to the last sentence for purposes of your opinion?
11         A     That is all it says.
12         Q     Maybe I got this wrong, but there
13    was -- were you suggesting that there was a
14    mismatch in the numbers that Barclays used between
15    the 22nd and the 19th?
16         A     Not related to these assets, only
17    related to the liabilities, which is the first
18    part of the calculation.
19         Q     Okay.  Let's turn to I guess your
20    opinion two, and your discussion of what was
21    represented to the Court.
22         Briefly, before we do that, let's go
23    back and just look at your, quote, windfall,
24    unquote, calculation chart, Exhibit B-1.  And
25    actually, before we get into what was described to

Page 167

1          M. Zmijewski
2     the Court, that 2.085 number, can you tell me what
3     that is?
4          A     Yes.  That is the non-financial
5     assets from the opening balance sheet, Barclays'
6     opening balance sheet.
7          Q     How did you calculate that number?
8          A     I took the number right off of
9     Barclays' opening balance sheet.
10         Q     When you say opening balance sheet,
11    are you talking about a particular document?
12         A     It's 88-B, and also -- is it 366-A?
13    Is that the number?  I don't know.  Let me go back
14    to footnote five.  88-B, 377-A.
15         Q     Let me show you a document previously
16    marked as 377-A.
17         A     Thank you.
18         Q     Is that the document that you got the
19    2.085 off of?
20         A     Yes.  You can calculate it from here.
21         Q     Can you show me how you calculate it?
22         A     I am trying to get this in focus.
23    Sorry.  It's small print.
24         It would be the subsidiaries
25    overseas.  I believe this is correct.  Let me

Page 168

1          M. Zmijewski
2     just -- intangibles.  Let's take the big piece.
3     The intangibles, which is line 26, or row 26,
4     1.45.  I am sorry, this is on the second page, 44.
5     The last two digits in the Bates number, 44, row
6     26, intangibles, 1.45.
7          Row 28, fixtures, .53.
8          Row 27, prepayments, deposits, .07.
9          And line 23, subsidiaries.
10         I believe that adds up to
11    two-point -- maybe not.  Does that add up?
12    What else is there?  And there aren't as
13    many significant digits here.  I believe if
14    you go to the other exhibit, 88-B, it has --
15    which is a spreadsheet, where you can
16    actually get all the detail
17         Q     And what types of -- can you describe
18    what types of things are intangible assets or
19    operating leases, row 26?
20         A     I would have to go back to Barclays'
21    documents to remember all the intangible assets.
22    There were customer lists.  I don't remember the
23    other intangible -- maybe there was some branding,
24    operating leases, leases of certain -- I don't
25    recall.  Maybe it's software.  I don't remember

Page 169

1          M. Zmijewski
2     the details.  I would have to go back to Barclays.
3          Q     Let me show you a document previously
4     marked as Exhibit 1.
5          A     I don't think I have seen this.
6     Where it all began.  Oh, did I see this?  This is
7     the asset purchase agreement.  Of course.
8          Q     So you have seen and reviewed this
9     document before?
10         A     Of course, yes.
11         Q     Will you describe what it is, please?
12         A     It's the asset purchase agreement,
13    dated September 16th, 2008, for the sales
14    transaction between Lehman and Barclays.
15         Q     And for good measure, let me just
16    also show you what has been previously marked as
17    Exhibit 24.  Do you recognize that document,
18    Exhibit 24?
19         A     Yes.
20         Q     Can you describe what it is, please?
21         A     It's the first amendment to the asset
22    purchase agreement, which is Exhibit 1.
23         Q     And let me show you a document
24    previously marked as Exhibit 25.  And do you
25    recognize Exhibit 25?

Page 170

1          M. Zmijewski
2     A     Yes.  This was a letter from Barclays
3  to Lehman, concerning the asset purchase agreement
4  in Exhibit 1, and the first amendment in Exhibit
5  2, or 24 rather.
6     Q     And do you understand this agreement
7  to modify or amend the asset purchase agreement?
8          MR. TAMBE:  Objection to the form of
9     the question.
10         MR. DAKIS:  Same objection.
11         MS. TABATABAI:  Same objection.
12    A     That is what it says it amends.  It
13  says that, okay.  I don't know if it -- if it
14  actually amended it or clarified.  I remember
15  clarified was used.  Both words are used in this
16  instance, clarifies and amends.
17    Q     You understand these three documents,
18  Exhibits 1, 24, and 25, the original APA, the
19  first amendment and the clarification letter, to
20  comprise the purchase agreement that the parties
21  entered?
22    A     In combination, it's the purchase
23  agreement that the parties signed.  I don't
24  believe it was the -- what the -- sale
25  transaction that was approved by the Court, but it

Page 171

1  is what the parties signed.
2     Q     Is there some other agreement between
3  the parties relating to the sale that comprises
4  the parties' agreement governing the sales
5  transaction other these three documents?
6     A     Not to the best of my knowledge, but
7  it's my understanding that the Court did not
8  approve this, all these documents, as part of the
9  sale transaction.
10    Q     When you talk about the sale
11  transaction that was approved, what agreement
12  between the parties are you referring to?
13    A     Well, it would be the agreement that
14  was approved, the nature of the agreement that was
15  approved by the Court.  That is my understanding
16  of the issue in this matter.
17    Q     So, what would be the actual
18  agreement?
19    A     I am not a lawyer.  I don't know.  I
20  don't know if the parties agreed to something
21  different than what the Court approved.  I don't
22  know the answer to your question in that
23  situation.
24         I am sure the Court's -- that is

Page 172

1          M. Zmijewski
2  something the Court has to figure out, I guess.  I
3  don't know.  You are pulling me into your area.  I
4  am getting uncomfortable.  I am not a lawyer.
5     Q     Well, there are statements about the
6  sales transaction, what was represented to the
7  court, and it's part of your baseline analysis,
8  right, what, what the agreement was between the
9  parties?
10         MR. TAMBE:  Objection.
11    Q     And on which you calculated windfall?
12         MR. TAMBE:  Objection to the form of
13     the question.
14         MR. DAKIS:  Objection.
15         MS. TABATABAI:  Same objection.
16    A     You said based on.  That is a
17  reasonable word.  I would call it a benchmark, and
18  that comes from Mr. Golden.
19    Q     Let's start with -- look at the
20  definition of -- well, let me ask you this:
21  Does -- do you have any idea what the terms of
22  this sale transaction that you deemed to be
23  approved by the Court are?
24    A     By terms, you mean terms in a
25  contract?

Page 173

1          M. Zmijewski
2     Q     Sure.
3     A     The only documents I have read are
4  the documents that -- with respect to this
5  transaction, are the documents that you handed me
6  with respect to the asset purchase agreement.
7  These are the three transactions, or three
8  documents that I am aware of with respect to the
9  asset purchase agreement.
10         That is different from, based on my
11  understanding from counsel, my understanding from
12  Mr. Golden's report, also from my understanding
13  just reading the record, that the Court didn't
14  necessarily approve all of these, all of these
15  documents.
16    Q     Did he tell you whether the Court
17  approved some other agreement between the parties,
18  or is it just that the Court didn't approve any
19  agreement?
20         MR. TAMBE:  Objection to the form.
21         MR. DAKIS:  Same objection.
22         MS. TABATABAI:  Objection.
23    A     I don't know the answer to the
24  question.
25    Q     So, for example, in paragraph 47 of

Page 174

1           M. Zmijewski
2   your report, when you say in the context of
3   criticizing Mr. Plfeiderer, in terms of his
4   analysis of the sale transaction, you say: "The
5   sale transaction approved by the Court was based
6   on certain representations of value for the asset
7   being purchased and the liabilities being
8   assumed."
9           And I just want to confirm when you
10  reference the sale transaction approved by the
11  Court, you have no idea what agreement that might
12  be referring to?
13          MR. TAMBE:  Objection to the form of
14      the question.
15          MR. DAKIS:  Same objection.
16          MS. TABATABAI:  Same objection.
17      A    I don't know what the Court --
18  specifically what the Court approved, what
19  documents the Court had in mind when it approved.
20          What the movants are claiming is that
21  these documents are not the documents that the
22  Court approved or the Court wasn't aware of the
23  information in these documents and was
24  inadvertently or intentionally or for whatever
25  reason not provided all the information that was

Page 175

1           M. Zmijewski
2   appropriate to represent to the Court what was
3   actually going to happen based on these documents.
4   That is my understanding of their claim.
5       Q    Looking at the APA, Exhibit 1,
6   definition of purchased assets, please.
7           Have you found that section yet?
8       A    Page six.
9       Q    And do you see there is a list of
10  different assets there?
11      A    I do.
12      Q    And are some of the assets that you
13  included in your 2.085 figure and in your Barclays
14  windfall calculation, are they defined as
15  purchased assets here?
16          MR. DAKIS:  Objection to the form of
17      the question.
18      A    Yes, yes.
19      Q    Are they all -- are they all
20  purchased assets?
21      A    I believe so.  I have no reason to
22  doubt that.
23      Q    So from the beginning, what is in
24  your 2.085 were assets that Barclays was acquiring
25  as part of the sales transaction; correct?

Page 176

1           M. Zmijewski
2           MR. DAKIS:  Objection to the form of
3       the question.
4       A    Yes.
5       Q    Do you have any reason to believe
6   that that changed at some point during the week,
7   that they were excluded from being assets
8   conveyed?
9           MR. TAMBE:  Objection to the form of
10      the question.
11          MR. DAKIS:  Same objection.
12          MS. TABATABAI:  Same objection.
13      A    Not to the best of my knowledge.
14      Q    Then why do you add them to your
15  calculation of a Barclays windfall?
16      A    If I may take it just a step back to
17  give you the big picture of this calculation, the
18  calculation is, here is Barclays' purchased assets
19  with a certain value, and those assets, if you add
20  them all up, add to $58.2 billion.
21          That is what they received in value
22  of the assets.  So that this is the adjusted total
23  assets acquired.  Do you see that?
24      Q    Yes.
25      A    So that's what they received.

Page 177

1           M. Zmijewski
2           What consideration did they pay?
3   Well, that is the liabilities and opening balance
4   sheet, adjusted comp and so forth, so they
5   actually in essence, because of assumption of
6   liabilities and cash payments, paid 47.03 billion.
7   The difference between those two is the gain.
8   They bought assets valued at 58, roughly
9   58 billion, paid 47 billion for them.  Well, that
10  means you have a gain of $11 billion.  That is
11  what this calculation is.
12          So the assets at the top include all
13  the assets they received plus assets that they are
14  claiming to have a right to but have not yet
15  received.  That is the 775.  So that is the top
16  part of this.
17          So all the assets, it's not as if
18  these assets shouldn't have been received.  That's
19  a different issue.  This is what they received and
20  that is the calculation.  What did they receive,
21  what is the value of it.  What did they pay, what
22  is the amount.
23          The difference is either a gain or a
24  loss, and in this case it's an $11 billion gain.
25          What did the Court approve?  The

Page 178

M. Zmijewski

1   M. Zmijewski
2   Court approved a net transfer to Lehman of 1.85.
3   Therefore, they benefited by, Barclays benefited
4   by 11. Lehman should have benefited by 1.85.
5   Therefore, the delta between the benchmark,
6   Mr. Golden's number, and what they actually
7   received is $13 billion. That is the big picture
8   of that calculation.
9       Q      The net transaction value, the 1.850.
10      A      Yes.
11      Q      Let me understand it. Your
12  understanding was that it was judicially mandated
13  that Barclays have a loss of $1.8 billion in the
14  deal?
15            MR. DAKIS: Objection to the form.
16            MR. TAMBE: Objection to the form.
17            MR. THOMAS: For the record, every
18  counsel laughed here at the table.
19            MR. DAKIS: I don't think I was
20  laughing, but I did object to your question.
21      A      I thought it was funny.
22      Q      The witness laughed.
23      A      And I will tell you why I thought it
24  was funny, because as a professor, it's a
25  mischaracterization. This isn't a gain or a loss,

Page 179

1   when you buy an asset. What this is is, when you
2   buy an asset and you pay just -- let's say you buy
3   a business, Professor Plfeiderer gives examples of
4   buying a business. If you buy a business and you
5   look at the assets and you look at -- let's just
6   assume it's simple.
7            Here is a piece of a building, that
8   is an office building, and you have a company in
9   this office building, but the only asset you
10  really have is the office building. The office
11  building has an appraised value of $100. You pay
12  $150 for it. Did you incur a loss? No, that is
13  not a loss. You paid $150. Why? Because the
14  value of these assets was $100, but you also
15  bought an ongoing business and you were willing to
16  pay more for it, because you had an ongoing
17  business, and that is called goodwill.
18            Accountants don't call that a loss.
19  If that was the case, I don't know what percent of
20  the mergers, but most of the mergers in the U.S.
21  would be loss situations. That is goodwill
22  because you are willing to pay more than the
23  appraised value of the individual assets, because
24  there is an ongoing business.

Page 180

1   M. Zmijewski
2            That would have been called goodwill.
3   It would have been put on Barclays' balance sheet
4   as goodwill, an asset. It wouldn't have been a
5   loss.
6       Q      So you think, excluding goodwill, it
7   was judicially mandated that assets -- liabilities
8   had to exceed assets by $1.8 billion?
9            MR. DAKIS: Objection to form.
10           MS. TABATABAI: Objection to form.
11           MR. TAMBE: Same objection.
12      A      That is not my opinion. I don't know
13  if Mr. Golden would agree with that
14  characterization of his opinion, but the
15  $1.85 billion would indicate that the value of the
16  assets minus the consideration, cash paid, plus
17  the value of the assumed liabilities, would have
18  been a negative $1.85 billion, and would have
19  resulted in that much benefit to Lehman's estate,
20  and that much goodwill put on the books of
21  Barclays. That is what the 1.85 billion means.
22      Q      Now, if the goodwill amount was
23  identified to be 250 million, right, then most, at
24  least most of that 1.850 would be loss; right?
25           MR. TAMBE: Objection to the form of

Page 181

1   M. Zmijewski
2   the question.
3            MR. DAKIS: Same objection.
4       A      Well, if the Court declared that the
5   approved transaction should have a $250 million
6   positive goodwill, which means that the value of
7   the assets minus the value of the consideration is
8   250 million, then that that number I would have
9   used there would be minus .25.
10      Q      So, the difference between assets and
11  liabilities is measured by goodwill?
12      A      The net -- the fair value of the
13  assets minus the fair value of the consideration,
14  cash plus liabilities, is equal to goodwill.
15  Either positive or negative. If it's positive,
16  it's put on the balance sheet as an asset. If
17  it's negative, which it was for Barclays in this
18  case, it is viewed as a gain, an immediate gain,
19  and flows into the shareholder's equity on the
20  equity side of the balance sheet.
21      Q      Now, is the 1.850 calculated?
22      A      That comes from Mr. Golden's report,
23  and you would have to read his report. It's
24  entirely his analysis.
25      Q      Have you read his report?

Page 182

M. Zmijewski

1    M. Zmijewski
2    A    Yes.
3    Q    And just on your knowledge, you talk
4    about amounts that he's represented to the Court
5    and so forth, can you tell me just roughly how you
6    get to assets being 1.85 billion less than
7    liabilities?
8    A    He has a schedule.  I don't remember
9    which table it is in his report, but he has a
10   schedule where he calculates based on his reading
11   of the record what all the assets are, and what
12   the consideration should be, and the delta, the
13   difference between those numbers is minus 1.85
14   negative.
15       It's a schedule right out of his
16   report.
17   Q    Being more specific, can you recall
18   what the liabilities were, for example?
19   A    I don't remember how he calculated
20   his number in that level of detail.  But it's well
21   specified in -- I don't know if it's the first
22   exhibit, but in his exhibit.
23   Q    I am just going to show you briefly
24   page seven of his report.
25   A    Sure.

Page 183

M. Zmijewski

1    M. Zmijewski
2    Q    Does that look like --
3    A    May I just take a quick look?
4    Q    Sure.
5    A    Yes.
6    Q    I will take it back.
7        Is that what you're referring to?
8    A    Yes.  You can see the 1.85 in the
9    bottom left-hand side.
10   Q    And conceptually, is it your
11   understanding -- how did he go about calculating
12   these?  Is this based upon particular values that
13   were mentioned in court?
14   A    Based on my reading of -- you should
15   ask him, of course.  Based on my reading of his
16   report, he looked at the court record and the
17   documents from the court record, and calculated
18   his understanding of what the court-approved
19   transaction was valued at.
20   Q    And is it your belief that on the
21   list of purchased assets there, any asset for
22   which a particular value was not mentioned has to
23   be excluded from the 1.85 calculation?
24   A    I'm sorry, I don't understand your
25   question.

Page 184

M. Zmijewski

1    M. Zmijewski
2    Q    Do you have any understanding of --
3    of what he included in -- he comes up with a
4    number, which supposedly is, is the amount of
5    assets Barclays was going to get pursuant to an
6    unidentifiable court-approved agreement, and a
7    number of liabilities that it was going to pay.
8    Is that right?
9        MR. TAMBE:  Objection to the form.
10   A    Correct.
11   Q    The asset side of the number, when he
12   comes up with the assets that Barclays was
13   supposed to get, is it your understanding that he
14   only added up -- strike that.
15       Is it your understanding that his
16   addition of all of the assets that
17   Barclays was to get pursuant to the APA, the
18   definition of purchased assets?
19   A    I am trying to -- I don't recall.
20   Sorry.  I would have to go back and read his
21   report again.
22   Q    I will make some copies of that and
23   we will work through it a little bit.
24   A    Okay.  It would be helpful to have
25   his whole report so I could read it, because

Page 185

M. Zmijewski

1    M. Zmijewski
2    that --
3    Q    Well, I think I am just going to ask
4    you based on this chart that he's copying.
5    A    The chart.
6    Q    You read his report; right?  You rely
7    on the report.  You are familiar with it.
8    A    I read his report several weeks ago.
9    Q    And you rely on the 1.8?
10   A    I do rely on the 1.85.  But that
11   doesn't mean that I could answer questions, closed
12   book questions.  I understand that you like those
13   tests, but --
14   Q    Actually, I have let you go through
15   your report on most of this.
16   A    That's true.
17   Q    It's just for shortening the process.
18   A    I appreciate that.
19   Q    If I lay out the questions to you and
20   you still want to see other parts of his report,
21   we will get you his report.
22   A    Okay.
23   Q    We will have to take a break and get
24   it.
25   A    I appreciate it.

Page 186

M. Zmijewski

1
2    Q    Let me ask you a question just
3    briefly.  Keep that there because we are going to
4    go back to it.
5    Turning back to the JPM settlement
6    and how to value what Barclays got from the sales
7    transaction with respect to those assets, if, as
8    part of the settlement agreement, in December of
9    2008, if instead of the JPM securities Barclays
10    had received some other unrelated securities, from
11    IBM, IBM securities, as a part of the settlement
12    agreement in court, okay, and those securities are
13    worth at the time of the settlement $3 billion.
14    At the time of the settlement, let's
15    say those securities were worth $20 billion.  At
16    the time -- excuse me.  At the time of closing,
17    let's say they were worth $20 billion, those same
18    IBM securities.
19    How would you then value what
20    Barclays got as far as the sales transaction?
21    Would you say they got $20 billion in assets
22    because those securities were worth $20 billion on
23    September 22nd, or would you value them at
24    $3 billion or what?
25    A    None of the above.

Page 187

M. Zmijewski

1
2    Q    What would you do?
3    A    It goes back to what I said before.
4    There is, as of the closing date -- it's a
5    hypothetical; right?  This is a hypothetical, of
6    course.  It's a good hypothetical.
7    But the issue isn't about what they
8    received in December and what the value of what
9    they received in December was, in some other date,
10    the 19th of September.  What is at issue here is
11    what the claim as of 12:01 a.m., on
12    September 22nd, what is the claim, what is the
13    value of that claim.  Because that is the value of
14    what they received at the closing date.  And that
15    is what I am attempting to value.
16    So if it was worth 20 billion, that's
17    irrelevant.  If it's worth 3 billion, it's
18    irrelevant.  Because it's not the same security,
19    it's not the same claim.  It was settled.  The
20    issue is what is the expected value of the claim
21    on -- as of 12:01 a.m. September 22nd.
22    Q    And your answer is the expected value
23    of the claim was 100 percent of the fair market
24    value of those JPM securities as of
25    September 19th; is that correct?

Page 188

M. Zmijewski

1
2    A    They -- no, it's not correct, because
3    there is also this 1.25 billion cash component.
4    So if you add the 1.25 billion, yes, that is
5    different.  So it's that cash component plus the
6    securities.
7    Q    Okay.  All right.  Let me show you
8    the chart that you have referred to.
9    A    Did you want to mark this?
10    Q    Yes.  That is a good catch.  You have
11    probably done more depositions than I have.  You
12    are really good at this.
13    708B.  Thank you.
14    (Exhibit 708B marked for
15    identification as of this date.)
16
17    A    You know, the first person I was ever
18    deposed -- not deposed by, cross-examined by, was
19    your partner, Mr. Boies.
20    Q    Really?
21    A    That was the start of my career,
22    1989.
23    Q    What was case was that?
24    A    United Airlines, that was being sued
25    by the other airlines for reservation systems.

Page 189

M. Zmijewski

1
2    That is for the reservation systems.  That's in
3    the late 1980s.
4    Q    What is the reservation --
5    A    Sabre.
6    Q    That was American's.  United was --
7    A    Not Worldspan.
8    Q    No.  Acobia or something.  But
9    anyway, it was about the airlines --
10    A    I did the Worldspan --
11    Q    Oh, did you?
12    A    -- three years, several years later.
13    Q    I worked with him a couple years
14    later on the Continental Northwest.  So we were on
15    the same side on that one.
16    A    Good.
17    No trick questions here.  I just
18    wanted to understand.  I mean, this is the chart
19    you referred to.
20    MR. TAMBE:  Note all the counsel is
21    chuckling now.
22    A    We take you at your word.
23    Q    You see the 1.85.
24    A    That is Mr. Golden's number.  That is
25    the number that I use in my analysis.

Page 190

1          M. Zmijewski
2     Q     And you see that he is adding up
3  certain assets, okay.
4     A     Yes.
5     Q     In the left column.  And do you
6  understand him to be saying that those are the
7  assets that Barclays was supposed to get as part
8  of what is called the court-approved sales
9  transaction?
10    A     Yes.
11    Q     Okay.  And let me go ahead and -- I
12 have seen some reference in your report to the
13 hearing transcripts, that you reviewed the hearing
14 transcripts.
15    A     Yes.
16    Q     You reviewed the hearing transcripts
17 of the sale transaction.
18          Let me show you what has been
19 previously marked as Exhibit 442.  And I am not
20 going to ask you to read that whole thing.
21    A     Thank you.
22    Q     But do you recognize it generally as
23 the --
24    A     Yes.
25    Q     -- September 19 sale hearing

Page 191

1          M. Zmijewski
2  transcript?
3     A     I do.
4     Q     Okay.  Have you read this whole
5  thing?
6     A     Yes.  The first thing that I have
7  done, or I did, was go through the motions, 60(b)
8  motions, and then we had these documents because
9  they were public, so very early when I read this.
10    Q     Okay.  And if you would turn to
11 page 47, please.
12    A     I am there.
13    Q     Do you see the reference to
14 $47.4 billion in line four?
15    A     I see that.
16    Q     The oddities of this case, and the
17 47.4 appears at line four of page 47.
18          Do you see the 47.4 in Exhibit 708B?
19    A     I do.
20    Q     And do you understand that 47.4 in
21 Mr. Golden's calculation of assets to be referring
22 to the 47.4 on page 47 of the hearing transcript?
23    A     I believe so, but you would have to
24 ask him.
25    Q     That is your understanding?

Page 192

1          M. Zmijewski
2     A     That is my general understanding,
3  yes.
4     Q     And it says, at the start of that
5  page 47, originally we were selling assets that
6  had a value of 70, approximately $70 million, and
7  today your -- those same assets have a value of
8  $47.4 billion.
9          The $70 billion, if you would turn
10 back to the APA, which is Exhibit 1, and if you
11 look at the definition of purchased assets again
12 in subpart D.
13    A     Government securities, commercial
14 paper, et cetera, $70 billion, collectively long
15 positions.
16    Q     Right.
17          And I know there is -- in your
18 report, you have a reference to the 47.4 number,
19 which is in paragraph 47, of course.  You refer to
20 that as, "The repo collateral was part of the
21 $47.4 billion of trading assets."
22    A     Yes.
23    Q     The trading assets description, is
24 that consistent with the description in subpart D
25 of the purchased assets?

Page 193

1          M. Zmijewski
2     A     Subpart --
3     Q     D.
4     A     Yes.
5     Q     And do you understand Ms. Fife of
6  Weil Gotshal to in fact be giving the Court some
7  updated estimate on the value of subpart D that
8  relates to what the 70 billion has become?
9          MR. TAMBE:  Objection to the form of
10     the question.
11    A     Yes, okay.  "Has become" is sort of
12 an interesting use of words.  You know, it's a
13 different set of assets at a different point in
14 time.
15    Q     Fair enough.  But it's the -- apples
16 to apples, it's the $70 billion trading assets
17 in the subpart D, and the -- and the -- and what
18 value of trading assets, similar trading assets is
19 now.
20          MR. TAMBE:  Objection to the form.
21    Q     At the time of the hearing.
22          MR. DAKIS:  Same objection.
23    A     No.  I think it's minus the set of
24 assets that were taken out and maybe some assets
25 that were put -- there were some musical chairs

Page 194

1        M. Zmijewski
2   there on assets.
3        Q    I didn't mean to suggest that the
4   value has gone down to 47.
5        A    All right.
6        Q    So subpart D is one set, obviously a
7   big set, of the purchased assets being conveyed as
8   part of the original purchase agreement; right.
9        A    Correct.
10       Q    When she says 47.4 -- she references
11  the 70 billion. Then she says the 47.4, and what
12  you described as trading assets. You understand
13  that she is referring to one set of assets being
14  conveyed, not necessarily every asset being
15  conveyed, with the sale of the company?
16       MR. TAMBE: Objection to form.
17       MS. TABATABAI: Objection to form.
18       MR. DAKIS: Same objection.
19       A    Yes. Later on this same page, this
20  is the page of the hearing, on line 16, the
21  discussion goes to, "And here's your real estate
22  assets."
23       Q    Right.
24       So there are other assets besides the
25  47.4 in trading assets. There are real estate

Page 195

1        M. Zmijewski
2   assets or the RESIs.
3        MR. TAMBE: Object to the form of the
4   question.
5        Q    There's the real estate assets?
6        A    Correct.
7        Q    And what about the RESIs?
8        A    I don't know where those are here. I
9   don't know where they are at this point.
10       Q    Do you see in subpart D in the
11  purchase assets of A, the RESIs?
12       MR. TAMBE: Sorry. Which one are you
13  on? Which document are you on?
14       MR. THOMAS: The original asset
15  purchase agreement.
16       Q    And you look below subpart D. Do you
17  see that RESIs are not part of D but are a
18  separate line item?
19       A    I see that is true here. I don't
20  know if the 47 -- it's not clear that the RESIs
21  are not in the 47.4 billion here. I understand
22  how your logic is going, whether she says 70 and
23  then 47.4. But it's not clear to me that the
24  residential wouldn't also be in the 47.4.
25       Q    Do you recall her going on -- well,

Page 196

1        M. Zmijewski
2   it's clear that they weren't originally in the 70;
3   right?
4        A    It is clear that they were not in the
5   70.
6        Q    Okay. And do you recall her going on
7   in a few pages to speak about the RESIs
8   separately?
9        A    No. I will have to read it.
10       THE VIDEOGRAPHER: Counsel.
11       MR. THOMAS: Okay. Why don't you go
12  ahead and switch now.
13       THE VIDEOGRAPHER: That is the end of
14  tape number three. The time is 2:54 p.m.
15       We are now off the record.
16       (Discussion off the record.)
17       THE VIDEOGRAPHER: This is the start
18  of tape number four. The time is now
19  2:56 p.m.
20       We are now back on the record.
21  BY MR. THOMAS:
22       Q    If you look at page 49, line eight,
23  do you see there being a statement that "there was
24  a provision in the old agreement pursuant to which
25  the parties were sharing the residential real

Page 197

1        M. Zmijewski
2   estate mortgages. There is no longer that
3   provision. Barclays was required to post
4   collateral actually this morning in order to get
5   the DEC to open up trading, and that collateral
6   was posted. Pursuant to this transaction,
7   Barclays is taking over and guaranteeing all of
8   those transactions, and they are assuming the risk
9   related to those transactions so that collateral
10  will remain with Barclays."
11       Do you see that?
12       A    Yes.
13       Q    Does that indicate to you that when
14  she separately addresses these RESIs, that they
15  are still not part of the trading assets of the
16  47.4, just like they weren't part of the
17  70 billion?
18       MR. TAMBE: Objection to the form of
19  the question.
20       MR. DAKIS: Same objection.
21       A    No.
22       Q    Putting aside whether you believe
23  that the RESIs were in the 47.4, clearly, clearly
24  items like the non-financial assets that you list
25  were not part of the 47.4; right?

Page 198

1           M. Zmijewski
2        MR. DAKIS:  Objection to form.
3      A    Correct.
4      Q    So -- and it's your understanding, I
5  think you already testified that it was your
6  understanding that those were in the deal from the
7  beginning and would always be in the deal; right?
8      A    To the best of my knowledge, yes.
9      Q    Okay.  So, if his calculation of
10  1.85, looking back at 708B, is -- is just taking
11  the 47.4 number; right?
12      A    Yes.
13      Q    And it's not including the 2.085
14  number in non-financial assets.  Are you with me?
15      A    I understand what you are saying,
16  yes.
17      Q    So that means if you -- since you are
18  adding them to your windfall calculation, you are
19  essential double counting them, because you are
20  not providing for them in your 1.85.  In other
21  words, if you add in on the asset side of this,
22  it's not 48.69, 708B; right?
23      A    I just missed -- just give me those
24  numbers again.
25      Q    48.69 --

Page 199

1           M. Zmijewski
2      A    Yes.
3      Q    -- is the asset calculation --
4      A    Correct.
5      Q    -- that feeds into the net loss of
6  1.85 billion.
7      A    Yes.
8      Q    Which you use as your base point for
9  calculating the Barclays windfall.
10      A    I used the 1.85; correct.
11      Q    Now, if you fail to include the 2.085
12  billion in its calculation of assets, if you
13  include that in, 2.085, which you agreed is part
14  of the deal from day one, you get a different
15  number; right?
16        MR. TAMBE:  Objection.
17      Q    It's not a loss of 1.85, it is a gain
18  of -- too many numbers today -- 130 million?
19        MR. TAMBE:  Objection to the form of
20      that question.
21        MR. DAKIS:  Same objection.
22        MS. TABATABAI:  Objection.
23      A    I believe your arithmetic is
24  incorrect.  Sorry.
25      Q    Sure.  It probably is.  It's a long

Page 200

1           M. Zmijewski
2  day with a lot of numbers.
3        So, if you add into the asset side --
4      A    I think you are taking 2.085 and
5  adding a negative 1.85.  I don't think -- maybe
6  it's right.
7      Q    I had 130.
8      A    130?  Is that correct?
9        MR. THOMAS:  Anybody else want to
10      challenge my math?
11        MR. TAMBE:  No.  Just challenge your
12      question.
13      Q    135.  And the difference would be, if
14  you add in -- so let's start that over.
15        If you add in the 2.085, of
16  non-financial assets, which were always in the
17  deal, and then that net gain or loss is not a loss
18  of 1.85, it's actually a gain of 135 million.
19        MR. TAMBE:  Objection to the form of
20      the question, if there was a question there.
21      A    I still don't trust your arithmetic,
22  but that is okay.  I understand what you are
23  trying to get at.  So let's get past the
24  arithmetic, if we could.
25        I think it might be 200, two, not

Page 201

1           M. Zmijewski
2  one.  Maybe I'm wrong.  I don't have a calculator,
3  and I don't trust my brain.
4      Q    You are right.  It is 235.
5      A    All right.  So there.
6      Q    I'm challenged in my math, which is
7  why I am a lawyer, not an expert.
8        Let's start over so we have a clear
9  record.  If you add in the 2.085, in non-material
10  assets, that was admittedly a part of the deal to
11  begin with, then instead of that loss of
12  1.85 billion, it would actually show a gain of
13  235 million; correct?
14        MR. TAMBE:  Objection to the form of
15      the question.
16        MS. TABATABAI:  Same objection.
17        MR. DAKIS:  Same objection.
18      A    Your arithmetic is now correct, I
19  agree.  I don't believe with your
20  characterization.  I believe it's wrong.
21      Q    What is wrong about my
22  characterization?
23      A    First, I don't double count.  That is
24  not what I do.  So therefore it's not -- that is
25  wrong, because I wouldn't do that.

Page 202

1              M. Zmijewski
2          Second, the issue isn't what were the
3      value, what's the value of the assets that Barclay
4      received when we are measuring values, the
5      $2.085 billion, that is not the question. The
6      question is: What was the Court told the value of
7      those assets was?
8          And so this column here represents
9      what the Court, what was represented to the Court
10     with respect to the value. And there is no
11     evidence in the record that says the intangible
12     assets were worth 1.3 or $1.4 billion. I don't
13     remember the numbers. That is not in there.
14         The Court wasn't told that based on
15     my recollection. So, if the Court was told
16     nothing about the value of intangible assets, then
17     a zero appears here, so this column here is the
18     value of the assets represented to the Court.
19         This calculation, the top part of it,
20     is the value of the assets that they actually
21     received. Different concepts.
22     Q    So in calculating your windfall for
23     your expert report, you understood and appreciated
24     that Mr. Golden's 1.85 calculation was based on an
25     asset calculation that allowed for zero non-,

Page 203

1      non-financial assets?
2      A    Correct.
3      Q    And would you agree that if it was
4      understood that those non-financial assets were
5      part of the approved sales transaction, it would
6      be inappropriate to add them to your windfall
7      calculation?
8          MR. TAMBE: Objection to the form of
9      the question.
10         MS. TABATABAI: Join the objection.
11         MR. DAKIS: Same objection.
12     A    No, I disagree with that. It's not
13     this clear. Let me just give you a clear
14     hypothetical.
15         Your Honor, we have a brand or a
16     customer list, and the intangible assets, of which
17     a customer list is a part. We have that asset and
18     we are giving it to Barclays, and it has zero
19     value, and Barclays puts it on its books at a
20     billion dollars.
21         Mr. Golden would have appropriately
22     zero, and I would have appropriately a billion
23     dollars. Why? Because the Court was told
24     something was going to be sold that had a value of

Page 204

1              M. Zmijewski
2      zero, when in fact it had a value of a billion
3      dollars. That is the nature of the windfall.
4          So it would be appropriate to have
5      zero or exclude it if it's zero from Mr. Golden's
6      calculation, and necessary to put it in my
7      calculation of the Barclays windfall.
8          Does that help?
9      Q    If it's an approved part of -- if
10     it's an asset that is understood and approved,
11     part of the sales transaction, that $2 billion,
12     just because it's coming over to Barclays and it
13     may be valued by Lehman as zero on their books,
14     you think that that means that that is a
15     $2 billion windfall over the approved amount of
16     the asset transfer?
17     A    That is not what I am saying. What I
18     am saying is the following: If the Court's
19     perception was -- so this is based on the Court's
20     perception. What I have -- the only number I have
21     for that at the moment is 1.85 negative from
22     Mr. Golden, but the Court naturally has its
23     perception and will say whatever it is at the
24     right time.
25         But if the Court's perception is that

Page 205

1              M. Zmijewski
2      that sales transaction was approved with an
3      intangible asset that the Court believed to have
4      zero value, and then it turned out to have a
5      $1 billion value, so the Court wasn't told the
6      correct information, that would be part of the
7      Barclays windfall.
8      Q    Now, you have changed it. First you
9      said that if it's valued zero on Lehman's books
10     and now you said if the Court believes it has zero
11     value; correct?
12         MR. TAMBE: Objection to the form of
13     the question.
14         MS. TABATABAI: Same objection.
15         MR. DAKIS: Same objection.
16     A    Maybe I said Lehman's books before.
17     If I did, I misspoke, because my whole, the whole
18     basis of my calculation is what is the value of
19     the transaction that the Court approved versus
20     what is the value of the transaction that actually
21     occurred for Lehman's. It's that difference.
22     Q    So now in your view, it would be only
23     appropriate to include the $2 billion if the Court
24     believed that, and was intending to value those
25     non-financial assets at zero?

Page 206

M. Zmijewski

1     M. Zmijewski
2          MR. TAMBE:  Objection to the form of
3     the question.
4          MR. DAKIS:  Same objection.
5          MS. TABATABAI:  Join.
6     A     No.  The 2 billion should be
7     included.  The only way you wouldn't include the
8     2.085 billion for non-financial assets is if it
9     was the situation like the real estate.  I did not
10    include the real estate here in my transaction.
11    Why?  In my calculation.  Why?  Because the real
12    estate, based on what the Court said, is that --
13    the real estate is going to be sold, it's going to
14    be sold at the appraised value.  You will --
15    therefore, the value is the appraised value.
16    Therefore, I could have put it up in the top, and
17    I could have put it in the second part of the
18    calculation, and it would have been a wash.  I
19    excluded it.
20          Mr. Golden has it here, actually,
21    both as an asset and as a consideration, so it's a
22    wash.
23          So in that case, then you could
24    exclude it, as I did, for the real estate, but
25    unless those two values are identical or the

Page 207

M. Zmijewski

1     concepts of value are identical, such as we're
2     going to -- the value, the real estate's appraised
3     value, and we will pay them appraised value,
4     unless it's a situation like that, you should be
5     including it on Mr. Golden's calculation and
6     including it on my calculation.
7     Q     If the Court understood and intended
8     there would be non-financial assets, like customer
9     lists and so forth, being transferred and that
10    $2 billion was in the acceptable valuation range
11    of those assets, you definitely wouldn't include
12    the $2 billion in your windfall gain; right?
13          MR. TAMBE:  Objection, objection to
14    the form of the question.
15          MR. DAKIS:  Same objection.
16          MS. TABATABAI:  Same objection.
17    A     If the non-financial assets -- let's
18    just assume, your Honor, the non-financial assets
19    will be transferred over per the APA, and the
20    value of those assets is $2.08 billion -- eight
21    five billion dollars.  In that particular -- if
22    that is the case, if that were the case, it's a
23    hypothetical of course, if that were the case, I
24    would have treated it like the real estate.  I

Page 208

M. Zmijewski

1     M. Zmijewski
2     would not have included it.
3     Q     And so it's a necessary premise of
4     your including it that the judge did not believe
5     there was going to -- by your including all of
6     it -- strike that.
7          It's a necessary premise of your
8     including all of the $2 billion in your windfall
9     calculation that the judge did not approve any
10    non-financial assets going over?
11          MS. TABATABAI:  Objection.
12          MR. TAMBE:  Objection to the form.
13          MR. DAKIS:  Same objection.
14    A     I don't believe I said that.
15    Q     I am not saying you said that.  I'm
16    just asking the question.
17    A     So, the judge --
18          MR. TAMBE:  Same objection.
19    A     It's the valuation of those assets,
20    it's not whether the judge approved or not
21    approved the transfer of the asset.  It's the
22    value of the asset.
23          So if he approved it and it was
24    valued at zero, which is -- that is what the
25    assumption is here, in Mr. Golden's report, then

Page 209

M. Zmijewski

1     M. Zmijewski
2     the difference is, since it's 1.85, he included it
3     at zero and I included it at .085.  That is the
4     delta.
5          If the judge said and approved of the
6     sale for those assets of a billion dollars, well,
7     then Mr. Golden would have put a billion dollars
8     here.  I would have kept the 2 billion here.  But
9     the 1.85 would have been negative .85, and it
10    would have gone down.
11          So, I wouldn't change anything that I
12    would do.  The only thing that I would change is
13    the minus 1.85, as we went through the example
14    before, the 1.85 changes, because this is the
15    court-approved document, or Mr. Golden's attempt
16    at figuring out what the court approved as far as
17    the sale transaction.
18          So, let's assume the judge says,
19    well, no, I knew those assets were being
20    transferred, and $2 billion is fair, that is okay,
21    well, then we do the arithmetic that you did, and
22    this number at the bottom here, and my numbers
23    would have changed, but the minus 1.85 would
24    change to the positive -- whatever you calculated
25    before.  We don't have to go through that

Highly Confidential

Page 210

M. Zmijewski

1    arithmetic again.
2    Q    235.
3    A    That's how we do it.  So any
4    difference between Mr. Golden's opinion and what
5    the judge, the Court finally determines as what
6    was the approved transaction would flow into an
7    adjustment to my minus 1.85.  Everything else
8    remains the same.
9    Q    When do you believe would have been
10   the soonest that $2 billion figure could have been
11   calculated in this case in these circumstances?
12        MR. TAMBE:  Objection to the form of
13        the question.
14   A    I don't know the answer to that.  I
15   don't know.
16   Q    Would it -- in a rough guess, would
17   it have been months after the closing?  Would it
18   have been on the closing date, before the closing
19   date?
20   A    Well, I -- it's a billion dollars.
21   Now, maybe to the bankers that is not a lot of
22   money, but if I were on the valuation team, I
23   would be valuing that.  I would be valuing every
24   asset I could possibly value.  Customer list.

Page 211

M. Zmijewski

1    They've purchased banks before.  They understand
2    the nature of that type of asset, what it's worth.
3        They had -- I would be shocked if
4    they didn't have some type of an assessment of the
5    value of assets like that.
6    Q    In what time period?
7    A    Before the transaction as they were
8    going through this.  This is normal course of
9    business for these people; right?  This is what
10   they do.  They buy banks all the time.
11   Q    This was a normal course of business
12   transaction?
13   A    This was a huge transaction, of
14   course, buying the customer list, the
15   intangible assets of this in a deal.  They
16   understand how to value it.
17        The Royal Bank of Scotland, for
18   example, they just -- I don't remember how far,
19   how much earlier that was.  They were bidding for
20   the Royal Bank of Scotland and lost.  I am sure
21   they were thinking about all these issues, so they
22   had to be prepared to do these kinds of
23   valuations.
24   Q    Do you have an understanding one way

Page 212

M. Zmijewski

1    or another whether Barclays was able to do any
2    valuation of non-financial assets prior to closing
3    of the deal?
4    A    Well, they have a fiduciary
5    responsibility to their shareholders, so I assume
6    they would be doing valuations of this sort,
7    something that is worth a billion dollars.
8    Q    Why do you keep saying a billion
9    dollars?
10   A    Because I think that is what it is.
11   I think you said it's 1.45 billion, the
12   intangibles.
13   Q    Do you know one way or the other or
14   are you just speculating with?
15   A    I am speculating, but it's an
16   informed speculation based on my experience
17   working with companies on buying another company.
18   Q    What about in a situation where the
19   parties agree that they are selling basically the
20   whole, all the business assets of the company, and
21   there is no specific value placed on the
22   non-financial assets, and the Court approves the
23   sales transaction?  Do you understand that the
24   subsequent recognition of any non-material,

Page 213

M. Zmijewski

1    non-financial assets should result in a
2    declaration that this was an inappropriate
3    windfall?
4        MR. TAMBE:  Objection to the form of
5        the question.
6    A    Could you repeat the first part
7    again.  I have just want to make sure I understand
8    the context.
9    Q    Sure.
10        In a situation where the parties
11   agree to the sale of a business or almost all the
12   business assets, and clearly there is going to be
13   some non-financial assets involved, but there is
14   no calculation made or presented and nothing is
15   predicated on that in the deal and so forth, do
16   you -- and the Court approved that transaction --
17   do you think that just because later there is a
18   valuation made of the non-financial assets, that
19   that is somehow an improper windfall that wasn't a
20   part of the court-approved transaction?
21        MR. TAMBE:  Objection to the form.
22        MS. TABATABAI:  Objection to form.
23        MR. DAKIS:  Same objection.
24   A    Let's go back to -- I would just like

Page 214

1        M. Zmijewski
2    to break that up into two pieces and separate the
3    Court approval process from the transaction
4    itself.
5        Two companies agree, Company A will
6    buy Company B, and you are not buying the
7    non-financial assets. You are buying the company
8    of course, and you would value that and tell your
9    company. Unequivocally, you would value the whole
10   company, and you would figure out what is the
11   value I am willing to pay for this company as a
12   going concern. That is the value that you would
13   put onto it.
14       You wouldn't pay that amount. That's
15   what you would be willing -- you would negotiate
16   around the range, but you would pay somewhere in
17   the range, what you felt comfortable the true
18   value of that asset is to you when you are buying
19   it. That's what you would do. That's how the
20   calculation would be made ex ante.
21   Q    In that situation it wouldn't matter
22   if later on you put a value on customer lists of a
23   billion dollars or something?
24   A    No. I wasn't finished.
25       How do we measure what the value is?

Page 215

1        M. Zmijewski
2    How do we measure what the value of that asset is
3    afterwards? Well, the accounting rules require
4    companies to conduct that calculation and say,
5    well, here is the value that you are assigning to
6    the total company, and you, according to the
7    accounting rules, must allocate that total value
8    that you agreed to purchase the company for and
9    allocate it across the fair market value of the
10   assets.
11       Companies are required to do that.
12   They have to also value the liabilities that were
13   assumed in that calculation.
14       So what we are doing is using the
15   balance sheet for the -- the initial balance sheet
16   or opening balance sheet of Barclays to actually
17   measure that value that they actually approved in
18   the deal, that they agreed to in the negotiation.
19   Q    So you are trying to measure the
20   value that they agreed to in the negotiation?
21       MR. TAMBE: Object to the form of the
22   question.
23       MR. DAKIS: Same objection.
24       MS. TABATABAI: Same objection.
25   A    Well, we're valuing based on your

Page 216

1        M. Zmijewski
2    opening balance sheet the value of the deal that
3    they actually received.
4    Q    Compared to the value of the deal
5    that they agreed to?
6    A    That is why I separated out the court
7    approval. In this particular case, it had to be
8    the court-approved deal, so it's not the value
9    they agreed to, but it's the -- the benchmark is
10   the deal that the Court approved, the value of
11   that.
12   Q    Let me understand. In a situation
13   where a company sells most of its business assets
14   and it's done very quickly, historically quickly,
15   and it's not predicated on certain assets having
16   certain values and so forth, and there is no --
17   and the parties understand that there is going to
18   be intangible assets that can go over as part of
19   the deal, it's no mystery, and the Court approves
20   this transaction, but then you think that if the
21   purchaser then when it does the balance sheet
22   assigns value to the intangible assets, that that
23   is somehow an improper windfall because that value
24   was not previously disclosed to the Court?
25       MR. TAMBE: Objection to the form of

Page 217

1        M. Zmijewski
2    the question.
3       MS. TABATABAI: Same objection.
4       MR. DAKIS: Same objection can.
5    A    I agree with that, yes.
6    Q    So you think it is?
7    A    Yes.
8    Q    So, so let's say the only assets --
9    let's say we are just talking about the
10   $2 billion, again, in non-financial assets, and
11   the parties give the Court a contract and ask for
12   approval, with lots of different items in the
13   purchase, in the purchased assets described, but
14   only a couple of the big ones have values attached
15   to them, and the Court approves the deal, approves
16   the sale of the transaction.
17       Your view is that you would add up
18   the specific values mentioned to the Court and
19   that would act as a bar or a cap on how much the
20   purchaser should get in terms of assets, and
21   everything else would be a windfall?
22   A    No, I don't believe that is what I
23   calculated. Hopefully I didn't characterize.
24   What I said was, in your hypothetical the Court
25   was told certain things, and at the end of the

Page 218

1          M. Zmijewski
2  day, the Court made a decision as to what the
3  value of this particular transaction was, your
4  hypothetical transaction. So the Court had in its
5  mind and its view a certain value to the
6  transaction, and based on that assessment of
7  value, the Court approved the transaction.
8          Then the question is: What was the
9  real value of that transaction? And I would
10 compare it to the Court's perception of value.
11 That is what is measured, and what Mr. Golden is
12 doing is his assessment to the best that he can of
13 assessing what the Court's view of what the
14 approved value of the transaction was.
15     Q     And his assessment is the Court
16 viewed the value of non-financial assets to be
17 zero?
18     A     Yes, that is absolutely correct.
19     Q     And then that assumption is fed into
20 your calculation of the windfall by the use of
21 Mr. Golden's number; right?
22     A     Correct.
23     Q     And that is true of every other asset
24 that wasn't specifically identified to the Court.
25     A     Yes. And keep in mind the goal here

Page 219

1          M. Zmijewski
2  isn't to look at all the assets. The goal is an
3  attempt to assess the Court's view of what the
4  value of the transaction was, and the way
5  Mr. Golden is doing it is by looking at
6  individual assets, looking at considerations that
7  were told to the Court.
8          But at the end of the day, if we
9  could, we would like to, you know, go to the
10 mountain and go up to the secret box and pull out,
11 here is the Court's assessment of value, and bring
12 it back down, and I would place that value here
13 where the value of minus 1.85 is.
14         So we are looking at individual
15 assets with the goal of assessing -- attempting to
16 assess what the Court's view of the value of the
17 transaction was.
18     Q     Have you ever estimated in any way
19 the value of the gain that Barclays would appear
20 to get in the face of the original asset purchase
21 agreement?
22     A     I'm sorry, I don't understand your
23 question.
24     Q     If you look at the original asset
25 purchase agreement, have you ever attempted to

Page 220

1          M. Zmijewski
2  calculate whether Barclays would receive a gain or
3  loss based on that transaction?
4     A     No.
5     Q     You have no idea which way it goes?
6     A     I haven't done that at all.
7     Q     But your view is that the asset
8  purchase agreement goes out the window and the
9  only thing that matters is Mr. Golden's divination
10 of what the Court thought the values were that
11 were being transferred?
12         MR. TAMBE: Objection to form.
13     A     No. What matters is the Court's view
14 on what the value of that transaction was, and I
15 am using Mr. Golden's assessment of the Court's
16 view of what the value of that transaction was.
17     Q     What type of expertise does
18 Mr. Golden have to say what the value, the Court's
19 perception of the value of the transaction was?
20         MR. DAKIS: Objection to the form.
21         MS. TABATABAI: Objection to the
22 form.
23     A     Well, you can read his background on
24 his CV. You know, he ran a company, took it
25 through bankruptcy. He's again been in front of

Page 221

1          M. Zmijewski
2  the courts, bankruptcy court several times.
3  I'm not here to judge his
4  qualification, but he seems qualified to me,
5  running a company. He was the CEO of a company,
6  and he went through bankruptcy, and he's been a
7  bankruptcy consultant.
8     Q     Do you have any expertise in
9  identifying or analyzing the Court's perception of
10 the value of the transaction?
11     A     It would depend on what the nature of
12 the record was, what the Court was saying.
13     Q     Do you have an opinion as to whether,
14 whether the 47.4 number mentioned by Ms. Fife, on
15 page 47 of the transcript, was intended to be a
16 cap on the assets which were transferred to
17 Barclays in addition to the real estate?
18         MR. TAMBE: Object to the form of the
19 question.
20         MR. DAKIS: Same objection.
21     A     I -- I don't have an opinion one way
22 or the other.
23         MR. THOMAS: This is probably a good
24 place for a short break.
25         THE WITNESS: Okay.

| Page 222 | Page 223 |
|---|---|

**Page 222**

1          M. Zmijewski
2          THE VIDEOGRAPHER:  The time is
3     3:25 p.m.
4          We are now off the record.
5          (Recess taken.)
6          THE VIDEOGRAPHER:  The time is now
7     3:46 p.m.  We are now back on the record.
8     BY MR. THOMAS:
9          Q     With respect to Exhibit 708B, and
10    your calculation of a windfall, is it fair to say
11    that your baseline for your windfall calculation
12    is only correct if the court approval of the sale
13    transaction carried with it a cap on assets to be
14    transferred apart from the real estate?
15         A     No.
16         MR. TAMBE:  Objection to form.
17         Q     Of $47.4 billion?
18         A     No.  Sorry.
19         Q     Can you -- do you agree that if the
20    sale -- the Court approved the sale transaction --
21    strike that.
22         Do you agree if the sale transaction
23    approved by the Court allowed for the transfer of
24    assets greater than $47.4 billion, plus the value
25    of the real estate, which we will keep out of

**Page 223**

1          M. Zmijewski
2     this, then your baseline would have to be adjusted
3     for your windfall calculation?
4          A     No.
5          Q     Can you explain why that didn't
6     follow?
7          A     Of course.  The concept isn't the
8     assets that I am using -- I am using the net gain
9     or loss or what Mr. Golden calls the net
10    transaction value to Barclays, so to the extent
11    that number, the minus 1.85 is not representative
12    of the Court's view of the net value of the
13    transaction, then I would change Exhibit B-1, the
14    net value of the transaction, I would change the
15    negative 1.85 to whatever the Court felt the, or
16    decided the appropriate value of the transaction
17    was at that time.
18         So it's the net transaction.  It's
19    not the assets or the liabilities.  It's the net
20    of all that.
21         Q     Holding liabilities constant, and
22    putting aside the real estate that was purchased,
23    if the sale transaction that was approved by the
24    Court did not have an asset limit or cap of
25    $47.4 billion, then you would have to adjust the

| Page 224 | Page 225 |
|---|---|

**Page 224**

1          M. Zmijewski
2     baseline of your windfall calculation; correct?
3          A     It's not a cap or not a cap.  At the
4     end of the day, the Court has a value of the net
5     transaction.  And if the Court doesn't have a
6     cap -- now, if you are telling me the Court
7     doesn't have a cap, and therefore, if the value is
8     50 billion, rather than 47.4, and therefore the
9     Court's view would be based on -- let me just say
10    it's 50.4 billion.  Well, then the bottom line
11    there, the negative 1.85, I would have to add a
12    positive 3 billion to it.  So I would take the
13    difference of those two, and that is the net
14    amount I would take, assuming nothing else
15    changed.
16         So it's the totality of the
17    calculation, but I need a number.  If it's
18    uncapped to infinity, well, then, then I don't
19    know.  If the Court said I don't really care what
20    the value of the assets is, it is what it is.
21    Then I would have to rethink how we are doing this
22    calculation.  I would have to think about that.
23         Q     It wouldn't make sense to try to
24    calculate a windfall for a deal that wasn't
25    predicated on a particular asset and liability

**Page 225**

1          M. Zmijewski
2     value mix; correct?
3          MR. TAMBE:  Objection to the form of
4     the question.
5          A     It's not the particular, it's the net
6     of whatever the value of the assets and
7     liabilities happens to be.
8          Did the judge assume -- I will try it
9     this way.  Let me just state it simple, because I
10    saw this language in some documents.  The word
11    "wash" has been used by Professor Pfleiderer.  It
12    has been used, I know, in the movants' motion, so
13    the word "wash," which I assume is assets equal
14    liabilities, it's a wash, they are essentially
15    zero.
16         If the Court assumes that the
17    transaction was a wash, Barclays should have
18    been -- the value of the assets transferred to
19    Barclays should have been roughly the same as the
20    consideration, it's a wash, then my negative 1.85
21    would be zero.
22         Q     So your report assumes that the judge
23    did not view the transaction as a wash; correct?
24         MR. TAMBE:  Object to the form of the
25    question.

## Page 226

1          M. Zmijewski
2          MS. TABATABAI: Same objection.
3          MR. DAKIS: Same objection.
4     A    Correct.
5     Q    Have you seen -- have you reviewed
6  the sale motion, motion to approve the sale?
7     A    Initially, yes.
8     Q    And have you reviewed the order
9  approving the sale?
10    A    Yes.
11    Q    Is there -- and you reviewed the
12 three contract documents?
13    A    Correct.
14    Q    Is there anything in there that you
15 think indicates that this sale transaction was
16 somehow predicated on a certain amount of assets
17 and a certain amount of liabilities?
18         MR. TAMBE: Object to the form.
19    A    Well, if you include in the set of
20 documents I read the movants' motions, it's
21 clearly -- all over those motions they talk about
22 either a net benefit to Lehman, from this
23 transaction, or that the transaction would be a
24 wash, so I mean it's all over those documents'
25    Q    I'm not asking about movants'

## Page 227

1          M. Zmijewski
2  motions, in their papers and briefs what they say.
3  The documents I asked about, the three sales
4  transaction agreements, documents, the motion to
5  approve the sale, and the sale order. In those
6  documents is there anything in there that
7  indicates the deal is somehow predicated on assets
8  having some relation to the liability?
9          MR. TAMBE: Objection to form.
10    A    I don't recall one way or the other,
11 I don't recall that being the case, but I don't
12 recall those documents well enough.
13    Q    So, one scenario is in which this was
14 more like a sale of a business in which it was
15 known that assets and liabilities were changing
16 and uncertain, and that the sale was not
17 predicated on any particular relationship between
18 assets and liabilities.
19         Do you accept that as one possible
20 scenario for the sales transaction?
21         MR. TAMBE: Object to form.
22    A    No, no.
23    Q    That is not possible?
24    A    Right.
25    Q    So all Lehman's financial advisors

## Page 228

1          M. Zmijewski
2  and lawyers have -- their concept of the deal is
3  just flat wrong?
4          MR. TAMBE: Object to the form.
5          MS. TABATABAI: Objection to the
6     form.
7          MR. DAKIS: Objection.
8     A    I don't think my response "no" to the
9  previous question leads to the conclusion that you
10 just stated in your question, your second
11 question.
12    Q    And have you read Harvey Miller's
13 deposition testimony and Barry Ridings' deposition
14 testimony?
15    A    Yes.
16    Q    And you have seen how they describe
17 the deal?
18    A    Yes.
19    Q    They certainly didn't describe it as
20 being predicated on some certain amount of assets
21 and liabilities, did they?
22    A    Again, it's not certain amount of A
23 or B. It's what is the net effect. I don't think
24 they said there was going to be a $13 billion
25 windfall to Barclays.

## Page 229

1          M. Zmijewski
2     Q    They didn't believe it was predicated
3  on it being a wash or a gain to Lehman, did they?
4          MR. TAMBE: Objection to the form of
5     the question.
6          MR. DAKIS: Same objection.
7     A    I just don't recall their testimony
8  in that level of detail.
9     Q    Is that -- would it be relevant -- I
10 know you have criticized Mr. Pfleiderer for not
11 reviewing and considering certain deposition
12 testimony in this case. Do you think it's
13 relevant to consider the lead bankruptcy's counsel
14 attorney for Lehman and their lead financial
15 advisors' view of what the sale transaction
16 actually was that was presented to the Court?
17    A    Well, you know, the benchmark
18 hurdle -- I forgot which word you used. I will
19 call it a benchmark. The benchmark isn't what
20 their opinion was of the deal. The benchmark is
21 what the Court's approved deal was, what was the
22 value of that deal. That is the benchmark.
23    Q    When you say the Court's approved
24 value of the deal, you are certainly not referring
25 to the Court's written sale order which doesn't

## Page 230

M. Zmijewski

1       M. Zmijewski
2 have anything of value in that, and you are
3 certainly not referring to the motion to approve
4 the sale, which doesn't have any values in there.
5 You are certainly not referring to the sale
6 agreements between the parties, which doesn't have
7 anything like that there that says that there has
8 to be a net relationship between the assets and
9 liabilities being one thing or the other.
10      So, when you are referring to the
11 Court approval, you are referring to Mr. Golden's
12 interpretation of the hearing transcript of the
13 19th?
14      MR. TAMBE:  Objection to the form.
15      MS. TABATABAI:  Objection to the
16 form.
17      MR. DAKIS:  Same objection.
18     A    I am referring to the Court's view on
19 what the value of this deal was that the Court
20 approved, and what I am using for that in my
21 calculation is Mr. Golden's assessment that that,
22 the value of the approved deal, was minus 1.85.
23      So if the Court assumed it was a
24 wash, the number for Mr. Golden becomes zero.  If
25 the Court viewed it as no, they should have had a

## Page 231

M. Zmijewski

1       M. Zmijewski
2 gain, a negative goodwill or an immediate gain of
3 X, well, then my number there would be X.
4      So at the end of this process,
5 although Mr. Golden provides a starting point, I
6 am fairly convinced that the Court will actually
7 say here is the number, put this number into your
8 calculation.
9     Q    So, it's inconceivable to you that
10 the relationship was -- between assets and
11 liabilities was simply not knowable at the time;
12 is that right?
13      MR. TAMBE:  Object to the form.
14      MR. DAKIS:  Same objection.
15      MS. TABATABAI:  Same objection.
16     A    That, you know, I'm not presuming to
17 know what the judge had in his mind or the Court
18 had in its view or not.  I don't have any
19 presumption of that.
20     Q    You rejected there was even a
21 possible hypothetical scenario that this was a
22 sale essentially of a business, most of the
23 business assets, that was not predicated on any
24 total value of assets or total value of
25 liabilities or net relationship between the two;

## Page 232

M. Zmijewski

1       M. Zmijewski
2 right?
3     A    I believe what I said was the -- I
4 rejected the view that the net value of this deal
5 was totally irrelevant to the Court.  It could
6 have been 1 billion, it could have been
7 100 billion to Barclays' benefit or Lehman's
8 benefit.
9      I reject the notion that the Court
10 did not care whether or not there was a positive
11 or a negative number or what the negative -- what
12 the number happened to be.  I rejected the Court
13 didn't care about that.
14      Your question was, essentially it was
15 irrelevant, and I don't think that is irrelevant
16 to a court in bankruptcy.
17     Q    I understand you are offering an
18 opinion as to what the Court cared about and
19 thought.  Put that aside.
20      Let me ask you a hypothetical,
21 separate from this case.  Okay.  Will you accept
22 that it is possible for there to be a transaction
23 in which there is essentially the sale of a
24 business or most of the business assets of a
25 company, if it's done quickly, the assets and

## Page 233

M. Zmijewski

1       M. Zmijewski
2 liabilities are not precisely known, and are
3 changing, and the sale is not predicated on any
4 particular valuation of the assets, or valuation
5 of the liabilities or net relationship between the
6 two?  Are you with me?
7     A    I understand what you are saying.
8     Q    Do you accept that that is -- apart
9 from this case, that is a possible hypothetical
10 sale transaction situation?
11     A    It wouldn't be if I were the
12 financial advisor of the seller or the buyer.
13     Q    Aside from that qualifier, can you
14 accept that as a scenario?
15     A    People are free to do whatever they
16 want to do, so of course it's possible, and there
17 are people who could do irrational things.  I
18 don't believe that would be rational.
19      In that particular situation, if you
20 had that much uncertainty, you would have some
21 kind of true-up ex post, after the fact true-up;
22 right?  So you would say -- so let's in your
23 hypothetical -- we don't know what the value of
24 these assets are, the liability.  We need to cut a
25 deal.  Okay.  Let's cut the deal, transfer the

| Page 234 |
| --- |

M. Zmijewski

1  M. Zmijewski
2  ownership to you. However, conditional on that
3  over the next time period, whatever we specify it
4  to be, based on these outcomes, you need to true
5  up.
6      Q     So if you wanted to have a sales
7  transaction predicated on some net relationship
8  between assets and liabilities, in a situation
9  where you couldn't immediately place accurate
10  values on the assets and liabilities as of the
11  closing date, one way to do it would be through a
12  true-up provision in the contract; correct?
13          MR. TAMBE: Objection to the form.
14      A     Again, speaking hypothetically?
15      Q     Sure.
16      A     Absolutely.
17      Q     Can you think of any other way to do
18  it in that scenario where you are unable to value
19  assets or liabilities that quickly?
20      A     I can't, as I sit here right now. If
21  I think of something, I will say it later.
22          The true-up seems to make sense. At
23  some point you will understand what the assets and
24  liabilities are worth. The big issue there is can
25  you monitor ex post what those liabilities are

| Page 235 |
| --- |

M. Zmijewski

1  worth or not, what the assets are worth.
2          In this case, where there is such a
3  large amount of financial assets, many of which
4  have readily available prices, an ex post true-up
5  is more feasible than in a company that makes some
6  product and it's hard to monitor performance.
7      Q     In that scenario, where you have sale
8  of a business, putting aside whether there is a
9  true-up or not, but a sale of a business that is
10  not predicated on assets being a certain amount or
11  liabilities being a certain amount, or a net
12  relationship, I mean, a particular kind, between
13  assets and liabilities, in that situation, would
14  your process of calculating a windfall the way you
15  do be applicable?
16          MR. TAMBE: Objection to the form.
17      A     With my true-up, it wouldn't be
18  necessary, because we would have a true-up and
19  there would be an automatic trigger mechanism. So
20  that in this particular case with these numbers,
21  $11 billion would be paid.
22      Q     That is if there was a true-up?
23      A     With a true-up.
24      Q     But even in that situation, your,

| Page 236 |
| --- |

M. Zmijewski

1      M. Zmijewski
2  your -- whether there is a true-up or not a
3  true-up, your -- it wouldn't make sense to try to
4  do your windfall calculation in that situation.
5  It wouldn't make sense to call it a windfall if
6  the deal is not predicated on a certain
7  relationship between assets and value -- and
8  liabilities; correct?
9      A     Well, first I -- you said with a
10  true-up or without a true-up. I reject the
11  without a true-up. The hypothetical is
12  economically irrational and shouldn't even be
13  considered. So I wouldn't even consider that as a
14  hypothetical, because it shouldn't happen.
15          But in the case of where there is a
16  true-up, then this calculation is not necessary,
17  because there is an automatically triggered
18  calculation that does the same thing.
19          So you can think about -- it's an
20  interesting point. This calculation is sort of
21  like a true-up; right? It's very similar to a
22  true-up. And it happens to be that there isn't a
23  true-up, or at least the true-up was taken out of
24  the contract. So there isn't a true-up anymore.
25  And this calculation essentially does that

| Page 237 |
| --- |

M. Zmijewski

1      M. Zmijewski
2  true-up.
3      Q     It's your understanding that there
4  was a true-up in the contract?
5      A     Based on my reading, there seemed to
6  be.
7      Q     That would perform a similar function
8  as to your windfall calculation?
9          MR. TAMBE: Objection to form.
10      A     Here's my understanding, that it
11  would be similar, and mostly for the financial
12  assets, though, so it wouldn't take into
13  consideration the non-financial assets. For
14  non-financial assets there was the repo
15  collateral.
16          My understanding of the repo
17  collateral was there was a liability, so at the
18  end of the day that should have gone through a
19  process to be liquidated or somehow exchanged, and
20  the repo collateral should have been trued up, and
21  it's only through the clarification letter, if I
22  remember that correctly, that -- calling it a
23  true-up, that true-up was taken away.
24          And then my recollection is, in the
25  asset purchase agreement, for certain assets there

Page 238

M. Zmijewski

1  was a payment to Lehman of, from the realization
2  of -- I think it's over $500 million of profits,
3  that Lehman gets a certain part or maybe all of it
4  for a certain amount.
5       So there were some true-ups in these
6  contracts, as I recall.
7       Q    In your view, did the Court approve
8  the removal of what you are referring to as a
9  true-up provision?
10      A    I am not a lawyer. I don't know what
11 the Court approved or didn't approve. You are
12 pulling me out of my territory again.
13      Q    Do you know whether it was disclosed
14 to the Court or not, the removal of the true-up
15 provision?
16      A    Well, I believe the asset purchase
17 agreement was disclosed to the Court. My
18 understanding based on the transcript from last --
19 last week -- was it last Friday? Based on that
20 transcript, that the Court did not approve the
21 clarification letter.
22      I don't know if the Court saw the
23 clarification letter or not, but my understanding
24 is that the Court didn't approve the clarification

Page 239

M. Zmijewski

1  letter, and that's when I believe the change
2  happened for the repo assets.
3       Q    Do you know whether the removal of
4  what you are referring to as a true-up provision
5  was raised with the Court or not at the sale
6  hearing?
7       A    I don't recall.
8       Q    Is that of any significance to you,
9  either way?
10      A    Only in that I might answer your
11 question differently. It has no effect on -- this
12 conversation, at least based on what I am hearing
13 of it so far, has no effect on my calculations.
14 It's sort of off on a tangent from what I can
15 tell.
16      Q    Let me go back to the hypothetical
17 that you haven't answered yet. I will try it one
18 more time.
19      A    I am trying.
20      Q    If you have a sale transaction, in
21 which the sale transaction is not predicated on
22 assets being a certain value, liabilities being a
23 certain value or any particular net relationship
24 between the two, and you don't have a true-up

Page 240

M. Zmijewski

1  provision, in that situation your windfall
2  calculation or approach would not be appropriate;
3  correct?
4       MR. TAMBE: Objection to the form of
5  the question.
6       A    There is no such calculation to make.
7  There can't be a claim, because at the end of the
8  day, we agreed to transact at whatever price we
9  transacted at, and it doesn't really matter what
10 happens. That is what you are saying, that is
11 your hypothetical.
12      So that means no matter what happens,
13 good or bad, no matter what information was
14 withheld from either party, it doesn't matter what
15 happened, that transaction is over. That is what
16 your -- that is your hypothetical.
17      If that is your hypothetical, then
18 there is no calculation like this or true-up or
19 any other calculation.
20      Q    Well, you added in something about
21 information withheld to the parties. My -- you
22 understand my hypothetical is simply that the
23 parties agreed to a sales transaction which was
24 not predicated on assets, liabilities or a net

Page 241

M. Zmijewski

1  relationship between the two, and it did not have
2  a true-up provision.
3       In that situation, without adding
4  anything else into that hypothetical, would you
5  agree that your windfall approach would not be
6  applicable?
7       A    Same answer that I gave previous.
8       Q    So you agree with me?
9       A    Yes.
10      Q    What is your definition of the term
11 "book value"?
12      A    I thought Mr. Garvey did a great job
13 at outlining book value, and I would refer you to
14 his report. There is nothing in his report on
15 book value or anything else that I disagree with.
16      Q    Can you tell me your general
17 understanding of the term "book value"?
18      A    I have it in my report of course, but
19 I refer to Mr. Garvey.
20      You want a closed book test again.
21      Q    On this one question, I would like
22 what you understand book value to be, if it has a
23 set meaning or different meanings to different
24 people or only one meaning. What is that meaning?

Page 242

M. Zmijewski

1   What does book value mean?
2
3       A    I think we need to restrict it
4   somehow to at least be we are talking about
5   companies and financial terms rather than grocery
6   list or something, okay.
7       Q    Sure.
8       A    All right.  So, keeping it in that
9   business framework, book value is the value of an
10  asset on a balance sheet, or liability.  It's the
11  value of an item on a balance sheet, whatever that
12  item is.
13      Q    And when you say that it's value,
14  would that be a fair market value?
15      A    No.  It's the value that's on the
16  balance sheet.
17      Q    What is written down?
18      A    Whatever is on the balance sheet.
19  Based on the accounting rules, it could be fair
20  value, or based on -- for a different type of item
21  at a different point in time, it might not be fair
22  value.
23      Q    I think we covered this earlier in
24  the day, but if a purchaser buys an asset that is
25  on the seller's book at $100, but in reality the

Page 243

M. Zmijewski

1
2   fair market value of that asset everyone agrees is
3   $90, and the purchaser pays $90 for the item, has
4   the purchaser received a discount?
5           MR. TAMBE:  Objection to the form of
6       the question.
7       A    So, the market value everybody agrees
8   is $90?
9       Q    Yes.
10      A    So it happens to have a book value of
11  $100?
12      Q    Yes.
13      A    It doesn't represent market value.
14      Q    Right.
15      A    Then it's -- it's an irrelevant
16  calculation.  There is no gain or loss.  There is
17  no concept of gain or loss in that way.
18      Q    The question is, if the purchaser
19  pays 90 for it, have they received a discount?
20          MR. TAMBE:  Object to the form.
21      A    There is no -- well, there is a
22  discount off of book value.  Again, discount
23  has -- it's such a broad term.  So there is a
24  discount off of the book value, but that discount
25  doesn't have an economic meaning related to a gain

Page 244

M. Zmijewski

1
2   or a loss.
3       Q    So if you were just asked -- can you
4   answer yes or no whether a purchaser in that
5   scenario where the book value says 100, but the
6   fair market value is really 90, and the seller
7   pays -- and the purchaser pays 90 for it, has that
8   purchaser received a discount?
9           MR. TAMBE:  Object to the form.
10      A    I can't answer yes or no.  I cannot
11  answer yes or no.
12      Q    Is that because the question is
13  vague?
14      A    Because you need to specify what the
15  book value is to which you refer.  If the book
16  value is some value on the books of $100, for
17  example, a fixed asset that isn't marked to
18  market, so it's not related to market value, it's
19  independent of market value, then there isn't a
20  discount.
21          If it is a market value and it's an
22  appropriate market value, then there would be a
23  discount.  But then we have this conflict of how
24  can both of those numbers be market value.  So we
25  have a conflict.

Page 245

M. Zmijewski

1
2           It's -- naturally hypotheticals are
3   not so clean-cut.  There are always complexities
4   involved.
5       Q    Well, let's say in a hypothetical
6   where your book value is 100, fair market value is
7   90, and the reason for the difference is either
8   because the book value hasn't been updated
9   recently or because it was just wrongly marked,
10  overly aggressively marked.
11          In that scenario where the purchaser
12  pays 90 for the asset, which has a fair market
13  value of 90, has the purchaser received a
14  discount?
15          MR. TAMBE:  Object to the form.
16      A    Again, you have to define discount.
17  So a discount relative to fair value, the answer
18  is no.  Discount relative to the book value, the
19  answer is yes.
20          Discount doesn't have a specific
21  meaning.  It could be a discount to either of
22  those.  It just means a reduction from one value.
23      Q    At paragraph 26 of your report, you
24  say you adjusted compensation liability to
25  1.5 billion.  Do you see that?

| Page 246 | Page 247 |
|---|---|

**Page 246**

1        M. Zmijewski
2    A    Yes.
3    Q    Now, you don't question that Barclays
4 incurred these other expenses that you identify in
5 your footnote in connection with the sale
6 transaction, do you?
7    A    I do not.
8    Q    Why do you discount them as
9 liabilities then if --
10    A    I don't discount them as liabilities.
11 My understanding from the movants' position -- of
12 the movants' position is that only the -- the only
13 liability that was represented to the Court was
14 liability related to bonuses and not these other
15 liabilities.  So, I do not include those other
16 parts of the liabilities because they don't relate
17 to the bonus.
18    Q    And so there are expenses incurred --
19 and remind me, where does this feed into your
20 report, this --
21    A    It would be under reported cash
22 consideration and liabilities, B-1, B as in boy
23 one, adjusted comp, severance subtracted.
24        So the difference is between the
25 $2 billion and the $1.55 billion.  That difference

**Page 247**

1        M. Zmijewski
2 is not related to bonus.  It's severance
3 subtracted.  It's my understanding the position of
4 the movants is that that severance should not be
5 included.
6    Q    And where does that understanding
7 come from?
8    A    From counsel.
9    Q    So they just told you to assume that
10 and back those numbers out.  This isn't based on
11 some independent expertise or analysis on your
12 part.
13    A    What they said was the severance is
14 not part -- should not have been included, and
15 then once they told me that, I did the calculation
16 to exclude the severance.
17    Q    Okay.  And if you would turn to
18 paragraph -- excuse me, paragraph 40 of your
19 report.
20    A    Okay.
21    Q    You make some observations concerning
22 the RESIs, residential -- you understand what I
23 mean by RESIs?
24    A    I do.
25    Q    And what is that?  What do you mean

| Page 248 | Page 249 |
|---|---|

**Page 248**

1        M. Zmijewski
2 by RESIs?
3    A    What I believe you mean by RESIs is
4 residential mortgages and mortgage-backed
5 securities?
6    Q    Right.
7        What is the point here that you are
8 making in paragraph 40?
9    A    Well, I think it's clear if you look
10 at the exhibit, which is -- I got all mixed up,
11 sorry.  D, as in David, 1.
12        I was asked the question:  What
13 percent of the mortgage and mortgage-backed
14 securities were transferred to Lehman's, and what
15 amount of value.  So, I -- the Exhibit D-1
16 calculated just that.
17    Q    I think you meant to say to Barclays.
18    A    Thank you.
19    Q    To what end?
20    A    I was asked this question by movants'
21 counsel, what mortgages, mortgage-backed
22 securities were transferred to Barclays from
23 Lehmans, and this calculation is the answer to
24 that question.
25    Q    You don't draw any significance or

**Page 249**

1        M. Zmijewski
2 relevance of it, you are just responding to a
3 specific question from the lawyers?
4    A    Well, it answers a specific question,
5 so that's my opinion, that 67 percent of the
6 mortgage, of the value of the mortgage and
7 mortgage-backed securities in Lehman, from Lehman,
8 was transferred to Barclays.
9    Q    There is no relevance as far as you
10 are aware to your windfall calculation?
11    A    It is not an input into my windfall
12 calculation.
13    Q    That is, you were asked a question,
14 you answered a question, and that's the sum of the
15 reason you included it in your report; right?
16    A    Correct.
17    Q    Did you use a -- in your calculation
18 of the percentage, your numerator and denominator,
19 they involved different dates; right?
20    A    My calculation of 70.3 percent, do
21 you see that number?  It's the fourth line down,
22 on the right hand -- oh, I'm sorry.  It was on the
23 exhibit.  My apologies.  The forth line down to
24 the right, 70.3 percent?
25    Q    Um-hum.

Page 250

M. Zmijewski

1
2     A     All of that analysis is based on
3 September 16th, 2008, the inventory that was
4 provided from Lehmans to Barclays with respect
5 to -- they were providing all the inventory, but
6 one of the spreadsheets was related to mortgage
7 and mortgage-backed securities, and I analyzed
8 that spreadsheet.
9           To make sure that I had just another
10 way to view it, the numerator of that calculation,
11 instead of using the Lehman prices, which had a
12 total value of 4.226, I used the custodial price
13 marks, and those price marks are available as of
14 9/19. So for that second calculation, which is
15 more conservative than the first, I used the
16 custodial marks of 4,034,000,000, and it is a
17 different date, 9/19.
18     Q     Why did you use different dates?
19     A     Because the inventory that was being
20 sent over and the records that were being
21 transferred are on 9/16 and the custodial marks
22 are 9/19, and neither one exists on the other
23 date.
24     Q     If you could turn to page 34 of your
25 report.

Page 251

M. Zmijewski

1
2           And just going back to your last
3 answer, what was your source for determining the
4 RESIs?
5     MR. TAMBE:  Object to the form of the
6 question.
7     Q     The values that you used.
8     A     There was a series of e-mails that --
9 which is footnote 72. If you look on page 23,
10 there are three e-mails that included eight Excel
11 files. These e-mails are from Lehman to Barclays
12 identifying here is our, here is our valuation of
13 all of our different financial assets, and it's in
14 eight different Excel files.
15           One of those files contained the
16 residential mortgages, mortgage and
17 mortgage-backed securities, not residential,
18 mortgage and mortgage-backed securities, of which
19 a subset was residential. That is the source of
20 the first four lines.
21           And that then the next line,
22 custodial values, are from the BoNY custodial
23 values and the JPM Annex A asset values, and that
24 is in -- I don't know what footnote it is in the
25 text. It is in footnote two to the table D-1.

Page 252

M. Zmijewski

1
2           Then the specific cites are given, in
3 that note two to table D-1. It would be in one of
4 the footnotes in the text as well, but I can't
5 grab it right away. I can look for it if you
6 would like.
7     Q     That's okay.
8           Turning to the footnote 115 on
9 page 34, you reference a conference call with
10 analysts on September 17th, 2008, in which
11 Barclays announced the Lehman acquisition will
12 improve its capital ratios.
13     A     Yes.
14     Q     The transaction is capital ratio
15 accretive without additional equity issuance.
16     A     Yes.
17     Q     Did you review the transcript of that
18 call?
19     A     Yes.
20     Q     What was the purpose in your
21 reviewing it?
22     A     I just wanted to -- Professor
23 Pfleiderer talks about it, so I wanted to read
24 what he wrote.
25     Q     Does that -- sorry.

Page 253

M. Zmijewski

1
2           In the conference call, does Barclays
3 indicate that they expect to have a gain on the
4 transaction, meaning that assets will be greater
5 than liabilities?
6     A     Yes.
7     Q     So it's clear from reading the
8 conference call that Barclays was at this time not
9 expecting the deal to be a wash or for them to
10 have to have a loss in terms of assets being more
11 than liability -- liabilities being more than
12 assets; correct?
13     MR. TAMBE:  Objection to the form of
14 the question.
15     A     Correct.
16     Q     And the gain that is being described
17 by Barclays, capital ratio accretive and so forth,
18 is not just a purchase accounting gain, but rather
19 a gain in terms of assets being greater than
20 liabilities; correct?
21     MR. TAMBE:  Objection to form.
22     A     They are one and the same thing,
23 so --
24     Q     Fair enough.
25           The gain was -- was it your

Page 254

1    M. Zmijewski
2  understanding from reading the conference call
3  that the gain was -- did not just involve
4  non-financial assets, but the actual financial
5  assets would be greater than liability?
6    MR. TAMBE: Object to the form.
7    A    No. It was the total assets. It was
8  the deal. It was the effect of the deal. It
9  wasn't financial, just financial or just
10  non-financial. It was the deal itself, the entire
11  deal, contrasting -- similar to Mr. Golden's
12  1.85 billion negative number, they have after tax
13  the positive $2 billion.
14    Q    You use the term "fire sale." What
15  is a fire sale?
16    A    I used the term?
17    Q    Yes, you do.
18    A    Oh, in my report?
19    Q    Yes.
20    A    Oh, okay.
21    That is the term that Professor
22  Pfleiderer used, and I would interpret that term
23  to be different from a willing buyer, willing
24  seller, where both side have information and
25  neither side has some type of pressure or stress

Page 255

1    M. Zmijewski
2  to sell.
3    I would view it not that, but indeed
4  that it's a price at which one of the parties had
5  some type of pressure to sell. So it would not be
6  a fair market value.
7    Q    So if a party was forced to sell
8  something quickly, that asset -- and they had an
9  auction and got the best available price for that
10  asset, and it sold at $100, the $100 would not be
11  the fair market value for that asset?
12    A    Because they were forced to sell it.
13  The whole notion of a fire sale is that they were
14  forced to sell it, and they could sell it for
15  something else if they were not forced to sell it.
16  The whole notion of a fire sale is that you are
17  selling something below what you could sell it if
18  you had sufficient time to go through the standard
19  normal process.
20    Q    It's a function of time, time
21  pressure or time horizon to sell?
22    A    Fire sales are usually a function of
23  time; correct.
24    Q    In a situation where someone has,
25  instead of, you know, six months to sell

Page 256

1    M. Zmijewski
2  something, they have a week to sell something, and
3  they have an auction and a bid, and the price, the
4  asset goes for $100, you would say that is not
5  fair market value because that time pressure --
6  the time span for selling it was short?
7    A    It doesn't meet the -- the definition
8  of a market value is where -- part of the
9  definition is where neither party has some undue
10  reason to sell, so that they are not pressured to
11  sell. The IRS has a definition like that. The
12  courts have a definition like that.
13    So, the very nature of your
14  hypothetical is that it violates that definition
15  of fair market value or market value.
16    Q    So, was Barclays' sale -- excuse me.
17    So, was Lehman's sale of its assets a
18  fire sale?
19    A    I don't know the answer to that.
20    Q    What would it depend on?
21    A    Did Barclays pay market value or
22  didn't they pay market value? Based on the
23  calculations that I have here, it indicates that
24  they did not pay market value.
25    Q    When you say based on the

Page 257

1    M. Zmijewski
2  calculations that you have here --
3    A    My calculations calculate the fair
4  value of the assets and the consideration and the
5  difference of $11 billion. They did not pay,
6  Barclays did not pay $11 billion.
7    Q    I want to unpack that, but you will
8  agree that a lot of those calculations are made by
9  others and you are relying on them; correct?
10    A    Correct.
11    Q    Now, if you think of the Barclays
12  sale in terms, and the Lehmans sale in terms of
13  the sale of a business that has been on the block
14  for months, and then finally gets sold for X,
15  isn't X arguably the market value?
16    A    Is this a hypothetical or --
17    Q    Yes.
18    A    -- trying to portray the facts?
19    Q    We will treat it as a hypothetical,
20  despite possible similarities with our case.
21    A    You said that under your breath. I
22  don't know if the microphone picked it up.
23    Q    She got it. It's up here.
24    A    Okay.
25    If in fact it was an orderly sale,

Page 258

M. Zmijewski

1  and at the time of the sale -- so a fire sale
2  typically happens because you don't have enough
3  time. If at the time of the sale, if the party
4  had some type of pressure to sell, which is
5  usually a function of time, then, then independent
6  of time, it's not a fair market value. It
7  violates the definition of fair market value. If
8  they had pressure to sell. If they were forced
9  for some reason to sell.
10    Q    How much time do they have to have in
11  order for it not to be a fire sale?
12    A    It is not just time. It's at the
13  time of the sale. Time is usually a part of this
14  calculation or part of this assumption, if you
15  have to sell immediately. So the issue is at the
16  time of the sale, do they have un- -- some undue
17  pressure to sell because of some liquidity issues
18  or some other issue where they need to dispose of
19  the asset, where in an orderly disposition the
20  price would be different.
21    Q    So if I, I take it, I have to sell my
22  house within a year, and I have it on the market
23  for a year, and the year comes up, and in the year
24  I take the best offer available, is that fair

Page 259

M. Zmijewski

1  market value for the house?
2    A    No, it would not be. It could -- it
3  might not be. It depends. If you are right at
4  the I have to sell tomorrow, and somebody makes
5  you an offer and they make you a lowball offer,
6  and you say I have to take it, I know it's not the
7  right price or it's not the price I could get if I
8  just kept waiting, then it's not fair market
9  value.
10    Q    If you would turn, please, to page 50
11  of your report.
12        Now, you say that movants -- strike
13  that.
14        You take exception to
15  Professor Pfleiderer's view that the presence of
16  some $5 billion discount with respect to the
17  $70 billion assets referred to in subpart D of the
18  purchase, the purchase agreement -- strike that.
19        Do you under- -- do you understand
20  this issue about a $5 billion discount, what it's
21  referring to?
22    A    Yes.
23    Q    What is it? What is the issue?
24    A    It's referring to a discount on

Page 260

M. Zmijewski

1  the -- I will call it the repo collateral. I
2  think that is what Mr. -- Professor Pfleiderer
3  calls it.
4    Q    Did you ever do anything to try to
5  value Lehman's assets as of any date prior to
6  September 17th?
7    A    I did not.
8    Q    The reference to $70 billion in
9  subpart D of the asset purchase agreement,
10  definition of purchased assets, do you have any
11  idea or any opinion as to whether that is an
12  accurate, reasonably accurate estimate of book
13  value -- excuse me, reasonably accurate estimate
14  of fair market value for those assets that are
15  referred to?
16    A    I do not.
17    Q    So, with respect to the -- you state
18  in paragraph 102 of your report, it is possible
19  that a $15 billion existed.
20        MR. TAMBE: Five billion.
21    Q    $5 billion discount existed at the
22  inception of the transaction. Do you see that?
23    A    I do.
24    Q    What do you mean by the inception of

Page 261

M. Zmijewski

1  the transaction?
2    A    Professor Pfleiderer -- if you go to
3  paragraph 98, this section of my report refutes
4  his opinion. And my opinion eight is quoted from
5  Professor Pfleiderer: "The movants' assertion of
6  a secret $5 billion discount from inception is
7  implausible."
8        So that is his opinion, and what I do
9  in the remainder of this section is refute that
10  opinion. And so I just -- and his
11  characterization of inception, so I am using
12  inception as he used it, his characterization of
13  inception was that when the deal was starting to
14  be negotiated and discussed prior to the closing,
15  at that point in time. That is how I interpreted
16  his report, and that's what I interpreted to be
17  inception.
18        And his opinion that -- is that it's
19  implausible, and I believe I documented clearly
20  that he doesn't have foundation and therefore it
21  is plausible.
22    Q    You say that it is possible. Have
23  you reached -- possible that a $5 billion discount
24  existed at inception of the transaction. Have you

| Page 262 | Page 263 |
|---|---|

**Page 262**

1              M. Zmijewski
2    reached any opinion as to whether it is likely or
3    unlikely?
4         A    Looking at the valuation experts'
5    analysis, the exhibit that we discussed earlier,
6    $5.1 billion is -- maps to this $5 billion, so
7    based on that evidence, the answer would be that
8    it is plausible and likely and -- that it existed.
9         Q    Is that based on anything other than
10   that?
11        A    No.
12        Q    Why do you say -- if you now believe
13   that it is likely, why is it you didn't say that
14   in your report?
15             MR. DAKIS:  Objection to form.
16        A    I do discuss in that previous
17   section, the undervaluation of the assets, which
18   is the 5 billion -- is equivalent to a $5 billion
19   discount.
20             Professor Pfleiderer was using
21   specific words in a specific context, and this
22   section of my report refutes his statement, and
23   his singular statement.  Well, and -- his
24   statement, which is a summary statement of a
25   number of other conclusions that he has in section

**Page 263**

1              M. Zmijewski
2    three of his report.
3         Q    You have seen your $5 billion
4    discount referenced in movants' papers; correct?
5    That you have read?
6         A    Correct.
7         Q    What do you understand that to be
8    referring to?
9         A    I believe it's the same as this
10   $5 billion discount, and it was a negotiated
11   discount off of the repo collateral.
12        Q    So that the repo collateral was
13   really worth the 49.7 that it was marked at?
14             MR. TAMBE:  Objection to the form of
15   the question.
16        Q    Is that part of this?
17             MR. DAKIS:  Same objection.
18        A    Yes.
19        Q    And the fact that the parties treated
20   it as being less than that for purposes of the
21   transaction, is that where the discount comes in?
22        A    Well, the movants had -- if I -- it's
23   been quite a while since I read those documents.
24   My recollection is that the movants have two
25   positions.

| Page 264 | Page 265 |
|---|---|

**Page 264**

1              M. Zmijewski
2             Position one was that the initial
3    decision was to mark down the value of the assets,
4    and by marking down the value of the assets, it
5    would be an embedded $5 billion discount.  If I
6    could finish.  I think that -- I believe that is
7    what is in their motion.  I might be wrong.  I
8    might not be remembering correctly.
9             The second position they have is that
10   the change because there was what I call the
11   true-up in the repo collateral was taken out in
12   the clarification letter, the alternative way that
13   Barclays was able to capture the discount was
14   through not having a true-up of the repo
15   collateral.
16             That is my recollection.  I haven't
17   read that in some time, but this again is just a
18   recollection of the movants' motions, and they are
19   what they are.
20        Q    On the first point, were you aware of
21   any evidence that Lehman's assets were marked down
22   by $5 billion?
23        A    If I didn't say it in my previous
24   response, their initial -- I believe the position
25   of the movants, and I mean, you can read their

**Page 265**

1              M. Zmijewski
2    documents, I am sure you have -- so, the initial
3    position was the discount was going to be
4    effectuated through a reduction in the book values
5    of Lehman's, but then was not, and was executing
6    through reversing or negating the true-up for the
7    repo collateral.  That is my recollection of their
8    position.
9         Q    Okay.  And on the first position, are
10   you referring to the assertion that the
11   $70 billion referred to in subpart D of the APA
12   was really worth more like $75 billion?
13        A    I would have to look at their
14   motions.  They pulled testimony from different
15   deponents.  I don't remember all that testimony.
16        Q    Do you recall whether there actually
17   was any markdown -- strike that.
18             Do you know whether the first
19   scenario you described had any residual impact on
20   the second scenario?
21        A    I don't.
22             MR. TAMBE:  Objection, objection to
23   the form of the question.
24             MR. DAKIS:  Same objection.
25        Q    Now, when you are giving your expert

| | |
|---|---|
| Page 266 | Page 267 |

**Page 266**

1        M. Zmijewski
2    testimony opinion about the $5 billion discount,
3    let me just make sure I understand which -- what
4    discount you are talking about, and that, and that
5    is your assertion that the repo assets were really
6    worth $5 billions more than -- than what?
7        A    Than they were recorded in the
8    opening balance sheet of Barclays.
9        Q    And what were they recorded in the
10   opening balance sheet of Barclays at?
11       A    This is on Exhibit A-2. It's
12   44.43 billion. It's the second column of numbers.
13       Q    You say A-2?
14       A    A-2. Apple two. Second column of
15   numbers, very last number.
16       Q    And that's your understanding of
17   the -- that is your understanding of Barclays'
18   final valuation of the repo collateral?
19       A    Well, I am not sure what you mean by
20   final. It's the valuation that was put in their
21   opening balance sheet that was provided.
22       Q    Okay.
23       A    To the shareholders, and the SEC and
24   all the regulatory agencies.
25       Q    That is your understanding of what

**Page 267**

1        M. Zmijewski
2    Barclays' valuation in their -- after their
3    audited financial process was of the repo?
4        A    Yes. This comes from Schedule 88-B.
5        Q    And you are saying that the Chicago
6    Partners valuation of that or calculation of
7    valuation perhaps based on other marks was
8    49 billion?
9        A    49.5; correct.
10       THE VIDEOGRAPHER: Counsel, I have to
11   change the tape.
12       MR. THOMAS: Go ahead.
13       THE VIDEOGRAPHER: That is the end of
14   tape number four. The time is now 4:46 p.m.
15       We are now off the record.
16       (Pause)
17       THE VIDEOGRAPHER: This is the start
18   of tape number five. The time is now
19   4:47 p.m.
20       We are now back on the record.
21   BY MR. THOMAS:
22       Q    And the $5 billion discount that you
23   referred to, you talked about in your report, is
24   the difference between the 49.5 and the 44.4?
25       A    Correct.

| | |
|---|---|
| Page 268 | Page 269 |

**Page 268**

1        M. Zmijewski
2        Q    That is what you are talking about
3    when you talk about the $5 billion difference,
4    discount?
5        A    Well, I characterize it as an
6    undervaluation.
7        Q    Okay. And that is a big difference,
8    though, right, undervaluation and discount?
9        MR. TAMBE: Object to the form.
10       Q    Or is it?
11       A    "Discount" is such a broad term. You
12   know, you go to the Walmart store and you get
13   discounts. I mean, it's such a broad term used in
14   so many different ways.
15       It's a discount off the market value.
16   An undervaluation. If somebody pays less than
17   fair market value, one can characterize that as a
18   discount. I call it an undervaluation. I think
19   that is a more precise term, indicating that the
20   value on their opening balance sheet is less than
21   the value calculated by these valuation experts.
22       Q    Now, the valuation experts calculated
23   this amount, and I think -- is it accurate that
24   most of them, like yourself, relied on other
25   valuations to do their calculations, by other

**Page 269**

1        M. Zmijewski
2    persons, or did they go out there and try to
3    independently value these assets?
4        MR. TAMBE: Object to the form of the
5    question.
6        MR. DAKIS: Same objection.
7        A    It's a mix of the two.
8        Q    And what you are referring to as the
9    mix that is independently valuing, you mean going
10   and looking up things in Bloomberg to see prices
11   and so forth?
12       MR. TAMBE: Object to the form.
13       A    I just didn't understand -- some of
14   what they did was comparable pricing.
15   Mr. Schwaba, I don't know if you deposed
16   Mr. Schwaba, but Mr. Schwaba discussed his
17   comparable pricing where he found similar
18   securities and used those securities to price the
19   securities at issues. That is a valuation method.
20       Some of it is looking up third-party
21   prices and using third-party pricing, which is
22   what I did and Barclays does for the equities.
23       And some of it then is having --
24   adopting a detailed valuation model and measuring
25   the inputs into that valuation model and pressing

## Page 270

1        M. Zmijewski
2    the button to do the calculations.
3        So, that is another form of
4    valuation, and Mr. Olvany, Mr. Slattery, used all
5    three of those methods.
6    Q    And this $49 billion figure was
7    calculated in late 2009, or early 2010?
8    A    Early 2010.
9    Q    And the $44.4 billion figure, as you
10   cited, was calculated by Barclays approximately
11   when?
12   A    I don't remember when they had
13   their -- they have a -- they came with a
14   preliminary balance sheet that turned out to be
15   very close to their final opening balance sheet.
16   I don't remember the date of that. It's sometime
17   in the middle, roughly in the middle of 2008.
18   Q    Nine?
19   A    Nine.
20   Q    2009?
21   A    Roughly in the middle of 2009, thank
22   you.
23   Q    So both of these figures are ex post
24   at least months after the sale transaction, that
25   these amounts were calculated; right?

## Page 271

1        M. Zmijewski
2    A    I wouldn't use ex post in the same
3    way. It's confusing. Because there is two ways
4    to use -- to say something is ex post. One is to
5    use ex post information, the other is to do it
6    after the date.
7        Barclays valued these assets after
8    the closing date and used after-the-fact
9    information.
10   Q    Okay.
11   A    Where the valuation experts only --
12   although they conducted the valuation in 2010, it
13   was using information as of the closing date.
14   Q    Both calculations were done months or
15   years after the sale transaction; correct?
16   A    Correct.
17   Q    Do you know what Barclays' valuation
18   or estimate or view of the value of the repo
19   collateral was at the time of the sale
20   transaction, if they had one?
21       MR. TAMBE:  Object to the form.
22   A    I don't know that there was one view.
23   I don't know that they had a specific view at the
24   time of the sales transaction. Clearly there is
25   evidence in the record from individuals from

## Page 272

1        M. Zmijewski
2    Barclays stating certain numbers related to the
3    value of these assets.
4    Q    Do you recall --
5    A    But I don't know if that is a
6    Barclays view or individuals at Barclays.
7    Q    Do you recall the rough range of
8    those numbers?
9    A    My Exhibit E, Edward, dash one, lists
10   different individuals, not all Barclays
11   individuals. Some of these individuals are from
12   Barclays.
13   Q    And you think -- you -- part of your
14   assumption in doing your work was that these
15   reflect, these values reflect Barclays' view of
16   the amount of the repo collateral?
17   A    That is not what I said. You asked
18   me the question did Barclays have a view, and my
19   answer was, well, some individuals gave testimony
20   about the number, and I don't know if that is
21   Barclays' view or the individuals' view, but there
22   is factual evidence on what some individuals at
23   Barclays said about the valuation.
24   Q    Are you aware of anyone at Barclays
25   at the time or representing Barclays at the time

## Page 273

1        M. Zmijewski
2    expressing the view that the value of the repo
3    assets were substantially lower than 49.7, closer
4    to the $45 billion range?
5        MR. TAMBE:  Objection to the form.
6    A    I don't remember.
7    Q    How did you pick out these particular
8    e-mails?
9    A    Searching the records, this is the
10   information I observed that was valuing these
11   assets somewhere between the 18th and the 20th of
12   September, 2008.
13   Q    So you went out and searched the
14   records yourself or had someone do it under your
15   direction?
16   A    The Chicago Partners staff did, yes.
17   Q    And the directive was to find
18   evidence of what Barclays viewed the value of the
19   repo collateral as?
20   A    No. These are not all Barclays
21   individuals. It was in the record what testimony
22   was offered related to the value of the repo
23   assets, so Ms. Leventhal, for example, was someone
24   who was at the New York Fed, so. And some of
25   these individuals -- there are two notes from the

Highly Confidential

Page 274

M. Zmijewski

1
2 court transcript, and Mr. King of course is from
3 the Malloy or from Barclays. Mr. Tonucci is from
4 Lehman.
5 It was just a collection of, for
6 these dates, what were people saying related to
7 these dates the value of these assets were. It
8 was just part of the record, so I put it on an
9 exhibit.
10 Q So you think Mr. King thought the
11 value of the repo collateral was over $52 billion?
12 A I don't know what he thought. I only
13 know what he wrote.
14 Q But is that an indication of what
15 he -- what you get, what you want to get is what
16 they thought; right? What they thought the value
17 was?
18 MR. TAMBE: Objection to the form of
19 the question.
20 MR. DAKIS: Same objection.
21 A The -- the work of -- I don't know
22 what he thought. He was deposed, I am sure. I
23 don't know if he discussed this issue or not,
24 and --
25 Q Did you read his deposition?

Page 275

M. Zmijewski

1
2 A Mr. King's, I did. I looked at all
3 these depositions. I just don't recall what he
4 said about this.
5 Q Your take-away from Mr. King's
6 deposition was that he thought the repo collateral
7 was, fair market value, worth $52 billion?
8 MR. TAMBE: Objection to the form of
9 the question.
10 A I don't believe I said that. I
11 believe I said that this is an e-mail that
12 Mr. King wrote, and in that e-mail he indicated
13 the value of the repo collateral was
14 $52.3 billion.
15 Q Are you putting this in there to try
16 to suggest to the Court that Mr. King thinks the
17 value is $52 billion?
18 MR. DAKIS: Objection to form.
19 A I created this exhibit in response to
20 Professor Pfleiderer's statement that because of
21 the stress and the timing and that individuals
22 weren't deposed for some time later, we should
23 ignore all the evidence in the record with respect
24 to timeliness, timely statements of what the value
25 of the assets was.

Page 276

M. Zmijewski

1
2 So in response to that, I collected
3 the valuation information that was relevant to
4 these particular dates.
5 Q Okay. So, is it your sum and total
6 take-away that Barclays has had a view that the
7 collateral was worth near $49 billion or less than
8 that, or do you have any view, or you just don't
9 know what Barclays' view was?
10 A As I said before, I don't have an
11 opinion one way or the other what Barclays' view
12 was.
13 Q How about Lehman's view of the value
14 of the repo collateral as the collateral was
15 actually delivered to -- strike that.
16 What do you understand of Lehman's
17 view of value of the collateral as of the 19th?
18 A Again, some of these individuals --
19 Mr. Tonucci was the treasurer of Lehman. So some
20 of these individuals made statements about what
21 the value of that collateral was. Again, I don't
22 know that these individuals represent Barclays'
23 view. I'm not sure what the -- what you -- how
24 you would define a Lehman's view. Who has to do
25 that? There must be some legal way to figure out

Page 277

M. Zmijewski

1
2 what a Lehman's view is.
3 These were individuals from Lehman,
4 and this is what they wrote in documents or
5 testified to in the court transcript or in some
6 other hearing.
7 Q Now, when you say -- when you refer
8 to a discount, what -- between these numbers, a
9 $5 billion difference between these numbers, what
10 exactly are you saying when you say "discount"?
11 MR. TAMBE: Objection.
12 Q Does that mean simply that Barclays
13 is -- there wasn't a separate payment made for the
14 repo collateral, was there?
15 MR. TAMBE: Objection to the form of
16 the question.
17 MR. DAKIS: Same objection.
18 MR. TAMBE: Objection. Asked and
19 answered.
20 MR. DAKIS: Same objections.
21 A You're sort of asking a couple
22 questions there.
23 Q Sure.
24 You said that the discount that you
25 are talking about in your report, and you give

| Page 278 | Page 279 |
|---|---|

**Page 278**

M. Zmijewski

1
2  opinions about and so forth, is reflected by the
3  difference between these two numbers, the
4  49.5 billion the 44.4 billion, and you have said
5  discount means a lot of different things, discount
6  to what.
7        So what are you saying when you say
8  "discount" there?  Are you making the assertion
9  that there is a difference between the amount
10  Barclay valued the price at versus what you
11  believe the fair value, fair market value is?
12        MR. DAKIS:  Objection to the form.
13        MR. TAMBE:  Objection.  Asked and
14    answered and form.
15    A     What you just said is what the
16  exhibit measures.
17    Q     Okay.  But when you say "discount,"
18  do you mean anything more than that?  Is there
19  just simply a difference between what you say the
20  value of the repo was and what Barclays says it
21  was?
22    A     In my exhibits related to the
23  Barclays windfall, I don't believe I used the term
24  "discount."  It's an undervaluation,
25  undervaluation meaning there is a valuation on

**Page 279**

M. Zmijewski

1
2  Barclays' books about and that valuation is $5.1 billion
3  lower than the fair market value as assessed by
4  the experts from Chicago Partners.
5    Q     And is that the extent of your
6  knowledge and opinions about the $5 billion
7  discount?
8        MR. TAMBE:  Objection, to the extent
9    it mischaracterizes his testimony.
10        MR. DAKIS:  Same objection.
11    A     My report has all sorts of comments
12  and responses to Professor Pfleiderer's comments
13  about a discount, so it's -- that is all over the
14  report.
15    Q     Are you aware of any evidence that
16  there was some agreement between anyone at
17  Barclays and anyone at Lehman to mark down or
18  artificially treat the repo collateral as being
19  $5 billion less in order to convey to Barclays a
20  $5 billion windfall?
21        MR. DAKIS:  Objection to form.
22        MR. TAMBE:  Objection.
23    A     My reading of the movants' documents
24  and the evidence they put forth in those documents
25  is that there was some type of implicit agreement

| Page 280 | Page 281 |
|---|---|

**Page 280**

M. Zmijewski

1
2  of that sort.
3    Q     Between whom?
4    A     I don't recall who they -- who they
5  said the agreement was -- I forgot the individuals
6  who were doing -- who were leading the
7  negotiation, and who were making the agreements.
8  I don't remember who they were, but it's in the
9  movants' documents, 60(b) motion or briefs,
10  responses.
11    Q     Is that something you are going to be
12  giving an opinion about, as to why --
13    A     I am only making the statements in
14  response to your questions.  It's not in my
15  report.  None of that is in my report.
16    Q     Okay.
17    A     My -- I am only expecting to testify
18  on what's in my report, and if I do additional
19  work afterwards because I learned something new, I
20  would add it to my report.  But it -- my testimony
21  would be restricted to my report.
22    Q     Do you know what you are referring to
23  when you said stuff in the movants' papers about
24  any kind of implicit agreements?
25    A     Of course I know what I am talking

**Page 281**

M. Zmijewski

1
2  about.  There were allegations.  I don't remember
3  the individuals' names, but individuals from
4  Lehmans who were negotiating the contract were
5  simultaneously negotiating some type of severance
6  packages or employment packages with Barclays for
7  themselves, and movants claim that was a conflict.
8  That is my recollection.
9    Q     That's what you are referring to?
10    A     Correct.
11    Q     As I read your discussion of risk,
12  what you are saying is not that Barclays wasn't
13  undertaking a lot of risk, but that the risk would
14  have been factored into the agreement; is that
15  right?
16    A     I agree with that statement, but that
17  is not what I am saying.
18        It would have been taken into account
19  in the agreement.  But it would also be taken into
20  account into the value of the transaction approved
21  by the Court.
22        So, remember the benchmark is the
23  court-approved value, Mr. Golden's negative
24  1.85 billion.  So -- so my point is, whatever that
25  value is, I am using Mr. Golden's number, but the

Page 282

M. Zmijewski

1 Court's approved value, whatever that value
2 happens to be, took into account the risk of the
3 situation. It also took into account the benefits
4 from this merger.
5        It took all of that into account,
6 it's pretty clear from the record, the riskiness
7 of the situation, and the potential benefits to
8 the world, essentially they are somewhere in
9 there, in the record, was known by all the
10 parties, including the Court, so it was taken into
11 consideration in the Court's assessment of what
12 the value of the transaction is.
13    Q    And just breaking this down, first
14 just the initial predicate, you agree that
15 Barclays was taking a huge risk in doing this
16 transaction?
17        MR. TAMBE: Objection to the form of
18    the question.
19        MR. DAKIS: Same objection.
20    A    I try not to use words like "huge"
21 because it's hard to really quantify something
22 like that, but, you know, it was a large
23 transaction for them. It was a volatile time in
24 the market. So there was uncertainty.

Page 283

M. Zmijewski

1        And it was therefore risky, higher
2 risk than you normally have in normal
3 circumstances.
4    Q    With higher risk, do you usually get
5 higher return, or a chance of higher return?
6        MR. DAKIS: Objection to form.
7    A    Yes. However, that is worked into
8 the price when everybody is settling, sitting down
9 at the table and determining the price. It's
10 figured out then.
11        MR. THOMAS: I may be close to done.
12 Why don't we go off the record a minute.
13        THE VIDEOGRAPHER: The time is
14 5:07 p.m.
15        We are now off the record.
16        (Recess taken.)
17        THE VIDEOGRAPHER: The time is now
18 5:19 p.m.
19        We are now back on the record.
20 BY MR. THOMAS:
21    Q    Let me show you a document we will
22 mark as 709B.
23    A    Thank you.
24        (Exhibit 709B marked for

Page 284

M. Zmijewski

1        identification as of this date.)
2
3    Q    Have you seen this document before?
4    A    Yes.
5    Q    Can you describe what it is, please?
6    A    So it's an annual report filed with
7 the United States Securities and Exchange
8 Commission.
9    Q    Does it include Barclays' opening
10 balance sheet from the Lehman sales transaction?
11    A    I believe so.
12    Q    What page is that?
13    A    Page 99 of 121.
14    Q    Ninety-nine?
15    A    Ninety-nine. Upper right-hand
16 corner.
17    Q    Oh, upper right, sorry.
18    A    Page 83 on the source document.
19    Q    Is it your testimony that you believe
20 that Barclays materially understated the assets on
21 its opening balance sheet with respect to the
22 Lehman transaction?
23    A    I haven't thought about that issue.
24 I wasn't asked to think about it, so I haven't

Page 285

M. Zmijewski

1        even thought about it.
2    Q    What percentage of the value of the
3 repo collateral was Lehman-related assets?
4        MR. TAMBE: Objection to the form.
5        MR. DAKIS: Same objection.
6    A    I don't remember.
7    Q    Did you know at one point and you
8 don't recall, or are you not sure?
9    A    It was something that we discussed at
10 one point, but it wasn't anything that was
11 specifically relevant to me.
12    Q    It wasn't relevant to you how much of
13 that repo collateral was Lehman related?
14        MR. TAMBE: Object to the form.
15    A    Correct.
16    Q    Do you have any idea roughly what
17 the -- 50 percent, 10 percent, 90 percent?
18    A    I don't remember.
19    Q    You referred to Chicago Partners'
20 efforts at valuing the repo collateral. Did
21 Chicago Partners, in valuing those assets, only
22 use information available at the time of the
23 closing?
24    A    I believe so.

| Page 286 | Page 287 |
|---|---|

**Page 286**

           M. Zmijewski
1
2      Q     Do you think it's -- why did they do
3  that?
4           MR. DAKIS:  Objection to form.
5      A     Because we were asked to measure fair
6  value as of the date of the closing, 12:01 a.m.,
7  September 22nd.
8      Q     And that necessarily means you can't
9  consider information that came into existence
10 after 12:01 September 22nd?
11          MR. TAMBE:  Objection to the form of
12 the question.
13          MR. DAKIS:  Same objection.
14     A     It's not information that was
15 available.  If it's information that wasn't
16 available as of the closing, then it can't be used
17 to measure the value as of the closing.
18     Q     And that is a function of what?
19 Accounting principles or what your attorneys asked
20 you to do or --
21     A     It's a function of economic
22 principles.  The first principle is, if you are
23 valuing an asset as of a certain date, you use
24 information -- or at a point in time, you use
25 information as of that point in time.

**Page 287**

           M. Zmijewski
1
2      Q     Would you agree that an economic
3  analysis of Barclays' gain might also include an
4  assessment of whether the gain was reasonable
5  under the circumstances?
6           MR. DAKIS:  Objection to form.
7           MR. TAMBE:  Objection to form.
8           MS. TABATABAI:  Objection to form.
9      A     For the purposes of my calculation?
10     Q     No, just --
11     A     Just generally?
12     Q     Yes.
13     A     I am sure there is some situations
14 where maybe that's relevant.
15     Q     For the purpose of your calculation?
16     A     Not relevant.
17     Q     Why not?
18     A     Because my calculation is clear, it's
19 what did the Court approve for a value versus
20 what -- which -- I'm assuming that the Court had
21 an assessment of what the value was and what the
22 value of that transaction would be, and a
23 comparison of that to what Barclays actually
24 received in value as of the close of the
25 transaction is a Barclays windfall.

| Page 288 | Page 289 |
|---|---|

**Page 288**

           M. Zmijewski
1
2      Q     You're assuming the Court's approval
3  of the deal was predicated on a particular
4  relationship between assets and liabilities;
5  right?
6      A     A particular net value.
7      Q     Yes.
8      A     Well, I am not sure what you meant by
9  relationship.  My answer is, if you mean by
10 relationship a particular net value, then yes.
11     Q     And that is a particular net value,
12 so let's try to make it clean.
13          Your assumption that underlies your
14 report is that the court approval of the
15 transaction was based on a particular relationship
16 or particular net value relationship between
17 assets and liabilities; correct?
18     A     Yes.
19     Q     In other words, that assets had to be
20 X and liabilities had to be Y.
21          MR. TAMBE:  Object to the form.
22          MR. DAKIS:  Same objection.
23          MS. TABATABAI:  Same objection.
24     A     No.  The net difference between
25 assets and liabilities, plus consideration, you

**Page 289**

           M. Zmijewski
1
2  have 250 million in cash, that net is a certain
3  value.
4      Q     So --
5      A     So there are many ways to get that
6  value; right?  So --
7      Q     So assets minus liabilities equals X.
8      A     Assets minus liabilities minus cash
9  payment equals X.
10     Q     Now, you don't think that that was
11 the deal actually agreed to by the parties, do
12 you?
13          MR. TAMBE:  Objection to the form.
14          MS. TABATABAI:  Objection to form.
15          MR. DAKIS:  Objection to form of the
16 question.  Assets minus liabilities minus
17 cash equal X.
18     Q     That the deal was predicated on a
19 certain asset, liability and value relationship?
20          MR. TAMBE:  Object to the form.
21     A     I don't know what the parties had in
22 mind.  You know, the Court had to approve a
23 certain transaction, so, I am assuming the parties
24 understood that the Court had to approve the
25 transaction.

Page 290

1              M. Zmijewski
2      Q      Isn't the parties' intent usually
3 found in the parties' agreement that they enter
4 and sign?
5          MR. DAKIS:  Objection to the form.
6      A      I am being pulled into the legal area
7 again, so -- so since I am not trying to make a
8 legal opinion, but you can only -- my very small
9 understanding of the bankruptcy law is, it's
10 not -- the parties can't contract to have a
11 transaction that is different from the
12 court-approved transaction.  It wouldn't be a
13 valid contract, as far as I know.  But I'm not a
14 lawyer, so you would know that better than I.
15      Q      You've seen the parties' -- you've
16 viewed the parties' contracts.  There is nothing
17 in there that makes you think that the parties
18 intended the deal to be predicated on a certain
19 net value relationship between assets and
20 liabilities, is there?
21          MR. DAKIS:  Objection to the form.
22          MR. TAMBE:  Objection to form.
23          MS. TABATABAI:  Objection to form.
24      A      And that includes all three documents
25 we spoke of earlier?

Page 291

1              M. Zmijewski
2      Q      Yes.
3      A      In combination?
4      Q      In combination or separately or any
5 combination you want.
6      A      Separately there was a true-up just
7 by the nature of the repo collateral, and there
8 was a true-up in the original asset purchase
9 agreement for some ex post profits above -- I
10 think it's above 500 million.  So there were some
11 of these true-ups in the asset purchase agreement
12 by the nature of the repo contract.
13          So there were some true-ups there,
14 and those true-ups -- it wasn't until the
15 clarification letter that those true-ups were
16 taken out of the mix.  Because of those true-ups,
17 that had a result in some relationship between
18 assets and liabilities.
19      Q      What true-ups are you referring to?
20          MR. TAMBE:  Objection, asked and
21 answered.
22          MR. DAKIS:  Same objection.
23      Q      The contract provision that was taken
24 out, I understand that one, but if there is other
25 true-ups.

Page 292

1              M. Zmijewski
2          MR. TAMBE:  Same objection.
3          MR. DAKIS:  Same objection.
4      A      My understanding of the repo
5 liability is based on a repo contract, repurchase
6 contract, you give me collateral, I give you cash.
7 At the end of it we figure out, okay, we have to
8 either liquidate the collateral or I can give the
9 collateral back to and you give the cash back to
10 me.
11          And there is a net where you get the
12 value of your collateral or the cash equivalent of
13 the value of your collateral.  Somehow that deal
14 is trued up so that you get your collateral back
15 in true value.
16          And I believe that was -- I'm going
17 to call it undone or unwound by the clarification
18 letter.
19      Q      Do you believe Barclays when it
20 entered into the repo would have entered into the
21 repo but for the overall sales transaction?
22          MR. DAKIS:  Objection to the form.
23      A      I don't know what Barclays would do.
24      Q      You have no basis for an opinion on
25 whether that would have been commercially

Page 293

1              M. Zmijewski
2 reasonable for Barclays to enter into a repurchase
3 agreement?
4          MR. DAKIS:  Objection to form.
5      A      I recall Professor Pfleiderer's
6 discussion of that, and he said they wouldn't
7 enter into it, but I don't believe he had any
8 economic analysis on that point.
9          MR. THOMAS:  Thank you.  I have
10 nothing further.
11          THE WITNESS:  Thank you.
12          (Contined on next page with wintess
13 jurat.)
14
15
16
17
18
19
20
21
22
23
24
25

| Page 294 | Page 295 |
|---|---|

**Page 294**

```
 1          M. Zmijewski
 2      MR. TAMBE:  Thank you.
 3      THE VIDEOGRAPHER:  That concludes the
 4  video record for today.  The time is
 5  5:33 p.m.
 6      We are now off the record.
 7          oOo
 8      I, MARK ZMIJEWSKI, the witness herein,
 9  do hereby certify that the foregoing testimony of
10  the pages of this deposition to be a true and
11  correct transcript, subject to the corrections, if
12  any, shown on the attached page.
13      _____
14          MARK ZMIJEWSKI
15  Subscribed and sworn to before me this
16  _____day of _____,_____.
17  _____
18      NOTARY PUBLIC
19
20
21
22
23
24
25
```

**Page 295**

```
 1
 2  STATE OF NEW YORK  )      Pg.  of Pgs.
 3  COUNTY OF NEW YORK )
 4      I wish to make the following changes
 5  for the following reasons:
 6  PAGE  LINE
 7  ____ ____  CHANGE:_____
 8          REASON:_____
 9  ____ ____  CHANGE:_____
10          REASON:_____
11  ____ ____  CHANGE:_____
12          REASON:_____
13  ____ ____  CHANGE:_____
14          REASON:_____
15  ____ ____  CHANGE:_____
16          REASON:_____
17  ____ ____  CHANGE:_____
18          REASON:_____
19  ____ ____  CHANGE:_____
20          REASON:_____
21  ____ ____  CHANGE:_____
22          REASON:_____
23  ____ ____  CHANGE:_____
24          REASON:_____
25          _____
```

| Page 296 | Page 297 |
|---|---|

**Page 296**

```
 1
 2          C E R T I F I C A T E
 3  STATE OF NEW YORK    )
 4          : SS.
 5  COUNTY OF NEW YORK   )
 6
 7          I, BONNIE PRUSZYNSKI, a Notary
 8  Public with and for the State of New York,
 9  do hereby certify:
10      That MARK ZMIJEWSKI, the witness
11  whose deposition is hereinbefore set forth,
12  was duly sworn by me and that such deposition
13  is a true record of the testimony given by
14  the witness.
15      I further certify that I am not related
16  to any of the parties to this action by
17  blood or marriage, and that I am in no way
18  interested in the outcome of this matter.
19      IN WITNESS WHEREOF, I have hereunto
20  set my hand this 14th of April, 2010.
21
22      _____
23          Bonnie Pruszynski
24
25
```

**Page 297**

```
 1
 2          I N D E X
 3  WITNESS                   PAGE
 4  MARK ZMIJEWSKI
 5  BY MR. THOMAS             6
 6
 7
 8          E X H I B I T S
 9  Exhibit 706B Mr. Zmijewski's Expert Report 26
10  Exhibit 707B Spreadsheet           137
11  Exhibit 708B Chart from Mr. Golden's    188
12      Report
13  Exhibit 709B Annual report          283
14
15
16
17
18
19
20
21
22
23
24
25
```