**WINTHROP COUCHOT**
**PROFESSIONAL CORPORATION**
660 Newport Center Drive, Fourth Floor
Newport Beach, CA 92660
Telephone: (949) 720-4100
Facsimile: (949) 720-4111
Sean A. O'Keefe – NY Bar No. 1980853, CA Bar No. 122417
Paul J. Couchot – CA Bar No. 131934
Counsel for the SunCal Voluntary Debtors[1]

**Hearing Date: May 12, 2010 at 10:00 a.m. (EST)**
**Objections Due: May 7, 2010 at 4:00 p.m. (EST)**

**THE LOBEL FIRM, LLP**
840 Newport Center Drive, Suite 750
Newport Beach, CA  92660
Telephone:     (949) 999-2860
Facsimile:     (949) 999-2870
William N. Lobel – CA Bar No. 93202
Counsel for the SunCal Trustee Debtors[2]

**MILLER BARONDESS, LLP**
1999 Avenue of the Stars, Suite 1000
Los Angeles, CA 90067
Telephone: (310) 552-4400
Facsimile: (310) 552-8400
Louis R. Miller – CA Bar No. 54141
Special Litigation Counsel for SunCal Debtors

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>**LEHMAN BROTHERS HOLDINGS INC, et al.,**<br><br>        **Debtors.** | **Chapter 11**<br><br>**Case No. 08-13555 (JMP)**<br><br>**Jointly Administered** |

## NOTICE OF MOTION OF THE SUNCAL DEBTORS FOR AN

## ORDER DETERMINING THAT THE AUTOMATIC STAY DOES NOT APPLY; OR, IN

## THE ALTERNATIVE, GRANTING RELIEF FROM STAY

---

[1] SunCal Communities I LLC, SunCal Communities III LLC, SCC/Palmdale LLC, Acton Estates LLC, SunCal Beaumont LLC, SunCal Emerald Meadows LLC, SunCal Johansson Ranch LLC, SunCal Bickford Ranch LLC, SunCal Summit Valley LLC, Seven Brothers LLC, Kirby Estates LLC, SJD Partners Ltd., SJD Development Corp., SCC Communities LLC, North Orange Del Rio Land LLC and Tesoro SF LLC, the debtors and debtors-in-possession (collectively, the "SunCal Voluntary Debtors").
[2] Steven M. Speier, the Chapter 11 Trustee on behalf of SunCal Marblehead, LLC, SunCal Heartland, LLC, LB/L-SunCal Northlake LLC, LB/L-SunCal Oak Valley LLC, SunCal PSV LLC, Delta Coves Venture LLC and SunCal Oak Knoll, LLC (collectively "SunCal Trustee Debtors).  The SunCal Voluntary Debtors and the SunCal Trustee Debtors are collectively referred to as the "SunCal Debtors."

62890.12

**PLEASE TAKE NOTICE**, that the SunCal Debtors have filed a Motion pursuant to Section 362(d) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for an Order Determining That the Automatic Stay Does Not Apply; Or, in the Alternative, for Relief from Stay (the "Motion").

**PLEASE TAKE FURTHER NOTICE** that a hearing will be held in connection with the Motion (the "Hearing") on **May 12, 2010 at 10:00 a.m. (prevailing Eastern time)** before the Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004, Room 601.

**PLEASE TAKE FURTHER NOTICE** that responses or objections, if any, to the Motion and the relief requested therein must be made in writing, conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Bankruptcy Court, set forth the basis for the objection and the specific grounds therefore, and be filed with the Bankruptcy Court electronically in accordance with General Order M-242, as amended by General Order M-269, by registered users of the Court's electronic case filing system (the User's manual for the Electronic case Filing System can be found at www.nysb.uscourts.gov, the official website for the Bankruptcy Court), with a hard copy delivered directly to the Chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004 and served in accordance with General Order M-242 or by first-class mail upon each of the following:

(i)    Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, (Attn: Richard P. Krasnow, Esq., Lori R. Fife, Esq., Shai Y. Waisman, Esq., and Jacqueline Marcus, Esq.), attorneys for the above-captioned Debtors;

(ii)    the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Andy Velez Rivera, Paul Schwartzberg, Brian Masumoto, Linda Riffkin, and Tracy Hope Davis);

(iii)    Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, (Attn: Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq.), attorneys for the Official Committee of Unsecured Creditors appointed in these cases;

(iv)    Cleary Gotlieb LLP, One Liberty Plaza, New York, NY 10006, (Attn: Lindsee P. Granfield, Esq. and Lisa Schweiger, Esq.) and Sullivan & Cromwell LLP, 125

Broad Street, New York, NY 10004, (Attn: Robinson B. Lacy, Esq. And Hydee R.

Feldstein, Esq.), attorneys for the Debtors' post-petition lenders;

      (v)    the attorneys for any other official committee(s) that may be appointed in

the above captioned cases;

      (vi)    Winthrop Couchot Professional Corporation, 660 Newport Center Drive,

Fourth Floor, Newport Beach, CA 92660 (Attn: Sean A. O'Keefe, Esq. and Paul J.

Couchot, Esq.) counsel for the SunCal Voluntary Debtors,

      (vii)    The Lobel Firm LLC, 840 Newport Center Dr Ste 750, Newport Beach, CA

92660 (Attn: William Lobel, Esq. and Mike Neue, Esq.) counsel for the SunCal Trustee

Debtors,

      (viii)    Miller Barondess LLP, 1999 Avenue of the Stars, Suite 1000, Los Angeles

CA 90067 (Attn: Louis R. Miller, Esq. and Martin H. Pritikin, Esq.) special litigation

counsel for the SunCal Debtors,

      (ix)    Irell & Manella LLP, 840 Newport Center Drive, Suite 400 Newport Beach,

CA 92660 (Attn: Alan Friedman, Esq.), attorneys for unsecured creditors' committee for

the SunCal Voluntary Debtors, and

      (x)    Weiland, Golden, Smiley, Wang Ekvall & Strok , LLP, Center Tower, 650

Town Center Drive, Suite 950, Costa Mesa, CA 92626 (Attn: Lei Lei Wang Ekvall, Esq.),

attorneys for unsecured creditors' committee for the SunCal Trustee Debtors.

so as to be received on or before 4:00 p.m. (prevailing Eastern time) on May 7, 2010, or such

shorter time as the Bankruptcy Court may hereafter order and of which you may receive

subsequent notice. Only those objections which have been timely filed and served by the Objection

Deadline in accordance with the procedures herein may be considered by the Court at the Hearing.

    **PLEASE TAKE FURTHER NOTICE** that if you do not timely file and serve a written

objection to the relief requested in the Motion in accordance with this Notice and the Court's

Amended Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 1015(c)

and 9007 Implementing Certain Notice and Case Management Procedures (D.I. 2837), dated

February 13, 2009, the Bankruptcy Court may deem any opposition waived, treat the Motion as

conceded, and enter an order granting the relief requested in the Motion without further notice or

hearing.

    .

**PLEASE TAKE FURTHER NOTICE** that a copy of the Motion may be obtained at no charge at http://www.lehman-docket.com or for a fee via PACER at http://www.nysb.uscourts.gov.

Dated: April 21, 2010

Respectfully submitted,

  /s/  Sean A O'Keefe
Sean A O'Keefe
Paul J. Couchot
WINTHROP COUCHOT
PROFESSIONAL CORPORATION
660 Newport Center Drive, Fourth Floor
Newport Beach, CA 92660
Telephone: (949) 720-4100
Facsimile: (949) 720-4111

  /s/  Louis R. Miller
Louis R. Miller
MILLER BARONDESS, LLP
1999 Avenue of the Stars, Suite 1000
Los Angeles, CA 90067
Telephone: (310) 552-4400
Facsimile: (310) 552-8400

  /s/  William N. Lobel
William N. Lobel
THE LOBEL FIRM
840 Newport Center Dr Suite 750
Newport Beach, CA 92660
Telephone: (949) 999-2860
Facsimile: (949) 999-2870

*Attorneys for the SunCal Debtors*

**WINTHROP COUCHOT**
**PROFESSIONAL CORPORATION**
660 Newport Center Drive, Fourth Floor
Newport Beach, CA 92660
Telephone: (949) 720-4100
Facsimile: (949) 720-4111
Sean A. O'Keefe – NY Bar No. 1980853, CA Bar No. 122417
Paul J. Couchot – CA Bar No. 131934
Counsel for the SunCal Voluntary Debtors

**THE LOBEL FIRM, LLP**
840 Newport Center Drive, Suite 750
Newport Beach, CA  92660
Telephone:      (949) 999-2860
Facsimile:      (949) 999-2870
William N. Lobel – CA Bar No. 93202
Counsel for the SunCal Trustee Debtors

**MILLER BARONDESS, LLP**
1999 Avenue of the Stars, Suite 1000
Los Angeles, CA 90067
Telephone: (310) 552-4400
Facsimile: (310) 552-8400
Louis R. Miller – CA Bar No. 54141
Special Litigation Counsel for SunCal Debtors

Hearing Date: May 12, 2010 at 10:00 a.m. (EST)
Objections Due: May 7, 2010 at 4:00 p.m. (EST)

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>**LEHMAN BROTHERS HOLDINGS INC, et al.,**<br><br><br>Debtors. | **Chapter 11**<br>**Case No. 08-13555 (JMP)**<br>**Jointly Administered** |

## MOTION OF THE SUNCAL DEBTORS FOR AN ORDER

## ORDER DETERMINING THAT THE AUTOMATIC STAY DOES NOT APPLY; OR, IN

## THE ALTERNATIVE, GRANTING RELIEF FROM STAY

The SunCal Debtors[3] by and through their undersigned attorneys, hereby file this motion ("Motion") pursuant to Section 362(d)(1) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") praying for the entry of an order substantially in the form attached hereto as Exhibit "A" confirming the non-applicability of, and/or granting certain relief from, the automatic stay in the Debtors' Chapter 11 cases. In support of the Motion, the SunCal Debtors respectfully represent as follows:

## I.

## PRELIMINARY STATEMENT

1.      The automatic stay in the pending cases of Lehman Commercial Paper, Inc. ("LCPI") and Lehman Brothers Holdings, Inc. ("LBHI") (collectively, "Lehman") should be modified to prevent Lehman from using its stay as a sword to impede the SunCal Debtors' equitable subordination litigation (the "Adversary Proceeding"), which has been pending before the Honorable Erithe Smith, Bankruptcy Court for the Central District of California,[4] for over a year. Judicial economy and the balance of harms favor allowing this litigation, and the integrally related plan of reorganization, to proceed.

2.      The SunCal Debtors' chapter 11 cases have been administered by the California Bankruptcy Court since November 2008. The SunCal Debtors have filed a joint plan of reorganization (the "Plan"), which includes provisions providing for the equitable subordination

---

[3] The "SunCal Debtors" include Palmdale Hills Property, LLC ("Palmdale Hills"), SunCal Beaumont Heights LLC ("SunCal Beaumont"), SCC/Palmdale, LLC ("SCC Palmdale"), SunCal Johannson Ranch, LLC ("SunCal Johannson"), SunCal Summit Valley, LLC ("SunCal Summit"), SunCal Emerald Meadows, LLC ("SunCal Emerald"), SunCal Bickford Ranch, LLC ("SunCal Bickford"), Acton Estates, LLC ("SunCal Acton"), Seven Brothers, LLC ("Seven Brothers"), SJD Partners, Ltd. ("SJD Partners"), SJD Development Corp. ("SJD Development"),  Kirby Estates, LLC ("Kirby Estates"), SunCal Communities I, LLC ("SunCal I"), SunCal Communities III ("SunCal III"), LLC, SCC Communities LLC ("SCC Communities"), North Orange Del Rio Land, LLC ("SunCal Del Rio"), and Tesoro SF, LLC ("SunCal Tesoro") (the "SunCal Voluntary Debtors"), and Steven M. Speier, the duly appointed trustee ("Trustee") for the Chapter 11 estates of LB/L-SunCal Oak Valley, LLC ("SunCal Oak Valley"), LB/L SunCal Northlake ("SunCal Northlake"), LLC, SunCal PSV, LLC ("SunCal PSV"), Delta Coves Venture, LLC ("SunCal Delta Coves"), SunCal Torrance LLC, SunCal Oak Knoll, LLC, SunCal Marblehead, LLC ("SunCal Marblehead"), and SunCal Heartland, LLC ("SunCal Heartland") (the "SunCal Trustee Debtors").
[4] Referred to herein as "Judge Smith" or the "California Bankruptcy Court."

62890.12

of, among others, a series of claims (and the associated liens) (the "Disputed Claims") that were

filed against the SunCal Debtors' estates by Lehman ALI, Inc. ("Lehman ALI"), LCPI, OVC

Holdings, LLC ("OVC") and Northlake Holdings, LLC ("Northlake") (the "Lehman Entities").

3.      The Disputed Claims were filed on the basis of seven loans that were originally

made to the SunCal Debtors by Lehman ALI or LCPI.  However, unbeknownst to the SunCal

Debtors, these loans (the "Sold Loans") had been sold, pre-petition, to Fenway Capital, LLC.

("Fenway"), a non-debtor, pursuant to an August 22, 2008 repurchase agreement ("Repo").

4.      In order to effectuate and adjudicate the equitable subordination provisions in the

Plan, the SunCal Debtors filed the Adversary Proceeding in January 2009, which provides, *inter

alia*, for the equitable subordination of the Disputed Claims.  At the time the Adversary Proceeding

was filed, LCPI was the only one of the Lehman Entities in bankruptcy.  Accordingly, the SunCal

Debtors—believing that LCPI still owned the Disputed Claims based on LCPI-originated loans—

did not initially name LCPI as a defendant.

5.      Shortly after the Adversary Proceeding was filed, LCPI, asserting itself as the "sole

lender" on the LCPI loans, moved for relief from stay to foreclose on the SunCal Debtors'

properties securing its loans, arguing that its own automatic stay precluded subordination of its

claims, and thus effectuation of the Plan.  (The Lehman Entities subsequently filed their own

competing plan.)

6.      In March 2009, Judge Smith ruled that the SunCal Debtors could defend themselves

against LCPI's claims by seeking equitable subordination of those claims, and LCPI was added as

a defendant in the Adversary Proceeding.  Then, in December 2009, the Ninth Circuit Bankruptcy

Appellate Panel ("BAP") reversed Judge Smith's ruling; and so in March 2010, in compliance with

Judge Smith's further ruling, LCPI was dismissed from the Adversary Proceeding.

7.      Prior to the BAP ruling, the SunCal Debtors learned of the Repo, and Judge Smith

ruled that the Sold Loans were in fact sold to Fenway.  She further found that the Lehman Entities

made misrepresentations regarding this sale and their status as creditors when filing the underlying

1

proofs of claims in the SunCal Debtors' cases.[5]  Fenway was thus added to the Adversary

Proceeding as the owner of the Sold Loans and the creditor holding the Disputed Claims.

Accordingly, when LCPI was dismissed pursuant to the BAP ruling, the Adversary Proceeding

was largely unaffected, as subordination of the Disputed Claims was being pursued against non-

debtor entities.

8.    LCPI recently sought approval of a motion ("Compromise Motion") to enter into a

transaction with Fenway (the "Transaction") that will bring the Sold Loans into its estate—

*including a billion dollars worth of Disputed Loans made by non-debtor Lehman ALI*. Although

LCPI was dismissed from the Adversary Proceeding *just one month ago* to insure that its automatic

stay was not an impediment to the relief sought in the Plan and Adversary Proceeding, LCPI has

indicated that it will (through the Transaction) put itself back into the Adversary Proceeding and

use its automatic stay as a "sword" to thwart the Adversary Proceeding and Plan.

9.    This Court has previously ruled that the filing and pursuit of a plan of

reorganization that provides for the equitable subordination of claims held by a Lehman debtor, or

in which a Lehman debtor claims an interest, is not a violation of the Lehman debtor's automatic

stay (the "Shinsei Bank Ruling").[6]

10.    By this Motion, the SunCal Debtors seek relief from the stay in all applicable

Lehman Chapter 11 cases, to the extent necessary, to continue to pursue the claims in the

Adversary Proceeding and the related relief in the Plan. This relief is directed against the Disputed

---

[5] *See* Order on Objections to and Motion For Order Striking Claims Filed by the Lehman Entities ("the "Claims Order") and Findings of Facts and Conclusions of Law in Support of the Order on Objections to Claims (the "Claims Findings") dated October 2, 2009, attached as Exhibits A and B to the Declaration of Sean O'Keefe.
[6] At that hearing, the Court stated:

"It is true that the Shinsei plan…would have the effect of causing LBHI to recover less on its claim against Sunrise….But the Shinsei plan's potential negative impact on LBHI's recovery does not render the equivalent of a seizure of or exercise of control over estate property.  LBHI's right to collect on its claim against Sunrise depends on that clai's amount and priority and being valid under relevant Japanese law.  Case law is replete with examples of permissible creditors' actions with actual or potential negative consequences for debtor property."

Hearing Transcript, October 14, 2009 at 22:20-23:11 (O'Keefe Decl., Exh. C) (emphasis added).

62890.12                                    2

Claims (and the underlying debts and liens described therein) that were affirmatively filed against the SunCal Debtors, and that must be addressed for their reorganization cases to proceed.

11.      Finding that the stay does not apply—or modifying the automatic stay to grant this limited relief—would be consistent with the Shinsei Bank Ruling, with Judge Drain's ruling in *In re Metiom, Inc.*, 301 B.R. 634, 638-639 (Bankr. S.D.N.Y. 2003), and a well-established line of precedent in this Circuit barring the use of the automatic stay as sword. *Bohack Corp. v. Borden, Inc.*, 599 F.2d 1160, 1168 (2d Cir. 1979) ("[We] must be cautious to avoid a decision which could convert [the automatic stay] from a shield into a weapon."); *In re Saxon Indus., Inc.*, 43 B.R. 64, 67 (Bankr. S.D.N.Y. 1984) ("In light of the litigation initiated by Saxon, it would clearly be inequitable to allow Saxon to use § 362 to prevent Fox from pressing counterclaims."); *In re Wedtech Corp.*, 87 B.R. 279, 289 (Bankr. S.D.N.Y. 1988) ("Here, were the stay not to be lifted in the adversary proceeding for all purposes, [counter-claimant] would never be able to fix its claim, a result which is highly inequitable in light of [debtor's] suit against [counter-claimant].")

12.      The purpose of the automatic stay is to shield the debtor *from* defending itself in other fora, not to allow it to affirmatively use the stay as a shield when it is the claimant.  Here, LCPI inserted itself into the SunCal Debtors' proceedings when it sought relief from stay, filed proofs of claim against their estates, and filed a competing plan of reorganization—and sought to use its stay offensively so as to prevent the SunCal Debtors from pursuing their own Plan.  LCPI now seeks to once again insert itself into the SunCal Debtors' cases—and use its stay offensively again—by acquiring property to stop litigation that has been proceeding against *non-debtors*.

13.      In addition to avoiding the inequities of offensive use of the stay, in considering whether to grant for relief from stay for "cause," courts in this Circuit consider the factors laid out in *In re Sonnax Indus., Inc.*, 907 F.2d 1280 (2d Cir. 1990).  In connection with the instant case, the most important of the *Sonnax* factors are judicial economy and the balance of harms.  Both factors overwhelmingly favor relief from stay.

14.      <u>Judicial Economy</u>.  Judge Smith has exclusive jurisdiction over the administration of the SunCal Debtors' bankruptcies, including the competing plans of reorganization filed by the

SunCal Debtors and Lehman.  Judge Smith has been dealing with all questions regarding the validity and priority of claims against the SunCal Debtors for a year and a half, and has been presiding over the Adversary Proceeding since January 2009.  Discovery is now well under way in that case, with millions of pages of documents produced, and depositions set to proceed in a matter of days.  If all other disputes regarding claims against the SunCal Debtors are handled by Judge Smith, but the issue of equitable subordination of LCPI's claims must be litigated separately in this Court, it will result in a massive duplication of effort, waste of judicial and party resources, and concomitant delays.  Indeed, most of the legal and factual questions that affect LCPI affect the other defendants as well, and most of the relevant witnesses and evidence will be identical.

15.    <u>Balance of Harms.</u>  The SunCal Debtors and their creditors will be severely prejudiced if Lehman succeeds in its offensive use of the automatic stay, as it will seriously impair the Adversary Proceeding, and thus the SunCal Debtors' reorganization efforts.  The SunCal Debtors' hundreds of unsecured creditors *may be deprived of any opportunity whatsoever for recovery* on over $100 million in losses.  Conversely, if relief from stay is granted, it will have relatively little impact on Lehman's estate.  The SunCal Debtors would not seek damages against LCPI, only subordination of claims asserted against the SunCal Debtors, and avoidance of associated liens.  Litigation costs should remain largely unchanged from what they would have been prior to LCPI's acquisition of the Sold Loans, and should be minimal in light of the size of the Lehman estate.  Indeed, because judicial economy is promoted by having all issues regarding the validity and priority of Lehman's claims against the SunCal Debtors heard by Judge Smith, Lehman itself benefits from the expeditious resolution of these issues that stay relief will provide.

16.    The issues before this Court differ slightly with regard to LCPI and LBHI.  As to LCPI, the issue of whether its automatic stay applies to the SunCal Debtors' efforts to equitably subordinate its claims is on appeal to the Ninth Circuit.  Pending that appeal, this Court may determine that, assuming LCPI's automatic stay applies, relief from stay should be granted.  As to LBHI, this Court may determine that its automatic stay is not implicated by the SunCal Debtors' Adversary Proceeding in the first place; or that if it does apply, relief from stay should be granted.

17.     LBHI—which has never been named a party in the Adversary Proceeding or otherwise directly participated in the SunCal Debtors' bankruptcy proceeding—claims that the SunCal Debtors' efforts to subordinate claims associated with the Sold Loans will violate *its* automatic stay.  LBHI's argument is premised on the notion that it either *has* an interest in the Sold Loans, or *will have* an interest following consummation of the Fenway transaction.  Neither is true. LBHI currently has only an *indirect* interest in the Sold Loans.  Such an indirect interest does not constitute property of LBHI's estate for purposes of invoking its stay.  And although LBHI claims it will be subrogated to Fenway's security interest in the Sold Loans upon consummation of the Transaction, no such rights will exist—that, indeed, is the whole purpose of the Transaction.

18.     Even if LBHI's speculative current or future interest in the Sold Loans constitutes property of its estate, its stay does not apply to the SunCal Debtors' efforts to subordinate the associated claims—the automatic stay does not apply to efforts by a party to *defend* a claim asserted against it.  And even if LBHI's stay does apply, relief from stay should be granted for all the same reasons that relief from LCPI's stay should be granted: judicial economy and fairness dictate that the SunCal Debtors be permitted to adjudicate all issues regarding the priority and validity of Lehman's claims against them before Judge Smith.

## II.

## SUMMARY OF MATERIAL FACTS

### A.    The SunCal Debtors

19.     The SunCal Debtors are part of integrated network of residential development entities that operate under the common dba "the SunCal Companies" or "SunCal." The SunCal Debtors were formed as part of a joint venture with affiliates of LBHI, including, most importantly, LCPI and non-debtor affiliate Lehman ALI, to develop a series of large residential real estate projects (the "Projects").  Between about 2005 and 2007, Lehman ALI and LCPI made loans and/or equity contributions to the SunCal Debtors totaling approximately $2 billion.  LCPI made three of the fourteen loans at issue, totaling about $700 million of the $2 billion total.

20.     The initial joint venture projects that SunCal entered into with Lehman Entities

were profitable. However, as market conditions slowed in 2007, financial problems developed. The Lehman Entities induced the SunCal Debtors to continue developing the Projects through promises of payment to the Debtors' vendors and service providers.  The Lehman Entities also began to exercise more and more control over decisions made by the SunCal Debtors. Unfortunately, the Lehman Entities later reneged on their promises of payment, and instead attempted to foreclose on the Projects and leave nothing for hundreds of unsecured creditors who were owed in excess of $100 million for the goods and services they provided on the Projects.[7]

21.    The SunCal Debtors filed Chapter 11 proceedings in November 2008 to stay the Lehman Entities' foreclosure proceedings and to obtain time to reorganize.  The SunCal Debtors' administratively consolidated cases are pending before Judge Smith in Santa Ana, California.

**B.    SunCal Debtors' Prior Motion for Relief from LCPI's Stay**

22.    On November 10, 2008, the SunCal Debtors and certain affiliated SunCal entities[8] filed a motion for relief from stay in order to generally administer the SunCal bankruptcy cases to the extent that such cases, and the relief requested by the debtors therein, may affect the rights of LCPI ("Prior RFS Motion").  LCPI opposed the Prior RFS Motion.  At the November 20, 2008 hearing, the Court denied any generalized relief without prejudice, to allow the SunCal Debtors to re-file subsequent motions that made specific requests for relief from stay for cause shown.

**C.    The SunCal Debtors' Adversary Proceeding Against Non-Debtor Lehman Entities**

23.    On January 6, 2009, the SunCal Debtors filed the Adversary Proceeding against various non-bankrupt Lehman-affiliates, including Lehman ALI and its successors on certain loans, Northlake Holdings and OVC, for equitable subordination and related claims.  The Adversary Proceeding complaint requested, amongst other relief, that these entities' claims be equitably subordinated and to have their liens preserved for the benefit of the SunCal Debtors' estates pursuant to 11 U.S.C. § 510(c).  In light of this Court's denial of the Prior RFS Motion, the

---

[7] *See* Fourth Amended Complaint, ¶¶ 69-77, 79-85, 86-96, 107-114, 131 (Exhibit 13 to Roesch Declaration dated April 12, 2010 [D.E. 8261 (08-13555(JMP))]) (hereinafter, "Roesch Decl.").
[8] SCC Acquisitions, Inc., SunCal Management, LLC, and SCC Acquisitions.

SunCal Debtors did not name LCPI as a defendant.[9]

**D.    LCPI is Added to the Adversary Proceeding Based on Judge Smith's Ruling**

24.    On January 23, 2009, LCPI and Lehman ALI filed motions for relief from stay against eight of the SunCal Debtors (the "Lehman RFS Motions").  LCPI sought to foreclose upon liens securing three prepetition loans referred to as the "SunCal I Loan," the "Palmdale Loan," and the "Mezzanine Loan."  LCPI argued that any effort to equitably subordinate these loans (and the liens securing the same) was barred by its stay.  According to LCPI, this deprived the SunCal Debtors of the ability to reorganize, justifying relief from stay under 11 U.S.C. § 362(d)(2).

25.    In response, the SunCal Debtors cited a series of decisions establishing that an effort to disallow or equitably subordinate a claim filed against the estate was necessarily defensive in nature.[10]  Accordingly, this action was not violative of LCPI's automatic stay.

26.    Judge Smith denied the Lehman RFS Motions, finding that the SunCal Debtors had established colorable claims for equitable subordination, and that the Adversary Proceeding could proceed without violating LCPI's stay (the "Stay Finding").[11]  LCPI appealed the Stay Finding to the Ninth Circuit Bankruptcy Appellate Panel.

27.    As a result of the Stay Finding, the Adversary Proceeding complaint was amended in March 2009 to add LCPI as a defendant in connection with the three LCPI-owned loans.  The SunCal Debtors did not seek any damages from LCPI; rather, consistent with Judge Smith's Stay Finding, they sought only to equitably subordinate claims that LCPI raised against the SunCal Debtors, and to void and/or transfer to the estates the liens associated with those claims.

**E.    The SunCal Debtors' Discovery of Fenway's Ownership of the Loans**

28.    In the SunCal Debtors' cases, the Lehman Entities continuously represented that they were the *owners* of each of the loans at issue and consequently that *they* were the "creditors."

---

[9] On February 3, 2009, a First Amended Complaint was filed adding the recently-appointed Trustee of the SunCal Trustee Debtors as a plaintiff.

[10] *In re Metiom*, 301 B.R. 634, 638-639 (Bankr. S.D.N.Y. 2003); *In re Financial News Network*, 158 B.R. 570 (S.D.N.Y. 1993); *In re Merrick*, 175 B.R. 333, 338 (9th Cir. BAP 1994); *In re PRS Ins. Group*, 331 B.R. 580, 587 (Bankr. D. Del. 2005); *In re Meade*, 1999 WL 33496001, *1 (E.D.Pa. 1999).

[11] Stay Finding (O'Keefe Decl., Exh. D).

For example, in the Lehman RFS Motions, LCPI represented that it was the "administrative agent *and the sole lender*" under the SunCal I Loan, Palmdale Loan, and the Mezzanine Loan.[12]

29.    The SunCal Debtors did not question the veracity of the Lehman Entities' representations regarding their ownership of the loans until March 25, 2009, when Danske Bank disclosed that it was the owner of the "Century City Loan." Based on this disclosure, the SunCal Debtors requested, by letter of March 26, 2009, that the Lehman Entities disclose whether any of the remaining loans had been transferred to third parties.[13]

30.    On March 27, 2009—the day after the SunCal Debtors' letter—the Lehman Entities filed numerous proofs of claim ("POCs") with the California Bankruptcy Court in which they represented that they were the "creditors" who owned all of the loans at issue.[14] Neither Fenway nor the Repo was mentioned in those POCs. While the riders to the POCs stated that the Lehman Entities were filing as agents for the "Lenders" under the respective loan agreements,[15] the loan agreements named only the Lehman Entities themselves as lenders.[16]

31.    The Lehman Entities did not respond to the March 26, 2009 letter until after the SunCal Debtors propounded a subpoena on JPMorgan noticed for return on April 17, 2009.[17] In a letter dated April 15, 2009, the Lehman Entities finally disclosed that loans secured by liens against no less than fifteen out of the twenty Projects were subject to repos.[18] The letter further said that "various counterparties" to these agreements (primarily Fenway and/or JPMorgan) "may claim some interest" in these loans. But it did not disclose what "interest" these counterparties "may claim," and did not provide any documentation relating to these claimed interests.

32.    It was not until JPMorgan produced documents in response to the subpoena that the SunCal Debtors learned that title in seven of the loans at issue (the "Sold Loans") had been

---

[12] Memo of P's and A's, Lehman RFS Motion, at 7:13, 8:21, 9:4 (emphasis added) (O'Keefe Decl., Exh. E).
[13] Letter dated March 26, 2009 (O'Keefe Decl., Exh. F).
[14] *See, e.g.*, POC filed by Lehman entity Northlake Holdings, LLC against SunCal Trustee Debtor LB/L-SunCal Northlake, LLC on March 27, 2009 (O'Keefe Decl., Exh. G).
[15] *See id.* at 2.
[16] *See, e.g.*, Loan Agreement between SunCal Debtor LB/L SunCal Northlake LLC, and Lehman ALI, Inc., *dated* September 9, 2005, p. 1 (O'Keefe Decl., Exh. H).
[17] Subpoena (O'Keefe Decl., Exh. I).
[18] Letter dated April 15, 2009 (O'Keefe Decl., Exh. J).

transferred to Fenway pursuant to an August 22, 2008 repurchase agreement (the "Repo").

**F.**     **The SunCal Debtors' Motion to Strike and Judge Smith's Findings Thereon**

33.     After the SunCal Debtors discovered the prepetition sale of the Sold Loans to

Fenway, they filed a motion (the "Motion To Strike") to strike the POCs (the "Disputed Claims")

that had been filed by the Lehman Entities with respect to the Sold Loans, as follows:

| Debtor | Sold Loan | Claimant | Claim No. | Claim Amount |
|--------|-----------|----------|-----------|--------------|
| SunCal I | SunCal Communities I Loan | LCPI | 1 | $343,221,391 |
| SunCal III | SunCal Communities I Loan | LCPI | 2 | (same) |
| SunCal Acton | SunCal Communities I Loan | LCPI | 6 | (same) |
| SunCal Emerald | SunCal Communities I Loan | LCPI | 7 | (same) |
| SunCal Bickford | SunCal Communities I Loan | LCPI | 16 | (same) |
| SunCal Summit | SunCal Communities I Loan | LCPI | 12 | (same) |
| Palmdale Hills | Ritter Ranch Loan | LCPI | 65 | $287,252,096 |
| SunCal PSV | SunCal PSV Loan | Lehman ALI | 12 | $88,257,340 |
| SunCal Delta Coves | SunCal Delta Coves Loan | Lehman ALI | 21 | $206,023,142 |
| SunCal Marblehead | Marblehead/ Heartland Loan | Lehman ALI | 9 | $354,325,126 |
| SunCal Heartland | Marblehead/ Heartland Loan | Lehman ALI | 21 | (same) |
| SunCal Oak Valley | Sun Cal Oak Valley Loan | OVC Holdings | 16 | $141,630,092 |
| SunCal Northlake | SunCal Northlake Loan | Northlake Holdings | 6 | $123,654,777 |
| **TOTAL** | | | | **$1,544,363,964** |

34.     At the June 30, 2009 hearing on the Motion to Strike, as confirmed in the Claims

Order and Findings, Judge Smith found that the Lehman Entities had transferred their entire

interest in the Sold Loans to Fenway, and that the Lehman Entities made a "misrepresentation" on

the POCs when they asserted that they, alone, were the creditors who owned the Sold Loans.[19]

35.     After Judge Smith ruled that the Sold Loans were owned by Fenway, the Lehman

Entities raised the argument, for the first time, that they retained the revolver portion of five of the

seven Sold Loans, constituting less than ten percent of the total value of the loans.[20] They sought

an order "clarifying" the scope of the Claims Order and Findings,[21] but Judge Smith has not ruled

on it and so has never adopted the Lehman Entities' belated argument.

---

[19] "The Lehman Entities could not properly file the Proofs of Claim as 'creditors.' When they listed
themselves as the "creditors" on the Proofs of Claims, this was a misrepresentation." Claims Finding 2.5 (O'Keefe
Decl., Exh. B).

[20] Surreply on Sales Procedures Motion dated July 24, 2009 at 4:3-5:1 (O'Keefe Decl., Exh. K).

[21] Motion for Clarification (O'Keefe Decl., Exh. L).

36.     The Lehman Entities' "revolver" argument has limited significance in any event. Of the three LCPI-based loans, LCPI conceded that the SunCal I Loan was transferred in its entirety to Fenway, and contended only that it retained the revolver portion of the Ritter Ranch Loan.  The Mezz Loan was the only one of the three LCPI loans *not* subject to the Repo.  But LCPI has conceded that this lien associated with the Mezz Loan was valueless, and that the lien would "expressly not [be] enforceable for the purpose of invoking and/or asserting the automatic stay."[22]  Thus, LCPI retained a valuable interest in—at most—only the Ritter Ranch revolver loan.

37.     In connection with the Motion to Strike, the Lehman Entities also argued that, even if they were not creditors, they were authorized as agents of Fenway to file the proofs of claims pursuant to Bankruptcy Rule 3001(b).  Judge Smith ultimately adopted this argument.  The SunCal Debtors have appealed this ruling, and the Lehman Entities have appealed the Claims Order.

## G.    Fenway Is Added to the Adversary Proceeding Based on Judge Smith's Ruling

38.     As a result of the Claims Order, the SunCal Debtors filed a Third Amended Complaint on July 10, 2009, naming Fenway as a defendant on the equitable subordination and related claims because it was the real creditor with regard to the seven Sold Loans.

## H.    The Ninth Circuit BAP Reverses Judge Smith's Stay Findings

39.     On December 15, 2009, a divided two-to-one Ninth Circuit Bankruptcy Appellate Panel issued a ruling regarding LCPI's appeal of the Stay Finding (the "BAP Ruling"),[23] holding that while the SunCal Debtors could *defend* against the Lehman Stay Relief Motions without regard to LCPI's own automatic stay, asserting a cause of action for equitable subordination was a different matter.  Because the BAP observed—without deciding—that LCPI *might* have an interest

---

[22] Couchot Declaration dated October 20, 2009, at ¶ 5 and Exhibit D thereto p. 4:7-9 (O'Keefe Decl., Exh. M); see also Lehman's First Amended Plan of Reorganization at 71:18 (O'Keefe Decl., Exh. N) (referring to *Stipulation Valuing Certain Collateral and Preserving Certain Liens*).  Thus, when Judge Smith stated that she had "always understood that there were sold and there were unsold loans," this was just as likely a reference to the Mezz Loan, which was never subject to the Repo, as to any retained interest in the Sold Loans.  *See* Compromise Reply ¶ 14, citing Feb. 11, 2009 Tr. at 187:1415 (Roesch Decl., Exh. 11).

[23] *Lehman Commercial Paper, Inc. v. Palmdale Hills Pro., LLC (In re Palmdale Hills Prop., LLC)*, 423 B.R. 655 (9th Cir. BAP 2009) (hereinafter, "BAP Ruling").

in certain of the loans, it held that the SunCal Debtors would need to seek relief from stay from this Court prior to pursuing claims for equitable subordination against LCPI.[24]

40.    The BAP ruling was of minimal impact to the SunCal Debtors, because by this point they had learned that all (or nearly all) of the claims that they sought to subordinate had been in the hands of non-bankrupt Lehman Entities, such as Lehman ALI, or Fenway, the non-bankrupt purchaser of the Sold Loans, since the inception of their proceedings.

## I.    LCPI Is Dismissed From the Adversary Proceeding Based on Judge Smith's Ruling

41.    Prior to the BAP Ruling, the Lehman Entities and Fenway had each filed motions to dismiss the Third Amended Complaint.  On March 8, 2010, Judge Smith denied the motions to dismiss the equitable subordination claims in their entirety, and denied those motions as to all but a few of the remaining preference claims.  However, at LCPI's request, and based on the BAP Ruling, Judge Smith dismissed LCPI as a defendant from the litigation without prejudice.[25]

42.    On March 26, 2010, in compliance with Judge Smith's ruling, the SunCal Debtors filed a Fourth Amended Complaint, which did not include any claims against LCPI.  Thus, the Adversary Proceeding once again names only non-debtors as defendants.[26]

## J.    Lehman Tries to Impede the SunCal Litigation Against Non-Debtors

43.    When the SunCal Debtors learned that Lehman had filed the Compromise Motion with this Court, whereby LCPI sought to acquire Sold Loans owned by non-debtor Fenway, they

---

[24] The SunCal Debtors' raised mootness and standing challenges to LCPI's appeal of the Stay Finding, on the ground that LCPI had no interest in the Sold Loans.  In rejecting these challenges, the BAP stated that "it is not clear that all the loans Lehman Commercial made to the Debtors were the subject of the October [Claims] Order."  BAP Ruling, 423 B.R. at 662.  This, again, may refer to the nothing more than the fact that the Mezz Loan was not subject to the Repo.  The BAP also noted that "Lehman Commercial has filed a motion for clarification" of the Claims Order and Findings—which has not been ruled on—and that "Lehman Commercial has stated that it will appeal the final order [on the Motion to Strike] after it is entered." *Id.* The BAP only assumed that LCPI *might* be found to have an ownership interest in the Sold Loans, based on rulings that might occur in the future (but still have not).  Similarly, the BAP stated that "[e]ven if Lehman Commercial has no interest in the Fenway Capital Loans, it has an interest in at least one of the loans to Debtors"—the admittedly valueless Mezz Loans—"and furthermore, *may possibly have an interest* in the Fenway Capital Loans under a contractual repurchase obligation.  Lehman Commercial also has an interest *if and when* the October Order becomes final *and is successfully appealed.*" *Id.* (emphasis added).  The BAP never found that LCPI had any ownership interest in the Sold Loans.
[25] *See* Order on Motion to Dismiss Third Amended Complaint dated April 13, 2010 (O'Keefe Decl., Exh. O).
[26] The SunCal Debtors are at a loss as to how LCPI could assert that "the SunCal debtors have consistently violated the automatic stay by refusing to comply with [Judge Smith's March 8, 2010] ruling."  Compromise Reply at p.11 ¶ 17.

filed an opposition, noting that, while they did not oppose the Lehman post-petition acquisition of the Sold Loans in principle, they would oppose any effort by LCPI to use that acquisition as a basis for invoking its stay with regard to the Sold Loans.

44.    Most specifically, the SunCal Debtors were concerned that LCPI might use the transaction as a basis to invoke its stay with regard to *all seven* of the Sold Loans—not merely the two loans (the SunCal I and Ritter Ranch Loans) for which the originator/claimant was LCPI, but also the five loans (Delta Coves, PSV, Marblehead/Heartland, Oak Knoll and Northlake) for which the originator/claimant was a *non-bankrupt* entity, *i.e.*, Lehman ALI, OVC or Northlake Holdings.

45.    Lehman's invocation of the stay threatens to derail a well-developed litigation, not one in its infancy.  The Lehman Entities recently answered the Adversary Proceeding complaint. But long before they answered, significant discovery had already been underway.  To date, the Lehman Entities, the SunCal Debtors, and other parties to the litigation have collectively produced several million pages of documents in response to requests for production.  The Lehman Entities and Fenway recently produced an estimated one hundred thousand additional pages in light of an order granting the SunCal Debtors' motion to compel.[27]  Depositions are set to commence on April 30, 2010, and discovery is set to conclude in September 2010.[28]

46.    The Compromise Reply, filed April 12, 2010, confirmed that Lehman's acquisition of the Sold Loans *would* be used as a basis for invoking the stay as to all seven of the Sold Loans. *See* Compromise Reply at p.13 ¶ 25 ("LCPI's automatic stay will attach to the property it receives as part of the Transaction as a matter of law, regardless of LCPI's intent.").  In fact, that Reply reveals that it is primarily *LBHI's* stay that will be invoked to block the Adversary Proceeding.  *Id. at* 15, ¶ 27 ("[D]espite the fact that the five [Lehman ALI-originated] loans at issue may be transferred to non-debtor entities that held such loans prior to the Fenway Repo, the automatic stay in favor of LBHI will continue to apply to LBHI's security interest in all the Repo Assets.").

---

[27] O'Keefe Decl., ¶ 17.
[28] *See* Scheduling Orders dated December 31, 2009 and March 23,, 2010 (O'Keefe Decl., Exhs. P and Q).

**K.      LBHI Asserts That Its Stay Applies to the Sold Loans**

47.      Lehman has argued that "LBHI is entitled to the full economic interest in the Repo Assets for two independent reasons—through its ownership of the CP Notes and through its security interest in the Repo Assets as subrogee of Fenway Capital."  Compromise Reply, at p.7 ¶ 10.  Lehman is incorrect on both fronts; but to explain why, it is necessary to first explain the nature of the Fenway transactions themselves and LBHI's role therein.

48.      LBHI is not a party to the Repo, but it has an *indirect* interest in the Sold Loans via its ownership of commercial paper that is "ultimately" secured by an interest in those loans.  Specifically,

(a)      LCPI sold $1.5 billion in SunCal loans (the "Sold Loans") to Fenway pursuant to the August 22, 2008 Repo;

(b)      At the same time, Fenway issued a "variable funding" note ("VFN") to its affiliate, Fenway Funding LLC ("Fenway Funding"), secured by the proceeds of the Repo, i.e., the Sold Loans;

(c)      Fenway Funding then issued commercial paper notes ("CP Notes") to LBHI, which in turn were backed by the proceeds of the VFN (i.e., Fenway Funding's rights in the Sold Loans); and

(d)      LBHI pledged the CP Notes to JPMorgan as collateral for liquidity from JPMorgan.[29]

49.      This all can be represented visually as follows:



---

[29] May 12, 2009 email from Irena Goldstein (Roesch Decl., Exh. 14 at Exhibit B thereto).

**1.      LBHI's Stay Does Not Apply By Virtue of its Ownership of the CP Notes**

50.      Lehman points out that "LBHI currently holds the CP Notes, which it has held since prior to the commencement of LBHI's chapter 11 case and are property of its Estate." Compromise Reply at 7 ¶ 10.  But the fact that the CP Notes may be property of LBHI's estate does not make the Repo Assets (including the Sold Loans) property of its estate.  Lehman states that the "CP Notes are *ultimately* secured by a pledge of Fenway's interests in the Repo Assets," *id.* (emphasis added), but does not state that that LBHI current has a security interest in Sold Loans themselves.  *Id.* at 10 ¶ 16 ("the CP notes are *ultimately* secured by, among other assets, a pledge of Fenway's interests in the SunCal Loans.") (emphasis added).  Nor can it—as the above diagram demonstrates, LBHI is two steps removed from the Sold Loans, and has at best an indirect interest in them.  As the authority cited below establishes, *see* Part V.C.1, *infra*, such an indirect interest does not make the Sold Loans property of LBHI's estate.[30]

51.      LBHI asserts that its stay has applied to these loans, based on its interest in the Repo, from the inception of the SunCal Debtors' cases in November 2008.  But in March 2009, when Lehman objected (in a "letter brief") to the SunCal Debtors' motion to approve the sale of Projects for which non-debtor *Lehman ALI* was the lender, the objection was based *not* on the Repo or any interest of LBHI therein, but on the ground that alter ego allegations in the Adversary Proceeding complaint (which were later removed) could possibility affect LCPI or LBHI.[31]

**2.      LBHI's Stay Will Not Apply Upon Consummation of the Transaction**

52.      Lehman argues in the alternative that *once* the Transaction is consummated, LBHI *will have* a direct interest in the Sold Loans:

> Upon this Court's approval and the subsequent consummation of the Transaction (and, in particular, the surrender of the CP Notes by LBHI…), LBHI will become

---

[30] Thus, the fact that "the SunCal Debtors have been aware of LBHI's interest in the CP Notes" (Compromise Reply at 15 ¶ 28) is irrelevant, as that indirect interest has not implicated LBHI's stay, and so has not impacted the SunCal Debtors' Adversary Proceeding.

[31] Notice of Filing of Letter Requesting Joint Status Conference dated March 9, 2009 (O'Keefe Decl., Exh. R).  Contrary to LCPI's contention that the SunCal Debtors sought the sale of *LCPI-financed* Projects (*see* Compromise Reply at 4 n.3), the SunCal Debtors specifically *eschewed* seeking a sale of such Projects specifically to avoid any claim of infringement of LCPI's stay.  *See* Sales Procedures Motion (O'Keefe Decl., Exh. S).

> subrogated to the claims and rights of Fenway and *will acquire the security interests*
> held by Fenway in the Repo Assets.

Compromise Reply at 10 ¶ 16 (emphasis added).

53.     The assertion that LBHI "will acquire the *security interests* held by Fenway in the Repo Assets" wrongly assumes that Fenway[32] will still *have* a "security interest" in the Sold Loans.  But according to the description of the Transaction in the Compromise Motion, upon consummation of the Transaction, Fenway will *no longer have rights* in the Sold Loans to which LBHI could be subrogated:

> LBHI, as guarantor, will return the CP Notes to Fenway Funding and Fenway Funding will return the VFN Note to Fenway Capital.  *The CP Notes and the VFN Note will be cancelled and* the Supplement, Base Indenture and other *documents relating to the VFN Note will be terminated*….
>
> LCPI will repurchase the Repo Assets from Fenway Capital…and, in connection therewith, Fenway Capital will assign to LCPI all of the Repo Assets and *the parties will terminate the MRA and the guaranty provided by LBHI with respect thereto*.

Compromise Motion at pp.9-10, ¶ 21 (emphasis added).

54.     In other words, the purpose of the Transaction is to *terminate* the Repo and related Fenway transactions, so that the Fenway parties will no longer have an interest in the Sold Loans. Lehman cannot simultaneously undo the Repo so as to eliminate Fenway's interests, but at the same time argue that Fenway will have ongoing interests into which shoes LBHI can step for purposes of invoking its stay.

55.     The significance of LBHI's role cannot be overstated, for Lehman has indicated that it is LBHI's stay—*not* LCPI's—that will impede the Adversary Proceeding as to the five Lehman ALI-originated loans.  Lehman concedes that,

> [a]lthough LCPI is the only party that can repurchase the Repo Assets, once the Transaction is effectuated LCPI will seek leave to transfer the five loans at issue back to non debtor entities that held such loans prior to the Fenway Repo.

---

[32] To be precise, Fenway Funding has a security interest in the Sold Loans via the VFN Note.  Judge Smith has already found that Fenway Capital has an ownership interest, not a mere security interest, in the Sold Loans.  Once the Repo is unwound pursuant to the Transaction, Fenway Funding's interest via the VFN will be terminated, and ownership of the Sold Loans would revert to LCPI.

15

Compromise Reply at pp. 14-15, ¶ 27.  Thus, LCPI's stay would no longer apply to these loans.[33]

But Lehman insists in the next breath that notwithstanding the removal of these Sold Loans from

LCPI's estate, LBHI will still retain an interest:

> That transfer will not, however, eliminate the security interest that LBHI will acquire in the
> Repo Assets as a result of the Transaction and LBHI's becoming subrogated to Fenway's
> rights under the Fenway Documents. Thus, despite the fact that the five loans at issue may
> be transferred to non-debtor entities that held such loans prior to the Fenway Repo, the
> automatic stay in favor of LBHI will continue to apply to LBHI's security interest in all the
> Repo Assets.

*Id.*  Thus, Lehman does indeed intend to use LBHI's purported stay to impede the Adversary

Proceeding to which LBHI is not now and has never been named as a party.

**L.      The Equities Regarding LCPI's Assertion of its Stay**

56.      As to the two Sold Loans that were originated by LCPI—the SunCal I and Ritter

Ranch Loan—Lehman apparently contends LCPI would retain those loans upon consummation of

the Transaction, and thus that its stay *would* apply to those loans.  Compromise Reply at p.13 ¶ 25

("LCPI's automatic stay will attach to the property it receives as part of the Transaction as a matter

of law, regardless of LCPI's intent.").

57.      LCPI cannot dispute that the Adversary Proceeding has been in progress for over a

year, that the litigation has been proceeding against non-debtor defendant Fenway for nine months,

or that extensive discovery has already been undertaken.  LCPI cannot dispute that the SunCal

Debtors are not seeking damages with regard to the LCPI loans, but rather only to subordinate

claims that have been asserted against the SunCal Debtors' estates, and to void or transfer the

associated liens.  LCPI also cannot dispute that assertion of its (or LBHI's stay) could be

devastating for the SunCal Debtors' creditors, and to their reorganization efforts.

58.      Rather, LCPI's position is that, since the SunCal Debtors have known for some time

that LCPI *wanted* to unwind the Repo, they have no excuse for not having sought relief from stay

from this Court long ago.  But this misconstrues the history in the SunCal Debtors' cases.

---

[33] *See In re Caplane*, 345 B.R. 45, 48 (Bankr. S.D.N.Y. 2006) (absent an injunction, the automatic stay only
"bar[s] proceedings against the debtor.").

59.     First, although LCPI has suggested since May 2009 that it would try to unwind the Repo, LCPI fails to admit that it concealed the fact that the Repo even *existed* from August 2008 until April 2009, when the SunCal Debtors compelled its disclosure through discovery.

60.     Second, when the SunCal Debtors discovered the Repo, they were not looking to sue Fenway; they were looking to discover who really owned the claims asserted against them. The SunCal Debtors could not risk pursuing subordination against the Lehman Entities, and then finding out down the road that they had been suing the wrong parties all along.

61.     Third, the SunCal Debtors did nothing improper by moving Judge Smith, upon discovery of the Repo, for an order striking the POCs filed by the Lehman Entities based on loans they did not own.  LCPI cannot plausibly contend that it was improper for Judge Smith to determine who owned the Sold Loans[34]—nor did it contend at the time of the Motion to Strike.

62.     Fourth, the SunCal Debtors did nothing improper by amending their complaint to add Fenway as a defendant.  They did so only after Judge Smith ruled that Fenway was the true owner of the Sold Loans.  Although Lehman contends that this ruling was wrong, unless and until the Lehman Entities successfully appeal that ruling, it is law of the case and they must accept it (just as the SunCal Debtors must accept the BAP Ruling reversing Judge Smith's Stay Finding, unless and until the Ninth Circuit reverses and/or this Court grants relief from stay).

63.     Fifth, the SunCal Debtors' prior knowledge that LCPI might *try* to unwind the Repo does not mean the SunCal Debtors should have sought relief from stay at the time.  LCPI was apparently unable to unwind the Repo back in 2008 because LBHI had pledged the CP Notes to JPMorgan.  Unless and until JPMorgan agreed to release the CP Notes, LCPI would be unable to unwind the Repo—indeed, it took a year and a half to obtain JPMorgan's release, and there was no guarantee that this would ever happen.  With Fenway as the owner, the SunCal Debtors had no

---

[34] *See In re Baldwin-United Corp. Litig.*, 765 F.2d 343, 347 (2d Cir. 1985) ("The court in which the litigation claimed to be stayed is pending has jurisdiction to determine not only its own jurisdiction but also the more precise question whether the proceeding pending before it is subject to the automatic stay.").

reason to seek relief from stay with regard to the Sold Loans. Had they done so, LCPI and/or
Fenway could have argued that stay relief was not ripe unless and until LCPI became the owner.

64.     Finally, although Lehman characterizes virtually everything the SunCal Debtors
have done in their cases as a willful violation of Lehman's stay,[35] the SunCal Debtors have
consistently tried to comply with binding rulings from Judge Smith, this Court, and the BAP.

65.     When this Court denied SunCal's prior stay relief motion, the SunCal Debtors
omitted LCPI as a defendant in their Adversary Proceeding so as to avoid a conflict with LCPI's
stay. When Judge Smith issued the Stay Finding permitting the SunCal Debtors to pursue
equitable subordination against LCPI, it was in response to a stay relief motion that *LCPI had filed
against the SunCal Debtors*. The SunCal Debtors were not looking to go after LCPI; instead,
LCPI came after them. And it was only once Judge Smith issued the Stay Finding that LCPI was
added to the Adversary Proceeding. Then, when Judge Smith ruled that Fenway was the owner of
the Sold Loans, Fenway was added to the Adversary Proceeding. When the Ninth Circuit BAP
issued its ruling reversing Judge Smith's Stay Finding, the SunCal Debtors did not immediately
dismiss LCPI, because (1) motions to dismiss were already pending; (2) the SunCal Debtors were
aware of authority that LCPI could be deemed a non-party without the need for affirmative
dismissal;[36] and (3) based on the Claims Order, Judge Smith had found that LCPI owned little or
none of the loans at issue in any event. But once Judge Smith ruled that LCPI must be dismissed
from the Adversary Proceeding, the SunCal Debtors promptly did so.

66.     Moreover, Lehman's criticism of the SunCal Debtors for not moving for relief from
stay earlier only serves to distract from the fact that the Repo itself was suspicious from its

---

[35] Lehman accused the SunCal Debtors of "fil[ing] a series of motion and proceedings attacking the property
of LCPI's estate." Compromise Reply at 4 ¶ 4. Many of Lehman's factual assertions are simply wrong. For example,
Lehman contended that the SunCal Debtors "attack[ed] property of LCPI's estate by "filing a motion seeking approval
to sell properties securing loans made by LCPI and disallowing credit bid rights [D.E. 125]" Compromise Reply at 4
n.4. But only SunCal Debtors who received loans from *Lehman ALI* brought that sale and credit bid motion,
specifically to *avoid* any contention of an infringement of LCPI's stay. Sales Procedures Motion at 5:11-13 (O'Keefe
Decl., Exh. S).

[36] *In re Miller*, 262 B.R. 499, 505 (9th Cir. BAP 2001) (where defendant Kendall in multi-defendant litigation
filed for bankruptcy, "[t]he court did not…dismiss the action against Kendall; rather, it merely treated Kendall 'as if
[it] were no longer a party to the litigation' and 'as if [it] were an interested non-litigant.'") (quoting In *In re Mahurkar
Double Lumen Hemodialysis Catheter Patent Litigation,* 140 B.R. 969, 978-79 (N.D. Ill. 1992)).

inception, and that the Lehman Entities may have attempted to conceal the Repo from the SunCal

Debtors in order to avoid publicity regarding the Repo itself.

**M.    Possible Improprieties Regarding the Fenway Repo**

67.    Fenway entered into the $3 billion Repo with LCPI on August 22, 2008[37]—three

days *before* the Lehman Entities signed an August 25, 2008 Settlement Agreement with the

SunCal Debtors, reaffirming their willingness and agreement to restructure the loans and assume

the SunCal Debtors' obligations in connection with the Projects securing the loans.  (The Lehman

Entities' repudiation of the promises reflected in the Settlement Agreement is a key allegation in

the Adversary Proceeding.[38])  The Repo was not disclosed to the SunCal Debtors.  This was three

weeks before LBHI filed for bankruptcy on September 15, 2008.

68.    As illustrated in the diagram above, pursuant to the Repo and other Fenway

transactions, Lehman effectively lent money to itself so that it could provide JPMorgan with

something other than the Sold Loans—loans secured by essentially undeveloped California land—

as collateral to obtain cash from JPMorgan to alleviate Lehman's financial stress.  Lehman has

conceded that "[o]ne of Lehman's objectives in entering into the Fenway Repo was to permit LCPI

to repackage real estate loans and other illiquid assets it had originated in a form that made them

marketable for corporate financing purposes."[39]  (To be precise, most of the Sold Loans were

originated by *non-debtor* Lehman Entities other than LCPI.)

69.    The recently released 2,300-page examiner's report in the Lehman bankruptcy (the

"Examiner's Report") reports that Lehman "created" Fenway "by securitizing … or funding  … its

own illiquid corporate and commercial real estate loans." Exam. Rpt. at 1103 n. 4024. When, in

mid-2008, JPMorgan demanded $5 billion in additional collateral from Lehman to secure the

liquidity JPMorgan was providing, Fenway was among the assets pledged. *Id*. at 1102-03.

70.    The substance of the Fenway transactions was not immediately apparent to

JPMorgan.  On September 11, 2008, JPMorgan learned that

---

[37] *Master Repurchase Agreement* (MRA) (O'Keefe Decl., Exh. T).
[38] *See* Fourth Amended Complaint, ¶¶ 102, 112-116, 131 (Exhibit 13 to Roesch Decl.).
[39] Lehman Motion to Compromise Fenway Transaction dated March 25, 2009 at p.5 ¶ 12.

a security known as Fenway, which Lehman had posted to JPMorgan at a stated value of $3 billion, was actually asset-backed commercial paper credit-enhanced by Lehman (that is, it was Lehman, rather than a third party, that effectively guaranteed principal and interest payments). JPMorgan concluded that *Fenway was worth practically nothing as collateral*.

*Id.* at 1071-72 (emphasis added). JPMorgan's concerns about Fenway contributed to its demand that Lehman post $5 billion in cash as collateral by the following day, September 12, 2008—the last business day before Lehman collapsed. *See id.* at 1160-65.[40]

71.    On Sunday, September 14, 2008, hours before Lehman's bankruptcy, Lehman's global treasurer, Paolo Tonucci, signed an agreement purporting to terminate the Repo and returning ownership of the Sold Loans to LCPI.[41] Apparently, Lehman was unable to unwind the Repo because it had already pledged the CP Notes to JPMorgan. Fenway's attorney testified that it was "amazing that [Tonucci] had signed anything on September 14th given what was going on at Lehman Brothers at the time," and "no one has explained to me, *nor* will they and probably *should they*, what was the state of the [T]reasurer's mind when he signed this termination agreement."[42]

72.    A recent *New York Times* front-page article casts doubt on the legitimacy of transactions between Lehman and Fenway's "program manager," Hudson Castle Group, Inc.:

> In the years before its collapse, Lehman used [Hudson Castle]—its "alter ego," in the words of a former Lehman trader—to shift investments off its books….While Hudson Castle *appeared to be an independent business, it was deeply entwined with Lehman*. For years, its board was controlled by Lehman, which owned a quarter of the firm. It was also stocked with former Lehman employees. *None of this was disclosed by Lehman, however*….[A] former employee said he was leery of the arrangement from the start. "*Lehman wanted to have a company it controlled, but to the outside world be able to act like it was arm's length*," this person said…."*This should have been disclosed, given how critical the relationship was*," said Elizabeth Nowicki, a professor at Boston University and a former lawyer at the SEC.[43]

---

[40] Lehman also included Fenway in its "liquidity pool." *Id*. at 1420-21, 1439.

[41] *See* September 14, 2008 Letter Agreement (O'Keefe Decl., Exh. U).

[42] Goldstein Tr. 26:14-16, 28:22-25 (O'Keefe Decl., Exh. V) (emphasis added)

[43] Louise Story and Eric Dash, "Lehman Channeled Risks Through 'Alter Ego' Firm," N.Y. Times, April 13, 2010 (O'Keefe Decl., Exh. W) (emphasis added).

## III.

## <u>JURISDICTION AND VENUE</u>

73.     This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and

1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court

pursuant to 28 U.S.C. §§ 1408 and 1409.

## IV.

## <u>RELIEF REQUESTED</u>

74.     By this Motion, the SunCal Debtors seek, pursuant to Section 362(d) of the

Bankruptcy Code and Bankruptcy Rule 4001, an order (1) determining that the automatic stay of

LBHI does not apply; and (2) granting the SunCal Debtors relief from the automatic stay of LCPI

and/or LBHI (in the event that the Court determines that LBHI's stay does apply), in order to (a)

pursue equitable subordination or other impairment of claims filed by LCPI, and transfer or

voidance of associated liens (against LCPI, and/or against any entity to which LCPI may transfer

the Sold Loans); and (b) seek approval of and administer the SunCal Debtors' reorganization plan,

which is premised in part upon subordination or other impairment of the Lehman Entities' claims.

## V.

## <u>ARGUMENT</u>

75.     Bankruptcy Code Section 362(d)(1) provides that, "[o]n request of a party in

interest and after notice and a hearing, the court shall grant relief from the stay... such as by

terminating, annulling, modifying, or conditioning such stay for cause..." 11 U.S.C. § 362(d)(1).

The party seeking relief from the stay is required to make an initial showing of cause, and if cause

is shown, the burden is shifted to the debtor to disprove the existence of cause under Section

§362(g)(2). *In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1286 (2d Cir. 1990).

76.     This Court has broad discretion to grant relief from stay. *In re Newman*, 196 B.R.

700, 703 (Bankr. S.D.N.Y. 1996) ("As to those areas protected by the automatic stay, relief from

the stay is liberally granted."); *In re Anton*, 145 B.R. 767, 770 (Bankr. E.D.N.Y. 1992) ("The

Bankruptcy Court has wide discretion to grant the relief and lift the automatic stay.").

**A.**    **Stay Relief Should Be Granted to Prevent Lehman From Using Its Stay As a Sword**

77.    The Second Circuit has made it clear that the stay should only be used as a shield, not a sword. *Bohack Corp. v. Borden, Inc.*, 599 F.2d 1160, 1168 (2d Cir. 1979) ("[We] must be cautious to avoid a decision which could convert [the automatic stay] from a shield into a weapon."); *see In Re Wedtech*, 87 B.R. 279, 290 (S.D.N.Y. 1988) ("where the debtor is the initiator of costly litigation, *Bohack* teaches us that the automatic stay should not be invoked to spare the debtor the expense of defending itself."); *In re Briarpatch Film Corp.* 281 B.R. 820, 834 (Bankr. S.D.N.Y. 2002) ("the automatic stay is a shield, not a sword"); *Int'l Distrib. Centers, Inc. v. Walsh Trucking Co., Inc*., 62 B.R. 723, 730 (S.D.N.Y. 1986) ("the automatic stay was not intended by Congress to be used as a sword.") (quotation omitted); *In re Moss,* 270 B.R. 333, 345 (Bankr. W.D.N.Y. 2001) (denying debtor's motion asserting violation of the stay, otherwise "the automatic stay would clearly and improperly have been utilized as a sword rather than as a shield").[44]

78.    Here, no claims were asserted by the SunCal Debtors against LCPI until after LCPI injected itself into the SunCal Debtors' estates by seeking relief from stay to foreclose on their properties, and Judge Smith held in the Stay Finding that they could defend against that action by asserting a claim for equitable subordination.  LCPI also subsequently filed proofs of claim against the SunCal Debtors' estates.  As Judge Markell, dissenting from the BAP Ruling, stated:

> The Code and our precedents recognize implicit equitable exceptions to the automatic stay that permit a debtor to defend against a filed proof of claim in any manner permitted by applicable nonbankruptcy law. All the bankruptcy court did here was to protect that right. Even if I am wrong, however, I believe Lehman Commercial waived its right to raise automatic stay issues when it filed its proof of claim.
>
> The unfairness of the majority's position can be seen under the facts present here. When Lehman Commercial sought to establish its claim, the Debtors had a duty on

---

[44] Other jurisdictions are in accord.  *In re Calder*, 907 F.2d 953, 956-957 (10th Cir. 1990) (lifting stay where to hold otherwise would be to "permit the automatic stay provision to be used as a trump card played after an unfavorable result was reached in state court" which would be inconsistent with the underlying purpose of the automatic stay.); *In re Countryside Manor, Inc.*, 188 B.R. 489, 491 (Bankr. D. Conn. 1995) (lifting stay to allow movants to file counter claim against debtor in debtor-initiated state court action finding that refusal to lift the stay would prejudice movants because it would deny them the ability to assert their claim in state court.).

behalf of the estate to respond by raising all appropriate responses. The Debtors believed this response included a challenge to the equity of Lehman Commercial's claimed priority. But the majority's position would have required the Debtors to obtain permission from Lehman Commercial's home bankruptcy court before responding on this ground. This extra step is just the type of "gratuitous impediment in dealing with an adversary who suffers no correlative constraint" that *Merrick* condemned.

BAP Ruling, 423 B.R. at 669-70 (Markell, dissenting) (quoting *Gordon v. Whitmore (In re Merrick)*, 175 B.R. 333, 338 (9th Cir. BAP 1994)).

79.    The Lehman Entities have not only filed stay relief motions and proofs of claims in the SunCal Debtors' cases; they have also filed a competing plan of reorganization.[45]  If Lehman is attempting to enforce its claims through a competing plan, the SunCal Debtors should be given the opportunity to assert all available defenses to that claim.  The SunCal Debtors are asserting the equivalent of a defense or counterclaim to LCPI's claims.  *See Bohack*, 599 F.2d at 1168 ("Where a debtor institutes a lawsuit and then invokes the protection of [the automatic stay] on a counterclaim, the situation warrants a very thoughtful scrutiny. Just as the court has discretion to deny setoffs in appropriate cases, so the court has an equitable duty to grant a setoff when a debtor moves outside the confines of the bankruptcy court in an attempt to reap the benefits but circumvent the burdens in another forum.").

80.    Equitable subordination is a *defense* to a claim filed *by* the bankrupt creditor, and so does not implicate the automatic stay.  In *In re Metiom*, 301 B.R. 634 (Bankr. S.D.N.Y. 2003), Judge Drain held that the automatic stay did not apply to an effort to equitable subordinate a claim filed a bankrupt creditor.  *Id.* at 638 ("The Trustee is not exercising control over [debtor's] property but, rather, simply is responding to a proof of claim filed in Metiom's chapter 11 case. Neither the language nor the policy of section 362(a)(3) apply in that context.").  Although the Ninth Circuit is currently considering the SunCal Debtors' appeal of the BAP Ruling, and so will decide whether LCPI's stay applies to their equitable subordination efforts, *Metiom* warrants this Court granting relief from stay for the same purposes—to defend against LCPI's claims.

---

[45] See Joint Chapter 11 Plan Filed By Lehman Lenders dated September 9, 2009 (O'Keefe Decl. Exh. X). *See also* SunCal Debtors' Joint Plan, pp. 89-94 (O'Keefe Decl., Exh. Z) (addressing treatment of LCPI claims).

81.     This Court recently rejected an argument by Lehman that the approval of a foreign plan of reorganization that provided for equitable subordination violated Lehman's stay, notwithstanding the fact that there might be a diminution of recovery on Lehman's claim:

> The debtors' characterization of Shinsei's submission of the Shinsei plan as the functional equivalent of a seizure of exercise of control over estate property [] is unpersuasive.  It is true that the Shinsei plan…would have the effect of causing LBHI to recover less on its claim against Sunrise.  It is also true that Shinsei as well as other unsecured creditors would consequently enjoy an enhanced recovery on claims against Sunrise.  But the Shinsei plan's potential negative impact on LBHI's recovery does not render the equivalent of a seizure of or exercise of control over estate property.  LBHI's right to collect on its claim against Sunrise depends on that claim's amount and priority and being valid under relevant Japanese law.  Case law is replete with examples of permissible creditor actions with actual or potential negative consequences for debtor property.[46]

The effect on Lehman of the SunCal Debtors' efforts to subordinate the claims associated with Sold Loans would be no different here.  As such, there is no violation of its stay.

82.     Thus, even if LCPI were correct that it has been the owner of the Sold Loans all along, stay relief should still be granted.  LCPI has been a willing, active participant in the SunCal Debtors' bankruptcies all along.  The SunCal Debtors are only seeking to raise defenses against LCPI's claims through equitable subordination or otherwise.

83.     But in fact, LCPI has not been the owner of the Sold Loans since late 2008.  Given that LCPI recently successfully sought dismissal from the Adversary Proceeding to *avoid* a conflict with its stay, and now plans to buy back the Sold Loans so it can re-insert itself into that litigation and *invoke* its stay, the case for granting stay relief is all the more compelling—LCPI wielded its stay as a sword when it first inserted itself in the case, and is now wielding it a second time.

**B.      The Sonnax Factors Weigh In Favor of Granting Relief From Stay**

84.     The Second Circuit, in *In re Sonnax*, enunciated a number of factors that should be considered in determining whether to modify the automatic stay.  *Sonnax* cited with approval *In re*

---

[46] Hearing Transcript, October 14, 2009 at 22:20-23:11 (O'Keefe Decl., Exh. C) (emphasis added).

*Curtis,* 40 B.R. 795 (Bankr. D. Utah 1984), which "catalogued a dozen factors to be weighed in deciding whether litigation should be permitted to continue in another forum. These are:

> (1) whether relief would result in a partial or complete resolution of the issues; (2) lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceeding; and (12) impact of the stay on the parties and the balance of harms.

*Sonnax,* 907 F.2d at 1286 (citing *Curtis,* 40 B.R. at 799-800).

85.    Only those factors relevant to the case need be considered, *Sonnax,* 907 F.2d at 1285, and a court need not assign them equal weight. *In re Anton,* 145 B.R. at 770; *In re Cole,* 202 B.R. 356, 361 (Bankr. S.D.N.Y. 1996) ("The court should consider only those factors relevant to a particular case") (granting stay relief after disregarding 5 factors as "irrelevant to [the] motion").

86.    Here, factors 10 and 12–judicial economy and the balance of harms—are the most significant factors. *In re G.S. Distrib., Inc.,* 331 B.R. 552, 568 (Bankr. S.D.N.Y. 2005) (lifting stay where, among other factors, judicial economy and balance of harms weight in favor of granting relief from stay); *In re Deep,* 279 B.R. 653, 660 (Bankr. N.D.N.Y. 2002) (lifting automatic stay where 8 factors were either irrelevant or did not weigh strongly in either direction, but judicial economy and balance of harms warranted relief).  As discussed below, not only these two factors, but virtually *all* of the *Sonnax* factors, warrant relief from stay.

### 1.    *Sonnax* Factor 10:  Judicial Economy

87.    The Adversary Proceeding has been pending before Judge Smith for fifteen months. Judge Smith is well versed in the legal issues, having considered hundreds of pages of briefing and many hours of argument on two rounds of motions to dismiss.  She has also resolved motions to compel brought by plaintiffs and defendants, and is familiar with the factual contentions and

evidentiary issues.  Judge Smith is also familiar with related issues regarding various challenges to

the Lehman Entities' claims in connection with the Motion to Strike and other contested matters in

the SunCal Debtors' bankruptcy proceedings.  *See In re G.S. Distrib.*, 331 B.R. at 568 (lifting stay

where district court had already ruled on preliminary injunction, and had given the parties

permission to file a motion for summary judgment and contempt sanctions); *In re Countryside

Manor, Inc.*, 188 B.R. 489, 491 (Bankr. D. Conn.1995) (lifting stay where "the administration of

justice, convenience of the parties and judicial economy are better served by having all the claims

and counterclaims resolved by the same court—in this instance, the state court.").

88.    Extensive litigation has been conducted in the Adversary Proceeding, both against

former defendant LCPI and all the other defendants.  Millions of pages of documents have been

produced.  Depositions are set to commence in a matter of days.  A comprehensive discovery

schedule has been set by the Court.  *In re Anton*, 145 B.R. at 770 (absent stay relief, second court

"will have to plow the same ground, lacking the advantages and headstart now enjoyed by the

District *Court* in which the action against AQN has been pending since 1989…."); *In re Fischer*,

202 B.R. 341, 355 (E.D.N.Y. 1996) (lifting stay to allow RICO claim where action was pending

for fours years, discovery was nearing completion, and district court had devoted time and

resources to numerous motions); *In re SCO Group, Inc.*, 395 B.R. 852, 860 (Bankr. D. Del.2007)

(lifting stay where district court had presided over case for four years, and it would be

"unreasonable," "economically inefficient and unnecessarily time consuming" for bankruptcy

court to spend substantial time learning and resolving issues).

89.    If LCPI (or litigation regarding the Sold Loans) were severed out from the

Adversary Proceeding, it would significantly disrupt the administration of that litigation.  The

litigation involves twenty Projects all located in California.  There are currently twenty-one

California-based plaintiffs and six defendants named in the Adversary Proceeding:  Lehman ALI,

OVC, Northlake Holdings, LV Pacific Point, LLC, Lehman Re, Ltd., and Fenway.  None of these

defendants are in bankruptcy proceedings, save for Lehman Re, which is subject to liquidation

proceedings in Bermuda, but which has consented to Judge Smith's jurisdiction, and has even filed

counter claims and a third-party cross-complaint against various California-based mechanic lien holders.  If stay relief is granted, LCPI will be just one party in complex, multi-party litigation, and the proofs of claim associated with the Sold Loans constitute only a portion of the claims filed against the SunCal Debtors by the Lehman Entities.  There are hundreds of California-based creditors who stand to benefit from the Adversary Proceeding, and any or all of them may be witnesses.  It is only logical that SunCal's defenses to all the claims should be tried together.  *In re Anton*, 145 B.R. at 770 ("If the stay is not lifted, the Movants will have to try the same facts twice, once against the other defendants in the District Court and a second time against the Debtor in the Bankruptcy Court. Multiplicity of suits involving unnecessary time and expense on the part of Movants should be avoided.").

90.    This factor is particularly pertinent here, where there is not only significant overlap between the legal and factual issues affecting LCPI and the other Adversary Proceeding defendants, but in many if not most cases the witnesses and evidence involved will be *identical*. Thus, severing out LCPI presents a very real risk not only of wasted time and effort duplicating litigation, but also inconsistent rulings between Judge Smith and this Court.

91.    LCPI's counsel, the law firms of Weil Gotshal & Manges, LLP, and Pachuslki, Stang, Ziehl & Jones LLP, also represent non-debtor defendants Lehman ALI, OVC, Northlake Holdings and LV Pacific Point LLC.  LCPI's counsel will continue to defend these entities in the Adversary Proceeding whether or not LCPI is a party.  Thus, Lehman itself will enjoy cost-savings if the Adversary Proceeding moves forward against all of the Lehman Entities, including LCPI.  *In re Deep*, 279 B.R. 653, 660 (Bankr. N.D.N.Y. 2002) (potential harm to the debtors did not "weigh as heavily" where the issue had to be resolved by some court anyway); *In re Anton*, 145 B.R. at 770 (although debtor would incur expenses defending himself in the pending litigation, "it is not clear that such expense would be any greater than in litigating [the] claim in this court.").

92.    Finally, denying relief from stay—aside from spurring costly and time-consuming appeals—will delay both the SunCal Debtors' reorganization efforts and Lehman's.  LCPI seeks to participate in the SunCal Debtors' bankruptcies, but cannot receive a distribution thereunder unless

and until all challenges to the validity and priority of its claims are resolved.  Delaying and disrupting the Adversary Proceeding only serves to delay distribution of any recovery therefrom to Lehman's creditors, and so actually undermines Lehman's reorganization efforts as well.  Thus, all parties are served by allowing the Adversary Proceeding to go forward against all defendants.

2.    ***Sonnax* Factor 12:  Balance of Harms**

93.    If Lehman is successful in asserting its stay as to the Sold Loans, over $1.5 billion out of $2 billion in claims and liens at issue in the SunCal Debtors' proceedings could potentially be shielded from subordination.  A billion dollars in loans made by non-debtors would be made subject to the stay.  This would impair the SunCal Debtors' reorganization efforts and provoke another unnecessary round of litigation.  It would also effectively reward Lehman for using its stay as a sword, actively participating in the SunCal Debtors' bankruptcy proceedings, then precluding the SunCal Debtors from pursuing any alternative to Lehman's competing reorganization plan.

94.    Lehman has argued that even if stay relief is denied, the SunCal Debtors can simply "initiate the equitable subordination action against Lehman Commercial in the New York Bankruptcy Case."  Compromise Reply at p. 13 ¶ 15 (quoting BAP Ruling, 423 B.R. at 667). However, as discussed above, relitigating against LCPI in New York the same issues litigated against all other defendants in California will be a massively inefficient use of resources, and raises the specter of inconsistent ruling.  It will needlessly deplete both the SunCal Debtors' and Lehman's estates, and will delay both estates' reorganization efforts.  *In re G.S. Distrib.*, 331 B.R. at 568 ("Although the Debtor claims that pursuit of the litigation would interfere with its efforts to reorganize and burden the estate with the additional costs, it does not appear that the Debtor can reorganize if it is not successful before the District Court.").

95.    By contrast, any adverse effect on Lehman of stay relief would minimal. *In re Countryside Manor,* 188 B.R. at 491 (lifting stay where debtor had not established any hardship that would result if stay was lifted, and refusal to lift stay would prejudice movants as it would deny them the ability to assert their claim in state court); *In re G.S. Distrib.*, 331 B.R. at 568.

96.    First, the SunCal Debtors would not be seeking any money damages from LCPI. They simply seek to defend themselves by raising all appropriate objections to claims that LCPI has asserted against them.  Thus, even when LCPI was named in the Adversary Proceeding, it was named only on causes of action for equitable subordination (to subordinate claims and preserve associated liens for benefit of the estates); fraudulent transfer (to avoid liens unsupported by value, not to recover damages); to void liens under 11 U.S.C. §§ 506(d) (again, based on liens unsupported by value); and to avoid and/or preserve claims and/or liens 541(a)(4) and 551 (derivatively based on the equitable subordination, fraudulent transfer, and § 506(d) claims).[47]

97.    Second, because LCPI's counsel will be participating in the Adversary Proceeding in any event, the Lehman Estate will not incur additional costs as a result of LCPI's participation. *In re Anton*, 145 B.R. at 770 (debtor was "not a stranger to the pending litigation"; as a principal in a company that was a party, he had been "kept advised" of the litigation and his "attention" would already have been diverted to it, and "the expenses of litigation will not be solely his to bear.").

98.    Third, even if LCPI will incur some additional costs in defending the Adversary Proceeding, "[t]he cost of defending litigation, by itself, has not been regarded as constituting 'great prejudice,' precluding relief from the automatic stay."  *In re Anton*, 145 B.R. 767 at 770.

99.    Fourth, LCPI cannot contend that it is prejudiced by having to defend itself in another jurisdiction.  LCPI has taken a very aggressive posture in the SunCal Debtors' cases. LCPI, and the other Lehman defendants, have proposed a competing Chapter 11 Plan in the SunCal cases.  "The automatic stay should not tie the hands of a defendant while the plaintiff debtor is given free rein to litigate."  *In re Merrick*, 175 B.R. 333, 338 (9th Cir. BAP 1994).

100.    Fifth, Lehman would not be prejudiced by granting relief from stay because the purpose of the automatic stay—to give the debtor a breathing spell from his creditors—has been served.  In *In re Anton*, the court granted relief from stay, noting that "[t]he debtors have had a breathing spell of *five months* since the Chapter 11 cases were filed.  They must now face the reality of defending plaintiff's charges in the District Court where, if the debtors are successful,

---

[47] *See* Third Amended Complaint at pp. 53, 74-76 (O'Keefe Decl., Exh. Y).

they will be in a better position to effect their desired reorganization in this court." *In re Anton*, 145 B.R. at 770 (emphasis added).  Here, *eighteen months* have passed since LCPI filed for bankruptcy.  (It has been nineteen months for LBHI.).  As in *Anton*, LCPI—win or lose in the Adversary Proceeding—will be in a "better position to effect [its] desired reorganization in this court" by participating in that Adversary Proceeding and expediting resolution of those issues.

101.    Finally, in weighing the balance of harms, the Court may consider whether the stay is being used, at least in part, to shield misconduct or in an otherwise improper manner.  *In re Highcrest Mgmt. Co., Inc.*, 30 B.R. 776, 778 (Bankr. S.D.N.Y. 1983) ("Cause may include misconduct.  Cause may also include bad faith.") (quotations omitted); *In re Anton*, 145 B.R. at 770 (considering "whether the automatic stay is being used to shield misconduct.") (citing *In re Unioil*, 54 B.R. 192 (Bankr. D. Colo.1985)).

102.    As noted above, there is evidence suggesting that Lehman entered into the Repo with Fenway at least in part to conceal its faltering finances.  The Lehman Entities concealed the Repo from the SunCal Debtors when it occurred in August 2008, just as the Lehman Entities were affirming their willingness to restructure the SunCal Debtors' loans.  They concealed it when they sought relief from stay to foreclose on the SunCal Debtors' properties in January 2009.  They concealed it when they filed their proofs of claims in March 2009, representing that they alone were the "creditors."  Lehman asserts that it has been transparent about its attempt to unwind the Repo all along, but this was only after concealing the Repo for months in the first place.

103.    Moreover, a debtor's acquisition of an asset subject to foreclosure or litigation, for the purpose of invoking its automatic stay, is an abuse of process, and therefore is not in good faith.  In *In re Brannan*, 40 B.R. 20 (Bankr. N.D. Ga. 1984), 14 months prior to the petition date, the debtor transferred certain real property to a third party.  Subsequently, the property was subject to a foreclosure proceeding.  The debtor filed for bankruptcy, and less than two months later, the third party transferred the real property to the debtor.  The debtor contended that the pending foreclosure was stayed, since the real property had become property of the estate.  The court disagreed, and observed that an attempt to "shield a property interest under the automatic stay by

conveying the property interest to" the debtor's estate during the pendency of the bankruptcy "*would be an abuse of the bankruptcy process*." *Brannan*, 40 B.R. at 24-25 (emphasis added).

104.    Here, as of the SunCal Debtors' November 2008 petition dates (and even as of Lehman's petition date), Fenway was the owner of the Sold Loans, and will continue to hold this ownership up until consummation of the Transaction.   The SunCal Debtors' Adversary Proceeding is well into the discovery stage, and Fenway has been an active participant/defendant in that the litigation for nine months.  If LCPI, which recently persuaded Judge Smith to dismiss it from the Adversary Proceeding, acquires the Sold Loans and then invokes its stay with regard to these assets—including over a billion dollars in loans originated by non-debtor Lehman ALI—so as to impede the Adversary Proceeding, this would be "an abuse of the bankruptcy process." *Brannan*, 40 B.R. at 24-25;[48] *see also In re Anton*, 145 B.R. at 771 (lifting stay where timing of debtor's Chapter 11 filing suggested that the proceeding "was filed for the shelter provided by the automatic stay against the pending litigation").[49]

### 3.    The Remaining *Sonnax* Factors

105.    *Sonnax* Factor 1: Whether relief would result in a partial or complete resolution of the issues.  Judge Smith has exclusive jurisdiction over the administration of the SunCal Debtors' estates and the distribution of such assets to allowed claims.  LCPI cannot realize any recovery on its claims against the SunCal Debtors' estates until and unless Judge Smith administers the claims asserted against the SunCal Debtors and determines their rights to distribution.  Since these issues are properly before Judge Smith, relief will allow a complete resolution of them.  *In re Highcrest*

---

[48] Lehman has attempted to distinguish *Brannan* on the ground that it involved a Chapter 7 case, where the property was conveyed by a non-debtor to the debtor, and not the debtor's estate, and thus the debtor's stay did not apply.  Compromise Reply at p. 13 n.16.  This misses the point.  *Brannan* stated that *if* the non-debtor were permitted to "shield a property interest under the automatic stay by conveying the property interest to an individual who had previously filed a Chapter 7 petition[, s]uch a transaction *would be* an abuse of the bankruptcy process."  *Id.* at 24-25.

[49] Notwithstanding Lehman's predictions that it *would* assert an interest in the Sold Loans if and when it could ever unwind the Repo, the automatic stay has *never previously been an issue* during the entire time the Adversary Proceeding has been pending vis-a-vis these loans.  Lehman asserts that LBHI has held an interest in the Sold Loans all along via its ownership of the CP Notes that are "ultimately" backed by the Sold Loans.  However, as discussed in Part V.C.1 below, this indirect interest in the Sold Loans is insufficient to implicate LBHI's automatic stay.

*Mgmt. Co., Inc.*, 30 B.R. at 778 ("The automatic stay should not be used as a shield to protect conduct which can only be fully and finally adjudicated in a case pending in the District Court.").

106.    *Sonnax* Factor 2:  Lack of any connection with or interference with the bankruptcy case.  The SunCal Debtors do not seek any affirmative claims or relief against LCPI's estate.  Rather, they seek only adjudication of the claims asserted by LCPI against their estates.  Therefore, the SunCal Adversary Action does not "interfere" with Lehman's bankruptcy cases.  In fact, because administration of LCPI's estate depends in part on resolution of LCPI's claims against the SunCal Debtors, relief from stay promotes LCPI's reorganization.

107.    *Sonnax* Factor 3: Whether the other proceeding involves the debtor as a fiduciary.  This factor is not relevant here.

108.    *Sonnax* Factor 4: Whether a specialized tribunal with the necessary expertise has been established to hear the cause of action.  Although both Judge Smith and this Court are well qualified to deal with bankruptcy matters, as noted above, over the last fifteen months Judge Smith has gained a particular expertise regarding the legal, factual, and evidentiary issues in the Adversary Proceeding.  As such, the California Bankruptcy Court is a "specialized tribunal."  *In re G.S. Distrib.*, 331 B.R. at 568 (district court had "necessary expertise" and was "familiar with the issues"); *In re SCO Group*, 395 B.R. at 855 n.4 (district court's "mastery of the facts and law pertaining to the [litigation] is a powerfully important consideration in the Court's decision to lift the stay"); *In re Fischer*, 202 B.R. at 355 (district court had "devoted substantial resources…to this case, in holding hearings, conducting conferences, and deciding numerous motions").

109.    *Sonnax* Factor 5: Whether the debtor's insurer has assumed full responsibility for defending it.  The SunCal Debtors are not seeking any affirmative relief against LCPI.  Thus, whether LCPI has insurance coverage for any claims asserted against it is irrelevant here.

110.    *Sonnax* Factor 6: Whether the action primarily involves third parties.  There are six Adversary Proceeding defendants, four of whom share LCPI's counsel.   It would be an inefficient use of judicial resources to allow the SunCal Adversary Action to proceeding solely as to the other defendants, and exclude LCPI.

111.    *Sonnax* Factor 7: Whether litigation in another forum would prejudice the interests of other creditors.  Again, LCPI cannot realize any recovery on its claims against the SunCal Debtors' estates until and unless Judge Smith administers the claims asserted against them and determines LCPI's rights to distribution from their estates.  Thus, creditors of LCPI will not be prejudiced by, but rather will benefit from, the expeditious resolution of LCPI's claims.  Conversely, hundreds of the SunCal Debtors' creditors may be severely prejudiced if they are precluded from defending against LCPI's claims, or are forced to sever out LCPI and duplicate litigation regarding virtually every issue in the case in both California and New York.

112.    *Sonnax* Factor 8: Whether the judgment claim arising from the other action is subject to equitable subordination.  Because the SunCal Debtors do not assert any affirmative claims against LCPI's estate, there is no claim against LCPI that could be subject to subordination.

113.    *Sonnax* Factor 9: Whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor.  Similarly, the SunCal Debtors seek no affirmative relief from LCPI's estate, and so do not assert a judicial lien that might be avoidable by LCPI.

114.    *Sonnax* Factor 11: Whether the parties are ready for trial in the other proceeding.  Substantial discovery has already occurred in the Adversary Proceeding, and all discovery is scheduled to conclude in September 2010.

C.    **LBHI's Indirect Interest in the Sold Loans Does Not Warrant Application of the Stay**

1.    **The Sold Loans Are Not and Will Not Be Property of LBHI's Estate**

115.    Lehman contends that LBHI has had an interest in the Sold Loans all along, based on its ownership of CP Notes that are "ultimately" backed by the Sold Loans:  the CP Notes are secured by the proceeds of Fenway Funding's VFN Note, and the VFN Note is backed by the Repo assets, including the Sold Loans.  Compromise Reply at p.10 ¶ 16.  Thus, claims Lehman, the Sold Loans constitute property of LBHI's estate, and so there is nothing inequitable about LBHI asserting its stay with regard to them to thwart the Adversary Proceeding.  *Id.* at p. 15 ¶ 28.

116.    However, LBHI's indirect interest in the Sold Loans is insufficient as a matter of law to subject such loans themselves to Section 362(a)(3).  "Although the definition of property for

purposes of the Code is broad … subsection 362(a)(3) does not bar every proceeding hostile to a debtor's claimed interest in property, no matter how intangible, unmatured or unliquidated the debtor's claim, and no matter how indirect the attack upon the estate's interest in property." *In re Continental Air Lines, Inc.*, 61 B.R. 758, 778 (S.D. Tex. 1986).

117.    It is well established that an indirect financial interest in an asset is not sufficient to render the asset itself property of the estate.  Thus, while the debtor's rights or interest may be property of the estate, the underlying asset is not.  *See e.g., In re Matter of Minton Group, Inc*., 46 B.R. 222, 225 (Bankr. S.D.N.Y. 1985) ("The determination that this particular interest in property is within the debtor's estate does not necessarily bring the real property itself within the estate."); *In re Albion Disposal, Inc*., 217 B.R. 394, 407 (W.D.N.Y. 1997) ("At most, the Debtors have an indirect financial interest in the Applications—*i.e.,* the Debtors' estate will receive a considerable amount of money if the Applications are approved and will receive very little money if the Applications are rejected. Any such financial interest is not a legal or equitable interest in the Applications [for purposes of Section 541(a)(1)].").[50]

118.    Here, LBHI owns the CP Notes, so the CP Notes are property of its estate.  Via its ownership in the CP Notes, LBHI has an indirect interest in the Sold Loans (derivatively, through LBHI's security interest in the VFN).  While that interest may be property of the Sold Loans, *the Sold Loans themselves are not*.  Thus, the SunCal Debtors' efforts to subordinate claims based on the Sold Loans do not affect property of LBHI's estate, and so do not implicate LBHI's stay.

119.    LBHI argues in the alternative that its stay *will* apply *once* the Transaction is consummated, because it "will acquire the security interests held by Fenway in the Repo Assets."  Compromise Reply at 10 ¶ 16 (emphasis added).  However, upon consummation of the transaction, LBHI "will return the CP Notes to Fenway Funding and Fenway Funding will return

---

[50] Numerous other cases are in accord.  *See Kreisler v. Goldberg*, 478 F.3d 209, 215 (4th Cir. 2007); *In re UAL Corp.,* 412 F.3d 775 (7th Cir. 2005); *Conti v. Blau*, 234 B.R. 67, 628 (S.D.N.Y. 1999); *Amplifier Research Corp. v. Hart,* 144 B.R. 693, 694 -695 (E.D. Pa. 1992); *In re Gyncor,* 251 B.R. 344, 355 (Bankr. N.D. Ill 2000); *In re Competrol Acquisition Partnership, L.P.,* 203 B.R. 914, 919 (Bankr. D. Del. 1996); *In re Hudgins,* 153 B.R. 441 (Bankr. E.D. Va. 1993); *In re Palumbo*, 154 B.R. 357 (Bankr. S.D. Fla. 1992); *In re HSM Kennewick, L.P.,* 347 B.R. 569,  572 (Bankr. N.D. Tex. 2006); *In re Cardinal Indus., Inc*., 105 B.R. 834, 851 (Bankr. S.D. Ohio 1989).

the VFN Note to Fenway Capital"; "LCPI will repurchase the Repo Assets from Fenway Capital"; "[t]he CP Notes and the VFN Note will be cancelled"; and "the parties will terminate the MRA and the guaranty provided by LBHI with respect thereto."  Compromise Motion at pp.9-10 ¶ 21. Fenway will no longer have rights in the Sold Loans to which LBHI could be subrogated.

### 2.    Equitable Subordination Does Not Implicate the Automatic Stay

120.    If LBHI is correct that it has (or will have) an interest in the Sold Loans, that still does not mean that its automatic stay would apply to efforts by the SunCal Debtors to equitably subordinate claims associated with those loans.  As noted above, equitable subordination is a *defense* to a claim filed *by* the bankrupt creditor, and so does not implicate the automatic stay.  In *In re Metiom*, 301 B.R. at 638.  Although the Ninth Circuit is currently considering the SunCal Debtors' appeal of the BAP Ruling regarding the applicability of *LCPI's* stay, this Court may determine that *LBHI's* stay does not apply to the SunCal Debtors' Adversary Proceeding or Plan. Such a determination would be wholly consistent with this Court's Shinsei Bank Ruling.[51]

### 3.    Even if LBHI's Stay Applies, Relief From Stay Should Be Granted

121.    Even if LBHI has an interest in the Sold Loans, and even if its stay applies to the SunCal Debtors' efforts to equitably subordinate those loans, relief from LBHI's stay should be granted for all the reasons that relief from LCPI's stay should be granted.  Moreover, if LBHI is correct that it *will* acquire some new interest in the Sold Loans upon consummation of the Transaction, such that its automatic stay will *then* apply to the Sold Loans, this only counsels further toward granting relief from stay.  Whatever this remote and undefined interest is, this is a clear example of a debtor acquiring property that was not previously part of its estate, and then using that new acquisition to invoke its stay where it did not previously apply.  *In re Brannan*, 40 B.R. 20 (Bankr. N.D. Ga. 1984).  In other words, LBHI would be using its stay as a sword rather than a shield.  And based on the other *Sonnax* factors cited above, stay relief should be granted.

---

[51] Hearing Transcript, October 14, 2009 at 22:20-23:11 (O'Keefe Decl., Exh. C) (emphasis added).

**WAIVER OF 10-DAY STAY UNDER BANKRUPTCY RULE 4001(a)(3)**

122.    In light of the urgency of the relief requested herein, the SunCal Debtors request

that the Court waive the 10-day stay requirement of Bankruptcy Rule 4001(a)(3) and provide that

any order granting the relief requested herein become effective immediately upon entry.

**NOTICE**

123.    Notice of this motion has been served, in accordance with the procedures set forth

in the amended order entered on February 13, 2009 governing case management and

administrative procedures for this case [Docket No. 2837], on (i) the chambers of the Honorable

James M. Peck ("Chambers"), One Bowling Green, New York, New York 10004, Courtroom 601;

(ii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, (Attn: Richard

P. Krasnow, Esq., Lori R. Fife, Esq., Shai Y. Waisman, Esq., and Jacqueline Marcus, Esq.),

attorneys for the Debtors; (iii) the Office of the United States Trustee for the Southern District of

New York (the "U.S. Trustee"), 33 Whitehall Street, 21st Floor, New York, New York 10004

(Attn: Andy Velez-Rivera, Paul Schwartzberg, Brian Masumoto, Linda Riffkin, and Tracy Hope

Davis); (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New

York 10005, (Attn: Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq.),

attorneys for the official committee of unsecured creditors appointed in these cases (the

"Committee"); (v) the attorneys for any other official committee(s) appointed in these chapter

cases; (vii) any person or entity with a particularized interest in the subject matter of a certain

Document (collectively, the "Standard Parties"), and (viiii) the Rule 2002 List.  The SunCal

Debtors submit that no further notice need be given and that the notice provided is sufficient.

124.    In the Prior RFS Motion, the SunCal Debtors were among the movants who had

moved this Court for relief from stay in order to generally administer their bankruptcy cases to the

extent that such cases, and the relief requested therein, may affect the rights of LCPI.  That

requested relief could include the more narrowly-tailored relief requested herein, *i.e.*, to pursue

against LCPI litigation that had heretofore been proceeding against non-debtors regarding property

recently acquired by LCPI, and to administer their related plan of reorganization.  During the

hearing at which the Court denied the Prior RFS Motion, the Court left open the option for the SunCal Debtors to "move again with a targeted motion focused on particular relief for cause shown." November 20, 2008 Tr. at 79:2-3. The instant motion seeks more particularized relief, as reflected in the proposed order attached hereto as Exhibit A.

## WAIVER OF MEMORANDUM OF LAW

125. This Motion sets forth the applicable authority upon which it relies herein and does not raise novel issues of law. Thus, the SunCal Debtors respectfully request that the Court waive the requirement contained in Rule 9013-1(b) of the Local Bankruptcy Rules for the Southern District of New York that a separate memorandum of law be submitted in support of the Motion.

## CONCLUSION

For all of the foregoing reasons, the SunCal Debtors request that the Court grant the Motion in its entirety.

Dated: April 21, 2010                              Respectfully submitted,

    /s/  Sean A O'Keefe
Sean A O'Keefe
Paul J. Couchot
WINTHROP COUCHOT, P.C.
660 Newport Center Drive, Fourth Floor
Newport Beach, CA 92660
Telephone: (949) 720-4100
Facsimile: (949) 720-4111

    /s/  Louis R. Miller
Louis R. Miller
MILLER BARONDESS, LLP
1999 Avenue of the Stars, Suite 1000
LOS ANGELES, CA 90067
Telephone: (310) 552-4400
Facsimile: (310) 552-8400

    /s/  William N. Lobel
William N. Lobel
THE LOBEL FIRM
840 Newport Center Dr Ste 750
Newport Beach, CA 92660
Telephone: (949) 999-2860
Facsimile: (949) 999-2870

*Attorneys for the SunCal Debtors*

# EXHIBIT A

62890.12

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | **Chapter 11** |
| | **Case No. 08-13555 (JMP)** |
| **LEHMAN BROTHERS HOLDINGS INC, et al.,** | **Jointly Administered** |
| Debtors. | |

## ORDER APPROVING MOTION OF THE SUNCAL DEBTORS FOR AN ORDER GRANTING RELIEF FROM THE AUTORMATIC STAY

Upon the Motion of the SunCal Debtors[52] for an Order Granting Relief from the Automatic Stay (the "Motion"), the Court finds that, (i) it has jurisdiction over the matters raised in the Motion pursuant to 28 U.S.C. §§ 157 and 1334; (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); (iii) the relief requested in the Motion is proper and should be granted; (iv) proper and adequate notice of the Motion and the Hearing thereon has been given and no other or further notice is necessary; and (v) upon the record herein after due deliberation thereon, good and sufficient cause exists for the granted of relief as set forth herein,

IT IS HEREBY ORDER THAT:

1.      The Motion is granted;

2.      The automatic stay under § 362(a) of the United States Bankruptcy Code (the Code") in the above-captioned cases, to the extent that it is otherwise applicable, is modified to permit the SunCal Debtors to pursue:

---

[52] The SunCal Debtors are comprised of the following: SunCal Communities II, LLC; SunCal Bickford Ranch, LLC; SCC/Palmdale, LLC; Palmdale Hills Property, LLC; SunCal Emerald Meadows Ranch, LLC; Acton Estates, LLC; SJD Partners, Ltd.; SJD Development Corp.; SunCal Summit Valley, LLC; Seven Brothers, LLC; Kirby Estates, LLC; SunCal Century City, LLC; SunCal Oak Knoll, LLC; SunCal Torrance Properties, LLC; SunCal Beaumont Heights, LLC; SunCal Johannson Ranch, LLC; SunCal Marblehead, LLC; SunCal Heartland, LLC; SunCal Communities I, LLC; SunCal Communities III, LLC; LB/L-SunCal Northlake, LLC; LB/L-SunCal Oak Valley, LLC; SunCal PSV, LLC; Delta Coves Venture, LLC; North Orange Del Rio Land, LLC; Tesoro SF LLC; and SCC Communities LLC.

62890.12

(a)      causes of action in an adversary proceeding in the Bankruptcy Court for the Central District of California titled *Palmdale Hills Property, LLC et al. v. Lehman ALI Inc. et al.*, Case No. 8:09-ap-01005-ES,(the "Adversary Proceeding") seeking to (i) equitably subordinate and/or otherwise impair claims filed against the SunCal Debtors' estates, and/or (ii) transfer, avoid or disallow associated liens associated with the loans on which such claims are premised, to be filed against (x) LCPI, to the extent that LCPI has filed such claims; and/or (y) any non-debtor to which LCPI transfers or has transferred an interest in the "Sold Loans" (as that term is defined in the Motion), including but not limited to Lehman ALI Inc., OVC Holdings LLC, and/or Northlake Holdings, LLC; and

(b)      approval of, and, in the event of approval, administration and effectuation of, the SunCal Debtors' plan of reorganization, which provides for equitable subordination and/or other impairment of LCPI's claims and claims premised on the Sold Loans, and for the transfer, avoidance, and/or disallowance of associated liens;

3.      Lehman Brothers Holdings, Inc.'s stay does not apply to the SunCal Debtors' efforts to pursue the actions described in Paragraph 2 above; but even if it were to apply, relief from stay should be granted;

4.      The modification of the automatic stay, to the extent that it is otherwise applicable, granted by this Order shall take effect immediately upon entry of this Order and shall not be stayed by operation of Rule 4001(a)(3) of the Federal Rules of Bankruptcy Procedures;

5.      The Court shall retain jurisdiction to hear and determine all matter arising from or related to the implementation of this Order.


Dated:      New York, New York
            May ___, 2010


                                    _____
                                    HONORABLE JAMES M. PECK
                                    UNITED STATE BANKRUPTCY JUDGE