### MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### INTRODUCTION

The Related Debtors each own residential real estate projects in California, each of which are owned by affiliated of the SunCal Companies ("SunCal") and each of which have Lehman Ali, Inc. as its primary secured creditor ("Lehman ALI"). Steven M. Speier is the Chapter 11 of nine related Chapter 11 debtors with cases pending before this Court ("Trustee Debtors"), each of which owns a residential real estate project in California, each of which are owned by affiliates of the SunCal and Lehman Brothers; and each of which has Lehman ALI or its successors OVC Holdings and North Lake Holdings as their primary secured creditor (Lehman ALI, OVC Holdings, and Northlake Holdings are hereinafter collectively referred to as the "Lehman Lenders"). None of the Lehman Lenders holding loans secured by the Projects that are the subject of this Motion have filed bankruptcy proceedings.

The Related Debtors and the Trustee have recently received the D.E. Shaw Offer for the Trustee's nine Projects and the Projects of the three Related Debtors, pending before this Court and in which the Lehman Lenders are also the primary secured creditors. The Trustee Debtors and the Related Debtors that are included in the D.E. Shaw Offer are hereinafter collectively referred to as the "Subject Debtors." The Trustee and the Related Debtors' representatives are hereinafter collectively referred to as the "Subject Debtors' Representatives". The proposed purchase price set forth in the D.E. Shaw Offer for the twelve Projects is up to $200 million consisting of $175 million cash and up to $25 million toward existing obligations arising from executory contracts to be assumed and assigned.

As set forth in the Faye Declaration, D.E. Shaw is a source of both debt and equity capital with SunCal on approximately nineteen other SunCal projects. D.E. Shaw is a global investment and technology development firm with more than 1,600 employees, approximately $30 billion in investment and committed capital as of January 1, 2009, and offices in North America, Europe and Asia.

MAINDOCS-#127500-v1-PalmdaleHillsSaleProceduresMotion.DOC

1       D.E. Shaw's real estate unit focuses on real estate opportunities worldwide and across all

2   levels of the capital structure, including equity, debt, and special situations. The unit has twelve

3   investment professionals in New York and London, and approximately $1.6 billion of invested

4   capital as of January 1, 2009.

5       Due to Lehman ALI's alleged breach of its funding obligations on the Subject Debtors'

6   Projects, there are approximately $11 million of real property taxes due and owing on the Projects,

7   and approximately $52 million of unsecured claims against the twelve (12) subject Debtors. There

8   are several public health and safety issues on the Projects as well. The Subject Debtors are

9   plaintiffs in a pending adversary proceeding seeking to, among other things, equitably subordinate

10  the Lehman Lenders claims below the unsecured creditors and have Lehman Lenders' liens

11  transferred to the Debtors' estates.

12      Based on the Subject Debtors' financial condition, the various public health and safety

13  issues arising therefrom, and the current economic climate, the Subject Debtors have accepted the

14  D.E. Shaw Offer subject to overbid and subject to this Court's express disallowance of any

15  purported credit bid rights of the Lehman Lenders.

16      The Subject Debtors intend to market their Projects by mailing out sales packages to

17  SunCal's (as defined hereinbelow) 25 largest competitors in the United States and to the ten (10)

18  largest real estate brokerage firms in California not later than 45 days before the Sale Date. The

19  Sale will also be advertised in the Wall Street Journal thirty (30) days prior to the Sale date.

20      By this instant Motion, the Subject Debtors seek to obtain Court approval of the proposed

21  overbid procedures, the proposed marketing and advertising efforts, the disallowance of any

22  purported credit bid rights of the Lehman Lenders, and a hearing date for the approval of the Sale

23  approximately sixty (60) days from Court approval of this Motion.

24

25

26

27

28

MAINDOCS-#127500-v1-PalmdaleHillsSaleProceduresMotion.DOC

## II.

## FACTUAL BACKGROUND

**A.    The SunCal Companies and the Debtor.**

The Subject Debtors are part of an integrated network of companies that operate under the common dba "the SunCal Companies" or "SunCal." SunCal is a family-owned business that has been in the land development business for over seventy years.

The Subject Debtors were formed as part of a joint venture to develop twenty-one residential real estate Projects with various affiliates of Lehman Brothers, Inc. ("Lehman"). There are a total of twenty six (26) entities with twenty one (21) Projects as part of the joint venture that currently have Chapter 11 cases pending before this Court (the twenty six Chapter 11 debtors are collectively referred to as the "Debtors"). Seventeen of the Debtors filed voluntary petitions beginning on November 6, 2008 (the "Voluntary Debtors"), and the nine (9) Trustee Debtors that had involuntary Chapter 11 petitions filed against them and are now represented by the Trustee. All of the Debtors have a common indirect parent, SunCal Acquisitions, LLC ("Acquisitions") and all of the Debtors have SunCal Management, LLC ("SunCal Management") as their management company.

SunCal historically financed its real estate projects with land acquisition and development loans from a number of different lenders and/or internal equity or third party equity partners. However, several years ago, SunCal formed a much closer relationship with Lehman and its affiliates who quickly became SunCal's largest funding source, providing over $2 billion in financing through a series of loan agreements and equity arrangements on the Debtors Projects.

The two Lehman affiliates that made loans to the Debtors were Lehman ALI and Lehman Commercial Paper, Inc. ("Lehman Commercial"). Initially, SunCal acted as the developer/operator for all of the Projects and Lehman Commercial and Lehman ALI as the financing sources, and in the case of the Trustee Debtors, Lehman affiliates are also equity partners.

MAINDOCS-#127500-v1-PalmdaleHillsSaleProceduresMotion.DOC

**B.**     **The Debtors' Claims Against the Lehman Lenders.**

    1.     <u>The Debtors' Fraud Claims against the Lehman Lenders arising from Interim</u>
<u>Loan and Restructuring Agreement that bound all of the Debtors under</u>
<u>Lehman's Control.</u>

       Although Lehman began its role in the joint venture primarily as a lender and equity partner, after the bursting of the California real estate market in or around the middle of 2007, Lehman took over effective control of all of the material aspects of the Debtors' Projects' operations - without regard as to which Lehman affiliate was the lender and without regard as to whether a Lehman affiliate was an equity member. The practical instruments through which Lehman exercised control over the Debtors, and through which Lehman ultimately created a plethora of unfunded cross entity obligations, were the October 2007 Interim Loan Agreement (the "Interim Loan Agreement") and the May 23, 2008 Restructuring Agreement (the "Restructuring Agreement"). The specific objectives that Lehman sought to achieve through these two agreements were the following:

       a.     Induce the Debtors' vendors and service providers, including SunCal, to continue performing critical services on the most valuable Projects in the portfolio (the "Key Projects") based on assurances of payments, thereby preserving the value of the same until they were transferred to a new Lehman controlled entity; and

       b.     Create new Lehman owned and controlled entities into which the Key Projects could be transferred and then to effectuate these transfers.

       The Interim Loan Agreement nominally provided a $20 million loan facility from Lehman ALI to Acquisitions, which by its terms, was intended to be used for the operations of SunCal and all of the Debtors. However, Lehman ALI maintained complete control over the use of the funds in this facility. By this point in time, Lehman ALI had effectively taken control over all of the Debtors. Eventually a team of project professionals employed by SunCal Management would meet with a Lehman ALI representative or representatives on a weekly basis or more. At these meetings, Lehman ALI would unilaterally dictate what future work would proceed (the "Authorized Work") and it would promise to pay for the same when it was completed. Lehman

-8-

1    ALI also decided what payables were "urgent" (the "Urgent Payables") and hence had to be paid

2    promptly to avoid severe consequences and what other payables could be deferred (the "Deferred

3    Payables").

4            Unfortunately this control and payment regime did not work out as planned or

5    anticipated. Even where Lehman ALI agreed to fund the Urgent Payables, it later ignored SunCal

6    Management's repeated requests for payment when performance was due, yet it continued to

7    authorize more work and to promise payment. When it came time for Lehman ALI to pay the

8    Authorized Work it reneged in many instances.

9            As to the Deferred Payables, Lehman ALI promised that its agent, Radco, would

10    meet with vendors and negotiate mutually satisfactory discounted payment arrangements with the

11    unpaid vendors. Although Radco initially purported to play this role, Lehman ALI only paid a

12    fraction of these claims.

13            Lehman's funding practices, dictatorial control over the Projects' operations, and

14    breach of its funding obligations created a common layer of unpaid unsecured debt that now

15    burdens all of the Debtors' estates in the estimated amount of $100 million. Furthermore, human

16    lives and property are being put at risk from situations as diverse as: (a) potential levee failures,

17    (b) airborne friable asbestos, (c) failure to provide dust and erosion control measures, (d) possible

18    brush fires in densely populated areas during peak periods of the California fire season due to the

19    failure to fund brush control, and (e) failure to provide adequate storm water control. In addition,

20    the condition and value of the assets are wasting; fines have been assessed or threatened to be

21    assessed due to the Projects' violation of governmental permits; entitlements are at risk;

22    availability of resources such as water are at risk; governmental bonds are being called; and taxes

23    and insurance are going unpaid.

24            2.    Lehman ALI's Ongoing Manipulation of The Bankruptcy System To

25                Continue Its Fraud on Creditors.

26            The intentional and malign nature of the actions taken by Lehman ALI in this case is

27    further confirmed by the following course of conduct. Shortly before or after the execution of the

28    May 2008 Restructuring Agreement, Lehman Commercial transferred all of its deeds of trust on the

-9-

MAINDOCS-#127500-v1-PalmdaleHillsSaleProceduresMotion.DOC

1   Debtors' Projects to Lehman ALI as Lehman ALI purportedly became the Debtors' sole lender

2   under the Restructuring Agreement. Yet shortly before Lehman Commercial's Chapter 11 filing,

3   Lehman ALI transferred back to Lehman Commercial all of the collateral that Lehman Commercial

4   had transferred to Lehman ALI as part of the Restructuring Agreement. These transfers largely

5   affected the Debtors where a SunCal entity held control, and hence the ability to file a voluntary

6   bankruptcy proceeding. In contrast, in those cases where Lehman had the ability to block a

7   Chapter 11 filing, Lehman ALI retained the loans, since a Lehman Commercials' bankruptcy stay

8   was apparently deemed unnecessary.

9           The objective of this bad faith stratagem is obvious. Lehman ALI has used Lehman

10  Commercial's automatic stay to thwart any reorganization effort of the voluntary cases, with the

11  end-game being a foreclosure that would eliminate the very claims created by Lehman ALI's fraud.

12          As to the Trustee Debtors, Lehman ALI invoked its equity affiliates' corporate veto

13  power over the Trustee Debtors' ability to file voluntary Chapter 11 proceedings in an attempt to

14  thwart these filings. This bad faith tactic forced the unsecured creditors holding claims against

15  these entities to file involuntary proceedings to stop Lehman ALI initiated foreclosures, which,

16  again, would eliminate the very claims that were created through Lehman's fraud.

17          3.    Lehman ALI's Blatant Money Grab of $3.4 Million.

18          Not only did Lehman ALI make repeated promises to fund the Debtors' Projects

19  expenses and failed to do so, just before the filing of the involuntary petitions against the Trustee

20  Debtors, Lehman ALI secretly swept $3.4 million of funds from restricted accounts that had been

21  specifically established to meet certain needs of Debtors SunCal Marblehead and SunCal Heartland.

22          C.    The Debtors' Adversary Proceeding Against the Lehman Lenders.

23          On January 6, 2009, the Voluntary Debtors and others filed an adversary proceeding

24  against the Lehman Lenders requesting, amongst other relief, that the Lehman Lenders claims be

25  equitably subordinated and to have the Lehman Lenders liens transferred to the Debtors' estates

26  (the "Adversary Proceeding"). On February 3, 2009, a First Amended Complaint was filed adding

27  the Trustee as an additional plaintiff on behalf of the Trustee Debtors. A true and correct copy of

28  the First Amended Complaint is attached to the Cook Declaration as Exhibit "4."

-10-

MAINDOCS-#127500-v1-PalmdaleHillsSaleProceduresMotion.DOC

**D.    The Debtors' Joint Chapter 11 Plan.**

On February 4, 2009, the Voluntary Debtors filed their joint Chapter 11 Plan ("Plan"). See Exhibit "5" attached to the Cook Declaration. The Trustee intends to file the identical Plan in the nine (9) Trustee Debtor cases. On behalf of all twenty-six Debtors, the Plan provides for, among other things, the following:

1.    Equitable subordination of the Lehman's Lenders' claims to the claims of unsecured creditors and the transfer of the Lehman Lenders' liens to the Debtors' estates;

2.    A sale of the Debtors' assets free and clear of all liens;

3.    Substantive consolidation of all twenty six (26) of the Debtors' estates; and

4.    Payment of the claims of all of the Debtors' creditors from the sales proceeds.

The Debtors' Plan is clearly feasible. The sales proceeds that will be generated by the D.E. Shaw Offer will be more than sufficient to pay all non-subordinated creditors in full with interest. A hearing on the Disclosure Statement is set for May 7, 2009, at 2:00 p.m. Plan confirmation should, therefore, occur in the summer of 2009.

**E.    The Proposed Sale, the Proposed Overbid Procedures Proposed, and the Proposed Marketing/Advertising Efforts.**

The Subject Debtors seek to sell their Projects to the bidder presenting the highest and best cash offer for the projects. A brief description of the Subject Debtors' Projects is attached to the Faye Declaration as Exhibit "1." The sale of the Projects pursuant to the D.E. Shaw Offer will ensure the financial feasibility of the Debtors' Plan. All net sale proceeds shall be held by the Subject Debtors in a segregated account with all alleged liens attaching thereto, subject to a further order of the Court.

The Bankruptcy Court will not consider any competing proposal ("Competing Proposal") unless the Competing Proposal (a) provides for a minimum all-cash overbid in the amount of $180 million; (b) contains terms and conditions that are at least as favorable to the Subject Debtors as those set forth in the D.E. Shaw Offer; (c) is made by a person or entity financially qualified to consummate the Competing Proposal on a timely basis; (d) is made by a person or entity who has

-11-

MAINDOCS-#127500-v1-PalmdaleHillsSaleProceduresMotion.DOC

1  completed its due diligence review of the Subject Debtors' books and records, and is satisfied with

2  the results thereof; (e) is accompanied by a deposit in the form of a wire transfer of funds or a

3  cashier's check payable to Winthrop Couchot PC (to be held in trust for the Debtors) in the amount

4  of not less than $18 million, which deposit shall be non-refundable if the bid is deemed to be the

5  Successful Bid (as defined below); and (f) the Competing Proposal is delivered to the Subject

6  Debtors and their counsel and filed with the Bankruptcy Court at least two (2) court days prior to

7  the Sale Date (as defined below). A Competing Proposal that satisfies the foregoing criteria shall

8  be referred to as a "Qualifying Competing Proposal."

9       The following terms and conditions shall also apply:

10          (i)    The Sale Motion will be provided to SunCal's 25 largest competitors in the

11  United States and to the ten (10) largest real estate brokerage firms in California not later

12  than 45 days before the sale date. The Sale Motion will indicate that interested bidders will

13  be provided access to a virtual due diligence website by contacting the Subject Debtors.

14  The Sale will also be advertised in the Wall Street Journal 30 days prior to the Sale Date.

15          (ii)    Any counter bid in the bidding process will be at least $5 million

16  ($5,000,000) higher than the prior bid or counter bid (which may not include a credit bid).

17          (iii)    At the Sale to be conducted commencing at 2:00 p.m. on the last business

18  day prior to the hearing on the sale (the "Sale Date") at 4100 Newport Place Drive, Third

19  Floor, Newport Beach, CA 92660, only D.E. Shaw and all other parties who have

20  submitted a Qualifying Competing Proposal shall be entitled to bid.

21          (iv)    At the hearing on the Sale Motion, the Subject Debtors shall recommend

22  and the Bankruptcy Court shall approve which of the bids is the highest and best bid, and

23  such bid shall be deemed to be the "Successful Bid." The bidder whose bid is definitively

24  approved by the Bankruptcy Court to be the Successful Bid must pay at the closing all

25  amounts reflected in the Successful Bid in cash and such other consideration as agreed

26  upon.

27

28

MAINDOCS-#127500-v1-PalmdaleHillsSaleProceduresMotion.DOC

## III.

## GOOD CAUSE EXISTS TO APPROVE THE OVERBID PROCEDURES

As set forth in the Speier and Faye Declarations, the Subject Debtors believe that the proposed overbid procedures are fair and reasonable. The amount of the initial and subsequent overbids in this case – $5 million – is less than 2.5% increment of the purchase offer for the Assets, well within the limits set by bankruptcy courts discussed below. In this regard, initial overbids of up to twenty percent of the sale price have been approved by bankruptcy courts. *See* In re Twenver, Inc., 149 B.R. 954, 956 (Bankr. D. Colo. 1992) (refers to initial overbid of 22% of sale price); In re Canyon Partnership, 55 B.R. 520 (Bankr.S.D.Cal. 1985) (approved overbid of $20,000 was 3% of sale price of $662,000); In re Great Northern Paper, Inc., 289 B.R. 497, 499 fn. 1 (D.Me. 2003) (approved bidding increment of 2.2%). As noted above, the *first* overbid must also be sufficient to satisfy the topping fee "so that the estate would not be put in the anomalous provision of either accepting a bid other than the highest bid or accepting the highest bid which results in a smaller net to the estate…" In re Tama Beef Packing, Inc., 290 B.R. 90, 101 (8th Cir.BAP 2003) (Kressel, dissenting).

Based upon the foregoing, the Subject Debtors respectfully request that the Court approve the overbid procedures outlined above.

## IV.

## THE COURT SHOULD APPROVE THE BREAK UP FEE AS PART OF THE BIDDING PROCEDURES IN THE EVENT THAT D.E. SHAW IS NOT THE SUCCESSFUL BIDDER AND THE SALE CLOSES TO A BUYER OTHER THAN D.E. SHAW

Aside from the proposed overbid procedures, D.E. Shaw has required a break-up fee in the event that that the closing of the contemplated Sale of Assets occurs, but that D.E. Shaw is not the Successful Bidder. Specifically, the D.E. Shaw Offer provides for a break-up fee to D.E Shaw in the amount of $4 million in the event of a sale to a party other than D.E. Shaw.

The necessity of a Break-up Fee to encourage bidding has been widely recognized by courts. As one court noted:

> Break-up fees are important tools to encourage bidding and to maximize the
> value of the debtor's assets….In fact, because the …corporation ha[s] a duty to

-13-

encourage bidding, break-up fees can be <u>necessary</u> to discharge [such] duties to maximize values.

<u>Official Committee of Subordinated Bondholders v. Integrated Resources, Inc.</u> (In re Integrated Resources, Inc.), 147 B.R. 650, 656-57, 660-61 (S.D.N.Y. 1992) (emphasis in original) (further stating that break-up fees can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); <u>In re Hupp Industries, Inc.</u>, 140 B.R. 191, 194 (Bankr.N.D.Ohio 1992) ("without such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's ... due diligence.") As a consequence, bankruptcy courts frequently approve break-up or topping fees in connection with proposed bankruptcy sales.

Courts have approved a wide range of breakup fees, as a percentage of the purchase price. See e.g., <u>In re Paging Network, Inc.</u>, Case No. 00-3098(GMS) (D.Del) (7.24% break-up fee is reasonable); <u>In re Philip Servs. Corp.</u>, Case No. 03-37718 (Bankr.S.D. Tex. June 2003) (14.29% break-up fee of $5 million for a $35 million purchase price is reasonable); <u>In re Hupp Indus., Inc.</u>, 140 B.R. 191, 193-94 (Bankr.N.D.Ohio 1992) (3.16% break-up fee of $150,000 for a $4.75 million purchase price is reasonable); <u>Gey Associates General Partnership v. 310 Assocs., L.P.</u>, No. 02 Civ.0710 (SHS), 2002 WL 31426344 (S.D.N.Y. Oct.29, 2002) (3.23% break-up fee of $100,000 for a $3.1 million purchase price is reasonable); <u>In re FSC Corp.</u>, Case No. 00-B-04659 (Bankr.N.D.Ill.2000) (3.4% break-up fee is reasonable); <u>In re O'Brien Envtl. Energy, Inc.</u>, 181 F.3d 527, 536 (3d Cir.1999) (break-up fee of approximately 4% is reasonable in relation to the purchase price).

As set forth in the Speier and Faye Declarations, the Subject Debtors believe that the Break Up Fee, representing approximately 2% of the purchase price[1] of the Assets is a reasonable reflection of the risk, effort and expense incurred by D.E. Shaw and will have no chilling effect or otherwise hamper the bidding process. Furthermore, the Break-Up Fee was a product of negotiation between the parties and was a material inducement leading to the D.E. Shaw Offer.

---

[1] The Break-up Fee will only be payable in the event of a successful overbid. Assuming only the minimum overbid of $205 million (consisting of $180 million in addition to up to $25 million toward executory contracts) is obtained, the Break-up Fee of $4 million will constitute approximately 2.2% of the Purchase Price.

-14-

MAINDOCS-#127500-v1-PalmdaleHillsSaleProceduresMotion.DOC

1    Furthermore, it is appropriate to approve the Break-up Fee as part of this Motion. In re

2    Food Management Group, LLC, 372 B.R. 171, 178 (Bankr.S.D.N.Y. 2007) ("granting a 2.5%

3    break-up fee to potential stalking horse bidders" as part of "Bid Procedures Order"); In re CXM,

4    Inc., 307 B.R. 94, 104 (Bankr.N.D.Ill. 2004) ("Sale Procedures Order merely authorizes a break-up

5    fee"); In re Belden Locker Co., 2008 WL 183291; In re Wetco Restaurant Group, LLC, 2007 WL

6    4163448, *1 (Bankr.W.D.La. 2007) ("*Bid Procedures Order*... approving the Break-Up Fee...");

7    In re Women First Healthcare, Inc., 332 B.R. 115, 118 (Bankr.D.Del. 2005) ("the Court entered a

8    Bid Procedures Order, which approved ... the stalking-horse bidder and allowed [stalking-horse

9    bidder] a break-up fee..."). Based upon the foregoing, the Subject Debtors Representatives

10    respectfully requests that the Court approve the Break-Up Fee as set forth above.

11    **V.**

12    **THE COURT SHOULD DISALLOW ANY PURPORTED**

13    **CREDIT BID RIGHTS OF THE LEHMAN LENDERS**

14    Section 363(k) of the Bankruptcy Code provides:

15    (k) At a sale under subsection (b) of this section of property that is
16    subject to a lien that secures an allowed claim, unless the court for
      cause orders otherwise the holder of such claim may bid at such sale,
17    and, if the holder of such claim purchases such property, such holder
      may offset such claim against the purchase price of such property.
18    11 U.S.C. § 363(k).

19    The ability to credit bid is expressly conditioned upon the existence of "lien that secures an

20    allowed claim". Moreover, the statute also explicitly recognizes that Court's authority to deny a

21    credit bid for "cause" (i.e., "unless the court for cause orders otherwise").

22    It is well established that a secured creditor is not be entitled to credit bid if its lien is

23    subject to a bonafide dispute and is unresolved at the time of sale. As recognized in Colliers on

24    Bankruptcy:

25    [10] Bidding-in by Lienholder; § 363(k)
26    At a sale free and clear of an interest, any holder of an interest is entitled to bid.
      Under section 363(k), if the holder's lien or interest is not in dispute, the holder
27    may offset its claim against the purchase price. **If the lien or interest is in bona
      fide dispute, the holder may not exercise an offset. This is because permitting
28    the creditor to "bid in" when its interest is in dispute would enable the**

-15-

1    **creditor to avoid proper judicial resolution of the dispute. This would**
     **frustrate the purpose of the section and overrule case law.**

2    Collier on Bankruptcy-15th Edition Rev. ¶ 363.06[10] (2009) (emphasis added).

3        Accordingly, several courts have denied a secured creditor's right to credit bid where its

4    lien was subject to bona fide dispute. See, e.g., National Bank of Commerce of El Dorado v.

5    McMullan (In re McMullan), 196 B.R. 818, 835 (Bankr. W.D. Ark. 1996) subsequently aff'd, 162

6    F.3d 1164 (8th Cir. 1998); In re Akard St. Fuels, L.P., 2001 WL 1568332, *3 (N.D. Tex. 2001);

7    Coulter v. Blieden, 104 F.2d 29, 32 -33 (8th Cir. 1939); Blanke Mfg. & Supply Co. v. Craig, 287 F.

8    345 (8th Cir. 1923).  One other court found that the disputed secured claimant can credit bid only if

9    it posts an irrevocable letter of credit drawn upon another bank in order to protect the estate in the

10   event the disputed lien is avoided.  See In re Octagon Roofing, 123 B.R. 583, 592 (Bankr. N.D. Ill.

11   1991).

12       In McMullan, there was an outstanding dispute as to whether the secured creditor's lien

13   was subject to avoidance.  The Court held that secured creditor was not allowed to credit bid in

14   light of the dispute, however its lien, if any, would attach to the sale proceeds.

15           At any such sale, NBC shall **not be entitled to offset bid any of its**
16           **claimed liens or security interest under 11 U.S.C. § 363(k) (1994)**
             **because the validity of its liens and security interests are**
17           **unresolved**.

18   McMullan, 196 B.R. at 835 (emphasis added).

19       Similarly, in In re Akard St. Fuels, L.P., 2001 WL 1568332 (N.D.Tex 2001), the District

20   Court affirmed the bankruptcy court's refusal to allow Morgan Stanley the right to credit bid its

21   secured claim based upon a "bona fide" dispute as to the validity of the lien:

22           The [bankruptcy] court also concluded that the challenge to Morgan Stanley's
             alleged liens constituted a bona fide dispute, that a rapid sale of estate assets was
23           necessary to prevent a sharp decline in the value of the estate, and that a
             comparatively lengthy period of time would be necessary to resolve the complex
24           dispute surrounding the challenged liens. These findings of fact, adequately
25           supported by record evidence, formed the basis for the bankruptcy court's legally
             permissible conclusion that cause existed to deny Morgan Stanley the right to
26           credit bid.

27   Akard St. Fuels, at *3.

28

MAINDOCS-#127500-v1-PalmdaleHillsSaleProceduresMotion.DOC

1    In In re Diebart Bancroft, 1993 WL 21423, *2 (E.D.La. 1993) the District Court affirmed

2    the bankruptcy court's refusal to allow a credit bid where a lien priority dispute existed. The

3    bankruptcy court required the lender to make a cash payment on the full amount of the disputed

4    first priority lien.

5    This rule is consistent with the pre-Code practice under the Bankruptcy Act. In Coulter v.

6    Blieden, 104 F.2d 29 (8th Cir. 1939), the Eight Circuit Court of Appeal affirmed the bankruptcy

7    court's refusal to allow a credit bid by a disputed secured creditor:

8    In his petition to vacate the order to sell the property free and clear of liens
9    appellant Morgan states that he desires to bid his claim as a part of the purchase
price of the assets of the bankrupt corporation, with the provision that, if his lien
10    claim is finally disallowed, he be permitted to substitute cash in lieu thereof to
the amount of his bid. Such a provision would be contrary to the terms
11    specifically set out in the order and notice of sale, and there was no guaranty that
this appellant would or could perform in case a cash deposit were deferred, and
12    ultimately, required as expressly stated in the terms of sale.
13    This court has held that, where an order for the sale of property requires the
sale to be cash and unconditional, it is error to accept or consider a bid on behalf
14    of the holder of a secured claim which is in litigation, and that considerations
governing judicial sales require that the sale be in conformity with the terms of
15    the order of sale.
16    ... [W]e do not find that sound discretion was abused in denying appellant's
motion to stay the sale, and his application for permission to bid the amount of
17    his alleged claim or part thereof on the sale price of said assets, as prayed.

18    Coulter v. Blieden, 104 F.2d 29, 32 -33 (8th Cir. 1939). See also Blanke Mfg. & Supply Co. v.

19    Craig, 287 F. 345 (8th Cir. 1923) (error to accept or consider a bid made on behalf of the holders of

20    secured claims, some of which were in litigation, which was conditioned that the sum bid should

21    not exceed the amount of such claims finally allowed).

22    Alternatively, the court in In re Octagon Roofing, 123 B.R. 583, 592 (Bankr. N.D. Ill. 1991)

23    held that the disputed lienholder was required to post a letter of credit as a condition to credit

24    bidding. In Octagon Roofing, the bank's lien was subject to a bona fide dispute, such that the

25    trustee was authorized to sell the property free and clear of the bank's lien pursuant to § 363(f)(4).

26    The court held that the bank was entitled to credit bid subject to the requirement that it post an

27    irrevocable letter of credit drawn upon another bank in order to protect the estate in the event the

28    lien is avoided as a fraudulent conveyance.

-17-

MAINDOCS-#127500-v1-PalmdaleHillsSaleProceduresMotion.DOC

1
2
3
4
5
6
7
8

Accordingly, pursuant to 11 U.S.C. § 363(f)(4) the sale to Polyglass or any higher bidder was allowed to proceed as moved by the Trustee, over the Bank's objection. However, the evidence did not present cause to preclude the Bank from making a credit bid of its lien in assets which Trustee proposed to sell pursuant to 11 U.S.C. § 363(k) so long as Trustee was protected (as was ordered separately) by the Bank posting an irrevocable letter of credit drawn on another bank. That letter of credit will guarantee payment of up to $416,008.90 to Trustee should Trustee ultimately prevail in his Adversary Complaint. Therefore, by separate order the Bank was allowed to credit bid its claim under 11 U.S.C. § 363(k). Trustee by separate order was allowed and directed to sell the Plant to the Bank for its high bid of $2,220,000 upon terms set forth therein, and to sell to Polyglass on its highest bid should the sale to the Bank abort.

9
10
11
12

Id. at 592. See also In re Octagon Roofing, 156 B.R. 214, 216 (Bankr. N.D.Ill. 1993) ("NBD was entitled to make a credit bid on the property pursuant to 11 U.S.C. § 363(k) so long as it posted an irrevocable letter of credit drawn on another bank in the amount of $416,008.90 and made payable to the Trustee in the event that NBD lost the Adversary and its lien was invalidated.").

13
14
15
16
17
18
19
20
21
22
23

Here, the Subject Debtors request that the Court prohibit the Lehman Lenders from credit bidding at the Sale. The liens held by the Lehman Lenders against the Subject Debtors' Projects are clearly subject to bona fide disputes in the Adversary Proceeding. See e.g., In re Millerburg, 61 B.R. 125 (Bankr. E.D.N.C. 1986) (potential lien avoidance action against a secured creditor would certainly qualify as a *bona fide* dispute for purposes of § 363(f)(4)); In re Oneida Lake Development, Inc., 114 B.R. 352 (Bankr.N.D.N.Y. 1990) (Chapter 11 debtor's proposed sale was justified under Section 363(f)(4) - lien was subject to bona fide dispute based upon potential lien avoidance action, even though no adversary proceeding had yet been commenced); In re IMI Acquisition of Boca Raton Corp., 221 B.R. 35, 37 (Bankr.S.D.Fla. 1998) (promissory notes were subject to contractual subordination rendered the note subject to a "bona fide dispute" for purposes of § 303).

24
25
26
27
28

As stated, the Adversary Proceeding seeks relief that such claims be equitably subordinated to the claims of unsecured creditors in all of the Debtors' cases and that the liens be transferred to the estates. If the Lehman Lenders are allowed to credit bid, the Subject Debtors cannot possibly go forward with the sale as the Adversary Proceeding and the Debtors' Plan will be rendered moot.

MAINDOCS-#127500-v1-PalmdaleHillsSaleProceduresMotion.DOC

## VI.

## THE COURT SHOULD SET A HEARING ON

## APPROVAL OF SALE OF ASSETS

The Subject Debtors request that the Court set a hearing on the approval of the D.E. Shaw Offer on or about 60 days from the approval of this Motion.

## VII.

## CONCLUSION

For the foregoing reasons, the Trustee respectfully requests that the Court grant the Motion.

DATED: February 18, 2009

WINTHROP COUCHOT
PROFESSIONAL CORPORATION


By:_____/s/_____
    Paul J. Couchot
    Peter W. Lianides
    Payam Khodadadi
General Insolvency Counsel for the Related
Debtors and Debtors in Possession

-19-

MAINDOCS-#127500-v1-PalmdaleHillsSaleProceduresMotion.DOC

# EXHIBIT T

# Master Repurchase Agreement

September 1996 Version

Dated as of    August 22, 2008

Between:    Fenway Capital, LLC (the "Buyer")

and    Lehman Commercial Printing Inc. (the "Seller")

## 1.  Applicability

From time to time the parties hereto may enter into transactions in which one party ("Seller")
agrees to transfer to the other ("Buyer") securities or other assets ("Securities") against the
transfer of funds by Buyer, with a simultaneous agreement by Buyer to transfer to Seller such
Securities at a date certain or on demand, against the transfer of funds by Seller. Each such
transaction shall be referred to herein as a "Transaction" and, unless otherwise agreed in
writing, shall be governed by this Agreement, including any supplemental terms or conditions
contained in Annex I hereto and in any other annexes identified herein or therein as
applicable hereunder.

## 2.  Definitions

(a)  "Act of Insolvency", with respect to any party, (i) the commencement by such party as
debtor of any case or proceeding under any bankruptcy, insolvency, reorganization,
liquidation, moratorium, dissolution, delinquency or similar law, or such party seeking
the appointment or election of a receiver, conservator, trustee, custodian or similar
official for such party or any substantial part of its property, or the convening of any
meeting of creditors for purposes of commencing any such case or proceeding or
seeking such an appointment or election, (ii) the commencement of any such case or
proceeding against such party, or another seeking such an appointment or election, or the
filing against a party of an application for a protective decree under the provisions of the
Securities Investor Protection Act of 1970, which (A) is consented to or not timely
contested by such party, (B) results in the entry of an order for relief, such an
appointment or election, the issuance of such a protective decree or the entry of an order
having a similar effect, or (C) is not dismissed within 15 days, (iii) the making by such
party of a general assignment for the benefit of creditors, or (iv) the admission in writing
by such party of such party's inability to pay such party's debts as they become due;

(b)  "Additional Purchased Securities", Securities provided by Seller to Buyer pursuant to
Paragraph 4 (a) hereof;

17530520 07150725

JPM-PALMDALE00000388
WC000009

(c) "Buyer's Margin Amount", with respect to any Transaction as of any date, the amount obtained by application of the Buyer's Margin Percentage to the Repurchase Price for such Transaction as of such date;

(d) "Buyer's Margin Percentage", with respect to any Transaction as of any date, a percentage (which may be equal to the Seller's Margin Percentage) agreed to by Buyer and Seller or, in the absence of any such agreement, the percentage obtained by dividing the Market Value of the Purchased Securities on the Purchase Date by the Purchase Price on the Purchase Date for such Transaction;

(e) "Confirmation", the meaning specified in Paragraph 3(b) hereof;

(f) "Income", with respect to any Security at any time, any principal thereof and all interest, dividends or other distributions thereon;

(g) "Margin Deficit", the meaning specified in Paragraph 4(a) hereof;

(h) "Margin Excess", the meaning specified in Paragraph 4(b) hereof;

(i) "Margin Notice Deadline", the time agreed to by the parties in the relevant Confirmation, Annex I hereto or otherwise as the deadline for giving notice requiring same-day satisfaction of margin maintenance obligations as provided in Paragraph 4 hereof (or, in the absence of any such agreement, the deadline for such purposes established in accordance with market practice);

(j) "Market Value", with respect to any Securities as of any date, the price for such Securities on such date obtained from a generally recognized source agreed to by the parties or the most recent closing bid quotation from such a source, plus accrued Income to the extent not included therein (other than any Income credited or transferred to, or applied to the obligations of, Seller pursuant to Paragraph 5 hereof) as of such date (unless contrary to market practice for such Securities);

(k) "Price Differential", with respect to any Transaction as of any date, the aggregate amount obtained by daily application of the Pricing Rate for such Transaction to the Purchase Price for such Transaction on a 360 day per year basis for the actual number of days during the period commencing on (and including) the Purchase Date for such Transaction and ending on (but excluding) the date of determination (reduced by any amount of such Price Differential previously paid by Seller to Buyer with respect to such Transaction);

(l) "Pricing Rate", the per annum percentage rate for determination of the Price Differential;

(m) "Prime Rate", the prime rate of U.S. commercial banks as published in The Wall Street Journal (or, if more than one such rate is published, the average of such rates);

(n) "Purchase Date", the date on which Purchased Securities are to be transferred by Seller to Buyer;

17530520 07150725                          2 • September 1996 • Master Repurchase Agreement

JPM-PALMDALE00000389

WC000010

(o) "Purchase Price", (i) on the Purchase Date, the price at which Purchased Securities are
transferred by Seller to Buyer, and (ii) thereafter, except where Buyer and Seller agree
otherwise, such price increased by the amount of any cash transferred by Buyer to Seller
pursuant to Paragraph 4(b) hereof and decreased by the amount of any cash transferred
by Seller to Buyer pursuant to Paragraph 4 (a) hereof or applied to reduce Seller's
obligations under clause (ii) of Paragraph 5 hereof;

(p) "Purchased Securities", the Securities transferred by Seller to Buyer in a Transaction
hereunder, and any Securities substituted therefor in accordance with Paragraph 9
hereof. The term "Purchased Securities" with respect to any Transaction at any time also
shall include Additional Purchased Securities delivered pursuant to Paragraph 4(a)
hereof and shall exclude Securities returned pursuant to Paragraph 4 (b) hereof;

(q) "Repurchase Date", the date on which Seller is to repurchase the Purchased Securities
from Buyer, including any date determined by application of the provisions of Paragraph
3 (c) or 11 hereof;

(r) "Repurchase Price", the price at which Purchased Securities are to be transferred from
Buyer to Seller upon termination of a Transaction, which will be determined in each
case (including Transactions terminable upon demand) as the sum of the Purchase Price
and the Price Differential as of the date of such determination;

(s) "Seller's Margin Amount", with respect to any Transaction as of any date, the amount
obtained by application of the Seller's Margin Percentage to the Repurchase Price for
such Transaction as of such date;

(t) "Seller's Margin Percentage", with respect to any Transaction as of any date, a
percentage (which may be equal to the Buyer's Margin Percentage) agreed to by Buyer
and Seller or, in the absence of any such agreement, the percentage obtained by dividing
the Market Value of the Purchased Securities on the Purchase Date by the Purchase
Price on the Purchase Date for such Transaction.

3.  **Initiation; Confirmation; Termination**

(a) An agreement to enter into a Transaction may be made orally or in writing at the
initiation of either Buyer or Seller. On the Purchase Date for the Transaction, the
Purchased Securities shall be transferred to Buyer or its agent against the transfer of the
Purchase Price to an account of Seller.

(b) Upon agreeing to enter into a Transaction hereunder, Buyer or Seller (or both), as shall
be agreed, shall promptly deliver to the other party a written confirmation of each
Transaction (a "Confirmation"). The Confirmation shall describe the Purchased
Securities (including CUSIP number, if any), identify Buyer and Seller and set forth (i)
the Purchase Date, (ii) the Purchase Price, (iii) the Repurchase Date, unless the
Transaction is to be terminable on demand, (iv) the Pricing Rate or Repurchase Price
applicable to the Transaction, and (v) any additional terms or conditions of the
Transaction not inconsistent with this Agreement. The Confirmation, together with this
Agreement, shall constitute conclusive evidence of the terms agreed between Buyer and
Seller with respect to the Transaction to which the Confirmation relates, unless with
respect to the Confirmation specific objection is made promptly after receipt thereof. In

17330320 07150725                        3 • September 1996 • Master Repurchase Agreement

JPM-PALMDALE00000390

WC000011

the event of any conflict between the terms of such Confirmation and this Agreement, this Agreement shall prevail.

(c) In the case of Transactions terminable upon demand, such demand shall be made by Buyer or Seller, no later than such time as is customary in accordance with market practice, by telephone or otherwise on or prior to the business day on which such termination will be effective. On the date specified in such demand, or on the date fixed for termination in the case of Transactions having a fixed term, termination of the Transaction will be effected by transfer to Seller or its agent of the Purchased Securities and any Income in respect thereof received by Buyer (and not previously credited or transferred to, or applied to the obligations of, Seller pursuant to Paragraph 5 hereof) against the transfer of the Repurchase Price to an account of Buyer.

4. Margin Maintenance

(a) If at any time the aggregate Market Value of all Purchased Securities subject to all Transactions in which a particular party hereto is acting as Buyer is less than the aggregate Buyer's Margin Amount for all such Transactions (a "Margin Deficit"), then Buyer may by notice to Seller require Seller in such Transactions, at Seller's option, to transfer to Buyer cash or additional Securities reasonably acceptable to Buyer ("Additional Purchased Securities"), so that the cash and aggregate Market Value of the Purchased Securities, including any such Additional Purchased Securities, will thereupon equal or exceed such aggregate Buyer's Margin Amount (decreased by the amount of any Margin Deficit as of such date arising from any Transactions in which such Buyer is acting as Seller).

(b) If at any time the aggregate Market Value of all Purchased Securities subject to all Transactions in which a particular party hereto is acting as Seller exceeds the aggregate Seller's Margin Amount for all such Transactions at such time (a "Margin Excess"), then Seller may by notice to Buyer require Buyer in such Transactions, at Buyer's option, to transfer cash or Purchased Securities to Seller, so that the aggregate Market Value of the Purchased Securities, after deduction of any such cash or any Purchased Securities so transferred, will thereupon not exceed such aggregate Seller's Margin Amount (increased by the amount of any Margin Excess as of such date arising from any Transactions in which such Seller is acting as Buyer).

(c) If any notice is given by Buyer or Seller under subparagraph (a) or (b) of this Paragraph at or before the Margin Notice Deadline on any business day, the party receiving such notice shall transfer cash or Additional Purchased Securities as provided in such subparagraph no later than the close of business in the relevant market on such day. If any such notice is given after the Margin Notice Deadline, the party receiving such notice shall transfer such cash or Securities no later than the close of business in the relevant market on the next business day following such notice.

(d) Any cash transferred pursuant to this Paragraph shall be attributed to such Transactions as shall be agreed upon by Buyer and Seller.

(e) Seller and Buyer may agree, with respect to any or all Transactions hereunder, that the respective rights of Buyer or Seller (or both) under subparagraphs (a) and (b) of this Paragraph may be exercised only where a Margin Deficit or Margin Excess, as the case

17530520 07150725                                    4 • September 1996 • Master Repurchase Agreement

JPM-PALMDALE00000391
WC000012

may be, exceeds a specified dollar amount or a specified percentage of the Repurchase Prices for such Transactions (which amount or percentage shall be agreed to by Buyer and Seller prior to entering into any such Transactions).

(f) Seller and Buyer may agree, with respect to any or all Transactions hereunder, that the respective rights of Buyer and Seller under subparagraphs (a) and (b) of this Paragraph to require the elimination of a Margin Deficit or a Margin Excess, as the case may be, may be exercised whenever such a Margin Deficit or Margin Excess exists with respect to any single Transaction hereunder (calculated without regard to any other Transaction outstanding under this Agreement).

## 5. Income Payments

Seller shall be entitled to receive an amount equal to all Income paid or distributed on or in respect of the Securities that is not otherwise received by Seller, to the full extent it would be so entitled if the Securities had not been sold to Buyer. Buyer shall, as the parties may agree with respect to any Transaction (or, in the absence of any such agreement, as Buyer shall reasonably determine in its discretion), on the date such Income is paid or distributed either (i) transfer to or credit to the account of Seller such Income with respect to any Purchased Securities subject to such Transaction or (ii) with respect to Income paid in cash, apply the Income payment or payments to reduce the amount, if any, to be transferred to Buyer by Seller upon termination of such Transaction. Buyer shall not be obligated to take any action pursuant to the preceding sentence (A) to the extent that such action would result in the creation of a Margin Deficit, unless prior thereto or simultaneously therewith Seller transfers to Buyer cash or Additional Purchased Securities sufficient to eliminate such Margin Deficit, or (B) if an Event of Default with respect to Seller has occurred and is then continuing at the time such Income is paid or distributed.

## 6. Security Interest

Although the parties intend that all Transactions hereunder be sales and purchases and not loans, in the event any such Transactions are deemed to be loans, Seller shall be deemed to have pledged to Buyer as security for the performance by Seller of its obligations under each such Transaction, and shall be deemed to have granted to Buyer a security interest in, all of the Purchased Securities with respect to all Transactions hereunder and all Income thereon and other proceeds thereof.

## 7. Payment and Transfer

Unless otherwise mutually agreed, all transfers of funds hereunder shall be in immediately available funds. All Securities transferred by one party hereto to the other party (i) shall be in suitable form for transfer or shall be accompanied by duly executed instruments of transfer or assignment in blank and such other documentation as the party receiving possession may reasonably request, (ii) shall be transferred on the book-entry system of a Federal Reserve Bank, or (iii) shall be transferred by any other method mutually acceptable to Seller and Buyer.

17530520 07150725                          5 • September 1996 • Master Repurchase Agreement

JPM-PALMDALE00000392
WC000013

8. Segregation of Purchased Securities

To the extent required by applicable law, all Purchased Securities in the possession of Seller shall be segregated from other securities in its possession and shall be identified as subject to this Agreement. Segregation may be accomplished by appropriate identification on the books and records of the holder, including a financial or securities intermediary or a clearing corporation. All of Seller's interest in the Purchased Securities shall pass to Buyer on the Purchase Date and, unless otherwise agreed by Buyer and Seller, nothing in this Agreement shall preclude Buyer from engaging in repurchase transactions with the Purchased Securities or otherwise selling, transferring, pledging or hypothecating the Purchased Securities, but no such transaction shall relieve Buyer of its obligations to transfer Purchased Securities to Seller pursuant to Paragraph 3, 4 or 11 hereof, or of Buyer's obligation to credit or pay Income to, or apply Income to the obligations of, Seller pursuant to Paragraph 5 hereof.

---

**Required Disclosure for Transactions in Which the Seller Retains Custody of the Purchased Securities**

Seller is not permitted to substitute other securities for those subject to this Agreement and therefore must keep Buyer's securities segregated at all times, unless in this Agreement Buyer grants Seller the right to substitute other securities. If Buyer grants the right to substitute, this means that Buyer's securities will likely be commingled with Seller's own securities during the trading day. Buyer is advised that, during any trading day that Buyer's securities are commingled with Seller's securities, they [will] * [may] ** be subject to liens granted by Seller to [its clearing bank] * [third parties] ** and may be used by Seller for deliveries on other securities transactions. Whenever the securities are commingled, Seller's ability to resegregate substitute securities for Buyer will be subject to Seller's ability to satisfy [the clearing] * [any] ** lien or to obtain substitute securities.

* Language to be used under 17 C.F.R. 13403.4(e) if Seller is a government securities broker or dealer other than a financial institution.
** Language to be used under 17 C.F.R. 13403.5(d) if Seller is a financial institution.

---

9. Substitution

(a) Seller may, subject to agreement with and acceptance by Buyer, substitute other Securities for any Purchased Securities. Such substitution shall be made by transfer to Buyer of such other Securities and transfer to Seller of such Purchased Securities. After substitution, the substituted Securities shall be deemed to be Purchased Securities.

(b) In Transactions in which Seller retains custody of Purchased Securities, the parties expressly agree that Buyer shall be deemed, for purposes of subparagraph (a) of this Paragraph, to have agreed to and accepted in this Agreement substitution by Seller of other Securities for Purchased Securities; provided, however, that such other Securities shall have a Market Value at least equal to the Market Value of the Purchased Securities for which they are substituted.

17530520 07150725                                    6 - September 1996 • Master Repurchase Agreement

JPM-PALMDALE00000393
WC000014

## 10. Representations

Each of Buyer and Seller represents and warrants to the other that (i) it is duly authorized to
execute and deliver this Agreement, to enter into Transactions contemplated hereunder and to
perform its obligations hereunder and has taken all necessary action to authorize such
execution, delivery and performance, (ii) it will engage in such Transactions as principal (or,
if agreed in writing, in the form of an annex hereto or otherwise, in advance of any
Transaction by the other party hereto, as agent for a disclosed principal), (iii) the person
signing this Agreement on its behalf is duly authorized to do so on its behalf (or on behalf of
any such disclosed principal), (iv) it has obtained all authorizations of any governmental body
required in connection with this Agreement and the Transactions hereunder and such
authorizations are in full force and effect and (v) the execution, delivery and performance of
this Agreement and the Transactions hereunder will not violate any law, ordinance, charter,
bylaw or rule applicable to it or any agreement by which it is bound or by which any of its
assets are affected. On the Purchase Date for any Transaction Buyer and Seller shall each be
deemed to repeat all the foregoing representations made by it.

## 11. Events of Default

In the event that (i) Seller fails to transfer or Buyer fails to purchase Purchased Securities
upon the applicable Purchase Date, (ii) Seller fails to repurchase or Buyer fails to transfer
Purchased Securities upon the applicable Repurchase Date, (iii) Seller or Buyer fails to
comply with Paragraph 4 hereof, (iv) Buyer fails, after one business day's notice, to comply
with Paragraph 5 hereof, (v) an Act of Insolvency occurs with respect to Seller or Buyer, (vi)
any representation made by Seller or Buyer shall have been incorrect or untrue in any
material respect when made or repeated or deemed to have been made or repeated, or (vii)
Seller or Buyer shall admit to the other its inability to, or its intention not to, perform any of
its obligations hereunder (each an "Event of Default"):

(a) The nondefaulting party may, at its option (which option shall be deemed to have been
exercised immediately upon the occurrence of an Act of Insolvency), declare an Event of
Default to have occurred hereunder and, upon the exercise or deemed exercise of such
option, the Repurchase Date for each Transaction hereunder shall, if it has not already
occurred, be deemed immediately to occur (except that, in the event that the Purchase
Date for any Transaction has not yet occurred as of the date of such exercise or deemed
exercise, such Transaction shall be deemed immediately canceled). The nondefaulting
party shall (except upon the occurrence of an Act of Insolvency) give notice to the
defaulting party of the exercise of such option as promptly as practicable.

(b) In all Transactions in which the defaulting party is acting as Seller, if the nondefaulting
party exercises or is deemed to have exercised the option referred to in subparagraph (a)
of this Paragraph, (i) the defaulting party's obligations in such Transactions to
repurchase all Purchased Securities, at the Repurchase Price therefor on the Repurchase
Date determined in accordance with subparagraph (a) of this Paragraph, shall thereupon
become immediately due and payable, (ii) all Income paid after such exercise or deemed
exercise shall be retained by the nondefaulting party and applied to the aggregate unpaid
Repurchase Prices and any other amounts owing by the defaulting party hereunder, and
(iii) the defaulting party shall immediately deliver to the nondefaulting party any
Purchased Securities subject to such Transactions then in the defaulting party's
possession or control.

17530320 07150725                              7 • September 1996 • Master Repurchase Agreement

JPM-PALMDALE00000394
WC000015

(c) In all Transactions in which the defaulting party is acting as Buyer, upon tender by the nondefaulting party of payment of the aggregate Repurchase Prices for all such Transactions, all right, title and interest in and entitlement to all Purchased Securities subject to such Transactions shall be deemed transferred to the nondefaulting party, and the defaulting party shall deliver all such Purchased Securities to the nondefaulting party.

(d) If the nondefaulting party exercises or is deemed to have exercised the option referred to in subparagraph (a) of this Paragraph, the nondefaulting party, without prior notice to the defaulting party, may:

    (i) as to Transactions in which the defaulting party is acting as Seller, (A) immediately sell, in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as the nondefaulting party may reasonably deem satisfactory, any or all Purchased Securities subject to such Transactions and apply the proceeds thereof to the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder or (B) in its sole discretion elect, in lieu of selling all or a portion of such Purchased Securities, to give the defaulting party credit for such Purchased Securities in an amount equal to the price therefor on such date, obtained from a generally recognized source or the most recent closing bid quotation from such a source, against the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder; and

    (ii) as to Transactions in which the defaulting party is acting as Buyer, (A) immediately purchase, in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as the nondefaulting party may reasonably deem satisfactory, securities ("Replacement Securities") of the same class and amount as any Purchased Securities that are not delivered by the defaulting party to the nondefaulting party as required hereunder or (B) in its sole discretion elect, in lieu of purchasing Replacement Securities, to be deemed to have purchased Replacement Securities at the price therefor on such date, obtained from a generally recognized source or the most recent closing offer quotation from such a source.

Unless otherwise provided in Annex I, the parties acknowledge and agree that (1) the Securities subject to any Transaction hereunder are instruments traded in a recognized market, (2) in the absence of a generally recognized source for prices or bid or offer quotations for any Security, the nondefaulting party may establish the source therefor in its sole discretion and (3) all prices, bids and offers shall be determined together with accrued Income (except to the extent contrary to market practice with respect to the relevant Securities).

(e) As to Transactions in which the defaulting party is acting as Buyer, the defaulting party shall be liable to the nondefaulting party for any excess of the price paid (or deemed paid) by the nondefaulting party for Replacement Securities over the Repurchase Price for the Purchased Securities replaced thereby and for any amounts payable by the defaulting party under Paragraph 5 hereof or otherwise hereunder.

(f) For purposes of this Paragraph 11, the Repurchase Price for each Transaction hereunder in respect of which the defaulting party is acting as Buyer shall not increase above the

JPM-PALMDALE000D0395
WC000016

amount of such Repurchase Price for such Transaction determined as of the date of the exercise or deemed exercise by the nondefaulting party of the option referred to in subparagraph (a) of this Paragraph.

(g) The defaulting party shall be liable to the nondefaulting party for (i) the amount of all reasonable legal or other expenses incurred by the nondefaulting party in connection with or as a result of an Event of Default, (ii) damages in an amount equal to the cost (including all fees, expenses and commissions) of entering into replacement transactions and entering into or terminating hedge transactions in connection with or as a result of an Event of Default, and (iii) any other loss, damage, cost or expense directly arising or resulting from the occurrence of an Event of Default in respect of a Transaction.

(h) To the extent permitted by applicable law, the defaulting party shall be liable to the nondefaulting party for interest on any amounts owing by the defaulting party hereunder, from the date the defaulting party becomes liable for such amounts hereunder until such amounts are (i) paid in full by the defaulting party or (ii) satisfied in full by the exercise of the nondefaulting party's rights hereunder. Interest on any sum payable by the defaulting party to the nondefaulting party under this Paragraph 11(h) shall be at a rate equal to the greater of the Pricing Rate for the relevant Transaction or the Prime Rate.

(i) The nondefaulting party shall have, in addition to its rights hereunder, any rights otherwise available to it under any other agreement or applicable law.

## 12. Single Agreement

Buyer and Seller acknowledge that, and have entered hereinto and will enter into each Transaction hereunder in consideration of and in reliance upon the fact that, all Transactions hereunder constitute a single business and contractual relationship and have been made in consideration of each other. Accordingly, each of Buyer and Seller agrees (i) to perform all of its obligations in respect of each Transaction hereunder, and that a default in the performance of any such obligations shall constitute a default by it in respect of all Transactions hereunder, (ii) that each of them shall be entitled to set off claims and apply property held by them in respect of any Transaction against obligations owing to them in respect of any other Transactions hereunder and (iii) that payments, deliveries and other transfers made by either of them in respect of any Transaction shall be deemed to have been made in consideration of payments, deliveries and other transfers in respect of any other Transactions hereunder, and the obligations to make any such payments, deliveries and other transfers may be applied against each other and netted.

## 13. Notices and Other Communications

Any and all notices, statements, demands or other communications hereunder may be given by a party to the other by mail, facsimile, telegraph, messenger or otherwise to the address specified in Annex II hereto, or so sent to such party at any other place specified in a notice of change of address hereafter received by the other. All notices, demands and requests hereunder may be made orally, to be confirmed promptly in writing, or by other communication as specified in the preceding sentence.

JPM-PALMDALE00000396
WC000017

### 14. Entire Agreement; Severability

This Agreement shall supersede any existing agreements between the parties containing general terms and conditions for repurchase transactions. Each provision and agreement herein shall be treated as separate and independent from any other provision or agreement herein and shall be enforceable notwithstanding the unenforceability of any such other provision or agreement.

### 15. Non-assignability; Termination

(a) The rights and obligations of the parties under this Agreement and under any Transaction shall not be assigned by either party without the prior written consent of the other party, and any such assignment without the prior written consent of the other party shall be null and void. Subject to the foregoing, this Agreement and any Transactions shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns. This Agreement may be terminated by either party upon giving written notice to the other, except that this Agreement shall, notwithstanding such notice, remain applicable to any Transactions then outstanding.

(b) Subparagraph (a) of this Paragraph 15 shall not preclude a party from assigning, charging or otherwise dealing with all or any part of its interest in any sum payable to it under Paragraph 11 hereof.

### 16. Governing Law

This Agreement shall be governed by the laws of the State of New York without giving effect to the conflict of law principles thereof.

### 17. No Waivers, Etc.

No express or implied waiver of any Event of Default by either party shall constitute a waiver of any other Event of Default and no exercise of any remedy hereunder by any party shall constitute a waiver of its right to exercise any other remedy hereunder. No modification or waiver of any provision of this Agreement and no consent by any party to a departure herefrom shall be effective unless and until such be in writing and duly executed by both of the parties hereto. Without limitation on any of the foregoing, the failure to give a notice pursuant to Paragraph 4(a) or 4(b) hereof will not constitute a waiver of any right to do so at a later date.

### 18. Use of Employee Plan Assets

(a) If assets of an employee benefit plan subject to any provision of the Employee Retirement Income Security Act of 1974 ("ERISA") are intended to be used by either party hereto (the "Plan Party") in a Transaction, the Plan Party shall so notify the other party prior to the Transaction. The Plan Party shall represent in writing to the other party that the Transaction does not constitute a prohibited transaction under ERISA or is otherwise exempt therefrom, and the other party may proceed in reliance thereon but shall not be required so to proceed.

17330520 07150725                                    10 • September 1996 • Master Repurchase Agreement

JPM-PALMDALE00000397
WC000018

(b) Subject to the last sentence of subparagraph (a) of this Paragraph, any such Transaction shall proceed only if Seller furnishes or has furnished to Buyer its most recent available audited statement of its financial condition and its most recent subsequent unaudited statement of its financial condition.

(c) By entering into a Transaction pursuant to this Paragraph, Seller shall be deemed (i) to represent to Buyer that since the date of Seller's latest such financial statements, there has been no material adverse change in Seller's financial condition which Seller has not disclosed to Buyer, and (ii) to agree to provide Buyer with future audited and unaudited statements of its financial condition as they are issued, so long as it is a Seller in any outstanding Transaction involving a Plan Party.

## 19. Intent

(a) The parties recognize that each Transaction is a "repurchase agreement" as that term is defined in Section 101 of Title 11 of the United States Code, as amended (except insofar as the type of Securities subject to such Transaction or the term of such Transaction would render such definition inapplicable), and a "securities contract" as that term is defined in Section 741 of Title 11 of the United States Code, as amended (except insofar as the type of assets subject to such Transaction would render such definition inapplicable).

(b) It is understood that either party's right to liquidate Securities delivered to it in connection with Transactions hereunder or to exercise any other remedies pursuant to Paragraph 11 hereof is a contractual right to liquidate such Transaction as described in Sections 555 and 559 of Title 11 of the United States Code, as amended.

(c) The parties agree and acknowledge that if a party hereto is an "insured depository institution," as such term is defined in the Federal Deposit Insurance Act, as amended ("FDIA"), then each Transaction hereunder is a "qualified financial contract," as that term is defined in FDIA and any rules, orders or policy statements thereunder (except insofar as the type of assets subject to such Transaction would render such definition inapplicable).

(d) It is understood that this Agreement constitutes a "netting contract" as defined in and subject to Title IV of the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA") and each payment entitlement and payment obligation under any Transaction hereunder shall constitute a "covered contractual payment entitlement" or "covered contractual payment obligation", respectively, as defined in and subject to FDICIA (except insofar as one or both of the parties is not a "financial institution" as that term is defined in FDICIA).

## 20. Disclosure Relating to Certain Federal Protections

The parties acknowledge that they have been advised that:

(a) in the case of Transactions in which one of the parties is a broker or dealer registered with the Securities and Exchange Commission ("SEC") under Section 15 of the Securities Exchange Act of 1934 ("1934 Act"), the Securities Investor Protection Corporation has taken the position that the provisions of the Securities Investor

17530520 07150725                                    11 • September 1996 • Master Repurchase Agreement

JPM-PALMDALE00000398
WC000019

Protection Act of 1970 ("SIPA") do not protect the other party with respect to any Transaction hereunder;

(b) in the case of Transactions in which one of the parties is a government securities broker or a government securities dealer registered with the SEC under Section 15C of the 1934 Act, SIPA will not provide protection to the other party with respect to any Transaction hereunder; and

(c) in the case of Transactions in which one of the parties is a financial institution, funds held by the financial institution pursuant to a Transaction hereunder are not a deposit and therefore are not insured by the Federal Deposit Insurance Corporation or the National Credit Union Share Insurance Fund, as applicable.

17530520 07150725          12 • September 1996 • Master Repurchase Agreement

JPM-PALMDALE00000399
WC000020

FENWAY CAPITAL, LLC, as Buyer

LEHMAN COMMERCIAL PAPER INC.,
as Seller

By:  GLOBAL SECURITIZATION
     SERVICES, LLC, its Manager

By: _____
Name:  Bernard J. Angelo
Title:   Senior Vice President

By: _____
Name:
Title:

S-1          September 1996 • Master Repurchase Agreement

JPM-PALMDALE00000400
WC000021

FENWAY CAPITAL, LLC, as Buyer

LEHMAN COMMERCIAL PAPER INC., as Seller

By:  GLOBAL SECURITIZATION
     SERVICES, LLC, its Manager

By: _____
Name:
Title:

By: _____
Name:  Paolo Tonucci
Title:  Global Treasurer

S-1          September 1996 • Master Repurchase Agreement

JPM-PALMDALE00000401
WC000022

**EXHIBIT C**

ANNEX I

Supplemental Terms and Conditions

This Annex I, dated as of August 22, 2008, forms a part of the Master Repurchase Agreement dated as of August 22, 2008 (the "Agreement") between Lehman Commercial Paper Inc. and Fenway Capital, LLC. Capitalized terms used but not defined in this Annex I shall have the meanings ascribed to them in the Agreement.

1.    Other Applicable Annexes.  In addition to this Annex I and Annex II, the following Annexes and any Schedules thereto shall form a part of the Agreement and shall be applicable thereunder:

Annex III    Hold-in-Custody Transactions
Addendum    Whole Loan Addendum

2.    The following Supplemental Terms and Conditions shall apply:

(a)    Definitions.

(i)    Section 2 shall be amended by replacing each indicated term with the following definitions:

"Margin Deficit" has (x) the meaning specified in Paragraph 4(a) of the Agreement or (y) with respect to any Securities held pursuant to a Tri-Party Custody Agreement, the meaning specified in such Tri-Party Custody Agreement.

"Margin Excess" has (x) the meaning specified in Paragraph 4(b) of the Agreement or (y) with respect to any Securities held pursuant to a Tri-Party Custody Agreement,  the meaning specified in such Tri-Party Custody Agreement.

"Pricing Rate" means Buyer's Cost of Funds plus 0.22%, or such other rate as is otherwise agreed by Buyer and Seller from time to time.

(ii)    Section 2 shall be amended by adding in the proper alphabetical order the definitions indicated in Part 2 to this Annex I.

(b)    Confirmation.  Section 3(a) and Section 3(b).  Seller shall deliver to Buyer each Confirmation referred to in Paragraph 3(b) of the Agreement.

(c)    Margin.  Section 4(a) and (b) shall be amended by adding the word "written" before the word "notice".  As regards Transactions which are processed through Euroclear or where the Purchased Securities are held-in-custody with Seller, all calculations of Market Value shall be performed by Seller.

17529923 07150725

JPM-PALMDALE00000402
WC000023

(d)  Substitution:  The parties hereto hereby agree to amend Section 9 of this Agreement by

  (i)  deleting and replacing Section 9(b) with the following:

  In Transactions in which Seller retains custody of Purchased Securities, the parties expressly agree that Buyer shall be deemed, for purposes of subparagraph (a) of this Paragraph, to have agreed to and accepted in this Agreement substitution by Seller of other Securities for Purchased Securities; *provided, however,* that such other Securities shall have a Market Value at least equal to the Market Value of the Purchased Securities for which they are substituted.

  (ii)  adding at the end thereto the following paragraphs (c) and (d):

  "(c)  In the case of any Transaction for which the Repurchase Date is other than the business day immediately following the Purchase Date and with respect to which Seller does not have any existing right to substitute substantially the same Securities for the Purchased Securities, Seller shall have the right, subject to the proviso to this sentence, with notice to Buyer, which notice shall be given at or prior to 11:00 a.m. (New York time) on the business day immediately following Seller's transfer to Buyer of substantially the same Securities for any Purchased Securities; *provided, however,* that Buyer may elect, by the close of business on the business day notice is received, or by the close of the next business day if notice is given after 11:00 a.m. (New York time) on such day, not to accept such substitution. In the event such substitution is accepted by Buyer, such substitution shall be completed by Buyer's transfer to Seller of such Purchased Securities, and after substitution, the substituted Securities shall be deemed to be Purchased Securities. In the event Buyer elects not to accept such substitution, Buyer shall offer Seller the right to terminate the Transaction, in which case Seller shall pay any related Breakage.

  "(d)  In the event Seller exercises its right to substitute or terminate under sub-paragraph (c), Seller shall be obligated to pay to Buyer, by the close of the business day of such substitution or termination, as the case may be, an amount equal to (A) Buyer's actual cost (including all fees, expenses and commissions) of (i) entering into replacement transactions; (ii) entering into or terminating hedge transactions; and/or (iii) terminating transactions or substituting securities in like transactions with third parties in connection with or as a result of such substitution or termination, (B) to the extent Buyer determines not to enter into replacement transactions, the loss incurred by Buyer directly arising or resulting from such substitution or termination, and (C) any Breakage. The foregoing amounts shall be solely determined and calculated by Buyer in good faith.".

2

17528925 07150725

JPM-PALMDALE00000403
WC000024

(e)   Events of Default.

(i)   The first paragraph in Section 11 shall be deleted and replaced with the following:

"In the event that (i) Seller fails to transfer Purchased Securities upon the applicable Purchase Date, (ii) Buyer fails to pay the Purchase Price on the Purchase Date (subject to Buyer's ability to issue Commercial Paper Notes on such Purchase Date), (iii) Seller fails to pay any Price Differential on the related Price Differential Payment Date, or to pay the Repurchase Price on the Repurchase Date, (iv) Seller fails to pay any Breakage or other amounts owing under this Agreement when due, (v) Seller or Buyer fails to comply with Paragraph 4 hereof, (vi) an Act of Insolvency occurs with respect to Seller, the Guarantor or Buyer, (vii) any representation made by Seller, the Guarantor or Buyer shall have been incorrect or untrue in any material respect when made or repeated or deemed to have been made or repeated, (viii) Seller fails to comply with any other covenant or agreement on its part under this Agreement and such failure continues for one business day after Seller obtains knowledge of such failure, (ix) Seller, the Guarantor or Buyer shall admit to the other its inability to, or its intention not to, perform any of its obligations hereunder, or (x) the Guarantee shall cease to be in full force and effect (each an "Event of Default"):"

(ii)   Paragraph 11(a) is amended by (i) deleting the parenthetical in the first sentence and replacing it with the following: ", after written notice (provided that no such notice shall be required in regards to an Act of Insolvency and an Event of Default shall automatically be deemed to have occurred in such event)" and (ii) inserting after the words "have occurred hereunder" the following: "(unless the defaulting party has cured or remedied such Event of Default)".

(iii)   Section 11(b) shall be deleted and replaced with the following:

"(b)   In all Transactions in which the defaulting party is acting as Seller, if the nondefaulting party exercises or is deemed to have exercised the option referred to in subparagraph (a) of this Paragraph, (i) the defaulting party's obligations in such Transactions to repurchase all Purchased Securities, at the Repurchase Price therefor on the Repurchase Date determined in accordance with subparagraph (a) of this Paragraph plus Breakage thereon and other amounts owing hereunder, shall thereupon become immediately due and payable, and the nondefaulting party may exercise any and all other rights available to it at law or in equity, (ii) all Income paid after such exercise or deemed exercise shall be retained by the nondefaulting party and applied to the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder, and (iii) the defaulting party shall immediately deliver to the nondefaulting

3

17528925 07150725

JPM-PALMDALE00000404
WC000025

party any Purchased Securities subject to such Transactions then in the defaulting party's possession or control."

(iv)    Section 11(d)(i) shall be deleted and replaced with the following:

"(i)    as to Transactions in which the defaulting party is acting as Seller, the Buyer may instruct the MI Administrator and any custodian with respect to the Purchased Securities and without limiting the scope of the Buyer's rights thereunder, the Buyer, in its sole good faith discretion, may immediately sell, in a public or private sale, or in any other manner, any or all Purchased Securities subject to such Transactions and apply the proceeds thereof (after deducting all of the Buyer's and/or the MI Administrator's costs and expenses of disposition) to the aggregate unpaid Repurchase Prices, any Breakage and any other amounts owing by the defaulting party hereunder. If a surplus of such proceeds remains after payment in full of the Seller's outstanding obligations (net of any costs, expenses and taxes), the Buyer shall with reasonable promptness pay such proceeds to the Seller or its successors. Seller may, but shall have no obligation to bid in any such sale; and"

(v)    A new Section 11(d)(iii) is hereby created, which reads:

"The nondefaulting party shall act in good faith and in a commercially reasonable manner in connection with the exercise of any remedies pursuant to Paragraph 11 of the Agreement."

(vi)    Section 11(j). A new Section 11(j) shall be inserted as follows:

"Upon the occurrence of an Event of Default in respect of the Seller in addition to all its other rights and obligations under the Agreement, at law and in equity, the Buyer shall have the rights and obligations of a secured party under the Uniform Commercial Code of the State of New York in respect of a debt equal to all amounts owing under this Agreement."

(f)    <u>Remedies for Purchased Securities Delivery Failure</u>. Notwithstanding clauses (i), (ii) and (iii) of the introductory paragraph to Paragraph 11 of the Agreement, it will not be an Event of Default:

(A)    if Seller fails to transfer all or any portion of the Purchased Securities on the applicable Purchase Date for a Transaction, but Buyer may, by written notice to Seller,

(1)    if Buyer has paid to Seller the Purchase Price relating to any of such undelivered Securities, require Seller to immediately repay the sum so paid together with all related Breakage;

(2)    if there exists a Margin Deficit in respect of such Transaction require Seller to pay (in accordance with the notice and delivery requirements

4

17528925 07150725

JPM-PALMDALE00000405
WC000026

of Paragraph 4 of the Agreement) margin in an amount equal to such Margin Deficit; and

    (3) at any time while such failure continues, terminate such Transaction (but only such Transaction) ("Buyer Mini Close-out")

and upon such termination, the provisions of Paragraph 11 of the Agreement shall apply with respect to the terminated Transaction (but only such Transaction).

(B) if Buyer fails to transfer Purchased Securities on the applicable Repurchase Date for a Transaction, but Seller may, by written notice to Buyer,

    (1) if Seller has paid the Repurchase Price to Buyer, require Buyer to immediately repay the sum so paid;

    (2) if there exists a Margin Excess in respect of such Transaction under the Agreement including the relevant Transaction, require Buyer to pay (in accordance with the notice and delivery requirements of Paragraph 4 of the Agreement and subject to paragraph 2(m) below) margin in an amount equal to such Margin Excess; and

    (3) at any time while such failure continues, terminate such Transaction (but only such Transaction) ("Seller Mini Close-out", and together with Buyer Mini Close-out, "Mini Close-out")

and upon such termination, the provisions of Paragraph 11 of the Agreement (as amended) shall apply with respect to the terminated Transaction (but only such Transaction).

Any repayment of the Purchase Price or Repurchase Price pursuant to Clauses (A)(1) or (B)(1) above, any transfer of margin pursuant to Clauses (A)(2) or (B)(2) above and any payment due pursuant to Clauses (A)(3) or (B)(3) above, shall be due and payable within the time period specified in Paragraph 4(c) of the Agreement (as if such notice from Buyer or Seller, as the case may be, were a notice requesting the delivery of margin). For the avoidance of doubt, Paragraph 5 (Income Payments) shall apply in the event Buyer fails to deliver Purchased Securities on the Repurchase Date and Seller elects not to terminate the Transaction.

(g) Paragraph 12 of the Repurchase Agreement is hereby amended by deleting the second sentence in its entirety and inserting the following in lieu thereof:

"Accordingly, each of Buyer and Seller agrees (i) to perform all of its obligations in respect of each Transaction hereunder and that a default in the performance of any such obligations shall constitute a default by it in respect of all Transactions hereunder and (ii) that, other than with respect to sections (vii) and (ix) of the introductory paragraph to Paragraph 11, (a) each of them shall be entitled to set

5

17527923 07150725

JPM-PALMDALE00000406
WC000027

off claims and apply property held by them in respect of any Transaction against obligations owing to them in respect of any other Transactions hereunder and (b) payments, deliveries and other transfers made by either of them in respect of any Transaction shall be deemed to have been made in consideration of payments, deliveries and other transfers in respect of any other Transactions hereunder, and the obligations to make any such payments, deliveries and other transfers may be applied against each other and netted."

(h)  Payments by Seller to Buyer.

Notwithstanding anything in this Agreement to the contrary,

(i)  Payment by Seller of Price Differential. The Seller or the Guarantor (to the extent Seller fails to pay) shall pay to the Buyer on each Price Differential Payment Date an amount equal to the accrued unpaid Price Differential.

(ii)  Breakage. In the event that Seller or the Guarantor pays the Repurchase Price or any portion thereof prior to the originally scheduled Repurchase Date (including without limitation pursuant to Paragraph 2(i) of this Annex I, Paragraph 9 or Paragraph 11 and regardless of which party is the defaulting party), it or the Guarantor (to the extent Seller fails to pay) shall pay in addition the related Breakage.

(iii)  Time of Payment. Seller shall pay all amounts due from it under this Agreement to Buyer by 12:00 p.m. New York time on the date due.

(iv)  Guarantee. In the event of Seller's failure to pay by 12:00 p.m. (New York time) amounts owing under clause (i) or (ii) above on the date such amounts are due, the Guarantor shall make such payments by 2:30 p.m. (New York time) on such date.

(i)  Accelerated Repurchase Date.

Buyer or Seller may declare the aggregate Repurchase Price of all Transactions then outstanding under this Agreement immediately due and payable by providing notice to the other party by 10:00 a.m. (New York City time) on any day upon which such declaration is to occur.

(j)  Term.

At any time after the first anniversary of the date of this Agreement, either party may terminate this Agreement by written notice to the other; provided that such termination shall not occur until the 270th day after the date of such notice or, if such 270th day is not a Business Day, the first Business Day thereafter (such 270th day (or succeeding Business Day, as applicable, the "Termination Date").

6

17528925 07150725

JPM-PALMDALE00000407
WC000028

(k)    Eligible Assets.

The Seller covenants that all Purchased Assets offered for sale hereunder shall be Eligible Assets.

(l)    Other Documents.

Each party shall deliver to the other, upon request, other documents such as tax forms, financial statements, articles of incorporation, corporate resolutions, or other evidence of capacity, authority, incumbency and specimen signatures and any other relevant documents that are required by law or are reasonably requested. Without limitation of the foregoing Seller shall deliver to the Buyer an opinion as to the enforceability of this Agreement and the Guarantee, the perfection of the security interest granted hereunder and related matters satisfactory to the Buyer, which opinion may be an opinion of Seller's in-house counsel.

(m)    Indemnification.

The Seller hereby agrees to indemnify, defend and hold the Buyer and the Program Manager and each of their respective affiliates and their respective officers, managers, members or shareholders (and the direct and indirect owners of such members or shareholders), employees, representatives and agents (the "Indemnified Parties") harmless from and against any and all losses, claims, damages, causes of action, suits, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) or judgments of whatever kind and nature (collectively, "Losses"), imposed upon, incurred by or asserted against any Indemnified Party arising out of or based upon this Agreement, any Confirmation, any custodial arrangement or the transactions contemplated thereby or hereby except to the extent resulting from the gross negligence or willful misconduct of the Buyer or, to the extent the MI Administrator is obligated to indemnify the Buyer for such Losses, the gross negligence or willful misconduct of the MI Administrator.

(n)    Limited Recourse.

Except as expressly set forth herein, the obligations of the Buyer under this Agreement, any Confirmations and any Transaction are solely the limited liability company obligations of the Buyer. Except as expressly set forth herein, no recourse shall be had for the payment of any amount owing by the Buyer under the Agreement or for the payment by the Buyer of any fee or any other obligation or claim of or against the Buyer arising out of or based upon the Agreement, against any employee, officer, director, incorporator or the manager or other affiliate of the Buyer; provided, however, that the foregoing shall not in the event of any fraud or willful misconduct, stop the Seller from instituting or prosecuting legal proceedings against the person or persons committing such fraud or willful misconduct. The Seller acknowledges that the Buyer shall be liable for any

17329325 07150725

7

JPM-PALMDALE00000408
WC000029

claims that it or any party may have against the Buyer only to the extent funds are or become available to pay such claims pursuant to the Base Indenture and the Buyer's other conduit program documents. The provisions of this paragraph shall survive termination of this Agreement.

(o)    Non-Petition.

The Seller hereby agrees that it shall not, prior to the date which is one year and one day (or if longer, the applicable preference period then if effect) after the payment in full of the latest maturing note issued by the Buyer under the Base Indenture, acquiesce, petition or otherwise, directly or indirectly, invoke or cause the Buyer to invoke the process of any governmental authority for the purpose of commencing or sustaining a case against the Buyer under any federal or state bankruptcy, insolvency or similar law or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Buyer or any substantial part of its property or ordering the winding up or liquidation of the affairs of the Buyer. The provisions of this paragraph shall survive the termination of this Agreement.

(p)    Amendment.

The Buyer and the Seller may agree to an increase or decrease in the Maximum Purchase Amount by any method of writing agreed between them, including without limitation, exchange of emails or facsimiles, *provided, however,* that (x) no such proposed increase shall be effective without written confirmation from each Rating Agency that rates the Commercial Paper Notes that such increase will not result in a reduction, qualification or withdrawal of its then-current ratings of such obligations (such written confirmation being delivered, if so agreed by the Buyer, Seller, and applicable Rating Agency, using the same form of writing as that employed by the Buyer and Seller), and (y) each Rating Agency shall be notified in writing by the Seller regarding such proposed decrease no later than the Business Day prior to such decrease becoming effective. Except as provided in the foregoing sentence, notwithstanding any other provision in the Repurchase Agreement to the contrary, no amendment to or waiver of any provision of this Repurchase Agreement shall be effective unless the same shall be in writing and signed by the parties hereto; provided, that no amendment or waiver shall be effective without written confirmation from each Rating Agency that rates the Commercial Paper Notes that such amendment or waiver will not result in a reduction, qualification or withdrawal of its then-current ratings of such obligations, unless such amendment or waiver is made for one of the following purposes (in each such case, Buyer shall promptly notify each Rating Agency of such amendment or waiver): (i) to cure any mistake, ambiguity, defect, or inconsistency or to correct or supplement any provision contained herein, (ii) to correct or supplement any provision herein which may be inconsistent with any other provision herein or to make any other provisions with respect to matters or questions arising under this Repurchase Agreement, or (iii) to add such provisions

8

17528925 07150725

JPM-PALMDALE00000409

WC000030

with respect to matters or questions arising hereunder as may be necessary or desirable and not inconsistent with the Repurchase Agreement.

(q)    **Perfection.**

The Seller hereby covenants and agrees that it will take such action as the Buyer may reasonably request to maintain and perfect the Buyer's ownership or security interest in the Purchased Securities, including filing Uniform Commercial Code financing statements.

(r)    **Reporting.**

(i)    Seller will provide reports as to the Market Values of the Purchased Securities and Margin amounts and such other information as the Buyer shall reasonably request and as is customary which shall be in a form reasonably satisfactory to the Buyer.

(ii)   Upon request from the Seller, the Buyer shall provide to the Seller documentation supporting its calculation of the Buyer's Cost of Funds.

(s)    **Notice to Rating Agencies.**

The Program Manger shall, to the extent it has actual knowledge thereof, notify, as soon as practicable, each Rating Agency that is rating the Commercial Paper Notes of any downgrade in the ratings assigned to the Guarantor by Moody's and/or S&P.

(t)    **Demands.**

In any case where a payment shall become due on the Guarantee, Buyer shall endeavor to make a demand (which demand may be made by e-mail to Guarantor at address set forth in Annex II to the Agreement) therefor at least one hour prior to the time that such payment is due, but failure to do so shall not excuse the Guarantor from its obligation to pay timely.

(u)    **Purchased Securities.**

Each of the terms "Purchased Securities" and "Purchased Assets" (as used in the Confirmation and the Guarantee) shall include the other.

(v)    **Minimum Transfer Amount.**   Seller and Buyer agree, with respect to all Transactions hereunder (but not less than all Transactions), that unless an Event of Default has occurred and is continuing, the respective rights of Buyer and Seller under subparagraphs (a) and (b) of Paragraph 4 of the Agreement may be exercised only where a Margin Deficit or Margin Excess, as the case may be, exceeds $500,000.

9

17578925 07150725

JPM-PALMDALE00000410

WC000031

(w)  **Custodian Failures.** Buyer shall not be responsible for the delivery of Purchased Securities held by a custodian (including, without limitation, Seller) on any Repurchase Date or for the remittance of Income received by a custodian, and Seller shall look solely to the custodian for the same; defaults by a custodian shall not be attributed to Buyer and shall not excuse timely performance by Seller of any obligation under the Agreement.

(x)  **Governing Law.** Paragraph 16 of the Agreement shall be amended by:

(i)  adding to the end of the title thereof ", Jurisdiction and Venue",

(ii)  adding to the end thereof the following:

"that would result in the application of the law of any other jurisdiction. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably submits to the exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City and waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party."

(y)  **Series 2008-2 Designations.** For purposes of the Series 2008-2 Supplement, the "Interest Collections" under this Agreement shall be the Price Differential, this Agreement shall be designated a "Group III Customer Agreement" and the Guarantee shall be designated a "Group III Customer Liquidity Agreement".

(z)  **Buyer Grant of Security Interest.** The parties acknowledge that Buyer has granted a granted to Deutsche Bank Trust Company Americas, as trustee for the benefit of certain secured parties, a security interest in Buyer's rights under the Repurchase Agreement and all payments due to Buyer thereunder.

(aa)  **Amendments to Tri-Party Sub-Custodial Agreements.** Seller shall not without Buyer's written consent, agree to any amendment, waiver or other modification of or under a Tri-Party Sub-Custodial Agreement (as defined in a Tri-Party Custody Agreement) that would reasonably be expected to have a material adverse effect on Buyer.

(bb)  **Tax Treatment.** Each party to this Agreement acknowledges that it is its intent for purposes of U.S. federal state and local income and franchise taxes to treat each Transaction as indebtedness of the Seller that is secured by the Purchased Assets and that the Purchased Assets are owned by the Seller in the absence of an Event of Default by the Seller. All parties to this Repurchase Agreement agree to such treatment and agree to take no action inconsistent with this treatment, unless required by law.

10

17528925 07150725

JPM-PALMDALE00000411

WC000032

(cc)    Expenses.  Seller shall pay to Buyer the costs and expenses of the CP Issuer in
connection with any amendment or modification of this Agreement, including but
not limited to the legal fees and out-of-pocket expenses of counsel, fees of the
rating agencies rating the Commercial Paper Notes, and fees and expenses of the
owner of the CP Issuer and Buyer. Buyer shall provide to Seller reasonable
supporting documentation detailing such costs, expenses and/or fees, and Seller
shall pay such amounts within 30 calendar days from the date of its receipt of
such documentation.

(dd)    Usage of Mortgage Asset Principal and Interest Payments.  Seller agrees that
if, on any date, more than 50 percent of the Purchased Assets consisting of debt
obligations are comprised of real estate mortgages, within the meaning of Code
section 7701(i) and Treasury Regulation section 1.7701(i)-1, then none of the
Price Differential or the Repurchase Price on all or any liability of Seller issued or
outstanding on or after such date shall be paid with monies attributable to, or
derived from or measured by, directly or indirectly, principal or income
collections on the Purchased Assets (it being understood that this section shall in
no way limit Seller's payment obligations under this Agreement).

[SIGNATURES FOLLOW]

11

17521925 07150725

JPM-PALMDALE00000412
WC000033

Lehman Commercial Paper Inc.

By: _____

Name: _Paolo Tonucci_

Title: _Global Treasurer_

Fenway Capital, LLC

By: Global Securitization Services, LLC,
    its Manager

By: _____

Name: _____

Title: _____

12

JPM-PALMDALE00000413
WC000034

Lehman Commercial Paper Inc.          Fenway Capital, LLC

                                      By:  Global Securitization Services, LLC,
                                           its Manager

By:_____            By:_____
Name:_____            Name:___Bernard J. Angelo_____
Title:_____          Title:____Senior Vice President___

12

JPM-PALMDALE00000414
WC000035

## ANNEX I, PART 2

### List of Additional Defined Terms

"*Base Indenture*": that certain Amended and Restated Base Indenture, dated as of November 29, 2001 (as amended, restated or modified from time to time), among the Buyer, the Indenture Trustee and the MI Administrator;

"*Breakage*": with respect to a payment of the Repurchase Price for a Transaction prior to the originally scheduled Repurchase Date for any reason (including, without limitation, as a result of a Buyer Mini Close-out or an Event of Default by either party), the amount determined by the Buyer as necessary to compensate the Buyer (if the income obtained by the Buyer upon the redeployment of an amount of funds equal to the amount of such prepayment is less than the interest applicable to the Commercial Paper Notes allocated by the Program Manager, in its sole discretion, to funding or maintaining such Transaction) for any loss, cost or expense incurred by the Buyer as a consequence of such prepayment (including the interest to accrue on such Commercial Paper Notes through their Final Maturity Date), such compensation to be limited to an amount equal to any actual loss or expense suffered by the Buyer during the period from the date of receipt of such prepayment to (but excluding) the scheduled Repurchase Date;

"*Business Day*": means any day other than a Saturday, Sunday or other day on which banks are authorized or required by law to be closed in New York City, New York;

"*Buyer's Cost of Funds*": with respect to any period, the weighted average cost of or related to the CP Issuer's issuance of Commercial Paper Notes (including the interest accrued on Commercial Paper Notes) allocated by the Program Manager to fund or maintain the Transactions entered into under this Agreement (expressed as a per annum percentage rate and as determined by the Program Manager (in its reasonable sole discretion)), which shall include (i) the fees and commissions of placement agents and dealers and incremental carrying costs incurred with respect to Commercial Paper Notes paid on dates other than those on which corresponding funds are received by the Buyer (for instance, in cases where funds are received by the Buyer too late to be applied to pay the Commercial Paper Notes on the date received) and (ii) costs, liabilities, losses, suits or expenses of any kind in any way related to the Agreement incurred by the Buyer or its officers, managers, members (and the direct and indirect owners of such members), employees, representatives and agents;

"*Commercial Paper Notes*": the Commercial Paper Notes issued by the CP Issuer pursuant to the terms of the CP Issuing and Paying Agency Agreement;

"*CP Issuer*": Fenway Funding, LLC;

"*CP Issuing and Paying Agency Agreement*": that certain Commercial Paper Note Issuing and Paying Agency Agreement dated as of August 22, 2008, between the CP Issuing and Paying Agent and the CP Issuer, as amended, restated, supplemented or otherwise modified from time to time;

"*CP Issuing and Paying Agent*": Deutsche Bank Trust Company Americas, a New York banking corporation;

1732925 07150725

JPM-PALMDALE00000415
WC000036

"*Eligible Assets*: means (i) whole mortgage loans (commercial and residential), (ii) trust receipts evidencing ownership of whole mortgage loans, (iii) corporate loans, (iv) securities and (v) any other assets approved by Buyer;

"*Final Maturity Date*": the maturity date of such Commercial Paper Note which shall not be more than 270 days from the date of issuance of such Commercial Paper Note;

"*Guarantee*": The Guarantee dated August 22, 2008 issued by the Guarantor;

"*Guarantor*": Lehman Brothers Holdings, Inc., which shall have a short term unsecured credit rating of at least A-1 by S&P and Prime-1 by Moody's as of the date hereof;

"*Indenture Trustee*": Deutsche Bank Trust Company Americas, a New York banking corporation;

"*Maximum Purchase Amount*": $5,000,000,000, as increased or reduced, from time to time, with a written agreement of the parties;

"*MI Administrator*": Deutsche Bank Trust Company Americas, a New York banking corporation;

"*Moody's*: Moody's Investors Service, Inc.;

"*Price Differential Payment Date*": means with respect to any Transaction (i) each interest payment date of the Commercial Paper Notes allocated by the Program Manager to fund or maintain such Transaction (as determined by the Program Manager, in its sole discretion), as specified in the applicable Confirmation, and (ii) each date on which the Seller is required to pay any Repurchase Price with respect to such Transaction pursuant to the Agreement;

"*Program Manager*": Hudson Castle Group Inc., a Delaware corporation;

"*Rating Agencies*": collectively, Moody's and S&P;

"*Repurchase Date*": with respect to any outstanding Transaction, the earliest of (i) Final Maturity Date of the Commercial Paper Notes allocated by the Program Manager to fund or maintain such Transaction (as determined by the Program Manager, in its sole discretion), (ii) the accelerated Repurchase Date as designated by either party pursuant to Paragraph 2(l) of this Annex and (iii) the occurrence of an Event of Default pursuant to Section 11 of this Agreement;

"*Repurchase Price*": (i) the price at which Purchased Securities are to be repurchased from the Buyer by the Seller, which price will be determined in each case (including Transactions terminable upon demand) as the sum of the Purchase Price, the accrued unpaid Price Differential as of the date of such determination, plus any related Breakage; and (ii) after the occurrence of an Event of Default, such amount decreased by (x) any Income (if received in, or converted to or exchanged for, United States dollars) applied by Buyer to reduce Seller's obligations under clause ii of Paragraph 5 of the Agreement and (y) any proceeds actually received by the Buyer upon liquidation of Purchased Securities in connection with the Buyer's

14

17528925 07150725

JPM-PALMDALE00000416

WC000037

exercise of its rights under Paragraph 11 of the Agreement and applied by the Buyer to pay the Commercial Paper Notes;

"*S&P*": Standard and Poor's Ratings Services;

"*Series 2008-2 Supplement*" means the Series 2008-2 Supplement dated as of August 22, 2008, among the MI Administrator, Fenway Capital, LLC and the Indenture Trustee;

"*Supplement*": the Supplemental Terms and Conditions, of even date herewith, attached hereto as Annex I and made a part hereof;

"*Termination Date*" has the meaning specified in paragraph 2(j) of Annex I, Part 1;

"*Tri-Party Custody Agreement*" has the meaning specified in Annex III to the Agreement.

15

17528925 07150723

JPM-PALMDALE00000417
WC000038

ANNEX II

Names and Addresses for Communication between Parties

LEHMAN COMMERCIAL PAPER INC.
745 Seventh Avenue, 19th Floor
New York, New York 10019
Attn.: [_____]
Tel: [_____]
Fax: [_____]
Email: [_____]

LEHMAN BROTHERS HOLDINGS, INC.
745 Seventh Avenue, 19th Floor
New York, New York 10019
Attn.: [_____]
Tel: [_____]
Fax: [_____]
Email: [_____]

FENWAY CAPITAL, LLC
c/o Hudson Castle Group
810 Seventh Avenue, 11th Floor
New York, NY 10019
Attn: John Heslin
Tel: (646) 624-2670
Fax: (646) 624-2621
Email: cmg@hudsoncastle.com

17528/25 07150725

JPM-PALMDALE00000418
WC000039

**EXHIBIT D**

## Annex III

### Hold-in-Custody Transaction Annex

This Annex III (the "HIC Annex") forms a part of the Master Repurchase Agreement dated as of August 22, 2008 (the "Agreement") between Lehman Commercial Paper Inc. and Fenway Capital, LLC. Capitalized terms used but not defined in this Annex III shall have the meanings ascribed to them in the Agreement.

1. Lehman Brothers Commercial Paper Inc. as hold-in-custody agent (in such capacity, "Agent") for the Purchased Securities and Additional Purchased Securities. In the event Seller does not make delivery of the Purchased Securities and Additional Purchased Securities:

 (a) Agent shall maintain the Purchased Securities and Additional Purchased Securities in a segregated account to the order of Buyer. Agent shall not lend the Purchased Securities and Additional Purchased Securities or any interest therein either to itself or to others.

 (b) Agent shall not subject the Purchased Securities or Additional Purchased Securities to any other right, charge, security interest, lien, claim or encumbrance in favor of any party or any person claiming through Agent.

 (c) Agent may not release the Purchased Securities or Additional Purchased Securities to the Seller without the prior written consent of Buyer, except (i) in accordance with the terms of the Agreement to the extent of Seller's right of substitution under the Agreement and (ii) to the extent otherwise permitted under the Agreement after an Event of Default as to Buyer.

 (d) Following the occurrence of an Event of Default in respect of the Seller, or, if the Guarantor's rating is put on watch for possible downgrade by S&P or by Moody's or is withdrawn or reduced below A-1 by S& P or P-1 by Moody's, Agent will upon demand of the Buyer, deliver by 4:00 p.m. (New York time) on the date of such demand (or if such demand is made after 10:00 am (New York time) then on the next Business Day) all Purchased Securities and Additional Purchased Securities to JPMorgan Chase Bank, N.A. or The Bank of New York, as appropriate, as custodian under the Tri-Party Custody Agreement, or if the custodian appointed by such Tri-Party Custody Agreement is unwilling or unable to serve, to Buyer or another custodian acceptable to Buyer. As used herein, "Tri-Party Custody Agreement" means an agreement in substantially the form attached hereto as Exhibit A, or in such other form as Seller and Buyer may approve.

 (e) This HIC Annex shall constitute a securities control agreement for purposes of the UCC and shall create a securities entitlement in favor of the Buyer. Agent shall not take any action (aside from actions in accordance with instructions from Buyer) in respect of the Purchased Securities or Additional Purchased Securities, except (i) to the extent otherwise provided in the Agreement in connection with

175289/25 07159/725

JPM-PALMDALE00000419

WC000040

Seller's right of substitution and (ii) to the extent otherwise permitted under the Agreement after an Event of Default as to Buyer.

2.  Appointment of Agent.  The Buyer appoints Agent to act as its hold-in-custody agent as described in this HIC Annex.

3.  Acknowledgment of Agent's Appointment.  Agent acknowledges and agrees to its appointment as hold-in-custody agent as described in this HIC Annex.

4.  Buyer's Margin Percentage.  Unless otherwise agreed in writing by Seller and Buyer in respect of any Transaction to which this HIC Annex applies, the Buyer's Margin Percentage shall be 102%.

5.  Governing Law.  This HIC Annex shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to choice or conflict of law doctrine.

6.  Counterparts.  This HIC Annex may be executed in counterparts, each of which shall be deemed an original.

7.  Conflicts.  If there is any conflict between the terms of this HIC Annex and the Agreement, the terms of this HIC Annex shall govern.


LEHMAN COMMERCIAL PAPER INC.,          FENWAY CAPITAL, LLC
for itself and as Agent pursuant to this
Annex III                                             By:  GLOBAL SECURITIZATION
                                                              SERVICES, LLC, its Manager

By:  _P. _____                          By:  _____
Name:  _Paul Tahadek_                         Name:  _____
Title:  _Global Treasurer_                      Title:  _____

JPM-PALMDALE00000420

WC000041

Seller's right of substitution and (ii) to the extent otherwise permitted under the Agreement after an Event of Default as to Buyer.

2.  <u>Appointment of Agent</u>. The Buyer appoints Agent to act as its hold-in-custody agent as described in this HIC Annex.

3.  <u>Acknowledgment of Agent's Appointment</u>. Agent acknowledges and agrees to its appointment as hold-in-custody agent as described in this HIC Annex.

4.  <u>Buyer's Margin Percentage</u>. Unless otherwise agreed in writing by Seller and Buyer in respect of any Transaction to which this HIC Annex applies, the Buyer's Margin Percentage shall be 102%.

5.  <u>Governing Law</u>. This HIC Annex shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to choice or conflict of law doctrine.

6.  <u>Counterparts</u>. This HIC Annex may be executed in counterparts, each of which shall be deemed an original.

7.  <u>Conflicts</u>. If there is any conflict between the terms of this HIC Annex and the Agreement, the terms of this HIC Annex shall govern.

LEHMAN COMMERCIAL PAPER INC.,
for itself and as Agent pursuant to this
Annex III

FENWAY CAPITAL, LLC

By:  GLOBAL SECURITIZATION
     SERVICES, LLC, its Manager

By: _____
Name: _____
Title: _____

By: _____
Name:  Bernard J. Angelo
Title:  Senior Vice President

JPM-PALMDALE00000421
WC000042

**EXHIBIT E**

# EXHIBIT U

September 14, 2008

From:  Fenway Capital, LLC
       Fenway Funding, LLC

To:    Lehman Brothers Holdings, Inc.
       Lehman Commercial Paper, Inc.

Attention: Paolo Tonucci, Treasurer

Re: Termination of Transactions under MRA

Lehman Commercial Paper, Inc. ("LCPI") and Fenway Capital, LLC ("Fenway Capital") are parties to that certain Master Repurchase Agreement dated August 22, 2008 (as amended from time to time and together with annexes and supplements, the "Repo Agreement"; capitalized terms not otherwise defined herein are used as defined in the Repo Agreement). The rights of Fenway Capital under the Repo Agreement are collateral for obligations of Fenway Capital to Fenway Funding LLC ("Fenway Funding") and certain other parties and pledged to secured those obligations pursuant to that certain Indenture dated November 29, 2001 among Fenway Capital, Deutsche Bank Trust Company Americas ("Deutsche") as indenture trustee and master administrator (as amended from time to time together with the Series 2008-2 Supplement thereto, the "Indenture"). Borrowings by Fenway Capital from Fenway Funding in connection with Series 2008-2 were funded by issuance of commercial paper (the "Commercial Paper Notes") to Lehman Brothers Holdings, Inc. or an affiliate of Lehman (collectively, "Lehman"), pursuant to that certain Commercial Paper Note Issuing and Paying Agency Agreement dated August 22, 2008 among Deutsche as CP issuing and paying agent and Fenway Funding as CP issuer -- as of the date hereof, all Commercial Paper Notes are held by Lehman.

Each of LCPI and Fenway Capital agree effective as of the date hereof to terminate all Transactions under the Repo Agreement.

Subject to satisfaction by Lehman of its obligation to deliver all Commercial Paper Notes as set forth in the next sentence, Fenway Funding and Fenway Capital will release any security or other interest in the Purchased Securities in consideration for the cancellation of the Commercial Paper Notes, which shall be deemed to have been paid in full as of the date hereof. Lehman agrees that it shall as soon as practicable cause the delivery to Fenway Funding of all Commercial Paper Notes held by Lehman.

Each of Fenway Capital, Fenway Funding, Lehman and LCPI agree that Hudson Castle Group, Inc. as program manager may instruct Deutsche to take such actions as are necessary to reflect

JPM-PALMDALE00000422

the foregoing transactions in its books and records and in the appropriate accounts of Fenway Funding held with DTC or its participants.

This letter agreement may be executed in counterparts and shall be governed by New York law.

Fenway Capital, LLC
Fenway Funding, LLC

By: HUDSON CASTLE GROUP INC., as Program Manager to Fenway Capital, LLC and Fenway Funding, LLC

By: _____
Name: Victor Ramportas
Title: M.D.

Lehman Commercial Paper, Inc.
Lehman Brothers Holdings, Inc.

By: _____
Name: Paolo Tonucci
Title: Global Treasurer

JPM-PALMDALE00000423

# EXHIBIT V

CERTIFIED COPY

# UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE NINTH CIRCUIT

BAP NOS. CC-09-1100, CC-09-1101, CC-09-1102,
CC-09-1103, CC-09-1104, CC-09-1105,
CC-09-1106, CC-09-1107
BK. NO. SA 08-BK-17206-ES

IN RE:
PALMDALE HILLS PROPERTY, LLC,
AND ITS RELATED DEBTORS,
        JOINTLY ADMINISTERED
        DEBTORS AND DEBTORS-IN-POSSESSION.

LEHMAN COMMERCIAL PAPER, INC.,   )
                          )
        APPELLANT,          )
                          )
VS.                          )
                          )
PALMDALE HILLS PROPERTY, LLC, ET AL., )
                          )
        APPELLEES.         )
_____)

## DEPOSITION OF IRENA M. GOLDSTEIN

JULY 17, 2009

ANNETTE ARLEQUIN
21421



Kelli Norden and Associates
Court Reporters
310.820.7733 phone 310.820.7933 fax
11726 San Vicente Boulevard Suite 205
Los Angeles, California 90049
kna@kellinorden.com  www.kellinorden.com

## DEPOSITION OF IRENA GOLDSTEIN

```
 1              UNITED STATES BANKRUPTCY APPELLATE PANEL

 2                      OF THE NINTH CIRCUIT

 3        BAP NOS. CC-09-1100, CC-09-1101, CC-09-1102,
              CC-09-1103, CC-09-1104, CC-09-1105,
 4                  CC-09-1106, CC-09-1107
                  BK. NO. SA 08-BK-17206-ES
 5
        IN RE:
 6      PALMDALE HILLS PROPERTY, LLC,
        AND ITS RELATED DEBTORS,
 7                      JOINTLY ADMINISTERED
                        DEBTORS AND DEBTORS-IN-POSSESSION.
 8

 9      LEHMAN COMMERCIAL PAPER, INC.,)
                                      )
10                      APPELLANT,    )
                                      )
11            VS.                     )
                                      )
12      PALMDALE HILLS PROPERTY, LLC, )
        ET AL.,                       )
13                                    )
                        APPELLEES.    )
14      _____)

15

16           DEPOSITION OF IRENA M. GOLDSTEIN, TAKEN

17      ON BEHALF ON THE DEBTORS AND TRUSTEE AT

18      1301 AVENUE OF THE AMERICAS, NEW YORK,

19      NEW YORK, COMMENCING AT 10:00 A.M. ON

20      FRIDAY, JULY 17, 2009, BEFORE ANNETTE

21      ARLEQUIN, CCR, RPR.

22

23

24

25
                                                          2
```

DEPOSITION OF IRENA GOLDSTEIN

```
 1     APPEARANCES OF COUNSEL:

 2

 3     FOR THE DEBTORS AND TRUSTEE:

 4          MILLER BARONDESS, L.L.P.
            BY: MARTIN H. PRITIKIN, ESQ.
 5          1999 AVENUE OF THE STARS
            SUITE 1000
 6          LOS ANGELES, CALIFORNIA, 90067
            310.552.4400
 7          MPRITIKIN@MILLERBARONDESS.COM

 8

 9     FOR THE LEHMAN ENTITIES:

10          WEIL, GOTSHAL & MANGES, L.L.P.
            BY: EDWARD SOTO, ESQ.
11              AND
                ROBERT CLAYTON ROESCH, ESQ.
12          1395 BRICKELL AVENUE, SUITE 1200
            MIAMI, FLORIDA  33131
13          305.577.3100
            EDWARD.SOTO@WEIL.COM
14          CLAY.ROESCH@WEIL.COM

15

16     FOR THE FENWAY ENTITIES AND THE DEPONENT:

17          DEWEY & LEBOEUF
            BY: RICHARD W. REINTHALER, ESQ.
18              AND
                CORRINE D. LEVY, ESQ.
19          1301 AVENUE OF THE AMERICAS
            NEW YORK, NEW YORK  10019-6092
20          212.259.8000
            RREINTHALER@DL.COM
21          CLEVY@DL.COM

22

23

24

25
```

3

## DEPOSITION OF IRENA GOLDSTEIN

1      A.    PROBABLY A MONTH AGO, I WOULD HAVE

2  SPOKEN WITH DANIEL METTE ABOUT IT.

3      Q.    AND DO YOU REMEMBER WHAT YOU SAID OR

4  WHAT WAS SAID IN THAT CONVERSATION?

5      A.    JUST IN GENERAL, WE DISCUSSED WHETHER

6  THE -- WHAT KNOWLEDGE THE TREASURER HAD WHEN

7  ENTERING INTO THIS TERMINATION AGREEMENT AND

8  WHETHER -- YOU KNOW, HOW IT OCCURRED.

9      Q.    AND WHAT WAS SAID ON THAT TOPIC?

10     A.    NOT MUCH.  I MEAN, DANIEL METTE DID

11  NOT, YOU KNOW, REALLY GET -- EXPLAIN TO ME WHAT

12  KNOWLEDGE -- OR I'M NOT SURE HE EVEN KNOWS WHAT

13  THE TREASURER KNEW, AND I THINK WE WERE JUST

14  TALKING IN GENERAL ABOUT IT WAS AMAZING THAT HE

15  HAD SIGNED ANYTHING ON SEPTEMBER 14TH GIVEN WHAT

16  WAS GOING ON AT LEHMAN BROTHERS AT THAT TIME.

17     Q.    WHY WOULD YOU SAY IT WAS AMAZING?

18     A.    WELL, IT'S GENERALLY KNOWN THAT

19  LEHMAN BROTHERS FILED FOR BANKRUPTCY ON

20  SEPTEMBER 15TH AND THAT THINGS WERE VERY HECTIC

21  AT LEHMAN BROTHERS, AND THERE WAS A QUITE A

22  STATE OF CONFUSION.

23          SO WE WERE JUST DISCUSSING AS LAWYERS

24  THAT IT WAS SURPRISING THAT HE HAD EVEN STOPPED

25  TO SIGN A DOCUMENT.

26

DEPOSITION OF IRENA GOLDSTEIN

1    CONDUIT?

2         A.    NO.

3         Q.    DID FENWAY GET ANYTHING OUT OF THAT

4    TRANSACTION?

5         A.    UNFORTUNATELY, NO.  THEY WOULD GET

6    THEIR FEE ON MATURITY AND IT HASN'T MATURED.

7         Q.    OKAY.

8              MR. REINTHALER:  WELL, ITS HAD ITS

9         LEGAL FEES HAVING TO PUT UP WITH DEPOSITION

10        NOTICES, FIVE SUBPOENAS.

11             MR. PRITIKIN:  RIGHT.

12   BY MR. PRITIKIN:

13        Q.    I THINK I ONLY ASKED PREVIOUSLY ABOUT

14   YOUR LAST CONVERSATION WITH THE WEIL ATTORNEYS

15   ABOUT THIS TOPIC OF TERMINATION OF THE

16   TRANSACTION.

17             DO YOU RECALL ANYTHING FROM ANY OF

18   YOUR OTHER CONVERSATIONS WITH LEHMAN'S ATTORNEYS

19   ABOUT THAT TOPIC?

20        A.    REALLY, ALMOST EVERY CONVERSATION WAS

21   ALONG THE SAME WAVELENGTH, WHICH IS, YOU KNOW,

22   NO ONE HAS EXPLAINED TO ME, NOR WILL THEY AND

23   PROBABLY SHOULD THEY, WHAT WAS THE STATE OF THE

24   TREASURER'S MIND WHEN HE SIGNED THIS TERMINATION

25   AGREEMENT.

28

DEPOSITION OF IRENA GOLDSTEIN

```
 1 |  STATE OF NEW YORK      )
   |                         )SS
 2 |  COUNTY OF NEW YORK     )
 3 |
 4 |
 5 |
 6 |                 DEPONENT'S DECLARATION
 7 |
 8 |
 9 |
10 |         I CERTIFY UNDER PENALTY OF PERJURY THAT
11 |  THE FOREGOING IS TRUE AND CORRECT.
12 |
13 |
14 |
15 |
16 |  EXECUTED AT  _____
17 |
18 |  ON  _____.
19 |
20 |
21 |
22 |           _____
23 |                  (SIGNATURE OF DEPONENT)
24 |
25 |
```

110

DEPOSITION OF IRENA GOLDSTEIN

```
 1    STATE OF NEW YORK     )
                            )SS
 2    COUNTY OF NEW YORK    )

 3

 4              I, ANNETTE ARLEQUIN, CERTIFIED

 5    SHORTHAND REPORTER FOR THE STATE OF NEW YORK,

 6    HEREBY CERTIFY:

 7              THE FOREGOING PROCEEDINGS WERE

 8    TAKEN BEFORE ME AT THE TIME AND PLACE THEREIN

 9    SET FORTH, AT WHICH TIME THE DEPONENT WAS

10    PLACED UNDER OATH BY ME;

11              THE TESTIMONY OF THE DEPONENT AND

12    ALL OBJECTIONS MADE AT THE TIME OF THE

13    EXAMINATION WERE RECORDED STENOGRAPHICALLY BY

14    ME AND WERE THEREAFTER TRANSCRIBED;

15              THE FOREGOING TRANSCRIPT IS A TRUE

16    AND CORRECT TRANSCRIPT OF MY SHORTHAND NOTES SO

17    TAKEN;

18              I FURTHER CERTIFY THAT I AM NEITHER

19    COUNSEL FOR NOR RELATED TO ANY PARTY TO SAID

20    ACTION, NOR IN ANY WAY INTERESTED IN THE OUTCOME

21    THEREOF.

22              IN WITNESS WHEREOF, I HAVE HEREUNTO

23    SUBSCRIBED MY NAME THIS 20TH DAY OF JULY, 2009.

24

25    _____
```

111

# EXHIBIT W

# The New York Times

e New York Times

Part 3 Pg

**National Edition**

Southern California: A shower in northeast Nevada. Mostly sunny in the south. Highs from 40s in northeast Nevada to 70s in Southern California. Weather map, Page A18.

## TUESDAY, APRIL 13, 2010

Printed in California          $2.00



DAMON WINTER/THE NEW YORK TIMES

rt-au-Prince, Haiti. Her right leg was amputated after the January earthquake.

## Dancer Is Caught Between Caregivers

SONTAG

E, Haiti — professional right leg in pped on her th the dusty ompound on y important

raphy clinic, ng a form- ess with a necklace, e examining nodel. Then d and posi- for X-rays , where, if Ms. Jean

s changing id that day, s after she s deadly in- agreeing to

has been working since to get her up and about? Or would the two organizations find a way to collaborate?

Among Haiti's thousands of new amputees, Ms. Jean, who was featured in an article in The New York Times in February, has been singled out for special opportunities because of serendipity, news media attention and her potential as a symbol of Haiti's resilience: if the dancer who almost died rises to dance again, that will resonate, her caregivers believe.

But Ms. Jean's situation also highlights the way in which many Haitians, like their country, are now dependent on international charity.

As Ms. Jean sees it, this is largely a blessing — "Thank God for the foreigners," she said — but it can also be complicated and uncomfortable.

The New York hospital, Mount Sinai Medical Center, wants to follow through on its Haiti relief team's involvement with Ms. Jean by offering her corrective

Continued on Page A6

## Lehman Channeled Risks Through 'Alter Ego' Firm

### Company Unknown to the Bank's Investors Helped Shore Up Its Balance Sheet

**By LOUISE STORY and ERIC DASH**

It was like a hidden passage on Wall Street, a secret channel that enabled billions of dollars to flow through Lehman Brothers.

In the years before its collapse, Lehman used a small company — its "alter ego," in the words of a former Lehman trader — to shift investments off its books.

The firm, called Hudson Castle, played a crucial, behind-the-scenes role at Lehman, according to an internal Lehman document and interviews with former employees. The relationship raises new questions about the extent to which Lehman obscured its financial condition before it plunged into bankruptcy.

While Hudson Castle appeared to be an independent business, it was deeply entwined with Lehman. For years, its board was controlled by Lehman, which owned a quarter of the firm. It was also stocked with former Lehman employees.

None of this was disclosed by Lehman, however.

Entities like Hudson Castle are part of a vast financial system that operates in the shadows of Wall Street, largely beyond the reach of banking regulators. These entities enable banks to exchange investments for cash to finance their operations and, at times, make their finances look stronger than they are.

Critics say that such deals helped Lehman and other banks temporarily transfer their exposure to the risky investments tied to subprime mortgages and commercial real estate. Even now, a year and a half after Lehman's collapse, major banks still undertake such transactions with businesses whose names, like Hudson Castle's, are rarely mentioned outside of footnotes in financial statements, if at all.

The Securities and Exchange Commission is examining various creative borrowing tactics used by some 20 financial companies. A Congressional panel investigating the financial crisis also plans to examine such deals at a hearing in May to focus on Lehman and Bear Stearns, according to two people knowledgeable about the panel's plans.

Most of these deals are legal. But certain Lehman transactions crossed the line, according to the account of the bank's demise prepared by an examiner of the bank. Hudson Castle was not mentioned in that report, re-

Continued on Page A3

## CHINA BACKS TALK TO PENALIZE IRAN

### Meeting Yields Results, White House Says

**By DAVID E. SANGER and MARK LANDLER**

WASHINGTON — President Obama secured a promise from President Hu Jintao of China on Monday to join negotiations on a new package of sanctions against Iran, administration officials said, but Mr. Hu made no specific commitment to backing measures that the United States considers severe enough to force a change in direction in Iran's nuclear program.

In a 90-minute conversation here before the opening of a sum-



Exhibit W, Page 203

# Lehman Channeled Risks Through 'Alter Ego' Company

*From Page A1*

leased last month, which concluded that some of Lehman's bookkeeping was "materially misleading." The report did not say that Hudson was involved in the misleading accounting.

At several points, Lehman did transactions greater than $1 billion with Hudson vehicles, but it is unclear how much money was involved since 2001.

Still, accounting experts say the shadow financial system needs some sunlight.

"How can anyone — regulators, investors or anyone — understand what's in these financial statements if they have to dig 15 layers deep to find these kinds of interlocking relationships and these kinds of transactions?" said Francine McKenna, an accounting consultant who has examined the financial crisis on her blog, re: The Auditors. "Everybody's talking about preventing the next crisis, but they can't prevent the next crisis if they don't understand all these incestuous relationships."

The story of Lehman and Hudson Castle begins in 2001, when the housing bubble was just starting to inflate. That year, Lehman spent $7 million to buy into a small financial company, IBEX Capital Markets, which later became Hudson Castle.

From the start, Hudson Castle lived in Lehman's shadow. According to a 2001 memorandum given to The New York Times, as well as interviews with seven former employees at Lehman and Hudson Castle, Lehman exerted an unusual level of control over the firm. Lehman, the memorandum said, would serve "as the internal and external 'gatekeeper' for all business activities conducted by the firm."

The deal was proposed by Kyle Miller, who worked at Lehman. In the memorandum, Mr. Miller wrote that Lehman's investment in Hudson Castle would give the bank and its clients access to financing while preventing "headline risk" if any of its deals went south. It would also reduce Lehman's "moral obligation" to support its off-balance sheet vehicles, he wrote. The arrangement would maximize Lehman's control over Hudson Castle "without jeopardizing the off-balance sheet accounting treatment."

Mr. Miller became president of Hudson Castle and brought several Lehman employees with

## Playing Many Sides of a Deal

Banks often borrow money from outside entities. Before Lehman Brothers filed for bankruptcy in 2008, it borrowed from a special purpose entity with which it had other ties.



**A Lehman unit borrowed from a special purpose entity managed by a company Lehman had influence over.** The entity, known as Fenway, was managed by Hudson Castle. Lehman owned a quarter of Hudson Castle.

**Lehman also invested in Fenway.** Lehman bought all of the commercial paper notes that Fenway issued to finance its trades, which also happened to be with Lehman.

**Lehman used Fenway's commercial paper to provide collateral for a loan** from JPMorgan.

Sources: Fenway Funding's bankruptcy claim; Lehman Brothers documents

THE NEW YORK TIMES

him. Through a Hudson Castle spokesman, Mr. Miller declined a request for an interview.

The spokesman did not dispute the 2001 memorandum but said the relationship with Lehman had evolved. After 2004, "all funding decisions at Hudson Castle were solely made by the management team and neither the board of directors nor Lehman Brothers participated in any way," he said, adding that Lehman was only a tenth of Hudson's revenue.

Still, Lehman never told its shareholders about the arrangement. Nor did Moody's choose to mention it in its credit ratings reports on Hudson Castle's vehicles. Former Lehman workers, who spoke on the condition that they not be named because of confidentiality agreements with the bank, offered conflicting accounts of the bank's relationship with Hudson Castle.

One said Lehman bought into Hudson Castle to compete with the big commercial banks like Citigroup, which had a greater ability to lend to corporate clients. "There were no bad intentions around any of this stuff," this person said.

But another former employee said he was leery of the arrangement from the start. "Lehman wanted to have a company it controlled, but to the outside world be able to act like it was arm's length," this person said.

Typically, companies are required to disclose only material

investments or purchases of public companies. Hudson Castle was neither.

Nonetheless, Hudson Castle was central to some Lehman deals up until the bank collapsed.

"This should have been disclosed, given how critical this relationship was," said Elizabeth Nowicki, a professor at Boston University and a former lawyer at the S.E.C. "Part of the problems with all these bank failures is there were a lot of secondary actors — there were lawyers, accountants, and here you have a secondary company that was helping conceal the true state of Lehman."

Until 2004, Hudson had an agreement with Lehman that blocked it from working with the investment bank's competitors, but in 2004, that deal ended, and Lehman reduced its number of board seats to one, from five, according to two people with direct knowledge of the situation and an internal Hudson Castle document. Lehman remained Hudson's largest shareholder, and its management remained close to important Lehman officials.

Hudson Castle created at least four separate legal entities to borrow money in the markets by issuing short-term i.o.u.'s to investors. It then used that money to make loans to Lehman and other financial companies, often via repurchase agreements, or repos. In repos, banks typically sell assets and promise to buy them back at a set price in the future.

One of the vehicles that Hudson Castle created was called Fenway, which was often used to lend to Lehman, including in the summer of 2008, as the investment bank foundered. Because of that relationship, Hudson Castle is now the second-largest creditor in the Lehman Estate, after JPMorgan Chase. Hudson Castle, which is still in business, doing similar work for other banks, bought out Lehman's stake last year. The firm's spokesman said Hudson operated independently in the Fenway deal in the summer of 2008.

Hudson Castle might have walked away earlier if not for Fenway's ties to Lehman. Lehman itself bought $3 billion of Fenway notes just before its bankruptcy that, in turn, were used to back a loan from Fenway to a Lehman subsidiary. The loan was secured by part of Lehman's investment in a California property developer, SunCal, which also collapsed. At the time, other lenders were already growing uneasy about dealing with Lehman.

Further complicating the arrangement, Lehman later pledged those Fenway notes to JPMorgan as collateral for still other loans as Lehman began to founder. When JPMorgan realized the circular relationship, "JPMorgan concluded that Fenway was worth practically nothing," according to the report prepared by the court examiner of Lehman.

# EXHIBIT X

1  Richard M. Pachulski (CA Bar No. 90073)
   Dean A. Ziehl (CA Bar No. 84529)
2  Robert B. Orgel (CA Bar No. 101875)
   PACHULSKI STANG ZIEHL & JONES LLP
3  10100 Santa Monica Blvd., 11th Floor
   Los Angeles, California  90067-4100
4  Telephone: 310/277-6910
   Facsimile:  310/201-0760
5
   Edward Soto (admitted *pro hac vice*)
6  Shai Y. Waisman (admitted *pro hac vice*)
   WEIL, GOTSHAL & MANGES LLP
7  767 Fifth Avenue
   New York, NY  10153-0119
8  Telephone:  (212) 310-8000
   Facsimile:  (212) 310-8007
9
   Attorneys for Lehman Commercial Paper Inc., Lehman ALI,
10 Inc., Northlake Holdings LLC and OVC Holdings LLC

11                  UNITED STATES BANKRUPTCY COURT
                    CENTRAL DISTRICT OF CALIFORNIA
12                        SANTA ANA DIVISION

13 In re:                                    Case No.: 8:08-bk-17206-ES
                                             Chapter 11
14 Palmdale Hills Property, LLC, and its Related
   Debtors,                                  Jointly Administered Case Nos.
15                                           8:08-bk-17209-ES; 8:08-bk-17240-ES;
                         Jointly Administered Debtors   8:08-bk-17224-ES; 8:08-bk-17242-ES;
16                       and Debtors-In-Possession      8:08-bk-17225-ES; 8:08-bk-17245-ES;
                                             8:08-bk-17227-ES; 8:08-bk-17246-ES;
17 Affects:                                  8:08-bk-17230-ES; 8:08-bk-17231-ES;
   ☐ All Debtors                             8:08-bk-17236-ES; 8:08-bk-17248-ES;
18 ☑ Palmdale Hills Property, LLC            8:08-bk-17249-ES; 8:08-bk-17573-ES;
   ☑ SunCal Beaumont Heights, LLC            8:08-bk-17574-ES; 8:08-bk-17575-ES
19 ☑ SCC/Palmdale, LLC                       8:08-bk-17404-ES; 8:08-bk-17407-ES;
   ☑ SunCal Johannson Ranch, LLC             8:08-bk-17408-ES; 8:08-bk-17409-ES;
20 ☑ SunCal Summit Valley, LLC               8:08-bk-17458-ES; 8:08-bk-17465-ES;
   ☑ SunCal Emerald Meadows, LLC             8:08-bk-17470-ES; 8:08-bk-17472-ES;
21 ☑ SunCal Bickford Ranch, LLC              and 8:08-bk-17588-ES
   ☑ Acton Estates, LLC
22 ☑ Seven Brothers, LLC                     JOINT CHAPTER 11 PLAN
   ☑ SJD Partners, Ltd.                      PROPOSED BY LEHMAN LENDERS
23 ☐ SJD Development Corp.
   ☑ Kirby Estates, LLC                      **Hearing:**
24 ☑ SunCal Communities I, LLC               Date:      October 15, 2009
   ☑ SCC Communities LLC                     Time:      2:00 p.m.
25 ☐ SunCal Communities III, LLC             Place:     Courtroom 5A
   ☑ North Orange Del Rio Land, LLC                     411 West Fourth Street
26 ☑ Tesoro SF, LLC                                     Santa Ana, CA  92701
   ☑ LB/L-SunCal Oak Valley, LLC
27 ☑ SunCal Heartland, LLC
   ☑ LB/L-SunCal Northlake, LLC
28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

52063-001\DOCS_LA:205532.21

# EXHIBIT Y

1  LOUIS R. MILLER, State Bar No. 54141
   smiller@millerbarondess.com
2  MARTIN PRITIKIN, State Bar. No. 210845
   mpritikin@millerbarondess.com
3  JAMES MILLER, State Bar No. 234267
   jmiller@millerbarondess.com
4  **MILLER BARONDESS, LLP**
   1999 Avenue of the Stars, Suite 1000
5  Los Angeles, California 90067
   Telephone:    (310) 552-4400
6  Facsimile:    (310) 552-8400
   Special Litigation Counsel for the Jointly
7  Administered Debtors in Possession and Steven
   M. Speier, the Chapter 11 Trustee
8
                    UNITED STATES BANKRUPTCY COURT
9        CENTRAL DISTRICT OF CALIFORNIA — SANTA ANA DIVISION

10  In re                                    **CASE NO. 8:08-bk-17206-ES**
                                             Jointly Administered With Case Nos.
11                                              8:08-bk-17209-ES; 8:08-bk-17224-ES;
    PALMDALE HILLS PROPERTY, LLC, AND ITS      8:08-bk-17225-ES; 8:08-bk-17227-ES;
12  RELATED DEBTORS,                           8:08-bk-17230-ES; 8:08-bk-17231-ES;
              Jointly Administered Debtors and 8:08-bk-17236-ES; 8:08-bk-17240-ES;
13            Debtors-in-Possession            8:08-bk-17242-ES; 8:08-bk-17245-ES;
                                               8:08-bk-17246-ES; 8:08-bk-17248-ES;
14  ─────────────────────────────────          8:08-bk-17249-ES; 8:08-bk-17404-ES;
    Affects:                                   8:08-bk-17407-ES; 8:08-bk-17408-ES;
15  ☒ All Debtors                              8:08-bk-17409-ES; 8:08-bk-17458-ES;
    ☒ Palmdale Hills Property, LLC,            8:08-bk-17465-ES; 8:08-bk-17470-ES;
16  ☐ SunCal Beaumont Heights, LLC             8:08-bk-17472-ES; 8:08-bk-17573-ES;
    ☒ SCC/Palmdale, LLC                        8:08-bk-17575-ES; 8:08-bk-17575-ES;
17  ☐ SunCal Johannson Ranch, LLC              8:08-bk-17588-ES
    ☒ SunCal Summit Valley, LLC
18  ☒ SunCal Emerald Meadows LLC               **Adversary No. 8:09-ap-01005-ES**
    ☒ SunCal Bickford Ranch, LLC
19  ☒ Acton Estates, LLC                       **THIRD AMENDED ADVERSARY**
20  ☐ Seven Brothers LLC                       **PROCEEDING COMPLAINT FOR:**
    ☒ SJD Partners, Ltd.
21  ☒ SJD Development Corp.                     1)  **EQUITABLE SUBORDINATION,**
22  ☐ Kirby Estates, LLC                           **11 U.S.C. §510(c);**
    ☒ SunCal Communities I, LLC
23  ☒ SunCal Communities III, LLC              2)  **FRAUDULENT INDUCEMENT;**
    ☒ SCC Communities LLC
24  ☒ North Orange Del Rio Land, LLC           3)  **AVOIDANCE AND RECOVERY OF**
    ☒ Tesoro SF, LLC                               **PREFERENTIAL TRANSFERS,**
25  ☒ LB-L-SunCal Oak Valley, LLC                  **11 U.S.C §§ 547, 550;**
    ☒ SunCal Heartland, LLC
26  ☒ LB-L-SunCal Northlake, LLC               4)  **AVOIDANCE AND RECOVERY OF**
27  ☒ SunCal Marblehead, LLC                       **FRAUDULENT TRANSFERS,**
    ☒ SunCal Century City, LLC                     **11 U.S.C. §§ 544(b), 548; CAL. CIVIL**
28  ☒ SunCal PSV, LLC                              **CODE §§ 3439.04, 3439.05;**

               **THIRD AMENDED ADVERSARY PROCEEDING COMPLAINT**

35043.17

1  ☒ Delta Coves Venture, LLC
☒ SunCal Torrance, LLC
2  ☒ SunCal Oak Knoll, LLC

5) **VOIDING LIENS, 11 U.S.C. § 506(d);**

3  **ADVERSARY PROCEEDING**

6) **DISALLOWANCE OF CLAIMS AND LIENS, 11 U.S.C. § 502(d); AND**

4  **Debtor-In-Possession Plaintiffs**

5  PALMDALE HILLS PROPERTY, LLC, a Delaware limited liability company; SUNCAL SUMMIT

7) **PRESERVATION OF CLAIMS AND LIENS FOR DEBTORS' ESTATES, 11 U.S.C. §551**

6  VALLEY, LLC, a Delaware limited liability company; SUNCAL EMERALD MEADOWS, LLC,
7  a Delaware limited liability company; SUNCAL BICKFORD RANCH, LLC, a Delaware limited
8  liability company; ACTON ESTATES, LLC, a Delaware limited liability company; SJD
9  PARTNERS, LTD., a California limited partnership; SJD DEVELOPMENT CORP., a California
10  corporation; NORTH ORANGE DEL RIO LAND, LCC, a Delaware limited liability company;
11  TESORO SF, LLC, a Delaware limited liability company; SCC COMMUNITIES, LLC, a Delaware
12  limited liability company; SUNCAL COMMUNITIES I, LLC, a Delaware limited liability
13  company; SUNCAL COMMUNITIES III, a Delaware limited liability company;
14  SCC/PALMDALE LLC, a Delaware limited liability company;

15  **Trustee Plaintiff:**
16  STEVEN SPEIER, Chapter 11 Trustee, on behalf of LB-L-SUNCAL OAK VALLEY, LLC, a Delaware
17  limited liability company; SUNCAL HEARTLAND, LLC, a Delaware limited liability company; LB-L-
18  SUNCAL NORTHLAKE, LLC, a Delaware limited liability company; SUNCAL MARBLEHEAD, LLC,
19  a Delaware limited liability company; SUNCAL CENTURY CITY, LLC, a Delaware limited liability
20  company; SUNCAL PSV, LLC, a Delaware limited liability company; DELTA COVES VENTURE,
21  LLC, a Delaware limited liability company; SUNCAL TORRANCE, LLC, a Delaware limited
22  liability company; and SUNCAL OAK KNOLL, LLC, a Delaware limited liability company,
23

24
25        Plaintiffs,
    v.

26  LEHMAN ALI, INC., a Delaware corporation; LEHMAN COMMERCIAL PAPER, INC., a
27  Delaware corporation; OVC HOLDINGS, LLC, a Delaware limited liability company; NORTHLAKE
28  HOLDINGS, LLC, a Delaware limited liability

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

---

**THIRD AMENDED ADVERSARY PROCEEDING COMPLAINT**

35043.17

1  company; LV PACIFIC POINT, LLC, a Delaware
   limited liability company; LEHMAN RE, LTD., a
2  Bermuda corporation; FENWAY CAPITAL, LLC, a
   Delaware limited liability company; DANSKE
3  BANK A/S, LONDON BRANCH, a United
   Kingdom corporation,

4
           Defendants.
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

35043.17

**THIRD AMENDED ADVERSARY PROCEEDING COMPLAINT**

## TABLE OF CONTENTS

Page

I.    SUMMARY OF ACTION ...............................................................................................1

II.   STATEMENT OF JURISDICTION AND VENUE ...................................................4

III.  PARTIES .....................................................................................................................4

    A.    Plaintiffs ...........................................................................................................4

        1.    Voluntary Debtor Plaintiffs ..................................................................4

        2.    The Trustee, on behalf of the Trustee Debtors ....................................5

    B.    Defendants .......................................................................................................6

        1.    Lehman Defendants ..............................................................................6

        2.    Other Defendants ..................................................................................7

IV.   FACTUAL ALLEGATIONS ......................................................................................8

    A.    The SunCal-Lehman Venture ..........................................................................8

    B.    The Debtors and Projects at Issue .................................................................11

    C.    The Disputed Lehman Loans at Issue ...........................................................12

    D.    Lehman ALI and LCPI Saddle the Projects with Unnecessary Excessive Debt .........13

    E.    Lehman ALI's and LCPI's Promises to Fund the Plaintiff Debtors' Projects.............15

    F.    Lehman ALI and LCPI's Imposition of Control Over the Debtors and the Projects ..17

    G.    The Parties' Restructuring Agreement ..........................................................19

    H.    The Projects Subject to the Restructuring Agreement ..................................22

    I.    Lehman ALI's Obligations to Fund Under the Restructuring Agreement ................23

    J.    Lehman ALI and LCPI Fail to Fund the Projects as Promised.....................24

    K.    Lehman ALI, LCPI, OVC and Northlake Holdings Secretly Shuffle Their Interests in the Plaintiff Debtors' Loans .................26

    L.    Lehman ALI, LCPI, OVC and Northlake Holdings' Failure to Close and Continued Refusal to Fund ..........26

    M.    Lehman ALI's Withdrawal of Badly Needed Cash from the Projects ......................28

i

**THIRD AMENDED ADVERSARY PROCEEDING COMPLAINT**

35043.17

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000, LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

N.  The Lehman Lenders' Refusal to Fund Necessitates Debtors' Bankruptcies..............28

O.  Lehman ALI, LCPI, OVC and Northlake Holdings' Attempts to Block the
Debtors' Bankruptcies ..........................................................................................29

P.  Lehman ALI, OVC and Northlake Holdings' Manipulation of the Lehman Equity
Members .................................................................................................................30

Q.  Lehman ALI, LCPI, OVC and Northlake Holdings' Attempts to Thwart Debtors'
Reorganization in Bankruptcy ...............................................................................33

R.  Lehman ALI, LCPI, OVC and Northlake Holdings' Concealment of their Sale of
the Loans at Issue...................................................................................................34

S.  Lehman ALI, LCPI, OVC and Northlake Holdings' Repeated Assertion of Their
"Ownership" of the Sold Loans .............................................................................37

    1.  Disputed Proofs of Secured Claims Filed by Lehman ALI, LCPI, OVC
    and Northlake Holdings Based on the Sold Loans .........................................37

    2.  Key Pleadings Filed By Lehman ALI, LCPI, OVC and Northlake
    Holdings Based On the Sold Loans ................................................................39

        a.  Stay Relief Motions ............................................................................39

        b.  Opposition to Sales Procedure Motion ..............................................39

T.  LCPI's Improper Invocation of the Automatic Stay.............................................40

    1.  New York Opposition to Priming Loan............................................................40

    2.  Objection to Cash Collateral Motion .............................................................41

    3.  "Emergency" Motion to Enforce Stay In New York .......................................41

    4.  Lehman ALI's Super-Priority Loan Resulting from LCPI's False
    Invocation of Its Stay ....................................................................................41

    5.  Intervention in Sales Procedures Motion ......................................................42

    6.  Stay Relief Motions ........................................................................................43

    7.  LCPI's Appeal from the Denial of its Stay Relief Motions.............................43

    8.  LCPI's Second Appeal....................................................................................44

U.  Summary of Lehman ALI, LCPI, OVC and Northlake Holdings' Post-Petition
Inequitable Conduct...............................................................................................44

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

ii

**THIRD AMENDED ADVERSARY PROCEEDING COMPLAINT**

35043.17

V.     Lehman ALI and LV Pacific Point's Fraudulent Acquisition of the Pacific Point
Project ........................................................................................................................45

W.     Summary of the Disputed Claims to Be Equitably Subordinated, and the
Associated Liens to Be Preserved for the Benefit of the Plaintiff Debtors' Estates....48

**V.**     FIRST CLAIM FOR RELIEF (Equitable Subordination, 11 U.S.C. §510(c)).......................53

**VI.**     SECOND CLAIM FOR RELIEF (Fraudulent Inducement) .....................................................61

**VII.**     THIRD CLAIM FOR RELIEF (To Avoid and Recover Preferential Transfers 11
U.S.C. § 547) ...............................................................................................................63

**VIII.**     FOURTH CLAIM FOR RELIEF (To Recover Avoided Transfers - 11 U.S.C. § 550)..........64

**IX.**     FIFTH CLAIM FOR RELIEF (To Avoid and Recover Fraudulent Transfers – 11
U.S.C. §§ 544(b), 548, Cal. Civil Code §§ 3439.04 and 3439.05).............................64

**X.**     SIXTH CLAIM FOR RELIEF (To Avoid and Recover Preferential Transfers – 11
U.S.C. § 547) ...............................................................................................................71

**XI.**     SEVENTH CLAIM FOR RELIEF (To Void Liens – 11 U.S.C. § 506(d) ..............................74

**XII.**     EIGHTH CLAIM FOR RELIEF (To Disallow Claims and Liens –
11 U.S.C. § 502(d) .......................................................................................................75

**XIII.**     NINTH CLAIM FOR RELIEF (To Preserve Claims and Liens for the Respective
Debtors' Estates -- 11 U.S.C. §§ 551 and 541(a)(4))...................................................76

**XIV.**     PRAYER FOR RELIEF .......................................................................................................76

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000, LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

iii

**THIRD AMENDED ADVERSARY PROCEEDING COMPLAINT**

35043.17

# I.

## SUMMARY OF ACTION

1.      This case is about a major Wall Street financial institution, Lehman Brothers, which—through its wholly-owned and controlled subsidiaries, defendants herein—induced the plaintiffs' creditors to render services, perform work and issue surety bonds, and then stiffed them for hundreds of millions of dollars.  With this action, the plaintiffs seek relief for the benefit of those creditors.

2.      The plaintiffs herein (collectively, the "Plaintiffs" or "Plaintiff Debtors")[1] are twenty-two of twenty-six debtors ("Debtors")[2] whose bankruptcy cases have been administratively consolidated before this Court.  The Debtors are all direct or indirect subsidiaries of SCC Acquisitions, Inc. ("SCC"), which is the "parent" of a group of affiliated entities known collectively as the SunCal Companies, or "SunCal."  SunCal is a California-based real estate developer.

3.      The causes of action alleged herein relate to SunCal's dealings with various affiliated entities which are all wholly owned and/or controlled by the Global Real Estate Group within Lehman Brothers Holdings, Inc. ("LBHI") (collectively, "Lehman").  These affiliates include

---

[1] They are: (i) Acton Estates LLC ("SunCal Acton"), SunCal Bickford Ranch LLC ("SunCal Bickford"), SunCal Emerald Meadows LLC ("SunCal Emerald"), SCC Palmdale LLC ("SCC Palmdale"), Palmdale Hills Property LLC ("Palmdale Hills"), SJD Partners, Ltd. ("SJD Partners"), SJD Development Corp. ("SJD Development"), SunCal Summit Valley LLC ("SunCal Summit"), SCC Communities LLC ("SCC Communities"), SunCal Communities I LLC ("SunCal I"), SunCal Communities III LLC ("SunCal III"), North Orange Del Rio Land LLC ("SunCal Del Rio"), and Tesoro SF LLC ("SunCal Tesoro") (collectively, the "Voluntary Debtor Plaintiffs or "Voluntary Plaintiffs"); and (ii) LB/L-SunCal Oak Valley LLC ("SunCal Oak Valley"), LB/L-SunCal Northlake LLC ("SunCal Northlake"), SunCal Heartland LLC ("SunCal Heartland"), SunCal Marblehead LLC ("SunCal Marblehead"), SunCal Century City LLC ("SunCal Century City"), SunCal PSV LLC ("SunCal PSV"), Delta Coves Venture LLC ("SunCal Delta Coves"), SunCal Torrance LLC ("SunCal Torrance"), and SunCal Oak Knoll LLC ("SunCal Oak Knoll") (collectively, the "Trustee Debtors").

To be precise, plaintiff Steven M. Speier, the Chapter 11 trustee ("Trustee") for the nine Trustee Debtors, is authorized to bring, and does bring, the claims herein on their behalf.  References to the Trustee Debtors as "Plaintiffs" are made for readability, and should be understood, where applicable, to refer to the Trustee himself.

[2] There are four administratively consolidated voluntary Debtors that are not currently named as Plaintiffs herein, for reasons explained below. They are: SunCal Beaumont Heights LLC ("SunCal Beaumont"), SunCal Johannson Ranch LLC ("SunCal Johannson"), Seven Brothers LLC ("Seven Brothers"), and Kirby Estates LLC ("Kirby").

1

**THIRD AMENDED ADVERSARY PROCEEDING COMPLAINT**

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

35043.17

1   defendants Lehman ALI, Inc. ("Lehman ALI"), Lehman Commercial Paper, Inc. ("LCPI") (itself

2   wholly owned by Lehman ALI), OVC Holdings, Inc. ("OVC"), Northlake Holdings LLC

3   ("Northlake Holdings"), LV Pacific Point LLC ("LV Pacific Point"), and Lehman Re, Ltd.

4   ("Lehman Re") (collectively, the "Lehman Defendants").[3]

5       4.       Plaintiffs are also naming as defendants herein successors to certain of the Lehman

6   defendants—specifically, Fenway Capital LLC ("Fenway") and Dansk Bank A/S London Branch

7   ("Danske"). (These successors are referred to collectively with the Lehman Defendants as

8   "Defendants.").

9       5.       The Plaintiff Debtors are owners of, and/or have equity interests in other Debtors who

10  are owners of, twenty real estate development projects located throughout California (the

11  "Projects"). As discussed in more detail below, after gaining control over the Debtors, certain of the

12  Lehman Defendants exercised that control to their own advantage, and to the detriment of the

13  Plaintiff Debtors and their creditors. They induced the Project-owning Plaintiff Debtors to incur

14  hundreds of millions dollars in debt through promises of payment—promises which they failed and

15  refused to fulfill.

16      6.       As to one Project in particular known as "Pacific Point," located in San Juan

17  Capistrano, Defendants Lehman ALI and LV Pacific Point fraudulently induced the Project-owning

18  Plaintiff Debtor, SJD Partners, to consent to a foreclosure and sale of the Project through their false

19  promises of funding.

20      7.       Defendants' inequitable conduct has continued post-petition—including making

21  repeated material misrepresentations to the Court and Debtors, and wasting vast amounts of the

22  Plaintiff Debtors' time and money—to the detriment of all of the Plaintiff Debtors' creditors.

23      8.       Because of the Defendants' wrongdoing, not only have the Plaintiff Debtors'

24  creditors' bills gone unpaid, the Projects themselves fell into a state of serious disarray. They have

---

[3] These affiliates also include, but are not limited to, non-defendants LBREP II/SunCal Land
Fund Member LLC ("LBREP II/SCLFM"), LB/L-DUC III Master LLC ("LB/L-Duc Master"),
SCLV Northlake LLC ("SCLV Northlake"), SCLV Oak Valley LLC ("SCLV Oak Valley"), and SC
Master Holdings II LLC ("SC Master Holdings") (collectively, the "Lehman Equity Members").

2

**THIRD AMENDED ADVERSARY PROCEEDING COMPLAINT**

35043.17

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

1  encountered erosion, problems with dust, fire control, friable asbestos, unmonitored levees and

2  partially constructed bridges, potential flooding and other serious health and safety hazards.

3  Defendants have refused even to pay property taxes on the Projects, resulting in significant penalties

4  and interest which have decreased the value of the Debtors' estates. The Projects are further

5  threatened with the loss of their governmental entitlements, which are critical to avoid disruptions in

6  the development process and to maintain value.

7      9.    This lawsuit is to obtain redress for the Plaintiff Debtors' creditors by way of:

8          (a) equitably subordinating the Defendants' claims in the Projects;

9          (b) setting aside the foreclosure of the Pacific Point property and returning it to its

10         rightful owner, SJD Partners;

11         (c) avoiding and recovering fraudulent and preferential transfers made to

12         Defendants;

13         (d) declaring void Defendants' liens that are not supported by value; and

14         (e) disallowing Defendants' claims and liens, and preserving those claims and

15         liens for the benefit of the Plaintiff Debtors' estates.

16     10.    This adversary proceeding is filed against defendants who are not in the bankruptcy

17  proceedings involving LBHI in New York, with the exception of LCPI, which is in bankruptcy.

18  LCPI filed a motion for relief from stay in order to foreclose on a number of the Projects. Not only

19  did this constitute the filing of an informal proof of claim against those estates pursuant to this

20  Court's rulings and governing law, but LCPI subsequently filed formal proofs of claim against those

21  estates. Moreover, except with regard to one loan (which LCPI admits is not secured by any value),

22  LCPI sold all of its interest in the loans at issue in this action to Fenway pre-petition. As such,

23  LCPI's automatic stay in its own bankruptcy does not apply—and has never applied—to Plaintiffs'

24  efforts to defend against LCPI's claims by asserting the causes of action alleged against it herein.

25     11.    Plaintiffs reserve the right to seek relief from stay to name any and all other Lehman-

26  related entities, agents and/or individuals as defendants as necessary, and/or to name other

27  defendants as necessary, to obtain and effectuate full and complete relief for the creditors.

28

MILLER BARONESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

3

**THIRD AMENDED ADVERSARY PROCEEDING COMPLAINT**

35043.17

## II.

## STATEMENT OF JURISDICTION AND VENUE

12.    The Bankruptcy Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), (C), (E), (F), (H), (K), and (O), and 1334.

13.    Venue properly lies in this judicial district pursuant to 28 U.S.C. § 1409, in that this civil proceeding arises under title 11 of the United States Code, and arises in and relates to a bankruptcy case pending in the district, and the claims alleged herein arose in this district.

14.    The causes of action alleged herein are all "core" proceedings to be heard and determined by the Bankruptcy Court pursuant to 28 U.S.C. §§ 157 and 1334(b).    To the extent that any claim is determined to be a non-core proceeding that is related to a case under title 11 under this Court's jurisdiction pursuant to 28 U.S.C. § 157(c)(1), Plaintiffs consent to an entry of final order or judgment on the non-core matters by this Court pursuant to 28 U.S.C. § 157(c)(2).

## III.

## PARTIES

15.    As this adversary proceeding deals with numerous plaintiffs and defendants, for convenience, the parties are broken down into the following categories:

### A.    *Plaintiffs*

#### 1.    *Voluntary Debtor Plaintiffs*

16.    Plaintiff SunCal Acton is the owner of the "Acton Estates" Project.

17.    Plaintiff SunCal Bickford is the owner of the "Bickford Ranch" Project.

18.    Plaintiff SunCal Del Rio owns CFD bonds proceeds on the "Del Rio" Project.

19.    Plaintiff SunCal Emerald is the owner of the "Emerald Meadows" Project.

20.    Plaintiff SCC Communities is the owner of the "Joshua Ridge" Project.

21.    Plaintiff SJD Partners is the former owner of the Pacific Point Project.

22.    Plaintiff SJD Development is the holder of an interest in SJD Partners, the owner of the Pacific Point Project.

23.    Plaintiff Palmdale Hills is the owner of the "Ritter Ranch" Project.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

4

**THIRD AMENDED ADVERSARY PROCEEDING COMPLAINT**

35043.17