24. Plaintiff SCC Palmdale is the holder of an interest in Palmdale Hills (itself the owner of the Ritter Ranch Project).

25. Plaintiff SunCal Summit is the owner of certain parcels of the "Summit Valley" Project, and is the holder of interests in Debtors Seven Brothers and Kirby, the owners of certain other parcels of the Summit Valley Project.

26. Plaintiff SunCal Tesoro is the owner of the "Tesoro Burnham" Project.

27. Plaintiff SunCal I is the holder of interests in SunCal Acton, SunCal Beaumont, SunCal Bickford, SunCal Emerald, SunCal Johannson, and SunCal Summit.

28. Plaintiff SunCal III is associated with the Acton, "Beaumont Heights," Bickford Ranch, Emerald Meadows, "Johannson Ranch," and Summit Valley Projects.

***2. <u>The Trustee, on behalf of the Trustee Debtors</u>***

29. The Trustee is authorized to bring, and hereby does bring, claims on behalf of the following Trustee Debtors:

(a) SunCal Century City, owner of the "Century City" Project;

(b) SunCal Torrance, owner of the "Del Amo" Project;

(c) SunCal Delta Coves, owner of the "Delta Coves" Project;

(d) SunCal Heartland, owner of the "Heartland" Project;

(e) SunCal Marblehead, owner of the "Marblehead" Project;

(f) SunCal Northlake, owner of the "Northlake" Project;

(g) SunCal Oak Knoll, owner of the "Oak Knoll" Project;

(h) SunCal Oak Valley, owner of the "Oak Valley" Project; and

(i) SunCal PSV, owner of the "Palm Springs Village" Project.

30. All of the Plaintiff Debtors are Delaware limited liability companies, except for SJD Partners, a California limited partnership, and SJD Development, a California corporation.

31. Four of the twenty-six administratively-consolidated Debtors are not currently named as plaintiffs in this action. This is because none of the Defendants herein has filed proofs of claim against these Debtors, since the Defendants' loans are allegedly secured by other Debtors' interests

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

in these Debtors, but not in property of these Debtors directly. These four Debtors are:

(a) SunCal Johannson, owner of the Johannson Ranch Project;

(b) SunCal Beaumont, owner of the Beaumont Heights Project;

(c) Seven Brothers, owner of certain parcels of the Summit Valley Project; and

(d) Kirby, owner of certain other parcels of the Summit Valley Project.

Plaintiffs reserve the right to amend their complaint to add these Debtors as plaintiffs in this adversary proceeding, including, but not limited to, in the event that substantive consolidation is granted.

***B. Defendants***

***1. Lehman Defendants***

32. On information and belief, Defendant Lehman ALI is a Delaware corporation with its principal place of business in New York, New York, is a wholly-owned subsidiary of the parent Lehman entity, LBHI. Lehman ALI is not in bankruptcy.

33. On information and belief, Defendant LCPI is a Delaware corporation with its principal place of business in New York, New York. LCPI was formerly a wholly-owned subsidiary of LBHI. It is now a wholly-owned subsidiary of defendant Lehman ALI.

34. On information and belief, Defendant OVC is a Delaware limited liability company, and is a wholly-owned subsidiary of LBHI. OVC has purported to be the assignee of Lehman ALI's loan to Plaintiff SunCal OakValley and of the associated lien on the Oak Valley Project. It is not in bankruptcy.

35. On information and belief, Defendant Northlake Holdings is a Delaware limited liability company, and is a wholly-owned subsidiary of LBHI. Northlake has purported to be the assignee of Lehman ALI's loan to Plaintiff SunCal Northlake and of the associated lien on the Northlake Project. It is not in bankruptcy.

36. OVC and Northlake are being sued both in their capacity as successors to Lehman ALI, and for their own wrongdoing.

37. On information and belief, Defendant LV Pacific Point is a Delaware limited liability

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

company with its principal place of business in Orange County, California, and is a wholly-owned subsidiary of LBHI. LV Pacific Point has purported to be the assignee of Lehman ALI's interest in the second priority deed of trust on the Pacific Point Project formerly owned by Plaintiff SJD Partners and of the associated lien. LV Pacific Point foreclosed on, and was the purchaser upon foreclosure of, the Pacific Point Project. LV Pacific Point is being sued both in its capacity as a successor to Lehman ALI, and for its own wrongdoing.

38. On information and belief, defendant Lehman Re is a Bermuda corporation with its principal place of business in New York, New York, and is a wholly-owned subsidiary of LBHI. On information and belief, Lehman Re is the transferee of some or all of Lehman ALI and/or LV Pacific Point's interests in the Pacific Point First and/or Pacific Point Second Loan (described below) to SJD Development and SJD Partners, and of the associated liens on the Pacific Point Project.

***2. Other Defendants***

39. On information and belief, Defendant Fenway is a Delaware limited liability company. Fenway is the transferee of loans to Plaintiffs SunCal Acton, SunCal Bickford, SunCal Delta Coves, SunCal Emerald, SunCal Heartland, SunCal Marblehead, SunCal Northlake, SunCal Oak Valley, SunCal PSV, Palmdale Hills, SunCal Summit, SunCal I and SunCal III, and of the associated liens on the Acton Estates, Bickford Ranch, Delta Coves, Emerald Meadows, Heartland, Marblehead, Northlake, Oak Valley, Palm Springs Village, Ritter Ranch and Summit Valley Projects, and/or other assets of these Plaintiff Debtors, including SunCal I's interests in SunCal Beaumont and SunCal Johannson, and SunCal Summit's interests in Seven Brothers and Kirby.

40. On information and belief, defendant Danske is a United Kingdom corporation, and is the transferee of the loan to Plaintiff SunCal Century City and of the associated lien on the Century City Project.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

IV.

## FACTUAL ALLEGATIONS

### *A. The SunCal-Lehman Venture*

41. SunCal is a family-owned and -operated California real estate business, and is the direct or indirect parent of each of the Debtors. SunCal is a highly-experienced and successful developer in business for over 70 years. It manages virtually all aspects of real estate development, from acquiring properties and obtaining governmental entitlements to construction and build-out, culminating in the sale of lots to merchant builders. SunCal has gained an expertise in these matters, and has formed relationships with many governmental entities and businesses throughout California.

42. The land development process is inherently capital intensive due to the size and costs of the assets being acquired, the front-loaded capital requirements, and the length of time between the initial acquisition and the ultimate realization of profits.

43. The acquisition and development of SunCal projects are typically financed through some combination of debt, mezzanine or "mezz" debt (secured by an equity ownership interest in the entity that owns the property), and/or equity contributions.

44. SunCal historically financed its projects with loans and/or equity from a number of different sources. However, beginning over a decade ago, an increasing number of SunCal's projects were financed by Lehman, as Mark Walsh ("Walsh"), the head of Lehman's Global Real Estate Group, began cultivating a business relationship with Bruce Elieff, CEO and owner of the SunCal parent entity, SCC.

45. In 1997, Lehman made its first investment with SunCal via a $20 million mezzanine loan to Plaintiff Debtor SJD Partners on the Pacific Point Project. As Lehman worked with SunCal on additional projects, a pattern emerged: Lehman's investments were structured with some type of participation by Lehman in the profitability of the projects, either as an equity partner, pursuant to a contingent interest loan that contains a profit participation component, or through a mezz loan with significant return.

46. Lehman also provided debt financing on a number of SunCal projects, but typically

only when Lehman was also a participant in the profitability of the project.

47. When Lehman participated as a lender on SunCal projects, it was, with rare exceptions, always through Defendants Lehman ALI and/or LCPI.

48. Soon after its initial investment, Lehman invested in several more projects with SunCal. Each of these early SunCal-Lehman projects proved to be highly profitable for Lehman, with some projects yielding a return on investment of over a hundred percent.

49. Based on these results, Lehman accelerated its debt and equity participation in SunCal projects. By 2003, Lehman had partnered with SunCal on approximately fifteen projects. By 2007, that number had grown to over forty.

50. By 2006, Lehman's distributions on its mezzanine and equity investments with SunCal exceeded its contributions by over a hundred million dollars.

51. Lehman generated quarterly projections regarding the profitability of its investments with SunCal extending out through the year 2015. Lehman anticipated earning at least $2 billion in profits on $4 billion in debt and equity investments over the course of its relationship with SunCal. Lehman thus accelerated its debt participation further. Between 2005 and 2007, Lehman ALI and/or LCPI lent or contributed over $2 billion to the Debtors.

52. Given Lehman's past and projected profitability, Lehman continued to seek an even closer and more exclusive relationship with SunCal. And SunCal acquiesced, allowing Lehman to take an increasing role in its Projects and finance an increased share of SunCal's business.

53. For example, in or about 2005, SunCal allowed Lehman—at Lehman's urging—to participate in $50 million in gains realized from sales in connection with the "Heritage Fields" project. This generated in excess of $22 million to Lehman, without Lehman having to make any capital investment. SunCal did so without any kind of agreement with Lehman, purely for relationship purposes.

54. There were other instances, such as the College Park and Summerwind projects, where SunCal allowed Lehman to participate—even though others were offering more favorable terms—for the sake of maintaining and building its relationship with Lehman. (LCPI financed the

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

Summerwind project.) Lehman pressured SunCal not to go with DE Shaw on the Century City Project, even though Shaw was offering better terms. Similarly, Lehman pressed SunCal not to use Goldman Sachs on the Marblehead Project. (Both the Century City and Marblehead Projects were financed by Lehman ALI, and both are at issue in this action.)

55. It was not just SunCal that brought Lehman in on projects; the partnership went both ways. Lehman brought SunCal in to develop and manage (and effectively rescue) two large projects that Lehman was already involved in: Terra Lago and Delta Coves (the latter of which is at issue in this suit, and was financed by debt from Lehman ALI.).

56. So close was the SunCal-Lehman relationship that in 2007, Lehman even financed an approximately $40 million unsecured option purchase in connection with the Delta Shores Project—something that would be unheard of from a mere arm's length "lender."

57. In furtherance of Lehman's desire for greater exclusivity, in August 2006, SunCal, through its subsidiary SunCal Communities II, LLC ("SunCal II"), and Lehman, through its wholly-owned and controlled subsidiary, LBREP II/SCLFM, entered into the Operating Agreement of the Lehman SunCal Real Estate Fund LLC (the "Lehman SunCal Fund"). Lehman SunCal Fund is the parent of Plaintiff Debtors SunCal Century City, SunCal Oak Knoll, SunCal Del Amo and SunCal PSV, which own, respectively, the Century City, Oak Knoll, Del Amo and Palm Springs Village Projects at issue in this suit.

58. The purpose of the Lehman SunCal Fund agreement was to make Lehman, with limited exceptions, the exclusive provider of financing for SunCal projects. Under that agreement, "SunCal and its Affiliates shall make available for purchase by the Company (i.e., the Lehman SunCal Fund), and the Company shall have the right of first refusal to purchase . . . all Proposed Properties . . . which are sourced by or brought to SunCal . . . ." Thus, with limited exceptions, SunCal and its affiliates were prohibited from making any investments in real property not in compliance with the provisions of the Fund.

59. By 2007, Lehman was by far SunCal's biggest source of funding. Sixty percent of SunCal's total financing came from Lehman. Two out of every three SunCal projects were financed

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

by Lehman. Seventy percent of SunCal's debt financing came from loans from Lehman ALI or LCPI.

***B. The Debtors and Projects at Issue***

60. Whenever Lehman ALI or LCPI provided financing for SunCal projects, the respective lending entities obtained liens on each property as security for their loans, and/or obtained pledges of equity interests in the SunCal-affiliated entities owning such properties.

61. This lawsuit involves disputes regarding eleven Projects associated with thirteen Voluntary Debtor Plaintiffs ("Voluntary Projects"), and nine Projects associated with nine Trustee Debtor Plaintiffs ("Trustee Projects," and collectively with the Voluntary Projects, the "Projects").[4]

62. The Plaintiff Debtors, the Projects they are associated with, and the Defendants who originally made the loan to each Plaintiff Debtor are as follows:

| VOLUNTARY DEBTOR PLAINTIFFS | | |
|---|---|---|
| **Plaintiff Debtor** | **Associated Project** | **Original Lender(s)** |
| SunCal Acton | Acton Estates | LCPI |
| SunCal Bickford | Bickford Ranch | LCPI<br>Lehman ALI |
| SunCal Del Rio | Del Rio | Lehman ALI |
| SunCal Emerald | Emerald Meadows | LCPI |
| SCC Communities | Joshua Ridge | Lehman ALI |
| SJD Partners | Pacific Point | Lehman ALI |
| SJD Development | Pacific Point | Lehman ALI |
| Palmdale Hills | Ritter Ranch | LCPI |
| SCC Palmdale | Ritter Ranch | LCPI |
| SunCal Summit | Summit Valley (including parcels owned by Seven Brothers and Kirby) | LCPI |
| SunCal Tesoro | Tesoro Burnham | Lehman ALI |
| SunCal I | Acton Estates, Beaumont Heights, Bickford Ranch, Emerald Meadows, Johannson Ranch, Summit Valley | LCPI |
| SunCal III | Acton Estates, Beaumont Heights, Bickford Ranch, Emerald Meadows, Johannson Ranch, Summit Valley | LCPI |

[4] The Voluntary Debtor Plaintiffs were able to file voluntary bankruptcies in the first instance, because they did not have Lehman Equity Members whose consents were required for filing. By contrast, involuntary petitions were initially filed against the Trustee Debtors, and only later were orders for relief entered and the Trustee appointed.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

| TRUSTEE DEBTOR PLAINTIFFS | | |
|---|---|---|
| **Plaintiff Debtor** | **Associated Project** | **Original Lender(s)** |
| SunCal Century City | Century City (10000 Santa Monica) | Lehman ALI |
| SunCal Delta Coves | Delta Coves | Lehman ALI |
| SunCal Heartland | Heartland | Lehman ALI |
| SunCal Marblehead | Marblehead | Lehman ALI |
| SunCal Northlake | Northlake | Lehman ALI |
| SunCal Oak Knoll | Oak Knoll | Lehman ALI |
| SunCal Oak Valley | Oak Valley | Lehman ALI |
| Sun Cal PSV | Palm Springs Village | Lehman ALI |
| SunCal Torrance | Del Amo | Lehman ALI |

### *C. The Disputed Lehman Loans at Issue*

63. The loans at issue in this lawsuit (the "Loans")[5] are as follows:

| LEHMAN LOAN | ORIGINAL LENDER | PLAINTIFF DEBTOR(S) | LOAN DATE | LOAN AMOUNT |
|---|---|---|---|---|
| Pacific Point Second Loan | Lehman ALI | SJD Partners | May 1997 | $20,000,000 |
| Bickford Second Loan | Lehman ALI | SunCal Bickford | May 25, 2005 | 30,000,000 |
| Northlake Loan | Lehman ALI | SunCal Northlake | September 9, 2005 | 100,000,000 |
| SunCal Communities I Loan | LCPI | SunCal Acton<br>SunCal Bickford<br>SunCal Emerald<br>SunCal Summit<br>SunCal I<br>SunCal III | November 17, 2005 | 395,313,713.37 |
| Pacific Point First Loan | Lehman ALI | SJD Partners<br>SJD Development | February 16, 2006 | 125,000,000 |
| Oak Valley Loan | Lehman ALI | SunCal Oak Valley | May 23, 2006 | 120,000,000 |
| Century City Loan | Lehman ALI | SunCal Century City | August 11, 2006 | 120,000,000 |
| Oak Knoll / Torrance Loan | Lehman ALI | SunCal Oak Knoll<br>SunCal Torrance | November 30, 2006 | 167,700,000 |
| Ritter Ranch Loan | LCPI | Palmdale Hills | February 8, 2007 | 264,000,000 |
| PSV Loan | Lehman ALI | SunCal PSV | February 12, 2007 | 90,000,000 |
| SCC Palmdale Loan | LCPI | SCC Palmdale | March 30, 2007 | 95,000,000 |
| Delta Coves Loan | Lehman ALI | SunCal Delta Coves | April 20, 2007 | 236,000,000 |
| Marblehead / Heartland Loan | Lehman ALI | SunCal Marblehead<br>SunCal Heartland | October 6, 2007 | 316,061,300 |
| Interim Loan | Lehman ALI | SCC Communities<br>SunCal Tesoro<br>SunCal Del Rio | October 31, 2007 | 20,000,000 |
| **TOTAL** | | | | **$2,099,075,013.37** |

[5] Many of the Loans were amended one or more times in regard to the amount loaned and/or the Projects providing security for the Loans, among other things. Also, proceeds from some of the later Loans were used to pay down outstanding amounts owing on earlier Loans. Thus, the table does not necessarily reflect the total funds provided on the Projects.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

64. Each of the above loans is secured by an alleged first-priority deed of trust in real property owned by the respective Debtors, with the following exceptions:

(a) The Pacific Point Second Loan is secured by an alleged second-priority deed of trust on the Pacific Point Project previously owned by Plaintiff SJD Partners.

(b) The Bickford Second Loan is secured by an alleged second priority deed of trust on the Bickford Project owned by Plaintiff SunCal Bickford.

(c) The SunCal Communities I Loan is secured by (1) alleged first-priority deeds of trust on the Acton Estates, Bickford Ranch, and Emerald Meadows Projects owned by Plaintiffs SunCal Acton, SunCal Bickford, and SunCal Emerald, respectively, (2) alleged pledges of Plaintiff SunCal I's interests in SunCal Acton, SunCal Beaumont, SunCal Bickford, SunCal Emerald, SunCal Johannson, and SunCal Summit; and (3) alleged pledges of Plaintiff SunCal Summit's interests in Seven Brothers and Kirby.

(d) The Pacific Point First Loan is secured by an alleged first-priority deed of trust on the Pacific Point Project previously owned by Plaintiff SJD Partners, as well as an alleged pledge of SJD Development's interest in Plaintiff SJD Partners.

(e) The Ritter Ranch Loan is secured by an alleged first-priority deed of trust on all real property and an alleged first priority lien on all personal property owned by Plaintiff Palmdale Hills.

(f) The SCC Palmdale Loan is secured by an alleged pledge of Plaintiff SCC Palmdale's interest in Plaintiff Palmdale Hills.

(g) The Interim Loan is secured by alleged first-priority deeds of trust on the Joshua Ridge and the Tesoro Burnham Projects owned by Plaintiffs SCC Communities and SunCal Tesoro, respectively, and an alleged first-priority lien on the net proceeds of the Del Rio CFD Bonds owned by Plaintiff SunCal Del Rio.

***D. Lehman ALI and LCPI Saddle the Projects with Unnecessary Excessive Debt***

65. In late 2005, around the same time that Lehman was negotiating to become SunCal's exclusive financing partner, LCPI made the "SunCal Communities I Loan" to Plaintiffs SunCal I,

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

SunCal III, SunCal Acton, SunCal Bickford, SunCal Emerald, and SunCal Summit, the claimed outstanding amount of which is $343,221,391.

66. Based on the SunCal Communities I Loan, LCPI has filed identical proofs of claim for $343,221,391 against the estates of Plaintiffs SunCal I, SunCal III, SunCal Acton, SunCal Bickford, SunCal Emerald, and SunCal Summit.[6]

67. The proceeds from the SunCal Communities I Loan Agreement were used in part to fund the Acton Estates, Beaumont Heights, Bickford Ranch, Emerald Meadows, Johannson Ranch, and Summit Valley Projects. However, the funds advanced under this Loan were distributed such that some Debtors received a large portion of the funds, while others received little or none at all.

68. Specifically, the following Plaintiffs received the following amounts: SunCal Acton ($380,069); SunCal Bickford ($174,570,287); SunCal Emerald ($44,763,858); SunCal Summit ($9,925,373).[7] Plaintiffs SunCal I and SunCal III each received *nothing* for their $343 million in indebtedness.

69. Each of these Plaintiffs was saddled with a $343 million loan obligation, even though each received only a fraction of that amount, if anything. By structuring the collateral for this Loan in this matter, LCPI ensured that it would enjoy a security interest in the full value of the entire pool of the properties—even in a good market in which Project values may have increased. At the same time, LCPI effectively shifted its credit risk to other creditors, even though neither these Plaintiffs nor their other creditors obtained any benefit in exchange for bearing this additional risk.

70. LCPI also filed a $120 million proof of secured claim against Plaintiff SCC Palmdale based on the SCC Palmdale Loan. Although this Loan was made to SCC Palmdale, and although it was secured by SCC Palmdale's interest in Plaintiff Palmdale Hills, the entire Loan proceeds were

---

[6] Although Debtors SunCal Beaumont or SunCal Johannson received some of the funds from this Loan, LCPI did not file claims against these Debtors as it has no alleged lien on their property, but rather has an alleged lien on SunCal I's interest in these Debtors. Similarly, LCPI did not file claims against Debtors Seven Brothers or Kirby, as it has no alleged lien on their property, but rather has an alleged lien on SunCal Summit's equity interest in these Debtors. Accordingly, these four Debtors are not currently named as plaintiffs herein. Should the Debtors' estates be substantively consolidated, Plaintiffs reserve the right to amend their complaint to add these Debtors as plaintiffs.

[7] Non-plaintiff Debtors SunCal Beaumont and SunCal Johannson received $42,030,925 and $14,636,674, respectively.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

used by LCPI to make a paydown on the SunCal Communities I Loan Agreement that did not involve either SCC Palmdale or Palmdale Hills. LCPI thus burdened SCC Palmdale with $120 million in debt for which it got no benefit.

71. Lehman ALI similarly cross-collateralized several Loans among multiple Plaintiffs and Projects so as to shift its credit risk to other creditors and increase its control over the Plaintiffs:

(a) The Oak Knoll/Torrance Loan was cross-collateralized by the Oak Knoll Project and the Del Amo Project. Lehman ALI filed identical proofs of claim arising from this Loan against Plaintiffs SunCal Oak Knoll and SunCal Torrance in the amount of $158,141,365. However, the loan proceeds received by SunCal Oak Knoll was only $103,575,426, and by SunCal Torrance only $45,185,350.

(b) The Marblehead/Heartland Loan was cross-collateralized by the Marblehead Project and the Heartland Project. Lehman ALI has filed identical proofs of claim arising from this Loan against Plaintiffs SunCal Heartland and SunCal Marblehead in the amount of $354,325,126. However, the loan proceeds received by SunCal Marblehead was only $258,843,352, and by SunCal Heartland only $49,594,848.

(c) The Interim Loan was secured by alleged first-priority deeds of trust on the Joshua Ridge and Tesoro Projects, and an alleged first-priority lien on the proceeds of the Del Rio CFD Bonds owned by SunCal Del Rio. Lehman ALI has filed identical proofs of claim arising from this Loan against Plaintiffs SCC Communities, SunCal Tesoro, and SunCal Del Rio in the amount of $23,795,013. However, none of the proceeds from the Interim Loan were used to fund any of these Plaintiffs' Projects.

## *E. Lehman ALI's and LCPI's Promises to Fund the Plaintiff Debtors' Projects*

72. For years prior to 2007, the SunCal-Lehman partnership thrived, and the parties prospered in their venture together. As of the start of 2007, Lehman projected making billions in profits over the ensuing years from its relationship with SunCal. However, in or about 2007, the real estate market experienced a downturn, and many of the Projects declined significantly in value.

73. Beginning in or about the summer of 2007, SunCal's CEO, Bruce Elieff, and its

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 · LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

President, Stephan Elieff, who were also authorized agents of each of the Plaintiff Debtors, had high-level discussions with Lehman representatives—including Walsh, as well as Paul Hughson ("Hughson") and Frank Gilhool ("Gilhool"), Managing Directors of Global Real Estate—to address these developments.

74. Each of these individuals at Lehman had both apparent and actual authority to act and make representations on behalf of both Lehman ALI, in its capacity as lender to the nine Trustee Debtors and Plaintiffs SunCal Bickford, SJD Partners, SJD Development, SunCal Del Rio, SCC Communities, and SunCal Tesoro; and LCPI, in its capacity as the lender to SunCal Bickford and the remaining Voluntary Debtor Plaintiffs. (Gilhool would later sign key agreements with SunCal and the Debtors as the authorized signatory on behalf of not only LBHI, but also Lehman ALI, LCPI, and other Lehman Defendants.)

75. In their dealings with SunCal, Walsh and the other Lehman executives generally made no distinction between the debt and equity interests, or between Projects financed by Lehman ALI debt and Projects financed by LCPI debt. As the financing partner in the parties' venture, Lehman would determine which Lehman entity would provide funding on which Projects, and would dictate the form that the funding would take, according to whatever suited Lehman's needs.

76. The SunCal principals, on behalf of the Debtors, expressed to the Lehman executives, in their capacity as agents of Lehman ALI and LCPI, that Loans on the Projects were out of balance, and that SunCal would not be able to finance its operations or manage the Projects without assistance. SunCal suggested shutting down or at least slowing development of the Projects.

77. On information and belief, it was not in Lehman ALI or LCPI's interest for SunCal to discontinue development activities, even though SunCal would not be able to move forward without additional funds. On information and belief, Projects with out-of-balance loans and/or slowed or halted construction would be harder for Lehman ALI or LCPI to market or syndicate, and these lenders' parent, LBHI, would likely be forced to report lower Project values on its books. On information and belief, Lehman ALI and LCPI wanted to create the appearance that they would recoup all, or a substantial portion, of their multi-billion dollar investment in the SunCal Projects, at

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

least in part to prop up LBHI's weakening stock price for the benefit of the securities markets and to entice potential investors that LBHI was pursuing to fortify its own faltering finances.

78. Walsh, on behalf of Lehman ALI and LCPI, instructed SunCal's Bruce Eileff not to slow down or stop work. He assured SunCal and the Debtors that Lehman ALI and LCPI would provide the necessary funding to pay vendors and keep development of their Projects moving forward, and that they would restructure the Debtors' Loans.

79. Similarly, in numerous telephone conversations between Gilhool and SunCal personnel, including SCC's COO, Frank Faye ("Faye"), and its General Counsel, Bruce Cook ("Cook") (who were also officers of each of the Debtors), in 2007 and 2008, Gilhool assured SunCal that Lehman ALI and LCPI were committed to funding the debts and obligations of the Projects and the work they directed to be performed; that funding would be forthcoming; and that SunCal and the Debtors should continue to have contractors undertake work to develop and preserve the value in the Projects.

80. In reliance on these representations, SunCal and the Debtors continued to move forward with the Projects and incurred substantial expenses in hiring contractors to maintain and/or develop them and to deal with public health and safety issues.

81. Substantially all of the unsecured creditor claims and mechanic's lien claims that have been filed against each of the Plaintiff Debtors' estates are obligations that Lehman ALI or LCPI authorized the Plaintiff Debtors to incur and promised to provide funding for and/or promised to assume. A list of the unsecured creditors that have filed proofs of claims against each of the Plaintiff Debtors, and the amounts of their claims, is included in Appendix A hereto. A list of mechanic lien claims filed against each of the Plaintiff Debtors, and the amounts of their claims, is included in Appendix B hereto.

***F. <u>Lehman ALI and LCPI's Imposition of Control Over the Debtors and the Projects</u>***

82. Prior to the market downturn, Lehman afforded its partner SunCal substantial discretion to use its expertise to manage development of the Projects. SunCal, primarily via the Debtors, would contract with third-party vendors to perform grading, health and safety compliance,

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

construction, landscaping, and other necessary services on the Project sites, and would coordinate with municipalities for easements, entitlements and other requirements to proceed with development. SunCal and the Debtors would conduct periodic budget meetings with Lehman ALI and LCPI to discuss anticipated expenses over the next quarter; SunCal and the Debtors would submit to Lehman ALI or LCPI documentation of expenses incurred on a monthly basis; and the applicable Lehman lender, Lehman ALI and/or LCPI, in the regular course would remit payment to SunCal and the Debtors so that the third-party vendors could be paid.

83. However, beginning in or about 2007, Lehman ALI and LCPI became much more "hands on" in scrutinizing—and approving—budgets and expenses. On periodic conference calls, SunCal would explain what Project payables had to be paid and what work had to be performed on the Projects, and Lehman ALI or LCPI would have to give pre-authorization before any work could occur or expenses be incurred. Lehman ALI and LCPI would unilaterally dictate what future work would proceed, and also decided what payables were "urgent" and what other payables could be deferred. Lehman ALI and LCPI thereby effectively took over not only financial control of the respective Debtors' Projects, but ultimate management control as well.

84. Lehman ALI and LCPI had not only input on, but importantly, veto power over any expenditure undertaken on the Projects. Lehman ALI and LCPI thus made SunCal, the Debtors and their creditors dependent on their willingness to continue financing the Projects, and so Lehman ALI and LCPI were in full control of the Projects.

85. Lehman ALI and LCPI also used their control to impose onerous financing terms that did not benefit the Debtors.

86. For example, when SunCal initially approached Lehman ALI and LCPI about the Projects' financial difficulties, they assured SunCal of immediate financing to cover operating expenses, starting out at the $20 to $25 million range per month, and increasing from there. However, only one such loan of $20 million (the October 2007 Interim Loan from Lehman ALI) was made, as what was supposed to be "quick" financing got bogged down in Lehman ALI's extensive documentation.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

87. Moreover, Lehman ALI insisted that SunCal put up security, previously unencumbered, to secure that financing, although that was not originally contemplated. In that connection, SunCal put up the interests of SunCal Del Rio, SCC Communities, and SunCal Tesoro in the Del Rio, Joshua Ridge and Tesoro Projects, respectively, as security for the Loan.

88. In addition, at the last minute, Lehman ALI decided to specify exactly what the $20 million could be used for, whereas all the way through the discussions, the money was simply to assist SunCal in meeting its operating expenses, as SunCal determined. Ultimately, Lehman ALI kept the funds and only disbursed them after it had approved the disbursements, most of which went to pay expenses of the Ritter Ranch Project, not any of SunCal Del Rio's, SCC Communities', or SunCal Tesoro's encumbered Projects.

***G. The Parties' Restructuring Agreement***

89. SunCal and the Debtors continued to work with the contractors and develop the Projects in reliance on a promised overall "work out" or restructuring of the Projects and of the Loans and/or liens held by Lehman ALI and LCPI, as well as an assumption of SCC's and Elieff's indemnity liability on surety bonds covering work that had been done and was being done on the Projects. (SCC and Elieff had agreed to be indemnitors on the bonds in reliance on the relationship with Lehman and on the parties' mutual understanding that, although the Debtors were technically the primary obligors on the bonds, Lehman ALI and LCPI were, in effect, the primary financial obligors, were well aware of the work that was required by the Projects' respective municipalities to be performed and bonded in order for development to proceed, and agreed to be responsible for payment of that work.)

90. It was contemplated as of the October 2007 Interim Loan that a restructuring agreement would be entered into shortly, by no later than January or February of 2008. However, implementation was again dragged out due in large part to Lehman's extensive documentation.

91. In the meantime, until a restructuring agreement was entered into, Lehman ALI and LCPI stopped paying vendor payables, nor would they pay any management fees of SunCal Management LLC, which was managing each of the Debtors' Projects.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

92. As the restructuring was pushed further and further out and Lehman ALI and LCPI continued to refuse to provide funding—despite their prior assurances—SunCal was effectively drained of liquidity, and so the Debtors became even more desperate and more dependent on Lehman ALI and LCPI financing.

93. Lehman ALI and LCPI used the Debtors' vulnerability to their advantage in negotiating a restructuring agreement that was tipped heavily in Lehman's favor. (They also specifically exploited the fact that SCC and Bruce Elieff were indemnitors on millions of dollars worth of surety bonds that covered work being done on the Debtors' Projects, including work that Lehman ALI and LCPI had specifically authorized and agreed to pay for. If Lehman ALI and LCPI did not pay for this work as promised, SCC, and Elieff personally, would be exposed to massive bond liability. Hughson, in his capacity as an agent of, among others, Lehman ALI and LCPI, directly threatened Bruce Elieff that if SunCal did not agree to what the Lehman parties wanted, they would leave Elieff "hung out on the bonds.")

94. For example, Lehman had indicated that it was open to suggestions from SunCal regarding the terms of a restructuring agreement. SunCal proposed that, particularly given the long and profitable history of the parties' venture together, the restructuring should take into account a reasonable view of the values of the properties, so that Lehman ALI and LCPI would at least in part share the burden of the market downturn.

95. In response, Lehman became irate and countered with what was essentially a take-it-or-leave-it offer. Under the counter-proposal, (1) Lehman ALI and LCPI would be paid in full for every dollar that they had invested with SunCal that had not been returned, including interest on those amounts, default interest, and penalty fees; (2) Lehman would recoup all money that it had put in as equity in certain projects; and (3) Lehman would receive a 15% return on all funds contributed (both debt and equity) until they were returned—all without regard to the value of the properties. For the most part, this is how the restructuring agreement was ultimately structured.

96. Similarly, when the restructuring agreement was finally entered into in late May 2008, SunCal sought to have its management fees reimbursed as of February 1, 2008, the date by

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

which the restructuring agreement should have and would have been entered into but for Lehman's delays. Lehman ALI and LCPI refused, and in fact insisted upon a waiver of all past management fees, with only management fees from May 15, 2008 onward being payable, at reduced rates.

97. Lehman ALI and LCPI also required that SunCal pledge $33 million of its equity interest in the four Lehman SunCal Fund projects (Century City, Del Amo, Oak Knoll and Palm Springs Village) as partial consideration for Lehman ALI and LCPI's satisfaction of existing debt on the other Projects subject to the restructuring agreement. SunCal did not believe these Projects (and Palm Springs Village in particular) should have to be included as collateral to secure the restructuring of the other Projects. Instead, SunCal felt that LBREP II/SCLFM, the Lehman equity member in the Lehman SunCal Fund, should cover the Fund Projects' expenses, as there was plenty of capital yet to be called to fund the existing debts and other needs of these Projects, per the terms of the Fund's Operating Agreement. (Lehman had committed to contributing up to $600 million in equity through the Fund, but had contributed only a fraction of that amount.) But Lehman ALI and LCPI insisted, and SunCal had no choice but to acquiesce.

98. Finally, on May 23, 2008, SunCal and certain of the Debtors entered into an omnibus "Restructuring Agreement" with LBHI, Lehman ALI and other Lehman-controlled entities. (LCPI, for reasons known to Lehman ALI and LCPI, was not a signatory to the Restructuring Agreement, although it was a signatory to the subsequent "Settlement Agreement" signed in August 2008.) Lehman's Gilhool signed the Restructuring Agreement on behalf of each of these entities.

99. The Restructuring Agreement was designed to culminate in a closing ("Closing") with the parties entering into a Settlement Agreement, the form of which was attached to the Restructuring Agreement. Under the Settlement Agreement, new Lehman-controlled entities (each with "SCLV" in its name, for "SunCal-Lehman Venture") would take title to the properties, assume Debtors' debt obligations to Lehman ALI and LCPI and assume bond obligations previously owed by SunCal, Elieff and the Debtors. These SCLV entities—along with what was purported by Lehman ALI and LCPI to be a substantial-net-worth Lehman-related entity—were also to provide indemnifications to SunCal and the Debtors. The Settlement Agreement was signed by the SunCal

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

and Lehman parties on August 25, 2008. But as explained below, the Lehman parties did not close.

*H.* ***The Projects Subject to the Restructuring Agreement***

100. As originally executed in May 2008, the Restructuring Agreement applied to twelve of the twenty Projects (as well as several other projects not at issue in this lawsuit): (1) Acton Estates; (2) Beaumont Heights; (3) Bickford Ranch; (4) Emerald Meadows; (5) Heartland; (6) Johannson Ranch; (7) Marblehead; (8) Northlake; (9) Oak Valley; (10) Pacific Point; (11) Ritter Ranch; and (12) Summit Valley. The Plaintiff Debtors that owned and/or held equity interests in the owners of these Projects were signatories to the May 2008 agreement.[8]

101. Between May and August 2008, four additional projects were added to the Restructuring Agreement by agreement of the parties: (1) Del Rio; (2) Joshua Ridge; (3) Palm Springs Village; and (4) Tesoro Burnham. Accordingly, the Plaintiffs associated with these Projects—SunCal Del Rio, SCC Communities, SunCal PSV, and SunCal Tesoro—became parties to the Restructuring Agreement as amended. These Plaintiff Debtors were signatories to the August 25, 2008 Settlement Agreement, along with the Debtors associated with the original twelve Projects, as "Borrowers" and/or "Grantors."

102. Lehman ALI at first held the Delta Coves Project out from the Restructuring Agreement, apparently because of the problems it was having with a separate participant in that Project. But later in the summer, Lehman ALI indicated that it wanted that Project added as well. SunCal and SunCal Delta Coves provided Lehman ALI information as to management fees, budgets, and the like with respect to that Project being part of the restructuring. But Delta Coves was not formally added to the Restructuring or Settlement Agreement by the time that the parent Lehman

---

[8] Specifically, the Restructuring Agreement was entered into by, among others, the "Borrowers," "Grantors" and "Pledgors," as defined in Annex 1 thereto. The "Borrowers" included Plaintiffs SunCal Marblehead, SunCal Heartland, SunCal Northlake, SunCal Oak Valley, SJD Partners, Palmdale Hills, SCC Palmdale, SunCal I, SunCal III, and SunCal Bickford.

The "Grantors" included Plaintiffs SunCal Marblehead, SunCal Heartland, SunCal Northlake, SunCal Oak Valley, SJD Partners, Palmdale Hills, SunCal Bickford, SunCal Acton, SunCal Summit and SunCal Emerald, and Debtors SunCal Beaumont and SunCal Johannson.

The "Pledgors" included Plaintiffs SCC Palmdale, SunCal I, SunCal Summit and SJD Development.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

entity, LBHI, filed for bankruptcy and Lehman ALI, LCPI and the other Lehman entities stopped moving forward with Closing.

103. Thus, four Projects were not formally added to the Restructuring Agreement—Century City, Delta Coves, Oak Knoll and Del Amo; and the four Debtors associated with these Projects—SunCal Century City, SunCal Delta Coves, Suncal Oak Knoll and SunCal Torrance—were not signatories to the Settlement Agreement. Lehman ALI was the lender on each of these Projects, three of which were part of the Lehman SunCal Fund.

104. However, even as to these four Projects, Lehman ALI engaged in the same course of conduct that it had regarding the other Projects regarding representations of funding. Lehman ALI encouraged SunCal and these four Plaintiff Debtors to continue developing these Projects, and made assurances of payment. Later, Lehman ALI approved all expenses, told these Plaintiffs what work to move forward with, and promised it would pay for such work. These Plaintiffs performed substantial work and incurred millions in third-party debt in reliance on Lehman ALI's promises of payment.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

***I. Lehman ALI's Obligations to Fund Under the Restructuring Agreement***

105. Pursuant to the Restructuring Agreement, Lehman ALI, "as the Lender with respect to each Loan," committed, among other things, to: (1) make advances under existing loans to fund the continuing costs necessary to preserve the value of the Projects; (2) move forward to resolve the accrued outstanding subcontractor payables, i.e., to make sure that the Projects' creditors were paid for their work; and (3) to Close the transaction, whereby related Lehman entities would assume the debt and obligations of the Projects.

106. SunCal and the Plaintiff Debtors signed the Restructuring Agreement with Lehman ALI with the understanding that Lehman ALI was by that point the entity that held the various first trust deeds and/or pledged interests on all of the Projects subject to the Restructuring Agreement, and that this was the reason why Lehman ALI, and not LCPI, was the signatory as "Lender."

107. In any event, even after the Restructuring Agreement was signed, Lehman continued to make no distinction between LCPI-financed Projects and Lehman ALI-financed projects, and

continued promises of financing emanated from the same Lehman representatives.

108. SunCal and the Debtors believed and relied on Lehman ALI's and LCPI's promises to maintain the long-term value of the Projects and that Lehman ALI and LCPI intended to act in good faith to continue with those Projects.

109. And it appeared—at least for a short while—that might be the case. Lehman ALI arranged for a third party, Radco, to settle outstanding contractor payables. On information and belief, Radco was provided some limited funding and authority to negotiate settlements, and did in fact do so with some creditors. (Funding for settlements on Lehman ALI- and LCPI-funded Projects came from the same source.) Lehman ALI and LCPI also provided approval for new work on the Projects, and Lehman ALI provided payment for some of it. But this funding was minimal and soon stopped.

***J. Lehman ALI and LCPI Fail to Fund the Projects as Promised***

110. In the summer of 2008, SunCal and the Debtors were unaware that Lehman was facing a looming financial crisis or that an LBHI bankruptcy was impending. However, Lehman's concealed liquidity problems were impacting Lehman ALI's and LCPI's conduct.

111. About a month prior to LBHI filing for bankruptcy in September 2008, Lehman ALI withdrew funding and settlement authority from Radco, and so halted the process of resolving millions of dollars of outstanding contractor payables on the Projects subject to the Restructuring Agreement. This was work that Lehman ALI and/or LCPI had previously authorized and directed SunCal to undertake, but that Lehman ALI later refused to pay for. The contractors would not perform new work unless they received payment for work already done. The halting of Radco's efforts further impeded development of the Projects and also impeded Plaintiffs' ability to deal with public health and safety issues. Radco ultimately ended up resolving only a fraction of the total outstanding payables.

112. On information and belief, Lehman ALI arranged for these negotiations to occur at least in part so it could maintain the appearance that the Projects would be funded and their value maintained, so that LBHI would not have to write-down the Projects' values on its balance sheet.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

113. Even as Lehman ALI was pulling back Radco's authority to fund, Lehman ALI's and LCPI's Gilhool continued to assure SunCal personnel, including Faye and Cook, that Lehman ALI and LCPI were committed to funding the Project obligations and paying for lender-authorized work, that the funds were coming, and that SunCal and the Debtors should continue work on the Projects.

114. Lehman ALI also failed to provide the funding promised on the four Projects that were not made part of the Restructuring Agreement.

115. At an August 25, 2008 meeting to sign closing documents for the Restructuring Agreement held in Los Angeles—just days after most of the Loans and associated liens had secretly been sold to Fenway—the Lehman parties announced that they wanted to push the Closing date out another month to September 30, 2008, ostensibly in order to obtain a few additional (and easily obtainable) third party consents. SunCal, still believing that the Lehman parties owned the Loans and were acting in good faith, agreed to the extension to September 30, 2008.

116. Cook, among others, on behalf of SunCal and the Debtors, and Gilhool, on behalf of Lehman ALI, LCPI, and the other Lehman parties, signed hundreds of pages of settlement documents at the August 25 meeting, including the Settlement Agreement itself. Specifically, Gilhool signed the settlement documents on behalf of, among others, OVC and Northlake Holdings—Lehman affiliates that had apparently been assigned the Oak Valley and Northlake Loans and associated liens at some point after the Restructuring Agreement was entered into. OVC and Northlake Holdings were controlled and represented by the same individuals within Lehman that represented and controlled Lehman ALI. These Lehman entities succeeded to Lehman ALI's respective obligations to Plaintiffs SunCal Oak Valley and SunCal Northlake.

117. Weil, Gotshal & Manges, the attorneys for Lehman ALI, LCPI, OVC and Northlake Holdings (and who are also their bankruptcy counsel), took all of the original signed settlement documents with them, claiming that they would provide copies to SunCal and the Debtors and that the Closing would occur shortly thereafter. (Despite months of requests, Lehman ALI, LCPI, OVC and Northlake Holdings only recently produced these signature pages in response to formal discovery requests.)

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

***K. Lehman ALI, LCPI, OVC and Northlake Holdings Secretly Shuffle Their Interests in the Plaintiff Debtors' Loans***

118. As discussed in more detail below, unbeknownst to SunCal or the Debtors at the time, on or just prior to August 22, 2008—days before Lehman ALI, LCPI, OVC and Northlake Holdings signed the Settlement Agreement and related documents that were to culminate in Closing—Lehman ALI transferred a number of its Loans and liens on the Projects to LCPI. OVC and Northlake apparently likewise transferred the Oak Valley and Northlake Loans and associated liens, respectively, to LCPI.

119. LCPI immediately turned around and sold all of its interest in those Loans and liens to a third party, Fenway, pursuant to an August 22, 2008 repurchase agreement, or "Repo."[9] Lehman ALI, LCPI, OVC and Northlake Holdings did not disclose to SunCal or the Debtors that they were selling to third parties the very obligations they were supposedly about to assume and restructure. On information and belief, LCPI and Fenway entered into this transaction as part of a larger series of transactions designed to inject badly needed liquidity into the Lehman corporate structure, while making it appear that this liquidity was secured by something other than the Loans themselves.

***L. Lehman ALI, LCPI, OVC and Northlake Holdings' Failure to Close and Continued Refusal to Fund***

120. On information and belief, the additional third-party consents required for Closing of the Restructuring Agreement and Settlement Agreement had been obtained (or could have been but for the Lehman parties' refusal to pursue them in good faith) by about the first week of September 2008, and thus all conditions precedent to closing had been met. Yet Lehman ALI, LCPI, OVC and Northlake Holdings and the other Lehman entities took no steps to proceed with Closing.

[9] A standard Repo consists of a two-part transaction. The first part consists of the transfer of specified property by one party, the seller, to another party, the buyer, in exchange for cash. The second part consists of the contemporaneous agreement by the seller to repurchase the property at the original price, plus an agreed upon amount of interest, on a specified future date.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

121. On September 15, 2008, LBHI filed a voluntary petition in bankruptcy court in the Southern District of New York. Notwithstanding the bankruptcy, Gilhool was still assuring SunCal and the Debtors that Lehman ALI, LCPI, OVC and Northlake Holdings would continue to fund the Plaintiff Debtors' respective Projects so as to avoid harm and damage to them and to ensure that Plaintiffs' creditors were paid.

122. As the end of September approached, SunCal and the Debtors became greatly concerned that Lehman ALI, LCPI, OVC, Northlake Holdings and the other Lehman parties were still not doing anything to facilitate closing. On September 29, 2008, counsel for SunCal and the Debtors sent Weil Gotshal a notice indicating that they were prepared to close, and that all conditions precedent to Closing had been satisfied. Lehman ALI, LCPI, OVC and Northlake Holdings did not provide a definitive response for weeks.

123. In the meantime, the Projects required work. Even if no new construction or development was to be undertaken, significant sums had to be spent on site security, erosion prevention, property taxes and other measures in order to prevent the Projects from becoming a public safety hazard, and in order to prevent losing valuable entitlements, accruing penalties and fines, and other losses to the Projects.

124. SunCal and the Debtors repeatedly requested that Lehman ALI, LCPI, OVC and Northlake Holdings provide funding to pay for critical health and safety and value preservation measures on the Projects. Between October 9 and November 4, 2008, SunCal's general counsel Cook sent Robert Brusco, an authorized agent of Lehman ALI, LCPI, OVC and Northlake Holdings, nearly two dozen letters practically begging them to provide promised funding to address critical needs on the Projects as promised.

125. These letters raised issues such as potential and/or actual public exposure to asbestos, flooding, wind damage, looters and vandals, soil erosion and wildfires, in addition to demands from third-party vendors for payment for services and threats to discontinue service. Cook's letters attached reports from governmental inspectors, and photographs documenting site conditions that posed a threat to public safety or that could subject the Projects to fines and penalties. Cook's letters

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

were in addition to the myriad of correspondence, from employees of SunCal and the Debtors who were working on the Projects to Lehman ALI, LCPI, OVC and Northlake Holdings employees, requesting payment for previously approved payables or funding for other particular urgent needs.

126. Despite Lehman ALI, LCPI, OVC and Northlake Holdings' assurances of their intent to proceed with funding the Projects, the Debtors' request that Lehman ALI, LCPI, OVC and Northlake Holdings address their critical financial needs fell on deaf ears. Lehman ALI, LCPI, OVC and Northlake Holdings repeatedly requested detailed budgets regarding the needs of the Projects, reinforcing the impression that they were willing and able to fund—budgets which SunCal and the Debtors repeatedly and promptly provided. Lehman ALI, LCPI, OVC and Northlake Holdings repeatedly promised the funding would be forthcoming. But the funds never materialized. In November 2008, Brusco, on behalf of Lehman ALI, LCPI, OVC and Northlake Holdings, delivered a message that these Lehman lenders were unwilling to fund the Projects and that they intended to foreclose on all of the Projects.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

***M. Lehman ALI's Withdrawal of Badly Needed Cash from the Projects***

127. At the same time that Lehman ALI, LCPI, OVC and Northlake Holdings were stringing SunCal along, promising that funding would be forthcoming but refusing to provide it, Lehman ALI was also secretly stripping the Projects of cash.

128. SunCal Marblehead Heartland LLC, the parent of Debtors SunCal Marblehead and SunCal Heartland, held approximately $3.4 million in two restricted accounts that were to be used for the needs of the Marblehead and Heartland Projects. Unbeknownst to the Debtors, in or about late October or early November 2008—precisely when the Debtors were begging that Lehman ALI provide promised funding—Lehman ALI withdrew the money in those accounts, and then closed the accounts. SunCal Marblehead and SunCal Heartland did not learn about the withdrawal or account closures until they requested updated bank statements from the financial institution holding the accounts.

***N. The Lehman Lenders' Refusal to Fund Necessitates Debtors' Bankruptcies***

129. In late October 2008, SunCal indicated to Lehman ALI, LCPI, OVC and Northlake

Holdings that if they continued to refuse to provide critical funding, the Debtors associated with the Projects would have no choice but to file for bankruptcy.

130. Finally, with creditor demands, fines and penalties and other expenses mounting, and no financial assistance forthcoming from Lehman ALI, LCPI, OVC or Northlake Holdings, the Voluntary Debtors filed for bankruptcy on November 6 and November 7, 2008. When the Lehman Equity Members in the Trustee Debtors refused to provide consents to their filing, their creditors filed involuntary petitions against them beginning on November 12, 2008.

131. There are now over 240 vendors and bonding companies claiming over $370 million in work and improvements that they provided on the Projects or are required to have performed. (A list of the unsecured creditors can be found at Appendix A, and mechanic lien claimants at Appendix B.) Substantially all of these sums are due to work done or bonded at Lehman ALI, LCPI, OVC and/or Northlake Holdings' behest, which they subsequently failed to pay for as promised.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

### *O. __Lehman ALI, LCPI, OVC and Northlake Holdings' Attempts to Block the Debtors' Bankruptcies__*

132. Lehman ALI, LCPI, OVC and Northlake Holdings responded to the initial SunCal bankruptcies with a flurry of activity to try to foreclose on the Projects and avoid their obligations to Debtors' creditors.

133. On November 12, the same day as the first of the SunCal involuntary bankruptcy filings, Lehman ALI rushed to improperly record notices of default against five Projects—Century City, Torrance, Palm Springs Village, Oak Knoll and Delta Coves—that were not yet in bankruptcy. Even aside from disputing the merits of the claimed defaults, these recordings were improper because no prior notice of default had been sent out, the contents of the notices were inadequate, and no opportunity was given to the equity members in these Projects to make contributions to avoid any default.

134. On November 13, 2008, Lehman ALI, LCPI, OVC and Northlake sent SunCal and the Debtors a letter repudiating the Restructuring and Settlement Agreement and their prior promises of continued funding.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

***P. Lehman ALI, OVC and Northlake Holdings' Manipulation of the Lehman Equity Members***

135. On information and belief, Lehman ALI, and OVC and Northlake Holdings as successors to Lehman ALI's role as lender to SunCal Oak Valley and SunCal Northlake, also used their control over the Lehman Equity Members in the nine Trustee Debtors to promote the lenders' interests at the expense of the Trustee Debtors or their creditors.

136. For each of the nine Trustee Projects, Lehman held an equity interest through a (nominally) separate Lehman Equity Member in addition to extending a loan through Lehman ALI. A SunCal equity member and Lehman Equity Member were either members in the Trustee Debtor directly, or in the parent entity that wholly owned the Trustee Debtor, as follows[10]:

| Project | Debtor | Parent Entity | SunCal Equity Member In Debtor (or Parent) | Lehman Equity Member In Debtor (or Parent) |
|---|---|---|---|---|
| Century City | SunCal Century City | Lehman SunCal Fund | SunCal II | LBREP II/SCLFM |
| Delta Coves | Suncal Delta Coves | Delta Coves Master JV LLC | SunCal Delta Coves LLC | LB/L-DUC Master |
| Northlake | SunCal Northlake | N/A | SCC/Northlake, LLC | SCLV Northlake |
| Oak Knoll | SunCal Oak Knoll | Lehman SunCal Fund | SunCal II | LBREP II/SCLFM |
| Oak Valley | SunCal Oak Valley | N/A | SCC/Oak Valley, LLC | SCLV Oak Valley |
| Palm Springs Village | SunCal PSV | Lehman SunCal Fund | SunCal II | LBREP II/SCLFM |
| Torrance (Del Amo) | SunCal Torrance | Lehman SunCal Fund | SunCal II | LBREP II/SCLFM |

137. For Oak Valley and Northlake, the applicable Lehman Equity Members ostensibly had management and control over the Debtors, SunCal Oak Valley and SunCal Northlake, including

---

[10] For Marblehead and Heartland, the SunCal and Lehman Equity Members were members in the "grandparent" (which wholly owned the parent entity that wholly owned the Debtors), as follows:

| Project | Debtor | Parent Entity | Grandparent Entity | SunCal Equity Member in Grandparent | Lehman Equity Member in Grandparent |
|---|---|---|---|---|---|
| Heartland | SunCal Heartland | SunCal Marblehead Heartland LLC | SunCal Master JV LLC | SCC JV Ventures LLC | SC Master Holdings |
| Marblehead | SunCal Marblehead | SunCal Marblehead Heartland LLC | SunCal Master JV LLC | SCC JV Ventures LLC | SC Master Holdings |

SC Master Holdings transferred its equity interest in SunCal Master JV LLC to SCC JV Ventures LLC in May 2009. The allegations of insider status against Lehman ALI via its affiliation with and/or control of the Lehman Equity Members extend to SC Master Holdings as well, but the other allegations regarding the Lehman Equity Members' breaches of their fiduciary duties do not.

control over whether to file for bankruptcy. For the other Trustee Projects, the Debtors could not file for bankruptcy without the consent of the respective Lehman Equity Members, which refused to provide such consent. Accordingly, all of the Trustee Projects were initiated as involuntary bankruptcies (on November 12, 14, and 19, 2008).

138. While Lehman ALI, OVC and Northlake Holdings left the Trustee Debtors no viable alternative to bankruptcy with their refusals to fund, the Lehman Equity Members, for their part, sat by silently and did nothing to try to prevent the Lehman lenders from foreclosing. They did not contribute penny one. This is particularly galling as it relates to the Lehman SunCal Fund Projects, because under the parties' operating agreement, the Lehman Equity Member on these Projects, LBREP II/SCLFM, had a capital commitment obligation for $600 million, which it never came close to satisfying.

139. On November 18, 2008, after creditors of some of the Trustee Projects filed involuntary petitions in order to stay foreclosure proceedings on the Projects, the Lehman Equity Members sent the Trustee Debtors (or their parents)[11] virtually identical letters stating that the SunCal equity members had no authority to consent to an order for relief from stay, nor make any decision on behalf of the Trustee Debtors.

140. The same parties within Lehman that controlled Lehman ALI, OVC and Northlake Holdings—Walsh and his associates within the Global Real Estate Group—had and exercised complete control over the Lehman Equity Members as well. The Lehman lenders' control of the Lehman Equity Members did not cease when the parent Lehman entity, LBHI, filed for bankruptcy in September 2008; the only thing that changed was the identity of the individuals running the show.

141. After declaring bankruptcy, LBHI's leadership was taken over by its "restructuring consultants," Alvarez & Marsal ("A & M"). A & M is in control not only of bankrupt Lehman

[11] Specifically, SCLV/Northlake sent its letter to Plaintiff Debtor SunCal Northlake regarding the Northlake Project; SCLV/Oak Valley LLC sent its letter to Plaintiff Debtor SunCal Oak Valley regarding the Oak Valley Project; LBREP II/SCLFM sent its letter to SunCal II regarding the Century City, Del Amo, and Palm Springs Village Projects; and LB/L-DUC Master sent its letter to SunCal Delta Coves LLC regarding the Delta Coves Project.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

entities such as LBHI and LCPI, but also the non-bankrupt Lehman lenders (Lehman ALI, OVC, and Northlake Holdings), as well as the non-bankrupt Lehman Equity Members.

142. Thus, when Lehman repudiated the Restructuring Agreement on November 12, 2008, it did so on behalf of LCPI and non-bankrupt Lehman ALI, OVC and Northlake Holdings in a letter by Gerald Pietroforte, one of two "Key A & M Contacts" in charge of Lehman's Real Estate "Asset Recovery Plan, Dispositions, and Pledged Collateral Issues."

143. Similarly, on November 18, 2008, A & M's Jeff Fitts—the other "Key A & M Contact"—sent the letters on behalf of each of the Lehman Equity Members refusing to consent to voluntary bankruptcy filings by the Trustee Debtors.

144. On information and belief, A & M and its asset recovery professionals involved in the Lehman-SunCal projects, Messrs. Fitts and Pietroforte, do not have in-depth hands-on experience or expertise in developing large-scale master-planned residential communities, as are involved here. On the other hand, SunCal and its cadre of experienced land development professionals have a very high level of expertise and experience based on many years and literally thousands of hours—including on the Projects at issue in this case.

145. Common sense and fiduciary duties require the Lehman Equity Members and their asset recovery professionals to pursue the course of action best suited to enhancing the value of the Projects and maximizing the recovery to creditors. Instead, on information and belief, A & M is seeking to oust the Debtors and take over ongoing Projects—without paying for the millions in work that the Lehman ALI, LCPI, OVC and Northlake Holdings induced—and then trying to "re-invent the wheel," not only to churn fees for itself, but also to retain any upside in the Projects for itself at the expense of creditors.

146. The Lehman Equity Members are using their control of the joint SunCal/Lehman Trustee Debtors not to benefit those entities or the Projects they represent, or to meet fiduciary duties to creditors, but solely to facilitate the interests of Lehman ALI, OVC and Northlake Holdings to effectuate foreclosures and avoid their obligations to creditors, and the interests of A & M itself.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

*Q.* ***Lehman ALI, LCPI, OVC and Northlake Holdings' Attempts to Thwart Debtors' Reorganization in Bankruptcy***

147. Once their efforts to prevent the Debtors from filing for bankruptcy failed, Lehman ALI, LCPI, OVC and Northlake Holdings tried everything in their power to delay and hinder the maintenance of value in the Projects or the successful reorganization of the respective Debtors. The goal of these actions was to ensure that there would be no option other than a foreclosure by Lehman ALI, LCPI, OVC and Northlake Holdings, leaving nothing for the unsecured creditors who were induced to provide goods and services for the Projects, or to guarantee such goods and services, by these Lehman lenders.

148. As for LCPI, the only one of these four entities that is in bankruptcy, it has fraudulently and deceitfully invoked its own automatic stay to try to impede the bankruptcies of Plaintiff Debtors Palmdale Hills, SunCal Acton, SunCal Bickford, SunCal Emerald, SunCal Summit, SunCal I and SunCal III (as well as Debtors SunCal Beaumont and SunCal Johannson).

149. These defendants' actions have delayed recovery to the Debtors' respective creditors, increased the claims against the Debtors' estates, increased the cost of administering their bankruptcies, and jeopardized the value of the Debtors' principal assets—the Projects themselves.

150. The following is a summary of some of the more significant actions Lehman ALI, LCPI, OVC and Northlake Holdings have taken to impede the Debtors' bankruptcies:

151. LCPI filed for bankruptcy in the Southern District of New York on October 5, 2008. In November 2008, LCPI refused to consent to relief from its automatic stay to allow the Debtors to, among other things, obtain a priming loan to pay creditors or preserve value in the Projects (even though it did not own the relevant loans).

152. In January 2009, Debtors Palmdale Hills, SunCal Acton, SunCal Beaumont, SunCal Bickford, SunCal Emerald, SunCal Johannson, and SunCal Summit filed a motion to use cash collateral for their Projects' critical needs (the "Cash Collateral Motion"). Lehman ALI and LCPI objected to the Cash Collateral Motion, and LCPI again (falsely) invoked its automatic stay. In response, these Debtors took the motion off calendar.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

153. Around the same time, LCPI moved for relief from stay in the bankruptcy proceedings of Plaintiff Debtors SunCal Acton, SunCal Bickford, SunCal Emerald, SunCal Summit, Palmdale Hills, SCC Palmdale and SunCal I to foreclose on the SunCal Communities I Loan, Ritter Ranch Loan and SCC Palmdale Loan; and Lehman ALI moved for relief from stay in the bankruptcy of SunCal Bickford to foreclose on the Bickford Second Loan (collectively, the "Stay Relief Motions"). Ironically, LCPI and Lehman ALI argued that they should be permitted to foreclose because of, among other things, Debtors' inability to preserve value in the Projects. LCPI also argued that these Debtors could not defend against its Stay Relief Motions, because its own purported automatic stay prevented them from seeking to equitably subordinate LCPI's claims.

154. In February 2009, Lehman ALI, OVC and Northlake Holdings opposed the "Sales Procedures Motion" brought by SCC Communities, SunCal Del Rio, SunCal Tesoro, and the Trustee, which sought an order approving overbid procedures relating to the proposed sale of the Joshua Ridge, Del Rio, Tesoro Burnham, and nine Trustee Projects to D.E. Shaw. (That motion has since been amended to include only the sale of the Trustee Debtors' nine properties.)

155. In March 2009, LCPI asserted—both before this Court and in New York—that the Sales Procedures Motion violated its automatic stay. LCPI also appealed the orders denying its Stay Relief Motions and holding that the Sales Procedures Motion did not violate LCPI's automatic stay, thus forcing the Debtors to incur the time and cost of defending those rulings before the Ninth Circuit Bankruptcy Appellate Panel.

156. The irony is, many of the actions that Lehman ALI, LCPI, OVC and Northlake Holdings took to hinder or delay the progress of the Debtors' bankruptcy proceedings were based on lies: their continued ownership of each of the Loans at issue and the applicability of LCPI's stay.

***R. <u>Lehman ALI, LCPI, OVC and Northlake Holdings' Concealment of their Sale of the Loans at Issue</u>***

157. Lehman ALI, LCPI, OVC and Northlake Holdings filed proofs of claims in the Debtors' bankruptcy proceedings, and have continuously represented that they owned the obligations set forth in the Loans and, consequently, that they are "creditors" of the Debtors. The Debtors did

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

not question the veracity of this representation—until Danske appeared before the Court on March 25, 2009 and disclosed that it held all right, title and interest in the $120 million Century City Loan to SunCal Century City and the associated lien, pursuant to an assignment from Lehman ALI. Prior to this appearance, Lehman ALI, LCPI, OVC and Northlake Holdings had been contending that they, collectively, were the holders of all of the Loans, including the Century City Loan.

158. Based upon this disclosure, the Debtors requested, by letter of March 26, 2009, that Lehman ALI, LCPI, OVC and Northlake Holdings disclose whether any of the remaining Loans had been transferred to third parties. Lehman ALI, LCPI, OVC and Northlake Holdings ignored this request for several weeks, and only responded after the Debtors had propounded a third-party subpoena on J.P. Morgan (who they believed may have been the transferee of various Loans) noticed for April 17, 2009.

159. In a letter dated April 15, 2009, Lehman ALI, LCPI, OVC and Northlake Holdings finally admitted that the Loans secured by liens against no less than fifteen out of the twenty Projects[12] were subject to Repos; they further admitted that the "various counterparties" to these agreements (primarily Fenway and/or J.P. Morgan) "may claim some interest" in these Loans. However, Lehman ALI, LCPI, OVC and Northlake Holdings did not disclose what "interest" these counterparties "may claim," and they did not provide the Debtors any of the documentation relating to these claimed interests.

160. It was not until J.P. Morgan produced documents in response to the subpoena on April 28, 2009 that the Debtors obtained confirmation of what was only hinted at in Lehman ALI, LCPI, OVC and Northlake Holdings' April 15 letter—that these Lehman lenders relinquished all right, title and interest in the seven "Sold Loans" (defined below) prior to the Debtors' petition dates.[13]

---

[12] They are: Acton Estates, Beaumont Heights, Bickford Ranch, Delta Coves, Emerald Meadows, Heartland, Johannson Ranch, Marblehead, Northlake, Oak Valley, Pacific Point, Palm Springs Village, Ritter Ranch, Summit Valley, and 10000 Santa Monica (aka Century City).

[13] On or about May 27, 2009, the Lehman lenders produced documents in response to Debtors' first set of requests for production. This production was substantially similar to, although in key respects less inclusive than, what J.P. Morgan produced. Thus, the Lehman lenders, A & M, and their attorneys continue their course of deception and concealment.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

161. The documents produced in discovery revealed the following: On August 22, 2008, Fenway Capital, as "Buyer," and LCPI, as "Seller," entered into a *Master Repurchase Agreement* (the "MRA"). On the same date, the parties entered into a repurchase transaction pursuant to which Fenway purchased all of LCPI's right, title and interest in the following loans (together, the "Sold Loans"):

| **Loan** | **Purported Lender** | **Alleged Balance** |
|---|---|---|
| SunCal Communities I Loan | LCPI | $343,221,391 |
| Ritter Ranch Loan | LCPI | $287,252,096 |
| SunCal PSV Loan | Lehman ALI | $88,257,340 |
| Delta Coves Loan | Lehman ALI | $206,023,142 |
| Marblehead/ Heartland Loan | Lehman ALI | $354,325,126 |
| Oak Valley Loan | OVC | $141,630,092 |
| Northlake Loan | Northlake Holdings | $123,654,777 |
| **TOTAL** | | **$1,544,363,964** |

162. This repurchase transaction was governed by the terms of the MRA, which states: "All of Seller's interest in the Purchased Securities shall pass to Buyer on the Purchase Date." As this Court ruled on June 30, 2009, this was a sale in which title passed to Fenway. After this transaction, LCPI served solely as the "hold-in-custody-agent" of the Sold Loans for Fenway.

163. Under the MRA documents, LCPI, as hold-in-custody agent, "shall not take any action (aside from actions in accordance with instructions from Buyer) in respect of the Purchased Securities or Additional Purchased Securities," save for certain limited exceptions that either never applied or ceased to apply once LCPI filed for bankruptcy and defaulted in fall 2008.

164. Moreover, the MRA states that LCPI's custodial duties cannot be assigned or transferred without the consent of Fenway. LCPI's limited custodial rights were never transferred to Lehman ALI, Northlake Holdings or OVC.

165. In summary, under the MRA, LCPI has no interest in the Sold Loans and is barred from taking any action with respect thereto. Lehman ALI, OVC and Northlake have no rights in the Sold Loans whatsoever.

166. In fact, the beneficial interest in the Sold Loans apparently lies elsewhere. The Sold Loans serve as collateral for a "Series 2008-2 Note" issued by Fenway to its affiliate, Fenway Funding, LLC ("Fenway Funding"), on August 22, 2008. The proceeds of the Series 2008-2 Note

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

serve as collateral for certain commercial paper notes ("CP Notes") that were issued by Fenway Funding on August 22, 2008 and acquired by LBHI. Around the same time, LBHI pledged the CP Notes to secure certain obligations owed to JP Morgan.

167. Notably, LCPI "repo'd" the Sold Loans to Fenway on August 22, 2008—just days before the August 25, 2008 meeting at which Lehman ALI, LCPI, OVC and Northlake signed the Settlement Agreement with SunCal in their capacity as "Lenders." Thus, while these Lehman lenders were apparently scrambling to obtain badly needed liquidity from J.P. Morgan (which, on information and belief, needed to appear to be secured by something other than the Sold Loans themselves—a maneuver Fenway was more than happy to facilitate), they were indicating to SunCal and the Debtors that they fully intended to perform and expected that they would perform their obligations under the Restructuring and Settlement Agreement. Moreover, they were still encouraging SunCal and the Debtors to move forward with development of the Projects, and assuring them that payment would be forthcoming.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

***S. Lehman ALI, LCPI, OVC and Northlake Holdings' Repeated Assertion of Their "Ownership" of the Sold Loans***

168. Despite the fact that Fenway owned the Sold Loans for months prior to Debtors' bankruptcy filings, Lehman ALI, LCPI, OVC and Northlake Holdings filed numerous proofs of claim and pleadings in the Debtors' bankruptcy cases—virtually all of which were designed to thwart Debtors' reorganization—in which they purported to own the Sold Loans.

***1. Disputed Proofs of Secured Claims Filed by Lehman ALI, LCPI, OVC and Northlake Holdings Based on the Sold Loans***

169. On March 27, 2009—*after* Debtors had asked Lehman ALI, LCPI, OVC and Northlake Holdings to come clean about the current ownership of the Loans— Lehman ALI, LCPI, OVC and Northlake Holdings filed thirteen proofs of secured claims based on the Sold Loans. They include the following (some clams are duplicative as they are based on cross-collateralized loans):

| DISPUTED PROOFS OF CLAIM FILED BY LEHMAN CLAIMANTS BASED ON SOLD LOANS | | | | |
|---|---|---|---|---|
| **Claimant** | **Sold Loan** | **POC No.** | **Debtor** | **Claim Amount** |
| LCPI | SunCal Communities I Loan | 6 | SunCal Acton | $343,221,391 |
| LCPI | SunCal Communities I Loan | 16 | SunCal Bickford | $343,221,391 |

| | | | | |
|---|---|---|---|---|
| LCPI | SunCal Communities I Loan | 7 | SunCal Emerald | $343,221,391 |
| LCPI | SunCal Communities I Loan | 12 | SunCal Summit | $343,221,391 |
| LCPI | SunCal Communities I Loan | 1 | SunCal I | $343,221,391 |
| LCPI | SunCal Communities I Loan | 2 | SunCal III | $343,221,391 |
| LCPI | Ritter Ranch Loan | 65 | Palmdale Hills | $287,252,096 |
| Lehman ALI | Delta Coves Loan | 21 | SunCal Delta Coves | $206,023,142 |
| Lehman ALI | Marblehead/Heartland Loan | 9 | SunCal Heartland | $354,325,126 |
| Lehman ALI | Marblehead/Heartland Loan | 21 | SunCal Marblehead | $354,325,126 |
| Lehman ALI | SunCal PSV Loan | 12 | SunCal PSV | $88,257,340 |
| Northlake Holdings | Northlake Loan | 6 | SunCal Northlake | $123,654,777 |
| OVC | Oak Valley Loan | 16 | SunCal Oak Valley | $141,630,092 |

170. On the Official Form for each of these proofs of claims, under "Name of Creditor (the person or other entitiy to whom the debtor owes money or property)," Lehman ALI, LCPI, OVC or Northlake Holdings, as applicable, listed itself, and did not note that it was acting in an agency capacity for Fenway or anyone else. However, as this Court held, Lehman ALI, LCPI, OVC and Northlake Holdings were not the "creditors" who could file proofs of claims. While the attachments to each proof of claim stated that the Lehman claimant was "agent for the lenders" under the applicable Loan agreement (which in every case was originally Lehman ALI or LCPI), they did not state who the current "lenders" were, and never made reference to Fenway, the MRA, or any transfer of any interest in the Sold Loans. Each of these proofs of claim—along with the attachments—was prepared by A & M's Gerald Pietroforte (as "Managing Director" of each Lehman lender) and/or by Weil Gotshal, and each was signed by Pietroforte.

171. Given the transfer of the seven Sold Loans to Fenway, the transfer of the Century City Loan to Danske, and the transfer of the Pacific Point First Loan to Lehman Re (discussed below), the only proofs of claim filed by the Lehman claimants that are based on Loans that may not have been transferred are the following (several are duplicative based on cross-collateralized Loans):

| **PROOFS OF CLAIM FILED BY LEHMAN CLAIMANTS NOT BASED ON SOLD LOANS** | | | | |
|---|---|---|---|---|
| **Claimant** | **Loan** | **POC No.** | **Debtor** | **Claim Amount** |
| LCPI | SCC Palmdale Loan | 1 | SCC Palmdale | $119,664,305 |
| Lehman ALI | Bickford Second Loan | 17 | SunCal Bickford | $56,494,059 |
| Lehman ALI | Oak Knoll/Torrance Loan | 12 | SunCal Oak Knoll | $158,141,365 |
| Lehman ALI | Oak Knoll/Torrance Loan | 4 | SunCal Torrance | $158,141,365 |
| Lehman ALI | Interim Loan | 9 | SCC Communities | $23,795,013 |
| Lehman ALI | Interim Loan | 14 | SunCal Del Rio | $23,795,013 |
| Lehman ALI | Interim Loan | 7 | SunCal Tesoro | $23,795,013 |

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

172. As Lehman ALI and LCPI have acknowledged in pleadings filed with this Court, the Bickford Second Loan has no value because it is subordinate to the SunCal Communities I Loan, and the SCC Palmdale Loan has no value because it is secured by a pledge of SCC Palmdale's equity interest in Palmdale Hills. Only Lehman ALI's Oak Knoll/Torrance Loan and the Interim Loan are supported by any value.

173. Thus, LCPI has no security interest in any of the proofs of claim it filed with this Court. Lehman ALI has a security interest only in the Oak Knoll/Torrance Loan and the Interim Loan. OVC and Northlake Holdings have no interest in any of the Loans whatsoever.

***2. Key Pleadings Filed By Lehman ALI, LCPI, OVC and Northlake Holdings Based On the Sold Loans***

**a. Stay Relief Motions**

174. In the brief filed by Lehman ALI and LCPI in support of their Stay Relief Motions, Lehman ALI and LCPI alleged that they were entitled to foreclose because, among other things, *their* interests in Plaintiff Debtors SunCal Acton, SunCal Bickford, SunCal Emerald, SunCal Summit, Palmdale Hills, and SunCal I's properties were not adequately protected.

175. The loans that formed the primary basis of LCPI's Stay Relief Motions—totaling $619 million of the $649 million at issue—were the Ritter Ranch Loan and the SunCal Communities I Loan, ostensibly still owned by LCPI. In fact, these Sold Loans were transferred to Fenway five months before the Stay Relief Motions were filed. Accordingly, the factual assertion of ownership underlying LCPI's Stay Relief Motions was and is false.

176. In fact, the only Loans on which the Stay Relief Motions were premised that were not Sold Loans were Lehman ALI's Bickford Second Loan and LCPI's SCC Palmdale Loan. But as noted above, these Loans were not secured by any value. Thus, the only Loans with regard to which Lehman ALI and LCPI were the real parties in interest who could seek a foreclosure were Loans with no value, making their Stay Relief Motions moot in their entirety.

**b. Opposition to Sales Procedure Motion**

177. The Sale Procedures Motion includes a provision disallowing Lehman ALI's, OVC's,

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

and Northlake Holdings' credit bid rights. On February 25, 2009, Lehman ALI, OVC and Northlake Holdings filed an objection to the Sale Procedures Motion that referred to the "Lehman Lenders' collateral," the "Lehman Lenders rights to credit bid," and the "liens held by the Lehman Lenders."

178. However, due to the August 22, 2008 MRA, OVC and Northlake Holdings have no legal or beneficial interest in the Oak Valley or Northlake Projects, respectively. Likewise, Lehman ALI has no interest in the following Trustee Debtors' Projects: Palm Springs Village, Delta Coves, Marblehead, Heartland or Century City (the last of which was separately assigned to Danske). Accordingly, except with respect to Lehman ALI's interest in the Oak Knoll / Torrance Loan, Lehman ALI, OVC and Northlake Holdings have no basis to oppose the Sale Procedure Motion.

***T. LCPI's Improper Invocation of the Automatic Stay***

179. Because property that a debtor holds as a mere custodian for another, without any beneficial interest, is not deemed "property" of the debtor's estate, efforts by Debtors SunCal Acton, SunCal Beaumont, SunCal Bickford, SunCal Emerald, SunCal Johannson, SunCal Summit, Palmdale Hills, and SunCal I to use cash or otherwise deal with personal or real property securing the Sold Loans does not implicate LCPI's automatic stay—and never has since the inception of these Debtors' bankruptcy proceedings.

180. Nevertheless, LCPI has filed numerous pleadings (or even procedurally improper "letter briefs") with this Court—as well as with the bankruptcy court in its own bankruptcy in New York, and even with the Ninth Circuit Bankruptcy Appellate Panel—in which it asserted that the automatic stay in its bankruptcy precluded these Debtors from taking certain actions in their proceedings. LCPI's assertions were based on its purported ownership of the Sold Loans. These pleadings include the following:

***1. New York Opposition to Priming Loan***

181. In November 2008, LCPI opposed Debtors' motion filed in New York seeking relief from LCPI's stay so that Debtors could administer their estates and, among other things, obtain a priming loan to address the Projects' critical needs. In (successfully) opposing that motion, LCPI asserted that its automatic stay applied to the Debtors' efforts to deal with all of the Projects—even

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

those encumbered by Sold Loans.

*2.* ***Objection to Cash Collateral Motion***

182. Given that Debtors could not obtain a priming loan due to LCPI's opposition, Debtors Palmdale Hills, SunCal Acton, SunCal Beaumont, SunCal Bickford, SunCal Emerald, SunCal Johannson, and SunCal Summit sought funding to preserve their Projects' value via the Cash Collateral Motion. LCPI had not raised the issue of its stay in opposing a cash collateral motion in related proceedings before this Court, nor in repeated discussions with the Court and Debtors' counsel.

183. Nevertheless, LCPI filed an objection to the Cash Collateral Motion in which it asserted that Debtors' attempt to use cash collateral to preserve value in the Projects constituted a "flagrant disregard of [its] automatic stay."

*3.* ***"Emergency" Motion to Enforce Stay In New York***

184. Not content with opposing the Cash Collateral Motion before this Court, LCPI, two business days before the Cash Collateral Motion was to be heard, filed a motion in its own proceedings in New York wherein it contended that it held a lien on the subject cash, and that the use of the funds proposed in the Cash Collateral Motion would violate its automatic stay. Counsel for the moving Debtors was even threatened with sanctions for bringing the Cash Collateral Motion. In response, the Cash Collateral Motion was taken off calendar.

185. In fact, the only Loan potentially secured by a lien against the cash that the Debtors were seeking to use was the Ritter Ranch Loan, one of the Sold Loans. Accordingly, all right, title and interest in this Loan and the associated lien is held by Fenway, which was not (and is not) in a bankruptcy proceeding. As such, LCPI's stay was not applicable. LCPI and its counsel falsely asserted LCPI's ownership to the Court and the Debtors.

*4.* ***Lehman ALI's Super-Priority Loan Resulting from LCPI's False Invocation of Its Stay***

186. Because LCPI first opposed Debtors' effort to obtain approval from the New York Court for a priming loan, and then opposed the Cash Collateral Motion, in April 2009, four

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

Voluntary Debtor Plaintiffs (SunCal Acton, SunCal Bickford, SunCal Emerald and Palmdale Hills) and the Trustee on behalf of eight of the Trustee Debtors (all except SunCal Torrance) were ultimately forced to stipulate to loans from Lehman ALI totaling $1.7 million to address the Projects' critical needs. Pursuant to the parties' stipulation and the Court's order, Lehman ALI's loan was granted super-priority status.

187. The source of the money that Lehman ALI "loaned" to these Debtors was cash in Plaintiff Debtor Palmdale Hills' account. This was the very same money that was sought to be used via the Cash Collateral Motion—money which was subject to disputed liens. Had LCPI not falsely invoked its stay and had the Cash Collateral Motion been granted, Debtors could have avoided repayment of those sums in the event that equitable subordination was granted. However, because of LCPI's false invocation of its stay and the resulting withdrawal of the Cash Collateral Motion, Lehman ALI managed, just a few months later, to endow the loan of these same funds with super-priority status, and thus ostensibly not subject to Plaintiffs' equitable subordination action.

188. Thus, Lehman ALI effectively turned a $1.7 million loan subject to defenses into a super-priority loan as a result of LCPI's lie regarding the applicability of its stay.

***5. Intervention in Sales Procedures Motion***

189. The Sales Procedures Motion was originally filed February 18, 2009, and was originally set to be heard on Tuesday, March 10, 2009. Although Lehman ALI, OVC, and Northlake Holdings filed an opposition, LCPI did not. This was not surprising, given that the Debtors—although they had contemplated a sale of all of the Projects since November—specifically tailored the Sales Procedures Motion to apply to a proposed sale of Projects on which LCPI did not purport to be the lender, in order to avoid any accusation that the Debtors were violating LCPI's purported automatic stay.

190. However, on the afternoon of Sunday, March 8, 2009, counsel for LCPI emailed Debtors' counsel, threatening that LCPI would seek sanctions in New York for Debtors' purported "flagrant violation" of its automatic stay, unless the moving Debtors withdrew the Sales Procedures Motion by 10:00 a.m. the next morning, March 9.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

191. On March 9, 2009, LCPI also e-mailed to this Court and the bankruptcy court in New York a "letter brief" which asserted that the Sales Procedures Motion, among other things, "threaten[s] LCPI's property interests." This letter brief attached the motion for sanctions that LCPI intended to file in New York.

192. In response to LCPI's threat, on March 9, 2009, the Trustee, SCC Communities, SunCal Del Rio, and SunCal Tesoro filed emergency motions seeking an order finding that the automatic stay in LCPI's bankruptcy case did not apply to the Sale Procedures Motion. (LCPI responded with another e-mail directly to the New York bankruptcy court.)

193. On March 10, 2009, the Court granted the moving Debtors' emergency motions, holding that the automatic stay in the LCPI bankruptcy case did not apply to the Sales Procedures Motion.

194. Had LCPI admitted all along that its automatic stay did not apply, Plaintiff Debtors SunCal Acton, SunCal Bickford, SunCal Emerald, Palmdale Hills and SunCal Summit, and Debtors SunCal Beaumont, SunCal Johannson, Seven Brothers and Kirby could have joined in the Sales Procedures Motion when it was originally filed. Thus, LCPI's false invocation of its stay delayed by months a proposal by these Debtors to sell the Acton Estates, Bickford Ranch, Beaumont Heights, Emerald Meadows, Johannson Ranch, Ritter Ranch, and Summit Valley Projects. This has delayed or diminished the prospect of recovery by the creditors of these Debtors who provided goods or services or guaranteed the work to be performed on these Projects.

***6. Stay Relief Motions***

195. As noted above, LCPI's Stay Relief Motions were premised entirely on Sold Loans (with the exception of the SCC Palmdale Loan admittedly supported by no value). LCPI argued in those Motions that the subject Debtors could not submit a feasible plan because their plan was premised on equitable subordination, and they could not seek to equitably subordinate LCPI's claims without violating LCPI's purported automatic stay. This contention was false.

***7. LCPI's Appeal from the Denial of its Stay Relief Motions***

196. The Court denied the Stay Relief Motions, ruling that LCPI's purported stay did not

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

apply to Debtors' efforts to equitably subordinate LCPI's claims (because Debtors were defending against affirmative conduct by LCPI, not because the Loans were not LCPI's property). LCPI has appealed the Court's ruling, and so has continued to falsely assert its stay, this time in the Ninth Circuit BAP. The moving Debtors have already had to file a lengthy opposition to LCPI's appeal.

***8. LCPI's Second Appeal***

197. The Court also granted an order allowing the Plaintiffs to file a second amended complaint in this adversary proceeding naming LCPI as a defendant. LCPI baselessly appealed that ruling to the BAP as well. The BAP clerk determined—only after briefing from both sides—that the ruling was interlocutory and not immediately appealable.

***U. Summary of Lehman ALI, LCPI, OVC and Northlake Holdings' Post-Petition Inequitable Conduct***

198. On information and belief, Lehman ALI, LCPI, OVC and Northlake Holdings were intentionally vague in their proofs of claim about the identity of the current owners of the Sold Loans, so as to "justify" LCPI having repeatedly invoked its inapplicable stay. Lehman ALI also took advantage of this ambiguity in securing super-priority status for its $1.7 million "loan." But for Danske's appearance and the Debtors' subsequent pursuit of discovery, the truth regarding the owners of the Sold Loans might never have been revealed.

199. Lehman ALI, LCPI, OVC and Northlake Holdings' conduct of making repeated misrepresentations to this Court regarding their ownership of the Loans and the applicability of LCPI's automatic stay has wasted many hundreds, if not thousands, of hours of the Plaintiff Debtors' and the counsel's time (not to mention the Court's), delaying the progress of the bankruptcy proceedings and wasting estate assets, to the detriment of all of the Debtors' creditors.

200. Lehman ALI, LCPI, OVC and Northlake Holdings' stubborn refusal to allow the Debtors to use funds to pay for the Projects' critical needs have increased the claims against the Debtors' estates. For example, Lehman ALI, LCPI, OVC and Northlake Holdings refused even to pay property taxes on the Projects. As a result, tax penalties have mounted and continue to increase. Because these tax claims have priority over unsecured and mechanic liens claims, the Lehman

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

defendants' conduct in letting these claims mount has made it even less likely that there will be funds available to pay for the less prioritized claims.

201. The delays Lehman ALI, LCPI and OVC have caused in work being performed on the Projects post-petition (as well as pre-petition) have also increased the claims against the Debtors' bonding companies, which have in turn increased the bond companies' claims against the Debtors.

202. The delays the Lehman lenders have caused in the administration of the Debtors' bankruptcies has also jeopardized the value of the Projects—the primary source of recovery for all creditors—through mounting fines, penalties, erosion, deterioration of work already performed, the failure to pay property taxes, and potential loss of entitlements, among other things.

203. Because of this extensive post-petition inequitable conduct, Defendants' alleged secured claims should be equitably subordinated not only to the general unsecured claims and mechanics' lien claims against the respective Plaintiff Debtors (substantially all of which are based on work induced by Defendants), but to the priority and administrative claims of the respective Plaintiff Debtor's estate as well.

### *V. Lehman ALI and LV Pacific Point's Fraudulent Acquisition of the Pacific Point Project*

204. Defendants' inequitable conduct regarding the Pacific Point Project was particularly egregious.

205. Pacific Point is a 200 plus acre development in a prime location overlooking the Pacific Ocean in San Juan Capistrano, California. At the time of the Restructuring and Settlement Agreement, the Pacific Point property was owned by Plaintiff SJD Partners.

206. Pacific Point was among the Projects included in the Restructuring and Settlement Agreement. SJD Partners was identified in Annex I to the Restructuring Agreement as both a "Borrower" and "Grantor," and SJD Development was identified as a "Pledgor."

207. Although the Restructuring and Settlement Agreements contemplated that at Closing, the Debtors would transfer title to the Projects to new Lehman entities, the parties' agreement was structured somewhat differently with regard to the Pacific Point Project.

208. Specifically, pursuant to the Restructuring Agreement, and as detailed in the

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

Settlement Agreement incorporated thereto, SunCal, SJD Partners and SJD Development agreed not to interfere with Lehman ALI's (or its designee's) foreclosure on the Pacific Point property, and the new Lehman entity, LV Pacific Point, would acquire the property upon foreclosure. In consideration for this, Lehman ALI and LV Pacific Point agreed to (a) assume SJD Partners' and SJD Development's outstanding accounts payable for Pacific Point third-party vendors, (b) assume SJD Partners', SJD Developments' and others' bond liability in connection with the Pacific Point Project, and (c) pay for millions of dollars worth of work that Lehman ALI had authorized.

209. On or about August 25, 2008, the Settlement Agreement was signed by the SunCal parties, including SJD Partners and SJD Development. It was signed by Frank Gilhool as authorized signatory on behalf of both Lehman ALI and LV Pacific Point.

210. All conditions for Closing had been met by the date for which Closing was scheduled.

211. As a signatory to the Settlement Agreement, LV Pacific Point was supposed to and agreed to acquire the property subject to the above obligations.

212. On August 28, 2008, LV Pacific Point foreclosed on Pacific Point, and title was transferred to LV Pacific Point at the foreclosure sale.

213. However, neither Lehman ALI nor LV Pacific Point assumed the liabilities and obligations as promised, to the detriment of the creditors of the estates of SJD Partners and SJD Development and the bond indemnitors.

214. The City of San Juan Capistrano even executed an estoppel certificate for the benefit of SJD Partners and Lehman ALI—at Lehman ALI's request—on August 26, 2008, two days before the foreclosure. That certificate stated, among other things, that the "Acquiring Entity [LV Pacific Point] shall by operation of law become the legal successor-in-interest to Developer [SJD Partners]" under SJD Partners' agreements with the City. That certificate further provided that there existed no breaches, defaults, or claims under SJD Partners' agreements with the City.

215. Despite this estoppel certificate, demands have been made by the City and/or other creditors—even after the estoppel was signed—against SunCal, Elieff, SJD Partners and SJD Development. Neither Lehman ALI nor LV Pacific Point has undertaken to assume any of those

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

obligations.

216. In fact, on information and belief, in early September 2008—just days after the foreclosure, and just days before LBHI filed for bankruptcy—Lehman ALI secretly transferred much or all of its interest in the Pacific Point First Loan and the first-priority deed of trust on the property to a separate Lehman-affiliated entity, Lehman Re. Lehman ALI and/or LV Pacific Point may have transferred some or all of their interests in the Pacific Point Second Loan and associated lien to Lehman Re as well.

217. The timing of these maneuvers by these Lehman entities confirms that Lehman ALI and LV Pacific Point never intended to fulfill their promises to assume the millions in Pacific Point obligations even at the time they made such promises. LBHI filed for bankruptcy on September 15, 2008. On information and belief, Lehman ALI and LV Pacific Point knew as of the August 28, 2008 Pacific Point foreclosure that they would not be in a position to fulfill, and would not be fulfilling, their funding obligations to SunCal, SJD Partners and SJD Development.

218. As a result of LV Pacific Point's foreclosure and Lehman ALI's and LV Pacific Point's failure to fulfill their payment obligations, SJD Partners no longer owns any real property, but has unsecured claims of approximately $50 million, including bond claims of approximately $34 million. Moreover, due to the deterioration of construction projects, unpaid taxes, fines, and penalties resulting from Lehman ALI and LV Pacific Point's conduct, this exposure continues to grow.

219. Had SunCal, SJD Partners and SJD Development known that Lehman ALI and LV Pacific Point had no intent to honor their promised obligations, they never would have agreed to cooperate with a foreclosure. Instead, SJD Partners could have filed for bankruptcy earlier, precluded a foreclosure and successfully reorganized the Project.

220. Not only did Lehman ALI and LV Pacific Point fraudulently induce SJD Partners' and SJD Development's consent to the foreclosure and sale of the Pacific Point Project, but that foreclosure and sale constitutes an avoidable transfer of the SJD Partners' property.

221. On information and belief, the fair market value of the Pacific Point Project was and

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

remains approximately $25 million. The foreclosure of the Pacific Point Project was pursuant to a second priority deed of trust held by LV Pacific Point in the amount of approximately $58 million. The alleged obligation securing the first deed of trust against the Pacific Point Project was approximately $82 million as of August 28, 2008.

222. There was no equity securing the obligation securing the second priority deed of trust. LV Pacific Point foreclosed on a second priority deed of trust that had no value and which would have been avoided in a hypothetical Chapter 7 Case pursuant to 11 U.S.C. § 506(d). In a hypothetical Chapter 7 Case, the second priority deed of trust would also be subject to equitable subordination and transfer of the lien pursuant to 11 U.S.C. § 510(c)(2). (Claims and liens associated with the Pacific Point First Loan are also subject to equitable subordination and transfer.)

223. Accordingly, the parties' agreement should be rescinded, the foreclosure should be set aside and/or a constructive trust should be imposed upon LV Pacific Point, and the property should be returned to its rightful owner, SJD Partners.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

### W. *Summary of the Disputed Claims to Be Equitably Subordinated, and the Associated Liens to Be Preserved for the Benefit of the Plaintiff Debtors' Estates*

224. As to each Plaintiff, the following is a summary of the Defendants' disputed secured claims which Plaintiffs seek to equitably subordinate, as well as the mechanics liens, priority and administrative claims, and general unsecured claims to which Plaintiffs seek to subordinate them:

| DEBTOR | DEFENDANTS' DISPUTED SECURED CLAIMS | MECHANIC LIEN CLAIMS | PRIORITY AND ADMIN. CLAIMS | GENERAL UNSECURED CLAIMS |
|---|---|---|---|---|
| Palmdale Hills | $287,252,096 | $1,069,855 | $499,970 | $33,027,677 |
| SCC Palmdale | $119,664,305 | $0 | $0 | $0 |
| SunCal Bickford | $343,221,391 (Bickford 1st) | $3,477,120 | $345,221 | $10,146,825 |
| | $56,494,059 (Bickford 2nd) | | | |
| SunCal Acton | (Same as Bickford 1st) | $0 | $59,242 | $1,428,250 |
| SunCal Emerald | (Same as Bickford 1st) | $1,279,043 | $188,695 | $7,878,901 |
| SunCal Summit | (Same as Bickford 1st) | $16,827 | $48,018 | $1,076,053 |
| SunCal I | (Same as Bickford 1st) | $0 | $0 | $0 |
| SunCal III | (Same as Bickford 1st) | $0 | $0 | $459 |
| SCC Communities | $23,795,013 | $0 | $27,072 | $32,813 |
| SunCal Del Rio | (Same as SCC Communities) | $0 | $261,542 | $7,966,115 |
| SunCal Tesoro | (Same as SCC Communities) | $0 | $118,891 | $170,969 |
| SunCal Oak Knoll | $158,141,365 | $4,700,604 | $874,609 | $1,135,298 |
| SunCal Torrance | (Same as SunCal Oak Knoll) | $0 | $160,914 | $203,838 |
| SunCal Century City | $120,000,000 | $1,434,520 | $1,040,005 | $3,289,632 |
| SunCal Delta Coves | $206,023,142 | $122,535 | $448,061 | $35,192,631 |

| DEBTOR | DEFENDANTS' DISPUTED SECURED CLAIMS | MECHANIC LIEN CLAIMS | PRIORITY AND ADMIN. CLAIMS | GENERAL UNSECURED CLAIMS |
|---|---|---|---|---|
| SunCal Heartland | $354,325,126 | $1,552,794 | $231,873 | $30,774,591 |
| SunCal Marblehead | (Same as SunCal Heartland) | $1,406,209 | $740,382 | $109,693,964 |
| SunCal Northlake | $123,654,777 | $0 | $729,432 | $911,296 |
| SunCal Oak Valley | $141,630,092 | $1,662,309 | $138,443 | $29,605,482 |
| SunCal PSV | $88,257,340 | $2,316,430 | $315,213 | $21,892,343 |
| SJD Development | $120,110,237 | $0 | $0 | $368,362 |
| SJD Partners | (Same as SJD Development) | $0 | $244,090 | $51,265,349 |
| **Total** | **$2,142,568,943** | **$19,038,246** | **$6,471,673** | **$346,060,848** |

225. The following should be noted regarding the above chart:

(a) Plaintiffs have not completed their investigation as to which claims are allowed.

(b) Administrative claims are ongoing.

(c) Certain proofs of claims filed against Palmdale Hills, among other Debtors, appear to be misfiled and relate to other Debtors.

(d) Certain disputed claims, such as duplicative claims, have been deducted from the figures above. For example, the Debtors have assumed surety bond claims according to the bond claims arising from the particular Debtors' Projects. The bond issuers (Arch Insurance Co. and Bond Safeguard Insurance Co.) have asserted various bond obligor claims against the Debtors in the approximate amount of $230 million ($155 million by Arch and $75 million by Bond Safeguard). The bond issuers assert that their claims are joint and several against all of the Debtors, which the Debtors dispute as lacking consideration and fraudulent conveyances to the extent that such Bond Claims do not arise from or exceed the amount of Bond Claims attributed to the Project of each Debtor. Thus, the $0 in unsecured claims listed against SCC Palmdale and SunCal I do not reflect the contingent bond claims.

(f) Plaintiffs believe that $368,362 in unsecured claims filed against Plaintiff SJD Development should have been filed against Plaintiff SJD Partners. However, even if those claims are correctly characterized, SJD Development would still be a plaintiff on the cause of action for equitable subordination, because of the contingent bond claims asserted against it.

(g) LV Pacific Point foreclosed upon and obtained the Pacific Point Project prior

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000, LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

to Plaintiff SJD Partner's bankruptcy filing. Neither LV Pacific Point nor Lehman Re have filed proofs of claim against SJD Partner's estate based on the Pacific Point Second Loan, but Lehman ALI has filed an unliquidated claim against SJD Partners that is contingent upon the unwinding or invalidation of the foreclosure sale. If the Court grants the requested relief and restores title in the Pacific Point Project to SJD Partners, then to the extent that any of these Defendants assert claims against SJD Partners or SJD Development, and/or attempt to enforce their liens, those claims should be subordinated and those liens preserved for the benefit of and transferred to SJD Partners' or SJD Development's estates, as applicable.

(h) Real property tax claims against the Plaintiff Debtors of $12,998,281 and other secured claims against certain Debtors have not been listed, as they are not subject to the disputed secured claims, and would not be affected by subordination under this action. However, Plaintiffs contend that Defendants' claims should be equitably subordinated to the other claims identified herein to the extent that Defendants have caused these tax claims to be filed and/or to increase through their wrongful conduct.

226. As to each Plaintiff Debtor, the following summarizes the original and apparent current lender on each disputed Loan, the outstanding amount claimed by Defendants with regard to the Loan, and the total amount of the claims to which Debtors seek to subordinate the Defendants' claims pursuant to 11 U.S.C. § 510(c)(1):

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

| PLAINTIFF DEBTOR | LOAN | ORIGINAL LENDER | CURRENT OWNER OF CLAIM[14] | DISPUTED SECURED CLAIMS THAT PLAINTIFFS SEEK TO SUBORDINATE | TOTAL CLAIMS TO BE GIVEN PRIORITY |
|---|---|---|---|---|---|
| Palmdale Hills | Ritter Ranch | LCPI | Fenway | $287,252,096 | $34,597,502 |
| SCC Palmdale | SCC Palmdale | LCPI | LCPI | $119,664,305 | $0 |
| SunCal Bickford | SunCal Communities I | LCPI | Fenway | $343,221,391 (Bickford 1st) | $13,969,166 |
| | Bickford Second | Lehman ALI | Lehman ALI | $56,494,059 | |
| SunCal Acton | SunCal Communities I | LCPI | Fenway | (see Bickford 1st) | $1,487,492 |
| SunCal Emerald | SunCal Communities I | LCPI | Fenway | (see Bickford 1st) | $9,346,639 |
| SunCal Summit | SunCal Communities I | LCPI | Fenway | (see Bickford 1st) | $1,140,898 |
| SunCal I | SunCal Communities I | LCPI | Fenway | (see Bickford 1st) | $0 |
| SunCal III | SunCal Communities I | LCPI | Fenway | (see Bickford 1st) | $459 |
| SCC Communities | Interim | Lehman ALI | Lehman ALI | $23,795,013 | $59,885 |
| SunCal Del Rio | Interim | Lehman ALI | Lehman ALI | (see SCC Communities) | $8,227,657 |
| SunCal Tesoro | Interim | Lehman ALI | Lehman ALI | (see SCC Communities) | $289,860 |
| SunCal Oak Knoll | Oak Knoll/ Torrance | Lehman ALI | Lehman ALI | $158,141,365 | $6,710,511 |
| SunCal Torrance | Oak Knoll/ Torrance | Lehman ALI | Lehman ALI | (see SunCal Oak Knoll) | $364,751 |
| SunCal Century City | Century City Loan | Lehman ALI | Danske Bank | $120,000,000 | $5,764,157 |
| SunCal Delta Coves | Delta Coves | Lehman ALI | Fenway | $206,023,142 | $35,763,227 |
| SunCal Heartland | Marblehead/ Heartland | Lehman ALI | Fenway | $354,325,126 | $32,559,258 |
| SunCal Marblehead | Marblehead/ Heartland | Lehman ALI | Fenway | (see SunCal Heartland) | $111,848,555 |
| SunCal Northlake | Northlake | Lehman ALI | Fenway | $123,654,777 | $1,640,728 |
| SunCal Oak Valley | Oak Valley | Lehman ALI | Fenway | $141,630,092 | $31,406,234 |
| SunCal PSV | PSV | Lehman ALI | Fenway | $88,257,340 | $24,523,986 |
| SJD Partners | Pacific Point First | Lehman ALI | Lehman Re | $120,110,237 (Pac Pt 1st) | $51,265,349 |
| | Pacific Point Second | Lehman ALI | LV Pacific Point and/or Lehman Re | (contingent claim) | |
| SJD Development | Pacific Point First | Lehman ALI | Lehman Re | (see Pac Pt 1st) | |
| **Total** | | | | **$2,142,568,943** | **$371,219,945** |

227. As to each Plaintiff Debtor, the following summarizes the disputed Loans and associated lien that Plaintiffs seek to transfer to and preserve for the benefit of their respective estates pursuant to 11 U.S.C. § 510(c)(2). The alleged holder, alleged security and the alleged amounts outstanding are taken from the disputed proofs of secured claims ("POCs") that have been filed; as noted in the above table, many of these liens now belong to the claimants' successors:

[14] In the event that the Court determines that Lehman ALI, LCPI, OVC and Northlake, and not Fenway, still have claims to be subordinated with regard to the applicable Sold Loans, they are named herein as defendants as to those Sold Loans, and nothing about this table should be construed as a waiver of Debtors' right to equitably subordinate those Defendants' claims.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

| LOAN(S) | ALLEGED HOLDER | PLAINTIFF DEBTOR(S) | ALLEGED SECURITY | ALLEGED OUTSTANDING AMOUNT |
|---|---|---|---|---|
| SunCal Communities I Loan | LCPI | SunCal I SunCal III SunCal Acton SunCal Emerald SunCal Bickford SunCal Summit | (a) Alleged first-priority deeds of trust on the Bickford, Acton Estates and Emerald Meadows Projects; (b) alleged pledges of SunCal I's interests in SunCal Acton, SunCal Summit, SunCal Beaumont, SunCal Johannson, SunCal Emerald, and SunCal Bickford; and (c) alleged pledges of SunCal Summit's interests in Seven Brothers and Kirby. | Identical $343,221,391 POC No. 1 asserted against SunCal I; No. 2 against SunCal III; No. 6 against SunCal Acton; No. 7 against SunCal Emerald; No. 16 against SunCal Bickford; and No. 12 against SunCal Summit |
| Ritter Ranch Loan | LCPI | Palmdale Hills | Alleged first-priority deed of trust on all real and an alleged first priority lien on all personal property owned by Palmdale Hills. | $287,252,096 POC No. 65 asserted against Palmdale Hills |
| SCC Palmdale Loan | LCPI | SCC Palmdale | Alleged pledge of SCC Palmdale's interest in Palmdale Hills. | $119,664,305 POC No. 1 asserted against SCC Palmdale |
| Bickford Second Loan | Lehman ALI | SunCal Bickford | Alleged second priority deed of trust on the Bickford Ranch Project. | $56,494,059 POC No. 17 asserted against SunCal Bickford |
| Interim Loan | Lehman ALI | SCC Communities, SunCal Tesoro and SunCal Del Rio | Alleged first-priority deeds of trust on the Joshua Ridge and the Tesoro Projects, and an alleged first-priority lien on the net proceeds of the Del Rio CFD Bonds. | Identical $23,795,013 POC No. 9 asserted against SCC Communities; No. 14 against SunCal Del Rio; No. 7 against SunCal Tesoro |
| Pacific Point First Loan | Lehman ALI | SJD Partners SJD Dev'pment. | Alleged first priority deed of trust on the Pacific Point Project, and alleged pledge of SJD Development's interest in SJD Partners. | Identical $120,110,237 POC No. 2 asserted against SJD Dev'pment; No. 23 against SJD Partners |
| Pacific Point Second Loan | Lehman ALI | SJD Partners | Alleged second priority deed of trust on the Pacific Point Project | Unliquidated contingent POC No. 24 asserted against SJD Partners |
| Oak Knoll/ Torrance Loan | Lehman ALI | SunCal Oak Knoll and SunCal Torrance | Alleged first-priority deeds of trust on the Oak Knoll Project and the Del Amo Project. | Identical $158,141,365 POC No. 12 asserted against SunCal Oak Knoll; No. 4 against SunCal Torrance |
| Century City Loan | Danske | SunCal Century City | Alleged first-priority deed of trust on the 10000 Santa Monica Project. | $120,000,000 POC No. 17 asserted against SunCal Century City |
| PSV Loan | Lehman ALI | SunCal PSV | Alleged first-priority deed of trust on the Palm Springs Village Project. | $88,257,340 POC No. 12 asserted against SunCal PSV |
| Delta Coves Loan | Lehman ALI | Delta Coves | Alleged first-priority deed of trust on the Delta Coves Project. | $206,023,142 POC No. 21 asserted against SunCal Delta Coves |
| Marblehead/ Heartland Loan | Lehman ALI | SunCal Marblehead; SunCal Heartland | Alleged first-priority deeds of trust on the Marblehead and the Heartland Projects. | Identical $354,325,126 POC No. 9 asserted against SunCal Heartland; No. 21 against SunCal Marblehead |

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

| LOAN(S) | ALLEGED HOLDER | PLAINTIFF DEBTOR(S) | ALLEGED SECURITY | ALLEGED OUTSTANDING AMOUNT |
|---|---|---|---|---|
| Oak Valley Loan | OVC | SunCal Oak Valley | Alleged first-priority deed of trust on the Oak Valley Project. | $141,630,092 POC No. 16 asserted against SunCal Oak Valley |
| Northlake Loan | Northlake Holdings | SunCal Northlake | Alleged first-priority deed of trust on the Northlake Project. | $123,654,777 POC No. 6 asserted against SunCal Northlake |
| TOTAL | | | | $2,142,568,943 |

## CAUSES OF ACTION

## V.

## FIRST CLAIM FOR RELIEF

**(Equitable Subordination, 11 U.S.C. §510(c))**

| By | Against |
|---|---|
| SunCal Acton | LCPI, Fenway |
| SunCal Bickford | LCPI, Lehman ALI, Fenway |
| SunCal Del Rio | Lehman ALI |
| SunCal Emerald | LCPI, Fenway |
| SunCal I | LCPI, Fenway |
| SunCal III | LCPI, Fenway |
| SCC Communities | Lehman ALI |
| SJD Partners | Lehman ALI, LV Pacific Point, Lehman Re |
| SJD Development | Lehman ALI, Lehman Re |
| Palmdale Hills | LCPI, Fenway |
| SunCal Summit | LCPI, Fenway |
| SCC Palmdale | LCPI |
| SunCal Tesoro | Lehman ALI |
| Trustee o/b/o SunCal Century City | Danske Bank |
| Trustee o/b/o SunCal Delta Coves | Lehman ALI, Fenway |
| Trustee o/b/o SunCal Heartland | Lehman ALI, Fenway |
| Trustee o/b/o SunCal Marblehead | Lehman ALI, Fenway |
| Trustee o/b/o SunCal Northlake | Northlake Holdings, Fenway |
| Trustee o/b/o SunCal Oak Knoll | Lehman ALI |
| Trustee o/b/o SunCal Oak Valley | OVC, Fenway |
| Trustee o/b/o Sun Cal PSV | Lehman ALI, Fenway |
| Trustee o/b/o SunCal Torrance | Lehman ALI |

228. Plaintiffs repeat and reallege each and every foregoing and subsequent allegation contained in the Complaint, and further allege as follows:

***Lehman ALI and LCPI***

229. LCPI has or purports to have disputed claims against Plaintiffs SunCal Acton,

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

SunCal Bickford, SunCal Emerald, Palmdale Hills, SunCal Summit, SCC Palmdale SunCal I and SunCal III.

230. Lehman ALI has or purports to have disputed claims against Plaintiffs SunCal Bickford, SunCal Del Rio, SCC Communities, SJD Partners, SJD Development, SunCal Tesoro, and Trustee Debtors SunCal Delta Coves, SunCal Heartland, SunCal Marblehead, SunCal Oak Knoll, SunCal PSV, and SunCal Torrance.

231. Plaintiffs are informed and believe, and on that basis allege, that Lehman ALI is an affiliate of an insider of each of the Trustee Debtors, and thus is a statutory insider under 11 U.S.C. §101(31). On information and belief, LBHI has had a 100% ownership interest in both Lehman ALI and LCPI, until recently, when Lehman ALI itself acquired a 100% interest in LCPI. (Thus, LBHI still indirectly has a 100% ownership interest in LCPI.) At the same time, LBHI wholly owns the Lehman Equity Members, which themselves have at least a 50% ownership interest in the Trustee Debtors and are therefore insiders of the Trustee Debtors. Accordingly, under 11 U.S.C. §101(2), Lehman ALI is an insider of the Trustee Debtors.

232. Even aside from Lehman ALI's status as a statutory insider, Lehman ALI and LCPI exerted actual control over all of the Debtors, and so are also non-statutory insiders under the law.

233. Lehman ALI and/or LCPI have partnered with SunCal and the Debtors for over a decade. Lehman ALI and LCPI have been Debtors' primary source of credit for years. SunCal granted Lehman a first right of refusal on most of SunCal's projects going forward. Thus, over the past several years, SunCal and the Debtors have been almost entirely dependent on Lehman ALI and LCPI for financing. SunCal and the Debtors effectively became the management and development arm of the Lehman real estate lenders, rather than independent developers that received outside funding.

234. Beginning in or about 2005, if not earlier, Lehman ALI and LCPI exercised their control over SunCal and the Debtors by insisting that many of their loans be cross-collateralized among multiple Projects, many of which received little or none of the loan proceeds. This made SunCal and the Debtors even more dependent on Lehman ALI and LCPI and to the terms that they

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

dictated. They also exercised their control by withholding promised funding in order to induce SunCal and the Debtors to concede to onerous terms.

235. At least after 2007, Lehman ALI and LCPI asserted management control as well. Debtors' management had to vet expenses with Lehman ALI and LCPI and get their approval before they could expend any funds to develop the Projects, and had conference calls or meetings with Lehman ALI and LCPI personnel on as much as a weekly basis or more for this purpose.

236. In some instances, such as on the Delta Coves Project owned by Plaintiff SunCal Delta Coves, Lehman ALI bypassed SunCal as the ostensible Project manager and dealt with third-party contractors directly; Lehman ALI also tried to exercise control over SunCal staff directly, bypassing SunCal's management structure.

237. Lehman ALI and/or LCPI also controlled decisions regarding which creditors would get paid, and Lehman ALI engaged Radco to negotiate such payments for the sixteen Projects subject to the Restructuring Agreement.

238. Lehman ALI and/or LCPI have engaged in a variety of pre- and post-petition inequitable conduct, including the following:

- LCPI cross-collateralized loans among multiple Debtors, including Plaintiffs SunCal Acton, SunCal Bickford, SunCal Emerald, SunCal Summit, SunCal I and SunCal III, some of whom received little or no benefit, so as to shift its lending risks to unsecured creditors and make SunCal and the Debtors even more unlikely to be able to elude its domination and control. SCC Palmdale likewise got nothing for its indebtedness.

- Lehman ALI similarly cross-collateralized loans, for the same purpose and to the same effect, on the Marblehead and Heartland Projects owned by Plaintiffs SunCal Marblehead and SunCal Heartland, respectively; the Del Amo and Oak Knoll Projects owned by Plaintiffs SunCal Torrance and SunCal Oak Knoll, respectively; and the Del Rio, Joshua Ridge, and Tesoro Burnham Projects owned by Plaintiffs SunCal Del Rio, SunCal Tesoro and SCC Communities, respectively.

- Lehman ALI and LCPI induced SunCal and each of the Plaintiff Debtors to incur massive additional indebtedness on each of the Projects, through representations that they would cover vendor payables and pay for third-party work they authorized, including work that was required by municipalities to be performed and bonded, and through promises of an overall restructuring of all of the Projects.

- Lehman ALI made similar promises of funding and inducements with regard to the four Projects—Century City, Delta Coves, Del Amo and Oak Knoll—that were not formally made part of the parties' Restructuring Agreement.

- Lehman ALI dragged out the effectuation of the Restructuring Agreement, so as to make SunCal and the subject Debtors even more cash-strapped and more desperate for

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

funds to pay creditors, in order to induce them to accept onerous terms.

- After pressuring and threatening Debtors to enter into the onerous Restructuring Agreement, Lehman ALI then failed to provide required funding under the Restructuring Agreement, thereby preventing Debtors' ability to pay creditors and develop and maintain the Projects, including addressing central health and safety issues, and exposing the bond companies and the bond indemnitors to liability for work performed and being performed. Lehman ALI also failed to provide promised funding as to the four Projects not subject to the Restructuring Agreement.

- Lehman ALI and LCPI surreptitiously transferred their liens and loans on at least fifteen of the Projects to Lehman affiliates or third parties in order to stave off a Lehman liquidity crisis, at the same time that they were signing restructuring settlement documents with the Debtors and purporting to be willing and able to proceed to Closing of the Settlement Agreement.

- Lehman ALI (along with LV Pacific Point) fraudulently induced SJD Partners and SJD Development to consent to LV Pacific Point's foreclosure of the Pacific Point Project by promising to cover bond and vendor obligations and pay for lender-authorized work, when it knew that an LBHI bankruptcy was looming and that payment would not be forthcoming.

- Lehman ALI and LCPI refused and failed to proceed to Closing of the Settlement Agreement when they were contractually required to do so.

- Lehman ALI and LCPI repudiated the Restructuring Agreement without cause. Lehman ALI also repudiated its funding obligations regarding the four non-covered Projects.

- Lehman ALI improperly filed notices of default on properties—Century City, Del Amo, Delta Coves, Oak Knoll, and Palm Springs Village—that were not yet in bankruptcy.

- Lehman ALI induced the Lehman Equity Members in Trustee Debtors SunCal Century City, SunCal Delta Coves, SunCal Oak Knoll, SunCal PSV, and SunCal Torrance to breach their fiduciary duties to these Trustee Debtors and their creditors in favor of their lender-affiliate, by refusing to fund the Projects, refusing to consent to bankruptcy filings, or take any other steps to avoid a lender foreclosure.

- LCPI and Lehman ALI filed their respective proofs of claim against the estates of Debtors SunCal Acton, SunCal Bickford, SunCal Emerald, SunCal Summit, Palmdale Hills, SunCal I, SunCal III, SunCal Delta Coves, SunCal Heartland, SunCal Marblehead, SunCal PSV, and SunCal Oak Valley, in which they purported to own Sold Loans which LCPI had actually sold to Fenway pre-petition. They at least in part did so for the purpose of "justifying" LCPI's repeated false invocation of its automatic stay.

- LCPI brought its Stay Relief Motions against Plaintiffs SunCal Acton, SunCal Bickford, SunCal Emerald Meadows, SunCal Summit, Palmdale Hills, and SunCal I to foreclose on their Projects; Lehman ALI filed the Stay Relief Motion in the SunCal Bickford proceeding to foreclose on the Bickford Ranch Project; and both Lehman Lenders objected to virtually every action the Debtors have taken in their efforts to reorganize the Projects—all without disclosing the true owner of the Loans at issue.

- LCPI repeatedly invoked its automatic stay to prevent the Debtors from obtaining a priming loan, using cash collateral, or otherwise obtaining funds to address the

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

Projects' critical needs and preserve the value of the Projects (which are LCPI's own purported collateral), and to justify its Stay Relief Motions. In fact, as LCPI well knew, LCPI's automatic stay was not and has never been applicable.

- LCPI's conduct also forced Plaintiffs SunCal Acton, SunCal Bickford, SunCal Emerald and Palmdale Hills, and all of the Trustee Debtors all except SunCal Torrance, to accede to a $1.7 million super-priority "loan" from Lehman ALI that was really a release of the same funds sought to be accessed via the Cash Collateral Motion.

- LCPI even invoked its stay to oppose the Sales Procedures Motion, which has only involved Lehman ALI-financed Projects. LCPI's false assertion of its automatic stay is what induced Debtors to leave LCPI-financed Projects out of the proposed sale in the first place, even though they had intended to include them.

239. Lehman ALI and LCPI's inequitable conduct has caused and continues to cause damage not only to the Plaintiff Debtors but to all of their creditors as well. Lehman ALI and LCPI's course of conduct of making repeated assurances of funding, drawing out the process, and ultimately refusing to provide needed funding caused them to take on additional third-party debt that they could not pay, increased the fees, penalties and interest assessed against the Debtors, and deepened the Debtors' insolvency, including their exposure to bond claims. Their actions forced the Debtors into bankruptcy, but they have done everything in their power to prevent bankruptcy filings, and to thwart or delay Debtors' reorganization efforts once their bankruptcies began, so as to avoid any outcome other than a foreclosure that leaves nothing for unsecured creditors. They have impeded steps by the Debtors to preserve value in the Projects. They have made and continue to make the Debtors' bankruptcies more time-consuming, expensive and burdensome through their lack of candor and obstructionist tactics. All this has worked to the detriment of the Debtors' respective creditors, diminishing their prospects for recovery.

***LV Pacific Point***

240. LV Pacific Point, along with Lehman ALI, represented in the Settlement Agreement that it would assume Pacific Point accounts payable and bond obligations, and pay for work authorized by Lehman ALI, in exchange for SunCal, SJD Partners and SJD Development's consent to a foreclosure. On information and belief, Lehman ALI and LV Pacific Point knew as of the August 2008 Settlement Agreement and foreclosure that, due to LBHI's own financial crisis, they would not be assuming these obligations upon foreclosure as promised. But for these defendants'

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

fraud, LV Pacific Point would not have obtained Plaintiffs' consent to the foreclosure, and SJD Partners would continue to own the property. This inequitable conduct has harmed all of the other creditors of SJD Partners (as well as SJD Development), not only because SJD Partners was induced to incur third-party debt it could not pay, but because it no longer has the Pacific Point property to satisfy these creditors' claims. As noted below, this Court should invalidate the foreclosure and restore the Pacific Point property to SJD Partners. To the extent that Lehman ALI and/or LV Pacific Point have claims and liens against SJD Partners or SJD Development, their claims should be equitably subordinated to the claims of the other creditors of these Debtors, and those liens should be preserved for the benefit of and transferred to these Debtors' estates.

241. Even aside from its own inequitable conduct, to the extent that LV Pacific Point is or purports to be a successor to Lehman ALI's loans and liens on the Pacific Point Project, it holds claims that are equally subject to equitable subordination, and its liens equally subject to transfer to SJD Partners' estate, as if it were Lehman ALI.

***OVC and Northlake***

242. To the extent that OVC Holdings and Northlake Holdings are or purport to be transferees of Lehman ALI's loans to Plaintiffs SunCal Oak Valley and SunCal Northlake and the liens on the Oak Valley and Northlake Projects, respectively, and to the extent that their claims have not been transferred to Fenway, they hold claims that are equally subject to equitable subordination, and their liens equally subject to transfer to the estates.

243. Not only does a transferee take a claim subject to all defenses that could be raised against the transferor, but OVC and Northlake Holdings' claims, if any, are also subject to equitable subordination based on their own insider status and own inequitable conduct.

244. Like Lehman ALI, OVC Holdings and Northlake Holdings are statutory insiders. On information and belief, LBHI has had a 100% ownership interest in both OVC and Northlake Holdings. At the same time, LBHI wholly owns the Lehman Equity Members in SunCal Oak Valley and SunCal Northlake, which themselves have at least a 50% ownership interest in SunCal Oak Valley and SunCal Northlake, respectively.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

245. OVC and Northlake Holdings' inequitable conduct includes the following:

- As evidenced by, among other things, recent joint correspondence on behalf of Lehman ALI, LCPI, OVC and Northlake Holdings, these four entities are controlled by the same people within Lehman. OVC Holdings and Northlake Holdings became successors to Lehman ALI's liens and loans with knowledge of the former's inequitable conduct, and as part of a scheme to usurp the Oak Valley and Northlake Projects without assuming the previously promised obligations.

- OVC and Northlake Holdings have purported to step into Lehman ALI's shoes as the lenders on the Oak Valley and Northlake Projects, but they did nothing to fulfill Lehman ALI's obligation as the "Lender" under the Restructuring Agreement.

- They apparently surreptitiously transferred the Oak Valley and Northlake Loans to LCPI so that LCPI could sell them to Fenway under a Repo, in order to stave off a Lehman liquidity crisis, at the same time that they were signing restructuring settlement documents with SunCal Oak Valley and SunCal Northlake and purporting to be willing and able to proceed to Closing.

- They signed but refused to proceed toward Closing of the Settlement Agreement.

- They induced the Lehman Equity Members in SunCal Oak Valley and SunCal Northlake to refuse to fund their Projects, and to refuse to put these Debtors in bankruptcy, in order to avoid any outcome other than a foreclosure to benefit the lenders, in violation of the Lehman Equity Members' fiduciary duties, and to the detriment of the interests of SunCal Oak Valley and SunCal Northlake and their respective creditors.

- They filed pleadings and proofs of claim with this Court in the estates of SunCal Oak Valley and SunCal Northlake based on their purported ownership of Sold Loans, without disclosing that LCPI had sold those Loans to a third party pre-petition, at least in part in order to "justify" LCPI's repeated false invocation of its automatic stay.

246. This inequitable conduct has harmed the other creditors of SunCal Oak Valley and SunCal Northlake, respectively, as described above.

***The Other Successor Lenders***

247. To the extent that Danske is or purports to be the assignee of Lehman ALI's (or LCPI's) loan to SunCal Century City and the associated lien on the Century City Project, Danske holds claims that are equally subject to equitable subordination, and its liens equally subject to transfer to SunCal Century City's estate. Not only does a transferee take a claim subject to all defenses that could be raised against the transferor, but Danske purports to have been assigned its claim post-petition, and even after the original complaint for equitable subordination was filed against Lehman ALI, and so took with knowledge of Lehman ALI's wrongdoing and the defenses

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

that would be raised in relation thereto.

248. To the extent that Fenway is the transferee of Lehman ALI, LCPI, OVC or Northlake Holdings' loans and associated liens on any of the Projects based on any of the Sold Loans, Fenway holds claims that are equally subject to equitable subordination, and its liens equally subject to transfer to the Plaintiff Debtors' respective estates. Not only does a transferee take a claim subject to all defenses that could be raised against the transferor, but, on information and belief, Fenway purchased the Sold Loans with knowledge that its transaction was part of an effort by LCPI to obtain liquidity for LBHI from JP Morgan that appeared to be collateralized by something other than the Sold Loans.

249. To the extent that Lehman Re is the transferee of Lehman ALI's and/or LV Pacific Point's loans and liens on the Pacific Point Project formerly owned by Plaintiff SJD Partners, and to the extent that Lehman Re has purported claims against SJD Partners or SJD Development, Lehman Re holds claims that are equally subject to equitable subordination, and its liens equally subject to transfer to these Debtors' estates. Not only does a transferee take a claim subject to all defenses that could be raised against the transferor, but, on information and belief, Lehman Re accepted the transfer with knowledge that it was part of an effort by Lehman ALI and LV Pacific Point to avoid their obligations to SJD Partners, SJD Development and their creditors.

250. By reason of the foregoing, Plaintiffs are entitled to equitably subordinate the respective Defendants' secured claims against the respective Plaintiff Debtors to the general unsecured claims, mechanic's lien claims, and priority and administrative claims against the respective Debtors, and to preserve the Defendants' liens for the benefit of the respective Debtors' estates. The total value of the claims to be equitably subordinated will be proven at trial, but is at least $370 million. Equitable subordination under the circumstances will achieve a result that is consistent with the purposes of the Bankruptcy Code.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

VI.

**SECOND CLAIM FOR RELIEF**

**(Fraudulent Inducement –**

**By SJD Partners against LV Pacific Point)**

251. Plaintiffs repeat and reallege each and every foregoing and subsequent allegation contained in the Complaint, and further allege as follows:

252. Lehman ALI and LV Pacific Point represented under the terms of the May 23, 2008 Restructuring Agreement, and under the August 25, 2008 Settlement Agreement, that Lehman ALI and/or LV Pacific Point would assume the millions of dollars in outstanding accounts payable for Pacific Point third-party vendors and millions in bond obligations, as well as pay for work authorized by Lehman ALI to be performed.

253. Frank Gilhool signed the Settlement Agreement as an authorized signatory of both Lehman ALI and LV Pacific Point.

254. Lehman ALI and LV Pacific Point made these representations for the purpose of inducing SunCal, SJD Development and SJD Partners, then the owner of the Pacific Point property, to consent to LV Pacific Point foreclosing upon the property. These representations in fact induced Plaintiffs' consent.

255. These representations were false. LV Pacific Point foreclosed upon and took ownership of the Pacific Point property; but LV Pacific Point and Lehman ALI have left millions in outstanding payables and bond liabilities on which Plaintiffs remain exposed.

256. Indeed, despite obtaining—at Lehman ALI's request—an estoppel certificate from the City of San Juan Capistrano days before the foreclosure, which stated that there had been no breaches of any agreements with the City by SJD Partners, it is SunCal, SJD Partners and SJD Development, and not Lehman ALI or LV Pacific Point, that have been facing millions of dollars of vendor and bond claims, even for amounts arising after the estoppel certificate was signed.

257. On information and belief, just days after the August 28, 2008 foreclosure, Lehman ALI and/or LV Pacific Point transferred their liens on the property to Lehman Re. The parent

Lehman entity, LBHI, filed for bankruptcy just days later, on September 15, 2008.

258. On information and belief, Lehman ALI and LV Pacific Point did not intend to honor their promises to cover the payables and bond obligations when they executed the Settlement Agreement, obtained the estoppel certificate, and effectuated the foreclosure in late August 2008. Gilhool's superiors within Lehman who were in charge of Lehman ALI and LV Pacific Point, including Walsh, knew of and authorized or directed the representations being made by him, and the transactions being entered into through him. Yet at the time, they knew that Lehman's liquidity crisis was acute, and knew that neither Lehman ALI nor LV Pacific Point would provide the promised payment.

259. But for Lehman ALI and LV Pacific Point's wrongdoing, LV Pacific Point would not have obtained Plaintiffs' consent to the foreclosure, and would not have obtained title to the property. Rather, SJD Partners would continue to own the property, and the Pacific Point property would still be part of its bankruptcy estate.

260. Because SJD Partners' consent was fraudulently induced by Lehman ALI and LV Pacific Point, this Court should rescind the parties' agreement to the extent that SJD Partners consented to the foreclosure and sale of the Pacific Point property; invalidate the foreclosure sale and/or impose a constructive trust upon the Pacific Point property; and direct LV Pacific Point to transfer title back to its rightful owner, SJD Partners.

261. As noted above, once the Pacific Point property is restored to its rightful owner, claims based on the Pacific Point Second Loan, and any associated liens held by the Defendants, should be equitably subordinated pursuant to 11 U.S.C. §510(c) to the claims of the other creditors of SJD Partners and/or SJD Development, and those liens should be preserved for the benefit of and transferred to those Debtors' estate.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

VII.

**THIRD CLAIM FOR RELIEF**

**(To Avoid and Recover Preferential Transfers 11 U.S.C. § 547 – By SJD Partners against LV Pacific Point)**

Plaintiffs repeat and reallege each and every foregoing and subsequent allegation contained in the Complaint, and further allege as follows:

262. The foreclosure of the Pacific Point Project was a transfer within the meaning of 11 U.S.C. §101(54).

263. The Pacific Point Project was owned by the debtor, SJD Partners, prior to the transfer, and thus the foreclosure was a transfer of an interest of the debtor in property.

264. LV Pacific Point, the assignee of or successor to Lehman ALI, was a creditor of SJD Partners at the time of the foreclosure within the meaning of 11 U.S.C. § 101(10).

265. The non-judicial foreclosure was based upon a pre-petition loan agreement and thus constitutes an antecedent debt.

266. The transfer was made while SJD Partners was insolvent.

267. LV Pacific Point non-judicially foreclosed on the Pacific Point Project belonging to SJD Partners on August 28, 2008.

268. The foreclosure occurred within 90 days of SJD Partners' bankruptcy filing.

269. The foreclosure was for the benefit of LV Pacific Point.

270. The foreclosure enabled LV Pacific Point to receive more than such creditor would receive if (a) the SJD Partners' bankruptcy case were a case under chapter 7 of Title 11; (b) the transfer had not been made; and (c) LV Pacific Point received payment of such debt to the extent provided by the provisions of Title 11.

271. SJD Partners is entitled to avoid the preferential transfer, including the liens, pursuant to Section 547(b) of the Bankruptcy Code.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

VIII.

**FOURTH CLAIM FOR RELIEF**

**(To Recover Avoided Transfers - 11 U.S.C. § 550 – By SJD Partners against LV Pacific Point)**

272. Plaintiffs repeat and reallege each and every foregoing and subsequent allegation contained in the Complaint, and further allege as follows;

273. LV Pacific Point was the initial transferee of the transfers or the immediate or mediate transferee of such initial transferee or the person for whose benefit the transfers were made.

274. Pursuant to Section 550(a) of the Bankruptcy Code, SJD Partners is entitled to recover from LV Pacific Point the property transferred, plus interest thereon to the date of payment and the costs of this action.

IX.

**FIFTH CLAIM FOR RELIEF**

**(To Avoid and Recover Fraudulent Transfers – 11 U.S.C. §§ 544(b), 548, Cal. Civil Code §§ 3439.04 and 3439.05 – By SCC Palmdale against LCPI; by SunCal Acton, SunCal Bickford, SunCal Emerald, SunCal Summit, SunCal I, and SunCal III against LCPI and Fenway; by SunCal Del Rio, SunCal Tesoro and SCC Communities, and by the Trustee on behalf of SunCal Oak Knoll and SunCal Torrance, against Lehman ALI; and by the Trustee on behalf of SunCal Marblehead and SunCal Heartland against Lehman ALI and Fenway)**

275. Plaintiffs repeat and reallege each and every foregoing and subsequent allegation contained in the Complaint, and further allege as follows:

***SunCal Communities I Loan***

276. LCPI filed identical proofs of secured claims against SunCal I (No. 1), SunCal III (No. 2), SunCal Acton (No. 6), SunCal Emerald (No. 7), SunCal Bickford (No. 16), and SunCal Summit (No. 12) arising from the SunCal Communities I Loan Agreement in the amount of $343,221,391.

277. A UCC Financing Statement was recorded by LCPI against SunCal I's interest in SunCal Acton, SunCal Summit, SunCal Beaumont, SunCal Johannson, SunCal Emerald, and SunCal

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

Bickford on November 22, 2005. A UCC Financing Statement was recorded by LCPI against SunCal Summit's interest in Seven Brothers and Kirby on December 12, 2006.

278. A deed of trust was recorded by LCPI against the property owned by SunCal Bickford on August 25, 2006. A deed of trust was recorded by LCPI against the property owned by Acton Estates on January 6, 2007. A deed of trust was recorded by LCPI against the property owned by SunCal Emerald on July 19, 2007.

279. The incurrence of the foregoing obligations and the transfers of interests are referred to herein as the "SunCal Communities I Transfers."

280. The funds advanced under the SunCal Communities I Loan Agreement were such that some of these Debtors received more and others received less funds: SunCal Acton ($380,069), SunCal Emerald ($44,763,858), SunCal Beaumont ($42,030,925), SunCal Johannson ($14,636,674), SunCal Bickford ($174,570,287) and SunCal Summit ($9,925,373). SunCal I and SunCal III never received any of these funds or any other consideration for the $343,221,391 proofs of secured claim filed against them.

281. LCPI's documentation under the SunCal Communities I Loan Agreement reduces the amounts owing by the Debtors by any portion that constitutes a fraudulent conveyance.

282. LCPI's $343,221,391 proof of secured claim gives rise to a fraudulent conveyance claim in favor of SunCal Acton's estate against LCPI in the amount of $342,841,322; in favor of SunCal Emerald's estate against LCPI in the amount of $298,457,533; in favor of SunCal Bickford's estate against LCPI in the amount of $168,651,104; in favor of SunCal Summit's estate against LCPI in the amount of $333,296,018; in favor of SunCal I's estate against LCPI in the amount of $343,221,391; and in favor of SunCal III's estate against LCPI in the amount of $343,221,391.

283. The SunCal I Loan Agreement Transfers are transfers as that term is defined in 11 U.S.C. § 101(54).

284. The SunCal I Loan Agreement Transfers were made for the benefit of LCPI.

285. These Debtors became insolvent as a result of the SunCal Communities I Loan Transfers.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

286. These Debtors were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with such Debtors were an unreasonably small capital in relation to the business or transaction.

287. These Debtors received less than the reasonably equivalent value in exchange for such transfer.

288. The SunCal Communities I Loan Transfers were made at a time when there existed at least one creditor of each of these Debtors who holds an unsecured claim that is allowable under 11 U.S.C. § 502 or that is not allowable only under 11 U.S.C. § 502(e).

289. To the extent that Fenway was a transferee of the SunCal Communities I Loan Transfers, it was not a good faith transferee.

290. Plaintiff Debtors SunCal Acton, SunCal Bickford, SunCal Emerald, SunCal Summit, SunCal I, and SunCal III are therefore entitled to set aside the SunCal Communities I Loan Transfers, including the liens, pursuant to 11 U.S.C. §§ 544(b), 548 and Cal. Civil Code §§ 3439.04 and 3439.05.

***SCC Palmdale Loan***

291. LCPI has filed a $120 million proof of secured claim no. 1 arising from the SCC Palmdale Loan against SCC Palmdale.

292. The SCC Palmdale Loan was made to SCC Palmdale and was secured by SCC Palmdale's interest in Palmdale Hills.

293. A UCC Financing Statement was recorded by LCPI against the property owned by SCC Palmdale on March 30, 2007.

294. The incurrence of the foregoing obligations and the transfers of interests are referred to herein as the "SCC Palmdale Transfers."

295. The entire loan proceeds of the SCC Palmdale Loan were used by LCPI to make a paydown on the SunCal Communities I Loan Agreement that did not involve SCC Palmdale or Palmdale Hills.

296. This lending arrangement, as structured, created an approximately $120 million

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

fraudulent conveyance claim in favor of SCC Palmdale's estate against LCPI, since SCC Palmdale's Estate incurred $120 million liability for no consideration.

297. The SCC Palmdale Transfers are transfers as that term is defined in 11 U.S.C. §101(54).

298. The SCC Palmdale Loan Transfers were made for the benefit of LCPI.

299. SCC Palmdale became insolvent as a result of the SCC Palmdale Fraudulent Transfers.

300. SCC Palmdale was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with such Debtor was an unreasonably small capital in relation to the business or transaction.

301. SCC Palmdale received less than the reasonably equivalent value in exchange for the SCC Palmdale Transfers.

302. The SCC Palmdale Transfers were made at a time when there existed at least one creditor who was holds an unsecured claim that is allowable under 11 U.S.C. § 502 or that is not allowable only under 11 U.S.C. § 502(e).

303. Plaintiff SCC Palmdale is therefore entitled to set aside the SCC Palmdale Transfers, including the lien, pursuant to 11 U.S.C. §§ 544(b), 548 and Cal. Civil Code §§ 3439.04 and 3439.05.

***Oak Knoll/Torrance Loan***

304. Lehman ALI filed identical proof of secured claim No. 12 against SunCal Oak Knoll and proof of secured claim No. 4 against SunCal Torrance arising from the Oak Knoll/Torrance Loan Agreement in the amount of $158,141,365.

305. Deeds of trust were recorded by Lehman ALI against the properties owned by SunCal Torrance and SunCal Oak Knoll on December 30, 2005 and March 30, 2006, respectively.

306. The incurrence of the foregoing obligations and the transfers of interests are referred to herein as the "SunCal Oak Knoll/SunCal Torrance Transfers."

307. The Oak Knoll/Torrance Loan Agreement was cross-collateralized by the Oak Knoll Project and the Del Amo Project. The loan proceeds received by SunCal Oak Knoll was

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

$103,575,426 and the loan proceeds received by SunCal Torrance was $45,185,350.

308. This lending arrangement, as structured, creates a fraudulent conveyance claim in favor of SunCal Oak Knoll against Lehman ALI in the amount of $54,565,939, and in favor of SunCal Torrance against Lehman ALI in the amount of $112,956,015.

309. The SunCal Oak Knoll/SunCal Torrance Transfers are transfers as that term is defined in 11 U.S.C. § 101(54).

310. These Transfers were made for the benefit of Lehman ALI.

311. SunCal Oak Knoll and SunCal Torrance received less than a reasonably equivalent value in exchange for the SunCal Oak Knoll/SunCal Torrance Transfers.

312. These Debtors became insolvent as a result of the SunCal Oak Knoll/SunCal Torrance Transfers.

313. These Debtors were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with such Debtors were an unreasonably small capital in relation to the business or transaction.

314. The SunCal Oak Knoll/SunCal Torrance Transfers were made at a time when there existed at least one creditor of each of these Debtors who holds an unsecured claim that is allowable under 11 U.S.C. § 502 or that is not allowable only under 11 U.S.C. § 502(e).

315. The Trustee, on behalf of SunCal Torrance and SunCal Oak Knoll, is therefore entitled to set aside the SunCal Oak Knoll/SunCal Torrance Transfers, including the liens, pursuant to 11 U.S.C. §§ 544(b), 548 and Cal. Civil Code §§ 3439.04 and 3439.05.

***Interim Loan***

316. Lehman ALI has filed identical proof of secured claim No. 9 against SCC Communities, proof of secured claim No. 7 against SunCal Tesoro, and proof of secured claim No. 14 against SunCal Del Rio arising from the Interim Loan Agreement in the amount of $23,795,013.

317. Deeds of trust were recorded against the properties owned by SunCal Tesoro and SCC Communities on November 2, 2007. The Interim Loan Agreement is also allegedly secured by an

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

alleged first-priority lien on the proceeds of the SunCal Del Rio CFD Bonds.

318. The incurrence of the foregoing obligations and the transfers of interests are referred to herein as the "Interim Loan Transfers."

319. None of the proceeds from the Interim Loan Agreement were used to fund SCC Communities, SunCal Tesoro or SunCal Del Rio. Consequently, SunCal Del Rio, SunCal Tesoro and SCC Communities each have fraudulent conveyance claims against Lehman ALI arising from the identical proofs of secured claims filed against them arising from the Interim Loan Agreement in the amount of 23,795,013.

320. The Interim Loan Agreement Transfers are transfers as that term is defined in 11 U.S.C. § 101(54).

321. The Interim Loan Agreement Transfers were made for the benefit of Lehman ALI.

322. SCC Communities, SunCal Tesoro and SunCal Del Rio received less than a reasonably equivalent value in exchange for the Interim Loan Agreement Transfers.

323. These Debtors became insolvent as a result of the Interim Loan Agreement Transfers.

324. These Debtors were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with such Debtors were an unreasonably small capital in relation to the business or transaction.

325. These Transfers were made at a time when there existed at least one creditor of each of these Debtors who holds an unsecured claim that is allowable under 11 U.S.C. § 502 or that is not allowable only under 11 U.S.C. § 502(e).

326. Plaintiffs SCC Communities, SunCal Tesoro and SunCal Del Rio are therefore entitled to set aside the Interim Loan Agreement Transfers, including the liens, pursuant to 11 U.S.C. §§ 544(b), 548 and Cal. Civil Code §§ 3439.04 and 3439.05.

***Marblehead / Heartland Loan***

327. Lehman ALI filed identical proof of secured claim No. 9 against SunCal Heartland and No. 21 against SunCal Marblehead in the amount of $354,325,126 based on the Marblehead/ Heartland Loan Agreement.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

328. Deeds of trust were recorded by Lehman ALI against the properties owned by SunCal Marblehead and SunCal Heartland on October 4, 2007.

329. The incurrence of the foregoing obligations and the transfers of interests are referred to herein as the "SunCal Marblehead/SunCal Heartland Transfers."

330. The Marblehead/Heartland Loan Agreement was cross-collateralized by the Marblehead Project and the Heartland Project. The loan proceeds received by SunCal Marblehead was $258,843,352 and the loan proceeds received by SunCal Heartland was $49,594,848.

331. This lending arrangement, as structured, creates a fraudulent claim in favor of SunCal Marblehead against Lehman ALI in the amount of $95,481,774, and in favor of SunCal Heartland against Lehman ALI in the amount of $304,730,278.

332. The SunCal Marblehead/SunCal Heartland Transfers are transfers as that term is defined in 11 U.S.C. § 101(54).

333. The SunCal Marblehead/SunCal Heartland Transfers were made for the benefit of Lehman ALI.

334. These Debtors became insolvent as a result of the SunCal Marblehead/SunCal Heartland Transfers.

335. These Debtors were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with such Debtors were an unreasonably small capital in relation to the business or transaction.

336. These Debtors received less than the reasonably equivalent value in exchange for the SunCal Marblehead/SunCal Heartland Transfers.

337. The SunCal Marblehead/SunCal Heartland Transfers were made at a time when there existed at least one creditor of each of these Debtors who holds an unsecured claim that is allowable under 11 U.S.C. § 502 or that is not allowable only under 11 U.S.C. § 502(e).

338. To the extent that Fenway was a transferee of the SunCal Marblehead/SunCal Heartland Transfers, it was not a good faith transferee.

339. The Trustee, on behalf of SunCal Marblehead and SunCal Heartland, is therefore

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

entitled to set aside the SunCal Marblehead/SunCal Heartland Transfers, including the liens, pursuant to 11 U.S.C. §§ 544(b), 548 and Cal. Civil Code §§ 3439.04 and 3439.05.

**X.**

**SIXTH CLAIM FOR RELIEF**

**(To Avoid and Recover Preferential Transfers – 11 U.S.C. § 547 – By the Trustee on behalf of SunCal Delta Coves, SunCal Marblerhead, and SunCal Heartland against Lehman ALI and Fenway, and on behalf of SunCal Century City against Lehman ALI and Danske)**

340. Plaintiffs repeat and reallege each and every foregoing and subsequent allegation contained in the Complaint, and further allege as follows:

***Delta Coves***

341. SunCal Delta Coves made pre-petition payments in the amount of $6,195,440.46 to Lehman ALI (the "Delta Coves Preferential Transfers"). The Delta Coves Preferential Transfers were to or for the benefit of Lehman ALI within the meaning of 11 U.S.C. § 547.

342. The Delta Coves Preferential Transfers were made for, or on account of, an antecedent debt owed by Delta Coves to Lehman ALI before the Delta Coves Preferential Transfers were made.

343. Delta Coves was insolvent throughout such period.

344. Lehman ALI was a creditor of Delta Coves at the time of the Delta Coves Preferential Transfers within the meaning of 11 U.S.C. § 101(10).

345. Lehman ALI was an insider of Delta Coves within the meaning of 11 U.S.C. § 101(31).

346. The Delta Coves Preferential Transfers were made within the year preceding Delta Cove's involuntary proceeding.

347. The Delta Coves Preferential Transfers were made at a time that the Delta Cove Loan Agreement was undersecured.

348. Lehman ALI asserts that the Delta Coves Project has a fair market value of $25,200,000.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

349. Lehman ALI submitted an alleged proof of a secured claim against SunCal Delta Coves of $206,023,142 (proof of secured claim No. 21).

350. To the extent that Fenway was a transferee of the Delta Coves Preferential Transfers, it was not a good faith transferee.

351. As a result of the Delta Coves Preferential Transfers, Lehman ALI received more than it would have received if: (i) this case was a case under chapter 7 of the Bankruptcy Code; (ii) the Delta Coves Preferential Transfers had not been made; and (iii) Lehman ALI received payment of such antecedent debt under the provisions of the Bankruptcy Code.

352. The Trustee, on behalf of SunCal Delta Coves, is entitled to avoid the Delta Coves Preferential Transfers, including the lien, pursuant to 11 U.S.C. § 547(b).

***Century City***

353. SunCal Century City made pre-petition transfers in the amount of $10,628,948.64 to Lehman ALI (the "Century City Preferential Transfers"). The Century City Preferential Transfers were to or for the benefit of Lehman ALI within the meaning of 11 U.S.C. § 547.

354. The Century City Preferential Transfers were made for, or on account of, an antecedent debt owed by SunCal Century City to Lehman ALI before such Transfers were made.

355. SunCal Century City was insolvent throughout such period.

356. Lehman ALI was a creditor of SunCal Century City at the time of the Century City Preferential Transfers within the meaning of 11 U.S.C. § 101(10).

357. Lehman ALI was an insider of SunCal Century City within the meaning of 11 U.S.C. § Section 101(31).

358. The Century City Preferential Transfers were made within the year preceding SunCal Century City's involuntary proceeding.

359. The Century City Preferential Transfers were made at a time that the SunCal Century City Loan Agreement was undersecured.

360. Lehman ALI asserts that the 10,000 Santa Monica Project has a fair market value of $50,900,000.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

361. Danske, as a successor to Lehman ALI, has filed proof of a secured claim No. 17 in the amount of $120,000,000 against SunCal Century City.

362. To the extent that Danske was a transferee of the Century City Preferential Transfers, it was not a good faith transferee.

363. As a result of the Century City Preferential Transfers, Lehman ALI received more than it would have received if: (i) this case was a case under chapter 7 of the Bankruptcy Code; (ii) the Century City Preferential Transfers had not been made; and (iii) Lehman ALI received payment of such antecedent debt under the provisions of the Bankruptcy Code.

364. The Trustee, on behalf of SunCal Century City, is entitled to avoid the Century City Preferential Transfers, including the lien, pursuant to 11 U.S.C. § Section 547(b).

***Marblehead / Heartland***

365. SunCal Marblehead Heartland Master LLC made pre-petition transfers in the amount of $3,390,280.37 to Lehman ALI ("Marblehead / Heartland Preferential Transfers"). The Marblehead / Heartland Preferential Transfers were to or for the benefit of Lehman ALI within the meaning of Section 547 of the Bankruptcy Code.

366. The Marblehead / Heartland Preferential Transfers were made for, or on account of, an antecedent debt owed by SunCal Marblehead / SunCal Heartland to Lehman ALI before such Transfers were made.

367. SunCal Marblehead and SunCal Heartland were insolvent throughout such period.

368. Lehman ALI was a creditor of SunCal Marblehead / SunCal Heartland at the time of the Marblehead / Heartland Preferential Transfers within the meaning of 11 U.S.C. § 101(10).

369. Lehman ALI was an insider of SunCal Marblehead / SunCal Heartland within the meaning of 11 U.S.C. § 101(31).

370. The Marblehead / Heartland Preferential Transfers were made within the year preceding SunCal Marblehead's and SunCal Heartland's involuntary proceedings.

371. The Marblehead / Heartland Preferential Transfers were made at a time that the

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

Marblehead/Heartland Loan Agreement was undersecured.

372. Lehman ALI asserts that the Marblehead Project has a fair market value of $187,500,000 and the Heartland Project has a fair market value of $7,900,000.

373. Lehman ALI has filed identical proof of secured claim No. 9 against SunCal Heartland and proof of secured claim No. 21 against SunCal Marblehead in the amount of $354,325,126.

374. As a result of the Marblehead / Heartland Preferential Transfers, Lehman ALI received more than it would have received if: (i) this case was a case under chapter 7 of the Bankruptcy Code; (ii) the Marblehead / Heartland Preferential Transfers had not been made; and (iii) Lehman ALI received payment of such antecedent debt under the Bankruptcy Code.

375. To the extent that Fenway was a transferee of the Marblehead / Heartland Preferential Transfers, it was not a good faith transferee.

376. The Trustee, on behalf of SunCal Marblehead and SunCal Heartland, is entitled to avoid the Marblehead/Heartland Preferential Transfers, including the liens, pursuant to 11 U.S.C. § 547(b).

## XI.

## SEVENTH CLAIM FOR RELIEF

**(To Void Liens – 11 U.S.C. § 506(d) – By SunCal I and SunCal III against LCPI and Fenway; by SCC Palmdale against LCPI; and by SunCal Bickford against Lehman ALI)**

377. Plaintiffs repeat and reallege each and every foregoing and subsequent allegation contained in the Complaint, and further allege as follows:

***SunCal Communities I Loan***

378. The value of LCPI's interest in SunCal I's equity interests in SunCal Acton, SunCal Summit, SunCal Beaumont, SunCal Johannson, SunCal Emerald, and SunCal Bickford is zero.

379. The value of LCPI's interest in SunCal III's non-existent interests is zero.

380. Therefore, LCPI's liens (1) against SunCal I's equity interests in SunCal Acton, SunCal Summit, SunCal Beaumont, SunCal Johannson, SunCal Emerald, and SunCal Bickford; and (2) against the SunCal III estate are void pursuant to 11 U.S.C. § 506(d).

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

381. To the extent that Fenway is the transferee of these liens, they are equally as void, pursuant to 11 U.S.C. § 506(d), as if they were still in the hands of LCPI.

***SCC Palmdale Loan***

382. The value of LCPI's interest in SCC Palmdale's equity interest in Palmdale Hills is zero.

383. Therefore, LCPI's lien against SCC Palmdale's equity interest in Palmdale Hills is void pursuant to 11 U.S.C. § 506(d).

***Bickford Second Loan***

384. The value of Lehman ALI's interest in the second priority deed of trust on the Bickford Ranch Project is zero.

385. Therefore, Lehman ALI's second priority lien against the Bickford Ranch Project owned by SunCal Bickford is void pursuant to 11 U.S.C. § 506(d).

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

**XII.**

**EIGHTH CLAIM FOR RELIEF**

**(To Disallow Claims and Liens – 11 U.S.C. § 502(d) — By SCC Palmdale against LCPI; by SunCal Acton, SunCal Bickford, SunCal Emerald, SunCal Summit, SunCal I, and SunCal III against LCPI and Fenway; by SunCal Del Rio, SunCal Tesoro and SCC Communities, and by the Trustee on behalf of SunCal Oak Knoll and SunCal Torrance, against Lehman ALI; by the Trustee on behalf of SunCal Delta Coves, SunCal Marblehead and SunCal Heartland against Lehman ALI and Fenway; and by the Trustee on behalf of SunCal Century City against Lehman ALI and Danske)**

386. Plaintiffs repeat and reallege each and every foregoing and subsequent allegation contained in the Complaint, and further allege as follows:

387. Defendants are entities from which property is recoverable under 11 U.S.C. §§ 542, 543, 550 or 553, or are transferees of one or more avoidable transfers under 11 U.S.C. §§ 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a).

388. Defendants have not paid the amount, or turned over any such property for which

Defendants are liable under 11 U.S.C. §§ 522(i), 542, 543, 550, or 553.

389. Pursuant to Section 502(d) of the Bankruptcy Code, the Defendants' claims are disallowable and the liens associated with such claims are avoidable.

**XIII.**

**NINTH CLAIM FOR RELIEF**

**(To Preserve Claims and Liens for the Respective Debtors' Estates -- 11 U.S.C. §§ 551 and 541(a)(4) – Against All Defendants)**

390. Plaintiffs repeat and reallege each and every foregoing and subsequent allegation contained in the Complaint, and further allege as follows:

391. Pursuant to 11 U.S.C. § 551 and 541(a)(4), any fraudulent transfer or preferential transfer that is avoided pursuant to 11 U.S.C. §§ 544(b), 547 or 548, any lien found to be void under 11 U.S.C. § 506(d), and any claim or lien subject to subordination under 11 U.S.C. § 510(c) should be preserved for the benefit of and/or transferred to the respective Debtor's estate.

**XIV.**

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray that this Court enter a judgment against Defendants as follows:

1. For equitable subordination of the Defendants' claims against the Plaintiff Debtors to the unsecured creditors claims, mechanic lien claims, and priority and administrative claims against the respective Plaintiff Debtors' estates; and for the preservation of any liens held by the Defendants for the benefit of, and transfer to, the respective Plaintiff Debtors' estates;

2. for: (a) an order rescinding the agreement among SJD Partners, Lehman ALI and LV Pacific Point regarding the foreclosure and sale of the Pacific Point property, invalidating the foreclosure sale of the Pacific Point property to LV Pacific Point, and/or imposing a constructive trust on LV Pacific Point directing it to transfer title of the Pacific Point property back to SJD Partners; and (b) equitable subordination of any claims Lehman ALI, LV Pacific Points and/or Lehman Re may have against SJD Partners and/or SJD Development to the unsecured creditors

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

claims, mechanic lien claims, and priority and administrative claims against these Debtors' estates; and for the preservation of any liens held by these Defendants for the benefit of, and transfer to, these Debtors' estates;

3. for avoidance and recovery of the above-alleged preferential transfers pursuant to Sections 547 and 550(a) of the Bankruptcy Code;

4. for avoidance and recovery of the above-alleged fraudulent transfers pursuant to Sections 544(b) and 548 of the Bankruptcy Code, and Sections 3439.04 and 3439.05 of the California Civil Code;

5. for a finding that the above-specified liens are void pursuant to 11 U.S.C. § 506(d);

6. for the disallowance of Defendants' claims and avoidance of the Defendants' liens pursuant to 11 U.S.C. § 502(d);

7. for the preservation of Defendants' claims and liens for the respective Debtor's estate pursuant to 11 U.S.C. § 551 and 541(a); and

8. For such other and further relief as this Court may, in its discretion, deem just and proper, including, without limitation, attorneys' fees, costs and interest, as appropriate.

Dated: July 10, 2009

**MILLER BARONDESS LLP**

By: [signature]

Louis R. Miller
Martin Pritikin
James Miller
Special Litigation Counsel for the Jointly Administered Debtors in Possession and Steven M. Speier, the Chapter 11 Trustee

# EXHIBIT Z

PAUL J. COUCHOT - State Bar No. 131934
SEAN A. O'KEEFE -- State Bar No. 122417
PETER W. LIANIDES - State Bar No. 160517
PAYAM KHODADADI - State Bar No. 239906
**WINTHROP COUCHOT**
**PROFESSIONAL CORPORATION**
660 Newport Center Drive, Fourth Floor
Newport Beach, CA 92660
pcouchot@winthropcouchot.com
sokeefe@winthropcouchot.com
plianides@winthropcouchot.com
pkhodadadi@winthropcouchot.com
Telephone: (949) 720-4165
Facsimile: (949) 720-4111
General Insolvency Counsel for Administratively Consolidated Debtors-in-Possession and Counsel for SCC Acquisitions, Inc.

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SANTA ANA DIVISION**

In re

PALMDALE HILLS PROPERTY, AND ITS RELATED DEBTORS,

Joint Administered Debtors and Debtors-in-Possession

Affects:

☒ All Debtors
☐ Palmdale Hills Property, LLC
☐ SunCal Beaumont Heights, LLC
☐ SCC/Palmdale, LLC
☐ SunCal Johannson Ranch, LLC
☐ SunCal Summit Valley, LLC
☐ SunCal Emerald Meadows LLC
☐ SunCal Bickford Ranch, LLC
☐ Acton Estates, LLC
☐ Seven Brothers LLC
☐ SJD Partners, Ltd.
☐ SJD Development Corp.
☐ Kirby Estates, LLC
☐ SunCal Communities I, LLC
☐ SunCal Communities III, LLC
☐ SCC Communities LLC
☐ North Orange Del Rio Land, LLC
☐ Tesoro SF LLC

*Caption Continued on Next Page*

Case No. 8:08-bk-17206-ES

Jointly Administered With Case Nos. 8:08-bk-17209-ES; 8:08-bk-17240-ES; 8:08-bk-17224-ES; 8:08-bk-17242-ES; 8:08-bk-17225-ES; 8:08-bk-17245-ES; 8:08-bk-17227-ES; 8:08-bk-17246-ES; 8:08-bk-17230-ES; 8:08-bk-17231-ES; 8:08-bk-17236-ES; 8:08-bk-17248-ES; 8:08-bk-17249-ES; 8:08-bk-17573-ES; 8:08-bk-17574 ES; 8:08-bk-17575-ES; 8:08-bk-17404-ES; 8:08-bk-17407-ES; 8:08-bk-17408-ES; 8:08-bk-17409-ES; 8:08-bk-17458-ES; 8:08-bk-17465-ES; 8:08-bk-17470-ES; 8:08-bk-17472-ES; and 8:08-bk-17588-ES

Chapter 11 Proceedings

**DEBTORS' ~~THIRD~~FOURTH AMENDED JOINT DISCLOSURE STATEMENT DESCRIBING DEBTORS' ~~THIRD~~FOURTH AMENDED JOINT CHAPTER 11 PLAN**

Date: October 15, 2009
Time: ~~10~~2:00 ~~a~~p.m.
Place: Courtroom 5A

*Continued from Previous Page*

- ☐ LBL-SunCal Oak Valley, LLC
- ☐ SunCal Heartland, LLC
- ☐ LBL-SunCal Northlake, LLC
- ☐ SunCal Marblehead, LLC
- ☐ SunCal Century City, LLC
- ☐ SunCal PSV, LLC
- ☐ Delta Coves Venture, LLC
- ☐ SunCal Torrance, LLC
- ☐ SunCal Oak Knoll, LLC

pursue their respective rights and remedies against the underlying real property collateral under applicable California law, but shall have no recourse against the Plan Trust or Plan Trustee.

**8.2. <u>The Plan's Treatment of Holders of Allowed Secured Real Property Tax Claims Against Real Properties Not Subject to Deeds of Trust Arising from Lehman's Disputed Claims (Classes 2.1 Through 2.5)</u>.**

The treatment of Holders of Class 2.1 through 2.5 Allowed Secured Claims under the Plan is as follows:

(a) The Holder(s)' rights are unimpaired under the Plan;

(b) The Holder(s) shall retain their underlying first priority liens on the applicable real property collateral and shall be fully paid from any conveyance thereof; and

(c) On the Effective Date, the Holder(s) shall be free to pursue their respective rights and remedies against the underlying real property collateral under applicable California law, but shall have no recourse against the Plan Trust.

**8.3. <u>The Plan's Treatment of Lehman's Disputed Claim(s) and Disputed Lien(s) (Classes 3.1 Through 3.14)</u>.**

The treatment of the Holder(s) of Classes 3.1 through 3.14 consisting of Lehman's Disputed Secured Claim(s) and Disputed Lien(s)-under the Plan shall be as follows:

(a) The Holder(s)' rights are impaired under the Plan;

(b) The Holder(s) shall retain their interest in their Disputed Lien(s) on the applicable Plan Trust's Assets pending a Final Order(s) resolving the Allowance of the applicable Disputed Claim(s) and the validity of the applicable Disputed Lien(s) against the applicable Plan Trust's Assets;

(c) The Holder(s) shall forebear from pursuing their rights and remedies against the Plan Trust's Assets until the expiration of the Sales Period;

(d) The Plan Trustee may sell or otherwise liquidate the Holder(s)' alleged collateral free and clear of the applicable Disputed Secured Claims and the applicable Disputed Liens without the right of such Holder to credit bid its Disputed Secured Claim(s) and Disputed Lien(s) provided such sales are subject to overbid procedures and a sale approved by the

Bankruptcy Court pursuant to Section 363 of the Bankruptcy Code. All Net Sale Proceeds generated from such sales shall be deposited into the applicable Net Sales Proceeds Account with all Disputed Claims and Disputed Liens attached thereto;

(e) If the Plan Trustee is able to consummate a sale or otherwise liquidate the particular Asset(s) subject to a Disputed Claim(s) and/or Disputed Lien(s) during the Sales Period, the Holder(s) of such Disputed Claim shall receive a distribution to the extent of available funds from the applicable Net Sale Proceeds Account(s) to the extent required by a Final Order determining the allowance andand priority of such the Disputed Claims and the validity and priority of the Disputed Liens in, including but not limited to, the Lehman Adversary Proceeding; and

(f)If the Plan Trustee is unable to consummate a sale or otherwise liquidate the particular Asset(s) subject to a Lehman Disputed Claim during the Sales Period, such Asset(s) shall be deemed abandoned by the Plan Trust, no payment shall be made to such Holder(s), and such Holder(s) shall be allowed to pursue their respective rights and remedies against the underlying collateral under applicable law subject to a Final Order determining the allowance and priority of the Disputed Claims and the validity of the Disputed Liens in, including but not limited to, the Lehman Adversary Proceeding.

(f)

**8.4. The Plan's Treatment of Holders of Secured Claims of Primary Secured Creditors Other than the Holders of Lehman's Disputed Claims (Classes 4.1 Through 4.15).**

The treatment of the Holders of Allowed Classes 4.1 through 4.15 under the Plan shall be as follows:

(a) The Holder(s)' rights are impaired under the Plan;

(b) The Holder(s) shall retain their respective underlying liens on the applicable real property collateral;

(c) On the Effective Date, the Holder(s) shall be allowed to pursue their rights against the subject real property collateral under applicable California law, but shall have no recourse against the Plan Trust.

**8.5. The Plan's Treatment of Holders of Asserted Mechanic Lien Claims Against the Debtors' Projects Subject to Lehman's Disputed Claims (Classes 5.1 Through ~~5.55~~5.56).**

The treatment of the Holders of Allowed Classes 5.1 through ~~5.55~~5.56 Secured Claims under the Plan shall be as follows:

(a) The Holder(s)' rights are impaired under the Plan;

(b) The Holder(s) shall retain their respective underlying liens on the applicable real property collateral but shall forebear from pursuing their rights and remedies until the expiration of the Sales Period;

(c) If the Plan Trustee is able to consummate a sale of the applicable underlying real property collateral during the Sales Period, such Holders shall receive a distribution to the extent of available Net Sale Proceeds in accordance with the priorities set forth under the Bankruptcy Code, subject to a Final Order(s) resolving the allowance and priority of the applicable Lehman's Disputed Claim(s) and the validity of the applicable Lehman Disputed Lien(s) in, including but not limited to, the Lehman Adversary Proceeding; and

(d) If the Plan Trustee is unable to consummate a sale of the applicable underlying real property collateral during the Sales Period, such real property collateral shall be deemed abandoned by the Plan Trustee, no payment shall be made to such Holder(s), and such Holder(s) shall be allowed to pursue their respective rights against the real property collateral under applicable California law, subject to a Final Order(s) resolving the allowance and priority of the applicable Lehman's Disputed Claim(s) and applicable Lehman Disputed Lien(s), without recourse to the Debtor (s).

**8.6. The Plan's Treatment of Asserted Mechanic Lien Claims Against Projects Not Subject to Lehman's Disputed Claims (Class 6).**

The treatment of the Holder of Allowed Class 6 under the Plan shall be as follows:

(a) The Holder(s)' rights are unimpaired under the Plan;

(b) The Holder(s) shall retain their respective underlying lien on the subject real property; and

(c) On the Effective Date, the Holder(s) shall be free to pursue their respective rights and remedies against real property collateral under California law, but shall have no recourse against the Plan Trust.

**8.7. The Plan's Treatment of Holders of Priority Claims (Classes 7.1 Through 7.4).**

The treatment of the Holders of Allowed Priority Claims under the Plan shall be as follows:

(a) The Holder(s) are unimpaired under the Plan; and

(b) The Holder(s) shall be paid either the applicable Distribution Account(s) (i) the full amount of such Allowed Priority Claim in Cash on the later of (x) the Effective Date, (y) the date such Claim becomes an Allowed Priority Claim or (z) the date such Allowed Priority Claim becomes payable in accordance with the terms governing such Allowed Priority Claim, or (ii) upon such other less favorable terms as may be agreed to by such Holder and the Plan Trustee.

**8.8. The Plan's Treatment of Holders of Allowed General Unsecured Claims Against Debtors with Assets that Are Not Subject to the Lehman's Disputed Claims and Disputed Liens (Classes 8.1 Through 8.5) (SunCal Beaumont, SunCal Johannson, Seven Brothers and Kirby Estates).**

The treatment of the Holders of Allowed Classes 8.1 through 8.5 Claims under the Plan shall be as follows:

(a) The Holders' rights are impaired under the Plan; and

(b) After payment in full of all Post Confirmation Expenses, Allowed Administrative Claims, and Allowed Priority Claims of the Debtors, the Holders of Allowed Classes 8.1 through 8.5 Claims shall receive Distribution(s) of their pro-rata share of the funds remaining in the applicable Distribution Account(s).