WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
                                                       :
In re                                                  :        **Chapter 11 Case No.**
                                                       :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*    :        **08-13555 (JMP)**
                                                       :
               **Debtors.**                            :        **(Jointly Administered)**
                                                       :
-------------------------------------------------------------------x

### NOTICE OF MOTION OF CERTAIN DEBTORS PURSUANT TO SECTIONS 105(a) AND 363(b) OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO ENGAGE STONE & YOUNGBERG AS INVESTMENT ADVISOR

PLEASE TAKE NOTICE that a hearing on the annexed motion of Lehman

Brothers Holdings Inc. ("LBHI") and certain of its affiliated debtors in the above-referenced

chapter 11 cases (together, the "Debtors"), pursuant to sections 105(a) and 363(b) of title 11 of

the United States Code, for authorization to engage and retain Stone & Youngberg LLC

("S&Y") as investment advisor (the "Motion"), all as more fully described in the Motion, will be

held before the Honorable James M. Peck, United States Bankruptcy Judge, at the United States

Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green,

New York, New York 10004 (the "Bankruptcy Court"), on **May 12, 2010 at 10:00 a.m.**

**(Prevailing Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall

be in writing, shall conform to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") and the Local Rules of the Bankruptcy Court for the Southern District of New York,

shall set forth the name of the objecting party, the basis for the objection and the specific grounds

thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order

M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy

Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in

Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing

format (with two hard copies delivered directly to Chambers), and shall be served upon:  (i) the

chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004,

Courtroom 601; (ii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York

10153, Attn: Richard P. Krasnow, Esq., attorneys for the Debtors; (iii) the Office of the United

States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York,

New York 10004 Attn:  Andy Velez-Rivera, Esq., Paul Schwartzberg, Esq., Brian Masumoto,

Esq., Linda Riffkin, Esq., and Tracy Hope Davis, Esq.; (iv) Milbank, Tweed, Hadley & McCloy

LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn:  Dennis F. Dunne, Esq.,

Dennis O'Donnell, Esq., and Evan Fleck, Esq., attorneys for the Official Committee of

Unsecured Creditors appointed in these cases, and (v) Shartsis Friese LLP, 1 Maritime Plaza,

18th Floor, San Francisco, California 94111, Attn: Carolyn S. Reiser, Esq., attorneys for S&Y,

so as to be so filed and received by no later than **May 5, 2010 at 4:00 p.m. (Prevailing Eastern

Time)** (the "Objection Deadline").

        PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not

received by the Objection Deadline, the relief requested shall be deemed unopposed, and the

Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend

the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: April 21, 2010
    New York, New York

/s/ Richard P. Krasnow
Richard P. Krasnow

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
: 
**In re** : **Chapter 11 Case No.**
: 
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,* : **08-13555 (JMP)**
: 
**Debtors.** : **(Jointly Administered)**
: 
------------------------------------------------------------------x

**MOTION OF CERTAIN DEBTORS PURSUANT TO SECTIONS 105(a)**
**AND 363(b) OF THE BANKRUPTCY CODE FOR AUTHORIZATION**
**TO ENGAGE STONE & YOUNGBERG AS INVESTMENT ADVISOR**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and certain of its affiliated debtors in

the above-referenced chapter 11 cases, as debtors and debtors in possession (together with LBHI,

the "Debtors" and, collectively with their non-debtor affiliates, "Lehman"), file this motion (the

"Motion") and respectfully represent:

**Preliminary Statement[1]**

1.       Pursuant to the order authorizing the Debtors to implement certain

investment guidelines and other related relief, dated March 11, 2009 [Docket No. 3048] (the

---

[1] Capitalized terms used but not defined in the Preliminary Statement shall have the meaning ascribed to
them in the Motion.

"Investment Guidelines"), the Debtors have authority to invest their cash in, *inter alia*, securities issued or directly and fully guaranteed or insured by the United States government or any agency or instrumentality thereof.  Consistent with that authority, the Debtors have been identifying and implementing investment strategies that comply with the Investment Guidelines and also maximize their return on investments.  In the exercise of their business judgment, certain of the Debtors[2] have determined, in consultation with Creditors' Committee, to invest up to $1 billion in a brokered certificate of deposit program (the "Brokered CD Program"), pursuant to which the Investing Debtors will purchase freely transferable brokered certificates of deposit from numerous institutions across the United States that will be fully insured by the Federal Deposit Insurance Company (the "FDIC") insurance program.

2.      To implement the Brokered CD Program, the Investing Debtors propose to engage Stone & Youngberg LLC ("S&Y") to provide certain advisory and other administrative services and, in connection therewith, have agreed to S&Y's engagement from time to time of certain independent contractors, subject to the Investing Debtors' consent, including the engagement of Structural Investment Management LLC ("Structural").  S&Y will apply its expertise and relationships to negotiate for the Investing Debtors the purchase of FDIC-insured certificates of deposit, monitor the overall yields of the Investing Debtors' investments, and ensure, through specialized software maintained by Structural, that the Investing Debtors' certificates of deposit that are purchased under the Brokered CD Program are at all times fully protected by the FDIC insurance program.

---

[2] The following Debtors will participate in the Brokered CD Program: LBHI; Lehman Brothers Special Financing Inc.; Lehman Brothers Commercial Paper Inc.; Lehman Brothers Commodity Services Inc.; Lehman Brothers Commercial Corporation; Lehman Brother OTC Derivatives Inc.; Lehman Brothers Financial Products Inc.; and Lehman Brothers Derivatives Products Inc. (collectively, the "Investing Debtors").

3.       By this Motion, the Investing Debtors seek authorization to engage S&Y

to assist with the development and implementation of the Brokered CD Program consistent with

the Investment Guidelines and subject to the terms and conditions of a Program Services

Agreement between the Investing Debtors and S&Y, dated April 21, 2010 (the "Program

Services Agreement"), a copy of which is annexed hereto as Exhibit A.

## Background

4.       Commencing on September 15, 2008 and periodically thereafter, LBHI

and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of

title 11 of the United States Code (the "Bankruptcy Code"). The Debtors' chapter 11 cases have

been consolidated for procedural purposes only and are being jointly administered pursuant to

Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). The

Debtors are authorized to operate their businesses and manage their properties as debtors in

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.       On September 17, 2008, the United States Trustee for the Southern

District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured

creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

## Jurisdiction

6.       This Court has subject matter jurisdiction to consider and determine this

matter pursuant to 28 U.S.C. §1334. This is a core proceeding pursuant to 28 U.S.C. §157(b).

## Lehman's Business

7.       Prior to the events leading up to these chapter 11 cases, Lehman was the

fourth largest investment bank in the United States. For more than 150 years, Lehman had been

a leader in the global financial markets by serving the financial needs of corporations, governmental units, institutional clients and individuals worldwide.

8.      Additional information regarding the Debtors' businesses, capital structures, and the circumstances leading to the commencement of these chapter 11 cases is contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications, filed on September 15, 2008 [Docket No. 2].

## Relief Requested

9.      The Investing Debtors request authorization to retain S&Y as investment advisor, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code and Bankruptcy Rule 6004(h), on the terms and conditions of the Program Services Agreement and in accordance with the fee structure described therein.  In addition, the Investing Debtors seek authorization to allow S&Y to select and engage, at its own expense, one or more independent contractors (the "Independent Contractors"), including Structural, to assist with the implementation of the Brokered CD Program, subject to certain conditions, including the Investing Debtors' prior written approval.  The Investing Debtors believe that their engagement of S&Y is in the ordinary course under section 363(c)(1) of the Bankruptcy Code, however, out of an abundance of caution, they are seeking the relief requested.  The Investing Debtors further request that, pursuant to Bankruptcy Rule 6004(h), the Court direct that the order granting the requested relief be effective immediately upon entry.

## The Retention of S&Y

10.      As noted above, the Investing Debtors seek to retain S&Y to assist the Investing Debtors to invest up to $1 billion in the aggregate of the Investing Debtors' cash in various certificates of deposit through the Brokered CD Program that are insured and fully

guaranteed by the FDIC.[3]  S&Y will advise the Investing Debtors with respect to the
implementation and monitoring of the Brokered CD Program in accordance with the Investment
Guidelines.  S&Y will seek to negotiate and purchase FDIC-insured certificates of deposit on
behalf of the Investing Debtors from multiple banks throughout the United States.  Spreading the
investments across multiple banks will enable the Investing Debtors to invest substantial
amounts while also maintaining FDIC insurance for the full investment.  The Investing Debtors
intend to invest in the aggregate up to $500 million in certificates of deposit with maturities of 1
year or less and up to $500 million certificates of deposit with maturities of not later than
December 31, 2011.

11.     S&Y will utilize its trading relationships with broker-dealers, underwriters
and issuers to negotiate and purchase FDIC-insured certificates of deposit for the Investing
Debtors that should yield favorable returns.  S&Y will also engage Independent Contractors,
upon the Investing Debtors' approval, to assist in the implementation of the Brokered CD
Program.  One such Independent Contractor has already been engaged to, among other things,
employ its specialized technology to monitor the investments to ensure that the Investing
Debtors' investments under the Brokered CD Program, including any interest earned thereon, are
at all times fully insured by the FDIC in compliance with the Investment Guidelines.

12.     S&Y is registered as an investment adviser under the Investment Advisers
Act of 1940, and is also a registered broker-dealer.  Founded in San Francisco in 1931, S&Y is
independently owned and operated and has offices in ten cities around the United States
including New York, N.Y.  S&Y structures and distributes fixed income securities and provides

---

[3] Each Investing Debtor's respective cash and investments will be separately maintained and will not be
commingled under the Program Services Agreement with the cash or investments of the other Investing
Debtors.

investment services to institutions, public agencies and individuals throughout the United States.

S&Y also has capability in institutional fixed income sales and trading in both tax-exempt and

taxable fixed income instruments, and its Portfolio Strategy Group uses customized analytical

models to assist in providing investment recommendations to the firm's clients.

13.     S&Y has expertise relevant to the Brokered CD Program based on its

experience of selling new-issue FDIC-insured brokered certificates of deposits to its clients and

its experience facilitating the purchase and sale of FDIC-insured certificates of deposit in the

secondary market for its clients.  In the aggregate, over a three-year period, S&Y and Structural

have collectively advised hundreds of clients in the purchase of FDIC-insured brokered

certificates of deposit in both the primary and secondary markets with a collective aggregate

value in excess of $200 million.

14.     Although the Debtors have retained other advisors, S&Y will be providing

services that differ from, and do not overlap with, those provided by the Debtors' other advisors.

15.     The Investing Debtors believe that the employment of S&Y, under the

terms set forth in the Program Services Agreement, is appropriate and necessary to enable the

Investing Debtors to execute faithfully their duties as debtors and debtors in possession and that

S&Y is well-qualified and able to serve as advisor to the Investing Debtors.

## S&Y's Relationship with the Debtors

16.     Although the Investing Debtors believe that the retention of S&Y is not

governed by section 327 of the Bankruptcy Code, out of an abundance of caution, the Investing

Debtors caused S&Y and Structural to perform internal searches to determine whether: (i)

S&Y/Structural has any connections with the Debtors; (ii) S&Y/Structural holds any claims

against the Debtors' estates; and (iii) whether employees of S&Y/Structural have a claim against

the Debtors' estates.  The Debtors have been advised by S&Y and Structural, respectively, that

based on these inquiries, neither S&Y and its employees involved in the implementation and

execution of the Program Services Agreement nor Structural and any of its employees hold or

represent any interest adverse to the Debtors.

**Terms of Retention**

17.     The material terms of S&Y's retention as set forth in the Program Services

Agreement include: [4]

- Services:  S&Y will assist the Investing Debtors to implement and monitor the Brokered CD Program pursuant to paragraph 1(a) of the Program Services Agreement.

- Reports:  Within 5 business days after the end of each month, S&Y will deliver to the Investing Debtors a statement that (a) describes all Instruments purchased as of such month-end by S&Y for the Accounts in the Purchase Program, (b) shows the percentage of the Purchase Program that has been completed as of such date, and (c) confirms that the restrictions imposed on the Purchase Program (Investment Guidelines) have been and are being complied with.

- Confidentiality:  The parties agree to maintain all personal and financial information in strict confidence.  S&Y and Structural agree not to disclose that Lehman is the customer of the Instruments.

- Indemnification:  Investing Debtors will indemnify S&Y pursuant to paragraph 10 of the Program Services Agreement with the exception of acts or omissions arising from S&Y's breach of fiduciary duty to the Investing Debtors, bad-faith, self-dealing, gross negligence or willful misconduct.

- Termination.  Any party may terminate the Program Services Agreement with or without cause on 10 days' written notice; *provided, however,* that in the event of a termination, S&Y will continue to monitor and track all Instruments in the Accounts until their maturity and undertake all steps that may be necessary to recover the proceeds of all investments of the Investing Debtors. S&Y will be compensated for any such post-termination services in accordance with the Program Services Agreement.

---

[4] Capitalized terms used but not defined in the Terms of Retention shall have the meaning ascribed to them in the Program Services Agreement.  To the extent there is a conflict between this summary and the terms of the Program Services Agreement, the Program Services Agreement controls.

18.    Moreover, the Investing Debtors and S&Y have agreed to the following compensation structure (the "Fee and Expense Structure"):

- The  fees will be calculated as of the last day of each month based on the following specified annual percentages of the Average Daily Market Value (as defined below) of Instruments in the Account for that month:

  ° First $100,000,000 of Average Daily Market Value @ 0.25%.

  ° Amount in excess of $100,000,000 of Average Daily Market Value @ 0.195%.

  ° The monthly Fee shall equal the amount determined above divided by 12.

  ° The "Average Daily Market Value of  Instruments in the Account" is, for any month, the sum of the Market Value of Instruments in the Account for each business day of that month, divided by the number of business days in that month.

Notwithstanding that each of the Investing Debtor's respective cash and investments will be separately maintained and will not be commingled, the Fees and Expense Structure will be calculated based upon the total amount of Instruments purchased by all of the Investing Debtors.[5] For example, if the Average Daily Market Value of funds in the Accounts is $300 million in the aggregate, S&Y's monthly fee will be calculated as follows: $250,000 ($100 million x .25%) plus $390,000 ($200 million x .195%) equaling a monthly fee of $53,333 ($640,000/12).  The Investing Debtors believe that the Fees and Expense Structure is reasonable.

### S&Y's Retention Should be Approved

19.    The Investing Debtors seek authorization to engage and compensate S&Y pursuant to section 363(b) of the Bankruptcy Code, which provides in relevant part that "[t]he trustee, after notice and a hearing, may use…, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Bankruptcy Code section 105(a) further provides

---

[5] The Investing Debtors will allocate the costs of S&Y's services amongst each other based upon the amount of Instruments each such Investing Debtor has purchased.

that the "court may issue any order, process, or judgment that is necessary or appropriate to carry

out the provisions of this title." 11 U.S.C. § 105(a).

20.    Under applicable case law in this and other circuits, if a debtor's proposed

use of its assets pursuant to section 363(b) of the Bankruptcy Code represents a reasonable

business judgment on the part of the debtor, such use should be approved. *See Committee of*

*Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983)

(requiring an "articulated business justification"); *Myers v. Martin (In re Martin)*, 91 F.3d 389,

395 (3d Cir. 1996) (noting that under normal circumstances, the court defers to the trustee's

judgment so long as there is a "legitimate business justification"); *In re Delaware & Hudson*

*R.R. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (courts have applied the "sound business

purpose" test to evaluate motions brought pursuant to section 363(b)).

21.    It is generally understood that "[w]here the debtor articulates a reasonable

basis for its business decisions (as distinct from a decision made arbitrarily or capriciously),

courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville*

*Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). If a valid business justification exists, there is

a strong presumption that "'the directors of a corporation acted on an informed basis, in good

faith and in the honest belief that the action taken was in the best interests of the company.'" *In*

*re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom,* 488

A.2d 858, 872 (Del. 1985)), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993). The burden of rebutting

this presumption falls to parties opposing the proposed exercise of a debtor's business judgment.

*Id.* (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

22.    Sound business reasons support the Investing Debtors' engagement of

S&Y. As set forth above, with S&Y's guidance and assistance, the Investing Debtors should be

able to increase their return on investments while ensuring that the Investing Debtors' certificates of deposit that will be purchased under the Brokered CD Program are at all times fully protected by the FDIC insurance program.  The Brokered CD Program will seek to maximize the cash available for recoveries to creditors within the restrictions of the Investment Guidelines.  Not only are S&Y's services necessary to negotiate the purchase of FDIC-insured certificates of deposit that should yield favorable rates of return and to utilize S&Y's access to the secondary market to sell securities if the Investing Debtors determine it is appropriate, but S&Y's services, along with Structural's software, are critical in ensuring that all of the Investing Debtors' cash invested under the Brokered CD Program is fully protected at all times.  The Investing Debtors do not have the resources to implement the Brokered CD Program without S&Y and Structural's services.

23.    A debtor is required to obtain bankruptcy court approval before it is permitted to hire professionals and compensate them with funds from property of the estate. However, as explained below, S&Y is not a "professional" as that term is used in the Bankruptcy Code.  Thus, S&Y should not be held to the requirements under section 327(a) of the Bankruptcy Code, and S&Y should not be required to submit fee applications pursuant to sections 330 and 331 of the Bankruptcy Code.

24.    Section 327(a) of the Bankruptcy Code provides, in relevant part, that a debtor

> … with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the [debtor] in carrying out the [debtor]'s duties under [the Bankruptcy Code].

11 U.S.C. § 327(a).  The United States Bankruptcy Court for the Southern District of New York has previously held that the term "professional" as it used under section 327(a) is a term of art

reserved for those who play a "an <u>intimate</u> role in the reorganization of the debtor's estate."
*John-Manville*, 60 B.R. at 619-20 (emphasis added).  While investment advisors are members of
a profession, they are not subject to section 327(a) if their work is not connected to the
administration of the debtor's bankruptcy proceeding.  *In re Seatrains Lines, Inc.*, 13 B.R. 980,
981 (Bankr. S.D.N.Y. 1981) (holding maritime engineers sought to be retained as consultants to
the debtor were not "professional persons" for purposes of section 327(a) because they were
merely involved in the mechanics of the debtor's business operations and did not affect the
administration of the debtor's reorganization); *see also In re Lexington Precision, et al.*, Case
No. 08-11153 (MG) (Bankr. S.D.N.Y. July 14, 2008) [Docket No. 249] (authorizing employment
of consultant advising on management and production efficiencies for debtors' business
operations).

        25.     In these chapter 11 cases, this Court has previously approved the retention
of Natixis Capital Markets Inc. as strategic advisor to the Debtors, Kelly Wright as art
consultant, and Omnium as fund administrator, pursuant to sections 105(a) and 363 of the
Bankruptcy Code.  *See* Docket Nos. 2308, 2678 and 7235.  Similarly, bankruptcy courts in this
District have authorized a debtor's engagement of a broad range of specialists pursuant to section
363 including lobbyists, executive search consultants and crisis managers.  *See, e.g., In re Johns-
Manville Corp.*, 60 B.R. 612, 621 (Bankr. S.D.N.Y. 1986) (holding that lobbyists performing
functions external to the reorganization as they had pre-petition for the debtor were not
"professional persons");  *In re PRC, LLC,* Case No. 08-10239 (MG) (Bankr. S.D.N.Y. May 28,
2008) [Docket No. 434] (authorizing retention of executive search consultants pursuant to
section 363 of the Bankruptcy Code); *In re Bally Total Fitness of Greater N.Y., Inc*., Case No.

07-12395 (BRL) (Bankr. S.D.N.Y. Aug. 21, 2007) [Docket No. 283] (authorizing retention of crisis managers pursuant to section 363 of the Bankruptcy Code).

26.     S&Y is being engaged for a limited role in the administration of the Investing Debtors' estates.  The Debtors have already retained other financial advisors to provide investment banking, financial, and restructuring services with respect to their estates generally. S&Y will play no role in formulating or negotiating the Debtors' proposed chapter 11 plans. Moreover, S&Y will not control or manage the day-to-day business decisions of the Debtors' estates, nor will it have any authority to determine how transactions should be structured, move cash or otherwise control the Debtors' assets.  Rather, S&Y's engagement will be limited to advising the Investing Debtors solely with respect to identifying and negotiating rates of return with institutions, making recommendations to the Investing Debtors, monitoring the Investing Debtors' investments, and ensuring that such investments are consistent with Investment Guidelines.  Accordingly, S&Y is not a "professional person" of the kind contemplated by section 327(a) of the Bankruptcy Code.

27.     The Investing Debtors believe that the terms of the indemnification are customary and reasonable for financial advisory engagements, both out-of-court and in chapter 11 proceedings.[6]   The terms are similar to indemnification terms that have previously been

---

[6] *See In re All American Semiconductor, Inc.,* No. 07-12963 (Bankr. S.D. Fla May 25, 2007); *In re Atlas Worldwide Holdings, Inc.,* No. 04-10792 (Bankr. S.D. Fla Apr. 22, 2004)*; see also In re New Century TRS Holdings, Inc.,* No. 07-10416 (Bankr. D. Del. Apr. 25, 2007); *In re Calpine Corp.,* Case No. 05-60200 (Bankr. S.D.N.Y. May 2, 2006).  *United Artists Theatre Co. v. Walton (In re United Artists Theatre Co.)*, 315 F.3d 217, 234 (3d Cir. 2003) (finding indemnification agreement between debtor and financial advisor reasonable under section 328); *In re Comdisco, Inc.*, No 02-C-1174 2002 U.S. Dist. WL 31109431 (N.D. Ill. September 23, 2002) (mem.) (affirming order authorizing indemnification of Lazard Frères & Co. LLC and Rothschild, Inc. by debtors and official committee of unsecured creditors respectively); *In re Joan & David Halpern, Inc.*, 248 B.R. 43, 47 (Bankr. S.D.N.Y. 2000), *aff'd*, No. 00-3601 (JSM), 2000 Bankr. WL 1800690 (S.D.N.Y. Dec. 6, 2000).

approved in these chapter 11 cases and by bankruptcy courts in this District and elsewhere.[7]

28.     Based upon the foregoing, the Investing Debtors believe that S&Y's retention is in the best interest of the Investing Debtors' estates and their creditors and should be approved.

## Notice

29.     No trustee has been appointed in these chapter 11 cases.  The Investing Debtors have served notice of this Motion in accordance with the procedures set forth in the amended order entered on February 13, 2009 governing case management and administrative procedures for these cases [Docket No. 2837] on (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; and (vi) S&Y. The Investing Debtors submit that no other or further notice need be provided.

30.     No previous request for the relief sought herein has been made by the Investing Debtors to this or any other court.

---

[7] *See* Order Authorizing the Debtors to Employ Natixis Capital Markets Inc. as Strategic Advisor, dated December 18, 2008 [Docket No. 2308]; Order Under 11 U.S.C §§ 328(a) and 1103, Fed. R. Bankr. P. 2014, and S.D.N.Y. LBR 2014-1 Authorizing Employment and Retention of Lazard Freres & Co. LLC as Investment Banker to Lehman Brothers Holdings Inc., et al., Effective as of September 15, 2008, dated December 17, 2008 [Docket No. 2275]; *see also In re Worldcom, Inc.*, 02-13533 (AJG) (Bankr. S.D.N.Y. January 14, 2003) (order authorizing retention of Lazard under similar terms); *In re Adelphia Commc'ns Corp.*, 02-41729 (REG) (Bankr. S.D.N.Y. September 27, 2002) (order authorizing retention of Lazard on terms including an indemnification agreement).

WHEREFORE the Investing Debtors respectfully request that the Court grant the

relief requested herein and such other and further relief as it deems just and proper.

Dated: April 21, 2010
       New York, New York

                                        /s/ Richard P. Krasnow
                                        Richard P. Krasnow

                                        WEIL, GOTSHAL & MANGES LLP
                                        767 Fifth Avenue
                                        New York, New York 10153
                                        Telephone: (212) 310-8000
                                        Facsimile: (212) 310-8007

                                        Attorneys for Debtors
                                        and Debtors in Possession

## Exhibit A

**Program Services Agreement**

## PROGRAM SERVICES AGREEMENT

This agreement (the "Agreement") is entered into as of April 21, 2010, by and between Stone & Youngberg LLC, a California/limited liability company ("S&Y"), and Lehman Brothers Holdings Inc., Lehman Brothers Special Financing Inc., Lehman Brothers Commercial Paper Inc., Lehman Brothers Commodity Services Inc., Lehman Brothers Commercial Corporation, Lehman Brothers OTC Derivatives Inc., Lehman Brothers Financial Products Inc. and Lehman Brothers Derivatives Products Inc. (each, a "Lehman Entity" and collectively, "Lehman"), each a company incorporated under the laws of the State of Delaware and a debtor and debtor in possession under chapter 11 of the United States Code (the "Bankruptcy Code") in a jointly administered case, Case No. 08-13555 (JMP) (the "Chapter 11 Cases") pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

Lehman desires to engage S&Y, and S&Y desires to be engaged by Lehman, to invest certain assets of Lehman, with the investment objective of purchasing certificates of deposit of specified sizes and maturities, such that all investments will be fully insured and guaranteed by the Federal Deposit Insurance Corporation at all times.  In consideration of the mutual covenants herein, Lehman and S&Y agree as follows:

1.    Services.

(a)    Lehman retains S&Y to execute the purchase program described on Appendix A hereto (the "Purchase Program"), subject to the terms and conditions set forth therein.  The Purchase Program consists of the purchase for the account or accounts of each of the Lehman Entities (each, an "Account" and collectively, the "Accounts") of brokered certificates of deposit ("Instruments") in such sizes and maturities as are described on Appendix A, and with such purchase amounts, terms and minimum yields as are communicated from time to time by Lehman to S&Y in writing in conjunction with the periodic Account reviews described in Appendix A.  An authorized representative of Lehman will direct S&Y as to which Lehman Entity Instruments shall be purchased for and deposited in such Lehman Entity's Account.  Each of the Lehman Entities intends to maintain separate Accounts and Instruments. No Assets or Instruments of one Lehman Entity will be commingled or combined with the assets of another Lehman Entity.  Subject to all of the foregoing parameters and limitations, each Lehman Entity grants S&Y full discretion to select which particular Instruments to cause its Accounts to purchase and sell to carry out the Purchase Program, and to determine the timing of each such transaction.  Lehman acknowledges that, depending on market conditions and the guidelines established by Lehman, S&Y may be unable to complete the Purchase Program as described in Appendix A and such guidelines, and undertakes no obligation to do so. Notwithstanding anything to the contrary in this Agreement, S&Y shall have no obligation to perform any Services (as defined below) under this Agreement until (i) Lehman has obtained the approval of the Bankruptcy Court, as described in section 3(a)(i), to execute, deliver and perform its obligations under this Agreement, and (ii) the Bankruptcy Court has approved S&Y's retention by Lehman under this Agreement and authorized Lehman to pay S&Y's fees and expenses hereunder, as described in section 5.

(b)    The services to be performed by S&Y under section 1(a) are referred to herein as the "Services."  S&Y is authorized to select and engage, at its own expense, one or

more independent contractors (each, an "Independent Contractor") to assist it in providing the Services, (i) subject to Lehman's prior written approval and (ii) on the condition that such Independent Contractors shall be subject to the terms and conditions set forth in sections 1(a), 1(c), 1(d), 1(e), 3(b)(ii), (iv) and (v), 4, 11, 12, 16, 17, and 23 of this Agreement and Appendix A. S&Y has engaged, and Lehman has approved, Structural Investment Management LLC as an Independent Contractor subject to this section 1(b).

(c)    S&Y will take all reasonable actions to assist Lehman and the Custodian in legal proceedings and other actions, including bankruptcies or class actions, involving Instruments held in or formerly held in the Accounts or the issuers of Instruments that may be necessary to recover the value of the Instruments.

(d)    Notwithstanding anything in this Agreement to the contrary, S&Y shall have no authority hereunder to take or have possession of any assets in the Accounts or to direct delivery of any Instruments or payment of any funds held in the Accounts to itself, or to direct any disposition of such Instruments or funds except to Lehman or for countervalue in accordance with the terms hereof.

(e)    Each Lehman Entity retains all authority to exercise voting rights with respect to Instruments in its Accounts, and S&Y is expressly precluded from exercising voting rights with respect to such Instruments.

2.    Custodian Account(s).

(a)    Lehman shall have the right to appoint one or more custodians to act as custodian of the Accounts (collectively, the "Custodian"). Each of the Lehman Entities will maintain one or more separate Accounts with the Custodian. The Custodian shall be directed to comply with instructions from S&Y for the purpose of executing the Purchase Program, as provided in a custodian agreement. Lehman shall grant S&Y a limited power of attorney or take such other action as may be required by the Custodian to authorize S&Y to perform the Services with respect to the Accounts.

(b)    Data. Lehman agrees promptly to furnish, or to cause the Custodian to furnish, to S&Y all data and information S&Y may reasonably request to render the Services described above, provided that Lehman's failure to do so promptly shall not constitute a breach of this Agreement, and provided further that Lehman acknowledges that any such failure may materially affect S&Y's ability to perform the Services.

3.    Representations and Warranties.

(a)    Each of the Lehman Entities represents and warrants to S&Y and agrees with S&Y as follows:

i.    Such Lehman Entity has the requisite legal capacity and will seek to obtain authority from the Bankruptcy Court to execute, deliver and perform its obligations under this Agreement. This Agreement has been duly authorized, executed and delivered by such Lehman Entity and, upon approval of the Bankruptcy Court, is the legal, valid and binding agreement of such Lehman Entity, enforceable against it in accordance with its terms. Upon

approval of the Bankruptcy Court, such Lehman Entity's execution of this Agreement and the performance of its obligations hereunder do not conflict with or violate any provisions of the governing documents (if any) of such Lehman Entity or any obligations by which it is bound, whether arising by contract, operation of law or otherwise. Lehman will deliver to S&Y evidence of such Lehman Entity's authority and compliance with its governing documents on S&Y's request.

ii.    Such Lehman Entity is the owner of its respective cash and Instruments in its Accounts, and the only restrictions on investment of the assets in its Account are those due to the Chapter 11 Cases, which restrictions are set forth in Appendix A.

iii.    Such Lehman Entity is aware of the financial, business, tax and legal risks associated with the Purchase Program. Such Lehman Entity understands that S&Y is not responsible for determining the suitability of the Purchase Program for that Lehman Entity or any other person.

iv.    At all times during the term of this Agreement, less than 25% of the assets of each Account, and of all Accounts in the aggregate, will be assets of employee benefit plans within the meaning of the Federal Employee Retirement income Security Act of 1974, as amended.

v.    The foregoing representations, warranties and agreements shall be continuing during the term of this Agreement and if at any time any event occurs that could reasonably be expected to make any of the foregoing incomplete or inaccurate, Lehman shall immediately notify S&Y of the occurrence of such event.

(b)    S&Y represents and warrants to Lehman and agrees with Lehman as follows:

i.    S&Y has the requisite legal capacity and authority to execute, deliver and perform its obligations under this Agreement. This Agreement has been duly authorized, executed and delivered by S&Y and is the legal, valid and binding agreement of S&Y, enforceable against S&Y in accordance with its terms. S&Y's execution of this Agreement and the performance of its obligations hereunder do not conflict with or violate any provisions of the governing documents (if any) of S&Y or any obligations by which S&Y is bound, whether arising by contract, operation of law or otherwise. S&Y will deliver to Lehman evidence of S&Y's authority and compliance with its governing documents on Lehman's request.

ii.    S&Y has been made aware of and acknowledges the restrictions imposed on Lehman's ability to invest its cash due to the Chapter 11 Cases, which restrictions are disclosed in Appendix A hereto. S&Y agrees that it shall in all instances comply with such limitations in providing the Services and shall make any Independent Contractors it may engage aware of such restrictions.

iii.    S&Y is a registered investment advisor with the U.S. Securities and Exchange Commission. S&Y has obtained and will maintain in effect all necessary

3

regulatory approvals, authorizations or consents required by applicable law to act as an investment advisor to Lehman and to fulfill its obligations under this Agreement.

iv.    S&Y and any Independent Contractor it may engage will not advise the entities issuing the Instruments under the Purchase Program that any Lehman Entity is the customer purchasing the Instruments.    S&Y will immediately advise Lehman if S&Y becomes aware that any such entities learn of Lehman's involvement in the Purchase Program or of any setoff exercised against any Account or Instruments.

v.    The foregoing representations, warranties and agreements shall be continuing during the term of this Agreement and if at any time any event occurs that could reasonably be expected to make any of the foregoing incomplete or inaccurate; S&Y shall immediately notify Lehman of the occurrence of such event.

4.    Confidentiality.

(a)    Except as required by law or requested by regulatory authorities, (i) S&Y agrees (A) to maintain in strict confidence all personal and financial information regarding Lehman that is furnished to S&Y by Lehman and (B) not to disclose that any Lehman Entity is the customer of the Instruments, and (ii) Lehman agrees to maintain in strict confidence all information furnished to Lehman by S&Y and any Independent Contractor.

(b)    Lehman and Structural Investment Management LLC will enter into a confidentiality agreement substantially in the form annexed hereto as Appendix C. Lehman may require that any Independent Contractor to be engaged by S&Y pursuant to this Agreement enter into a similar confidentiality agreement with Lehman.

5.    Fees.    Lehman shall pay S&Y the fees set forth in Appendix B (the "Fees") for the period for which S&Y performs the Services or the post-termination services described in section 12.    The Fees constitute full compensation to S&Y for all charges, costs and expenses incurred by S&Y on behalf of Lehman in purchasing Instruments for the Accounts, unless otherwise specifically agreed to in writing by Lehman.    Lehman shall not be responsible for the fees, expenses, charges and costs of any Independent Contractors, including Structural Investment Management LLC, engaged by S&Y pursuant to section 1(b).    S&Y will calculate the monthly Fees owed to it by Lehman, using the formula set forth in Appendix B, and will include such calculation in each monthly report it furnishes to Lehman under section 6. Lehman will pay to S&Y the Fee for each month, calculated in accordance with Appendix B, within 60 days of receipt by Lehman of that month's report from S&Y, subject to the following sentence.    Both parties agree and acknowledge that due to the Chapter 11 Cases, Lehman may not pay such fees, expenses and other amounts until S&Y's retention is approved by the Bankruptcy Court and Lehman is authorized to pay S&Y's fees and expenses under this Agreement.    S&Y agrees to promptly take all reasonable steps to be retained by Lehman in the Chapter 11 Cases and to comply with the requirements and obligations imposed on S&Y that are communicated by Lehman to S&Y as a result of such retention.

6.      Reports.

(a)      Lehman shall cause the Custodian to send to S&Y a daily Account statement at the end of each business day, identifying the amount of funds and each Instrument in each Account at the end of such day, and setting forth all transactions in the Accounts during that day.

(b)      Within 5 business days after the end of each month, S&Y will deliver to Lehman and the Custodian a statement that (i) describes all Instruments purchased as of such month-end by S&Y for the Accounts in the Purchase Program, (ii) shows the percentage of the Purchase Program that has been completed as of such date, (iii) confirms that the restrictions imposed on the Purchase Program set forth in Appendix A have been and are being complied with and (iv) calculates the Fee owed for that month using the formula set forth in Appendix B. Upon completion of 25%, 50%, 75% and 100% of the Purchase Program for each of the one-year and two-year Instruments, S&Y shall deliver to Lehman a report that describes the average collective yield of the Accounts' aggregate portfolio.    S&Y will work with the Custodian to provide such additional reports as are reasonably requested by Lehman from time to time.

7.      Responsibility for Custodial Expenses.    S&Y shall not be responsible for custodial fees, bank service fees, CUSIP fees or DTC fees associated with the Accounts or the Purchase Program.

8.      Brokerage.

(a)      Lehman understands that S&Y will select Instruments for the Accounts in a manner consistent with Section 1 and its fiduciary duties to Lehman, taking into account a number of factors, including, but not limited to, any transaction fees or expenses associated with certain Instruments.   Although S&Y is registered as a broker-dealer, neither S&Y nor any of its affiliates will execute transactions for the Accounts or otherwise act as a broker for Lehman or the party on the other side of any purchase or sale of Instruments for the Accounts.

(b)      If because of a prior relationship between Lehman and one or more sellers or purchasers of Instruments or for other reasons, Lehman has instructed S&Y to cause the Accounts to purchase or sell certain Instruments from such parties, Lehman represents and warrants that Lehman is satisfied with the terms and conditions of such purchases or sales. S&Y shall not have any responsibility for obtaining for the Accounts from any such party the best prices for Instruments purchased from or sold to such party.   Lehman recognizes that in such cases Lehman may pay more or obtain lower sale prices for Instruments than it might if S&Y had discretion to buy and sell Instruments from other parties.   Lehman agrees that if S&Y believes, in its exclusive discretion, that S&Y cannot satisfy its fiduciary duty by causing the Accounts to purchase or sell an Instrument from or to a party designated by Lehman, S&Y may transact with a different party.   Lehman shall promptly inform S&Y in writing, either in a periodic Account review as described in Appendix A or otherwise, if Lehman desires that S&Y not transact with such different party.

9.      Allocation of Investments.   Lehman acknowledges and understands that S&Y engages in an investment advisory business apart from performing the Services.  This will create

conflicts of interest with the Accounts over S&Y's time devoted to performing the Services, and S&Y's allocation of investment opportunities between the Accounts and the investment advisory client accounts it manages.    Nothing in this Agreement shall be deemed to obligate S&Y to acquire for the Accounts any Instrument that it or its officers, managers, members, employees or affiliates may acquire for S&Y's or their own accounts or for the account of any other investment advisory client, if, in the reasonable discretion of S&Y, it is not practical or desirable to acquire such Instrument for the Accounts.

10.    <u>Account Losses</u>.  To the extent permitted under applicable law, Lehman agrees that S&Y will not be liable to any Lehman Entity for any losses incurred by any Lehman Entity that arise out of or are in any way connected with any recommendation or other act or failure to act of S&Y under this Agreement, including, but not limited to, any (a) failure to obtain the lowest transaction costs for the Accounts or failure to recapture any such costs for the benefit of the Accounts, (b) trade error made by any person in connection with any transaction on behalf of the Accounts, (c) negligent error in judgment with respect to the Account, or (d) tax liability asserted against any Lehman Entity by any federal, state or local authority as a result of any position taken by S&Y with respect to the Accounts, so long as such recommendation or other act or failure to act does not constitute bad-faith, self-dealing, gross negligence, willful misconduct or a breach of fiduciary duty by S&Y (for these purposes, a failure or error described in clauses (a) through (c) shall not be deemed a breach of S&Y's fiduciary duty).  Lehman shall indemnify and defend S&Y, its officers, managers, members, employees and affiliates and hold them harmless from and against any and all claims, losses, damages, liabilities and expenses, as they are incurred, by reason of any act or omission of Lehman or any Custodian, broker, agent or other third party selected by an S&Y in a commercially reasonable manner or selected by Lehman, except such as arise from S&Y's breach of fiduciary duty to Lehman, bad-faith, self-dealing, gross negligence or willful misconduct. Anything in this section 10 or otherwise in this Agreement to the contrary notwithstanding, however, nothing herein shall constitute a waiver or limitation of any rights that Lehman may have under any federal or state securities laws.

11.    <u>No Setoff</u>.

(a)    S&Y hereby agrees that, with or without notice, it will not nor will it permit its affiliates to set-off, appropriate or apply any assets of the Accounts against any obligation owed by Lehman or any of its affiliates to S&Y or any of its affiliates in any capacity, whether such obligation is direct or indirect, absolute or contingent, matured or unmatured, and S&Y hereby irrevocably and unconditionally waives any and all rights to exercise any such right of set-off whether such rights arise by virtue of contract or law.

(b)    S&Y further agrees to provide reasonable assistance at Lehman's request if Lehman seeks assurance that entities issuing Instruments agree not to setoff, appropriate or apply Lehman's investments or the proceeds thereof against any claims such parties, their affiliates or third-parties may have against Lehman.

12.    <u>Termination; Withdrawals</u>.  This Agreement may be terminated by any party with or without cause on 10 days' prior written notice to the other parties.  In the event of a termination, S&Y shall be required to continue to monitor and track all Instruments in the Accounts until their maturity and to undertake all steps that may be necessary to recover the

proceeds of all investments made pursuant to this Agreement for Lehman; provided that Lehman shall continue to pay S&Y Fees under section 5, as calculated pursuant to Appendix B, for as long as S&Y continues to provide services under this sentence.    The parties' respective obligations under Section 4(a) of this Agreement shall survive the termination, if any, of this Agreement and the parties will remain bound by Section 4(a) of this Agreement notwithstanding any such termination.

13.    <u>Delivery of Information</u>.    Each Lehman Entity acknowledges receipt of Part II of S&Y's Form ADV.    If a Lehman Entity received such material less than 48 hours before signing this Agreement, that Lehman Entity may terminate this Agreement within 5 days from the effective date of this Agreement without penalty.    On written request from Lehman, S&Y agrees to deliver annually, without charge, Part II of S&Y's Form ADV.

14.    <u>Independent Contractor</u>.    S&Y is and will hereafter act as an independent contractor and not as an employee of Lehman, and nothing in this Agreement may be interpreted or construed to create any employment, partnership, joint venture or other relationship between S&Y and Lehman or any holder of assets in the Accounts.

15.    <u>Assignment</u>.    S&Y may not assign this Agreement without the prior consent of Lehman.    This Agreement shall bind and inure to the benefit of and be enforceable by the parties and their respective successors and assigns.

16.    <u>Governing Law.</u>    This Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of New York without regard to conflict of law principles.

17.    <u>Jurisdiction</u>.    Any suit, action, or proceeding against any party or any of its assets arising out of or relating to the Agreement shall be brought in the Bankruptcy Court, and each party hereby irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court over the subject matter of any such suit, action, proceeding, dispute or controversy arising from or related to the Agreement.    If the Bankruptcy Court abstains from exercising jurisdiction or does not have jurisdiction with respect to such suit, action, or proceeding, then the Courts of the State of New York and the United States District Court, in each case located in the County of New York, shall have exclusive jurisdiction in respect of such suit, action or proceeding.

18.    <u>Notices</u>.    All communications under this Agreement must be in writing and will be deemed duly given and received when delivered personally, when transmitted by e-mail, three days after being sent by first class mail, or one business day after being deposited for next-day delivery with a nationally recognized overnight delivery service, all charges or postage prepaid, properly addressed to the party to receive such notice at that party's address indicated below that party's signature on this Agreement, or at any other address that either party may designate by notice to the other.    All communications to Lehman should be directed to Peter Cheston (pcheston@alvarezandmarsal.com) and Janet Birney (janet.birney@lehmanholdings.com).    All communications to S&Y should be directed to Bill Post (bpost@syllc.com) and Bill Evans (bevans@syllc.com).

19.  Amendment.  This agreement, including the appendixes hereto, may only be amended by a written agreement executed by Lehman and S&Y.

20.  Severability.  The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any and all other provisions hereof.

21.  Entire Agreement.  This Agreement (including the Purchase Program and Fee Schedule attached hereto) is the entire agreement of the parties and supersedes all prior or contemporaneous written or oral negotiations, correspondence, agreements and understandings (including any and all preexisting investment management agreements, which are hereby cancelled), regarding the subject matter hereof.

22.  Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

23.  No Third-Party Beneficiaries.  Neither party intends for this Agreement to benefit any third party not expressly named in this Agreement.

IN WITNESS WHEREOF, this Agreement has been duly signed by or on behalf of the parties hereto on the dates set forth below their respective signatures.

LEHMAN BROTHERS HOLDINGS INC.          STONE & YOUNGBERG LLC

By:  _____          By:  _____
Print Name: _Peter Cheston_              Print Name: _____
Title: _SVP + Co Treasurer_              Title: _____


Dated:        April 21, 2010             Dated:        April 21, 2010

Address:      1271 Avenue of the Americas   Address:      One Ferry Bldg, Ste. 275
              New York, NY 10020                          San Francisco, CA 94111


Telephone:    646-285-9134               Telephone:    (415) 445-2300
Facsimile:    646-285-9318               Facsimile:    (415) 445-2317

8

19.    _Amendment_.  This agreement, including the appendixes hereto, may only be amended by a written agreement executed by Lehman and S&Y.

20.    _Severability_.  The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any and all other provisions hereof.

21.    _Entire Agreement_.  This Agreement (including the Purchase Program and Fee Schedule attached hereto) is the entire agreement of the parties and supersedes all prior or contemporaneous written or oral negotiations, correspondence, agreements and understandings (including any and all preexisting investment management agreements, which are hereby cancelled), regarding the subject matter hereof.

22.    _Counterparts_.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

23.    _No Third-Party Beneficiaries_.  Neither party intends for this Agreement to benefit any third party not expressly named in this Agreement.

IN WITNESS WHEREOF, this Agreement has been duly signed by or on behalf of the parties hereto on the dates set forth below their respective signatures.

LEHMAN BROTHERS HOLDINGS INC.    STONE & YOUNGBERG, LLC

By: _____    By: _____
      Print Name: _____          Print Name: _William A Evans_
      Title: _____          Title: _Managing Director_
                                                _Private Client Group_

Dated:    April 21, 2010          Dated:    April 21, 2010

Address:  1271 Avenue of the Americas    Address:  One Ferry Bldg, Ste. 275
          New York, NY 10020                      San Francisco, CA 94111

Telephone:  646-285-9134         Telephone:  (415) 445-2300
Facsimile:  646-285-9318         Facsimile:  (415) 445-2317

8

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____

Print Name: _Peter Cheston_

Title: _Co - Treasurer_

Dated:        April 21, 2010

Address:     1271 Avenue of the Americas
             New York, NY 10020

Telephone:   646-285-9134
Facsimile:   646-285-9318

LEHMAN BROTHERS COMMERCIAL PAPER INC.

By: _____

Print Name: _Peter Cheston_

Title: _Co - Treasurer_

Dated:        April 21, 2010

Address:     1271 Avenue of the Americas
             New York, NY 10020

Telephone:   646-285-9134
Facsimile:   646-285-9318

9

LEHMAN BROTHERS COMMODITY SERVICES INC.

By: _____

Print Name: _Peter Cheston_

Title: _Co – Treasurer_


Dated:          April 21, 2010

Address:        1271 Avenue of the Americas
                New York, NY 10020

Telephone:      646-285-9134
Facsimile:      646-285-9318


LEHMAN BROTHERS COMMERCIAL CORPORATION

By: _____

Print Name: _Peter Cheston_

Title: _Co – Treasurer_


Dated:          April 21, 2010

Address:        1271 Avenue of the Americas
                New York, NY 10020

Telephone:      646-285-9134
Facsimile:      646-285-9318

10

LEHMAN BROTHERS OTC DERIVATIVES INC.

By: _____

Print Name: *Peter Cheston*

Title: *Co - Treasurer*


Dated:          April 21, 2010

Address:        1271 Avenue of the Americas
                New York, NY 10020

Telephone:      646-285-9134
Facsimile:      646-285-9318


LEHMAN BROTHERS FINANCIAL PRODUCTS INC.

By: _____

Print Name: *William J. Fox*

Title: *Chief Financial Officer, Controller and Senior Vice President*


Dated:          April 21, 2010

Address:        1271 Avenue of the Americas
                New York, NY 10020

Telephone:      646-285-9134
Facsimile:      646-285-9318

11

LEHMAN BROTHERS DERIVATIVES PRODUCTS INC.

By: _____

Print Name: William J. Fox

Title: *Chief Financial Officer, Controller and Senior Vice President*

Dated:          April 21, 2010

Address:       1271 Avenue of the Americas
               New York, NY 10020

Telephone:     646-285-9134
Facsimile:     646-285-9318

## APPENDIX A -- PURCHASE PROGRAM

### Brokered Certificate of Deposit Purchase Program ("BCDPP")

S&Y will implement the BCDPP for Lehman as follows:

Up to $500,000,000 in the aggregate of Certificates of Deposit of One year or less;
and
Up to $500,000,000 in the aggregate of Certificates of Deposit with maturities of not later than December 31, 2011.

Purchase of CDs may include instruments of less than one and two years respectively. Such instruments, whose maturities match or closely precede the timing of cash needs, may be purchased to maximize achieved yields. For example, if a one year term is required, S&Y may purchase a nine month deposit which has the highest yield spread over Treasuries and upon maturity roll funds into a three month deposit.

All cash invested pursuant to this Agreement and any interest earned thereon must at all times be directly fully guaranteed by the United States Government or an agency or instrumentality thereof, such as the Federal Deposit Insurance Corporation. S&Y does not have authority under the Agreement to cause the Accounts to purchase or sell instruments except in compliance with the immediately preceding sentence. This Appendix may only be modified in a manner that is consistent with Lehman's authority to invest its cash pursuant to the Bankruptcy Code and an order of the Bankruptcy Court.

S&Y will review with Lehman, at Lehman's request on a weekly basis, the Instruments purchased pursuant to this Agreement and the average collective yield of the Accounts' portfolios. The meetings shall be conducted by telephone at a mutually acceptable time during the implementation of the Purchase Program. Lehman, in its discretion, may change the time and frequency of such meetings. During this review, Lehman can submit to S&Y in writing, guidelines for purchase amount, term and minimum yields, net of fees, that it requires at that time with respect to the Purchase Program. Such changes will remain in effect until otherwise modified in writing by Lehman in a subsequent review. Lehman acknowledges that although S&Y will comply with any guidelines Lehman submits with respect to all investments for the Accounts that S&Y makes after such guidelines are established, investments S&Y made previously for the Accounts may not comply with such guidelines and therefore may prevent the overall portfolio of the Accounts from complying with such guidelines.

## APPENDIX B -- FEE SCHEDULE

Lehman shall pay S&Y a monthly fee (the "Fee") as follows pursuant to section 5 of the Agreement, calculated as of the last day of each month based on the following specified annual percentages of the Average Daily Market Value of Instruments in the Accounts for that month:

First $100,000,000 of Average Daily Market Value --  @ 0.25%
Amount in excess of $100,000,000 of Average Daily Market Value -- @ 0.195%

The monthly Fee shall equal the amount determined above, divided by 12.

The "Average Daily Market Value of Instruments in the Accounts" is, for any month, the sum of the Market Value of Instruments in the Accounts for each business day of that month, divided by the number of business days in that month.

The "Market Value of Instruments in the Accounts" as of any day is the aggregate Market Value of all Instruments in the Accounts at the end of that day, as determined by the Custodian.

If S&Y begins providing Services under the Agreement on a date other than the first day of a month or ceases to provide Services under the Agreement on a date other than the last day of a month, the Fee for that initial or final month shall be calculated based on the number of business days in that month on which S&Y provided Services (i.e., calculating the Average Daily Market Value of Instruments in the Accounts using only the business days in the month on which S&Y provided services, and using as the denominator that number of business days rather than the total number of business days in that month).

The fees described herein shall be calculated in the aggregate based upon the total value of Instruments of all of the Lehman Entities' Accounts notwithstanding that the Accounts and Instruments of the various Lehman Entities are not to be commingled or combined.

EXAMPLE OF MONTHLY FEE CALCULATION:

Market Value of Instruments in the Accounts on each of days 1-5:   0
Market Value of Instruments in the Accounts on each of days 6-10:  $100,000,000
Market Value of Instruments in the Accounts on each of days 11 and 12:  $200,000,000
Market Value of Instruments in the Accounts on each of days 13-30: $500,000,000

Average Daily Market Value of Instruments in the Accounts:

$$[(5 \times \$0) + (5 \times \$100mm) + (2 \times \$200mm) + (18 \times \$500mm)] / 30 = \$330mm$$

Month's Fee:

$$[(0.25\% \times \$100,000,000) + (0.195\% \times \$230,000,000)] / 12 =$$

$$(\$250,000 + \$448,500) / 12 = \underline{\$58,208.33 \text{ Fee for the month}}$$

**<u>APPENDIX C – STRUCTURAL CONFIDENTIALITY AGREEMENT</u>**

## CONFIDENTIALITY AGREEMENT

This agreement (the "Agreement") is entered into as of April 21, 2010, by and between Structural Investment Management LLC ("Structural"), a Delaware limited liability company, and Lehman Brothers Holdings Inc., Lehman Brothers Special Financing Inc., Lehman Brothers Commercial Paper Inc., Lehman Brothers Commodity Services Inc., Lehman Brothers Commercial Corporation, Lehman Brothers OTC Derivatives Inc., Lehman Brothers Financial Products Inc. and Lehman Brothers Derivatives Products Inc. (each, a "Lehman Entity" and collectively, "Lehman"), each a company incorporated under the laws of the State of Delaware and a debtor and debtor in possession under chapter 11 of the United States Code (the "Bankruptcy Code") in a jointly administered case, Case No. 08-13555 (JMP) (the "Chapter 11 Cases") pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

Pursuant to a Program Services Agreement dated as of April 21, 2010 (the "PSA"), Lehman has engaged Stone & Youngberg LLC ("S&Y"), a California limited liability company, to execute a purchase program (the "Purchase Program") for certain accounts of Lehman (collectively, the "Account"), consisting of the purchase of certain instruments ("Instruments") in accordance with parameters specified by Lehman in the PSA. Pursuant to an Independent Contractor Agreement dated January 26, 2010 (the "Structural Agreement"), S&Y has engaged Structural to assist S&Y in identifying Instruments for the Purchase Program and otherwise to assist S&Y in performing services under the PSA. Under section 1(b) of the PSA, Lehman has approved S&Y's engagement of Structural. In consideration of the mutual covenants herein, Lehman and Structural agree as follows:

1.      Confidentiality.  Except as required by law or requested by regulatory authorities, Structural agrees (a) to maintain in strict confidence all personal and financial information regarding Lehman that is furnished to Structural by S&Y or Lehman and (b) not to disclose to any third-party, including, without limitation, the issuers of the Instruments in the Account, that any Lehman Entity is the customer of the Instruments.  Except as required by law or requested by regulatory authorities, Lehman agrees to maintain in strict confidence all information furnished to Lehman by Structural.

2.      No Setoff.  Structural hereby agrees that, with or without notice, it will not nor will it permit its affiliates to set-off, appropriate or apply any assets of the Account against any obligation owed by Lehman or any of its affiliates to Structural or any of its affiliates in any capacity, whether such obligation is direct or indirect, absolute or contingent, matured or unmatured, and Structural hereby irrevocably and unconditionally waives any and all rights to exercise any such right of set-off whether such rights arise by virtue of contract or law.

3.      Notification.  Structural will immediately advise Lehman if Structural becomes aware (a) that any issuers of the Instruments in the Account learn of Lehman's involvement in the Purchase Program or (b) of any setoff exercised against the Account or Instruments in the Account.

4.      Survival of Obligations.  The parties' respective obligations under Section 1 of this Agreement shall survive the termination, if any, of the PSA and/or the Structural Agreement

and the parties will remain bound by Section 1 of this Agreement notwithstanding any such termination.

5.    No Employment.  Nothing in this Agreement may be interpreted or construed to create any employment, partnership, joint venture or other relationship between Structural and Lehman or any holder of assets in the Account.

6.    Assignment.  Structural may not assign this Agreement without the prior consent of Lehman.  This Agreement shall bind and inure to the benefit of and be enforceable by the parties and their respective successors and assigns.

7.    Governing Law.  This Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of New York without regard to conflict of law principles.

8.    Jurisdiction.  Any suit, action, or proceeding against any party or any of its assets arising out of or relating to the Agreement shall be brought in the Bankruptcy Court, and each party hereby irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court over the subject matter of any such suit, action, proceeding, dispute or controversy arising from or related to the Agreement.  If the Bankruptcy Court abstains from exercising jurisdiction or does not have jurisdiction with respect to such suit, action, or proceeding, then the Courts of the State of New York and the United States District Court, in each case located in the County of New York, shall have exclusive jurisdiction in respect of such suit, action or proceeding.

9.    Notices.  All communications under this Agreement must be in writing and will be deemed duly given and received when delivered personally, when transmitted by e-mail, three days after being sent by first class mail, or one business day after being deposited for next-day delivery with a nationally recognized overnight delivery service, all charges or postage prepaid, properly addressed to the party to receive such notice at that party's address indicated below that party's signature on this Agreement, or at any other address that either party may designate by notice to the other. All communications to Lehman should be directed to Peter Cheston (pcheston@alvarezandmarsal.com) and Janet Birney (janet.birney@lehmanholdings.com).  All communications to Structural should be directed to Ned Lucia (nlucia@structuralinvest.com).

10.    Amendment.  This Agreement may only be amended by a written agreement executed by Lehman and Structural.

11.    Severability.  The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any and all other provisions hereof.

12.    Entire Agreement.  This Agreement is the entire agreement of the parties and supersedes all prior or contemporaneous written or oral negotiations, correspondence, agreements and understandings (including any and all preexisting investment management agreements, which are hereby cancelled), regarding the subject matter hereof.

13.    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

14.    <u>No Third-Party Beneficiaries</u>.  Neither party intends for this Agreement to benefit any third party not expressly named in this Agreement.


IN WITNESS WHEREOF, this Agreement has been duly signed by or on behalf of the parties hereto on the dates set forth below their respective signatures.


LEHMAN BROTHERS HOLDINGS INC.          STRUCTURAL INVESTMENT
                                       MANAGEMENT LLC

By: _____            By: _____
    Print Name: _Peter Cheston_            Print Name: _____
    Title: _SVP Co Treasurer_              Title: _____

Dated:        April 21, 2010            Dated:        April 21, 2010

Address:      1271 Avenue of the Americas    Address:      201 California St., Ste. 600
              New York, NY 10020                           San Francisco, CA 94111


Telephone:    646-285-9134              Telephone:    (415) 963-4900
Facsimile:    646-285-9318              Facsimile:    (415) 963-4901



LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____
    Print Name: _Peter Cheston_
    Title: _Co - Treasurer_

Dated:        April 21, 2010

Address:      1271 Avenue of the Americas
              New York, NY 10020

Telephone:    646-285-9134
Facsimile:    646-285-9318

3

13.    <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

14.    <u>No Third-Party Beneficiaries</u>. Neither party intends for this Agreement to benefit any third party not expressly named in this Agreement.

IN WITNESS WHEREOF, this Agreement has been duly signed by or on behalf of the parties hereto on the dates set forth below their respective signatures.


LEHMAN BROTHERS HOLDINGS INC.    STRUCTURAL INVESTMENT
MANAGEMENT LLC.

By: _____    By: _____
    Print Name: _____        Print Name: _Ned Tucci_
    Title: _____        Title: _President & CEO_

Dated:          April 21, 2010    Dated:          April 21, 2010

Address:        1271 Avenue of the Americas    Address:        201 California St., Ste. 600
                New York, NY 10020                             San Francisco, CA 94111


Telephone:      646-285-9134    Telephone:      (415) 963-4900
Facsimile:      646-285-9318    Facsimile:      (415) 963-4901



LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____
    Print Name: _____
    Title: _____

Dated:          April 21, 2010

Address:        1271 Avenue of the Americas
                New York, NY 10020

Telephone:      646-285-9134
Facsimile:      646-285-9318

LEHMAN BROTHERS COMMERCIAL PAPER INC.

By: _____

Print Name: _Peter Cheston_

Title: _Co - Treasurer_

Dated:          April 21, 2010

Address:        1271 Avenue of the Americas
                New York, NY 10020

Telephone:      646-285-9134
Facsimile:      646-285-9318

LEHMAN BROTHERS COMMODITY SERVICES INC.

By: _____

Print Name: _Peter Cheston_

Title: _Co - Treasurer_

Dated:          April 21, 2010

Address:        1271 Avenue of the Americas
                New York, NY 10020

Telephone:      646-285-9134
Facsimile:      646-285-9318

LEHMAN BROTHERS COMMERCIAL CORPORATION

By: _____

Print Name: _Peter Cherton_

Title: _Co - Treasurer_

Dated:          April 21, 2010

Address:        1271 Avenue of the Americas
                New York, NY 10020

Telephone:      646-285-9134
Facsimile:      646-285-9318


LEHMAN BROTHERS OTC DERIVATIVES INC.

By: _____

Print Name: _Peter Cherton_

Title: _Co - Treasurer_

Dated:          April 21, 2010

Address:        1271 Avenue of the Americas
                New York, NY 10020

Telephone:      646-285-9134
Facsimile:      646-285-9318

5

LEHMAN BROTHERS FINANCIAL PRODUCTS INC.

By: _____
Print Name: William J. Fox
Title: Chief Financial Officer, Controller and Senior Vice President

Dated:          April 21, 2010

Address:        1271 Avenue of the Americas
                New York, NY 10020

Telephone:      646-285-9134
Facsimile:      646-285-9318


LEHMAN BROTHERS DERIVATIVES PRODUCTS INC.

By: _____
Print Name: William J. Fox
Title: Chief Financial Officer, Controller and Senior Vice President.

Dated:          April 21, 2010

Address:        1271 Avenue of the Americas
                New York, NY 10020

Telephone:      646-285-9134
Facsimile:      646-285-9318

6

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
                        :

In re                          :       Chapter 11 Case No.
                          :

LEHMAN BROTHERS HOLDINGS INC., *et al.*,   :       08-13555 (JMP)
                          :

               Debtors.       :       (Jointly Administered)
                          :

------------------------------------------------------------------x

## ORDER GRANTING MOTION OF CERTAIN
## DEBTORS PURSUANT TO SECTIONS 105(a) AND
## 363(b) OF THE BANKRUPTCY CODE FOR AUTHORIZATION
## TO ENGAGE STONE & YOUNGBERG AS INVESTMENT ADVISOR

Upon the motion, dated April 21, 2010 (the "Motion"),[1] of Lehman Brothers

Holdings Inc. ("LBHI") and certain of its affiliated debtors in the above-referenced chapter 11

cases, as debtors and debtors in possession (collectively, the "Investing Debtors")[2], pursuant to

sections 105(a) and 363(b) of title 11 of the United States Code (the "Bankruptcy Code") and

Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for

authorization and approval of, among other things, the Investing Debtors' retention of Stone &

Youngberg LLC ("S&Y") as investment advisor, all as more fully described in the Motion; and

the Court having jurisdiction to consider the Motion and the relief requested therein in

accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to

Bankruptcy Judges for the Southern District of New York Any and All Proceedings Under Title

---

[1] Capitalized terms that are used but not defined in this Order have the meanings ascribed to them in the Motion.

[2] The Investing Debtors are: LBHI; Lehman Brothers Special Financing Inc.; Lehman Brothers Commercial Paper Inc.; Lehman Brothers Commodity Services Inc.; Lehman Brothers Commercial Corporation; Lehman Brother OTC Derivatives Inc.; Lehman Brothers Financial Products Inc.; and Lehman Brothers Derivatives Products Inc.

11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief

requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of

the Motion having been provided in accordance with the procedures set forth in the amended

order entered February 13, 2009 governing case management and administrative procedures

[Docket No. 2837] to (i) the United States Trustee for the Southern District of New York; (ii) the

attorneys for the Official Committee of Unsecured Creditors; (iii) the Securities and Exchange

Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern

District of New York; and (vi) S&Y, and it appearing that no other or further notice need be

provided; and the Court having found and determined that the relief sought in the Motion is in

the best interests of the Investing Debtors, their estates and creditors, and all parties in interest

and that the legal and factual bases set forth in the Motion establish just cause for the relief

granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that pursuant to sections 105(a) and 363(b) of the Bankruptcy Code,

the Investing Debtors are authorized to engage S&Y as investment advisor on the terms and

conditions set forth in the Program Services Agreement attached to the Motion as Exhibit A; and

it is further

ORDERED that the Investing Debtors are authorized to permit S&Y to select and

engage, at its own expense, one or more Independent Contractors pursuant to the terms and

conditions of the Program Services Agreement without further order of this Court; and it is

further

ORDERED that the terms of the Program Services Agreement, including, without limitation, the fee provisions and the indemnification provisions, are reasonable and are approved; and it is further

ORDERED that the terms of the Program Services Agreement, including, without limitation, the termination provision, may be implemented in accordance with the terms thereof without further order of the Court; and it is further

ORDERED that the Investing Debtors are authorized to take all further actions that may be necessary or required for the Investing Debtors' entry into and performance of the Program Services Agreement; and it is further

ORDERED that the Investing Debtors are authorized to pay S&Y in such amounts and at such times as is provided in the Program Services Agreement without further order of this Court and S&Y shall not be required to file fee applications with the Court; and it is further

ORDERED that pursuant to Bankruptcy Rule 6004(h), this Order shall be effective immediately upon entry; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation and/or interpretation of this Order.

Dated: May __, 2010
       New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE