SALANS LLP
  Claude D. Montgomery
  Paul C. Gunther
  Michael Kauffman
Rockefeller Center
620 Fifth Avenue
New York, NY 10020-2457
Tel: (212) 632-5500
Fax: (212) 632-5555

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

In re                                                  :      **Chapter 11 Case No.**
                                          :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*    :      **08-13555 (JMP)**
                     **Debtors.**    :      **(Jointly Administered)**
                                          :

------------------------------------------------------------x

**SWEDBANK'S MEMORANDUM OF LAW PURSUANT TO**
**FED. R. BANKR. P. 8005 FOR STAY PENDING APPEAL OF**
**THE ORDER GRANTING THE DEBTORS' MOTION PURSUANT**
**TO SECTIONS 105(a) AND 362 OF THE BANKRUPTCY CODE**
**ENFORCING THE AUTOMATIC STAY AGAINST AND**
**COMPELLING PAYMENT OF POST-PETITION FUNDS BY SWEDBANK AB**

## TABLE OF CONTENTS

Preliminary Statement...................................................................................................2

Jurisdiction....................................................................................................................2

Background ....................................................................................................................2

I.    GROUNDS FOR RELIEF FROM THE ORDER PENDING APPEAL............................6

      A.    Stay Granted as a Matter of Court Discretion....................................6

      B.    Stay Granted as a Matter of Course .....................................................7

II.   SWEDBANK HAS MADE A STRONG SHOWING ON THE MERITS OF ITS
      PROPER EXERCISE OF SETOFF RIGHTS UNDER THE SAFE HARBOR
      PROVISIONS .......................................................................................................7

      A.    The Plain Meaning of the Bankruptcy Code Permits Swedbank's Setoff...............7

      B.    Pre versus Post Petition Mutuality is Irrelevant Under Safe Harbor Provisions ..11

            1.    Case Law Holds Section 553 Not Applicable...........................11

            2.    Mutuality Concept Outside of Section 553 Inapplicable............................12

            3.    Congress Specifically Rejected the Term "Mutual" In Drafting Safe
                  Harbor Provisions .............................................................13

      C.    Enforcing Safe Harbor Contractual Rights Consistent with Bankruptcy Code's
            Purpose.......................................................................................15

      D.    Express Limitations of Section 553(b) Are Consistent with Section 560 .............17

III.  SWEDBANK WILL BE IRREPARABLY HARMED IF THE STAY RELIEF IS NOT
      GRANTED. .......................................................................................................18

      A.    Swedbank Will Forever Lose Its Setoff Claim .......................................18

      B.    Even If Swedbank is Victorious on Appeal, Collection Impossibility May Bar
            Swedbank's Recovery on Its Setoff Claim............................................19

IV.   THE REQUESTED RELIEF WILL NOT HARM OTHER PARTIES .............................20

V.    THE REQUESTED RELIEF IS NOT CONTRARY TO PUBLIC POLICY ...................20

VI.   SWEDBANK'S APPEAL DOES NOT WARRANT THE POSTING OF A BOND ......21

i

Relief Requested ........................................................................................................................22

ii

# TABLE OF AUTHORITIES

## CASES

Cisneros v. Alpine Ridge Group,
    508 U.S. 10 (1993).................................................................................10

Citizens Bank of Maryland v. Strumpf,
    516 U.S. 16 (1995).................................................................................18

Illinois Nat. Guard v. Federal Labor Relations Authority,
    854 F.2d 1396 (D.C. Cir. 1988) ............................................................10

In re Adelphia,
    361 B.R. 337 (S.D.N.Y. 2007)...............................................................20

In re Advanced Mining Sys., Inc.,
    173 B.R. 467 (S.D.N.Y. 1994)...............................................................20

In re Bennett Funding Group,
    212 B.R. 206 (B.A.P. 2d Cir. 1997).......................................................16

In re Collated Prods. Corp.,
    121 B.R. 195 (D. Del. 1990)..................................................................19

In re Country Squire Associates of Carle Place, L.P.,
    203 B.R. 182 (2d Cir. 1996) .................................................................19

In re Ealy,
    396 B.R. 20 (8th Cir. 2008) .................................................................19

In re England Motor Co.,
    2010 WL. 220152 (Bankr. N.D.Miss. Jan. 19, 2010) ...........................16

In re Great Barrington Fair and Amusement, Inc.,
    53 B.R. 237 (Bankr. D. Mass. 1985) ....................................................6

In re Howley,
    38 B.R. 314 (Bankr. Minn. 1984) ........................................................7

In re K Town, Inc.,
    171 B.R. 313 (Bankr. N.D.Ill. 1994) ...................................................16

iii

In re Lifestyle Furnishings, LLC,
    418 B.R. 382 (Bankr. D.Idaho 2009) ..................................................................18

In re Metromedia Fiber Network, Inc.,
    416 F.3d 136 (2d Cir. 2005)...............................................................................20

In re Neisner Bros., Inc.,
    10 B.R. 299 (Bankr. S.D.N.Y. 1981) ...................................................................6

In re SemCrude, L.P.,
    399 B.R. 388 (Bankr. D.Del. 2009) ....................................................................16

In re Sphere Holding Corp.,
    162 B.R. 639 (E.D.N.Y. 1994) ...........................................................................21

In re St. Johnsbury Trucking Co., Inc.,
    185 B.R. 687 (S.D.N.Y. 1995)............................................................................19

In re Suprema Specialties, Inc.,
    330 B.R. 93 (S.D.N.Y. 2005)..........................................................................6, 19

In re Weisberg,
    136 F.3d 655 (9th Cir. 1998) .........................................................................11, 12

Liberty Mut. Ins. Co. v. Bankers Trust Co.,
    769 F. Supp. 130 (S.D.N.Y. 1991) .......................................................................7

Matter of Litchfield Const. Management, Inc.,
    137 B.R. 98 (Bankr. D. Conn. 1992) ..................................................................18

N.L.R.B. v. Bildisco and Bildisco,
    465 U.S. 513, 104 S. Ct. 1188 (1984)................................................................13

Perry v. Commerce Loan Co.,
    383 U.S. 392, 86 S. Ct. 852 (1966)....................................................................10

Playa Marel, P.M., S.A. v. LKS Acquisitions, Inc.,
    No. C-3-06-336, 2007 WL. 3342450 (S.D. Ohio Nov. 6, 2007)........................19

Thrifty Oil Co. v. Bank of America Nat. Trust and Sav. Ass'n,
    322 F.3d 1039 (9th Cir. 2003) ..............................................................................7

U.S. v. Ron Pair Enterprises, Inc.,
    489 U.S. 235, 109 S. Ct. 1026 (1989).................................................................9

iv

## STATUTES

11 U.S.C. § 362(b)(6) ...................................................................................................12, 13, 14

11 U.S.C. § 362(b)(17) ......................................................................................................14, 15

11 U.S.C. § 560.................................................................................................................. passim

11 U.S.C. § 561....................................................................................................................8, 9

28 U.S.C. § 1334..................................................................................................................2

28 U.S.C. § 157(b) ...............................................................................................................2, 6

Financial Netting Improvements Act of 2006, Pub. L. No. 109-390 (2006)..................................13

## MISCELLANEOUS

136 Cong. Rec. S7535 ..........................................................................................................17

5 Collier on Bankruptcy, § 553.03[3][b][ii]..............................................................................16

Brief of Petitioner-Appellant at 20-26, In re Weisberg, 136 F.3d 655 (9th Cir. 1998) .................12

H.R. Rep. 109-31(I) ............................................................................................................17

v

SALANS LLP
  Claude D. Montgomery
  Paul C. Gunther
  Michael Kauffman
Rockefeller Center
620 Fifth Avenue
New York, NY 10020-2457
Tel: (212) 632-5500
Fax: (212) 632-5555

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x

| | |
|---|---|
| **In re** : | **Chapter 11 Case No.** |
| : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.* : | 08-13555 (JMP) |
| **Debtors.** : | **(Jointly Administered)** |
| : | |

----------------------------------------------------------------x

## SWEDBANK'S MEMORANDUM OF LAW PURSUANT TO FED. R. BANKR. P. 8005 FOR STAY PENDING APPEAL OF THE ORDER GRANTING THE DEBTORS' MOTION PURSUANT TO SECTIONS 105(a) AND 362 OF THE BANKRUPTCY CODE ENFORCING THE AUTOMATIC STAY AGAINST AND COMPELLING PAYMENT OF POST-PETITION FUNDS BY SWEDBANK AB

Swedbank AB (publ.) ("Swedbank") by and through its undersigned counsel, files

this motion ("Motion") pursuant to Federal Rules of Bankruptcy Procedure ("FRBP") Rule 8005

for Stay Pending Appeal of the Order Granting the Motion of Lehman Brothers Holdings Inc.

("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as debtors and

debtors in possession (together, the "Debtors") Pursuant to Sections 105(A) and 362 of the

Bankruptcy Code Enforcing the Automatic Stay Against and Compelling Payment of Post-

Petition Funds by Swedbank AB, dated January 22, 2010.

## Preliminary Statement

Swedbank seeks (i) a stay of the Order (as defined below) granting the
Underlying Motion (as defined below), and (ii) a waiver of any requirement to post a bond. As
more fully described below, Swedbank wishes to pursue preservation of its Safe Harbor Setoff
Rights (as defined below) pursuant to five (5) ISDA Master Agreements and related credit
support guarantees from challenge by the Debtors. Maintenance of the *status quo ante* is
necessary to preserve those appeal rights.

## Jurisdiction

This Court has subject matter jurisdiction to consider and determine this matter
pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## Background

As provided in additional detail in Swedbank's original Objection, attached hereto
as Exhibit A, commencing in 1996, Swedbank entered into an ISDA Master Agreement with
each of the following Lehman entities: Lehman Brothers Commercial Corporation ("LBCC"),
Lehman Brothers International (Europe), Inc ("LBIE"), Lehman Brothers Finance, S.A.
("LBFSA"), Lehman Brothers Special Financing, Inc. ("LBSFI" and together with LBCC, LBIE
and LBFSA, "Lehman Subsidiaries"), and LBHI, acting through its UK Branch. The ISDA
Master Agreements for the Lehman Subsidiaries, and LBHI shall be referred to collectively as
the "ISDA Master Agreements."

LBHI has guaranteed the ISDA Master Agreement obligations of each of the
Lehman Subsidiaries through guarantees under each ISDA Master Agreement ("LBHI
Guarantees").

2

Under each of the Master Agreements, an Event of Default[1], whether subject to proper notice or automatic termination, triggers an Early Termination Date. Early termination gives rise to a payment obligation from one party or another irrespective of the identity of the defaulting party. A party entitled to receive the payment may credit "setoff" the obligation due to it against obligation it may owe to the other party. ISDA Master Agreements, § 6(e). "Set-off" is defined as "set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer." ISDA Master Agreements, § 14.

The Schedule to the LBHI Master Agreement *inter alia* provides:

> In addition to any rights of set-off a party may have as a matter of law or otherwise, upon the occurrence of an Event of Default or an Additional Termination Event and the designation of an Early Termination Date pursuant to Section 6 of the Agreement with respect to a party ("X"), the other party ("Y") will have the right (but not be obliged) without prior notice to X or any other person to set-off or apply any obligation of X owed to Y (and to any Affiliate of Y) (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation) against any obligation of Y (and of any Affiliate of Y) owed to X (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation).

Schedule to the LBHI Master Agreement, Part 5 (b).

On September 15, 2008, LBHI filed a voluntary petition for reorganization under Chapter 11 ("LBHI Reorganization Case") in the United States Bankruptcy Court of the Southern District of New York ("Bankruptcy Court").

---

[1] Each capitalized term that is not defined herein shall have the same definition as in the ISDA Master Agreements.

*LBHI'S Obligations to Swedbank*

During the pendency of the LBHI Reorganization Case, Swedbank has timely and properly preserved all its rights with respect to all amounts under the ISDA Master Agreements and LBHI Guarantees, including the timely filing of claims against LBHI related to (i) Swedbank's ISDA Master Agreement with LBHI in the amount of SEK 356,712, and (ii) LBHI's guarantees of the Lehman Subsidiaries in the amount of SEK 119,231,860, which included SEK 1,219,792 due from LBCC, SEK 43,296,206 due from LBIE, SEK 62,586,227 due from LBFSA, and SEK 12,129,635 due from LBSFI. All amounts claimed were exclusive of costs and interest as provided for under the ISDA Master Agreements.

Swedbank has never been in default under any of the ISDA Master Agreements or the LBHI ISDA Master Agreement and has not engaged in any conduct resulting in an Event of Default. LBHI has not suggested to the contrary in any communication to Swedbank or its counsel.

*Swedbank Obligations to LBHI*

In January 2008, LBHI, through its UK Branch, opened a deposit account at Swedbank identified as No. 17608 ("Setoff Account"). The pre-petition balance in the Setoff Account was SEK 2,640,124.06, but rose due to a series of unsolicited post-position deposits in the amount of SEK 82,765,466.45. The Setoff Account balance reached its related peak on November 12, 2008 with a balance of SEK 84,906,363.85.

Following a communication from LBHI, by letter dated November 27, 2008, Swedbank notified LBHI that it would, on December 1, 2008, setoff SEK 371,012 against the Setoff Account under the ISDA Master Agreement with LBHI the related LBHI Guarantees.

4

By letter dated January 30, 2009, Swedbank indicated that it had placed an administrative freeze on the Setoff Account arising from LBHI's obligations as guarantor of the ISDA Master Agreements with LBCC, LBFSA, LBIE and LBSFI. Such letter utilized the following additional language: "*Swedbank also reserve[s] and retain[s] the right to set off against the account any claims in relation to qualified financial transactions under the safe harbor provisions or otherwise.*" Exhibit D of the Declaration of Adrian Teng in Support of Debtors' Motion Enforcing the Automatic Stay Against Swedbank AB [Dkt. 6736] ("Teng Declaration").

Since the imposition of the Administrative Freeze, the amount in the Setoff Account has remained constant at SEK 82,765,466.45 ("Current Setoff Account Balance"). The Current Setoff Account Balance is roughly USD $11,453,300 at current exchange rates.

### Procedural History of Underlying Motion

On January 22, 2010, LBHI moved, Pursuant to Sections 105(a) and 362 of the Bankruptcy Code for an Order Enforcing the Automatic Stay Against and Compelling Payment of Post-Petition Funds by Swedbank AB [Dkt. 6734] ("Underlying Motion").

On February 3, 2010, Swedbank filed its objection to the Underlying Motion [Dkt. 6976] ("Objection") which Objection attached the First Declaration.

On April 9, 2010, LBHI replied to the Objection [Dkt. 8196] ("Reply").

On April 14, 2010, the Bankruptcy Court granted LBHI's Motion after oral arguments reserving the right to submit a written opinion in the event Swedbank elected to appeal. The Court denied Swedbank's oral request for a stay pending appeal requiring the submission of papers for consideration of such a request.

5

On April 16, 2010, by email correspondence, Swedbank's counsel inquired of LBHI's counsel if it would consent to a stay pending appeal. LBHI rejected Swedbank's stay pending appeal request by email dated April 19, 2010.

On April 20, 2010, LBHI and Swedbank agreed to a proposed order ("Order") providing for, *inter alia*, the payment of the Current Setoff Account Balance within one business day of the entry into force of the Order.

On April 21, 2010, LBHI submitted to Order to the Court for signature.

## I.    GROUNDS FOR RELIEF FROM THE ORDER PENDING APPEAL

FRBP 8005 authorizes the making of motions for a stay of a bankruptcy court order pending appeal of such order. FRBP 8005. Ordinarily, such motions are made in the first instance to the bankruptcy court. *Id.* ("A motion to stay of the …. order… of a bankruptcy judge… pending appeal must ordinarily be presented to the bankruptcy judge in the first instance").

### A.    Stay Granted as a Matter of Court Discretion

Courts interpreting FRBP Rule 8005 have granted a stay pending appeal, independent of any bond requirement, based on the following four criteria: "(1) whether there is a substantial possibility of success on appeal, (2) the risk of irreparable injury to Movants absent a stay, (3) the lack of substantial harm to the Trustee if a stay is granted, and (4) the public interests that may be affected.." *In re Suprema Specialties, Inc.*, 330 B.R. 93 (S.D.N.Y. 2005) (granting stay of pending appeal). In evaluating these factors, not all factors must be given equal weight, *In re Great Barrington Fair and Amusement, Inc.*, 53 B.R. 237 (Bankr. D. Mass. 1985), but rather, adjudication of a stay pending appeal is nothing "other than that of judicial discretion exercised to protect the rights of all parties in interest." *In re Neisner Bros., Inc.*, 10 B.R. 299 (Bankr. S.D.N.Y. 1981) (granting a stay pending appeal where "payment of monies … might,

6

albeit improbably, cause harm"). Such relief should be considered "in light of the importance of

the right of appeal and preservation of the *status quo* during the appeal." *In re Howley*, 38 B.R.

314 (Bankr. Minn. 1984).

**B.    Stay Granted as a Matter of Course**

Where a bond is posted, a stay is granted as a matter of course. *Liberty Mut. Ins.*

*Co. v. Bankers Trust Co.*, 769 F.Supp. 130 (S.D.N.Y. 1991) (granting stay because it is normally

done; "[a] stay of a money judgment is normally granted when a supersedeas bond is posted.

Accordingly, the application for a stay is granted"). This is true even if there is no evidence of

potential harm. *Id.* (even if applicant cannot show it will be "harmed in any way … a stay of a

money judgment is normally granted"). Notwithstanding, and as discussed in greater detail

below, Swedbank's appeal poses no risk to the Debtors and therefore the requested stay relief

should be granted without requiring the posting of a bond.

**II.    SWEDBANK HAS MADE A STRONG SHOWING ON THE
MERITS OF ITS PROPER EXERCISE OF
SETOFF RIGHTS UNDER THE SAFE HARBOR PROVISIONS**

Swedbank has a substantial likelihood of prevailing on the merits for three central

reasons: (i) the plain meaning of the Bankruptcy Code supports a reading that the constraints

contained in section 553 do not apply to the ISDA Master Agreements and Lehman Guarantees,

(ii) case law regarding the application of analogous Safe Harbor provisions supports this reading,

as does (iii) the legislative history of various Safe Harbor provisions and the wide-spread

understanding of the Safe Harbor provisions by recognized secondary sources.

**A.    The Plain Meaning of the Bankruptcy Code Permits Swedbank's Setoff**

Transactions under ISDA Master Agreements are "swap agreements" within the

meaning of the Bankruptcy Code. *Thrifty Oil Co. v. Bank of America Nat. Trust and Sav. Ass'n*,

322 F.3d 1039 (9th Cir. 2003) (finding an ISDA swap transaction to be a swap agreement under

7

the Bankruptcy Code). As such, the ISDA Master Agreements qualify as "swap agreements" under Bankruptcy Code 361 (7) and (17) and 560 and 561. The ISDA Master Agreements are also master netting agreements under section 561.

Subsection (a) of section 561 of Title 11 of the United States Code ("Bankruptcy Code") provides:

> [T]he exercise of *any* contractual right, because of [an *ipso facto* clause] to cause the termination, liquidation, or acceleration of or to *offset* or net termination values, payment amounts, or other transfer obligations arising under or in connection with one or more (or the termination, liquidation, or acceleration of one or more) ... (5) swap agreements; or (6) master netting agreements, *shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by any order of a court or administrative agency in any proceeding under this title*

("Safe Harbor Contractual Rights"). 11 U.S.C. § 561(a).

The Safe Harbor Contractual Rights of offset apply equally to pre-petition and post-petition obligations. First, sections 560 and 561 do not contain any language which limits netting or setoff of obligations relating to Safe Harbor transactions between pre- and post-petition obligations. Were they to do so, it would eviscerate the very purpose of the Safe Harbor provisions. By their own terms, sections 560 and 561 apply to "any" contractual right, whenever arising. Second, and by way of contrast, where the Bankruptcy Code contemplates differentiating between pre- and post-petition obligations, it does so specifically. For example, sections 362(a)(7) and 553, which cannot limit Safe Harbor transactions, explicitly differentiate between pre- and post-petition obligations. Sections 362 and 553 demonstrate that, when Congress intends to differentiate pre- and post-petition obligations in the context of a setoff, it does so in plain terms. Further, in 2005, Congress amended section 553 to explicitly exclude

8

transactions or setoff subject to the provisions of Sections 555, 556, 559, 560 and 561 ("Safe

Harbor Sections").

In leaving the section 553 pre- and post-petition distinction intact while leaving

the Safe Harbor Sections without pre- and post-petition distinction Congress purposefully

declined, again, to distinguish pre- and post-petition setoff obligations under Safe Harbor

Sections.

Subsection 561(b) makes clear that offset or netting permitted by the applicable

agreements, cannot be restricted. Subsection 561(b) states only one limitation on setoff, which is

contractual in nature: "A party may exercise a contractual right described in subsection (a) to

terminate, liquidate, or accelerate only to the extent that such party could exercise such a right

under section 555, 556, 559, or 560 for each individual contract covered by the master netting

agreement in issue." Neither subsection (b) of Section 561 nor any other provision of the

Bankruptcy Code restricts the contractual right "to offset or net termination values, payment

amounts, or other transfer obligations arising under or in connection with one or more ... (5)

swap agreements; or (6) master netting agreements." Indeed, there is no limit on the type of

obligation against which a master netting agreement counterparty can set off against, including

non-derivative obligations such as a debt, loan, promissory note, letter of credit—in fact, *any*

type of obligation for which the master netting agreement provides a "contractual right." *See* 11

U.S.C. § 561.

The United States Supreme Court has been clear in its approach to interpreting the

Bankruptcy Code. Where the meaning is clear, and does not yield an absurd result or frustrate

the Bankruptcy Code's overarching policy, a court is compelled to follow the Bankruptcy Code's

plain meaning. *U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 109 S.Ct. 1026 (1989) (holding

9

that, because the meaning of §506(b) of the Bankruptcy Code is clear and unambiguous, it shall

be enforced as written; "The plain meaning of legislation should be conclusive, except in the rare

cases [in which] the literal application of a statute will produce a result demonstrably at odds

with the intentions of its drafters") (internal quotes omitted); *Perry v. Commerce Loan Co.*, 383

U.S. 392, 86 S.Ct. 852 (1966) ("There is, of course, no more persuasive evidence of the purpose

of a statute than the words by which the legislature undertook to give expression to its wishes").

Additionally, statutory language that by its plain terms overrides other statutes is

both commonplace and to be enforced as written.  The command that protections of sections 560

and 561 "shall not be stayed, avoided, or otherwise limited by operation of any provision of this

title" is similar to the phrase, "Notwithstanding any other provision of law ..." which has

consistently been interpreted as written.  *Cisneros v. Alpine Ridge Group*, 508 U.S. 10 (1993)

(noting that courts "have interpreted similar 'notwithstanding' language ... to supersede all other

laws") (internal quotes omitted).  Indeed, the Court of Appeals for the District of Columbia

wrote of such trumping language that, "[a] clearer statement is difficult to imagine: section

709(e) must be read to override any conflicting provision of law in existence at the time that the

Technician Act was enacted." *Illinois Nat. Guard v. Federal Labor Relations Authority*, 854

F.2d 1396 (D.C. Cir. 1988) (holding the phrase "Notwithstanding any other provision of law" to

trump any existing law and finding difficultly only with laws passed *after* the Technician Act;

"Application of [the statute] is less certain, however, with respect to a statute such as the Labor-

Management Act, adopted after the Technician Act.").  Because Section 553 was written prior to

the Safe Harbor Provisions, the terms of Section 553 must yield to the 'notwithstanding'

language of the Safe Harbor Provisions.

10

NewYork 1345632.10

In short, the statutory language is clear and unambiguous. Under the plain meaning of the Bankruptcy Code sections 560 and 561 allow the master netting agreement participants to realize any setoff or netting permitted under the terms of the master netting agreement to which they are parties.

**B.    Pre versus Post Petition Mutuality is
<u>Irrelevant Under Safe Harbor Provisions</u>**

At oral argument, LBHI premised its request for the grant of the Underlying Motion upon section 553, which, on its face, appears to limits the setoff of pre-petition debt against post-petition assets of a debtor. However, section 553 does not control the determination of Swedbank's Safe Harbor Contractual Rights, because it is a "a provision of this title [title 11]" whose applicability is excluded from sections 560 and 561. Properly read, section 553 can be seen as containing the mutually reinforcing references to sections 560 and 561. As shown below, (i) the pre and post petition mutuality requirement of Section 553 is not applicable to Safe Harbor Contractual Rights, and further, (ii) any concept of mutuality beyond Section 553 also does not impact Safe Harbor Contractual Rights.

**1.    <u>Case Law Holds Section 553 Not Applicable</u>**

Courts have held that exercise of Safe Harbor Contractual Rights operate equally on pre- and post-petition funds and obligations regardless of Section 553. Although not originally cited by either party in this case, *In re Weisberg*, 136 F.3d 655 (9th Cir. 1998) holds that creditors may exercise their Safe Harbor Contractual Rights equally with respect to both pre- and post-petition obligations. In *Weisberg*, Weisberg and Shearson Lehman Brothers, Inc. ("Shearson"), were both parties to a certain "Client Agreement" which provided, *inter alia*, that Weisberg could borrow funds from Shearson if Weisberg secured such borrowed funds with shares of stock kept in a Shearson margin loan account ("Account"). The Client Agreement

11

required Weisberg to maintain a 35% margin in the Account, and, failing that, authorized

Shearson to liquidate Weisberg stock to reestablish the 35% margin.

On October 8, 1990, under the terms of the Client Agreement, Weisberg

borrowed $50,000. By the time Weisberg filed for bankruptcy on November 26, 1991, the value

of the stock securing the loan had fallen to $26,000. In October 1992, Shearson, after repeatedly

notifying Weisberg post-petition of his margin deficiency liquidated stock to reestablish the 35%

margin without seeking relief from the automatic stay. Weisberg's trustee sought sanctions for

Shearson's violation of the automatic stay, arguing that normally a creditor may not collect

against pre- or post- petition obligations without relief from the automatic stay. The Ninth

Circuit held for Shearson, finding that (i) the Client Agreement contained a "contractual right" of

the kind contemplated by Congress under Safe Harbor provision 11 U.S.C. § 362(b)(6) and (ii)

that there was no violation of the automatic stay. Importantly, the Ninth Circuit held that it was

irrelevant that a *post*-petition setoff was used to satisfy a *pre*-petition obligation, *In re Weisberg*,

136 F.3d at 659, ignoring strenuously phrased mutuality arguments by the debtor. *Brief of*

*Petitioner-Appellant* at 20-26, *In re Weisberg*, 136 F.3d 655 (9th Cir. Jan. 8, 1998).

In sum, *In re Weisberg* holds that when a "contractual right" is within the

contractual rights Congress intended to shelter under the Safe Harbor provisions, Section 553 is,

like every other provision of the Bankruptcy Code, unable to operate to stay or impair "any

contractual right."

### 2.    Mutuality Concept Outside of Section 553 Inapplicable

No mutuality concept outside of Section 553 trumps the plain meaning of the Safe

Harbor provisions or is otherwise availing to the Debtors.

The foundation of pre/post petition mutuality distinction stems from the idea no

pre-petition obligation can be mutual to a post-petition obligation because the entity that

12

becomes the debtor upon the filing of a bankruptcy petition is a different entity post-petition (the so-called "new entity" theory).

The Supreme Court has rejected the "new entity" theory, holding that there is no change in the identity of the entity that enters bankruptcy; it is and remains the same entity. *N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 104 S.Ct. 1188 (1984). The upshot of *Bildisco* is that any mutuality restrictions across the pre-petition / post-petition membrane a party seeks to enforce must be found in the text of the Bankruptcy Code since the pre and post petition debtors are in fact the same legal entity. So when Congress states setoff "shall not be stayed, avoided or otherwise limited by operation of any provision of this title" in sections 560 and 561 what ever mutuality can be found in the Master Agreements is preserved as to the legal entities describe in those agreements.

### 3.  Congress Specifically Rejected the Term "Mutual" In Drafting Safe Harbor Provisions

Congress explicitly removed any mutuality restriction from Safe Harbor provisions when it removed language containing the word "mutual" from previous versions of 362(b)(6), (b)(17), and (b)(27), and replacing that language with "any contractual right."

In 2006, Congress passed the Financial Netting Improvements Act of 2006, Pub. L. No. 109-390 (2006) ("FINA"). Prior to 2006, 11 U.S.C. § 362(b)(6) read, in relevant part:

> (6) under subsection (a) of this section, of the setoff ... of *any mutual debt and claim* under or in connection with commodity contracts, ... forward contracts, or securities contracts, ...*that constitutes the setoff of a claim* against the debtor for a margin payment.

After FINA, 11 U.S.C. § 362(b)(6) read, in relevant part, as follows:

> (6) under subsection (a) of this section, of the exercise *of any contractual right* ... under any security agreement or arrangement or other credit enhancement forming a part of or related to any commodity contract, forward contract or securities contract, or of any contractual right ... to offset or net out any

termination value, payment amount, or other transfer obligation arising under or
in connection with 1 or more such contracts, including any master agreement for
such contracts;

>    Subsection (17) of 11 U.S.C. § 362(b) received similar treatment under FINA.

Prior to FINA, subsection (17) read, in relevant part:

>    (17) under subsection (a), of the setoff by a swap participant or financial
>    participant of *a mutual debt and claim* under or in connection with one or more
>    swap agreements that constitutes the setoff of a claim against the debtor for any
>    payment or other transfer of property due from the debtor under or in connection
>    with any swap agreement against any payment due to the debtor from the swap
>    participant or financial participant under or in connection with any swap
>    agreement;

>    Like subsection (6), subsection (17) after FINA, 11 U.S.C. § 362(b)(17) read, in

relevant part, as follows:

>    (17) under subsection (a) of this section, of the exercise by a swap participant or
>    financial participant of *any contractual right* ... under any security agreement or
>    arrangement or other credit enhancement forming a part of or related to any swap
>    agreement, or of any contractual right ... to offset or net out any termination
>    value, payment amount, or other transfer obligation arising under or in connection
>    with 1 or more such agreements, including any master agreement for such
>    agreements;

>    Subsection (27) of 11 U.S.C. § 362(b) likewise received similar treatment under

FINA.    Prior to FINA, subsection (27) read:

>    (27) under subsection (a), of the setoff by a master netting agreement participant
>    of a *mutual debt and claim* under or in connection with one or more master
>    netting agreements or any contract or agreement subject to such agreements that
>    constitutes the setoff of a claim against the debtor for any payment or other
>    transfer of property due from the debtor under or in connection with such
>    agreements or any contract or agreement subject to such agreements against any
>    payment due to the debtor from such master netting agreement participant under
>    or in connection with such agreements or any contract or agreement subject to
>    such agreements or against cash, securities, or other property held by, pledged to,
>    under the control of, or due from such master netting agreement participant to
>    margin, guarantee, secure, or settle such agreements or any contract or agreement
>    subject to such agreements, to the extent that such participant is eligible to
>    exercise such offset rights under paragraph (6), (7), or (17) for each individual
>    contract covered by the master netting agreement in issue; and

14

Like subsections (6) and (17), subsection (27) after FINA, 11 U.S.C. § 362(b)(27) read, in relevant part, as follows:

> (27) under subsection (a) of this section, of the exercise by a master netting agreement participant of **any contractual right** … under any security agreement or arrangement or other credit enhancement forming a part of or related to any master netting agreement, or of any contractual right … to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such master netting agreements to the extent that such participant is eligible to exercise such rights under paragraph (6), (7), or (17) for each individual contract covered by the master netting agreement in issue;

FINA demonstrates that when Congress intends the Safe Harbor Provisions to limit the exercise of setoff to only mutual debts and claims it does so by using the words "any mutual debt and claim." Equally, FINA also demonstrates that when Congress intends that Safe Harbor Provisions to not be limited by mutuality, it does so by using the works "any contractual right." Consistent with the plain language of every Safe Harbor Provision, when Congress writes "any contractual right" in sections 560 and 561, is means "any contractual right" and does not intend that such rights are constrained by section 553 or mutuality generally. In sum, the history of various Safe Harbor Provision visions reveals: (a) Congress has explicitly and directly considered limiting Safe Harbor Provisions by mutuality, and (b) has explicitly and directly rejected limiting Safe Harbor Provisions by mutuality.

## C.    Enforcing Safe Harbor Contractual Rights Consistent with Bankruptcy Code's Purpose

Both the Underlying Motion and the Court's remarks during oral argument indicated reluctance to enforce Safe Harbor Contractual Rights to the full extent provided for by Congress. That permitting setoff under the safe harbor provisions without reference to Section 553 does not lead to absurd commercial results is demonstrated by looking to routine commercial contracts regularly upheld by non-bankruptcy courts. Guarantees, for example, are in essence

15

agreements by which the guarantor contracts to mutuality with the guarantee recipient for the

benefit of a third party. The validity of these contracts, and of the setoff rights that arise pursuant

thereto, is routinely recognized by not only non-bankruptcy, but also bankruptcy courts. *See,*

*e.g., In re Bennett Funding Group*, 212 B.R. 206, 215 (B.A.P. 2d Cir. 1997) (mutuality existed

where bank was indebted to debtor in amount of deposit account, and debtor was indebted under

promissory notes and lease payment guarantee); *In re England Motor Co.*, 2010 WL 220152, at *

(Bankr. N.D.Miss. Jan. 19, 2010) (guaranty provision in deed of trust permitted bank to seek

payment from one dealership for parent company); *In re K Town, Inc.*, 171 B.R. 313, 319

(Bankr. N.D.Ill. 1994) (finding that lack of a common law right to setoff was "unimportant"

where terms of guarantee granted right to setoff against checking account).

Although "triangular" setoff agreements, which permit A to setoff what it owes to

B against what C owes to A, are not as routinely recognized by bankruptcy courts, see *In re*

*SemCrude, L.P.*, 399 B.R. at 397 (distinguishing triangular setoff agreements from guarantees,

which "create an indebtedness of one party to another"), they are recognized outside of

bankruptcy where supported by an express agreement. *5 Collier on Bankruptcy, §*

553.03[3][b][ii]. Since cross-affiliate netting under such contracts it strains logic as to why

Congress would have intended to restrict the exercise of such rights in contravention of the

purpose of the safe harbor amendments—to promote predictability and efficiency and in the

derivatives industry by enforcing the contractual rights to which the parties agreed. As noted,

*infra*, Section 553 of the Bankruptcy Code not only preserves any setoff rights that a creditor

possesses under non-bankruptcy law but also "imposes additional restrictions" on such rights in

bankruptcy outside of the safe harbor context. *In re SemCrude, L.P.*, 399 B.R. 388, 393 (Bankr.

D.Del. 2009) (finding triangular setoff impermissible in bankruptcy without applying sections

16

560 or 561). The results that would obtain from the exercise of the parties' Congressionally recognized contractual Safe Harbor setoff rights without the additional limitations imposed by Section 553 are thus far from anomalous.

In sum, the plain reading of the Safe Harbor Provisions and the legislative history of the Safe Harbor Provisions are mutually reinforcing. The drafting history reveals that mutuality was expressly removed such that no Safe Harbor Provision contains any mutuality language. And the plain language of the Safe Harbor Provisions reveals a consistent result: there is no mutuality requirement. As the congressional record indicates, the Safe Harbor Provisions, "will be to provide certainty for swap transactions and thereby stabilize domestic markets by *allowing the terms of the swap agreement to apply notwithstanding the bankruptcy filing*." 136 Cong. Rec. S7535 (remarks of Sen. DeConcini) and quoted with approval in *Thrifty Oil Co.* at 1051. Further, H.R. Rep. 109-31(I), which provides that "the protection of netting and offset rights in sections 560 and 561 is *in addition to* the protections afforded in sections 362(b)(6), (b)(7), (b)(17), and (b)(28) of the Bankruptcy Code." (Emphasis added.)

### D.    Express Limitations of Section 553(b) Are Consistent with Section 560

The Debtors also highlighted the existence of specific references to sections 560 and 561 contained in section 553(b)(1) in support of their position. However, the presence of a reference to sections 560 and 561 is not inconsistent with Swedbank's construction of sections 560 and 561, because 553(b)(1) deals exclusively with setoffs that were taken during the 90 period prior to the filing. In the absence of the express exclusion language, "setoff of a kind described in section …section 362(b)(17), 362(b)(27),…560, 561 …of this title" would be subject to avoidance. Congress' use of the phrase "of a kind" is necessary, because sections 560 and 561 do not literally apply in the pre petition context. Sections 560 and 561 apply only if termination or setoff follow an event described in section 365(e)(1), i.e. an *ipso facto* clause

17

event including the filing of a bankruptcy petition.[2] Consistent with Congress' desire to protect

derivative transactions whenever they are terminated, section 553(b)(1) excepts setoffs relating

to safe harbor transactions from avoidance as pre petition transfers, including swaps.

### III.    SWEDBANK WILL BE IRREPARABLY HARMED IF THE STAY RELIEF IS NOT GRANTED.

Swedbank will suffer irreparable injury if the Order is not stayed pending appeal

because (i) Swedbank's claims will be rendered moot by its loss of a setoff claim, and (ii)

Swedbank will likely never fully recover all moneys owed it by the Debtors, who are nearing the

distribution of all estate funds.

#### A.    Swedbank Will Forever Lose Its Setoff Claim

Swedbank has a right to setoff the Safe Harbor Setoff Amount against the

amounts owed by LBHI to Swedbank under the LBHI Master Agreements. The payment of the

Safe Harbor Setoff Amount will extinguish this right and thereby cause irreparable harm to

Swedbank.

A deposit account is a debt owed by the bank to the depositor; it is *not* money

held by the bank on behalf of the depositor. *See Citizens Bank of Maryland v. Strumpf*, 516 U.S.

16, 21 (1995) (bank account is "a promise to pay"). The Safe Harbor Setoff Amount is therefore

a debt owed to LBHI. Since Swedbank seeks to setoff the Safe Harbor Setoff Amount against

LBHI's obligations to the bank, payment of the debt will extinguish Swedbank's setoff rights.

*See, e.g., Matter of Litchfield Const. Management, Inc.*, 137 B.R. 98, 99 (Bankr. D. Conn. 1992)

(concluding that bank's right to setoff was lost after delivery of funds to trustee). The mutuality

required for setoff will be destroyed upon payment. *See In re Lifestyle Furnishings, LLC*, 418

---

[2] See discussion *infra* at p.8.

18

B.R. 382, 389 (Bankr. D.Idaho 2009) (holding that bank's right to setoff was extinguished upon

delivery of funds to trustee).

The loss of Swedbank's setoff rights will moot both its claim and its right to

appeal. *See, e.g., In re Ealy*, 396 B.R. 20, 22 (8th Cir. 2008) (once creditor released funds to

debtor it lost setoff rights and its appeal was moot); *see, e.g., Playa Marel, P.M., S.A. v. LKS*

*Acquisitions, Inc.*, No. C-3-06-336, 2007 WL 3342450, at *3 (S.D. Ohio Nov. 6, 2007) (holding

plaintiff's setoff claim was moot where defendants' counterclaims were dismissed). Courts in

this district have repeatedly recognized that such loss constitutes irreparable injury. *In re*

*Country Squire Associates of Carle Place, L.P.*, 203 B.R. 182, 183 (2d Cir. 1996) (staying a

foreclosure sale where it was "apparent that absent a stay pending appeal ... the appeal will be

rendered moot," resulting in a "quintessential form of prejudice" to appellant). *See, e.g., In re St.*

*Johnsbury Trucking Co., Inc.*, 185 B.R. 687, 690 (S.D.N.Y. 1995) (finding sufficient irreparable

injury where denying a stay would threaten government's ability to appeal a bankruptcy court's

decision). Irreparable injury exists for the additional reason that Swedbank's setoff theory, even

if vindicated on appeal, may go unsatisfied. *See In re Suprema Specialties, Inc*, 330 B.R. 93, 95

(Bankr. S.D.N.Y. 2005) (finding irreparable injury where funds in which movant had an interest

could become unavailable); *In re Collated Prods. Corp.*, 121 B.R. 195, 201 (D. Del. 1990)

(concluding bank would suffer "irreparable harm" if funds were withdrawn from deposit

account).

**B.    Even If Swedbank is Victorious on Appeal, Collection
Impossibility May Bar Swedbank's Recovery on Its Setoff Claim**

Even assuming, *arguendo*, that the bankruptcy court finds that withdrawal of the

funds would not extinguish Swedbank's setoff rights, there is a substantial risk that Swedbank's

appeal would be rendered equitably moot because the bankruptcy estate will have distributed all

19

estate funds pursuant to the Plan. *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 143 (2d

Cir. 2005) (recognizing that "[e]quitable mootness is a prudential doctrine that is invoked to

avoid disturbing a reorganization plan once implemented"); *In re Advanced Mining Sys., Inc.*,

173 B.R. 467, 468-69 (S.D.N.Y. 1994) (finding irreparable injury prong met where, absent a stay

of the bankruptcy court's order, the distribution of assets to creditors would moot any appeal and,

thus, quintessentially prejudice appellants). The Debtors' Plan of Reorganization provides that

distributions from the estate will be made on the effective date following plan confirmation.

While the actual date of confirmation is not and cannot be known at this date, it is known that the

appellate process could take at least one and possibly two years. Thus, if Swedbank is successful

on its appeal, given the appeals time frame there is a substantial, if not likely, possibility that the

Debtors' will have no remaining, unencumbered or unscrambled funds to distribute on

Swedbank's claim. *See, e.g., In re Adelphia*, 361 B.R. 337, 351 (S.D.N.Y. 2007) ("Once

distributions are made pursuant to the plan, it will become impracticable to ever fashion effective

relief for appellants").

## IV.    THE REQUESTED RELIEF WILL NOT HARM OTHER PARTIES

In contrast to Swedbank's injury if the Debtors make a distribution prior to the

final resolution of any appeal, if Debtors are ultimately successful on appeal, Debtors will,

without injury to any party, recover and distribute the Current Setoff Account Balance.

Moreover, if final appeal is exhausted prior to distribution, no other party will be affected, let

alone injured, by staying the Order.

## V.    THE REQUESTED RELIEF IS NOT CONTRARY TO PUBLIC POLICY

There is nothing in this appeal that is contrary to public policy. Indeed, the

enforcement of Swedbank's contractual rights as provided for under the Safe Harbor Provisions

consistent with the public policy. It is the same public policy originally promulgated by Congress with the passage of FINA, *infra* at I.B.3.

## VI.    SWEDBANK'S APPEAL DOES NOT WARRANT THE POSTING OF A BOND

Swedbank respectfully requests that the Court grant the requested relief without requiring the posting of a bond. Federal Rule of Bankruptcy Procedure 8005 grants this Court discretion to decide. *See* Fed.R.Bankr.P. 8005 (bankruptcy court may make any order "on such terms as will protect the rights of all parties in interest"); *see also In re Sphere Holding Corp.*, 162 B.R. 639, 644-45 (E.D.N.Y. 1994) (the posting of a bond under Rule 8005 "is discretionary"). As noted in the Stenberg Declaration, Swedbank Group is "well capitalized and solvent," has a Tier 1 capital ratio of 13.5% according to Basel 2 standards and is able, and willing, to pay the Current Setoff Account Balance in the event that the Debtors prevail on appeal. *See* Stenberg Dec., ¶¶ 7, 29-30. The bond requirement is discretionary because the bond is not a jurisdictional requirement for appeal under the Bankruptcy Code. Indeed, bankruptcy courts in this district have dispensed with a bond requirement when there was no danger to the appellee. *See, e.g., In re Supreme Specialties, Inc.*, 330 B.R. 93, 96 (S.D.N.Y. 2005) (holding that posting of bond was not necessary where trustee holding insurance settlement proceeds would not pay creditors during pendency of appeal); *In re Sphere Holding Corp.*, 162 B.R. 639, 644-45 (E.D.N.Y. 1994) (bond was not required where "little or no damage" would be incurred as a result of the stay).

Furthermore, Swedbank is subject to the power of this Court and other courts of New York. Any valid Debtors' claim is fully enforceable against Swedbank should Debtors' ultimately prevail on appeal. Swedbank has submitted itself to the jurisdiction of this Court by, *inter alia*, responding to the Debtors' Objection and by having filed proofs of claims in the Debtors' bankruptcy cases totaling at least $21,308,680.41. Furthermore, Swedbank also

21

maintains a branch office in New York. *See* Stenberg Dec., ¶ 8. Swedbank is thus well within

the reach of both this Court and other courts in New York.

### Relief Requested

Swedbank seeks (i) a stay of the Order entered by this Court, and (ii) waiver of

any requirement that Swedbank post a bond. ("Relief Requested").

WHEREFORE, Swedbank respectfully requests that the Court grant the Motion,

grant Swedbank the Relief Requested and grant such other and further relief as is just and proper.

Dated: New York, New York
      April 21, 2010

                SALANS LLP

                By: /s/ Claude D. Montgomery
                    Claude D. Montgomery, Esq.
                    Paul C. Gunther Esq.
                    Michael Kauffman, Esq.
                620 Fifth Avenue
                New York, New York 10020
                (212) 632-5500