**QUINN EMANUEL URQUHART & SULLIVAN LLP**
51 Madison Avenue, 22nd Floor
New York, New York  10010
Susheel Kirpalani
James C. Tecce

*Special Counsel to the Official Committee of Unsecured*
*Creditors of Lehman Brothers Holdings Inc., et al.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------x

| | |
|---|---|
| In re: | : Chapter 11 |
| | : Case No. 08-13555 (JMP) |
| **LEHMAN BROTHERS HOLDINGS INC., et al.,** | : Jointly Administered |
| | : |
| Debtors. | : |

-------------------------------------------------------------------------x

| | |
|---|---|
| In re: | : SIPA Proceeding |
| | : Case No. 08-01420 (JMP) |
| **LEHMAN BROTHERS INC.,** | : |
| | : |
| Debtor. | : |

-------------------------------------------------------------------------x

**OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF
LEHMAN BROTHERS HOLDINGS INC., ET AL. TO MOTION OF BARCLAYS
CAPITAL, INC. FOR AN ORDER COMPELLING DOCUMENTS FROM LBHI,
TRUSTEE, CREDITORS' COMMITTEE AND THEIR FINANCIAL ADVISORS
DELOITTE, FTI, ALVAREZ & MARSAL, AND HOULIHAN LOKEY**

## TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ................................................................................1

II. FACTUAL BACKGROUND .................................................................................3

    A.    COMMITTEE RULE 60 MOTION...............................................................3

    B.    BARCLAYS' FIRST MOTION TO COMPEL ATTORNEY-CLIENT
        COMMUNICATIONS...................................................................................4

    C.    COURT'S DECISION ON BARCLAYS FIRST MOTION TO COMPEL...............6

    D.    BARCLAY'S OBJECTION, COMMITTEE REPLY AND APRIL 9 ORAL
        ARGUMENT .............................................................................................7

    E.    BARCLAYS' SECOND MOTION TO COMPEL.............................................10

III. ARGUMENT .......................................................................................................11

    A.    WORK PRODUCT DOCTRINE PROTECTS ANY ECONOMIC ANALYSES THAT
        WERE PREPARED BY COMMITTEE'S FINANCIAL ADVISORS ...................11

        1.    SECOND CIRCUIT HAS ADOPTED MORE EXPANSIVE "BECAUSE OF
            LITIGATION" STANDARD.................................................................12

        2.    DOCUMENTS PREPARED IN CONNECTION WITH BANKRUPTCY CASES
            ARE PREPARED "IN ANTICIPATION OF LITIGATION"...................14

        3.    ANY ANALYSES COMMITTEE FINANCIAL ADVISORS PREPARED IN
            CONNECTION WITH SALE TRANSACTION WERE PREPARED IN
            ANTICIPATION OF LITIGATION....................................................16

    B.    COMMITTEE DID NOT WAIVE WORK PRODUCT PROTECTION BY PUTTING
        DOCUMENTS OR COMMUNICATIONS PROTECTED BY THAT PRIVILEGE AT
        ISSUE IN RULE 60 MOTION .....................................................................20

        1.    COMMITTEE'S CLAIMS DO NOT RELY ON WORK PRODUCT
            MATERIALS..................................................................................20

        2.    BARCLAYS CANNOT SEEK PRIVILEGED DOCUMENTS TO FORTIFY
            ALLEGED ESTOPPEL, WAIVER AND MANDATE RULE DEFENSES ...............23

    C.    BARCLAYS CANNOT SHOW SUBSTANTIAL NEED JUSTIFIES EXCEPTION TO
        WORK PRODUCT PROTECTION .................................................................24

IV. CONCLUSION ....................................................................................................27

i

## TABLE OF AUTHORITIES

**Page**

### Cases

Bodega Inv. LLC v. United States,
   2009 WL 2634765 (S.D.N.Y. Aug. 21, 2009) ........................................................................5

Byrnes v. Empire Blue Cross Blue Shield,
   1999 WL 1006312 (S.D.N.Y. Nov. 4, 1999) .......................................................................12

In re Celotex Corp.,
   196 B.R. 596 (M.D. Fla. 1996) .....................................................................................15, 16

In re Copper Market Antitrust Lit.,
   200 F.R.D. 213 (S.D.N.Y. 2001) ..........................................................................13, 17, 20

In re County of Erie,
   546 F.3d 222 (2d Cir. 2008)........................................................................................5, 6, 22

In re Hardwood P-G, Inc.,
   403 B.R. 445 (Bankr. N.D. Tex. 2009) ...........................................................................16, 24

Highland Financial Corp.,
   216 B.R. 109 (Bankr. S.D.N.Y. 1997) .................................................................................24

Morande Auto. Group v. Metropolitan Group, Inc.,
   2009 WL 650444 (D. Conn. March 12, 2009) ....................................................................22

Nycomed U.S. Inc. v. Glemark Generics Ltd.,
   2009 WL 3334365 (E.D.N.Y. Oct. 14, 2009) .....................................................................22

Resolution Trust Corp. v. Massachusetts Mutual Life Ins. Co.,
   200 F.R.D. 183 (W.D.N.Y. 2001)...................................................................................5, 23

In re Suprema Specialties, Inc.,
   2007 WL 1964852 (Bankr. S.D.N.Y. Jul. 2, 2007) ...........................................12, 13, 18, 24

In re Tri-State Outdoor Media Group, Inc.,
   283 B.R. 358 (M.D. Georgia 2002) ..................................................................14, 16, 17, 19

U.S. v. Argentina,
   No. 00-62780, 2008 WL 510556 (2d Cir. Feb. 26, 2008) ..................................................24

United States v. Adlman,
    134 F.3d 1194 (2d Cir. 1998) ................................................................................................. 13

United States v. Naegele,
    468 F. Supp. 2d 165 (D.D.C. 2007) ................................................................................ 15, 16

The Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al.
(the "Committee") hereby objects to Barclays' Motion For An Order Compelling Documents
From LBHI, Trustee, Creditors' Committee And Their Financial Advisors Deloitte, FTI, Alvarez
& Marsal, And Houlihan Lokey, dated April 14, 2010 (the "Barclays' Second Motion To
Compel"), and, in support thereof, respectfully states as follows:[1]

## I.    PRELIMINARY STATEMENT

1.      In December 2009, the Court denied Barclays' extraordinary request for a finding
that the Committee waived the sacrosanct attorney-client privilege in seeking Rule 60 relief by
placing "at issue" communications among the Committee and its attorneys.  Barclays now
requests disclosure of any economic analyses prepared by the Committee's financial advisors,[2]
alleging (again) the same argument that the Committee has waived work-product privileges
protecting those materials by placing them at issue in this litigation.  Barclays has not satisfied
the condition precedent for showing an at-issue waiver because the Committee's motion neither
relies upon, nor places at issue any materials protected by the work-product privilege, even in
demonstrating newly discovered evidence and timeliness.  Indeed, since the Court examined this
issue in December 2009, nothing has changed -- especially the Committee's claim that because of
a series of misstatements and mistakes, the balanced, going-concern transaction represented to,
reviewed by, and approved by the Court bears no resemblance to the consummated transaction.

---

[1]     Capitalized terms not otherwise defined herein have the meanings ascribed to them in the
Committee's Memorandum In (I) Opposition To Motion Of Barclays Capital Inc. To Enforce Sale
Order And Secure Delivery Of All Undelivered Assets And (II) Further Support Of Its Motion,
Pursuant To 11 U.S.C. § 105(a), Fed. R. Civ. P. 60(b), and Fed. R. Bankr. P. 9024, for Relief
From Order Under 11 U.S.C. §§ 105(a), 363 and 365 and Federal Rules of Bankruptcy Procedure
2002, 6004 and 6006 Authorizing and Approving (A) Sale of Purchased Assets Free and Clear of
Liens and Other Interests and (B) Assumption and Assignment of Contracts and Unexpired
Leases, Dated September 20, 2008 (and Related SIPA Sale Order), dated March 18, 2010 (the
"Committee Reply") (Docket No. 7667).

[2]     Even though the Committee provided Barclays with a privilege log, Barclays has not identified
the specific documents it requests and instead issues a blanket demand for all such analyses.

1

2.     Barclays' 330-page opposition brief filed in January 2010 corroborates the Committee's assertion that Barclays seeks discovery of work-product materials to fortify its purported defenses, not because the Committee put them at issue.  As set forth therein, Barclays' estoppel and waiver defenses rest upon the proposition that the Committee was aware of the Sale Transaction's salient features when the Court approved it or shortly thereafter (and failed to timely seek reconsideration or appeal).  Notwithstanding protracted discovery, which enabled Barclays to depose and propound broad document demands on nearly every possible third party that did (or could have) supplied information concerning the Sale Transaction to the Committee and its advisors, Barclays has not uncovered any evidence of the Committee's knowledge of material aspects of the consummated Sale Transaction before Rule 2004 discovery.[3]  Running out of options, Barclays once again seeks to pierce sacred privileges in an attempt to fortify a defense it cannot sustain.  But, offensively placing work product at issue to support defenses is an impermissible use of the waiver doctrine.

3.     Barclays contends the work-product privilege does not apply because the analyses were not prepared in anticipation of litigation.  That argument ignores the adversarial nature of bankruptcy cases (i.e., the Court's consideration of the Sale Motion was a contested matter under Bankruptcy Rule 9014), misapprehends the critical role a statutorily-appointed committee's financial advisors play in bankruptcy cases, discounts the Second Circuits' adoption of a more flexible standard (i.e., documents prepared "because of litigation"), and is inconsistent with case

---

[3]     The Committee is not exaggerating.  Barclays propounded discovery on (or was given access to discovery with respect to) the Committee (documents and depositions), Milbank Tweed (documents and depositions (2)), Houlihan Lokey (documents and depositions (2)), FTI Consulting (documents and deposition), Weil Gotshal (documents and depositions (2)), Alvarez & Marsal (documents and depositions (5)), Lazard Freres (documents and deposition), Hughes Hubbard (documents and depositions (3)), Deloitte & Touche (documents and deposition), Cleary Gottlieb (documents and depositions (2)), Simpson Thatcher (documents and depositions), and Akin Gump (counsel to an objector to the sale (documents)).

law finding that the tension between chapter 11 debtors and statutory committees inherent in

bankruptcy cases rises to the level of "litigation" for purposes of the work-product privilege.

4.      In recognition of the thin reed upon which its at-issue waiver argument rests,

Barclays seeks to overcome the presumptive protections attendant to work product materials by

claiming, without any foundation or evidence, that it has a substantial need for the information it

seeks.  Barclays' argument fails because it has been given every opportunity to challenge the

Committee's assertions concerning knowledge (or lack thereof) of the Sale Transaction's material

terms by taking discovery from all the parties that may have provided information to the

Committee's professionals as well as extensive discovery of the Committee itself.  The Court

should not invade a privilege designed to preserve the zone of privacy in which attorneys can

develop legal theories and promote the adversarial system simply because Barclays' efforts have

failed to uncover any evidence to fortify its purported defenses.

## II.      FACTUAL BACKGROUND

### A.      COMMITTEE RULE 60 MOTION

5.      The Committee Rule 60 Motion alleges that Barclays' blatant failure to disclose

the material differences between the approved and consummated transactions incurably infected

the sale process.[4]  The Committee also maintains the Court did not approve the Clarification

Letter to the extent it materially altered the terms of the Sale Transaction it reviewed and

approved.[5]  Neither the allegations concerning mistake (for purposes of Rule 60(b)(1)), newly

discovered evidence (for purposes of Rule 60(b)(2)), misrepresentation (for purposes of Rule

60(b)(3)) nor other reasons for relief (Rule 60(b)(6)) articulated in the Committee Rule 60

---

[4]      See, e.g., Committee Rule 60 Mot. at p. 1; at ¶¶ 1, 2, 4, 5, 6, 23, 33, 34, 64, 75, 77.

[5]      See, e.g., Committee Rule 60 Mot. at ¶¶ 65-70, 78-82.

Motion rely on or otherwise mention documents or communications protected by the work product doctrine.[6]

### B.    BARCLAYS' FIRST MOTION TO COMPEL ATTORNEY-CLIENT COMMUNICATIONS

6.    In December 2009, Barclays filed its First Motion To Compel,[7] arguing the Committee Rule 60 Motion is "predicated in large part on the assertion that the moving parties and their attorneys misunderstood the terms and effect of the sale documents.  This misapprehension … led them to either (i) mistakenly support the sale transaction, or (ii) refrain from objecting to, seeking reconsideration of, or appealing the Sale Order.  By making these arguments, the movants place at issue the extent to which the attorneys who represented them in the transaction understood and adequately explained the terms of the transaction."[8]  It also argued (a) that the new evidence on which the Committee relies involves its attorneys' interpretation of the transaction documents, (b) that the Committee placed at issue its attorneys' advice by acting exclusively through them in connection with the Sale Transaction and (c) that in order to establish that the Committee requested Rule 60(b) relief within a reasonable time, the Committee will have to reveal its attorneys' understanding of the Sale Transaction at different points in time.

---

[6]    See, e.g., Committee Rule 60 Mot. at ¶¶ 63-70 (mistake (Rule 60(b)(1)), at ¶¶ 71-72 (newly discovered evidence (Rule 60(b)(2)), at ¶¶ 73-75 (misrepresentation Rule 60(b)(3)), and at ¶¶ 76-77 (other reasons (Rule 60(b)(6)).

[7]    Barclays' Motion To Compel Production Of Documents From Trustee And Committee Based On Privilege Waiver, dated December 2, 2010 (the "First Motion To Compel") (Docket No. 6005).

[8]    Barclays First Mot. to Compel at 1.

7.      The Committee's objection to the First Motion To Compel[9] asserted principally

that the Rule 60 Motion did not satisfy the bedrock principle underpinning an at issue waiver,

i.e., reliance on an attorney-client communication to prove an affirmative element of its claim.[10]

The Committee argued specifically that:

- Barclays failed to identify the specific attorney-client communication on which the Committee relies in seeking Rule 60 relief;

- Barclays attempted to manufacture reliance on an attorney-client communication by mischaracterizing the Committee's claim as seeking relief from the Sale Order because the Committee did not understand the terms of the transaction as interpreted by its attorneys;

- the Committee does not maintain its professionals **misunderstood** the transaction documents, but rather that neither the Court nor the Committee was advised of its salient features (e.g., the undisclosed $5 billion discount);

- because the Committee's claims entailed an examination of Court disclosures and the contours of the consummated transaction, the Committee asserts an "objective" claim and not a "subjective" one requiring a determination of the Committee's state of mind as influenced by advice rendered by its advisors;[11]

---

[9]     Objection Of Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al., To Motion Of Barclays Capital, Inc. To Compel Production Of Documents From Trustee and Committee Based on Privilege Waiver, dated December 7, 2009  (Docket No. 6067).

[10]    See, e.g., In re County of Erie, 546 F.3d 222, 228-29 (2d Cir. 2008) ("The key to a finding of implied waiver in the third instance is some showing by the party arguing for a waiver that the opposing parties **relies** on the privileged communication as a claim or defense …. We hold that a party must rely on privileged advice from his counsel to make his claim or defense.  We decline to specify or speculate as to what degree of reliance is required because Petitioners here to do not rely upon the advice of counsel in the assertion of their defense").  See, e.g., Resolution Trust Corp. v. Massachusetts Mutual Life Ins. Co., 200 F.R.D. 183, 191 (W.D.N.Y. 2001) ("The 'at issue' waiver has been described as occurring when the privilege holder makes assertions in a litigation context that put its otherwise privileged communications at issue").

[11]    Compare In re County of Erie, 546 F.3d at 229 (examining whether emails exchanged between county attorney and sheriffs concerning strip searches were admissible in a lawsuit challenging their constitutionality; defendants invoked qualified immunity defense; noting defense is an objective, not a subjective one because it depended on the state of the law, not state of mind: "[p]etitioners do not claim a good faith or state of mind defense.  They maintain only that their actions were lawful and that any rights violated were not clearly established.  In view of the litigation circumstances, any legal advice rendered is irrelevant to any defense so far raised …. [Qualified immunity implicates] an objective, not a subjective, test, and reliance upon advice of counsel therefore cannot be used to support the defense of qualified immunity"), with, Bodega

- Barclays has alternative avenues to pursue discovery of what the Committee's advisors were told that did not implicate the attorney-client privilege;[12] and

- the Committee will not rely on attorney-client communications to establish that the evidence upon which the Rule 60 Motion rests was newly discovered and that the Committee requested relief within a reasonable time.

### C. COURT'S DECISION ON BARCLAYS FIRST MOTION TO COMPEL

8.    The Court denied Barclays' First Motion to Compel on December 16, 2009.  With respect to reliance, the Court noted "the claims asserted by the trustee and the committee in the 60(b) motions do not rely on any legal advice provided by their respective advisors with respect to the sale transaction.  Instead[,] these claims rely on allegedly misleading and incomplete public representations made to the Court at the sale hearing and on the alleged failure of Barclays and certain Lehman executives to say anything to contradict those representations."[13]  The Court also agreed with the Committee's argument that it asserted "objective" claims i.e., "asking the Court to compare in-court disclosures concerning the sale transaction with the provisions of the sale transaction as actually consummated.  Neither the trustee nor the committee asserts claims based on their subjective state of mind at the time of the sale hearing."[14]

---

Inv. LLC v. United States, 2009 WL 2634765, at *2 (S.D.N.Y. Aug. 21, 2009) (finding at issue waiver with respect to Plaintiffs' claim  against the Internal Revenue Service ("IRS") that IRS statements to attorney estopped it from asserting interest claim for audit period; plaintiff relied on his attorney's representations recounting IRS agent's statement to attorney that in agreeing to extend statutory limitations period during IRS audit, interest accumulation also would be suspended:  "there is no question, unlike in Erie, that we are required to determine a state of mind and also that that state of mind was potentially influenced by advice rendered by the attorney.  Hence at-issue waiver for any such advice is appropriately triggered").

[12]    C.f., In re Erie County, 546 F.3d at 229 ("Here … there is no unfairness to Respondents, because they are 'in no way worse off' as a result of the disclosure that communications exist than they would be if they were unaware of them …. Respondents have not been denied access to information vital to their claims").

[13]    Tr., Hearing, December 16, 2009 at 116:25-117:7, a copy of the relevant portions of which is attached hereto as Exhibit 1.

[14]    Id. at 117:7-14.

6

9.      With respect to Barclays' argument that the Rule 60 Motions necessarily implicate contemporaneous legal advice in arguing reliance on purported mistakes and newly discovered evidence, the Court disagreed, noting "[t]he Committee argued at the hearing and in its 60(b) motion that the newly discovered evidence underlying its 60(b) motion consists of discovery unearthed during the Rule 2004 investigation, purportedly demonstrating representations and nondisclosures relating to the sale transaction."[15]  Lastly, the Court observed Barclays' "is not unfairly prejudiced by this holding because other means exist for it to obtain relevant information in support of its defense," finding "Barclays remains free to pursue discovery from third parties that provide information to the committee and the trustee's advisors concerning the sale transaction."[16]

### D.    BARCLAY'S OBJECTION, COMMITTEE REPLY AND APRIL 9 ORAL ARGUMENT

10.      On January 29, 2010, Barlcays filed its 330-page Brief asserting two primary defenses to the Committee's Rule 60 Motion.  Barclays argues first that the parties did not agree to any discount but instead to a valuation that purported to reflect the assets' true market value. Barclays maintains further that even if the parties agreed to a discount, the Committee was aware of that discount as well as the inflated liabilities, the additional assets transferred and the significant gain Barclays stood to receive.  Accordingly, Barclays maintains the Committee did not seek Rule 60 relief on a timely basis.[17]

11.      Barclays also argues the Committee Rule 60 Motion does not rely on newly-discovered evidence because the Committee had enough information at the time of the Sale Hearing and shortly thereafter (e.g., the September 17 Press Release and Analyst Call, drafts of the Clarification Letter, a general understanding of repo transactions and haircuts) to understand

---

[15]      Id. at 117:24:118:4.

[16]      Id. at 117:7-14.

[17]      Barclays Br. ¶¶ 546-52.

the material differences between the consummated transaction and the transaction represented to the Court, to know the Barclays Repo Collateral was worth at least $49 billion, to know Barclays stood to realize a windfall gain, and to discern that the estimates for Cure and Compensation Liabilities significantly overstated actual accruals (by, among other things, reviewing cure schedules).[18]  Critically, Barclays argues the Committee should be estopped from seeking Rule 60 Relief (and waived entitlement to it) because it purportedly knew of the $5 billion discount and acquiesced to it by, among other things, supposedly "signing off" on the discount (after purportedly reviewing a line-by-line examination of all assets transferred) or otherwise failing to appeal the Sale Order.[19]

12.    On March 18, 2010, the Committee filed a detailed reply refuting each of these arguments -- without referencing or relying on any work product documents or communications. The Committee Reply stresses that:

- mistakes, omissions and misrepresentations provide a basis for Rule 60 relief, including, among others, mistakes and misrepresentations concerning the value of the financial assets transferred, the stated justification for the purported decline in the value of those assets, the valuation methods used in valuing those assets (<u>e.g.</u>, book value versus liquidation value), and the existence of a negotiated, $5 billion discount;[20]

---

[18]    Barclays Br. ¶¶ 48, 49, 175, 294-97, 477-78, 488-90, 491-92, 493-501.

[19]    Barclays Br. ¶¶ 467-68 ("The Committee fully participated in all-weekend meetings at Weil Gotshal where drafts of the agreements were circulated and discussed, and the Committee received a 'line by line' review of each asset 'being transferred and how it was being transferred.' Even though the Committee was fully aware of the '$5 billion secret discount' it now alleges and its attorneys (Milbank Tweed) complained about to Weil Gotshal prior to closing, the Committee freely opted to sign off and thus by silence represented to the Court that the transaction was ready for closing without the need for further authorization. Shortly after the closing, and well within the appeal period, the Committee attended a presentation by Alvarez & Marsal (the Debtor's restructuring advisor and administrator), and reviewed a document from Alvarez listing the assets purchased by Barclays and expressly stating that Barclays '*negotiated a $5.0 billion reduction*' from '*Lehman stale marks*´ on the Repo Collateral.  Yet even after receiving and plainly comprehending all that information, the Committee did not appeal and did not support Bay Harbour's appeal …. ***Judicial estoppel prohibits all of the Movants from changing course now***") (emphasis added).

[20]    <u>See</u> Committee Reply ¶¶ 186-195.

- the Committee's motion rests on newly discovered evidence unearthed in Rule 2004 discovery, concerning, among other things, Barclays' insistence on an immediate, day-one gain, Barclays' belief it acquired assets irrespective of their value, the negotiated $5 billion discount, the use of the Barclays Repurchase Agreement as a conduit through which the $5 billion discount would be transferred, the attribution of liquidation value to the Barclays Repo Collateral and the transfer of billions in additional assets (in addition to the imbedded discount) ostensibly to fill-in the illusory shortfall in the value of the Purchased Assets;[21]

- the Committee was justifiably ignorant of that evidence given, among other things, the limited time available to diligence the transaction and the inaccuracy of the information provided to the Committee (including deficient disclosure to the Court and the representations made during the Klein Meeting);[22] and

- the Committee requested Rule 60 relief in a timely manner considering, among other things, the deficiency and inaccuracy of the disclosures made concerning the transaction, the Committee's persistent requests for a reconciliation, its requests for, and attendance at meetings with the Debtors' professionals following the closing where it brought the issue of its reconciliation requests to the forefront of the estates' attention, the estates' ability to cooperate given their own issues with Barclays' limiting access to employees and information under the Transition Services Agreement, its Limited Objection to the December Settlement, its informal document requests to Barclays and attempts to obtain the information consensually and its joinder in the Rule 2004 discovery.[23]

13.    During the April 9, 2010 oral argument, Barclays continued invoking the issue of the Committee's alleged understanding of the salient terms of the Sale Transaction in furtherance of its defenses.  Indeed, Barclays further argued waiver and estoppel based on the Committee's alleged knowledge of the $5 billion discount and other material, undisclosed transaction terms.[24]

---

[21]    See Committee Reply ¶¶ 196-208.

[22]    See Committee Reply ¶¶ 209-212.

[23]    See Committee Reply ¶¶ 221-233.

[24]    See Tr., Hearing April 9, 2010, at 225:21-226:17 ("I want the Court to focus on this one because this is where we have one of the clearest statements that this 5 billion dollar so-called discount … was known about.  And after this, did anybody come and say we are going to oppose the affirmance of this order on the appeal.  Quite the contrary, they fought for it on appeal.  Did anybody come in and say we now want to reexamine it we want to reopen it?  Nobody did that …. [E]verybody was not only accepting but seriously desiring the continuation of the Barclays transaction"); at 233:9-234:12 ("This is what the committee, committee's counsel was told by Goldman Sachs before the sale on September 19, 'The proposed sale goes way beyond this in that it allows Barclays to cherry-pick owned inventory, investment and other assets at a windfall

E.    **BARCLAYS' SECOND MOTION TO COMPEL**

14.    Barclays' Second Motion To Compel raises the same arguments in the First
Motion to Compel.  It asserts the Committee put work-product materials at issue in seeking Rule
60 relief, i.e., economic analyses the Committee's advisors performed through March 13, 2009
concerning the Sale Transaction, including documents showing an attempt to understand the
values of assets and liabilities.[25]  According to Barclays, in arguing justifiable ignorance of the
Sale Transaction's salient terms (and purportedly putting assertions concerning the Committee's
subjective knowledge in the Committee Reply), the Committee must now produce the financial
analyses "showing what they really did understand about the values and economics of the
transaction."[26]  Lastly, Barclays submits it has a substantial need for the analyses because it
would be unfair for the Committee to assert it was justifiably ignorant of the salient terms of the
Sale Transaction without affording Barclays access to its financial advisors' work product
materials concerning the assets transferred and liabilities assumed.[27]

---

discount to fair market value, a discount is at least several billion dollars' …. And so although
they knew exactly what was going on, they didn't say anything. They didn't object, and not only
did they not object, but they continued to support this transaction in this Court and on appeal");
at 262:21-263:8 ("If I have done anything today, I hope I have shown you that the kinds of facts
that the movants knew at the time in the period from September to December were [sic] the
exactly the facts that they now come into this court and say ought to be the basis for this relief");
at 266:14-25 ("And I would just ask the Court to look at the documentary evidence.  Look not at
what people are saying now, not at what people are trying to explain, but look at the
contemporaneous documents, look at what was exchanged at the time … look at what these
people knew at the time …. They knew about it and the documents show that"), copies of the
relevant portions of which are attached hereto as Exhibit 2.

[25]    See Barclays Second Mot. to Compel ¶¶ 2 ("But while they argue they did not understand the
economics of the Sale Transaction -- and were kept in the dark regarding the estimated values of
the assets and liabilities in that transaction -- the Movants *refuse* to produce to Barclays the
*economic analyses* that their financial advisors performed at the time showing their
understanding"), 5, 8.

[26]    See Barclay Br. ¶¶ 9, 18.

[27]    See Barclay Br. ¶ 3, 5.

## III.    ARGUMENT

### A.    WORK PRODUCT DOCTRINE PROTECTS ANY ECONOMIC ANALYSES THAT WERE PREPARED BY COMMITTEE'S FINANCIAL ADVISORS

15.    Houlihan's engagement letter states specifically that its services will consist of, among other things, "[e]valuating the assets and liabilities of the Debtors;" "[a]ssessing the financial issues and options concerning (i) sale of the Debtors, either in whole or in part …;" [p]roviding such financial analyses as the Committee may require in connection with the Cases;" and "[p]roviding testimony in court on behalf of the Committee with respect to any of the foregoing, if necessary …"[28]  The Committee also retained FTI as a financial advisor to, among other things, provide "[a]ssistance with review of the Debtors' short-term cash management procedures and monitoring cash flow;" "[a]ssistance  and advice to the Committee with respect to the Debtors' identification of core business assets and the disposition of assets …"; and "[l]itigation advisory services with respect to accounting and tax matters, along with expert witness testimony on case related issues as required by the Committee."[29]

16.    Barclays argues any economic analyses the Committee's advisors prepared relating to the Sale Transaction were not prepared "in anticipation of litigation" for purposes of the work-product privilege.  Instead, Barclays contends the documents were prepared as part of the typical diligence that surrounds any business transaction and because the Committee needed to understand the economics of the sale, which "would have been necessary regardless of

---

[28]    Houlihan Engagement Letter (¶ 1), a copy of which is attached hereto as Exhibit 3.

[29]    Application To Employ FTI Consulting, a copy of which is attached hereto as Exhibit 4.

Notably, FTI did not play any significant role in connection with the Sale Transaction on the Committee's behalf, nor was it part of the team of Committee professionals pursuing a reconciliation.  See Committee Reply, Ex. 74 (Tr., Deposition of Connor Tully, February 10, 2010) at 16:17-22 ("[M]y role, a very significant piece … was we were doing cash management. So we were trying to -- in any bankruptcy case, cash, understanding your cash position on the day of filing and what it is going to be going forward is imperative"); 18:7-18:24 ("[W]e wanted to … make sure we were staying on top of the people who were trying, supposed to be monitoring that process.… The focus was … to insure that claims weren't actually double counted").

whether they intended to sue Barclays."[30]  Barclays' position finds no support in the facts or case law.

### 1.    SECOND CIRCUIT HAS ADOPTED MORE EXPANSIVE "BECAUSE OF LITIGATION" STANDARD

17.    "Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)."  Fed. R. Civ. P. 26(b)(3)(A).  Such materials are only discoverable where "the party shows that it has a substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means."   Fed. R. Civ. P. 26(b)(3)(A)(ii).

18.    "The work-product privilege, or doctrine, has been codified in Fed. R. Civ. P. 26(b)(3) …. It is viewed as promoting the adversary system since it allows attorneys to be free to prepare their cases without fear that their work product will be used against their clients." Resolution Trust Corp., 200 F.R.D. at 188 (citations omitted).[31]

19.    "[A] document is privileged if 'in light of the nature of the document and the factual situation of the particular case, the document can be fairly said to have been prepared or obtained *because of* the prospect of litigation.'"   In re Suprema Specialties, Inc., 2007 WL 1964852, at *3 (Bankr. S.D.N.Y. Jul. 2, 2007) (citing United States v. Adlman, 134 F.3d 1194, 1202 (2d Cir. 1998)).  See also Byrnes v. Empire Blue Cross Blue Shield, 1999 WL 1006312, at *5 (S.D.N.Y. Nov. 4, 1999) ("As recently interpreted by the Second Circuit, this wording covers documents prepared 'because of' litigation or the prospect of litigation, regardless of whether the

---

[30]    Barclays' Second Mot. to Compel ¶¶ 12-13.

[31]    The work product privilege protects the communications at issue to the same extent as the attorney-client privilege.  Cf. Asbestos Health Claimants Committee v. Jasper Corp. (In re Celotex Corp.), 196 B.R. 596, 599 (M.D. Fla. 1996) ("The Doctrine is not coterminous with attorney-client privilege; it may protect information from discovery that falls outside the attorney-client privilege") (citations omitted).

document was intended to assist in such litigation …. [t]here is no requirement that the

anticipated litigation be imminent rather than merely a potential future prospect. If the

preparation of the document is attributable to concern about the possibility of such litigation in

the future, Rule 26(b)(3) is triggered") (citation omitted).

20.    "The Aldman case explicitly rejected a line of cases that protected only

documents created 'primarily to assist in litigation' and adopted a broader standard that protects

documents created 'because of' litigation.  This 'because of' standard means that documents are

protected even if they analyze only the likely impact of litigation in order to assist in business

decisions."  In re Suprema Specialties, Inc., 2007 WL 1964852, at *3-4 (Bankr. S.D.N.Y. Jul. 2,

2007) (emphasis added).

21.    "[A] document that assists a business decision is protected by work-product

immunity if the document was created because of the prospect of litigation.  In addition …

documents prepared in anticipation of litigation need not be created at the request of an attorney.

Once it is established that a document was prepared in anticipation of litigation, work product

immunity protects 'documents prepared by or for a representative party.'"  In re Copper Market

Antitrust Lit., 200 F.R.D. 213, 221 (S.D.N.Y. 2001) (documents prepared by public relations

advisor that "specializes in litigation-related crises management" in collaboration with counsel in

context of litigation ensuing from copper trading scandal were protected by work-product

doctrine when firm was hired shortly after "it was apparent that [Commodities Futures Trading

Commission] might commence an enforcement action;" "RLM's services were provided initially

because of the prospect of the CTFC's investigation and then because of the actual litigation

which ensued thereafter").

## 2. DOCUMENTS PREPARED IN CONNECTION WITH BANKRUPTCY CASES ARE PREPARED "IN ANTICIPATION OF LITIGATION"

22.     Barclays argues bankruptcy cases are not "litigation" and urges the Court to "reject such a bright-line expansive rule that would hereafter shroud within the confines of work product *all work* done by *any party* having *any connection* whatsoever to a bankruptcy proceeding."[32]  Barclays dramatically overstates the Committee's position.  The Committee submits that analyses prepared by an official committee's retained financial advisor in a contested matter are prepared "in anticipation of litigation" for purposes of the work-product doctrine.  The Committee's position finds ample support in the case law, which actually goes further in saying that the litigation in anticipation of which the document was prepared can be the producing party's participation in a main bankruptcy case.

23.     Examining this very issue, In re Tri-State Outdoor Media Group, Inc., 283 B.R. 358 (M.D. Georgia 2002), concluded bankruptcy cases constitute the adversarial process for purposes of work-product protection.  The court examined a motion to compel analyses Houlihan prepared in connection with an ad hoc committee's review of a possible restructuring for the debtor.  Later, when Houlihan represented the Committee, these analyses could not be discovered in contested matters in the bankruptcy cases initiated by motions to extend exclusivity and the time to assume or reject leases:  "[a]ccording to the Engagement Letter, Bankruptcy was contemplated at the inception of Houlihan's work on the Tri-State matter.  ***While bankruptcy is certainly not litigation, it is an adversarial proceeding, particularly when considering the rights of the debtor versus the rights of the unsecured creditors***.  Thus the documents in question were created in anticipation of Bankruptcy and 'in anticipation of litigation.'"  Id. at 364 (emphasis added).

---

[32]     Barclays Second Mot. to Compel ¶ 14.

24.     Similarly, In re Celotex Corp., 196 B.R. 596, 599-600 (M.D. Fla. 1996), found the
valuation analyses prepared by the debtor's expert, Alex Brown & Sons, in the chapter 11 cases
in connection with plan confirmation were not discoverable in a fraudulent transfer adversary
proceeding commenced by the committee because they were, among other things, protected by
the work-product doctrine:  "[t]hese documents, their transmittal and ultimate relevance, are
found in the general bankruptcy case.  Production of these documents in the adversary
proceeding cannot be divorced from the document origination in the general bankruptcy case."
See id. at 601 (noting existence of "the ongoing contested matter over confirmation in the
general bankruptcy case").

25.     Barclays cites United States v. Naegele, 468 F. Supp. 2d 165 (D.D.C. 2007) for
the proposition that a bankruptcy filing is not itself litigation in anticipation of which protected
attorney work product can be created.  (Barclays Br. at 8 (¶ 16)) (citing Naegele, 468 F. Supp. 2d
at 173).  Naegele, however, examined an entirely unrelated issue, i.e., whether, in a bankruptcy
fraud prosecution, defendant's attorney could assert work product protection over, inter alia, the
defendant's draft bankruptcy forms prepared by the attorney.  Given their presumed disclosure to
third parties, the work product protection did not attach:  "the factual information contained in
them does not contain [attorney's] mental processes, was intended to be disclosed to third parties,
and the forms were not prepared in anticipation of litigation.  Naegele retained [attorney] to file a
bankruptcy petition -- to disclose to a court and creditors expansive detail about his financial
condition -- not to litigate a case."  Id. at 173.

26.     Moreover, Naegele neither examined nor disagreed with In re Tri State Outdoor
Media Group, Inc. or In re Celotex Corp., specifically their findings that work product provided
by financial advisors in the context of the bankruptcy cases was prepared in anticipation of
litigation for work product purposes.  Naegele concluded simply that the act of preparing
bankruptcy petitions was not done in anticipation of litigation.  Hence, the drafts of those

15

petitions were not privileged.  See id. ("This bankruptcy filing was not itself 'litigation' in

anticipation of which protected attorney work product can be created.  The Court therefore

concludes that the draft bankruptcy filings are not protected by the work-product privilege").[33]

### 3. ANY ANALYSES COMMITTEE FINANCIAL ADVISORS PREPARED IN CONNECTION WITH SALE TRANSACTION WERE PREPARED IN ANTICIPATION OF LITIGATION

27.    The Court's consideration of the Sale Motion was a contested matter under the

Bankruptcy Rules.[34]  In response to the Sale Motion, the Committee and its retained

professionals attempted (to the extent possible) to diligence the Sale Transaction to ascertain

whether the Committee would support or oppose it.  To that end, the Committee's legal counsel

depended on its financial advisors (a common occurrence for counsel to statutory committees),

whose mandate included examining asset dispositions and, if necessary, advocating objections to

those transactions.  While the Committee was unable to arrive at an informed position in time for

the Sale Hearing, any analyses it performed relating to the Sale Transaction, both before and

after the Sale Hearing, were performed because of the potential future prospect of litigation.

---

[33]    Barclays also argues In re Hardwood P-G, Inc., 403 B.R. 445, 461-64 (Bankr. N.D. Tex. 2009) (finding attorney-client and work-product privileges protected disclosure of, inter alia, memorandum prepared by creditors' committee counsel evaluating causes of action), stands for the proposition that "courts have applied work product protection to materials prepared in connection with bankruptcy proceedings only … for scenarios where materials were prepared in connection with an investigation into potential causes of action for preferential and fraudulent transfers, or materials were prepared to oppose the relief being sought in an upcoming contested bankruptcy proceeding."  Barclays Br. at 8 & n. 8.  In re Hardwood P-G, however, neither (a) discusses the meaning of the phrase "in anticipation of litigation" in the bankruptcy context nor (b) establishes an exception to the findings in the cases of In re Tri-State Outdoor Media, Inc. and In re Celotex Corp.  See In re Hardwood P-G, Inc., 403 B.R. at 462-65 (examining work product doctrine).

[34]    See, e.g., Fed. R. Bankr. P. 6004(b) ("An objection to the proposed use, sale, or lease of property is governed by Rule 9014"); 6006(a) ("A proceeding to assume, reject or assign an executory contract, or unexpired lease, other than as part of a plan, is governed by Rule 9014"); Fed. R. Bankr. P. 9014(a) ("In a contested matter not otherwise governed by these rules, relief shall be requested by motion").

28.    *First*, the Committee could have lodged an objection to the Sale Transaction (based on its advisors' analysis) if the material terms of the Sale Transaction had been disclosed accurately.  The fact that the Committee did not lodge such an objection does not open its advisors' analyses to inspection.  That result leads to the absurd result of requiring parties to lodge objections simply to protect the privileged nature of their work-product materials.  See, e.g., Aldman, 134 F.3d at 1196 ("The work product doctrine … is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy with an eye toward litigation, free from unnecessary intrusion by his adversaries").  It also follows the more stringent standard which Aldman rejected, i.e., that the documents must have been prepared primarily to assist in litigation to enjoy protection.  See, e.g., In re Copper Market Antitrust Litigation, 200 F.R.D. at 220-21 (noting Aldman rejected formulation that "work-product immunity protects only documents primarily to assist in litigation").

29.    *Second*, irrespective of whether the Committee formally opposed the Sale Transaction, as a fiduciary for unsecured creditors, its interests still were "adversarial" to those of the transaction proponents as part of the inherent tension in chapter 11 cases between statutory committees and the debtors' estates.  See, e.g., In re Tri-State Outdoor Media Group, Inc., 283 B.R. at 364 ("While bankruptcy is certainly not litigation, it is an adversarial proceeding, particularly when considering the rights of the debtor versus the rights of the unsecured creditors").

30.    *Third*, prior to and following the closing of the Sale Transaction, the Committee persistently pursued a reconciliation.  As Mr. Burian advised Mr. Miller, the Committee required a reconciliation to verify the representations made to it at the Klein Meeting.  If those representations were false (which since has proven to be the case), litigation was foreseeable.[35]

---

[35]    Committee Reply, Ex. 55, Burian Tr. at 262:13-263:17 (describing Klein Meeting:  "I took comfort in the fact that the number footed because it showed that this -- what Michael Klein said to me was consistent with what I was told by my guys, which is … there is a list of securities

17

Cf. In re Suprema Specialties, Inc., 2007 WL 1964852, at *4 (finding work product protection applied to board of directors' audit committee report written in response to suspected accounting wrongdoing by senior management: "because it was prepared in anticipation of litigation that would foreseeably arise out of an alleged fraudulent activity of members of Suprema's management").

31.    **Fourth**, any analyses the Committee's financial advisors prepared were never intended to be disclosed or filed publicly like the bankruptcy petitions examined in Naegele.  At best, they would have been distributed to the Committee and its professionals, but in no event would they have been filed with the Court or distributed generally to creditors.

32.    **Fifth,** Barclays cannot maintain the analyses were prepared for the sole purpose of assisting the Committee in making "a business decision."  The Lehman Sellers, not the Committee, arrived at the relevant business decisions with respect to the Sale Transaction.  Instead, the Committee's advisors' analyses were prepared to enable the Committee to garner an understanding of, and arrive at a position with respect to the Lehman Sellers' business decision.  See, e.g., Aldman, 134 F.3d at 1200-02 ("We see no basis for adopting a test under which an attorney's assessment of the likely outcome of litigation is freely available to his litigation

---

[September 21 Schedules] that purport to be part of the transfer.  It is close to 50 billion dollars. …. [T]he Barclays loan is 45.5, and here I had a, not only a plausible but consistent explanation of the mismatch, that there was some significant deterioration in value in the interim.  Mike [Fazio] wanted to ask about that and that was cut off …. I turned to [Mr. Miller] and said … are you comfortable with this, is this what's going on, and he said, yeah …. [T]hen the conversation clearly ended with us saying, gentlemen … if this is what's going on, this is an explanation, … I understand it[;] you know … I can't diligence this[;] I have to trust you and what you're telling me is going on.… [I]t sounds like … the values have dropped in value. … [W]e don't understand why those values would have dropped, but if that's where Lehman and you guys are and the values dropped, we will get a reconciliation and it is what it is");  Committee Reply, Ex. 85, Burian Decl. ¶ 6 ("During (or immediately after) the Klein Meeting, I made clear that the Committee (a) was relying on the Lehman Sellers' and Barclays' representations concerning market value deterioration and other particulars of the Sale Transaction that were described by Mr. Klein – which we had no ability to diligence or confirm and (b) would require reconciliation verifying and confirming Barclays' and the Lehman Sellers' representations").

adversary merely because the document was created for a business purpose rather than for a litigation purpose.  The fact that a document's purpose is business related appears irrelevant to the question of whether it should be protected under Rule 26(b)(3)") (examining study prepared for an attorney assessing likely result of litigation in connection with assessment of desirability of business transaction).

33.     Indeed, this is the heart of the function of a statutory committee.  To conclude otherwise would eviscerate the important role statutory committees play, such as ensuring the preservation and maximization of estate assets.  See, e.g., 11 U.S.C. § 1103(c)(2) (authorizing committee to investigate "the acts, conduct, assets, liabilities and financial condition of the debtor … and any other matter relevant to the case")

34.     *Sixth*, Barclays cannot accurately argue that the Committee's financial advisors would have conducted these analyses irrespective of potential litigation.  The advisors conducted this analysis in the context of a contested matter in which Barclays and the Lehman Sellers pursued consummation of the Sale Transaction in the first five days of the bankruptcy cases.  They hardly were prepared in the ordinary course of the advisors' business or constitute ordinarily generated reports.  They were analyses prepared in connection with an investigation that foreseeably could have led to litigation.

35.     *Lastly*, litigation ultimately was commenced in these cases (the Committee Rule 60 Motion and adversary proceedings), albeit following Rule 2004 discovery that, among other things, revealed the existence of the $5 billion discount and misrepresentations concerning the contours of the consummated transaction.  Barclays is hard pressed to argue economic analyses examining assets that were the subject of the Sale Transaction were not prepared in anticipation of litigation.  See, e.g., In re Copper Market Antitrust Litigation, 200 F.R.D. at 211 (documents prepared by crisis management public relations firm enjoyed work product protection because

they were prepared because of prospect of Commodities Futures Trading Commission and then

because, <u>inter alia</u>, "actual litigation ensued thereafter").

### B.    COMMITTEE DID NOT WAIVE WORK PRODUCT PROTECTION BY PUTTING DOCUMENTS OR COMMUNICATIONS PROTECTED BY THAT PRIVILEGE AT ISSUE IN RULE 60 MOTION

#### 1.    COMMITTEE'S CLAIMS DO NOT RELY ON WORK PRODUCT MATERIALS

36.    The Committee claims Barclays failed to disclose the material aspects of the Sale

Transaction, resulting in the consummated transaction differing materially from the one

represented to and approved by the Court.  That objective claim neither relies on nor puts at issue

any economic analyses the Committee's financial advisors prepared.  To the contrary, it focuses

on Barclays' disclosures (or lack thereof) to the Court, not any subjective factors (<u>e.g.</u>, the

Committee's "state of mind").

37.    The Committee has demonstrated that mistakes and misrepresentations provide a

basis for Rule 60 relief,[36] that the Committee's motion rests on newly discovered evidence,[37] that

the Committee was justifiably ignorant of that evidence,[38] and that the Committee requested Rule

60 relief in a timely manner.[39]  The Committee points to non-privileged, corroborating

testimonial and documentary evidence adduced during Rule 2004 discovery to support those

assertions -- not attorney work product prepared by its financial advisors, including, without

limitation:

- the revelation that statements made by Mr. Klein during the Klein Meeting have proven to be misrepresentations when, among other things, the marked value of the Barclays Repo Collateral did not decline -- but instead that decline was attributed a liquidation valuation performed at Barclays' insistence;

---

[36]    <u>See</u> Committee Reply ¶¶ 186-195.

[37]    <u>See</u> Committee Reply ¶¶ 196-208.

[38]    <u>See</u> Committee Reply ¶¶ 209-212.

[39]    <u>See</u> Committee Reply ¶¶ 221-233.

- the representations during the Sale Hearing that values of the transferred assets had declined because of market fluctuations when, in point of fact, liquidation valuations were being ascribed to those assets;

- the revelation that the mark-to-market valuation for the assets transferred to Barclays as of September 19 was at least $52 billion, not the $47.4 billion represented to the Court (and confirmed by Mr. McDade's testimony that the assets had been marked that morning on a line-by-line basis);

- misrepresentations by Mr. Klein that the marked value of the repo collateral on the Lehman Sellers' books should be ignored as "stale marks" that did not accurately reflect the collateral's value; and

- the Committee's dogged efforts to pursue a reconciliation, both from the estates and from Barclays.

38.    Each of these elements was set forth in the Committee Rule 60 Motion,[40] and not first developed in the Committee Reply.  Thus, nothing has changed from the time the Court previously declined Barclays' request to find an at issue waiver.  Moreover, even assuming, arguendo, the Committee's financial advisors' analyses are somehow relevant to these assertions, their tangential relationship (if any) does not put them at issue in this litigation.  As noted in County of Erie, privileged communications are in some sense relevant in every lawsuit.  That does not, however, mean they always are "at issue."[41]

---

[40]    See Committee Rule 60 Mot. pp. 38-45.

[41]    See, e.g., In re County of Erie, 546 F.3d at 229 ("But privileged information may be in some sense relevant in any lawsuit.  A mere indication of a claim or defense certainly is insufficient to place legal advice at issue"); Nycomed U.S. Inc. v. Glemark Generics Ltd., 2009 WL 3334365, at * 1 (E.D.N.Y. Oct. 14, 2009) ("A mere indication of a claim or defense is insufficient to place legal advice at issue;" rejecting argument that attorney assistance in preparing notice letter alleging legal and factual basis upon which patent allegedly was invalid; noting "numerous other litigation circumstances in which discussions between clients and counsel result in documents (such as pleadings) that become part of the public record …") (citing In re Erie County, 546 F.3d at 229); Morande Auto. Group v. Metropolitan Group, Inc., 2009 WL 650444, at *2 (D. Conn. March 12, 2009) (finding assertion of negligent misrepresentation claim did not put attorney-client communications at issue, even if those attorney-client communications related to whether client's reliance on defendant's misrepresentations was reasonable:  "[w]hen the plaintiffs asserted negligent misrepresentation claims against [defendants], they raised the question of [plaintiff's] reliance on the [defendants], not the question of [plaintiff's] reliance on [its attorney's] advice.  Knowing [attorney's] advice would ostensibly make the [defendant's] defense case an easier one, but that advice is neither integral nor necessary for the resolution of [plaintiff's] negligent misrepresentation claims").

39.    Barclays again mischaracterizes the Committee's claim in an attempt to manufacture waiver.  Contrary to Barclays' assertions,[42] the Committee does not claim it misunderstood the Sale Transaction.  It argues instead that through a series of mistakes and misrepresentations, the material terms of the Sale Transaction were neither presented to, reviewed by, nor approved by the Court.  Nor does the Committee claim it misunderstood the Clarification Letter.  The Clarification Letter is incomplete.  It fails to reveal, among other things, Barclays' insistence on a day-one gain, a negotiated, $5 billion discount from the assets' 'book value,' and the attribution of liquidation value to the financial assets.  Moreover, the Clarification Letter fails to reveal that the additional assets (e.g., the Clearance Box and 15c3 Assets), were added to the transaction as an 11th hour demand (in addition to a $5 billion discount) -- not, as the Committee was told, to compensate for a purported decline in the value of the Barclays Repo Collateral.  Indeed, the evidence corroborating those assertions stems from, inter alia, the testimony of Barclays' and the Lehman Sellers' employees (e.g., Mr. Hughes, Mr. Tonucci, Mr. Lowitt, Mr. Klein, Mr. Seery, among others) -- not the Committee's financial advisors' economic analyses.

40.    As with Barclays First Motion To Compel, Barclays asks the Committee to "disprove a negative."[43]  Stated differently, Barclays asks the Committee to disprove affirmatively Barclays' defense that the Committee did know about the material differences between the approved and consummated transactions -- even though the Committee has shown (without reliance on work product materials) that it lacked this information.  The Committee does not bear that burden.

---

[42]    Barclays Second Mot. to Compel ¶¶ 2-3, 18.

[43]    See Barclays' Second Mot. to Compel at 4 ("The arguments made by movants in their reply briefs and the April 9 argument – which are the arguments movants *must* make in order to advance their claims -- demonstrates that their *actual, subjective understanding* of the Sale Transaction is just as relevant as the objective information which put them on notice …. Movants must show *both that they did not actually know and* that *they reasonably could not have known*, the information they now claim they discovered in Rule 2004 discovery").

### 2. BARCLAYS CANNOT SEEK PRIVILEGED DOCUMENTS TO FORTIFY ALLEGED ESTOPPEL, WAIVER AND MANDATE RULE DEFENSES

41.     As confirmed in the Barclays Brief and during the April 9, 2010 oral argument, Barclays continues to pursue privileged and protected information for the impermissible purpose of supporting its purported defenses.  Courts do not sanction such offensive use of the at issue doctrine.[44]

42.     Barclays asserts the Committee's claims are barred under waiver and estoppel doctrines (and under the mandate rule) because the Committee knew all material terms of the transaction when the Court approved it.  To that end, Barclays -- not the Committee -- raises the issue of Committee knowledge.  Barclays does so in the context of attempting (albeit unsuccessfully) to show the absence of mistake, that the evidence was not newly discovered, and that the Committee did not move in a timely fashion.  It also asserts the Committee cannot satisfy the "newly discovered evidence" exception to the mandate rule.[45]  Barclays cannot, however, obtain protected materials in an effort to fortify its defenses to the prima facie showing made by the Committee on these issues.

---

[44]     See, e.g., Resolution Trust Corp., 200 F.R.D. 183, 191 (W.D.N.Y. 2001) ("It cannot be possible for defendant to justify breaching privilege ... by reason of its own affirmative defense.  That would give an adversary who is a skillful pleader the ability to render the privilege a nullity").

[45]     See, e.g., Barclays Br. ¶ 21 ("Movants claim the economics of the deal are newly discovered evidence.  While Barclays does not believe any such exception to the mandate rule exists in the Second Circuit … if Movants knew of the alleged 'new evidence' in time to present that evidence to the district court or seek a stay of the district court's ruling, these differences do not constitute 'newly discovered evidence'").  See, e.g., U.S. v. Argentina, No. 00-62780, 2008 WL 510556, at *1 (2d Cir. Feb. 26, 2008); Highland Financial Corp., 216 B.R. 109, 114 (Bankr. S.D.N.Y. 1997) (noting an exception given "the availability of substantially different evidence at the trial on remand").

23

### C.    BARCLAYS CANNOT SHOW SUBSTANTIAL NEED JUSTIFIES EXCEPTION TO WORK PRODUCT PROTECTION

43.    Barclays has not satisfied its burden of establishing substantial need or undue hardship.  See, In re Suprema Specialties, Inc., 2007 WL 1964852, at *4 ("Parties can compel the production of documents constituting work product, however, if they can show they have a 'substantial need' for the documents").[46]

44.    Substantial need means the information is both essential to the parties case and otherwise not available.  "Generally, a document must be 'essential' to a party's case to fall under this exception …. Cases in which a 'substantial need' exists generally involve unavailable witnesses due to circumstances such as death, faulty memory due to brain damage, or being outside the court's reach."  In re Suprema Specialties, Inc., 2007 WL 1964852, at *4 (citations omitted).[47]

45.    The Committee has produced 51,000 pages of documents from seven Committee members (and their counsel).  It afforded Barclays access to two Houlihan witnesses (one of whom served as a Rule 30(b)(6) witness), one FTI witness, the Committee Co-Chair and counsel to the Committee (also a Rule 30(b)(6) witness).  Both the LBHI and LBI estates similarly afforded Barclays access to documentary and testimonial evidence from their principals, their attorneys (e.g., Weil, Simpson Thacher, Hughes Hubbard) and their financial advisors (e.g.,

---

[46]    See, e.g., In re Hardwood P-G, Inc., 403 B.R. at 464 (noting court can compel production of ordinary work product when requesting party "[(i)] has a substantial need for the materials in the preparation of the parties case, and (ii) it is unable, without undue hardship, to obtain the equivalent of the materials by other means.  To show either substantial need or undue hardship, a party seeking discovery of attorney work product must make a detailed showing of either need or hardship; a broad, unsubstantiated assertion is not sufficient") (citations omitted)

[47]    See also In re Hardwood P-G, Inc., 403 B.R. at 464 ("Undue hardship can be demonstrated if witnesses cannot remember key facts or are unavailable for depositions or if there is unusual expense incurred [in] interviewing or discovering the sought-after person or information …. Substantial need may be shown where the information is only discoverable with the documents at issue themselves") (citations omitted); In re Suprema Specialties [insert] (witness has no memory)

24

Lazard Freres, Alvarez & Marsal, Deloitte).  Barclays even propounded discovery on Akin
Gump, counsel to an objector at the Sale Hearing, and the Federal Reserve Bank.

46.    Barclays has been given every opportunity to challenge the Committee's
assertions concerning knowledge (or lack thereof) of the Sale Transaction's material terms by
taking discovery from the parties (including principals and attorneys) that may have provided
information to the Committee's professionals.  Indeed, Barclays has had access to all discovery
needed to explore the Committee's alleged knowledge:

| TOPICS OF DISCOVERY | ABILITY TO PURSUE OTHER SOURCES |
|---|---|
| • "Barclays believes the Court needs to see *everything* the Committee had informing its understanding of the deal's economics, not just those items the Committee selectively chooses to present to the Court for its own benefit." (Barclays Second Mot. to Compel ¶ 19 & n. 10) (citing to April 9 Transcript:  "Up until recently it was Houlihan's understanding that the assets would be valued using only book value or mark to market value") (Tr. 108:12-20))<br><br>• September 17 Press Release and Analyst Call Transcript; email from Goldman Sachs complaining about gain | • Depositions of every party that provided information to the Committees' advisors, including Mr. Klein, Mr. Seery, Weil, Alvarez & Marsal, Lazard Freres, Simpson Thatcher and Cleary Gottlieb, have been taken, and these entities have produced documents<br><br>• Depositions of Houlihan (2), FTI Consulting (1), the Committee Co-Chair, and Milbank (2) have been taken; each has produced documents responsive to several Barclays' subpoenae<br><br>• September 17 Press Release and Analyst Call Transcript and Goldman Sachs email were shown to Houlihan, Milbank, FTI and Committee witnesses during their depositions |
| • "Among other examples, Movants' statements concerning the October 8 Alvarez & Marsal presentation demonstrate the unfairness of having to defend against Movant's assertions without access to their post-Closing attempts to evaluate the Sale …. Movants concede they were aware of this information, but assert that they did not sufficiently understand the information they possess."  (Barclays Second Mot. to Compel ¶ 23). | • October 8 Presentation was presented to following witnesses during depositions, each of whom was asked about it:  Mr. Burian (Houlihan), Mr. O'Donnell (Milbank), Mr. Purcell (Committee Co-Chair); Mr. Fazio (Houlihan); Mr. Tully (FTI Consulting); Mr. Despins (formerly Milbank); Mr. Kruse (Alvarez & Marsal); Mr. Marsal (Alvarez & Marsal); Mr. Coles (Alvarez & Marsal); Ms. Korycki (Alvarez & Marsal); Mr. Fogarty (Alvarez & Marsal); Mr. Miller (Weil); and Mr. Ridings (Lazard Freres) |

| TOPICS OF DISCOVERY | ABILITY TO PURSUE OTHER SOURCES |
|---|---|
| • "Movants likewise assert that they did not understand other information -- such as the Leventhal Declaration submitted in connection with the December Settlement or the publicly available cure amounts – that they had in their possession prior to the appellate mandate" (Barclays Second Mot. to Compel ¶ 24). | • Barclays deposed Mr. Burian, who submitted a declaration in support of the Committee's Limited Objection to the December Settlement Motion and partly in response to the Leventhal Declaration submitted in support of the December Settlement Motion<br><br>• Barclays has deposed Ms. Leventhal<br><br>• Cure notices were shown to Mr. Burian and Mr. O'Donnell during their depositions |

47.    Accordingly, Barclays has not satisfied its burden of showing a substantial need for the discovery.  Indeed, to the extent the information it seeks exists (i.e., Committee knowledge of the transactions' material terms prior to the commencement of Rule 2004 discovery), Barclays has been afforded every opportunity to uncover that information.  It simply does not exist, and divulging documents that enjoy sacrosanct protections based on a narrowly applied exception will not change that inescapable conclusion.

### IV.   <u>CONCLUSION</u>

For the foregoing reasons, the Committee respectfully requests that the Court enter an

order denying the Barclays' Second Motion To Compel, sustaining the Committee's objection

and granting the Committee such further, different relief as the Court deems just.


Dated: April 22, 2010
       New York, New York


**QUINN EMANUEL URQUHART &
SULLIVAN LLP**

<u>/s/ JAMES C. TECCE</u>
Susheel Kirpalani
James C. Tecce

51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone No.:  (212) 849-7000

*Special Counsel to Official Committee Of
Unsecured Creditors Of Lehman Brothers
Holdings Inc., et al.*

27