# EXHIBIT A

B 10 (Official Form 10) (12/07)

| UNITED STATES BANKRUPTCY COURT     Southern District of New York | | PROOF OF CLAIM |
|---|---|---|

| Name of Debtor:<br>Lehman Brothers Holdings Inc. | Case Number:<br>08-13555 |
|---|---|

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. ? 503.*

| | |
|---|---|
| Name of Creditor (the person or other entity to whom the debtor owes money or property):<br>Goodmorning Shihan Securities Co., Ltd. | ☐ Check this box to indicate that this claim amends a previously filed claim. |
| Name and address where notices should be sent:<br><br>Mr. Hoon Nam Koong<br>Goodmorning Shihan Securities Co., Ltd., Legal Affairs Department<br>8th Floor, 23-2 Yoido-dong,Youngdeungpo-Gu Seoul, South Korea 150-721<br>Telephone number:<br>82 2 3772 2164 | **Court Claim Number:**_____<br>*(If known)*<br><br><br>Filed on:_____ |
| Name and address where payment should be sent (if different from above):<br><br><br><br><br>Telephone number: | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>☐ Check this box if you are the debtor or trustee in this case. |

| | |
|---|---|
| **1. Amount of Claim as of Date Case Filed:**     $_____13,942,060.91_____<br><br>If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.<br><br>If all or part of your claim is entitled to priority, complete item 5.<br><br>☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges. | **5. Amount of Claim Entitled to Priority under 11 U.S.C. ? 07(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**<br><br>Specify the priority of the claim.<br><br>☐ Domestic support obligations under 11 U.S.C. ? 07(a)(1)(A) or (a)(1)(B). |
| **2. Basis for Claim:** swap transaction guarantees<br>(See instruction #2 on reverse side.) | ☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. ? 07 (a)(4). |
| **3. Last four digits of any number by which creditor identifies debtor:** _____<br><br>     **3a. Debtor may have scheduled account as:** _____<br>          (See instruction #3a on reverse side.) | |
| **4. Secured Claim (See instruction #4 on reverse side.)**<br>Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.     *Please See Attached.*<br><br>Nature of property or right of setoff: ☐ Real Estate   ☐ Motor Vehicle   ☑ Other<br>Describe:<br><br>Value of Property:$_____   Annual Interest Rate____%<br><br>Amount of arrearage and other charges as of time case filed included in secured claim,<br><br>if any: $_____   Basis for perfection: _____<br><br>Amount of Secured Claim: $_____   Amount Unsecured: $_____ | ☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).<br><br>☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).<br><br>☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8). |
| **6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. | ☐ Other – Specify applicable paragraph of 11 U.S.C. ? 07 (a)(___). |
| **7. Documents:** Attach redacted c~~opies of any documents that support the claim, such as promisso~~ry notes, purchase orders, invoices, itemized statemen~~ts of running accounts, contracts, judgments, mortgages, and se~~curity agreements.<br>You may also attach a summary. ~~Attach redacted copies of documents providing evidence of perf~~ection of a security interest. You may also a~~ttach a summary. (See instruction 7 and definition of "redacted.~~)<br>**Please see attached documen~~t.**<br>DO NOT SEND ORIGINAL DOC~~UMENTS. ATTACHED DOCUMENTS MAY BE DESTROY~~ED AFTER SCANNING.<br><br>If the documents are not available, please explain: | **Amount entitled to priority:**<br><br>$_____<br><br>*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with ~~respect to cases commenced on or after the date of adjustment.~~ |

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)     0000002710

FOR COURT USE ONLY

FEB 11 2009

| Date: Feb. 6th, 09 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. |
|---|---|

Mr. Hoon Nam Koong, Chief of Legal Department     *Nam Koong, Hoon*

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. ? 152 and 3571.*

EPIQ BANKRUPTCY SOLUTIONS, LLC

**EXHIBIT A
PAGE 6**

B 10 (Official Form 10) (12/07) – Cont.

## INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules.*

### Items to be completed in Proof of Claim form

**Court, Name of Debtor, and Case Number:**
Fill in the federal judicial district where the bankruptcy case was filed (for example, Central District of California), the bankruptcy debtor's name, and the bankruptcy case number. If the creditor received a notice of the case from the bankruptcy court, all of this information is located at the top of the notice.

**Creditor Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the Bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**
Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See DEFINITIONS, below.) State the type and the value of property that secures the claim, attach copies of lien

documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. ? 07(a).**
If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority. (See DEFINITIONS, below.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**7. Documents:**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2), authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

---

### DEFINITIONS

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is the person, corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing.

**Claim**
A claim is the creditor's right to receive payment for a debt that was owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. ? 01 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the clerk of the same bankruptcy court in which the bankruptcy case was filed.

**Secured Claim Under 11 U.S.C. ? 06(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car.

A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. ? 07(a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's tax-identification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

### INFORMATION

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim or you may access the court's PACER system (www.pacer.psc.uscourts.gov) for a small fee to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. ? 101 *et seq.*), and any applicable orders of the bankruptcy court.

**EXHIBIT A**
**PAGE 7**

## ADDENDUM TO PROOF OF CLAIM

### Brief Description of Basis of Claim

Goodmorning Shinhan Securities Co., Ltd.'s ("GMSH's") claim against Lehman
Brothers Holdings, Inc. ("LBHI") arises from a Guarantee it executed in GMSH's favor
in connection with derivative swap transactions between GMSH and Lehman Brothers
Commercial Corporation Asia Limited ("Lehman Asia"). As a result of terminated swap
transactions between Lehman Asia and GMSH, as of September 15, 2008, LBHI was
liable to GMSH in the amount of $13,942,060.91. As of January 16, 2009, the amount of
GMSH's claim, including accrued interest and charges is $14,968,653.09. Interest may
continue to accrue until the claim is paid.

### Relevant Documentation
- Exhibit 1: Guarantee of LBHI dated April 6, 2007;
- Exhibit 2: Master Agreement between GMSH and Lehman Asia dated April 6, 2007;
- Exhibit 3: Transaction Term Sheet dated March 28, 2007 between Lehman Asia and GMSH;
- Exhibit 4: Transaction Term Sheet dated June 1, 2007 between Lehman Asia and GMSH;
- Exhibit 5: Transaction Term Sheet dated June 15, 2007 between Lehman Asia and GMSH;
- Exhibit 6: Structured Equity Solutions Term Sheet referencing $135,623.87 initial exchange amount between Lehman Asia and GMSH;
- Exhibit 7: Structured Equity Solutions Term Sheet referencing $151,179.31 initial exchange amount between Lehman Asia and GMSH;
- Exhibit 8: Structured Equity Solutions Term Sheet referencing $604,842.68 initial exchange amount between Lehman Asia and GMSH;
- Exhibit 9: worksheet calculating amounts owed under the terminated swap transactions and applicable charges and interest; and
- Exhibit 10: documentation concerning setoff.

# EXHIBIT 1

**EXHIBIT A**
**PAGE 9**

# LEHMAN BROTHERS

## GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

Lehman Brothers Commercial Corporation Asia Limited ("Party A") and Good Morning Shinhan Securities Co., Ltd. ("Party B") have entered into a Master Agreement dated as of April 6, 2007, as amended from time to time (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)    Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A in connection with each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement (whether at maturity, by acceleration or otherwise). Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)    Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)    Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of any obligation of Party A under the Agreement , the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into any amendments to the Agreement, additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which is waived) provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment with respect to any Event of Default or Potential Event of Default, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)    This Guarantee shall remain in full force and effect until receipt by Party B of a written notice of termination from Guarantor. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e)    Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

1

(f)     Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

(g)     Guarantor shall have no right of subrogation with respect to any payments made under this Guarantee until all obligations of the Guaranteed Party under the Agreement are paid in full.

(h)     Guarantor represents and warrants (which representations and warranties shall be deemed to have been made by Guarantor on the date of each Transaction) that:

     i.     Guarantor is a corporation duly incorporated, validly existing and in good standing under the laws of Delaware;

     ii.     Guarantor has the legal capacity and the legal right to execute and deliver this Guarantee and to perform Guarantor's obligations hereunder;

     iii.     no consent or authorization of, filing with, or other act by or in respect of, any governmental authority and no consent of any other person (including, without limitation, any creditor of Guarantor) is required in connection with the execution, delivery, performance, validity or enforceability of this Guarantee;

     iv.     this Guarantee has been duly executed and delivered by Guarantor and constitutes a legal, valid and binding obligation of Guarantor enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws; and

     v.     the execution, delivery and performance of this Guarantee will not violate any provision of the certificate of incorporation, by laws or other organizational documents of Guarantor, or any law, treaty, rule or regulation or determination of an arbitrator, a court or other governmental authority, applicable to or binding upon Guarantor or any of its property or to which Guarantor or any of its property is subject.

(i)     Any provision of this Guarantee which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

(j)     No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege, and no waiver by Party B of any right or remedy hereunder on any one occasion shall be construed as a bar to any right or remedy which Party B would otherwise have on any future occasion. No failure to exercise, nor any delay in exercising, any right, power or privilege hereunder shall operate as a waiver thereof. The rights and remedies herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any other rights or remedies provided by law.

EXHIBIT A
PAGE 11

(k)     If any term, provision, covenant, or condition of this Guarantee, or the application thereof to any party or circumstance, shall be held to be illegal, invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants and conditions hereof shall continue in full force and effect as if this Guarantee had been executed with the illegal, invalid or unenforceable portion eliminated, so long as this Guarantee as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Guarantee and the deletion of such portion of this Guarantee will not substantially impair the respective benefits or expectations of the parties to this Guarantee.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York without regard to conflicts of laws principles. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed by its duly authorized officer as of the date of the Agreement

LEHMAN BROTHERS HOLDINGS INC.

By:
    Name:   James J. Killerlane III
    Title :   Vice President
    Date :   December 11, 2007

3

**EXHIBIT A
PAGE 12**

美國雷曼兄弟亞洲商業有限公司
## LEHMAN BROTHERS COMMERCIAL CORPORATION ASIA LIMITED
### (the "Company")

Minutes of a Meeting of the Board of Directors of the Company held at 27/F, Man Yee Building, 68 Des Voeux Road, Central, Hong Kong on July 15, 2008.

---

**PRESENT**      Ms. Sarah Rose BOWER
            Mr. Ming CHEUNG

**CHAIRMAN**

A sufficient quorum being present, Ms. Sarah Rose BOWER was elected Chairman of the meeting.

**NOTICE AND QUORUM**

The Chairman reported that the notice of this Meeting has been given to all Directors. The necessary quorum being present, the Chairman called the Meeting to order.

**APPOINTMENT OF DIRECTOR – Shaun Peter BRAMHAM**

**IT WAS RESOLVED THAT** Shaun Peter BRAMHAM be and is hereby appointed as a director of the Company with immediate effect.

**CLOSE OF MEETING**

There being no further business, the Chairman declared the meeting closed.

_____
Chairman

**Lehman Brothers Commercial Corporation Asia Limited**
**Director's Specimen Signature**

Shaun Peter Bramham

Sarah Rose Bower

Joseph Ming Cheung

Date:  15ᵗʰ July, 2008

# EXHIBIT 2

(Multicurrency-Cross Border)

# ISDA®

International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of **April 6, 2007**

| | |
|---|---|
| **LEHMAN BROTHERS COMMERCIAL** | **GOODMORNING SHINHAN** |
| **CORPORATION ASIA LIMITED** | **SECURITIES CO., LTD.** |

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:—

1.      **Interpretation**

(a)      *Definitions.*  The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)      *Inconsistency.*  In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail.  In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purposes of the relevant Transaction.

(c)      *Single Agreement.*  All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

2.      **Obligations**

(a)      *General Conditions.*

(i)    Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)   Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency.  Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)  Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

(b)    *Change of Account*. Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting*. If on any date amounts would otherwise be payable:—

    (i)    in the same currency; and

    (ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    *Deduction or Withholding for Tax.*

    (i)    *Gross-Up*. All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

        (1)    promptly notify the other party ("Y") of such requirement;

        (2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

        (3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

        (4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

            (A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

            (B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

                ISDA® 1992

(ii) *Liability*. If: —

    (1) X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

    (2) X does not so deduct or withhold; and

    (3) a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)    *Default Interest; Other Amounts*. Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

3.    **Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)    *Basic Representations*.

    (i)    *Status*. It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

    (ii)    *Powers*. It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

    (iii)    *No Violation or Conflict*. Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

    (iv)    *Consents*. All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

    (v)    *Obligations Binding*. Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

    **ISDA® 1992**

**EXHIBIT A
PAGE 18**

(b)    *Absence of Certain Events*. No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)    *Absence of Litigation*. There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, government body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)    *Accuracy of Specified Information*. All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)    *Payer Tax Representation*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)    *Payee Tax Representations*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

4.    **Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)    *Furnish Specified Information*. It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

    (i)    any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

    (ii)    any other documents specified in the Schedule or any Confirmation; and

    (iii)    upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)    *Maintain Authorisations*. It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)    *Comply with Laws*. It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)    *Tax Agreement*. It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)    *Payment of Stamp Tax*. Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

**5.    Events of Default and Termination Events**

(a)    *Events of Default*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i)    *Failure to Pay or Deliver*. Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)    *Breach of Agreement*. Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii)    *Credit Support Default*.

(1) Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2) the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3) the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv)    *Misrepresentation*. A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)    *Default under Specified Transaction*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)    *Cross Default*. If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

5

ISDA® 1992

**EXHIBIT A**
**PAGE 20**

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party: —

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption*. The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: —

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)   *Termination Events*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

ISDA® 1992

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

(i)  *Illegality*. Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party): —

(1)  to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2)  to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii)  *Tax Event*. Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iii)  *Tax Event Upon Merger*. The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

(iv)  *Credit Event Upon Merger*. If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(v)  *Additional Termination Event*. If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)  *Event of Default and Illegality*. If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

                                                                    **ISDA® 1992**

6.    **Early Termination**

(a)    *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    *Right to Terminate Following Termination Event.*

   (i)    *Notice.* If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

   (ii)    *Transfer to Avoid Termination Event.* If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

   If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

   Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

   (iii)    *Two Affected Parties.* If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

   (iv)    *Right to Terminate.* If: —

      (1)    a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

      (2)    an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

   either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c) *Effect of Designation.*

(i) If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii) Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d) *Calculations.*

(i) *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii) *Payment Date.* An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e) *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i) *Events of Default.* If the Early Termination Date results from an Event of Default: —

(1) *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2) *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3) *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

9

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4) *Second Method and Loss*. If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)   *Termination Events*. If the Early Termination Date results from a Termination Event: —

(1) *One Affected Party*. If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2) *Two Affected Parties*. If there are two Affected Parties: —

(A) if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B) if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)  *Adjustment for Bankruptcy*. In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)  *Pre-Estimate*. The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

**ISDA® 1992**

**7.    Transfer**

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that: —

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

**8.    Contractual Currency**

(a)    *Payment in the Contractual Currency.* Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments.* To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)    *Separate Indemnities.* To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss.* For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

ISDA® 1992

## 9.    Miscellaneous

(a)    *Entire Agreement*. This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    *Amendments*. No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations*. Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative*. Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations*.

(i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall he entered into as soon as practicable and may he executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights*. A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings*. The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

## 10.    Offices; Multibranch Parties

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

## 11.    Expenses

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

ISDA® 1992

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**12.    Notices**

(a)    *Effectiveness*. Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

(i)    if in writing and delivered in person or by courier, on the date it is delivered;

(ii)    if sent by telex, on the date the recipient's answerback is received;

(iii)    if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

(v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)    *Change of Addresses*. Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

**13.    Governing Law and Jurisdiction**

(a)    *Governing Law*. This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    *Jurisdiction*. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

(i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Service of Process*. Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)  *Waiver of Immunities.* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

**14.    Definitions**

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)  in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)  in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)  in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)  in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

ISDA® 1992

**"Defaulting Party"** has the meaning specified in Section 6(a).

**"Early Termination Date"** means the date determined in accordance with Section 6(a) or 6(b)(iv).

**"Event of Default"** has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

**"Illegality"** has the meaning specified in Section 5(b).

**"Indemnifiable Tax"** means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

**"law"** includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and **"lawful"** and **"unlawful"** will be construed accordingly.

**"Local Business Day"** means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

**"Loss"** means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

**"Market Quotation"** means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

ISDA® 1992

**EXHIBIT A**
**PAGE 30**

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of: —

(a)    the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)    such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meanings specified in the Schedule.

ISDA® 1992

"*Specified Indebtedness*" means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

"*Specified Transaction*" means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

"*Stamp Tax*" means any stamp, registration, documentation or similar tax.

"*Tax*" means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

"*Tax Event*" has the meaning specified in Section 5(b).

"*Tax Event Upon Merger*" has the meaning specified in Section 5(b).

"*Terminated Transactions*" means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

"*Termination Currency*" has the meaning specified in the Schedule.

"*Termination Currency Equivalent*" means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

"*Termination Event*" means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

"*Termination Rate*" means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

"*Unpaid Amounts*" owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

| LEHMAN BROTHERS COMMERCIAL CORPORATION ASIA LIMITED | GOODMORNING SHINHAN SECURITIES CO., LTD. |
|---|---|
| *(Name of Party)* | *(Name of Party)* |

By: _____      By: _____

Name:                          Name: Man Ki Jeong

Title:  Tan Ser Kiat             Title: Chief Financial Officer

Director / Authorised Signatory

Date:  December 5, 2007       Date: Nov. 30, 2007

18

(Multicurrency-Cross Border)

**SCHEDULE**
to the
**Master Agreement**
dated as of **April 6, 2007**
between
**LEHMAN BROTHERS COMMERCIAL CORPORATION ASIA LIMITED** ("Party A"),
a company incorporated with limited liability
under the laws of the Hong Kong Special Administrative Region
of the People's Republic of China
and
**GOODMORNING SHINHAN SECURITIES CO., LTD.** ("Party B"),
a limited liability corporation organized under the laws of
the Republic of Korea

**Part 1: Termination Provisions**

In this Agreement:-

(a)     **"Specified Entity"** means in relation to Party A for the purpose of:-

           Section 5(a)(v),   Not applicable.
           Section 5(a)(vi),  Not applicable.
           Section 5(a)(vii), Not applicable.
           Section 5(b)(iv),  Not applicable.

        and in relation to Party B for the purpose of:-

           Section 5(a)(v),   Not applicable.
           Section 5(a)(vi),  Not applicable.
           Section 5(a)(vii), Not applicable.
           Section 5(b)(iv),  Not applicable.

(b)     **"Specified Transaction"** will have the meaning specified in Section 14 of this Agreement.

(c)     The **"Cross Default"** provisions of Section 5(a)(vi) will apply to Party A and Party B.

        The following provisions apply:-

        **"Specified Indebtedness"** will have the meaning specified in Section 14 of this Agreement.

        **"Threshold Amount"** means the lesser of (i) USD 100 million and (ii) two percent (2%) of the Stockholders' Equity of Lehman Brothers Holdings Inc. ("Lehman Brothers Holdings Inc." or "Holdings"), in the case of Party A (or its equivalent in any other currency), and the lesser of (i) USD 10 million and (ii) two percent (2%) of the Stockholders' Equity of Party B, in the case of Party B (or its equivalent in any other currency).

        For purposes hereof, **"Stockholders' Equity"** means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles consistently applied.

(d)     The **"Credit Event Upon Merger"** provisions of Section 5(b)(iv) will apply to Party A and Party B; provided, however, that the term "materially weaker" means, with respect to Party A, that Lehman Brothers Holdings Inc. or the resulting, surviving or transferee entity of Holdings, as the case may be, fails to maintain a long-term senior unsecured debt rating of at least Baa2 as determined by Moody's Investors Service, Inc. ("Moody's")

19

and BBB as determined by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P").

(e)    The **"Automatic Early Termination"** provision of <u>Section 6(a)</u> will not apply to Party A and will apply to Party B.

(f)    **Payments on Early Termination.** For the purpose of <u>Section 6(e)</u> of this Agreement, Loss and the Second Method will apply.

(g)    **"Termination Currency"** means United States Dollars ("USD").

(h)    **Additional Termination Events** will apply. Each of the following shall constitute an Additional Termination Event:

   (i)    **Sovereign Event.** Party B is not able to discharge its obligations with respect to a Transaction through the relevant booking office as a result of any law (other than bankruptcy, insolvency or similar laws), order or other action by, or threat of any such law, order or other action by or on behalf of, any governmental or other similar authority (de jure or de facto) at the location of such office. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

   (ii)   **Non-Convertibility Event.** Party A has determined in its reasonable discretion that either of the following has occurred and that any such occurrence has not been satisfactorily cured: (1) a market condition in the Republic of Korea has had the effect of prohibiting, restricting or delaying (x) the free and unconditional exchange of Korean Won for USD or (y) the free and unconditional transferability of any USD resulting from any such exchange or (2) an action or failure to act by the government of the Republic of Korea or any agency or regulatory authority thereof has had the effect of prohibiting, restricting or delaying (x) the free and unconditional exchange of Korean Won for USD or (y) the free and unconditional transferability of any USD resulting from any such exchange. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

   (iii)  **Adequate Assurances.** Party B fails to give Party A adequate assurances of Party B's ability to perform any of its obligations under this Agreement within one (1) Local Business Day of a written request to do so. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

20

**Part 2: Tax Representations**

(a)  **Payer Tax Representations.**  For the purpose of <u>Section 3(e)</u> of this Agreement, Party A and Party B will each make the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under <u>Sections 2(e)</u>, <u>6(d)(ii)</u> and <u>6(e)</u> of this Agreement) to be made by it to the other party under this Agreement.  In making this representation, it may rely on (i) the accuracy of any representation made by the other party pursuant to <u>Section 3(f)</u> of this Agreement, (ii) the satisfaction of the agreement of the other party contained in Section <u>4(a)(i)</u> or <u>4(a)(iii)</u> of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to <u>Section 4(a)(i)</u> or <u>4(a)(iii)</u> of this Agreement; and (iii) the satisfaction of the agreement of the other party contained in <u>Section 4(d)</u> of this Agreement, <u>provided</u> that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under <u>Section 4(a)(iii)</u> of this Agreement by reason of material prejudice to its legal or commercial position.

(b)  **Payee Tax Representations.** For the purpose of Section 3(f) of this Agreement Party A represents that it is a company incorporated with limited liability under the laws of the Hong Kong Special Administrative Region of the People's Republic of China and Party B represents that it is a limited liability corporation duly organized and validly existing under the laws of the Republic of Korea.

(c)  **Tax Representations in Confirmations.** For purposes of <u>Sections 2(d)(i)(4)</u> and <u>3(f)</u>, any payee tax representation specified in a Confirmation under this Agreement shall be deemed to be specified in this Schedule.

21

**Part 3: Agreement to Deliver Documents**

For the purpose of Sections 4(a)(i) and (ii) of this Agreement, each party agrees to deliver the following documents, as applicable:

(a)    Party A and Party B will deliver forms and/or documents described in Section 4(a)(iii) of this Agreement upon reasonable demand by the other party.

(b)    Other documents to be delivered are:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A and Party B | Incumbency certificate or other evidence reasonably satisfactory to the other party of the authority and genuine signature of the individual signing the Agreement and any Credit Support Document on behalf of such party to execute the same and, in the case of Party B, to include relevant portions of Party B's official signature book of authorized signatories and powers of attorney, if any. | Upon execution of this Agreement. | Yes |
| Party A and Party B | Evidence reasonably satisfactory to the other party of the authority of such party and its Credit Support Provider to enter into the Agreement, any Credit Support Document and each Transaction entered into hereunder. | Upon execution of this Agreement. | Yes |
| Party A and Party B | A copy of the annual report (i) in the case of Party A, of its Credit Support Provider and (ii) in the case of Party B, Party B's annual audited financial report, containing audited consolidated financial statements for such fiscal year certified by independent public accountants and prepared in accordance with generally accepted accounting principles consistently applied. | Upon request. | Yes |

22

EXHIBIT A
PAGE 37

 

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A and Party B | For its most recent fiscal quarter, a copy of the unaudited financial statements of (i) in the case of Party A, its Credit Support Provider and (ii) in the case of Party B, Party B's, prepared in accordance with generally accepted accounting principles consistently applied. | Upon request. | Yes |
| Party A and Party B | Any Credit Support Document(s) specified in Part 4 of this Schedule. | Upon execution of this Agreement. | No |
| Party B | An opinion of counsel to Party B substantially in the form of Exhibit B to this Schedule. | Promptly after execution of this Agreement. | No |
| Party B | A certified copy of (i) its articles of incorporation, (ii) any other constitutional documents of Party B, including, but not limited, to any relevant legislation or enabling statutes and (iii) extracts of its Company Registry. | Upon execution of this Agreement. | Yes |
| Party B | A certificate, certified by the Chief Operating Officer of Party B approving the entering into of this Agreement and the Transactions contemplated hereby and delegating the powers to named individuals to enter into any individual Transactions contemplated hereby or any other evidence of due authorization satisfactory to Party A. | Upon execution of this Agreement. | Yes |
| Party B | Certified true copy of any necessary governmental approval in respect of all Transactions requiring such approval. | Upon execution of Confirmation for each affected Transaction. | No |

23

EXHIBIT A
PAGE 38



| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party B | A seal certificate of the Representative Director to authenticate any seal which is affixed to this Agreement or any subsequent Transaction. | Upon execution of this Agreement and, with respect to any relevant documents executed and delivered after execution of this Agreement, upon request. | Yes |
| Party B | Such documents as Party A may reasonably request to demonstrate that the representation set out in Part 5(b)(i) (Professional Investor) of this Schedule is correct. | Upon request. | Yes |

24

**EXHIBIT A
PAGE 39**

**Part 4: Miscellaneous**

(a)  **Addresses for Notices.** For the purpose of Section 12(a) of this Agreement:

Address for notices or communications to **Party A**:

Address:    Lehman Brothers Commercial Corporation Asia Limited
            25/F-26/F & 27/F Unit 2706-2714
            Two International Finance Centre
            8 Finance Street
            Central
            Hong Kong

Attention:      Head of Compliance
Telephone No.:  852-2252-6052
Facsimile No.:  852-2372-5050

For all purposes.

Address for notices or communications to **Party B**:

Address:    Good Morning Shinhan Securities Co., Ltd.
            Good Morning Shinhan Tower, 8F
            23-2, Youido-Dong, Youngdungpo-Ku
            Seoul, 150-712, Korea

Attention:      Chae Seong, Yun / Seong Soo, Hong / Byoung Seok, Kwon
Telephone No.:  (822) 3772 2232 / (822) 3772 2327 / (822) 3772 2008
Facsimile No.:  (822) 6234 0060 / (822) 786 3547 / (822) 782 7952

For all purposes.

(b)  **Process Agent.** For the purpose of Section 13(c) of this Agreement:

Party A appoints as its Process Agent:    Lehman Brothers Inc.
                                          Corporate Advisory Division
                                          Transaction Management Group
                                          745 Seventh Avenue
                                          New York, NY 10019
                                          Attention:  Head of Transaction Management Group, New York

Party B appoints as its Process Agent:    GoodMorning Shinhan Securities USA Inc.
                                          1325 6th Avenue #702
                                          New York, NY 10019, USA

(c)  **Offices.** The provisions of Section 10(a) will apply to this Agreement.

(d)  **Multibranch Party.** For the purpose of Section 10(c) of this Agreement:

Party A is not a Multibranch Party.

Party B is not a Multibranch Party.

(e)  **Calculation Agent.** The Calculation Agent is Party A, unless otherwise specified in a Confirmation in relation to the relevant Transaction.

25

**EXHIBIT A**
**PAGE 40**

(f)    **Credit Support Document.** Details of any Credit Support Document, each of which is incorporated by reference in, constitutes part of, and is in connection with, this Agreement and each Confirmation (unless provided otherwise in a Confirmation) as if set forth in full in this Agreement or such Confirmation:

In the case of **Party A:**    Guarantee of Party A's obligations hereunder in the form annexed hereto as Exhibit A to this Schedule.

In the case of **Party B:**    Not Applicable.

(g)    **Credit Support Provider.**

Credit Support Provider means in relation to Party A:    Lehman Brothers Holdings Inc.

Credit Support Provider means in relation to Party B:    Not applicable.

(h)    **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine).

(i)    **Netting of Payments.** Subparagraph (ii) of Section 2(c) of this Agreement will not apply to any Transactions.

(j)    **"Affiliate"** will have the meaning specified in Section 14 of this Agreement, provided, however, that with respect to Party A, such definition shall be understood to exclude Lehman Brothers Derivative Products Inc. and Lehman Brothers Financial Products Inc.

(k)    **Jurisdiction.** Section 13(b) is hereby amended by: (i) deleting in the second line of subparagraph (i) thereof the word "non-"; and (ii) deleting the final paragraph thereof.  The following shall be added at the end of Section 13(b): "Nothing in this provision shall prohibit a party from bringing an action to enforce a money judgment in any other jurisdiction."

**Part 5: Other Provisions**

(a)    **Representations.** <u>Section 3</u> of this Agreement is hereby amended by adding the following additional subsections:

(g)    *No Reliance.* It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisors as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of the Transaction will not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party will be deemed to be an assurance or guarantee as to the expected results of that Transaction.

(h)    *Assessment and Understanding.* It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

(i)    *Status of Parties.* The other party is not acting as a fiduciary for or an advisor to it in respect of that Transaction.

(j)    *No Agency.* It is entering into this Agreement, including each Transaction, as principal and not as agent of any person or entity.

(b)    **Additional Representation of Party B.** Party B represents to Party A in accordance with <u>Section 3</u> of this Agreement (which representations will be deemed to be repeated by Party B at all times until termination of this Agreement) that:

(i)    **Professional Investor.** Party B is a "professional investor", as such term is defined in the Securities and Finance Ordinance (Cap.571) of Hong Kong and any rules made under the Ordinance.

(c)    **Set-off.** Section 6 of this Agreement is hereby amended by adding the following new subsection 6(f):

(f)    *Set-off.*

(i)    In addition to any rights of set-off a party may have as a matter of law or otherwise, upon the occurrence of an Event of Default, Credit Event Upon Merger, or an Additional Termination Event and the designation of an Early Termination Date pursuant to <u>Section 6</u> of the Agreement with respect to a party ("X"), the other party ("Y") will have the right (but not be obliged) without prior notice to X or any other person to set-off or apply any obligation of X owed to Y (and to any Affiliate of Y) (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation) against any obligation of Y (and of any Affiliate of Y) owed to X (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation).

(ii)    For the purpose of cross-currency set-off, Y may convert either obligation at the applicable market exchange rate selected by Y on the relevant date.

(iii)    If the amount of an obligation is unascertained, Y may in good faith estimate that amount and set-off in respect of the estimate, subject to the relevant party accounting to the other when the amount of the obligation is ascertained.

(iv)    This clause (f) shall not constitute a mortgage, charge, lien or other security interest upon any of the property or assets of either party to this Agreement.

27

**EXHIBIT A
PAGE 42**

(d)   **Transfer.** Notwithstanding anything to the contrary in <u>Section 7</u> of this Agreement, Party A may assign its rights and obligations under this Agreement, in whole and not in part, to (1) any Affiliate of Holdings effective upon delivery to Party B of the guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate, such guarantee to be substantially the same as the guarantee then in effect of the obligations of the transferor, or (2) to any affiliate with the same or higher long-term senior unsecured debt rating (as determined by S&P or Moody's) as Holdings at the time of such transfer.

(e)   **Notices.** For the purposes of <u>subsections (iii)</u> and <u>(v)</u> of <u>Section 12(a)</u>, the date of receipt shall be presumed to be the date sent if sent on a Local Business Day or, if not sent on a Local Business Day, the date of receipt shall be presumed to be the first Local Business Day following the date sent.

(f)   **Service of Process.** The penultimate sentence of <u>Section 13(c)</u> shall be amended by adding the following language at the end thereof: "if permitted in the jurisdiction where the proceedings are initiated and in the jurisdiction where service is to be made."

(g)   **Outstanding Specified Transactions.** Upon the effectiveness of this Agreement, unless otherwise agreed to in writing by the parties to this Agreement with respect to enumerated Specified Transactions, all Specified Transactions then outstanding between the parties shall be subject to the terms hereof.

(h)   **Waiver of Trial By Jury.** Insofar as is permitted by law, each party irrevocably waives any and all rights to trial by jury in any legal proceeding in connection with this Agreement or any Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Agreement and each Transaction hereunder.

(i)   **Accuracy of Specified Information.** <u>Section 3(d)</u> is hereby amended by adding in the third line thereof after the word "respect" and before the period the words "or, in the case of audited or unaudited financial statements or balance sheets, a fair presentation of the financial condition of the relevant person."

(j)   **Escrow Payments.** If (whether by reason of the time difference between the cities in which payments are to be made or otherwise), it is not possible for simultaneous payments to be made on any date on which both parties are required to make payments hereunder, either party may, at its option and in its sole discretion, notify the other party that payments on that date are to be made in escrow: In this case, deposit of the payment due earlier on that date shall be made by 2:00 p.m. (local time at the place for the earlier payment) on that date with an escrow agent selected by the notifying party, accompanied by irrevocable payment instructions (1) to release the deposited payment to the intended recipient upon receipt by the escrow agent of the required deposit of the corresponding payment from the other party on the same date accompanied by irrevocable payment instructions to the same effect or (2) if the required deposit of the corresponding payment is not made on that same date, to return the payment deposited to the party that paid it into escrow. The party that elects to have payments made in escrow shall pay all costs of the escrow arrangements and shall cause those arrangements to provide that the intended recipient of the payment due to be deposited first shall be entitled to interest on that deposited payment for each day in the period of its deposit at the rate offered by the escrow agent for that day for overnight deposits in the relevant currency in the office where it holds that deposited payment (at 11:00 a.m. local time on that day) if that payment is not released by 5:00 p.m. local time on the date it is deposited for any reason, other than the intended recipient's failure to make the escrow deposit it is required to make hereunder in a timely fashion.

(k)   **Severability.** If any term, provision, covenant, or condition of this Agreement, or the application thereof to any party or circumstance, shall be held to be illegal, invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants and conditions hereof shall continue in full force and effect as if this Agreement had been executed with the illegal, invalid or unenforceable portion eliminated, so long as this Agreement as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Agreement and the deletion of such portion of this Agreement will not substantially impair the respective benefits or expectations of the parties to this Agreement. It shall in particular be understood that this Severability clause shall not affect the "single agreement" concept of Section 1(c) of the Master Agreement.

28

(l)    **Recording of Conversations.** Each party (i) consents to the recording of telephone conversations between the trading, marketing and other relevant personnel of the parties in connection with this Agreement or any potential Transaction, and (ii) agrees, to the extent permitted by applicable law, that recordings may be submitted in evidence in any Proceedings.

(m)    **Additional Events of Default.** Section 5(a) of this Agreement shall be amended as follows:

    (1)    deleting the word "or" at the end of Section 5(a)(vii);

    (2)    deleting the full stop at the end of Section 5(a)(viii) and substituting therefor a semi-colon and the word "or"; and

    (3)    adding the following additional subsections:

    "(ix)    The voluntary or involuntary suspension of all or substantially all of Party B's business activities or the issuance of a court order or an administrative or other similar order to suspend or revoke any of its material business licenses in whole or in substantial part;

    (x)    Party B is disqualified from a bill clearing house in the Republic of Korea; or

    (xi)    The net capital ratio of Party B as defined in the Regulation on Supervision of Securities Business of the Republic of Korea falls below 150%. Such net capital ratio shall be calculated in accordance with the Regulation on Supervision of Securities Business in effect as of the date of this Agreement; provided, however, that Party A may elect, in its sole discretion, to calculate the net capital ratio in accordance with (i) any revised Regulation on Supervision of Securities Business that may be in effect from time to time after the date of this Agreement or (ii) any successor law, rule or regulation that may be adopted by the Republic of Korea."

(n)    **Impossibility.** Section 5(b) of this Agreement shall be amended as follows:

    (1)    deleting the word "or" at the end of Section 5(b)(iv);

    (2)    deleting the full stop at the end of Section 5(b)(v) and substituting therefor a semi-colon; and

    (3)    adding the following additional subsection:

"(vi)  *Impossibility.* Due to the occurrence of a natural or man-made disaster, armed conflict, act of terrorism, riot, labour disruption or any other circumstance beyond its control after the date on which a Transaction is entered into, it becomes impossible (other than as a result of its own misconduct) for such a party (which shall be the Affected Party):

(1) to perform any absolute or contingent obligation, to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2) to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction."

In addition, the following amendments shall be made:

(1) Section 5(c) shall be amended to include the words "or Impossibility" after the words "constitutes an Illegality" and the words "or Impossibility, as the case may be" after the words "treated as an Illegality", both in the second line.

(2) Section 6(b)(iii) shall be amended to include the words ", an Impossibility under Section 5(b)(vi)(1)" after "Illegality under Section 5(b)(i)(1)" in the first line.

(3) Section 6(b)(iv)(2) shall be amended to include the words ", an Impossibility under Section 5(b)(vi)(2)" after "Illegality under Section 5(b)(i)(2)" and Section 6(b)(iv) shall be further amended to include the words "or an Impossibility" after "Illegality" in the first line of the third paragraph.

(4) <u>Section 14</u> shall be amended by the inclusion of:

    (A)    the word "Impossibility," after "Illegality" in the definition of "Affected Transactions" and the words "an Impossibility" after the words "an Illegality" in the definition of "Termination Event" and

    (B)    the following definition: ""Impossibility" has the meaning specified in Section 5(b)(vi)".

(o)    **Automatic Early Termination.**  The provisions of <u>Section 6(a)</u> of this Agreement are hereby amended by deleting the second sentence thereof and replacing it with the following:

"If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of (i) an Event of Default specified in Section 5(a)(vii)(1),(3),(4),(5),(6) or, to the extent analogous thereto, (8) or (ii) an Event of Default specified in Section 5(a)(x) or Section 5(a)(xi)."

(p)    **FETR Provision.**  Party B represents to Party A (which representation will be deemed to be repeated by Party B at all times until the termination of this Agreement) that each Transaction (and each payment made or received in connection therewith) is in accordance with the applicable provisions of the Foreign Exchange Transaction Regulations of the Republic of Korea (i) for that type of Transaction or payment and (ii) in effect as of the time of entering into the Transaction and as of the time any payment is made or received in connection therewith.

**EXHIBIT A
PAGE 45**

**Part 6: Additional Terms for FX Transactions and Currency Options**

(a)     **Incorporation and Amendment of 1998 FX and Currency Option Definitions**

      (i)     Incorporation of 1998 FX and Currency Option Definitions.  The 1998 FX and Currency Option Definitions, as amended or supplemented from time to time (the "1998 Definitions"), published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee, are hereby incorporated by reference with respect to any "Currency Option Transactions" and "FX Transactions" as defined by the 1998 Definitions, except as otherwise specifically provided herein or in the Confirmation.

      (ii)    Amendment of 1998 FX and Currency Option Definitions.  The following amendments are made to the 1998 Definitions:

            Section 2.1 of the 1998 Definitions is amended by adding the following as Section 2.1(b):

            **Currency Obligation.**  "Currency Obligation" means the undertaking of a party hereunder to receive or deliver an amount of currency, including a netted Currency Obligation, and including any Currency Obligation previously entered into by the parties.

(b)     **Confirmations.**  Any confirmation (whether provided by mail, facsimile, e-mail or other electronic means, and whether manually or electronically generated) in respect of any FX Transaction or Currency Option Transaction into which the parties may enter, or may have entered into prior to the date hereof, that fails by its terms to expressly exclude the application of this Agreement shall (to the extent not otherwise provided for in this Agreement) (i) constitute a "Confirmation" as referred to in this Agreement even where not so specified in such confirmation and (ii) supplement, form a part of, and be subject to this Agreement, and all provisions in this Agreement will govern such Confirmation except as modified therein.

(c)     **Netting and Related Provisions.**  Section 2(c) shall not apply to FX Transactions or Currency Option Transactions.  In lieu thereof, the following shall apply:

      (i)     Netting, Discharge and Termination of FX Transactions. The following provisions shall apply to FX Transactions:

            Unless otherwise agreed by the parties, whenever an FX Transaction is entered into between the parties which creates a Currency Obligation in the same currency and for the same Settlement Date as an existing Currency Obligation between the parties, such Currency Obligations shall automatically and without further action be netted, individually canceled and simultaneously replaced through novation by a new Currency Obligation under which the party having the obligation to deliver the greater aggregate amount of currency shall be obligated to deliver the excess of such greater aggregate currency amount over such lesser aggregate currency amount. Such new Currency Obligation shall be considered a "Currency Obligation" under this Agreement.

      (ii)    Netting, Discharge and Termination with Respect to Currency Option Transactions.  The following provisions shall apply to Currency Option Transactions:

            Unless otherwise agreed by the parties, any Call or Put written by a party will automatically be terminated and discharged, in whole or in part, as applicable, against a Call or a Put, respectively, having the same identical terms, written by the other party; and, upon the occurrence of such termination or discharge, neither party shall have any further obligation to the other party in respect of the parts so terminated and discharged (except for the obligation of either party to pay any Premium due, but not paid, thereunder); and the remaining portion of any Currency Option Transaction, which is partially discharged and terminated, shall continue to be a Currency Option Transaction under this Agreement.

31

(d)    **Inconsistencies.** In the event of any conflict between:

    (i)    the terms of a Deliverable FX Transaction Confirmation and this Agreement, the terms of this Agreement shall supersede;

    (ii)    the terms of a Deliverable FX Transaction Confirmation, where the Confirmation explicitly states that it shall so prevail and has been signed by both parties, its terms shall supersede the terms of this Agreement;

    (iii)    the terms of a Currency Option Transaction or a Non-Deliverable FX Transaction Confirmation and this Agreement, the terms of the Confirmation shall supersede.

(e)    **Definitions.** Section 14 is hereby amended as follows:

The definition of "Terminated Transactions" shall be deemed to include Currency Obligations.

**EXHIBIT A
PAGE 47**

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

| LEHMAN BROTHERS COMMERCIAL CORPORATION ASIA LIMITED | GOODMORNING SHINHAN SECURITIES CO., LTD. |
|---|---|
| *(Name of Party)* | *(Name of Party)* |

| | | | |
|---|---|---|---|
| By: | | By: | |
| Name: | | Name: | Man Ki Jeong |
| Title: | Tan Ser Kiat<br>Director / Authorised Signatory | Title: | Chief Financial Officer |
| Date: | December 5, 2007 | Date: | Nov. 30, 2007 |

33

EXHIBIT A
PAGE 48

## AMENDMENT AGREEMENT

AMENDMENT AGREEMENT (the "Amendment") dated as of June 13, 2008 between **LEHMAN BROTHERS COMMERCIAL CORPORATION ASIA LIMITED** ("Party A") and **GOODMORNING SHINHAN SECURITIES CO., LTD.** ("Party B").

### WITNESSETH

WHEREAS, Party A and Party B have entered into an ISDA Master Agreement dated as of April 6, 2007 (the "Master Agreement") and

WHEREAS, Party A and Party B wish to amend the Master Agreement and to have the Master Agreement, as amended herein, govern the rights and obligations of Party A and Party B with respect to each and every Transaction which is (a) outstanding on the date hereof, and (b) entered into on or after the date hereof,

NOW, THEREFORE, in consideration of the mutual agreements herein contained, Party A and Party B hereby acknowledge and agree as follows:

1.   _Certain Definitions._   Unless otherwise defined herein, capitalized terms used herein have the meanings specified in or pursuant to the Master Agreement.

2.   _Amendments._

(a)   Part 4(f) of the Schedule to the Master Agreement is hereby deleted in its entirety and replaced with the following:

(f)   **Credit Support Document.**

In the case of **Party A:**

Guarantee of Party A's obligations hereunder in the form annexed hereto as Exhibit A to this Schedule.

Credit Support Annex annexed hereto which supplements, forms part of, and is subject to, this Agreement.

In the case of **Party B:**

Credit Support Annex annexed hereto which supplements, forms part of, and is subject to, this Agreement.

(b)   The Schedule to the Master Agreement is hereby amended to add the following Part 5(q) at the end thereto:

(q)   **Bankruptcy.** Section 5(a)(vii) of this Agreement is hereby amended as follows in relation to Party B only:

(i)   Section 5(a)(vii)(4) of this Agreement is amended by deleting the text after the word "liquidation" in line 9 of Section 5(a)(vii); and

(ii)   Section 5(a)(vii)(7) of this Agreement is amended by deleting the text after the word "assets" in line 19 of Section 5(a)(vii).

(c)   The Master Agreement is hereby amended, as of the date hereof, by incorporating therein the 1994 ISDA Credit Support Annex dated as of the date hereof as a Credit Support Document with respect to Party A and Party B, a copy of which is attached hereto as Annex 1 (the "CSA"). Party A and Party B acknowledge that the CSA shall supplement and form a part of the Master

소 갑 제 1 호증의 4

Agreement as if set forth in full therein so that the Master Agreement and the CSA shall constitute a single agreement between Party A and Party B.

3.　　Except as specifically amended hereby, all of the terms and conditions of the Master Agreement shall continue to be in full force and effect and shall be binding upon the parties in accordance with their respective terms.

4.　　Each of the parties hereby represents and warrants that:

(a)　the representation and warranties contained in the Master Agreement are true on and as of the date hereof as if made by the party on and as of said date, and

(b)　the execution, delivery and performance of this Amendment are within the party's corporate power and have been duly authorized by all necessary corporate action, and this Amendment constitutes the legal, valid and binding obligation of the party in accordance with its terms.

5.　This Amendment may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

6.　This Amendment shall be construed in accordance with and be governed by the laws of the State of New York (without reference to choice of law doctrine).

2

IN WITNESS WHEREOF, the parties have caused this Amendment to be executed by their respective officers or authorized representatives as of the day and year first above written.

~~LEHMAN BROTHERS ENTITY~~                    **GOODMORNING SHINHAN SECURITIES**
                                               **CO., LTD.**

**For and on behalf of**
**LEHMAN BROTHERS COMMERCIAL**                               *Party B*
**CORPORATION ASIA LIMITED**

By: _____              By: _____
            *Authorized Signature(s)*
Name:   **Shaun Peter Bramham**            Name: Jung Sang , Yoo

Title:    **Director / Authorised Signatory**   Title: Director of Trading / Derivatives Business Group

Date:                                       Date: 2008. 9. 3

3

**Annex 1**

EXHIBIT A
PAGE 52

# ISDA®

*International Swaps and Derivatives Association, Inc.*

# CREDIT SUPPORT ANNEX

to the Schedule to the

**Master Agreement**

dated as of April 6, 2007

between

| LEHMAN BROTHERS COMMERCIAL | GOODMORNING SHINHAN SECURITIES |
|:---:|:---:|
| CORPORATION ASIA LIMITED | CO., LTD. |
| *Party A* | *Party B* |

This Annex supplements, forms part of, and is subject to, the above-referenced Agreement, is part of its Schedule and is a Credit Support Document under this Agreement with respect to each party.

Accordingly, the parties agree as follows:

**Paragraph 1. Interpretation**

(a)     *Definitions and Inconsistency*.  Capitalized terms not otherwise defined herein or elsewhere in this Agreement have the meanings specified pursuant to Paragraph 12, and all references in this Annex to Paragraphs are to Paragraphs of this Annex. In the event of any inconsistency between this Annex and the other provisions of this Schedule, this Annex will prevail and in the event of any inconsistency between Paragraph 13 and the other provisions of this Annex, Paragraph 13 will prevail.

(b)     *Secured Party and Pledgor*.  All references in this Annex to the "Secured Party" will be to either party when acting in that capacity and all corresponding references to the "Pledgor" will be to the other party when acting in that capacity; *provided, however*, that if Other Posted Support is held by a party to this Annex, all references herein to that party as the Secured Party with respect to that Other Posted Support will be to that party as the beneficiary thereof and will not subject that support or that party as the beneficiary thereof to provisions of law generally relating to security interests and secured parties.

**Paragraph 2.  Security Interest**

Each party, as the Pledgor, hereby pledges to the other party, as the Secured Party, as security for its Obligations, and grants to the Secured Party a first priority continuing security interest in, lien on and right of Set-off against all Posted Collateral Transferred to or received by the Secured Party hereunder.  Upon the Transfer by the Secured Party to the Pledgor of Posted Collateral, the security interest and lien granted hereunder on that Posted Collateral will be released immediately and, to the extent possible, without further action by either party.

Copyright © 1994 by International Swaps and Derivatives Association, Inc.

**CREDIT SUPPORT ANNEX**
Elections and Variables
dated as of June 13, 2008
between
**LEHMAN BROTHERS COMMERCIAL CORPORATION ASIA LIMITED**
(hereinafter referred to as "Party A")
and
**GOODMORNING SHINHAN SECURITIES CO., LTD.**
(hereinafter referred to as "Party B")

**Paragraph 13.  Elections and Variables**

(a)    *Security Interest for "Obligations".*  The term *"Obligations"* has the meaning specified in Paragraph 12.

(b)    *Credit Support Obligations.*

   (i)    *Delivery Amount, Return Amount and Credit Support Amount.*

      (A)    *"Delivery Amount"* has the meaning specified in Paragraph 3(a).

      (B)    *"Return Amount"* has the meaning specified in Paragraph 3(b).

      (C)    *"Credit Support Amount"* means, for any Valuation Date (A) the Secured Party's Exposure for that Valuation Date plus (B) the aggregate of all Independent Amounts applicable to the Pledgor, if any, minus (C) the Pledgor's Threshold; provided, however, that (x) in the case where the sum of the Independent Amounts applicable to the Pledgor exceeds zero, the Credit Support Amount will not be less than the sum of all Independent Amounts applicable to the Pledgor and (y) in all other cases, the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields an amount less than zero.

   (ii)    *Eligible Collateral.*  The following items will qualify as "Eligible Collateral" for the party specified; provided that the aggregate Value of Eligible Collateral consisting of KRW Collateral posted under this Annex by Party B shall not exceed USD 20,000,000 and if, on any date of Transfer by Party B, as Pledgor, of Eligible Collateral to Party A, as Secured Party, the Value of all Posted Collateral consisting of KRW Collateral held by Party A, as Secured Party, together with such Transfer will exceed USD 20,000,000, Party B, as Pledgor, shall Transfer to Party A, as Secured Party, Eligible Collateral consisting of USD Collateral having a Value as of the date of Transfer at least equal to the excess amount.

|  | Party A | Party B | Valuation Percentage |
|---|---|---|---|
| (A)    **USD Collateral** | | | |
| (i) USD Cash | [X] | [X] | 100% |
| (ii) Negotiable debt obligations issued by the U.S. Treasury Department having a maturity at issuance of not more than one year. | [X] | [X] | 98% |
| (iii) Negotiable debt obligations | [X] | [X] | 95% |

- 11 -

issued by the U.S. Treasury
Department having a maturity at
issuance of more than one year but
not more than ten years.

| | | | |
|---|---|---|---|
| (iv) Negotiable debt obligations issued by the U.S. Treasury Department having a maturity at issuance of more than ten years. | [X] | [X] | 90% |

**(B)   KRW Collateral**

| | | | |
|---|---|---|---|
| (i) KRW Cash | [X] | [X] | 95% |
| (ii) KRW Eligible Government Bonds having a maturity at issuance of not more than one year. | [X] | [X] | 93% |
| (iii) KRW Eligible Government Bonds having a maturity at issuance of more than one year but not more than three years. | [X] | [X] | 91% |
| (iv) KRW Eligible Government Bonds having a maturity at issuance of more than three years but not more than five years. | [X] | [X] | 88% |
| (v) KRW Eligible MS Bonds having a maturity at issuance of not more than one year. | [X] | [X] | 93% |
| (vi) KRW Eligible MS Bonds having a maturity at issuance of more than one year but not more than three years. | [X] | [X] | 91% |
| (vii) KRW Eligible Corporate Bonds having a maturity at issuance of not more than five years. | [X] | [X] | 80% |

**(C)   Other Collateral**

| | | | |
|---|---|---|---|
| (i) Non-KRW Eligible ROK Bonds having a maturity at issuance of not more than one year. | [X] | [X] | 95% |
| (ii) Non-KRW Eligible ROK Bonds having a maturity at issuance of more than one year but not more than five years. | [X] | [X] | 92% |
| (iii) Non-KRW Eligible ROK Bonds having a maturity at issuance of more than five years but not more than ten years. | [X] | [X] | 90% |

- 12 -

(iii)    *Other Eligible Support.* The following items will qualify as "Other Eligible Support" for the party specified: None.

(iv)    *Thresholds.*

(1)    *"Independent Amount"* shall mean the Base Currency Equivalent of the amount, if any, as set forth in a Confirmation with respect to Party B.

(2)    **"Credit Rating"** means, with respect to Party A, the long-term senior unsecured debt (or any successor rating) of Lehman Brothers Holdings Inc., which is rated by Moody's Investors Service, Inc. (or any successor rating agency) ("Moody's"), Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. (or any successor rating agency) ("S&P") and Fitch Inc. (or any successor rating agency) ("Fitch") and it being understood that if Party B is assigned a rating by Moody's, S&P and Fitch, then rating(s) by Moody's, S&P and Fitch respectively will apply.

(3)    **"Threshold"** means, with respect to Party A, or its Credit Support Provider, as the case may be, and in the case of Party B, if any Credit Rating of Party B is assigned by Moody's, S&P and/or Fitch, the Threshold with respect to Party A and Party B means the amount corresponding to the Credit Rating of such entity as set forth in the table below, provided that (A) if Moody's, S&P and Fitch have assigned ratings at different levels for any Credit Rating, the lower of such ratings shall be used for purposes hereof and (B) if (I) an Event of Default, Credit Event Upon Merger, Additional Termination Event or, solely with respect to Party B, Credit Support Event has occurred and is continuing, then the Threshold with respect to the Defaulting Party or Affected Party shall be zero and (II) such entity ceases to be rated by either Moody's, S&P or Fitch or ceases to have a Credit Rating, then the Threshold with respect to Pledgor shall be zero:

| S&P's Rating | Moody's Rating | Fitch Rating | Threshold (USD) |
|---|---|---|---|
| AAA | Aaa | AAA | 40,000,000 |
| AA+ | Aa1 | AA+ | 40,000,000 |
| AA | Aa2 | AA | 40,000,000 |
| AA- | Aa3 | AA- | 40,000,000 |
| A+ | A1 | A+ | 30,000,000 |
| A | A2 | A | 30,000,000 |
| A- | A3 | A- | 15,000,000 |
| BBB+ | Baa1 | BBB+ | 10,000,000 |
| BBB | Baa2 | BBB | 5,000,000 |
| BBB- | Baa3 | BBB- | 3,000,000 |
| below BBB- or if Pledgor ceases to have a Credit Rating. | below Baa3 or if Pledgor ceases to have a Credit Rating. | below BBB- or if Pledgor ceases to have a Credit Rating. | ----0---- |

- 13 -

"**Threshold**" means, with respect to Party B, USD 2,000,000, <u>provided</u> that if an Event of Default, Credit Event Upon Merger, Additional Termination Event or Credit Support Event has occurred and is continuing, then the Threshold with respect to Party B shall be zero.

Each of the following shall constitute a "**Credit Support Event**":-

    (i)    The Republic of Korea (i) fails to maintain a foreign currency long-term debt rating of at least Baa1 as determined by Moody's Investors Service, Inc. ("Moody's"); or (ii) fails to maintain a foreign currency long-term debt rating of at least BBB+ as determined by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P"); or (iii) fails to maintain a foreign currency long-term debt rating of at least BBB+ as determined by Fitch Inc. ("Fitch"); or (iv) ceases to be rated by any one of Moody's, S&P or Fitch. For clarification, in the event Moody's assigns a rating to the Republic of Korea that is below the rating specified in (i) above or S&P assigns a rating to the Republic of Korea that is below the rating specified in (ii) above or Fitch assigns a rating to the Republic of Korea that is below the rating specified in (iii) above, then such rating shall be determinative.

    (4)    "**Minimum Transfer Amount**" means, with respect to a party, USD250,000; <u>provided</u> that, notwithstanding anything to the contrary contained herein, the Minimum Transfer Amount shall not apply to the Independent Amount, and <u>provided further</u> that (A) (i) if an Event of Default, Credit Event Upon Merger or Additional Termination Event with respect to Party A has occurred and is continuing, then the Minimum Transfer Amount with respect to Party A shall be zero and (ii) if an Event of Default, Credit Event Upon Merger, Additional Termination Event or Credit Support Event with respect to Party B has occurred and is continuing, then the Minimum Transfer Amount with respect to Party B shall be zero and (B) if Pledgor in the case of Party B or the Pledgor's Credit Support Provider in the case of Party A ceases to be rated by either Moody's or S&P or ceases to have a Credit Rating, then the Minimum Transfer Amount with respect to Pledgor shall be zero.

    (5)    **Rounding.** The Delivery Amount and the Return Amount will be rounded up and down respectively to the nearest integral multiple of USD1,000.

(c)   *Valuation and Timing.*

    (i)    *"Valuation Agent"* means Party A.

    (ii)    *"Valuation Date"* means any Local Business Day.

    (iii)    *"Valuation Time"* means the close of business in the location where the relevant product is traded; *provided* that the calculations of Value and Exposure will be made as of approximately the same time on the same date.

    (iv)    *"Notification Time"* means 5:00 p.m., Tokyo time, on a Local Business Day.

(d)   *Conditions Precedent and Secured Party's Rights and Remedies.* For the purposes of Paragraph 8(a), each Termination Event will constitute a Specified Condition with respect to Pledgor, if Pledgor fails to pay when due any amount payable by it in connection with an Early Termination Date designated in connection with that Termination Event. For all other purposes of this Annex, each Termination Event specified below with respect to a party will be a "Specified Condition" for that party (that party being the Affected Party, if the Termination Event occurs with respect to that party):

| | Party A | Party B |
|---|---|---|
| Illegality | [ ] | [ ] |

- 14 -

| | | | |
|---|---|---|---|
| Tax Event | | [  ] | [  ] |
| Tax Event Upon Merger | | [  ] | [  ] |
| Credit Event Upon Merger | | [ X ] | [ X ] |
| Additional Termination Event(s) specified in Part 1(h) of the Schedule | | [ X ] | [ X ] |

(e)    *Substitution.*

    (i)    *"Substitution Date"* has the meaning specified in Paragraph 4(d)(ii).

    (ii)    *Consent.* If specified here as applicable, then the Pledgor must obtain the Secured Party's consent for any substitution pursuant to Paragraph 4(d): Applicable, such consent not to be unreasonably withheld.

(f)    *Dispute Resolution.*

    (i)    *"Resolution Time"* means 1:00 p.m., Tokyo time, on the Local Business Day following the date on which notice is given that gives rise to a dispute.

    (ii)    *Value.* For the purpose of Paragraphs 5(i)(C) and 5(ii), the Value of Posted Credit Support consisting of KRW Collateral and/or Other Collateral will be calculated in accordance with the definition of "Value" as amended in this Paragraph 13 and the Value of Posted Credit Support consisting of USD Collateral will be calculated as follows:

        (1)    With respect to USD Cash, the face value of the amount thereof multiplied by the applicable Valuation Percentage.

        (2)    With respect to any USD Collateral other than USD Cash (referred to herein as "Collateral Obligations") the sum of (1)(x) the bid price quoted on such date by a mutually acceptable principal market maker for such Collateral Obligations, or (y) if no such quotation is available from a principal market maker for such date, such bid price as of the day, next preceding such date, on which such quotation was available, in either case multiplied by the applicable Valuation Percentage, plus (2) the accrued interest on such Collateral Obligations (except to the extent Transferred to a party pursuant to any applicable section of this Agreement or included in the applicable price referred to in (1) of this clause) as of such date.

        (iii)    *Alternative.* Paragraph 5 will apply.

(g)    *Holding and Using Posted Collateral.*

    (i)    *Eligibility to Hold Posted Collateral; Custodians.*

        (1)    Party A and/or its Custodian will be entitled to hold Posted Collateral pursuant to Paragraph 6(b); *provided* that the following conditions applicable to it are satisfied:

            (A)    Party A is not a Defaulting Party.

            (B)    With respect to Posted Collateral consisting of KRW Collateral (other than KRW Cash), the Custodian is Lehman Brothers International (Europe), Seoul Branch ("LBKR").

            (C)    With respect to Posted Collateral consisting of USD Collateral (other than USD Cash), the Custodian, if any, is a wholly owned, direct or indirect, subsidiary of Lehman Brothers Holdings Inc. or a bank or trust company located in the State of New York having total assets of at least USD 1 billion. Initially, the Custodian is: Not applicable.

- 15 -

(D)    With respect to Posted Collateral consisting of Other Collateral, the Custodian is: Not applicable and such Other Collateral are not held in the Republic of Korea.

(2)    Party B and/or its Custodian will be entitled to hold Posted Collateral pursuant to Paragraph 6(b); *provided* that the following conditions applicable to it are satisfied:

(A)    Party B is not a Defaulting Party.

(B)    With respect to Posted Collateral consisting of KRW Collateral (other than KRW Cash), the Custodian is KSD.

(C)    With respect to Posted Collateral consisting of USD Collateral (other than USD Cash), the Custodian, if any, is a bank or trust company located in the State of New York having total assets of at least USD 1 billion. Initially, the Custodian is: To be decided.

(D)    With respect to Posted Collateral consisting of Other Collateral, the Custodian is: Not applicable and such Other Collateral are not held in the Republic of Korea.

(ii)    *Use of Posted Collateral.* The provisions of Paragraph 6(c) will apply to the Secured Party; *provided* that with respect to KRW Collateral (excluding KRW Cash), the words ",notwithstanding Section 9-207 of the New York Uniform Commercial Code," shall be deemed to be deleted and sub-paragraphs (i) and (ii) shall be deemed to be amended to read as follows:

"(i)    re-pledge any Posted Collateral it holds, free from any claim or right of any nature whatsoever of the Pledgor, to the fullest extent permitted under applicable law; and

(ii)    register or record any relevant security interest (including the re-pledge or re-hypothecation) granted under Paragraph 6 over any Posted Collateral in accordance with any applicable law."

For the avoidance of doubt, with respect to KRW Cash, USD Collateral (including USD Cash) and Other Collateral, the Secured Party shall have all of the rights set forth in Paragraph 6(c) and the deemed deletion and deemed amendment set forth in this clause (ii) shall not be operative.

(h)    *Distributions and Interest Amount.*

(i)    *Interest Rate.*

(1)    With respect to USD Cash, the Interest Rate will be the Federal Funds Rate. "Federal Funds Rate" means the rate per annum equal to the overnight Federal Funds Rate for each day cash is held by the Secured Party, as reported in Federal Reserve Publication H.15-519.

(2)    With respect to KRW Cash, the Interest Rate will be KMBOIS. "KMBOIS" means, for any day, the reference rate equal to the overnight call rate as calculated by the Bank of Korea which appears on the Reuters Page KMBOIS as of 11:00 a.m., Seoul time, on the first Seoul Business Day (defined as a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in Seoul, Republic of Korea) following that day. If such rate does not appear on the Reuters Page KMBOIS, the rate for that day will be a rate as determined by Party A.

(ii)    *Transfer of Interest Amount.* The Transfer of the Interest Amount will be made on or before the fifth Local Business Day of each calendar month and on any Local Business Day that Posted Collateral in the form of Cash is Transferred to the Pledgor pursuant to Paragraph 3(b).

- 16 -

**EXHIBIT A
PAGE 59**

(iii)    *Alternative to Interest Amount.* Paragraph 6(d)(ii) will apply.

(iv)    *Distributions.* Subject to Paragraph 4(a), the Pledgor shall be entitled to receive any Distributions with respect to the Posted KRW Eligible Government Bonds and the Posted KRW Eligible MS Bonds.

(i)    *Additional Representation(s).*

The Pledgor represents to the Secured Party (which representations will be deemed to be repeated by the Pledgor on each date on which it, as the Pledgor, Transfers Eligible Collateral) that:

(i)    the Pledgor's representations set forth in Section 3 of this Agreement are true and correct; and

(ii)    all necessary consents, approvals or other authorizations of any governmental authority or regulatory body required in connection with the Transfer of Eligible Collateral have been obtained and are in full force and effect.

Party B represents to Party A (which representation will be deemed to be repeated as of each date on which it, as the Pledgor, Transfers Eligible Collateral) that:

(i)    the Pledgor's assets exceed its liabilities.

(j)    *Other Eligible Support and Other Posted Support.*

(i)    *"Value"* with respect to Other Eligible Support and Other Posted Support means:  Not Applicable.

(ii)    *"Transfer"* with respect to Other Eligible Support and Other Posted Support means:  Not Applicable.

(k)    *Demands and Notices.*

All demands, specifications and notices under this Annex (except any notice requesting the delivery or return of Eligible Collateral or Posted Collateral pursuant to Paragraph 3 of this Annex) will be made pursuant to Section 12 (Notices) of this Agreement. Notwithstanding Section 12 of this Agreement, any communication by a party ("X") to the other party ("Y") requesting the delivery or return of Eligible Collateral or Posted Collateral pursuant to Paragraph 3 of this Annex may be given orally (including telephonically to the telephone number of Y set forth below, or any other telephone number Y may notify X of in writing) during normal business hours in Seoul, Republic of Korea on any Local Business Day to any officer, employee or agent of Y which identifies himself or herself as being permitted to receive oral communications on behalf of Y with respect to this Annex. Any such oral communication will be deemed received and effective when actually received by any such officer, employee or agent of Y. X shall deliver to Y, within one Local Business Day following receipt of an oral or written request by Y, a written confirmation of any such oral communication.

Party A: [phone number]

Party B: [phone number]

(l)    *Addresses for Transfers.* As agreed between the parties from time to time.

- 17 -

(m)    *Other Provisions.*

(i)    With respect to KRW Collateral (excluding KRW Cash), the first sentence of Paragraph 2 of this Annex is hereby deemed to be deleted in its entirety and deemed to be replaced by the following (provided that Paragraph 2 of this Annex shall remain operative (without regard to such deemed deletion and such deemed replacement) with respect to USD Collateral (excluding USD Cash) and Other Collateral):

"(a)    **Security Interest.**  The Pledgor, as security for the performance of the Obligations, pledges and agrees to pledge, with full title guarantee, in favor of the Secured Party all Posted Collateral and grants and agrees to grant a first priority perfected security interest (Kun Jil Kwon) in favor of the Secured Party in all Posted Collateral.

(b)    **Preservation of Security.**  The security constituted by this Annex shall be a continuing security and shall not be satisfied by any intermediate payment or satisfaction of the whole or any part of the Obligations but shall secure the ultimate balance of the Obligations. The security constituted by this Annex shall be in addition to and shall not be affected by any other security now or subsequently held by the Secured Party for all or any of the Obligations.

(c)    **Immediate Recourse.**  The Pledgor waives any right it may have of first requiring the Secured Party to proceed against or claim payment from any other person or enforce any guarantee or security before enforcing this Annex."

(ii)    As applied to Cash (in KRW or USD) held in Korea, the following additional provisions shall apply:

(1)    Cash shall be deemed to be provided to the Secured Party as a "security deposit" (Bojung Kum).

(2)    Cash shall be Transferred in the manner described in Sub-Paragraph (i) of the definition of "Transfer" in Paragraph 12.

(iii)    Without the prior written consent of the Secured Party, the Pledgor agrees that it will not sell, assign, transfer, exchange or otherwise dispose of, or grant any option with respect to, Posted Collateral, nor will it create, incur or permit to exist any pledge, lien, mortgage, hypothecation, security interest, charge, option or any other encumbrance with respect to any of the Posted Collateral, or any interest therein, or any proceeds thereof, except for the lien and security interest provided for by this Annex.

(iv)    The following subparagraph (c) is hereby added to Paragraph 3 of this Annex:

"(c)    *No offset.*  On any Valuation Date, if either (i) each party is required to make a Transfer under Paragraph 3(a) or (ii) each party is required to make a Transfer under Paragraph 3(b), then the amounts of those obligations will not offset each other."

(v)    Paragraph 7(i) shall be amended by deleting the word "two" and inserting in lieu thereof the word "one".

(vi)    Paragraph 8(a) of this Annex shall be amended as follows:

(1)    deleting the word "and" at the end of Paragraph 8(a)(iii);
(2)    deleting the full stop at the end of Paragraph 8(a)(iv) and substituting therefor a semi-colon; and
(3)    adding the following additional subsections:

- 18 -

"(v)     the Secured Party shall have the right to apply any amount of Cash (whether in KRW or USD) to any amounts payable by the Pledgor with respect to any Obligations; and

(vi)     the right to acquire absolute title to any Posted Collateral in the form of KRW Eligible Government Bonds or KRW Eligible MS Bonds either (a) for purposes of liquidation of such Posted Collateral, in which case the Secured Party shall liquidate the Posted Collateral and apply the proceeds to any amounts payable by the Pledgor with respect to any Obligations in such order as the Secured Party may elect (provided that the acquisition price shall be deemed to be the same as the sale price at any subsequent sale of the Posted Collateral), or (b) for purposes of holding them as the Secured Party's assets, in which case the Secured Party shall set off any amounts payable by the Pledgor with respect to any Obligations against the Base Currency Equivalent of the Market Value (as defined in the definition of "Value" in Paragraph 12, as amended hereby) of such Posted Collateral as of the date of acquisition of title by the Secured Party, provided that the Secured Party shall give notice to the Pledgor of its choice between (a) and (b) within a reasonable period of time after the acquisition of title to the Posted Collateral;

PROVIDED ALWAYS THAT if an Early Termination Date has occurred or been designated in respect of all outstanding Transactions as the result of the operation of "Automatic Early Termination" under this Agreement, the Secured Party shall be deemed to have exercised its rights under Paragraph 8(a)(vi)(b) in respect of any Posted Collateral in the form of KRW Eligible Government Bonds or KRW Eligible MS Bonds then held by it on such Early Termination Date.

For the purposes of this Paragraph 8(a), the Secured Party shall be entitled to make any currency conversions or effect any transaction in currencies which it thinks fit, and to do so at such times and rates as it thinks proper."

(vii)     The words "Cash equivalent" appearing in Paragraph 8(a)(iii), 8(a)(iv) and 8(b)(iv)(A) shall be replaced with the words "Base Currency Equivalent".

(vliii)     The following additional clause shall be added after Paragraph 8(d):

"(e)     *Power of Attorney.* The Pledgor, by way of security and solely for the purpose of more fully securing the performance of the Obligations, irrevocably appoints the Secured Party the attorney of the Pledgor on its behalf and in the name of the Pledgor or the Secured Party (as the attorney may decide) to do all acts, and execute all documents which the Pledgor could itself execute, in relation to any of the Posted Collateral in the form of KRW Collateral (other than KRW Cash) including (but without limitation):

(i)     to execute any Transfer, bill of sale or other assurance in respect of the Posted Collateral;

(ii)     to exercise all the rights and powers of the Pledgor in respect of the Posted Collateral;

(iii)     to ask, require, demand, receive, compound and give a good discharge for any and all moneys and claims for moneys due and to become due under or arising out of any of the Posted Collateral; and

(iv)     to make any claims or to take any action or to institute any proceedings which the Secured Party considers to be necessary or advisable to protect or enforce the security interest created by this Annex."

EXHIBIT A
PAGE 62

(ix)    The definitions in Paragraph 12 shall be amended as follows:

(A)    The following definitions shall be added:

*"Base Currency"* means US dollars.

*"Base Currency Equivalent"* means with respect to an amount on a Valuation Date or date of calculation (the "Applicable Date"), in the case of an amount denominated in the Base Currency, such Base Currency amount and, in the case of an amount in Korean Won or Euro, the Base Currency amount required to purchase such amount in KRW or Euro, as the case may be, at a rate of exchange determined by the Valuation Agent in good faith and in a commercially reasonable manner.

*"KRW"* or *"KRW Cash"* or *"Korean Won"* means the lawful currency of the Republic of Korea.

*"KRW Collateral"* means the Eligible Collateral described in Paragraph 13(b)(ii)(B).

*"KRW Eligible Corporate Bonds"* means KRW denominated negotiable debt obligations settled through the book-entry system operated by the KSD of the following issuers, provided that such issuer at all times maintains an S&P long term foreign issuer credit rating of at least BBB and a Moody's long-term senior unsecured debt rating of at least Baa2 (lower rating determinative).

(I)    Export-Import Bank of Korea
(II)   Korea Deposit Insurance Corporation
(III)  Korea Development Bank

*"KRW Eligible Government Bonds"* means KRW-denominated Korean government bonds issued by the Ministry of Finance and Economy of the Republic of Korea (Korean Treasury Bonds, or KTBs) settled through the book-entry system operated by the KSD, provided that the country risk rating of the Republic of Korea is at least BBB by S&P or Baa2 by Moody's.

*"KRW Eligible MS Bonds"* means KRW-denominated Monetary Stabilisation Bonds issued by the Bank of Korea and settled through the book-entry system operated by the KSD, provided that the country risk rating of the Republic of Korea is at least BBB by S&P or Baa2 by Moody's.

*"KSD"* means the Korea Securities Depository or any successor thereto.

*"Local Business Day"* means, for the purposes of this Annex only, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in New York, Tokyo, Japan and Seoul, Republic of Korea and on which the KSD is open for business in Seoul, Republic of Korea.

*"Non-KRW Eligible ROK Bonds"* means USD and Euro denominated negotiable debt obligations, settled through Euroclear or Clearstream, issued by the Republic of Korea, provided that the foreign currency long-term debt rating is at least BBB by S&P or Baa2 by Moody's.

*"Other Collateral"* means the Eligible Collateral described in Paragraph 13(b)(ii)(C).

*"USD"* or *"USD Cash"* or *"US dollars"* means the lawful currency of the United States of America.

*"USD Collateral"* means the Eligible Collateral described in Paragraph 13(b)(ii)(A).

(B)    The definition of *"Exposure"* shall be amended by adding the words "on the basis that the Base Currency is the Termination Currency" immediately before the word ";provided".

(C)    The definition of "Cash" shall be amended to read as follows:

- 20 -

""*Cash*" means USD or KRW, as applicable."

(D)    With respect to KRW Collateral (excluding KRW Cash), sub-paragraph (ii) and (iii) of the definition of "Transfer" is hereby deemed to be amended to read as follows (provided that sub-paragraph (ii) and (iii) of the definition of "Transfer" shall remain operative (without regard to such deemed amendment) with respect to all USD Collateral, KRW Cash and Other Collateral):

    (ii)    "necessary to constitute a legally valid transfer to the recipient" shall be changed to "necessary to constitute a legally effective pledge and perfection of the security interest to or for the recipient or release such security interest to or for the recipient, as the case may be".

    (iii)    "to result in a legally effective transfer of the relevant interest to the recipient" shall be changed to "to result in a legally effective pledge and perfection of the security interest to or for the recipient or release such security interest to or for the recipient, as the case may be".

(E)    With respect to KRW Collateral and Other Collateral, Sub-paragraph (i) of the definition of "Value" shall be deemed to be amended to read as follows (provided that Sub-paragraph (i) of such definition shall remain operative (without regard to such deemed amendment) with respect to USD Collateral):

    "(i)    Eligible Collateral or Posted Collateral that is:

        (A)    KRW Cash, the Base Currency Equivalent of the face value multiplied by the applicable Valuation Percentage; and

        (B)    a KRW Eligible Government Bond, a KRW Eligible MS Bond or a Non-KRW Eligible ROK Bond, the Base Currency Equivalent of the Market Value obtained by the Valuation Agent multiplied by the applicable Valuation Percentage. "Market Value" means, unless otherwise agreed by the parties, the fair market value of the relevant securities as of the applicable date as determined by the Valuation Agent in good faith and in a commercially reasonable manner, provided that the Market Value so determined by the Valuation Agent shall be presumed to be conclusive and binding on both parties hereto, absent manifest error."

(n)    *Successors.*

    This Annex and all obligations of Party A and Party B hereunder shall be binding upon the respective successors and permitted assigns of Party A and Party B and shall, together with the rights and remedies of each party hereunder, inure to the benefit of such party and its respective successors and assigns; provided that any assignment of this Annex by either party will require the prior written consent of the other party.

(o)    *No Third Party Rights.*

    This Annex has been and is made solely for the benefit of Party A and Party B and their respective permitted assigns, and no other person, partnership, association, corporation or other entity shall acquire or have any right under or by virtue of this Annex.

(p)    *Governing Law.*

- 21 -

This Annex will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine); provided that this Annex will be governed by and construed in accordance with the laws of the Republic of Korea to the extent necessary in order to interpret and give effect to the provisions of this Annex in so far as this Annex relates to any Eligible Collateral held in the Republic of Korea.

EXHIBIT A
PAGE 65

The parties executing this Credit Support Annex have executed the Master Agreement and have agreed as to the contents of this Credit Support Annex.

LEHMAN BROTHERS COMMERCIAL
CORPORATION ASIA LIMITED
*Party A*

By: _____

Name: **Shaun Peter Bramham**

Title: **Director / Authorised Signatory**

Date:

GOODMORNING SHINHAN SECURITIES
CO., LTD.
*Party B*

By: _____

Name: Jung Sang, Yoo

Title: Director of Trading / Derivatives Business Group

Date: 2008.9.3

- 23 -

# EXHIBIT 3

**EXHIBIT A**
**PAGE 67**

# LEHMAN BROTHERS

### Transaction

Date:       28 March, 2007

To:         Good Morning Shinhan Securities Co., Ltd.
            Attention:      Documentation Unit

From:       Lehman Brothers Commercial Corporation Asia Limited
            c/o Lehman Brothers Asia Limited
            Confirmations Group
            Facsimile:      (+1) 646-758-6317 (United States of America)
            E-Mail:         aseqdstrconf@lehman.com

Effort Id:    1285744
Global Id:    2939563

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers Commercial Corporation Asia Limited ("Party A") acting as principal, and Good Morning Shinhan Securities Co., Ltd. ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

This Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition, you and we agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form"), with such modifications as you and we will in good faith agree. Upon the execution by you and us of such an agreement, this Confirmation shall supplement, form a part of, and be subject to that agreement (the "Agreement"). All provisions contained or incorporated by reference in the Agreement, upon its execution, will govern this Confirmation except as expressly modified below. Until we execute and deliver the Agreement, this Confirmation, together with all other documents confirming transactions entered into between us and referring to the ISDA Form, shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement in such form (but without any Schedule) on the Trade Date of this Transaction. In the event of any inconsistency between the provisions of that agreement, or the Agreement, when executed, and this Confirmation, this Confirmation will prevail for the purpose of this Transaction.

The definitions and provisions contained in the 2002 ISDA Equity Derivatives Definitions (the "Equity Definitions") and the 2000 ISDA Definitions (the "Swap Definitions", and together with the Equity Definitions, the "Definitions"), in each case as published by the International Swaps and Derivatives Association, Inc. ("ISDA") are incorporated into this Confirmation. References herein to "Transaction" shall be deemed references to "Swap Transaction" for purposes of the Swap Definitions. In the event of any inconsistency between the Equity Definitions and the Swap Definitions, the Equity Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

Lehman Brothers Asia Limited ("LBAL") is acting as agent on behalf of Party A for this Transaction. LBAL has no obligations, by guarantee, endorsement or otherwise, with respect to the performance of this Transaction by Party A.

Lehman Brothers Commercial Corporation Asia Limited
26/F Two International Finance Center 8 Finance street Central Hong Kong

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

Party B represents that it is not in possession of any material non-public information concerning the business, operations or prospects of the Issuer(s) and was not in possession of any such information at the time of placing any order with respect to the Transaction.

"Material" information for these purposes is any information to which an investor would reasonably attach importance in reaching a decision to buy, sell or hold any securities of the Issuer(s).

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Trade Date: | 12 March 2007 |
| Effective Date: | 19 March 2007 |
| Termination Date: | 10 March 2010, subject to adjustment in accordance with the Following Business Day Convention and subject to early termination in accordance with the Knock-out Event provisions below. |
| Basket: | The basket of Shares specified in Column 1 of Appendix I, as further identified by the stock code specified in Column 2 of Appendix I. |
| Exchange(s): | For each Share in the Basket, as specified in Column 3 of Appendix I. |
| Related Exchange(s): | All Exchanges |
| Initial Reference Price: | For each Share in the Basket, as specified in Column 4 of Appendix I ($P_{i,0}$) |
| Initial Payment: | USD6,234,384.92 to be paid by Party B to Party A on the Effective Date subject to adjustment in accordance with the Following Business Day Convention. For the avoidance of doubt, the Initial Payment is calculated in accordance with the following formula: |

(Equity Notional Amount / Initial Exchange Rate) x Initial Exchange Percentage

where:

Equity Notional Amount has the meaning as defined

**EXHIBIT A**
**PAGE 69**

below;

Initial Exchange Rate is KRW944.60/USD1.00; and

Initial Exchange Percentage is 98.15%.

Knock-out Event:

A "Knock-out Event' occurs where the Closing Prices of all Knock-out Reference Securities in the Basket on any Knock-out Determination Day are equal to or greater than their respective Knock-out Prices.

Upon the occurrence of a Knock-out Event, Party A shall pay to Party B the relevant Knock-out Settlement Amount on the relevant Knock-out Settlement Date and all the other rights and obligations of Party A and Party B in respect of the Transaction shall be terminated.

Knock-out Price:

For each Share in the Basket, as specified in Column 5 Appendix I.

Knock-out Reference Securities:

The Shares in the Basket.

Knock-out Determination Days:

Each date as specified in Column 2 of Appendix II, subject to adjustment in accordance with the Following Business Day Convention.

Knock-out Valuation Time:

The Scheduled Closing Time on the Exchange on the Knock-out Determination Days.

Knock-out Settlement Amount:

The amount in USD, as determined using the relevant formula specified in Column 4 of Appendix II:

where,

Annual Return means 8.00%;

$FX_t$ means the Exchange Rate on the first Business Day following the Knock-out Determination Day in the relevant Period (as specified in Column 1 of Appendix II);

Exchange Rate means the spot KRW/USD exchange rate, expressed as the amount of Korean Won per US dollar, as agreed between Party A and Party B, failing which the spot KRW/USD exchange rate as determined by the Calculation Agent with reference to such rate as displayed under "USD today" on the Reuters page "KFTC18" at around 4:00 p.m.(Seoul time) on the first Business Day following the relevant Knock-out Determination Day. If it is impracticable for the Calculation Agent to make reference to Reuters page "KFTC18", the rate shall be determined by the Calculation Agent in good faith and in a commercially reasonable manner.

For the avoidance of doubt, the Business Days for Initial Payment and Knock-out Settlement Date shall

EXHIBIT A
PAGE 70

|  | be used for determining the Business Days for Exchange Rate. |
|---|---|
| Knock-out Settlement Date: | The third Business Day immediately following the Knock-out Determination Day, and which are currently expected to fall on the dates set out in Column 3 of Appendix II. |
| Business Days for Knock-out Determination Day(s): | Seoul |
| Business Days for Initial Payment and Knock-out Settlement Date: | Seoul and New York |
| Closing Price: | means, in relation to any Share in the Basket, the official closing price of such Share, calculated and published at the Valuation Time by the relevant Exchange or if there is no official closing price, the mid-market price per such Share as determined by the Calculation Agent. |

**Equity Amounts payable by Party A:**

| Equity Amount Payer: | Party A |
|---|---|
| Equity Amount Receiver: | Party B |
| Equity Notional Amount: | KRW6,000,000,000 |
| Equity Amounts payable by Party A: | Notwithstanding Section 8.6 of the Equity Definitions, an amount in USD determined in accordance with the following formula: |

(1) If the Closing Prices of all the Shares in the Basket on the Valuation Date are equal to or greater than its respective Knock-out Prices, then Party A Equity Amount shall be calculated in accordance with the following formula:

Equity Notional Amount x (100% + 3 x Annual Return) / $FX_F$

(2) Or, if the Closing Price of the Worst Performing Share "X" (as defined below) in the Basket on the Valuation Date is less than its Knock-out Price, then Party A Equity Amounts shall be calculated in accordance with the following formula:

Equity Notional Amount x 100% / $FX_F$

where,

Worst Performing Share "X" means, as determined by the Calculation Agent in good faith and in a commercially reasonable manner, the Share in the Basket which has the lowest value on the Valuation Date according to the following formula:

$(P_{i,F} / P_{i,0}) - 1$

with $P_{i,F}$ being the Closing Price of the relevant Share

in the Basket on the Valuation Date;

$FX_F$ means the Exchange Rate on the first Business Day following the Valuation Date.

For the avoidance of doubt, in the event that the Calculation Agent determines the above formula produces two or more Shares in the Basket with the same performance on the relevant Valuation Date, then the Calculation Agent shall, in its sole discretion (acting reasonably and in a commercially reasonable manner) select one of such Shares to be the Worst Performing Share "X".

| | |
|---|---|
| Valuation Date: | 5 March 2010, subject to adjustment in accordance with the Following Business Day Convention. |
| Equity Notional Reset: | Not Applicable |
| Business Day for Valuation Date: | Seoul |
| Floating Amount: | Not applicable. No Floating Amount shall be payable by either party. |

**Settlement Terms:**

| | |
|---|---|
| Cash Settlement: | Applicable |
| Settlement Currency: | USD (all amounts shall be converted to USD at the Exchange Rate by the Calculation Agent in a commercially reasonable manner) |
| Cash Settlement Payment Dates: | 10 March 2010, subject to adjustment in accordance with the Following Business Day Convention. |
| Business Days for Settlement Date: | Seoul and New York |

**Share Adjustments:**

| | |
|---|---|
| Method of Adjustment: | Calculation Agent Adjustment |

**Extraordinary Events:**

**Consequences of Merger Events:**

| | |
|---|---|
| Share-for-Share: | Modified Calculation Agent Adjustment |
| Share-for-Other: | Modified Calculation Agent Adjustment |
| Share-for-Combined: | Modified Calculation Agent Adjustment |
| Determining Party: | Party A |

**Tender Offer:**                        Applicable

**Consequences of Tender Offers:**

**EXHIBIT A
PAGE 72**

| | |
|---|---|
| Share-for-Share: | Modified Calculation Agent Adjustment |
| Share-for-Other: | Modified Calculation Agent Adjustment |
| Share-for-Combined: | Modified Calculation Agent Adjustment |
| Determining Party: | Party A |
| Tender Offers: | The definition of "Tender Offer" in Section 12.1 of the Equity Definitions will be amended by replacing the phrase "outstanding voting shares of the Issuer" in the fourth line thereof with "outstanding Shares" |
| **Composition of Combined Consideration:** | Not Applicable |
| **Nationalization, Insolvency or Delisting:** | Cancellation and Payment (Calculation Agent Determination) |
| **Additional Disruption Events:** | |
| Change in Law: | Applicable; provided that Section 12.9(a)(ii)(B) is replaced in its entirety as follows: "(B) due to the promulgation of or any change in the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law or regulation (including any action taken by a taxing authority), the Calculation Agent determines in good faith that it has become illegal to hold, acquire or dispose of Hedge Positions relating to such Transaction". |
| Insolvency Filing: | Applicable |
| | The definition of "Insolvency Filing" in Section 12.9 of the Equity Definitions shall be amended by deleting the clause "provided that such proceedings instituted or petitions presented by creditors and not consented to by the Issuer shall not be deemed an Insolvency Filing" at the end of such definition and replacing it with the following: "; or it has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by a creditor and such proceeding is not dismissed, discharged, stayed or restrained in each case within fifteen days of the institution or presentation thereof." |
| | Section 12.9(b)(i) of the Equity Definitions is hereby amended by adding the following sentence at the end: "If neither party elects to terminate the Transaction, the Calculation Agent may adjust the terms of the |

**EXHIBIT A**
**PAGE 73**

| | Transaction upon the occurrence of such an event pursuant to Modified Calculation Agent Adjustment (as if such event were a Tender Offer)." |
|---|---|
| Hedging Disruption: | Applicable. For the purpose of this Transaction, "Hedging Disruption" means that, at any time from and including the Trade Date, Party A or any of its affiliates (the "Hedging Party"), is or will become unable to or prevented from acquiring, establishing, re-establishing, substituting, maintaining, unwinding or disposing of, in whole or in part, any transaction(s) the Hedging Party deems necessary to hedge the equity price risk of entering into and performing Party A's obligations with respect to the Transaction, acting through customary legal channels (including but not limited to purchasing, holding, selling or otherwise disposing of any Shares, any options or future contracts on the Shares or any other instruments or assets) for any reason whatsoever including without limitation any action by any authority of the Relevant Country in the event of natural calamities, wars, conflict or arms or grave and sudden changes in domestic or foreign economic circumstances or other similar circumstances pursuant to any law or regulation such Relevant Country or any other such prohibition or restriction on transactions in the Shares, options and/or future contracts on the Shares or on other instruments or assets of any type whatsoever by non-residents of the Relevant Country. |
| Hedging Party: | Party A |
| Increased Cost of Hedging: | Not Applicable |
| Loss of Stock Borrow: | Not Applicable |
| Increased Cost of Stock Borrow: | Not Applicable |
| Determining Party: | Party A |
| **Additional Representations, Agreements and Acknowledgments:** | |
| Non-Reliance: | Applicable |
| Agreements and Acknowledgments Regarding Hedging Activities: | Applicable |
| Additional Acknowledgments: | Applicable |
| **Additional Provision:** | If a Merger Date or Tender Offer Date is scheduled to be after, in respect of an Option Transaction, the Expiration Date or, in respect of any other Transaction, the Valuation Date, the Calculation Agent will determine the economic effect on the theoretical value of the Transaction of the announcement of a potential Merger Event or Tender |

Offer Event (including without limitation any change in volatility, expected dividends, stock loan rate or liquidity relevant to the Shares or to the Transaction) from the Announcement Date to the Expiration Date or the Valuation Date, as applicable. If such economic effect is material, the Calculation Agent will adjust the terms of the Transaction to reflect such economic effect.

**Convertibility Event:**

An event which has the effect of preventing, limiting or otherwise restricting foreign exchange transactions involving the Relevant Currency through legal channels (including, without limitation, any such prohibition, limitation or restriction affecting the conversion or delivery of the Relevant Currency into the Settlement Currency, the delivery of the Settlement Currency from accounts within the Relevant Country to accounts outside such jurisdiction or the delivery of the Relevant Currency between accounts within the Relevant Country to a person who is a non-resident of that jurisdiction), including any action by any authority of the Relevant Country in the event of natural calamities, wars, conflict or arms or grave and sudden changes in domestic or foreign economic circumstances or other similar circumstances pursuant to any law or regulation of the Relevant Country.

**Relevant Country:**          Republic of Korea

**Relevant Currency:**          The lawful currency of the Relevant Country

**Consequences of a Convertibility Event:**          If the Calculation Agent determines in its sole discretion that a Convertibility Event has occurred and is continuing on the Exercise Date, Payment Dates, Cash Settlement Payment Dates, the date that any other amount is payable by Party A, or the date that the Transaction terminates or cancels, that prevents Party A from performing its obligations with respect to the Transaction and/or that prevents the Hedging Party from accessing, liquidating, unwinding or otherwise disposing of any assets or instruments denominated in the Relevant Currency as such party may hold, directly or indirectly, as part of the arrangements made to hedge the equity price risk of entering into and performing Party A's obligations with respect to the Transaction and/or that prevents the Hedging Party from converting the proceeds from the sale or the unwinding or the disposal of any such assets or instruments into the

**EXHIBIT A
PAGE 75**

Settlement Currency, then the determination of the any amount that may be payable by Party A, or any early termination amount, as the case may be, and/or Party A's obligation to pay such amount, as the case may be, to Party B shall be postponed until the Business Day which falls the same number of Business Days after the Business Day on which such Convertibility Event ceases to exist as the Cash Settlement Payment Date was originally scheduled to be after the relevant Valuation Date.

For the avoidance of doubt, if a Convertibility Event coincides with a Market Disruption Event, the above provisions shall take effect only after such postponements or adjustments have been made as a result of such Market Disruption Event and Party A's obligation to pay an amount that may be payable by Party A, as the case may be, shall continue to be postponed in accordance with the above provisions. Further, the occurrence of a Convertibility Event will not constitute an Event of Default and no interest or other sum shall accrue to Party B in the event that any payment is postponed.

**Unwinding:**

Under normal market conditions, and upon request from Party B, Party A will provide an indicative unwind price (in respect of all or part of the Notional Amount of this Transaction). Any full or partial unwind of this Transaction will be subject to final agreement between Party A and Party B.

**Representations:**

Section 3 of the ISDA Form is hereby amended by adding the following additional subsections:

(g)  *No Reliance.*  It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction, it being understood that information and explanations related to the terms and conditions of this Transaction will not be considered investment advice or a recommendation to enter into this Transaction.   No communication (written or oral) received from the other party will be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(h)  *Assessment and Understanding.*  It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of this

Transaction. It is also capable of assuming, and assumes, the risks of this Transaction.

(i)   *Status of Parties.* The other party is not acting as a fiduciary for or an advisor to it in respect of this Transaction.

(j)   *No Agency.* It is entering into this Transaction, as principal and not as agent of any person or entity.

**Additional Representations of Party B:**   Party B represents to Party A in accordance with Section 3 of the ISDA Form (which representations will be deemed to be repeated by Party B at all times that this Transaction is outstanding) that:

(i)   It is a "professional investor", as such term is defined in the Securities and Finance Ordinance (Cap.571) of Hong Kong and any rules made under that Ordinance.

**Additional Termination Event:**   Each of the following shall constitute an Additional Termination Event (provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence):-

(i)   **Sovereign Event.** Party B is not able to discharge its obligations with respect to this Transaction through the relevant booking office as a result of any law (other than bankruptcy, insolvency or similar laws), order or other action by, or threat of any such law, order or other action by or on behalf of, any governmental or other similar authority (de jure or de facto) at the location of such office. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(ii)   **Non-Convertibility Event.** Party A has determined in its sole discretion that either of the following has occurred and that any such occurrence has not been satisfactorily cured: (1) a local market condition has had the effect of prohibiting, restricting or delaying (x) the free and unconditional exchange of Korean Won for USD or (y) the free and unconditional transferability of any USD resulting from any such exchange or (2) an action or failure to act by the government of the Republic of Korea or

**EXHIBIT A
PAGE 77**

any agency or regulatory authority thereof has had the effect of prohibiting, restricting or delaying (x) the free and unconditional exchange of Korean Won for USD or (y) the free and unconditional transferability of any USD resulting from any such exchange. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(iii) **Adequate Assurances.** Party B fails to give Party A adequate assurances of Party B's ability to perform any of its obligations under this Transaction within one (1) Local Business Day of a written request to do so. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(iv) **Material Adverse Change.** Party A has determined in its sole discretion that Party B has experienced or is experiencing a material adverse change in its business, assets, operations or financial condition. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

**Additional Events of Default:**

Section 5(a) of the ISDA Form shall be amended as follows:

(1) deleting the word "or" at the end of Section 5(a)(vii);

(2) deleting the full stop at the end of Section 5(a)(viii) and substituting therefor a semi-colon and the word "or"; and

(3) adding the following additional subsections:

"(ix) The voluntary or involuntary suspension of all or substantially all of Party B's business activities or the issuance of a court order or an administrative or other similar order to suspend or revoke any of its business licenses in whole or in part;

(x) A court of the Republic of Korea or the governmental authorities of the Republic of Korea issue an attachment order or a provisional attachment order against any payment or delivery owed to Party B under this Transaction;

**EXHIBIT A**
**PAGE 78**

(xi)    Party B is disqualified from a bill clearing house in the Republic of Korea; or

(xii)    The net capital ratio of Party B as defined in the Regulation on Supervision of Securities Business of the Republic of Korea falls below 150%. Such net capital ratio shall be calculated in accordance with the Regulation on Supervision of Securities Business in effect as of the Trade Date, provided, however, that Party A may elect, in its sole discretion, to calculate the net capital ratio in accordance with (i) any revised Regulation on Supervision of Securities Business that may be in effect from time to time after the Trade Date or (ii) any successor law, rule or regulation that may be adopted by the Republic of Korea."

**Miscellaneous:**

FETR

Party B represents to Party A (which representation will be deemed to be repeated by Party B at all times until the termination of this Transaction) that this Transaction and each payment made or received in connection with this Transaction is in accordance with all applicable provisions of the Foreign Exchange Transaction Regulations of the Republic of Korea in effect as of the time of entering into this Transaction and as of the time any payment is made or received in connection with this Transaction.

Failure to Pay or Deliver

Section 5(a)(i) of the ISDA Form is hereby amended by deleting the word "third" and inserting in lieu thereof the word "first".

Calculation Agent:

Party A

Office:

For the purposes of this Transaction, Party A is not a Multibranch Party, and Party B is not a Multibranch Party.

Transfer:

Notwithstanding anything to the contrary in Section 7 of the ISDA Form, Party A may assign its rights and obligations under this Transaction, in whole and not in part, to any Affiliate of Lehman Brothers Holdings Inc. ("Holdings").



Governing Law:

The laws of the State of New York (without reference to choice of law doctrine); provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election.

EXHIBIT A
PAGE 79

| | |
|---|---|
| Waiver of Trial by Jury: | Insofar as is permitted by law, Party A and Party B irrevocably waive any and all rights to trial by jury in any legal proceeding in connection with this Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Transaction. |
| Termination Currency: | USD; provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election. |

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (+1) 646-758-6317 (United States of America), Attention: Confirmations Group.

Yours sincerely,

Accepted and agreed to:

**Lehman Brothers Commercial Corporation Asia Limited**

**Good Morning Shinhan Securities Co., Ltd.**

By: _____
Name: Lokki Woo
Title: Authorized Signatory

By: _____
Name:
Title:    Kee Wook, Lee
          Head of Process Innovation & Service Dept.

Execution time will be furnished upon Counterparty's written request.

**Appendix I**

|  | Column 1 | Column 2 | Column 3 | Column 4 | Column 5 |
|---|---|---|---|---|---|
| i | Shares | Bloomberg Code | Exchange | Initial Reference Price (KRW), $P_{i,0}$ | Knock-out Price (KRW), 100% x $P_{i,0}$ |
| 1 | POSCO (the "Issuer") | 005490. KS | Korea Exchange | 379,666 | 379,666 |
| 2 | Shinhan Financial Group, Ltd (the "Issuer") | 055550. KS | Korea Exchange | 54,033 | 54,033 |

**Appendix II**

| Column 1 | Column 2 | Column 3 | Column 4 |
|---|---|---|---|
| Period | Knock-out Determination Day | Knock-out Settlement Date | Knock-out Settlement Amount (in USD) |
| 1 | 12 September 2007 | 17 September 2007 | Equity Notional Amount x (100% + 0.5 x Annual Return) / $FX_t$ |
| 2 | 12 March 2008 | 17 March 2008 | Equity Notional Amount x (100% + 1.0 x Annual Return) / $FX_t$ |
| 3 | 12 September 2008 | 18 September 2008 | Equity Notional Amount x (100% + 1.5 x Annual Return) / $FX_t$ |
| 4 | 12 March 2009 | 17 March 2009 | Equity Notional Amount x (100% + 2.0 x Annual Return) / $FX_t$ |
| 5 | 11 September 2009 | 16 September 2009 | Equity Notional Amount x (100% + 2.5 x Annual Return) / $FX_t$ |

EXHIBIT A
PAGE 81

# EXHIBIT 4

**EXHIBIT A**
**PAGE 82**

# LEHMAN BROTHERS

### Transaction

Date:       1 June, 2007

To:         Good Morning Shinhan Securities Co., Ltd.
            Attention:      Documentation Unit

From:       Lehman Brothers Commercial Corporation Asia Limited
            c/o Lehman Brothers Asia Limited
            Confirmations Group
            Facsimile:      (+1) 646-758-6317 (United States of America)
            E-Mail:         aseqdstrconf@lehman.com

Effort Id:   1351274
Global Id:   2942588                                OTCELL 0(38)  기내 3)

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers Commercial Corporation Asia Limited ("Party A") acting as principal, and Good Morning Shinhan Securities Co., Ltd. ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

This Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition, you and we agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form"), with such modifications as you and we will in good faith agree. Upon the execution by you and us of such an agreement, this Confirmation shall supplement, form a part of, and be subject to that agreement (the "Agreement"). All provisions contained or incorporated by reference in the Agreement, upon its execution, will govern this Confirmation except as expressly modified below. Until we execute and deliver the Agreement, this Confirmation, together with all other documents confirming transactions entered into between us and referring to the ISDA Form, shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement in such form (but without any Schedule) on the Trade Date of this Transaction. In the event of any inconsistency between the provisions of that agreement, or the Agreement, when executed, and this Confirmation, this Confirmation will prevail for the purpose of this Transaction.

The definitions and provisions contained in the 2002 ISDA Equity Derivatives Definitions (the "Equity Definitions") and the 2000 ISDA Definitions (the "Swap Definitions", and together with the Equity Definitions, the "Definitions"), in each case as published by the International Swaps and Derivatives Association, Inc. ("ISDA") are incorporated into this Confirmation. References herein to "Transaction" shall be deemed references to "Swap Transaction" for purposes of the Swap Definitions. In the event of any inconsistency between the Equity Definitions and the Swap Definitions, the Equity Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

Lehman Brothers Asia Limited ("LBAL") is acting as agent on behalf of Party A for this Transaction. LBAL has no obligations, by guarantee, endorsement or otherwise, with respect to the performance of this Transaction by Party A.

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

Party B represents that it is not in possession of any material non-public information concerning the business, operations or prospects of the Issuer(s) and was not in possession of any such information at the time of placing any order with respect to the Transaction.

"Material" information for these purposes is any information to which an investor would reasonably attach importance in reaching a decision to buy, sell or hold any securities of the Issuer(s).

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Trade Date: | 16 March 2007 |
| Effective Date: | 22 March 2007 |
| Termination Date: | 15 March 2010, subject to adjustment in accordance with the Following Business Day Convention and subject to early termination in accordance with the Knock-out Event provisions below. |
| Basket: | The basket of Shares specified in Column 1 of Appendix I, as further identified by the stock code specified in Column 2 of Appendix I. |
| Exchange(s): | For each Share in the Basket, as specified in Column 3 of Appendix I |
| Related Exchange(s): | All Exchanges |
| Initial Reference Price: | For each Share in the Basket, as specified in Column 4 of Appendix I ($P_{i,0}$) |
| Initial Payment: | USD1,640,377.68 to be paid by Party B to Party A on the Effective Date, subject to adjustment in accordance with the Following Business Day Convention. For the avoidance of doubt, the Initial Payment is calculated in accordance with the following formula: |

(Equity Notional Amount / Initial Exchange Rate) x Initial Exchange Percentage

where:

Equity Notional Amount has the meaning as defined below;

"Initial Exchange Rate" means KRW942.60/USD1.00; and

"Initial Exchange Percentage" means 98.80%.

| | |
|---|---|
| Knock-out Event: | A "Knock-out Event" occurs where, (i) the Closing Prices of all Knock-out Reference Securities in the Basket at the Knock-out Valuation Time I on any Knock-out Determination Day I are equal to or greater than their respective Knock-out Prices I, or (ii) the prices of all Knock-out Reference Securities in the Basket at the Knock-out Valuation Time II on any Knock-out Determination Day II are equal to or greater than their respective Knock-out Prices II. |
| | Upon the occurrence of a Knock-out Event, Party A shall pay to Party B the relevant Knock-out Settlement Amount on the relevant Knock-out Settlement Date and all the other rights and obligations of Party A and Party B in respect of the Transaction shall be terminated. |
| Knock-out Price I: | For each Share in the Basket, as specified in Column 6 of Appendix I. |
| Knock-out Price II: | For each Share in the Basket, as specified in Column 7 of Appendix I. |
| Knock-out Reference Securities: | The Shares in the Basket |
| Knock-out Determination Days I: | Each date as specified in Column 2 of Appendix II, subject to adjustment in accordance with the Following Business Day Convention. |
| Knock-out Determination Days II: | Any Scheduled Trading Day form and excluding the Trade Date to and including the Knock-out Determination Day I of the then current Period for Period 1, and from and excluding the Knock-out Determination Day I of the previous Period to and including the Knock-out Determination Day I of the then current Period for subsequent Periods. |
| Knock-out Valuation Time I: | The Scheduled Closing Time on the Exchange on the Knock-out Determination Days I. |
| Knock-out Valuation Time II: | Any time during a regular trading session on the Exchange on the Knock-out Determination Days II. |
| Knock-out Settlement Amount: | The amount in USD, as determined using the relevant formula specified in Column 4 of Appendix II: |
| | where, |
| | "Annual Return" means 9.70%; |
| | "FX," means the Exchange Rate on the first Business |

Day following the Knock-out Determination Day I in the relevant Period (as specified in Column 1 of Appendix II);

"Exchange Rate" means the spot KRW/USD exchange rate, expressed as the amount of Korean Won per US dollar, as agreed between Party A and Party B, failing which the spot KRW/USD exchange rate as determined by the Calculation Agent with reference to such rate as displayed under "USD today" on the Reuters page "KFTC18" at around 4:00 p.m. (Seoul time). If it is impracticable for the Calculation Agent to make reference to Reuters page "KFTC18", the rate shall be determined by the Calculation Agent in good faith and in a commercially reasonable manner.

For the avoidance of doubt, the Business Days for Initial Payment and Knock-out Settlement Date shall be used for determining the Business Days for Exchange Rate.

| | |
|---|---|
| Knock-out Settlement Date: | The third Business Day immediately following the Knock-out Determination Day I, and which are currently expected to fall on the dates set out in Column 3 of Appendix II. |
| Elimination Event: | An "Elimination Event" occurs where the Calculation Agent determines that the Closing Price of a Share in the Basket on any Knock-out Determination Day I is equal to or greater than its Knock-out Price I. If an Elimination Event occurs, the relevant Share affected by the Elimination Event will be eliminated from the Basket with effect from and including the Scheduled Trading Day immediately following the relevant Knock-out Determination Day I. |
| Knock-in Event: | Notwithstanding Section 1.44 of the Equity Definitions, "Knock-in Event" means an event where the Closing Price of one or more Shares in the Basket (except for the ones that have been removed by an Elimination Event) are less than their respective Knock-in Prices on any Knock-in Determination Day. |
| Knock-in Price: | Notwithstanding Section 1.42 of the Equity Definitions, each Share in the Basket shall have the Knock-in Price as specified in Column 5 of Appendix I. |
| Knock-in Determination Days: | Any Scheduled Trading Day from and including the Trade Date to and including the Valuation Date. |
| Business Days for Knock-out Determination Day(s): | Seoul, New York, Hong Kong, TARGET and Tokyo |

EXHIBIT A
PAGE 86

| | |
|---|---|
| Business Days for Initial Payment and Knock-out Settlement Date: | Seoul and New York |
| Closing Price: | means, in relation to any Share in the Basket, the official closing price of such Share, calculated and published at the Valuation Time by the relevant Exchange or if there is no official closing price, the mid-market price per such Share as determined by the Calculation Agent. |

**Equity Amounts payable by Party A:**

| | |
|---|---|
| Equity Amount Payer: | Party A |
| Equity Amount Receiver: | Party B |
| Equity Notional Amount: | KRW 1,565,000,000 |
| Equity Amounts payable by Party A: | Notwithstanding Section 8.6 of the Equity Definitions, an amount in USD determined in accordance with the following formula: |

(1) (i) If the Closing Price of the Worst Performing Share "X" (as defined below) in the Basket on the Valuation Date is equal to or greater than its Knock-out Price I, then Party A Equity Amount shall be calculated in accordance with the following formula:

Equity Notional Amount x (100% + 3 x Annual Return) / $FX_F$

(2) Or, if the Closing Price of the Worst Performing Share "X" in the Basket on the Valuation Date is less than its Knock-out Price I and a Knock-in Event has occurred, but Knock-out Event has not occurred, then Party A Equity Amount shall be calculated in accordance with the following formula:

Equity Notional Amount x 100% / $FX_F$

(3) Or, if the Closing Price of the Worst Performing Share "X" in the Basket on the Valuation Date is less than its Knock-out Price I and neither Knock-in Event nor Knock-out Event has occurred, then Party A Equity Amount shall be calculated in accordance with the following formula:

Equity Notional Amount x 129.1% / $FX_F$

where,

"$P_{X,F}$" means the Closing Price of the Worst Performing Share "X" in the Basket on the Valuation Date;

"$P_{X,0}$" means the Initial Reference Price of Worst Performing Share "X";

"Worst Performing Share "X"" means, as determined

by the Calculation Agent in its sole and absolute discretion, the Share in the Basket which has the lowest average value on Valuation Date according to the following formula:

$$(P_{i,F} / P_{i,0}) - 1$$

with "$P_{i,F}$" being the Closing Prices of the relevant Share in the Basket on Valuation Date;

"$FX_F$" means the Exchange Rate on the first Business Day following the Valuation Date.

In the event that the Calculation Agent determines the above formula produces two or more Shares in the Basket with the same performance on Valuation Date, then the Calculation Agent shall, in its sole discretion (acting reasonably and in a commercially reasonable manner) select one of such Shares to be the Worst Performing Share "X".

| | |
|---|---|
| Valuation Date: | 9 March 2010, subject to adjustment in accordance with the Following Business Day Convention. |
| Equity Notional Reset: | Not Applicable |
| Business Day for Valuation Date: | Seoul, New York, Hong Kong, TARGET and Tokyo |
| **Floating Amount:** | Not applicable. No Floating Amount shall be payable by either party. |

**Settlement Terms:**

| | |
|---|---|
| Cash Settlement: | Applicable |
| Settlement Currency: | USD (all amounts shall be converted to USD at the Exchange Rate by the Calculation Agent in a commercially reasonable manner) |
| Cash Settlement Payment Dates: | 15 March 2010, subject to adjustment in accordance with the Following Business Day Convention. |
| Business Days for Settlement Date: | Seoul and New York |
| **Disrupted Day:** | If there is a Disrupted Day in relation to a Share on any date which would otherwise have been a Knock-out Determination Day I, a Knock-in Determination Day or a Valuation Date, then the Knock-out Determination Day I, the Knock-in Determination Day or the Valuation Date for all Shares shall be the first succeeding Scheduled Trading Day that is not a Disrupted Day relating to all of the Shares, unless each of the eight Scheduled Trading Days immediately following the scheduled Knock-out Determination Day I, Knock-in Determination Day or Valuation Date is a Disrupted Day. In that case: |

**EXHIBIT A**
**PAGE 88**

(a) that eighth Scheduled Trading Day shall be deemed to be the Knock-out Determination Day I, Knock-in Determination Day or Valuation Date (as relevant) notwithstanding the fact that such day is a Disrupted Day (the "Deemed Date"); and

(b) the Calculation Agent shall determine its good faith estimate of the value for all of the Shares that would have prevailed but for that Disrupted Day as of the Valuation Time on that Deemed Date.

| | |
|---|---|
| **Share Adjustments:** | |
| Method of Adjustment: | Calculation Agent Adjustment |
| **Extraordinary Events:** | |
| Consequences of Merger Events: | |
| Share-for-Share: | Modified Calculation Agent Adjustment |
| Share-for-Other: | Modified Calculation Agent Adjustment |
| Share-for-Combined: | Modified Calculation Agent Adjustment |
| Determining Party: | Party A |
| **Tender Offer:** | Applicable |
| Consequences of Tender Offers: | |
| Share-for-Share: | Modified Calculation Agent Adjustment |
| Share-for-Other: | Modified Calculation Agent Adjustment |
| Share-for-Combined: | Modified Calculation Agent Adjustment |
| Determining Party: | Party A |
| Tender Offers: | The definition of "Tender Offer" in Section 12.1 of the Equity Definitions will be amended by replacing the phrase "outstanding voting shares of the Issuer" in the fourth line thereof with "outstanding Shares" |
| **Composition of Combined Consideration:** | Not Applicable |
| **Nationalization, Insolvency or Delisting:** | Cancellation and Payment (Calculation Agent Determination) |
| **Additional Disruption Events:** | |
| Change in Law: | Applicable; provided that Section 12.9(a)(ii)(B) is replaced in its entirety as follows: "(B) due to the promulgation of or any change in the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law or regulation (including any action taken by a taxing authority), the Calculation Agent determines in good faith that it has become illegal to hold, acquire or dispose of Hedge Positions relating to such |

|  | Transaction". |
|---|---|
| Insolvency Filing: | Applicable |

The definition of "Insolvency Filing" in Section 12.9 of the Equity Definitions shall be amended by deleting the clause "provided that such proceedings instituted or petitions presented by creditors and not consented to by the Issuer shall not be deemed an Insolvency Filing" at the end of such definition and replacing it with the following: "; or it has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by a creditor and such proceeding is not dismissed, discharged, stayed or restrained in each case within fifteen days of the institution or presentation thereof."

Section 12.9(b)(i) of the Equity Definitions is hereby amended by adding the following sentence at the end: "If neither party elects to terminate the Transaction, the Calculation Agent may adjust the terms of the Transaction upon the occurrence of such an event pursuant to Modified Calculation Agent Adjustment (as if such event were a Tender Offer)."

| Hedging Disruption: | Applicable. For the purpose of this Transaction, "Hedging Disruption" means that, at any time from and including the Trade Date, Party A or any of its affiliates (the "Hedging Party"), is or will become unable to or prevented from acquiring, establishing, re-establishing, substituting, maintaining, unwinding or disposing of, in whole or in part, any transaction(s) the Hedging Party deems necessary to hedge the equity price risk of entering into and performing Party A's obligations with respect to the Transaction, acting through customary legal channels (including but not limited to purchasing, holding, selling or otherwise disposing of any Shares, any options or future contracts on the Shares or any other instruments or assets) for any reason whatsoever including without limitation any action by any authority of the Relevant Country in the event of natural calamities, wars, conflict or arms or grave and sudden changes in domestic or foreign economic circumstances or other similar circumstances pursuant to any law or regulation of the Relevant Country or any other such prohibition or restriction on transactions in the Shares, options and/or future contracts on the Shares or on other instruments or assets of any type whatsoever by |
|---|---|

EXHIBIT A
PAGE 90

|  | non-residents of the Relevant Country. |
|---|---|
| Hedging Party: | Party A |
| Increased Cost of Hedging: | Not Applicable |
| Loss of Stock Borrow: | Not Applicable |
| Increased Cost of Stock Borrow: | Not Applicable |
| Determining Party: | Party A |

**Additional Representations, Agreements and Acknowledgments**

| Non-Reliance: | Applicable |
|---|---|
| Agreements and Acknowledgments Regarding Hedging Activities: | Applicable |
| Additional Acknowledgments: | Applicable |

**Additional Provision:** If a Merger Date or Tender Offer Date is scheduled to be after, in respect of an Option Transaction, the Expiration Date or, in respect of any other Transaction, the Valuation Date, the Calculation Agent will determine the economic effect on the theoretical value of the Transaction of the announcement of a potential Merger Event or Tender Offer Event (including without limitation any change in volatility, expected dividends, stock loan rate or liquidity relevant to the Shares or to the Transaction) from the Announcement Date to the Expiration Date or the Valuation Date, as applicable. If such economic effect is material, the Calculation Agent will adjust the terms of the Transaction to reflect such economic effect.

**Convertibility Event:**

An event which has the effect of preventing, limiting or otherwise restricting foreign exchange transactions involving the Relevant Currency through legal channels (including, without limitation, any such prohibition, limitation or restriction affecting the conversion or delivery of the Relevant Currency into the Settlement Currency, the delivery of the Settlement Currency from accounts within the Relevant Country to accounts outside such jurisdiction or the delivery of the Relevant Currency between accounts within the Relevant Country to a person who is a non-resident of that jurisdiction), including any action by any authority of the Relevant Country in the event of natural calamities, wars, conflict or arms or grave and sudden changes in domestic or foreign economic circumstances or other similar

**EXHIBIT A
PAGE 91**

circumstances pursuant to any law or regulation of the Relevant Country.

| | |
|---|---|
| Relevant Country: | Republic of Korea |
| Relevant Currency: | The lawful currency of the Relevant Country |
| Consequences of a Convertibility Event: | If the Calculation Agent determines in its sole discretion that a Convertibility Event has occurred and is continuing on the Exercise Date, Payment Dates, Cash Settlement Payment Dates, the date that any other amount is payable by Party A, or the date that the Transaction terminates or cancels, that prevents Party A from performing its obligations with respect to the Transaction and/or that prevents the Hedging Party from accessing, liquidating, unwinding or otherwise disposing of any assets or instruments denominated in the Relevant Currency as such party may hold, directly or indirectly, as part of the arrangements made to hedge the equity price risk of entering into and performing Party A's obligations with respect to the Transaction and/or that prevents the Hedging Party from converting the proceeds from the sale or the unwinding or the disposal of any such assets or instruments into the Settlement Currency, then the determination of any amount that may be payable by Party A, or any early termination amount, as the case may be, and/or Party A's obligation to pay such amount, as the case may be, to Party B shall be postponed until the Business Day which falls the same number of Business Days after the Business Day on which such Convertibility Event ceases to exist as the Cash Settlement Payment Date was originally scheduled to be after the relevant Valuation Date. |

For the avoidance of doubt, if a Convertibility Event coincides with a Market Disruption Event, the above provisions shall take effect only after such postponements or adjustments have been made as a result of such Market Disruption Event and Party A's obligation to pay an amount that may be payable by Party A, as the case may be, shall continue to be postponed in accordance with the above provisions. Further, the occurrence of a Convertibility Event will not constitute an Event of Default and no interest or other sum shall accrue to Party B in the event that any payment is postponed.

| | |
|---|---|
| **Unwinding:** | Party A will provide an indicative value of the Transaction (the "Indicative Market Value") to Party B upon a request from Party B, provided that the request falls on an Exchange Business Day and there is no Market Disruption Event, upon which the request will be fulfilled by Party A on the following Exchange Business Day where there is no Market Disruption Event. |

In the event that Party B notifies Party A in writing that it wishes to unwind the Transaction in whole or in part (if in part such unwinding is subject to a minimum Nominal Amount of USD10,000), Party A will provide an Indicative Market Value determined by Party A acting in good faith with a bid offer spread of 1%.

Party B may then give notice to Party A confirming the exact Nominal Amount to be unwound and Party A, will acting in good faith as soon as practicable depending on prevailing market conditions, notify Party B :

1) of the amount due by a party to the other in respect of the Nominal Amount to be unwound by the Manager ; and

2) the identity of the party liable for such payment.

Such amount will be paid by the party liable for such payment to the other party on the third Business Day following the day on which the above mentioned notice is sent by Party A to Party B.

**Representations:**    Section 3 of the ISDA Form is hereby amended by adding the following additional subsections:

(g)   *No Reliance*.   It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction, it being understood that information and explanations related to the terms and conditions of this Transaction will not be considered investment advice or a recommendation to enter into this Transaction.   No communication (written or oral) received from the other party will be deemed to be an assurance or guarantee as to the expected results of this Transaction.

**EXHIBIT A
PAGE 93**

(h)   *Assessment and Understanding.* It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of this Transaction.

(i)   *Status of Parties.* The other party is not acting as a fiduciary for or an advisor to it in respect of this Transaction.

(j)   *No Agency.* It is entering into this Transaction, as principal and not as agent of any person or entity.

**Additional Representations of Party B:**

Party B represents to Party A in accordance with Section 3 of the ISDA Form (which representations will be deemed to be repeated by Party B at all times that this Transaction is outstanding) that:

(i)   It is a "professional investor", as such term is defined in the Securities and Finance Ordinance (Cap.571) of Hong Kong and any rules made under that Ordinance.

**Additional Termination Event:**

Each of the following shall constitute an Additional Termination Event (provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence):-

(i)   **Sovereign Event.** Party B is not able to discharge its obligations with respect to this Transaction through the relevant booking office as a result of any law (other than bankruptcy, insolvency or similar laws), order or other action by, or threat of any such law, order or other action by or on behalf of, any governmental or other similar authority (de jure or de facto) at the location of such office. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(ii)  **Non-Convertibility Event.** Party A has determined in its sole discretion that either of the following has occurred and that any such occurrence has not been satisfactorily cured: (1) a local market condition has had the effect of prohibiting, restricting or delaying (x) the free

**EXHIBIT A
PAGE 94**

and unconditional exchange of Korean Won for USD or (y) the free and unconditional transferability of any USD resulting from any such exchange or (2) an action or failure to act by the government of the Republic of Korea or any agency or regulatory authority thereof has had the effect of prohibiting, restricting or delaying (x) the free and unconditional exchange of Korean Won for USD or (y) the free and unconditional transferability of any USD resulting from any such exchange. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(iii) **Adequate Assurances.** Party B fails to give Party A adequate assurances of Party B's ability to perform any of its obligations under this Transaction within one (1) Local Business Day of a written request to do so. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(iv) **Material Adverse Change.** Party A has determined in its sole discretion that Party B has experienced or is experiencing a material adverse change in its business, assets, operations or financial condition. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

**Additional Events of Default:**

Section 5(a) of the ISDA Form shall be amended as follows:

(1)  deleting the word "or" at the end of Section 5(a)(vii);

(2)  deleting the full stop at the end of Section 5(a)(viii) and substituting therefor a semi-colon and the word "or"; and

(3)  adding the following additional subsections:

"(ix)  The voluntary or involuntary suspension of all or substantially all of Party B's business activities or the issuance of a court order or an administrative or other similar order to suspend or revoke any of its business licenses in whole or in part;

(x)  A court of the Republic of Korea or the governmental authorities of the Republic of

EXHIBIT A
PAGE 95

Korea issue an attachment order or a provisional attachment order against any payment or delivery owed to Party B under this Transaction;

(xi)    Party B is disqualified from a bill clearing house in the Republic of Korea; or

(xii)    The net capital ratio of Party B as defined in the Regulation on Supervision of Securities Business of the Republic of Korea falls below 150%. Such net capital ratio shall be calculated in accordance with the Regulation on Supervision of Securities Business in effect as of the Trade Date, provided, however, that Party A may elect, in its sole discretion, to calculate the net capital ratio in accordance with (i) any revised Regulation on Supervision of Securities Business that may be in effect from time to time after the Trade Date or (ii) any successor law, rule or regulation that may be adopted by the Republic of Korea."

**Miscellaneous:**

FETR

Party B represents to Party A (which representation will be deemed to be repeated by Party B at all times until the termination of this Transaction) that this Transaction and each payment made or received in connection with this Transaction is in accordance with all applicable provisions of the Foreign Exchange Transaction Regulations of the Republic of Korea in effect as of the time of entering into this Transaction and as of the time any payment is made or received in connection with this Transaction.

Failure to Pay or Deliver

Section 5(a)(i) of the ISDA Form is hereby amended by deleting the word "third" and inserting in lieu thereof the word "first".

Calculation Agent:

Party A

Office:

For the purposes of this Transaction, Party A is not a Multibranch Party, and Party B is not a Multibranch Party.

EXHIBIT A
PAGE 96

| | |
|---|---|
| Transfer: | Notwithstanding anything to the contrary in Section 7 of the ISDA Form, Party A may assign its rights and obligations under this Transaction, in whole and not in part, to any Affiliate of Lehman Brothers Holdings Inc. |
| Governing Law: | The laws of the State of New York (without reference to choice of law doctrine); provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election. |
| Waiver of Trial by Jury: | Insofar as is permitted by law, Party A and Party B irrevocably waive any and all rights to trial by jury in any legal proceeding in connection with this Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Transaction. |
| Termination Currency: | USD; provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election. |

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (+1) 646-758-6317 (United States of America), Attention: Confirmations Group.

Yours sincerely,                          Accepted and agreed to:

Lehman Brothers Commercial                Good Morning Shinhan Securities Co., Ltd.
Corporation Asia Limited


By: _____                     By: _____
Name: Lokki Woo                           Name:
Title: Authorized Signatory               Title:    Kee Wook, Lee
                                                    Head of Process Innovation & Service Dept.

Execution time will be furnished upon Counterparty's written request.

Appendix I

| | Column 1 | Column 3 | Column 4 | Column 4 | Column 5 | Column 6 | Column 7 |
|---|---|---|---|---|---|---|---|
| i | Shares | Bloomberg Code | Exchange | Initial Reference Price (KRW), $P_{i,0}$ | Knock-in Price (KRW), 80% x $P_{i,0}$ | Knock-out Price I (KRW), 100% x $P_{i,0}$ | Knock-out Price II (KRW), 110% x $P_{i,0}$ |
| 1 | HSBC Holdings Plc | 5 HK Equity | Hong Kog Stock Exchange | HKD133.70 | HKD106.96 | HKD133.70 | HKD147.07 |
| 2 | Deutsche Bank AG | DBK GY Equity | XETRA Stock Exchange | EUR94.04 | EUR75.232 | EUR94.04 | EUR103.444 |
| 3 | Merrill Lynch & Co | MER UN Equity | New York Stock Exchange | USD79.90 | USD63.92 | USD79.90 | USD87.89 |
| 4 | Mitsubishi UFJ Financial Group | 8036 JT Equity | Tokyo Stock Exchange | JPY1,310,000 | JPY1,048,000 | JPY1,310,000 | JPY1,441,000 |

Appendix II

| Column 1 | Column 2 | Column 3 | Column 4 |
|---|---|---|---|
| Period | Knock-out Determination Day I | Knock-out Settlement Date | Knock-out Settlement Amount |
| 1 | 10 September 2007 | 14 September 2007 | Equity Notional Amount x (100% + 0.5 x Annual Return) / $FX_t$ |
| 2 | 10 March 2008 | 14 March 2008 | Equity Notional Amount x (100% + 1.0 x Annual Return) / $FX_t$ |
| 3 | 8 September 2008 | 12 September 2008 | Equity Notional Amount x (100% + 1.5 x Annual Return) / $FX_t$ |
| 4 | 9 March 2009 | 13 March 2009 | Equity Notional Amount x (100% + 2.0 x Annual Return) / $FX_t$ |
| 5 | 9 September 2009 | 15 September 2009 | Equity Notional Amount x (100% + 2.5 x Annual Return) / $FX_t$ |

EXHIBIT A
PAGE 98

# EXHIBIT 5

# LEHMAN BROTHERS

### Transaction

| | |
|---|---|
| Date: | 15 June, 2007 |
| To: | Good Morning Shinhan Securities Co., Ltd. |
| | Attention:      Documentation Unit |
| From: | Lehman Brothers Commercial Corporation Asia Limited |
| | c/o Lehman Brothers Asia Limited |
| | Confirmations Group |
| | Facsimile:      (+1) 646-758-6317 (United States of America) |
| | E-Mail:      aseqdstrconf@lehman.com |
| Effort Id: | 1416327 |
| Global Id: | 3091191 |

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers Commercial Corporation Asia Limited ("Party A") acting as principal, and Good Morning Shinhan Securities Co., Ltd. ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

This Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition, you and we agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form"), with such modifications as you and we will in good faith agree. Upon the execution by you and us of such an agreement, this Confirmation shall supplement, form a part of, and be subject to that agreement (the "Agreement"). All provisions contained or incorporated by reference in the Agreement, upon its execution, will govern this Confirmation except as expressly modified below. Until we execute and deliver the Agreement, this Confirmation, together with all other documents confirming transactions entered into between us and referring to the ISDA Form, shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement in such form (but without any Schedule) on the Trade Date of this Transaction. In the event of any inconsistency between the provisions of that agreement, or the Agreement, when executed, and this Confirmation, this Confirmation will prevail for the purpose of this Transaction.

The definitions and provisions contained in the 2002 ISDA Equity Derivatives Definitions (the "Equity Definitions") and the 2000 ISDA Definitions (the "Swap Definitions", and together with the Equity Definitions, the "Definitions"), in each case as published by the International Swaps and Derivatives Association, Inc. ("ISDA") are incorporated into this Confirmation. References herein to "Transaction" shall be deemed references to "Swap Transaction" for purposes of the Swap Definitions. In the event of any inconsistency between the Equity Definitions and the Swap Definitions, the Equity Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

Lehman Brothers Asia Limited ("LBAL") is acting as agent on behalf of Party A for this Transaction. LBAL has no obligations, by guarantee, endorsement or otherwise, with respect to the performance of this Transaction by Party A.

Lehman Brothers Commercial Corporation Asia Limited
26/F Two International Finance Center 8 Finance street Central Hong Kong

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

Party B represents that it is not in possession of any material non-public information concerning the business, operations or prospects of the Issuer(s) and was not in possession of any such information at the time of placing any order with respect to the Transaction.

"Material" information for these purposes is any information to which an investor would reasonably attach importance in reaching a decision to buy, sell or hold any securities of the Issuer(s).

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Trade Date: | 31 May 2007 |
| Effective Date: | 8 June 2007 |
| Termination Date: | 2 June 2010, subject to adjustment in accordance with the Following Business Day Convention and subject to early termination in accordance with the Knock-out Event provisions below. |
| Basket: | The basket of Indices specified in Column 1 of Appendix I, as further identified by the code specified in Column 2 of Appendix I. |
| Exchange(s): | For each Index in the Basket, as specified in Column 3 of Appendix I |
| Related Exchange(s): | All Exchanges |
| Initial Reference Price: | For each Index in the Basket, as specified in Column 4 of Appendix I ($P_{i,0}$) |
| Initial Payment: | USD9,356,691.47 to be paid by Party B to Party A on the Effective Date, subject to adjustment in accordance with the Following Business Day Convention. For the avoidance of doubt, the Initial Payment is calculated in accordance with the following formula: |

(Equity Notional Amount / Initial Exchange Rate) x Initial Exchange Percentage

where:

**EXHIBIT A
PAGE 101**

Equity Notional Amount has the meaning as defined below;

"Initial Exchange Rate" means KRW927.30/USD1.00; and

"Initial Exchange Percentage" means 98.15%.

**Knock-out Event:** A "Knock-out Event" occurs where, (i) the level of all Knock-out Reference Securities in the Basket as of the Valuation Time on any Knock-out Determination Day I are equal to or greater than their respective Knock-out Prices I, or (ii) the level of all Knock-out Reference Securities in the Basket as of the Valuation Time on any Knock-out Determination Day II are equal to or greater than their respective Knock-out Prices II.

Upon the occurrence of a Knock-out Event, Party A shall pay to Party B the relevant Knock-out Settlement Amount on the relevant Knock-out Settlement Date and all the other rights and obligations of Party A and Party B in respect of the Transaction shall be terminated.

**Knock-out Price I:** For each Index in the Basket, as specified in Column 6 of Appendix I.

**Knock-out Price II:** For each Index in the Basket, as specified in Column 7 of Appendix I.

**Knock-out Reference Securities:** The Indices in the Basket

**Knock-out Determination Days I:** Each date as specified in Column 2 of Appendix II, subject to adjustment in accordance with the Following Business Day Convention.

**Knock-out Determination Days II:** Any Scheduled Trading Day form and including the Trade Date to and including the Knock-out Determination Day I of the then current Period for Period 1, and from and excluding the Knock-out Determination Day I of the previous Period to and including the Knock-out Determination Day I of the then current Period for subsequent Periods.

**Knock-out Valuation Time:** The Scheduled Closing Time on the Exchange on the Knock-out Determination Days I and the Knock-out Determination Days II.

**Knock-out Settlement Amount:** The amount in USD, as determined using the relevant formula specified in Column 4 of Appendix II:

where,

"Annual Return" means 10.00%;

"FX," means the Exchange Rate on the first Business Day following the final Knock-out Determination Day

**EXHIBIT A**
**PAGE 102**

in the relevant Period (as specified in Column 1 of Appendix II);

"Exchange Rate" means the spot KRW/USD exchange rate, expressed as the amount of Korean Won per US dollar, as agreed between Party A and Party B, failing which the spot KRW/USD exchange rate as determined by the Calculation Agent with reference to such rate as displayed under "USD today" on the Reuters page "KFTC18" at around 4:00 p.m. (Seoul time). If it is impracticable for the Calculation Agent to make reference to Reuters page "KFTC18", the rate shall be determined by the Calculation Agent in good faith and in a commercially reasonable manner.

For the avoidance of doubt, the Business Days for Initial Payment and Knock-out Settlement Date shall be used for determining the Business Days for Exchange Rate.

| | |
|---|---|
| Knock-out Settlement Date: | The third Business Day immediately following the Knock-out Determination Day I, and which are currently expected to fall on the dates set out in Column 3 of Appendix II. |
| Knock-in Event: | Notwithstanding Section 1.44 of the Equity Definitions, "Knock-in Event" means an event where one or more Indices in the Basket trade on the relevant Exchange at a price which is less than their respective Knock-in Prices, at any time during regular trading hours on any Scheduled Trading Day from (and including) the Trade Date to (and including) the Valuation Date. |
| Knock-in Price: | Notwithstanding Section 1.42 of the Equity Definitions, each Index in the Basket shall have the Knock-in Price as specified in Column 5 of Appendix I. |
| Business Days for Knock-out Determination Day(s): | Tokyo |
| Business Days for Initial Payment and Knock-out Settlement Date: | Seoul and New York |
| Equity Amounts payable by Party A: | |
| Equity Amount Payer: | Party A |
| Equity Amount Receiver: | Party B |
| Equity Notional Amount: | KRW8,840,000,000 |
| Equity Amounts payable by Party A: | Notwithstanding Section 8.6 of the Equity Definitions, an amount in USD determined in accordance with the following formula: |

(1) (i) If the level of all the Indices in the Basket as of

Page 4 of 13
Risk ID: T065353 / Effort ID: 1416327 / Global Deal ID: 3091191

the Valuation Time on the Valuation Date are equal to or greater than their respective Knock-out Prices I, or (ii) if the level of all Indices in the Basket as of the Valuation Time are equal to or greater than their respective Knock-out Prices II on any Scheduled Trading Day from and excluding the last Knock-out Determination Day I to and including Valuation Date, then Party A Equity Amount shall be calculated in accordance with the following formula:

Equity Notional Amount x (100% + 3 x Annual Return) / $FX_F$

(2) Or, if the level of the Worst Performing Index "X" (as defined below) in the Basket as of the Valuation Time on the Valuation Date is less than its Knock-out Price I and a Knock-in Event has occurred, but Knock-out Event has not occurred, then Party A Equity Amount shall be calculated in accordance with the following formula:

Equity Notional Amount / $FX_F$

(3) Or, if the level of the Worst Performing Index "X" in the Basket as of the Valuation Time on the Valuation Date is less than its Knock-out Price I and neither Knock-in Event nor Knock-out Event has occurred, then Party A Equity Amount shall be calculated in accordance with the following formula:

Equity Notional Amount x 118% / $FX_F$

where,

"Worst Performing Index "X"" means, as determined by the Calculation Agent in its sole and absolute discretion, the Index in the Basket which has the lowest value on Valuation Date according to the following formula:

$(P_{i,F} / P_{i,0}) - 1$

with "$P_{i,F}$" being the level of the relevant Index in the Basket as of the Valuation Time on Valuation Date;

"$FX_F$" means the Exchange Rate on the first Business Day following the Valuation Date.

In the event that the Calculation Agent determines the above formula produces two or more Indices in the Basket with the same performance on Valuation Date, then the Calculation Agent shall, in its sole discretion (acting reasonably and in a commercially reasonable manner) select one of such Indices to be the Worst Performing Index "X".

| | |
|---|---|
| Index Disclaimer: | Applicable |
| Additional Acknowledgments: | Applicable |
| Convertibility Event: | An event which has the effect of preventing, limiting or otherwise restricting foreign exchange transactions involving the Relevant Currency through legal channels (including, without limitation, any such prohibition, limitation or restriction affecting the conversion or delivery of the Relevant Currency into the Settlement Currency, the delivery of the Settlement Currency from accounts within the Relevant Country to accounts outside such jurisdiction or the delivery of the Relevant Currency between accounts within the Relevant Country to a person who is a non-resident of that jurisdiction), including any action by any authority of the Relevant Country in the event of natural calamities, wars, conflict or arms or grave and sudden changes in domestic or foreign economic circumstances or other similar circumstances pursuant to any law or regulation of the Relevant Country. |
| Relevant Country: | Republic of Korea |
| Relevant Currency: | The lawful currency of the Relevant Country |
| Consequences of a Convertibility Event: | If the Calculation Agent determines in its sole discretion that a Convertibility Event has occurred and is continuing on the Exercise Date, Payment Dates, Cash Settlement Payment Dates, the date that any other amount is payable by Party A, or the date that the Transaction terminates or cancels, that prevents Party A from performing its obligations with respect to the Transaction and/or that prevents the Hedging Party from accessing, liquidating, unwinding or otherwise disposing of any assets or instruments denominated in the Relevant Currency as such party may hold, directly or indirectly, as part of the arrangements made to hedge the equity price risk of entering into and performing Party A's obligations with respect to the Transaction and/or that prevents the Hedging Party from converting the proceeds from the sale or the unwinding or the disposal of any such assets or instruments into the Settlement Currency, then the determination of any amount that may be payable by Party A, or any early termination amount, as the case may be, and/or Party A's obligation to pay such amount, as the case may be, to Party B shall be postponed until the Business Day which falls the same number of Business Days |

**EXHIBIT A
PAGE 105**

| | |
|---|---|
| Valuation Date: | 28 May 2010, subject to adjustment in accordance with the Following Business Day Convention. |
| Equity Notional Reset: | Not Applicable |
| Business Day for Valuation Date: | Seoul |
| Floating Amount: | Not applicable. No Floating Amount shall be payable by either party. |

**Settlement Terms:**

| | |
|---|---|
| Cash Settlement: | Applicable |
| Settlement Currency: | USD (all amounts shall be converted to USD at the Exchange Rate by the Calculation Agent in a commercially reasonable manner) |
| Cash Settlement Payment Dates: | 2 June 2010, subject to adjustment in accordance with the Following Business Day Convention. |
| Business Days for Settlement Date: | Seoul and New York |

**Index Adjustment Event:**

| | |
|---|---|
| Index Cancellation: | Calculation Agent Adjustment |
| Index Modification: | Calculation Agent Adjustment |
| Index Disruption: | Calculation Agent Adjustment |

**Additional Disruption Events:**

| | |
|---|---|
| Change in Law: | Applicable; provided that Section 12.9(a)(ii)(B) is replaced in its entirety as follows: "(B) due to the promulgation of or any change in the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law or regulation (including any action taken by a taxing authority), the Calculation Agent determines in good faith that it has become illegal to hold, acquire or dispose of Hedge Positions relating to such Transaction". |
| Hedging Disruption: | Applicable |
| Hedging Party: | Party A |
| Increased Cost of Hedging: | Applicable |
| Hedging Party: | Party A |
| Determining Party: | Party A |

**Additional Representations, Agreements and Acknowledgments:**

| | |
|---|---|
| Non-Reliance: | Applicable |
| Agreements and Acknowledgments Regarding Hedging Activities: | Applicable |

EXHIBIT A
PAGE 106

after the Business Day on which such Convertibility Event ceases to exist as the Cash Settlement Payment Date was originally scheduled to be after the relevant Valuation Date.

For the avoidance of doubt, if a Convertibility Event coincides with a Market Disruption Event, the above provisions shall take effect only after such postponements or adjustments have been made as a result of such Market Disruption Event and Party A's obligation to pay an amount that may be payable by Party A, as the case may be, shall continue to be postponed in accordance with the above provisions. Further, the occurrence of a Convertibility Event will not constitute an Event of Default and no interest or other sum shall accrue to Party B in the event that any payment is postponed.

**Unwinding:**

Under normal market conditions, and upon request from Party B, Party A shall provide an indicative unwind price (in respect of all or part of the Equity Notional Amount of this Transaction). Any full or partial unwind of this Transaction will be subject to final agreement between Party A and Party B.

**Representations:**

Section 3 of the ISDA Form is hereby amended by adding the following additional subsections:

(g) *No Reliance.* It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction, it being understood that information and explanations related to the terms and conditions of this Transaction will not be considered investment advice or a recommendation to enter into this Transaction. No communication (written or oral) received from the other party will be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(h) *Assessment and Understanding.* It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of this Transaction.

(i) *Status of Parties.* The other party is not acting as a fiduciary for or an advisor to it in respect of

this Transaction.

(j)     *No Agency*. It is entering into this Transaction, as principal and not as agent of any person or entity.

**Additional Representations of Party B:**     Party B represents to Party A in accordance with Section 3 of the ISDA Form (which representations will be deemed to be repeated by Party B at all times that this Transaction is outstanding) that:

(i)     It is a "professional investor", as such term is defined in the Securities and Finance Ordinance (Cap.571) of Hong Kong and any rules made under that Ordinance.

**Additional Termination Event:**     Each of the following shall constitute an Additional Termination Event (provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence):–

(i)     Sovereign Event. Party B is not able to discharge its obligations with respect to this Transaction through the relevant booking office as a result of any law (other than bankruptcy, insolvency or similar laws), order or other action by, or threat of any such law, order or other action by or on behalf of, any governmental or other similar authority (de jure or de facto) at the location of such office. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(ii)     Non-Convertibility Event. Party A has determined in its sole discretion that either of the following has occurred and that any such occurrence has not been satisfactorily cured: (1) a local market condition has had the effect of prohibiting, restricting or delaying (x) the free and unconditional exchange of Korean Won for USD or (y) the free and unconditional transferability of any USD resulting from any such exchange or (2) an action or failure to act by the government of the Republic of Korea or any agency or regulatory authority thereof has had the effect of prohibiting, restricting or delaying (x) the free and unconditional exchange of Korean Won for USD or (y) the free and unconditional transferability of any

EXHIBIT A
PAGE 108

USD resulting from any such exchange. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(iii) **Adequate Assurances.**  Party B fails to give Party A adequate assurances of Party B's ability to perform any of its obligations under this Transaction within one (1) Local Business Day of a written request to do so.  For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(iv) **Material Adverse Change.**  Party A has determined in its sole discretion that Party B has experienced or is experiencing a material adverse change in its business, assets, operations or financial condition. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

**Additional Events of Default:**         Section 5(a) of the ISDA Form shall be amended as follows:

(1)    deleting the word "or" at the end of Section 5(a)(vii);

(2)    deleting the full stop at the end of Section 5(a)(viii) and substituting therefor a semi-colon and the word "or"; and

(3)    adding the following additional subsections:

"(ix)    The voluntary or involuntary suspension of all or substantially all of Party B's business activities or the issuance of a court order or an administrative or other similar order to suspend or revoke any of its business licenses in whole or in part;

(x)    A court of the Republic of Korea or the governmental authorities of the Republic of Korea issue an attachment order or a provisional attachment order against any payment or delivery owed to  Party B under this Transaction;

(xi)    Party B is disqualified from a bill clearing house in the Republic of Korea; or

(xii)    The net capital ratio of Party B as defined in the Regulation on Supervision of Securities

**EXHIBIT A
PAGE 109**

Business of the Republic of Korea falls below 150%. Such net capital ratio shall be calculated in accordance with the Regulation on Supervision of Securities Business in effect as of the Trade Date, provided, however, that Party A may elect, in its sole discretion, to calculate the net capital ratio in accordance with (i) any revised Regulation on Supervision of Securities Business that may be in effect from time to time after the Trade Date or (ii) any successor law, rule or regulation that may be adopted by the Republic of Korea."

**Miscellaneous:**

FETR

Party B represents to Party A (which representation will be deemed to be repeated by Party B at all times until the termination of this Transaction) that this Transaction and each payment made or received in connection with this Transaction is in accordance with all applicable provisions of the Foreign Exchange Transaction Regulations of the Republic of Korea in effect as of the time of entering into this Transaction and as of the time any payment is made or received in connection with this Transaction.

Failure to Pay or Deliver

Section 5(a)(i) of the ISDA Form is hereby amended by deleting the word "third" and inserting in lieu thereof the word "first".

Calculation Agent:

Party A

Office:

For the purposes of this Transaction, Party A is not a Multibranch Party, and Party B is not a Multibranch Party.

Transfer:

Notwithstanding anything to the contrary in Section 7 of the ISDA Form, Party A may assign its rights and obligations under this Transaction, in whole and not in part, to any Affiliate of Lehman Brothers Holdings Inc.

Governing Law:

The laws of the State of New York (without reference to choice of law doctrine); provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election.

Waiver of Trial by Jury:

Insofar as is permitted by law, Party A and Party B irrevocably waive any and all rights to trial by jury in any legal proceeding in connection with this Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into

EXHIBIT A
PAGE 110

this Transaction.

Termination Currency:                    USD; provided, however, any provision to the
                                         contrary in the Agreement, when executed, shall take
                                         precedence over this election.

Please confirm your agreement with the foregoing by executing this Confirmation and returning such
Confirmation, in its entirety, to us at facsimile number (+1) 646–758–6317 (United States of America),
Attention: Confirmations Group.

Yours sincerely,                         Accepted and agreed to:

**Lehman Brothers Commercial**           Good Morning Shinhan Securities Co., Ltd.
**Corporation Asia Limited**

By:                                      By:
Name: Lokki Woo                          Name:
Title: Authorized Signatory              Title:    Kee Wook, Lee
                                                   Head of Process Innovation & Service Dept.

Execution time will be furnished upon Counterparty's written request.

**EXHIBIT A**
**PAGE 111**

## Appendix I

| | Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 |
|---|---|---|---|---|---|---|---|
| i | Index | Bloomberg Code | Exchange | Initial Reference Price, $P_{i,0}$ | Knock-in Price, 80% x $P_{i,0}$ | Knock-out Price I, 100% x $P_{i,0}$ | Knock-out Price II, 115% x $P_{i,0}$ |
| 1 | NIKKEI 225 | NKY Index | Tokyo Stock Exchange | 17,936.0100 | 14,348.8080 | 17,936.0100 | 20,626.4115 |
| 2 | TSEREIT | TSEREIT Index | Tokyo Stock Exchange | 2,589.8900 | 2,071.9120 | 2,589.8900 | 2,978.3735 |

## Appendix II

| Column 1 | Column 2 | Column 3 | Column 4 |
|---|---|---|---|
| Period | Knock-out Determination Day I | Knock-out Settlement Date | Knock-out Settlement Amount (in USD) |
| 1 | 4 December 2007 | 7 December 2007 | Equity Notional Amount x (100% + 0.5 x Annual Return) / $FX_t$ |
| 2 | 4 June 2008 | 10 June 2008 | Equity Notional Amount x (100% + 1.0 x Annual Return) / $FX_t$ |
| 3 | 4 December 2008 | 9 December 2008 | Equity Notional Amount x (100% + 1.5 x Annual Return) / $FX_t$ |
| 4 | 4 June 2009 | 9 June 2009 | Equity Notional Amount x (100% + 2.0 x Annual Return) / $FX_t$ |
| 5 | 4 December 2009 | 9 December 2009 | Equity Notional Amount x (100% + 2.5 x Annual Return) / $FX_t$ |

# EXHIBIT 6



**LEHMAN BROTHERS**
## Structured Equity Solutions

### Callable Equity Linked Swap on a Basket of two Korean stocks, (005490.KS + 055550.KS), denominated in US dollars

*Prospective purchasers should carefully consider the contents of this term sheet. This term sheet will constitute a binding agreement upon you signing or otherwise consenting to the terms set out below*

### The Swap Final Terms and Conditions

### Part 1 - GENERAL TERMS:

| | |
|---|---|
| Party A: | Lehman Brothers Commercial Corporation Asia Limited |
| Party B: | Goodmorning Shinhan Securities Co. Ltd,. |
| Principal Guarantee: | 100% Principal Guarantee |
| Underlying Basket: | A basket made up of the 2 shares (each a "Share") as shown in the table below: |

| I | Shares | Bloomberg Code | Initial Reference Price (KRW), $P_{i,0}$ | Trigger Price (KRW), 100% * $P_{i,0}$ |
|---|---|---|---|---|
| 1 | POSCO | 005490.KS | 379,666.00 | 379,666.00 |
| 2 | Shinhan Financial Group Ltd | 055550.KS | 54,033.00 | 54,033.00 |

| | |
|---|---|
| Settlement Currency: | US Dollar |
| Notional Amount ("NA"): | KRW 6,000,000,000 which is equivalent to Us Dollar ("USD") USD 5,424,954.79 at the $FX_0$ |
| Trade Date: | 10 September 2008 |
| Effective Date: | 16 September 2008 |
| Valuation Dates: | 5 March 2010, provided that if such day is not a Scheduled Trading Day, then the immediately following Scheduled Trading Day shall be the Valuation Date |
| Termination Date: | The earlier of (1) 10 March 2010 and (2) the Early Termination Date relating to the Observation Period during which the Early Termination Event takes place |
| Initial Reference Price ($P_{i,0}$): | N/A |
| Initial Exchange Percentage: | 2.50% |
| Initial Exchange Amount: | USD 135,623.87 |

$$(=\text{Notional Amount} \times \left(\frac{1}{FX_0}\right) \times \text{Initial Exchange Percentage})$$

Party B shall pay party A the Initial Exchange Amount for value on the Effective Date.

| | |
|---|---|
| Initial Fixing Date: | N/A |
| $FX_0$: | USD1:KRW 1,106.00 |

**EXHIBIT A**
**PAGE 114**




## Structured Equity Solutions

the spot KRW/USD exchange rate as determined by the Calculation Agent with reference to such rate as displayed under "USD today" on the Reuters Page "KFTC 18" at around 4:00 p.m.(Seoul time) on 11 September 2008

**FX₁:**    the Exchange Rate on the first Business Day following the final Observation Date in the relevant Observation Period

**FX_F**    the Exchange Rate on the first Business Day following the final Valuation Date

**Exchange Rate:**    The spot KRW/USD exchange rate, expressed as the amount of Korea Won per US dollar, as agreed between Party A and Party B, failing which the spot KRW/USD exchange rate as determined by the Calculation Agent with reference to such rate as displayed under "USD today" on the Reuters Page "KFTC 18" at around 4:00 p.m.(Seoul time) on (a) the first day Business Day following the final Observation Date in the relevant Observation Period, and (b) the first Business Day following the final Valuation Date, as applicable. Provided that if it is impracticable for the Calculation Agent to make reference to Reuters page "KFTC18", the rate shall be determined by the Calculation Agent in a commercially reasonable manner.

**Exchange:**    The Korea Exchange

**Related Exchange(s):**    All Exchanges

**Annual Return:**    8.00%

**Strike:**    100%

**Trigger Price:**    100% of the Initial Reference Price of the relevant Share in the Underlying Basket

**Early Termination Event:**    "Early Termination Event" means, in respect of any Observation Period, the official closing prices of all of the Shares in the Underlying Basket are equal to or greater than their respective Trigger Prices on the Observation Date of the relevant Observation Period. For the avoidance of doubt, the first Exchange Business Day of the 1st Observation Period is given as the Trade Date

**Consequence of
Early Termination Event**    In the event an Early Termination Event occurs, this Transaction will be automatically terminated on the Early Termination Date of the relevant Observation Period. Such Settlement Date will then be deemed as the Termination Date and both Party A and Party B will not have further obligations under this Transaction after such Termination Date

**Observation Dates:**    See below

**Early Redemption Amount:**

| Observation Period | Observation Date | Early Termination Date | Early Termination Amount |
|---|---|---|---|
|  |  |  |  |




## Structured Equity Solutions

| 1 | 12 September 2008 | 18 September 2008 | NA * (1.5 * Annual Return) / $FX_t$ |
|---|---|---|---|
| 2 | 12 March 2009 | 17 March 2009 | NA * (2.0 * Annual Return) / $FX_t$ |
| 3 | 11 September 2009 | 16 September 2009 | NA * (2.5 * Annual Return) / $FX_t$ |

In the event that any scheduled Observation Date is not a Scheduled Trading Day, then the relevant Observation Date shall be the first following Scheduled Trading Day, subject to the provisions under the "Effect of a Disrupted Day".

**Scheduled Trading Day:** Any day (i) in respect of a Share in the Underlying Basket, on which the Exchange and any Related Exchange are open for trading during their respective regular trading sessions; and (ii) on which commercial banks are open for business (including dealing in foreign exchange in accordance with the market practice of the foreign exchange market) in Korea.

**Disrupted Day** Any Scheduled Trading Day on which the Exchange fails to open for trading during its regular trading session or on which a Market Disruption Event has occurred

**Effects of a Disrupted Day:** If there is a Disrupted Day in relation to a Share in the Underlying Basket on any date which would otherwise have been a Valuation Date or an Observation Date (as the case may be), then such Valuation Date or Observation Date (as the case may be) shall be the first succeeding Scheduled Trading Day that is not a Disrupted Day in relation to that Share in the Underlying Basket, unless there is a Disrupted Day relating to that Share in the Underlying Basket on each of the eight Scheduled Trading Days immediately following the date that, but for the failure to open for trading during its regular trading session or the Market Disruption Event, would have been such Valuation Date or Observation Date (as the case may be). In that case:

a) that eighth following Scheduled Trading Day shall be deemed to be the Valuation Date or Observation Date (as the case may be) in relation to such Share in the Underlying Basket notwithstanding it is a Disrupted Day; and

b) the Calculation Agent, in consultation with Party B, shall determine in its good faith estimate of the Exchange traded price for that Share in the Underlying Basket that would have prevailed but for that Disruption Day as of the Scheduled Closing Time on the relevant Exchange on that eighth following Scheduled Trading Day.

**Market Disruption Event:** Section 6.3(a) of the 2002 ISDA Equity Derivatives Definitions shall apply

**Business Day for Observation and Valuation Date:** Seoul

**Settlement Business Days:** A day (excluding Saturday and Sunday) on which commercial banks are open for business (including dealings in foreign exchange in accordance




**LEHMAN BROTHERS**

**Structured Equity Solutions**

|  | with the market practice of the foreign exchange market) in Seoul and New York |
|---|---|
| Calculation Agent: | Party A |
| Adjustments: | |
| Method of Adjustment: | Calculation Agent Adjustment(in consultation with Party B) |
| Extraordinary Events: | |
| Consequences of Merger Events: | |
| Share-for-Share: | Modified Calculation Agent Adjustment |
| Share-for-Other: | Modified Calculation Agent Adjustment |
| Share-for-Combined: | Modified Calculation Agent Adjustment |
| Determining Party: | Calculation Agent |
| Tender Offer: | Applicable |
| Consequences of Tender Offer: | |
| Share-for-Share: | Modified Calculation Agent Adjustment |
| Share-for-Other: | Modified Calculation Agent Adjustment |
| Share-for-Combined: | Modified Calculation Agent Adjustment |
| Determining Party: | Calculation Agent |
| Nationalization, Insolvency or Delisting: | Cancellation and Payment (Calculation Agent Determination) |
| Determining Party: | Calculation Agent |
| Additional Disruption Events: | |
| Failure to Deliver: | Applicable |
| Determining Party: | Calculation Agent |
| **Non-Reliance:** | Applicable |
| **Agreements and Acknowledgments** | |
| **Regarding Hedging Activities:** | Applicable |
| **Additional Acknowledgments:** | Applicable |
| Convertibility Event: | An event which has the effect of preventing, limiting or otherwise restricting foreign exchange transactions involving the Relevant Currency through legal channels (including, without limitation, any such prohibition, limitation or restriction affecting the conversion or delivery of the Relevant Currency into the Settlement Currency, the delivery of the Settlement Currency from accounts within the Relevant Country to accounts outside such jurisdiction or the delivery of the Relevant Currency between accounts within the Relevant Country to a person who is a non-resident of that jurisdiction), including any action by any authority of the Relevant Country in the event of natural calamities, wars, conflict or arms or grave and sudden changes in domestic or foreign economic circumstances or other similar circumstances pursuant to any law or regulation of the Relevant Country. |
| **Relevant Country:** | Korea |
| **Relevant Currency:** | The lawful currency of the Relevant Country |
| **Consequences of a Convertibility Event:** | If the Calculation Agent determines in a commercially reasonable manner that a Convertibility Event has occurred and is continuing on the Exercise |




**LEHMAN BROTHERS**
### Structured Equity Solutions

Date, Payment Dates or the date that the Transaction terminates or cancels, that prevents Party A (or any of its affiliates) from performing its obligations with respect to the Transaction and/or that prevents the Hedging Party from accessing, liquidating, unwinding or otherwise disposing of any assets or instruments denominated in the Relevant Currency as such party may hold, directly or indirectly, as part of the arrangements made to hedge the equity price risk of entering into and performing Party A's obligations with respect to the Transaction and/or that prevents the Hedging Party from converting the proceeds from the sale or the unwinding or the disposal of any such assets or instruments into the Cash Settlement Currency, then the determination of the Equity Amount, the Cancellation Amount or any early termination amount, as the case may be, and/or Party A's obligation to pay such amount, as the case may be, to shall be postponed until the Business Day which falls the same number of Business Days after the Business Day on which such Convertibility Event ceases to exist as the Cash Settlement Payment Date was originally scheduled to be after the relevant Valuation Date.

| | |
|---|---|
| **Documentation:** | Long form confirmation. Any capitalized terms used herein and not otherwise defined shall, unless the context otherwise requires, have the meaning ascribed to them in the 2000 ISDA Definitions or the 2002 ISDA Equity Derivatives Definitions, as the case may be (the "Definitions") |
| **Unwinding:** | Party A will provide an indicative value of the Transaction (the "Indicative Market Value") to Party B upon a request from Party B, provided that the request falls on an Exchange Business Day and there is no Market Disruption Event, upon which the request will be fulfilled by Party A on the following Exchange Business Day where there is no Market Disruption Event. |

In the event that Party B notifies Party A in writing that it wishes to unwind the Transaction in whole or in part (if in part such unwinding is subject to a minimum Nominal Amount of USD10,000), Party A will provide an Indicative Market Value determined by Party A acting in good faith with a bid offer spread of 1%.

Party B may then give notice to Party A confirming the exact Nominal Amount to be unwound and Party A, acting in good faith as soon as practicable depending on prevailing market conditions, will notify Party B :

1) of the amount due by a party to the other in respect of the Nominal Amount to be unwound; and
2) the identity of the party liable for such payment.

Such amount will be paid by the party liable for such payment to the other party on the third Currency Business Day following the day on which the above mentioned notice is sent by Party A to Party B.

| | |
|---|---|
| **Governing Law:** | New York Law |

## Part  2  - FLOATING RATE AMOUNT
**Floating Rate Amount**




**Structured Equity Solutions**

| | |
|---|---|
| **Payer:** | Party B |

Party B shall pay Floating Rate, Actual/365 (Fixed), on the Notional Amount on each Floating Rate Payer Payment Date translated to USD based on KRW/USD Exchange Rate on the second Business Day immediately preceding the relevant Floating Rate Payer Payment Date as determined by the Calculation Agent.

Floating Rate Payer Calculation Amount shall accrue from (and including) a Floating Rate Payer Payment Date to (and excluding) the next relevant Floating Rate Payer Payment Date provided that for the purpose of the first Floating Rate Payer Payment Date, Floating Rate Payer Calculation Amount shall accrue from (and including) the Effective Date to (and excluding) the first Floating Rate Payer Payment Date falling in December 2008.

If an Early Termination Event had occurred before any following Floating Rate Payment Date, then Party A will receive the accrued amount from (and including) the previous Floating Rate Payer Payment Date to (and excluding) the following Early Termination Date, in which Floating Rate Payer Payment Date will be the Early Termination Date.

**Floating Rate Payer Payment Date**

On every December 16th, March 16th, June 16th, September 16th, and starting on December 16th 2008 and ending on Termination Date, subject to adjustment in accordance with the Following Business Day Convention.

For the avoidance of doubt, on the date that Party A shall pay its final Equity Amount under this transaction (the "Party A Final Payment Date"), Party B shall pay a Floating Rate Payer Calculation Amount calculated for the period from and including the immediately preceding Floating Rate Payer Payment Date to but excluding the Party A Final Payment Date (the "Party B Final Payment") and Party B shall have no further Floating Rate Payer Calculation Amount under this transaction.

Any Party B Final Payment shall be made on the Party A Final Payment Date. For the avoidance of doubt, Party B shall not be required to make any Party B Final Payment if the immediately preceding Floating Rate Payer Payment Date falls on the same day as the Party A Final Payment Date.

**Floating Rate**

The rate will be 120 basis points plus the Korea bond rate for 91 day certificates of deposit published by the Korean Securities Dealers Association which appears on Check screen Page 3220 under the caption "TODAY 15:30" as of 3:30 p.m. Seoul time (the "Rate Page") on the day that is one Seoul Business Day prior to the immediately preceding Floating Rate Payer Payment Date. If no such rate is quoted, the Floating Rate shall be determined by the Calculation Agent in a commercially reasonable manner.

However, the Floating Rate for the first Floating Rate Payer Payment Date will be the Korea bond rate for 91 day certificates of deposit that appears on the Rate Page on 12 September 2008.

## Part 3 - EQUITY AMOUNT

Party A and Party B Equity Amounts are only applicable if the Early Redemption Event never occurs

 

## Structured Equity Solutions

**Equity Amount Payer:**      Party A

**Equity Amount:**      (1) If the official closing prices of all of the Shares in the Underlying Basket on the Valuation Date are equal to or greater than their respective Trigger Prices then Party A Equity Amount shall be calculated in accordance with the following:

$$NA * (3 * \text{Annual Return}) / FX_F;$$

<u>OR ELSE</u>

(2) Equity Amount Payer will be Party B if the official closing prices of the Worst Performing Share in the Underlying Basket on the Valuation Date is less than the Trigger Price of the Worst Performing Share and a Early Termination Event has not occurred but a Knock-In Event has occurred, then Equity Amount shall be calculated in accordance with the following:

$$NA * \{1-P_{X,F} / [\text{Strike} * P_{X,0}]\} / FX_F$$

<u>OR ELSE</u>

(3) If the official closing price of the Worst Performing Share in the Underlying Basket on the Valuation Date is less than the Trigger Price of the Worst Performing Share and both Early termination Event and Knock-In Event have not occurred, then Party A Equity Amount shall be calculated in accordance with the following:

$$NA * (\text{Conditional Return}) / FX_F$$

where for (2) and (3) above, Worst Performing Share "X" means, as determined by the Calculation Agent in its sole and absolute discretion, the *ith* Share in the Underlying Basket which has the lowest value on the Valuation Date according to the following formula:

$$(P_{LF} / P_{L0}) - 1$$

with $P_{LF}$ being the official closing price of the *ith* Share in the Underlying Basket on the Valuation Date.

In the event that the Calculation Agent determines the above formula produces two or more Shares in the Underlying Basket with the same lowest performance on the relevant Valuation Date, then the Calculation Agent shall, in its sole discretion (acting reasonably and in a commercially reasonable manner) select one of such Shares to be the Share with the lowest performance.

**Equity Amount Payment Date:**      Termination Date

### RISK FACTORS

**SUITABILITY**
**Investors should determine whether an investment in the transaction is appropriate to their particular circumstances.** Prospective purchasers should consult with their own independent financial, legal, business and/or tax advisers to determine the consequences of an investment in the Transaction and to arrive at their own evaluation of the investment.

**MARKET RISK**
**The value of the Transaction will increase or decrease according to the performance of the Shares in the Underlying Basket.** The Transaction does not provide principal protection even if the Transaction is




**LEHMAN BROTHERS**
**Structured Equity Solutions**

held to maturity. There can be no assurance that the Transaction will return at maturity more than the amount initially invested.

**EVENT RISK**
There may be adjustments to the terms of the Transaction due to certain events. Examples include (but are not limited to) mergers and disposals, price source disruption, trading suspension and change in taxation laws, as set out in the Documentation.

**EARLY REDEMPTION RISK**
Prospective investors should be aware that the Issuer may, at its discretion, early redeem or terminate the Transaction prior to Maturity upon notice to investors under a variety of conditions and/or circumstances. For example, this may be applicable where the Issuer determines that, for reasons beyond its control, the performance of its obligations under the Transaction has become illegal or impractical in whole or in part for any reason; or the Issuer determines that, for reasons beyond its control, it is no longer legal or practical for it to maintain its hedging arrangements with respect to the Transaction for any reason. If the Issuer redeems the Transactions early under any of the conditions or circumstances permitted under the terms of the Transaction, the redemption amount may be lower than the principal amount of the Transaction.

**CORRELATION RISK**
In certain circumstances, the return on the Transaction is based on the performance of the lowest Share in the Underlying Basket, and as a result, the performance of the Transaction depends on the correlation between the different Shares in the Underlying Basket. You should consider the effect of diversification on the return. You should also be aware that the worst performing Share within the Underlying Basket may not perform when the other(s) rise, and having a diversified basket may reduce potential investment return.

**FOREIGN EXCHANGE RISK**
The Transactions are denominated in USD and will be redeemed in USD. Therefore, purchasers who require funds in other currencies will be exposed to the exchange rate risk between USD and the required currency.

**INTEREST RATE RISK**
Movements in interest rates will have an impact on the value of the Transactions. If interest rates move upwards, the value of the Transactions fall.

**EVENT RISK (including risk of substitution of the Shares)**
There may be adjustments to the terms of the Transactions due to events such as (but not limited to) mergers and disposals, price source disruption, trading suspension and change in taxation laws as set out in the Documentation. This may in certain cases, include the replacement of the Shares in the Underlying Basket.

**LIQUIDITY RISK**
There can be no assurance that a secondary market in the Transaction shall exist or at which price a bid would be made. The bid price given, if any, may be affected by many factors including, but not limited to, the remaining term of the Transaction, the performance of the Shares, interest rates, fluctuations in exchange rates and credit spreads. Prospective investors must be prepared to hold the Transactions for an indefinite period of time or until the redemption or maturity of the Transaction.

**CREDIT RISK**
Investors assume credit risk of the Issuer and the Guarantor. Prospective purchasers should also be aware that any changes to the credit rating of the Guarantor will affect the price and value of the Transaction.

**SETTLEMENT RISK**
Settlement may be temporarily prevented or delayed if a change occurs in the settlement rules of (i) the clearing system through which the Transactions are cleared or (ii) the country where the exchange or clearing system for any of the Underlying Shares is located due to emergencies or special situations, market conditions or legal holidays,

**POTENTIAL CONFLICTS OF INTEREST**
Potential and actual conflicts of interest might arise from the different roles played by Lehman Brothers in connection with the Transaction. Lehman Brothers and its affiliates are the Seller and the Calculation Agent, in respect of the Transaction. Prospective investors should seek independent advice as



**LEHMAN BROTHERS**
## Structured Equity Solutions

deemed appropriate to evaluate the risk of this potential conflict of interest. Although the Issuer and the Guarantor owe no duty or responsibility to you to avoid such conflicts, should any conflict of interests arise, Lehman Brothers will take reasonable steps to protect the interests of all affected parties and in doing so will act in a fair and commercially reasonable manner.

### DISCLAIMER

*This termsheet is binding and confirms any transaction described herein subject to any commercial information that may be incomplete or condensed or modified by mutual agreement. Under no circumstances may this termsheet be shown, copied or otherwise given to any person other than your authorised representatives. Scenario analysis of the risk involved in the above transaction is available upon your request.*

*Lehman Brothers does not act as an adviser and assumes no fiduciary responsibility or liability for any consequences financial or otherwise arising from the execution of this transaction. Before entering into this transaction you should consider the suitability of the transaction to your particular circumstances and independently review (with your professional advisers as necessary) the specific financial risks as well as the legal, regulatory, credit, tax and accounting consequences. Lehman Brothers, its affiliates and subsidiaries and/or their directors, officers and employees may (i) have long or short positions in and may deal as principal, agent or otherwise in the Shares or other securities issued by the issuer of the Shares, and such positions may be increased or decreased in the future, and (ii) maintain a commercial or investment banking relationship with the issuer of the Shares or of related entities.*

# EXHIBIT 7

**EXHIBIT A
PAGE 123**

LEHMAN BROTHERS

## Structured Equity Solutions

## Callable Swap Transaction Linked to 4 Stocks denominated in US dollars

**Indicative Terms and Conditions as of 10 September 2008. Prior to making any trading decision, prospective counterparties should carefully consider the contents of this term sheet and the risk factors set out herein.**

## The Swap Final Terms and Conditions

### Part 1 - General Terms:

| | |
|---|---|
| Party A: | Lehman Brothers Commercial Corporation Asia Limited |
| Party B: | Goodmorning Shinhan Securities Co. Ltd., |
| Trade Date: | 10 September 2008 |
| Effective Date: | 17 September 2008 |
| Termination Date: | The earlier of (1) 15 March 2010 and (2) the Early Termination Date |
| Underlying Basket: | A basket of 4 Shares (each a "Share") as shown in the table below, subject to removal pursuant to an Elimination Event. |

| I | Share | Bloomberg Code | Initial Reference Price , $(P_{i,0})$ | Knock-In Price , (80.00% * $P_{i,0}$) | Knock-Out Price , (110.00% * $P_{i,0}$) |
|---|---|---|---|---|---|
| 1 | HSBC Holdings Plc | 5 HK Equity | 133.70 | 106.96 | 147.07 |
| 2 | Deutsche Bank AG | DBK GY Equity | 94.04 | 75.232 | 103.444 |
| 3 | Merrill Lynch & Co | MER UN Equity | 79.90 | 63.92 | 87.89 |
| 4 | Mitsubishi UFJ Financial Group | 8306 JT Equity | 1,310,000 | 1,048,000 | 1,441,000 |

Notional Amount ("NA"):    USD 1,140,975.92 (which is equivalent to Korean Won ("KRW") KRW 1,265,000,000 ("KRW Notional Amount") converted to USD at $FX_0$)

Initial Reference Price $(P_{i,0})$:    N/A

Initial Fixing Date:    N/A

Initial Exchange Percentage: 13.25%

EXHIBIT A
PAGE 124

 

Structured Equity Solutions

**Initial Exchange Amount:** USD 151,179.3?

(which is equivalent to the KRW Notional Amount $\times \left( \dfrac{1}{FX_0} \right) \times$ Initial

Exchange Percentage)

**Initial Exchange Amount Payer:** Party A shall pay Party B the Initial Exchange Amount for value on the Effective Date.

**$FX_0$:** USD1:KRW 1108.7

**$FX_i$:** The Exchange Rate on the second Business Day following each Observation Date

**$FX_F$:** The Exchange Rate on the second Business Day following the Valuation Date

**Exchange Rate:** The spot KRW/USD exchange rate, expressed as the amount of Korea Won per US dollar, as agreed between Party A and Party B, failing which the spot KRW/USD exchange rate as determined by the Calculation Agent with reference to such rate as displayed under "USD Today" on the Reuters Page "KFTC 18" at around 4:00 p.m.(Seoul time) on (a)  the first day Business Day following the relevant Observation Date, and (b) the first Business Day following the Valuation Date, as applicable. Provided that if it is impracticable for the Calculation Agent to make reference to Reuters page "KFTC18", the rate shall be determined by the Calculation Agent in its sole and absolute discretion.

**Exchanges:** The New York Stock Exchange, XETRA Stock Exchange, the Tokyo Stock Exchange, and the Hong Kong Stock Exchange

**Related Exchange(s):** All Exchanges

**Annual Return:** 9.70%

**Conditional Return:** 29.1%

**Strike:** 100%

**Trigger Prices:** See the table below

**Observation Dates:** See the table below.  In the event that any of the scheduled Observation Dates is not a Scheduled Trading Day, then the relevant Observation Date shall be the first following Scheduled Trading Day.   In addition an Observation Date shall be subject to postponement in accordance with the "Effect of a Disrupted Day" provisions.

| Observation | Observation Date | Trigger Price |
|---|---|---|
| 1 | 9 March 2009 | 100.00% of the Initial Reference Price of the relevant Share in the Underlying Basket |
| 2 | 9 September 2009 | 100.00% of the Initial Reference Price of the relevant Share in the Underlying Basket |





## Structured Equity Solutions

| Observation | Observation Date | Trigger Price |
|---|---|---|
| 3 | 9 March 2010 | 100.00% of the Initial Reference Price of the relevant Share in the Underlying Basket |

**Observation Periods:** The period from but excluding the Trade Date to and including the first Observation Date, thereafter the periods from but excluding each Observation Date to and including the immediately following Observation Date.

**Early Termination Event:** means,

(1) on an Observation Date (excluding the last Observation Date), the Calculation Agent determines that the official closing price of each of the Shares in the Underlying Basket is equal to or greater than its Trigger Price, or

(2) on any single Exchange Business Day during an Observation Period (excluding the last Observation Period), the Calculation Agent determines that the official closing price or intraday price of each Share in the Basket is equal to or greater than its Knock-Out Price.

**Consequence of Early Termination Event:** If an Early Termination Event occurs, this Transaction will be automatically terminated on the date falling 3 Business Days after the relevant Observation Date. The currently scheduled Early Termination Dates are set out in the table below. Such Early Termination Date will then be deemed as the Termination Date and, following the payment of the Early Termination Amount, both Party A and Party B will not have any further obligations under this Transaction after such Termination Date

**Early Termination Amount:** See the table below.

| Observation | Observation Date | Early Termination Date | Early Termination Amount |
|---|---|---|---|
| 1 | 9 March 2009 | 13 March 2009 | NA * (2.00 * Annual Return) / FX$_t$ |
| 2 | 9 September 2009 | 15 September 2009 | NA * (2.50 * Annual Return) / FXt |

**Early Termination Amount Payer:** Party A.

**Elimination Event:** means, in respect of an Observation Date (excluding the last Observation Date), the Calculation Agent determines that the official closing price of a Share in the Underlying Basket is equal to or greater than its Trigger Price. If an Elimination Event occurs, the relevant Share affected by the Elimination Event will be eliminated from the Underlying Basket with effect from and including the Scheduled Trading Day immediately following the relevant Observation Date (for the avoidance of doubt, the relevant



LEHMAN BROTHERS
Structured Equity Solutions

Observation Date for each Observation Period is the last day of such Observation Period)

**Knock-In Event:** means, in respect of any Scheduled Trading Day from and including the Trade Date to and including the Valuation Date (each such day being a "Daily Observation Date"), the official closing price of one or more Shares in the Underlying Basket (except for the ones that have been removed by an Elimination Event) are below their respective Knock-In Prices.

## Part 2 - Floating Rate Amount

**Floating Rate Amount**

**Payer:** Party B

Party B shall pay Floating Rate, Actual/365 (Fixed), on the Notional Amount on each Floating Rate Payer Payment Date translated to USD based on KRW/USD Exchange Rate on the second Business Day immediately preceding the relevant Floating Rate Payer Payment Date as determined by the Calculation Agent.

Floating Rate Payer Calculation Amount shall accrue from (and including) a Floating Rate Payer Payment Date to (and excluding) the next relevant Floating Rate Payer Payment Date provided that for the purpose of the first Floating Rate Payer Payment Date, Floating Rate Payer Calculation Amount shall accrue from (and including) the Effective Date to (and excluding) the first Floating Rate Payer Payment Date falling in December 2008.

If an Early Termination Event had occurred before any following Floating Rate Payer Payment Date, then Party A will receive the accrued amount from (and including) the previous Floating Rate Payer Payment Date to (and excluding) the following Early Termination Date, in which Floating Rate Payer Payment Date will be the Early Termination Date.

**Floating Rate Payer**

**Payment Date**

On every December 17th, March 17th, June 17th, September 17th, and starting on December 17th 2008 and ending on Termination Date, subject to adjustment in accordance with the Following Business Day Convention.

For the avoidance of doubt, on the date that Party A shall pay its final Equity Amount under this transaction (the "Party A Final Payment Date"), Party B shall pay a Floating Rate Payer Calculation Amount calculated for the period from and including the immediately preceding Floating Rate Payer Payment Date to but excluding the Party A Final Payment Date (the "Party




**Structured Equity Solutions**

B Final Payment") and Party B shall have no further Floating Rate Payer Calculation Amount under this transaction.

Any Party B Final Payment shall be made on the Party A Final Payment Date. For the avoidance of doubt, Party B shall not be required to make any Party B Final Payment if the immediately preceding Floating Rate Payer Payment Date falls on the same day as the Party A Final Payment Date.

**Floating Rate**

The rate will be 120 basis points plus the Korea bond rate for 91 day certificates of deposit published by the Korean Securities Dealers Association which appears on Check screen Page 3220 under the caption "TODAY 15:30" as of 3:30 p.m. Seoul time (the "Rate Page") on the day that is one Seoul Business Day prior to the immediately preceding Floating Rate Payer Payment Date. If no such rate is quoted, the Floating Rate shall be determined by the Calculation Agent in a commercially reasonable manner.

However, the Floating Rate for the first Floating Rate Payer Payment Date will be the Korea bond rate for 91 day certificates of deposit that appears on the Rate Page on 16 September 2008.

## Part 3 - Equity Amount  (in the event of no Early Termination)

**Equity Amount Payer:**    Party A

**Valuation Date:**    The last Observation Date, provided that if such day is not a Scheduled Trading Day, then the immediately following Scheduled Trading Day shall be the Valuation Date

**Equity Amount:**    (1) If the official closing prices of all of the Shares in the Underlying Basket on the Valuation Date are equal to or greater than their respective Trigger Prices then Party A Equity Amount shall be calculated in accordance with the following:

$$NA * (3 * \text{Annual Return}) / FX_F;$$

_____    OR ELSE

(2) Equity Amount Payer will be Party B if the official closing prices of the Worst Performing Share in the Underlying Basket on the Valuation Date is less than the Trigger Price of the Worst Performing Share and a Early Termination Event has not occurred but a Knock-In Event has occurred, then Equity Amount shall be calculated in accordance with the following:

$$NA * \{1 - P_{X,F} / [\text{Strike} * P_{X,0}]\} / FX_F$$

_____    OR ELSE

(3) If the official closing price of the Worst Performing Share in the Underlying Basket on the Valuation Date is less than the Trigger Price of the Worst Performing Share and both Early termination Event and Knock-In



Structured Equity Solutions

Event have not occurred, then Party A Equity Amount shall be calculated in accordance with the following:

NA * (Conditional Return) / FX$_F$

where for (2) and (3) above, Worst Performing Share "X" means, as determined by the Calculation Agent in its sole and absolute discretion, the i*th* Share in the Underlying Basket which has the lowest value on the Valuation Date according to the following formula:

$(P_{LF} / P_{L0}) - 1$

with $P_{LF}$ being the official closing price of the i*th* Share in the Underlying Basket on the Valuation Date.

In the event that the Calculation Agent determines the above formula produces two or more Shares in the Underlying Basket with the same lowest performance on the relevant Valuation Date, then the Calculation Agent shall, in its sole discretion (acting reasonably and in a commercially reasonable manner) select one of such Shares to be the Share with the lowest performance.

| | |
|---|---|
| Equity Amount Payment Date: | Termination Date |

### Part 4 – Settlement Terms

| | |
|---|---|
| Settlement Currency: | USD |
| Cash Settlement: | Applicable |
| Cash Settlement Payment Date: | The Termination Date, subject to adjustment in accordance with the Following Business Day Convention |
| Scheduled Trading Day: | means any day on which each Exchange and the Related Exchanges are scheduled to be open for trading for their respective regular trading sessions. |
| Disrupted Day | Any Scheduled Trading Day on which an Exchange fails to open for trading during its regular trading session or on which a Market Disruption Event has occurred |
| Effects of a Disrupted Day: | If there is a Disrupted Day in relation to an Share on any date which would otherwise have been the Initial Fixing Date, an Observation Date or a Daily Observation Date, then the Initial Fixing Date, the Observation Date or the Daily Observation Date for all of the Indices shall be the first succeeding Scheduled Trading Day that is not a Disrupted Day relating to all of the Indices, unless each of the eight Scheduled Trading Days immediately following the scheduled Observation Date or Daily Observation Date is a Disrupted Day. In that case: |

(a) that eighth Scheduled Trading Day shall be deemed to be the Initial Fixing Date, the Observation Date or the Daily Observation Date (as relevant) notwithstanding the fact that such day is a Disrupted Day (the "Deemed Date"); and



## Structured Equity Solutions



(b) the Calculation Agent shall determine its good faith estimate of the value for all of the Indices that would have prevailed but for that Disrupted Day as of the Valuation Time on that Deemed Date.

| | |
|---|---|
| Market Disruption Event: | Subject to the Effects of a Disrupted Day provisions, section 6.3(a) of the 2002 ISDA Equity Derivatives Definitions shall apply |
| Business Day for Observation and Valuation Dates: | **Seoul, New York, TARGET, Hong Kong and Tokyo** |
| Business Days: | A day (excluding a Saturday and Sunday) on which commercial banks are open for business (including dealings in foreign exchange in accordance with the market practice of the foreign exchange market) in Seoul and New York |
| Calculation Agent: | Party A |

**Extraordinary Events:**

**Consequences of Merger Events:**

| | |
|---|---|
| Share-for-Share: | Modified Calculation Agent Adjustment |
| Share-for-Other: | Modified Calculation Agent Adjustment |
| Share-for-Combined: | Modified Calculation Agent Adjustment |
| Determining Party: | Party A |
| Tender Offer: | Applicable |

**Consequences of Tender Offers:**

| | |
|---|---|
| Share-for-Share: | Modified Calculation Agent Adjustment |
| Share-for-Other: | Modified Calculation Agent Adjustment |
| Share-for-Combined: | Modified Calculation Agent Adjustment |
| Composition of Combined Consideration: | Not Applicable |
| Nationalization, Insolvency or Delisting: | Cancellation and Payment (Calculation Agent Determination) |
| Determining Party: | Party A |

**Additional Disruption Events:**

| | |
|---|---|
| Change in Law: | Applicable; _provided_ that Section 12.9(a)(ii)(B) is replaced in its entirety as follows: "(B) due to the promulgation of or any change in the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law or regulation (including any action taken by a taxing |




**LEHMAN BROTHERS**

**Structured Equity Solutions**

authority), the Calculation Agent determines in good faith that it has become illegal to hold, acquire or dispose of Hedge Positions relating to such Transaction".

| | |
|---|---|
| Determining Party: | Party A |

Hedging Disruption:      Applicable. Section 12.9(a)(v) of the Equity Definitions is replaced in its entirety as follows: "Hedging Disruption" means that a Hedging Party is unable, after using commercially reasonable efforts, to either (i) acquire, establish, re-establish, substitute, maintain, unwind or dispose of any transaction(s) or asset(s) it deems necessary to hedge the equity price risk (or any other relevant price risk including, but not limited to, the currency risk) of entering into and performing its obligations with respect to this Transaction, or (ii) freely realize, recover, receive, repatriate, remit or transfer the proceeds of Hedge Positions or this Transaction between accounts within the jurisdiction of the Hedge Positions (the "Affected Jurisdiction") or from accounts within the Affected Jurisdiction to accounts outside of the Affected Jurisdiction. For the purposes of Section 12.9(b)(iii) of the Equity Definitions, the reference to "the Hedging Party" shall be deemed to be a reference to the Hedging Party affected by the Hedging Disruption (the "Affected Hedging Party") (or if both parties are Affected Hedging Parties, to an Affected Hedging Party) and the reference to the "Non-Hedging Party" shall be deemed to be a reference to the other party (even if such party is also an Affected Hedging Party).

| | |
|---|---|
| Hedging Party: | Party A |
| Determining Party: | Party A |

**Additional Representations, Agreements and Acknowledgments:**

| | |
|---|---|
| Non-Reliance: | Applicable |
| Agreements and Acknowledgments Regarding Hedging Activities: | Applicable |
| Additional Acknowledgments: | Applicable |

**Additional General Terms**

Documentation:      The 2002 Equity Derivatives Definitions (the "Equity Definitions") and the 2000 ISDA Definitions under 1992 ISDA Master Agreement entered into between the Parties. Terms used herein shall have the meaning specified in the Equity Definitions and the 2000 ISDA Definitions.

Convertibility Event:      An event which has the effect of preventing, limiting or otherwise restricting foreign exchange transactions involving the Relevant Currency through legal channels (including, without limitation, any such



**LEHMAN BROTHERS**
## Structured Equity Solutions

prohibition, limitation or restriction affecting the conversion or delivery of the Relevant Currency into the Settlement Currency, the delivery of the Settlement Currency into accounts within the Relevant Country to accounts outside such jurisdiction or the delivery of the Relevant Currency between accounts within the Relevant Country to a person who is a non-resident of that jurisdiction), including any action by any authority of the Relevant Country in the event of natural calamities, wars, conflict or arms or grave and sudden changes in domestic or foreign economic circumstances or other similar circumstances pursuant to any law or regulation of the Relevant Country.

| | |
|---|---|
| Relevant Country: | Korea |
| Relevant Currency: | The lawful currency of the Relevant Country |
| Consequences of a Convertibility Event: | If the Calculation Agent determines in its sole discretion that a Convertibility Event has occurred and is continuing on the Exercise Date, Payment Dates or the date that the Transaction terminates or cancels, that prevents Party A (or any of its affiliates) from performing its obligations with respect to the Transaction and/or that prevents the Hedging Party from accessing, liquidating, unwinding or otherwise disposing of any assets or instruments denominated in the Relevant Currency as such party may hold, directly or indirectly, as part of the arrangements made to hedge the equity risk of entering into and performing Party A's obligations with respect to the Transaction and/or that prevents the Hedging Party from converting the proceeds from the sale or the unwinding or the disposal of any such assets or instruments into the Cash Settlement Currency, then the determination of the Equity Amount, the Cancellation Amount or any early termination amount, as the case may be, and/or Party A's obligation to pay such amount, as the case may be, to shall be postponed until the Business Day which falls the same number of Business Days after the Business Day on which such Convertibility Event ceases to exist as the Cash Settlement Payment Date was originally scheduled to be after the relevant Valuation Date. |
| Documentation: | Long form confirmation. Any capitalized terms used herein and not otherwise defined shall, unless the context otherwise requires, have the meaning ascribed to them in the 2000 ISDA Definitions or the 2002 ISDA Equity Derivatives Definitions, as the case may be (the "Definitions") |
| Unwinding: | Party A will provide an indicative value of the Transaction (the "Indicative Market Value") to Party B upon a request from Party B, provided that the request falls on an Exchange Business Day and there is no Market Disruption Event, upon which the request will be fulfilled by Party A on the following Exchange Business Day where there is no Market Disruption Event. |



## Structured Equity Solutions

 

In the event that Party B notifies Party A in writing that it wishes to unwind the Transaction in whole or in part (if in part such unwinding is subject to a minimum Nominal Amount of USD10,000), Party A will provide an Indicative Market Value determined by Party A acting in good faith with a bid offer spread of 1%.

Party B may then give notice to Party A confirming the exact Nominal Amount to be unwound and Party A, will acting in good faith as soon as practicable depending on prevailing market conditions, notify Party B :

1) of the amount due by a party to the other in respect of the Nominal Amount to be unwound by the Manager ; and
2) the identity of the party liable for such payment.

Such amount will be paid by the party liable for such payment to the other party on the third Currency Business Day following the day on which the above-mentioned notice is sent by Party A to Party B

**Governing Law:**        New York Law



Structured Equity Solutions

## RISK FACTORS

**SUITABILITY**
Investors should determine whether an investment in the Transaction is appropriate to their particular circumstances. Prospective investors should consult with their own independent financial, legal, business and/or tax advisers to determine the consequences of an investment in the Transaction and to arrive at their own evaluation of the investment.

**MARKET RISK**
The value of the Transaction will increase or decrease according to the performance of the Shares in the Underlying Basket.

**EVENT RISK**
There may be adjustments to the terms of the Transaction due to certain events. Examples include (but are not limited to) mergers and disposals, price source disruption, trading suspension and change in taxation laws.

**EARLY TERMINATION RISK**
Prospective investors should be aware that the Transaction may early terminate prior to the Termination Date under a variety of conditions and/or circumstances. For example, this may be applicable where Party A determines that, it is no longer legal or practical for it to maintain its hedging arrangements with respect to the Transaction for any reason..

**CORRELATION RISK**
In certain circumstances, the return on the Transaction is based on the performance of the lowest Share in the Underlying Basket, and as a result, the performance of the Transaction depends on the correlation between the different Shares in the Underlying Basket. You should consider the effect of diversification on the return. You should also be aware that the worst performing Share within the Underlying Basket may not perform when the other(s) rise, and having a diversified basket may reduce potential investment return.

**FOREIGN EXCHANGE RISK**
The Transactions is a USD notional Transaction but quantoed in KRW. Therefore, purchasers who require funds in other currencies will be exposed to the exchange rate risk between KRW and the required currency.

**INTEREST RATE RISK**
Movements in interest rates will have an impact on the value of the Transaction. If interest rates move upwards, the value of the Transaction fall.

**EVENT RISK** (including risk of substitution of the Shares)
There may be adjustments to the terms of the Transactions due to events as set out in the Documentation. This may in certain cases, include the replacement of the Shares in the Underlying Basket.

**SETTLEMENT RISK**
Settlement may be temporarily prevented or delayed if a change occurs in the settlement rules

**POTENTIAL CONFLICTS OF INTEREST**
Potential and actual conflicts of interest might arise from the different roles played by Lehman Brothers in connection with the Transaction. Lehman Brothers and its affiliates are the Seller and the Calculation Agent, in respect of the Transaction. Prospective investors should seek independent advice as deemed appropriate to evaluate the risk of this potential conflict of interest. Although the Issuer and the Guarantor owe no duty or responsibility to you to avoid such conflicts, should any conflict of interests arise, Lehman Brothers will take reasonable steps to



Structured Equity Solutions

protect the interests of all affected parties and in doing so will act in a fair and commercially reasonable manner.

### DISCLAIMER

*This termsheet is indicative only and does not confirm any transaction. Under no circumstances may this termsheet be shown, copied or otherwise given to any person other than your authorised representatives. This material is for your private information, and Lehman Brothers is not soliciting any action based upon it. The information in this termsheet may be incomplete or condensed. It does not include a number of terms and provisions that will be included in any actual transaction. If a transaction is entered into, the terms and provisions will be reflected in related documents which will supersede and replace this summary. The terms and conditions may change with market fluctuations and/or in*
*accordance with such conditions as may be imposed by regulatory or supervisory authorities because well as Lehman Brothers' internal policy. Although the information set forth above is reflective of the terms, as of the specified date, under which Lehman Brothers believes the transaction might be structured, no assurance can be given that such a transaction could in fact be executed and completed. Scenario analysis of the risk involved in the above transaction is available upon your request.*

*Lehman Brothers does not act as an adviser and assumes no fiduciary responsibility or liability for any consequences financial or otherwise arising from the execution of this transaction. Before entering into this transaction you should consider the suitability of the transaction to your particular circumstances and independently review (with your professional advisers as necessary) the specific financial risks as well as the legal, regulatory, credit, tax and accounting consequences. Lehman Brothers, its affiliates and subsidiaries and/or their directors, officers and employees may have long or short positions in and may deal as principal, agent or otherwise in the indices through futures and option transactions and OTC swaps and options and such positions may be increased or decreased in the future.*

# EXHIBIT 8

**EXHIBIT A
PAGE 136**





## Callable Equity Linked Swap on a Basket of two Japanese Indices, denominated in US dollars

### Terms and Conditions as of 10 September 2008

| | |
|---|---|
| **Party A:** | Lehman Brothers Commercial Corporation Asia Limited (acting as principal) |
| **Party B:** | Good Morning Shinhan Securities Co., Ltd. |
| **Trade Date:** | 10 September 2008 |
| **Effective Date:** | 16 September 2008 |
| **Settlement Currency:** | US Dollars ("USD") |
| **Notional Amount ("NA"):** | KRW 8,158,000,000 which is equivalent to USD 7,376,130.20 at the $FX_0$ |
| **$FX_0$:** | the Exchange Rate on USD1:KRW 1,106.00 |
| **Underlying Basket:** | A basket made up of the two indices (each an "Index") as shown in the table below: |

| I | Index | Bloomberg Code | Initial Reference Price (KRW), $P_{i,0}$ | Trigger Price (KRW), 100.00% * $P_{i,0}$ | Knock-In Price (KRW), 80.00% * $P_{i,0}$ | Knock-Out Price (KRW), 115.00% * $P_{i,0}$ |
|---|---|---|---|---|---|---|
| 1 | NIKKEI 225 | NKY Index | 17,936.01 | 17,936.0100 | 14,348.8080 | 20,626.4115 |
| 2 | TSEREIT | TSEREIT Index | 2,589.89 | 2,589.8900 | 2,071.9120 | 2,978.3735 |

| | |
|---|---|
| **Exchange:** | The Tokyo Stock Exchange |
| **Related Exchange(s):** | All Exchanges |
| **Valuation Dates:** | 28 May 2010, subject to adjustment in accordance with the Following Business Day Convention |
| **Termination Date:** | The earlier of (1) 02 June 2010 and (2) the Early Termination Date |
| **$P_{i,0}$:** | N/A |
| **Initial Fixing Dates:** | N/A |
| **Exchange Rate:** | The spot KRW/USD exchange rate, expressed as the amount of Korea Won per US dollar, as determined by the Calculation Agent with reference to such rate as displayed under "USD today" on the Reuters Page "KFTC 18" at around 4:00 p.m.(Seoul time) on the relevant day. Provided that if it is impracticable for the Calculation |



LEHMAN BROTHERS
Structured Equity Solutions

Agent to make reference to Reuters page "KFTC18", the rate shall be determined by the Calculation Agent in a commercially reasonable manner.

## Initial Exchange

**Initial Exchange Percentage:** 8.20%

**Initial Exchange Amount :** USD 604,842.68

**Payer:**                                    Party A

## Early Termination

**Early Termination Event:**    means

1 - the official closing prices of all of the Indices in the Underlying Basket are equal to or greater than their respective Trigger Prices on an Observation Date, or

2 - the official closing prices of all of the Indices in the Underlying Basket are equal to or greater than their respective Knock-Out Prices on any Exchange Business Day during the Observation Period.

**Observation Period:**    The period from and including the Trade Date to and including the final Observation Date

**Consequence of Early Termination Event:**    In the event an Early Termination Event occurs:

1 – the Early Termination Amount Payer will pay the Early Termination Amount on the Early Termination Date;

2 - this Transaction will be automatically terminated on date falling 3 Business Days following the Early Termination Event (an "Early Termination Date"). The currently scheduled Early Termination Dates are set out below. Party A and Party B will not have further obligations under this Transaction after such Early Termination Date

**Early Termination Amount**

**Payer:**                Party A

| Observation Date | Early Termination Date | Early Termination Amount |
|---|---|---|
| 04 December 2008 | 9 December 2008 | NA * (1.5 * Annual Return) / FX$_t$ |
| 04 June 2009 | 9 June 2009 | NA * (2.0 * Annual Return) / FX$_t$ |
| 04 December 2009 | 9 December 2009 | NA * (2.5 * Annual Return) / FX$_t$ |

**EXHIBIT A**
**PAGE 138**



**LEHMAN BROTHERS**
**Structured Equity Solutions**

| | |
|---|---|
| **FX₁:** | the Exchange Rate on the first Business Day following the Observation Date in the relevant period |

**Floating Rate Amount**

**Payer:**    Party B

Party B shall pay Floating Rate, Actual/365 (Fixed), on the Notional Amount on each Floating Rate Payer Payment Date translated to USD based on KRW/USD Exchange Rate on the second Business Day immediately preceding the relevant Floating Rate Payer Payment Date as determined by the Calculation Agent.

Floating Rate Payer Calculation Amount shall accrue from (and including) a Floating Rate Payer Payment Date to (and excluding) the next relevant Floating Rate Payer Payment Date provided that for the purpose of the first Floating Rate Payer Payment Date, Floating Rate Payer Calculation Amount shall accrue from (and including) the Effective Date to (and excluding) the first Floating Rate Payer Payment Date falling in December 2008.

If an Early Termination Event had occurred before any following Floating Rate Payment Date, then Party A will receive the accrued amount from (and including) the previous Floating Rate Payer Payment Date to (and excluding) the following Early Termination Date, in which Floating Rate Payer Payment Date will be the Early Termination Date.

**Floating Rate Payer**

**Payment Date**

On every December 16th, March 16th, June 16th, September 16th, and starting on December 16th 2008 and ending on Termination Date, subject to adjustment in accordance with the Following Business Day Convention.

For the avoidance of doubt, on the date that Party A shall pay its final Equity Amount under this transaction (the "Party A Final Payment Date"), Party B shall pay a Floating Rate Payer Calculation Amount calculated for the period from and including the immediately preceding Floating Rate Payer Payment Date to but excluding the Party A Final Payment Date (the "Party B Final Payment") and Party B shall have no further Floating Rate Payer Calculation Amount under this transaction.

Any Party B Final Payment shall be made on the Party A Final Payment Date. For the avoidance of doubt, Party B shall not be required to make any Party B Final Payment if the immediately preceding Floating Rate Payer Payment Date falls on the same day as the Party A Final Payment Date.





**Structured Equity Solutions**

**Floating Rate**

The rate will be 120 basis points plus the Korea bond rate for 91 day certificates of deposit published by the Korean Securities Dealers Association which appears on Check screen Page 3220 under the caption "TODAY 15:30" as of 3:30 p.m. Seoul time (the "Rate Page") on the day that is one Seoul Business Day prior to the immediately preceding Floating Rate Payer Payment Date. If no such rate is quoted, the Floating Rate shall be determined by the Calculation Agent in a commercially reasonable manner.

However, the Floating Rate for the first Floating Rate Payer Payment Date will be the Korea bond rate for 91 day certificates of deposit that appears on the Rate Page on 12 September 2008.

Equity Amount (only applicable if an Early Redemption Event never occurs)

**Equity Amount Payer:**    Party A

**Equity Amount:**

(1) If the official closing prices of all of the Indices in the Underlying Basket on the Valuation Date are equal to or greater than their respective Trigger Prices then Party A Equity Amount shall be calculated in accordance with the following:

$$NA * (3 * Annual\ Return) / FXF;$$

<u>OR ELSE</u>

(2) Equity Amount Payer will be Party B if the official closing prices of the Worst Performing Index in the Underlying Basket on the Valuation Date is less than the Trigger Price of the Worst Performing Index and a Early Termination Event has not occurred but a Knock-In Event has occurred, then Equity Amount shall be calculated in accordance with the following:

$$NA * \{1-PX,F / [Strike * PX, 0]\} / FXF$$

<u>OR ELSE</u>

(3) If the official closing price of the Worst Performing Index in the Underlying Basket on the Valuation Date is less than the Trigger Price of the Worst Performing Index and both Early termination Event and Knock-In Event have not occurred, then Party A Equity Amount shall be calculated in accordance with the following:

$$NA * (Conditional\ Return) / FXF$$

where for (2) and (3) above, Worst Performing Index "X" means, as determined by the Calculation Agent in its sole and absolute discretion, the ith Index in the Underlying Basket which has the lowest value on the   Valuation Date according to the following



formula:

$$( P_{i,F} / P_{i,0} ) - 1$$

with $P_{i,F}$ being the official closing price of the ith Index in the Underlying Basket on the Valuation Date.

In the event that the Calculation Agent determines the above formula produces two or more Indices in the Underlying Basket with the same lowest performance on the relevant Valuation Date, then the Calculation Agent shall, in its sole discretion (acting reasonably and in a commercially reasonable manner) select one of such Indices to be the Index with the lowest performance.

| | |
|---|---|
| **Annual Return:** | 10.00% |
| **Conditional Return:** | 18.00% |
| **FX$_F$** | the Exchange Rate on the first Business Day following the final Valuation Date |
| **Knock-In Event:** | "Knock-In Event" means, in respect of any Scheduled Trading Day from and including the Trade Date to and including the final Valuation Date, the Index price of one or more Indices in the Underlying Basket trades below its respective Knock-In Price at any time during scheduled trading hours. |
| **Equity Amount Payment Date:** | Termination Date |

**General**

| | |
|---|---|
| **Market Disruption Event:** | Section 6.3(a) of the 2002 ISDA Equity Derivatives Definitions shall apply |
| **Business Day for Observation and Valuation Dates:** | Tokyo |
| **Business Days:** | A day (excluding a Saturday and Sunday) on which commercial banks are open for business (including dealings in foreign exchange in accordance with the market practice of the foreign exchange market) in Seoul and New York |
| **Calculation Agent:** | Party A |
| **Adjustments:** | |

**Index Adjustment Events**

| | |
|---|---|
| Index Cancellation: | Cancellation and Payment |
| Index Modification: | Calculation Agent Adjustment |
| Index Disruption: | Calculation Agent Adjustment |
| Determining Party: | Calculation Agent |

 

**Structured Equity Solutions**

| | |
|---|---|
| Tender Offer: | Applicable |
| Determining Party: | Calculation Agent |

**Additional Disruption Events:**

| | |
|---|---|
| Failure to Deliver: | Applicable |
| Determining Party: | Calculation Agent |
| Change in Law: | Applicable |
| Hedging Disruption: | Applicable |
| Increased Cost of Hedging: | Applicable |
| Hedging Party: | Party A |
| Determining Party: | Party A |

**Additional General Terms**

| | |
|---|---|
| Non-Reliance: | Applicable |
| Agreements and Acknowledgments Regarding Hedging Activities: | Applicable |
| Index Disclaimer: | Applicable |
| Additional Acknowledgements: | Applicable |
| Documentation: | |

The 2002 Equity Derivatives Definitions (the "**Equity Definitions**") and the 2000 ISDA Definitions under 1992 ISDA Master Agreement entered into between the Parties and Anti-Money Laundering Documentation. Terms used herein shall have the meaning specified in the Equity Definitions and the 2000 ISDA Definitions.

| | |
|---|---|
| Non-Reliance: | Applicable |
| Agreements and Acknowledgments | |
| Regarding Hedging Activities: | Applicable |
| Additional Acknowledgments: | Applicable |

Convertibility Event:    An event which has the effect of preventing, limiting or otherwise restricting foreign exchange transactions involving the Relevant Currency through legal channels (including, without limitation, any such prohibition, limitation or restriction affecting the conversion or delivery of the Relevant Currency into the Settlement Currency, the delivery of the Settlement Currency from accounts within the Relevant Country to accounts outside such jurisdiction or the delivery of the Relevant Currency between accounts within the Relevant Country to a person who is a non-resident of that jurisdiction), including any action by any authority of the Relevant Country in the event of natural calamities, wars, conflict or arms or grave and sudden changes in domestic or foreign economic circumstances or other similar circumstances pursuant to any law or regulation of the Relevant Country.




Structured Equity Solutions

| | |
|---|---|
| **Relevant Country:** | Korea |
| **Relevant Currency:** | The lawful currency of the Relevant Country |
| **Consequences of a Convertibility Event:** | If the Calculation Agent determines in its sole discretion that a Convertibility Event has occurred and is continuing on the Exercise Date, Payment Dates or the date that the Transaction terminates or cancels, that prevents Party A (or any of its affiliates) from performing its obligations with respect to the Transaction and/or that prevents the Hedging Party from accessing, liquidating, unwinding or otherwise disposing of any assets or instruments denominated in the Relevant Currency as such party may hold, directly or indirectly, as part of the arrangements made to hedge the equity price risk of entering into and performing Party A's obligations with respect to the Transaction and/or that prevents the Hedging Party from converting the proceeds from the sale or the unwinding or the disposal of any such assets or instruments into the Cash Settlement Currency, then the determination of the Equity Amount, the Cancellation Amount or any early termination amount, as the case may be, and/or Party A's obligation to pay such amount, as the case may be, to shall be postponed until the Business Day which falls the same number of Business Days after the Business Day on which such Convertibility Event ceases to exist as the Cash Settlement Payment Date was originally scheduled to be after the relevant Valuation Date. |
| **Documentation:** | Long form confirmation. Any capitalized terms used herein and not otherwise defined shall, unless the context otherwise requires, have the meaning ascribed to them in the 2000 ISDA Definitions or the 2002 ISDA Equity Derivatives Definitions, as the case may be (the "Definitions") |
| **Unwinding:** | Party A will provide an indicative value of the Transaction (the "Indicative Market Value") to Party B upon a request from Party B, provided that the request falls on an Exchange Business Day and there is no Market Disruption Event, upon which the request will be fulfilled by Party A on the following Exchange Business Day where there is no Market Disruption Event. |
| | In the event that Party B notifies Party A in writing that it wishes to unwind the Transaction in whole or in part (if in part such unwinding is subject to a minimum Nominal Amount of USD10,000), Party A will provide an Indicative Market Value determined by Party A acting in good faith with a bid offer spread of 1%. |
| | Party B may then give notice to Party A confirming the exact Nominal Amount to be unwound and Party A, acting in good faith as soon as practicable depending on prevailing market conditions, will notify Party B : |

 



1) of the amount due by a party to the other in respect of the Nominal Amount to be unwound; and

2) the identity of the party liable for such payment.

Such amount will be paid by the party liable for such payment to the other party on the third Currency Business Day following the day on which the above mentioned notice is sent by Party A to Party B.

Governing Law:          New York Law

## RISK FACTORS

**SUITABILITY**
Investors should determine whether an investment in the transaction is appropriate to their particular circumstances. Prospective purchasers should consult with their own independent financial, legal, business and/or tax advisers to determine the consequences of an investment in the Transaction and to arrive at their own evaluation of the investment.

**PRINCIPAL LOSS RISK**
The Transaction is not capital guaranteed. Prospective purchasers should be aware that the return of principal on the Transaction is linked to the value of the Indices in the Underlying Basket. Movements in the value of the Indices may adversely affect the value of the Transaction and could result in prospective purchasers sustaining an entire loss of their investment.

**MARKET RISK**
The value of the Transaction will increase or decrease according to the performance of the Indices in the Underlying Basket. The Transaction does not provide principal protection even if the Transaction is held to maturity. There can be no assurance that the Transaction will return at maturity more than the amount initially invested.

**EVENT RISK**
There may be adjustments to the terms of the Transaction due to certain events. Examples include (but are not limited to) mergers and disposals, price source disruption, trading suspension and change in taxation laws, as set out in the Documentation.

**EARLY REDEMPTION RISK**
Prospective investors should be aware that the Issuer may, at its discretion, early redeem or terminate the Transaction prior to Maturity upon notice to Investors under a variety of conditions and/or circumstances. For example, this may be applicable where the Issuer determines that, for reasons beyond its control, the performance of its obligations under the Transaction has become illegal or impractical in whole or in part for any reason; or the Issuer determines that, for reasons beyond its control, it is no longer legal or practical for it to maintain its hedging arrangements with respect to the Transaction for any reason. If the Issuer redeems the Transactions early under any of the conditions or circumstances permitted under the terms of the Transaction, the redemption amount may be lower than the principal amount of the Transaction.

**CORRELATION RISK**
In certain circumstances, the return on the Transaction is based on the performance of the lowest Index in the Underlying Basket, and as a result, the performance of the Transaction depends on the correlation between the different Indices in the Underlying Basket. You should consider the effect of diversification on the return. You should also be aware that the worst performing Index within the Underlying Basket may not perform when the other(s) rise, and having a diversified basket may reduce potential investment return.

 

### Structured Equity Solutions

**FOREIGN EXCHANGE RISK**
The Transactions are denominated in USD and will be redeemed in USD. Therefore, purchasers who require funds in other currencies will be exposed to the exchange rate risk between USD and the required currency.

**INTEREST RATE RISK**
Movements in interest rates will have an impact on the value of the Transactions. If interest rates move upwards, the value of the Transactions fall.

**EVENT RISK (including risk of substitution of the Indices)**
There may be adjustments to the terms of the Transactions due to events such as (but not limited to) mergers and disposals, price source disruption, trading suspension and change in taxation laws as set out in the Documentation. This may in certain cases, include the replacement of the Indices in the Underlying Basket.

**LIQUIDITY RISK**
There can be no assurance that a secondary market in the Transaction shall exist or at which price a bid would be made. The bid price given, if any, may be affected by many factors including, but not limited to, the remaining term of the Transaction, the performance of the Indices, interest rates, fluctuations in exchange rates and credit spreads. Prospective investors must be prepared to hold the Transactions for an indefinite period of time or until the redemption or maturity of the Transaction.

**CREDIT RISK**
Investors assume credit risk of the Issuer and the Guarantor. Prospective purchasers should also be aware that any changes to the credit rating of the Guarantor will affect the price and value of the Transaction.

**SETTLEMENT RISK**
Settlement may be temporarily prevented or delayed if a change occurs in the settlement rules of (i) the clearing system through which the Transactions are cleared or (ii) the country where the exchange or clearing system for any of the Underlying Indices is located due to emergencies or special situations, market conditions or legal holidays,

**POTENTIAL CONFLICTS OF INTEREST**
Potential and actual conflicts of interest might arise from the different roles played by Lehman Brothers in connection with the Transaction. Lehman Brothers and its affiliates are the Seller and the Calculation Agent, in respect of the Transaction. Prospective investors should seek independent advice as deemed appropriate to evaluate the risk of this potential conflict of interest. Although the Issuer and the Guarantor owe no duty or responsibility to you to avoid such conflicts, should any conflict of interests arise, Lehman Brothers will take reasonable steps to protect the interests of all affected parties and in doing so will act in a fair and commercially reasonable manner.

### DISCLAIMER

*This termsheet is indicative only and does not confirm any transaction. Under no circumstances may this termsheet be shown, copied or otherwise given to any person other than your authorised representatives. This material is for your private information, and Lehman Brothers is not soliciting any action based upon it. The information in this termsheet may be incomplete or condensed. It does not include a number of terms and provisions that will be included in any actual transaction. If a transaction is entered into, the terms and provisions will be reflected in related documents which will supersede and replace this summary. The terms and conditions*



**LEHMAN BROTHERS**
**Structured Equity Solutions**

may change with market fluctuations and/or in
accordance with such conditions as may be imposed by regulatory or supervisory authorities
because well as Lehman Brothers' internal policy. Although the information set forth above is
reflective of the terms, as of the specified date, under which Lehman Brothers believes the
transaction might be structured, no assurance can be given that such a transaction could in fact
be executed and completed. Scenario analysis of the risk involved in the above transaction is
available upon your request.

Lehman Brothers does not act as an adviser and assumes no fiduciary responsibility or liability
for any consequences financial or otherwise arising from the execution of this transaction. Before
entering into this transaction you should consider the suitability of the transaction to your
particular circumstances and independently review (with your professional advisers as
necessary) the specific financial risks as well as the legal, regulatory, credit, tax and accounting
consequences. Lehman Brothers, its affiliates and subsidiaries and/or their directors, officers
and employees may (i) have long or short positions in and may deal as principal, agent or
otherwise in the Indices or other securities issued by the issuer of the Indices, and such positions
may be increased or decreased in the future, and (ii) maintain a commercial or investment
banking relationship with the issuer of the Indices or of related entities.

 

**LEHMAN BROTHERS**
**Structured Equity Solutions**

## 24-month Up & Out Call Option with Rebate on a US Stock (Bloomberg : XLF US Equity) denominated in US dollars

### Indicative Terms and Conditions as of 29 May 2008

#### Part 1 - GENERAL TERMS:

| | |
|---|---|
| **Seller:** | Lehman Brothers Commercial Corporation Asia Limited ("Party A") |
| **Buyer:** | GoodMorning Shinhan Securities Co., Ltd. ("Party B") |
| **Trade Date:** | 29 May 2008 |
| **Effective Date:** | 4 June 2008 |
| **Expiration Date:** | Valuation Date |
| **Valuation Date:** | 28 May 2010, provided that if such day is not a Scheduled Trading Day, then the immediately following Scheduled Trading Day shall be the Valuation Date |
| **Termination Date:** | 3 June 2010 |
| **Notional Amount ("NA"):** | Korean Won ("KRW") KRW 10,000,000,000 |

#### Part 2- Option terms:

| | |
|---|---|
| **Option Style:** | European |
| **Option Type:** | Call |
| **Number of Options:** | |
| **Underlying (the "Stock"):** | Financial Select Sector SPDE Fund (Bloomberg Code: XLS US Equity) |
| **Reference Spot:** | USD [25.08] |
| **Strike Price:** | USD [25.08 ] (100.00% of Reference Spot) |
| **Knock-out Price:** | USD [32.604] (130.00% of Reference Spot) |
| **Premium Amount:** | USD [1,086,765.99] |
| | (=NA * 11.16% / Initial KRW Exchange Rate) |
| **Initial KRW Exchange Rate:** | [1,026.9] KRW / USD, which is the spot KRW/USD exchange rate, expressed as the amount of Korea Won per US dollar,  as determined by the Calculation Agent with reference to such rate as displayed under "USD today" on the Reuters Page "KFTC 18"  at around 4:00 p.m.(Seoul time) 2 business days following the Trade Date. Provided that if it is impracticable for the Calculation Agent to make reference to Reuters page "KFTC18", the rate shall be determined by the Calculation Agent in a commercially reasonable manner. |
| **Premium Payment Date:** | Trade Date + 4 Currency Business Days |

This termsheet is indicative only if so specified in which case it is subject to change without notice. Information other than indicative terms (including market data and statistical information) has been obtained from various sources. We do not represent that it is complete or accurate. Any analysis presented herein that indicates a range of outcomes that may result from changes in market parameters, is not comprehensive, is not intended to suggest that one outcome is more likely than another and may have been derived using Lehman Brothers proprietary models, historic data and subjective interpretation. This term sheet does not constitute an offer or an agreement, or a solicitation of an offer or an agreement, to enter into any transaction. No assurance is given that any transaction on the terms indicated can or will be arranged or agreed. Transactions of the sort described herein contain complex characteristics and risk factors. Transactions incorporating derivatives may create additional risks and exposures. Before entering into any transaction, you should consider the suitability of the transaction to your particular circumstances and independently review (with your professional advisers as necessary) the specific financial risks as well as the legal, regulatory, credit, tax and accounting consequences. Lehman Brothers does not act as an adviser or fiduciary to its counterparties except where written agreement expressly provides otherwise. References herein to 'Lehman Bros' shall include Lehman Brothers Asia Limited and Lehman Brothers Japan Inc. and their affiliates.




**LEHMAN BROTHERS**
## Structured Equity Solutions

**Premium Payment Currency:** USD. Any amount denominated in KRW shall be converted into USD with reference to the Initial KRW Exchange Rate.

**Knock-out Event:** Applicable. A Knock-out Event means a determination by the Calculation Agent that the level of the Stock is at or above the Knock-out Price at any time during a regular trading session on any Exchange Business Day from and excluding the Trade Date to and including the Expiration Date

**Knock-out Determination Day:**
Any Scheduled Trading Day from and excluding the Trade Date to and including the Expiration Date

**Knock-out Valuation Time:** Continuous Monitoring

**Consequences of Knock-out Event:** Upon the occurrence of a Knock-out Event, neither party shall have any right to exercise any Option. Party A shall pay to Party B the Knock-out Settlement Amount on the Knock-out Settlement Date.

**Knock-out Settlement Amount:** NA * 20.1% (30% * PR) / Final KRW Exchange Rate

**Knock-out Settlement Date:** 4 Business Days following the occurrence of the Knock-out Event

### Part 3 –  Settlement Terms

**Automatic Exercise:** Applicable.

**Cash Settlement:** Applicable

**Participation Rate( "PR"):** 67.00%

**Settlement Amount:** PR * NA * Max[ Final_spot - Strike, 0]/ Reference Spot

where

Final_spot is the official closing price of the Stock on the Expiration Date

**Cash Settlement Payment Date:** Termination Date

**Settlement Currency:** USD. Any amount denominated in KRW shall be converted into the Settlement Currency by dividing it at the Final KRW Exchange Rate.

**Final KRW Exchange Rate:** [ ] KRW / USD, which is the spot KRW/USD exchange rate, expressed as the amount of Korea Won per US dollar,  as determined by the Calculation Agent with reference to such rate as displayed under "USD today" on the Reuters Page "KFTC 18"  at around 4:00 p.m.(Seoul time) 2 business days following the Expiration Date. Provided that if it is impracticable for the Calculation Agent to make reference to Reuters page "KFTC18", the rate

This termsheet is indicative only if so specified in which case it is subject to change without notice. Information other than indicative terms (including market data and statistical information) has been obtained from various sources.  We do not represent that it is complete or accurate.  Any analysis presented herein that indicates a range of outcomes that may result from changes in market parameters, is not comprehensive, is not intended to suggest that outcome is more likely than another and may have been derived using Lehman Brothers proprietary models, historic data and subjective interpretation.  This term sheet does not constitute an offer or an agreement, or a solicitation of an offer or an agreement, to enter into any transaction.  No assurance is given that any transaction on the terms indicated can or will be arranged or agreed. Transactions of the sort described herein contain complex characteristics and risk factors.  Transactions incorporating derivatives may create additional risks and exposures.  Before entering into any transaction, you should consider the suitability of the transaction to your particular circumstances and independently review (with your professional advisors as necessary) the specific financial risks as well as the legal, regulatory, credit, tax and accounting consequences.  Lehman Brothers does not act as an adviser or fiduciary to its counterparties except where written agreement expressly provides otherwise.  References herein to 'Lehman Bros' shall include Lehman Brothers Asia Limited and Lehman Brothers Japan Inc. and their affiliates.

 

LEHMAN BROTHERS
Structured Equity Solutions

|  |  |
|---|---|
|  | shall be determined by the Calculation Agent in a commercially reasonable manner. |
| **Settlement Business Days:** | A day (excluding a Saturday and Sunday) on which commercial banks are open for business (including dealings in foreign exchange in accordance with the market practice of the foreign exchange market) in Seoul and New York |
| **Business Day Convention:** | Following |
| **Exchange:** | American Exchange |
| **Related Exchange:** | All Exchanges |
| **Exchange Business Days:** | New York |
| **Business Day for** |  |
| **Valuation Date:** | New York |
| **Currency Business Days:** | Seoul and New York |
| **Unwinding:** | Party A will provide an indicative value of the Transaction (the "Indicative Market Value") to Party B upon a request from Party B, provided that the request falls on an Exchange Business Day and there is no Market Disruption Event, upon which the request will be fulfilled by Party A on the following Exchange Business Day where there is no Market Disruption Event. |

In the event that Party B notifies Party A in writing that it wishes to unwind the Transaction in whole or in part (if in part such unwinding is subject to a minimum Nominal Amount of USD10,000), Party A will provide an Indicative Market Value determined by Party A acting in good faith with a bid offer spread of 1%.

Party B may then give notice to Party A confirming the exact Nominal Amount to be unwound and Party A, acting in good faith as soon as practicable depending on prevailing market conditions, will notify Party B :

1) of the amount due by a party to the other in respect of the Nominal Amount to be unwound; and
2) the identity of the party liable for such payment.

Such amount will be paid by the party liable for such payment to the other party on the third Currency Business Day following the day on which the above mentioned notice is sent by Party A to Party B.

This termsheet is indicative only if so specified in which case it is subject to change without notice. Information other than indicative terms (including market data and statistical information) has been obtained from various sources. We do not represent that it is complete or accurate. Any analysis presented herein that indicates a range of outcomes that may result from changes in market parameters, is not comprehensive, is not intended to suggest that outcome is more likely than another and may have been derived using Lehman Brothers proprietary models, historic data and subjective interpretation. This term sheet does not constitute an offer or an agreement, or a solicitation of an offer or an agreement, to enter into any transaction. No assurance is given that any transaction on the terms indicated can or will be arranged or agreed. Transactions of the sort described herein contain complex characteristics and risk factors. Transactions incorporating derivatives may create additional risks and exposures. Before entering into any transaction, you should consider the suitability of the transaction to your particular circumstances and independently review (with your professional advisers as necessary) the specific financial risks as well as the legal, regulatory, credit, tax and accounting consequences. Lehman Brothers does not act as an adviser or fiduciary to its counterparties except where written agreement expressly provides otherwise. References herein to 'Lehman Bros' shall include Lehman Brothers Asia Limited and Lehman Brothers Japan Inc. and their affiliates.





LEHMAN BROTHERS
Structured Equity Solutions

### Part 4 – Adjustments

**Documentation:**    Long form confirmation incorporating the 2002 ISDA Equity Derivatives
Definitions and the 2006 ISDA Definitions (together, the "ISDA
Definitions"). Any capitalized terms used herein and not otherwise
defined shall, unless the context otherwise requires, have the meaning
ascribed to them in the Definitions.

### Disclaimer:

This term sheet is indicative only if so specified, in which case this term sheet will be subject to change
without notice and no assurance is given that any transaction on the terms indicated can or will be arranged
or agreed. Information other than economic terms (including market data and statistical information) has
been obtained from various sources we consider reliable but we do not represent that it is complete or
accurate and it should not be relied upon as such. Any analysis presented herein that indicates a range of
outcomes that may result from changes in market parameters is not comprehensive, is not intended to
suggest that any outcome is more likely than another and may have been derived using Lehman Brothers
proprietary models, historic data and subjective interpretation. This term sheet does not constitute an offer
or an agreement, or a solicitation of an offer or an agreement, to enter into any transaction. This term sheet
must be read in conjunction with the related ISDA Master Agreement and applicable ISDA Definitions
(including Annexes and Supplements thereto) and the relevant transaction Confirmation (the "Related
Documentation"). This term sheet supersedes any prior versions hereof and, if this term sheet is indicative,
will be deemed to be superseded by any subsequent versions hereof and, with respect to any transaction
described therein, by the Related Documentation. Transactions of the sort described herein contain
complex financial characteristics and risk factors. Transactions incorporating derivatives may create
additional risks and exposures. Before entering into any transaction, you should consider the suitability of
the transaction in light of your particular circumstances and independently review (with your professional
advisers as necessary) the: (i) specific financial risks as well as the legal, regulatory, credit, tax and
accounting consequences of entering into such transaction; and (ii) any information, warnings, risk
disclosures and other matters disclosed in the Related Documentation. In entering into the Transaction, the
counterparty is deemed to represent to Lehman Brothers that it has obtained such professional advice as it
deemed necessary and that it entered into the Transaction for legitimate commercial and business reasons.

Lehman Brothers and its affiliates do not act as an adviser or fiduciary to its counterparties except where
written agreement expressly provides otherwise. This term sheet is for your sole information and should not
be distributed to private clients or any third parties without Lehman Brothers' prior written approval. Lehman
Brothers International (Europe), its affiliates world-wide, and their respective officers, directors, partners and
employees, including persons involved in the preparation or issuance of this term sheet, may from time to
time deal in, hold or act as market-makers or advisors, brokers or commercial and/or investment bankers in
relation to any product or transaction described herein or any transaction related thereto, including any
related derivatives transaction.

References herein to "Lehman Brothers" shall include Lehman Brothers Asia Limited, Lehman Brothers
Japan Inc. and its affiliates. Lehman Brothers Asia Limited and Lehman Brothers Japan Inc. are authorised
and regulated by the Hong Kong Securities and Futures Commission and the Japan Securities and
Exchange Surveillance Commission respectively. © 2007 Lehman Brothers. All rights reserved.

This termsheet is indicative only if so specified in which case it is subject to change without notice. Information other than indicative terms
(including market data and statistical information) has been obtained from various sources. We do not represent that it is complete or
accurate. Any analysis presented herein that indicates a range of outcomes that may result from changes in market parameters, is not
comprehensive, is not intended to suggest that outcome is more likely than another and may have been derived using Lehman Brothers
proprietary models, historic data and subjective interpretation. This term sheet does not constitute an offer or an agreement, or a
solicitation of an offer or an agreement, to enter into any transaction. No assurance is given that any transaction on the terms indicated
can or will be arranged or agreed. Transactions of the sort described herein contain complex characteristics and risk factors. Transactions
incorporating derivatives may create additional risks and exposures. Before entering into any transaction, you should consider the
suitability of the transaction to your particular circumstances and independently review (with your professional advisers as necessary) the
specific financial risks as well as the legal, regulatory, credit, tax and accounting consequences. Lehman Brothers does not act as an
adviser or fiduciary to its counterparties except where written agreement expressly provides otherwise. References herein to 'Lehman
Bros' shall include Lehman Brothers Asia Limited and Lehman Brothers Japan Inc. and their affiliates.

**EXHIBIT A**
**PAGE 150**

# EXHIBIT 9

## 1 Outstanding Position

CMGSH had the following position between 10-Sep-2008 with LBCCAL

| # | Trade Conf. | Product | (Buy/Sell) | Notional Amount (KRW) | Receivable Date |
|---|---|---|---|---|---|
| #1 | #3364054 | Open (Unwind) | XLF (US Equity) | KRW 10,000,000,000 | 28-May-10 |
| #2 | #3391561 | Open (Fully Funded) | MOSCONDO | KRW 5,149,999,997.15 | 28-May-10 |
| #3 | #3942388 | Open (Fully Funded) | OTC-XLS-0631 | KRW 1,097,387,501.07 | 5-Mar-10 |
| #4 | #3391191 | Open (Fully Funded) | OTC-XLS-0706 | KRW 1,565,000,000 | 9-Mar-10 |
|  |  | Open (Fully Funded) | HK2KE22370E Red | KRW 1,565,000,000 | 9-Mar-10 |
|  |  |  |  | KRW 1,345,000,000 | 28-May-10 |
|  |  |  |  | KRW 14,411,000,000 |  |

CMGSH totally unwound #2,#3,#4 deal and simultaneously trade #2,#3,#4 with unfunded form on 10-Sep-2008, settlement date: 16-Sep-08, 17-Sep-08
but LBCCAL didn't pay the settlement amount or settle date

## 2 Transactions On 10-Sep-2008 » attached file : 04. Final Transfers, Transactions On 10-Sep-2008

| Trade No | Deal Type | Scheduled Payment Due | Settlement Amount | Valuation Date | Price at Up/Down | FX | Notional Amount(KRW) |
|---|---|---|---|---|---|---|---|
| #1-U | Closed (Fully Funded) | 16-Sep-08 | USD 1,506,779.64 | 5-Mar-10 | Unwind 102.50% | 1106.00 | KRW 10,000,000,000 |
| #2-U | Closed (Fully Funded) | 17-Sep-08 | USD 989,796.61 | 9-Mar-10 | Unwind 80.75% | 1108.70 | KRW 6,000,000,000 |
| #3-U | Closed (Fully Funded) | 16-Sep-08 | USD 4,771,287.52 | 28-May-10 | Unwind 91.80% | 1106.00 | KRW 1,097,387,501.07 |
| #4-U | Open (Unfunded) | 16-Sep-08 | USD 1,162,037.87 | 18-Sep-08 | Upfront 1.25% | 1106.90 | KRW 7,590,045,950.52 |
|  | Open (Unfunded) | 16-Sep-08 | USD 989,796.61 | 18-Sep-08 | Upfront 1.25% | 1108.60 | KRW 150,000,000.17 |
|  | Open (Unfunded) | 17-Sep-08 | USD 151,179.31 | 9-Mar-10 | Upfront 0.75% | 1106.70 | KRW 1,565,000,000 |
|  | Open (Unfunded) | 17-Sep-08 | USD 604,842.43 | 9-Mar-10 | Upfront 0.25% | 1108.60 | KRW 1,345,000,000 |
|  | Open (Unfunded) | 16-Sep-08 | USD 604,795.00 | 28-May-10 | Upfront 0.30% | 1106.00 | KRW 14,411,000,000 |

## 3 Transaction Cost

USD 13,542,000.81  USD 137.502(net V)  USD 8,418.17  USD 2,844,603.16

LBHI entered USD Sell with Bank on 11,12-Sep-08 expecting to receive the settlement amt but didn't receive the settlement amt so CMGSH had to enter USD Buy with Bank on 16-Sep-08.

SoCMGSH had FX Trading Loss

## 4 Related FX Transactions » » attached file : 05. Related FX Transactions

| Deal No | Trade Date | Scheduled Payment Due | Early Termination Due | RefNo. | Sell Amount | Applicable Rate (Default Rate) | Value Date | Exchange Rate | 1106 (KRW=USD) (Sep-08 FX) | Settlement Amount(1) | Payment Date * | Interest | Settlement Amount(1) + Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| #1-FX | 11-Sep-08 | 16-Sep-08 | 25-Sep-08 | #2-U,2-N | USD 4,254,754.76 | 9-Mar-10 | 17-Sep-08 | 1105.90 | KRW 5,995,457,920 | USD 13,183,165.82 | 16-Jun-09 | USD 5,373.10 | USD 13,183,170.92 |
| #2-FX | 11-Sep-08 | 16-Sep-08 | 25-Sep-08 | #4-U | USD 4,771,287.52 | 9-Mar-10 | 17-Sep-08 | 1105.90 | KRW 1,097,387,501.07 | USD 779,310.77 | 16-Jun-09 | USD 997.93 | USD 779,310.77 |
| #3-FX | 11-Sep-08 | 16-Sep-08 | 25-Sep-08 | #4-U | USD 1,287.52 | 18-Sep-08 | 1108.60 | 1108.60 | KRW 7,590,045,950.52 | USD 35,573.54 | 16-Jun-09 | USD 0.00 | USD 35,573.54 |
| #4-FX (Cancel) | 12-Sep-08 | 16-Sep-08 | 25-Sep-08 | #4-U | USD 989,796.61 | 18-Sep-08 | 1108.60 | 1108.60 | KRW 1,287,280,735 |  |  |  |  |
| #5-FX (Cancel) | 12-Sep-08 | 16-Sep-08 | 25-Sep-08 | #1x2,2-FX,3-FX | KRW 14,517,966,508 |  |  |  | KRW 672,597,383 |  |  |  |  |
| #6-FX (Cancel) | 16-Sep-08 | 17-Sep-08 | 29-Sep-08 | #4-FX | USD 1,038,206,101 | 17-Sep-08 | 1114.12 | 1114.12 | KRW 12,801,084.99 |  |  |  |  |
| #7-FX (Cancel) | 16-Sep-08 | 18-Sep-08 | 29-Sep-08 | #4-FX | USD 604,795.00 | 18-Sep-08 | 1150.00 | 1150.00 | KRW 695,000,000 |  |  |  |  |
|  | 16-Sep-08 | 16-Sep-08 | 29-Sep-08 | #5-FX | KRW 173,856,206 | 18-Sep-08 | 1150.00 | 1150.00 | KRW 604,795,000 |  |  |  |  |

USD 13,542,000.81  USD 13,912(net V)  USD 131,179.31  -ADS net FX Trading Loss

## 5 Replacement Trading

CMGSH traded the following deals with ABN Barclays to hedge the LBCCAL Positions on 29-Sep-08 early termination date

### 3 Replacement Trading

CMGSH the No.Replacement Trading

| Deal No | Early Termination Due | Settlement Due | Replacement Trade Due | Notional Amount (Remaining) (J) | Replacement Trade Price (%) | (KRW) | Settlement Amount (J) | Payment Date * | Interest | Settlement Amount + Interest |
|---|---|---|---|---|---|---|---|---|---|---|
| #1-FX | 25-Sep-08 | 18-Sep-08 | 29-Sep-08 | KRW 406,483.002 | 8.79% | KRW 879,000,000 | USD 375,911.35 | 16-Jun-09 | USD 2,199.42 |  |
| #2-N |  | 29-Sep-08 | 29-Sep-08 | KRW 10,000,000,000 | 100.70% | KRW 42,000,000 | USD 997.93 | 16-Jun-09 | USD 0.00 |  |
| #3-N |  | 29-Sep-08 | 29-Sep-08 | KRW 6,000,000,000 | 0.00% | KRW 0 | USD 0.00 | 16-Jun-09 | USD 0.00 |  |
| #4-N |  | 29-Sep-08 | 29-Sep-08 | KRW 3,130,000,000 | 91.35% | -KRW 666,901,000 | -USD 555,645.45 | 16-Jun-09 | -USD 16,331.34 |  |

EXHIBIT A
PAGE 152



| 4. Total | ETD Identification | | Claim Amount |
|---|---|---|---|
| | $ 14,548,712.22:<br><br>1. Settlement amount : $13,989,159.07= $13,942,060.91 (settled amount on 09/10/08 to be paid by 09/17/08)+ $47,098.16 (interest up to the ETD)<br><br>*<br><br>2. FX transaction cost: $532,514.04 = $531,594.96 + $919.08 (interest up to the ETD)<br><br>*<br><br>3. Replacement trade cost: $207,039.11 (no interest accrued) | | Claim Amount as of 01/16/09 |
| | | | $ 14,968,63A.00: ETD Notification Amount (0+ $ 419,740.87 (accrued interest up to 01/16/09) |

Applicable Rate (Default Rate) = Funding Cost + Margin amount)

Funding Cost : Korean Non-Guaranteed AA-rated Non-Bank Financial Institution Bond Yield On 29-Sep-2008

Payment Date : = the Date that Notice of the amount payable is effective

# EXHIBIT 10

GOODMORNING SHINHAN   Good Morning Shinhan Tower 23-2, Youido-Dong, Youngdungpo-Gu, Seoul, 150-712 Korea
SECURITIES   TEL 82 2 3772 1000   http://www.goodi.com

Feb. 6th, 2009

Lehman Brothers Commercial Corporation Asia Limited
Care of KPMG (appointed provisional liquidator)
27/F, Alexandre House, 18 Charter Road, Central, Hong Kong
Attn.: Mr. Edward Middleton / Joint and Several Provisional Liquidator

CC:   Attn: Mr. Na, Young Jun, Manager
Settlement Dept. Shinhan Bank, 120 Bungi, Taepyeong-ro, 2-ga, Jung-gu, Seoul, Korea
100-102

### Notice of Setoff

It is hereby notified that our claim against you (description and amount is as follows) and the debt owed by Shinhan Bank to you (description and amount is as follows) were set off against each other today to the extent of the applicable amount, in accordance with Part 5. (c) of the Schedule to the Master Agreement dated as of April 6, 2007.   Shinhan Bank is our affiliate company of which headquarters is located in 120 Bungi, Taepyeong-ro, 2-ga, Jung-gu, Seoul, Korea.   The set-off of the above debt shall be applied to the interest in our claim described below.

1.   **Description of Claim**

USD 15,057,617.11, the total claim amount of ours against you, which includes the principal, USD 13,942,060.91, incurred by us as a result of unwinding the terminated transactions under the ISDA Master Agreement dated April 6th, 2007 which occurred on Sept.10th, 2008, other costs and charges incurred by us as a result of your default in   payment of the principal, USD 558,634.07, and the interest accruing thereto, USD 542,957.24.

*n. K. n*

GOODMORNING SHINHAN    Good Morning Shinhan Tower 23-2, Youido-Dong, Youngdungpo-Gu, Seoul, 150-712 Korea
SECURITIES    TEL 82 2 3772 1000    http://www.goodi.com

## 2.    Description of Debt

The amount of USD 10,877.63 owed by Shinhan Bank to you as a result of the structured gold linked swap trade conducted on Dec. 14th, 2007 between you and Shinhan Bank.

As a result of the set-off, the amount of the interest in Description of Claim, USD 542,957.24, has been reduced to USD 532,079.61 and the total amount of our claim as of today in Description of Claim, USD 15,057,617.11, has been reduced to USD 15,046,739.48 accordingly.    If you have any questions or concerns in respect of our exercise of the set-off herein, please feel free to contact us at 822-3772-2164 or 8210-8255-7712.

Best regards,

*Nam Koong, Hoon*

Nam Koong, Hoon / Senior Manager of Legal Affairs Dept.
Goodmorning Shinhan Securities Co., Ltd.

Extend Your Financial Network ™

From:   Origin ID: CIBA   (310) 552-3100
Grazel Garcia
Peitzman, Weg & Kempinsky LLP
10100 Santa Monica Blvd.
Suite 1450
Los Angeles, CA 90067



**FedEx**
Express

**E**

J901100012329023

SHIP TO:   (866) 879-0688          BILL SENDER

**Epiq Bankruptcy Solutions, LLC**
**Lehman Brothers Holdings**
**757 Third Avenue, 3rd Floor**
**New York, NY 10017**



Ship Date: 10FEB09
ActWgt: 1.0 LB
CAD: 5180398/INET9010
Account#: S *********

Delivery Address Bar Code



Ref #    Lehman Brothers Holding
Invoice #
PO #
Dept #



BY: _____ **WED - 11FEB**          **A1**

TRK# 7973 2832 0069       **STANDARD OVERNIGHT**
[0201]

10017
NY-US
EWR

# XA OGSA



Shipping Label: Your shipment is complete

1. Use the 'Print' feature from your browser to send this page to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.**

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.