JONES DAY
222 East 41st Street
New York, New York 10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Corinne Ball
Jayant W. Tambe
Aviva Warter Sisitsky

*Attorneys for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
|   | : |   |
|---|---|---|
| In re: | : | Chapter 11 |
|   | : |   |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : | Case No. 08-13555 (JMP) |
|   | : |   |
| Debtors. | : | (Jointly Administered) |
|   | : |   |

-------------------------------------------------------------x
|   | : |   |
|---|---|---|
| LEHMAN BROTHERS HOLDINGS INC. and | : |   |
| LEHMAN BROTHERS SPECIAL | : | Adv. Proc. No. 10- _____ |
| FINANCING, INC. | : |   |
|   | : |   |
| Plaintiffs, | : |   |
|   | : |   |
| -against- | : |   |
|   | : |   |
| NOMURA INTERNATIONAL PLC., | : |   |
|   | : |   |
|   | : |   |
| Defendant. | : |   |

-------------------------------------------------------------x

## <u>ADVERSARY COMPLAINT AND OBJECTION</u>

Lehman Brothers Holdings Inc. ("<u>LBHI</u>") and Lehman Brothers Special

Financing Inc. ("<u>LBSF</u>") (and together with LBHI's affiliated debtors in the above-referenced

chapter 11 cases, the "Debtors"), as debtors and debtors in possession, as and for their Adversary

Complaint[1] against Nomura International plc ("Nomura"), hereby allege as follows:

## INTRODUCTION

1.      This action seeks redress against Nomura for its egregious inflation by hundreds

of millions of dollars of the proofs of claim that Nomura filed under penalty of perjury against

LBSF and LBHI.[2]  Nomura's claims have no basis in law, or in the parties' agreement.  Those

claims are premised on purported valuations and calculations that are commercially

unreasonable, divorced from economic reality, and bear no relation to any actual damages or

losses suffered by Nomura.  Indeed, based solely on the facts set forth in Nomura's claims, not

only is Nomura not entitled to a single cent from the Debtors, but instead it is Nomura that owes

the Debtors tens of millions of dollars.[3]

2.      Nomura's proofs of claim, numbers 17198 and 17199 (the "Nomura Claims"),

demand over $720 million from Debtors under a terminated ISDA Master Agreement with

---

[1]     Contemporaneously herewith, the Debtors also have filed (a) an adversary proceeding relating to certain proofs of claim filed by Nomura Securities Co. Ltd. ("Nomura Securities") against LBSF and LBHI, and (b) an objection to certain proofs of claim filed by Nomura Global Financial Products, Inc. ("Nomura GFP") against LBSF and LBHI.  The proofs of claim filed by Nomura Securities and Nomura GFP are based on separate swap agreements with the Debtors, and each of those claims also suffers from, among other things, egregious inflation.  Due to certain common issues presented by these three filings, for the sake of efficiency and judicial economy, disputes relating to the specific derivatives claims of all three Nomura entities should be heard together, and accordingly the Debtors have moved, contemporaneously herewith, to consolidate these disputes.  In total, the six proofs of claim demand over $1 billion from each of LBSF and LBHI.

[2]     References to proofs of claim include the facts set forth by Nomura in its supporting Derivatives Questionnaire, which it submitted on October 20, 2009.

[3]     This matter is being brought as an Adversary Complaint, rather than a claim objection, because the proper calculation of amounts owed under the Swap Agreement leads to both the disallowance of the Nomura Claims in their entirety and an affirmative recovery for LBSF, which, pursuant to Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), can only be sought by the commencement of an adversary proceeding, which, in turn, requires the filing of the Adversary Complaint.

LBSF, dated as of October 16, 1992 (the "Master Agreement" and together with the Schedule

thereto and various Confirmations entered into thereunder, the "Swap Agreement").[4]

3.     The Swap Agreement between LBSF and Nomura provided for Automatic Early

Termination of the agreement upon the occurrence of a "Bankruptcy" Event of Default (the

"Bankruptcy Event of Default").[5]  That Event of Default occurred no later than the bankruptcy

filing of LBHI, LBSF's Credit Support Provider, at approximately 2 a.m., Eastern Daylight

Time, on September 15, 2008 (the "Termination Date"), and may actually have occurred even

earlier.  Pursuant to the plain terms of the Swap Agreement, Nomura was required to calculate

the Settlement Amount owed upon the Early Termination of the Swap Agreement, as of the date

and time of the termination.  In the Swap Agreement, the parties expressly agreed that if the

Settlement Amount calculation yielded a negative number, *i.e.* Nomura had gained as a result of

the termination, then Nomura would be required to pay that gain to LBSF, notwithstanding that

LBSF was the Defaulting Party under the contract.

4.     Just prior to termination of the Swap Agreement, as of the close of business on

September 8, 2008, Nomura had calculated the value for the Swap Agreement as significantly in

favor of LBSF (the "Exposure")—approximately $248 million.  As required by the Swap

Agreement, Nomura transferred credit support to the Debtors in recognition of this Exposure.

---

[4]     Pursuant to the Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim, Approving the Form and Manner of Notice Thereof and Approving the Proof of Claim Form [Docket No. 4271], each Nomura Entity electronically uploaded supporting documentation on the website (http://www.lehman-claims.com), as required in the Derivative Questionnaire, including the Master Agreements with applicable Schedules and Credit Support Annexes, the September 2008 Calculation Statements, and with respect to Nomura, the February 2009 Calculation Statement.

[5]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Master Agreement, defined above, or the Credit Support Annex, dated as of October 16, 1992, between Nomura and LBSF (the "CSA"), which supplements and forms part of and is subject to the Master Agreement.

5.      Notwithstanding Nomura's own Exposure calculation in favor of the Debtors, Nomura delivered a Calculation Statement on September 30, 2008 (the "September 2008 Calculation Statement") purporting to calculate its Loss as of the "close of business" on September 16, 2008 (almost two full days following LBHI's petition for bankruptcy) and setting forth a Settlement Amount calculation of $172 million due and owed *by the Debtors to Nomura*. This calculation presented a swing of over $420 million in Nomura's favor from the calculation of its Exposure as of September 8, 2008.[6]

6.      The Swap Agreement required Nomura to calculate the Settlement Amount on the basis of market quotations obtained from multiple independent dealers.  Nomura acknowledged that it could not obtain any such quotes.  Instead, as Nomura admitted, it resorted to the alternative Loss method of calculating the Settlement Amount.  Under the Swap Agreement's definition of the Loss method of calculation, Nomura's Settlement Amount calculation was limited to actual contract damages, namely, the benefit of the bargain or costs actually incurred as a result of the early termination.

7.      Nomura admitted in its September 2008 Calculation Statement that it had calculated its Loss by using its own "internal models" to derive values for thousands of transactions entered into under the Swap Agreement and applying a "bid/offer spread" to pairs of offsetting and overlapping transactions.  As described below, Nomura arbitrarily manufactured a significant portion of its claim by applying a bid/offer spread on offsetting positions that posed zero economic risk to Nomura.

---

[6]      Nomura's Calculation Statements actually demanded $433 million which is the sum of:  the approximately $248 million in credit support Nomura had delivered to LBSF, the Settlement Amount of approximately $172 million and an additional amount of approximately $12 million in Unpaid Amounts.

8.      On February 13, 2009, Nomura delivered yet another Calculation Statement, in which it claimed an even larger Settlement Amount—$443,978,774.00 (the "February 2009 Calculation Statement").[7] Nomura's further inflation of the Settlement Amount by approximately $270 million stemmed entirely from a revised claim by Nomura for credit protection payments under ten Transactions with respect to certain Icelandic banks that experienced defaults in November 2008 – two months after the Swap Agreement had automatically terminated.  Thus, Nomura's claim for an additional $270 million was based on events, facts and circumstances that occurred long after the Swap Agreement was terminated.  There was no legal, factual or other basis for Nomura's inclusion in its February 2009 Calculation Statement of these further inflated claims or amounts.[8]

9.      The February 2009 Calculation Statement formed the basis of the Nomura Claims submitted on September 18, 2009.  The amounts in the February 2009 Calculation Statement were further inflated by Nomura's claim to unmatured interest and improper legal fees.

10.     The egregious inflation summarized above and detailed below is nothing more than an attempt by Nomura to wrongfully extract hundreds of millions of dollars from the Debtors to the direct detriment of the Debtors' estates and creditors.  Accordingly, the Debtors hereby bring this action to obtain (a) the disallowance of the Nomura Claims in their entirety, (b) a judgment finding that Nomura is in breach of the Swap Agreement and awarding LBSF the full amount that it is entitled to thereunder, (c) a declaration of the parties' rights and obligations

---

[7]     Attached to the Derivatives Questionnaire is the February 13, 2009 letter to LBSF in which Nomura attempted to recalculate the portion of the Settlement Amount attributable to the transactions with the Icelandic banks as Reference Entities.  This increased the total amount demanded by Nomura from $433 million to $704 million.

[8]     To be sure, LBHI and LBSF in no way concede the accuracy of Nomura's September 2008 calculation of amounts allegedly owning with respect to these Icelandic Bank transactions.   The original calculation is also inflated and widely in excess of an appropriate valuation.

08-13555-mg    Doc 8610    Filed 04/23/10    Entered 04/23/10 11:54:51    Main Document
Pg 6 of 25

under the Swap Agreement, and (d) attorney's fees and costs associated with the enforcement of

LBSF's rights under the Swap Agreement.

## JURISDICTION AND VENUE

11.     The statutory predicates for the relief requested herein are (a) sections 105, 502,

541 and 562 of title 11 of the United States Code (the "Bankruptcy Code"), (b) Rules 3007 and

7001 of the Bankruptcy Rules and (c) sections 2201 and 2202 of title 28 of the United States

Code.

12.     This Court has subject matter jurisdiction to consider and determine this matter

pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

13.     This Court has personal jurisdiction over Nomura due to the filing of the Nomura

Claims in the Debtors' chapter 11 cases and Nomura's active participation in these proceedings.

14.     Venue is proper in this district pursuant to 28 U.S.C. § 1409.

## PARTIES

15.     On September 15, 2008 and October 3, 2008 LBHI and LBSF respectively,

commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code. LBSF's

chapter 11 case has been consolidated with LBHI's chapter 11 case for procedural purposes only,

and those cases are being jointly administered pursuant to Bankruptcy Rule 1015(b). LBHI's

and LBSF's principal places of business are located at 1271 Sixth Avenue, New York, New

York 10020 and each is authorized to operate its businesses and manage its properties as a

debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

16.     Nomura is a limited liability company organized under the laws of the United

Kingdom, with its principal business address at Nomura House 1, St. Martin's-le-Grand, London

EC1A 4NP, United Kingdom.

## BACKGROUND

### I.    The Proofs Of Claim

17.    On September 18, 2009, Nomura filed the Nomura Claims against LBSF and LBHI. Those claims arose under the Swap Agreement with LBSF and, with respect to LBHI, in its capacity as Credit Support Provider under the Swap Agreement. The Nomura Claims were verified and signed by Robert Eveleigh for Nomura.

18.    Under the Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filling Proofs of Claim, Approving the Form and Manner of Notice Thereof and Approving the Proof of Claim Form, dated July 2, 2009 [Docket No. 4271], Nomura was additionally required to file a Derivatives Questionnaire, which under penalty of perjury was to provide the basis for the Nomura Claims. On October 20, 2009, Nomura submitted its Derivatives Questionnaire in connection with the Nomura Claims. The Derivatives Questionnaire included, among other things, Nomura's basis for the calculation of the Settlement Amount under the Master Agreement.

### II.    The Relevant Provisions Of The Master Agreement

19.    This adversary proceeding and claim objection concerns the application of the Master Agreement between Nomura and LBSF, dated as of October 16, 1992, as modified by the parties' execution of the Schedule.

20.    The Master Agreement governed approximately 2,464 derivatives Transactions entered into between Nomura and LBSF between 1992 and September 15, 2008. With respect to any particular Transaction, the parties' contract was comprised of the Master Agreement, Schedule and a Confirmation. The Master Agreement provided that, in the event of any inconsistencies between the Schedule and the other provisions of the Master Agreement, the Schedule would prevail. (*See* Master Agreement, § 1(b)).

A.    **Terms Relating To The Bankruptcy Event Of Default And Termination**

21.    The bankruptcy filing by LBHI, the Credit Support Provider under the Master

Agreement, constituted an Event of Default under Sections 5(a)(vii)(4) and (5) of the Master

Agreement.  Sections 5(a)(vii)(4) and (5) provided in relevant part:

> **5.    Events of Default and Termination Events**
>
> (a) *Events of Default*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—
>
> (vii) Bankruptcy. The party, any Credit Support Provider of such party [or] [. . .] (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation [. . . ; or] (5) has a resolution passed for its winding-up, official management or liquidation [. . . .]

22.    Pursuant to this provision, both a formal resolution to file for bankruptcy and a

bankruptcy filing itself constituted an Event of Default.

23.    The parties agreed that upon certain Events of Default, "[t]he 'Automatic Early

Termination' provisions of Section 6(a) will apply [. . . .]"  (*See* Schedule, Part I(e)).

24.    Section 6(a) of the Master Agreement provides that:  "If [ ] 'Automatic Early

Termination' is specified in the Schedule as applying to a party, then an Early Termination Date

in respect of all outstanding Transactions will occur immediately upon the occurrence with

respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or to the

extent analogous thereto (8), and as of the time immediately preceding the institution of the

relevant proceeding or the presentation of the relevant petition upon the occurrence with respect

to such party of an Event of Default specified in Section 5(a)(vii)(4) [. . . .]"

### B.    Terms Relating To Valuation

25.    The parties agreed in Part I(f) of the Schedule that payments due and owed under the Master Agreement on early termination would be calculated in accordance with "Market Quotation" and would be measured by "Second Method."

26.    Section 6(e)(i)(3) of the Master Agreement defined the Market Quotation and Second Method as follows:

> If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. *If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.*

(Emphasis added).

27.    In other words, if upon the Early Termination the Non-defaulting Party enjoyed a gain on the Terminated Transactions, it would be required to pay the amount of that gain to the Defaulting Party.

### III.    The Relevant Provisions Of The Credit Support Annex

28.    Nomura and LBSF also entered into a Credit Support Annex, dated as of October 16, 1992 ("CSA"), which supplemented, formed part of and was subject to the Master Agreement.  The CSA detailed the parties' rights and obligations in respect of credit support delivered by either party to the other.

29.    Paragraph 10 of the CSA defined "Exposure" as a calculation of amounts that would be owed on an Early Termination:

> "'Exposure' means, with respect to a party on a Valuation Date and subject to Paragraph 4 in the case of a dispute, the amount, if

any, that would be payable to that party by the other party
(expressed as a positive number) or by that party to the other party
(expressed as a negative number) pursuant to Section 6(e)(ii)(1) of
this Agreement if all Transactions (other than the Transaction
constituted by this Annex) were being terminated as of the relevant
Valuation Time, on the basis that (i) that party is not the Affected
Party and (ii) the Base Currency is the Termination Currency:
*provided* that Market Quotations will be determined by the
Valuation Agent on behalf of that party using its estimates at mid-
market of the amounts that would be paid for replacement
transactions (as that term is defined in the definition of 'Market
Quotation')"

30.     The parties calculated Exposure on nearly a daily basis over the life of the Swap

Agreement.

31.     As of Monday, September 8, 2008, Nomura had delivered credit support to LBSF

in an amount of over $248 million.  Consistent with Paragraph 10 of the CSA, Nomura's

delivery of credit support was an express admission by Nomura that, as of the close of business

on September 8, 2008, Nomura had calculated that $248 million was the amount required to

offset the funds Nomura would owe LBSF, "if all Transactions…were being terminated as of

[September 8, 2008]."  (CSA ¶ 10.)

**IV.     Termination Of The Swap Agreement**

32.     The LBHI Board of Directors met on September 14, 2008, at approximately

8 p.m., Eastern Daylight Time, and took action, among other things, to approve a resolution

authorizing LBHI to commence a chapter 11 proceeding.

33.     In accordance with Sections 5(a)(vii)(4) and 5(a)(vii)(5) of the Swap Agreement,

that resolution on September 14, 2008 in furtherance of the bankruptcy filing may have

constituted an Event of Default.  In any event, the resolution on September 14, 2008 was

followed within hours by a formal filing of LBHI's petition for bankruptcy, on September 15,

2008, at approximately 2 a.m., Eastern Daylight Time.  Under the Swap Agreement, an Event of Default, and Automatic Early Termination, occurred no later than this date and time.

34.    This Bankruptcy Event of Default triggered the agreed-upon Automatic Early Termination provision of Section 6(a) of the Master Agreement and caused all the Transactions under the Master Agreement to be automatically terminated "as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4)."  (*See* Master Agreement, § 6(a)).

35.    On September 19, 2008, Nomura delivered to LBSF a Notice of Automatic Early Termination on the basis of LBHI's bankruptcy filing but failed to identify the applicable Automatic Early Termination Date.

36.    "On or as soon as reasonably practicable" following the Automatic Early Termination Date, Nomura was required to deliver to LBSF a Calculation Statement, which would determine the Settlement Amount under the Swap Agreement.  (*See* Master Agreement, § 6(d)(i)).

## V.    Nomura Calculated The Settlement Amount Without Regard To Contract Damages Or Actual Loss

37.    Despite Nomura's recognition of its Exposure to the Debtors as of September 8, 2008, in an amount over $248 million, on September 30, 2008, Nomura delivered the September 2008 Calculation Statement to the Debtors, which stated that it was the *Debtors* that owed *Nomura* over $433 million, as of September 16, 2008.  This calculation by Nomura, as reflected in the September 2008 Calculation Statement, resulted in a swing in the valuation of the Transactions of approximately $420 million in favor of Nomura.  (*See* p. 4, *supra*).

38.     Nomura's September 2008 Calculation Statement failed to identify the Automatic Early Termination Date and simply identified September 16, on "the close of business," as the date and time that Nomura used to determine its purported Loss.

39.     Nomura was required to calculate its Loss as close in time to the Automatic Early Termination Date as reasonably practicable.  The Automatic Early Termination Date was no later than the time that LBHI filed for bankruptcy in the early hours of September 15, 2008.

40.     The Swap Agreement provided that, upon notice of early termination, the Settlement Amount was required to be calculated using Market Quotation and Second Method. Applying this calculation methodology, the Settlement Amount is determined based on market quotations that the Non-defaulting Party obtains from Reference Market-makers to determine the cost of replacing the transactions.  If the overall cost of replacing the transactions is positive, the Defaulting Party must pay that cost to the Non-defaulting Party, but if the replacement cost is negative, meaning that the termination of the transactions led to a net gain for the Non-defaulting Party, the Non-defaulting Party must pay that gain to the Defaulting Party.  (*See* Master Agreement, §§ 6(e) and 14.)

41.     In its September 2008 Calculation Statement, Nomura admitted that it did not calculate the Settlement Amount in accordance with Market Quotation, but instead reverted to a Loss calculation.  Nomura stated that it "sent notices to four Reference Market-makers to obtain Market Quotations for the Terminated Transactions, but no Reference Market-maker was willing to provide any Market Quotation with respect to any of the Transactions."

42.     Nomura stated that "Market Quotations could not be determined and would not, in the reasonable belief of the Non-Defaulting Party, produce a commercially reasonable result,

and that the Credit Support threatened to decline speedily in value." (*See* September 2008 Calculation Statement).

43.    Nomura further admitted in the September 2008 Calculation Statement that Loss is "the amount that the Non-Defaulting Party reasonably determines in good faith to be its total losses and costs (expressed as a positive number) (or gain in which case expressed as a negative number) in connection with each Terminated Transaction."  Nomura thus stated that it determined its Loss "at the close of business on 16 September 2008, by reference to" its own "internal models (which generate a 'mid' value), and by reference to a bid/offer spread." (*See* September 2008 Calculation Statement).  Nomura neither provided the Debtors with its "internal models" nor explained why it was entitled to take a "bid/offer spread" at all, let alone in the commercially unreasonable manner it did so, to calculate its Loss under Section 14 of the Master Agreement.

## VI.    Nomura's Egregious Inflation Of Its Claims

44.    In the Nomura Claims, Nomura asserted that as of September 16, 2008, LBSF owed Nomura a termination payment under Section 6(e) of the Master Agreement in the hundreds of millions of dollars.

45.    However, just days earlier, on September 8, 2008, Nomura admitted, through its delivery of credit support to LBSF, that the portfolio was valued in favor of the Debtors—not the other way around.  This swing of hundreds of millions of dollars between how the transactions were valued by Nomura on September 8, 2008 and how Nomura claimed those same transactions were valued just days later, is but one example of Nomura's egregious claim inflation.

46.    Indeed, the Nomura Claims were higher still and included amounts for unmatured interest, unreasonable fees and expenses and hundreds of millions of dollars claimed by Nomura for credit events that took place *after* the Transactions were terminated.

47.    Upon information and belief, this material swing in the value of the transactions under the Swap Agreement did not arise solely, or even substantially, from changes in the market between September 8th and September 16th, but rather from how Nomura admits it manipulated its calculation of Loss.  Nomura's calculation was in violation of both the terms of the Swap Agreement and Nomura's obligation to mitigate its damages.

48.    A systemic problem with the Nomura Claims was Nomura's failure to properly value offsetting mirror Transactions.  For example, Nomura acknowledged in its September 2008 Calculation Statement, submitted under oath to this Court, that it had determined its Loss by using its "internal models" to derive a value for each of the thousands of individual Transactions, and then applying a "bid/offer spread" to each one.  Many of these Transactions, however, were credit derivative Transactions and represented both the purchase of credit protection and the sale of credit protection against the exact same underlying reference obligations with identical Maturity Dates and Effective Dates.  There was little or no net risk to Nomura or LBSF on collections of such offsetting Transactions between themselves.  By applying deflated bid prices and inflated offer prices, Nomura generated hundreds of millions of dollars of "Loss" without actually suffering any loss at all because these positions, when viewed together, posed minimal, if any, economic risk.

49.    By way of illustration, set forth below is an analysis from Nomura's own submissions of 23 separate Credit Derivative Transactions, concerning a particular index as the reference obligation – Markit CDX North America Investment Grade Index, Series 5, 5 Year maturity ("CDX IG CDSI S5 5Y").  With respect to this index, Nomura sold credit protection to LBSF in 13 separate Transactions each with the same Effective Date of September 21, 2005, the same Maturity Date of December 20, 2010 and the same coupon.  The total notional amount of

these 13 Transactions was $1.54975 billion.  With respect to exactly the same index, LBSF sold

credit protection to Nomura in 10 other transactions, also each with an Effective Date of

September 21, 2005 and a Maturity Date of December 20, 2010.  The total notional amount of

these 10 Transactions was $1.5355 billion.  These 23 transactions, although they represent gross

notional amounts of over $3 billion, presented a smaller economic risk, that is, on a net basis

these 23 Transaction were economically equivalent to a single transaction in which Nomura sold

credit protection to LBSF on the CDX IG CDSI S5 5Y index on a notional amount of $14.25

million, with an Effective Date of September 21, 2005 and a Maturity Date of December 20,

2010.  The 23 transactions discussed above are graphically illustrated as follows:



-15-

50.     Using the above 23 transactions as an example, an analysis of Nomura's valuation is revealing.  Instead of valuing the net economic exposure of these Transactions, Nomura has inflated and exaggerated the economic risk by applying broadly divergent bid prices and offer prices for these otherwise identical and offsetting transactions.  By doing so, Nomura was able to generate a Settlement Amount valuation for these 23 Transactions in the amount of $2.479 million owed by LBSF to Nomura.  Nomura offered no insight or explanation into its pricing or methodology let alone an explanation or justification for why it derived and employed multiple bid prices and multiple offer prices.  The net effect of Nomura's methodology is described below.  In sharp contrast to Nomura's skewed valuation, a proper economic analysis, using Nomura's own prices, would yield a settlement amount value for these Transactions of approximately $589,736 owed by Nomura to LBSF.[9]

---

[9]     Based on the prices Nomura quoted in its Calculation Statement, and applying the price most favorable to Nomura on the net Exposure, the result of this analysis is still one in which Nomura would owe money to LBSF.  Because Nomura has not divulged its internal models and pricing methodology, Debtors cannot evaluate the validity of any Nomura price, and reserves all of its rights to contest and challenge the prices actually used.



51.     This is not an isolated example but instead Normura's *modus operandi*.  Nomura repeated this procedure with hundreds of offsetting Transactions, leading to a massive inflation of its claims.

52.     Nomura provided no justification for this valuation methodology—Nomura merely stated in its claims that Nomura's Loss is based on its "internal models (which generate a 'mid' value) and by reference to a bid/offer spread," determined by it "as appropriate for the Transaction in question."  Nomura provided neither its "internal models" nor its methodology for determining the "bid/offer spread."  Because Nomura's calculation bore no reasonable

relationship to the actual economic effect of the terminated Transactions, Nomura breached the

Swap Agreement and determined its bankruptcy claims in bad faith.

53.     Nomura has offered no explanation or basis for claiming any bid/offer spread, let

alone a bid/offer spread applied in the commercially unreasonable manner as Nomura has done.

Indeed, there is no indication in Nomura's submissions that it incurred any actual losses or

damages at all as a result of the Early Termination.

**VII.    Nomura Compounds Its Wrongful Conduct And Bad Faith Through
The Revised Calculation Statement Delivered Months Later**

54.     In February 2009, apparently unsatisfied with its inflated September 2008

Calculation Statement Nomura sought to unilaterally substitute a new calculation, purportedly to

correct an "error" that increased Nomura's Settlement Amount by additional hundreds of

millions of dollars.

55.     An examination of the Nomura Claims revealed that certain of the terminated

credit derivative transactions under the Swap Agreement identified three Icelandic Banks as their

Reference Entities (the "Icelandic Bank Transactions").

56.     These Icelandic Banks suffered credit events late in 2008, well-after the Icelandic

Bank Transactions had been terminated pursuant to the Automatic Early Termination provision

of the Master Agreement.  Nomura nonetheless claimed that it had a right to re-calculate its

Settlement Amount to claim protection under the Icelandic Bank Transactions.

57.     There was no language in the Swap Agreement, however, that permitted Nomura

to further inflate its claims based on events, facts and circumstances that occurred long after the

Transactions had been terminated.  Simply stated, the Swap Agreement did not entitle the buyer

of protection to payment for a Credit Event that occurs after the Swap Agreement had

terminated.

58.    Section 6(c)(ii) of the Master Agreement provided that upon "the occurrence of an Early Termination Date, no further payments [. . .] in respect of the Terminated Transactions will be required to be made [. . . .]"

59.    Indeed, Nomura acknowledged in its September 19, 2008 Notice of Automatic Early Termination that as of September 15, 2008, the Swap Agreement, and all transactions thereunder, were terminated, including those with Icelandic bank Reference Entities.  There can be no dispute that all Transactions under the Swap Agreement, including the Icelandic Bank Transactions, terminated no later than September 15, 2008.

60.    In fact, in its September 2008 Calculation Statement, Nomura provided Loss values for, among other transactions, the Icelandic Bank Transactions.

61.    In the February 2009 Calculation Statement, Nomura recalculated the portion of the Settlement Amount attributable to the Icelandic Bank Transactions, based on its knowledge in hindsight that credit events had taken place with respect to those Icelandic Bank Transactions *after* they were terminated and used values for the payment amounts allegedly owed based on values that were determined at an auction in November, 2008.  Applying these new values to the Icelandic Bank Transactions increased Nomura's already inflated Settlement Amount by hundreds of millions of dollars more.

62.    In Nomura's September 2008 Calculation Statement it calculated a Settlement Amount for the 12 Icelandic Bank Transactions: (a) 10 Transactions in which LBSF sold protection to Nomura with a total notional amount of approximately USD 485,890,900 and a Maturity Date of September 20, 2011, and (b) two Transactions in which Nomura sold protection to LBSF with a total notional amount of approximately USD 10,039,284 and Maturity Dates of September 20, 2015 and 2016.  In the September 2008 Calculation Statement, Nomura valued

the ten Transactions in which LBSF sold protection to Nomura at approximately $175 million in Nomura's favor. However, in February of 2009, Nomura provided LBSF with the 2009 Calculation Statement in which it more than doubled its valuation of the 10 Transactions to nearly $450 million.[10] In the September 2008 Calculation Statement, Nomura valued the two Transactions where LBSF bought protection transactions at approximately $1.5 million owing to Lehman. When, in February 2009, Nomura recalculated the Icelandic Bank Transactions in which it had purchased credit protection from LBSF, Nomura did not recalculate the Icelandic Bank Transactions in which it had sold that same credit protection. Had Nomura at least taken the same approach with all of the Icelandic Transactions, the protection LBSF purchased would have been worth over $7 million. This omission further exaggerated the Nomura Claims.

63.    There was no basis under the Swap Agreement and no justification in industry practice for Nomura's effort to recalculate the values of these transactions based on events that took place weeks and months after the Transactions terminated. This is yet another example of Nomura's willingness to ignore its obligations under both the contract and the law in an effort to secure a windfall from the Debtors' bankruptcy.

64.    The Nomura Claims were based on the egregiously inflated February 2009 Calculation Statement, and the Nomura Claims furthermore included improper claims for unmatured interest and legal fees.

## VIII.    Nomura Is Not Entitled To Unmatured Default Interest Or Legal Fees

65.    The Nomura Claims included (a) alleged default interest accruing through September 18, 2009, and (b) alleged expenses incurred in connection with the enforcement of the

---

[10]    Debtors do not accept the validity of the values for the Icelandic Bank Transactions in Nomura's September 2008 Calculation Statement, and reserves all of its rights to contest and challenge those valuations.

Swap Agreement.  Neither the interest, nor the attorney's fees were properly included in the Nomura Claims.

66.     As a threshold matter, because Nomura was not entitled to a Settlement Amount under the Swap Agreement, Nomura is not entitled to default interest or expenses associated with the enforcement of its non-existent right to collect amounts from LBHI.  Furthermore, even if LHBI owed Nomura amounts under the Swap Agreement, which it does not, Nomura would not be entitled to default interest or expenses.  That is, Nomura admitted in the Nomura Claims that the claimed attorney's fees cover work done not only on its behalf, but also that done on behalf of other related entities:  Nomura Securities and Nomura GFP.  There was no provision in the Swap Agreement that permitted Nomura to seek the payment of legal fees incurred by its related entities, in pursuit of payment under agreements other than the Swap Agreement.

67.     Even distributed among the three entities, the fees claimed were unreasonably high and unjustifiable under the circumstances.  Both under the Swap Agreement and as a matter of equity, Nomura should not be able to place the burden of its unreasonableness on other creditors of the Debtors' estates.

68.     Further, the Default Interest was largely unmatured on the date when the Debtors filed for bankruptcy, and therefore not rightly included in a proof of claim.  The Nomura Claims sought interest accruing through September 18, 2009.  Substantially all of the claimed interest would have accrued post-petition.  Nomura had no basis to claim such unmatured interest and all such amounts should be disallowed pursuant to section 502(b)(2) of the Bankruptcy Code.

## FIRST CAUSE OF ACTION
### (Objections to Claims)

69.     The Debtors hereby incorporate the foregoing paragraphs as if fully restated herein.

70.    Pursuant to section 502(a) of the Bankruptcy Code, a proof of claim will not be "deemed allowed" where a party in interest objects thereto.

71.    The Debtors hereby object to the Nomura Claims.

72.    The Nomura Claims are not valid claims against LBSF and LBHI, as the Swap Agreement between Nomura and LBSF is terminated and LBSF and LBHI have no remaining obligations to Nomura under the Swap Agreement.

73.    Nomura's proffered Settlement Amount calculation as reflected in the Nomura Claims is not commercially reasonable, is egregiously inflated and was not calculated in good faith as required by the Swap Agreement.

74.    Further, the Nomura Claims expressly include amounts allegedly owed for unmatured interest and such amounts should be disallowed (a) pursuant to section 502(b)(1) of the Bankruptcy Code, because Nomura is not entitled to such interest under the Swap Agreement and (b) even if a Settlement Amount was owed to Nomura, pursuant to section 502(b)(2) of the Bankruptcy Code.

75.    The Nomura Claims also include amounts owed for attorney's fees and costs that (a) Nomura is not entitled to under the Swap Agreement and (b) are unreasonable and unjustified.

76.    The Nomura Claims should be disallowed in their entirety and expunged, and the Debtors hereby expressly reserve the right to further object to the Nomura Claims, or any other claims filed by Nomura, on any other basis.

### SECOND CAUSE OF ACTION
**(Breach of Contract)**

77.    The Debtors hereby incorporate the foregoing paragraphs as if fully restated herein.

78.     Nomura further breached the Swap Agreement by calculating its Loss in bad faith and in a manner that was both commercially unreasonable and wholly unrelated to its actual economic damages.

79.     Upon information and belief, Nomura breached the Swap Agreement by failing properly to mitigate its damages by replacing the terminated transactions in a commercially reasonable manner.

80.     Under the Swap Agreement, Nomura was required to pay the Debtors for any gains it enjoyed as a result of termination.

81.     As a direct and proximate result of Nomura's breaches of the Swap Agreement, the Debtors have been deprived of a substantial sum of money in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
**(Declaratory Judgment)**

82.     The Debtors hereby incorporate the foregoing paragraphs as if fully restated herein.

83.     The parties to this action are the parties who have or who may claim to have an interest that may be affected by the declaration requested.

84.     This action is within the jurisdiction of this Court and the Debtors are entitled to declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

85.     An actual controversy exists between the Debtors and Nomura, which is justiciable in character, and speedy relief is necessary to preserve the parties' respective rights.

86.     Nomura's calculation of the Settlement Amount was not in compliance with Market Quotation or Loss as defined in the Swap Agreement, nor did it have any legitimate commercial or economic basis.

87.     Unless this Court makes a declaration of the rights and obligations of the parties under the Swap Agreement, the Debtors will continue to suffer substantial harm.

88.     A declaratory judgment will resolve the entire dispute between the parties and save the parties substantial costs and expenses.

## FOURTH CAUSE OF ACTION
### (Attorney's Fees, Costs and Litigation Expenses)

89.     The Debtors hereby incorporate the foregoing paragraphs as if fully restated herein.

90.     The Swap Agreement is valid and enforceable against Nomura as a matter of law.

91.     The Swap Agreement provides that Nomura's failure to abide by its terms entitles the Debtors to an award of attorney's fees and reasonable expenses.

92.     Nomura's egregious calculation of the Settlement Amount constitutes a material breach of the Swap Agreement.

93.     The Debtors have been forced to incur attorney's fees and expenses because of Nomura's failure to abide by the terms of the Swap Agreement and its failure to calculate the Settlement Amount in good faith.

94.     The Debtors are thus entitled to an award of attorney's fees, costs and litigation expenses.

## PRAYER FOR RELIEF

WHEREFORE, the Debtors pray for judgment against Nomura as follows:

A.      Sustaining the Debtors' objection to the Nomura Claims and disallowing and expunging such claims in their entirety as set forth herein;

B.      Determining that Nomura has breached the Swap Agreement and owes LBSF damages in an amount to be determined at trial;

C.    Awarding declaratory judgment in favor of the Debtors, including a declaration of the parties' rights and obligations under the Swap Agreement;

D.    Awarding the Debtors attorney's fees, costs and other expenses incurred in connection with this action; and

E.    Granting the Debtors such other and further relief as the Court deems just and proper.

Dated:  New York, New York
         April 23, 2010

                                        Respectfully submitted,


                                        ____/s/ Jayant Tambe_____
                                        Corinne Ball
                                        Jayant W. Tambe
                                        Aviva Warter Sisitsky
                                        JONES DAY
                                        222 East 41st Street
                                        New York, New York 10017
                                        Telephone:  (212) 326-3939
                                        Facsimile:  (212) 755-7306

                                        *Attorneys for the Debtors and
                                        Debtors in Possession*