JONES DAY
222 East 41st Street
New York, New York 10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Corinne Ball
Jayant W. Tambe
Aviva Warter Sisitsky

*Attorneys for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
                                        :
In re:                                  :    Chapter 11
                                        :
LEHMAN BROTHERS HOLDINGS INC., et al.,  :    Case No. 08-13555 (JMP)
                                        :
              Debtors.                  :    (Jointly Administered)
                                        :
------------------------------------------------------------- x
                                        :
LEHMAN BROTHERS HOLDINGS INC. and       :
LEHMAN BROTHERS SPECIAL                 :    Adv. Proc. No. 10- _____
FINANCING, INC.                         :
                                        :
              Plaintiffs,               :
                                        :
   -against-                            :
                                        :
NOMURA SECURITIES CO. LTD.              :
                                        :
              Defendant.                :
------------------------------------------------------------- x
```

<u>**ADVERSARY COMPLAINT AND OBJECTION**</u>

Lehman Brothers Holdings Inc. ("<u>LBHI</u>") and Lehman Brothers Special

Financing Inc. ("<u>LBSF</u>") (and together with LBHI's affiliated debtors in the above-referenced

chapter 11 cases, the "<u>Debtors</u>"), as debtors and debtors in possession, as and for their Adversary

Complaint[1] against Nomura Securities Co. Ltd. ("<u>Nomura Securities</u>"), hereby allege as follows:

## <u>NATURE OF ACTION</u>

1.      This action seeks redress against Nomura Securities for its egregious inflation by

tens of millions of dollars of the proofs of claim that Nomura Securities filed under penalty of

perjury against LBSF and LBHI.[2]  Nomura Securities' claims have no basis in law, or in the

parties' agreement.  Those claims are premised on purported valuations and calculations that are

commercially unreasonable, divorced from economic reality, and bear no relation to any actual

damages or losses suffered by Nomura Securities.  Indeed, based solely on the facts set forth in

Nomura Securities' claims, not only is Nomura Securities not entitled to a single cent from the

Debtors, but instead it is Nomura Securities that owes the Debtors millions of dollars.[3]

2.      Nomura Securities' proofs of claim, numbers 17202 and 17203 (the "<u>Nomura</u>

<u>Securities Claims</u>") demand over $40 million from Debtors under a terminated ISDA Master

Agreement with LBSF, dated as of September 21, 2000 (the "<u>Master Agreement</u>" and together

---

[1]      Contemporaneously herewith, the Debtors also have filed (a) an adversary proceeding relating to certain proofs of claim filed by Nomura International plc ("<u>Nomura</u>") against LBSF and LBHI, and (b) an objection to certain proofs of claim filed by Nomura Global Financial Products, Inc. ("<u>Nomura GFP</u>") against LBSF and LBHI.  The proofs of claim filed by Nomura and Nomura GFP are based on separate swap agreements with the Debtors, and each of those claims also suffers from, among other things, egregious inflation.  Due to certain common issues presented by these three filings, for the sake of efficiency and judicial economy, disputes relating to the specific derivatives claims of all three Nomura entities should be heard together, and accordingly the Debtors have moved, contemporaneously herewith, to consolidate these disputes.  In total the six proofs of claim demand over $1 billion from each of LBSF and LBHI.

[2]      References to proofs of claim include the facts set forth by Nomura Securities in its supporting Derivatives Questionnaire, which it submitted on October 21, 2009.

[3]      This matter is being brought as an Adversary Complaint, rather than a claim objection, because the proper calculation of amounts owed under the Swap Agreement leads to both the disallowance of the Nomura Securities Claims in their entirety and an affirmative recovery for LBSF, which, pursuant to Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), can only be sought by the commencement of an adversary proceeding, which, in turn, requires the filing of the Adversary Complaint.

with the Schedule thereto and various Confirmations entered into thereunder, the "Swap Agreement").[4]

3.        The Swap Agreement between LBSF and Nomura Securities provided for Automatic Early Termination of the agreement upon the occurrence of a "Bankruptcy" Event of Default (the "Bankruptcy Event of Default").[5] That Event of Default occurred no later than the bankruptcy filing of LBHI, LBSF's Credit Support Provider, at approximately 2 a.m., Eastern Daylight Time, on September 15, 2008 (the "Termination Date"), and may actually have occurred even earlier.  Pursuant to the plain terms of the Swap Agreement, Nomura Securities was required to calculate the Settlement Amount owed upon the Early Termination of the Swap Agreement, as of the date and time of the termination.  In the Swap Agreement, the parties expressly agreed that if the Settlement Amount calculation yielded a negative number, *i.e.* Nomura Securities had gained as a result of the termination, then Nomura Securities would be required to pay that gain to LBSF, notwithstanding that LBSF was the Defaulting Party under the contract.

4.        Just days prior to termination of the Swap Agreement, as of the close of business on September 5, 2008, Nomura Securities had calculated the value for the Swap Agreement as significantly in favor of LBSF (the "Exposure")—approximately $90 million.  As required by the

---

[4]        Pursuant to the Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim, Approving the Form and Manner of Notice Thereof and Approving the Proof of Claim Form [Docket No. 4271], each Nomura Entity electronically uploaded supporting documentation on the website (http://www.lehman-claims.com), as required in the Derivative Questionnaire, including the Master Agreements with applicable Schedules and Credit Support Annexes, the September 2008 Calculation Statements, and with respect to Nomura, the February 2009 Calculation Statement.

[5]        Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Master Agreement, defined above, or the Credit Support Annex, dated as of September 21, 2000, between Nomura Securities and LBSF (the "CSA"), which supplements and forms part of and is subject to the Master Agreement.

Swap Agreement, Nomura Securities transferred credit support to the Debtors in recognition of this Exposure.

5.    Notwithstanding Nomura Securities' own Exposure calculation in favor of the Debtors, Nomura Securities delivered a Calculation Statement on September 30, 2008 (the "September 2008 Calculation Statement") purporting to calculate its Loss as of September 16, 2008 (almost two full days following LBHI's petition for bankruptcy) and setting forth a Settlement Amount calculation of $42 million due and owed by Nomura Securities.  This calculation presented a swing of over $47 million in Nomura Securities' favor from the calculation of its Exposure as of September 5, 2008.[6]

6.    The Swap Agreement required Nomura Securities to calculate the Settlement Amount on the basis of market quotations obtained from multiple independent dealers.  Nomura Securities acknowledged that it could not obtain any such quotes.  Instead, as Nomura Securities admitted, it resorted to the alternative Loss method of calculating the Settlement Amount.  Under the Swap Agreement's definition of the Loss method of calculation, Nomura Securities' Settlement Amount calculation was limited to actual contract damages, namely, the benefit of the bargain or costs actually incurred as a result of the early termination.

7.    Nomura Securities admitted in its September 2008 Calculation Statement that it had calculated its Loss "in some cases" by using its own "internal models" to derive values for over 700 transactions entered into under the Swap Agreement and applying a "bid/offer spread" to pairs of offsetting and overlapping transactions.  As described below, Nomura Securities

---

[6]    Nomura Securities' Calculation Statement actually demanded that LBSF pay Nomura Securities $37 million, which is the sum of:  the approximately $80 million credit support Nomura Securities had delivered to LBSF, *i.e.* the Exposure less a $10 million Threshold Amount, less the $42 million Settlement Amount payable to LBSF.

arbitrarily manufactured a significant portion of its claim by applying a "bid/offer spread" on offsetting positions that posed zero economic risk to Nomura Securities.

8.      The September 2008 Calculation Statement formed the basis of the Nomura Securities Claims submitted on September 18, 2009.  The amounts in the September 2008 Calculation Statement were further inflated by Nomura Securities' claim to unmatured interest and improper legal fees.

9.      The egregious inflation summarized  above and detailed below is nothing more than an attempt by Nomura Securities to wrongfully extract tens of millions of dollars from the Debtors to the direct detriment of the Debtors' estates and creditors.  Accordingly, the Debtors hereby bring this action to obtain (a) the disallowance of the Nomura Securities Claims in their entirety, (b) a judgment finding that Nomura Securities is in breach of the Swap Agreement and awarding LBSF the full amount that it is entitled to thereunder, (c) a declaration of the parties' rights and obligations under the Swap Agreement, and (d) attorney's fees and costs associated with the enforcement of LBSF's rights under the Swap Agreement.

## JURISDICTION AND VENUE

10.     The statutory predicates for the relief requested herein are (a) sections 105, 502, 541 and 562 of title 11 of the United States Code (the "Bankruptcy Code"), (b) Rules 3007 and 7001 of the Bankruptcy Rules and (c) sections 2201 and 2202 of title 28 of the United States Code.

11.     This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

12.     This Court has personal jurisdiction over Nomura Securities due to the filing of
the Nomura Securities Claims in the Debtors' chapter 11 cases and Nomura Securities' active
participation in these proceedings.

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1409.

## PARTIES

14.     On September 15, 2008 and October 3, 2008 LBHI and LBSF respectively,
commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code.  LBSF's
chapter 11 case has been consolidated with LBHI's chapter 11 case for procedural purposes only,
and those cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).  LBHI's
and LBSF's principal places of business are located at 1271 Sixth Avenue, New York, New
York 10020 and each is authorized to operate its businesses and manage its properties as a
debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

15.     Nomura Securities is a limited liability company organized under the law of
Japan, with its principal business address at 1-9-1 Nihonbashi, Chuo-ku, Tokyo 103-8011, Japan.

## BACKGROUND

### I.     The Proofs Of Claim

16.     On September 18, 2009, Nomura Securities filed the Nomura Securities Claims
against LBSF and LBHI.  Those claims arose under the Swap Agreement with LBSF and with
respect to LBHI, in its capacity as Credit Support Provider under the Swap Agreement.  The
Nomura Securities Claims were verified and signed by Hiroaki Usui, for Nomura Securities.

17.     Under the Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and
Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filling Proofs of Claim, Approving
the Form and Manner of Notice Thereof and Approving the Proof of Claim Form, dated July 2,
2009 [Docket No. 4271], Nomura Securities was additionally required to file a Derivatives

Questionnaire, which under penalty of perjury was to provide the basis for the Nomura Securities

Claims.  On October 21, 2009, Nomura Securities submitted its Derivatives Questionnaire in

connection with the Nomura Securities Claims.  The Derivatives Questionnaire included, among

other things, Nomura Securities' basis for the calculation of the Settlement Amount under the

Master Agreement.

## II.    The Relevant Provisions Of The Master Agreement

18.    This adversary proceeding and claim objection concerns the application of the

Master Agreement between Nomura Securities and LBSF, dated as of September 21, 2000, as

modified by the parties' execution of the Schedule.

19.    The Master Agreement governed approximately 726 derivatives Transactions

entered into between Nomura Securities and LBSF between 2000 and September 15, 2008.  With

respect to any particular Transaction, the parties' contract was comprised of the Master

Agreement, Schedule and a Confirmation.  The Master Agreement provided that, in the event of

any inconsistencies between the Schedule and the other provisions of the Master Agreement, the

Schedule would prevail.  (*See* Master Agreement, § 1(b)).

### A.    Terms Relating To The Bankruptcy Event Of Default And Termination

20.    The bankruptcy filing by LBHI, the Credit Support Provider under the Master

Agreement, constituted an Event of Default under Sections 5(a)(vii)(4) and (5)of the Master

Agreement.  Sections 5(a)(vii)(4) and (5) provided in relevant part:

> **5.    Events of Default and Termination Events**
>
> (a) *Events of Default*. The occurrence at any time with respect to a
> party or, if applicable, any Credit Support Provider of such party or
> any Specified Entity of such party of any of the following events
> constitutes an event of default (an "Event of Default") with respect
> to such party:—

(vii) Bankruptcy. The party, any Credit Support Provider of
such party [or] [. . .] (4) institutes or has instituted against it a
proceeding seeking a judgment of insolvency or bankruptcy or any
other relief under any bankruptcy or insolvency law or other
similar law affecting creditors' rights, or a petition is presented for
its winding-up or liquidation [. . . ; or] (5) has a resolution passed
for its winding-up, official management or liquidation [. . . .]

21.    Pursuant to this provision, both a formal resolution to file for bankruptcy and a
bankruptcy filing itself constituted an Event of Default.

22.    The parties agreed that upon certain Events of Default, "[t]he 'Automatic Early
Termination' provisions of Section 6(a) will apply [. . . .]"  (*See* Schedule, Part I(e)).

23.    Section 6(a) of the Master Agreement provides that:  "If [ ] 'Automatic Early
Termination' is specified in the Schedule as applying to a party, then an Early Termination Date
in respect of all outstanding Transactions will occur immediately upon the occurrence with
respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or to the
extent analogous thereto (8), and as of the time immediately preceding the institution of the
relevant proceeding or the presentation of the relevant petition upon the occurrence with respect
to such party of an Event of Default specified in Section 5(a)(vii)(4) [. . . .]"

**B.    <u>Terms Relating To Valuation</u>**

24.    The parties agreed in Part I(f) of the Schedule that payments due and owed under
the Master Agreement on early termination would be calculated in accordance with "Market
Quotation" and would be measured by "Second Method."

25.    Section 6(e)(i)(3) of the Master Agreement defined the Market Quotation and
Second Method as follows:

If the Second Method and Market Quotation apply, an amount will
be payable equal to (A) the sum of the Settlement Amount
(determined by the Non-defaulting Party) in respect of the
Terminated Transactions and the Termination Currency Equivalent

of the Unpaid Amounts owing to the Non-defaulting Party less (B)
the Termination Currency Equivalent of the Unpaid Amounts
owing to the Defaulting Party. *If that amount is a positive number,
the Defaulting Party will pay it to the Non-defaulting Party; if it is
a negative number, the Non-defaulting Party will pay the absolute
value of that amount to the Defaulting Party.*

(Emphasis added).

26.     In other words, if upon the Early Termination the Non-defaulting Party enjoyed a

gain on the Terminated Transactions, it would be required to pay the amount of that gain to the

Defaulting Party.

### III.     The Relevant Provisions Of The Credit Support Annex

27.     Nomura Securities and LBSF also entered into a Credit Support Annex, dated as

of September 21, 2000 ("CSA"), which supplemented, formed part of and was subject to the

Master Agreement.  The CSA detailed the parties' rights and obligations in respect of credit

support delivered by either party to the other.

28.     Paragraph 10 of the CSA defined "Exposure" as a calculation of amounts that

would be owed on an Early Termination:

"'Exposure' means, with respect to a party on a Valuation Date
and subject to Paragraph 4 in the case of a dispute, the amount, if
any, that would be payable to that party by the other party
(expressed as a positive number) or by that party to the other party
(expressed as a negative number) pursuant to Section 6(e)(ii)(1) of
this Agreement if all Transactions (other than the Transaction
constituted by this Annex) were being terminated as of the relevant
Valuation Time, on the basis that (i) that party is not the Affected
Party and (ii) the Base Currency is the Termination Currency:
*provided* that Market Quotations will be determined by the
Valuation Agent on behalf of that party using its estimates at mid-
market of the amounts that would be paid for replacement
transactions (as that term is defined in the definition of 'Market
Quotation')"

29.     Paragraph 11(b)(iii)(B)(1) of the CSA provides that Nomura Securities was

required to deliver credit support to LBSF once a "Threshold Amount" has been met.  Paragraph

11(b)(iii)(B)(1) assigned a predetermined and agreed upon "Threshold Amount," which was calculated by reference to the then-applicable rating of the "senior unsecured debt of Nomura Securities Ltd."—here, $10 million.

30.    The parties calculated Exposure on a weekly basis over the life of the Swap Agreement.

31.    As of Friday September 5, 2008, Nomura Securities had delivered credit support to LBSF in an amount over $80 million dollars.  Consistent with Paragraphs 10 and 11 of the CSA, Nomura Securities' delivery of credit support was an express admission by Nomura Securities that, as of the close of business on September 5, 2008, Nomura Securities had calculated that $90 million was the amount required to offset the funds Nomura Securities would owe LBSF, "if all Transactions…were being terminated as of [September 5, 2008]." (CSA ¶ 10.)

**IV.    Termination Of The Swap Agreement**

32.    The LBHI Board of Directors met on September 14, 2008, at approximately 8 p.m., Eastern Daylight Time, and took action, among other things, to approve a resolution authorizing LBHI to commence a chapter 11 proceeding.

33.    In accordance with Sections 5(a)(vii)(4) and 5(a)(vii)(5) of the Swap Agreement, that resolution on September 14, 2008 in furtherance of the bankruptcy filing may have constituted an Event of Default.  In any event, the resolution on September 14, 2008 was followed within hours by a formal filing of LBHI's petition for bankruptcy, on September 15, 2008, at approximately 2 a.m., Eastern Daylight Time.  Under the Swap Agreement, an Event of Default, and Automatic Early Termination, occurred no later than this date and time.

34.    This Bankruptcy Event of Default triggered the agreed-upon Automatic Early Termination provision of Section 6(a) of the Master Agreement and caused all the Transactions under the Master Agreement to be automatically terminated "as of the time immediately

preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4)."  (*See* Master Agreement, § 6(a)).

35.    On September 19, 2008, Nomura Securities delivered to LBSF a Notice of Automatic Early Termination on the basis of LBHI's bankruptcy filing but failed to identify the applicable Automatic Early Termination Date.

36.    "On or as soon as reasonably practicable" following the Automatic Early Termination Date, Nomura Securities was required to deliver to LBSF a Calculation Statement, which would determine the Settlement Amount under the Swap Agreement.  (*See* Master Agreement, § 6(d)(i)).

**V.    Nomura Securities Calculated The Settlement Amount
Without Regard To Contract Damages Or Actual Loss**

37.    Despite Nomura Securities' recognition of its Exposure to the Debtors as of September 5, 2008 in an amount over $90 million, on September 30, 2008, Nomura Securities delivered the September 2008 Calculation Statement to the Debtors, which stated that it was the *Debtors* that owed *Nomura Securities* over $37 million as of September 16, 2008.  This calculation by Nomura Securities as reflected in the September 2008 Calculation Statement resulted in a swing in the valuation of the Transactions of approximately $47 million in favor of Nomura Securities.  (*See* p. 4, *supra*).

38.    Nomura Securities' September 2008 Calculation Statement failed to identify the Automatic Early Termination Date and simply identified September 16 as the date that Nomura Securities used to determine its purported Loss, with no reference to time.

39.    Nomura Securities was required to calculate its Loss as close in time to the Automatic Early Termination Date as reasonably practicable.  The Automatic Early Termination

Date was no later than the time that LBHI filed for bankruptcy in the early hours of September 15, 2008.

40.     The Swap Agreement provided that, upon notice of early termination, the Settlement Amount was required to be calculated using Market Quotation and Second Method. Applying this calculation methodology, the Settlement Amount is determined based on market quotations that the Non-defaulting Party obtains from Reference Market-makers to determine the cost of replacing the transactions.  If the overall cost of replacing the transactions is positive, the Defaulting Party must pay that cost to the Non-defaulting Party, but if the replacement cost is negative, meaning that the termination of the transactions led to a net gain for the Non-defaulting Party, the Non-defaulting Party must pay that gain to the Defaulting Party.  (*See* Master Agreement, §§ 6(e) and 14.)

41.     In its September 2008 Calculation Statement, Nomura Securities admitted that it did not calculate the Settlement Amount in accordance with Market Quotation, but instead reverted to a Loss calculation.  Nomura Securities stated that it "sent notices to four Reference Market-makers to obtain Market Quotations for the Terminated Transactions, but no Reference Market-maker was willing to provide any Market Quotation with respect to any of the Transactions."

42.     Nomura Securities stated that "Market Quotations could not be determined and would not, in the reasonable belief of the Non-Defaulting Party, produce a commercially reasonable result, and that the Credit Support threatened to decline speedily in value."  (*See* September 2008 Calculation Statement).

43.     Nomura Securities further admitted in the September 2008 Calculation Statement that Loss is "the amount that the Non-Defaulting Party reasonably determines in good faith to be

its total losses and costs (expressed as a positive number) (or gain in which case expressed as a negative number) in connection with each Terminated Transaction." Nomura Securities thus stated that it determined its Loss "as of 16 September 2008, by reference to" its own "internal models (which generate a 'mid' value), and by reference to a bid/offer spread." (*See* September 2008 Calculation Statement). Nomura Securities neither provided the Debtors with its "internal models" nor explained why it was entitled to take a "bid/offer spread" at all, let alone in the commercially unreasonable manner it did to calculate its Loss under Section 14 of the Master Agreement.

## VI.    **Nomura Securities' Egregious Inflation Of Its Claims**

44.    In the Nomura Securities Claims, Nomura Securities asserted that as of September 16, 2008, it owed LBSF a termination payment under Section 6(e) of the Master Agreement of $37 million.

45.    However, just days earlier, on September 5, 2008, Nomura Securities admitted, through its delivery of credit support to LBSF, that the portfolio was valued at approximately $90 million in favor of the Debtors—more than twice that amount. This swing of tens of millions of dollars between how the transactions were valued by Nomura Securities on September 5, 2008 and how Nomura Securities claimed those same transactions were valued just days later, is but one example of Nomura Securities' egregious claim inflation.

46.    Upon information and belief this material swing in the value of the transactions under the Swap Agreement did not arise solely or even substantially from changes in the market between September 5th and September 16th, but rather from how Nomura Securities admits it manipulated its calculation of Loss. Nomura Securities' calculation was in violation of both the terms of the Swap Agreement and Nomura Securities' obligation to mitigate its damages.

47.     A systemic problem with the Nomura Securities Claims was Nomura Securities' failure to properly value offsetting mirror Transactions.  For example, Nomura Securities acknowledged in its September 2008 Calculation Statement, submitted under oath to this Court, that it had determined its Loss by using its "internal models" to derive a value for each of the hundreds of individual Transactions, and then applying a "bid/offer spread" to each one.  Many of these Transactions, however, were mirror image interest rate swap Transactions in which Nomura Securities and LBSF swapped cash flows related to identical pairs of interest rates, with identical Maturity Dates and Effective Dates.  There was little or no net risk to Nomura Securities or LBSF on collections of such offsetting Transactions between themselves.  By applying deflated bid prices and inflated offer prices, Nomura Securities generated tens of millions of dollars of "Loss" without actually suffering any loss at all because these positions, when viewed together, posed minimal, if any, economic risk.

48.     By way of illustration Nomura Securities and LBSF entered into several pairs of Japanese Yen-denominated (JPY) floating interest rate swaps in which one party made periodic fixed interest rate payments and the other made periodic floating interest rate payments.  In one Transaction, Nomura Securities agreed to pay LBSF periodic floating rate payments based on six-month LIBOR[7] and LBSF agreed to pay Nomura Securities periodic payments based on a fixed interest rate of 1.0175%.  In the other Transaction, LBSF agreed to pay Nomura Securities periodic floating payments of six-month LIBOR and Nomura Securities agreed to pay LBSF periodic fixed interest rate payments of 1.0775%.  Both Transactions had the same JPY 100 billion notional amount, the same Maturity Date and were effective on the Early Termination Date.  As a consequence of entering into this pair of offsetting Transactions, as of the Early

---

[7]     LIBOR is the London Interbank Offer Rate and the most widely used reference rate for short term interest rates.  Six-month LIBOR is the rate on an Interbank loan with a six month maturity.

Termination Date, Nomura Securities and LBSF were exposed to little if any interest rate risk. The floating components of these two Transactions effectively negated one another and the net economic exposure was a fixed amount—determined simply by comparing the difference between the two fixed rates: 1.0175% versus 1.0775%; that is a difference of only 0.06%.

49.    Using the same pair of Transactions as an example, an analysis of Nomura Securities' valuation is revealing.  Instead of simply using the fixed and pre-determined value of this pair of offsetting Transactions that posed little or no economic risk, Nomura Securities inflated and exaggerated the economic risk by applying a divergent bid price and offer price for these otherwise overlapping and offsetting positions.  This fact pattern repeats itself across the entire portfolio of interest rate swap Transactions and results in an overall inflation of Nomura Securities' purported "Losses" by millions of dollars with regards to Transactions that posed little or no economic risk to Nomura Securities.

50.    Moreover, upon information and belief, Nomura Securities' valuation does not reflect its actual gains or losses in connection with the terminated Transactions because Nomura Securities would not have managed its interest rate risk on a Transaction by Transaction basis, but instead by employing other risk management and risk mitigation techniques.  Thus, Nomura's approach to valuing its purported Loss on a Transaction by Transaction basis and by applying a "bid/offer spread," bears no relationship to the commercial reality and is therefore commercially unreasonable.

51.    Nomura's Loss exaggerations are not confined to interest rate Transactions but also extend to the credit derivatives transactions entered into between Nomura Securities and LBSF.  By way of illustration set forth below is an analysis from Nomura Securities own submissions of 17 separate Credit Derivative Transactions, concerning a particular index as the

reference obligation –  Markit iTraxx Japan Index, Series 8, 5 Year Maturity ("ITRX JAPAN CDSI S8 5Y").  With respect to this index, Nomura Securities sold credit protection to LBSF in 8 separate Transactions each with an Effective Date of September 20, 2007 and a Maturity Date of December 20, 2012.  The total notional amount of these 8 Transactions was approximately USD 149.16 million.  With respect to exactly the same index, LBSF sold credit protection to Nomura Securities in 9 other transactions, also each with an Effective Date of September 20, 2007 and a Maturity Date of December 20, 2012.  The total notional amount of these 9 Transactions was approximately USD 111.87 million.  These 17 Transactions, although they represent gross notional amounts of over USD 261 million, presented a smaller economic risk, that is, on a net basis these 17 Transactions were economically equivalent to a single Transaction in which Nomura Securities sold credit protection to LBSF on the ITRX JAPAN CDSI S8 5Y index on a notional amount of approximately USD 37.29 million, with an Effective Date of September 20, 2007 and a Maturity Date of December 20, 2012.  The 17 transactions discussed above are graphically illustrated as follows:



52.    Using the above 17 transactions as an example, an analysis of Nomura Securities'
valuation is revealing.  Instead of valuing the net economic exposure of these Transactions,
Nomura Securities has inflated and exaggerated the economic risk by applying broadly divergent
bid prices and offer prices for these otherwise identical and offsetting transactions.  By doing so,
Nomura Securities was able to generate a Settlement Amount valuation for these 17 Transactions
in the amount of $1.51 million owed by Nomura Securities to LBSF.  Nomura Securities offered
no insight or explanation into its pricing or methodology.  The net effect of Nomura Securities'
methodology is described below.  In sharp contrast to Nomura Securities skewed valuation, a
proper economic analysis, using Nomura Securities' own prices, would yield a settlement

amount value for these Transactions of approximately $1.95 million owed by Nomura Securities

to LBSF.[8]



53.    Nomura Securities provided no justification for this valuation—Nomura

Securities merely stated in its claims that Nomura Securities' Loss is based on its "internal

models (which generate a 'mid' value) and by reference to a bid/offer spread" determined by it

"as appropriate for the Transaction in question."  Nomura Securities provided neither its

"internal models" nor its methodology for determining the "bid/offer spread."  Because Nomura

Securities' calculation bore no reasonable relationship to the actual economic effect of the

---

[8]    This valuation is based on applying Nomura Securities own bid price.  Because Nomura Securities has not
divulged its internal models and pricing methodology, Debtors cannot evaluate the validity of any Nomura
Securities price, and reserves all of its rights to contest and challenge the prices actually used.

terminated Transactions, Nomura Securities breached the Swap Agreement and determined its

bankruptcy claims in bad faith.

54.    Nomura Securities has offered no explanation or basis for claiming any bid/offer

spread, let alone a bid/offer spread applied in the commercially unreasonable manner as Nomura

Securities has done.  Indeed, there is no indication in Nomura Securities' submissions that it

incurred any actual losses or damages at all as a result of the Early Termination.

55.    The Nomura Securities Claims were based on the egregiously inflated September

2008 Calculation Statement, and the Nomura Securities Claims furthermore included improper

claims for unmatured interest and legal fees.

## VII.    Nomura Securities Is Not Entitled To Unmatured Default Interest Or Legal Fees

56.    The Nomura Securities Claims included (a) alleged default interest accruing

through August 31, 2009, and (b) alleged expenses incurred in connection with the enforcement

of the Swap Agreement.  Neither the interest, nor the attorney's fees were properly included in

the Nomura Securities Claims.

57.    As a threshold matter, because Nomura Securities was not entitled to a Settlement

Amount under the Swap Agreement, Nomura Securities is not entitled to default interest or

expenses associated with the enforcement of its non-existent right to collect amounts from LBHI.

Furthermore, even if LHBI owed Nomura Securities amounts under the Swap Agreement, which

it does not, Nomura Securities would not be entitled to default interest or expenses.  That is,

Nomura Securities admitted in the Nomura Securities Claims that the claimed attorney's fees

cover work done not only on its behalf, but also that done on behalf of other related entities:

Nomura and Nomura GFP.  There was no provision in the Swap Agreement that permitted

Nomura Securities to seek the payment of legal fees incurred by its related entities in pursuit of

payment under agreements other than the Swap Agreement.

58.     Even distributed among the three entities, the fees claimed were unreasonably high and unjustifiable under the circumstances.  Both under the Swap Agreement and as a matter of equity, Nomura Securities should not be able to place the burden of its unreasonableness on other creditors of the Debtors' estates.

59.     Further, the Default Interest was largely unmatured on the date when the Debtors filed for bankruptcy, and therefore not rightly included in a proof of claim.  The Nomura Securities Claims sought interest accruing through August 31, 2009.  Substantially all of the claimed interest would have accrued post-petition.  Nomura Securities had no basis to claim such unmatured interest and all such amounts should be disallowed pursuant to section 502(b)(2) of the Bankruptcy Code.

## FIRST CAUSE OF ACTION
### (Objections to Claims)

60.     The Debtors hereby incorporate the foregoing paragraphs as if fully restated herein.

61.     Pursuant to section 502(a) of the Bankruptcy Code, a proof of claim will not be "deemed allowed" where a party in interest objects thereto.

62.     The Debtors hereby object to the Nomura Securities Claims.

63.     The Nomura Securities Claims are not valid claims against LBSF and LBHI, as the Swap Agreement between Nomura Securities and LBSF is terminated and LBSF and LBHI have no remaining obligations to Nomura Securities under the Swap Agreement.

64.     Nomura Securities' proffered Settlement Amount calculation as reflected in the Nomura Securities Claims is not commercially reasonable, is egregiously inflated and was not calculated in good faith as required by the Swap Agreement.

65.    Further, the Nomura Securities Claims expressly include amounts allegedly owed for unmatured interest and such amounts should be disallowed (a) pursuant to section 502(b)(1) of the Bankruptcy Code, because Nomura Securities is not entitled to such interest under the Swap Agreement and (b) even if a Settlement Amount was owed to Nomura Securities, pursuant to section 502(b)(2) of the Bankruptcy Code.

66.    The Nomura Securities Claims also include amounts owed for attorney's fees and costs that (a) Nomura Securities is not entitled to under the Swap Agreement and (b) are unreasonable and unjustified.

67.    The Nomura Securities Claims should be disallowed in their entirety and expunged, and the Debtors hereby expressly reserve the right to further object to the Nomura Securities Claims, or any other claims filed by Nomura Securities, on any other basis.

## SECOND CAUSE OF ACTION
### (Breach of Contract)

68.    The Debtors hereby incorporate the foregoing paragraphs as if fully restated herein.

69.    Nomura Securities further breached the Swap Agreement by calculating its Loss in bad faith and in a manner that was both commercially unreasonable and wholly unrelated to its actual economic damages.

70.    Upon information and belief, Nomura Securities breached the Swap Agreement by failing properly to mitigate its damages by replacing the terminated transactions in a commercially reasonable manner.

71.    Under the Swap Agreement, Nomura Securities was required to pay the Debtors for any gains it enjoyed as a result of termination.

72.    As a direct and proximate result of Nomura Securities' breaches of the Swap Agreement, the Debtors have been deprived of a substantial sum of money in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### (Declaratory Judgment)

73.    The Debtors hereby incorporate the foregoing paragraphs as if fully restated herein.

74.    The parties to this action are the parties who have or who may claim to have an interest that may be affected by the declaration requested.

75.    This action is within the jurisdiction of this Court and the Debtors are entitled to declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

76.    An actual controversy exists between the Debtors and Nomura Securities, which is justiciable in character, and speedy relief is necessary to preserve the parties' respective rights.

77.    Nomura Securities' calculation of the Settlement Amount was not in compliance with Market Quotation or Loss as defined in the Swap Agreement, nor did it have any legitimate commercial or economic basis.

78.    Unless this Court makes a declaration of the rights and obligations of the parties under the Swap Agreement, the Debtors will continue to suffer substantial harm.

79.    A declaratory judgment will resolve the entire dispute between the parties and save the parties substantial costs and expenses.

## FOURTH CAUSE OF ACTION
### (Attorneys' Fees, Costs and Litigation Expenses)

80.     The Debtors hereby incorporate the foregoing paragraphs as if fully restated herein.

81.     The Swap Agreement is valid and enforceable against Nomura Securities as a matter of law.

82.     The Swap Agreement provides that Nomura Securities' failure to abide by its terms entitles the Debtors to an award of attorney's fees and reasonable expenses.

83.     The Nomura Securities' egregious calculation of the Settlement Amount constitutes a material breach of the Swap Agreement.

84.     The Debtors have been forced to incur attorney's fees and expenses because of Nomura Securities' failure to abide by the terms of the Swap Agreement and its failure to calculate the Settlement Amount in good faith.

85.     The Debtors are thus entitled to an award of attorney's fees, costs and litigation expenses.

## PRAYER FOR RELIEF

WHEREFORE, the Debtors pray for judgment against Nomura Securities as follows:

A.     Sustaining the Debtors' objection to the Nomura Securities Claims and disallowing and expunging such claims in their entirety as set forth herein;

B.     Determining that Nomura Securities has breached the Swap Agreement and owes LBSF damages in an amount to be determined at trial;

C.     Awarding declaratory judgment in favor of the Debtors, including a declaration of the parties' rights and obligations under the Swap Agreement;

D.     Awarding the Debtors attorney's fees, costs and other expenses incurred in connection with this action; and

E.      Granting the Debtors such other and further relief as the Court deems just and proper.

Dated: New York, New York
       April 23, 2010

Respectfully submitted,

___/s/ Jayant Tambe_____
Corinne Ball
Jayant W. Tambe
Aviva Warter Sisitsky
JONES DAY
222 East 41st Street
New York, New York 10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

*Attorneys for the Debtors and
Debtors in Possession*