JONES DAY
222 East 41st Street
New York, New York 10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Corinne Ball
Jayant W. Tambe
Aviva Warter Sisitsky

*Attorneys for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------x
                                              :
In re:                                        :    Chapter 11
                                              :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,      :    Case No. 08-13555 (JMP)
                                              :
              Debtors.                        :    (Jointly Administered)
--------------------------------------------------------------x

**NOTICE OF OBJECTION OF DEBTORS AND DEBTORS IN POSSESSION**
**TO CLAIMS OF NOMURA GLOBAL FINANCIAL PRODUCTS, INC.**

**PLEASE TAKE NOTICE** that a hearing on the annexed Objection of Debtors and

Debtors in Possession to Claims of Nomura Global Financial Products, Inc. (the "Objection")

will be held before the Honorable James M. Peck, United States Bankruptcy Judge, at the United

States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling

Green, New York, New York 10004 (the "Bankruptcy Court"), on **June 16, 2010 at 10:00 a.m.**

**(Prevailing Eastern Time)** (the "Hearing").

**PLEASE TAKE FURTHER NOTICE** that responses, if any, to the Objection shall be

in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of

the Bankruptcy Court for the Southern District of New York, shall set forth the name of the

responding party, the basis for the response and the specific grounds thereof, shall be filed with

the Bankruptcy Court electronically in accordance with General Order M-242 (which can be

found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing

system and by all other parties in interest on a 3.5 inch disk, preferably in Portable Document

Format (PDF), Microsoft Word, or any other Windows-based word processing format (with two

hard copies delivered directly to Chambers), and shall be served upon (i) the chambers of the

Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601;

(ii) Jones Day, 222 East 41st Street, New York, New York 10017 (Attn:  Jayant W. Tambe,

Corinne Ball, and Aviva Warter Sisitsky) and Weil Gotshal & Manges LLP, 767 Fifth Avenue,

New York, New York 10153 (Attn:  Richard P. Krasnow, Lori R. Fife, Shai Y. Waisman, and

Jacqueline Marcus), attorneys for the Debtors; (iii) the Office of the United States Trustee for the

Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004

(Attn:  Andy Velez-Rivera, Paul Schwartzberg, Brian Masumoto, Linda Riffkin, and Tracy Hope

Davis); and (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York,

New York 10005 (Attn:  Dennis F. Dunne, Dennis O'Donnell, and Evan Fleck), attorneys for the

official committee of unsecured creditors appointed in these cases, so as to be received no later

than **May 24, 2010 at 4:00 p.m.** (Prevailing Eastern Time) (the "Response Deadline").

       **PLEASE TAKE FURTHER NOTICE** that if a response to the Objection is not

received by the Response Deadline, the relief requested shall be deemed unopposed, and the

Bankruptcy Court may enter an order sustaining the Objection without a hearing.

       **PLEASE TAKE FURTHER NOTICE** that responding parties are required to

attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated:     New York, New York                    Respectfully submitted,
           April 23, 2010


                                                  _/s/ Jayant W. Tambe_____
                                                  Jayant W. Tambe
                                                  Corinne Ball
                                                  Aviva Warter Sisitsky
                                                  JONES DAY
                                                  222 East 41st Street
                                                  New York, New York  10017
                                                  Telephone:  (212) 326-3939
                                                  Facsimile:  (212) 755-7306

                                                  ATTORNEYS FOR DEBTORS AND
                                                  DEBTORS IN POSSESSION

Hearing Date:  June 16, 2010 at 10:00 a.m. (ET)
Response Deadline: May 24, 2010 at 4:00 p.m. (ET)

JONES DAY
222 East 41st Street
New York, New York 10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Corinne Ball
Jayant W. Tambe
Aviva Warter Sisitsky

*Attorneys for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
                                        :
In re:                                  :    Chapter 11
                                        :
LEHMAN BROTHERS HOLDINGS INC., et al.,  :    Case No. 08-13555 (JMP)
                                        :
            Debtors.                    :    (Jointly Administered)
                                        :
-------------------------------------------------------------x
```

## OBJECTION OF DEBTORS AND DEBTORS IN POSSESSION TO CLAIMS OF NOMURA GLOBAL FINANCIAL PRODUCTS, INC.

Lehman Brothers Holdings Inc. ("LBHI") and Lehman Brothers Special Financing Inc. ("LBSF") (and together with LBHI's affiliated debtors in the above-referenced chapter 11 cases, the "Debtors"), as debtors and debtors in possession, as and for their objection[1] to certain claims of Nomura Global Financial Products, Inc. ("Nomura GFP") against LBSF and LBHI, hereby allege as follows:

---

[1]     Contemporaneously herewith, the Debtors also have filed (a) an adversary proceeding and objection relating to certain proofs of claim filed by Nomura Securities Co. Ltd. ("Nomura Securities") against LBSF and LBHI, and (b) an adversary proceeding and objection relating to certain proofs of claim filed by Nomura International plc ("Nomura") against LBSF and LBHI.  The proofs of claim filed by Nomura Securities and Nomura are based on separate swap agreements with the Debtors, and each of those claims also suffers from, among other things, egregious inflation.  Due to certain common issues presented by these three filings, for the sake of efficiency and judicial economy, disputes relating to the specific derivatives claims of all three Nomura entities should be heard together, and accordingly the Debtors have moved, contemporaneously herewith, to permit the claim objections to be heard together and to consolidate these disputes.  In total the six proofs of claim demand over $1 billion from each of LBSF and LBHI.

## INTRODUCTION

1.      This objection seeks redress against Nomura GFP for its egregious inflation by hundreds of millions of dollars of the proofs of claim that Nomura GFP filed under penalty of perjury against LBSF and LBHI.  Nomura GFP's claims have no basis in law, or in the parties' agreement.  Those claims are premised on purported valuations and calculations that are commercially unreasonable, divorced from economic reality, and bear no relation to any actual damages or losses suffered by Nomura GFP.[2]

2.      Nomura GFP's proofs of claim, numbers 17204 and 17205 (the "Nomura GFP Claims"), demand over $241 million from Debtors under a terminated ISDA Master Agreement with LBSF, dated as of November 1, 2001 (the "Master Agreement" and together with the Schedule thereto and various Confirmations entered into thereunder, the "Swap Agreement").[3]

3.      The Swap Agreement between LBSF and Nomura GFP provided for Automatic Early Termination of the agreement upon the occurrence of a "Bankruptcy" Event of Default (the "Bankruptcy Event of Default").[4]  That Event of Default occurred no later than the bankruptcy filing of LBHI, LBSF's Credit Support Provider, at approximately 2 a.m., Eastern Daylight Time, on September 15, 2008 (the "Termination Date") and may actually have occurred even

---

[2]      References to proofs of claim include the facts set forth by Nomura GFP in its supporting Derivatives Questionnaire, which it submitted on October 21, 2009.

[3]      The Master Agreement applicable to Nomura GFP was constituted pursuant to an ISDA Transfer & Amendment Agreement, among LBSF, Nomura GFP, Nomura International, Nomura Securities, and Nomura Global Holdings, Inc., dated as of November 1, 2001, which novated an existing 1992 ISDA Master Agreement with Nomura and replaced Nomura with Nomura GFP.  Pursuant to the Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim, Approving the Form and Manner of Notice Thereof and Approving the Proof of Claim Form [Docket No. 4271], each Nomura Entity electronically uploaded supporting documentation on the website (http://www.lehman-claims.com), as required in the Derivative Questionnaire, including the Master Agreements with applicable Schedules and Credit Support Annexes, the September 2008 Calculation Statements, and with respect to Nomura, the February 2009 Calculation Statement.

[4]      Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Master Agreement, defined above, or the Credit Support Annex, dated as of November 1, 2001, between Nomura GFP and LBSF (the "CSA"), which supplements and forms part of and is subject to the Master Agreement.

earlier.  Pursuant to the plain terms of the Swap Agreement, Nomura GFP was required to calculate the Settlement Amount owed upon the Early Termination of the Swap Agreement, as of the date and time of the termination.  In the Swap Agreement the parties expressly agreed that if the Settlement Amount calculation yielded a negative number, *i.e.* Nomura GFP had gained as a result of the termination, then Nomura GFP would be required to pay that gain to LBSF, notwithstanding that LBSF was the Defaulting Party under the contract.

4.    Just prior to termination of the Swap Agreement, as of the close of business on September 11, 2008, Nomura GFP had calculated the value for the Swap Agreement as significantly in favor of LBSF (the "Exposure")—in excess of $146 million.  As required by the Swap Agreement, Nomura GFP transferred credit support to the Debtors in recognition of this Exposure.

5.    Notwithstanding Nomura GFP's own Exposure calculation in favor of the Debtors, Nomura GFP delivered a Calculation Statement on September 30, 2008 (the "September 2008 Calculation Statement") purporting to calculate its Loss as of September 15, 2008 and setting forth a Settlement Amount calculation of $87 million due and *owed by the Debtors to Nomura GFP*.  This calculation presented a swing of over $233 million in Nomura GFP's favor from the calculation of its Exposure as of September 11, 2008.[5]

6.    The Swap Agreement required Nomura GFP to calculate the Settlement Amount on the basis of market quotations obtained from multiple independent dealers.  Nomura GFP acknowledged that it could not obtain any such quotes.  Instead, as Nomura GFP admitted, it resorted to the alternative Loss method of calculating the Settlement Amount.  Under the Swap

---

[5]    Nomura GFP's Calculation Statement actually demanded $234 million which is the sum of:  the approximately $146 million in credit support Nomura GFP had delivered to LBSF, the Settlement Amount of approximately $87 million, and an additional claim of approximately $85 million for repayment of "payments in error," less a net payment of approximately $84 million for Unpaid Amounts.

Agreement's definition of the Loss method of calculation, Nomura GFP's Settlement Amount calculation was limited to actual contract damages, namely, the benefit of the bargain or costs actually incurred as a result of the early termination.

7.      Nomura GFP admitted in its September 2008 Calculation Statement that it had calculated its Loss "in some cases" by using its own "internal models" to derive values for thousands of transactions entered into under the Swap Agreement and applying a "bid/offer spread" to pairs of offsetting and overlapping transactions, "and in other cases by reference to [its] actual replacement costs." As described below, Nomura GFP arbitrarily manufactured a significant portion of its claim by applying a bid/offer spread on offsetting positions that posed zero economic risk to Nomura GFP. Further, although Nomura GFP admits that "no Reference Market-maker was willing to provide any Market Quotation with respect to any of the Transactions," Nomura GFP nevertheless purports, inexplicably, to have calculated at least part of its Loss based on "actual replacement costs."

8.      The September 2008 Calculation Statement formed the basis of the Nomura GFP Claims submitted on September 18, 2009. The amounts in the September 2008 Calculation Statement were further inflated by Nomura GFP's claim to unmatured interest and improper legal fees.

9.      The egregious inflation summarized above and detailed below is nothing more than an attempt by Nomura GFP to wrongfully extract hundreds of millions of dollars from the Debtors to the direct detriment of the Debtors' estates and creditors. Accordingly, the Debtors hereby bring this objection to obtain the disallowance of the Nomura GFP Claims, to the extent they do not approximate Nomura GFP's actual Loss.

**JURISDICTION AND VENUE**

10.    The statutory predicates for the relief requested herein are (a) sections 105, 502 and 562 of title 11 of the United States Code (the "Bankruptcy Code"), and (b) Rule 3007 of the Bankruptcy Rules.

11.    This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

12.    This Court has personal jurisdiction over Nomura GFP due to the filing of the Nomura GFP Claims in the Debtors' chapter 11 cases and Nomura GFP's active participation in these proceedings.

13.    Venue is proper in this district pursuant to 28 U.S.C. § 1409.

**RELIEF REQUESTED**

14.    Pursuant to sections 105, 502 and 562 of the Bankruptcy Code and Bankruptcy Rule 3007, the Debtors hereby seek entry of an order reducing the Nomura GFP Claims in an amount to be determined at the hearing on this Objection.

**BASIS FOR RELIEF REQUESTED**

15.    The Debtors hereby object to the Nomura GFP Claims.  Pursuant to section 502(a) of the Bankruptcy Code, a proof of claim will not be "deemed allowed" where a party in interest objects thereto.  Section 502(b) of the Bankruptcy Code provides that a claim shall not be allowed to the extent:  "(1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured; [and] (2) such claim is for unmatured interest[.]"  11 U.S.C. § 502(b)(1) and (2).

16.    A substantial portion, if not all, of the Nomura GFP Claims are not valid claims against LBSF and LBHI, because they are neither supportable by the Swap Agreement nor

-5-

applicable law.  As described in detail below, Nomura GFP's proffered Settlement Amount

calculation as reflected in the Nomura GFP Claims is not commercially reasonable, is

egregiously inflated and was not calculated in good faith as required by the Swap Agreement,

and accordingly, should be reduced to an amount that reflects Nomura GFP's actual Loss as of

the Termination Date, pursuant to section 502(b)(1) of the Bankruptcy Code.

17.      Further, the Nomura GFP Claims expressly include amounts allegedly owing for

unmatured interest and should be disallowed pursuant to section 502(b)(2) of the Bankruptcy

Code.  The Nomura GFP Claims also include amounts owing for attorney's fees and costs that

are unreasonable and unjustified.

## PARTIES

18.      On September 15, 2008 and October 3, 2008 LBHI and LBSF respectively,

commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code.  LBSF's

chapter 11 case has been consolidated with LBHI's chapter 11 case for procedural purposes only,

and those cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).  LBHI's

and LBSF's principal places of business are located at 1271 Sixth Avenue, New York, New

York 10020 and each is authorized to operate its businesses and manage its properties as a

debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

19.      Nomura GFP is a corporation organized under the laws of Delaware, with its

principal business address at 2 World Financial Center, Building B, New York, New York

10281-1198.

## BACKGROUND

I.      **The Proofs Of Claim**

20.      On September 18, 2009, Nomura GFP filed the Nomura GFP Claims against

LBSF and LBHI.  Those claims arose under the Swap Agreement with LBSF and with respect to

LBHI in its capacity as Credit Support Provider under the Swap Agreement. The Nomura GFP Claims were verified and signed by Thomas Salatte for Nomura GFP.

21.    Under the Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filling Proofs of Claim, Approving the Form and Manner of Notice Thereof and Approving the Proof of Claim Form, dated July 2, 2009 [Docket No. 4271], Nomura GFP was additionally required to file a Derivatives Questionnaire, which under penalty of perjury was to provide the basis for the Nomura GFP Claims. On October 21, 2009, Nomura GFP submitted its "Derivatives Questionnaire" in connection with the Nomura GFP Claims. The Derivatives Questionnaire included, among other things, Nomura GFP's basis for the calculation of the Settlement Amount under the Master Agreement.[6]

## II.    The Relevant Provisions Of The Master Agreement

22.    This claim objection concerns the application of the Master Agreement between Nomura GFP and LBSF, dated as of November 1, 2001, as modified by the parties' execution of the Schedule.

23.    The Master Agreement governed approximately 1,178 derivatives Transactions entered into between Nomura GFP and LBSF between 2001 and September 15, 2008. With respect to any particular Transaction, the parties' contract was comprised of the Master Agreement, Schedule and a Confirmation. The Master Agreement provided that, in the event of

---

[6]    In addition to filing the Nomura GFP claims, on February 27, 2009, Nomura GFP filed an adversary complaint against LBSF and Lehman Brothers Inc., styled Nomura Global Financial Products, Inc. v. Lehman Brothers Special Financing Inc., et al., 09-01061 (Bankr. S.D.N.Y. Feb. 27, 2009) (the "Nomura GFP Litigation"). In the Nomura GFP Litigation, Nomura GFP seeks recovery on account of allegedly erroneous payments transferred by Nomura GFP to LBSF on September 15, 2008. On April 3, 2009, both parties filed answers, and LBSF filed a counterclaim, seeking a declaratory judgment confirming and enforcing Nomura GFP's payment under the terms of the Master Agreement. The Nomura GFP Litigation is currently pending before this Court.

any inconsistencies between the Schedule and the other provisions of the Master Agreement, the

Schedule would prevail.  (*See* Master Agreement, § 1(b)).

A.    **Terms Relating To The Bankruptcy Event of Default And Termination**

24.    The bankruptcy filing by LBHI, the Credit Support Provider under the Master

Agreement, constituted an Event of Default under Sections 5(a)(vii)(4) and (5) of the Master

Agreement.  Sections 5(a)(vii)(4) and (5) provided in relevant part:

> 5.    **Events of Default and Termination Events**
>
> (a) *Events of Default*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—
>
> (vii) Bankruptcy. The party, any Credit Support Provider of such party [or] [. . .] (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation [. . . ; or] (5) has a resolution passed for its winding-up, official management or liquidation [. . . .]

25.    Pursuant to this provision, both a formal resolution to file for bankruptcy and a

bankruptcy filing itself constituted an Event of Default.

26.    The parties agreed that upon certain Events of Default, "[t]he 'Automatic Early

Termination' provisions of Section 6(a) will apply [. . . .]"  (*See* Schedule, Part I(e)).

27.    Section 6(a) of the Master Agreement provides that:  "If [ ] 'Automatic Early

Termination' is specified in the Schedule as applying to a party, then an Early Termination Date

in respect of all outstanding Transactions will occur immediately upon the occurrence with

respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or to the

extent analogous thereto (8), and as of the time immediately preceding the institution of the

relevant proceeding or the presentation of the relevant petition upon the occurrence with respect

to such party of an Event of Default specified in Section 5(a)(vii)(4)."

### B. Terms Relating To Valuation

28.     The parties agreed in Part I(f) of the Schedule that payments due and owed under

the Master Agreement on early termination would be calculated in accordance with Market

Quotation and would be measured by Second Method.

29.     Section 6(e)(i)(3) of the Master Agreement defined the Market Quotation and

Second Method as follows:

> If the Second Method and Market Quotation apply, an amount will
> be payable equal to (A) the sum of the Settlement Amount
> (determined by the Non-defaulting Party) in respect of the
> Terminated Transactions and the Termination Currency Equivalent
> of the Unpaid Amounts owing to the Non-defaulting Party less (B)
> the Termination Currency Equivalent of the Unpaid Amounts
> owing to the Defaulting Party. *If that amount is a positive number,
> the Defaulting Party will pay it to the Non-defaulting Party; if it is
> a negative number, the Non-defaulting Party will pay the absolute
> value of that amount to the Defaulting Party.*

(Emphasis added).

30.     In other words, if upon the Early Termination the Non-defaulting Party enjoyed a

gain on the Terminated Transactions, it would be required to pay the amount of that gain to the

Defaulting Party.

### III. The Relevant Provisions Of The Credit Support Annex

31.     Nomura GFP and LBSF also entered into a Credit Support Annex, dated as of

November 1, 2001 ("CSA"), which supplemented, formed part of and was subject to the Master

Agreement.  The CSA detailed the parties' rights and obligations in respect of credit support

delivered by either party to the other.

32.    Paragraph 10 of the CSA defined "Exposure" as a calculation of amounts that

would be owed on an Early Termination:

> "'Exposure' means, with respect to a party on a Valuation Date
> and subject to Paragraph 4 in the case of a dispute, the amount, if
> any, that would be payable to that party by the other party
> (expressed as a positive number) or by that party to the other party
> (expressed as a negative number) pursuant to Section 6(e)(ii)(1) of
> this Agreement if all Transactions (other than the Transaction
> constituted by this Annex) were being terminated as of the relevant
> Valuation Time, on the basis that (i) that party is not the Affected
> Party and (ii) the Base Currency is the Termination Currency:
> *provided* that Market Quotations will be determined by the
> Valuation Agent on behalf of that party using its estimates at mid-
> market of the amounts that would be paid for replacement
> transactions (as that term is defined in the definition of 'Market
> Quotation')"

33.    The parties calculated Exposure on nearly a daily basis over the life of the Swap

Agreement.

34.    As of Thursday September 11, 2008, two business days preceding the

Termination Date, Nomura GFP had delivered credit support to LBSF of over $146 million.

Consistent with Paragraph 10 of the CSA, Nomura GFP's delivery of credit support was an

express admission by Nomura GFP that, as of the close of business on September 11, 2008,

Nomura GFP had had calculated that $146 million was the amount required to offset the funds

Nomura GFP would owe to LBSF, "if all Transactions…were being terminated as of [September

11, 2008]."  (CSA ¶ 10)

**IV.    Termination Of The Swap Agreement**

35.    The LBHI Board of Directors met on September 14, 2008, at approximately

8 p.m., Eastern Daylight Time, and took action, among other things, to approve a resolution

authorizing LBHI to commence a chapter 11 proceeding.

36.     In accordance with Sections 5(a)(vii)(4) and 5(a)(vii)(5) of the Swap Agreement, that resolution on September 14, 2008 in furtherance of the bankruptcy filing may have constituted an Event of Default.  In any event, the resolution on September 14, 2008 was followed within hours by a formal filing of LBHI's petition for bankruptcy, on September 15, 2008, at approximately 2 a.m., Eastern Daylight Time.  Under the Swap Agreement, an Event of Default, and Automatic Early Termination, occurred no later than this date and time.

37.     This Bankruptcy Event of Default triggered the agreed-upon Automatic Early Termination provision of Section 6(a) of the Master Agreement and caused all the Transactions under the Master Agreement to be automatically terminated "as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4)."  (*See* Master Agreement, § 6(a)).

38.     On September 19, 2008, Nomura GFP delivered to LBSF a Notice of Automatic Early Termination on the basis of LBHI's bankruptcy filing but failed to identify the applicable Automatic Early Termination Date.

39.     "On or as soon as reasonably practicable" following the Automatic Early Termination Date, Nomura GFP was required to deliver to LBSF a Calculation Statement, which would determine the Settlement Amount under the Swap Agreement.  (*See* Master Agreement, § 6(d)(i)).

## V.    Nomura GFP's Calculated The Settlement Amount Without Regard To Contract Damages or Actual Loss

40.     Despite Nomura GFP's recognition of its Exposure to the Debtors as of September 11, 2008, in an amount over $146 million, on September 30, 2008, Nomura GFP delivered the September 2008 Calculation Statement to the Debtors, which stated that it was the

*Debtors* that owed *Nomura GFP* over $234 million, as of September 15, 2008.  This calculation by Nomura GFP as reflected in the September 2008 Calculation Statement resulted in a swing in the valuation of the Transactions of approximately $233 million in favor of Nomura GFP.  (*See* p.3, *supra*)

41.     Nomura GFP's September 2008 Calculation Statement failed to identify the Automatic Early Termination Date and simply identified September 15th as the date that Nomura GFP used to determine its purported Loss with no reference to time.

42.     Nomura GFP was required to calculate its Loss as close in time to the Automatic Early Termination Date as reasonably practicable.  The Automatic Early Termination Date was no later than the time that LBHI filed for bankruptcy in the early hours of September 15, 2008.

43.     The Swap Agreement provided that, upon notice of early termination, the Settlement Amount was required to be calculated using Market Quotation and Second Method. Applying this calculation methodology, the Settlement Amount is determined based on market quotations that the Non-defaulting Party obtains from Reference Market-makers to determine the cost of replacing the transactions.  If the overall cost of replacing the transactions is positive, the Defaulting Party must pay that cost to the Non-defaulting Party, but if the replacement cost is negative, meaning that the termination of the transactions led to a net gain for the Non-defaulting Party, the Non-defaulting Party must pay that gain to the Defaulting Party.  (*See* Master Agreement, §§ 6(e) and 14.)

44.     In its September 2008 Calculation Statement, Nomura GFP admitted that it did not calculate the Settlement Amount in accordance with Market Quotation, but instead reverted to a Loss calculation.  Nomura GFP stated that it "sent notices to four Reference Market-makers

to obtain Market Quotations for the Terminated Transactions, but no Reference Market-maker was willing to provide any Market Quotation with respect to any of the Transactions."

45.     Nomura GFP stated that "Market Quotations could not be determined and would not, in the reasonable belief of the Non-Defaulting Party, produce a commercially reasonable result, and that the Credit Support threatens to decline speedily in value." (*See* September 2008 Calculation Statement).  Inexplicably, Nomura GFP also states that its Loss is "in [some] cases" determined by Nomura GFP "by reference to" Nomura GFP's "actual replacement costs."[7]

46.     Nomura GFP further admitted in the September 2008 Calculation Statement that Loss is "the amount that the Non-Defaulting Party reasonably determines in good faith to be its total losses and costs (expressed as a positive number) (or gain in which case expressed as a negative number) in connection with each Terminated Transaction."  Nomura GFP thus stated that it determined its Loss "as of 15 September 2008, in some cases by reference to the Non-Defaulting Party's international models (which generate a 'mid' value), and by reference to a bid/offer spread […] as appropriate for the transaction in question." (*See* September 2008 Calculation Statement).  Nomura GFP neither provided the Debtors with its "internal models" nor explained why it was entitled to take a "bid/offer spread" at all, let alone in the commercially unreasonable manner it did so to calculate its Loss under Section 14 of the Master Agreement.

## VI.    <u>Nomura GFP's Egregious Inflation Of Its Claims</u>

47.     In the Nomura GFP Claims, Nomura GFP asserted that as of September 15, 2008, LBSF owed Nomura GFP a termination payment under Section 6(e) of the Master Agreement in the hundreds of millions of dollars.

---

[7]     Nomura GFP provides no cognizable basis for how it was able to actually replace some of the Transactions when "no Reference Market-maker was willing to provide any Market Quotation with respect to any of the Transactions."  (*See* Exhibit C).

48.    However, just days earlier, on September 11, 2008, Nomura GFP admitted, through its delivery of credit support to LBSF, that the portfolio was valued in favor of the Debtors—not the other way around.  This swing of hundreds of millions of dollars between how the transactions were valued by Nomura GFP on September 11, 2008 and how Nomura GFP claimed those same transactions were valued just days later, is but one example of Nomura GFP's egregious claim inflation.

49.    Upon information and belief, this material swing in the value of the transactions under the Swap Agreement did not arise solely or even substantially from changes in the market between September 11 and September 15, but rather from how Nomura GFP admits it manipulated its calculation of Loss.  Nomura GFP's calculation was in violation of both the terms of the Swap Agreement and Nomura GFP's obligation to mitigate its damages.

50.    A systemic problem with the Nomura GFP Claims was Nomura GFP's failure to properly value offsetting transactions.  For example, Nomura GFP acknowledged in its September 2008 Calculation Statement, submitted under oath to this Court, that it had determined its Loss by using its "internal models" to derive a value for each of the thousands of individual Transactions, and then applying a "bid/offer spread" to each one.  Many of these Transactions, however, were mirror image interest rate swap Transactions in which Nomura GFP and LBSF swapped cash flows related to identical pairs of interest rates, with identical Maturity Dates and Effective Dates.  There was little or no net risk to Nomura GFP or LBSF on collections of such offsetting Transactions between themselves.  By applying deflated bid prices and inflated offer prices, Nomura GFP generated hundreds of millions of dollars of "Loss" without actually suffering any loss at all because these positions, when viewed together, posed minimal, if any, economic risk.

51.    By way of illustration Nomura GFP and LBSF entered into several pairs of interest rate swaps in which one party made periodic fixed interest rate payments and the other made periodic floating rate payments.  In one Transaction, Nomura GFP agreed to pay LBSF periodic floating rate payments based on the three-month LIBOR[8] and LBSF agreed to pay Nomura GFP periodic payments based on a fixed interest rate of 4.85%.  In the other Transaction, LBSF agreed to pay Nomura GFP periodic floating payments of three-month LIBOR and Nomura GFP agreed to pay LBSF periodic fixed rate payments of 4.7798%.  Both Transactions had the same $50 million notional amount, the same Effective Date and the same Maturity Date.  As a consequence of entering into this pair of offsetting Transactions, Nomura GFP and LBSF were exposed to little if any interest rate risk.  The floating components of these two Transactions effectively negated one another and the net economic exposure was a fixed amount—determined simply by comparing the difference between the two fixed rates: 4.85% versus 4.7798%; that is a difference of only 0.0702%.

52.    Using the same pair of Transactions as an example, an analysis of Nomura GFP's valuation is revealing.  Instead of simply using the fixed value of this pair of offsetting Transactions that posed little or no economic risk to Nomura GFP, Nomura GFP inflated and exaggerated the economic risk by applying a broadly divergent bid price and offer price for these otherwise overlapping and offsetting positions.  As a result, Nomura GFP calculated a combined value of $337,926 payable to Nomura GFP for this pair of Transactions that posed no economic risk to Nomura GFP.

53.    This is not an isolated example but Nomura GFP's *modus operandi*.  Nomura GFP repeated this procedure with hundreds of offsetting Transactions across its entire portfolio

---

[8] LIBOR is the London Interbank Offer Rate and the most widely used reference rate for short term interest rates.  Three-month LIBOR is the rate on an Interbank loan with a three month maturity.

of interest rate swap Transactions, leading to a massive inflation of its purported Loss by millions of dollars.

54.     Moreover, upon information and belief, Nomura GFP's valuation does not reflect its actual gains or losses in connection with the terminated Transactions because Nomura GFP would not have managed its interest rate risk on a Transaction by Transaction basis, but instead by employing other risk management and risk mitigation techniques.  Thus, Nomura GFP's approach to valuing its purported Loss on a Transaction by Transaction basis, and applying a "bid/offer spread," bears no relationship to the commercial reality and is therefore commercially unreasonable.

55.     Nomura GFP provided no justification for this valuation methodology—Nomura GFP merely stated in its claims that Nomura GFP's Loss is based on its "internal models (which generate a 'mid' value) and by reference to a bid/offer spread" determined by it "as appropriate for the Transaction in question" or based on "actual replacement costs."  Nomura GFP did not provide its "internal models," its methodology for determining the "bid/offer spread," nor support for its "actual replacement costs."  Because Nomura GFP's calculation bore no reasonable relationship to the actual economic effect of the terminated Transactions, Nomura GFP breached the Swap Agreement and determined its bankruptcy claims in bad faith.

56.     Nomura GFP has offered no explanation or basis for claiming any bid/offer spread, let alone a bid/offer spread applied in the commercially unreasonable manner as Nomura GFP has done.  Indeed, there is no indication in Nomura GFP's submissions that it incurred any actual losses or damages at all as a result of the Early Termination.

57.    For the foregoing reasons, the Settlement Amount included in the Nomura GFP Claims should be reduced to an amount that reflects Nomura GFP's actual Loss as of the Termination Date, pursuant to section 502(b)(1) of the Bankruptcy Code.

## VII.    Nomura GFP Is Not Entitled To Unmatured Default Interest Or Legal Fees

58.    The Nomura GFP Claims included (a) alleged default interest accruing through September 18, 2009, and (b) alleged expenses incurred in connection with the enforcement of the Swap Agreement.  Neither the interest, nor the attorney's fees were properly included in the Nomura GFP Claims.

59.    Nomura GFP admitted in the Nomura GFP Claims that the claimed attorney's fees cover work done not only on its behalf, but also that done on behalf of other related entities: Nomura and Nomura Securities.  There was no provision in the Swap Agreement that permitted Nomura GFP to seek the payment of legal fees incurred by its related entities in pursuit of payment under agreements other than the Swap Agreement.

60.    Even distributed among the three entities, the fees claimed were unreasonably high and unjustifiable under the circumstances.  Both under the Swap Agreement and as a matter of equity, Nomura GFP should not be able to place the burden of its unreasonableness on other creditors of the Debtors' estates.

61.    Further, the Default Interest was largely unmatured on the date when the Debtors filed for bankruptcy, and therefore not rightly included in a proof of claim.  The Nomura GFP Claims sought interest accruing through September 18, 2009.  Substantially all of the claimed interest would have accrued post-petition.  Nomura GFP had no basis to claim such unmatured interest and all such amounts should be disallowed pursuant to section 502(b)(2) of the Bankruptcy Code.

## RESERVATION OF RIGHTS

62.     The Nomura GFP Claims should be disallowed and expunged in an amount to be determined, and the Debtors hereby expressly reserve the right to further object to the Nomura GFP Claims, or any other claims filed by Nomura GFP, on any other basis.

## NOTICE

63.     No trustee has been appointed in these chapter 11 cases. Notice of this Objection has been provided to (i) Nomura GFP; (ii) the U.S. Trustee; (iii) the attorneys for the Creditors' Committee; (iv) the Securities and Exchange Commission; (v) the Internal Revenue Service; and (vi) the United States Attorney for the Southern District of New York, in accordance with the Amended Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 1015(c) and 9007 Implementing Certain Notice and Case Management Procedures, dated February 13, 2009 [Docket No. 2837] and the Procedures Order.  The Debtors submit that such notice is sufficient and no other or further notice need be provided.

WHEREFORE, the Debtors request entry of an order, substantially in the form attached hereto as Exhibit A, (a) sustaining the Debtors' objection to the Nomura GFP Claims and disallowing and expunging such claims in an amount to be determined, and (b) granting the Debtors such other and further relief as the Court deems just and proper.

Dated: New York, New York
April 23, 2010

Respectfully submitted,


_____/s/ Jayant Tambe_____
Corinne Ball
Jayant W. Tambe
Aviva Warter Sisitsky
JONES DAY
222 East 41st Street
New York, New York 10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

*Attorneys for the Debtors and
Debtors in Possession*

## EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
                                        :
In re:                                  :    Chapter 11
                                        :
LEHMAN BROTHERS HOLDINGS INC., et al.,  :    Case No. 08-13555 (JMP)
                                        :
                    Debtors.            :    (Jointly Administered)
                                        :
-------------------------------------------------------------x
```

### ORDER GRANTING DEBTORS AND DEBTORS IN POSSESSION'S OBJECTION TO THE CLAIMS OF NOMURA GLOBAL FINANCIAL PRODUCTS, INC.

Upon the objection to the claims of Nomura Global Financial Products, Inc. ("Nomura GFP"), dated April 23, 2010 (the "Nomura GFP Objection"), of Lehman Brothers Holdings Inc. ("LBHI") and Lehman Brothers Special Financing Inc. ("LBSF") (and together with LBHI's affiliated debtors in the above-referenced chapter 11 cases, the "Debtors"), seeking entry of an order, pursuant to sections 105, 502 and 562 of title 11 of the United States Code (the "Bankruptcy Code"), and Rule 3007 of the Federal Rules of Bankruptcy Procedure, reducing the Nomura GFP Claims[1] on the grounds that such claims are incorrectly calculated and include claim amounts that are not properly included in Nomura GFP's claim; and due and proper notice of the Nomura GFP Objection having been provided, and it appearing that no other or further notice need be provided; and the Court having found and determined that the relief sought in the Nomura GFP Objection is in the best interests of the Debtors, their estates, creditors, and all parties in interest and that the legal and factual bases set forth in the Nomura GFP Objection establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Nomura GFP Objection.

ORDERED that the relief requested in the Nomura GFP Objection is granted to the extent provided herein; it is further

ORDERED that, pursuant to section 502(b) of the Bankruptcy Code, each of the Nomura GFP Claims is reduced to an amount of $_____ (the "Surviving Portion"), subject to the Debtors' right to further object as set forth herein; it is further

ORDERED that nothing in this Order or the partial disallowance of the Nomura GFP Claims constitutes any admission or finding with respect to the validity or allowance of the Surviving Portion, and the Debtors' rights to object to such amounts on any basis is hereby preserved; it is further

ORDERED that this Order has no *res judicata*, estoppel, or other effect on the validity, allowance, or disallowance of, and all rights to object and defend on any basis to the Surviving Portion of the Nomura GFP Claims are expressly reserved; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to this Order.

Dated: _____, 2010
New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE