**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | : | **Case No. 08-13555 (JMP)** |
| | : | |
| | : | **(Jointly Administered)** |
| Debtors. | : | |
| **In re:** | : | |
| | : | |
| | : | |
| **LEHMAN BROTHERS INC.,** | : | **Case No. 08-01420 (JMP) (SIPA)** |
| | : | |
| Debtor. | : | |
| | : | |

**DECLARATION OF SETH D. ROTHMAN IN SUPPORT OF THE**
**TRUSTEE'S OBJECTION TO BARCLAYS' MOTION TO**
**COMPEL PRODUCTION OF DOCUMENTS FROM LBHI, THE**
**TRUSTEE, THE COMMITTEE AND THEIR FINANCIAL ADVISORS**

      I, SETH D. ROTHMAN, declare that the following is true and correct:

      1.     I am a member of the firm of Hughes Hubbard & Reed LLP, attorneys for James W. Giddens (the "Trustee"), as trustee for the SIPA liquidation of Lehman Brothers Inc.  I am an attorney duly admitted to practice in the State of New York and in this Court.  I make this declaration based on my personal knowledge and the documents referred to herein.

      2.     I make this declaration in support of the Trustee's Objection To Barclays' Motion To Compel Production Of Documents From LBHI, The Trustee, The Committee And Their Financial Advisors, for the purpose of introducing copies of documents that are cited in the Trustee's Objection.

3.      Attached hereto as Exhibit 1 is a true and correct copy of excerpts of the transcript of the hearing held before this Court on December 16, 2009.

4.      Attached hereto as Exhibit 2 is a true and correct copy of excerpts of the transcript of the deposition of Marlo Karp, conducted on January 20, 2010.

5.      Attached hereto as Exhibit 3 is a true and correct copy of excerpts of the transcript of the deposition of James B. Kobak, Jr., conducted on December 7, 2009.

6.      Attached hereto as Exhibit 4 is a true and correct copy of excerpts of the transcript of the deposition of Christopher Kiplok, conducted on March 4, 2010.


Executed on        April 23, 2010
                   New York, New York


                                              By:    /s/ Seth D. Rothman
                                                     Seth D. Rothman

2

**<u>Exhibit 1</u>**

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555(JMP)

Adv. Case No. 08-01420(JMP)(SIPA)

Adv. Case No. 09-01480

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS HOLDINGS INC., et al.,

                    Debtors.

- - - - - - - - - - - - - - - - - - - -x

SECURITIES INVESTOR PROTECTION CORPORATION,

                    Plaintiff-Appellant,

          -against-

LEHMAN BROTHERS INC.,

                    Defendant.

- - - - - - - - - - - - - - - - - - - -x

PT BANK NEGARA IndONESIA (PERSERO) TBK,

                    Plaintiff,

          -against-

LEHMAN BROTHERS SPECIAL FINANCING, INC.,

                    Defendant.

- - - - - - - - - - - - - - - - - - - -x

(continued on next page)

115

1       At the outset, the Court examines the relevant law

2   governing the attorney-client privilege.  This privilege exists

3   to encourage full and frank communication between attorneys and

4   their clients, and thereby promote broader public interest in

5   the observance of law and the administration of justice.  See

6   Morande Auto Group v. Metropolitan Inc., 2009 WL 650444 at *2

7   (D. Conn., Mar. 12, 2009).  Accordingly, courts in the Second

8   Circuit have exercised great caution when construing rules

9   resulting in the waiver of the privilege.  Per re: the County

10  of Erie, 546 F.3d 222 at 228 (2nd Cir. 2008).  An excerpt from

11  that case, "Rules which result in the waiver of this privilege

12  and thus possess the potential to weaken attorney-client trust

13  should be formulated with caution."

14      Generally, courts have found that parties implicitly

15  waive the attorney-client privilege in three factual scenarios.

16  When a client testifies concerning portions of the attorney-

17  client communication, when a client places the attorney-client

18  relationship directly at issue, and when a client asserts

19  reliance on an attorney's advice as an element of a claim or

20  defense.  County of Erie, 546 F.3d at 228.  It is this third

21  instance of at issue privilege waiver on which Barclays relies.

22  County of Erie sets forth the applicable legal standard in the

23  Second Circuit for determining implied at issue waiver of

24  attorney-client privilege.  That case defined the test as

25  whether the moving party can prove that the opposing party

116

1    "relied on the privileged communication as a claim or defense,

2    was an element of a claim or defense."  546 F.3d at 228.

3    County of Erie examined whether e-mails exchanged between a

4    county attorney's office and sheriff's office concerning strip

5    searches were admissible in a lawsuit challenging their

6    constitutionality.  The defendants in that case invoked an

7    objective, qualified immunity defense in that they believed

8    their conduct had been legal.  County of Erie, 546 F.3d at 229.

9    The Second Circuit held that the defendant's reliance on an

10   objective, rather than subjective legal defense did not

11   constitute at issue waiver.  As stated in that case,

12   "Petitioners do not claim a good faith or state of mind

13   defense.  They maintain only that their actions were lawful or

14   that any rights violated were not clearly established.  In view

15   of the litigation circumstances, any legal advice rendered is

16   irrelevant to any defense so far raised."

17        Moreover, the Second Circuit emphasized that a finding

18   of waiver requires actual reliance on privileged advice,

19   whereas the "mere indication" of privileged advice is

20   "insufficient to place legal advice at issue."  Under the test

21   as enunciated in Erie, then, the 60(b) motions filed by the

22   trustee and the committee did not implicitly waive the

23   attorney-client privilege with respect to their advisor's

24   knowledge and understanding of the sale transaction.  Despite

25   Barclays' arguments to the contrary, the claims asserted by the

1 trustee and the committee in the 60(b) motions do not rely on

2 any legal advice provided by their respective advisors, with

3 regard to the sale transaction.  Instead, these claims rely on

4 allegedly misleading and incomplete public representations made

5 to the Court at the sale hearing and on the alleged failure of

6 Barclays and certain Lehman executives to say anything to

7 contradict those representations.  In other words, the claims

8 asserted by the trustee and the committee in the 60(b) motions

9 constitute what I'll call objective claims, asking the Court to

10 compare in-court disclosures concerning the sale transaction

11 with the provisions of the sale transaction as actually

12 consummated.  Neither the trustee nor the committee asserts

13 claims based on their subjective state of mind at the time of

14 the sale hearing.

15    The Court is also not persuaded by Barclays insistence

16 that the context of the claims of the trustee and the committee

17 and the 60(b) motions means that they necessarily waive the

18 attorney-client privilege.  At bottom, Barclays seems to argue

19 that reliance that purported mistakes and newly discovered

20 evidence means that the claims for relief under Rule 60(b)

21 necessarily implicate the contemporaneous advice provided by

22 professionals for the trustee and the committee at the time of

23 the sale hearing.  Based on the Court's review of these

24 motions, the Court disagrees.  The committee argued at the

25 hearing and in its 60(b) motion that the newly discovered

1    evidence underlying its 60(b) motion consists of discovery

2    unearthed during the Rule 2004 investigation, purportedly

3    demonstrating misrepresentations and nondisclosures related to

4    the sale transaction.  The trustee's 60(b) motion makes clear

5    that his arguments, with respect to mistakes, are, in fact,

6    premised on insufficient disclosure to the Court.  Thus the

7    60(b) motions simply do not implicate and rely on the advice

8    given by attorneys.

9         This holding on at issue waiver comports with widely-

10   recognized principles of public policy.  The attorney-client

11   privilege is critically important to ensuring open and frank

12   communications between attorneys and their clients.  For this

13   reason, policy considerations weigh in favor of strictly

14   construing any implied waivers of the privilege such as urged

15   by Barclays.

16        Barclays is not unfairly prejudiced by this holding

17   because other means exist for it to obtain relevant information

18   in support of its defense to the 60(b) motions.  The agreement

19   by LBHI to share otherwise privileged information is certainly

20   one important source.

21        Additionally, Barclays remains free to pursue

22   discovery from third parties that provided information to the

23   committee and the trustee's advisors concerning the sale

24   transaction.  Accordingly, Barclays is not worse off in that it

25   has not been denied access to information vital to its claims.

1   See County of Erie 546 F.3d at 229.

2           Moreover, should it become apparent at a later date

3   that the claims of the trustee or the committee as actually

4   presented, do, in fact, rely on legal advice provided by their

5   respective professionals, then Barclays remains free to assert

6   an at issue waiver at that time and seek additional related

7   discovery.

8           Finally, the fact that LBHI has agreed to produce

9   otherwise privileged documents to Barclays is not relevant to

10  any purported privilege waiver by either the trustee or the

11  committee.  The trustee and the committee are not similarly

12  situated to LBHI with respect to the current dispute.

13          As mentioned by counsel for LBHI on the record at the

14  hearing, LBHI viewed itself as distinct from the trustee and

15  the committee because LBHI made representations to the Court

16  with respect to the sale transaction at the sale hearing and

17  LBHI initiated the Rule 2004 discovery from Barclays.  LBHI

18  also based its 60(b) motion in part on the contention that its

19  attorneys were kept in the dark with respect to changes in the

20  sale transaction.

21          The motion by Barclays is denied without prejudice to

22  bringing a later motion should it become clear at some future

23  date that the committee or trustee is relying on privileged

24  communications to support 60(b) relief.  That's the ruling of

25  the Court.

**Exhibit 2**

Page 1

1

2              UNITED STATES BANKRUPTCY COURT

3               SOUTHERN DISTRICT OF NEW YORK

4     ------------------------x

5     In Re:

6                          Chapter 11

7     LEHMAN BROTHERS         Case No. 08-13555(JMP)

8     HOLDINGS, INC., et al,    (Jointly Administered)

9                Debtors.

10    ------------------------x

11

12              DEPOSITION OF MARLO KARP

13                 New York, New York

14                 January 20, 2010

15

16    Reported by:

17    MARY F. BOWMAN, RPR, CRR

18    JOB NO. 27306

19

20

21

22

23

24

25

1                         KARP

2    educational background?

3         A.    I have a BS/BA from Washington

4    University in St. Louis, and I have a master's

5    from Columbia University.

6         Q.    And what is the master's in?

7         A.    Finance.

8         Q.    So are you an accountant?

9         A.    Yes, I am.

10        Q.    When did you first have any

11   involvement with the Lehman/Barclays

12   transaction?

13            MR. ROTHMAN:  Are you asking her

14        personally or Deloitte?

15        Q.    That's a good distinction.  They may

16   conflate.

17            When did Deloitte first have any

18   involvement with the Barclays/Lehman

19   transaction?

20        A.    We received a call from SIPC, either

21   the 15th or 16th of September, asking whether or

22   not Deloitte might be -- have the time and be

23   able to help if Lehman Brothers, Inc. went into

24   liquidation.

25        Q.    And was it a -- what was your

                             KARP

1

2    contract, you may have raised that?

3         A.    It was purely unclear as if we

4    understood -- if we had any specific questions

5    as to -- that might affect our role, and we

6    didn't have any specific questions regarding our

7    role.  That was all we looked at it from.

8         Q.    At any point did anyone from Deloitte

9    provide an analysis of the APA or the purchase

10   agreement?

11        A.    No.  We were not asked to do so.

12        Q.    Let me go ahead and show you a

13   document that without the cover has been

14   previously marked, but we will go ahead and mark

15   this as 566.

16             (Exhibit 566, document Bates stamped

17             DT 303 to 356 marked for identification, as

18             of this date.)

19             MR. ROTHMAN:  Go ahead, look through

20             it.

21        Q.    Does that appear to be the document

22   you referred to as the APA and that Deloitte

23   received on approximately September 18, 2008?

24        A.    The draft that we received had a bunch

25   of markups on it, handwritten notes.  So it

Page 13

1                              KARP

2      as Exhibit 567, do you recognize this document?

3          A.    Yes.

4          Q.    Can you describe what it is, please.

5          A.    I believe it is referred to as the

6      clarification letter.

7          Q.    And did you understand it to revise

8      and amend the original asset purchase agreement?

9                MR. ROTHMAN:   Objection to the form.

10         A.    I understood that it was in addition

11     to the asset purchase agreement.  I don't know

12     that it -- I know it was afterwards that may

13     have changed some of the terms.

14         Q.    And is it your understanding that this

15     is part of the deal that the parties consummated

16     on September 22, 2008?

17         A.    That's how it has -- sorry.

18               MR. ROTHMAN:   Go ahead.

19         A.    That's how it has been described to

20     me.

21         Q.    When was the first time you received

22     that document, the clarification letter?

23         A.    It would have been the same time I

24     received the final version of the APA, so early

25     October.

Page 14

                              KARP

1

2      Q.     And what was the -- why was Deloitte

3   sent a version of the final APA and the

4   clarification letter?

5           MR. ROTHMAN:  Let me just caution you

6       not to reveal any conversations or things

7       that you might have learned from counsel

8       concerning that question.

9      A.     We generally request documents for our

10   engagements for our file so we understand what's

11   going on.  These would be typical documents we

12   would have requested versions of to understand.

13      Q.     Was anyone from Deloitte at any of the

14   bankruptcy court hearings related to the

15   Lehman/Barclays transaction in September of

16   2008?

17      A.     No.

18      Q.     Was Deloitte following those hearings

19   in any way?

20      A.     Following, no.  I believe we received

21   a phone call at that weekend letting us know

22   that the hearing, that the hearing had gone

23   through, the sale was going to go through, but

24   we were asked not to do anything else at that

25   time.

1                          KARP

2        Q.    Is that a phone call you received

3   personally?

4        A.    No.

5        Q.    Was -- was Deloitte aware that the

6   clarification letter was being finalized over

7   that weekend of the 20th and 21st over at Weil

8   Gotshal?

9        A.    I don't know when we knew about the

10  clarification letter.

11       Q.    Was anyone from Deloitte ever over at

12  Weil or Lehman prior to September 22?

13       A.    No.

14       Q.    So you were, Deloitte was relying on

15  reports from others in terms of what was going

16  on with the negotiation of the deal, the

17  finalization of the deal?

18       A.    Yes.

19       Q.    And what was the -- what work did

20  Deloitte do in that month of September?

21       A.    We attended a meeting on the 22nd at

22  75 -- the 745 building, the building with the

23  trustee, his counsel, Weil Gotshal, a lot of

24  attorneys, a lot of former Lehman personnel

25  there as well, where we started getting some

1                          KARP

2     information about where we could sit, how we

3     would get documents, how we would get books and

4     records.

5          Basically sat there -- it was an

6     organizational meeting at that point, and that

7     is all we were asked to do for pretty much that

8     first week, was just try to get organized, start

9     getting teams organized, people, because we were

10    asked to not do anything while the customer

11    transfers were going on.

12    Q.    What was the goal of the getting

13    organized?  Getting organized to do what?

14    A.    To proceed with the SIPA liquidation

15    process, so how would we do claims, how would we

16    marshal the assets of the firm, just build on --

17    what teams would work on what with which

18    attorneys from Hughes Hubbard, and that was --

19    and where would we sit, because it would be a

20    large group of people.

21    Q.    When was the first time Deloitte had

22    conversations with someone other than Hughes

23    Hubbard or the trustee concerning the

24    transaction?

25    A.    We received a phone call from SIPC

Page 17

1                           KARP

2    back on the 15th or 16th about the potential for

3    it, and John Manley had subsequent conversations

4    with SIPC once or twice during that week as it

5    became clear it might actually go into

6    liquidation, to find out if there were

7    conflicts.

8        Q.    Did Deloitte ever meet with Weil

9    Gotshal to discuss the deal?

10       A.    No.

11       Q.    Do you know if they met with Houlihan?

12       A.    No.

13       Q.    No, you don't know or --

14       A.    No, they did not.

15       Q.    Did it ever become important to

16   Deloitte's work to understand what assets and

17   liabilities had been transferred as part of the

18   Lehman Barclays sale transaction and what

19   hadn't?

20       A.    Not in that context.  It became

21   important to understand what assets were under

22   the trustee's control in order to begin the

23   customer claim process, which is where our focus

24   was.

25       Q.    To understand what assets were still

Page 18

1                               KARP

2     under the trustee's control, was it important to

3     understand which of LBI's assets had been

4     transferred over to Barclays?

5         A.    It was part of the -- it was part of

6     the understanding, but our first priority was to

7     get a handle on what assets were -- what cash

8     securities and other assets were under the

9     trustee's control or we needed to get under the

10    trustee's control.  That was our primary

11    responsibility.

12        Q.    So you were -- the goal was more in

13    terms of establishing what the trustee still

14    controlled, but one part of achieving that goal

15    was understanding what had been transferred in

16    the purchase agreement and what had been

17    retained, correct?

18              MR. ROTHMAN:  Objection to the form.

19              You can answer the question.

20        A.    That became the next step of the

21    process, but we didn't have access to the books

22    and records to validate a lot of that

23    information, so it became more important for us

24    to make sure that we could get all the assets

25    that were -- that we thought belonged to LBI

1                          KARP

2      under the trustee's control first, and as we got

3      access we would then proceed to see what was

4      left, what was still owed to customers.

5          Q.    When Deloitte received the

6      clarification letter in early October, did it

7      review the clarification letter?

8          A.    I know I read through parts of it.  I

9      would -- I don't know about the others.

10         Q.    Let me ask you to look at 567 and ask

11     about a few sections that are -- on the first

12     page, see where it says "purchased assets,

13     excluded assets"?

14         A.    Yes.

15         Q.    And then subparagraph 2 there,

16     capital A, it says, "The securities owned by LBI

17     and transferred to purchaser or its affiliates

18     under the Barclays repurchase agreement as

19     defined below, as specified on Schedule A,

20     previously delivered by seller and accepted by

21     purchaser."  Do you see that?

22         A.    Yes.

23         Q.    And if you flip to page 5,

24     paragraph 13, where it's entitled "Barclays

25     Repurchase Agreement," it says, "Effective at

1                          KARP

2        Q.    Can I ask what -- it seems like you

3    were clarifying your language.  Was there

4    something you were going to say before that?

5        A.    We have been in the process of

6    creating a draft balance sheet, but Deloitte

7    hasn't been doing the valuations.

8        Q.    Who has been doing the valuations for

9    the draft balance sheet?

10       A.    The valuations have been coming from

11   third-party sources and Barclays.

12       Q.    What were the third-party sources?

13       A.    They are publicly available sources.

14   The two that I remember are Bloomberg and IDSI.

15       Q.    Is that work still going on?

16       A.    Yes.

17       Q.    When did Deloitte first work on in any

18   way a balance sheet for BLI?

19       A.    It started in late '08.  We did not

20   have access to the books and records until

21   around that time to be able to get the details

22   to start creating a balance sheet.

23       Q.    What was the purpose of creating a

24   balance sheet?

25       A.    To determine what the assets and

Page 30

1                          KARP

2     liabilities existed as of 9/19/08, the date of

3     liquidation.

4          Q.    And Deloitte is still working on that

5     balance sheet today?

6          A.    Yes.

7          Q.    After you got the books and so forth,

8     records, why is it taking so long to do the

9     balance sheet?

10              MR. ROTHMAN:   Objection to the form.

11         A.    There is a lot of reconciliation work

12    that had to be done in order to create the

13    balance sheet.

14         Q.    And just explain in a little more

15    detail the type of reconciliation work.

16         A.    Yes.  There were over 200,000 failed

17    transactions between LBI and LBIE that need to

18    be reconciled.

19              There were, I believe, 10, 11 thousand

20    cash breaks related to the bank accounts.

21              We had difficulties in obtaining

22    statements from depositories where securities

23    were being held.  All that took time to get the

24    statements and the information and to begin

25    reconciling the data.

1                    KARP

2              And in addition, our ability to access

3    the data came in spurts, as we worked through

4    different issues with Barclays on access.

5        Q.    Was it difficult to value some of

6    LBI's assets?

7              MR. ROTHMAN:  Objection to the form.

8        Objection -- go ahead.

9        A.    We didn't value the assets.

10       Q.    Was it difficult to obtain valuations

11   of the assets that you believed, that Deloitte

12   believed were reliable valuations?

13             MR. ROTHMAN:  Objection to form.

14       A.    We didn't say one way or the other

15   whether or not the valuations were reliable.

16   That determination was not made by Deloitte.

17       Q.    Who made that determination?

18       A.    That -- Barclays provided services by

19   which their price verification group looked at

20   the valuations that were provided and questioned

21   whether or not, whether or not -- they did their

22   questioning methodologies to determine whether

23   or not the valuation methods were appropriate.

24       Q.    Did Deloitte agree or disagree with

25   Barclays' determinations?

Page 32

1                          KARP

2              MR. ROTHMAN:  Objection to the form.

3        A.    We didn't -- we didn't agree or

4   disagree.  That was -- the agreement was to rely

5   upon Barclays' pricing.

6        Q.    Let me ask more specifically about a

7   couple of these items.  First, do you know as of

8   September 16 or thereabouts the amount of

9   retained cash that LBI had?

10       A.    No.

11       Q.    And when I say "you," I mean Deloitte,

12  not just yourself.

13       A.    No, we didn't.

14       Q.    Just so I understand, Deloitte has

15  never attempted to identify or figure out the

16  value of these items listed under the purchased

17  assets?

18       A.    No.

19       Q.    And that would include efforts even

20  using some other third parties to help with

21  valuation?  Deloitte has never made that effort

22  to try to identify the value of these items?

23             MR. ROTHMAN:  Objection to the form.

24       A.    Not these specific -- not -- we -- the

25  only effort we made from putting together

Page 37

1                          KARP

2        may have learned solely from lawyers.

3        Q.    You can give a yes or no to begin

4    with.

5        A.    I don't know.

6        Q.    Now, you referenced an effort by

7    Deloitte to establish some valuations as of

8    September 19, 2008.  Is that correct?

9              MR. ROTHMAN:  Objection,

10             mischaracterizes her testimony.

11       A.    We prepared a balance sheet, but we

12   did not do the valuations.

13       Q.    But you attempted to gather

14   valuations, correct?

15       A.    Yes.

16       Q.    And can you describe the items that

17   you attempted to get valuations for?

18       A.    It would have been market value of

19   assets and liabilities on the balance sheet to

20   the extent that these required outside market

21   values.

22       Q.    What did Deloitte do to first

23   establish what assets were still -- still

24   belonged to LBI after the Barclays transaction?

25             MR. ROTHMAN:  Objection to form.

Page 38

```
 1                        KARP

 2       A.    We prepared a balance sheet as of

 3   9/19, irrespective of any transaction, and

 4   obtained bank statements and depository

 5   statements to reconcile to 9/19.

 6       Q.    Did that include obtaining a list of

 7   securities that were posted earlier in the week

 8   with the Fed as part of the Fed repo?

 9       A.    Not for the 9/19 balance sheet, it did

10   not.  It was only what existed at that date.

11       Q.    So you're familiar with the collateral

12   that was supposed to go to Barclays, that was

13   part of the repo that was supposed to go to

14   Barclays in return for Barclays putting up

15   45 billion dollars?

16       A.    I understand that there was a Barclays

17   repo transaction.

18       Q.    And the securities, for the purposes

19   of your 9/19 balance sheet, how were the repo

20   securities treated as still belonging to LBI or

21   not belonging to LBI?

22            MR. ROTHMAN:  Objection to the form.

23       A.    We would show a repo transaction.  So

24   it would be in a liability.

25       Q.    And the liability at that point, the
```

1                          KARP

2    about, you are distinguishing?

3        A.    Well, those assets would have been

4    part of the balance sheet.

5        Q.    OK.

6        A.    So they would have been valued for the

7    balance sheet of 9/19.  It would have included

8    that pool.

9        Q.    Is the balance sheet -- when do you

10   expect to complete the balance sheet for 9/19?

11       A.    I'm not sure.

12       Q.    Is it complete with respect to items

13   such as the clearance box assets?

14       A.    It's being reviewed at this time by

15   the trustee and his counsel --

16            MR. ROTHMAN:  No, don't talk about

17        things that the lawyers are doing, please.

18       Q.    It is OK to just indicate that it is

19   not in your bailiwick.  It is being reviewed I

20   think is OK to say.  Otherwise, it is hard to

21   figure out the story of why.

22            OK, just let me talk about any

23   valuations you have placed on the clearance box

24   assets.  Has Deloitte placed, assigned a value

25   to the clearance box assets?

1                          KARP

2        A.     Deloitte has not done valuation.

3        Q.     The valuation that's on the draft

4    balance sheet, do you know how it was obtained?

5        A.     They would have been through

6    third-party pricing sources and Barclays.

7        Q.     The third-party pricing sources, did

8    Deloitte go out and make use of third-party

9    pricing sources?

10       A.     No.  Those sources would have come

11   through Barclays and existing Lehman Brothers

12   relationships that continued past bankruptcy.

13       Q.     Can you be a little bit more specific

14   on the last part?

15       A.     We still have a relationship with

16   Bloomberg to obtain some pricing information.

17       Q.     "We" being LBI, the trustee?

18       A.     LBI, the estate.

19       Q.     Do you know the amounts that are on

20   the draft balance sheet for clearance box

21   assets?

22              MR. ROTHMAN:  Objection to the form.

23       A.     There is no specific amount for

24   clearance box assets.  It's listed as firm

25   inventory.

1                          KARP

2          about it, you should direct it to Hughes

3          Hubbard, not a witness.

4               MR. THOMAS:  I am going use it to ask

5          some questions.  If you want to instruct not

6          to answer based on privilege, you can.  But

7          I'm really just using it as a prop because

8          it has dates, it does have some pertinent

9          information on it.

10          Q.    There is a reference in the

11     description to the item 10, "Analysis of asset

12     purchase agreement."  Do you see that?

13          A.    Yes.

14          Q.    Did Deloitte ever prepare analysis of

15     the asset purchase agreement?

16               MR. ROTHMAN:  No, I am sorry, I

17          object.  I'm not going to let her answer

18          questions about the -- try to delve into the

19          privilege log.

20               MR. THOMAS:  I'm not delving into what

21          the document is.

22               MR. ROTHMAN:  First of all, you have

23          already asked her if she read the APA,

24          Deloitte has read the APA.  We have been

25          through this already.  Now you are trying to

Page 146

1                          KARP

2         do it in a way that I think is improper.

3              MR. THOMAS:  It is simply asking --

4         the question was, did Deloitte ever prepare

5         an analysis of the asset purchase agreement.

6         That can't possibly be privileged.  It is

7         certainly a legitimate question.

8              MR. ROTHMAN:  You can go ahead and

9         answer.

10        A.    No.

11             MR. TECCE:  Mr. Thomas, I don't mean

12        to interrupt you.  There is an page attached

13        to the back of this that you may want.

14             MR. THOMAS:  Let me go ahead and get

15        that back.

16             MR. ROTHMAN:  We can rip that out.

17        Q.    There is an entry number 12, there is

18   a reference, again, Marlo Karp is you, who works

19   for Deloitte?

20        A.    Yes.

21        Q.    And Felicia Sokalski also works for

22   Deloitte?

23        A.    Yes.

24        Q.    There is a reference in the

25   description to Lehman balance sheet, e-mail and

1                         KARP

2        A.    It was a balance sheet --

3              MR. ROTHMAN:  Objection to the form.

4        A.    It was a balance sheet for LBI which

5   if I remember correctly basically was trying to

6   show what the result of the sale would do to the

7   financial position, the balance sheet of LBI.

8        Q.    Was that relevant to your work at this

9   time in any way?

10             MR. ROTHMAN:  Objection to the form.

11       A.    No.  We were asked to not perform any

12  work at that time until the customer account

13  transfers had been completed.

14       Q.    So when did you actually first start

15  doing work?

16       A.    Not until after September 26, 2008.

17       Q.    And again, I may have asked this

18  already, but your primary focus after

19  September 26, 2008, was what?

20       A.    Was to get the information on the

21  assets that were under the trustee's control.

22       Q.    Who is Todd Scarpino?

23       A.    He is a member of the Deloitte team.

24       Q.    I was going to ask you about one more

25  of these here.  Item 22, dated September 25,

Page 162

```
 1                        KARP

 2        Q.    Does he work in your group?

 3        A.    He was working for me on the project.

 4        Q.    What project was that?

 5        A.    The Lehman SIPC liquidation.

 6        Q.    And when you complete the 9/19 balance

 7   sheet, how will you use that document and for

 8   what purposes?

 9        A.    Which?  The clean file?

10        Q.    No, the balance sheet that's --

11   Deloitte has been working on?

12        A.    I don't know.  You would have to ask

13   the trustee.

14        Q.    OK.  You are preparing it for the

15   trustee?

16        A.    Yes.

17        Q.    Deloitte has been working on it for

18   over a year without any understanding of how it

19   is going to be used?

20             MR. ROTHMAN:  Objection to the form.

21        A.    Anything that we would know would have

22   been discussions between counsel.

23        Q.    This e-mail, it says, "During the past

24   hour, I have been attempting to conduct the

25   exercise we discussed during our 1:30 call."
```

**Exhibit 3**

Page 1

1                           J. KOBAK

2             UNITED STATES BANKRUPTCY COURT

3             SOUTHERN DISTRICT OF NEW YORK

4      ----------------------x

5      In Re:

6                                  Chapter 11

7      LEHMAN BROTHERS            Case No. 08-13555(JMP)

8      HOLDINGS, INC., et al.,    (Jointly Administered)

9

                    Debtors.

10

       ----------------------x

11

12       * * * PARTIALLY HIGHLY CONFIDENTIAL * * *

13     (Pages 144-145 have been marked Highly Confidential.)

14

15     VIDEOTAPED DEPOSITION OF JAMES B. KOBAK, JR.

16                   New York, New York

17                   December 7, 2009

18

19

20

21

22

23     Reported by:

24     KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25     JOB NO. 26430

Page 14

1                           J. KOBAK

2    it would be likely if there were another big

3    brokerage liquidation that went into SIPA, they

4    might think of us for doing that.  I don't think

5    any of us had something like Lehman in mind, but

6    I think that was the understanding.

7         Q.    And so is it fair to say that, at the

8    time he was appointed, the trustee had some

9    expertise in how broker-dealers operate?

10        A.    Well, in the mechanics of a SIPC

11   liquidation, particularly.

12        Q.    And at the time he was appointed, did

13   the trustee understand the basics of

14   broker-dealer financing?

15        A.    I would say yes.  I don't know, you

16   know, where you draw the line between basics and

17   details.

18        Q.    Fair.

19        A.    And it might be different for

20   different brokerage firms.

21        Q.    Right.  At the time of his

22   appointment, would the trustee have had a basic

23   understanding of what a repurchase agreement

24   was?

25        A.    I believe so.

Page 24

1                           J. KOBAK

2     assisted by professionals at my firm and had

3     engaged Deloitte & Touche to act as

4     accountants."  Do you see that?

5          A.    Yes.

6          Q.    When was Deloitte & Touche engaged?

7          A.    We talked to them again.  I don't know

8     when the engagement letter was signed.  It might

9     have been after the liquidation actually began

10    because, again, that I think was approved by

11    SIPC as well as ourselves, but we talked to them

12    shortly before Friday, I don't know if it would

13    have been Wednesday or Thursday.  And again,

14    they had a few people involved.  Clearly they

15    didn't have time to get a full team together and

16    they really didn't have -- wouldn't have had

17    access to any information anyway.

18         Q.    Can you tell me why Deloitte & Touche

19    was engaged?

20         A.    Well, we knew we would need an

21    accounting firm to assist us.  This is a major

22    liquidation.  There are a lot of books and

23    records.  There's 200,000 computer systems, or

24    something like that.  Substantial work needed to

25    be done to reconcile accounts and so forth, so

Page 32

                        J. KOBAK

1   17th at some point.

3      Q.    And who at the trustee would have been

4   responsible for reviewing this to understand the

5   nature of the deal?

6      A.    I think at that time it would have

7   been primarily myself and the trustee.

8      Q.    And at the time you reviewed this, did

9   you understand the economics of the deal?

10     A.    We understood primarily the economics

11  of the deal, which originally I think was said

12  to involve some $70 billion of assets against

13  some amount of liabilities, and I think that was

14  the basis for our understanding of the overall

15  economics.  We had some understanding at that

16  time of the items that were to be transferred to

17  Barclays.  Those -- what we were primarily

18  interested in what would remain behind because

19  that would be our job, to liquidate those things

20  and take care of the customers.

21     Q.    And who would you have gotten

22  information from other than Weil Gotshal?

23     A.    I think it was primarily Weil Gotshal.

24  I don't know, they may have had one or two

25  businesspeople who I guess at that time would be

Page 46

1                          J. KOBAK

2    correct?

3         A.    That's correct.

4         Q.    But it did have a series of assets

5    that totaled up to book value of approximately

6    74.3 billion, correct?

7              MR. CARDEN:  Objection to form.

8         A.    Yes.

9         Q.    And it had one set of short positions

10   in the liabilities that was given a value of, a

11   book value of approximately 69 billion, correct?

12        A.    That's correct.

13        Q.    And the trustee never told anyone that

14   that -- the economics of that transaction was

15   unacceptable?

16        A.    No, we did not.  I think our

17   understanding was that the -- there was a rough

18   equivalence probably between the value of the

19   assets and the value of the liabilities.  And

20   again, our concern was that with really the

21   entity that was going to remain behind.

22        Q.    When you say you had an understanding

23   there was a rough equivalence, do you mean 69

24   billion and 74.3 billion represent a rough

25   equivalence of book value?

Page 47

1                    J. KOBAK

2          MR. CARDEN:   Objection to form.

3      A.    Well, I think there's a rough

4  equivalent of the long positions and the short

5  positions.  There are a few other assets.  There

6  are also other liabilities.  As I've said, I

7  don't think some of the assets probably had the

8  value ascribed to them, and when you put that

9  all together, it seems to me you have a deal

10  where it's fairly -- the assets and the

11  liabilities are fairly equivalent, at least

12  within a fairly narrow range, I would say.

13      Q.    What was the narrow range?

14      A.    Well, you said 74.3 to 69 plus.  I've

15  told you I don't think the 74.3 probably was

16  really worth quite 74.3, but you're talking

17  about something where you probably have, if

18  there were any profit ascribed to the deal, a

19  very narrow profit, possibly at the end of the

20  day there would be a net cost to Barclays.  And

21  I think that was our understanding of what was

22  involved.

23      Q.    Did the trustee ever communicate to

24  anyone that they would not approve the deal if

25  Barclays recorded a profit on the deal?

Page 53

1                          J. KOBAK

2       A.    I don't remember, and this doesn't

3   refresh my recollection in that regard.

4       Q.    Do you know whether the trustee ever

5   spoke to either of those gentlemen about the

6   transaction?

7       A.    I don't remember.

8       Q.    The next sentence of the e-mail says,

9   "The numbers relating to the transaction are

10  still being finalized, so the post-closing

11  amounts are subject to change."  Do you see

12  that?

13      A.    Yes, I do.

14      Q.    What was the trustee's understanding

15  of that sentence when he received this e-mail?

16      A.    That this was a pretty rough and ready

17  balance sheet that kind of gave you, at most, a

18  gross approximation of what we might be talking

19  about.

20      Q.    Did the trustee understand that the

21  valuations being given for the assets in this

22  transaction were generally estimates?

23      A.    Yes.

24      Q.    Did he understand that, given the

25  emergency nature -- let me just make sure we

Page 54

1                          J. KOBAK

2      agree on that.  Would you agree that this

3      transaction was negotiated and approved under

4      emergency circumstances?

5              MR. CARDEN:  Objection to form.

6      A.    I believe the Court described it as

7      extraordinary circumstances, and I would

8      certainly subscribe to that.

9      Q.    Under those extraordinary

10     circumstances, would you agree that there was no

11     time to do a final and formal appraisal of all

12     the assets in the deal?

13     A.    Yes.

14             MR. CARDEN:  Objection to form.

15     Q.    And would you agree there was no time

16     to do a formal and final appraisal of all of the

17     financial trading assets in the deal?

18             MR. CARDEN:  Same objection.

19     A.    Yes, I don't know what kind of

20     analysis might have been done of those things

21     before, if some of them were marked to market on

22     a daily basis, for instance.

23     Q.    You don't know whether the assets were

24     being marked to market on a daily basis during

25     the week of September 15 through to September

**Exhibit 4**

Page 1

1

2            UNITED STATES BANKRUPTCY COURT

3            SOUTHERN DISTRICT OF NEW YORK

4    ---------------------------X

5    IN RE:

6                         Chapter 11

7    LEHMAN BROTHERS        Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,

9

10               Debtors.

11   ---------------------------X

12

13

14

15        HIGHLY CONFIDENTIAL DEPOSITION OF

16            CHRISTOPHER KIPLOK

17            New York, New York

18         Thursday, March 4, 2010

19

20

21

22

23

24   Reported by:
     JOMANNA DeROSA, CSR
25   JOB NO. 27494

1             KIPLOK - HIGHLY CONFIDENTIAL

2    saying is I remember there were other discussions,

3    but I just don't remember specifics.  The specific

4    is the point I mentioned about the 250 million.

5             Q.    Were you involved at all in the

6    negotiation of the terms of the clarification

7    letter?

8             A.    No, not at all.

9             Q.    Were you involved in any

10   discussions concerning the terms of the

11   clarification letter over the course of that

12   weekend?

13            A.    First of all, I don't think I was

14   aware that a clarification letter existed until

15   sometime into the evening on Sunday, which I guess

16   is the 21st. I was aware that after the parties

17   had left the courtroom, that certain statements

18   had been made on the record that needed to be --

19   I'll use your word -- "clarified," but that -- the

20   understanding I had was that such would have been

21   accomplished shortly after the sale hearing or

22   first thing Saturday morning.

23            So, again, I was focused on account

24   transfers and the like.  But Sunday evening I do

25   recall the term "clarification letter" quite

1              KIPLOK - HIGHLY CONFIDENTIAL

2    clearly.  I think there were drafts on conference

3    room tables.  I never had an opportunity to what

4    I'd say read or review the document.  The one

5    thing I do remember is at some point being in a

6    conference room.  You know, I was in and out of

7    many as different documents and issues were

8    percolating through the wee hours of the morning,

9    where I believe Mr. Messineo from Weil Gotshal was

10   at a laptop computer, and there was an issue as to

11   the 15c3 account, the clarification letter.  And

12   at some point I recall saying to him we need that

13   asset or something along those lines, and his

14   response being, you know, don't worry -- don't

15   worry, we've made -- you know, we've got that

16   covered, and he raised his hand off of the laptop.

17   I recall that.

18              But beyond that session where I was

19   in that conference room, which was -- I think

20   there were three or four Weil Gotshal lawyers and

21   at least a half dozen Cleary lawyers, and a couple

22   of Simpson Thatcher lawyers in the room, I don't

23   recall any -- anything else regarding drafting of

24   the clarification letter.

25              Q.   Were you present for any

Page 32

```
 1            KIPLOK - HIGHLY CONFIDENTIAL

 2    discussions concerning the economic terms of the

 3    sale transaction?

 4            A.    No.

 5            Q.    Did anyone, over the course of that

 6    weekend, state or suggest, in any way, to your

 7    knowledge, that the -- that the terms of the sale

 8    transaction, as captured in the APA and the

 9    clarification letter, differed from what had been

10    approved by the Court?

11            A.    I don't recall.  I don't recall

12    that.

13            Q.    Was anyone representing the Trustee

14    tasked with monitoring the negotiation of the

15    clarification letter?

16            A.    No. We were -- I think

17    Mr. Frelinghuysen and myself -- Mr. Frelinghuysen

18    had been at Weil Gotshal from the early morning of

19    Saturday, actually.  We asked him to go up to

20    execute whatever needed to be done to finalize the

21    deal that had been presented to Judge Peck.  And

22    he remained at Weil Gotshal for countless hours

23    and even into Sunday for that to occur, and that

24    did not happen.

25                When I arrived at Weil Gotshal, I
```