**JENNER&BLOCK**

**Anton R. Valukas**
**Chairman of the Firm**
Tel 312 923-2903
Fax 312 840-7679
avalukas@jenner.com

Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654-3456
Tel  312 222-9350
www.jenner.com

Chicago
Los Angeles
New York
Washington, DC

April 1, 2010

*Via E-mail and US Mail*

Diana Adams
United States Trustee
Office of the United States Trustee
33 Whitehall Street, 21st Fl.
New York, NY 10004

*Re:    Best Practices for Examiners*

Dear Diana:

When I undertook my appointment as Examiner in the Lehman bankruptcy, you and Cliff White asked that I report, at the conclusion of my investigation, on suggested best practices that might assist future Examiners perform their work.  The Lehman examination was, of course, unique to Lehman; and given its size and scope, practices that worked for Lehman may or may not translate to other examinations.  But I offer the following observations.

*Initial Steps*

*Recommendation 1:  New Examiners should speak with and review the reports of former Examiners to learn what worked in prior assignments.*

The recommendations that follow are not simply mine.  As I embarked upon this process, I began by speaking with other Examiners who had served in major proceedings, precisely to get a sense of best practices before I formed my own work plan.  I spoke with Richard Thornberg (Worldcom), Neal Batson (Enron), and Josh Hochberg (Refco), and I was greatly assisted by their input.  I reviewed the reports filed by those Examiners, and by others, in great detail, to see how they organized, conducted and reported upon their own investigations.  All of that was enormously useful and future Examiners should build on our collective experience.

Diana Adams
April 1, 2010
Page -2-

*Recommendation 2: If the Court has not imposed a timetable for the Report, the Examiner should give himself and his team the discipline of a deadline.*

The Lehman matter was especially challenging, given the scope of my assignment and the size of the universe I was asked to explore. It was apparent that our factual investigation would require hundreds of witness interviews. The volume of Lehman documents alone was estimated to amount to close to half a trillion pages; and relevant documents resided not just at Lehman but with dozens of third parties. Added to the magnitude of the work was the limit of time. Although the Court did not impose any deadline for the completion of my Report, I was keenly aware of the exclusivity date for the Debtors to suggest a plan and the fact that the value of my Report would be greatly enhanced if I were able to deliver the Report prior to that date.

My team and I ultimately reviewed more than thirty million pages of documents and interviewed more than 250 witnesses; we produced a comprehensive Report and filed it within thirteen months of my appointment. We could have done more work. We had collected millions more pages we might have reviewed; we had billions more pages we might have requested. We had identified hundreds more people we might have talked to. We might have circled back and re-interviewed each of the 250+ persons we had already talked to. But the fact is that doing that additional work might in theory have added marginally to the final product, while the stark reality is that to do so would have come at an unreasonable cost, both in dollars and time. I set a deadline and adhered to it; and the process was better for that.

*Recommendation 3: The Examiner should enlist, accept, and use the aid and cooperation of the community.*

I have said this before, and I emphasize it again here. My Report could not have been filed as expeditiously as it was without the genuine assistance and cooperation my team and I received from nearly every constituent in the Lehman community.

My order of appointment required that I meet with the interested parties. I would like to think that I would have had the good sense to do exactly that even if the Court had

Diana Adams
April 1, 2010
Page -3-

not had the wisdom to have ordered it, because those meetings were extremely helpful.

By the time of my appointment, the Debtors, the Creditors Committee, and other parties had assembled documents and performed analyses. We asked for – and were provided access to – all of that work product.[1]

The Debtors, the Creditors Committee and the interested parties were and are represented by the cream of the New York and National bars. These excellent lawyers had excellent suggestions, and our conversations with the parties provided real guidance to steer the investigation. Other Examiners could benefit as I did by seeking out and listening to the parties.

That said, while it is important to seek suggestions and guidance from the parties and their counsel, it is critical that the Examiner maintain independence and objectivity.

*Recommendation 4: The Examiner should perform every task necessary to produce a complete report; but do each task once, and do it right. That said, there is utility in doing some early interviews even before document production is complete.*

We were eager to begin witness interviews immediately. We needed, of course, to first collect and review documents. But there were exceptions. One of the suggestions made by other Examiners was that a few key interviews – even before document production – could be very useful to inform issues and suggest the direction of the investigation.

---

[1] While I am sincere in my praise of the parties' cooperation, I don't want to overstate its contribution to the final Report. I have also said this before: we had hoped that the parties' document collection and analysis, by the time of my appointment four months after the bankruptcy filing, would have been more mature and complete than it turned out to be. Because it was not so, I had to extend the projections I had made for completion of my work. But the fact remains that it is a good practice to feed off the work of others wherever possible.

Diana Adams
April 1, 2010
Page -4-

We identified a relatively small number of key witnesses to interview even though document production was in its infancy. In general, those early interviews were with persons who (1) would help inform us on overriding issues and (2) would be available and willing to submit to further interviews after document review. And the other Examiners were right – these initial, early interviews did greatly assist the direction of the investigation.

*Organization of the Team*

*Recommendation 5: The Examiner, of course, needs to assemble the right team for the task and organize it efficiently.*

Every examination will be different and the manpower and organization needs will vary accordingly. But let me set out what did work for me and this matter as a guide for others.

It was apparent that this matter would require the almost full-time participation of scores of lawyers and financial professionals. Organizing them, coordinating their efforts, and avoiding redundancies and waste would present challenges.

*First*, we analyzed the 10 issues that had been assigned to me in my order of appointment and sorted them into four substantive areas. Five teams were created – four substantive teams and one administrative team which exercised oversight and coordination.

*Second*, we assembled a group of senior lawyers as team leaders with backgrounds and experience as trial lawyers, former prosecutors, bankruptcy lawyers, securities specialists and corporate lawyers. Each team was then staffed with other lawyers as necessary. As you know, Bob Byman served as my lead attorney, basically as chief of staff. It was his job to coordinate the activities of the five teams.

*Third*, each team was required to develop a work plan for my approval, so that they and I had a shared understanding of what work they proposed to do and by what deadlines. The work plans were shared among all of the teams so that we could reach consensus that nothing was overlooked but that nothing was being done twice. The work plans from each team listed the documents they wanted to collect, the search

Diana Adams
April 1, 2010
Page -5-

terms to be used for collection, and the parties from whom to request documents. The work plans listed the witnesses each team proposed to interview and the anticipated order and dates for interviews. Of course, there were many witnesses listed by multiple teams; Bob would coordinate which team would take the lead for individual witnesses.

*Fourth,* each team prepared and periodically updated an annotated proof outline of its anticipated sections of the Report. That way, we were able to see early on what areas were covered, what areas remained for planned fills, and whether there were any holes that needed to be plugged.

*Fourth,* we asked Duff & Phelps, my financial advisors, to organize themselves similarly so that each legal team would have counterparts – dedicated advisors focusing on specific issues. To minimize unnecessary expense to the estate, Duff was asked to periodically list for us each deliverable they had been asked to perform, including the team which had made the assignment and the expected delivery date. Duff was instructed that it was not to perform any tasks unless they were reported on the deliverables list.

When we identified areas which required education on topics that even great lawyers might not be intimately familiar with – topics such as credit default swaps or derivative trading or FAS 157 accounting – we had Duff prepare and give us tutorials. We offered the same tutorials to the government as part of our cooperation with them (see below).

*Fifth,* we had regular communication among and within teams to ensure that teams and sub-teams did not develop silo mentalities, at the same time avoiding redundancy as much as possible.

Fee examiners in run of the mill cases typically react negatively to billing entries that show inter-office meetings. This was not a run of the mill event. As the investigation unfolded, hundreds of thousands of documents were reviewed daily; multiple witnesses were interviewed each day. Individual witnesses and documents did not usually fit neatly within a single team's responsibility. It was critical that every team knew what every other team was finding in real time.

Diana Adams
April 1, 2010
Page -6-

We held weekly team leader meetings; key documents were circulated to all team leaders as they were found; interview summaries were circulated to all team leaders as they were prepared. We decided that all team leaders needed to be kept as informed as possible about daily events; each team leader exercised discretion as to whether and to what extent to pass on information to team members.

*Government Coordination*

*Recommendation 6: Government coordination is essential, and best accomplished by regular, agreed protocols.*

My order of appointment, of course, required that I cooperate with government agencies that may have an investigative interest in Lehman; but even if I had not been so ordered, cooperation was essential lest the government decide to block or shut down an area of my inquiry.

I initially met with the SEC and representatives of the US Attorneys for the Southern and Eastern Districts of New York and the District of New Jersey. After the initial face to face meetings, we held weekly conference calls for most of the period. We had several other face to face meetings.

We established several protocols that made the process agreeable to the government, so that they did not feel a need to restrict my investigation.

*First*, we agreed to clear with them any witness before we took an interview. We sent our proposed list of witnesses to the government periodically; after a default period of time (generally 5 business days) without express reservation, we would then be free to schedule an interview. Once scheduled, we would give the government notice of that, so that they had another opportunity to ask us not to interview a particular individual. We asked the government to advise us if there were any questions or subjects they wished us to address in interviews. Over the course of the investigation, the government did ask us to defer speaking to a number of individuals; but eventually, they released us to speak with every person we requested.

*Second*, we kept the government informed in real time of the significant facts we were developing. Our communications were, as these things almost always are, one way.

Diana Adams
April 1, 2010
Page -7-


In our weekly calls, we would debrief the government on key information or documents as we learned it.

*Third*, as mentioned above, we made Duff available – as well as our lawyers who became expert in areas such as Repo 105 – to give the agencies tutorials on subjects they might not be totally familiar with.

Cooperation with the government, of course, includes our interaction with your office. We need not describe to you what that interaction was, but I hope you agree that I achieved my goal to keep you appropriately informed without overly immersing you in unnecessary detail.

*Document Collection and Review*

*Recommendation 7: The Examiner should get – but try not to have to use – Rule 2004 Subpoena power.*

Within weeks of my appointment, I filed a motion asking that the Court grant me expansive Rule 2004 subpoena powers. It was important to have subpoena power; and it was equally as important not to have to use it. Having the power gave my lawyers the leverage to negotiate voluntary production on a much faster track than formal process would have provided.

It was also important that the parties knew I would use the power if pressed. There was a single party which did not voluntarily in timely fashion produce the documents we requested. We issued a subpoena to that party and teed up a motion to compel for the Court; and the party decided to produce rather than fight the subpoena. With the exception of a few other instances where a producing party *requested* a subpoena, we were not otherwise required to use formal process or the Court's assistance to get the documents and interviews we sought.

The document experience carried into the way we conducted interviews, which I describe in detail below. But in all areas, the point is that the Examiner's role is investigative but not adversarial. It is necessary to get the facts, to ask the hard questions, to press for complete production. But it is not necessary to do so with an adversarial tone; it was my experience that we achieved full and complete production

Diana Adams
April 1, 2010
Page -8-

far more quickly by adopting a cooperative tone than we would have through a formal subpoena process.

*Recommendation 8: The Examiner will likely be asked to agree to confidentiality stipulations to get documents; he should agree, but perhaps with a standard order.*

Nearly every producing party requested confidentiality agreements during document production. As part of the cooperative process, I agreed to any reasonable request for such agreements rather than take the time to negotiate or argue. In retrospect, this is the one area in which I might have acted differently than I did. We ended up with 16 different formal agreements and 5 different informal undertakings. It turns out that only a single agreement has come to issue – our relatively minor dispute with the CME over the publication of three documents. But if there had been more disputes, the Court and I would have had to sort out all of these different agreements with slightly different terms. If I had it to do over, I might have asked the Court to approve a single form of protective order to govern production from all parties.

*Recommendation 9: The Examiner should use contract attorneys where possible to conduct document review.*

As you know, we used contract attorneys to the fullest extent practicable to do first level document review. We had as many as 70 contract attorneys working at the same time, and our experience with them was excellent. We estimate that the savings to the estate, over the rates that would have been charged by Jenner associates, was in the tens of millions of dollars; moreover, we could not have deployed 70 additional, full time Jenner lawyers without a substantial time lag – the whole process would have taken much longer without the use of contract attorneys.

*Recommendation 10: But substantive review must be done by lawyers who are fully integrated and invested.*

We do not want to suggest that contract attorneys should have been used to an even greater extent than they were. As a group, the contract attorneys performed very well for first level review – that is, the initial screening of a data dump to identify documents of possible substantive interest. All second level review was performed by Jenner

Diana Adams
April 1, 2010
Page -9-

lawyers. Our experience was that most of the contract attorneys did not have the skills, background and commitment to do effective and efficient second level review.

Jenner lawyers supervised the contract attorneys and exercised quality control. Jenner lawyers who did document review were fully integrated into the substantive teams so that they actually knew what to look for and so that they were able to make more refined searches to locate key documents more quickly.

*Recommendation 11: The documents should be collected and maintained so as to make them an asset of the estate.*

Our document collection and archival was conducted by seasoned trial lawyers who know how to try cases. As a result, the data base we have assembled is, as it should be, a valuable asset of the estate to limit costs in any pending and future litigation.

Many lawyers are familiar with document management systems such as Concordance which have served them in the past. But we recognized early on that those usual systems would not be up to the task of handling the quantities of documents we would assemble. We involved IT personnel at the outset to ensure that we had the right systems, and opted to maintain our document repository on two extremely robust, easy to search systems, CaseLogistics and Stratify.

The numbers are staggering. We extracted roughly 35 million pages of documents from Lehman's systems – an enormous amount of material, yet only one tenth of one per cent of the universe of Lehman's electronically stored data. We used carefully refined searches so that we would not be overwhelmed with returns. We kept careful records of the search terms we used, the date ranges of the searches, and the custodians against whom the searches were run. Those searches need not be rerun; the parties can look at our searches and add focused additional searches if necessary to their specific needs, but they need not reinvent our wheel. We have assembled the collected documents into electronic, searchable format, so that parties may pull what is relevant to them.[2]

*Witness Interviews*

---

[2] Protective order issues still remain before free public access can be granted, but the documents are assembled; that substantial work need not be done again.

Diana Adams
April 1, 2010
Page -10-

*Recommendation 12: The Examiner should consider using informal interviews in most cases.*

As you know, one of the suggestions made to me by other Examiners – which I adopted – was that wherever possible interviews be conducted informally, without requiring that the witness be sworn and without transcripts. There are obvious pros and cons. Even had I used transcribed statements under oath, they would have no evidentiary value in pending or future litigation, so the real advantage of oath and transcription is that a quotation of a witness's testimony can be precise. But my team of seasoned litigators estimated that it could easily double the amount of time take interviews with transcription; it would add significant cost; and, significantly, we anticipated that witnesses would be far more likely to be open and candid in an informal setting than if a reporter was transcribing each word. Moreover, the creation of transcribed statements might have impacted pending Government investigations and the government's willingness to release persons for interview.

Balancing these factors, I decided to use informal interviews wherever possible – and that turned out to be possible in all cases. As I noted above in the document collection process, our tone was investigative rather than adversarial. The informality of the interviews was a definite aid. We asked the tough questions where we had to; but the informal setting and objectivity we brought to the process made the witnesses comfortable to fully answer our questions.

To assure accuracy, all interviews were conducted by at least two attorneys, one of whom was assigned to keep careful notes. Flash summaries were prepared as soon as possible, usually the day of the interview, and reviewed by all lawyers present while recollections remained sharp; and full summaries were made and reviewed as soon as practical after that.

*Recommendation 13: The Examiner should make the interviews an open book, not an occasion for cross-examination.*

Prior to each interview we provided advance notice of the topics we intended to cover and advance copies of the documents we anticipated showing the witness. That procedure would have been anathema to a litigator – but, again, my goal was to get the

Diana Adams
April 1, 2010
Page -11-

facts, not to surprise a witness into some admission. By giving advance notice, witnesses were able – and expected – to refresh recollection before the interview rather than on the fly. That greatly reduced the need for follow-up interviews. It put the witnesses and their counsel at ease that we were not trying to trap.

A number of the parties – including nearly every party against whom I reported colorable claims – have expressly told me that while they might disagree with my conclusions, they were satisfied with the process. I commend that process to future Examiners.

*Recommendation 14: Interview outlines should be shared among teams.*

In general, detailed interview outlines were prepared at least a week in advance and circulated among team leaders so that all substantive teams could have input on each interview. Moreover, having the outlines prepared in advance allowed us to identify the topics to counsel for the interviewee as described above.

*Recommendation 15: The Examiner can supplement or supplant interviews with written questions.*

In all, my lawyers and I interviewed more than 250 individuals. There was only one individual I sought to interview but could not – Hector Sants, chief executive of the UK's Financial Services Authority ("FSA"). However, the FSA did provide detailed, written answers to specific questions that would have been posed to Mr. Sants, and while not perhaps as satisfying as an interview, they sufficed.

In other cases, letters to interested parties' counsel with fairly discrete questions to confirm key background facts proved very helpful. For example, we asked a clearing bank to confirm that we had set out in a written question a comprehensive list of all collateral calls made in a particular period. The written exchange was more efficient than Q&A in an interview.

Diana Adams
April 1, 2010
Page -12-

*The Report*

*Recommendation 16: Examiners should carefully define terms not defined in their orders of appointment.*

My order of appointment asked me to opine on the existence of colorable claims but did not define that term. The Second Circuit has described colorable claims as ones "that on appropriate proof would support a recovery," "much the same as that undertaken when a defendant moves to dismiss a complaint for failure to state a claim."[3]

I was mindful of the fact that there is a high likelihood that an actual claim will be asserted wherever I have concluded that a colorable claim exists, so I was reluctant to adopt a motion to dismiss standard. Having conducted an extensive factual investigation, I felt it was appropriate to use a higher threshold standard, and therefore defined "colorable claim" as one for which I found sufficient credible evidence to support a finding by a trier of fact.

In addition to defining terms, I recommend that future Examiners do something early on that I did somewhat late. Appendix 2 to my Report is a 98 page glossary of defined terms, names, acronyms and phrases; without that glossary and the ability to use abbreviations for defined terms, the Report would have been cumbersome and unwieldy. I did not append another document that was created during the writing process – a set of protocols that collectively amounts to our own private Blue Book of Citations. Although there were many individuals who contributed first drafts of sections, the overall Report was carefully edited to conform to the Glossary and Blue Book, resulting in a uniform style and appearance. That is not merely cosmetic; I believe that it greatly enhanced the readability of this lengthy tome.

But I confess that we came a little late to the realization how useful the Glossary and Blue Book would be. The editing process would have been less a challenge had we begun assembling and circulating those documents to the substantive teams before first drafts were created.

---

[3] *In re STN Enters.*, 779 F.2d 901, 905 (2d Cir. 1985); *In re KDI Holdings, Inc.*, 277 B.R. 493, 508 (Bankr. S.D.N.Y. 1999).

08-13555-mg    Doc 8626-1    Filed 04/23/10    Entered 04/23/10 17:35:42    Letter    Pg 13 of 14

Diana Adams
April 1, 2010
Page -13-


*Recommendation 17: The Report should contain as much detail on the claims that are not found as it does for claims which are found.*

We devoted as much time and energy to conclude that claims did not exist as we did to conclude that there were claims. And we devoted almost as much space in the Report to those non-claims as we did to the claims.

I felt it was important that the Report set out the detailed facts that led me to conclude the absence of claims so that the parties can use that analysis to make measured judgments whether to expend their own time pursuing claims I have concluded are not there.

*Recommendation 18: Examiners should consider whether persons against whom the Examiner tentatively determines there are colorable claims should be given an opportunity to supplement the record.*

After I made tentative determinations as to colorable claims, I decided to give each such person and entity an opportunity to present additional factual detail they thought might dissuade me. I stressed that I was not looking for a *Wells* submission, but simply additional facts that I might not have had in making the initial determination. Every identified party took me up on the offer and presented additional materials.

I should stress that I perceived no obligation to go through that procedure, and I do not recommend that any such procedure be used in all Examiners' investigations. I simply note that under the unique circumstances of my investigation, the process worked; it had a real impact upon reaching fair and reasoned judgments. Future Examiners should consider whether it might work for them.

\*     \*     \*     \*     \*     \*

Diana Adams
April 1, 2010
Page -14-

Diana, it has been my great honor and privilege to have served as Examiner in this matter; thank you again for the trust you showed in me and our firm. I hope that this is useful to you; and I stand ready to assist in any further way I can.

Sincerely,

Anton R. Valukas

cc:    Robert L. Byman