1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555(JMP)

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS HOLDINGS INC., et al.,


                    Debtors.

- - - - - - - - - - - - - - - - - - - -x


              U.S. Bankruptcy Court

              One Bowling Green

              New York, New York


              April 20, 2010

              10:05 AM


  B E F O R E:

  HON. JAMES M. PECK

  U.S. BANKRUPTCY JUDGE

2

HEARING re Debtors' Motion for Authorization to Purchase and

Sell Notes Issued by Certain Special Purpose Vehicles [Docket

No. 7920]


HEARING re Motion of Simeon Moreno to Confirm Termination or

Absence of Stay (Simeon Moreno's Motion for Declaration That

the Automatic Stay Does Not Apply and That His Claims

Constitute Administrative Expenses of the Estate) [Docket No.

7924]


HEARING re Motion of Simeon Moreno to (1) Deem Proof of Claim

as Timely Filed; (2) for Relief from the Automatic Stay; (3)

for Permission to Attend Hearing via Telephone Conference; and

(4) for Exemption from Service Requirements as to Certain

Parties in the Master Service List [Docket No. 7366]


HEARING re First Motion of Mark Glasser to Extend Time for

Claim [Docket No. 6386]


HEARING re Motion of Pacific Life Insurance Company to File

Proof of Claim After Claims Bar Date [Docket No. 5599]

3

1

2     HEARING re Joint Motion of Sea Port Group Securities, LLC and

3     Berner Kantonalbank to Deem Proofs of Claim to be Timely Filed

4     by the Securities Programs Bar Date [Docket No. 6150]

5

6     HEARING re Motion of Pennsylvania Public School Employees'

7     Retirement System for Entry of an Order that its Timely Filed

8     Guarantee Questionnaire be Considered a Timely Filed Proof of

9     Claim [Docket No. 6558]

10

11    HEARING re Motion of Dynegy Power Marketing Inc. for Entry of

12    an Order that its Timely Filed Guarantee Questionnaire be

13    Deemed a Timely Filed Proof of Claim [Docket No. 7008]

14

15    HEARING re Amended Motion of Tensor Opportunity Limited to

16    Permit it to File a Late Proof of Claim [Docket No. 7162]

17

18    HEARING re Motion to Authorize Santa Fe Entities to Treat Their

19    Claims as Timely Filed [Docket No. 7144]

20

21    HEARING re CVI GVF (LUX) Master S.A.R.L.'s Motion to Treat

22    Claim Filed by Black River Asia Fund Ltd. as Timely Filed

23    [Docket No. 7290]

24

25    Transcribed by:  Clara Rubin

4

```
 1    A P P E A R A N C E S :

 2    WEIL, GOTSHAL & MANGES, LLP

 3         Attorneys for Lehman Brothers Holdings, Inc. and

 4          Affiliated Debtors

 5         767 Fifth Avenue

 6         New York, NY 10153

 7

 8    BY:   SHAI Y. WAISMAN, ESQ.

 9          RICHARD L. LEVINE, ESQ.

10          MARK I. BERNSTEIN, ESQ.

11

12    AKIN GUMP STRAUSS HAUER & FELD LLP

13         Attorneys for Dynegy Power Marketing Inc.

14         One Bryant Park

15         New York, NY 10036

16

17    BY:   ROBERT A. JOHNSON, ESQ.

18

19    CHAPMAN AND CUTLER LLP

20         Attorneys for U.S. Bank National Association, as Trustee

21         111 West Monroe Street

22         Chicago, IL 60603

23

24    BY:   FRANKLIN H. TOP III, ESQ.

25          JAMES HEISER, ESQ. (TELEPHONICALLY)
```

5

1

2   DUANE MORRIS

3        Attorneys for Pennsylvania School Employees' Retirement

4         System

5        30 South 17th Street

6        Philadelphia, PA 19103

7

8   BY:   LAWRENCE J. KOTLER, ESQ.

9

10  GUSRAE, KAPLAN, BRUNO & NUSBAUM PLLC

11       Attorneys for Mark Glasser

12       120 Wall Street

13       New York, NY 10005

14

15  BY:   DANIEL BRANOWER, ESQ.

16

17  MILBANK, TWEED, HADLEY & MCCLOY, LLP

18       Attorneys for the Official Committee of

19        Unsecured Creditors

20       One Chase Manhattan Plaza

21       New York, NY 10005

22

23  BY:   DENNIS C. O'DONNELL, ESQ.

24        LENA MANDEL, ESQ.

25

6

1

2    QUINN EMMANUEL URQUHART OLIVER & HEDGES, LLP

3         Special Counsel to the Official Committee of Unsecured

4          Creditors

5         51 Madison Avenue

6         22nd Floor

7         New York, NY 10010

8

9    BY:   ROBERT K. DAKIS, ESQ.

10

11   CLEARY GOTTLIEB STEEN & HAMILTON LLP

12        Attorneys for Creditor, Goldman Sachs Banks

13        2000 Pennsylvania Avenue, NW

14        Washington, DC 20006

15

16   BY:   BENJAMIN MEEKS, ESQ. (TELEPHONICALLY)

17

18   FAEGRE & BENSON LLP

19        Attorneys for Creditor, Santa Fe, et al.

20        2200 Wells Fargo Center

21        90 South Seventh Street

22        Minneapolis, MN 55402

23

24   BY:   MICHAEL M. KRAUSS, ESQ. (TELEPHONICALLY)

25

7

1

2   IRELL & MANELLA LLP

3        Attorneys for the Official Committee of Unsecured

4         Creditors

5        840 Newport Center Drive

6        Suite 400

7        Newport Beach, CA 92660

8

9   BY:   ALAN J. FRIEDMAN, ESQ. (TELEPHONICALLY)

10

11  LEO & WEBER, P.C.

12        Attorneys for Creditor, Liberty Mutual

13        One N. LaSalle Street

14        Suite 3600

15        Chicago, IL 60602

16  BY:   T. SCOTT LEO, ESQ. (TELEPHONICALLY)

17

18  LAW OFFICES

19        Attorneys for Claimant, Simeon Moreno

20        5602 Stearns Hill Road

21        Waltham, MA 02451

22

23  BY:   SARA DISCEPOLO, ESQ. (TELEPHONICALLY)

24

25

8

1

2    STUTMAN TREISTER & GLATT

3         Attorneys for Interested Party, Elliott Company

4         1901 Avenue of the Stars

5         12th Floor

6         Los Angeles, CA 90067

7

8    BY:   JEFFREY H. DAVIDSON, ESQ. (TELEPHONICALLY)

9          WHITMAN L. HOLT, ESQ. (TELEPHONICALLY)

10

11   STUTMAN TREISTER & GLATT

12        Attorneys for Creditor, Perry Capital

13        1901 Avenue of the Stars

14        12th Floor

15        Los Angeles, CA 90067

16

17   BY:   MARINA FINEMAN, ESQ. (TELEPHONICALLY)

18

19   APPALOOSA MANAGEMENT

20        Interested Party

21   BY:   JAY SHETH (TELEPHONICALLY)

22

23   BANK OF AMERICA

24        Creditor

25   BY:   NATALIE FOY (TELEPHONICALLY)

9

1

2     CHICAGO FUNDAMENTAL INVESTMENT PARTNERS

3          Interested Party

4     BY:   PETER GRUSZKA (TELEPHONICALLY)

5

6

7     FARALLON CAPITAL MANAGEMENT

8          Creditor

9     BY:   ANATOLY BUSHLER (TELEPHONICALLY)

10

11

12    KING STREET CAPITAL

13          Interested Party

14    BY:   SUZANNE COVENTRY (TELEPHONICALLY)

15

16

17

18

19

20

21

22

23

24

25

10

P R O C E E D I N G S

1   THE COURT:  Be seated, please.

2   Good morning.

3   MR. WAISMAN:  Good morning, Your Honor.  Shai Waisman,

4   Weil, Gotshal & Manges, for the Lehman debtors.

5   Your Honor, Lehman's omnibus -- well, not omnibus

6   hearing but carryover matters, this morning's calendar -- we

7   filed an amended agenda letter yesterday evening; it reflects

8   one contested matter, other than claims-related issues, that we

9   would handle first; my first partner Rick Levine will handle

10  that.  And then we could move to the claims portion of the

11  agenda, three contested matters there, and then just a slew of

12  other matters that have been on submission.

13  THE COURT:  Fine.

14  MR. WAISMAN:  So the first matter this morning, Your

15  Honor, item number 1 under contested matters, debtors' motion

16  for authorization to purchase and sell notes issued by certain

17  special-purpose vehicles, response deadline, Your Honor, was

18  April 13th.  We received one objection, the objection of U.S.

19  Bank National Association.  And the creditors' committee filed

20  a statement in support.  With that, I would turn over to my

21  partner.

22  MR. LEVINE:  Good morning, Your Honor.  Richard Levine

23  from Weil Gotshal, for the debtors.

24  Your Honor, the debtors filed this motion, with the

VERITEXT REPORTING COMPANY

212-267-6868                                                    516-608-2400

11

1     support of the committee, as Mr. Waisman pointed out, as part

2     of their ongoing efforts to maximize recovery from existing

3     investments.  As the Court is aware, prior to the filing of

4     these cases, the debtors, in the regular course of their

5     business, entered into various transactions with special-

6     purpose vehicles, SPVs; these were either derivative contracts

7     or loan agreements.  The SPVs then issued notes, which were

8     supported by collateral; that collateral also protected the

9     debtors' right to recover under their contracts with the SPVs.

10          In many cases, based on terminations of the colla --

11    of the derivative agreements between the debtors and the SPVs,

12    or otherwise, the debtors were owed a lot of money by the SPVs

13    as of the petition dates and as of today.  Many of the SPVs,

14    however, as Your Honor is aware from one or more particular

15    cases, have taken the position that the debtors' priority-of-

16    payment rights with respect to the collateral became

17    subordinated to the rights of the noteholders as a result of

18    the SPVs declaring an event of default directly tied to the

19    debtors' filings for relief under Chapter 11.  As Your Honor

20    knows, it is the debtors' position in such cases that any such

21    change to the priority of payment violates the ipso facto

22    clause.  And obviously the debtors have resumed litigation with

23    that regard and have been fairly successful today.

24          There are others of these SPVs where there are

25    different disputes, largely relating to situations where the

12

1    noteholders have been unwilling or unable to direct the

2    liquidation of the collateral so that the situation is frozen

3    and the debtors can't recover what they're owed under the

4    derivative contracts.  The debtors have been engaged in a

5    multi-prong effort to try to address these situations; that

6    effort includes litigation both here and overseas, it includes

7    alternate dispute efforts and includes negotiations.  However,

8    the debtors and their financial advisors, in consultation with

9    the committee and its advisors, have concluded that there is

10   another alternative which in particular cases and in particular

11   circumstances, and in the exercise of the debtors' business

12   judgment on a case-by-case basis, may be the most efficient and

13   best method of trying to resolve these disputes, and that's to

14   allow the debtors to go out into the marketplace and, either in

15   face-to-face negotiations or through markets, purchase the

16   notes of these SPVs.

17        The debtors consider this to be ordinary-course

18   business.  However, for an abundance of caution and to make

19   sure that there's full disclosure, they have filed this motion

20   to make sure that they have the authority.

21        The debtors believe that the acquisition of notes

22   issued by SPVs may serve a number of purposes in maximizing the

23   debtors' ability to recover on their existing investments.  As

24   described in the motion, the debtors seek authority to purchase

25   the notes issued by SPVs with respect to which the particular

13

1     debtor who would buy the notes has an existing derivative

2     contract or loan agreement.  The debtors may seek to acquire

3     notes at a discount.  Many of these notes are trading at a

4     discount, we believe largely because of the market's

5     recognition of the ipso facto issue and the fact that there's a

6     considerable issue as to where the priorative (sic) payments

7     will lay, and because noteholders are aware that if the debtors

8     win on the ipso facto issue, much of the money will go to the

9     debtors.  The notes are trading at a discount, and if the

10    debtors -- based on the particular terms or particular SPVs, if

11    the debtors acquire a sufficient number of the notes or a

12    percentage of the notes, they may be able to direct the

13    liquidation of the collateral.

14          Another situation is acquiring notes at discount may

15    serve as a hedge against litigation risk, either in this court

16    or, probably more likely in terms of the hedging, in a court

17    overseas.

18          Third, the debtors may be able to direct the

19    indentured trustee or noteholders, if they accumulate a

20    sufficient position in notes, to settle litigation with the

21    debtors, or at least allow the debtors to negotiate a

22    settlement that they could not otherwise, because the debtors

23    will also be able to take into account their recovery on notes

24    above whatever purchase price they pay.

25          As the Court is aware, the documentation relating to

14

1    these SPVs and derivative loan contracts are very complicated.

2    While the debtors have had success at challenging the

3    modification of the priority of payment to date in certain

4    deals, the language in the documents differs from deal to deal,

5    the facts differ from deal to deal, and the expense of

6    litigating these matters, given the number of them, would be

7    enormous.

8         Thus, the debtors, in consultation with the committee,

9    have moved this Court for permission, pursuant to Sections

10   105(a) and 363(b)(1) of the Code, to establish procedures

11   detailed in the motion by which they may purchase, either in

12   the open market or through private negotiations with current

13   noteholders, notes issued by SPVs with which the particular

14   debtor is a party to a transaction agreement, the right to

15   exercise whatever contractual legal rights may come as a holder

16   of notes, and the right to sell any purchase notes if

17   circumstances change, and, in the business judgment of the

18   debtors, selling notes makes sense.

19        The debtors believe this relief is consistent with

20   relief the Court has granted the debtors with respect to

21   investments, to enhance or preserve recoveries on real estate

22   and with respect to hedging transactions.

23        As Your Honor is aware, not only was the committee

24   involved in developing the concept behind and the procedures

25   set forth in the motion, but it's filed a statement of support.

15

1    Moreover, not a single economic stakeholder has objected.  We

2    think that's because parties which understand the nature of

3    these instruments and these markets believe that what the

4    debtors are proposing to do makes sense.  In a given case, it

5    may be that by buying out a particular minority noteholder

6    there's no longer any dispute and a settlement can be easily

7    reached and the minority noteholder has made a business

8    decision to sell the notes to the debtors.  So there are all

9    kinds of circumstances where it just may make a lot of sense

10   and may be a very efficient and economically --

11         (Phone ringing over loudspeaker)

12         MR. LEVINE:  -- attractive way to go.

13         THE COURT:  I believe that CourtCall just joined.

14   They missed the best part of your argument.

15         MR. LEVINE:  All the jokes are still coming, Your

16   Honor.

17         THE COURT:  All right, great.  I look forward to

18   those.

19         MR. LEVINE:  The only objection was filed by U.S. Bank

20   in its capacity as a trustee for some of these SPVs.  U.S.

21   Bank, in such capacity, objects that the proposed transactions

22   would be speculative and that it's an improper use of the

23   assets of the debtor.  While the debtors understand that these

24   types of purchases and sales of notes are not typical, this is

25   not a typical bankruptcy.  And the debtors were involved in

16

1    these business pre-petition and need the flexibility, under

2    appropriate oversight by the committee or, if the committee

3    doesn't agree, by the Court, to hedge and maximize the value of

4    these transactions.  This is not an effort to enter into new

5    business; this is not an effort to make new investments.  This

6    is an effort to maximize the return from existing investments.

7    Thus, we do not believe these proposed transactions are

8    governed by Section 345(a) of the Bankruptcy Code.

9         We actually suspect that what U.S. Bank is concerned

10   about is a situation in which it already finds itself:  It is

11   caught in the middle.  Obviously, U.S. Bank, as trustee, has

12   taken the position that the event-of-default language changing

13   the priority of payment does not violate the ipso facto clause.

14   The debtors obviously disagree.  And we believe U.S. Bank is

15   concerned that in some hypothetical circumstance down the road

16   there may be a situation where the debtors, say, own the

17   majority of notes and there are minority noteholders who are

18   objecting, telling U.S. Bank you can't listen to the debtors

19   even though they hold a majority, because they have a conflict

20   of interest.

21        Your Honor, that could happen.  We don't know; it may

22   not happen.  But the key thing, we think, for this motion is

23   that the debtors are not seeking any relief whatsoever with

24   respect to that circumstance.  If -- all the debtors are not

25   asking the Court to prejudge what the debtors' rights would be

17

1    in that circumstance, and the debtors are not asking the judge

2    to prejudge what rights or remedies other noteholders or the

3    SPVs or the trustees would have.  If there are such disputes,

4    they'd, to use language I should never use, abide the event,

5    because hopefully that'll never happen or there'll be

6    settlements or everything will be worked out.  But if there are

7    disputes, they can be litigated in the appropriate forum at the

8    appropriate time.

9         In that regard, both our motion and our reply

10   expressly made the point that we're not looking for Your Honor

11   to rule in any way on what the debtors' rights would be as

12   noteholders or what the rights would be of other noteholders.

13   And speaking to Mr. Top, counsel for U.S. Bank, this morning, I

14   said that to the extent he would be -- some of his concerns

15   would be addressed by adding some language to the order to make

16   that clear in the order, we're happy to work with him to do

17   that, because it really is not our purpose here to get Your

18   Honor to prejudge any of those issues.

19        The other objections asserted by U.S. Bank really go

20   to those very issues, and, again, we don't think they're really

21   ripe at this moment, because we're not seeking relevant relief

22   and, frankly, we think they're wrong on the law, as we set

23   forth in the reply, but we don't think Your Honor needs to get

24   there today.

25        I guess the final point is that we are -- question

18

1    whether what U.S. Bank is doing is precluding the opportunity

2    of noteholders who may want to sell to the debtors, should the

3    debtors be interested, from having that opportunity to sell

4    their notes.  And, again, we don't think that's something which

5    this Court should be precluding, based on whatever concerns

6    U.S. Bank has as trustee.

7         Your Honor, we submitted in support of this motion a

8    declaration of Daniel Ehrman (ph.).  Unfortunately, Mr. Ehrman

9    is not here today because he's attending the protocol meetings.

10   We're prepared to make a proffer of the testimony of Mr. Locke

11   McMurray, a managing director of the debtors, who is prepared

12   to testify, who was completely involved in the work that led up

13   to the motion and can testify to whatever Mr. Ehrman was

14   prepared to testify to.  Though I don't think that U.S. Bank's

15   objection raises any factual issues, we're prepared -- we are

16   prepared to proceed with a proffer just based on Mr. Ehrman's

17   declaration or by making a formal proffer of what Mr. McMurray

18   would testify to, or by calling Mr. McMurray to the stand,

19   whatever Your Honor would find most helpful.

20        THE COURT:  Well, let me find out if U.S. Bank, the

21   only objector, has any issues with my considering the existing

22   declaration of Mr. Ehrman even though he's not present, and how

23   U.S. Bank would prefer we deal with the testimony of Mr.

24   McMurray.

25        MR. LEVINE:  Thank you, Your Honor.

19

1          THE COURT:  Is U.S. Bank here?

2          Why don't we just limit your response to simply the

3     evidentiary question which is before the Court.

4          MR. TOP:  Your Honor, our objection to this particular

5     motion really has nothing to do so much with the facts that

6     were submitted in connection with it; rather, just a legal

7     question.

8          THE COURT:  Do you have any objection, then, to my

9     consideration of the declaration and any proffer that might be

10    offered?

11         MR. TOP:  I do not.

12         THE COURT:  Fine.

13         Okay, I'll hear the proffer if you want to make it;

14    otherwise, you can rest on the declaration.

15         MR. LEVINE:  Your Honor, we're happy to rest on the

16    declaration.

17         THE COURT:  Fine.  I --

18         MR. LEVINE:  Mr. McMurray's here if the Court has

19    questions.

20         THE COURT:  Fine.  I accept the declaration as the

21    evidentiary support for the motion.

22    (Declaration of Daniel Ehrman (ph.) was hereby received into

23    evidence as a Debtors' exhibit, as of this date.)

24         THE COURT:  And I think I should hear from the

25    creditors' committee and then hear from U.S. Bank; that way,

20

1      proponents of the motion have gone first.

2              MR. O'DONNELL:  Your Honor, Dennis O'Donnell, Milbank,

3      Tweed, Hadley & McCloy, on behalf of the creditors' committee.

4              As Mr. Levine indicated, we did, through -- the

5      committee, through its derivative subcommittee, did work

6      closely with the debtors on this motion and the procedures

7      behind it.  We addressed both the prudence of the proposed use

8      of the funds, and we do believe that, given the limitations and

9      the oversight that the committee will have on it, that these

10     funds will be used in a prudent way, consistent with other uses

11     of estate assets, to preserve and protect and advance the

12     interests of the estate and other asset classes.

13             We're also comfortable that the procedures that are

14     proposed that would involve the committee and its advisors in

15     the process on a real-time basis will ensure that we have the

16     opportunity to ensure that the use of the funds will in fact be

17     prudent, and also believe that the objections raised by U.S.

18     Bank largely are not ripe for the Court to address today.  They

19     relate to issues that could be raised down the road if certain

20     circumstances come to pass, and can be addressed at that time.

21     There's no need to address them in the context of approving the

22     motion.

23             THE COURT:  All right, thank you.

24             MR. TOP:  Good morning, Your Honor.  Frank Top from

25     Chapman and Cutler, and I'm here on behalf of U.S. Bank

1    National Association as trustee.

2         And our -- U.S. Bank's concern with -- in connection

3    with this motion is primarily a concern that the motion to

4    purchase these particular securities, and thereby purchase the

5    rights that particular notes or certificates might have, might

6    be used to squeeze out the minority of noteholders in a

7    particular transaction or for other coercive purposes.

8         In a lot of these transactions, the key economic

9    driver is really a credit default swap in which an issuer in

10   these special-purpose vehicles and the debtors entered into as

11   part of the transaction.  And in these transactions it was

12   generally the case that the debtors were the ones that

13   purchased the protection, meaning that in the event that there

14   was some defined credit event under the terms of the swap

15   agreement, that the issuer would then owe them a cash

16   settlement payment.

17        And, again, most of these transactions were terminated

18   as a result of the filing of the bankruptcy petitions, first by

19   LBHI and thereafter by the other credit -- the other swap

20   counterparty, generally LBSF, and as a result it generally

21   triggered a right to termination payment under the terms of

22   another credit default agreement.  However, as a result of

23   various priority-of-payment provisions, as Your Honor is very

24   well aware of, often contained in both the indenture and in the

25   swap agreements themselves, these payments may be subordinated

22

1    to payments that might be owed to holders under the terms of

2    the agreements.  And obviously there's all sorts of litigation

3    going on before Your Honor and in other courts relating to

4    those particular issues.

5         But the key is, in this thing, is that the termination

6    payment in each of these cases may be very, very significant,

7    and it obviously depends upon a number of factors:  you know,

8    the reference entities that are involved in those things; the

9    duration of the swap; whether or not there's a loss threshold.

10   But not only might the termination payment be significant in

11   and of itself, but there also might be significant issues in

12   how one goes about calculating a termination payment for these

13   particular credit default swaps.  At the time that Lehman went

14   into bankruptcy, I'm not sure exactly what the state of the

15   market was as it related to someone coming in and stepping into

16   their shares to determine whether or not that person would be

17   willing to pay a particular amount for that particular swap

18   agreement.

19        So there are issues not only with priority of

20   payments, but there may be significant issues, as well, as how

21   one goes about calculating what that termination payment might

22   be.  And so there are potentially large dollars at stake for

23   both the debtors as a credit -- as a swap counterparty, as well

24   as for bondholders in these particular transactions.

25        And as the debtors pointed out, there are all sorts of

23

1     different types of documents, and they have varied rights.  In

2     some cases, a majority of noteholders has the right to take

3     certain action to direct trustees; in other cases, there's a

4     supermajority required, in some cases maybe a majority is

5     required, to take certain action.  Again, it's hard to

6     generalize because they're all so different.  But the trustee's

7     concerned that the debtors might be seeking to purchase these

8     notes with a view towards exercising those noteholder rights to

9     reach some kind of a settlement of the transaction against the

10    will of the minority noteholders to the sole or primary benefit

11    for themselves, not as a noteholder but to enhance their

12    position in connection with the credit default swap termination

13    payment.  This is particularly true where that termination

14    payment might be significant or there's a significant

15    disagreement as to the terminat -- how the termination payment

16    should be calculated.

17         And the concern is that the debtors won't act as a

18    rational noteholder or certificate holder would in this

19    particular situation but, rather, in a manner that's in the

20    best interest of the termination payment that might be due the

21    debtors under the swap, which seems to be a clear conflict of

22    interest of some type.

23         THE COURT:  Let me stop you for a second, because I

24    understand your argument, but what does that have to do with

25    what's before the Court today?  That's something that might

24

1   happen, but then again it might not happen.  The authority to

2   purchase doesn't necessarily mean that a purchase will take

3   place.  And even if a purchase does take place, there's nothing

4   to indicate that this parade of horribles that you lay out will

5   ever occur.  It's highly speculative, it seems.

6        MR. TOP:  I would respond in this way, Your Honor.

7   First of all, we acknowledge that there are situations where it

8   may be totally appropriate.  For example, if you reached a

9   resolution with a majority of holders in a particular

10  transaction and you're just trying to take care of the

11  remainder of the transactions, seems appropriate that you might

12  make an offer to those minority bondholders to buy them out by

13  purchasing their securities.  That seems to be an appropriate

14  use of this particular thing.  Or if the debtors decided that

15  boy, the best solution here is these notes are trading at such

16  a discount we're just going to buy them all, and then collapse

17  the entire transaction, that certainly is appropriate as well.

18       It's just in this particular -- in this situation,

19  which I think will probably more -- may be more likely than the

20  Court might think, where the debtors might take a majority

21  piece, use their voting rights or whatever other rights it

22  might have under the indenture, to the detriment of minority

23  noteholders, not, again, as a rational noteholder might do but,

24  again, to try to prefer their position on their credit default

25  swap agreement --

25

1          THE COURT:  Let's just say --

2          MR. TOP:  -- and --

3          THE COURT:  Let's just say, for the sake of

4    discussion, that that's what happens.  What's the court of

5    competent jurisdiction that should decide such a dispute?

6          MR. TOP:  Well, I would suspect that, again, it

7    depends upon how the context of this particular proceeding

8    would --

9          THE COURT:  But aren't we talking about noteholders of

10   nondebtor SPVs?

11         MR. TOP:  Non -- that is correct, but I would suspect

12   that the debtors might try to enforce rights in this particular

13   court.

14         THE COURT:  Well, they might, but then again they

15   might not.  And would you, as the indentured trustee of the

16   SPV, be seeking guidance from this Court, or would you be going

17   elsewhere?

18         MR. TOP:  Your Honor, again, it would depend upon the

19   facts and circumstances at the time, how noteholders might

20   direct the trustee, what type of action the trustee ought to

21   take in that particular circumstance.

22         THE COURT:  It seems to me you're agreeing, then, that

23   there's no one roadmap to the future that we can look to.

24         MR. TOP:  No, the problem, though, is, Your Honor,

25   that, again, there might be significant amounts of money that

26

1    are expended in connection with buying up some of these notes

2    and some of these certificates.  And to a certain extent, then,

3    the horse is already out of the barn; what we're buying is a

4    potential dispute.

5        And so we thought it would be appropriate to bring

6    this particular circumstance up to the Court so that the Court

7    at least understand the trustee's concern in connection with

8    this -- these types of transactions.

9        We think that there might be things that could be

10   done, in giving the approval, that might help the situation,

11   perhaps where the debtors intend to use these notes or

12   certificates in a coercive manner; perhaps those are situations

13   that ought to be brought to the Court -- Court's attention

14   prior to buying the securities.  Or perhaps there should be an

15   admonition against using them coercively.  I don't know.

16       But, again, what we're ask -- what they may be asking

17   the Court to do is approve the expenditure of a large amount of

18   money, in which case to a certain extent the horse is already

19   out of the barn.

20       THE COURT:  Okay.  I understand your argument.  Are

21   you really here more in the nature of letting me know about

22   your concerns, or are you here seeking to block the approval of

23   this program to acquire notes?

24       MR. TOP:  Well, I would -- I am not -- again, we are

25   not against the purchase of all notes and certificates by SPVs

27

1     at this point, but, you know, to the extent that they are

2     intended to be used in a coercive manner, we think that those

3     ought to be blocked until it can be examined how they're going

4     to be used.

5          THE COURT:  Well, the use of the term "coercive" is a

6     fairly colorful and judgmental term.  I think coercive may be

7     in the eye of the beholder.  Are you suggesting as a neutral

8     trustee that definitionally an acquisition by a Lehman Brothers

9     entity of these notes, in order to achieve a desirable

10    commercial purpose, is coercive?

11         MR. TOP:  Again, desirable commercial -- I'm not sure

12    what you mean by "desirable commercial purpose".

13         THE COURT:  Make money --

14         MR. TOP:  I think we are concerned about --

15         THE COURT:  Make money, avoid litigation, hedge

16    against risk.  Those are all things that a nondebtor would do,

17    and may be doing now.

18         MR. TOP:  Right.  But our concern is to the -- is

19    using the rights of these notes and certificates to force

20    something down -- to force a solution on a minority noteholder

21    that might not otherwise select that particular method of

22    resolution, particularly in the circumstance where that

23    minority noteholder may not be getting what might be otherwise

24    deemed fair value because of this situation.

25         THE COURT:  So is it your principal concern to protect

28

1     the interests of the as yet unidentified minority holders?

2              MR. TOP:  That's correct.

3              THE COURT:  Okay.  I understand.

4              MR. TOP:  And, Your Honor, we do think -- well, I have

5     not found a case that's remotely similar to a situation where

6     there's a swap counterparty and noteholder on the other side,

7     but we do think that there are some things that Courts have

8     done in the past, in connection with voting on a plan of

9     reorganization, for example, where --

10             THE COURT:  I don't view that as analogous here at

11    all.

12             MR. TOP:  Well, it's -- again, it's -- I agree with

13    you it's not identical, but a lot of the same concerns in that

14    kind of a situation arise in this particular situation as well.

15    And the same was true in the early '90s of exit consents where

16    you have a group of majority noteholders approving of an

17    amendment to an indenture, which in fact they were not going to

18    be party to, however, because they were being paid out on the

19    other side.

20             So, I mean, there are circumstances that, you know,

21    Courts have looked to in the past to determine whether or not

22    the use of a particular right was appropriate or inappropriate

23    in the context of that situation.

24             Your Honor, well, I did -- we did raise some points on

25    particular provisions in the indentures and things like that

29

1    that may be stumbling blocks in all of this.  From what I

2    understand, the debtors are agreeing to add language in

3    connection -- to reserve the rights of parties with respect to

4    the language in the indentures.  I don't think they're

5    intending to change those rights.  So with that, I'm not going

6    to say anything further about our objection.

7             THE COURT:  Okay.  Fine.

8             The objection is noted but overruled --

9             MR. LEVINE:  Thank you, Your Honor.

10            THE COURT:  -- with the understanding that the form of

11   order to be submitted will be modified in a fashion acceptable

12   to counsel for U.S. Bank, as it relates to the offers made at

13   the opening of today's argument by debtors' counsel to put in

14   some protective language.  I don't know what that language is,

15   but I'm sure it'll be innocuous.

16            MR. LEVINE:  Right, right.  Your Honor, as I

17   understand and simply want to make clear that Your Honor's

18   order is not prejudging any of the issues that Mr. Top is

19   referring to.

20            THE COURT:  You don't even need language that says

21   that.  It's very clear to me that nothing in this order is

22   intended to prejudge issues that aren't yet ripe.

23            MR. LEVINE:  So, Mr. Top, do you still want to add

24   that language, or are you comfortable based on that statement

25   that we can go ahead with the present order?

30

1          MR. TOP:  I think it's probably better for the record,

2     as there's other people looking at the case, that maybe we just

3     have a couple of -- just a sentence.

4          But I agree with Your Honor that it could be very

5     innocuous, so that should be easily be --

6          MR. LEVINE:  Okay, Your Honor, we'll take care of

7     that.

8          THE COURT:  Fine.

9          MR. LEVINE:  I don't think it's going to be a problem.

10         THE COURT:  Okay.

11         MR. LEVINE:  Thank you, Your Honor.

12         MR. WAISMAN:  Your Honor, now that that matter's

13    concluded, I think there are a few people that may want to be

14    excused as they have no interest in the rest of the calendar,

15    if that's okay.

16         THE COURT:  Anyone who would like to leave is free to

17    leave.

18         UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

19         MR. WAISMAN:  Your Honor, we now turn to the claims

20    portion of the agenda.  There are three claims matters to be

21    argued today.  The first two listed on the second page of the

22    agenda that we filed last night, matters 2 and 3, are the

23    motions of Simeon Moreno.  I believe Mr. Moreno's counsel is

24    participating by telephone this morning.

25         THE COURT:  Is Mr. Moreno's counsel on the telephone?

31

```
 1        (Telephone interference)

 2            MS. DISCEPOLO:  Hello.  Can you hear me?

 3            THE COURT:  What planet are you on?  Are you calling

 4    from Boston?

 5            MS. DISCEPOLO:  Yes, I am.  From Waltham, Your Honor.

 6    My name is Sara Discepolo.  I'm an attorney for Simeon Moreno.

 7            THE COURT:  Okay.  Fine.  I just wanted to make sure

 8    you were on and my reference was to the feedback that we heard

 9    on the line that made it sound as --

10            MS. DISCEPOLO:  I understand.

11            THE COURT:  -- made it sound as if you're on an

12    orbiting satellite.

13            MS. DISCEPOLO:  Well, I heard that too.  It scared me

14    as well.

15            THE COURT:  All right.  This is your motion, so, why

16    don't you proceed.

17            MS. DISCEPOLO:  Okay, Your Honor.  I don't know if

18    you'd like me to give you some very brief chronology, but I'll

19    just begin by saying that there are two motions before you and

20    there are two issues.  One is the automatic stay and the other

21    is a type of claim or a mechanical or Mr. Moreno's claim in

22    this case.

23            First, I'll just proceed under the motion, under 28

24    U.S.C. Section 959; it's the second motion I filed.  And it's

25    based on the fact that in Mr. Moreno's own bankruptcy here in
```

32

1    Massachusetts, Lehman Brothers filed a proof of claim to serve

2    it's servicer in November of 2008.  That was two months -- yes,

3    two months after Lehman's bankruptcy filing, so, it's post-

4    petition.  And it's around the date and even before it, Lehman

5    Brothers subsidiary, a wholly-owned indirect subsidiary,

6    Property Asset Management, have been trying to foreclose.

7           Now, the subsidiary in its March 2009 motion for

8    relief of stay in that case, I'm not the bankruptcy lawyer for

9    that case; I filed an adversary proceeding December of '09, but

10   in March of '09 the subsidiary filed a motion for a relief from

11   stay and described itself as a secured creditor.  The

12   foreclosure was scheduled for December of '09, that's when I

13   got involved, filed an adversary proceeding and request for

14   injunctive relief based upon imminent foreclosure.  And it was

15   at that hearing for the first time that my client found out

16   that Lehman Brothers that it's claiming to be the creditor and

17   owner of the loan.

18          After that happened, within approximately thirty days,

19   on Mr. Moreno's behalf, I filed a proof of claim in your case.

20   And the types of claims in the adversary proceeding are based

21   upon two sets of transactions and occurrences.  One is that the

22   loan itself is predatory and the proper disclosures weren't

23   made.  And the other is -- the other sets of the transactions

24   and occurrences is based upon the improper foreclosure by a

25   Lehman subsidiary.

33

1          At the end of December '09, on behalf of Mr. Moreno, I

2     sent Lehman Brothers a notice of rescission under truth and

3     lending laws.  And subsequent to that, the subsidiary pursued

4     the foreclosure and -- through it's motion for relief of the

5     stay.  The Massachusetts Bankruptcy Court, in December,

6     reinstated its stay and set it down for an evidentiary hearing

7     on the subsidiary motion for relief from stay.  That took place

8     in April.

9          At that time, at the hearing, the subsidiary brought

10    in a witness from Lehman Brothers to testify on its behalf.

11    And I attended in my reply motion -- my reply brief, the

12    affidavit admitted into evidence in that case in which Lehman

13    Brothers states that its subsidiary is doing everything at the

14    direction of Lehman Brothers, etcetera.

15         So, there is this agreement between Lehman Brothers

16    and its subsidiary to foreclose.  And my motion, my Section 959

17    motion, requests that you declare the automatic stay as

18    inapplicable to any of Mr. Moreno's claims in the bankruptcy

19    case that spin out of the proof of claim filed by Lehman's

20    servicer.

21         THE COURT:  Let me stop you for a second because I

22    think I have read that Lehman doesn't have an issue with

23    providing what amounts to consensual relief from the automatic

24    stay to permit litigation to proceed in the Boston bankruptcy

25    court, is that correct?

34

1        MS. DISCEPOLO:  Actually --

2        MR. BERNSTEIN:  Yes, Your Honor.

3        MS. DISCEPOLO:  -- I don't believe that's correct,

4 Your Honor.  I don't want to speak for Lehman Brothers, but --

5        THE COURT:  But counsel for Lehman Brothers just stood

6 up and said that's correct.

7        MS. DISCEPOLO:  Well, that's not what the objection

8 says.  The objection says they are consenting to a limited

9 relief of the automatic stay based upon --

10       THE COURT:  If that' not good enough -- if that's not

11 good enough, I'd like to understand why that's not good enough.

12       MS. DISCEPOLO:  Okay.  Well, the reason it's not good

13 enough, Your Honor, is that under Section 959 and federal

14 common law, Lehman Brothers waived immunity from all claims not

15 just ones related to the determination of the note and the

16 mortgage.  There are other issues in the case besides whether

17 the note and the mortgage -- issues related to that.

18       For example, Lehman Brothers, when it received the

19 notes of rescission in December of '09, didn't do anything to

20 terminate the mortgage.  And that in itself is a violation

21 under the federal and state truth in lending laws.

22       Second, there are claims against a subsidiary and

23 there will be claims against Lehman Brothers for a joint

24 venture between Lehman Brothers and its subsidiary in taking

25 improper actions to foreclose where the subsidiary, number one,

35

1     doesn't have standing to foreclose.  And number two, it

2     continues to try to foreclose where the mortgage has been

3     voided by operation of law under rescission statute.  So, there

4     are more issues in the case.  And --

5          THE COURT:  Yes, but let me stop you.  Aren't those

6     issues all issues that are before the bankruptcy court in

7     Boston and they're not issues that are presently in front of me

8     except to the extent that you are now making argument based on

9     those issues?

10          MS. DISCEPOLO:  Well, let me explain why I'm coming to

11     you.  Under Section 959, Lehman's actions are the debtor in

12     possession and I can't file suit against Lehman without going

13     to any court.  However, the better course of practice is to go

14     to the reorganization court and seek a Court order declaring

15     the automatic stay inapplicable.  Because under Section 959,

16     it's not a matter of waiving some or limiting some relief under

17     the automatic stay.  The automatic stay has no applicability in

18     my case whatsoever and I'm simply going to you for you to

19     declare it so that there won't be any argument that I am

20     violating any automatic stay.  In other words, I just want to

21     do this correctly and get a declaration from the reorganization

22     board that under Section 959, and also under federal common law

23     because they waived any immunity when they filed their proof of

24     claim, that the automatic stay just doesn't apply at all to any

25     claims in that case.  That's the first issue.

36

1        THE COURT:  Well, let's deal with the first issue

2   because I think that it's more likely than not covered by

3   Lehman's agreement even though you don't like the term

4   "limited" to consent to have these issues litigated in the

5   Boston bankruptcy court.  So, I'm going to ask Lehman's counsel

6   a fairly narrow question which is whether the litigation, which

7   has been brought in the Boston court, can proceed in accordance

8   with whatever ordinary practice the Boston bankruptcy judge

9   establishes for that case without any concern as to the

10  automatic stay.  To the extent that's not true, what are the

11  impediments to proceeding?

12       MR. BERNSTEIN:  Your Honor, the debtors agree with

13  your statement that is to proceed in the Massachusetts court.

14       THE COURT:  In that sense, the motion is moot by which

15  the agreement made by Lehman.  You can proceed in Boston;

16  Lehman consents.  Now, you don't need further relief from me.

17       MS. DISCEPOLO:  Okay.  The only other issue, Your

18  Honor, is the type of claim that Mr. Moreno has.  I have argued

19  in the Section 959 motion that all of his claims and the

20  damages that might result and payable by Lehman, would be

21  administrative expense priority claims.

22       THE COURT:  I'm not deciding that today.  You're going

23  to have to move your case in Boston a lot farther along than it

24  is right now in order to have a predicate for determining the

25  type of claim.  And as to the lateness of the claim, that will

37

1    be a subject to be litigated when you're physically present in

2    this courtroom.  You're not going to do it on the telephone.

3           You've had permission to appear by phone, but as to

4    issues of late-filed claims I'm not deciding that issue for you

5    today at all.  It's deferred until after there is a

6    determination, a final determination, of whatever is now

7    proceeding in Boston.  It's without prejudice to your rights

8    whenever you come back.  The motion will be carried and not

9    decided today.

10          MS. DISCEPOLO:  Okay.  Thank you, Your Honor.

11          Oh, Your Honor, will you be issuing an order or

12   anything?

13          THE COURT:  The debtors will propose a form of order

14   consistent with the colloquy that we've had on the record today

15   which you'll have a chance to review and approve before it's

16   entered.  Okay?

17          MS. DISCEPOLO:  Okay.  And how do I review it?  How do

18   I get a chance to be heard if I find out it's not in accordance

19   with today's decision?

20          THE COURT:  You're going to have to talk with Weil,

21   Gotshal & Manges' lawyers probably on a number of occasions to

22   get it right to your satisfaction.  And you're at a

23   disadvantage in that you're in Boston or Waltham, but you may

24   have to get on a train or a plane or just exchange a lot of e-

25   mails and at some point you'll have consensus.

38

1    You're at a disadvantage in that you're representing

2    an individual client in a case which is in New York.  And I

3    recognize that this is an important matter for Mr. Moreno, but

4    you are one of -- I think it's sixty-six thousand creditors.

5    So, remember that you're not any less important nor are you any

6    more important than any of the others.

7         MS. DISCEPOLO:  Well, just for clarification, Your

8    Honor, now, you're saying that I can come back for any

9    administrative expense priority claim --

10        THE COURT:  I am not determining today any entitlement

11   to administrative priority and I think you should assume that

12   that's in your best interest.  Because if I were to decide it

13   today, you would end up on the wrong end of that issue.

14        MR. BERNSTEIN:  Your Honor --

15        THE COURT:  So, sometimes it's better to say less.

16        My suggestion to you is that you have a discussion

17   with counsel for the debtor as to the form of order and that

18   you continue with your litigation consistent with that order in

19   Boston to the point that you reach a resolution either by

20   agreement or adjudication.  To the extent that you have other

21   claims, you should know that in today's docket, there are

22   numerous other late-filed claims that are before me.  It is

23   highly unlikely that you will be granted leave to file a late-

24   filed claim without demonstrating that you fit within the

25   pioneer standards.

39

1       Second Circuit law is extremely strict with respect to

2   late-filed claims.  I am not deciding your claim today nor am I

3   determining whether or not it is an administrative claim and I

4   believe that you should have some useful conversations with

5   debtors' counsel, not only as to the form of the order, but as

6   to some kind of consensual resolution of your dispute.  That

7   would be time --

8       MS. DISCEPOLO:  Well, I --

9       THE COURT:  -- that will be time well spent.

10      MS. DISCEPOLO:  -- well, I'll do that, Your Honor, but

11  in my first motion, I did ask for the claim to be timely filed

12  and that --

13      THE COURT:  I'm not deciding that today.  Didn't you

14  hear me say that?  I wasn't deciding that question.

15      MS. DISCEPOLO:  Okay.  Well, then, Your Honor, is

16  there a claims procedure that -- I saw on the docket that there

17  will be some claims procedure.  Is my client going to be

18  subject to that?

19      THE COURT:  My strong suggestion to you and what you

20  can't see because you're on the telephone is that there are

21  probably thirty-five people in the courtroom listening to this

22  conversation.  It's an incredibly wasteful use of judicial time

23  and the time that the lawyers listening.

24      I've said to you on repeat occasions and I'm going to

25  say it for what may be the fourth time, please talk to debtors'

40

1    counsel.  If you have questions, they'll be answered, I'm sure.

2    It's not my position to respond to your questions.  This matter

3    will be carried to another day following the entry of the order

4    that we've just talked about which will permit you to litigate

5    this issue in Boston and that's the only matter that being

6    decided today.

7         MR. WAISMAN:  Shai Waisman, Your Honor, we will draft

8    a proposed order and -- consistent with Your Honor's ruling

9    today and share it with Ms. Moreno (sic) and hopefully come to

10   a consensus on the order and submit it to chambers.  We have

11   spoken extensively to Mr. Moreno's counsel and will continue to

12   do so.

13        THE COURT:  Fine, thank you.

14        MR. WAISMAN:  Your Honor, the next matter on the

15   agenda, and this is the final matter to be argued today, is on

16   page 2 of the agenda, item number 4, first motion of Mark

17   Glasser to extend time for claim.

18        MR. BRANOWER:  Good morning, Your Honor.  For

19   Mr. Glasser, Daniel Branower, Gusrae, Kaplan, Bruno & Nusbaum.

20        I'll be brief, Your Honor.  Mr. Glasser has a claim in

21   connection with a bonus he earned while he was working for

22   Lehman Brothers broker/dealer in August of 2008.  After that,

23   he moved from Lehman to Barclays and to his eyes things

24   generally appeared to be the same.  Quite simply, he didn't

25   realize that he had to vigilant with respect to his mail in

41

1    terms of looking for a notice of a bar date for -- concerning

2    his claim.

3            THE COURT:  Can I ask you a question?

4            MR. BRANOWER:  Yes, Your Honor.

5            THE COURT:  How is it possible for someone who was a

6    former Lehman employee who was working, I presume, at -- was he

7    working at 757 7th Avenue?

8            MR. BRANOWER:  I'm not certain of that, Your Honor.  I

9    don't know.

10           THE COURT:  Was he working with other people who had

11   been Lehman employees?

12           MR. BRANOWER:  Yes, Your Honor.

13           THE COURT:  How is it possible for someone who's

14   working with a group of people who are all concerned about

15   their claims against Lehman not to know about the bar date?

16   That's -- that's borderline incredible to me.

17           MR. BRANOWER:  Your Honor, I think -- I understand

18   Your Honor's sentiment.  At the same time, Your Honor, he had

19   assumed because he was working with all the same people that he

20   would be notif -- that he would be informed, that he would get

21   a little more guidance from his employer and that he would be

22   walked through the process a little more than he was.  It

23   wasn't until after the bar date passed that he realized gee,

24   this is taking a long time, I don't know what's going on.

25           THE COURT:  Did he know that there was a bar date?

42

1          MR. BRANOWER:  I don't believe he did, Your Honor.  I

2     think he expected that he would be walked through it through --

3          THE COURT:  What's his position?

4          MR. BRANOWER:  I'm sorry.

5          THE COURT:  What does he do at Barclays and what did

6     he do at Lehman?

7          MR. BRANOWER:  He's a broker -- a broker, Your Honor.

8     A registered representative.  A securities salesman.

9          THE COURT:  Okay.  So, proceed with your argument.

10          MR. BRANOWER:  That's essentially it, Your Honor.

11     He -- the debtor has attached papers showing that notice was

12     delivered to an address.  That was an apartment he leased.  He

13     had no longer lived there and he wasn't as vigilant as he

14     should have been in terms of keeping track of the mail that was

15     sent to the apartment.  But again, Your Honor, he was in touch

16     with his employer, you know, he went to work every day and he

17     communicated with them through e-mail, so, he didn't realize

18     that that was where he was going to be leaving -- going to be

19     getting legally significant documents and that he would have to

20     do something within this proceeding.

21          THE COURT:  At the time that the bar date notice was

22     sent to that address, what was his domicile?

23          MR. BRANOWER:  His domicile was, I believe, 465 East

24     65th Street at the time the notice was sent.

25          THE COURT:  And the notice was sent to what address?

43

1            MR. BRANOWER:  To 157 East 57th Street.

2            THE COURT:  And was that an occupied apartment or a

3     vacant apartment?

4            MR. BRANOWER:  I believe it was a vacant apartment,

5     Your Honor.

6            THE COURT:  And did he receive other mail at that

7     address?

8            MR. BRANOWER:  He did receive other mail at that

9     address which he would occasionally pick up and had tried to

10    coordinate with his doorman to occasionally get to that mail.

11           THE COURT:  Okay.  I hear you.  This is a distinctly

12    unpersuasive argument, no offense.

13           MR. BRANOWER:  I can't change the facts, Your Honor.

14           THE COURT:  The facts aren't good for you.  Is your

15    client present?

16           MR. BRANOWER:  No, Your Honor.

17           THE COURT:  I'll hear from the debtor.

18           MR. BERNSTEIN:  Good morning, Your Honor.  Mark

19    Bernstein, Weil, Gotshal & Manges for the Chapter 11 debtors.

20    The debtors are prepared to rest on their papers on this

21    matter.  I mean we don't believe this satisfies the standard

22    for relief under 9006(b) in this jurisdiction.

23           MR. BRANOWER:  Nothing further, Your Honor.

24           THE COURT:  Okay.  This is an unusual circumstance, in

25    part, because this is the sort of matter that would lead to the

44

1    stipulation of facts or an evidentiary hearing in order for

2    there to be a sufficient record for the Court to decide the

3    question.  And the parties are acting as if the record has been

4    made on the basis of scant paperwork that has been filed.

5    There's a two page declaration which I read from your client

6    and you've made an argument which is consistent with that

7    paperwork.  But there's some credibility issues here.

8         If I were to look purely at the declaration of your

9    client and rely solely on that, I would have a hard time

10   granting them the relief.

11        It is acknowledged that notice was sent to an address

12   that was, in fact, this former employee's home address.  He

13   continued to collect mail from this apartment even though based

14   upon the representations of counsel it seems he did not reside

15   there at the time.

16        Ordinarily, people arrange to have their mail

17   forwarded or they assume the risk that mail which is not

18   collected may, in fact, be important.  On that basis, absent

19   some showing of extraordinary cause, mail that was delivered to

20   a proper address but that wasn't timely collected, in my view

21   should be deemed actual or constructive notice of the bar date.

22        If there were some compelling circumstance, which has

23   not yet been presented to me, indicating personal hardship,

24   incapacity, an inability to collect the mail, mental

25   impairment, something that rises to a level of compelling

45

1    excusable neglect, I might feel differently about this issue.

2    But this seems to me to fall into the area of inexcusable

3    neglect.

4         What is particularly hard for me to fathom, is how an

5    employee who was a former Lehman employee who migrated to

6    Barclays along with ten thousand or so other colleagues could

7    not know about the bar date.  Proverbial water cooler chatter

8    should be sufficient to put every employee on the functional

9    equivalent of notice as well.  It seems to me inconceivable

10   that the internal discussions among employees did not at some

11   point turn to, so, what are we going to do about our claims

12   against Lehman?  I cannot imagine that anybody who was not in a

13   cocoon and who worked at Barclays did not know that a bar date

14   had been set in the case.  Additionally, beyond actual delivery

15   of notice, there was constructive notice, conspicuous notice on

16   websites that I'm certain all former employee -- Lehman

17   employees had access to.  And absent some further showing, I

18   find that this employee has failed to demonstrate cause for

19   relief from the bar date consistent with applicable Second

20   Circuit precedent.

21        I make this finding, however, without prejudice to the

22   claimant's ability to request an evidentiary hearing to the

23   extent that he is able to credibly present evidence here, on

24   one of the upcoming adversary proceeding dates.  To overcome my

25   conclusions by demonstrating that, in fact, he did live within

46

1    a cocoon, he would have to show that he worked alone, that he

2    didn't talk to anybody and somehow make that credible to me.

3    Because I'm visualizing somebody who is on a trading floor

4    surrounded by phones and people and that who occasionally goes

5    to the men's room.

6         For these reasons I find that it's probably unlikely

7    that he'll be able to make such a showing and it will be up to

8    him and his counsel to determine if it's worth doing and

9    ultimately it will be his credibility that will be on the line.

10        So that this doesn't linger, the decision to either

11   proceed this way or to abandon the claim should be made within

12   the next thirty days.

13        MR. BRANOWER:  Thank you, Your Honor.

14        THE COURT:  Okay.

15        MR. WAISMAN:  Shai Waisman, Your Honor.  I believe

16   that concludes the matters to be heard this morning on the

17   agenda.  The rest of the matters are the claims matters that

18   are on submission.

19        THE COURT:  May I ask a question about that list?  And

20   if I'm remembering correctly, there was a matter involving

21   Palmyra that was a late-filed claim that was adjourned from the

22   omnibus hearing in March that hasn't popped up on this list.

23   And one of the things that I was going to do was to hear -- I

24   may have the name wrong, but I think that's the right name, I

25   was going to hear that one and then add that to the list of

47

1    others and then come up with a global resolution of all of the

2    late-filed claims.

3            MR. WAISMAN:  Your Honor is correct.  That was the

4    Palmyra matter.  Palmyra filed a notice withdrawing their

5    motion a week, two weeks ago, on the docket and served it on

6    the service list.

7            THE COURT:  This was the Paul Hastings notice, I

8    think?

9            MR. WAISMAN:  That's correct.

10           THE COURT:  All right.  I didn't understand that when

11   it was filed.  I guess that means that's no longer an issue I

12   need to consider.

13           MR. WAISMAN:  It is no longer an issue you need to

14   consider and not one that should come up.

15           THE COURT:  What I will be doing is issuing a written

16   decision in due course.  It won't be more than a few weeks

17   which will deal with each of the pending matters and there's no

18   need to carry this to the next omnibus hearing.  It will be

19   decided on the papers.

20           MR. WAISMAN:  Very well, Your Honor.

21           THE COURT:  Okay.

22           MR. WAISMAN:  Thank you.

23           THE COURT:  We're adjourned for today.  Thank you.

24       (Proceedings concluded at 11:03 AM)

25

48

1                                I N D E X

2

3                              E X H I B I T S

4   PARTY    NO    DESCRIPTION                      ID.        EVID.

5   Debtors        Declaration of Daniel                         19

6                  Ehrman (ph.)

7

8                              R U L I N G S

9   DESCRIPTION                                  PAGE        LINE

10  Objection of U.S. Bank to purchase and         29          8

11  sale of notes issued by certain

12  special-purpose vehicles, overruled

13

14  Motion of Simeon Moreno for Relief             36          16

15  from the Automatic Stay is to Proceed

16  in the Boston Court

17

18  First Motion of Mark Glasser to Extend         46          12

19  Time for Claim, granted for thirty days

20

21

22

23

24

25

49

1

2                              C E R T I F I C A T I O N

3

4        I, Clara Rubin, certify that the foregoing transcript is a true

5        and accurate record of the proceedings.

6

7        _____

8        Clara Rubin

9        AAERT Certified Electronic Transcriber (CET**D-491)

10

11

12       Veritext

13       200 Old Country Road

14       Suite 580

15       Mineola, NY 11501

16

17       Date:  April 21, 2010

18

19

20

21

22

23

24

25