1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS HOLDINGS INC., et al.

              Debtors.

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS INC.

              Debtor.

- - - - - - - - - - - - - - - - - - - -x

              United States Bankruptcy Court

              One Bowling Green

              New York, New York


              April 27, 2010

              9:38 AM


B E F O R E :

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

2

1

2   HEARING re Motion by Barclays Capital Inc. for an Order

3   Compelling Documents from LBHI, the Trustee, the Creditors'

4   Committee and their Financial Advisors Deloitte, FTI, Alvarez &

5   Marsal, and Houlihan Lokey

6

7   HEARING re Statement of the Securities Investor Protection

8   Corporation in Support of Trustee's Motion for Relief Pursuant

9   to the Sale Orders or, Alternatively, For Certain Limited

10   Relief Under Rule 60(b)

11

12   HEARING re Objection of HWA 555 Owners, LLC to the Motions of

13   Lehman Brothers Holdings Inc., James W. Giddens as Trustee for

14   Lehman Brothers Inc., and the Official Committee of Unsecured

15   Creditors of Lehman Brothers Holdings Inc. to Modify the

16   September 20, 2008 Sale Order and for Other Relief

17

18   HEARING re Objection of SunGard Entities to the Motion of the

19   Trustee for Relief Pursuant to Sale Orders or, Alternatively,

20   for Certain Limited Relief Under Rule 60(b) and Reservation of

21   Rights

22

23

24

25

1

2    HEARING re Motion of Evergreen Solar, Inc. to Join in Motion of

3    Official Committee of Unsecured Creditors of Lehman Brothers

4    Holdings Inc.

5

6    HEARING re Statement of the Bank of New York Mellon Trust

7    Company in Support of the Motions for (I) an Order Modifying

8    the September 20, 2008 Sale Order and Granting Other Relief and

9    (II) to Unseal Motions for Relief from September 20, 2008 Sale

10   Order (and Related SIPA Sale Order)

11

12   HEARING re Objection of SunGard Entities to (1) the Motion of

13   the Debtors for an Order Modifying the September 20, 2008 Sale

14   Order and Granting Other Relief and (2) the Motion of Official

15   Committee of Unsecured Creditors of Lehman Brothers Holdings

16   Inc.

17

18   HEARING re Joint Statement And Reservation Of Rights Of The

19   Bank Of Tokyo-Mitsubishi UFJ, Ltd. And Lloyds TSB Bank, plc In

20   Connection With (I) Motions Of Lehman Brothers Holdings, Inc.,

21   The Official Committee Of Unsecured Creditors, And James W.

22   Giddens, As Trustee For Lehman Brothers, Inc., For Certain

23   Relief Pursuant To The September 20, 2008 Sale Orders; And (II)

24   Motion Of Barclays Capital Inc. To Enforce The Sale Orders And

25   Secure Delivery Of Undelivered Assets

4

1

2    HEARING re Australia & New Zealand Banking Group LTD's Letter

3    Regarding Rule 60 Proceedings

4

5    HEARING re LibertyView's: (A) Joinder to (i) the SIPA Trustee's

6    Motion, (ii) the Committee's Motion; and (iii) LBHI's Motion

7    for Relief from the Sale Orders or, Alternatively, for Certain

8    Limited Relief Under Rule 60(b); and (B) Objection to Barclays

9    Capital Inc.'s Motion to Enforce the Sale Order

10

11    HEARING re Joinder of Newport Global Opportunities to

12    LibertyView's: (A) Joinder to (i) the Trustees' Motion, (ii)

13    the Committee's Motion; and (iii) LBHI's Motion for Relief from

14    the Sale Orders or, Alternatively, for Certain Limited Relief

15    Under Rule 60(b); and (B) Objection to Barclays Capital Inc.'s

16    Motion to Enforce the Sale Order

17

18    HEARING re Motion of Debtor to Modify the September 20, 2008

19    Sale Order and Granting Other Relief

20

21    HEARING re Motion of the Trustee for Relief Pursuant to the

22    Sale Orders or, Alternatively, for Certain Limited Relief Under

23    Rule 60(b)

24

25

5

1

2      HEARING re Motion of Official Committee of Unsecured Creditors

3      of Lehman Brothers Holdings Inc., Authorizing and Approving (a)

4      Sale of Purchased Assets Free and Clear of Liens and Other

5      Interests; and (b) Assumption and Assignment of Executory

6      Contracts and Unexpired Leases, Dated September 20, 2008 (and

7      Related SIPA Sale Order) and Joinder in Debtors and SIPA

8      Trustees' Motions for an Order Under Rule 60(b) to Modify Sale

9      Order

10

11     HEARING re Motion of Barclays Capital Inc. to Enforce the Sale

12     Order and Secure Delivery of All Undelivered Assets

13

14     HEARING re Trustee's Adversary Complaint

15

16     HEARING re LBHI's Adversary Complaint

17

18     HEARING re Creditors' Committee Complaint for Declaratory

19     Relief Pursuant to 11 U.S.C. Section 105(a) and 28 U.S.C.

20     Sections 2201, 2202 and for an Accounting

21

22

23

24

25     Transcribed by:  Lisa Bar-Leib

6

1

2    A P P E A R A N C E S :

3    JONES DAY

4         Special Counsel for the Debtors

5         222 East 41st Street

6         New York, NY 10017

7

8    BY:   ROBERT W. GAFFEY, ESQ.

9         WILLIAM J. HINE, ESQ.

10

11   QUINN EMMANUEL URQUHART OLIVER & HEDGES, LLP

12        Special Counsel to the Official Committee of Unsecured

13         Creditors

14        51 Madison Avenue

15        22nd Floor

16        New York, NY 10010

17

18   BY:   SUSHEEL KIRPALANI, ESQ.

19        JAMES C. TECCE, ESQ.

20        RICHARD I. WERDER, JR., ESQ.

21

22

23

24

25

7

1

2   QUINN EMMANUEL URQUHART OLIVER & HEDGES, LLP

3        Special Counsel to the Official Committee of Unsecured

4         Creditors

5        865 S. Figueroa St., 10th Floor

6        Los Angeles, CA 90017

7

8   BY:   ERICA P. TAGGART, ESQ.

9

10  HUGHES HUBBARD & REED LLP

11        Attorneys for the James W. Giddens, SIPA Trustee

12        One Battery Park Plaza

13        New York, NY 10004

14

15  BY:   WILLIAM R. MAGUIRE, ESQ.

16

17  SECURITIES INVESTOR PROTECTION CORPORATION

18        805 15th Street, N.W.

19        Suite 800

20        Washington, DC 20005

21

22  BY:   KENNETH J. CAPUTO, ESQ.

23

24

25

8

1

2    BOIES, SCHILLER & FLEXNER LLP

3         Attorneys for Barclays Capital, Inc.

4         5301 Wisconsin Avenue, N.W.

5         Washington, DC 20015

6

7    BY:   HAMISH P.M. HUME, ESQ.

8         JONATHAN D. SCHILLER, ESQ.

9

10   BOIES, SCHILLER & FLEXNER LLP

11        Attorneys for Barclays Capital, Inc.

12        10 North Pearl Street

13        4th Floor

14        Albany, NY 12207

15

16   BY:   TRICIA J. BLOOMER, ESQ.

17

18   BOIES, SCHILLER & FLEXNER LLP

19        Attorneys for Barclays Capital, Inc.

20        401 East Las Olas Boulevard

21        Suite 1200

22        Fort Lauderdale, FL 33301

23

24   BY:   TODD THOMAS, ESQ.

25

9

1

2   GOODWIN PROCTER LLP

3        Attorneys for Evergreen Solar Inc.

4        The New York Times Building

5        620 Eighth Avenue

6        New York, NY 10018

7

8   BY:   K. BRENT TOMER, ESQ.

9

10  CHAPMAN & CUTLER

11       Attorneys for Creditor, US Bank

12       111 West Monroe Street

13       Chicago, IL 60603

14

15  BY:   JAMES HEISER, ESQ.

16       FRANKLIN H. TOP III, ESQ.

17       (TELEPHONICALLY)

18

19  DEWEY & LEBOEUF LLP

20       Attorneys for CAPCO, Inc.

21       1301 Avenue of the Americas

22       New York, NY 10019

23

24  BY:   ELIZABETH P. SMITH, ESQ.

25       (TELEPHONICALLY)

10

```
 1
 2    STUTMAN TREISTER & GLATT
 3         Attorneys for Interested Party, Elliott Company
 4         1901 Avenue of the Stars, 12th Floor
 5         Los Angeles, CA 90067
 6
 7    BY:   WHITMAN L. HOLT, ESQ.
 8         REBECCA S. REVICH, ESQ.
 9         (TELEPHONICALLY)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

11

P R O C E E D I N G S

1

2          THE COURT:  Be seated, please.  Good morning.  As I

3     indicated at the close of yesterday's hearing, I'm prepared to

4     rule this morning on the Barclays discovery motion and that's

5     how we're going to begin.  Here's my ruling:

6          The discovery motion brought by Barclays is the latest

7     version of its ongoing efforts to obtain documents from each

8     movant that has which documents had been withheld on grounds of

9     privilege.  Barclays' earlier motion from December 2009 based

10    on alleged at issue waiver, requested documents withheld due to

11    the attorney/client privilege.  Barclays now focuses its

12    attention more narrowly on materials prepared by the movants'

13    professional advisors.

14         Barclays argues that there was a logical impossibility

15    in the movants' cases in that the movants are unable to satisfy

16    the legal standard governing their respective requests for

17    leave without demonstrating that they were justifiably ignorant

18    of the terms of the September 2008 sale transaction.  To that

19    end, Barclays styles the information requested as necessarily

20    underpinning the movants' affirmative claims for relief.

21         It is plain to the Court, however, that Barclays

22    present motion seeks information also for the purpose of

23    bolstering or proving its defenses.  The Court reaffirms the

24    statements made at yesterday's hearing that for substantially

25    reasons set forth in the Court's bench ruling from December 16,

12

1    2009, the current motion is denied with respect to information

2    requested from LBHI and the trustee.

3         In addition, with respect to the SIPA trustee, the

4    papers submitted by the parties failed to show that Deloitte &

5    Touche, the SIPA trustee's financial advisor, possesses any

6    pertinent information and it is clear that the trustee did not

7    rely on anything produced by Deloitte in his motion for 60(b)

8    relief.  This conclusion is made even clearer to the Court by

9    virtue of certain of the deposition excerpts that were played

10   at yesterday's hearing.

11        Moreover, with respect to information requested by

12   Barclays from LBHI, Barclays has failed to demonstrate any

13   substantial need for any information not already produced

14   pursuant to the letter agreement dated October 14, 2009.

15   Indeed, counsel for LBHI confirmed on the record yesterday that

16   LBHI's production to Barclays includes work product generated

17   by Alvarez & Marsal through the period ending September 30,

18   2008, but also includes certain other documents from later

19   periods that relate to those documents.

20        As for the Barclays' motion with respect to documents

21   produced by the committee's financial advisors, particularly

22   Houlihan Lokey and FTI, The Court finds that Barclays'

23   substantial need for the information requested, at least in

24   this instance, overrides the work product protection asserted

25   by the committee.

13

1      The committee is a unique entity that purely is a

2   creature of the bankruptcy process.  It acts in a

3   representative capacity as a watchdog for all creditors.  As

4   such, the committee is a fiduciary that essentially functions

5   through its retained professionals.  For that reason, as a

6   general matter, a committee's professionals should be entitled

7   to claim both the attorney/client privilege and the work

8   product privilege.

9      Nonetheless, because the committee is seeking relief

10   under Rule 60(b), the timing of what the committee knew and the

11   information available to it is at the heart of the committee's

12   motion.  The issue, as framed by the committee itself in its

13   opening, is for the Court to see what the committee saw.

14      A salient feature of an affirmative motion for relief

15   under Federal Rule of Civil Procedures 60(b)(2) is that a

16   movant must show that it could not have discovered any new

17   evidence in time to move for a new trial.

18      In the Court's judgment, it would be unduly burdensome

19   for Barclays to be prevented from reviewing the analyses

20   created by Houlihan and FTI that informed the committee at the

21   time of the sale and thereafter.  Barclays has shown that is

22   has a substantial need to challenge what the committee knew at

23   the time of the sale and what insights the committee developed

24   thereafter.  Given that the Court, and not a jury, is the

25   finder of fact in this litigation, I'm in the position not to

1    be unduly influenced or prejudiced by the contents of any

2    disclosed work product.  Accordingly, production of the

3    documents requested will cause no substantial harm to the

4    movants.  In addition, the Court has a need to know any

5    relevant information with respect to the knowledge of the

6    committee inasmuch as that information may shed light on the

7    committee's entitlement to relief.

8         From the very beginning, transparency has been an

9    important objective in these proceedings.  And that remains so

10   in my determination of this motion.  Therefore, the Court

11   grants Barclays' motion only with respect to the committee.  To

12   the extent any materials produced are confidential or involve

13   other matters subject to litigation, the parties should take

14   appropriate steps to protect those documents.  That's the

15   ruling of the Court.

16        MR. TECCE:  Your Honor, may I ask one question with

17   respect to the scope of Your Honor's ruling?  The request by

18   Barclays is through March 31.  And Your Honor had said that --

19        THE COURT:  I thought it was through March 13th.

20        MR. TECCE:  March 13th, I'm sorry.  So is Your Honor's

21   ruling that it's our work product through March 13th?  I only

22   say so because we did appear in December and we filed an

23   objection to a settlement motion raising our concern about the

24   sale transaction.  So is there a time limit --

25        THE COURT:  Well, regrettably, the papers filed by the

15

1    committee in opposition to the Barclays' motion didn't raise

2    the issue you're now raising.  At least I don't remember seeing

3    that.  It was simply a generalized objection based on work

4    product.  There was no issue as to the scope of the request

5    until now.

6            MR. TECCE:  Well --

7            THE COURT:  Did I miss something or is this a new

8    thought on your part?

9            MR. TECCE:  Well, it's not a new thought, Your Honor,

10   but I think you're correct.  We did not specifically ask for a

11   pushback of the date.  But I think that we did raise the issue

12   that we had appeared and objected in December as one of the

13   elements that we rely on to show time in this.  But --

14           THE COURT:  I understand.

15           MR. TECCE:  - that is something different.

16           THE COURT:  My ruling is not limited as to date

17   because no issue as to date was presented either in the papers

18   in opposition to the motion or at argument yesterday.  So the

19   horse left that barn.

20           I do think, however, that the parties should meet and

21   confer regarding scope in much the same way that they would in

22   the granting of a garden variety discovery motion to the extent

23   that there are issues concerning materials created late in the

24   process.

25           Additionally, I treat this ruling as somewhat

16

1   exceptional.  For reasons that I said, I believe that the

2   committee's professionals, as a general matter, are entitled to

3   assert the work product doctrine or the attorney/client

4   privilege.  It's essential to the orderly operations of a well

5   functioning creditors' committee.  And there's nothing here

6   that is intended to undermine that activity in this or any

7   other case.

8           But the nature of the relief being sought by all of

9   the movants is, to put it mildly, highly unusual.  And for that

10  reason, I'm very concerned, as factfinder, that I have a

11  complete record and that the work product doctrine not be used

12  to withhold information that I need to see.  If there's

13  information that I need to see that was created in March, I

14  want to see it.  I don't want this to be litigation which is

15  won or lost on the basis of materials that had been

16  legitimately withheld but that are highly probative.

17  Accordingly, I want to see basically everything that there is

18  to see about this.  And the reason that the committee ended up

19  in the crosshairs of this outcome is purely circumstantial.

20  The Deloitte evidence, to me, makes clear they have nothing to

21  offer.  And the LBHI limited waiver makes clear that Barclays

22  has no substantial need for that information.  So you're the

23  last person standing.

24          MR. TECCE:  Fair enough, Your Honor.  And I didn't

25  mean to disrupt the process.  I just noted that for LBHI, they

17

1    stopped at September 30th.  So --

2         THE COURT:  I understand.  Too late.  Should have made

3    the argument before.

4         MR. TECCE:  Thank you, Your Honor.

5         MR. BOIES:  Your Honor, we have one totally unrelated

6    housekeeping matter.  And that involves Barclays' chairman,

7    John Varley, and when he appears as a witness.  We've been

8    trying to work this out with the other side and we've been

9    unable to do that.  They have requested that he come on a week

10   from Friday.  Now, we've agreed to bring all of the other

11   people that they've asked for on the dates that they asked for

12   them.  However, Mr. Varley has some real scheduling problems.

13   And we first requested that he be put on early this week to

14   avoid those.  They declined to do that.  And what we would ask

15   is that he be permitted to testify when we resume in September

16   or August.  He'll come at any time then.  But he's got his

17   general shareholder meeting, annual general meeting on this

18   coming Friday.  And then the British elections are the

19   following week.  Because of his position, he needs to be there

20   then.

21        THE COURT:  Is he running for anything?

22        MR. BOIES:  He's not, Your Honor, but he's extremely

23   prominent person in the UK.  And I think there's a widespread

24   belief that it would inappropriate for him not to be there.

25   Now, obviously, he is subject to the Court's direction.  But we

18

1   see no prejudice to the other side in having this one witness

2   brought when we resume.  He was not even going to be brought if

3   we stipulated to the admissibility of some documents.  So he's

4   not somebody who's critical.  He's going to be the last -- he's

5   going to be coming, by their request, on the last day of this

6   two week session in any event.  So it's not like he's going to

7   provide some predicate for somebody else to testify.

8          So all we're saying is rather than put him on the last

9   day of this session, we put him the first day or any day of

10   their choosing in one of the additional sessions we're going to

11   have.

12          THE COURT:  I prefer not to convert this housekeeping

13   item into something that's going to prompt time consuming

14   debate this morning.  Let's simply reserve on the issue and

15   perhaps discuss it in a chambers conference setting.  I can't

16   do it today but perhaps tomorrow at the close of regular

17   business and we can discuss scheduling at that time.

18          MR. BOIES:  Thank you, Your Honor.

19          THE COURT:  I presume we're continuing the cross-

20   examination of yesterday's witness.

21     (Pause)

22          THE COURT:  Good morning, Mr. McDade.

23          THE WITNESS:  Good morning.

24   RESUME CROSS-EXAMINATION

25   BY MR. BOIES:

19

1    Q.    Good morning, Mr. McDade.

2    A.    Good morning.

3    Q.    I'd like to direct your attention now to the circumstances

4    of the week of September 15th, 2008.  The markets at that point

5    during that week, throughout that week, were, as I think you've

6    described them, tumultuous and volatile, correct?

7    A.    That's correct.

8    Q.    And the market had changed dramatically from Friday to

9    Saturday and then again from Saturday to Sunday, again from

10   Sunday to Monday and changed again from Monday at 9 a.m. to

11   Monday at 11 a.m. and continued to change, correct?

12   A.    Yes, they did.

13   Q.    And the prices were changing dramatically, correct?

14   A.    That's correct.

15   Q.    Now, at your deposition, you said that all the markets had

16   shut down.  Can you explain what you mean by that?

17   A.    What I meant by markets shutting down, normal trading

18   volumes had shrunk to small percentages of their norm in all

19   asset classes from liquid asset classes, like government

20   securities, all the way through to the lesser liquid asset

21   classes.  There was a tremendous amount of uncertainty and

22   really a shrinkage of capital that was being used by market

23   makers across the world.

24   Q.    And you mentioned liquid and illiquid assets.  And we

25   talked some about that yesterday.  But it's the case that

20

1    originally Barclays had wanted to take as few illiquid assets

2    as possible, correct?

3    A.   From the original transaction?

4    Q.   Yes.

5    A.   Prior to bankruptcy.

6    Q.   Yes.

7    A.   Yes, that's correct.

8    Q.   And then when bankruptcy occurred, Barclays wanted to

9    avoid certain asset classes like the mortgage securities,

10   correct?

11   A.   That's correct.

12   Q.   On the other hand, during the week of September 15th,

13   Lehman was pushing Barclays to take, for example, these

14   mortgage securities, correct?

15   A.   Lehman wanted to -- we wanted to move all of the assets

16   and balance sheet given our challenges in terms of being able

17   to manage any of the balance sheet, that's correct.

18   Q.   And, in fact, you recognized that Barclays would have

19   preferred simply to buy the business without the assets,

20   correct?

21   A.   I certainly reflected that that would have been a much

22   easier thing to do, to buy a great franchise, yes.

23   Q.   And that would have limited Barclays' risk if they had

24   been able to do that, correct?

25   A.   That's correct.

21

1   Q.   But from Lehman's side, you didn't want them to do that,

2   correct?

3   A.   We were, again, motivated to move the balance sheet

4   because of the challenges we were having operationally.

5   Q.   And you recognized that Barclays, in the deal that was

6   ultimately done, was taking on a tremendous risk, correct?

7   A.   Yes, they were.

8   Q.   And that had to do with the size of the transaction, the

9   volatility of the markets, the illiquidity of some of the

10   assets and many other considerations, correct?

11   A.   Yes.

12   Q.   In order to come up with a price for the transaction or to

13   determine the consideration that Barclays was going to be paid,

14   you described a process that the Barclays and Lehman traders

15   went through in terms of valuing assets.  Do you recall that/

16   A.   Yes, I do.

17   Q.   How did you come to your understanding of what that

18   process was?

19   A.   I communicated through the head of all of our capital

20   markets businesses, which would have been Michael Gelband who

21   would have been individually responsible for the individual

22   business asset class managers at that point in time.

23   Q.   And as the president of Lehman and senior negotiator in

24   the process, did you attempt to satisfy yourself that the

25   process in terms of valuing the assets was a process that you

22

1    thought was a sensible one?

2    A.   I did attempt to reconcile with that, yes.

3    Q.   Now, did you ever discuss with anyone at Lehman that the

4    assets in terms of the value you put on them should be valued

5    based on Lehman's marks at the time that you started this

6    process?

7    A.   No.  We started a process with valuing them as of Monday

8    morning when we -- Monday mid-afternoon when we started.

9    Q.   And at that point, the Lehman marks were as of Friday

10   night, correct?

11   A.   That's correct.

12   Q.   And the markets had dramatically moved from Friday until

13   Monday, correct?

14   A.   That is correct.

15   Q.   And it was your view that it would be inappropriate to try

16   to use the marks on Lehman's books as an indication of the

17   value of the assets, correct?

18   A.   It was my view that anyone looking at those assets would

19   not have used Friday night's marks.  They would have used, at

20   that point in time, in the new week's marks.

21   Q.   And you believed that the Friday mark didn't reflect any

22   relevance didn't reflect any relevance to what had happened in

23   the market or to an actual transaction, correct, sir?

24   A.   Yes, that's correct.

25   Q.   Now, the process that you started was what you described

23

1    as a bottoms-up process, correct?

2    A.    Yes, I did.

3    Q.    And what was this bottoms-up process of trying to value

4    Lehman's assets?

5    A.    We took a snapshot of what the portfolio, if you will, of

6    assets or the inventory was starting on Monday.  We broke down

7    those assets in terms of the specific asset classes.  We broke

8    out into individual teams working through -- Barclays and

9    Lehman working through those assets.  And then we went through

10   a process of trying to identify the significant concentrated

11   positions because we didn't have time to value every single

12   line item.  But we went through the concentrated positions that

13   led to the bulk of the assets being considered in that process.

14   Q.    And you would have established what you believed to be a

15   fair market value for the individual assets that were the most

16   important assets in the portfolio, correct?

17   A.    Most important in terms of the concentration of their size

18   as a percentage of the total, correct.

19   Q.    Most important, in terms of how much value they

20   represented, is that correct?

21   A.    That's correct.

22   Q.    And for those, you would have determined a fair market

23   value on an individual asset-by-asset basis, correct?

24   A.    That's correct.

25   Q.    How many people were involved in this process?

24

1   A.   It's -- I wasn't in the room for all of the individual

2   breakout team meetings but my guess would be over twenty.

3   Q.   And is that over twenty from Lehman or about ten from

4   Lehman, about ten from Barclays.

5   A.   I'm sorry, yes.  About ten from each.

6   Q.   About ten from each of the two companies?

7   A.   Yes.

8   Q.   And among these people that were actually doing the

9   valuing of the assets, was there a lot of back and forth as to

10  what price was the right price?

11  A.   Yes, there was.

12  Q.   Was there a lot of disagreement?

13  A.   Yes, there was.

14  Q.   And, particularly under the circumstances of that week,

15  would you have expected that there would be a lot of

16  disagreement as to what the right price was for assets?

17  A.   Yes, I would have.

18  Q.   Now there came a time when you and the teams that were

19  valuing these assets reached at least a tentative conclusion as

20  to valuation, correct?

21  A.   That's correct.

22  Q.   And that was approximately 1 p.m. on Tuesday, September

23  16th, correct?

24  A.   That's about correct, yes.

25  Q.   And the reason that you continued to work on valuation up

25

1   until 1 p.m. was because the market price was changing even

2   during Tuesday, correct?

3   A.   Absolutely, yes.

4   Q.   And changing in significant ways, correct?

5   A.   Yes, it was.

6   Q.   And the market had changed dramatically overnight just

7   from September 15th to September 16th, correct?

8   A.   Yes, it had.

9   Q.   After 1 p.m. on September 16th, the process didn't stop,

10  correct?

11  A.   No, it did not.

12  Q.   And indeed, this process of valuation was an ongoing

13  effort throughout the week, correct?

14  A.   Yes.  I would agree.

15  Q.   And that was because as the week continued, the markets

16  continued to move in very significant ways, correct?

17  A.   That's correct.

18  Q.   Now, was there a free flow of information exchanged by all

19  of the interested parties in full view of the attorneys from

20  Weil Gotshal and Simpson Thacher and the financial advisors

21  from Lazard with respect to this process?

22  A.   Yes, there was.

23       MR. GAFFEY:  Objection, Your Honor.  I don't think the

24  witness is competent to testify about anything other than his

25  own activities, not a free flow amongst other people.

26

1        THE COURT:  Well, I think what he's in a position to

2   testify to is what he observed.  So, to the extent that he was

3   in meetings attended by these individuals and these subjects

4   were discussed openly, he's certainly in a position to testify

5   as to that.  And if Mr. Boies will accept that modification of

6   the question, I think the witness can answer it as modified.

7        MR. BOIES:  Yes.

8   **A.   Yes.  I observed a very open process with all the advisors**

9   **and attorneys from both sides.**

10  **Q.   And there wasn't any effort to keep any of this valuation**

11  **process secret from anyone, was there?**

12  **A.   No, there was --**

13       MR. GAFFEY:  Unless modified in the same way, Your

14  Honor, same objection.

15       THE COURT:  All right.  Let's see if we can pick up

16  the same judicial gloss on the question and then allow it to be

17  answered.

18  **Q.   Insofar as you were aware as the president of Lehman**

19  **Brothers and as a lead negotiator in this process, by your**

20  **observation, was there any effort to keep anything secret or**

21  **private about this valuation process or to keep anybody from**

22  **knowing anything about what was going on there?**

23  **A.   No, t here was not.**

24  **Q.   Was there any effort, according to what you observed and**

25  **understood, to understate any of the assets?**

27

1   A.   No, there was not.

2   Q.   Now, you have testified that you believe that what you

3   were trying to do was to get the assets and liabilities that

4   Barclays was going to acquire and assume in some kind of rough

5   balance.  Do you recall that generally?

6   A.   I testified we were trying to get to a place where we get

7   the best value for the Lehman assets.  In the end, it roughly

8   ended up as an equivalent as it was structured for total value

9   of the deal.

10   Q.   Yes.  That's an important distinction and I want to follow

11   up on it.  You were representing Lehman and you were trying to

12   get the best deal for Lehman, correct?

13   A.   That's correct.

14   Q.   And there were people representing Barclays that were

15   trying to get the best deal for Barclays, correct?

16   A.   That's correct.

17   Q.   And when you talk about there being a rough balance,

18   you're talking about that's the way it ended up, correct?

19   A.   That's correct.

20   Q.   You're not saying that there was an representation or

21   warranty that there was going to be a rough balance, correct?

22   A.   There was not.

23   Q.   Okay.  Now, when you talked about this deal ending up to

24   be a rough balance, am I correct that you're talking about a

25   rough balance between the assets that were valued and the

28

1    liabilities that were valued?

2    A.    Yes.

3    Q.    Now, Barclays was acquiring certain assets that were not

4    value, correct?

5    A.    Yes.

6    Q.    For example, the name, customer lists, things like that.

7    There was a long list of assets that Barclays was acquiring

8    that nobody attempted to value, correct?

9    A.    Yes.

10   Q.    And those asset values were not included in any

11   calculation of rough balance because they were never valued,

12   correct?

13   A.    That's correct.

14   Q.    So if Barclays made a gain based on the assets that had

15   not been part of your valuation process, that would not be in

16   any way inconsistent with what you were attempting to achieve,

17   correct?

18   A.    Correct.

19   Q.    Now, you testified about a difference of approximately you

20   thought about five billion dollars between the numbers that you

21   came up with in your valuation process and the Friday night

22   Lehman marks.  Do you recall that?

23   A.    Yes, I do.

24   Q.    Now, you didn't personally participate in comparing the

25   valuation numbers with the numbers from the Friday marks,

29

1    correct?

2    A.    That's correct.

3    Q.    And if you were to do that, what you would do is you would

4    go to those Friday marks themselves, correct?

5    A.    Yes, you would.

6    Q.    And those Friday marks are in a system called the GFS

7    system, correct?

8    A.    To the best of my understanding, yes.

9    Q.    And you could go to the GFS system, find out what those

10   marks were and compare it to the valuation number that you came

11   up with and that would give you the best evidence of what the

12   difference, if any, was, correct?

13           MR. GAFFEY:   Objection.  Witness is incompetent to

14   determine what's the best evidence, Your Honor.

15           THE COURT:  Well, I didn't think we were going to get

16   into the best evidence rule as quickly.

17           MR. BOIES:  I meant in a colloquial sense.

18           THE COURT:  Maybe we can restate the question so that

19   we stay away from best evidence.  Maybe competent evidence,

20   maybe credible evidence --

21           MR. BOIES:  Yes.

22           THE COURT:  --  maybe some evidence but not the best

23   evidence.

24           MR. BOIES:  Okay.  I apologize, Your Honor.  That was

25   a -- awkward choice of words for an examination of a fact

30

1    witness.

2    Q.   Mr. McDade, as a business person, would you consider the

3    best way and the most accurate way to figure out the extent to

4    which, if any, the valuation process came up with a number that

5    was different than the Friday marks would be to compare the

6    valuation process number with the Friday marks from the GFS

7    system.

8         MR. GAFFEY:  Your Honor, I still think it's

9    objectionable opinion evidence.

10        THE COURT:  Well, I'd sustain the objection in that

11   the witness is being asked to opine as to the relative benefit

12   of comparing marks with a particular benchmark standard.  And I

13   think there's probably an easier way just to get at it.  And if

14   we can stay away from putting qualitative references into the

15   system that was in effect on Friday for comparison purposes and

16   just say whether or not a businessperson would compare today's

17   marks with last Friday's marks and as a result find out the

18   difference, that might be a way to get at it.  But I'm not

19   suggesting the question.

20        MR. BOIES:  Nevertheless, let me adopt the Court's

21   formulation.

22   Q.   Mr. McDade, if you, as the president of Lehman Brothers,

23   wanted to know what the difference was between the valuation

24   number estimating the value of Lehman assets and the Friday

25   night Lehman marks estimating the value of those same assets,

31

1    am I correct that you would compare the valuation number with

2    the results from the GFS system?

3    A.    Yes.

4    Q.    Okay.  Now, am I correct that you don't recall who it was

5    that mentioned the approximate five billion dollar difference,

6    do you?

7    A.    There were a lot of specific meetings over the course of

8    Monday and Tuesday as that process of valuation was working

9    through the different teams.  So I don't recall a specific

10   conversation with respect to it.  But I recall Mr. Kelly's

11   being part of a process to try to mark a moment early on

12   Tuesday.

13   Q.    Okay.  Now, this five billion dollar differential or

14   approximate five billion dollar differential, you would not

15   describe as a discount, correct?

16   A.    I would not describe it as a discount.  That's correct.

17   Q.    You would describe it as a change in the valuation of the

18   assets, correct?

19   A.    That's correct.

20   Q.    Now you never spoke with anyone at Barclays where this

21   five billion dollar differential was mentioned, correct?

22   A.    No, I did not.

23   Q.    And you never had any discussion with anyone at Barclays

24   about the concept of a discount, correct?

25   A.    No, I did not.

32

1   Q.   I'd like to now turn to a document that you were given

2   yesterday by Lehman's counsel, Movants' Exhibit 2.  And that's

3   in the book that you have up there, I think.  Do you have that

4   document in front of you?

5   A.   Yes, I do.

6   Q.   And this is a document that has a September 16th, 2008

7   date on it both in handwriting and in printing, correct?

8   A.   Yes, it does.

9   Q.   And the time printed is 11:18 a.m.?

10   A.   Yes.  I see that.

11   Q.   And who prepared this document as you understand it?

12   A.   I don't have a specific knowledge of who actually prepared

13   the document.

14   Q.   When did you first see this document?

15   A.   I saw this document as it started to be used as a guidance

16   document at some point in the process between Monday late and

17   Tuesday.

18   Q.   And am I correct that there were different versions of

19   this document or schedule that had different numbers and totals

20   on them as the negotiation process and the market changes

21   continued?

22   A.   Yes.  That would be my recollection.

23   Q.   And there would have been versions of this schedule both

24   before and after September 16th at 11:18 a.m., is that correct?

25   A.   That's correct.

33

1    Q.    Now, if you look at the numbers here for the assets on

2    Movants' Exhibit 2 --

3    A.    Yes.

4    Q.    -- you would consider, as of the time this was prepared,

5    to be the book value of those assets as far as Lehman was

6    concerned, correct?

7    A.    No.  I've described -- this would -- I would consider to

8    be the book value as of the process that we went through with

9    the different teams.

10   Q.    Can you explain what you mean by that?

11   A.    This would have been the market value after the

12   discussions with the Barclays and Lehman team.

13   Q.    And when you say it's a book value in terms of the

14   process, what do you mean by that?

15          MR. GAFFEY:  Objection, Your Honor.  I believe the

16   witness said market value.

17          THE COURT:  Well, what does the record say the witness

18   said?

19          MR. MAGUIRE:  Your Honor, the question reads at page

20   30 of the transcript starting at line 20:

21   "Q.  Can you explain what you mean by that?

22   "A.  That would have been the market value after the

23   discussions with the Barclays and Lehman team.

24   "Q.  And when you say it's a book value in terms of that

25   process, what do you mean by that?"

34

1          MR. BOIES:  You need to start three lines above, Your

2     Honor, where he says -- if you could scroll it down.  Scroll it

3     down some -- yeah.  He started after the witness said

4     something, Your Honor.

5          MR. MAGUIRE:  Yeah.  The previous --

6          MR. BOIES:  The previous thing that the witness

7     said --

8          THE COURT:  Let's stop for a moment so that we can all

9     read the text in full context.

10          MR. BOIES:  At line -- if you start at line 13, which

11    is the witness' answer, he says -- the question precedes it:

12    "Q.  -- you would consider, as of the time this was prepared,

13    to be the book value of assets as far as Lehman was concerned,

14    correct?

15    "A.  No.  I've described -- this would -- I would consider to

16    be the book value as of the process that we went through with

17    the different teams."

18         And now my question is:

19    "Q   When you said that you would consider this to be the book

20    value as of the process, what did you mean?"

21          THE COURT:  Based upon that, do you continue with the

22    objection, Mr. Maguire?

23          MR. MAGUIRE:  I think subject to the clarification

24    that the witness has explained market value of the prior

25    answer, I withdraw my objection.

35

1          THE COURT:  Fine.

2    Q.   Do you have the question, sir?

3          THE COURT:   We have just demonstrated the value of

4    LiveNote.

5    A.   Could you repeat it?  I apologize.

6    Q.   Sure.  Sure.  You considered the asset values on Movants'

7    trial exhibit to represent the book value of the assets in

8    terms of the valuation process that you were undertaking,

9    correct?

10   A.   That's correct.

11   Q.   Can you explain what you meant by that?

12   A.   What I meant is that this would reflect the prices after

13   discussions and negotiations between the Barclays risk team and

14   the Lehman risk team.

15   Q.   And these prices were the prices that you believed were

16   the market value at that time, correct?

17   A.   That's correct.

18   Q.   And you believed that the book value of assets should be

19   the market value of those assets, correct?

20   A.   The book value at any given night would equal the market

21   value -- the fair value on any given night in a normal process,

22   yes.

23   Q.   Thank you.

24        (Pause)

25   Q.   Now I think you testified that Lehman had not marked its

36

1   books on September 15th, correct?

2   A.   To the best of my understanding, yes.

3   Q.   And indeed, you have testified that it would have been in

4   your view impossible to mark on Monday the 15th, correct?

5   A.   Given all the issues that we had with our personnel, yes.

6   Q.   And I think you've already answered this but I want the

7   record to be absolutely clear.  You believe that the asset

8   values on Exhibit 19 were the fair market value of those assets

9   at the time that this exhibit was prepared.  And Exhibit 19 is

10  the deposition number for Movants' Exhibit 12, correct?

11  A.   Yes, I do.

12  Q.   And you believed that the asset values that are on this

13  exhibit, Movants' Exhibit 12, were the fair market value of

14  those assets at the time that this exhibit was prepared,

15  correct?

16  A.   Yes, I do.

17       MR. MAGUIRE:  Just so the record is clear, Your

18  Honor --

19       THE COURT:  It's Movants' Exhibit 2.

20       MR. MAGUIRE:  Thank you.

21       MR. BOIES:  I apologize.

22  Q.   Movants' Exhibit 2, correct?

23  A.   Yes. Yes.

24  Q.   Let me just be sure I got the words right.  You believe

25  that the asset values on Movants' Trial Exhibit 2 represent the

37

1   fair market value of those assets at the time Movants' Exhibit

2   2 was prepared, correct?

3   A.   Yes.

4   Q.   Thank you.  You were the president of Lehman Brothers at

5   the time and there were other senior people from Lehman

6   Brothers that were involved in the process of valuation that

7   you've described, correct?

8   A.   Yes, that's correct.

9   Q.   And you testified yesterday about how you had made sure

10  that there were no employment discussions with you because you

11  wanted to preserve your independence.  Do you recall that?

12  A.   Yes, I do.

13  Q.   Now, you were aware that there were a number of other

14  Lehman personnel that were involved in this process that did

15  have either employment discussions or employment agreements

16  with -- or potential employment agreements with Barclays,

17  correct?

18  A.   Yes, I was.

19  Q.   Did you believe that that somehow compromised their

20  ability to represent Lehman in these circumstances?

21  A.   No, I did not.

22       MR. GAFFEY:  Objection, Your Honor.  Opinion.

23       THE COURT:  It's true.  It's a belief as to

24  compromised ability.  But I think that's the sort of lay

25  opinion that people engage in all the time.  So he's not really

38

1   being asked as an expert.  He's being asked in his capacity as

2   a senior officer of Lehman at the time his belief.  I can weigh

3   it for whatever probative value it has which may be zero.  He

4   can answer the question.

5   Q.   I think you -- did you answer the question?

6   A.   I think I did.

7   Q.   And just for the record, what was the answer?

8   A.   If you could --

9   Q.   I'll put the question again.

10        MR. GAFFEY:  Your Honor, I can stipulate the answer

11   was "No, I did not."

12        MR. BOIES:  Okay.

13        MR. GAFFEY:  The beauty of LiveNote again, Your Honor.

14   Q.   And why -- why was that?

15   A.   I had worked with all of the individuals that potentially

16   were part of that conflicted group for a long period of time.

17   In fact, in most cases, well into decade plus -- and I knew

18   them of great integrity.  And I think I described in my

19   deposition, I knew they bled Lehman green.

20   Q.   Now, you are now aware that there came a time that the

21   Barclays transaction was considered by the Lehman board,

22   correct?

23   A.   Yes.

24   Q.   You were not personally involved in any of the board

25   meetings relating to the Barclays transaction, correct?

39

1    A.    I don't have a recollection of that.

2    Q.    You reviewed the APA prior to the time it was signed to

3    make sure that it accurately reflected the final agreement,

4    correct?

5    A.    Yes, I did.

6    Q.    After the APA was signed, is it fair to say that the

7    valuation process started all over again at the end of that

8    week?

9    A.    The valuation process continued through the week, yes.

10   Q.    And at some point it became clear that the securities that

11   could be delivered to Barclays had decreased significantly

12   between Tuesday when the APA was signed and Thursday.

13   A.    The composition of the assets had changed dramatically,

14   yes.

15   Q.    And that was, in part, because of market decline, correct?

16   A.    In part, yes.

17   Q.    And it was, in part, because there was some collateral

18   stuck at J.P. Morgan?

19   A.    Correct.

20   Q.    And it was, in part, because Lehman's positions had been

21   wiped out or closed out at a number of places, correct?

22   A.    That's correct.

23   Q.    Can you describe some examples of where Lehman positions

24   were wiped out or closed out during the course of the week of

25   September 15th?

40

1   A.   I would use the example of the call that we got late in

2   the week from the CME with respect to positions that we had had

3   on that exchange.

4   Q.   And what happened there?

5   A.   Despite our asking for it not to happen, our positions

6   were put out into an open auction process.  And ultimately, we

7   were taken out of those positions and the margin associated

8   with those positions.

9   Q.   Let me be sure I understand what you're saying there.  At

10  the CME, you had certain positions and you had certain margin

11  on deposit as collateral for those positions, correct?

12  A.   That's correct.

13  Q.   And when your positions were closed out by the CME, you

14  lost your margin or collateral, correct?

15  A.   Correct.

16  Q.   And how much was involved there approximately, if you

17  recall?

18  A.   I don't have the specific recollection but it was in

19  excess of a billion dollars to the best of my recollection.

20  Q.   Now, you were asked some questions about the repo

21  financing.  Do you recall that?

22  A.   Yes.

23  Q.   And just for context, that was financing that was

24  originally provided by the Fed to Lehman Brothers, is that

25  correct?

VERITEXT REPORTING COMPANY

41

1    A.   Yes, it is.

2    Q.   And then on the week of September 15th, the Fed asked

3    Barclays to substitute Barclays for the Fed, correct?

4    A.   Yes, it did.

5    Q.   And so it was necessary, as part of this process, for

6    there to be the same kind of valuation of the assets included

7    in the repo as had been done previously in the week, correct?

8            MR. GAFFEY:  Objection.

9            THE COURT:  What's the basis for the objection?

10           MR. GAFFEY:  Foundation, Your Honor.  No personal

11   knowledge of how the repo valuations were done.

12           THE COURT:  All right.  That objection is sustained.

13   We can ask a few questions to get to the same point.

14   Q.   Do you have any understanding one way or the other as to

15   whether the process for valuing the repo assets was the same

16   process that you have described that went on earlier in the

17   week in terms of trying to value Lehman's assets?

18   A.   I have an understanding that the process would have been

19   similar, yes, and many of the assets would have been the same

20   assets.

21   Q.   Let me follow up on that.  What do you mean by many of the

22   assets would have been the same assets?

23   A.   The inventory from Schedule -- the 19 was -- and the

24   marked process that we went through, that was originally

25   financed through the Fed.  But it's the same inventory as a

42

1   bulk of the inventory that moved that would have been part of

2   the now Barclays repo.

3   Q.   Let me be sure the record is clear.  In the initial

4   valuation process, you would have been valuing the assets that

5   were subject to the Fed repo because they were Lehman assets

6   even though they were used as collateral for the Fed repo, is

7   that correct?

8   A.   Correct.  That's correct.

9   Q.   Let me turn to the subject of 15c3 which I think you

10  testified was something that you had never heard of before this

11  process.

12  A.   That's correct.

13  Q.   And it's something that I never heard of before this

14  process.  This was something that was identified to you either

15  Thursday or Friday, correct?

16  A.   It wasn't Friday.  It was before -- it was before Friday -

17  -

18  Q.   Before Friday.

19  A.   -- because we had identified it as a possible value in

20  terms of -- asset with potential value in terms of the

21  transaction.

22  Q.   And the purpose of identifying the 15c3 assets was to

23  provide Barclays with additional assets, is that correct?

24  A.   That would be correct.

25  Q.   And you're also trying to provide Barclays with additional

43

1   assets through what you described as unencumbered assets, do

2   you recall that/

3   A.   Yes.

4   Q.   And were those unencumbered assets, at least in part, what

5   have been referred to as clearance box assets?

6   A.   Yes.

7   Q.   And would you describe for the record what clearance box

8   assets are?

9   A.   Simply an asset that has not been pledged in any repo.  So

10  it's an inventory that would have been unencumbered from any

11  borrowing against it.

12  Q.   And there would be clearance box assets, for example, at

13  the DTCC, correct?

14  A.   They would be identified at the DTC, yes, but through our

15  clearing -- clearing bank through ultimately DTC, yes.

16  Q.   Now, you testified about some discussions between Barclays

17  and the DTCC from which Lehman people were excluded.  Do you

18  recall that?

19  A.   Yes.

20  Q.   Did you feel at the time that there was anything improper

21  or inappropriate about your being excluded from those

22  discussions?

23  A.   Frustrated, yes.  Improper?  I had no reason to believe it

24  would be improper.

25  Q.   As you would have liked to have been there but you

44

1  understood that they were going to try to exclude you, correct?

2  A.   Yes.

3  Q.   The -- did you get reports from anyone as to what had

4  happened in those discussions?

5  A.   Yes, we did.

6  Q.   Who did you get those reports from?

7  A.   We got those reports generally from gathering back

8  together as the larger group of the Barclays/Lehman team

9  including advisors.

10  Q.   And at that time, somebody from Barclays would give you a

11  report as to what had happened, is that correct?

12  A.   Yes.  I don't have a specific name in terms of a

13  recollection but yes, generally.

14  Q.   Did you ever come to believe that anything that had gone

15  on between the DTCC and Barclays or any agreement between them

16  had changed in any way the terms of the APA?

17  A.   The original terms of the APA?

18  Q.   Yes.

19  A.   Yes.

20  Q.   What?

21  A.   Yes.

22  Q.   In what way?

23  A.   A requirement of a deposit of 250 million dollars being

24  used to satisfy the DTC's concerns.

25  Q.   Other than the deposit of 250 million dollars, did you

45

1    ever come to believe that anything between the DTCC and

2    Barclays, any agreement or discussion, changed in any way the

3    deal that Barclays was doing with Lehman?

4    A.    No.

5    Q.    Now the DTCC had essentially told Lehman that they were

6    going to shut down your ability not only to transact business

7    going forward but to shut down hundreds of thousands of

8    settlements that were already in process, correct?

9    A.    That's correct.

10   Q.    And if that had happened, that would have had a

11   devastating effect on Lehman and its value, correct?

12   A.    Yes, I believe so.

13   Q.    Let me turn to the subject of exchange traded derivatives

14   and the margin and collateral associated with that.  First, you

15   don't recall one way or the other what the terms were of any

16   deal with respect to exchange traded derivatives or their

17   collateral, correct?

18   A.    Could you repeat the question?

19   Q.    Yes.  You don't personally -- you were not personally

20   involved in and you do not personally recall one way or the

21   other what the deal was with respect to exchange traded

22   derivatives and their collateral.

23   A.    To the specifics, yes, that's correct.

24   Q.    And that's because you were not personally involved in

25   those negotiations, correct?

46

1    A.    That's correct.

2    Q.    Who was involved in the negotiations with respect to

3    exchange traded derivatives and their collateral?

4    A.    I don't have a specific answer or knowledge of that.

5    Q.    Okay.  You did recognize at the time that the margin or

6    collateral that Lehman had with respect to exchange traded

7    derivatives, including at the OCC, could be wiped out if those

8    positions were closed, correct?

9    A.    It had happened during the week already as an example with

10   the CME so yes.

11   Q.    And the OCC was, in fact, threatening to close out

12   Lehman's position, correct, during that week?

13   A.    I have no knowledge of that.

14   Q.    One way or the other?

15   A.    No idea.

16   Q.    And because of what had happened at the CME, you had no

17   confidence that Lehman would ever realize any value from the

18   margin or collateral that it had at OCC, correct?

19   A.    No.  I wouldn't make that a correct statement, no.

20   Q.    Let me ask you to look at page 275 of your deposition and,

21   particularly, at line 3.  And perhaps, for context, let me go

22   to page 274, line 20:

23   "Q.  And those are positions and derivatives that LBI had?

24   "A.  Yes, exchange traded.

25   "Q.  The exchange traded, do those include derivatives that

1    were traded on the Options Clearing Corporation or OCC?

2    "A.  Yes.

3    "Q.  Did you understand that in addition to the long positions

4    and the short positions that Lehman had OCC, it also had

5    additional cash and assets that were deposited as margin and

6    also clearing funds deposited at the OCC?

7    "A.  Yes, I did.  But keep in mind the context, that we had had

8    assets like that, for example, at the CME and they lost those

9    assets over the course of the week.  So we had no confidence

10   that those were potentially our assets given what had been

11   transpiring."

12        Do you see that?

13   A.   Yes.

14   Q.   And was that accurate testimony at the time you gave it?

15   A.   That was accurate testimony, sir.  I wouldn't have used

16   those assets in a transaction of -- because I wasn't confident

17   that we had those assets to give.

18   Q.   Right.  So you didn't have any confidence you had those

19   assets to give at that time?

20   A.   Correct.

21   Q.   And you didn't have any confidence, as you say here, "that

22   those were potentially our assets given what had been

23   transpiring", correct?

24   A.   Correct.

25   Q.   Let me turn to the subject of compensation and the

48

1   exposure to compensation that Barclays was taking over.  First,

2   you were present when a proffer was given to the Court

3   concerning what your testimony would have been with respect to

4   this subject matter, correct?

5   A.   Yes, I was.

6   Q.   And the Court was told that you would have testified that

7   the exposure for employees -- Barclays' exposure for employees

8   that accepted offers of employment was estimated to be an

9   exposure of approximately two billion dollars, correct?

10  A.   That's correct.

11  Q.   And you recognized that that was Barclays' exposure.  It

12  was not necessarily what Barclays would actually end up paying,

13  correct?

14  A.   Yes.

15  Q.   And I'd like to go through some of the components of that

16  exposure.  It included bonuses that Barclays was obligated to

17  pay employees, correct?

18  A.   It included bonuses that Barclays would be paying

19  employees, yes.

20  Q.   That is, it included an exposure -- I said obligated and I

21  shouldn't have.  And you corrected me and that's correct -- and

22  I appreciate that.  This included bonuses that Barclays was

23  exposed to possibly paying, correct?

24  A.   And the bonuses that Barclays was exposed to possibly

25  paying employees were greater than the bonuses that were

49

1    accrued on Lehman's books, correct?

2    A.   That's correct.

3    Q.   And that was true for a number of reasons, correct?

4    A.   That's correct.

5    Q.   One of the reasons is that the bonuses that had been

6    accrued had not been annualized, correct?

7    A.   They represented three-quarters of the year, yes.

8    Q.   Another reason is that Lehman paid bonuses both partly in

9    stock and partly in cash, correct?

10   A.   That's correct.

11   Q.   And Lehman gave a higher proportion of its bonus in stock

12   than other Wall Street firms, correct?

13   A.   Yes, we did.

14   Q.   And Lehman only accrued on its books that portion of the

15   bonus that represented the cash portion, correct?

16   A.   Correct.

17   Q.   Now, in addition, Barclays was exposed to possibly paying

18   severances for people that were terminated, correct?

19   A.   Barclays was definitively exposed to severance for those

20   that wouldn't be hired after the ninety-day period.

21   Q.   And the amount of severance would depend on how many

22   people were actually terminated, correct?

23   A.   How many people and that constituent of who those people

24   were.

25   Q.   That is, how much severance they were due.

50

1    A.    Correct.

2    Q.    In addition, Barclays was required to hire all of Lehman's

3    employees at the time the closing, correct?

4    A.    Yes, that's correct.

5    Q.    And it was required to keep those people employed, I

6    think, for -- was it ninety days?

7    A.    Ninety days.

8    Q.    So Barclays was also exposed to paying the salaries of

9    people that it didn't want for that ninety-day period, correct?

10   A.    Yes.  I agree.

11   Q.    Did you make any effort to determine how much Barclays was

12   exposed to pay for employees that it was taking on in addition

13   to what was on Lehman's books?

14   A.    Did I personally?

15   Q.    Yes.

16   A.    I personally had reviewed the process that had taken place

17   between mostly the human resources teams on both sides.  But I

18   personally did not go through the specific information or the

19   specific data.

20   Q.    Based on your review of what the two sides had done, did

21   you think that the estimated exposure that they had come up

22   with was a reasonable one?

23   A.    Yes.  I thought it was fair.

24   Q.    Okay.  Let me turn next to something that has been

25   referred to sometimes as cure payments.

51

1    A.    Yes.

2    Q.    And you're familiar with that term, are you not?

3    A.    Yes, I am.

4    Q.    And the fact that Barclays had certain potential cure

5    payments to make was one of the things that was included in the

6    consideration of the deal that you were involved in, correct?

7    A.    Yes, it was.

8    Q.    Now, Lehman had on its books certain estimates of cure

9    payments, correct?

10   A.    Yes.

11   Q.    Now, the cure payments that were on Lehman's books only

12   included cure payments that were already overdue, correct?

13   A.    I'm not aware in that specific detail.

14   Q.    Okay.  That is, you don't know whether the numbers on

15   Lehman's books included cure payments for what the estimate was

16   that was going to be owed or only what was already past due?

17   A.    Yes.  I have no knowledge of that.

18   Q.    Okay.  Did some of the vendors that provided services and

19   that were owed money provide invoices to Lehman's affiliates

20   rather than to LBI directly?

21   A.    I have no knowledge of that.

22   Q.    Do you know whether the cure estimates on Lehman's books

23   included amounts owed to vendors who performed services for

24   LBI's business but who had contracts with Lehman affiliates?

25   A.    I have no knowledge of that.

52

1    Q.    Do you know whether the cure payment accrual numbers on

2    Lehman's books included amounts owed for services that had

3    already been performed but for which the vendor had not sent an

4    invoice?

5    A.    I have no knowledge of that.

6    Q.    Do you know whether the accrual payments on Lehman's books

7    included amounts for services to be performed during the sixty-

8    day period following closing which Barclays was required to pay

9    under Section 2.5 of the APA.

10   A.    I have no specific knowledge, again, of that.

11   Q.    Did you participate in coming up with the cure estimate

12   that was included in some of the schedules relating to this

13   transaction with Barclays?

14   A.    I did not participate in a specific way, no.

15   Q.    Who was responsible for that?

16   A.    That would have been Martin Kelly, the controller.

17   Q.    Did you recognize that whatever estimate Mr. Kelly came up

18   with represented a ceiling or maximum exposure.

19   A.    It was described as a potential exposure.

20   Q.    A potential exposure.  And you recognized that that

21   exposure might or might not actually result in payments by

22   Barclays, correct?

23   A.    Yes.  Yes, I did.

24   Q.    And you understood that Barclays had sixty days under the

25   agreement to determine which contracts to assume, correct?

53

1    A.   Yes, I did.

2    Q.   And which contracts Barclays assumed would determine what

3    its cure payments were, correct?

4    A.   That's correct.

5    Q.   And the process of determining what contracts Barclays was

6    going to assume was not going to start until after the closing,

7    correct?

8    A.   It couldn't start until after the closing given all the

9    significant integration issues that had to take place.

10   Q.   And you understood that Barclays had complete discretion

11   as to what contracts to accept and what contracts to reject,

12   correct?

13   A.   Yes, I did.

14            MR. BOIES:  Your Honor, may I have a moment?  Or would

15   this be a convenient time for the --

16            THE COURT:  You may have more than a moment if you'd

17   like a --

18            MR. BOIES:  Thank you.

19            THE COURT:  We're very close to our morning break.

20            MR. BOIES:  Thank you, Your Honor.

21            THE COURT:  Are you --

22            MR. BOIES:  Could we take a break now?

23            THE COURT:  Are you ready for a break?  That's fine.

24   We'll take a break for fifteen minutes resuming at 11:05.

25            (Recess from 10:48 a.m. until 11:09 a.m.)

54

1        THE COURT:  Be seated, please.

2        MR. BOIES:  Thank you, Your Honor.

3   RESUME CROSS-EXAMINATION

4   BY MR. BOIES:

5   Q.   Mr. McDade, do you still have Movants' Trial Exhibit

6   number 2 in front of you?

7   A.   No.

8   Q.   Would you turn to that?  That's in the book that counsel

9   for the movants gave you.  This is the 9/16/2008 11:18 a.m.

10  version of the schedule we were talking about.  You have that/

11  A.   Yes.

12  Q.   Now, any one of these asset categories, and perhaps the

13  liabilities categories as well, could change significantly over

14  the course of a few days, correct, in terms of valuation?

15  A.   Yes.

16  Q.   And in some cases they did during that week, correct?

17  A.   Yes.

18  Q.   And if any one of these asset categories changed

19  significantly either by dropping out or by changing in value,

20  that would put it in balance unless there was another change, a

21  corresponding change, in the liabilities, correct?

22  A.   You'll have to repeat that.  Sorry.

23  Q.   Sure.  If you had a change in the assets either because

24  the value changed significantly, as you indicated was happening

25  day by day, or because one of these categories dropped out,

55

1    unless there was a corresponding change in the liabilities, the

2    deal would not be in balance, correct?

3    A.    That's correct.

4    Q.    And if such a change happened before closing, there would

5    be a possibility of making a corresponding adjustment in the

6    liabilities, correct?

7    A.    Make -- you'll have to explain the "making a corresponding

8    adjustment".

9    Q.    Sure.  If there was a significant change in the valuation

10   of one of the asset categories or one of those asset categories

11   just dropped out, if it happened before closing there would be

12   at least the possibility that the deal could be adjusted by

13   changing the liabilities.

14   A.    Yes.

15   Q.    But once the closing happened, if such a change occurred,

16   there couldn't be any rebalancing, correct?

17   A.    I agree.

18   Q.    And you never had any conversations with anyone from

19   Barclays about the deal being a wash or any requirement that

20   assets and liabilities match or bounce, correct?

21   A.    No, I did not.

22   Q.    Let me ask you to look at --

23         MR. BOIES:  Did we hand out our binder?  Okay.  We

24   have -- the "Witness Examination".  We have a small binder for

25   you, too.

56

1          THE COURT:  Thank you.

2          MR. GAFFEY:  Your Honor, I'm going to need a binder.

3          UNIDENTIFIED SPEAKER:  Yes, I'm aware.

4          THE COURT:  This is the second time that has happened.

5          MR. GAFFEY:  I'm not hurt yet.

6          MR. BOIES:  Next time she'll give it to him first,

7    Your Honor.  As she's going around the courtroom, she has to

8    start and end someplace.  And if counsel wishes, she will start

9    with him next time.

10         MR. GAFFEY:  Mr. Boies' ability to take a hint is

11   impressive, Your Honor.

12   BY MR. BOIES:

13   **Q.   Mr. McDade, would you turn to tab 7 of this document?**

14   **This is a document that has been marked as BCI Exhibit number**

15   **189-A and also here is Exhibit 189.  They are both copies of**

16   **the same e-mail.  189-A is a slightly better copy.  Do you**

17   **recall receiving this e-mail?**

18   **A.   I don't recall, no.**

19   **Q.   You know that you did receive it, though, correct?**

20   **A.   Yes. I can see that at the top.**

21   **Q.   And indeed, if you look at the next tab, which is Exhibit**

22   **190, you sent a reply message indicating that the Exhibit 189-A**

23   **e-mail had been read.**

24         MR. GAFFEY:  Objection, Your Honor.

25   **Q.   Is that correct?**

57

1        MR. GAFFEY:  Objection, Your Honor.

2        THE COURT:  What's the objection?

3        MR. GAFFEY:  Foundation.  I'm not sure it's apparent

4    from the face of the document whether Mr. McDade sent it or

5    whether this is an automatic return receipt.

6        THE COURT:  All right.  But at least the witness is in

7    a position to know whether or how he interacted with this.  So

8    I think the question's permissible.

9    A.   I don't have a recollection of seeing the document.  I

10   don't have a recollection of some evidence of creating this as

11   "was read".

12   Q.   I'm sorry.  Say that again.

13   A.   I don't have a recollection of reading the document.  So I

14   don't have an explanation for how the message was created in

15   terms of "was read".

16   Q.   Even though you don't have any recollection of either

17   seeing the e-mail or sending the "Was read" e-mail that is

18   Exhibit 190, as you sit here now, you don't have any doubt that

19   you actually did get this e-mail, correct?

20   A.   It's possible my assistant replied and potentially

21   printed.  But I don't -- I don't know how to answer that

22   question specifically.  It certainly looks like I read it from

23   this e-mail, yes.

24   Q.   Let me direct your attention to Exhibit 189-A.  On the

25   first page, do you see the heading "What is being acquired"?

58

1    A.    Yes, I do.

2    Q.    And this purports to be the highlights from a Barclays

3    conference call, correct?

4    A.    Yes.   It looks like that, yes.

5    Q.    And this e-mail is being sent around on September 17th,

6    2008, a Wednesday, correct?

7    A.    That's correct.

8    Q.    And in addition to going to you, it goes to a number of

9    other people.   And I'd like to try to get you to identify them

10   for the record.

11   A.    Sure.

12   Q.    The first person listed is you, correct?

13   A.    That's correct.

14   Q.    The second person listed is Gerald Donini.   Do you see

15   that?

16   A.    Yes.

17   Q.    Do you know who he is?

18   A.    Global head of the equity division.

19   Q.    Of Lehman?

20   A.    Of Lehman.

21   Q.    The next person is Richard Cunningham.   Do you know who he

22   is?

23   A.    Yes.   He ran U.S. sales for equities at Lehman.

24   Q.    The next person is Joseph Cochran.   Do you know who he is?

25   A.    U.S. head of trading for Lehman -- equities.

59

1    Q.    The next person is Ajay Nagpal.

2    A.    Ajay Nagpal was the global head of sales for equity

3    division.

4    Q.    And all of these are Lehman executives?

5    A.    Yes, they are.

6    Q.    The next person is Patrick Qualin (ph.).  Do you know who

7    he is?

8    A.    Yes.  He was the equity senior employee.

9    Q.    The next person is Stuart Lin (sic).  Do you know that is?

10   A.    Stuart Linde was the head of research in equity division.

11   Q.    The next person is Ravi Mattu.

12   A.    Ravi Mattu was the head of research for dead-end equity.

13   Q.    The next person is William Meyers.

14   A.    Chief operating officer for equity research at Lehman.

15   Q.    The next person is Ann Gillin-Lefever.

16   A.    Ann Gillin was the head of a desk analyst group in the

17   equity division.

18   Q.    The next person is Stephen Gresdo.

19   A.    Desk analyst, equities, Lehman.

20   Q.    The next person, Eric Johnston.

21   A.    Equity trading -- cash equity trading head, U.S., Lehman.

22   Q.    The next person is James Everett.

23   A.    Cash equity trader, Lehman.

24   Q.    The next person is Ryan Abrahamson.

25   A.    Trader, equities, Lehman.

60

1    Q.    The next person is Eric Bertrand (ph.).

2    A.    I apologize to him.  I don't recall him.

3    Q.    Okay.  The next person, Alex Cramm (ph.).

4    A.    Do not know.

5    Q.    Steven Trong (ph.).

6    A.    Do not know.

7    Q.    Jason Goldberg.

8    A.    Equity research, Lehman.

9    Q.    Bruce Harting.

10   A.    Equity research, Lehman.

11   Q.    Jay Gelb.

12   A.    Equity research, Lehman.

13   Q.    Eric Berg.

14   A.    Equity research, Lehman.

15   Q.    Andrea Jou (ph.)

16   A.    Equity research, Lehman.

17   Q.    Richard Gross.

18   A.    Equity research, Lehman.

19   Q.    Robert Cornell.

20   A.    Equity research, Lehman.

21   Q.    Gary Chase.

22   A.    Equity research, Lehman.

23   Q.    Roger Freeman.

24   A.    The deliverer, equity research.

25   Q.    And Roger Freeman is the person who sent this, is that

61

1    correct?

2    A.    Correct.

3    Q.    And did Mr. Freeman have a title at Lehman?

4    A.    Mr. Freeman was the U.S. equity research analyst for

5    financial institutions in the broker-dealer and exchange names.

6    Q.    Now, on the first page, under "What is being acquired", it

7    says:  "Trading assets of seventy-two billion and liabilities

8    of sixty-eight billion".  Do you see that?

9    A.    Yes, I do.

10   Q.    And is that consistent with your understanding of the

11   state of the negotiations as of September 17th?

12   A.    Yes.

13   Q.    And the next page, under "Capital Requirements" near the

14   bottom of the page --

15   A.    Yes.  I see that.

16   Q.    -- it says "This transaction, due to two billion dollars

17   in after-tax negative goodwill, is accretive to capital ratios

18   immediately.  Do you see that?

19   A.    Yes, I do.

20   Q.    First, what is "negative goodwill"?

21   A.    That would be some value created without a purchase price

22   for Barclays.

23   Q.    And do you know what the basis of Barclays' negative

24   goodwill was?

25   A.    No.  I have no knowledge of how Barclays would have looked

62

1   at this from an accounting point of you.

2   Q.   Is there anything inconsistent with Barclays having after-

3   tax negative goodwill immediately upon the closing of the

4   transaction with what you were intending to accomplish?

5   A.   No.

6           MR. BOIES:  Your Honor, I have no more questions.

7           THE COURT:  All right.  Is there any redirect?

8           MR. GAFFEY:  Yes, Your Honor.

9   REDIRECT EXAMINATION

10  BY MR. GAFFEY:

11  Q.   Good morning, Mr. McDade.

12  A.   Good morning.

13  Q.   Now, Mr. McDade, you were asked yesterday by Mr. Boies

14  whether at the time the transaction was presented to the Court,

15  based on everything you know now, do you believe that the

16  transaction was presented to the Court in a fair and balanced

17  way and you answered, "Yes, I do".  Do you recall that?

18  A.   Yes, I do.

19  Q.   Can you -- and today, you've spent some time in your

20  testimony talking about a process where there were interactions

21  between Barclays traders and Lehman traders to arrive at a

22  market value for the assets to be transferred in the sale

23  transaction, is that right?

24  A.   Yes.

25  Q.   And it is not the normal method, is it, of coming to a

63

```
 1    view of what the marks should be on a broker-dealer's books, to

 2    do so by negotiations with a single purchaser, is it?

 3    A.    I would agree with that.

 4    Q.    You've never heard of that being done before, have you?

 5    A.    I can't say that I have, no.

 6    Q.    So that's not the method by which you arrive at mark-to-

 7    market accounting on the books and records of a broker-dealer.

 8    Is that right?

 9    A.    The normal course -- in the normal course.

10    Q.    And do you have any recollection at any point in your

11    testimony at the sale hearing of telling the Court that the

12    method by which the book value of Lehman's assets was arrived,

13    was through this unusual method of negotiating with a single

14    purchaser?

15    A.    In my proffer?

16    Q.    Either in your proffer or at any point on cross-

17    examination, sir?

18    A.    I believe in Mr. Ridings -- my recollection, in some

19    questions by Mr. Ridings, there was discussion around the

20    process of other potential -- of potential buyers, why not

21    there was a process of four other potential buyers in the

22    process.  And it was explained through what Lehman had gone

23    through previously, in terms of trying to sell ourselves before

24    the whole bankruptcy process.

25    Q.    I think we may be missing each other on the question, sir.
```

64

1    Do you recall at any point, any disclosure being made to the

2    Court that the method by which the values were arrived at for

3    the sale transaction were a negotiation between Lehman and

4    Barclays, as opposed to Lehman's normal method of arriving at

5    book value?

6    A.    No, I do not.

7    Q.    Do you recall a portion of your testimony at the sale

8    hearing where you described a line-by-line valuation that had

9    taken place up through that morning?

10   A.    No.

11        MR. GAFFEY:  Can I have a copy of 241 for the witness,

12   please?

13        UNIDENTIFIED ATTORNEY:   261.

14        MR. GAFFEY:   261.   That would be even better.   Your

15   Honor, may I approach?

16        THE COURT:  Yes, you may.

17        THE WITNESS:  Thank you.

18        THE COURT:  Thank you.

19   Q.    I've given you, Mr. McDade, Movants' Trial Exhibit 261,

20   which is the transcript of proceedings before the Court at the

21   sale hearing on the 19th of September.  And I'd ask you, sir,

22   to take a look at page 109, and go down to line 19.  And for

23   context, sir, I will tell you, this is not part of your

24   proffer, this is on cross-examination by a Mr. Qureshi.  And

25   that's reflected at page 103 of the transcript.

65

1        Now, sir, in your testimony on cross-examination by Mr.

2   Qureshi, he asked you:

3   "Q.  Does Lehman have any valuations -- internal valuations of

4   any of the assets that are being transferred to Barclays?

5   "A.  Absolutely.  There are many complex securities involved,

6   many different models that we use to evaluate those securities.

7   "Q.  And so, sir, is it your testimony then, that a valuation

8   was conducted within Lehman of all of the assets that are being

9   transferred to Barclays?  When was that conducted?"

10        And your answer, over on page 110 is, "Portfolio moved

11   during the week, but that was conducted all last evening, all

12   through and up to the arrangement -- the agreement today."

13        Now, was there a reason, sir, that when you answered that

14   question at the sale hearing, you did not mention that the

15   line-by-line valuation included participation by the purchaser,

16   by Barclays?

17   A.   I don't recall a specific reason why.

18   Q.   Do you recall, at any point, saying anything to reveal the

19   fact that Barclays was involved in the valuations that you

20   brought to the Court as evidence of fair value to the debtor,

21   here?

22   A.   Barclays clearly was purchasing a set of assets as part of

23   the whole business acquisition.

24   Q.   Well, let's go back to Mr. Qureshi's question.  When you

25   were asked if there was a valuation performed, sir -- we've

66

1    agreed that the type of valuation we're talking about here was

2    a little unusual, where the purchaser and the seller sit down

3    and arrive at what you would view as a substitute for book

4    value, correct?

5    A.    Correct.

6    Q.    Was it sufficiently unusual that you might have seen fit

7    to mention it when you were asked at the sale hearing how the

8    valuation was done?

9    A.    I don't think I would agree with that.  It was very clear

10   it's a transaction between Barclays and Lehman and an agreed-

11   upon negotiation in terms of the price.

12   Q.    And I think we established yesterday by looking at the

13   asset purchase agreement together, sir, that the description of

14   the Long Position was in terms of Lehman's book value.  Do you

15   recall that?

16   A.    I do recall that.

17   Q.    And we've agreed, have we not, that book value is not

18   achieved by negotiating with a purchaser, it's achieved by the

19   broker-dealer making access to models and outside data,

20   etcetera.  Is that right?

21   A.    In a normal course of business all inputs, in terms of all

22   trades that happen in the marketplace, plus all models that are

23   used, are part of that process.  We still used that in the

24   process of Lehman going through this process with Barclays.

25   Q.    And in all your time at Lehman, sir, can you identify any

67

1    other incident where the books of Lehman -- the book value that

2    Lehman applied to its property, to its assets, was determined

3    by means of discussions and a process with a single purchaser?

4    A.    Well, every transaction that would have taken place in my

5    twenty-five years, ultimately would have been reflected in book

6    value for every trade that happened, that was consummated.

7    Q.    The question, sir, was whether you can recall a single

8    episode where book value for Lehman Brothers was determined in

9    a process in which Lehman participated with one single

10   purchaser?

11   A.    I don't recall a specific example of that, no.

12   Q.    This is the only specific example you can give, the one

13   you've described today.  Is that right?

14   A.    No, I wouldn't -- I wouldn't describe it that way.  Every

15   time we did a transaction, and we did many bulk transactions

16   over the course of time, that would have reflected on -- any of

17   those actions would have been reflected on the books of Lehman.

18   Q.    Well, when you reflect -- when you make a mark-to-market

19   on the books of Lehman, isn't it a fact that you don't look at

20   the entire bulk of the securities, you look at predictably

21   salable pieces of that asset class.  Is that right?

22   A.    That's fair, yes.

23   Q.    A smaller -- a subset of the entire bulk of the

24   securities, correct?

25   A.    That's correct.

68

1    Q.    And you've talked today about Lehman's goal being to move

2    all the assets in the transaction, correct?

3    A.    That's correct.

4    Q.    And the process you've described today is the purchase of

5    that entire bulk, of all of those assets, correct?

6    A.    Yes, correct.

7    Q.    So that's not the same thing as taking account of what

8    purchases there might be across the market.  That's looking at

9    what one buyer will pay for that entire class of assets.  Is

10   that right?

11   A.    That's correct.

12   Q.    And in your experience, you've never heard book value

13   determined by that process, what one buyer would pay for the

14   entire class of assets.  Is that correct?

15   A.    My specific experience, no.

16   Q.    All of your experience, sir?

17   A.    Yes.

18   Q.    Now, the valuation process that you described when you

19   answered Mr. Boies' questions, you were not, yourself,

20   personally involved in that, correct?

21   A.    That's correct.

22   Q.    You had delegated that.  Is that right?

23   A.    That's correct.

24   Q.    So you don't know what the -- you know there was back-and-

25   forth, but you don't know what the back-and-forth was as

69

1    between the various traders talking about the various asset

2    classes, correct?

3    A.   That's correct.

4    Q.   You don't know as to any of the asset classes that were

5    under that discussion, how any particular price -- how any

6    particular value came into being.  Is that correct?

7    A.   That's correct -- that's correct.

8                MR. GAFFEY:  Could we have Exhibit 2 up on the screen,

9    please?

10   Q.   Exhibit 2 in your book, sir, it's the financial schedule.

11   Just take a look at that.  So by way of example, sir, the forty

12   billion dollar item annotated against the governments on the

13   asset side, you don't know where that forty billion dollars

14   came from, correct?

15   A.   That's correct.

16   Q.   And you would say the same thing with respect to

17   commercial paper, mortgages, debt, equity, derivatives, and

18   cash --

19   A.   Yes, I would.

20   Q.   -- apart from cash?

21   A.   Yes, I would.

22   Q.   And with respect to the liabilities for cure and comp, and

23   you did not personally participate in estimating or calculating

24   those numbers.  Is that correct?

25   A.   I did not personally participate in cure.  I had a few

70

1    brief conversations with individuals around compensation, but

2    not any significant discussions.

3    Q.   And in the conversations you had around the comp issue,

4    you learned or determined that the comp number of two billion

5    dollars was an agreed number, correct?

6    A.   It was -- it was ultimately data given by Lehman and a

7    formulation in terms of an estimate by Barclays, who would be

8    assuming those liabilities, and obviously agreement at the end

9    in terms of the Lehman team.

10   Q.   And it was a billion dollars over the accruals that Lehman

11   had on its books for bonus, correct?

12   A.   As of the third quarter, yes.

13   Q.   And you'd agree with me, sir, that the billion dollar

14   difference, a hundred percent increase, could not be accounted

15   for by annualizing, correct?

16   A.   Yes, I would agree with that.

17   Q.   And the arrival at the number of two billion dollars was

18   Barclays agreeing that that was the number.  That's why you've

19   described it as an agreed number, correct?

20   A.   Yes.

21   Q.   And it's your understanding that Barclays had input into

22   that number to determine what its exposure would be for comp,

23   correct?

24   A.   Yes.

25   Q.   And when you learned about the two billion dollar comp

71

1    number, if I understood your testimony correctly yesterday,

2    sir, you've never had a conversation with Barclays about what

3    it actually thought it would pay or intended to pay for

4    bonuses.  Is that correct?

5    A.    I did not have those conversations, no.

6    Q.    And you didn't ask in any of your negotiations with

7    Barclays, correct?

8    A.    No, I did not.

9    Q.    But you would agree with me, sir, that the two billion

10   dollars in comp is a part of the consideration in the asset

11   purchase agreement, yes?

12   A.    Yes.

13          MR. BOIES:  Objection, Your Honor.  Calls for a legal

14   conclusion.

15          THE COURT:  Well, I'm going to overrule that

16   objection.  He's been examined for two days now on his

17   understanding of this transaction, and he certainly has said in

18   response to earlier questions, that he is familiar with the

19   asset purchase agreement.  If he can't answer the question, he

20   can't answer the question.  But it doesn't call for a legal

21   conclusion.  Overruled.

22   Q.    The answer was yes.  Is that right, sir?

23   A.    Could you repeat the question.

24   Q.    As you understood, the comp -- the assumption of

25   liabilities for compensation to be part of the consideration

72

1    that Barclays was paying in the transaction?

2    A.   Part of the total value, yes.

3    Q.   So to the extent the total -- that two billion dollar

4    element of total value dropped, sir, the amount of assets that

5    were transferred to Barclays should have dropped if the deal

6    was to remain in balance, as you thought it was, correct?

7    A.   If the deal was to remain in balance, yes.

8    Q.   And you thought it was a deal that was described to the

9    Court as one in balance, correct?

10   A.   Roughly in balance, yes.

11   Q.   And you understood --

12        MR. GAFFEY:  If I may, Your Honor?  Thank you.  I'm

13   never sure if they're coming for me.

14   Q.   And you understood the deal was one that was to be in

15   balance through the entire process, from the 15th through the

16   closing on the 22nd, correct?

17   A.   No.  I understood the deal to be Lehman trying to extract

18   the best price for the franchise and the assets.  I understood,

19   as we wound down, that it was roughly in balance.

20   Q.   And you understood that it was described to this Court as

21   roughly in balance?

22   A.   Yes.

23        MR. BOIES:  Objection, Your Honor.  How it was

24   described in this court is a matter of record.  It's not for

25   this witness to testify.

73

1          THE COURT:  Well, I'm going to overrule that objection

2     as well.  I mean, this is the same witness who sat right there

3     on September 19th and was cross examined and who made

4     representations to the Court.  So he's certainly in a position,

5     more than most others, to be able to answer that question.

6     Q.    So you heard the deal described to Judge Peck as one that

7     was in balance, correct?

8     A.    Correct.

9     Q.    And you never heard anybody describe it as any other type

10    of deal other than one that was in balance, correct?

11    A.    That's correct.

12    Q.    And you agree with me, do you not, sir, that to the extent

13    the comp number -- the comp assumed liability -- would come

14    down, that should reduce the number of assets that are

15    transferred for the deal to remain in balance, correct?

16    A.    I would agree with that.

17    Q.    And you'd also agree with me, sir, that to the extent the

18    cure number came down, that should affect the value of the

19    assets being transferred to Barclays for the deal to stay in

20    balance, correct?

21    A.    The cure was described as a potential liability.

22    Q.    Well, you said that a couple of times, sir, that it was a

23    potential liability.  Did you have an understanding when that

24    number was given to this Court in your proffer, that 1.5

25    billion dollars was only a potential that could range from zero

74

1   to 1.5 billion dollars?

2   A.   I had an understanding that it could range from a number

3   lower, not zero.

4   Q.   Okay.  Something higher than zero?

5   A.   Yes.

6   Q.   Maybe something higher than a billion?

7   A.   I had no specific knowledge of the actual contracts, so I

8   had -- I hadn't formed a view of the specific number.

9   Q.   Well, it's a different question, sir.  It's what you

10  understood the 1.5 billion to mean when it was given in the

11  proffer of your testimony to this Court.  You've described it

12  as a potential for cure liability.  Did you understand the

13  potential to have a range of something between zero and 1.5

14  billion dollars?

15  A.   No, I did not have it to be zero and the 1.5 number.  I --

16  Q.   Okay.  So we're agreed it's something above zero, up to

17  1.5 billion dollars, correct?

18  A.   Yes.  Yes.

19  Q.   Is it something above a billion to 1.5 billion dollars?

20  A.   Again, I had not formed a specific number.  All of the

21  integration process had not started, so the specific knowledge

22  of what Barclays had or needed and what Lehman had or needed to

23  run these franchises, was to be forthcoming.

24  Q.   Well, you had implored Mr. Lowitt and Mr. Kelly to get

25  that cure number to be as accurate as possible.  Is that

75

1    correct?

2    A.    That is correct.

3    Q.    And when you implored Mr. Lowitt and Mr. Kelly to get that

4    cure number to be as close to accurate as possible, it was

5    because you understood, this was consideration your company was

6    receiving in this transaction, correct?

7    A.    Yes, I did.

8    Q.    And you implored Mr. Kelly and Mr. Lowitt to come as close

9    as they could to an accurate number, because you knew that

10   number would be given to this Court in describing the

11   consideration Barclays was paying, correct?

12   A.    Yes, that's correct.

13   Q.    And at no point, when you were imploring Mr. Kelly or Mr.

14   Lowitt to come up with a cure number, did you tell them to come

15   up with a range between 1.5 billion dollars and something below

16   it, did you?

17   A.    No, I did not.

18   Q.    You wanted them to come as close as they could to an

19   accurate estimate of the contracts that Barclays would actually

20   need to run the business, correct?

21            MR. BOIES:  Objection, Your Honor.

22            THE COURT:  What's the objection?

23            MR. BOIES:  Misstates what the witness has said.

24            MR. GAFFEY:  I'm not citing his prior testimony, Your

25   Honor.  It was a question.

76

1          THE COURT:  It's a question about what he wanted.  He

2     can either answer that a yes or no.  Objection's overruled.

3     A.    Could you repeat that, Mr. Gaffey?

4     Q.    When you implored Mr. Kelly and Mr. Lowitt to get as

5     accurate a number as possible for the cure amount, it was

6     because you understood this Court was going to be given that

7     number, yes?

8     A.    Yes.

9     Q.    And another reason that you implored them to make it as

10    accurate as possible is you understood it was the consideration

11    that was going to be given to your company, correct?

12    A.    Yes.

13    Q.    And at no point did you ask Mr. Lowitt or Mr. Kelly, while

14    you are imploring them to be accurate, to come up with a range

15    to be given to the Court of how high it could be or how low it

16    could be, correct?

17    A.    That's correct.

18    Q.    Your understanding of the cure number was based -- you

19    understood that on the Barclays side, these vendor contracts

20    would be necessary to the running of the business, correct?

21    A.    Yes.

22    Q.    So the idea here was to figure out which contracts were

23    mission-critical, figure out what they were worth, and come up

24    with a cure number, correct?

25    A.    No, the idea was to come up with a list of all of the

77

1   vendor contracts.

2   Q.   And to come to court and describe it as consideration in

3   the deal?

4   A.   Yes.

5   Q.   With the understanding, which I think we now have, that to

6   the extent it's below the number given to the Court, for the

7   deal to be in balance, the assets have to drop as well,

8   correct?

9   A.   With the understanding that there would be a process after

10  the closing to identify what those actual obligations to be

11  undertaken by Barclays would be.

12  Q.   As of the 19th, when you sat in that chair, sir, and

13  testified before the Court, were you attempting, when your

14  testimony was proffered, and 1.5 billion dollars was given to

15  the Court as the estimate for the cure number, to come as close

16  as you could to telling Judge Peck what the cure number

17  actually was going to be?

18  A.   Yes, that was the information we had.

19  Q.   Now, Mr. Boies asked you a few moments ago about whether

20  there were representations or warranties in the -- going to

21  this idea of a rough equivalence.   And your recollection is

22  there were none in the asset purchase agreement.   Is that

23  correct?

24  A.   That's correct.

25  Q.   When you understood the transaction to be described to the

78

1      **Court as one in balance, did you consider that to be making a**

2      **representation or a warranty to the Court about the nature of**

3      **the transaction it was being asked to approve?**

4              MR. BOIES:  Objection, Your Honor.

5              THE COURT:  Did he consider it to be a representation

6      to the Court.  What's the basis for the objection?

7              MR. BOIES:  Assumes a fact not in evidence.

8              THE COURT:  Well, I don't know what that fact is.

9      Excuse me?

10             MR. BOIES:  It's a when did you stop beating your wife

11     kind of question.  He said when you understood the transaction

12     to be described to the Court as one in balance.  That's a fact

13     that's not been established.

14             MR. GAFFEY:  Your Honor, I think that's been well and

15     truly established.

16             THE COURT:  Well, I think that it's certainly been

17     established that that was this witness' understanding of the

18     transaction.

19             MR. BOIES:  Yes, Your Honor, that is true.  But what

20     counsel just did was framed a question, a predicate of which,

21     was that this Court was told that it was in balance.  And I

22     would just ask counsel to identify in the record where counsel

23     believes that happened.

24             THE COURT:  Well, rather than have us do that, unless

25     counsel wishes to do that, my suggestion is that we try a

79

1    different question.

2    BY MR. GAFFEY:

3    Q.    It was your understanding, Mr. McDade, that your role as a

4    witness for Lehman, was to describe the transaction to Judge

5    Peck, correct?

6    A.    That's correct.

7    Q.    And it was your understanding that the transaction you

8    were describing to the Court was one that was roughly to be in

9    balance, correct?

10   A.    That's correct.

11   Q.    And one of the purposes of your testimony to the Court was

12   to transmit that information about the structure of the deal to

13   the Court, correct?

14   A.    Yes.

15   Q.    And you understood that the reason for this hearing was so

16   that the Court could understand the transaction and determine

17   whether or not to approve it, correct?

18   A.    Yes, I did.

19   Q.    So unlike the asset purchase agreement, the contractual

20   arrangement, I'm asking you this question about your testimony

21   to the Court.  When you sat there in that chair and gave that

22   testimony about a deal you understood to be balanced, with the

23   understanding Judge Peck was going to take into account what

24   you said in approving it, did you consider that to be a

25   representation to the Court that it was a balanced transaction?

80

1          MR. BOIES:  Your Honor, I object.  He's just done it

2     again.  He's just said "gave that testimony about a deal you

3     understood to be balanced."  And I don't believe that the

4     witness said that, and I ask that counsel, if he's going to

5     keep saying that the witness said that to the Court, that he

6     show the witness and the Court what he's talking about.

7          THE COURT:  Well, I'm going to overrule the objection

8     based upon the line of questions leading up to this question.

9     The witness has stated his personal understanding that the

10    transaction was in balance.  And he's been asked the question,

11    which I'm now going to recount and perhaps state incorrectly,

12    as to whether or not when he testified, he believed he was

13    making a representation to the Court that the transaction was

14    in balance.  That does not mean that he said in so many words,

15    Judge Peck, the transaction is in balance.  That rather means

16    that his state of mind at the time he said what he said on

17    September 19, was that this was a transaction he believed to be

18    in balance, and as a result, he viewed his own testimony as

19    being a representation to that effect.

20         Objection overruled.

21    Q.   Can you answer --

22    A.   Yes.

23    Q.   -- the question, sir?

24    A.   Yes.

25    Q.   Now, you also answered some question from Mr. Boies, sir,

81

1    about the GFS system --

2    A.    Um-hum.

3    Q.    -- the global -- could you tell me what GFS stands for?

4    A.    It was global finance system.

5    Q.    And the global finance system is not something you

6    personally checked in connection with your work around this

7    transaction, correct?

8    A.    No.  That's correct.

9    Q.    And you don't know whether those who were doing the work

10   around the valuation in connection with the transaction,

11   checked the global financial system.  Is that correct?

12   A.    Just to be clear, the risk operators working from Lehman?

13   Q.    Yes.

14   A.    Yes, I have no knowledge that they would have checked GFS.

15   Q.    And you don't know if the Barclays traders involved in

16   this dynamic process that you described to come up with a

17   value, you don't know if they had access to GFS, do you?

18   A.    I don't believe they would have had access to GFS.

19   Q.    Well, and in -- well, you don't believe they would have

20   had access to GFS in the course of this collaborative dynamic

21   process in coming up with a book value for Lehman for the 15th

22   and 16th?

23   A.    They would have had access to data from GFS, but specific

24   access to a Lehman system at that point in time, with no

25   consummation, no.

82

1   Q.   But you don't know if GFS data was supplied to the

2   Barclays side of the table?

3   A.   I don't know.

4   Q.   And in your work as president or head of equities, did you

5   have much day-to-day contact with the GFS system?

6   A.   I had no interaction with GFS on a day-to-day basis.

7   Q.   Okay.  An on a day-to-day basis, if you wanted to know

8   anything about the information produced by the GFS system, one

9   of the people you would ask would be the chief financial

10  officer, correct?

11  A.   In my role as head of equities, or --

12  Q.   In any role you had?  If you wanted the best information

13  about GFS, you'd ask the CFO, correct?

14  A.   No, you would ask the line operators, depending on the

15  asset class that you were asking the questions about.

16  Q.   And --

17  A.   You would be at a lower level than the CFO.

18  Q.   Okay.  And when you wanted to get to the upper level, the

19  final result of whatever purpose GFS had, whether the books and

20  records of the corporation were accurate, you'd look to the CFO

21  for that information, correct?

22  A.   Yes, you would.

23  Q.   Or you might look to Mr. Kelly for that information,

24  correct?

25  A.   Yes.

83

1   Q.   Now, with regard to the daily marking of assets, generally

2   or as reflected in GFS, it is a fact, sir, that not all assets

3   are marked every day.  Is that right?

4   A.   All assets are -- yes, that's a fact.

5   Q.   Some of the more illiquid categories of assets are marked

6   on a more periodic basis, say once a week or once a month even,

7   correct?

8   A.   That's correct.

9   Q.   And the more liquid assets, say governments or freely-

10  tradable equities, can be marked every day, because there's a

11  market available, correct?

12  A.   They are marked every day.

13  Q.   Because the books are marked by reference to that type of

14  extraneous data, what's out in the markets, yes?

15  A.   That's correct.

16  Q.   And with regard to the most common form of equities, just

17  by way of example, that marking does not require, in every

18  case, human intervention, does it?

19  A.   All marking -- it doesn't require it in that there are

20  market inputs from trading systems and news services, etcetera.

21  So yes, it's possible that it doesn't require it.

22  Q.   And the way GFS worked is, to the extent there were inputs

23  from these market systems, they were automated inputs into the

24  system?

25  A.   I don't have the specific knowledge of that.

84

1    Q.    Do you know one way or the other?

2    A.    I don't know one way or the other.  No specific knowledge.

3          THE COURT:  We had almost an objection.  But it never

4    made it to the record.

5          MR. BOIES:  As to foundation.

6    Q.    Now, sir, Mr. Boies asked you if you would describe the

7    five billion dollar element that we were talking about as a

8    discount, and you said no.  Do you recall that?

9    A.    Yes.

10   Q.    Let's move away from that particular now.  Would you agree

11   with me that the five billion dollar element we talked about

12   constituted a five billion dollar all-in loss versus Lehman's

13   marks as they stood at the time?

14   A.    Yes.

15   Q.    And Mr. Boies asked you about --

16         MR. GAFFEY:  Can we have Exhibit 2, again, please,

17   Steve?

18   Q.    -- Exhibit 2.  And I believe in one of your answers you

19   said you had seen different versions of that document?

20   A.    Correct.

21   Q.    And when you saw the different versions of the document,

22   were they in this format?

23   A.    Yes.  That became roughly the format of the document.

24   Q.    And in the course of your work in connection with the

25   negotiations, you saw these different iterations of this

85

1   schedule?

2   A.   I saw some of the iterations.  I'm not sure I saw all of

3   them.

4       (Pause)

5           MR. GAFFEY:  Your Honor, may I approach?

6           THE COURT:  Yes.  Thank you.

7   Q.   Mr. McDade, I put before you what is marked as Movants'

8   Exhibit 254, and I'd ask you to take a look through that

9   document, please, all of its pages.

10      (Pause)

11  Q.   Let me know when you've had a chance to look through the

12  document sufficient to say you're familiar with its contents,

13  sir?

14  A.   Okay.

15  Q.   Now, do you know who John Grenier is?

16  A.   No, I do not.

17  Q.   Do you know Tim Sullivan?

18  A.   Yes, I do.

19  Q.   Okay.  Tim Sullivan is the addressee on this particular

20  e-mail?

21  A.   Yes.

22  Q.   You see that?  And next to the e-mail are what appear to

23  be a series of spreadsheets similar to Movants' Exhibit 2.  Do

24  you see that?

25  A.   Yes, that's correct.

86

1    Q.   Do these include or are they the iterations of Exhibit 2

2    that you saw during your work around these negotiations?

3    A.   I don't have a specific rec -- many of these, I have no

4    recollection of seeing different formats where estimate versus

5    different dates, so no, those aren't familiar to me at all.   I

6    don't have a specific recollection to any one in particular.

7    But there would be an example or two, for example, page 7 might

8    have been something that I might have seen, where there were

9    different numbers on the actual document that I would receive.

10   Q.   I think what you're saying, sir, is that interleafed

11   between here are some formats that just come to zero or show

12   the adjustment that goes to the next one.   Is that right?

13   A.   Right.

14   Q.   And you didn't see those interim ones?

15   A.   No, I did not.

16   Q.   But you did see the schedules themselves as they came to a

17   bottom line, yes?

18   A.   Yes.

19        MR. GAFFEY:   Your Honor, on that basis, I would

20   move -- ask that Exhibit 254 be admitted in evidence?

21        THE COURT:   Any objection?

22        MR. BOIES:   Yes, Your Honor.   It's hearsay.   And it

23   can't be being admitted for his state of mind, because he

24   didn't see the whole document.   Now, if we limit the pages to

25   the pages that he says he saw, I don't have an objection to

87

1   admitting it for his state of mind, but not for the truth of

2   the matter asserted.

3           MR. GAFFEY:  I'll take it on that basis for now, Your

4   Honor, and see where I can go with it after that.

5           THE COURT:  You might as well get what you can get.

6           MR. GAFFEY:  Okay.

7           THE COURT:  It's admitted on that basis.

8   (Movants' Exhibit 254, e-mail to Tim Sullivan with spreadsheets

9   attached, was hereby received into evidence as of this date.)

10  **Q.   Now, let's take a look through some of the pages of the**

11  **document, Mr. McDade.  And I'll direct your attention first to**

12  **page 4 of the document.**

13          MR. GAFFEY:  And I'll ask that we put on the screen

14  page 4 of the document, and Movants' Exhibit 2.  I beg your

15  pardon.  I have the wrong page.  One second.  Page 3.  And can

16  you move that over and also put up Exhibit 2?

17      (Pause)

18  **Q.   While we get the screen right here, sir, if you would**

19  **compare page 3 of Exhibit 254 with Exhibit 2.  What I want to**

20  **ask you to do, sir, is agree with me that this page constitutes**

21  **the final that is ultimately signed by Mr. Berkenfeld.  If you**

22  **compare the numbers and take a look at the annotation in the**

23  **lower right-hand corner of that page?**

24          MR. BOIES:  Objection, Your Honor.  Again --

25          THE COURT:  What's the objection?

88

1          MR. BOIES:  -- again, there's a predicate in here,

2    "that was signed by Mr. Berkenfeld."

3          THE COURT:  Well, I'm actually confused by the

4    question, because I can't tell which document we're talking

5    about.

6          MR. GAFFEY:  I'm not too fond of it at the moment,

7    either, Your Honor.  Let me back up -- let me withdraw the

8    question and try this another way, if that's okay?

9          THE COURT:  I'm happy to have you start over.

10         MR. GAFFEY:  Okay.

11   Q.   Sir, all I'm asking you to do at this stage is agree with

12   me that page 3 of the multiple drafts that are within Exhibit

13   254, bears the same numbers as wound up on Movants' Exhibit 2,

14   the final schedule?

15   A.   Yes, it does.

16   Q.   And you see the annotation in the lower right-hand corner

17   of page 3 that says "9/18/2008 4:33 p.m. BS5 final Tuesday

18   morning."  Do you see that?

19   A.   Yes, I do.

20   Q.   Okay.  Now, if you would turn to the last page of Exhibit

21   254, sir, that is the multiple versions of the schedule.  And

22   we don't need Exhibit 2 anymore.  Take a look at the asset

23   description there, sir.  And take note that down the asset

24   side, it adds up to a total of 77.4.  Do you see that?

25   A.   Yes, I do.

89

1   Q.   All right.  And this is identified in its lower right-hand

2   corner as BS1, balance sheet 1.  Do you see that?

3   A.   Yes, I do.

4   Q.   Okay.  Now, to your recollection, sir, was there a point

5   where, in the negotiations, the value put on the assets under

6   discussion was in the range of 77.4 billion?

7   A.   I've not -- I don't have a recollection of seeing this

8   document, so I have no recollection of that, no.

9   Q.   Why don't you go through the whole document and tell me if

10   you have a recollection of seeing any of the pages that are in

11   it?

12   (Pause)

13   A.   I can't -- I can't ratify that I have an exact

14   recollection of seeing any of these specific individual

15   documents.

16   Q.   Do you have any general recollection of seeing any of

17   them?

18   A.   Well, I used an example of page 7 as a general

19   recollection of seeing the iteration of the -- of the form of

20   these.

21   Q.   Do you know who prepared -- without regard to this

22   particular document, Mr. McDade.  When you testified before

23   about there being various versions of this, do you know who

24   prepared those versions?

25   A.   Specifically?  No.

90

1    Q.   Generally?

2    A.   Generally, it would have been a combination of the

3    advisors and the operatives in the finance department with the

4    advisors, the lawyers and the participants in the -- what we

5    described as the -- you know, the congregating room of all the

6    parties at Barclays and Lehman together.

7    Q.   And the finance department you referred to, would that be

8    Mr. Kelly and Mr. Tonucci?

9    A.   Correct.

10   Q.   And Mr. Kelly and Mr. Tonucci were the people responsible

11   for actually generating the schedule itself, as opposed to the

12   process that led to it.  Is that right?

13   A.   Generating the data that went into the schedule.

14   Q.   Now, with regard, sir, to -- you can put that exhibit

15   aside, Mr. McDade.  I want to go back to this topic of whether

16   the books and records were marked after the 12th of September.

17   I think, if I understood your testimony yesterday correctly,

18   you don't have direct personal knowledge of whether that is, in

19   fact, so, correct?

20   A.   That's correct.

21   Q.   And that the person you would ask to know whether that was

22   in fact so would be Mr. Lowitt, correct?

23   A.   Correct.

24   Q.   And you would agree that Mr. Lowitt's knowledge of whether

25   or not the books and records were accurate as to mark values on

91

1    the 15th and the 16th would be greater than yours, correct?

2    A.    Yes.

3    Q.    And you said that you came to your view that the books had

4    not been marked since the 12th of September, because of

5    personnel problems.  Is that right?

6    A.    Correct.

7    Q.    And by that you meant that on those -- in those particular

8    tough days, there were people leaving.  Some weren't showing up

9    at work, some were leaving in the middle of the day.  You had a

10    bit of mayhem on the personnel side, yes?

11    A.    The majority of the employees left on Sunday evening.

12    Q.    And you did not take an effort on Monday or Tuesday --

13    that is the 15th or the 16th of September -- to determine one

14    way or the other, whether sufficient personnel were on the

15    premises to mark the books on the 15th and the 16th?

16    A.    I did not, personally.

17    Q.    You didn't have a conversation with anybody about that?

18    A.    I did not.

19    Q.    You inferred -- you put two and two together to determine

20    that because a lot of people were out, it was possible the

21    books hadn't been marked, correct?

22    A.    Correct.

23    Q.    You had no knowledge as to whether the books hadn't been

24    marked?

25    A.    I had no specific knowledge.

92

1    Q.    I believe you said, sir, that your understanding of the

2    asset purchase agreement -- when you were talking to Mr. Boies

3    about compensation exposure, I think I heard you say that it

4    was your understanding that Barclays was required to take all

5    of the Lehman employees?

6    A.    All of the Lehman employees in this transaction, yes.  Not

7    all of Lehman globally.

8    Q.    Okay.  So anyone -- it was your understanding of the

9    agreement that Barclays had an obligation to hire anyone on the

10   Lehman -- on the LBI payroll, on the North American broker-

11   dealer payroll?

12   A.    North American.  For a period of ninety days.

13   Q.    Isn't it a fact, sir, that the deal was actually

14   structured so that certain people were deemed to be critical --

15   that was the so-called elite eight, yes?

16   A.    Yes.

17   Q.    And below that level, the contract required approximately

18   200 more relatively senior executives, correct?

19   A.    A percentage of the 200.

20   Q.    A percentage of the 200.  And below that, a percentage of

21   the total workforce, correct?

22   A.    I don't have a specific recollection of that piece.

23          MR. GAFFEY:  May I consult for one moment, Your Honor?

24   I may be able to shorten this some.

25          THE COURT:  Okay.  That's fine.

93

1    Q.   Mr. McDade, I want to go back sort of to where I started

2    in this phase, and remind you of the question and answer in Mr.

3    Boies' cross of you last evening:  "At the time the transaction

4    was presented to the Court, based on everything you know now,

5    do you believe that the transaction was presented to the Court

6    in a fair and balanced way?"  And your answer was:  "Yes, I

7    do."

8        I want to explore a little bit the idea of what you know

9    now.  You didn't mean to suggest with that answer, sir, that

10   had there been an embedded first-day gain in the transaction

11   for Barclays, which was not disclosed to the Court, that it

12   would have been accurately disclosed -- disclosed in a fair and

13   accurate way.  Is that right?

14   A.   The total value of the transaction, an accounting

15   interpretation of which I have no specific knowledge of how it

16   was determined, specific to asset balance sheet items, as

17   opposed to the total value that we -- that we described in the

18   courtroom, I have no knowledge of how that would have occurred,

19   and I don't have an issue with how it was described, given the

20   total value that was described.

21   Q.   What I'm addressing, I think, is something slightly

22   different.  Yesterday you told us that you had no knowledge of

23   a first-day gain for Barclays embedded in the structure of the

24   transaction, correct?

25   A.   That's correct.

94

**Q.   And yesterday you told us that if there had been an**
**embedded first-day gain for Barclays in the structure of the**
**transaction, that would be inconsistent with the deal that you**
**made, correct?**

**A.   I'm --**

     MR. BOIES:  Objection, Your Honor.

     THE COURT:  What's the objection?

     MR. BOIES:  I would ask that the witness be shown his
testimony, because I don't think that accurately describes it.
He's now purporting to summarize the witness' testimony --

     THE COURT:  Well --

     MR. BOIES:  -- as opposed to asking --

     THE COURT:  -- I concur that there may be a
questioner's bias in the way the question has been phrased, but
it is cross-examination, and we have a sophisticated witness,
and the record speaks for itself.  And he can -- we're not
going to have him mislead, but he's certainly in a position to
answer the question.

     MR. BOIES:  Your Honor, I won't argue, but it's not
cross-examination.  This is their witness.

     THE COURT:  I understand.  It's redirect.

     THE WITNESS:  Could you repeat it?  I'm sorry.

     MR. GAFFEY:  Could we read the question back, Your
Honor?  Is that -- we can't.  It's the unofficial court --

     THE COURT:  We'll read the question back and we'll see

95

1    if maybe after it's reread we want to stay with it.

2         MR. GAFFEY:  Let me go straight to rephrasing it.

3    BY MR. GAFFEY:

4    Q.   You agreed in your testimony yesterday, sir, did you not,

5    that if there had been an embedded first-day gain for Barclays

6    on acquisition, in the structure of this transaction, that

7    would have been inconsistent with the deal that you made?

8    A.   Gain as described for total value.  That's correct.

9    Q.   And if there had been such an embedded first-day gain for

10   Barclays in the transaction, you would have wanted that

11   disclosed to the Court, correct?

12   A.   As described in the total valuation, yes.

13   Q.   And you sat through the hearings on the 17th of September

14   and the 19th of September in full, correct?

15   A.   Yes, I did.

16   Q.   And you did not hear a word said about an embedded first-

17   day gain in the structure of the transaction for Barclays, did

18   you?

19   A.   There was none.

20   Q.   Given that, sir, is it your testimony, you think if there

21   were such an embedded first-day gain for Barclays, you would

22   think the deal was presented to the Court in a fair and

23   balanced way?

24   A.   If there were a first-day gain to Barclays embedded in the

25   deal, in total value?

96

1    Q.    Yes.

2    A.    Embedded in the deal?  That would not have been a fair

3    representation.

4          MR. GAFFEY:  I have nothing further, Your Honor.

5          THE COURT:  Okay, the other movants are not

6    choosing --

7          MR. MAGUIRE:  Nothing further, Your Honor.

8          THE COURT:  -- to redirect.  Mr. Boies are you

9    choosing to recross?

10          MR. BOIES:  I am, Your Honor.

11   RECROSS-EXAMINATION

12   BY MR. BOIES:

13   Q.    Mr. McDade, you were asked a number of questions about

14   something called an embedded first-day gain.  Do you recall

15   that?

16   A.    Yes.

17   Q.    What is an embedded first-day gain, as you understand that

18   term?

19   A.    My understanding, it's an accounting gain for assets minus

20   liabilities -- balance sheet assets and liabilities.

21   Q.    And was there anything inconsistent with your

22   understanding of the transaction or the description of the

23   transaction to the Court, with there being an accounting gain

24   for Barclays on the first day?

25   A.    No.

97

1    Q.    You said no?

2    A.    No.

3    Q.    And when you answered counsel's question about a gain, and

4    you said "as described in the total valuation," I want to

5    follow up on that.  Am I correct that what you were referring

6    to is that to the extent the deal ended up being in rough

7    balance, it was rough balance with respect to the assets and

8    liabilities that had actually been valued in the process?

9    A.    Assets and liabilities valued and assumed payments for

10   cure and comp.

11   Q.    Yes.  And it did not include assets that were not valued,

12   like intangibles, perhaps furniture and furnishings.  Whatever

13   the assets were that were not valued, that was not included in

14   what you called the rough balance, correct?

15   A.    That was not included, with the view that those assets, to

16   a nonoperating, ongoing concern Lehman, would have been of

17   little value.

18   Q.    All right.  And I just want to emphasize that.  When you

19   talked about assets and liabilities being -- or ending up being

20   in rough balance, you were talking about the assets and

21   liabilities valued from Lehman's perspective, not from

22   Barclay's perspective, correct?

23   A.    That's correct.  I'd have no ability to understand how

24   Barclays would value that.

25   Q.    And there were a number of assets that might have little

1    or no value to Lehman as a nonoperating company, that might

2    have substantial value to Barclays as an operating company,

3    correct?

4    A.   Yes, I would agree.

5    Q.   And if that difference resulted in a first-day gain for

6    Barclays, that was in no way inconsistent with your

7    understanding of the deal, correct?

8    A.   Yes.

9    Q.   Let me ask you to go to Movants' Exhibit 254 which counsel

10   showed you.  Did Barclays have any role in preparing any of

11   these pieces of paper, as you understand it?

12   A.   As I understand it, preparation of the document -- if

13   you're talking about the data acquired for the document itself,

14   no.  If you're talking about the document itself, it was a

15   collaborative effort with Michael Klein, Mark Schaffer and the

16   deal operatives and the lawyers, etcetera.

17   Q.   Now, counsel asked you whether the approximately five

18   billion dollar number that you had heard somebody talk about

19   represented a loss as it stood at the time, from Lehman's

20   books.  Do you recall that?

21   A.   Yes, I do.

22   Q.   Was that because, as you understood it, Lehman's books

23   were stale and outdated?

24   A.   It's because the markets had changed dramatically, and

25   they hadn't been marked since Friday night.

99

1    Q.    Counsel also asked you whether it was unusual to have the

2    value on a company's books be determined by negotiations with a

3    single buyer.  Do you recall that?

4    A.    Yes, I do.

5    Q.    And you said it was unusual, correct?

6    A.    Yes.

7    Q.    Was this an unusual situation?

8    A.    Extraordinary.

9    Q.    Was it usual to have a situation in which the only

10   alternative to selling these assets was liquidation and

11   bankruptcy?

12   A.    Very unusual.

13   Q.    And was it unusual to have only one buyer or potential

14   buyer for these assets, at that time?

15   A.    Yes.

16   Q.    Counsel also asked you a number of questions about what

17   was described to the Court.  Do you recall that?

18   A.    Yes, I do.

19   Q.    Do you recall the Court being told -- and this is for

20   counsel's benefit, at page 47 of Movants' Exhibit 261 -- that

21   as of that day, Lehman was only selling assets that have a

22   value of 47.4 billion dollars, and Barclays is assuming

23   liabilities, however, of 45.5 billion dollars in connection

24   with those assets?

25   A.    Yes, I do.

100

1   Q.   Do you recall anybody saying that this deal was a wash, to

2   the Court?

3   A.   No, I don't recall that.

4   Q.   Do you recall anybody saying that the deal was in balance,

5   to the Court?

6   A.   The exact words "in balance", I don't have a specific

7   recollection of that.

8   Q.   You told counsel that Mr. Lowitt would be better than you

9   at determining the accuracy of Lehman's marks.  Do you recall

10  that?

11  A.   Yes.

12  Q.   Who would be better, if anyone, than Mr. Lowitt?

13  A.   Mr. Kelly.

14       MR. BOIES:  Thank you.  I have no more questions.

15       MR. GAFFEY:  Just one or two more, Your Honor, if I

16  may?  It was a new issue that was raised by Mr. Boies' --

17       THE COURT:  All right.

18       MR. GAFFEY:  -- questioning.

19  FURTHER REDIRECT EXAMINATION

20  BY MR. GAFFEY:

21  Q.   With regard to intangibles, sir, the value of intangibles,

22  do you have any knowledge of any discussions with anyone at

23  Barclays about the value of intangibles during these

24  negotiations?

25  A.   Specific knowledge -- my specific knowledge?  No.

101

1          MR. GAFFEY:  Nothing further, Your Honor.

2          THE COURT:  We've come to the end.  You're excused.

3     Thank you.

4          THE WITNESS:  Thank you, Your Honor.

5          THE COURT:  It's 12:15, and it occurs to me this might

6     be a good time to break, rather than start with a new witness.

7          MR. GAFFEY:  It's fine with me, Your Honor.

8          THE COURT:  I assume it's fine with everybody.  We'll

9     take a break till -- let's call it just before 2:00, so we can

10    maybe jump the gun on the afternoon, since we're taking a

11    slightly early lunch.  How about we resume at 1:45?

12       (Recess from 12:13 p.m. to 1:50 p.m.)

13         THE COURT:  Be seated, please.

14         MR. GAFFEY:  May I proceed, Your Honor?

15         THE COURT:  Let's proceed.

16         MR. GAFFEY:  Movants call Steven Berkenfeld.

17       (Witness duly sworn)

18         THE COURT:  Be seated, please.

19         MR. GAFFEY:  Thank you, Your Honor.  May I approach

20    with a witness book for the witness and the Court?

21         THE COURT:  Yes.

22    DIRECT EXAMINATION

23    BY MR. GAFFEY:

24    Q.   Good afternoon, Mr. Berkenfeld.

25    A.   Good afternoon.

102

1    UNIDENTIFIED ATTORNEY:  You haven't given --

2    MR. GAFFEY:  Oh, I beg your pardon.  I've made the

3    same mistake.

4    THE COURT:  It's payback.  Please proceed.

5    MR. GAFFEY:  Just trying to keep it even.

6    Q.   Good afternoon, Mr. Berkenfeld.

7    A.   Good afternoon.

8    Q.   Mr. Berkenfeld, have we met before?

9    A.   We have.

10   Q.   When did we meet, sir?

11   A.   During my deposition.

12   Q.   And have we spoken at any time since then, other than --

13   A.   Just greetings today.

14   Q.   And you are currently employed by Barclays Capital.  Is

15   that correct?

16   A.   That's correct.

17   Q.   And you are a managing director in the investment banking

18   division there?

19   A.   That's correct.

20   Q.   And you report to Skip McGee.  Is that correct?

21   A.   Yes, that's correct.

22   Q.   Who was also formerly employed by Lehman?

23   A.   Yes.

24   Q.   Now, for context, sir, you recall, do you not, that the

25   sale transaction that's brought us here today, closed on

103

1    September 22, 2008.  Is that correct?

2    A.   Yes, that is.

3    Q.   And prior to December (sic) 22, 2008, had you had

4    discussions with anyone concerning the prospect of future

5    employment at Barclays?

6    A.   Before the closing on September 22nd?

7    Q.   That's right, sir.

8    A.   No, I did not have discussions with anyone about future

9    employment at Barclays.

10   Q.   And to be clear, sir, my question would encompass

11   discussions amongst your then-coworkers at Lehman about the

12   prospect of going over to Barclays.  Did you have any such

13   discussions with them?

14   A.   I did not have any of those discussions.

15   Q.   And when you did first have discussions about joining

16   Barclays, the issue was raised with you by Mr. Ian Lowitt.  Is

17   that correct?

18   A.   That is correct.

19   Q.   Mr. Lowitt came to see you about being offered employment

20   at Barclays after the closing.  Is that right?

21   A.   The first discussion I had about employment at Barclays

22   was with Ian Lowitt after the closing.

23   Q.   And to your knowledge, other senior officers at Lehman had

24   discussions prior to the closing on September 22nd, with

25   Barclays, about being employed by Barclays after the closing,

104

1   correct?

2   A.   To my knowledge there was a group of employees who had

3   discussions prior to the closing, in the context of negotiating

4   the asset purchase agreement.  During that time frame, that

5   week, there were some discussions with employees about

6   employment at Barclays.

7   Q.   And to your knowledge, was one Mr. Lowitt one of those

8   people?

9   A.   I don't know what discussions Ian had directly.

10  Q.   Do you know if he had any?

11  A.   I don't know if he had any.

12  Q.   Now, sir, I'd like to turn to what role, if any, you had

13  with respect to the sale transaction, as well as your

14  recollections concerning the role of others.  You were not

15  involved in the negotiation of the business terms.  Is that

16  correct?

17  A.   That's correct.  I was not involved in negotiating the

18  principal terms dealing with business terms of the purchase

19  agreement.  That's correct.

20  Q.   You were not involved?

21  A.   I was not.

22  Q.   And you were involved in what you have referred to as the

23  lawyering of the asset purchase agreement.  Is that right?

24  A.   I think that describing it as involved in the lawyering of

25  the purchase agreement is a fair description.  To be clear, to

105

1    me what that means is not being involved with negotiation of

2    the business terms --

3    Q.    Of the economic terms?

4    A.    -- of the economic terms.  Not drafting the purchase

5    agreement, which was being done by outside counsel.

6    Q.    Well, the primary drafters were the lawyers at Weil

7    Gotshal, correct?

8    A.    That's my understanding, yes.

9    Q.    And you sat with the lawyers from Weil Gotshal and

10    participated, if not with pen in hand, in the drafting process.

11    Is that about right?

12    A.    To describe my role as being involved in the lawyering of

13    the transaction, at some point in the process, I joined the

14    table, the group of lawyers who were sitting around going

15    through the purchase agreement, and reviewing it to make sure

16    that it reflected the terms of the transaction as it was being

17    described to us.

18    Q.    And fairly described, sir, that would constitute being

19    involved in the preparation and drafting of the asset purchase

20    agreement.  Is that correct?

21    A.    Not on my part.  I joined those discussions, I would say

22    pretty late in the process.  My role was much more around how

23    was Lehman Brothers going to operate now that we were in

24    bankruptcy.  So the bankruptcy filing happened in the middle of

25    the night Sunday into Monday, hitting Monday, it was chaotic

106

1    from my standpoint.  And there were hundreds of questions that

2    were coming in, unprecedented first impression, things that we

3    had no time to prepare for, things that we hadn't thought

4    through.

5         And so my role, really, for Monday and most of Tuesday,

6    and actually continuing on through closing, was -- maybe the

7    best way to describe is somewhat of an air traffic controller,

8    as these issues were coming in; resolving the ones I could and

9    then shipping out the ones that were in better hands, whether

10   with the other lawyers -- internal lawyers involved, Weil

11   Gotshal, Simpson Thacher, integrating Alvarez & Marsal, getting

12   them involved.

13        So I was not involved -- I wouldn't describe it as sitting

14   around drafting provisions.  I did come into those discussions

15   at some point, probably on Tuesday, and get an understanding of

16   the agreement, and reviewed it, and evaluated whether I thought

17   it represented the transaction as it was being described to me,

18   mostly by Weil Gotshal.  But I wouldn't characterize it as

19   being involved at an early stage.

20   Q.   You would not characterize it as being involved in the

21   drafting and preparation of the asset purchase agreement?

22   A.   I don't -- I think that overstates it.

23   Q.   Okay.  In the book we've put before you, sir, is your

24   deposition transcript.  Could you turn to that?  Let me know

25   when you've gotten to it in the binder, sir.

107

1    A.    Which section is it?

2    Q.    It ought to have a tab on it that says --

3    A.    Oh, transcript.

4    Q.    -- yes.  You got there?  And if you would, sir, turn to

5    page 28 of your deposition transcript?  It's page 28 starting

6    at line 23.  Do you have it there, sir?

7    A.    Page 28?

8    Q.    Correct?

9    A.    Yep.

10   Q.    And at page 28, starting at line 23, I put you the

11   following -- I made the following statement and then asked the

12   following question:

13   "Q.  Yeah, that's what I said.  There may have been more.  Just

14   so our record is clear, there may not be a complete list."

15        I beg your pardon.  I'm on the wrong page.  At 26 at line

16   24, I asked you the following question:

17   "Q.  We'll come to that agreement.  Obviously, I'm going to

18   spend some time with it today, but do you have a general

19   recollection -- let me ask you, were you involved in the

20   negotiations of the asset purchase agreement?

21   "A.  I was involved in the preparation and drafting of the

22   asset purchase agreement."

23        Was that a true statement when you made it, sir?

24        MR. SCHILLER:  For completeness, Judge, I'd ask my

25   friend to turn to page 29 where he repeats the question at line

1   8, and he gets an answer consistent to what you just heard.

2   Lines 8 through line 5 of the next page, I'd also like read,

3   Your Honor.

4           MR. GAFFEY:  Your Honor, could I have an answer to the

5   question I asked, and then I'll move on to that?

6           THE COURT:  I think we can do that.  Also, I think,

7   just for the sake of good order, while I understand the desire

8   to include deposition references in context, thereby reading,

9   on occasion, material that goes beyond the quoted excerpt, I

10  think that there should be a formal objection, rather than a

11  calling out.  I think that at some level, this is a matter for

12  cross, rather than for interjection, and prefer not to have

13  anybody's examination interrupted needlessly.  I consider that

14  a needless interruption.

15          MR. SCHILLER:  Okay, Judge.   Thank you.

16  **Q.   So, Mr. Berkenfeld, the question is, when you answered, "I**

17  **was involved in the preparation and drafting of the asset**

18  **purchase agreement", was that true testimony at the time that**

19  **you gave it?**

20  **A.   It's true testimony.  I believe it's a shorthand answer to**

21  **the question.  A simplification.**

22  **Q.   You were involved in the preparation and drafting?**

23  **A.   I was involved, yes.**

24  **Q.   And others were involved as well, including lawyers at**

25  **Weil Gotshal?**

109

1    A.    That's correct.

2    Q.    And working on the preparation and drafting of the asset

3    purchase agreement was within the ambit of things that you were

4    doing that week?

5    A.    Within the ambit?  I would rather say --

6    Q.    You were doing other things?

7    A.    -- it was one of many --

8    Q.    Okay.

9    A.    -- things.  Hundreds of things that I was doing in the

10    course of that week.

11    Q.    Now, your recollection is that the economic terms were

12    dealt with by Bart McDade, Skip McGee, Mark Schaffer and

13    others.  Is that right?

14    A.    Yes, that's correct.  On behalf of Lehman.

15    Q.    On behalf of Lehman.  And from the Barclays side, your

16    recollection is, it was Mr. Ricci, Archie Cox and Michael

17    Klein, as Barclays' chief negotiators.  Is that correct?

18    A.    As chief negotiators, I think that's correct.  Yes.

19    Q.    And others at the executive level in Barclays were

20    involved on the Barclays side of the table in the negotiations.

21    Is that right?

22    A.    That's correct.

23    Q.    And one of those people was Bob Diamond?

24    A.    I didn't see Bob Diamond at all at the negotiations,

25    although I didn't know who Bob Diamond was at the time.  But I

110

1     don't have a recollection of interacting with Bob Diamond at

2     all.

3     Q.    You had no discussions with him?

4     A.    I had no discussions with Bob Diamond.

5     Q.    And the business deal that we're discussing was negotiated

6     over the course of Monday, September 15th into the morning

7     hours of Tuesday, September 16th.  Is that correct?

8     A.    The business deal --

9     Q.    Yes.

10    A.    -- did you ask?  Yes, that would -- I think that's the

11    correct timeframe, from early on Monday into Tuesday morning.

12    Q.    And after the business deal was reached, the economic

13    terms, that's when the process of drafting it into an asset

14    purchase agreement began.  Is that right?

15    A.    That's not how I recall it.

16    Q.    How do you recall it?

17    A.    I think there was some work that was already being done on

18    the asset purchase agreement.  We wouldn't have had enough time

19    to put together an agreement in those couple of hours on

20    Tuesday.  So my recollection is that Weil Gotshal was already

21    working on a form of asset purchase agreement, that of course

22    went through many modifications.  But I think that the work on

23    the agreement itself, the shell, probably also got started at

24    some point on Monday.  I wouldn't know exactly when.

25    Q.    And the process of drafting and finalizing an asset

111

1   purchase agreement ended either very late the night of the 16th

2   or extremely early the morning of the 17th.  Is that right?

3   A.   Finalizing the agreement?  I believe that it was finalized

4   the afternoon -- Tuesday afternoon, the 16th.

5   Q.   Now when you first -- you mentioned before that you had a

6   lot to do.  You were air traffic controller.  And you only got

7   next to the Weil Gotshal lawyers a little later in the process.

8   When you joined the drafting folks, did you have an

9   understanding of the business terms?

10  A.   When I joined the drafting folks?

11  Q.   Yes.

12  A.   No, I think as I joined the drafting folks, that's how I

13  got the understanding of the business terms.

14  Q.   You were playing some degree of catch-up on the business

15  terms when that started.  Is that right?

16  A.   I think that's a fair characterization, yes.

17  Q.   And that would be on the Tuesday after the economic terms,

18  to your understanding, had been agreed?

19  A.   I don't know exactly when the economic terms were agreed

20  to, but it happened sometime before I got involved in the

21  process.

22  Q.   And to your knowledge, sir -- to your knowledge, the Weil

23  Gotshal lawyers involved in the drafting process were

24  documenting what was being told to them by the business people.

25  Is that correct?

112

1   A.   To my knowledge they were documenting what was being told

2   by the business people.  And some of the Weil attorneys were

3   very much in the middle of the discussions.

4   Q.   On the asset purchase agreement side?

5   A.   On the asset purchase agreement side.  That's correct.

6   Q.   Let me show you, sir -- actually, if you'd just turn to

7   tab -- well, let me ask you this first.  In the course of the

8   negotiations, who was involved in valuing the assets to be

9   transferred?

10  A.   We had our marks as of Friday.  There was a process

11  starting Monday to review those marks and come up with an

12  agreed, then-current market valuation, with everything that had

13  happened in the intervening time.  So at close of business

14  Friday, we weren't expecting to file for bankruptcy over the

15  weekend.  Markets were very volatile.  That's an

16  understatement.  They were chaotic.  Going into Monday and

17  Tuesday, there was an effort on the way to look at the current

18  market positions and for the sides to figure out what was an

19  appropriate then-current market valuation.  I didn't observe

20  any of those, but everyone was very aware that that was going

21  on.

22  Q.   You didn't observe it, and you weren't personally involved

23  in that process.  Is that right?

24  A.   I was not personally involved and I was not in the room as

25  it was going on.  But I knew that it was going on, that Lehman

113

1    personnel and some of the Lehman executives that -- guys like

2    Eric Felder and Jim Seery and Alex Kirk were involved in this

3    process of coming up with then appropriate marks, given what

4    was going in on the markets at the time.

5    Q.   And two of the senior executives that the lawyers were

6    relying on were Paolo Tonucci and Martin Kelly.  Is that right?

7    A.   I wouldn't say they were relying on them for the marks.

8    The marks come from the businesses, the people who are closer

9    to what's going on in the markets.  Paolo and Martin were in

10   the finance staff.  They wouldn't have known what was happening

11   to government securities.  They wouldn't have known what was

12   happening to Omega Corporate equities, because they could see

13   what's coming across the tape.

14        But there would have known commercial papers, some of the

15   other securities positions that were being transferred over.

16   So they might have been a position of aggregating that.  I

17   don't know.  But they were not the ones that, at that point in

18   time, were actually marking the positions.

19   Q.   They were the people who -- the lawyers in the room,

20   outside counsel, Weil Gotshal, Simpson Thacher and you, were

21   relying on them to put together the list of assets that were

22   the assets that were estimated at the time to be transferred

23   over to Barclays, though.  Isn't that right?

24   A.   Relying on who?

25   Q.   Tonucci and Kelly?

114

1    A.   We were getting information from them about the security

2    positions that were being transferred over.  There's a

3    reference in the purchase agreement to securities positions

4    that are being transferred.  They were a conduit for that.

5    They were, perhaps, aggregating that information.  I don't

6    think we were relying on them for that.  I don't know if that's

7    the way I would characterize it.

8    Q.   To your knowledge, sir, you were relying on them to put

9    together a schedule of the assets to be transferred.  Is that

10   correct?

11   A.   I know we'll get more into the schedule, but I don't think

12   we were looking to them for a schedule.  The asset purchase

13   agreement, on its face, was pretty clear that there would be

14   securities positions transferred over that had a book value of

15   approximately seventy billion.  That's what the asset purchase

16   agreement said.  We weren't asking for a schedule of those

17   assets, much like there'd be schedules attached to most asset

18   purchase agreements.  Most transactions of an asset purchase

19   there are hundreds of pages of schedules attached that go

20   through everything from every piece of furniture, in this case,

21   every particular security.  We weren't looking for them to put

22   together a schedule that defined the agreement, if that's what

23   you're asking.

24   Q.   Was there a schedule prepared in connection with the

25   transaction?

115

1    A.    There was a schedule prepared.

2    Q.    And who put that schedule together?

3    A.    My understanding was that it was put together by the

4    finance department.

5    Q.    And by finance department, you mean Mr. Lowitt and Mr.

6    Tonucci and Mr. Kelly.  Is that right?

7    A.    Or people that worked for them in the finance department.

8    Q.    Well, you and the other lawyers in the room were depending

9    on Mr. Tonucci and Mr. Kelly to put that schedule together,

10   were you not?

11   A.    No, I wouldn't say we were depending on it.  I think that

12   the schedule, which I initialed, is being somewhat overstated

13   in terms of what its role was in the transaction.  The

14   transaction was the asset purchase agreement.  We were not

15   depending on them.  The schedule had a very -- in my mind, as

16   the person who initialed it -- a very specific and limited

17   purpose.  And I don't -- I wouldn't say that we were depending

18   on them or the transaction was dependent on that schedule.  The

19   transaction, as negotiated by the principals, was reflected in

20   the asset purchase agreement.  The schedule was not part of the

21   asset purchase agreement.

22   Q.    We'll get to the part about what the role of the schedule

23   was, sir.  Right now, my question is for the purpose of

24   preparing that schedule, you and the other lawyers were relying

25   on Tonucci and Kelly to prepare it.  Is that correct?

116

1   A.   The schedule was being transmitted to us by Martin Kelly

2   and Paolo Tonucci.  I think primarily Martin.  That's where we

3   got it from.  That's the way I think I prefer to describe it.

4   I think that's more accurate.  I don't think we were sitting

5   around relying on them to deliver a schedule or waiting for

6   them to deliver a schedule.  That wasn't driving the

7   negotiation or the drafting.

8   Q.   Do you have your transcript handy?

9   A.   Um-hmm.

10   Q.   Could you turn to page 36?  I'm directing your attention

11   to the question that begins at line 15 and the answer that

12   continues through page 37, line 12.

13   A.   Page 36, line 15?

14   Q.   We're starting at page 36, line 15.

15   A.   Um-hum.

16   Q.   And I asked this question -- these questions, and you gave

17   these answers:

18   A.   Yes.  You never asked me which was worse.

19   Q.   Beg your pardon, sir?

20   A.   You never asked me which was worse.

21   Q.   "Q.  Tell me what you know about what they did to get that

22   schedule put together?

23   "A.  Tuesday was a very -- as was Monday -- crazy and hectic

24   day.

25   "Q.  I'll ask you later which was worse."

117

1        I'll try to ask you that today.

2    "A.   And people were involved in different tasks.

3    "Q.   Um-hum.

4    "A.   In somewhat of a vertical approach.  You might have been

5    involved in many different verticals but this was all hands on

6    deck.

7    "Q.   Right?

8    "A.   Paolo Tonucci, who was the treasurer of Lehman, and Martin

9    Kelly, who was the comptroller, were two of the most senior

10   people on the finance staff.  So the people in the room,

11   myself, outside counsel, Weil Gotshal, Simpson Thacher on

12   behalf of Lehman Brothers, were relying on them to put together

13   the list of assets that were the assets that were estimated

14   that at the time would be transferred over to Barclays."

15       Do you see those questions and those answers?

16   A.   Yes.

17   Q.   Did you give truthful answers to those questions when I

18   asked them to you?

19   A.   Yes.

20   Q.   So I'll ask you again.  Were you relying on Kelly and

21   Tonucci to deliver the schedule estimating the assets to be

22   transferred over to Barclays in the transaction?

23   A.   We were relying on them to put together the list of

24   assets.

25   Q.   And at the time Mr. Kelly was the treasurer of Lehman,

118

1    correct?

2    A.   No.  That's not correct.  Mr. Kelly was the comptroller,

3    and Paolo Tonucci was the treasurer.  Did I mishear your

4    question?  I'm sorry.

5    Q.   No, I misread it.  Mr. Tonucci was the treasurer and Mr.

6    Kelly was the comptroller, correct?

7    A.   Yes.

8    Q.   Okay.  Would you turn, sir, to tab M-2 in your book?  It's

9    Exhibit Movants' (sic) 2 in evidence, the schedule that we've

10    been talking about.  I suppose I should ask you, that's the

11    schedule we've been discussing, correct?

12    A.   Correct.

13    Q.   And in the upper right-hand corner of that schedule, there

14    are the initials, S.B.  Are those your initials, sir?

15    A.   Yes, they are.

16    Q.   And above that is the date, September 16th '08?

17    A.   That's correct.

18    Q.   And in your handwriting, sir, that's the word "final"?

19    A.   That's correct.

20    Q.   Before putting your initials on that piece of paper, sir,

21    had you seen prior versions of that schedule?

22    A.   Yes.

23    Q.   Had you seen prior iterations of it with different

24    calculations, other than the ones that are shown there?

25    A.   When you say iterations what do you --

119

1   Q.   Different versions.  You know, one that had a number

2   higher or lower, for example, than 72.65?

3   A.   If you're repeating the question.  I saw prior schedules

4   that had somewhat different numbers.  I don't recall what those

5   numbers were, though.

6   Q.   Now, why did you -- well, you put your initials and the

7   word "final" on the schedule that's marked as Movants' 2 to

8   acknowledge that this was the final schedule.  Is that correct?

9   A.   That's correct.

10  Q.   And to acknowledge that you had received final signoff on

11  that schedule from finance, as to the schedule of assets and

12  liabilities, correct?

13  A.   I think it was to mark the final schedule.  Because as you

14  had mentioned, there were previous drafts.  They were changing.

15  There had been one earlier than this, and people said it might

16  have been final.  And then another one came.  And I said, okay,

17  this one is the final.  I actually believe I might have

18  initialed an earlier one, and then we got another schedule and

19  I initialed this one with the word "final".

20  Q.   Let me see if I can remind you that.  You put your

21  initials on another draft that had a 500 million dollar error,

22  correct?

23  A.   I don't recall.

24  Q.   It had some kind of error on it?

25  A.   I don't recall.  I don't know if it was an error.  I don't

120

1    know.

2    Q.    Do you recall resigning a schedule and writing the word --

3    adding the word "final" to indicate that the one with the word

4    "final" on it was the final schedule?

5    A.    Yes.

6    Q.    Okay.    The other versions of the schedule prior to the one

7    that you signed, sir, that you said you saw, did they indicate

8    estimates of the assets that were made during the negotiation

9    process between Lehman and Barclays?

10   A.    I don't know.

11   Q.    Did you know at the time?

12   A.    I don't know that I did.

13   Q.    Did you have any knowledge at the time about anything

14   concerning the negotiation process between Lehman and Barclays

15   that led to the completion and your signing of that final

16   schedule?

17   A.    As I mentioned before, I knew that there was a process

18   that was ongoing between principals of Barclays and Lehman

19   representatives to come up with what were the appropriate marks

20   for these securities positions at that time, given what was

21   going on in the market and what had changed since the prior

22   marks on Friday.

23        MR. GAFFEY:  May I approach, Your Honor?

24        THE COURT:  Yes.

25        (Pause)

121

1          MR. SCHILLER:  Your Honor?

2          THE COURT:  Yes, sir.

3          MR. SCHILLER:  Before the examination begins, this was

4     an exhibit that was objected to with the last witness on

5     hearsay grounds.  I'm going to make the same objection here.

6          MR. GAFFEY:  Now?

7          THE COURT:  So far, the only thing that's happened is

8     that I've been handed a document.  The use of the document has

9     not yet occurred, but I understand that there is an objection

10    to any use of the document that would result in the

11    impermissible introduction of hearsay evidence, either through

12    the witness or through the document, so.

13         MR. GAFFEY:  My understanding, Your Honor, is it's in

14    for the limited purpose of the state of mind of the prior

15    witness.

16         THE COURT:  It was admitted for that purpose, and I

17    think I also said something to the effect that you should get

18    what you can get at the time that you get it.

19         MR. GAFFEY:  Yes, Your Honor.

20         THE COURT:  And it was put in at that time for the

21    limited purpose as stated at that time.  It, as a result, can

22    still be used in the same manner.

23         MR. GAFFEY:  Thank you, Your Honor.

24    BY MR. GAFFEY:

25    **Q.   Mr. Berkenfeld, would you take a look through Movants'**

122

1    Trial Exhibit 254, and tell me if the collection of schedules

2    annexed to that document are documents -- are documents of the

3    type that you saw before you signed Movants' Exhibit 2?

4    A.    I don't recall having seen any of these schedules.  I

5    certainly don't recall any schedule that had two columns in it,

6    like the one on page 1 and 2.  This -- I've never seen these

7    before.  I've never seen the cover note.  I have no knowledge

8    of this.

9    Q.    Now, do you recall, sir, that when the final schedule, the

10   one that you initialed, was put together, it was delivered into

11   the room of negotiators by Mr. Kelly and Mr. Tonucci?

12   A.    I recall that it was delivered into the room of lawyers,

13   not negotiators, in the corner conference room where everyone

14   was sitting around the table working through the agreement.

15   That's where I saw it.  I don't know what was delivered into

16   the negotiators.

17   Q.    So what you remember is Mr. Kelly and Mr. Tonucci bringing

18   that schedule into the room for lawyers working on the drafting

19   of the asset purchase agreement?

20   A.    My recollection is I remember Martin Kelly bringing it in,

21   not them bringing it in together.

22   Q.    Now, do you know the source of the numbers on Movants'

23   Exhibit 2?

24   A.    I do not.

25   Q.    Well, you know, sir, that it was from the finance

123

1    department, correct?

2    A.   Yes.

3    Q.   And by the finance department, you included Kelly and

4    Tonucci, correct?

5    A.   Yes.

6    Q.   And the adjusted total assets number on that schedule,

7    sir, of 72.65 billion, do you recall, sir, that this was an

8    estimate of the assets that would be transferred over from

9    Lehman to Barclays?

10   A.   Maybe it's best if I describe what I thought this schedule

11   was?

12   Q.   I don't mean to be rude, sir, but if you'd answer my

13   question --

14   A.   Could you repeat your question?

15   Q.   Do you recall that that schedule was an estimate of the

16   assets that would be transferred over from Lehman to Barclays?

17   A.   I viewed this schedule as an estimate, as guidance, of

18   what the allocation of securities would be that was referenced

19   in the purchase agreement.  The reason it was important to me,

20   important enough to initial, is that the purchase agreement

21   said that there would be assets with a book value of

22   approximately seventy billion and it listed government

23   securities, commercial paper, corporate debt, corporate equity.

24   It didn't say whether that was sixty-nine billion of government

25   securities and one billion of corporate equities or whether it

124

1   was one billion of government securities and sixty-nine billion

2   of corporate equities.  It's just that seventy billion of all

3   these different types of securities.  And to me the

4   significance of this schedule was that it gave guidance.  A

5   rough estimate of how that seventy billion -- and also on the

6   liability side, too, on the short positions, how that was

7   allocated across these very different -- different risk

8   profile, different volatility securities.  So, it mattered to

9   me a lot when the government number was forty, as indicated, or

10  sixty-nine or one.  And so, to me the significance of the

11  schedule was not that it defined the agreement, it was not part

12  of the agreement.  It wasn't attached to the agreement.  It

13  really -- it wasn't incorporated by reference.  The agreement

14  was the purchase agreement.  To me, the point of this was to

15  provide some guidance around what was meant by the purchase

16  agreement when there was a number for long positions and a

17  number for short positions.

18  Q.   And the long position that you're referring to is the long

19  position described in the asset purchase agreement itself, yes?

20  A.   Yes.

21  Q.   And what this schedule is meant to do is to take that

22  seventy billion dollar book value long position described in

23  the asset purchase agreement and break it down into its

24  component parts?

25  A.   That's correct.

125

1   Q.   And the reason that that adds up to more than seventy

2   billion is it also takes into account the residential -- the

3   mortgage basket, correct?

4   A.   Yes.   The mortgages were covered in another subsection of

5   the purchase agreement.

6   Q.   Okay.   When you take the 2.7 shown on the asset side for

7   mortgages out of the total of assets, you come to roughly the

8   seventy billion dollar book value long position described in

9   the asset purchase agreement, is that right?

10  A.   That's correct.

11  Q.   And that's how that schedule relates to the asset purchase

12  agreement that was executed on the 16th of September, correct?

13  A.   In my mind that's how it related, yes.

14  Q.   And that's what you mean when you describe it as guidance

15  for the deal, is that right?

16  A.   A guidance for that provision or of the asset purchase

17  agreement, yes.

18  Q.   And in total, it was guidance for the value of the total

19  assets that it afforded to allocate that would be transferred

20  in the long position, correct?

21  A.   The guidance for the assets in that section of -- that one

22  section of the asset purchase agreement that referred to

23  securities positions and defined as long positions, yes.

24  Q.   And it was your understanding that there would be a

25  transfer of the assets that were approximated on the

126

1    allocations and Movant's Exhibit 2, the schedule?

2    A.   My understanding was that the asset purchase agreement

3    contemplated that approximately seventy billion book value

4    would be transferred over, broken up into these categories,

5    into these components.

6    Q.   And at the time -- well, let me -- you mentioned the

7    liability side.  The source for the numbers -- the figure with

8    regards to comp shown there, was also the finance department,

9    correct?

10   A.   When I referred to the liability side, I was referring to

11   the securities positions above that.  But not to the final two

12   items.

13   Q.   Let me ask you about those final two items.  Do you know

14   the source of that two billion dollar liability for comp that's

15   listed on the schedule?

16   A.   I actually don't know what the source was.

17   Q.   Well, you know that the source of all the numbers on the

18   schedule was the same source, the finance department, correct?

19   A.   I think what I said before was I don't know that they were

20   the source.  For instance, they weren't the source of the

21   marks.  I don't know if that came from the finance department,

22   it came from the HR department.  If it was part of the business

23   deal.

24        Source means the original source to me.  It was

25   transmitted to us through the finance department but I didn't

127

1    view them as the source, necessarily, of those numbers.  I

2    didn't know.

3    Q.    Could you turn to page 60 of your deposition?  And I'm

4    going to direct your attention, sir, on page 60 to lines 9

5    through 19.  And I ask you these questions and you gave these

6    answers.

7    "Q.  Do you know it is?

8    "A.   It's a liability for -- of two billion for comp that's

9    estimated on the schedule.

10   "Q.  Do you know the source of that two billion liability for

11   comp that's listed on the schedule?

12   "A.   The source of all the numbers on this schedule were the

13   same source, from our finance department.

14   "Q.  That would be Kelly/Tonucci?

15   "A.   Correct."

16        Is that truthful testimony when you gave it, sir?

17   A.    Truthful testimony?  I think what I said now was more

18   precise.

19   Q.    Was the source of all the numbers on that schedule the

20   finance department, in general, and, in particular, Kelly and

21   Tonucci?

22   A.    I don't know if they were the original source in those

23   numbers.

24   Q.    Now --

25   A.    The original source is the distinction I'm making between

VERITEXT REPORTING COMPANY

212-267-6868                                        516-608-2400

128

1    source and -- where was I getting it from?  I was getting it

2    from the finance department.  That was my source.

3    Q.   So, the lawyers --

4    A.   I don't know if they were the original source of putting

5    together those numbers.  I mean that's a distinction that I

6    didn't make at the time of deposition, but for me I was getting

7    it from the finance department.  I don't know if they were the

8    ones that created those numbers or they also got them from

9    someone else.

10   Q.   Okay.  So, the state of your knowledge as one of the

11   people involved in the lawyering is that this schedule comes

12   from Kelly and from Tonucci, correct?

13   A.   My understanding, my knowledge, at the time was that the

14   schedule was produced, I know quotes don't work in the

15   transcript, but that -- it was created by them.  I don't know

16   if they were the source of all the numbers.  I don't know where

17   all --

18   Q.   I've heard you say that, sir.  I'm breaking it down into

19   some slightly smaller parts.

20   A.   Okay.

21   Q.   When you're at the table involved in the preparation and

22   drafting of the asset purchase agreement with the other lawyers

23   and you're in the room with the lawyers into which this

24   schedule, marked as M-2, is delivered.  The source to you of

25   the schedule is finances; Kelly and Tonucci?

129

1    A.   Yes.

2    Q.   Yes.  Okay.  And you're knowledge about where they got the

3    numbers on that schedule, you don't know where they got the

4    numbers, is that correct?

5    A.   That's correct.

6    Q.   So, your information stops at Kelly and Tonucci.  You know

7    they delivered a schedule but you don't know what went into

8    calculating the figures on that schedule?

9    A.   That's correct.

10   Q.   But you did understand that on the asset side that the

11   asset classes shown on that schedule were based on Lehman's

12   marks, correct?

13   A.   My understanding was that those valuations reflected what

14   was referred to in the purchase agreement at the book value at

15   the time.  And that reflected the agreement that had been

16   reached since the marks on Friday.  I was aware that there was

17   a process going on to come up with values for these assets.  I

18   knew that if it was starting on Monday we were working off of

19   close of day on Friday and those marks were no longer really

20   relevant to what was going on on Monday or Tuesday.

21   Q.   Do you have your deposition there?

22   A.   Yes, I do.

23   Q.   Could you turn to page 62, please?  And directing your

24   attention to line 20 through page 63, line 7.  Are you there?

25   A.   Um-hmm.

130

1   Q.   And you, just for context, sir, you'll see that Movant's

2   Exhibit 2 was Deposition Exhibit 19?  You notice that?  I just

3   want to put the question in context.

4   A.   Yes.

5   Q.   Okay.

6   "Q.  Again, for 19, sir, do you know if the figures there on

7   the asset side for those asset classes of government agency,

8   commercial paper, etcetera, bore any relation to the marks at

9   which they were shown on Lehman's books?

10   "A.  My understanding is that they were based on the marks.

11   "Q.  How did you get that understanding?

12   "A.  From the same source.  Again, in the delivery of the

13   schedule from Martin and Paolo.

14   "Q.  Did they say something to you?

15   "A.  I don't recall exactly what they said."

16   Were those answer's truthful when you gave them at your

17   deposition?

18   A.   They were and I think they're consistent with what I said.

19   The valuations were based on marks that started as of Friday

20   and then were revised to reflect what the mark should have been

21   as of Monday and Tuesday.

22   Q.   We'll come to that, sir.

23   A.   Okay.

24   Q.   Was that truthful testimony when you gave it?

25   A.   Yes.

131

Q.   Your understanding is that the figures on the schedule

that were delivered to you by Kelly and Tonucci were based on

Lehman's marks?

A.   No.  I said they were based on "the" marks.  When you say

just "the" marks --

Q.   Do you think they were based on Barclays' marks, sir?

A.   No.

Q.   All right.  What marks were you referring to when you said

"the marks" in your deposition?  Are you referring to Lehman's

marks?

A.   I don't think we had then current marks as of Monday.

It's sort of within the context of what was going on where we

had just filed for bankruptcy and the markets were as chaotic

as imaginable.  I don't think that there was a real time

marking going on by these guys at a Lehman system independent.

     So, based on the marks at the time -- there wasn't a close

of books on Monday with Lehman's marks in the ordinary course

of business, as I understand it, like there had been for all

the prior days in the week before and the years before.  It was

a different situation, different context.  Do I believe that

they were based on the marks?  Yes.  Do I believe that they

started with the marks on Friday to arrive at marks that were

relevant for Monday and then Tuesday?  Yes.

Q.   So, at your deposition when you said, "My understanding is

that they were based on the marks", what you were trying to

132

1    tell me was they were based on Friday's marks as adjusted into

2    Monday based on a process in which you were not involved.  Am I

3    understanding your testimony correctly, sir?

4    A.    No.  At the time I gave -- I answered a question that you

5    posed to me at the time and you didn't ask me any follow-up

6    questions at the time.  And that was a truthful answer at the

7    time.  They were based on the marks.  But it was a more

8    complicated question and it required a more complicated answer.

9    Q.    I just want to explore a little bit by you meant with the

10   two word phrase, "the marks" at your deposition.  By "the

11   marks", did you mean the number that was generated through a

12   process that was not in the ordinary course of business to

13   generate what should have been the marks?

14   A.    I meant they were based on the then relevant current

15   marks.

16   Q.    And the then relevant current marks were as of the 16th of

17   September when that schedule marked as M-2 was generated?

18   A.    Yes.

19   Q.    And that's what the asset purchase agreement described it

20   to be.  Is that correct?

21   A.    The asset purchase agreement, again, separating the

22   schedule and the asset purchase agreement, the asset -- the

23   schedule was not part of the asset purchase agreement.  It very

24   easily could have been.  It would have taken two words to

25   attach it to the back of it and say this is what we mean by

133

1   book value of seventy billion of securities position.  It

2   wasn't.  It deliberately wasn't.

3       Again, I think that the significance of the schedule was

4   somewhat overstated.  You know, there were a lot of

5   sophisticated lawyers in that room from the top law firms.

6   They knew that schedule was being prepared.  It would have been

7   a very simple matter to just incorporate it and it wasn't done.

8   It was not meant as part as the asset purchase agreement.  And

9   I think -- you know, I said that at the time of my deposition

10  too.

11  Q.   Would you take a look, sir, at the asset purchase

12  agreement which is in evidence as Exhibit M-1?  It's in your

13  book.  And turn to page -- well, first let's turn to the last

14  page.  And just for the sake of good order, sir, is that your

15  signature?

16  A.   For Lehman Brothers Holdings and Lehman Brothers, Inc.,

17  yes it is.

18  Q.   You signed for both entities?

19  A.   Yes.

20  Q.   All right.  And you read this before you signed it?

21  A.   Yes.

22  Q.   And you understood it at the time that you signed it on

23  behalf of both of those entities, correct?

24  A.   I believe that I did.

25  Q.   Okay.  Take a look at page 6, sir.  And directing your

134

1    attention, in particular, to the definition of purchased assets

2    subsection (d) which reads as follows, quote, "Government

3    securities, commercial paper, corporate debt, corporate equity,

4    exchange traded derivatives and collateralized short term

5    agreements with a book value as of the date hereof of

6    approximately seventy billion, collectively, long positions."

7    You see that?

8    A.    Yes.

9    Q.    Now, as I understand your testimony, sir, you understood

10   that to be a reference to the guidance that was in the schedule

11   which we've marked as Exhibit M-2.  Although the schedule was

12   not itself incorporated into the AP, is that right?

13   A.    No.  I'm not sure I caught all that but if you say that

14   was a reference to the schedule?

15   Q.    Let me withdraw the question and try it another way.

16         The description of long position in the asset purchase

17   agreement, derives, as it says "from the book value as of the

18   date hereof".  Is that correct?

19   A.    Yes, sir.

20   Q.    Was Lehman's book value for the long position as of the

21   16th of September seventy billion dollars?

22   A.    I don't know for sure.

23   Q.    Did you know for sure at the time you signed the asset

24   purchase agreement?

25   A.    No, I don't think I did.

135

1    Q.   If the -- what's referred to in there as book value of the

2    long position was, in fact, a negotiated value between Lehman

3    and Barclays, it would have been a simple matter too to put in

4    a couple of words in the asset purchase agreement to say so.

5    Isn't that correct?

6    A.   Yes, it would have been.

7    Q.   And you were involved in the drafting of this agreement,

8    correct?

9    A.   I was involved in the drafting of this agreement.

10    Q.   And you put your sig --

11    A.   But I was not a drafter of the agreement and I did sign

12    it, yes.

13    Q.   And when you signed it, sir, on the 16th of September, you

14    knew it was going to be submitted to this Court as the

15    description of the transaction the Court would be asked to

16    approve, correct?

17    A.   Yes.

18    Q.   Now, in your -- what post did you -- what was your title

19    at Lehman on the 16th of September?  You're head of legal audit

20    and compliance then.  Is that right?

21    A.   Going back to pre-bankruptcy?  The Friday?

22    Q.   Yes.  What were you on the 15th?

23    A.   Or the 14th.  I had a few different jobs.  One was

24    chairman of our transac -- investment banking transaction

25    approval committees.  One was chief investment officer private

136

1   equity and principal investing.  And the third which you're

2   referring to was the head of the legal compliance of audit

3   division.

4   Q.   Okay.  And in none of those positions, sir, was it your

5   job to assess what was the current book value of assets that

6   Lehman owned, correct?

7   A.   That's correct.

8   Q.   And in none of those positions, did you have any

9   involvement in assessing what was the book value of positions

10  that Lehman owned, correct?

11  A.   No.  I think that might be something of an overstatement.

12  I did have involvement, for instance, on the private equity

13  side and the principal investment side and we went through a

14  process of marking those positions.  Not on a daily basis but

15  at private positions.  But that process of marking those with

16  something in my role -- in that role, I had involvement in.

17  Did I have a role in marking these types of securities listed?

18  No, I did not.

19  Q.   And in the process with which you were familiar on the

20  private equity side, you had some familiarity with how book

21  value was determined on a daily basis, correct?

22  A.   Well, on the private equity side, we would value it at the

23  fair market value.

24  Q.   Fair market.  Okay.  And that was the value that was held

25  in Lehman's books, correct?

1   A.   My understanding was that's correct.

2   Q.   So, that would fairly be described as Lehman's book value,

3   would it not?

4   A.   For those positions, that's correct.

5   Q.   Okay.  And for those positions, the process involved an

6   internal valuation by Lehman with access to public record

7   information or computer modeling or other data available to

8   Lehman, correct?

9   A.   Are you referring to these positions?

10   Q.   No, I'm referring to the private equity valuations you

11   said you were involved in.

12   A.   Could you repeat the question?

13   Q.   They were internal evaluations conducted -- developed by

14   Lehman for the purpose of measuring fair market value for

15   Lehman's books.

16   A.   There were internal valuations based on many factors.

17   Q.   Okay.

18   A.   Including external value.

19   Q.   And in your experience in your private equity capacity

20   when you were involved with this, you never once saw an episode

21   where the book value of a position was determined by the

22   negotiation with a single purchaser for the entire position,

23   did you?

24   A.   We were not selling the business.  We were not selling the

25   firm.  So, there wouldn't have been an opportunity for one

138

```
 1    single buyer to weigh in on what the book value was.  But if
 2    you're asking the question, and one my positions was chairman
 3    of the fairness opinion committee, so before the firm, the
 4    investment banking division, would deliver a fairness opinion
 5    around a MMA transaction, it would be bought to committee and
 6    we would go through the analysis.
 7         Do I think it is relatively common for a purchaser in an
 8    asset purchase agreement and potentially even a stock purchase
 9    merger although it's not as relevant 'cause they're buying
10    stock, but an asset purchase agreement to weigh in and have a
11    view on what the book value of those securities were?  Yes, if
12    that's what you're asking me.  Absolutely.  I don't know that
13    there's too many financial institution's transactions that
14    occur without the buyer having their own view on what book
15    value is.  No buyer looks at the books of a seller and says
16    you've marked all of these assets at this level, fine with us.
17    You know, we'll buy it at that level.  It's a negotiation
18    between a buyer and seller on what the appropriate value is.
19    If it wasn't that way, then all the financial institutions in
20    the world would trade at book value but they don't.  They trade
21    at premiums and discounts and there's different views on what
22    is book value depending on what those assets are.  And in the
23    context of a sale of a business, there will be a negotiation
24    between a buyer and a seller to determine what is an agreed
25    upon book value especially around an asset purchase agreement
```

139

1    where a buyer is buying a portion of the business of, in

2    particular, of national institutions.

3    Q.   So, the process you're describing is, if I can shorten it

4    a bit, a negotiated price, yes?

5    A.   It's a negotiated -- I'm not shortening it a lot, it's a

6    negotiated price, but the price is sort of the second tier.

7    You start with the negotiation of what do you think the assets

8    are worth and then you decide what you're going to pay for the

9    business based on what those assets are worth, based on what

10   the going concern might be.  I mean it's a -- it's a process.

11   You make a deal.  But the first step or one of the first steps

12   of a buyer in looking to buy assets is to come up with their

13   own view of what the value, the fair market value, of those

14   assets they're buying.  And they would not, in very rare cases,

15   just accept the book value of the seller.

16   Q.   Well, a buyer would say to the seller, your book value is

17   too high.  I'm going to pay you less.  Yes?

18   A.   Well, they might -- that's where it might start but say

19   let's actually go through these assets and let's go through a

20   process where we determine what is an appropriate book value

21   for these assets.

22   Q.   Seller carries its assets at a hundred bucks and the buyer

23   says I'll give you eighty and the price is ninety.  And that's

24   the agreed price below the book value of the seller.

25   A.   Yeah, but I'm --

140

1    Q.   Is that right, sir?

2    A.   -- referring to something different than that.

3    Q.   Maybe you can infer this.  Seller carries its assets at a

4    hundred bucks.  Buyer says he'll give you eighty.  They agree

5    on ninety.  The price is below the seller's book value, yes?

6    A.   That's not what I was describing.  But the answer to your

7    question is yes.  But that's not what I was describing.  I was

8    saying that you're carrying your assets at a hundred.  We're

9    going in and doing due diligence, we actually think those

10   assets are worth eighty-five.  But then from that point,

11   there's still a negotiation on price.  But there is always a

12   discussion on the book value of assets if you're a buyer buying

13   assets.  I think that's a part of any -- of any well

14   negotiated, well lawyered transaction.

15   Q.   Let's talk about a well disclosed transaction.  Was the

16   description of the seventy billion dollar long position that

17   was submitted to this court that described it only as book

18   value, was that meant to tell the Court about this process of

19   purchaser involvement in determining what the book value should

20   have been by expressing its views?

21   A.   I don't know what's intended to disclose to the Court in

22   this context.  My view is that seventy billion book value as of

23   the date hereof is an accurate statement of the party's

24   agreement of what those securities positions were worth as of

25   that Tuesday in a very unprecedented and volatile market.

141

1    So, I think that it was a joint process, it was a

2    bilateral process, but there was discussions around what's the

3    appropriate book value.  I didn't expect that Barclays would

4    take the marks of Lehman and say, you know, yeah, load up

5    seventy billion at whatever you marked it at.  It was a

6    discussion.  And it was an agreement on what the appropriate

7    book value of those securities were as of that date.

8    Q.   Was your assumption there based on the assumption that the

9    value of the assets to be transferred were relevant in the

10   transaction?

11   A.   My -- I would say yes to some extent. That's right.

12   Q.   Now, when you said you didn't know what was meant to be

13   disclosed to the Court, let me to ask you to put your head of

14   legal compliance and audit hat back on on the 15th of

15   September.  In that capacity, did you have any concern that the

16   transaction for the sale of the firm would be accurately

17   disclosed to this Court?

18   A.   Did I have a concern about that?

19   Q.   Yes.

20   A.   Not with Weil Gotshal representing us.

21   Q.   Okay.

22   A.   And also Weil Gotshal being involved in both the drafting

23   and negotiation of the asset purchase agreement and with them

24   representing us in bankruptcy court.  I had hired Weil Gotshal.

25   I hired them deliberately because my view is that they were the

142

1   best we could get to go through this bankruptcy process.

2   Q.   And that said, when you reviewed the asset purchase

3   agreement before you signed it, you understood one of the

4   things that would happen with that agreement is the next day it

5   would be submitted to this Court for its review and potentially

6   for its approval?

7   A.   Yes.  Yes, I understood that.

8   Q.   And you understood that the asset purchase agreement would

9   be one means by which the transaction was described to the

10  Court, correct?

11  A.   Correct.

12  Q.   And you understood that the asset purchase agreement would

13  be included in a motion asking for the Court's approval of the

14  transaction, correct?

15  A.   Correct.

16  Q.   And you did take the time to be sure that you read it and

17  understood it before you signed it?

18  A.   Correct.

19  Q.   Now, prior to the time that you signed the asset purchase

20  agreement, you had never had any discussions with anyone on the

21  Lehman's side of the table about any discount off of Lehman's

22  marks.  Is that correct?

23  A.   I was not aware of any discount off of the then current

24  marks.  To be clear, again, there was this process where marks

25  were changing from where they were on Friday which was our last

143

1    official mark of our book.  And I knew that on Monday and

2    Tuesday, there was this process of what are the appropriate

3    marks of these securities positions based on everything that

4    had gone on since the Lehman bankruptcy.  So, I was aware of

5    that.  But from those marks at the then current fair market

6    value, I was not aware of any discount off of that mark.

7    Q.   And you understood that the Friday was the last official

8    marks on your books?

9    A.   That was my understanding.

10   Q.   And did you have that understanding at the time?

11   A.   I believe I did.

12   Q.   So, that would make the book value according to the last

13   official marking of the books, whatever was shown on the books

14   as of the 12th, correct?

15   A.   Could you repeat the question?

16   Q.   That would make the value to be the last value shown on

17   the books when they were last officially marked, correct?

18   A.   The value of what?

19   Q.   Let me try this another way.  Come the 16th, the Tuesday,

20   if I understand your testimony, sir, it was your understanding

21   that the books had not been marked at all since the prior

22   Friday, the 12th of September, is that right?

23   A.   My understanding was that we hadn't gone through our

24   normal course mark to market process on Monday.

25   Q.   Had any of the mark to market process been followed, to

144

1    your knowledge, between Friday the 12th of September and Monday

2    the 15th of September?

3    A.    Between those two dates?

4    Q.    Yes, sir.

5    A.    You mean over the weekend?

6    Q.    Yeah.

7    A.    I don't think that there was any marking of the book over

8    the weekend.

9    Q.    Okay.  What about by the end of Monday?  Had there been

10   any marking of the books during Monday the 15th, do you know?

11   A.    I think just within the context of this transaction.  I

12   don't know if we were going through -- I don't know if we were

13   going through our independent marked process.  Some of that is

14   automated, but a lot of it isn't.  So, I don't really know what

15   was going on.  Monday was an unprecedented day.

16   Q.    And when you say some of it is automated, the more liquid

17   assets are those that tend to be updated on an automated basis,

18   correct?

19   A.    It's beyond my area of expertise, but there are certain

20   securities like government securities and corporate equities

21   where there's a very liquid market and it's easy enough to just

22   pull marks off of trading information, trading systems.

23   Q.    Okay.  Let's go back to Exhibit M-2, please, and you see,

24   sir, that on the asset side of that schedule, the bulk of the

25   assets are government securities, correct?

145

1    A.    Correct.

2    Q.    And this is the allocation within the entire long position

3    that you told us about before, correct?

4    A.    Correct.

5    Q.    So, government securities to your knowledge are -- can be

6    marked on an automated basis, correct?

7    A.    I don't know first-hand.

8    Q.    Okay.  Do you know if the forty billion dollars in

9    governments shown on this schedule dated the 16th of September

10   was marked down from whatever the last official books were?

11   A.    I don't know.

12   Q.    Did you know at the time that you signed this schedule?

13   A.    I did not.

14   Q.    Did you know at the time you signed the asset purchase

15   agreement?

16   A.    I did not.

17   Q.    So, as far as you knew, sir, when the asset purchase

18   agreement described as seventy billion dollar long position to

19   the extent it included government securities, when it said

20   "long position on the book value as of the date hereof", it was

21   talking about a book value on the 16th of September, on

22   Tuesday?

23   A.    I never saw book values from Friday.  So, I don't know how

24   those positions changed from Friday.

25   Q.    Other than the testimony of Mr. McDade, Mr. Berkenfeld,

146

1    can you tell us what your basis is for the understanding that

2    the books had not been marked since the 12th of September?

3    A.   Just the chaos that was going on at the time.

4    Q.   Okay.  And you sat in the courtroom and heard Mr. McDade's

5    testimony?

6    A.   I sat -- I was in the courtroom this morning, yes.

7    Q.   And you heard Mr. McDade say that he had not had

8    conversations with anybody in particular about whether the

9    books actually had been marked on the 15th and the 16th.  Did

10   you hear that?

11   A.   I guess I did.  I don't recall it.

12   Q.   And you heard Mr. McDade say that he was inferring from

13   the chaos that chances are that people involved in marking the

14   books were not available to mark the books, correct?

15   A.   I did read the complaint.  There was some preparation

16   going into this.  I remember beyond his testimony things I

17   think in your own complaint, I believe, that said there was no

18   one answering the phone.  There was no one there to do the

19   work.  It was in a lot of the materials before I came to

20   testify.

21   Q.   Okay.  So, your understanding that the books hadn't been

22   marked since the 12th of September was based on reading the

23   movant's complaint?

24   A.   No.  No.  It was also based on what was going on at the

25   time.  We were not in ordinary course of business mode.  I

1    think that's where I started.  We were in something that -- the

2    context is important here.  We had people with no basis,

3    whatsoever, just rumor and innuendo, coming into the office on

4    Sunday night packing up their personal belongings and thinking

5    that the doors were going to be locked the next day.

6        People were in a state of shock.  They were stunned.  They

7    were not performing their ordinary duties.  A big part of what

8    I was trying to do was try to get us to figure these issues out

9    and operate in as much of an ordinary course as we could

10   bringing in whatever systems we could from Alvarez & Marsal,

11   from Weil Gotshal.  It was not -- it's not fair to characterize

12   this as a normal operating day where everybody was there doing

13   their jobs marking their position.  It wasn't like that.  And

14   it wasn't like that from Monday into Tuesday and, frankly,

15   although some of the panic had subsided after there was an

16   agreement that had been announced, it wasn't like that for the

17   remainder of the week either.  There was a lot of uncertainty

18   and unfortunately people just didn't come in, put their heads

19   down, and do their normal course of job.  It was very difficult

20   and people were dealing with issues they hadn't done before.

21       So, from my standpoint as air traffic controller, yes, I

22   was aware that we were trying to hold something together and

23   keeping things from crashing.  But we didn't think, given that

24   we just filed for bankruptcy at the holding company, that -- we

25   weren't really concerned about a potential SEC books and

148

1   records violation Monday night because we hadn't marked our

2   position.  That's just not the mindset at the time.

3   Q.   Let's go back to my question.  The basis of your

4   understanding that the books had not been marked since

5   September 12th, as I've got it so far, are the movant's

6   complaint and the general chaos that was in existence in the

7   early part of the week.  Is that a fair summary of your

8   testimony, sir?

9   A.   And I would add that the involvement of some of the people

10  who would normally be involved in it at the end of the day in

11  the process of the asset purchase agreement.

12  Q.   So, I guess we can agree that in your view Monday was very

13  extraordinary time for Lehman, yes?

14  A.   That's one way to characterize it.

15  Q.   Okay.  And the manner in which the books were kept, if at

16  all, was not in the ordinary course of business, correct?

17  A.   Correct.

18  Q.   So whatever would constitute the book value of the long

19  position on the 16th of September would be a book value that

20  was determined in the most extraordinary of circumstances,

21  correct?

22  A.   Correct.  It was a much more manual process involving some

23  of the senior leaders of the firm who normally wouldn't be

24  involved in a mark to market process.

25  Q.   Okay.  And these senior leaders of the firm understood as

149

1    you did that the descriptions of the transaction given to the

2    Court were descriptions upon which it would rely in determining

3    whether or not to approve the transaction.  Did you have that

4    understanding at the time?

5    A.    I did.  I wouldn't say that the other senior executives

6    involved in that process necessarily did.  Most of them --

7    well, I don't know if any of them were lawyers.  They wouldn't

8    have thought through that the process they were going through

9    was going to end up in a motion in front of the bankruptcy

10   court.  So, I wouldn't characterize it that way.

11   Q.    Okay.

12   A.    From my standpoint, yes.

13   Q.    Well, from your standpoint as head of legal compliance and

14   audit, that is certainly something that would have crossed your

15   screen, yes?

16   A.    Yes.

17   Q.    Okay.

18        MR. GAFFEY:  Can we have page 6 of the asset purchase

19   agreement again, please?

20   Q.    And when this description of long positions stated only as

21   "with a book value as of the date hereof of approximately

22   seventy billion", collectively long positions, did you give

23   some thought, sir, to whether the extraordinary out of the

24   ordinary course of business chaotic way in which book value was

25   determined should have been disclosed to the Court so that

150

1    interested parties would know?

2    A.   I don't know that my thought process went that way.   I

3    think that the chaos in the markets was very evident to anybody

4    who was paying attention to what was going on.

5    Q.   So, anybody --

6    A.   I think I used the term then and used in depositions that

7    we were on the brink of a financial Armageddon.   And what had

8    happened subsequent to the Lehman bankruptcy over the course of

9    Monday or Tuesday was unprecedented.

10   Q.   Let's just --

11   A.   I'm sorry.

12   Q.   I beg your pardon.   Let's just back up a little bit.

13   A.   So, I -- to me, did I recall a deliberate thought process

14   that said the Court may need to be informed that marks of

15   positions are uncertain right now?   That there's a lot of

16   volatility in the market?   I don't recall that but I think it

17   was pretty apparent to anybody who was paying attention to what

18   was going on in the world.

19   Q.   So, anybody who was paying attention to what was going on

20   in the world, would read "with a book value as of the date

21   hereof of approximately seventy billion" to actually mean

22   through a negotiated process unprecedented means history to

23   determine what should have been a book value because there

24   wasn't one.   Have I got that right?

25   A.   I don't think I said that.

151

1    Q.    Did you give any thought, sir, as to whether a more

2    detailed description of what constituted book value should have

3    been given to the Court when you signed this agreement to be

4    submitted to it?

5    A.    I did not give that thought.  I relied on my counsel to

6    the asset purchase agreement and my bankruptcy counsel, Weil

7    Gotshal.  Who's involved in both to make the determination of

8    how the transaction should be presented to the Court.

9    Q.    And at the time that you signed the asset purchase

10   agreement, you had not had any discussions with anyone on the

11   Lehman's side of the table about a discount off of the marks,

12   whatever the marks were.  Correct?

13   A.    I was not aware of any discount from the then current

14   marks.

15   Q.    And you were not aware of any agreed bulk discount

16   concerning the assets that were to be transferred in the

17   transaction, correct?

18   A.    Again, I was not aware of any discount from the current

19   market valuation at that time.

20   Q.    Bulk or otherwise?

21   A.    Bulk or otherwise.

22   Q.    And at the time of the transaction, you had no information

23   concerning the economics of the transaction because that had

24   been done by others, correct?

25   A.    Had no information?  No.  I would say that I had

152

1    information that was given to me primarily as I recall from

2    Weil Gotshal about what the terms of the transaction were.

3    Q.    Whoever your source was, sir, before you signed the

4    agreement, you had never been informed that the economics of

5    the transaction involved a five billion dollar overall loss to

6    Lehman versus its marks, had you?

7    A.    I'm not sure what you mean by a five -- I think you said

8    that the transaction resulted in a five billion dollar loss?  I

9    wouldn't characterize it that way.  I would say the markets

10   resulted, if it is a five billion dollar loss, I don't know

11   what it was before or after.  But it wasn't the transaction

12   that resulted in it.  It was that the markets had moved so

13   dramatically since Friday.  So, we had a loss and, probably, so

14   did most of the other firms on Wall Street.  Anyone who had

15   securities positions might have had a loss depending on what

16   their positions were.  Maybe they were short mortgages and had

17   a gain.  But it wasn't a loss from the transaction.  It was a

18   loss from what was going on in the market.  It was a mark to

19   market and the valuation, the current market valuation, of

20   those securities positions changed since Friday.  Since Friday,

21   Lehman filed for bankruptcy.  It shocked the world.  It changed

22   the world.  And because of that, in a circular way, the

23   positions that we had on Friday were worth less on Monday.  So,

24   if there was a loss, and, again, I never did the before and

25   after, I wouldn't say it's from the transaction, I would have

153

1    said it was from the markets.

2    Q.    Whatever its cause, you were never informed that a

3    transaction involved a five billion dollar overall loss to

4    Lehman versus its marks, were you?

5    A.    I was never informed that.  I didn't think that our loss,

6    after we had filed for bankruptcy off of our marked positions

7    on Friday, was really all that relevant.  We were already

8    bankrupt.  I don't know how many more losses we could have had.

9         So, it's, again, the mindset at the time.  I'm not saying,

10   boy, we had a terrible day in the market; we lost a lot of

11   money.  We would have filed for bankruptcy.  It was at that

12   point as a standalone entity, game over.  The loss we had on

13   all the securities positions we had or the game we had in those

14   securities positions was not a focal point for me and many of

15   the -- well, I should say what other people's focal point was,

16   but it wasn't a focal point for me.  I wasn't thinking about

17   this transaction or what was happening in the markets as

18   creating a loss.  It just wasn't a relevant point.

19        The relevant point was and the relevant point going into

20   this transaction was how do we make the best out of this

21   situation?  This -- what's left of this firm will quickly fall

22   apart.  And the way we looked at the transaction was this is an

23   opportunity, to some extent, keep at least the North American

24   business and some other subsidiaries together and to give

25   people jobs.  We weren't thinking about it in terms of a loss

154

1   off a book value.

2   Q.   Were you thinking about it at all in terms of preserving

3   value for the creditors of the corporation?

4   A.   Yes.

5   Q.   So, in addition to the jobs for the people you worked

6   with, you were thinking about the value for creditors who would

7   make claims in these proceeding?

8   A.   Yes, as to Lehman.

9   Q.   And when you say whether there was a loss was not a

10  relevant point, did you think it would be relevant to the Court

11  proceedings or to the creditors who would attend those Court

12  proceedings whether Lehman had agreed to sell its assets for

13  five billion less than it showed on its most recent marks?

14  A.   Again --

15  Q.   If you could start with a yes or no, I'll give you a

16  chance to explain.  If you could just answer the question with

17  a --

18  A.   Then I would say, no.

19  Q.   Okay.

20  A.   The loss on the marks, again, was because of what happened

21  in the market.  That was out of our control.  The fact that

22  there were mark to market paper losses on the securities

23  positions that were held at the time, Monday, Tuesday, was not

24  the way we're thinking about it.  If they move down and those

25  securities positions were being transferred over to Barclays, I

155

1    think what was relevant was what was the current market value

2    at the time they were transferred.  Not -- what they were

3    marked at on Friday, wasn't relevant to me.  It was no longer

4    applicable.  It didn't -- it was a context that was completely

5    different.  And marks as of Friday and whether that mark was

6    down five billion or one billion or ten billion from Friday was

7    not, again, something that came out of the transaction.  It

8    came out of the markets.

9    Q.   Okay.  Now, when you looked at the definition of purchased

10   assets in the agreement when you signed it, did you give some

11   thought to whether instead of saying, "with a book value as of

12   the date hereof of approximately seventy billion," you could

13   have said the current market value at the time they are

14   transferred?  Would that have been a more accurate description?

15   A.   In hindsight, it probably would have been but at the time

16   of what was going on, no one made the suggestion to change it

17   and I'm not sure where the term "book value" originally came

18   from.  Whose term it was?

19   Q.   It could be a mistake, yes?

20   A.   I don't know that I'd characterize it as a mistake, I just

21   don't know.

22   Q.   But in any event, you would agree with me that a

23   description, to use the term you just used, the current market

24   value at the time they were transferred, would be an accurate

25   description of the long position, correct?

156

1    A.    The way I was thinking of it was it was the current market

2    value of those securities at that time?

3    Q.    You were not thinking about it in terms of Lehman's book

4    value?

5    A.    I was not thinking about it in terms of book value.

6    Q.    And when you signed the agreement that described it in

7    terms of a book value "as of the date hereof of approximately

8    seventy billion", you did understand that was a reference to

9    Lehman's book value, yes?

10   A.    I couldn't actually say that at the time when I looked at

11   it I thought the word "Lehman" should be inserted before book

12   value.  I think that -- I agree that the current market value

13   at the time might have been a better way to describe it.  But I

14   don't view this as any different.  I didn't view book value as

15   something different.  I certainly didn't think it was our book

16   value as of Friday.

17   Q.    Did you -- did you --

18   A.    I thought our book value was, I don't want to say

19   synonymous, but it was meant to represent the same thing as the

20   current market value at the time.

21   Q.    Okay.  In your capacity as head of legal compliance and

22   audit, would you have viewed the term "book value" as a term

23   that has a particular meaning?

24   A.    I don't know that I viewed it as -- as having a particular

25   meaning at the time.

157

1    Q.   You wouldn't have had a view one way or the other as to

2    whether the term book value had a particular meaning in

3    September of 2008?

4    A.   I don't recall zeroing in on that term.  In the context of

5    everything that was going on and the record setting time that

6    this agreement was put together, I don't recall zeroing in on

7    the use of word book value as an alternative term.

8    Q.   Well, it's up there on the screen to zero in on now, sir.

9    As you look at it --

10   A.   But you asked me what I -- at the time and I just --

11   Q.   I'm about to ask you another question.  As you look at it

12   now, can you see it?

13   A.   Yep.

14   Q.   Okay.  As you look at it now, it has some particular

15   meaning, the phrase "book value", does it not?  That's not an

16   ideally chosen phrase, is it?

17   A.   I'm not sure whether it was ideally chosen.

18   Q.   Do you have any understanding, sir, of whether the term --

19   of how the term "book value" came to be added to the agreement?

20   A.   I don't.

21        MR. GAFFEY:  Your Honor, may I have one moment to

22   reach for a document?

23        THE COURT:  Sure.

24   Q.   In the course of your work and the drafting and

25   preparation of the asset purchase agreement, do you recall that

158

1    there was a version of the asset purchase --

2            MR. GAFFEY:  Withdrawn.

3    Q.    Do you recall that when you first signed the asset

4    purchase agreement there were handwritten interlineations on

5    it?

6    A.    When I first signed it?  I don't recall.

7    Q.    Do you recall re-signing the agreement after it was

8    conformed in typewriting?

9    A.    I don't actually recall that.

10           MR. GAFFEY:  Your Honor, may I approach?

11           THE COURT:  Yes.

12           MR. GAFFEY:  Do you have copies of this?

13           I beg your pardon, Your Honor, my document

14   organization is falling apart a little bit.  So, we just have

15   to get copies for Mr. Schiller and the Court.

16           THE COURT:   I think we should give Mr. Schiller --

17           MR. GAFFEY:  May I approach?

18           THE COURT:  -- let's give Mr. Schiller his copy first.

19           MR. GAFFEY:  That's what I thought.

20           MR. SCHILLER:  Thank you, Your Honor.  I appreciate

21   it.

22           MR. GAFFEY:  I try not to be rude in the same way

23   twice.

24           May I approach, Your Honor?

25           THE COURT:  Yes.  Thank you.

1    Q.   Now, Mr. Berkenfeld, I put before you what is Movant's

2    Trial Exhibit 118 in evidence.  It is the sale motion that was

3    submitted by Lehman's counsel on the 17th of September 2008.

4    And document's a little bit hard to work with, sir, but I'll

5    ask you to take a look at Exhibit A to that sale motion which

6    is the asset purchase agreement.  And when you get there, would

7    you go to page 6 for context and then turn to page 7?

8    A.   6 and then 7?

9    Q.   Where I'd like you to go is the definition of purchased

10   assets in this version, the asset purchase agreement.  I

11   apologize, it has no page numbers.  Are you there?

12   A.   I believe so.

13   Q.   Now, there is the definition of purchased assets, are you

14   with me?

15   A.   Um-hmm.

16   Q.   Okay.  And if you go to the end of that document --

17   A.   The end of the document?

18   Q.   I beg your pardon, the end of that section overleaf; you

19   see the definition of government securities that we've been

20   talking about in the retyped asset purchase agreement, right?

21   A.   The definition of government securities?

22   Q.   Well, the definition of purchased assets, subsection (d).

23   A.   Right.  Which is defined as long positions.

24   Q.   And you see there, sir, that the -- that the phrase,

25   quote, "With the book value" on the next page, page 7 -- there

160

1    we go at the top -- the phrase "With a book value as of the

2    date hereof of approximately seventy billion" and the phrase

3    "collective long positions".  Do you see that?

4    A.   Yes.

5    Q.   You note that they are added by hand in the copy of the

6    asset purchase agreement that was submitted to the Court on the

7    17th of September.  Do you see that?

8    A.   Yes.

9    Q.   Does that refresh your recollection as to whether when the

10   agreement was final, it was in a form where it had not yet been

11   fully typed and there were handwritten interlineations?

12   A.   I haven't seen this in a long time.  But vaguely I recall

13   that there was a hand draft, but I don't know if I signed this.

14   I just don't recall.

15   Q.   Well, you don't have any reason to think, sir, that the

16   agreement that you signed is any different from the agreement

17   that was submitted to the Court do you?

18   A.   I have no reason to believe that.

19   Q.   So, looking again at the handwritten interlineation, it

20   says, quote, "With a book value as of the date hereof of

21   approximately seventy billion", end quote.  Do you recall when

22   the phrase "book value" was added to the agreement?

23   A.   I don't -- what I recall about this is that a draft of the

24   agreement just mentioned these securities positions without any

25   value put on them.  So, I think at some point in the process

161

1    people said well, wait a minute, you know, are we talking about

2    all government securities or all corporate equity, all exchange

3    trade derivatives?  There was no context.

4        I remember that being added to this and I did look ahead

5    and saw that a similar change was made to the short positions,

6    but it was to add the concept of a value of seventy billion.  I

7    don't recall a focus on book value.  It wasn't adding the word

8    "book value".  It was adding the concept of "with a book value

9    as a date hereof of approximately seventy billion".

10   Q.   Okay.  Let's agree on the terms we're going to use.  It

11   does actually add the term "book value", sir.  You see it

12   there, right?

13   A.   Not by itself.

14   Q.   I understand that.  But the term "book value" was amongst

15   the things added to the agreement.  You didn't mean to say that

16   wasn't added to the agreement, did you?

17   A.   No.

18   Q.   Okay.

19   A.   The question was when you asked about adding the term

20   "book value" you made it sound to me that the book value was

21   added as a separate addition.  And you're taking a change that

22   was made and taking four of the words of it and say when were

23   those four words added without looking at the other ten words

24   or whatever it is.

25   Q.   Well, at some point in the drafting and preparation of the

162

1   asset purchase agreement, it was determined that it was

2   necessary to add a description of the value of the long

3   position, correct?

4   A.   Yes.

5   Q.   And the words chosen to describe the value of the long

6   position was "book value as of the date hereof of approximately

7   seventy billion".  Correct?

8   A.   Correct.

9   Q.   I take it from your testimony, sir, you're not the guy who

10  decided those are the words that have to go in the agreement?

11  A.   I was not the person who said those words had to go in,

12  but in the review late in the process of this agreement, I

13  think I was part of the discussion that we kind of left the

14  open-ended provision here that needs better definition.

15  Q.   When you say an open-ended provision, you're talking about

16  that provision without the what's now added by hand?

17  A.   The printed part of (d); government securities, commercial

18  paper, mortgage loans, corporate debt, corporate equity,

19  exchange traded derivatives, collateral, short term agreements,

20  but without any sense of all of them, some of them, any kind of

21  context of value.

22  Q.   And when you were involved in the discussion about putting

23  in a more precise definition of that collection of securities

24  and commercial paper, etcetera, did you suggest to anyone that

25  it should be described instead of book value as the current

163

1   market value at the time they are transferred, the term you

2   used before?

3   A.   I don't recall suggesting the term "book value" or any

4   alternatives to book value.

5   Q.   Well, regardless of who came up with what ultimately was

6   said, sir, I think I heard you say you were in the

7   conversation.  You were in the discussion of putting in a more

8   refined agreement -- definition in the agreement, yes?

9   A.   Yes.  But I don't recall if I was part of the agreement

10  that these would be the right words.  I just don't remember.

11  Q.   Okay.  So, you were in the discussion.  You may not have

12  been there when the decision got made?

13  A.   I just don't recall.

14  Q.   Okay.  And having been in the discussion about putting in

15  a more refined, a more definite definition of the assets being

16  transferred, when you reviewed the asset purchase agreement

17  before you signed it, did you take any extra care to see how

18  that drafting issue had been fixed?

19  A.   I don't recall where I devoted my focus when I was

20  reviewing it but I don't recall focusing on the words "book

21  value" and say we could come up with a better description.  I

22  just don't remember that.

23  Q.   Now, let's go back to -- I kind of took myself off on a

24  side road there, sir.  I was asking you before we started

25  talking about this definition.  If at the time of the

164

1    transaction you had ever been informed that the economics

2    involved of five billion dollar overall economic loss to Lehman

3    versus its marks.  Had you been informed of that when you

4    signed the asset purchase agreement?

5    A.    And I answered that in a long way but to give you the

6    short answer --

7    Q.    Thank you very much.  I appreciate it.

8    A.    -- than giving you the long one, I was not informed of

9    that.

10   Q.    Okay.  And you had never seen any document that said that?

11   A.    No.  Not that I recall.

12   Q.    And when you were involved in drafting the asset purchase

13   agreement, you did not have an understanding that there was to

14   be a discount given at Barclays off the value of the assets to

15   be transferred, is that right?

16   A.    Again, I never -- I did not see the word "discount" in any

17   documents.  I don't recall anyone using the word "discount".  I

18   was not aware of any discount off of the current market

19   valuation.

20   Q.    So, you have no knowledge of that either?

21   A.    I have no knowledge of that.

22         MR. GAFFEY:  And could we put M-2 back up, please?

23   Q.    When the schedule was put together, you had no knowledge

24   of the discount in the range of five billion being calculated

25   before the schedule was put together, correct?

165

1    A.   I had no knowledge of a discount.

2    Q.   Now, on this schedule, sir, you see that on the liability

3    side, there's a reference to cure payments in the amount of

4    2.25 billion.  Do you see that?

5    A.   Yes.

6    Q.   Did anyone ever suggest to you in sum or substance that

7    when you saw the financial schedule, that the comp and the cure

8    numbers were plug numbers to make it balance?

9    A.   No one ever suggested to me that they were plug numbers.

10   Q.   And with respect to the -- to these categories of

11   assumed -- did you understand them to be guidance for the

12   liabilities that Barclays would assume pursuant to the asset

13   purchase agreement?

14   A.   I didn't really focus on those two parts in the context of

15   the schedule.  I think that for those two lines, I look to the

16   asset purchase agreement.

17        Going back to what I testified before, to me, the purpose

18   of the schedule was to allocate the securities positions to be

19   clear, those assets; the governments, the corporate debt, the

20   corporate equity.  And the short positions; trading positions.

21        Again, the schedule was not the agreement.  It was not

22   meant to be a balance sheet of the deal.  It just never had

23   that significance to it; that meaning.  And we had a lot of

24   lawyers sitting around the table.  We all could have agreed or

25   someone could have suggested let's put this on the back of the

166

1    agreement.  Let's submit it to the Court.  None of that was the

2    purpose of this agreement.  It was relevant as guidance to how

3    those securities positions should be allocated because without

4    it, there were lots of different ways it could have been

5    allocated.  And it was changing and I did initial it and say

6    this one should be final so we have a sense that out of that

7    seventy billion, forty is governments.  Not one, not sixty-

8    nine.

9         But with regard to compensation and cure payments, in my

10   mind, the cure payments and the compensation were dealt with

11   specifically in the asset purchase agreement and I would look

12   to the asset purchase agreement in terms of what the

13   obligations of the parties were.

14   Q.   Do you have your deposition transcript there?

15   A.   Yeah.

16   Q.   Would you turn to page 104, please and directing your

17   attention to 104 at line 13 through 105 line 4.

18        MR. GAFFEY:  Steve, would you put the schedule up

19   there so he can see its deposition exhibit number?  The whole

20   thing.  Shrink it.

21   Q.   Just before I read that to you, sir, you recall that this

22   schedule we've been talking about today, marked as M-2, was

23   deposition -- Exhibit 19, your deposition?  Take a look at the

24   tag on it.

25   A.   I'm sorry, the tag 19 on my deposition?

167

1    Q.   No, sir.  Take a look at the tab -- actually, if you --

2    can you see the screen?

3    A.   Yes.

4    Q.   You see that's called "Deposition Exhibit 19" as well?

5    A.   Yes.

6    Q.   Okay.  I just want you to understand the question as I

7    read it to you.

8    A.   Okay.

9    Q.   And now, back on page 104 of your deposition starting at

10   line 13.

11   "Q.  Did anyone ever suggest to you in sum or substance, sir,

12   when you saw the financial schedule marked as Exhibit 19 that

13   the comp and cure numbers were just plug numbers to make it

14   balance?

15   "A.  To my recollection, no one had ever suggested that to me.

16   "Q.  Was it the contemplation?  Was it part of the structure of

17   the transaction that Barclays was, in fact, going to undertake

18   to assume liabilities in roughly the amounts guided by the

19   schedule marked as Exhibit 19?

20   "A.  I believe it was the understanding that Barclays would

21   assume liabilities that were at the time estimated roughly to

22   be in this amount."

23        When I asked that question and you gave that answer, was

24   that truthful testimony, sir?

25   A.   Yes, it was.  I should have said I believe it was my

168

1   understanding.  I can't speak to others, but yes.  And I think

2   that's consistent with what I just said.

3   Q.   Okay.  So, let's go back to the question I asked you a

4   moment ago with regard to Exhibit M-2, the financial schedule.

5        MR. GAFFEY:  Can we have that up here, please, Steve?

6   Q.   Now, do you recall I asked you a few moments ago whether

7   or not the comp and cure numbers were plug numbers to make this

8   sheet appear to be balanced?  You told me, no.

9   A.   That's correct.

10  Q.   Okay.  And then I asked you if whether it was the

11  contemplation, was it part of the structure of the transaction

12  with Barclays, in fact, was going to assume -- was going to

13  undertake to assume liabilities in roughly the amounts guided

14  by that exhibit, M-2?

15  A.   I believe my answer was I wasn't looking at the schedule

16  for guidance for that.  I wasn't looking to schedule.  There

17  was an understanding, my understanding, my impression, that

18  there would be comp and cure payments in about those amounts

19  and my recollection, again, from reading things before

20  testimony was that the numbers that were represented to the

21  Court around comp and cure payments were not those numbers.

22  They were two and half are comp and one and a half are cure, I

23  think.  But regardless, the cure payments was something that

24  was going to be determined over time.  And there might have

25  been estimates that were made; I'm not sure where they came

1   from.  But I didn't view this as a obligation on the part of

2   Barclays to assume cure payment liabilities of 2.25 billion.  I

3   didn't think the schedule stood for that.  And I didn't think

4   that the schedule stood for that there was an obligation to pay

5   comp for two billion.

6        From the person who initialed it, that's not what I

7   thought this schedule was.  I think there were provisions on

8   the asset purchase agreement on those points.  It would have

9   been easy enough to incorporate those numbers to get the

10  schedule to bring those numbers into the asset purchase

11  agreement or to make the schedule part of the asset purchase

12  agreement and that wasn't done.

13  Q.   And with regard to the schedules, sir, when the agreement

14  that was going to be submitted to the Court was finalized, was

15  it your understanding that Barclays would assume liabilities

16  that were estimated roughly in those amounts?

17  A.   My understanding, when it was presented to the Court, was

18  that Barclays could be assuming liabilities up to the amounts

19  that were presented to the Court, not based on what was in the

20  schedule.

21  Q.   Now, when you say Barclays could have been assuming

22  liabilities up to the amounts, did you track whether the Court

23  was told that the estimates of liabilities for comp and cure

24  were ceilings as opposed to estimates of what Barclays actually

25  would pay?

1  A.   Poor choice of words on my part to say up to but I don't

2  think it was -- I don't recall it being a ceiling.  I think it

3  was for cure payments and open-ended question.   Dependent on

4  what -- what contracts were going to be assumed and what

5  Barclays felt it needed to conduct the business in the ordinary

6  course.

7  Q.   Let's talk about the comp number for a minute.  Let's stay

8  away from what contracts would be assumed.  We'll come to that.

9  Let's look at the comp number for a minute.  Was it your

10  understanding when you signed the asset purchase agreement that

11  Barclays was going to pay compensation amounts in roughly the

12  amount shown on Exhibit M-2, two billion dollars?

13  A.   My understanding of the comp amount came from the asset

14  purchase agreement.  It didn't come from the schedule.

15  Q.   Sir, I'm going to have to ask you look again at page 104

16  of your deposition starting at line 20 and reading over to line

17  4 on page 105.

18        UNIDENTIFIED SPEAKER:  Your Honor?

19        THE COURT:  Yes.

20        UNIDENTIFIED SPEAKER:  Respectfully, I would like to

21  object on the grounds of completeness and ask that my friend

22  read the next question and the next answer as well.  That is

23  line 5 on page 105 through line 24 on that page, Your Honor.

24  Thank you.

25        THE COURT:  Okay.  There's been a request for some

1    additional context.

2           MR. GAFFEY:  Can I read what I want, get an answer,

3    and then I'll read that?  How's that?

4           THE COURT:  That sounds fine to me.

5           UNIDENTIFIED SPEAKER:  I object to that.

6           THE COURT:  Well, this is -- this is the examination

7    within the movant's case of a current Barclays employee and

8    without getting into who's hostile to whom at this point, I'm

9    going to let the questioning proceed in the manner proposed by

10   Mr. Gaffney over your objection.  He'll then read the material

11   that you'd like him to read and, trust me, I can process this

12   information at whatever order it's presented.

13          UNIDENTIFIED SPEAKER:  I appreciate it, Judge.

14          THE COURT:  Thank you.

15   BY MR. GAFFNEY:

16   **Q.   So, Mr. Berkenfeld, let's go back to page 104, line 20, of**

17   **your deposition through 105, line 4.**

18   **"Q.  Was it the contemplation, was it part of the structure of**

19   **the transaction that Barclays was in fact going to undertake to**

20   **assume liabilities in roughly the amounts guided by the**

21   **schedule marked as Exhibit 19?**

22   **"A.  I believe it was the understanding Barclays would assume**

23   **liabilities that were at the time estimated roughly to be in**

24   **this amount."**

25          **Was your testimony in response to that question truthful**

172

1    at the time you gave it?

2    A.   Yes, it was and I didn't say in my answer "guided by the

3    schedule".  That was in your question.  It was not in my

4    answer.  I said that "it was my understanding that Barclays

5    would assume liabilities that were at the time estimated

6    roughly to be in this amount" but I didn't think it was guided

7    by the schedule.

8    Q.   Let's -- can we -- I just want to go back to this.  So,

9    when I ask you was it -- the contemplation, "was it part of the

10   structure of the transaction that Barclays was, in fact, going

11   to undertake to assume liabilities in roughly the amounts

12   guided by the schedule marked as Exhibit 19", are you telling

13   us now your answer had nothing to do with whether it was guided

14   by the schedule marked as Exhibit 19?

15   A.   I think the distinction I'm trying to make, which I was

16   making before, is that --

17   Q.   Sir, with respect, could I have an answer to the question

18   I asked?  My question was when I asked you a question that

19   ended "in roughly the amounts guided by this schedule marked as

20   Exhibit 19", was your answer meant not to relate to the amounts

21   guided by the schedule marked in Exhibit 19?  That's a yes or

22   no question, sir?

23   A.   Then I guess my answer is, no.

24   Q.   So, you understood the question that I asked you "to

25   include whether or not the amounts were guided by the schedule

1    marked as Exhibit 19" when I asked you that question?

2    A.   I don't remember what I was thinking at the time but what

3    I was saying was that the amounts, the rough estimates, were

4    consistent.  They weren't guided by the schedule.  It's a

5    comment I've been making throughout my testimony.

6        The schedule is not the agreement.  It wasn't even

7    attached.  These numbers weren't brought in.  So, I didn't view

8    the deal.  Let's talk about the tail wagging the dog.  I didn't

9    view the schedule as guiding the deal.  The schedule to me had

10   a purpose of allocating assets.  The asset purchase agreement

11   was the deal between the parties, not the schedule.  It was not

12   meant as a balance sheet of the transaction.  I never viewed it

13   that way.  I didn't initial it in that context.  It doesn't

14   include all the elements of the transaction.  It wasn't

15   contemplated that way.  And so, at the time of my deposition

16   and today, I consistently say that these decisions weren't

17   guided by the schedule.  It makes it sound like the schedule

18   was the agreement between the parties, and it wasn't.  The

19   asset purchase agreement was the agreement between the parties.

20   Q.   Did it come to your attention during the week when the

21   hearings were held in this court on the 17th and the 19th that

22   the two billion dollar comp number was given to the Court?

23   A.   My understanding was that a comp number was given to the

24   Court that originally was higher than the two billion but at

25   the time, I think of Friday was at two billion.

174

1   Q.   And did the two billion dollar number that was given the

2   Court, sir, bear any relation to the two billion dollar number

3   on that schedule?

4   A.   Well, the numbers aren't consistent.

5   Q.   Okay.  Did it bear any relations to the calculation of two

6   billion dollars for comp on that schedule?

7   A.   Bear relation, yes.

8   Q.   And at some point, I believe by the 17th, that is the time

9   between the preparation of this schedule and the submission of

10   the sale motion, the calculation for cure came to 1.5, reduced

11   from two and a quarter, do you recall that?

12   A.   I -- I don't recall how it got from one number to the

13   other.  I wasn't part of those discussions.

14   Q.   Okay.  You do recall the fact that it went from two and a

15   quarter to 1.5?

16   A.   I recall that a 1.5 number was presented to the Court.

17   Q.   Okay.  And you were working closely with the lawyers who

18   were preparing and drafting the asset purchase agreement and

19   who were preparing the sale motion to be submitted to the

20   Court, correct?

21   A.   Working closely when?

22   Q.   On the 16th of September.

23   A.   Well, I described before what I was doing, but this was

24   one piece of many things that I was doing.  And so was I with

25   my sleeves rolled up, there around the clock, working through

175

the agreement?  No, that's not correct.

Q.   You had a general idea that estimates for comp and cure

were being given to the Court as part of a package of materials

submitted to seek the Court's approval of a transaction, yes?

A.   Yes, that's correct.

Q.   And was it your understanding that the estimates for comp

and cure that were given to the Court as part of the package

for seeking its approval were meant to be understood to be

estimates of what Barclays actually would wind up paying?

A.   My understanding, my impression, was that they were rough

estimates of what Barclays might be paying.  In particular on

the cure, though, I think it was -- is extre -- exceedingly

rough estimate that there were going to be a lot of factors

that were going to weigh into exactly what --

Q.   Okay.

A.   -- who was going to pay.

Q.   And -- but the 1.5 that was given to the Court, rough, I

hear what you're saying, but the 1.5 was meant to be an

estimate to the Court -- and estimate to the Court of what

Barclays could wind up paying in cure amounts?

A.   My impression of it was it was sort of the -- the best

good faith effort -- estimate at the time --

Q.   Okay.

A.   -- and could be made at the time.

Q.   And when you had that understanding that it was the best

176

1    good faith effort that could be had at the time, did you have

2    any information about what Barclays' plan was with respect to

3    the amounts that it would undertake for contract cure?

4    A.    No, I did not.

5    Q.    And did you have any information as to Barclays' plan for

6    how much it would spend for compensation?

7    A.    No, I did not.

8    Q.    And was it known to you when the schedule was prepared on

9    the 16th of September, that the comp amount shown on that

10    schedule was a billion dollars in excess of the amount accrued

11    on Lehman's books?

12    A.    I was not aware of that.

13    Q.    Did that ever come to your attention before the asset

14    purchase agreement was submitted?

15    A.    No, it did not.

16    Q.    Just to return a bit, sir, to the top of marking books.

17    If you wanted to know whether the books -- whether Lehman's

18    books accurately reflected market values on the 15th or 16th of

19    September, you would ask the chief financial officer, correct?

20    A.    I would start with chief financial officer, Ian Lowitt and

21    the comptroller.

22    Q.    And another person you would ask would be Martin Kelly,

23    correct?

24    A.    Correct.

25    Q.    Now, do you know if the values that were calculated which

177

1    wound up being collected in this allocation on Exhibit 2 were

2    done an asset-by-asset basis -- an asset class-by-class basis

3    or any other basis?

4    A.   I don't know.

5    Q.   Did you have any understanding at the time when you signed

6    the schedule?

7    A.   No, I -- I don't think I did.  I wasn't involved in that

8    process, I wasn't participating or observing.  It came to me as

9    more of a completed process.

10   Q.   Now, to your knowledge, sir, none of the lawyers involved

11   in the drafting of the asset purchase agreement were aware of

12   any loss on assets in the structure of the deal?  Is that

13   correct?

14   A.   I'm not sure what you mean by loss on asset?

15   Q.   Well, to your knowledge, were any of the lawyers involved

16   in the drafting told anything about a five billion dollar

17   overall loss to Lehman against its marks?

18   A.   I believe that -- I -- I don't want to say all the

19   lawyers, but most of the lawyers were aware that the securities

20   positions were worth less then they were on Friday.  And if

21   that's what you mean by a loss from Fridays' marks, I think

22   most of the lawyers were aware of that, just aware of what's --

23   was going in the market.

24   Q.   So is it correct, sir, that -- or incorrect, that none of

25   the lawyers involved in the drafting were aware of any loss on

178

1    assets?

2    A.   My view on that as you're stating the question is that

3    it's not accurate.

4    Q.   Okay.  And if I put that in the context of asking you this

5    question:  To your knowledge, were any of the lawyers involved

6    in the drafting told anything about a five billion overall loss

7    to Lehman against the marks?  Would the statement, "To your

8    knowledge, none of the lawyers involved in the drafting were

9    aware of any loss on assets" be true?

10   A.   I -- I'm really not trying to split hairs here.  It goes

11   back to the point of was it a loss on assets from marks on

12   Friday versus a loss relating to the transaction.  I think that

13   the lawyers knew generally that there was a loss on the

14   positions, the value of the positions since Friday.  If you're

15   asking me about another loss around the transaction, I don't

16   know that lawyers knew about that.  I'm not sure what you're

17   referring to.

18       I'm trying to be very precise in answering exactly what

19   you're asking me, and -- and the terminology you're using, to

20   me, is ambiguous.

21   Q.   And you were trying to be precise when your deposition was

22   taken?

23   A.   I was trying to be.

24   Q.   You understood that was testimony, just like the testimony

25   you're giving today?

179

1   A.   Yes.

2   Q.   Can you turn to page 70 of your deposition?  And I'd ask

3   you, sir, to take a look at -- starting at line 20 on page 70

4   and we'll go over to page 71 at line 2.

5        I asked you this question:  To your knowledge, were any of

6   the lawyers involved in the drafting told anything about a five

7   billion overall economic loss to Lehman against the marks?

8   Answer:  To my knowledge, none of the lawyers involved in the

9   drafting were aware of any loss on assets.

10       Was that a true answer when you gave it?

11  A.   Yes, but --

12  Q.   Were you trying to --

13  A.   -- I think I understand your question to mean, at the

14  time, a loss on the marks as of Tuesday; the then-current

15  marks.  And I think you're asking me now about the marks as of

16  Friday.  So my -- and --and maybe you intended something

17  different when you asked the question.  My reading of this was

18  overall economic loss to Lehman against the marks, and I

19  interpreted marks to mean the then-current marks:  Was there a

20  discount to the then-current marks on Tuesday?

21  Q.   Okay, because without a qualification, you would assume a

22  reference to the marks to be a reference to the current marks?

23  On the day we're talking about, yes?

24  A.   Within the context of that question, yes.

25  Q.   Okay.  Can we go back to the definition of purchased

1    assets in the asset purchase agreement, please?  Page 6 of

2    Exhibit 1.  Now would it be a -- given the interpretation you

3    just suggested with regard to your deposition answer, would it

4    be reasonable, sir, to assume that a reader of that clause

5    describing the long position would assume that it meant the

6    book value as shown on the books on the date hereof, that is

7    the 16th of September, 2008?

8    A.   Yes.  And -- and -- and if you're asking me whether the

9    lawyers knew that the book value as of the date hereof, on that

10   Tuesday, was really seventy-five billion, then this would have

11   some more context to it.  But that's not what you asked at the

12   time and I don't think that's what you asked before.  This was

13   the view of the book value as of the date of Tuesday and

14   lawyers were not aware, as far as I know, of any discount off

15   of the then-current market valuation that had been agreed to on

16   those securities positions.

17   Q.   Now, you don't recall it -- did you at some point during

18   the week, sir, the week leading up to the sale hearing, become

19   aware of a repurchase agreement between Lehman and Barclays?

20   A.   Tangentially removed, I was not involved in the -- in the

21   repo financing.  I was involved in a lot of other things, but I

22   had delegated that to people who had more expertise in -- in

23   repo financing.

24   Q.   All right.  And so I take it then, sir, that you had no

25   knowledge concerning how the repo came or didn't come to play

181

1   any role in the transaction as it ultimately was concluded?

2   A.   Not really.

3   Q.   Okay.  And you had no knowledge of the manner in which or

4   formula by which the assets in the repo were valued, correct?

5   A.   I was not involved in that.

6   Q.   Okay.  Did you attend the sale hearing?

7   A.   On Friday?

8   Q.   Yes.

9   A.   Yes, I did.

10  Q.   Did you attend the whole thing?

11  A.   Yes, I did.

12  Q.   So when a description of the sale was given to the Court

13  at the sale hearing and you heard no reference to the repo

14  other than as an overnight financing device, it wouldn't have

15  struck you that more disclosure might need to be made, is that

16  right?

17  A.   It would not have because I wasn't enough involved that I

18  knew much more than what the lawyers were saying in court about

19  it.

20  Q.   And you don't recall it coming to your attention during

21  the week of September 15th that there was going to be a mark-

22  down of Lehman's books to reflect a discount off of the Lehman

23  book value?  Is that correct?

24  A.   Could you repeat the question?

25  Q.   Well, do you recall it coming to your attention during the

182

1    week of September 15th that there was going to be a mark-down

2    of the books to give Barclays a discount?

3    A.    A mark-down of the books to give Barclays a discount, in

4    what context?

5    Q.    Just -- that's my question, sir.

6    A.    I've -- I wasn't familiar with a mark-down of -- of books

7    to give Barclays a discount.  No, I was not.

8    Q.    And to your knowledge no component of the business

9    terms -- you had no knowledge of any component of the business

10   terms that were agreed upon including a discount off of

11   Lehman's marks, at the time you signed the APA, correct?

12   A.    I was not aware of any discount off the then-agreed to

13   current market valuation.

14   Q.    And in order to make a full and truthful answer to that

15   question, do you have to add the phrase then-agreed to?

16   A.    I think that's the appropriate answer I'd like to give as

17   a full answer.

18   Q.    Could you go to your deposition at page 63?  And starting

19   at line 14 and working through line 18, sir.

20        Halfway across line 14 I asked this question:  To your

21   knowledge did any component of the business terms that were

22   agreed include a discount off those marks?  Answer:  I'm not

23   aware of any discount off the marks.

24        To be precise in your answer then, you didn't need to add

25   that phrase, the then-current marks.  Were you being precise at

183

1    your deposition?

2    A.   Not as precise as I'm being now.

3    Q.   Okay.  Being more precise now because we're here in the

4    courtroom?

5    A.   Yes.

6    Q.   You did understand when you gave your deposition it's the

7    equivalent of testimony as sitting in court?

8    A.   Yes, sir.

9    Q.   Now, to your knowledge, sir, none of the people

10   responsible for making disclosures to the bankruptcy court were

11   told that would be some kind of bulk discount given to

12   Barclays, correct?

13   A.   I -- within Weil Gotshal I don't know what information was

14   known and what was disclosed.  Weil Gotshal was all over the

15   transaction, they were our deal lawyers on the asset purchase

16   agreement.  They have lawyers specifically assigned to the

17   finance department to answer any questions that came up.  They

18   asked, you know, we need a lawyer on-call.  They were given

19   that.

20        There were lawyers involved in the financing and there

21   were lawyers presented to the bankruptcy court.  How

22   communication occurred within Weil and who exactly knew what, I

23   don't know.  But we were re -- I was relying on Weil as our

24   counsel for the transaction and our counsel in bankruptcy court

25   to make sure that all material information was disclosed to the

184

1    court.  They were in the best position to know the information

2    and to evaluate the information.

3    Q.    Could you take a look at your deposition at page 72, sir?

4    And I'm at page 72, starting at line 22 and going over to page

5    73, line 3:

6    "Q.  And to your knowledge, sir, were any of the people

7    responsible for making disclosures to the bankruptcy court told

8    that there would be some kind of bulk discount given to

9    Barclays?

10   "A.  Not to my knowledge."

11        Was that a truthful answer when --

12   A.    Yes.

13   Q.    -- you gave it, sir?

14   A.    That's in -- consistent with what I just said --

15   Q.    Were --

16   A.    -- not to my knowledge.

17   Q.    Were you being precise when you gave the answer "not to my

18   knowledge" without an explanation that Weil Gotshal might have

19   known?

20   A.    In -- in the context of the deposition and the question

21   you asked?  Yes.

22   Q.    Okay.  So to your knowledge, sir, were any of the people

23   responsible for making disclosures to the bankruptcy court told

24   that there would be some kind of bulk discount given to

25   Barclays?

185

1    A.   Not to my knowledge.

2    Q.   And that remained the state of your knowledge through the

3    time from the original notification to court, the original

4    motion through the closing on September 22nd?  That nobody

5    responsible for making disclosures to the Court was aware of

6    any bulk discount?

7    A.   Not to my knowledge.

8    Q.   Okay.  And as far as you know, nobody responsible for

9    making disclosures to the Court had knowledge of the discount

10   after September 22nd?   What's wrong -- sir, as far as you

11   know, none of the lawyers who described this deal to the Court

12   at any time had any knowledge of a discount.  Is that correct?

13   A.   To my knowledge, none of the lawyers who described the

14   transaction to the Court, to my knowledge, had any knowledge of

15   a discount.  As -- as we've defined it.

16          THE COURT:  Mr. Gaffey, we've been at this for just

17   about two hours.  I'm wondering whether or not you're going to

18   be much longer.  If so, it might be a good time for a break.

19   If you think you're going to be concluding in a relatively

20   short period of time, we'll take a break at that point.

21          MR. GAFFEY:  Your Honor, what I -- I think taking a

22   break now would make some sense because I will be able -- I

23   think, if I go through the rest of my outline, to shorten it.

24          THE COURT:  Okay.

25          MR. GAFFEY:  And then be --

186

1          THE COURT:  Let's take a break.

2          MR. GAFFEY:  -- brief when we return.

3          THE COURT:  Let's take a break until around 4 o'clock.

4    Let me just give everyone this admonition.  I have a scheduled

5    telephone conference at 5:30, which will probably be a forty-

6    five minute conference.  If it's absolutely critical that we

7    finish today, I'll see if we can make arrangements to come back

8    at 6:15 to conclude this evening, so as not to have the witness

9    return.  But if that's just not feasible and it may not be,

10   based upon the timing of the day, we can end at 5:25 and resume

11   with wherever we are in Mr. Berkenfeld's testimony tomorrow

12   morning.

13         MR. GAFFEY:  I can't say, Your Honor.  With respect to

14   our next witness, Mr. Miller, he may actually be behind me now.

15   He may not be, but --

16         THE COURT:  Well, he did stick his head in.  I saw

17   that he is here and he made a brief appearance about ten

18   minutes ago.

19         MR. GAFFEY:  he's roughly been apprised, Your Honor,

20   he's been apprised that chances are he's going to have to be

21   testifying tomorrow and I understand he's available.  So from

22   the point of view of once we finish with Mr. Berkenfeld, I'll

23   be ready to go in the morning.  So, whether Mr. Berkenfeld

24   needs to finish tonight is a function of he and his lawyer.

25         MR. SCHILLER:  Mr. Berkenfeld works in the city, he's

187

1    available tomorrow, Judge.  We're happy to break at 5:20 for

2    Your Honor's call.

3            THE COURT:  Okay, terrific.  Meanwhile, we'll break

4    for about ten minutes.

5            MR. GAFFEY:  All right.  And if Mr. Miller was out

6    there, I'm going to send him back to Weil Gotshal --

7            THE COURT:  You might want to send him back so he can

8    bill some time.

9            MR. GAFFEY:  I will do that, Your Honor.

10          (Recess from 3:49 p.m. until 4:05 p.m.)

11          THE COURT:  Please be seated.

12          MR. GAFFEY:  Thank you, Your Honor.

13          THE COURT:  You sent Mr. Miller home?

14          MR. GAFFEY:  I did.

15          THE COURT:  Good.

16          MR. GAFFEY:  With instructions to bill time, as

17   ordered.  He seemed quite enthusiastic at the prospect, Your

18   Honor.

19          THE COURT:  Regrettably, I don't need to tell him to

20   do that.  He can do that on his own.

21   RESUME DIRECT EXAMINATION

22   BY MR. GAFFEY:

23   **Q.   Mr. Berkenfeld, could you take a look at Exhibit M-3?**

24   **It's in the binder in front of you; it's in evidence as**

25   **Movants' Exhibit 3, the so-called clarification letter.**

188

1    A.    Yes.

2    Q.    Okay.  And just for completeness, sir, if you would turn

3    to the signature page for Lehman Brothers Holdings, Inc.  Is

4    that your signature there?

5    A.    Yes, it is.

6    Q.    Okay.  And do you recall when you signed this

7    clarification letter?

8    A.    To the best of my recollection, it was early Monday

9    morning, I believe, bracketed around 7:30, 8 o'clock in the

10   morning.

11   Q.    And when you signed the clarification letter, at the time

12   you signed the letter, you had not developed an understanding

13   of the reason for each and every one of its terms, is that

14   right?

15   A.    I -- I think that's a fair characterization.

16   Q.    And you did not ask about each and every one of the terms

17   in the clarification letter at the time you signed it?

18   A.    There were parts of it I was very familiar with,

19   provisions having to do with for instance, transfer of

20   businesses as opposed to assets, and I had spent a lot of my

21   time from the signing of the asset purchase agreement that week

22   on issues like how we keep on operating, what about businesses

23   like Canada, Israel, Eagle Energy, what was in, what was out,

24   what's -- came in.  So I was very familiar with those and was

25   to some extent leading some of the discussions on -- on what

189

1    should be done with some of those businesses.  But some of the

2    others, in particular the provisions around the financing, I

3    was less familiar with.

4    Q.   Okay.  Generally, you understood -- the portions that you

5    focused on were more long the side of the spectrum concerning

6    the new business deal that had been agreed to, is that right?

7    A.   Not the new business deal, the inclusion of -- of

8    businesses, like the private investment management business,

9    whether that was going to be in the deal or not.  And that was

10   something that was moving around and -- and some of those

11   businesses like Eagle Energy Commodity Business was originally

12   in the transaction and then was taken out.  So my focus from

13   signing to closing was on that.  Back to the point of how does

14   Lehman operate and not reflective clarification agreement but

15   the transition services agreement and how would the Lehman

16   estate be able to function post the acquisition of the Lehman

17   Brothers North American business.

18   Q.   Now would it be fair to describe the deal reflected in the

19   clarification letter that you signed as a different deal than

20   the one that you signed on the 16th?

21   A.   Yes, that would be fair.

22   Q.   It would be fair to characterize it as an amended deal, is

23   that correct?

24   A.   You could characterize it as amended deal, that's correct.

25   Q.   You would characterize it as an amended deal, isn't that

190

1    right?

2    A.   Yes.

3    Q.   And among the changes reflected in the amendments of the

4    clarification letter, some of the changes were not immaterial,

5    is that right?

6    A.   I think the part of the agreement was the same.  That it

7    was a purchase of real estate assets, for an appraised value.

8    There was a payment of 250 million for Lehman Brothers and

9    there was a acquisition of assets and assumption of liabilities

10    to allow Barclays to operate the business in the ordinary

11    course.  I think the -- the fundamentals of the transaction, in

12    my mind, were the same.

13    Q.   One fundamental aspect of the deal that changed, however,

14    was that you understood that the assets to be transferred had

15    dropped in value, correct?

16    A.   I understood that assets with a lower value were being

17    transferred.

18    Q.   And that was a combination of -- that was caused by a

19    combination of -- but, some element in the different number was

20    the unavailability of certain assets to be transferred,

21    correct?

22    A.   Yes.

23    Q.   For example, the Chicago market closed-out positions which

24    prevented assets from being transferred over to Barclays,

25    correct?

191

1    A.    That's going -- I knew about the -- the CME issues, was

2    somewhat involved with that, but really not that close to where

3    some assets were getting held up and -- and couldn't be

4    transferred.   It wasn't an area that I was particularly focused

5    on.

6    Q.    And understanding when you signed it that it was a

7    amendment to the asset purchase agreement what steps, if any,

8    did you take to ensure that the clarification letter was

9    brought to the Court's attention?

10   A.    I went through the clarification letter or discussed it

11   with Weil Gotshal and with Simpson Thacher who were both

12   reviewing it.   I got comfort from Weil that it was something

13   that was appropriate to sign.   I signed it because at the time,

14   at Weil's offices, I was the only authorized officer of Lehman

15   Brothers Holdings that was there that could sign it.   But I

16   don't recall any discussion with Weil about what needed to be

17   disclosed to the Court.

18   Q.    And there was no discussion one way or the other about --

19   A.    there was no discussion one way or the other.   There was

20   not a discussion that we should or that we shouldn't.   I just

21   don't remember the subject coming up in my -- in my discussions

22   with Weil Gotshal.

23   Q.    To your knowledge, were additional assets added to the

24   transaction by virtue of the clarification letter?

25   A.    When you say assets, are you meaning securities positions?

192

1    Q.    I'll take that, sure.

2    A.    Not -- I don't -- not that I know of.

3    Q.    Okay.  Did you have any understanding at the time about

4    the contents of certain clearance boxes being added through the

5    clarification letter?

6    A.    No, I didn't.  Again, it was beyond my area of expertise

7    and my area of focus.

8    Q.    Did you have an understanding at the time about the

9    addition of certain 15c3 assets being added being added through

10   the clarification letter?

11   A.    I was not involved in those discussions.

12   Q.    If you would take a look at the -- did you have an

13   understanding at the time that the definition of purchased

14   assets was changed through the clarification letter?

15   A.    Yes.

16   Q.    Okay.  And would you take a look -- we'll blow it up on

17   the screen here -- within Purchased Assets, subsection 2, and

18   both on pages 1 and 2, now you see in the clarification letter,

19   sir, there is a change in the definition of purchased assets

20   that makes reference to, in subsection (a), securities owned by

21   LBI and transferred to purchaser or to affiliates under the

22   Barclays repurchase agreement as specified on Schedule A

23   previously delivered by seller and accepted by purchaser.  Do

24   you see that?

25   A.    Yes.

193

1   Q.   And at the time that you signed the clarification letter,

2   did you have an understanding of what comprised those

3   securities?

4   A.   I would say a very general understanding.

5   Q.   Was it general -- was it any more specific than the fact

6   that there were some repurchase agreement securities?  In other

7   words, did it go beyond the actual language of the letter?

8   A.   No, it did not.

9   Q.   Okay.  You had no knowledge concerning the value of that

10   particular component?

11   A.   I had no independent knowledge and I wasn't part of any of

12   those discussions, as that was gener --

13   Q.   So I take it then you had no knowledge as to how the

14   collateral on that particular component was valued?

15   A.   I did not.

16   Q.   Okay.  And in subsection (b) of the change in the

17   defini -- in the definition of purchased assets in the

18   clarification letter, there's a reference to sub-securities and

19   other assets held in LBI's clearance boxes as of the time of

20   the closing.  Which at the close of business on September 21,

21   2008 were as specified on Schedule B previously delivered by

22   seller and accepted by purchaser.  Do you see that?

23   A.   Yes.

24   Q.   Did you have any understanding of what comprised the

25   securities and other assets held in LBI's clearance box at the

194

1    time you signed the clarification letter?

2    A.    Not with any specificity.  Not the L -- what was in the

3    clarification letter.

4    Q.    Same question.  Did --

5    A.    Yes.

6    Q.    -- what is said here is what you knew and you had no

7    knowledge beyond that, correct?

8    A.    That's correct.

9    Q.    Okay.  So I take it then that you had no knowledge as to

10    the value of the securities and other assets held in the

11    clearance boxes at the time you signed the clarification

12    letter?

13    A.    That's correct.

14    Q.    And then the next logical issue, of course, is you didn't

15    have any knowledge as to how or by what formula the securities

16    and other assets in the clearance box were valued?

17    A.    Right, I had no knowledge one way or the other.

18    Q.    Okay.  And as to both the contents of the repo collateral

19    and the contents and the clearance boxes, you had no knowledge

20    as to who had conducted any valuations regarding those two

21    categories of securities, correct?

22    A.    That's correct.

23    Q.    Now sir, at the time that you signed the asset purchase

24    agreement, your understanding of the transaction as reflected

25    in the asset purchase agreement was that Barclays would not on

195

1    acquisition, have an immediate excess value in the assets that

2    were being transferred to it, is that correct?

3    A.    We weren't thinking of the agreement that way.  We weren't

4    really looking at it from Barclays' standpoint.  We were

5    thinking of the -- of the transaction from Lehman's standpoint,

6    so the issue of whether or not Barclays had a gain was not

7    something that I discussed with any of the Barclays

8    representatives or any the Lehman principals one way or the

9    other.

10        It was my impression that -- I didn't -- I really --

11   really didn't know if there was going to be a gain.  I think

12   that the agreement didn't require it, it didn't guarantee it,

13   but it didn't require a guarantee of loss, either.  And neither

14   was a gain or a loss precluded.  But I don't -- it's really not

15   the way we were thinking about it.  But it was not my

16   understanding at the time I signed it that -- I didn't know how

17   Barclays was account (sic) for it, I didn't know if there would

18   be a gain to them one way or the other.

19   Q.    Okay.  I want to go back to the verb I think I used in my

20   question.  To your understanding of the transaction -- was it

21   your understanding of the transaction that on acquisition, as

22   reflected in the asset purchase agreement, it was not intended,

23   intended, that Barclays would have an immediate excess value in

24   the assets that they were bringing over?

25   A.    I don't know what was intended but it was my impression

196

1    that there wasn't an immediate gain on acquisition.

2    Q.   Did you have any thoughts about what was intended when you

3    signed the agreement?

4    A.   My thoughts of what was intended when I signed the

5    agreement were from Lehman's perspective.  What were we

6    accomplishing for Lehman.  I wasn't really focused on whether

7    Barclays was going to have a gain or not, short-term or long-

8    term.  I expected that there would be a gain, ultimately,

9    because I believe that the franchise value of Lehman was -- was

10   worth more than 250 million.  If they were able to keep the

11   team together, if the markets would normalize, I thought over

12   time there'd be value.  That was my impression.  But the focus

13   was what are we doing for Lehman.  What are we doing for the

14   estate, what are we doing for the employees?   And not really

15   what Barclays was going to -- how Barclays was going to account

16   for this.

17   Q.   Well, I'm not actually asking about the long-term value.

18   I'm asking about on acquisition.  At the time you signed the

19   asset purchase, was it intended by the agreement that on

20   acquisition Barclays would have a gain?

21   A.   I don't think the agreement, as you said intended by the

22   agreement, I don't think the agreement addresses it one way or

23   the other.  I think the agreement, as I said, didn't require

24   it, it didn't preclude it.  It didn't preclude a loss, either.

25   I don't -- I don't think the agreement as drafted had anything

197

1    to do with gain or loss to Barclays.

2    Q.    Could you take a look at your deposition on page 112?  And

3    directing your attention to the question beginning at line 7,

4    concluding through the answer ending at line 25:

5    "Q.  I'm not actually asking about the long-term value.  If it

6    operates what it bought while it makes money in the long-term,

7    great.  I'm asking whether it was, whether the transaction was

8    in your mind when you signed it, was it structured so that

9    Barclays would enjoy a gain because of the excess of the fair

10   value of the net assets it acquired over the consideration that

11   Barclays paid?"

12        There's an objection and then this question:

13   "Q.  Not whether it was going to long-term be successful

14   operating the business, on acquisition?

15   "A.  My understanding of the transaction is that on

16   acquisition, as reflected in the asset purchase agreement, it

17   was not intended that Barclays would have an immediate excess

18   value in the assets that they were bringing over."

19        Was that after a testimony when you gave it, sir?

20   A.    It was and the question you asked me --

21   Q.    And were you giving it the same degree --

22   A.    -- before was, was it intended by the agreement.  I did

23   not understand your question to be was it intended by the

24   agreement.  Was the agreement drafted so that there would be a

25   gain to Barclays, or excess value to Barclays.  That's the

198

1   question you asked me before and that's why I talked about the

2   agreement, not having a -- as -- as far as I understood, my

3   impression, there was not an intent.  But I didn't discuss that

4   with the principals and so I don't know what the intention of

5   the Barclays principals were or some of the Lehman principals.

6   It just wasn't a discussion that I had one way or the other.

7   Q.   Let me just read your answer again and ask you if it's an

8   accurate statement of your testimony, beginning at line 21:

9        "My understanding of the transaction was that on

10  acquisition as reflected in the asset purchase agreement, it

11  was not intended that Barclays would have an immediate excess

12  value in the assets that they were bringing over."

13       Is that a true statement?

14  A.   That was true as to my understanding.

15  Q.   And to your knowledge, it was not intended in any part of

16  the deal as it evolved between the 16th of September through

17  when it closed on the 22nd?  Is that correct?

18  A.   Intended by whom?  I can't answer a question with a

19  predicate, but --

20  Q.   Let's start with the parties to the agreements that you

21  signed, sir.

22  A.   I --

23  Q.   Those parties.

24  A.   I didn't have a discussion one way or the other with

25  anyone from Barclays or any of the Lehman principals where it

199

```
 1    was communicated to me that there would be a gain or a loss in

 2    the agreement -- from the agreement, from this transaction to

 3    Barclays.

 4    A.    To your knowledge, to your knowledge --

 5    A.    To my knowledge.

 6    Q.    -- it was not intended in any part of the deal as it

 7    evolved from the 16th through the 22nd that there would be a

 8    gain on acquisition for Barclays?  Yes or no.

 9    A.    My impression, my understanding was that there was not

10    excess value in the assets that were being transferred over.  I

11    didn't really know how Barclays was going to account for it.

12    Q.    And you didn't understand it to be an imperative of the

13    transaction that there be a first day gain for Barclays,

14    correct?

15    A.        That is correct.

16          MR. GAFFEY:  I have nothing further, Your Honor.

17          MS. TAGGART:  No questions from the committee.

18          MR. MAGUIRE:  If it please the Court.

19    CROSS-EXAMINATION

20    BY MR. MAGUIRE:

21    Q.    Mr. Berkenfeld, my name is Bill Maguire.  I represent the

22    SIPA trustee.  You testified a little bit about the

23    clarification letter and you mentioned that you had -- you had

24    signed that.

25    A.    Correct.
```

200

1    Q.    Were you present for the closing?

2    A.    I was present at the time the agreement was signed, yes.

3    Q.    And were you --

4    A.    Clarification letter, excuse me.

5    Q.    Were you provided with an execution page?

6    A.    Yes.

7    Q.    And you signed the execution of page?

8    A.    Yes.

9    Q.    And where was that?

10   A.    At the offices of Weil Gotshal in their conference center.

11   Q.    And where in the conference center?

12   A.    In one of the conference rooms.

13   Q.    You mentioned that you had been present for the entire

14   sale here?

15   A.    The sale in the Court on Friday?

16   Q.    Yes.

17   A.    That's correct.

18   Q.    So from the time that the sale herein concluded in the

19   early hours of Saturday morning until the time of the closing

20   in Weil Gotshal's conference center on Monday morning, you were

21   not aware of any significant changes to the deal between the

22   parties?

23   A.    Well, I was aware of the terms of the clarification

24   letter, if that's what you're asking.  When -- when I -- there

25   were drafts of a clarification letter that were going around

201

1    that weekend after I left the hearing , went home, worked from

2    home all day and again answered hundreds of questions about

3    what was included in the bankruptcy, what was it, what was

4    going on with different assets.

5        The clarification letter was being worked on by the

6    lawyers, the outside counsel.  I was not that directly involved

7    in it, but I knew that changes were being made and I knew that

8    the clarification letter ultimately on Sunday reflected changes

9    to -- some changes to the agreement, the asset purchase

10   agreement.

11   Q.   And, sir, you refer to changes in the clarification letter

12   in your answer just now.  If you turn to your deposition

13   transcript, at page 154, starting at line 3, you were asked the

14   following question and you gave the following answer:

15   "Q.   In the weekend, that's the Saturday the 20th and Sunday

16   the 21st, were there significant changes made in the terms over

17   the weekend leading to the Monday?

18   "A.   Not that I recall."

19       That was a true answer then, was it not, sir?

20   A.   Yes.

21   Q.   Is that still a true answer?

22   A.   I don't recall if the changes were significant or not,

23   over the Saturday 'til I came into Weil Gotshal's offices on

24   Sunday.

25   Q.   Do you have Movants' Exhibit 3, the clarification letter

202

1    in the binder before you?  If you turn to the second page of

2    the letter, sir.  And just for context, at the very top of the

3    page, there's a carry over from the first page and it continues

4    the description of purchased assets.  I'd like you, sir, to

5    focus on the last two lines of that paragraph on the page.

6    You'll see right after the words "exchanged traded

7    derivatives," I've -- there's a parenthetical.  Do you see

8    that, sir?

9    A.    Yes.

10   Q.    And that parenthetical reads and I quote: "and any

11   property that may be held to secure obligations under such

12   derivatives."  You're with me, sir?

13   A.    Yes.

14   Q.    Now it's true, is it not, that you were not aware what the

15   business deal was between the parties that is reflected in that

16   parenthetical?

17   A.    That is correct.

18   Q.    You've no knowledge whether indeed there was any business

19   deal with respect to that parenthetical?

20   A.    I have no knowledge of the meaning of that par --

21   parenthetical and where it originated from.

22   Q.    And specifically, sir, you are not aware of any business

23   agreement between Lehman and Barclays to transfer Lehman's

24   margin assets to Barclays?

25   A.    I'm not -- I'm not aware of it.

203

1   Q.   You are aware that the Court was told during the sale

2   hearing that there was no cash being transferred to Barclays?

3   A.   I think that the reference -- I remember that being said,

4   that the reference to cash was in terms of the cash that was

5   originally part of the purchased assets and that that amount of

6   cash that was in the asset purchase agreement as one of the

7   purchased assets was no longer part of the transaction.

8        I don't remember if there was a broader comment about no

9   cash in any other context being transferred over or not as --

10  as collateral or -- or margin, I don't know.  I think the cash

11  that I recall at the hearing had to do with unencumbered cash

12  on the balance sheet.

13  Q.   There was an exclusion for cash in the asset purchase

14  agreement, was there not?

15  A.   There was in the original asset purchase agreement, there

16  was actually cash that was going with the transaction.

17  Q.   You're referring to the retained cash?

18  A.   I don't recall the definitions off-hand.

19  Q.   You recall that this was an asset purchase agreement?

20  A.   Yes, but I don't know if it was called retained cash, I'd

21  have to look back at the asset purchase agreement.

22  Q.   Okay.  So I'll represent to you that there was a -- that

23  there was an exclusion for cash and cash equivalents in the

24  asset purchase agreement, okay?

25  A.   As I recall, there was some cash excluded and some cash

204

1    included in the asset purchase agreement.

2    Q.   And the cash that was included was ultimately dropped out

3    of the agreement, do you recall that?

4    A.   Yes, I do.

5    Q.   And you are not aware of any business deal between the

6    parties over the weekend of the clarification letter to add

7    Lehman's cash into the purchased assets?

8    A.   I'm not aware of any.

9    Q.   Thank you, sir.

10        MR. MAGUIRE:  No further questions.

11        THE COURT:  Mr. Schiller, it's cross-examination.

12   CROSS-EXAMINATION

13   BY MR. SCHILLER:

14   Q.   Good afternoon, Mr. Berkenfeld.

15   A.   Good --

16   Q.   Jonathan Schiller for Barclays.  I want to ask you to open

17   the book my friend gave you to the transcript section.

18   A.   Yes.

19   Q.   And to page 63.

20   A.   Yes.

21   Q.   If you recall, you were asked to read -- you were asked

22   about questions that began on page 62, line 20 and you gave an

23   answer:  "My understanding is that they were based on the

24   marks."  Do you see that?   Top of 63?

25   A.   Yes.

205

1    Q.   And I raised a question about completeness inappropriately

2    at the time, so I would like to return to that and ask you to

3    read the question and answer, lines 6 through 11:

4    "Q.  Did they say something to you?  Answer:  I don't exactly

5    recall what they said.  "Yeah," from the examiner.

6    "A.  But it was in the delivery of the schedule and what it

7    represented as an estimate for purchased assets and assumed

8    liabilities."

9         Do you see your answer there?

10   A.   Yes.

11   Q.   Are those -- that question -- the answer to those

12   questions was accurate?

13   A.   Yes.

14   Q.   And were you referring when you referred to the estimate

15   of purchased assets that assume liabilities, the process that

16   you described with negotiations between the parties on Monday

17   and Tuesday?

18   A.   Yes.

19   Q.   Again, you were asked at page 104 and 105, would you turn

20   to that in the transcript please.  You were asked a question

21   beginning at line 13 through your answer at page 105.  And the

22   question was: "Did anyone ever suggest to you that sum or

23   substance, sir, when you saw the financial schedule marked as

24   Exhibit 19 that the comp and the cure were just plugged numbers

25   to make it balanced?"

206

"A.   To my recollection, no one had ever suggested that to me.

"Q.   Was it a contemplation, was it part of the structure of

your transaction that Barclays was in fact going to undertake

to assume liabilities in roughly the amounts guided by the

schedule marked as Exhibit 19?"

You remember that question?

A.   Yes.

Q.   In that colloquy with my friend?  And your answer:  "I

believe it was the understanding the Barclays would assume

liabilities that were at the time estimated roughly to be in

this amount."

And then you went on to answer the next question.  And let

me bring that to your attention.  Again, at line 5, was the

question:

"Q.   And the liabilities -- well, at that Barclays -- I don't

want to hold you to that exact set of the number" -- my friend

said -- "that level of specificity.  But the liability that

Barclays would assume would be roughly in the neighborhood of

the comp, cure and comp, for cure and comp would be roughly in

the neighborhood of the cure and comp amounts shown on the

financial schedule as guidance."

And you answered:  "As of the date of this agreement, I

believe it was the understanding that there were liabilities

being assumed by Barclays, some of which could be estimated

with more precision than others.  Certain of the securities

207

1    positions, for instance, could be estimated with more

2    precision, but that the obligation of Barclays from where to be

3    set forth in the purchase agreement, not determined by the

4    schedule."  Is that your answer?

5    A.   Yes, it was.

6    Q.   Was it accurate then?

7    A.   Yes.

8    Q.   Is it accurate today?

9    A.   Yes.

10   Q.   Let me ask you to turn to the first tab of Movants' book

11   that they put in front of you, which is the agreement, the APA.

12   DO you have it?

13   A.   Yes.

14   Q.   Incidentally, before I do that, let me go back to your

15   schedule for just one second.  It's just the next tab.  And

16   Exhibit 19 -- did your schedule list all of the assets that

17   Barclays was acquiring through this sale?

18   A.   No, it did not.

19   Q.   Now let's go back to the APA if you will.  Please turn to

20   page 6 of the asset purchase agreement.

21   A.   Okay.

22   Q.   Do you see the definition of purchased assets?  And I know

23   it has been put before you and the Court extensively today, so

24   I will try to be brief.  You see there's a long list of asset

25   categories, all listed under the heading "Purchased Assets" on

208

1   page 6 and running through page 7, correct?

2   A.   Yes.

3   Q.   Now, I'll represent to you without you having to count

4   that there are nineteen such categories.  Did the schedule you

5   initialed and wrote "final" on include all of those asset

6   categories that are found in the APA?

7   A.   No, it did not.

8   Q.   Let me ask you to look at the purchased asset definition

9   and ask you whether subparagraph (b) all deposits, et cetera --

10  is that reflected on your schedule?

11  A.   No, it's not.

12  Q.   Please go below that, (c) the transferred real property

13  leases together with all improvements, fixtures and other

14  pertinences thereto.  Is that included on your schedule?

15  A.   No, it's not.

16  Q.   (e) fifty percent of each position in the residential

17  estate mortgage securities, and we've heard a lot about the

18  residential mortgage securities, haven't we?

19  A.   Yes.

20  Q.   Is that reflected on your schedule?

21  A.   That, I believe, is reflected in the schedule.

22  Q.   The furniture and equipment, subparagraph (f), is that

23  reflected on your schedule?

24  A.   No, it's not.

25  Q.   Is it your understanding that under the purchase

209

1    agreement, those assets would transfer to Barclays upon

2    closure?

3    A.    Yes.

4    Q.    Did you expect that those assets had value?

5    A.    Yes.

6    Q.    Did the contract estimate a value?

7    A.    No, it did not.

8    Q.    Did your schedule estimate that value?

9    A.    No, it did not.

10   Q.    If Barclays recognized value in its acquisition accounting

11   after the sale, would that be inconsistent with your

12   understanding of the transaction?

13   A.    It would not be inconsistent with my understanding.

14   Q.    If you turn to subsection (i) -- and that refers to

15   customer lists, I hope.  You see that in the middle of little

16   (i) --

17   A.    Yes.

18   Q.    -- on page 7?  Is that reflected -- that asset reflected

19   on your schedule?

20   A.    No, it's not.

21   Q.    And was it your understanding under the purchase agreement

22   that Barclays was entitled to those lists and all other assets

23   in little (i)?

24   A.    Yes.

25   Q.    And did you expect that the customer list had value to the

210

1   going concern following the sale?

2   A.   My expectation would be that they did have value to

3   Barclays.

4   Q.   Did the contract between Lehman and Barclays estimate that

5   value anywhere on its face?

6   A.   No, it did not.

7   Q.   Did the schedule you initialed?

8   A.   No, it did not.

9   Q.   If Barclays recognized value from customer lists with

10   respect to the assets in its acquisition accounting, would that

11   be inconsistent with your understanding of the transaction?

12   A.   No, it would not.

13   Q.   Please turn to page 8 of the APA, if you would.  You see

14   at subsection (q), the definition of purchased assets lists

15   "all past and present good will and other intangible assets

16   associated with or symbolized by the business."?

17   A.   Yes.

18   Q.   Is that category of assets listed anywhere on the

19   financial schedule you initialed on September 16th?

20   A.   No, it's not.

21   Q.   But would those assets transfer to Barclays under the

22   purchase agreement, as far as you were concerned?

23   A.   Yes, they were transferred to Barclays.

24   Q.   And if Barclays were to assign a value to those assets in

25   its acquisition accounting, would that be consistent with the

211

1    APA?

2    A.    It would not be inconsistent.

3    Q.    And if Barclays -- withdraw that.

4         Did Barclays buy all the assets used in the business

5    including the assets listed on pages 6 through 8?

6    A.    The agreement provided that -- I'm going back to the

7    beginning --

8    Q.    Page 6.

9    A.    Page 6, that they buyer was buying all the assets of the

10   seller used in connection with the business, excluding the

11   excluded assets and then it listed some of the examples of

12   those assets that were used in connection with the business --

13   Q.    Okay.

14   A.    -- the objective was to allow Barclays to operate the

15   business in the ordinary course.

16   Q.    And for the Court's reference, do you see the word

17   "including" in the sentence?

18   A.    Yes, right before the -- the colon.

19   Q.    And you -- could you turn to -- briefly to page 10 of the

20   APA?  And you'll see toward the bottom of that page, there is a

21   definition of the word included.

22   A.    Yes.

23   Q.    Please read that.  The word including or

24   A.    The word --

25   Q.    -- any variation thereof means including without

212

1   limitation.  You see that?

2   A.   Yes.

3   Q.   Was is your understanding that these assets would come

4   without limitation, those that were included before, per this

5   definition?

6   A.   It is my understanding that the asset purchase agreement

7   were transferring assets used in the business.  The list of

8   assets that were included in the subsections did not exclude

9   any other assets by the limited list -- inclusion of a list.

10  Q.   Is there any value, anywhere in the APA for any of the

11  purchased assets except the so-called long positions?

12  A.   Not that I recall.

13  Q.   In terms of the short positions, is there a valuation?

14  A.   The short positions that were being assumed?

15  Q.   Yes.

16  A.   Not -- the -- is there a valuation on the schedule?

17  Sorry.

18  Q.   In the contract, anywhere --

19  A.   In the contract, there is a provision that says sixty - -

20  approximately sixty-nine billion for the short positions.

21  Q.   With regard to the long positions, and you were examined

22  perhaps for an hour on that provision, did you have any

23  discussions with anyone concerning the word book value in that

24  description of long positions?

25  A.   Not that I recall.

213

1    Q.    Did you have any discussions with anyone at the time

2    concerning the use of the words book value in the description

3    of the assets?

4    A.    Not that I recall.

5    Q.    Now you were asked about whether the contract was intended

6    to convey gain or loss and you provided testimony on your views

7    of that.  Going back to that area of your direct examination,

8    was there any representation or warranty in the purchase

9    agreement concerning the value of the assets that Barclays was

10   going to acquire in this sale?

11   A.    No, there was not.

12   Q.    Is there any representation that you know of concerning

13   the value of the assets and liabilities in the deal?

14   A.    Not that I know of.

15   Q.    I think you've said that the week of the 15th through the

16   22nd was a very volatile week in the financial markets, right?

17   A.    Correct.

18   Q.    Was there a great deal of uncertainty about the value of

19   the assets in Lehman's portfolio, during the period September

20   15 through September 22nd?

21   A.    The securities positions, yes.

22   Q.    Now, notwithstanding the volatility with respect to those

23   positions, this contract contains no mechanism to ensure any

24   particular profit or loss outcome for either Lehman or

25   Barclays, correct?

214

1   **A.     Correct.**

2   **Q.     Thank you very much.**

3          MR. SCHILLER:  Thank you, Your Honor.

4          THE COURT:  Is there any redirect?

5          MR. GAFFEY:  No redirect from the debtor, Your Honor.

6          THE COURT:  Mr. Berkenfeld, you're excused.

7          THE WITNESS:  Thank you.

8          THE COURT:  Maybe we shouldn't have sent Mr. Miller

9   home.

10         MR. GAFFEY:  I'm not inclined to go get him, Your

11  Honor.

12         THE COURT:  All right, and I'm not inclined to suggest

13  that you do.  Is there anything else for this afternoon?

14         MR. GAFFEY:  I've not got anything to begin or add at

15  this point, Your Honor, having such a short cross --

16         THE COURT:  Fine.  We can all enjoy the unexpectedly

17  free afternoon between a quarter to 5 and 5:30 and I'll see you

18  tomorrow morning at 9:30.

19         MR. GAFFEY:  Thank you, Your Honor.

20         (Whereupon these proceedings were concluded at 4:45 p.m.)

21

22

23

24

25

215

```
 1
 2                         I N D E X
 3
 4                     T E S T I M O N Y
 5   WITNESS              EXAM BY              PAGE    LINE
 6   Bart McDade          Mr. Boies            18      24
 7   Bart McDade          Mr. Gaffey           62       9
 8   Bart McDade          Mr. Boies            96      11
 9   Bart McDade          Mr. Gaffey          100      19
10   Steven Berkenfeld    Mr. Gaffey          101      22
11   Steven Berkenfeld    Mr. Maguire         199      19
12   Steven Berkenfeld    Mr. Schiller        204      12
13
14
15                     E X H I B I T S
16   NO.          DESCRIPTION               ID.    EVID.
17   Movants' 254  E-mail to Tim Sullivan with      87
18                 spreadsheets attached
19
20
21                     R U L I N G S
22   DESCRIPTION                           PAGE    LINE
23   Barclays' motion for an order compelling   12    1
24   document production from LBHI and SIPA trustee
25   denied
```

216

I N D E X, cont'd


R U L I N G S

| DESCRIPTION | PAGE | LINE |
|---|---|---|
| Barclays' motion for an order compelling | 14 | 11 |
| Document production from creditors' committee | | |
| granted | | |

217

1

2                        C E R T I F I C A T I O N

3

4       I, Lisa Bar-Leib, certify that the foregoing transcript is a

5       true and accurate record of the proceedings.

6

7       _____

8       LISA BAR-LEIB

9       AAERT Certified Electronic Transcriber (CET**D-486)

10

11      Veritext

12      200 Old Country Road

13      Suite 580

14      Mineola, NY 11501

15

16      Date:  April 29, 2010

17

18

19

20

21

22

23

24

25