1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS HOLDINGS INC., et al.

            Debtors.

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS INC.

            Debtor.

- - - - - - - - - - - - - - - - - - - -x

            United States Bankruptcy Court

            One Bowling Green

            New York, New York


            April 28, 2010

            9:33 AM


B E F O R E :

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

2

1

2   HEARING re Statement of the Securities Investor Protection

3   Corporation in Support of Trustee's Motion for Relief Pursuant

4   to the Sale Orders or, Alternatively, For Certain Limited

5   Relief Under Rule 60(b)

6

7   HEARING re Objection of HWA 555 Owners, LLC to the Motions of

8   Lehman Brothers Holdings Inc., James W. Giddens as Trustee for

9   Lehman Brothers Inc., and the Official Committee of Unsecured

10   Creditors of Lehman Brothers Holdings Inc. to Modify the

11   September 20, 2008 Sale Order and for Other Relief

12

13   HEARING re Statement of the Bank of New York Mellon Trust

14   Company in Support of the Motions for (I) an Order Modifying

15   the September 20, 2008 Sale Order and Granting Other Relief and

16   (II) to Unseal Motions for Relief from September 20, 2008 Sale

17   Order (and Related SIPA Sale Order)

18

19

20

21

22

23

24

25

3

1

2    HEARING re Joint Statement And Reservation of Rights of the

3    Bank Of Tokyo-Mitsubishi UFJ, Ltd. and Lloyds TSB Bank, plc in

4    Connection with (I) Motions of Lehman Brothers Holdings, Inc.,

5    The Official Committee Of Unsecured Creditors, And James W.

6    Giddens, as Trustee For Lehman Brothers, Inc., for Certain

7    Relief Pursuant to the September 20, 2008 Sale Orders; and (II)

8    Motion of Barclays Capital Inc. to Enforce the Sale Orders and

9    Secure Delivery Of Undelivered Assets

10

11   HEARING re Australia & New Zealand Banking Group LTD's Letter

12   Regarding Rule 60 Proceedings

13

14   HEARING re LibertyView's: (A) Joinder to (i) the SIPA Trustee's

15   Motion, (ii) the Committee's Motion; and (iii) LBHI's Motion

16   for Relief from the Sale Orders or, Alternatively, for Certain

17   Limited Relief Under Rule 60(b); and (B) Objection to Barclays

18   Capital Inc.'s Motion to Enforce the Sale Order

19

20   HEARING re Joinder of Newport Global Opportunities to

21   LibertyView's: (A) Joinder to (i) the Trustees' Motion, (ii)

22   the Committee's Motion; and (iii) LBHI's Motion for Relief from

23   the Sale Orders or, Alternatively, for Certain Limited Relief

24   Under Rule 60(b); and (B) Objection to Barclays Capital Inc.'s

25   Motion to Enforce the Sale Order

4

1

2    HEARING re Motion of Debtor to Modify the September 20, 2008

3    Sale Order and Granting Other Relief

4

5    HEARING re Motion of the Trustee for Relief Pursuant to the

6    Sale Orders or, Alternatively, for Certain Limited Relief Under

7    Rule 60(b)

8

9    HEARING re Motion of Official Committee of Unsecured Creditors

10   of Lehman Brothers Holdings Inc., Authorizing and Approving (a)

11   Sale of Purchased Assets Free and Clear of Liens and Other

12   Interests; and (b) Assumption and Assignment of Executory

13   Contracts and Unexpired Leases, Dated September 20, 2008 (and

14   Related SIPA Sale Order) and Joinder in Debtors and SIPA

15   Trustees' Motions for an Order Under Rule 60(b) to Modify Sale

16   Order

17

18   HEARING re Motion of Barclays Capital Inc. to Enforce the Sale

19   Order and Secure Delivery of All Undelivered Assets

20

21   HEARING re Trustee's Adversary Complaint

22

23   HEARING re LBHI's Adversary Complaint

24

25   Transcribed by:  Lisa Bar-Leib

5

1

2    A P P E A R A N C E S :

3    JONES DAY

4        Special Counsel for the Debtors

5        222 East 41st Street

6        New York, NY 10017

7

8    BY:    ROBERT W. GAFFEY, ESQ.

9        WILLIAM J. HINE, ESQ.

10

11    QUINN EMMANUEL URQUHART OLIVER & HEDGES, LLP

12        Special Counsel to the Official Committee of Unsecured

13         Creditors

14        51 Madison Avenue

15        22nd Floor

16        New York, NY 10010

17

18    BY:    SUSHEEL KIRPALANI, ESQ.

19        JAMES C. TECCE, ESQ.

20        RICHARD I. WERDER, JR., ESQ.

21

22

23

24

25

6

1

2    QUINN EMMANUEL URQUHART OLIVER & HEDGES, LLP

3         Special Counsel to the Official Committee of Unsecured

4          Creditors

5         865 S. Figueroa St., 10th Floor

6         Los Angeles, CA 90017

7

8    BY:   ERICA P. TAGGART, ESQ.

9

10   HUGHES HUBBARD & REED LLP

11        Attorneys for the James W. Giddens, SIPA Trustee

12        One Battery Park Plaza

13        New York, NY 10004

14

15   BY:   WILLIAM R. MAGUIRE, ESQ.

16

17   SECURITIES INVESTOR PROTECTION CORPORATION

18        805 15th Street, N.W.

19        Suite 800

20        Washington, DC 20005

21

22   BY:   KENNETH J. CAPUTO, ESQ.

23

24

25

7

1

2    BOIES, SCHILLER & FLEXNER LLP

3         Attorneys for Barclays Capital, Inc.

4         5301 Wisconsin Avenue, N.W.

5         Washington, DC 20015

6

7    BY:   HAMISH P.M. HUME, ESQ.

8          JONATHAN D. SCHILLER, ESQ.

9

10   BOIES, SCHILLER & FLEXNER LLP

11        Attorneys for Barclays Capital, Inc.

12        10 North Pearl Street

13        4th Floor

14        Albany, NY 12207

15

16   BY:   TRICIA J. BLOOMER, ESQ.

17

18   BOIES, SCHILLER & FLEXNER LLP

19        Attorneys for Barclays Capital, Inc.

20        401 East Las Olas Boulevard

21        Suite 1200

22        Fort Lauderdale, FL 33301

23

24   BY:   TODD THOMAS, ESQ.

25

8

1

2   GOODWIN PROCTER LLP

3        Attorneys for Evergreen Solar Inc.

4        The New York Times Building

5        620 Eighth Avenue

6        New York, NY 10018

7

8   BY:   K. BRENT TOMER, ESQ.

9

10  CHAPMAN & CUTLER

11       Attorneys for Creditor, US Bank

12       111 West Monroe Street

13       Chicago, IL 60603

14

15  BY:   JAMES HEISER, ESQ.

16       FRANKLIN H. TOP III, ESQ.

17       (TELEPHONICALLY)

18

19  DEWEY & LEBOEUF LLP

20       Attorneys for CAPCO, Inc.

21       1301 Avenue of the Americas

22       New York, NY 10019

23

24  BY:   ELIZABETH P. SMITH, ESQ.

25       (TELEPHONICALLY)

9

```
 1

 2   STUTMAN TREISTER & GLATT

 3         Attorneys for Interested Party, Elliott Company

 4         1901 Avenue of the Stars, 12th Floor

 5         Los Angeles, CA 90067

 6

 7   BY:   WHITMAN L. HOLT, ESQ.

 8         REBECCA S. REVICH, ESQ.

 9         (TELEPHONICALLY)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

10

1               P R O C E E D I N G S

2          THE COURT:  Be seated, please.  Good morning.  Let's

3    proceed.

4          MR. GAFFEY:  Your Honor, movants call Harvey Miller.

5          THE COURT:  Good morning, Mr. Miller.  You find

6    yourself in an unfamiliar spot in this court this morning.

7          THE WITNESS:  Good morning, Your Honor.  Glad to be

8    here.

9          THE COURT:  I'm going to swear you in even though I

10   know you are a member of the bard.

11      (Witness duly sworn)

12          THE COURT:  Fine.  Thank you.  Be seated.

13          MR. GAFFEY:  Thank you, Your Honor.  Your Honor, as

14   before, we have a witness book.  And I'd like to approach and

15   give Mr. Miller and the Court a copy.

16          THE COURT:  That's fine.

17          MR. GAFFEY:  I have given Mr. Schiller his copy this

18   morning.

19          THE COURT:  Preempting the issue.

20   DIRECT EXAMINATION

21   BY MR. GAFFEY:

22   Q.   Good morning, Mr. Miller.

23   A.    Good morning.

24   Q.   Mr. Miller, I'm Robert Gaffey from Jones Day, special

25   counsel to the estate in this matter.  For the record, I

VERITEXT REPORTING COMPANY

11

1    suppose, sir, you are a partner at Weil Gotshal & Manges?

2    A.   I am

3    Q.   And you have had a role, as I take it, in connection with

4    these bankruptcy proceedings.

5    A.   I believe so.

6    Q.   Could you describe for the Court what your role has been?

7    A.   I was the lead -- I am the leader of the team that dealt

8    with the bankruptcy aspects of the collapse of Lehman Brothers.

9    Q.   And you continue to do so in the ongoing bankruptcy

10   proceeding, sir?

11   A.   I do.

12   Q.   Mr. Miller, I'd like to begin by taking you back to

13   September of 2008.  And I'd like you just to summarize briefly

14   what was happening the week of September 16th through September

15   22nd.

16   A.   On September 15, 2008, Lehman Brothers Holdings Inc. filed

17   a Chapter 11 petition with this Court at about 2 a.m. in the

18   morning.  And starting early in the morning of September 15th,

19   negotiations began with Barclays Capital in connection with a

20   potential acquisition of a North American capital markets

21   business.  It was a week, I think, without any kind of

22   precedent.  It was a catastrophic atmosphere.  I think the only

23   words that you could use to describe it would be organized

24   chaos.

25       On September 15th, the headquarters at 745 Seventh Avenue

12

1    was a scene of large demoralization of the workforce, hundreds

2    of people milling about, negotiations going on.  I can't

3    remember if it was the thirty-first or thirty-second floor.  A

4    certain sense of a frenzy, distress.  Markets were beginning to

5    plunge.  There was great concern on the part of the Lehman

6    executives who were involved in the situation, Mr. McDade, Mr.

7    Russo, Mr. Berkenfeld, to some extent Mr. Fuld about what could

8    be done to preserve value.  Cash was becoming an extremely

9    difficult position to ascertain.  I would say it was a very

10   hectic week and it got worse as the week progressed in terms of

11   the chaos that involved.  There was enormous effort on the part

12   of the team led by Mr. McDade to try and preserve value.  I

13   think the first notice of a potential meeting with the Barclays

14   people was at 7 a.m. in the morning.  Many of us who were

15   involved in the transaction over the weekend were just coming

16   out of the shower when e-mails began to arrive, how fast can

17   you get to 745 Seventh Avenue.  I think I arrived something

18   around 9:00 in the morning.  There were discussions going on at

19   that point between a team of Barclays representatives with

20   their attorneys, Cleary Gottlieb, in a large conference room.

21   As I said, it was sort of a scene of organized chaos.

22        The atmosphere was in the context of can we do something

23   to preserve value here, try and stabilize the markets.  There

24   was great concern over the future of some 10,000 employees.

25   People were still streaming in and out with their personal

13

1   possessions.  You have to remember that this was a Chapter 11

2   filing that was -- proceeded with essentially no planning

3   whatsoever.

4        The negotiations proceeded all day Monday.  There were

5   lots of flash fires.  People were going in and out of the room

6   as these different flash fires occurred.  There were different

7   meetings going on in different places all through the floor.

8   There were many, many lawyers from Simpson Thacher, Sullivan &

9   Cromwell, Cleary Gottlieb and other lawyers.  There were

10   hundreds of people floating around on that floor.

11        Those negotiations were proceeding on the basis of could

12   there be a transaction that could be effected within a very

13   short period of time.  The issue was that -- and I hate to use

14   the analogy again but it was used in the courtroom -- of the

15   melting ice cube.  And in the negotiations with the Barclays

16   team, it was made clear that time was of the essence as the

17   business eroding.  And there was even, I would say, some

18   persuasion from the federal regulators that if you can do a

19   deal, get a deal done, the markets were getting worse.  And the

20   big issue, from my perspective during Monday, was could you get

21   a deal done within the time constraints which were laid out by

22   Barclays.  The feel was if you did not accomplish this

23   transaction within a very constricted time period, there would

24   be no assets to preserve, no business to be preserved.

25        So my little aspect of it was how could we do this.  And

14

1  it was complicated by the fact that the business that was being

2  sold was essentially the business of Lehman Brothers Inc.

3  Lehman Brothers Inc. was a registered broker-deal.  It did not

4  qualify for Chapter 11.  It could not be a debtor under Chapter

5  11.  And we were trying to structure a transaction in which

6  there would be, in effect, a joint sale of the assets of LBI,

7  Lehman Brothers Inc.  And late in the afternoon, or sometime in

8  the afternoon, we talked about and I suggested that what we

9  ought to be doing is communicating with the Securities Investor

10  Protection Corporation and trying to work out an arrangement

11  where the Securities Investor Protection Corporation would

12  cooperate, would arrange for the filing of a proceeding under

13  the Securities Investor Protection Act, essentially select a

14  nominated trustee that Monday or Tuesday, I can't remember.

15  The times sort of merged into each other -- and try and keep

16  SIPC up to date on what was happening.

17      When I came up with the idea, there were Securities and

18  Exchange Commission attorneys on premises.  I went down to talk

19  with them.  Their initial reaction was that it could not be

20  done, that the Securities Investor Protection Corporation would

21  not go along with it.  It was not exactly consistent with their

22  statutory obligations.  And we had a -- I would call it

23  somewhat of a debate with the SEC.  And finally, I said, why

24  don't we just call the president of the Securities Investor

25  Protection Corporation, Mr. Harback, who I knew from being a

1    SIPC trustee a number of times.  And we got Steve Harback on

2    the phone.  I explained to Mr. Harback my idea of a coordinated

3    Chapter 11 and a SIPA proceeding.  And after -- it was twenty

4    minutes or a half hour on the phone, he said I'd buy into it.

5    I think it's a good idea and we should proceed on that basis.

6    And then the question was how fast can this transaction be

7    accomplished.  The Barclays team was very anxious that the

8    transaction be completed before the end of Friday, September

9    19, I guess it was.  And the Barclays team also was very

10   adamant that it would have to be a judicial sale.  Barclays

11   didn't have any desire to be involved in a transaction which

12   would ultimately or possibly lead to a post-transaction claim

13   that it was a fraudulent transfer or a fraudulent conveyance.

14   So it had to be a judicial sale with a provision that it was

15   free and clear in accordance with Section 363(f) of the

16   Bankruptcy Code.

17        Once we decided on a structure, then the question was

18   getting appropriate papers to arrange for a sale.  Hopefully

19   the Court would understand the exigencies of the situation, the

20   chaos that was prevailing and that this was a very unusual

21   transaction.  This was not a normal merger, acquisition or

22   purchase and sale.  Essentially, this was a distressed sale to

23   try and preserve value, to try to preserve employment

24   opportunities and to try to have a somewhat beneficial or

25   quieting effect on the marketplace.

16

1     So starting sometime Monday night into Tuesday morning, as

2     people were negotiating the asset purchase agreement, efforts

3     were being made to prepare appropriate papers so that we could

4     get sale procedures approved by the bankruptcy court, set a

5     date for approval of a sale transaction coordinating with the

6     Securities Investor Protection Corporation and having all those

7     things going on contemporaneously.  So there were different

8     work streams going on in connection with this transaction.

9     That was very demanding.

10    Tuesday morning, is my recollection, there was a draft or

11    a proposed asset purchase agreement which would form the basis

12    for the motion which was made to approve the sale procedures.

13    At the same time, cash was becoming an extraordinarily short

14    item.  And there were negotiations carried on with Barclays to

15    do debtor-in-possession financing under Section 364 of the

16    Bankruptcy Code.  My recollection that was something like --

17    something in the area of 2 to 400 million dollars of DIP

18    financing.

19    So a motion had to be prepared to have that financing

20    approved.  The motion for approval of the sales procedures was

21    filed, I think, late Tuesday afternoon.  The Court was very

22    responsive to our request for acceleration.  And a hearing was

23    set on Wednesday afternoon to the approval of sale procedures.

24    Notice was given -- as much notice as possible was given,

25    electronically and otherwise, very shortly after the motion was

17

1    filed, objections being had to come in in great volume,

2    electronically and otherwise.

3        There was a hearing on Wednesday which was the 17th of

4    September.  A creditors' committee was appointed.  The Office

5    of the United States Trustee recognized that this was a very

6    unusual case, that it had to move quickly.  And on Tuesday

7    morning, one day after the filing, the Office of the United

8    States Trustee had an organizational meeting and appointed a

9    creditors' committee.  Wednesday -- I think it was Wednesday

10   morning, the creditors' committee selected counsel, Milbank

11   Tweed.  On the way down to the courthouse, I remember getting a

12   call from an attorney at Milbank Tweed, Luke Despins, who

13   advised me that he had just been appointed -- or his firm had

14   just been appointed as counsel for the creditors' committee and

15   that they have just started to review the motion for the

16   approval of the sales procedures and that they intended to ask

17   for an adjournment and wanted us to consent to it.  And I told

18   Luc that there was no way that we could consent to it.  Time

19   was running against us.  The markets were continuing to plunge.

20   What I had predicted in terms of what would happen because of

21   the Lehman bankruptcy that past Sunday at the Federal Reserve

22   Bank were coming to fruition.  I had used the word Armageddon

23   and Armageddon was beginning and was in place.

24       I told Mr. Despins I would meet him at the courthouse if

25   he wanted to discuss it.  We met outside in the corridor here.

18

1     I tried to explain to him the urgency of the situation and he

2     suggested we ask a judge for a chambers conference.  Judge Peck

3     accommodated us and met with us and we both explained our

4     positions.  Judge Peck said if you want to object, you should

5     put it on the record.  We're going to go into the courtroom and

6     I will hear the motion and if the committee feels it should

7     object, at least that's my recollection, it should object.

8           I think the hearing -- I can't remember if the hearing

9     started 2:00, 4:00, someplace in the afternoon.  It was a long

10    hearing.  There were a large number of objectors who were

11    heard.  I explained the need for speed and that it was

12    important that a sale procedures be put into place and that

13    asked the Court for a hearing on Friday the 19th.  After

14    hearing the objections, the Court did say that I'm going to

15    allow this to go to a sale hearing.  I think the record speaks

16    for itself.  And that hearing was a hearing that went on, I

17    think, until after 8:00 at night.  And a hearing was set for

18    Friday afternoon to approve the sale transaction.

19          And in light of the time that was involved, the Court said

20    that it would accept objections right up to the beginning of

21    the hearing and that objections could be oral, could be

22    written, could be electronic.  And the objections began to flow

23    through.  It was made very clear that this was an extraordinary

24    case.  And on Wednesday, the 17th, at the time of the hearing,

25    the market was beginning to cease up.  Commercial Paper market

19

 1    was drying up.  The crisis was getting extremely worse than we

 2    had anticipated.  Credit -- there was a crisis of confidence.

 3    Credit markets dried up.  We were on the edge of a financial

 4    collapse of the dimensions which I don't think anybody could

 5    have imagined, probably much more severe than the crisis of the

 6    so-called Great Depression.

 7         During the course of the hearing on sale procedures, I

 8    think that I explained to the Court that this was a moving

 9    target, that it was a very fluid situation.  It was changing

10    every hour, every minute.  Values were plummeting and were

11    continuing to plummeting (sic) and nobody was able to project

12    when it would hit bottom.

13         I can't recall but I think maybe the DIP arrangement --

14    DIP financing was approved on that Wednesday.  And my

15    recollection is that Lehman drew down 200 million dollars

16    immediately of the term loan.  We went back to Lehman.  We

17    explained what happened.  The negotiations were continuing.

18    There were changes being made to the asset purchase agreement.

19    The parties that were negotiating the terms were continuing to

20    negotiate.  Those negotiations continued through Thursday the

21    18th.  There were, as I said different work streams.  I was

22    part of the work stream that was preparing for the hearing on

23    the 19th.  I spent most of Thursday afternoon into the late

24    evening hours with Mr. McDade and Mr. Ridings -- Barry Ridings

25    of Lazard Freres.  Mr. McDade, because he was going to be the

20

1    witness in support of the transaction; and Mr. Ridings as the

2    financial advisor to the company.

3         I decided because of the situation at Lehman Brothers that

4    we would never get done with the preparation because of

5    everything that was going on at 745 Seventh Avenue.  And I made

6    Mr. McDade come with me back to the Weil Gotshal offices where

7    we could have some quiet and prepare his testimony as well as

8    Mr. Ridings' testimony.  So I personally was with Mr. McDade

9    and Mr. Ridings right through the evening into the early

10   morning hours of that day.

11        Then on Friday the 19th, we continued to prepare for the

12   hearing.  Negotiations were still continuing among the parties.

13   There was an amended asset purchase agreement and there were

14   ongoing negotiations about preparing a clarification letter.

15   My recollection is that we asked the Court to push back the

16   hearing an hour which the Court accommodated us.  We got down

17   to the Court -- I came down with one team while the

18   negotiations were continuing back at 745 Seventh Avenue in

19   respect of the clarification letter.  The courtroom was packed

20   and I had great difficulty getting into the courtroom.  I had

21   to get the clerk of the court to open a path for me to get into

22   the courtroom.  And the hearing was about to start, I think,

23   maybe about 4:00.

24        And what happened -- there was an overflow into, I think,

25   two more courtrooms.  Just about at the time the hearing was

21

1    going to start, my partner, Lori Fife, came down.  She came

2    directly from 745 Seventh Avenue from the negotiations about

3    the clarification letter.  And we asked the Court if we could

4    take some time before the actual beginning of the hearing to

5    explain to the people who were attending what the status of the

6    clarification letter was and what it was clarifying.  And my

7    recollection is that took thirty, forty minutes.  There were --

8    maybe an hour.  And we took questions from the audience and

9    there were a large number of questions which we tried to

10   answer.  And after maybe close to an hour, it was getting late

11   in the afternoon and we began the hearing.

12        The hearing went from, my guess, 4:00 to midnight of that

13   day or slightly after midnight.  Mr. McDade was a witness.  Mr.

14   Ridings was a witness.  As I said, the objections were coming

15   in in volume. Blackberries were wearing out as the objections

16   kept pouring in.  There were a large number of people; I can't

17   tell you the exact amount -- people who stood up and objected.

18   Mr. McDade was cross-examined by a number of people.  Mr.

19   Ridings was cross-examined by a number of people.  The sale,

20   the transaction, was supported by Federal Reserve Bank of New

21   York, the SEC, U.S. Treasury, SIPC.  I should add that in

22   accordance with the arrangements which we had made with SIPC

23   early in the day in the morning, SIPC started a SIPA proceeding

24   against Lehman Brothers Inc.  Lehman Brothers Inc. consented to

25   it.  James Giddens, a partner at Hughes Hubbard & Reed was

22

1    appointed as the trustee.  The SIPA case was referred to Judge

2    Peck and the sale hearing was a joint hearing in which the

3    trustee and SIPC joined and, as I said, the federal regulators

4    and governmental agencies vigorously supported the transaction.

5    And I think all the way through the 19th, we explained that

6    this was a moving transaction and tried to emphasize to the

7    Court that it wasn't the normal M&A transaction and that not

8    every i was dotted and not every t was dotted (sic).  But what

9    we were trying to do is prevent loss of value and, very

10   importantly, preservation of jobs.  The agreement contemplated

11   that the approximately 10,000 employees at Lehman would become

12   employees at Barclays.  They would have essentially a ninety-

13   day employment period during which Barclays would make its

14   determination as to which employees it was going to keep and

15   which employees would be terminated.

16        So that after this extensive hearing which went through

17   exactly what happened during the week of the 16th, as you're

18   aware, Mr. Gaffey, the Court -- and I think it must have been

19   12:01 or something like that -- announced that it would approve

20   the transaction.  And I don't want to par -- I hate to

21   paraphrase Judge Peck 'cause I always get into trouble, but

22   Judge Peck approved the transaction and he basically said he

23   approved the transaction because he didn't see any other

24   realistic alternative.  And his concern about the employees

25   and, in light of the testimony of Mr. McDade that if this

23

1    transaction were not approved, it would be a cataclysmic

2    catastrophe.  There would be no business to operate on Monday

3    morning.  And the likelihood of Lehman opening up on Monday

4    morning was virtually nil.

5         And in addition to that, there were a whole host of other

6    problems which kept popping up as we went forward.  On

7    Wednesday, the CME had closed out Lehman at a loss of a billion

8    eight or thereabout.  At the hearing on the 19th, Hal Novikoff,

9    an attorney from the Wachtell firm, announced that there were

10   serious problems at JPMorgan Chase in connection with the

11   transaction and whether JPMorgan Chase would continue to clear

12   transactions.  The following Monday, which was a dispute

13   basically between JPMorgan Chase and Barclays, we assumed that

14   that would be taken care of.  Unfortunately, we found out on

15   Sunday the 21st that that had not been cleared.  And there was

16   a major dispute which could have derailed the transaction.

17   That again brought into play the federal authorities who

18   exercised their influence during the closing.  This is post-

19   September 19th after Judge Peck signed the order approving the

20   sale.  And I might add that after Judge Peck made his oral

21   bench ruling, he did say that he was willing to stay around for

22   another hour or so in order for people to refine the sale

23   approval order.  And he did.  And I think it took another hour,

24   hour and a half as everybody sat around these tables and

25   reviewed the sale order.  There were some changes made to it

24

1    and I think it must have been between 1 a.m. and 2 a.m. that

2    Judge Peck signed the sale order.

3        The closing was scheduled to begin early Saturday morning.

4    We had hoped that it might -- I think -- I remember vaguely the

5    time of 10:45 p.m.  If the sale had been approved before that,

6    it was a possibility of closing it Friday night.  Obviously, we

7    didn't make that.  The sale closing began early Saturday

8    morning and went on from that time to just before the opening

9    of the markets on Monday, September 22nd.  I think we made it

10   just about two minutes before the market opened.

11       It was a very, very difficult closing.  There were lots of

12   problems in the closing.  And at something around 6 a.m., it

13   looked like it was going to close.  So my characterization of

14   organized chaos continued over the weekend, I think, without

15   the input and influence of the Federal Reserve Bank.  The

16   Treasury -- there was a real possibility it might not have

17   closed.  I can describe the closing if you would like.

18   Q.   Why don't I give you a break, Mr. Miller?

19   A.   Okay.

20   Q.   And why don't I also give you a bottle of water.  I'm

21   sure --

22   A.   No.  I'm fine.

23            MR. GAFFEY:  May I approach, Your Honor?

24            THE WITNESS:  Thank you.

25            THE COURT:  Sure.

25

1          (Pause)

2     Q.    Thank you for that, Mr. Miller.  I want to follow up,

3     obviously, on a couple of things that you said.  Can you give

4     the Court an idea -- I take it in this organized chaos, there

5     were a lot of lawyers from Weil Gotshal who needed to be

6     involved.  Could you give the --

7     A.    There were a lot of lawyers from every law firm.

8     Q.    I -- on the Weil Gotshal side of things --

9     A.    There were a lot of lawyers.

10    Q.    Approximately how many people on the team?

11    A.    Very hard for me to count.  There were people from

12    corporate, people from the business finance and restructuring.

13    Ten to fifteen maybe.

14    Q.    And you referred to the parties negotiating the agreement.

15    What role, if any, did you or the other Weil Gotshal lawyers

16    have in the negotiation of the economic terms of the asset

17    purchase agreement?

18    A.    Practically none.

19    Q.    And who, to your knowledge, sir, was involved in the

20    negotiation of the economic terms of the agreement?

21    A.    Mr. McDade and his team.

22    Q.    And when did the Weil Gotshal team that an agreement in

23    principle had been reached?

24    A.    I can't give you a precise time.  There was a negotiation

25    going on.  I was in the room some of the time.  Kept getting

26

1    called out for these flash fires.  Tom Roberts, my partner in

2    the corporate department, was there most of the time.  Michael

3    Lubowitz was in the room most of the time.  Lori Fife was in

4    and out of the room.  We were not negotiating the economic

5    terms.  We were there answering legal issues.

6    Q.   And what role, if any, did Weil Gotshal play in assessing

7    the values of the assets that were to be transferred from

8    Lehman to Barclays?

9    A.   We didn't pay any role.  I don't think we are qualified to

10   assess values.

11   Q.   So I take it Weil Gotshal was not asked to conduct any

12   independent assessment of the values --

13   A.   No.

14   Q.   -- with respect to the assets being transferred?

15   A.   No, we were not.

16   Q.   And to your knowledge, sir, during the negotiations, was

17   there any discussion concerning a negotiated amount for

18   compensation, liabilities that Barclays would assume as part of

19   the transaction?

20   A.   Not initially.  Not during Monday when I was in the room.

21   I think that occurred later on in the process when --

22   Q.   The general structure of the deal, sir, involved a

23   transfer of assets to Barclays and the consideration included

24   cash and the assumption of some liabilities, correct?  That's

25   away from the real estate.

27

A.    The transaction, as I understood it, was the purchase of

the North American capital markets business which was,

essentially, the business of Lehman Brothers Inc.  It was a

transfer and an assumption of liabilities.  Initially, I think

there was supposed to be 700 million dollars of cash that was

going to move with the transaction.  That 700 million dollars

was eliminated.  In the hearing on Wednesday the 17th, there

was a -- let me call it an accusation that eight billion

dollars of funds belonging to Lehman Brothers Europe had been

taken on the eve of the filing by Lehman Brothers Holdings Inc.

It was a story, I think, in the Financial Times or someplace.

And during the course of the hearing on Wednesday, people

raised the issue of this so-called grab of the eight billion

dollars which came up again on the 19th.  The transaction

changed and the deal that was proposed for approval did not

include the transfer of cash, free cash.

Q.    With regard to the noncash assets to be transferred, do

you know if estimates were made of the value of the securities

portion of the assets to be transferred?

A.    There was a lot of discussion.  Values were changing all

the time.

Q.    And who made those estimates to assess those values?

A.    The Lehman team.

Q.    And did Weil Gotshal have any role during the week in

addressing estimates value or valuation of assets?

28

1    A.    We're not valuation experts.  This was left to the

2    businesspeople.

3    Q.    Now, sir, prior to the -- well, after an agreement in

4    principle was reached overnight from the 15th to the 16th, did

5    it come to your attention that there was a meeting of the

6    Lehman board?

7    A.    Did it come -- at that time?

8    Q.    Yes, sir.

9    A.    I knew there was going to be a board meeting at some time.

10   I don't recall specifically being told the meeting was -- are

11   you suggesting Tuesday?

12   Q.    The time is not relevant to my question, sir.

13   A.    No.  I knew there would be a meeting of the board, yes.

14   Q.    And did members of Weil Gotshal attend the board meeting

15   as far as you know?

16   A.    I believe that Tom Roberts and Lori Fife attended.  All or

17   part of the meeting, I can't tell you.

18   Q.    Did you attend, sir?

19   A.    I did not.

20   Q.    And did you learn at any point what the board had

21   authorized with respect to a transaction?

22   A.    All that I was told was the board had approved the

23   transaction.

24   Q.    Did you learn at any time what description was given to

25   the board about the transaction it was asked to authorize?

29

1    A.   I'm not quite sure I understand what you mean, what

2    description was given to the board.

3    Q.   Did anybody tell you what the board was told about the

4    transaction?

5    A.   No.  I was told the board approved the transaction and I

6    needed that knowledge in connection with preparing for the

7    court hearing.

8    Q.   And why did you need that knowledge to prepare for the

9    court hearing?

10    A.   Because this was a major transaction.  And generally, in

11    corporate law, you need a board of directors to approve a sale

12    of assets of this size.

13    Q.   In the binder before you, Mr. Miller, is what's in

14    evidence as Exhibit M-2.  If you could turn to that tab in your

15    book.

16    A.   Yes.

17    Q.   And you'll see, sir, that M-2 is a financial schedule.

18    A.   Is a what?

19    Q.   A financial schedule.  Are we on the same document, sir?

20    A.   A schedule?  I don't think it's a schedule.

21    Q.   It's the document up on the screen.  Are we in the same

22    tab, sir?

23    A.   Yes.  It has two columns, "Assets" and "Liabilities".

24    Q.   We could call it whatever you like, sir.  Balance sheet?

25    A.   You could call it a balance sheet.

30

1   Q.   Okay.  Taking a look at the balance sheet that's marked as

2   Movants' Trial Exhibit 2 --

3   A.   Yes.

4   Q.   -- did this balance sheet come to the attention of you or

5   your team members at Weil Gotshal at around the time that the

6   asset purchase agreement was being negotiated?

7   A.   I can only speak for myself.

8   Q.   Sure.

9   A.   There were a number of balance sheets -- or I wouldn't

10  call them balance sheets.  People were sitting at PCs making

11  various assumptions.  You have to understand that the system

12  wasn't exactly working when LBIE, the English entity went into

13  administration in the United Kingdom.  It basically closed down

14  the system.  So getting information was very difficult.

15       Also, in the context of the chaos that prevailed, getting

16  information was very difficult.  So my recollection is seeing

17  people sitting around the table with PCs making assumptions and

18  spitting out paper.

19       I wouldn't call this a balance sheet.  I mean, there's so

20  many zeros on it that I'm not sure what it reflects.

21  Q.   Have you seen the document before?

22  A.   I did see the document before.

23  Q.   When did you first see it?

24  A.   I don't have a specific recollection.  I would say

25  probably on Tuesday or Wednesday.

31

1    Q.    Okay.  And did you see it in connection with your work

2    regarding the asset purchase agreement?

3    A.    I'm sorry?

4    Q.    What was the context in which you saw it?

5    A.    Probably in connection with the preparation for the

6    hearings.

7    Q.    Okay.  And who provided you with the document?

8    A.    I think it came internally through somebody at Weil.

9    Q.    Okay.  And in preparing Mr. McDade for his testimony at

10   the sale hearing, did you review the document with him?

11   A.    No.

12   Q.    In discussions with your colleagues at Weil Gotshal or

13   with the Lehman businesspeople involved in the drafting of the

14   asset purchase agreement, did you have any discussions with

15   them about the document?

16   A.    No.  By Wednesday of that week, the value of the assets

17   had deteriorated so substantially that this document was

18   virtually useless.

19   Q.    Was there a discussion about that document?

20   A.    There was a discussion about the deterioration in the

21   values.

22   Q.    Was the discussion related to the document marked as

23   Exhibit M-2?

24   A.    No.

25   Q.    And did Weil Gotshal have any role in preparing the

32

1   document marked as Exhibit M-2?

2   A.   I don't believe so.  I'd be shocked if they did.

3   Q.   Now, I direct your attention, Mr. Miller, to the figures

4   in the lower right-hand corner on the "Liabilities" side.

5   A.   Yes.

6   Q.   -- for "Comp and Cure".  Do you know the basis for those

7   numbers?

8   A.   Well, the cure amount, which I think changed -- I don't

9   recall.  The cure amount was an estimate of the potential

10  exposure in connection with the transaction.  Under the terms

11  of the transaction, there was an opportunity for Barclays to

12  take assignments of executory contracts and perhaps leases.

13  Obviously, in the short time frame, there had been no

14  determination as to what executory contracts or what leases

15  would be assumed.  And a figure was derived as to the potential

16  exposure.  This was a contingent figure.  If they assumed -- I

17  mean, if all those contracts were assumed by the debtor-in-

18  possession and then assigned to Barclays, these -- this amount

19  might be the cure amount.

20       In connection with the compensation, that also was an

21  estimate as to the possible exposure for Lehman employees going

22  over to Barclays who would either be terminated or were

23  entitled to bonuses.  So it was supposed to cover both

24  severance pay and bonuses.

25       And as I said before, it was an estimate.  I don't

33

1    remember -- I don't recall -- I don't think I ever knew who

2    really made the estimate.

3    Q.    Do you know -- did you ever speak to Martin Kelly about

4    those estimates?

5    A.    I have never spoken to Martin Kelly.  I don't believe I've

6    ever spoken to him up through today.

7    Q.    Have you ever spoken to Paolo Tonucci about those

8    estimates?

9    A.    Oh, yes.  Not this.

10   Q.    About these numbers?

11   A.    Not about these numbers, no.

12   Q.    And I take it from your answer, sir, you don't have

13   knowledge as to how these figures were derived, how they were

14   calculated.

15   A.    They were calculated on the basis of somebody at Lehman

16   reviewing the executory contracts and leases and coming up with

17   the estimate.  On the compensation, I think they looked at the

18   compensation records for 2007.

19   Q.    In the course of dealing with the Barclays side of the

20   table on the negotiations, do you know, sir, if any Lehman

21   personnel or representatives of Lehman personnel inquired of

22   Barclays as to what it planned to pay in terms of comp and cure

23   after the transaction?

24   A.    I think that's covered by the asset purchase agreement.

25   Q.    I'm sorry, sir.  I didn't hear your answer.

34

1    A.    I believe their obligation is set forth in the asset

2    purchase agreement.

3    Q.    The question goes to whether there were any discussions

4    during the week, any discussions in the negotiations --

5    A.    I'm not aware.

6    Q.    -- about what Barclays planned to do.

7    A.    I'm not -- I don't think -- maybe I'm misunderstanding

8    you.  I'm trying to understand what do you mean by what they

9    planned.

10    Q.    Well, did you see any figures that Barclays generated as

11    to what they thought their cure obligation would be?

12    A.    No, sir.

13    Q.    Did you see any figures as to what Barclays thought it

14    would wind up paying in the compensation element?

15    A.    What Barclays thought?

16    Q.    Yes, sir.

17    A.    I wasn't privy to Barclays' thinking.

18    Q.    I want to get a sense of in the process of reaching the

19    asset purchase agreement that was part of the information

20    shared or if Barclays kept that to itself.

21    A.    Not that I was involved with.

22    Q.    Okay.  To your knowledge, was anybody at Weil Gotshal made

23    privy to Barclays' calculations of what it ultimately planned

24    to pay on those items?

25    A.    I can't answer that question precisely but I don't think

35

1   so.

2   Q.   Now, on the "Assets" side of the schedule, sir --

3   A.   Yes.

4   Q.   -- do you know if there were discussions between the

5   Lehman side of the table and the Barclays side of the table

6   toward calculating those figures on the "Assets" side of

7   Movants' Exhibit 2?

8   A.   I can't answer that question in the context of this

9   exhibit.   There were continuing discussions between Barclays

10  and Lehman as to values.   As I said, the market was plunging.

11  Q.   And you were not privy to those discussions about the

12  asset values between Lehman and Barclays?

13  A.   I was in conference rooms where I heard discussions.   I

14  heard discussions about -- or arguments about the marks that

15  Lehman had marked too aggressively, that the values were

16  declining so rapidly that there were questions about the value

17  of the deal.

18  Q.   And in those discussions, did you hear references to

19  Lehman's book value?

20  A.   I don't recall that.

21  Q.   But I'm trying to get a sense of the terminology.   You

22  used the word "marks".   Is that the term -- is that the --

23  A.   There was a lot of conversation about mark-to-market.

24  Q.   Okay.

25  A.   And since Lehman was a mark-to-market company, I assume

36

1    that book value would equate to the market value.

2    Q.    And was there ever a time, sir, where you or members of

3    the Weil Gotshal team were privy to any discussion about

4    marking down Lehman's books to reflect agreed values?

5    A.    Not as a participant.  But being in a room which went on

6    for hours and hours and hours between the Barclay team and the

7    Lehman team with huge computer runs going CUSIP number by CUSIP

8    number to try to get to what the market value was.

9    Q.    And apart from that discussion about what the market --

10   what the various views were of market value, the question is

11   whether you or anyone at Weil Gotshal were privy to a

12   discussion about marking down Lehman's books, changing Lehman's

13   marks, to reflect negotiated values.

14   A.    It was clear just sitting in the conference room that that

15   was happening.

16   Q.    The marking down of Lehman's books?

17   A.    Not -- I can't say the marking down of Lehman's books but

18   arguments as to what the market value of the particular

19   security was.

20   Q.    And once some sort of collaborative view was reached about

21   the value of the marks, did you or anyone at Weil Gotshal --

22   were you or anyone at Weil Gotshal privy to any discussions

23   about marking down Lehman's books and records to reflect that

24   negotiated value?

25   A.    No, sir.

37

1    Q.    Were you or anyone at Weil Gotshal privy to any

2    discussions concerning giving Barclays a discount from Lehman's

3    marks, from Lehman's book value?

4    A.    No, sir.

5    Q.    On the exhibit, sir, in the upper right-hand corner,

6    you'll see an annotation "91608" and "SB".  Do you know the

7    source of those handwritten annotations?

8    A.    I believe that must be Steve Berkenfeld.

9    Q.    Okay.  And what's your basis to believe it's Steve

10   Berkenfeld.

11   A.    He told me so.

12   Q.    Okay.  Recently or at the time?

13   A.    Oh, he told me yesterday and he told me before that.

14   Q.    Okay.  Did he tell you at or around the time of the

15   transaction that he had signed the --

16         MR. GAFFEY:  Withdrawn, sir.

17   Q.    At or around the time of the transaction, did he tell you

18   that he had put his initials on a sheet like this?

19   A.    No, sir.

20   Q.    Okay.  If you would turn in your binder, Mr. Miller, to

21   tab M-1, you'll find a copy of the asset purchase agreement.

22   I'd ask you to turn to that.

23   A.    Yes.

24   Q.    And you've described for us somewhat the drafting process.

25   Who was involved -- who was involved in the actual drafting of

38

```
 1    this piece of paper, this agreement?
 2    A.    From which side?
 3    Q.    Well, let's start with the Lehman side.
 4    A.    Probably Tom Roberts, Mike Lubowitz.
 5    Q.    Anyone else?
 6    A.    I'm sure there were associates assigned to it, but I
 7    couldn't tell you who they were.
 8    Q.    With the number of them I have here, I'm not going to say
 9    they don't matter, sir.  But I'm looking more for the more
10    senior people.  The Tom Roberts --
11    A.    Roberts and Lubowitz.
12    Q.    Okay.  Thanks.  And on the Barclays side, who was involved
13    in the drafting?
14    A.    Victor Lewkow -- they were a whole team.  I don't remember
15    the names of -- a lot of people from Cleary Gottlieb.
16    Q.    And were you yourself involved in the process of
17    negotiating and drafting the terms of the asset purchase
18    agreement?
19    A.    No, sir.
20    Q.    I take it you were occupied with the DIP financing and
21    prepping Mr. McDade and getting ready for the hearing and
22    putting out flash fires and --
23    A.    That's correct.
24    Q.    -- everything else.  Okay.  Now, if I could direct your
25    attention, Mr. Miller, to page 6 of the asset purchase
```

39

1   agreement.  And you'll see there, once you get to page 6, sir,

2   you'll see there's a definition of "purchased assets".  Are you

3   with me in the document?

4   A.   Yes.

5   Q.   Okay.  And within the definition of "purchased assets" in

6   subsection (d), there's a reference to government securities,

7   Commercial Paper, et cetera.  Are you there?

8   A.   Yes.

9   Q.   Okay.  And in that definition of "purchased assets", it

10  describes those various types of securities "with a book value

11  as of the date hereof of approximately seventy billion dollars,

12  collectively, long positions".

13  A.   Yes.

14  Q.   Do you know who was the proponent or who required the term

15  "book value" in that portion of the asset purchase agreement,

16  sir?

17  A.   No, I do not.

18  Q.   Do you know if there was any discussion between the Lehman

19  side of the table and the Barclays side of the table about the

20  use of that term, "book value"?

21  A.   I'm not aware of that.

22  Q.   And do you know when the term "book value" came to be used

23  in the asset purchase agreement, sir?

24  A.   No, sir.

25  Q.   Now, at the time the asset purchase agreement was drafted,

40

1    Mr. Miller, was anyone at Weil Gotshal in a position to

2    independently assess whether the book value of the securities

3    to be transferred was seventy billion dollars as of the 16th of

4    September 2008?

5    A.   I don't believe so.

6    Q.   And was Weil Gotshal asked to assess or verify whether the

7    book value of the securities to be transferred stood at

8    approximately seventy billion dollars as of September 16th?

9    A.   I wasn't asked and I can't speak for anybody else.

10    Q.   To your knowledge, was anyone on your team asked to do

11    that?

12    A.   I have no knowledge of --

13    Q.   Did it ever come to your attention that anybody on your

14    team was doing work along those lines?

15    A.   No.

16    Q.   Okay.  And were you or anyone else at Weil Gotshal, sir,

17    privy to any discussions between Lehman businesspeople and

18    Barclays businesspeople about whether the book value of Lehman

19    securities to be transferred stood at approximately seventy

20    billion dollars as of the 16th of September?

21    A.   I was not involved.

22    Q.   Do you know if anyone else at your firm was?

23    A.   I don't know.

24    Q.   Now, do you recall, Mr. Miller, when the asset purchase

25    agreement was finalized?

41

1    A.    There was an amended asset purchase agreement.  I can't

2    remember -- that was Wednesday or Thursday.  And that amended

3    asset purchase agreement then was subject to the clarification

4    letter.

5    Q.    My question goes to the first asset purchase agreement,

6    sir.  Do you recall what time during the day on the 16th or

7    early the 17th was it finalized, do you know?

8    A.    I can't recall.  I don't know if that was changed.

9    Q.    Now, if you would take a look, Mr. Miller, at tab 118 in

10   your book.  It's --

11   A.    Okay.

12   Q.    118.

13   A.    Yes.

14   Q.    It's a copy, sir, and it's in evidence, of the sale

15   motion --

16   A.    Yes.

17   Q.    -- that was filed on the 17th of September.  Now, in the

18   organized chaos of those days, sir, I take it the sale motion

19   was done probably overnight, yes?

20   A.    Yes, that's fair.

21   Q.    And it was filed, as I understand it, I think, as you said

22   this morning, early afternoon or at some point early-ish in the

23   day on the 17th, correct, sir?

24   A.    Hold on just one minute.  No.  This was the hearing to

25   consider the entry of the sale procedures order.  The hearing

42

1    day was September 17th.  My recollection is that this was filed

2    on the 16th.

3    Q.    Okay.  And I may have picked up a different nomenclature

4    of that over the last year, sir, so we'll call that the sale

5    procedures order?

6    A.    Yeah.

7    Q.    Okay, thanks.  And the sale procedures order was the

8    subject of the appearance before Judge Peck on the 17th of

9    September, yes?

10   A.    That's correct.

11   Q.    Okay.  And were you -- well, I know members of your team

12   would have been -- the question is to yourself, sir.  Were you

13   involved in the drafting of the sale procedures motion?

14   A.    Yes.

15   Q.    And was this the first -- was the sales procedures motion

16   the first step in addressing to the Court -- in bringing to the

17   Court the need for an approval of the Lehman/Barclays

18   transaction?

19          MR. GAFFEY:  That's a terrible question.

20   Q.    Was there anything before the sale motion where the Court

21   was informed approval would be required?

22   A.    There may have been references to the proposed transaction

23   in the motion for the approval of the DIP financing.

24   Q.    Okay.

25   A.    I have a vague recollection there was some hearing on

43

1    Tuesday, the 16th.  So -- and in that hearing, I think -- I

2    believe that we did alert the Court that there was a

3    transaction being negotiated.

4    Q.    Sure.  Okay.  Mr. Miller, I'm sorry.  Could you pull the

5    microphone a little closer because I'm having a little trouble

6    hearing you.

7    A.    Okay.

8    Q.    Thank you.  That's much better.  Now, in the sale

9    procedures motion, the debtor described the proposed

10   transaction, is that right?

11   A.    Yes.

12   Q.    I want to ask you about a couple of portions of it.  And I

13   would direct your attention, please, to paragraphs 9 and 10 of

14   the motion.  And this is within the section of the motion that

15   refers to the need for an expeditious sale.

16   A.    Yes.

17   Q.    And in paragraph 9 of the motion, you refer to the

18   purchaser paying approximately 1.7 billion in cash for the

19   purchased assets.  Do you see that?

20   A.    Yes.

21   Q.    Okay.  And what was the basis of the calculation of 1.7?

22   Did that include the real estate?

23   A.    That was the real estate.

24   Q.    Okay.  And in paragraph 10, sir, it reads as follows:

25   "Upon consummation of the transaction, the purchaser will

44

1    assume ownership of substantially all operations of LBI

2    including assumption of seller's liabilities under assumed

3    contracts and performance under seller's obligations as to

4    securities and other transactions.  All remaining customer

5    accounts will be transferred to the purchaser.  The purchaser

6    also will assume substantial liabilities relating to LBI's

7    employees estimated at approximately 2.5 billion.  The sale

8    will relieve LBHI of exposure based upon its guaranties of many

9    of LBI's obligations."

10       Sir, the number in there of 2.5 billion, can you tell me

11    how that figure was derived?

12    A.   I can't tell you how it was derived.  I can tell you it

13    was furnished -- it was by Lehman.

14    Q.   Okay.  And I take it from y our answer that Weil Gotshal

15    played no role in calculating or deriving that figure.

16    A.   That's correct.

17    Q.   Do you recall who within Lehman -- do you know who within

18    Lehman supplied that figure to Weil Gotshal?

19    A.   I think I got the figure from Mr. McDade.

20    Q.   Now, if you could turn, Mr. Miller, to paragraph 14 of the

21    sales procedures motion -- it's on page 6.

22    A.   Yes.

23    Q.   Where there is a description in bullet form of the

24    purchase agreement -- are we in the same place?

25    A.   Yes, I am.

45

1    Q.    Okay.  And in the third -- actually, in the fourth bullet

2    point entitled "Assumption of Contracts" --

3    A.    Yes.

4    Q.    -- there's a reference in there -- there's a -- well, let

5    me read it.  "The purchaser shall have the right but not the

6    obligation to take assignment of contracts and leases which are

7    designated for assumption and assignment by purchaser.  The

8    parties estimate that the cure cost associated with such

9    assumptions and assignments will be approximately 1.5 billion

10   dollars."

11        Can you tell the Court, sir, how the 1.5 billion dollar

12   figure that's recited there was derived?

13   A.    No.  As I said, we did not participate in the derivation.

14   It was a figure that was given to us.

15   Q.    Okay.  And the reference to the parties in there, sir, am

16   I correct that it refers to the parties to the agreement?

17   A.    I believe so.

18   Q.    Okay.  And do you know how the parties to the agreement

19   went about estimating the cure cost?  What mechanically was

20   done to figure out what contracts there were that would or

21   might be assumed or what they were worth?

22   A.    I can only assume and tell you that somebody within Lehman

23   did a calculation.

24   Q.    Okay.  Was anybody at Weil Gotshal involved in any aspect

25   of the reviewing of contracts that could or might be assumed?

46

1   A.    Only to the extent of advising Lehman that if you assume a

2   contract and there is a default amount, a monetary default, in

3   order to effect an assignment, you have to -- and an

4   assumption, you have to cure that.

5   Q.    I'm more on the mechanical over the table, looking at the

6   document --

7   A.    The calculation --

8   Q.    -- side of things, sir.

9   A.    The calculation of the 1.5 billion dollars?

10  Q.    Yes.

11  A.    No.  We were not involved in that.

12  Q.    Okay.  And I take it there were -- or would you tell us

13  please whether there were any discussions between personnel at

14  Weil Gotshal and anybody from Barclays, the businesspeople or

15  their lawyers, about Barclays' view of whether the estimate

16  that cure cost associated with such assumptions and assignments

17  will be approximately 1.5 billion dollars was accurate?

18  A.    I was not involved in any -- I think you have to bear in

19  mind my description of organized chaos continued.  There were

20  maybe literally hundreds of different conversations going on at

21  the same time.  And maybe thousands of e-mails going on at the

22  same time.

23  Q.    I take it, in that context, Mr. Miller, if I were to --

24  would you be able to tell me who or when or by what manner the

25  1.5 million dollar number was given to the Weil Gotshal folks

47

1    for the drafting purposes?

2    A.   We gave the Lehman people the legal standards. And then

3    they took those legal standards and I assume they applied it in

4    coming up with the calculation.  And somebody within the

5    financial section of Lehman made the calculation.

6    Q.   My question is a little more micro than that.  Do you know

7    who handed what, who handed any piece of paper to anybody at

8    Weil Gotshal --

9    A.   I can't

10   Q.   -- with that number on it?  How it was --

11   A.   I can't get that granular.

12   Q.   You don't know?

13   A.   I can't get that granular.

14   Q.   Okay.

15   A.   I know Mr. McDade gave me a figure when we were preparing

16   these papers.

17   Q.   Now, directing your attention --

18       MR. BOIES:  We can take it off the screen, thanks.

19   Q.   Directing your attention to the 17th, the afternoon of the

20   17th, Mr. Miller, that's when the initial sale procedures

21   hearing takes place before Judge Peck.

22   A.   That's correct.

23   Q.   And by the time you've come down to court for the sale

24   procedures hearing, the motion papers already had been filed,

25   correct?

48

1    A.    Yes.

2    Q.    Okay.  And at the hearing, did you outline the terms of

3    the transaction for the Court?

4    A.    I tried.

5    Q.    Okay.  I'd like to go through a few portions of that part

6    of the hearing.  If you could turn to Exhibit 260 in your book.

7    That's the transcript of the sales procedures hearing on the

8    17th.

9    A.    Yes.

10   Q.    And directing your attention, Mr. Miller, to page 22,

11   lines 8 to -- well, 8 to 11.  To the extent it puts it in

12   context for you, sir, although I'm sure your memory of it is

13   pretty good, if you want to read the portions before that.  But

14   my question goes to lines 8 to 11.  And it is what you

15   explained to the Court when you said: "looking at it from the

16   net of this transaction, there will be approximately 1.7

17   billion dollars yielded out of this transaction".  What was the

18   calculation that got you to that number, please?

19   A.    The cash portion of the transaction was literally tied to

20   the real estate.  There would be no other cash other than the

21   250 million dollars which was attributed to the goodwill of

22   Lehman Brothers Inc.  The building at 745 Seventh Avenue we

23   thought had a value -- I can't remember.  I think it was, like,

24   1,450,000,000 dollars.  And there were two data centers in New

25   Jersey which, combined, had another value, I think, maybe of

49

1   400 million dollars.

2   Q.   And were assumed liabilities also part of the

3   consideration?

4   A.   Yes.  This was just a reference to the cash --

5   Q.   Sure.

6   A.   -- coming out of the transaction.

7   Q.   And that's why I asked, by the time you were in court, the

8   sale motion's already been filed.  And that also describes the

9   transaction --

10  A.   As we understood it, yes.

11  Q.   Okay.  Now, if you could turn, sir, to page 23 --

12  actually, I should, Mr. Miller, first direct your attention to

13  page 22 starting at line 20 so we both have the topic in mind.

14  A.   Okay.

15  Q.   From page 22, line 20, through 23, line 4, you're

16  describing to the Court that Barclays has requested a breakup

17  fee in connection with the transaction.  You see that?

18  A.   I see it.

19  Q.   And I take it one of the goals of this initial hearing was

20  to have the Court rule on the breakup fee issue right there and

21  not wait until the Friday sale hearing, yes?

22  A.   Yes.

23  Q.   Okay.  And from lines -- and you describe the breakup fee

24  to the Court at a figure of 125 million dollars?

25  A.   A hundred million dollars plus reimbursement of expenses

50

1    of up to twenty-five million dollars.

2    Q.    Okay.  And Judge Peck asks a question at that point about

3    how to equate the -- and I'm reading at line 7:  "how to equate

4    that breakup fee and expense reimbursement with the purchase

5    price".  And the Court says "I've attempted to assess the

6    notional value of the transaction because in addition to the

7    1.7 billion dollars, there's a reference to 1.5 billion dollars

8    in cure amounts and possibly as much as 2.5 billion dollars in

9    certain employee related severance expenses which may or may

10   not be triggered.  For purposes of my evaluating the fairness

11   of the overall proposed breakup fee and expense reimbursement

12   as a percentage of the transaction, not that I need to do that

13   but frequently Courts are viewed as approving breakup fees

14   within a certain market range."

15        And then the Court puts this question:  "How should I view

16   the fair value of the overall transaction?"  And you gave Judge

17   Peck a fairly detailed description that begins at line 21.  And

18   coming over to page 24, sir -- well, in your answer, sir, you

19   refer to the cash component and you refer to the 2.5 billion

20   dollars in employee related expenses.  And then overleaf, sir,

21   you refer to the billion five for contract cure.

22        And why did you include those components, Mr. Miller, in

23   the answer to the judge's question about how the Court should

24   view the fair value of the overall transaction?

25   A.    They were potential assumed liabilities that go to the

51

1    cost of the deal.  And I think, as Judge Peck pointed out, the

2    severance expenses may or many not be triggered should they be

3    included in the context of determining what is an appropriate

4    breakup fee.  This all related to the approval of the breakup

5    fee which, from my perspective in connection with this

6    transaction, was a request by Barclays but the likelihood of

7    anybody else coming in to bid was so minimal -- the universe of

8    potential bidders was so small that this was really a sideshow.

9    This was just to satisfy Barclays' need.

10   Q.    And in responding to Judge Peck's question about the

11   overall value of the transaction, my question, sir, was --

12   well, my question is why did you select the cash and the two

13   components of assumed liabilities?

14   A.    It was the easiest items to refer to.

15   Q.    Okay.  And they were the easiest items in the asset

16   purchase agreement?  Is that --

17   A.    Looking at what Lehman was getting out of the deal in

18   terms of the 1.7 and the liability -- the clear liabilities

19   that were being assumed just to establish a basis for the

20   breakup fee.

21   Q.    Now, by the afternoon, sir, when you're appearing before

22   Judge Peck in connection with the sale procedures motion, had

23   yours or Weil Gotshal's knowledge concerning the derivation of

24   these figures grown any?

25   A.    Grown from where?

52

1    Q.    From nothing to something.

2    A.    It was the same as I had already testified to.

3    Q.    Okay.  Now, at page 24 of the transcript, sir, starting at

4    line 9 and continuing through line 17, you describe to His

5    Honor a repo arrangement with a prospective purchaser which you

6    describe as the purchaser "backing up and allowing these repos

7    to be settled and to be financed.  In addition, if this goes

8    forward, there will be a support agreement for this interim

9    period of two or three days where Barclays Capital will be on

10   premises, will be offering oversight and in the sole

11   discretion, may be willing to advance some monies in the

12   interim period."

13          As of the 17th, Mr. Miller, how involved, if at all, had

14   Weil Gotshal been in the negotiation or structuring or

15   documenting of the repo arrangement you described.

16   A.    Which repo are you talking about?

17   Q.    The one you described on the 17th.

18   A.    That's a repo of -- I think was 15.8 billion dollars that,

19   if I recall correctly, was done on Tuesday.  It was negotiated

20   between Lehman and Barclays and, I think, J.P. Morgan.

21   Q.    Any Weil Gotshal role in those negotiations?

22   A.    No.

23   Q.    Any Weil Gotshal role in the documenting of that?

24   A.    No.

25   Q.    At any point during the week, Mr. Miller -- by the week, I

53

1    mean, the 15th -- the tumultuous week, the 15th through the

2    22nd of September -- was Weil Gotshal privy to any discussions

3    amongst Lehman personnel about defaulting on a repo as a means

4    of delivering a block discount to Barclays?

5    A.    No.

6    Q.    Now, directing your attention, Mr. Miller, to the sale

7    hearing on Friday the 19th.  I want to first put that down as a

8    time milestone in between the appearance before the Court on

9    the 17th and then the appearance before the Court on the 19th.

10   Were there any other court appearances or filings in between

11   those two points?

12   A.    I don't recall.  There may have been some ancillary motion

13   or something.

14   Q.    With regard to the sale transaction, I take it, the two

15   appearances before the Court on the 17th and the 19th were the

16   only -- and the filing of the sale motion itself, the sale

17   procedures motion, were the three means by which the sale

18   transaction was described to the Court, is that right?

19   A.    That's correct.

20   Q.    Okay.  Now, at the sale hearing, you told us earlier this

21   morning that there was some delay in getting it started.  There

22   was some work being done on a clarification letter and other

23   things and that at the beginning of the sale hearing -- as you

24   and Ms. Fife arrived --

25   A.    We didn't arrive together.

54

1    Q.   Okay.  Well, actually, I should back up to that.  How did

2    you come down here?  Did you come down with anyone?

3    A.   Yes.

4    Q.   Apart from in a hurry.  Did you come down with anyone?

5    A.   Yes.  I was escorted down by associates.

6    Q.   Okay.  And there had been changes in the deal during that

7    week that was your plan to report to the Court at the sale

8    hearing, is that right?

9    A.   There were -- there was an amended asset purchase

10   agreement which I think was fil -- I believe was filed or

11   presented at the hearing.  Other than that, I'm not quite sure

12   there was anything -- there wasn't much time between the close

13   of the sale procedures hearing --

14   Q.   Right.

15   A.   -- and the beginning of the sale hearing.

16   Q.   But that's what my question goes to.  In between the close

17   of the sale procedures hearing and the beginning of the sale

18   hearing, as I've got your answer so far, you're working on DIP

19   financing.  Your prepping Mr. McDade.

20   A.   DIP financing was finished by Wednesday.

21   Q.   Okay.  That's over.  You're prepping Mr. McDade.  You've

22   got him back at your office.  It's organized chaos.  The

23   beehive is going on on the thirty-second floor.  I'm trying to

24   get a sense of how information got to you and to Ms. Fife about

25   the transaction you were going to describe as you prepared to

55

1   go there on the 19th.  I take it, it was done in that organized

2   chaos that you described.

3   A.   Ms. Fife was at 745 Seventh Avenue --

4   Q.   Okay.

5   A.   -- with Mr. Roberts and others.  I took Mr. McDade back to

6   767 Fifth Avenue.  And we live in a world of communications.

7   There were phone messages.  There were conference calls.  Mr.

8   McDade would have to go out and participate.  And then there

9   was -- Mr. Ridings also had to be prepped.

10  Q.   Okay.  And you arrived in court separately from Ms. Fife?

11  A.   I did.

12  Q.   And approximately how long after you -- well, who got here

13  first?

14  A.   I got here first.

15  Q.   Okay.  And how long after you got here did she get here?

16  A.   Probably a half hour to forty-five minutes.

17  Q.   Okay.  And after Ms. Fife arrived, how long before the

18  sale hearing actually began?

19  A.   I think, as I've already testified, thirty to forty-five

20  minutes.

21  Q.   Okay.  And the thirty to forty-five minutes, I want to be

22  sure that we're on the -- that I'm on the right page.  You

23  referred to a session in the courtroom --

24  A.   Yes.

25  Q.   -- where the judge was off the bench where some changes in

56

1    the deal were described to the people assembled.  Is that the

2    thirty minutes you're talking about?

3    A.    Yes.

4    Q.    Okay.

5    A.    It was probably -- it was probably forty-five to an hour.

6    Q.    Okay.  So let me back up a little bit because I want to

7    address the timing of things as you get to court.  You arrive;

8    Ms. Fife arrives.  Approximately how much time elapses between

9    her arrival and the beginning of that off the record session?

10   A.    Almost immediately after she came.

11   Q.    Okay.

12   A.    We asked the Court if we could have the time.  And Judge

13   Peck was very considerate and he left the bench and we spent

14   that next forty-five minutes to an hour explaining where we

15   were and answering questions from the audience.

16   Q.    And the purpose of that off the record session was to

17   explain the changes in the deal that had occurred since the

18   filing of the sale motion and the sale procedures hearing on

19   the afternoon of the 17th?

20   A.    In very broad terms, yes, I guess that's an adequate

21   description.

22   Q.    It was to bring people up to date.

23   A.    Yeah.

24   Q.    Okay.  And how -- excuse me.  How had you and Ms. Fife

25   learned what the changes were?

57

1    A.    Ms. Fife was in -- as I said, at 745 Seventh Avenue.

2    She's prob -- I'm guessing now.  She was probably in the

3    conference room where these things were discussed.

4    Q.    Well, let me ask you, when she arrived -- before she

5    arrived, were you yourself up to date on the changes?

6    A.    Not totally.

7    Q.    Okay.  And so it was Ms. Fife who had the last word on

8    what the changes were, she being the last to arrive.

9    A.    She had the last word on the current status of events --

10   Q.    Okay.

11   A.    -- which, I believe, when the hearing started, I believe

12   Ms. Fife made a statement to the Court in which she described

13   what had transpired since the sale procedures hearing.

14   Q.    Okay.  And if you would turn, Mr. Miller, to tab 261 in

15   your book.  That's the transcript of the sale hearing on the

16   19th.

17   A.    261?

18   Q.    Yes, sir.

19   A.    In my book, it's 260 -- oh, yeah, yeah.  261.

20   Q.    Okay?

21        (Pause)

22   Q.    Excuse me, Mr. Miller.  It takes me a little while to page

23   through all the appearances.  Here we go.  Starting at page --

24   A.    I think you're looking at page 46.

25   Q.    Actually, if you don't mind, sir, I'd like to start at

58

1    page 43.  You may remember, sir, the judge briefly took the

2    bench before this thirty minute session or so.  And this is

3    during that portion.  And you say to Judge Peck -- I'm on line

4    14: "In any event, Your Honor, as we described last Wednesday,

5    there are a lot of moving parts to this transaction.  And

6    they've been moving with great velocity over the last days

7    since Wednesday.  And as a consequence, Your Honor, there has

8    had to be some major changes in the transaction.  And

9    unfortunately, they weren't finalized until about a half hour

10   ago.  What I would propose, Your Honor, is that if Your Honor

11   will give us a recess for approximately a half hour so we can

12   explain orally to this audience" -- and then at that point

13   Judge Peck gives you the courtroom, takes an adjournment and

14   the description is made to the creditors -- to those in

15   attendance.

16   A.   Is that a question.

17   Q.   No.

18   A.   Oh, okay.

19   Q.   Here comes the question.  Well, who had told you the

20   changes had been finalized only a half hour ago?

21   A.   I have no specific recollection.  It probably came in

22   through a phone call.

23   Q.   And at the time that you addressed the Court before the

24   adjournment, did you yourself know what the major changes were?

25   A.   Generally.

59

1    Q.   Okay.  You had a chance to talk to Ms. Fife about them?

2    A.   Yes.

3    Q.   Okay.  Now, as you noted, sir, beginning on page 46, Ms.

4    Fife describes the changes to the Court, the Court having

5    now -- now being back in session.  And that is more or less

6    immediately after the adjournment.

7    A.   I'm sorry?

8    Q.   That's more or less immediately after the adjournment is

9    the first thing she --

10   A.   I wouldn't call it an adjournment.  It was a recess.

11   Q.   More or less immediately after the recess.

12   A.   I'm trying to --

13        (Pause)

14   A.   I think Judge Peck described it as a break.  And on page

15   45, he left the courtroom and said we were adjourned until 5:15

16   provisionally.  He actually came back at 5:41.  So it was just

17   slightly less than hour.

18   Q.   Okay.

19   A.   And he asked would somebody tell him what happened.  And

20   at that point, Ms. Fife made a presentation to the Court.

21   Q.   Okay.  And my question, Mr. Miller, is, to your knowledge,

22   when Ms. Fife made the presentation to Judge Peck about the

23   changes in the deal, was that -- were those -- was there

24   anything different about the description she gave to the Court

25   than had been said during the recess to those assembled.

60

1      A.    I don't believe so.

2      Q.    Now, we see that Ms. Fife gives a description at page 46.

3      My question to you, sir, is at that time, at that point, did

4      you or, to your knowledge, anyone else from Weil Gotshal have

5      any knowledge about a role that the repurchase agreement had

6      come to play in the transaction, in the agreement between

7      Lehman and Barclays?

8      A.    I can't pinpoint the time -- you're talking now about the

9      forty-five billion dollar repo?

10     Q.    Yes, sir.

11     A.    I can't pinpoint the time when that occurred.  It was not

12     significant because, in our view, Barclays was buying all the

13     assets of LBI and the collateral pledged for that repo -- which

14     was originally with the Federal Reserve Bank of New York, for

15     all assets of LBI.  And I have my own views as to why the

16     Federal Reserve wanted to get out of that repo.  And I assume

17     made a demand upon Barclays to step into the shoes of the

18     Federal Reserve Bank.

19     Q.    When after the Fed made the demand that Barclays step into

20     the shoes, to your knowledge, did Barclays step into the shoes

21     of the Fed?

22     A.    I believe so.

23     Q.    Do you know the mechanics of how that was done?

24     A.    No, sir.

25     Q.    Did you know them at the time?

61

1   A.   I think it was on Thursday the 17th.

2   Q.   On Thursday the 17th, did you know the mechanics of how

3   Barclays stepped into the shoes?

4   A.   They wired or hand-delivered or sent the single dollar

5   bills equal to forty-five billion dollars or thereabouts to the

6   Federal Reserve Bank and the Federal Reserve Bank undertook to

7   release the collateral.   The collateral had to go through

8   JPMorgan Chase.   These were securities.   My understanding is

9   that there were a very substantial amount of securities.   Even

10  though DTC agreed to stay open till midnight, they were unable

11  to transfer all of the securities to Barclays by midnight.

12  There was something like seven billion dollars in securities

13  that were not transferred as of that Thursday which created a

14  huge problem in connection with the closing.

15  Q.   Do you know, sir, if the funds were actually wired from

16  Barclays to the Fed as opposed to from Barclays to Lehman?

17  A.   I was not personally involved in it so I don't know.

18  Q.   And my question, sir, is whether Weil Gotshal, any lawyers

19  at Weil Gotshal, had any role or involvement in that portion of

20  the transaction, arranging for the repo, seeing to the wire

21  transfers, documenting the repo, anything connected to the

22  repo.

23  A.   We were not involved in the mechanics.   We knew what was

24  happening.

25  Q.   And did Weil Gotshal have any role of any kind in

62

1    determining the value of the collateral in that repo between

2    Lehman and Barclays?

3    A.   We're not in the valuation business.

4    Q.   Okay.  Were you privy -- was anyone at Weil Gotshal privy

5    to the method by which the collateral and the repo was valued?

6    A.   I don't really understand your question.

7    Q.   Well, I understand you're not involved --

8    A.   There was collateral at the Federal Reserve Bank.  It

9    consisted of securities.  The securities are what the

10   securities were.

11   Q.   And to your knowledge, sir, was anybody at Weil Gotshal

12   asked to or involved in determining what the value of those

13   securities were?

14   A.   As I stated, we're not valuation experts.

15   Q.   And was anybody at Weil Gotshal privy to the method or

16   mechanism that the valuation experts used to determine how much

17   repo was in the collateral?

18   A.   I don't know who valued it or if it was valued.

19   Q.   Okay.

20   A.   And I don't know if the Federal Reserve valued it.  The

21   underlying premise of a repo is that the collateral securities

22   should exceed the amount of the money loaned.  I think in the

23   context of what was happening in the marketplace, I believe --

24   this is just my impression and my opinion, the Fed was very

25   concerned about the value of the collateral sinking and the Fed

63

1    had no desire to end up as an unsecured creditor.

2    Q.   And I take it, sir, that on the 17th or the 18th, neither

3    you nor, to your knowledge, anyone else at Weil Gotshal knew

4    one way or the other whether the stated values for the

5    collateral and repo were accurate or correct?

6    A.   Mr. Gaffey, we were not running the business of Lehman.

7    Q.   And did you or anyone at Weil Gotshal have any knowledge

8    or understanding, sir, of the makeup, the composition of the

9    particular securities that were the assets securing the repo?

10   A.   The only knowledge that I had was that the Federal Reserve

11   Bank had said on Sunday that Lehman would have to comply with

12   the collateral value rules of the Federal Reserve Bank.

13   Q.   As to the component parts of the collateral, what kind of

14   securities it was or -- do you know?

15   A.   No.  No.

16   Q.   Did you know at the time?

17   A.   No.

18   Q.       Now, back at the September 19th hearing, sir, you'll

19   see at page 46, where you were before, starting at page (sic)

20   19, Ms. Fife describes changes in the deal to the Court and

21   says:  "Let me try to summarize the changes that were made to

22   the transaction.  In terms of the economic changes, they result

23   largely because of the markets, unfortunately.  And from the

24   time that the transaction was actually entered into till now,

25   the markets dropped and the value of the securities dropped as

64

1    well.

2        "So, originally, we were selling assets that had a value

3    of seventy -- approximately seventy billion dollars.  And

4    today, Your Honor, we're only selling assets that have a value

5    of 47.4 billion dollars."

6        Did you know one way or the other, sir, at the time that

7    Ms. Fife was describing this, who had calculated the 47.4?

8    A.    It was the figure given to us by Lehman.

9    Q.    Okay.  And when the fig -- do you know who at Lehman gave

10   that figure to you or Ms. Fife?

11   A.    I'm pretty sure it came from Mr. McDade.

12   Q.    Okay.  And do you recall Mr. McDade giving any description

13   of how the 47.4 had been calculated?

14   A.    Again, sir, in the context of what was happening and all

15   of the turmoil that was going on, no.

16   Q.    Okay.  So the 47. -- do you know what the basis was for

17   the assessment that the number had dropped from seventy billion

18   dollars to 47.4 because of a drop in the markets?

19   A.    I don't understand your question.

20   Q.    Well, do you know, for example, sir, whether one reason

21   for the drop from the seventy to the 47.4 had to do with

22   unavailability of some collateral that had been promised at the

23   beginning of the week but couldn't be delivered?

24   A.    I never heard that.

25   Q.    Okay.  Did anybody tell you that the 47.4 was against an

65

1    indentified body of collateral and it was valued in the

2    following way?

3    A.    No.

4    Q.    Did you or Ms. Fife have anything other than the 47.4

5    billion dollar number from your client to give to the Court?

6    A.    That's what we had.

7    Q.    Okay.  And Ms. Fife, in her presentation about the changes

8    in the deal continues on page 47, line 5:  "Barclays is

9    assuming liabilities, however, of 45.5 billion dollars in

10   connection with those assets."

11        Did you or Ms. Fife have any more detail than what she

12   told the Court?

13   A.    As I think I testified previously, the economic terms of

14   the transaction were negotiated between Lehman personnel and

15   Barclays personnel.

16   Q.    Okay.  So I take it you had no knowledge at the time as to

17   who calculated those liabilities, the method they used to

18   calculate them, the derivation of that number.

19   A.    I do not.

20   Q.    And further down in her description of the changes in the

21   transaction, Ms. Fife says "Barclays is still agreeing to pay

22   the cure amounts on any leases that it assumes or that we

23   assume and assign to it.  Barclays is also agreeing to the same

24   employee compensation arrangements.  And it is also agreeing to

25   pay the 250 million dollars of goodwill to LBI."

66

1    By the time Ms. Fife was describing to the Court on the

2    19th at the sale hearing the cure amounts and the employee

3    compensation, I take it Weil Gotshal's knowledge or basis as to

4    how those numbers had originally been calculated had not

5    increased or grown?

6    A.    Had not what?

7    Q.    You still had those numbers from your client and didn't

8    know how they calculated it.

9    A.    That's correct.

10   Q.    Now, sir, why is it that immediately after the recess when

11   the judge comes back on the bench, why was Ms. Fife describing

12   drops in asset value to the court?

13   A.    There had been an enormous change in values because of

14   what was going on in the week.  As I said, the bottom was

15   falling out of the market.  It was before Secretary Paulson had

16   asked for 700 billion dollars to save the economy.  AIG had

17   occurred on Tuesday when the Treasury or the Federal Reserve, I

18   can't remember which, agreed to put up eighty-five billion

19   dollars as an infusion to AIG.  The markets had frozen.

20   Commercial Paper could not be sold.  Major U.S. corporations

21   could not redeem Commercial Paper.  We were in a major

22   tailspin.

23   Q.    My -- of all the things that could have been told to the

24   Court -- I mean, my question is why was the value of the assets

25   a topic that was chosen --

67

1    A.    'Cause I think --

2    Q.    -- to describe to the Court.

3    A.    I think on the 17th we may have referred to the seventy

4    billion dollar amount.

5    Q.    Well, I guess, then I have the same question about the

6    hearing on the 17th.  Why are you or Ms. Fife describing the

7    value of assets to the Court when you're talking about the sale

8    transaction?

9    A.    To give the Court a guide as to what was involved in the

10   transaction.

11   Q.    And why are you or Ms. Fife on the 17th and the 19th

12   describing the value of the assumed liabilities?

13   A.    Because that was the nature of the transaction.

14   Q.    The reference that Ms. Fife made to 250 million dollars in

15   goodwill, do you know how that number was agreed?

16   A.    It's just a negotiation with Barclays.

17   Q.    Okay.  Again, a number supplied by the client?

18   A.    No.  It was the result of a negotiation.

19   Q.    Okay.

20         THE COURT:  Mr. Gaffey, it's just past 11:00 and we've

21   been at this since about 9:30.  It occurs to me that if this a

22   convenient time we might take a morning break.

23         MR. GAFFEY:  Absolutely, Your Honor.

24         THE COURT:  Fine.  Let's break until 11:15.

25   (Recess from 11:03 a.m. until 11:22 a.m.)

68

1          THE COURT:  Be seated, please.

2          MR. GAFFEY:  May I proceed, Your Honor?

3          THE COURT:  Please do.

4    RESUME DIRECT EXAMINATION

5    BY MR. GAFFEY:

6    Q.    Before the recess, Mr. Miller, we were talking about the

7    repurchase agreement.  Did it ever come to your attention or to

8    your knowledge the intention of any -- the attention of anyone

9    else at Weil Gotshal that on the morning of the 19th Barclays

10   had demanded that certain repo collateral be substituted?

11   A.    Certain repo collateral be substituted for what?

12   Q.    For what was already in the repo?

13   A.    No.

14   Q.    And had it come to your attention by the time the sale

15   hearing began, that on the morning of the 19th of September,

16   Barclays had demanded additional assets?

17   A.    I'm not sure I understand what you mean by additional

18   assets.

19   Q.    That Barclays had made a demand on the morning of the 19th

20   saying there wasn't enough value in the deal for it to close,

21   and therefore demanded additional assets?

22   A.    I was aware that Barclays was concerned about the value of

23   the transaction and that because of what was happening in the

24   markets, that the transaction was becoming less attractive.

25   Q.    Did anyone from your client, sir, tell you before the sale

69

1   hearing began, that Barclays had said it would not close if

2   more assets, more value, was not identified and added to the

3   deal?

4   A.   No, sir.

5   Q.   Do you have any knowledge about a search for additional

6   value or assets taking place within Lehman prior to the

7   commencement of the sale hearing?

8   A.   Prior to the commencement of the sale hearing?  No.

9   Q.   Now, if you would turn, please, Mr. Miller to tab M-38 in

10  evidence in your book.  Are you there, Mr. Miller?

11  A.   Yes.

12  Q.   At the time of -- by the time of the sale hearing, sir,

13  had you seen this document entitled "Notice of repurchase date

14  notice of termination"?

15  A.   No, I did not.

16  Q.   Were you aware, sir, at the time that the sale hearing

17  began, in any fashion, that the repo agreement between Lehman

18  and Barclays had been terminated?

19  A.   No, I was not.

20  Q.   Did there come a time when you became aware of that?

21  A.   No.

22  Q.   Did there come a time, to your knowledge, when others at

23  Weil Gotshal became aware of that?

24  A.   I'm not aware of that.

25  Q.   Now, you referred earlier today to a clarification letter

70

1    that was being worked on to reflect the changes in the deal.

2    And do you recall, sir, that Ms. Fife referred to that

3    clarification letter at the sale hearing on the 19th?

4    A.    Yes.

5    Q.    Was a draft of the clarification letter in existence at

6    the time of the sale hearing?

7    A.    There was a draft being worked on.

8    Q.    Did there come a point during the sale hearing where a

9    draft made its way to the courtroom?

10   A.    My recollection is that near the end of the hearing, a

11   draft arrived that was reviewed and it was determined wasn't

12   consistent with the understanding of the parties.

13   Q.    And had it been the plan to offer the clarification letter

14   to the Court during the sale hearing?

15   A.    I don't believe that we actually had a plan.

16   Q.    Had a plan, okay.  If you could turn to tab M-137 in your

17   book, sir.  It's a document in evidence consisting of an e-mail

18   from David Murgio to a long list of people saying, "Please find

19   attached a revised version of the clarification letter

20   reflecting our conversation this afternoon.  The black-line is

21   marked to reflect changes from the draft previously circulated

22   by Cleary."

23       And do you know, sir -- well, David Murgio is your

24   colleague at Weil Gotshal?

25   A.    He was a senior associate at the time.

71

1   Q.   And is the document marked as Exhibit M-137 the draft that

2   was in existence at the sale hearing, the one that was reviewed

3   and found to be incorrect?

4   A.   I can't -- I don't have any personal knowledge of that.

5   Q.   Okay.  Were you personally involved in the process of

6   reviewing drafts of the clarification letter?

7   A.   No, I was not.

8   Q.   Was there ever a point where you were involved in

9   reviewing drafts of the clarification letter?

10  A.   No.

11  Q.   And so, was there ever a point from the sale hearing

12  through the closing where you were involved in reviewing drafts

13  of the clarification letter?

14  A.   I saw drafts.  I was not involved in the drafting.

15  Q.   Now, when was a clarification letter finalized?

16  A.   Precisely, I can't tell you.  It was over the weekend of

17  the 19th to the 22nd.

18  Q.   Do you recall, sir, when the clarification letter was

19  signed?

20  A.   I think it was signed before the closing ended.

21  Q.   Would that be on the Monday morning?

22  A.   It could have been.  It could have been earlier.  I don't

23  know.

24  Q.   Okay.  And do you recall what it was about the draft

25  clarification letter that made its way down to court on Friday

72

1   that was wrong?

2   A.   Other than looking at the black-line versus what you say

3   is the draft, no.

4   Q.   And in your conversation with Mr. Roberts, did he tell you

5   what was wrong with it?  I understand there's a million things

6   going on.  So was it as short as, this isn't right, we have to

7   do it later; or this isn't right because, and he gave you a

8   reason?

9   A.   I personally was not involved.  As I told you, the -- we

10  didn't leave the courtroom until 2:30 a.m. or thereabouts.  I

11  had a nine o'clock appointment at another client in the

12  morning.  So I was not there in the morning of the -- I guess

13  that was the 20th.

14  Q.   I'm just a little surprised you had time for another

15  client on Saturday morning, sir.

16  A.   When the client demands, the client demands.

17  Q.   That's right.  Would you take a look, please at tab 53 in

18  your book, sir?

19  A.   53?

20  Q.   Five-three, yes.

21  A.   Yes, sir.

22  Q.   And this is a document also in evidence, Mr. Miller, and

23  it is a draft sent under cover of an e-mail from Robert

24  Messineo on Saturday, September 20th, at 2:39 p.m., containing

25  a draft clarification letter.  Do you recall -- I take it from

73

1    your prior answers, you may not -- do you recall if you saw

2    this particular draft?

3    A.    I don't recall.

4    Q.    That said, let me direct your attention anyway to where

5    the black-line begins.  And I have to apologize, this is not

6    Bates numbered.  So if you could leaf through it to where the

7    black-line portion of the document begins?  At least the Bates

8    numbers are cut off.  It's after Bates 24261.

9    A.    I don't think I have a black-line.

10   Q.    Within Exhibit --

11   A.    I'm looking at M-53.  My copy in here is not black-lined.

12   Q.    Are you in tab 137, Mr. Miller?

13   A.    We're back to 137?

14        THE COURT:  There are two documents, one is black-

15   lined and one is not.

16   Q.    I've got you on the wrong document.  Tab 137, please.

17        THE COURT:  Can I just clarify that I have the right

18   document?

19        MR. GAFFEY:  As soon as I'm --

20        THE COURT:  Under tab M-53 in my binder, there are two

21   versions of the letter, clean and black-line.

22        MR. GAFFEY:  Right.

23        THE COURT:  The black-line is at the back end of --

24        MR. GAFFEY:  If I could -- I beg your pardon, Your

25   Honor.  I was --

74

1        THE COURT:  No, I'm just trying to understand what's

2   in the binder and what you're trying to accomplish right now.

3        MR. GAFFEY:  Let me back up and start over a little

4   bit.

5   BY MR. GAFFEY:

6   Q.   Let's go back to tab M-53.

7   A.   Yes.

8   Q.   And tab M-53 is the Messineo Saturday, September 20th

9   e-mail, yes?

10  A.   Messineo.

11  Q.   Messineo.

12  A.   Yes.

13  Q.   And about halfway through that document begins a black-

14  line.

15       (Pause)

16  A.   I'm going -- I've gone right up to the signature page, and

17  I don't have any black-line.

18       MR. GAFFEY:  Your Honor, may I approach?  I have

19  another copy of 53.

20       THE COURT:  Yes, you may approach.

21       MR. GAFFEY:  Thank you.

22  Q.   Mr. Miller, I've handed you the original of Exhibit M-53

23  and it's opened to where the black-lined page begins.  And so

24  I'm sure we're on the same page, sir, that black-line should

25  say at the top, "WGM Final September 20, 2008 a.m."?

75

1    A.    This black-line that you just handed to me says "WGM

2    Draft," stricken out, "Final September 20, 2008 7:30 p.m.,"

3    stricken out.  And it's got an a.m.

4    Q.    We're in the same place, sir.

5    A.    Okay.

6    Q.    And directing your attention down to the definition of

7    purchased assets in that black-line?

8    A.    Yes.

9    Q.    Do you see, sir, that there are changes made?

10   A.    Yes.

11   Q.    And at the bottom of page 2, and overleaf -- at the bottom

12   of page 1 and overleaf to page 2, I'd ask you to take a look at

13   what was stricken from that paragraph and what was added in

14   paragraph 1(ii), running from pages 1 to 2 of the exhibit.

15   A.    Do you want me to read it?

16   Q.    No, just take a look at it to yourself.  The question,

17   sir, is going to be:  do you have any knowledge about the

18   circumstances under which the definition was changed from the

19   language that's stricken out on page 2 to the language that's

20   contained on page 1 in the black-line?

21   A.    Question again, please?

22   Q.    Do you know -- do you have any knowledge about the

23   circumstances under which that change in the definition of

24   purchased assets was made?

25   A.    I was not a party to the negotiations with respect to the

76

1  drafting.

2  Q.   And if you would go back to your book, Mr. Miller, you

3  should find in there tab M-138, which is Exhibit M-138 in

4  evidence.

5  A.   Yes.

6  Q.   And have you seen that document before?

7  A.   I don't have any recollection of it.

8  Q.   Do you recall a point over the weekend of the 20th and the

9  21st of September, Mr. Miller, when some language was proposed

10 for inclusion in the clarification letter concerning the

11 termination of the repo?

12 A.   I don't recall language about it.  I recall some

13 discussion about the repo.

14 Q.   What do you recall about the discussion about the repo?

15 A.   That the repo was essentially going to be canceled and

16 the -- it was essentially a credit against the purchase price.

17 Q.   And if you would turn, sir, to tab M-3 in your book, sir.

18 It's the final of the clarification letter in evidence.

19 A.   What's the number, again?

20 Q.   It's M-3.

21 A.   M-3.  Yes.

22 Q.   Now, was there a point, sir, in the closing that took

23 place over the weekend and through Monday morning, when a

24 decision was made whether or not to bring this final

25 clarification letter back to the Court?

77

1   A.   The clarification letter was going to be attached to an

2   order, I think, that was submitted the following week.

3   Q.   Was there a discussion about whether the clarification

4   letter should or should not be brought back to the Court prior

5   to the closing?

6   A.   There was some discussion about whether there had been any

7   material changes in the transaction.  And the conclusion was

8   not.

9   Q.   Okay.  Would you describe that discussion to the Court?

10  A.   I did not really participate except for a very minor

11  event.

12  Q.   Was there a point where you asked others, including

13  lawyers from Cleary at a closing table, whether anyone thought

14  there were changes that required court approval before the

15  closing?

16  A.   There was a discussion.  I can't recall specifically.  I

17  think the Cleary people were involved, yes.

18  Q.   And at the time that discussion took place -- at any time

19  prior to that discussion, sir, had there been any discussions

20  back and forth between Lehman and its representatives and

21  Barclays and its representatives, about any implications under

22  the Bankruptcy Code concerning the termination of a repurchase

23  agreement?

24  A.   No.

25  Q.   And when the discussion that you recall took place about

78

1    whether the clarification letter needed to be brought to the

2    Court, was that a discussion that included representatives of

3    Barclays?  Do you remember?

4    A.   I can't be a hundred percent sure.  It may have.  I think

5    it also included representatives of the creditors' committee

6    and maybe -- I don't have a clear recollection -- maybe the

7    representatives of the SIPC trustee.

8    Q.   And at the time the decision was made about whether or not

9    to bring the clarification letter back to the Court, did you or

10   anyone from Weil Gotshal, by that time, have knowledge about

11   the fact that the repo had been terminated?

12   A.   Yes.

13   Q.   And --

14   A.   I don't think it was a question of bringing the

15   clarification letter back to the Court.  The question was

16   whether the transaction had changed in any material fashion.

17   And our conclusion was, it had not.

18   Q.   I put that out there as a point in time.  At any point

19   before the discussion took place about that, were you or anyone

20   else from Weil Gotshal aware that the repo had, in fact, been

21   terminated by Barclays?

22   A.   I don't know what you mean by terminated.  I don't think

23   that's the correct terminology.  The repo was going to be -- if

24   you want call it -- rescinded.  It had no material effect on

25   the transaction since the collateral security relating to the

1    repo were assets of LBI, and would be going back to LBI, and

2    transferred to Barclays in any event.  So in effect, it was

3    sort of a shortcut.

4    Q.    At the time the decision was made, did any of the lawyers

5    have knowledge about the relative size of the amount advanced

6    against the collateral posted, in terms of value?

7    A.    I think you have to understand that the values were so

8    volatile during this period of time, the understanding was that

9    if the Fed had done its job, the collateral value would have

10   been somewhat in excess of the loan amount.  I think there was

11   serious consternation as to whether that collateral still had

12   any excess value over and above the loan value.

13   Q.    Do you know who conducted the valuation of the repo and

14   the Fed collateral?

15   A.    I have no idea, except I know that Lehman people were

16   concentrating on it.

17   Q.    Do you know who conducted the valuation of the collateral

18   in the Lehman-Barclays repurchase agreement?

19   A.    I believe Mr. Tonucci was involved.  I think Alex Kirk was

20   involved.  Jim Seery was involved.  Mr. McDade would come into

21   the room from time to time.  There were numerous people there

22   from Barclays.  As I said, there were computer runs that were

23   very extensive.  And I think they were going through it, as I

24   recall, CUSIP number by CUSIP number.

25   Q.    And do you know if a collateral agent also had -- do you

80

1    know if a collateral agent had also produced a valuation of the

2    repo?

3    A.    Who was the collateral agent?

4    Q.    Bank of New York.

5    A.    Not that -- not that I'm aware of.

6    Q.    And just a couple more questions and then I'll be done,

7    sir, with regard to the cure and comp elements.  Was it --

8    would you agree, sir, that the two billion in comp, that the --

9    would you agree that the assumption of compensation liabilities

10    by Barclays was part of the consideration in the asset purchase

11    agreement?

12    A.    The assumption of some exposure for severance and bonus

13    compensation was part of the transaction.  It was an estimate,

14    and it had a lot to do with how many employees Barclays would

15    continue to employ after the ninety-day period had expired.

16    Q.    I may not have put the question well.  The question is

17    whether you considered it to be part of the consideration in

18    the contract?

19    A.    I said, the assumption of the exposure was part of the

20    deal.

21    Q.    And was that also true with respect to the cure?

22    A.    Yes, but nobody knew the exact amount or what it would be.

23          MR. GAFFEY:  Your Honor, I have nothing further.

24    Thank you, Mr. Miller.

25          THE WITNESS:  Thank you.

81

1          MR. WERDER:  For the record, Your Honor, Richard

2    Werder of Quinn Emanuel for the committee.  The committee has

3    no questions at this time.

4          MR. MAGUIRE:  If it please the Court.

5    DIRECT EXAMINATION

6    BY MR. MAGUIRE:

7    Q.   Mr. Miller, I'm Bill Maguire for the SIPA trustee.

8    A.   Good afternoon.

9    Q.   Now, sir, I'd like to start by asking you about

10   discussions that occurred over the weekend of the clarification

11   letter, concerning an asset that ended up in the clarification

12   letter involving some 769 million dollars of securities in the

13   account that was referred to as the customer reserve account,

14   or the Rule 15c3-3 account.

15   A.   Yes, sir.

16   Q.   You have an understanding that that was a lockup account?

17   A.   Yes.

18   Q.   You understood that the assets in that account were set

19   aside for the exclusive benefit of Lehman's customers?

20   A.   I had a lot of experience with 15c3-3 accounts.

21   Q.   And that's an account that's regulated by the Securities

22   and Exchange Commission?

23   A.   Correct.

24   Q.   Can you tell us, what was the agreement between the

25   parties with respect to that 769 million?

82

1    A.   During the early morning hours of Monday, whatever the day

2    Monday was -- the 22nd -- it came to my attention that Barclays

3    asserted that it was entitled to the transfer of the 15c3-3

4    account, which, as you said, had something like 769 million

5    dollars in securities, and I think close to a billion dollars

6    in cash.  And I got into a debate with, I think it was Michael

7    Klein who was advising Barclays, that Barclays was not entitled

8    to that account.  It was a customer protection account.  It was

9    subject to approval by the SEC in terms of release.  And there

10   was actually a letter that related to the prior transaction

11   when Barclays was negotiating to buy the entire Lehman

12   enterprise, that was either addressed to the SEC asking for

13   release of that account in connection with that transaction,

14   which was outdated.  I think it was dated sometime the prior

15   week.

16       Barclays' position was that since they were taking the

17   customer accounts of the LBI business, they were entitled to

18   that account.  I had previously been engaged in cases where I

19   had transferred customer accounts, and I did not transfer the

20   15c3-3 account.  It was held back to protect the customers.  So

21   there was an argument which involved certainly Mr. Klein,

22   myself, Tom Roberts, and representatives of the creditors'

23   committee were there.  I think somebody may have been there

24   from your office.  I can't recall directly.

25       And there were two points we were -- I was making.  One,

83

1    it's a customer protection account.  You can't have it unless

2    the SEC releases it, number one.  Number two, we had made a

3    representation to the Court that no cash was going to Barclays.

4    And there was no way we were going to let that billion dollars

5    go to Barclays.

6        This was, as I say, in the early morning hours of Monday

7    the 22nd.  There was a lot of pressure to get this deal

8    approved -- I mean, consummated.  And Mr. Klein went back in --

9    there was a room set up for the Barclays people on this

10   conference room center.  And he went back into the room, came

11   back and made a proposal that Lehman keeps the billion dollars,

12   that would be LBI, and if they could get it released from the

13   SEC, the securities.

14   Q.   So the billion dollars in cash was going to stay with

15   Lehman?

16   A.   Correct.

17   Q.   And the 769 million dollars, subject to it being

18   regulatorily appropriate, would be transferred as part of the

19   purchase price?

20   A.   That's the essence of that agreement.

21   Q.   Did you at any time enter into any commitment on behalf of

22   Lehman that Barclays would get the 769 million dollars,

23   unconditionally?

24   A.   I assume when you say me, you're talking about Lehman?

25   Q.   I'm referring actually to you personally or anyone that

84

1    you know acting on behalf of Lehman?

2    A.   Absolutely no commitment.

3    Q.   Did you or anyone that you know acting on behalf of

4    Lehman, undertake or give Michael Klein or anyone at Barclays a

5    commitment that if there was a regulatory problem and the 769

6    million dollars in securities could not be transferred from

7    inside the 15c3 account, Lehman would be required to substitute

8    and provide 769 million dollars from somewhere outside that

9    account?

10    A.   Absolutely not.

11    Q.   A name came up earlier, Mr. Robert Messineo?

12    A.   Yes.

13    Q.   Sir, can you tell me, what was his role in this

14    transaction?

15    A.   He's a partner at Weil Gotshal.  He was part of the group

16    that was working on closing.  And I believe he was involved in

17    the 15c3 draft.

18    Q.   Sir, now I'd like to ask you some questions with respect

19    to Lehman's relationship with the Depository Trust Clearing

20    Corporation.  You understand that there were some issues that

21    had arisen with respect to Lehman's relationship with the

22    Clearing Corporation, that by the weekend threatened or

23    jeopardized the progress of the sale itself?

24    A.   Correct.

25    Q.   At the sale hearing, there had been some kind of agreement

85

1    that had been reached with the Depository Trust Corporation, in

2    which they were provided with certain residential mortgage

3    securities and also with a 250 million dollar holdback.  Do you

4    recall that?

5    A.    I recall that Sheldon Hirshon from the Proskauer firm

6    appeared at the hearing on the 19th and described that there

7    was a major problem at DTCC, which is a combination clearing

8    exchanges, where DTCC was very concerned that the level of

9    fails had increased dramatically and that the clearing

10   corporation was -- would be liable and that there was not

11   sufficient collateral to support DTCC opening up the exchanges.

12   And that was a major concern.

13   Q.    And while DTCC had been promised certain residential

14   mortgage securities, over the weekend it transpired that they

15   were not available.  Do you recall that?

16   A.    I recall that, yes.

17   Q.    And Barclays had to enter into negotiations with DTCC to

18   see if they could come to some new arrangement?

19   A.    Well, Barclays' position was, if we can't clear, then we

20   don't have a business.  So that was a major problem from

21   Barclays' perspective and from our perspective.  And my

22   recollection is that Mr. Hirshon who was -- Hirshon, who was at

23   the closing, and Barclays' representatives went off someplace,

24   another conference room, to negotiate a resolution.

25   Q.    And what was your role in Barclays' negotiations with the

1   Depository Trust Clearing Corporation?

2   A.   We had no role.

3   Q.   And can you explain why you and your firm did not

4   participate in those negotiations --

5   A.   It was --

6   Q.   -- with Barclays and the DTCC?

7   A.   -- it was a problem for Barclays to have a clearing

8   facility -- having clearing facilities.  And it was something

9   that would have to be worked out between DTCC and Barclays,

10  going forward, post-closing.

11  Q.   Were you, at any time, invited into any of those

12  negotiations?

13  A.   I wasn't, and I don't believe anybody else at Weil Gotshal

14  was.  It was very similar to the problem that arose with

15  JPMorgan Chase and Barclays.  And that was resolved in

16  something similar to that, where Barclays and JPMorgan Chase

17  went off to another conference room on some part of the floor

18  and spent four or five hours negotiating that particular

19  problem.

20  Q.   Did you receive reports from Barclays as to the progress

21  of the negotiations with the Depository Trust Clearing

22  Corporation?

23  A.   Progress reports?

24  Q.   Yes.

25  A.   No.

87

1    Q.    Did you generally hear from the Barclays representatives?

2    A.    Only that they were working it out.

3    Q.    And did you ultimately come to understand that an

4    agreement was reached between Barclays and the Depository Trust

5    Clearing Corporation?

6    A.    Yes.

7    Q.    And were you informed that as part of that agreement, the

8    Depository Trust Clearing Corporation would be getting that

9    holdback, the 250 million dollars limited guarantee?

10    A.    I did not have specifics, but I knew there was additional

11    collateral for DTCC.

12    Q.    Did anyone from Barclays inform you that as part of the

13    agreement with the DTCC, Barclays had specifically agreed that

14    all of the assets that Lehman had at DTCC would be excluded

15    assets under the agreement, and would remain subject to the

16    authority of the trustee?

17    A.    I have no recollection of that.

18    Q.    Did you review Barclays' letter agreement with the DTCC?

19    A.    I did not see it during that weekend, and I did not see it

20    until a long time afterwards.

21    Q.    Let me ask you this question, sir.  The Court has before

22    it two agreements.  Under one, the clarification letter, the

23    assets in question -- purchased assets, they go to Barclays.

24    Under the other agreement, these same assets are excluded

25    assets.  They stay with the estate, are subject to the

88

1    authority of the trustee.  Can you help the Court understand

2    how it could have before it, these two agreements?

3    A.    The agreement between DTCC and Barclays was a separate

4    agreement.  It wasn't an agreement in which Lehman was

5    involved.  This was Barclays dealing with the assets which it

6    was acquiring.

7    Q.    Does the clarification letter reflect any conscious effort

8    on the part of you or your law firm, to conform that agreement,

9    that draft agreement or that final agreement, with Barclays'

10   separate letter agreement with the DTCC?

11   A.    I don't believe we saw the DTC letter.

12   Q.    Are you aware of any effort on the part of Weil Gotshal to

13   conform the clarification letter to the DTCC letter?

14   A.    Since we did not have the letter, I don't believe there

15   were any efforts to do that.

16   Q.    Sir, you referred earlier in your testimony to the sale

17   hearing and also to the fact that the Court was told that there

18   was no cash being transferred to Barclays.  And I believe the

19   sale hearing is at Movant's Exhibit 261.  If I could invite

20   your attention, sir, to page 53 of that transcript.

21   A.    Yes.

22   Q.    That, sir, is where you partner, Ms. Fife, represented to

23   the Court that there's no cash being transferred to Barclays.

24   Is that correct?

25   A.    Could you refer me to the line?

89

1  Q.   I'm sorry.  It's at the very bottom of the page, starting

2  at line 24.

3  A.   Yes, I see the lines.

4  Q.   And if you could further turn, sir, to page 242 of the

5  transcript?  You might want to look just for reference or

6  context to page 241.  In the middle of page 241 at line 14,

7  you'll see that you're addressing the Court in this passage.

8  A.   I see I'm addressing the Court.  I'm not quite sure what

9  it means, but go ahead.

10  Q.   Well, I'm --

11  A.   I don't know who the woman is.

12  Q.   -- I won't delay you on that.  I'll ask you, sir, to turn

13  to page 242, starting at line 13.  And you'll see there, again,

14  and this time you represent to the Court, "Cash -- we're not

15  transferring any cash to Barclays.  That's out of the

16  agreement."?

17  A.   Yes.

18  Q.   And the representations that you made and that Ms. Fife

19  made to the Court, that was entirely consistent with your

20  understanding of the transaction.  Isn't that correct?

21  A.   Yes.  In referring to free cash, unencumbered cash.

22  Q.   I believe you said, "we're not transferring any cash to

23  Barclays.  That's out of the agreement."  When you say free

24  cash, that's obviously cash, sir.  But I understand what you

25  said to the Court was "we're not transferring any cash."  Was

90

1    there some variety of cash that you were excluding from your

2    representation?

3    A.   Yeah, there was margin cash associated with the customer's

4    account, and they were taking the customer's account.   They

5    were taking the whole account.   So if there was collateral cash

6    in that account, that cash would go with the customer's

7    account.

8    Q.   So you weren't discussing customer property here, you were

9    talking about Lehman's own proprietary property?

10   A.   Well, I may -- your use of the word "customer cash" --

11   collateral, margin payments.   I'm not sure how you would

12   characterize that as whether it's Lehman cash or customer cash.

13   But as a general proposition, with the accounts being

14   transferred, everything relating to those accounts was being

15   transferred.

16   Q.   So you certainly were not including customer cash when you

17   said "no cash is being transferred to Barclays"?

18   A.   That's correct.

19   Q.   You understood the customers deposited cash with Lehman.

20   And with the customer accounts, the cash that belonged to them

21   would also go?

22   A.   That's correct.

23   Q.   Lehman, on the other hand, had its own cash which it used

24   for a variety of purposes, did it not?

25   A.   It had some cash, yes.

91

1    Q.    Including, for example, the cash that was restricted in

2    the 15c3 account, correct?

3    A.    That's correct.  That was not available for use at any --

4    under any circumstances.

5    Q.    And you represented to the Court that there was not any

6    cash that was being transferred to Barclays, correct?

7    A.    In the context of our last two minutes, yes.

8    Q.    And of course, that was of concern to you on the Sunday

9    night or the early Monday morning when you learned that

10   Barclays wanted not only 769 million in government securities,

11   but in addition, one billion dollars of restricted cash in the

12   customer reserve account, correct?

13   A.    I think I testified to that.

14   Q.    And that's what led to a heated argument, in which you

15   took the position that a representation had been made to the

16   Court that no cash was being transferred to Barclays, and you

17   therefore insisted that that one billion dollars in cash not be

18   transferred to Barclays from the restricted customer accounts?

19   A.    That was one aspect or one branch of the debate, if you

20   want to call it that.  The other being that that account was a

21   protected account and should not have been transferred.  We

22   also, I might add, gave an admonition to Barclays that the

23   likelihood of the SEC ever releasing that account was slim to

24   none.

25   Q.    You mentioned in your last answer, I believe -- or the

92

1    previous answer -- margins, sir.  And you personally did not

2    have any discussions with anyone at Barclays about Lehman's

3    margin.  Isn't that right, sir?

4    A.   That's correct.

5    Q.   And by Lehman's margin, you understand Lehman's cash, cash

6    equivalents and government securities that Lehman posted as

7    collateral with clearing corporations?

8    A.   Correct.

9    Q.   And indeed, you are not aware of anyone at your firm, the

10   Weil Gotshal law firm, who had any discussions with anyone at

11   Barclays concerning the question of Lehman's margins?

12   A.   As far as I'm aware, that's correct.

13   Q.   Thank you, sir.

14        MR. MAGUIRE:  No further questions.

15        THE COURT:  Mr. Schiller?

16        MR. SCHILLER:  Thank you, Your Honor.

17   CROSS-EXAMINATION

18   BY MR. SCHILLER:

19   Q.   Jonathan Schiller from Barclays, Mr. Miller.

20   A.   Good afternoon.

21        MR. SCHILLER:  I have a book, Your Honor, that I would

22   like to distribute, with the Court's permission.

23        THE COURT:  That's fine.

24        THE WITNESS:  Am I finished with this one?  Mr.

25   Schiller, do I need this one anymore?

93

1        MR. SCHILLER:  Would you just, please, leave it up

2   there?  I may make reference to it.  Thank you.

3        (Pause)

4   Q.   I would like to begin, Mr. Miller, with tab 2 of the book

5   that I provided you, which would be the hearing transcript from

6   the September 19th hearing, which you described extensively

7   this morning.  I would like to go back to what you advised

8   Judge Peck at page 60, lines 19 through 23, where you advised

9   the Court that, "The substance of this transaction is to

10  continue a business for the benefit of the general economy, the

11  employees, whose lives are at stake, and to fit a small piece

12  into the jigsaw puzzle of maintaining a stable economy."  Do

13  you see that, sir?

14  A.   Yes, I do.

15  Q.   Were those benefits that you set forth there for the Court

16  realized?

17  A.   I would say, in part.  The problem that I'm having is the

18  stable economy.  I have very fixed views about that, which I

19  don't think I should express, Your Honor.

20       THE COURT:  There's no need to express those views

21  here.

22  A.   But I would say generally, the transaction did accomplish

23  that in terms of the employees, in terms of the customers of

24  LBI.  I think it was of enormous benefit to the nation and to

25  the city.  And it accomplished what I think we set out to

94

1    accomplish.  We saved a business that on Monday the 22nd, if

2    the transaction had not closed, would have been catastrophic,

3    with 10,000 people out of work, pandemonium, values lost, an

4    empty building in a real estate market that was crumbling.  So

5    I am very proud of what happened.

6    Q.   And the business that you saved, I believe you've always

7    characterized that in terms of the sale transaction as the

8    purchase of the North American business.  Is that right?

9    A.   North American capital markets business.

10   Q.   And that business was sold, through the asset purchase

11   agreement.  And that provided for Barclays to acquire all

12   assets used in connection with that business, except for those

13   which were explicitly excluded, correct?

14   A.   That's correct.

15   Q.   And when you proffered Mr. McDade's testimony to the Court

16   on the 19th, Mr. Miller, at page 98, lines 19 through 22, you

17   brought to the attention of Judge Peck that "McDade would

18   testify that the asset purchase agreement provides for the sale

19   of the North American broker-dealer business of LBI, which

20   includes banking and capital market business, in addition to

21   numerous other divisions," which you've just referenced again?

22   A.   Yes, sir.

23   Q.   Through that tumultuous week of September 15th through the

24   22nd, which you've described dramatically this morning again,

25   you never had what you would call an accurate Lehman balance

95

1    sheet.  Is that correct?

2    A.    That's a fair statement.

3    Q.    And because there was no accurate Lehman balance sheet in

4    that chaotic period, there was significant uncertainty over the

5    value of Lehman's assets and liabilities that were being

6    transferred?

7    A.    There was volatility in the values.  There was a high

8    level of risk in the transaction, I think particularly from

9    Barclays' perspective.  And that was one of the major elements

10   in this volatility about this transaction during the week and

11   concern about the decline in the values.

12   Q.    And this uncertainty in values was one of the reasons that

13   the discussions ensued over valuation, that you've described

14   generally, correct?

15          MR. GAFFEY:  Objection.

16          THE COURT:  What's the objection?

17          MR. GAFFEY:  Mr. Miller testified he wasn't involved

18   in those discussions.

19          THE COURT:  Let me think about this.  Objection is

20   sustained.

21   Q.    You observed discussions, did you not, discussions you

22   were in and out of, where there was debate over the value of

23   the assets being transferred?

24   A.    As I testified, I was in a number of conference rooms.  I

25   wouldn't call it a debate.  There were discussions between the

96

1    Lehman team and the Barclays team, as to the appropriate marks

2    or marks to market of various securities.  As I said before, it

3    was a very long, laborious process.  When you go CUSIP number

4    by CUSIP number, it could take a long time.

5    Q.   Was it your impression that they were trying together to

6    get to appropriate marks for that period in the week?

7    A.   That was my impression.

8    Q.   Is it your testimony before the Court, Mr. Miller, that

9    this was not a balance sheet deal?

10    A.   It was not a balance sheet deal, from my perspective, at

11    any time, nor from Mr. McDade's perspective.

12    Q.   Why is that?

13    A.   Because nobody really had a firm fix on the assets.  This

14    was a distressed sale, when you get down to it, in an

15    extremely -- I mean, I've been at this for fifty years, and

16    I've never been in a situation like this.  And what Mr. McDade

17    and his team were out to do, was to get the best deal they

18    could, the best deal that would preserve the employment

19    opportunities and the best deal to protect the customers of the

20    brokerage firm.

21    Q.   In this environment, the APA that was presented to the

22    Court contained no representations or warranties regarding the

23    values of all of the assets and liabilities being acquired by

24    Barclays, correct?

25    A.   That is correct.

97

1    Q.    And the APA did not provide for a "true-up" regarding the

2    values of all of the assets and liabilities that were being

3    acquired, did it?

4    A.    There was no provision for a true-up, and in the context

5    of what we were doing, having a true-up would have been, I

6    think, virtually impossible.  And then if you had a true-up --

7    and let's assume that Lehman had a true-up, where would Lehman

8    get the assets to true up?  I do recall that the Cleary

9    Gottlieb folks said there is no -- there will be no true-up,

10   and that's why I think there are no representations or

11   warranties.

12   Q.    And in light of that impossibility that you've just

13   described --

14   A.    Almost.

15   Q.    -- Mr. Miller, you did not tell the Court on the 19th or

16   on the 17th, or represent to the Court, that this deal was

17   going to be in balance or roughly equivalent or a wash,

18   correct?

19   A.    I did not -- I never used those expressions.

20   Q.    Nor did you proffer through the testimony of Mr. McDade or

21   Barry Ridings that these assets and liabilities in this

22   transaction would be roughly equivalent or in balance or a

23   wash.  Isn't that correct, sir?

24          MR. GAFFEY:  Objection.

25   A.    Well, I think --

98

1          THE COURT:  What's the objection?

2          MR. GAFFEY:  It's twofold, Your Honor.  Mr. McDade's

3    testimony speaks for itself; and Mr. Miller's view of it is

4    eliciting an impermissible opinion.

5          THE COURT:  Well, Mr. Miller is here as a fact

6    witness, but there's probably no one I can think of with

7    greater expertise in the subject matter.  This is a hearing in

8    which what he represented to me at the time of the sale hearing

9    is an essential element of what's in dispute, and I'm going to

10   let him answer the question.

11         It's also a compound question, which I think is a

12   problem with the question as phrased, and would request that

13   the question be broken down so that it's actually a proper

14   question.  I thought that was what the objection was going to

15   be.  That's the objection I would have made to it.

16         MR. SCHILLER:  Thank you, Judge.

17   Q.   In light of the Court's objection to my question, let me

18   rephrase it.  Mr. Miller on the 17th or the 19th, given the

19   impossibility that you mentioned a moment ago, did you tell the

20   Court or represent to the Court that the deal was going to

21   reflect roughly equivalent values of assets and liabilities?

22   A.   Well, one, I think the transcript speaks -- the record

23   speaks for itself, and two, I don't believe I ever did that.

24   Q.   Did you ever represent to the Court that this deal was

25   going to be a "wash"?

99

1    A.    I did not.

2    Q.    Did you say in words or substance to the Court on the 17th

3    or on the 19th, that assets and liabilities would "be in

4    balance"?

5    A.    Since I didn't view the deal as that kind of a

6    transaction, I'm sure I never said that.

7    Q.    You testified earlier that you spent a very long afternoon

8    and evening, late into the night, with Mr. Ridings and Mr.

9    McDade, preparing for this hearing before Judge Peck, given the

10   importance of that sale.  Do you remember that?

11   A.    Yes.

12   Q.    And you were shown Movant's Exhibit 2, which is in their

13   book.  I'm sorry to burden you.  It's on the screen, I'm told,

14   so you don't have to go to the book.  Thank you.

15   A.    Yes.

16   Q.    I believe it's your testimony that in the course of many

17   hours of preparation for this hearing and presenting to the

18   Court why it would offer fair value, among other things, for

19   this sale to be approved -- fair value to Lehman and its

20   creditors -- this document was not in the room or discussed.

21   Is that correct?

22   A.    The document was not in the room.  And I have no

23   recollection of discussing it.

24   Q.    Thank you.  Staying with the APA, Mr. Miller, which is tab

25   3 in your book that I gave you.  If I might ask you to turn to

100

1    page 14, which is the -- at 3.1, the definition of

2    consideration.

3    A.   Yes, sir.

4    Q.   And consideration refers to the cash amount and the

5    assumption of assumed liabilities by purchaser --

6    A.   Yes.

7    Q.   -- and the cash amount was a definite amount.  I believe

8    you've mentioned already, it was 250 million plus the appraised

9    value of the real estate?

10   A.   That's correct.

11   Q.   Which you describe as the building on Park Avenue and the

12   centers in New Jersey?

13   A.   Seventh Avenue.

14   Q.   Seventh Avenue, I'm sorry.  The assumed liabilities

15   included some liabilities for which valuation estimates were

16   given -- the APA had some valuation estimates -- and some, as

17   you look at it, for which no valuation estimates were given,

18   correct?

19   A.   That's correct.

20   Q.   And the consideration section, 3.1, was freestanding, was

21   it not?

22   A.   What do you mean by freestanding?

23   Q.   It was an independent, unconnected term.  It stood by

24   itself in terms of describing what would be paid by Barclays to

25   Lehman?

101

1    A.    In paragraph 3.1?

2    Q.    Yes.

3    A.    Yes.

4    Q.    And the 3.1 section of the APA, it doesn't define

5    consideration to be paid by Barclays as being based on "the

6    book value" of Long Positions, as that term is used in

7    subsection (d), does it?

8    A.    That's correct.

9    Q.    And similarly, the description of Long Positions as having

10   the book value as of the date hereof of approximately seventy

11   billion, does not describe the consideration being paid by

12   Barclays as set forth above?

13   A.    That's correct.

14   Q.    You've said in the past under oath, just to remind you,

15   that --

16   A.    Remind me that I'm under oath --

17   Q.    -- Barclays -- no, just to -- in your deposition --

18   A.    Oh, okay.

19   Q.    -- you testified that Barclays was not making the

20   acquisition for the purpose of taking a loss.  Do you recall

21   that?

22   A.    Yes.

23   Q.    And there was nothing in the purchase agreement as

24   approved by this Court that limited Barclays in any way from

25   accounting for a gain, was there?

102

1   A.   Not that I recall.

2   Q.   Let me ask you to turn to tab 4 of the book that I

3   provided you, please.

4        MR. SCHILLER:   Exhibit 419, for the record, Your

5   Honor.

6   A.   Yes.

7   Q.   And that is a letter to the examiner's team dated March

8   24, 2010.

9   A.   That's what it is.

10  Q.   And in the course of this letter to the examiner's team,

11  your partner Richard Davis writes that -- at paragraph 4, "In

12  response to your question as to why there wasn't a protection

13  of the balance between assets and liabilities, the assets were

14  going up, and while in some deals there might be a post-closing

15  true-up, no such provision was in this agreement"?

16  A.   I think the paragraph says the assets were going down, not

17  up.  I read the paragraph, yes.

18  Q.   Yes.  And it's accurate?

19  A.   I believe it's accurate.

20  Q.   And it's accurate in terms of your understanding of the

21  transaction, not what Mr. Roberts may have said to the

22  examiner?

23  A.   That's correct.

24  Q.   May I ask you to turn to the next page, please.  And you

25  see a paragraph there.  May I ask you to read it to yourself?

103

1    **A.    Yes, I have.**

2    **Q.    Is it also correct, Mr. Miller, that while maintaining a**

3    **balance between the assets and the liabilities, as is written**

4    **here, might have been desirable, everyone understood that the**

5    **agreement did not require there to be such a balance?  Do you**

6    **agree with that?**

7           MR. GAFFEY:  Objection, Your Honor.  The witness is

8    not competent to testify to what everybody understood.

9           THE COURT:  Well, I think that's true, although this

10   is cross examination.  Although I think that Mr. Miller is not

11   hostile to either side here, he's just here as a source of

12   impartial information, as far as I can tell.

13          To the extent that it talks about what everybody knew

14   or everybody understood, it's probably a question that cannot

15   be answered --

16          MR. SCHILLER:  Let me rephrase it, Your Honor.

17          THE COURT:  -- but that's the language that's in the

18   letter.

19          MR. SCHILLER:  Yes.  Let me rephrase it.

20   **Q.    Maintaining -- is it correct, Mr. Miller, that maintaining**

21   **a balance between the assets and the liabilities might have**

22   **been desirable among the parties, but you, and in your**

23   **discussions reflected with Mr. McDade and Mr. Ridings,**

24   **understood that the agreement did not require that there be**

25   **such a balance?**

104

1    A.   The understanding and what Mr. McDade told me in the long

2    hours of preparing him -- prepping him for his examination,

3    that this was not a balance sheet transaction.

4    Q.   Thank you.  Let me turn to the subject of gain and day-one

5    gain, which has been presented to the Court already in this

6    trial.  And let me ask you to turn to the -- actually I don't

7    need to burden you with the transcript, I don't think.  Do you

8    recall that Barclays made a public announcement on or about

9    September 17, 2008, that it expected to have a multibillion

10   dollar gain -- accounting gain on day one of the acquisition,

11   that was two days before the sale hearing?

12           THE WITNESS:  Do I get a right to object, Your Honor?

13           THE COURT:  Regrettably as a witness, you don't.  But

14   I think --

15           MR. SCHILLER:  I'm happy to rephrase.

16           THE COURT:  -- I think Mr. Miller doesn't like that

17   question.

18           MR. SCHILLER:  So I gather.

19   Q.   If Barclays announced on September 17th, two days before

20   the hearing, publically, in an analysts call, and reported in

21   the press that it anticipated to have a multibillion dollar

22   accounting gain if the sale were approved, would that be

23   inconsistent with your understanding of the sale you presented

24   to Judge Peck?

25   A.   Not inconsistent with my understanding.  We live in an era

105

1    of financial engineering.  And an accounting gain, which is

2    not, at least in my terms, in real money, would not have made

3    any difference.

4    Q.   Would you also agree with me, it's not uncommon for

5    someone to buy assets in a bankruptcy process and make money on

6    that purchase?

7    A.   In my experience, people who come to the bankruptcy court

8    to buy assets do not do it as eleemosynary institutions.

9    Q.   Are --

10   A.   They do it --

11   Q.   -- I'm sorry.

12   A.   -- in the hope that they're going to make money and that

13   it's going to be in some way accretive to them.

14   Q.   And if they hope and announce that it may be accretive to

15   them, are they required to file such statements -- public

16   statements in the court, in your experience?

17   A.   I don't know whether you're asking for a legal opinion or

18   just general advice.  If your question is premised upon some

19   fiduciary duty, I would have to explore that and research it.

20   I don't think I'm really qualified to answer that question.

21   Q.   If a purchase made, as Barclays, I represent to you, that

22   they did in a public announcement on the 17th of anticipated

23   accounting game in this proceeding, would you have brought it

24   to the Court's attention on the 19th?

25   A.   I'm not quite sure I would have.  I don't -- an accounting

106

1    game really did not go to the substance of the transaction and

2    I assume if they made a public announcement it was in the

3    public domain.

4    Q.    Thank you.  Now I may have covered this once before but I

5    would like to cover the subject again, if it's not duplicative.

6    And that is, that the APA provided to the Court had no

7    contractual limitations on the value of the purchased assets

8    that were being acquired by Barclays in the sale.

9    A.    That's correct.

10   Q.    Indeed the purchased assets were being acquired by

11   Barclays in the sale irrespective of what their values may have

12   been that week, correct?

13   A.    Technically, yes.

14   Q.    And because of that technicality in the contract there was

15   no valuation cap contractually for specific assets in the

16   transaction, correct?

17   A.    That is correct.

18   Q.    Indeed, between Lehman and Barclays, in their purchase

19   agreement, there was no valuation cap for all of the purchased

20   assets, correct?

21   A.    In the agreement, that's correct.

22   Q.    Is it fair to say that on September 19th, before this

23   Court when Lori Fife spoke, you, Mr. Miller, did not understand

24   the 47.4 billion dollars that she mentioned in terms of those

25   long position to be a valuation cap on the purchased assets

107

1    under the purchase agreement, correct?

2    A.    It was just given for guidance as to the potential

3    dimensions of the transaction.

4    Q.    And that guidance was given as to the long positions, the

5    hard assets which had been seventy billion on Tuesday and now

6    we're in freefall and you had a number 47.4, correct?

7    A.    That's correct.

8    Q.    I think it's important to review with the Court the fact

9    that the purchase agreement, which your firm and other lawyers

10   worked hard on with their clients, provided no valuation for

11   many of the purchased assets that were identified in the APA,

12   correct?

13   A.    Barclays was buying the North American capital markets

14   business, whatever it was.

15   Q.    And I hate to take up too much of your time and burden you

16   with this contract, but it is important in terms of what's been

17   said to this Court before you took the stand.

18        If I could have you turn back to the APA, which is again

19   tab 3 and look at pages 6 through 8 with me, Mr. Miller,

20   briefly?

21   A.    Yes, sir.

22   Q.    The APA doesn't provide valuations for many of the

23   nineteen categories of purchased assets that you see identified

24   there under the definition and through pages 6 and 8.

25   A.    Yes, sir.

1    Q.   It does provide a valuation of approximately seventy

2    billion for long positions and approximately a valuation of

3    1.34 retained cash.  But it has no estimated valuations at all

4    for any of the other seventeen categories of purchased assets.

5    Do you see that and agree with that?

6    A.   I do.

7    Q.   Was Barclays entitled to each of those assets listed there

8    as clarified in the clarification letter, specifically

9    identified irrespective of whether there was a valuation

10    provided for it?

11    A.   Pursuant to the approved APA, yes.

12    Q.   And was Barclays entitled to any of these assets,

13    irrespective of any value that Barclays might ascribe to them

14    under its accounting on its balance sheet once it acquired the

15    business?

16    A.   Under the APA as approved, yes.  At least that's my

17    opinion.

18    Q.   And subsection q, Mr. Miller, within that definition of

19    purchased assets --

20    A.   Q?

21    Q.   Yes, sir.  On page 8.  There's a reference there to

22    intangible assets.

23    A.   Yes, sir.

24    Q.   And the agreement provides that "Intangible assets

25    associated with or symbolized by the business, including

109

1   customer and supplier lists" are to transfer on the sale.  Do

2   you see that?

3   A.   Yes.

4   Q.   Now was Barclay to acquire those intangible assets not

5   matter what value Barclays might attribute to those assets on

6   its balance sheet?

7   A.   As you've pointed out, there's no valuation caps in the

8   asset purchase agreement or the clarification letter.

9   Q.   And some of these assets that are discussed there may be

10  of value to Barclays in ongoing business on Monday but not to

11  Lehman, correct?

12  A.   If the transaction did not close it would have no value.

13  Q.   Indeed, the same is true for all the purchased assets --

14  A.   My recollection --

15  Q.   -- listed in the APA.  I'm sorry, go ahead.

16  A.   My recollection is that there was a problem with the

17  intellectual property and some of the intellectual property

18  belonged to another entity.

19  Q.   All right.

20  A.   And that was brought to the attention of the Court.

21  Q.   Thank you.  In terms of those elements of the purchased

22  assets for which there was no value, there were a number of

23  them, as I've taken you through, seventeen categories.  Seats

24  on the New York Stock Exchange, for example, weren't valued in

25  this deal were they?

110

1    A.    No.

2    Q.    They'd be of value Monday morning, because you got this

3    deal done, to Barclays when the markets opened but they meant

4    nothing to Lehman, correct?

5    A.    You have to go back to the concept of the deal.  The

6    concept of the deal was the sale of a business, an ongoing

7    business.

8    Q.    It's been brought up before Judge Peck, Mr. Miller, that

9    this process that you observed, of the parties discussing

10   valuation, trying to get to a correct valuation, was not

11   presented to Judge Peck adequately on the 19th.  To the extent

12   that is alleged by these movants, do you agree with it?

13   A.    No.

14   Q.    May I address your attention, again, to the transcript of

15   the 19th.  And I'd ask you to turn --

16   A.    What's the number?

17         (Pause)

18   Q.    It's tab 2 in the binder I placed before you.

19   A.    Okay.

20   Q.    And I draw your attention to page -- before I do that,

21   let's make sure I provided you with enough pages.  Page 109.

22   A.    I don't have 109.

23   Q.    If you would turn to --

24   A.    It's on the screen.

25   Q.    Okay.  Well, let's look at it on the screen.  That's fine.

111

1    And in particular, questions put to Mr. McDade beginning at

2    line 5.  He is asked:

3    "Q.  Well, in the absence of a closing balance sheet having

4    been prepared, can you please describe for the Court how it is

5    that the debtor determined that fair value was being realized

6    for the sale of these assets?

7    "A.  For the assets?

8    "Q.  Yes.

9    "A.  The individual assets on the balance sheet, the trading

10   inventory, was bottoms up.  Meaning, individual line item

11   detail processed through all of our individual risk businesses

12   in coordination with a normal finance professionals who are

13   incorporated into the valuation process.

14   "Q.  Did the debtors have any form of valuations of any of the

15   assets that are being transferred?

16   "A.  Sorry?

17   "Q.  Does Lehman have any valuations, internal valuations of

18   any of the assets being transferred?

19   "A.  Absolutely.  There are many complex security models

20   involved, many different models we used to evaluate those

21   securities.

22   "Q.  And is it your testimony that a valuation was conducted

23   within Lehman for all the assets being transferred to Barclays,

24   when was that conducted?

25   "A.  Portfolio moved during the week."

112

1        At the top of page 110.

2    "A.  But that was conducted all last evening, all through and

3    up to the arrangement -- the agreement today."

4    Q.   Does that testimony by Mr. McDade conveying to the Court

5    the process which you described briefly today?

6    A.   There was a process of trying to establish the appropriate

7    evaluation for the securities that were going to be transferred

8    based on the mark-to-market basis.  There was a general theme

9    that Lehman's marks were aggressive.

10   Q.   Let me turn to the questions of comp and cure, if I will,

11   those assumed liabilities that you've been asked about.  It's

12   your testimony that those figures on comp and cure that were

13   presented this morning were very contingent, is that right?

14   A.   Yes.  They were contingent figures.  It was an estimate of

15   exposure.

16   Q.   And these were rough estimates that were inherently

17   uncertain and made in good faith to the Court, were they not?

18   A.   I would adopt the words good faith.  I can't tell you they

19   were rough, you'd have to go to the person who calculated them.

20   Q.   And the Court was told these were estimates of potential

21   exposures, correct?

22   A.   It was subject to variables in terms of which contracts,

23   if any, were going to be assumed and there were many, many,

24   many contracts, whether there were defaults that had to be

25   cured, and that goes to the executory contracts and the

113

1    unexpired leases.

2        In terms of compensation we were talking about,

3    approximately 10,000 employees, what would Barclays -- if the

4    transaction closed, how many of those employees, ultimately,

5    would be retained by Barclays which would diminish the

6    exposure.

7    Q.   And the Court was told, through the APA, what Barclays

8    might have to pay depending on how it conducted its business

9    upon closing rather than actual amount that Barclays would pay,

10   correct?

11   A.   It was, as we just discussed, it was an estimate.  It was

12   an exposure amount.

13   Q.   And the 1.5 billion, with respect to what are called cure

14   payments, that was a maximum exposure, correct?

15   A.   It was an estimate that was to take into account the -- if

16   all of the contracts or substantially all the contracts were

17   going to be assumed, what might have been required to cure any

18   defaults under those contracts.

19   Q.   You've described how chaotic it was that week, haven't

20   you?

21   A.   Yeah.

22   Q.   And you've described the situation in Lehman itself upon

23   your arrival there, in terms of the people, their operations

24   and their systems being down; do you remember that?

25   A.   Yes, I do.

114

1    Q.   Was there -- and you described the melting iceberg which

2    you dramatically reviewed with the Court that important evening

3    of September 19th.  It's 2010 now but that ice cube was melting

4    in September of 2008, wasn't it?

5    A.   I would say with some speed.

6    Q.   Was there time for an integration analysis for Barclays

7    and Lehman as in an ordinary merger, to sit down and see how

8    these business could be merged?

9    A.   This was not an ordinary transaction in any sense of the

10   word.

11   Q.   Was there any time --

12   A.   Can I finish?

13   Q.   I'm sorry; yes, sir.

14   A.   This was, as I said before, the most hectic, difficult

15   transaction I've ever been involved in, different from any

16   financial crisis, maybe 10,000 more difficult than the Refco

17   case in terms of a transaction.

18        In the context that this was not peculiar to Lehman, we

19   were in an economy which was going through the floor and that's

20   why the federal government was actively involved.

21   Q.   And there was precious little time to do a synergistic

22   review of what contracts would be assumed, if those contracts

23   could even be identified and located, correct?

24   A.   I believe that to be correct.

25   Q.   There was no way to know what the number for cure would be

115

1    in the amount of time available to negotiate the sale that

2    week.

3    A.    My recollection is, there were thousands of contracts that

4    had to be reviewed.  We want to set up a process that would not

5    be a tremendous burden on the court, where parties would, in

6    effect, negotiate whether the contract should be assumed,

7    cured, defaults waved, etcetera, and there was a process that

8    was being set up, almost like an EDR process.

9    Q.    No one knew what contracts would be assumed?

10   A.    On the 19th and over the weekend certainly not.

11   Q.    And no one knew, on the 19th or over the weekend, whether

12   Barclays would get a bargain from the vendor on any of those

13   contracts?

14   A.    That's correct.

15   Q.    So there was, it's fair to say, a wide range of what

16   Barclays would choose to do and expend between some number and

17   1.5 billion, correct?

18   A.    Could be.

19   Q.    Okay.  You were not concerned, I think you've indicated

20   already, with what Barclays ultimate accounting treatment for

21   cure payments would be, is that right?

22   A.    I didn't have any major concern about that.  The -- how

23   you treat things for accounting purpose always mystified me.

24   Q.    In fact, you generally considered Barclays' accounting

25   irrelevant to what you were doing with your colleagues that

116

1    week?

2    A.    I don't think accounting for negative good will was a

3    particularly important thing.

4    Q.    And with respect to the two billion dollar estimate of

5    exposure for both bonus and severance, which you addressed

6    briefly, that number could be known with precision either

7    because it wasn't known how many employees would accept at

8    Barclays or how many would terminate and for those accepted how

9    long they'd be there.

10    A.    I think I testified to that.

11    Q.    You were asked earlier about discussion of whether to take

12    the clarification letter back to court on the evening before

13    the closing was completed, Sunday night, do you remember that?

14    Subject earlier in the --

15    A.    Over the weekend there was a discussion about that.

16    Q.    Yes, over the weekend.

17    A.    Yes.

18    Q.    Now in April of 2010 our economy is a different place then

19    it was, as you described the economy in the circumstances of

20    Lehman in September 2008, correct?

21    A.    Is the economy different now?

22    Q.    Yes.

23    A.    Then it was back in September of 2008?

24    Q.    It's much improved, isn't it?

25    A.    I guess you can say so.  I think the president might say

117

1    so.

2    Q.   On April 9th, movants said to this Court that it was an

3    egregious mistake for Weil Gotshal and other lawyers involved

4    in Lehman, not to bring the clarification letter back to the

5    Court.

6          MR. GAFFEY:  Misquotes the papers, Your Honor

7          MR. SCHILLER:  "Egregious mistake" is in the

8    transcript, Judge.

9          MR. GAFFEY:  Those two words are in it but not as Mr.

10   Schiller just read it, Your Honor

11         THE COURT:  Right.  It's a misleading question then.

12   Why don't you rephrase it?

13   Q.   If my friend referred to the decision not to bring the

14   clarification letter back as a mistake what is your view of

15   that?

16   A.   The issues was whether there was any material change in

17   the basic transaction which had been presented to the Court.

18   And after discussion a number of people including, I think, the

19   creditors' committee representatives who where there the

20   conclusion was there was no material change that required going

21   back to the Court.

22         In fact, as late as, I think, two months after the closing

23   in a meeting with the attorneys for the creditors' committee

24   the question was raised again and the issue, which was

25   discussed, I think his name Matthew Barr, a partner of Milbank,

118

1   do you want to rethink that and we said that we are perfectly

2   comfortable that there was no material change and Mr. Barr said

3   fine, as far as the committee's concerned, unless they see the

4   variance of two billion dollars they won't say anything --

5   anything further, I should say.

6   Q.   Do you recall a discussion with Mr. Despins on the --

7   A.   Mr. who?

8   Q.   I probably didn't pronounce his name correctly, for the

9   creditors' committee.

10  A.   Mr. who?  Oh.

11  Q.   The lawyer.

12  A.   Luc Despins?

13  Q.   Yes.

14  A.   Yeah.  Mr. Despins was at the closing with the national

15  advisors for the creditors committee.  I think, as I testified

16  in my deposition, about 3, 4 a.m. Monday morning they decided

17  to leave and that was after the discussion about the 15c3-3

18  account.  And it looked as if all of the issues relating to the

19  closing had been reconciled and agreed to about that time.  And

20  they decided that they had been there all weekend, that they

21  could leave.  And we had a short discussion and basically my

22  recollection is that, I think, Saul Burian said if it's okay

23  with you guys, it's okay with us and they left.  They were not

24  there for the final crisis at 6 a.m.

25  Q.   Mr. Miller, let me ask you briefly about the repo

119

1   collateral.  I believe it's your testimony that what was the

2   fed repo -- what Barclays stepped into the shoes of, as of the

3   closing, was to come to Barclays.  That is, the loans paid in

4   that collateral eventually was to transfer Barclays?

5   A.   My understanding was that Barclays was stepping into the

6   shoes of the federal reserve bank by paying off the repo loan

7   and that the securities, which were securing that loan, were

8   going to be transferred, delivered, to Barclays whether it was

9   through JPM or how they were going to do it, I was not involved

10  with the mechanics.

11  Q.   Do you recall appearing before the Court in December 2008

12  in connection with what's called the JPM settlement by some in

13  December?

14  A.   Yes.

15  Q.   Do you recall Ms. Leventhal, from the fed, offering her

16  evidence through declaration and appearing before the Court

17  that day?

18  A.   I do.

19  Q.   And do you recall that she described the repo securities,

20  as listed at a value of 49.7 billion and a loan of forty-five

21  billion as being consistent with the repo between Barclays and

22  Lehman after Barclays stepped into the shoes?

23  A.   I do not specifically remember the figures.  I think the

24  record would speak for itself.  I remember the December hearing

25  to approve the settlement, which I think was triangular, JPM,

120

1    Pacific Estate and Barclays.  And as I recall, both on behalf

2    of Lehman and on behalf of the creditors' committee there were

3    no objections to the settlement but there was a complete

4    reservation of rights.

5    Q.   Do you recall, also, that you were asking this Court to

6    complete the purchase agreement, including the clarification

7    letter, by providing to Barclays the values of assets it was

8    entitled to?

9    A.   I think that's a compound -- I don't understand that

10   question.

11   Q.   The clarification letter was integrated into the purchase

12   agreement, wasn't it?

13   A.    That's correct.

14        MR. GAFFEY:  Objection, Your Honor.

15   Q.   And the repo collateral --

16        THE COURT:  One second.  Let's deal with the

17   objection.

18        MR. GAFFEY:  There's no foundation for the

19   clarification letter -- was integrated into the purchase

20   agreement.  It's Mr. Schiller's characterization.  We haven't

21   had any evidence that establishes --

22        THE COURT:  The objection is sustained.  Rephrase the

23   question, please.

24   Q.   Was the clarification letter a part of the sale order

25   approved by this Court, late at night, early in the morning of

121

1    September 20th?

2    A.    The clarification was not a part -- was not a part of the

3    sale order that was signed on September 19th, I think is the

4    official date.   The clarification letter was filed on Monday,

5    the 22nd, is my recollection.

6    Q.    The clarification letter was referenced in the first

7    paragraph of the sale order, wasn't it?

8    A.    I don't recall.

9    Q.    Well, let me get that for you and before --

10          THE COURT:   Mr. Schiller, before you go there.

11          MR. SCHILLER:   Sure.

12          THE COURT:   It's now ten to 1.  I've been conscious of

13   the fact that Mr. Miller has been here all morning and now into

14   the early afternoon.  Just if you could give me an estimate as

15   to whether or not you think you're going to be concluding with

16   your examination promptly we'll stay with this and then find

17   out how much redirect, if any, there's going to be and make a

18   judgment about a lunch break.

19          If you think you're going to be a while and as a

20   result you think Mr. Miller is going to have to be called back

21   after lunch I'll take the break now.

22          MR. SCHILLER:   I don't think I will -- I may have

23   fifteen or twenty more minutes, Judge.

24          THE COURT:   Okay.  If it's twenty minutes that's 1:10.

25   Let me just ask if there is to be any redirect?

122

1          MR. GAFFEY:  If there's any it's no more than ten

2     minutes, Your Honor.

3          THE COURT:  All right.  Then I'm going to ask the

4     witness for his personal preference.  Would you like to stay

5     and conclude this or would you be happier refreshing yourself

6     and coming back at 2:00?

7          THE WITNESS:  I'd be delighted to stay and conclude

8     it, Your Honor.

9          THE COURT:  Fine.  Let's get this over with then.  And

10    in reference to the questions that you're about to ask Mr.

11    Miller about the content of the sale order, I certainly don't

12    intend to intrude upon your manner of examination but since

13    that's my order and it says what it says, even though it was

14    drafted by others, I don't know what you gain by having Mr.

15    Miller confirm what's already in the public record.

16         The legal consequence of that is something ultimately

17    to be determined here and Mr. Miller's not in the position to

18    add anything of value to the finder of fact with respect to

19    that question.

20         MR. SCHILLER:  All right.

21    **Q.  Let me just ask you one question about Exhibit 16 in the**

22    **book that I gave you.  In the first paragraph of the Court's**

23    **sale order, if you go four lines from the bottom you see a**

24    **reference to that letter agreement clarifying and supplementing**

25    **the asset purchase agreement dated September 20th, 2008?**

123

1    A.    Yes.

2    Q.    Is that a reference to the clarification letter?

3          (Pause)

4    A.    Yes.

5    Q.    Thank you.  And the clarification letter identified the

6    assets in the business that Barclays was acquiring, did it not?

7    A.    It says what it says.

8    Q.    Can we go to the clarification letter at tab 12, please,

9    of the binder I put in front of you?

10   A.    Ten?

11   Q.    Twelve, sir.

12   A.    Twelve.  Let's see.  Yes.

13   Q.    And I bundled a question about the repurchase agreement a

14   few moments ago and perhaps with the help of this letter I can

15   straighten that out.

16         If you look to paragraph numbered 1(a)(ii) at the bottom

17   of the page.

18   A.    Uh-huh.

19   Q.    It references the purchased assets.  And it says, with

20   respect to clauses A, D and E of the definition of purchased

21   assets in the original agreement, instead of the items referred

22   to in such clauses, "A.  The securities instead of what's

23   referred to in such clauses, the following will replace them:

24   A, the securities owned by LBI and transferred to the purchaser

25   under the Barclays' repurchase agreement as specified in

124

1    Schedule A, previously delivered by the seller and accepted by

2    the purchaser."  Do you see that?

3    A.   Yes.

4    Q.   And do you understand that that is a reference to the repo

5    that began with Barclays standing in the shoes of the fed and

6    entering that REPO with Lehman?

7    A.   I believe that's correct.

8    Q.   Also, if you continue in that paragraph you'll see it at

9    subparagraph (b) the writer makes reference to the fact that

10   Barclays will receive such securities and other assets held in

11   LBI's clearance box at the time of the closing, which the close

12   of business on September 21, 2008 were as specified on Schedule

13   B previously delivered, you see that?

14   A.   What paragraph is that?

15   Q.   I'm sorry, it's still purchased assets, it's still A, and

16   the bottom of the page of page 1.  I'm still on page 1 and that

17   full paragraph.

18   A.   Okay.

19   Q.   And I was reading to you after the reference to the

20   Barclays' repurchase agreement the very next section, Section

21   B, which makes reference to the fact that, "Such securities and

22   other assets held in LBI's clearance boxes shall be conveyed to

23   Barclays at the time of the closing," you see that?

24   A.   I see the language, yes.

25   Q.   And was that your understanding during the closing that

125

1   Barclays would be receiving the assets that were held in LBI's

2   clearance boxes?

3   A.   Whatever the agreements provided for.

4   Q.   So Barclays is to receive what the clarification letter

5   provides for?

6   A.   It became an operative document.  At the time I don't

7   believe anybody was -- really knew what was in the clearance

8   boxes.

9           MR. SCHILLER:  One moment, Your Honor?

10          THE COURT:  All right.

11      (Pause)

12  Q.   You were asked earlier about the DTCC discussions with

13  Barclays over that weekend to try to resolve the issues, so

14  that Barclays could operate effectively on Monday.  And there

15  is reference to the DTCC agreement with Barclays at page 3,

16  paragraph D at the top of the page, do you see that?

17  A.   Yes, I do.

18          MR. SCHILLER:  Thank you very much, Mr. Miller.  Thank

19  you, Your Honor.

20          THE COURT:  Is there any redirect?

21          MR. GAFFEY:  Much less than ten minutes, Your Honor,

22  yes.  I have three or four questions.

23          Can we have Exhibit 2 on the screen, please?

24          THE WITNESS:  Is that your Exhibit 2 or his Exhibit 2?

25          MR. GAFFEY:  My Exhibit 2.  We can just use the

126

1    screen.

2    REDIRECT EXAMINATION

3    BY MR. GAFFEY:

4    Q.   Mr. Miller, I'll be very quick.  In your discussions with

5    Mr. McDade that Mr. Schiller asked you about, did Mr. McDade

6    ever tell you that he understood this -- this document to bear

7    a significant relation to the deal?

8    A.   No, he did not.

9    Q.   Did Mr. McDade ever tell you that he understood this

10   document to be a summation of the assets and liabilities to be

11   transferred in the deal?

12   A.   No, he did not.

13   Q.   And in your discussions with Mr. McDade, did he at any

14   point tell you that in his view the deal reflected or should

15   have reflected an equivalent exchange of assets and

16   liabilities, a wash?

17   A.   No, he did not.

18   Q.   And did Mr. McDade ever tell you that he understood that

19   if there were a first day gain for Barclays it would be

20   inconsistent with his view of the deal?

21   A.   Mr. McDade and I spent six to eight hours on Thursday and

22   he never used the word wash.  He never referred to this as a

23   transaction which was a balance sheet transaction.  His only

24   reference was we're trying to make the best deal we can make to

25   preserve a business and save jobs and try to help the economy.

127

1   Q.   Apart from the particular word wash, sir, just so --

2   A.   I thought you use the words washers now.

3   Q.   It was one of them.  Did Mr. McDade tell you in sum or

4   substance that it was his understanding that this deal was

5   structured to be an equivalent exchange of assets and

6   liabilities?

7   A.   Mr. McDade never said that to me.

8          MR. GAFFEY:  Thank you.  I have nothing further, Your

9   Honor.

10         THE COURT:  All right.

11         MR. WERDER:  I have about four or five questions, Your

12  Honor.

13         THE COURT:  That's a surprise considering you didn't

14  ask any before.  But please proceed.

15         MR. WERDER:  They do relate to the cross-examination.

16         THE COURT:  Fine.

17  RECROSS-EXAMINATION

18  BY MR. WERDER:

19  Q.   Good afternoon now, Mr. Miller.  Rick Werder from Quinn

20  Emmanuel, one of the committee's counsel.

21  A.   Good afternoon.

22  Q.   Mr. Schiller asked you some questions about the list of

23  purchased assets in the APA, do you recall that?

24  A.   Yes, I do.

25  Q.   And he pointed out to you that for some number of the

128

1    listed purchase assets there was no value assigned to them, and

2    that is -- that is a true statement, is it not?

3    A.    That's correct.

4    Q.    Okay.  But there was a value assigned to what were defined

5    as the long positions in the APA, correct?

6    A.    Yes.

7    Q.    And that value was stated to be approximately seventy

8    billion dollars based upon Lehman's book values, correct?

9    A.    The figure seventy billion dollars is in the agreement.

10   Q.    Okay.  And in addition to the discussion of assets in the

11   APA there was also a value assigned to what was defined as

12   short positions, was there not?

13   A.    I don't have a present recollection.

14   Q.    Let me ask you if you could turn to tab 3 of Mr.

15   Schiller's book.

16   A.    Yes.

17   Q.    Which is the APA.

18        MR. WERDER:  And for the record, his version of it is

19   identified as BCI Exhibit Number 1.

20   Q.    And I'll ask you to turn your attention to page 12,

21   please.  And I want to direct you, Mr. Miller, if I could,

22   specifically to Section 2.3(i), which is the third paragraph on

23   the top of page 12.

24   A.    I got it, yes.

25   Q.    And that references a defined term "short positions," does

129

1   it not?

2   A.   It does.

3   Q.   And it indicates that those short positions which Lehman

4   was going to take over included -- had a book value of

5   approximately sixty-nine billion, correct?

6   A.   That's what it says.

7   Q.   And so a reader of the APA would infer, would he not, that

8   the long positions and the short positions described as to be

9   transferred pursuant to the APA, but roughly imbalanced?

10          MR. SCHILLER:  Objection, Your Honor.

11          THE COURT:  Sustained.

12          MR. WERDER:  No further questions.

13          THE COURT:  Anything more?

14          MR. GAFFEY:  No questions, Your Honor.

15          THE COURT:  Mr. Miller, you're excused.  And thank you

16   for your time.

17          THE WITNESS:  Thank you, sir.

18          THE COURT:  We're adjourned until 2:00.

19          MR. GAFFEY:  Thank you, Your Honor.

20       (Recess from 1:01 p.m. until 2:10 p.m.)

21          THE COURT:  Good afternoon.

22          MR. GAFFEY:  May I proceed, Your Honor.

23          THE COURT:  More books?

24          MR. GAFFEY:  I have one for the Court, I have one for

25   the witness, all others are I think -- Mr. Schiller has his.

130

1          THE COURT:  Good.

2          MR. GAFFEY:  And we call Martin Kelly, Your Honor.

3          THE COURT:  And you may approach.

4          MR. GAFFEY:  Thank you.

5          THE COURT:  Thank you.  Mr. Kelly, before sitting down

6    could you raise your right hand, please.

7          (Witness duly sworn)

8          THE COURT:  Be seated, please.

9    DIRECT EXAMINATION

10   BY MR. GAFFEY:

11   Q.   Good afternoon, Mr. Kelly.

12   A.   Good afternoon.

13   Q.   I'm Robert Gaffey from Jones Day, special counsel to the

14   debtor.  We met before, sir?

15   A.   Yes.  I recall that.

16   Q.   At your deposition?

17   A.   I recall that, yes.

18   Q.   And not any time since then, correct?

19   A.   That's correct.

20   Q.   How are you currently employed, Mr. Kelly?

21   A.   I remain employed as the Americas CFO at Barclays Capital.

22   Q.   And how long have you been employed by Barclays Capital?

23   A.   Since October of 2008.

24   Q.   And, in addition, you've held the title of chief financial

25   officer in the Americas at Barclays, is that correct?

131

1    A.    That is the position I hold, yes.

2    Q.    And Barclays' head of finance for structured capital

3    markets, is that correct?

4    A.    I retain that, although I'm in the process of

5    transitioning that to someone else.

6    Q.    And have you held any other titles at Barclays since

7    you've been employed there?

8    A.    I have.  When I first moved to Barclays I was the

9    financial controller for Barclays Capital based in London.  And

10   I also held a position known as the Americas head of financial

11   decisions support, which was based here.

12   Q.    Do the titles you currently hold constitute promotions?

13   A.    I've remained reporting to the same individual, Patrick

14   Clackson, throughout that entire period.  But I think that the

15   responsibility of the CFO role is larger than the initial

16   responsibility.

17   Q.    And when were you first -- well, prior to your employment

18   by Barclays where'd you work?

19   A.    I was employed by Lehman Brothers.

20   Q.    And you were employed -- when were you employed by Lehman

21   Brothers?

22   A.    I started employment at Lehman Brothers in August of 2000.

23   And I was employed by Lehman until I moved up to Barclays.

24   There was a period of time between May of 2005 and January of

25   2006 when I was not employed by Lehman.

132

1    Q.   And would you describe for us briefly the sequence of jobs

2    you had when you were employed by Lehman?

3    A.   Sure.  I joined Lehman in the fixed income division.  And

4    I was employed in a sales capacity, a client-facing role which

5    was a structuring role in nature.  And it drew upon my

6    accounting background.  But the role was centered around

7    transaction development for clients of the firm.

8    Q.   And in and round September of 2008 you were Lehman's

9    global financial controller, is that correct?

10   A.   That's correct, yep.

11   Q.   And as global financial controller at Lehman your duties

12   included financial and regulatory reporting of the firm's

13   finances and results, is that correct?

14   A.   That's correct, yes.

15   Q.   And you reported directly to Ian Lowitt?

16   A.   At that time, yes.

17   Q.   And Mr. Lowitt was the firm's chief financial officer at

18   that time, is that correct?

19   A.   That's correct.

20   Q.   And when you were a global financial controller, you had

21   people that reported directly to you, is that correct?

22   A.   That's correct.

23   Q.   And they included Brian Traversy (sic), yes?

24   A.   Ryan Travesary (ph.) was one.

25   Q.   Okay.  And Marie Stewart?

133

1    A.    Yes, she was another.

2    Q.    And was Kristy Juan (ph.) one?

3    A.    For a -- not for that entire period, but for the latter

4    part of that nine-month period.

5    Q.    But that would include September of 2008, yes?

6    A.    Yes, it did.

7    Q.    Now, your compensation from Lehman in 2007, sir, was

8    approximately 1.1 million dollars, is that right?

9    A.    That's correct.

10   Q.    And that was made up of a base salary as well as cash and

11   stock bonus components?

12   A.    That's correct.

13   Q.    And the base salary was about 200,000 dollars?

14   A.    That's correct.

15   Q.    The stock component was approximately 350,000?

16   A.    Approximately.

17   Q.    And the cash component was approximately 550,000, is that

18   right?

19   A.    Approximately, yes.

20   Q.    And the cash component, the cash component of your bonus,

21   sir, was that a year-end bonus?

22   A.    Well, bonuses were paid once each year.

23   Q.    At the end of each year?

24   A.    Well, they'll pay it I think in January of the year

25   following.

134

1    Q.    The beginning of the next?

2    A.    That's correct.

3    Q.    Now, at the time of the sales transaction that's brought

4    us here today, sir, you expected that your 2008 compensation

5    from Lehman would be about two million dollars, is that right?

6    A.    That's correct.  That was based on a conversation that I

7    had had with my manager at the time I moved into that position.

8    Q.    In 2008 your base salary was still in the roughly 200,000

9    dollar range, correct?

10   A.    That's correct.

11   Q.    The point being most of your compensation consisted of the

12   bonus component, yes?

13   A.    It did, as is customary.

14   Q.    Now, obviously, sir, you recall the Lehman bankruptcy in

15   September of 2008, is that right?

16   A.    Yes, I do.

17   Q.    And you recall the significant troubles of the company in

18   the weeks and the months leading up to the bankruptcy, is that

19   correct?

20   A.    Yes, I do.

21   Q.    Those troubles occupied a significant portion of your

22   time, did they?

23   A.    They did, yes.

24   Q.    And in the time leading up to that bankruptcy filing you

25   had concerns for your own continued employment prospects, is

135

1    that right?

2    A.   I'm not sure what you mean by that.

3    Q.   Are you aware if the company went bankrupt that you'd lose

4    your job?

5    A.   I never thought the company would go bankruptcy and sell

6    off the day we filed.

7    Q.   Well, at the time of the bankruptcy do you recall learning

8    about the bankruptcy filing?

9    A.   Yes, I was there at the time.

10   Q.   And that was on September 15th of 2008, is that right?

11   A.   Yeah, I think it was late on the Sunday and the filing

12   occurred early on the Monday morning.

13   Q.   Right.  And when you learned about the bankruptcy filing

14   you had concerns for your own continued employment, is that

15   right?

16   A.   I didn't think about it, actually.  I was exhausted, I

17   knew that there'd be a lot of work to do, I would not

18   characterize it as saying I had concerns for my employment.

19   Q.   Well, was it a fact, sir, that employees of Lehman in your

20   view were distraught at the time, because of the bankruptcy

21   filing?

22   A.   Some were.  Yeah, I think people were -- people were

23   exhausted.  People were emotionally and physically tired.

24   Q.   And you were in the same state yourself?

25   A.   To an extent.  I think I was certainly exhausted.

136

Q.   Now, at or around the time of the bankruptcy you did work

in connection with the negotiations with Barclays concerning a

possible acquisition of Lehman, is that correct?

A.   I was not a negotiator, but I was present as negotiations

were occurring.

Q.   Okay.  Well, you were involved in the work around the

negotiations, you weren't just a witness to them, right, sir?

A.   I just want to be careful how I answer that, because it

depends how -- what you mean by involved.  I was there, the

negotiations were happening on the thirty-second floor of the

building, I was there.  I was involved around them.  But I

wasn't negotiating.

Q.   When you say you weren't negotiating, you mean to say,

sir, you were not at the table making offers, hearing offers,

doing the horse trading, right?

A.   I'd characterize it as I was not making decisions around

what was being sold or assets or liabilities being assumed, or

the values associated with it.

Q.   You were supplying information to the people who were?

A.   Sure, I was part of a team.  There was a team of people

that was working on the transaction.  And I was -- I was

supplying information to various parties that day and that

night.

Q.   Well, in the course of the work that you were doing in

connection with the transaction, you had contact with senior

137

1    Barclays negotiators, is that right?

2    A.    I'm not sure I did then or even do now understand who was

3    negotiating for Barclays.  I had had involvement with a

4    Barclays' team at the end of the prior week when they were

5    looking at acquiring all of Lehman.  And I was helping them and

6    helping coordinate due diligence efforts that they were

7    undertaking.  I was working with a similar group of people.  I

8    don't know -- I don't know if that group was negotiating or

9    doing things similar to what I was doing in terms of, you know,

10   collecting information.

11   Q.    Well, in the period after the bankruptcy when negotiations

12   were taking place -- let me pinpoint that a bit more.  Is it

13   your understanding, sir, that negotiations took place overnight

14   from Monday the 15th into the early morning of the 16th when an

15   agreement in principal was reached?

16   A.    I think I know that now.  At the time I was no aware that

17   there was a possibility of a transaction with Barclays until I

18   woke up on the Monday morning and came into the office.  So at

19   that time that's when I became aware of it.  I think I've since

20   heard that it may have started the night before.

21        MR. GAFFEY:  For a bit of clarity, I'm going to ask

22   that we -- do we have a calendar that we can put up?

23   Q.    This is a calendar for September of 2008, Mr. Kelly.

24        On Monday morning, the 15th, you learned that there was

25   the possibility of a transaction with Barclays, is that right?

138

1    A.    That's my recollection, yes.

2    Q.    And you learned that from your superior, Ian Lowitt, the

3    chief financial officer, correct?

4    A.    I think it was from Ian.

5    Q.    Okay.  And you came into work that Monday morning and did

6    some work in connection with the negotiations that had started

7    on the 15th, is that correct?

8    A.    Well, I think I came into work not really expecting what

9    I'd be doing.  I'd been there until we filed the bankruptcy

10   filing early that day.

11   Q.    My question goes more to what you did, sir, not what you

12   expected.  When you got there on the Monday, did you start

13   doing work in connection with the transaction?

14   A.    Yeah.  I'm just trying to provide some context because I

15   think it changed pretty quickly.  I came in knowing that it

16   would be a hellish day; there'd be a lot to do.  There wasn't

17   really a road map or planning around what that was.  And I'm

18   not sure if I found out about the potential transaction with

19   Barclays as soon as I walked in the door that morning, but

20   sometime that morning I became aware of that.

21   Q.    And you began to do some of your work around the

22   transaction, correct?

23   A.    Well, I think the initial step was that there was an

24   expectation that a team would arrive from Barclays.  And I

25   think I recall that there was an expectation or desire to get a

139

1    transaction done by that night.  And so we started to gear up

2    for what would be a lot of information requests from the

3    Barclays side, and presumably from our own side.

4    Q.   So you spent some time on the 15th gearing up, and then at

5    some point on the 15th you started doing stuff, right?

6    A.   My recollection is the team arrived sometime in the

7    afternoon.

8    Q.   Okay.

9    A.   And it converged on the thirty-second floor.

10   Q.   And the team being the Barclays' team?

11   A.   Correct, the Barclays' team and different advisors; law

12   firms and bankers.

13   Q.   And on that day, on the 15th of September, did you have

14   any communications with Archie Cox from Barclays?

15   A.   No, I don't believe so.

16   Q.   And did you have any communications with Patrick Clackson

17   from Barclays?

18   A.   Yes, I did.

19   Q.   Okay.  And that's on the 15th?

20   A.   Yes, that's on the 15th.

21   Q.   Okay.  Did you have any communications on the 15th with

22   Mr. Richard Richie?

23   A.   No.  I believe it was several days later before I met

24   Rich.

25   Q.   And you spoke to your boss, Mr. Lowitt, about the

140

1    negotiations as well?

2    A.   Well, yes, we were working together on a variety of things

3    around the transaction, yeah.

4    Q.   Now, did there come a time when Mr. Clackson invited you

5    to join the team at Barclays?

6    A.   I don't have a precise recollection of when.  I do know I

7    received a contract in writing from Barclays on Tuesday, the

8    23rd.  I think I may have had a quick conversation with Patrick

9    very shortly before that.  And I'm guessing, but my best guess

10   would be, on the Monday, the 22nd.

11   Q.   Are you certain, sir, you didn't have that -- it's not

12   possible you had that conversation during the latter part of

13   the week of the 15th?

14   A.   I'm virtually certain that it did not happen until or

15   after the 22nd.

16   Q.   Okay.  Do you have a good memory of that happening on or

17   after the 22nd?

18   A.   No.  As I explained I can't precisely pinpoint it.  It

19   was -- I seem to recall it was a phone call, not a meeting.

20   And I seem to remember it was a very quick conversation along

21   the lines of, you know, we'd like you to join the team.

22   Q.   Is it at least within the realm of your memory, sir, that

23   you were approached about the possibility of employment at

24   Barclays either late in the week of the 15th or early in the

25   week of the 22nd?

141

1    A.   The first indication I had of an employment opportunity at

2    Barclays came through Ian Lowitt.  And, again, I'm not certain

3    as to the date.  My recollection is that it occurred very soon

4    before I got the contract.  So, again, I'm guessing but I think

5    it was Monday the 22nd.  It's possible that it happened on the

6    prior Friday, the 19th.  I don't think that was the case,

7    however.

8    Q.   And you had conversations before that point with Mr.

9    Lowitt, about going to Barclays?

10    A.   No, sorry, that was the conversation with Mr. Lowitt.

11    Q.   Did Mr. Lowitt approach you about the possibility of

12    employment at Barclays?

13    A.   He called me, yeah.

14    Q.   Did he offer you employment at Barclays?

15    A.   No.  He said something like, you know, the Barclays team

16    have gotten to know you through the due diligence.  And they'd

17    like to find a position for you.  It wasn't any more specific

18    than that in terms of role.  And he wasn't offering.

19    Q.   So during the week of the 15th, the earlier or late in

20    that week, you had an indication that there would be a spot for

21    you at Barclays, is that right?

22    A.   No, I didn't say that.  I said my best recollection is

23    that the initial conversation with Ian, and that was the

24    initial conversation around employment, occurred on the 22nd.

25    It's possible that it occurred on the 19th, on the Friday.  I

142

1   did not -- it was a conversation along the lines of they'd like

2   to find a role for you.  It was nothing more committal than

3   that.

4   Q.   Do you recall the first time you spoke to Mr. Clackson

5   about joining the team at Barclays?

6   A.   Yeah.  Well, as I said I think I had a call with Patrick

7   before I received the contract, but I'm not certain about that.

8   I think I did, and I think it was on the 22nd.  I'm virtually

9   certain it didn't happen before that day.  I then had a

10  subsequent conversation with Patrick around a potential role

11  with more clarity.  But that was not until a week or so into

12  October.

13  Q.   Mr. Kelly, do you recall putting in a declaration in

14  opposition to the Rule 60 motions that are the subject to this

15  hearing?

16  A.   Yes, I do.

17       MR. GAFFEY:  Your Honor, may I approach?

18       THE COURT:  Yes.  Thank you.

19  Q.   Mr. Kelly, I put before you what has been marked by

20  Barclays' counsel as BCI Exhibit 362.  And that's a copy of the

21  declaration you put in with Barclays' papers.  And I would

22  direct your attention, sir, to paragraph 8.

23       MR. SCHILLER:  Your Honor, may I ask a question of

24  counsel?

25       THE COURT:  You --

143

1          MR. SCHILLER:  This document appears to have a word

2     circled.  Is this part of the original document?

3          MR. GAFFEY:  No, it's not, Your Honor.  That's mine --

4          MR. SCHILLER:  I apologize.  Is this my copy?  It says

5     involved and it's circled.  I don't know if that's part of the

6     original.  I just raise it now as a question.  It doesn't look

7     like the exhibit.

8          MR. GAFFEY:  Your Honor, it's an office note from my

9     side of the aisle.  It was given to us clean.  So --

10         THE COURT:  Do you have a problem with the use of the

11    document?

12         MR. SCHILLER:  Absolutely not.

13         THE COURT:  Fine.

14         MR. GAFFEY:  Thank you.

15         THE COURT:  I think all we've done is demonstrate that

16    the circling of that word occurred at Jones Day.  It didn't

17    occur elsewhere.

18         MR. GAFFEY:  That's right, Your Honor.

19         THE COURT:  Fine.

20    BY MR. GAFFEY:

21    Q.   Now, in your declaration, Mr. Kelly, in paragraph 8, and

22    I'm reading from the sentence on page 3, you say -- well, in

23    paragraph 8 you say, "I believe at some point during the week

24    of September 15th I was approach by Alvarez & Marsal North

25    America LLC, the restructuring advisor retained by the LBHI

144

1   bankruptcy estate regarding potential employment opportunities

2   related to the estate.  I believe that subsequent to this I was

3   approached about the possibility of employment at Barclays.

4   Either late in the week of September 15th, or early in the week

5   of September 22nd, you see that?

6   A.   Yes, I do.

7   Q.   And when you said that in your declaration, when you said

8   you were approached about the possibility of employment at

9   Barclays, you were referring to the conversation you had with

10  Mr. Lowitt, is that right?

11  A.   Yes, that's what I was referring to.

12  Q.   You were referring to the conv -- so it was Mr. Lowitt who

13  approached you about employment at Barclays?

14  A.   About the possibility of employment at Barclays, yes.

15  Q.   Now, did there come a time when you entered into a written

16  employment agreement with Barclays?

17  A.   Yes, there was.  It's consistent with what's in this

18  declaration here.  So I signed a contract on October 10, 2008

19  and dated it the same day.

20  Q.   Okay.  Would you turn to Tab M, 117 in the binder before

21  you, sir.

22  A.   217, sir?

23  Q.   117.

24       (Pause)

25  Q.   Have you turned to the document, sir?

145

1    A.    Yes, I have.

2    Q.    Is that a copy of the contract that you were offered by

3    Barclays in September of 2008?

4    A.    Yes, it appears to be, yeah.

5    Q.    And that contract provides for a special cash award of

6    700,000 dollars, is that right?

7    A.    Yes, it does.

8    Q.    And it provides for a 2008 guaranteed cash bonus of

9    1,185,000 dollars, is that correct?

10   A.    That's correct.

11   Q.    And that bonus was in respect of your Lehman bonus that

12   you hadn't received, is that right?

13   A.    I don't know what it's in respect of.

14   Q.    Say again, sir?

15   A.    I didn't know.  I didn't know what it was in respect of.

16   It was not explained to me.

17   Q.    Did you have -- when you got the contract did you not know

18   why you got a 2008 guaranteed cash bonus from a company you

19   hadn't worked for?

20   A.    It was a contract to join Barclays Capital.  I didn't

21   think about for what service and over what time period.

22   Q.    Did you ask anybody why they gave you a contract for a

23   company that you joined in -- well, did you think your bonus

24   for your work at Barclays in the last three months was

25   1,185,000 dollars?

146

1    A.    I didn't think about it in those terms.  I was informed

2    that there was a group of people.  And it was explained to me

3    as somewhere between 100/200 people that were being offered a

4    contract.  I understood the terms of the contract were similar

5    to the ones I had, as described here.

6    Q.    You didn't view the 2008 guaranteed cash bonus, sir, as

7    replacing the bonus you would not have received after Lehman

8    went bankrupt?

9    A.    I don't think I thought about it in that sense.  I just --

10   I was offered a contract; I understood the terms of the

11   contract.  And on October the 10th, I signed the contract.

12   Q.    Did you negotiate the contract at all?

13   A.    There was some minor terms I negotiated.  I did not

14   negotiate any of the dollar amounts.  But there was some

15   modifications that I asked for on some of the other -- some of

16   the other paragraphs.

17   Q.    And when you were having -- when you were involved in

18   negotiations about your employment contract, did you mention

19   the dollar amounts at all to the people at Barclays who you

20   were speaking to?

21   A.    No, I don't think so.  I was -- my recollection is I only

22   discussed this contract with the person in HR who was, I

23   assume, was doing a similar thing for anyone who had been

24   offered contracts.  I don't recall discussing the dollar

25   amounts with her.  I did not discuss the dollar amounts with

147

1   anyone else.

2   Q.    And you didn't ask anyone why you were getting a bonus in

3   respect of 2008.  Is that your testimony?

4   A.    Yes.

5   Q.    Now, in the work that you did in connection with the

6   prebankruptcy discussions, you referred a little while ago to

7   some work you were doing in the few days leading up to the

8   weekend.  One of the things you did is you helped to coordinate

9   responses from various Lehman constituents to request for

10  information from Barclays, is that right?

11  A.    Yeah.  Let me just make sure I understand.  In the period

12  prior to the 15th, is that right?

13  Q.    That's right, in the few days leading up to bankruptcy

14  weekend?

15  A.    Yes, that's right.  We had a team of people at the offices

16  of Simpson Thacher, I think I recall.  There was a team of

17  Barclays' people there.  And they had a whole range of requests

18  for financial information.

19  Q.    And who were the Barclays people you were dealing with at

20  that time, before the weekend?

21  A.    I believe James Walker was there, Gary Romain, Chris

22  Weidler.  I remember meeting Mike Keegan and John Monn (ph.).

23  I remember TJ Givenda, Matt Hughey.  There was actually a team

24  from PricewaterhouseCoopers that they had engaged to help them.

25  So there were individuals from PWC.  There were others I'm

148

1    sure, they're the names that I recall.

2    Q.    And the transaction, it was contemplated -- the work

3    around the transaction and that transaction didn't happen, is

4    that right?

5    A.    That transaction did not happen.  I should have said to

6    the prior question.  It's possible I met Patrick Clackson, but

7    I actually don't recall.

8    Q.    And in any event, that transaction didn't happen, yes?

9    A.    That's correct.

10   Q.    So you come back on the Monday and you learn on the Monday

11   morning, after you came back to the office, that negotiations

12   had commenced around a sale of a portion of the business -- a

13   portion of the firm, yes?

14   A.    Yeah.  Parts of the U.S. business, yeah.

15   Q.    And you understood that the negotiations you'd heard about

16   concerned a transaction whereby Lehman would transfer certain

17   assets and liabilities to Barclays, yes?

18   A.    That's correct, yeah.

19   Q.    And your role in those post-bankruptcy discussions were

20   similar to the role you had played in the prior talks, correct?

21   A.    Similar in some respects and not so in others I think.

22   There was an ongoing need for information that the Barclays

23   team needed, and I helped to coordinate that.  Part of that was

24   connecting Barclays' people with Lehman people.  Part of it was

25   supplying information.  And then there was also an effort that

149

1    night to understand the terms of the transaction as they were

2    being negotiated.  And to help to assemble that.

3    Q.   And the work that you were doing to assemble this

4    information and understand the terms of the transaction went on

5    overnight from Monday into the Tuesday, is that right?  Your

6    work?

7    A.   Well, it continued for the rest of the week, actually.

8    But --

9    Q.   But, good, sir, I'd like to focus on the Monday I asked

10   you about.  From Monday to Tuesday you worked all night, yes?

11   A.   I worked until 5:00 and then I went home.

12   Q.   Okay.  Now, in your declaration, sir, you say in paragraph

13   7 that the work -- you were asked from time-to-time to assemble

14   information, do you see that?

15   A.   Yes, I do.

16   Q.   And when you say from time-to-time, you don't mean to

17   suggest to the Court that those requests were only occasions,

18   do you?

19       (Pause)

20   A.   Well, I think I meant from time to time throughout the

21   course of that week.

22   Q.   You didn't mean to suggest something like once on Monday

23   and once on Thursday, you were working on this pretty

24   constantly during that week, is that right?

25   A.   I was working -- I was working on it fairly constantly

150

1    that day and night.  I was working on it for the rest of the

2    week.  But I also was working on a number of other things that

3    week, as a consequence of the sale transaction, but not

4    directly related to it.

5    Q.   And in the portion of the week from the 15th to 16th,

6    where you worked all night, you learned the terms of the

7    agreement that was reached, is that correct?

8    A.   I would say I learned, or I helped assemble an

9    understanding of assets that would be moving to Barclays, and

10   liabilities that would be assumed by Barclays.  I don't think I

11   understood all of the terms of the transaction and how all that

12   fits together.

13   Q.   You did understand the basic structure of the transaction?

14   A.   I'm not sure I can say that either.  I -- I -- you know --

15   Q.   When you learned what you did learn about the transaction,

16   sir, you were participating in a meeting between the bankers

17   for both, Barclays and Lehman, isn't that right?

18   A.   I was in involved in a meeting between Barclays and

19   Lehman, and their bankers, for a part of that night, yes.

20   Q.   Okay.  And that's when you learned that an agreement had

21   been reached, when you were participating in that meeting

22   between the bankers for Lehman and Barclays, correct?

23   A.   Yeah, I believe that the outcome of that meeting was an

24   agreement, yeah.

25   Q.   Well, you say you believe, sir.  Did you learn in the

151

 1    meeting your were participating in, between the bankers for

 2    Lehman and Barclays in the early morning hours of the 16th of

 3    September that an agreement had been reached?

 4    A.    I think so.  There were a number of different parts of the

 5    transaction that had been negotiated.  That meeting was very

 6    focused on negotiations around the real estate.  And there were

 7    potential -- there were discussions around the potential

 8    inclusion in the sale process of certain of the businesses in

 9    South America, and I think Canada.

10    Q.    Okay.

11    A.    So those discussions were a specific part.  The

12    transaction, as a whole, was much broader.  I think that the

13    end result of all of that was that there is an agreement.

14    Q.    Okay.  So you learned there was an agreement.  And you

15    knew it had something -- and you learned about the real estate

16    piece, yes?

17    A.    Yes.

18    Q.    And you learned about the inclusion of some subsidiaries,

19    yes?

20    A.    Well, I think exclusion at that point.  I think my

21    understanding was that most of them had been excluded at that

22    point.  Some of the discussions that were around other

23    businesses or entities that might be included I think were sort

24    of delaying and complicating it.  And my recollection is that

25    the decision was made to keep them out.

152

1    Q.   And you learned some terms of the agreement with regard to

2    the transfer of securities, is that right?

3    A.   Well, prior to that meeting starting there had been a

4    series of negotiations around which assets specifically would

5    move and how they should be valued.  I think I had that

6    understanding going into that meeting, and I don't think that

7    understanding changed as a result of that meeting.

8    Q.   It didn't change much during the night?

9    A.   Not between the start and the end of that particular

10   meeting.

11   Q.   And when you learned that an agreement had been reached

12   and that the terms regarding the securities assets hadn't

13   changed much overnight, you informed your boss, Mr. Lowitt, is

14   that right?

15   A.   I just want to be careful with time.  I wouldn't say

16   overnight.  I think it was between, let's say 2 in the morning

17   and 5 in the morning.

18   Q.   Sometime around 5:00 in the morning on Tuesday, September

19   16th, you communicated with Mr. Lowitt to tell him what the

20   terms of the deal were, isn't that correct, sir?

21   A.   My recollection is I had an in-person meeting with Bart

22   McDade.  And that was a follow-up to earlier meetings that I'd

23   had with Bart and others earlier that night and earlier that

24   morning.  And then Ian was not around at that time, so I sent

25   him an e-mail, which effectively I think confirmed what I

153

1    thought he understood already from the meetings earlier that

2    night.

3    Q.   And the e-mail that you wrote, you wrote shortly after you

4    had learned that a deal had been reached, and you developed an

5    understanding of its terms, correct?

6    A.   My recollection is that the meeting ended, there was an

7    agreement.  The agreement needed to be approved by the board.

8    But I had discussed it with Bart.  And then I recall writing

9    that e-mail I think in the back of a cab actually on the way

10   home Ian and Fowler.

11   Q.   Would you take a look at tab M-8 in your binder, Mr.

12   Kelly.  It's the e-mail marked as Movants' 8, the e-mail you

13   just described that you wrote to Mr. Lowitt to describe the

14   terms of the deal?

15   A.   Yes, that's the one.

16        MR. GAFFEY:  Your Honor, I offer Exhibit M-8 in

17   evidence.

18        MR. SCHILLER:  No objection, Your Honor.

19        THE COURT:  It's admitted.

20   (Movants' Exhibit M-8, e-mail to Mr. Lowitt describing terms,

21   was hereby received into evidence as of this date.)

22        THE COURT:  It raises actually a question in my mind

23   as to what's -- what needs to be done with documents.  I

24   thought that all the documents in these binders had already

25   been admitted.

154

1          MR. GAFFEY:  Until a second ago the objection was

2     hearsay.  There are some to which Barclays has objected, Your

3     Honor.

4          THE COURT:  Fine.

5          MR. GAFFEY:  Is the point.  The list we gave you on

6     Monday --

7          THE COURT:  I have this list and I haven't compared

8     the list with documents as they're being used.  But if there's

9     no objection it's admitted.

10         MR. GAFFEY:  Thank you, Your Honor.

11         MR. SCHILLER:  I think we had withdrawn this on

12    Monday.

13         THE COURT:  Fine.

14         MR. SCHILLER:  Your Honor, we'll make sure they

15    understand --

16         MR. GAFFEY:  I understood, Your Honor, but we can take

17    that up at another time.

18         THE COURT:  Okay.

19    BY MR. GAFFEY:

20    **Q.   Now, when you say in your e-mail that it took all night**

21    **and lots of back and forth, that's a reference to the all night**

22    **sessions we were just talking about, is that right, Mr. Kelly?**

23    **A.   It's a reference to the final meeting that I participated**

24    **in which took a number of hours, yes.**

25    **Q.   And you refer in your e-mail to the final price, you say**

155

1  it did not change meaningfully, you've seen that?

2  A.   Yes, I do.

3  Q.   And that's the price with respect to the securities assets

4  that we've talked about, is that right?

5  A.   Well, I going to say approximately a five plan or an

6  economic loss.  And I think what I was referring to was that

7  the economics of the transaction hadn't changed meaningfully

8  from the prior conversion or meeting, actually, that I had with

9  them.

10  Q.   Okay.  So -- and the economics of the transaction included

11  a five billion all in economic loss versus your marks, is that

12  correct?

13  A.   The -- yeah, the transaction included an approximately

14  five billion dollar difference between the values that had been

15  negotiated for the assets that were moving, and their most

16  recent book values on the books of Lehman.

17  Q.   And that five billion dollar all in economic loss was not

18  a factor that changed meaningfully over the night, is that

19  correct?

20  A.   Yeah, that's right.  It did not change meaningfully as a

21  result of the meeting that we spoke about earlier.  And the

22  reason for that is I recall the negotiations around real

23  estate, which took several hours, resulted in an agreed value

24  that was close to book.  So there wasn't really an economic

25  gain or loss resulting from the continuing discussions.

156

1    Q.   So your testimony is that the number was close to book and

2    there was no gain or loss?

3    A.   On the real estate my recollection is that the prices that

4    were negotiated in the context of the transaction were not

5    meaningfully different.

6    Q.   But in the context of the securities assets there was a

7    five billion dollar loss against the books?

8    A.   That's right, yeah.  To answer your question that's

9    specific to real estate.  And I think the fact that nothing

10   else changed, meaning that the entities or operations in South

11   America weren't moving.  So that didn't result in an impact.

12   Q.   I may have confused us here, sir.  With regard to

13   securities that were being transferred there was a five billion

14   dollar loss against the books, is that correct, yes or no?

15   A.   Well, it does -- as I explained, there was an

16   approximately five billion dollar difference between the

17   negotiated values and the most recent book value as to Lehman.

18   Q.   And that was against the book value as of the morning of

19   the 16th, correct?

20   A.   At the time I don't recall thinking at the time when the

21   book value was as of.  As I've spent time thinking about it

22   more recently I think that any book values from that day

23   reflecting prices on that day would be highly unlikely.  I

24   think that the -- you know, the book values that we were using

25   were most likely the close of business prices from the Friday,

157

1   the 12th.

2   Q.   And when you say they were most likely, the books that

3   were being used at the close of business on Friday, when you've

4   thought about this more recently, have you thought about it

5   with some other people, or have you thought about it just

6   yourself?

7   A.   I thought about it myself, preparing for today.

8   Q.   And as you prepared for today have you had any discussions

9   with anyone about these thoughts you've had what really must

10   have happened, what was likely to have happened, has this

11   affected the Friday marks?

12   A.   I talked to my lawyers about it, yeah.

13   Q.   Apart from your lawyers have you talked to anybody else

14   about it?

15   A.   No.

16   Q.   And did you come to the view that -- you know, as you've

17   thought about it more recently to prepare for today that it

18   must have been the Friday marks, was that after you spoke to

19   your lawyers?

20   A.   Well, I think as I thought about what was practical and

21   feasible and what was not, the infrastructure of the firm on

22   that Monday was just not working.  There were people who had

23   left with their boxes, there were people that didn't show up

24   for work.  And it was chaotic and very difficult in the sense

25   that getting information was difficult to impossible.  And I

158

1    think as I've thought about could it be possible that prices

2    would be available on the 16th to represent -- sorry, the 15th,

3    to represent prices on that day, I think the answer is no.  And

4    the reason for that is because the valuations are done on a

5    like business, in any case, in a normal state with the firm

6    operating as normal, and all the people in their seats doing

7    what they normally do.  Prices come out the day after for the

8    close of business the night before.  So you would typically

9    expect to get prices for a Friday night close, I think sometime

10   on Monday.  It was a daily process.  My understanding is that

11   there was not an ability to do it and close it more often than

12   daily, and that it was sort of a process whereby positions and

13   prices fed down into systems on an overnight basis.

14   Q.   Well, that's if --

15   A.   Combined with the fact that people just -- people were not

16   there.  Well, certainly, a number of people were not there.  It

17   was just, I think, highly unlikely even in a normal state, but

18   certainly in a state like it was on that day, to have prices as

19   of that day.  So I think to answer your question --

20   Q.   I think my question was when did you come to this

21   realization, sir.  So my question was when you came to this

22   realization?  So if you could answer that question I'd be

23   grateful.  Did you come to this realization after you met with

24   your lawyers?

25   A.   I came to that realization more recently.

159

1    Q.   More recently?

2    A.   Yeah.  I think at the time if I put myself back at that

3    time, I don't think I thought about when the book phase were

4    at -- sorry, were as of.  I was just working off a book value.

5    I think the thoughts I've just described are thoughts that to

6    me seem rationale.  And I've thought about more recently.

7    Q.   Okay.  I'm still going to push for answer to when.  How

8    much more recently did you come to this realization that it

9    must have been the books from the 12th and not the books on the

10   day?

11   A.   I think in the last six months or so.

12   Q.   Okay.  And did you read anything that brought you to the

13   realization that made you start to think about this?

14   A.   No.

15   Q.   Did you ever read the motion papers in this case?

16   A.   Excuse me?

17   Q.   Did you ever read the motion papers in this case?

18   A.   No, I didn't.

19   Q.   Okay.  Have you ever had them described to you?

20   A.   Parts of it, yeah.

21   Q.   Ever have anyone describe to you that there's an issue as

22   to whether or no there was a five billion all in economic loss

23   against the marks as of September 16th?

24        MR. SCHILLER:  Your Honor, I'm just going to object to

25   the extent that he has counsel, perhaps he would have discussed

160

1    my pleadings for counsel, I don't know.  But if that's the case

2    then I would object to the extent he's asking for a

3    conversation with his lawyers.  I don't know that that's the

4    case.

5           THE COURT:  Well, excluding conversations with

6    counsel.  You can answer the question.

7    A.   Sorry.  Could you repeat the question?

8    Q.   Did you talk to anybody and learned that one of the issues

9    in this case is whether there was a five billion dollar all in

10   economic loss against the books as of September 16th?

11   A.   I don't believe so, no.  Excluding counsel

12   Q.   So just as you didn't know you were going to testify in

13   this trial six months ago, did you, sir?

14   A.   That's correct.

15   Q.   Okay.  And your deposition had already taken place, is

16   that right?

17   A.   I was deposed in August, and November.

18   Q.   So sometime between August and when you learned you were

19   going to testify you came to this view that it must have been

20   the Friday marks, is that right?

21   A.   I was asked by counsel.

22   Q.   Now, when you wrote your e-mail to Mr. Lowitt on the

23   morning of September 16th you were not referring to the Friday

24   marks, were you?

25   A.   I don't think I was referring to a date of a particular

161

1    meeting.   I don't recall at the time thinking when the -- when

2    the marks were as of.

3    Q.   Well, at the time you were the global financial controller

4    of Lehman Brothers, is that right?

5    A.   That's correct.

6    Q.   And the books of Lehman Brothers were something of

7    significant concern to you in your role as global financial

8    controller, is that right?

9    A.   Yes, they were.

10   Q.   Would you be in a habit of writing e-mails to the chief

11   financial officer of Lehman about the marks without an idea of

12   what day you're talking about?

13   A.   Well, I'd say a few things.   One, all of this happened in

14   a very hurried and hectic manner.   It might be helpful to

15   explain what my responsibilities were and what they were not as

16   far as senior people in finance were concerned.   The

17   responsibility for the firm's securities inventory and the

18   marks around that, and the control processes around that was

19   the responsibility of the product controller, Gerry Reilly and

20   his team.   The responsibility for funding the firm and

21   determining what assets were encumbered or not encumbered,

22   pledged or not pledged, was that of the treasurer Paolo

23   Tonucci.   And my role as the financial controller was reporting

24   the firm's results for management purposes, for regulatory

25   purposes, and for external financial statement purposes.

162

Q.   And when you did that --

A.   Most -- sorry, most of my processes were monthly

processes, which involved a process around the general ledger

which closed monthly.  I was -- the information certainly

contained -- that we reported certainly contained information

that fed in from product controllers.  But the responsibility

for the sort of the daily marks and the controls, and the

reconciliations around that sat with the product control team.

Q.   And, again, sir, I believe my question was when you wrote

to the chief financial officer, was it your habit to use the

term marks without reference to any particular day, regardless

of whose responsibility it was who kept the books.  When you

wrote to the chief financial officer on the 16th of September

and you said there was a five billion dollar overall

economic -- all in economic loss versus our marks, you meant

the marks on the 16th, didn't you?

A.   No, I didn't --

Q.   Then it was some other day?

A.   I think I can only repeat what I said.  I didn't think

what day the marks were as at.  When I wrote that e-mail on

that day, sitting here now, I don't recall thinking about the

moment in time that those marks were as of.

Q.   So sitting here, your testimony is when you wrote about a

five billion dollar loss against the marks to the chief

financial officer of the company, your direct superior, you

163

1   didn't give much thought to what marks you were talking about?

2   A.   I just -- I have to repeat what I already said --

3   Q.   Actually, sir, I prefer you answer the question I asked

4   you.

5   A.   At the time I didn't think whether the marks were as of

6   that moment in time, which would have been impossible, sometime

7   on the Monday or sometime other than the Monday.  I did not --

8   sitting here now I don't recall the moment in time that I

9   thought the marks were as of.

10  Q.   And in all this analysis you've done to come to this more

11  detailed view, you're still at the point where you'd be

12  speculating, you don't know, at least, whether the books had

13  been marked or not marked on the 15th or the 16th, is that

14  right?

15  A.   Well, I think its -- I think it's actually much stronger

16  than speculation.

17  Q.   You're basing it on people who aren't at work, right?

18  A.   No.  I'm basing it on the fact that there was a monthly --

19  sorry, a daily process which was in a normal environment on an

20  overnight basis.  So -- and, you know, stress environment like

21  the one we're in we'd certainly be in no better position to do

22  all of that for the reasons I explained.  So my understanding

23  is that the closing positions and prices for any portfolio of

24  assets, and all portfolios of assets were available on an

25  overnight basis, once a day, sometime the following day.

164

1    Q.   Well, let's account for the 15th, the Monday.

2         MR. GAFFEY:  Can you put the calendar back up?

3    Q.   It was your understanding that that process was followed

4    on a daily basis with marks available the following the day,

5    correct?  Yes?

6    A.   No.  Not for that day in particular.  No.  I can't.

7    Q.   Well, in normal times, sir, that's what happened, yes?

8    A.   If you pick any other day than I would agree with you.

9    Q.   Okay.

10   A.   Before then.  Yeah.

11   Q.   Any other day except the 15th you'd agree with me that

12   there'd be marks available in the morning?  Yes?

13   A.   Before that date, yes.

14   Q.   Okay.  And you'd also agree with me --

15   A.   Well, no, I'm sorry.  I -- no, I -- you said the morning.

16   It's sometime the following day.  I don't know precisely when.

17   Q.   Okay.  And you'd also agree with me that the marks, when

18   they're done, are not all done on a daily basis, correct?  Some

19   marks are done at longer intervals, right?

20   A.   I'm not sure about that, actually.

21   Q.   Well, would you agree with me too, sir, that some marks

22   are done on an automated basis?  No human intervention

23   required?

24   A.   I'm not -- I can't talk to that.  I'm not close enough to

25   that process.

165

1   Q.   If I wanted the answer to that question would I ask Mr.

2   Lowitt?

3   A.   I think you would have asked Gerry Reilly.

4   Q.   Well, Mr. Reilly's been gone --

5   A.   Or -- or --

6   Q.   -- since December of 2008, correct, sir?

7   A.   Yes.

8   Q.   And Mr. Lowitt was the chief financial officer of the

9   corporation, correct, sir?

10  A.   That's right.

11  Q.   And you understood he was the senior officer responsible

12  for the maintenance of the books and records of Lehman,

13  correct?

14  A.   Yes.

15  Q.   And you were a direct report to him, correct?

16  A.   I was, yes.

17  Q.   And so, sir, if you wanted to know the state of the books

18  of Lehman you'd ask the chief financial officer, wouldn't you?

19  A.   Well, I think --

20  Q.   Especially since Mr. Reilly died.  After Mr. Reilly died

21  you'd ask Mr. Lowitt, wouldn't you?

22  A.   What?  It's a general question, the state of the books.

23  If --

24  Q.   It's quite a specific question, sir.  The question is

25  would you ask Mr. Lowitt?

166

1    A.   If the question is when would you expect to know prices

2    from the prior day you could ask Mr. Lowitt, but I think a more

3    likely place to ask would be people that worked for Gerry

4    Reilly.

5    Q.   Did you ever talk to Mr. McDade about the values of the

6    assets that were going to be transferred in the transaction?

7    A.   By that you mean the negotiated values --

8    Q.   I mean say words, and Mr. McDade was there and heard them.

9    Did you speak to Mr. McDade about the value of the assets that

10   were transferred in the transaction?  That's what I mean.

11   A.   I recall talking to Bart about the difference between the

12   values and the -- the negotiated values and the book values.

13   It's quite possible we talked about the aggregate values.  I

14   don't have a specific recollection of that, though.

15   Q.   Now, the five billion all-in economic loss that you wrote

16   to Mr. Lowitt about, you also wrote that to Mr. Reilly and Mr.

17   Tonucci.  Is that right?

18   A.   Just Mr. --

19   Q.   I beg your pardon.  Mr. Tonucci and Mr. Lowitt, yes.

20   A.   Yes.

21   Q.   You know, if you take a look at Exhibit MA and you'll note

22   that Mr. Lowitt, your boss, writes back to you "You are a hero.

23   Well done.  Ian."  You have any idea why your superior was

24   congratulating you on the deal?

25   A.   I don't know.  I think it was relief that something had

167

1  been done.

2  Q.   It wasn't because you had anything to do with it?

3  A.   I had stayed around through the remainder of that night.

4  I described the activities that I recall occurring during that

5  period of time.  I don't think that I was important to the

6  finalization of the agreement or the negotiation of that.

7  Q.   Yet did there come any time, sir, where you made

8  calculations concerning marking down the books to reflect this

9  five billion all-in economic loss?

10  A.   I don't recall that, no.

11  Q.   You don't recall ever making notes reflecting a markdown

12  from book value?

13  A.   I recall making notes around what the values of each of

14  the asset classes was at a, or the expected values at different

15  points in time, but not in terms of how to mark down the books

16  as a result of that.

17  Q.   And when you wrote your early morning e-mail to Mr. Lowitt

18  and Mr. Tonucci, Mr. Tonucci, what was Mr. Tonucci's title?

19  A.   He was the firm's treasurer.

20  Q.   And the firm's treasurer wrote back to you fantastic.

21  Great work.  Paolo.  Any idea why Paolo was congratulating you?

22  A.   I would repeat the answer to the question about Ian.  I

23  don't know.  I think it was relief at a transaction having been

24  agreed to.

25  Q.   Did you ask either one of them why they seemed to be

168

1   congratulating you --

2   A.   No.

3   Q.    -- on this deal?

4   A.   No.

5   Q.   Now, the five billion dollar difference between the books

6   and the agreed value was the result of a series of discussions

7   conducted at a portfolio level.  Is that right?

8   A.   That's correct, yes.

9   Q.   And representatives from Barclays and Lehman conferred

10  about particular asset classes to determine how much difference

11  there would be between book value and the agreed value,

12  correct?

13  A.   I'd say that's partly right and partly not.  I think

14  the -- there were a series of discussions going on between

15  Barclays and Lehman.  The end result of that was negotiated

16  values for each of the portfolios or each of the asset classes.

17  Q.   I guess my point is it's done by class, not by particular

18  security, yes?

19  A.   That was my understanding, it was done by asset class, but

20  I just want to make sure I make the point, though, that I don't

21  know if those discussions involved a discussion around the

22  difference between a negotiated value and the Lehman marks.  I

23  know that they derived a negotiated value by asset class.

24  Q.   And your understanding is that the five billion dollar

25  item was an aggregation, correct?

169

1    A.    It was an aggregation of each of those conversations in

2    terms of determining the negotiated valued and then -- and then

3    that was compared, at least by the Lehman team, with the book

4    values.

5    Q.    And it wasn't done CUSIP by CUSIP?

6    A.    I wasn't part of the discussions.  I don't believe it was.

7    Q.    Now, sometime after this e-mail you learned that the plan

8    was there would be a markdown of Lehman's books to reflect the

9    five billion dollar difference, correct?

10   A.    I think sometime after that we started the process to --

11   well, a couple of things.  One, we looked at what the expected

12   impact of the transaction would be before it closed on what the

13   books of Lehman were, and, then, subsequent to the transaction

14   closing there was a very large effort to reflect the actual

15   transaction and its impact on the books.

16   Q.    And the we you refer to obviously includes yourself, yes?

17   A.    For parts of that, yeah.

18   Q.    And the plan was that the assets on Lehman's books would

19   be marked to the negotiated sale price, right?

20   A.    I don't know, actually.  I think the plan was that the

21   transaction, as it was eventually agreed to, would be reflected

22   in the books and records.  I can't say if there was a plan to

23   adjust the existing or the preexisting marks prior to that

24   process.

25   Q.    Well, at some point you did learn that there was a plan to

170

1    reflect the markdown on Lehman's books, yes?

2    A.    I think my understanding was that there was a plan to

3    reflect the transaction on Lehman's books.  I think the deal

4    changed so much over the course of that week that I'm actually

5    not sure how relevant the contents of this e-mail were at the

6    end of the day in terms of reflecting the ultimate transaction.

7    Q.    It reflected the transaction as you understood it on the

8    morning of the 16th of September, yes, Mr. Kelly?

9    A.    This e-mail?

10   Q.    Yes.

11   A.    Certain parts of it, yeah.  I mean, when I say economic

12   loss that's a consequence of a lot of conversations at a

13   portfolio level.

14   Q.    And you understood the deal included an economic loss to

15   Lehman?

16   A.    At the time I understood that the values negotiated for

17   the assets were lower than the preexisting books values, so,

18   yes.

19   Q.    Now, you also refer in here to an extra one billion of

20   comp beyond our accrual.  Do you see that?

21   A.    Yes, I do.

22   Q.    And what did you mean when you wrote about an extra one

23   billion dollar of comp beyond accrual?

24   A.    My understanding was that the compensation liability for

25   employees that were moving from Lehman to Barclays was

171

1    negotiated at an aggregate value of 2 billion dollars.  At the

2    time I wrote this I had an understanding that the existing

3    accrual on the books of Lehman or the estimate -- everything

4    was an estimate -- the estimate of that accrual was

5    approximately one billion dollars.

6    Q.   And so that would make the -- what you reference in your

7    e-mail as to an accrual of a billion over what's shown on

8    Lehman's books, yes?

9    A.   That's correct.

10   Q.   And the accruals for employment expense was something that

11   was within your area of responsibility at the time, correct?

12   A.   The accounting for it was, yeah.  The decisions around it

13   were not.

14   Q.   Well, the amount and who got paid is somebody else's job.

15   Keeping track of what it would be was yours, yes?

16   A.   Yeah, it was, but I think it -- the compensation is an

17   area, I think, that's probably different from any other, and

18   given the confidentiality around it, and so, the output of

19   calculations around bonus accruals came into my group.

20   Q.   Sir, was it part of your job to have knowledge of how much

21   was accrued on Lehman's books for compensation?

22   A.   Yes, it was.

23   Q.   Thank you.  Now, let me direct your attention, Mr. Kelly,

24   to Exhibit M-235, which is tab M-235 in your book.  Tell me

25   when you've had a chance to take a look at that.  You've got

172

1    M-235 at hand, sir?

2    A.   Yes, I do.

3    Q.   And you recognize the document?

4    A.   Yeah, I recall the -- I recall this as being one of

5    several templates, actually, that were prepared to summarize

6    the terms of the transaction.

7    Q.   And would you turn to -- you see there's portions of the

8    document that contain handwriting?

9    A.   Yes.

10   Q.   And the handwriting is yours.  Is that right?

11   A.   Yeah, that's all mine.

12   Q.   And these are notes that you made in and around the time

13   you were doing work around the transaction?

14   A.   Yeah, it was.  The time -- it's difficult to pinpoint the

15   time.  The first column is labeled as September 17, so it was

16   presumably on or after that date.

17   Q.   The question is a bit more general, sir.  These are notes

18   you made after the transaction was negotiated and while it was

19   on its way to approval.  You made these notes during the week

20   of the 15th of September, correct?

21   A.   I can't say that for sure, actually.  I think it's

22   probably likely that that's the case, but the efforts to

23   reflect the transaction took a long time.  I was pretty closely

24   involved with it for a few weeks, but it's probably that week.

25   Q.   Well, I'd like to concentrate on the week of the 15th

173

1  through the 22nd, that is from the day that Lehman filed for

2  bankruptcies through the day the sale transaction closed.  Do

3  you have that period of time in mind, sir?

4  A.    Yes.

5  Q.    Okay.  And one of the things you did during that week was

6  help to prepare a closing balance sheet to show the ultimate

7  effect of the transaction.  Is that right?

8  A.    That was an objective, to prepare a closing balance sheet,

9  but it was a work in progress.

10  Q.    The question for you is you worked on it.

11  A.    I worked on versions of it.

12  Q.    Okay.

13  A.    And --

14  Q.    And you worked on versions of it with Brett Beldner.  Is

15  that right?

16  A.    Brett was on my team.  I believe he was working on it,

17  yeah.

18  Q.    And if you would turn to page 115-145 within the exhibit

19  you'll see some notes down the right-hand side.  You see those?

20  A.    Oh, I'm sorry.  It's not this.  Different tab.  Same tab.

21  Q.    Same tab.

22  A.    Okay.

23  Q.    The Bates number at the bottom.

24  A.    Okay.  The next --

25  Q.    All right.  Are you with me on the notes?  They're up

174

1   there on the screen too.

2   A.   It's the following page.   Yes.

3   Q.   Okay.   And the notes down the right-hand column there are

4   yours?

5   A.   Yes.

6   Q.   And the word at the top there is Brett.   Is that correct?

7   A.   I think so.

8   Q.   And the date that you've written there is September 20th.

9   Is that right?

10   A.   I write as of 9/20.

11   Q.   Is that what the little sign means before 9/20?   Okay?

12   A.   Yeah.

13   Q.   And the calculations you're doing down the right-hand side

14   are to calculate the impact at Barclays first day of the

15   transaction.   Is that right?

16   A.   Sorry.   The impact at Barclays?

17   Q.   Yeah.

18   A.   Let me just understand the question.   You're asking if

19   this was an attempt to look at the -- if you, like, the opening

20   balance sheet to Barclays of the transaction?

21   Q.   That's right.

22   A.   No, I don't think so.

23   Q.   Do you have any recollection of working on an opening day

24   balance sheet for Barclays with Brett Beldner?

25   A.   Well, if it's during this period of time I was working on

175

1    Lehman related matters.  I remember working on the balance

2    sheets of Barclays of the transaction that were continued for

3    several months, but I didn't start that until October, maybe,

4    November, time frame.

5    Q.   Okay.  So it's your testimony that you were not involved

6    in calculating an opening day balance sheet to reflect the

7    first day impact of this transaction on Barclays during the

8    period of time you were working at Lehman?  Is that your

9    testimony?

10   A.   If the question is whether I was working on an opening

11   balance sheet from Barclays perspective then that is my

12   testimony.  If the question is related to what's the set of

13   assets and the set of liabilities moving across then -- and

14   there were different versions of that, that set, those sets of

15   schedules were intended to represent negotiated values, I think

16   at all times it was intended to capture the transaction from

17   Lehman's perspective.  Could Barclays have used it?  Possibly.

18   I was not involved in that, no.

19   Q.   Did you ever prepare or participate in the preparation of

20   an opening day balance sheet that was sent to James Walker

21   during the time you were employed by Lehman?

22   A.   Well, I think that's what I'm referring to.  I think if I

23   sent information to James Walker, I remember that, that

24   information included estimates of what the negotiated balance

25   sheet looked like from the perspective of Lehman.

176

1    Q.   While you were employed by Lehman, sir, did you

2    participate in the preparation of an opening day balance sheet

3    that calculated the equity it would deliver to Barclays, the

4    transaction would deliver to Barclays?

5    A.    No.  I'd say I worked on preparing estimates of what the

6    impact to Lehman would be of the transaction.

7    Q.   I got myself a little distracted there, sir.  Would you

8    turn to page 115 to 152 within the same exhibit?

9    A.    Yes, I do.

10   Q.   And is that your handwriting on that page?

11   A.    Yes, it is.

12   Q.   And am I reading your handwriting correctly in the center

13   column at the top where you've written key issues?

14   A.    Yes.

15   Q.   And the number one key issue, does that say marking book

16   down?

17   A.    No, I think that says matched book down.

18   Q.   That says matched book down, sir?

19   A.    I believe so.  I think that's a "ch".

20   Q.   Well, I don't want to fight with you about your

21   handwriting, sir, but is there a "g" at the end of the word

22   matched?

23   A.    No, I think -- I think it says matched.  I don't think it

24   says marking.  I think the third letter is a "k" or a "c".  No,

25   that doesn't --

177

1    Q.    Well, I thought it was a "k", too, sir.  Is it a "k"?  Is

2    the word marking?

3    A.    It's possible.  I think it says matched.

4    Q.    When you write notes, sir, do you often have to speculate

5    about what the word is?  This is your handwriting, sir.  Do you

6    know whether it says marking or matching?

7    A.    I don't often have to speculate.

8    Q.    You don't?  Okay.

9    A.    But I don't know.  I think it says matched.

10   Q.    I'm sorry to keep it in this orb, but, just for the

11   record, do you think that says m-a-t-c-h-e-d?

12   A.    I do.  Yeah.

13   Q.    You're sure the next word is book, though, right?

14   A.    Yes.

15   Q.    Okay.  That's a "k" there?

16   A.    That's a "k".

17   Q.    Okay.  And the next word is down.  So it's matched book

18   down?

19   A.    I think so.

20   Q.    Does that phrase "matched book down" have any meaning to

21   you, sir?

22   A.    Well, the matched book was the repo book or parts of the

23   repo book, so I know that there were changes in the repo

24   balances that were moving across.

25   Q.    So, before we move on to some of your other notes, Mr.

178

1    Kelly, is it your testimony, as you sit here, that this note

2    does not reflect that one of the key issues you noted in your

3    notes was marking book down.  That's your testimony?

4    A.   My testimony is I believe that that word is matched.

5    Q.   Can you think of any reason you would have written marking

6    book down?

7    A.   Well, I think the transaction ultimately had to be

8    reflected on the books of Lehman.  I don't -- that's not a

9    phrase that I used or use.  You know, could it have been notes

10   from a meeting I attended where someone else said it?  Yes,

11   it's possible, but I don't think that's what it says.

12   Q.   You know, in the book there, sir, is a copy of your

13   deposition transcript.  Could you reach for that tab?  And you

14   might want to keep a finger or a pen or something at Exhibit

15   235, because we're going to come back to that.

16        And before we go to your deposition, sir, let me just ask

17   you, isn't it a fact that that phrase "marking book down" was

18   to reflect the negotiated sale price and that the books of

19   Lehman would have to be marked down early in the week?

20   A.   I don't think that's a fact, because the transaction was

21   changing throughout the course of the week.

22   Q.   All right.  Let's take a look at your deposition at page

23   315.  Actually, sir, why don't you turn first, for context, to

24   page 305?

25        MR. GAFFEY:  Steve, can you put Exhibit 235 up there,

179

1    please, next to it?  The first page.

2    Q.   Okay.  I just want to be sure we're talking about the same

3    document here, sir.  At page 305 of your deposition we see that

4    I show you, starting at line 6:

5    "Q.  Mr. Kelley, I've put before you what we have marked as

6    Deposition Exhibit 428."

7         Do you see that text?

8    A.   Yes, I do.

9    Q.   And take a look at the label next to Movants' Exhibit

10   Trial 235, and you see that's Deposition Exhibit 428.

11   A.   I'm sorry.  Can you just say that once --

12   Q.   The label.

13   A.   Are you still asking the same question or --

14   Q.   No.  I'm over on the document itself, sir.  Take a look on

15   the screen.  Do you see the exhibit tag there, 428?

16   A.   Yes, I do.

17   Q.   Okay.  So you remember my showing you this document at

18   your deposition, right?

19   A.   You showed me lots of documents at the deposition.

20   It's --

21   Q.   Does that refresh your recollection that I showed you this

22   one at your deposition, your handwritten notes on a simplified

23   balance sheet for LBI?

24   A.   We looked at different versions of this.  It may well have

25   been this version.

180

1   Q.   Okay.  Well, we'll go back and see if we can straighten

2   that out in a second, sir, but, in the meantime, would you turn

3   to page 314 of your deposition transcript?  And you see there

4   on 314 at line 15 I ask you to turn to page 115-152 of the

5   exhibit?

6          MR. SCHILLER:  Objection, Your Honor.  With permission

7   for completeness or would you rather just not do that and wait?

8          THE COURT:  Excuse me?

9          MR. SCHILLER:  I just would ask that counsel read the

10  question at the top of the page on this issue, page 315, the

11  first question, first answer, along with what he's reading,

12  sir.

13         MR. GAFFEY:  Your Honor, I, just --

14         THE COURT:  I think that this is impeachment of the

15  most important kind, and I am not going to have anything

16  interrupting this line of questioning.

17         MR. SCHILLER:  Okay.

18         THE COURT:  This witness has a credibility problem

19  with the Court.  A serious one.

20  Q.   Now, Mr. Kelly --

21  A.   Yes.

22  Q.   Looking at page 314 of your deposition transcript from

23  lines 15 through 20.  Do you recall this question and answer?

24  "Q.   Would you turn, please, to page 115 to 152 of Exhibit 428?

25  There are a few numbered items in the upper right-hand corner

181

1   of the page next to the phrase 'key issues' circled.  Are you

2   with me on the document?

3   "A.  Yes."

4      Right?  You see that?

5   A.  I see it.  I just need a minute to catch up there, please.

6      (Pause)

7   A.  Okay.  Yes.

8   Q.  So you agree with -- we're talking about the same

9   document.  Do you agree with me now, Mr. Kelly?

10  A.  I -- yeah.  I think so.

11  Q.  Okay.

12  A.  Yes.  Yes.

13  Q.  And the next thing I asked you about the document --

14      MR. GAFFEY:  Would you put the document, please, on

15  the screen at 115 to 152.

16  Q.  And the next thing I asked you about the document on that

17  page was is that your handwriting and you told me yes.  You see

18  that?

19  A.  Yes, I do.

20  Q.  And I asked you if you recalled making that list of key

21  issues and you said, then, no, you didn't remember it, right?

22  You see that?

23  A.  I see that, yes.

24  Q.  All right.  And turn over to page 315, the part your

25  counsel wanted me to read.  At the top it says:

182

1   "Q.  Do you recall writing the phrase marking book down?

2   "A.  No."

3       Do you see that?

4   A.  Yes, I do.

5   Q.  And I asked you

6   "Q.  Do you have any explanation for the phrase marking book

7   down on this page of the document?"

8       And your answer was

9   "A.  Yeah.  I think that was to reflect the transaction on the

10  books of Lehman."

11      Do you see that?

12  A.  Yes, I do.

13  Q.  All right.  So when I asked you that question about this

14  document at your deposition, sir, you were able to read your

15  handwriting then, weren't you?

16  A.  Well, evidently yes.

17  Q.  Evidently you didn't recognize that word to be matching

18  book down when I took your deposition, did you, sir?

19  A.  No.  That's correct.

20  Q.  And you'd recognized it at the time as the phrase marking

21  book down, didn't you, sir?

22  A.  Well --

23  Q.  Sir, it's a simple question.  When I asked you at your

24  deposition did that phrase say marking book down you recognized

25  it to say that, didn't you?

183

1    A.   Well, you asked me if I had an explanation for it.  I, you

2    know, I -- you didn't ask me if I recog -- if that's what it

3    said.

4    Q.   Okay, sir.  And you didn't tell me the explanation was

5    that wasn't the phrase, isn't that right?

6    A.   That's correct.

7    Q.   All right.  So at the time, you recognized your own

8    handwriting to say the phrase "marking book down" next to the

9    phrase "key issues".  Isn't that correct, sir?

10   A.   Yeah, evidently it is.

11   Q.   Is your understanding that it says "matching book down"

12   something else you've thought about in the last six months, as

13   this day approached?

14   A.   No, I haven't thought about it at all.

15   Q.   Does it say "marking book down" on your notes, sir?

16   A.   I believe it says "match book".

17   Q.   That's your testimony today, under oath?  You believe that

18   says "match book" on those notes?

19   A.   If you look at the word, I believe --

20   Q.   I am, sir.

21   A.   Okay, I believe the first letter is an M, the second

22   letter is an A, I think the third letter is a T, the fourth

23   letter looks like a C, the fifth letter looks like an H, and

24   then an E and then the last letter, I would agree, could be a G

25   or a D.

184

1   Q.   Okay.  So it could be a G.  Can you think of any reason,

2   sir, that the phrase "matching book down" would be explained by

3   saying that was to reflect the transaction on the books of

4   Lehman?

5   A.   No, I think this is to reflect the fact that the assets

6   that were moving were changing.  And --

7   Q.   Well, back in your deposition, sir, page 315, the next

8   question and answer I asked you was at line 10.  Are you with

9   me in the transcript?

10  A.   I should also say, though --

11  Q.   Mr. Kelly, could you turn to page 315 of your deposition

12  transcript?

13  A.   Yes.

14  Q.   And at page 315, take a look at lines 10 through 13.

15  A.   Yes, I see that.

16  Q.   Do you recall I asked you yet another follow-up question?

17  "What do you mean it was to reflect the transaction on the

18  books of Lehman?"  Answer:  "To reflect" -- reflect -- "the

19  negotiated sales price."  Do you recall being asked that

20  question and giving that answer?

21  A.   I don't recall it specifically, but I see it here, so --

22  Q.   When you sat at your deposition, sir, were you giving

23  truthful answers to the questions that I asked you?

24  A.   Yes, I was.

25  Q.   So let's review.  Let's put the notes back up on the

185

1    screen.  Does that say "marking book down" at the top of that

2    page, sir?  Is that your testimony under oath?  Does that say

3    "marking book down"?

4    A.    I believe it says "matched book down".

5    Q.    And does the phrase "matched book down", if that's what it

6    says, reflect the trans -- have anything to do with reflecting

7    the transaction on the books of Lehman?

8    A.    Well it does, and let me explain.  I think the second

9    point there is --

10   Q.    I think I'd prefer just a yes or no, sir.

11   A.    I feel I have to give some context to this answer.

12           THE COURT:  Give a yes or no.  It's as simple as that.

13   Give a yes or no.

14   A.    Okay.  Could you repeat the question, please?

15   Q.    Does the phrase "match book down" have anything to do with

16   reflecting the transaction on the books of Lehman?

17   A.    To the extent that the matched book was changing, then

18   yes.  As to the extent that the shorts were changing, that

19   would impact it as well.

20   Q.    And the fact that the shorts were changing would have

21   nothing to do with the negotiated sales prices, would it, sir?

22   A.    Well, no, if -- it depends how both sides of the balance

23   sheet were changing.

24   Q.    Sir, isn't it much more likely that the phrase is "marked

25   book down", and what you meant by that note is the first key

186

1    issue was to mark the book down to reflect the negotiated sales

2    price under the terms of the sales transaction as you

3    understood them, beginning the morning of the 16th of

4    September, 2008?

5    A.    It's possible, but I don't think so.

6    Q.    You did understand, based on your understanding of the

7    transaction at the time, that certain of the assets would have

8    to be marked down, didn't you?

9    A.    It was my understanding that we had to reflect the sales

10    transaction on the books of Lehman.  To the extent that --

11    Q.    By marking it down, sir?

12    A.    To the extent that the values were different from the book

13    value, then they' have to be adjusted.

14    Q.    Sir, was it necessary to mark down the books to reflect

15    the negotiated sales price?  Was that your understanding at the

16    time?

17    A.    As of the Monday night, Tuesday morning, yes.  As the week

18    developed, I can't say I know because the transaction changed

19    so much.

20    Q.    On the 16th of September, sir, the day you wrote your e-

21    mail to Mr. Lowitt and Mr. Tonucci about a five billion all-in

22    economic loss versus the marks, it was your understanding that

23    portions of the books would have to be written down to reflect

24    the negotiated price in the transaction.  Isn't that correct?

25    A.    At that time, yes.  If the negotiated values were less

187

1    than the book values, which they were.

2    Q.   And the negotiated values were in the aggregate, five

3    billion less than the book value.  Yes?

4    A.   That was my understanding at the time, yes.

5    Q.   Now, you never discussed -- in the course of your work

6    around the sales transaction, did you have any contact with the

7    lawyers at Weil, Gotshal?

8    A.   Through the course of that week, I did, yes.

9    Q.   And you never discussed with any lawyer from Weil, Gotshal

10   marking the books down to reflect the negotiated sales price in

11   the transaction as you understood it on the 16th, isn't that

12   correct?

13   A.   I don't recall those discussions.

14   Q.   Okay, there were times toward the end of the week and the

15   beginning of the next week where you dealt with personnel from

16   Alvarez & Marsal, isn't that correct?

17   A.   Yes.

18   Q.   And you never told anyone from Alvarez & Marsal anything

19   about marking down the books to reflect a negotiated sales

20   price; isn't that correct?

21   A.   I may have.  I don't recall that, though.

22   Q.   Sir, your best recollection is the only people you ever

23   talked to about marking down the books were Ian Lowitt, Gerard

24   Reilly, and Paolo Tonucci, isn't that correct?

25   A.   Well, Bart McDade was part of those conversations, too.

188

1    Q.    Beyond those four men, sir, you don't recall talking about

2    marking down the books to reflect the negotiated sales price to

3    anybody; isn't that right, sir?

4    A.    That's correct.

5    Q.    Now, you had no reason to believe at that time that the

6    marks at which Lehman carried those assets on its books were

7    inaccurate; isn't that correct?

8    A.    No, I had no reason to -- I guess it depends on what you

9    mean by "at that time".  I think at that time, I --

10   Q.    The 16th of September, 2008, sir.

11   A.    At that time --

12   Q.    The morning you learned the terms of the sale transaction.

13   You had no reason at that time to believe that the marks at

14   which Lehman carried those assets were inaccurate.  Isn't that

15   true?

16   A.    Well, as I said before, I didn't think about when they

17   were as that, but as a generally matter, no, I didn't have that

18   reason to believe.

19   Q.    And it's this thinking about it since and the realization

20   you came to some time in the last six months that gives you

21   some reason now to think you might have had a reason to

22   question the accuracy of the books.  That's your testimony?

23   A.    No, no.  That's not my testimony.  No.  I think I

24   understated at the time that it would be reasonable to expect a

25   difference between the negotiated prices and the book values

189

1    based on the uncertainty of the moment and the markets at that

2    point in time.  And also, the size of the transaction; it was a

3    very large transaction at a very uncertain time.  So in my

4    mind, there were reasons for a difference.  I didn't have -- I

5    did not have a view on the size of the difference.

6    Q.    Well, you had a view that the size of the difference was

7    in the neighborhood of five billion dollars, didn't you?

8    A.    Yeah.  I'm sorry.  I should say in terms of the

9    reasonableness of the difference because --

10   Q.    Sir, for the moment, I'm not going to ask you about

11   whether you thought it was a good or a bad idea to have that

12   difference.  For the moment, I'm not going to ask you if you

13   were involved in agreeing to that difference.  What I am going

14   to ask you, sir, is you were aware of the fact of that

15   difference, yes?

16   A.    Yes.  At that point in time --

17   Q.    And you were aware that at the time, you had no reason to

18   believe that Lehman's marks were inaccurate, yes?

19   A.    Yes, that's right.

20   Q.    And you were aware that at the time, Lehman kept its books

21   in accordance with valuation policies and under U.S. GAAP.

22   Yes?

23   A.    Yes, that's right.

24   Q.    And you were aware that much of the keeping of those books

25   was automated, yes?

190

1   A.   I -- I don't -- I can't say that.  I was not close enough

2   to it.

3   Q.   Well, apart from thinking that people weren't coming to

4   work, you had no reason to think that the books on the 16th of

5   April were inaccurate, did you, sir?

6   A.   As I said, I didn't think about the point in time.

7   Q.   Right, and at that time, then, sir, you understood that

8   the terms of the transaction included a five billion all-in

9   economic loss against the marks at the 16th which at that time,

10  you had no reason to believe were inaccurate.  Is that correct?

11  A.   I didn't think about the marks as -- in terms of them

12  being as of the morning of the 16th.  I did not think about

13  that.

14  Q.   And you didn't speak to anyone about this other than Mr.

15  Lowitt, Mr. McDade, Mr. Tonucci, and Mr. Reilly, is that

16  correct?

17  A.   my recollection is I was informed of the five billion

18  dollar amount in a conversation with those four individuals.

19  And I believe I was informed by either Ian or Bart.

20  Q.   That question, sir --

21  A.   Yeah, so --

22  Q.   -- is in addition to Bart McDade, Ian Lowitt, Martin

23  Kelly, Paolo Tonucci, and Gerard Reilly, you are not aware of

24  anyone who discussed this five billion dollar overall economic

25  loss versus the marks, is that correct?

191

1    A.   Yes, but I think in my mind, I'd been advised by my boss

2    and by the president of the firm.  So I didn't see it as my

3    responsibility to go and then tell other people.

4    Q.   Speaking of your responsibility, sir, you don't know if

5    anyone at the time, that is, during the week beginning the 15th

6    through Monday the 22nd, you don't know if anyone told the

7    judge about the five billion all-in economic lost versus Lehman

8    marks, do you?

9    A.   No, I was not involved in that process.  I don't know.

10   Q.   And you don't know if anyone ever followed up to see if

11   anyone did tell the Court about a five billion dollar all-in

12   economic loss versus Lehman's marks, isn't that correct?

13   A.   That's correct, but the deal had also changed so much in

14   ways that I didn't understand how it all came together.  So I

15   don't think I understood if five billion dollars ultimately was

16   the difference or not.

17   Q.   Now, during the week, sir, you learned that there was a

18   written agreement between Lehman and Barclays, is that correct?

19   A.   The purchase contract?  The purchase contract?

20   Q.   Yes.

21   A.   Yes.

22   Q.   You learned that during the week of the 15th, yes?

23   A.   Yes, I did.

24   Q.   And you were given a copy of that agreement during the

25   week, yes?

192

1    A.   I -- I may have been.  I recall seeing parts of it; I

2    don't -- I don't recall reading it.  I may have been given a

3    copy of it.

4    Q.   If you turn in your binder, sir, to tab M-1, and I would

5    direct your -- do you recognize that to be the purchase

6    agreement you just mentioned?

7    A.   I -- I recall -- if I look through it, I recall pieces of

8    it.

9    Q.   Take a look at page 6.  Now, the work -- before I direct

10   your attention to a portion of page 6, the work that you did

11   around the transaction, sir, involved collecting information

12   about the assets to be transferred, is that right?

13   A.   Yes, that's correct.

14   Q.   Okay.  So take a look, if you would, at the definition of

15   purchased assets on page 6, subsection D, beginning with the

16   words "government securities".  Let me know when you've found

17   that passage, near the bottom of the page.  And for your ease,

18   sir, it's up on the screen.

19   A.   Yes.

20   Q.   See that?

21   A.   Yes, I do.

22   Q.   See the description, "Government securities, commercial

23   paper, corporate debt, corporate equity, exchange-traded

24   derivatives and collateralized short-term agreement with a book

25   value as of the date hereof of approximately seventy billion";

193

1    do you see that, sir?

2    A.   Yes, I do.

3    Q.   And turn back to the first page of the agreement, sir.

4    See the agreement is dated "as of September 16th"?

5    A.   Yes.

6    Q.   That statement -- let's go back to page 6.  That

7    description regarding book value as of the date hereof is

8    false, isn't it, sir?

9    A.   I can't say that.  I don't know what book value is

10   intended to represent.

11   Q.   At the time, on the 16th of September, you understood

12   there was an agreed five billion dollar loss against book

13   value, didn't you?

14   A.   Against the value to Lehman.

15   Q.   You don't think book value refers to anybody else's book

16   value, do you, Mr. Kelly?

17   A.   I don't know what it means.

18   Q.   Okay, assume with me --

19   A.   I don't -- but I don't know --

20   Q.   I'll represent to you, sir, it refers to Lehman's book

21   value.  Now, with Lehman's book value as the definition,

22   Lehman's book value as of the date hereof of approximately

23   seventy billion, based on what you knew, that's a false

24   statement, isn't it?  Wasn't book value; it was five billion

25   less.  Isn't that right?

194

1    A.   Sorry, did you say you're representing the book value is

2    the book value to Lehman?

3    Q.   I'll try to slow down, sir.  I have a habit of talking

4    quickly.  I'm representing to you, sir, that the phrase "book

5    value" means "Lehman's book value".  With that in mind, you

6    agree with me, sir, that the description of these securities

7    being transferred to Barclays having a book value as of the

8    date hereof of approximately seventy billion was, to your

9    knowledge, a false statement as of the 16th of September, 2008

10   because you knew there was a five billion all-in economic loss

11   versus the marks as of that day.  Isn't that correct?

12   A.   I don't know because I haven't seen this.  I -- it depends

13   when the book value is as of.

14   Q.   Okay.  So when you saw this agreement during the week,

15   sir, this may not have been one of the portions that you saw?

16   A.   I may have looked at this.

17   Q.   Having done your work --

18   A.   Probably did.

19   Q.   -- around the transaction, sir, with regard to assessing

20   the assets to be transferred, isn't the purchased assets

21   definition a provision of the contract you should have been

22   particularly interested in reviewing?

23   A.   Yes, I said I probably did.

24   Q.   So you probably did see this definition referring to book

25   value as of the date hereof, September 16th, is that right?

195

1   A.   Is it right that I probably would have looked at it?

2   Q.   Is it right that you probably saw it?

3   A.   Yes.

4   Q.   And at the time that you probably saw it, you would have

5   known it was inaccurate because you knew it was a negotiated

6   price below book value.  Isn't that correct?

7   A.   No, it depends when the book value is at.  If the book

8   value was intended to represent a market value at a point in

9   time, then it depends when.  If it's intended to represent that

10  value on the morning of the 16th, then in my mind, that would

11  be the negotiated value.

12  Q.   Well, you didn't come to your view, sir, that this was

13  really about the books on the 12th until sometime after your

14  deposition and before today.  So that wouldn't have been your

15  view on the 16th of September, 2008, isn't that right?

16  A.   Well, but regardless, the negotiated value was

17  representing the market conditions at that time.

18  Q.   At the time, sir, it would have been your view that how

19  the assets were recorded on Lehman's books was not a relevant

20  matter for Barclays.  What was relevant was the sales price

21  that was agreed; isn't that correct?

22  A.   Relevant for Barclays is the question?

23  Q.   Yeah.

24  A.   Yes.

25  Q.   Now, I'd like to go back to your e-mail, sir, Exhibit M-8

196

1   where you refer to an extra one billion of comp beyond our

2   accrual, remind you of that clause in your e-mail.  Take a

3   look.  You see it?

4   Q.   Just excuse me for a minute.

5        THE WITNESS:  Your Honor, I'd like a bathroom break in

6   a minute, please.

7        THE COURT:  Excuse me, what do you need?

8        THE WITNESS:  A bathroom break and some water, please?

9        MR. GAFFEY:  It's not a bad time for a break.

10       THE COURT:  This is fine.  We'll take a break and

11   we'll resume at 4 o'clock.

12       MR. GAFFEY:  Thank you, Your Honor.

13       (Recess from 3:50 p.m. until 4:00 p.m.)

14       THE COURT:  Be seated, please.  Mr. Kelly, you can

15   return to the stand.

16       MR. GAFFEY:  Thank you, Your Honor.  With the Court's

17   permission, Your Honor?

18       THE COURT:  Please proceed.

19   RESUME DIRECT EXAMINATION

20   BY MR. GAFFEY:

21   Q.   Mr. Kelly, would you take a look, please at Exhibit M-2 in

22   your book?

23   A.   Yes.

24   Q.   You've seen this document before?

25   A.   Yes, I have.

197

1    Q.    Now, this schedule, or versions of this schedule were

2    prepared based on input from a number of people at Lehman, is

3    that correct?

4    A.    Yes, that's correct.

5    Q.    And among the people at Lehman who were involved were Ian

6    Lowitt, Gerry Reilly, Paolo Tonucci, and Reed Stewart (ph.),

7    the latter of whom worked for you, right?

8    A.    Yeah.  I believe that's right, yeah.

9    Q.    And you played a role in the preparation of this schedule,

10    is that correct, sir?

11    A.    Yes, I did.

12    Q.    And the schedule is based on data that you collected and

13    supplied in your work around the transaction, correct?

14    A.    I think the data was collected by each of the people that

15    you referenced.

16    Q.    Okay.  And you knew -- and the asset total on this

17    schedule incorporated the five billion dollar all-in economic

18    loss that we were talking about before the recess, is that

19    right, sir?

20    A.    I can't talk about this specific version, but I'm very

21    familiar with versions of this.  And my recollection is that

22    the asset values on those versions represented the negotiated

23    values.

24    Q.    Okay.  And by the negotiated value, you mean the one below

25    book value?

198

1    A.    That's correct.

2    Q.    Okay.  And you said you can't -- you can't comment on this

3    particular version on it.  Is that because it has initials on

4    it?

5    A.    I don't recall seeing any version with initials until much

6    later.

7    Q.    Okay.

8    A.    I -- I don't recall the specific numbers on the page as

9    being the final version as of the Tuesday morning, the 16th.

10   Q.    Okay, take a look within your book at Exhibit 198.  Now,

11   you see that 198, which is in evidence, is an e-mail from James

12   Walker at Barclays Capital to you, cc'd to Chris [Weedler], is

13   that how I pronounce that name?

14   A.    [Wideler].

15   Q.    Weidler.  And it says, "Martin, the attached summary

16   balance sheet was used by the LEH side in the overnight

17   discussions of Monday.  I believe Chris Weidler spoke to you

18   earlier.  Team are looking for backup details including

19   position-level info to tie into the attached.  Thanks, James".

20   Do you see that?

21   A.    Yes, I do.

22   Q.    Did you receive that e-mail on the 17th of September from

23   Mr. Walker at Barclays Capital?

24   A.    I see that, yes.

25   Q.    Okay.  And attached to that e-mail -- and it's the second

199

1   page of the exhibit -- is a schedule.  Do you see that?

2   A.   Yes, I do.

3   Q.   Okay, now, I'm going to ask that that schedule be shrunk

4   so that M-2 can be put up next to it so we can see them both on

5   the screen.  And comparing that page of Exhibit 198 with the

6   schedule, with the one marked as M-2, that is, the initialed

7   one, you can see, sir, you agree with me that the numbers are

8   identical, is that right?

9   A.   Yes, they are.

10  Q.   And both documents bear a footer in the lower right-hand

11  corner that says "September 16th, 2008, 11:18 a.m."  Do you see

12  that?

13  A.   Yes.

14  Q.   That's both documents, being Movants' Trial Exhibit 2 and

15  Movant's Trial Exhibit 198, correct?

16  A.   Yeah.  They're identical.

17  Q.   Okay.

18  A.   I wasn't following the exhibit numbers, but, yes.

19  Q.   So when you were in correspondence with Messrs. Walker and

20  Weidler at Barclays Capital about this schedule, that is, the

21  second page of Exhibit 196 -- well, let me back up.  Now that

22  we've agreed the numbers are identical, we agree that the asset

23  side reflects the negotiated values, not book value, correct?

24  A.   That's -- that's my recollection, yes.

25  Q.   Okay.  And the liability side reflects in the section

200

1    marked "comp and cure", that comp amount of two billion dollars

2    reflects the one billion dollars over accrual that you referred

3    to in your early morning e-mail to Messrs. Lowitt and Tonucci,

4    right?

5    A.   Well, the two billion represents the amount that I

6    understood had been negotiated as being the comp accrual.

7    Q.   Okay.  And the negotiated amount for comp accrual shown on

8    that balance sheet was -- when it shows two billion, was one

9    billion over what Lehman had actually accrued for '08 employee

10   expenses in that year, yes?

11   A.   Yeah.  My understanding was that it was approximately a

12   billion dollars over -- over Lehman's accrual for the year to

13   that point in time.

14   Q.   And the cure number that's shown in the liabilities side

15   of this schedule which, on this schedule, is put at two and a

16   quarter billion.  You had input into calculating that cure

17   number, did you not?

18   A.   I did, at points during the week.  At this point in time,

19   on the Monday night/Tuesday morning, I remember discussing it.

20   I don't think I had input into the calculation of it.

21   Q.   Okay.  But with respect to the comp number, you were aware

22   at the time when you saw this, when this was sent to you by Mr.

23   Walker that, number one, the assets reflected an amount below

24   book value, and the comp liability was one billion over

25   Lehman's marks -- over Lehman's accruals, yes?  You knew those

201

1    two things?

2    A.    I want to be clear.  I don't recall receiving the e-mail.

3    Apparently I did, from looking at it now.  But the way I

4    described the comp is it was a negotiated number.

5    Q.    Okay.  You don't have any doubt that you received the e-

6    mail from Mr. Walker, correct?

7    A.    No, I can see I received it.

8    Q.    Okay.  You're not surprised to find yourself in

9    correspondence with Mr. Walker over at Barclays Capital during

10   the week of September 15th about matters related to the sale

11   transaction, correct?

12   A.    No.  We had a number of e-mails.

13   Q.    Okay.  And it doesn't surprise you to see correspondence

14   with Mr. Walker over at Barclays Capital about the assets that

15   are going to be transferred, correct?

16   A.    It does not surprise me.

17   Q.    Okay.  And would you tell the Court what, if any,

18   discussions you had with Mr. Walker or Mr. Weidler about the

19   fact that this schedule reflected agreed amounts below book

20   value?

21   A.    I don't recall having discussions with James Walker or

22   Chris Weidler --

23   Q.    Did you have any discussions with anybody on the Barclays

24   side of the table about either this schedule or the provisions

25   of the asset purchase agreement?

202

1    A.   At this point in time, no, not that I recall.

2    Q.   And when you differentiate as to at this point in time,

3    are you doing it broadly between your time as a Barclays

4    employee and your time as a Lehman employee?

5    A.   I am, and I'm also referring more to the asset purchase

6    agreement than I am to the schedule.

7    Q.   Okay.  Did there -- after you went over to Barclays, who

8    was your direct superior over there?

9    A.   Patrick Clackson.

10   Q.   Okay.  And did you have some sort of relationship on the

11   organization chart to James Walker when you went over to

12   Barclays?

13   A.   I did.  I had a couple of different roles, and one of

14   them, I reported to James; and two of them, I was sort of a

15   colleague of James.

16   Q.   Okay.  And eventually, you took James' job, if I recall

17   correctly, correct?

18   A.   He resigned about a year ago.

19   Q.   Okay.  And you were moved into his position?

20   A.   That's correct.

21   Q.   Okay.  And did you work with Mr. Weidler when you moved

22   over to Barclays?

23   A.   Yes, in one of the roles that I mentioned, he was a direct

24   report of me.

25   Q.   And in the work you did at Barclays, some of the work you

203

1    did was to address the nature of Barclays' gain on the

2    transaction, is that correct?

3    A.    It was.  By the time I started to work at Barclays, that

4    process was well underway.  It continued for quite a long time,

5    actually, so yes, I became involved in it, I don't know,

6    around -- I would say around the November time frame.

7    Q.    Okay.  And once you went to work at Barclays in -- you

8    signed your contract September 25th, so late September, early

9    October 2008, once you went to work there, who did you talk to

10   at Barclays about the fact that the agreed price on the assets

11   transferred under the asset purchase agreement was actually

12   below book value shown on Lehman's books.  Did you have that

13   conversation with anybody?

14   A.    I think I started to think of myself as a Barclays

15   employee after I signed the contract on October 10.  I think at

16   that point in time, I don't think that Lehman's prior book

17   value is relevant to Barclays.  What was relevant to them was

18   the price they negotiated.  And then the assets would be run

19   through their own pricing processes to reflect current pricing

20   at that point in time.

21   Q.    And as far as you know, the assets were run through their

22   own pricing processes after the transaction had closed,

23   correct?

24   A.    From what I understand, yes.  Ultimately, yes.  But I

25   think it was phased in because getting information that they

204

1    needed to run it through their processes was difficult at a

2    granular enough level.  But ultimately, yes, it ran through

3    Barclays' processes.

4    Q.   Now, the cure number on that balance sheet, sir, which, on

5    that sheet, is shown at two and a quarter billion dollars,

6    there came a point during the week where you knew that number

7    was going down, is that right?

8    A.   Yes, that's right.

9    Q.   And you came to understand -- well, you know that it -- by

10   the next morning, the estimate was 1.5 billion, correct?

11   A.   No.  I'm not familiar -- I don't recall a 1.5 billion

12   dollar estimate.

13   Q.   And when -- but when you made -- when you came to

14   understand, during the week of September 15th, that the cure

15   payment was less than had been stated on this document, you

16   knew it came down by at least a billion dollars, is that

17   correct?

18   A.   My recollection is it came down to 1.0 billion.

19   Q.   Okay.  And when you -- and you learned that fact because

20   you and Mr. Lowitt, the CFO, had reviewed various data and

21   determined that the liability estimate was overstated, correct?

22   A.   I think -- I think a few things are relevant.  One is, the

23   concept of cure was something that was new, and certainly new

24   to me, new to many on the Monday night/Tuesday morning.  And so

25   there was a long discussion to understand what cure meant and

1    how people could dimension what the potential liability might

2    be.  I also recall a conversation on the -- in the early

3    morning of the 16th with Mark Shapiro from Lehman whereby I had

4    an understanding that the contract had an adjustment mechanism

5    in it whereby, if you like, the purchase price would be

6    adjusted to reflect actual liabilities assumed versus the

7    estimate that was made.

8        So two things happened subsequent to that, and I would

9    estimate that they happened around the Tuesday/Wednesday time

10   frame.  One was I became aware of the fact that there was not

11   adjustment mechanism.  And two, I became -- it may have been

12   myself, it may have been me with Ian, but as we were going

13   through versions of a balance sheet -- spreadsheet that looks

14   like this in this type of format, either I or Ian or both of us

15   made an observation that the cure looked high relative to the

16   funds-expense run rate.  And so either I or Ian and I made a

17   determination that in the absence of having a contract by

18   contract buildup which work had started but it was a long and

19   complex process, we had to come up with an estimate, and we

20   based an estimate off the funds run rate.  And the estimate

21   that we used was one quarter's worth of nonpersonal expenses

22   for the firm as a reasonable proxy for what the cure liability

23   might be, having spent time thinking about all of the uncertain

24   aspects of cure.

25       We then had a conversation with Bart to reflect both of

206

1    those understandings -- there was no adjustment mechanism,

2    which he knew -- and to suggest an alternative way of

3    estimating the liability.  His -- his comment, his reaction to

4    that was we just left a billion dollars on the table.

5    Q.   Is that what he said?

6    A.   Words to that effect.  It may have been those exact words.

7    And then subsequent to that, either -- either directly or

8    indirectly, I communicated that to my team who were then

9    working on versions of a balance sheet to estimate the impact

10   of the transaction to Lehman and to Lehman's books and records.

11   And so versions of that spreadsheet were then used and sent to

12   people both inside and outside the firm.

13   Q.   And this knowledge that you gained during the week about

14   once you took a closer look at the run rate that the estimation

15   for cure was overstated by as much as a billion dollars, and

16   then the conversation that you described -- the work you did

17   with Mr. Lowitt and the conversation you described with Mr.

18   McDade, did all of that take place before Friday, September

19   19th?

20   A.   Yeah.  I think it took place on the Tuesday and Wednesday.

21   I can't precisely pinpoint it, but that's my -- that's what

22   I --

23   Q.   Can you pinpoint whether it was Tuesday or Wednesday?  Was

24   it the day you learned about the deal, which would be the

25   Tuesday?

207

1   A.   I can't pinpoint.  It may have been during the day on

2   Tuesday, later, after the early morning.  It may have been

3   Wednesday.

4   Q.   So on either Tuesday, September 16th or Wednesday,

5   September 17th, you learned and spoke to Mr. Lowitt and Mr.

6   McDade about the fact that the estimate for cure was overstated

7   by a billion dollars.  Is that correct?

8   A.   Yeah, the conversation was along the lines of a revised

9   estimate would be one billion dollars.  So the initial estimate

10  had to come down.

11  Q.   Do you know if anyone ever told any of the lawyers

12  representing Lehman about that conversation?

13  A.   It was included on a version of an estimated balance

14  sheet, and that was sent to -- versions of that spreadsheet

15  were being sent to people including Lehman's lawyers.

16  Q.   Sir, the fact of the matter is, you've seen one version of

17  that example of the spreadsheet you're talking about, isn't

18  that right?  You talk about it as if there's a bunch of them.

19  You've only actually ever seen one, right?

20  A.   No, I've seen more than one version.

21  Q.   Okay.  And you saw them while you were preparing for your

22  testimony, right?

23  A.   Well, I -- yeah, I saw them, yes, I saw them as I was

24  preparing.

25  Q.   When you had your deposition taken, did you have a memory

208

1   that you had shared records of transaction adjustments with

2   lawyers?

3   A.   I recall -- there was an e-mail that I had sent to Weil

4   with an attachment with a version of the spreadsheet on it.  I

5   did not recall sending the e-mail.  But the e-mail suggested

6   that I did.  I do recall a conversation with Weil about the

7   cure estimate Friday morning and around the fact that the

8   estimate had changed throughout the course of the week.

9   Q.   And did you write anything about this conversation with

10  Weil?

11  A.   Did I write anything?

12  Q.   Yeah.

13  A.   No.  No.

14  Q.   And when did you first recall this conversation with Weil?

15  A.   My recollection was it was --

16  Q.   No, I'm not asking when it happened, sir.  I'm asking you

17  when you first recalled that it happened.

18  A.   When did I first recall it?

19  Q.   Yeah, is this something else you remembered about six

20  months ago?

21  A.   No, I don't believe so.

22  Q.   Now, let me show you tab M-32 in your book.  Are you

23  there, sir?

24  A.   Yes, I am.

25  Q.   That's Exhibit Movant's 32 in evidence.  Do you recognize

1  the document?

2  A.    The attachment?

3  Q.    Well, the whole thing.  It's an e-mail to you.

4  A.    I don't recall receiving the e-mail.

5  Q.    Do you know Bryan Young?

6  A.    I recognize the name.  I don't recall what he did, but

7  he's referring to a woman by the name of Rose, who I'm pretty

8  sure is Rose Hausenberg (ph.).

9  Q.    Okay.

10  A.    Rose worked indirectly for me.

11  Q.    And if you take a look, sir, at the third page of the

12  document -- first of all, tell us what the attachment is.

13  A.    The attachment is -- is an attempt to project at different

14  points in time what the impact of the sale transaction to

15  Barclays would be on the books of Lehman.  And as -- so the

16  format is, start with what we thought the balance sheet was in

17  that column labeled 9/17.  The balance sheet wasn't perfect and

18  accurate.  You can see it doesn't actually balance.  And that's

19  because there was no general ledger mid-month.  So you can see

20  notes columns which indicate where some of the numbers came

21  from.  And then there was a -- a column labeled transaction

22  adjustments, and then there's a label -- a column labeled

23  balance sheet transfer to get to remaining balance sheet post

24  the transaction.

25  Q.    And reading across from left to right -- as opposed to

210

1    looking for a balance bottom line -- leaving across from left

2    to right, sir, on the item for compensation payable, it starts

3    in the September 17th column at 520 million, is that right?

4    A.   Yes.

5    Q.   And there's a transaction adjustment of a billion,

6    correct.

7    A.   I can see that, but I don't recognize the number.

8    Q.   Well, you see that it's a billion dollar transaction

9    adjustment?

10   A.   Yes, I do.

11   Q.   And you see that that transaction adjustment brings the

12   number for compensation payable into the range of one and a

13   half billion, correct?

14   A.   I can see that on this page, yes.

15   Q.   All right, and apart from demonstrating that we're both

16   literate, sir, can you give me an explanation for why it is

17   that upward adjustment of a billion dollars is being made at

18   that point?

19   A.   Well, this is an attempt to project the terms of the sales

20   contract -- sorry, to project the impact of the sale contract

21   to Lehman.  The difficulty I have looking at this, the

22   compensation liability line, here, is that I don't recognize

23   the final number, the 1.25 billion.  In my mind, it was always

24   2.0 billion from the Monday night, and in my mind, that number

25   never changed.

211

1  Q.   Well, take a look at the trade payable line below that.

2  You'll see a transaction adjustment there adjusting from 400

3  million as of 9/17 with an upward adjustment of 383 million

4  bringing you to a total of 783 as balance sheet transfer.  Did

5  that number move around during the week?

6  A.   Well, that's the number we spoke about previously.

7  Q.   The cure?

8  A.   Well, trade liabilities were a component of cure, and I

9  think that it was put against this line because it was a

10  placeholder for that.  It was a place to put it.  The number --

11  my recollection is that the final number, the final estimate

12  for cure, changed from 2.25 billion to 1.0 billion.  I don't

13  recall any other estimates for cure throughout the course of

14  that week.

15  Q.   As a matter of understanding this document itself, is it

16  correct to say, sir, that the column for 9/17 reflects what

17  Lehman's books actually showed, and the transaction adjustments

18  are to make it agree with the purchase agreement.  Is that

19  right?

20  A.   Well, not entirely because the 9/17 column is compiled

21  from a number of different sources.  So as a starting point, I

22  know that that's not from the general ledger because it doesn't

23  balance.  A general ledger always balances.  So you can see at

24  the bottom of -- of the last page, there's an out-of-balance

25  amount of 1.5 million dollars, negative.

212

Q.   Let me try this another way.  The transaction adjustment

has no basis other than the fact that it's an adjustment to

reflect the purchase agreement, correct?

A.   Yeah.  It's a -- it's an adjustment to reflect the terms

of the purchase agreement, but recognizing that the opening

balances are not entirely reliable and the opening balances

represent those only for this entity, LBI.

Q.   Well, take a look, sir, if you would, at Exhibit M-17.

        MR. GAFFEY:  Your Honor, I think there may be an

objection to this.  Maybe my friend, Mr. Schiller, could let me

know if that objection's been withdrawn as well?

        THE COURT:  Is there an objection to Exhibit 17?

        MR. SCHILLER:  Checking the list, Your Honor.  We do

not have an objection to it; we do not, Your Honor.

        THE COURT:  Fine.  So this is now on the admitted

column.

        MR. GAFFEY:  I -- we'll -- yes, Your Honor.  Thank

you.

        THE COURT:  Fine.

Q.   M-17, sir, there's some handwriting.  And first I want to

know if the handwriting is yours.  It's starting at about the

third page.  Is that your handwriting?

A.   Yes, that's my handwriting.

Q.   And are these notes that you made during the course of

your work around the transaction during that week?

213

1    A.    It's certainly around the course of the transaction

2    because it's in the same format.

3    Q.    Well, directing your attention, sir, to Bates page 115129,

4    which is the fourth page of the document, does that page bear

5    your handwriting?

6    A.    Yes, that's mine.

7    Q.    Okay, now, you recall the document we looked at a moment

8    ago that had a 15 -- a 1.5 billion dollar item for bonus

9    payable, and this is now changed to 2 billion.

10   A.    Yes.

11   Q.    Is that your handwriting changing it to two billion?

12   A.    Yes.

13   Q.    And on this one, trade liabilities are shown at one

14   billion with a transaction adjust at 286.  Do you see that?  Do

15   you have any explanation for that?

16   A.    Well, I think the billion dollars in the last column there

17   is a number I do recognize and I do recall.  So that's

18   consistent with where I recall the estimate moving to.  The

19   difference to get there adjusts for the fact that we're looking

20   at the ledger, or we're looking at a version of a balance sheet

21   for an entity called Lehman Brothers, Inc. --

22   Q.    Okay.

23   A.    -- whereas cure was a border concept on that.

24   Q.    And while I'm in that neighborhood in the book, sir, would

25   you take a look at tab M-15?

214

1          MR. GAFFEY:  And again, I'd ask the same question,

2    Your Honor.  My notes reflect an objection.  I don't know if

3    there actually is one.

4          MR. SCHILLER:  No, no objection, Your Honor.

5          MR. GAFFEY:  Thank you, Your Honor.

6    Q.   Do you recognize the handwriting on that document?

7    A.   Yeah, this is not my handwriting.

8    Q.   Do you recognize it to be Ian Lowitt's handwriting?

9    A.   I do believe it's Ian's handwriting.

10   Q.   You recognize this to be Ian Lowitt's handwriting making

11   adjustments off a version of the balance sheet that we looked

12   at before?

13   A.   Well, yeah, but the total assets on the prior version were

14   not seventy-seven.  They were --

15   Q.   No, they weren't, sir.  The total assets on the prior

16   version were seventy-two:  five billion dollar difference.  So

17   my question, sir, is do you recall -- do you recognize these to

18   be the handwritten notes of Ian Lowitt addressing a balance

19   sheet showing a seventy-seven billion dollar asset value?  Just

20   above the word "mark-down", there, sir.

21   A.   Yeah.  I can see that.  I can see seventy-seven, and it's

22   Ian's handwriting.

23   Q.   And do you recognize Mr. Lowitt's handwriting where the

24   word "mark-down" is written?

25   A.   I can see the words "mark-down".  I -- I -- I don't know

215

1    if that's Ian's.

2    Q.    Okay.

3    A.    I presume it is.

4    Q.    And over by the cure and comp section, which is what we

5    were talking about, sir, is that his handwriting next to the

6    cure and comp items that stay at 2.25 and 2.0?

7    A.    I think all the numerical notations are Ian's.

8    Q.    Okay.  And in the course of your work around the

9    transaction, did you see versions like this of the balance

10   sheet we looked at before that had an additional adjustment

11   column on them?

12   A.    Yeah.  I may have.  I don't have a specific recollection,

13   but I may have.

14   Q.    Okay.

15            MR. GAFFEY:  If may just have a moment, Your Honor,

16   I've lost my place in my outline.

17            THE COURT:  No problem.  Take your time.

18            MR. GAFFEY:  Thank you.  Your Honor, may I approach

19   with -- I have an original exhibit here.

20            THE COURT:  You may approach.  Thanks.

21   Q.    Mr. Kelly, I've given you a copy of what we've marked as

22   Exhibit -- Movant's Trial Exhibit 254.  I'm not particularly

23   concerned about the e-mail on the front, sir, but I would ask

24   you if you would look through these versions of the balance

25   sheet that we've been talking about and tell me if these are or

216

1    are similar to the versions that you saw in your work around

2    the transaction that week.  Let me rephrase.  Is this the type

3    of balance sheet that you saw over the course of your work that

4    led to the September 16th balance sheet we saw before?

5    A.   Well, I think -- it looks like most of these are after the

6    16th.  They've all got a time stamp that's 9/18 on the bottom.

7    Q.   If I were to represent to you, sir, that that's the date

8    it was printed for this particular version --

9    A.   I think I recall seeing versions where there was an

10   adjusted column -- printed versions where there was a --

11   Q.   Okay.

12   A.   -- so there was per contract estimate and then a different

13   set of numbers next to it.  What I'm not sure I can do is put

14   them in sequence.

15   Q.   Well, let's try it this way.  Take a look at page 3 of the

16   collection of documents there.  You have the balance sheet

17   found at page 3?

18   A.   Yes.

19   Q.   And it's got an annotation at the bottom that says "BS5,

20   final, Tuesday morning", do you see that?

21   A.   Yes.

22   Q.   And you recognize the numbers on there to be the same as

23   what we talked about before in Exhibit 2, that is the final --

24   it's got that 72.65 number -- data?

25   A.   Yes.

217

1    Q.   Okay.  So working from that with that as the final, do you

2    recall seeing these other variations or documents like them

3    that were variations on this schedule, the final schedule that

4    showed the 72.65?

5    A.   I have a recollection of seeing different versions of it.

6    Q.   Were they versions like the ones before you?

7    A.   I do recall seeing -- well, there's two different formats

8    here.  One format has two columns next to which, asset and

9    liability.  I think I do recall seeing versions that looked

10   like that.  But I think I need to ask you a question again.

11   Did you ask if this was before the final version?  Or --

12   Q.   Are these versions of the spreadsheet that you saw around

13   the time of your work on Movant's Exhibit 2, the final?

14   A.   I can't -- I can't place them in sequence in order.  So I

15   just don't know if they were before or after that version.

16   Q.   You saw versions like this, though, right, with different

17   numbers on them?

18   A.   Yes, yeah.

19        MR. GAFFEY:  Can I consult for one second, Your Honor?

20        (Pause)

21        MR. GAFFEY:  Your Honor, again, I'm confused by what

22   I -- is there an objection to this document?  If there is, I'm

23   going to try to move it in, and if there's not, I can move onto

24   another topic.

25        MR. SCHILLER:  No objection, Your Honor.

218

1          MR. GAFFEY:  Thank you, Your Honor.

2          THE COURT:  It's in.

3     (Movants' Exhibit 254, versions of balance sheets, was hereby

4     received into evidence as of this date.)

5     Q.    Now, Mr. Kelly, during the week of September 15th, did you

6     become aware of the fact that a repurchase agreement between

7     Lehman and Barclays had come to play a role in the sales

8     transaction?

9     A.    A repurchase agreement?

10    Q.    Yes.

11    A.    I was aware that there was a repurchase agreement, yes, at

12    some point then.

13    Q.    And you had conversations with Mr. Lowitt and Mr. Tonucci

14    about the repurchase agreement, correct?

15    A.    Yeah, my recollection is I became aware of it through

16    either or both of Paolo and Ian.

17    Q.    Okay.  And did you have -- you became aware that the repo

18    somehow became involved in connection with the closing of the

19    Lehman Barclays sale transaction, is that right?

20    A.    I'd say I became aware of it as a component of the

21    transaction.  How it fit in, I didn't know

22    Q.    Do you recall that there were conversations around the

23    time, there were discussions around that time concerning a

24    possible default on the repo?

25    A.    No, I don't recall that.

219

1    Q.   Well, do you recall conversations about a possible default

2    on the repo although you might not be aware of who the parties

3    to the repo were?

4    A.   I don't think so.

5    Q.   You have any recollection that you heard Mr. Lowitt and

6    Mr. Tonucci engaged in conversations about a possible default

7    on a repo?

8    A.   It's possible, but I don't think so.  I think I just

9    became aware that there would be a repo as part of the

10   settlement transaction.

11   Q.   Would you turn, in your binder, sir, to Exhibit M-188?

12   And first I direct your attention, sir, to the addressees at

13   the top of this e-mail chain which shows from Paolo Tonucci to

14   Ian Lowitt, Michael Gelband, cc: Martin Kelly.  Do you see

15   that?

16   A.   Yes, I do.

17   Q.   Did you receive this e-mail from Mr. Tonucci?

18   A.   I don't recall receiving it, but evidently I did, looking

19   at this.

20   Q.   You have no reason to doubt that you received it, correct?

21   A.   That's correct.

22   Q.   And it was the normal course of business of Lehman to

23   communicate with your coworkers and your superior by e-mail?

24   A.   Well, it was a method of communicating.

25   Q.   Normal course to send e-mails to coworkers, yes?

220

1   A.   Yeah.   E-mails, calls, meetings.

2   Q.   And this e-mail was sent in connection with Lehman

3   business, as far as you can see by reading it, correct?

4   A.   Yes.

5        MR. GAFFEY:   Your Honor, I move Exhibit M-188 into

6   evidence.

7        MR. SCHILLER:   No objection, Your Honor.

8        THE COURT:   This is admitted.

9   (Movants' Exhibit 188, e-mail From Paolo Tonucci to Ian Lowitt,

10  Michael Gelband and Martin Kelly, was hereby received into

11  evidence as of this date.)

12       MR. GAFFEY:   It's admitted, Your Honor?

13       THE COURT:   It's admitted, yes.

14       MR. GAFFEY:   Thank you.

15  Q.   Now, at the bottom of that e-mail chain, Mr. Kelly,

16  there's an e-mail from Gerry Reilly dated September 18th, 2008

17  entitled "Open issues on the deal".   It's to Ian Lowitt,

18  Michael Gelband and with copies to Paolo Tonucci and to you.

19  Do you see that?

20  A.   Yes, I do.

21  Q.   And do you see that Mr. Reilly writes in item 3 in his

22  list of three things, "Not clear on the amount of block

23  discount or how we make it happen.   Defaulting on repo could be

24  the best as discount could be taken from haircut.   If not then,

25  we need to give business an allocation of block discount so

221

1    they can mark down the books tonight.  Does that create a

2    problem as it could tip the broker early?  Would we rather have

3    that be in the sale price tomorrow?"  Do you see that?

4    A.    Yes, I do.

5    Q.    Does that refresh your recollection as to whether you were

6    aware of conversations or communications concerning a default

7    on the repo?

8    A.    No, it does not.

9    Q.    Do you recall any communications with Mr. Lowitt, your

10   superior, or Mr. Tonucci, your coworker, about defaulting on

11   the repo as a means of delivering a block discount?

12   A.    No, I do not.

13   Q.    Did you understand this at the time to be a reference to

14   the block discount that was represented by the five billion

15   dollar all-in economic loss you learned about on Tuesday

16   morning?

17   A.    I don't -- I don't recall the -- the term block discount

18   doesn't mean anything to me in the context of the transaction.

19   Q.    You don't understand that to mean a discount on a big

20   bunch of assets, sir?  Block discount?

21   A.    Well, a block discount, yes.  If you --

22   Q.    Okay.

23   A.    It was not a term that I was familiar with or using that

24   way.

25   Q.    And your understanding of a five billion dollar all-in

222

1    economic loss on the large body of assets being transferred

2    from Lehman to Barclays would, under that definition,

3    constitute a block discount, wouldn't it?

4    A.    No, I don't think so.  No, I think the -- in my mind, the

5    five billion dollar amount that we referenced before was the

6    difference between where the prices had been agreed to and the

7    book values.

8    Q.    Well, do you have any explanation, sir, for why Mr. Reilly

9    is writing to Lowitt, Gelband, Tonucci, and Martin Kelly asking

10   for help resolving some issues, which is how he introduces his

11   e-mail, and saying, "It's not clear on the amount of block

12   discount or how we make it happen."  Do you have any

13   explanation for that, sir?

14   A.    The explanation, I think, for me being included on the

15   e-mail, as I sit here today, is -- is that he wanted to keep me

16   informed of issues that he was working on.

17   Q.    Any particular reason he'd keep you informed on a block

18   discount or defaulting on a repo, sir?

19   A.    We were all trying to keep each other informed as the week

20   progressed.  There was a lot happening and a lot changing.  And

21   it doesn't surprise me that he's copied me on the e-mail.

22   Q.    Well, let's look at the second item of Mr. Riley's three

23   items.  No.  Item number 2 in the bottom e-mail.  There we go.

24   Looks like we have PB Financing balances left in LBI and

25   according to Cogs, they do not want it.  What does it mean to

223

1    leave it behind?  Do you see that?

2    A.    Yes.

3    Q.    You recognize Cogs to be a reference to John Coughlin

4    (ph.)?

5    A.    Yes.

6    Q.    And do you have any idea what Mr. Reilly is talking about

7    when he talks about PB Financing balances?

8    A.    PB would stand for Prime Brokerage.

9    Q.    Okay.  Does that have anything to do with your end of the

10   world at Lehman?

11   A.    Well, anything to do with my end of the world -- I think

12   Prime Brokerage was a business that --

13   Q.    Did it report up to you?

14   A.    No, it didn't.  It was a business that Gerry supported as

15   the prime comptroller.  I think --

16   Q.    Did you work with Cogs?

17   A.    Did I work with Cogs?

18   Q.    Yes.

19   A.    Not in -- I don't think in the period I was the financial

20   comptroller I worked with him.

21   Q.    So I guess my question's the same.  Can you think of a

22   reason Mr. Reilly would be including you in an e-mail about

23   this topic?

24   A.    I -- as I said, I think he's trying to keep me informed of

25   issues that he's working on.  And Prime -- Prime Balancing --

224

1    sorry, Prime Brokerage Financing is a reference to repos and

2    reverse repos.  That -- that was a component of the transaction

3    earlier in the week.

4    Q.    And then in the first paragraph, number 1 there, it says

5    "Auction Rate Book."  "We've been making the assumption that

6    this is going.  I'm not sure BarCap knows that and assume there

7    could be no auction process and instead can we leave it

8    behind?"  Do you see that?

9    A.    Yes, I do.

10   Q.    Any particular reason Mr. Reilly would be writing to you,

11   sir, about ARS coming or going in the transaction?

12   A.    I -- I think for the same reason.

13   Q.    So of the three candidates there, sir, isn't it most

14   likely that Mr. Reilly's writing to you about the block

15   discount and defaulting on a repo as a means of delivering it,

16   because you're the guy who knew and told him about the five

17   billion dollar overall economic loss versus Lehman's marks?

18   A.    No, I -- I updated him on a conversation I recall we'd all

19   had earlier that -- that morning, so I don't think I told him

20   about it.  I think I was informing him that it had not changed.

21   Ultimately, any process to reflect the transaction on the books

22   and -- and the inventory balances would be undertaken by Gerry

23   and his team.

24   Q.    As you sit here today, sir, do you have any recollection

25   of sending an e-mail or walking down to the office of or

225

1    getting on the telephone with Gerry Reilly and saying in sum or

2    substance, "What block discount?"

3    A.   No, I don't.

4    Q.   "What repo default?"

5    A.   No, I don't.

6    Q.   Were you curious why he was writing to you about that

7    topic?

8    A.   I -- I don't recall receiving the e-mail.

9    Q.   You did ultimately know though, sir, that -- what you did

10   at the time, sir, understand the term haircut when used in

11   connection with a repo, yes?

12   A.   Yes.  Haircut is a -- is a general term for -- for any

13   repo contract.

14   Q.   You understood it to be the difference between the amount

15   of financing provided under the repo and the market value of

16   the securities under the repo, yes?  That was the haircut?

17   A.   That's how you haircut on a repo, yes.

18   Q.   And you did come to understand at the time, sir, that

19   defaulting on a repo was used as a means of settling the

20   contract between Leman and Barclays?  Is that correct?

21   A.   No, I do not have that understanding.

22   Q.   You didn't learn that at the time?

23   A.   No, I did not.

24   Q.   Would you turn to page 177 of your deposition?  At page

25   177, sir, starting at line 5 and reading through line 19.  And

226

line 5:

"Q.  Did you ever learn whether defaulting on a repo was used

as a means of settling the contract between Lehman and Barclays

at any time?  Did you ever learn that at any time?

"A.  Until what point in time?

"Q.  Two seconds ago, up 'til the present?  Apart from anything

you've learned from your lawyers?

"A.  I understand that that was the mechanism, defaulting on

the repo was the mechanism.

"Q.  And how did you come to have the understanding that

defaulting on the repo was the mechanism?

"A.  I don't know."

        And my question to you, sir, is as you sit here now, do

you remember that you came to understand that defaulting on the

repo was a mechanism for settling the contract between Lehman

and Barclays, having read that deposition testimony?

A.    I'm sorry.  The question is how I came to learn?

Q.    Did you?

A.    Did I come to learn?

Q.    I know the answer to how, sir, is "I don't know."  I just

read it.  The question is did you come to understand that a

default on the repo was used as a mechanism of settling the

contract between Lehman and Barclays?

A.    I'm actually not sure.  I don't know if that ultimately

was -- was part of the transaction.

227

1   Q.   Sir, when I asked you at your deposition, "Did you ever

2   learn whether defaulting on a repo was used as a means to

3   settle the contract between Lehman and Barclays" and you said,

4   "I understand that that was the mechanism, defaulting on the

5   repo was the mechanism", did you know then that defaulting on

6   the repo was a mechanism that was used to settle the contract

7   between Lehman and Barclays?

8   A.   I don't recall, looking at the words, presumably I did.

9   Q.   Do you recall that you were -- well, when you gave me that

10  answer at the deposition, sir, were you being truthful?

11  A.   I was -- yes, I was.

12  Q.   You were giving me your best memory at the time, weren't

13  you?

14  A.   Yes.  Yes, I was.

15  Q.   And more time has passed since then, yes?

16  A.   That's correct.

17  Q.   And you'd agree with me your memory would have been better

18  closer to the event than now, correct?

19  A.   Yes, probably.

20  Q.   All right.  So having said at your deposition, "I

21  understand that that was the mechanism, defaulting on the repo

22  was the mechanism," let me ask you again.  Did you come to

23  understand that defaulting on the repurchase agreement was a

24  mechanism -- was used to settle the contract between Lehman and

25  Barclays?

228

1    A.   I -- I don't know that for sure.

2    Q.   Well.  There did come a time when you learned what was

3    exchanged between Barclays and Lehman as a result of the

4    default on the repo, correct?

5    A.   No, I -- I'm not sure.  I think that's related to the

6    prior question, I'm not sure -- I'm not sure I did.

7    Q.   Well, you learned it when you became a Barclays employee

8    at least, right?

9    A.   Well, I learned that assets had come in to Barclays and --

10   and liabilities had been assumed.  I -- I don't know, sitting

11   here now, I don't know if defaulting on a repo was the method

12   of effecting the transaction.

13   Q.   You learned what was exchanged through the repo?  After

14   you got to Barclays, is the question, sir.

15   A.   Yeah, I think that's true.

16   Q.   And you learned that from conversations with James Walker

17   and Gary Romain, is that right?

18   A.   Yeah.  Pro -- Gary, maybe Patrick.  I'm not sure about

19   James.

20   Q.   Could you turn to tab M-21 in your book?  Are you there,

21   sir?

22   A.   Yes, I am.

23   Q.   This is Movants' Exhibit 21 and I point out to you, sir,

24   it appears to be an e-mail from Gerard Reilly to you, dated

25   September 17th, 2008, entitled "Due diligence items".  Did you

229

1   receive this e-mail from Mr. Reilly?

2   A.   Again.  I don't recall receiving this, but -- but I don't

3   have reason to doubt that, looking at this.

4   Q.   You don't have any reason to doubt that this is a genuine

5   e-mail that Mr. Reilly sent to you in the course of business,

6   correct?

7   A.   Correct.

8   Q.   And this is the type of e-mail you would receive from time

9   to time from Mr. Reilly in the course of your business with

10  Lehman, correct?

11  A.   Well, I'm not sure about the type, but I receive ma --

12  many e-mails from Gerry and -- and others on this, too.

13  Q.   You were working on due diligence items at the time,

14  weren't you, sir?

15  A.   I was working on the tra -- transaction was one of the

16  things I was working on at this time.

17          MR. GAFFEY:  Your Honor, if it's not already in, and

18  again, I apologize for the confusion, I move the admission of

19  Exhibit M-21.

20          THE COURT:  Is there an objection?

21          MR. SCHILLER:  No, there is not, Your Honor.

22          THE COURT:  Good, well, it's in again.

23  (Movants' Exhibit M-21, e-mail from Gerard Reilly to Mr. Kelly

24  dated 9/17/08, was hereby received into evidence as of this

25  date.)

230

BY MR. GAFFEY:

Q.   Now, I asked you before, Mr. Kelly, if you hadn't been
involved in calculating a gain to Barclays as a result of the
transaction at a time when you still were a Lehman employee.
Do you recall that?

A.   Yes, I do.

Q.   And I showed you some notes that reflected your adding up
a total of 52.8.  Do you recall that?

     Let's -- you know, rather than do that, let's put the
document back in front of you, Exhibit M-235.

A.   I have the exhibit.  So what's the number, please?

Q.   Are you at M-235, sir?  And would you turn to page 115145,
of that exhibit?  It's the one with your handwritten notes down
the right-hand side.

A.   Right.

Q.   Okay.  We talked about this one a bit before.  This is
where the word "Brett" is at the top?  See that?

A.   Yes.

Q.   And the number 52.8 is calculated in your handwriting?

A.   Yes.

Q.   And I asked you, I believe, before whether this
represented calculations and work that you were doing in
connection with preparing an opening day balance sheet that
reflected equity for Barclays as a result of the transaction.
Do you recall that?

231

1   A.   I recall the question, yes.

2   Q.   Okay.  And as you -- at the moment, sir, do you recall

3   working on a balance sheet, an opening day balance sheet for

4   Barclays?

5   A.   No, I was not working on a -- on an opening day balance

6   sheet for Barclays.  I was working on a closing day balance

7   sheet for Lehman.

8   Q.   Would you take a look at page M -- at Movants' Exhibit M-

9   74, please?

10  A.   Okay.

11  Q.   You with me in your book, sir?

12  A.   Yes.

13  Q.   Okay.  And that -- that's Exhibit Movants' 74 which is in

14  evidence, Mr. Kelly.  And you see that it's an e-mail to, among

15  others, Gary Romain at Barclays capital, James Walker at

16  Barclays Capital, T.J. Givenda at Barclays Capital.  Those are

17  all men that when I asked you before who you'd come to know at

18  Barclays, you identified for me?

19  A.   That I --

20  Q.   Do you recognize the names of those men?

21  A.   Yes, I do.

22  Q.   And is the CC to you and Paolo Tonucci and Gerard Reilly

23  and Brett Beldner (ph.) and Ian Lowitt.  Do you see that?

24  A.   Yes.

25  Q.   Okay.  And the Brett Beldner referred to in this e-mail is

232

1    the same Brett you were referring to in your handwritten notes,

2    is that right?

3    A.    I believe so; I don't know any other Brett.

4    Q.    Okay.  Now I'm going to ask you to compare -- and we'll

5    put them both up on the screen for you, sir -- well, first, is

6    there a reason you are receiving a copy of an opening balance

7    sheet from Robert Asrad (ph.) that's addressed to Barclays

8    executives on the 21st of September, before the closing?

9    A.    Well, I think -- I think there's -- there's some symmetry

10   to an analysis if -- if -- if there's a set of assets that

11   Lehman's selling, then the other side of that is -- is those

12   same assets that Barclays is acquiring.  So, I think, sitting

13   here today, I think this is another version of an estimate, of

14   assets and liabilities moving and -- and -- and intended to

15   represent -- represent the negotiated values.

16       So how Barclays used this for their own accounting and

17   specifically to your question for purposes of calculating any

18   opening impacts, I -- I -- I did not know that time.

19   Q.    My question goes to a slightly different point, Mr. Kelly.

20   I think you told us before the recess that you had not worked

21   on an opening balance sheet while employed at Lehman, you had

22   not worked on an opening balance sheet that reflected equity

23   for Barclays.  Am I remembering your testimony correctly?

24       Let me just ask you the question again.  While you were

25   employed by Lehman, did you work on an opening balance sheet

233

1    that showed equity for Barclays as a result of the transaction?

2    A.    From the perspective of Barclays and in terms of how

3    Barclays would account for it, no.  To the extent that

4    information was the same on both sides and it was relevant to

5    Lehman and may also be relevant to Barclays, then -- yes, to

6    some degree.

7    Q.    Well, let's take a look -- I'm not sure I understand that

8    answer from you, sir.  Let's take a look at the second page of

9    Exhibit 74.  Now, based on the answer you just gave me, is this

10   what you call from Barclays' perspective or is this what you

11   call from Lehman's perspective or this seen from both sides?

12   A.    I think this is information prepared by Lehman, because

13   it's come from Robert Asrad who was a -- a Lehman guy.  It --

14   represents, I think, what was our understanding of the

15   transaction at that point in time.  Well, his un -- I should

16   say his understanding of the transaction at that point in time.

17   I can understand how Barclays would use this information as

18   part of their opening balance sheet process, but how exactly

19   Barclays accounted for each of these components as part of an

20   opening sheet, I don't know.  If the question did you

21   participate in preparing an opening balance sheet --

22   Q.    Let me make my question a little simpler.  Did you

23   participate in preparing this document?

24   A.    I don't recall it, but it's certainly possible.

25   Q.    Okay.  Let's take a look at Exhibit 235.  You might want

234

1   to, as I said before, keep your finger by M-74, but let's look

2   at 235, a hand-written note, and again go back to page 115145.

3   Okay, and I'm going to ask that we highlight the right hand

4   side there with your hand-written notes, starting with Brett as

5   of September 20.  Do you see that, sir?

6   A.   Yes.

7   Q.   Okay.  And now I'm going to ask that we put up on the

8   screen the items in the opening day balance sheet within

9   Exhibit M-74, and compare the two.  All right, now you see that

10  they both, sir, come to -- both your hand-written notes and the

11  opening day balance sheet both come to a total of 52.8,

12  roughly?

13  A.   Yes, I do.

14  Q.   And the inventory numbers are roughly the same as you go

15  down, 29, 8.8., 3.1, 3.186, and 95 and 80.  Do you see those

16  similar but not exactly identical numbers there?

17  A.   Yes.

18  Q.   Okay.  And there was also an accounting on your notes if

19  we can broaden that out a little bit, move it the left.  Okay.

20       Now, looking at the notes in Exhibit 235, sir, and

21  comparing them to the entries in Exhibit 74, does that tell you

22  that you were working with Brett, one of the addresses of the

23  opening balance sheet, on September 20th -- now you were

24  working on the document marked as Exhibit M-74?

25  A.   I agree there's a -- a close correlation between my hand-

235

1   written notes and the typed schedule.  So it seems that the

2   notes that I'd written were translated into this type-written

3   schedule known as M-74.

4   Q.   And do you have any idea, sir, why the notes that you had

5   written were translated into this typewritten schedule and sent

6   to Gary Romain and James Walker and T.J. Givenda before the

7   closing?

8   A.   I think it's likely that they asked for the latest version

9   of the assets and liabilities moving.

10  Q.   Okay.  And the latest version as of the 20th of September

11  had the assets worth 44.88 billion, correct?

12  A.   Looking at this schedule, yes.

13  Q.   Okay, according to that schedule?  And then there was an

14  item for 15c3 lockup release valued on this schedule at about a

15  billion?

16  A.   Yes.

17  Q.   Did you ever find out what the number was for the 15c3

18  item that was identified in connection with the transaction?

19  A.   Yeah, subsequently.  It was 769 million dollars.

20  Q.   You actually did a little work trying to figure that out,

21  find out where that was and get it added to the assets that

22  were being sent over to Barclays, right?

23  A.   I did some work with its end to estimate what the 15c3

24  requirement was.

25  Q.   Okay.  And down on the liability path there's a reference

236

1    to the accrued bonuses, and that's at that two billion we've

2    talked about, right?  See that?

3    A.   Yes.

4    Q.   And it says "assumed to be all accrued".  Any explanation

5    for what that means?

6    A.   I don't know for sure.  I think it's referring to an --

7    that the fact that is an estimate of the actual liability that

8    Barclays would issue.

9    Q.   And the cure payments, which are put here at two and a

10   quarter, the number on that original balance sheet you worked

11   on, there's a parenthetical there that says "placeholder for

12   actual accrual".  Do you see that?

13   A.   Yes.

14   Q.   Now, in this correspondence between Lehman personnel and

15   Barclays personnel that refers to a placeholder for actual

16   accrual, did you know at the time that there was a difference

17   between what was shown on the schedule and the actual accrual

18   for cure payments?

19   A.   At this time, if this is on Sunday the 21st, I'm not aware

20   of an estimate for an actual accrual.  As I explained before, I

21   think cure is a broad concept.  I don't think the workup of all

22   the contracts that might go into that had been completed at

23   this stage.

24   Q.   A large component of that number was just because those

25   were the numbers that agreed with the purchase agreement, isn't

237

1    that right?

2    A.   I'm not sure.  The 2.25 is the number I recognize from

3    the --

4    Q.   Well, take a look at --

5    A.   -- Monday night

6    Q.   -- Exhibit 236, sir.  Now, 236 contains correspondence

7    from you to James Walker at Barclays and Gary Romain, with a

8    copy to Gerry Reilly.  Were you writing to Reilly to keep him

9    apprised of what you were working on?

10   A.   I would imagine so, yeah.

11   Q.   Okay.  And it's entitled "Assets and Liabilities

12   Acquired".  I take it this is a reference to the sale

13   transaction, yes?

14   A.   Yes.

15   Q.   And that's also written on Saturday, September 20th, yes?

16   A.   Yes.

17   Q.   And you tell James and Gary, "Right now the BS" -- which I

18   take it means balance sheet --

19   A.   Yes.

20   Q.   -- is that right?

21   A.   Yes.

22   Q.   Okay.  "Right now the BS is still a work in progress.

23   Will probably take overnight to resolve.  Will keep you

24   updated."

25        Here is what we know and don't know:  You put cash at

238

1   seven billion, see that?

2   A.   Yes.

3   Q.   And you put inventory at 44.8 billion, correct?

4   A.   Yes.

5   Q.   And then there's that 15c3 at a billion, right?

6   A.   Yes.

7   Q.   And further down, "Financing, 45.2 billion.  Believe this

8   to be a good number.  Will need to validate with you."  What's

9   the 45.2 that's referred to there?

10  A.   It could be the shorts or repo financing.

11  Q.   Might be in the repo?

12  A.   Could be the repo.

13  Q.   Okay, and if you added 45 billion in the repo to 7

14  billion, you'd get the 52.8 billion dollar number, or in that

15  range, that you were calculating on your handwritten notes,

16  correct?

17  A.   I'm sorry.  Can you say that again, please?

18  Q.   If you took the seven billion dollar cash, that's your

19  item 1, and the forty-five billion dollar repo number, you come

20  roughly to the fifty-two billion dollar number you've calcu --

21  that was calculated on that opening balance sheet we looked at,

22  isn't that right?

23  A.   Yes, that's right.

24  Q.   Yes?

25  A.   Yeah, it appears to, yeah.

239

1    Q.    And then in item 5, "Other Payables":  "Partly on our

2    books today, partly purchase price related.  4.25 billion

3    agrees to PA."  You see that?

4    A.    Yes, I do.

5    Q.    PA means purchase agreement, correct?

6    A.    I believe so, yes.

7    Q.    And this memo tells Mr. Walker and Mr. Romain that the

8    cure number consists, at least in part, of items that are the

9    result only of the purchase agreement, not of actual cure

10   liabilities, is that right?

11   A.    Sorry, could you ask that again?

12   Q.    4.25 agrees to PA?

13   A.    Right.  Sorry, what was your follow-up question, please?

14   Q.    Let me ask the question again.  Item 5, quote, "Other

15   Payables":  "Partly on your books today, partly purchase price

16   related.  4.25B agrees to PA."  Do you see that?

17   A.    Yes, I do.

18   Q.    That's your telling Mr. Walker and Mr. Romain that part of

19   the estimates for cure and comp were based only on the purchase

20   agreement and were not based anywhere on Lehman's books, isn't

21   that right?  Isn't that what you meant when you said "4.25B

22   agrees to PA"?

23   A.    I don't know what I meant.  I think that the component of

24   that 4.25 that represents comp is the negotiated number.  The

25   component of that that represents cure -- I guess I have a few

240

1    observations:  one, it's at the 2.25 number, not at the 1.0

2    number; I don't know why that is.  It's -- the process to

3    estimate cure, as far as I recall, hadn't been finished at this

4    point.  So there wasn't an actual accrual for cure.  Cure was a

5    broader concept.  And I think at all times we were working with

6    estimates.

7    Q.   It was never estimated at lower than the amount on

8    Lehman's books, right?

9    A.   We didn't have an est -- we didn't have anything on the

10   books for cure.  It was -- cure was sort of -- encompassed some

11   liabilities recognized on the books and potentially others.

12   But there wasn't an ability to go to the ledgers and pull out

13   certain accounts and say that's cure.  It wasn't possible.

14   Q.   Now, I'd like you to turn, Mr. Kelly, to Exhibit M-14.

15   And M-14, in evidence, is a set of your handwritten notes, is

16   it not?

17   A.   No, I think this is Ian Lowitt's handwriting.

18   Q.   Well, isn't it a fact, sir, that the handwriting is yours

19   on all but the second page?

20   A.   I think it's all mine except for the front page and except

21   for the number on the top of the second page, which says

22   "61.9".  I don't recognize that as mine.

23   Q.   So the handwriting on the very first page, the one -- I

24   got it.

25       Let's turn to page 115169.  Is that your handwriting on

241

1    that page, sir?

2    A.   It is, except for the number on the top.  The 61.9 I don't

3    recognize.

4    Q.   Which number's not yours, sir?

5    A.   The 61.9.

6    Q.   Do you know whose handwriting that is?

7    A.   I think it's Ian's.  I'm not sure.

8    Q.   Now, in the middle of the page there's -- in your

9    handwriting there is this annotation that has three columns:

10   BV -- you see that?

11   A.   Yes.

12   Q.   Proceeds, see that?

13   A.   Yes.

14   Q.   And Loss/Gain, do you see that?

15   A.   Yes.

16   Q.   All right, and in this calculation, sir --

17           MR. GAFFEY:  Actually, maybe we just blow up that

18   whole page?  Just bring from BV, there, all the way down to the

19   bottom and put it all up on one slide.  There you go.

20   Q.   Now, BV stands for book value, correct?

21   A.   Yes.

22   Q.   And these notes show your calculation -- well, the

23   calculation's meant to show an estimate of the assets and

24   liabilities being sold to Barclays, and they're associated

25   values on Lehman's books, is that right?

242

1    A.    The -- you're referring to the first column?

2    Q.    Well, I'm referring to the whole calculation, but --

3    A.    I think the first column is referring to the then current

4    book values to Lehman.  I think the second column is most

5    likely referring to the negotiated values for each of those

6    items as a -- sort of a proxy for the proceeds.

7    Q.    Okay.

8    A.    And then the last column is the resulting difference.

9    Q.    And that shows the difference between what's shown on

10   Lehman's books with the price that was actually agreed, yes?

11   A.    Sorry, can you just ask that one more time?

12   Q.    That shows the difference between the amount shown on

13   Lehman's books and the price that was actually agreed, yes?

14   A.    Using these book values, that's correct, yeah.

15   Q.    Okay.  And those -- that -- those calculations lead you to

16   have calculated a loss to Lehman of approximately 5.25 billion,

17   is that right?

18   A.    Yes, that's right.

19   Q.    And when you calculated that loss, it was primarily a

20   function of the difference between the book value of the

21   inventory and the value negotiated, is that right?

22   A.    Yes, primarily.

23          (Pause)

24          MR. GAFFEY:  Your Honor, may I consult for just one

25   moment?  I want to make sure I've kept track of the documents

243

1    I'm supposed to.

2          THE COURT:  Sure.

3       (Pause)

4          MR. GAFFEY:  Your Honor, I maybe actually am -- a bit

5    of housekeeping:  one more document with regard to -- I thought

6    there was an objection to Movants' 7 and, if so, I need to move

7    it in through the witness.  It's a copy of Movants' 8, same

8    text.

9          MR. SCHILLER:  We have no objection, Your Honor.

10          MR. GAFFEY:  And, Your Honor, I have no further

11   questions for Mr. Kelly at this time.

12          THE COURT:  So is that document in?

13          MR. GAFFEY:  Yes --

14          THE COURT:  Fine.

15          MR. GAFFEY:  -- at least according to us.

16          THE COURT:  Let's see if we can complete the direct

17   this evening.

18          Just for planning purposes, Mr. Maguire, do you have

19   any sense as to the length of your examination?

20          MR. MAGUIRE:  I would estimate maybe twenty minutes,

21   Your Honor.

22          THE COURT:  Okay.

23          And will the committee be examining?

24          MR. KIRPALANI:  We're not asking any questions, Your

25   Honor.

244

1          THE COURT:  All right.  Fine.

2          MR. MAGUIRE:  May I approach, Your Honor?

3          THE COURT:  Yes, you may.  It's a very thin book.

4     (Pause)

5          MR. MAGUIRE:  If it please the Court.

6   CROSS-EXAMINATION

7   BY MR. MAGUIRE:

8   Q.   Sir, my name is Bill Maguire.  I represent the SIPA

9   trustee.

10        You have the thin book, black binder, your counsel

11  provided you?

12  A.   Yes, I do.

13  Q.   I believe you mentioned in the course of your testimony

14  this afternoon that you had done some work in connection with

15  calculating or attempting to calculate the 15c3 reserve

16  requirement for Lehman, is that correct, sir?

17  A.   Yes, that's correct.

18  Q.   That was a -- turned into a substantial undertaking, did

19  it not?

20  A.   Yeah, it was a very complex and lengthy process.

21  Q.   Sir, if you'd turn to the second tab in your binder,

22  you'll see Movants' Trial Exhibit 438.

23  A.   Yes.

24  Q.   That is an e-mail, on which you were copied, that was sent

25  by Lehman's Paolo Tonucci on Saturday, September 20 at around

245

1   forty minutes after 9 o'clock in the evening, is that correct?

2   A.   Yes, that's correct.

3   Q.   And that concerns the 15c3 calculation?

4   A.   Correct.

5   Q.   And this was sent to a representative of the United States

6   Securities and Exchange Commission, correct?

7   A.   Yes, that's correct.

8   Q.   And that's Mr. Macchiarelli (ph.)?

9   A.   Correct.

10  Q.   And in that, Mr. Tonucci told Mr. Macchiarelli that "We

11  may need your quick response to a rerun of the 15c3 calc as of

12  Friday."  You see that, sir?

13  A.   Yes, I do.

14  Q.   And that was a reference to Friday, the 19th of September,

15  correct?

16  A.   I'm not sure.  Probably, but I'm not -- yeah, likely, I'd

17  say.

18  Q.   This was Saturday the 20th, right?

19  A.   Right.

20  Q.   And you and your colleagues were engaged at that stage in

21  trying to do the most current and necessary 15c3 calculation,

22  correct?

23  A.   Yeah, certainly on the Saturday, that's correct.

24  Q.   Mr. Tonucci went on to say "We expect that there will be a

25  further reduction in the requirement because of the transfer of

246

1    clients and continued reduction in client exposures.

2    Consequently, we hope to release some cash which would become

3    part of the sale."  That was consistent with your understanding

4    at that time, correct?

5    A.    My understanding was that there was -- an effort was

6    started, I think on the Friday, to determine if there was

7    excess or a surplus in the 15c3 calculation requirement

8    relative to the actual cash that was locked up.  I understood

9    that that was in the context of needing to find assets for

10   Barclays because other assets that we thought were available

11   were in fact not available to be sold.

12   Q.    And you understood in the course of the process, to the

13   extent you were tasked with running or determining what the

14   reserve requirement was under Rule 15c3, it was important for

15   Lehman, you and your colleagues to be transparent with the

16   Securities and Exchange Commission?

17   A.    I mean, I think, to the extent that the calculation could

18   be as accurate as possible, then that would be important.  So,

19   yes, I would agree with that.

20   Q.    If you turn to the next tab, you'll see Movants' Trial

21   Exhibit 452.

22        (Pause)

23   Q.    And, sir, I'm going to ask you about the e-mail at the

24   bottom of the first page, continuing to the top of the second

25   page, and that's an e-mail that was sent by Anthony Stucchio at

247

1   around 11 o'clock Saturday night to a number of people,

2   including you?

3   A.   Yes.

4   Q.   And that's an update on 15c3-3, you see that?

5   A.   Yes, I do.

6   Q.   And in that, Mr. Stucchio reports "As I have mentioned

7   previously, the number of stock record breaks are

8   overwhelming."

9        Can you tell us, sir, what did you understand were the

10  stock record breaks?

11  A.   I understood that the -- there were a lot of fails, both

12  into Lehman and out of Lehman, around unsettled transactions.

13  And fails impacts the requirement of the 15c3 formula to the

14  extent that you need to lock up cash, in some predefined

15  percentage, based on the amount of fails; on both sides,

16  actually, in and out, delivers and receives.

17       So I think that, in my mind, the fails were driving the

18  complexity in the formula, and I think that this, in my mind,

19  is an overlap or a correlation between the fails and the stock

20  record breaks.

21  Q.   If you'd turn to the next tab, sir, Movants' Trial Exhibit

22  236.   The bottom of the first page, this is an e-mail that you

23  referred to earlier in your testimony; it's one that you sent

24  Saturday night at just after 9 p.m.

25  A.   Yes, I see that.

248

1    Q.   And in item 3 you note "15c3 receivable, 1B" -- is that

2    one billion dollars?

3    A.   That's correct.

4    Q.   -- "have many breaks/fails here.  Have a large team

5    working now and through the night to resolve."  Was that in

6    fact the case, sir?

7    A.   Yes, it was.

8    Q.   At the top of the page, you send an e-mail to James Walker

9    at Barclays at -- on Sunday at about 2:30.  You see that, sir?

10   A.   Yes, I do.

11   Q.   And you note "Have been working all night trying to clear

12   up 15c3 issue.  Will be in contact as soon as I can."

13       You were trying to keep Barclays on the loop on your

14   efforts, were you not, sir?

15   A.   Yeah, I think I was trying to keep them updated on what

16   the calculation was showing in terms of what the reserve

17   requirement was and what the cash lockup was.

18   Q.   I guess it was of keen interest to Barclays, was it not?

19   A.   It was of interest.  I'm not sure it was of keen interest,

20   to be honest.  I think it was one of many issues, I think, that

21   were still being worked through at that time.

22   Q.   No one from Barclays suggested that you did not need to

23   bother them with any updates on 15c3?

24   A.   No.

25   Q.   If you'd turn to the next tab, Movants' Trial Exhibit 463.

249

1   This, sir, is a preliminary reserve -- customer reserve

2   requirement analysis, is it not, as of Friday, September 19?

3   A.   Yes, that would appear to be the case.

4   Q.   If you'd turn to the next tab, Movants' Trial Exhibit 548.

5   This is an e-mail that you sent to Mr. Stucchio Sunday the 21st

6   after 10 p.m.?

7   A.   Yes, I see that.

8   Q.   You refer in the second sentence of your e-mail to the

9   latest version of 15c3, and you refer to a "big caveat around

10  ADP".  What were you referring to there?"

11  A.   Well, if you turn back to the prior exhibit, ADP was one

12  of the sections of the formula, so that that long Excel

13  spreadsheet has a section entitled "ADP".  The MTS system,

14  which is referred to above, and the ADP system we used for

15  different types of securities.  And so there were multiple,

16  sort of, calculations within the overall calculation that

17  needed to be undertaken.  And so --

18  Q.   If you go on -- I'm sorry.  Were you finished with your

19  answer?

20  A.   Yeah, so ADP was one component of the overall calculation.

21  Evidently, that was the one that was causing us some concerns

22  in terms of data completeness and quality.

23  Q.   In the last couple sentences of your e-mail you say "My

24  plan with SEC" -- and you're referring to Securities and

25  Exchange Commission?

250

1   A.   Yes.

2   Q.   -- "is not to fight the formula but to create a mechanism

3   under which Barclays has first lien to first billion dollars as

4   it clears up.  That way, we hold onto the cushion until the

5   customer account balances clear."  You see that, sir?

6   A.   Yes.

7   Q.   If you'd turn to the next exhibit, Movants' Trial Exhibit

8   492.  If we start on the second page of the exhibit, sir, you

9   will see that the second e-mail from the bottom is from Robert

10  Azerad, and that was sent Sunday, September 21 at 5:16 p.m.

11  A.   Right.  I see that.

12  Q.   Mr. Azerad was Lehman's global head of assets and

13  liabilities management?

14  A.   He had a senior role in treasury, reporting to Paolo.

15  That may have been his function.

16  Q.   You'll see the subject is entitled "Final 15c3-3 Reserve

17  Formula as of 9/17/2008".  You see that?

18  A.   Yes, I do.

19  Q.   And Mr. Azerad's e-mail said "Any estimate for 9/19",

20  September 19, "this is what is urgently needed."  You see that,

21  sir?

22  A.   Yes.

23  Q.   Now, at that time there were a number of iterations being

24  made of the 9/19 reserve requirement, correct?

25  A.   I recall many versions of the calculation; it likely

1    included for the 19th.  I don't recall that specifically.

2    Q.   If you turn to the next tab, you'll see Movants' Trial

3    Exhibit 237.  At the bottom of the first page is your e-mail to

4    Gary Romain and a number of other people, which you send

5    Sunday, September 21 at 5:33 p.m.  See that, sir?

6    A.   Yes, I do.

7    Q.   Who's Gary Romain?

8    A.   Gary works at Barclays and he was in charge of the

9    technical accounting group at Barclays Capital.

10   Q.   These other names, the other people you sent this e-mail

11   to, by whom were they employed?

12   A.   Well, like I say, Barclays employees were Gary Romain,

13   James Walker, T.J. Givenda and Matt Hughey.  Actually, and Bob

14   Martini (ph.).  So all the two recipients are, like I say,

15   Barclays.  All the cc'd were, like I say, Lehman.

16   Q.   The first cc is Chris O'Meara.  What was Chris O'Meara's

17   role?

18   A.   At this stage I recall Chris became involved in helping

19   think through some of the issues around getting information

20   that were needed for the calculation.

21   Q.   You say in your e-mail "Trying to get hold of the SEC to

22   ensure they are in agreement with our approach."  Did you

23   personally get in touch with the SEC, sir?

24   A.   No, my recollection at this time is that Paolo was doing

25   that, and I think I was speaking on behalf of Lehman.  I did

252

1    have a conservation with Mike Macchiarelli at the SEC, but it

2    was -- I think it was the following week.  I'm almost certain

3    it was the following week.  And I walked past a conversation

4    that he was already having with Paolo.

5    Q.    If you'd turn to the next tab, sir, Movants' Trial Exhibit

6    450?  This is an e-mail on which you were copied, an e-mail

7    that Chris O'Meara sent to Bart McDade.  And he's reporting

8    progress on 15c3, and he describes, starting in the middle of

9    his e-mail, "We spoke with SEC as well to tell them the plan

10   and explain that some amount of the excess 15c3-3 lockup is

11   part of the purchase price consideration."

12         That was consistent with your understanding, was it not,

13   sir?

14   A.    I don't think at this point I ever understood what the

15   specific agreement was around the 15c3 surplus.  At this point

16   I understood that calculating the surplus was very important

17   and it was related to the transaction in the context of finding

18   assets to replace others that weren't available.  But at this

19   time I didn't have an understanding of how that factored into

20   the purchase agreement or the purchase price consideration.

21   Q.    The next sentence goes on to say "They", meaning the SEC,

22   "don't object but want to see the info once the reconciliation

23   break has been resolved, and want to ensure that all customer

24   balances are moved cleanly before authorizing the release of

25   the cushions."

253

1      That was consistent with what you understood to be the

2   position of the SEC, is that correct, sir?

3   A.   Yeah, I think there was certainly an understanding that we

4   needed to speak with the SEC.  I don't know if I knew at the

5   time whether we required their formal approval, but I was aware

6   of the concern that they had around ensuring that there's

7   appropriate segregation for customers.  And at one point, I

8   think, separation of the needs for customers that were moving

9   to Barclays versus staying behind was something that Mike

10  Macchiarelli at the SEC asked us to do; so to run yet another,

11  sort of, version of the formula, looking at customers going or

12  staying.

13  Q.   If you'd turn to the next tab, Movants' Trial Exhibit 83.

14  Is that the subject of the e-mail that you sent Monday,

15  September 22 and just after 1 a.m.?

16  A.   Yes, I believe that relates to my prior comment.

17  Q.   And so you reported "Guys, SEC told us we need to do a

18  15c3 calc" -- that's a calculation, right?

19  A.   That's right.

20  Q.   -- "for each of the accounts that transfer and those which

21  will not, before they are comfortable" -- "they" is a reference

22  to the SEC?

23  A.   Yes.

24  Q.   -- "releasing cushion/surplus to Barclays.  We agreed with

25  Weil.  A mechanic to have" -- "A mechanic to have value

254

1    transferred to Barclays as it'd freeze, when we have the

2    separate calculations done, the SEC will permit us to transfer

3    the one billion.  Once the ADP break is resolved, the team

4    needs to focus on separate calculations in the next day or so."

5    And then you continue, correct?

6    A.    Right.

7    Q.    If you'd turn, sir, to the next tab, Movants' Trial

8    Exhibit 513?  If you turn to the second page of the exhibit,

9    you'll see an e-mail that you sent to a number of executives,

10   and this is dated Friday, September 26.  Now, this is the end

11   of the week following the closing, and it's on the subject,

12   same subject, "15c3 Process", right?

13   A.    Correct.

14   Q.    This had turned into an arduous exercise, had it not?

15   A.    Yeah.  This was a long complex process.

16   Q.    You report that "There are some significant open items

17   that need to be resolved to finalize the 15c3 process and free

18   up cash to make payment to Barclays."  You see that?

19   A.    Yes, I do.

20   Q.    And you referred to your concern that several of these

21   items were -- "will require significant time and effort,

22   sometimes out of our control", and you referred specifically to

23   Chase, SIPC and the SEC.  You see that?

24   A.    Yes, I do.

25   Q.    Now, if you look down the list, you have a list of items

255

1   of these significant open items.  And if you go down to the

2   fourth one down, you'll see where it starts "We have posted

3   prop Treasury positions at the OCC."

4   A.   Yes.

5   Q.   When you say "prop", you mean proprietary --

6   A.   I --

7   Q.   -- is that correct?

8   A.   Yeah, I believe so, yeah.

9   Q.   So this is Lehman property that was posted at the OCC in

10  the amount of half a billion dollars, correct?

11  A.   Sorry.  Could you just repeat that question, please?

12  Q.   Yeah.  The first sentence in that asterisk, "We have

13  posted prop Treasury positions" -- that's proprietary Treasury

14  positions, right?

15  A.   Yes, I believe so.

16  Q.   So that's Lehman property?

17  A.   Um -- I don't know, actually.  It could be Lehman; it

18  could be customer.

19  Q.   Okay.  Well, let's continue reading.  -- "Treasury

20  positions at the OCC of half a billion dollars to cover

21  customer margin requirements on option positions."  So Lehman

22  customers had positions, right?

23  A.   Yes.

24  Q.   And those positions were collateralized with this half

25  billion dollars at the OCC, right?

256

1   A.   Yeah, some -- I don't -- I don't recall, but, yeah, it

2   would appear from this that some portion somehow is

3   collateralized with the half a billion.

4   Q.   Well, this goes on to say "This has been reflected as an

5   offset to the reserve requirement."  That's the 15c3 reserve

6   requirement, is it not, sir?

7   A.   I expect so, yeah.

8   Q.   And it's a fact, is it not, that a broker-dealer who sets

9   aside collateral at the OCC is allowed to take as a debit item

10  on the customer reserve account that cash and use that cash to

11  reduce the amount of the reserve requirement that it would have

12  to set aside for the exclusive benefit of customers?

13       MR. SCHILLER:  Objection, Your Honor, to the extent

14  the question calls for a legal conclusion by Mr. Kelly.

15       THE COURT:  I'll sustain that objection.

16       But you can rephrase it.

17       MR. MAGUIRE:  Certainly.

18  Q.   If we continue in your -- in this asterisked section of

19  your e-mail, you note that "As part of the account transfer, we

20  will be making payment to Barclays to cover the half billion of

21  customer payables they are assuming."  And what you're

22  referring to there is full responsibility --

23       MR. MAGUIRE:  Let me strike that.

24  Q.   When customers take positions, they are required to

25  deposit collateral with the broker-dealer, are they not?

257

1    A.   Yes, that's correct.

2    Q.   And the half billion dollars that they had deposited with

3    Lehman was being transferred to Barclays?  That's what you're

4    referring to here, right?

5    A.   I don't know if the half billion is customer or firm.  I'm

6    confused because we refer to -- I refer to prop positions.

7    Q.   Well, let me make this simple.  A customer deposits money

8    as collateral with Lehman; when that happens, the company has a

9    payable to the customer, does it not?

10   A.   Yes.

11   Q.   And that payable was being transferred to Barclays, was it

12   not --

13   A.   I'm aware --

14   Q.   -- with the customer accounts?

15   A.   Well, if these were the customer accounts that were

16   moving, then, yes.  I just -- what I can't tell you is which

17   customer accounts were moving or not.  And --

18   Q.   Well, we're obviously talking here about making payment to

19   Barclays.  So that would be for customers who are transferring

20   to Barclays, not for customers who are not transferring to

21   Barclays, isn't that fair, sir?

22        MR. SCHILLER:  Objection.  I'm not sure that there is

23   a foundation for this question in terms of them being customer

24   accounts, Your Honor.

25        THE COURT:  Well, I'm not sure either, but if the

258

1    witness understands the question I'm going to let him answer

2    it.  If he doesn't, and he might not, Mr. Maguire can try

3    again.

4    A.   I am struggling with the question.  I need one minute just

5    to read that entire --

6    Q.   Yeah, take your time.

7    A.   -- section, if I could.

8    Q.   Take all the time you need.  Just let me know when you're

9    ready.

10   A.   Okay.

11   Q.   Let's take it in steps.  Let's start with the sentence:

12   "As part of the account transfer".  See that?

13   A.   Yes.

14   Q.   -- "we will be making payment to Barclays to cover the

15   half billion dollars of customer payables they are assuming."

16   Now, the customer payables that Barclays was assuming was

17   payables to customers, was it not?

18   A.   I -- that, I think, is right from reading the words here.

19   I --

20   Q.   It says "customer payables", does it not?

21   A.   It says "customer payables", yeah.  So, definitionally,

22   that's payables to customers.

23   Q.   Okay.  So Barclays was taking on the responsibility to pay

24   customers the half billion dollars, and in connection with that

25   you noted here that Barclay -- that Lehman was transferring --

259

1    sorry -- "We will be making payment to Barclays to cover the

2    half billion dollars of the customer payables."

3        So Barclays was taking the customer payables and Lehman

4    was giving Barclays a payment of half a billion dollars to

5    cover that obligation to customers?

6    A.   I don't disagree with that reading of the words.

7    Q.   Okay.

8    A.   I don't recall the e-mail, but that's -- I don't disagree

9    with that.

10   Q.   You were concerned, however, about an additional issue,

11   because you say "I need confirmation that the prop Treasury

12   positions have not also been transferred to Barclays as part of

13   the asset sale," right?  That was your concern in this open

14   item?

15   A.   That would -- yeah, that would appear to be the case;

16   they're not being double-counted.

17   Q.   Because then you would have double-counting, isn't that

18   right?  Barclays would be getting the half billion dollars not

19   once but twice?

20   A.   Yes, if it's prop positions in both cases.  I think if it

21   was customer collateral that was being moved over, then no,

22   that should not have been reflected as a -- as an asset on the

23   books of Lehman.

24   Q.   And you go on to say "I need confirmation that the prop

25   Treasury positions have not also been transferred to Barclays

260

1   as part of the asset sale." And you go on to say "If they have

2   been transferred as part of the sale, the reserve surplus must

3   correspondingly be reduced by a half billion dollars."

4        And when you say "the reserve surplus", you're talking

5   about the result of the 15c3 calculation?

6   A.   That's correct, yeah.

7   Q.   Now, sir, the last open item on your e-mail, you say

8   "Finally, we need to provide to the SEC a reserve schedule

9   splitting customer accounts between those which stay at Lehman

10  and those which move to Barclays. We cannot obtain SEC

11  approval to release funds from the reserve until this is

12  complete," correct?

13  A.   That's what it says here.

14  Q.   Okay. Now, sir, let me ask you just very briefly about

15  the subject of Lehman's margin, and when I say "Lehman's

16  margin", I'm referring to cash, cash equivalents or government

17  securities that Lehman posted at clearing organizations like

18  the Options Clearing Corporation, okay?

19  A.   It's own assets. Okay.

20  Q.   In the course of your employment at Lehman, through all of

21  the events of the week of September 15 and through the closing,

22  you were not at any time aware that any Lehman margin was to be

23  transferred from Lehman to Barclays, isn't that right, sir?

24  A.   I was not aware one way or the other.

25  Q.   And, in fact, you didn't become aware that there was any

261

1    issue about Barclays claiming some entitlement to Lehman's

2    margin until after you had settled into your new role at

3    Barclays, isn't that right?

4    A.   Yeah, I think that's correct, but my involvement

5    throughout the week was around certain pieces of the

6    transaction.  So I don't think I -- I didn't really have a --

7    an understanding one way or the other at that time.

8    Q.   And in none of the work that you did on the balance sheet,

9    whether it was the opening balance sheet for Barclays or the

10   closing balance sheet for Lehman, however you wish to describe

11   it, in none of that balance sheet work, in none of the work

12   about the transaction adjustments, in none of the work that you

13   did with the senior finance people at Lehman, did it ever come

14   to your attention that Lehman margin was going to Barclays,

15   correct?

16   A.   I don't think it did at the time, partly based on the

17   versions of the balance sheets that I've seen since then.  I

18   don't recall that.  And I think what the team -- me as part of

19   the team were doing were trying to keep up with the transaction

20   as it evolved.  And I think, as we've seen today, there were --

21   you know, there wasn't instantaneous communication between all

22   people on changes at all times.  So, you know, it -- something

23   could have been negotiated and I just didn't know about it, nor

24   would my team, who I think were probably a step or two behind

25   my understanding.

262

**Q.   Well, if anybody did any -- ever negotiate any such thing,**

**they sure didn't tell you about it?**

**A.   No, they didn't, but I wasn't being advised of many of the**

**changes that were occurring.  It actually, frankly, doesn't**

**surprise me.**

MR. MAGUIRE:  No further questions.

THE COURT:  Let me ask you a question, Mr. Schiller.

Would you like to complete with the witness this evening?

MR. SCHILLER:  Yes, I would.

THE COURT:  And does everybody, including the witness,

have the stamina for that?

MR. SCHILLER:  I can complete the witness this

evening, and I'll need about thirty minutes.  If we took a ten-

minute break -- I don't know what your Court's preference is at

this hour, Judge.  It's ten to 6.

THE COURT:  If we compl -- if we make the commitment

to do that and can finish before 6:30, it seems to me that

we'll do a better job of staying on the schedule that we've

allowed for ourselves, because we have another witness who was

to have started this afternoon, who is supposed to continue

tomorrow, Mr. Lowitt, and we'll do a better job of staying on

schedule if we complete -- so I suggest we try to do that if we

can.  And a break is fine.

MR. SCHILLER:  My colleague advises me, though,

there's a section to do that's going to involve documents that

263

1    I will require some time to pull together; not a lot of time.

2    I could do it efficiently in the morning in thirty minutes,

3    more efficiently than I can do it now.  It would just take

4    longer, that's all, Judge.

5              THE COURT:  Well --

6              MR. SCHILLER:  And I ask the Court's indulgence in

7    that.

8              THE COURT:  It also seems to me that, from Mr. Kelly's

9    perspective, he gets to go back to work tomorrow too, which is

10   not a bad thing.

11             Why don't we take a ten --

12             MR. SCHILLER:  Why don't I -- I can -- Your Honor, may

13   I?  I'm sorry.

14             THE COURT:  I was going to say why don't we take a

15   ten-minute break and kind of --

16             MR. SCHILLER:  Sure.

17             THE COURT:  -- collect our thoughts on this, and maybe

18   you can do it in a half hour starting at 6.

19             MR. SCHILLER:  I will try.  Thank you.

20             THE COURT:  Let's take a ten-minute break.

21        (Recess from 5:49 p.m. until 6:03 p.m.)

22             THE COURT:  Be seated, please.

23        (Pause)

24             THE COURT:  Please proceed, Mr. Schiller.

25             MR. SCHILLER:  Thank you, Your Honor.

264

CROSS-EXAMINATION

BY MR. SCHILLER:

Q.    Good evening, Mr. Kelly.    Jonathan Schiller for Barclays.

A.    Good evening.

        MR. SCHILLER:  I have one other exhibit, Exhibit 589,

that I'd like hand to the Court.  May I approach?

        THE COURT:  You may.

        (Pause)

        MR. SCHILLER:  And we -- may we put up Movants'

Exhibit 235, please?

Q.    Mr. Kelly, you were asked about this document and your

handwriting, do you recall that?

A.    Yes, I do.

Q.    Let me ask you to look at Movants' Exhibit 589, please.

There's an e-mail from Ian Lowitt at the bottom of this string,

dated September 17th at 22:00 hours.  Do you see that?  And

you're copied on it.

A.    Yes, I see that.

Q.    And it reads "Today was very bad, with very large number

of surprises and increased requirement of seven-or-so billion.

Cannot get through tomorrow if not tighter.  Cannot get through

tomorrow if not tighter. (sic)  Not sure what to suggest other

than someone makes ensuring great discipline the number one

priority.  Let's huddle in the morning to see the best way

forward.  Also, need to shrink matched book, which as of

265

1  yesterday was much larger than expected.  Gerry and Martin have

2  details.  Ian."

3      You recall getting this e-mail at the time, or was it --

4  or did you receive it at the time?

5  A.   I recall -- I don't recall the e-mail specifically.  I can

6  see that I was cc'd on it.  I do recall increased requirements,

7  financing haircuts, which I think is what the "seven-or-so

8  billion" is referring to.

9  Q.   And tell the Court what "shrink matched book" meant to you

10 as of September 17th, please.

11 A.   Well, the matched book was financing to customers,

12 generally hedge funds, which was done through the form of

13 reverse repo contracts and repurchase contracts.

14 Q.   And was this need to shrink matched book on September 17th

15 a responsibility for you to take on?

16 A.   No, it was not.

17 Q.   Was this a key issue facing your team that day?

18 A.   I don't recall this being an issue at that time.

19 Q.   Let me show you Movants' Exhibit 188, which is an e-mail

20 from Ian Lowitt to Gerard Reilly and Michael Bilaban (ph.) in

21 which you and Paolo Tonucci are copied.  Do you see that?

22 September 18th?

23 A.   Yes, I do.

24 Q.   This is the next day:  "Also need to figure out how to

25 shrink down matched book, unless, Gerry, that hasn't yet been

266

1    reflected in balance sheet we looked at yesterday.  Gerry, sit

2    with Cogs (ph.) and Mike to figure out what we need to do and

3    if balance sheet showing matched book at forty is right.  Ian."

4    You see that?

5    A.   Yes, I do.

6    Q.   Does this reflect your recollection whether this was a key

7    issue facing your time?

8    A.   I don't recall this being an issue.

9         MR. SCHILLER:  May we have M-14 up on the screen,

10   Movants' Exhibit 14?

11   Q.   Your handwritten notes.  Now, you see the column on the

12   left under "BV" where it refers to inventory?

13   A.   Yes, I do.

14   Q.   And what's that number there?

15   A.   I believe this was an estimate of assets exclusive of the

16   repo book, the reverse repo book if it's an asset.

17   Q.   Did the inventory include all mortgages at that time in

18   your note?

19   A.   I don't know -- I don't know when this page was written,

20   so I don't know.  I remember the mortgages being included and

21   the proposed sale changed, but I'm not sure if this includes

22   all, half or none of the mortgage book.

23        MR. SCHILLER:  May we have Exhibit 2 from Movants'

24   book on the screen, please?

25   Q.   You see this schedule that you were asked about earlier?

267

1    A.   Yes, I do.

2    Q.   And under "Assets", do you see "Mortgages".

3    A.   Yes, I do.

4    Q.   And does this reflect the mortgages at fifty percent, as

5    far as you recall?

6    A.   Yeah.  My recollection is that the mortgages were around

7    six billion in total.  So this would be approximately fifty

8    percent of that.

9    Q.   So a hundred percent of that would be 5.4, right?

10   A.   If you took this number grossed up, that would be right.

11   Q.   So returning to Exhibit 14, the total book value would be

12   sixty-five, wouldn't it?

13   A.   Grossed up -- uh --

14   Q.   With a hundred percent --

15   A.   Yes.

16   Q.   -- of the mortgage.

17   A.   At a hundred percent, yes.

18        MR. SCHILLER:  Let's turn to M-1, the APA, and page 6

19   of the APA, please.

20   Q.   Mr. --

21        MR. SCHILLER:  And let's go down to paragraph (d)

22   under "Purchased Assets".

23   Q.   Mr. Kelly, you were asked earlier in your examination

24   whether that number, approximately seventy billion long

25   positions, was false.  And I recall -- noted your answer that

268

1     it was the negotiated values representing the market conditions

2     at the time.  If that is indeed what it was, is it false?

3     A.   What do you mean by "false"?

4     Q.   Let me ask you -- approach it differently.  When you say

5     to the Court a number represents negotiated values representing

6     the market conditions, what negotiated values are you referring

7     to?

8     A.   When I said that, I meant the values of the assets that

9     had been negotiated between the respective Lehman and Barclays

10    traders.

11    Q.   And if seventy billion on long positions reflects that

12    negotiation, would you believe it to be accurate?

13    A.   Yes, I would.

14    Q.   You were asked about cure in your examination, and you

15    testified to the Court that you believed the 2.25 number was

16    too high at some point, you couldn't remember precisely when

17    that was, and that you, or you together with Mr. Lowitt,

18    thought about another way to do it.  Do you remember that

19    testimony?

20    A.   Yes, I do.

21    Q.   And I think you said to the Court it had something to do

22    with a one-quarter run rate?

23    A.   Yes, that's right.

24    Q.   Is that a scientific way to do cure?

25    A.   No.  That was an estimate that we developed and suggested

269

1    as a reasonable way, based on the information we had at the

2    time, to estimate what the cure liability might ultimately

3    become.

4    Q.    And because of operational problems, was it possible to

5    identify and acquire all the contracts relevant to approaching

6    the cure issue?

7    A.    It was -- I don't think it was possible to calculate a

8    precise number for what I understood to be cure, for a variety

9    of reasons, including operational but also including

10   definitional in terms of what was in and what was not, and also

11   just not having contract-level information to understand what

12   the obligation might be if the contracts were assumed by

13   Barclays.

14   Q.    And without that information that you described, you

15   developed this alternative way to value cure and you estimated

16   it to be about one billion dollars, is that right?

17   A.    That's right.  I was aware that there was a process that

18   was on the way to try to identify, from a bottoms-up basis, all

19   the components of what the cure liability might look like.  I

20   was aware that that was a large process.  I didn't think that

21   it would be completed within the time frame that we had.

22         And so we -- I, or I and Ian, developed an estimate, and

23   it was simply in the absence of having any more detailed

24   information and access to contracts and the like, based off

25   what the firm's expense run rate was.

270

1    Q.   And you shared that information with whom on Monday,

2    Tuesday or Wednesday of that week?

3    A.   I think it was Tuesday or Wednesday.  And if it was me

4    that developed it, I shared it with Ian first, and then we both

5    went to Bart.  If it was Ian and I that developed it, then we

6    both went to Bart.

7    Q.   And I think you advised the Court of your testimony as to

8    what Mr. McDade's response was to that.  You also were asked

9    about whether you spoke to anyone else about it during that

10   week, any of the lawyers or financial advisors.  You recall

11   that?

12   A.   I do, yeah.  I --

13   Q.   And you responded that you had had a conversation with

14   Weil.  When was that?  And would you describe that conversation

15   for the Court, please?

16   A.   Sure.  My recollection is that that conversation was on

17   Friday morning, the 18th -- 19th.  It was a call that I

18   received from Lori Fife at Weil, and it was in reaction to an

19   updated version of the balance sheet that she had received

20   through one of her team or one of her partners, where she made

21   an observation that the cure estimated had moved relative to

22   where it was earlier in the week.

23        There was some urgency to the conversation, and I believe

24   it was Friday morning, because I had an understanding -- or I

25   do have an understanding that Ms. Fife was leaving shortly or

271

1   on her way to court.

2   Q.   Were you asked about that conversation by Movants at your

3   deposition, do you recall?

4   A.   I don't believe so.

5   Q.   Let me turn to the subject of margin.  What knowledge do

6   you have, sir, about the terms of the parties' agreement

7   regarding margin associated with exchange-traded derivatives?

8   A.   Could you repeat that, please?

9   Q.   What knowledge do you have about the parties' agreement

10  regarding margin that is associated with exchange-traded

11  derivatives?

12  A.   At the time, I had no knowledge.

13  Q.   Okay.  What expertise do you have, if any, concerning the

14  rules and regulations of the Securities Investor Protection

15  Act?

16  A.   I don't think I have even a cursory understanding.

17       MR. SCHILLER:  Let me ask you to put up Exhibit 1 for

18  Mr. Kelly, please.

19       (Pause)

20       MR. SCHILLER:  And let's go down to the bottom

21  paragraph there.  And blow it up.

22  Q.   Do you recall being asked about this paragraph and what

23  "amount of block discount" meant?

24  A.   Yes, I do.

25  Q.   And as I recall your testimony, you didn't have an

272

1    understanding of it?

2    A.    That's right.  It's not a term that I'm familiar with.

3         MR. SCHILLER:  Let me ask you to pick up the book that

4    we distributed, Your Honor; Exhibit 7 in that book.

5         (Pause)

6         MR. SCHILLER:  Oh, I'm sorry, Judge.  I thought we

7    distributed it.

8         THE WITNESS:  I have one.

9         THE COURT:  I was so thankful that no book had been

10   distributed.

11   Q.    Now, you mentioned -- I'm sorry, please review that

12   exhibit, from beginning to end.

13        MR. SCHILLER:  It is a four-page e-mail, Your Honor.

14        (Pause)

15   Q.    And, Mr. Lowitt (sic), I believe your testimony earlier

16   today was that when you came to work on Monday the 15th you

17   were advised at some point that morning of a deal -- possible

18   deal with Barclays, and you and your team had to get ready.  Do

19   you recall that?

20   A.    Yes, I do.

21   Q.    And you were getting ready, as I recall your testimony,

22   because your team was assembling and a Barclays team was

23   assembling to come over for negotiations, correct?

24   A.    Yeah.  I think throughout the course of the morning into

25   the afternoon a team was assembling.

273

1    Q.    And were lawyers from a variety of law firms representing

2    both Lehman and Barclays present?

3    A.    There were many people present that day and that night

4    that were -- I was aware that there were law firms present.  I

5    couldn't recognize individuals as being associated with --

6    Q.    Do you know whether partners from Lazard were present, a

7    financial advisor?

8    A.    I had an understanding that they were working on the

9    transaction.  I don't think I ever met any as part of the

10   entire transaction.

11   Q.    Right.  Well, I showed you that e-mail from Mr. Reilly,

12   and this is another e-mail in which Mr. Reilly is involved.

13   And if I take you to page 402 of this e-mail, which is directed

14   from Mr. Reilly to you and Daniel Flores -- you see that?

15   A.    Yes, I do.

16   Q.    Now, incidentally, you said you were going to be providing

17   information to Barclays and to Lehman in connection with the

18   deal, correct?

19   A.    I said I was part of a team that was doing that, yes.

20   Q.    And did your team also provide information to the lawyers

21   and the financial advisors?

22   A.    Yes.  Yes.

23   Q.    And did you do that specifically?

24   A.    On occasion I did; on other occasions, other members of

25   the team did.

274

1    Q.   On other occasions, did Daniel Flores do that?

2    A.   I'm not aware.  I'm not aware.  I can see by reading the

3    e-mail here that he sent this e-mail on to individuals at

4    Lazard.

5    Q.   Let me direct your attention to this e-mail to you and to

6    him.  "The first question is very difficult," Reilly writes.

7    "My understanding of the deal is that they will purchase our

8    assets that remain in LBI on the closing date, which will not

9    be the same as the assets on the 12th."  Does that refer to

10   Friday, September 12th?

11   A.   I believe that refers to Friday the 12th, yeah.

12   Q.   "The purchases will be at a fixed discount on the assets

13   that remain, to reflect the bulk size of the purchase."  Do you

14   see that?

15   A.   Yes, I do.

16   Q.   Did you have an understanding when you received this

17   e-mail as to what was meant by that by Mr. Reilly?

18   A.   I don't recall receiving this e-mail, but I don't think at

19   any point did I understand that there'd be a fixed discount.

20   Q.   And if you turn the page, you see that Mr. Flores has sent

21   this e-mail to Mr. Bruhmuller and that Mr. Bruhmuller writes --

22   and he's from Lazard, do you see that?

23   A.   Yes, I do.

24   Q.   So whatever this bulk discount meant, whatever this fixed

25   discount on the assets meant, it was sent by Mr. Flores, upon

275

1  **your and his receipt, to the financial advisors of Lehman --**

2  **Lazard, correct?**

3        MR. GAFFEY:  Your Honor, objection.

4  **A.    Based on this e-mail --**

5        THE COURT:  One --

6        MR. GAFFEY:  Objection, Your Honor.

7        THE COURT:  One second, Mr. Kelly.

8        MR. GAFFEY:  The e-mail from where Mr. Schiller's

9  reading doesn't indicate Mr. Kelly's involved at all anymore.

10  Foundation objection.  I'm not sure he has personal knowledge

11  as to what got sent to Lazard and what they did with it.

12        THE COURT:  That's a fair objection and I sustain it.

13  So to the extent that this is an attempt to get through this

14  witness what happened to an e-mail that he was first receiving

15  but may not have had anything to do with forwarding, the

16  objection is sustained.  If you can establish that he

17  participated in forwarding it to Mr. Bruhmuller, that's a

18  different story.

19        MR. SCHILLER:  All right.

20  **Q.    Let me ask you a question from the next page, 9401.  Mr.**

21  **Bruhmuller writes to Mr. Flores with respect to diligent (sic)**

22  **items, "We are trying to get a sense of how the marks have**

23  **evolved since Friday."  You see that?**

24  **A.    Yes, I do.**

25  **Q.    "I think the first priority would be to see the inventory**

276

1   of what's being sold, how the marks have evolved, and info on

2   the buyer discount."  You see that?

3   A.   Yes, I do.

4   Q.   Were you involved in any subsequent discussion with Mr.

5   Bruhmuller about any of these issues he was trying to get a

6   sense of?

7   A.   No, I was not.

8        (Pause)

9   Q.   Let me ask you also to turn to tab 3 in the book that we

10  presented.

11       (Pause)

12           MR. SCHILLER:  And I reference, for the record,

13  Exhibit 207, Your Honor.

14  Q.   And this is an e-mail from you, Mr. Martin (sic), on

15  September 17th, to Mr. Krasnow of Weil Gotshal, correct?

16  A.   Yes, I can see that.

17  Q.   And does this provide Weil Gotshal with information

18  showing that transaction adjustments were being made on the

19  balance sheet in estimating the potential exposure for cure and

20  compensation liabilities?

21  A.   Yes, this attachment is in the format that I described

22  earlier where it's an attempt to reflect on a prospective basis

23  at that point in time what the impact of the sale transaction

24  would be to the remaining balance sheet of Lehman.

25  Q.   Again, would you explain to Judge Peck what the purpose

277

1   was of creating these types of balance sheets?

2   A.   I think there was a need to understand, for several

3   reasons, what the impact of the transaction would be, the sale

4   transaction.  One of the purposes, and one of the other tasks

5   that I was working on that week, was trying to identify what

6   filings would be necessary with the SEC as part of the

7   transaction.  And so I think, related to that effort, we had

8   commenced a process to estimate the impact of the transaction

9   on the books of Lehman.

10  Q.   How reliable is the information before His Honor in terms

11  of its point in time?

12  A.   I think I could say that virtually every number on the

13  page here, with the exception of the 8/31 column, which is off

14  the ledger and balances, is an estimate of one form of another.

15  There were just so many issues in getting information, both in

16  terms of trying to establish what we thought we had on that

17  date and what it was worth, and liabilities that we had and

18  what they were worth.

19  Q.   Were these figures -- I'm sorry.  I want you to finish

20  your answer.

21  A.   And then I think there was uncertainty and a lag in

22  reflecting changes to the terms of the transaction on the

23  spreadsheet.

24  Q.   Were the figures changing constantly that week that

25  contributed to these associated liabilities?

278

1    A.   Yes, I think that different categories of liabilities

2    changed throughout the week, as the assets changed as well.

3    Q.   How was this information prepared?

4    A.   My recollection is that this was under the ownership of

5    someone that reported to me, Kristie Wong, and she was with a

6    large group of people and, through e-mail and conversations,

7    including with myself, trying to capture both what we thought

8    we had as a firm at that point in time as well as what she

9    thought the terms of the transaction were.

10   Q.   Why did you share this information with Weil Gotshal?

11   A.   I think this was an evolving attempt to reflect our best

12   estimate at different points in time of what the impact of the

13   transaction would be to Lehman.

14   Q.   And this effort and this communication to the lawyers, is

15   that part of the process that began on Monday and continued

16   through the week?

17   A.   There were lawyers -- well, I believe there were lawyers

18   in the Monday night -- sorry, Tuesday morning conversation that

19   I referenced earlier, where we were talking about real estate

20   negotiations.  There were lawyers -- we were all on the same

21   floor at 745 7th Avenue, the thirty-second floor.  There were -

22   - and we spent several days there.  There were lots of people

23   in different capacities there at the same time.

24        So I have difficulty saying, you know, a particular person

25   or a law firm or advisor was present at any one particular

279

1    point in time --

2    Q.    Was it an open process?

3    A.    It was open and there were also -- all of the conference

4    rooms were being used and people were walking in and out all

5    the time.  I think that there was -- one part of the

6    negotiations that I do recall vividly is there was a Lehman

7    trader by the name of Eric Felder, and his counterpart at

8    Barclays Stephen King, they were negotiating on a sofa right to

9    the side of the reception desk, presumably because there was no

10   where else that they could go.  And they were, sort of,

11   debating back and forth among themselves.

12       There were different meetings like that occurring around

13   the floor, and there were -- there was involvement by, you

14   know, different sets of advisors around those meetings.

15   Q.    And were -- was information, like this information that

16   you sent to Weil Gotshal, also shared with Lazard, as far as

17   you know?

18   A.    I don't know.

19   Q.    Let me ask you to turn to tab 4, Exhibit 209, an e-mail at

20   the beginning from Kristie Wong, copying you; it's to Daniel

21   Flores.  And you see at the top of the page it says "From

22   Daniel Flores to Barry Ridings".

23       Would you advise the Court whether the balance sheet at

24   9-2 of this exhibit is information that was also showing a

25   transaction adjustment to the balance sheet and estimating the

280

1   potential exposure for cure and comp?

2   A.   Yeah, this -- it looks to be in a slightly different

3   format with the -- all the sales marked on the page.  But it

4   looks to be a similar version to one of the other versions of

5   the spreadsheet that we looked at earlier.

6   Q.   And this is dated on the 19th, is it not -- I'm sorry, on

7   the 18th, in terms of the e-mail from Ms. Wong?

8   A.   The e-mail is as of the -- is sent at 6 p.m. on the 18th,

9   that's right.

10  Q.   Can I ask you to turn to tab 5, please, another e-mail

11  concerning transaction adjustments to the balance sheet?

12  A.   Yes.

13         MR. SCHILLER:  This is Exhibit 212, for the record,

14  Your Honor.

15  Q.   And this is an e-mail from Ms. Wong to Mr. Coles of

16  Alvarez & Marsal, correct?  And you're copied on it.  Do you

17  see that?  September 18th?

18  A.   Yes, I do.

19  Q.   And would you turn to the last page where the balance

20  sheet appears?  And do you see under Payables it says "Bonus

21  payable and cure and comp"?

22  A.   Yes, I do.

23  Q.   And a transaction adjustment, do you see that?

24  A.   Yes, I do.

25  Q.   Two billion for comp and 1.6 for cure?

281

1    A.   Yes, I do.

2    Q.   Does this e-mail reflect that the information showing

3    transaction adjustments on its balance sheet, in estimating the

4    potential exposures for comp and cure, were shard with Alvarez

5    & Marsal by your team?

6    A.   Yes, it does.

7         MR. SCHILLER:  May we put Movants' Exhibit 14 up on

8    the screen, please?

9    Q.   Now, a question came up at the beginning of your

10   deposition as to employment prospects for you the week of

11   September 15th through the 22nd, 2008.  Do you recall that?

12   A.   Yes, I do.

13   Q.   And you and the Court were provided with BCI Exhibit 362,

14   Your Honor, which was a handout.

15        THE COURT:  I have that, but I'm confused by your

16   question.  You said about -- you were asking about a question

17   at the beginning of this witness' deposition.  Are you

18   referencing his deposition?

19        MR. SCHILLER:  I'm sorry, I mean beginning of his

20   examination here, Your Honor --

21        THE COURT:  All right.

22        MR. SCHILLER:  -- concerning employment prospects.

23   Q.   And if I can address your attention to paragraph 8 of your

24   declaration.

25   A.   Sorry, I don't have that, I don't think, here.

282

Q.    It's a loose exhibit.

A.    (Pause).  I'm sorry, I think I've misplaced it.

          THE COURT:  Here.  You can take mine.

          MR. SCHILLER:  Thank you, Judge.

Q.    Did you receive an offer of employment by Alvarez & Marsal

during the week of September 15th, 2008?

A.    Yes.  I had conversations with Alvarez & Marsal about a

variety of topics, starting on Tuesday the 16th.  And I recall

several meetings with the Alvarez folks that week; the initial

conversations were focused on Lehman and how Lehman was

structured, both from a business and a legal entity

perspective.  And after several meetings, I recall that Alvarez

suggested that they'd like me to either stay with Lehman or

join the team.  And one option that they talked about was that

they needed someone as the CFO of Lehman on an ongoing basis.

And so in my mind that was an option or an opportunity that was

available to me.

Q.    And following that opportunity to consider the job of CFO

for Lehman under the Alvarez & Marsal administration, did you

work with Alvarez & Marsal on this transaction through and

after closing?

A.    Yes, I did.  The work that I did with Alvarez continued

until after October 10, after I became a Barclays employee and

signed the contract.  I was still working with Alvarez.  The

effort diminished over time as a team was assembled to focus on

283

1    Lehman-related matters.  But certainly through the weeks

2    leading up until that point in time, I did.

3           MR. SCHILLER:  Let me turn to the subject of cure,

4    Your Honor, and this will conclude examination.  I appreciate

5    the Court's patience and of everybody in the courtroom, but

6    Your Honor wanted to finish tonight and I'm doing my best --

7           THE COURT:  That's fine.

8           MR. SCHILLER:  -- to get that done.

9    Q.   When did you first hear that Lehman would need to estimate

10   potential cure exposure of Barclays as a part of this

11   transaction?

12   A.    I recall it was Monday.  I recall it was Monday the 15th.

13   I recall it was late at nighttime.  And I recall that that

14   conversation -- the initial conversation occurred with Mark

15   Shapiro from Lehman.

16   Q.   And what was your understanding of what he explained to

17   you and what needed to be done?

18   A.    Well, the notion of cure was foreign; I had never heard of

19   it, and it took a while to conceptualize what it meant.  It

20   became, as we talked about it -- and I do recall it was a

21   series of conversations and one of them involved a large group

22   of people, because I don't think anyone actually understood

23   what the concept was -- well, from where I sat, of what cure

24   was, except for Mark.

25          The -- I think the -- what I learned was that it was a

284

1    broad concept.  It would -- in substance, it would apply to any

2    liabilities that Barclays would assume to continue to operate

3    the businesses that it was acquiring.

4    Q.   Did you have any understanding whether the estimate of

5    cure would be binding on Barclays through the contemplated sale

6    agreement?

7    A.   No.  I understood at some point -- it may not have been

8    the Monday night, but I understood that there was a period of

9    time during which Barclays had the right to accept or reject

10   contracts.  I also mentioned earlier that I had an

11   understanding on the Monday night/Tuesday morning, the

12   15th/16th, that there was an adjustment feature, which I

13   thought was to adjust any purchase consideration back to the

14   liabilities that were actually issued.

15   Q.   As the financial comptroller, did you have any

16   understanding that an estimate for cure could be readily

17   generated from Lehman's general ledger?

18   A.   The concept of cure was certainly not anything that was

19   reflected as an account or a set of accounts on the ledger.  I

20   think part of the difficulty I had just trying to understand

21   what it meant was that it was potentially quite broad.  It was

22   very difficult to define what types of contracts would be

23   covered by it and what would not.  And then ultimately it was

24   Barclays' decision to accept them or not.

25         So I had an understanding that at its most fundamental it

285

1    included trade, liabilities and accounts payable, and the like,

2    that were reflected on the ledger, and reflected either

3    invoices that had been received or accruals that had been made

4    for costs that were known about.

5        But there was uncertainty around the number and the type

6    of contracts.  There was uncertainty around what other

7    liabilities might need to be assumed beyond, sort of, obvious

8    trade creditor type liabilities.  There was uncertainty around

9    how to identify all of the contracts, because Lehman had a

10   system for allocating expenses among different legal entities.

11       And so while LBI reflected some of the accrual and some of

12   the liabilities, other entities in the group would have been

13   holding a liability or had a liability, whether recognized or

14   not, that related to the businesses that were being acquired.

15   Q.   Did anyone tell you or your team which contracts during

16   the week of September 15th that Barclays intended or expected

17   to assume?

18   A.   No.  I don't recall being told or seeing a list.  I was

19   aware that there was -- as I mentioned, there was an effort to

20   identify contracts.  I don't believe I ever saw that, actually.

21   Q.   From September 15th through September 22nd, did you have

22   any conversations with anyone at Barclays about what they

23   expected or intended to spend on cure after they took over the

24   business?

25   A.   No, I did not.

286

1   Q.   Do you believe that the Lehman estimates of cure or comp

2   were inflated intentionally in any way?

3   A.   No, absolutely not.

4   Q.   Thank you, Mr. Kelly.

5        MR. SCHILLER:  Thank you, Your Honor.

6        THE COURT:  Thank you.

7        Is there any redirect?

8        MR. GAFFEY:  One question, Your Honor.

9   REDIRECT EXAMINATION

10  BY MR. GAFFEY:

11  Q.   When you spoke to Ms. Fife and gave her the number, you

12  didn't tell her how you calculated it, right?  You just told

13  her it was 1.5 billion dollars?

14  A.   No.  My recollection is that the conversation was 1.0

15  billion, not 1.5.  I don't recognize 1.5 billion as a number.

16  Q.   That's your memory?

17  A.   That's my memory.

18  Q.   Did you write her a memo?

19  A.   No, I didn't write her a memo.

20  Q.   Did you give her a document that said 1.0?

21  A.   I don't recall giving her directly anything.  There were

22  versions of the balance sheet that went to Weil.  I believe

23  that one of them had the 1.0 billion --

24  Q.   So you didn't --

25  A.   -- on its --

287

Q.   -- speak to Ms. Fife?

A.   I did speak to Ms. Fife.  She called me to ask why the

estimate had moved down, and my recollection of "down to" was

1.0 billion.

Q.   Okay, and that's your recollection is the 1.0 billion?

There's no memo, there's no e-mail, there's no document that

reflects it?

A.   No.  I clearly remember receiving a call.  I remember it

being of some urgency.  My recollection is it was 1.0 billion,

and my recollection is that I explained why it had moved down.

        MR. GAFFEY:  Nothing further, Your Honor.

        MR. SCHILLER:  Just one question, Judge.

RECROSS-EXAMINATION

BY MR. SCHILLER:

Q.   Why, of all the things that were going on that week on

Friday, do you remember this call?  Was there an interaction in

this call that causes you to -- has caused you to remember it

through to today?

A.   I -- yeah, I hadn't spoken with Lori Fife before that

point that I can recall.  I'd heard her name.  I think the

thing that makes me recall it is that the -- it was quite

evident to me that the information was important and that she

needed to know it and have it.  And I think she was surprised

that it had moved down.  And she was, as I mentioned before,

either leaving for or on her way to court.

288

1    **Q.    Thank you.**

2              MR. SCHILLER:  Thank you, Your Honor.

3              MR. GAFFEY:  No further questions.

4              THE COURT:  Okay, Mr. Kelly, thank you, you're

5    excused, and I'm sure you'll be relieved to go back to work

6    tomorrow.

7              THE WITNESS:  Thank you, Your Honor.

8              THE COURT:  Before we conclude, yesterday there was

9    the debate that I asked to table to another day, having to do

10   with the scheduling of Mr. Varley for Friday, May 7th.  I don't

11   know if the parties have made any progress with regard to

12   scheduling, and it's also not clear to me whether or not

13   because we're falling a little bit behind this is a problem

14   that may take care of itself.  But rather than burden the

15   record or the parties at this late hour, I'm going to suggest

16   that we have a conference on scheduling sometime before the end

17   of the week and that, to the extent it's possible for the

18   parties to work this out consensually, that would be obviously

19   ideal.  To the extent it's not, we'll do it in a chambers

20   conference.

21             MR. SCHILLER:  Thank you, Your Honor.

22             UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

23             THE COURT:  Okay.  We're adjourned.

24        (Whereupon these proceedings were concluded at 6:47 p.m.)

25

289

1

2                    I N D E X

3

4                T E S T I M O N Y

5    WITNESS                EXAM BY              PAGE      LINE

6    Harvey Miller          Mr. Gaffey            10        20

7    Harvey Miller          Mr. Maguire           81         5

8    Harvey Miller          Mr. Schiller          92        17

9    Harvey Miller          Mr. Gaffey           126         2

10   Harvey Miller          Mr. Werder           127        17

11   Martin Kelly           Mr. Gaffey           130         9

12   Martin Kelly           Mr. Maguire          244         8

13   Martin Kelly           Mr. Schiller         264         6

14   Martin Kelly           Mr. Gaffey           287        16

15   Martin Kelly           Mr. Schiller         287        20

16

17                E X H I B I T S

18   NO.          DESCRIPTION                 ID.      EVID.

19   Movants' 8     E-mail to Mr. Lowitt describing        153

20                  terms

21   Movants' 254   Versions of balance sheets             218

22   Movants' 188   E-mail From Paolo Tonucci to           220

23                  Ian Lowitt, Michael Gelband

24                  and Martin Kelly

25

290

1

2                          I N D E X, cont'd

3

4                          E X H I B I T S

5     NO.                DESCRIPTION                    ID.     EVID.

6     Movants' 21    E-mail from Gerard Reilly to              229

7                    Mr. Kelly dated 9/17/08

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

291

1

2                      C E R T I F I C A T I O N

3

4        I, Lisa Bar-Leib, certify that the foregoing transcript is a

5        true and accurate record of the proceedings.

6

7        _____

8        LISA BAR-LEIB

9        AAERT Certified Electronic Transcriber (CET**D-486)

10

11       Veritext

12       200 Old Country Road

13       Suite 580

14       Mineola, NY 11501

15

16       Date:  April 30, 2010

17

18

19

20

21

22

23

24

25