as well as the limited partners in Defendants' funds, understood that Defendants would pay such fees to PIM.

20.    The fee schedule set forth in paragraphs 15 and 16 above were set forth in writing, among other places, on the Lehman Brothers internal website, known as LehmanLive, and on various memoranda provided to the persons responsible for managing the PIM business when it was still part of LBHI. The written fee schedule reflects Defendants' intention to be bound to pay fees to PIM, which Defendants regularly paid in a manner consistent with the written fee schedule until September 2008.

21.    When Barclays and LBHI completed the Asset Purchase Transaction in September 2008, they agreed in writing that "The private investment management business (other than CTS (Corporate Cash) business) (the "PIM Business") is a Purchased Asset and the Purchased Assets shall include the assets of the Seller used exclusively in the PIM Business." Subsequent to the sale, Barclays re-branded PIM as "Barclays Wealth."

22.    Thus, there can be no dispute that Barclays succeeded to the economic rights enjoyed by PIM. Indeed, that is precisely what Barclays purchased (among other things) as part of the multi-billion dollar Asset Purchase Transaction. The fees owed by Defendants to PIM were an asset of the PIM business, and therefore part of what Barclays purchased from Lehman Brothers in September 2008.

23.    PIM relied to its detriment on Defendants' commitment to pay PIM a portion of the financial commitments made by Defendants' limited partner investors. PIM's professionals devoted substantial resources to matching up potential investors with Defendants' private equity funds, with the justified expectation that Defendants would

6

live up to their obligations to pay, and continue to pay, a portion of limited partners'
financial commitments to PIM pursuant to the agreements. The scope of PIM's efforts is
demonstrated by the substantial scope of investments that PIM originated for Defendants'
funds – more than $2 billion.

24.    If PIM was aware that Defendants would later assert that Defendants were
not required to pay PIM for those services, and that PIM's work would purportedly be
performed free of charge, then PIM would have instead directed its resources to placing
investors with clients that would provide revenue to PIM.

25.    Since September 2008, Barclays Wealth has continued to provide the
same level of service to Defendants that PIM provided prior to its purchase by Barclays
in September 2008, including, among other things:

    a.   Involvement in investor capital calls and distributions;

    b.   Handling individual investor questions on fund performance;

    c.   Facilitating investor calls.

26.    Nonetheless, subsequent to the closing of the Asset Purchase Transaction,
Defendants have refused to pay Barclays any fees in connection with the investments
generated by PIM.

27.    Pursuant to the written fee schedule set forth above, Defendants owe more
than $16 million in fees to Barclays.

## FIRST CLAIM FOR RELIEF
### (Quantum Meruit – Breach of Implied Contract)

28.    Barclays realleges the allegations contained in paragraphs 1 to 27 as
though fully set forth herein.

29.     Through their course of conduct, Defendants formed a contract with PIM to pay commissions or placement agent fees to PIM or its successors, including Barclays, in connection with the sourcing of investors by PIM for the benefit of Defendants.

30.     This course of conduct included, but is not limited to:

    a.  Regularly paying the fees to PIM, as compensation for investor placement and continued service, until Barclays' purchase of PIM in September 2008;

    b.  Referencing the fee payout schedule in written materials;

    c.  Acknowledging the General Partner's responsibility, in the Limited Partnership Agreement of each of the funds at issue here, to pay placement agent fees;

    d.  Representing to investors that a portion of their investments will be paid, in the form of non-refundable fees, to PIM in consideration for PIM's acting as a placement agent.

31.     The benefits of these agreements were transferred to Barclays following Barclays' purchase of LBHI's assets, which included the PIM assets.

32.     Upon the sale of PIM to Barclays in September 2008, Defendants ceased paying fees in breach of the agreements they had formed with PIM.

33.     By reason of the foregoing, Barclays has suffered damages in an amount to be determined at trial, but not less than $16 million.

## SECOND CLAIM FOR RELIEF
### (Quantum Meruit – Promissory Estoppel)

34.     Barclays realleges the allegations contained in paragraphs 1 to 33 as though fully set forth herein.

35.     Barclays has provided the same services to Defendants that PIM provided prior to the purchase by Barclays of PIM in September 2008, in reliance on the promise that Defendants would continue to pay for such services and would reasonably compensate Barclays for these services.

36.     Defendants accepted and have benefited from the ongoing investor services Barclays has provided to them.

37.     Defendants knew that PIM provided these services with an expectation of reasonable compensation.

38.     PIM reasonably relied on Defendants' promise to its detriment, by expending substantial resources on generating investments into Defendants' funds instead of focusing on other potential streams of revenue.

39.     Defendants' acceptance of Barclays' services without reasonable payment for those services is inequitable.

40.     As a result of the Defendants' failure to reasonably compensate Barclays for its services, Defendants have been unjustly enriched at the expense of Barclays.

41.     Barclays has suffered injury to its business by reason of Defendants' unjust enrichment in an amount to be determined at trial, but not less than $16 million.

### THIRD CLAIM FOR RELIEF
#### (Unjust Enrichment)

42.     Barclays realleges the allegations contained in paragraphs 1 to 41 as though fully set forth herein.

43.     Since Barclays' purchase of PIM in September 2008, Defendants have collected management fees from their limited partners at rates that were set to include the

9

fees due to placement agents such as PIM/Barclays, as reflected in the language of
Defendants' constitutive partnership agreements.

44.    Barclays has continued to provide the same level of service to Defendants
that PIM provided prior to its purchase by Barclays in September 2008, yet Defendants
have wrongfully ceased paying fees owed to Barclays.

45.    Defendants have failed to compensate Barclays for the benefit they have
received, and consequently have been unjustly enriched at the expense of Barclays.

46.    Barclays has suffered injury to its business by reason of the Defendants'
unjust enrichment in an amount to be determined at trial, but not less than $16 million.

### FOURTH CLAIM FOR RELIEF
### (Constructive Trust)

47.    Barclays realleges the allegations contained in paragraphs 1 to 46 as
though fully set forth herein.

48.    When they entered into the agreement to pay a portion of the funds'
management fees to PIM, the relationship between Defendants and PIM was one of
confidential and fiduciary nature.

49.    In reliance on Defendants' agreement to pay PIM a portion of the money
committed to Defendants' funds by investors placed by PIM, PIM generated more than
$2 billion of investments for the benefit of Defendants.

50.    Barclays has continued to provide the same level of service to Defendants
that PIM provided prior to its purchase by Barclays in September 2008, yet Defendants
have wrongfully ceased paying fees owed to Barclays.

51.    Defendants have failed to compensate Barclays for the benefit they have
received, and consequently have been unjustly enriched at the expense of Barclays.

52.     Barclays has suffered injury to its business by reason of Defendants' unjust enrichment in an amount to be determined at trial, but not less than $16 million.

## FIFTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty)

53.     Barclays realleges the allegations contained in paragraphs 1 to 52 as though fully set forth herein.

54.     PIM and Defendants, while each operating under the Lehman Brothers brand name, enjoyed a confidential and fiduciary relationship.

55.     As part of this fiduciary relationship, Defendants undertook to preserve designated portions of the investments received from Defendants' limited partner investors for the exclusive benefit of PIM and its successors.

56.     Defendants repeatedly promised PIM that it would make these payments, and in furtherance of this promise, did in fact make such payments through September 2008.

57.     Defendants hold significant assets that have been allocated specifically for the benefit of PIM, and which Defendants have reserved for the specific benefit of PIM.

58.     In reliance on Defendants' agreement to pay PIM a portion of the funds' management fees, PIM generated more than $2 billion of investments for the benefit of Defendants.

59.     Barclays has continued to provide the same level of service to Defendants that PIM provided prior to its purchase by Barclays in September 2008, yet Defendants have wrongfully ceased paying fees owed to Barclays.

11

60.    Barclays has suffered injury to its business by reason of Defendants'
unlawful withholding of fees set aside for PIM in an amount to be determined at trial, but
not less than $16 million.

WHEREFORE, plaintiff Barclays seeks judgment:

    a.    Declaring that Defendants have breached their legal obligations under
the agreements alleged herein;

    b.    Awarding Barclays compensatory damages against Defendants,
including interest thereon, in an amount to be determined at trial, but
not less than $16 million;

    c.    Awarding attorney fees and costs associated with bringing this action;
and

    d.    Awarding such other relief as the Court deems just, equitable, and
proper.

Dated: March 16, 2010
       New York, New York

Respectfully submitted,

BOIES, SCHILLER & FLEXNER LLP

By: _____
Jonathan D. Schiller
Christopher E. Duffy
Bridget Brown
575 Lexington Avenue, 7th Floor
New York, New York 10022
Phone: (212) 446-2300
Fax:  (212) 446-2350

*Attorneys for Plaintiff Barclays Capital Inc.*

## EXHIBIT E

[Clarification Letter]

# BARCLAYS CAPITAL INC.

As of September 20, 2008

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
LB 745 LLC
Attn: Steven Berkenfeld, Esq.
Facsimile: (646) 758-4226

Ladies and Gentlemen:

        Reference is made to the Asset Purchase Agreement, dated as of September 16, 2008 (the
"Original Agreement") as amended by the First Amendment thereto dated as of September 19,
2008 (the "First Amendment" and, the Original Agreement as so amended, the "Agreement"), by
and among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI"), LB 745
LLC ("745") and Barclays Capital Inc. ("Purchaser"). Each capitalized term used and not
defined herein shall have the meaning ascribed to it in the Original Agreement. This letter
agreement (this "Letter") clarifies the intention of the parties with respect to certain provisions of
the Agreement, supplements in certain respects the agreements of the parties stated therein and
amends the Agreement in certain respects, and is binding on the parties hereto upon its execution
and delivery. All references herein to the Original Agreement are to the conformed copy
attached hereto of the hand marked Original Agreement.

    1.    Purchased Assets; Excluded Assets.

        (a)    The Purchased Assets means (i) all of the assets of Seller used
primarily in the Business or necessary for the operation of the Business (in each case,
excluding the Excluded Assets) and (ii) none of the assets of Subsidiaries of LBHI (other
than assets of LBI except as otherwise specifically provided in the Agreement or this
Letter. Purchased Assets shall include:

        (i)    the items set forth in clauses (b), (c) and (f) through (o) and (q)
through (s) of the definition of "Purchased Assets" in the Original Agreement;

        (ii)    with respect to clauses (a), (d) and (e) of the definition of
"Purchased Assets" in the Original Agreement, instead of the items referred to in such
clauses, (A) the securities owned by LBI and transferred to Purchaser or its Affiliates
under the Barclays Repurchase Agreement (as defined below) as specified on Schedule A
previously delivered by Seller and accepted by Purchaser, (B) such securities and other
assets held in LBI's "clearance boxes" as of the time of the Closing, which at the close of
business on September 21, 2008 were as specified on Schedule B previously delivered by
Seller and accepted by Purchaser (provided, however, that Purchaser in its discretion may

1

elect within 60 days after the Closing to return any such securities to LBI); provided, that
no securities owned by LBHI or any Subsidiary of LBHI (other than LBI and other than
as specified in the Agreement or clause (iii) below) are Purchased Assets and (C)
exchange-traded derivatives (and any property that may be held to secure obligations
under such derivatives) and collateralized short-term agreements;

      (iii)    the equity of Lehman Brothers Canada, Inc., Lehman Brothers
Sudamerica SA and Lehman Brothers Uruguay SA; and

      (iv)    all prime brokerage business and accounts and repurchase
agreement operations and securities lending operations of the Business (for the avoidance
of doubt, other than those that are part of the IMD Business); and

      (v)    any rights or interests Seller may have with respect to any escrow
or other account established in connection with the Global Research Analyst Settlement
entered by the U.S. District Court on October 31, 2003 (the "Research Settlement"), or
funds otherwise set aside for the procurement of independent research pursuant to the
Research Settlement, but only to the extent that Purchaser is required to make payments
in accordance with the Research Settlement as a result of its acquisition of LBI's
investment banking and research operations.

      (b)    For the avoidance of doubt, the "Business" includes LBI's
commodities business, government securities trading operations and mortgage-backed
securities trading operations of LBI (but not any securities of such nature held by Seller
except as otherwise specified herein or in the Agreement).

      (c)    The Excluded Assets shall mean the assets of Seller and its
Subsidiaries referred to in clauses (a), (c) through (j), and (l) through (q) of the definition
of "Excluded Assets" in the Original Agreement and the other assets identified in this
Letter as Excluded Assets  Except as otherwise specified in the definition of "Purchased
Assets," "Excluded Assets" shall include any cash, cash equivalents, bank deposits or
similar cash items of Seller and its Subsidiaries; provided that "Excluded Assets" shall
not include any and all property of any customer, or maintained by or on behalf of LBI to
secure the obligations of any customer, whose account(s) are being transferred to
Purchaser as part of the Business. The following shall also be Excluded Assets: All of
the investments held by Seller or their Subsidiaries in collateralized debt obligations,
collateralized loan obligations, over-the-counter derivatives, TBA mortgage notes and
similar asset-backed securities and corporate loans, other than those subject to the
Barclays Repurchase Agreement, and until any securities pledged as collateral under
Seller clearing arrangements with JP Morgan Chase & Co. or its Affiliates (other than
those referred to in Section 1(a)(ii) of the Letter). Also included in the Excluded Assets
are the mortgage servicing rights for Ginnie Mae guaranteed securities. Included in
clause (h) of the definition of "Excluded Assets" in the Original Agreement are life
insurance policies owned by Seller and its Subsidiaries.  For the avoidance of doubt, the
equity interests and assets of Lehman Brothers Commodity Services, Inc., including the
equity of, as well as the assets of the energy marketing and services business of Eagle
Energy Management LLC, are Excluded Assets (rather than Purchased Assets).  The

2

reference to "third parties" in clause (i) of the definition of "Excluded Assets" includes any person, including Affiliates of Seller. Clause (h) of the definition of Excluded Assets in the Original Agreement is hereby amended to remove the following clause: "other than customer account insurance supplemental to SIPC coverage included in the Business."

(d)     Sections 3 and 4 of the First Amendment are hereby deleted in their entirety and shall be of no effect *ab initio*. LBI hereby instructs Purchaser to pay at the Closing $250 million of the Cash Amount to the Depository Trust Clearance Corporation ("DTC") for deposit as collateral against LBI's obligations to DTC (including its affiliated clearing organizations). Such collateral account shall be maintained in accordance with the agreement among LBI, Purchaser and DTC entered into in connection with the Closing.

(e)     Seller hereby represents and warrants to Purchaser that LB I Group Inc. has and had as of the date on which LB I Group Inc. transferred to LBI the equity of Townsend Analytics, Ltd., LB I Group Inc. no indebtedness.

2.     IMD Business. For purposes of the Agreement, the IMD Business consists of the asset management and the alternatives – private equity businesses of Seller and the Subsidiaries, but not the private investment management business of Seller and the Subsidiaries (other than the CTS (Corporate Cash) business). As a result, Excluded Assets include the asset management business, the alternatives-private equity business and the CTS (Corporate Cash) business. The private investment management business (other than the CTS (Corporate Cash) business) (the "PIM Business") is a Purchased Asset and the Purchased Assets shall include the assets of the Seller used exclusively in the PIM Business. The forgivable notes issued by PIM employees to Seller or its Affiliates shall be an Excluded Asset. Excluded Liabilities shall include any pre-closing legal, tax or compliance Liabilities associated with IRA accounts for the benefit of clients of the PIM Business.

3.     Assumed and Excluded Liabilities. Clause (a) of the definition of "Assumed Liabilities" consists solely of all Liabilities incurred by Purchaser and arising after the Closing in connection with the Business. Clause (d) of the definition of "Assumed Liabilities" in the Original Agreement is understood as though it read as follows: "accounts payable incurred in the Ordinary Course of Business of Seller after, with respect to each entity comprising Seller, the date on which such entity commenced a voluntary case or cases under Chapter 11 or Chapter 7, as the case may be, of the Bankruptcy Code, associated with the Business (other than accounts payable arising out of or in connection with any Excluded Contract), including, for the avoidance of doubt, to the extent arising after such date (i) invoiced accounts payable and (ii) accrued but uninvoiced accounts payable)." Consistent with the other provisions of this Letter, no Liabilities described in clause (i) of the definition of Assumed Liabilities shall be "Assumed Liabilities." For the avoidance of doubt, any Liabilities of Seller or its Subsidiaries under the $15.8 billion tri-party repurchase facility dated on or about September 18, 2008 funded by JP Morgan Chase shall be "Excluded Liabilities."

4.     Consideration. The parties, after considering the available appraisal information, have agreed upon the value of the Lehman headquarters at 745 Seventh Avenue , the Cranford New Jersey Data Center and the Piscataway New Jersey Data Center shall be in the aggregate $1,290,000,000 and shall not be subject to reduction with respect to any commission

3

and, accordingly, the Cash Amount shall be $1,540,000,000 (subject to certain holdback amounts relating to the real estate being transferred pursuant to the Agreement as provided by Section 12.2 of the Agreement).

      5.     License. All marks containing the words "LEHMAN" or "LEHMAN BROTHERS" assigned under the Agreement shall be considered Licensed Marks under Section 8.9 of the Agreement. The license to use the Licensed Marks granted pursuant to Section 8.9 of the Agreement with respect to the investment banking and capital markets businesses of Seller and its Subsidiaries is limited to a term of 2 years from the Closing Date (without limiting the perpetual term of the license granted for use in connection with the IMD Business (including in respect of any one or more of the private equity or other investment funds within the IMD Business) or in connection with winding up of any operations or businesses of Seller or any of its Subsidiaries). The licenses pursuant to Section 8.9 are not assignable or sublicensable, except that such licenses are assignable and sublicensable (i) for use in connection with IMD Business or any portion of the IMD Business and (ii) to Seller's Subsidiaries or to a purchaser of any business of Seller and its Subsidiaries solely for use by such Subsidiaries or purchaser in connection with the winding up of such business.

      6.     Subordinated Notes of LBI. The outstanding subordinated notes of LBI are not Assumed Liabilities, and such subordinated notes and any Liabilities associated with such subordinated notes therefore are Excluded Liabilities.

      7.     Breakup Fee. 745 is jointly and severally liable with LBHI and LBI for Seller's obligations under the Agreement to pay the Breakup Fee and Expense Reimbursement (each of which has the meaning ascribed to it in the Breakup Fee and Competing Bid Order).

      8.     Transfer of Customer Accounts. All customer accounts of LBI (other than customer who are Affiliates of LBI) shall be transferred to Purchaser. In connection therewith, Purchaser shall receive (i) for the account of the customer, any and all property of any customer, including any held by or on behalf of LBI to secure the obligations of any customer, whose account(s) are being transferred to Purchaser as part of the Business and (ii) to the extent permitted by applicable law, and as soon as practicable after the Closing, $769 million of securities, as held by or on behalf of LBI on the date hereof pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934, as amended, or securities of substantially the same nature and value. Liabilities arising under Seller's arrangements with DTC and its affiliated clearing organizations shall be Excluded Liabilities.

      9.     Deletion of Purchase Price Adjustment Provisions. Section 3.3 of the Original Agreement is hereby deleted in its entirety and shall be of no effect *ab initio*.

      10.     Payables, Deposits and Receivables. No payables or deposits of a Seller or Subsidiary shall be Assumed Liabilities, except to the extent resulting from a Purchased Contract and except as provided in Section 8. No receivables shall be Purchased Assets, except to the extent resulting from a Purchased Contract.

      11.     Intercompany Obligations. Except as expressly contemplated by this Letter, the Agreement or the Transition Services Agreement, Purchased Assets and Assumed Liabilities shall not include any intercompany receivables or payables or other obligations

4

between or among any Seller and any of LBHI or any Subsidiary of LBHI. It is understood that nothing contained in this Letter shall affect the rights or obligations of the parties to the Transition Services Agreement contemplated by the Agreement.

12. Schedule 12.3. Following the Closing, the parties shall reasonably agree to an allocation of the purchase price (including the Assumed Liabilities) among the Purchased Assets for tax purposes and set forth such allocation on a Schedule 12.3 to be signed by the parties.

13. Barclays Repurchase Agreement. Effective at Closing, (i) all securities and other assets held by Purchaser under the September 18, 2008 repurchase arrangement among Purchaser and/or its Affiliates and LBI and/or its Affiliates and Bank of New York as collateral agent (the "Barclays Repurchase Agreement") shall be deemed to constitute part of the Purchased Assets in accordance with Paragraph 1(a)(ii) above, (ii) Seller and Purchaser shall be deemed to have no further obligations to each other under the Barclays Repurchase Agreement (including, without limitation, any payment or delivery obligations), and (iii) the Barclays Repurchase Agreement shall terminate. Additionally, the Notice of Termination relating to the Barclays Repurchase Agreement dated September 19, 2008 is hereby deemed rescinded and void *ab initio* in all respects.

14. Risk of Loss of Artwork. During such period that Purchaser has the right to possess the artwork following the Closing pursuant to Section 8.16 of the Agreement, Purchaser shall bear the risk of loss for such artwork. In the event that any artwork is damaged or lost during such period, Purchaser shall pay to Seller an amount equal to the damage or loss, consistent with the insured appraised value (as determined by an independent, recognized appraiser) for such artwork, assuming such artwork had not been lost or damaged.

15. Records. The records referred to in Section 8.7 include all Documents that are Purchased Assets and shall be considered to include all electronic documents, including e-mail. The joint administrators of the Lehman European entities are parties to which records and personnel shall be made available in accordance with the terms of Section 8.7.

16. Subleases. Notwithstanding anything to the contrary contained in Sections 4.2(d), 4.3(c), 8.14 or any other provision of the Agreement, with respect to the leased premises located in (i) 555 California Street, San Francisco, California ("SF Property"), (ii) 125 High Street, Boston, Massachusetts ("Boston Property"), (iii) 190 S. LaSalle Street, Chicago, Illinois ("Chicago Property"), and (iv) 10250 Constellation Boulevard, Los Angeles, California ("LA Property" and together with the SF Property, Boston Property and Chicago Property, the "Sublease Properties"), the parties agree as follows:

(a) As contemplated in the Agreement, on the Closing Date, (i) the underlying leases affecting the Chicago Property, the LA Property and the Boston Property shall be assumed by LBHI or LBI in connection with its bankruptcy proceeding and each of such leases shall be assigned by Seller to Purchaser and Purchaser shall assume all of Seller's obligations thereunder pursuant to assignment and assumption agreements mutually acceptable to Seller and Purchaser, and (ii) the underlying lease affecting the SF Property shall be assumed by Seller in connection with the bankruptcy proceedings.

5

(b)      With respect to each Sublease Property, Seller and Purchaser shall, within
a commercially reasonable period of time following the Closing Date, negotiate in good
faith, and thereafter execute and deliver, a sublease agreement reasonably acceptable to
both Purchaser and Seller and subject to the terms of the applicable underlying lease,
pursuant to which a portion of the demised premises under such underlying lease (such
portion of the premises to be agreed upon by the parties) shall be subleased to (A) with
respect to the SF Property, the Purchaser, and (B) with respect to the LA Property,
Chicago Property and Boston Property, the Seller (regardless of the creditworthiness of
Seller) or any person who purchases the IMD Business (provided that any such purchaser
entering into the sublease agreement as a subtenant shall be reasonably acceptable to the
Purchaser) (the landlord under such sublease being referred to as the "Sublandlord" and
the tenant under such sublease being referred to as the "Subtenant"), in each case, upon
such terms as shall be mutually acceptable to the Sublandlord and Subtenant provided
that (1) the Subtenant shall pay rent and other charges under such sublease agreement
equal to its proportionate share of the rent and other charges payable by the Sublandlord
to the landlord under the underlying lease (which proportionate share shall be based upon
the relative square footage of the subleased space in proportion to the square footage of
the overall demised space under the underlying lease), (2) the term of the sublease
agreement shall be a period commencing on the Closing Date and ending on the day
immediately preceding the expiration date of the underlying lease (as the same may be
extended pursuant to the terms of the underlying lease), (3) any alterations or
modifications which the Sublandlord and Subtenant mutually agree need to be made to
the demised premises in order to segregate the subleased space from the remainder of the
demised premises under the underlying lease shall be performed by the Sublandlord and
the cost thereof (including the cost of any plans and specifications, drawings, permits,
licenses, and other "soft" costs related thereto) shall be shared by the Sublandlord and
Subtenant in proportion to the square footage of their respective spaces.  Prior to the
execution and delivery of the sublease agreement for a particular Sublease Property,
subject to reasonable premises security procedures and giving due regard to regulatory
considerations (e.g., segregation) including the right to relocate such employees within
the applicable premises, and for a commercially reasonable period after the Closing Date,
(i) with respect to the SF Property, to the extent that Transferred Employees occupied any
portion of the SF Property prior to Closing, such Transferred Employees shall be
permitted to continue to occupy and use the SF Property to the same extent and for the
same purposes as the SF Property was occupied by such Transferred Employees prior to
the Closing; provided, that the foregoing shall be subject to Purchaser's ability to
substitute a substantially similar number of new employees of Purchaser for any such
Transferred Employees as provided in Paragraph 18 below, and (ii) with respect to each
Sublease Property other than the SF Property, to the extent that Excluded Employees
occupied any portion of such Sublease Property prior to Closing, such Excluded
Employees shall be permitted to continue to occupy and use such Sublease Property to
the same extent and for the same purposes as such Sublease Property was occupied by
such Excluded Employees prior to the Closing; provided, that the foregoing shall be
subject to Seller's ability to substitute a substantially similar number of new employees
of Seller for any such Excluded Employees as provided in Paragraph 18 below.  In each
case described in clauses (i) and (ii) above, no rent or other payments shall be made to the

6

party which is the tenant under the underlying lease until execution and delivery of the
applicable sublease agreement at which time all rent calculated under the sublease
agreement for the period from the Commencement Date (which date shall be the Closing
Date) through end of the month in which the sublease agreement is executed shall be paid
to the Sublandlord contemporaneously with the execution and delivery of the sublease
agreement.

(c)     If any consent or approval from any landlord under an underlying lease is
required pursuant to the terms of the underlying lease in order to effectuate the applicable
sublease agreement and/or to the extent that any landlord under an underlying lease has
recapture and/or termination rights that would be triggered by the proposed sublease
arrangement to be reflected in the applicable sublease agreement, Seller and Purchaser
will cooperate and use commercially reasonable efforts in obtaining such consent to the
applicable sublease agreement and/or obtaining waivers from the landlord with respect to
any such recapture and/or termination rights and shall otherwise comply in all respects
with the terms and provisions of the underlying lease in connection with the execution
and delivery of the applicable sublease agreement.

17.     Deferred Transfers.  Notwithstanding anything to the contrary contained in
the Agreement, (a) the parties agree that during the nine month period after the Closing Date that
Excluded Employees are permitted to occupy and use real property subject to a Transferred Real
Property Lease in accordance with Section 8.11(f) of the Agreement, that the Seller and its
Affiliates shall also be permitted to substitute a substantially similar number of new employees
of Seller or its Affiliates for any such Excluded Employees, and that any such new employees of
Seller or its Affiliates shall be permitted to occupy and use such real property to the same extent
and on the same basis as the Excluded Employees in accordance with Section 8.11(f), and (b) the
parties agree that during the nine month period after the Closing Date that Transferred
Employees are permitted to occupy and use real property is not subject to a Transferred Real
Property Lease in accordance with Section 8.11(g) of the Agreement, that the Purchaser and its
Affiliates shall also be permitted to substitute a substantially similar number of new employees
of Purchaser or its Affiliates for any such Transferred Employees, and that any such new
employees of Purchaser or its Affiliates shall be permitted to occupy and use such real property
to the same extent and on the same basis as the Transferred Employees in accordance with
Section 8.11(g).

18.     745 Seventh Avenue.  The parties acknowledge that there is no mortgage
encumbering 745's interest in the premises at 745 Seventh Avenue, New York, New York and
that, notwithstanding Section 10.1(d) of the Agreement, only the $500,000,000 promissory note
made by 745 in favor of LW-LLP Inc. will be fully repaid and extinguished.

19.     Prorations.  Notwithstanding Section 12.2 of the Agreement, to the extent
that the parties are unable to agree upon all customary prorations for the Purchased Assets as of
the Closing, they shall cooperate in finalizing all such prorations within thirty (30) days
following the Closing Date.

20.     Schedules.  Corrected Schedules 1.1(a) and 1.1(b) are attached hereto.

7

21.    <u>Definition of Excluded Contract.</u>  As used in the Agreement, the term
"Excluded Contract" shall include any ISDA Master Agreement and any master swap agreement
and any schedule thereto or supplement or amendment thereto.

22.    <u>PIM Business Leases.</u>

(a)  Notwithstanding anything to the contrary contained in the Agreement,
Purchaser shall have a period of ten (10) days following the Closing Date to perform due
diligence on the leases listed on Schedule 1(c) attached hereto (the "<u>PIM Leases</u>").  At any time
during such period, Purchaser and its Affiliates shall have the option to cause Seller to assume
and assign any or all of such PIM Leases to Purchaser, and Seller agrees to assume and assign
such PIM Leases to Purchaser.  Upon assignment of a PIM Lease to Purchaser, such PIM Lease
shall become a Transferred Real Property Lease.  With respect to any PIM Lease that becomes a
Transferred Real Property Lease, during the nine month period after the Closing Date, to the
extent that Excluded Employees occupied real property subject to such Transferred Real
Property Leases prior to Closing, such Excluded Employees, and a substantially similar number
of new employees of Seller or its Affiliates that may be substituted for any such Excluded
Employees, shall be permitted to occupy and use such real property on the same basis as
provided in Section 8.11(f) of the Agreement.

(b)  Notwithstanding the foregoing or anything to the contrary contained in
Section 22(a) or any other provision of the Agreement, with respect to the PIM Lease for the
premises located at 399 Park Avenue, New York, New York (the "<u>New York Property</u>"), the
underlying lease shall not be subject to assignment to Purchaser and the Purchaser shall only
have the option to require that Seller sublease to Purchaser or its Affiliates the sixth floor of the
New York Property (or a portion of the sixth floor) (the "<u>NY Sublease Premises</u>"), and Seller
agrees to sublease the NY Sublease Premises, subject to the parties' compliance with the terms
of the underlying lease including, without limitation, any notice or consent requirements set forth
therein.  If Purchaser elects to sublease the NY Sublease Premises as provided herein, all of the
terms and conditions set forth in this letter agreement applicable to the SF Property shall also
apply to the sublease of the NY Sublease Premises.

23.    <u>No Overseas Assets.</u>  Although LBI has been part of a global business and
Purchaser remains interested in potentially acquiring other portions thereof and obtaining the
services of the employees thereof, all assets and rights of the Lehman companies that would
otherwise be Purchased Assets (other than Seller, 745 and any Subsidiaries sold pursuant to the
Original Agreement or the Letter) that cannot be sold pursuant to Section 2.1 of the Original
Agreement as a result of being subject to governmental conservatorship or administration shall
be considered "Excluded Assets," except as notified by the administrator to LBI from time to
time or until such assets and rights can be so sold.  Except with respect to Purchased Intellectual
Property, no assets owned (in whole or in part) by any Subsidiary of LBHI (other than LBI, 745
and any Subsidiaries sold pursuant to the Original Agreement or the Letter) organized under the
laws of a jurisdiction other than the United States of America or a state thereof are included
among the Purchased Assets; provided, however, that to the extent any such asset is jointly
owned by any such Subsidiary and Seller and used primarily in or necessary for the operation of
the Business, Seller and Purchaser shall each use its commercially reasonable efforts to cause
such Subsidiary to enter into arrangements reasonably acceptable to Purchaser to permit

8

Purchaser to acquire the interest of such Subsidiary in such asset or to have the use thereof (provided that neither Seller nor Purchaser shall be required to make any payment in order to establish such arrangement).

The representations and warranties of the parties contained in this Letter and in the Agreement shall not survive the Closing. This Letter shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within that state. This Letter may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[Remainder of page left blank.]*

Sincerely,

BARCLAYS CAPITAL INC.

By: _____

Name:

Title:

Agreed to and accepted as of the date first written above:

LEHMAN BROTHERS HOLDINGS INC.

By: _____

Name:

Title:

LEHMAN BROTHERS INC.

By: _____

Name:

Title:

LB 745 LLC

By: _____

Name:

Title:

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:

Agreed to and accepted as of the date first written above:

LEHMAN BROTHERS HOLDINGS INC.

By: _____
Name: Steven Berkenfeld
Title: Vice President

LEHMAN BROTHERS INC.

By: _____
Name:
Title:

LB 745 LLC

By: _____
Name:
Title:

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:


Agreed to and accepted as of the date first written above:


LEHMAN BROTHERS HOLDINGS INC.


By: _____
Name:
Title:


LEHMAN BROTHERS INC.

By: _____
Name: Anson B. Frelinghuysen
Title:    as Counsel for James W. Giddens,
          Trustee for the SIPA Liquidation
          of Lehman Brothers Inc.
LB 745 LLC


By: _____
Name:
Title:

SEP-20-2008  19:48                                                          P.04/05
Sep-20-08 06:41P                              516 365 0150                  P.04
  SEP-20-2008  18:39

Sincerely,

**BARCLAYS CAPITAL INC.**

By: _____
Name:
Title:

Agreed to and accepted as of the date first written above:

**LEHMAN BROTHERS HOLDINGS INC.**

By: _____
Name:
Title:

**LEHMAN BROTHERS INC.**

By: _____
Name:
Title:

**LB 745 LLC**

By: *Mark Marcucci*
Name: MARK MARCUCCI
Title: President

*[SIGNATURE PAGE TO CLARIFICATION LETTER]*

# Schedule 1(a) – Excluded Real Estate Assets

**New York**
1301 Avenue of the Americas - 7th Floor
1271 Avenue of the Americas
399 Park Avenue
605 Third Avenue
85 Tenth Avenue

**New Jersey**
Jersey City - 101 Hudson St.
Livingston - 2 Peachtree Hill Road (Co-location)
Florham Park - 230 Park Avenue
Hoboken - 111 River Street (Sublease)

**Branches**
Atlanta - 3414 Peachtree Road
Calgary - 150 Sixth Avenue, Suite 3370 - Petro Canada
Columbia - Little Paluxent Parkway (NB)
Dallas - 200 Crescent Court
Dallas - 325 N. St. Paul Street (former Crossroads)
Greenwich - 8 Sound Shore Drive
Houston - 600 Travis Street
Los Angeles - 10880 Wilshire Blvd.
Menlo Park - 3000 Sand Hill Road
Miami - 1111 Brickell Avenue - Barclay's Financial Center
Newport Beach - 680 Newport Center Dr, Suite150
Palm Beach - 450 Royal Palm Way (License agreement for 1,704 on 6th floor)
Philadelphia - 1735 Market Street - Mellon Bank Center
San Francisco - 555 California Street
Tampa - 401 East Jackson Street, 24th flr (NB)
Wilmington - 1000 West Street - Brandywine Building (LBB)

**South America Branches**
Mexico City - Av. Paseo de la Reforma 265 Col. Cuauhtemoc

## Schedule 1(b) - Included Real Estate Assets

## SCHEDULE 1(C)

## PIM LEASES

| | City | State | Address | Tenant | Landlord |
|---|---|---|---|---|---|
| 1. | Atlanta | GA | 3414 Peachtree Road, NE | Lehman Brothers Inc. | Monarch Centre Associates, LLC |
| 2. | Dallas | TX | 200 Crescent Court | Lehman Brothers Inc. | Crescent TC Investors LP |
| 3. | Greenwich | CT | 8 Sound Shore Drive | Lehman Brothers Holdings Inc. | 8 Sound Shore Associates, LLC |
| 4. | Miami | FL | 1111 Brickell Avenue | Lehman Brothers Inc. | 1111 Brickell Office, LLC |
| 5. | Newport Beach | CA | 680 Newport Center Drive | Lehman Brothers Holdings Inc. | The Irving Company |
| 6. | Palm Beach | FL | 450 Royal Palm Way | Lehman Brothers Inc. | Palm Beach Centre 1, LLC |
| 7. | Philadelphia | PA | 1735 Market Street | Lehman Brothers Inc. | Nine Penn Center Associates, LP |
| 8. | New York | NY | 399 Park Avenue | Lehman Brothers Inc. | Boston Properties LP |