Exhibit "A"

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555 (JMP) (Jointly Administered)

Adv. Case. No. 08-01420 (JMP) (SIPA)

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS HOLDINGS INC., et al.,

      Debtors.

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS INC.,

      Debtor.

- - - - - - - - - - - - - - - - - - - -x

        United States Bankruptcy Court

        One Bowling Green

        Room 601

        New York, New York


        November 20, 2008

        2:00 PM


B E F O R E :

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

1

2    HEARING re Case Conference

3

4    HEARING Debtors' Application to Employ and Retain Weil, Gotshal

5    & Manges LLP

6

7    HEARING re Debtors' Application to Employ and Retain Curtis,

8    Mallet-Prevost, Colt & Mosle LLP as Conflicts Counsel

9

10   HEARING re Debtors' Application to Employ and Retain Simpson,

11   Thacher & Bartlett LLP as Special Counsel to the Debtors

12

13   HEARING re Creditors' Committee Application to Retain and

14   Employ Milbank, Tweed, Hadley & McCloy LLP as Counsel

15

16   HEARING re Creditors' Committee Application to Retain and

17   Employ Quinn Emanuel Urquhart Oliver & Hedges, LLP, as Special

18   Counsel

19

20   HEARING re Creditors' Committee Application to Employ and

21   Retain FTI Consulting Inc., as Financial Advisor

22

23   HEARING re Debtors' Motion to Enter into a Transition Services

24   Agreement with Lehman Europe

25

1    HEARING re Debtors' Motion for Authorization to Implement the

2    Retention and Recruitment Program

3

4    HEARING re Motion of ING Real Estate Finance (USA) LLC for

5    Relief from the Automatic Stay

6

7    HEARING re Motion to Set Prompt Date for Assumption or

8    Rejection of the Debtors' Amended and Restated Master

9    Repurchase Agreement with Sixth Gear

10

11   HEARING re Motion of Sumitomo Mitsui Banking Corporation for

12   Relief from the Automatic Stay to Foreclosure on Its Collateral

13   [filed in Debtor Affiliated Case No. 08-13900 Docket No. 17,

14   prior to entry of the Joint Administration Order]

15

16   HEARING re Motion of DnB NOR Bank ASA for Relief from the

17   Automatic Stay to Effect Setoff or, in the Alternative,

18   Adequate Protection

19

20   HEARING re Debtors' Amended Motion to Further Extend the Time

21   to File the Debtors' Schedules, Statements of Financial Affairs

22   and Related Documents

23

24   HEARING re SunCal Entities' Motion for an Order Granting Relief

25   from the Automatic Stay

1  HEARING re Trustee's Amended Motion to Authorize and Approve

2  Expedited Procedures for the Sale or Abandonment of Lehman

3  Brothers Inc.'s De Minimis Assets

4

5  HEARING re Motion and Motion of DCP Parties for Leave to

6  Conduct Rule 2004 Discovery of Trustee

7

8  HEARING re Application of the Trustee to Retain and Employee

9  Norton Rose LLP as U.K. Counsel, Nunc Pro Tunc to October 27,

10  2008

11

12

13

14

15

16

17

18

19

20

21

22

23

24  Transcribed by:  Clara Rubin

25

1    A P P E A R A N C E S :

2    WEIL, GOTSHAL & MANGES LLP

3         Attorneys for Debtors

4         767 Fifth Avenue

5         New York, NY 10153

6

7    BY:   HARVEY R. MILLER, ESQ.

8          JOHN W. LUCAS, ESQ.

9

10   HUGHES HUBBARD & REED LLP

11        Attorneys for James W. Giddens, Trustee for

12           SIPA Liquidation of Lehman Brothers Inc.

13        One Battery Park Plaza

14        New York, NY 10004

15

16   BY:   JAMES B. KOBAK, JR.

17         DAVID W. WILTENBURG, ESQ.

18

19   MILBANK, TWEED, HADLEY & MCCLOY LLP

20        Attorneys for the Official Committee of Unsecured

21           Creditors

22        One Chase Manhattan Plaza

23        New York, NY 10005

24

25   BY:   DENNIS F. DUNNE, ESQ.

```
1    CLEARY GOTTLIEB STEEN & HAMILTON LLP

2         Attorneys for Barclays Capital Inc.; Luke Barefoot

3         One Liberty Plaza

4         New York, NY 10006

5

6    BY:   LINDSEE P. GRANFIELD, ESQ.

7

8    BLANK ROME LLP

9         Attorneys for Thomson Reuters

10        The Chrysler Building

11        405 Lexington Avenue

12        New York, NY 10174

13

14   BY:   EDWARD J. LOBELLO, ESQ.

15

16   UNITED STATES DEPARTMENT OF JUSTICE

17        Office of the United States Trustee

18        33 Whitehall Street

19        Suite 2100

20        New York, NY 10004

21

22   BY:   ANDREW D. VELEZ-RIVERA, ESQ.

23

24

25
```

1    BINGHAM MCCUTCHEN LLP

2         Attorneys for Harbinger Capital Partners Special

3              Situations Fund, L.P. and Harbinger Capital Master

4              Fund I, Ltd.

5         150 Federal Street

6         Boston, MA 02110

7

8    BY:   RHEBA RUTKOWSKI, ESQ.

9

10   HENNIGAN, BENNETT & DORMAN LLP

11        Attorneys for the DCP Parties

12        865 South Figueroa Street

13        Suite 2900

14        Los Angeles, CA 90017

15

16   BY:   MICHAEL A. MORRIS, ESQ.

17

18   MAYER, BROWN, ROWE & MAW, LLP

19        1675 Broadway

20        New York, NY 10019

21

22   BY:   FREDERICK D. HYMAN, ESQ.

23

24

25

1    MORGAN, LEWIS & BOCKIUS LLP

2         Attorneys for SCC Entities

3         101 Park Avenue

4         New York, NY 10178

5

6    BY:   ANDREW D. GOTTFRIED, ESQ.

7

8    MORRISON & FOERSTER LLP

9         Attorneys for ING Real Estate Finance

10        1290 Avenue of the Americas

11        New York, NY 10104

12

13   BY:   Lorenzo Marinuzzi, Esq.

14

15   WHITE & CASE LLP

16        Attorneys for DnB NOR Bank ASA

17        1155 Avenue of the Americas

18        New York, NY 10036

19

20   BY:   PHILIP JOHN NICHOLS, ESQ.

21

22

23

24

25

```
 1    WINTHROP COUCHOT PROFESSIONAL CORPORATION

 2         Attorneys for SCC Entities

 3         660 Newport Center Drive

 4         Fourth Floor

 5         Newport Beach, CA 92660

 6

 7    BY:   PAUL J. COUCHOT, ESQ.

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

PROCEEDINGS

1

2      THE COURT:  Please be seated.  Mr. Miller, good

3  afternoon.

4      MR. MILLER:  Good afternoon, Your Honor.  Harvey

5  Miller on behalf of the debtors, Your Honor.  I thought, Your

6  Honor, that I might give a slight succinct update of where we

7  stand today, if I might.

8      THE COURT:  Great.

9      MR. MILLER:  I'm relieved to report, Your Honor, that

10  under the leadership of Mr. Marsal and the Alvarez & Marsal

11  team, the administration of the Chapter 11 cases has achieved a

12  level of stabilization.  Just to recap the major events up

13  through October 16, we consummated the sale with Barclays

14  Capital Inc.  We've negotiated the sale of the investment

15  management division, which is subject to an auction and court

16  approval.  That auction is supposed to be on December 1st of

17  this year.  We've consummated the sales of Eagle Energy

18  Partners for a recovery of about 230 million dollars and R3

19  Capital Partners with a gross recovery of about 500 million

20  dollars.  And, in addition, there have been negotiations and

21  other sales, including the sale of the G4.  There are other

22  claims which are on the market right now.

23      The financial condition of the debtors, Your Honor,

24  and their liquidity has improved significantly.  From September

25  15 through November 7, 2008, the aggregate cash balances have

1    increased by over 2.2 billion dollars. So the debtors and

2    nondebtors are administering an aggregate of over 4.8 billion

3    dollars in cash after refunding an inadvertent deposit made of

4    almost 400 million dollars that was property that belong to

5    LBIE, Lehman Brothers Europe.

6         Credited to the accounts of the Chapter 11 debtors is

7    approximately 3.5 billion dollars. The balance of the 4.8

8    billion dollars represents monies held in Neuberger Berman and

9    other nondebtor entities, but it's all subject to the

10    oversights, Your Honor, of LBHI and its team.

11         The debtors have successfully instituted procedures

12    to redirect remittances to new bank accounts. As a result of

13    that process, it has obtained, or is in the process of

14    obtaining, no setoff letters from other institutions so that it

15    can open additional deposit accounts.

16         In terms of corporate governance, Your Honor, there

17    was an extended meeting of the board of directors last Friday,

18    November 14. At that meeting, the board passed a resolution

19    that, effective of the close of business on December 31, 2008,

20    Mr. Marsal will succeed Richard Fuld as the chief executive

21    officer of Lehman Brothers Holdings Inc.

22         As to the administration of the Chapter 11 cases, as

23    Your Honor will recall when Mr. Marsal was here, the number one

24    priority was the collection and preservation of data. And it

25    was the problem of the disintegration of the IT systems as a

1   result of the insolvency proceedings in the U.K. and in Asia,

2   and also including the sale to Barclays Capital Inc.  It

3   resulted in limited access to the data and information that was

4   necessary to the administration.  So that became the first

5   priority.  And I'm happy to report, Your Honor, the situation

6   is improving, and over half of the data has been captured to

7   date.  The number of crises is diminishing, and there are fewer

8   emergencies as to deteriorating assets.  There is complete

9   control over the cash disbursements system and visibility and

10  oversight over nondebtor cash and business activities.  A

11  weekly liquidity report is provided to FTI as the financial

12  advisor to the statutory creditors' committee.  Capability is

13  being achieved to conduct forensic review and reconstruction of

14  the financial records to bridge the August 31 balance sheet to

15  September 15, 2008.  And it's anticipated that the financial

16  statements as of September 15, 2008 will be produced within the

17  very near future.  The problem has been to overcome

18  unreconciled trades, and they're working on that very

19  intensely, Your Honor.  Efforts are underway to track all

20  activity between September 15 and the respective filing dates

21  of the seventeen subsidiaries that also filed in October.  The

22  debtors are also complying with the requirements under the

23  securities laws and have filed a number of 8-Ks since the

24  commencement of the case.

25          As to wind-down issues, Your Honor, after the

1   consummation of the Barclays transaction, the administration of

2   the Chapter 11 cases started out with approximately 170 formal

3   Lehman employees.  Almost 10,000 employees, Your Honor, went

4   over to Barclays, and we actually were counting that at 9,100,

5   but it was much closer to 10,000 for at least a period of

6   ninety days.

7          As a result of that workforce being so limited,

8   Alvarez & Marsal had to dedicate a large number of people to

9   the administration of the Chapter 11 cases.  As of November 10,

10  2008, as a result of active recruiting to fill in holes as to

11  different aspects of the administration and as to some level of

12  attrition to the original 170 Lehman legacy employees, the

13  headcount was 264 persons.  The target for the year-end is to

14  have a workforce of approximately 620 employees, the largest

15  bulk of whom will be dedicated to working on derivates

16  transactions.  In addition to those employees, Your Honor,

17  there are employees of Barclays Capital who have been dedicated

18  to assist in the administration of the Chapter 11 cases

19  pursuant to the transition services agreement with Barclays

20  Capital as well as the Alvarez & Marsal teams and others.

21         In that connection, Your Honor, the transition

22  services agreement with Barclays, as Your Honor may recall when

23  Mr. Marsal was here, he alluded to the fact that it was a

24  somewhat bumpy road.  It was complicated by what happened to

25  the disintegration of these systems, and also Barclays was, in

1   effect, orienting itself to what it had purchased.  Since the

2   beginning of November, there has been marked improvement in

3   performance.  Derivative inventories are substantially marked,

4   loan book has been substantially marked, data capture is

5   working well and financial and accounting issues are a work in

6   process.  Barclays has ring fenced, Your Honor, approximately

7   272 employees to support the Chapter 11 administration.

8            On today's calendar, Your Honor, we will be hearing

9   about a retention recruitment program to retain current

10  employees and hire former Lehman employees and other

11  individuals with the requisite skill sets.  This was created,

12  Your Honor, in cooperation with the creditors' committee and

13  has been adopted subject to approval by the Court.  Employees

14  are being recruited to that program -- I'm sorry.  Employees

15  that are recruited, Your Honor, will be broken into asset teams

16  for:  1) derivatives, 2) real estate, 3) private equity, 4)

17  bank book assets, 5) finance, 6) legal and 7) IT services.  The

18  objective is to create a workforce that is capable of

19  administering the cases and allowing for the contraction in the

20  number of Alvarez & Marsal people dedicated to Lehman.  The

21  result will reduce the cost of administration.

22           The debtors have also been negotiating, Your Honor,

23  additional transition service agreements with other entities,

24  and they have been negotiated or are in process.  One to be

25  heard today, Your Honor, is with LBIE.  A cross-border

1   insolvency protocol is being negotiated for Lehman Brothers

2   Holdings Inc., Lehman Brothers Inc. and Lehman Brothers Europe

3   which provides for coordination and cooperation.  A protocol

4   was entered into with LBHI and Nomura Holdings Asia Pacific on

5   September 29, 2008 relative to the sale of Lehman Asia.  There

6   is an administrator access letter between LBHI and Nomura

7   Holdings, Inc. Asia Pacific that's dated September 29, 2008.

8            On October 6, another protocol was entered into with

9   LBHI and Nomura Holdings India in connection with the sale of

10  Lehman India.  There is a TSA with LBHI/Eagle Energy Partners

11  relative to the sale of Eagle Energy, and there are additional

12  five more TSAs that are in the process of being negotiated with

13  other entities to facilitate the administration of the Chapter

14  11 cases.

15           As to international proceedings, Your Honor, there

16  are at least seventy-six different foreign proceedings covering

17  over fifteen countries.  The debtors are in regular contact

18  with the administrators or receivers in those foreign

19  proceedings.  As indicated, TSAs or protocols for coordination,

20  flow and access to information are being negotiated or have

21  been negotiated.  This is the list, Your Honor, I'm holding in

22  my hand of the foreign proceedings, which just cover the entire

23  globe.  If Your Honor would like a copy, I'd be glad to hand --

24           THE COURT:  I would like a copy.

25           MR. MILLER:  May I approach?  I will also bring up,

1    Your Honor, the latest organizational chart, which changes from

2    day to day almost.

3              THE COURT:  Fine.  Well, I'm happy to look at today's

4    version.  Okay, thank you.

5              MR. MILLER:  In most of those cases, Your Honor,

6    Lehman Brothers Holdings will be the largest single creditor in

7    those proceedings.  As of yesterday, Lehman Brothers Holdings

8    Inc. was appointed to the official creditors' committee in the

9    Lehman Brothers Europe case pending in the United Kingdom.  It

10   is a committee consisting of five members and is scheduled to

11   have its first meeting in London on December 3, 2008.  Lehman

12   Brothers Holdings Inc. was represented at the meeting of

13   general creditors that was convened in London by the joint

14   administrators, LBIE, and it was held on November 14, 2008.

15             In connection with transparency and access to

16   information, Your Honor --

17             THE COURT:  Why don't we stop there for one second?

18             MR. MILLER:  Sure.

19             THE COURT:  There seems to be a feeding frenzy for

20   documents behind you, and I think we'll just wait till the

21   scene calms down a little bit because I find it very

22   distracting.

23             Why don't we resume with transparency?

24             MR. MILLER:  In connection with the creditors'

25   committee, Your Honor, there are daily calls with the

1  creditors' committee's professionals to review the status of

2  the Chapter 11 cases.  There is an in-person meeting with the

3  creditors' committee at least once a month.  The last meeting

4  was held on November 13, 2008, a week ago.  That meeting

5  consumed almost four hours with an extended presentation on the

6  part of the debtors.

7       There are -- in connection with the SIPA trustee,

8  Your Honor, Mr. Giddens, there are weekly status updates and

9  conference calls with the trustee and his professionals.  The

10  intention is to work more closely and in a more integrated

11  fashion with the SIPA trustee and his staff.

12       As for the U.S. Trustee's Office, Your Honor, there

13  is continuing discussion with the U.S. Trustee's Office as to

14  the administration of the estate.

15       And as to individual creditors, Your Honor, I have to

16  say that Mr. Marsal and the Alvarez & Marsal team have been

17  very generous in devoting substantial time to numerous meetings

18  with individual creditors and groups of creditors seeking

19  information as to particular accounts.

20       In addition, Your Honor, there are a large number of

21  Web sites which are devoted to the Lehman case.  The primary

22  Web site is www.lehman.com, which provides direct access to

23  seven Web sites.  Then there is www.lehmanbrothersestate.com,

24  which provides direct contact information for approximately one

25  hundred people at Lehman, Alvarez & Marsal and Weil, Gotshal &

1    Manges.  This list is broken down by work streams and

2    geographic regions.  The third Web site, Your Honor, is

3    www.lehman.com/press, which contains press releases described

4    in the acquisition of IMD -- or potential acquisition, I should

5    say, by Bain Capital and Hellman & Friedman.  The fourth is

6    www.nb.com, which has information relating to Neuberger Berman

7    and links to the most recent press releases.  The fifth Web

8    site, Your Honor, is www.pwc.co.uk, which is the Web site of

9    PricewaterhouseCoopers and the joint administrators, which

10   provides information relating to the Lehman companies in the

11   U.K. and European administration.  The sixth is www.nomura.com,

12   which has information relating to the acquisition of Lehman's

13   Asia Pacific businesses.  And the seventh, Your Honor, is

14   www.barcap.com, which has information relating to Barclays

15   investment banking and capital markets business.  And the

16   eights is www.barclayswealthamericas.com, which has information

17   relating to Barclays' various investment services to

18   individuals and businesses.

19         The debtors' claim agent also maintains a separate

20   Web site at http://chapter11.epicsystems.com/lehman.  This Web

21   site effectively and efficiently allows the debtors to

22   distribute information that includes:  1) full access to the

23   docket at no charge, and is updated on a real-time basis, 2) a

24   list of all Chapter 11 debtors, their case numbers and the

25   filing date, 3) information with respect to asset sales,

1    including Barclays, IMD, CES Aviation and other entities, 4)

2    information relating to the trading restrictions provided by

3    the NOL order, 5) blank proofs of claim and mailing information

4    for filing and 6) portions of information with presentations

5    that were made to the creditors' committee.

6        The creditors' committee also maintains a Web site,

7    Your Honor, at www.lehmancreditors.com, which contains

8    information relating to:  1) significant events in the case, 2)

9    a calendar of events, 3) monthly reports, 4) committee-filed

10    pleadings and 5) committee professional contact information.

11        In connection with data preservation, Your Honor, as

12    I said, it has improved at least a hundred percent.  The

13    debtors made an inventory of 400 thousand backup tapes.  They

14    have identified file servers containing two petabytes of

15    information and ninety-three key applications.  It is expected

16    that the data preservation should be completed by year-end.

17        In terms of projected administration, Your Honor, the

18    next major phase in the administration of these cases will be

19    the forensic area of locating and recovering assets for the

20    benefit of the respective estates.  We have previously reported

21    that there were approximately 1,450,000 derivative transactions

22    that encompassed 8,000 counterparties.  I'm afraid that did not

23    tell the full story.  In addition to those derivative

24    transactions, there are intercompany derivative transactions

25    approximating one million in number that have to be unwound,

1    analyzed and valued.  The biggest area in this administration

2    right now, Your Honor, is the derivates.  The biggest

3    recruiting program is to fill in that team.  All the other

4    teams are now complete.  And what Mr. Marsal is looking for are

5    people how have experience in the derivative area that used to

6    work for Lehman.

7              THE COURT:  I just have a question about your

8    reference to the term "intercompany derivative transactions".

9              MR. MILLER:  Yes, sir.

10             THE COURT:  Are these all internal to LBHI and its

11   affiliates or does it extend to the various proceedings that

12   are pending around the world?

13             MR. MILLER:  It may relate to other proceedings

14   around the world, Your Honor.

15             THE COURT:  Okay.

16             MR. MILLER:  This is like peeling an artichoke, if

17   that's the right expression, to find out where these all are.

18   There are different -- in 4,000 companies, there are many

19   transactions, Your Honor.

20             THE COURT:  I think it's usually an onion, but we'll

21   take artichoke today.

22             MR. MILLER:  Okay.  I don't eat artichokes anyway.

23   There are continuing efforts, Your Honor, to determine the

24   value of different investment accounts and transactions as well

25   as the relationships with financial institutions, trading

partners and exchanges.  That's peeling the onion, Your Honor.

Then, Your Honor, the other item is the examiner motions which are not on the calendar for today, but I would say to Your Honor that the issue of an examiner was discussed long before the motion that was made by The Walt Disney Company.  It was anticipated at some point in these proceedings there would be a motion or even an affirmative motion by the debtors with the support of the creditors' committee for the appointment of an examiner, and that was under discussion.  It was mutually agreed among the people who were discussing, obviously, that it made no sense to have an examiner until you stabilized the system, until you were able to close the books and create a factual basis and a foundation for which the examiner could proceed to do whatever investigation was authorized.  And those discussions were underway when the motion was filed by The Walt Disney Company.

Since November 5, Your Honor, or whenever that motion was filed, we have been in discussions with various parties, including Disney, as to the scope of an order that Your Honor might enter in connection with the appointment of the examiner.  And as one of the joinders to the Disney motion, I think, as the Harbinger Funds had suggested in its joinder, that the appointment should be deferred until the end of the year.  We've worked on that principle and with Mr. Bienenstock in developing what might be the scope of the investigation.

1          In that perspective, Your Honor, the debtors have

2    agreed with Disney, just the debtors, that it is in the best

3    interests of the administration of the cases that there be a

4    proposal of a consensual order for the appointment of an

5    examiner containing a proposed scope of the examiner's duties.

6    It's the intention of the parties, Your Honor, to present such

7    an order to the Court at the omnibus hearing schedule for

8    January 14, 2009.

9          THE COURT:  Let me break in and just make this

10   observation and comment --

11         MR. MILLER:  Yes, sir.

12         THE COURT:  -- in connection with this aspect of the

13   report.  As you might imagine, in addition to the thinking that

14   has been going on that I am only now hearing about, I've also

15   done some thinking about the subject of the examiner motion,

16   which is not to be heard until January of next year.  And while

17   I will certainly be receptive to anything that may be proposed

18   in a consensual order, it needs to be clearly understood that

19   the discretion is solely mine and that you're not going to be

20   usurping it by attempting to document something and ask me to

21   rubber stamp, because that's not going to happen.

22         MR. MILLER:  There was never any intention of that.

23   That would be the last thing, Your Honor --

24         THE COURT:  I want it to be really clear, however,

25   since we're not dealing with any argument today in connection

1   with the examiner, that the parties are not going to craft this

2   for my approval.  I am going to decide the scope.  It may be

3   that there'll be complete overlap, but there may not be.

4          MR. MILLER:  This would only be a recommendation,

5   Your Honor --

6          THE COURT:  Understood.

7          MR. MILLER:  -- nothing more than that.

8          THE COURT:  Okay.  I'm just -- I'm not fencing you

9   there as much as telling you that the power to appoint is mine,

10  as is the power to determine scope.

11         MR. MILLER:  Absolutely, Your Honor, but all that we

12  have done, Your Honor, is try to flesh out some things that

13  Your Honor might consider and also take input, for example,

14  from the Office of the U.S. Trustee, which had various

15  suggestions.  And we also, Your Honor, to be candid, were

16  contacted by the U.S. attorneys to make sure that they have

17  their input into the order.

18         THE COURT:  I recognize that --

19         MR. MILLER:  And nothing, Your Honor, would be

20  binding on you.

21         THE COURT:  I understand, and I would certainly

22  appreciate seeing what you have to propose.

23         MR. MILLER:  Thank you, Your Honor.  With that, Your

24  Honor, I would go to the agenda for today.

25         THE COURT:  That's fine.  But just before we do that,

1  because this is the status report portion of the agenda, I'm

2  going to simply ask if there's anything that the creditors'

3  committee wishes to add.  It may be that the answer to that is

4  no, and that's a perfectly good answer.

5          MR. DUNNE:  It is no at this time.  Mr. Miller was

6  very precise as to his description of the fact that the

7  creditors' committee has not weighed in yet on the examiner

8  motion.  We expect to do that, with respect to the scope,

9  between now and January.  And either it will be on the sides of

10 a recommendation to you or making our recommendations outside

11 the four corners of the document that Mr. Miller's working out

12 with Mr. Bienenstock.  But he was precise on that.

13         THE COURT:  Fine.

14         MR. MILLER:  We hope, Your Honor, it will be a joint

15 recommendation, for whatever it's worth.

16         THE COURT:  I hope so too.

17         MR. MILLER:  In turning to the calendar for today,

18 Your Honor, and starting with the uncontested matters, item 1

19 is the application of the debtors to engage Weil, Gotshal &

20 Manges under a general engagement.  There are no objections,

21 Your Honor, and it's all, of course, subject to further

22 disclosures and reservation of rights on the part of the Office

23 of the U.S. Trustee.

24         THE COURT:  That's granted on a final basis.

25         MR. MILLER:  The second matter on the calendar, Your

Honor, is the debtors' application to employ Curtis, Mallet-Prevost, Colt & Mosle and conflicts counsel, nunc pro tunc to September 26, 2008. Similar, Your Honor, without prejudice to further disclosure and the rights of the Office of the United States Trustee, there are no objections, Your Honor.

THE COURT: Motion granted.

MR. MILLER: The next application, Your Honor, is the debtors' application to employ Simpson Thacher & Bartlett as special counsel pursuant to Section 327(e) of the Bankruptcy Code, nunc pro tunc to the commencement date. In connection with this application, Your Honor, Simpson Thacher & Bartlett was very active in the Barclays sale and very active during that period up to the beginning of October. Essentially, I would point out, Your Honor, a lot of the services have been completed. There is really one active matter that's representing LBA Y.K. in a nondebtor indirect subsidiary of LBHI in litigation pending in the United States and Japan. That's the primary ongoing services, Your Honor. So subject to the same statement of our reservation of rights, I don't think there are any objections.

THE COURT: Application granted.

MR. MILLER: Thank you, Your Honor. The next three matters, Your Honor, on behalf of the creditors' committee, Mr. Dunne?

MR. DUNNE: Thank you. For the record, Dennis Dunne

1    from Milbank, Tweed, Hadley & McCloy, on behalf of the official

2    committee of unsecured creditors.  Agenda item number 5 is the

3    creditors' committee's application to retain and employ

4    Milbank, Tweed, Hadley & McCloy LLP as counsel to the committee

5    effective as of September 17, 2008.  We've received no

6    objections to that, Your Honor.

7          THE COURT:  That application is granted.

8          MR. DUNNE:  Agenda item number 6, Your Honor, is the

9    creditors' committee's application to retain and employ Quinn

10    Emanuel as conflicts counsel to the committee, again, effective

11    as of September 17, 2008.  We have received no responses.

12          THE COURT:  Also granted.

13          MR. DUNNE:  Agenda item number 7, Your Honor, is the

14    creditors' committee's application to employ and retain FTI

15    Consulting Inc. as financial advisor effective as of September

16    17, 2008.  We've received no responses.

17          THE COURT:  That one is granted as well.

18          MR. DUNNE:  And with respect to the Houlihan Lokey

19    application, we've adjourned that to the December 16th hearing

20    date, Your Honor.

21          THE COURT:  Which leads me to ask if there is a

22    pending concern of the U.S. Trustee's Office or any other

23    party-in-interest in connection with that application.

24          MR. VELEZ-RIVERA:  Andrew Velez-Rivera for the United

25    States Trustee.  Your Honor, we are in ongoing discussions with

1 Houlihan and with Houlihan's counsel with regard to several

2 features of its application.

3         THE COURT:  Fine.

4         MR. DUNNE:  Thank you, Your Honor.

5         THE COURT:  Thank you.

6         MR. MILLER:  I might add, Your Honor, in connection

7 with that, there will be an application on the part of the

8 debtors to hire Lazard Freres -- Lazard Ltd.  That has similar

9 issues as the Houlihan application, and that has also been put

10 on to the same date.  I think it's December 16th, if I'm

11 correct.  So we're working on resolving those issues, Your

12 Honor.

13         THE COURT:  As long as we're talking about hearings

14 in December, I just wanted to ask a question that ties into

15 your reference to the Neuberger Berman transaction.  There is

16 currently scheduled a December 22 hearing date in connection

17 with approval of that sale.

18         MR. MILLER:  Yes, sir.

19         THE COURT:  Just given the nature of that week and

20 its closeness to year-end, I just wanted to confirm that that

21 is in fact a firm date and that we're holding it.

22         MR. MILLER:  It is a firm date, Your Honor, but under

23 the terms of the IMD asset purchase agreement, there are

24 various conditions in it which relate to the market.  And if

25 the market -- if the S&P goes below a certain amount, there is

1    an opportunity to walk.  And we're not quite sure where Bain

2    and Heller & Friedman will be when we get to December 1st.

3              THE COURT:  Understood.

4              MR. MILLER:  So it's --

5              THE COURT:  But assuming that the market-out

6    condition is not exercised, it would be the debtors'

7    anticipation that a hearing will take place as scheduled on

8    that date?

9              MR. MILLER:  Yes, sir.

10             THE COURT:  Fine.  Thank you.

11             MR. MILLER:  And that brings the issue, Your Honor,

12   to the debtors' motion, I think it's number 8, Your Honor, to

13   enter into a transition services agreement with Lehman Brothers

14   Europe.  The debtors are requesting authority to enter into

15   this TSA.  Frankly, Your Honor, I was always of the opinion

16   that this was ordinary course of business, but from the

17   standpoint of the joint administrators in London they prefer

18   that we bring it before the Court and get a court order so that

19   they are convinced that Lehman Brothers Holdings Inc. is bound

20   by the agreement.  The objective of the agreement, Your Honor,

21   is the need to unwind the debtors' sizeable book of business in

22   Europe, which consists of more than one million trading

23   positions, amounting to billions of dollars in receivables for

24   the estate.  Lehman Europe employees possess the expertise and

25   familiarity necessary to unwind the debtors' trading position.

1    Using other employees to unwind these trades would prove

2    unfeasible and time-consuming and perhaps not particularly

3    satisfactory.

4         So this transition services agreement was negotiated,

5    and it would give us access to critical parts of the data and

6    applications necessary to unwind those transactions.  Without

7    access to those systems, the debtors may not be able to execute

8    trades or even evaluate their positions.

9         This was heavily discussed with the creditors'

10   committee, Your Honor.  The creditors' committee supports it.

11   There was an objection of -- I think it was an objection, filed

12   by Thomson Reuters.  I believe, Your Honor, that that

13   objection --

14        THE COURT:  I read it as a reservation of rights with

15   some limited objections associated --

16        MR. MILLER:  Limited objections.  But as you read on,

17   Your Honor, the word "limited" sort of got dropped near the end

18   of the objection.  We've reached an agreement, Your Honor.  We

19   will make a representation on the record, and as I understand

20   it, Thomson Reuters will withdraw their limited objection, the

21   Chapter 11 debtors under the LBIE TSA acknowledge that they do

22   not have the right and will not provide access to the Thomson

23   Reuters platforms and systems to nondebtor third parties.  The

24   Chapter 11 debtors will work cooperatively with Thomson Reuters

25   to promptly resolve all outstanding issues, including those

1   raised by third-party exchangers and vendors.  And in that

2   context, Your Honor, I believe -- I don't know if Thomson

3   Reuters is present.

4         MR. LOBELLO:  Good afternoon, Your Honor.  Edward

5   Lobello, Blank Rome, for Thomson Reuters.  We did file a

6   limited objection.  As Your Honor knows, this was filed on a

7   short notice.  We had very limited time to react.  We did file

8   our objection; then had a conversation with Weil.  The

9   representations that Mr. Miller has made are accurate, and we

10   will accept those.

11         THE COURT:  And as a result, you withdraw your

12   limited objection?

13         MR. LOBELLO:  That's correct, Your Honor.

14         THE COURT:  Fine.

15         MR. MILLER:  In addition, Your Honor, as you know,

16   LBIH (sic) has a TSA with Barclays, which I referred to before.

17   Under the terms of that TSA, LBHI may not provide the services

18   it receives from Barclays to third parties, and it may not

19   sublicense under the TSA.  To avoid any problems, we represent

20   now that LBHI will not provide the services it receives under

21   the Barclays TSA to LBIE, under the LBIE TSA or otherwise.

22   Barclays and LBIE are negotiating their own TSA.  And to the

23   extent appropriate, LBHI will assist in those negotiations.

24         Lindsee, do you want to take --

25         MS. GRANFIELD:  Yes.  Thank you very much.  We were

1  able to discuss this with -- excuse me, Your Honor.  Lindsee

2  Granfield, Cleary Gottlieb Steen & Hamilton LLP, on behalf of

3  Barclays Capital.  We're able to discuss this cooperatively

4  with Weil Gotshal to obviate the need for filing an objection

5  because we're just a little concerned about some of the

6  language in the LBIE TSA.  But with that representation, that's

7  fine.  Thank you very much.

8            THE COURT:  Okay.

9            MR. MILLER:  I might add, Your Honor, in connection

10  with the LBIE proceeding in London at the general meeting of

11  creditors last Friday, it was announced that that proceeding

12  may extend to three or four years before there's any

13  distribution to creditors of any significance.  So that, which

14  I think is like a microcosm of LBHI and the related debtors, is

15  sort of a flashpoint for us, although we expect to move faster,

16  Your Honor.

17            THE COURT:  I would hope so.

18            MR. MILLER:  I hope so. Not before the young lady has

19  her baby but we hope to move quickly.  With that, Your Honor,

20  there are no other objections to the LBIE TSA.

21            THE COURT:  Is there anyone who wishes to make any

22  comment with respect to the LBIE TSA, particularly counsel for

23  LBIE's administrators, if there's anyone here speaking on their

24  behalf?  If there's no comment and a shake of the head from

25  Mr. Flicks, so I'll assume that this is really a weigh-up, and

1    I'll approve it.

2           MR. MILLER:  Thank you, Your Honor.  Number 9, Your

3    Honor, is the debtors' motion for authorization to implement

4    the retention and recruitment program.  Again, Your Honor, this

5    application was, I would say, almost a joint effort on the part

6    of the debtors and the creditors' committee.  There were

7    extensive discussions about this program, valuations of the

8    need and so on.  The objective here, Your Honor, is to fill 620

9    job slots.  The course, Your Honor, is not insignificant.  The

10   base salaries would be ninety-six million dollars if all these

11   slots are filled.  There's a bonus program that could

12   approximate 110 million dollars.  But what the debtors are

13   looking for, Your Honor, are people with the appropriate skill

14   sets to enable a very efficient and economical administration

15   of these estates.  And as I said before, the primary recruiting

16   is being done in the derivatives area.  It apparently is a

17   field that not many people know about or understand.  So

18   getting the people that understand it is a real search project.

19          There have been no objections filed to this, Your

20   Honor.  It is in the best interests of the estate.  I should

21   point out, Your Honor, that after the motion was filed, there

22   were negotiations with Mr. David Goldfarb.  At a point in time,

23   Mr. Goldfarb was in the top five at Lehman Brothers.  Prior to

24   the commencement of the Chapter 11 cases, he was not in the top

25   five and had not been in the top five for several months, at

1    least.  Mr. Marsal has negotiated with him, and he would come

2    in as an employee, approximately about six months of service,

3    Your Honor.  He is -- background in the business, he is very

4    experienced in the principal private equity portfolio, which is

5    approximately thirteen billion dollars.  And he has

6    relationships with the persons who are employed both at

7    Barclays and Nomura and would be of tremendous assistance, Your

8    Honor, in the administration of the estate.  So I just wanted

9    to note that because that's not in the motion.

10            THE COURT:  And what position would he have and what,

11   if any, special compensation arrangements might apply to him

12   given his seniority and importance to the project?

13            MR. MILLER:  Your Honor, my recollection is -- I'm

14   looking for my notes.  I have them but I don't -- I think his

15   base compensation, Your Honor, is 500,000 dollars on an annual

16   basis.  And then he has an opportunity to realize another

17   500,000 dollars based upon achieving the critical points on the

18   incentive program.  He's a -- sorry.  I'm sorry, Your Honor.  I

19   have misstated.  It's for the six-month period of 500,000

20   dollars.  But the bonus is not guaranteed.  He has to perform.

21            THE COURT:  Okay.  Thank you for that report.

22            MR. MILLER:  I don't believe there are any responses

23   or opposition to this, Your Honor.

24            THE COURT:  Is there anyone who wishes to comment in

25   connection with this application?  Apparently not.  I'm

1   prepared to approve it.  And I recall, Mr. Miller, when you

2   first broached the subject of the need to hire people who had

3   the requisite experience and expertise to supplement the

4   debtors' diminished human resources at a time when there was a

5   tremendous need for expertise to deal with the derivatives

6   needing to be unwound.  And you mentioned at the time, which I

7   think was one of the early status reports, that you saw this as

8   a potentially controversial subject, or at least one that might

9   attract attention.  And I think it's worth noting that this has

10  been presented and vetted to the point that the creditors'

11  committee filed more or less simultaneously with the

12  application and statement of support and at this hearing, which

13  is well-populated, has produced not a single comment in

14  opposition to what you're seeking.  And I consider that to be

15  an achievement worth, at least, noting.

16          MR. MILLER:  Thank you, Your Honor.  I would say,

17  Your Honor, that both the committee and the debtors put in an

18  enormous amount of effort into this to reach an acceptable

19  package that would really benefit the administration of the

20  estates.

21          The next matter, Your Honor, is the motion of ING

22  Real Estate Finance (USA) LLC for relief from the automatic

23  stay.  I'll let counsel for --

24          MR. MARINUZZI:  Good afternoon, Your Honor.  Lorenzo

25  Marinuzzi, Morrison & Foerster, on behalf of ING Real Estate

1 Finance. Pleased to report to the Court that we've an

2 agreement in principle, and execution pages were exchanged this

3 morning among the parties. Under this arrangement, Lehman

4 would resign as agent and appoint ING as the replacement agent,

5 and it would assign its loan position to Swed Bank, or Swede

6 Bank. I've heard it pronounced it both ways. Assuming the

7 client advises me that the papers are in order, we expect to

8 file a formal withdrawal of the motion. The details of these

9 arrangements were shared by the debtors with the committee. No

10 objection was received. And as soon as we get the okay from

11 the client, we'll withdraw the motion formally. Thank you.

12 THE COURT: Does that mean that the consensual

13 arrangements that you're documenting will not be the subject of

14 public disclosure and/or Bankruptcy Court approval because you

15 are simply withdrawing the motion?

16 MR. MARINUZZI: We're simply withdrawing the motion.

17 That's correct, Your Honor.

18 THE COURT: And does the debtor deem this arrangement

19 to be ordinary course?

20 MR. MILLER: Yes, Your Honor.

21 THE COURT: All right.

22 MR. MARINUZZI: Thank you, Your Honor.

23 THE COURT: Thank you.

24 MR. MILLER: Just a point of procedure, Your Honor.

25 Should we carry this until the formal withdrawal notice is

1  filed?

2          THE COURT:  It probably makes sense for agenda

3  purposes to just put it over to the December --

4          MR. MILLER:  3rd.

5          THE COURT:  -- 3 hearing date.  And we'll hold it

6  there just for purposes of good order and assume that it will

7  disappear automatically, assuming that the papers are signed,

8  executed and delivered.

9          MR. MILLER:  Thank you, Your Honor.

10         MR. MARINUZZI:  Thank you, Your Honor.

11         MR. MILLER:  Your Honor, moving to what has been

12  described as contested matters, the first matter is the motion

13  of Sixth Gear to set a date for assumption and rejection of a

14  master repurchase agreement.  That matter, Your Honor, has been

15  resolved, and there's an order to be presented.

16         MR. LUCAS:  Yeah.  I was told that movant's counsel

17  is going to appear and present an order.

18         MR. MILLER:  Ah.  There is movant's counsel.

19         THE COURT:  Are you counsel for Sixth Gear?

20         MR. LEVITAN:  I am, Your Honor.  Good afternoon, Your

21  Honor.  Jeffrey Levitan, Proskauer Rose, counsel for Sixth

22  Gear.  We had a very constructive meeting yesterday with

23  representatives of Sixth Gear and the debtors, and we have

24  agreed on the terms of an order pursuant to which the debtors

25  will reject the master repurchase agreement between Sixth Gear

1   and Lehman Commercial Paper and providing for a reservation of

2   rights for all parties.

3           THE COURT:  I take it the reservation of rights picks

4   up the references to a counterclaim that I saw in the response

5   papers?

6           MR. LEVITAN:  It does, Your Honor.

7           THE COURT:  Fine.

8           MR. LEVITAN:  Thank you.

9           MR. MILLER:  Thank you, Your Honor.  Next matter,

10  Your Honor, number 12, is the motion of Sumitomo Mitsui Banking

11  Corporation for relief from the automatic stay.  Your Honor,

12  there is a settlement in process in connection with that

13  matter.  Your Honor may recall the matter when the question was

14  is there going to be a valuation dispute.  There will be no

15  valuation dispute.  We were hopeful, Your Honor, that the

16  stipulation resolution would have been done by the time of the

17  hearing.  But there's a little wordsmithing going on, so I

18  would suggest, Your Honor, we just put this over to December

19  3rd.  And, in the interim, we will probably file the

20  stipulation.

21         THE COURT:  Mr. Hyman, do you wish to be heard?

22         MR. HYMAN:  No, Your Honor.  I agree with that.

23  Thank you very much.  Rick Hyman of Mayer, Brown, Rowe & Maw,

24  on behalf of Sumitomo Mitsui Bank Incorporation.  That is a

25  correct description.

1              THE COURT:  Fine.  Great.

2              MR. MILLER:  Thank you, Your Honor.  Number 13, Your

3    Honor, is the motion of DnB NOR Bank ASA for relief from the

4    automatic stay.  This, Your Honor, was, I think, if I recall

5    correctly, was to be set up as a status conference with White &

6    Case representing the moving parties.  The parties are in

7    negotiation, Your Honor, to resolve this matter.  They are very

8    confident that by December 3 it will be resolved.  So we're

9    asking that it be moved to the December 3 calendar.

10             THE COURT:  Are you from White & Case?

11             MR. NICHOLS:  Philip Nichols, White & Case, Your

12   Honor, for DnB.  Mr. Miller has correctly stated the status of

13   the matter.

14             THE COURT:  That's fine.  And I'll simply note that

15   when this came up at the November 5 hearing, December 3 was

16   noted as an outside date for purposes of conducting what might

17   have been a contested hearing.  I take it from the comments

18   both of counsel for the movant and for the debtor that parties

19   are highly confident that this will be resolved prior to the

20   December 3 hearing by consent.  Is that correct?

21             MR. MILLER:  The debtors are confident, Your Honor.

22             MR. NICHOLS:  As with DnB, Your Honor.  However --

23             THE COURT:  Fine.

24             MR. NICHOLS:  However, we would hope that we'd keep

25   that on as for potentially being a contested hearing, if the

1    need arose, if the parties were not able to --

2         THE COURT:  It'll be on the list, and what happens

3    that day will be determined that day.

4         MR. NICHOLS:  Thank you, Your Honor.

5         MR. MILLER:  Your Honor, the next matter on the

6    calendar, number 14, is the debtors' amended motion to further

7    extend the time to file the debtors' schedules, statement of

8    financial affairs and related documents.  There is an objection

9    that's been filed, Your Honor, by Harbinger Funds opposing the

10   extension of time.  As we have pointed out, Your Honor, in the

11   motion and in the reply, in many respects, this is a unique,

12   complex and a very large and complex case.  And we have

13   outlined, Your Honor, in the reply similar cases of almost this

14   type of complexity and size in which the extension of time to

15   file schedules and statement of affairs, etcetera, has been

16   extended for a considerable period of time.

17        We have explained, Your Honor, and I think almost

18   everybody is aware of the complexities of this case,

19   particularly, with respect to closing the books, preparing the

20   schedules, which is going to be a Herculean task, Your Honor,

21   with the number of creditors and transactions that still have

22   to be ascertained.  And every day there are new situations that

23   are popping up.  An extension of sixty days, Your Honor, in the

24   context of these cases, is really a -- almost mandatory because

25   of the nature of this case.  And for all the reasons we've

1    said -- I mean, the objection of Harbinger is there is no

2    transparency.  That may have been true, Your Honor, in the

3    first two weeks of this case, but that has changed

4    dramatically.  As I pointed out, with the additional Web

5    sites -- and there are a hundred names in one Web site, Your

6    Honor, of people who can be contacted about individual

7    problems, tracing their assets to the extent we can trace.  And

8    one of the problems is, Your Honor, is going through these

9    wonderful technologically advanced systems that you keep

10   hitting roadblocks and you have to find the person who can give

11   you the password to get past that portion of it to get

12   information.

13          But surprisingly, Your Honor, information is

14   beginning to come in as to where, for example, somebody's

15   securities may have been trapped on September 15th.  So there

16   is -- I would submit to Your Honor, there is a really great

17   amount of transparency at this time and that every effort will

18   be made to get these schedules and statement of affairs filed

19   as soon as possible.  And sixty days is a relatively mild

20   request.  So we submit, Your Honor, that the request should be

21   granted.

22          THE COURT:  Is Harbinger still pressing its

23   objection?  Apparently so.

24          MS. RUTKOWSKI:  Good afternoon, Your Honor.  Rheba

25   Rutkowski from Bingham McCutchen representing the Harbinger

1    Funds.  And, yes, we do continue to press our objection.  Yes,

2    we are concerned about transparency but, in this instance,

3    we're concerned only about just broad disclosure of information

4    to all creditors that the bankruptcy rules require be disclosed

5    early on in the case.  We appreciate all the obstacles that the

6    debtors have run into in terms of trying to stabilize the

7    situation and gain access to information, but the reasons

8    proffered in support of this further request for an extension

9    are essentially the same as the reasons proffered in the first

10   request.  And I wonder if we'll still be here in January with

11   another request because what I'm hearing about progress, and

12   I'm hearing that things are coming together and that there is

13   stabilization and greater access, but I haven't heard anything

14   yet that indicates that we will be any closer in January than

15   we are today.

16        Our objection is limited.  We're not asking for an

17   order requiring that this information be disclosed tomorrow.

18   We think by thirty days they ought to be able to provide

19   something at least in accordance with what Mr. Marsal

20   represented at the October 16th hearing.  If they do have a

21   handle on it, then we ought to have disclosure for everybody,

22   not by contacting people on a Web site or asking for one-off

23   meetings.  Surely, that is not the most efficient way to

24   proceed with this.

25        So, that's all we ask for is what the Bankruptcy Code

1    requires.  And we haven't heard anything that constitutes, in

2    our view, just cause for a further extension based on the same

3    reasons that were supplied before.

4         THE COURT:  Okay.  I'm very mindful of Harbinger's

5    early request for information and the fact that, at the time

6    that request was initially made for 2004 discovery, this case

7    was in a different place.  And Mr. Miller's opening remarks

8    today made clear that enormous progress has been made even in

9    the last month in terms of stabilizing the business,

10   normalizing its operations.  And the ability as a result of the

11   approval today of the debtors' ability to hire new people to

12   deal with the unwind of derivative trades, to me, is a further

13   sign that this a work in progress as to which very substantial

14   work has already been accomplished.

15        But it is not unusual for bankruptcy courts to extend

16   for cause shown the time to file schedules and statements of

17   financial affairs.  The Harbinger papers, as written, note that

18   this is the largest -- and I think the language is "and perhaps

19   the most complex" bankruptcy cases ever filed.  And that

20   recognition, I think, isn't a statement against interest as

21   much as it is a statement that recognizes the elephant that is

22   in the room.  The elephant in the room is a massive information

23   problem, massive in its quantity and massive in its complexity

24   and enormous detail.

25        The fact that there are more Web sites than I can

1   count on the fingers of one hand confirms to me that reasonable

2   efforts are underway to provide the public, which has a need to

3   know, as much information as can be provided in a timely way.

4           I believe that the request to extend the time for the

5   filing of schedules and statements of financial affairs through

6   the middle of January is, under the circumstances of this case,

7   an eminently reasonable time period.  And even the Harbinger

8   papers acknowledge that some more time is needed.  So we're not

9   quibbling over whether or not there is more time needed.  It's

10  an attempt by one creditor to cut back by thirty days the

11  period of time that the debtor itself has said is needed to get

12  the job done right.

13          I recognize that it's entirely possible, as counsel

14  for Harbinger noted, that we may find ourselves at the January

15  hearing with a request for additional time.  There are

16  circumstances in this case that may not be fully ascertainable

17  now, but it's clearly squarely within my discretion to grant

18  this additional time.  It's certainly not an abuse of that

19  discretion to do so, and I do so now.

20          MR. MILLER:  Thank you, Your Honor.  I don't want to

21  gild the lily, Your Honor, but, as Your Honor may recall,

22  Harbinger was the first of the Rule 2004 moving parties.  And

23  after the -- I think it was the October 6th hearing -- or the

24  first omnibus hearing in October, Your Honor, Mr. Marsal and

25  the Alvarez team spent over two and a half hours with

1  Harbinger's representatives going over the information that was

2  requested by Harbinger.  And Harbinger only has a claim based

3  upon two swap agreements in this case, Your Honor.  We have

4  since discovered that Harbinger is a prime brokerage account

5  with LBIE and has a bigger involvement with LBIE.  But as a

6  result of that conference, Your Honor, Your Honor may recall

7  the Harbinger Rule 2004 motion was adjourned without date.  So

8  we did provide information.  We continue to provide information

9  every time there is a call from Harbinger.  So we are trying to

10  deal with that.  And what Mr. Marsal said on October 16th that

11  in forty-five to sixty days we should be able to answer

12  specific customer requests, not that we'd be able to file

13  schedules.  So, thank you, Your Honor.

14        The next --

15        THE COURT:  I think Harbinger's counsel would like

16  something as a result of your having gilded the lily.

17        MR. MILLER:  Okay.

18        MS. RUTKOWSKI:  Yes.  Thank you, Your Honor.  I

19  understand your ruling, and I respect it.  I just wish to take

20  issue and want to make clear that all we were asking for here

21  are disclosures required by the Bankruptcy Code.

22        THE COURT:  I know exactly what you were asking for.

23        MS. RUTKOWSKI:  And it has nothing to do --

24        THE COURT:  I know exactly what you're asking for,

25  and I know exactly the reason that you asked for it.  And

1    you're certainly within your rights to do what you did, and

2    you've lost.

3                MS. RUTKOWSKI:  Thank you.

4                THE COURT:  So you can sit down now.

5                MR. MILLER:  Your Honor, the next matter on the

6    calendar, number 15, is the motion by the trustee of SunCal for

7    relief from the automatic stay.

8                MR. GOTTFRIED:  Good afternoon, Your Honor.  Andrew

9    Gottfried, Morgan, Lewis & Bockius, along with Paul Couchot of

10   Winthrop Couchot, counsel for the movants on this matter.  The

11   SunCal, or SCC entities, which are about thirty some odd

12   movants that are in bankruptcy cases pending in the Central

13   District of California -- the movants are real estate

14   development entities with projects that are in various states

15   of development.  The debtor, Lehman Commercial Paper

16   Incorporated, and a nondebtor affiliate, Lehman ALI, have

17   advanced approximately 2.3 billion dollars for the projects.

18   They've stopped advancing, and the projects sit fallow.  These

19   advances are secured by deeds of trust on the projects' real

20   property.

21               What we have here, Your Honor, is a true anomaly

22   under the Bankruptcy Code, a situation not typical and, I

23   believe, not contemplated by the Bankruptcy Code.  In the

24   relationship between SunCal and Lehman, SunCal is the debtor in

25   bankruptcy and Lehman is the secured creditor.  Yet, the

1    automatic stay in Lehman's case, the creditor's case in this

2    relationship, prevents the debtors, the SunCal entities, from

3    taking necessary actions in their bankruptcy cases.  Now, what

4    are these actions that SunCal, the debtor, wishes to undertake

5    in their bankruptcy cases that implicate Lehman's automatic

6    stay?  Use of cash collateral, priming debtor-in-possession

7    financing, potential Section 363 sales and a plan of

8    reorganization, ultimately.  All of these are debtor rights

9    under the Bankruptcy Code which the SunCal entities are

10   authorized to pursue in the Bankruptcy Court where their cases

11   are pending which is the Central District of California.

12          Except for this unusual twist of fate, SunCal finds

13   itself before this Court arguing with its secured creditor that

14   it should be allowed to make motions which any other debtor in

15   bankruptcy have the absolute right to make where their cases

16   are pending.

17          THE COURT:  That's not entirely true.  You have the

18   right to make all manner of motions in the bankruptcy case that

19   have nothing to do with Lehman, including, if you had access to

20   capital, a motion to borrow money junior to the Lehman secured

21   position that didn't impact the Lehman position at all, or a

22   motion for appointment of a trustee, or a motion to convert the

23   case to a Chapter 7, or -- and you can go through the list.

24   How about the appointment of an examiner?  We just talked about

25   that earlier today.  You can do that.

1          MR. GOTTFRIED:  Absolutely, Your Honor, but there's

2     no money to pay it.  All of the cash is cash collateral,

3     Lehman's cash collateral.  We can't use it without an order of

4     the Bankruptcy Court in Central District of California.

5          THE COURT:  So is your focus today use of cash

6     collateral?

7          MR. GOTTFRIED:  Our focus, Your Honor, is to obtain

8     debtor-in-possession financing, use of cash collateral and a

9     potential 363 sale.  Clearly, plans of reorganization are

10    further down the road.  And these are all intertwined.  We

11    can't get a DIP loan without a priming lien.  And we recognize

12    that this is a burden that will have to be met in our case.

13         THE COURT:  It's also a burden that, as you describe

14    it, would be a burden imposed on the Lehman estate because,

15    unless they're consenting to such a priming lien, which I

16    suspect they're not consenting to, you end up with a valuation

17    hearing, the expense of expert witnesses, the burden of

18    significant legal expenses on all sides, including the Lehman

19    side, and a burden on this estate.  Isn't that right?

20         MR. GOTTFRIED:  The way you posit it, Your Honor,

21    yes, but I submit this is an improper way of looking at it.

22    The automatic stay is designed to protect a debtor from

23    creditor action.  In the instant case, Lehman's automatic stay

24    serves to protect a secured creditor from debtor relief in

25    bankruptcy which, we believe, Your Honor, turns the automatic

1  stay on its head.

2       THE COURT:  If you were involved in a priming

3  fight -- I mean, I'm not having an argument with you; that's

4  for Mr. Kessler to do, I suspect.  But if you're involved in a

5  priming fight, there'd be a new lender imposed over Lehman

6  potentially taking value away from Lehman, and that would be

7  the creditor, not the debtor, that would be seeking relief at

8  Lehman's expense and would be causing Lehman, through the

9  debtors' efforts, in your California case, to incur unnecessary

10  expense and distraction.  So I think, while I understand your

11  colorful argument that it's been turned on its head, it really

12  hasn't been in your example because it's a new creditor of your

13  California debtors who will be coming in at your request to

14  take advantage of the Lehman position and collateral.

15       MR. GOTTFRIED:  Well, respectfully, Your Honor, "take

16  advantage", I would submit, is a harsh way of looking at it.

17  We would have the burden of convincing the California court

18  that Lehman's position was adequately protected.  And there's

19  no reason to assume that the California court is not able to

20  make that kind of determination.

21       THE COURT:  Yes, but it would be, if contested, a

22  determination that can only be made after the expenditure of

23  some cost expense delay, inconvenience and the like.  It

24  wouldn't happen easily.  And I suspect that Lehman will not go

25  quietly.

1            MR. GOTTFRIED:  That may very well be, Your Honor,

2      but, again, the automatic stay is for the protection of the

3      debtor, not the secured creditor.  And it is Lehman's position

4      as secured creditor that's at issue here.  Every secured

5      creditor would prefer not to have a priming lien motion made

6      against them in Bankruptcy Court, but no other secured creditor

7      has the right to stop the debtor from doing that.  That's what

8      Lehman is asking for, Your Honor, in objecting to this --

9            THE COURT:  Actually, Lehman's not asking for

10     anything.

11           MR. GOTTFRIED:  In objecting to this motion.

12           THE COURT:  Mr. Gottfried, you're not -- Lehman's not

13     asking for anything.  Lehman is in court not because they're

14     asking for something.  They're in court because you're the

15     moving party asking for something.  So you have it backwards.

16           MR. GOTTFRIED:  Well, let me postulate this, Your

17     Honor.  Lehman's objection to this relief:  What is it really

18     going to do on a practical level?  On a practical level, what

19     they're saying is if we, SunCal entities, want to make a motion

20     for a priming DIP in our bankruptcy case, we have to first

21     convince Your Honor of the merit of that motion.  That's really

22     what they're asking for in the practicalities of this, that we

23     have to try our priming motion first before Your Honor, and if

24     Your Honor agrees with our position at that point that there is

25     merit to our priming motion, you would then grant us relief

1  from the automatic stay.  We would then go to California in our

2  Bankruptcy Court and make our motion for a priming lien,

3  priming DIP yet again, and they would get to argue yet again

4  before the Bankruptcy Court in California that the relief

5  shouldn't be granted.  I would submit, Your Honor, that this is

6  not a tenable proposition where you have two competing

7  bankruptcy cases like this that to require the debtor in the

8  California case because of the happenstance of the Lehman case

9  to try all of its motions twice is unfair and unnecessary.

10  There's sort of this sub silentio, I think, tenor in opposing

11  this motion that somehow Lehman's not going to get a fair shake

12  out there, and there's no basis for that.  Lehman will have the

13  rights of any secured creditor in opposing whatever relief we

14  seek from the Bankruptcy Court in California.  The automatic

15  stay was not designed to promote a secured creditor's position

16  the way it is attempted to be utilized in this instance.

17         Since we made this motion for relief from the

18  automatic stay, the nondebtor Lehman affiliate, Lehman ALI,

19  served additional foreclosure notices on us.  This is turning

20  the automatic stay not from the shield that it's supposed to be

21  into a sword to be used against another debtor in another

22  court.  This just isn't -- it isn't fair.  And it just isn't a

23  practical way to handle the coordination of two debtors that

24  find themselves in the circumstances that they're in.

25         THE COURT:  Well, let me tell you what the practical

1  way is.  Mr. Miller, during his opening status report,

2  commented on a number of bankruptcy cases that actually all

3  involve Lehman entities around the world, and parties-in-

4  interest in those cases are working cooperatively with each

5  other with different estates.  Litigation is not the answer;

6  some attempt to consensual resolution might be.  And that's not

7  to say that it's possible in this instance, but your rhetoric

8  about how unfair it is that your lender happens to be in

9  bankruptcy, believe me, your lender doesn't think it's so fair

10  to be in bankruptcy either.  There are a whole bunch of world

11  circumstances that caused that.  And if your particular client

12  happens to be at the wrong end of this proceeding, as they used

13  to say in law school, you take your plaintiffs as you find

14  them.  Well, you take this lender as you find it, which is a

15  large complex Chapter 11 debtor that happens to be your lender,

16  to the tune of 2.3 billion dollars.  That's a huge asset to

17  protect in this case.  And you're suggesting to me that what I

18  should do in the interest of giving you the ability to file any

19  motion you want to file in cases that are not before me is to

20  basically strip away the singular benefit that this debtor has,

21  which is the automatic stay, for no cause shown?  Simply that

22  there's the potential for a brush fire on one of your

23  properties?  This was listed today, Mr. Gottfried, as an

24  emergency as a result of a hearing that took place by phone in

25  which one of your colleagues urged me to list this early

1    because there was a stated emergency.  And the stated emergency

2    included a list of potential horribles that could befall the

3    assets in California.  I don't for a minute suggest having seen

4    video reports of brush fires in California that it's not a very

5    real risk.  But why should this estate bear any of it?

6             MR. GOTTFRIED:  I think, Your Honor, number one, we

7    weren't suggesting unfairness by Lehman but unfairness by the

8    circumstance of the automatic stay, which I don't believe was

9    intended to apply in this situation.  Others may disagree, but

10   that's what I believe.  We are an extremist.  We have no access

11   to any funds whatsoever.  We do have real practical problems,

12   and I recognize this is not an evidentiary hearing where we can

13   put that forth.  And we think it is justified, Your Honor, to

14   weigh the relative harm and not just focus on the fact that

15   this is a substantial asset for Lehman, an asset that it holds

16   as a creditor.  There is a countervailing equity in favor of

17   the SunCal companies, which are stymied right now because they

18   can't do anything of practicality in their bankruptcy cases,

19   that while Your Honor mentioned that there are types of motions

20   that can be made, which is true, but not the critical motions

21   that have to be made in any case where all of the assets are

22   subject to a lien.  We have no use of cash collateral.  We have

23   no ability to get a DIP loan because nobody's providing one on

24   a junior basis.  That's just the facts which I don't think are

25   subject to any dispute.

1    So to say that the matter can be resolved, of course,

2    I'm the first one to suggest that matters in most instances can

3    be resolved, but we don't find ourselves either with a luxury

4    of time, because of the condition we're in in California, for a

5    prolonged discussion which we've tried to have.  We're out of

6    time.  That's just the facts.  We're not stripping Lehman of

7    any rights.  There's a court that will hear any motions that we

8    bring before it.  If we don't have merit to our motions, the

9    Court will deny it.  And, yes, there will be some expense

10   involved for the estate, but this is an asset of the estate

11   that, obviously, it will want to protect and it's worth the

12   expenditure of some money if they view it as being advisable.

13   But to say, in effect, that we're just going to put those cases

14   on ice in California because Lehman has the automatic stay is

15   not right.  I don't think it's in Lehman's interest, but it's

16   not for me to say so.  But it's certainly not in the interest

17   of the SunCal debtors that are frozen in position.  We can't do

18   anything in these cases without access to funds.  We have no

19   funds to do anything.

20   And we can, I'm sure, debate about, if it comes down

21   to this, whether brush has to be cleared or levies fixed or

22   security measures taken against vandalism and things like that,

23   but that's really not the point.  The point is we're just

24   frozen in place.  And we realize this is a massive case, Your

25   Honor, nobody every suggested otherwise, with multiple

1   interests.  But this is truly, I believe, a unique situation.

2   To my knowledge, this did not come up before in this case, and

3   I don't know whether it will subsequently.  But it is

4   juxtaposition where the debtor is the creditor and, therefore,

5   can hold its debtor at bay in its bankruptcy case.  And what we

6   are suggesting, Your Honor, is to just break that Gordian Knot

7   so that normal debtor/creditor relations in bankruptcy can

8   proceed.  And I'm not for a moment denying yes, some funds will

9   be expended, but this estate has the funds, certainly, to

10   appear in Bankruptcy Court in California on a few occasions if

11   it deems it advisable to protect its large investment.  And I

12   think it's that type of balancing, Your Honor, that's critical

13   to this situation.  But to just, in effect, say well, work it

14   out, well, we'd love to work it out.

15          THE COURT:  Mr. Gottfried, that's not what I said.

16   Just to the extent that you're in a throwaway attempting to

17   characterize comments from the bench, I'm going to break in and

18   correct you.  What I suggested was not just work it out; I

19   suggested that there are examples already available to me in

20   this case of parties who have been successful in resolving

21   enormously intricate problems, intercreditor problems, within

22   the Lehman enterprise itself, demonstrating that it is possible

23   for creative hardworking intelligent people to find solutions.

24   Obviously, there are remedies available if those solutions

25   can't be crafted.

1      You have, however, come in on an emergency basis

2  seeking a blanket lifting of the automatic stay.  At the time

3  you filed your motion, there was a general reference to DIP

4  financing.  The DIP financing motion was not attached, not

5  described in detail.  I didn't even learn the identity of the

6  lender until a telephone conference when I asked the question.

7  So the papers that bring you to Court are incredibly broad in

8  general and seek incredibly broad and general relief, which

9  goes well beyond which I consider appropriate in terms of

10  showing the cause that you need to show.

11      Additionally, you need to be married to the Sonax

12  standards, and I'm not at all sure that you have satisfied one

13  of them.  You make what amounts to an equitable argument,

14  "we're in trouble and we need help from you," so that we can go

15  to the Bankruptcy Court in California and file the motions that

16  we need to file that admittedly will be disadvantageous to

17  Lehman.  Give me your list of Sonax standards that suggest to

18  me that stay relief is appropriate today.

19      MR. GOTTFRIED:  I'm afraid, Your Honor, that our

20  position, as I've tried to articulate -- that this is a unique

21  circumstance.  It's not just Sonax; it's the unique

22  circumstance that what we're talking about is the automatic

23  stay, not as debtor protection but as creditor protection,

24  because that's the relationship between the parties here.

25      My client's the debtor in this relationship.  Lehman

1 is the creditor. At the very least, Your Honor, we should be

2 permitted to make a motion for use of cash collateral and a

3 motion for debtor-in-possession financing.

4 THE COURT: So is that a modification of your motion?

5 MR. GOTTFRIED: If it would please Your Honor, then,

6 yes. If it would please Your Honor, that would at least enable

7 us to start a process in the works. And I appreciate Your

8 Honor didn't have a DIP term sheet; these things are sort of

9 fast-moving. As Your Honor can appreciate, sometimes DIP loans

10 don't get finally negotiated until a hearing in court or a half

11 hour before the hearing in court, and that's not always in the

12 control of the debtor that these things are fluid. But there's

13 no reason, Your Honor, respectfully, that we shouldn't at least

14 have the opportunity to take our best shot at preserving

15 something here and avoiding a worse situation. If Lehman is

16 correct that it wants to oppose our motion it will have every

17 opportunity to do so.

18 THE COURT: But at the moment, the only motion that

19 Lehman is opposing is your motion for broad-based relief from

20 the automatic stay to allow you to do whatever you think you

21 need to do in your bankruptcy cases in California. That's the

22 only motion which I'm aware of which is pending.

23 MR. GOTTFRIED: That is, Your Honor. And if we could

24 have stay relief to make a motion for use of cash collateral

25 and for obtaining debtor-in-possession financing, that would at

1   least enable us to start down a process.  And I'm not

2   precluding discussions with Lehman as that process goes on, but

3   it puts us on a level playing field to move forward.

4        THE COURT:  There was a question that I asked you

5   that you didn't answer, and I'm not going to press you on it

6   but I'm simply going to give you the opportunity, if you wish

7   to, to give me the list of Sonax factors that you believe are

8   satisfied here.

9        MR. GOTTFRIED:  I don't think it's the list of Sonax

10   factors, Your Honor; I think it's cause based upon the

11   relationship of the parties here that the stay was not intended

12   as a creditor protection.

13        THE COURT:  So your argument is more or less

14   exclusively based on the fact that you believe it is anomalous

15   for a secured creditor to also be a debtor in a bankruptcy case

16   entitled to automatic stay protections and that that is a

17   situation which was not contemplated by the drafters of the

18   code or Congress in enacting the automatic stay?  Is that your

19   argument?

20        MR. GOTTFRIED:  Yes, Your Honor.  I believe that is

21   the case.  Now, this is not to say that we don't have other

22   factors that we could present about the extreme situation we're

23   in, but I recognize this is not an evidentiary hearing so

24   that -- but I don't believe --

25        THE COURT:  But that's your legal argument?

1      MR. GOTTFRIED:  Yes, that is correct, Your Honor.

2      THE COURT:  Okay.  I understand your argument.

3      MR. GOTTFRIED:  Thank you, Your Honor.

4      MR. KESSLER:  Good afternoon, Your Honor.  Michael

5  Kessler for Weil, Gotshal & Manges, for the debtors.  Based on

6  the argument of the movants and also on the Sonax case

7  decision, which says that the movant must establish a prima

8  facie case before the debtor even has to respond, I think that

9  it would be appropriate in the nature of a motion for judgment

10  to ask that you deny the motion before I even respond and then,

11  if necessary, I should go on.  I don't believe that they've

12  made a prima facie case.

13      THE COURT:  Well, we're just having a family

14  argument.  Rather than treat this like we're at the midpoint of

15  a jury trial, I think what we're going to do is give you an

16  opportunity to express on the public record why I should deny

17  this motion as opposed to simply assume that your opponent has

18  already fallen on his sword.

19      MR. KESSLER:  All right.  The SunCal bankruptcies in

20  California are enormously complicated, and, as you heard, there

21  are approximately thirty of them that have now been filed.

22  This motion, however, only relates to approximately fourteen of

23  those cases.  The 2.3 billion dollars of Lehman loans and

24  first-lien mortgages relate to those properties and not to many

25  of the others.  And so what you see before you is just,

1   perhaps, the tip of the iceberg.  And if you open this door

2   today for the lift stay, I believe you're going to be flooded

3   with these types of things.

4            THE COURT:  Explain that to me.  Let's just say, for

5   the sake of discussion, that I were to agree that the stay

6   should be lifted.  What is the parade of horribles that flows

7   from that?

8            MR. KESSLER:  Well, I will go through what the

9   lifting of the stay, pursuant to the motion before you, will

10  result in.  But as you so noted from reading their pleadings,

11  they are not looking in their motion to lift the stay solely to

12  obtain use of cash collateral and to get a priming DIP lien.

13  That's what they wanted to do initially.  But their motion is

14  more expansive than that as it's asking this Court to lift the

15  automatic stay, for all purposes, in their case.  And we

16  already know that another of the SunCal cases in California

17  which they haven't brought before you for a lift stay yet --

18  there have been representations made in pleadings and even

19  copies of complaints attached as exhibits in an effort to stop

20  Lehman foreclosures of its properties in other cases that they

21  intend to bring fraudulent conveyance actions, insubordination

22  actions under 510(c) and other affirmative actions.  So what

23  this motion is not telling you up front, when they say we want

24  to do four things but perhaps more and we're asking you to open

25  the door for everything, is not telling you that undoubtedly

1    what they want to do is try to bring other affirmative actions

2    against Lehman in these cases, too.

3            Now, if I may, I'd like to kind of go through with

4    you my argument as to why the stay shouldn't be lifted here.

5    First, contrary to what you heard, this Court should not give

6    any special deference to the fact that the SunCal entities are

7    in their Chapter 11 proceeding.  There's nothing in Section 362

8    or in the cases that in any way alters the burdens or the test

9    for a Chapter 11 debtor to obtain stay relief from another

10   Chapter 11 debtor.  I believe that this Court needs to look at

11   their motion to lift stay in the same way as it would if they

12   were a nondebtor in Chapter 11 and they were attempting to

13   bring an action or a lawsuit against this Chapter 11 debtor in

14   another court, because that's exactly what they would be doing.

15   They're seeking affirmative relief in the form of a priming DIP

16   loan or the use of cash collateral or any of the other things

17   that they would do if you opened the door here.

18           Now, to give any special deference to them because

19   they are a Chapter 11 debtor is, in essence, this Court saying

20   their Chapter 11 cases are more important or more significant

21   than these Chapter 11 cases, that our automatic stay should

22   give way because they are in a Chapter 11.  And I don't believe

23   that there's any case law --

24           THE COURT:  Mr. Kessler, let me break in and just ask

25   you a question on that.  I'm not trying to intrude on the

1     sequence of your arguments but there's something that concerns

2     me.  It's not a question of whether one Chapter 11 case is more

3     important than another, as much as what happens, just in terms

4     of case administration, to the various cases that are pending

5     in Santa Ana, California.  If there is never any relief from

6     the automatic stay, these Lehman cases have the potential of

7     being long-lasting.  Mr. Miller, at the outset, talked about

8     cases in the U.K. that might go on for four years, and I have

9     no idea how long these cases will be active before me.  But is

10    it your position that there is a permanent freeze on case

11    administration in the California bankruptcy cases?  Because

12    that's a problem, too.

13              MR. KESSLER:  Right, and I do not make that argument.

14              THE COURT:  So is there a way --

15              MR. KESSLER:  I'm here arguing against the motion

16    that's before you today --

17              THE COURT:  I understand, but --

18              MR. KESSLER:  -- not any other motion that may be

19    brought.  And Your Honor made one suggestion, and that is the

20    parties should talk and try to reach some form of consensual

21    agreement.  There are other ways that Courts have resolved

22    these difficult issues where there are debtors in multiple

23    bankruptcies.  We've had protocols, for example, in other

24    cases.  And that's not a subject that's on the calendar for

25    today, but it's something that Your Honor might suggest the

1    parties talk about. But it's not something that should be

2    raised today when they're asking for this type of emergency

3    relief. So there are other options that don't necessarily

4    involve an immediate lifting of the stay.

5           THE COURT: Fine.

6           MR. KESSLER: Now, as Your Honor pointed out, we have

7    to look at the statute, and Section 362(d)(1) tells us that, as

8    far as the SunCal debtors are concerned, the only basis for

9    their lifting the automatic stay is 362(d)(1) for cause. And

10    during the telephonic chambers conference in which they sought

11    an expedited hearing for this motion, Your Honor permitted the

12    hearing to go forward today with legal argument only and noted

13    that if an evidentiary hearing is necessary we would reschedule

14    it for another day.

15           And so I understood that ruling to mean that this

16    will be, if it doesn't conclude today on oral argument, a

17    preliminary hearing under 362(e) and that if an evidentiary

18    hearing is necessary we'll go to a later adjourned date for

19    that as a final hearing. The reason I say that is because I

20    want to raise in defense of their motion a lot of fact issues

21    that are in their motion, in attachments to their motion, and

22    are relevant to the matters raised in their motion but are not

23    identified for them. And to the extent -- and I don't believe

24    that they're subject to any form of dispute, but if they are,

25    then I think that we're entitled to go to the next hearing and

1    put evidence on to show what I will demonstrate.

2        So they haven't made any prima facie showing of cause

3    here at all.  In fact, Your Honor asked several times how do

4    you meet the Sonax factors, which is the Second Circuit's test

5    for relief from the automatic stay in a situation of this sort.

6    They cite the Sonax.  They say in their pleading that Sonax

7    controls but they don't, in any way, try to demonstrate to the

8    Court that they do meet the Sonax factors.  Well, in fact, if

9    you do go through the Sonax factors, you see that they don't

10   actually meet them in this case.  The way the Sonax factors are

11   weighed is that where a movant seeks relief from the automatic

12   stay in order to bring an action against the debtor -- excuse

13   me, I shouldn't say against the debtor.  In order to bring an

14   action in another court to the effect that that action does not

15   affect the debtor or does not affect the debtor materially, it

16   weighs more in favor of lifting the stay.  But the first Sonax

17   factor says that if there is lack of any connection with or

18   interference with the bankruptcy case, then it weighs more in

19   favor of lifting the stay; whereas when there is a strong

20   connection to the bankruptcy case, where there is interference

21   with the bankruptcy case, it weighs strongly in favor of not

22   lifting the automatic stay.  Here, as Your Honor so rightly

23   pointed out, in order to get a priming DIP loan where they've

24   already conceded that we have a first lien secured mortgage on

25   all of their properties for 2.3 billion dollars, they would be

1    taking affirmative action against the estate clearly in

2    violation -- I shouldn't say in violation, but clearly in a way

3    that the first Sonax factor says you should not lift the stay.

4         There are other Sonax factors that clearly weigh

5    against lifting the stay:  whether the other proceeding

6    involves a debtor as a fiduciary; whether the debtors' insurer

7    has assumed full responsibility for defending; whether the

8    action primarily involves third parties; whether the litigation

9    in the other forum will prejudice the interest of other

10   creditors.  All of these factors clearly weigh in favor of not

11   lifting the stay here because we don't have a situation, for

12   example, where it affects third parties and not so much the

13   debtor.  We don't have a situation where an insurer is going to

14   take over the litigation on behalf of the creditor and,

15   therefore, it won't affect the estate.  We don't have a

16   situation where the litigation in the other forum will not

17   prejudice the interests of creditors in this case.  All of

18   those factors weigh strongly in favor of not lifting the stay

19   here.

20        There are at least two other Sonax factors that are

21   not relevant at all here:  whether the judgment claim that they

22   seek in the other action is subject to equitable subordination;

23   whether the movant's success in the other proceeding would

24   result in a judicial lien against the debtor.  In sum, the SCC

25   motion relies almost entirely on grounds for cause that are

1    just allegations that don't meet any of Sonax factors.

2         Now, let me go through some of what they say in their

3    motion.  The allegations they make in the motion are a complete

4    red herring.  What they say is that they have these emergency

5    expenses and that these debtors committed, through a

6    restructuring agreement, to advance monies to cover these

7    expenses.  We've advanced all the monies that were to be

8    advanced under the 2.3 billion dollars in first liens.  They're

9    not saying that there are any monies to be advanced there.

10   What they're saying is that there is this restructuring

11   agreement between the parties in which the debtors agree to

12   advance monies for emergency repairs.  The restructuring

13   agreement is attached to the declaration of Mr. Cooke, which

14   is, in turn, attached to as an exhibit in their motion.  And it

15   is clear, if you look at Section 1(h) of the restructuring

16   agreement on page 5 of that agreement, that if any party is

17   obligated to advance funds for emergency basis, it's Lehman

18   ALI, Lehman A-L-I, who is not even a debtor in this case.

19   There is nothing that restructuring agreement -- that even if

20   there were an obligation that they allege that would commit or

21   require a debtor in this case to advance those funds.

22        THE COURT:  Let me stop you for a second on that

23   point, Mr. Kessler.  In the ordinary course of troubled real

24   estate workouts or bankruptcies, secured creditors, who do not

25   necessarily have a legal obligation to do so, will nonetheless

1  make so-called protective advances in order to assure that

2  their collateral will be secure and that the value of their

3  investment will be preserved and protected.  What I don't

4  understand in terms of the current dispute, and I'm not

5  suggesting it needs to be answered now, but I'd like you to

6  think about it at some point between today's hearing and the

7  next hearing if there is one, is why there isn't a business

8  solution and why either the nondebtor Lehman ALI, as a

9  potential funding source, if it has liquidity, or given the

10 billions of dollars in cash resources that Lehman currently

11 has, wouldn't consider it prudent, assuming it were prudent, to

12 protect this asset.  It's a 2.3 billion dollar investment; some

13 cost.

14        MR. KESSLER:  I think I can address that, Your Honor,

15 as --

16        THE COURT:  Okay.

17        MR. KESSLER:  -- I continue through.  It's a little

18 convoluted, but I think I can address it.

19        THE COURT:  I'm used to convoluted.

20        MR. KESSLER:  Okay.  If I can refer next to page 3 of

21 their motion and continuing on to page 4, the movant set out in

22 seven bullet points the details of their alleged needs for

23 emergency funds as a substantiation for lifting the stay here.

24 The first bullet point speaks to a need for cash to avoid the

25 calling of completion bonds to complete the streets -- or to

complete streets.  The calling of these bonds would indeed
result in cash to complete the streets.  To ask for a priming
DIP lien to avoid the calling of the bonds is for one reason
and one reason specifically, and that is because some of the
principals of the SunCal entities are personally obligated on
the bonds.  And to have someone else fund those expenses
relieves them of personal liability.  And what they would do is
have Lehman advance those funds when there are other sources of
cash available in the form of the completion bonds.

Now, the second bullet point speaks to cash needs for
the Pacific Point project.  The SCC entities no longer even own
this project.  The project was foreclosed by Lehman and is
owned by a Lehman entity.

The fourth, sixth and seventh bullet points relate to
the 10,000 Santa Monica, the Oak Knoll and the Delta Cove
projects.  These projects are not even covered by the
restructuring agreement, which they use as their basis for
Lehman's obligation to advance funds to them.  If you read the
agreement, those three projects are not even projects that are
to be funded under that agreement.

Now, the reason -- the primary reason for seeking
emergency relief from the stay is alleged to be a desire to
obtain a seventy-five million dollar priming DIP loan that
would prime Lehman's approximately 2.3 billion dollars of first
liens.  And the motion, of course, doesn't identify the lender.

1    But at our chambers conference, Your Honor required that they

2    provide us with a copy of the term sheet for that loan, and

3    they did.

4          And so the term sheet perspective lender is from D.E.

5    Shaw, and we reviewed the term sheet.  As we say in our

6    response, there's at least two strong reasons based on that

7    term sheet to not grant the stay relief that would allow the

8    SCC entities to proceed with the fool's mission, as we say it,

9    to seek approval of this DIP loan.  This DIP loan is nothing

10   but a blackmail loan in order to compel Lehman to come in and

11   protect its property interest by advancing the monies.  And, in

12   fact, it has already been somewhat successful in that blackmail

13   mission.  We have given them an alternate DIP proposal.  We

14   haven't discussed it with them yet because we only gave it to

15   them yesterday, and we would welcome the opportunity to discuss

16   it.  But one of the obvious means for getting that term sheet

17   was to compel Lehman to try to advance monies.

18         Now, why do I say that?  They concede in their

19   motion, in several places, in paragraphs 2, 7 and 20, and also

20   in the declaration, that all of the SCC entities' assets are

21   encumbered by Lehman's first lien.  Lehman's loans are 2.3

22   billion dollars, and no one here will contest that the

23   collateral value has declined far below the 2.3 billion dollar

24   loan amount.  If there was equity in these properties, they

25   would have said so in their motion.  They would have put their

1  best foot forward in their motion to get relief from the stay

2  here, but they didn't.

3       In addition, they concede that there are no

4  unencumbered assets from which they can give adequate

5  protection to Lehman.  You can't give us adequate protection

6  from the collateral we -- from excess value in the collateral.

7  They can't give us adequate protection from unencumbered assets

8  because there are none.  And they have no other means for

9  providing adequate protection.  Again, I would offer, Your

10  Honor, if they did have adequate means, you would have seen it

11  in the motion or you would have heard someone say it here

12  because they're trying to get relief from the stay.

13       So why would the Court grant this type of stay relief

14  to force us to go to California and defend against that DIP

15  motion with property appraisers and an awful lot of money spent

16  in legal fees and other professional fees when it's clear on

17  the face of it that they don't have a basis for providing

18  adequate protection?  But even assuming, arguendo, that one

19  could convince a Court that Lehman would somehow be adequately

20  protected, the D.E. Shaw term sheet outlines what we call an

21  egregious loan that cannot be consummated under its terms or

22  alternatively as a classic loan to own.  It's a blackmail loan

23  to steal Lehman's property if Lehman doesn't come up and pay

24  off that loan.  And here's why.  The loan has a ninety-day

25  maturity date, and it provides for the immediate requirement to

1 file a 363 motion to sell the assets. So if that loan were

2 approved for the full seventy-five million dollars, a 363 sale

3 motion would have to be approved by the Court, and this

4 property would be put up for sale immediately. And if not

5 sold, the loan would mature in ninety days and D.E. Shaw would

6 be in there trying to foreclose out Lehman's 2.3 billion

7 dollars of liens in order to pay them back seventy-five million

8 dollars.

9         Now, I would submit to you that the SCC entities

10 can't even meet the closing conditions because, among other

11 things, it requires that LV Pacific Point LLC be a borrower.

12 That's a company that Lehman owns entirely. It's the company

13 that took the Pacific Point project through foreclosure. So

14 they can't meet that condition of the term sheet.

15         They also can't meet the condition of the term sheet

16 because some of the other required borrowers who are in

17 bankruptcy through -- the involuntarily petitions have been

18 filed against them are entities in which Lehman controls the

19 equity. And so they couldn't give those properties and

20 those -- they couldn't make those entities borrowers to D.E.

21 Shaw without Lehman's consent.

22         Now, the D.E. Shaw loan gets even worse. This

23 seventy-five million dollar loan for a maximum ninety-day term

24 has a fourteen percent interest rate, a four and a half million

25 dollars in cash fees paid half at closing and half at the

1   ninety-day maturity and a half percent per month, which is an

2   additional six percent per annum, payable monthly on the unused

3   portion of the seventy-five million dollars, calculated

4   together, this loan -- the interest and fees over the ninety-

5   day period calculates out to a thirty-eight percent interest

6   rate for the ninety-day period.  And it's all being paid out of

7   the funding of the DIP loan.  So, in essence, D.E. Shaw is

8   lending money and putting it back in its own pocket for a

9   ninety-day period.

10          Now, as I mentioned earlier, what we're going to have

11  in this ninety-day period, if it's somehow approved, is we're

12  going to have a 363 motion to sell the property.  And if it

13  doesn't sell in the ninety days, we're going to have a

14  foreclosure action to pay off the DIP.  So what does all this

15  mean to Lehman?  Within ninety days, Lehman, to protect its

16  interest in the collateral, securing it's 2.3 billion dollars

17  in loans, we're going to have to step up to either buy out the

18  D.E. Shaw loan at the 363 sale or at the foreclosure sale.  And

19  we're going to end up buying out that loan inclusive of the

20  over seven million dollars in interest and fees that will have

21  been paid, the expenses that would have been advanced so that

22  the bonds are not called, where we could have called the bonds

23  and let those monies be used to pay property expense.

24          And so how does the weighing of harm in this case

25  tilt in favor of the SCC entities?  As I mentioned earlier,

1   this is a blackmail DIP loan.  They know, and anyone who looks

2   at it knows, that these debtors, these Lehman debtors, are

3   going to have to come in and protect their interest and advance

4   up to seventy-five million dollars if that DIP loan is

5   approved.  There is no other way out of it.  These debtors

6   can't repay the property -- I mean, repay the loan.  They've

7   admitted it.  They're either going to sell it or let it go to

8   foreclosure.  And the only advantage of this process for SCC is

9   to not allow these bonds -- these completion bonds to be

10  called.

11          And so for all those reasons, we clearly don't

12  believe that the motion carries the day and that this Court

13  should protect Lehman under its automatic stay from having to

14  undergo that process and have to fight its way in a California

15  court on this fool's mission for them to get a DIP loan that is

16  clearly engineered to be blackmail upon Lehman to force it to

17  come in and fund those amounts.

18          And, as I've said, it has now partially worked

19  because we've given them a proposed alternate DIP loan:

20  different terms, no fees, lower interest rate and also, for

21  obvious reason, lower an amount.  And if the Court denies the

22  lift stay motion, I think it's perfectly reasonable that we'll

23  go out and start talking to them about our alternate proposal.

24          You asked me the question earlier why doesn't Lehman

25  want to advance the funds to protect this collateral, and I

1    said I would answer it.  And I'm saying to you that's why we

2    propose an alternate DIP loan.  We think that our alternate

3    proposal for a DIP would advance the necessary funds to protect

4    our collateral in a reasonable way, paying the most

5    emergency -- the expenses that are the greatest emergency on a

6    program that the SunCal entities had previously presented to

7    the Lehman entities.  There is no need for seventy-five million

8    dollars here.  There is no need for high fees.  There's no need

9    for egregious interest rates.  And there's no need to compel

10   Lehman to come in and pay off someone else's loan in ninety

11   days.

12         THE COURT:  Thank you.  I'll hear from the creditors'

13   committee.

14         MR. DUNNE:  Thank you, Your Honor.  For the record,

15   Dennis Dunne, from Milbank Tweed, on behalf of the Official

16   Creditors Committee.  I'm not going to repeat the arguments in

17   the pleadings or made by Mr. Kessler a few moments ago, which

18   frankly moots out a lot of what I had to say.  But let's just

19   take it back to the motion that was actually filed here today

20   and talk about why we think that that should not be granted and

21   then some suggestions for moving forward.

22         Unfortunately, there are just some realities we can't

23   change.  I'm sure there are not many, if not most, Lehman

24   creditors who wish that in the middle of September the Fed had

25   made a different determination with respect to bailing out

1    Lehman or not.  But they did what they did, or didn't do what

2    they didn't do, and we're here today.  SunCal, no doubt, wishes

3    that their secured creditors weren't in Chapter 11, but they

4    are and we can't change that.  And it is those secured claims

5    that constitute the property of this estate; they're assets of

6    these estates.

7         And part of the argument that counsel for the movants

8    were making I didn't fully comprehend or it didn't make sense

9    to me.  It's the notion that those claims, or secured claims,

10   which are assets -- clearly the automatic stay protects them.

11   I don't think counsel for the movants would be arguing that if

12   SunCal were not in bankruptcy that they could somehow slot in a

13   priming loan on top of Lehman's secured claims if SunCal was

14   outside of Chapter 11.

15        So if you posit that is the case, I know of no law or

16   no legal precep that the automatic stay which protects Lehman,

17   and we've done nothing to alter that, we haven't left Chapter

18   11, we haven't confirmed a plan or lifted the stay, can be

19   affected by the fact that somebody who wants to take action

20   against property of the estate has, themselves, filed for

21   Chapter 11.

22        Also, counsel for the movants, I think, postulated

23   that we will end up arguing the same legal arguments twice:

24   once before Your Honor and once in California.  I don't think

25   that's true either because, while there are two Chapter 11

1    cases, the relief, obviously, is different depending on which

2    court we're in.  And I think they recognize that by moving to

3    lift the stay before Your Honor to seek approval of financing

4    in California.

5            So you have the standards under 362, which we submit

6    we haven't heard any evidence with respect to.  And you'll have

7    the standards under 364, potentially Section 363 in California.

8    There's simply no reason to dispense with the automatic stay

9    because of inconvenience or perceived unfairness.  Yes, this

10   case -- or these cases and this fact pattern are unusual and

11   extraordinary but it is a factual reality we can't ignore, and

12   I think we've got to give effect to both cases and the law

13   that's applicable in both.

14           In terms of the way forward, and everyone's touched

15   on this, there are ways to deal with this.  We should have at

16   least ad hoc negotiations with respect to what they need to

17   accomplish now and to see whether we can address that.  Maybe

18   we can formalize larger, more permanent workarounds or

19   protocols, but we haven't had time or the opportunity to do

20   that.  But today, under the currently crafted request for an

21   umbrella opt-out of the automatic stay on this record, as it

22   applies to the Lehman estates, the committee submits is just

23   not proper and the request should be denied.

24           And unless Your Honor has any questions, that's the

25   committee's position.

1      THE COURT:  I don't, thank you.  I'll hear from

2  Mr. Gottfried, who wanted to say a few words in response to

3  Mr. Kessler's argument.

4      MR. GOTTFRIED:  Thank you, Your Honor.  Counsel for

5  the committee actually had a curious statement, which was that

6  he didn't believe we would have this two-court problem that I

7  mentioned previously.  But I disagree, and I think the basis

8  for that disagreement was made clear by counsel for Lehman

9  because what counsel for Lehman was doing before was arguing

10  the merits or their perceived lack of merits in a DIP term

11  sheet for a motion that we haven't made yet for a DIP loan.

12  And that is the legal predicament that we are in, Your Honor,

13  right now, which is that if we want a DIP loan, whether it's

14  D.E. Shaw or XYZ or even Lehman, that we have to, in effect,

15  under the present circumstances, try it first in this Court and

16  then, if Your Honor agrees it's appropriate, try it again in

17  California.  And that would be true even if it were a Lehman

18  DIP loan without relief from the automatic stay.

19      And that, Your Honor, I submit is not proper.  It's

20  not proper procedure, it's not proper coordination through two

21  bankruptcy courts and it is unfair.  No one's seeking to take

22  advantage of Lehman.  They will have all of their arguments.

23  And if the DIP motion we ultimately make is as bad as they

24  portray it, I suspect the Court will deny it.

25      THE COURT:  Which court?

1            MR. GOTTFRIED:  The court in California, if Your

2      Honor grants us stay relief to make that motion.  But, instead,

3      counsel was telling you everything that's wrong with it, and

4      that, of course, is designed to influence Your Honor and say

5      gee, this is a terrible DIP proposal, I'd never approve it.

6      But I think that misses the point.  That misses the point that

7      this two-step process doesn't work.  And what we're suggesting

8      is a one-step process, and that's true for anybody who makes us

9      a DIP loan, whether it's D.E. Shaw, whether it's Lehman,

10     whether it's somebody else who we manage to rustle up on the

11     eve of our hearing in California.

12            And what I'd respectfully request, Your Honor, is

13     that we have stay relief at least to seek debtor-in-possession

14     financing and use of cash collateral.  To the extent that other

15     relief is sought in our motion, we could adjourn that.  But

16     this is our immediate need, right now Your Honor, and it has to

17     be faced.  And I'm submitting, Your Honor, that a one-court

18     solution is the best solution to this situation.  Thank you.

19            THE COURT:  I don't think there's any need for

20     further discussion.  This is a highly unusual circumstance, as

21     everybody seems to recognize, but there's nothing unusual about

22     the automatic stay, which is something that every bankruptcy

23     lawyer is totally familiar with.  And the jurisprudence

24     surrounding the automatic stay and the circumstances for a

25     judge in this circuit to grant relief from the stay happen to

be very well-established.

There's absolutely nothing about the circumstances described by counsel for the movant that takes the situation out of the normative case law that guides the Court. Just because the secured claim happens to be a show stopper, from the perspective of the debtors in Southern California doesn't mean that the secured claim is not entitled to all of the protections that Section 362 provide.

The motion, in the form that it was presented which has been heard on an expedited schedule at the request of the movant, seeks broad relief that is not currently focused on use of cash collateral of DIP lending, although both of those issues are identified within the motion. The objections that have been filed by the debtor and by the creditors' committee to the relief sought are fundamentally sound in noting that the relief is broad and unspecified would expose the Lehman estate to a parade of horribles and is not presently warranted on the current record.

As a matter of law, counsel for the movant declined the Court's invitation to focus on the Sonax factors and instead focused on an equitable argument, that it's simply unfair to these debtors, in their California cases, to be subjected to what amounts to a blocking position of a secured creditor who happens to be benefitted by the automatic stay. That's just the way it is. And that's the way it will remain

1    until such time as one of the following things occurs.  Either

2    the SunCal parties move again with a targeted motion focused on

3    particular relief for cause shown or the parties, following

4    discussions, agree by stipulation to limited relief from the

5    automatic stay.  Or the parties, through discussions, reach

6    agreement concerning the terms and conditions of financing that

7    may be afforded by Lehman related entities.

8         Mr. Gottfried is wrong when he suggests, in his final

9    argument, that if Lehman were the lender that the same problem

10   would exist.  Of course it wouldn't exist.  If Lehman were the

11   lender it would be a consensual arrangement.  It would include

12   consensual stay relief and the terms and conditions would no

13   doubt be perfectly acceptable to Lehman because Lehman was

14   offering the deal.

15        To the extent that the only lending which is

16   available in California is lending which comes on a priming

17   basis, a priming fight in the current environment is something

18   to be avoided.  I encourage the parties, however, to talk to

19   each other and to talk constructively with each other about

20   ways to solve the financing aspect of this problem.  That

21   doesn't mean that they're going to reach agreement nor does it

22   mean that that's the end of the problems that the SunCal

23   entities are exposed to in their bankruptcy cases.  But let's

24   recognize reality, if Lehman entities hold secured claims of

25   2.3 billion dollars somebody in charge at the SunCal companies

1   needs to be speaking with, dealing with, respecting the rights

2   of the Lehman entities because they're not going to get out of

3   bankruptcy without passing through Lehman.  Lehman's right will

4   be protected in this court except for cause shown, which hasn't

5   been shown today.  Motion denied without prejudice.

6              MR. MILLER:  Thank you.

7              THE COURT:  And I'll accept an order that so holds.

8              MR. MILLER:  Thank you, Your Honor.  If I might,

9   Your Honor, I would go to the adjourned matters.  There are, in

10  addition to the three matters which we put over from the early

11  calendar.

12             THE COURT:  Before you go to the adjourned matters, I

13  noticed that this happened during the last omnibus hearing on

14  November 5, and there's no problem with it if you want to do

15  it, but you went through the list and we had a review of

16  everything that was adjourned, which took some time.

17             MR. MILLER:  I'm not proposing to do that,

18  Your Honor.

19             THE COURT:  I'm proposing you don't do that.

20             MR. MILLER:  I was just going to say, Your Honor,

21  there are nineteen matters.  Fourteen are being adjourned to

22  December 3, four to December 16, two to January 14 and one to

23  February 11th.

24             THE COURT:  I accept that summary.

25             MR. MILLER:  I would just point out, Your Honor, at

1　the rate that we are receiving objections to various matters on

2　the December 3 calendar; it looks like it's going to be a very

3　long, extensive calendar.  So I'm just alerting the Court.

4　　　　　The one other matter, Your Honor, is the adversary

5　proceeding.  And I think Your Honor's familiar with that.  The

6　pre-trial conference as put over, I think, to December 16th or

7　something like that Your Honor.  So that's fine and I will now

8　turn the podium over to the LBI trustee, Your Honor.

9　　　　　THE COURT:  Thank you very much, Mr. Miller.

10　　　　　MR. KOBAK:  Good afternoon, Your Honor.  James Kobak,

11　Hughes Hubbard & Reed for Mr. Giddens, the Lehman Brothers,

12　Inc. trustee.

13　　　　　Your Honor, if you wish I'm prepared to give a brief

14　status report, I hope a little bit briefer than Mr. Miller's,

15　just to bring you up to date on progress.

16　　　　　THE COURT:  I'd be interested in hearing it.

17　　　　　MR. KOBAK:  And then Mr. Wiltenburg will handle our

18　actual calendar for today.

19　　　　　I want to focus, as I have in the past, on the return

20　of customer property because that's really what our proceeding

21　is all about.  Unlike some of the other proceedings that you've

22　heard about today, our effort has been to get property to

23　customers and I don't mean any criticism of anybody else it's

24　just that a SIPC proceeding has a different focus and SIPC,

25　particularly in this case, has really emphasized that this

1  should be our goal.

2      As I've reported, we've transferred approximately

3  135,000 accounts with approximately 140 billion dollars worth

4  of property to Barclays and to Neuberger Berman.  That process,

5  I just want to make clear to everybody, that transferring these

6  accounts isn't quite as simple as pressing a button,

7  particularly when it comes to moving the attendant property.

8  And that's a process that's continuing.  We've made a lot of

9  progress, probably ninety-eight or ninety-nine percent of the

10  property has been moved by now.  But we still remain to do

11  that.  We have disputes, sometimes, with Barclays or with

12  people who are holding our collateral.  There are a lot of

13  books and records to reconcile and so forth.  So it's still an

14  extensive process.  It involves a number of LBI people some of

15  whom are now ring fenced for us by Barclays.  It also

16  increasingly involves people from Deloitte.  SIPC oversees the

17  process and when there are questions about whether funds can

18  come out of the 15(c)(3) account or so forth, the SEC will also

19  be involved.

20      I reported last time that we had begun, under our

21  protocol of dealing with the prime brokerage accounts, that

22  attracts a lot of attention so I wanted to spend a few minutes

23  on that today.  The process that we established is not a

24  traditional SIPC claims process, although it's similar to that.

25  But the idea was designed a process so that people could get

1  identifiable property back as quickly as possible when it's

2  available to be returned to them.

3          The prime brokers can avail themselves of this

4  process or if they don't like the results they're always free

5  to file a claim in the SIPC proceeding.

6          We have, approximately, 250 relationships which

7  covers something like 750 accounts; most of the prime

8  brokerages have several accounts associated with them.  It's a

9  very complicated procedure because there are a lot of

10  transactions in these accounts.  In some of the equity accounts

11  there are margin accounts.  Some of the accounts have repos

12  where there may be funds owing to Lehman that may have to be

13  netted out against what they can claim.  We have to look, in

14  some cases property was collateralized or other Lehman

15  entities, particularly LBIE, has rights or claims to some of

16  the property involved.  So we have to research all of that.

17          Early on we had some difficulties getting access to

18  the screens that were maintained by third parties, where some

19  of these accounts were located.  We've been able to resolve

20  those questions, most of the time, although I think as Mr.

21  Miller was alluding to, there's still problems with somebody's

22  password not being recognized or the like.  And it can be a

23  somewhat cumbersome process.

24          Our process is, originally most of this work was

25  done, again, by Legacy LBI employees.  We've tried to move away

1    from that although there's still a number of them that we rely

2    on that have been ring fenced.  And we've increasingly brought

3    Deloitte into the process.  On this process alone we know have

4    twenty-five Deloitte people who look at these accounts and do

5    the reconciliation and check the work and so forth.  Overall

6    we're now up to 135 Deloitte employees that help us with

7    various aspects of the liquidation.

8         In addition to our people and the former Lehman

9    people and the Deloitte people, SIPC has made available several

10   staff members who are here on a weekly basis, rotating basis,

11   in New York.  And they supervise the work that's done.  The SEC

12   is also involved.  They don't really bless or approve the

13   process necessarily but when there are questions, again, about

14   the 15(c)(3) account or something like that, they're available

15   and they're aware of the process.

16        So it's a somewhat lengthy and arduous process,

17   probably more so then we envisioned when we got started at it.

18   There are just a lot of questions to be resolved sometimes in

19   these accounts.

20        When we've reached our determination of what we think

21   is properly owing to the customer as the appropriate

22   disposition of the account, there's then a -- and often this

23   actually starts before the work is completely finished, but

24   there's a back and forth communication with the account

25   involved to make sure that they agree and to work out any

1  problems with disposition.  So that can sometimes take a little

2  bit of time.

3      To date we've basically satisfied, and we can't in

4  all cases completely satisfy the claim because, as I've said,

5  there may be some property that LBIE or some other entity has

6  claims to or there may be some amounts that are still owing to

7  Lehman.  But we have substantially completed the process with

8  respect to about 120 of these 250 relationships.  Currently we

9  have about twenty that are with the customer involved for the

10  customer's review.  So we're just waiting, really, for the

11  customer to get back to us.

12      There are around ten cases where, for various reasons

13  including sometimes when you net everything out the customer

14  owes us money and so they don't really want to submit to this

15  process.  So there are another ten of those.  And there are

16  about a hundred that we're still working on, almost all of

17  which have now been completed or substantially been completed

18  by Deloitte and in many cases reviewed by SIPC and looked at by

19  the SEC as well.

20      So again, it will take some time.  It'll take several

21  weeks, I think, to complete that process but we have made a lot

22  of progress.  But I just did want some of the creditors,

23  customers in the audience, to understand that this is not a

24  simple procedure, you don't just get a piece of paper and say

25  okay, we owe you this and send it out.  There's a lot of work

1    and reconciliation that goes into this.

2         When we finish that process, as Your Honor knows, you

3    approved a couple of weeks ago our claims forms and our claims

4    process.  We had intended that those be mailed out by December

5    1st.  Our claims people, EPIC, actually say they may be able to

6    commence that mailing a little bit early, perhaps by

7    Thanksgiving.  So that won't really affect the bar date that

8    customers have but it will give them a little more time to deal

9    with the forms.

10        We've set up a process for dealing with those claims.

11   A combination of EPIC people, a large number of Deloitte people

12   will be reviewing them in the first instance.

13        As I've said last time, we mailed out, I think it's

14   830,000 customer claim forms and another 100,000 proof of

15   claims for general creditors.  No one has any experience in a

16   liquidation of this size and this nature, I don't think, as to

17   how many claims we're likely to receive.  Many accounts have

18   been transferred out so one would think that those people would

19   not have claims, in most cases, although there might be some.

20   But we do anticipate we will probably get a lot of

21   communications from people who might be somewhat confused by

22   the process.

23        And we do have a number of accounts remaining and we

24   probably will have a number of prime brokerage and other

25   customers who will have some disputes, if not about the way

1    their claims were handled at least about some property that

2    couldn't be returned to them.  We are anticipating that there

3    will be people with repos and certain kinds of derivatives that

4    probably do not have what we consider customer claims, or at

5    least that's our initial analysis, and they may well dispute

6    that.  Fortunately or unfortunately for Your Honor, I think

7    there'll be some very interesting issues that will be coming

8    before the Court.

9         And we think that the claims process, we'll try to do

10   it as expeditiously as we can, but if we have the volume of

11   correspondence and communications that we fear that we may

12   have, I think it's going to be a somewhat lengthy process

13   before we get to the end of it.

14        At this point we have a fairly small internal staff.

15   We are trying to beef that up selectively.  But to a large

16   extent we're relying on Deloitte, at this point.  You're about

17   to hear a motion to appoint Norton Rose as counsel, so they

18   will be playing a role with respect to monitoring some of the

19   activities in LBIE particularly.  They've also been helpful

20   with some asset sales and questions that have arisen, really

21   all around the world, particularly in Asia with some of the

22   other proceedings that are pending.

23        We are not quite as far along as some of the other

24   entities in working out transition service agreements; we have

25   been discussing that with Barclays.  They have identified and

1    we've discussed with them a number of ring fence people.  We

2    haven't completely determined what the terms are but we are

3    making good progress on that.  I suspect that to some extent we

4    will have a similar agreement, perhaps, with LBHI and Alvarez.

5    But even in the absence of such an agreement we have been

6    working cooperatively with them.

7           Your Honor heard about protocols for the

8    international proceedings and we have been in discussions about

9    that.  I have to say that I think that just because of the

10   nature of our proceeding, that we are a bankruptcy liquidation

11   we're not a reorganization.  We have had a big focus on getting

12   property returned.  That to some extent our interest and the

13   interest of the others diverge a little bit with respect to

14   some aspects of the protocol.  But having said that, we are

15   very anxious to enter something that would deal with sharing of

16   basic information and to the extent possible, dealing with

17   claims on a cross border basis because we certainly have a lot

18   of claimants who also had or think they had property at LBIE.

19   And I know LBIE has the same situation with respect to some of

20   their claimants.  So we are all spending a lot of time doing

21   drafts of protocols and I think we're making progress.  It's

22   not an easy process because this is a pretty unprecedented

23   situation.

24          One final thing I want to focus on is the examination

25   of the debtor, under Section 78 (FFF-1)(d) and particularly

1  subparagraph 2, a SIPC trustee has a specific power and duty to

2  conduct an examination of the debtor, to take depositions, to

3  report to the Court and the creditors on what he's found.  And

4  we take that responsibility very serious.  We think that

5  shortly it will be time to embark on that and we do intend to

6  embark on it.  We will be issuing a report, both as to some of

7  the causes of the liquidation and to causes of action and other

8  things that we discover during the process.  And that will also

9  involve things like inter-company receivables and so forth.

10         So I just wanted Your Honor to know that we do have

11 that responsibility.  We do intend to discharge it and I think

12 we will begin discharging it as soon as we can get a little

13 further along on the process of returning customer property.;

14         THE COURT:  Thank you for that report.

15         MR. KOBAK:  Thank you, Your Honor.

16 (Pause)

17         MR. WILTENBURG:  Good afternoon, Your Honor.

18 David Wiltenburg, Hughes Hubbard & Reed representing James W.

19 Giddens as trustee for the liquidation of Lehman Brothers, Inc.

20         Your Honor, I believe there are three matters on the

21 calendar that require discussion.  Two are uncontested motion

22 sand the third is a 2004 application that is contested.

23         The first is the trustee's motion for a final order

24 authorizing and approving expedited procedures for the sale or

25 abandonment of Lehman Brothers, Inc.'s de minimis assets.

1           THE COURT:  This is the one we talked about last

2      time?

3           MR. WILTENBURG:  Indeed, Your Honor.  And as the

4      Court may recall we were before the Court on October 8th on an

5      emergency basis due to an exigent circumstance that existed

6      with respect to property located in Beijing, China.  That

7      situation was addressed under the interim order that was

8      entered at that time.  And for purposes of consideration of a

9      final order, at the Court's request, we've provided some

10     additional information, sketching on a non-exclusive basis,

11     categories of assets that would be potentially subject to the

12     abandonment or sale procedures that are described.  With some

13     indication of the ranges of book values, at least, that are

14     attached to these categories.  And this, again, is based on the

15     activities of Deloitte in drilling down and getting behind

16     balance sheet items to understand assets.

17          Your Honor, we have received some comments,

18     originally for purposes of the October hearing we had a request

19     by the official creditors' committee of the Lehman Brothers

20     Holdings case to be included as a notice party, and they are so

21     included in the proposed final order.

22          More recently we've had a request by the asset

23     purchaser, Barclays Capital, to be included as a notice party

24     and the reason for that is the potential for ambiguity or

25     question vis-a-vis particular assets as to whether they are

1  purchased assets within the meaning of the contractual

2  documentations or excluded assets.  And it would be good to

3  understand those issues if there are any, as a particular item

4  is proposed to be sold or abandoned.  So that comment too has

5  been taken into account in the proposed final order.

6          THE COURT:  Are those the only changes?

7          MR. WILTENBURG:  Yes, Your Honor.

8          THE COURT:  There are no objections to this and

9  relatively speaking this is ministerial and I'm prepared to

10  approve it.  I would note, however, that the supplemental

11  declaration only answered some of the questions that I had

12  posed during the emergency hearing that you reference in your

13  remarks.  One of the things that I was interested in knowing

14  was how the trustee determined what was de minimis, the break

15  points in terms of numbers, not just the categories of assets.

16  But this thing has gone for such a long time without being

17  adjudicated and no one seems to care about except me.  So I

18  think I'll just approve it and assume that the noticed parties,

19  to the extent there are any issues, will take care of what

20  needs to be taken care of when something's being sold for too

21  little.

22          MR. WILTENBURG:  Thank you, Your Honor.

23          THE COURT:  Ms. Granfield wishes to speak.

24          MS. GRANFIELD:  Yes, Your Honor.  Thank you.  Lindsee

25  Granfield, Cleary, Gottleib, Steen & Hamilton, LLP, on behalf

1    of Barclays Capital.  Mr. Wiltenburg is quite correct that we

2    resolved any issue in terms of this order for today.  But one

3    thing I did want to point out, because partly our interest got

4    very much piqued, actually, by the declaration that

5    Mr. Wiltenburg filed, because we looked at it, and

6    unfortunately we said hey, that's our property.  And so this

7    has been dealt with for today in terms of Barclays being a

8    noticed party and, in fact, for a certain amount of time, for

9    this order, getting notice of everything that's proposed.

10           The order does provide that it's without prejudice to

11   Barclays' asking in January that that period of time to get

12   notice of everything continue at least for a while.  And we're

13   obviously not there yet, knowing which way we'll go on that or

14   whether we'll think that's necessary.  But we do very much have

15   an interest in making sure that Barclays' purchase assets are

16   Barclays' purchase assets, but not unduly causing dispute or

17   just working things out if there are issues when we see these

18   notices.

19           THE COURT:  Well, maybe you'll find something on the

20   shopping list you'll want to buy.

21           MS. GRANFIELD:  That could happen too.

22           MR. WILTENBURG:  Thank you, Your Honor.  I think the

23   next item is the trustee's application to retain and employ

24   Norton Rose, LLP as U.K. counsel, nunc pro tunc, to October 27,

25   2008.  As the Court is aware, the liquidation proceedings or

1    administration of Lehman Brothers Europe is proceeding in

2    London under the auspices of court-appointed liquidators.  And

3    the relationships between LBI and LBIE, as it's called, are

4    complex and substantial, and have the potential to have

5    material effects, both on the estates of the entities involved

6    and interest holders in those estates.  And accordingly, the

7    trustee believes it's prudent to have representation present in

8    connection with the proceedings in London, and has selected

9    Norton Rose as particularly good candidate to be the trustee's

10   representative in that forum.

11          Your Honor, the application is supported by a

12   declaration of disinterestedness executed by Mr. Radford

13   Goodman, who's a partner in Norton Rose, that we believe meets

14   the required standard of disinterestedness under SIPA.  We've

15   received no opposition to the application and would request

16   that it be approved.

17          THE COURT:  I'm prepared to approve it in the absence

18   of objection.  If there's no objection, it's approved.

19          MR. WILTENBURG:  Finally, Your Honor, there is the

20   motion for a Rule 2004 examination that's being presented by

21   parties identified as the DCP parties, and I will step aside to

22   let them present.

23          THE COURT:  Okay.

24          MR. MORRIS:  Good afternoon, Your Honor.  I'm Michael

25   Morris of Hennigan, Bennett & Dorman.  We represent what we

1  refer to as the DCP parties.  These are participants in and

2  beneficiaries of various -- or at least two -- deferred

3  compensation programs that were in place at Lehman for many,

4  many years.  Some of these participants left the employ of

5  Lehman quite some time ago, some were more recent.  We

6  initially were contacted by a group of eight individuals that

7  we currently represent who had been in a process of organizing

8  participants and beneficiaries of these deferred compensation

9  programs, and through the efforts of these eight individuals,

10 they've contacted, as it now stands, approximately 260

11 additional people who are participants in these programs, and

12 are working to find others.  But they do not know, nor do they

13 have possession of a list that would have the universe of

14 people that are beneficiaries of and participants in these

15 programs.

16      THE COURT:  Do you know how large the potential

17 universe is?

18      MR. MORRIS:  We believe, although we can't be certain

19 because we don't have a list, but we believe it's approximately

20 500 people.  And we believe that the neighborhood of the claims

21 is in the range of approximately 500 million.  And that is, of

22 course, uncertain at this point, because we don't have the

23 list.

24      THE COURT:  Why is this a group that needs to be

25 jointly represented by the same group of lawyers?

1    MR. MORRIS:  Well, there's nothing inherent that says

2  they have to be jointly represented.

3    THE COURT:  No, I'm just wondering what the purpose

4  is of organizing a group like this and what your firm's purpose

5  is in seeking the names so that you can expand your client

6  list?

7    MR. MORRIS:  The request to expand -- it's not so

8  much to expand the firm's client list.  There was an effort --

9    THE COURT:  I didn't mean it the way it sounded.

10    MR. MORRIS:  I understand, Your Honor.  It was an

11  effort by these individuals to be sure that they had contacted

12  the universe of people who would have an interest, recognizing

13  that any actions that may be taken, any steps that may be

14  taken, would:  a) be of interest to other people who had

15  similarly situated claims, and conceivably could affect what

16  would happen to those claims in the context of the case,

17  depending on what happens and what actions might be taken.

18    In addition, in terms of sharing of information, the

19  clients that we represent have benefited, they think,

20  substantially and significantly for being able to talk to the

21  people that they have located thus far, all of whom have

22  different pieces of information at times relative to their

23  claims.  They have different ideas as to the way in which

24  claims might be protected, what the rights of the claims might

25  be.  And this provides a beneficial and fertile source for the

1   group as a whole in directing its counsel as to what actions it

2   should pursue, where it should direct its efforts, and what

3   would be of interest to the broadest possible group.

4   THE COURT:  I noticed your reference in the papers,

5   and I may have misunderstood this, that this is a program that

6   was insurance-based, at least in part.

7   MR. MORRIS:  That's our understanding, yes.

8   THE COURT:  And what I'm wondering is, if there's an

9   insurance product that is at the bottom of this, why isn't

10  there an insurance company that has a list of its

11  policyholders?

12  MR. MORRIS:  It is our understanding, although we

13  don't have great information with respect to this, as yet, and

14  it's one of the areas in which we would like to get better

15  information, but it's my understanding that there's not a

16  single insurance company that has issued the policies that are

17  related to this plan.  There are several.  And because this

18  program extended over many, many years, it is entirely possible

19  that policies were issued at various times depending upon what

20  corporate family Lehman was in at the time, the individuals at

21  the time, and the availability of the products.  So we don't

22  know of a central place.  We don't even know, in many cases,

23  which insurance companies might or might not be involved.  So

24  there's no central location that we're aware of that we could

25  go to and obtain such a list or such information.

1          THE COURT:  But surely your existing clients must

2     have some record of the insurance products that were part of

3     the program.

4          MR. MORRIS:  I expect that some do.  But we don't

5     believe it's in any way a complete or reliable --

6          THE COURT:  Okay.

7          MR. MORRIS:  -- list of information.  The simple fact

8     is, the trustee has, at his fingertips, a list that all we are

9     asking for is the names and addresses of these individuals, so

10    we can send a communication.  If they do not wish to

11    participate, that's fine.  It would be at an end.  The

12    communication would come from this group which we refer to as

13    the steering committee, not necessarily a formal committee, but

14    they are all our clients at this time.  It would come from

15    them.  And it would be a simple communication to facilitate

16    this organizational process.

17         We frankly are surprised the trustee has taken the

18    approach of opposing this.  His basis for opposing it, we find

19    puzzling at best.  We think this is clearly within the scope of

20    Rule 2004.  It clearly affects the administration of this case.

21    This also concerns the liabilities of the debtor.  But more

22    importantly, it affects how this case will be administered and

23    the ability of this large group of individual creditors to have

24    their interest adequately represented in the context of the

25    case.

1       THE COURT:  Now, I'm hearing you on that and I'm

2  sympathetic to the argument you're making about how this

3  affects the administration.  But I don't quite understand how

4  it does.  And that's partly because I don't think I understand

5  what it is that this group intends to do, what claims it has,

6  and whether or not these are claims that would simply be

7  routinely handled in the ordinary course of the SIPA

8  proceeding, without the need for a law firm such as yours to

9  become involved, or whether or not these are more extraordinary

10  in nature and claims that might be more creatively articulated,

11  because your firm has a reputation for doing such things.  So

12  it's hard for me to imagine that this is just ministerial.

13  What's going on?

14       MR. MORRIS:  Well, Your Honor, the truth is, at this

15  stage of the proceedings, we're not sure that we have a sense

16  of the universe of what might be going on.  But there are a

17  number of issues that we think that would be important to this

18  group.  Included among those issues are, for example, the very

19  large amount of intercompany claims that were shown on the

20  books of LBI prior to the filing of this Chapter 11 case, and

21  the relative ranking and treatment of those intercompany claims

22  vis-a-vis general creditors of the estate, such as is

23  represented by this group.  That could end up being a very

24  crucial and critical issue in this case, and could dramatically

25  affect the distributions that may be made to unsecured

1    creditors and to the beneficiaries of these deferred

2    compensation plans.

3            And that's an interest that creditors need to be very

4    aware of, and this group in particular believes that it needs

5    to be very aware of.  There are other issues that may come

6    before the Court.  We note -- and before I leave the subject of

7    intercompany claims -- that recently there's been at least some

8    attention to that.  There has been discussion today about the

9    merits and the size and the importance of intercompany claims.

10   There was a provision inserted into a recent order that deals

11   in some respect with intercompany claims, although candidly, we

12   don't really understand either the purpose or intent of that

13   paragraph as yet.  But this could form a very significant issue

14   for creditors of these estates and these beneficiaries in

15   particular.

16           THE COURT:  Is it your position that the group you're

17   trying to assemble has claims that are particular to that group

18   because of the deferred compensation aspects of it, or are

19   these claims, claims that would be typical of a broader class

20   of claimants?

21           MR. MORRIS:  I actually think it's both.  In some

22   respects, to the extent that they are general creditors, they

23   share characteristics with other general creditors of this

24   estate.  However, as you noted earlier, these deferred

25   compensation plans were put in place with insurance features

1    and insurance policies.

2         THE COURT:  Who owns those policies?

3         MR. MORRIS:  That is a very significant issue.  But I

4    think it will have to be addressed in the context of these

5    cases, and I think that that is a particular issue where the

6    interest of these claimants may diverge from other creditors of

7    these estates.  There are also issues relative to -- just as an

8    example, even independent of the issue of ownership, which

9    again, we think may be a very key and important issue in the

10   context of these cases, there's also the issue that a number of

11   the people that might make up this group are, for example, old

12   enough that they would be beyond the age where they could

13   obtain an insurance rating and insurance on their own, and

14   might therefore have -- these are insurance policies on their

15   lives.

16        They might have a direct interest in those policies,

17   and the trustee's intentions with respect to those policies,

18   and what happens with those policies.  So that area in

19   particular is an area in which the interests of these creditors

20   may well diverge from those of other creditors.

21        There are other issues relative to the history of

22   this particular corporate entity.  It has bounced around.  It

23   has had different corporate families and different parents.

24   And there may be relative rights that arise by reason of the

25   way in which those combinations and separations occurred.

1    Truthfully, we don't have any detail on this as yet.  It's

2    simply an area of inquiry.  So there are certainly going to be

3    some areas in which these creditors would share interest along

4    with other general creditors, but there are a number of areas

5    where they could have particular interests that are divergent

6    and different from other creditors of these estates.

7             THE COURT:  Thank you, very much.

8             MR. MORRIS:  The other aspect that runs through the

9    trustee's opposition to turning over this list is one of

10   confidentiality.  And I would like to briefly address that,

11   because I don't think it requires much more than a brief

12   address.  It is undoubtedly true that the debtor in this case,

13   and the trustee as successor to the debtor, has confidential

14   information with respect to those people.  We are not asking

15   for that information.  We do not want any confidential

16   information from the personnel files of these individuals.

17   We're looking only for the names and addresses of creditors of

18   this estate.

19           We do not believe, under any rationale, simple names

20   and addresses of creditors could be considered to be

21   confidential.  Indeed, in most cases that information is

22   publicly disclosed at the outset of the case, and it's only the

23   peculiarities of this case that make it not so.  We don't think

24   confidentiality is a valid reason to deny this request.  And

25   the third reason advanced by the trustee for the denial of the

1  request is the notion that we are somehow creating false

2  expectations of some kind on behalf of these participants.  We

3  believe that that is unfounded.  There's no basis on which the

4  trustee should or could have reason to harbor those suspicions,

5  and we believe it doesn't form a basis for the denial of the

6  motion.

7          THE COURT:  Is that because there are no expectations

8  whatsoever concerning this representation?  What are the

9  expectations?

10         MR. MORRIS:  I don't know.

11         THE COURT:  Okay.

12         MR. MORRIS:  And each individual probably has

13 different expectations.  But it will not be the role or the

14 result of counsel of creating any expectations that we believe

15 are in any respect false in the minds of our clients.  Your

16 Honor, we think that it's a simple request.  It can be complied

17 with a very minimum of effort on behalf of the trustee, costing

18 virtually no money.  The list we ask for could be delivered

19 before I could return to my office.  We think that the motion

20 should be approved.

21         THE COURT:  How far away is your office?

22         MR. MORRIS:  Even if it were down the block, it could

23 be delivered faster than that.

24         THE COURT:  Okay.

25         MR. MORRIS:  Thank you, Your Honor.

1    THE COURT:  I'll hear from the trustee now.

2    MR. WILTENBURG:  Your Honor, David Wiltenburg,

3  Hughes, Hubbard & Reed, representing the trustee.  Your Honor,

4  I think omitted from counsel's discussion of the basis for the

5  trustee's opposition was really the central item, and I'll

6  comment on some of the practical and factual aspects of it as

7  well.  But basically, it is that there are some things that

8  Rule 2004 is about and is meant to do, and some things that

9  it's not meant to do.  And I think that really comes out of the

10  language of the rule itself which provides that the scope of

11  the examination may relate "only to the acts, conduct or

12  property or to the liabilities and financial condition of the

13  debtor or to any matter which may affect the administration of

14  the debtor's estate."

15    The word "only" there has to have meaning, and I

16  think in order to respect that meaning, it's not possible to

17  grant really expansive understanding to the enumerated matters

18  there.  It cuts back against the intent of the specification --

19    THE COURT:  But he's not dealing with that, because

20  "only" appears in the sentence that precedes:  "only to acts,

21  conduct or property or to the liabilities and financial

22  condition of the debtor or to any matter which may affect the

23  administration of the debtor's estate or to the debtor's right

24  to a discharge."  I think regrettably for your argument, the

25  word "only" appears only in one place and it's set off by ors,

1    suggesting to a fair reader that the "only" applies to the

2    first part of that, to the "only to the acts, conduct, or

3    property." Because it then picks up "or to the liabilities".

4    So I'm just quibbling with you --

5            MR. WILTENBURG:  Okay.

6            THE COURT:  -- on the strength of that argument.

7            MR. WILTENBURG:  Well --

8            THE COURT:  I'm finding that lacking.

9            MR. WILTENBURG:  -- Your Honor, in support of that,

10   we cited cases at page 3 of our memorandum of law.  And those

11   are cases that emphasize the limited qualities of 2004.

12           THE COURT:  There are very few cases that actually

13   emphasize the limited nature of the power of 2004.

14           MR. WILTENBURG:  Well, but --

15           THE COURT:  It's nice that you found some.

16           MR. WILTENBURG:  Okay, Your Honor.  Would it be fair

17   to say, could we all agree, that this request that is being

18   made here for the purpose of soliciting creditors, is not

19   within the heartland of what's traditionally been thought of as

20   Rule 2004, and indeed, that there is no authority supporting

21   the idea that a list of creditors for purposes of making

22   solicitations is within the scope of Rule 2004 examination?

23           Your Honor, I think, looking at the practical side,

24   one question here might be is it really a good idea?  I mean

25   the effect of an order granting this application would be that

1  apparently over 500 persons will receive solicitations from

2  counsel.  Near as we can figure, over eighty percent of those

3  persons have rights that are subordinated to the rights of

4  other creditors by contract.

5       Indeed, all of these people are going to be receiving

6  proofs of claim within the next couple of weeks.  And as that

7  process is going forward, each of them will probably be

8  receiving solicitations as well.  It may well appear to them

9  that that solicitation is kind of part of the claims process,

10  maybe even that it's endorsed by the trustee or even the Court.

11       I suppose if the application is granted it would be

12  possible to say to a recipient of the solicitation that the

13  Court has entered an order granting access to your name for the

14  purpose of that solicitation.  Most of these parties are going

15  to be -- the vast majority, are going to be subordinated by

16  contract.  And that contract provides that their rights are

17  subordinate to all present and future creditors of the

18  applicable Lehman entity.  Will it be a good idea?  I suppose

19  it would be up to each claimant to seek advice on the question,

20  will it be a good idea to invest legal fees in the protection

21  of a subordinated claim in this case.

22       THE COURT:  Well, that's not what this hearing is

23  about.  This hearing is about whether or not the request for

24  those names fits within the ambit of 2004.  And one of the

25  questions that I have.  People generally pick their battles and

1  decide what's worth fighting about.  And it's obvious that you

2  and your client and others involved in the SIPA case on behalf

3  of the trustee have decided that this is a time to draw a line

4  in the sand with respect to a request that under ordinary

5  circumstances might have just been granted and never got to

6  this level.  Say okay, here are the names.  Why has this become

7  from the perspective of the trustee such a big deal.

8        MR. WILTENBURG:  Your Honor, we didn't feel

9  comfortable, first of all, just releasing the names without

10  guidance from the Court, without discussion of kind of the

11  unusual quality of that.  It might be considered, in this

12  connection, what will happen when another party comes forward

13  saying, well, I would like to know the names of all SWAPS

14  participants or I would like to know the names of all parties

15  having foreign exchange based claims, or I would like to know

16  the names of all creditors in this category or that category

17  going forward.  I think it supposes a lot to suppose that each

18  one of those requests would be appropriate, whether in terms of

19  the privacy or considerations that would be personal to

20  creditors, or from the point of view of the policy behind it

21  and the potential for a precedent.

22        THE COURT:  Well, let me understand something which

23  really goes to the essential difference between the SIPA

24  proceeding and the Chapter 11 case.  We had some argument

25  earlier today about the schedules and statement of financial

1    affairs and when those were going to be filed.  And we're

2    currently looking at a mid-January date for filing those in the

3    LBHI case.  Ordinarily the names of creditors in Chapter 11

4    cases are in the public domain.  They're known because they're

5    scheduled or they're known because there's a repository of

6    proofs of claim in which parties identify themselves.  There's

7    no expectation of confidentiality as to that list.

8            MR. WILTENBURG:  Certainly a creditor who files a

9    proof of claim has no expectation of confidentiality.

10           THE COURT:  And there's none with respect to the

11   fishbowl of bankruptcy altogether, because there is a duty on

12   the part of the estate, at least in a Chapter 11 setting, to

13   reveal who's out there with claims, by class, with indications

14   as to whether or not there may even be a dispute with respect

15   to those claims.  So what happens in the SIPA case?  Is there

16   an ability for a group such as the one represented by movant's

17   counsel to access by category that list?

18           MR. WILTENBURG:  Your Honor, that categorization

19   process will not come to pass under the SIPA regime, and the

20   reason is that there is a provision in the statute that

21   requires identification from the books and records of the

22   debtor, the entire body of persons who may potentially have

23   claims and the mailing of claim forms to those persons.  And

24   that is the process that was under discussion two weeks ago as

25   we talked about the claims process and the claims forms that

1   will be mailed out and published.  That body of persons is

2   several hundred thousand, and the process of mailing to them is

3   going forward and hopefully to be completed by December 1st.

4           THE COURT:  I understand, but that's not what I was

5   asking.  I wasn't asking about the mailing that's going on.  I

6   was asking about the disclosure to the world in an accessible

7   form of the names of the parties who, in fact, have claims.  Is

8   there such a vehicle?  There would be if this were a Chapter 11

9   case.  I'm simply asking an incredibly nanve question which

10  calls for a very simple answer.  And if the answer is well,

11  there's no such vehicle, I think it's meaningful to the pending

12  motion.

13          MR. WILTENBURG:  Well, Your Honor, under I believe

14  it's Rule 1007 --

15          THE COURT:  I know that rule.

16          MR. WILTENBURG:  -- there is provision for the filing

17  of schedules by a debtor and there is no requirement on a

18  trustee to file such schedules.

19          THE COURT:  Well, whether there's a requirement or

20  not, do you have any plan to do so?

21          MR. WILTENBURG:  Your Honor, I think when the

22  investigation that Mr. Kobak referred to is complete, there

23  will be an understanding of the creditor body.  Whether it

24  comes in the form of listings of hundreds of thousands of

25  creditors who have claims or potential claims, I don't know

1    that.

2           THE COURT:  Okay.  I'm going to assume that that

3    means probably not.  Do I assume correctly?

4           MR. WILTENBURG:  Your Honor, I don't know otherwise.

5    I'm willing to assume that for purposes of this hearing that it

6    will not --

7           THE COURT:  Let's assume for purposes of this hearing

8    that it's your position on behalf of your client that there's

9    no obligation to file publicly accessible documents that are

10   equivalent to the schedules that would be filed in accordance

11   with Rule 1007.  Is that a fair assumption?

12          MR. WILTENBURG:  Yes, Your Honor.  I think that's the

13   case.

14          THE COURT:  Okay.

15          MR. WILTENBURG:  Your Honor, finally, it appears that

16   the Hennigan firm has already succeeded in contacting half or

17   more than half of the persons who it believes are in this

18   category.  That's a substantial percentage.  Now, the question

19   is whether contacting of the other half is going to be

20   basically ordered pursuant to Rule 2004.  As it now stands,

21   even the fact of this motion and the hearing we're having on

22   the record today, it's a matter of public record that such a

23   group exists with respect to these DCP claimants.  The names of

24   the counsel that may be contacted on the part of parties who

25   are interested enough to do so, that's a matter of public

1    record.

2         Your Honor, I would suggest that just as a matter of

3    exercise of discretion, which is of course what we're talking

4    about here, there's no real cause to change the position of the

5    parties to upset the playing field as it exists.  Parties who

6    have seen what happens and have the interest in proceeding know

7    what to do without the imposition of a Rule 2004 examination.

8    Thank you, Your Honor.

9         THE COURT:  Okay.  Is there anything more on this?

10        MR. MORRIS:  Very briefly.  The Court's not ordering

11   any solicitation.  The Court, if it grants our motion, is

12   simply delivering to us a list, and our clients will decide if

13   they wish to make such a solicitation.  I expect they will.

14   The fact that our clients have been able to contact roughly

15   half of the potential body only argues for the release of the

16   list, because otherwise the group becomes simply haphazard in

17   terms of who learned about the organization of group pulling

18   others who don't know of it but might like to participate.  And

19   without a vehicle to figure out what the universe is and

20   contact them, it leaves those people potentially who might

21   desire to join the group unable to do so.  I won't belabor any

22   of the other points.  We would ask that the motion be approved.

23        THE COURT:  Okay.  What I'm going to do with this is

24   a little bit unusual relative to how I've handled contested

25   matters in this case up to this point.  I want to think about

1    this a little bit, and I'm going to take it under advisement

2    and we'll endeavor to rule on this at the next omnibus hearing

3    on the 3rd of December.  I have my thoughts on this but I'd

4    like to also collect them and give some further consideration

5    to the 2004 scope that is really appropriate in the SIPA case

6    as it relates to other similarly situated parties who may be

7    seeking information of the same sort as is being requested by

8    the DCP class.

9          And after giving that some thought, I'll provide a

10    ruling at some point during the 12/3 hearing and simply ask

11    that it be carried as an agenda item in the SIPA case, with the

12    understanding that I'll say something that will be the

13    functional equivalent of a ruling, or I'll have written

14    something.  But there will at least be a ruling.

15          MR. WILTENBURG:  Thank you, Your Honor.

16          THE COURT:  Is there anything more for today?

17          MR. MILLER:  No, Your Honor.  We're finished.

18          THE COURT:  That's fine.  We're adjourned.

19          IN UNISON:  Thank you, Your Honor.

20    (Proceedings concluded at 4:52 p.m.)

21

22

23

24

25

                              I N D E X


                             R U L I N G S

DESCRIPTION                                      PAGE    LINE

Debtors' application to employ and retain         24      24

Weil, Gotshal & Manges LLP under a general

agreement granted on a final basis


Debtors' application to employ and retain         25       6

Curtis, Mallet-Prevost, Colt & Mosle LLP

as conflicts counsel nunc pro tunc to

9/26/08 granted


Debtors' application to employ and retain         25      21

Simpson Thacher & Bartlett LLP as special

counsel to the debtors nunc pro tunc to

commencement date granted


Creditors' committee application to retain        26       7

and employ Milbank, Tweed, Hadley & McCloy

LLP as counsel effective 9/17/08 granted

1                    I N D E X, cont'd

2

3     DESCRIPTION                              PAGE    LINE

4     Creditors' committee application to retain     26      12

5     and employ Quinn Emanuel Urquhart Oliver

6     & Hedges, LLP as conflicts counsel

7     effective 9/17/08 granted

8

9     Creditors' committee application to employ     26      17

10    and retain FTI Consulting Inc., as financial

11    advisor granted

12

13    Debtors' motion to enter into a transition     32       1

14    services agreement with Lehman Europe granted

15

16    Debtors' motion for authorization to implement  34      1

17    the retention and recruitment program approved

18

19    Debtors' amended motion to further extend the   34      19

20    time to file the debtors' schedules, statement

21    of financial affairs and related documents granted

22

23    SunCal entities motion for an order granting    80       5

24    relief from the automatic stay denied without prejudice

25

1                    I N D E X, cont'd

2

3     DESCRIPTION                              PAGE    LINE

4     Trustee's application to retain and employ    93      18

5     Norton Rose, LLP as U.K. counsel, nunc pro

6     tunc to October 27, 2008 approved

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T I O N

3

4      I, Clara Rubin, certify that the foregoing transcript is a true

5      and accurate record of the proceedings.

6

7      _____

8      CLARA RUBIN

9

10     Veritext LLC

11     200 Old Country Road

12     Suite 580

13     Mineola, NY 11501

14

15     Date:  November 22, 2008

16

17

18

19

20

21

22

23

24

25