**Exhibit "D"**

1  PAUL J. COUCHOT State Bar No. 131934
   PETER W. LIANIDES - State Bar No. 160517
2  CHARLES LIU – State Bar No. 190513
   **WINTHROP COUCHOT**
3  **PROFESSIONAL CORPORATION**
   660 Newport Center Drive, Fourth Floor
4  Newport Beach, CA 92660
   Telephone: (949) 720-4100
5  Facsimile: (949) 720-4111

6  [Proposed] General Insolvency Counsel for
   the Jointly Administered Debtors
7  and Debtors-in-Possession

8              **UNITED STATES BANKRUPTCY COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10                    **SANTA ANA DIVISION**

11

12 | In re                                          | Case No. 8:08-bk-17206-ES

13 | PALMDALE HILLS PROPERTY, LLC,                   | Jointly Administered With Case Nos.
   | and its Related Debtors.                        | 8:08-bk-17209-ES; 8:08-bk-17240-ES

14 |        Jointly Administered Debtors and         | 8:08-bk-17224-ES; 8:08-bk-17242-ES
   |        Debtors-in-Possession                    | 8:08-bk-17225-ES; 8:08-bk-17245-ES

15 |                                                 | 8:08-bk-17227-ES; 8:08-bk-17246-ES
   |                                                 | 8:08-bk-17230-ES; 8:08-bk-17231-ES;

16 | Affects:                                        | 8:08-bk-17236-ES; 8:08-bk-17248-ES
   | ☐ All Debtors                                   | 8:08-bk-17249-ES; 8:08-bk-17573 ES

17 | ☒ Palmdale Hills Property, LLC,                 | 8:08-bk-17574 ES; 8:08-bk-17575 ES

18 | ☒ SunCal Beaumont Heights, LLC
   | ☐ SCC/Palmdale,                                 | Chapter 11 cases

19 | ☒ SunCal Johannson Ranch, LLC

20 | ☒ SunCal Summit Valley, LLC                     | **DEBTORS' NOTICE OF MOTION**
   | ☒ SunCal Emerald Meadows LLC                    | **AND MOTION FOR ORDER**

21 | ☒ SunCal Bickford Ranch, LLC                    | **AUTHORIZING SURCHARGE**
   |                                                 | **UNDER 11 U.S.C. § 506(c), AND, IN**

22 | ☒ Acton Estates, LLC                            | **THE ALTERNATIVE, USE OF CASH**
   | ☐ Seven Brothers LLC                            | **COLLATERAL; MEMORANDUM OF**

23 | ☐ SJD Partners, Ltd.                            | **POINTS AND AUHTORITIES;**
   | ☐ SJD Development Corp.                         | **DECLARATIONS IN SUPPORT**

24 | ☐ Kirby Estates, LLC                            | **THEREOF**

25 | ☐ SunCal Communities I, LLC                     | [11 U.S.C. §§ 363(c), 364(d) & 506(c)]
   | ☐ SunCal Communities III, LLC

26 | ☐ SCC Communities LLC                           | <u>HEARING DATE</u>

27 | ☐ North Orange Del Rio Land, LLC                | DATE:    February 3, 2009
                                                     | TIME:    2:00 P.M.
28 | ☐ Tesoro SF, LLC                                | CTRM:    5A

1   **TO THE HONORABLE ERITHE SMITH, UNITED STATES BANKRUPTCY JUDGE,**

2   **THE OFFICE OF THE UNITED STATES TRUSTEE, AND OTHER PARTIES-IN-**

3   **INTEREST:**

4       **PLEASE TAKE NOTICE** that on February 3, 2009, at 2:00 P.M.,, a hearing shall be held

5   on the within motion filed by Palmdale Hills Property, LLC; SunCal Beaumont Heights, LLC;

6   SunCal Johannson Ranch, LLC; SunCal Summit Valley, LLC; SunCal Emerald Meadows, LLC;

7   SunCal Bickford Ranch, LLC; Acton Estates, LLC; comprising seven of the seventeen of the

8   jointly administered debtors and debtors-in-possession herein (the "Moving Debtors"), for an

9   order providing for the following relief:

10      (a)    Authorizing Palmdale Hills Property, LLC ("Palmdale") to use and surcharge,

11  pursuant to 11 U.S.C. § 506(c) and/or use the purported cash collateral of Lehman Commercial

12  Paper, Inc. ("LCPI"), pursuant to 11 U.S.C. § 363(c)(2), in order to pay for the reasonable and

13  necessary maintenance expenses required to preserve the value of the Moving Debtors' projects

14  that are subject to deeds of trust held by LCPI pursuant to the budget attached to the Declaration of

15  Frank Faye ("Faye Declaration") as Exhibit "A" (the "Budget").

16      (b)    Authorizing the Moving Debtors to exceed any line item in the Budget by up to

17  twenty percent (20%) in any one month, as long as the overage for all items in the aggregate does

18  not exceed fifteen percent (15%) of the total budget amount for that month, and providing that any

19  unused funds in one period may be carried over and used in a later budget period; and

20      (c)    Granting such further relief as the Court deems just and proper.

21      This motion is made on the basis of the accompanying Faye Declaration and the

22  Declaration of Bruce Cook ("Cook Declaration"), the within the points and authorities, and such

23  other evidence as the Court elects to consider prior to or at the hearing on this matter.

24      **IF YOU DO NOT OPPOSE THE MOTION DESCRIBED ABOVE, YOU NEED**

25  **TAKE NO FURTHER ACTION.  HOWEVER, IF YOU OPPOSE THE MOTION,**

26  **PURSUANT TO AN ORDER SHORTENING TIME, OPPOSITION TO THE MOTION**

27  **MUST BE FILED WITH THE CLERK OF THE UNITED STATES BANKRUPTCY**

28  **COURT LOCATED AT 411 WEST FOURTH STREET, SUITE 2030, SANTA ANA,**

1   CALIFORNIA 92701.  YOU MUST ALSO SERVE A COPY OF YOUR OPPOSITION TO

2   THE MOTION UPON COUNSEL FOR THE MOVING DEBTORS AT THE MAILING

3   ADDRESS INDICATED IN THE UPPER LEFT CORNER OF THE FIRST PAGE OF

4   THIS MOTION, AND UPON THE OFFICE OF THE UNITED STATES TRUSTEE

5   LOCATED AT 411 WEST FOURTH STREET, SUITE 9041, SANTA ANA, CALIFORNIA

6   92701.  OPPOSITION, IF ANY, MUST BE FILED AND SERVED SO AS TO BE

7   ACTUALLY RECEIVED BY 4:00 P.M. PACIFIC STANDARD TIME ON JANUARY 26,

8   2009.  DEBTORS' PROPOSED COUNSEL WILL ACCEPT E-MAIL SERVE AT THE

9   FOLLOWING ADDRESSES:  PCOUCHOT@WINTHROPCOUCHOT.COM, WITH A

10  COPY TO PJ@WINTHROPCOUCHOT.COM.  REPLIES TO ANY OPPOSITION WILL

11  BE SERVED AND FILED SUCH THAT THEY ARE ACTUALLY RECEIVED BY NOON

12  PACIFIC STANDARD TIME ON JANUARY 30, 2008.

13      ANY FAILURE TO TIMELY FILE AND SERVE AN OPPOSITION MAY

14  RESULT IN ANY SUCH OPPOSITION BEING WAIVED, AND THE COURT MAY

15  ENTER AN ORDER GRANTING THE MOTION WITHOUT FURTHER NOTICE.

16      **WHEREFORE,** the Moving Debtors pray that this Court enter an order granting the

17  relief requested herein and such other and further relief as the Court deems just and appropriate

18  DATED:  January 16, 2009                **WINTHROP COUCHOT**
                                            **PROFESSIONAL CORPORATION**
19

20                                          By: _/s/ Paul J. Couchot_
                                                Paul J. Couchot
21                                              Peter W. Lianides
                                                [Proposed] General Insolvency Counsel for the
22                                              Debtors and Debtors-in-Possession

23

24

25

26

27

28

-3-

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## PRELIMINARY STATEMENT

The Moving Debtors are seven (7) of approximately thirty (30) single-purpose entities formed to develop twenty-four (24) master-planned residential projects (the "Projects") throughout California as part of a joint venture between the SunCal Companies ("SunCal") and Lehman Brothers ("Lehman"). The joint venture contemplated that SunCal would be the developer/manager of the Projects and that Lehman would be the financial partner.

Unfortunately, after the bursting of the California real estate bubble in mid-2007, Lehman took over control of the Projects, disregarded any legal separateness of the entities, assured that the Projects' vendors and service providers would receive ongoing payments, and then breached its funding obligations after valuable goods and services were rendered to the Projects in reliance on Lehman's assurances. As a result, there are approximately $100 million of unsecured creditors and several critical public health and safety issues at the various Projects.

The Lehman entities that made loans to the joint venture entities are Lehman ALI, Inc. and LCPI. The Moving Debtors are all project-level entities that have LCPI as their secured lender.

By this Motion, the Moving Debtors are requesting Court authority to use and surcharge the purported cash collateral of LCPI in order to pay the necessary and reasonable expenses required to maintain and preserve the value of the Moving Debtors' Projects in accordance with the Budget. The funds to be utilized to pay such expenses consist of approximately $21 million held by Palmdale subject to a disputed lien of LCPI. Further, the Moving Debtors submit that the payment of these reasonable and necessary Project expenses for the purpose of preserving and maintaining the value of the Projects constitute adequate protection of LCPI's interest in the Moving Debtor's property.

MAINDOCS-#126346-v1-SCC_Palmdale_Mtn_SurchargeCashCollateral.DOC

## II.

## SUMMARY OF MATERIAL FACTS

1.    **The SunCal Companies**. The Debtors are part of an integrated network of companies that operate under the common dba the "SunCal Companies" or "SunCal." SunCal is a family-owned business that has been in the land development industry for over seventy years.

SunCal's business focuses upon the "development" primarily of residential land. A typical SunCal development project begins with the acquisition of one or more parcels of raw land. Thereafter, the SunCal team develops a master plan for the acreage that incorporates streets, homes, parks, schools and commercial areas and it works with the applicable municipal planning authorities (the city, county, state and federal) to secure the necessary approvals or "entitlements" to achieve this plan. This process, which requires input from land planners, civil engineers, architects, lawyers, and other land specialists, takes a period of years. Once the plan is approved, SunCal will grade acreage, install the major project infrastructure (streets, utilities, etc.) onsite and offsite and proceed to sell the lots in the project to merchant home builders.

The land development process is inherently capital intensive due to size and costs of the assets being acquired; the time and expense of obtaining government approvals; grading the acreage; and, installing the major project infrastructure. A typical SunCal project will initially be financed through an equity contribution coupled with an acquisition and development loan. In some cases a layer of mezzanine debt (secured by an equity interest in the entity that owns the project) will be employed to provide additional funding.

SunCal has historically financed its projects using funding provided by an array of lenders. However, approximately five years ago, the company formed a closer relationship with Lehman and Lehman quickly became SunCal's largest funding source, providing over $2.5 billion financing to approximately 24 projects.

In seventeen of the joint venture entities, SunCal is the owner of the equity partner with full corporate governance authority and Lehman is the primary secured lender. These entities are currently debtors and debtors-in-possession in the above-captioned jointly administered voluntary Chapter 11 proceedings (the "Voluntary Debtors"). Of the Voluntary Debtor entities, the Moving

MAINDOCS-#126346-v1-SCC_Palmdale_Mtn_SurchargeCashCollateral.DOC

1    Debtors are the entities with Projects encumbered by deeds of trust held by LCPI. The Voluntary

2    Debtors also have three projects that are financed by Lehman ALI.

3        In nine of the other joint venture entities, SCC and Lehman are both equity holders and

4    Lehman ALI is the secured lender. In these situations, SCC was not authorized to file a voluntary

5    Chapter 11 proceeding for the entities without Lehman's consent. Because Lehman refused to

6    provide such consents, these entities became involuntary debtors in nine different involuntary

7    proceedings before this Court (the "Involuntary Debtors").[1] The Voluntary Debtors and the

8    Involuntary Debtors are hereinafter collectively referred to as the "Debtors."

9        On or about January 6, 2008, orders for relief were entered as to all of the Involuntary

10    Debtors, accordingly, the Involuntary Debtors are now debtors-in-possession (notwithstanding, for

11    the ease of distinction, these debtors are still referred to herein as the Involuntary Debtors).

12    Motions to appoint a Chapter 11 trustee as to each of the Involuntary Debtors were granted on

13    January 14, 2009.

14        **2.    Lehman's Effective Merger of the Debtors and Subsequent Breach of Its**

15    **funding Obligations**. Since 2005, LCPI has required the Debtors to pledge their assets to receive

16    one hundred percent of each other's obligation to LCPI. In March of 2007, LCPI made a

17    $95,000,000 loan to SCC Palmdale. However, the loan proceeds were used to pay for the funding

18    needs of all of the Debtors and to pay down other loans of LCPI secured by deeds of trust on other

19    of the Debtors' projects.

20

21    [1] On November 12, 14, and 19, respectively, involuntary petitions were filed as against the following nine (9) entities

22    (collectively the "Involuntary debtors") by SunCal Management, LLC and SCC Acquisitions, Inc. (the "Petitioning
Creditors"):

23

| Involuntary debtor | Case No. | Petition Date |
|---|---|---|
| LB/L-SunCal Oak Valley LLC ("Oak Valley") | 8:08-17404-ES | November 12, 2008 |
| SunCal Heartland LLC ("Heartland") | 8:08-17407-ES | November 12, 2008 |
| LB/L-SunCal Northlake LLC ("Northlake") | 8:08-17408-ES | November 12, 2008 |
| SunCal Marblehead LLC ("Marblehead") | 8:08-17409-ES | November 12, 2008 |
| SunCal Century City LLC ("Century City") | 8:08-17458-ES | November 14, 2008 |
| SunCal PSV LLC ("PSV") | 8:08-17465-ES | November 14, 2008 |
| Delta Coves Venture LLC ("Delta Coves") | 8:08-17470-ES | November 14, 2008 |
| SunCal Torrance LLC ("Torrance") | 8:08-17472-ES | November 14, 2008 |
| SunCal Oak Knoll LLC ("Oak Knoll") | 8:08-17588-ES | November 19, 2008 |

-6-

MAINDOCS-#126346-v1-SCC_Palmdale_Mtn_SurchargeCashCollateral.DOC

1    By the middle of 2007, as the California real estate market collapsed, the Lehman Entities

2    cast aside all pretense of maintaining the veneer of separateness among the Debtors. At this point

3    in time, Lehman ALI acquired all of LCPI's SunCal related loan positions, and effectively

4    demanded the right to control all material aspects of the Debtors' operations.

5    In March of 2007, SCC Palmdale as borrower and Lehman Commercial as lender entered

6    into that certain Mezzanine Credit Agreement pursuant to which Lehman made a $95 million loan

7    (the "SCC Palmdale Loan"). Although the SCC Palmdale Loan was made to SCC Palmdale, and it

8    was secured by SCC Palmdale's ownership interest in Palmdale Hills (the entity that owns the

9    massive Ritter Ranch Project), the loan agreement frankly states that the funds were not being used

10    for the benefit of either SCC Palmdale or Palmdale Hills, the obligors adding this debt to their

11    balance sheets. Instead, the loan proceeds were used, in part, to cover funding for all of the moving

12    Debtors.

13    By October of 2007, Lehman cast aside all pretense of the separateness of the Debtors by

14    causing the Debtors to enter into a $20 million loan agreement and in May of 2008 a follow-up

15    restructuring agreement whereby the practice of cross-entity funding continued and Lehman took

16    over effective control of the Debtors. Once this occurred, SunCal began to meet with Lehman

17    representatives on a weekly basis to explain what project payables had to be paid and what work

18    had to be performed for the projects to avoid immediate closure. Lehman would then unilaterally

19    dictate what future work would proceed and it would promise to pay for the same when it was

20    completed. Lehman also decided what payables were "urgent" and hence had to be paid promptly

21    to avoid severe consequences and what other payables could be "deferred."

22    Unfortunately, even though Lehman agreed to fund the payables, it later ignored SunCal's

23    repeated requests for payment when performance was due, yet it continued to authorize more work

24    and to promise payment. Similarly, when it came time for Lehman to pay for the authorized work

25    it reneged.

26    In the case of deferred payables, Lehman promised that its agent, Radco, would meet with

27    vendors and negotiate mutually satisfactory discounted payment arrangements with the unpaid

28

MAINDOCS-#126346-v1-SCC_Palmdale_Mtn_SurchargeCashCollateral.DOC

1    vendors.  Although Radco ran around purporting to play this role, ultimately Lehman only paid a

2    small fraction of these claims.

3         Lehman's dictatorial control over the Projects' operations and subsequent breach of

4    funding obligations created a common layer of unpaid unsecured debt that now burdens all of the

5    Debtors' estates.  Furthermore, human lives and property are being put at risk from situations as

6    diverse as:  (a) potential levee failures, (b) airborne friable asbestos, (c) failure to provide dust and

7    erosion control measures, (d) possible brush fires in densely populated areas during peak periods

8    of the California fire season due to the failure to fund brush control, and (e) failure to provide

9    adequate storm water control.  In addition, the condition and value of the assets are wasting; fines

10   have been assessed due to projects' violation of governmental permits and more fines are

11   imminent; entitlements are at risk; availability of resources such as water are at risk; governmental

12   bonds are being called; and taxes and insurance are going unpaid.

13        Furthermore, on the eve of LCPI's Chapter 11 filing in September of 2008, Lehman ALI

14   transferred back to LCPI all of the loans initially made to the Debtors by LCPI where a SunCal

15   entity held control, and, hence, had the ability to file a voluntary bankruptcy proceedings.  In

16   contrast, in those cases where a Lehman entity had the ability to block a Chapter 11 filing, Lehman

17   ALI retained the loans, since the stay invoked in LCPI's case was apparently deemed to be

18   unnecessary.

19        Since the filing of the LCPI Bankruptcy case in September of 2008, the SunCal

20   representatives have contacted Lehman personnel numerous times by email and phone requesting

21   that Lehman provide funding for the critical expenses of the Projects, only to be met with inaction.

22   However, on November 2, 2008, Lehman informed SunCal that Lehman was not prepared to

23   immediately fund any costs for any of the Projects (including insurance payments) except for

24   approximately $270,000 on two of the Projects.  The $270,000 was not even sufficient to address

25   the immediate problems at those Projects or complete work necessary to address critical public

26   health and safety issues.

27        In order to address the multitude of issues caused by Lehman's failure to honor its

28   obligations under the Agreement, SunCal caused the filing of the voluntary chapter 11 petitions for

1    those Project entities as to which they are authorized to file such a petition.  In addition SunCal

2    requested that Lehman consent to the filing of voluntary Chapter 11 petitions for those Project

3    entities for which Lehman's consent to such action is required.  Like SunCal's requests for

4    funding, however, those requests were met with inaction, and no consent was given.

5          As a result of Lehman's failure to fund the critical expenses of the Projects, SunCal also

6    located an alternative source willing to fund obligations up to $75 million for these expenses.

7    However, that funding commitment was conditioned upon a Court-approved priming lien in the

8    Chapter 11 cases of the Debtors, which in the case of the Moving Debtors, arguably required relief

9    from the automatic stay in LCPI's Chapter 11 case.

10         Consequently, the Debtors filed a Motion seeking an order modifying the automatic stay in

11   LCPI's Chapter 11 Case to allow the Debtors to administer their own Chapter 11 cases to the

12   extent that such cases, and the relief requested by the Debtors therein, may affect the rights of

13   Lehman, including, without limitation, filing a motion to approve post-petition debtor-in-

14   possession ("DIP") financing on a priming lien basis that would subordinate Lehman's interests to

15   those of a proposed DIP lender.  LCPI opposed the motion and the motion was denied by the

16   Presiding Judge in LCPI's Chapter 11 case.

17         **3.    The Debtor's Adversary Proceeding Against Lehman**.  SunCal believes that

18   Lehman ALI, LCPI and Lehman's equity members have breached their fiduciary duty to the

19   Debtors' creditors and should be held responsible to pay the claims of creditors from the sale

20   proceeds of dispositions of the Projects.  Consequently, on January 6, 2009, SunCal caused the

21   filing of an adversary proceeding against Lehman in the jointly administered cases of the

22   Voluntary Debtors requesting, amongst other relief, that Lehman ALI's liens be equitably

23   subordinated to the claims of unsecured creditors in all of the Debtors' cases, Adv. No. 8:09-ap-

24   01005 ("Equitable Subordination Action").

25

26

27

28

-9-

## III.

## THE COURT MAY SURCHARGE THE SALE PROCEEDS FOR THE COSTS AND
## EXPENSES OF PRESERVING AND DISPOSING OF THE PROPERTY

**A.** **Section 506(c) authorizes the Surcharge of the Collateral**. Section 506(c) of the Bankruptcy Code provides that the trustee or debtor in possession may surcharge collateral for the costs and expenses of preserving, or disposing of, such property:

> (c) The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property.

11 U.S.C. § 506(c).

The Legislative History reflects that: "Any time the trustee or debtor in possession expends money to provide for the reasonable and necessary cost and expenses of preserving or disposing of a secured creditor's collateral, the trustee or debtor in possession is entitled to recover such expenses from the secured party or from the property securing an allowed secured claim held by such party."

"The underlying rationale for charging a lienholder with the costs and expenses of preserving or disposing of the secured collateral is that the general estate and unsecured creditors should not be required to bear the cost of protecting what is not theirs." In re Chicago Lutheran Hosp. Ass'n, 89 B.R. 719, 727 (Bankr.N.D.Ill. 1988); In re Codesco, Inc., 18 B.R. 225, 230 (Bankr.S.D.N.Y. 1982).

"The purpose of this provision is to prevent a windfall to a secured creditor at the expense of the estate. Thus, § 506(c) allows the trustee to recover administrative expenses from the collateral of a secured creditor to the extent that the expenditures benefit the secured creditor." In re JKJ Chevrolet, Inc., 26 F.3d 481, 483 (4th Cir. 1994).

> "Section 506(c) was intended by Congress as a codification of ... the equitable principle that a lienholder may be charged with the reasonable costs and expenses incurred by the ... trustee which are required to preserve or dispose of the property subject to lien to the extent the lien-holder derives a benefit therefrom." 3 Collier's on Bankruptcy, ¶ 506.06. "The underlying rationale for charging a lienholder with the costs and expenses of preserving or disposing of the secured collateral is that the general estate and unsecured creditors should

1    not be required to bear the cost of protecting what is not theirs." *In re Codesco,*

*Inc.,* 6 C.B.C.2d 395, 18 B.R. 225 ([Bankr.]S.D.N.Y.1982).

2    In re Proalert, LLC, 314 B.R. 436, 442 (9th Cir. BAP 2004) quoting In re Senior-G & A Operating

3    Co. Inc., 957 F.2d 1290, 1298 (5th Cir.1992) (ellipsis in original).

4        The Ninth Circuit BAP has broadly interpreted Section 506(c), and allowed a surcharge for

5    the costs of a commission paid to a real estate broker:

6            We disavow decisions which limit Section 506(c) expenses to the amount of
         the foreclosure cost saved by the lienholder such as *In re Codesco,* 18 B.R.
7        225, 229 (S.N.Y.1982) and *In re Truitt, supra,* 15 B.R. at 171. Such a
         limitation stems from a fundamental misreading of both the statute and its
8        legislative history. No such limitation is contained in the wording of the
9        statute.
            The statute imposes only three limitations on the expenses that can be
10        recovered from a secured party. The expenses must be necessary and
         reasonable and are limited to the extent of the benefit to the secured party.
11

12    In re Anderson, 66 B.R. 97, 99 -100 (9th Cir. BAP 1986).

13        Similarly, the Ninth Circuit has held that "[u]nder § 506(c), therefore, [the debtor] must

14    demonstrate that the expenses it seeks to surcharge against the Banks were reasonable, necessary,

15    and beneficial to the Banks' recovery, or that the Banks caused or consented to those expenses."

16    In re Compton Impressions, Ltd., 217 F.3d 1256, 1260 (9th Cir. 2000).

17        Section 506(c) does not mandate that the debtor must have best interests of secured

18    creditors in mind when expenses are incurred. "Rather, the focus is on whether the expenditure in

19    question was directed specifically toward the collateral, as opposed to property of the estate

20    generally." In re Choo, 273 B.R. 608, 611-612 (9th Cir. BAP 2002).

21        Various categories of expenses have been consistently allowed by the Court, including but

22    not limited to the following:

23            (i)    Insurance expenses relating to the property. *See e.g.,* In re Conveyor

24    Technology Group, Inc., 2004 WL 2044092, *2 (Bankr.D.Kan. 2004) (granting debtor's

25    motion for surcharge including *inter alia* as to "insurance on the debtor's property"); In re

26    Lunan Family Restaurants Ltd. Partnership, 192 B.R. 173, 181 (Bankr.N.D.Ill. 1996)

27    (health insurance claims filed by restaurant employees properly subject to surcharge); In re

28

-11-

1   <u>Sombrero Reef Club, Inc.</u>, 89 B.R. 988, 991 fn. 1 (Bankr.S.D.Fla. 1988) (Section 506(c)

2   surcharge "for the insurance premiums and the watchman's services").

3          (ii)    Environmental remediation with respect to the property. See <u>In re Guterl</u>

4   <u>Special Steel Corp.</u>, 198 B.R. 128, 136 -137 (Bankr.W.D.Pa. 1996).

5          (iii)   Expenditures for the security and safety of the property. See e.g., <u>In re</u>

6   <u>Parque Forestal, Inc.</u>, 949 F.2d 504, 512 (1st Cir. 1991) (authorizing surcharge of

7   expenditures for security of vacant homes to protect against break-ins and vandalization);

8   <u>Matter of Iberica Mfg., Inc.</u>, 180 B.R. 707, 717 (Bankr.D.P.R. 1995) ("The costs of the

9   security services may be recovered from the proceeds of the sale of the real property

10  pursuant to § 506(c).")

11         (iv)    Improvements to the property. See e.g., <u>In re North County Place, Ltd.</u>, 92

12  B.R. 437, 445 (Bankr.C.D.Cal. 1988) ("Where the improvement of property confers a

13  direct quantifiable benefit on a secured creditor, the Court holds that the trustee may

14  recover the costs and expenses of the improvement, subject to the ceiling of the value

15  conferred.")

16         (v)     Management fees. See <u>In re North County Place, Ltd.</u>, 92 B.R. 437, 450

17  (Bankr.C.D.Cal. 1988). See also <u>In re AFCO Enterprises, Inc.</u>, 35 B.R. 512 (Bankr.D.Utah

18  1983) (authorized surcharge for trustee's management of resort for 10 months pending

19  sale).

20  **B.     <u>The Budget Consists of Expenditures that May Be Surcharged Under § 506(c)</u>.**

21  Attached to the Faye Declaration as Exhibit "A," is a three month budget (February through April

22  2009) relating to the Projects (the "Budget") owned by the Moving Debtors. As stated in the Faye

23  Declaration, all of the expenses set forth in the Budget are reasonable and necessary for the

24  maintenance and preservation of the value of the respective Projects. The specific categories of

25  expenditures proposed in the Budget include:

26         • insurance;

27         • erosion control and dust control;

28         • utilities (water, electricity, etc.);

MAINDOCS-#126346-v1-SCC_Palmdale_Mtn_SurchargeCashCollateral.DOC

- payments for performance bonds;
- management fee;
- security fencing;
- entitlements/track map, preparation and approval of engineering infrastructure plans;
- soil engineering.

All of the expenditures identified in the budget are reasonable and necessary for the preservation and maintenance of the collateral, and will therefore adequately protect LCPI as the secured lender.

**C.   Management Fee.**  The Budget includes a management fee for SunCal Management LLC.  In the related case, In re LBREP/L-SunCal Master I, LLC, Case No. 8:08-bk-15588-ES, SunCal Management filed a Motion for Approval of SunCal Managements Fees per Cash Collateral Order, set for hearing on January 8, 2009, which raises substantially similar issues as the above entitled Debtors.

As the Court is aware, these are massive projects with a multitude of issues that need to be addressed on a daily basis in order to maintain and preserve the Project values.  Work by the SunCal Management team has included, but has not been limited to, the following:

a.   Coordinate and manage erosion control refurbishment - working on contract issues interacting with and superintending erosion control contractors

b.   Document the existing condition on public/county/agency property prior to the rainy season

c.   Coordinate and manage regular and daily maintenance of properties – landscaping, streetlights, security etc.

d.   Periodic site inspections

e.   Review and update spend projections/mothball budgets

f.   Process invoices for payment, field vendor calls, research invoices

g.   Contract management:

- Erosion control implementation contract prep, review and execution

-13-

1        •    Organize and manage existing contracts e.g. fencing, utilities etc.

2    h.    Update financial schedules for monthly activity, prepared necessary journal entries

3       to record monthly activity, bank reconciliations etc.

4    i.    Coordinate and maintain insurance coverage and tax payments.

5     In sum, there was absolutely no way the Moving Debtors can preserve and maintain the

6 value of these Projects without the assistance of SunCal Management, which was retained pre-

7 petition by Moving Debtors to perform the same services.

8 **IV.**

9 **IN THE ALTERNATIVE, THE MOVING DEBTORS SHOULD BE AUTHORIZED TO**

10 **USE CASH COLLATERAL IN ACCORDANCE WITH THE BUDGET**

11     Assuming *arguendo* that any of the expenses set forth in the Budget are not subject to the

12 right of surcharge under Section 506(c), the Moving Debtors request *in the alternative* an order

13 authorizing the use of cash collateral pursuant to the Budget. Section 363(c)(2) provides:

14
15     (2) The trustee may not use, sell, or lease cash collateral under paragraph (1) of
    this subsection unless--
      (A) each entity that has an interest in such cash collateral consents; or

16       (B) the court, after notice and a hearing, authorizes such use, sale, or lease in
    accordance with the provisions of this section.

17 11 U.S.C. §363(c)(2).

18
19     In order to obtain an order authorizing the use of cash collateral, a debtor must establish

20 that the "interest" of creditors holding liens on the subject collateral will remain "adequately

21 protected." 11 U.S.C. § 363(e). Pursuant to <u>United States v. Timbers of Inwood Forest</u>, 484 U.S.

22 365, 108 S. Ct 626 (1988), the "interest in property" entitled to adequate protection under

23 11 U.S.C. §363(e) is no more or less than the "value of the collateral" that is subject to the secured

24 creditor's lien.

25     **A.**    <u>Use of Cash Collateral will Preserve and Enhance the Value of the Collateral.</u>

It has long been established that "cash collateral may be used to maintain and preserve security

26 property." <u>In re Epstein</u>, 26 B.R. 354, 358 (Bankr.D.Tenn. 1982).

27
28     Manifestly, the application of the rent income solely to maintain and repair the
    property so as to prevent further deterioration will enhance the value of the

-14-

property which serves as the collateral for the plaintiff-mortgagee's claim. The protection and maintenance of the plaintiff-mortgagee's collateral, without any diversion of funds to the debtor, clearly ensures that the plaintiff-mortgagee's investment is adequately protected.

In re Pine Lake Village Apartment Co., 16 B.R. 750, 756 (Bankr.S.D.N.Y.1982); In re Constable Plaza Associates, L.P. 125 B.R. 98, 105 (Bankr.S.D.N.Y. 1991)

Similarly, the court may order the use of cash collateral to pay for environmental clean up and remediation of the debtor's property. Matter of Environmental Waste Control, Inc., 125 B.R. 546, 552 (N.D.Ind. 1991) ("11 U.S.C. § 363(c)(2), however, allows the use of the debtor's property for purposes such as environmental clean-up despite the claims of secured creditors, upon order of the court after notice and hearing. Notice has been given and hearing has been held; the court is persuaded that the facts and authorities recited above compel implementation of the corrective action programs.")

Here, in the event that specific expenditures do not meet the elements of a surcharge under 11 U.S.C. § 506(c), the Court may authorize the same expenditure as an appropriate use of cash collateral under 11 U.S.C. § 363(c).

**B.      Use of Cash Collateral Should be Granted to Promote the Debtor's Reorganization, which will Provide Benefit to the other Creditors of the Estate.** In In re O'Conner, 808 F.2d 1393 (10th Cir. 1987), the Tenth Circuit Court of Appeals recognized that the ultimate goal of Chapter 11 proceedings is to enhance the prospects of reorganization. In this regard, the Tenth Circuit stated as follows:

> [T]he Debtors' efforts are not only to be encouraged, but also their efforts during the administration of the proceeding are to be measured in light of that quest. Because the ultimate benefit to be achieved by a successful reorganization inures to all the creditors of the estate, a fair opportunity must be given to the Debtors to achieve that end…
>
> In order to encourage the Debtor's efforts in the formative period prior to the proposal of a reorganization, the court must be flexible in applying the adequate protection standard.

Id. at 1397-98 (emphasis added).

Here, a determination to grant to the Moving Debtors' use of any cash collateral will help promote a successful reorganization, as it will allow the Moving Debtors to preserve and maintain

1    the projects. The Moving Debtors' efforts to successfully reorganize its financial affairs, in turn,

2    will be to the ultimate benefit of the LCPI, by preserving and enhancing the value of its secured

3    interest. Likewise, in In re Cann & Saul Steel Co., 76 B.R. 479, 485 (Bankr.E.D.Pa. 1987), the

4    court found its "cautious optimism that the Debtor will be able to present a confirmable Plan

5    which will result in a betterment of the financial status of all of its creditors" was a considerable

6    factor in establishing adequate protection even where there was no equity cushion:

> 7    It is far more significant in the weight of considerations as to whether a
>      creditor is "adequately protected" to analyze debtor's prospects for a
> 8    successful reorganization in Chapter 11. If these prospects are strong...
>      then the measure of the secured creditor's adequate protection is the
> 9    probability that the debtor will be able to propose an effective plan.

10   76 B.R. at 485 (emphasis added).

11   In Cann & Saul, the debtor (a steel manufacturer that had been in business for almost a

12   century) had been losing money every year for a period of at least four years prior to the filing of

13   its Chapter 11 petition. However, the court found that the debtor had strong potential for

14   reorganization, given such factors as the debtor's production of high quality product, the debtor's

15   stability and good public image, and the debtor's acceptance of changes necessary for maintaining

16   its labor force. Id. at 487-88.

17   Here, the Moving Debtors can successfully reorganize if it is allowed to use cash collateral

18   to continue to maintain and preserve its assets.

19                                          V.

20                                     **CONCLUSION**

21   Accordingly the Moving Debtor requests that the Court enter an order for the following

22   relief on an emergency basis:

23   1.    Authorizing Moving Debtors to use and surcharge, pursuant to 11 U.S.C. § 506(c)

24   and/or 11 U.S.C. § 363, the proceeds from the Palmdale Funds, to provide for continued

25   maintenance and preservation of the value of the Moving Debtors' Projects that serve as LCPI's

26   collateral pursuant to the Budget.

27   2.    Authorizing the Moving Debtors to exceed any line item in the Budget by up to

28   twenty percent (20%) in any one month, as long as the overage for all items in the aggregate does

-16-

1  not exceed fifteen percent (15%) of the total budget amount for that month, and providing that any

2  unused funds in one period may be carried over and used in a later budget period; and

3      3.      Granting such further relief as the Court deems just and proper.

4  DATED:  January 16, 2009              **WINTHROP COUCHOT**
                                        **PROFESSIONAL CORPORAITON**

5

6                                        By:  */s/ Paul J. Couchot*_____

7                                              Paul J. Couchot, Esq.
                                              Peter W. Lianides, Esq.

8                                              Charles Liu, Esq.
                                        Reorganization Counsel for the Voluntary Debtors

9                                        and Debtors-in-Possession

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MAINDOCS-#126346-v1-SCC_Palmdale_Mtn_SurchargeCashCollateral.DOC

# DECLARATION OF BRUCE V. COOK

I, Bruce V. Cook hereby declare and state as follows:

1.      I am and have been the General Counsel for SunCal Management, LLC and the Moving Debtors since formation of such entities. I have personal knowledge of the following facts and, if called as a witness, I could and would competently testify thereto.

2.      I submit this declaration in support of the Moving Debtors' *NOTICE OF MOTION AND MOTION FOR ORDER AUTHORIZING SURCHARGE UNDER 11 U.S.C. §506(c), AND, IN THE ALTERNATIVE, USE OF CASH COLLATERAL; MEMORANDUM OF POINTS AND AUHTORITIES; DECLARATIONS IN SUPPORT THEREOF* (the "Motion"). I am authorized by SunCal Management and the Voluntary Debtors to submit this Declaration.

3.      SunCal Companies have historically financed their projects using funding provided by an array of lenders. However, approximately five years ago, SunCal formed a close relationship with Lehman Brothers, Inc. and its affiliated entities (collectively the "Lehman") and Lehman quickly became SunCal's largest funding source, providing over $2.5 billion in financing to approximately 24 projects.

4.      In seventeen of the joint venture entities, SunCal is the owner of the equity partner with full corporate governance authority and Lehman is the primary secured lender. These entities are currently debtors and debtors-in-possession in the above-captioned jointly administered voluntary Chapter 11 proceedings. The Voluntary Debtor cases are jointly administered under the lead case Palmdale Hills Property, LLC, Case No. 8:08-bk-17206-ES.

| Case Name | Case Number | Petition Date |
|---|---|---|
| Palmdale Hills Property, LLC | 8:08-17206 ES | November 6, 2008 |
| SunCal Beaumont Heights, LLC | 8:08-17209 ES | November 6, 2008 |
| SCC/Palmdale, LLC | 8:08-17224 ES | November 7, 2008 |
| SunCal Johannson Ranch LLC | 8:08-17225 ES | November 7, 2008 |
| SunCal Summit Valley LLC | 8:08-17227 ES | November 7, 2008 |
| SunCal Emerald Meadows LLC | 8:08-17230 ES | November 7, 2008 |
| SunCal Bickford Ranch LLC | 8:08-17231 ES | November 7, 2008 |
| Acton Estates, LLC | 8:08-17236 ES | November 7, 2008 |
| Seven Brothers LLC | 8:08-17240 ES | November 7, 2008 |
| SJD Partners, Ltd. | 8:08-17242 ES | November 7, 2008 |
| SJD Development Corp. | 8:08-17245 ES | November 7, 2008 |
| Kirby Estates, LLC | 8:08-17246 ES | November 7, 2008 |
| SunCal Communities I, LLC | 8:08-17248 ES | November 7, 2008 |
| SunCal Communities III, LLC | 8:08-17249 ES | November 7, 2008 |

| Case Name | Case Number | Petition Date |
|---|---|---|
| SCC Communities LLC | 8:08-17573 ES | November 19, 2008 |
| North Orange Del Rio Land, LLC | 8:08-17574 ES | November 19, 2008 |
| Tesoro SF, LLC | 8:08-17575 ES | November 19, 2008 |

Of these entities, the Moving Debtors are the entities with Projects encumbered by deeds of trust held by LCPI.

5.    In the remainder of the joint venture entities, SCC and Lehman are both equity holders and Lehman is also the secured lender. In these situations, SCC was not authorized to file a voluntary Chapter 11 proceeding for the entities without Lehman's consent. Because Lehman refused to provide such consents, these entities became involuntary debtors in the nine different involuntary proceedings before this Court (the "Involuntary Debtors"). On November 12, 14, and 19, respectively, involuntary petitions were filed as against the following nine (9) entities (collectively the "Involuntary debtors"):

| Involuntary debtor | Case No. | Petition Date |
|---|---|---|
| LB/L-SunCal Oak Valley LLC ("Oak Valley") | 8:08-17404-ES | November 12, 2008 |
| SunCal Heartland LLC ("Heartland") | 8:08-17407-ES | November 12, 2008 |
| LB/L-SunCal Northlake LLC ("Northlake") | 8:08-17408-ES | November 12, 2008 |
| SunCal Marblehead LLC ("Marblehead") | 8:08-17409-ES | November 12, 2008 |
| SunCal Century City LLC ("Century City") | 8:08-17458-ES | November 14, 2008 |
| SunCal PSV LLC ("PSV") | 8:08-17465-ES | November 14, 2008 |
| Delta Coves Venture LLC ("Delta Coves") | 8:08-17470-ES | November 14, 2008 |
| SunCal Torrance LLC ("Torrance") | 8:08-17472-ES | November 14, 2008 |
| SunCal Oak Knoll LLC ("Oak Knoll") | 8:08-17588-ES | November 19, 2008 |

6.    On or about January 6, 2008, orders for relief were entered as to all of the Involuntary Debtors, accordingly, the Involuntary Debtors are now debtors-in-possession (notwithstanding, for the ease of distinction, these debtors are still referred to herein as the Involuntary Debtors). Motions to appoint a Chapter 11 trustee as to each of the Involuntary Debtors are presently pending for hearing on January 14, 2009. The Voluntary Debtors and the Involuntary Debtors are hereinafter collectively referred to as the "Debtors."

7.    As stated, the two Lehman entities that made loans to the Debtors are Lehman Ali and LCPI. Initially these two entities provided financing to different Debtor entities: LCPI loans were provided to the Moving Debtors and the Lehman ALI loans were provided to the Involuntary

1   Debtors, as well as SCC Communities LLC, North Orange Del Rio Land, LLC and Tesoro SF,

2   LLC.  However, as more fully explained herein, this changed in 2007 and 2008.

3          8.    In March of 2007, SCC Palmdale as borrower and Lehman Commercial as lender

4   entered into that certain Mezzanine Credit Agreement pursuant to which Lehman made a

5   $95 million loan (the "SCC Palmdale Loan").  Although the SCC Palmdale Loan was made to

6   SCC Palmdale, and it was secured by SCC Palmdale's ownership interest in Palmdale Hills, the

7   loan agreement frankly states that the funds were not being used for the benefit of either SCC

8   Palmdale or Palmdale Hills, the obligors adding this debt to their balance sheets. Instead, the loan

9   proceeds were used, in part, to cover funding for several of the Debtors, including all of the

10  Moving Debtors and to pay down other Lehman loans.

11         9.    By October 2007, as the California real estate market continued to collapse and the

12  market declined further, Lehman ALI had acquired all of LCPI's SunCal related loan positions

13  and effectively demanded the right to control all material aspects of the Debtors' operations.  At

14  this time, Lehman cast aside all pretense of the separateness of the Debtors by causing certain of

15  the Debtors to enter into a $20 million loan agreement and in May of 2008 a follow-up

16  restructuring agreement whereby the practice of cross-entity funding continued and Lehman took

17  over effective control of the Debtors.  At this point, every week the team of project professionals

18  employed by SunCal Management would meet, typically via telephone conference, with a Lehman

19  ALI representative or representatives to explain what project payables were urgent and what work

20  had to be performed for the projects to meet public health and safety issues and development

21  needs.  Lehman ALI would then unilaterally dictate what future work would proceed and it would

22  promise to pay for the same when it was completed. Lehman ALI also decided what payables

23  were "urgent" and hence had to be paid promptly to avoid severe consequences and what other

24  payables could be deferred.

25         10.   Unfortunately, even though Lehman ALI agreed to fund the payables, it later

26  ignored SunCal Management's repeated requests for payment when performance was due, yet it

27  continued to authorize more work and to promise payment. Similarly, when it came time for

28  Lehman ALI to pay the authorized work it eventually reneged in most instances.

1      11.    By the second quarter of 2008, Lehman ALI was negotiating discounts agreements

2    with the Debtors' existing creditors, it was deciding what prospective work would be performed

3    on the Projects, and it was specifically promising to pay for this authorized work. Lehman ALI's

4    dictatorial control over the Projects' operations and subsequent breach of funding obligations not

5    only caused the Debtors to incur millions in unpaid liabilities, it created a common layer of unpaid

6    unsecured debt that now burdens all of the Debtors' estates. The damage toll caused by the

7    actions of Lehman ALI is approximately $100 million. This represents the unsecured claims that

8    Lehman ALI either promised would be paid, or that were incurred based upon Lehman ALI's

9    promises to pay.

10      12.    Also, as a result of the breach of the agreed-upon funding, human lives and

11    property are being put at risk from situations as diverse as: (a) potential levee failures, (b)

12    airborne friable asbestos, (c) failure to provide dust and erosion control measures, (d) possible

13    brush fires in densely populated areas during peak periods of the California fire season due to the

14    failure to fund brush control, and (e) failure to provide adequate storm water control. In addition,

15    the condition and value of the assets are wasting; fines have been assessed due to projects'

16    violation of governmental permits and more fines are imminent; entitlements are at risk;

17    availability of resources such as water are at risk; governmental bonds are being called; and

18    property taxes and insurance are going unpaid.

19      13.    On the eve of LCPI's Chapter 11 filing in September of 2008, Lehman ALI

20    transferred back to LCPI all of the loans initially made to the Debtors by LCPI where a SunCal

21    entity held control, and, hence, had the ability to file voluntary bankruptcy proceedings. In

22    contrast, in those cases where a Lehman entity had the ability to block a Chapter 11 filing,

23    Lehman ALI retained the loans.

24      14.    Since the filing of LCPI's Chapter 11 case in September 2008, SunCal

25    representatives, including myself, have also contacted Lehman personnel numerous times by email

26    and phone requesting that Lehman provide funding for the critical expenses of the Projects, only

27    to be met with inaction. However, on November 2, 2008, Mr. Robert Brusco of Lehman informed

28    me that Lehman was not prepared to immediately fund any costs for any of the Projects (including

1   insurance payments) except for approximately $270,000 on two of the Projects. The $270,000

2   was not even sufficient to address the immediate problems at those Projects or complete work

3   necessary to address critical public health and safety issues.

4        15.    As a result of Lehman's failure to fund the critical expenses of the Projects, SunCal

5   located an alternative source willing to fund obligations up to $75 million for these expenses.

6   However, that funding commitment was conditioned upon a Court-approved priming lien in the

7   Chapter 11 cases of the Debtors, which in the case of the Moving Debtors, arguably required relief

8   from the automatic stay in LCPI's Chapter 11 case.

9        16.    Consequently, in order to ensure the efficient administration of their cases, the

10  Debtors filed a Motion for an order modifying the automatic stay in LCPI's Chapter 11 to allow

11  the Debtors to administer their own Chapter 11 cases to the extent that such cases, and the relief

12  requested by the Debtors therein, may affect the rights of Lehman, including, without limitation:

13  filing a motion to approve post-petition debtor-in-possession ("DIP") financing on a priming lien

14  basis that would subordinate Lehman's interests to those of a proposed DIP lender. LCPI opposed

15  the motion and the motion was denied by the Presiding Judge in LCPI's Chapter 11 case.

16       17.    SunCal believes that Lehman has breached its fiduciary duty to the Debtors'

17  creditors and should be held responsible to pay the claims of creditors. Consequently, on

18  January 6, 2009, SunCal caused the filing of an adversary proceeding against Lehman in the jointly

19  administered cases of the Voluntary Debtors requesting, amongst other relief, that Lehman ALI's

20  liens be equitably subordinated to the claims of unsecured creditors in all of the Debtors' cases,

21  Adv. No. 8:09-ap-01005 ("Equitable Subordination Action").

22       I declare under penalty of perjury that the foregoing is true and correct. Executed this

23  ___ day of January 2009, at Irvine, California.

24

25               */s/ Bruce V. Cook*
             Bruce V. Cook

26

27

28

## DECLARATION OF FRANK C. FAYE

I, Frank C. Faye, hereby declare and state as follows:

1.      I am and have been the Chief Operating Officer for SunCal Management, LLC and the Voluntary Debtors since August of 2007 and a member of SunCal Management's executive management since 2002. The matters stated herein are within my own knowledge and, if called as a witness, I could and would competently testify thereto.

2.      I have general knowledge of the Debtors' books and records, and I am familiar with the Debtors' projects and their operational affairs. As to the following facts, I know them to be true of my own knowledge, or I have gained such knowledge from the business records of the Debtors which were made at or near the time of the acts, conditions or events to which they relate. Any such document or record was prepared in the ordinary course of business by a person who had personal knowledge of the event being recorded and had a business duty to accurately record such event.

3.      I submit this declaration in support of the Moving Debtors' *NOTICE OF MOTION AND MOTION FOR ORDER AUTHORIZING SURCHARGE UNDER 11 U.S.C. §506(c), AND, IN THE ALTERNATIVE, USE OF CASH COLLATERAL; MEMORANDUM OF POINTS AND AUHTORITIES; DECLARATIONS IN SUPPORT THEREOF* (the "Motion"). I am authorized by the SunCal Management and the Voluntary Debtors to submit this Declaration.

4.      The Debtors are part of an integrated network of companies that operate under the common dba the "SunCal Companies" or "SunCal." SunCal is a family-owned business that has been in the land development industry for over seventy years.

5.      SunCal's business focuses upon the "development" primarily of residential land. A typical SunCal development project begins with the acquisition of one or more parcels of raw land. Thereafter, the SunCal team develops a master plan for the acreage that incorporates streets, homes, parks, schools and commercial areas and it works with the applicable municipal planning authorities (the city, county, state and federal) to secure the necessary approvals or "entitlements" to achieve this plan. This process, which requires input from land planners, civil engineers, architects, lawyers, and other land specialists, takes a period of years. Once the plan is approved,

-23-

1  SunCal will grade acreage, install the major project infrastructure (streets, utilities, etc.) onsite and

2  offsite and proceed to sell the lots in the project to merchant home builders.

3        6.     The land development process is inherently capital intensive due to size and costs

4  of the assets being acquired; the time and expense of obtaining government approvals; grading the

5  acreage; and installing the major project infrastructure. A typical SunCal project will initially be

6  financed through an equity contribution coupled with an acquisition and development loan. In

7  some cases a layer of mezzanine debt (secured by an equity interest in the entity that owns the

8  project) will be employed to provide additional funding.

9        7.     Palmdale held two accounts at Smith Barney, account nos. 315-0K043-15 222 and

10  315-0540A-15 222, respectively. Account No. 315-0K043-15 222 existed primarily to receive

11  interest payments on the bonds that Palmdale Hills Property owns. Account No. 315-0540A-15

12  222 was a development account established originally when the loan with Credit Suisse was

13  funded (the "Palmdale Funds").

14        8.     Pursuant to an order of this Court, the funds were deposited into DIP accounts in an

15  approved depository subject to any alleged liens thereon to the same extent, validity and priority

16  of the pre-petition liens thereon, if any. The within Motion requests authority to use the Palmdale

17  Funds in order to address what are the reasonable and necessary expenses required to maintain and

18  preserve the value of the Moving Debtor's Projects that are subject to the deeds of trust and other

19  security held by LCPI.

20        9.     Attached hereto as Exhibit "A," is a three month budget (February through April

21  2009) relating to the Projects of the Moving Debtors ("Budget") that was prepared under my

22  supervision. All of the expenses set forth in the Budget are, in my opinion, reasonable and

23  necessary in order to maintain and preserve the value of the respective Projects. The specific

24  categories of expenditures proposed in the budget are as follows:

| Debtor | Categories of Proposed Expenditures |
| --- | --- |
| Palmdale Hills Property, LLC | Insurance; erosion/dust control; utilities (water, electricity, storage rental, construction trailer, etc.); payments for performance bond; management fee; property taxes |
| SunCal Beaumont Heights, LLC | Management fee; insurance; property taxes |

-24-

| Debtor | Categories of Proposed Expenditures |
|---|---|
| SunCal Johannson Ranch LLC | Management fee; insurance, property taxes |
| SunCal Summit Valley LLC | Insurance; management fee; property taxes |
| SunCal Emerald Meadows LLC | Insurance; security fencing; Erosion Control - Refurbishment; Utilities (water required for dust control per South Coast AQMD); "I" Map (Tentative Tract 32971); Preparation and approval of engineering infrastructure plans for the approval and recordation of the "I" Map; management fee; property taxes |
| SunCal Bickford Ranch LLC | Insurance; utilities (Water, electricity, storage rental, construction trailer); VELB Habitat Maintenance required per 404 permit; Oak Tree Mitigation Maintenance required per 404 permit; DTSC O&M Monitoring required per 404 permit; 2008 Year-End Reporting required per 404 permit with Army Corp of Engineers; Erosion Control BMP installation & maintenance; management fee; property taxes |
| Acton Estates, LLC | Insurance; site maintenance and fencing for erosion control; Utilities (water); management fee; property taxes |

10.    The Moving Debtors cannot preserve and maintain the value of these Projects without the assistance of SunCal Management, which was retained pre-petition by Moving Debtors to perform the same services.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___ day of January 2009, at Irvine, California.


/s/ Frank C. Faye
Frank C. Faye

MAINDOCS-#126346-v1-SCC_Palmdale_Mtn_SurchargeCashCollateral.DOC

# EXHIBIT "A"

CONTINUATION/MAINTENANCE BUDGET
PROJECT NAME:     Summit Valley
LOCATION:         Hesperia, CA

ACREAGE:          2,500

LOTS DELIVERED:   0
LOTS REMAINING:   6,023
TOTAL LOTS:       6,023
**Note: Total lot count and acreage is subject to change as parcels have been lost.
STATUS:           Owned
YEAR PURCHASED:   2004-2006
PURCHASE PRICE:   $49m

| Summary | | SunCal Companies |
|---|---|---|
| A. Health/Safety/Insurance | $ | 162 |
| B. Non-Compliance | $ | 566,385 |
| C. Entitlements/Preservation of Value | $ | - |
| D. Supervision, Reporting and Management | $ | 28,818 |
| Subtotal | $ | 595,365 |
| E. Other | $ | - |
| Grand Total | $ | 595,365 |

| Category Ref | Cost Items | Feb-09 | Mar-09 | Apr-09 | Total | Source of Value | Explanation/Consequence |
|---|---|---|---|---|---|---|---|
| **A. Health/Safety/Insurance** | | | | | | | |
| A-1 | Insurance | 54 | 54 | 54 $ | 162 | | General Liability and floater insurance |
| | Subtotal $ | 54 $ | 54 $ | 54 $ | 162 | | |
| **B. Non-Compliance** | | | | | | | |
| | 12/08 Past Due Property Taxes | 296,678 | | $ | 296,678 | | Property taxes in February reflect past due amounts plus a 10% penalty. |
| | Property Taxes | | | 269,707 $ | 269,707 | | |
| | Subtotal $ | 296,678 $ | - $ | 269,707 $ | 566,385 | | |
| **C. Entitlements/Preservation of Value** | | | | | | | |
| | Subtotal $ | - $ | - $ | - $ | - | | |
| **D. Supervision, Reporting and Management** | | | | | | | |
| D-1 | General & Administrative | 9,606 | 9,606 | 9,606 $ | 28,818 | | Agreed management fee per Omnibus Management Agreement needed to manage the spend schedule. |
| | Subtotal $ | 9,606 $ | 9,606 $ | 9,606 $ | 28,818 | | |
| **E. Other** | | | | | | | |
| | Subtotal $ | - $ | - $ | - $ | - | | |
| **GRAND TOTAL** | | $ 306,338 $ | 9,660 $ | 279,367 $ | 595,365 | | |

**CONTINUATION/MAINTENANCE BUDGET**
**PROJECT NAME:** Bickford
**LOCATION:** Placer, CA

**ACREAGE:** 1,940

**LOTS DELIVERED:** 0
**LOTS REMAINING:** 2,105
**TOTAL LOTS:** 2,105

**STATUS:** Owned
**YEAR PURCHASED** 2005
**PURCHASE PRICE:** $174m

| Summary | | SunCal Companies |
|---|---|---|
| A. Health/Safety/Insurance | $ | 50,508 |
| B. Non-Compliance | $ | 2,524,948 |
| C. Entitlements/Preservation of Value | $ | - |
| D. Supervision, Reporting and Management | | 229,416 |
| **Subtotal** | **$** | **2,804,872** |
| E. Other | $ | 12,000 |
| **Grand Total** | **$** | **2,816,872** |

| Category Ref | Cost Items | Feb-09 | Mar-09 | Apr-09 | Total | Source of Value | Explanation/Consequence |
|---|---|---|---|---|---|---|---|
| **A. Health/Safety/Insurance** | | | | | | | |
| A-1 | Insurance | 11,836 | 11,836 | 11,836 $ | 35,508 | Estimate | General Liability and floater insurance |
| A-2 | Utilities | 5,000 | 5,000 | 5,000 $ | 15,000 | | Water, electricity, storage rental, construction trailer |
| | Subtotal $ | 16,836 $ | 16,836 $ | 16,836 $ | 50,508 | | |
| **B. Non-Compliance** | | | | | | | |
| B-1 | VELB Habitat Maintenance | 3,700 | 3,700 | 3,700 $ | 11,100 | Estimate | Habitat Required to be maintained per our 404 permit and Entitlement Approvals |
| B-2 | Oak Tree Mitigation Maintenance | 2,500 | | 2,500 $ | 5,000 | Estimate | Habitat Required to be maintained per our 404 permit and Entitlement Approvals during summer months |
| B-3 | DTSC O&M Monitoring | 1,500 | | $ | 1,500 | Estimate | Required per our 404 permit/Entitlements |
| B-4 | 2008 Year-End Reporting - ACOE | 10,000 | 10,000 | $ | 20,000 | Estimate | Required per our 404 permit with Army Corp of Engineers |
| B-5 | Erosion Control BMP installation & maint | 30,000 | 15,000 | 15,000 $ | 60,000 | Estimate | Required by County and Regional Water Quality Control Board to avoid large fines |
| | 12/08 Past Due Property Taxes | 1,271,468 | | | 1,271,468 | | Property taxes in February reflect past due amounts plus a 10% penalty. |
| | Property Taxes | | | 1,155,880 $ | 1,155,880 | | |
| | Subtotal $ | 1,319,168 $ | 28,700 $ | 1,177,080 $ | 2,524,948 | | |
| **C. Entitlements/Preservation of Value** | | | | | | | |
| | | | | | $ | - | |
| | Subtotal $ | - $ | - $ | - $ | - | | |
| **D. Supervision, Reporting and Management** | | | | | | | |
| D-1 | General & Administrative | 76,472 | 76,472 | 76,472 $ | 229,416 | | Agreed management fee per Omnibus Management Agreement needed to manage the spend schedule. |
| | Subtotal $ | 76,472 $ | 76,472 $ | 76,472 $ | 229,416 | | |
| **E. Other** | | | | | | | |
| E-1 | Legal | 4,000 | 4,000 | 4,000 $ | 12,000 | | Legal needed to avoid defaults on suits and maintain ability to negotiate settlements at less than 100% if a judgement is otherwise granted |
| | Subtotal $ | 4,000 $ | 4,000 $ | 4,000 $ | 12,000 | | |
| **GRAND TOTAL** | | **$ 1,416,476 $** | **126,008 $** | **1,274,388 $** | **2,816,872** | | |

CONTINUATION/MAINTENANCE BUDGET

| | |
|---|---|
| PROJECT NAME: | Ritter |
| LOCATION: | Palmdale, CA |
| ACREAGE: | 10,625 |
| LOTS DELIVERED: | 0 |
| LOTS REMAINING: | 7,158 |
| TOTAL LOTS: | 7,158 |
| STATUS: | Owned |
| YEAR PURCHASED: | 2004-2007 |
| PURCHASE PRICE: | $67m |

**SunCal Companies**

| Summary | | |
|---|---|---|
| A. Health/Safety/Insurance | $ | 100,979 |
| B. Non-Compliance | $ | 3,491,128 |
| C. Entitlements/Preservation of Value | $ | - |
| D. Supervision, Reporting and Management | $ | 332,316 |
| **Subtotal** | **$** | **3,924,423** |
| E. Other | $ | 132,957 |
| **Grand Total** | **$** | **4,057,380** |

ESCROW ACCOUNT

| Category Ref | Cost Items | Feb-09 | Mar-09 | Apr-09 | Total | Source of Value | Explanation/Consequence |
|---|---|---|---|---|---|---|---|
| **A. Health/Safety/Insurance** | | | | | | | |
| A-1 | Insurance | 7,493 | 7,493 | 7,493 | $ 22,479 | | General Liability and floater insurance |
| A-2 | Erosion Control/Dust Control | 28,500 | 3,000 | 3,000 | $ 34,500 | Contract | Sand bags and erosion control |
| A-3 | Dust Control | 8,000 | 3,000 | 3,000 | $ 14,000 | Contract | Dust control and irrigation for trees SEE EXHIBIT #5 and #8 |
| A-4 | Utilities | 10,000 | 10,000 | 10,000 | $ 30,000 | Contract | Water, electricity, storage rental, construction trailer,ect. EXHIT #7 |
| | | | | | $ - | | |
| | | **Subtotal $** | **53,993 $** | **23,493 $** | **23,493 $** | **100,979** | |

***Please note that this does not include $4.2m of ELR (Elizabeth Lake Road) work as an escrow account is established to cover these costs. If in the event this escrow account were not honored then this 4.2m would be moved to the Healthand Safety category.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **B. Non-Compliance** | | | | | | | |
| | 12/08 Past Due Property Taxes | 1,841,128 | | | $ 1,841,128 | | Property taxes in February reflect past due amounts plus a 10% penalty. |
| | Property Taxes | | | 1,650,000 | $ 1,650,000 | | |
| | | **Subtotal $** | **1,841,128 $** | **- $** | **1,650,000 $** | **3,491,128** | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **C. Entitlements/Preservation of Value** | | | | | | | |
| | | | | | $ - | | |
| | | | | | $ - | | |
| | | | | | $ - | | |
| | | | | | $ - | | |
| | | | | | $ - | | |
| | | **Subtotal $** | **- $** | **- $** | **- $** | **-** | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **D. Supervision, Reporting and Management** | | | | | | | |
| D-1 | General & Administrative | 110,772 | 110,772 | 110,772 | $ 332,316 | Contract | Agreed management fee per Omnibus Management Agreement needed to manage the spend schedule. |
| | | **Subtotal $** | **110,772 $** | **110,772 $** | **110,772 $** | **332,316** | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **E. Other** | | | | | | | |
| E-1 | Legal | 30,000 | 30,000 | 30,000 | $ 90,000 | Estimate | Legal needed to avoid defaults on suits and maintain ability to negotiate settlements at less than 100% if a judgement is otherwise granted |
| E-2 | Bond Premiums | 31,212 | 920 | 10,825 | $ 42,957 | Contract | Renewal payments for performance bonds SEE EXHIT #6 |
| | | **Subtotal $** | **61,212 $** | **30,920 $** | **40,825 $** | **132,957** | |

| | | | | | | |
|---|---|---|---|---|---|---|
| **GRAND TOTAL** | | **$ 2,067,105 $** | **165,185 $** | **1,825,090 $** | **4,057,380** | |

**CONTINUATION/MAINTENANCE BUDGET**

| PROJECT NAME: | Johansen |
| LOCATION: | Modesto, CA |
| ACREAGE: | 132 |
| LOTS DELIVERED: | 0 |
| LOTS REMAINING: | 921 |
| TOTAL LOTS: | 921 |
| STATUS: | Owned |
| YEAR PURCHASED: | 2006 |
| PURCHASE PRICE: | $15m |

**SunCal Companies**

| Summary | | |
|---|---|---:|
| A. Health/Safety/Insurance | $ | - |
| B. Non-Compliance | $ | 256,059 |
| C. Entitlements/Preservation of Value | $ | - |
| D. Supervision, Reporting and Management | $ | 25,350 |
| Subtotal | $ | 281,409 |
| E. Other | $ | - |
| Grand Total | $ | 281,409 |

| Category Ref | Cost Items | Feb-09 | Mar-09 | Apr-09 | Total | Source of Value | Explanation/Consequence |
|---|---|---|---|---|---|---|---|
| **A. Health/Safety/Insurance** | | | | | $    - | | |
| | Subtotal | $    - | $    - | $    - | $    - | | |
| **B. Non-Compliance** | | | | | | | |
| | 12/08 Past Due Property Taxes | 134,126 | | | $ 134,126 | | Property taxes in February reflect past due amounts plus a 10% penalty. |
| | Property Taxes | | | 121,933 | $ 121,933 | | |
| | Subtotal | $ 134,126 | $    - | $ 121,933 | $ 256,059 | | |
| **C. Entitlements/Preservation of Value** | | | | | $    - | | |
| | Subtotal | $    - | $    - | $    - | $    - | | |
| **D. Supervision, Reporting and Management** | | | | | | | Agreed management fee per Omnibus Management Agreement needed to manage the spend schedule. |
| D-1 | General & Administrative | 8,450 | 8,450 | 8,450 | $ 25,350 | Contract | |
| | Subtotal | $ 8,450 | $ 8,450 | $ 8,450 | $ 25,350 | | |
| **E. Other** | | | | | $    - | | |
| | Subtotal | $    - | $    - | $    - | $    - | | |
| **GRAND TOTAL** | | $ 142,576 | $ 8,450 | $ 130,383 | $ 281,409 | | |

CONTINUATION/MAINTENANCE BUDGET
PROJECT NAME:    Emerald Meadows
LOCATION:        Rubidoux, CA

ACREAGE:         178

LOTS DELIVERED:  0
LOTS REMAINING:  1,002
TOTAL LOTS:      1,002

STATUS:          Owned
YEAR PURCHASED:  2005-2007
PURCHASE PRICE:  $40m

| Summary | | SunCal Companies |
|---|---|---|
| A. Health/Safety/Insurance | $ | 59,138 |
| B. Non-Compliance | $ | 258,892 |
| C. Entitlements/Preservation of Value | $ | - |
| D. Supervision, Reporting and Management | $ | 137,235 |
| **Subtotal** | **$** | **455,265** |
| E. Other | $ | 432,000 |
| **Grand Total** | **$** | **887,265** |

| Category Ref | | Cost Items | Feb-09 | Mar-09 | Apr-09 | Total | Source of Value | Explanation/Consequence |
|---|---|---|---|---|---|---|---|---|
| **A. Health/Safety/Insurance** | | | | | | | | |
| | A-1 | Insurance | 63 | 63 | 63 $ | 188 | Estimate | General Liability and floater insurance |
| | A-2 | Security Fencing - rental (Expires in 2/09) | | $ | 1,300 $ | 1,300 | Contract | Security Fencing required by Riverside County Code Enforcement to prohibit potential dumping of toxic and unwanted debris and to prevent illegal access to the site by adjacent residents and outsiders. |
| | A-3 | Monthly fence maintenance | $ 1,200 $ | 600 $ | 600 $ | 2,400 | Estimate | The monthly maintenance of the security fencing is required to prohibit potential dumping of toxic and unwanted debris and to prevent illegal access to the site by adjacent residents and outsiders. |
| | A-4 | Erosion Control - Refurbishment | 33,150 $ | 11,050 $ | 11,050 $ | 55,250 | Bid | Per the State of Ca, Water Quality Control Board, WDID#, 8 33C335206 to remain in compliance with the State of Ca. Clean Water Act |
| | | Subtotal $ | 34,413 $ | 11,713 $ | 13,013 $ | 59,138 | | |
| **B. Non-Compliance** | | | | | | | | |
| | | 12/08 Past Due Property Taxes | $ 139,792 | | $ | 139,792 | | Property taxes in February reflect past due amounts plus a 10% penalty. |
| | | Property Taxes | | | 119,100 $ | 119,100 | | |
| | | Subtotal $ | 139,792 $ | - $ | 119,100 $ | 258,892 | | |
| **C. Entitlements/Preservation of Value** | | | | | | | | |
| | C-1 | Utilities | | | $ | - | Estimate | Payment for water usage required for dust control per South Coast AQMD. |
| | | Subtotal $ | - $ | - $ | - $ | - | | |
| **D. Supervision, Reporting and Management** | | | | | | | | |
| | D-1 | General & Administrative | 45,745 | 45,745 | 45,745 $ | 137,235 | Contract | Agreed management fee per Omnibus Management Agreement needed to manage the spend schedule |
| | | Subtotal $ | 45,745 $ | 45,745 $ | 45,745 $ | 137,235 | | |
| **E. Other** | | | | | | | | |
| | E-1 | Legal | 4,000 | 4,000 | 4,000 $ | 12,000 | Estimate | Legal needed to avoid defaults on suits and maintain ability to negotiate settlements at less than 100% if a judgement is otherwise granted |
| | E-2 | "I" Map (Tentative Tract 32971) | 20,000 | 20,000 | 20,000 $ | 60,000 | Bid | Costs represent the completion and recordation of the "I" Map to satisfy the obligation of the Purchase & Sale Agreement. |
| | E-3 | Consulting (for engineering infrastructure pla | 120,000 | 120,000 | 120,000 $ | 360,000 | Bid | Costs for the preparation and approval of engineering infrastructure plans required for the approval and recordation of the "I" Map. |
| A/P | E-4 | Proactive Engineering | | | $ | - | Contract | |
| | | Subtotal $ | 144,000 $ | 144,000 $ | 144,000 $ | 432,000 | | |
| **GRAND TOTAL** | | | $ 363,950 $ | 201,458 $ | 321,858 $ | 887,265 | | |

CONTINUATION/MAINTENANCE BUDGET
**PROJECT NAME:** Beaumont Heights
**LOCATION:** Beaumont, CA

**ACREAGE:** 1,191

**LOTS DELIVERED:** 0
**LOTS REMAINING:** 1,203
**TOTAL LOTS:** 1,203
**Note: Total lot count and acreage is subject to change as parcels have been lost.
**STATUS:** Owned
**YEAR PURCHASED:** 2004-2007
**PURCHASE PRICE:** $52m

| Summary | | |
|---|---|---|
| A. Health/Safety/Insurance | $ | |
| B. Non-Compliance | $ | 583,800 |
| C. Entitlements/Preservation of Value | $ | |
| D. Supervision, Reporting and Management | $ | 23,373 |
| Subtotal | $ | 607,173 |
| E. Other | $ | - |
| Grand Total | $ | 607,173 |

| Category Ref | Cost Items | Feb-09 | Mar-09 | Apr-09 | Total | Source of Value | Explanation/Consequence |
|---|---|---|---|---|---|---|---|
| **A. Health/Safety/Insurance** | | | | | | | |
| | | | | | $    - | | |
| | Subtotal $ | - | $    - | $    - | $    - | | |
| **B. Non-Compliance** | | | | | | | |
| | 12/08 Past Due Property Tax | 305,800 | | | $ 305,800 | | Property taxes in February reflect past due amounts plus a 10% penalty. |
| | Property Taxes | | | 278,000 | $ 278,000 | | |
| | Subtotal $ | 305,800 | $    - | $ 278,000 | $ 583,800 | | |
| **C. Entitlements/Preservation of Value** | | | | | | | |
| | | | | | $    - | | |
| | Subtotal $ | - | $    - | $    - | $    - | | |
| **D. Supervision, Reporting and Management** | | | | | | | |
| D-1 | General & Administrative | 7,791 | 7,791 | 7,791 | $ 23,373 | Contract | Agreed management fee per Omnibus Management Agreement needed to manage the spend schedule. |
| | Subtotal $ | 7,791 | $ 7,791 | $ 7,791 | $ 23,373 | | |
| **E. Other** | | | | | | | |
| | | | | | $    - | | |
| | Subtotal $ | - | $    - | $    - | $    - | | |
| **GRAND TOTAL** | $ | 313,591 | $ 7,791 | $ 285,791 | $ 607,173 | | |

**CONTINUATION/MAINTENANCE BUDGET**
**PROJECT NAME:** Acton
**LOCATION:** Acton, CA

**ACREAGE:** 175

**LOTS DELIVERED:** 0
**LOTS REMAINING:** 136
**TOTAL LOTS:** 136

**STATUS:** Owned
**YEAR PURCHASED:** 2006
**PURCHASE PRICE:** $16m

| Summary | | SunCal Companies |
|---|---|---|
| A. Health/Safety/Insurance | $ | 62,085 |
| B. Non-Compliance | $ | 219,906 |
| C. Entitlements/Preservation of Value | $ | - |
| D. Supervision, Reporting and Management | $ | 43,788 |
| **Subtotal** | **$** | **325,779** |
| E. Other | $ | - |
| **Grand Total** | **$** | **325,779** |

| Category | Ref | Cost Items | Feb-09 | Mar-09 | Apr-09 | | Total | Source of Value | Explanation/Consequence |
|---|---|---|---|---|---|---|---|---|---|
| **A. Health/Safety/Insurance** | | | | | | | | | |
| | A-1 | Insurance | 19,545 | 19,545 | 19,545 | $ | **58,635** | Estimate | General Liability and floater insurance |
| | A-2 | Site Maintenance and Fencing | 1,000 | 1,000 | 1,000 | $ | **3,000** | Estimate | Site maintenance erosion control fencing |
| | A-3 | Utilities | 150 | 150 | 150 | $ | **450** | Estimate | LA County Water |
| | | Subtotal $ | 20,695 | $ 20,695 | $ 20,695 | $ | **62,085** | | |
| **B. Non-Compliance** | | | | | | | | | |
| | | 12/08 Past Due Property Taxes | 119,371 | | | $ | **119,371** | | Property taxes in February reflect past due amounts plus a 10% penalty. |
| | | Property Taxes | | | 100,535 | $ | **100,535** | | |
| | | Subtotal $ | 119,371 | $ - | $ 100,535 | $ | **219,906** | | |
| **C. Entitlements/Preservation of Value** | | | | | | | | | |
| | | Subtotal $ | - | $ - | $ - | $ | **-** | | |
| **D. Supervision, Reporting and Management** | | | | | | | | | |
| | D-1 | General & Administrative | 14,596 | 14,596 | 14,596 | $ | **43,788** | Contract | Agreed management fee per Omnibus Management Agreement needed to manage the spend schedule. |
| | | Subtotal $ | 14,596 | $ 14,596 | $ 14,596 | $ | **43,788** | | |
| **E. Other** | | | | | | | | | |
| | | Subtotal $ | - | $ - | $ - | $ | **-** | | |
| **GRAND TOTAL** | | | $ 164,662 | $ 35,291 | $ 135,826 | $ | **325,779** | | |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I.
Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 660 Newport Center Drive, 4th Floor, Newport Beach, CA 92660.

The foregoing document described: DEBTORS' NOTICE OF MOTION AND MOTION FOR ORDER AUTHORIZING SURCHARGE UNDER 11 U.S.C. § 506(c), AND, IN THE ALTERNATIVE, USE OF CASH COLLATERAL; MEMORANDUM OF POINTS AND AUHTORITIES; DECLARATIONS IN SUPPORT THEREOF will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On January 16, 2009 I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

⊠   Service information continued on attached page

II. **SERVED BY U.S. MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served):
On January 16, 2009 I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

⊠   Service information continued on attached page

III. **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on January 16, 2009 I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

⊠   Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| | | |
|---|---|---|
| January 16, 2009 | Viann Corbin | |
| Date | Type Name | Signature |

MAINDOCS-#126346-v1-SCC_Palmdale_Mtn_SurchargeCashCollateral.DOC

**BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")**

| | |
|---|---|
| Jason Wallach, Esq.<br>Berger Kahn | jwallach@bergerkahn.com |
| Committee Counsel<br>Irell & Manella<br>Alan J. Friedman, Esq.<br>Kerry Lyman, Esq. | afriedman@irell.com<br>klyman@irell.com |
| Lehman Ali, Inc., Lehman Commercial<br>c/o Weil, Gotshal & Manges LLP<br>Michael Kessler, Esq. | Michael.Kessler@weil.com |
| Lehman Bros. Holdings, Inc.<br>Jeffer, Mangels, etc.<br>Joseph A. Eisenberg, Esq. | jae@jmbm.com |
| Debra A. Riley, Esq.<br>Allen Matkins Leck Gamble Mallory &<br>Natsis LLP | driley@allenmatkins.com |
| Michael Hribar | mhribar@rutan.com |
| James Bastian | jbastian@shbllp.com |
| Kelly C. Griffith | bkemail@harrisbeach.com |
| Richard W. Esterkin<br>Asa S. Hami<br>Morgan Lewis & Bockius LLP | resterkin@morganlewis.com<br>ahami@morganlewis.com |

**OVERNIGHT MAIL**

| | |
|---|---|
| Wells Fargo Equipment Finance, Inc.<br>c/o Solomon, Grindle, Silverman & Spinella<br>Richard A. Solomon, Esq.<br>12651 High Bluff Dr., #300<br>San Diego, CA 92130 | Secured Creditor<br>OVC Holdings LLC<br>c/o Trimont Real Estate Advisors, Inc.<br>2 Park Plaza, Suite 850<br>Irvine, CA 92614-8515 |
| General Security Services, Inc.<br>c/o Treacy & Keidser LLP<br>Kari A. Keidser, Esq.<br>5777 West Century Park Blvd., #1100<br>Los Angeles, CA 90045 | Asphalt Professionals, Inc.<br>c/o Law Offices of Ray B. Bowen, Jr., Esq.<br>19318 Ventura Blvd., #100<br>Tarzana, CA 91356-3097 |

MAINDOCS-#126346-v1-SCC_Palmdale_Mtn_SurchargeCashCollateral.DOC

1

## EMAIL SERVICE

2

| | |
|---|---|
| Mr. Steve Elieff<br>SCC Acquisitions, Inc. | selieff@suncal.com<br>bcook@suncal.com |
| AMEC Earth & Environmental<br>c/o Gibbs, Giden, etc.<br>Christopher E Ng., Esq. | cng@gglts.com |
| Jeffrey Fitts<br>Alvarez & Marsal | jfitts@alvarezandmarsal.com<br>jeff.fitts@lehman.com |
| Hui-Li Dou et al<br>c/o Raymond H. Aver, Esq. | ray@averlaw.com |
| Lehman Commercial Paper Inc.<br>c/o Michael Kessler, Esq.<br>Weil Gotshal & Manges LLP | michael.kessler@weil.com |
| Wood Rogers<br>c/o Murphy Austin etc.<br>J. Scott Alexander, Esq. | salexander@murphyaustin.com |
| Lehman Ali & Lehman Commercial<br>c/o Weil, Gotshal & Manges LLP | elisa.lemmer@weil.com |
| Lehman Bros. Holdings, Inc.<br>c/o Jeffer Mangles, etc.<br>Caroline R. Djang, Esq. | cdjang@jmbm.com |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MAINDOCS-#126346-v1-SCC_Palmdale_Mtn_SurchargeCashCollateral.DOC