**Exhibit "F"**



PAUL J. COUCHOT -- State Bar No. 131934
PETER W. LIANIDES – State Bar No. 160517
**WINTHROP COUCHOT P.C.**
660 Newport Center Drive, Fourth Floor
Newport Beach, CA 92660
Telephone: (949) 720-4100
Facsimile: (949) 720-4111

General Insolvency Counsel for
Jointly Administered Debtors in Possession

LOUIS R. MILLER, State Bar No. 54141
MARTIN PRITIKIN, State Bar. No. 210845
BRIAN PROCEL, State Bar No. 218657
**MILLER BARONDESS, LLP**
1999 Avenue of the Stars, Suite 1000
Los Angeles, California 90067
Telephone:     (310) 552-4400
Facsimile:     (310) 552-8400

[Proposed] Special Litigation Counsel for
Jointly Administered Debtors in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

| | |
|---|---|
| In re | Case No. 8:08-bk-17206-ES |
| PALMDALE HILLS PROPERTY, LLC, AND ITS RELATED DEBTORS, | Jointly Administered With Case Nos. 8:08-bk-17209-ES; 8:08-bk-17240-ES; 8:08-bk-17224-ES; 8:08-bk-17242-ES; 8:08-bk-17225-ES; 8:08-bk-17245-ES; 8:08-bk-17227-ES; 8:08-bk-17246-ES; 8:08-bk-17230-ES; 8:08-bk-17231-ES; 8:08-bk-17236-ES; 8:08-bk-17248-ES; 8:08-bk-17249-ES; 8:08-bk-17573-ES; 8:08-bk-17574-ES; 8:08-bk-17575-ES; |
| Jointly Administered Debtors and Debtors-in-Possession | |

Affects:

☐ All Debtors
☒ Palmdale Hills Property, LLC,
☐ SunCal Beaumont Heights, LLC
☒ SCC/Palmdale, LLC
☐ SunCal Johannson Ranch, LLC
☒ SunCal Summit Valley, LLC
☒ SunCal Emerald Meadows LLC
☒ SunCal Bickford Ranch, LLC
☒ Acton Estates, LLC
☐ Seven Brothers LLC
☐ SJD Partners, Ltd.
☐ SJD Development Corp.
☐ Kirby Estates, LLC
☒ SunCal Communities I, LLC
☐ SunCal Communities III, LLC
☐ SCC Communities LLC
☐ North Orange Del Rio Land, LLC
☐ Tesoro SF, LLC

Chapter 11 cases

**THE DEBTORS' OMNIBUS OPPOSITION TO MOTIONS FOR RELIEF FROM THE AUTOMATIC STAY FILED BY LEHMAN COMMERCIAL PAPER INC. AND LEHMAN ALI, INC.**

[Declarations and Request for Judicial Notice filed concurrently herewith]

DATE:     February 20, 2009
TIME:      10:00 a.m.
PLACE:    Courtroom 5A

# TABLE OF CONTENTS

**PAGE**

I.   INTRODUCTION ........................................................................................................ 1

II.  FACTUAL BACKGROUND ...................................................................................... 4
     A.   The SunCal Companies and the Debtors ...................................................... 4
     B.   Lehman's Manipulative Lending Practices and Fraudulent
          Actions Against the Debtors and Their Creditors ........................................ 5
          1.   The Debtors' $273 Million Fraudulent Conveyance
               Actions Against Lehman Arising from the $277 Million
               SunCal Communities I Loan ............................................................... 5
          2.   The $95 Million Fraudulent Conveyance Claim Against
               Lehman Commercial Arising from the Ritter Ranch Mez Loan ......... 6
          3.   The Debtors' Fraud Claims Against the Lehman Entities
               Arising from Interim Loan and Restructuring Agreement
               that Bound all of the Debtors Under Lehman's Control ..................... 7
          4.   Lehman's Ongoing Manipulation of the Bankruptcy System
               to Continue Its Fraud on Creditors .................................................... 8
          5.   Lehman's Blatant Money Grab of $3.4 Million ................................. 9
     C.   The Debtors' Adversary Proceeding Against Lehman .................................. 9
     D.   The Debtors' Chapter 11 Plan and the Lehman Adversary Proceeding ................... 10
     E.   Lehman Commercial Has Used Its Automatic Stay as a Sword
          Against the Debtors ....................................................................................... 11

III. ARGUMENT ............................................................................................................. 
     A.   Because the Validity of Lehman's Liens Are Subject to a
          Bona Fide Dispute, Lehman Cannot Prove that the Debtors'
          Estates Lack Equity in the Subject Projects and Lehman Is Not
          Entitled to Adequate Protection .................................................................... 14
     B.   Lehman's Secured Claims Are Subject to Equitable
          Subordination and the Liens Securing Those Claims Should
          Be Transferred to the Estate .......................................................................... 17
          1.   Lehman's Inequitable Conduct ......................................................... 18
          2.   Lehman's Inequitable Conduct Substantially
               Harmed Creditors .......................................................................... 23
          3.   Equitable Subordination Is Not Inconsistent with
               the Bankruptcy Code ...................................................................... 24
     C.   This Court May Determine that Proposed Amended Complaint
          Subordinating Lehman Commercial's Lien & Renewal of the
          Cash Collateral Motion Does Not Violate Lehman Commercial's
          Automatic Stay ............................................................................................. 24
     D.   Lehman Is Not Entitled to Relief Pursuant to § 362(d)(1), Pending
          a Determination of the Extent and Validity of Its Liens in the
          Equitable Subordination Action .................................................................... 27
     E.   Lehman Is Not Entitled to Relief Pursuant to § 362, Where Its
          Collateral Is Admittedly Worthless ............................................................. 28

MAINDOCS-#126738-v3-SCCOmnibusOppReRFS.DOC

## TABLE OF CONTENTS

### (Continued)

|  |  | PAGE |
|---|---|---|
| F. | The Lehman Entities Are Not Entitled to Relief Pursuant to Section 362(d)(2) | 30 |
| | 1. The Amount of Equity Is in Dispute | 30 |
| | 2. The Projects Are Necessary for the Debtor's Reorganization, and the Debtors Have Filed a Plan that Has a Reasonable Possibility of Being Confirmed Within a Reasonable Time | 31 |
| G. | Lehman Is Not Entitled to Relief from Stay Pursuant to § 362(d)(3) | 32 |
| H. | Alternatively, the Court Should Condition any Relief Upon a Level Playing Field, Preventing Lehman from Using its Stay as a Sword to Thwart the Debtors' Reorganization | 34 |
| IV. | CONCLUSION | 36 |

MAINDOCS-#126738-v3-SCCOmnibusOppReRFS.DOC

# TABLE OF AUTHORITIES

**PAGE**

**Cases**

Hunt v. Bankers Trust,
    799 F.2d 1060 (5th Cir.1986) .................................................................................25

In re 604 Columbus Ave. Realty Trust,
    968 F.2d 1332 (1st Cir.1992)..........................................................................18, 21

In re 80 Nassau Associates,
    169 B.R. 832 (Bankr. S.D.N.Y. 1994) ..................................................................18

In re 9281 Shore Road Owners Corp.,
    187 B.R. 837 (E.D.N.Y. 1995) .......................................................................16, 17

In re Aluminum Mills Corp.,
    132 B.R. 869 (Bankr. N.D. Ill. 1991) ...................................................................20

In re American Lumber Co.,
    5 B.R. 470 (D.C. Minn. 1980) .......................................................................18, 19

In re American Mariner Industries, Inc.,
    734 F.2d 426 (9th Cir. 1984) ...............................................................................29

In re Baldwin-United Corp.,
    765 F.2d 343 (2d Cir. 1985)..................................................................................24

In re Bessey,
    65 B.R. 638 (Bankr.S.D.Cal. 1986) .....................................................................29

In re Beverages International, Ltd.,
    50 B.R. 273 (Bankr. D.Mass. 1985) .....................................................................23

In re Bialac,
    694 F.2d 625 (9th Cir. 1982) ...............................................................................14

In re Calore Exp. Co., Inc.,
    288 F.3d 22 (1st Cir. 2002).................................................................................30

In re Chicoine,
    97 B.R. 30 (Bankr.D.Mont. 1988) .......................................................................25

In re Clowser,
    39 B.R. 883 (Bankr.E.D.Va. 1984)......................................................................34

In re Con Am Grandview Associates, L.P.,
    179 B.R. 29 (S.D.N.Y. 1995)................................................................................32

MAINDOCS-#126738-v3-SCCOmnibusOppReRFS.DOC

# TABLE OF AUTHORITIES

## (Continued)

**PAGE**

In re Dino & Artie's Automatic Transmission Co., Inc.,
    68 B.R. 264 (Bankr.S.D.N.Y. 1986) ....................................................... 14, 27

In re Enterprise Acquisition Partners, Inc.,
    319 B.R. 626 (9th Cir.BAP 2004) .................................................................. 19

In re Financial News Network,
    158 B.R. 570 (S.D.N.Y. 1993) ....................................................................... 26

In re First Alliance Mortg. Co.,
    471 F.3d 977 (9th Cir. 2006) .......................................................................... 18

In re Fort Ann Express,
    226 B.R. 746 (N.D.N.Y. 1998) ...................................................................... 19

In re Fortune Natural Resources Corp.,
    350 B.R. 693 (Bankr.E.D.La. 2006) ............................................................. 19

In re GTI Capital Holdings, LLC,
    2007 WL 2493671, 17 (Bankr.D.Ariz. 2007) ................................................ 20

In re Heartland Chemicals Inc.,
    103 B.R. 1012 (Bankr. C.D. Ill. 1989) ......................................................... 20

In re Hedged-Investments Associates, Inc.,
    380 F.3d 1292 (10th Cir. 2004) ..................................................................... 18

In re Kaplan Breslaw Ash, LLC,
    264 B.R. 309, fn 64 (Bankr. S.D.N.Y. 2001) ................................................ 14

In re KDI Holdings,
    277 B.R. 493 (S.D.N.Y. 1999) ....................................................................... 19

In re Lopez-Soto,
    764 F.2d 23 (1st Cir. 1985) ...................................................................... 29, 30

In re Mahan,
    373 B.R. 177 (Bankr.M.D.Fla. 2007) ........................................................... 24

In re Meade,
    1999 WL 33496001, *1 (E.D.Pa. 1999) ....................................................... 26

In re Merrick,
    175 B.R. 333 (9th Cir. BAP 1994 ..................................................... 25, 26, 27

# TABLE OF AUTHORITIES

## (Continued)

**PAGE**

In re Metiom,
 301 B.R. 634 (Bankr.S.D.N.Y. 2003) ............................................................26, 27

In re Metropolitan Plant & Flower, Inc.,
 1997 WL 638454, 5 (N.D.Ill. 1997) ...................................................................25

In re Mr. R's Prepared Foods, Inc.,
 251 B.R. 24 (Bankr. D. Conn. 2000) ............................................................15, 16

In re Osborne,
 42 B.R. 988 (W.D. Wis. 1984) ...........................................................................20

In re Pacific Exp.,
 69 B.R. 112 (9th Cir. BAP 1986) ........................................................................18

In re Poughkeepsie Hotel Assoc. Joint Venture,
 132 B.R. 287 (Bankr. S.D.N.Y. 1991) ...........................................................14, 15

In re PRS Ins. Group,
 331 B.R. 580 (Bankr.D.Del. 2005) .....................................................................26

In re Senior Cottages of America, LLC,
 320 B.R. 895 (Bankr.D.Minn. 2005) ..................................................................25

In re Springs Hospitality,
 2006 WL 2458679, 9 (Bankr.D.Colo. 2006) ......................................................15

In re T. E. Mercer Trucking Co.,
 16 B.R. 176 (Bankr. Tex. 1981) .........................................................................18

In re Topgallant Lines, Inc.,
 1993 WL 13004125, *2 (Bankr.S.D.Ga. 1993) .............................................14, 35

In re Universal Farming Industries,
 873 F.2d 1334 (9th Cir. 1989) ............................................................................17

In re Waste Alternatives, Inc.,
 171 B.R. 147 (Bankr.M.D.Fla. 1994) ...........................................................16, 35

In re Wheatfield Business Park,
 308 B.R. 463 (9th Cir. BAP 2004) ................................................................25, 26

Int'l Distribution Centers v. Walsh Trucking,
 62 B.R. 723 (S.D.N.Y. 1986) .............................................................................34

MAINDOCS-#126738-v3-SCCOmnibusOppReRFS.DOC

# TABLE OF AUTHORITIES

## (Continued)

PAGE

Lockyer v. Mirant,
     398 F.3d 1098 (9th Cir. 2005) ..................................................................................25

Matter of Pizza of Hawaii, Inc.,
     761 F.2d 1374 (9th Cir. 1985) ..................................................................................25

N.L.R.B. v. Edward Cooper Painting,
     804 F.2d 934 (6th Cir. 1986) ...................................................................................25

National Bank of Commerce of El Dorado v. McMullan (In re McMullan),
     196 B.R. 818 (Bankr. W.D. Ark. 1996)...................................................................28

Reorganized CF & I Fabricators of Utah,
     518 U.S. 213 (1996)...........................................................................................22, 24

Stoumbos v. Kilimnik,
     988 F.2d 949 (9th Cir. 1993) .......................................................................18, 22, 23

Turner Broadcasting v. Sanyo Elec.,
     33 B.R. 996 (D.Ga. 1983) ........................................................................................34

U.S. v. Rose,
     104 F.3d 1408 (1st Cir. 1997)..................................................................................28

United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.,
     484 U.S. 365 (1988)...........................................................................................29, 30

United States v. Noland,
     517 U.S. 535 (1996).................................................................................................24

Zink v. Vanmiddlesworth,
     300 B.R. 394 (N.D.N.Y. 2003) ................................................................................28

**Statutes**

11 U.S.C. § 101(31) ...............................................................................................................19
11 U.S.C. § 362(a) .................................................................................................................24
11 U.S.C. § 362(a)(1)........................................................................................................26, 27
11 U.S.C. § 362(a)(3)........................................................................................................26, 27
11 U.S.C. § 362(b) .................................................................................................................24
11 U.S.C. § 362(d) ......................................................................................................14, 15, 24
11 U.S.C. § 362(d)(1)........................................................................................................27, 30
11 U.S.C. § 362(d)(2)..........................................................................................................2, 30
11 U.S.C. § 362(d)(3)...............................................................................................2, 3, 32, 33
11 U.S.C. § 363.........................................................................................................................3

# TABLE OF AUTHORITIES

## (Continued)

**PAGE**

11 U.S.C. § 363(f).................................................................................................35
11 U.S.C. § 364(d)..................................................................................................3
11 U.S.C. § 502(d)................................................................................................26
11 U.S.C. § 506(a)............................................................................................2, 29
11 U.S.C. § 506(d)............................................................................................2, 29
11 U.S.C. § 510(c)....................................................................1, 15, 16, 17, 20, 26
11 U.S.C. § 510(c)(2)...........................................................................................17
11 U.S.C. § 547....................................................................................................26
11 U.S.C. § 549....................................................................................................26

**Rules**

LBR 9013-1(f)................................................................................................... viii

MAINDOCS-#126738-v3-SCCOmnibusOppReRFS.DOC

1 | **TO THE HONORABLE ERITHE A. SMITH, UNITED STATES BANKRUPTCY JUDGE:**

2 |       Debtors Palmdale Hills Property, LLC, SCC/Palmdale, LLC, SunCal Summit Valley, LLC,

3 | SunCal Emerald Meadows LLC, SunCal Bickford Ranch, LLC, Acton Estates, LLC, SunCal

4 | Communities I, LLC, seven of the 17 above-captioned Debtors and Debtors-in-Possession (the

5 | "Opposing Debtors"), in their administratively consolidated Chapter 11 cases, submit their Omnibus

6 | Opposition (the "Opposition") to the Motions for Relief From the Automatic Stay Under 11 U.S.C.

7 | § 362 (the "Motions"), filed by Lehman Commercial Paper, Inc. ("Lehman Commercial") and

8 | Lehman ALI, Inc. ("Lehman ALI") (collectively, "Lehman"), the following memorandum of points

9 | and authorities, and the Declaration of Bruce V. Cook ("Cook Declaration"), the Declaration of Skip

10 | Miller ("Miller Declaration"), the Declaration of Frank Faye ("Faye Declaration") and the Declaration

11 | of Paul J. Couchot ("Couchot Declaration"), and the Request for Judicial Notice filed separately in

12 | support hereof.

13 |       PURSUANT TO LOCAL BANKRUPTCY RULE 9013-1(f), ANY REPLY TO THIS

14 | OPPOSITION MUST BE FILED WITH THE COURT NOT LATER THAN SEVEN (7)

15 | CALENDAR DAYS PRIOR TO THE HEARING ON THE MOTION.

16

17

18

19

20

21

22

23

24

25

26

27

28

MAINDOCS-#126738-v3-SCCOmnibusOppReRFS.DOC

# I.

## **INTRODUCTION**

Lehman's Motions drips with irony.  It was Lehman's promises to pay that induced creditors to provide millions of dollars of work on the Debtors' Projects, and Lehman's refusal to pay for that work that caused Debtors' insolvency in the first place.  Yet once Debtors were loaded with this debt, Lehman tried to prevent Debtors from seeking protection in bankruptcy.  Now that the Debtors are bankrupt, Lehman has done everything in its power to prevent them from paying the creditors that Lehman fraudulently induced.  Lehman has opposed relief from stay in *its* bankruptcy proceedings to facilitate salvaging the Projects for the creditors' benefit, yet now seeks relief from Debtors' stay in order to foreclose on those very same Projects.  Lehman seeks this relief, even though doing so would deprive Debtors of the opportunity to equitably subordinate Lehman's claims based on its wrongful conduct.  And Lehman argues that stay relief is proper because it is not adequately protected, yet Lehman is the one who has blocked all of the efforts to maintain and preserve the Projects.

Lehman's requested relief would not only be a perversion of justice on the facts, it is unsupported by law.  Lehman's position puts the cart before the horse:  if and only if the equitable subordination claim has been resolved can it be known if Lehman *has* valid liens upon which to foreclose.  Thus, much of Lehman's arguments and supporting authority are simply irrelevant.

Specifically, Lehman's Motions should be denied for the following reasons:

1.    As to all of the Lehman Loans forming the basis of Lehman's Motion, Lehman's inequitable conduct entitles the Debtors to completely subordinate Lehman's claims and cause Lehman's liens to be transferred to the Debtors' estates.  Furthermore, Lehman Commercial's argument that its automatic stay prevents the Debtors from pursuing an equitable subordination action against Lehman Commercial is incorrect.  Lehman's Motion constitutes a classic "informal proof of claim" under applicable Ninth Circuit case law and, in such case, equitable subordination actions do not violate the automatic stay.  Consequently, as lienholders with liens subject to complete avoidance pursuant to Bankruptcy Code Section 510(c), Lehman is not entitled to relief from stay until a final determination has been made as to the validity and extent of their liens;

1        2.     Lehman is not entitled to relief from the automatic stay against any of the opposing

2    Debtors based on either the $30 million Bickford Second Lien Loan (as defined in the Motion), or

3    the $95 million Ritter Ranch Mez Loan (as defined in the Motion), as the purported liens are void

4    pursuant to Bankruptcy Code § 506(a) and (d).  Lehman's Memorandum concedes that there is no

5    value supporting such junior liens.  It is well established that liens on valueless collateral are not

6    entitled to adequate protection nor entitle to relief from stay;

7        3.     As to the $277,742,750 SunCal Communities I loan (as defined in the Motion) and the

8    $95 million Ritter Ranch loan (assuming it is not void), Lehman has failed to prove a *prima facie*

9    case for relief from the automatic stay against any of the Opposing Debtors.  Lehman has failed to

10    prove the amount of its claims against the opposing Debtors since, as Lehman's own loan

11    documents show, such purported claims are fraught with fraudulent conveyances that reduce the

12    amount of such claims;

13        4.     Similarly, because of Lehman's fraudulent and inequitable conduct, the Opposing

14    Debtors have a valid affirmative defense to the Motion, such that Lehman cannot meet its burden to

15    prove that the Opposing Debtors' estates' lack equity in their real properties under Bankruptcy Code

16    Section 362(d)(2).

17        5.     In addition, the Opposing Debtors' real properties are valuable to their estates, and

18    absolutely necessary for the Debtors' joint plan (the "Plan"), which has now been filed with the

19    Bankruptcy Court and addresses all twenty-six of the Debtors and all twenty one of the Debtors'

20    Projects.  Therefore, the Lehman Entities are not entitled to relief from the automatic stay pursuant

21    to Bankruptcy Code Section 362(d)(2);

22        6.     As stated, all of the Debtors have now filed their Plan within 90 days of each of their

23    respective petition dates and the Plan has a reasonable <u>probability</u> of being confirmed.  The Plan

24    seeks to equitably subordinate the Lehman claims to those of the Debtors' unsecured creditors,

25    transfer Lehman's liens to the Debtors estates, substantively consolidate all of the Debtors' estates,

26    and sell all of the subject real properties for the benefit of all of the Debtors' creditors.  Therefore,

27    Lehman is not entitled to relief from the automatic stay under Bankruptcy Code Section 362(d)(3);

28

MAINDOCS-#126738-v3-SCCOmnibusOppReRFS.DOC

7.    Even assuming *arguendo* that (a) Lehman Commercial's claim cannot be subordinated without violating Lehman Commercial's automatic stay, and (b) the Debtors cannot obtain relief from stay from the New York Bankruptcy Court, the mere subordination of liens of the Lehman Lenders who are not in Chapter 11 (e.g., Lehman ALI, OVC Holdings LLC, and Northlake Holding LLC) will generate sufficient funds to pay all non-subordinated creditors in full; and

8.    Lehman Commercial has actively used its own bankruptcy proceeding and automatic stay as a sword, rather than a shield, against the Debtors in these Chapter 11 proceedings.[1]  In order to create a more level playing field to allow these cases to move forward in a more efficient manner, the Debtors propose, in the alternative to outright denial of Lehman's Motions, the following conditional modification of the stay:

- The Debtors' automatic stay is lifted to allow Lehman to record a Notice of Default as to each of the respective Projects.

- The Debtors' automatic stay shall remain in effect as to any notice of sale and/or foreclosure; however, such stay shall be lifted upon entry of a final judgment in the Equitable Subordination Action, in the event that the Debtors do not prevail in such action.

- The above relief from stay would be expressly conditioned upon Lehman Commercial stipulating to relief from stay in its bankruptcy proceeding (i) allowing the Debtor(s) to seek equitable subordination of Lehman Commercial's claim pursuant to either an adversary proceeding and/or a Chapter 11 plan, (ii) allowing the Debtors to bring a motion for use of cash collateral and/or surcharge in these Chapter 11 proceedings, and (iii) allowing the Debtors to seek to sell one or more of the Projects pursuant to 11 U.S.C. §363 via either a motion or a Chapter 11 plan.

---

[1] Lehman Commercial asserts cause for relief from stay *inter alia* because the Projects are not being adequately maintained and the Debtor's cannot reorganize.  However, Lehman Commercial has actively used its automatic stay as a sword, by taking the following actions: (a) Lehman Commercial successfully opposed the Debtors' motion for relief from stay before the New York Bankruptcy Court to allow the Debtors to seek a priming lien under §364(d) in these Chapter 11 cases; (b) Lehman Commercial moved the New York Bankruptcy Court to enforce its automatic stay to block the Debtors' motion for use of cash collateral, and (c) now Lehman Commercial contends that the Debtors cannot seek to equitably subordinate Lehman Commercial's claim without violating its automatic stay.  The Debtors disagree with Lehman Commercial's contention that its automatic stay is violated by the Debtor's pursuit of use of cash collateral and prosecution of an equitable subordination action, as set forth in detail below.

MAINDOCS-#126738-v3-SCCOmnibusOppReRFS.DOC

1  For all of the above reasons, as discussed in detail herein, the Debtors respectfully request that

2  the Court deny Lehman's Motions, or condition such relief as proposed herein.

3  **II.**

4  **FACTUAL BACKGROUND**

5      **A.**    **The SunCal Companies and the Debtors**.

6  All seventeen of the above-jointly administered Chapter 11 debtors (the "Voluntary

7  Debtor(s)") are part of an integrated network of companies that operate under the common dba "the

8  SunCal Companies" or "SunCal." SunCal is a family-owned business that has been in the land

9  development business for over seventy years.

10  The Debtors were formed as part of a joint venture to develop twenty-one residential real estate

11  Projects with affiliates of Lehman Brothers, Inc. ("Lehman"). The Voluntary Debtors filed voluntary

12  petitions beginning on November 6, 2008, and there are also nine related Chapter 11 Debtors that had

13  involuntary Chapter 11 petitions filed against them and are now represented by their Court-appointed

14  Chapter 11 trustee, Mr. Steven Speier (the "Trustee Debtors"). The Voluntary Debtors and the Trustee

15  Debtors are hereafter collectively referred to as the "Debtors". All of the Debtors have a common

16  indirect parent, SunCal Acquisitions, LLC ("Acquisitions") and all of the Debtors have SunCal

17  Management, LLC ("SunCal Management") as their management company.

18  SunCal's business focuses primarily upon the "development" of residential land. A typical

19  SunCal development begins with the acquisition of one or more parcels of raw land. Thereafter, the

20  SunCal team develops a master plan for the acreage that incorporates streets, homes, parks, schools

21  and commercial areas, and then it works with the applicable municipal planning authorities (city,

22  county, state and federal authorities) to secure the necessary approvals or "entitlements" to achieve

23  this plan. This process, which requires the assistance of land planners, civil engineers, architects,

24  lawyers, and other land specialists, takes a period of years. Once the required entitlements to use are

25  approved, SunCal provides for the engineering and grading of the project, and the installation of the

26  foundational infrastructure (streets, utilities, etc.) and then sells the lots or parcels within the project to

27  merchant builders.

28

MAINDOCS-#126738-v3-SCCOmnibusOppReRFS.DOC

SunCal historically financed its projects with land acquisition and development loans from a number of different lenders and/or internal equity or third party equity partners. However, several years ago, SunCal formed a much closer relationship with Lehman who quickly became SunCal's largest funding source, providing over $2.3 billion in financing through a series of loan agreements and equity arrangements on the Debtors Projects.

The two Lehman affiliates that made loans to the Debtors were Lehman ALI and Lehman Commercial. Initially, SunCal acted as the developer/operator for all of the Projects and Lehman as the financing source, and in the case of the Trustee Debtors, Lehman was also an equity partner.

**B.**     **Lehman's Manipulative Lending Practices and Fraudulent Actions Against the Debtors and Their Creditors.**

Since 2005, the structure of Debtors' loan arrangements with Lehman, and the manner in which the loan proceeds were disbursed, created a web of liens, guarantees and fraudulent conveyance claims against Lehman that are completely ignored in Lehman's Motions.

1.     The Debtors' $273 Million Fraudulent Conveyance Actions Against Lehman Arising from the $277 Million SunCal Communities I Loan.

In November of 2005, Lehman Commercial as lender and SunCal Communities I as borrower entered into a Credit Agreement that provided for a $75 million loan facility (the "SunCal Communities I Loan"), which increased over time to approximately $395 million and thereafter was reduced to approximately $277 million. The proceeds from this loan were used to fund projects owned by Acton, Beaumont, Johannson Ranch, Emerald Meadows Ranch, Bickford Ranch and Summit Valley and other projects. However, the loan was secured by liens against the Projects owned by Emerald Meadows, Bickford Ranch and Acton, a pledge of SunCal Communities I's ownership interest in its subsidiaries Acton, Beaumont, Bickford Ranch, Emerald Meadows, Johannson Ranch, and Summit Valley, a pledge of Summit Valley's ownership interest in its subsidiaries Kirby Estates and Seven Brothers, as well as a pledge of other Projects.

The funds advanced under the $277 million SunCal Communities I Loan to SunCal Communities I, Acton, Emerald Meadows, Beaumont, Johannson Ranch, Bickford Ranch, Summit

1  Valley, Kirby Estates and Seven Brothers varied, with some of these Debtors receiving more, others

2  receiving less.

3  However, on November 17, 2006, Lehman added SunCal Communities III as an obligor to the

4  $277 million SunCal Communities I loan.  At the time this occurred, SunCal Communities III owned

5  North Orange Del Rio, LLC ("Del Rio") and other Projects.  *Since the balance owing on the*

6  *$277 million SunCal Communities I Loan was $273M when SunCal Communities III was added as an*

7  *obligor, a $273M liability was effectively added to the balance sheet of SunCal Communities III,*

8  *without a penny of offsetting value.*  Later amendments to this loan would increase the outstanding

9  balance to $395M, yet SunCal Communities III and its subsidiaries would never receive any of these

10  funds or any other consideration.

11  By cross-collateralizing the $277 Million Loan among the original obligors, Lehman created

12  fraudulent conveyance claims.  By later adding Communities III to the loan, Lehman created a $273 M

13  fraudulent transfer claim in favor of SunCal Communities III and it subsidiaries against Lehman.

14  These fraudulent conveyance claims are highly relevant to these Motions as Lehman's own

15  documentation reduces its claims against these subsidiaries by any portion that constitutes a fraudulent

16  conveyance.  However, Lehman's moving papers completely ignore these provisions in their own loan

17  documents.  Lehman's claims against Emerald Meadows, Acton, Johannson, Bickford, Summit,

18  Beaumont, Kirby, and Seven Brothers and Palmdale have not been proven in light of these clear

19  fraudulent conveyances that these subsidiaries have that would effectively reduce the obligation.

20      2.    The $95 Million Fraudulent Conveyance Claim Against Lehman Commercial Arising

21          from the Ritter Ranch Mez Loan.

22  In March of 2007, SCC Palmdale and Lehman entered into that certain Mezzanine Credit

23  Agreement pursuant to which Lehman made a $95 million loan (the "Ritter Ranch Mez Loan").

24  Although this loan was made to SCC Palmdale, and although it was secured by SCC Palmdale's

25  ownership interest in Palmdale Hills, the loan proceeds were used by Lehman to make a paydown on

26  the $277 million SunCal Communities I Loan that did not involve SCC Palmdale or Palmdale Hills.

27  This lending arrangement, as structured, created a $95 million claim in favor of the creditors of

28  SCC Palmdale and Palmdale Hills against Lehman since the creditors of SCC Palmdale were seeing

-6-

1   their obligor pick up a $95 million liability for no consideration.  Again, Lehman fails to address these

2   clear fraudulent conveyances in its Motion.

3           3.      The Debtors' Fraud Claims against the Lehman Entities arising from Interim Loan

4                   and Restructuring Agreement that bound all of the Debtors under Lehman's Control.

5           Although Lehman began its role in the joint venture primarily as a lender and equity partner,

6   after the bursting of the California real estate market in or around the middle of 2007, Lehman took

7   over effective control of all of the material aspects of the Debtors' operations - without regard as to

8   which Lehman affiliate was the lender and without regard as to whether a Lehman affiliate was an

9   equity member.  The practical instruments through which Lehman exercised control over the Debtors,

10  and through which Lehman ultimately created a plethora of unfunded cross entity obligations, were the

11  October 2007 Interim Loan Agreement and the May 23, 2008 Restructuring Agreement.  The specific

12  objectives that Lehman sought to achieve through these two agreements were the following:

13          a.  Induce the Debtors' vendors and service providers, including SunCal, to continue

14              performing critical services on the most valuable projects in the portfolio (the "Key Projects")

15              based on assurances of payments, thereby preserving the value of the same until they were

16              transferred to a new Lehman controlled entity; and

17          b.  Create new Lehman owned and controlled entities into which the Key Projects could be

18              transferred and then to effectuate these transfers.

19          The Interim Loan nominally provided a $20 million loan facility to Acquisitions originally

20  intended to be used for operations of Acquisitions.  However, Lehman maintained complete control

21  over the use of the funds in this facility, and dictated that in large part such funds be used for the

22  purposes of funding all of the Debtors.  By this point in time, Lehman was effectively taking control

23  over all of the Debtors. Eventually a team of project professionals employed by SunCal Management

24  would meet with a Lehman representative or representatives on a weekly basis or more.  At these

25  meetings, Lehman would unilaterally dictate what future work would proceed (the "Authorized

26  Work") and it would promise to pay for the same when it was completed. Lehman also decided what

27  payables were "urgent" (the "Urgent Payables") and hence had to be paid promptly to avoid severe

28  consequences and what other payables could be deferred (the "Deferred Payables").

1  Unfortunately this control and payment regime did not work out as planned or anticipated.

2  Even where Lehman agreed to fund the Urgent Payables, it later ignored SunCal Management's

3  repeated requests for payment when performance was due, yet it continued to authorize more work

4  and to promise payment. When it came time for Lehman to pay the Authorized Work it reneged in

5  many instances.

6  As to the Deferred Payables, Lehman promised that its agent, Radco, would meet with vendors

7  and negotiate mutually satisfactory discounted payment arrangements with the unpaid vendors.

8  Although Radco initially purported to play this role, Lehman only paid a fraction of these claims.

9  Lehman's funding practices, dictatorial control over the Projects' operations, and breach of its

10  funding obligations created a common layer of unpaid unsecured debt that now burdens all of the

11  Debtors' estates in the estimated amount of $100 million. Furthermore, human lives and property are

12  being put at risk from situations as diverse as: (a) potential levee failures, (b) airborne friable

13  asbestos, (c) failure to provide dust and erosion control measures, (d) possible brush fires in densely

14  populated areas during peak periods of the California fire season due to the failure to fund brush

15  control, and (e) failure to provide adequate storm water control. In addition, the condition and value

16  of the assets are wasting; fines have been assessed or threatened to be assessed due to the projects'

17  violation of governmental permits; entitlements are at risk; availability of resources such as water are

18  at risk; governmental bonds are being called; and taxes and insurance are going unpaid.

19  4.  Lehman's Ongoing Manipulation of The Bankruptcy System To Continue Its Fraud

20  on Creditors.

21  The intentional and malign nature of the actions taken by Lehman in this case is further

22  confirmed by the following course of conduct. Shortly before or after the execution of the May 2008

23  Restructuring Agreement, Lehman Commercial transferred all of its deeds of trust on the Debtors'

24  Projects to Lehman ALI as Lehman ALI purportedly became the primary lender under the

25  Restructuring Agreement. Yet shortly before Lehman Commercial's Chapter 11 filing, Lehman ALI

26  transferred back to Lehman Commercial all of the collateral that Lehman Commercial had transferred

27  to Lehman ALI as part of the Restructuring Agreement. These transfers largely affected the Debtors

28  where a SunCal entity held control, and hence the ability to file a voluntary bankruptcy proceeding. In

1    contrast, in those cases where Lehman had the ability to block a Chapter 11 filing, Lehman ALI

2    retained the loans, since a Lehman bankruptcy stay was apparently deemed unnecessary.

3         The objective of this bad faith stratagem is obvious. Lehman has used Lehman Commercial's

4    automatic stay to thwart any reorganization effort of the voluntary cases, with the end-game being a

5    foreclosure that would eliminate the very claims created by Lehman's fraud.

6         As to the Trustee Debtors, Lehman invoked its equity affiliates' corporate veto power over the

7    Trustee Debtors' ability to file voluntary Chapter 11 proceedings in an attempt to thwart these filings.

8    This stratagem forced the unsecured creditors holding claims against these entities to file involuntary

9    proceedings to stop Lehman initiated foreclosures, which, <u>again,</u> would eliminate the very claims that

10   were created through Lehman's fraud.

11        5.    <u>Lehman's Blatant Money Grab of $3.4 Million.</u>

12        Not only did Lehman make repeated promises to fund project expenses and failed to do so, just

13   before the filing of the involuntary petitions against the Trustee Debtors, Lehman secretly swept

14   $3.4 million of funds from restricted accounts that had been specifically established to meet certain

15   needs of SunCal Marblehead and SunCal Heartland.

16        **C.**    **<u>The Debtors' Adversary Proceeding Against Lehman.</u>**

17        On January 6, 2009, the Voluntary Debtors and others filed an adversary proceeding against

18   Lehman ALI and other Lehman affiliates requesting, amongst other relief, that Lehman ALI's claim

19   be equitably subordinated and to have Lehman ALI's liens transferred to the Debtors' estates

20   ("Equitable Subordination Action"). On February 3, 2009, a first amended complaint was filed

21   adding the Trustee of the Trustee Debtors as an additional plaintiff.

22        The Debtors have prepared a further amended complaint to include, among other things,

23   Lehman Commercial as an additional defendant under the equitable subordination cause of action (the

24   "Proposed Amended Complaint"). A copy of the Proposed Amended Complaint is attached as exhibit

25   "1" to the Miller Declaration. Upon a determination that Lehman Commercial's automatic stay is

26   either lifted or does not apply, the Debtors will file the Proposed Amended Complaint.

27        Lehman contends that "the Debtors would need to obtain relief from the automatic stay in the

28   LCPI Bankruptcy Case in order to add LCPI as a defendant in the Equitable Subordination Action..."

1   Memorandum, 19:26-27.  As noted in more detail below, this Court has concurrent jurisdiction to

2   determine whether adding Lehman Commercial as a defendant in the Equitable Subordination Action

3   falls within the scope of Lehman Commercial's automatic stay.  Accordingly, the Debtors herein

4   request that this court determine that Lehman Commercial's automatic stay does not prevent the

5   filing, service and prosecution of the Proposed Amended Complaint.

6       **D.    The Debtors' Chapter 11 Plan and the Lehman Adversary Proceeding**.

7           On February 4, 2009, the Voluntary Debtors filed their joint Chapter 11 Plan ("Plan") and Joint

8   Chapter 11 Disclosure Statement.  See Exhibits "1" and "2" attached to Request for Judicial Notice. On

9   behalf of all twenty-six Debtors, the Plan provides for the following:

10          1.  Equitable subordination of Lehman's claims to the claims of unsecured creditors and

11      the transfer of Lehman liens to the Debtors' estates;

12          2.  A sale of the Debtors' assets free and clear of all liens;

13          3.  Substantive consolidation of all twenty six (26) of the Debtors' estates; and

14          4.  Payment of the claims of all of the Debtors' creditors from the sales proceeds.

15          The Debtors' plan is clearly feasible.  As mentioned, the Equitable Subordination Action seeks

16  to, among other things, equitably subordinate all of Lehman's claims and transfer all of Lehmans'

17  liens to the Debtors' estates.  The Debtors are also negotiating with a potential "stalking horse"

18  purchaser of all of the Debtors' Projects for prices sufficient to pay all of the Debtors' unsecured

19  creditors in full in addition to a return to Lehman.  A hearing on the Disclosure Statement is set for

20  May 7, 2009, at 2:00 p.m.  Plan confirmation should, therefore, occur in the summer of 2009.

21          Even assuming *arguendo* that (a) Lehman Commercial's claim cannot be subordinated without

22  violating Lehman Commercial's automatic stay, and (b) the Debtors cannot obtain relief from stay

23  from the New York Bankruptcy Court, the mere subordination of liens of the Lehman Lenders who

24  are not in Chapter 11 (e.g., Lehman ALI, OVC Holdings LLC, and Northlake Holding LLC) should

25  generate sufficient funds, via the sales proposed in the Plan, to pay all non-subordinated creditors of

26  all of the Debtors in full.

27

28

1    **E.    Lehman Commercial Has Used it Automatic Stay as a Sword Against the Debtors**.

2    It is a fundamental principle of Bankruptcy law that the automatic stay is designed as a shield

3    for a debtor, and not as a sword.  Lehman Commercial has repeatedly used its automatic stay as a

4    sword to thwart the Debtors' reorganization, and is now using the same as "cause" in order to obtain

5    relief to foreclose on the Debtors' Projects.

6    On November 10, 2008, the Debtors, among other entities, filed a motion in the Bankruptcy

7    Court for the Southern District of New York ("New York Bankruptcy Court") for relief from stay on

8    Lehman Commercial's Chapter 11 Proceeding for an order to allow the Debtors to generally

9    administer their California Chapter 11 cases in order to avoid the need for having to file repeated relief

10    from stay motions in New York (the "NY Lift Stay Motion").  The NY Lift Stay Motion also

11    requested an expedited hearing for purposes of obtaining relief from the stay to allow the Debtors to

12    file a priming lien motion in California to address the public health and safety needs of the Projects,

13    because Lehman would not address them.  The NY Lift Stay Motion did not request a determination as

14    to what particular actions of the Debtors violate the automatic stay.

15    On November 18, 2008, Lehman Commercial filed an opposition to the NY Lift Stay Motion

16    vigorously opposing any broad based relief from stay for the Debtors' California bankruptcy

17    proceeding.  In effect, Lehman Commercial asserted that the Debtors must make repeated narrowly

18    tailored motions for relief from stay to the New York Bankruptcy Court as to each proposed action to

19    be taken in this California bankruptcy proceeding.  Thus, Lehman Commercial has advocated that for

20    every action or motion to be taken in California, the Debtors must go through a two step procedure,

21    first seeking relief before the New York Bankruptcy Court, and only if relief from stay is granted, may

22    the Debtors file the substantive motion or proceeding before the California Bankruptcy Court.  Not

23    only does Lehman Commercial wish to delay the progress of the Debtors' reorganization, but Lehman

24    Commercial also wishes to have two opportunities to oppose any action by the Debtors (first before

25    the New York Bankruptcy Court, and second before this California Bankruptcy Court).

26    At the hearing on November 20, 2008, the New York Bankruptcy Court (while not make any

27    findings as to what actions by the Debtors would violate Lehman Commercial's automatic stay) agreed

28

MAINDOCS-#126738-v3-SCCOmnibusOppReRFS.DOC

1   with Lehman Commercial's position, and denied the motion without prejudice to allow the Debtors to

2   file specific motions for specific relief.

3          On January 16, 2009, the Debtors filed a motion for an order authorizing surcharge or use of

4   cash collateral ("Cash Collateral Motion") which included *inter alia* the use of Lehman Commercial's

5   cash collateral.  The Debtors did not believe that the Cash Collateral Motion violated Lehman

6   Commercial's automatic stay because: (i) in the related Chapter 11 case before this Court involving

7   both SunCal and Lehman Commercial, In re LBREP/L-SunCal Master I LLC, Bankruptcy Case No.

8   8:08-bk-15588 ES, Lehman Commercial had not taken the position that use of its cash collateral

9   violated its automatic stay; (ii) at a Chapter 11 status conference in the instant cases held before this

10  Court on January 15, 2009, one of the primary topics of discussion was the Debtor's proposed use of

11  cash collateral; multiple counsels for Lehman Commercial were present who did not at any time raise

12  the issue of alleged applicability of Lehman Commercial's automatic stay in these protracted

13  discussions; and (iii) the Debtors believed that the Cash Collateral Motion was a defensive action

14  which did not involve Lehman Commercial's automatic stay (see case law in Section III(C) below).

15         Much to the Debtors' surprise, Lehman's Opposition to the Cash Collateral Motion invoked its

16  automatic stay.  In the Debtor's Reply, the Debtor cited well established case law that the California

17  Bankruptcy Court has concurrent jurisdiction to determine whether the Cash Collateral Motion

18  violated Lehman Commercial's stay, and also briefed the several legal arguments why Lehman's

19  automatic stay did not apply (see case law in Section III(C) below). *See* Debtor's Reply attached to

20  Request for Judicial Notice as Exhibit "3".  Accordingly, this California Bankruptcy Court could and

21  should have made the threshold determination as to whether the Cash Collateral Motion violated

22  Lehman Commercial's stay.  However, rather than allow this California Bankruptcy Court to decide

23  the issue, Lehman Commercial - in less than two hours within its receipt of the Debtors' Reply and

24  two court days before this Court had scheduled hearing on the matter - filed an emergency motion with

25  the New York Bankruptcy Court to Enforce the Automatic Stay ("Stay Enforcement Motion").  The

26  New York Bankruptcy Court then scheduled a telephonic meeting within an hour of the Debtors'

27  receipt of the Stay Enforcement Motion.  While the New York Bankruptcy Court again did not rule on

28  the applicability of the stay, it effectively forced the Debtors to take the Cash Collateral Motion off-

1    calendar, by stating that a hearing would be held the following court day which was one day prior to

2    the cash collateral hearing. *See* Couchot Declaration.

3         Now in the height of hypocrisy, Lehman's Motion contends that the Projects need additional

4    work and maintenance and are therefore depreciating in value, resulting in a lack of adequate

5    protection. *See* Memorandum 15:4-16:12. Lehman Commercial neglects to mention that these

6    problems with the Projects are the direct result of (i) Lehman's failure to fulfill its funding obligations

7    under the Restructuring Agreement, (ii) Lehman Commercial's opposition to the NY Lift Stay Motion

8    to allow the Debtors to seek a priming lien under §364(d) in order to preserve the Projects, and

9    (iii) Lehman Commercial's emergency motion before the New York Bankruptcy Court staying the

10    Debtors' Cash Collateral Motion to preserve the Projects. It is clearly hypocritical of Lehman to

11    contend that the Debtors are not maintaining the Projects when it is Lehman Commercial who is

12    aggressively utilizing its automatic stay to prevent the Debtors from maintaining the Projects.

13         Moreover, Lehman Commercial's Memorandum repeatedly suggests that the Debtors cannot

14    confirm a plan within a reasonable time in part because bringing the Equitable Subordination Action

15    against Lehman Commercial would violate its automatic stay. *See* Memorandum, 5:12-15, 19:9-12,

16    26-28. Accordingly, any delays are not the result of the actions of the Debtors, but rather the result of

17    Lehman's opposition to the NY Lift Stay Motion and Lehman's continuing refusal to stipulate to lift

18    its stay.

19         The Debtors disagree with Lehman's contention regarding the applicability of the stay, and, as

20    set forth below, ask this court to exercise its concurrent jurisdiction to determine that Lehman

21    Commercial's stay is not applicable to the Equitable Subordination Action (see case law in Section

22    III(C) below) nor the renewal of the Cash Collateral Motion. .

23

24

25

26

27

28

MAINDOCS-#126738-v3-SCCOmnibusOppReRFS.DOC

### III.

### ARGUMENT

**A.      Because the Validity of Lehman's Liens Are Subject to a Bona Fide Dispute, Lehman Cannot Prove that the Debtors' Estates Lack Equity in the Subject Projects and Lehman Is Not Entitled to Adequate Protection.**

Numerous courts, including the Ninth Circuit, hold that, on a motion for relief from the automatic stay, a court should consider affirmative defenses and counterclaims that directly involve the validity of a movant's security interest and/or the debtor's equity in the property. "When a debtor's affirmative defenses and counterclaims [to the creditor's motion for relief from stay] directly involve the question of the debtor's equity, they should be heard in the stay proceeding." In re Bialac, 694 F.2d 625, 627 (9th Cir. 1982); In re Kaplan Breslaw Ash, LLC, 264 B.R. 309, 327 fn 64 (Bankr. S.D.N.Y. 2001) (same); In re Poughkeepsie Hotel Assoc. Joint Venture, 132 B.R. 287, 291 (Bankr. S.D.N.Y. 1991).

> It is well-settled that when the court is made aware at a stay relief hearing that fundamental questions exist over the extent, validity, or priority of a movant's security interest it is appropriate to deny relief until such issues can be resolved in an adversary proceeding. [citing cases]

In re Topgallant Lines, Inc., 1993 WL 13004125, *2 (Bankr.S.D.Ga. 1993).

Indeed, the text of 11 U.S.C. § 362(d) dictates consideration of a challenge to the validity of the creditor's lien on a motion for relief from stay. "[W]hen the debtor's defense to a motion for relief from the automatic stay contests the validity of the creditor's lien ... the court should entertain this issue because it goes to the heart of the creditor's interest in the property.  This is so because 11 U.S.C. § 362(d) expressly provides that relief from the automatic stay with respect to property of the estate may be sought by 'a party in interest.' If the moving creditor does not have a lien on the property in question, it follows that the creditor is not 'a party in interest' as to such property." In re Dino & Artie's Automatic Transmission Co., Inc., 68 B.R. 264, 268 (Bankr.S.D.N.Y. 1986).

More specifically, courts have held that they must considered whether the moving creditor's secured claim is subject to equitable subordination, as an affirmative defense to motion for relief from the automatic stay. See, e.g., Poughkeepsie Hotel, 132 B.R. at 292-93; In re Mr. R's Prepared Foods,

-14-

Inc., 251 B.R. 24, 28 (Bankr. D. Conn. 2000).[2] For example, in Poughkeepsie Hotel, *supra*, the major secured creditor moved for relief from stay to enforce a foreclosure judgment. The trustee and an unsecured creditor opposed relief arguing the mortgage lien should be equitably subordinated pursuant to Code § 510(c). The sole issue before the court was "whether equitable subordination under Code § 510(c) may be asserted as a defense to a motion for relief from the automatic stay under Code § 362(d)." Id. at 289. The Court decided in the affirmative, reasoning as follows:

> The rationale for allowing the affirmative defense of equitable subordination to a motion for relief from the automatic stay is easily illustrated. Where a foreclosure action is pending, a debtor may file a bankruptcy petition or its creditors may commence an involuntary petition against the debtor to stay the foreclosure sale. Upon commencement of the bankruptcy case, the debtor and its unsecured creditors have a "variety of protections under the Bankruptcy Code to capture any equity in the property, subject to providing adequate protection to the secured creditor." These protections include ... Code § 510(c) (equitable subordination). Should, for example, the respondent to a motion for relief from the automatic stay prevail on an equitable subordination defense, the movant would be deprived of secured status, thereby creating equity for the benefit of the estate.

Poughkeepsie Hotel, 132 B.R. at 293 (quotations and citations omitted).

The Court in Poughkeepsie Hotel, held that while it was inappropriate to formally adjudicate the subordination of the lien in the context of a relief from stay hearing, the Court could and should consider equitable subordination in determining that creditor's right to relief. Poughkeepsie Hotel, at 293 ("While adjudication of the merits of potential counterclaims and affirmative defenses could seriously infringe upon the creditor's right to an expedited hearing, it is perfectly appropriate to acknowledge the presence of such claims in determining that creditor's equitable right to relief.") (quotation omitted). After concluding that the defense could be raised, the court continued for a final hearing to consider "the sufficiency of the defense". Id.

Similarly, in Mr. R's Prepared Foods, 251 B.R. 24 (Bankr.D.Conn. 2000), the moving creditors sought relief from stay to enforce their security interest. Certain "objectors" opposed relief from stay on the ground that the security interest should be equitably subordinated pursuant to Bankruptcy Code

---

[2] See also In re Springs Hospitality, 2006 WL 2458679, 9 (Bankr.D.Colo. 2006) ("Equitable subordination is a defense to a motion for relief from the automatic stay. In appropriate circumstances, bankruptcy courts will deny a motion for relief from stay for the purpose of litigating the subordination issue. This is proper because the subordination issue goes to the question of the Debtor's equity in its property and the moving creditor's status as a secured creditor.") (citation omitted).

§ 510(c).  Id. at 28.  The Court held that equitable subordination may be properly considered as an

affirmative defense to a motion for relief from stay, and that the motion should be denied where a

sufficient showing of the bona fides of the subordination claim is presented:

> While the objectors do not dispute the debtor's lack of equity or the validity of the
> movants' security interests, they assert, as an affirmative defense, that the security
> interests at issue should be equitably subordinated.  The affirmative defense of
> equitable subordination under Code § 510(c) may properly be asserted as a defense to
> a motion for relief from stay.  The issue is limited to whether the [objectors have]
> presented sufficient evidence of the bona fides of their claim for the court to deny the
> motion for relief from stay.

Mr. R's Prepared Foods, 251 B.R. at 28 (Bankr.D.Conn. 2000) (internal quotes & citations omitted).

For the same reasons, a secured creditor is not entitled to adequate protection pending a

determination of the validity of its lien.  In In re Waste Alternatives, Inc., 171 B.R. 147, 148

(Bankr.M.D.Fla. 1994), a secured creditor moved for relief from stay.  The committee challenged the

validity of the creditor's lien.  The Court held that while it may not determine the validity of the lien

in the context of a relief from stay motion, it may consider evidence of the invalidity of the lien "in

determining the appropriateness of requiring the parties to litigate the lien's validity at all *or the need*

*for adequate protection.*"  Id. at 148 (emphasis added).  The Bankruptcy Court lifted the automatic

stay "only to the extent that an action be filed in a court of competent jurisdiction to determine the

validity and extent of [creditor's] lien."  Id.  The Court concluded that it would not lift the stay to

allow foreclosure, nor grant adequate protection, until after the determination of the validity of the

creditor's lien:

> The complexity of the issues raised in opposition to [creditor's] motion requires, as
> stated in the Code, the filing of an adversary proceeding or a separate trial, *** [T]he
> resolution of [creditor's] lien is necessary before the Court can decide the merits of
> lifting the stay and allowing [creditor] to act upon the collateral. ...

Id. at 148.  Only after an adjudication of the validity and extent of the lien would the court determine

"(1) further modification of the automatic stay; or, (2) the need for adequate protection until a plan is

confirmed."  Id. at 149.

If Lehman is granted relief from stay to foreclose prior to an adjudication of Lehman's liens,

the Debtors will deprived "of a significant right" to seek equitable subordination.  As observed by the

court in In re 9281 Shore Road Owners Corp., 187 B.R. 837 (E.D.N.Y. 1995):

MAINDOCS-#126738-v3-SCCOmnibusOppReRFS.DOC

1
2
3

In this case, the Debtor has been summarily deprived of the right to try its equitable subordination claim on the merits in the only available forum, the Bankruptcy Court. This resulted in the deprivation of a significant right on behalf of the Debtor. The right to equitable subordination in a bankruptcy proceeding is so important that it has been adjudicated as a defense to a motion for relief from the automatic stay.

4    9281 Shore Road Owners, 187 B.R. at 854.

5    Here, the validity of the Lehman Entities' liens, and the estates' equity in the Projects are

6    subject to a bona fide dispute. Due to Lehman's pre-petition and post-petition inequitable

7    misconduct, the Debtors' estates are entitled to subordinate the Lehman Entities' claims and transfer

8    Lehman's liens to the Debtors' estates. (As discussed below, contrary to Lehman Commercial's

9    assertion, the automatic stay currently does not prevent the Debtors from filing an equitable

10   subordination action against Lehman Commercial.) Once the Debtors prevail in equitably

11   subordinating the Lehman Entities' liens through either the adversary proceeding or under the plan,

12   there will be substantial equity in the Projects, which will be made available for the benefit of the

13   Debtors' estates.

14   **B.    Lehman's Secured Claims Are Subject to Equitable Subordination and the Liens**

15   **Securing Those Claims Should Be Transferred to the Estate.**

16   Lehman asserts without citation that "there is no basis in law for subordinating [its] secured

17   claims." Memorandum, 5:1. Nothing could be further from the truth. It is well-settled that

18   "bankruptcy courts exercise broad equitable power to subordinate claims." See In re Universal

19   Farming Industries, 873 F.2d 1334, 1337 (9th Cir. 1989). Pursuant to § 510(c), the bankruptcy court

20   may "(1) under principals of equitable subordination, subordinate for purposes of distribution all or

21   part of an allowed claim to all or part of another allowed claim. . .; or (2) order that any lien securing

22   such a subordinated claim be transferred to the estate." 11 U.S.C. § 510(c). Section 510(c)(2)

23   provides that the Court may "order that any lien securing such a subordinated claim be transferred to

24   the estate." A lien transferred pursuant to 11 U.S.C. § 510(c)(2), is preserved for the benefit of the

25   estate, such that the trustee steps into the shoes of the subordinated creditor, thereby preventing junior

26   lienholders from improving their position.

27   Equitable subordination generally requires the three following findings: "(1) that the claimant

28   engaged in some type of inequitable conduct; (2) that the misconduct injured creditors or conferred

unfair advantage on the claimant; and (3) that the subordination would not be inconsistent with the Bankruptcy Code." In re First Alliance Mortg. Co., 471 F.3d 977, 1007 (9th Cir. 2006). The inequitable conduct justifying equitable subordination need not arise from the acquisition or assertion of the claim sought to be subordinated. See, In re Pacific Exp., 69 B.R. 112, 116 (9th Cir. BAP 1986).

"[T]here are generally three situations pursuant to which courts will apply the doctrine: when a fiduciary of the debtor misuses his position to the disadvantage of others; when a third party dominates or controls the debtor to the disadvantage of others; or when a third party defrauds other creditors." In re First Alliance Mortg. Co., 298 B.R. 652, 667 (C.D.Cal. 2003) *citing* In re 604 Columbus Ave. Realty Trust, 968 F.2d 1332, 1360 (1st Cir.1992). Bankruptcy courts have recognized that subordination is proper where a lender exercises control over the borrower to the detriment of other creditors or to gain an unfair advantage. See, e.g., In re American Lumber Co., 5 B.R. 470, 478 (D.C. Minn. 1980); In re T. E. Mercer Trucking Co., 16 B.R. 176, 189-90 (Bankr. Tex. 1981).

### 1.    Lehman's Inequitable Conduct.

The standard for inequitable conduct may differ depending on whether the creditor is an "insider" of the debtor. Where the claimant is an insider of the debtor, the party requesting equitable subordination is subject to a lesser burden of proof and pleading, as the claimant's actions will be subject to rigorous scrutiny. Stoumbos v. Kilimnik, 988 F.2d 949, 959 (9th Cir. 1993).

> When the trustee seeks to subordinate the claim of a creditor the trustee must present evidence of the creditor's unfair conduct. If the trustee meets this burden, 'the claimant then must prove the fairness of his transactions with the debtor or his claim will be subordinated.

Stoumbos, 988 F.2d at 958; see also In re Hedged-Investments Associates, Inc., 380 F.3d 1292, 1301 (10th Cir. 2004) ("Where the claimant is an insider or a fiduciary, the party seeking subordination need only show some unfair conduct, and a degree of culpability, on the part of the insider.")

Even where a creditor is not deemed an insider, its claim may still be equitably subordinated where it engaged in "gross and egregious conduct, tantamount to fraud, misrepresentation, overreaching, spoilation or conduct involving moral turpitude." In re First Alliance Mortgage Co., 298 B.R. 652, 668 (C.D. Cal. 2003); but see In re 80 Nassau Associates, 169 B.R. 832, 840 (Bankr. S.D.N.Y. 1994) ("In commercial cases, the proponent must demonstrate a substantial breach of

1  contract and advantage-taking by the creditor"; fraud or misrepresentation need only be proven in the

2  absence of contractual breach).

3      Bankruptcy Code section 101(31) lists certain specific categories of insiders, but the list is not

4  exclusive. Indeed, "[b]ankruptcy law recognizes two types of insiders: those specifically identified in

5  § 101(31), commonly referred to as 'per se' insiders, and those not so identified but who have a

6  sufficiently close relationship with the debtor to be insiders, commonly referred to as 'non-statutory'

7  insiders." In re Fortune Natural Resources Corp., 350 B.R. 693, 695 (Bankr.E.D.La. 2006) citing In re

8  Enterprise Acquisition Partners, Inc., 319 B.R. 626, 631 (9th Cir.BAP 2004).

9      Here, both Lehman ALI and Lehman Commercial were insiders of the Debtors, thus their

10  conduct is subject to rigorous scrutiny. As to those Debtors that had a Lehman equity partner, both

11  Lehman ALI and Lehman Commercial were undeniably "affiliates" of such equity partners (they all

12  shared a common parent, Lehman Holdings), and so are "statutory insiders" under 11 U.S.C.

13  § 101(31). See Cook Declaration.

14      As to those Debtors that have no Lehman equity partner, both Lehman ALI and Lehman

15  Commercial are "non-statutory" insiders. "In cases involving non-management creditors, a creditor

16  will be held to an insider standard where it is found that it dominated and controlled the debtor." Id.

17  Here, as to all the Debtors, the Lehman lenders were insiders because, after mid-2007, they took over

18  complete financial control and dominion of the Debtors' projects. Lehman micro-managed all the

19  projects through, among other things, weekly conference calls with SunCal, in which Lehman's

20  approval for every vendor expenditure was required before any work could proceed. Lehman also

21  unilaterally decided which creditors would or would not get paid. In re Fort Ann Express, 226 B.R.

22  746, 755-56 (N.D.N.Y. 1998) (creditor deemed insider of debtor where it "directed and managed the

23  financial affairs of [debtor], determined which creditors would be paid and in what amounts ... and

24  established administrative procedures"). And because the Debtors had no other source of funding,

25  they had no choice but to acquiesce to Lehman's taking control. In re KDI Holdings, 277 B.R. 493,

26  512 (S.D.N.Y. 1999) (factors include "whether the lender is the debtors sole source of credit");

27  American Lumber, 5 B.R. at 478 ("since the Bank was [debtor's] sole source of credit, its decision not

28  to honor [debtor's] payroll checks clearly placed [debtor] within the coercive power of the Bank").

MAINDOCS-#126738-v3-SCCOmnibusOppReRFS.DOC

1      Lehman's wide-reaching fraudulent conduct is egregious and warrants equitable subordination,

2   regardless of its insider status.  When Lehman knew in 2007 that the Projects were devalued due to the

3   market downturn, Lehman—rather than pulling the plug at that point and avoiding further Debtor

4   indebtedness to third parties—represented to SunCal that it would continue funding the Projects and

5   paying the various contractors and creditors for the millions of dollars of goods and services they

6   provided to the Projects.[3]  SunCal and its vendors and contractors relied on Lehman's promises and

7   representations of funding.[4]

8      Unbeknownst to SunCal, Lehman had its own agenda for taking control and promising to

9   continue financing the Projects.  Lehman wanted to prop up its weakening stock price and conceal its

10   faltering finances.  It thus sought to minimize to the outside world the Projects' decline in value, while

11   at the same time keeping SunCal and the other creditors on the hook.  Ultimately, it was this scheme

12   to misrepresent and inflate asset value that undermined Lehman's credibility and contributed to its

13   own demise.  And when Lehman foresaw that its bankruptcy was inevitable, Lehman's strategy

14   became to foreclose on its first trust deed liens and to usurp the Projects for itself, enjoying the benefit

15   of the millions of dollars of work that creditors put into improving the Projects, without paying them a

16   penny for it, in disregard of its inducements and assurances.  See In re Heartland Chemicals, 103 B.R.

17   at 1014 (sufficient allegations of "gross misconduct" included "scheme to shift its credit risks to

18   [debtor]'s trade creditors").

19      In furtherance of this scheme, Lehman threatened SunCal with, among other things, massive

20   bond exposure, in an effort to obtain its consent to the Restructuring Agreement.  In May 2008, faced

21   with no other option, SunCal agreed to the Restructuring Agreement, under which Lehman would act

22   as both lender and equity partner and recoup its investment plus interest and more.  As the lender,

23   Lehman committed to the assumption by such newly created entities of the existing obligations of the

24

25   [3] Cf. In re Aluminum Mills Corp., 132 B.R. 869, 894 (Bankr. N.D. Ill. 1991) (equitable subordination properly
pleaded where lender "used its control to keep the debtor in business while it was insolvent").

26   [4] Cf. In re Osborne, 42 B.R. 988, 999 (W.D. Wis. 1984) (equitable subordination proper where lender participated in
scheme to misrepresent debtor's financial situation to another creditor so that the other creditor would continue to
give the debtor credit); In re GTI Capital Holdings, LLC, 2007 WL 2493671, 17 (Bankr.D.Ariz. 2007) (courts focus

27   § 510(c) analysis "on the creditors' misrepresentations to other creditors or the creditors' actions to improve their
positions at the expense of other creditors"); In re Heartland Chemicals Inc., 103 B.R. 1012, 1014 (Bankr. C.D. Ill.

28   1989) (sufficient to allege inequitable conduct through lender's misrepresentations to debtor and creditors regarding
financing of debtor's operations).

-20-

1    Projects; and Lehman agreed to provide continuing financing that was necessary to keep the projects

2    going, as well as pay creditors for amounts owed.  But Lehman's funding never materialized anywhere

3    close to what was promised and needed, and it eventually cut off the flow of funds altogether.

4         Even after filing for bankruptcy in September 2008, Lehman for a time continued to tell

5    SunCal that it would fund ongoing critical expenses of the Projects, and continued to encourage and

6    authorize SunCal to incur expenses in connection with the Projects.  Although there were millions of

7    dollars of critical expenses on many of the Projects, Lehman—after months of begging and dozens of

8    letters sent by SunCal's general counsel—offered to pay a mere $270,000 on just two of the projects.

9    It was far too little far too late, and the Debtors' bankruptcies—and many millions in unpaid creditor

10   bills—were the inevitable result.  Lehman eventually repudiated the restructuring agreement

11   altogether.  See In re 604 Columbus Ave. Realty Trust, 119 B.R. 350, 377 (Bankr.D.Mass.1990), aff'd

12   in part and vacated in part on other grounds, 968 F.2d 1332 (1st Cir.1992) (lender's fraud, breach of

13   contract, and conversion of loan proceeds to detriment of creditors warranted equitable subordination

14   regardless of lender's insider status).

15        Various Lehman affiliates—including Lehman ALI and Lehman Commercial—have been

16   acting and continue to act in concert to further their squeeze play, all under the control of the same

17   Lehman players at the top.  Lehman equity members in many of the Projects refused to consent to

18   bankruptcy filings, putting the interests of the Lehman lenders before the Projects and their creditors.

19   Lehman ALI—which is not in bankruptcy—transferred first deeds of trust on the Projects to its

20   affiliate, Lehman Commercial, shortly before the latter filed for bankruptcy.  Lehman ALI improperly

21   submitted notices of default on Projects that were not yet in bankruptcy.  Lehman ALI also secretly

22   withdrew millions of dollars of funds from restricted accounts that had been established precisely to

23   meet certain Projects' critical needs, and did so precisely when those funds were needed most—a

24   blatant money grab.  See In re 604 Columbus Ave. Realty Trust, 119 B.R. at 377 (affirming equitable

25   subordination where lender, among other things, "appropriate[ed] for the [lender]'s own benefit funds

26   that the Debtor had bargained with the [lender] to set aside for construction creditors").

27        Lehman Commercial, for its part, also strung SunCal along, and also participated in the

28   shuffling of ownership of first trust deeds in anticipation of its bankruptcy.  And now that Lehman

-21-

1   Commercial has gone bankrupt, it has used its bankruptcy to block any result other than a Lehman

2   foreclosure.  Lehman Commercial refused to consent to relief from its bankruptcy stay to facilitate

3   DIP financing of the Projects or to allow funds to be used to preserve value on the Projects.

4       After having used its automatic stay as a sword, rather than a shield, it is thus ironic, to say the

5   least, that Lehman Commercial and Lehman ALI are now bringing joint motions for relief from the

6   Debtors' stay in order to foreclose on a number of the Projects and wipe out all of the Debtors'

7   unsecured creditors.

8       The Ninth Circuit case, <u>Stoumbos v. Kilimnik</u>, 988 F.2d 949 (9th Cir. 1993), bears some

9   striking similarities to the case at bar.  In <u>Stoumbos</u>, an insider of the Debtor, Kilimnik, held a major

10  secured claim against the debtor's assets.  Kilmnik declared a default on the note, and initiated state

11  court foreclosure proceedings against the debtor.  Notwithstanding the pending foreclosure

12  proceedings, the debtor "placed unusually large orders with several of its suppliers" and gave

13  assurances of payment to trade creditors.  <u>Id</u>. at 953.  Kilmnik formed a new business entity and began

14  to transition the debtor's business to the new entity.  Kilmnik resigned his position from the debtor,

15  and a shareholders' resolution agreed to surrender the collateral (inventory, equipment and

16  receivables) to Kilimnik, in exchange for Kilimnik waiver of any deficiency claim.   An involuntary

17  bankruptcy was later filed, and an equitable subordination action was brought by the trustee.  The

18  Bankruptcy Court held in favor of Kilimnik; however, the Ninth Circuit reversed holding that all the

19  elements of equitable subordination had been met.  The Ninth Circuit determined that the record was

20  sufficient to establish the first prong, "inequitable conduct" as follows:

21      The court expressly found that "[i]n foreclosing on his note, opening [the new entity] and
22      having Debtor renounce its interest in collateral, Kilimnik intended, if possible, to place his
        own interest, which he believed to be secured, ahead of the interests of Debtor's creditors."
23      *** In addition...Kilimnik operated [debtor] in such a way as to prepare for [new entity] to
        take over its business (he rented separate additional office space at the end of July 1985).
24      The bankruptcy court found that there was evidence to suggest that Kilimnik had not
        purposely increased inventories or built up trade debt before he foreclosed on the [debtor's]
25      assets; however, the court also noted that [debtor], while under Kilimnik's control, had
        made somewhat larger purchases from its suppliers, and that Kilimnik had made assurances
26      to [debtor's] suppliers to persuade them to continue to do business with [debtor]. <u>Cf.</u>
        <i>Fabricators,</i> 926 F.2d at 1467 (insider creditor acted inequitably when it induced other
27      creditors to extend credit to debtor, where insider knew debtor was in financial trouble).

28  <u>Id</u>. at 959-960.  The "inequitable conduct" facts here are at least as strong as those in <u>Stoumbos</u>.

## 2. **Lehman's Inequitable Conduct Substantially Harmed Creditors**.

In <u>Stoumbos</u>, the Ninth Circuit found that the second prong, "injury to competing claimants" had been satisfied as well:

> The proper inquiry was whether Kilimnik's self-dealing resulted in "injury to competing claimants or an unfair advantage" to Kilimnik himself. ... [R]eassurances by Kilimnik induced [trade creditors] to continue supplying [debtor] and to postpone efforts to collect on past due debt. .... Kilimnik contends that the trade creditors have suffered no injury because any harm to them "merely flowed from their status as junior unsecured creditors." This is incorrect: at issue is whether Kilimnik's inequitable conduct harmed the trade creditors by, for example, inducing them to ship goods to [debtor] when there was little likelihood they would be paid.

<u>Stoumbos</u>, 988 F.2d at 960 and fn. 5.

Here, the harm to the Debtors' creditors caused by Lehman's inequitable conduct is obvious. Lehman's conduct in stringing SunCal along led to the Debtors' deepening insolvency and ultimately to their bankruptcies. Lehman promised it would provide funding, induced hundreds of creditors to provide millions of dollars in work and improvements, and then refused to pay them. And although it is Lehman that is responsible for this mountain of debt, and for Debtors' bankruptcies, Lehman is now doing everything in its power to prevent a successful reorganization of the Debtors and payment to the creditors. <u>See</u> <u>In re Beverages International, Ltd.</u>, 50 B.R. 273, 283 (Bankr. D.Mass. 1985) ("Harm may consist of . . . continued buildup of unsecured debt caused by the manipulation of the debtor by the claimant to his own advantage"). Neither SunCal nor the Project creditors had any knowledge of the Lehman scheme—if SunCal had known, it could and would have acted to avert, or at least mitigate, the Projects' diminution in value and harm to creditors.

Aside from the direct financial carnage it has caused, Lehman brazenly ignores its responsibility for causing the various "life-safety issues affecting the Properties" (Memorandum, 15:12-13) including dust and fire control, friable asbestos, flooding, erosion, problems with unmonitored levees and partially constructed bridges. Lehman cynically asserts that the Debtors have "failed to discharge *their duties* to address" these problems, <u>Id</u>. (emphasis added), conveniently omitting that Lehman itself had contractually committed to provide the funding to rectify these issues. The Projects are further threatened with the loss of their governmental entitlements, which are critical to avoid massive disruptions in the development process and to diminution of the Projects' value. All

1    of this, of course, further harms the prospects of creditor repayment, and thus justifies subordination

2    of Lehman's claims to the extent necessary to ensure that other creditors are paid.

3        **3.    Equitable Subordination is Not Inconsistent with the Bankruptcy Code**

4        The application of equitable subordination to Lehman's claims would not run counter to the

5    principles and requirements of the Bankruptcy Code.  As the Supreme Court has pointedly held in

6    United States v. Noland, 517 U.S. 535 (1996), "the bankruptcy court may not equitably subordinate

7    claims on a categorical basis in derogation of Congress's scheme of priorities." Id. at 536.  See also

8    Reorganized CF & I Fabricators of Utah, 518 U.S. 213 (1996).  Specifically, subordination cannot

9    amount to a categorical reordering of statutory priorities without a finding of inequitable conduct.

10       Here, the equitable subordination of Lehman's claims is not inconsistent with the Bankruptcy

11   Code. See In re Mahan, 373 B.R. 177, 185 (Bankr.M.D.Fla. 2007) ("*Noland* and *Reorganized CF & I*

12   do not prevent courts from equitably subordinating a general unsecured claim to the other general

13   unsecured claims on a case-by-case basis where inequitable conduct is present.")

14       **C.    This Court May Determine that Proposed Amended Complaint Subordinating**

15   **Lehman Commercial's Lien & Renewal of the Cash Collateral Motion Does Not Violate**

16   **Lehman Commercial's Automatic Stay.**

17       Without any analysis, Lehman contends in conclusory fashion that "the Debtors would need to

18   obtain relief from the automatic stay in the LCPI Bankruptcy Case in order to add LCPI as a defendant

19   in the Equitable Subordination Action..." Memorandum, 19:26-27.

20       While the Debtors acknowledge that only the presiding judge in the Southern District of the

21   New York Bankruptcy Court (the "New York Bankruptcy Court") has the authority to *lift* the

22   automatic stay under § 362(d) arising from Lehman Commercial's Bankruptcy Case, based on the

23   overwhelming authorities cited below, this Court has concurrent jurisdiction with the New York

24   Bankruptcy Court to *determine the scope or applicability* of the automatic stay under § 362(a) or (b).

25       It is well established that a federal court in which litigation is pending has concurrent

26   jurisdiction to determine the applicability of the automatic stay to such litigation.  In re Baldwin-

27   United Corp., 765 F.2d 343, 347 (2d Cir. 1985) ("Whether the stay applies to litigation otherwise

28   within the jurisdiction of a district court or court of appeals is an issue of law within the competence

-24-

1  of both the court within which the litigation is pending, and the bankruptcy court supervising the

2  reorganization").[5]  Accordingly, this Court has jurisdiction to determine whether adding Lehman

3  Commercial as a defendant in the Equitable Subordination Action, and the renewal of the Cash

4  Collateral Motion is subject to Lehman Commercial's automatic stay.

5  In a situation where there are two independent bankruptcy estates in which one asserts a claim[6]

6  against the other, it is well established that defensive acts with respect to the allowance or

7  subordination of such claim does not violate the automatic stay.  For example, In re Wheatfield

8  Business Park, 308 B.R. 463 (9th Cir. BAP 2004), involved a Chapter 11 debtor pending in the Central

9  District of California.  A creditor (the Appellant) was also a chapter 11 debtor in a proceeding pending

10  in the Southern District of New York. Id. at 465.  The California Bankruptcy Court granted the

11  motion disallowing the claim, and the Creditor/Appellant appealed on the grounds that there had been

12  no order granting relief from stay. The Bankruptcy Appellate Panel affirmed, agreeing with the lower

13  court that "[t]he automatic stay doesn't apply to plaintiffs, or it doesn't apply when plaintiffs get

14  automatic stays. It only applies when defendants get automatic stays." Id. at 465.  Specifically, the

15  court held: "The bankruptcy court correctly decided that Debtor did not violate the automatic stay in

16  Appellant's Chapter 11 by objecting to the claim filed in Debtor's case. Appellant was the claimant,

17  and the automatic stay does not apply under such circumstances." Id. at 466..

18  Notably, in reaching this conclusion, the Wheatfield court cited relied upon In re Merrick, 175

19  B.R. 333, 338 (9th Cir. BAP 1994. See Wheatfield, 308 B.R. at 466. In Merrick, the debtor was a

20  _____

21  [5] See also Lockyer v. Mirant, 398 F.3d 1098, 1107 (9th Cir. 2005) ("We therefore hold, in accordance with
established law, that a district court has jurisdiction to decide whether the automatic stay applies to a proceeding
before it, over which it would otherwise have jurisdiction."); N.L.R.B. v. Edward Cooper Painting, 804 F.2d

22  934, 939 (6th Cir. 1986); Brock v. Morysville Body Works, Inc., 829 F.2d 383, 387 (3d Cir. 1987); Hunt v. Bankers
Trust, 799 F.2d 1060, 1069 (5th Cir.1986).

23  [6] Here, Lehman is asserting a claim via its motions for relief from stay.  See Matter of Pizza of Hawaii, Inc., 761
F.2d 1374, 1381 (9th Cir. 1985) (motion for relief on automatic stay sufficiently stated explicit demand showing

24  nature and amount of claim against the estate, evidenced an intent to hold the debtor liable and constituted informal
proof of claim); In re Chicoine, 97 B.R. 30 (Bankr.D.Mont. 1988) (judgment creditor's motion for relief from was

25  sufficient to constitute informal proof of claim). Similarly, Lehman's Opposition to the Debtor's motion for use of
cash collateral also constitutes an informal claim. In re Metropolitan Plant & Flower, Inc., 1997 WL 638454, 5

26  (N.D.Ill. 1997) ("cash collateral objection satisfies the existence, nature and amount requirements for an informal
proof of claim").

27  Moreover, an equitable subordination action is ripe, where the facts establish an informal claim by the creditor.
See In re Senior Cottages of America, LLC, 320 B.R. 895 (Bankr.D.Minn. 2005) (Absence of proof of claim against

28  Chapter 7 estate did not preclude, for lack of ripeness, trustee's request for equitable subordination, where bill was
submitted to debtor constituting informal proof of claim).

1   plaintiff in litigation pending in state court.  The defendants sought to dismiss the action, and the

2   plaintiff-debtor contended that such act constituted a violation of the automatic stay.  The BAP held

3   that defending against an action or claim brought by a debtor does not violate the automatic stay.

4   Merrick, 175 B.R. at 336 -337.  In so doing, the court relied upon Judge Posner's observation that

> [T]he automatic stay is inapplicable to suits *by* the [debtor].  This appears from the
> statutory language, which refers to actions "against the debtor," 11 U.S.C.
> § 362(a)(1), and to acts to obtain possession of or to exercise control over "property
> of the estate," § 362(a)(3), and from the policy behind the statute, which is to protect
> the bankrupt's estate from being eaten away by creditors' lawsuits and seizures of
> property before the trustee has had a chance to marshal the estate's assets and
> distribute them equitably among the creditors.  There is ... no policy of preventing
> persons whom the bankrupt has sued from protecting their legal rights.  True, the
> bankrupt's cause of action is an asset of the estate; but as the defendant in the
> bankrupt's suit is not, by opposing that suit, seeking to take possession of it,
> subsection (a)(3) is no more applicable than (a)(1) is.

12  Merrick, 175 B.R. at 336 -337 *quoting* Martin-Trigona v. Champion Fed. Sav. & Loan Ass'n., 892

13  F.2d 575, 577 (7th Cir.1989).

14          In the case of two bankruptcy estates where one estate asserts a claim against the other, the

15  BAP decision in Wheatfield Business equates a bankruptcy estate asserting a claim with a plaintiff,

16  and concludes that the creditor/plaintiff's stay does not apply to the claim objection.  Numerous other

17  cases outside the Ninth Circuit have reached the same holding.  See, e.g., In re Financial News

18  Network, 158 B.R. 570 (S.D.N.Y. 1993); In re Metiom, 301 B.R. 634, 638-639 (Bankr.S.D.N.Y.

19  2003); In re PRS Ins. Group, 331 B.R. 580, 587 (Bankr.D.Del. 2005); In re Meade, 1999 WL

20  33496001, *1 (E.D.Pa. 1999).  In Metiom, the Court held that the automatic stay did not apply to a

21  claim objection to, and proceeding to equitably subordinate, a claim filed by another bankruptcy estate

22  (Intira/Divine).  The Trustee objected to a claim based upon §502(d) and sought in the alternative to

23  subordinate the claim under Section 510(c), but otherwise waived affirmative relief against the other

24  bankruptcy estate.  In rejecting Intira/Devine's position, the court held:

> The Trustee does not seek affirmative relief under either sections 547 or 549 of
> the Bankruptcy Code or damages resulting from Intira's postpetition conduct.  He has
> waived such claims, asserting such rights only as grounds for objecting to, or
> equitably subordinating, the Claim.  Divine's argument, therefore, that the Trustee has
> violated the automatic stay merely by asserting defenses that could give rise to a
> claim, hardly merits a response.  By waiving affirmative relief, the Trustee has
> expressly not attempted "to recover a claim against the debtor," 11 U.S.C.

§ 362(a)(1), or "to obtain possession of property of the estate or of property from the estate" of divine. 11 U.S.C. § 362(a)(3). Accordingly, the only provision of section 362(a) of the Bankruptcy Code arguably implicated by the Claim Objection is section 362(a)(3)'s stay of "any act to ... to exercise control over property of the estate."

However, this provision of section 362(a)(3) does not apply, either, because the Trustee is proceeding defensively--not asserting a counterclaim--in objecting to the Claim. The Trustee is not exercising control over divine's property but, rather, simply is responding to a proof of claim filed in Metiom's chapter 11 case. Neither the language nor the policy of section 362(a)(3) apply in that context.

Metiom, 301 B.R. at 638-639.

Accordingly, a bankruptcy estate which is merely defending against the claim asserted by another debtor does not violate the other's stay. Here, Lehman Commercial stands in the position of a plaintiff against the Debtors. The acts of the Debtors to defend against the claim of Lehman Commercial are not actions against Lehman Commercial, and thus do not violate Section 362(a)(1). Similarly, any act of the Debtor's to oppose Lehman Commercial's claim "is not, by opposing that [claim], seeking to take possession of it, [hence] subsection (a)(3) is no more applicable than (a)(1) is." Merrick, 175 B.R. at 337. Nor does it seek to "exercise control over the property of the estate." Metiom, 301 B.R. at 639. At most, the proposed subordination is a defensive act with respect to Lehman Commercial's claim, and does not seek any affirmative recovery against Lehman Commercial itself. As such, there is no violation of the automatic stay..

### D.    Lehman Is Not Entitled to Relief Pursuant to § 362(d)(1), Pending a Determination of the Extent and Validity of its Liens in the Equitable Subordination Action.

Section 362(d)(1) of the Bankruptcy Code provides, in relevant part:

On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay–
(1) for cause, including the lack of adequate protection of an interest in property of such party in interest.

Here, the threshold issue of where Lehman holds an "interest in property" is subject to dispute. "[W]hen the debtor's defense to a motion for relief from the automatic stay contests the validity of the creditor's lien ... the court should entertain this issue because it goes to the heart of the creditor's interest in the property. ... If the moving creditor does not have a lien on the property in question, it follows that the creditor is not 'a party in interest' as to such property." Dino & Artie's Automatic Transmission Co., 68 B.R. at 268 (Bankr.S.D.N.Y. 1986).

1    As demonstrated above, Lehman's secured claim in each bankruptcy case should be

2    subordinated, and the liens securing Lehman's claims should be transferred to the Debtors' estates.

3    The Court should not permit Lehman to foreclose on liens that can and will be completely eliminated.

4    Furthermore, the Lehman Entities are not entitled to adequate protection of such liens for the same

5    reason. See cases cited above, Part III.A. Accordingly, until there is an adjudication as to the extent

6    and validity of Lehman's liens, their Motions should be denied.

7    Lehman makes repeated statements by counsel that its collateral is declining in value,

8    Memorandum, 2:22-23, 6:2, 10:16; 16:8, and that "in the past 14 months, the residential real estate

9    market has cooled." Memorandum, 15:2-3. However, Lehman fails to submit any evidence of a *post-*

10   *petition* decline in the value of the collateral. Lehman's appraisals and supporting declaration speak

11   of an "as is" value as of a particular date and do not speak of any postpetition decline in value. *See*

12   Zink v. Vanmiddlesworth, 300 B.R. 394, 403 (N.D.N.Y. 2003) (Evidence that collateral declined in

13   value during five months preceding debtor's filing was insufficient, without more, to satisfy creditors'

14   initial burden of demonstrating postpetition decline in value). Accordingly, statements by Lehman's

15   counsel of a post-petition decline in value have no evidentiary value. *See* U.S. v. Rose, 104 F.3d

16   1408, 1416 (1st Cir. 1997) ("argument by counsel is not evidence").

17   To the extent Lehman is truly concerned about any alleged post-petition depreciation in the

18   value of the Projects pending the determination of the Equitable Subordination Action, the Debtors

19   propose, in the alternative, that Lehman consent to the sale of such Projects, waiving any alleged right

20   to credit bid its disputed lien,[7] in exchange for which the sale proceeds will be held in escrow pending

21   resolution of the Equitable Subordination Action.

22   **E.    Lehman Is Not Entitled to Relief Pursuant to § 362(d)(1), where its Collateral is**

23   **Admittedly Worthless.**

24   Lehman's Memorandum concedes that as to its junior liens, the $30 million Bickford Second

25   Lien Loan (as defined in the Motion), and the $95 million Ritter Ranch Mez Loan (as defined in the

26   Motion), there is absolutely no collateral value supporting these junior lien because the collateral is

27

28
_____

[7] A secured creditor may not credit bid when its lien is subject to bona fide dispute. National Bank of Commerce of
El Dorado v. McMullan (In re McMullan), 196 B.R. 818, 835 (Bankr. W.D. Ark. 1996).

MAINDOCS-#126738-v3-SCCOmnibusOppReRFS.DOC

fully encumbered by the senior liens. See Memorandum, 10:6 & 9, & fn. 3, 4. Since there is no collateral value to support these junior liens, Lehman is not entitled to relief from the automatic stay as to either the Bickford Second Lien Loan or the Ritter Ranch Mez Loan, as the purported liens are void pursuant to Bankruptcy Code § 506(a) and (d). Therefore, it is well established that Lehman is not entitled to adequate protection, and is not entitled to relief from stay.

In In re Bessey, 65 B.R. 638 (Bankr.S.D.Cal. 1986), a junior secured creditor moved for relief from stay to allow it to foreclose on the debtor's real property. The Court determined that the first deed of trust and the property tax claims fully encumbered the property, with no value to support the movant's junior lien. Id. at 642. As a result, the Bankruptcy Court denied relief from stay to foreclose on the property.

> The debtor contends his security interest in the residence is worthless and not entitled to adequate protection. *** [I]t would seem to strain any reasonable interpretation of *American Mariner* to require a debtor to adequately protect the interest of a secured creditor, where that interest is presently worthless.

Bessey, 65 B.R. at 642-643. Accordingly, the Bankruptcy Court denied relief from stay to foreclose on the property.[8]

Similarly, in In re Lopez-Soto, 764 F.2d 23 (1st Cir. 1985), the third lienholder moved for relief from stay to foreclose, where the first two liens exhausted the value of the property, making the movant's position valueless. The First Circuit concluded that a junior lienholder with valueless collateral should be treated as an unsecured creditor and was not entitled to adequate protection.

> [T]hey point out that the first two mortgages exhaust the property's value. It is well established that in such circumstances a bankruptcy court will often treat a lienholder essentially like an *un* secured creditor. *See* 11 U.S.C. § 506(a). As noted in *Collier*, in the context of a "stay lifting" proceeding there is an "existing rule," reinforced by section 506(a), "to the effect that valueless junior secured positions or unsecured deficiency claims will not be entitled to adequate protection." Thus, the Cruz's are entitled to ask the bankruptcy court what "cause" there can be for allowing Superior to enforce its lien against collateral from which it (perhaps concededly) cannot derive legitimate value.

---

[8] Based upon the then-binding Ninth Circuit case, In re American Mariner Industries, Inc., 734 F.2d 426 (9th Cir. 1984), an undersecured creditor was entitled to adequate protection for lost opportunity costs. Based upon anticipated repairs to the property in Bessey, the Court award some adequate protection payments based upon the expectation that there would be some value to support the junior lien once the repairs were completed. However, the American Mariner decision was subsequently overruled by Supreme Court decision in United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd., 484 U.S. 365 (1988). See In re Cimarron Investors, 848 F.2d 974, 976 (9th Cir. 1988) (recognizing American Mariner overruled by Timbers). Accordingly, the portion of Bessey decision authorizing potential adequate protection payments for lost opportunity costs is no longer good law.

MAINDOCS-#126738-v3-SCCOmnibusOppReRFS.DOC

1  Lopez-Soto, 764 F.2d at 26 (quotations and citations omitted). See also In re Calore Exp. Co., Inc.,

2  288 F.3d 22, 36 (1st Cir. 2002) ("The cause the government invoked was 'the lack of adequate

3  protection of an interest in property' under § 362(d)(1). If as of the time of the hearing Fleet

4  indisputably had rights senior to the government's in the contested receivables, and if Calore's debt to

5  Fleet equaled or exceeded the value of those receivables, then the bankruptcy court correctly denied

6  the motion to lift the stay. This would be ... *because the government's security interest would have no*

7  *value and the government would be entitled to no protection of that interest.*") (emphasis added).

8       Accordingly, as to the Bickford Second Lien Loan and the Ritter Ranch Mez Loan, the

9  Lehman Memorandum concedes there is no value supporting such liens.  Therefore, the Lehman

10 Entities are not entitled to adequate protection, and are not entitled to relief from stay.

11     **F.    The Lehman Entities Are Not Entitled to Relief Pursuant to Section 362(d)(2).**

12       Section 362(d)(2) provides that the Court shall grant relief from the automatic stay, "if–(A) the

13 debtor does not have an equity in such property; and (B) such property is not necessary to an effective

14 reorganization."  To meet its burden of proving that the property is necessary to an effective

15 reorganization, a debtor must prove that there is a "reasonable possibility of a successful

16 reorganization within a reasonable time."  The United States Supreme Court has held:

> Once the movant under § 362(d)(2) establishes that he is an undersecured
> creditor, it is the burden of the debtor to establish that the collateral at issue is
> "necessary to an effective reorganization."  What this requires is not merely a
> showing that if there is conceivably to be an effective reorganization, this
> property will be needed for it; but that the property is essential for an effective
> reorganization that is in prospect. This means, as many lower courts, including
> the en banc court in this case, have properly said, that there must be "a
> reasonable possibility of a successful reorganization within a reasonable
> time."

22 Timbers, 484 U.S. at 375-76.  Pursuant to § 362(g)(1), the party requesting relief from the automatic

23 stay has the burden of proving the debtor's equity in the subject collateral.

24     **1.    The Amount of Equity Is in Dispute.**

25       The amount of equity available for the estates is in dispute. As discussed above, the Debtors

26 can create substantial equity in the Projects based on the Debtors' adversary proceeding against the

27 Lehman Entities.  The liens previously held by Lehman will be held by the estates.  Thus, any value

MAINDOCS-#126738-v3-SCCOmnibusOppReRFS.DOC

1   generated by the Projects that would have previously been paid to Lehman will be available to the

2   Debtors' general unsecured creditors.

3          In addition, as to the SunCal Communities I loan and the Ritter Ranch loan (assuming it is not

4   void), Lehman has failed to prove a *prima facie* case for relief from the automatic stay against any of

5   the Opposing Debtors as Lehman has failed to prove the amount of its claims against the opposing

6   Debtors since such purported claims are fraught with fraudulent conveyances that reduce the amount

7   of such claims pursuant to Lehman's own loan documentation.  The Guarantee and Collateral

8   Agreement, dated November 17, 2005, provides:

9          Anything herein or in any other Loan Document to the contrary notwithstanding, (i)
       the maximum liability of each Guarantor hereunder and under the other Loan
10      Documents shall in no event exceed the amount that can be guaranteed by such
       Guarantor under applicable federal and state laws regarding fraudulent conveyances
11      or transfers or the insolvency of debtors (after giving effect to the right of
       contribution established in Section 2.2) and (ii) the maximum liability of the
12      Borrowers under this Section 2 shall in no event exceed the amount that can be

13      guaranteed by the Borrower under applicable federal and state laws relating to
       fraudulent conveyances and transfers or the insolvency of debtors (after giving effect
14      to the right of contribution established in Section 2.2).

15   See Guarantee and Collateral Agreement, §2.1(b).  Lehman's own documents doom its argument.

16          **2.    The Projects are Necessary for the Debtor's Reorganization, and the Debtors**

17          **Have Filed a Plan that Has a Reasonable Possibility of Being Confirmed Within**

18          **a Reasonable Time.**

19          The Projects are unquestionably necessary for an effective reorganization that is reflected in

20   the Debtors' plan filed on February 4, 2009.  The Debtors' plan focuses on the Debtors' equitable

21   subordination action and the elimination of the Lehman Entities' liens against the Debtors' Projects.

22   Under its plan, the Debtors will then sell the Projects to provide a meaningful distribution to its

23   general unsecured creditors.

24          Lehman makes various dubious assertions in its Motion that can be summarily addressed:

25          (a)    Lehman asserts that the Debtors cannot confirm a plan in a reasonable time because

26   Lehman threatens to drag out the litigation and force the Debtors to incur massive litigation costs.

27   Memorandum, 20:4-7.  Lehman's argument is essentially that they should be rewarded for their

28   threats of protracting and obfuscating the litigation by being granted relief from stay.  Not only does

1    this turn equity on its head, it is unwarranted. At the last status conference, this Court stated that trials

2    would be conducted by declaration for direct testimony and exhibits, and that it would allocate a week

3    in June or shortly thereafter for cross-examinations. The Debtors anticipate they will require only 6 to

4    8 depositions, and will be ready to proceed for trial by the date indicated by the Court. See Miller

5    Declaration. Accordingly, it appears Lehman assertion is based on its intention to violate Bankruptcy

6    Rule 9011 and "cause unnecessary delay or needless increase in the cost of litigation."

7        (b)    Lehman also cites several cases for the proposition that plan confirmation is not probable

8    because recovery on litigation is too speculative. Memorandum, 20:14-21:13. These cases are

9    distinguishable because the equitable subordination claims do not seek a cash recovery that might be

10   of speculative collectability. The Court has jurisdiction over the validity of Lehman's liens against

11   the Debtors' estate; as a result, there is no issue of speculative collectability. These cases simply have

12   no applicability when equitable subordination is raised as a defense to a motion for relief from stay.

13       (c)    Despite Lehman's contention that plan confirmation is unlikely because the Debtors lack

14   funding for the Equitable Subordination Action, Memorandum, 20:24-28, SCC has recently reached

15   an agreement with the Debtors' two bond companies to jointly finance the Equitable Subordination

16   Action with SCC, thus mooting this concern. *See* Cook Declaration.

17       In any event, it is well established that in the early stages of a Chapter 11 proceeding, the

18   debtor-in-possession has only a minimal burden or "relaxed standard" to establish an effective

19   reorganization in progress, which burden increases in later stages of the case. In re Con Am

20   Grandview Associates, L.P., 179 B.R. 29, 33 (S.D.N.Y. 1995) (affirming the bankruptcy court's an

21   effective reorganization "given the more relaxed standard under which a debtor's potential

22   reorganization plan is judged at the early stages of a bankruptcy proceeding.").

23       Here, the Debtors are in the early stages on their Chapter 11 case, and have filed their joint

24   Chapter 11 plan within the first ninety (90) days of the petition date for the first of the Debtors to

25   commence its Chapter 11 proceeding. Accordingly, the Debtors have clearly met their "relaxed

26   standard" for establishing an effective reorganization in progress.

27   **G.    <u>Lehman Is Not Entitled to Relief from Stay Pursuant to § 362(d)(3)</u>.**

28   Section 362(d)(3) provides for relief from the automatic stay where:

1

2   (3) with respect to a stay of an act against single asset real estate under subsection
    (a), by a creditor whose claim is secured by an interest in such real estate, unless, not
    later than the date that is 90 days after the entry of the order for relief (or such later

3   date as the court may determine for cause by order entered within that 90-day period)
    or 30 days after the court determines that the debtor is subject to this paragraph,

4   whichever is later--
    (A) the debtor has filed a plan of reorganization that has a reasonable possibility of

5   being confirmed within a reasonable time; or
    (B) the debtor has commenced monthly payments that-- *** (ii) are in an amount

6   equal to interest at the then applicable nondefault contract rate of interest on the value
    of the creditor's interest in the real estate;

7

8   11 U.S.C. § 362(d)(3).

9       The memorandum in support of Lehman's Motion states that: "the Debtors inability to submit

10  a feasible plan and inability to confirm a plan in a reasonable amount of time warrants relief under

11  section 362(d)(3)." Memorandum, 4:17-18.

12      Lehman's argument under Section 362(d)(3) is defective on multiple grounds:

13      (1)    Section 362(d)(3) is only invoked "90 days after the entry of the order for relief ... or

14  *30 days after the court determines that the debtor is subject to this paragraph, whichever is later...*"

15  (emphasis added).  Here, there has been <u>no</u> court determination that the Debtors are subject to Section

16  362(d)(3).  Since only the later of the two deadlines apply, Section 362(d)(3) is not applicable.

17      (2)    Even assuming *arguendo* that Section 362(d)(3) is applicable, Lehman filed its motion

18  for relief less than "90 days after the entry of the order for relief" and thus at the time of the filing of

19  the motion, there was no basis for relief under Section 362(d)(3).

20      (3)    Even assuming *arguendo* that Section 362(d)(3) is applicable, all of the Debtors have

21  now filed their joint Chapter 11 Plan within 90 days of their respective petition dates, and the Plan has

22  a reasonable <u>probability</u> of being confirmed.  The Plan seeks to equitably subordinate the Lehman

23  claims to those of the Debtors' unsecured creditors, transfer Lehman's liens to the Debtors estates,

24  substantively consolidate all of the Debtors' estates, and sell all of the subject real properties for the

25  benefit of all of the Debtors' creditors.  Therefore, Lehman is not entitled to relief from the automatic

26  stay under Bankruptcy Code Section 362(d)(3).

27

28

**H.     Alternatively, the Court Should Condition any Relief Upon a Level Playing Field, Preventing Lehman from Using its Stay as a Sword to Thwart the Debtors' Reorganization**

As set forth above, Lehman Commercial has repeatedly used its automatic stay as a sword to thwart the Debtors' reorganization.  Lehman Commercial has opposed the NY Lift Stay Motion to allow the Debtors to seek a priming lien to preserve the Properties.  Lehman Commercial brought an emergency motion before the New York Bankruptcy Court staying the Debtors' Cash Collateral Motion to preserve the Properties.  It is hypocritical of Lehman to contend that the Debtors are not maintaining the Properties when Lehman Commercial is aggressively utilizing its automatic stay to prevent the Debtors from maintaining the Properties.  It is likewise hypocritical to assert that the Debtors cannot reorganize in a timely fashion when Lehman Commercial repeatedly utilized its stay in an attempt thwart reorganization.

As set forth above, Lehman Commercial asserts that the Debtors must go through a two step procedure, first seeking relief from stay before the New York Bankruptcy Court for any matter that might impact Lehman Commercial, and only if relief from stay is granted in New York, may the Debtors file the substantive motion or proceeding before the California Bankruptcy Court.  It is clear from Lehman's Opposition to the NY Lift Stay Motion that Lehman Commercial wishes to have the NY Bankruptcy Court address the merits of any action to be brought before the California Bankruptcy Court, notwithstanding the fact that such matters are within the exclusive jurisdiction of this Court.

"[T]he automatic stay was not intended by Congress to be used as a sword." In re Clowser, 39 B.R. 883, 886 (Bankr.E.D.Va. 1984); Int'l Distribution Centers v. Walsh Trucking, 62 B.R. 723, 730 (S.D.N.Y. 1986).  The automatic stay is designed to be defensive shield, "the stay is not designed to be offensive weapon - a sword..." Turner Broadcasting v. Sanyo Elec., 33 B.R. 996, 1000 (D.Ga. 1983). Here, Lehman Commercial has repeatedly used its automatic stay as a sword to thwart the Debtors' reorganization, and is now using the same as "cause" in order to obtain relief to foreclose on the Debtors' Property.  Clearly, this Court should not countenance such a result.

In order to create a more level playing field to allow these cases to move forward in a more efficient manner, the Debtors proposed the following conditional modification of the stay:

MAINDOCS-#126738-v3-SCCOmnibusOppReRFS.DOC

1    • The Debtors' automatic stay is lifted to allow Lehman to record a Notice of Default as to

2    each of the respective Projects.

3    • The Debtors' automatic stay shall remain in effect as to any notice of sale and/or

4    foreclosure, however, such stay shall be lifted upon entry of a final judgment in the Equitable

5    Subordination Action, in the event that the Debtors do not prevail.

6    • The above relief from stay is expressly conditioned upon Lehman Commercial stipulating

7    to relief from stay in its bankruptcy proceeding (i) allowing the Debtor(s) to seek subordination of

8    Lehman Commercial's claim  via either an adversary proceeding or a Chapter 11 plan, (ii)

9    allowing the Debtors to bring a motion for use of cash collateral and/or surcharge in these Chapter

10   11 proceedings, and (iii) allowing the Debtors to seek to sell one or more of the Projects pursuant

11   to 11 U.S.C. §363(f) via either a motion or a Chapter 11 plan.

12   Such conditional relief is consistent with the case law cited above, that relief from stay to

13   allow foreclosure should be denied, pending the resolution of the extent and validity of the creditor's

14   liens.[9] The Debtors believe that such conditional relief balances the respective interests of the parties,

15   and will move this matter to a more prompt and efficient resolution.

16   **IV.**

17   **CONCLUSION**

18   For the foregoing reasons, the Debtors request that the Court deny the Lehman's Motions, or,

19   in the alternative, grant only conditional relief as set forth herein.  The Debtors further request that the

20   Court determine that the filing, service and prosecution of Proposed Amended Complaint, and the

21   renewal of the Cash Collateral Motion does not violate Lehman Commercial's automatic stay.

22   Dated: February 6, 2009            **WINTHROP COUCHOT**
                                        **PROFESSIONAL CORPORATION**
23

24   By: _Paul J Couchot_____
                                        Paul J. Couchot
25                                      General Insolvency Counsel for
                                        Jointly Administered Debtors in Possession
26

27   [9] *See* Topgallant Lines, at 2 ("when the court is made aware at a stay relief hearing that fundamental questions exist
     over the extent, validity, or priority of a movant's security interest it is appropriate to deny relief until such issues can
28   be resolved in an adversary proceeding."); Waste Alternatives, 171 B.R. at 148 ("the resolution of [creditor's] lien is
     necessary before the Court can decide the merits of lifting the stay and allowing [creditor] to act upon the
     collateral.")

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 660 Newport Center Drive, 4th Floor, Newport Beach, CA 92660.

The foregoing document described: **THE DEBTORS' OMNIBUS OPPOSITION TO MOTIONS FOR RELIEF FROM THE AUTOMATIC STAY FILED BY LEHMAN COMMERCIAL PAPER INC. AND LEHMAN ALI, INC.** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On February 6, 2009 I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

    ☒   Service information continued on attached page

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served): On <u>February 6, 2009,</u> I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

    ☒   Service information continued on attached page

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL (indicate method for each person or entity served)**: Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on February 6, 2009, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

    ☒   Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| February 6, 2009 | Susan Connor | |
|---|---|---|
| Date | Type Name | Signature |

MAINDOCS-#126738-v3-SCCOmnibusOppReRFS.DOC

**BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")**

- Raymond H Aver    ray@averlaw.com
- James C Bastian    jbastian@shbllp.com
- Paul J Couchot    pcouchot@winthropcouchot.com, pj@winthropcouchot.com
- Caroline Djang    crd@jmbm.com
- Joseph A Eisenberg    jae@jmbm.com
- Richard W Esterkin    resterkin@morganlewis.com
- Alan J Friedman    afriedman@irell.com
- Kelly C Griffith    bkemail@harrisbeach.com
- Asa S Hami    ahami@morganlewis.com
- Michael J Hauser    michael.hauser@usdoj.gov
- Michelle Hribar    mhribar@rutan.com
- Peter W Lianides    pj@winthropcouchot.com
- Charles Liu    cliu@winthropcouchot.com
- Kerri A Lyman    klyman@irell.com
- Cassandra J Richey    cmartin@pprlaw.net
- Debra Riley    driley@allenmatkins.com
- Martha E Romero    Romero@mromerolawfirm.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
- Jason Wallach    jwallach@bergerkahn.com

**MAIL**

| | |
|---|---|
| Wells Fargo Equipment Finance, Inc.<br>c/o Solomon, Grindle, Silverman & Spinella<br>Richard A. Solomon, Esq.<br>12651 High Bluff Dr., #300<br>San Diego, CA 92130 | Secured Creditor<br>OVC Holdings LLC<br>c/o Trimont Real Estate Advisors, Inc.<br>2 Park Plaza, Suite 850<br>Irvine, CA 92614-8515 |
| General Security Services, Inc.<br>c/o Treacy & Keidser LLP<br>Kari A. Keidser, Esq.<br>5777 West Century Park Blvd., #1100<br>Los Angeles, CA 90045 | Asphalt Professionals, Inc.<br>c/o Law Offices of Ray B. Bowen, Jr., Esq.<br>19318 Ventura Blvd., #100<br>Tarzana, CA 91356-3097 |

**EMAIL SERVICE**

| | |
|---|---|
| Mr. Steve Elieff<br>SCC Acquisitions, Inc. | selieff@suncal.com<br>bcook@suncal.com |
| AMEC Earth & Environmental<br>c/o Gibbs, Giden, etc.<br>Christopher E Ng., Esq. | cng@gglts.com |

MAINDOCS-#126738-v3-SCCOmnibusOppReRFS.DOC

| | | |
|---|---|---|
| 1 | Jeffrey Fitts<br>Alvarez & Marsal | jfitts@alvarezandmarsal.com<br>jeff.fitts@lehman.com |
| 2 | | |
| 3 | Wood Rogers<br>c/o Murphy Austin etc.<br>J. Scott Alexander, Esq. | salexander@murphyaustin.com |
| 4 | | |
| 5 | Lehman Ali & Lehman Commercial<br>c/o Weil, Gotshal & Manges LLP<br>Elise Lemmer, Esq.<br>Edward Soto, Esq.<br>Shai Waisman, Esq.<br>Gregory Hull, Esq. | elisa.lemmer@weil.com<br>Edward.soto@weil.com<br>Shai.waisman@weil.com<br>Gregory.hull@weil.com |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | Lehman Ali & Lehman Commercial<br>c/o Jeffer, Mangels, Butler & Marmaro LLP<br>Joseph A. Eisenberg P.C. | jeisenberg@jmbm.com |
| 10 | | |

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MAINDOCS-#126738-v3-SCCOmnibusOppReRFS.DOC