**Exhibit "L"**

# MILLER BARONDESS, LLP

ATTORNEYS AT LAW
1999 AVENUE OF THE STARS
SUITE 1000
LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400
FAX: (310) 552-8400
www.millerbarondess.com

March 18, 2010

LOUIS R. MILLER
DIRECT DIAL: (310) 552-5251
EMAIL: SMILLER@MILLERBARONDESS.COM

*VIA U.S. MAIL & E-MAIL*

Richard Pachulski
Pachulski, Stang Ziehl & Jones
10100 Santa Monica Blvd., Suite 1100
Los Angeles, CA 90067

Re:  *Palmdale Hills Properties and its Related Debtors*
     *United States Bankruptcy Court 8:08-bk-17206-ES*

Dear Richard:

I am writing regarding the issue of the Fenway Repo, its role in the case and its impact on these proceedings. I write this not in order to trade accusations, but because there are highly disturbing issues that need to be addressed. I write because, as the law firm on your side of this case apparently not involved in the acts addressed below, I think you have an obligation to investigate and get to the bottom of these matters.

### The Fenway Repo

Fenway entered into the $3 billion repurchase transaction ("Repo") with Lehman Commercial Paper, Inc. ("LCPI") on August 22, 2008—three days *before* the Lehman Entities signed the August 25, 2008 Settlement Agreement with the Suncal Debtors, reaffirming their willingness and agreement to restructure the loans and assume the Debtors' obligations in connection with the Projects securing the loans. This was three weeks before the parent Lehman company, Lehman Brothers Holdings, Inc. ("LBHI"), filed for bankruptcy on September 15, 2008.

The timing alone indicates that the Lehman entities could not—and never intended to—honor the terms of the Settlement Agreement when they signed it on August 25, 2008. But that is not all. The Repo was not an isolated transaction, but rather one piece of a series of simultaneous transactions designed to inflate and misrepresent the condition of Lehman's balance sheet. Specifically,

61290.8

**MILLER BARONDESS, LLP**

Richard Pachulski
March 18, 2010
Page 2

 (a) LCPI sold $1.5 billion in SunCal loans (the "Sold Loans") to Fenway pursuant to the Repo;

 (b) At the same time, Fenway issued a "variable funding" note ("VFN") to its affiliate, Fenway Funding LLC ("Fenway Funding"), secured by the proceeds of the Repo, i.e., the Sold Loans;

 (c) Fenway Funding then issued commercial paper notes ("CP Notes") to LBHI, which in turn were backed by the proceeds of the VFN (i.e., Fenway Funding's rights in the Sold Loans); and

 (d) LBHI pledged the CP Notes to JP Morgan as collateral for liquidity from JPMorgan.

 It appears that Lehman was lending money to itself so that it could provide JPMorgan with something other than the Sold Loans—loans secured by essentially undeveloped California land—as collateral to obtain cash from JPMorgan to alleviate Lehman's severe financial stress. As a result of these "transactions," the collateral Lehman pledged to JPMorgan was not the Sold Loans, but rather CP Notes that were only indirectly backed by the Sold Loans.

 As Fenway's own person most knowledgeable, Irena Goldstein, testified in deposition, "it was basically at the end of the day one Lehman entity owing money to another Lehman entity through Fenway as a conduit." Goldstein Depo. Tr. 27:15-17. And as Fenway's attorney Richard Reinthaler recently told the Court on February 11, 2010, Fenway was a "straw man with no economic interest" in the Repo transaction.

 Plainly, Fenway was not an independent purchaser. Although we do not know the full extent of Fenway's history with Lehman, Ms. Goldstein testified that Lehman had an ownership interest in Fenway's "program manager," Hudson Castle Group, Inc. ("Hudson"), at the time of the Repo. We have also learned that the Hudson principals had been longstanding Lehman employees prior to Hudson's formation.

 The Repo confirmations—on which the Lehman Entities have repeatedly relied—indicate that the Sold Loans were sold to Fenway in August 2008 at par value, at a time when the actual value of the loans was only a small fraction of par value. The Repo was not only concealed from the Debtors; it was part of an effort to conceal Lehman's faltering finances from investors, regulators and shareholders.

 The recently released 2,300-page examiner's report in the Lehman bankruptcy (the "Examiner's Report") confirms all this and more. The Examiner's Report corroborates that Fenway was actually at the heart of both Lehman's collapse and the deceit Lehman had been engaging in to try to stave off that collapse. Thus, the significance of Fenway and the Repo— and the attendant machinations and cover-up—potentially extend well beyond the parameters of the instant litigation.

61290.8

**MILLER BARONDESS, LLP**

Richard Pachulski
March 18, 2010
Page 3

By early 2008, if not sooner, "it was clear—and clear to Lehman—that its net leverage and liquidity numbers were of critical importance." Exam. Rpt. at 5.

> After the Bear Stearns crisis in March 2008, it became acutely apparent to Lehman that *any disruption in liquidity could be catastrophic.* Lehman thus paid careful attention to its liquidity pool *and how it was described in the market.*"

*Id.* at 1082 (emphasis added). But Lehman's "ability to deleverage by selling assets was severely limited by the illiquidity and depressed prices of the assets it had accumulated." *Id.* at 18.[1] Accordingly, Lehman turned to creative accounting and other maneuvers to maintain outside confidence and its access to vital liquidity from parties such as JPMorgan.

The Examiner's Report confirms that Fenway was conceived by Lehman to re-package its own illiquid assets—including its commercial real estate loans. *See* Exam. Rpt. at 1103 n. 4024 (Lehman "created" Fenway, "by securitizing ... or funding ... its own illiquid corporate and commercial real estate loans."). When, in the summer of 2008, JPMorgan demanded $5 billion in additional collateral from Lehman to secure the liquidity that JPMorgan was providing, Fenway was among the assets that Lehman pledged. *See id.* at 1102-03.

Once JPMorgan began to realize what was really going on, it was greatly concerned about the true value of its collateral. On or about September 11, 2008,

> JPMorgan learned that a security known as Fenway, which Lehman had posted to JPMorgan at a stated value of $3 billion, was actually asset-backed commercial paper credit-enhanced by Lehman (that is, it was Lehman, rather than a third party, that effectively guaranteed principal and interest payments). JPMorgan concluded that *Fenway was worth practically nothing as collateral.*

Exam. Rpt. at 1071-72 (emphasis added); *see id.* at 1159-60 (JPMorgan's outside counsel described the Fenway commercial paper that had been pledged to JPMorgan as "'conduit CP'... which had been represented by Lehman to be worth par.").

JPMorgan's concerns about Fenway contributed to its demand that Lehman post $5 billion in cash as collateral by the following day, September 12, 2008—the last business day before Lehman collapsed. *See id.* at 1160-65.

---

[1] SunCal constituted a "significant portion" of these assets, and Lehman apparently tried to minimize the impact on its financial condition. *See id.* at 266 n.974 ("A significant portion of positions held in the Commercial Book related to Lehman's investments in Archstone and SunCal. However, Lehman did not price test these positions as part of the Commercial Book price testing process."); *id.* at 239 (noting "prominence of Archstone and SunCal positions in 2008").

61290.8

**MILLER BARONDESS, LLP**

Richard Pachulski
March 18, 2010
Page 4

Lehman included Fenway in its "liquidity pool" in order to inflate its financial condition to ratings agencies, regulators, investors, and counterparties. *Id.* at 1420-21, 1439. Thus, not only was Lehman overstating the value of Fenway as collateral to JPMorgan, it was essentially "double counting" the Fenway commercial paper by including it in Lehman's liquidity figure when in fact it was encumbered.

### The Attempted Repo "Unwind"

That the Repo was a sham is further confirmed by Fenway's last-minute dash to unwind it. On Sunday, September 14, 2008, just hours before Lehman's bankruptcy filing, Fenway got Lehman's global treasurer, Paolo Tonucci, to sign an agreement purporting to "terminate" the Repo agreement and returning ownership of the Sold Loans to LCPI. Apparently, Lehman wanted to undo this manipulation but was unable to do so because it had already pledged the CP Notes to JPMorgan.

Fenway's attorney and PMK, Ms. Goldstein, testified in deposition that this attempted termination was unusual. She testified that she found it "amazing that [Lehman Treasurer Tonucci] had signed anything on September 14th given what was going on at Lehman Brothers at the time" (Goldstein Tr. 26:14-16); and that "no one has explained to me, *nor* will they and probably *should they*, what was the state of the [T]reasurer's mind when he signed this termination agreement." *Id.* at 28:22-25 (emphasis added).

Not only is this eleventh-hour scramble highly unusual, it also demonstrates that both Lehman and Fenway knew that unless and until the Repo was unwound, Fenway was the owner of the loans. Yet, neither Lehman nor Fenway disclosed the existence of the Repo or Fenway's ownership of the Sold Loans until they were outed and forced to do so, indicating the existence of a cover-up and giving rise to further serious legal issues.

### Concealment of the Fenway Repo

The Lehman Entities continuously represented that they were the *owners* of the obligations set forth in the Loans and, consequently, that they were *creditors* of the Debtors. For example, in the memorandum of points and authorities in support of the motions for relief from stay filed January 21, 2009, the Lehman Entities asserted that "LCPI is the administrative agent *and the sole lender*" under the SunCal Communities I Loan, the Ritter Ranch Loan and the Ritter Ranch Mezz Loan. Memo. of P's & A's at 7:13, 8:21, 9:4 (emphasis added).

The Debtors did not question the veracity of these representations—until on or about March 25, 2009 when Danske Bank disclosed that it was the owner of the Century City Loan. Based upon this disclosure, I requested, by letter of March 26, 2009, to Lehman Entities' attorney Ed Soto, that the Lehman Entities disclose whether any of the remaining Loans had been transferred to third parties.

61290.8

08-13555-mg    Doc 8812-15    Filed 05/05/10    Entered 05/05/10 22:20:20    Exhibit L
Pg 6 of 14

MILLER BARONDESS, LLP

Richard Pachulski
March 18, 2010
Page 5

On March 27, 2009—the day after my letter asking the Lehman Entities to come clean about the ownership of the loans—the Lehman Entities filed numerous proofs of claim ("POCs") with the Court in which they represented under oath that they, alone, were the "creditors" who owned the Sold Loans. Neither Fenway nor the Repo were mentioned in those POCs. While the riders to the POCs stated that the Lehman Entities were filing as agents for the "Lenders" under the respective loan agreements, the loan agreements listed only the Lehman Entities themselves as lenders.

The Lehman Entities did not respond to my letter of March 26, 2009, until after the Debtors propounded a subpoena on JPMorgan noticed for return on April 17, 2009. In a letter dated April 15, 2009, Mr. Soto finally disclosed that the Loans, which were secured by liens against no less than fifteen out of the twenty Projects, were subject to Repos. The Soto letter further said that the "various counterparties" to these agreements (primarily Fenway and/or J.P. Morgan) "may claim some interest" in these Loans. However, the letter did not disclose what "interest" these counterparties "may claim" and did not provide the Debtors any of the documentation relating to these claimed interests.

It was not until J.P. Morgan produced documents in response to the subpoena that the Repo and Fenway's ownership of the Sold Loans was finally discovered. Had the Debtors not vigorously pursued this issue through discovery, it is likely that the existence of Fenway never would have come to light; and that the aforesaid deception and cover-up never would have been exposed.

By order dated October 2, 2009, the Court found that the Lehman Entities made "misrepresentations" on the POCs when they asserted that they, alone, were the creditors who owned the loans. Indeed, the Lehman Entities' attempt to conceal the sale of the loans to Fenway indicates that Lehman and Fenway thought they had something to hide and, thus, that the Repo transaction itself was improper when it occurred in August 2008.

Although Fenway claims that it is a "straw man" with "no economic interest" in the Sold Loans (as if that somehow helps it when it is accused of facilitating a sham transaction), Fenway's conduct in this litigation says otherwise. If Fenway's witnesses really had no material information, and Fenway really had no "skin in the game," Fenway would not be fighting so hard against producing documents or witnesses for deposition. I have never seen a party to a litigation—let alone one that claimed to be disinterested—resist discovery as intensively as Fenway has done here.

Indeed, the evidence that the Fenway–Lehman transactions were fraudulent not merely as to SunCal and the Debtors, but also as to Lehman's investors and the public at large, explains the Lehman Entities' and Fenway's *motivation* and the lengths to which they went to conceal the Repo from the Court and the Debtors. Lehman and Fenway sought to avoid having their relationship explored, their transactions scrutinized and their wrongdoing come to light, because

MILLER BARONDESS, LLP

Richard Pachulski
March 18, 2010
Page 6

they knew that the implications could spill beyond the Lehman Entities' dispute with the Debtors.

### The Reinthaler Revelations

Fenway's lead attorney recently made significant admissions regarding $1.5 billion worth of POCs filed by the Lehman Entities ostensibly on Fenway's behalf.

In order to have properly filed the POCs as Fenway's agents under Bankruptcy Rule 3001(b), Lehman must have been acting as Fenway's "authorized agent[s]." An "authorized agent" under that rule is one who has *express authority* to file a proof of claim on behalf of a creditor:

> It is noteworthy that the Supreme Court chose to employ the term '*authorized agent*' in Bankruptcy Rule 3001(b). Use of the qualification "authorized" reflects the Supreme Court's intention that an entity that files a proof of claim on another's behalf have *express*—and not merely implied—permission to do so.

*In re North Bay General Hosp., Inc.*, 404 B.R. 443, 459 (Bankr. S.D. Tex 2009) (emphasis added) (noting the Bankruptcy Rules are promulgated by the Supreme Court).

In arguing that the Lehman Entities filed the POCs as "expressly authorized" agents of Fenway, as the law requires, the Lehman Entities and Fenway conceded that: (1) the underlying loan agreements did not mention the authority to file POCs; and (2) there was never any communication between Fenway and the Lehman Entities mentioning POCs. Rather, the Lehman Entities argued that they were authorized generally to take actions on Fenway's behalf in the bankruptcies and that this authorization necessarily included the filing of POCs.

This is the position the Court accepted in its January 28, 2010, Findings of Fact and Conclusions of Law regarding the agency issue: "It is sufficient that Ms. Goldstein testified she expected the Lehman Lenders to pursue recovery on behalf of Fenway in the SunCal bankruptcies and certainly pursuing and attempting to recover would necessarily include the filing of the Proofs of Claims." Conclusion 2.7. Debtors have appealed this ruling.

However, at the February 11, 2010 hearing on Fenway's and the Lehman Entities' motions to dismiss, Fenway attorney Richard Reinthaler stated that Fenway did *not* authorize the Lehman Entities to engage in the actions they undertook in connection with the Debtors' bankruptcies. This directly and unequivocally undercuts the basis for the finding of an expressly authorized agency.

The authority to file proofs of claims was upheld *solely* because it was part and parcel of the broader authority to act in bankruptcy; yet Mr. Reinthaler repudiated that very same agency. As he asserted in open Court:

61290.8

**MILLER BARONDESS, LLP**

Richard Pachulski
March 18, 2010
Page 7

> [T]here is nothing in the complaint, in the repo agreement, or in the related transaction documents that would suggest or permit the plausible inference that the Lehman entities were acting as Fenway's agents in connection with Lehman's alleged failure to close the so-called settlement agreement, Lehman's alleged failure to fund the projects, Lehman's alleged withdrawal of funds from the projects, Lehman's alleged efforts to block the debtors' bankruptcies, its invocation of the automatic stay in its own bankruptcy case, et cetera, et cetera. All of the alleged acts in the complaint relate solely to Lehman's entirely separate relationship with SunCal. There is no allegation in the complaint that Fenway had knowledge of or acquiesced in any of that conduct. *And even with respect to the proofs of claim, as your Honor is aware, the record in this proceeding is clear, that no one at Fenway ever received or approved the proof of claim forms before they were filed.* Fenway, through its counsel, merely sought and received assurances from Lehman that it was taking appropriate action to protect Fenway's interest in the loans.

Transcript of Proceedings, Feb. 11, 2010, 137:19-138:14 (emphasis added).

Fenway is plainly attempting to gerrymander the scope of the purported agency to suit its convenience. When it benefited Fenway, it insisted that the Lehman Entities were acting as its authorized agent in "pursu[ing] recovery on behalf of Fenway in the SunCal bankruptcies"—which includes moving for relief from stay, as well as LCPI's "invocation of the automatic stay in its own bankruptcy case." Now Fenway backtracks to avoid the incriminating implications of that agency relationship. Fenway's backtracking undercuts—and we believe negates—its "authorized agency" position.

Mr. Reinthaler's statements in Court constitute, by law, judicially-binding admissions. *Magallanes-Damian v. INS*, 783 F.2d 931, 934 (9th Cir. 1986) ("Petitioners are bound by the conduct of their attorneys, including admissions made by them...."); *McCaskill v. SCI Mgmt Corp.*, 298 F.3d 677, (9th Cir. 2002) ("The verbal admission by SCI's counsel at oral argument is a binding judicial admission, the same as any other formal concession made during the course of proceedings."); *Kohler v. Inter-Tel Technologies*, 244 F.3d 1167, 1170 n.3 (9th Cir. 2001) ("attorney's statement during oral argument constitutes judicial admission").

The Debtors have supplemented the record on appeal of the agency issue to include the hearing transcript containing the Reinthaler judicial admission, as a further basis for reversal and remand. Mr. Reinthaler's statements make it likely that the Court's ruling on the agency issue will be reversed on appeal and remanded, subjecting the $1.5 billion in claims filed by the Lehman Entities purportedly on behalf of Fenway to being stricken for lack of authorization.

61290.8

MILLER BARONDESS, LLP

Richard Pachulski
March 18, 2010
Page 8

### RICO Claim

It gets worse. Not only does the Lehman Entities' and Fenway's conduct in engaging in and covering up the sham Repo constitute inequitable conduct for purposes of equitable subordination; it also exposes them to potential RICO liability under 18 U.S.C. § 1964.[2]

Section 1964(c) provides for a private right of action—and treble damages and attorney's fees—for victims of RICO violations under Section 1962. *See* 18 U.S.C.A. § 1964(c) ("Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . .").

Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." Section 1962(d) makes it unlawful to conspire to violate the other substantive RICO provisions.

An "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C.A. § 1961(4). "RICO's enterprise element does not require the allegation or proof of any separate organizational structure." *Newcal Industries, Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1056 (9th Cir. 2008).

A "'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C.A. § 1961(5). Under section 1961(1)(B), the offenses that can constitute a predicate act of "racketeering activity" include, among others, mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343) and obstruction of justice (18 U.S.C. § 1503).

There is controlling Ninth Circuit authority upholding allegations of a "pattern of racketeering activity" based on similar, though less egregious, facts than those here. In *Sun Savings & Loan Ass'n v. Dierdorff*, 825 F.2d 187 (9th Cir. 1987), the former president of a savings and loan was alleged to have created a secret checking account under a fictitious name where he deposited moneys he received through a fraudulent kickback scheme, and then wrote four separate letters over a five month period to state and federal agencies and to Sun's outside auditor seeking to conceal the true purpose of the account and the nature of the scheme. These four letters were the predicate acts of mail fraud for the RICO claim, and the Ninth Circuit held that there was sufficient "continuity" among these acts to constitute a "pattern."

---

[2] All section references herein are to Title 18 of the United States Code unless otherwise indicated.

61290.8

MILLER BARONDESS, LLP

Richard Pachulski
March 18, 2010
Page 9

Here, the Repo plainly was part of an effort by Lehman to "launder" its real estate loans and conceal its true financial condition. Fenway was just as clearly a willing participant in this effort. The Repo was concealed from SunCal and the Debtors, even though it took place just days before the Lehman Entities affirmed, through their signing of the August 25, 2008 Settlement Agreement, their willingness and ability to restructure the Debtors' loans.

Lehman's scheme to cover-up its improper conduct continued even after the bankruptcy was filed.

- On November 18, 2008, LCPI opposed a motion for relief from automatic stay to allow the Debtors to, among other things, obtain a priming loan to pay creditors or preserve value in the Projects. In opposing the motion, LCPI argued that Debtors had "failed to show that cause exists to modify its automatic stay," and specifically cited its interests in "approximately $2.0 billion" in obligations owed by the Debtors notwithstanding the fact that most of the purported obligations were owned by Fenway.[3] The New York court denied the motion.

  In fact, the stay relief motion that Debtors filed was also the direct result of Lehman's outright deceit regarding it's ownership of the Sold Loans, and the applicability of LCPI's automatic stay. That motion came about after 60 days of SunCal imploring Lehman in countless letters and telephone calls to address, among other urgent matters, health and safety issues arising on the properties as a result of an unusually strong fire season in California. After indicating it would make such a loan for several weeks and requesting several modifications to proposed budgets, Lehman abruptly informed SunCal that such a loan would not be forthcoming, and that SunCal should simply cooperate in turning over the properties to Lehman and its new regime. In addition to forcing them to seek Chapter 11 protection, Debtors were forced to seek alternative financing that would address the critical needs of the Projects. Debtors made alternative arrangements with D.E. Shaw. However, because Lehman had refused to stipulate to relief from stay, D.E.

---

[3] *Debtors' Objection to the SCC Entities' Motion for Relief from the Automatic Stay* [S.D.N.Y. 08-13555, D.E. 1584] at 2, 3 ¶ 1. ("Lehman Commercial Paper, Inc. ('LCPI'), Lehman ALI, Inc. ('Lehman ALI'), a non-debtor affiliate of LBHI, OVC Holdings LLC ('OVC Lender'), a non-debtor affiliate of LBHI, and Northlake Holdings LLC ('Northlake Lender' and together with LCPI, Lehman ALI and OVC Lender, the 'Lehman Lenders'), a non-debtor affiliate of LBHI, are lenders to certain of the SCC Entities (collectively, the 'SCC Borrowers') pursuant to various separate loan agreements and are owed by the SCC Borrowers approximately $2.0 billion on account of such obligations (the 'Obligations'). The Obligations are secured, in part, by first priority deeds of trust on various real estate projects located in the State of California (collectively, the 'Projects').")

61290.8

**MILLER BARONDESS, LLP**

Richard Pachulski
March 18, 2010
Page 10

> Shaw conditioned the financing on an order granting relief from stay in New York, and an offer to purchase all of the Debtors' properties subject to approved overbid procedures. As described above, Debtors filed the motion, which Lehman boldly opposed on the basis of LCPI's inapplicable stay, and the New York Court denied the motion.
>
> - On January 16, 2009, still in need of financing, seven Debtors filed a motion for the use of Palmdale Hills cash collateral to address the critical needs of those Debtors' Projects (the "Cash Collateral Motion"). LCPI again falsely invoked its automatic stay and on that ground objected to the Cash Collateral Motion. LCPI also filed a motion to enforce its purported stay in its own Chapter 11 proceeding in New York, invoking the power of the New York court, and threatening Debtor's general insolvency counsel with sanctions if Debtors did not dismiss the motion. With the threat of sanctions looming for violating LCPI's automatic stay, Debtors were forced to take the motion off calendar. The Ritter Ranch Loan, which was the subject of the Cash Collateral Motion, had at that time already been sold to Fenway pursuant to the Repo. LCPI had no legitimate basis to oppose the motion or invoke its purported automatic stay.
>
> - On January 23, 2009, LCPI moved for relief from stay in the bankruptcy proceedings of certain Debtors to foreclose on the SunCal Communities I Loan, Ritter Ranch Loan and SCC Palmdale Loan. Lehman ALI also moved for relief from stay in the bankruptcy of SunCal Bickford to foreclose on the Bickford Second Loan (collectively, the "Stay Relief Motions"). LCPI argued, among other things, that these Debtors could not defend against its Stay Relief Motions, because its automatic stay prevented them from seeking to equitably subordinate LCPI's claims. *These contentions were false.* LCPI did not even own the SunCal Communities I Loan or the Ritter Ranch Loan.
>
> - In February 2009, SCC Communities, SunCal Del Rio, SunCal Tesoro, and the Trustee, filed a motion seeking, among other things, an order approving overbid procedures relating to the proposed sale of the Joshua Ridge, Del Rio, Tesoro Burnham, and the nine Trustee Projects to D.E. Shaw ("Sales Procedures Motion"). The Sales Procedures Motion was later amended to include only the sale of the Trustee Debtors' nine Projects. On March 9, 2009, Weil Gotschal threatened that it would seek sanctions in New York for the Debtors' purported "flagrant violation" of LCPI's automatic stay, unless the moving Debtors withdrew the Sales Procedures Motion by the next morning. The same day, LCPI e-mailed a "letter brief" to the Bankruptcy Courts in California and in New York, arguing that the Sales Procedures Motion violated its automatic stay. The letter brief also attached the motion for sanctions that LCPI intended to file in New York. By virtue of this deceit and manipulation, Lehman effectively tried to pit two federal judges—Judge Smith in the Central District of California and Judge Peck in the Southern District of New York—against each other regarding the issue of who would determine the scope of LCPI's *inapplicable* stay. As a result, Debtors were forced to file an

61290.8

MILLER BARONDESS, LLP

Richard Pachulski
March 18, 2010
Page 11

emergency motion for an order from Judge Smith confirming that the Sales Procedures Motion did not violate LCPI's automatic stay. The Court granted that motion.

These are but a few examples of Lehman's pattern of fraudulent filings and repeated improper invocation of its purported (inapplicable) stay.[4]

Alvarez & Marsal may be liable for RICO violations to the same extent as Lehman. Alvarez & Marsal concealed the facts relating to the Repo in late 2008. On November 18, 2008, it was Alvarez & Marsal's Jeff Fitts that sent letters on behalf of each of the Lehman equity members and addressed to the SunCal equity members refusing to consent to the voluntary bankruptcy filings by the Trustee debtors so that Lehman could foreclose on loans it did not own. Moreover, it was Alvarez & Marsal's Mr. Pietroforte who executed and authorized the filing of the proofs of claim, which misrepresented the ownership of the Sold Loans and further concealed the existence of the Repo.

In addition to the potentially billions of dollars in harm sustained by Lehman's own investors and creditors, Lehman's conduct has directly injured the parties to these proceedings. First, the Debtors have been forced to incur the costs associated with maintaining the properties, in order to preserve their value, rather than being allowed to develop or sell them. Had Lehman disclosed the existence of the Repos in November 2008, and not falsely invoked LCPI's stay, a stay relief order in New York would not have been a condition of the arrangement with D.E. Shaw. The priming loan and sale motion subject to overbid of *all* of the Debtors' properties would have gone forward in late 2008, and would have been complete in or around the first quarter of 2009. Instead, 18 months later, tens of millions of dollars have been spent in order to simply preserve the properties. After having been threatened with sanctions and contempt on multiple occasions with respect to LCPI's stay, and having been denied relief from stay in New York, neither D.E. Shaw nor Debtors felt they were legally allowed to sell the properties allegedly subject to the LCPI liens. In fact, the Voluntary Debtors' Projects with loans tied to LCPI were *purposely excluded* from the Sales Procedures Motion out of concerns that such attempts would violate LCPI's stay. Had LCPI not falsely invoked its stay, the Projects could have been sold to D.E. Shaw or another third party pursuant to procedures similar to those set forth in the Sales Procedures Motion. Lehman's acts have therefore also harmed the creditors who continue to go unpaid.

Second, as a result of Lehman's numerous fraudulent filings, the Debtors have been forced to incur attorneys' fees in order to defend against Lehman's baseless and unjustifiable legal maneuvering in New York and California federal district courts. In addition to the litigation of each of the above-listed motions, Lehman forced the Debtors to incur the time and

---

[4] Lehman's pattern of improperly invoking the automatic stay of LCPI by filing misleading documents certainly continued. In June 2009, the Lehman Entities asserted that they "did not bring the Stay Relief Motions on behalf of a third party that owns the property." (Opposition to Motions to Strike, at 20:5-6.) That was yet another falsehood perpetrated by Lehman.

61290.8

MILLER BARONDESS, LLP

Richard Pachulski
March 18, 2010
Page 12

cost of defending the bankruptcy court orders denying the Stay Relief Motions and holding that the Sales Procedures Motion did not violate LCPI's automatic stay before the Ninth Circuit Bankruptcy Appellate Panel.

The Lehman Entities—with assistance from Weil Gotschal and Alvarez & Marsal—submitted numerous POCs and other filings with the Court in 2009 wherein they concealed the existence of the Repo and the sale of the Sold Loans to Fenway, and tried to foreclose on loans they didn't own. We believe that these multiple ongoing acts in furtherance of the cover-up—as in the *Sun Savings* case—constitute predicate acts of mail and/or wire fraud, and in fact are more egregious.[5]

The efforts to cover-up the Repo and Fenway's ownership through false and misleading filings with the Court may also constitute the predicate RICO offense of obstruction of justice. Section 1503(a) provides that "Whoever corruptly... endeavors to ... impede any...officer in or of any court of the United States...in the discharge of his duty...or corruptly...influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished...."

Here, there appears to have been an attempt to conceal material facts from and/or actively mislead the Court. *United States v. Lench*, 806 F.2d 1443, 1445 (9th Cir. 1986) (party failed to produce documents in response to grand jury subpoena; "These actions constitute at least an endeavor to conceal, if not outright concealment. Under section 1503, that is all that is necessary to obstruct justice."); *United States v. Spalliero*, 602 F. Supp. 417, 425-26 (C.D. Cal. 1984) (evasive answers can also constitute obstruction of justice).

Thus, at the very least, the Lehman Entities, Fenway, Alvarez & Marsal and its agent, Gerald Pietroforte (who personally reviewed and signed under oath the false and misleading POCs that concealed Fenway and the Repo), face possible civil and/or criminal RICO exposure. The civil RICO claim may be property of the Debtors' estates. *Smith v. Arthur Andersen LLP*, 421 F.3d 989, 1002 (9th Cir. 2005) ("property" of estate under 11 U.S.C. § 541(a)(1) includes the debtor's "causes of action").

These are serious matters, implicating potential legal and ethical issues. Before pursuing them, I would like the benefit of your thoughts and any and all additional facts and

---

[5] The filings, letters, and POCs identified herein potentially account for at least 20 separate acts of fraud between November 2008 and June 2009. *Cf. Sun Savings & Loan Ass'n*, 825 F.2d 187 (holding that four letters sent over a five month period to conceal the fraudulent checking account scheme constituted a "pattern" as predicate acts of mail fraud for a RICO claim.)

61290.8

MILLER BARONDESS, LLP

Richard Pachulski
March 18, 2010
Page 13

considerations, so we are fully informed as we move forward. Thank you for your consideration.

Sincerely,

Louis R. Miller

LRM:ab
cc (via e-mail):   Richard Reinthaler
                   Ed Soto
                   Shai Waisman
                   Dean Ziehl

61290.8