1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS HOLDINGS INC., et al.

            Debtors.

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS INC.

            Debtor.

- - - - - - - - - - - - - - - - - - - -x

            United States Bankruptcy Court

            One Bowling Green

            New York, New York


            April 30, 2010

            9:40 AM


B E F O R E :

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

2

1

2   HEARING re Statement of the Securities Investor Protection

3   Corporation in Support of Trustee's Motion for Relief Pursuant

4   to the Sale Orders or, Alternatively, For Certain Limited

5   Relief Under Rule 60(b)

6

7   HEARING re Objection of HWA 555 Owners, LLC to the Motions of

8   Lehman Brothers Holdings Inc., James W. Giddens as Trustee for

9   Lehman Brothers Inc., and the Official Committee of Unsecured

10  Creditors of Lehman Brothers Holdings Inc. to Modify the

11  September 20, 2008 Sale Order and for Other Relief

12

13  HEARING re Statement of the Bank of New York Mellon Trust

14  Company in Support of the Motions for (I) an Order Modifying

15  the September 20, 2008 Sale Order and Granting Other Relief and

16  (II) to Unseal Motions for Relief from September 20, 2008 Sale

17  Order (and Related SIPA Sale Order)

18

19

20

21

22

23

24

25

3

1

2    HEARING re Joint Statement And Reservation of Rights of the

3    Bank Of Tokyo-Mitsubishi UFJ, Ltd. and Lloyds TSB Bank, plc in

4    Connection with (I) Motions of Lehman Brothers Holdings, Inc.,

5    The Official Committee Of Unsecured Creditors, And James W.

6    Giddens, as Trustee For Lehman Brothers, Inc., for Certain

7    Relief Pursuant to the September 20, 2008 Sale Orders; and (II)

8    Motion of Barclays Capital Inc. to Enforce the Sale Orders and

9    Secure Delivery Of Undelivered Assets

10

11   HEARING re Australia & New Zealand Banking Group LTD's Letter

12   Regarding Rule 60 Proceedings

13

14   HEARING re LibertyView's: (A) Joinder to (i) the SIPA Trustee's

15   Motion, (ii) the Committee's Motion; and (iii) LBHI's Motion

16   for Relief from the Sale Orders or, Alternatively, for Certain

17   Limited Relief Under Rule 60(b); and (B) Objection to Barclays

18   Capital Inc.'s Motion to Enforce the Sale Order

19

20   HEARING re Joinder of Newport Global Opportunities to

21   LibertyView's: (A) Joinder to (i) the Trustees' Motion, (ii)

22   the Committee's Motion; and (iii) LBHI's Motion for Relief from

23   the Sale Orders or, Alternatively, for Certain Limited Relief

24   Under Rule 60(b); and (B) Objection to Barclays Capital Inc.'s

25   Motion to Enforce the Sale Order

4

1

2 HEARING re Motion of Debtor to Modify the September 20, 2008

3 Sale Order and Granting Other Relief

4

5 HEARING re Motion of the Trustee for Relief Pursuant to the

6 Sale Orders or, Alternatively, for Certain Limited Relief Under

7 Rule 60(b)

8

9 HEARING re Motion of Official Committee of Unsecured Creditors

10 of Lehman Brothers Holdings Inc., Authorizing and Approving (a)

11 Sale of Purchased Assets Free and Clear of Liens and Other

12 Interests; and (b) Assumption and Assignment of Executory

13 Contracts and Unexpired Leases, Dated September 20, 2008 (and

14 Related SIPA Sale Order) and Joinder in Debtors and SIPA

15 Trustees' Motions for an Order Under Rule 60(b) to Modify Sale

16 Order

17

18 HEARING re Motion of Barclays Capital Inc. to Enforce the Sale

19 Order and Secure Delivery of All Undelivered Assets

20

21 HEARING re Trustee's Adversary Complaint

22

23 HEARING re LBHI's Adversary Complaint

24

25 Transcribed by:  Lisa Bar-Leib

5

1

2   A P P E A R A N C E S :

3   JONES DAY

4        Special Counsel for the Debtors

5        222 East 41st Street

6        New York, NY 10017

7

8   BY:   ROBERT W. GAFFEY, ESQ.

9        WILLIAM J. HINE, ESQ.

10

11   QUINN EMMANUEL URQUHART OLIVER & HEDGES, LLP

12        Special Counsel to the Official Committee of Unsecured

13         Creditors

14        51 Madison Avenue

15        22nd Floor

16        New York, NY 10010

17

18   BY:   SUSHEEL KIRPALANI, ESQ.

19        JAMES C. TECCE, ESQ.

20        RICHARD I. WERDER, JR., ESQ.

21

22

23

24

25

6

1

2    QUINN EMMANUEL URQUHART OLIVER & HEDGES, LLP

3          Special Counsel to the Official Committee of Unsecured

4           Creditors

5          865 S. Figueroa St., 10th Floor

6          Los Angeles, CA 90017

7

8    BY:   ERICA P. TAGGART, ESQ.

9

10   HUGHES HUBBARD & REED LLP

11         Attorneys for the James W. Giddens, SIPA Trustee

12         One Battery Park Plaza

13         New York, NY 10004

14

15   BY:   WILLIAM R. MAGUIRE, ESQ.

16

17   SECURITIES INVESTOR PROTECTION CORPORATION

18         805 15th Street, N.W.

19         Suite 800

20         Washington, DC 20005

21

22   BY:   KENNETH J. CAPUTO, ESQ.

23

24

25

7

1

2    BOIES, SCHILLER & FLEXNER LLP

3         Attorneys for Barclays Capital, Inc.

4         333 Main Street

5         Armonk, NY 10504

6

7    BY:   DAVID BOIES, ESQ.

8

9    BOIES, SCHILLER & FLEXNER LLP

10        Attorneys for Barclays Capital, Inc.

11        5301 Wisconsin Avenue, N.W.

12        Washington, DC 20015

13

14   BY:   HAMISH P.M. HUME, ESQ.

15        JONATHAN D. SCHILLER, ESQ.

16

17   BOIES, SCHILLER & FLEXNER LLP

18        Attorneys for Barclays Capital, Inc.

19        10 North Pearl Street

20        4th Floor

21        Albany, NY 12207

22

23   BY:   TRICIA J. BLOOMER, ESQ.

24

25

8

 1

 2   BOIES, SCHILLER & FLEXNER LLP

 3        Attorneys for Barclays Capital, Inc.

 4        401 East Las Olas Boulevard

 5        Suite 1200

 6        Fort Lauderdale, FL 33301

 7

 8   BY:   TODD THOMAS, ESQ.

 9

10   GOODWIN PROCTER LLP

11        Attorneys for Evergreen Solar Inc.

12        The New York Times Building

13        620 Eighth Avenue

14        New York, NY 10018

15

16   BY:   K. BRENT TOMER, ESQ.

17

18   CHAPMAN & CUTLER

19        Attorneys for Creditor, US Bank

20        111 West Monroe Street

21        Chicago, IL 60603

22

23   BY:   JAMES HEISER, ESQ.

24        FRANKLIN H. TOP III, ESQ.

25        (TELEPHONICALLY)

9

1

2    DEWEY & LEBOEUF LLP

3        Attorneys for CAPCO, Inc.

4        1301 Avenue of the Americas

5        New York, NY 10019

6

7    BY:   ELIZABETH P. SMITH, ESQ.

8        (TELEPHONICALLY)

9

10   STUTMAN TREISTER & GLATT

11       Attorneys for Interested Party, Elliott Company

12       1901 Avenue of the Stars, 12th Floor

13       Los Angeles, CA 90067

14

15   BY:   WHITMAN L. HOLT, ESQ.

16       REBECCA S. REVICH, ESQ.

17       (TELEPHONICALLY)

18

19

20

21

22

23

24

25

10

1            P R O C E E D I N G S

2            THE COURT:  Be seated, please.  And we can proceed

3    with the trial.

4            MR. TAMBE:  Good morning, Your Honor.  Jay Tambe from

5    Jones Day, special counsel to the debtor, Lehman Brothers

6    Holdings, Inc.

7    RESUME DIRECT EXAMINATION

8    BY MR. TAMBE:

9    Q.    Good morning, again, Mr. Clackson.  How are you?

10   A.    Good morning.

11   Q.    Let's go back to a topic we were discussing at some length

12   yesterday, and that has to do with cure, and what it is that

13   you at Barclays knew about the magnitude of the cure assumed

14   liabilities prior to this Court's entry of the sale order in

15   the early hours of Saturday morning, the 20th of September.

16   Okay?  As of 9/19, which is the Friday --

17            MR. TAMBE:  Can you put the calendar up, please,

18   Steve?

19   Q.    As of 9/19, September 19th, the Friday, you knew that the

20   cure estimate that had been provided by Lehman to Barclays had

21   dropped from 2.25 to 1.5 billion, correct?

22   A.    Yes, that's correct.

23   Q.    And you knew as of Friday that on the list of contracts

24   provided to you by Lehman that the total list had total

25   exposure, outside exposure, of 800 million dollars, correct?

11

1    A.    I'm not aware that we had that list.  I thought we got it

2    something over the weekend.

3    Q.    Okay.

4         MR. TAMBE:  May I approach, Your Honor?

5         THE COURT:  Yes.

6         THE WITNESS:  Thank you.

7         THE COURT:  Thank you.

8    Q.    Sir, I placed before you a document marked Movants' Trial

9    Exhibit 95.  Take a moment to look at that series of e-mails

10   and let me know when you're done.

11   A.    Yes, I've looked at the exhibit.

12   Q.    And starting with the e-mail chain from the back of the

13   document to the front, you'll see that the last e-mail in the

14   chain is one from Gary Romain who was your head of technical

15   accounting, correct.

16   A.    Yes, that's correct.

17   Q.    And he is writing to Jay Westwood, and the subject is cure

18   payments.  Do you see that?

19   A.    Yes.

20   Q.    Okay.  And he writes to Jay that you, Patrick Clackson,

21   have suggested that you may be able to assist with an area of

22   judgment affecting the acquisition balance sheet.  You see

23   that?

24   A.    Yes.

25   Q.    Okay.  Drawing your attention to the second paragraph of

12

1    the e-mail that Gary has written to Jay.

2         MR. TAMBE:   And if you could just highlight that

3    second paragraph.

4    Q.   And he writes in there, "I believe you are looking into

5    this general area and was hoping you might have an initial view

6    of the proportion of the cures we might end up making.   I

7    believe the total list is something like 800 million, but would

8    imagine we'll end up rejecting a significant proportion of the

9    underlying contracts."  Do you see that?

10    A.   Yes, I can see that.

11    Q.   Okay.  And if you go up in the document to the response

12    from Jay Westwood, Mr. Westwood writes back to Gary Romain, "I

13    understood the critical piece was 158 million when got it

14    Friday."  Do you see that?

15    A.   Yes, I can see that.

16    Q.   And that's inline with your testimony yesterday where you

17    said that as of Friday, you, at Barclays, had identified what

18    you called mission-critical contracts which you need on day

19    one, and I think the number you used was around 200 million

20    yesterday.

21    A.   Yes.  I was aware there were some day one contracts, yes.

22    Q.   Having seen this e-mail from Jay Westwood, would you agree

23    with me that the range for the mission critical contracts, the

24    day one contracts, was probably close in the range of 150

25    million as opposed to 200 million?

13

1    A.   Yes.  My understanding was that the day one, sort of,

2    critical contracts was a list we got from Lehman, so I -- this

3    may relate to the same list.  I'm not sure.  But that was my

4    understanding.

5    Q.   I'm sorry, are you saying that the list of what was

6    critical --

7    A.   List of day one --

8    Q.   -- the list of what was mission critical was a

9    determination made by Lehman or a determination made by

10   Barclays?

11   A.   I don't -- I thought we -- because we didn't have the time

12   to work out that list, I thought we got the list from Lehman

13   but that was my understanding.  I, you know, wasn't involved in

14   the details, as I said, because I was in London.

15   Q.   I just want to be clear on one issue.  In terms of

16   identifying out of a list of all potential contracts that might

17   be subject to this cure, assumed liability, the decision as to

18   which were mission critical, that was a decision that you

19   believe was made by Lehman and not Barclays?

20   A.   That was my belief at that time.  I thought on the Friday,

21   we hadn't done, as I said, the detailed work to know which were

22   mission critical.

23   Q.   And what's the basis for that understanding, sir?

24   A.   That's just my recollection from the time.  But --

25   Q.   Someone told you that?

14

1    A.    Probably, yes.

2    Q.    Do you remember who told you that?

3    A.    I can't remember the details.

4    Q.    And had you made any assessment as to what proportion of

5    the list of contracts you believed that Barclays would be

6    assuming or be required to assume?

7    A.    As I said, I didn't remember -- I thought the work was

8    done over the weekend.  I didn't remember any of that work

9    being done until the next week.  Obviously, from this, it looks

10   like some work was being done on that Friday -- or Thursday, --

11   sorry -- this is Thursday, isn't it?

12   Q.    Okay.  If you could turn in the binder of exhibits, if you

13   still have it before you --

14   A.    Yeah.

15   Q.    -- to tab 41, Movants' 41.  And you recognize that, sir,

16   as an e-mail exchange -- an e-mail chain that first comes to

17   you from James Trevelyan, and then you forward it on to Rich

18   Ricci, do you see that?

19   A.    Yes.

20   Q.    Okay.  And what James is asking you is, in the second

21   paragraph of his e-mail, he's trying to get some clarity around

22   the negative goodwill number again.  Do you see that?

23   A.    Yes.

24   Q.    And he has there a version of the formula we talked about,

25   where you take the 2 and the 2.25 that's been listed in certain

15

1   schedules, the four and a quarter, and you take away from that

2   the circa 1.3 to come up with the negative goodwill number, do

3   you see that?

4   A.   Yes.

5   Q.   Okay, moving up to your response and forwarding that

6   response to Rich Ricci, you start of by telling Mr. Ricci the

7   official line FYI, do you see that?

8   A.   Yes.

9   Q.   And you were giving Mr. Ricci the official line with

10  respect to how to think about this accounting negative goodwill

11  concept, correct?

12  A.   Yeah, what I said yesterday, because there was a lot of

13  confusion because people were asking to try and understand how

14  this negative goodwill arose and where it came from.  But --

15  and they were asking Rich and myself, and I wanted to make sure

16  that Rich understood my understanding so that we didn't add

17  more confusion to the system.

18  Q.   And in your explanation to Mr. Ricci, you didn't correct,

19  sort of, the formula or the math that was being used by James

20  to describe where the negative goodwill was arising from,

21  correct?

22  A.   No.  In this e-mail, I didn't make any reference to that.

23  Q.   You mean, the formula was consistent with your view of how

24  that negative goodwill could be thought of, correct?

25  A.   Sorry.  I'd have to just read it to make sure.

16

1   Q.   Yes.

2   A.   Yes.  So I -- yeah, yes, that's correct.

3   Q.   All right.  Now going up to your response to Mr. Ricci,

4   with respect to cure payments -- so that's the third paragraph

5   of your e-mail, you state to Mr. Ricci, cure payments are

6   optional.  And though some will be incurred, most will be

7   covered by our ongoing supply relationships and fall into

8   monthly expenses.  Do you see that?

9   A.   Yes.  That was my understanding.

10  Q.   And you had reached that determination as of Friday,

11  September 19th, correct?

12  A.   Yeah, yes, that's correct.

13  Q.   And contracts that were covered by ongoing supply

14  relationships would be contracts that Barclays would have no

15  reason to assume, correct?  You have existing relationships

16  with those suppliers.

17  A.   I think as I said yesterday, yes, if we were getting some

18  of the services already, we wouldn't need to get the service

19  again, right.

20  Q.   And you knew as of September 19th that that was true with

21  respect to most of the contracts on the list?

22  A.   I don't know if I knew that.  I think at the time I hoped

23  that was the case.  But I don't think I had any knowledge,

24  because as I said, I don't think we'd had the time to go

25  through all the details at that point.

17

1    Q.    Well, you don't say to Mr. Ricci, "I hope most will be

2    covered," do you, sir?  You say, "Most will be covered."  Is

3    that right?

4    A.    Yes.  I also say I don't -- I don't say that I know most

5    will be covered, as well.

6    Q.    And this is still the week where you are being

7    conservative and not being a cowboy, correct?

8    A.    We're trying to work out what the right accounting rate,

9    the transaction is.

10   Q.    You're not trying to suggest to Mr. Ricci in this e-mail

11   that, well, there won't be many assumed liabilities.  If

12   anything, you want to be erring on the side of saying well,

13   there may be substantial liabilities, but that's not what you

14   say.  You say most will be covered by our ongoing

15   relationships, correct?

16   A.    As I said, that was my hope at the time.

17   Q.    And you know that to be the case on September 19th,

18   correct?

19   A.    That's not correct.  As I said, I didn't know.  I hoped

20   that was the case, but I didn't have the knowledge.

21   Q.    If we could turn back to another document we discussed

22   yesterday.  This was M-45, Movants' 45.

23        MR. TAMBE:  Steve, if you could just blow up the e-

24   mail, please.

25   Q.    And we discussed yesterday that you had received an Excel

18

1    spreadsheet from Jason Yang, which you then forwarded on to

2    Rich Ricci.  Do you remember that discussion?

3    A.   Yes, we did.

4    Q.   And this is happening on Friday, September 19th, correct?

5    A.   Yes.

6    Q.   Okay, we had also looked at the second page of this

7    exhibit which is a print-out of the Excel spreadsheet.  Do you

8    see that?

9    A.   Yes.

10   Q.   And it was your understanding that this was a document

11   created by Barclays, correct?

12   A.   I don't think I said I knew who it had been created by,

13   but it was my understanding, as I said yesterday, it was

14   something which gave us some idea of what was coming across in

15   the Fed facility.  I don't think I had any understanding of

16   where it came from.  Jason Yang did work for Barclays who

17   forwarded it.

18   Q.   And he worked in the same group as Mr. King, correct?

19   A.   Yes, he worked for Mr. King.

20   Q.   Okay, keeping your attention on M-45, I'm going to ask for

21   the native version of that Excel spreadsheet to be pulled up

22   because the document was produced in a native Excel format, so

23   we can see the Excel data.

24   A.   Okay.

25        MR. TAMBE:  Steve, could you do that, please?

19

1         And Your Honor, that's been identified by the movants

2    as Movants' Exhibit 45N, as in Nancy, to suggest that that's a

3    Native format document.

4         MR. SCHILLER:  Your Honor, we have no objection to it.

5    (Movants' Exhibit 45N, Native version of Excel spreadsheet, was

6    hereby marked for identification as of this date.)

7    **Q.   And as you take a look at the document on the screen,**

8    **that's the native format document.  Feel free to compare it to**

9    **the documents you have in your binder under Movants' 45.**

10   **Please confirm for us that that is, in fact, the same**

11   **spreadsheet.**

12   **A.   It looks very similar.  I suppose my -- obviously, the**

13   **spreadsheets people can go in and change cells and change**

14   **things, so -- the numbers, here, look the same.  You know,**

15   **things like the highlights and whatever, I've no -- I don't**

16   **know that is exactly the same version or if something's been**

17   **changed, just so the Court understands that.**

18   **Q.   Okay.  And just to make sure, in response to your last**

19   **comment about whether things may have been changed on this**

20   **document --**

21        MR. TAMBE:  Can we please pull up the metadata on

22   M-45, then?

23   **Q.   And you'll see, sir, there, it shows that the author of**

24   **this document is someone called Yang, J.A., and it was last**

25   **saved by Clackson, P.  Do you see that?**

20

1  A.   Yes.

2  Q.   Right.  And the company is Barclays Capital, Inc.  Do you

3  see that?

4  A.   Yes.

5  Q.   And you see the time content created, 9/19, 4:13 a.m.  Do

6  you see that?

7  A.   Yes.

8  Q.   And last save, 9/19, 7:08 a.m., correct?

9  A.   Yes.

10  Q.   You have no reason to doubt that any of that information

11  is full and accurate, right?

12  A.   No, no.  I have none.

13  Q.   Thank you.  Could you turn in your book to Exhibit

14  Movants' 579, please?

15         MR. TAMBE:  Steve, could you pull up 579, please?

16  A.   I'm sorry.  579?

17  Q.   579.  And you recognize this, sir, do you not, as a cover

18  e-mail from Gary Romain to you and Rich Ricci and James Walker,

19  do you see that?

20  A.   Yes.  I can see that.

21  Q.   And starting as early as the weekend, the 20th, there were

22  a series of similar e-mails, each attaching different

23  iterations of the acquisition balance sheet, correct?

24  A.   Yes, that's correct.  I can see this one is on the --

25  Q.   This is on the 22nd.

21

1    A.    Yeah.  On the evening of the 22nd, it appears.

2    Q.    Okay.  I promise you I'm not going to take you through

3    every single one of those iterations.

4    A.    Thank you.

5    Q.    But I'm going to take you through a few of the iterations.

6    So focusing on this particular one, you see in the cover e-

7    mail, there's a discussion of various items, and the last item

8    makes a reference to "the 2.83 billion valuation adjustment is

9    S. King's first cut only".  Do you see that?

10   A.    Yes, I do.

11   Q.    And that's a reference to Stephen King, correct?

12   A.    Yes, I think so.

13   Q.    The trader in the PMTG group, correct?

14   A.    Yes.

15   Q.    And he's been involved throughout the week in negotiating

16   prices across the table from Lehman, correct?

17   A.    Yes.  So he was one of the traders who was involved in

18   large, as I said, follow the asset-backed securities to try and

19   work out what the fair market value of those was.

20   Q.    And you can see here he has input on the acquisition

21   balance sheet that's being prepared by Gary Romain and others,

22   correct?

23   A.    Yes.

24   Q.    And if you turn to the spreadsheet itself, which is the

25   third page behind the tab, first focusing attention to the

22

1    upper left-hand quadrant of this document which is the

2    financial assets calculation.  Do you see that?

3    A.    Yes, I can see that.

4    Q.    Okay.  The financial assets subtotal up to 50.32 billion

5    there, correct?

6    A.    Yes, that's correct.

7    Q.    Okay.

8    A.    Yes, it is correct.  I'm obviously not able to add it up

9    in my head, but --

10    Q.    Well, assuming Mr. Romain has created an accurate Excel

11    spreadsheet.

12    A.    I assume it probably was correct and Gary is.

13    Q.    He is your head of technical accounting, right?

14    A.    Yes.

15    Q.    That 50.32 number is after taking into account the 2.83

16    billion valuation adjustment, you see that?

17    A.    Yes, I see that.

18    Q.    That's Mr. King's first cut at reducing the valuations of

19    the financial assets, correct?

20    A.    Getting to the fair market value of the assets, yes.

21    Q.    And you have an item there below the valuation adjustment

22    two lines down, cash:  seven billion.  Do you see that?

23    A.    Yes, I can see that.

24    Q.    And that, as you told us yesterday -- may have told us

25    yesterday relates to the JPMorgan piece of the Fed repo assets

23

1    that were supposed to come over.  Some did not come over.

2    There was a seven billion dollar cash component created as a

3    result, correct?

4    A.   Yes.

5    Q.   So that cash line there is sort of the JPM line, correct?

6    A.   Yes.  That was the cash due from JPMorgan.

7    Q.   And therefore, the adjustment that Mr. King is making is

8    to the rest of the inventory, the inventory that had made it

9    over.

10   A.   Yes, that's correct.  So he can -- well, he can only

11   adjust the inventory which he knows about.

12   Q.   And then in calculating the liabilities further down --

13   well, let me -- before we get to the liabilities, there's a

14   note 5 -- do you see that -- next to the valuation adjustment.

15            MR. TAMBE:  And if we could just blow up the note a

16   little bit further, please?

17   Q.   And Mr. Romain notes in that footnote, trades are

18   initially booked at BoNY prices.  That's the Bank of New York

19   prices, correct?

20   A.   Yes, that's correct.

21   Q.   And Bank of New York was the custodial agent for the tri-

22   party repo between Lehman and Barclays, correct?

23   A.   Yes.  That was my understanding.

24   Q.   And the Bank of New York was Barclays' agent in that

25   agreement, correct?

24

1    A.    That might be right.  I don't know, technically, actually,

2    what their position was.

3    Q.    And so you understand this document to show that what is

4    being done here is a valuation adjustment to the prices that

5    were initially booked at BoNY prices, at Bank of New York

6    prices?

7    A.    Yes.  That would be my understanding of this.

8    Q.    Okay.  And then going back into the full document and the

9    liability section --

10         MR. TAMBE:  And if we could blow up the liability

11   section, the total liabilities.

12   Q.    And what you list on there is the repo liability of forty-

13   five billion.  You've listed cure payment in the amount of 800

14   million, do you see that?  So not the 1.5 or the 2.25 for the

15   reasons that you've told us before.

16   A.    Correct.

17   Q.    Got nothing on retention payments, and there's a note

18   related to that, "Details to be forthcoming," do you see that?

19   A.    Sorry, I think that note -- you say that relates to

20   retention payments.  I think that relates to the cure payments,

21   that note.

22   Q.    So there's no note related to the retention payment.

23   Losing my eyesight.  And then there's a bonus accrual line of

24   1.7.  Do you see that?

25   A.    Yes, and I can see that.  What I don't know, specifically,

25

1    is that total compensation or what the components of that are.

2    Q.   Okay.  In any event, all of those total liabilities round

3    up to about 47.50.

4    A.   That's -- that's correct, yes.

5    Q.   Right.  And that drives a net asset number, and that, in

6    turn, drives a negative goodwill number of 2.98.  Do you see

7    that?

8    A.   Yes, that's correct.

9    Q.   And just keep in mind the two numbers that we've just

10   discussed:  the 50.32 which is the total financial assets

11   number, and the total liabilities number of 47.50.  And this is

12   where things stood on the evening of the 22nd of September,

13   Monday, the Monday following the closing -- the Monday of the

14   closing date, correct?

15   A.   Yes.

16   Q.   The transaction had closed prior to the markets opening

17   that day.

18   A.   Yes.  Yes.  So this is a working draft at that point.  As

19   you said a bit earlier, the numbers were changing quite a lot,

20   and obviously, as set out here, this is provisional at that

21   point.  But you're correct, this was the latest data, the

22   latest draft we had then.

23   Q.   Okay.  Now, just focusing on the assets and Barclays

24   writes the assets, you understand, sir, do you not, from the

25   asset purchase agreement, that the parties have specifically

26

1    agreed that title and interest in the purchased assets would

2    transfer as of 12:01 a.m. the day of the closing?

3    A.   I'm not sure I can remember that detail.

4    Q.   If you could turn to Movants' Exhibit 1, please, and in

5    particular, to page 15.  If you take a look at the paragraph

6    titled 4.1 Closing Date.  Do you see that?  And the last

7    sentence.  It says, "Unless otherwise agreed by the parties in

8    writing, the closing shall be deemed effective and all right,

9    title, and interest of seller to be acquired by purchaser

10   hereunder shall be considered to have passed to purchaser as of

11   12:01 a.m. time on the closing date."  You see that?

12   A.   Yes, I can see that.

13   Q.   And you are aware of no agreement by the parties in

14   writing to the contrary, sir, are you?

15   A.   I've got no recollection of such agreement.

16   Q.   Okay.  With respect to the assets that had been acquired,

17   the financial assets --

18        MR. TAMBE:  And if we could go back to 579, please.

19   Q.   Please, Mr. Clackson, feel free to go back to 579 which

20   was the acquisition balance sheet we were looking at.  Putting

21   aside the JPM component, the cash of seven billion, the other

22   inventory that is talked about there -- there was substantial

23   amount about inventory that had come over Thursday night,

24   correct, as part of Barclays taking over the Fed repo, correct?

25   A.   I think, as I said earlier, I wasn't in New York.  I think

27

1    it did come in dribs and drabs through the week.  I don't know

2    exactly how much came when.

3    Q.   Well, you knew that you had a substantial -- so you had

4    substantial possessions in Barclays' books by the Friday the

5    19th, correct?

6    A.   I knew that we were taking on all these long positions.

7    Physically, what had been delivered and when that was

8    physically delivered, I don't know.  But I knew we were exposed

9    to now, as I said, a transaction where we just were taking on

10   long positions, yes.

11   Q.   And you were aware with respect to the long equity

12   positions which were approximately eight billion dollars of

13   long equity positions, correct?

14   A.   Yes.  Specifically, I was very aware of that.

15   Q.   And in fact, the markets, with respect to those eight

16   billion dollars of long equity positions moved significantly in

17   Barclays' favor on Friday the 19th, correct?

18   A.   Yes, the equity market rallied significantly on Friday,

19   you're right.

20   Q.   If you could turn to M-230, please.  Movants' 230.

21        MR. TAMBE:  And if you could just blow up that e-mail,

22   please.  Actually, the entire text, really.

23   Q.   This is an e-mail chain.  That's you at the top of the e-

24   mail chain corresponding with Lee Guy.  Do you see that?

25   A.   Yes, I can see that.

28

1    Q.   And then further down, there are other e-mails between Lee

2    and you.  Do you see that?

3    A.   Yes.

4    Q.   And he makes a reference at the bottom of the page to the

5    eight billion dollars long equity position.  Do you see that?

6    A.   Yes, I can see that.

7    Q.   Okay.  Now, you respond to him in your e-mail where you

8    say trade date is Monday, completion 7 a.m.

9    A.   Yes, that's correct.

10   Q.   All right.  And that was your anticipation as of Sunday

11   the 21st as to when the actual documents would be signed --

12   A.   Yeah.

13   Q.   -- the paper closing, correct?  And Lee Guy writes back to

14   you and says "I thought valuations were agreed for an earlier

15   date."  Do you see that?

16   A.   Yes, that's correct.

17   Q.   Okay.  And then you respond by saying, "Yep, so we made a

18   load."  Do you see that?

19   A.   Yes, I can see that.

20   Q.   So you don't disagree with Mr. Guy that valuations were

21   agreed for an earlier date, do you?

22   A.   It's -- no, I don't disagree.  It's a kind of strange e-

23   mail in that way because -- yeah, I don't disagree, but you're

24   right.

25   Q.   You have no reason to doubt that you sent this e-mail, do

29

1    you, sir?

2    A.   No, no, I don't.  No, I don't.  It's my e-mail.

3    Q.   Okay.  All right.  And you go on to say, "Yep, so we made

4    a load."  Do you see that?

5    A.   Yes, I can see that.

6    Q.   And you're referring to the load that Barclays made on the

7    long equity positions?

8    A.   Yes, sir, because the equity market rallied and because I

9    knew we had a long equity eight billion position, I thought we

10   made money on those equities moving up in market value on the

11   Friday.

12   Q.   Okay.  How big was that load?

13   A.   I've got no recollection.  I think because we hadn't

14   booked all the equities and we had the high level information

15   that we had eight billion equities, we knew the S&P had

16   rallied.  And therefore, we said we should have made some money

17   because the S&P had rallied.  I don't know if we have a detail

18   of how much that was.  I can't recall any specific numbers.

19   Q.   200 million?

20   A.   As I said, I can't recall.

21   Q.   400 million?

22   A.   As I said, I've got no recollection.

23   Q.   All right.  Let's go back to 579, please.  By the way, on

24   Friday the 19th, you didn't get an e-mail saying we've lost a

25   bundle on the nonequity positions, did you, sir?

30

1   A.   No, I don't --

2   Q.   No such e-mail, sir.

3   A.   -- I can't remember such an e-mail, no.

4   Q.   So going back to 579, we had talked about the net assets,

5   and then we talked about the negative goodwill number on that

6   acquisition balance sheet of 2.98.

7   A.   Yes, that's correct.

8   Q.   In the board presentation that had been made earlier in

9   the week to Barclays' board, the board had been told the

10  expected negative goodwill from the transaction would be three

11  billion.  Do you remember that?

12  A.   Yes, I think that was the number.

13  Q.   So this is coming in a little shy of that negative

14  goodwill?

15  A.   Yes.

16  Q.   And in part, that negative goodwill is at 2.98 because

17  you've got a 2.83 billion dollar negative adjustment on the

18  financial assets, correct?  That's the math.

19  A.   Yeah.  The math, the 2.98 reflects everything above it in

20  the balance sheet.

21  Q.   Okay.  How did that go down -- how did that 2.98 number go

22  down with your boss, Rich Ricci.

23  A.   I can't remember.  As I said, we had lots of acquisition

24  balance sheets.  And some showed higher negative goodwill, some

25  showed lower.  I think, generally, we wanted a number as high

31

1    as possible.  So it was lower, probably went down badly; when

2    it was higher, it went down well.  That was generally the

3    reaction.

4    Q.   And if we turn to Movants' 580, we can see one of his

5    reactions to this number.  And if you can turn to the second

6    page of that exhibit, you'll see that last e-mail --

7    A.   Sorry, exhibit --

8    Q.   M-580.  And you can compare to what you have on the

9    screen, just to make sure you have the right document.  Are you

10   there, sir?

11   A.   Yes.

12   Q.   Okay.  So if you look at the second page of Exhibit 580,

13   that last e-mail is the e-mail that was the cover e-mail on the

14   acquisition balance sheet, 579, that we were looking at,

15   correct?

16   A.   Yes.  It appears to be the same.

17   Q.   So this is an e-mail chain that starts off with that

18   message, and there's a series of back and forths.

19   A.   Yes.

20   Q.   And in corresponding with Mr. Ricci with respect to that

21   balance sheet, you say in the next e-mail up in the chain, "So

22   some things we have to keep working on to squeeze out what we

23   can, but looks more like 3 to 3.5 rather than 4 plus.  Basic

24   issue is outside repo, not enough assets."  Do you see that?

25   A.   Yes, I can see that.

32

1    Q.    And in part, the valuation of the repo assets is being

2    driven by what Mr. King is doing, in terms of his valuation

3    exercise, correct?

4    A.    Yes.  So he's going to fair value the assets.

5    Q.    And go on the first page of 580.  There's discussions

6    about other points, but the third e-mail from the top is from

7    Mr. Rich Ricci to you.

8    A.    Yeah.

9    Q.    And he says, "Need to get to four or no write-down

10   capacity."  Got a typo in his e-mail, but it's write-down

11   capacity.

12   A.    That's correct.

13   Q.    And you understand that as a reference to write-down

14   capacity.

15   A.    Yeah.  I think what I said in my deposition is the same

16   thing.  Precisely what he meant, you should ask Mr. Ricci

17   exactly what he meant by that.

18   Q.    You had no idea what he meant by that?

19   A.    I think, as I said before, he was trying to get to as

20   large a number as possible.

21   Q.    What's he trying to write-down?

22   A.    But in terms of exactly what he's talking about, yeah, I

23   can't recall exactly, and you should talk to Mr. Ricci.

24   Q.    I'm sure we will.  What did you do in response to that

25   statement or observation from Mr. Ricci, "Need to get to four

33

1   or no write-down capacity"?  Well, if you didn't understand

2   what he meant, you probably didn't know what to do, right?

3   A.    Yeah -- no.  I mean, as I said, we were looking at

4   everything, and yes, we obviously wanted as large a number as

5   possible.

6   Q.    Let's go to Movants' 229, please.  Are you there, sir?

7   A.    Yes.

8   Q.    And that's another iteration of the acquisition balance

9   sheet, this one dated the 24th of September.

10  A.    That's correct, yes.

11  Q.    The day after Mr. Ricci stating need to get to four or no

12  write-down capacity, right?

13  A.    Was that on Tuesday?  Yes --

14  Q.    Take a look.  It's Exhibit 580.

15  A.    Yes.

16  Q.    And if you look at the negative goodwill number on

17  Movants' 229, there you have Mr. Ricci's number:  4.47 negative

18  goodwill.  Do you see that?

19  A.    I don't think it's Mr. Ricci's number, but I can see we

20  have a higher negative goodwill number.  I mean, as I said, and

21  you can see from the footnotes here, there's huge confusion as

22  we were trying to work out what we had.  People were doing the

23  work to try to work out what the different pieces were, and I

24  think you can see on this balance sheet, there were a

25  significant number of items which have moved on the balance

34

1    sheet.  I haven't done a map, but as we went through time,

2    stuff was changing.

3    Q.   Well, I took a look to see, kind of, what had changed over

4    the course of that day.  And if you look at this acquisition

5    balance sheet, Movants' 229, take a look at the valuation

6    adjustment.  That's Mr. King's number, correct?

7    A.   Sorry, I can't --

8    Q.   It may be a little bit better on the screen.

9    A.   Sorry, it's very vague on my monitor.

10         MR. TAMBE:  Do we have a native version of this?

11   Could you pull that up, please?

12         With your permission, Your Honor?  We're asking to

13   pull up the Excel version of this document.

14         THE COURT:  All right.

15         MR. TAMBE:  It might be easier to read.

16         THE COURT:  That leads to a question in my mind, and

17   this is really a question in general application.  I noticed it

18   in reference to Exhibit 45N which is Exhibit 45 in native form.

19   How are these electronic documents separately in evidence?  Is

20   it simply part of the record that you have referred to them and

21   that they've been used in questioning?  Or do I have physical

22   versions of them to refer to if I need to?

23         MR. TAMBE:  If you don't already have physical

24   versions of these, you will have a CD with the Excel files on

25   them --

35

1        THE COURT:  All right.

2        MR. TAMBE:  -- with the metadata.

3        THE COURT:  Fine, thank you.

4        MR. TAMBE:  Thank you, Your Honor.

5        Do we have that on Excel?  Maybe we don't.

6   Q.   Are you having trouble making out that writing, sir, the

7   valuation, BoNY Thursday close, and below that, valuation

8   adjustment, 1.38?

9   A.   Yes, it looks like 1.38.  That's what it looks like.

10  Q.   So the day before, two days before, it was 2.83 --

11  A.   Your question was is that Stephen King's adjustment.

12  Q.   Yeah.

13  A.   I was just trying to -- yeah, this doesn't say here that

14  it's Stephen King's adjustment.  So I don't know why that

15  number changed and I don't know what -- I don't know this is

16  Stephen's latest adjustment or not.

17  Q.   Well, other than Mr. King, are you aware of any other

18  trader at this point in time who is providing valuation

19  adjustment inputs on the acquisition balance sheets, sir?

20  A.   I wasn't aware.  I'm just saying that it doesn't say here

21  that this is Mr. Stephen King's adjustment.

22  Q.   Okay.  So either Mr. King or someone else changed the

23  valuation adjustment of 2.83 down to 1.38, and that is the main

24  driver that pushes the negative goodwill number over 4.47, do

25  you see that?

36

A.   Yes, I'm -- as you said, there were many versions of this
document, and I know as well as the traders who were doing the
marking exercise, we also had people like people working in the
control group who were also trying to do a bottom-up booking
the trades exercise.  So I don't know, is what I'm saying, if
this is Stephen King's number or coming from somewhere else
like the product control group.

Q.   Well, on the 24th of September, sir, you are aware that
the PCG group was just getting its process underway, correct?
It took them months to get that done.

A.   Yeah.  It took them a long, long time.  I don't know
this -- but all I'm saying is I just don't know the source of
that number.

Q.   So you're guessing.  You're guessing it might have been
PCG.

A.   Or I'd be guessing it was Stephen King.

Q.   But at this point in time in September 2008, you're not
aware of anyone other than Stephen King who has been providing
input on the valuation adjustments on these acquisition balance
sheets, correct?

A.   I think all I'm saying is I don't know where that came
from.  I -- Gary Romain would have a better idea, I think, than
I would about precisely where that came from.

Q.   And knowing Gary, as you do, and having him as your head
of technical accounting, Gary wouldn't just make up that

37

1    number, correct?  He wouldn't put that number in there unless

2    someone gave it to him --

3    A.    I think Gary --

4    Q.    -- a trader gave it to him.

5    A.    -- Gary would have some source where he got that number

6    from, yes.

7    Q.    Can we next go to M-668?  And this is another cover e-mail

8    with another acquisition summary balance sheet -- or,

9    acquisition balance sheet attached to it.  Do you see that?

10   A.    Yes, I can see this.  This looks like it's a week or so

11   later.

12   Q.    Yeah, we're into early October, now.

13   A.    Yes, right.

14   Q.    And there's a cover e-mail at the bottom of that e-mail.

15   This is from you to James Walker and others, do you see that?

16   A.    Yes.

17   Q.    And the subject line reads, "Need the latest on

18   acquisition balance sheet ASAP."  And you continue to say "and

19   all areas where we may have upside.  Looks like we will need as

20   current JP offer is one billion cash and six billion

21   securities, which Stephen values at 4.3 billion."  Do you see

22   that?

23   A.    Yes, I can see that.

24   Q.    Right.  And so this is a reference to the conversion of

25   the seven billion dollars of cash into something different from

38

1   JPM, which is a billion in cash and six billion in securities,

2   correct?

3   A.   Yes, that's correct.  That was my understanding.

4   Q.   Right.  And you note at the end, Stephen values those

5   securities, those six billion dollars of securities, at 4.3

6   billion.  Do you see that?

7   A.   Yes, I can see that.  I -- the only thing I'm -- I can't

8   recall whether that Stephen values just the securities or

9   whether it's the securities and the cash.  But I'm sure that's

10  shown in other documents.

11  Q.   If you could just keep the microphone close to you.  I

12  lost --

13  A.   Sorry.

14  Q.   I lost the end of your answer, there.

15  A.   Shall I repeat what I said?

16  Q.   If you could, please.

17  A.   Yeah.  So the only thing -- I can't recall whether this is

18  saying Stephen values the securities at 4.3 or whether the 4.3

19  relates to the securities and the cash.  I just can't recall.

20  It's not clear in this e-mail.

21  Q.   So the confusion in your mind is it might be this total

22  bundle of seven billion, one billion cash, six billion

23  securities, that entire bundle could be valued by Stephen at

24  4.3.

25  A.   I can't remember if it's 4.3 or 5.3.  And maybe it shows

39

1    in the subsequent document.

2    Q.    Do you know exactly -- and the Stephen you're talking

3    about here is Stephen King, correct?

4    A.    That's correct, yes.

5    Q.    Did you have discussions with Stephen King as to how he

6    came up with that number?

7    A.    As I said, Stephen was trying to fair value the securities

8    which we took on.  I think with the ones from JPMorgan, I -- my

9    recollection is we didn't have all of the detail about what

10   they were.  But I think maybe Stephen did get some detail, but

11   we had a lot of different lists which we were trying to use in

12   terms of what the underlying securities were.

13   Q.    Well, you knew, did you not, sir, that that 4.3 billion

14   dollar number that Stephen had come up with, he was deriving,

15   applying the haircuts to the Fed's facility, correct?

16   A.    I can't remember if I knew that at the time.

17   Q.    If you could turn to 701, please.

18        MR. TAMBE:  Don't put it up.

19   Q.    If I could draw your attention to -- there's a long series

20   of e-mails, but I want to draw your attention to the last in

21   the series of e-mails.

22        MR. SCHILLER:  Your Honor, we're going to object to

23   this exhibit which we were given yesterday on grounds of

24   hearsay.  The witness is not involved in this transmission at

25   all.

40

1      THE COURT:  I'm sorry, I can't hear you, Mr. Schiller.

2      MR. SCHILLER:  The witness is not involved in this

3  communication at all.  It concerned the JPMorgan settlement

4  which is before Your Honor, that's in December 2008.

5      MR. TAMBE:  If I may respond, I think his name appears

6  in the last e-mail.  It was addressed to him.

7      THE COURT:  What's the Bates number that --

8      MR. TAMBE:  I'm sorry, it's Bates number 97, last two

9  numbers.

10      THE COURT:  Well, it's true that Mr. Clackson did

11  receive, it appears, on Sunday, October 5, an e-mail from

12  Stephen King, along with a number of other Barclays employees.

13  On the question of admissibility, I'll reserve judgment until I

14  see how the document is used.  But even if the document is not

15  admissible or includes hearsay elements, there's no reason why

16  the witness can't be questioned about it.  So I'm simply

17  reserving on whether or not it's ultimately admissible.

18      MR. SCHILLER:  All right.  I would just point out to

19  the Court, as was the case yesterday in the exhibit you and I

20  discussed, Your Honor, this e-mail is at the very beginning,

21  and it's not the communication he's about to ask the witness

22  about.  In other words, the Stephen King e-mail on which he's

23  copied is the very beginning of e-mail communication between

24  Mr. Hughes and Ms. Leventhal.  Thank you, Judge.

25      THE COURT:  Okay, he can still use the document.

41

1    Whether it ever ends up in evidence, we'll find out later.

2    BY MR. TAMBE:

3    Q.   Mr. Clackson, drawing your attention to that e-mail that

4    begins on Bates number 97 and carries on over to Bates number

5    98, you recognize that as an e-mail you received from Mr. King,

6    correct?

7    A.   Yes, that's correct.

8    Q.   And this is an e-mail that Mr. King would have prepared

9    and sent to you in the ordinary course of business, correct?

10   A.   I don't know what you mean the ordinary course of

11   business, but as part of a deal, yes, he was sending me a lot

12   of things to keep me updated about what was happening, what was

13   going on.

14   Q.   Right.  Part of -- one of his jobs in this transaction was

15   to focus on the collateral and valuation issues and update the

16   accounting team --

17   A.   Yes.

18   Q.   -- the finance team about those issues, correct?

19   A.   That's correct.

20   Q.   And you recognize this e-mail as part of that business

21   effort?

22   A.   Yes, that's correct.

23        MR. TAMBE:  Your Honor, we offer Exhibit 701 in

24   evidence.

25        MR. SCHILLER:  Sorry, Your Honor.  I have the same

42

1    objection to continues on from the internal Barclays e-mail

2    that he has put before Mr. Clackson, and that is Barclays'

3    communication with the creditor.

4         THE COURT:  Well, since I don't know how the document

5    is going to be used in the questioning of the witness, it will

6    be admitted for purposes of the communication to Mr. Clackson

7    and others, which is the start of the e-mail chain.

8         But I'm going to reserve judgment on the balance of

9    the document, and it's not admitted for those purposes -- these

10   other purposes, unless there's some way to connect this witness

11   to the other communications, including communications with

12   Shari Leventhal of the New York Fed, which seem to be the

13   principal components of the first few pages of the document.

14        It's entirely possible that through other witnesses,

15   this document may later become admissible for all purposes,

16   which raises, of course, the question that I continue to have

17   as to how documents are being used in the case.  At the very

18   beginning of the trial, on Monday, I was handed an exhibit list

19   of exhibits which are not the subject of objections and, as a

20   result, are all deemed to be admitted.  Presumably, the process

21   that led to this agreed list is one in which documents have

22   been determined by means of deposition testimony or sources of

23   production to be authentic and, in all respects, reliable.  I

24   don't know why this document, in particular, is subject to a

25   present debate in the course of the trial and why it isn't on

43

1    the list of admitted documents or whether it can later be

2    admitted.  But it is not my position to question the trial

3    techniques of anyone involved in the case.

4         As a technical matter, I believe Mr. Schiller is

5    correct that the document, at least as it's being presented to

6    me now, appears not to relate to this witness except at the

7    beginning.  So I'll admit it for purposes of whatever use you

8    wish to make of it with the witness as to the beginning of the

9    document where he has acknowledged having received it, and I'll

10   reserve judgment as to the balance.

11   (Movants' Exhibit 701, e-mail chain between Mr. King and Mr.

12   Clackson and others, was hereby received into evidence for a

13   limited purpose only as of this date.)

14        MR. TAMBE:  Thank you, Your Honor.  I intend to

15   examine Mr. Clackson only with respect to that e-mail at the

16   beginning of the e-mail chain.  We obviously reserve our right

17   to seek to admit the rest of the document --

18        THE COURT:  Fine.

19        MR. TAMBE:  -- through other witnesses.

20        THE COURT:  In that case, I didn't need to go through

21   this entire discourse on the document, but fine.  We'll --

22        MR. TAMBE:  And I really didn't want to interrupt you,

23   Your Honor.

24        THE COURT:  We'll admit it only for that portion of it

25   where the witness is involved and to which you intend to

44

1    question him.

2        MR. TAMBE:  And just in response to Your Honor's

3    observation.  The reason this document is not on the list you

4    were submitted is we were told that there would be objections

5    to this document.

6        THE COURT:  And you were told correctly --

7        MR. TAMBE:  We were told correctly.

8        THE COURT:  -- because Mr. Schiller did, in fact,

9    object, and we did spend three minutes talking about it.

10   BY MR. TAMBE:

11   Q.   Turning your attention, Mr. Clackson, to the e-mail from

12   Mr. King to you and others, you will see in that e-mail, Mr.

13   King sets out his rationale for valuing the one billion cash

14   and six billion in securities from JPMorgan.  Do you see that?

15   A.   I can see calculations.  I can't quite see where it says

16   it's a rationale for valuing.  I can see at the bottom of the

17   e-mail on -- below where it says net cash received, it says "we

18   estimate the collateral to be worth 4.3 billion."  I can't see

19   how that calculation is derived.

20   Q.   If you look at principle 1 in Mr. King's e-mail, he states

21   there "the ratio of collateral to cash should be at least the

22   ratio on the original facility."  Do you see that?  "Therefore,

23   six billion of collateral is worth 5.34 of cash."  Do you see

24   that?

25   A.   Yes, I see that.

45

1    Q.   You don't recognize that or understand that to be a

2    valuation calculation, is that what you're saying?

3    A.   Yes.

4    Q.   Okay.  Did you have any conversations with Mr. King about

5    this calculation?

6    A.   I can't remember having any conversations about this

7    calculation.

8    Q.   Did you have conversations with anyone else about this

9    approach to calculation?

10   A.   I think, as I said, I wasn't really very involved in this.

11   I was copied and/or these documents were sent to me, but in

12   terms of the exact logic in the calculations, I've got no

13   recollection of them.

14   Q.   Okay.  Well, did you believe the calculations were

15   reliable?

16   A.   That -- what we were trying to get from Stephen King was

17   the fair market value of the assets.  I believe when we got the

18   final numbers -- Stephen knew we were trying to get fair market

19   values, and when we got the -- those final numbers, we would

20   have got the fair market values of the assets, which then,

21   independently, as you know, we tested within our product

22   control group.  And so in terms of this calculation, I don't

23   understand how that fits into this.

24   Q.   If I understand you correctly, then, what you're saying is

25   that this calculation based on ratios and haircuts you don't

46

1    believe to be a fair market valuation exercise?

2    A.   I think I'm just saying I don't understand this

3    calculation or what he's doing.

4    Q.   But you certainly don't recognize it as a fair market

5    valuation exercise, correct?

6    A.   Yeah.  I don't understand it, so -- and I wasn't -- I

7    don't remember focusing on it, so I don't know if it is or

8    isn't, to be honest.

9    Q.   If I could ask you to turn to Movants' 668, please?  And

10   that's the document we were discussing which began with your e-

11   mail at the bottom about the JPM offer -- the JP offer, one

12   billion cash, nine billion securities -- oh, six billion

13   securities.

14   A.   Yes.

15   Q.   And there's a spreadsheet attached to this document.  If

16   you could turn to the spreadsheet, please.

17   A.   Yes.

18   Q.   And this is an updated acquisition balance sheet, and the

19   seven billion cash component is now gone, correct?

20   A.   Yes, that's correct.

21   Q.   Instead, what you have are two components:  cash, 1

22   billion; securities from JPM, 4.3 billion.

23   A.   Yes, that's correct.

24   Q.   And that's the 4.3 calculation from Stephen King.

25   A.   Well, it's the 4.3 from the end of that e-mail, yes.

47

1   Q.   And in fact, at the bottom of the page, footnote 10, or

2   note 10 states that's an initial estimate of fair value?

3   A.   Yes, that's correct.

4   Q.   And this is a document prepared by Gary Romain, correct?

5   A.   That's correct, yes.

6   Q.   Okay.  Other than the calculation that we just walked

7   through in Exhibit 701, are you aware of any other calculations

8   that were done at this point in time to arrive at the 4.3

9   billion dollar number for that JPM collateral?

10  A.   Yeah  I wasn't aware of any other calculations, though I'm

11  still not quite sure if I understand how that 4.3 was derived

12  from that calculation on the earlier e-mail.

13  Q.   I suppose we'd have to ask Mr. King that.

14  A.   Yes, well, he would be the right person, obviously, to

15  talk to.

16  Q.   Turn to Movants' 105, please.  It's a multipage document,

17  and you recognize this document, right, sir?

18  A.   It's a spreadsheet of which there were many.  I don't know

19  if you could help explain what it is to me.

20  Q.   I'm sorry, I will need to explain it to you?

21  A.   Yes.  Sorry, we have many spreadsheets which look like

22  this, so I don't recognize each version of a spreadsheet with

23  different numbers on it.  I don't have, as I think I told you

24  earlier, a photographic memory around numbers.

25  Q.   Well, let's go to the first document, see if that rings

48

1    any bells.  Do you recognize that as a spreadsheet that rolls

2    into your earnings announcement issued on or about February

3    9th, 2009 by Barclays?

4    A.   Sorry, yes, it does look like.  But the footing reconciles

5    to our earnings announcement, yes.

6    Q.   Okay.  So that's -- at the end of the day when all the

7    to's and fro's on the acquisition balance sheet are done,

8    that's what you end up with, right?

9    A.   Yes. I assume that's the case.  As I say, I'm, you know,

10   validating whether this is the final version.  I'm unable to

11   validate that this is, but it looks like the number at the

12   bottom reconciles.  I have no reason to believe it isn't.

13   Q.   And do you understand that the spreadsheets that are

14   attached to this cover document are the guts of the

15   calculation; they explain how the calculation was arrived at?

16   A.   I think there would be further analysis behind this.

17   Q.   Right.  In fact, this is step 2, and, in fact, there's a

18   step 3 analysis that goes into layers of granularities, CUSIP

19   by CUSIP, correct?

20   A.   Yes.  So I think this would, yeah --

21   Q.   And how all these spreadsheets hang together.  You can go

22   from one to the other all the way down to an individual CUSIP

23   level.

24   A.   Yes.  I think that would be correct.

25   Q.   Testing my eyesight, again, if we could go to page 2 of

49

1    this exhibit, which is an Excel spreadsheet, you'll see there

2    that there is a breakout by categories of various asset classes

3    and various liabilities.  You see that?

4    A.   Yes.  I can -- well, I can see that; I'm not sure if I can

5    read it very easily.

6    Q.   Okay.  We'll try and expand the top left-hand quadrant of

7    the document, focusing on the financial assets.  This document

8    and your earnings announcement was released just shy of five

9    months after the closing date, correct?

10   A.   Yeah, about February 2009.

11   Q.   And you'd had, in that time period, your PCG group working

12   feverishly to validate fair market valuations, correct?

13   A.   Yes.  They were going through thousands and thousands of

14   different positions to try and work out what the appropriate

15   valuation was.

16   Q.   Okay.  And the result of all of their labors is summarized

17   in the listing of asset values right about that subtotal,

18   correct?

19   A.   Yes.  I think that would be correct.  As I said, I find it

20   difficult reading the detail here, but yeah.

21   Q.   That number that appears there, at the end of the day when

22   all the shouting is done, for financial assets acquired in the

23   acquisition as of the acquisition date is 50.16 billion.  Do

24   you see that?

25   A.   Yes, I do see that.

50

1    Q.   That's about 160 million dollars away from the number that

2    had been arrived at on the 22nd of September, almost five

3    months earlier, correct?

4    A.   Yes, you're right.  The number's quite similar.  I seem to

5    remember a lot of big plusses and minuses, but.

6    Q.   And if you look at the liabilities number, total

7    liabilities, 46.92.  Do you see that?  That's about half a

8    billion dollars away from the total liabilities you'd come up

9    with on the 22nd of September, correct?

10   A.   Yeah.  Again, there are a lot of changes in terms of the

11   underlying components.  For example, you can see in

12   liabilities, you can see on bonuses, it says "cash elements".

13   So there are some other elements which didn't appear there in

14   liabilities, like share elements, bonuses.  So there are quite

15   a lot of different changes.

16   Q.   And I understand.  There were lots of changes.

17   A.   Yeah.

18   Q.   You went up and down.

19   A.   Yeah.

20   Q.   Right.  And you went back up, roughly where you started.

21   A.   Yeah, a lot of changes.

22   Q.   Just getting into the guts of the valuation briefly, let's

23   turn to M-102, please, Movants' 102.  We're going to try and

24   expand it on the screen and see if we have it in native format

25   to save everyone's eyesight.  It's on your screen, as well, I

51

1   believe, sir.  Do you see it?

2   A.   Yes, I can see it.

3   Q.   I'm not going to go through line items.  I just want to

4   draw your attention to a couple of the figures.  Column C, line

5   14 --

6            MR. TAMBE:  If you could just highlight that, please,

7   and the whole column?

8   Q.   That column C is titled "BoNY value".  Do you see that?

9   A.   Yes, I do see that.

10   Q.   Is that the Bank of New York values?

11   A.   Yes, right.

12   Q.   And in the total row, number 14, the number up here says

13   forty-five billion, do you see that?

14   A.   Yes, I can see that.

15   Q.   And then there's various adjustments and changes made to

16   that number, and two columns over, column E --

17            MR. TAMBE:  And highlight that, please.

18   Q.   -- that's a column titled "Market Value 9/22 With Bid

19   Offer".  Do you see that?

20   A.   Yes, I can see that.

21   Q.   And the number that appears there on line 14 is forty

22   billion?

23   A.   Yes, that's correct.

24   Q.   And that is the number that then rolls up into your

25   acquisition balance sheet, correct?

52

1   A.   Yes.  So that's fair value which goes into my acquisition

2   balance sheet.

3   Q.   So it's a five billion dollar difference on the non-JPM

4   securities, correct?

5   A.   Between the BoNY value and that final market value, yes,

6   it looks about four and a half million dollars, you're right.

7   Q.   So let's turn to Exhibit 103 and discuss what happened to

8   the JPM values.

9        MR. TAMBE:  If we could just expand that, please.

10  Q.   And you recognize Movants' 103, sir, as a similar

11  calculation with respect to the JPM assets, correct?

12  A.   Yes.  I think it's similar backing.

13  Q.   And behind this spreadsheet is a CUSIP-by-CUSIP valuation?

14  A.   Yes, it's a similar method.

15  Q.   And this is the securities component, the cash of a

16  billion, and what ended up being, I think, a billion-two-five

17  is not included in here, correct?

18  A.   Yes, okay.

19  Q.   Again, drawing your attention to column D, "Portfolio

20  Totals," you'll see a number that is just shy of six billion.

21  Do you see that?

22  A.   Yes.

23  Q.   Right.  And that's got a valua -- that has a date at the

24  top of it of 30 September.  Do you see that?

25  A.   Yes, that's correct.

53

1   Q.   And as you move two columns over to column F, that's a

2   column title "MV" -- Market Value -- "with Liquidity", you see

3   that?

4   A.   Yes, I can see that.

5   Q.   And the number that appears there in the total line, the

6   portfolio totals line is 3.7 billion, do you see that?

7   A.   Yes.

8   Q.   So that's roughly a 2.2 billion dollar difference on the

9   JPM assets?

10  A.   Yeah.  Between the -- yeah.  The first column saying "JP

11  Values" -- yeah, okay.  Yes, you're right.  It's a 2.2 billion

12  difference there, yes.

13  Q.   And just -- that column that we were just looking at,

14  column F, doesn't have a date at the top of it.  If you look at

15  column E, you will see there's a column titled "22 December

16  '08, PCG Value".  Do you see that?

17  A.   Yes, I can see that.

18  Q.   And you understand those to be values derived by the

19  Barclays product control group effective December 22nd, 2008,

20  correct?

21  A.   Yes, because my understanding is that's when we were

22  delivered the assets, so we got the assets as of that date.  So

23  that's the point we valued them as of.

24  Q.   You didn't value them as of September 22nd, for example?

25  A.   No.  We valued them at the time we got them.

54

1    Q.   And markets had moved sharply downwards between September

2    and December, correct?

3    A.   Yeah.  Markets have been incredibly volatile.  I think for

4    these assets, probably markets have generally moved down.

5    Q.   And just to be clear as to "these assets", you recognize

6    that the majority of these assets are PMTG assets, correct?

7    A.   I know the PMTG group was managing them.  You can see a

8    number of these identified as things like corporate successor

9    which --

10   Q.   And that's --

11   A.   -- as I said before were the asset-backed securities.  And

12   I think some of these -- yeah, sorry, at the bottom, you can

13   see there's a large section of PMTG assets.

14   Q.   And that's Mr. King's group, correct?

15   A.   That's Mr. King's group, yes.

16   Q.   With respect to the assets that came over from the Fed

17   repo facility to Barclays Thursday night into Friday morning,

18   you understood, did you not, sir, that Barclays had received

19   assurances from the Fed that that collateral was available and

20   was eligible for the prime dealer credit facility?

21   A.   Sorry, I wasn't really involved in those discussions with

22   the Feds, so in terms of knowing what things are eligible for,

23   I wasn't involved in any of those discussions.

24   Q.   At no point in any of the work that you were doing in

25   connection with the transaction were you told that the assets

55

1    that we're getting as part of the Fed repo, well, we can't repo

2    them in turn.  No one will refinance these assets.  No one said

3    that to you, did they, sir?

4    A.   I'll tell you what I can -- what I can recall is that a

5    number of those assets were carried on financing through the

6    Fed at some time.  You could well be right that I may have been

7    told at some point other people couldn't finance those assets.

8    I can't recall if I was told or not that.

9    Q.   And the people in finance who might know that would be

10   people like who?

11   A.   I'm not sure the people in finance would know,

12   necessarily, where things could be financed.  It would be more

13   to do with the treasury group who would know where the

14   financing of assets was or the operations group.  The finance

15   people are more to do with the accounting and bookkeeping.

16   Q.   So on the operations side, those would be people like

17   Gerry LaRocca?

18   A.   Yes, that would be correct.

19   Q.   And maybe David Petrie -- Petrie?

20   A.   Yeah.  You mentioned David Petrie earlier.  I'm -- I don't

21   know if he is in operations or not.  You might be correct.

22   Q.   But one way or the other, you don't have any personal

23   knowledge about assurances given by the Fed to Barclays with

24   respect to financing the Fed repo assets that came over

25   Thursday night into Friday?

56

1    A.    Yeah.   I wasn't involved in those discussions.

2          MR. TAMBE:   Let me just consult, Your Honor.   I think

3    I'm done.

4          Thank you, Your Honor.   I have no further questions.

5          THE COURT:   Any questions by the other movants?

6          MR. MAGUIRE:   If it pleases the Court.

7    CROSS-EXAMINATION

8    BY MR. MAGUIRE:

9    Q.    Mr. Clackson, my name is Bill Maguire.   I represent the

10   SIPA trustee.

11   A.    Good morning.

12   Q.    I understand, sir, that your colleague, Stephen King, was

13   involved in meetings with him and his team with his

14   counterparts at Lehman concerning Lehman's positions and their

15   values, is that correct?

16   A.    Yes, that's correct.   He was part of our team in terms of

17   negotiating to get to the fair values.

18   Q.    And you weren't personally part of those -- at those

19   meetings?

20   A.    No.   I wasn't involved personally in any of those

21   negotiations.

22   Q.    But he sent you a lot of stuff?

23   A.    That's right.   He was keeping me informed of what was

24   going on, the state of those negotiations.

25   Q.    Is it fair to say he was in the front line?

57

1   A.   Yes.  So -- yeah.  He was dealing with the Lehman traders

2   because they were the experts who understood the market and

3   understood the positions in those markets.  So we had the right

4   people on our side who would be able to work out the values,

5   yes.

6   Q.   And your perspective was more from the accounting

7   implications of whatever the business deal was.

8   A.   Yes.  So I was trying to add together all the different

9   pieces of the deal so I could understand what the accounting

10  implications for Barclays could be -- would be.

11  Q.   And as the chief financial officer, you oversee Barclays'

12  accounting?

13  A.   Yes, that's correct.

14  Q.   And that includes accounting for various kinds of

15  securities and financial instruments?

16  A.   Yes, that's correct.

17  Q.   And that includes derivatives?

18  A.   Yes, that's correct.

19  Q.   Including exchange traded derivatives?

20  A.   Yes, that's correct.

21  Q.   Now, when a person has positions at an exchange,

22  derivatives positions, the exchange or the clearinghouse may

23  require that person to post collateral margins, isn't that

24  right?

25  A.   Yes, that is correct.

58

1    Q.   And that may take the form, the clearinghouse or the

2    exchange may require cash or cash-equivalents or government

3    securities or property of that nature, isn't that right?

4    A.   As part of the margin payment, yes, that's correct.

5         MR. MAGUIRE:  If we could put up the calendar.

6    Q.   Do I understand that in the early part of the week of

7    September 15, you were here in New York?

8    A.   Yes, that's correct.

9    Q.   And the latter part, you were back in London?

10   A.   Yes, that's correct.

11   Q.   But you were still hearing some reports back there as to

12   what was going on.

13   A.   Yes.  I was on various conference calls and receiving e-

14   mails.

15   Q.   And did there come a time, specifically on Thursday, late

16   Thursday, early Friday, when the Barclays team decided that it

17   was going to approach top Lehman executives and seek additional

18   value in the deal?

19   A.   So, as I think I said yesterday, when the deal changed,

20   and we realized rather than getting long and short offsetting

21   portfolios, and we realized we paid forty-five billion in cash

22   to get a portfolio of securities from the Fed, some of which we

23   hadn't seen before, there was some work to make sure that we

24   understood all the other assets we could get in the deal and

25   any other assets -- the deal was, just going back to the

59

1    beginning, you may remember, we purchased a business of

2    Lehman's in North America, and we excluded various assets.  So

3    we excluded things like over-the-counter derivatives in the

4    deal.  And at the time, later in the week, we were trying to

5    look at the business we were acquiring and making sure that we

6    identified any other assets in the business which were within

7    the scope of what we were acquiring.  So that went on in the

8    end of the week, yes.

9    Q.   And specifically on Thursday night, the Barclays team was

10   trying to come up with ideas for additional assets, additional

11   values to add to the deal.

12   A.   Yes.  So the Barclays team were looking through the

13   business to make sure that was there anything we hadn't

14   identified earlier and to make sure that assets within the

15   scope of what we were acquiring were identified.  And I think

16   they were then set out in a letter of clarification just to

17   make it clear to everyone.

18   Q.   And Mr. King, Stephen King, suggested an addition to you,

19   did he not?

20   A.   There were lots of conversations, so I'm -- he may have

21   suggested many things, and I'm sure he would have suggested

22   things to me.

23   Q.   On Thursday night, specifically, he suggested adding

24   Lehman's margin to the deal, isn't that correct?

25   A.   I can't recall exactly, but -- I don't know.  I'm sure --

60

1    I can't recall that, but I'm -- as I said, I had conversations

2    and as I said earlier, my recollection at the time was we'd

3    done a deal purchasing the business excluding some things,

4    things like exchange traded derivatives were always in the

5    deal.  So margin relating to those would always have been in

6    the deal because it wouldn't have been excluded.  So Stephen

7    might have said well, we haven't valued the margin which we've

8    got as part of the deal.

9    Q.    When you say it was always in the deal, sir, you have no

10   personal knowledge of that?  You didn't have any negotiation or

11   discussion with anyone at Lehman about that, isn't that

12   correct?

13   A.    That is completely correct.  I read the asset and purchase

14   agreement, and my understanding of that agreement was we were

15   buying the business and excluding various things.  The reason

16   why I'm saying it was always in the deal is I don't think that

17   was one of the exclusions which was set out.

18   Q.    That's your assumption, isn't that right, sir?

19   A.    From reading the documents, yes.

20   Q.    That's not based on any discussion or negotiation with

21   anyone at Lehman, isn't that right?

22   A.    That's correct.  So I didn't have any discussion or

23   negotiation with them.  But I did read the documents, so that's

24   what it's based on.

25   Q.    Can you open your book, sir, at Exhibit 620?  This is, at

VERITEXT REPORTING COMPANY

212-267-6868                                                     516-608-2400

61

1    the bottom, an e-mail that you received from Stephen King on

2    Thursday, September 18.  Isn't that correct, sir?

3    A.   Yes, that's correct.

4    Q.   And Mr. King said to you, "Why don't we add to the initial

5    margin on the repos?"  Do you see that?

6    A.   Yes, I can see that.

7    Q.   And then he sent you another e-mail shortly afterwards

8    correcting himself, and saying, "Sorry, I meant exchanges and

9    clearinghouses."  You see that?

10   A.   Yes, I see that.

11   Q.   You understand what an exchange and a clearinghouse is,

12   isn't that right, sir?

13   A.   Sorry, what was the question?

14   Q.   You understand what's meant --

15   A.   Yes, I do, yes, I do.

16   Q.   -- by an exchange and a clearinghouse.

17   A.   Yes, I do.

18   Q.   That's where people buy and sell exchange-traded

19   derivatives, correct?

20   A.   Yes, that's correct.

21   Q.   So what Mr. King, when we look at his corrected message,

22   here, was suggesting to you was, why don't we -- you understand

23   that -- when you got this e-mail, you understood that when he

24   said "we", he was referring to Barclays, right?

25   A.   Yes, that's correct.

62

1    Q.   He was saying why don't we add margin at the exchanges and

2    clearinghouses.  Isn't that right?

3    A.   Yes.  That's what he said.  In terms of what I don't

4    understand about this is whether he's saying why don't we add

5    it to our accounting list where we're setting out the values of

6    the assets and liabilities we've acquired, or is he saying why

7    don't we add it to a deal.  I don't -- but I think at the time,

8    it wasn't, as you can see, on our earlier acquisition balance

9    sheets.  So I think he's saying why don't we add it to that.

10   But I don't know, exactly, which of those two he meant, and

11   you'd have to ask Stephen that.

12   Q.   Did you do anything at the time to follow up on his

13   suggestion?

14   A.   I probably forwarded this e-mail to someone else, asked

15   him to have a look at it, yes.  But I can't recall who --

16   Q.   Do you know one way or the other --

17   A.   No --

18   Q.   -- whether you forwarded this e-mail?

19   A.   -- I can't recall what I did.

20   Q.   Do you recall doing anything to follow up on this

21   suggestion?

22   A.   As I said, I can't recall precisely.  I suspect I did

23   because I generally, when I was getting things, was trying to

24   send them to the right people to follow up on them.

25   Q.   Anything that you know?

63

1   A.   But I can't remember precisely.

2   Q.   You did respond.  And you didn't shoot the idea down.  You

3   said, "Agreed.  Paolo is saying the right stuff."  You see

4   that?

5   A.   Yes, I can see that.

6   Q.   Now, who's Paolo?

7   A.   Paolo's Paolo Tonucci who was the Lehman treasurer at the

8   time.  And I think he was one of the people we were working

9   with to try to identify unencumbered assets which were a part

10  of the business we were acquiring.

11  Q.   And when you said Paolo is saying the right stuff, were

12  you communicating that Mr. Tonucci was doing everything he

13  could to assist Barclays in getting additional value into the

14  deal?

15  A.   Yes.  I think what Paolo was doing was helping us identify

16  the assets, which we were acquiring as part of the business.

17  Q.   Did you ask Mr. Tonucci to add margin to the deal?

18  A.   As I said before, I couldn't recall exactly what I did in

19  terms of sending e-mails on.  I said I thought I probably did,

20  but I can't remember precisely what I did.

21  Q.   You have no recollection --

22  A.   That's what I said.

23  Q.   -- of any communication with Mr. Tonucci on the subject of

24  margin.  Isn't that correct, sir?

25  A.   Yes, I said I couldn't remember precisely.

64

1    Q.    Barclays has an audit committee?

2    A.    Yes, that's correct.

3    Q.    They oversee the financial function?

4    A.    Yes, that's correct.

5    Q.    The financial reporting of the company?

6    A.    Yes, that's correct.

7    Q.    It's important, is it not, that Barclays provide its audit

8    committee with reliable information?

9    A.    Yes, that's correct.

10   Q.    And management has a process of providing not only verbal

11   reports but also written materials to the audit committee on a

12   regular basis, isn't that correct?

13   A.    That's correct, yes.

14   Q.    Now, some weeks after this transaction closed, the audit

15   committee needed to be brought up to date on the transaction,

16   isn't that right?

17   A.    Yes, that's correct.

18   Q.    And materials were prepared for the committee, correct?

19   A.    Yes, that's correct.

20   Q.    Did you have a role in preparing those materials?

21   A.    Yes, I would have a role.

22   Q.    When you reviewed those materials, were you satisfied that

23   they were reliable?

24   A.    Again, I can't recall exactly what, but normally, I have a

25   tendency to edit and change these materials as they go past me.

65

1          MR. MAGUIRE:  Your Honor, if I might approach?

2          THE COURT:  Yes.

3          THE WITNESS:  Thank you.

4    Q.   Sir, I provided you with Movants' Trial Exhibit 436.  You

5    see that document?

6    A.   Yes.

7    Q.   This is a report for the board audit committee of

8    Barclays, is it not?

9    A.   Yes, it is.

10   Q.   Who is Chris Lucas?

11   A.   He's the Barclays PLC finance director.

12   Q.   And did this represent the most reliable information that

13   you had for the audit committee as of the date, 14 October

14   2008?

15   A.   Yes.  It would have represented the latest view we had at

16   that time.

17   Q.   If you turn, sir, of the last page of the exhibit, you'll

18   see a provisional acquisition balance sheet and negative

19   goodwill calculation.  Do you see that?

20   A.   Yes, I can see that.

21   Q.   And down the lower part of the page, you'll see a section

22   called sensitivities.

23   A.   Yes.

24   Q.   See that sir?

25   A.   Yeah.

66

1    Q.   It was important, was it not, to alert the members of the

2    audit committee to any conditions or contingencies associated

3    with this provisional balance sheet?

4    A.   Yes, that's correct.

5    Q.   And it specifically notes "all of the amounts presented

6    above are subject to finalization".  Do you see that?

7    A.   Yes, I can.

8    Q.   And then it says, specifically, "in particular, the

9    following are of note".  Do you see that, sir?

10   A.   Yes, I can see that.

11   Q.   Now, I invite your attention to note 2.  You will see that

12   note says "the release of this deposit is subject to SEC

13   approval".

14   A.   Yes, I can see that.

15   Q.   And that specifically refers to an item that is the third

16   asset listed at the top of the page under financial assets,

17   specifically, cash deposit, 15 C3.  See that, sir?

18   A.   Yes, I can see that.

19   Q.   And that was your best understanding at the time of this

20   report to the audit committee, approximately a month after the

21   closing of the transaction; isn't that correct?

22   A.   Yes, it's correct.

23   Q.   And this is the report that was made to Barclays' audit

24   committee on or about that date.

25   A.   Yes, that's correct.

67

1    **Q.   Thank you, sir.**

2         MR. MAGUIRE:  No further questions.

3         THE COURT:  Thank you.  No questions from the

4    committee?  We'll take a morning break before getting to Mr.

5    Schiller's questioning, and we'll resume at about 11:10.

6       (Recess from 10:59 a.m. until 11:14 a.m.)

7         THE COURT:  Be seated, please.

8         And you may proceed, Mr. Schiller.

9         MR. SCHILLER:  Thank you.  Good morning, Your Honor.

10   CROSS-EXAMINATION

11   BY MR. SCHILLER:

12   **Q.   Good morning, Mr. Clackson.**

13        MR. SCHILLER:  May we distribute the thin books,

14   please?  I apologize.  We should have done that right now.  My

15   mistake.

16      (Pause)

17        THE COURT:  Thank you.

18        THE WITNESS:  Thank you.

19      (Pause)

20   **Q.   Good morning --**

21   **A.   Good morning.**

22   **Q.   -- Mr. Clackson.  How are you?**

23   **A.   Good, thank you.**

24   **Q.   In your examination earlier this morning, you were shown**

25   **an e-mail and asked about the success Barclays had on Friday of**

68

1   that week, the 13th through the 22nd, in terms of the equity

2   markets turning and some gains being anticipated.  Do you

3   remember that?

4   A.   Yes, I remember that.

5   Q.   And you had an e-mail about making a load, or something

6   like that.  Do you recall that?

7   A.   Yes, I recall that.

8   Q.   Would you compare for the Court that aspect of the private

9   equity issue you were reviewing in the e-mail, with the early

10  morning call that you participated in, which you testified

11  yesterday with respect to being incredibly frightened about a

12  possible huge loss based on what your people were seeing in the

13  assets that were coming over Thursday night and Friday through

14  this repo?

15  A.   Yeah.  So as I said, the call when I was working up in the

16  middle of the night when we realized we were paying out forty-

17  five billion dollars in cash and we were getting some assets,

18  some of which we'd never seen before and we didn't know the

19  value of them, and at that point we were terrified because we

20  thought we could have a huge shortfall, as I said yesterday I

21  think.  So rather than realize an accounting gain, we could

22  realize a huge accounting loss, substantially.

23      There's a huge amount of ups and downs in that period, as

24  probably I think the trail shows, that we were terrified.  We

25  heard some good news, we felt a bit better, then we heard some

69

1    bad news.  There were quite significant mood swings over that,

2    you know, twenty-four/forty-eight hour period.

3    Q.    And as a result of the bad news in the morning, what did

4    your colleagues do here in New York with Lehman?

5    A.    So my understanding is that they got some of the Lehman

6    people together to try and make sure they could und -- because

7    a lot of the assets we thought originally in the deal we were

8    acquiring had been encumbered.  So other people who'd

9    securitize them had taken those assets away, so they were no

10   longer being able to deliver.  We were trying to find, in terms

11   of the business we were buying, whether there were other

12   unencumbered assets in that business, and trying to identify

13   those unencumbered assets, to make sure that it was clear then

14   that we understood all the assets which were covered in the

15   deal of the business we were acquiring.

16   Q.    And there were some securities your colleagues told you

17   they were having trouble valuing, is that correct?

18   A.    There are a number of different cases where people were

19   having trouble valuing securities.  Some were because, as we've

20   talked about, we did that extensive exercise earlier in the

21   week on the Monday when we went through all the securities.  We

22   had new securities coming from the Fed.  And it wasn't one or

23   two or three; it was, my understanding, lists of thousands of

24   securities.

25        And as I think I said earlier today or yesterday, some of

70

1    these were own label Lehman securities, so they were one-off

2    securities which had been manufactured by Lehman to get funding

3    and placed in the Fed.  And in terms of those securities, to

4    value them you couldn't just go and find a price or see where

5    are they trading in the market.  You had to do fundamental

6    analysis to try and find out what was underlying the security

7    and what value, if any, that had.

8    Q.    Do you recall being told the magnitude of the issue in

9    terms of whether it was billions of dollars of concern over

10   values that Friday morning?

11   A.    I can't recall any specific numbers, but my recollection

12   was the level of anxiety we had, as I said, was in the

13   billions.  So it was more than wiping out any accounting gain

14   we thought we made.

15   Q.    You testified earlier this morning on the subject of

16   negative goodwill, that you wanted as large a negative goodwill

17   number on your acquisition balance sheet as you could achieve.

18   A.    Yes, that's correct.

19   Q.    And why is that?

20   A.    I suppose we wanted to realize the largest accounting gain

21   we could for our financials and because it helped our capital

22   position.  And as I said earlier on, capital was an extremely

23   scarce commodity.  If we had a larger accounting gain, the

24   accounting gain goes into the capital calculation.

25   Q.    And did you maintain the view of wanting as large a

71

1    negative goodwill number through the filing of your balance

2    sheet in February of 2009?

3    A.    Yes, that's correct.

4    Q.    With respect to the valuation of assets, is it correct

5    that the higher the valuation of the financial assets the

6    higher the negative goodwill will be on your accounting balance

7    sheet?

8    A.    Yes.  Yes, that's correct, but I suppose I should say the

9    thing I said before.  We don't have a choice about the value of

10   the financial assets.  The accounting rules are you have to

11   value them at the fair value; so the fair market value.  A

12   higher value would give you a higher goodwill, but that doesn't

13   mean we could just choose a higher value.  The accounting rules

14   are pretty strict, and we went through a pretty extensive

15   process, as has been discussed earlier, to make sure we got to

16   the fair value.

17   Q.    And the fair values that you got to, were those audited,

18   sir?

19   A.    Yes.  In our accounts we had a detailed disclosure of our

20   acquisition balance sheet and of the values of all the assets,

21   breaking down to get the gain.  And there was extensive work

22   done by our auditors going through the valuation of those

23   assets to make sure that we were reflecting an appropriate fair

24   value.

25   Q.    Mr. Clackson, let's turn to the subject of cure on which

72

1    you were examined both yesterday and then again this morning.

2    This Court has been told by Movants that it was Barclays' plan

3    to pay in the range of 200 million for assumed contracts, not

4    1.5 billion but 200 million for the assumed contracts, and that

5    Barclays knew this on the 16th of September.  Is that accurate?

6    A.   As I think I said earlier, we hadn't done our detailed

7    work at that point in time, so we didn't know what we were

8    going to spend.  And what we knew were the estimates we had

9    received from Lehman, and I think the original estimate which I

10   remember was for 2.25 billion I think is what we knew the 16th

11   of September.

12           MR. SCHILLER:  Would you put on the screen the April

13   9th transcript, at page 34, lines 24 through 34.2, please?  On

14   page 33, I'm sorry, at lines 12 through 25.

15   Q.   You see it says, line 12:  "Now, with respect to the

16   assumed liabilities, Barclays planned on them.  They insisted

17   on a discount and they planned, and the liability numbers being

18   inflated"?  Do you see that?

19   A.   Yes, I can see.

20           MR. SCHILLER:  And now go down to line 24.

21   Q.   "Now, what that indicates, it was Barclays' plan to pay in

22   the range of 200 million for assumed contracts --"

23           MR. SCHILLER:  Over to the next page.

24   Q.   "-- not 1.5 billion as the Court had been told, and that

25   they, Barclays, knew this on the 16th."

73

1          Is that accurate, sir?

2     A.   No.  As I've said, I don't think that is accurate, because

3     I don't think on the 16th we knew what we were going to spend.

4     Q.   When you were informed of the 1.5 billion number on --

5     later on Friday the 19th, which you've testified about earlier,

6     did you have any understanding as to how Lehman derived that

7     number that it presented to the Court?

8     A.   No, sir.  I didn't have any understanding of how Lehman

9     derived the original number of 2.25 billion or the subsequent

10    number of the 1.5 billion.

11    Q.   And I believe your testimony is that, over the weekend,

12    information started coming in?

13    A.   Yes.  That was my understanding.

14    Q.   And the mission critical element of that, when did that

15    come in, do you know, those contracts that were needed to begin

16    the business on Monday, and continue it Saturday and Sunday

17    actually?

18    A.   So my understanding is that there was a list of mission

19    critical contracts which, as I said this morning, I understood

20    had been pulled together by Lehman, because they understood the

21    business and understood what you needed to keep the lights

22    running, the computers working, et cetera.  So they provided

23    that list.  And I think, as I said earlier, I thought the value

24    of that list of day one mission critical contracts was about

25    200 million dollars.

74

Q.   Now, you spoke earlier today about how that weekend you

hoped most of the vendor contracts might provide overlap, and

you explained to the Court that you didn't know that but that

you hoped that.  When did you and your colleagues begin to get

some grasp of the contracts themselves, the Lehman contracts,

and how they compared to the contracts that Barclays itself had

with thousands of vendors?

A.   So the work, as I said earlier, I thought started over the

weekend, and then we were getting notified of updates over the

next two or three weeks.  I think the final work wasn't

completed till -- I think it was November at some point when we

had actually gone through all the contracts.

I think my understanding is, in the week following the

close when a lot of the work done (sic), clearly the work would

have been done looking at the larger contracts.  So people

would have looked at the major supply contracts.

It's quite a complex exercise, because you have to -- I

may have explained this yesterday, but let me explain again.

You have to work out -- you have to find out what all the

contracts are and make sure you have the complete list of all

the contracts.  You then have to determine which of those

services Barclays already has, find the contracts for the

Barclays service, to see if there's any duplication of the

service or if it's a service we need additionally.  If it is a

service which we need to continue additionally, you then have

75

1    to go back and find out what the cure amount is.  So there were

2    probably a lot of people working on quite an involved process

3    over a number of weeks.

4    Q.   When was it that you, Mr. Clackson, had a clear sense of

5    what the cure payments would actually be?

6    A.   I think, following the sixty-day period and the close --

7    so it's probably about late November -- I think I had a much

8    more accurate view.  Obviously we had a number which went into

9    our financial statements which had closed during February, and

10   that was the final number we disclosed.

11        As I think I mentioned before, we did subsequently make

12   some cure payments, I think, in the region of twenty million

13   dollars or so in 2009, which we didn't include in that total.

14   Q.   Was there public disclosure of the cure amounts you were

15   agreeing to take on, do you know?

16   A.   No.  I don't know what the disclosure was.

17           MR. SCHILLER:  May I approach, Your Honor?

18           THE COURT:  Yes.

19           MR. SCHILLER:  Your Honor, I'm giving you Exhibit 506,

20   to which there's no objection.

21   Q.   Mr. Clackson --

22   A.   Thank you.

23   Q.   And 506 is a snapshot of a website operated by Weil

24   Gotshal and Lehman.  Have you seen this document before, Mr.

25   Clackson?

76

1    A.    No.   I haven't seen this document before.

2    Q.    Let me ask you to turn to the fourth page.  And, I

3    apologize, this is not Bates-stamped.  You see the top of this

4    page of the website it refers to, and I quote, "The deadline to

5    a written objection concerning designated contracts was Monday,

6    October 27th at 4 p.m."?  And then it has a series of entries:

7    "On October 21st, purchaser filed an additional notice of

8    assumption and assignment of executory contracts and unexpired

9    leases."

10         MR. TAMBE:  Objection, Your Honor.  I have no

11   objection to the document, but I do have an objection to the

12   competence of this witness to testify about it.

13         THE COURT:  I think that's a fair objection.  This is

14   a snapshot of a publicly available website which is designed to

15   provide transparency into the case.  To the extent that the

16   witness knows the substance of something which is within it

17   because of his personal knowledge, it's obviously fair game for

18   questioning.  But he has no particular ability to comment on

19   the formatting of the document, the substance of the document,

20   or anything about the document, any more than Mr. Schiller

21   does.

22         MR. SCHILLER:  And I'm not about to testify.

23   Q.    Why don't you put that aside for the moment and just tell

24   the Court whether you reached decisions periodically from

25   September 22nd through November as to which contracts were

77

1    being taken on and assumed.

2    A.    Yeah.  So as I said, I think there was a significant

3    amount of work done, and the people doing that work will have

4    got to a point where they decided, you know, which contract to

5    assume.

6    Q.    And did you have a team that worked on this process?

7    A.    Yeah.  There was a team of people in New York working on

8    this.

9    Q.    And it took them months, is that right?

10   A.    That was my understanding, yes.

11   Q.    Let me ask you to turn to tab 6 in the binder that we

12   handed out.

13          MR. SCHILLER:  Your Honor, that's Exhibit 774.  It's

14   in evidence.

15   Q.    You were asked about this document this morning, Mr.

16   Clackson.  You see the date September 22nd and the time?  This

17   is probably Sunday night for you in London, is that correct?

18   A.    I think this was -- yeah, from Gary in New York.  He sent

19   it, I think -- yeah, it must have been about 11 o'clock New --

20   11 p.m. New York time.  So it would have been, yeah, early

21   morning in London.

22   Q.    And may I ask you to address your attention to the next

23   page, the attachment in Exhibit 774?  And you see the -- where

24   it says "total assets"?

25   A.    Yes.

78

1    Q.    And there's a reference to cure payment and the 2.25

2    number?

3    A.    Yes.

4    Q.    And then the bonus accrual and the 2.00 number?

5    A.    Yes, I can see that.

6    Q.    And who prepared this document for you?

7    A.    So this would have been prepared by Gary Romain.

8    Q.    And does this reflect certainty or uncertainty as to the

9    cure payment situation as of Sunday night?

10   A.    I mean, Gary would have been pulling together the latest

11   information he had.  I think, if you look at the bottom of the

12   exhibit --

13   Q.    Yes, sir, the footnotes -- the notes?

14   A.    Yeah, so the -- sorry, the notes down at the bottom.  He's

15   saying here he's just assuming the full cure payment required.

16   My assumption is that at the time he had no better information

17   than that.

18        Given the timing of this document was -- I think I may

19   have said this before, but the timing was on Sunday night --

20   obviously Gary's information here is it's out of date.  We know

21   because we know that a number of 1.5 billion was presented to

22   the Court on the Friday.  So obviously, the data he had is from

23   sometime before that.

24   Q.    So he was making an assumption and he lacked any more

25   precise information than that himself --

79

1    A.    Yes.

2    Q.    -- that evening?

3    A.    Yes.

4    Q.    Let me ask you to turn to the next tab, 7, which is

5    Exhibit 775.

6              MR. SCHILLER:   And that is in evidence, Your Honor.

7    Q.    Would you identify 775, another Gary Romain e-mail to you

8    and others, Mr. Clackson?

9    A.    Yes.  This is the same draft acquisition balance sheet

10   which Gary sent.  This is nearly a day later, so it's Monday

11   night now.

12   Q.    And it's a day later, and Mr. Romain is saying to you and

13   Mr. Ricci and Mr. James, who you've identified to the Court

14   already in your testimony --

15   A.    Sorry.  It's Mr. Walker, actually.  It's Mr. James Walker.

16   Q.    James Walker?  "Please find the latest acquisition balance

17   sheet and negative goodwill calculation.  In addition to the

18   general verification and the valuation of trading positions,

19   additional moving parts include," and your second bullet there

20   is "The appropriate cure payment accrual requires further

21   attention."  And this following the closing that day in New

22   York, is that right?

23   A.    Yes, that's correct.  This is the evening of that day.

24   Q.    So in the twenty-four hours -- or the twenty hours that

25   have passed between Exhibit 774 and Exhibit 775, has your

80

1    calculation of cure changed based on your information?

2    A.    I think if you go on to the next page, the attachment, and

3    you go to the same piece below Total Assets --

4    Q.    You're referring, in the "Total Assets" section, to where

5    cure payment appears?

6    A.    Yes.  There's an amount here, if you can see, NOR, .8

7    billion, or 800 million dollars.  And so there was quite a

8    change between this and the day before.  And I think my

9    understanding is, as I said, we're getting some over the

10   weekend.  So as opposed to the Lehman estimate, which we had in

11   earlier, this number of 800 million I think related to, you

12   know, some bottom-up data.  So some underlying contract or data

13   we've got.  But you can see in terms of note 4 --

14   Q.    Footnote 4, yes.

15   A.    Footnote 4. -- "Details OS".  "OS" means outstanding.  So

16   he still didn't have any detailed backup supporting that

17   number.  And Betty Wang, who worked in Barclays Capital Finance

18   in New York, was following up in terms of -- I presume,

19   following up to try and make sure we got the detail supporting

20   that number.

21   Q.    So as of Monday night, after the closing, you had an 800

22   million estimate, but there were still outstanding details in

23   terms of information that you needed to pursue this cure issue?

24   A.    Yes, that's correct.

25   Q.    And that took how long?

81

1   A.   As I said, I didn't think we completed the process until

2   November time.  So that's, whatever, a month and a half, six

3   weeks from here.

4   Q.   Let me ask you to turn to tab 8, which is Barclays'

5   Exhibit 776.  And this is another draft of the acquisition

6   balance sheet from Gary Romain dated -- it's from you,

7   actually.  Why don't you identify the document dated September

8   25th for the Court, please?

9   A.   Sorry.  I was forwarding to Mr. Abraham a latest version

10  of the acquisition balance sheet, which I think you can see

11  below was sent to me by Gary Romain.

12  Q.   And so this is several days later.  And if you look at

13  that sheet and turn to the total assets in the attached balance

14  sheet, you have now another number, don't you?  And would you

15  describe that to the Court, and note 4 as well?

16  A.   Yeah.  So at this point the estimate of the cure payment

17  was, NOR, .5 billion, or 500 million.  And footnote 4, you can

18  see, says in this case 500 million total cure payment list is

19  included.  So, obviously, at this point we did have some

20  detailed backup supporting the number.

21       But you can see that it was an initial estimate, which it

22  said at the bottom, and we still hadn't completed the work at

23  this point.  And you can also see that it says the finance

24  people were still following up on the detail.

25  Q.   So it was initial estimate -- an initial estimate.  It had

82

1    gone from 800 to 500 million.  There was still more to do, is

2    that right --

3    A.   Yes, that's correct.

4    Q.   -- as of September 25th?  You were shown earlier this

5    morning Movants' Exhibit 95, which is also on the September

6    25th e-mail concerning cure payments.  And on the second page

7    of that there is an e-mail from Gary Romain dated September

8    25th to Mr. Westwood, and you were asked about that.

9        Let me point out to you in the second sentence it says,

10   "In the balance sheet we need to make provisions for the cure

11   payments we actually expect to make."  You hadn't arrived at

12   that expectation at that point?

13   A.   Yes, that's correct.  We hadn't arrived at that

14   expectation.

15   Q.   You say, "plus, that the related suppliers would expect us

16   to make".  You see that?

17   A.   Yes, I can see that.

18   Q.   To what do you refer there, for the Court's information?

19   A.   (No audible response).

20   Q.   And I say "you" because --

21   A.   Sorry.

22   Q.   -- he's reporting on Patrick Clackson's comment.  So I

23   realize this is just in substance what you may have conveyed to

24   Gary Romain.

25   A.   I think by that time -- so later in the week when we

83

1    discussed with auditors how we were going to account for cure,

2    which, as I said I think yesterday, was a new concept to us.

3    And it wasn't clear to us exactly how to account for it.  You

4    can see at that point we said, in terms of the acquisition

5    balance sheet -- we come to the view at this point that we

6    needed to make provision for the cure payments in the

7    acquisition balance sheet which, you may recall, the week

8    before this, we didn't believe that we'd have to make provision

9    for those payments in the acquisition balance sheet.  So that's

10   what I understood this to mean.

11   Q.   And the next sentence says, "This would seem a significant

12   exercise to complete in detail.  I've seen the listing and

13   understand how long it is, but we are trying to make an initial

14   estimate today, if at all possible."

15        Was that your view?  Did you share that with Mr. Romain on

16   or about September 25th?

17   A.   I can't remember if that was my view or Gary's, but I

18   think it's consistent with my understanding that it was a huge

19   long list and a lot of work to do.  But the thing I was trying

20   to get was an initial estimate so I had a view of our position.

21   Q.   You just mentioned that the cure payments were back on the

22   acquisition balance sheet by this point in the transaction --

23   A.   Yes.

24   Q.   -- after closing.  Let me take you back to what my friend

25   refers to as the first transaction proceeding Monday and

84

1    **Tuesday, the 15th and 16th of September, because I would like**

2    **you to review that again with the Court.**

3              MR. SCHILLER:  And I would ask that you look at

4    Exhibit 135, which is tab 3, Your Honor, in the little book we

5    have in front of you.

6              THE COURT:  Just so we're clear on our terms --

7              MR. SCHILLER:  Yes, sir.

8              THE COURT:  -- I thought that the first transaction

9    was over the weekend or pre-bankruptcy, the second transaction

10   was the 15th and 16th, and the third transaction is the one

11   that was actually closed on the 22nd.  So to the extent that

12   your question includes an incorrect reference to --

13             MR. SCHILLER:  Thank you, Judge.

14             THE COURT:  -- the movants' use of the term, I think

15   it needs to be amended.

16             MR. SCHILLER:  Right.  Right.  Thank you.  Let me

17   rephrase the question.

18   **Q.   Referring to the transaction you were at work on Monday**

19   **and Tuesday, the 15th and 16th, and which was presented to the**

20   **Court in terms of its progress on the 17th, that is what I am**

21   **referring to when I ask you to look at Exhibit 135.**

22        **And at the bottom of that page, on the first page, you see**

23   **there is an e-mail from you to Bill Castell?**

24   **A.   Yes, I can see that.**

25   **Q.   Now, does this document show a negative goodwill**

85

1   calculation assuming what Barclays would spend on cure, that it

2   would spend 200 million or less on cure?

3   A.   No.  This document -- sorry, bounce around here.  This

4   calculation had nothing to do with spend in terms of spend on

5   cure.  It was a calculation of what we thought the accounting

6   liability we would have to recognize in respect of, in this

7   case, both cure and compensation would be.  But -- which is

8   distinct from spend.  So at the time, I think as I said

9   yesterday, looking at cure in isolation, we didn't have any

10  more information than the 2.25 estimate which we got from

11  Lehman.  We didn't have any knowledge of the bottom-up list of

12  contracts.  So we didn't know anything about what we were going

13  to spend.

14       But for accounting purposes, at that point, because in the

15  contract we thought the wording appeared to be optional on a

16  supplier, we didn't think that we'd recognize any accounting

17  liability in respect of cure.

18       So in terms of that calculation, the accounting liability

19  doesn't include anything in respect of cure, but that was --

20  had nothing to do with how much we expected to spend, 2.25

21  billion, or I think you mentioned 200 million.  I don't quite

22  understand how that fits in.  But we had no knowledge of what

23  we were going to spend.

24  Q.   Others have objected to my questions from time to time,

25  and you should feel free to do that too. If we look at the

86

1    first line of that e-mail to Bill, you said here, Mr. Clackson,

2    it's a Long Island side, LI side, not BarCap, in terms of where

3    this information comes from; do you see that?

4    A.   Yes, that's correct.  I -- sorry.  Yes, I can see that.

5    Q.   So you're relying on their estimate at that point, as

6    you've mentioned?

7    A.   Yes.

8    Q.   And now you have this accounting liability issue.  You've

9    taken the cure, as I think you explained to the Court

10   yesterday, the 2.25, completely off the acquisition balance

11   sheet and over in the direction of your profit and loss to be

12   charged as these contracts are assumed and paid, is that right?

13   A.   Yeah.  So that was my understanding at the time that, as

14   we did the work on cure and worked out the payments we'd have

15   to make, those would be charged against our accounting results

16   subsequent to the acquisition.

17   Q.   And the 1.35, once again for me and for His Honor, what

18   does that refer to in terms of the comp?  What are you moving

19   off of the acquisition balance sheet in terms of comp and over

20   toward your profit and loss statement?

21   A.   So the estimate we had for comp there was number 2 in that

22   formula.  So I think we had an estimate that we were going to

23   pay two billion dollars.  And in terms of what accounting

24   liability we'd reflect in the opening balance sheet or the

25   completion balance sheet, at the time we thought we would only

87

1    reflect accounting liability for bonuses, where we had a name-

2    by-name list of the bonuses we were going to guarantee to

3    individuals.

4        So of that two billion, the 1.35 was the amount where I

5    thought we had a name-by-name list.  The balance, the 650

6    million dollars balance, I think as I said yesterday, was money

7    which we're expected to spend for the other individuals who

8    were taking on the other of the 10,000 people we were taking

9    on.  We didn't know how many of those we would keep or whether

10   they would go, and so we didn't know whether that conversation

11   on liability related to bonus or severance.

12   Q.   If this Court were told that that 1.35 number is the

13   amount that Barclays is planning to spend on comp and cure,

14   would that have been accurate?

15   A.   No.  That wasn't my understanding at the time.  As I said,

16   the 1.35 is a subset of the amounts which were guaranteed.  I

17   didn't have any better data from my human resources people

18   other than the two billion dollar estimate at that time.

19        MR. SCHILLER:  May we look at the April 9 transcript

20   at page 35, lines 6 through 10, please?

21   Q.   Mr. Clackson, please look with me at this section of the

22   transcript.  It refers to what the Court has been told, and it

23   says -- this is Lehman's balance sheet and it gives the final

24   asset split.  And this is what Mr. Clackson writes," referring

25   to this e-mail:

88

1          "Negative goodwill from this method is the sum of 2.25

2     plus 2, which comes to 4.25, minus 1.35.  That's the amount

3     Barclays is planning to spend."

4          Is that accurate, sir?

5     Q.   No, I think this is a misreading of a document, because

6     1.35, I think as I've just said, isn't the amount we plan to

7     spend; 1.35 was the accounting liability which we thought we

8     would have to reflect in our opening balance sheet.  And as I

9     said earlier, we didn't know how much we were going to spend in

10    terms of a cure.

11    Q.   Let me show you Movants' 2, if I may.  You were -- had

12    been asked about that.

13         MR. SCHILLER:  That is in evidence, as you know, Your

14    Honor.

15    Q.   Now, if you look at the cure payment set forth on this

16    piece of paper there, and you say -- this isn't your balance

17    sheet, but what you've described from your U.K. accounting --

18    A.   Sorry.  What's the date of --

19    Q.   This is --

20    A.   I --

21    Q.   -- 9/16/08, handwritten at the top of the page.  Do you

22    see that?

23    A.   Okay, yes, I could see that.

24    Q.   And I'm pointing down to the 2.25 number on cure that

25    appears on this document, and it is in a balance sheet setting

89

1    of assets and liabilities in the transaction, some of them.

2    And there's, here, the 2.25 number that you've been testifying

3    about.  And if you were to move that number from your

4    acquisition balance sheet to a profit and loss accounting, it

5    would not be part of an asset and liabilities comparison,

6    correct?

7    A.   Yes, that's correct.  So if it was charged through our

8    profit and loss statement, it means we wouldn't on day one have

9    to recognize a liability.  So we're saying on day one we

10   wouldn't recognize a liability, but we would recognize a

11   liability as we settled with the customers.  And at the time

12   you recognize a liability, there would be a charge which would

13   go through our profit and loss account.  So that was our

14   understanding of how we would treat that.

15   Q.   And in terms of the comp number, which appears there as

16   two billion, you explained to the Court that a portion of that

17   would also be moved off your acquisition balance sheet at that

18   point in the transaction.  Also on a charged basis under P&L?

19   A.   Yeah.  So we thought, because we didn't have at the time,

20   you know, a detailed list of either the -- for the 650 million,

21   we didn't think it would appear as a liability because we

22   didn't know who would end up getting severance or who would end

23   up getting bonus or how much.  We didn't think that we could

24   show that as a liability on day one.

25        And so we would have to accrue those charges either as

90

1    they arose or, you know, during the relevant period for the

2    rest of the year.  That was our understanding.

3    Q.   And so if 650 or 700 million were also taken off this

4    sheet of paper as it was for you on your acquisition balance

5    sheet, how would the total financial assets compare to the

6    total financial liabilities?

7    A.   So the assets would obviously exceed, in this case for

8    liabilities, by the amount you took off.  So if you took of

9    2.25 and 650, there would be -- the assets would be 2.9 billion

10   greater for the liabilities, which means, for accounting

11   purposes, on that day one acquisition balance sheet you would

12   realize a negative goodwill gain, which is effectively what my

13   earlier e-mail described.

14   Q.   And that would be an acquisition accounting gain based on

15   the numbers you've just described, a buffer between the assets

16   and the liabilities as one basis for that?

17           MR. SCHILLER:  I withdraw the question.

18           THE WITNESS:  Yeah.

19   Q.   The -- in terms of the two billion dollar comp liability,

20   Mr. Clackson, I want to be clear.  I'd like the Court to

21   understand your view as to what comprised that two billion at

22   the time this transaction closed.  Did that mean to you two

23   billion in bonuses, or were there other elements to the two

24   billion dollars?

25   A.   My understanding was we were taking on compensation

1   liabilities for the 10,000 or so employees we're taking on.  A

2   portion of that, as I've said before, comprised bonuses which

3   have been fixed.  There was a portion where we didn't know

4   whether people would receive severance payments or bonuses, and

5   therefore my understanding was that included both bonus,

6   severances and any related payroll taxes on those amounts.

7   Q.   So if the Court were told -- Mr. Clackson, if His Honor

8   was told by movants that Barclays had signed and realized that

9   it expressly mandatorily makes Barclays responsible to pay two

10  billion for bonuses, would that be complete or incomplete?

11          MR. TAMBE:  Objection, Your Honor.  It calls in part

12  for legal -- for a legal conclusion, because he's being asked

13  to compare that representation with what the contract may or

14  may not require Barclays to do.  I don't think he's competent

15  to testify to that.

16          THE COURT:  I'm going to sustain the objection for the

17  reasons stated and for another reason, because it's a question

18  that ties into a hypothetical representation to the Court.  If

19  you ask it as a purely factual matter without the reference to

20  the representation, I think it's a better question.  And I also

21  think that this witness is not in a position in terms of

22  representations to the Court.  He's only in a position to talk

23  about what he knows about comp and cure.  That's it.

24          MR. SCHILLER:  Thank you, Judge.  And he has testified

25  as to that, so I'm not going to go over that again with him.

92

1          THE COURT:  Okay.

2          MR. SCHILLER:  I think it's important, at least it is

3     to us, that the trier of fact see what has been alleged

4     compared to what his evidence is, and I tried to dramatize that

5     for you.  I won't do that again, Judge.

6          THE COURT:  No, it's okay.  You can be as dramatic as

7     you like.

8     BY MR. SCHILLER:

9     Q.   I'd like to return to Exhibit 110.

10          MR. SCHILLER:  And I have to distribute that, with the

11    Court's permission.  May I approach?

12          THE COURT:  Sure.

13          (Pause)

14          MR. SCHILLER:  Your Honor, this is an unobjected to

15    exhibit of a Barclays public announcement on the 17th of

16    September, 2008.

17    Q.   Do you see that --

18    A.   Yes, I --

19    Q.   -- Mr. Clackson?

20    A.   -- see that.

21    Q.   And it references John Varley and his address.  Can you

22    describe to the Court, if you recall, what Mr. Varley was

23    describing that morning and generally to whom?

24    A.   Mr. --

25          MR. TAMBE:  Your Honor, I'm not sure foundation was

93

1    laid as to this witness' knowledge about this presentation.

2    **Q.   Are you familiar with this announcement in Exhibit 110,**

3    **Mr. Varley (sic).**

4         MR. TAMBE:  Mr. Clackson.

5         MR. SCHILLER:  Mr. Clackson, yeah.

6         THE COURT:  I'm not familiar with it at all.  I'm

7    about to be.  If there's a foundation objection, the foundation

8    objection is granted.  Lay your foundation and we'll proceed.

9         MR. SCHILLER:  Okay.  Thank you, Judge.  I'm sorry.

10   Didn't mean to interrupt.

11   **A.   Yes.  No --**

12   **Q.   Did you contribute any data to Mr. Varley's remarks that**

13   **day?**

14   **A.   Yeah, we would have -- my team and myself contributed all**

15   **the financial data which went into his announcement to the**

16   **market.**

17   **Q.   May I ask you to turn to the second page of Mr. Varley's**

18   **announcement to the market on September 17th, two days before**

19   **the hearing before His Honor?  And turn to the third paragraph,**

20   **the second sentence, in which Mr. Varley says "We are acquiring**

21   **trading assets with a current value estimated" -- "a current**

22   **estimated value of seventy-two billion dollars and trading**

23   **liabilities with a current estimated value of sixty-eight**

24   **billion dollars for a cash consideration of 250 million**

25   **dollars."**

94

1      Did you provide that information to Mr. Varley?

2  A.   Yeah, so that's the information we would have given him.

3  Q.   And two paragraphs below, it says "We also mentioned in

4  our announcement today that certain of our shareholders have

5  expressed support for the transaction and an interest in

6  increasing their share holdings in Barclays.  In fact, the

7  transaction is capital ratio accretive without additional

8  equity issuance.  And the source of that accretion is the

9  negative goodwill from the transaction which amounts to about

10 two billion U.S. dollars."

11     Did you provide the data for Mr. Var -- to Mr. Varley for

12 this public statement?

13 A.   Yeah.  So again, we'd have provided that data.  Me and my

14 team would have provided that data.

15 Q.   You were asked earlier this morning about a 75.3 billion

16 dollar number in Barclays' board deck.  Do you recall that?

17 A.   Umm --

18 Q.   Let me help you --

19 A.   Yeah, I'm not sure --

20 Q.   -- by asking you to turn to Exhibit M-6 in their binder.

21     (Pause)

22 Q.   And please turn to page 5, which was the page that you

23 were examined about, and it's headed "Total Assets and New

24 Transaction are Seventy-Five Billion Dollars."  Do you see

25 that?

95

1   A.   Yes, I can see that.

2   Q.   And on the very first line there's an entry for mortgages.

3   What is that, the new transaction included entry, 6.5 billion?

4   A.   I think it would be related to mortgage-backed securities.

5   Q.   And are those the resis, or the residential -- the real

6   estate mortgage securities?

7   A.   Yes.  If you look at the right-hand side it breaks out

8   that it's -- yeah, there'd be real estate mortgage securities

9   and other ABS products, you can see, which we've done for

10  asset-backed securities.

11  Q.   So here in this exhibit, the seventy-five billion is made

12  up in part of 6.5 billion for residential real estate mortgage

13  securities.  Is that how you read it?

14  A.   Yes.  That's how I read this.

15  Q.   And now let me ask you to hold your finger on that, but

16  turn to M-1, which is tab 1 in the binder you received, and to

17  page 6, which has that definition of purchased assets.  And at

18  subparagraph (d), it specifically describes the long positions.

19  The long positions are described as government securities,

20  commercial paper, corporate debt, corporate equity, exchange-

21  traded derivatives, and collateralized short-term agreements,

22  with a book value of approximately seventy billion.  Do you see

23  that?

24  A.   Yes, I can see that.

25  Q.   Does the description of these long positions on page 6

1    include residential estate mortgage securities?

2    A.   No.  I don't think it does.  I think you can -- that I

3    include it separately from this.

4    Q.   Is it treated separately in the next paragraph?

5    A.   Yes, it is.

6    Q.   Subparagraph (e) which reads, "Fifty percent of each

7    position in the residential real estate mortgage securities"?

8    A.   Yeah.  So that sets it out separately from the other

9    positions.

10   Q.   But there's no value for that listed in the APA, is there?

11   A.   No, there isn't.

12   Q.   But if you were to include this 6.5 billion number that

13   appears as a new transaction included for this mortgage

14   subject, in M-6, and added that, you would have a 76.5 billion

15   dollar number, would you not?  Added that to the seventy?

16   A.   Yes, that's correct.  If you added the seventy to the six

17   and a half, you have seventy-six and a half billion.

18   Q.   And if you excluded the -- keeping your finger on the page

19   with the mortgage-backed securities listed, if you wear to

20   exclude the 6.5 billion of residential real estate mortgages

21   from the 75.3 total, on that page, does that leave

22   approximately seventy billion of securities?

23   A.   Yeah or sixty-nine billion it would be.  Yes.

24   Q.   And are the remaining seventy billion of securities on

25   this page, sir, of Movants' Exhibit 6, the New Transaction

97

1    Included, are the approximately seventy billion dollars of the

2    securities in the remaining categories the types of securities

3    also listed in the APA definition of long positions that we

4    just looked at?  In Tab 1, of the APA.

5    A.   Yes, I do think they're consistent break downs, so in line

6    with -- yes, the purchase assets.

7         MR. SCHILLER:  I'm going to want to get an exhibit

8    number, Your Honor.

9         THE COURT:  All right.

10        MR. SCHILLER:  What is the exhibit number?

11   Q.   Earlier in your examination you were showed a document

12   showing net asset and funding estimates, which mentions a

13   negotiated discount of five billion dollars.  Do you recall

14   that?

15   A.   I've been shown so many documents, I'm -- it would be

16   helpful if you could direct me to the document just so I know

17   I'm talking about the appropriate one.

18   Q.   I don't have that handy.  Let me see if the examination's

19   finished.

20        MR. SCHILLER:  That concludes my cross, thank you.

21        THE COURT:  Okay.

22        MR. TAMBE:  If I could have one minute, I think I'll

23   have five minutes of questions and that's --

24        THE COURT:  We'll have a moment of silence.

25   REDIRECT EXAMINATION

1    BY MR. TAMBE:

2    Q.   Mr. Clackson, just a couple of questions.  One is just a

3    calendar issue, because maybe I'm confused on my calendar.

4    Could you put up the September calendar, please?   Friday the

5    19th of September was a Friday, correct?

6    A.   Yes, that's correct.

7    Q.   Not the weekend and you understood there was a hearing

8    before this Court on the 19th, correct?

9    A.   That was my understanding, yes.

10   Q.   Okay.  If you could pull up Exhibit M-41, please?  The

11   e-mail that you write to Mr. Rich Ricci is on Friday, September

12   19th at 3 p.m., do you see that?

13   A.   Yes, I can see that.

14   Q.   And that -- and so it's not on the weekend, it's on the

15   Friday that the hearing is being held, correct?

16   A.   Yes, that's correct.

17   Q.   And that's where you express your statement, "Cure

18   payments are optional and though some will be incurred, most

19   will be covered by our ongoing supply relationships and fall

20   into motley expenses," correct?

21   A.   Yes, though I think as I said earlier that was my hope

22   that that is what would happen.

23   Q.   And in terms of your hopes and aspirations with respect to

24   cure, you walked through a whole series of acquisition balance

25   sheet drafts where the number went from 2.25 to 1 to 800 to 500

99

1   and ultimately you ended up with 220 million, correct?

2   A.   Yes, that's correct.

3   Q.   Your hopes were right?  They were achieved?

4   A.   That was --

5   Q.   Came full circle back to where you thought you would be on

6   Friday?

7   A.   On the Friday, I had no knowledge of where we would be and

8   I don't -- you know, we ended up at 238.  I don't think I ever

9   expressed a number on the Friday of where we would be.

10  Q.   No, you did not express a number.  If you could turn to

11  Exhibit -- that was handed to you by your counsel, BCI Exhibit

12  110, which is the earnings of analyst call tran -- from the

13  looks of it.  Do you have that before you?  I think it was a

14  loose document.

15  A.   Yes, I have that.

16  Q.   And you testified that you did provide some of the data

17  that was used by Mr. Varley, the group Barclays PLC chief

18  executive --

19  A.   Right, that's correct.

20  Q.   -- in addressing the masses, the investors?

21  A.   That's correct.

22  Q.   Like an important call?

23  A.   Yes, that's correct.

24  Q.   Like, you want to make sure your chief executive when he

25  gets up there and talks to the investor base is absolutely one

100

1    hundred percent accurate, right?

2    A.    Yes, that's correct.

3    Q.    Can't mess up?

4    A.    Based on the data we have of that time, yes, sir.

5    Q.    Can't owe a promise.  Can't owe a promise, right?

6    A.    Yeah.  I mean, we want to make sure he had good data for

7    that call, yes.

8    Q.    You're making a significant announcement -- Barclays is

9    making a significant announcement in the middle of a tumultuous

10   week, correct?  You were being very careful with the date that

11   you give Mr. Varley, correct?

12   A.    Yes, that's correct.

13   Q.    Let's look at some of the statements that Mr. Varley makes

14   and you can tell us whether you provided any information to

15   back those up.  At the bottom of page 1 of Exhibit 110 he

16   states:  "The knowledge that the opportunity might arise also

17   caused us to manage our exposures to Lehman Brothers and we

18   have minimum exposure arising out of the bankruptcy."

19        Did you provide any data to Mr. Varley in support of that

20   statement?

21   A.    I can't remember, it's -- personally providing him data,

22   but in terms of the -- the transaction, I set out an agreement.

23   Obviously, we did what we did to make sure that we didn't have

24   exposure to things like OTC contracts which would be -- link us

25   in to the whole Lehman bankruptcy process because that sort of

101

1    master agreements would cross over to Lehman, so, yes, I was

2    involved in the work to make sure that we didn't have those

3    sort of exposures.

4    Q.    And therefore you would agree with Mr. Varley's statement

5    there, that "we have minimum exposure arising out of the

6    bankruptcy"?

7    A.    And -- and --

8    Q.    DO you agree, sir?

9    A.    Out -- arising out of the bankruptcy, yes, I agree.  We

10   had --

11   Q.    Turn to the next page.

12   A.    -- from that.

13   Q.    And the first paragraph at the top of the page.  So he

14   states there to the assembled masses, the investors:  "We knew

15   from that work over the summer that there was a significant

16   value opportunity in the business and we knew that there might

17   be a good economic opportunity available to us."  Do you see

18   that?

19   A.    Yes, I do.

20   Q.    And based on what you know, anything wrong with what Mr.

21   Varley has said that?

22   A.    Yes, so the work we did previously in the summer was when

23   we had looked at Lehman Brothers, the whole firm globally as a

24   potential acquisition and we looked at the synergy between the

25   Lehman business and the Barclays business.  So that's what this

102

1    was based on.

2    Q.   Okay.  So in addition to what we've called Lehman 1, the

3    weekend exercise, there was a summer exercise looking into

4    Lehman?

5    A.   There -- there was a desktop review so there was no

6    more --

7    Q.   What type of review, sir?

8    A.   A desktop review, so we got Lehman's financials, details

9    of their businesses and tried to compare them with ours and see

10   where there were overlaps, et cetera.

11   Q.   And then Mr. Varley goes on to say, "Furthermore, we

12   satisfied ourselves in the due diligence process which tool

13   place at the back end of last week and over the weekend.  But

14   the franchise of much of Lehman's and in particular the U.S.

15   Broker Dealer business, remains strong and healthy."  Do you

16   see that?

17   A.   Yes, I do.

18   Q.   And did you provide any data to Mr. Varley in support of

19   that statement?

20   A.   I can't remember any specific data I supplied to Mr.

21   Varley --

22   Q.   And you don't disagree with the expression that Mr. Varley

23   makes in that statement, that much of Lehman's and in

24   particular the U.S. broker-dealer business remains strong and

25   healthy, do you, sir?

1    A.   No.   Much of the franchise was strong and healthy, that's

2    correct.

3    Q.   If you could turn further on in the -- in this transcript

4    where your chief executive is speaking to investors, page 7 of

5    18.   And for your benefit, you may want to read the question

6    that Mr. John Varley is responding to, which is on page 6 of

7    18.   There's a question from someone at MF Global and you can

8    read that to yourself and then we'll discuss Mr. Varley's

9    answer.

10        (Pause)

11   Q.   And in particular, I want to draw your attention to the

12   last sentence there, where Mr. Mon (ph.) from MF Global asks,

13   "They're our own bank positions in the forty billion that you

14   have acquired and you are just telling they are perfectly,

15   adequately marked.   Is that right?"   See that?

16   A.   Yes, I do.

17   Q.   That's the question and then Mr. Varley answers that,

18   right?   On the next page.

19   A.   Yes.

20   Q.   And he says, "I will ask Chris to comment on the detail."

21   That's Chris Lucas, your group PLC CFO, if I --

22   A.   Yes, that's correct.

23   Q.   But Mr. Varley goes on to provide an answer, do you see

24   that?

25   A.   Yes.

104

1    Q.    And he says, "I suppose what I would say to you that you

2    know there's no coincidence in this transaction if you see what

3    I mean.  We have had the circumstances in which we have been

4    able to execute the transaction mean that we have been able to

5    be very deliberate either pro or con, so there isn't

6    serendipity or coincidence in the transaction; the transaction

7    is structured as we wanted it to be.  It is, of course, subject

8    to court approval and we are respectful of the Court.  But we

9    have been very deliberate in our choices here."  Do you see

10   that?

11   A.    Yes, I can see that.

12   Q.    And you disagree with any sentiment expressed by Mr.

13   Varley in his address to investors on that day?

14   A.    No, because I think in your terminology, this was, you

15   know, referring to -- I think you call the Lehman 2

16   transaction, where we had gone through, as you know, this

17   extensive exercise of making sure we got to the right fair

18   value for all the positions we were taking on.  And we'd also

19   gone through quite a lot of detail to make sure, in terms of

20   acquiring business, we were excluding things which we thought

21   linked us back to the Leman bankruptcy or the rest of Lehman.

22   Q.    Right.  You don't recall Mr. Varley taking to the

23   airwaves, with respect to Lehman 3, do you?

24   A.    No, I --

25   Q.    There was no other address to investors?

105

1    A.   Well, but the timing of this address, I think, is at the

2    time we thought the Lehman 2 transaction was going to happen

3    and I think as I said earlier, in that case we were able to

4    look at all the positions, go through the exercise of marking

5    the positions, so that's obviously what John is referring to

6    here.

7    Q.   And then, at least with respect to Lehman 2 what you're

8    saying is, "John's got it right."

9    A.   He has got it right, yes.

10   Q.   And further down there's another question and answer on

11   page 7 of 18.  And you can read the question to yourself, but

12   I'm going to focus on the answer.  Let me know when you're done

13   reading the question, sir.

14        And Mr. Varley says, "Your group chief executive says,

15   'This is -- and that is because we have not taken the entire

16   balance sheet that creates that income.  What we have taken is

17   a portfolio trading assets and liabilities that are first of

18   all, all'" --

19   A.   I think I might have read the wrong question.  I read the

20   one on the bottom of page 7.

21   Q.   No.  It's actually just the next question down.  It's over

22   here.

23   A.   On page 8?

24   Q.   Yeah, it's titled "Further Questions".  I guess by Mr. Mon

25   again, from MF Global, just going back to the earlier question.

106

1    Do you see that?  Do you have the right question, sir?

2    A.    Sorry, page -- on 8.  I can't see anything saying --

3    Q.    Page 7 of 18.

4    A.    Oh, okay, sorry.  At the top of this page.  Sorry.  I was

5    looking at the bottom.  Yes, I see that.

6    Q.    I'll give you a moment.  Do you want to read that first

7    question at the top of the page, it's below the heading Further

8    Question.

9    A.    Yes, I can see that.

10    Q.    And a response to that further question from Mr. Mon, what

11    John Varley says is, "And that is because we have not taken the

12    entire balance sheet that creates that income.  What we have

13    taken is a portfolio of trading assets and liabilities that are

14    first of all, the risk and secondly, those that need to support

15    the ongoing parts of the business that we have acquired.  And

16    therefore they are predominantly market making assets and

17    liabilities and very tradable."  Do you see that?

18    A.    Yes, I do.

19    Q.    And had you provided any data or information to Mr. Varley

20    in support of that statement?

21    A.    Again, I think this relates to the Lehman 1 transaction

22    which is the transaction we had at that time --

23    Q.    I think you mean Lehman 2, sir.

24    A.    Sorry, Lehman 2.  You're right.  Thank you.  And what

25    we've been through and looked at the details on that, yes.  I'm

107

1    not sure if I would have said it quite so strongly, but

2    obviously I'm an accountant rather than a chief executive,

3    but --

4    Q.   Do you think he got it wrong?

5    A.   I'm not saying he got it wrong, I'm just saying I wouldn't

6    have expressed it so strongly.

7    Q.   You'd have added the sentence down a little bit?

8    A.   I would have added --

9    Q.   Going back up to page 2 of 18 and I want to draw your

10   attention to the paragraph that my friend asked you about, the

11   third paragraph on page 2.  The acquisition of the core of

12   hold, that's the paragraph.  Do you have it?

13   A.   Yes, I do.

14   Q.   Okay.  And there, the second sentence I believe, the third

15   sentence reads, "We are acquiring trading assets with a current

16   estimated value of seventy-two billion dollars and trading

17   liabilities with a current estimated value of sixty-eight

18   billion dollars for a cash consideration of 250 million

19   dollars."  Do you see that?

20   A.   Yes, I can see that.

21   Q.   All right.  And then you provided those numerical details

22   to Mr. Varley?

23   A.   Yes, that's correct.

24   Q.   And you would agree with me, would you not, sir, that that

25   description of the deal does not include any number for assumed

108

1    liabilities, correct?

2    A.   It's specific that it talks about trading liabilities, so

3    it doesn't talk about any nontrading liabilities, which would

4    be the personnel, the comp liabilities and cure liabilities,

5    which we discussed earlier.

6    Q.   In fact, I mean -- correct me if I'm wrong.  I don't see

7    either there or in the next paragraph that your attention was

8    directed to, the -- two paragraphs down which talks about the

9    two billion dollars post-tax, negative good will.  A specific

10   description off the assumed liabilities for comp and cure.

11   A.   You're right.  They don't appear in this document.

12   Q.   Not there?

13   A.   You're right.

14   Q.   And the number that Mr. Varley lays out there for the

15   investors in that next paragraph down which begins "We also

16   mentioned," that last sentence there, "and the source of that

17   accretion is the negative good will from the transaction, which

18   amounts to about two billion US dollars, post-tax."  Do you see

19   that?

20   A.   Yes, I can see that.

21   Q.   And that's the post-tax number that derives from the

22   formula that you discussed before, 2.25 plus 2, minus 1.35,

23   right?

24   A.   Yes.  So that's the accounting -- it's post-tax equivalent

25   of that accounting gain because -- yeah.

109

1   Q.   So that number, that formula's been discussed a number of

2   times here.   That feeds up into a statement made by Mr. Varley

3   to the public?

4   A.   Yes, that's correct.

5   Q.   And what you're comparing there really is the 2.25 and the

6   2 that was set forth in Movants' Exhibit 2 versus how you were

7   going to account for that liability, correct?

8   A.   That's correct, yes.

9        MR. TAMBE:  If I may approach, Your Honor?

10       THE COURT:  Are we starting all over?

11       MR. TAMBE:  We -- just one document and one suit of

12   questions, Your Honor.

13       THE COURT:  I hope it relates to the cross, because if

14   it's --

15       MR. TAMBE:  It does, Your Honor.

16       THE COURT:  Okay.

17   Q.   When we were discussing here Mr. Varley's statements

18   and --

19       MR. SCHILLER:  Your Honor, may I interpose an

20   objection to this.  I apologize for interrupting you -- to --

21   this witness is not copied on this.  He didn't prepare this.

22   So we object to it, to this part of the document on hearsay

23   grounds and also the lack of foundation.

24       THE COURT:  Well, I don't know yet how it's going to

25   be used.  So I'll reserve judgment on the objection.  Is this a

110

1   document which is not in evidence?

2         MR. TAMBE:  It's submitted, Your Honor.  There was no

3   objection lodged with respect to it.

4         THE COURT:  Well, if it's a document that's in

5   evidence, I suppose it can be used with any witness as long as

6   it's relevant to the questioning of the witness, so let's

7   proceed.  But let's also recognize that this witness has been

8   on the stand all morning and into an extended session last

9   evening.  So let's move it along if we can.

10         MR. TAMBE:  And I will, Your Honor.

11   **Q.   If you could take a look at this document, Exhibit 140,**

12   **and please tell us whether you played any role in the**

13   **preparation of the analysis that is attached to this e-mail**

14   **chain?**

15   **A.   I -- it says -- at the top it relates to a red briefing,**

16   **which the initials of Robert E. Diamond -- and I would have**

17   **been involved in a briefing for Robert Diamond with investors,**

18   **so I'm sure I would have been involved.  In terms of the**

19   **specific details of this, I've got no recollection of seeing**

20   **this.  I don't know if I ever did.**

21   **Q.   Thank you.  Thank you, Mr. Clackson.**

22         MR. TAMBE:  No further questions, Your Honor.

23         THE COURT:  All right.  Nothing more?  Mr. Clackson,

24   you've had a longer visit to this court than you probably had

25   anticipated.  Thank you for your time.  Have a good trip home

111

1    and we'll take a lunch break until 2:00.  But before we all get

2    up and leave, I want to know who the witness will be at 2

3    because there are two possibilities, it seems to me.  One is

4    Mr. Hughes and one is Mr. Despins.

5            MR. GAFFEY:  Mr. Hughes is the next witness, Your

6    Honor.

7            THE COURT:  All right.  Does that mean that Mr.

8    Despins will not be taken today?

9            MR. GAFFEY:  I think that's probable, I mean, given

10   that the amount of time I plan to spend with Mr. Hughes and

11   what I expect will be cross, I think it's unlikely we're going

12   to have Mr. Despins today.

13           THE COURT:  All right.

14           MR. GAFFEY:  If we did, we wouldn't finish him, so it

15   probably makes sense to --

16           THE COURT:  Okay.  At the end of the afternoon

17   session, I'd simply like to reserve some time for an off the

18   record conversation about scheduling.  That includes how to

19   deal with the need to fit some of this week's witnesses into

20   next week and also how to deal with the Monday schedule which,

21   I had mentioned in a chambers conference, might involve some

22   strange start and stop times.

23           I'm prepared to simply dispense with my midday

24   obligation and allow us to have a full trial day, but I also

25   recognize that there are any number of people who might be

112

1    involved in the case who would similarly be involved in that

2    activity at midday.  So I want to talk about that off the

3    record so that we can develop an appropriate schedule for

4    Monday.

5         MR. SCHILLER:  For Your Honor's information, we were

6    advised last night that they had dropped five live witnesses,

7    so there's not pressure at this point as far as we know as them

8    completing their live witnesses next week, with the exception

9    of Mr. Varley, of course, who we reached agreement on.

10        MR. GAFFEY:  Not quite the issue, Your Honor, and I'm

11   happy to take that up in the chambers conference.  I wanted to

12   say only that we have dropped a few of our in-person witnesses

13   scheduled for this coming week as opposed to coming phase, I

14   think Judge, we can talk about later.  But if Your Honor needed

15   to address your schedule for Monday over the lunch hour, I can

16   say that there is some room on Tuesday and Wednesday to move

17   witnesses and it won't impinge any plans of any party, I think.

18   Am I getting nods?  Yes.  I mean, the point, Your Honor, is the

19   schedule is now built for overflow.  If a witness goes long,

20   we're still going to finish on the current list by the end of

21   the week --

22        THE COURT:  Okay.

23        MR. GAFFEY:  -- and we will have some time next week

24   to read some deposition transcripts and get that process

25   moving, too, so we can move the record along and excite Your

113

1    Honor with deposition transcripts.

2         THE COURT:  That's really something for me to look

3    forward to.  Okay, terrific.  We'll take a lunch break, resume

4    at 2:00 and hopefully have some time at the end of the day to

5    talk off the record.  And an off the record conversation that

6    would probably be the easiest would be to simply have people

7    who are not party to the conversation leave the courtroom.  We

8    can all stay here, close the record and then have a -- what

9    amounts to a chambers conference in the courtroom.

10        MR. GAFFEY:  All right.

11        THE COURT:  Okay.

12        MR. TECCE:  Your Honor, if I may.  I'm sorry.  I just

13   didn't know we resolved the point about Mr. Despins, if -- he's

14   prepared to come today, I just don't know if the expectation is

15   that he should or not.  If he's not, I would like to be able to

16   tell him.

17        THE COURT:  Let's release him.

18        MR. GAFFEY:  We hadn't talked about it and yes, we

19   should release him.

20        MR. TECCE:  Okay.

21        MR. GAFFEY:  I know how long I'm going to takes with

22   Mr. Hughes, around.

23        THE COURT:  Let's release him and he, I suppose,

24   becomes either the first or second witness on Monday.

25        MR. GAFFEY:  Or we can figure out a place for him.

114

1          THE COURT:  Or some other place that's convenient for

2     the parties.  Fine.

3          MR. GAFFEY:  Thank you, Your Honor.

4          THE COURT:  We'll break for lunch until 2.

5     (Recess from 12:31 p.m. until 2:10 p.m.)

6          THE COURT:  Be seated, please.  Good afternoon.  Is

7     Mr. Hughes the next witness?

8          MR. GAFFEY:  Beg your pardon, Your Honor?

9          THE COURT:  Is Mr. Hughes the next witness?

10          MR. GAFFEY:  Mr. Hughes is the next witness, yes.

11     Movants call Jonathan Hughes.

12          THE COURT:  Fine.  Good afternoon, Mr. Hughes.  Please

13     raise your right hand.

14     (Witness duly sworn)

15          THE COURT:  Be seated, please.

16     DIRECT EXAMINATION

17     BY MR. GAFFEY:

18     **Q.   Good afternoon, Mr. Hughes.**

19     **A.   Good afternoon.**

20     **Q.   Mr. Hughes, I remember from our deposition you have a soft**

21     **voice.  So I'm going to ask you, please, to pull the microphone**

22     **and sit close to it as best you can remember to do that,**

23     **please.**

24     **A.   I'll do my best.**

25     **Q.   Thank you.  Other than your deposition, sir, we have not**

115

1   met, is that correct?

2   A.   Other than Starbucks for Monday morning, I think --

3   Q.   That's true.  That's true.

4   A.   -- that's --

5   Q.   You didn't buy me coffee and I didn't buy you coffee.  Mr.

6   Hughes, how are you employed, sir?

7   A.   I am employed by Barclays Capital.  Up until a few weeks

8   ago, I was the global general counsel for Barclays Capital.  In

9   the last few weeks, I've taken on another role which will be to

10  investigate a seed of a new business and have relinquished my

11  general counsel responsibilities with the exception of looking

12  after this good piece of litigation.

13  Q.   Okay.  And did you hold those general counsel

14  responsibilities in September of 2008 when the sale transaction

15  took place?

16  A.   I did.

17  Q.   And I take it you were intimately involved with the

18  Barclays activities in connection with the sale transaction, is

19  that right?

20  A.   As intimately as I could be, yes.

21  Q.   Okay.  And just by way of background, sir, could you give

22  the Court a brief description of your education and any

23  professional licenses or qualifications?

24  A.   Sure.  I qualified as a lawyer originally in England in

25  1983 when I was accord to the bar.  I practiced as a barrister

116

1    for about four years in England.  When I joined -- moved from

2    the bar to join what was then the predecessor of the UBS group,

3    I worked for UBS in London and New York as a lawyer, originally

4    setting up their legal and compliance function in London from

5    '87 through to about 1996.  I was a partner in two different

6    law firms, lastly Katten Muchin.  And I joined Barclays Capital

7    in 2003.  Along the way, I went through the pain of the New

8    York bar and qualified around '96, I think.

9    Q.    Okay.  And with regard to the sale transaction, Mr.

10   Hughes, would you give the Court a brief description of the

11   nature of your activities with regard to the sale transaction

12   during the week -- well, in the period beginning, say,

13   September 11th and 12th through the closing of the sale

14   transaction on the 22nd?

15   A.    The first time that I was aware that there was a

16   transaction of any meaning possible was on the evening of the

17   Thursday -- I would guess it would be the 11th of September

18   when I was in Frankfurt and I received a call from Gerard

19   LaRocca who is the chief administrative officer of Barclays

20   Capital Inc. mentioning that there might be a transaction that

21   we needed to work on.  I was due to come back to New York from

22   German on the following day in any event.  I spent a bit of

23   time in between finding counsel who might be able to act on the

24   transaction.  And I arrived back in New York around about 7:30

25   on the Friday evening which was then the 12th, I guess.  I went

117

1    immediately to the offices of Simpson Thacher where some of the

2    early due diligence had commenced with respect to what was the

3    initial planned -- transaction.  And from then on, I was

4    directly responsible for marshaling the legal resources

5    necessary to pursue a transaction with Lehman Brothers which

6    meant marshaling both the internal and the external resource

7    from a legal perspective that was necessary to pursue the

8    transaction.

9        I stayed intimately involved from that point in time right

10   through -- up to and including the closing and, indeed, beyond.

11   I can certainly take you through the detail of what happened

12   between the 12th and the 22nd but I suspect --

13   Q.   We'll spend a bit of time on that.

14   A.   -- that's where we're going to go to.

15   Q.   Now, one of the things you mentioned is that you were

16   marshaling the various legal resources.  Do I understand that

17   correctly to mean that from the client perspective you were the

18   one responsible for instructing outside counsel?

19   A.   Ultimately, yes.  As the person -- the seniormost lawyer

20   within Barclays Capital, I was responsible for the legal

21   aspects of the deal.  And that included, at least to some

22   degree, both personally but through people who worked with me

23   directing the resource as best we could.

24   Q.   And one of the things you may recall, sir, that has

25   occurred during the course of this litigation is you have been

118

1   designated by Barclays as its witness under Rule 30(b)6) with

2   regard to a variety of topics, correct?

3   A.   I was so designated prior to my deposition.  I confess I'm

4   not entirely certain whether I sill am a 30(b)(6) but I'm

5   expecting that you're going to tell me that I am.

6   Q.   Well, as part of your duties as a 30(b)(6) witness, with

7   respect to those topics, you went off and you conducted an

8   investigation to learn the state of Barclays' knowledge about

9   those matters, is that right?

10  A.   I did do as much of that as I could.

11  Q.   Or designated by Barclays to speak on its behalf with

12  regard to those topics, do you recall that?

13  A.   I do.

14  Q.   And those topics included the sale hearing?  Do you recall

15  that?

16  A.   Certainly aspects of the sale hearing.

17  Q.   And representations made to the Court -- whether

18  representations to the Court were fairly and accurately

19  disclosed regarding the sale transaction?  Do you recall that

20  being a topic?

21  A.   I do.

22  Q.   And the topic of Barclays' gain, if any, on the

23  acquisition.  Do you recall that being a topic about which you

24  were a 30(b)(6) witness?

25  A.   It was a topic.  I didn't think I was the only person who

119

1    was capable of giving testimony or being deposed about those

2    issues.  But certainly, they were part of the subject matter

3    that I covered, yes.

4    Q.   Okay.  And there were other subjects and we may come to

5    those later today.  But those three were within the ambit of

6    your designation as a 30(b)(6) witness and your investigation

7    of those topics to be a 30(b)(6) witness, correct?

8    A.   I believe that's correct, yes.

9    Q.   Okay.  Now, in your capacity as the chief legal officer

10   around the transaction, was it also one of your

11   responsibilities to monitor the proceedings in this Court

12   concerning approval of the transaction?

13   A.   No.  I don't think I had a responsibility to monitor the

14   proceedings.  And I didn't -- nor was I actually present during

15   the proceedings either on the Friday, the 19th, or on the 17th.

16   So I wouldn't say it was a responsibility to monitor them, no.

17   Q.   I don't mean monitor in the sense of physically attending

18   the hearing, sir.  I mean, more along the lines of keeping

19   yourself aware of the progress of the proceedings and the

20   events that occurred in the proceedings before this Court.  You

21   did that during the week of the 15th of September through the

22   closing on the 22nd, is that right?

23   A.   I think at a high level, I did my best to keep aware of

24   what had actually transpired.  But there were an enormous

25   number of things going on at that point in time.  If I wasn't

120

1    personally able to be specifically knowledgeable about it then

2    there were either members of my department attending to those

3    events or, alternatively, or perhaps in addition, members of

4    the law firm of Cleary Gottlieb and/or Sullivan & Cromwell also

5    attending to those matters.  And clearly, part of their role

6    was to let me know if there was something of meaning or

7    significance that they felt that I should be aware of.

8    Q.   So, generally, during that week, sir, things of meaning

9    and significance would have included the hearing before this

10   Court on the 17th of September, 2008, the initial sale

11   procedures hearing?

12   A.   Yes.  I was certainly aware that they were happening.  And

13   there were some reports, I'm sure, of the proceedings.

14   Q.   And motions that were filed with the Court in connection

15   with seeking the Court's approval of the sale transaction?

16   A.   Again -- again, certainly, at that high level I was aware

17   of them.  Certainly.

18   Q.   Okay.  And certainly the sale hearing that took place on

19   Friday the 19th of September, yes?

20   A.   Absolutely.  I was aware of it, yes.

21   Q.   All right.  And events in the weekend following the sale

22   hearing with regard to, among other things, the finalizing of a

23   certain clarification letter.  Is that included in things you

24   kept apprised of?

25   A.   As best I could, yes.

121

1    Q.    Now, you have said in the past, Mr. Hughes, that Barclays

2    only intended to do the deal, do the sale transaction if it

3    yielded a gain to Barclays, is that right?

4    A.    I believe I answered that.  And that was my understanding

5    at the time.

6    Q.    And the concept of Barclays deriving a gain on the

7    transaction never changed in yours or Barclays' view from the

8    15th of September through the closing of the transaction,

9    correct?

10    A.    I think that's correct.  And I think it was so for a

11    couple of reasons.  The -- there were important drivers at that

12    point in time.  The first, I think, was -- and if you'll

13    forgive me, I think it's worthwhile stepping back a second

14    here.  The strategic goal for Barclays in this transaction was

15    it -- was the paramount reason for doing the transaction.  By

16    "strategic goal", I mean, at that point in time, while Barclays

17    Capital had grown appreciably in the United States in prior

18    years, we were, relative to some of our other competitors in

19    the marketplace, somewhat smaller.  The Lehman transaction

20    presented a strategic opportunity for growth which, I think,

21    the bank felt at the time was unlikely to come along again any

22    time soon.  And if it were -- if it proved to be on other tests

23    an appropriate transaction, it was one way in which to achieve

24    that strategic goal of growth in the United States.

25         One of those additional tests was always likely to be what

122

1    the impact of the transaction will be for the capital of the

2    bank.  That particular issue was profoundly more important in

3    September 2008 than it would have been, I think, in any other

4    time either before or since.  As I'm sure you'll recall, there

5    was a substantial amount of concern with respect to the capital

6    of all financial institutions.  We were not immune from that

7    concern particularly from our shareholders and particularly

8    also from our regulators.

9         So I think it was particularly important for the bank

10   to -- if it were to pursue a transaction to ensure that it was

11   positive from a capital standpoint both for shareholders and,

12   indeed, just as importantly for regulators who I think at the

13   time would have been extremely concerned had we not -- had we

14   proposed a transaction that might have some negative impact

15   upon capital.

16   Q.   And it was sufficiently -- profoundly so important that it

17   was, in Barclays' view, a precondition of the sale transaction

18   that's brought us here, that it yielded a first day gain for

19   Barclays, is that right?

20   A.   I think it was a -- my understanding at the time was that

21   it was a -- for Barclays it was, essentially, a precondition.

22   I don't know that there was ever a portion of the day-to-day

23   discussion or that people used that particular word to describe

24   it.  But it was so important to Barclays.  And my impression

25   was that people on the Barclays team understood it to be so

123

1   important that this was a positive thing to do from a capital

2   standpoint that I felt it to be for our purposes a

3   precondition.

4   Q.   So you're couching your answer in terms of, for Barclays'

5   purposes, for our purposes, the people on the Barclays team.

6   Was it made known to anyone outside of Barclays, sir, that it

7   was a precondition to the transaction that Barclays have a day

8   one gain?

9   A.   I didn't think it was specifically mentioned, for example,

10  to people at Lehman Brother that it was a precondition as such.

11  But I do think it was plain during the course of the

12  negotiations that for Barclays to receive assets as compared to

13  liabilities they were greater than those liabilities, that that

14  was an important feature of our ability to do a transaction

15  because without some greater amount of assets as compared to

16  liabilities and greater value coming to Barclays than the

17  liabilities that Barclays was going to take on in the

18  transaction, I think that it was very likely, from our

19  perspective, that we would, at a minimum, risk there being a

20  negative impact on capital.  And it was, in my view at the time

21  and at my understanding at the time, that Barclays simply did

22  not want as best it could to take a risk of a negative capital

23  impact.

24       So it's a rather longwinded answer and I apologize.  I

25  wouldn't say we haven't told anybody it was an actual

124

1    precondition but that's how we went about the job, so to speak.

2    Q.    Well, you said, sir, it was plain, it was plain in the

3    negotiations.   Let's explore that a little bit.   Nobody at

4    Barclays ever told anyone at Lehman it was a precondition to

5    Barclays that Barclays have a first day gain on the sale

6    transaction.   Is that correct?

7    A.    I don't recall anybody using that phraseology.

8    Q.    Well, let's not stumble over the particular noun, sir.

9    Did anyone from Barclays say to anyone at Lehman, in sum or

10   essence, that it was a precondition of Barclays doing the

11   transaction that it make a first day gain?

12   A.    I don't think anybody at Barclays said the words the words

13   that you just said, no.

14   Q.    Okay.  Did anyone ever say to anyone -- did anyone from

15   Barclays ever say to anyone at Lehman it was imperative to

16   Barclays that there be a first day gain on the acquisition?

17   A.    I'm not aware of anybody, again, using that phraseology.

18   Q.    So, from your point of view, sir, the answer to that

19   question is no?

20   A.    Well, your question, I think, was in sum or essence.

21   Nobody used those phrases.   But --

22   Q.    Well, that's what -- forgive me for interrupting.  But

23   let's use that particular word.   Let's use that particular

24   word.   To your knowledge, did you or anyone else from Barclays

25   say to anyone from Lehman in the negotiations it's imperative

125

1    that Barclays have a first day gain in this transaction.

2    A.   No, not that I know.

3    Q.   Okay.  And to your knowledge, sir, did anyone inform this

4    Court that it was a precondition to the transaction that

5    Barclays have a first day gain?

6    A.   I'm not aware that anybody used that phrase, again, no.

7    Q.   Let's try in sum or essence again then.  Do you know if

8    anyone informed this Court, in sum or essence, that it was a

9    precondition that Barclays have a first day gain?

10   A.   I don't think the -- I think the short answer is no.  No.

11   I don't think anybody did use that phraseology.  I don't think

12   anybody said that there needed to be -- that it was a

13   precondition that there be a gain.  In one of my earlier

14   answers, I said that there were other issues that were known.

15   But I don't think anybody said it was a precondition.

16   Q.   And no one from either Lehman or Barclays informed the

17   Court in any way, shape or form, sir, that it was a

18   precondition to the transaction that Barclays have a first day

19   gain, isn't that correct?

20   A.   Sorry.  Could you repeat it?  Did you ask me whether --

21   Q.   As far as you know --

22   A.   -- Barclays said that?

23   Q.   Let's start with Barclays.  As far as you know, sir,

24   nobody from Barclays said to this Court in any way, shape or

25   form that it was a precondition or imperative to Barclays that

126

1   there be a first day gain for Barclays in the sale transaction?

2   A.    I'm not aware of anybody in Barclays saying that, no.

3   Q.    And you're not aware, sir, of anybody from Lehman

4   informing the Court in any way, shape or form that it was

5   imperative for Barclays to complete the transaction to have a

6   first day gain, are you?

7   A.    I don't think that was said.

8   Q.    And in all of your work keeping apprised of the events

9   before this Court concerning the sale transaction, you didn't

10  learn that anyone informed the Court in any way shape or form

11  that the sales transaction required a first day gain for

12  Barclays?

13  A.    With the exception that there were other pieces of

14  information from which one might have been able to deduce that,

15  I agree with your -- I agree with you.

16  Q.    Okay.  So apart from pieces from information from which

17  one might have been able to deduce that it was a precondition

18  to Barclays that there be a first day gain, you're aware of no

19  other way for the Court to know that it was a precondition to

20  Barclays that there be a first day gain.  Is that correct?

21  A.    That's correct.

22  Q.    And I take it that as part of your duties in connection

23  with the sale transaction, you would have reviewed the motions

24  that were filed before the Court seeking the Court's approval

25  of this acquisition?

127

1    A.    I can't tell you now that I did do that.  I don't recall

2    whether or not I did.

3    Q.    Okay.  Well --

4    A.    Somebody in my department would certainly do it.  And

5    certainly, lawyers acting for Barclays Capital did.

6    Q.    Okay.  I take it from your prior answers that nothing ever

7    came to your attention in the various papers that were filed

8    with the Court concerning a first day gain for Barclays or

9    precondition of a first day gain for Barclays.

10    A.    I'm not aware of anything in the papers that, again,

11    highlighted a precondition for Barclays, no.

12    Q.    And I take it then, sir, that nothing that --

13         MR. GAFFEY:  Withdrawn.

14    Q.    I believe you said, sir, that Barclays' representation --

15    its outside representation in connection with the sale

16    transaction included the lawyers at Cleary Gottlieb, is that

17    right?

18    A.    Correct.

19    Q.    And lawyers at Sullivan & Cromwell, is that correct?

20    A.    Yes.

21    Q.    And actually, later in the sequence, come December of

22    2008, some lawyers from Boies Schiller as well, is that

23    correct?

24    A.    Yes.  At that point in time, Boies Schiller was

25    representing us with respect to a particular set of issues

128

1   which came -- which arose during the transaction.  But Boies

2   Schiller was not at that point advising us with respect to the

3   Lehman transaction.

4   Q.   I didn't mean to suggest they were, sir.  So the record is

5   clear, the Boies Schiller involvement -- and we'll get to the

6   topic a little later -- is, roughly, the end of the year.  It's

7   November/December, is that right?

8   A.   Correct.

9   Q.   It's not in connection with the sale transaction itself in

10  real time when it's being brought to the Court for approval.

11  A.   Correct.

12  Q.   Okay.  Now, I take it in your position as chief legal

13  officer and your work in connection with the sale transaction,

14  it would have been within the ambit of your responsibilities to

15  give instructions to your outside counsel to make the necessary

16  disclosures to the Court so it had fair and accurate disclosure

17  of the terms of the transaction.  Is that right?

18  A.   Yes.  Any obligation that we owed at that point in time to

19  the Court I would certainly expect that, together with our

20  external advisors, we'd ensure -- we'd do everything we could

21  to meet those obligations.  Absolutely.

22  Q.   And you refer to any obligation that we had at any point

23  at that time.  By "that time", do you mean the period from the

24  15th through the 22nd, that is, the days leading up to the sale

25  hearing and through the closing?

129

1    A.    Well, I think any obligation in connection with the

2    proceedings before the Court, yeah.

3    Q.    And in Barclays' view, did it have an obligation to make

4    disclosures to the Court in connection with the sale

5    transaction?

6    A.    I think that the way that the transaction was framed and

7    the arrangements framed, there was an agreement that the

8    lawyers acting for Lehman Brothers would be responsible for

9    making the necessary disclosures to the Court, making the

10   necessary arrangements so that the relevant Court relief could

11   be sought and hopefully achieved.  And I think that the

12   parties, although I don't recall a specific discussion about

13   this, I think the parties presumably felt that it was the right

14   thing to do to have one presentation of the facts that were

15   relevant.  And I believe, in that context, there was an

16   agreement that we would seek consent before we did anything.

17   So there was a limitation to that extent.  But certainly, if

18   there was anything that arose that was of meaning or of

19   relevance or felt to require intervention by Barclays, I

20   certainly would have expected our external lawyers to tell us

21   that and, if necessary, to do something about it.

22   Q.    This agreement you referred to, sir, concerning the extent

23   to which Barclays could make disclosures to the Court, was that

24   part of the asset purchase agreement?

25   A.    I think it was, yes.

130

1    Q.    You have before you, sir, a binder, I hope.

2    A.    I do.

3              MR. GAFFEY:    And, Your Honor, you appear to be the

4    only one without your book.    Can I approach?

5              THE COURT:    Yes.

6    Q.    And you'll find behind tab 1 of your binder, Mr. Hughes,

7    Section 7.2.

8    A.    That's M-1, yeah?

9    Q.    I beg your pardon.    M-1.

10   A.    Yes, I see it.

11   Q.    And is Section 7.2 the asset purch -- take a moment, sir,

12   to familiarize yourself with the section.    And then tell us

13   whether Section 7.2 of the asset purchase agreement is the

14   agreement you referred to a moment ago concerning whether or

15   when Barclays could address the Court with regard to the sale

16   transaction.

17   A.    Yes.    That looks like it's the relevant section.

18   Q.    And that section reads, I think in pertinent part,

19   beginning the last two words on page 22:    "Purchaser shall not

20   without the prior written consent of seller file, join in or

21   otherwise support in any manner whatsoever any motion or other

22   pleading relating to the sale of the purchased assets

23   hereunder."    Do you see that?

24   A.    I do.

25   Q.    Is that the provision which you are reading which, in your

131

1    view, restricted Barclays from making disclosures to the Court

2    in connection with the sale transaction?

3    A.   I think -- that's the provision I'm referring to.  I think

4    it said there was a limitation.  I don't -- and -- but that's

5    the provision that I had in mind, yeah.

6    Q.   I'm sorry, sir.  Did you say you don't think of it as a

7    limitation?

8    A.   No.  I think I said I used the word "limitation", not the

9    word "restriction".

10   Q.   Okay.

11   A.   But that's what I had in mind, yes.

12   Q.   All right.  And when you had that in mind, did you notice

13   the provision about how ever it was it limited Barclays or, to

14   use my word, restricted Barclays, it was an easy limitation to

15   lift simply by asking the permission of the seller?

16   A.   Yes.  It didn't actually arise as far as I recall.  But

17   yes.  It would have been a fairly easy thing to seek that

18   consent, absolutely.

19   Q.   Well, did Barclays have lawyers in attendance at the sale

20   procedures hearing on the 17th of September and at the sale

21   hearing on the 19th?

22   A.   Yes.

23   Q.   And to your knowledge, did lawyers for Barclays address

24   the Court in connection with the sale procedures hearing and

25   the sale hearing?

132

1    A.    I don't immediately recall exactly what the addresses

2    referred to.  But I think there were moments during each of the

3    proceedings when representatives of Barclays' law firms did

4    speak, yes.  Absolutely.

5    Q.    Well, for example, sir, there were, to use your word,

6    moments when Lindsay Granfield stood up and addressed the Court

7    about aspect of the sale transaction, correct?

8    A.    Correct.

9    Q.    For example, do you recall a time when Ms. Granfield,

10   toward the end of the sale hearing, talked about whether or not

11   certain safe harbor provisions applied?

12   A.    I don't know -- recall that specific piece.  But

13   certainly, there were several occasions when people when Cleary

14   Gottlieb spoke.

15   Q.    And I don't mean to single out Ms. Granfield.  I mean, as

16   a general matter, sir, there were lawyers from Cleary Gottlieb

17   in the courtroom for both hearings and they spoke to the Court,

18   correct?

19   A.    I believe that's correct, yes.

20   Q.    And in fact, sir, do you recall or have you learned that

21   at the beginning of the sale hearing before -- well, the Court

22   convened briefly and then granted a recess so that lawyers and

23   others could talk to those assembled about changes that had

24   occurred in the deal during the week.

25   A.    I did become aware of that, yeah.

133

1    Q.   Okay.  And you are aware, are you not, that a man named

2    Michael Klein spoke during that recess provision -- that

3    recess?

4    A.   I wouldn't say that I'm aware that Michael Klein spoke.

5    As you pointed out, one of the things that I tried to do as a

6    30(b)(6) witness was to try to establish what, in fact, had

7    happened at that hearing.  It was own dim and shaky

8    recollection that perhaps Michael Klein had spoken or because,

9    as I say, I wasn't present.  But my own recollection was that I

10   did speak to Michael Klein to try to establish whether in fact

11   such a discussion took place or -- and if so, what was said.

12   My recollection of that discussion with Michael Klein was that

13   he could not remember particularly well and so I didn't feel

14   that, in light of my own shaky recollection I could say one way

15   or another.  I thought he had.  He wasn't sure.  I didn't --

16   I'm still not sure.

17   Q.   Okay.  Quite apart from the content of what he said, sir,

18   the fact is you vaguely know and you learned as part of your

19   30(b)(6) related investigation that Michael Klein stood in this

20   courtroom as a representative of Barclays talking to attendees

21   at the sale hearing, yes?

22   A.   No.  I think I may not have -- my last answer may not have

23   been clear.  What I intend to say is I'm not sure about that.

24   I had thought at one point in time that that had happened but

25   I'm not sure that it did.  I think, in any event, it did take

134

1    place, if at all, at a time when the Court was not sitting as I

2    understand it.

3    Q.    Would that be the distinction in your mind, sir?  You make

4    that point, that the Court was not sitting.  Is there some

5    distinction between the court being in session with Judge Peck

6    on the bench and a recess at a hearing before the Court in

7    terms of this limitation that you think 7.2 put on Barclays?

8    A.    Well, I hadn't thought about it in that context, to be

9    honest.  The distinction is does it help me remember better

10   when the thing may have happened.  My recollection had been,

11   shaky otherwise, that if Michael Klein had made some kind of

12   presentation, I had thought that it was at a time when the

13   Court wasn't sitting.  So that's the reason why I focused on

14   that.

15       The specific language of this clause allow for Michael

16   Klein to do something on a more informal basis.  I think if I

17   read it now I could probably justify that approach.  But that's

18   now I had thought about whether or not the event had taken

19   place.

20   Q.    Quite apart from Section 7.2 of the asset purchase

21   agreement, sir, the fact is that lawyers and other

22   representatives -- well, lawyers representing Barclays

23   addressed the Court during proceedings relating to the sale

24   transaction, right?

25   A.    Correct.

135

1    Q.   We agree on that?

2    A.   Correct.

3    Q.   And they made representations or arguments or statements

4    to the Court in connection with the motion seeking approval of

5    the sale transaction, correct?

6    A.   Again, I can't recall the specifics.  But yes, they

7    addressed the Court and presumably said things of substance.

8    Q.   And you agree with me -- and as a 30(b)(6) witness, sir,

9    Barclays agrees, does it not, that if its lawyers do stand up

10   and speak to the Court, they have -- Barclays has a full and

11   complete duty of truth and accurate disclosure about the

12   transaction at issue, correct?

13   A.   Of course.  Absolutely.

14   Q.   Of course they do.  And if they know that there is

15   material or pertinent information that is not being told to the

16   Court, Barclays has an obligation to bring that information to

17   the Court's attention, correct?

18   A.   Certainly, if it's material.  We could possibly debate

19   what pertinent means but certainly, if it's material.  Of

20   course.

21   Q.   And they either should address the Court directly or

22   inform those who are about a mistake or incorrect information

23   or incomplete information that's given to the Court.  Barclays

24   understood it had that obligation, correct?

25   A.   Absolutely.

136

1   Q.   Now, you described the -- you agree that the -- that

2   Barclays' view was that it was imperative that it make a first

3   day gain on the acquisition.  Do you know, sir, if the lawyers

4   for Barclays were aware that it was an imperative that Barclays

5   make a first day gain on the acquisition?

6   A.   Again, I don't recall whether or not there was any

7   discussion in those terms.  I do think that the lawyers acting

8   for Barclays understood that it was crucial to Barclays that

9   there be positive outcome on that transaction.  And by

10  positive, I mean one which yielded -- which I could use the

11  term -- the phraseology now, which yielded a gain for Barclays.

12  In other words, it was positive from a capital standpoint and

13  that we made money on it and we didn't lose money.

14  Q.   You used the term before that you believed, although

15  Barclays had not said that it was an imperative there be a

16  first day gain, that people might have been able to deduce that

17  that was a precondition for Barclays.  You recall that?

18  A.   Yes.

19  Q.   Was it Barclays' view that the Court might have been able

20  to deduce that it was imperative there be a first day gain for

21  Barclays on the acquisition?

22  A.   I certainly wouldn't want to speak for what the Court

23  would or would not be able to --

24  Q.   I'm asking about Barclays' view, sir, not the Court's

25  view.  I'm asking if it was Barclays' view that the Court might

137

1    have been able to deduce that it was imperative there be a

2    first day gain for Barclays on the acquisition.

3    A.    As I was conducting the review that we've touched on once

4    or twice to prepare to be a 30(b)(6) witness, it appeared to me

5    from what I read and from what -- and from the people I spoke

6    to that that was possible, yes.

7    Q.    And was it Barclays' view at the time of the sale

8    transaction proceedings that it was sufficient, as a matter of

9    disclosure, that the Court might have been able to deduce that

10   it was an imperative Barclays have a first day gain on the

11   acquisition?

12   A.    Could you repeat the question?

13   Q.    Well, sir, did Barclays think that was enough in terms of

14   disclosure that the Court might have been able to figure it

15   out?

16   A.    I think at the time those present for Barclays would not

17   have been -- even if they were knowledgeable about the detail,

18   they wouldn't necessarily have been certain about it.  I don't

19   think that at that particular point in time those present for

20   Barclays felt that it was a necessity to make the disclosure in

21   those terms.  I think the people who were present in the room

22   for Barclays felt that what was disclosed to the Court at the

23   time was full and fair and accurate, was sufficient, certainly,

24   to fulfill what we felt were our disclosure requirements at the

25   time.  Naturally, we were relying, to some degree, on others to

138

1    make the presentation and to make the relevant disclosures.

2    And there was a certain amount of faith, absolutely, placed in

3    the Weil Gotshal firm to get that right.  But certainly, we

4    didn't -- I believe, through the people I've spoken to or from

5    what I've read, feel that there was a lack of disclosure in any

6    way.

7    Q.   Well, sir, you said a few moments ago that Barclays had

8    not actually told anybody outside of Barclays that it was

9    imperative that there be a first day gain for Barclays.  Do you

10   recall that?

11   A.   I recall -- that's absolutely what I said, yeah.

12   Q.   Okay.  And I take it then that nobody from Barclays ever

13   told anybody from Weil Gotshal it was imperative there be a

14   first day gain for Barclays, is that correct?

15   A.   I don't know that anybody did.

16   Q.   Okay.  So to the extent that Barclays was relying on Weil

17   Gotshal to make disclosures, you would agree with me, sir, that

18   Weil Gotshal wasn't in a position to make a disclosure that it

19   was imperative for Barclays there be a first day gain on the

20   acquisition, correct?

21   A.   It would have been hard for them to do so.

22   Q.   Well, it would be impossible, wouldn't it, sir?  If they

23   don't know, they can't tell the Court.  Unless they had been

24   able to deduce that it was imperative there be a first day gain

25   for Barclays.

139

1    A.    I agree with you.

2    Q.    Okay.  So had Weil Gotshal been able to deduce that it was

3    imperative, Weil Gotshal might have been in a position to make

4    a disclosure to the Court about this precondition of the sale

5    transaction.  Is that right?

6    A.    I don't think, as I said, that it was a precondition to

7    the sale transaction in a formal sense.  I've -- we've

8    Q.    It was --

9    A.    -- used that term to identify the significance to Barclays

10    of the need for a gain.

11    Q.    Well, sir, was it a condition of the agreement -- was it a

12    condition of the agreement that Barclays make a first day gain?

13    A.    No.  Which is possibly part of the reason why nobody felt

14    that it needed to be disclosed, I don't know.

15    Q.    So it was an informal precondition?  Does that make it a

16    preference?  Does that make it its desire or does that make it

17    a precondition to the deal?  Which is it, sir?

18    A.    I think it's an indication of what is of real significance

19    to Barclays without making a comment in using that phrase about

20    what was imperative to Lehman Brothers or whether or not that

21    particular imperative of Barclays needed to be disclosed itself

22    to the Court.

23    Q.    Okay.

24    A.    At the time, nobody at Barclays felt that that imperative,

25    as I've subsequently described it, needed to be disclosed.

140

1    Q.   I want to ask you this question very precisely, sir.   Was

2    it a condition of the agreement that Barclays make a first day

3    gain?

4    A.   No.

5    Q.   Would you turn to page 350 of your deposition transcript

6    which is in the binder before you?

7    A.   Can you tell me whereabouts it is in the binder?

8    Q.   You ought to have a tab that says "Transcript".  Find it?

9    A.   Yes.  I have it.

10   Q.   And when you're there, go to page 350.  And I'd ask you

11   take a look at the question and answer from line 2 through line

12   4.  Let me know when you get to the page.  Okay.  Do you see

13   this question and this answer, sir?

14   "Q.  Was it a condition of the agreement that Barclays make a

15   first day gain?

16   "A.  It was a precondition for Barclays."

17        Was that truthful testimony when you gave it, sir?

18   A.   Yes.

19   Q.   All right.  And when I asked you a moment ago those

20   precise words, was it a condition of the agreement that

21   Barclays make a first day gain and you answered "No", are you

22   making some distinction between a condition and a precondition?

23   A.   Not just that, but also I did use the phrase "for

24   Barclays".

25   Q.   Ahh.

141

1   A.   I wasn't intending to suggest when I gave you that answer

2   nor was I intending to suggest today that it was a condition of

3   the agreement in the sense that I would view a condition of the

4   agreement in a legal sense.

5   Q.   Okay, sir.

6   A.   It was a precondition for us to close the transaction.

7   For us, we wanted to ensure a gain.

8   Q.   So when I asked you at your deposition was it a condition

9   of the agreement that Barclays make a first day gain and you

10   answered "It was a precondition for Barclays", those present

11   were meant to understand your answer to mean no?

12   A.   I think the answer was intended to be understood as I've

13   just described.  I don't recall at the time being asked either

14   then or subsequently whether it was a condition in a formal

15   legal sense.  It's possible that you were asking me that but I

16   didn't interpret it that way at the time.

17   Q.   Okay.  So let's explore a little bit this concept of an

18   informal precondition.  Would Barclays have done the deal if

19   there was no first day gain built in to the deal?

20   A.   I wouldn't say, first of all --

21   Q.   Was it formal to that extent --

22   A.   -- that there was any gain built into the deal, first of

23   all.  Secondly, if by your question you mean that Barclays --

24   would Barclays have closed the transaction if it didn't think

25   it was going to make a gain, no I don't think Barclays would

142

1    have.

2    Q.    And in that sense, is that what you meant by it was a

3    precondition for Barclays?  It wouldn't close if it didn't have

4    a first day gain?

5    A.    It wouldn't do the transaction.  If I may take you back to

6    something I said earlier, the -- this transaction was first and

7    foremost about strategic development of the bank.  And

8    secondly, assuring that if we were to pursue that sort of

9    strategic transaction that it was positive to capital and

10   beneficial therefore to shareholders and not a negative from a

11   regulatory capital and, therefore, from our regulators'

12   perspectives.

13   Q.    Okay.

14   A.    So it was, for us, a precondition.  Other words that one

15   could use?  I didn't necessarily spend a lot of time then

16   thinking about the particular word "precondition".  I was more

17   concerned to identify for you in answering the question that

18   this was something that was of huge importance to Barclays.  I

19   couldn't tell you whether it was of huge importance to anybody

20   else.  But it was not a formal condition in the legal sense in

21   the agreement.

22   Q.    Okay.  Did you think it might be of some degree of

23   importance to the Court when it was assessing the transaction

24   for the purpose of deciding whether to grant or deny the sale

25   motion that Barclays wouldn't close if there wasn't a first day

143

1    gain in it?

2    A.    No, I didn't think that and nor did the people who were

3    then present for Barclays because I think those people present

4    thought then and Barclays had always thought that the necessary

5    disclosures were made to the Court to enable the Court to make

6    a determination.

7    Q.    Would those be disclosures sufficient to enable the Court

8    to maybe be able to deduce that Barclays would take more assets

9    than it would assume liabilities, that it would have a first

10    day gain?

11    A.    There is, I'm sure, more that goes into the analysis of

12    what yields a first day gain than just do the assets outweigh

13    the liabilities though I would think that would be likely a

14    pointer.  But I think it's important for me to say that at the

15    time, I don't think anybody at Barclays nor any of its

16    advisors, felt that there was an absence of any formal or -- of

17    disclosure or detailed disclosure.  And I don't think anybody

18    ever advised Barclays nor did Barclays think at the time that

19    it was a necessary part of the disclosure to identify this

20    point of huge significance to Barclays.

21    Q.    Was it -- this point of huge significance to Barclays,

22    have you ever spoken to Bob Diamond, the president of Barclays,

23    about it?

24    A.    I couldn't tell you that I specifically have spoken to Bob

25    about it.

144

1    Q.   Have you -- has it come to your attention that Mr. Diamond

2    has said that an asset/liability mismatch in Barclays' favor

3    was a condition to the deal?

4    A.   It's possible that Mr. Diamond may have said something to

5    that effect at his deposition.

6    Q.   Let me refresh your recollection, sir.  You came to Mr.

7    Diamond's deposition, correct?

8    A.   I think I just finished off that last sentence by saying

9    it's possible he said something to that effect at his

10   deposition.

11   Q.   All right.  'Cause I remember seeing you there.  Did you

12   hear him say that an asset/liability mismatch in Barclays'

13   favor was a condition to the deal?

14   A.   I don't now recall that phrase but it wouldn't surprise me

15   if he used it.

16   Q.   Wouldn't surprise you because you knew it at the time back

17   in September of 2008, correct?

18   A.   I think that Barclays was looking to take on a greater

19   value of assets than the liabilities.  Absolutely.

20   Q.   And in the process, meet its own condition for a first day

21   gain, yes?

22   A.   That would be a good part of it.  I'm not necessarily

23   saying right now that it's the whole but it's certainly a big

24   part of it, yes.

25   Q.   So let me go back to the question I asked you a few

1  moments ago.  While Barclays had the view that it was a

2  precondition that it have this asset/liability mismatch, this

3  first day gain, was Barclays of the view that it was not

4  necessary to tell that fact to the Court when approval was

5  sought for the transaction?

6  A.   The fact of the precondition for Barclays?  Is that your

7  question?

8  Q.   Yeah.

9  A.   I don't think that that was a necessary disclosure to the

10  Court.  And certainly nobody ever advised Barclays that it was,

11  either.

12  Q.   Of all those making representations to the Court, sir,

13  concerning the structure and the terms of the transaction,

14  you're not aware of anybody who made any representations to the

15  Court who is in a position to know one way or the other whether

16  Barclays would have a gain, correct?

17  A.   I think it would have been hard for the particular

18  individuals at court to know that with certainty.

19  Q.   And no one knew one way or the other who was making -- no

20  one who was making representations to the Court knew one way or

21  the other that it was imperative for Barclays to have that

22  first day gain or it would not close, did they?

23  A.   I think that the people representing Barclays then and

24  people present then would have been aware that it was important

25  for Barclays to not to lose money on the transaction.  It would

146

1   have been important for Barclays to take on more assets than

2   liabilities in the transaction.  And I believe that they

3   understood how important that was and that those were

4   imperatives.  Whether they could or were in a position to

5   translate that into knowledge of a first day gain, I think is

6   doubtful in the absence of a real discussion on that particular

7   point and in the absence of probably of a discussion involving

8   additional people at Barclays.  And I don't know -- I doubt

9   that those people would have known that for one way or another

10  whether the imperative of a first day gain, so described, was

11  there or not.  They would certainly have known that it was

12  hugely important to Barclays to take on more assets than

13  liabilities and to make money on the transaction and not to

14  lose money on the transaction.

15  Q.   When you say imperative of a first day gain, so described,

16  sir, you don't mean to suggest those are my words and not

17  yours, do you?

18  A.   No.  But I think those words are meaningfully different

19  potentially so that -- because a first day gain may not have

20  been the currency of discussion among the relevant lawyers who

21  were present but certainly the currency of discussion prior to

22  that point would have been about taking on more assets than

23  liabilities and making money rather than losing money.

24  Q.   On the --

25  A.   So to that extent, I think there was a difference.  But

147

1    otherwise --

2    Q.    On the first day.  On acquisition at signing as opposed to

3    successfully operating the business thereafter and making

4    money.  It had to be a first day gain, correct?

5    A.    Well, I think both of those things that you mentioned were

6    very important.  Getting back to your earlier question, I

7    thought you were asking me about what the people present would

8    have actually known.  And I thought I was answering that

9    question by saying that I think they would have known that it

10   was very important to Barclays to make money, a gain.  Whether

11   they would have thought about or know one way or the other

12   whether it was imperative that that be a day one gain, I'm not

13   sure that they would've known that.  Nor am I sure that it was,

14   as we've earlier discussed, that it would've been known to

15   others.

16   Q.    Sir, have you in the past expressed a view that the Court

17   felt that it was not relevant whether or not a windfall profit

18   did or did not exist in the sale transaction for Barclays?

19   A.    It's possible that I used language to that effect in my

20   deposition.  I seem to recall you asking me a question about

21   sort.

22   Q.    Well, let's turn to your deposition and see if it was in

23   the question or the answer, okay?  It's sort of a long answer,

24   sir, so I'm going to ask you first to go to page 38, line 15.

25   And then we're going to read through to page 40, line 2.  And

148

1    then we'll come back to a couple of particular lines in your

2    answer.  Let me know when you're at that page, sir.

3    A.   I'm at 38 now.

4    Q.   Okay.  Starting at line 15:

5    "Q.  Sir, is Barclays aware of any disclosure to the Court of

6    any profit or gain that Barclays anticipated it would make from

7    the sale transaction?

8    "A.  On September the 19th, I'm not aware of anybody

9    identifying to the Court a gain nor am I aware that anybody who

10   made any representations to the Court was in a position to know

11   one way or the other whether Barclays would have had a gain.  I

12   do think there were objections at that hearing based on the

13   notion that Barclays would make a windfall profit from the

14   transaction.  There was some meaningful complaints, for one of

15   a better word, made on behalf of creditors, I believe, that

16   identified to the Court a strong likelihood that Barclays would

17   make what, in their description, was a windfall profit.  And I

18   believe that the judge heard those complaints and dismissed

19   them as being insignificant in light of the importance of the

20   transaction and in the importance of approving the transaction,

21   among other things, for the benefit of the estate, creditors

22   and customers."

23        And here, I'm at line 19:

24        "And I believe also that the Court felt that it was not

25   relevant whether or not that windfall profit did or did not

149

1    exist.  Even if it did, I think that the judge explained there

2    was a greater need in light of the turmoil and the markets at

3    that point in time.  But as I mentioned, in particular, for the

4    benefit of the estate and creditors."

5         So was that a truthful answer when you gave it at your

6    deposition?

7    A.   Yes, it was truthful.

8    Q.   Okay.  And at line 19, you see you say "And I believe also

9    that the Court felt that it was not relevant whether or not

10   that windfall profit did or did not exist."  You see that?

11   A.   I do see that.

12   Q.   Okay.  So we've agreed, sir, that is a statement you've

13   made before?

14   A.   Yes.

15   Q.   And you believe it was a truthful statement when you  made

16   it?

17   A.   I do believe it was true, yes.

18   Q.   And does it accurately state Barclays' view of the

19   proceedings that took place in this Court on the 19th of

20   September, 2008 that the Court felt it was irrelevant that

21   there might be a windfall profit for Barclays?

22   A.   What I was communicating here, as I think we've earlier

23   discussed, was the aggregation of the recollections of people

24   present and also my own review of what I hoped were relevant

25   documents at the time.  And what I think I'm rendering here is

1    the impression that I gleaned from all of that information.

2    Q.    Did you learn, sir, that during the course of the

3    hearings, both on the 17th and the 19th, the Court asked

4    specific questions about the value that was being transferred

5    to the purchaser?

6    A.    I do recall that, yes.

7    Q.    And do you recall that the Court asked specific questions

8    about the consideration given in return for that value?  Do you

9    recall that?

10   A.    I do recall there were questions, yes.

11   Q.    And do you recall that the Court asked at one point how to

12   value the overall value of the transaction?  Do you recall

13   that?

14   A.    I recall something of that sort, yes.  I don't recall the

15   specific words, obviously.

16   Q.    And, in particular, with respect to particular portions of

17   the transaction concerning such things as variances on real

18   estate values and whether an appraisal was done for the real

19   estate piece of the deal, the Court asked particularized and

20   particular questions about whether an adequate investigation

21   had been done or whether adequate information was available

22   about the value to be transferred.  Do you recall that?

23   A.    I do recall that and many other questions about value

24   during the evening, yes.

25   Q.    Did you learn about those things in the course of your

151

1    investigation as a 30(b)(6) witness?

2    A.   Yes.

3    Q.   So you learned them before you gave this answer, "And I

4    believe also that the Court felt that it was not relevant

5    whether or not that windfall profit did or did not exist."  Is

6    that correct?

7    A.   As I said, I was giving an impression from the information

8    that I had gathered.  There was also a lot of other information

9    relevant to forming the opinion that I expressed during my

10   deposition including a substantial amount of other relevant

11   information regarding valuations of one form or another.  Most

12   significant among which was that I think it was clear at the

13   time and it certainly appears to be clear to me that few, if

14   any, values could be ascertained with any certainty.  Those

15   valuations were themselves moving around at lightening pace not

16   just at that particular point in time but had been for quite a

17   long time and, indeed, I think continued to thereafter.  And it

18   was in light of those additional comments that I -- that

19   appeared to me the phraseology I used at the time of my

20   deposition was appropriate.  It may not be artful but it is

21   intended to suggest that there was a lot of information

22   presented to the Court, a lot of information around

23   uncertainties with respect to values.  There were particular

24   exchanges, as I read the transcript, which suggested, first of

25   all, that complaints had been raised and that the Court, having

152

1    heard them, certainly at a minimum declined to take the course

2    urged by those complainants.  And from all of that, it seemed

3    to me at the time I gave this answer to your question that

4    there were more important considerations than just the amount

5    of profit that Barclays might make out of the transaction not

6    least among there seemed to me to be that it was very, very

7    difficult indeed, at a minimum, for anybody to establish values

8    either on the night of the 19th or indeed at any other time.

9    And certainly, the fact that it was so difficult to establish

10   those values was a significant part of the reason why I used

11   the language that I used in my deposition.

12   Q.   Do you recall learning that at the sale procedures hearing

13   and again at the sale hearing on the 19th, the Court was told

14   that the amount of cure liabilities that Barclays would assume

15   as part of the transaction was in the range of 1.5 billion

16   dollars?

17   A.   I don't immediately recall exactly when that suggestion

18   was made but I do recall it was made, yes.

19   Q.   Yeah.  You know it was made and you know it was that

20   amount, 1.5 billion dollars?

21   A.   At some point, yes.  I agree.

22   Q.   Okay.  And do you think, sir, it was important that if an

23   estimate of cure liability assumptions was given to the Court

24   that it be the best estimate of how much would actually be

25   spent on assumed liabilities for cure?

153

A.    I think it was important that any estimate that was given

was given -- was as good an estimate as it could be in the

circumstances.  And you happened to pick the cure estimate.

It's my belief from what I knew at the time of the transaction

and from the discussions I had subsequently that there was a

good faith effort made to establish what that number should be.

That estimate and that effort was made necessarily by people at

Lehman Brothers because Barclays had no prior knowledge about

the relevant information that would go into that estimate and

nor any ability at the time to test the estimate.  And I do

believe it was a conditional, if you'll forgive me for using

that word, part of the agreement that Barclays might take on

that sort of liability.

Q.    Okay.  That was a formal or an informal condition, sir?

A.    I think that was a much more important than a formal

condition.

Q.    And did you think it was a formal or informal condition

that the number bear some relation to what actually would be

spent after the transaction by Barclays on assumed cure --

liability for contract cure?

A.    I don't think anybody knew at that point in time what was

likely to be spent.

Q.    Okay.  Did you think if nobody knew what was likely to be

spent somebody should have put a caveat on that number, like it

could be 1.5 billion, it could be 238 million, it could be

154

1  zero?

2  A.   I believe that Weil Gotshal representing Lehman Brothers

3  identified very plainly that it was an estimate and that it was

4  an estimate that was difficult to be sure about not least

5  because Barclays had at least sixty days post-closing to

6  determine which of the contracts relevant to the cure payment

7  might actually be taken on.  And indeed, I don't believe that

8  there was an opportunity for Barclays at the time to assess

9  that.

10  Q.   I take it from our discussion, sir, over the last half

11  hour or so that since it was a precondition or an imperative

12  for Barclays that there be a first day gain, that Barclays, in

13  fact, did have a first day gain on the transaction.  I'm

14  deducing that from the fact that you closed.  But is that true?

15  A.   I believe we -- I believe we did announce a gain on the

16  transaction, yes.

17  Q.   Okay.  Did there come a time, to your knowledge, when --

18       MR. GAFFEY:  Withdrawn.  Could we put --

19  (Pause)

20  Q.   Sir, in your book, if you could reach for M-259.  And I'd

21  ask you, sir, to turn to page 23, paragraph 56.

22  A.   Sorry.  Could you repeat the number?

23  Q.   Yeah.  Just if we could stay on this first page for a

24  moment.  This, so you have context, is the objection of

25  Barclays Capital Inc. to debtors' motion for an order under

155

1    Rule 2004 authorizing discovery of Barclays Capital Inc.  You

2    see that in the title?

3    A.   I do.

4    Q.   Now if you could turn, sir, to page 23.  Now I'm going to

5    direct your attention in a moment, sir, to paragraph 56.  But

6    do you recall, sir, a time when an application was made by the

7    movants represented here for an order allowing discovery from

8    Barclays --

9    A.   Yes.

10   Q.   -- concerning the sale transaction?

11   A.   Yes.

12   Q.   And you saw the papers that were filed in connection with

13   that application for an order compelling discovery?

14   A.   I'm sure I did see them.  Whether I read all of them, I

15   don't know.

16   Q.   Okay.  Now, we spoke a moment ago about the fact that

17   Barclays had an immediate gain on acquisition -- and, sir, we

18   can go find the document but you do recall that an immediate

19   gain on acquisition was announced by Barclays in February of

20   2009.  Do you recall that?

21   A.   I think it was announced then, yes.

22   Q.   Okay.  Take a look at --

23   A.   It's possible that it was announced earlier but I'm not

24   sure.

25   Q.   We'll get to that document in a moment.  I'll remind you

156

1    of the exact date.  But take a look at paragraph 56, sir, of

2    this brief filed by Barclays in which it's opposing the

3    discovery that was sought.  And it says the following:

4    "Finally, LBHI also points to the fact that Barclays has

5    recorded a gain for accounting purposes on the transaction and

6    implies that this supports its request for broad discovery.

7    This accounting gain is irrelevant to the fairness of the sale

8    transaction and is not a basis for seeking discovery.  The fact

9    that thus far the acquired businesses have performed well and

10   have generated an accounting gain has no bearing on the

11   adequacy of consideration when the transaction closed."  Do you

12   see that?

13   A.   Yes.

14   Q.   Do you read that sentence to disclose the fact that the

15   gain was on acquisition or that it was from successful post-

16   closing operation of the company?

17        (Pause)

18   A.   I'm not sure it is capable of being read in only one way.

19   My understanding is that there was an accounting gain on day 1.

20   My understanding also is that since that day 1 accounting gain

21   -- or if that's the right phrase to use -- was announced that

22   the businesses have operated well and that that, I think,

23   likely yields further gain.

24   Q.   Do you think "thus far the acquired businesses have

25   performed well" would allow one to possibly deduce it was

157

1    referring to a first day gain, sir?

2    A.   Well, this phrase seems to be referring to a period which

3    is after first day.

4    Q.   It does, doesn't it?

5    A.   So I don't know whether, from an accounting standpoint, it

6    would be relevant to the assessment of a first day gain.

7    Q.   Okay.  And further down in the paragraph, sir, it says

8    "LBHI is not entitled to a purchase price adjustment" -- you

9    with me in the document?  It might be easier to follow on the

10   screen where we're highlighting it.  Your choice but --

11   A.   Yeah.  It's highlighted here as well.

12   Q.   "LBHI is not entitled to a purchase price adjustment based

13   on the positive performance of those businesses thus far under

14   Barclays' management."  Do you see that?

15        MR. BOIES:  Your Honor, for contextual purposes, could

16   we read the next two sentences, particularly the last sentence?

17        THE COURT:  Sure, although it's on the screen anyway.

18   So we all can see what it says.  But let's include it in the

19   record.

20        MR. GAFFEY:  I'll read it out loud, Your Honor.

21   Q.   "Further the accounting gain does not reflect the

22   substantial costs and expenditures relating to integration of

23   the acquired business assets and does not reflect the

24   considerable risk Barclays undertook at the time by entering

25   into the transaction, governing accounting standards, preclude

158

1   application of liquidity discounts to the significant number of

2   illiquid positions acquired as part of the transaction and

3   require recognition of anticipated future revenue associated

4   with intangible assets which could depress Barclays results in

5   future periods as the intangible assets are amortized over

6   time."

7        Now, having read you the whole thing, sir, do you see

8   anything in there that suggests that Barclays' gain was on

9   acquisition, it was immediate, it was a first day gain?

10  A.   I don't think that it says specifically a first day gain.

11  As I read the whole of the paragraph, it seems to be, at least

12  in part, explaining how post-closing performance from an

13  accounting standpoint is relevant to the establishment of the

14  gain.  Again, I'm not an accountant and so I could be

15  interpreting that wrongly.

16  Q.   Okay.  Well, let's look at another document that describes

17  Barclays' gain and see if we can find a difference between how

18  you describe these things.  If you would turn, Mr. Hughes, to

19  M-100 in evidence.

20       MR. GAFFEY:  I should mention for the record, Your

21  Honor, we're all trying to do it, M-259, which I referred to a

22  moment ago, is also in evidence.

23       THE COURT:  Fine.  I'm going to assume that every

24  document that's used is in evidence unless somebody is making a

25  motion to admit it after its use or before its use.

159

1          MR. GAFFEY:  Thank you, Your Honor.

2   Q.   Are you at Exhibit M-100?

3   A.   Yes.

4   Q.   And why don't you turn to page 95 of that exhibit?  And

5   for context, sir, you recognize this to be the Barclays'

6   results announcements, figures 2008 that was published in or

7   around February of 2009?

8   A.   It says on the front that it's the results announcement,

9   figures 2008.

10  Q.   Okay.  The date it was published is not relevant to the

11  question I'm going to ask you, sir.  I want you to take a look

12  at how the gain is described here.

13  A.   Page 95.

14  Q.   At page 95, you'll see -- it's one of notes.  It's note

15  11, "Acquisitions".

16  A.   Yes, I see that.

17  Q.   And you can take your time if you'd like, sir, but I'll

18  tell you that what follows in "Acquisitions" describes the

19  transaction.  And the paragraph I'm interested in is the second

20  from the last on the page beginning "The excess".  Do you see

21  that?

22  A.   Where it says "The excess of the value of these assets".

23  Q.   Yes.

24  A.   Yes, I see that.

25  Q.   That's the one.  The one that says, "The excess of the

160

1    fair value of net assets acquired over consideration paid

2    resulted in 2,262,000,000 pounds of gains on acquisition."

3    That sentence.  Do you see that?

4    A.    I do.

5    Q.    Now that tells you that the gain was immediate, correct?

6    A.    Well, it says "gains on acquisition".  I don't know that

7    that means immediate day 1 or additional factors that need, for

8    results announcements purposes, to be factored into gains on

9    acquisition.

10   Q.    So, sir, you think we can read that sentence to mean the

11   gain might have been on the first day or it might have been

12   thus far after successful performance of the company?

13   A.    I don't know the answer to that.

14   Q.    Okay.  You mentioned a few moments ago, sir, that you

15   understood that the numbers that were given to the Court --

16         MR. GAFFEY:  We can take it off the screen, Steve.

17   Q.    -- the numbers that were given to the Court during the

18   sale hearing were estimates because there was great difficulty

19   in establishing values.  Do you recall that?

20   A.    Yes.

21   Q.    And do you recall at any time, sir, seeing or hearing or

22   reading anything in the -- in connection with the sale hearing

23   where the difficulty in establishing values was explained to

24   the Court?

25   A.    It's my recollection that there were many occasions on

161

1    which numbers given in respect to assets or liabilities were

2    described as estimates and that the context in which those

3    estimates were arrived at were -- made it extremely difficult,

4    to be sure, about any of those valuations or any of those

5    numbers.

6    Q.   Would it have been a true statement the day after -- well,

7    you understand, sir, that an agreement was reached on the 16th

8    of September 2008?

9    A.   Yes.

10   Q.   Would it have been a true statement to say on the 17th of

11   September that the deal had been de-risked?

12   A.   I'm not sure what you -- which deal are you talking about?

13   Q.   The transaction that Barclays agreed to with Lehman on the

14   16th of September 2008.  That deal.  Would it have been

15   truthful to describe that deal as de-risked?

16   A.   I don't know whether de -- I'm not sure what de-risked

17   means in that context.  Could you explain what you mean by

18   de-risked in that context?

19   Q.   I'll show you an example of the use of the word, sir, and

20   I'll have a few questions for you about it.  Did you ever have

21   conversations -- at the time of the transaction, did you ever

22   any conversations with Bart McDade, the president of Lehman?

23   A.   If by "conversations" you mean did we have one on one

24   discussions, no, we didn't.  It's possible that we were both

25   participants in one or more discussions at the same time.  But

162

1    I couldn't remember with any specificity.

2           MR. GAFFEY:  Your Honor, may I approach?  I have a

3    loose --

4           THE COURT:  Sure.

5           MR. GAFFEY:  -- exhibit for the witness.

6    (Pause)

7    Q.   Mr. Hughes, I've put before you what's marked as Barclays

8    -- BCI Exhibit number 110, an exhibit your counsel has put in

9    evidence.  And it is a transcript of an analyst call that took

10   place on the 17th of September, 2008 that appears to have been

11   attended by, among others, John Varley, the group executive of

12   Barclays.  Do you know John Varley?

13   A.   Yes.

14   Q.   Okay.  And are you familiar with this document?  You've

15   seen it before?

16   A.   I have seen it.

17   Q.   Okay.  In fact, you have described this document, this

18   analyst call, as a means of public disclosure of the terms of

19   the deal, have you not?

20   A.   I'm not sure whether I used that specific expression.  It

21   was, together with the press release, I believe around about

22   the same time, a public disclosure of certain aspects of the

23   transaction that clearly it refers to in the text.

24   Q.   Now, if you'd take a look at page 7 of 18 within Exhibit

25   B110.  And you'll see a question that's put to Mr. Varley and

163

1    then this answer.  Let me just read it into the record.  The

2    question is:  "Just going back to the earlier question about

3    what the revenues you are acquiring, you're getting a fraction

4    of the balance sheet and you were kind of hinting that this

5    business could generate up to half of Lehman revenues which

6    would make a fantastic deal from that perspective."

7    "A.   (John) And that is because we have not taken the entire

8    balance sheet that creates that income.  What we have taken is

9    a portfolio of trading assets and liabilities that are, first

10   of all, de-risked and, secondly, those that need to support the

11   ongoing parts of the business that we have acquired.  And

12   therefore, they are predominantly market-making assets and

13   liabilities and very tradable."  Do you see that?

14   A.   I do see that.

15   Q.   Okay.  Did you have an understanding -- did you see this

16   transcript at or around 17 September 2008 or listen in on the

17   analyst call that it transcribes?

18   A.   The answer to both questions is no.

19   Q.   No?  Okay.  You neither read it nor heard it?

20   A.   At the time, no.

21   Q.   Okay.  And when did you first read the document?

22   A.   I couldn't be certain.  It's probable that it was in

23   preparing for my deposition.

24   Q.   Okay.  Is that the deposition where you told me that this

25   document was a document that was a means of public disclosure

164

1   of a first day gain?

2   A.   Again, I don't recall whether I used that specific

3   expression.  But certainly, I recall we did discuss this

4   document.  I'm sure I did suggest that this was public

5   disclosure of some form, yes.

6   Q.   Well, is it accurate to describe the transaction to which

7   Lehman and Barclays agreed on 16 September 2008 as de-risked?

8   Do you have a sense of what that word means now?

9   A.   I'm not sure I would use that word.  But looking at the

10  parts of the document that you've pointed me to, it looks like

11  it's referring to something else.  Exactly what it's referring

12  to, I'm not sure.  But as I say, I don't think I would use that

13  expression to describe the transaction that I was then engaged

14  in.

15  Q.   Now, you mentioned a moment ago a press release in

16  addition to this analyst call.  I'd like to review with you,

17  Mr. Hughes, your understanding of what mechanisms, what means,

18  were used or available to make disclosure to the Court about

19  the terms of the transaction.  There was the written sale

20  motion that was filed on the 17th of September.  You agree with

21  me?

22  A.   Yes.

23  Q.   Okay.  And there is the sale procedures hearing that takes

24  place before -- that takes place on the 17th of September

25  shortly after those motion papers were filed, correct?

165

1    A.    Yes.

2    Q.    And there is the sale hearing itself which took place on

3    the 19th of September, 2008, correct?

4    A.    Correct.

5    Q.    Okay.  And if I understand your views correctly, there's

6    also this analyst call that we've marked as Exhibit 110 -- or

7    that your counsel has marked as Exhibit 110, correct?

8    A.    I don't think I -- I don't know whether or the Court

9    actually saw this document or participated in the call or saw

10   the press release.  But I think there were masses of public

11   record at the time.  So if that's what you mean then I think

12   they were available, yes.

13   Q.    Okay.  Well, would you turn in your book, so we have both

14   documents in front of you, to tab M-133, Movants' Exhibit 133.

15   Is Movant's Exhibit 133 the press release that you're referring

16   to?

17   A.    It looks like it, yes.

18   Q.    Okay.  Now, to your knowledge, sir, was this press release

19   submitted to Judge Peck?

20   A.    Not as far as I know.

21   Q.    Okay.  And to your knowledge, was Judge Peck invited to

22   join the analyst call?

23   A.    I doubt it.  I certainly didn't invite him.  I don't know.

24   Q.    And to your knowledge, were either the press release or

25   the analyst call submitted in written form to the Court in

166

1    connection with the motion seeking approval of the sale

2    transaction?

3    A.    I doubt it very much.  I don't think they were.

4    Q.    Now apart from this press release and that analyst call,

5    you're aware of no other public record information concerning

6    any disclosure that Barclays planned to have, improved capital

7    ratios or capital accretion or any kind of gain on this deal,

8    isn't that right?  Actually, I should add into that the sale

9    motion --

10         MR. GAFFEY:  Withdraw that.

11   Q.    Sir, when you read the sale motion, did you understand it

12   to provide sufficient information for the Court to deduce that

13   there might be a first day gain for Barclays?

14   A.    I don't ever recall reading it with that specifically in

15   mind.

16   Q.    So beyond that public document because it's filed in the

17   court's public record, there are the press release and the

18   analyst call, yes, that we've just been talking about?

19   A.    Yes.

20   Q.    Okay.  And beyond those documents, the sale motion that

21   was filed, the press release and the analyst call, are you

22   aware of a single public record document that announced in any

23   fashion prior to the sale hearing on the 19th of September that

24   there would be a gain for Barclays?

25   A.    Assuming by sale motion, you mean any of the surrounding

167

1    papers associated with the court procedures, no, I'm not aware

2    of anything else.

3    Q.   Okay.  And is it your view, sir, that either the press

4    release or the analyst call described the transaction

5    sufficiently so the existence of a first day gain for Barclays

6    could be deduced?

7    A.   Again, I don't know that I'd use in that context the

8    phrase "the first day gain".  I think that if one did have

9    notice of these documents, one could establish that there was a

10   significant difference between the value -- the anticipated

11   value of the assets and the anticipated value of the

12   liabilities to see a meaningful difference.

13   Q.   Okay.

14   A.   It's possible that one could, if one was -- it's possible

15   that one could view that as likely to yield a gain for

16   Barclays.

17   Q.   Well --

18   A.   Whether it would be a first day gain or not, I don't know

19   that I could say that.

20   Q.   Well, let's talk about any kind of gain, sir.  You agree

21   with me, do you not, that in order for anyone to deduce that

22   Barclays would make a gain on the transaction, first, second,

23   third day, first week, you'd need to know both the assets

24   acquired and the consideration paid, yes?

25   A.   Those would be among the things you'd probably want to

168

1   know, yeah.

2   Q.   Okay.  Well, let's just work with those two, the assets

3   acquired and the consideration paid.  And you'd agree with me,

4   would you not, that the assumption of certain liabilities for

5   contract cure and compensation items was part of the

6   consideration that Barclays gave in the transaction, correct?

7   A.   Could you repeat that?

8   Q.   That assumed liabilities for contract cure and certain

9   employee items was part of the consideration that Barclays paid

10   in the transaction.  You agree with me there, right?

11   A.   I think the contract, by which you mean the APA, provided

12   that the potential employee liabilities were part of the

13   consideration.  Again, as a form of that.  I don't think that

14   the cure were but --

15   Q.   Okay.

16   A.   -- certainly, Barclays took on a commitment to meet those

17   cure payments that arose after the sixty-day period in which

18   Barclays had the opportunity to determine which ones they

19   wanted to take on.  So there was a commitment.  I'm not sure

20   whether strictly it was a formally part of the consideration as

21   defined in the contract.

22   Q.   Let's agree to disagree about the cure piece for the

23   moment and just talk about the comp piece.  I think I hear

24   you're agreeing with me that the assumption of liability with

25   respect to compensation was part of the consideration that

169

1    Barclays was giving in the transaction for the assets it was

2    receiving.

3    A.   I think that it was though I don't think the size of it

4    was defined in the contract.

5    Q.   All right.  Even without regard to whether the size of it

6    was defined in the contract.  The size of it was described to

7    the Court, yes?

8    A.   I think an estimate of the potential exposure to Barclays

9    was given to the Court, yes.

10   Q.   Would you look through Exhibit B-110, the analyst call,

11   and the press release marked as M-133, and show us where the

12   compensation piece is referred to at all.

13       (Pause)

14       THE COURT:  It's 3:30.  We're going to take a break

15   for ten minutes.  And that way the witness will have as much

16   time as he needs to read an eighteen-page document to answer

17   the question unless you want to make a representation that it's

18   not there.

19       MR. GAFFEY:  I'll make a representation.  I don't

20   think he's going to find it, Your Honor.  I'll withdraw the

21   question.  And a break would be a good idea anyway.

22       THE COURT:  Fine.  We'll take a ten-minute break.

23       (Recess from 3:32 p.m. until 3:49 p.m.)

24       THE COURT:  Let's proceed.

25       MR. GAFFEY:  Thank you, Your Honor.

170

1    RESUME DIRECT EXAMINATION

2    BY MR. GAFFEY:

3    Q.   Mr. Hughes, you'll find in the binder in front of you

4    Exhibit M-1, the copy of the asset purchase agreement.   Could

5    you turn to that please?  And turn to page 6.

6        (Pause)

7    Q.   Are you there?

8    A.   I am.

9    Q.   Okay.  And you'll see on page 6 begins the definition of

10   "purchased assets" from the "Definitions" section.  You see

11   that?

12   A.   I do.

13   Q.   And down in subsection (d) is a reference to government

14   securities, Commercial Paper, corporate debt, corporate equity,

15   exchange traded derivatives and collateralized short term loans

16   for a book value as of the date hereof of approximately seventy

17   billion, collectively, long positions.  You see that?

18   A.   I do.

19   Q.   And to not belabor the point, sir, you understand that

20   that language in the asset purchase agreement is an issue with

21   some centrality in this proceeding, yes?

22   A.   I believe --

23   Q.   At least to Lehman it is.

24   A.   -- it's important to the proceedings, yes.

25   Q.   Okay.  And the fact of the matter, though, is, sir,

171

1    that -- well, Barclays agreed to the use of the term "book

2    value" in the asset purchase agreement.  We can agree on that,

3    yes?

4    A.   I think given we signed the document, yes.

5    Q.   And you do not know who was the proponent of the

6    particular term "book value", who wanted it in the agreement,

7    is that right?

8    A.   I don't know who wanted it in the agreement nor am I aware

9    that it was ever even discussed before it went in.

10   Q.   You are aware it was added by hand before it was submitted

11   to the Court?

12   A.   I'm not aware of that.

13   Q.   Now, Barclays has never felt the term "book value" was of

14   great consequence, is that correct?

15   A.   I think that's correct in the sense that one might think

16   of a variety of terms to use in this context.  But the fact

17   that that was selected by somebody -- we didn't spend a lot of

18   time thinking about it.  So to that extent, it wasn't of great

19   consequence at the time as far as I recall.

20   Q.   Well, we've established, sir, that you don't know who

21   selected it but you don't know how much thought went into its

22   selection, right?

23   A.   Given that I don't know who did it, yes.

24   Q.   Okay.  So you don't know one way or the other whether it

25   was a deliberately chosen term, "book value", in that

172

1    definition, do you?

2    A.    Well, what -- I don't.  What I meant to say by my earlier

3    reply was that, as I recall at the time, I don't think that on

4    the Barclays side at least there was any great discussion of

5    that term.  So whether other people discussed it at the time

6    and considered at length, I don't know.  But from Barclays'

7    point of view, I don't recall anybody spending any real time on

8    it at the time.  And it's in that sense that I don't think it

9    was, at the time, of any great consequence.

10    Q.    And another reason Barclays didn't consider it to be of

11    great consequence is that Barclays was satisfied with the

12    negotiated valuation of the assets to which that provision

13    referred, correct?

14    A.    I think Barclays was satisfied that a good discussion had

15    been had and a debate had been had between the parties to

16    arrive at the appropriate values.  And so, to that extent, yes,

17    I think Barclays was satisfied at the time.

18    Q.    Barclays didn't consider the negotiated values, the

19    process that led to these values to have satisfied it to be an

20    arrival at a book value as that term is commonly understood.

21    A.    I don't recall at the time Barclays ever considering that

22    term.  I think what Barclays thought that process was about and

23    what the process yielded was an appropriate value for their own

24    securities in question.

25    Q.    Barclays did understand, however, when the document was

173

1    signed that it would be submitted to the Court as a

2    representation of the terms and conditions of the transaction

3    the Court was asked to approve, correct?

4    A.    Barclays certainly understood that the document was going

5    to be presented to the Court.  Clearly, it was, at that point

6    in time in particular, the core agreement between the parties.

7    Whether the people engaged in the process that you mentioned

8    and who arrived at those then appropriate values knew that that

9    was going to be directly translated to a document that went to

10   court, I don't know.

11   Q.    I think we may be missing each other a bit here, sir.  In

12   fact, let's just talk about you instead of Barclays.  You

13   understood, as a member of the bar, that if this is filed with

14   a motion that it is a representation of the terms and

15   conditions of the transaction, yes?

16   A.    Yes.

17   Q.    Okay.  And one reason that Barclays did not consider the

18   terms to be of great consequence is because by the time the

19   deal closed it had changed meaningfully, correct?

20   A.    No.  I think before you were asking me about what the

21   consideration -- or I understood you to be asking me about the

22   consideration of that phrase at the time that the agreement was

23   entered into and at the time that the process by which those

24   approximate values were reached --

25   Q.    I may have --

174

1    A.    -- what happened after that is different.

2    Q.    Let me put another question so that I'm not being

3    confusing.  But let me ask you to focus on the period Wednesday

4    the 17th through Monday the 22nd when the closing occurred,

5    okay?

6    A.    Yes.

7    Q.    By the 22nd -- well, by 19th when the sale hearing took

8    place, Barclays did not think the term book value was of great

9    consequence because by that time the deal had meaningfully

10   changed, yes?

11   A.    The two points are not connected in my mind nor were they

12   in Barclays mind at the time.  What I'm trying to make clear,

13   and forgive me if I'm not, is that the term "book value" when

14   it was used at that time was not one that, in Barclays' mind,

15   had attracted a lot of discussion.  Your reference to changes

16   in the transaction or to facets of the transaction between the

17   17th and the 22nd, certainly, there were changes but I don't

18   associate the two things in the way that your question

19   associates them.

20   Q.    Okay.  Let's move on to the changes then.  We can move on

21   from the definition of "book value" and talk a bit about a

22   repurchase agreement that arose that was entered into between

23   Lehman and Barclays midweek, the week of the 15th of September

24   2008.  Do you recall that?

25   A.    I do.

175

1   Q.   And did you play any role in the structuring or

2   negotiations or agreement of that repurchase agreement?

3   A.   I was not directly involved either in the structuring or

4   the agreement -- the specific agreement between the parties.  I

5   was aware of it, certainly.

6   Q.   And you were aware of it for, among other reasons -- well,

7   so we can know what we're talking about here, the repurchase

8   agreement was a repo under which Barclays advanced forty-five

9   billion dollars, correct?

10  A.   It was a repo that had previously been between the Lehman

11  Brothers and the New York Fed.  And New York Fed asked

12  Barclays, first of all, on Monday the 15th, but then more

13  definitely on Tuesday the 16th to take that financing which was

14  then in the form of a repo.  Barclays agreed to do that.  And

15  then on the 18th Barclays sent forty-five billion dollars of

16  cash to Lehman Brothers pursuant to that repo, correct.

17  Q.   And what did Barclays receive in return for its forty-five

18  billion dollars?

19  A.   A pool of collateral which turned out to be very different

20  from the pool of collateral that we thought we were going to

21  receive, which was supposed to mimic the collateral that had

22  previously been with the Fed.  The whole idea of the Fed -- of

23  replacing the Fed was that Barclays would plainly stand in the

24  shoes of the Fed.  At that point in time it was utterly out of

25  the blue, frankly, that Barclays would have to consider that

176

1    within the transaction led up to that point in time had been

2    discussed among Lehman Brothers and Barclays.  So it was -- you

3    know, it was a meaningful intervention, shall we say.  But it

4    was particularly important to Barclays, I think, that it knew

5    that the collateral that had previously been the Fed, which at

6    the time we probably deduced was capable of -- probably had had

7    some kind of risk assessment associated with it.  If we were to

8    get that same collateral, then at least it would give us some

9    idea of what form of risk we might be taking albeit we didn't

10   have time to go through each and every asset in the repo and

11   identify precisely what it was, and identify precisely what its

12   value would be.  I think we probably derived some comfort from

13   the fact that the Fed had felt it appropriate to take that

14   pool, and that was -- as I say, probably some comfort at the

15   time.

16   Q.   I believe my question was what did Barclays get in return?

17   A.   We got assets on the Thursday night that -- some assets

18   that had been within that pool previously placed with the Fed.

19   But the total amount that was due to be delivered was not

20   delivered.  And, indeed, substantial portions of the whole that

21   we did receive turned out to be different from the pool that

22   had previously been with the Fed.  So there was a deficit, both

23   in terms of value and a significant difference in the nature

24   and type of the assets that we received back.  We should have

25   received, I think, something like somewhere between forty-nine

177

1    and fifty billion dollars worth of collateral.  But I think the

2    ultimate numbers were substantially lower than that.

3    Q.   Did there come a time later in the year where Barclays was

4    in a dispute with J.P. Morgan over facts that had arisen out of

5    the repo?

6    A.   Yes.

7    Q.   In short form, sir, there was a dispute between Barclays

8    and J.P. Morgan input in its simplest form over the fact that

9    Barclays said J.P. Morgan should have sent to Barclays seven

10   billion dollars, yes?

11   A.   I'd put it slightly differently from that to that date.

12   The dispute arose because on the night of the 18th by agreement

13   among Lehman Brothers and Barclays because those insufficient

14   collateral being delivered in the repo in place of the seven

15   billion dollars of cash, should be and, indeed, was placed in

16   Barclays account.  And that seven billion dollars was moved

17   that was taken out of Barclays' account, put into a different

18   account.  That was the providence and the essence of the

19   dispute.

20   Q.   I ask this only because I want to ask you if around near

21   the end of the year when there were discussions about a

22   potential resolution of that issue, did you represent -- say to

23   the New York Fed that Barclays had expected to receive forty-

24   nine odd billion, and that the settlement should be based on

25   those numbers?

178

1    A.   I don't recall the specifics of discussions with the New

2    York Fed.  I did have communications with the New York Fed

3    pursuant to what were then confidential settlement

4    negotiations.  And the precise details of that I can't say.

5         MR. BOIES:  May I interrupt?  If they're confidential

6    settlement negotiations I would object on the settlement

7    privilege.

8         THE COURT:  Look, he said what were then confidential

9    settlement negotiations.  I don't know whether or not they

10   remained confidential today.

11        MR. BOIES:  I don't know either, Your Honor.  And I

12   interject the objection just so that we can be sure that we

13   don't inadvertently get into something that is covered by the

14   privilege.

15        MR. GAFFEY:  Your Honor, I think whether they're

16   confidential or not they're not covered by Rule 408.  Neither

17   prong is there.  Neither an offering compromise nor a

18   discussion made in settlement negotiations.  Barclays and the

19   New York Fed don't have a dispute.  If Barclays is

20   communicating with the New York Fed about a dispute it has with

21   J.P. Morgan that doesn't come in within Rule 408.

22        THE COURT:  Well, that may be absolutely true.  I

23   think the reason we're having this dialogue now is that the

24   witness said then confidential settlement discussions, which

25   triggered in Mr. Boise's mind, I suspect, I better stand up and

179

1  protect the record, and so he did that.  The question now is

2  whether or not there's anything that needs to be protected

3  relative to this proceeding.

4          And his concern, I believe, at lest what he expressed,

5  was some kind of privilege.  I don't know if anything that the

6  witness is about to get into involves communications between

7  the witness and Mr. Boise or his firm, or any law firm that the

8  may have retained to deal with the issue in connection with the

9  New York Fed.

10          I'm familiar with this if it's the same matter because

11  it ripened into a December hearing involving a settlement that

12  I ended up approving.  Is that what we're talking about?

13          MR. GAFFEY:  Well --

14          THE COURT:  Or we're talking about something else.

15          MR. GAFFEY:  It is, Your Honor, and we'll get to it in

16  a while.  I can actually solved the immediate problem by moving

17  onto another topic.

18          THE COURT:  Even better.

19          MR. GAFFEY:  Yeah.  And the objection, as Your Honor

20  said, stayed away.  So --

21          THE COURT:  Well, we filled a couple of pages of

22  transcript that no one need read.

23  BY MR. GAFFEY:

24  **Q.   Now, the fact of the matter with regard to the repo, Mr.**

25  **Hughes, is that by the 17th of September the repo was already**

180

1   an important feature of the sale transaction, is that right?

2   A.   It had become very important, not least because from

3   Barclays' perspective of the time it significantly enhanced the

4   risk in the transaction to Barclays.

5   Q.   And, essentially, the transaction became -- the sale

6   transaction became an exchange -- became giving to Barclays,

7   the assets and the repo, in exchange for what Barclays paid

8   under the repo, yes?

9   A.   No.   The transaction --

10  Q.   Let me try it again, see if I can get a yes.

11       A large part of the transaction became that Barclays would

12  keep the collateral in the repo -- would keep the collateral in

13  the repo, yes?

14  A.   I think Barclays would ultimately take the collateral in

15  the repo, but the transaction was always the same transaction

16  during the course of that week.   As I said at the outset, this

17  was not a transaction which started with the premise on the

18  some securities here that we'd like to acquire.   There was a

19  much bigger premise which was is there an operational business

20  here that would be strategically valuable to Barclays to

21  acquire.   The agreement was for the purchase and sale of that

22  business as a whole, limited, frankly, only to the extent that

23  we agreed that certain assets would be excluded.   So the

24  transaction never changed from that point of view at any point

25  in time to my knowledge or recollection.

181

1          The reason that repo became so significant as I recall,

2     was that in the early part of the week to the extent that the

3     purchase and sale transaction involved securities or securities

4     positions, assets and liabilities related to securities, or

5     derivatives of one for more another, those facets of the

6     transaction changed because of a number of -- for a number of

7     reasons.   There were market interventions around their

8     securities, by which I mean various counterparties, including

9     clearing organizations.   Their actions made many of those

10    security positions no longer available.   There was a

11    significant -- a substantial diminution in the value of those

12    assets.   And the intervention of the repo and the request by

13    the Fed that we take on that repo financing changed what had

14    previously been an assessment of risk surrounding pools of

15    assets and liabilities in that securities context into a

16    transaction where Barclays sends forty-five billions of dollar

17    of cash to Lehman Brothers had to wait what then felt like an

18    eternity to see the collateral come back -- or some of the

19    collateral, as it turned out, come back in return for that.   So

20    it was significant in my view because of the enhancement of the

21    risk associated with that part of the transaction.   But the

22    transaction is still for all the parties involved an effort to

23    sell the business as a whole and to ensure that as far as we

24    were able, as much of that business could stay operational by

25    the time the market's open on the 22nd.   So an important

182

1    feature of the transaction had changed, but the transaction

2    hadn't changed.

3    Q.    And do you know if a change in important -- if that

4    particular change in an important feature of the transaction

5    was ever brought to the Court's attention, prior to the

6    issuance of the sale order?

7    A.    I believe the facts of the repo was brought to the Court's

8    attention.

9    Q.    What you just described to us about the risk and how it

10   changed the deal, and how it became an essential part of the

11   deal, do you know if any of that was described to the Court at

12   the sale hearing on the 19th of September 2008?

13   A.    From my recollection from the transcript I don't recall

14   anybody describing it in that way.  But, again, I wouldn't have

15   expected people to have understood it in that way.  I didn't

16   think people necessarily, for example, understood or

17   necessarily knew at that particular point in time that Barclays

18   had sent forty-five billion dollars in cash on the morning of

19   September the 18th, and had to wait until the early hours of

20   the morning of the 19th to get substantially less in collateral

21   back.  So those portions -- those risk elements of the

22   transaction were ones which we were intensely focused upon at

23   the time.  But in the overall time available to assess all of

24   that and determine what needed to be done as a result of it, I

25   didn't think we necessar -- the time in that specific example

183

1    to decide exactly what needed to be presented or not.  I think

2    the fact that the repo was described, the securities that

3    formed the collateral in the repo were intended, at least, to

4    be some portion, I believe, of the securities that were

5    previously in the Fed repo.  They were all securities assets

6    held in the business of Lehman Brothers, and all of those

7    assets were, in any event, you know, the cornerstone of the

8    transaction to come to Barclays.

9         So I didn't think it really changed the transaction in any

10   material way, it changed the risk assessment from Barclays'

11   point of view, but it hadn't changed the transaction in a

12   material sense.

13   Q.   I don't think I've heard a number yet as to the value of

14   the repo -- of the collateral that Barclays received through

15   the repo.  What was it supposed to be about that, about fifty

16   billion, correct?

17   A.   I think it's slightly below fifty billion, yes.

18   Q.   And because of some operational difficulties collateral

19   valued only at approximately forty-two billion was transferred

20   to Barclays, correct?

21   A.   I don't recall the actual values at the time.  The net

22   distinction between what should have been delivered on the

23   night -- on the Thursday night through Friday morning was seven

24   billion dollars.  Hence, the seven billion dollars that -- in

25   cash at the time that should have been -- that was placed in

184

1    Barclays' account to account for the shortfall in collateral

2    that had been delivered.

3    Q.   And that cash then came out of the account and you're off

4    to the races with JPM, right?

5    A.   I wouldn't say we were off to the races, because it was a

6    while before we knew that the cash wasn't there.

7    Q.   Okay, all right.

8    A.   But it's now.

9    Q.   You can speak with JPM over that.  But the point is in the

10   connection with the repo, itself, we're totaling up to about

11   fifty billion, yes?

12   A.   I think, sir, no.  Because the actual value of the

13   securities that were delivered turned out to be appreciably

14   less.  Secondly, the securities that were, in fact, delivered

15   were different from those in the Fed repo that had formed the

16   basis of the valuation of just below fifty billion.  The actual

17   values -- I was not involved in the actual valuations, I don't

18   know today what those valuations were determined to be at that

19   specific point in time, or after the exercise that had been

20   undertaken to establish the differences than what we actually

21   received, and they're values as compared to what we should have

22   received in their values, I couldn't tell you.

23   Q.   Rather than go down a path about value, let me ask you

24   this.  You did understand that the collateral was received by

25   Bank of New York, which was Barclays' collateral agent,

185

1    correct?

2    A.    I believe -- certainly, the bulk of it, I think, that was

3    received would have been received by BONY.

4    Q.    And Bank of New York, as Barclays' collateral agent, put a

5    value of some kind on the collateral that was received,

6    correct?

7    A.    I believe they did.  It would have been a typical part of

8    a collateral agent's role.

9    Q.    That's the service they provide, it includes value in the

10   collateral that they hold, yes?

11   A.    It usually does, yes.

12   Q.    And Bank of New York put a value on the collateral here?

13   A.    I presume they did, yes.  I think they did.  Though,

14   again, I wouldn't know what the value was.  I should add that

15   the Bank of New York in their circumstances, as I believe any

16   collateral agent would be in their circumstance is an agent.

17   And I'm sure part of the role, as we've agreed, is to value the

18   securities that come in as part of a repo for example.  But I

19   think ultimately we would have always valued the securities

20   ourselves.  I would certainly expect that we did that.

21   Q.    After your agent had valued them?

22   A.    I beg your pardon?

23   Q.    After your agent had valued them?

24   A.    Well, I think in those circumstances it would have been

25   inevitable, because at the particular point in time, I didn't

186

1    think we would necessarily have been able to value everything

2    at one and the same time as the Bank of New York.  So it was

3    obviously a process that took time.

4    Q.    Yes, after your agent valued them?

5    A.    I don't know --

6    Q.    It's yes or no question, sir.  After your agent valued

7    them?

8    A.    I don't know.  I don't know whether in fact we did it

9    afterwards, or whether it was all done at the same time.  I

10   would imagine that it took several days, but I don't know

11   exactly.

12   Q.    Now, further along the week of the 15th, sir, there comes

13   a time when -- when Barclays says to Lehman in substance,

14   there's not enough value in the deal we need more, is that

15   right?  That's on Friday morning, the 19th of September.

16   A.    I'm not sure whether that was a phrase that was used.  I

17   think that by Friday morning because of what had happened

18   during the course of the week, and because of the problems with

19   the repo transaction that the value apparent to Barclays in the

20   business that we were acquiring seemed to be appreciably less

21   than it had seemed earlier in the week.  And so I do believe

22   that at that point or somewhere around that time, Barclays made

23   very plain to Lehman that we needed to see -- you know, that

24   was problem because the possibility that transaction might at

25   that point not deal in the submission value became very, very

187

1   real.  And it was -- it looked like an undue risk at that time.

2   Q.   Have you ever described this transaction as one

3   irrespective of value with the assets?

4   A.   I think I may have used the term irrespective of value.

5   I'm not sure whether I used the precise -- I'm not sure the

6   exact context.  I'd probably want to see the context to be

7   sure.

8   Q.   Would you see an inconsistency between a deal that was

9   irrespective of value and Barclay saying it won't close because

10  there's not enough value in it?

11  A.   I'm not sure I've -- I'm not sure I would have -- I think

12  I would see a distinction.  The -- I think it's feasible to

13  make a determination as to whether there is -- whether one

14  would execute a transaction not knowing exactly what the values

15  are, but being able to make judgments about them on the one

16  hand.  And on the other hand if you -- if there's -- if there's

17  not a submission of visibility around those assets then perhaps

18  it would be hard to do that.  So I could see circumstances

19  where it would be different.  So take that example, I think on

20  the Friday morning there were clear -- it was clearly

21  understood between the parties that any valuation with respect

22  to an asset or liability to that point was estimated, there

23  were huge uncertainties around those.  But up to that point we

24  were proceeding, we felt in a position to make judgments about

25  it, nevertheless.  Not least because we felt that the amount of

188

1    value coming while distinctly uncertain, it was sufficiently

2    greater we thought than the liabilities that we were taking on

3    at the same time.

4        When he got to Friday morning that imbalance was we felt

5    no longer there.  And so I think what was important to us

6    was -- at the time was to try to identify what -- with more

7    precision what the value of the assets was.  And if there were

8    other assets that we hadn't been told about in that time that

9    we could see what those looked like, to make the same risk

10   determinations.  So I think we could know sufficient, without

11   being certain, to do a deal irrespective of the actual value.

12   By which I mean the precise values.  And at the same time need

13   to have shown or need to know more about the value of the

14   assets.

15       So I think to that extent --

16   A.   Is that a no, you don't think it's inconsistent, no.

17   Q.   Thank you.  Now, on the morning of Friday the 19th,

18   Barclays demanded that Lehman provide more value in the deal,

19   yes?

20   A.   I wouldn't put it that way.  I think --

21   Q.   Then let me try another question, sir.

22   A.   I beg your pardon?

23   Q.   Let me try another question then.

24   A.   Okay.

25   Q.   I've got to get some of this time sir.  Did Barclays

189

1    communicate to Lehman in any fashion on Friday morning -- on

2    September 19th at any time, did Barclays communicate to Lehman

3    that it needed to see, have, add, identify more value in the

4    deal?

5    A.   Yes.

6    Q.   Okay.  Let's pick a verb.  Was it add more value to the

7    deal?

8    A.   No.

9    Q.   Okay.  Was it identify more value for the deal?

10   A.   I think that would be a fair word to use.

11   Q.   Okay.  And the reason that verb's important to you is it's

12   your view that all assets were in the deal unless excluded.

13   And, therefore, a demand for assets would only be identifying

14   that which should be included, yes?

15   A.   That -- in part, yes.  But --

16   Q.   Okay, now --

17   A.   -- also because that's actually what happened.

18   Q.   Now, there came a time, sir, when a clarification letter

19   was done regarding certain assets that were, to use your verb,

20   identified on that Friday, yes?

21   A.   The clarification letter that you speak of was -- was --

22   it was produced, I agree.  It had been -- I think it actually

23   started -- work had started on it well before the 19th.

24   Q.   As finally signed, one of the topics it addressed was the

25   value that had been, to use your verb, identified on the

190

1    Friday?

2    A.   Correct.

3    Q.   In particular, clearance box assets worth about 1.9

4    billion, yes?  Clearance box valued by Lehman at one point nine

5    billion?

6    A.   I'm not sure now whether there was a value put in the

7    clarification letter, I can't immediately remember.

8    Q.   I'm not asking you if the clarification letter said it,

9    I'm asking if you know how much the clearance box assets were

10   valued by Lehman, it was about 1.9 billion, yes.

11   A.   That's correct.

12   Q.   Okay.  And in addition to that, a category of assets

13   called 15c3 assets, correct?

14   A.   Correct.

15   Q.   And that was worth about 769 million dollars, correct?

16   A.   Correct.

17   Q.   Okay.  And that approximately 2.7 billion dollars was,

18   your verb, identified as assets that were to be transferred in

19   the deal, correct?

20   A.   Correct.

21   Q.   Okay.  And there came a time on Friday afternoon at the

22   sale hearing on the 19th of September, when to your knowledge

23   one of the Weil lawyers explained to those present that there

24   were changes in the deal, correct?

25   A.   That's correct.

191

Q.   And she put that number at 47.4 billion -- she said that

the value of the assets had dropped because of the markets and

she gave the Court a number of 47.4 billion dollars, do you

recall that?

A.   I recall the number 47.4, yes.

Q.   And the assets that were identified -- I'm making quotes

here, the assets that were identified the clearance box assets

and the 15c3 assets were -- to your knowledge, were not

included in the 47.4 that Ms. Fife gave the Court, is that

right?

A.   I don't know what Ms. Fife intended to include.  My

interpretation of what was said and the interp -- and what

Barclays though at the time was that the 47.4 was a reference

to the diminution in value of the long positions that we spoke

about earlier.

Q.   Well, put another way.  Then listening to your answer,

sir, Barclays didn't know one way or the other whether that

47.4 number that Ms. Fife gave the Court included or excluded

the 2.7 billion dollars in newly identified assets, correct?

A.   I think Barclays thought at the time it was a reference to

the change in the value of the long positions.

Q.   And if it was a reference to a change in the value of the

long position the clearance box was not part of the long

position, correct?

A.   I don't know the answer to that.

192

1    Q.   Okay.  Do you know if the 15c3 assets were part of the

2    long position?

3    A.   Again, I don't know the answer to that.

4    Q.   So you don't know -- Barclays didn't know whether the

5    newly identified assets; clearance box and 15c3 were included

6    in the 47.4 that Ms. Fife gave to those assembled in Court, is

7    that right?

8    A.   I think we didn't know because we didn't know how Ms. Fife

9    had come up with that specific number.  I think at the time, as

10   I say, we felt and understood it to be a reference to a change

11   in the diminution of the value of the long positions.  As I

12   recall it followed direct -- the number was given directly off

13   the back of an explanation around that.  It seemed to me,

14   therefore, as I read the transcript and I spoke to the people

15   from Barclays who were there, that was a, you know, a

16   reasonable interpretation of what was being said.

17   Q.   The reasonable interpretation is that it did include, or

18   did not include?

19   A.   No.  That it was a reference to the seventy.  I think it

20   probably was felt if anybody thought about it at the time, and

21   I don't know that they did, I don't think they were included

22   because it was a reference to the long position specifically.

23   So I think if I were able to guess it would be a guess of what

24   was in this client's name.

25   Q.   No.  We wouldn't want you to guess, sir.  Let me ask you

193

```
 1    another question.  To your knowledge were any steps taken by
 2    Lehman or Barclays to inform the Court at the sale hearing on
 3    the afternoon of the 19th about this identification of new
 4    categories of assets?
 5    A.    I believe the Court was told there were in-train changes
 6    to aspects of the transaction.  I'm not aware that there was
 7    specific mention of the 15c3 assets or the clearance boxes.
 8    Q.    Okay.  Starting with your premise sir, that everything was
 9    included unless it was excluded, and then, therefore, there was
10    no need to add the clearance box and the 15c3, have I pretty
11    much got that formulation right?
12    A.    It's pretty close.
13    Q.    Okay.  To your knowledge did anybody at Barclays say at
14    anytime on Friday the 19th in sum or substance, geez, we almost
15    forgot 2.7 billion dollars, why wasn't this added earlier in
16    the week, anything along those lines?  Lucky us, found that 2.7
17    billion that hadn't been identified?
18    A.    I don't think anybody did think that, because they --
19    the -- as I had said I think more than once, the estimations of
20    value with respect to assets in the transaction were incredibly
21    uncertain at the time.  I'm sure that you've heard many people
22    relay the circumstances at the time.
23    Q.    Sir, this doesn't go to the value of the assets, this goes
24    to the fact that two categories; substantial categories of
25    assets, are identified on Friday the 19th.  They're valued 2.7,
```

194

1   market's volatile, maybe it's only two billion dollars.  My

2   question is do you know if anybody at Barclays said anything

3   like boy, it's a good thing we asked because we almost left two

4   billion dollars behind; 2.7 billion behind, a big bag of money

5   behind.  Do you remember anybody saying anything like that?

6   A.   I do recall on the 19th Barclays making it very plain to

7   Lehman Brothers that we were very concerned to see how much

8   value, in fact, was going to be conveyed, that had been to our

9   minds a significant diminution in our estimations with respect

10   to that.  Which estimations had been made a very short time

11   before.

12   Q.   I'd like to --

13   A.   And there was certainly relief that additional assets had

14   been identified in that way, absolutely there was.

15   Q.   I'd like to move on, sir, to the clarification letter.

16   Now, the clarification letter was finalized over the weekend of

17   the 20th and the 21st of September, correct?

18   A.   I think, in fact, it was finalized in the morning of the

19   22nd, but, yes, that's correct.

20   Q.   Now, to Barclays view would it be accurate to say that the

21   clarification letter amended the APA?

22   A.   I think it amended certain aspects of the APA, yes.

23   Q.   Would it be accurate to say that there were additional

24   categories of securities and other assets set forth in the

25   clarification letter?

195

1   A.   I don't recall that specific language.  If you showed it

2   to me I might be able to.

3   Q.   Would you turn again, sir, to Exhibit 259?  That's that

4   Rule 2004 discovery motion you saw before.  And this time I'd

5   like you to turn to page 21, paragraph 52.

6   A.   I'm sorry.  Page 21?

7   Q.   Yeah.

8   A.   I have it.

9   Q.   Okay.  And paragraph 52 begins "it likewise has been

10  repeatedly disclosed that Barclays was entitled to receive

11  additional categories of securities and other assets set forth

12  in the clarification letter which amended the APA."  Is that a

13  true sentence?

14  A.   I think it's true.  I might have expressed it different,

15  but I think it's true.

16  Q.   So if I were to ask you the question so would it be

17  accurate to say that there were additional categories of

18  securities and other assets set forth in the clarification

19  letter, would that be an accurate statement?

20  A.   It would be accurate.

21  Q.   It would?  The reason I asked, sir, is you said no at your

22  deposition.  And we can go into the transcript.  And I'm trying

23  to find whether or not Barclays agrees that additional

24  categories of securities were -- that categories of securities

25  were added by the clarification letter, additional categories

196

1    of securities?

2    A.   Can I ask you a question.  What do we mean --

3    Q.   Actually, no, sir, you can't.  You have to answer my --

4    A.   All right, okay.

5         MR. BOIES:  I'll object to the form of the question,

6    Your Honor.

7    A.   Could you tell me what you mean by --

8         THE COURT:  Well, now we have a very interesting

9    dynamic.  We have a question, a question, an objection to the

10   form of your witness's question?

11        MR. BOIES:  Maybe of both of them, Your Honor.

12        MR. GAFFEY:  I guess what comes next, Judge, I'll

13   withdraw the question and I'll try another one.

14        THE COURT:  That's the best outcome.  We'll start

15   over.

16   Q.   Do you agree, sir, that the clarification letter added

17   categories of securities to the transaction?

18   A.   It depends what you mean by added.  Because --

19   Q.   Really?  It means there were more than there were before,

20   sir.  It means that there used to be X amount of securities,

21   and by signing a clarification letter there were X plus Y,

22   there were more than there used to be, there were additional

23   securities.  Securities were added, sir, that's what I mean by

24   added.  Were securities added by the clarification letter?

25   A.   They were added in the sense that they were added to those

197

1    that had previously been identified.

2    Q.   Okay.

3    A.   And those assets were not added to the deal, because they

4    were assets that were owned and used in the business of Lehman

5    Brothers.  So by definition they couldn't have been added to

6    the deal.  They were added to the APA by the clarification of

7    that.  Equally there were assets that were taken away.

8    Q.   Now, let me move on to another topic, sir.  Did there come

9    a time in October of 2008, Mr. Hughes, when you were engaged in

10   communications with Shari Leventhal at the New York Fed about

11   Barclays' dispute with Chase, that we talked about a little

12   while ago?

13   A.   Yes.

14   Q.   Okay.  And would you turn in your book to Exhibit 701?

15        MR. BOIES:  Your Honor, this document we do have a 408

16   objection -- Rule 408 objection to.  They're statements made in

17   compromised negotiations.

18        MR. GAFFEY:  They're not negotiations, Your Honor.

19   There is no dispute between the Fed and Barclays.

20        THE COURT:  Okay.  Well, let's -- first of all, let me

21   ask question number 1.  Is Movants' Trial Exhibit 701 not in

22   evidence?

23        MR. GAFFEY:  This is one from Mr. Tambe's examination

24   earlier today, Your Honor, where --

25        THE COURT:  We have the backend of it in.

198

1          MR. GAFFEY:  That's right, and I'm going to move in

2     the rest of it now.

3          THE COURT:  Okay.  We had a discussion this morning

4     when Mr. Schiller was sitting in that first chair.  And he

5     raised an objection to the document.  And it was apparent that

6     the witness who was then on the stand, Mr. Clackson, had

7     received the initial e-mail from Mr. King.  That's Bates number

8     ending in 97.

9          Now, the rest of the document we can talk about

10    whether or not it's 408 governed or some other issue.  At the

11    moment, the only party that it seems to me is in a position to

12    raise an issue as to this would be the New York Fed to the

13    extent that there's an aspect of this that's unresolved by the

14    approved settlement.  Isn't -- isn't this simply background to

15    a matter which is now public?

16         MR. GAFFEY:  Well, I think that's right, Your Honor.

17    But I also think just on the text of the document, itself, it

18    just isn't settlement negotiations.  This particular document

19    does not address or involve a dispute between Barclays and the

20    New York Fed.  It addressed and involves a dispute between

21    Barclays and J.P. Morgan about which Mr. Hughes is writing to

22    the New York Fed.  If he wrote that e-mail to me it wouldn't be

23    anymore protective under Rule 408.

24         MR. BOIES:  Your Honor, if I may?  What happened was

25    Barclays took over the repo from the Fed.  Portions were not

199

1    delivered, or portions that we believed should have been

2    delivered weren't delivered.  There was then a series of

3    negotiations that involved the three parties to that

4    transaction; the Fed, Barclays and J.P. Morgan.  And I think

5    the issue  that counsel is raising is whether under 408(a)(2)

6    it is necessary that the statement be part of a offer, that is

7    whether it's a back and forth of negotiations, or whether it is

8    sufficient to be a statement made in compromised negotiations.

9    And we believe that this is clearly a statement made in

10   compromised negotiations.

11        Now, rather than delay it --

12        THE COURT:  Well, I think importantly 408(a), and

13   let's just focus on this, "evidence of the following is not

14   admissible on behalf of any party when offered to prove

15   liability for, in validity of, or an amount of a claim that was

16   disputed as to validity or amount, or to impeach through a

17   prior inconsistent statement or contradiction."  I don't know

18   yet how this document is being used, other than to explore

19   aspects of the consideration paid in this case.  I don't see

20   Rule 408(a) as implicated at all so far.  And I'm going to

21   overrule your objection, but I'm not admitting the document

22   yet.  And I'll give you the ability after we see the

23   examination proceed to renew the objection once I understand

24   what's going on a little more clearly.

25        MR. BOIES:  Thank you, Your Honor.

200

1          MR. GAFFEY:  Just for practicality, Your Honor, I take

2     it I can proceed without regard to other foundation or other

3     objections that exist to the 408 issue?

4          MR. BOIES:  With this witness it's just a 408 issue,

5     because this witness was involved in the communications.

6          MR. GAFFEY:  Thank you, Your Honor.

7          THE COURT:  Ask away.

8     BY MR. GAFFEY:

9     Q.   Mr. Hughes, why were you in correspondence with Shari

10    Leventhal of the Fed about the repo between Lehman and

11    Barclays?

12    A.   Because -- two reasons, really.  The Fed was involved in

13    the repo transaction at the outset.  And, indeed, was

14    facilitating the discussions, shall I say, between J.P. Morgan

15    and Barclays in an effort to try to resolve the dispute between

16    them.  Both parties I think were engaged in discussions, quite

17    appeared and engaged in communications with Ms. Leventhal to

18    try to see if the Fed could help broker a resolution, so to

19    speak.  That was the essential reason.

20    Q.   And in the course of broker -- of trying to assist to

21    broker a resolution, did you have discussions with Ms.

22    Leventhal about the representations that had been made to this

23    Court in connection to the value of the sale transaction?

24    A.   I don't recall speaking about the sale transaction.  It's

25    possible, but I don't recall it specifically.

1    **Q.   Your Honor, I'm going to move on to another document, but**

2    **I move the admission of Exhibit 701 based on the witness's**

3    **description of it.   I don't think it falls within the ambit of**

4    **Rule 408.**

5         MR. BOIES:  Your Honor, I just heard the testimony

6    differently.  I think that to the extent that what we have is

7    the current foundation it does fall within 408.  I think the

8    witness's answer established that.

9         THE COURT:  I'm going to reserve on this.  I'm going

10   to take a look at the questions and answers in reference to

11   408.  And if the parties feel strongly enough about this issue

12   and this document you can submit letter briefs on the question

13   before the start of the trial on Monday morning.  I'll examine

14   those and reserve judgment on admissibility.  But I'd like

15   supplemental briefing on the application of 408 in reference

16   to, both the document and the testimony that has just been

17   adduced with respect to the document.

18        MR. GAFFEY:  For the completeness of that record, Your

19   Honor, I have another similar document.  Let me just put it in

20   the record.  It's only one letter, you're not going to get two

21   letter briefs.  But there's another document I'd like to show

22   the witness.

23        THE COURT:  Okay.

24        MR. GAFFEY:  It's Trial Exhibit 705.  It's not in the

25   book, Your Honor, so may I approach the witness?

202

1          THE COURT:  Yes.  Is this another document that may be

2    covered by 408(a).

3          MR. GAFFEY:  Maybe this will fall -- it's more of the

4    same correspondence that I --

5          THE COURT:  Okay.

6          MR. GAFFEY:  I might suggest, Your Honor, for

7    practicality, if we can just agree the testimony about the

8    reason for writing the letter would be the same.  I just need

9    to have this offered to the Court and we can both brief this as

10   if he had given the same answer.

11         MR. BOIES:  I so stipulate, Your Honor.

12         THE COURT:  Fine, it's in the same zone of uncertain

13   treatment.

14         MR. GAFFEY:  Thank you, Your Honor.  And with that,

15   Your Honor, I have no further questions for Mr. Hughes.

16         THE COURT:  It looks like we have Mr. Maguire.  And

17   will the committee be asking any questions?

18         MS. TAGGART:  No, Your Honor.

19         THE COURT:  Okay.

20         MR. MAGUIRE:  If I might approach, Your Honor?

21         THE COURT:  You may.

22         MR. MAGUIRE:  Thank you.

23      (Pause)

24         MR. MAGUIRE:  If it please the Court.  And, Mr.

25   Hughes, as you know, I'm Bill Maguire, I represent the SIPA

203

1    trustee.

2    CROSS-EXAMINATION

3    BY MR. MAGUIRE:

4    Q.   I'd like to follow-up first with some questions you were

5    asked, some testimony you gave on the subject of Barclays day

6    one gain.  Are you with me?

7    A.   Yes.

8    Q.   I believe you said in the course of your testimony that

9    there was no a built in gain, is that your position?

10   A.   I think I said it wasn't built in in the sense that the

11   deal wasn't built in in the sense of deliberately structured by

12   the parties.  As I said there was certainly an imperative for

13   Barclays to achieve a gain.

14   Q.   From Barclays standpoint it was absolutely essential that

15   a gain be built in to the transaction, isn't that correct?

16   A.   Again, I would put it differently.  As I think I said

17   earlier, it was -- it was essential to Barclays that Barclays

18   derived a gain from the transaction.

19   Q.   In fact, sir, if there was not a gain from the transaction

20   you didn't have authority to do the deal, isn't that right?

21   A.   I don't know whether specifically there was -- I'm not

22   sure exactly what you mean by authority.  I think it was -- it

23   was certainly -- it was certainly what we always wanted to

24   achieve.  And I think to have derived a loss was certainly not

25   part of the authority, so to speak.  But I think that we were

204

1    taking risks in the transactions.  So I don't think we could

2    say definitively what -- in that sense, in terms of authority,

3    it would be a gain.  Certainly, the board I'm sure wanted to

4    achieve a gain.

5    Q.    You know more than that, sir, do you not, you were present

6    as you told Mr. Gaffey at Mr. Diamond's deposition, were you

7    not?

8    A.    I was.

9    Q.    And he testified at that deposition.  And it is admitted

10   by Barclays and stipulated by the parties in the admitted fact

11   stipulation at paragraph 117 that Mr. Diamond testified that

12   there had --

13          MR. BOIES:  Excuse me, do you have a copy?

14          MR. MAGUIRE:  I can show you.  Paragraph 117, Diamond

15   testified.  And I'll read the applicable part.

16   Q.    "So when I say capital accretive, accretive to the capital

17   ratios, which means that the assets, liability mismatch had to

18   have a mismatch in favor of a positive capital accretion or we

19   weren't authorized to do a deal."

20          MR. BOIES:  Could I ask for context, introduction to

21   that, the first two sentences of what is in the stipulation be

22   read for context.

23          THE COURT:  Mr. Boise -- I've overheard his ask for

24   context.  Has he read enough or not enough?

25          MR. BOIES:  No, Your Honor.  What I wanted him to do

205

1    is read the first part of this paragraph in the stipulation

2    which has the -- immediately proceeds what he read.

3         THE COURT:  Why don't we read that an avoid the

4    objection.

5    Q.   Reading in full, sir, paragraph 117 of the admitted facts

6    stipulation.  Diamond testified, "The regulators that we are

7    responsible to, the financial services authority in the UK

8    holds us to specific capital standards.  So, for example, a

9    core equity, tier one equity and it was becoming increasingly

10   clear during this time that they were focusing more on core

11   equity than tier one equity.  And that they were thinking the

12   banks would potentially have to hold higher core equity.  So

13   when I say capital accretive, accretive to the capital ratios

14   which means that the asset liability mismatch had to have a

15   mismatch in favor of a positive capital accretion or we weren't

16   authorized to do a deal."

17       It's pretty clear from Mr. Diamond's testimony that the

18   board did not give him authority to do a deal unless there was

19   a gain, a mismatch in favor of Barclays, isn't that right, sir?

20   A.   If it involved as you said it then that would have to be

21   right, because he was the board member to whom the authority

22   was delegated.  So he would be much more accurate about it than

23   I could be.  So, yes.

24   Q.   If Bob Diamond did not have authority from the board to do

25   this deal without an asset liability mismatch then you did not

206

1   have authority to do this deal on that basis, correct?

2   A.   Correct.

3   Q.   Now, you were here Monday, sir?

4   A.   Yes.

5   Q.   You heard a number of questions on the general subject of

6   whether this deal was approved by the board of the holding

7   company, Lehman Brothers Holdings Inc., on the understanding

8   that it involved an exchange of reasonably equivalent value, or

9   a wash.  You generally recall that?

10  A.   I recall that, yes.

11  Q.   And is it your position, sir, that Barclays did not agree

12  to do this deal on the basis of reasonably equivalent value?

13  A.   That's correct.

14  Q.   In fact, Barclays could not have done this deal on the

15  basis of reasonably equivalent value given the mandate from its

16  board, isn't that right, sir?

17  A.   I think that's probably right to say because that wouldn't

18  necessarily have led to a capital agreed to transaction to use

19  the phrase that Bob used.

20  Q.   And that mandate from the board put Barclays in a very

21  awkward position coming into this courtroom on Friday the 19th,

22  isn't that right, sir?

23  A.   No.

24  Q.   Barclays was coming to this Court seeking an order; a

25  judicial order authorizing the sale.  And that order involved a

207

1      judicial finding of reasonably equivalent value or fair

2      consideration, isn't that correct, sir?

3      A.   First of all, it was Barclay seeking an order.  And I

4      couldn't tell you offhand exactly what the requirements are

5      for -- as a legal matter for the order to be made.  So if

6      that's what you're suggesting I'd have to look at that just to

7      be sure that I'd be accurate.

8      Q.   Well, let's take a look, then, at the sale order, sir.

9      It's in your book and it's at tab 6.

10          MR. MAGUIRE:  And this, Your Honor, is Movants' Trial

11     Exhibit 441.

12     Q.   If you turn, sir, to page 6 of the sale order.  And I'd

13     invite your attention, sir, to paragraph M, "Consideration".

14     Now, Barclays was before this Court seeking an order that

15     provided "that the consideration here constitutes reasonably

16     equivalent value or fair consideration as the case may be."

17     You see those words, sir?

18          MR. BOIES:  Can we have the very next parenthetical

19     that explains the concept, Your Honor?

20          THE COURT:  Okay, let's -- we can do that, it's

21     just -- we're talking about an order that was prepared, no

22     doubt cooperatively, by counsel for Barclays and counsel for

23     the seller.  That's how it works in bankruptcy court.  The

24     purchaser has a meaningful role in the drafting of the order

25     that approves the sale.  And while I have no record on it, I'm

208

1    absolutely confident that's true.  For purposes of examining

2    this witness who is the chief internal legal officer at the

3    time for the buyer, given his sophistication there is no need

4    for context.  He can read as much or as little as he chooses to

5    before answering the question.

6    **Q.   Barclays understood, did it not, sir, that an issue before**

7    **the Court was whether there was reasonably equivalent value in**

8    **this sale?**

9             MR. BOIES:  Object to the form of the question, Your

10   Honor.

11            THE COURT:  Overruled.

12   **A.   I -- having read the language that you just alluded to**

13   **would interpret it as being reasonably equivalent by all fair**

14   **consideration.  My understanding is that fair consideration was**

15   **given in the transaction.  And that as the paragraph goes on to**

16   **state that the purchase agreement did represent a fair and**

17   **reasonable offer to purchase the assets in the circumstances,**

18   **and that no other personal other group -- no other person, or**

19   **entity, or group of entities other than the purchaser has**

20   **offered to purchase the purchased assets, and so on.  So I**

21   **didn't understand this at the time to be -- the phrase**

22   **"reasonably equivalent value" was the focal point.  I would**

23   **have I think then and now focused more on ensuring that there**

24   **is fair consideration for the transaction.  And I think there**

25   **was fair consideration.**

209

1   Q.   Barclays understood that an issue before the Court was

2   whether there was reasonably equivalent value in this sale,

3   isn't that correct, sir?

4   A.   I'm not sure I can say what the -- reasonably equivalent

5   refers to.  I don't know definitively what that requirement is.

6   The sale order that you're equating from and that you're

7   looking at seems to be saying that the consideration was that

8   or fair consideration, and goes on to explain in further detail

9   what seems to be important in terms of consideration for the

10  sale.

11  Q.   Are you denying that Barclays understood at the time that

12  an issue before this Court at the sale hearing was whether

13  there was a reasonable reasonably equivalent value?  Do you

14  deny that, sir?

15  A.   I don't deny it that it was before the Court because it

16  appears in the sale order.

17  Q.   And you understand that an inquiry into reasonably

18  equivalent value involves some disclosure of what is the

19  consideration that Barclays is providing, and what, on the

20  other hand, it is getting, you understand that, do you not?

21  A.   I do.  And I believe that disclosure was made.

22  Q.   Now Barclays was paying 250 million dollars for the

23  business, isn't that right?

24  A.   It paid 250 million dollars, it paid some further amounts

25  for some real estate, and it assumed liabilities.

210

1   Q.   With respect to the business it was paying 250 million

2   dollars for the business, isn't that right, sir?

3   A.   I don't recall a specific language used.  Certainly 250

4   million dollars was paid.

5   Q.   And that was disclosed to the Court, was it not, that

6   Barclays was paying 250 million dollars for the business of

7   Lehman Brothers, Inc.?

8   A.   Again, I don't have in front of them the precise language

9   used.  But the disclosure regarding the 250 million payment was

10  certainly made, yes.

11  Q.   And it's your view that one of those assets of the

12  business, just one, the 15c3-3 asset alone was worth 769

13  million dollars, isn't that right?

14  A.   That is the value of that asset.

15  Q.   And you would agree with me, sir, that the proportion of

16  250 million to 769 million, just on that asset alone, would

17  mean that from that one asset Barclays was getting more than

18  three times what it was paying for the business, isn't that

19  correct, sir?

20  A.   Again, I wouldn't view the transaction that way.  I would

21  view the transaction and the disclosure regarding it as a

22  disclosure around the entirety of the transaction, not just the

23  two specific features that you mentioned.

24  Q.   But if you do look at those two features, if you look at

25  250 million dollars for the business, and you look at just one

211

1    asset from the business; that one 15c3 alone, then you have

2    Barclays getting three times its money -- more than three times

3    its money back on just that one asset alone, isn't that

4    correct?

5    A.    I don't think that -- I think that's a fair way to look at

6    the relative assets and liabilities and the transactions as a

7    whole.  Obviously, there's a significant difference of almost

8    three times between 769 and 250.  But that's not how Barclays

9    viewed the transaction.  I don't believe that's how the

10   transaction was described.  And I do believe the relevant

11   disclosures about the transaction were made to the Court

12   through -- on the night of the 19th.

13   Q.    Let's get back and see where we are.  The board gives a

14   mandate that this must have a mismatch of assets and

15   liabilities or else, and that must be in favor of Barclays and

16   against the estate or else there's no authority to do the deal,

17   right?

18   A.    I don't think that that's, again, how I've characterized

19   it.  Because you've used the phrase against the estate.  I

20   believe that the transaction in question which was before the

21   Court, not just the two facets you've described was, in fact, a

22   transaction that saved the estate probably quite a lot.  And

23   the estate probably wouldn't have had any of those assets on

24   Monday morning if the transaction hadn't happened.

25   Q.    The game, the mismatch, had to be in favor of Barclays,

212

1    not in favor of the estate, right?

2    A.    There was a mismatch as between assets and liabilities

3    conveyed by Lehman Brothers.

4    Q.    If the mismatch went the other way in favor of the estate

5    and against Barclays you didn't have authority to do the deal?

6    A.    I think that's fair.

7    Q.    So Bob Diamond sends his team out to negotiate a deal --

8    A.    Can I just add one point to that?  I don't think it's -- I

9    wouldn't have said that at the time were looking at a mismatch

10   as between Barclays and the estate.  We were negotiating for

11   the purchase of the ongoing operations of Lehman Brothers.  And

12   it was -- I think it was understood among the parties to

13   determine if that transaction didn't happen, and I do believe

14   this was discussed in the court, too, but if the transaction

15   didn't happen, there was likely going to be no value left for

16   the estate.  And I believe that was the subject for quite a lot

17   of discussion.

18   Q.    The mismatch, and the assets and the liabilities had to be

19   in favor of Barclays or there was no deal, right?  You didn't

20   have authority?

21   A.    That's -- I think I've already agreed.

22   Q.    Your negotiators succeed after sending Lehman off on the

23   Friday asset scramble in getting all these assets together so

24   that they have a deal that has the buffer, the mismatch,

25   exactly what the board requires.  And then the parties come to

213

1    this Court with Lehman and Barclays apply to the Court for an

2    order; a judicial finding approving the sale.  That's the

3    chronology, is it not, sir?

4              MR. BOIES:  Objection, Your Honor.

5              THE COURT:  What's the objection?

6              MR. BOIES:  Compound; misstates the record.

7              THE COURT:  Well --

8              MR. BOIES:  Argumentative.

9              THE COURT:  Okay.  Well, I don't think it's any of

10   those things.  It's just saying that's the sequence, that's the

11   chronology.  And since that's the pending question and it seems

12   to me that it is, in fact, a correct statement of the

13   chronology, if the witness has a disagreement with that he can

14   say so.  Is that or is that not the chronology?

15             THE WITNESS:  As a chronology events of the type you

16   described they did happen in that sequence, yes.  But I'm not

17   sure I would describe that chronology in the way that you

18   described it.

19   Q.   Barclays came before this Court looking for an order

20   approving this sale, isn't that right?

21   A.   Yes, together with others.

22   Q.   In fact, it needed -- it, in fact, was not prepared to go

23   forward with the transaction unless there was a judicial sale,

24   unless there was an order approving the sale, isn't that

25   correct?

214

1    A.    I think that's correct.  We were advised that that was the

2    most appropriate thing to do in those circumstances.

3    Q.    And Barclays was well represented in this courtroom, was

4    it not?

5    A.    Yes.

6    Q.    You had five partners from Sullivan & Cromwell, did you

7    not?

8    A.    I don't know the exact number of people from Sullivan &

9    Cromwell that were here.

10    Q.    You had five partners from Cleary Gottlieb, did you not?

11    A.    Again, I don't know if there were five, there were

12    certainly several.  From each firm, I think there were at least

13    two from each firm, probably.

14    Q.    You had your in-house legal staff here?

15    A.    Two people, yes.

16    Q.    You had top negotiators here, did you not?

17    A.    Yes.

18    Q.    You had Michael Klein here?

19    A.    Correct.

20    Q.    You had Archie Cox here?

21    A.    Correct.

22    Q.    You had Gerard LaRocca here, at least at the beginning of

23    the hearing, did you not?

24    A.    Correct.

25    Q.    It's also your position, is it not, that under this

215

1    transaction Barclays was entitled to billions of dollars of

2    Lehman's cash, Lehman's cash margin assets, isn't that correct?

3    A.    Yes.

4    Q.    And you would agree that it would be relevant to any

5    inquiry into whether this sale provides reasonably equivalent

6    value for the parties to disclose to the Court that it includes

7    billions of dollars of Lehman cash and cash equivalents?

8    A.    I didn't think that at the time of the sale either Lehman

9    Brothers or Barclays -- certainly Barclays, knew what the

10   composition of the margin was that you're referring to.  So I

11   didn't think Barclays was in a position to say anything one way

12   or another about the cash elements of that portion of the

13   assets that were in Lehman's business.

14   Q.    Well, what about over the weekend when Barclays obtained

15   information about billions of dollars of Lehman's cash?  Did

16   Barclays consider coming back to the Court and advising the

17   Court that, in fact, Barclays has determined that there is

18   billions of dollars of Lehman's cash that, we, Barclays,

19   believes is part of this sale?  Did you consider doing that,

20   sir?

21   A.    Whether it was specifically over the weekend or not

22   Barclays did consider whether there was a need to go back to

23   the Court.  And I think we were advised that really it was not

24   necessary.  I believe also that the representative of Lehman

25   Brothers considered the same question and came to the same

216

1    conclusion.  I don't know today exactly when it became reliably

2    clear what amount of cash was then held in the business of

3    Lehman Brothers as margin.  Certainly, before the sale hearing

4    I didn't think we had any information on that.  And it took us

5    a very long -- it took us a good amount of time after that

6    Friday to establish I think anything really reliable about the

7    margin, and, indeed, the exchange traded business as a whole.

8    Q.   If you turn in your binder to your deposition transcript.

9    And I'll invite your attention to page 86, starting at line 7:

10   "Q.  Can you tell me in how it was clear to the Court that

11   Barclays would be acquiring margin?

12   "A.   It was clear to the Court because margin is necessarily

13   part of the exchange traded business of Lehman Brothers."

14        You were asked that question and you gave that answer,

15   sir, did you not?

16   A.   I did.

17   Q.   And it was your position was it, sir, that the Court could

18   have deduced from the facts that Barclays was acquiring

19   exchange traded derivatives the fact that there could also

20   be -- or was, also, billions of dollars of Lehman cash being

21   provided to Barclays?

22   A.   I think in the follow-up question I said that I didn't

23   believe there was a figure given with respect to it.  But I did

24   believe then and I believe now that it was clear from the

25   documents that the exchange traded business -- derivatives

217

1    business was being conveyed it was part of the business.  By

2    definition, any of the assets used in connection with that

3    business were part of the sale.  I believed then that the

4    exchange -- it's widely known that the exchanged traded

5    derivatives business requires margin in connection with the

6    conduct of that business.  And I think that's why I gave you

7    the answer that I gave you during the deposition.

8    Q.   In fact, sir, there was absolutely no disclosure to the

9    Court that billions of dollars of Lehman cash was going to

10   Barclays, isn't that right?

11   A.   I think I said that I'm not aware that a figure with

12   respect to margin or any form of margin was either known or

13   given.

14   Q.   It's a little bit more than that, sir, is it not?  If you

15   turn in your binder to tab 2, the asset purchase agreement.

16   A.   Is the binder that you gave to me?

17   Q.   Yes.  And if you turn, sir, to page 11.  You'll see in

18   Section 2.2 we have excluded assets, you see that, sir?

19   A.   Yes.

20   Q.   This was before the Court, was it not?

21   A.   I believe so.

22   Q.   And you know that in this transaction there were assets

23   that were purchased and there assets that were excluded, right?

24   A.   Yes.

25   Q.   And this section provides, "That nothing herein contained

218

1   shall be deemed to sell, transfer, assign or convey the

2   excluded assets to purchaser and seller directly and indirectly

3   shall retain all right, title and interest to, in and under the

4   excluded assets."  You're with me?

5   A.   I am.

6   Q.   Now, sir, please turn to the deposition of excluded assets

7   on page 2 of the document.  That's at the very bottom of the

8   page.  Excluded assets subsection (b).  And that provides that

9   "Excluded from this sale is all cash, cash equivalents, bank

10  deposits, or similar cash items of Lehman and its

11  subsidiaries."  And the only exception is the retained cash,"

12  which is 1.3 billion dollars here.

13  A.   I don't think that's what it says.  I think it says after

14  the word "subsidiaries":  "(the retained cash) other than 1.3

15  billion" and so forth.

16  Q.   Other than quibbling about the words, do we have any

17  difference in substance here?

18          MR. BOIES:  Objection, Your Honor.

19          THE COURT:  Objection to "other about quibbling to the

20  words?"

21          MR. BOIES:  Yes, Your Honor.

22          THE COURT:  Okay.  Why don't we rephrase the question

23  to remove the term quibble which is somewhat pejorative.

24  Q.   Sir, the retained cash, that's 1.3 billion dollars here,

25  that was originally in the asset purchase agreement, that was

1   originally in the sale, wasn't it?

2   A.   1.3 billion dollars of cash was originally in the sale.   I

3   think that there was a confusion in the drafting of this

4   document in the sense -- it was more than one confusion I think

5   in the sense that there is a paragraph of this sort in excluded

6   assets, but also in the purchased assets, I believe.   And that

7   was one of the many reasons why a clarification letter became

8   necessary right from the word go.   There were several aspects

9   of the APA, including some of the definitions that needed to be

10   clarified because they appeared to confuse to everybody

11   involved.

12   Q.   And the retained cash was originally 1.3 billion dollars?

13   A.   I think that it was agreed there was 1.3 billion dollars

14   that would go to Bar -- which would be included and go to

15   Barclays.   That number changed.   As I say there were confusions

16   around the proper definition of retained cash.   But I think the

17   substance of it was that 1.3 billion originally was to go to

18   Barclays as part of the transaction.

19   Q.   And that ultimately became -- that was then changed to 700

20   million dollars?

21   A.   That I believe to be right, yes.   And the balance I think

22   was then expected to remain with Lehman Brothers.

23   Q.   And then that 700 million dollars, which was the amount of

24   the retained cash, was ultimately dropped out of the deal

25   altogether?

220

1    A.    That's correct.

2    Q.    And so what you had left was an exclusion of cash and no

3    exception for the retained cash?

4    A.    I think there was an exclusion of cash as a separate

5    asset.  So cash that wasn't connected with any other activity.

6    Q.    So you would not describe anything that we have read so

7    far as a disclosure to the Court that billions of dollars of

8    Lehman cash, margin, and cash equivalents were being conveyed

9    in this sale from Lehman to Barclays?

10   A.    I don't think it was that disclosure because it relates to

11   free cash that was the subject of specific discussion among the

12   parties.  And separately there was specific discussion.  I

13   don't know the specific discussion about margin, but there was

14   a separate discussion about the exchanged traded derivative

15   business.

16   Q.    Were you here for Harvey Miller's testimony?

17   A.    Yes.

18   Q.    You saw when we put up on the screen the representations

19   that were made to the Court on the subject of cash at the sale

20   hearing?  We can do it again for you if you want.

21   A.    Yes.  I do recall that, yes.

22   Q.    Okay.  And the one representation was that of Lori Fife

23   who told the Court there's no cash that's being transferred to

24   Barclays.  Do you recall that?

25   A.    I recall that being said, yes.

221

1    Q.    And that certainly was not a disclosure to the Court hat

2    billions of dollars of Lehman cash and cash equivalents were

3    being transferred to Barclays.

4    A.    I think at the time and today Barclays believes that that

5    was a reference to the change in retained cash that you've just

6    described.

7    Q.    It certainly was not disclosing that billions of dollars

8    of Lehman cash and cash equivalents were in the sale to

9    Barclays, isn't that correct, sir?

10   A.    That's correct.  It didn't refer to anything other than

11   the retained cash, as far as I was aware.

12   Q.    And, similarly, when the Court was told at page 242 of the

13   sale hearing transcript by Mr. Miller, and this is at line 13

14   to 14:  "Cash, we're not transferring any cash to Barclays;

15   that's out of the agreement."  Again, that was not a disclosure

16   that billions of dollars of Lehman cash and cash equivalents

17   were somehow in the sale to Barclays, was it, sir?

18   A.    It wasn't a disclosure of the type that you've described.

19   My understanding was a disclosure, again, that referred to

20   something else.

21   Q.    So it did not disclose that billions of dollars of Lehman

22   cash and cash equivalents were being transferred to Barclays,

23   did it, sir?

24   A.    It did not make the disclosure you described.  As I say, I

25   think it was a reference to a debate around some specific LBIE

222

1    cash.  And I believe, since you referred to Mr. Miller's

2    testimony that he did say that cash in that sense -- free cash

3    was not conveyed in the deal.  And that's how Barclays

4    interpreted it then and interpreted it now.

5    Q.   Do you know the total amount in dispute between Barclays

6    and the trustee in terms of Lehman's cash and cash equivalents

7    today?

8    A.   I don't know the specific number.  I do believe that in

9    terms of margin there was certainly at one point around about

10   four billion dollars worth of -- as a total amount in dispute,

11   I believe.

12   Q.   That's quite a big number, is it not, sir?

13   A.   Absolutely, yes.

14   Q.   Do you think that four billion dollars would have had any

15   relevance to a judicial inquiry as to whether there was

16   reasonably equivalent value in this sale?

17   A.   It is absolutely possible that that would be a relevant

18   number.  I don't think that -- as I said before, Barclays was

19   not aware of that number at the time.  Nor do I believe that

20   anybody at Lehman Brothers was capable of giving any reliable

21   information about that number at that time.

22   Q.   Well, you keep saying that Barclays wasn't aware at the

23   time.  There's no doubt, is there, sir, that Barclays actually

24   got the statement from the Options Clearing Corporation,

25   itself, over the weekend of the clarification letter, which

223

1    disclosed the margin at the OCC alone?

2    A.   I didn't know exactly when Barclays first received

3    something from the OCC of the type you described.  It's

4    possible that it came over the closing weekend, I just don't

5    know.

6    Q.   At any event, even after receiving whatever information it

7    did over the weekend and learning of the amount of Lehman

8    margin at issue here, Barclays did not come back to this Court?

9    A.   Not only did Barclays not think that that was necessary, I

10   believe since you mentioned the closing weekend that the

11   trustee was also perfectly well aware, was being implored by

12   the SEC to agree to the conveyance of all forms of margins.

13   Because Barclays was taking over all of those relevant

14   accounts.  So I think it was actively discussed.  And at the

15   time I think everybody, at that point, probably first learned

16   that there would have been some cash-in margin.  Whether we

17   knew exactly what the amount was I don't know.  I'm not sure

18   the trustee knew exactly what the amount was.  But certainly it

19   was clear to everybody at the time that margin was coming in

20   whatever form.

21   Q.   Actively discussed?

22   A.   Well, I don't know if it was actively discussed, but there

23   was an active flow of communication.  I certainly recall there

24   were e-mails at the time that were addressed, among others, to

25   either the trustee or representatives of the trustee to

224

1    representatives of Lehman Brothers.  I recall having

2    discussions myself with our own advisors about it over the

3    closing weekend.  The discussion were not focused on cash, they

4    were focused on ensuring that all of the margin associated with

5    the exchanged traded derivatives businesses were properly

6    conveyed.  The OCC was equally concerned to ensure that that

7    happened in the appropriate way.  And so from that perspective

8    we knew about margin and we knew, I think at that point, there

9    was some cash within the margin that the OCC held.  And I think

10   all the parties knew that.

11   Q.   Are you suggesting that there was any active discussion

12   between anyone at Barclays or representing Barclays, and anyone

13   representing the trustee in which Barclays disclosed to the

14   trustee that there was billions of dollars of Lehman

15   proprietary margin, that Barclays wanted in this transaction

16   and was taking in this transaction and disclosed to the trustee

17   that that was cash and cash equivalents of the Lehman estate,

18   that Barclays was taking not for the account of customers, but

19   for Barclays own account?  Was there any such active

20   discussion?

21   A.   I'm not aware of a discussion that has --

22   Q.   Do you withdraw the answer in which you suggest that there

23   was an active discussion?

24        THE COURT:  For a comment, witness should finish his

25   answer before we start the next one.

225

1    A.   I'm not aware of a discussion of the type that you just

2    described.  I did have active discussions with our lawyers

3    about margin.  There was as I said a series of e-mail at a

4    minimum that the trustee represented it saw on the subject of

5    margin.  I believe, but I couldn't be absolutely certain right

6    now, but I believe that within those communications there was

7    not only a discussion and an agreement to convey all of the

8    margin; it was made plain in those communications that some of

9    the margin was in the form of cash.  As I've said I don't think

10   there was ever an opportunity for Barclays at that time to

11   ascertain what amount of cash there was.

12   Q.   At no point?

13   A.   Clearly the trustee in my view the trustee knew there was

14   cash as part of the margin.  I believe that the trustee knew

15   not least because during the course of that period there was a

16   collateral agreement referring to it.  There was a transfer and

17   assumption agreement which referred to it.  And as I've said,

18   several e-mails which made plan that there was cash included in

19   margin.  The amounts, I agree with you I don't think were

20   actively discussed.

21   Q.   In fact, you're not aware of any discussion, are you, sir?

22   A.   Other than the ones that I mentioned, no.

23   Q.   No discussion with anyone from the trustee?

24   A.   Correct.

25   Q.   Now, you've mentioned several times that Barclays was

226

1    uncertain about the amount of margin on Friday.  There was no

2    uncertainty at all on the part of Barclays with respect to the

3    15c3 assets, isn't that right?

4    A.    There was uncertainty in the sense that Lehman and/or Weil

5    were concerned that to deliver the 769 million excess from the

6    15c3 account might need some form of regulatory approval.  So

7    there was that concern.  Barclays I believe dealt with that by

8    agreeing with Weil -- with Lehman Brothers that if it turned

9    out that that regulatory approval was necessary and wasn't

10   forthcoming the 769 million dollars of securities will be

11   delivered in any event, from some other source.

12   Q.    Barclays' position, is, is it not, that it believed from

13   the very beginning it was entitled somehow to these assets,

14   absolutely and unconditionally, irrespective of regulatory

15   approval, isn't that right, sir?

16   A.    I wouldn't use the word unconditionally because there was

17   the possibility that it didn't -- it wouldn't ultimately come

18   from the 15c3 excess, and it would come from somewhere else.

19   If that's what you mean by unconditionally then, yes.  But

20   otherwise -- I wouldn't describe it as unconditionally in that

21   sense.

22   Q.    And the amount of assets that Barclays was claiming, in

23   fact, was not 769 million.  As of Friday Barclays' position was

24   that it was entitled to everything in the customer reserve

25   account, isn't that right, sir?

227

1   A.   I think Barclays was told by Lehman Brothers that there

2   was a much higher number available or a higher value available

3   from the 15c3 reserve.  And that was excess and capable of

4   being delivered.  So there was a point on Friday, the precise

5   time I can't exactly recall, but there was a time on Friday

6   when we thought it was more like 1.7 because that is what

7   representatives of Lehman Brothers said early on Friday

8   morning.

9   Q.   The 769 million dollars was government securities, right?

10  A.   I don't know whether it was all government securities, but

11  there were securities.

12  Q.   And the one billion dollars was cash?

13  A.   As it turned out, I believe that's correct.

14  Q.   And as of Friday Barclays believed it was getting the 1.7

15  billion, according to Barclays, right?

16  A.   Yes.  Whether we knew at that point in time the

17  composition I don't know.  In fact, I believe that when the

18  asset was first raised and the possibility that it could be

19  delivered was first raised early on the Friday morning, just a

20  number was given.  I don't believe that there was any

21  discussion at that point in time what the composition of the

22  15c3 reserve account was.  There was just somebody from Lehman,

23  I believe either Paolo Tonucci or Ian Lowitt, saying we can

24  deliver this asset to -- this is something that we hold in our

25  business, it's available, its value for you.

228

Q.   And that 1.7 billion dollars?

A.   Yeah, I think so, roughly, yeah.

Q.   And Barclays learned that before the sale hearing?

A.   We were told that was available.  There were then
discussions which followed, both with respect to the 15c3 asset
and the clearance boxes to try to ascertain what, in fact, was
meant by those assets, and what, in fact, the composition was.

Q.   And would you agree, sir, that it would be relevant to an
inquiry whether there's reasonably equivalent value in this
sale for the people to disclose if, indeed, Barclays was
claiming that this was part of the sale, that there was 1.7
billion dollars, whether it was cash or government securities,
that was part of the sale going to Barclays?

Q.   Again, as I tried to indicate in one or more of the
earlier questions, what Barclays thought was important was that
there was the appropriate disclosure.  As we've said Barclays
certainly had an obligation to say something if it felt that
the Court was not getting the information that it needed with
respect to the transaction.  But Barclays believed that the
Court was getting the necessary information.  Because these
were assets that were already part of the business, which was
the transa -- the essence of the transaction, I don't think
Barclays felt at the time that it was necessary to raise those
matters specifically.  And certainly by the time of the sale
hearing there was still sufficient uncertainty around the

229

1   values that we couldn't have put a number on it reliably in any

2   event.

3   Q.   Barclays knew that the Court was not provided with the

4   total amount of assets that were being conveyed to Barclays,

5   isn't that right, sir?

6   A.   I think in what -- I think that the Court was told the

7   total amount.  The Court just wasn't given a precise value as

8   to all of that.  Because the total amount was all of the assets

9   in the business, less what was excluded.

10      I should just note that there were several other assets

11  that were part of the discussions still at that point in time.

12  Several other assets referred to in the clarification letter

13  which also weren't raised specifically as I understand it.  So

14  there were other assets which were left out of the disclosure

15  as you call it.  And I believe for the same reason that neither

16  Weil nor anybody else thought that was the necessary

17  disclosure.

18  Q.   Have you concluded your answer?

19  A.   Yes.

20  Q.   If you turn, sir, to page 96 of your deposition transcript

21  and read from line 21.  You were asked the following questions

22  and you gave the following answers:

23  "Q.  So I am still waiting for you to explain to me whether

24  Barclays believed the Court was told what the total value was

25  of the assets that Barclays was acquiring?

230

1    "A.   I believe the Court was given an estimation of that total

2    value.

3    "Q.   And what was that estimation?

4    "A.   I don't know what the total number was.  I don't think a

5    total number was actually given."

6         So which is it, sir?  Was the Court given or was the Court

7    not given the total value of the assets that were being

8    conveyed to Barclays?

9    A.   I don't think a total number was given for all of the

10   assets in the business that were conveyed.

11   Q.   In one respect, sir, there was full disclosure at the sale

12   hearing.  And that's with respect to the liabilities that

13   Barclays was assuming, isn't that correct?

14   A.   Again, I don't know whether the full number -- total

15   number was given.  Or if, indeed, that number an accurate

16   number.  I couldn't say.

17   Q.   Isn't it a fact, sir, that you cannot think of any

18   meaningful liability that was not disclosed to this Court?

19   A.   I think the liability in the repo transaction, for

20   example, were not necessarily disclosed in full.  Because,

21   again, the actual liabilities weren't known.  I'd have to think

22   longer to be able to determined exactly which liabilities were

23   accorded values.  I think, as I've said before all of the

24   estimations of value were precisely that.  I think that it was

25   understood, or at least as I reviewed the sale hearing

231

 1   transcript and as I reviewed the recollections of others, it

 2   seemed that everybody understood that the estimations were

 3   that, and it was also impossible to come to actual total

 4   numbers.

 5   Q.   If you turn, sir, to page 104 of your deposition

 6   transcript.  Starting at line 3, you were asked the following

 7   question and you gave the following answer:

 8   "Q.  Can you tell me what were the most significant liabilities

 9   that were not disclosed to the Court?"

10       Over Mr. Stern's objection to the form.

11   "A.  I don't think any meaningful liability was not disclosed

12   to the Court."

13       You were asked that question and you gave that answer,

14   sir?

15       (Pause)

16   Q.   You do not deny that testimony, sir, do you?

17   A.   I don't deny the testimony.

18       MR. MAGUIRE:  In that case, Your Honor, I have no

19   further questions.

20       THE COURT:  Well, this means we're at interesting

21   moment in the trial.  It's Friday afternoon, almost 5:30.  A

22   long week with very few breaks.  And we have the witness on the

23   stand.  We have two choices.  One choice is to push on assuming

24   Mr. Boise's examination may be concise, another is to adjourn

25   until Monday morning.  Call the witness back at a time to be

232

1   determined during the chambers conference to take place in a

2   few moments, and proceed with him as our first witness on

3   Monday on cross-examination.  I rather think that may be the

4   better course, but I will leave it to the counsel to tell me if

5   I'm wrong in that.

6        MR. BOIES:  I don't think you're wrong, Your Honor,

7   particularly in light of what I think is the importance of the

8   chambers conference that we have scheduled.

9        THE COURT:  So my suggestion is if it's not a major

10  inconvenience to the witness, he can enjoy New York this

11  weekend; he's probably going to do that anyway.  And he'll be

12  our first witness.  And Mr. Boise will tell him what time that

13  will be.

14       And then anyone else who doesn't need to stay for the

15  chambers conference is excused.  And I'll be out in another,

16  say, five or ten minutes, without my robe and we'll visit

17  together and talk about scheduling and the timing of deliver of

18  the letter briefs.  It doesn't have to be a weekend exercise,

19  if you want to defer that question to another time.  These are

20  things that we can talk about profitably I think, including the

21  schedule for the week ahead.

22       We're adjourned until Monday morning at a time to be

23  determined.  And I'll see you in ten minutes for the chambers

24  conference.  We're otherwise adjourned.

25       (Whereupon these proceedings were concluded at 5:25 p.m.)

233

I N D E X

T E S T I M O N Y

| WITNESS | EXAM BY | PAGE | LINE |
|---------|---------|------|------|
| Patrick Clackson | Mr. Tambe | 10 | 7 |
| Patrick Clackson | Mr. Maguire | 56 | 7 |
| Patrick Clackson | Mr. Schiller | 67 | 10 |
| Patrick Clackson | Mr. Tambe | 98 | 2 |
| Jonathan Hughes | Mr. Gaffey | 114 | 16 |
| Jonathan Hughes | Mr. Maguire | 203 | 1 |

E X H I B I T S

| NO. | DESCRIPTION | ID. | EVID. |
|-----|-------------|-----|-------|
| M-45N | Native version of Excel Spreadsheet | 19 | |
| M-701 | E-mail chain between Mr. King and Mr. Clackson and others admitted for a limited purpose only | | 43 |

VERITEXT REPORTING COMPANY

212-267-6868                                                          516-608-2400

234

1

2                          C E R T I F I C A T I O N

3

4       I, Lisa Bar-Leib, certify that the foregoing transcript is a

5       true and accurate record of the proceedings.

6

7       _____

8       LISA BAR-LEIB

9       AAERT Certified Electronic Transcriber (CET**D-486)

10

11      Veritext

12      200 Old Country Road

13      Suite 580

14      Mineola, NY 11501

15

16      Date:  May 5, 2010

17

18

19

20

21

22

23

24

25