1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS HOLDINGS INC., et al.

             Debtors.

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS INC.

             Debtor.

- - - - - - - - - - - - - - - - - - - -x

             United States Bankruptcy Court

             One Bowling Green

             New York, New York


             May 3, 2010

             9:04 AM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

2

1    EVIDENTIARY HEARING re 60(b) Motions

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Lisa Bar-Leib

3

1    A P P E A R A N C E S :

2    JONES DAY

3         Special Counsel for the Debtors

4         222 East 41st Street

5         New York, NY 10017

6

7    BY:   ROBERT W. GAFFEY, ESQ.

8

9    QUINN EMMANUEL URQUHART OLIVER & HEDGES, LLP

10        Special Counsel to the Official Committee of Unsecured

11         Creditors

12        51 Madison Avenue

13        22nd Floor

14        New York, NY 10010

15

16   BY:   RICHARD I. WERDER, JR., ESQ.

17

18   HUGHES HUBBARD & REED LLP

19        Attorneys for the James W. Giddens, SIPA Trustee

20        One Battery Park Plaza

21        New York, NY 10004

22

23   BY:   WILLIAM R. MAGUIRE, ESQ.

24

25

4

1    BOIES, SCHILLER & FLEXNER LLP

2         Attorneys for Barclays Capital, Inc.

3         333 Main Street

4         Armonk, NY 10504

5

6    BY:   DAVID BOIES, ESQ.

7

8    KING STREET CAPITAL MANAGEMENT, LLC

9         for King Street Capital Management, LLC

10

11   BY:   MITCHELL SOCKETT

12         (TELEPHONICALLY)

13

14   FARALLON CAPITAL MANAGEMENT

15         for Farallon Capital Management

16         One Maritime Plaza, Ste. 2100

17         San Francisco, CA  94111

18

19   BY:   ANATOLY BUSHLER

20         (TELEPHONICALLY)

21

22

23

24

25

5

1    STUTMAN TREISTER & GLATT

2         Attorneys for Interested Party, Elliott Company

3         1901 Avenue of the Stars, 12th Floor

4         Los Angeles, CA 90067

5

6    BY:   WHITMAN L. HOLT, ESQ.

7         REBECCA S. REVICH, ESQ.

8         MARINA FINEMAN, ESQ.

9         (TELEPHONICALLY)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

P R O C E E D I N G S

1

THE COURT:  Good morning.  Be seated, please.  I'm

2   informed that the live note court reporter is going to be late

3   this morning, and as a result, we're going to start without

4   her.  And I've indicated that she can simply walk right in

5   whenever she arrives.

6

MR. UNIDENTIFIED:  Thank you, Your Honor.

7

MR. GAFFEY:  Your Honor, I don't mean to interrupt,

8   but we have a revised calendar that'll give Your Honor an idea

9   of where we're going to go this week.

10

THE COURT:  Okay.  I'd appreciate that.

11

MR. GAFFEY:  We sent this off to Barclays' counsel

12   yesterday.  Again, it's an estimate, but may I approach?

13

THE COURT:  Yes.  Thank you.  Okay.

14

MR. BOIES:  Thank you, Your Honor.  We were examining

15   Mr. Hughes.

16

THE WITNESS:  Good morning, Your Honor.

17

THE COURT:  Good morning.

18

JOHNATHAN HUGHES, WITNESS, PREV. SWORN

19

CROSS-EXAMINATION

20   BY MR. BOIES:

21

Q.  Good morning, Mr. Hughes.

22

A.  Good morning, Mr. Boies.

23

Q.  During your examination by Movant's Counsel, you were

24

asked some questions about the additional assets that Lehman

25

7

1    was looking for late in the week, and you said that you didn't

2    consider those additional assets to be added to the deal, you

3    considered those additional assets identified for the deal.

4    Can you explain what that distinction was?

5    A.   Yes.   In my view, by definition, the assets they refer to

6    were already being used in the business of Lehman Brothers.   I

7    think as I mentioned on Friday, the deal at its heart was an

8    attempt to maintain as much of the Lehman business as possible.

9    And the deal that was constructed was to deliver to Barclays as

10   much of that business as Barclays felt was appropriate to take

11   on.

12        That led to certain assets being excluded, but otherwise,

13   to the extent there were assets used in the business, they were

14   due to be delivered to Barclays, so that was the purchase.   The

15   clearance bulked assets and the 15(c)(3) assets were, I think

16   by definition, used in the business of Lehman Brothers.

17        So from that perspective, they certainly were at no point

18   added to the deal.   They were, in my view, already within it.

19   My point about identification was that it was clearly

20   important, particularly on that Friday morning for Barclays to

21   be able to see what the value of the purchased assets was going

22   to be.   Albeit, bearing in mind there was huge uncertainty with

23   respect to those values, it was clearly important to Barclays

24   to do its best to identify what that value might look like.

25        So there was clearly an attempt to identify those assets,

8

1     and for better or worse, Barclays made a judgment about the

2     value of those assets at the time.  So in my view, they were

3     always within the business, and therefore, were coming as part

4     of the deal.  In any event, whether they had been identified or

5     not, it was nevertheless important to identify them on that

6     Friday morning.

7     Q.    You were also asked some questions about comparing the 250

8     million dollar cash consideration with the 769 million dollars

9     that you were getting in connection with the 15(c)(3) provision

10    of the clarification agreement.  Do you recall that?

11    A.    I do.

12    Q.    And Movant's Counsel suggested that there was a disparity

13    between those two numbers.  Do you recall that?

14    A.    I do and I think I agree with him.

15    Q.    Do you agree that that's a relevant disparity?

16    A.    Not at all.

17    Q.    Why?

18    A.    Again, the amount 250 was one portion of the

19    consideration.  The 15(c)(3) assets, as I think I've just

20    described, were clearly part of the business and so they were

21    coming in any event.

22          Furthermore, I think that there was relatively few of the

23    purchased assets that were described in valuation terms, either

24    in the APA or I believe before the Court at the sale hearing,

25    and the same is true of liabilities.  Clearly, as I think has

9

1   been said now many times, not just by me, it was extremely

2   difficult to tag any particular category of assets with a

3   particular certain value.

4       That 769 was a representation of value by Lehman Brothers,

5   but again in common with other assets, Barclays had a

6   relatively limited opportunity to figure out, in fact, whether

7   that was a good estimate.  There were other aspects of the

8   purchase that were not identified in the clarification letter.

9   There were other aspects of the purchase that were not

10  identified with particular valuations.

11      So for example, the res's, which is the abbreviated term

12  for the residential mortgages that were once part of the

13  discussion, that had a value, I believe, of roughly 2.7 billion

14  dollars, an amount I think appreciably more than 769.  Equally,

15  the 45 billion dollars' worth of cash that Barclays extended to

16  Lehman Brothers on the Thursday was also an amount that didn't

17  receive a lot of attention in the clarification letter.

18  Q.   Let me see if I can break that down a little bit.  First,

19  are you saying that your understanding of the deal was that

20  Barclays was buying Lehman's broker dealer business, and all of

21  the assets used in that business, except to the extent that

22  they were specifically excluded?

23  A.   Absolutely.  I think that's very clear from the APA.

24  Q.   And are you saying that the entire package of the assets

25  and -- that you received and the cash you paid, the employees

10

1    that you took on, the business you took on, the liabilities you

2    assumed, was all together the deal and that you can't break out

3    any specific piece of consideration, and match it with another

4    piece of consideration from the other side?

5    A.    Correct.

6    Q.    Now, you said that there was a list of specifically

7    identified purchased assets in the APA and in the clarification

8    letter.  Do you recall that?

9    A.    Yes.

10   Q.    Now, was that an exclusive list or a non-exclusive list?

11   A.    I think again it was plain in the APA that it was a --

12   that the purchased assets included a list of, I think, nineteen

13   specific assets.  But it's very plain in the APA, to my mind,

14   and it was to Barclays at the time, that that was an included

15   list, but without limitation.  And again, it would've been

16   impossible at that point, I think, to -- in the time available,

17   to identify each and every asset that was to come with that

18   broker dealer business that you described.

19   Q.    Now, of the nineteen assets that you indicate, you recall

20   being identified in the APA, were valuations associated with

21   all those?

22   A.    No, as I recall, there were valuation estimates given with

23   respect to I think just two of the assets, I could be wrong --

24   two or three, but not with respect to the others.

25   Q.    In the APA, is there any stated value for all of the

11

1   assets that Barclays is assuming or receiving?

2   A.   No.  Again, I don't think it would've been feasible to

3   arrive at such a number in the time available.

4   Q.   At any place in the APA or the clarification letter, is

5   there any total valuation as to the liabilities and obligations

6   that Barclays is assuming?

7   A.   Again, the answer to that is no, and I think for the same

8   reason.

9   Q.   And my first question asked about the APA, but I want to

10   broaden it now to both the APA and the clarification letter.

11   Is there anywhere in the APA or the clarification letter that a

12   total amount or value for the assets that Barclays was

13   receiving is stated?

14   A.   No.

15   Q.   Is there anywhere in the APA including the clarification

16   letter, where there is any agreement that the assets that

17   Barclays is acquiring will be roughly equivalent to the value

18   of the liabilities it is assuming and consideration that it's

19   paying?

20   A.   No, there is no such provision, and there was no such

21   agreement, nor were there any such discussion, as far as I know

22   of.

23   Q.   Was there any representation or warranty or condition or

24   covenant by either Barclays or Lehman, as to the value of

25   assumed liabilities or the value of assets that Barclays was

12

1   acquiring?

2   A.    No.  Once again, there were estimations given with respect

3   to one or two of the assets and liabilities, but that was the

4   extent of it.

5   Q.    Now, during the examination, Counsel for the Movants

6   showed you a document that has been marked as Movant's Exhibit

7   441, which is the order approving the sale order, and they

8   directed your attention to a paragraph there, that I want to

9   take you to as well.  And that was paragraph M, relating to

10  consideration.

11       And you were directed to your attention to the words where

12  it says, "The consideration constitutes reasonably equivalent

13  value."  Do you see that?

14  A.    I do.

15  Q.    Now, as I think you pointed out, the next three words, "or

16  fair consideration."  Do you see that?

17  A.    Yes.

18  Q.    And how did you interpret that, if at all?

19  A.    I don't think I interpreted it before Friday afternoon,

20  but I interpret it as being an expression of a requirement that

21  there be fair consideration delivered in the purchase and sale.

22  Q.    Now, it then goes on to say that "These terms are defined

23  under certain statutes, the Uniform Frauds and Transfer Act,

24  the Uniform Fraudulent Conveyance Act, and Section 548 of the

25  Bankruptcy Code."  Do you see that?

13

1   A.   I do.

2   Q.   Are you an expert in any of those provisions?

3   A.   Unfortunately not.

4   Q.   Do you know what the technical definition of those terms

5   would be under any of those provisions?

6   A.   No.

7   Q.   You're aware that there was originally a true-up provision

8   in the APA; is that correct?

9   A.   That is correct, and it was removed.

10  Q.   I'm sorry, what did you say?

11  A.   I said it was also removed.

12  Q.   It was removed.  That was going to be my next question.

13       I'd like to direct your attention next to Movant's Trial

14  Exhibit 100, and particularly to page 95 that Movant's Counsel

15  asked you about.  And the next to last paragraph on that page,

16  where it says, "The excess of the fair value of net assets

17  acquired over consideration paid resulted in 2.262 billion

18  pounds of gains on acquisition."  Do you see that?

19  A.   I do.

20  Q.   Now, you were asked a number of questions about a day one

21  gain.  Do you recall that?

22  A.   I do.

23  Q.   And as you interpreted the term "day one gain", is that

24  equivalent to a gain on acquisition, as indicated here?

25  A.   I don't think it's -- the indication here is necessarily a

14

1   day one gain.  I think this gain on acquisition includes a

2   number of factors that from an accounting standpoint are

3   required to be reflected on the acquisition balance sheet.

4   Q.   Let me break that up.  And I want to distinguish between

5   two concepts.  One concept is when the gain is figured as of,

6   and the other is when the gain is calculated.  Okay?  Do you

7   understand that distinction?

8   A.   I do.

9   Q.   Now, first, am I correct that if you are thinking about

10  when the gain is calculated as of, that is, if you're

11  calculating whether or not Barclays had a gain when it closed

12  the transaction, the terms on acquisition or perhaps the more

13  colloquial term, a day one gain, would be equivalent, correct?

14  A.   Yes.

15  Q.   But either of those two formulations would relate to a

16  calculation that could not be performed the day of the closing,

17  correct?

18  A.   Also correct, yes.

19  Q.   Okay.  Now, what are some of the reasons why the question

20  of whether or not you could have or did have a gain on

21  acquisition, what was sometimes referred to during your

22  examination as the day one gain, could not be calculated on day

23  one or the day of the closing?

24  A.   There may be more than two reasons, but there are two

25  important reasons, at least to my mind.  First of all, that the

15

1   calculations with respect to the valuations of a significant

2   proportion of the assets and liabilities that were the subject

3   of the transaction, were not capable of being calculated on

4   September 22nd.

5       Secondly, I believe that some of the numbers that go into

6   establishing what the overall acquisition gain might be are

7   dependent on a number of other factors.  Again, I'm not an

8   accountant, but one example that I have become aware of before

9   and after this acquisition is intangible assets, for example.

10  So that the value that Barclays derives through the -- through

11  various intangible assets also needs to be calculated after the

12  closing time, and after the closing date.  And I believe it's

13  right to say that all of those factors go into what ultimately

14  the acquisition gain might prove to be.

15  Q.   And realizing that you're not an accountant, were you

16  generally aware that Barclays' view and its outside auditors'

17  view, as to what, if anything, would be the gain on

18  acquisition, was something that changed significantly over the

19  period of time immediately following closing?

20      MR. GAFFEY:  Objection to the outside auditors' view,

21  Your Honor, hearsay.

22      THE COURT:  Sustained as to the outside auditors.

23  Q.   Let me break it down and ask you first whether you are

24  aware that Barclays' view, as to what gain, if anything, would

25  be achieved on acquisition from the Lehman transaction changed

16

1   significantly in the days immediately preceding the closing and

2   the days and weeks following the closing?

3   A.   Yes.  Again, at least for the two reasons that I just

4   tried to describe, there was enormous uncertainty around the

5   valuations that were necessary to arrive at those figures.  And

6   that uncertainty, with respect to a number of categories of

7   assets continued for quite some period of time.

8   Q.   And wait a moment before answering this question, because

9   there may be an objection.  Was Barclays' understanding that it

10  was difficult to determine what the day one acquisition gain,

11  if any was, informed in part by the views, whatever they were,

12  of the outside auditors that Barclay had retained?

13        MR. GAFFEY:  No objection if the answer's yes or no,

14  Your Honor.

15        THE COURT:  Apparently there's no objection, but

16  there's also a qualification.  Can you answer that yes or no?

17        THE WITNESS:  If Mr. Boies could restate the question,

18  certainly.

19  BY MR. BOIES:

20  Q.   Certainly.  You testified that Barclays' view was that in

21  the days immediately preceding and the days and weeks following

22  the closing, it was uncertain what, if anything, the gain on

23  acquisition would ultimately be, and the estimates of that

24  changed significantly over that period of time, correct?

25  A.   Yes.

17

1    Q.   Was -- and this is a yes or no question.  Was Barclays'

2    view in that respect informed, in significant part, by the

3    views, whatever they were, of Barclays' outside auditors?

4    A.   Yes.

5    Q.   Now, you have said two things, and Counsel for the Movant

6    suggested that they were or might be somehow inconsistent.  You

7    have said that the deal was one that was irrespective of the

8    value of the assets and liabilities, correct?

9    A.   I think I did use that phrase once upon a time.

10   Q.   And you've also said that as of September 19th, if

11   Barclays did not believe that there was enough value in the

12   deal to justify going forward, Barclays was not prepared to go

13   forward.  Do you recall that?

14   A.   Yes.

15   Q.   Now, do you see any inconsistency at all between those two

16   beliefs?

17   A.   No, I don't.  I -- by using the phrase irrespective of

18   values with respect to the deal, my point simply was to perhaps

19   inartfully make plain that the transaction, as I've described

20   it on a number of occasions now, was not -- was one that was

21   necessarily to occur without a definition around values.  And

22   therefore, to that extent, it was irrespective of what the

23   actual values proved it to be; and I think as I've also

24   mentioned, Barclays ultimately was taking a substantial amount

25   of risk in pursuing a transaction without that level of

18

1    certainty.

2         When it comes to identifying values, be it on September

3    the 19th or at any other point in time, clearly Barclays was

4    doing its best to minimize the risks that were present in the

5    transaction.  And while it was not in that period of time

6    feasible to identify with precision what the valuations were,

7    the reality was that the better the identification in value

8    around assets, the more likely it was that Barclays could reach

9    a judgment about relative values.

10        And so to that extent, I don't view the phrases as

11   inconsistent at all.  On the one hand, the transaction was

12   going to happen without certainty with respect to values, if

13   the parties reached agreement.  But during the process, it

14   clearly was important to Barclays to do as much as it could in

15   the time available to limit what the risks might prove to be.

16   Q.   Now, in connection with that last answer, you referred to

17   the risks that Barclays was taking on.  Now, do you recall that

18   they, the Movant's Counsel, showed you some testimony by Mr.

19   Robert Diamond, about an asset liability mismatch --

20   A.   Yes.

21   Q.   -- and about the Barclays' intention and commitment that

22   there be what Mr. Diamond referred to as an asset liabilities

23   mismatch?

24   A.   I do remember that, yes.

25   Q.   Now, you were present at Mr. Diamond's deposition, were

19

1    you not?

2    A.   I was.

3    Q.   And did Mr. Diamond, in that deposition, make clear that

4    the commitment to attempt to have an asset liability mismatch,

5    was something that could not be guaranteed?

6         MR. GAFFEY:  Objection, Your Honor.  Calls for the

7    witness to characterize the absent Mr. Diamond's testimony.

8    Mr. Diamond will be here Friday.

9         THE COURT:  I sustain the objection, although would

10   permit questioning to the extent there's a page and line

11   reference that the witness actually remembers that deals with

12   the subject, but I also note, although we're not dealing with

13   the best evidence rule here, that if Mr. Diamond is going to be

14   here, we don't need this witness's characterization of his best

15   recollection of what he said one day in the past.  I'll hear it

16   myself from him, presumably.

17        MR. BOIES:  Your Honor, in that case, I will save the

18   time and pass that.

19        THE COURT:  Fine.

20   BY MR. BOIES:

21   Q.   Going back to the question of the relationship, if any,

22   between assets and liabilities, one of the questions Movant's

23   Counsel asked you was whether or not there were any meaningful

24   liabilities that were not disclosed to the court.  Do you

25   recall that generally?

20

1    A.    I do.

2    Q.    And one of the things that you said in one of your

3    answers, was that there were liabilities, for example, in the

4    REPO transaction, that were not necessarily disclosed in full

5    because the actual liabilities were not known.  Do you recall

6    that?

7    A.    I don't recall that specific language, but I recall the

8    topic, yes.

9    Q.    Okay.  Now, were there other liabilities that were not

10   fully disclosed, that is, it might have been disclosed that the

11   liabilities exist, but the valuation of those liabilities was

12   not disclosed?

13   A.    I believe so, yes.

14   Q.    All right.  For example, with respect to -- take exchange

15   traded derivatives, you are aware that Barclays was assuming

16   certain obligations with respect to Lehman's exchange traded

17   derivatives, correct?

18   A.    Yes, I believe the agreement was that we would take on the

19   whole of the exchange traded derivatives business, which

20   included all of the liabilities associated with that business.

21   It was notable on a number of levels, but particularly in that

22   sense, that all of those liabilities associated with that part

23   of the business, Barclays agreed to acquire.

24   Q.    And was there ever any estimate that the parties discussed

25   and agreed to prior to closing, as to what the magnitude of

21

1   those exchange traded derivative liabilities were?

2   A.   No, there was no such disclosure.  My recollection is that

3   there were discussions among representatives of Barclays and

4   Lehman Brothers on the subject of exchange traded derivatives,

5   but that prior to the sale hearing, Barclays had no reliable

6   information of any sort with respect to the amounts of those

7   liabilities.

8   Q.   Now, with respect to exchange traded derivatives, was it

9   your understanding that Barclays was acquiring not only the

10   derivative positions themselves, but included there, any margin

11   or collateral associated with those positions?

12   A.   Absolutely, yes.

13   Q.   Was that important to Barclays?

14   A.   It was certainly important.  I would say that it's

15   feasible to consider taking on business in exchange traded

16   derivatives without some margin, but only if it's being very

17   specifically and very deliberately constructed.  Otherwise, I

18   would think it an utterly irrational thing for somebody to take

19   on an exchange traded derivatives business without taking all

20   of the margins associated with it.

21   Q.   And I forget exactly the words you used, and we don't have

22   Live Notes this morning, but you said that it might be

23   conceivable under certain circumstances.  What were those

24   circumstances again?

25   A.   Well, I think I could conceive of a situation in which a

22

1    specific exchange traded derivatives contracts would be

2    executed, and there would be a deliberate attempt to

3    specifically hedge one contract, for example, with another.  I

4    don't think there was any such aspect to the business that

5    Barclays acquired from Lehman Brothers, but with the exception

6    of a very deliberate attempt to hedge and to match a particular

7    set of exchange traded derivatives, I don't -- it would be

8    inconceivable to me that one would take on a business without

9    the margin.  The two are inextricably linked.

10   Q.   In the context of the transaction that Barclays was doing

11   with Lehman's where you were taking all of the exchange traded

12   derivative positions, is it conceivable to you that someone

13   would have acquired those positions without acquiring the

14   associated collateral and margin?

15   A.   Certainly not.

16   Q.   Now, with respect to the issue of margin, you were asked

17   what the amount of the margin in dispute between Barclays and

18   the trustee was in terms of cash and cash equivalents.  Do you

19   recall that?

20        MR. BOIES:  And this is at page 1915 for Counsel's

21   reference.

22   A.   I recall being asked about the total amount in dispute, or

23   at least I thought that was the question.  I do recall also

24   questions about cash and cash equivalents.

25   Q.   And you said that you didn't know what the specific number

23

1    was, but you thought at some point there was some discussion

2    around four billion dollars as a total amount in dispute.  Do

3    you recall that?

4    A.   I recall that answer.  In giving it, I was not referring

5    specifically to cash and cash equivalents.  It was my perhaps

6    loose recollection of what the total amount in dispute between

7    the parties may be, with respect to exchange traded derivatives

8    as a whole.

9    Q.   And that would include both cash and securities; is that

10   correct?

11   A.   Correct.  And it would include assets already delivered by

12   the trustee and assets yet to be delivered.

13   Q.   Let me ask you to turn, and I think -- do you still have

14   the book that Movant's Counsel gave you up there?

15   A.   I have two books.

16   Q.   Two books.  Would you turn to Barclays Exhibit 110.  This

17   is the analyst's report that Movant's Counsel asked you about.

18        If you don't have it handy, let me give you --

19   A.   I can see it on the screen.

20   Q.   What?  You can see it on the screen, okay.

21   A.   On the screen, yeah.

22   Q.   Now, you recall that this was an analyst's report, or I'm

23   sorry, an analyst call that occurred on Wednesday, September

24   17th, 2008; is that correct?

25   A.   That's correct.

24

1    Q.   And Movant's Counsel directed your attention, I think to

2    page seven.  And a portion in the middle of the page where

3    there is a statement that "What we have taken is a portfolio of

4    trading assets and liabilities that are first of all derisked."

5    Do you see that?

6    A.   I do.

7    Q.   And he asked you whether the assets that you had taken in

8    this transaction had been derisked.  Do you recall that?

9    A.   I do.

10    Q.   And you said you thought that this related to a comparison

11    of this transaction with another transaction.  Do you recall

12    that?

13    A.   I do.

14    Q.   Now, let me show you a portion of this exhibit that

15    Movant's Counsel did not direct your attention to, and that is,

16    on page two, and it's the fourth paragraph from the bottom.

17    And would you read that paragraph into the record, please.

18    A.   Yes.  It says, "The acquisition of these businesses and

19    assets significantly enhances BarCap's position in the United

20    States, by a transaction that is derisked by excluding the

21    overwhelming majority of Lehman risk assets."

22    Q.   And does that help put in context the portion of the

23    exhibit that Movant's Counsel showed you?

24    A.   In part, yes.  I was trying not to speak for Mr. Barley on

25    Friday afternoon.  I think it does in part explain the

25

1    difference between the earlier transaction that had been the

2    subject of discussion among Barclays and Lehman Brothers, and

3    there were also other aspects of that transaction that I think

4    involved greater risk than the transaction that it was actually

5    consummated.

6    Q.    And you're comparing there what has sometimes been

7    referred to as Lehman 1 with Lehman 2; is that correct?

8    A.    Yes.

9    Q.    And this analyst call is about Lehman 2, correct?

10   A.    Yes.

11   Q.    And --

12   A.    But it does refer to Lehman 1.

13   Q.    But it does refer to Lehman 1.  And in what sense was

14   Lehman 2 derisked, compared to Lehman 1?

15   A.    Well, I think in addition to the point that we've just

16   referred to and you've highlighted, Lehman 1 was a transaction

17   which involved the vast proportion, if not the whole of the

18   Lehman business.  And therefore, a size of balance sheet which

19   was substantially greater than one that we were looking at,

20   that involved substantially greater numbers of assets and

21   liabilities.  So it was necessarily I think a much more risky

22   transaction in that environment at the time.

23   Q.    Now, whatever derisk means in this context, is it the case

24   that anyone who saw this on or about September 17th, knew that

25   it was Lehman's -- it was Barclays' view that the Lehman

1    transaction had been derisked in some way?

2    A.    I'm sorry, would you repeat that?

3    Q.    Sure.  I messed up the question by confusing Lehman and

4    Barclays.  I apologize.

5          Is it the case that whatever derisk means, anyone who read

6    this on or about September 17th, 2008 would've known that it

7    was Barclays' view that the transaction had been quote

8    derisked, close quote in some way?

9          MR. GAFFEY:  Objection, Your Honor.

10         THE COURT:  Sustained, particularly as it relates to

11   anyone who reads this.

12   Q.    Barclays was not keeping its view concerning the extent to

13   which the Lehman transaction had been derisked secret, was it,

14   sir?

15   A.    Certainly not.

16   Q.    And Barclays' view as to the extent to which, if any, the

17   transaction had been derisked was there for anybody to see,

18   correct, sir?

19         MR. GAFFEY:  Objection, Your Honor.

20         THE COURT:  The same issue as for anyone to see which

21   ties into anyone who reads this, although the difference

22   between anyone can see and anyone who reads this, is that it is

23   a reference to there being disclosure that was not hidden.

24         MR. BOIES:  Yes, Your Honor.

25         THE COURT:  I accept that, although suggest that the

27

1    anyone can see reference be deleted, and that you simply make

2    reference to the fact that there was no effort to conceal or

3    hide, and that there was conspicuous disclosure, which I can

4    see myself.

5           MR. BOIES:  Okay.

6           THE COURT:  The question is to whom, which of course,

7    is not covered by any of the questions.

8           MR. BOIES:  Your Honor, I will adopt that.

9    BY MR. BOIES:

10   Q.    There was no effort to conceal Barclays' view in this

11   respect, correct, sir?

12   A.    That's correct.

13   Q.    And indeed this was posted on Barclays' website after it

14   occurred, correct, sir?

15   A.    That's correct.

16   Q.    Let me ask you to look at some other portions of this, and

17   in particular, staying on page two, I want to go to the third

18   paragraph from the top, the last sentence.  It says, "We are

19   acquiring trading assets with a current estimated value of 72

20   billion dollars and trading liabilities with a current

21   estimated value of 68 billion dollars for a cash consideration

22   of 250 million dollars."  Do you see that, sir?

23   A.    I do.

24   Q.    And there was never any attempt by Barclays to conceal or

25   restrict access to Barclays' view in this respect, correct,

28

1    sir?

2    A.    That's also correct.

3    Q.    If you'd go down two paragraphs where it says, "In fact,

4    the transaction is capital ratio accretive without additional

5    equity issuance."  Do you see that?

6    A.    I do.

7    Q.    And does that mean that there's going to be a gain on

8    acquisition?

9    A.    Essentially, yes.

10   Q.    And it then goes on to say, "The source of the accretion

11   is the negative goodwill from the transaction which amounts to

12   about two billion U.S. dollars post-tax."  Do you see that?

13   A.    I do, yes.

14   Q.    And was there any effort by Barclays at any time to

15   conceal its view that this was going to result in a two billion

16   dollar U.S. dollar post-tax gain on acquisition from anyone?

17   A.    There was no such effort.

18   Q.    Let me ask you to go to the next page, page three, at the

19   bottom of the page, the last two sentences.  Where it says,

20   "There is a small amount of mortgage paper which has been

21   heavily written down and included in those numbers.  So we have

22   been through a process where we took the original marks,

23   reviewed them, and then took some further write-downs, but that

24   is against the very small portion, less than five percent of

25   that book."  Do you see that?

29

1    A.    Yes.

2    Q.    And was there any effort by Barclays to conceal that with

3    respect to the amount of mortgage paper that they had taken on,

4    it had been heavily written down and then written down further?

5    A.    No, there was no such attempt.

6    Q.    Let me ask you to look at page four.  The first

7    significant paragraph, the third sentence which it says, "First

8    and foremost, as Chris said, we got to choose which inventory

9    came with the deal."  Do you see that?

10   A.    Yes.

11   Q.    And was there any effort by Barclays ever to conceal its

12   view that Barclays got to choose which inventory came with the

13   deal?

14   A.    No, there was no such effort here, and I believe it was

15   always part of the discussion with Lehman Brothers that we were

16   interested to acquire certain assets, but certainly not

17   interested to acquire others.

18   Q.    Let me ask you to look at page five, and the first -- I

19   want to begin with the first paragraph, which is a question.

20   And in the fourth sentence there, the questioner, which is Tom

21   Rayner from CitiGroup says, "You have a buffer between the

22   trading assets and liabilities of four."  Do you see that?

23   A.    Yes.

24   Q.    And then I want you to go down to the answer, the second

25   sentence, where it says, "We absolutely expect to preserve that

30

1   buffer." Do you see that?

2   A.   I do see it, yes.

3   Q.   And did Barclays ever make any effort to conceal its

4   belief that it would preserve a buffer of approximately four

5   billion dollars between the trading assets and trading

6   liabilities?

7   A.   No, indeed I think it was important to Barclays that to do

8   as good as a job as it was able to do at the time to explain to

9   shareholders and investors and the analyst community, which was

10   part of the audience here, that the transaction was in the

11   shareholders' interest, and to describe to those shareholders

12   and investors that there was likely a buffer of that size was

13   an important piece of information for the market at the time.

14        So not only was there not an attempt to hide it, it was

15   important to disclose it.

16   Q.   Now, you were asked by Movant's Counsel whether other than

17   this analyst call and other than a press release, you were

18   aware of a single public record document that announced prior

19   to the sale on the 19th, that there would be a gain for

20   Barclays.  Do you recall that question generally?

21        MR. BOIES:  And that's at page 1840, for Counsel's

22   reference.

23   A.   Yes, I do.

24   Q.   And you answered, "Assuming by sale motion, you mean any

25   of the surrounding papers associated with the court

31

1    proceedings, no, not aware of anything else." Do you recall

2    that?

3    A.   Yes.

4    Q.   Now, even though that you're not aware of any of the other

5    surrounding papers associated with the court proceedings

6    talking about a gain, are you aware that there were a number of

7    newspaper and other media reports concerning Barclays'

8    announcement that it would have a gain on acquisition?

9    A.   I do recall there was a lot of media commentary about the

10   transaction at the time.  When I was asked the questions to

11   which you refer, I made the assumption that we were referring

12   to documents.  I didn't include media articles in that term.

13            MR. BOIES:  Let me ask that we hand out Barclays Book

14   3.

15            THE COURT:  Thanks.

16   Q.   I'd like to direct your attention to tabs thirteen and

17   seventeen -- through seventeen; thirteen, fourteen, fifteen,

18   sixteen, and seventeen, which are Barclays Exhibits 796, 797,

19   798, 115 and 111.

20            MR. BOIES:  And I would offer these exhibits for the

21   limited purposes of showing the extent to which the press

22   reported prior to September 19th that Barclays planned to book

23   a gain on acquisition.

24            THE COURT:  Is there any objection to the receipt of

25   these media stories that appear to be taken off of the

32

1    internet?

2            MR. GAFFEY:  Not for that limited purpose, Your Honor,

3    no.

4            THE COURT:  Fine.  They're admitted for that limited

5    purpose.

6    (Barclays Exhibits 796, 797, 798, 115 and 111 admitted.)

7    BY MR. BOIES:

8    Q.   Now, did there come a time, as you understood it, when

9    Lehman discovered and Barclays perhaps discovered as well, that

10   Lehman was not going to be able to deliver the assets that it

11   had promised on September 16th to deliver?

12   A.   Yes.

13   Q.   And what was your understanding as to why that was so?

14   A.   At the time, the representatives of Lehman and Barclays

15   discussed the apparent transactions of counterparties in the

16   market between September the 16th and the 18th, which led to a

17   substantial diminution in the size of the pool of assets that

18   was available to be conveyed in the transaction.  There was

19   also an attendant, and again I think significant, decrease in

20   the value of all of those assets.

21   Q.   Now, at the same time all that was happening, did Barclays

22   advance a sum of money to cover what had previously been a

23   Federal Reserve Bank REPO financing transaction for Lehman

24   Brothers?

25   A.   Yes, on the Tuesday afternoon, we had received a second

33

1   request from the New York Fed to stand in their shoes, or to

2   replace them in that REPO transaction and so on the -- as it

3   happened on the 18th, we conveyed forty-five billion dollars in

4   cash early that morning to Lehman Brothers.

5   Q.   Did conveying that forty-five billion dollars increase to

6   any extent the risk that Barclays faced in this transaction?

7   A.   I think that the risk increased dramatically at that

8   point.  Prior to that point, the discussion among the parties

9   was -- concerned the conveyance of some long positions and some

10  short positions, which by their nature, didn't require

11  certainly at that point in time Barclays to follow with

12  anything.  I took on -- it might have taken on certain

13  liabilities in association with those long positions, but

14  certainly there was a substantial difference in our mind

15  between that discussion on the one hand, and one which required

16  us, and in fact took place, to convey forty-five billion

17  dollars in cash.  Put another way, Barclays went short forty-

18  five billion dollars in cash, and had to wait for a substantial

19  volume of securities to come in with the aim of exceeding that

20  amount.

21       As it turned out, that never transpired.  So I think the

22  relative risks of Barclays went up quite substantially at that

23  point in time.

24  Q.   And did the fact that Barclays' risk was going up

25  substantially and the value of Lehman's assets was going down

34

1   substantially affect at all the need to have Lehman identify

2   additional specific assets that could help Barclays become

3   assured that it would be getting the assets that it needed to

4   feel comfortable to do the deal?

5   A.   Absolutely, yes.  There was considerable concern on the

6   point of Barclays at that point.  We had, as I say, sent forty-

7   five billion dollars to Lehman Brothers at a time when all of

8   those assets available to be conveyed in the transaction

9   appeared to be dwindling, both in size and in value.  The

10  effort therefore, to identify at that point in time what the

11  value of the purchased assets could be, was crucial.

12  Q.   And as you understood it, on September 19, did Barclays

13  have the right to walk away from the deal, particularly in

14  light of the fact that Lehman was unable to deliver what it had

15  promised in the APA?

16  A.   Absolutely, yes, that was clearly in Barclays' mind at

17  that point in time, and I think it was right, we did have the

18  right to walk away.

19  Q.   And according to your understanding, would Barclays, in

20  fact, have walked away if assets had not been identified that

21  gave it reasonable assurance that it would receive the assets

22  that it felt it needed to be comfortable in closing the deal?

23  A.   Yes, I believe that would've happened.

24  Q.   And I think you've identified two of those assets as being

25  what you refer to as the clearance box assets and the 15(c)(3)

35

1   assets, correct?

2   A.   Correct.

3   Q.   And did Lehman represent to Barclays what the clearance

4   box assets were, in Lehman's view, worth approximately?

5   A.   Yes.  When the topic first was raised, Lehman suggested

6   they were worth in the region of 1.9 billion dollars.

7   Q.   Now, let me turn to the 15(c)(3) assets for a moment.  Did

8   what Lehman represented those assets to be worth change over

9   the course of the day or 36 hours that those assets were being

10  discussed?

11  A.   I'm not sure that the total value of the assets changed or

12  the estimation of that value changed.  There was a change in

13  the amount of those assets that were agreed to be conveyed.

14  Q.   Originally, what was the amount of those 15(c)(3) assets

15  that Lehman was agreeing to convey to Barclays?

16  A.   Initially, the suggestion was, that the words

17  approximately 1.7 billion dollars' worth of value that Lehman

18  could convey from their reserve account or the 15(3)(c)

19  account.

20  Q.   And did that get reduced later on?

21  A.   Yes.  Ultimately it was agreed to be 769 million dollars.

22  Q.   And the 769 million dollars from the 15(c)(3) accounts and

23  the 1.9 billion dollars from the clearance box asset account,

24  total approximately 2.7 billion dollars, correct?

25  A.   I think it's slightly less than that, but approximately,

36

1    yes.

2    Q.    Now, if Lehman Brothers on September 19th or 20th had

3    said, we're not going to convey to you the clearance box assets

4    and the 15(c)(3) assets.  According to your understanding,

5    would Barclays have been prepared to close?

6    A.    My understanding is that we would not have closed if that

7    had been so.  You know, not only was it not said, but it was

8    also inconsistent with the deal that we'd agreed to that point,

9    namely that all of the assets in the business would be conveyed

10   with the business.  As I've said, the idea was to maintain as

11   much of an operational business as we could.

12   Q.    You're aware in this proceeding that the Movants, or at

13   least some of them at least, perhaps all, are taking the

14   position that Barclays is not entitled to the 1.9 billion

15   dollars, and is not entitled to receive the 769 million

16   dollars; is that correct?

17   A.    That seems to be what they're suggesting, yes.

18   Q.    Now, if Lehman had said that at the time that the deal was

19   being considered on September 19th, 2008, would Barclays have

20   been prepared to go ahead with the deal?

21   A.    I don't think so, no.

22   Q.    There was a clarification letter that was drafted,

23   correct?

24   A.    Correct.

25   Q.    And that clarification letter began to be drafted almost

37

1   immediately after the APA was signed on September 16th,

2   correct?

3   A.    That is correct, yes.

4   Q.    And why is that?

5   A.    I think it reflected two things.  One, that there were

6   aspects of the APA that upon signature were known among the

7   parties to be the subject of ongoing discussion; and indeed it

8   became apparent very quickly indeed that there were aspects of

9   the APA which needed to be refined.  The document, in common

10  with most documents drafted at that point in time, was drafted

11  probably more hastily than people would have liked, and so

12  there was both a need to reflect ongoing discussions, but also

13  to tidy up, so to speak, some aspects of the APA, which perhaps

14  we all preferred to express more accurately.

15  Q.    Did the clarification letter preserve what you have

16  described as the basic structure of the deal, which is that all

17  of the assets of Lehman used primarily in the acquired business

18  would be acquired by Barclays unless they were specifically

19  excluded?

20  A.    Certainly the clarification letter didn't change the deal

21  at all in my view, certainly not in that respect.  It did

22  change certain details of the transaction and tried its best to

23  make those more clear than they had been earlier in the week.

24  Q.    And two of those, I don't mean to suggest that this is in

25  any way an exhaustive list, but two of those were to

38

1     specifically identify clearance box assets and the 15(c)(3)

2     assets as purchased assets that Barclays was acquiring,

3     correct?

4     A.     That's correct.

5     Q.     Incidentally, there was some examination with respect to

6     the term book value, as that term is used in the APA.  Do you

7     recall that generally from Movant's examination of you?

8     A.     I do.

9     Q.     And in the clarification letter, did the clarification

10    letter strike out all of the references to book value from the

11    APA?

12    A.     I believe so, yes.

13    Q.     Now, we mentioned earlier the subject of REPO collateral.

14    Was it Barclays' understanding that it was going to acquire the

15    entire so-called REPO collateral as part of this transaction?

16    A.     Yes.

17    Q.     And according to your understanding, was that so specified

18    in the clarification letter?

19    A.     I believe so, yes.

20    Q.     Now, even if the REPO transaction, and by REPO

21    transaction, I mean when Barclay stepped into the shoes of the

22    Fed for the REPO; do you understand that?

23    A.     I do.

24    Q.     If that had not happened, and the transaction had simply

25    closed with the Fed continuing to be the REPO financier for

39

1   Lehman Brothers, would Barclays still have acquired the REPO

2   collateral?

3   A.   I think yes, we would have, if there'd been no other

4   changes to the deal, we would've taken those assets because

5   again, by definition, they were assets that had been used by

6   Lehman Brothers in the course of its business.  I think it

7   would've been somewhat unlikely that the Fed would've allowed

8   us to take those securities without also taking on some

9   liability for its own exposure.  But I think by definition

10   again, the securities are used in Lehman's business, they

11   couldn't have come from anywhere else, and I don't believe they

12   did come from anywhere else.

13   Q.   And to the extent that those assets in the REPO were not

14   specifically identified as excluded assets, Barclays would've

15   acquired them, whether or not it took over the Fed REPO or not,

16   correct?

17   A.   Correct.

18   Q.   To the extent that they were excluded assets, Barclays

19   would not have acquired them, correct?

20   A.   Again, correct.

21   Q.   And I don't know whether this goes beyond what you know

22   about the REPO or not, but I'll ask the question.

23       Do you know whether the REPO collateral did, in fact,

24   include some excluded assets?

25   A.   That's my belief.  You asked me a question earlier about

40

1    the enhanced risk in the transaction at the time we took on the

2    REPO.  One of the things that happened during the operation or

3    during the execution, should I say, of the REPO transaction,

4    was that substantial amounts of securities that had previously

5    been collateral placed with the Fed, ended up elsewhere in the

6    market and was not delivered to Barclays.

7        I believe also along the way, there were assets delivered

8    to Barclays that we had previously identified as being of a

9    type and of a nature that we wished to exclude.

10   Q.   And did that mean that when Barclays took over all of the

11   REPO assets, including some previously specifically excluded

12   assets that Barclay had not wished to acquire, that that also,

13   in addition to some of the other things we've mentioned,

14   increased Barclays' risk?

15   A.   I think it increased the risk and subsequently decreased

16   the value.

17   Q.   Now, let me turn specifically to the 15(c)(3) assets.  In

18   that connection, I'm going to ask you to look at the

19   clarification letter, which I think is in one of the volumes

20   that you have, and I can put it up on the screen in any event.

21   And this is Barclays Exhibit 5, and it is Movant's Exhibit -- I

22   guess we don't know.

23        MR. BOIES:  Do you know what Movant's Exhibit No. is?

24        MR. GAFFEY:  Three.

25        MR. BOIES:  Movant's Exhibit 3.

VERITEXT REPORTING COMPANY

212-267-6868                                                    516-608-2400

1    BY MR. BOIES:

2    Q.    And let me direct your attention to page four of this

3    where it talks about 15(c)(3).  And that is where it says,

4    "transfer of customer accounts," paragraph eight.  Do you see

5    that?

6    A.    I do.

7    Q.    And it says that "All customer accounts of LBI, other than

8    customers who are affiliates of LBI, shall be transferred to

9    purchaser."  Do you see that?

10   A.    Yes.

11   Q.    And it then goes on to say "In connection therewith,

12   purchaser shall receive (i) For the account of the customer,

13   any and all property of any customer, including any held by or

14   on behalf of LBI to secure the obligations of any customer

15   whose accounts are being transferred to purchaser as part of

16   the business."  Do you see that?

17   A.    Yes.

18   Q.    And then it goes on to say, "and (ii) To the extent

19   permitted by applicable law, and as soon as practicable after

20   the closing, 769 million of securities, as held by or on behalf

21   of LBI on the date hereof, pursuant to Rule 15(c)(3)(3) of the

22   Securities Exchange Act of 1934, as amended, or securities of

23   substantially the same nature and value."  Do you see that?

24   A.    Yes.

25   Q.    And as you understand it, what was the purpose of adding

42

1      the words "or securities of substantially the same nature and

2      value"?

3      A.    The purpose was to ensure that Barclays received 769

4      million dollars of securities.

5      Q.    Did anyone from Lehman, any representative of Lehman ever

6      suggest that that language, the language that says "securities

7      of substantially the same nature and value" had any purpose

8      other than to guarantee that you would get the 769 million

9      dollars from one source or another?

10     A.    There was never any suggestion that it was for any other

11     reason, not at the time, nor am I ever aware -- nor am I aware

12     of any suggestions subsequently from anybody at Lehman Brothers

13     that was involved in the transaction.

14     Q.    Let me now ask you to focus specifically on the clearance

15     box assets.  Now, you have said that the clearance box assets

16     were unencumbered assets that were used in connection with

17     LBI's business, correct?

18     A.    That's correct.

19     Q.    And your view was that they were therefore purchased

20     assets, both under the original APA and under the clarification

21     letter, correct?

22     A.    That's correct.  I think it was Barclays' view, and I

23     believe it was Lehman Brothers' view at the time, too.

24     Q.    Now, let me ask you to look again at Movant's Exhibit 3

25     and Barclays Exhibit 5, the clarification letter.  And I want

43

1     you to look at section 1(a)(ii) of paragraph B.  It's at the

2     bottom of the first page.

3         And this is a listing of specific purchased assets,

4     correct?

5     A.    Some of them, yes.

6     Q.    Of some of them, yes.  And subpart B reads, "Such

7     securities and other assets held in LBI's 'clearance boxes' as

8     of the time of the closing, which at the close of business on

9     September 21, 2008 were specified on Schedule B, previously

10    delivered by seller and accepted by purchaser (provided however

11    that purchaser in its discretion may elect within 60 days after

12    the closing to return any such securities to LBI); provided

13    that no securities owned by LBHI or any subsidiary of LBHI,

14    other than LBI and other than as specified in this agreement or

15    clause three below."  Do you see that?

16    A.    Yes.

17    Q.    And does that indicate that -- well, let me ask you.  From

18    Barclay' standpoint, what was your understanding of the purpose

19    and effect of that provision?

20    A.    It recorded the agreement reached between Barclays and

21    Lehman that Lehman would convey all of the unencumbered assets

22    in what were described as the clearance boxes, as purchased

23    assets within the APA.

24    Q.    And as you understand it, at the time that this was being

25    negotiated and up through closing, did anyone from Lehman, any

44

     1    representative of Lehman, ever suggest that Barclays was not

     2    entitled to all of the assets, of whatever kind or nature that

     3    were held in these clearance boxes?

     4    A.    Nobody at Lehman nor any of its many advisors suggested

     5    anything of that sort.

     6    Q.    While we're on this page, item C listed here as one of the

     7    non-exclusive listed purchased assets is exchange traded

     8    derivatives and any property that may be held to secure

     9    obligations under such derivatives.  Do you see that?

    10    A.    Yes.

    11    Q.    And as you understood it, representing Barclays at the

    12    time, what did this refer to?

    13    A.    I think the purpose of this provision was first of all to

    14    make absolutely plain the agreement with respect to the

    15    exchange traded derivatives, but also to make plain that any

    16    type of property that was held, with respect to that business

    17    were also -- was also part of the purchased assets and would be

    18    conveyed; and the term "any property" I think was very plainly

    19    intended and understood by the parties to be any property of

    20    any type.

    21    Q.    Now, you testified earlier this morning that under the

    22    circumstances here, it was inconceivable to you that Barclays

    23    would've required these exchange traded derivatives and other

    24    Lehman positions without also acquiring the collateral or

    25    margin held to secure those obligations.  Do you recall that?

45

1   A.   Yes.

2   Q.   And is the specific language here where it says that

3   Barclays is acquiring any property that may be held to secure

4   obligations under such derivatives an example of that?

5   A.   Well, it wasn't just an example, but I think it's also the

6   -- it also includes in all of the margin or collateral, that

7   was held in that exchange traded derivatives business.

8   Q.   Now, there was a suggestion by the Counsel for the trustee

9   that the obligation to deliver margin and collateral did not

10  include the obligation to deliver cash margin and collateral.

11  Do you recall that?

12  A.   Yes.

13  Q.   In that connection, I'd like you to look at tab eight in

14  the binder that I handed out.  This is Exhibit 231, and at the

15  beginning, there is a particular page that we have marked as

16  Exhibit 231-A.  And let me begin with Exhibit 231-A if I could.

17       This is the September 19th, 2008 agreement that was signed

18  by Barclays and by the trustee, correct, sir?

19  A.   That is correct.

20  Q.   And this execution copy has the signature of the trustee

21  and the trustee's lawyer, correct?

22  A.   That's correct.

23  Q.   And it begins by saying that "Effective as of the close of

24  business on September 19th, 2008, it is expected that Lehman

25  Brothers and Barclays Capital will complete the transfer of

46

1    certain business assets and liabilities from LBI to Barclays."

2    Do you see that?

3    A.   Yes.

4    Q.   And it then goes on to say "In connection with such

5    transfer, LBI has assigned to Barclay all rights in securities,

6    cash, and other property, which is defined as collateral,

7    pledged by LBI to the Options Clearing Corporation, OCC, and

8    held for OCC's benefit at JP Morgan Chase." Do you see that?

9    A.   Yes.

10   Q.   Now, are the securities, cash, and other property, the

11   collateral, pledged by LBI to the Options Clearing Corporation,

12   an example of what we were just talking about a few moments

13   ago?

14   A.   Yes.  The OCC was obviously one of the major participants

15   in the exchange traded derivatives business.  It is one of the

16   major participants.  It was interested in all of the collateral

17   and margin held by, in association with LBI's business, and

18   clearly wanted to ensure that it fully understood what would

19   happen to that margin in the event of the consummation of the

20   transaction between LBI and Barclays.

21   Q.   The next sentence says "Barclays has assumed all the

22   rights and obligations of LBI in respect of said collateral,

23   and LBI has consented to set assignment and assumption." Do

24   you see that, sir?

25   A.   Yes.

47

1    Q.   And was that your understanding at the time?

2    A.   Absolutely, yes.

3    Q.   And it then says "Therefore, LBI hereby authorizes and

4    directs JP Morgan Chase to transfer on its books, as of the

5    close of business on Friday, September 19th, 2008, the

6    collateral pledged to OCC to the account or accounts of

7    Barclays Capital, and to reflect on the records of JP Morgan

8    Chase that such collateral is pledged to OCC by Barclays

9    Capital." Do you see that, sir?

10    A.   I do see it.

11    Q.   And collateral is specifically defined here as including

12    cash, correct, sir?

13    A.   That's correct.

14    Q.   And then it is signed by the trustee, correct?

15    A.   Yes.

16    Q.   And I'm going to ask you to look at a document that you

17    may or may not have seen before. This is behind tab ten. It

18    is BCI Exhibit 233. And this is a communication from James

19    McDaniel at Sidley Austin, and do you know who Mr. McDaniel and

20    Sidley Austin represented in this?

21    A.   I believe they represented the OCC.

22    Q.   Represented the OCC?

23    A.   I believe so, yes.

24    Q.   And this goes to Lehman and representatives of the trustee

25    and a number of other people. Do you see that?

48

1     A.   Yes.  Including at least one representative from Weil

2     Gotschal.

3     Q.   And at the bottom it says, "In addition, OCC is holding

4     nearly one billion in cash for the accounts of LBI.  It is

5     important that the disposition of these assets is understood

6     and agreed to among all parties, and that the documentation

7     addresses it in a consistent way."  Do you see that?

8     A.   Yes.

9     Q.   And was that your understanding at the time, that that was

10    the position of the OCC?

11    A.   It was certainly Barclays' understanding, because as I

12    said earlier, it didn't become clear until some time during the

13    course of the weekend that there was cash being held at the

14    OCC, or indeed at other clearing organizations relevant to the

15    exchange traded derivatives business.  But I do recall that

16    during -- at some point during the weekend, the fact that there

17    was cash there within the totality of the margin was the

18    subject of, at a minimum, several e-mails I think going between

19    some of the parties that are also addressed on this e-mail.

20         So it was the subject of active consideration at the time.

21    Q.   Now, insofar as you are aware, did you or anyone from

22    Barclays actually get a copy of this particular communication?

23    A.   I couldn't tell you specifically now whether somebody at

24    Barclays actually received it.  I do know that representatives

25    of Barclays received it, and it's my belief that

49

1    representatives of Barclays, in particular to Cleary Gottlieb

2    engaged in this discussion.  I don't know whether that was in

3    person, by phone, or further by e-mail, but I do recall it was

4    an active consideration of the issues, as I say.

5    Q.    Now, insofar as you are aware, did any of the recipients

6    of this e-mail, the trustee, the representatives of LBHI, their

7    lawyers, or any of the other representatives of the Movants

8    that got a copy of this, did any of them feel that it was

9    necessary or desirable or appropriate to go to court and say,

10   you know, they're transferring some cash as part of the

11   collateral for exchange traded derivatives?  Did that happen,

12   sir?

13          MR. GAFFEY:  Objection, Your Honor.  Goes to his state

14   of mind.

15          THE COURT:  I sustain the objection because the

16   question was did any of these representatives feel that it was

17   necessary to go to court; and I think even Mr. Boies would

18   sustain that objection.

19          MR. BOIES:  I would, Your Honor.  I would, Your Honor,

20   and I apologize for the awkward phrase.

21          THE COURT:  Why don't you rephrase.

22   BY MR. BOIES:

23   Q.    According to your knowledge and recollection, sir, did any

24   of the representatives, any of the many representatives of the

25   Movants, who received this e-mail, after receiving it, go into

50

1    court or notify the Court, or communicate to the Court in any

2    way, that the Court needed to be aware that there was cash

3    being transferred to Barclays as part of these margin and

4    collateral accounts?

5    A.   No, none of them did.

6    Q.   Let me ask you to go to the next tab, which is BCI Exhibit

7    262.  And this is another communication to various

8    representatives of the Movants from Mr. McDaniel of Sidney

9    Austin representing the OCC.  Do you see that?

10   A.   Yes.

11   Q.   And this is dated Sunday, September 21, 2008, at 4:03

12   p.m., correct?

13   A.   Correct.

14   Q.   And paragraph two says, "Having heard nothing further from

15   you with respect to cash held by OCC, in respect of the LBI

16   accounts, and in accordance with the terms of the transfer and

17   purchase agreement, all such cash in the accounts will be

18   transferred to Barclays assuming that the transaction closes

19   this evening."  Do you see that, sir?

20   A.   I do.

21   Q.   Now, according to your knowledge and recollection, did any

22   of the representatives of the Movants that received this go

23   into court, or communicate with the Court in any way, saying to

24   the Court, you ought to be aware that OCC is going to transfer

25   cash from LBI to Barclay.  Did that ever happen, sir, as far as

51

1   you know?

2   A.   No, it didn't.  Might I add, at the time, nobody, as far

3   as I'm aware, at either Lehman Brothers or any of its advisors

4   suggested at any point that there was not to be transferred

5   cash as part of the margin to be transferred, not just by OCC

6   but by anybody else.

7   Q.   Now, at some point prior to closing, there was an issue

8   raised about the DTCC's wind down exposure, correct?

9   A.   That's correct, yes.  I believe it was first raised

10   earlier in the week.  As far as I can remember, it was probably

11   first raised by DTCC with Barclays at least on the Thursday of

12   that week, of the buy week.

13   Q.   And just to be clear, the DTCC was where the clearance box

14   assets were, or at least some of them, correct?

15   A.   I'm pretty sure that some of them were there.  Whether

16   absolutely all were there, the bulk certainly.

17   Q.   There was certainly a substantial amount of Lehman's

18   clearance box assets that were at the DTCC, correct?

19   A.   Yes.  Easily the vast proportion.

20   Q.   And did Barclays and DTCC reach an agreement as to some

21   protection that Barclays would give the DTCC to cover certain

22   clearing obligations in Lehman accounts?

23   A.   Yes.  The agreement ultimately was that the 250 million of

24   cash that Barclays was to convey in the deal to Lehman Brothers

25   would be held as unlimited indemnity for DTCC.

52

1    Q.   And was that a resolution memorialized in a written

2    agreement with the DTCC?

3    A.   Yes, it was.

4    Q.   And let me put Barclays Exhibit 6 up on the screen.  This

5    is a September 22, 2008 DTCC letter.  And I would ask you

6    whether this is the letter that memorialized Barclays'

7    agreement with the DTCC?

8    A.   Yes.

9    Q.   And does this letter accurately reflect the terms that

10   were reached with the DTCC and Barclays on Sunday night,

11   September 21st?

12   A.   Yes.

13   Q.   Was the clarification letter written to include provisions

14   to take into account the provisions of this DTCC letter that

15   has been marked as Barclays Exhibit 6?

16   A.   I believe it was, yes.

17   Q.   And did the clarification, in fact, nullify, if that's the

18   right word, those provisions of the first amendments to the APA

19   that it provided a guarantee to the DTCC?

20        MR. GAFFEY:  Objection, Your Honor.  The document

21   speaks for itself.  He's being asked to characterize what the

22   document --

23        THE COURT:  I think that's an --

24        MR. GAFFEY:  -- encompasses.

25        THE COURT:  -- objection that's well taken and even

53

1    the question's, use of the term nullify, I think is one that

2    calls for a conclusion as to which documents are still

3    operative; and under the circumstances, I think either the

4    question should be rephrased or withdrawn.

5         MR. BOIES:  I will, Your Honor.

6    BY MR. BOIES:

7    Q.   As you recall, was there a first amendment to the APA,

8    sir?

9    A.   Yes, there was.

10   Q.   And as you understood it, on behalf of Barclays at the

11   time, did that first amendment provide a guarantee to the DTCC

12   from Barclays?

13   A.   It did, yes.

14   Q.   As you understood it, representing Barclays, did the

15   clarification letter affect that guarantee in the first

16   amendment?

17   A.   Yes.  The coverage in the first amendment agreement was

18   provided in the form of some residential mortgage securities,

19   which it turned out were no longer available for that purpose.

20   In addition, after discussions between Barclays and DTCC, DTCC

21   concluded that the 250 million dollar cash limits of indemnity

22   that I referred to earlier, was sufficient for its purposes,

23   and that was reflected in the -- that change was reflected in

24   the clarification letter.

25   Q.   Now, was it Barclays' understanding at the time that this

54

1    letter that has been marked as BCI Exhibit 6 affected in any

2    way Barclays' entitlement to LBI's clearance box assets?

3    A.    Certainly not.

4    Q.    Was Barclays ever asked by Lehman Brothers or the DTCC or

5    anyone else as part of the negotiations of the Barclays Exhibit

6    6 agreement, to relinquish any right to any of the clearance

7    box assets?

8    A.    Nobody ever made any suggestion of that sort to Barclays,

9    nor indeed if such a suggestion had been made would we have

10   agreed to it.  I think it's worth noting that the clearance box

11   assets were only raised for the particular purpose of

12   identifying the value that we spoke about earlier, in

13   circumstances in which Barclays was greatly concerned about the

14   amount of that value that could be delivered.  For us to give

15   up that additionally identified value within -- at any point in

16   time would seem to me to be nonsensical, but equally for that

17   to have purportedly happened within hours of that agreement

18   having been reached, it just didn't happen.  And as I say, if

19   it would've been suggested, Barclays clearly would have

20   rejected it.

21   Q.    Did anyone ever suggest prior to closing that the DTCC

22   letter agreement with Barclays that is Barclays Exhibit 6,

23   reduced in any way Barclays' rights to the Lehman clearance box

24   assets?

25   A.    No.

55

1   Q.   Does the DTCC and Barclays letter agreement that is

2   Barclays Exhibit 6 address different subject matters than the

3   clarification letter?

4   A.   Very much so, yes.

5   Q.   Could you explain that?

6   A.   The clarification letter relates to particular assets that

7   were subject -- that were the subject of discussion between

8   Lehman Brothers and Barclays; and obviously given what I said

9   earlier, were part of the sale transaction.

10      The discussions with DTCC were completely different, in

11   the sense that DTCC was concerned about other outstanding

12   clearance and settlement obligations of LBI.  It's perhaps

13   worth noting that the whole of this transaction was being

14   negotiated while there were other outstanding clearing and

15   settlement obligations of Lehman Brothers from days prior.  It

16   was an active broker dealer during the course of that week, in

17   addition to prior weeks, and there were in DTCC's mind, and I

18   think as we all would've expected, potentially significant

19   outstanding clearance and settlement obligations that needed to

20   go through the accounts of Lehman Brothers.  That was

21   legitimately a concern of DTCC, and DTCC was interested to

22   learn from Barclays what Barclays' position would be with

23   respect to those clearance and settlement obligations.

24      They were -- the discussions with DTCC, in my

25   recollection, took place separately from any other discussions

56

1   with respect to the transaction; and I think quite

2   appropriately so.  It was a debate between DTCC and Barclays

3   about what Barclays might give coverage to DTCC for.  That was

4   ultimately the agreement with respect to that was ultimately

5   recorded here.

6        Barclays separately had discussions about assets which

7   were within some accounts held at DTCC, but certainly Barclays

8   was intent on not taking on any further liability for those

9   other accounts, or for anything else in those accounts.

10  Q.   Now, you drew a distinction between the DTCC accounts and

11  the assets in those accounts, correct?

12  A.   Yes.

13  Q.   And under the clarification letter, what happened to the

14  assets held in the clearance boxes for Lehman Brothers at the

15  DTCC?

16  A.   I think both under the APA as originally written, and by

17  virtue of the clarification letter, those assets were to be

18  conveyed.  Those securities and other assets were to be

19  conveyed to Barclays from the accounts.

20  Q.   And does that say anything about what happens to the

21  accounts themselves?

22  A.   Absolutely not.  They stay where they were.

23  Q.   Now, is there anything unusual in an account owner

24  transferring assets from its account to another person without

25  also transferring the account itself?

57

1   A.   Certainly not from my perspective.

2   Q.   Now, we've talked about the DTCC accounts, and the DTCC

3   clearance box assets, and the OCC assets, and I want to try to

4   keep those clear.

5        You have just distinguished between the DTCC accounts and

6   the DTCC assets that were held, correct?

7   A.   Yes.

8   Q.   Now I'd like you to focus on the difference between the

9   DTCC accounts and the OCC accounts.  You said that Barclays did

10  not acquire the DTCC accounts, correct?

11  A.   That's correct.

12  Q.   Did Barclays acquire the OCC accounts?

13  A.   Yes.

14  Q.   What was the purpose of acquiring the OCC accounts, but

15  not the DTCC accounts?

16  A.   The OCC accounts were part of the exchange traded

17  derivatives business, I believe, and the intention from day one

18  of the discussions was to continue that business.  By

19  definition, we had agreed to acquire it, and therefore, wished

20  to continue to pursue that business.  The OCC accounts were a

21  necessary part of that, not just from our point of view, but

22  also from OCC's point of view.  I believe that OCC would not

23  have agreed to the assignment of all of those rights and

24  obligations with respect to those accounts if Barclays had not

25  agreed to do that.

58

1       The DTCC accounts, by contrast, were accounts primarily

2    related to the securities business of Lehman Brothers as a

3    broker dealer, which business was not going to continue.  By

4    definition, those accounts were going to be wound down.  They

5    did not have margin associated with them.  They were two very

6    different scenarios.  On the one hand, the business was going

7    to wind down, and we were not going to pursue it, and had not

8    agreed to take on that business, whereas, the OTC -- sorry, the

9    exchange traded derivatives businesses, we had agreed to take

10    on and intended to pursue those businesses.

11  Q.   Now, focusing again on the DTCC Barclays letter agreement

12  of September 22, 2008, that is Barclays Exhibit 6, did that

13  letter agreement benefit Lehman in any way?

14       MR. GAFFEY:  Objection, Your Honor.

15       THE COURT:  Well, it's sustained to the extent that

16  you're asking this witness to comment as to what benefited

17  Lehman.  He hardly seems to be in a position to give that

18  opinion.

19  Q.   As a representative of Barclays, did you have an

20  understanding as to whether or not the DTCC letter agreement of

21  September 22, 2008 with Barclays would benefit Lehman Brothers?

22       MR. GAFFEY:  Objection, Your Honor.  I don't think

23  that cures it at this time.  He can't have knowledge -- well,

24  objection, Your Honor, I think it's the same objection as the

25  last question.

59

1           THE COURT:  I think it is the same objection, although

2      if you lay a foundation that he actually has a basis to answer

3      the question, maybe you can get at it that way, if you really

4      need to get at it at all.

5           MR. BOIES:  I don't think it's critical that I --

6           THE COURT:  Well, you can proceed any way you wish.

7           MR. BOIES:  -- get at --

8           THE COURT:  It's just I think there's a foundation

9      problem in getting this witness to the point that he has any

10     knowledge whatsoever as to what might benefit Lehman in this

11     aspect of the transaction.

12          MR. BOIES:  Let me try one more question, and if it

13     doesn't work, I'll move on.

14     BY MR. BOIES:

15     Q.   I'm only asking for your understanding, Mr. Hughes.  At

16     the time that the DTCC September 22 letter with Barclays was

17     executed, you were aware of that letter, correct?

18     A.   I was.

19     Q.   And at that time, as a representative of Barclays, did you

20     have an understanding as to whether or not you believed that

21     that letter was going to benefit Lehman Brothers or not?

22     A.   I think the answer to that is yes, for a couple of

23     reasons.  The provenance of the discussion with DTCC, with

24     DTCC's concern with respect to cash and securities flowing

25     through DTCC accounts on Monday morning, the 22nd, without that

60

1    concern none of this would have existed.

2         It was part of DTCC's position on the Thursday, the 18th,

3    going through to the conclusion of this agreement that if we

4    did not achieve an agreement, that it would not allow cash and

5    securities to flow through those accounts.  I think it was a

6    crucial agreement to reach, therefore, in order that the

7    transaction could take effect, and in addition, that other

8    outstanding clearance and settlement obligations of Lehman

9    Brothers could also be met.

10        The need, for example, and just one example to have those

11   accounts open for business on Monday morning to allow the

12   securities and cash to flow to Barclays, allowed Lehman to

13   consummate the transaction.  If those accounts had not been

14   opened, I don't think Lehman Brothers would've been able to

15   perform the transaction.

16   Q.   I have just two more questions.  I'd like to direct your

17   attention to some testimony that Mr. McDade gave at pages 97

18   and 98 of the trial transcript.  And in particular, I want to

19   start at line 18.

20        MR. BOIES:  If we can put it up on the screen.  If

21   not, I will do it the old-fashioned way.

22   Q.   I will read it to you, sir.  Beginning --

23        THE COURT:  It's on the screen.

24        MR. BOIES:  It's on the screen.

25   Q.   At line 18, on page 97 --

61

1          MR. BOIES:  Excuse me, Your Honor, can I have just a

2     moment?

3          THE COURT:  Sure.

4          MR. BOIES:  Your Honor, this is going to take me just

5     a minute.  I apologize --

6          THE COURT:  That's fine.

7          MR. BOIES:  This pagination.

8          THE COURT:  While we're on this unanticipated pause, I

9     note that I'm not receiving my Live Note through my computer.

10    I don't know if anybody else is, and I just wanted to alert the

11    reporter that nothing's functioning at the moment --

12         THE REPORTER:  I'm going to make sure it's --

13         THE COURT:  -- at least as far as I can tell.

14         MR. GAFFEY:  One of our screens, but not mine, Your

15    Honor, seems to be receiving.

16         THE COURT:  All right.

17         MR. BOIES:  Your Honor, I am going to do this the old-

18    fashioned way.  I'm just going to read a question and answer

19    and ask him whether he agrees with it.

20    BY MR. BOIES:

21    **Q.   And follow along with me, Mr. Hughes, as best you can**

22    **without the advantage of the new technology that puts it on the**

23    **screen.  I began by asking Mr. McDade --**

24         THE COURT:  I'm sorry, Mr. Boies, can I just ask you

25    again for the page and line reference.

62

1          MR. BOIES:  I have this as 97 at line 18, and you can

2     read along with me if you want.

3          MR. GAFFEY:  If you don't mind.

4          MR. BOIES:  Not a bit.

5     BY MR. BOIES:

6     Q.   "Q. I just want to emphasize that.  When you talked about

7     assets and liabilities being or ending up being in rough

8     balance, you were talking about the assets and liabilities and

9     value from Lehman's perspective, not from Barclays'

10    perspective, correct?

11         "A. That's correct.  I'd have no ability to understand how

12    Barclays would value that.

13         "Q. And there were a number of assets that might have

14    little or no value to Lehman as a non-operating company that

15    might have substantial value to Barclays as an operating

16    company, correct?

17         "A. Yes, I would agree.

18         "Q. And if that difference resulted in a first day gain

19    for Barclays, that was in no way inconsistent with your

20    understanding of the deal, correct?

21         "A. Yes."

22         Do you agree with Mr. McDade's statement of his

23    understanding of the deal?

24    A.   I do.

25         MR. BOIES:  No more questions, Your Honor.

63

1          THE COURT:  Is there redirect?

2          MR. GAFFEY:  Yes, there is, Your Honor.

3                  REDIRECT EXAMINATION

4     BY MR. GAFFEY:

5     Q.   Mr. Hughes, Barclays' Counsel asked you about the fact

6     that no valuations were done for all of the assets -- that

7     valuations were not done for all of the assets, and I think you

8     said they were only done for two of the categories of assets;

9     is that right?

10    A.   I think I said there were estimates given for, what I

11    thought were two, possibly three, but I think two.

12    Q.   All right.  Do you recall, sir, that we've discussed and

13    you've seen in this case that there was a point at the sale

14    procedures hearing before Judge Peck on the 17th of September,

15    2008, when the Court inquired as to the -- how to assess the

16    overall value of the transaction?

17    A.   I think I recall reading that in the transcript at some

18    point, yes.

19    Q.   Were your -- were Barclays' representatives at the

20    hearings under any type of instruction to ensure that the Court

21    knew that in addition to whatever description Mr. Miller gave

22    of the overall value that there would be value of these other

23    categories, other than the two for which -- to which numbers

24    had been applied?

25    A.   I couldn't say that there was a specific instruction to

64

1    that effect, but I do believe that the Barclays representatives

2    knew that to the extent that a disclosure was relevant to the

3    Court or to the extent that something misleading had being

4    mentioned to the Court that they would've done something about

5    that.

6    Q.   And you have no recollection of them adding to Mr.

7    Miller's response to the Court, correct?

8    A.   That's correct.  I believe that they were satisfied that

9    Mr. Miller and Mr. Miller's representations and the other

10   representations to the Court were appropriate in the

11   circumstances.

12   Q.   Now, you also spoke a bit before to Barclays' counsel

13   about -- well, we established on Friday, sir, that you were

14   very involved in this transaction, correct?

15   A.   That's correct.

16   Q.   And you were closely tracking everything that you could

17   with regard to the transaction during the week of September

18   15th, correct?

19   A.   I know that I said that I did my best to track as much as

20   I could.  It's important to note that there was an enormous

21   number of different things happening during the course of that

22   week, and I don't think any single person could've tracked

23   everything, no matter how hard one tried.

24   Q.   And the analyst call that Mr. Boies showed you, took you

25   through a little bit and told you it was on the website, you

65

1   didn't see that analyst call.  You never read the transcript of

2   that analyst call until your deposition was taken in this

3   action; isn't that right, sir?

4   A.   I can't recall whether that was the very first time that I

5   saw it, but I certainly didn't see it at the relevant time.

6   Q.   It is your best recollection that it's probable that you

7   saw it in preparing for your deposition, right?

8   A.   It's probable.

9   Q.   And it was your practice as the general counsel at

10  Barclays during the time of this transaction to keep track of

11  those things that were material or important to the

12  transaction, yes?

13  A.   Again, I tried to do that.  I don't think it was feasible

14  for me to track all of those aspects that were material, but I

15  did have external advisers and internal colleagues who were

16  also a part of the team trying to do all of those things.

17  Q.   Now, Mr. Hughes, Mr. Boies asked you about -- whether the

18  clarification letter was the means by which the definition of -

19  - whether the term book value was stricken from the asset

20  purchase agreement through the clarification letter.  Do you

21  recall that?

22  A.   I recall the question.

23  Q.   And do you recall that your answer was yes, that that's

24  where the book value definition was changed?

25  A.   I think that I said that it came out, it certainly came

66

1    out in the clarification letter.  Whether it was referred to

2    elsewhere prior to that, I can't now recall.

3    Q.   And you would agree with me, sir, would you not, that

4    changing the definition of purchased assets in an asset

5    purchase agreement is a pretty important thing?

6    A.   I think changes to the definition of purchased assets to

7    the extent that they were needed at the time were made in the

8    clarification letter.  So clearly the parties felt there were

9    aspects of it that were meaningful enough to include in the

10   clarification letter, yeah.

11   Q.   And it was meaningful enough to strike the definition of

12   book value from the asset purchase agreement in the

13   clarification letter, sir, but it was not meaningful enough to

14   file that clarification letter with the Court, before the

15   closing?

16   A.   I don't have any particular recollection at the time of

17   the discussion about book value.  As I think I said to you on

18   Friday, that specific phrase, to the extent anybody at Barclays

19   did consider it, was not something that we spent a lot of time

20   thinking about.  Again as I said, we were considering

21   appropriate market values for the assets that were the subject

22   of discussion.

23   Q.   But the elimination of the book value definition was

24   meaningful enough to include in the clarification letter,

25   correct?

67

1    A.    I can't say whether at the time people felt that it was

2    meaningful enough.   I can tell you that in fact it's not in the

3    clarification letter.

4    Q.    Well, I'm asking about your answer a moment ago, sir.   Did

5    you not say that it was considered sufficiently meaningful to

6    include in the clarification letter, the elimination of the

7    book value term?

8              MR. BOIES:   Objection, Your Honor.

9              THE COURT:   What's the objection?

10             MR. BOIES:   He didn't say that.

11             THE COURT:   Well, if he didn't say that, then it's a

12   fair objection to the question.   I frankly don't remember in a

13   nuanced way exactly what he did say in reference to what's

14   being restated.   So why don't you just state a different

15   question.

16             MR. GAFFEY:   Let me try it a different way.   Thank

17   you, Your Honor.

18   BY MR. GAFFEY:

19   Q.    Mr. Hughes, the elimination of the term book value was

20   sufficiently meaningful that it was removed by virtue of the

21   clarification letter from the asset purchase agreement,

22   correct?

23   A.    Again, I don't know whether it was sufficiently

24   meaningful.   As I recall, the phrase was used with reference

25   only to the long positions, and I believe possibly also the

68

1   short positions.  The meaningful, if you wish to use that term,

2   the meaningful change was to make plain that the long positions

3   and the short positions were no longer a part of the APA, and

4   they had been replaced.

5        So to the extent that references to long positions and

6   short positions were going to be removed, then if I'm right and

7   that was the only reference to book value, it seems to me

8   likely that that reference would come out, too.

9   Q.   Well, do you recall when the term book value was -- the

10  removal of book value from the APA was addressed in a draft to

11  the clarification letter?

12  A.   I have no idea.

13  Q.   Okay.  Would you take a look at tab 53 in your binder?

14  A.   The binder, the one that you gave me on Friday?

15  Q.   Yes.  It's the fat book there.  And when you get to page

16  53, and again, I apologize, because the Bates numbers are cut

17  off on this, but if you would go to the first page, about

18  midway through the document where the blackline version begins,

19  Mr. Hughes, and let me know when you're there.

20  A.   Should I be looking at M-53?

21  Q.   It's the tenth page from the back, Mr. Hughes.

22  A.   I think I'm there.

23  Q.   Okay.  And you're at the first page of the blackline --

24  A.   Yes.

25  Q.   -- where the date is September 21st, shown in blackline

69

1   form?

2   A.   It's -- the date says September 21st, top left.  On the

3   top right it says --

4   Q.   Right.

5   A.   -- September 20th.

6   Q.   Okay.  And if you would turn overleaf -- actually, take a

7   look starting at the first page of the blackline in Section

8   1(a)(ii), where it begins "plus the securities."  Do you see

9   that?  Are we in the same place?

10  A.   Yes.

11       MR. GAFFEY:  Actually, I'm going to ask to have it put

12  on the screen all of that subsection two which runs over to the

13  next page.

14  Q.   All right.  Now, you can see from the blackline, Mr.

15  Hughes, that in the prior version of the letter, the one that's

16  being marked up, the definition had said, and I'm reading under

17  the blackline, "It being understood that the long positions

18  referred to in Clause D of the purchased assets do not have a

19  book value of approximately 70 billion."  Are you with me there

20  under the --

21  A.   Yes.

22  Q.   You see what was stricken from the prior draft?

23  A.   I see it, yes.

24  Q.   And above that, in the blackline is what was substituted

25  for it, and that's the reference -- those are the references to

70

1    the clearance box and -- yeah, that's the reference to the

2    clearance box assets, right?

3    A.    In Roman two, yes.

4    Q.    So you would agree with me, sir, that this appears to be

5    the draft where the term book value was removed from the asset

6    purchase agreement, correct?

7    A.    I don't know whether this is the draft as you describe it.

8    I wasn't involved in these drafts necessarily.  It may well be

9    that I saw them at the time, but I couldn't tell you when, or

10   by whom, or in which version of the letter.

11   Q.    Okay.  Well, let's take a look.  It'd probably be best if

12   you'd keep your finger in this section, so we don't have to

13   count the pages again.  But would you go to the first page of

14   the document, please, Mr. Hughes?

15        And, Mr. Hughes, at the very first page of the document,

16   you see -- which is an e-mail.

17   A.    Yes.

18   Q.    And you see that that e-mail is from Robert Messineo at

19   Weil to Victor Lewkow at Cleary Gottlieb, correct?

20   A.    I see that.

21   Q.    Mr. Lewkow is Barclays' counsel, correct?

22   A.    One of them, yes.

23   Q.    All right.  And Mr. Messineo's note says, "Here is the

24   current version of the clarification letter, along with a copy

25   marked to show the changes from last night's version," correct?

71

1    A.    I see that, yes.

2    Q.    And you'll see that Mr. Messineo's e-mail is dated

3    Saturday, September 20th, 2008, 2:39 p.m.  Do you see that?

4    A.    I do.

5    Q.    And do you understand that Mr. Messineo's -- well, given

6    the date, sir, you know that "the last night" Mr. Messineo's

7    referring to would be the night of the sale hearing, correct?

8    A.    Yes.

9    Q.    All right.  So does this change not indicate to you, Mr.

10   Hughes, that the definition of book value came out after the

11   sale hearing concluded?

12   A.    I don't know, because I don't know what the version is

13   that Mr. Messineo is referring to, apart from it says last

14   night, it doesn't say when last night.  So I've no idea.

15   Q.    We can't agree, sir, that this document circulated at 2:39

16   p.m. on September 20th is the one where the term "book value"

17   is stricken from the draft?  Go back to where I said to keep

18   your finger in the document.

19   A.    Well, I don't know whether it is the version as you

20   describe it.  It's clear that book value comes out in this

21   version.

22   Q.    And I think we're agreed too, sir, that the removal of the

23   term book value from the asset purchase agreement was not in

24   any way brought to the attention of the Court during the sale

25   hearing, correct?

72

1   A.   I don't recall any specific reference to book value or its

2   removal from having read the transcript or spoken to anybody.

3   Q.   And we're agreed, sir, that the clarification letter was

4   not filed with the Court until after the closing, correct?

5   A.   I think that is correct, I think it was referred to.

6        MR. GAFFEY:  I have nothing further, Your Honor.

7        THE COURT:  All right.

8        MR. MAGUIRE:  If it please the Court.

9                    RECROSS-EXAMINATION

10  BY MR. MAGUIRE:

11  Q.   Mr. Hughes, again, Bill Maguire for the SIPA Trustee.  I'd

12  like to start with some testimony that you offered on the

13  subject of the Depository Trust Clearing Corporation or the

14  DTCC.

15       You testified it was separate, Barclays' negotiations with

16  the DTCC separately from Lehman, and that you thought was done

17  quite appropriately.  Do you recall that testimony?

18  A.   Yes.

19  Q.   And you recall Mr. McDade's testimony where he testified

20  that Barclays had excluded Lehman from those negotiations with

21  DTCC?

22  A.   I don't recall specifically whether Mr. McDade said they

23  were excluded or not.  I do agree that Mr. McDade didn't

24  participate in those discussions.

25  Q.   It was a fact, was it not, sir, that this issue with DTCC

73

1  was of enormous importance to the people who were trying to

2  close this transaction?

3  A.   I think it was of enormous importance to all parties to

4  the transaction, yes.

5  Q.   It would have been hugely problematic to close this

6  transaction if DTCC had not reached an agreement with Barclays;

7  isn't that right?

8  A.   That is right.

9  Q.   Now, the assets that were at the DTCC, the Lehman assets

10  that were at DTCC, the 1.9 billion dollars, Barclays was never

11  able to actually value or even establish that there was a value

12  to those assets; isn't that right?

13  A.   I don't think we had the time then to establish whether

14  1.9 was a good number or not.  I think subsequently it turned

15  out not to be a good number.  They were worth appreciably less

16  than that.

17  Q.   In fact at the time, despite having a due diligence team

18  at DTCC's office, Barclays was not even able to reach a

19  conclusion as to whether those assets might not, in fact, be

20  liabilities; isn't that correct?

21  A.   I'm not sure what you mean by a due diligence team, nor do

22  I recall specifically who was present at DTCC at the time you

23  refer to.

24  Q.   You do recall, however, that Barclays was unable to

25  conclude by the end of the day Sunday, on the weekend the

74

1    clarification letter was negotiated, by the end of that day

2    Sunday, Barclays was not able to conclude one way or another,

3    whether those assets at DTCC might not, in fact, be liabilities

4    if Barclays were to take them on?

5    A.    I think Barclays concluded that first of all, there were

6    substantial risk and uncertainty with respect to the valuations

7    of those assets.

8          Secondly, that it could be -- it could make a reasonable

9    judgment about those assets at the time.  And thirdly, that

10   there may well be some assets within the pool that could prove

11   not only to be worth less than represented, but possibly,

12   possibly represent potential liability to Barclays.

13   Q.    In fact, sir, was the draft clarification letter, not

14   drafted so as to give Barclays an express contractual right to

15   put any of those assets back to Lehman, that it did not want?

16   A.    Again, I don't know what happened in the drafts.  I

17   believe that the ultimate agreement allowed -- gave Barclays

18   that opportunity if it wished to take it.

19   Q.    Now, you understand that the whole point of the DTCC

20   negotiations was to come up with some mechanism that would

21   protect DTCC?

22   A.    I think that the DTCC's initial concern with respect to

23   its potential liability was the reason why they asked -- why

24   they started the discussion with Barclays, yes.

25   Q.    The whole point of the discussions was that if DTCC did

VERITEXT REPORTING COMPANY

212-267-6868                                              516-608-2400

75

1   not feel that it was sufficiently protected then you would have

2   a huge problem closing this transaction.

3   A.   That was what was suggested at the time, yes.

4   Q.   Now, in your testimony to your counsel this morning, you

5   drew a distinction between accounts and assets in the accounts.

6   Do you recall that?

7   A.   For that purpose, yes.

8   Q.   You know that at the time DTCC had rights in the assets

9   that were in Lehman's accounts at the DTCC?

10   A.   Which assets are you referring to?

11   Q.   The Lehman assets at DTCC, the clearing box assets.

12   A.   I don't know exactly what DTCC's rights with respects to

13   those unencumbered assets were.  I'm not sure that its rights

14   were necessarily the same with respect to those assets, when

15   compared to rights with respect to other assets.  I think

16   probably they were different.

17   Q.   Well, what you're suggesting in your distinction between

18   the accounts and the assets is that the accounts with all of

19   the liabilities that DTCC was so concerned about would stay

20   behind, and that the assets, which were the only protection

21   that DTCC had, other than the 250 million, would go to

22   Barclays.  That's the import of the distinction you're making;

23   is it not?

24   A.   My understanding is that DTCC was concerned about the

25   entirety of the outstanding clearance and settlement

76

1    transactions in the DTCC system.  My understanding also was

2    that the assets in the clearance boxes were unencumbered, and I

3    think therefore, the two were in Barclay's mind at the time,

4    distinct; and I think in practice, they have remained distinct.

5        The fact that DTCC, following my urging, did agree that a

6    rational assessment of its liabilities was no more than 250

7    million dollars, suggests to me that that's the best way to

8    establish what DTCC thinks or thought at the time was its

9    principal concern.

10   Q.   You're suggesting that at your urging on Sunday night,

11   DTCC reconsidered its view and decided that it was no longer so

12   concerned about its exposure that it would accept a mere 250

13   million dollars?  Is that what you just suggested, sir?

14   A.   No.  What I'm suggesting is that on Thursday evening, I

15   had a discussion with a representative of DTCC.  At the

16   beginning of that discussion there was a request from DTCC for

17   Barclays to provide a blanket guarantee for potential clearance

18   and settlement obligations.  I suggested to them, indeed I

19   urged quite urgently that they should consider a rational

20   number for that protection, that they had the relevant

21   information from which they could establish a potential net

22   liability to DTCC, which information was clearly not available

23   to Barclays.

24       I don't know what the thought patterns were from that

25   point until the signing of the DTCC letter, but I do know what

77

1    the DTCC letter ultimately says.

2    Q.   You know that you offered DTCC 250 million dollars

3    Thursday night?

4    A.   I don't recall specifically whether we offered 250.  It's

5    possible that we offered that specific number.  I don't recall.

6    Q.   And you know that DTCC rejected that offer?

7    A.   If that offer was made Thursday night, it probably -- it

8    may well have been rejected.  I don't recall whether the

9    specifics were as you describe them.

10   Q.   And when the parties appeared before the Court at the sale

11   hearing, DTCC was being provided with billions of dollars of

12   additional residential mortgage backed securities as collateral

13   in addition to the 250 million.  You know that.

14   A.   Again, I don't recall the specifics.  My recollection is

15   that in the first amendment, the residential mortgages were to

16   be provided as a form of limited guarantee, which residential

17   mortgages were to be coming, in essence, from Lehman Brothers.

18   But that again was changed, as you've described.  Certainly by

19   Sunday night, that had changed.

20   Q.   By Sunday night, the residential mortgage securities were

21   no longer available for DTCC's protection.

22   A.   That's correct.  Lehman was no longer in a position to

23   deliver those assets to Barclays, and therefore, Barclays was

24   not in a position to use them to give any protection to

25   anybody.

78

1   Q.   And you're not aware of any discussions with DTCC after

2   Friday night?

3   A.   I was not personally involved, I think, in such

4   discussions, but I believe, though I can't be precise about the

5   timing of the discussions, that there were discussions among

6   DTCC and representatives of Barclays during -- at some point

7   between in Thursday, Friday, and through to the close on

8   Monday.

9   Q.   You were certainly in no position to tell us if we were to

10  ask DTCC if they suddenly became sanguine about their exposure

11  Sunday night, you are in no position to tell us what answer

12  they will give us.

13  A.   No, but as I say, I am in a position to tell you what the

14  beginning of the discussion was, and what the conclusion of the

15  discussion was.

16  Q.   Now, the conclusion of the discussion ultimately was that

17  Barclays entered into the agreement with the Depository Trust

18  Clearing Corporation, right?

19  A.   Correct.

20  Q.   And it obviously would have been of great importance for

21  the DTCC in entering into that agreement, to know about and to

22  understand the distinction that you have made today between the

23  accounts at DTCC and the assets, the contents of those

24  accounts.   That would be of extraordinary importance to DTCC,

25  where they are looking to the contents of those accounts for

79

1    their protection.  You would agree it would be important for

2    them to know that distinction?

3            MR. BOIES:  Objection, Your Honor.

4            THE COURT:  Sustained.  For the very same reasons I

5    sustained a similar objection that was made to one of Mr.

6    Boies' questions during direct.

7    Q.   Did anyone at Barclays tell DTCC about the distinction

8    that you have drawn today between the accounts and the contents

9    of those accounts?

10   A.   I didn't know whether it was a specific discussion of the

11   type that you mention, but I do know that there was never any

12   suggestion by anybody at the time that Barclays would either

13   not take the clearance box securities, or would give them up

14   for any reason whatsoever.  The agreement, I think, is short

15   and very clear with DTCC.  It's about the accounts and

16   liabilities to DTCC with respect to the clearance and

17   settlement obligations associated with those accounts.  And

18   there was no need to discuss the clearance box securities,

19   certainly from Barclays' perspective, and I'm not aware as I

20   say, there was any suggestion from anybody, DTCC included, that

21   the clearance box securities were relevant to the consummation

22   of that discussion and agreement between Barclays and DTCC.

23   Q.   Well, I was hoping to avoid this, but maybe we can put up

24   to the DTCC agreements.

25           THE COURT:  Well, before we get there, Mr. Maguire,

1    you are over the witching hour that I had established during

2    our conference Friday afternoon, and I need to know how much

3    more time you expect to be, because if it's going to be a

4    while, I don't want to cut you off in any way, we're going to

5    have to come back at 2:30.

6          MR. MAGUIRE:  I think it might be better if we come

7    back at 2:30, Your Honor.

8          THE COURT:  That's an inconvenience for the witness,

9    I'm sorry about that, but when you say a while, how long are

10   you going to be?

11         MR. MAGUIRE:  It's going a little more slowly than I'd

12   hoped, Your Honor.  I'm guessing probably another half hour.

13         THE COURT:  Well, under those circumstances, with

14   regrets that our schedule seems to be suffering a setback,

15   we'll resume at 2:30.  We're adjourned till then.

16   (Recessed and reconvened.)

17         THE COURT:  Be seated, please.  Let's proceed.

18         MR. MAGUIRE:  If it please the Court.  Again, Bill

19   Maguire for the SIPA Trustee.

20                    RECROSS-EXAMINATION, CONTINUED

21   BY MR. MAGUIRE:

22   **Q.   I believe, Mr. Hughes, before the lunch break, we were**

23   **looking at Movant's Trial Exhibit 449, which is the DTC (sic)**

24   **letter agreement that Barclays entered into with the Depository**

25   **Trust Clearing Corporation.  Now, this is that document?**

81

1   A.   It appears to be, yes.

2   Q.   The understanding here was that the sale would close some

3   time before the markets opened, right?

4   A.   That was everybody's hope, yes.

5   Q.   And that the DTCC, assuming an agreement was reached with

6   the DTCC, would then proceed to wind down the open trading

7   positions of Lehman, right?

8   A.   I'm not privy to what the DTCC planned to do immediately

9   upon the opening of the markets on the Monday morning, but it

10   was my belief that both from its perspective and from Lehman's

11   perspective, there would be a wind down of the Lehman accounts.

12   Q.   And you understood that that was expected to take some

13   time?

14   A.   I'm not sure I considered it at the time, to be frank.

15   Q.   Okay.  Let's turn to the second page of this exhibit,

16   which deals with the winding down of accounts.  Let's see if we

17   can blow up just the first sentence of that section.

18        You understand that this refers to the accounts of Lehman

19   at the Depository Trust Clearing Corporation?

20   A.   I believe so, yes.

21   Q.   And you'll see here that this agreement provides that

22   Barclays has indicated "and hereby agrees that all of the

23   accounts of Lehman maintained at the Clearing Agency's

24   subsidiaries, the accounts, constitute excluded assets within

25   the meaning of the APA."  You see that, sir?

82

1    A.    I do, yes.

2    Q.    And you understand that APA here means Asset Purchase

3    Agreement?

4    A.    Yes.

5    Q.    And you understand that excluded assets under the APA are

6    those assets which were not purchased assets and did not go to

7    Barclays, but were instead excluded assets that stayed with the

8    estate?

9    A.    Yes.

10    Q.    And I believe it's your position this morning, sir, that

11    notwithstanding the fact that all of the accounts of Lehman at

12    the DTCC were excluded assets, it's nonetheless Barclays'

13    position that all of the assets, all of the securities in those

14    accounts, were nonetheless purchased assets that were going to

15    go to Barclays?

16    A.    The assets that you were asking about earlier, namely the

17    clearance box assets, the answer is yes, and indeed any other -

18    - I think that's really what we were discussing this morning,

19    so yes.

20    Q.    So the accounts were staying with DTCC with Lehman and all

21    of the securities in the accounts belonged at closing to

22    Barclays?

23    A.    The clearance box securities, yeah.

24    Q.    Right.  Now, if you turn, sir, to the next paragraph of

25    the letter, the one that starts, "As part of this close-out

83

1    process," it says that "the Trustee hereby authorizes DTC (sic)

2    to accept and act upon instructions from NSCC to deliver

3    securities from the DTC LBI account to NSCC's account in order

4    to reduce or eliminate LBI's outstanding delivery obligations

5    to NSCC."  Do you see that, sir?

6    A.   Yes.

7    Q.   And you understand that the NSCC was an affiliate of the

8    DTCC?

9    A.   Yes.

10   Q.   You understand that the NSCC was that organization charged

11   with clearing all the unsettled trades of Lehman?

12   A.   I don't know whether it was to clear all of the unsettled

13   trades, but it certainly would've been there to clear some.

14   Q.   And in the ordinary course of business when NSCC clears

15   trades and it needs securities, it turns, does it not, to the

16   broker dealer and asks the broker dealer who owns those

17   securities to deliver them, so that it can satisfy those

18   obligations?

19   A.   That would be part of -- that would be a natural part of a

20   transaction that needed to be settled.

21   Q.   And here you will see, sir, that it is the trustee, not

22   Barclays, the trustee, which is exercising that authority?

23   A.   Because the trustee had the authority of the accounts.

24   Q.   These are securities that you say belong to Barclays, and

25   in this provision it is the trustee that is authorizing DTC to

84

1   deliver those securities that you maintain belong to Barclays.

2   A.   I don't think this is a reference to the clearance box

3   securities.  There were many, many delivery obligations of LBI,

4   which were then in the hands of the trustee, which also

5   required the DTCC to understand instructions for.  The

6   appropriate person to give the instructions to DTCC or NSCC at

7   -- thereafter for all of those other clearance and settlement

8   negotiations would've been the trustee.

9   Q.   You don't think that this is a reference to the clearance

10  box securities, when this specifically says in the second line,

11  "to deliver securities from the DTC LBI account," you don't

12  think that's a reference to the clearance box securities in

13  that account?

14  A.   I don't think that in this discussions -- in the

15  discussions which led to this agreement with the DTCC, as I

16  think I said earlier, there was any discussion of the clearance

17  box assets, period.  I think this is an instruction and an

18  authorization by the person responsible for the accounts, that

19  it was necessary for DTCC to fulfill its functions in clearance

20  and settlement terms upon the opening on Monday morning.

21  Q.   My question, sir, is the reference to securities and to

22  deliver securities from the DTC LBI account is a reference to

23  the clearance box securities; is it not?

24  A.   I don't know whether it is such a reference.  As I said, I

25  don't recall any discussion of the sort that you're referring

85

1   to, and there was no discussion with DTCC specifically about

2   the clearance box securities.

3   Q.   Now, sir, let me ask you some questions about the 15(c)(3)

4   asset, and your testimony this morning.

5        I believe you said that it was difficult to put any

6   particular values with any certainty.  Now, sir, with respect

7   to the 15(c)(3) assets, there are, in fact, only two components

8   to those assets; cash and government securities; isn't that

9   correct?

10  A.   I believe that -- those were the representations at the

11  time, yes.

12  Q.   And it is not difficult to value government securities, is

13  it, sir?

14  A.   On the whole, government securities are among the easy

15  ones to value.

16  Q.   And it is certainly not difficult to value cash.

17  A.   It shouldn't be.

18  Q.   In fact, the 769 million dollars of government securities

19  in the (c)(3) account were worth exactly 769 million dollars;

20  isn't that right, sir?

21  A.   I don't know, in fact, the full composition of the 769

22  million.  I don't recall looking at it at the time, and I

23  haven't looked at it since.  If they were all government

24  securities at the time, then I would expect that 769 would be a

25  good estimation of that value, but I don't think anybody at

86

1    Barclays certainly had an opportunity to review those

2    securities in that account at the relevant time, in order to

3    satisfy itself that it was, in fact, worth 769.

4    Q.   Will you agree with me that the one billion dollars in

5    cash was certainly worth one billion dollars?

6    A.   If it was cash in dollars, then probably it was.  If it

7    was there, and as I say, if it was in U.S. dollars at the time;

8    but I don't know.

9    Q.   So at the time that the parties appeared before this Court

10   on September 19th, Barclays knowing that there was cash and

11   securities in the 15(c)(3) account, that it maintains it was

12   promised, would have had no difficulty in knowing what the

13   valuation of that cash and those government securities were at

14   the time that it appeared before this Court?

15   A.   I wouldn't put it that way.  I think that it's fair to say

16   that Barclays had been told that those were the values.  All of

17   the parties at the time, who had been privy to the discussions

18   were under the impression those were the values.  But as I say,

19   I don't think Barclays, in fact, knew what those values were.

20   Q.   Well, if Barclays has been told those values, and Barclays

21   is appearing before the Court seeking approval, a sale order

22   approving this transaction, and Barclays takes the position

23   that it was entitled, absolutely and unconditionally to these

24   assets, then would you agree that that is something, and even

25   if the cash has to be estimated in value, or the government

87

1    securities have to be estimated in value, at the very least,

2    it's incumbent upon Barclays to make a disclosure to the Court

3    of the nature of the assets that's being transferred?

4    A.   As I think I said before, there were many assets in

5    Lehman's business that were coming to Barclays as a result of

6    the sale transaction.  Few, if any of them, were capable of

7    being ascertained with certainty.  I believe the parties

8    understood as best as they could at that point in time what the

9    approximate valuations of the 15(c)(3) reserve might be, but

10   Barclays had had no opportunity to test the existence of those

11   assets, nor in fact, the valuations associated with them.

12       We were working upon the representations delivered to us

13   by Lehman Brothers at the time, but had no opportunity even to

14   look at the 15(c)(3) reserve calculations to establish whether

15   the representation was accurate or not.

16   Q.   Now, sir, you said that -- in your testimony that if --

17   that your understanding was if Lehman could not for any reason

18   give you 769 million dollars from the (c)(3) account, then it

19   would have to give Barclays 769 million dollars from somewhere

20   else.  Do you recall that?

21   A.   In securities, correct, yes.

22   Q.   Right.  Now, let me show you the testimony of Harvey

23   Miller at the trial on this point, and that is the April 28th

24   transcript at line (sic) 1008, starting at line 7.  You'll see

25   there, it starts:

88

1       "Q. And that's what led to a heated argument in which you

2    took the position that a representation had been made to the

3    Court that no cash was being transferred to Barclays, and you

4    therefore insisted that one billion dollars in cash not be

5    transferred to Barclays from the restricted customer account?

6       "A. That was one aspect or one branch of the debate, if

7    you want to call it that.  The other being that the account was

8    a protected account and should not have been transferred.  We

9    also, I might add, gave an admonition to Barclays that the

10   likelihood of the SEC ever releasing that account was slim and

11   none."

12      You saw that testimony, sir?

13   A.   Yes.

14   Q.   Did Barclays understand at the weekend that the likelihood

15   of it ever getting any assets from the customer reserve

16   account, the protected account, was slim or none?

17   A.   No, Barclays didn't understand that.  We -- I understand

18   today and the point was raised at the material time, that there

19   was the possibility of a difficulty with respect to that

20   delivery, and certainly at points during that weekend, and

21   indeed on the Friday, the possibility that there might be a

22   difficulty in securing that asset was raised.

23      I don't think Barclays necessarily felt at that point in

24   time, nor since, that the description you just read is

25   accurate.  Having said that, there was clearly a discussion

89

1    about it, and it was precisely because of that doubt that

2    Barclays and Lehman Brothers agreed that if it transpired that

3    there would be such a difficulty, that Barclays would, in any

4    event, get 789 million dollars of securities.

5    Q.    Let me show you Mr. Miller's testimony at page 998 of the

6    trial transcript.  And starting at line 14.

7          "Q. Did you or anyone that you know acting on behalf of

8    Lehman undertake or give Michael Klein or anyone at Barclays a

9    commitment that if there was a regulatory problem and the 769

10   million dollars in securities could not be transferred from

11   inside the 15(c)(3) account, Lehman would be required to

12   substitute and provide 769 million dollars from somewhere

13   outside that account?

14         "A. Absolutely not."

15         You see that testimony, sir?

16   A.    I do.

17   Q.    So you'll agree that Mr. Miller was certainly not aware of

18   any such commitment on the part of Lehman?

19   A.    He appears not to be from this question and answer,

20   correct.

21   Q.    And, in fact, you spoke with Michael Klein, did you not,

22   about this 15(c)(3) account?

23   A.    I think before my deposition I did speak to Michael Klein

24   on a number of issues and probably asked him about this.

25   Q.    And you found that his recollection was not very strong;

90

1    isn't that right?

2    A.    I think that's probably correct.

3    Q.    You found indeed that it was not very clear; isn't that

4    right?

5    A.    I may have used that term.  But I think that my deposition

6    testimony referred to the discussions between Mr. Miller -- or

7    the discussion that Mr. Miller referred to in the passage that

8    you just described.

9    Q.    Now, let me ask you some questions, sir, about the Lehman

10   cash, cash equivalents, and government securities that were

11   used as margin at clearing organizations, okay?

12   A.    Before you do, can I just add one comment to my last

13   answer?

14   Q.    By all means, sir.

15   A.    I didn't think you'd object.  My understanding at the time

16   of the transaction, was that there had been a discussion

17   between Lehman Brothers and Barclays with respect to the

18   15(c)(3) asset.  And while, as you rightly pointed out, Michael

19   Klein could not remember clearly or with any strength, a

20   discussion with Mr. Miller, it was my understanding at the time

21   that the -- or substantially similar securities, a provision in

22   the agreement was specifically agreed to between Barclays and

23   Lehman Brothers.

24   Q.    Now, I believe you said this morning, sir, with respect to

25   Lehman's margin, that it was feasible to do a deal that did not

91

1   involve margin, a deal without margin.

2   A.   I don't think I did say that.

3   Q.   I'm sorry?

4   A.   I don't think I did say that.  I think the essence of what

5   I said was that I could conceive of a situation in which one

6   could construct directly matching exchange traded relative

7   positions that wouldn't necessarily require the obtaining of

8   margin from a separate source to secure those matching

9   exposures.  I think I also said that in fact, in this instance,

10  that was not the case, and that for the most part, without that

11  deliberate design, one absolutely would need margin to secure

12  the exposures.

13  Q.   Well, if you didn't buy Lehman's cash, then Barclays would

14  have to use its own cash; isn't that right?

15  A.   Well, first of all, for these purposes we did take the

16  cash, and if the cash or any other form -- part of the margin

17  had not been available, we wouldn't have taken the exchange

18  traded derivatives business, in which case, all of the margin,

19  in my view, would've been taken by all of the relevant clearing

20  houses in exchanges, and there would've been nothing left.

21  Q.   That's not my question, sir.  My question is, if you

22  didn't buy Lehman's cash, then Barclays would've had to use its

23  own cash; isn't that correct?

24  A.   For what purpose exactly?

25  Q.   To keep the clearing agencies comfortable.  The clearing

92

1    agencies want margin, and you don't buy Lehman's margin, then

2    they're going to ask you to put up your own, Barclays' cash,

3    right?

4    A.   I think they wouldn't necessarily ask for cash, but

5    certainly the OCC and similar organizations would not have

6    delivered accounts or margin to another party without an

7    agreement to cover the margin relevant to those accounts.

8    Q.   And Barclays is a bank, is it not?

9    A.   It is.

10   Q.   And these days, with all the wonderful technology that

11   Barclays has, it is possible for the bank to transfer cash

12   almost instantaneously; isn't that right, sir?

13   A.   I think that's frequently possible, yes.

14   Q.   Indeed, did you not tell us this morning, that on Thursday

15   alone, Barclays transferred some forty-five billion dollars of

16   cash to the New York Fed, correct?

17   A.   In effect, yes.

18   Q.   Now, you referred to the clarification letter, and you

19   also referred to the transfer and assumption agreement.  Did

20   either of those documents, in your view, were either of those

21   documents intended to fundamentally change the economics of

22   this sale?

23   A.   I don't believe they were intended to change the

24   fundamentals of the deal at all, no.

25   Q.   The Lehman margin is an important issue for Barclays; is

93

1    it not?

2    A.    It was a very important issue then, and it comprises

3    significant value for Barclays today, yes.

4    Q.    And it's your assertion, sir, that this is something, this

5    agreement between Lehman and Barclays to transfer all four

6    billion dollars of Lehman's cash, cash equivalents, and

7    government securities to Barclays, that agreement is something

8    that was orally agreed before it ever got reduced to writing;

9    is that correct?

10    A.    Yes.  I think it was also reduced to writing in the APA.

11    Q.    But you cannot tell us who it was at Barclays who had this

12    oral agreement with Lehman?

13    A.    I am not -- I was not privy to the initial discussions,

14    with respect to the exchange traded derivatives business, but

15    it's clear the parties agreed in the APA that the exchange

16    traded derivatives business would be conveyed, and it was later

17    clarified in the clarification letter, in the ways that we've

18    referred to.

19    Q.    And you cannot tell us who is the person at Lehman who

20    orally agreed to transfer all of Lehman's cash, cash

21    equivalents, and government securities to Barclays?

22    A.    Again, as I say, I don't know who was involved in the

23    discussion of -- that you describe.  I do know that as I say,

24    the exchange rated derivatives business was agreed to be

25    conveyed.  I do know that all of the assets used in that

94

1    business were agreed to be conveyed, and necessarily the margin

2    in whatever form was part of that business and therefore to be

3    conveyed.

4    Q.   You have not --

5    A.   I'm not sure that an oral discussion is actually necessary

6    for that purpose if it's all written down.

7    Q.   I'm not asking whether it's necessary, sir.  It's your

8    assertion, you've testified, that there was an oral agreement.

9    In fact, you have no personal knowledge of any such oral

10   agreement; isn't that right, sir?

11   A.   I don't have a knowledge of any discussion with respect to

12   the margin price at the signing of the APA, no.

13   Q.   In fact, you haven't even asked anyone about that oral

14   agreement, have you, sir?

15   A.   I can't now remember whether I've raised that specific

16   point.  It may be that I haven't.

17   Q.   Let me ask you to refer to your deposition transcript at

18   page 115.  Starting at line six, "When did margin become part

19   of the sale transaction?"

20       "A. When did margin become part of the sale transaction?

21   At the beginning.

22       "Q. In the original APA?

23       "A. It was agreed orally before it ever got reduced to

24   writing in the APA, but it was subsequently included in the

25   APA.

95

1        "Q. When you say it was agreed orally, who from Barclays

2   agreed to that?

3        "A. I haven't asked that specific question of anybody, so

4   I can't tell you a specific answer.  The people negotiating on

5   behalf of Barclays at that time, and indeed throughout,

6   included the names we mentioned before, Michael Klein, Archie

7   Cox.  There were also a number of people in the early part of

8   the week of the 15th discussing certain types of assets, and it

9   is probable, though I haven't yet checked, that there was a

10  discussion among some of those people with respect to the

11  exchange traded derivatives."

12       Do you see that, sir?

13  A.   Yes.

14  Q.   Now, this was a topic, a specific topic for your

15  designation as a Rule 30(b)(6) witness, was it not?

16            MR. BOIES:  Objection, Your Honor.

17            THE COURT:  What's the objection?

18            MR. BOIES:  This is way outside of any cross-

19  examination I did.

20            THE COURT:  Well, I think it's not outside in this

21  respect, Mr. Boies.  The examination that you conducted this

22  morning included a review of the letter with the DTC, issues

23  surrounding exchange trade derivatives and the clearance box

24  assets.  This is examination with respect to this witness's

25  knowledge concerning that subject, and I believe as a result

96

1    that it's perfectly appropriate cross-examination.  So I

2    overrule your objection.  I believe it's within the scope.

3    BY MR. MAGUIRE:

4    Q.   This negotiation of the deal concerning margin was a

5    specific topic for your deposition, was it not, sir?

6    A.   I think it was, yes.

7    Q.   That notice was served on Barclays on November 3, and you

8    were deposed on January 15; isn't that correct?

9    A.   I think that's probably right.  I don't recall the

10   specific dates.  I don't have any reason to think that's wrong.

11   Q.   And at no time in that intervening period or since, have

12   you asked the question, who is the person at Barclays who had

13   this oral agreement for Lehman's margin with someone at Lehman;

14   isn't that correct?

15   A.   I certainly don't recall asking that specific question,

16   and I don't think, I haven't asked it subsequent to my

17   deposition.  I did -- there were a lot of subjects that I was

18   trying to cover as a 30(b)(6) witness.  If I said that at the

19   time, then it's accurate.

20   Q.   So you testified at your deposition about an oral

21   agreement of which you had no personal knowledge, and about

22   which you had not asked anyone; isn't that correct?

23            MR. BOIES:  Objection, Your Honor.

24            THE COURT:  What's this one?

25            MR. BOIES:  That the conduct of the 30(b)(6)

97

1    deposition and what he did or didn't do in preparation for a

2    30(b)(6) deposition, that if they didn't like it, they could've

3    complained to the Court a long time ago is not proper redirect

4    examination.

5         THE COURT:  I think this is impeachment.  I'm going to

6    overrule your objection, and it's obviously noted as part of

7    the record, but the quality of this witness's actual knowledge

8    of the subject matter as to which he has testified is fair

9    game.  Overruled.

10        THE WITNESS:  I don't have actual personal knowledge

11   of a discussion of the type.  It was my understanding that

12   there had been discussions prior to the signing of the APA, but

13   I don't have any actual personal knowledge of that.

14   BY MR. MAGUIRE:

15   Q.  Sir, let me show you Mr. McDade's testimony on the first

16   day of trial at page 603 of the trial transcript.  Starting at

17   line 3:

18       "Q. Can you please tell the Court whether Lehman's margin

19   assets were included in the sale?

20       "A. They were not intended to be included in the

21   transaction.

22       "Q. Did you ever authorize any agreement with anyone at

23   Barclays to include any Lehman cash margin in this sale?

24       "A. No, I did not."

25       Do you see that testimony, sir?

1    A.    I do.

2    Q.    So if anyone at Lehman entered into any purported oral

3    agreement with anyone at Barclays concerning Lehman's margin,

4    it was certainly without the knowledge or authority of the

5    president of the company, Bart McDade, correct?

6    A.    It appears from that testimony that Mr. McDade is not

7    aware of such an agreement.  He was not the only person

8    negotiating the agreement.

9    Q.    Let me show you, please, Movant's Exhibit 2.  You were

10   here when Mr. McDade testified about this document, were you

11   not?

12   A.    I believe so, yes.

13   Q.    About the exchange traded derivatives under the asset

14   side, those positions, four and a half billion dollars?  You

15   were here for that?

16   A.    I think I was here for all of his testimony.

17   Q.    And when he described the positions, the four and a half

18   billion dollars of short positions under liabilities, you were

19   here for that, too?

20   A.    I was.

21   Q.    Now, sir, if we were to add four billion dollars of Lehman

22   margin to the asset side of this balance sheet, that would

23   fundamentally change the economics of this transaction; would

24   it not?

25   A.    I don't think I can answer that without knowing what those

99

1    numbers comprised at the time.  And as I think I've said

2    before, Barclays was not in a position at the time of the

3    authorship of this document to know what was in Lehman's margin

4    assets.

5    Q.    Now, sir, now Lehman maintained accounts for its customers

6    at the Options Clearing Corporation; isn't that right?

7    A.    I believe so, yes.

8    Q.    In fact, all of the exchange traded derivatives trading

9    that Lehman did for its clients, its customers, at the OCC, all

10   of those went through Lehman's accounts at the OCC?

11   A.    I'm not sure I could say that absolutely and with

12   certainty.  I would imagine that certainly some of it did.

13   Q.    When customers posted cash to the -- to Lehman, they gave

14   Lehman cash as margin for their trading on the OCC, Lehman kept

15   that cash off the exchange in money market funds and not at the

16   OCC.  Are you aware of that?

17   A.    I have no knowledge of that.

18   Q.    Well, are you aware that when the OCC demanded cash margin

19   to cover customer trading, Lehman put up not customer cash, but

20   its own cash at the OCC?

21   A.    I'm not sure that I'm sufficiently familiar with Lehman

22   practices at the time to be able to answer that question.

23   Q.    So, you, yourself cannot tell us whether all of the Lehman

24   cash at the OCC belonged to Lehman or belonged to customers?

25   A.    I don't think I would be able to identify with that degree

100

1    of detail.  I do think it's right to say that all of that cash

2    or margin of any other form was being used in that business,

3    and was therefore part of what was agreed to be conveyed to

4    Barclays.

5    Q.   Now, you were shown by your counsel an e-mail that

6    referred to one billion dollars of cash at the OCC.  Do you

7    recall that?

8    A.   Yes.

9    Q.   Did Barclays know that all of that cash belonged to Lehman

10   and not to Lehman's customers?

11   A.   I'd have to be sure about the particular e-mail, but I

12   think that at that point in time Barclays was not sufficiently

13   knowledgeable one way or another to know where the cash came

14   from, to whom it was referable, which contracts it was

15   referable to.  I don't think we had that information, where it

16   was at the relevant time.

17   Q.   Now, Barclays did come to learn over the weekend of the

18   clarification letter that there was some two billion dollars of

19   cash margin and government securities at the OCC that was all

20   Lehman property, right?

21   A.   Again, I couldn't tell you specifically what the amounts

22   of cash were suggested to be there at that point in time.  As I

23   think I said earlier, I do recall there was communication, at a

24   minimum by e-mail among a number of parties, that identified

25   cash, but I don't have a recollection sitting here now, what

101

1    exactly those amounts were.

2    Q.    Well, let me see if I can help you by showing you Movant's

3    Trial Exhibit 503.  These are some notes of a Barclays

4    employee, Elizabeth James, for her deposition.

5          MR. MAGUIRE:  And if you can just highlight the 9/21

6    entry at the bottom of the page.

7    Q.    This refers to the report that Barclays obtained from the

8    OCC reflecting values as of 9/19 and 9/22.  At 4:07 p.m.,

9    Barclays receives this e-mail with a report reflecting that as

10   of Friday, the total margin is in excess of two billion

11   dollars.  Do you see that, sir?

12   A.    I haven't -- I don't think I've seen this before.  I don't

13   see any reference to margin there.  I think it says report

14   reflecting 9/19 date showed a total of two billion order.  It

15   doesn't right there, at least, tell me exactly what that's

16   referring to.

17   Q.    I don't need to delay you on this.  I'll represent to you

18   that over the weekend Barclays received a report from the OCC

19   disclosing in excess of two billion dollars of Lehman margin at

20   the OCC.

21         My question for you, sir, is this:  Did anyone from

22   Barclays make any effort to explain to the trustee that all of

23   the cash, cash equivalents, and government securities at the

24   OCC, including all of the margin that was covering customer

25   accounts and customer trading activities all belonged to

102

1    Lehman, and was all going to be transferred to Barclays, not

2    for customer accounts, but for the account of Barclays?

3        Did anyone try to explain that to the trustee?

4    A.   First of all, this information, as I -- assuming is the

5    information you describe it to be, at the time was clearly very

6    recently received, without any opportunity to assess its

7    accuracy or otherwise.  I am not aware today, nor was I then,

8    of a specific discussion advising the trustee as to what the

9    breakdown of the margin would be, by type, or whether it was

10   referable to customers, or to proprietary activities of Lehman

11   Brothers.  But I do recall, as we've earlier discussed, it was

12   plain from the OCC communications to the trustee, that there

13   were substantial amounts of margin that it wanted to convey to

14   Barclays in order that it could properly cover OCC positions.

15       I believe it was very clear from the collateral agreement

16   on the night of the sale hearing, and also through the TAA, and

17   during the course of the weekend, that all of that margin was

18   going to be conveyed in whatever form, and for whatever purpose

19   it had previously been held.

20   Q.   Let's leave aside the trustee for one moment, sir, and let

21   me show you testimony of Mr. Harvey Miller at this trial at

22   page 1008.  Starting at line 22:

23       "Q. You mentioned in your last answer, I believe or the

24   previous answer, margin, sir, and you personally did not have

25   any discussions with anyone at Barclays about Lehman's margin;

103

1   isn't that right, sir?

2       "A. That's correct.

3       "Q. By Lehman's margin, you understand Lehman's cash, cash

4   equivalents, and government securities that Lehman posted as

5   collateral with the clearing corporations?

6       "A. Correct.

7       "Q. And indeed, you were not aware of anyone at your firm,

8   the Weil Gotschal law firm who had any discussions with anyone

9   at Barclays concerning the question of Lehman's margin?

10      "A. As far as I'm aware, that's correct."

11      So there was certainly no disclosure to Mr. Miller or his

12  firm about any transfer of billions of dollars of Lehman margin

13  to Barclays; isn't that correct, sir?

14  A.   I don't think that is correct.  I think it was plain from

15  the e-mails we discussed earlier, and I'm not sure that we

16  discussed all of them, that people at Weil Gotschal were

17  included in those e-mails, from which I think it was very plain

18  that there was margin, there was cash margin, and all of it was

19  going to go from the OCC to Barclays.

20  Q.   And, sir, let me ask you about the creditors' committee.

21  There was certainly no disclosure by Barclays to the creditors'

22  committee concerning the margin; isn't that correct?

23  A.   I don't recall a specific discussion between Barclays and

24  the creditors' committee about margin, but for the reasons I've

25  alluded to earlier, I think it was plain to those present

104

1    during that weekend, that the margin was intended to be

2    conveyed.  I think it was also easily deducible from the APA.

3    Q.   Now, sir, you were asked by your counsel some questions

4    about the sale order, and specifically about the words that

5    came after reasonably equivalent value, the words "or fair

6    consideration."  Do you recall that testimony?

7    A.   Yes.

8    Q.   Barclays understood, did it not, that it was not for

9    Barclays to make the call as to whether the consideration here

10   was fair; isn't that correct?

11   A.   I'm not sure what you mean by "make the call."

12   Q.   You understood that that was a question that was reserved

13   exclusively for the Court, not for Barclays?

14   A.   The determination as to whether, in fact, there was fair

15   consideration was one for the Court, I agree.

16   Q.   And in order to permit the Court to conduct that judicial

17   inquiry and to make a finding, it was important, was it not,

18   sir, for the parties to provide the Court with an understanding

19   of the economics of the sale?

20   A.   Yes, and I believe that happened.

21   Q.   And that happened without providing the Court the total

22   amount of assets that Barclays was acquiring?

23   A.   It certainly wasn't a total valuation, that's correct.

24   Q.   And that happened without telling the Court about the

25   15(c)(3) assets?

105

1    A.    I don't recall any specific reference to that during the

2    sale hearing, no.

3    Q.    And that happened, sir, without disclosing to the Court

4    the transfer of Lehman's cash, cash equivalents, or government

5    securities used as margin; is that right, sir?

6    A.    Again, there was I think knowledge that cash and other

7    securities were to be conveyed.  I think there was a reference

8    to it in the sale order.  Whether it was disclosed in precisely

9    the fashion you've just recited, I don't think it was.

10   Q.    Now, sir, I believe you said or you were asked by your

11   counsel about the uncertainty as to what, if anything, there

12   would be by way of a day one gain for Barclays.  Do you recall

13   your testimony on that subject?

14   A.    I recall questions and answers.  I can't recall the

15   specific testimony.

16   Q.    In fact, sir, it's your understanding, based on all of the

17   work that the Barclays' due diligence teams did, that Barclays

18   was in a position to be highly confident that this transaction

19   would involve a day one gain and be capital accretive for

20   Barclays, correct?

21   A.    I think that's correct.

22   Q.    In fact, Mr. Diamond was in a position, was he not, to be

23   highly confident in telling the Board that this transaction

24   would be capital accretive?

25   A.    I believe that was a part of Mr. Diamond's testimony at

106

1    deposition, yes.

2    Q.   And Mr. Diamond had sufficient information to be in the

3    position to tell the Board that conclusion, correct?

4    A.   I believe so, yes.

5    Q.   So none of the various uncertainties that existed

6    precluded Mr. Diamond from accurately representing to the Board

7    that he was highly confident this transaction was capital

8    accretive; isn't that correct?

9    A.   That's correct, but the uncertainties remained.

10        MR. MAGUIRE:  Thank you, sir.  I have no further

11   questions.

12        THE COURT:  Mr. Boies, was there anything you wished

13   to add to this?

14        MR. BOIES:  Yes, Your Honor.

15                    FURTHER RECROSS-EXAMINATION

16   BY MR. BOIES:

17   Q.   Good afternoon.

18   A.   Good afternoon.

19   Q.   Mr. Maguire spent a lot of time talking about a possible

20   oral agreement.  Is Barclays, insofar as you understand it,

21   relying on any oral agreement in this proceeding?

22   A.   No.

23   Q.   What is Barclays relying on, as you understand it, sir?

24   A.   The APA and the sale order.

25   Q.   And when you refer to the APA, do you include the

VERITEXT REPORTING COMPANY

212-267-6868                                        516-608-2400

1    clarification letter?

2    A.    Yes.

3    Q.    And do those make clear that the 15(c)(3) assets are being

4    conveyed to Barclays?

5    A.    Yes.

6    Q.    And did the trustee sign the clarification letter?

7    A.    Yes, among other documents.

8    Q.    And did the trustee ever complain to Barclays that the

9    15(c)(3) assets should not be conveyed to Barclays?

10    A.    Not only did the trustee not complain about the 15(c)(3)

11    assets, the trustee didn't complain until a long time

12    afterwards about the margin, about cash, about the clearance

13    box assets, or indeed any of the assets that had been a

14    substantial portion of this discussion.

15    Q.    And did the trustee, at the time of closing, or at any

16    reasonable time after the closing, come to the Court and say,

17    Barclays is getting this 15(c)(3) assets, and these clearance

18    box assets that are specified in the clarification letter?

19         MR. GAFFEY:  Objection, Your Honor, issue of

20    reasonable time is for the Court, not the witness.

21         THE COURT:  I'm sorry, what was the objection?

22         MR. GAFFEY:  The question included whether or not

23    Movants came within a reasonable time.  That's not an issue the

24    witness is competent to testify to.

25         MR. BOIES:  I'll withdraw the question and put another

108

1   one, Your Honor.

2          THE COURT:  Okay.  That's even better.

3   BY MR. BOIES:

4   Q.   Did the trustee or any Movant come to the Court at the

5   time of the closing and say, Barclays is being given exchange

6   traded derivative assets and margin and 15(c)(3) assets in the

7   clarification letter, and we object to that?  Did they do that

8   at the time the clarification letter was signed, or at the time

9   of the closing?

10  A.   No.

11  Q.   Did they do that at any time in September of 2008?

12  A.   No.  And during that month, they continued to deliver

13  assets which comprised margin, they continued to deliver cash,

14  they continued to deliver clearance box securities.

15  Q.   And did they come to the Court at any time and object that

16  Barclays was being given, and they in fact, were giving and

17  authorizing the giving of these assets to Barclays at any time

18  in October of 2008?

19  A.   No.

20  Q.   At any time in November of 2008?

21  A.   No.

22  Q.   They showed you some testimony from Mr. Miller.  Let me

23  ask you to look at pages 1005 and 1006 of the trial transcript.

24  And at line 14 and 15, Mr. Miller is referred to where he told

25  the Court at the hearing, "cash, we're not transferring any

1     cash to Barclays, that's out of the agreement." And Mr. Miller

2     says "Yes." And the next question is,

3         "And the representations that you made and that Ms. Fife

4     made to the Court, that was entirely consistent with your

5     understanding of the transaction; isn't that correct?"

6         "A. Yes. In referring to free cash, unencumbered cash.

7         "Q. I believe you said, we're not transferring any cash to

8     Barclays, that's out of the agreement. When you say free cash,

9     that's obviously cash, sir, but I understand what you said to

10    the Court was, we are not transferring any cash. Was there

11    some variety of cash that you are excluding from your

12    representation?"

13        And obviously from the record, this is Movant's

14    examination of Mr. Miller. Mr. Miller answers "There was

15    margin cash associated with a customer account. They,"

16    referring to Barclays, "were taking the customer account. They

17    were taking the whole cash, so if there was collateral cash in

18    that account, that cash would go with the customer account."

19        "Q. You weren't discussing customer property here, you

20    were talking about Lehman's own proprietary property?

21        "A. I may. Your use of the word customer cash,

22    collateral, margin payments, I'm not sure how you would

23    characterize that as whether it is Lehman cash or customer

24    cash. As a general proposition with the accounts being

25    transferred, everything relating to those accounts was being

110

1    transferred."

2        Do you recall that testimony, sir?

3    A.   I do.

4    Q.   Do you agree with it, sir?

5    A.   I do agree with it.

6    Q.   Now, Counsel for the Movants also asked you about a line

7    in the DTCC agreement that talked about the NCCC.

8        MR. BOIES:  And can we put up that page again on the

9    screen, so everybody can see it?

10   Q.   Let's begin with what Mr. Maguire first directed your

11   attention to, which is at paragraph number one, where he read

12   you about how Barclays has indicated and hereby agrees that all

13   the accounts of LBI maintained at the clearing agency

14   subsidiaries, the accounts constitute excluded assets within

15   the meaning of the APA.

16       And then he asked you about that language and you drew a

17   distinction between the accounts themselves, and the assets in

18   those accounts; am I correct?

19   A.   Yes.

20   Q.   He then dropped down, skipping several sentences, and

21   directed your attention to a point where it reads, "As part of

22   this close-out process, the trustee hereby authorizes DTC to

23   accept and act upon instructions from NSCC to deliver

24   securities from the DTC LBI account to NSCC's account, in order

25   to reduce or eliminate LBI's outstanding delivery obligations

111

1    to NSCC."

2         Do you see that, sir?

3    A.    I do.

4    Q.    Now, what he didn't direct your attention to is what is in

5    between.  And that says, "Accordingly, pursuant to the

6    authority granted to the trustee in the orders, the trustee

7    hereby instructs the clearing agency subsidiaries to close out

8    the pending transactions in the accounts of the clearing agency

9    subsidiaries, and to use the proceeds in accordance with the

10   rules and procedures of the clearing agency subsidiaries.  Such

11   liquidation transaction shall be transferred to and closed out

12   by the relevant clearing agency subsidiary, in the same manner

13   as it closes out positions of participants, members from whom

14   it has ceased to act."

15        Do you see that, sir?

16   A.    Yes.

17   Q.    And this was all related to closing out transactions that

18   had begun, but had not been completed, correct, sir?

19   A.    That's correct.

20   Q.    It was designed -- the whole point of this was designed to

21   allow these trades in progress to finish, correct, sir?

22   A.    Correct.

23   Q.    Did this have anything to do at all with a question of

24   what assets Barclays vis-à-vis Lehman was entitled to?

25   A.    Nothing.

112

1          MR. BOIES:  I have no more questions, Your Honor.

2          THE COURT:  Is there anything more, Mr. Maguire?

3          MR. MAGUIRE:  Nothing further, Your Honor.

4          THE COURT:  Mr. Hughes, you'll be pleased to hear that

5    you're excused.

6          THE WITNESS:  Thank you, Your Honor.

7          THE COURT:  My next witness is Mr. Seery.  You must be

8    Mr. Seery.  Please raise your right hand.

9               JAMES SEERY, WITNESS, SWORN

10         THE COURT:  Be seated, please.

11         MR. WERDER:  Good afternoon, Your Honor, Richard

12   Werder from Quinn Emmanuel for the Committee.

13                   DIRECT EXAMINATION

14   BY MR. WERDER:

15   Q.   Good afternoon, Mr. Seery.

16   A.   Good afternoon.

17   Q.   Will you state your name, your full name for the record,

18   please?

19   A.   James Seery.

20   Q.   And taking you back, Mr. Seery, to the week of September

21   15th of 2008, where were you employed at that time?

22   A.   Lehman Brothers.

23   Q.   And how long had you been at Lehman Brothers as of

24   September of 2008?

25   A.   Nearly ten years.

113

1   Q.   What was your position in September '08?

2   A.   I was a managing director.

3   Q.   And were you a managing director responsible for some

4   particular area within Lehman?

5   A.   I was.

6   Q.   What was the area that you were responsible for?

7   A.   I was responsible for the fixed income loans.

8   Q.   To whom did you report?

9   A.   Alex Kirk.

10   Q.   And did you have people that reported to you?

11   A.   I did.

12   Q.   Approximately how many?

13   A.   It was a moving number, but at least five and sometimes up

14   to ten or fifteen.

15   Q.   Were those direct reports or did you intend to include

16   indirect reports within that number?

17   A.   Five were definitely direct, and sometimes that number

18   would grow, depending on whether we put someone in between

19   myself and that group.

20   Q.   After the closing of the sale transaction between Lehman

21   and Barclays, did you go to work for Barclays?

22   A.   I did.

23   Q.   Was that consistent with your expectation prior to the

24   closing of the sale?

25   A.   No.

114

1    Q.   Did you assume prior to the closing of the sale that

2    Barclays would want to hire you?

3    A.   I assumed that I'd have an opportunity.  I didn't have an

4    expectation that I'd take it.

5    Q.   You had an assumption but not an expectation that you

6    would necessarily go there?

7    A.   That's correct.

8    Q.   Were you looking at other opportunities at the time?

9    A.   At that point I was, yes.

10   Q.   Okay.  But your assumption during the week of September

11   15th was that if you wanted to go to Barclays, there would be a

12   position there for you?

13   A.   Yes.

14   Q.   And was that assumption based upon any information that

15   had been conveyed to you, either by someone from Barclays or by

16   someone from Lehman?

17   A.   At what time?

18   Q.   During the week of September 15th when you had the

19   assumption that you would have the opportunity to go to

20   Barclays if you so desired?

21   A.   Let me clarify.  If the sale closed, I thought I'd have an

22   opportunity to go to Barclays.  I didn't have any discussions

23   with anyone prior to the execution of the asset and purchase

24   agreement.  I don't recall exactly when I finally had a

25   discussion with somebody at Lehman Brothers that there would be

1  an opportunity.

2  Q.   And you did, in fact, go to Barclays after the sale

3  closed, correct?

4  A.   I did.

5  Q.   And what was the position that you assumed at Barclays

6  when you joined them?

7  A.   I was a managing director.

8  Q.   Were you a managing director in any particular area of the

9  Barclays business?

10  A.   I didn't have a specific responsibility.

11  Q.   And is it fair to say that the -- your role at Barclays

12  after the close was somewhat undefined?

13  A.   Initially, it was defined, and that we moved over the loan

14  business to Barclays.  Thereafter, because they run their

15  business very differently, there wasn't a role that fit exactly

16  what I had done previously, and because of the seniority I had,

17  there really wasn't a great fit within the same framework that

18  I had at Lehman Brothers.  So I looked at other opportunities

19  within Barclays.

20  Q.   And then did you ultimately end up leaving Barclays?

21  A.   I did, yes.

22  Q.   And did you leave Barclays because there wasn't a good fit

23  between your -- the responsibilities that you were being given

24  and your experience?

25  A.   No.  It was a number of other reasons, but I was offered

116

1    some significant roles at Barclays that were interesting to me,

2    but they weren't precisely what I wanted to do, and there was

3    an opportunity to look at something different after this

4    experience and consider other options.

5    Q.   While you were at Barclays, did you have anyone report to

6    you?

7    A.   No, I did not.

8    Q.   To whom did you report while you were at Barclays?

9    A.   That was an open question; I really didn't know.

10   Q.   Okay.  For the -- you were at Barclays from approximately

11   September of 2008 to May of 2009, correct?

12   A.   That's correct.

13   Q.   And during that period of time, you didn't know who you

14   were reporting to?

15   A.   That's correct.

16   Q.   How much were you paid by Barclays for the period of time

17   when you were there?

18   A.   I had a base salary, I think it was approximately 200,000

19   dollars.  I don't really know.

20   Q.   And did you receive a bonus as well?

21   A.   I received a bonus for 2008 that Barclays had covered as

22   part of the package, and I received a retention payment along

23   with that bonus.

24   Q.   Okay.  And what was the total, approximately?

25   A.   I don't know.

117

1    Q.    Okay.  Was that sum paid to you pursuant to an agreement?

2    A.    Yes, it was.

3    Q.    And is it fair to say that that sum totaled several

4    million dollars, sir?

5    A.    Yes.

6    Q.    When did -- you left Barclays in May of 2009, correct?

7    A.    That's correct.

8    Q.    And did you have a severance agreement when you left

9    Barclays?

10   A.    I did, yes.

11   Q.    Did that agreement require that you cooperate with

12   Barclays for purposes of this litigation in any way?

13   A.    Not to my recollection, no.

14   Q.    Is there any reference to this litigation in your

15   severance agreement?

16   A.    Not that I recollect, no.

17   Q.    When you left Barclays, did you have any discussions with

18   anybody at Barclays concerning any role that you might play in

19   this litigation after you left?

20   A.    Not at all.

21   Q.    And where are you currently employed, sir?

22   A.    Sidley and Austin.

23   Q.    At Sidley and Austin, have you done work for Barclays?

24   A.    I have, yes.

25   Q.    And leaving aside the work that you've done for Barclays

118

1   at Sidley and Austin, have you met with Barclays' counsel since

2   leaving Barclays in connection with this litigation?

3   A.   Yes, I have.

4   Q.   And approximately how many times have you done so?

5   A.   Three or four.

6   Q.   And what was the most recent one, sir?

7   A.   This morning.

8   Q.   You met with counsel for Barclays this morning?

9   A.   Yes, I did.

10  Q.   Did you meet with them yesterday also?

11  A.   I did, yes.

12  Q.   And including yesterday and this morning, is the total

13  amount of times that you've met with Barclays in connection

14  with this litigation three or four?

15  A.   Yes.

16  Q.   And in addition to those -- were those in-person meetings?

17  A.   Yes, they were.

18  Q.   In addition to those in-person meetings, were there

19  additional times when you communicated with counsel for

20  Barclays concerning this litigation by other means?

21  A.   Sporadically by phone, we may have exchanged e-mails.

22  Q.   And you have, in fact, cooperated with Barclays in the

23  defense of this litigation, have you not?

24  A.   They've asked me questions and I've responded.

25  Q.   Okay.  And who did you meet with this morning when you met

119

1    with Barclays' counsel?

2    A.   I met with Mr. Stern and Mr. Schiller.

3    Q.   Okay.  And are those the same two gentlemen that you met

4    with yesterday?

5    A.   They are.

6    Q.   Was anyone else there when you met with them?

7    A.   They had certain associates coming in and out of the room,

8    yes.

9    Q.   Okay.  And is it fair to say that you met with them in

10   preparation for your testimony here today?

11   A.   It's fair to say that I met with them to review my prior

12   testimony and to prepare for this hearing, yes.

13   Q.   Okay.  And going back to the question I asked you a couple

14   of questions ago about the -- your cooperation with Barclays,

15   you said that they've asked you questions and you've responded

16   to them.  You also gave a declaration in this litigation in

17   January of 2010; did you not?

18   A.   I did, yes.

19   Q.   And that was after the first deposition that you had given

20   in the case, and before the second deposition, correct?

21   A.   I believe that's correct.

22   Q.   And was the declaration that you gave in January of 2010,

23   something that Barclays asked you to do?

24   A.   It is, yes.

25   Q.   And it was something that you agreed in response to their

120

1    request to do, correct?

2    A.    Yes.

3    Q.    Did you meet with Barclays' counsel concerning the

4    declaration?

5    A.    No.

6    Q.    Did you discuss the declaration with them over the phone?

7    A.    Yes.

8    Q.    And did they provide -- did they give you some indication

9    of the topics, the subject matters that they hoped to have you

10    cover in a declaration?

11    A.    Of course.

12    Q.    And did they give you some indication about what they

13    hoped that the declaration would say?

14    A.    I'm not quite sure what the question means.  They asked me

15    about certain facts related to the case at that point, certain

16    notes that they provided to me, what my review of it was, and

17    they provided me with a summary, a written summary, of that

18    explanation that I gave them.  I marked that up, and they

19    provided it back to me, I made additional corrections or

20    changes, and then executed it.

21    Q.    And you, in fact, executed the declaration when you were

22    in Alta, Utah, correct?

23    A.    Yes.  The actual signature on it is my assistant's, and I

24    did it by phone.

25    Q.    Okay.  I mentioned -- we mentioned a couple of moments

121

1    ago, the two depositions that you'd given in the case.  Both of

2    those depositions were taken after you had left Barclays,

3    correct?

4    A.   I believe so, yes.

5    Q.   The first one was in September of 2009, that would've been

6    after --

7    A.   Yes.

8    Q.   -- you left Barclays, right?

9    A.   That's correct.

10   Q.   Okay.  And the second one obviously was later than that.

11   Did you have any preparation sessions with Barclays' counsel in

12   preparation for either of the two depositions that you gave in

13   this case?

14   A.   I believe I had one.  I don't know if it was by phone or

15   in person for the first one, I don't recollect if I had one for

16   the second one.

17   Q.   You think you had one for the first, but you're not sure

18   about the second?

19   A.   Right.  So my count of four would be today, yesterday,

20   Friday, and the one prior to the first one.  I don't believe I

21   had one for the second one, I could be wrong.

22   Q.   Okay.  And in the session that you had with Barclays, the

23   sessions that you had with Barclays' counsel yesterday and

24   today, did you review any documents?

25   A.   Yes.

122

1    Q.    What documents did you review?

2    A.    There were many documents that I believe are all exhibits

3    that I've seen in various deposition testimony that I've given.

4    Q.    And did you review deposition transcripts in the meetings

5    yesterday or today?

6    A.    I certainly reviewed my deposition transcript.  I don't

7    recall if I looked at anyone else's.  There may have been

8    snippets of other depositions.

9    Q.    Okay.  Did you review any trial testimony from last week

10   of this proceeding?

11   A.    I don't believe so.

12   Q.    Did you have trial testimony of any witness summarized for

13   you by Barclays' counsel?

14   A.    Written?  I believe orally, yes; written, no.

15   Q.    Whose testimony was summarized for you orally?

16   A.    Mr. Miller's.  I don't believe Mr. -- I don't recollect if

17   Mr. Ridings' was trial testimony or deposition testimony, and

18   that's about it.

19   Q.    Anyone else?

20   A.    I think that's about it.

21   Q.    Okay.  And was there any review in the course of the

22   session yesterday or today about the types of questions that

23   Barclays' counsel expected you might be asked today?

24   A.    There was review of the topics, not the types of

25   questions.

123

1    Q.   Okay.  And did they review with you the questions or the

2    topics that they intended to examine you about at today's

3    hearing?

4    A.   Yes.

5    Q.   Okay.  And you don't work for Barclays anymore or have any

6    confidential relationship with them, do you, sir?

7    A.   I do not.

8    Q.   All right.  At yesterday's meeting, did you -- did

9    Barclays' counsel provide you with an errata sheet for the

10   deposition that you gave in March of this year?

11   A.   Yes.  Yes, they did.

12   Q.   And was that an errata sheet that Barclays' counsel had

13   prepared and then gave to you?

14   A.   Yes.  It came out of discussion we had in reviewing the

15   testimony, and I believe it was in the morning or on Friday

16   where certain words were wrong.  There's a number of mistakes

17   in the transcript, which I had not seen previously.  When I saw

18   it on Friday, it includes references to the word mark written

19   as marked, mark as market, a number of mistakes like that.

20   There's also a number of places where I think the stenographer

21   just inserted words where maybe I had paused.

22        So for example, where a number of places it says, you

23   know, I don't recall ever saying that.  I'd like to see the

24   videotape to determine whether I did.

25   Q.   All right.

124

1          MR. WERDER:  May I approach the witness, Your Honor?

2          THE COURT:  Yes.

3          THE WITNESS:  Excuse me, can I -- thanks.

4    BY MR. WERDER:

5    Q.    Mr. Seery, we've been using these binders of exhibits for

6    convenience, and there are a number of tabs in your particular

7    binder.  What I'd like you to do is to direct your attention to

8    the tab that's marked M-714.  Leaving aside the first page,

9    which is an e-mail from one of Barclays' lawyers to some of the

10   Movant's lawyers yesterday afternoon, can you identify the

11   certification as the certification that you filed yesterday?

12   A.    That is my signature, yes.

13   Q.    Okay.  And is it your testimony that this document was

14   prepared by Barclays' counsel based upon some prior

15   communication that you had had with them?

16   A.    My testimony was that we'd reviewed the transcript.  They

17   prepared this going through certain changes, which I reviewed

18   the changes, and this is the sheet that I signed.

19   Q.    Maybe I --

20   A.    I didn't quite understand your question.

21   Q.    I think I misunderstood you.  So you had a discussion

22   about the transcript yesterday, and that resulted --

23   A.    I don't recall if it was Friday or yesterday morning, and

24   at some point during yesterday's discussion, after reviewing

25   certain of the changes, for example, as I mentioned, Sal to

125

1    Saul, marked to mark, they prepared this, I reviewed it again,

2    and then executed the certification on the front.

3    Q.    And you mentioned specifically the word marked and market,

4    and it's true, is it not, that the changes that you've made,

5    changed the word market to the word marked for some number of

6    instances of the use of those words, correct?

7    A.    Yeah.  I think if you go through the deposition

8    transcript, you can see the context where it's wrong.

9    Q.    And did you go back and review the videotape of the

10   deposition before making these changes and signing the

11   certification?

12   A.    I did not.  I think a minute ago I said I didn't review

13   the videotape.

14   Q.    Okay.  And so then my question would be whether the

15   changes that you made specifically with respect to the use of

16   the word marked versus market, were those changes intended to

17   correct something that you thought that the reporter had failed

18   to transcribe correctly, or were they changes that were

19   intended to correct an answer where you might have used the

20   wrong word in the deposition?

21   A.    The former.

22   Q.    And other than -- how did you -- what did you do to

23   determine that you thought the reporter had made a

24   transcription error with respect to the use of the word marked

25   versus market?

126

1   A.   I don't recall which of these specific items led to this

2   discussion with Barclays' counsel, but we noticed one where it

3   was clearly wrong, and you could see it in the context of the

4   sentence.   And so we went back, and they went back and reviewed

5   it further and found others.   And there was, as I mentioned, a

6   number of other items that were just clean-up items.

7   Q.   And did you ask anybody on the Barclays team to go and

8   check the videotape to make sure that it was a transcription

9   error versus some error that you now perceived with the benefit

10  of hindsight?

11  A.   No, I did not.

12  Q.   Okay.   Did Barclays' counsel in the course of the meeting

13  that you had with them, or either of the meetings that you had

14  with them, or the call that you may have had with them on

15  Friday, did they point out to you the issue with respect to the

16  use of the word market versus marked?

17  A.   I don't recall who pointed it out to whom, but it came up

18  in our discussion and it was wrong.

19  Q.   You don't recall who --

20  A.   Whether I pointed it out or whether they pointed it to me,

21  and asked, did you say this, and I would have said no.

22  Q.   Okay.   And you remember your deposition from March well

23  enough to know that you -- the word that you used at the time

24  without going back to the videotape, is that --

25  A.   I believe I testified that you could see it from the

127

1    context.

2    Q.    And that's the basis?  Is that the sole basis for your

3    correction the -- your after the fact reading of the sentences

4    in context?

5    A.    It'd be hard to correct it before the fact.

6    Q.    Okay.  Let me, if I could, direct your attention to --

7    away from the meetings that you've had over the last couple of

8    days, back to the week of September 15th.  And at some point

9    during the week of September 15th of 2008, did you become aware

10   of what has been called the Fed REPO transaction?

11   A.    I did.

12   Q.    And were you involved in setting up the Fed REPO

13   transaction?

14   A.    I was not.

15   Q.    During the week of September 15th of 2008, did Barclays,

16   for want of a better phrase, step into the shoes of the Fed on

17   the REPO?

18   A.    Barclays took over the REPO from the Fed.  You have to

19   remember how REPO actually works.  At night, all the securities

20   -- these securities are not financed with equity entirely.

21   There's debt against them.  The Fed had stepped into a REPO,

22   stepped into a REPO that had been REPO'd out to the street many

23   times.  That financing came from the Fed for a few days.

24   They'd made very clear from my time at the Fed until it

25   actually happened that they wanted out, and they wanted out of

128

1    that risk fast.  They didn't like the risk, they didn't want to

2    be in that position.

3        Barclays started to take some of the securities back, but

4    each day that Barclays stepped more and more into that

5    position, the securities could change during the day.  So when

6    we say stepped into, it wasn't as if they took an assignment of

7    a particular collateral package that goes back to the clearing

8    broker during the day, and then it gets back REPO'd out at

9    night, and yes, I was aware that Barclays had done that.

10   Q.   And did that happen gradually over the course of the week,

11   or did that happen in one fell swoop on one day, to your

12   recollection?

13   A.   My recollection is that it started on Tuesday or Wednesday

14   with Barclays taking about three billion dollars of REPO, and

15   then gradually took a little bit more.  And I believe on

16   Thursday night, they took the vast majority of it.  But when

17   they take it, remember, it comes back to the clearing bank, and

18   then they take a full new forty-five, fifty, sixty-five,

19   seventy each day, depending on the amount that has to be

20   REPO'd.

21   Q.   And the numbers that you're using, are those numbers that

22   you recall during the week of September 15th as being numbers

23   that were associated with the REPO transactions?

24   A.   Well, the REPO transaction amount that I recall is 50.6

25   billion dollars.

129

1    Q.    50.6 billion dollars?

2    A.    That's correct.

3    Q.    That was the amount of the Fed REPO that Barclays

4    eventually took over; is that correct?

5    A.    Yeah, subject to the description I just gave, yes.

6    Q.    Understood.  And in a standard REPO contract -- withdrawn.

7          A REPO is essentially a financing vehicle; is it not, sir?

8    A.    It's structured as a -- it's a financing structured as a

9    sale.  So the one party sells the assets to the other party,

10   the other party agrees to buy them back.

11   Q.    And the party, the buyer agrees to sell them back, as

12   well, correct?

13   A.    That's correct.

14   Q.    And generally -- it's generally expected, is it not, that

15   the selling party will, in fact, buy the collateral back at the

16   price that it was sold for, plus some mark-up that's intended

17   to reflect the financing charge, correct?

18   A.    Generally that's the case, yes.

19   Q.    Okay.  And was that the case with respect to this REPO

20   arrangement?

21   A.    The economics of the margin, I don't know.

22   Q.    Okay.  In a standard REPO contract, sir, does the lender

23   extend less cash than the amount of the collateral?

24   A.    The party buying, which you've denominated as the lender,

25   has a cushion between what they buy and what they extend.  So

130

1    in this case, 45 billion extended by the Fed and subsequently

2    45 billion dollars extended by Barclays to purchase those

3    assets, the assets would have a nominal number of value greater

4    than the amount extended.

5    Q.   Okay.  And so it was the -- I used the word lender in my

6    last question, and you appropriately appointed out that that

7    use of the word is somewhat imprecise.  But in relation to a

8    description of a REPO as a financing transaction, the REPO --

9    the buyer of the assets is essentially in the position of a

10   lender, correct?

11   A.   That's correct.

12   Q.   Okay.  And that was the case with respect to the Fed REPO,

13   the REPO that the Fed had stepped into during the week of

14   September 15th, was it not?

15   A.   Yes.

16   Q.   And it was the case with respect to the REPO at the time

17   that Barclays gradually stepped into the Fed's shoes as well,

18   correct?

19   A.   That's correct.

20   Q.   And the amount -- I think you said 50.6, was that the

21   collateral that was posted for the REPO by Lehman?

22   A.   That's my recollection, yes.

23   Q.   Very good.  Moving to the morning -- through the week of

24   September 15th to the morning of September 19th.  Was the --

25   were you aware that the sale hearing had been scheduled for the

131

1    afternoon of September 19th?

2    A.    I believe it was actually scheduled for the morning of

3    September 19th originally, and it was moved.

4    Q.    It was ultimately postponed to the afternoon, was it not?

5    A.    That's correct.

6    Q.    And were you aware of the scheduling of that hearing at

7    all relevant times during the day on the 19th of September?

8    A.    I was, yes.

9    Q.    And in terms of your role in the sale transaction, were

10   you personally involved in the events and the negotiations

11   leading up to the sale transaction?

12   A.    Certainly certain of the events, yes.

13   Q.    Okay.  And as a result of what -- well, why don't you just

14   describe generally, characterize your role with respect to the

15   transaction, if you would, sir?

16   A.    Well, we can start back, but it was a very hectic week.

17   We'd obviously, and I mean we, me personally, with a few of my

18   colleagues spent the weekend at the Fed trying to negotiate the

19   sale of the entirety of Lehman to Barclays.  When that

20   transaction was turned down by various regulatory agencies

21   related to a number of issues, which I think had become public,

22   we looked for a different alternative transaction.  We also

23   looked for a way to finance the firm.

24       The Fed had made clear to us that they wanted us to file,

25   the Fed and the SEC, to file for bankruptcy on Sunday night,

132

1   and we looked for an alternative transaction.  And I was

2   involved in both helping come up with the idea of an

3   alternative transaction to Barclays, as well as trying to help

4   keep the firm running during that week.  And I think what is

5   forgotten is that the -- it was a very difficult time.

6   Employees were stressed beyond belief.  The organization was

7   stretched.  The filing in Europe really upset a lot of

8   counterparties' accounts, brokerage clients, so that really

9   hurt the sales organization.  It was a very, very difficult

10  hectic week, and so I was involved in a number of different

11  aspects of trying to help consummate that sale to keep the

12  business together.

13       They included working on the DIP financing, which was

14  required to help fund Lehman through the sale period, which we

15  thought could run as much as ten days, and without the

16  financing, we wouldn't have been able to do it.  As well as

17  certain aspects related to the asset purchase agreement and

18  closing the transaction with Barclays.

19  Q.   And were you aware that there was a proposed transaction

20  that was submitted to the Court during the week of September

21  15th?

22  A.   I was here, yes.

23  Q.   Okay.  And were you generally familiar with the terms of

24  the deal that had been presented to the Court and the asset

25  purchase agreement that was filed with the Court?

133

1   A.    Generally, yes.

2   Q.    Okay.

3   A.    Now, one point to keep in mind again, is that we

4   compartmentalized a lot of the things that had to be done.  And

5   if we had not been able to divide those tasks, we probably

6   wouldn't have gotten it done.  So my knowledge, working

7   knowledge, is of the deal generally, and then there are the

8   things that I worked on specifically.

9   Q.    And did you have an understanding by Friday morning, the

10  19th, that the deal had changed somewhat from the deal that had

11  been filed with the Court earlier in the week?

12  A.    Yes, I did.

13  Q.    And did you have an understanding generally of the terms

14  of the deal that were under discussion with Barclays by Friday

15  morning?

16  A.    I did, yes.

17  Q.    And it's fair to say, is it not, that the deal that was

18  under discussion with Barclays on -- by Friday morning was a

19  different deal than the deal that had been previously presented

20  to the Court, correct?

21  A.    Certain of the aspects were very different, with respect

22  to the securities that would trade.  The basic of the set-up of

23  the deal was identical.  Barclays was going to buy the U.S.

24  franchise for roughly 250 million dollars.  They were going to

25  assume certain liabilities with respect to that franchise.

134

1   They were going to buy the building for about a billion

2   dollars, and they were going to buy some data centers for, I

3   think, roughly 200 million dollars.  So that framework was the

4   same.  The question was what assets would be available, and

5   what assets would actually transfer to Barclays that would help

6   run the business, and whether Barclays would buy those assets,

7   or something else would happen to them.

8   Q.   Let me ask a slightly more specific question, and that

9   information was helpful, but the original deal, sir, did not

10  involve the REPO transaction, did it?

11  A.   I don't recollect whether the original deal involved the

12  REPO transaction.  It was clear on Sunday night and into

13  Monday, and I believe the asset purchase agreement or the order

14  reflected it.  I apologize, I don't recollect, that the Fed

15  wanted out the REPO, and they were not going to wait around.

16  So there was a lot of pressure from the Fed financing Lehman

17  Brothers.

18       We had offered, I specifically had offered the Fed and the

19  SEC the opportunity to wind Lehman Brothers down over a longer

20  period of time.  We could've looked for a different buyer, we

21  could've liquidated the securities, we would've kept all the

22  derivatives positions in place.  They specifically turned that

23  down.  When they were in the Fed REPO position, which is

24  funding approximately 50 plus billion dollars of Lehman

25  Brothers' assets, they were not comfortable, and I believe they

135

1     made that well known.

2          So I don't -- I just don't recollect, when you say it

3     wasn't part of the deal, I think from my perspective, getting

4     the Fed out of their REPO was pretty important, and certainly

5     from the noise we heard from the Fed, it was important from

6     them as well.

7     Q.   By Friday morning, was part of the deal that was under

8     discussion to essentially turn the REPO into an asset sale?

9     A.   Yes.

10    Q.   And that's -- the concept of turning the REPO into an

11    asset sale was a different concept than the concept that had

12    been presented in the APA earlier in the week; was it not, sir?

13    A.   I don't know how the payment mechanism worked in the APA.

14    Q.   So you don't know one way or the other?

15    A.   I just don't recollect right now, no.

16    Q.   Okay.  Was the -- on the morning of the 19th, was the

17    value of the REPO collateral that Barclays had received a topic

18    that was under discussion between Barclays and Lehman?

19    A.   Yes, it was.

20    Q.   And were you involved in those discussions?

21    A.   I was.

22    Q.   And I think that you mentioned earlier the 50.6 billion

23    number, and it's true, is it not, that based upon Lehman's

24    marks, the aggregate value of the collateral that went to

25    Barclays was about 50 billion dollars, correct?

136

1    A.   Lehman's marks for the Fed facility were 50.6.  I don't

2    recollect exactly what the -- when the securities went to

3    Barclays, exactly what they were off the top my head, or

4    whether that aggregated exactly 50.6, but it's in that

5    neighborhood.

6    Q.   Okay.  And certainly, you are familiar that the marks for

7    the collateral that the Fed had received earlier in the week,

8    they were marked at about 50.6 billion, correct?

9    A.   That's correct.

10   Q.   All right.  And were you familiar with the process that

11   Lehman used to mark securities as of the time period September

12   2008?

13   A.   Generally, yes.

14   Q.   And you had confidence in that process; did you not, sir?

15   A.   I did.

16   Q.   And the Lehman team, including you, believed that the

17   marks that Lehman had on its securities were accurate marks,

18   correct?

19   A.   Well, I had confidence in the marks that I was responsible

20   for.  And during that week, it was very difficult to keep

21   traders in their seats and to mark liquid assets, let alone

22   illiquid assets.  So I don't believe that from my own personal

23   experience, I have good confidence in the process that Lehman

24   used, generally.  In that week, it was difficult.

25   Q.   But generally, you did have confidence in the process,

137

1   including in that week; did you not, sir?

2   A.   I think I just testified that, generally, I had confidence

3   in the process and during that week, it was very difficult.  So

4   there was questions about what was happening that week.  My own

5   positions, I felt pretty good about.

6   Q.   Well, let me direct your attention, if I could, sir, to

7   page 253 of your deposition; actually, 252 and 253.  That's the

8   end of your -- the last thing in your binder.  And it'll be --

9   it should be after the -- it's your second deposition, page

10  253.  The numbers ran sequentially.

11  A.   Uh-huh.

12  Q.   And focusing on the bottom of page 252 and to the top of

13  page 253, you were asked:

14      "Q.  But you were familiar generally with this process

15  that Lehman was using to mark your liquid securities, right?

16      "A.  Yes.

17      "Q.  And you had confidence in it at the time?"

18      And your answer was yes.  That was your testimony,

19  correct, sir?

20  A.   That's exactly what I just said.

21  Q.   And is it your -- are you testifying here that that

22  deposition testimony was limited to the marks that you were

23  personally involved in or did it extend to the overall

24  portfolio?

25  A.   I think the context of this -- these statements are

138

1    important.  I'm being asked about modeling, was I familiar with

2    how Lehman modeled illiquid securities.  The answer is yes.

3    You're asking me now -- you're trying to take this and say on

4    that date was I sure that they were up to date.  For my own

5    securities that I was responsible for, that I signed Sarbanes

6    Oxley for, I was comfortable.  But in that market it was still

7    difficult to be very accurate, particularly with respect to

8    illiquid securities.

9        And I think the testimony I gave earlier is identical to

10   what I gave here.  You've just taken I think part of it out of

11   context, and there should be other places in the deposition

12   where the very question you asked me I was asked and I answered

13   in the very same way.

14   Q.    And as a general proposition in its dealings with Barclays

15   on -- in the week of September 15th, it was Lehman's position

16   that the marks on the Fed collateral were accurate marks,

17   correct?

18   A.    Yes.

19   Q.    And that the value of the securities was consistent with

20   the marks on the securities, correct?

21   A.    That was our position, yes.

22   Q.    Okay.  And the result of that would be that the -- there

23   would be a difference between the marks on the securities and

24   the amount that had been advanced under the REPO financing

25   transaction, correct?

139

1    A.    That's correct.

2    Q.    And that difference was approximately five billion

3    dollars, wasn't it, sir?

4    A.    That's correct.

5    Q.    All right.  Taking you to Friday morning, we started to

6    mention some of the discussions with Barclays.  Is it fair to

7    say that there were some issues that had arisen with respect to

8    the transaction by Friday morning that, perhaps, called the

9    transaction into question?

10   A.    That is fair to say.  Yes.

11   Q.    And were you involved in discussions with Barclays

12   concerning those issues?

13   A.    I was.

14   Q.    And did the issues involve, among other things, a

15   difference of opinion, with respect to the value of the

16   collateral that Barclays had received when it stepped into the

17   shoes of the Fed under the REPO transaction?

18   A.    They did.  What happened was on Thursday night, Barclays

19   began to take in the REPO.  And during that night, they were

20   purchasing around 50 billion dollars, face amount roughly, of

21   assets in -- marked on Lehman's books.  And they were advancing

22   around 45 billion dollars of cash.

23        Their team in London called and checked certain items that

24   were getting delivered to them by JPMorgan.  Some of those

25   items they questioned the value of, and one of them in

140

1    particular, they called me.  And that led to some concern about

2    the value of that asset, because it didn't -- it wasn't an

3    asset that was marked, to my knowledge, at any regular

4    interval.

5         In addition, on Friday morning, when they looked at what

6    they had, there were a number of other assets in the REPO that

7    they had questions about the marks.  And so they challenged

8    Lehman's marks with respect to those assets.

9    Q.   And were they, as part -- oh, I'm sorry.  Were you

10   finished?

11   A.   Yes, I am.

12   Q.   I thought I cut you off, sorry.  Were they threatening not

13   to close on the transaction as a result of these issues?

14   A.   They were, yes.

15   Q.   And were you involved in various discussions with Barclays

16   concerning the issues that they were raising?

17   A.   I was, yes.

18   Q.   Who from Lehman other than yourself were involved in those

19   discussions?

20   A.   Alex Kirk.

21   Q.   Anyone else?

22   A.   Bart McDade.

23   Q.   Anyone besides the three of you?

24   A.   I believe Mark Shapiro, as well.

25   Q.   And who from Barclays do you recall being involved?

141

1    A.   Mike Keegan, Rich Ricci.

2    Q.   Any others from Barclays that you recall being involved?

3    A.   I believe, at least briefly, Mr. Diamond.

4    Q.   And at some point on Friday morning, did you assemble a

5    group of Lehman traders and give them an assignment?

6    A.   I did, yes.

7    Q.   And do you recall the approximate time at which you did

8    that?

9    A.   No, I don't.

10   Q.   Was it -- can you approximate it at all, whether it was

11   first thing in the morning, mid-morning, late morning?

12   A.   The time runs completely together, because I don't believe

13   we went home on Thursday night.  The calls that I got from

14   London with respect to some of the assets that were trying to

15   get put into the REPO were middle of the night calls.  We

16   scrambled to try to figure out what those assets were.

17       By early Friday morning, I had met with Mr. Kirk and

18   discussed some of the issues that Barclays had, particularly

19   Mike Keegan.  I believe, at that point, the hearing may not yet

20   have even been moved.  And we knew we had to prepare Mr.

21   Ridings for testimony.

22       So I met with Mr. Ridings, had other conversations

23   involved with their dispute with respect to -- Barclays'

24   dispute with respect to the amount or value of certain of the

25   assets.  And then in connection with preparing Mr. Ridings and

142

1  thinking about the value dispute, I called together a bunch of

2  traders, so I don't have a real accurate reflection of the time

3  as it all ran together.

4  Q.   And was the -- did you, in fact, call them together as

5  part of the process of gathering information for Mr. Ridings'

6  testimony?

7  A.   Yes, that was the primary purpose.

8  Q.   Okay.  Where did this -- the meeting of the traders take

9  place?

10  A.   I believe it was on the third floor at Lehman Brothers in

11  one of the conference rooms.

12  Q.   And do you have any recollection about how the meeting was

13  set up?  Was it set up in advance, was it a spur of the moment

14  kind of a thing?

15  A.   It was very much spur of the moment.  I sat down with Mr.

16  Ridings.  I don't recall whether there was someone from Weil

17  Gotschal there or not to review Mr. Ridings' testimony and

18  review the changes to the deal, to discuss the securities, as

19  well as the other assets that were being transferred.

20      I then quickly assembled a number of traders to review

21  categories of positions.  I don't recall how many traders, but

22  it was at least ten or fifteen, probably more like twenty, and

23  was doing it with one of the guys who ran hedge fund sales.

24  Q.   And you mentioned the meeting that you had with Mr.

25  Ridings.  Did Mr. Ridings give you some indication at that

143

1    meeting about what information he thought he needed for

2    purposes of the hearing?

3    A.    I don't recollect a specific discussion.  This was an area

4    of law that I'm generally familiar with.  And so I was prepared

5    to work with Mr. Ridings to help him get the information he

6    needed for his testimony.

7    Q.    And did you have some understanding then based upon your

8    familiarity about the kind of information that Mr. Ridings

9    needed, even though he didn't tell you?

10   A.    Yes, I did.

11   Q.    And what was your --

12   A.    Well, I don't -- excuse me.  I don't know that he didn't

13   tell me.  I just don't have a specific recollection of the

14   discussion.

15   Q.    What was your understanding of the kind of information

16   that Mr. Ridings needed for purposes of his testimony?

17   A.    I think he was going to testify that the sale was fair and

18   reasonable.  And in order to do that, he had to consider what

19   the alternative sales of Lehman Brothers would look like.

20   Q.    And did that include a liquidation value of the assets

21   under consideration?

22   A.    It included a sale of all of the securities and all of the

23   other assets and what they would have looked like.  We didn't

24   do a liquidation value in the term, the way the term is

25   normally used in bankruptcy court, where you have a liquidation

144

1    analysis that goes along with a disclosure statement.  We

2    really tried to look at, you know, what the securities were

3    worth versus what our marks were.

4    Q.   And so it's your testimony that the work that you were

5    doing was not intended to come up with a liquidation bid for

6    the collateral?

7    A.   No, it was a liquidation bid.  It was to sell the assets,

8    you know, over a relatively swift period of time.  I didn't set

9    up parameters and say we're putting it on the auction block

10   tomorrow, but to sell securities over a couple of days to see

11   what you could get out of them in the context of the business.

12   Q.   And that was the instructions that you gave, in fact, to

13   the traders were to -- well, withdrawn.

14        Have you -- we're going to get into the specifics of the

15   meeting in a moment.  But in describing the meeting that you

16   had with Mr. Ridings, have you fully described the impetus for

17   the meeting that you assembled of the Lehman traders?

18   A.   I'm not quite sure what your question is.

19   Q.   Well, you talked about Mr. Ridings and his need to

20   testify.  And after the -- after you had the meeting with Mr.

21   Ridings, you went and called this meeting of traders, correct?

22   A.   Yes.

23   Q.   And what I was trying to ask you, not very artfully, was

24   whether there were other meetings in which you had participated

25   that also contributed to your decision to call this meeting of

145

1    the traders.

2    A.   No.  It was coming out of my meeting with Barry.

3    Q.   Okay.  So the meeting with Barry was the, I think you said

4    was the primary impetus of --

5    A.   Yes.

6    Q.   -- the calling of the meeting of the traders?

7    A.   Yes.

8    Q.   Okay.  And you mentioned Mr. Ricci of Barclays.  Was he

9    present at Lehman's facility on the morning of the 19th?

10   A.   He was at the facility, he wasn't at that meeting.

11   Q.   And had you met with him earlier in the morning prior to

12   calling the meeting of the traders?

13   A.   I don't think I met with Mr. Ricci that -- before that

14   meeting, and I was only in one meeting with Mr. Ricci around

15   that time.

16   Q.   All right.  How about Mr. Keegan, was he -- did you meet

17   with him shortly in advance of calling the meeting --

18   A.   No.

19   Q.   -- of the traders?

20   A.   No.  This was a meeting with our financial advisor, our

21   expert, just Lehman people.  And there was nobody from

22   Barclays.  This was on the third floor.  The people from

23   Barclays were on the 31st floor.  This was on the trading

24   floors, bringing guys in and telling them what we want them to

25   do.  And it wasn't a formal meeting as we're sitting here in

146

1    this court.  It was guys standing up and saying this is what we

2    need and we need it fast.

3    Q.   And was it you who did the selection of the traders that

4    you assembled for purposes of this task?

5    A.   I don't believe I actually picked the individual traders.

6    I think that was Peter Hornick.

7    Q.   I'm sorry?

8    A.   Peter Hornick.

9    Q.   Peter Hornick picked the traders.  And did Mr. Hornick

10   notify the traders that the meeting was going to occur?

11   A.   Literally ran around the floor and grabbed guys off their

12   desk and said, come with me.

13   Q.   And is it fair to say that the purpose of the gathering of

14   the traders was to have the traders provide values for certain

15   assets?

16   A.   It was, yes.

17   Q.   And were those assets the assets that constituted the REPO

18   collateral?

19   A.   They really weren't, because I didn't have the full deck

20   of what was in the REPO collateral.  They were categories of

21   assets that were in the Fed collateral.  So they went from

22   things like agency debentures, to pass through certificates, to

23   CMO equity even.  So all kinds of different securities that

24   otherwise would have made their way into the Fed REPO.

25   Q.   So was the base that you were working with then the --

147

1    what you understood to be the Fed collateral, the Fed REPO

2    collateral?

3    A.    Didn't hand out a sheet to anybody.  We simply asked them

4    to look at those categories of assets that we believed were

5    involved in the trade and get a sense of where the market had

6    moved and how they would do if they were trying to sell those

7    assets, whether they -- if the market was very liquid, they

8    could sell it this afternoon, if it wasn't so liquid, it could

9    take a couple days.  But to move both the type of asset and the

10   size position that they had through the market.

11   Q.    And did you give the traders a specific assignment?

12   A.    That was the assignment I gave them.

13   Q.    Okay.  And it was you that gave them the instruction,

14   correct, not anybody else?

15   A.    That's correct.

16   Q.    You personally gave the instruction to the traders?

17   A.    I'm sure Peter amplified it, but I gave it in at least the

18   first instance.

19   Q.    And it's true, is it not, that the assignment that you

20   gave to the traders was to determine what the appropriate

21   liquidation bid would be with respect to the collateral?

22   A.    To their various securities.  But liquidation bid the way

23   you're using it, is just selling the securities over a short

24   period of time.  You're not looking to sell them all to one

25   buyer, you'll get killed.  In the context of your market and

148

1    the securities that you trade, how much of a hit to your mark,

2    how much of an adjustment to your marks would you realize if

3    you had to sell it in the market during that week.

4    Q.    And the term liquidation bid with respect to the

5    collateral was, in fact, part of the instructions that you gave

6    to the Lehman traders; was it not, sir?

7    A.    I don't really know.

8    Q.    All right.  Let me --

9    A.    I may well have used that term.  I don't know.

10   Q.    Okay.  Let me direct your attention, if I could, to page

11   257 of your deposition.  And there's kind of a long question

12   and answer there.  Why don't you take a moment to review the

13   question that starts on line 12 of page 257 and the answer that

14   runs over to the end of page 258.

15   A.    Just so I'm in the right place, your question is, "So

16   what's the next thing that you folks do, that you do

17   personally?"

18   Q.    That's correct, sir, thank you.

19   (Pause)

20   A.    Okay.

21   Q.    And without -- I don't want to take the -- burden the

22   court reporter by reading the entire answer into the record,

23   but it is true, is it not, sir, that you were, in this answer,

24   describing the meeting that you had with the traders and the

25   instructions that you gave to them?

149

1    A.    That's correct.

2    Q.    And your instructions included to figure out what would be

3    the appropriate liquidation bid with respect to this

4    collateral, correct?

5    A.    Again, the term here, I'm not quoting from myself, you

6    know, a year-and-a-half ago.  I'm perfectly fine with that bid,

7    and you seemed to be focused -- that term, you seem to be

8    focused on it.  I'll stand by this testimony.

9    Q.    You're not quibbling with the fact that you used --

10   A.    Not at all.

11   Q.    -- the word liquidation bid in your instructions to the

12   traders, are you, sir?

13   A.    I'm quibbling -- I'm not quibbling with the fact that I

14   used the term liquidation bid in my testimony.  I said I may

15   well have used it in my instruction to the trader.  It doesn't

16   have a significance that I'm aware of that would change

17   anyone's view from the more detailed description that I give

18   below.

19   Q.    And you also instructed the traders that the value that

20   you wanted or the values that you wanted them to come up with

21   would be the values that would be attainable if 50 billion

22   dollars of securities hit the market in rapid succession,

23   correct?

24   A.    That's what I was looking for.  I didn't tell them what

25   the gross positions were.  They knew what their own positions

150

1    were.  So each trader knows what his market can bear and what

2    he can handle, and that's what we asked them to determine.

3    They didn't -- each trader didn't have 50 billion dollars in

4    securities.  From those categories of assets, the aggregate is

5    50 billion.  Some of them were just a couple hundred million or

6    50 million, some of them were multiple billion.

7    Q.    So, sir, is it your testimony as you sit here today then,

8    that your description of the assignment to the traders did not

9    include a hypothesis or a parameter that you wanted them to

10   come up with the values that would be -- that what would happen

11   if 50 billion dollars of securities hit the market in rapid

12   succession?  Is that your testimony?

13   A.    I don't recall telling them about 50 billion dollars.

14   Each trader was told to look at their own positions and look to

15   how those positions would move.

16   Q.    And is it your --

17   A.    And I'm not sure that would make a difference, but that's

18   what I recollect telling them.

19   Q.    Okay.  So is it your testimony now then, sir, that the

20   traders were not advised that the collateral that was at issue

21   was the 50 billion dollars of the Fed REPO collateral?

22   A.    I think that's similar to my testimony before, yes.

23   Q.    So you're -- you deny that that's what the traders were

24   told?

25   A.    I don't recollect telling anybody, and there would have

151

1    been no need to tell them about the aggregate.  Barry certainly

2    knew about the aggregate.  But each trader had to figure out

3    their own positions and knew what they were.

4    Q.   Well, let me direct your attention, if I could, to page

5    259 of your transcript, sir.

6    A.   Uh-huh.

7    Q.   And in particular, to line 5.  And there's a question --

8    well, first of all, there's a reference to thirty different

9    people on line 4.  Do you see that?

10   A.   Yes.

11   Q.   Does that refresh your recollection about the number of

12   traders that were involved in the exercise that we're

13   discussing?

14   A.   I don't think that -- I don't know that they were all

15   senior traders.  There were at least that many people in the

16   room.

17   Q.   Okay.  And --

18   A.   Now I said at least.  That might be a little bit of a

19   hyperbole.  It was more than fifteen for sure.

20   Q.   Okay.  So you don't know if it was -- thirty may have been

21   a hyperbole.  Is that what you're saying now?

22   A.   Yes, I don't know for sure.

23   Q.   Okay.  So directing your attention, sir, to the question

24   that begins on line 5.

25        "Q.  Was there -- did you speak to all thirty or did you

152

1    have a point of contact?

2        "A.   Got the senior traders all in a room and said, here's

3    what we need, here's the category of assets that you're

4    responsible for, we're going to come back and circulate, and

5    come back to each of you, and we need a view as to where, what

6    kind of discount you would be forced to take if you were to

7    liquidate these assets in a relatively short period of time."

8        Is that -- that was your testimony, was it not, sir?

9    A.   Yes, it was.

10   Q.   And is that consistent with the instruction that you gave

11   to the traders?

12   A.   Yes, it was.

13   Q.   And you told the traders that you wanted a liquidation bid

14   for the assets, correct?

15   A.   Again, we can replow this term again.  I don't know if I

16   used the term liquidation bid.  In our parlance, on Wall

17   Street, when you sell something, you're liquidating it.  So how

18   much would it take to liquidate that position, to sell that

19   position.

20       Again, in bankruptcy, liquidation sometimes has a

21   different connotation.  For example, a Chapter 7 proceeding or

22   a TIPIC proceeding, we're telling them to -- on their desk, go

23   out and liquidate securities.

24   Q.   So your -- is it your testimony then that the liquidation

25   bids that you were seeking were coextensive with the market

153

1    value of the assets?  Is that your testimony, sir?

2    A.   The liquidation bids I was receiving was coextensive with

3    the market values of those assets, yes.

4    Q.   Let me direct --

5    A.   We asked them -- yes.  We asked them to sell the assets in

6    the market.  What would it take to sell your position, to

7    liquidate your position in the context of the market?  If you

8    could do it in an hour, do it in an hour.  If it takes two

9    days, couple of days.  Come back to us and tell us how you

10   would liquidate those positions over that period of time.  It

11   does not connote a bid wanted in comp, which is a term of art

12   where a dealer goes out and says I have five billion, everybody

13   come in with your best bid.

14        It connotes selling them within the context of the market.

15   And understanding the markets at that time, they were very

16   distressed market.  So I think the market value and the

17   liquidation value were probably pretty darn close using your

18   terms.

19   Q.   So just so that I understand your testimony here.  Your

20   testimony is essentially that any disposition of the assets

21   would have reflected a liquidation bid?  Is that your

22   testimony, sir?

23   A.   Any disposition of the assets?  I think it really depends.

24   If you're -- my term liquidation bid is selling your assets.

25   If you're -- if you want to bid to get out of everything in

154

1    large size, if I want to sell a million treasuries even in that

2    week, that probably wouldn't have been very difficult.  If I

3    wanted to sell eleven billion of them, that might have been a

4    little more difficult.

5    Q.   Well, sir, let me direct your attention, if I could, to

6    pay 263 of your -- of the transcript, and in particular, to the

7    question that begins on line 6.  Are you with me?

8    A.   Yes.

9    Q.   Question:

10        "Q.  And to the best of your recollection, what

11   exactly were the words that you said?  I understand

12   the time?

13        "A.  I have no specific recollection of the

14   words.  I can tell you what generally was requested,

15   which is what I already said.

16        "Q.  Okay.

17        "A.  Which was, we went you to provide us with a

18   view as to the liquidation bid for these assets.  If

19   you had to sell the full size in a short period of

20   time, what kind of discount would you need to give the

21   buyers in order to move that assets."

22   A.   "That full size."

23   Q.   "To move that full size," I'm sorry.

24   A.   Yes.

25   Q.   And that was the instruction that you gave them?

155

1    A.    That was as close as I could remember.  I think I said I

2    didn't recollect the exact words.

3    Q.    And it's your testimony, as you sit here today, that in

4    asking the traders to develop a liquidation bid for the full

5    size of the assets in a short period of time, you are asking

6    them to basically give you market value.  Is that your

7    testimony, sir?

8    A.    No.  I said the full size of their positions.  All right.

9    Not -- and each asset could be different.

10   Q.    Well --

11   A.    Then if a -- there was a very small size in a particular

12   asset, it would move very easily.  If it was a large size, and

13   it would depend on the asset class, it could be much more

14   difficult.

15   Q.    And you mentioned several times Mr. Ridings and the

16   testimony that he was about to give.  And you're trained as a

17   bankruptcy lawyer; are you not, sir?

18   A.    I am, yes.

19   Q.    And you understood that one of the things that Mr. Ridings

20   might be required to do, in defending the sale transaction, is

21   to testify that the asset values that were being achieved

22   through the sale, were better than what would be achieved in a

23   liquidation, correct?

24   A.    The entire sale of Lehman Brothers, that's correct.

25   Q.    And that was the context for the meeting that you called

156

1    with the traders, at which you gave the traders the

2    instructions to come up with the liquidation bid; was it not,

3    sir?

4    A.    That's correct.

5    Q.    And the instructions -- and the people you were meeting

6    with were not bankruptcy lawyers, correct?

7    A.    Not to my knowledge.

8    Q.    Okay.  But what you were asking them for was the kind of

9    information that you knew that Mr. Ridings might be required to

10   present to the Court, to contrast the deal that was on the

11   table to liquidation values?  You knew that; did you not, sir?

12   A.    I did, yes.

13   Q.    And you gave instructions to the traders that were

14   consistent with developing the kind of information that you

15   knew that Mr. Ridings might need for purposes of his testimony,

16   correct?

17   A.    It was in the context of what he might need.  What you

18   have to remember is that we didn't put together a liquidation

19   analysis, as I said earlier, that you'd see in a plan of

20   reorganization.  We're trying to figure out, with the

21   organization in place, how could they sell these securities and

22   what would be the level they got.  And also, the context that

23   we're going through, this discussion that we're having now,

24   exceeds the time of this meeting by ten times.

25   Q.    Well, let me ask you this, sir.  When you met with the

157

1    Barclays' lawyers over the last couple days, did you talk about

2    the term liquidation bid?

3    A.    Certainly did.

4    Q.    And was that one of the issues in your deposition that you

5    focused on in the preparation sessions that you had with them

6    over the last couple of days?

7    A.    I told them very much what I just told you.

8    Q.    Okay.  And it's true, is it not, that the impetus for your

9    meeting with the traders, was a desire to have from the

10   traders, the kind of information that Mr. Ridings would need

11   for purposes of his testimony?  That's the -- that was the

12   purpose, correct?

13   A.    That's correct.

14   Q.    And you gave them -- it's fair to assume, is it not, that

15   you gave the traders instructions that were consistent with

16   developing that information, right?

17   A.    That's correct.

18   Q.    The traders would not have known without you telling them,

19   would they, sir, what kind of information Mr. Ridings was

20   likely to need for purposes of his testimony, correct?

21   A.    I don't believe we gave them the context of what Mr.

22   Ridings was doing or anything to do with what might be needed

23   in court.  We just asked them for those values to help prepare

24   Barry, yes.

25   Q.    I understand that, sir.  But you gave the traders -- you

158

1    told -- whatever you told the traders was intended to give you

2    information that you could then give to Mr. Ridings for

3    purposes of his testimony, correct?

4    A.   That's right.

5    Q.   And what you knew about his testimony was that he might be

6    in a position where he needed to compare and contrast the price

7    that was being paid pursuant to the deal to liquidation prices,

8    correct?

9    A.   I did, yes.

10   Q.   Okay.  And so, when you instructed the traders, you gave

11   them instructions that were consistent with that potential data

12   need, correct?

13   A.   It's a little bit different, because I didn't have a

14   context to just do a complete liquidation as you'd think of a

15   Chapter 7 liquidation, which is a normal bankruptcy context.

16   All I had was the traders and what their marks were versus what

17   they could sell in -- over some period of time.  If you shut

18   the doors and you had Gordon Brothers come in and sell the

19   securities, I had no way to estimate what that value would be.

20   Q.   Well, you had their marks, correct?

21   A.   I had their marks, yes.

22   Q.   And you understood that the marks were intended to reflect

23   market prices, correct?

24   A.   I testified before, generally, that's the case.  We were

25   in a week that no one that I've ever experienced -- certainly a

159

1   week that I've never experienced in the securities market, and

2   I don't think anyone else had.  And it wasn't just the markets.

3   It was the challenges of the organization.  So there were

4   concerns about those marks.

5   Q.   Well, we'll talk about those concerns in a moment.  But

6   for present purposes, you knew that while there might be debate

7   about the marks, the marks were intended to reflect the prices

8   that the assets were worth if they were sold in the market to a

9   willing buyer and by a willing seller, correct?

10  A.   That's correct.

11  Q.   That was the entire -- that's the entire purpose behind

12  marking to market, correct?

13  A.   I don't think that's the entire purpose, but that is a

14  purpose, yes.

15  Q.   Well, it's the measure of value that is intended to be

16  used in marking to market; is it not, sir?

17  A.   That's correct.

18  Q.   And the -- and there were a set of marks that were in

19  existence at the time that you called this meeting, right?

20  A.   Yes.

21  Q.   And what you were intending to do was to come up with some

22  alternative values that represented what, at your least your

23  deposition testimony indicated, would be a liquidation bid if

24  you were to sell the full size of the position in relatively

25  short order, correct?

160

1    A.    That's correct.  And that happens, by the way, all the

2    time in the securities business.  You can have a security

3    marked at ninety-five and go to sell it in the market, and it

4    looks like it's ninety-five, but today you can only get ninety.

5    Q.    And by the way, sir, did anyone at Barclays tell you that

6    it was their intention to sell the full 50 billion dollars'

7    worth of -- or whatever billion dollars' worth of assets,

8    constituted the collateral very quickly and all at once?

9    A.    No.  Barclays had nothing to do with this discussion.

10   Q.    Okay.  So Barclays did not tell you that they intended --

11   A.    No.

12   Q.    -- to do some sort of a quick liquidation, a fast

13   liquidation of these assets, correct?

14   A.    They did not, no.

15   Q.    And you knew at the time that you were undertaking this

16   effort with your traders that Barclays would not do that,

17   correct?

18   A.    I didn't know exactly what Barclays would do.  I assumed

19   that the only reason they were buying these securities was to

20   use them in the business.  Otherwise, they would have been just

21   as well off and perhaps better off if they had never advanced

22   45 billion dollars against these securities and use that money

23   to capitalize the business.

24   Q.    Well, let me direct your attention, sir, to page 266 of

25   your deposition and, in particular, to the question starting at

161

1    line 10.  Are you there?

2    A.   Yes, I am.

3    Q.   Question:

4        "Q.  Did anybody at Barclays say that they

5    intended to sell the securities very quickly, very

6    soon, and all at once?

7        "A.  Not that I recall.

8        "Q.  And do you know one way or another whether

9    that's what Barclays actually did with the securities?

10        "A.  I don't know.  Actually, I do know.

11        "Q.  And?

12        "A.  They wouldn't do that."

13        That was your testimony, correct?

14   A.   That's correct.

15   Q.   And you understood, on the morning of Friday, September

16   19th of 2008, that Barclays would not be going out into the

17   market and selling these securities en masse, all at once, very

18   quickly, correct?

19   A.   They could have lost money.  They advanced 45 billion

20   dollars against them. They would have been insane.  They were

21   -- they had no hedge.  Nobody would have done that, to just

22   sell them the next day.  You'd lose money.

23   Q.   And so, you knew that they wouldn't do that, correct?

24   A.   Yes.

25   Q.   It was not their --

162

1   A.   And, in fact, they didn't do it.

2   Q.   It was not their intention to sell the assets all at once

3   and very quickly, correct?

4   A.   I never had any discussions with them, but no dealer that

5   I know would ever have done that.

6   Q.   And, sir, isn't it fair to say that the values that you

7   were asking your traders to come up with were fire sale prices?

8   A.   I never used the term fire sale.

9   Q.   Well, you understand what a fire sale is in the context of

10  a liquidation of securities; do you not, sir?

11  A.   A fire sale is when you have a fire at a store and then

12  you sell everything, because you can't keep the store open.

13  Q.   And --

14  A.   I certainly did not ask them to go treat it as if there

15  were -- we had a fire at Lehman Brothers and you had to sell

16  them all tomorrow.

17  Q.   And, sir, let me direct your attention if I could to --

18  well, let me ask you another question first.

19       You said fire sale is when you have a fire at the store

20  and you sell the inventory.  It's also used as an analogy in

21  other contexts; is it not, sir?

22  A.   It's an idiom that's frequently used in the language, yes.

23  Q.   And it's used in connection with dispositions of

24  securities; is it not, sir?

25  A.   Not usually.

163

1    Q.    You've understood it to be used in that context though,

2    haven't you, sir?

3    A.    If you told me that a hedge fund was having a fire sale, I

4    would assume that that meant that they were out of business.

5    Q.    Well, sir, let me direct your attention, if I could, to

6    page 267 of your deposition.

7    A.    Uh-huh.

8    Q.    And in particular, to the question that begins at line 4.

9    Question -- are you there?

10   A.    Yes, I am.

11   Q.    "Q.  I'd like to know what, if somebody says that there's

12   a fire sale relating to securities, what would they be relating

13   to?

14       "A.  I think they're just using it as an idiom,

15   that there's actually no fire, and that they're not

16   selling the goods from the store, but they're mean --

17   but they mean they're selling it very quickly.

18       "Q.  Would you describe the value that you were

19   trying to get an estimate of as a fire sale value?

20       "A.  That might be a way to do it.  I don't think

21   I did it."

22       So you didn't use the phrase fire sale, but the kinds of

23   values that you were seeking from your traders were, in fact,

24   fire sale values, correct, sir?

25   A.    I really wasn't.  I mean, the question is obviously

164

1    bringing me there.  I said that might be a way to do it.  It's

2    not the way I did it.

3    Q.    And so your testimony is that -- well, withdrawn.

4    A.    I'll stand by this testimony.

5    Q.    We'll move on, sir.

6          After you gave the traders this assignment, did the

7    traders go off to carry out the assignment to your knowledge?

8    A.    I believe they did, yes.

9    Q.    And did you later get back some reports from the traders

10   concerning the values that they had come up with?

11   A.    Very swiftly, within -- as again, time runs together, but

12   some five minutes, some two minutes, some an hour.  Whereas,

13   illiquid, they might have had to think about their models.

14   Q.    And --

15   A.    But we did get reports, but not written formal reports.

16   These were just the same ladies and gentlemen reporting back to

17   us as to the results of their analysis.

18   Q.    They left the room and scattered; did they not, sir?

19   A.    They left the room and went to -- back to their desks, I

20   assume.

21   Q.    And at some point after that, they came back to you,

22   either directly or indirectly, with information that was

23   responsive to the assignment that you had given them, correct?

24   A.    Indirectly.

25   Q.    Indirectly.

165

1    A.    Someone else got that data for me.

2    Q.    Who did that?

3    A.    Peter Hornick.

4    Q.    Okay.  So the traders -- you're -- the -- whatever number

5    of traders were in the room, in fact, reported back to Mr.

6    Hornick?

7    A.    Yes.  I was running around on other items, and Mr. Hornick

8    handled receiving that data.

9    Q.    And did Mr. Hornick then report back to you at some point

10   in time?

11   A.    Yes.

12   Q.    And did you have a -- did you sit down in a room with Mr.

13   Hornick or how did that work?

14   A.    I don't recollect if we sat in a room, if we met in a

15   room, if we just met on the trading floor and got the general

16   idea of what the asset values were.

17   Q.    And the reports that came back from the traders reflected,

18   did they not, the kind of discounts that your traders thought

19   would reflect liquidation values for the various securities,

20   security classes that were under consideration, correct?

21   A.    Again, they came back with their values of these

22   securities and the context of that market, answering my

23   assignment.  I didn't quiz them if they did it as a liquidation

24   bid, as you've described, a fire sale bid.  They just came back

25   and responded here's what it would take to move these

166

1   securities.

2   Q.   Well, you'd asked them for liquidation bids; had you not,

3   sir?

4   A.   I went through that about eleven times already, but.

5   Q.   And you don't have any reason to think they didn't come

6   back with exactly what you asked for, correct?

7   A.   No, I don't think they did.

8   Q.   All right.

9   A.   I think they came back with exactly what I asked for.

10  Q.   Okay.  And did you make some record then of the

11  information that you received from the traders?

12  A.    I don't recollect.  You know, I certainly would have

13  written it down somewhere.  I don't recollect making a record

14  of it.

15  Q.   Well, let me direct your attention, if I could, to --

16           MR. WERDER:  And, Your Honor, I'm going to move to an

17  exhibit that I have a fair number of questions about.  I don't

18  know what the Court's pleasure is with respect to taking any

19  sort of a break.

20           THE COURT:  We've been going for about two hours.  So

21  we should take a break.  How much longer do you think you're

22  going to be at this?

23           MR. WERDER:  I probably have about another, let's

24  say, 25 minutes, Your Honor.

25           THE COURT:  Let's take a break then.  Let's break

167

1   until quarter of the hour.

2   (Recessed and reconvened)

3            THE COURT:  Be seated, please.  Please proceed.

4            MR. WERDER:  Thank you, Your Honor.

5   BY MR. WERDER:

6   Q.   Mr. Seery, right before the break we were just starting to

7   look at Exhibit 147, which I believe is in front of you.  Do

8   you still have your binder?

9   A.   I do.

10  Q.   So look at the -- if you look at the tabs, you'll see the

11  second tab is labeled M-147.

12  A.   Got it.

13  Q.   And can you identify Exhibit M-147 as some notes that you

14  took on -- either on a standalone basis or on a copy of

15  documents?

16  A.   This appears to be documents that I produced which contain

17  some of my handwritten notes, as you described, stand alone.

18  Others are on some of the documents.  And it looks like some of

19  the documents and exhibits I haven't marked at all.

20  Q.   And are these -- this is a set of documents that you

21  produced in the form in which it appears in Exhibit 147,

22  correct?

23  A.   I believe so, yes.

24  Q.   And the notes that -- the handwriting on the pages here,

25  does that reflect your handwriting?  For example, on the first

168

1   page, is that your handwriting there?

2   A.   On the first page, that is clearly my handwriting, yes.

3   Q.   Okay.  And then if we just flip to page 002, for example,

4   is that your handwriting also?

5   A.   That's also my handwriting, yes.

6   Q.   All right.  And the third page?

7   A.   That's my handwriting, yes.

8   Q.   Okay.  So we'll ask you about a couple specific pages in a

9   moment.  But before I do that, are these notes that you took

10  during the course of the week of September 5th -- between

11  September 15th and September, let's say, 21st?

12  A.   I believe the handwriting -- the handwritten notes were

13  all completed during -- some time during that week.

14  Q.   All right.  Now, sir, I'd like to direct your attention,

15  if I could, to the last page of the exhibit, one that has the

16  last two numbers are 70.

17  A.   Yes.

18  Q.   Are you with me on that?

19  A.   I am.

20  Q.   Okay.  And this is a document that you made part of your

21  collection of notes during the week of the 15th, correct?

22  A.   I don't understand "made part of my collection of notes."

23  Just to be precise, I had a bunch of notes when I left Lehman

24  Brothers, and these documents were included in those notes.

25  Q.   And so this particular sheet of paper, and specifically,

169

1   the last page of Exhibit 147, that was part of the documents

2   that you had gathered up as part of your work on the sale

3   process during the week of the 15th and that you had when you

4   left Lehman, correct?

5   A.   Yes.

6   Q.   And the writing on the last page of Exhibit 147, that is,

7   in fact, your writing; is it not?

8   A.   I believe the numbers, the 45.5 and the 1.9 BN are --

9   Q.   Uh-huh.

10  A.   -- my writing.  I believe the cross out of a number, which

11  I believe to be 50.6 billion --

12  Q.   Yes.

13  A.   -- is my cross out.  I'm not positive about the circling

14  of the ten percent there.

15  Q.   Okay.  But at least the cross out and the 45.5 and the 1.9

16  billion are -- they're indisputably your handwriting, correct?

17  A.   I believe them to be my handwriting.  There's probably

18  some pretty good forgers out there.

19  Q.   Okay.  But you don't have any reason to think that

20  somebody forged your handwriting on a document --

21  A.   I don't, Counsel --

22  Q.   -- that you had in your file, correct?

23  A.   You asked me if it was indisputable.  I don't have a

24  dispute with it.

25  Q.   Okay.  Very good.

170

1    A.    Someone might.

2    Q.    Okay.  That's probably good enough for present purposes,

3    that you don't dispute it.

4          And I want to focus, in particular, on -- as I said, on

5    page -- the last page of the documents.  And this is a sheet

6    that you saw on the morning of September 19th; is it not?

7    A.    I'm sorry, 70?

8    Q.    Yes.

9    A.    I don't know exactly what date I saw it on.

10   Q.    Well, sir, let me ask you to direct your attention to

11   pages 271 and 272 of your deposition.

12   A.    I see it.

13   Q.    Let me ask you before you do that, I'll ask you a few

14   other questions and then we'll -- maybe we'll eliminate the

15   need for the deposition.

16         So right now, you're not recalling specifically when you

17   saw this document.  Is that your testimony?

18   A.    I don't recollect specifically when I saw it.  It appears

19   that I testified previously at deposition that I saw it on the

20   19th.

21   Q.    Okay.  And this is a document that was created for you,

22   correct?

23   A.    I don't know who created it.  I believe it has my input

24   from the afore-discussed traders' meeting.  I did not create

25   the document and I'm not sure who did.

171

1    Q.   All right.  Well, sir, let me direct your attention to --

2    let me ask you one more specific question before directing your

3    attention to the deposition.  And that is the document was --

4    it was your testimony in deposition, was it not, that the

5    document was created for you?

6    A.   I don't believe that was my testimony.  I don't know --

7    Q.   Well, I direct --

8    A.   I don't know who created it and I just don't -- it's in my

9    notes.  It contains my writing.  It contains what I recollect

10   to be the categories of assets that had been in the Fed

11   facility.  And it contains a haircut figure that corresponds

12   with what I recollect of that meeting that I had gotten back.

13   But I don't know who created the document.  I just don't know.

14   Q.   All right.  So direct your attention to page 271 of your

15   deposition, line 17.

16   A.   Uh-huh.

17   Q.   And the question is:

18        "So can you describe what is being shown here on

19   that last page, that's 70.

20        "I can.

21        "Did you create this document?

22        "A.  I don't believe I created it.  I don't know

23   who did this for me."

24        That was your testimony, correct?

25   A.   That's my testimony, yes.

172

1   Q.   Okay.  Is it -- was this document, in fact, created for

2   you, sir?

3   A.   I don't know.

4   Q.   All right.  It is a document that you had input on you

5   testified, correct?

6   A.   I believe I did, again, because I don't know who created

7   it, it was in my notes, it has my writing.  It's roughly those

8   categories.  It contains what I recollect to be haircut

9   amounts, but I don't recollect specifically the creation of

10   this document.

11   Q.   All right.  And the document does, does it not, contain

12   the information that you -- we were previously discussing, that

13   you said you sought from the Lehman traders?

14   A.   I think it does.  Again, because of the specifics of your

15   question, I'm just really -- as I look at it more and more, I'm

16   not sure exactly what information or who created it, or how it

17   got in there.  It does correspond with what I believe to be

18   roughly the haircuts that would have been required, which was

19   along the lines of the discussion we had before.  However, I

20   did not ask the traders for haircuts.  It's just the form that

21   it's set up that way.

22   Q.   Well, sir, direct your attention to page 271, line 6.

23   A.   Uh-huh.

24   Q.   And the question was asked:

25       "And if you turn to the very last page that ends

173

1    in the Bates that ends in 70, does this relate to the

2    information that you received from Lehman traders?

3         "A.  This does."

4    A.   Again --

5    Q.   That was your testimony, correct?

6    A.   That was my testimony.  What I would qualify that with

7    was, I think it does.  I just don't know for certain.

8    Q.   Well, what's the qualification, sir?  At your deposition

9    in March, you testified that it related to the information that

10   you received from the traders, now you have some doubt about

11   that?  Is that your testimony?

12   A.    I don't doubt that it has the information.  I just don't

13   know who created it.  And the more I look at the document, I

14   just don't have a good recollection of where I got it from.  So

15   it's -- I'm not walking away from this document being in my

16   notes.  That is my handwriting, at least I believe it to be.

17   Q.   Well, I --

18   A.   And I just don't know who created it, and I believe that

19   information is consistent with the information that I got back

20   from the traders.

21   Q.   Well, I want to press you just a little bit on that.  I

22   understand you now say that it's consistent with the

23   information that you received from the traders, but my question

24   is a little more specific, and that is, whether the information

25   that you got from the traders is, in fact, recorded on this

174

1    document?

2    A.   Well, again, I believe it is.  I didn't get the

3    information directly from the traders, as I testified.  And it

4    went into this document.  These haircuts, which we didn't use

5    as haircuts before -- we talked about them as adjustments or

6    the bid you'd get for selling your -- the amount you'd get for

7    selling your positions over that short period of time, looked

8    roughly consistent with what information I got at that time.

9    Q.   Well, is it roughly consistent, sir, or is it consistent?

10   A.   Well, I don't have the information.  And since it was

11   never given to me directly, I'm recalling from memory and I'm

12   saying it's roughly consistent.

13   Q.   Okay.  You don't know whether it's more than roughly

14   consistent?

15   A.   I'm saying it's roughly consistent.

16   Q.   Okay.  And I'm asking you whether you can tell me if it's

17   -- if to your recollection it's more than roughly consistent

18   and, in fact, reflects the information that you received from

19   the traders on the morning of the 19th.

20   A.   I think you're looking for more precision than I can give

21   you.  I don't know if you're asking is it more rough or less

22   rough.  It's roughly consistent with what I recollect.  I like

23   these figures, I'll stand by them.  They work generally with

24   what I recollect from that week and that day.

25   Q.   Okay.  And by the way, sir, is this one of the documents

175

1    that you discussed with the Barclays' lawyers over the last

2    couple days in preparation for your testimony here?

3    A.   They asked me about it, and I actually told them very much

4    the same thing this morning, that when I look at that document,

5    I just can't bring up who made it and exactly how the

6    information got into it.

7    Q.   But it was something that you discussed with them either

8    Sunday, yesterday or today?

9    A.   Very much this morning along these lines.

10   Q.   Okay.  Let's look at the document.  And I want to -- I

11   just want to have you kind of walk me through it if we could,

12   starting at the very top line.  There's a reference there to

13   long Fed facility.  Do you see that?

14   A.   Yes.

15   Q.   And does that -- is that intended, to your knowledge, to

16   reference the Fed REPO and the collateral that was pledged for

17   the Fed REPO?

18   A.   I believe this is to be a summary of the assets that had

19   been contained in the Fed REPO before the trade with Barclays.

20   Q.   Okay.  And then there's -- under long Fed facility, it

21   says asset type.  Do you see that?

22   A.   Yes.

23   Q.   And then there's -- these are various asset types that

24   were used as collateral for the REPO facility that are listed

25   there; is that correct?

176

1   A.   That's my understanding, that those are the asset types

2   that were in that Fed facility, correct.

3   Q.   Okay.  And then there's a -- if we move across, there's an

4   entry that says Lehman MV dollars and billions.  Do you see

5   that?

6   A.   Yes.

7   Q.   And that's the Lehman market value, correct?

8   A.   That would be the Lehman market value which Lehman would

9   have had as their mark on the books at that time, yes.

10  Q.   And I just want to make sure, because those words are so

11  closely -- are so similar that there isn't any confusion.

12  Those numbers would, in fact, reflect the Lehman market value,

13  correct?

14  A.   These are the amounts that Lehman had marked on their

15  books and what Lehman's books showed as the market value.

16  Whether the market actually would -- whether you would be able

17  to exceed or obtain that value is part of the discussion I had

18  with the traders.

19  Q.   And let me direct your attention, if I could, sir, to page

20  273 of your deposition.  And for the sake of completeness, I'm

21  going to read a few more lines than beyond the first question.

22  But --

23       "Q.  What is Lehman MV?

24       "A.  Market value.

25       "Q.  And what does that refer to?

177

1    "A.   That is the mark.

2       "Q.   And does that, to the best of your

3    recollection, reflect the market value that Lehman had

4    on its books as of September 19?

5       "A.   That would reflect that mark that Lehman had

6    on its book as of that date."

7       And that was your testimony, correct?

8    A.   And if you read further, it basically says exactly what I

9    just said.

10   Q.   And the -- and that is intended to reflect some

11   uncertainty on your part about whether the Lehman market value

12   was, in fact, the market value on the 19th, correct?

13   A.   That's correct.

14   Q.   All right.  Then the next entry across that line says

15   haircut.  Do you see that?

16   A.   Are we going back to the --

17   Q.   Yes.  We're back to --

18   A.   I assume we're going back to --

19   Q.   Yeah.  We're back away from the deposition.  I apologize,

20   sir.

21   A.   Okay.

22   Q.   But back to page -- the last page of Exhibit 147, and in

23   particular, the word haircut there, which we hadn't used

24   previously.  But that was intended to reflect -- or is

25   consistent with -- withdrawn.

178

1          The data that appears under haircut, is consistent with

2     the information that you received back from the Lehman traders,

3     or roughly consistent with it, correct, sir?

4     A.    I believe that's correct, yes.

5     Q.    And the -- that information is intended to reflect the

6     liquidation values that the Lehman traders provided you with

7     pursuant to the instructions that you gave them on the morning

8     of the 19th, correct?

9     A.    I do believe that information is consistent with my

10    request and shows their input.

11    Q.    And just to make sure that the record is clear, it does,

12    in fact, reflect the liquidation bids that you sought from the

13    traders with respect to liquidation bids for all of the assets

14    in the Fed facility if they sold it at its full size, correct,

15    sir?

16    A.    This was for categories, not for the specific assets.

17    Q.    Well --

18    A.    The list of the assets is, you know, a couple hundred

19    pages long at least.

20    Q.    Let me direct you -- let me ask you the question one more

21    time, sir.

22         The information that's reflected under haircut is, in

23    fact, consistent with or roughly consistent with the

24    information that the Lehman traders gave you, in response to

25    your request for information on liquidation bids for all of the

179

1    assets in the Fed facility if they were sold at its full size,

2    correct?

3    A.    Let me back up for one second just to make sure we're

4    clear.  The traders didn't get from me a list of all of the

5    assets in the Fed facility.  What they got were categories.

6    And what we tried to do was have them apply their view of the

7    market to those categories and the growth sizes that had been

8    in that Fed facility prior to it going to Barclays.  So they

9    didn't have a list of every securities.  They knew what their

10    own securities were, but they don't know whether they're

11    pledged to the Fed or not.  So these are categories.  And if I

12    said something that implied a scientific precision, what I've

13    tried to explain at deposition and here today, is there wasn't

14    scientific precision to this exercise.

15    Q.    I'm not really asking about scientific precision, sir.

16    What I'm asking you is whether the information in the column

17    under haircut is roughly consistent with the information that

18    you received back from the Lehman traders, in response to your

19    request for information on liquidation bids that would be

20    attainable in the event that the Fed facility was sold at its

21    full size.

22    A.    Again, if I testified that they looked at the Fed

23    facility, my apologies.  This is their categories.  This is

24    roughly consistent with what they gave me in those categories.

25    If you'd stopped your question right at when you said respect I

180

1   think, then the answer would be absolutely yes, without any

2   kind of qualification.  I just don't have -- and they did not

3   have, to my knowledge, any list of the securities that had

4   actually been pledged.  They knew the categories and the size.

5   Q.   Let me direct your attention, if I could, sir, to page 273

6   of your deposition.  Are you there?

7   A.   Yes.

8   Q.   And in particular, to the question that begins on line 19:

9        "Q.  And is that what the Lehman traders were

10  reporting would be the discount that would need to be

11  given to buyers if there was a liquidation bid for all

12  of the assets in the Fed facility if they sold it at

13  its full size?

14       "A.  That's my recollection, yes."

15       That was your testimony; was it not, sir?

16  A.   That was.  I definitely qualify that.  That's just not the

17  case, because again, I didn't show them the full size and they

18  didn't have the facility.

19  Q.   And let me direct your attention now to page 276 of your

20  deposition, sir.

21  A.   Uh-huh.

22  Q.   And in particular, to the question that begins on line 4:

23       "Q.  But this is the number that the Lehman

24  trader --"

25       That should probably be traders --

181

1          "-- came back after hearing your instruction that

2      you wanted the view as to a liquidation bid as to the

3      assets if you sold the full size and what discount you

4      would give to the buyer?

5          "A.   That's correct."

6          That was your testimony; was it not, sir?

7      A.   And I agree with that now.

8      Q.   Okay.  Let's go back if we could to Exhibit 147 and to

9      page 70 of the document if we could.  We've covered I think all

10     the columns except the last column at this point.  And am I

11     correct, sir, that the last column reflects the application of

12     a percentage discount to the particular asset classes?

13     A.   I believe that's just the math, yes.

14     Q.   Okay.  So, for example, agency PT's.  What are PT's?

15     A.   Pass-throughs.

16     Q.   So agency pass-throughs.  The Lehman market value was 9.51

17     billion, correct?

18     A.   That's correct.

19     Q.   And then there was a five percent discount that was --

20     that the traders came up with, consistent with the instructions

21     that you gave them, correct?

22     A.   I believe so, yes.

23     Q.   And then the .48 billion reflects five percent times the

24     9.51 billion, correct?

25     A.   That's correct.

182

1   Q.   And that same methodology would apply to all of the lines

2   -- all of the rows under the long facility, correct?

3   A.   That's correct.

4   Q.   Okay.  Now the total under long facility totals up to a

5   6.04 --

6   (Transcriber note:  Recording ended and started, no overlap:)

7   Q.   -- dollars discount for these liquidation bids that your

8   traders came back with, correct?

9   A.   That's correct.

10  Q.   All right.  And then you said, I think, that the 45.5 and

11  the 1.9 billion reflected your handwriting, correct?

12  A.   Yes, they did.

13  Q.   And the 45.5 reflects the -- well, let me just ask you.

14  Withdrawn.

15       Is the 45.5 intended to reflect the information that the

16  Lehman traders provided you with concerning the liquidations

17  bids that you requested for these assets?

18  A.   Unfortunately, I don't think it does, simply because the

19  math doesn't work.

20  Q.   So what is the 45.5 then, sir?

21  A.   I don't recollect specifically.  I thought that was the

22  general view of the value at that time.  And what doesn't make

23  sense, and I think I testified at my deposition, the number

24  that's crossed out, which I don't know if you can see on that

25  screen, I believe is 50.6 something, and minus 6.04 does not

183

1    come to 45.5.

2    Q.   Right.  In fact, it's 50.64 was in the original, correct,

3    sir?

4    A.   Correct.

5    Q.   And the 6.04 off that would come up to something less than

6    45.5, correct?

7    A.   It would.

8    Q.   But I think you testified earlier that you weren't engaged

9    in a scientifically precise exercise, correct?

10   A.   No, but I can do the math.

11   Q.   All right.  Is the 45.5 -- was the 45.5 when you wrote it

12   on that page, intended to reflect the view after the Lehman

13   traders exercise of the liquidation of the assets in the fed

14   repo?

15   A.   I'm not so sure again, because the six -- I don't recall

16   when I wrote the 45.5 and the math doesn't work.  Again, to

17   your point, it wasn't supposed to have precision.  The 6.04

18   doesn't make a lot of sense, but it's just applying the

19   percentage haircuts to those numbers, and that's what you come

20   up with.  I just don't know when I put the 45.5 there.  That's

21   in the ballpark though of these numbers for sure.

22   Q.   Well, do you have any reason to think, sir, that you put

23   the 45.5 there at some point other than the morning of

24   September 19th of 2008?

25   A.   It was in that timeframe.  I don't know.

184

1    Q.   That was the time when you were working on this project;

2    wasn't it, sir?

3    A.   It was, yes.

4    Q.   And that was the time that you were receiving the

5    information back from the Lehman traders in response to the

6    directive that you gave them, correct?

7    A.   I was.  But if the numbers were delivered and put into

8    this form, then I wouldn't have needed to recalculate that.  I

9    would have just had the addition done, the subtraction of the

10   50.6, the 6.05, and 6.04, hence, my uncertainly about this

11   particular exhibit.

12   Q.   The numbers are pretty close, are they not, sir, 45.5

13   versus 44. -- I guess it would be 44.6?

14   A.   I believe they are very close, yes.

15   Q.   Okay.  And let me ask you about the 1.9 billion number

16   that appears on that sheet.  That reflects, does it not, the --

17   some additional assets that were put into the deal on Friday

18   morning in response to Barclays' request for more assets,

19   correct?

20   A.   I don't know when they were put into the deal.  And that's

21   another one of the confusions I have.  I just don't know when I

22   would have added that 1.9.

23   Q.   Okay.  You do recognize the 1.9 as relating to what's been

24   described as the unencumbered box, don't you, sir?

25   A.   That's correct, yes.

185

1   Q.   Okay.  And 45.5 and 1.9 work out to 47.4; do they not,

2   sir?

3   A.   That would be the math, yes.

4   Q.   All right.  And then this -- the sheet that we're talking

5   about, you don't have any doubt, do you, sir, that this was a

6   sheet that was considered by you in connection with the work

7   that you did with the Lehman traders on the morning of the

8   19th?

9   A.   Well, I expressed some reservation.  I believe it is

10  correct.  I just didn't -- and follows that line.  I expect I

11  already expressed some reservation about it.

12  Q.   Okay.  And then whatever the numbers were, after you got

13  back the information from the Lehman traders, did you come up

14  with a number that you thought was the number that reflected

15  the assignment that you had given them in response to

16  Mr. Ridings' request?

17  A.   I'm sorry.  I don't quite understand.

18  Q.   That was a little confusing.  There seems to be some

19  confusion about exactly what the number was that was derived

20  from the Lehman traders' work, so I want to take the exact

21  number out of the equation for the moment and just ask you more

22  generally.

23       Some number was arrived at as a result of the Lehman

24  traders work done at your directive, correct?

25  A.   Yes, that's correct.

186

1   Q.   Okay.  And since we don't know right now what that number

2   is, what I want to ask you is whether you would have reported

3   whatever the number was to someone else in Lehman or to some

4   professionals associated with Lehman?

5   A.   Yes, I would have.

6   Q.   And would Alex Kirk have been one of the people that got

7   that information?

8   A.   I expect he would have been.

9   Q.   And would Barry Ridings have been one of the people who

10  got that information?

11  A.   Yes.

12  Q.   And when you gave them the information, did you explain to

13  them how it is that you came up with whatever numbers you gave

14  them?

15  A.   Yes.

16  Q.   And would your explanation have been consistent with what

17  we've talked about previously, that you were asking your

18  traders to get a liquidation bid for a quick sale of all the

19  assets at once?

20  A.   Exactly as I previously described, yes.

21  Q.   Okay.  So the answer to my question is yes?

22  A.   I think you keep couching it in terms of -- you know, we

23  went through this.  Each of the traders looked at their

24  respective assets.  We didn't -- I don't recollect showing them

25  the full book.  They looked at how their categories of assets

187

1    would be liquidated in the market.  They came back with the

2    numbers.  Those are, I believe reflected on this sheet, and it

3    is roughly consistent with my recollection.

4    Q.   Let me direct your attention, if I could, sir, to page 282

5    of your deposition.  Are you with me?

6    A.   I will be.

7    Q.   And there's some questions about Mr. Ridings and Mr. Kirk.

8    Do you see those there?

9    A.   Yes.

10   Q.   Okay.  And then beginning at line 15, there's a question:

11        "Q. What about generally, what did you report?"

12        "A. Generally, here's the numbers they're

13   reporting back if we had to do a fast liquidation.  I

14   don't recall if I had a view about whether those were

15   liberal or conservative.  I just don't remember."

16        That was your testimony, correct, sir?

17   A.   Yes.

18   Q.   And then the 45.5 billion number that's handwritten --

19   we're going back to 147 now.  I apologize for jumping around on

20   you, sir.

21   A.   Yes.

22   Q.   But the 45.5 billion number that's handwritten on page 70

23   of Exhibit 147, that's a number that you gave to the committee

24   on September 19th; is it not?

25   A.   I don't recollect.  It's certainly in the neighborhood of

188

1    the numbers we talked about.

2    Q.    All right.  Now let me direct your attention to Exhibit

3    568, M-568.

4    A.    Yes.

5    Q.    That's your declaration, correct, sir?  That's the

6    declaration that you signed in January of 2006, correct?

7    A.    That's correct.

8    Q.    And directing your attention to paragraph six.  Does

9    reviewing paragraph six refresh your recollection that you

10   advised the committee on September 19th that the -- of the 45.5

11   billion dollar number?

12   A.    It does and that is consistent with the notes that are

13   attached.

14   Q.    Okay.  And is it fair to assume that in preparing this and

15   reviewing this declaration and signing it, you tried as hard as

16   you could to be accurate and to accurately summarize the

17   communication that you had had with the committee?

18   A.    Accepting your tried as hard as you could, I believe it's

19   accurate.

20   Q.    Okay.  And there's no references there, sir, in paragraph

21   six to an exercise with the Lehman traders to come up with

22   liquidation bids that would be attainable if you sold the full

23   size of the position in a relatively quick manner, correct?

24   A.    I didn't reference it, no.

25   Q.    Okay.

189

1    A.   I was looking at Mr. Burion's (ph) notes, and that's what

2    I derived my recollection from.  Those do show haircuts which

3    are consistent with the numbers that we just talked about.  But

4    I don't -- I didn't reference those in paragraph six, no.

5    Q.   My question was a little bit different though, sir, and

6    that is that in describing what information you provided to the

7    committee on the 19th, your description did not include a

8    description of an effort or a project, a brief project at

9    Lehman, to come up with the liquidation bids that would be

10   attainable if you sold the full size of the position relatively

11   quickly, correct?

12   A.   Paragraph six does not reference that, no.

13   Q.   All right.  Let me direct your attention to paragraph

14   seven.  And you talked about the -- well, let me just ask you a

15   question after you have a moment to review paragraph seven.

16   A.   Yes.

17   Q.   Okay.  And is -- am I correct in assuming that the

18   exercise that is referred to in paragraph seven is the exercise

19   that we've been discussing for most of your testimony here

20   today?

21   A.   It is with the exception that when I look at these notes

22   in the context of that last exhibit, its categories.  I don't

23   know that they went to Barclays.  It's just says has that

24   facility.  I don't know that those are the exact same assets.

25   Q.   Okay.  Well, the specific question though is the exercise

190

1    that your -- that you discussed with the committee is the same

2    exercise that we've been talking about for the last couple of

3    hours, correct?

4    A.   Yes.

5    Q.   And you didn't make any reference in describing that

6    exercise to the committee to the instructions that you gave to

7    the traders to come up with liquidation bids that would be

8    attainable if you liquidated the entirety of the position

9    relatively quickly, correct?

10   A.   I don't know how you made that assumption.  I don't

11   recollect testifying to that just now.  You just --

12   Q.   Well, there's no reference to liquidation bids in

13   paragraph seven, is there, sir?

14   A.   It says that -- it says what it says.  It says the Lehman

15   traders independently assessed what it would be like to sell

16   that collateral in those stressed market circumstances.

17   Q.   And that's the -- this is more or less what you told the

18   committee on the 19th, correct?

19   A.   I don't know exact -- this doesn't reference what I told

20   the committee, nor does it purport to say exactly what I told

21   the committee.

22   Q.   Well, the entire subject of the declaration relates to

23   what you told the committee, doesn't it, sir?

24   A.   It relates to Mr. Burion's notes, which reference

25   discussions about the 50.6 billion of assets, the 5 billion of

191

1    haircut, the 45.5 of value, and these other closed out

2    positions, and then onto another page.  I can't really read the

3    writing, but it seems to have haircuts.

4    Q.    But the notes --

5    A.    I didn't purport to say exactly what I said to the

6    committee in this paragraph.  I don't have a specific

7    recollection of exactly what I said to Saul in terms of whether

8    it was a liquidation bid.  I did say that the traders went out

9    and gave us view as to the value.

10   Q.    Okay.  And there isn't any reference here, and there

11   wasn't any reference in the communication you made to Mr.

12   Burion to an instruction to the traders to develop liquidation

13   bids, correct, sir?

14   A.    I don't recollect specifically if I said what we did.  I

15   did tell him that we had our traders give us a view as to the

16   market value at that time.

17   Q.    And let me just ask you directly, sir.  You didn't tell

18   the committee that the values that were reflected in the 45.5

19   were liquidation values, correct?

20   A.    Again, I did tell the committee that we had our traders

21   look at it.  And we had questions about the 50.6 being the

22   value.  And Burion probed and asked me quite a bit about why we

23   had that view.

24   Q.    Let me direct your attention to page 305 of your

25   deposition, sir.  And in particular to line 12.  Are you with

192

1    me?

2    A.    305?

3    Q.    Yes.

4    A.    Yes.

5    Q.    Line 12:

6         "Q. More generally, is there any time that you,

7    prior to the sale hearing, told anybody at the

8    committee about this process of the Lehman traders

9    gathering information about a potential haircut for

10   this sort of liquidation discount value?

11        "A. I don't recall right now."

12        That was your testimony, correct, sir?

13   A.    Give me one second, please. I believe I told -- I don't

14   recall the specifics in line 8 to 11, and I don't recall, at

15   that time, when I was giving this deposition, specifically what

16   I said.  And I still don't recall as I just testified --

17   Q.    Okay.

18   A.    -- specifically what I said prior to the sale hearing.

19   Q.    All right.  You were in court during the sale hearing on

20   the afternoon of the 19th; were you not, sir?

21   A.    I was.

22   Q.    And you heard Lehman's lawyer Ms. Fife describe the

23   current value of the assets in the deal as being 47.4 billion

24   dollars, correct?

25   A.    I definitely heard Ms. Fife speak, and I don't recall the

193

1   specifics of everything that was said.  But I was here for the

2   entire hearing, including the breaks.

3   Q.   And so, if Ms. Fife reported a value of 47.4 billion --

4   A.   I would have heard.

5   Q.   -- you would have heard that, correct?

6   A.   Yes.

7   Q.   All right.  And did you also hear Ms. Fife attribute that

8   number to a drop in the markets?

9   A.   I've seen that in looking at testimony, but I did not -- I

10  do not have any recollection of that.

11  Q.   Did you hear anything during the course of the discussion,

12  either on the record or off the record, when the deal was

13  presented outside of Judge Peck's presence to an effort that

14  you undertook with the Lehman traders to develop liquidation

15  bids for the entirety of the fed portfolio sold en masse on a

16  relatively quick basis?

17  A.   I don't believe that there was any discussion of the

18  preparation of Mr. Ridings with the work that I did with the

19  traders.

20  Q.   Okay.  Do you know whether Ms. Fife -- I'll just ask you.

21  I'll represent to you that Ms. Fife presented a 47.4 billion

22  dollar number.  And I'll ask you whether you know whether she

23  got that number from you.

24  A.   I don't know.  I don't think so, but I don't know.

25  Q.   That number is consistent with the number, the 47.4

194

1    billion, that you have written on the last page of Exhibit 147;

2    is it not, sir?

3    A.   It is consistent with that number, yes.

4    Q.   And when you heard that number presented in court on the

5    afternoon of the 19th, did you recognize it as a number that

6    you had seen or heard before?

7    A.   I don't recall if I had seen or heard it before or I wrote

8    it at the hearing.  I just don't know.

9    Q.   Is it your testimony that you may have written the

10   47 -- the 45.5 and the 1.9 billion at the hearing?

11   A.   It's my testimony that I don't know.

12   Q.   Okay.  In any event, you didn't take any steps at the sale

13   hearing on the 19th to advise anyone that an effort had been

14   made to come up with liquidation bids that came in with a

15   number in the vicinity of 45 billion, did you, sir?

16   A.   That's not true.

17   Q.   Who did you advise of that, sir?

18   A.   Mr. Ridings.

19   Q.   Your testimony is that you told Mr. Ridings on the

20   afternoon of the 19th that a -- that liquidation bids had been

21   used?

22   A.   My testimony is that we did the work for Mr. Ridings, and

23   I previously testified --

24   Q.   Oh, I'm sorry.

25   A.   -- to you what I told him.

195

1    Q.    I'm sorry.  You told Mr. Ridings.  I'm -- yeah, okay.  I

2    should have -- I apologize.  I misunderstood your answer.

3        The question that I really wanted to ask was anyone other

4    than a Lehman professional, did you tell them -- did you tell

5    anyone other than a Lehman professional on the 19th about the

6    fact that you had commissioned the Lehman traders to go out and

7    develop these liquidation bids?

8    A.    At the hearing?

9    Q.    Yes.

10   A.    At the hearing, I don't believe so.

11   Q.    Okay.  Let me ask you, sir, going back to the Friday

12   morning valuation exercise, what was the role, if any, of

13   Barclays' traders in the process that your traders undertook at

14   your direction on the morning of the 19th?

15   A.    There was none.

16   Q.    Isn't it a fact, sir, that the Barclays' traders came over

17   to Lehman on the morning of the 19th to work with people on

18   valuation exercises?

19   A.    Not that I was aware of.

20   Q.    Let me direct your attention, if I could, to Exhibit 658,

21   sir, see if that refreshes your recollection.  And you're not

22   on this so, but if you look at the bottom of -- are you with me

23   on 658?

24   A.    I am, yes.

25   Q.    Okay.  So the earliest in time e-mail is an e-mail from

196

1    Ian Lowitt to various people at Lehman, correct?

2    A.   Yes.

3    Q.   And are any of the individuals who are the recipients the

4    -- among the people that were involved in the exercise that you

5    conducted on the morning of the 19th?

6    A.   Not that I recall, no.

7    Q.   Okay.  And does this e-mail that says "Barclays' teams are

8    way -- on their way over to meet with us on our positions and

9    marks," obviously critical, does that refresh your recollection

10   about any participation that Barclays' traders may have had in

11   your traders' efforts on the 19th?

12   A.   They didn't -- no, it does not.  They didn't have any role

13   in my exercise.

14   Q.   You're sure?  And how do you know that, sir?

15   A.   I'm the one who gathered them in that room.  Hornick had

16   them go do the work.  It was very quick.  They did it right on

17   the trading floor.  I don't recollect seeing any Barclays'

18   traders on that trading floor.  They had no role whatsoever.

19   Q.   All right.  Let me direct your attention finally, sir, to

20   Exhibit M-45.  Have you seen this document before, sir?

21   A.   No, I have not.

22   Q.   Was it a document that was discussed in your preparation

23   session with the Barclays' lawyers yesterday and today?

24   A.   I would have said I'd seen it.  I have not seen it before.

25   Q.   Did you have any discussion with the Barclays' lawyers

197

1    about the fact that a version of the chart that appears as page

2    70 of Exhibit 147 was actually created at Barclays early in the

3    morning of the 19th?

4    A.    I heard them mention it.  I have disagreement with that.

5    It just doesn't seem consistent.  No one from Barclays gave it

6    to me.  I don't know how it would have gotten in my notes if

7    that was the case.

8    Q.    So they -- so -- first of all, the answer to my question

9    is you did discuss the fact that there was a document that he

10   had the long fed facility and Lehman market values and haircuts

11   that was created in Barclays on the morning of the 19th, you

12   discussed that with the Barclays' lawyers?

13   A.    I was asked if the document came from Barclays.  I said

14   no.

15   Q.    So you don't -- and -- but you don't, in fact, know one

16   way or the other whether it did come from Barclays, correct?

17   A.    I don't know exactly where it came from.  I know I didn't

18   receive it from anyone from Barclays.

19   Q.    Well, if the document -- let me just ask you to assume

20   that the document existed on Barclays' system at 7:00 o'clock

21   in the morning on the 19th.  Can you make that assumption, sir?

22   A.    You've asked me to do it, I can do it.

23   Q.    And that would have pre-existed the exercise that you've

24   described your traders going through, wouldn't it, sir?

25   A.    That's correct.

198

1    Q.    Okay.

2              MR. WERDER:  No further questions.

3              MR. GAFFEY:  No questions for Lehman Brothers Holding.

4              MR. UNIDENTIFIED:  No questions, Your Honor.

5              MR. BOIES:  Your Honor, I have as much time on my

6    cross as counsel did on his direct.  Do you want to continue or

7    would this be a good time to adjourn?  So we're not going to

8    finish this evening is my point to Your Honor.

9              THE COURT:  Well, as much time as we just experienced

10   would be most of tomorrow morning.

11             MR. BOISE:  Yes, Your Honor.

12             THE COURT:  Okay.  Well, let's break.

13             MR. BOISE:  Thank you, Judge.

14             THE COURT:  We'll break until tomorrow morning at

15   9:30.  We're adjourned until then.

16        (Whereupon these proceedings were concluded at 5:32 p.m.)

17

18

19

20

21

22

23

24

25

199

I N D E X


T E S T I M O N Y

| WITNESS | EXAM BY | PAGE | LINE |
|---------|---------|------|------|
| Mr. Murphy | Mr. Boies | 6 | 20 |
| Mr. Murphy | Mr. Gaffey | 63 | 3 |
| Mr. Murphy | Mr. McGuire | 72 | 9 |
| Mr. Murphy | Mr. Boies | 106 | 15 |
| Mr. Seery | Mr. Werder | 112 | 13 |


E X H I B I T S

| NO. | DESCRIPTION | ID. | EVID. |
|-----|-------------|-----|-------|
| BCI 111 | Media report | 32 | 32 |
| BCI 115 | Media report | 32 | 32 |
| BCI 796-798 | Media report | 32 | 32 |

200

1

2

3                    C E R T I F I C A T I O N

4

5       I, Lisa Bar-Leib, certify that the foregoing transcript is a

6       true and accurate record of the proceedings.

7

8       _____

9       LISA BAR-LEIB

10      AAERT Certified Electronic Transcriber (CET**D-486)

11

12      Veritext

13      200 Old Country Road

14      Suite 580

15      Mineola, NY 11501

16

17

18

19

20

21

22

23

24

25