WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Shai Y. Waisman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | |
| | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

-----------------------------------------------------------------x

## DEBTORS' MOTION PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 6004 AND 9019 FOR AUTHORIZATION TO RESTRUCTURE CERTAIN TERMS OF THE ARCHSTONE CREDIT FACILITIES

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

   Lehman Brothers Holdings Inc. ("LBHI"), Lehman Commercial Paper Inc.

("LCPI") and their affiliated debtors in the above-referenced chapter 11 cases, as debtors in

possession (together, the "Debtors" and, collectively with their non-debtor affiliates, "Lehman"),

submit this motion (the "Motion"), and respectfully represent:

### Preliminary Statement

   1.  In 2007, certain of the Debtors and their non-Debtor affiliates made

certain equity investments and loans in connection with the leveraged buyout of a publicly-

traded real estate investment trust known as Archstone-Smith Trust (together with its affiliates,

"Archstone").  Through their non-Debtor affiliates, the Debtors currently hold approximately 47% of the controlling common equity interests in Archstone.  Affiliates of Barclays Capital Real Estate Inc. ("Barclays") and affiliates of Bank of America, N.A ("Bank of America") collectively hold approximately 47% of such interests.  In total, affiliates of Lehman, Bank of America and Barclays invested approximately $4.8 billion in the aggregate into the common equity of Archstone, with $2.4 billion attributable to the Debtors' indirect interests.

2.      In connection with the acquisition of Archstone, LCPI, Bank of America and Barclays (collectively, the "Co-Sponsors") provided secured financing to Archstone that consisted of certain term loans, revolving loans, a development loan and mezzanine loans (the "Acquisition Financing").  As of March 31, 2010, LCPI held a beneficial interest of approximately $2.5 billion of the Acquisition Financing provided to Archstone.  The other Co-Sponsors hold, in the aggregate, approximately $2.8 billion of such secured debt.  The Co-Sponsors originally contemplated that Archstone would generate sufficient funds to repay the Acquisition Financing through property sales and operations.  However, due to a decline in the state of the real estate market, it has proven difficult for Archstone to generate the revenues or property sales necessary to meet its liabilities, resulting in Archstone's need for additional liquidity.

3.      In order to preserve the value of their debt and equity investments, commencing in January 2009, the Co-Sponsors modified the terms of the Acquisition Financing (the "Initial Loan Modification") pursuant to this Court's *Order Granting The Debtors' Motion Pursuant To Sections 105(a), 363(b) And 365(a) Of The Bankruptcy Code And Bankruptcy Rules 6004 And 6006 For Authorization to (I) Assume, As Modified, Certain Loan Agreements, And (II) Consummate Related Loans to be Made by Lehman Commercial Paper Inc. and Other*

*Lenders to Archstone* (the "Initial Modification Order") [Docket No. 2677].  As part of the Initial

Loan Modification, the Co-Sponsors committed an additional $485 million, plus available letters

of credit, as new Priority Financing (the "Priority Financing") to offset Archstone's cash

shortfalls.  Among other things, the Initial Loan Modification was intended by the Co-Sponsors

to provide Archstone with additional time to generate revenues through asset sales, and to

preserve the Co-Sponsors' sizeable stake in Archstone.

4.      In light of current general economic conditions, the state of the real estate

market, and related challenges faced by Archstone, the Debtors propose to effectuate a more

comprehensive restructuring of the Acquisition Financing and the Priority Financing to improve

Archstone's cash flow and liquidity on a long term basis (the "Restructuring") as described

herein.  The Debtors are still negotiating the Restructuring and, therefore, its terms are not yet

final.  The Debtors will require agreement by Barclays and Bank of America to effectuate the

Restructuring (which agreement has not been obtained) and will not proceed with the

Restructuring without reaching a definitive agreement with Barclays and Bank of America.  The

key terms of the Restructuring proposed the Debtors involve (i) the conversion of approximately

$5.2 billion of the Acquisition Financing to classes of new equity interests entitled to a preferred

return, (ii) the conversion of the Priority Financing to a new revolving credit facility with an

extended maturity date, and (iii) extensions of the maturity dates of the portions of the

Acquisition Financing that are not converted to preferred equity.[1]  The Debtors believe that the

Restructuring is the best solution to stabilize Archstone's balance sheet, minimize the need for

additional owner capital infusions and preserve the Debtors and their affiliates' substantial

investment in Archstone's business.

---

[1] The terms of the Restructuring set forth herein are subject to agreement by Barclays and Bank of America.

**Relief Requested**

5.       By this Motion, the Debtors seek authorization, pursuant to sections 105 and 363(b)(1) of the Bankruptcy Code and Bankruptcy Rules 6004(h) and 9019, to enter into definitive documents in accordance with terms substantially similar to those set forth in the Term Sheet (as defined below) and consummate all transactions contemplated thereby, including the Restructuring.

**Background**

6.       Commencing on September 15, 2008 and periodically thereafter (as applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b).  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.       On September 17, 2008, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

8.       On January 19, 2009, the U.S. Trustee appointed Anton R. Valukas as examiner in the above-captioned chapter 11 cases (the "Examiner") and by order, dated January 20, 2009 [Docket No. 2583] the Court approved the U.S. Trustee's appointment of the Examiner. The Examiner issued a report of his investigation pursuant to section 1106 of the Bankruptcy Code on March 11, 2010 [Docket No. 7531].

9.       On March 22, 2010, the Debtors filed their joint chapter 11 plan pursuant to section 1121 of the Bankruptcy Code [Docket No. 7572].  On April 14, 2010, the Debtors filed their the disclosure statement for their joint chapter 11 plan pursuant to section 1125 of the Bankruptcy Code [Docket No. 8332].

## Jurisdiction

10.      This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. §1334.  This is a core proceeding pursuant to 28 U.S.C. §157(b).

## Lehman's Business

11.      Prior to the events leading up to these chapter 11 cases, Lehman was the fourth largest investment bank in the United States.  For more than 150 years, Lehman had been a leader in the global financial markets by serving the financial needs of corporations, governmental units, institutional clients and individuals worldwide.

12.      Additional information regarding the Debtors' businesses, capital structures, and the circumstances leading to the commencement of these chapter 11 cases is contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications, filed on September 15, 2008 [Docket No. 2].

## The Acquisition of Archstone

13.      As of March 31, 2010, Archstone owned interests in approximately 200 apartment communities in the United States and over 230 apartment communities in Europe, including communities under development, collectively representing over 80,000 residential units.  Archstone specializes in multi-family residential property ownership, acquisition, development and management.  For most of 2007, Archstone was the second largest publicly-traded, multi-family real estate investment trust in the United States.  On October 5, 2007, a

Lehman affiliate and Tishman Speyer formed a joint venture to take Archstone private through a

leveraged buyout, in which other Lehman affiliates and affiliates of Bank of America and

Barclays provided secured financing and made equity investments that they intended to resell to

other investors.

14.    The Acquisition Financing was structured through various agreements,

including, but not limited to:

- that certain Amended and Restated Credit Agreement, dated as of November 27, 2007 among the predecessor in interest of Archstone, Bank of America, Barclays, and LCPI, among other parties (as amended, restated, modified or supplemented from time to time in accordance with its terms and the Initial Loan Modification, the "Archstone Credit Agreement," the loans made to Archstone in connection therewith referred to herein as the "Corporate Loans");

- that certain Credit Agreement, dated as of October 5, 2007 among the predecessor in interest of Archstone Multifamily Holdings I (Development Borrower), Bank of America, Barclays, and LCPI, among other parties (as amended, restated, modified or supplemented from time to time in accordance with its terms and the Initial Loan Modification, the "Development Loan Agreement," the loan evidenced thereby referred to herein as the "Development Loan"), and

- the Mortgage/Mezzanine Documents (as such term is defined in the Archstone Credit Agreement) evidencing certain mezzanine loan facilities (the "Mezzanine Loans").

Each of the loans made to Archstone under the Acquisition Financing has been fully funded.

15.    In March 2009, taking into consideration the decline in the real estate

market and Archstone's need for additional liquidity, the Debtors consummated the Initial Loan

Modification pursuant to the Initial Modification Order.  As part of the Initial Loan Modification,

the Co-Sponsors and their affiliates, among other things, provided an additional financing

commitment to Archstone in an aggregate amount of up to $485 million, plus certain letters of

credit, as part of the Priority Financing and extended the maturity date of the Development Loan

for one year to April 1, 2010.  In March 2010, the Co-Lenders consented to a further extension of

the maturity date of the Development Loan to July 1, 2010 to facilitate further discussions

regarding the Restructuring.

16.    As of March 31, 2010, Lehman's beneficial share of the outstanding Priority Financing totaled approximately $119.5 million.  The Priority Financing is senior in priority of payment to all other Co-Sponsor debt (other than the Development Loan) and, therefore, is entitled to repayment prior to the repayment of the Acquisition Financing (other than the Development Loan).

17.    In addition to the Acquisition Financing and the Priority Financing, financing commitments were provided to certain of Archstone's consolidated subsidiaries through loan facilities made by third-party lenders (the "Third-Party Financing"), which had an aggregate outstanding balance of $9.8 billion as of March 31, 2010.

## The Restructuring

18.    The Debtors propose the Restructuring in order to stabilize Archstone's balance sheet and strengthen the quality of its assets and growth capabilities.  The Restructuring principally consists of (i) the conversion of approximately $5.2 billion of the Acquisition Financing into classes of new equity interests entitled to a preferred return (the "Equity Conversion"); (ii) the conversion of the Priority Financing to a new revolving facility;  and (iii) extensions of the maturity dates of the Priority Financing and the portion of Acquisition Financing not subject to the Equity Conversion.

### The Equity Conversion

19.    Approximately $2.4 billion of the $2.5 billion of the Acquisition Financing currently beneficially held by LCPI or its affiliates will be converted to preferred equity as part of the Equity Conversion.  The Equity Conversion involves multiple tranches of debt, each to be converted to a separate class of new equity interests entitled to a preferred return (the "New Equity Interests").  The Debtors propose that the following loans of which the Acquisition Financing is comprised would be converted into separate classes of New Equity

Interests: (i) approximately $970 million of the Mezzanine Loans; (ii) approximately $250

million of a Corporate Loan comprised of a revolving credit facility (the "Revolver"); (iii)

approximately $948 million of the Corporate Loan known as Term Loan A; and (iv)

approximately $3 billion of the Corporate Loan known as Term Loan B (collectively, the

"Converted Loans").[2] The New Equity Interests will have preferred returns substantially similar

to the existing interest rates of the applicable Converted Loans but no set redemption date. The

Debtors will beneficially own the same percentage of New Equity Interests as the percentages of

their current interests in the Converted Loans. The priority of the New Equity Interests is

intended to reflect the priority of the Converted Loans and, as a result, rank senior to existing

preferred equity interests in Archstone.

### The Post-Restructuring Financing

20.     After the Equity Conversion, the Development Loan's entire outstanding

amount of approximately $198 million and existing collateral structure will remain in place. The

maturity date for the Development Loan will be extended from June 1, 2010 to July 1, 2011,

which may or may not be subject to additional yearly maturity extensions until April 1, 2015,

subject to agreement by the Co-Sponsors.

21.     Approximately $237 million of the Corporate Loans will remain

outstanding as a new fully-funded term loan (the "Post-Conversion Term Loan"). The Post-

Conversion Term Loan will not amortize prior to maturity, and payments of accrued interest due

thereunder will not be capitalized until maturity. Additionally, the Priority Financing (of which

approximately $205 million was funded as of March 31, 2010), plus certain outstanding letters of

---

[2] Prior to the Commencement Date, all or a portion of the Debtors' interests in certain of the Converted Loans were
pledged and/or participated to certain structured finance vehicles including SASCO C2-2008, LLC, Pine CCS, Ltd.
and Verano CCS, Ltd., among others.

credit, will be converted into a new multiple-tranche revolving credit facility in the maximum

principal amount of approximately $596 million (the "Post-Conversion Revolver" and together

with the Post-Conversion Term Loan, the "Post Conversion Facilities").  The Post-Conversion

Facilities will have maturity dates of up to five years from the closing date of the Restructuring,

subject to agreement by the Co-Sponsors.  To provide Archstone with maximum flexibility to

operate its business and optimize the value of its assets, the Archstone Credit Agreement would

be amended to eliminate the mandatory disposition covenant, which currently requires Archstone

to dispose of its assets at certain specified sale prices each year.

22.    The below chart displays the effects of the Restructuring:



*Salient Terms of the Restructuring*

23.    The salient terms of the Restructuring are as follows:[3]

| | |
|---|---|
| ***Exchange of Contributed Debt for New Equity Interests*** | One or more exchange and contribution agreements would be entered into by the holders of the Contributed Debt, pursuant to which such parties would contribute the Converted Loans to one or more Archstone affiliates in exchange for the New Equity Interests.<br><br>Concurrently with the contribution of the Converted Loans, the organizational documents of various Archstone entities would be amended in order to admit the holders of the Contributed Debt as equity holders and issue to such holders various classes of the New Equity Interests. |
| ***Preferred Return Rate and Priority of the New Equity Interests*** | Each of the Converted Loans will represent a separate class of New Equity Interests.  The preferred return rate for each class of the New Equity Interests will be approximately equal to the interest rate payable under the applicable Converted Loan at the time of the Equity Conversion.  The New Equity Interests issued in respect of each of the Converted Loans shall also have a liquidation preference that mirrors the priorities of the applicable Converted Loan.  The liquidation preferences for each class of New Equity Interests will be equal to the debt converted plus any accrued and unpaid preferred return on such New Equity Interests. |
| ***Distributions of New Equity Interests*** | Distributions will be made to holders of New Equity Interests when, as, and if determined by the managing member of the issuer of such interests.  With respect to each issuer, no distributions will be made out of cash available for distribution (i.e., after taking into account the operating needs of the enterprise) to the holders of common interests of such issuer as long as such issuer has New Equity Interests outstanding.  The New Equity Interests will have no set redemption date. |
| ***Post-Conversion Term Loan*** | Approximately $237 million of the Priority Financing will remain outstanding as the Post-Conversion Term Loan, which shall be deemed fully funded.  The Post-Conversion Term Loan will not amortize prior to maturity.  Payments of accrued interest due thereunder will not be capitalized until maturity. |
| ***Post-Conversion Revolver*** | The Post-Conversion Revolver will be available in multiple tranches, with an expected aggregate maximum principal amount of up to approximately $596 million.  Portions of such amounts will be made available for working capital needs, while other portions will be made available for capital projects, acquisitions and as otherwise agreed upon by, and subject to agreement by, |

---

[3] This summary (this "Summary") is qualified in its entirety by the provisions of a term sheet describing the Equity Conversion and a term sheet describing Archstone's post-Conversion credit facilities (collectively, the "Term Sheet").  The parties are still negotiating the Restructuring and, therefore, the Term Sheet is not final and not attached to this Motion.  The Term Sheet will be filed on the docket of these cases as soon as practicable following its finalization and in no event later than seven days prior to the hearing on this Motion.  The Term Sheet will control in the event that there is any inconsistency between this Motion and the Term Sheet.  The terms of the Restructuring set forth in this Summary are subject to agreement by Barclays and Bank of America.

| | |
|---|---|
| | the Co-Sponsors and Archstone. <br><br> Amounts repaid under the Post-Conversion Revolver may be reborrowed with a cap on such reborrowing to be agreed upon by, and subject to agreement by, the Co-Sponsors.  The maturity of the Post-Conversion Revolver shall be up to five years from the date of the closing of the Restructuring, subject to agreement by the Co-Sponsors.  There will be an unused fee to be agreed upon by, and subject to agreement by, the Co-Sponsors. |
| *Development Loan* | The Development Loan and its existing collateral structure will remain in place.  The maturity of the Development Loan will be extended to July 1, 2011.  The maturity date may or may not be subject to additional yearly maturity extensions until April 1, 2015 upon consent of the Co-Sponsors, subject to agreement by the Co-Sponsors. |
| *Pricing of Post-Conversion Financing* | The interest rates per annum applicable to the Post-Conversion Facilities are to be agreed upon by, and subject to agreement by, the Co-Sponsors and Archstone. |
| *Mandatory Disposition Covenant* | The mandatory disposition covenant in the Archstone Credit Agreement, which currently requires Archstone to generate certain amounts of net cash proceeds through dispositions of its assets each year, would be eliminated. |
| *Termination of Flex Letter* | Archstone and its affiliates previously granted the Co-Sponsors rights to change the pricing, fees, terms and structure of the Acquisition Financing (the "Flex Rights") to facilitate the Co-Sponsors attempts to sell their interests in such financing to third-party investors. The Flex Rights will be terminated, subject to agreement by the Co-Sponsors. |

## The Compromises of Debt Contemplated Under the Restructuring Meet
## The Legal Standard Established Under Rule 9019 and is in the Best Interests of the Estate

24. Because the Restructuring, including the Equity Conversion, contemplates the compromise of outstanding debt extended under the Acquisition Financing and the Priority Financing, the Debtors are seeking relief under Bankruptcy Rule 9019.  The Restructuring is in the Debtors' best interest and should be approved under Bankruptcy Rule 9019.  Bankruptcy Rule 9019 provides, in part, that "[o]n motion by the [debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement."  FED. R. BANKR. P. 9019(a). Bankruptcy Rule 9019 empowers bankruptcy courts to approve settlements "if they are in the best interests of the estate."  *Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel*

*Burnham Lambert Group, Inc.)*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991); *see also Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *Fisher v. Pereira (In re 47-49 Charles St., Inc.)*, 209 B.R. 618, 620 (S.D.N.Y. 1997); *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 426 (S.D.N.Y. 1993), <u>aff'd</u>, 17 F.3d 600 (2d Cir. 1994). A decision to accept or reject a compromise or settlement is within the sound discretion of the Court. *Drexel Burnham Lambert Group*, 134 B.R. at 505; *see also* 9 COLLIER ON BANKRUPTCY ¶ 9019.02 (15th ed. rev. 2001). The settlement need not result in the best possible outcome for the debtor, but must not "fall below the lowest point in the range of reasonableness." *Drexel Burnham Lambert Group*, 134 B.R. at 505 (internal citations omitted); *see also Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983); *In re Spielfogel*, 211 B.R. 133, 143-44 (Bankr. E.D.N.Y. 1997). Indeed, courts have long considered compromises to be "a normal part of the process of reorganization." *TMT Trailer Ferry*, 390 U.S. at 424 (quoting *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 130 (1939).

25.     The decision to approve a particular compromise lies within the sound discretion of the bankruptcy court. *Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994). Additionally, a court may exercise its discretion "in light of the general public policy favoring settlements." *In re Hibbard Brown & Co., Inc.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998). However, the analysis must focus on the question of whether a particular compromise is "fair and equitable, . . . and [ ] in the best interest of the estate." *In re Best Products Co.*, 168 B.R. 35, 50 (Bankr. S.D.N.Y. 1994) (internal citations omitted).

26.     While a court must evaluate "all . . . factors relevant to a full and fair assessment of the wisdom of the proposed compromise," *TMT Trailer Ferry*, 390 U.S. at 424, a court need not conduct a "mini-trial" of the merits of the claims being settled, or conduct a full

independent investigation. *Drexel Burnham Lambert Group*, 134 B.R. at 505. "The bankruptcy judge does not have to decide the numerous questions of law and fact. . . . The court need only canvass the settlement to determine whether it is within the acceptable range of reasonableness." *Nellis*, 165 B.R. at 123 (internal citations omitted).

27.    The court may give weight to the "informed judgments of the . . . debtor-in-possession and their counsel that a compromise is fair and equitable, and consider the competency and experience of counsel who support the compromise." *Drexel Burnham Lambert Group*, 134 B.R. at 505 (internal citations omitted); *see also In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522-23 (S.D.N.Y. 1993); *accord In re Ashford Hotels, Ltd.*, 226 B.R. 797, 802 (Bankr. S.D.N.Y. 1998) ("Significantly, that test does not contemplate that I substitute my judgment for the Trustee's, but only that I test his choice for reasonableness. . . . If the Trustee chooses one of two reasonable choices, I must approve that choice, even if, all things being equal, I would have selected the other.") (internal citations omitted).

28.    Significantly, there is no requirement that "the value of the compromise . . . be dollar-for-dollar the equivalent of the claim." *Ionosphere Clubs, Inc.*, 156 B.R. at 427. Instead, "there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." Id. at 427-28 (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 n.2 (2nd Cir. 1974)).

29.    After analyzing various alternatives, the Debtors have determined that the Restructuring provides the best framework for preserving and maximizing the prospects of a recovery of their sizeable debt and equity investments in Archstone.  Most notably, if effectuated, the Restructuring (i) will reduce the leverage of the capital structure of Archstone by approximately $5.2 billion; (ii) will provide the Debtors with the benefit of enhanced economic

terms governing the provisions of the Post-Conversion Revolver and Post-Conversion Term Loan, as compared to the existing Revolver, Term Loan A and Term Loan B; (iii) through such deleveraging and enhanced economics, is anticipated to maximize the value of the Post-Conversion Financing; improves Archstone's capital structure to potentially attract new third-party debt and equity; and (iv) is expected to minimize the need for additional capital infusions from the Co-Sponsors by reducing the accrual and payment of interest.  Additionally, by improving Archstone's balance sheet, the Restructuring is anticipated to remediate market perception of the financial condition of Archstone, as a real estate owner, operator, acquirer and developer.

30.    The potential benefits of the Restructuring substantially outweigh what the Debtors are giving up in connection therewith – their status as a secured creditor – in exchange for the New Equity Interests.[4]  Although under the terms of the Restructuring proposed by the Debtors the holders of the New Equity Interests would relinquish their secured debt positions in exchange for preferred equity positions, collection of the amounts owing under the Acquisition Financing and Priority Financing is, at best, prone to uncertainty if concerns regarding Archstone's balance sheet are not addressed in short order.  Furthermore, while the Converted Loans will no longer be secured debt after the Restructuring, the priority of the New Equity Interests is intended to maintain the existing priority of the Converted Loans relative to the interests of other creditors of and holders of equity in Archstone.

---

[4]  The Restructuring will result in the recognition by the Debtors of a material amount of cancellation of debt income ("CODI") for federal, and applicable state and local, income tax purposes.  The Debtors' internal tax group has been engaged to evaluate potential strategies to mitigate the impact of the CODI on the Debtors including deferring the CODI under current federal income tax law and pairing the CODI with existing losses to minimize the impact of the CODI.

31.    In addition, the Debtors anticipate that, given the current interest rate environment, the Equity Conversion may reduce Archstone's overall interest expense by at least $150 million per year.  To provide Archstone with maximum flexibility to operate its business and optimize the value of its assets, the Archstone Credit Agreement would be amended to eliminate the mandatory disposition covenant, which required Archstone to dispose of its assets at certain specified sale prices each year.  The elimination of the mandatory disposition covenant will allow Archstone to sell assets when it believes values are optimized, instead of on a pre-determined schedule.  As a result, the Restructuring provides Archstone with the best way to obtain a source of liquidity that will provide for the capital needs of its business and increase the Debtors' prospects of recovering their investment.

32.    Additionally, the terms of the Restructuring are the product of a protracted, good-faith, arms'-length negotiation process since September 2009.  The parties to such negotiations, each represented by competent counsel, have participated in numerous meetings and negotiations.  Furthermore, the terms of the Restructuring are the results of approximately nine months of negotiations among such parties, and are designed to provide mutually acceptable benefits and burdens to each of such parties.  For all of the foregoing reasons, the Restructuring meets the requirements of Bankruptcy Rule 9019, is in the best interests of the Debtors' estates, and should be approved.

**The Restructuring is an Appropriate Exercise of the Debtors' Business Judgment**

33.    The Restructuring is an appropriate exercise of the Debtors' business judgment and should be approved.  Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  While section 363

of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a

court to authorize the sale, disposition, or other use of a debtor's assets, courts in the Second

Circuit, in applying this section, have required that it be based upon the sound business judgment

of the debtor. *See In re Chateaugay Corp.*, 973 F.2d 141, 143-45 (2d Cir. 1992) (holding that a

judge reviewing a section 363(b) application must find from the evidence presented a good

business reason to grant such application); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re

Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (same).  Section 105 of the Bankruptcy Code

provides, in pertinent part, that "[t]he court may issue any order, process, or judgment that is

necessary or appropriate to carry out the provisions of [title 11]."  11 U.S.C. § 105(a).

34.     It is generally understood that "[when] the debtor articulates a reasonable

basis for its business decisions (as distinct from a decision made arbitrarily or capriciously),

courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville

Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  If a valid business justification exists, there is

a strong presumption that "'the directors of a corporation acted on an informed basis, in good

faith and in the honest belief that the action taken was in the best interests of the company.'" *In

re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488

A.2d 858, 872 (Del. 1985), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).  The burden of rebutting

this presumption falls to parties opposing the proposed exercise of a debtor's business judgment.

*Id.* (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

35.     For the reasons set forth above, approval of the Restructuring is in the best

interests of the Debtors' estates.  The Restructuring is necessary, in the Debtors' judgment, to

allow the Debtors to maximize the prospect of a recovery on their investments in Archstone.  In

light of the direct and indirect benefits inuring to the Debtors and their estates and creditors

pursuant to the Restructuring, entry into the Restructuring is a proper exercise of the Debtors'

business judgment and should be approved.

### Relief Under Bankruptcy Rule 6004(h)

36.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale,

or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless

the court orders otherwise."  FED. R. BANKR. P. 6004(h).  The loan documents evidencing certain

of the Third-Party Financing provide that Archstone submit certain required audited financial

statements to such third-party lenders on an annual basis.  Archstone's accountants may be

unable to provide the audited financial statements required under the documents evidencing such

Third-Party Financing absent consummation of certain of the transactions contemplated under

the Restructuring, including extension of the maturity dates of the Development Loan and certain

of the Mezzanine Loans and modification of the payment terms and covenants contained in the

agreements evidencing certain loans provided under the Acquisition Financing.  As a result, the

Debtors believe it is in the best interests of their estates for Archstone to consummate certain

elements of the Restructuring by June 1, 2010 in order to provide Archstone's accountants with

sufficient time to prepare the required audited financial statements.  Accordingly, the Debtors

respectfully request that any order approving the Restructuring be effective immediately by

waiving the 14-day stay.

### Notice

37.    No trustee has been appointed in these chapter 11 cases.  The Debtors

have served notice of this Motion in accordance with the procedures set forth in the amended

order entered on February 13, 2009 governing case management and administrative procedures

for these cases [Docket No. 2837] on (i) the U.S. Trustee; (ii) the attorneys for the Creditors'

Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service;

(v) the United States Attorney for the Southern District of New York; (vi) the attorneys for

Archstone; (vii) the attorneys for Bank of America and (viii) the attorneys for Barclays.  The

Debtors submit that no other or further notice need be provided.

        38.    No previous request for the relief sought herein has been made by the

Debtors to this or any other court.

        WHEREFORE the Debtors respectfully request that the Court grant the relief

requested herein and such other and further relief as it deems just and proper.

Dated:  May 6, 2010
      New York, New York


      /s/ Shai Y. Waisman
      Shai Y. Waisman

      WEIL, GOTSHAL & MANGES LLP
      767 Fifth Avenue
      New York, New York 10153
      Telephone: (212) 310-8000
      Facsimile: (212) 310-8007

      Attorneys for Debtors
      and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x
                                            :
In re                                       :    Chapter 11 Case No.
                                            :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,    :    08-13555 (JMP)
                                            :
            Debtors.                        :    (Jointly Administered)
                                            :
                                            :
----------------------------------------------------------------x

### ORDER GRANTING THE DEBTORS' MOTION PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 6004 AND 9019 FOR AUTHORIZATION TO RESTRUCTURE CERTAIN TERMS OF THE ARCHSTONE CREDIT FACILITIES

Upon the motion (the "Motion"),[1] of Lehman Brothers Holdings Inc. ("LBHI")

and Lehman Commercial Paper Inc. ("LCPI") and their affiliated debtors in the above-referenced

chapter 11 cases, as debtors and debtors-in-possession (collectively, the "Debtors" and, together

with their non-debtor affiliates, "Lehman"), pursuant to sections 105 and 363 of title 11 of the

United States Code (the "Bankruptcy Code") and Rules 6004 and 9019 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") for authorization and approval of a restructuring

(the "Restructuring") of the documents evidencing the Acquisition Financing and the Priority

Financing (together with all collateral agreements and other documentation entered in connection

with the transactions contemplated thereby, the "Loan Documents") pursuant to definitive

documentation entered into on terms substantially consistent with those set forth in the Term

Sheet, all as more fully described in the Motion; and the Court having jurisdiction to consider the

Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the

Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of New York

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and

consideration of the Motion and the relief requested therein being a core proceeding pursuant to

28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and

1409; and due and proper notice of the Motion having been provided in accordance with the

procedures set forth in the amended order entered February 13, 2009 governing case

management and administrative procedures [Docket No. 2837] to (i) the United States Trustee

for the Southern District of New York; (ii) the attorneys for the Official Committee of Unsecured

Creditors; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v)

the United States Attorney for the Southern District of New York; (vi) counsel to Archstone;

(vii) counsel to Bank of America, N.A.; and (viii) counsel to Barclays Capital, Inc., and it

appearing that no other or further notice need be provided; and the Court having found and

determined that the relief sought in the Motion is in the best interests of the Debtors, their estates

and creditors, and all parties in interest and that the legal and factual bases set forth in the Motion

establish just cause for the relief granted herein; and after due deliberation and sufficient cause

appearing therefore, it is

ORDERED that the Motion is granted; and it is further

ORDERED that the objections to the Motion, if any, that have not otherwise been

withdrawn or resolved are overruled; and it is further

ORDERED that, pursuant to Bankruptcy Rule 9019 and sections 105(a) and

363(b) of the Bankruptcy Code, the Restructuring is hereby approved and the Debtors: (i) are

duly authorized to consummate any and all of the transactions contemplated thereby, including

the Equity Conversion, on terms substantially consistent with those set forth in the Term Sheet,

(ii) are duly authorized to execute, deliver, implement, and fully perform any and all obligations,

instruments, documents and papers (including, without limitation, the execution and delivery of

one or more restated documents, agreements modifying or amending the Loan Documents,

successor agency agreements, security agreements, pledge agreements, control agreements,

mortgages and financing statements) that may be necessary or appropriate to consummate each

of the component transactions contemplated by the Restructuring; and (iii) shall have the right

both in connection with and following consummation of the transactions contemplated by the

Restructuring to vote and make all determinations and take all other actions under each Loan

Document as modified consistent in all material respects with the terms of the Restructuring, it

being understood that nothing in this Order shall prejudice the right of Lehman Commercial

Paper Inc. to assign, in accordance with the terms of the Loan Documents as modified consistent

in all material respects with the terms of the Term Sheet, any portion of its loans and

commitments to, or equity interests in, Archstone, any borrower under the Loan Documents, or

their affiliates, it being further understood that any actions described in this paragraph taken by

the Debtors or their affiliates (a) need not be taken simultaneously and may be taken as part of

separate consecutive transactions and (b) may be taken without the necessity of any further court

proceedings or approval or any consent of any third party, and shall be conclusive and binding in

all respects on all parties in interest in these cases; and it is further

ORDERED that the Loan Documents may be further modified, amended or

supplemented by the parties thereto in accordance with the terms thereof without further order of

the Court, *provided* that, in each case, any such modification, amendment or supplement does not

have a material adverse effect on the Debtors' estates; and it is further

ORDERED that this Order shall be binding upon and shall govern the acts of all

entities, including without limitation, all filing agents, filing officers, title agents, title companies,

recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies,

governmental units, secretaries of state, federal, state and local officials, and all other persons

and entities who may be required by operation of law, contract, or the duties of their office to

accept, acknowledge, assent or consent to, file, register, record or release any documents or

instruments with respect to any Loan Document and consummation of the transactions

contemplated by the Restructuring; and it is further

      ORDERED that this Order shall be effective and enforceable immediately upon

entry and its provisions shall be self-executing and shall not be stayed pursuant to Bankruptcy

Rule 6004; and it is further

      ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to the implementation and/or interpretation of this Order.

Dated: May __, 2010
     New York, New York

                        _____
                        UNITED STATES BANKRUPTCY JUDGE