instruments necessary and appropriate to consummate the transactions contemplated by the
Purchase Agreement.

        7.    **Injunction**.  Except as expressly permitted by the Purchase Agreement or
by this Sale Order, all persons and entities, including, but not limited to, all debt security holders,
equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors,
litigation claimants and other creditors, holding Interests or Claims of any kind or nature
whatsoever against or in the Debtors or the Debtors' interests in the Purchased Assets (whether
legal or equitable, secured or unsecured, matured or unmatured, contingent or non contingent,
liquidated or unliquidated, senior or subordinated), arising under or out of, in connection with, or
in any way relating to, the Debtors, the Purchased Assets, the operation of the Debtors'
businesses before the Closing Date or the transfer of the Debtors' interests in the Purchased
Assets to the Purchaser, shall be and hereby are forever barred, estopped and permanently
enjoined from asserting, prosecuting or otherwise pursuing against the Purchaser, its property, its
successors and assigns, its affiliates or the interests of the Debtors in such Purchased Assets,
such persons' or entities' Interests or Claims.  Following the Closing Date, no holder of an
Interest in or Claim against the Debtors shall interfere with Purchaser's title to or use and
enjoyment of the Debtors' interests in the Purchased Assets based on or related to such Interests
or Claims, and all such Claims and Interests, if any, shall be, and hereby are transferred and
attached to the Debtors' interests in the Sale proceeds as provided in this Sale Order in the order
of their priority, with the same validity, force and effect which they have against such Purchased
Assets as of the Closing Date, subject to any rights, claims and defenses that the Debtors' estates
and Debtors, as applicable, may possess with respect thereto.

8.    **Release of Interests**.  This Order (a) shall be effective as a determination that, on the Closing Date, all Interests of any kind or nature whatsoever existing as to the Purchased Assets (except to the extent that certain intellectual property rights may be owned by entities other than the Seller) prior to the Closing Date have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of all entities including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets.

9.    **Direction to Release Interests**.    On the Closing Date, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release its Interests in the Purchased Assets, if any, as such Interests may have been recorded or may otherwise exist.

10.    **No Successor Liability**.  Neither Purchaser nor its affiliates, successors or assigns shall, as a result of the consummation of the transaction contemplated by the Purchase Agreement,: (a) be a successor to the Debtors or their estates; (b) have, de facto or otherwise, merged or consolidated with or into the Debtors or their estates; or (c) be a continuation or substantial continuation of the Debtors or any enterprise of the Debtors.  Except for the Assumed Liabilities, the transfer of the Purchased Assets to Purchaser under the Purchase Agreement shall not result in (i) Purchaser, its affiliates, members, or shareholders, or the Purchased Assets,

15

having any liability or responsibility for any claim against the Debtors or against an insider of the
Debtors, (ii) Purchaser, its affiliates, members, or shareholders, or the Purchased Assets, having
any liability whatsoever with respect to or be required to satisfy in any manner, whether at law or
in equity, whether by payment, setoff or otherwise, directly or indirectly, any Interest or
Excluded Liability, or (iii) Purchaser, its affiliates, members, or shareholders, or the Purchased
Assets, having any liability or responsibility to the Debtors except as is expressly set forth in the
Purchase Agreement.

       11.    **Examples of No Successor Liability**. Without limiting the effect or
scope of the foregoing, as a result of the closing of the transactions contemplated by the Purchase
Agreement, the Purchaser shall have no successor or vicarious liabilities of any kind or character,
including, but not limited to, any theory of antitrust, environmental, successor or transferee
liability, labor law, de facto merger or substantial continuity, whether known or unknown as of
the Closing Date, now existing or hereafter arising, whether asserted or unasserted, fixed or
contingent, liquidated or unliquidated with respect to the Debtors or any obligations of the
Debtors arising prior to the Closing Date, including, but not limited to, liabilities on account of
any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to
the operation of the Purchased Assets prior to the Closing Date.

       12.    **Assumption and Assignment of Contracts**. In accordance with
Bankruptcy Code sections 363, 365 and 105(a), and subject to the terms of the Purchase
Agreement and this Sale Order, the Sellers are hereby authorized to assume and assign the
Closing Date Contracts, including customer account agreements, to which they are a party to the
Purchaser. All counterparties to Closing Date Contracts shall have until the Cure Amount
Objection Deadline to file an objection to the Cure Amounts (including as to the specific identity

16

of such contracts).  To the extent that any counterparty does not object to its Cure Amount by the Cure Amount Objection Deadline, such counterparty is deemed to have consented to such Cure Amounts and the assignments of their respective Closing Date Contracts to the Purchaser.  To the extent any objections are timely filed, the Debtors, Purchaser and the counterparty shall meet and confer in good faith to attempt resolve any such objection without Court intervention.  If the objecting party and the Purchaser determine that the objection cannot be resolved without judicial intervention, then such dispute will be determined by the Court upon written application by either party on 20 (twenty) days notice, with any response due to such an application 15 (fifteen) days after such application is filed. The Purchaser shall pay any Cure Amount as soon as reasonably practicable after (i) the date on which the contracting counterparty consents in writing to the Cure Amount, (ii) the date on which the counterparty is deemed to have consented, or (iii) the date on which the Court enters an order determining the Cure Amount after the notice and hearing procedure set forth above.  The procedures with respect to assumption, assignment and cure of the Designated Contracts will be set forth in one or more separate orders of the Court which will be entered at a later date or dates.

> 13.    **Bankruptcy Code Sections 365(b)(1) and 365(f)(2).**  The requirements of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code are hereby deemed satisfied with respect to the Closing Date Contracts.

> 14.    **Binding Effect of Order**.  This Order shall be binding upon and shall govern the acts of all entities, including without limitation all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties

of their office, or contract, to accept, file, register or otherwise record or release any documents

or instruments, or who may be required to report or insure any title or state of title in or to any of

the Purchased Assets.

15.  **Ipso Facto Clauses Ineffective**.  Upon the Debtors' assignment of the

Contracts to the Purchaser under the provisions of this Sale Order and any additional order

contemplated by the Purchase Agreement, no default shall exist under any Closing Date

Contract, and no counterparty to any Closing Date Contract shall be permitted to declare a

default by the Purchaser under such Closing Date Contract or otherwise take action against the

Purchaser as a result of any Debtors' financial condition, bankruptcy or failure to perform any of

its obligations under the relevant Closing Date Contract.

16.  **Binding on Successors**.  The terms and provisions of the Purchase

Agreement and this Order shall be binding in all respects upon the Debtors, their estates, all

creditors of (whether known or unknown) and holders of equity interests in either Debtor,

Purchaser and its respective affiliates, successors and assigns, and any third parties,

notwithstanding any subsequent appointment of any trustee of the Debtors under any chapter of

the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding.

This Order and the Purchase Agreement shall inure to the benefit of the Debtors, their estates,

their creditors, the Purchaser and the respective successors and assigns of each of the foregoing.

17.  **Bankruptcy Code Section 363(n)**.  The consideration provided by

Purchaser for the Purchased Assets under the Purchase Agreement is fair and reasonable and

may not be avoided under Bankruptcy Code section 363(n).

18.  **Good Faith**.  The transactions contemplated by the Purchase Agreement

are undertaken by Purchaser without collusion and in good faith, as that term is used in

Bankruptcy Code section 363(m) and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including the assumption and assignment of the Closing Date Contracts) with Purchaser, unless such authorization is duly stayed pending such appeal prior to the Closing Date. Purchaser is a good faith Purchaser of the Purchased Assets, and is entitled to all of the benefits and protections afforded by Bankruptcy Code section 363(m).

19.    **Fair Consideration**. The consideration provided by the Purchaser to the Debtors and LBI pursuant to the Purchase Agreement for its purchase of the Debtors' interest in the Purchased Assets constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and under the laws of the United States, any state, territory, possession or the District of Columbia; provided that nothing in the foregoing shall waive or compromise any claim of a creditor, including a non -debtor affiliate to seek relief against any estate or any person other than the Purchaser, arising out of or related to flows of funds to and from the Debtors prior to entry of this Order.

20.    **Retention of Jurisdiction**. This Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret, implement, and enforce the terms and provisions of this Order, all amendments thereto and any waivers and consents thereunder, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Purchased Assets to Purchaser; (b) interpret, implement and enforce the provisions of this Order; (c) protect Purchaser against any Interests in or Claims against the Sellers or the Purchased Assets of any kind or nature whatsoever, attaching to the proceeds of the Sale, and (d)

enter any orders under section 363 and 365 of the Bankruptcy Code with respect to the

Designated Contracts.

21.   **Retention of Rights By the Government**.  Nothing in this Order or in the

Purchase Agreement (i) releases, nullifies, or enjoins the enforcement of any liability to a

governmental unit under police and regulatory statutes or regulations that any entity would be

subject to as the owner or operator of property after the date of entry of this Order; or (ii) should

be construed to give Purchaser any more protection against any government unit than it is

otherwise entitled to under 11 U.S.C. § 363(f). Nothing in this paragraph should be construed to

create for any governmental unit any substantive right that does not already exist under law.

22.   **Surrender of Possession**.  All entities that are currently, or on the Closing

Date may be, in possession of some or all of the Purchased Assets in which the Sellers hold an

interest hereby are directed to surrender possession of the Purchased Assets either to (i) the

Debtors or LBI  before the Closing Date, or (ii) to Purchaser on the Closing Date.

23.   **Fees and Expenses**.  Any amounts payable by the Debtors under the

Purchase Agreement or any of the documents delivered by the Debtors in connection with the

Purchase Agreement, including, but not limited to the Breakup Fee or Expense Reimbursement,

shall be paid in the manner provided in the Purchase Agreement and the Break-Up Fee and

Competing Bid Order, entered on September 17, 2008, without further order of this Court, shall

be an allowed administrative claim in an amount equal to such payments in accordance with

sections 503(b) and 507(a)(2) of the Bankruptcy Code, shall have the other protections provided

in the Break-Up Fee and Competing Bid Order, and shall not be discharged, modified or

otherwise affected by any reorganization plan for the Debtors, except by an express agreement

with Purchaser, its successors, or assigns.

20

24. **Sale Proceeds**. Any and all valid and perfected Interests in Purchased Assets of the Debtors shall attach to any proceeds of such Purchased Assets immediately upon receipt of such proceeds by the Debtors (or any party acting on any Debtor's behalf) in the order of priority, and with the same validity, force and effect which they now have against such Purchased Assets, subject to any rights, claims and defenses the Debtors, their estates or any trustee for any Debtor, as applicable, may possess with respect thereto, and, in addition to any limitations on the use of such proceeds pursuant to any provision of this Order, except as required by this Order or the Purchase Agreement, no proceeds subject to an asserted Interest shall be used or disbursed by the Debtors without the express consent of the party or parties asserting an Interest therein or further order of the Court after notice (to all parties who have asserted an Interest in such proceeds) and a hearing, consistent with the requirements of the Bankruptcy Code.

25. **Non-material Modifications**. The Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates and has been agreed to between the Committee, the Debtors and the Purchaser.

26. **Subsequent Plan Provisions**. Nothing contained in any chapter 11 plan confirmed in any Debtor's bankruptcy case or any order confirming any such plan or in any other order in these chapter 11 cases (including any order entered after any conversion of a chapter 11 case of any of the Debtors to a case under chapter 7 of the Bankruptcy Code) shall alter, conflict with, or derogate from, the provisions of the Purchase Agreement or this Order.

08-13555-mg    Doc 8842    Filed 05/06/10    Entered 05/06/10 15:01:26    Doc #1 Not.
Case 1:10-cv-03524-NRB    Document 1-3    Filed 05/03/10    Page 9 of 42
of Removal part3    Pg 9 of 42

27.   **Failure to Specify Provisions**.  The failure specifically to include any particular provisions of the Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Purchase Agreement be authorized and approved in its entirety; provided, however, that this Order shall govern if there is any inconsistency between the Purchase Agreement (including all ancillary documents executed in connection therewith) and this Order.  Likewise, all of the provisions of this Order are nonseverable and mutually dependent.

28.   **Further Notice to Lienholders**.  The Debtors, at the Debtors' expense, shall provide additional notice to any additional lienholders identified after the Debtors obtain additional lien searches (such searches shall be done in a manner to the reasonable satisfaction of the Purchaser).  If additional lienholders are identified after the Debtors' additional searches, then such additional lienholders identified will be sent notice of the relief granted in the Sale Motion and will be given 15 (fifteen) days after such notice to file an objection to the 11 U.S.C. § 363(f) relief provided herein.  If after such notice, any objections are filed, the Debtors and the Purchaser will have 15 (fifteen) days to respond to such objections and such objections will be set for hearing and determined by this Court.

29.   **No Stay of Order**.  Notwithstanding the provisions of Interim Bankruptcy Rule 6004 and Bankruptcy Rule 6006 or any applicable provisions of the Local Rules, this Order shall not be stayed for ten (10) days after the entry hereof, but shall be effective and enforceable immediately upon entry.  Time is of the essence in closing the transactions referenced herein, and the Debtors and the Purchaser intend to close the Sale as soon as practicable.  Any party objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay, or risk its appeal being foreclosed as moot.

30. **Allocation**. The consideration received by Seller pursuant to the Purchase

Agreement on account of the Lehman headquarters at 745 Seventh Avenue in New York City,

the Cranford New Jersey Data Center and the Piscataway New Jersey Data Center (collectively,

the "Real Estate Assets") shall become property of the LBHI estate. The rights of all parties in

interest in respect of the proper allocation of proceeds received by the Seller on account of the

Purchased Assets other than the Real Estate Assets are reserved, as among each Seller (and

without impairing or affecting in any way Purchaser's rights under the Purchase Agreement),

subject to the further order of the Court. The Debtors shall seek an order approving such

allocation, on notice to the SIPA Trustee and the Committee, in the event of any dispute

regarding such allocation.

31. **Preservation of Certain Records**. Subject to further order of the Court,

the Seller and the Purchaser are hereby ordered to take appropriate measures to maintain and

preserve, until the consummation of any chapter 11 plan for the Debtors, the books and records

and any other documentation, including tapes or other audio or digital recordings and data in or

retrievable from computers or servers, relating to or reflecting the records held by it or its

Affiliates relating to the Business, including the accounts, property and trading records of the

customers of the Seller.  In addition, the Debtors and Committee shall promptly identify

reasonable procedures for preserving information in the Seller or Purchaser's possession related

to potential tax or financial audits of, government investigations of, or claims against Seller, as

well as any claims that the Debtors may have against third parties, and the Seller and Purchaser

shall maintain and reserve such information, subject to further order of the Court until the

consummation of any chapter 11 plan for the Debtors.

32.    Notwithstanding anything to the contrary set forth in this order, this order does not (i) alter the rights of parties to "forward contracts," "securities contracts," "repurchase agreements," "commodity contracts," "swap agreements," "master netting agreements" (each as defined in the Bankruptcy Code) from exercising their rights pursuant to the "financial contract safe harbor" provisions of the Bankruptcy Code, including without limitation those set forth in sections 555, 556, 559, 560, 561 and 562 or (ii) affect any right of JPMorgan under or with respect to any securities contract, commodities contract, forward contract, repurchase agreement, swap agreement or master netting agreement (each as defined in the Bankruptcy Code) to exercise any contractual right (as defined in the relevant section of the Bankruptcy Code) of a kind described in section 362(b)(6), (7), (17), or (27), 362(o), 555, 556, 559, 560 or 561 of the Bankruptcy Code.

33.    Nothing in this order or actions taken pursuant to this Order shall undermine any obligations of the Debtors or the SIPA Trustee to comply with the rules of the Chicago Mercantile Exchange.

Dated:  New York, New York
        September 19, 2008

                              s/ James M. Peck
                              HONORABLE JAMES M. PECK
                              UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT D**

[Summons and Complaint]

08-13555-mg   Doc 8842-4   Filed 05/06/10   Entered 05/06/10 15:01:26   Doc #1 Not.
Case 1:10-cv-03244-NRB   Document 10-3   Filed 04/16/2013   Page 13 of 42
of Removal part3   Pg 13 of 42

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

Index No. *600674/2010*

-------------------------------------------------------X
                                    :

BARCLAYS CAPITAL INC.,            :

                   Plaintiff,       :

         -against-         :

TRILANTIC CAPITAL PARTNERS III L.P. and  :
TRILANTIC CAPITAL PARTNERS IV L.P.,    :

                 Defendants.    :

-------------------------------------------------------X

Date Purchased
March 16, 2010

Plaintiff designates
New York
County as the place of trial.

The basis of the venue is
Defendants' Residence

**SUMMONS**

NEW YORK
COUNTY CLERK'S OFFICE

MAR 16 2010

NOT COMPARED
WITH COPY FILED

To: Trilantic Capital Partners III, L.P.
    399 Park Avenue, 15th Floor, New York, New York 10022

    Trilantic Capital Partners IV L.P.
    399 Park Avenue, 15th Floor, New York, New York 10022

    **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and
to serve a copy of your answer, or, if the complaint is not served with this summons, to
serve a notice of appearance, on the Plaintiff's Attorneys within 20 days after service of
the summons, exclusive of the day of service (or within 30 days after the service is
complete if this summons is not personally delivered to you within the State of New
York); and in case of your failure to appear or answer, judgment will be taken against
you by default for the relief demanded in the complaint.

Dated: March 16, 2010

                           BOIES, SCHILLER & FLEXNER LLP

                           By: _____

                           Jonathan D. Schiller
                           Christopher E. Duffy
                           Bridget Brown
                           575 Lexington Avenue
                           New York, New York 10022
                           (212) 446-2300
                           *Attorney for Plaintiff*

08-13555-mg    Doc 8842-4    Filed 05/06/10    Entered 05/06/10 15:01:26    Doc #1 Not.
of Removal part3    Pg 14 of 42
Case 1:10-cv-03224-NRB    Document 1-3    Filed 04/15/2010    Page 14 of 42

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

BARCLAYS CAPITAL INC.,

Plaintiff,

v.

TRILANTIC CAPITAL PARTNERS III L.P. and
TRILANTIC CAPITAL PARTNERS IV L.P.,

Defendants.

---

Index No. _600674/2010_

**COMPLAINT**

---

Plaintiff Barclays Capital Inc. ("Barclays"), for its Complaint against Trilantic

Capital Partners III L.P. ("TCP III") and Trilantic Capital Partners IV L.P. ("TCP IV"),

alleges as follows:

<u>**Summary of the Action**</u>

1.    This is an action for breach of fiduciary duty, breach of implied contract,

quantum meruit, and unjust enrichment.  Barclays' claims arise from Defendants' failure

to comply with their obligations to pay millions of dollars owed to Barclays in connection

with the placement of investors in Defendants' private equity funds by the Private

Investment Management ("PIM") business unit now owned by Barclays, and Barclays'

continued service to Defendants with respect to collecting additional capital contributions

from the investors that Barclays brought to Defendants.

2.    Barclays' PIM business (which it purchased from Lehman Brothers in

2008) generated more than $1 billion of committed investments in Defendants' funds.

PIM did so in consideration for Defendants' agreement to pay it a portion of the

management fee based upon the commitments made by investors that PIM placed with

Defendants' funds.  Prior to September 2008, Defendants regularly paid these fees to

PIM in accordance with a written fee schedule.  Subsequent to September 2008, however,

Defendants have breached their obligations to do so. Instead of paying Barclays the portion of the management fee to which Barclays is entitled, Defendants have unlawfully enriched themselves with money that they agreed to hold for the benefit of, and ultimately pay to, Barclays.

3.      The only thing that has changed since September 2008 is the ownership of PIM. In a transaction in September 2008 (the "Asset Purchase Transaction"), Barclays purchased billions of dollars of assets from Lehman Brothers Holdings, Inc. ("LBHI"). Included among the assets that Barclays purchased from LBHI was PIM. Upon the closing of the Asset Purchase Transaction in September 2008, Barclays immediately succeeded to the economic rights held by the business units that it purchased in the Asset Purchase Transaction, including PIM, which now operates under the brand name "Barclays Wealth."

4.      Included among the economic rights owned by PIM at the time of the Asset Purchase Agreement, and thus transferred to Barclays, were rights to fees based upon the financial commitments made by the investors that PIM had placed with the Defendants' funds. Prior to September 2008, Defendants compensated PIM for those fees pursuant to agreements and arrangements between PIM and Defendants. Pursuant to those agreements, PIM placed investors with Defendants, and committed to continue to provide services to Defendants by, among other things, collecting and facilitating annual capital contributions from the investors they had placed. In exchange, Defendants agreed to pay PIM (or its successors) a designated portion of the management fees based upon the financial commitments made to Defendants' funds by the investors whom PIM had

2

sourced.  Defendants agreed that they would hold that portion of the management fee in a fiduciary capacity for the benefit of PIM, to be paid at agreed upon intervals.

5.      Since the closing of the Asset Purchase Transaction in September 2008, Defendants have failed to make payments required under the agreements in breach of their obligations to Barclays, which is the successor to the economic rights held by PIM.

6.      Barclays now brings this action in order to remedy Defendants' failures to meet their obligations under the agreements with PIM, including their unlawful self-enrichment with money that they agreed to hold for PIM's benefit, and ultimately pay to PIM.  Plaintiff seeks monetary relief and all other appropriate relief to which it is entitled under New York law.

### Parties

7.      Plaintiff Barclays is a Connecticut corporation with its principal place of business in New York, New York.  Barclays is the successor in interest to the economic rights held by Lehman Brothers Private Investment Management.

8.      Defendant TCP III is a limited partnership with its principal place of business in New York, New York.

9.      Defendant TCP IV is a limited partnership with its principal place of business in New York, New York.

### Jurisdiction

10.     Jurisdiction is proper in this Court pursuant to N.Y. C.P.L.R. §§ 301 and 302, as plaintiff Barclays is a foreign corporation doing business in New York, and Defendants' principal place of business is in New York County.

11.     Venue is proper in this Court pursuant to N.Y. C.P.L.R. § 503, because New York County is the principal place of business for each of the Defendants, and a substantial as the Defendants' principal places of business are located in New York County, and a substantial portion of the conduct at issue occurred in New York County.

**Factual Allegations**

12.     Prior to September 2008, PIM generated more than $1 billion of investments in Defendants' private equity funds in exchange for a percentage of the financial commitments made to Defendants by investors placed with Defendants by PIM. PIM made these efforts in reliance upon Defendants' agreement to pay specified portions of the fees to PIM.  When the agreement was made, PIM and Defendants' funds had a relationship of mutual trust and confidence.  At the time, PIM and each of the Defendants' funds operated under the "Lehman Brothers" brand name, and shared certain administrative services and confidential information with one another.  Prior to 2008, PIM operated as Lehman Brothers Private Investment Management; TCP III operated as Lehman Brothers Merchant Banking Partners III L.P.; and TCP IV operated as Lehman Brothers Merchant Banking Partners IV L.P.

13.     Pursuant to an agreement reached in January 2004, the compensation payable to PIM by Defendants consisted of a designated portion of the financial commitment made to the funds by the investors whom PIM had placed with Defendants. Specifically, the agreements provided that PIM would receive 3.0% of the first $20 million of investments placed with each Defendant's funds, with such payments spread over a six-year period:  1.25% in year one, 0.625% in year two, 0.375% in year three, and 0.25% in each of years four, five and six.

14.    The agreements further provided that PIM would receive 1.525% of investments in excess of $20 million, also spread over a six-year period: 0.625% in year one, 0.325% in year two, 0.2% in year three, and 0.125% in each of years four, five and six. These compensation terms were recorded in writing.

15.    These payments to PIM were in exchange for PIM's efforts in bringing the investors to Defendants in the first place, and for continuing to service Defendants' relationship with those investors, including by, among other things, facilitating the collection of annual capital contributions from the investors. PIM's efforts resulted in investments of more than $1 billion into Defendants' funds.

16.    Defendants' recognition of their obligation to pay these fees to Barclays is reflected in a "Confidential Private Placement Memorandum" that states that the limited partnership "will be responsible for their *pro rata* share of all costs, fees and expenses (including costs, fees and expenses of any placement agent or finder) in connection with the organization of the General Partner, the Advisor, the Partnership (and Parallel Funds) and the offering of interests therein. . . . Any commissions, fees, costs and expenses payable to any third-party placement agents or finders, which may be engaged in respect of the sale of Interests to Limited Partners, will be allocated to and paid by all Limited Partners, with (other than indemnification) a corresponding reduction in such amount to future Management Fees payable by all Limited Partners."

17.    Defendants informed the potential investors and PIM that PIM would receive a portion of the funds each limited partner agreed to invest under the LPA. PIM, as well as the limited partners in Defendants' funds, understood that Defendants would pay such fees to PIM.

5

18.    The fee schedule set forth in paragraphs 13 and 14 above were set forth in
writing, among other places, on the Lehman Brothers internal website, known as
LehmanLive, and on various memoranda provided to the persons responsible for
managing the PIM business when it was still part of LBHI.  The written fee schedule
reflects Defendants' intention to be bound to pay fees to PIM, which Defendants
regularly paid in a manner consistent with the written fee schedule until September 2008.

19.    When Barclays and LBHI completed the Asset Purchase Transaction in
September 2008, they agreed in writing that "The private investment management
business (other than CTS (Corporate Cash) business) (the "PIM Business") is a
Purchased Asset and the Purchased Assets shall include the assets of the Seller used
exclusively in the PIM Business."  Subsequent to the sale, Barclays re-branded PIM as
"Barclays Wealth."

20.    Thus, there can be no dispute that Barclays succeeded to the economic
rights enjoyed by PIM.  Indeed, that is precisely what Barclays purchased (among other
things) as part of the multi-billion dollar Asset Purchase Transaction.  The management
fees owed by Defendants to PIM were an asset of the PIM business, and therefore part of
what Barclays purchased from Lehman Brothers in September 2008.

21.    PIM relied to its detriment on Defendants' commitment to pay PIM a
portion of the financial commitments made by Defendants' limited partner investors.
PIM's professionals devoted substantial resources to matching up potential investors with
Defendants' private equity funds, with the justified expectation that Defendants would
live up to their obligations to pay, and continue to pay, a portion of limited partners'
financial commitments to PIM pursuant to the agreements.  The scope of PIM's efforts is

6

demonstrated by the substantial scope of investments that PIM originated for Defendants'
funds – more than $1 billion.

22.     If PIM was aware that Defendants would later assert that Defendants were
not required to pay PIM for those services, and that PIM's work would purportedly be
performed free of charge, then PIM would have instead directed its resources to placing
investors with clients that would provide revenue to PIM.

23.     Since September 2008, Barclays Wealth has continued to provide the
same level of service to Defendants that PIM provided prior to its purchase by Barclays
in September 2008, including, among other things:

      a.   Involvement in investor capital calls and distributions;

      b.   Handling individual investor questions on fund performance;

      c.   Facilitating investor calls.

24.     Nonetheless, subsequent to the closing of the Asset Purchase Transaction,
Defendants have refused to pay Barclays any fees in connection with the investments
generated by PIM.

25.     Pursuant to the written fee schedule set forth above, Defendants owe more
than $18 million in fees to Barclays.

### FIRST CLAIM FOR RELIEF
#### (Quantum Meruit – Breach of Implied Contract)

26.     Barclays realleges the allegations contained in paragraphs 1 to 25 as
though fully set forth herein.

27.     Through their course of conduct, Defendants formed a contract with PIM
to pay commissions or placement agent fees to PIM or its successors, including Barclays,
in connection with the sourcing of investors by PIM for the benefit of Defendants.

28.    This course of conduct included, but is not limited to:

a.  Regularly paying the fees to PIM, as compensation for investor placement and continued service, until Barclays' purchase of PIM in September 2008;

b.  Referencing the fee payout schedule in written materials;

c.  Acknowledging the General Partner's responsibility, in the Limited Partnership Agreement of each of the funds at issue here, to pay placement agent fees;

d.  Representing to investors that a portion of their investments will be paid, in the form of non-refundable fees, to PIM in consideration for PIM's acting as a placement agent.

29.    The benefits of these agreements were transferred to Barclays following Barclays' purchase of LBHI's assets, which included the PIM assets.

30.    Upon the sale of PIM to Barclays in September 2008, Defendants ceased paying fees in breach of the agreements they had formed with PIM.

31.    By reason of the foregoing, Barclays has suffered damages in an amount to be determined at trial, but not less than $18 million.

**SECOND CLAIM FOR RELIEF**
**(Quantum Meruit – Promissory Estoppel)**

32.    Barclays realleges the allegations contained in paragraphs 1 to 31 as though fully set forth herein.

33.    Barclays has provided the same services to Defendants that PIM provided prior to the purchase by Barclays of PIM in September 2008, in reliance on the promise

8

that Defendants would continue to pay for such services and would reasonably

compensate Barclays for these services.

34. Defendants accepted and have benefited from the ongoing investor

services Barclays has provided to them.

35. Defendants knew that PIM provided these services with an expectation of

reasonable compensation.

36. PIM reasonably relied on Defendants' promise to its detriment, by

expending substantial resources on generating investments into Defendants' funds instead

of focusing on other potential streams of revenue.

37. Defendants' acceptance of Barclays' services without reasonable payment

for those services is inequitable.

38. As a result of the Defendants' failure to reasonably compensate Barclays

for its services, Defendants have been unjustly enriched at the expense of Barclays.

39. Barclays has suffered injury to its business by reason of Defendants'

unjust enrichment in an amount to be determined at trial, but not less than $18 million.

### THIRD CLAIM FOR RELIEF
**(Unjust Enrichment)**

40. Barclays realleges the allegations contained in paragraphs 1 to 39 as

though fully set forth herein.

41. Since Barclays' purchase of PIM in September 2008, Defendants have

collected management fees from their limited partners at rates that were set to include the

fees due to placement agents such as PIM/Barclays, as reflected in the language of

Defendants' constitutive partnership agreements.

42. Barclays has continued to provide the same level of service to Defendants that PIM provided prior to its purchase by Barclays in September 2008, yet Defendants have wrongfully ceased paying fees owed to Barclays.

43. Defendants have failed to compensate Barclays for the benefit they have received, and consequently have been unjustly enriched at the expense of Barclays.

44. Barclays has suffered injury to its business by reason of the Defendants' unjust enrichment in an amount to be determined at trial, but not less than $18 million.

**FOURTH CLAIM FOR RELIEF**
**(Constructive Trust)**

45. Barclays realleges the allegations contained in paragraphs 1 to 44 as though fully set forth herein.

46. When they entered into the agreement to pay a portion of the funds' management fees to PIM, the relationship between Defendants and PIM was one of confidential and fiduciary nature.

47. In reliance on Defendants' agreement to pay PIM a portion of the money committed to Defendants' funds by investors placed by PIM, PIM generated more than $1 billion of investments for the benefit of Defendants.

48. Barclays has continued to provide the same level of service to Defendants that PIM provided prior to its purchase by Barclays in September 2008, yet Defendants have wrongfully ceased paying fees owed to Barclays.

49. Defendants have failed to compensate Barclays for the benefit they have received, and consequently have been unjustly enriched at the expense of Barclays.

50. Barclays has suffered injury to its business by reason of Defendants' unjust enrichment in an amount to be determined at trial, but not less than $18 million.

08-13555-mg Doc 8842-4 Filed 05/06/10 Entered 05/06/10 15:01:26 Doc #1 Not.
Case 1:10-cv-03244-NRB Document 1-3 Filed 04/15/2015 Page 24 of 42
of Removal part3 Pg 24 of 42

## FIFTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty)

51.     Barclays realleges the allegations contained in paragraphs 1 to 50 as though fully set forth herein.

52.     PIM and Defendants, while each operating under the Lehman Brothers brand name, enjoyed a confidential and fiduciary relationship.

53.     As part of this fiduciary relationship, Defendants undertook to preserve designated portions of the investments received from Defendants' limited partner investors for the exclusive benefit of PIM and its successors.

54.     Defendants repeatedly promised PIM that it would make these payments, and in furtherance of this promise, did in fact make such payments through September 2008.

55.     Defendants hold significant assets that have been allocated specifically for the benefit of PIM, and which Defendants have reserved for the specific benefit of PIM.

56.     In reliance on Defendants' agreement to pay PIM a portion of the funds' management fees, PIM generated more than $1 billion of investments for the benefit of Defendants.

57.     Barclays has continued to provide the same level of service to Defendants that PIM provided prior to its purchase by Barclays in September 2008, yet Defendants have wrongfully ceased paying fees owed to Barclays.

58.     Barclays has suffered injury to its business by reason of Defendants' unlawful withholding of fees set aside for PIM in an amount to be determined at trial, but not less than $18 million.

WHEREFORE, plaintiff Barclays seeks judgment:

    a.  Declaring that Defendants have breached their legal obligations under the agreements alleged herein;

    b.  Awarding Barclays compensatory damages against Defendants, including interest thereon, in an amount to be determined at trial, but not less than $18 million;

    c.  Awarding attorney fees and costs associated with bringing this action; and

    d.  Awarding such other relief as the Court deems just, equitable, and proper.

Dated: March 16, 2010
         New York, New York

Respectfully submitted,

BOIES, SCHILLER & FLEXNER LLP

By: _____

Jonathan D. Schiller
Christopher E. Duffy
Bridget Brown
575 Lexington Avenue, 7th Floor
New York, New York 10022
Phone: (212) 446-2300
Fax:  (212) 446-2350

*Attorneys for Plaintiff Barclays Capital Inc.*

08-13555-mg Doc 8842-4 B Filed 05/06/10 Entered 05/06/10 15:01:26 Doc#1 Not
Case 1:10-cv-03221-NRB Document 1-3 Filed 04/08/2010 Page 26 of 42
of Removal part3 Pg 26 of 42

**EXHIBIT E**

[Clarification Letter]

**BARCLAYS CAPITAL INC.**

As of September 20, 2008

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
LB 745 LLC
Attn: Steven Berkenfeld, Esq.
Facsimile: (646) 758-4226

Ladies and Gentlemen:

      Reference is made to the Asset Purchase Agreement, dated as of September 16, 2008 (the "Original Agreement") as amended by the First Amendment thereto dated as of September 19, 2008 (the "First Amendment" and, the Original Agreement as so amended, the "Agreement"), by and among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI"), LB 745 LLC ("745") and Barclays Capital Inc. ("Purchaser"). Each capitalized term used and not defined herein shall have the meaning ascribed to it in the Original Agreement. This letter agreement (this "Letter") clarifies the intention of the parties with respect to certain provisions of the Agreement, supplements in certain respects the agreements of the parties stated therein and amends the Agreement in certain respects, and is binding on the parties hereto upon its execution and delivery. All references herein to the Original Agreement are to the conformed copy attached hereto of the hand marked Original Agreement.

    1.    <u>Purchased Assets; Excluded Assets</u>.

      (a)    The Purchased Assets means (i) all of the assets of Seller used primarily in the Business or necessary for the operation of the Business (in each case, excluding the Excluded Assets) and (ii) none of the assets of Subsidiaries of LBHI (other than assets of LBI except as otherwise specifically provided in the Agreement or this Letter. Purchased Assets shall include:

      (i)    the items set forth in clauses (b), (c) and (f) through (o) and (q) through (s) of the definition of "Purchased Assets" in the Original Agreement;

      (ii)    with respect to clauses (a), (d) and (e) of the definition of "Purchased Assets" in the Original Agreement, instead of the items referred to in such clauses, (A) the securities owned by LBI and transferred to Purchaser or its Affiliates under the Barclays Repurchase Agreement (as defined below) as specified on Schedule A *previously delivered by Seller and accepted by Purchaser*, (B) such securities and other assets held in LBI's "clearance boxes" as of the time of the Closing, which at the close of business on September 21, 2008 were as specified on Schedule B previously delivered by Seller and accepted by Purchaser (provided, however, that Purchaser in its discretion may

1

Case 1:10-cv-03214-NRB    Document 1-3    Filed 04/05/2010    Page 29 of 42

elect within 60 days after the Closing to return any such securities to LBI); provided, that no securities owned by LBHI or any Subsidiary of LBHI (other than LBI and other than as specified in the Agreement or clause (iii) below) are Purchased Assets and (C) exchange-traded derivatives (and any property that may be held to secure obligations under such derivatives) and collateralized short-term agreements;

(iii)    the equity of Lehman Brothers Canada, Inc., Lehman Brothers Sudamerica SA and Lehman Brothers Uruguay SA; and

(iv)    all prime brokerage business and accounts and repurchase agreement operations and securities lending operations of the Business (for the avoidance of doubt, other than those that are part of the IMD Business); and

(v)    any rights or interests Seller may have with respect to any escrow or other account established in connection with the Global Research Analyst Settlement entered by the U.S. District Court on October 31, 2003 (the "Research Settlement"), or funds otherwise set aside for the procurement of independent research pursuant to the Research Settlement, but only to the extent that Purchaser is required to make payments in accordance with the Research Settlement as a result of its acquisition of LBI's investment banking and research operations.

(b)    For the avoidance of doubt, the "Business" includes LBI's commodities business, government securities trading operations and mortgage-backed securities trading operations of LBI (but not any securities of such nature held by Seller except as otherwise specified herein or in the Agreement).

(c)    The Excluded Assets shall mean the assets of Seller and its Subsidiaries referred to in clauses (a), (c) through (j), and (l) through (q) of the definition of "Excluded Assets" in the Original Agreement and the other assets identified in this Letter as Excluded Assets  Except as otherwise specified in the definition of "Purchased Assets," "Excluded Assets" shall include any cash, cash equivalents, bank deposits or similar cash items of Seller and its Subsidiaries; provided that "Excluded Assets" shall not include any and all property of any customer, or maintained by or on behalf of LBI to secure the obligations of any customer, whose account(s) are being transferred to Purchaser as part of the Business. The following shall also be Excluded Assets:  All of the investments held by Seller or their Subsidiaries in collateralized debt obligations, collateralized loan obligations, over-the-counter derivatives, TBA mortgage notes and similar asset-backed securities and corporate loans, other than those subject to the Barclays Repurchase Agreement, and until any securities pledged as collateral under Seller clearing arrangements with JP Morgan Chase & Co. or its Affiliates (other than those referred to in Section 1(a)(ii) of the Letter).  Also included in the Excluded Assets are the mortgage servicing rights for Ginnie Mae guaranteed securities.  Included in clause (h) of the definition of "Excluded Assets" in the Original Agreement are life insurance policies owned by Seller and its Subsidiaries.  For the avoidance of doubt, the equity interests and assets of Lehman Brothers Commodity Services, Inc., including the equity of, as well as the assets of the energy marketing and services business of Eagle Energy Management LLC, are Excluded Assets (rather than Purchased Assets).  The

2

reference to "third parties" in clause (i) of the definition of "Excluded Assets" includes
any person, including Affiliates of Seller. Clause (h) of the definition of Excluded Assets
in the Original Agreement is hereby amended to remove the following clause: "other than
customer account insurance supplemental to SIPC coverage included in the Business."

(d)   Sections 3 and 4 of the First Amendment are hereby deleted in their
entirety and shall be of no effect *ab initio*. LBI hereby instructs Purchaser to pay at the Closing
$250 million of the Cash Amount to the Depository Trust Clearance Corporation ("DTC") for
deposit as collateral against LBI's obligations to DTC (including its affiliated clearing
organizations). Such collateral account shall be maintained in accordance with the agreement
among LBI, Purchaser and DTC entered into in connection with the Closing.

(e)   Seller hereby represents and warrants to Purchaser that LB I Group Inc.
has and had as of the date on which LB I Group Inc. transferred to LBI the equity of Townsend
Analytics, Ltd., LB I Group Inc. no indebtedness.

2.   IMD Business. For purposes of the Agreement, the IMD Business
consists of the asset management and the alternatives – private equity businesses of Seller and
the Subsidiaries, but not the private investment management business of Seller and the
Subsidiaries (other than the CTS (Corporate Cash) business). As a result, Excluded Assets
include the asset management business, the alternatives-private equity business and the CTS
(Corporate Cash) business. The private investment management business (other than the CTS
(Corporate Cash) business) (the "PIM Business") is a Purchased Asset and the Purchased Assets
shall include the assets of the Seller used exclusively in the PIM Business. The forgivable notes
issued by PIM employees to Seller or its Affiliates shall be an Excluded Asset. Excluded
Liabilities shall include any pre-closing legal, tax or compliance Liabilities associated with IRA
accounts for the benefit of clients of the PIM Business.

3.   Assumed and Excluded Liabilities. Clause (a) of the definition of
"Assumed Liabilities" consists solely of all Liabilities incurred by Purchaser and arising after the
Closing in connection with the Business. Clause (d) of the definition of "Assumed Liabilities" in
the Original Agreement is understood as though it read as follows: "accounts payable incurred
in the Ordinary Course of Business of Seller after, with respect to each entity comprising Seller,
the date on which such entity commenced a voluntary case or cases under Chapter 11 or Chapter
7, as the case may be, of the Bankruptcy Code, associated with the Business (other than accounts
payable arising out of or in connection with any Excluded Contract), including, for the avoidance
of doubt, to the extent arising after such date (i) invoiced accounts payable and (ii) accrued but
uninvoiced accounts payable)." Consistent with the other provisions of this Letter, no Liabilities
described in clause (i) of the definition of Assumed Liabilities shall be "Assumed Liabilities."
For the avoidance of doubt, any Liabilities of Seller or its Subsidiaries under the $15.8 billion tri-
party repurchase facility dated on or about September 18, 2008 funded by JP Morgan Chase shall
be "Excluded Liabilities."

4.   Consideration. The parties, after considering the available appraisal
information, have agreed upon the value of the Lehman headquarters at 745 Seventh Avenue ,
the Cranford New Jersey Data Center and the Piscataway New Jersey Data Center shall be in the
aggregate $1,290,000,000 and shall not be subject to reduction with respect to any commission

3

and, accordingly, the Cash Amount shall be $1,540,000,000 (subject to certain holdback amounts relating to the real estate being transferred pursuant to the Agreement as provided by Section 12.2 of the Agreement).

     5.    <u>License</u>.  All marks containing the words "LEHMAN" or "LEHMAN BROTHERS" assigned under the Agreement shall be considered Licensed Marks under Section 8.9 of the Agreement.  The license to use the Licensed Marks granted pursuant to Section 8.9 of the Agreement with respect to the investment banking and capital markets businesses of Seller and its Subsidiaries is limited to a term of 2 years from the Closing Date (without limiting the perpetual term of the license granted for use in connection with the IMD Business (including in respect of any one or more of the private equity or other investment funds within the IMD Business) or in connection with winding up of any operations or businesses of Seller or any of its Subsidiaries).  The licenses pursuant to Section 8.9 are not assignable or sublicensable, except that such licenses are assignable and sublicensable (i) for use in connection with IMD Business or any portion of the IMD Business and (ii) to Seller's Subsidiaries or to a purchaser of any business of Seller and its Subsidiaries solely for use by such Subsidiaries or purchaser in connection with the winding up of such business.

     6.    <u>Subordinated Notes of LBI</u>.  The outstanding subordinated notes of LBI are not Assumed Liabilities, and such subordinated notes and any Liabilities associated with such subordinated notes therefore are Excluded Liabilities.

     7.    <u>Breakup Fee</u>.  745 is jointly and severally liable with LBHI and LBI for Seller's obligations under the Agreement to pay the Breakup Fee and Expense Reimbursement (each of which has the meaning ascribed to it in the Breakup Fee and Competing Bid Order).

     8.    <u>Transfer of Customer Accounts</u>.  All customer accounts of LBI (other than customer who are Affiliates of LBI) shall be transferred to Purchaser.  In connection therewith, Purchaser shall receive (i) for the account of the customer, any and all property of any customer, including any held by or on behalf of LBI to secure the obligations of any customer, whose account(s) are being transferred to Purchaser as part of the Business and (ii) to the extent permitted by applicable law, and as soon as practicable after the Closing, $769 million of securities, as held by or on behalf of LBI on the date hereof pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934, as amended, or securities of substantially the same nature and value.  Liabilities arising under Seller's arrangements with DTC and its affiliated clearing organizations shall be Excluded Liabilities.

     9.    <u>Deletion of Purchase Price Adjustment Provisions</u>.  Section 3.3 of the Original Agreement is hereby deleted in its entirety and shall be of no effect *ab initio*.

     10.    <u>Payables, Deposits and Receivables</u>.  No payables or deposits of a Seller or Subsidiary shall be Assumed Liabilities, except to the extent resulting from a Purchased Contract and except as provided in Section 8.  No receivables shall be Purchased Assets, except to the extent resulting from a Purchased Contract.

     11.    <u>Intercompany Obligations</u>.  Except as expressly contemplated by this Letter, the Agreement or the Transition Services Agreement, Purchased Assets and Assumed Liabilities shall not include any intercompany receivables or payables or other obligations

4

between or among any Seller and any of LBHI or any Subsidiary of LBHI.  It is understood that
nothing contained in this Letter shall affect the rights or obligations of the parties to the
Transition Services Agreement contemplated by the Agreement.

        12.    Schedule 12.3.  Following the Closing, the parties shall reasonably agree
to an allocation of the purchase price (including the Assumed Liabilities) among the Purchased
Assets for tax purposes and set forth such allocation on a Schedule 12.3 to be signed by the
parties.

        13.    Barclays Repurchase Agreement.  Effective at Closing, (i) all securities
and other assets held by Purchaser under the September 18, 2008 repurchase arrangement among
Purchaser and/or its Affiliates and LBI and/or its Affiliates and Bank of New York as collateral
agent (the "Barclays Repurchase Agreement") shall be deemed to constitute part of the
Purchased Assets in accordance with Paragraph 1(a)(ii) above, (ii) Seller and Purchaser shall be
deemed to have no further obligations to each other under the Barclays Repurchase Agreement
(including, without limitation, any payment or delivery obligations), and (iii) the Barclays
Repurchase Agreement shall terminate. Additionally, the Notice of Termination relating to the
Barclays Repurchase Agreement dated September 19, 2008 is hereby deemed rescinded and void
*ab initio* in all respects.

        14.    Risk of Loss of Artwork.  During such period that Purchaser has the right
to possess the artwork following the Closing pursuant to Section 8.16 of the Agreement,
Purchaser shall bear the risk of loss for such artwork.  In the event that any artwork is damaged
or lost during such period, Purchaser shall pay to Seller an amount equal to the damage or loss,
consistent with the insured appraised value (as determined by an independent, recognized
appraiser) for such artwork, assuming such artwork had not been lost or damaged.

        15.    Records.  The records referred to in Section 8.7 include all Documents that
are Purchased Assets and shall be considered to include all electronic documents, including e-
mail.  The joint administrators of the Lehman European entities are parties to which records and
personnel shall be made available in accordance with the terms of Section 8.7.

        16.    Subleases.  Notwithstanding anything to the contrary contained in Sections
4.2(d), 4.3(c), 8.14 or any other provision of the Agreement, with respect to the leased premises
located in (i) 555 California Street, San Francisco, California ("SF Property"), (ii) 125 High
Street, Boston, Massachusetts ("Boston Property"), (iii) 190 S. LaSalle Street, Chicago, Illinois
("Chicago Property"), and (iv) 10250 Constellation Boulevard, Los Angeles, California ("LA
Property" and together with the SF Property, Boston Property and Chicago Property, the
"Sublease Properties"), the parties agree as follows:

        (a)    As contemplated in the Agreement, on the Closing Date, (i) the underlying
leases affecting the Chicago Property, the LA Property and the Boston Property shall be
assumed by LBHI or LBI in connection with its bankruptcy proceeding and each of such
leases shall be assigned by Seller to Purchaser and Purchaser shall assume all of Seller's
obligations thereunder pursuant to assignment and assumption agreements mutually
acceptable to Seller and Purchaser, and (ii) the underlying lease affecting the SF Property
shall be assumed by Seller in connection with the bankruptcy proceedings.

5

(b)      With respect to each Sublease Property, Seller and Purchaser shall, within
a commercially reasonable period of time following the Closing Date, negotiate in good
faith, and thereafter execute and deliver, a sublease agreement reasonably acceptable to
both Purchaser and Seller and subject to the terms of the applicable underlying lease,
pursuant to which a portion of the demised premises under such underlying lease (such
portion of the premises to be agreed upon by the parties) shall be subleased to (A) with
respect to the SF Property, the Purchaser, and (B) with respect to the LA Property,
Chicago Property and Boston Property, the Seller (regardless of the creditworthiness of
Seller) or any person who purchases the IMD Business (provided that any such purchaser
entering into the sublease agreement as a subtenant shall be reasonably acceptable to the
Purchaser) (the landlord under such sublease being referred to as the "Sublandlord" and
the tenant under such sublease being referred to as the "Subtenant"), in each case, upon
such terms as shall be mutually acceptable to the Sublandlord and Subtenant provided
that (1) the Subtenant shall pay rent and other charges under such sublease agreement
equal to its proportionate share of the rent and other charges payable by the Sublandlord
to the landlord under the underlying lease (which proportionate share shall be based upon
the relative square footage of the subleased space in proportion to the square footage of
the overall demised space under the underlying lease), (2) the term of the sublease
agreement shall be a period commencing on the Closing Date and ending on the day
immediately preceding the expiration date of the underlying lease (as the same may be
extended pursuant to the terms of the underlying lease), (3) any alterations or
modifications which the Sublandlord and Subtenant mutually agree need to be made to
the demised premises in order to segregate the subleased space from the remainder of the
demised premises under the underlying lease shall be performed by the Sublandlord and
the cost thereof (including the cost of any plans and specifications, drawings, permits,
licenses, and other "soft" costs related thereto) shall be shared by the Sublandlord and
Subtenant in proportion to the square footage of their respective spaces.  Prior to the
execution and delivery of the sublease agreement for a particular Sublease Property,
subject to reasonable premises security procedures and giving due regard to regulatory
considerations (e.g., segregation) including the right to relocate such employees within
the applicable premises, and for a commercially reasonable period after the Closing Date,
(i) with respect to the SF Property, to the extent that Transferred Employees occupied any
portion of the SF Property prior to Closing, such Transferred Employees shall be
permitted to continue to occupy and use the SF Property to the same extent and for the
same purposes as the SF Property was occupied by such Transferred Employees prior to
the Closing; provided, that the foregoing shall be subject to Purchaser's ability to
substitute a substantially similar number of new employees of Purchaser for any such
Transferred Employees as provided in Paragraph 18 below, and (ii) with respect to each
Sublease Property other than the SF Property, to the extent that Excluded Employees
occupied any portion of such Sublease Property prior to Closing, such Excluded
Employees shall be permitted to continue to occupy and use such Sublease Property to
the same extent and for the same purposes as such Sublease Property was occupied by
such Excluded Employees prior to the Closing; provided, that the foregoing shall be
subject to Seller's ability to substitute a substantially similar number of new employees
of Seller for any such Excluded Employees as provided in Paragraph 18 below.  In each
case described in clauses (i) and (ii) above, no rent or other payments shall be made to the

6

party which is the tenant under the underlying lease until execution and delivery of the applicable sublease agreement at which time all rent calculated under the sublease agreement for the period from the Commencement Date (which date shall be the Closing Date) through end of the month in which the sublease agreement is executed shall be paid to the Sublandlord contemporaneously with the execution and delivery of the sublease agreement.

(c)    If any consent or approval from any landlord under an underlying lease is required pursuant to the terms of the underlying lease in order to effectuate the applicable sublease agreement and/or to the extent that any landlord under an underlying lease has recapture and/or termination rights that would be triggered by the proposed sublease arrangement to be reflected in the applicable sublease agreement, Seller and Purchaser will cooperate and use commercially reasonable efforts in obtaining such consent to the applicable sublease agreement and/or obtaining waivers from the landlord with respect to any such recapture and/or termination rights and shall otherwise comply in all respects with the terms and provisions of the underlying lease in connection with the execution and delivery of the applicable sublease agreement.

17.    Deferred Transfers.  Notwithstanding anything to the contrary contained in the Agreement, (a) the parties agree that during the nine month period after the Closing Date that Excluded Employees are permitted to occupy and use real property subject to a Transferred Real Property Lease in accordance with Section 8.11(f) of the Agreement, that the Seller and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Seller or its Affiliates for any such Excluded Employees, and that any such new employees of Seller or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Excluded Employees in accordance with Section 8.11(f), and (b) the parties agree that during the nine month period after the Closing Date that Transferred Employees are permitted to occupy and use real property is not subject to a Transferred Real Property Lease in accordance with Section 8.11(g) of the Agreement, that the Purchaser and its Affiliates shall also be permitted to substitute a substantially similar number of new employees of Purchaser or its Affiliates for any such Transferred Employees, and that any such new employees of Purchaser or its Affiliates shall be permitted to occupy and use such real property to the same extent and on the same basis as the Transferred Employees in accordance with Section 8.11(g).

18.    745 Seventh Avenue.  The parties acknowledge that there is no mortgage encumbering 745's interest in the premises at 745 Seventh Avenue, New York, New York and that, notwithstanding Section 10.1(d) of the Agreement, only the $500,000,000 promissory note made by 745 in favor of LW-LLP Inc. will be fully repaid and extinguished.

19.    Prorations.  Notwithstanding Section 12.2 of the Agreement, to the extent that the parties are unable to agree upon all customary prorations for the Purchased Assets as of the Closing, they shall cooperate in finalizing all such prorations within thirty (30) days following the Closing Date.

20.    Schedules.  Corrected Schedules 1.1(a) and 1.1(b) are attached hereto.

7

     21.    <u>Definition of Excluded Contract.</u>  As used in the Agreement, the term "Excluded Contract" shall include any ISDA Master Agreement and any master swap agreement and any schedule thereto or supplement or amendment thereto.

     22.    <u>PIM Business Leases.</u>

     (a)  Notwithstanding anything to the contrary contained in the Agreement, Purchaser shall have a period of ten (10) days following the Closing Date to perform due diligence on the leases listed on Schedule 1(c) attached hereto (the "<u>PIM Leases</u>").  At any time during such period, Purchaser and its Affiliates shall have the option to cause Seller to assume and assign any or all of such PIM Leases to Purchaser, and Seller agrees to assume and assign such PIM Leases to Purchaser.  Upon assignment of a PIM Lease to Purchaser, such PIM Lease shall become a Transferred Real Property Lease.  With respect to any PIM Lease that becomes a Transferred Real Property Lease, during the nine month period after the Closing Date, to the extent that Excluded Employees occupied real property subject to such Transferred Real Property Leases prior to Closing, such Excluded Employees, and a substantially similar number of new employees of Seller or its Affiliates that may be substituted for any such Excluded Employees, shall be permitted to occupy and use such real property on the same basis as provided in Section 8.11(f) of the Agreement.

     (b)  Notwithstanding the foregoing or anything to the contrary contained in Section 22(a) or any other provision of the Agreement, with respect to the PIM Lease for the premises located at 399 Park Avenue, New York, New York (the "<u>New York Property</u>"), the underlying lease shall not be subject to assignment to Purchaser and the Purchaser shall only have the option to require that Seller sublease to Purchaser or its Affiliates the sixth floor of the New York Property (or a portion of the sixth floor) (the "<u>NY Sublease Premises</u>"), and Seller agrees to sublease the NY Sublease Premises, subject to the parties' compliance with the terms of the underlying lease including, without limitation, any notice or consent requirements set forth therein.  If Purchaser elects to sublease the NY Sublease Premises as provided herein, all of the terms and conditions set forth in this letter agreement applicable to the SF Property shall also apply to the sublease of the NY Sublease Premises.

     23.    <u>No Overseas Assets.</u>  Although LBI has been part of a global business and Purchaser remains interested in potentially acquiring other portions thereof and obtaining the services of the employees thereof, all assets and rights of the Lehman companies that would otherwise be Purchased Assets (other than Seller, 745 and any Subsidiaries sold pursuant to the Original Agreement or the Letter) that cannot be sold pursuant to Section 2.1 of the Original Agreement as a result of being subject to governmental conservatorship or administration shall be considered "Excluded Assets," except as notified by the administrator to LBI from time to time or until such assets and rights can be so sold.  Except with respect to Purchased Intellectual Property, no assets owned (in whole or in part) by any Subsidiary of LBHI (other than LBI, 745 and any Subsidiaries sold pursuant to the Original Agreement or the Letter) organized under the laws of a jurisdiction other than the United States of America or a state thereof are included among the Purchased Assets; provided, however, that to the extent any such asset is jointly owned by any such Subsidiary and Seller and used primarily in or necessary for the operation of the Business, Seller and Purchaser shall each use its commercially reasonable efforts to cause such Subsidiary to enter into arrangements reasonably acceptable to Purchaser to permit

8

Purchaser to acquire the interest of such Subsidiary in such asset or to have the use thereof (provided that neither Seller nor Purchaser shall be required to make any payment in order to establish such arrangement).

The representations and warranties of the parties contained in this Letter and in the Agreement shall not survive the Closing. This Letter shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within that state. This Letter may be executed in any number of counterparts (including by facsimile), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

*[Remainder of page left blank.]*

Sincerely,

BARCLAYS CAPITAL INC.

By: _Gerardi A Barca_

Name: Gerard X Barca

Title:


Agreed to and accepted as of the date first written above:


LEHMAN BROTHERS HOLDINGS INC.


By: _____
Name:
Title:


LEHMAN BROTHERS INC.


By: _____
Name:
Title:


LB 745 LLC


By: _____
Name:
Title:

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:

Agreed to and accepted as of the date first written above:

LEHMAN BROTHERS HOLDINGS INC.

By: _____
Name: Steven Berkenfeld
Title: Vice President

LEHMAN BROTHERS INC.

By: _____
Name:
Title:

LB 745 LLC

By: _____
Name:
Title:

08-13555-mg    Doc 8842-4    Filed 05/06/10    Entered 05/06/10 15:01:26    Doc #1 Not.
Case 1:10-cv-03214-NRB    Document 1-3    Filed 04/16/2010    Page 38 of 42
of Removal part3    Pg 38 of 42

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:

Agreed to and accepted as of the date first written above:

LEHMAN BROTHERS HOLDINGS INC.

By: _____
Name:
Title:

LEHMAN BROTHERS INC.

By: _____
Name:  Anson B. Frelinghuysen
Title:  as Counsel for James W. Giddens,
        Trustee for the SIPA Liquidation
        of Lehman Brothers Inc.

LB 745 LLC

By: _____
Name:
Title:

Sincerely,

BARCLAYS CAPITAL INC.

By: _____
Name:
Title:


Agreed to and accepted as of the date first written above:


LEHMAN BROTHERS HOLDINGS INC.


By: _____
Name:
Title:


LEHMAN BROTHERS INC.


By: _____
Name:
Title:


LB 745 LLC

By: _____
Name: MARK MARCUCCI
Title: President


[SIGNATURE PAGE TO CLARIFICATION LETTER]

Case 1:10-cv-03214-NRB    Document 1-3    Filed 04/16/2010    Page 40 of 42

# Schedule 1(a) - Excluded Real Estate Assets

**New York**
1301 Avenue of the Americas - 7th Floor
1271 Avenue of the Americas
399 Park Avenue
605 Third Avenue
85 Tenth Avenue

**New Jersey**
Jersey City - 101 Hudson St.
Livingston - 2 Peachtree Hill Road (Co-location)
Florham Park - 230 Park Avenue
Hoboken - 111 River Street (Sublease)

**Branches**
Atlanta - 3414 Peachtree Road
Calgary - 150 Sixth Avenue, Suite 3370 - PetroCanada
Columbia - Little Patuxent Parkway (NB)
Dallas - 200 Crescent Court
Dallas - 325 N. St. Paul Street (former Crossroads)
Greenwich - 8 Sound Shore Drive
Houston - 600 Travis Street
Los Angeles - 10880 Wilshire Blvd.
Menlo Park - 3000 Sand Hill Road
Miami - 1111 Brickell Avenue - Barclay's Financial Center
Newport Beach - 680 Newport Center Dr, Suite150
Palm Beach - 450 Royal Palm Way (License agreement for 1,704 on 6th floor)
Philadelphia - 1735 Market Street - Mellon Bank Center
San Francisco - 555 California Street
Tampa - 401 East Jackson Street, 24th flr (NB)
Wilmington - 1000 West Street - Brandywine Building (LBB)

**South America Branches**
Mexico City - Av. Paseo de la Reforma 265 Col. Cuauhtemoc



SCHEDULE 1(C)

PIM LEASES

| | City | State | Address | Tenant | Landlord |
|---|---|---|---|---|---|
| 1. | Atlanta | GA | 3414 Peachtree Road, NE | Lehman Brothers Inc. | Monarch Centre Associates, LLC |
| 2. | Dallas | TX | 200 Crescent Court | Lehman Brothers Inc. | Crescent TC Investors LP |
| 3. | Greenwich | CT | 8 Sound Shore Drive | Lehman Brothers Holdings Inc. | 8 Sound Shore Associates, LLC |
| 4. | Miami | FL | 1111 Brickell Avenue | Lehman Brothers Inc. | 1111 Brickell Office, LLC |
| 5. | Newport Beach | CA | 680 Newport Center Drive | Lehman Brothers Holdings Inc. | The Irving Company |
| 6. | Palm Beach | FL | 450 Royal Palm Way | Lehman Brothers Inc. | Palm Beach Centre 1, LLC |
| 7. | Philadelphia | PA | 1735 Market Street | Lehman Brothers Inc. | Nine Penn Center Associates, LP |
| 8. | New York | NY | 399 Park Avenue | Lehman Brothers Inc. | Boston Properties LP |

[New York #1951426 v5]