1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555-jmp

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS HOLDING, INC., et al.,


        Debtors.


- - - - - - - - - - - - - - - - - - - -x


                U.S. Bankruptcy Court

                One Bowling Green

                New York, New York


                May 4, 2010

                9:35 AM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

2

1

2      HEARING re Australia & New Zealand Banking Group LTD's Letter

3      Regarding Rule 60 Proceedings

4

5      HEARING re LibertyView's: (A) Joinder to (i) the SIPA Trustee's

6      Motion, (ii) the Committee's Motion; and (iii) LBHI's Motion

7      for Relief from the Sale Orders or, Alternatively, for Certain

8      Limited Relief Under Rule 60(b); and (B) Objection to Barclays

9      Capital Inc.'s Motion to Enforce the Sale Order

10

11     HEARING re Joinder of Newport Global Opportunities to

12     LibertyView's: (A) Joinder to (i) the Trustees' Motion, (ii)

13     the Committee's Motion; and (iii) LBHI's Motion for Relief from

14     the Sale Orders or, Alternatively, for Certain Limited Relief

15     Under Rule 60(b); and (B) Objection to Barclays Capital Inc.'s

16     Motion to Enforce the Sale Order

17

18     HEARING re Motion of Debtor to Modify the September 20, 2008

19     Sale Order and Granting Other Relief

20

21     HEARING re Motion of the Trustee for Relief Pursuant to the

22     Sale Orders or, Alternatively, for Certain Limited Relief Under

23     Rule 60(b)

24

25     HEARING re Motion of Official Committee of Unsecured Creditors

3

1   of Lehman Brothers Holdings Inc., Authorizing and Approving (a)

2   Sale of Purchased Assets Free and Clear of Liens and Other

3   Interests; and (b) Assumption and Assignment of Executory

4   Contracts and Unexpired Leases, Dated September 20, 2008 (and

5   Related SIPA Sale Order) and Joinder in Debtors and SIPA

6   Trustees' Motions for an Order Under Rule 60(b) to Modify Sale

7   Order

8

9   HEARING re Motion of Barclays Capital Inc. to Enforce the Sale

10   Order and Secure Delivery of All Undelivered Assets

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Dena Page

VERITEXT REPORTING COMPANY

212-267-6868                                          516-608-2400

4

1

2      A P P E A R A N C E S :

3      JONES DAY

4            Special Counsel for the Debtors

5            222 East 41st Street

6            New York, NY 10017

7

8      BY:    ROBERT W. GAFFEY, ESQ.

9            JAYANT W. TAMBE, ESQ.

10

11

12     QUINN EMMANUEL URQUHART OLIVER & HEDGES, LLP

13           Special Counsel to the Official Committee of Unsecured

14             Creditors

15           51 Madison Avenue

16           22nd Floor

17           New York, NY 10010

18

19     BY:    RICHARD I. WERDER, JR., ESQ.

20

21

22

23

24

25

5

1

2   BOIES, SCHILLER & FLEXNER LLP

3        Attorneys for Barclays Capital, Inc.

4        333 Main Street

5        Armonk, NY 10504

6

7   BY:   DAVID BOIES, ESQ.

8

9

10   BOIES, SCHILLER & FLEXNER LLP

11        Attorneys for Barclays Capital, Inc.

12        5301 Wisconsin Avenue, N.W.

13        Washington, DC 20015

14

15   BY:   JONATHAN D. SCHILLER, ESQ.

16

17

18   HUGHES HUBBARD & REED LLP

19        Attorneys for the James W. Giddens, SIPA Trustee

20        One Battery Park Plaza

21        New York, NY 10004

22

23   BY:   WILLIAM R. MAGUIRE, ESQ.

24

25

6

1                    P R O C E E D I N G S

2          THE COURT:  Be seated, please.  Good morning.

3          Mr. Seery.  Please be seated.

4          THE WITNESS:  Thanks.

5          MR. SCHILLER:  Good morning, Your Honor.

6          THE COURT:  Good morning, Mr. Schiller.

7    CROSS-EXAMINATION

8    BY MR. SCHILLER:

9    Q.   Good morning, Mr. Seery.  Jonathan Schiller for Barclays.

10   A.   Good morning.

11   Q.   Yesterday, early in your examination, you were asked about

12   the legal work that you had done for Barclays after leaving

13   Barclays, do you remember that?

14   A.   Yes.

15   Q.   And I believe you mentioned the law firm where you now

16   work?

17   A.   Yes, Sidley Austin.

18   Q.   And what is your position at Sidley Austin?

19   A.   I'm a partner.

20   Q.   As a partner at Sidley Austin, have you also done work for

21   the Lehman estate?

22   A.   Yes, I have.

23   Q.   Could you describe that representation to the Court,

24   please?

25   A.   We currently represent Lehman as an ordinary course

7

1    professional.

2    Q.    I'm having trouble hearing you.

3    A.    I'm sorry.  We currently represent Lehman as an ordinary

4    course professional in connection with a work-out loan called

5    Varel.  Lehman is the agent; it owns about twenty million

6    dollars of the senior piece.  It's about 155 million dollars a

7    senior.  Lehman also owns in a different subsidiary, LB1 Group,

8    about seventy million dollars of the mezz piece.  And it's a

9    pretty significant amount of work, actually.

10   Q.    It's a significant amount of work that you're now doing

11   for the Lehman estate, is that correct?

12   A.    That's correct, yes.

13   Q.    In the course of the work that you've done for the Lehman

14   estate as a partner at Sidley Austin, have you testified before

15   Judge Peck?

16   A.    I testified in this court, but not when I was a partner at

17   Sidley.  It was before -- after the sale had closed and before

18   I had left Barclays, and it related to Lehman's desire to

19   assign some agency positions along with some loans, and Lehman

20   had asked me to testify on behalf of the estate with respect to

21   the assignment of those positions.

22   Q.    Do you recall who engaged you to do your legal work for

23   Lehman while you were a partner at Sidley Austin?

24   A.    Yes, there's a number of folks, but Frank Turner is a

25   gentleman who runs the loan business, and he works with Dave

8

1   Walsh from Alvarez & Marsal and the Alvarez team.

2   Q.   Mr. Seery, yesterday, early in your examination, you were

3   also asked about the Fed repo.  And you explained to the Court

4   that you had a very clear recollection that the Federal Reserve

5   was insisting on being taken out of its repo or repos very

6   early in the week of September 15th.  Do you remember that?

7   A.   Yes, I do.  My recollection stems from meetings that I

8   personally participated at the Fed with Alex Kirk, Bart McDade,

9   Ian Lowitt, Harvey Miller, and Lori Fife were also there.  And

10  there were about twenty-five people combined from the Fed and

11  the SEC.  We went through a number of scenarios, made clear to

12  us that they wanted us to file that night.  Later on in the

13  day, the indicated that they didn't want to continue funding.

14  We came back down to press them on that issue.  And they made

15  very clear to us that they were in a position they didn't want,

16  they were not comfortable with, and they insisted that they be

17  taken out of it expeditiously.

18  Q.   You're explaining events that may have happened on

19  Wednesday or Thursday of the week, correct?

20  A.   Actually, these happened on Sunday.  The days do, as I

21  said, run together quite a bit.

22  Q.   I see.  Sunday the 14th of September?

23  A.   But they happened on Sunday the 14th with us filing that

24  evening.

25  Q.   Now, you were asked whether the Fed required that they be

9

1   taken out of repos with Lehman as part of a deal that they did.

2   And you testified that you believe so but you weren't sure.  Do

3   you remember that?

4   A.    Yeah, my recollection -- I apologize, Judge -- my

5   recollection from the hearing was that the Federal Reserve was

6   actually at the first hearing and either the Fed or the SEC --

7   I know the Fed was here -- one of the two spoke.  And they did

8   press to get the transaction done, and I believe that they

9   pressed at that hearing or in the documents -- I just don't

10   have a specific recollection --

11   Q.    Let me --

12   A.    -- to be taken out of their facility.

13   Q.    I'm sorry to interrupt you.  Let me hand out, with the

14   Court's permission, a binder which has a document in it that I

15   want to take you to.

16        THE COURT:  Sure.

17        MR. SCHILLER:  Thank you, Judge.

18   A.    Excuse me.  Can I put this binder from yesterday away?

19   Q.    For my purposes, yes.

20   A.    There's a number of others right here, so I'll just put it

21   in that library.

22   Q.    Can you turn to tab 15, which is Barclays' Exhibit 11A.

23   It's at the very back of the binder.  And it's the debtors'

24   motion to schedule a sale hearing for September 17th, 2008.  Do

25   you see that?

10

1    A.   Yes, I do.

2    Q.   And if you turn to page 3 of their motion -- actually, let

3    me direct your attention to page 3 of the attachment, Exhibit

4    A, toward the back.  These aren't Bates-stamped, so I'm afraid

5    you'll have to shuffle through until you get to Exhibit A, to

6    the proposed order.

7    A.   Yes, I see it.

8    Q.   And at page 3, there are certain standards for qualified

9    bidders for the Lehman business.  You see that in the middle of

10    the top paragraph --

11    A.   I do.

12    Q.   -- "Qualified bidder means third party"?

13    A.   Yes.

14    Q.   And then if I can draw your attention to the bottom five

15    lines, ii, "Arranges for the termination of any master

16    repurchase agreement, masters security lending agreement,

17    masters open market agreement, or any other financing between

18    any of the debtors and the Federal Reserve Bank no later than

19    the opening of business, September 22nd, and provides adequate

20    assurance for the performance of such obligations."  Is this

21    what you had in mind yesterday?

22    A.   Yes.

23    Q.   Let me turn your attention now to Friday morning,

24    September 19th, and meetings that you testified about yesterday

25    at Lehman headquarters, 745 Seventh Avenue.  Do you recall a

11

1    meeting that Friday morning at Lehman with Lehman

2    representatives and Barclays representatives?

3    A.    Yes, there were a number of meetings.

4    Q.    Do you remember a meeting where Barclays expressed concern

5    to Lehman about the value of the repo securities that Barclays

6    had received the night and the afternoon before?

7    A.    Yes.  My recollection is that Alex Kirk had called me

8    upstairs from my office on the fourth floor at 745 to come up

9    to discuss issues with respect to the repo.  Barclays had, that

10   morning, raised to him concerns with respect to the value of

11   those securities.  Subsequently, I entered a meeting with

12   Barclays personnel where those same concerns were expressed and

13   in some detail.

14   Q.    Were there -- do you remember whether Mr. Keegan and Mr.

15   Ricci were present with you?

16   A.    The meeting I'm specifically thinking of, Mr. Keegan was

17   in alone.  Mr. Ricci was in a separate room, and the meetings

18   would go from room to room.

19   Q.    Was Mr. Kirk or Mr. McDade in that room?

20   A.    Mr. Kirk was; Mr. McDade was not in the one I'm

21   considering now.

22   Q.    As a general matter, were these meetings open to legal

23   advisors and financial advisors that morning?

24   A.    The doors were wide open.  Literally, there's a number of

25   offices on the thirty-first floor, many of which had been

12

1    vacated so that we could set up rooms to negotiate in.  And in

2    those offices and certain of the conference rooms, people could

3    walk in and out and did.

4    Q.   Do you remember, in terms of this meeting, whether

5    representatives of Weil Gotshal or Lazard came in at any point?

6    A.   I don't recall Mr. Miller or Mr. F -- or, Ms. Fife -- I

7    apologize -- being there.  I recall Mr. Ridings being in and

8    out of those meetings.

9    Q.   Did Mr. Keegan express concerns about illiquid securities

10   that had been transferred to Barclays the night before?

11   A.   He did.  With respect to the one particular meeting, Alex

12   and I started in a meeting in a smaller office that Mr. Keegan

13   was in.  I believe Mr. Kirk left that meeting and I continued

14   with Mr. Keegan.  Mr. Keegan's concerns -- and I related some

15   of this yesterday -- were with respect to one transaction which

16   was called the RACERS, which was a structured transaction.  It

17   was a CDO, in essence, that had come off of Lehman's shelf.

18   This particular piece of that CDO was, I believe, marked at

19   about eight and a half billion dollars.  It did not get to

20   Barclays as part of that transfer of repo collateral from

21   JPMorgan.  And Barclays felt very lucky to not have gotten

22   that.  This was the piece that I had advised them could have

23   been problematic and simply was concerned that the value might

24   not be what they had ascribed to it.

25       In addition, Mr. Keegan specifically mentioned some other

13

1    structured finance transactions.  Again, the list of

2    securities, I didn't have at that point, but individual

3    securities could be pulled out.  Now, most of them, I daresay,

4    Mr. Keegan, off the top of his head, would not have known the

5    value of those.  But certain of these transactions, he could

6    ascertain that value.  Again, these were structured

7    transactions where there were a number of underlying assets

8    that were contained in them.  So for example, there were three

9    in particular:  Pine, Spruce, and Verano.  These were trades

10   that Lehman had structured that Mr. Keegan saw come over in the

11   repo.  He was familiar with some of the underlying loans that

12   were contained in those structured vehicles, and he expressed

13   disagreement as to the value that we ascribed to those loans

14   versus what he ascribed to those loans.

15   Q.   Are you saying to the Court that you understood Friday

16   morning that Barclays had declined an asset called RACERS that

17   had a value of 8.5 billion?

18   A.   It had a mark of 8.5 billion; the value was suspect.  And

19   what happened on Thursday night was it was not that particular

20   part of RACERS -- I was generally familiar with the program,

21   but I was not familiar with that particular CDO.  And we had

22   some folks in the CDO business, I had them do some work for me

23   to take a quick look, and it had not been marked in a long

24   time.  And that was something that John Mon (ph.) from London

25   Barclays had called me on Thursday night and asked whether that

14

1    was an acceptable repo collateral that he should take, and I

2    told him that he should be careful and that was -- might be a

3    little bit difficult.

4    Q.    Let me just go over this a bit more slowly.

5    A.    Okay.

6    Q.    You just mentioned a man name -- a man's name, John Mon.

7    A.    Yes.

8    Q.    Who is that?

9    A.    I believe he worked in the repo business in London for

10   Barclays.  He called me that Thursday night.

11   Q.    About an asset that was being tendered to Barclays

12   pursuant to this repo transaction?

13   A.    Yes, I believe he asked me about a few different assets,

14   most of which weren't a problem.  This one stuck out; it wasn't

15   one I was familiar with, so we checked it.

16   Q.    Did the Archstone asset become part of the conversation

17   with Mr. Keegan or Mr. Kirk?

18   A.    It was part of the conversation with Mr. Keegan; I don't

19   recall Mr. Kirk being in that portion of the conversation.  And

20   that related to these three vehicles, and there were a couple

21   others, but those are the ones that I can recall off the top of

22   my head.  Mr. Keegan had the data for the actual assets that

23   were underlying those programs, and they included the Archstone

24   loan, and I believe an Archstone mezzanine piece.

25   Q.    So is it your testimony that of these illiquid securities,

15

1    Spruce, Pine, Verano, and in part, Archstone, Mr. Keegan

2    complained to you about them, expressed concerns that they were

3    troubled, and to some extent, you agreed with him or concurred

4    with him?

5    A.    I didn't necessarily concur.  I understood his position.

6    Mr. Keegan owned Archstone.  Barclays was one of the lenders on

7    that facility.  So it was a loan with which he was very

8    familiar.  There were a number of other loans that were part of

9    Mr. Keegan's business at Barclays, portfolio loans where Lehman

10   owned a piece and Barclays owned a piece.  He had a different

11   view on certain of those loans, including senior loans, as well

12   as mezzanine.  These were not liquid -- many of them were not

13   liquid securities.  So it was difficult to value, and there

14   could be a disagreement about value?  What --

15   Q.    Would -- I'm sorry.

16   A.    I'm sorry.  What you have to understand -- and I tried to

17   express this yesterday; I don't know if I did it eloquently or

18   sufficiently slowly -- these are incredibly volatile markets.

19   The S&P and the Dow, which are highly liquid equity securities,

20   moved a ton in those couple weeks.  I think the Dow moved at

21   least a thousand points.  And prior to the Barclays transaction

22   and the Federal Reserve and the Treasury coming in, the markets

23   were in free-fall.  So the volatility in illiquid assets,

24   assets that aren't quoted, was tremendous.  In addition, as I

25   said, items like Archstone or Archstone Mezzanine are not

16

1    actively traded.  They didn't have a market.  Somebody had to

2    model them.  There could be significant disagreement on what

3    the value of those assets could be.

4    Q.   Did Mr. Keegan, that morning, indicate to you or to others

5    his concern that the Lehman marks were too high or were out of

6    date?

7    A.   He indicated he thought they were too high.  I don't know

8    if he expressed any view as to when they were last marked.

9    Q.   Did he express concern that their value -- the value of

10   the repo securities -- would not cover the loan advanced by

11   Barclays to Lehman?

12   A.   He was very nervous and did express that concern.  I think

13   Mr. Keegan, and my perception in what he told me, was it was

14   his responsibility to make sure that Barclays didn't lose money

15   on that repo, and he was nervous about it.

16   Q.   How much money had Barclays advanced to Lehman on that

17   repo the week of September 15th, specifically the day,

18   September 18th?

19   A.   Again, my understanding was that it started with an

20   initial three or three and a half billion dollars that Mr.

21   LaRocca explained to me, when we talked about it earlier in the

22   week, and then turned into the full amount, which they advanced

23   forty-five billion dollars, in cash, to -- I believe they

24   actually advanced it to JPMorgan who then satisfied the Federal

25   Reserve.

17

Q.   So the day before your meetings with Mr. Ricci and Mr.
Keegan and perhaps others at Lehman headquarters Friday
morning, the day before, Barclays had given Lehman as much as
forty-five billion dollars in cash?

A.   They wired the money, I believe, to Lehman's accounts at
JP at the clearing bank, and then the clearing bank pays off
the Fed.

Q.   Was there time that morning in your discussions with Mr.
Keegan or Mr. Kirk to do detailed valuations or models of these
securities and their values?

A.   Again, the time -- and it's hard to appreciate it in
this -- with this passage of time that we've had and the
ability to reflect on it, but the time was -- everything was
compressed.  And when I went into the office, I wasn't just
dealing with one thing, or Mr. Kirk wasn't just dealing with
one thing.  There were employees who wanted to leave.  They
were getting bid away by different banks who were trying to
hire them.  There were others who just wanted to quit.  It was
hard keeping people in their seats.  It was hard dealing with
customers, particularly customers who had been burned by the
Lehman filing in Europe and were very concerned about their
securities.  These aren't folks that you just deal with once;
they're folks that you've dealt with for ten years.

Q.   Did you --

A.   So very, very difficult.  There was no time to sit down,

18

1    bring up a modeling team, and model hundreds of securities.

2    Q.    That was very -- it was very busy that morning.

3    A.    It was crazy.

4    Q.    It was very hectic that morning.

5    A.    Indeed.

6    Q.    Had you slept the night before?

7    A.    I don't believe I did.

8    Q.    Did you leave the meeting with Mr. Keegan and perhaps Mr.

9    Ricci?

10   A.    The meetings moved in and out of different rooms.  And so

11   there wasn't one big meeting.  It was a very fluid situation.

12   So initially, when I went up to meet Mr. Keegan, he complained

13   about Archstone, Spruce, Pine, Verano, mentioned the RACERS.  I

14   would run back to my desk and get some underlying data out --

15   admittedly, some of it was dated on my desk because I was just

16   pulling it off, and this was before many people were at the

17   office -- to walk through with him some of the underlying

18   assets that were in those vehicles and to discuss with him why

19   we thought the values were different than what he thought they

20   were.  But it was a very fluid situation, and I left a number

21   of times.

22   Q.    You mentioned yesterday that you had other

23   responsibilities that morning, and you went on to talk about

24   your assisting Mr. Ridings to prepare for appearing before His

25   Honor later that day.  Before I ask you about that, were you

19

1    aware of any resolution with Mr. Keegan that morning, before

2    you went to work with Mr. Ridings, about his concern that the

3    marks were too high and that Barclays was not getting the value

4    that they required for the forty-five billion dollars they'd

5    paid the day before to Lehman?

6    A.   I don't believe that there had been a resolution by that

7    point.  Again, the time sequence is very hard for me to

8    determine at this point, but my recollection was that with Mr.

9    Ridings there, we started thinking about preparing him for his

10   testimony just to make sure he had a fluid understanding -- or,

11   fluent understanding, excuse me, of the business and could

12   articulate it.  And then we went about the exercise we talked

13   about yesterday, determining where we could actually sell these

14   assets versus our current marks.  And that meeting, I believe,

15   took place before there was any resolution.  I had left the

16   floor before there was any agreement.  So coming into the

17   Riding -- meeting with Mr. Ridings and subsequent to that,

18   there wasn't complete agreement with Barclays that we would

19   even have a deal.

20   Q.   So when you went to speak with Mr. Ridings about his

21   testimony before His Honor later that day, you were not aware

22   of satisfaction on the part of Mr. Keegan and his colleagues.

23   You had no certainty that the deal would close.

24   A.   I didn't have certainty that the deal would close.  I

25   believe by the time that I actually came down with Mr. Ridings,

20

1    we had had a general agreement on the terms, and that was the

2    conversation I had with Mr. Burian by phone that are -- some of

3    which is reflected in the notes that were shown to me

4    yesterday.  So I apologize, but the sequence of events is very

5    difficult, but I believe the meetings with Mr. Keegan and Mr.

6    Ricci in the morning, trying to push them into getting the deal

7    done, nervous that -- we were nervous that they might not

8    close, they appeared very nervous to us that they were going to

9    lose money on this deal, meeting with Mr. Ridings, subsequent

10   meeting with Mr. Kirk and Mr. McDade and the rest of the team,

11   a call with Mr. Burian as things were changing, and then

12   transportation down here on the subway with Mr. Ridings.

13   Q.   All right --

14   A.   That's probably more than you asked for; sorry about that.

15   Q.   -- let me try to go to a part of that stream, and I

16   understand how, years later, that hectic period flows together,

17   as you testified before His Honor yesterday.

18        Before you spoke with Mr. Ridings, was there time to

19   prepare what you describe as a Chapter 7 liquidation analysis

20   of the sale, of the assets that had come over in the repo the

21   night before?

22   A.   No, and in fact, we didn't try to do that.  We weren't

23   going through a confirmation hearing.  We were going through a

24   very expedited sale hearing.  And so what we tried to do, as I

25   testified yesterday, was to arm Mr. Ridings with some factual

21

1    data to augment his experience, which was what our traders

2    thought they could do in a fast period of time to sell and

3    liquidate those securities.  So it wasn't a traditional

4    liquidation analysis, and there certainly wouldn't have been

5    anything that we could have attached to a disclosure statement

6    that would have been the normal standards of this court.

7    Q.   Let me show you Mr. Ridings' testimony about a liquidation

8    sale of Lehman's assets and ask you whether that is similar or

9    different than the liquidation sale analysis that you did and

10   testified about yesterday in preparation for Ridings'

11   testimony.

12        (Video testimony begins)

13   "Q.   If there were no sale approved to Barclays on September

14   9th (sic), did you have a view whether there would be the risk

15   of enormous loss to Lehman?

16   "A.   That is my view, and more so if this transaction didn't

17   happen, I think the repercussions in the financial market would

18   have been catastrophic to a number of other financial

19   institutions.  So the reverberation of a Lehman liquidation

20   would have had a major negative impact on the U.S. capital

21   markets.

22   "Q.   You had past experience with Drexel Burnham and the

23   failure of that investment bank, is that correct?

24   "A.   Unfortunately, yes.  I was a managing director at Drexel

25   when it also went bankrupt.

22

1    "Q. And did your experience there help inform the views that

2    you held on September 19th as you just described?

3    "A. Yes.

4    "Q. Was it possible to calculate potential losses to Lehman of

5    a liquidation, as of September 19th, with any certainty?

6    "A. I don't think you could have done it with certainty

7    because you would have been making assumptions. But in a

8    financial meltdown of this magnitude, the prices of securities

9    would have dropped by enormous amounts.

10   "Q. And it was your view on September 9th (sic) that a sale to

11   Barclays was superior to any liquidation value?

12   "A. Yes."

13       (Video testimony begins)

14   Q.  What Mr. Ridings refers to as a financial meltdown, is

15   that the analysis you undertook?

16   A.  No, we didn't go through that. I think -- what you have

17   to -- and again, I don't think I expressed it well enough

18   yesterday, but perhaps it's hard to express. We were trying to

19   come up with best estimates. In these kinds of markets, the

20   analysis that we were doing very, very quickly was how much

21   could you get if you sold your positions in the market over the

22   next couple of days. It assumed that those traders were at

23   their desks, at work, getting paid, selling the positions into

24   the market. We didn't ask them to assume that there was

25   financial Armageddon, meltdown, whatever the terms Mr. Ridings

23

1    has used throughout his deposition.  We didn't seek that out,

2    nor did we provide that kind of information to him.  I don't

3    know that you could have.

4    Q.      Let me direct your attention and the Court's to the

5    proffer that was -- of Mr. Ridings' testimony that was offered

6    to Your Honor on September 19th from Mr. Miller, and that's

7    page 141, lines 8 through 10 of the hearing transcript

8            MR. WERDER:  Can we have the question, Your Honor, so

9    we can put it in context as to what this witness is going to be

10   asked about that proffer?

11           THE COURT:  Well, I'm not going to require that any

12   more than I required context for the showing of the Mr. Barry

13   Ridings video excerpt.  I trust that there will be a question

14   following a reference to his proffer.  It's really more of the

15   same.

16           MR. SCHILLER:  It is a bit more of the same, but a bit

17   different, too; with Your Honor's permission.

18   Q.   At lines 8 through 10, Mr. Ridings' testimony was

19   proffered that, "As a result of the experiences at Drexel, he

20   understood the consequences of failure of a major investment

21   bank and the costs in dislocation that occur."  And at page

22   146, lines 7 through 10, Mr. Ridings' proffer continued:

23   "Absent the sale to Barclays, counterparties will be required

24   to liquidate their collateral positions which may entail a

25   wholesale dumping of the collateral into the marketplace with

24

1   the attendant erosion of values." Was that wholesaling dumping

2   the liquidation analysis that you undertook?

3   A.   No, it was not.  As I explained, it was a fast, quick

4   liquidation of those securities.  If they could do it in a day,

5   that would be great.  If it took a couple days, that was fine,

6   too.  We wanted to know how they could get out of the

7   securities in the best way possible over that short period of

8   time.

9   Q.   Let me return to another period Friday concerning the

10  spreadsheet, the prices and the lists of the repo securities

11  that were available to you and to Barclays.  And let me ask you

12  to turn to tab 8, Your Honor, of the small book that's in front

13  of you.

14         MR. SCHILLER:  To explain to the Court, that tab 8 is

15  an excerpt from Exhibit 739, Judge, which is this spreadsheet.

16  And rather than put that in the book, I've taken from it a

17  couple of pages to put before Your Honor.

18  Q.   Let me first ask you, Mr. Seery, can you identify for His

19  Honor Barclays' Exhibit 739?  And you can reference the binder,

20  which you have, along with the tab 8 excerpts.

21  A.   This document looks very similar to the run of the repo

22  securities that we had on Sunday night at Weil Gotshal, that

23  the committee had, that we had, that Barclays had, as the

24  securities that Barclays received.  Obviously, I can't tell

25  with certainty whether these were actually the securities they

25

1    received, because there's a lot of securities on this list.

2    Q.   Do you recall who prepared this spreadsheet?

3    A.   My recollection is this was done out of treasury, which

4    was Paolo Tonucci's responsibility.

5    Q.   And did you specifically see this spreadsheet on Sunday?

6    A.   Did I specifically see it?

7    Q.   Yes.

8    A.   Yes, I did.  I had a copy of it.  My recollection,

9    however, is that it was on larger paper, like, legal size so I

10   could read it.

11          MR. SCHILLER:  I offer 739 into evidence, Your Honor.

12          THE COURT:  Is there any objection?

13          MR. GAFFEY:  No objection, Your Honor.

14          THE COURT:  It's admitted.

15   (Spreadsheet Showing Repo Securities was hereby received into

16   evidence as Barclays' Exhibit 739, as of this date.)

17   Q.   Now, were the repo positions set forth in Exhibit 739, to

18   your knowledge, reviewed by Lehman and Barclays on Friday?

19   A.   They were certainly reviewed by Lehman.  Barclays had

20   them; I believe they reviewed them as well.

21   Q.   Do you know when they were available to the parties,

22   generally?

23   A.   I don't recall when they were avail -- you said Friday?  I

24   don't recall exactly when they were available Friday.  The

25   documents that we saw Friday morning were much less settled

26

1    than these.  It was more fluid and they were sheets coming in

2    by the minute.  So I don't recall.  Early Friday morning, this

3    document was not assembled in this fashion.

4    Q.    Did Mr. Kirk, at any point Friday, to your knowledge, as

5    for an analysis of that spreadsheet?

6    A.    I don't recollect Mr. Kirk doing a separate analysis of

7    the spreadsheet other than in my discussions with him just

8    around the -- around the value.  But I don't recollect him

9    going and getting a separate analysis of this spreadsheet.

10   Q.    In terms of discussions around the value, were there

11   discussions between Barclays and Lehman Friday about the values

12   set forth in that spreadsheet?

13   A.    There were numerous discussions, as the ones I described

14   from the morning, they -- we had disputes around specific

15   positions and the values overall of where they were marked.

16   There wasn't, to my knowledge or my own experience, a line-by-

17   line debate about each of these securities.

18   Q.    You said earlier that you weren't aware when you went off

19   to work with Mr. Ridings of any resolution of the values of

20   these securities as between Barclays and Lehman.  Did there

21   come a time when Mr. Kirk or anyone else informed you of a

22   resolution on Friday?

23   A.    Yes.  I don't recall if it was before we left for the

24   hearing or as we left for the hearing.  But when I was on the

25   phone with Mr. Burian, there were still some loose items,

27

1    before we left for the hearing, but we were pretty close by

2    that point.

3    Q.    If I ask you to turn to the third page of tab 8 where it

4    refers to collateral and market value on a schedule --

5    A.    Yes.

6    Q.    Is that a summary of the schedule there?

7    A.    I believe that's a summary of all of the collateral with

8    market values marked.

9    Q.    And was this the approximate values of the securities set

10   forth in the schedule that was presented that day?

11   A.    Yes, I believe I previously testified that my recollection

12   was right around fifty billion dollars, and obviously, this

13   number's right around fifty billion dollars.

14   Q.    And what did Mr. Kirk advise you was the resolution of the

15   negotiations between Barclays and Lehman that day over the

16   current market value or the negotiated market value of those

17   securities in this sale transaction?

18   A.    Ultimately, I believe they reached an agreement.  I wasn't

19   part of the reaching of that agreement, but ultimately, they

20   reached the agreement, around forty-five billion dollars.

21   Q.    Yesterday, I believe you said you weren't clear as to when

22   he informed you of that forty-five billion resolution.  Is that

23   right?

24   A.    That's correct.  As I think I mentioned, I certainly knew

25   it by the time we were in the hearing, and I believe I had

28

1     knowledge of it when I was on the phone with Mr. Burian, or at

2     least that we were close to that resolution, but while I was on

3     the phone with Mr. Burian, things were still changing.  So it

4     couldn't have been completely settled at that point.

5     Q.   Let me ask --

6     A.   And so I think it was right around that time.

7     Q.   Let me ask you to turn to tab 7 in your binder which is

8     Barclays' Exhibit 679, Your Honor.  And this is an e-mail at

9     the top from Alex Kirk to you, Mr. Seery, at the very top.

10    Last time is 5:55.  These e-mails begin earlier than that,

11    earlier in the 5 o'clock hour.  But I want to address your

12    attention to the two top exchanges between you and Mr. Seery

13    (sic).  Do you see those?

14    A.   Me and Mr. Kirk, yes.

15    Q.   You and Mr. Kirk.  And you write to Mr. Kirk, Mr. Seery,

16    on this chain of what's going on.  Does that refer to what's

17    going on in court?

18    A.   Yes, it does.  I had my BlackBerry in court.

19    Q.   You had your BlackBerry in court and you wrote this e-mail

20    to Mr. Kirk, "What is the value of the collateral the Barclays

21    posted to the DTC today?"  Do you see that?

22    A.   Yes.

23    Q.   Would you please explain to Judge Peck what that refers

24    to, that posting to the DTC?

25    A.   Yes, first, I would like to point out that while the court

29

1    was in session, I would turn my BlackBerry off so it wouldn't

2    interfere with the trans -- the telephone.  That -- we were

3    trying to figure out exactly what the agreement on the value

4    was to get a reminder of that value of the collateral that

5    Barclays actually received.  So when I posted to the DTC,

6    that's their collateral; they've now purchased it as part of

7    the repo.  And Alex responds to me that I believe the value is

8    45.5.  I don't know what the marked value is.  So I think the

9    marked value would be the forty-nine and change that you just

10   showed me.

11   Q.    And what did you understand he meant by the 45.5 value?

12   A.    That's the current market value as opposed to where the

13   marks are.

14   Q.    And is that a market value agreed by the parties?

15   A.    It would have had to have been.  There's no other way to

16   come up with that number because we didn't, as I'd said, remark

17   the entire book.

18        MR. SCHILLER:  May we have Exhibit 650 at page 70 up

19   on the screen.

20   Q.    Yesterday, you were asked about your hand-written number

21   there, 45.5, do you see that?

22   A.    I do, yes.

23   Q.    And you couldn't recall when you wrote it.  Remember that?

24   A.    That's correct.

25   Q.    You mentioned that it wasn't the same as the total, there,

30

1    if the haircut were applied to the Lehman market values.  You

2    said it was a different number, as much as a billion dollars

3    different, although you didn't describe that as a significant

4    amount.  Do you remember that?

5    A.    I believe it -- 50.6 minus the 6.04.

6    Q.       After looking at Exhibit 679, is it possible that you

7    hand-wrote that number based on what Mr. Kirk wrote to you?

8             MR. GAFFEY:  Objection, Your Honor.  Calls for

9    speculation.

10            THE COURT:  I sustain the objection simply because

11   most anything is possible.  And --

12            MR. SCHILLER:  Fine, Your Honor.  Let me withdraw that

13   question --

14            THE COURT:  Right.

15            MR. SCHILLER:  -- and ask a different question.

16   Q.    Does the review of your e-mails with Mr. Kirk refresh your

17   recollection as to whether your hand-written note resulted from

18   any communication with Mr. Kirk that day?

19   A.    Unfortunately -- or fortunately, it doesn't matter -- it

20   really doesn't.  I just don't know when I wrote the 45.5.

21   Obviously, the numbers are the same, and the 1.9 is the same as

22   the DTC amount that was referenced and I've referenced before.

23   But I just don't know when I wrote that on that page.

24   Q.    Fair enough.  Thank you.  Now, you've mentioned Mr. Burian

25   a couple of times in summing up events Friday before court.  On

31

1    September 19th, Mr. Seery, on behalf of Lehman Brothers, did

2    you keep Mr. Burian and his colleagues up to date on the status

3    of the sale negotiations prior to the hearing before His Honor?

4    A.    I did.   I'd started my conversations with the committee

5    before that; because of my personal and professional

6    experiences, I'm friendly with most of the ladies and gentlemen

7    from Milbank, as well as from Houlihan Lokey, some of whom are

8    very good friends of mine, and it was my responsibility, as it

9    evolved, to keep them informed of the negotiations on the

10   transaction.   So I had conversations with Mr. Burian, Mr. Brad

11   Geer, one of their other associates, I believe Mr. Fazio as

12   well, during that week.   A number of phone calls with Mr. Geer

13   and Mr. Burian, and then a long phone call on Friday describing

14   the transaction and the resolution we were trying to reach with

15   Barclays that morning.

16   Q.    You mentioned some familiarity with Mr. Burian and Mr.

17   Geer and Mr. Fazio, as well?

18   A.    Mr. Fazio only from this transaction.

19   Q.    And how did you know Mr. Burian and Mr. Geer, other than

20   from this transaction?

21   A.    Mr. Burian had been, I'm sure the Court's aware, a

22   bankruptcy lawyer and partner at Kramer Levin for a long time,

23   so professional experiences, we'd worked together a number of

24   times.   Mr. Geer was at Houlihan Lokey and did a lot of work

25   for me.   At Lehman Brothers, we hired him a lot and became

32

1    quite friendly with Brad.

2    Q.    In the course of -- you say you had a call with them.

3    Where were you when you placed or they placed the call?

4    A.    The call on the 30 -- I'm sorry, the call on Friday --

5    Q.    The 19th, yes.

6    A.    -- I was on the thirty-first floor at Lehman Brothers in

7    Mr. Kirk's office; however, he was not in that office.

8    Q.    And who was on the line with you?

9    A.    On the line with me, I don't recollect everyone that was

10   in the room.  There was, I believe, a junior -- or, mid-level

11   analyst or associate that -- I'm getting that wrong, or senior

12   vice president, probably, now -- from Lehman, Brendan Hayes

13   who'd been working with me on the transaction.  I don't recall

14   who else was in the room, but there were a number of other

15   people in Alex's office with me.  And then on the line were Mr.

16   Burian, Mr. Fazio, I don't recall if Mr. Geer was on the line.

17   I believe he was.  And I believe either Mr. Despins or Mr.

18   Dunnee were on the line.

19   Q.    Did you discuss the repo?

20   A.    We --

21   Q.    Did you discuss Barclays' views of the repo assets that it

22   had received?

23   A.    We discussed -- we tried -- what I tried to do was lay out

24   the entire transaction and how it had evolved.  As I mentioned

25   earlier, the transaction had changed.  The value of the

33

1    securities had dropped significantly over that week.  The

2    actual securities that were going to be delivered had changed

3    quite a bit, and we were walking through the structure of the

4    transaction.  And certainly, those who know Mr. Burian know

5    that he was asking questions.

6    Q.   Did you discuss with them, on that call, in substance, the

7    transfer of repo securities to Barclays the night before, and

8    Barclays reactions to that, as you've testified you learned of

9    early Friday morning.

10   A.   I believe I did, yes.

11   Q.   Do you recall what you said to the committee about the

12   transfer of repo assets and Barclays' concerns upon receiving

13   them?

14   A.   I believe I generally explained to Mr. Burian the

15   substance of the transaction, laid out how the long positions

16   had changed, that Barclays had actually received different

17   securities, that they had concerns about the value, that the

18   face amount of the securities that we had marked was about

19   fifty billion and that they thought that it was worth a lot

20   lower number.  I explained that they had advanced forty-five

21   billion dollars against that, and there was a five billion

22   dollar difference between the amount they advanced and the

23   marked amount of those securities, and that the transaction

24   would close and Barclays would take the securities versus the

25   forty-five billion dollars they advanced and the five billion

34

1      dollars they believed -- Barclays believed wasn't there because

2      the securities were worth less than the marked value, and that

3      there was, you know, some legitimate dispute about that that we

4      pushed back.  I didn't concede, again, that they were worth

5      less than fifty billion dollars, but certainly told him that

6      our own traders had taken a look at these values, and there was

7      question.

8      Q.   Do you recall whether Mr. Burian questioned you about this

9      five billion dollar difference that you say you told him would

10     go to Barclays if there were a gain?

11     A.   We certainly discussed the five billion dollar difference,

12     and we certainly discussed the potential value of those

13     securities and the risk.  It was -- the risk was to Barclays if

14     they weren't worth forty-five billion dollars, that was

15     Barclays' problem.  If they were worth more than forty-five

16     billion dollars, there was no upside to the estate.

17     Q.   Did Mr. Burian question you in the course of this call, or

18     did Mr. Despins, if he was on it, or the others you named, Mr.

19     Geer, question you about why there was a five billion dollar

20     difference as you were describing it to them?

21     A.   The questioning I recall was not from Mr. Despins or Mr.

22     Geer.  Mr. Geer's involvement, I just don't specifically

23     recall.  But Mr. Fazio and Mr. Geer -- I'm sorry, Mr. Burian

24     certainly questioned me about the transaction and the

25     difference at that point.  Yes.

35

1    Q.    So Mr. Fazio and Mr. Burian, as best you can recall for

2    Judge Peck, questioned you on Friday on the telephone about a

3    five billion dollar difference that you had described between

4    what Barclays had paid Lehman the day before, the forty-five

5    billion, and what the collateral, in exchange, was worth.

6    A.    Yes, they did.  Mr. -- you know, again, this was not --

7    this was very fluid conversation.  During the conversation,

8    certain aspects of the transaction changed, even while we were

9    on that call.  So at one point, I laid out what the longs were,

10   that is the long positions that Barclays took, the 50.6 versus

11   the 45; I also laid out the short positions that they were

12   going to take, and those would have been the hedge against that

13   long.  As we were on the phone, Mr. Kirk came in and told me

14   that the shorts were gone, that we'd been closed out or they

15   couldn't be delivered from JPMorgan, and so I had to explain to

16   Mr. Burian that that had changed.  The long position stayed the

17   same but the short position had changed.

18   Q.    During the call, Mr. Kirk came in and told you that the

19   short positions were gone, and you shared that with Mr. Burian.

20   Is that your testimony?

21   A.    Yes, it is.

22   Q.    And in terms of this five billion dollar difference, did

23   you describe for Mr. Burian and Mr. Fazio the process of

24   negotiation that had gone on that day between Barclays and

25   Lehman?

36

1    A.    I don't recall the specific words or the discussion in

2    terms of the give and take with Mr. Keegan.  I do recall

3    explaining to him that the traders had told us that there could

4    be questions about or value and in that market, they were

5    probably legitimate questions.

6    Q.    Let me ask you to turn to tab 11 in your book.  Before you

7    do that, I just want you to know that I'm going to show you

8    notes.  I know they're not your notes, but I want to ask you

9    whether you said things to Mr. Burian and others in the course

10   of this call that may be reflected in those notes.  And they're

11   at tab 11, Barclays' Exhibit 143A, Your Honor.

12            UNIDENTIFIED SPEAKER:  Your Honor, objection.

13            THE COURT:  What's the basis for the objection?

14            UNIDENTIFIED SPEAKER:  The only possible basis for

15   doing this would be to use the notes as a basis for refreshing

16   his recollection, and he hasn't laid a proper foundation at

17   this point for refreshing recollection with the notes, nor is

18   he refreshing recollection in a way that's permitted by the

19   rules.

20            THE COURT:  Well, I'm not sure that's what's going on

21   here.  We can debate whether or not this is permissible use of

22   these notes.  But what I glean from the introduction made by

23   Mr. Schiller is that he's attempting to validate that these are

24   notes taken at a time that the witness spoke with Mr. Burian,

25   thereby, in effect, validating the notes or demonstrating their

37

1   source.  I think he can use the document, and I'm going to

2   overrule the objection.  It doesn't mean that the document

3   comes in through the witness, nor do I accept, necessarily, as

4   true that the notes have accurately reflected what was said.

5   But I think it's permissible examination; I'm going to overrule

6   you.

7   **Q.   Mr. Seery, have you reviewed these notes?**

8   **A.   I have seen them before, yes.**

9           MR. SCHILLER:  143A, Your Honor, is an enlarged,

10   colored version of the notes at 143 so they may appear more

11   legible to us.

12   **Q.   In that call with Mr. Burian and the committee, at the**

13   **risk of being repetitive, I'm going to explain to the committee**

14   **that there was a five billion dollar difference to Lehman**

15   **between the marked value of the assets in the Fed repo and the**

16   **amount advanced in the Fed repo to purchase those assets.**

17   **A.   Well, I did, but looking at page 1 from that conversation**

18   **that day, I don't think those notes would have -- are**

19   **reflective of that conversation.  I certainly wouldn't have**

20   **been discussing with Mr. Burian the number of employees or the**

21   **IMV division at that point.  That was --**

22   **Q.   Let me address your attention to --**

23   **A.   -- well beyond that.**

24   **Q.   I'm sorry.  Let me address your attention to the third and**

25   **the fourth page of the notes --**

38

1          MR. SCHILLER:  -- which are pages 189 and 190, Your

2     Honor, in 143.

3     Q.    And do you see the section through which an X is marked?

4     A.    I do, yes.

5     Q.    And over on the left it says LB, you see that?

6     A.    Yes.

7     Q.    And to the right, you see the number 50.6 billion assets?

8     A.    Yes, 50.64.

9     Q.    Did you explain to the committee during the call that

10    there were 56 billion (sic) in marked value in the repo assets?

11    A.    50.64; I believe that is correct.  So this re -- this

12    comports with my recollection of our discussion where we talked

13    about the total number of assets, some breakout of what those

14    assets were, that it was a collateralized repo of Barclays

15    taking out the Fed loan.

16    Q.    Now, you see three lines down, there's a note, "five

17    billion".  You see that?

18    A.    Yes.

19    Q.    And is that consistent with your discussion of the five

20    billion with the committee and Mr. Burian in the course of your

21    call?

22    A.    It is.  Again, in the 45.5, which has shown up a few times

23    this morning, I don't recall that number being that firm at

24    that time, but if he wrote it down, it may well have -- it

25    would have had to come from me.  And so this reflects my

39

1    discussion with him regarding the amount advanced, the forty-

2    five billion advanced by Barclays versus the fifty face and the

3    five billion.  And then there's the other parts of the

4    transaction including cure payments, comp and severance, and

5    then there's a note at the bottom, repo 50.6.

6    Q.   And with regard to this five billion dollar difference,

7    did you make clear that Barclays could gain or could lose,

8    depending on how and when they liquidated these assets?

9    A.   I believe I did.  It says no upside in the portfolio.

10   Barclays was buying those assets.  If there was no issue --

11   Q.   Let me just direct the Court to where you are.  There you

12   are.  How do you read that note?

13   A.   I read it as no upside in the portfolio.

14   Q.   To Lehman?

15   A.   To Lehman.  Previously in the transaction, as it had

16   originally been structured, my recollection is there was some

17   upside sharing on certain of the assets.  I don't know if that

18   was just the mortgage assets or some other assets, but at this

19   point, it was you're buying this book of assets, 50.6 marked,

20   disagreement about the value, and as we talked about, I believe

21   there was an agreement, ultimately, that it was worth about

22   forty-five.  Barclays had advanced forty-five billion dollars

23   against it, and that was the trade of those assets.

24   Q.   Let me ask you to turn the page to what is page 190 in the

25   exhibit, and to look at the second line there.  Did you tell

40

1    Mr. Burian, following your conversation with Mr. Kirk on the

2    telephone that Lehman's short positions --

3            MR. SCHILLER:   Let me withdraw that because you said

4    Mr. Kirk came into the room, I think.

5    Q.   Did you tell the committee and Mr. Burian substance that

6    Lehman's short positions had been closed out?

7    A.   Yes.  I'm not positive if he came into the room or had me

8    just step out, but it was right in the room; I didn't leave it

9    for more than a couple seconds.  And he had told me that the

10   shorts were either all closed out or we couldn't deliver the

11   positions from JPMorgan.

12   Q.   And were you clear with Mr. Burian and the committee that

13   the negotiations that day between Lehman and Barclays had

14   resulted in an estimated actual value of the Fed repo

15   securities at 45.5, that it had shrunk to that.

16   A.   My recollection was right around forty-five billion.

17   Again, I do not have the specific recollection of when that

18   45.5 came, other than through that e-mail that Mr. Kirk sent

19   me.

20   Q.   Would the 45.5 long number at the top of the page be

21   consistent with your discussion Friday afternoon, before the

22   hearing, with the committee that the estimated value of the

23   repo securities had shrunk to approximately forty-five billion

24   according to the discussions between Barclays and Lehman?

25   A.   Yes, that's my recollection.  Again, I didn't concede

41

1   that -- we didn't know the value.  These are best estimates of

2   what they could be.  So if that value is forty-two that day or

3   forty-one, that wouldn't have surprised me that much, although

4   that would have been a pretty precipitous drop, a ten percent

5   difference between the marked amount and the agreed-upon value

6   during that week for securities like this, some of which were

7   liquid, others of which were in more active markets, wouldn't

8   have surprised me all that much.

9   Q.   Let me ask you to flip back, if you will --

10        MR. SCHILLER:  Your Honor, to the page -- the

11  preceding page, 189 of this exhibit.

12  Q.   And you'll see that there's a cross there, a box and an X.

13  Did you tell Mr. Burian, in the course of this call, after you

14  spoke with Mr. Kirk, to disregard everything you had told him

15  previously?

16  A.   I don't recall the exact language, but I do recall

17  getting -- spending a fair bit of time walking through the

18  short side, and almost as I finished my statements about how

19  the shorts were transferring, Mr. Kirk advised me that we

20  couldn't deliver those, and I remember telling Mr. Burian,

21  "Forget everything we just said; let's go back.  Here's how the

22  transaction's going to work.  The long side is as we described;

23  the short side is now gone."  And then we reviewed the

24  transaction again.

25  Q.   Did you tell him to ignore the difference between the --

42

1   the five billion dollar difference between the marked value and

2   the repo loan amount?

3   A.    No, that would have been pretty hard to ignore.

4   Q.    Was that the major subject of your discussion with him?

5   A.    That was a significant part of the discussion.  He

6   certainly needed to understand the changes to the transaction,

7   some of which I think they knew through the week and knew it

8   was evolving, and I talked to them a couple times, and he

9   needed to know how the shorts had fallen out.  But he really

10  needed to know the whole transaction, and that was, obviously,

11  a critical component of the transaction.

12  Q.    Let me ask you to turn the page once more to page 190 of

13  the notes, and direct your attention to the middle of the page

14  where there are some notations and a range of percentages.  Do

15  you see that?

16  A.    Yes.

17  Q.    Yesterday, you were asked if you told Houlihan in your

18  discussions with them on Friday that the Lehman traders had

19  applied haircuts in trying to arrive at a liquidation bid for

20  the Fed repo collateral.  Do you remember generally that

21  question and your answer?

22  A.    I remember generally that question and my answer.

23  Q.    Now, if you look at these figures that I just directed you

24  to, do you see that there's a range of haircuts there, agencies

25  is one to two percent, pass-throughs appears to be three to

43

1    five percent, and corp. appears to be five to ten percent.

2    Now, can we compare that to Barclays Exhibit 650 at page 70,

3    please?

4    A.    Is that an exhibit number?

5    Q.    You just watch it on the screen.

6    A.    Oh.

7    Q.    This is the exhibit that my friend put before you

8    yesterday with the haircuts in it and ask you whether those

9    haircuts that are reflected in these notes compare to those set

10   forth in that exhibit on agencies, pass-throughs, and

11   corporate?

12   A.    Well, these show on Mr. Burian's notes a range, and

13   obviously, the ones on 70 show a fixed haircut.  But they are

14   in the same context, yes.

15   Q.    And did you describe certain of these haircuts to Mr.

16   Burian and Houlihan before the hearing to reflect Lehman's

17   efforts to value the repo marks -- the repo marks to market?

18   A.    I believe I did, and these notes have been shown to me as

19   Mr. Burian's notes of our conversation, so I don't have the

20   specific recollection of telling him agencies one to two

21   percent, pass-throughs three to five.  I know that we talked

22   about the value of the collateral versus the forty-five billion

23   dollars that Barclays had advanced, and I know we talked

24   about -- because Mr. Burian probes -- how we could agree to a

25   number that was less than the marked amount.  And we'd had

44

1    previous discussions about marks either with Mr. Burian or Mr.

2    Geer.  I just don't recall the specifics of walking him through

3    here's what the trader came back with:  one to two percent or

4    two to five percent.

5    Q.    In terms of an agreement between Lehman and Barclays to

6    mark to market, were they seeking to mark to market that day,

7    or were they seeking to mark below market?

8    A.    I wasn't involved in the actual agreement that was reached

9    to come up with the 45.5 that Mr. Kirk refers to, but I

10   believe, from the numbers that --

11            UNIDENTIFIED SPEAKER:  Objection, Your Honor, lack of

12   foundation based upon that statement.

13            THE COURT:  He was in the middle of an answer.  So was

14   that an objection to the question or was that an objection to

15   the answer?

16            UNIDENTIFIED SPEAKER:  Well, I think that the first

17   part of the answer established that he lacked foundation to

18   give -- to actually answer the question by saying he wasn't

19   involved.

20            THE COURT:  I think that if you want to move to strike

21   after it's all over, you have the right to do that, but I think

22   you don't object in the middle of an answer.  And if the

23   witness can recall where he was, he can continue.

24   A.    I think I was at, I believe we were trying to reach a

25   value that was in line with the market and comported with the

45

1    previous work that we had done versus where Barclays was.  My

2    recollection is that Barclays -- and I was shown notes

3    yesterday, my own notes, at a value that was below 45.5.

4    Q.   And do you know whether --

5         UNIDENTIFIED SPEAKER:  Objection, move to strike.

6         THE COURT:  Denied.

7    Q.   Do you know whether Barclays' valuation that you just

8    referred to was shared with Lehman in the course of

9    discussions?

10   A.   Well, it was certainly shared with me because it shows up

11   in my notes.  I don't recall the specific discussion of how I

12   got that number, but it shows up in my notes.  So it was

13   certainly shared with me, and I was Lehman.

14   Q.   With regard to this call, how long, roughly, did it take,

15   the call with the committee and Mr. Burian?

16   A.   It was -- again, it's very hard in this amount of time --

17   since this amount of time has passed to tell you exactly how

18   long the call was.  I would estimate it had to be at least

19   fifteen minutes, but I don't really know.  It certainly wasn't

20   very, very fast; it had enough time to walk through certain --

21   in certain detail a fair amount of the transaction, and it had

22   enough time, then, to go through the changes to the transaction

23   that happened while we were on the call, and then to summarize

24   those changes, once again, and basically end with us meeting

25   them in court.

46

1    Q.   And did you make your best efforts to answer all of the

2    questions that the committee put to you in that call?

3    A.   Certainly.

4    Q.   Did you decline to answer any questions or did you lack

5    answers to any of the questions, as you recall?

6    A.   I don't recall that we lacked any answers.  We might have

7    lacked specificity as how do you come up with this exact number

8    for these securities, and it's a negotiated number based upon

9    two sides' views regarding the actual value versus the marked

10    value, so I wouldn't have had specifics or formulas.  And as

11    you can see from these numbers, we talked in terms of ranges.

12    Because again, the work that the traders did for me or anyone

13    would have done in this market are best estimates of where

14    you'd come out, selling these securities.  There wasn't that

15    kind of precision.

16    Q.   Let's move to the weekend after His Honor's ruling, late

17    Friday night, early Saturday morning.  And let's specifically

18    go to further conversations that you had, that you can recall,

19    for Judge Peck, conversations that you had with the committee

20    and its representatives.  Do you recall meeting with the

21    committee on Sunday, September 21st to provide further

22    explanations about the structure and the specifics of the

23    transaction?

24    A.   I do.  When we left, late Friday night, when we left

25    court, I believe we were pretty sure we were getting towards a

1    closing.  There wouldn't be a significant problem closing the

2    transaction.  The Court had approved the transaction.  It was

3    very late; I think it was past midnight.  And I believe I

4    actually went home and slept a little bit that night.  I came

5    back on Saturday to work on a number of different matters

6    related to transferring the business as well as making sure

7    there were no issues with respect to the transaction, and there

8    really weren't very many that I saw on Saturday.

9    Q.   May I interrupt you just for a minute?

10        MR. SCHILLER:   I apologize, Your Honor.

11   Q.   I didn't mention this, and I want His Honor to know, were

12   you present through that long, grueling, and important hearing

13   Friday night into Saturday morning?

14   A.   I was.  And again, my apologies, because I did have the

15   BlackBerry.  But it was a -- it was a long hearing.  I did step

16   out a number of times to confer with Mr. Kirk or get additional

17   data for the discussions that we were having in court.

18   Q.   Do you recall with whom you were sitting during the course

19   of Judge Peck's hearing that evening?

20   A.   I was next to Mr. McDade, along the rail there, inside the

21   rail.  There were a number of other Lehman representatives, and

22   then there was, obviously, counsel from Weil Gotshal as well as

23   counsel from the committee.

24   Q.   Let me now go back to Sunday.  Thank you, I apologize for

25   the interruption.  Would you please describe for the Court any

48

```
 1    meetings that you had Sunday with the committee and its

 2    representatives?  I believe you said they were at Weil Gotshal?

 3    A.   Yes.  On Sunday, I went back to Lehman to continue the

 4    work towards closing, and Mr. Kirk and Mr. McDade called me,

 5    told me to get over to Weil Gotshal, that things were going

 6    awry, particularly between JPMorgan and Barclays, and that the

 7    transaction might not close.  So -- excuse me -- I ran over to

 8    JP -- excuse me, to Weil at that time to their conference

 9    floor, and there were separate conference rooms for, really,

10    each of the parties.  So the committee had a room, Barclays had

11    a room, Lehman had a room, and I believe JP had a separate

12    room.

13    Q.   And when you say JP, you're referring to the bank,

14    JPMorgan?

15    A.   I am.  JPMorgan had representatives there and a large

16    team.

17    Q.   And were you in a meeting with your colleagues from Lehman

18    and representatives of JPMorgan?

19    A.   Yes, I was.

20    Q.   Who else was present?

21    A.   At that meeting was a large contingent from JPMorgan.  The

22    committee representatives, Mr. Burian, I believe Mr. Despins,

23    and Mr. Fazio, Barclays' representatives, including Mr. Ricci

24    and I believe Mr. Hughes, Lehman representatives, Kirk, McDade,

25    and myself, Weil Gotshal attorneys and attorneys all around.
```

49

1    Q.    I've given you a binder of Exhibit 739, the spreadsheet.

2    You recall that?

3    A.    It's before you.

4    Q.    By the time of this meeting with JPMorgan and others, did

5    you say the Fed was also participating?

6    A.    I didn't mention the Fed.  I believe they were there, and

7    I recall their participation, but I don't recall if it was by

8    phone or if they were in the room.

9    Q.    By this meeting -- indeed, prior to this meeting, to your

10   knowledge, had the committee received Exhibit 739, the

11   spreadsheet?

12   A.    Certainly by this meeting, the committee had this -- this

13   document.  And it was -- as I recollect, it was on much larger

14   paper.  It also was -- I don't recall it being two-sided, so it

15   was -- it was quite a bit thicker.

16   Q.    Now, in this larger meeting with JPMorgan, was the repo

17   transaction discussed among the lawyers, the advisors, and the

18   principals of Lehman, Barclays and JPMorgan?

19   A.    Yes, it was.

20   Q.    Let me ask you to turn to tab 6 in your book.

21         MR. SCHILLER:  Your Honor, which is Barclays Exhibit

22   650.

23   Q.    And we have -- could you identify Exhibit 650 for Judge

24   Peck, please, Mr. Seery?

25   A.    Yes, these are my notes taken at various times.  I believe

50

1   before the -- one of the depositions, someone asked me, and I

2   think it was Mr. Stern, a question, and I said, well, let me

3   check my notes, and he said, you have notes?  And I said, yeah,

4   I have some notes that I gathered up; I'll bring them.  And so

5   then he -- I gave them to him, and he turned them over to the

6   committee.  These were never subpoenaed, and like all good

7   things, no good deed goes unpunished.

8   Q.   Did you have -- not from my standpoint.  Did you have any

9   understanding whether these notes on 650 at page 67 were made

10  by you on Sunday, September 21st?

11  A.   66, 67, I'm not so sure about 68 because I don't recall

12  Alvarez & Marsal being at that meeting --

13  Q.   All right.

14  A.   -- 69, where I've dated it, were certainly made that day.

15  And 66, 67, and I believe 69 were from that meeting or series

16  of meetings.

17  Q.   So you believe that your notes in 650, pages 67, pages 68,

18  page 69, and page 66 were recorded by you in the course of the

19  meetings Sunday, September 21st, the day before closing.  Is

20  that right?

21  A.   I do, with the possible exception of 68.  Again, I recall

22  that these came in order, so I assume it to have been done out

23  of my notebook at that time.  I just don't -- it doesn't have a

24  date on it.  While 66 doesn't have a date on it, nor 67, that

25  was the substance of the conversation and 66 reflects a

51

1    gentleman's name at the top, Pat Daniello, who is someone I'd

2    worked with previously, and Pat was a JPMorgan employee who was

3    at the meeting.

4    Q.   Were committee representatives, including Mr. Burian, Mr.

5    Fazio, present at this JPMorgan and Fed meeting?

6    A.   Yes, they were.  I believe Mr. Despins was also there, I

7    believe.

8    Q.   And was there a detailed discussion of the repo

9    transaction values in the course of that meeting?

10   A.   There was.  There was significant dispute between Barclays

11   and JPMorgan related to both the values and the quality of the

12   securities that were transferred over as well as a significant

13   amount of cash that was in dispute.

14   Q.   Was that seven billion dollars in cash that was in

15   dispute, if you recall?

16   A.   That's the number I recollect, yes.

17           MR. SCHILLER:  Your Honor, for the ease of reading Mr.

18   Seery's notes and examining him on them, I have had 650B typed

19   of page 67, and that appears right after the blue divider at

20   tab 6, Your Honor.

21   Q.   And Mr. Seery, could you compare 650B to page 67 of

22   Exhibit 650?

23   A.   I can.  There's one -- I hesitate to do this.  I

24   apologize.  There's a --

25   Q.   Just take a minute, please.

52

1    A.   I believe there's a page missing which is the inside of

2    this folder that says Michael Klein on the front and Mike

3    Keegan in my writing.  It's just the inside of the folder.  My

4    recollection is that that's where I've written Barclays' view

5    of the value.

6    Q.   But if you were to compare -- I'm not sure what you just

7    told me, so let me ask you a question.

8    A.   Okay.

9    Q.   If you were to compare page 67 in your hand-written notes

10   to page 67 of 650B, are those numbers, as you look at them, and

11   I'd like you to take your time, accurately typed at 67 on 650B?

12   A.   They appear to be, yes.

13   Q.   Let me take 650B up with you, for a moment.

14        MR. SCHILLER:  And Your Honor, I offer 650 and 650B in

15   evidence.

16        THE COURT:  Is there an objection?

17        MR. WERDER:  650B is a demonstrative?

18        MR. SCHILLER:  No, it is a typed version of his hand-

19   written notes.  It is evidence.  He has just confirmed that it

20   is accurate with his notes.

21        THE COURT:  Do you want time to compare?

22        MR. WERDER:  Well, I'm looking at -- Your Honor, I'm

23   looking at these letters that are in it, here, for example, and

24   unless I'm missing something on a quick comparison, I don't

25   think I see these.  There are things that are highlighted on

53

1  here, for example.

2        THE COURT:  Well, the offer is for the hand-written

3  document which is Bates number 67 and the typewritten version

4  which is 650B.  And there's a pending objection to 650B, is

5  that right?

6        MR. WERDER:  Correct, Your Honor.  For example -- we

7  haven't really had time to study these and compare them in

8  detail, but there are a number of things that are circled and

9  that have letters of the alphabet attached to them that don't

10 correspond to the page that the --

11       THE COURT:  It's plainly not an exact copy because of

12 the circling and the bolded letters.

13       MR. SCHILLER:  Your Honor, maybe I can help this go

14 more quickly.  I will just offer Exhibit 650 in evidence, not

15 650B, and use that 650B in the examination along with 650.

16       THE COURT:  With that modification, there's no

17 objection?

18       MR. WERDER:  That's fine, Your Honor.

19       THE COURT:  Fine.

20       MR. SCHILLER:  Thank you.

21 (Mr. Seery's Hand-written Notes was hereby received into

22 evidence as Barclays' Exhibit 650, as of this date.)

23 BY MR. SCHILLER:

24 **Q.   Now, on 650B, for ease of following, I put a label A next**

25 **to the number 42.935.  Do you see that?**

54

1    A.    Yes, I do.

2    Q.    What is the 42.935 number?

3    A.    Those are the -- that's the number, and I believe, that

4    that is the marked value of the securities that were

5    transferred to Barclays by JPMorgan as part of Barclays taking

6    the Fed out of the repo position.  Again, it goes through the

7    clearing bank.

8    Q.    So the 42.9, as you recall, is the marked value of the

9    assets that were transferred the day before to Barclays?

10   A.    Yes.

11   Q.    And what I mean by the day before, I mean September 18th.

12   A.    Would have been --

13   Q.    Or, actually on Sunday.

14   A.    It would have been on the Thursday going into Friday.

15   They wouldn't have transferred them over the weekend.

16   Q.    And if you look at the circle labeled B, which has a

17   seven-figure there, could you tell the Court what your notes

18   reflect there?

19   A.    That was seven billion dollars in cash at JPMorgan.  It

20   says in Barclays, which is in a Barclays account.  And then

21   there's an arrow going over, and that shows 8.55.  That's my

22   recollection of the RACERS security which JP was insisting that

23   Barclays take and Barclays didn't want.

24   Q.    And do you recall whether cash in lieu of securities was

25   delivered by JPMorgan to Barclays early in the morning of the

55

1    19th to make up for a shortfall in securities?

2    A.   I don't recall that specifically; I do recall the seven

3    billion was sitting in that account.  Again, it was at

4    JPMorgan, so it -- but it was, presumably, Barclays' cash, but

5    there was a dispute about getting it out.

6    Q.   Was there discussion at this meeting Sunday with JPMorgan

7    of Barclays paying seven billion in cash back to Lehman in

8    exchange for JPMorgan providing undelivered securities to

9    complete the repo transaction?

10   A.   JPMorgan was insisting that Barclays take all of the

11   securities that were delivered, and they wanted the cash and

12   wanted to deliver the 8.55 in securities to Barclays.

13   Q.   The RACERS?

14   A.   The RACERS.  Barclays was complaining about not only the

15   RACERS but the other securities they got and the value of those

16   securities and claiming that JPMorgan had put securities into

17   that delivery that may not have been appropriate.

18   Q.   And on the left side, referring to the face value, on the

19   left side of your notes where I put the letter G, and your

20   notes, it's very clear, forty-nine billion face market value,

21   is that what it says?

22   A.   That's correct.  So that's what the marked value of those

23   securities in cash would be.

24   Q.   And in this meeting, was Barclays challenging that value?

25   A.   Barclays thought it was worth less, more like 43.5

56

1    billion, and certainly do not want the 8.55 in securities

2    versus that cash.

3    Q.    Do you recall whether Barclays said to all the parties

4    that were there, Lehman, the Fed, JPMorgan, their lawyers,

5    their financial advisors, that these marks were out of date?

6    A.    I don't know if they used those terms.  They certainly

7    complained about the value and the marked value, and it was a

8    very heated discussion between those parties.  Frankly, Lehman

9    and the committee sat on the side of that meeting while JP and

10    Barclays really went at it.

11    Q.    Well, did the committee ask any questions about this idea

12    that the securities were worth less than their marked value in

13    the course of this meeting?

14    A.    Not during that portion of the meeting at all, no.

15    Q.    Now, you have a number, 1.9, below the 49 in your notes.

16    Do you see that?

17    A.    I do, yes.

18    Q.    What are you referring to there?

19    A.    This was additional unencumbered assets that were at the

20    DTC that were to be transferred over to Barclays.  And then I

21    also have an additional, it says, plus BoNY.  I believe there

22    were some assets at Bank of New York, some treasuries and some

23    high-grade corporates.

24    Q.    And just above that, above the 1.96 billion about which

25    you've just testified is a figure, 43.5 billion value adjusted.

57

1    Do you see that?

2    A.    Yes.

3    Q.    And what appears after adjusted?

4    A.    MV, market value.

5    Q.    And would you explain to Judge Peck what that notation

6    was, as best you can recall.

7    A.    This was my shorthand of the -- of the summary of the

8    transaction where 49 billion in face marked value was being

9    delivered, which included the cash and not those securities

10   which would have taken it up, obviously, over 40, versus a

11   market value that Barclays ascribed to those securities and

12   cash of 43.5 billion.

13   Q.    So in this meeting, do you recall Barclays' view that the

14   adjusted value was closer to 43.5 billion?

15   A.    They certainly ascribed, and you'll see over on the right,

16   it says forty-five billion advanced.  That's the capital, the

17   money that Barclays advanced to JPMorgan to pay for the

18   securities, and they felt that they were under water.

19   Q.    And remind us when Barclays advanced forty-five billion

20   dollars to Lehman that week.

21   A.    It was Thursday night, going into Friday.

22   Q.    And was that pursuant to the insistence of the Fed that

23   Barclays step into its shoes in the repo transaction?

24   A.    That's my understanding, is that the Fed required that as

25   part of the transaction, and Barclays didn't have a real option

08-13555-mg   Doc 8917   Filed 05/06/10   Entered 05/07/10 15:13:58   Main Document
Pg 58 of 228

58

1    **to walk away from that part of the deal.**

2         MR. SCHILLER:  Your Honor, I'm going to move to

3    another meeting, and I know Your Honor often has a break at 11,

4    and I --

5         THE COURT:  This is a good time for that break.

6         MR. SCHILLER:  Thank you, Judge.

7         THE COURT:  We'll resume in fifteen minutes.

8        (Recess from 10:58 a.m. until 11:17 a.m.)

9         THE COURT:  Be seated.

10        MR. SCHILLER:  Your Honor, before I resume, I'd like

11   to provide the Court with a stipulation by the parties

12   admitting a number of Barclays exhibits which include the

13   exhibits I will use in the remainder of the examination.

14        THE COURT:  Okay.

15       (Pause)

16        MR. SCHILLER:  And just for the Court's information,

17   Mr. Burian's notes are in evidence pursuant to Movants' Exhibit

18   380 which the Court admitted earlier in the trial.

19   RESUME CROSS-EXAMINATION

20   BY MR. SCHILLER:

21   **Q.   Mr. Seery?**

22   **A.   Yes?**

23   **Q.   After the large meeting with JPMorgan, the Federal**

24   **Reserve, the parties, their lawyers and financial advisors**

25   **regarding repo collateral issues, did you have a subsequent**

59

1    meeting with Mr. Burian and other representatives of the

2    creditors' committee?

3    A.    Yes.  I had several meetings that some of which ran

4    together.  There were breaks.  But in that very room, we had

5    the first meeting discussing the particulars of the

6    transaction.

7    Q.    Just so His Honor can follow this -- and if you can just

8    please speak up -- I know you've been on the stand awhile.  In

9    this room where all these parties were, another meeting took

10   place after the JPMorgan meeting.  How did it arise that you

11   met with Mr. Burian and others just after the JPMorgan meeting,

12   if you recall?

13   A.    We were in a large conference room at Weil Gotshal.

14   Barclays was on one end of the room; JPMorgan was on the other.

15   The other participants, including the Lehman representatives

16   and the creditors' committee, were on different sides of the

17   room.  The committee and Lehman were on opposite sides of this

18   conference room which is about the size of this courtroom.  We

19   would be on the long lengths of the rectangle.

20   Q.    After that meeting adjourned --

21   A.    When that meeting adjourned, Mr. Burian and Mr. Fazio, and

22   I believe Mr. Despins, came across the room to talk to me, Mr.

23   McDade and Mr. Kirk about the transaction and to review the

24   particulars of the transaction, in particular, to review the

25   repo part of the transaction.  Mr. McDade and Mr. Kirk left and

60

1    I walked through the transaction particulars with Mr. Fazio and

2    Mr. Burian.

3    Q.   Did you review with Mr. Fazio and Mr. Burian Lehman's view

4    based on its discussions with Barclays that the marks of the

5    repo collateral received by Barclays was different, that the

6    market value --

7            MR. SCHILLER:   Let me withdraw the question.

8    Q.   Did you discuss with Mr. Burian and Mr. Fazio, again,

9    whether Lehman and Barclays' assessment of the actual values

10   was different than the marked values of the repo collateral

11   received by Barclays?

12   A.   Yes.  This was a basis of the discussions.  That is, Mr.

13   Fazio and Mr. Burian, continuing the call that we had had on

14   Friday, were probing the difference between the forty-five

15   billion advanced and the fifty, roughly, face value of those

16   assets.  And their concern was that five billion dollar

17   difference.  So that was the basis of the conversation.  If

18   there had not been that difference, there wouldn't be any

19   reason to have a conversation.

20   Q.   What did you say to Mr. Burian when he probed the five

21   billion dollar difference?

22   A.   He had just been in the meeting with JPMorgan and Barclays

23   where Barclays expressed a view that the value was even lower

24   than the forty-five billion dollars that we had arrived at, the

25   45.5.  Mr. Burian knew there was dispute, and Mr. Despins and

61

1    Mr. Fazio as well, about the value of those assets.  And our

2    discussions were along the lines of what Lehman had done and

3    our own view that there were issues with respect to the marks.

4    Did we have an absolute value of these securities that

5    reflected that it was forty-five and a half, forty-three and a

6    half, forty-nine?  No.  We did not.  We told them that there

7    was a difference, there was a dispute.  The forty-five five was

8    a negotiated amount.

9    Q.    So you explained to them that if these securities were

10   sold they may be sold for more than the negotiated values that

11   the parties estimated?

12   A.    The risk was Barclays and the benefit was Barclays.  If

13   Barclays sold them for more, there was no up side in the

14   portfolio, it would go to Barclays.  If Barclays sold them for

15   less, they would suffer the consequences.  Remember, this is

16   before the markets recovered.  The markets were in a downfall,

17   significant downfall.

18   Q.    And do you recall saying that in substance to Mr. Burian

19   and Mr. Fazio Sunday evening at Weil Gotshal following the

20   meeting with JPMorgan and the Fed?

21   A.    Several times.  And the first meeting in the one I

22   described in the larger conference room, we had that very

23   discussion.  It was brief, probably fifteen, twenty minute

24   meeting and discussing the general terms of the transactions.

25   And Mr. Burian and Mr. Fazio and Mr. Despins pushing back as to

62

1    whether there was another deal we could do, whether there was a

2    way to get more out of Barclays.  In subsequent meetings, in

3    separate conference rooms, on the Weil conference floor, we

4    further discussed the transaction and the difference between

5    the amount that Barclays had advanced and the marked value of

6    those repos as opposed to the market value of those securities.

7    And they probed a number of times on whether there was another

8    transaction that we could do.

9    Q.    And do you recall how you or Mr. Kirk responded?

10   A.    The conversations were generally with me.  I don't recall

11   if Mr. Kirk was involved in any of those conversations

12   directly.  But my response was that this was the only

13   transaction that we had.  We had Barclays willing to close.  We

14   had a loose agreement that there would be some sort of

15   settlement with JPMorgan.  And this was the only transaction.

16   And that if they didn't approve the transaction, they had a

17   veto right.  And if they disagreed with this transaction, we'd

18   have to come back and fight it out in front of Judge Peck.  But

19   this was the transaction that we had.  There was not an

20   alternative.  And it was likely that if they disagreed and we

21   weren't able to open on Monday, there would be significant

22   damage to the franchise.  We may not get Barclays.  We might

23   not have gotten anybody.

24   Q.    Just to set this meeting for Judge Peck, what time of day

25   Sunday night or early Monday morning was this discussion that

63

1    you've just recounted?

2    A.    I believe the first -- the first meeting with JPMorgan was

3    late in the day, in the afternoon.  But I believe the sun was

4    still out.  The sub -- I think when I first began to speak with

5    Mr. Burian and Mr. Fazio and Mr. Despins, it was probably

6    beyond sunset that day.  And these discussions went well, well

7    into the night.  We didn't -- the transaction closed Sunday

8    night, Monday morning.  We didn't go home.  We did not sleep.

9    Q.    Do you remember whether Mr. Fazio or Mr. Burian responded

10    to you when you explained in substance that they had a veto

11    right and that they needed to take a position because there may

12    be a need to see Judge Peck in the morning?

13    A.    They knew they had a veto right.  But these gentlemen --

14    they're sophisticated guys.  They've been around bankruptcy,

15    they've been around financial transactions.  They certainly

16    understood how this transaction was structured, the risk and

17    the benefit.  But they're also human.  They didn't want to have

18    this transaction necessarily blow up because of them.  They

19    didn't want to put all of those employees at Lehman Brothers

20    out on the street.  They knew the risk.  We talked about it.

21    In fact, Mr. Burian asked me very directly, why -- you know,

22    tell us why we're doing this.  Tell us that this transaction is

23    not that bad.  And my response to Saul was it's not that bad.

24    It's the only one we have.  I don't know if these securities

25    are worth forty-three billion or forty-five billion or fifty

64

1    billion.  I just don't know.  I know we have a market that's in

2    freefall.  I have securities that are getting transferred to

3    Barclays.  I know they advanced forty-five billion dollars.  I

4    know that no one else in the world had advanced that money.  I

5    know that JPMorgan had a complete look at the book.  They had

6    the cash.  If it was such a great deal, they could have taken

7    it.  I know HSBC had turned their nose up at it.  No one else

8    showed up.  And I put it to them that this was the transaction

9    that they had to either approve or not.  And we wanted them to

10   approve it.

11   Q.    And what did they say in response as best you recall?

12   A.    They assented to the deal.  There's no question in my mind

13   that they assented to the deal.  I don't recall him saying yes,

14   go forward, we approve.  But they were in the room.  It was put

15   to them, what do you want to do, and they agreed to go forward.

16   Q.    You say you discussed with Mr. Burian and his colleagues

17   what would happen to the ten thousand Lehman employees if there

18   were no sale the next day.

19   A.    I'd certainly discussed the employees.  I don't think we

20   necessarily had to go through the number of employees that were

21   there or precisely whether they would be out.  But there was

22   certainly a huge personal dynamic in this transaction.  It

23   wasn't just keeping jobs.  It was the effect on the rest of New

24   York and U.S. and the global economy.  It was health benefits.

25   Lehman was self-insured.  The folks who were at Lehman

65

1    Brothers, if Lehman Brothers goes under and goes into a Chapter

2    7, they don't have any health benefits other than we tried to

3    set up a trust at the beginning of the case to benefit them for

4    some period of time.  There's no COBRA.  There's no protection

5    for those folks.  The committee was well aware of those issues.

6    Q.    Did you --

7    A.    They were aware of them because we talked about them.

8    Q.    Did you also talk about what would happen to these

9    securities that were to be transferred to Barclays if there

10   were no sale?

11   A.    Well, they knew at that point that Barclays had actually

12   purchased them.  So what would happen in the repo, I think

13   most -- we didn't discuss the specifics of how the securities

14   would hit the market, but at that point, there was concern what

15   would be the effect.  The repo counterparty, Barclays, could

16   close them out and sell them as fast as they wanted to.

17   Barclays, however, was very concerned, to my mind, that they

18   weren't even covered.  So how they were going to make up that

19   shortfall was Barclays' problem, but it certainly would have

20   had a depressing effect on the market.

21   Q.    Did you discuss with Mr. Burian and his colleagues what

22   would happen to our economy if there were no sale Monday

23   morning?

24   A.    We generally discussed, and this had been a theme

25   throughout the case if it hadn't closed before the markets

66

1    opened and how the markets would treat it.  By that end of the

2    week, the Fed was already -- and the Treasury were already

3    making some inroads in to trying to help out the banks.  But

4    there was a significant concern that if Lehman were to fail,

5    other banks would fail as well.  So Mr. Burian and Mr. Fazio

6    are fairly astute fellows.  They knew these issues.

7    Q.    And is it your testimony to Judge Peck that early Monday

8    morning, late Sunday night, Mr. Burian and Mr. Fazio assented?

9    They did not try to stop the sale?  They agreed to let it go

10   forward?

11   A.    No one ever tried to stop the sale that night.  They knew

12   they had the right to.  We discussed it.  We had the initial

13   discussion in the larger conference room about this portion of

14   it.  There were obviously a number of other portions of the

15   transaction which had to be discussed.  We continued that

16   discussion even in detail with them reviewing the large ledger

17   size pieces of paper with the securities positions on them.  We

18   couldn't do a security by security review of how we came up

19   with 45.5 versus the forty-nine billion of face on those

20   securities.  We talked about the difference between the amount,

21   the forty-five billion dollars that Barclays had advanced

22   versus the face amount.  They knew they had the right to object

23   to it.  And we knew we'd have to go to court if they did.  But

24   they didn't object.

25   Q.    Did they tell you that they were putting some condition on

67

1    the sale in terms of their assent and their decision to let it

2    go forward?

3    A.    No.   They certainly did not tell me that.

4    Q.    Did they press you again early Monday morning about this

5    five billion dollar difference?   Did Mr. Burian ask you, for

6    example, how do you justify this?

7    A.    That was all part of the discussion.   And it was started

8    from the beginning in the larger room.   Now they were party to

9    or privy to the debate between Barclays and JPMorgan.   So they

10   knew the issues between those two parties and the concerns

11   about the securities that Barclays expressed.   So they knew

12   that that was an issue.   We told them we pressed as best we

13   could in terms of trying to get the best deal we could.   We

14   didn't have another buyer.   They did probe, no question about

15   it.   We did go through specific securities.   We looked at the

16   book.   They pulled out examples where they thought that that

17   security was fairly valued.   They didn't have any data but just

18   looking at that number, they would say a short dated Treasury,

19   you know, how can that be much different than par.   And I would

20   tend to agree with them.   This was the value for the total

21   transaction that we were able to sell the 45.5.

22   Q.    Please tell Judge Peck, were you clear with them about

23   this five billion negotiated value, the difference between what

24   the collateral was in the repo and what the parties believed

25   its value was in the market that day?

68

1   A.   We were -- I was absolutely clear.  And again, if there

2   wasn't a difference between the amount of money that Barclays

3   advanced and what the company believed the securities to be

4   worth, we wouldn't have had any discussions.  Why would we be

5   having a debate right after the big meeting and then

6   subsequently several into the night to review these items if

7   there was no disagreement on the value versus the amount

8   advanced?  We went through this a number of times.  And,

9   frankly, that's what has made me a little bit distressed about

10  this litigation.  The idea that this is a great secret?  It

11  wasn't a secret.  They knew exactly what this was.

12  Q.   All right.  Let me ask you to turn to tab 12.

13       MR. SCHILLER:  Your Honor, that's Barclays Exhibit

14  813.  It's at tab 12 in the notebook we distributed.

15  Q.   Do you have it?

16  A.   Yes.  Yes.

17       MR. SCHILLER:  Your Honor, this is a document that was

18  provided to Barclays last week pursuant to Your Honor's order

19  compelling production of certain materials that had been

20  withheld on work product grounds, just for the Court's

21  information.

22       THE COURT:  All right.  Thank you for that.

23  Q.   I'm reminded of one thing before I go to this.  And that

24  is, in the course of your discussions early in the morning with

25  the committee, did Michael Klein participate at all?

69

1    A.    Michael Klein did participate in one of those discussions.

2    Q.    Do you recall that discussion?

3    A.    I do.  Mr. Klein came in -- it was one of the middle

4    conference rooms on that floor.  Mr. Klein came into that room

5    with Mr. Miller and wanted to engage in that discussion because

6    the discussion was taking a while and the committee had not yet

7    consented to the deal.  And I was walking them through these

8    issues, as I said, a number of times.  And Mr. Klein came in

9    and gave his thoughts on the issue.

10   Q.    And did he leave the meeting?

11   A.    He did.

12   Q.    And did the meeting continue?

13   A.    He did.  When Mr. Klein was through, again, at least with

14   respect to Mr. Despins and Mr. -- and I believe he was there --

15   and Mr. Burian -- they're gentlemen I know.  And when Mr. Klein

16   left the meeting, they turned to me and said, okay, now back to

17   you.  We want you to explain it.

18   Q.    Is there any question you didn't answer that night as best

19   you can recall for Mr. Fazio or Mr. Burian?

20   A.    There's no question that I didn't answer if I didn't have

21   the answer.  For example, they certainly would have asked for

22   more detailed line by line -- we didn't have a line by line

23   reevaluation of the book.  So if I couldn't answer the

24   question, I told them I couldn't answer the question.  But

25   every question they put to me, I answered.

70

1    Q.   Was this meeting rushed or did you take your time to

2    satisfy their questions?

3    A.   Frankly, everything was rushed.  But this was a number of

4    different meetings where they could -- they kept coming back.

5    We certainly didn't end it and kick them out because they -- it

6    was their prerogative to say no deal.

7    Q.   Let me now turn your attention to Barclays Exhibit 13A

8    which is in evidence.  It is an e-mail, a string of e-mails.

9    And at the top, it's from a Mr. Bell of Milbank to Mr. Despins

10   who you've mentioned of Milbank.  And could you state for the

11   record who Milbank represented in your discussions over the

12   weekend?

13   A.   Milbank Tweed represented the creditors' committee.

14   Q.   And you see at the -- at page 435 that the subject of

15   these e-mails is "Issues relating to the value of assets to

16   Barclays".  Do you see that?

17   A.   Yes, I do.

18   Q.   And then in the middle of the page, there's an earlier e-

19   mail on October 10th, 2008 from Michael -- from Mr. Bell of

20   Milbank to Michael Fazio and Brad Geer regarding the value of

21   the assets to Barclays.  Can you remind the Court of whom Mr.

22   Fazio and whom Mr. Geer is?

23   A.   Mr. Fazio was, I believe, formerly of Deutschebank in the

24   securities business and was working for Houlihan.  And Mr. Geer

25   is a managing director at Houlihan.

71

1   Q.   And he's writing to them about the value of the assets to

2   Barclays and issues associated with those values, correct?

3   A.   That's what the subject is.

4   Q.   Now it says redacted there.  So I haven't seen what's

5   there.  And I'm not able to ask you about it.  But if you turn

6   the page, you will see information that we do have thanks to

7   the Court's ruling last week.  And I've turned to page 436.

8           MR. SCHILLER:  And this is as we received it, Your

9   Honor.

10  Q.   It looks like it says Footnote A at the top.  Do you see

11  at the bottom where it says Alvarez & Marsal?

12  A.   Yes, I do.

13  Q.   Can you identify Alvarez & Marsal for the record, please?

14  A.   Alvarez and Marsal is the restructuring firm that Lehman

15  Brothers retained right before the filing --

16  Q.   And over on the right side --

17  A.   -- to help with their --

18  Q.   -- it says "Draft - Barclays Deal Recap".  Do you see

19  that?

20  A.   Yes.

21  Q.   Now, this number at the bottom, forty-three billion

22  transferred under the repo agreement -- do you see that?

23  A.   Yes, I do.

24  Q.   Is that similar to the number that the committee saw on

25  Sunday, September 21st for the value of the repo security that

72

1    was transferred?

2    A.    It's very close.  It's slightly different from the summary

3    that is contained at the beginning of the large exhibit that

4    you have that has all of the securities on it.

5    Q.    Right.  I'm asking you because this is dated October 10th.

6    And I'm asking you whether this is similar to -- comparable to

7    the number that you reviewed with them on Sunday, September

8    21st before the closing.

9    A.    It is comparable.

10   Q.    And you also had notes at Exhibit 650 at page 67.  And

11   your handwritten notes showed the same marked value shown to

12   the committee on the September 21st meeting with the committee.

13   Do you recall that?

14   A.    I'm sorry.  My notes -- can you repeat that?

15   Q.    Your notes reflect, and I believe you've testified, that

16   the 42.9 billion in your notes is what the committee heard from

17   you on Sunday.

18   A.    Yes.  And from numerous parties.

19   Q.    And that is comparable to the forty-three billion listed

20   here in the Alvarez & Marsal Barclays Deal Recap, correct?

21   A.    Yes.  It's close.

22   Q.    Let me ask you to turn the page to 437.

23          MR. SCHILLER:  Your Honor, these are in the order we

24   received them.

25   Q.    And you notice at the top of the page it says, "LBI Sale

73

1    Value of Assets Transferred to Barclays"?

2    A.   Yes, I see that.

3    Q.   And the first sentence reads:  "Barclays APA and

4    clarification letter" -- the APA is a purchase agreement, isn't

5    it?

6    A.   APA stands for asset purchase agreement, yes.

7    Q.   -- "and the clarification letter are silent as to the

8    aggregate amounts of assets and liabilities to be transferred."

9    Do you agree with that?

10   A.   Yeah.  The way the deal was structured is that as the

11   brokerage continued to move -- do business, and the values

12   moved up or down, you could fix the amount of securities that

13   were getting transferred or the amount of liabilities that were

14   getting transferred.  So the asset purchase agreement never had

15   a fixed amount.

16   Q.   Now, this document says "Draft 10/10" at the top.  But I

17   want to take you down to the "Components of Value" section

18   toward the bottom of the page.  Do you see that?

19   A.   I do, yes.

20   Q.   And ask you to compare that information there to what was

21   shared with the committee over the weekend before the sale.

22   A.   These numbers look pretty similar to the numbers from my

23   notes.  I don't recollect which tab that was.  But the forty-

24   three --

25   Q.   That is 560B at 67.  Can you compare that, yes?

74

1    A.    So at 42.9 securities -- .935 versus forty-three; the

2    miscellaneous or the DTC box was mentioned on my notes as well,

3    the 1.9 billion; the reserves related to customer accounts -- I

4    don't recollect on my notes.  We had some additional collateral

5    and the BoNY piece.  I'm not sure if those are the same or not.

6    Q.    And you see the five billion --

7    A.    Seven billion is the -- the seven billion is the cash.

8    And then so it's totaling, roughly fifty-three when you tally

9    that all up versus a five billion dollar Schedule A haircut

10   which is the five billion that we talked about as being the

11   difference between the fifty and the forty-five billion dollars

12   that Barclays had wired into JP for the deal.

13   Q.    So is the Marsal & Alvarez "Components of Value" on this

14   "Draft 10/10" consistent with your notes of what you told the

15   committee the evening of September 21st before the closing the

16   morning of September 22nd.

17   A.    Yeah.  I can't vouch for this being from Alvarez & Marsal.

18   I don't know this document except that you're showing it to me

19   now.  But these are largely consistent with those numbers.

20   Q.    Thank you.  And I want to note for the record you're

21   correct.  It was the preceding page that referenced Alvarez &

22   Marsal.  So this document, the 10/10 and the summary of values

23   was transmitted from Milbank to Michael Fazio and Brad Geer

24   according to this e-mail, correct?

25   A.    That's correct, yes.

75

1    Q.   Now, let me ask you to turn to the next page, 438.  And I

2    would like you to read with me the first paragraph:  "The night

3    of the close" -- "The night of the close of the transaction, we

4    told Lehman/Weil that the pieces of the transaction that were

5    being described to us added up to the fifty-two, fifty-three

6    billion rather than the approximately forty-seven billion that

7    had been described in court the Friday before."  You see that?

8    A.   I see that, yes.

9    Q.   And is that consistent with your -- the substance of your

10   discussion with the committee at Weil Gotshal on Sunday, the

11   night of the close?

12   A.   That would be the addition for the face value, yes.  So

13   the forty-nine billion from my notes previously plus the 1.9

14   billion of the DTC unencumbered plus a couple other things.

15   Q.   And just to remind the Court, when this discussion was had

16   at Weil Gotshal with the committee, who was present to your

17   recollection?

18   A.   My recollection is Mr. Burian, Mr. Fazio and Mr. Despins.

19   And I'd also note just on the top of my notes, I have forty-

20   five over fifty-three; without seven billion, thirty-eight over

21   forty-six.  So these numbers are largely consistent with the

22   numbers we talked about.

23   Q.   Thank you.  The second paragraph reads "A few hours after

24   we raised the issue, Lehman came and got us and sat down to try

25   and show us how things added up."  Is that a reference to you,

76

1   among others, where it says "Lehman"?

2   A.   It would be.  I would disagree with the "few hours".  This

3   was real time.  As I said, they walked over -- as other folks

4   were walking out of the meeting, we began our discussion.  So

5   there wasn't a few hour time frame where there was no

6   discussion.

7   Q.   "We were told", this writing says, "that some of the marks

8   shown on Schedule A were out of date."  Were they told by

9   someone from Lehman in this meeting that the marks on Schedule

10  A were out of date according to the parties?

11  A.   It's in quotes.  I don't know that I used that term but I

12  certainly told them that there was dispute about the marks as I

13  previously testified.

14  Q.   It continues:  -- "and that the parties, Lehman and

15  Barclays, had agreed to a five billion dollar discount as the

16  appropriate mark-to-market adjustment for the securities."  Did

17  you discuss in substance Sunday night an adjustment in the

18  mark-to-market securities because of agreed discussions between

19  Lehman and Barclays?

20  A.   Again, I don't believe we remarked the book.  We agreed to

21  the adjustment and we told -- and I told the committee that I

22  couldn't put an absolute value and that Lehman wasn't able to

23  put an absolute on each of the securities.  But we had agreed

24  to an amount that was five billion less than the face amount

25  where they were marked.

77

1    Q.    And on what basis was that agreement made as best you

2    recall?

3    A.    It was a negotiated settlement that the parties reached

4    with respect to the value where Barclays was arguing that the

5    value was lower and Lehman was arguing it was higher.

6    Q.    And was this settlement an effort to reach market between

7    the parties in the context of the sale transaction?

8    A.    It was an effort by Barclays to get the price lower and

9    Lehman to try to get the price higher.  And it's closer to

10   market than perhaps the actual marks were.

11        MR. SCHILLER:  At paragraph 5, Your Honor, begins "We

12   are still looking".

13   Q.    "We are still looking at the remaining balance of the 14.4

14   billion on Schedule A.  And that Schedule A is that

15   spreadsheet, is it not?

16   A.    Yes.  That's the section that they refer to as "DTC

17   Settled".

18   Q.    It continues:  "But it is clear, there shouldn't be a five

19   billion dollar haircut necessary here.  A five billion dollar

20   discount would imply an average mark of sixty-five percent and

21   a lot of these securities are household names."  Did they probe

22   the basis for this haircut, this five billion dollar

23   adjustment, with you Sunday night before the sale?

24   A.    They certainly did.

25   Q.    Did they challenge the five billion dollar difference or

78

1    discount before the sale closed in conversation with you, Mr.

2    Seery?

3    A.    They probed it.   I don't know whether you'd call it --

4    they challenged me, why are we doing this.   We certainly had

5    those discussions, yes.

6    Q.    Did they tell you they needed to know how Barclays and

7    Lehman had come up with this five billion dollar difference?

8    A.    I told them it was a negotiated amount.

9    Q.    Did they ask you and others at these meetings Sunday not

10   to close on Monday because the five billion dollar haircut was

11   "not necessary"?

12   A.    No, they did not.

13   Q.    Let me ask you to read the last paragraph with me.

14        MR. SCHILLER:   Your Honor, it begins at the bottom of

15   the page, "In summary".

16   Q.    "In summary", this 10/10 e-mail to Milbank reads, "the

17   statement in court said that the 47.4 billion in assets were to

18   be transferred."   Did you hear that before Judge Peck when you

19   were in court?

20   A.    I said I was here the whole time, I previously testified.

21   I don't recollect Ms. Fife's specific dollar amount.   But I

22   certainly would have heard it.

23   Q.    "In summary, the statement in court said that 47.4 billion

24   in assets were to be transferred and 45.5 billion in assets

25   were to be assumed.   It appears that the assets transferred

79

1    were significantly greater and the liabilities assumed

2    significantly less than the figures represented in court by at

3    least a few billion dollars in each case."  Do you see that?

4    A.    I see it, yes.

5    Q.    Did you tell the committee Sunday night before the Monday

6    morning closing in words or substance that the value of the

7    repo assets transferred to Barclays might be higher than 45.5

8    billion dollars?

9    A.    We discussed that it might be higher.  It might be lower.

10   The five billion dollar difference we discussed on Friday

11   between the face value and the amount advanced.  On Sunday we

12   went through, as I just described, detailed discussions about

13   what those values could be and that we were using our best

14   estimates and this was a negotiated number.  This paragraph

15   seems to say that a two billion dollar difference is okay.  But

16   a five billion is not?  They never raised -- they never -- we

17   discussed the issue.  They never objected to closing on that

18   negotiated number.  It was the only deal.  The choice was close

19   the deal or lose the deal.

20   Q.    Is it your testimony you understood them to accept your

21   explanation?

22   A.    Yes.  I didn't say they liked it.  But they accepted it.

23   Q.    Let me ask you to turn to the next exhibit.

24         MR. SCHILLER:  Your Honor, at tab 13.

25   Q.    And this is also a document provided to Barclays last week

80

1     pursuant to Your Honor's ruling.  And this is another e-mail.

2     Would you take a look at it, Mr. Seery, please?  If you look at

3     the --

4          (Pause)

5     Q.    -- bottom e-mail first, you see it is a message from Luc

6     Despins to Mr. Fazio and Mr. Geer.  Do you see that?

7     A.    Yes.

8     Q.    And it's sent September 28th.  That's a week after the

9     transaction.

10    A.    That's correct.

11    Q.    And it refers to Barclays' schedules.  Do you see that?

12    A.    Yes.

13    Q.    And Mr. Despins writes, "Brad and Mike, we finally

14    received the schedules to the APA on Friday.  Did you guys get

15    them?  They should be audited now because if there is an issue

16    with them, we need to speak up now" -- "to speak up now before

17    the trail gets cold."  Do you see those words?

18    A.    Yes, I do.

19    Q.    Did the committee "speak up" before closing about a five

20    billion dollar difference between the forty-five billion loaned

21    in cash by Barclays and the 49.7 worth of collateral that

22    Barclays was supposed to receive?

23    A.    No.  This is a week later.  They had the schedule of all

24    of the assets on Sunday at the closing.  They had that

25    schedule.  So there may have been other schedules they're

81

1    referring to.  But they had the list of the assets and they

2    understood where we came out, the face mark versus the settled

3    amount versus the forty-five billion that Barclays advanced.

4    Q.    They had the values on all of the assets.  That's your

5    testimony?

6    A.    Yes.

7    Q.    And if the committee had doubts or questions, they

8    could've refused to consent to the deal?

9    A.    And just -- the answer is yes.  And in fact, at the top of

10   it, it says, "We're looking at them.  Schedule A appears

11   consistent with that which we had last Sunday."

12   Q.    And you recognized that as the spreadsheet that you and

13   others provided and discussed with them on Sunday, Schedule A?

14   A.    That's correct.  The issue is very clear.  And this e-mail

15   at the top, to me, the first two lines I just read --

16   Q.    Well, why don't I read it?

17   A.    Okay.

18   Q.    Why don't I read it into the record so that the record

19   will reflect what you're talking about?  So Mr. Despins has

20   written to Brad and Mike and saying we received these

21   schedules.  They should be audited because if there's an issue,

22   we need to speak up.  And the answer back from Mr. Geer -- and

23   he's a Houlihan employee, is that right?

24   A.    Yes, he is.

25   Q.    And he writes back to Mr. Despins, the lawyer from Milbank

82

1    for the committee, and to Mr. Fazio, copying Mr. Bell, "Yes",

2    Mr. Geer writes, "We're looking at them.  Schedule A appears

3    consistent with that which we had last Sunday night at Weil."

4    And that's the Sunday before closing, correct?

5    A.    That's correct.

6    Q.    "So the issue is if they really were only worth the amount

7    that was agreed to between Lehman and Barclays or if they were

8    worth more."  And that was an issue you discussed -- you and

9    others discussed exhaustibly with the committee Sunday night

10   before closing?

11   A.    Yes, we did.

12   Q.    It continues, and I quote, "We can price a fairly big

13   portion of the securities, but there are some we don't know on

14   Schedule A.  Those that we have looked at seem to suggest that

15   they're worth more than implied by the negotiated mark in the

16   deal which amount isn't shown in detail on any schedule.  For

17   example, the two sides somehow said 'that although the detailed

18   Schedule A totals to X, it is really worth Y in the aggregate

19   because the marks in the system are somehow outdated.'"  Is

20   that consistent with the conversations you had Sunday night

21   before the closing on September 22nd?

22   A.    It's generally consistent.  Again, I don't recall using

23   the specific words "out of date".

24   Q.    And Mr. Geer writes "which seems odd".  Did anyone tell

25   you in the course of your discussions Sunday night with the

83

1    committee and its advisors that it was odd that the total on

2    Schedule A amounts to X but it's really worth Y because the

3    marks in the system are outdated?

4    A.    No.  What you have to remember and why it doesn't seem odd

5    at all is there was one buyer for forty-five billion dollars

6    worth of stuff in an incredibly volatile market that now has no

7    hedge against it.  So Barclays buys forty-five billion dollars

8    worth of securities.  They have a dispute about a big piece.

9    They don't have any hedge on it.  Some of it is very liquid,

10    easily identifiable collateral.  Others is not.  It doesn't

11    seem odd at all that there's a difference between what they're

12    willing to pay and what Lehman previously had marked.

13    Q.    And Mr. Geer writes to Mr. Despins on September 28th that

14    the difference between X, what Schedule A shows, and Y, what

15    the collateral is worth in the aggregate, is several billion

16    dollars.  Is that consistent with the discussions you had with

17    the committee and its advisors --

18    A.    The difference --

19    Q.    -- Sunday night?

20    A.    The difference between what Barclays advanced and what the

21    marks were was several billion dollars.  Again, we had a

22    negotiated amount to reach agreement.  We didn't have an exact

23    view of the actual value of that collateral package on that

24    day.

25    Q.    Does this e-mail from Mr. Geer to Mr. Despins confirm what

84

1    you, in substance, told the committee with respect to the

2    difference between the marked value of the repo collateral and

3    the actual value as negotiated by the parties and the

4    difference in those values?

5    A.    Again, this is a week later.  But in substance, this is

6    very similar to the discussions that we had.  I don't recall

7    Mr. Geer being in the room at that time but the other

8    representatives were.

9    Q.    Let me ask you to turn to the next exhibit.

10          MR. SCHILLER:  Your Honor, Exhibit -- Barclays Exhibit

11   814 which is also in evidence.  And again, this is another

12   document which Barclays received last week pursuant to Your

13   Honor's ruling.

14   Q.    This is an e-mail, again, concerning schedules.  And this

15   is dated December 23rd, 2008.  Do you see that?

16   A.    Yes.

17   Q.    Now, do you recall that on December 22nd His Honor held a

18   hearing regarding whether the Court would approve what's called

19   the JPMorgan settlement on a motion by the trustee?

20   A.    I'm generally familiar with the settlement but I don't

21   re -- have any specific recollection of the hearing.  I didn't

22   attend it.

23   Q.    Well, you recall -- do you recall that the settlement was

24   the trustee's request to provide further cash and assets to

25   Barclays to make them whole on the repo transaction pursuant to

85

1    the clarification letter?

2    A.    That's my understanding.  This is the settlement of the

3    disputes that bubbled up on the 21st of September just before

4    the closing that I previously described with JPMorgan and

5    Barclays in the room.

6    Q.    So this is written Sunday night by James Tecce of Quinn

7    Emanuel.  Do you know Mr. Tecce?

8    A.    The bottom e-mail looks like it's written by Mr. Tecce.

9    The top one is written by Mr. Geer.  I don't know Mr. Tecce.

10   Q.    All right.  He writes to Mr. Fazio and Mr. Geer, correct?

11   A.    Yes, that's correct.

12   Q.    And he says, "Guys, we have schedules to the clarifying

13   letter.  And the judge knows this.  I understand that

14   information doesn't help us.  Is incomplete.  Can't be

15   deciphered.  Can you please give me particulars as to why?

16   Judge Peck may ask tomorrow."  And if I turn your attention to

17   the top e-mail from Mr. Geer to Mr. Tecce, with a copy to Mr.

18   Fazio, he says, in the second paragraph:  "We first uncovered

19   this Sunday night after the hearing when Weil/Lehman presented

20   draft versions of the clarifying letter Schedules A and B.

21   These draft versions which someone in our office would still

22   have a copy of, I believe, had individual marks for all" --

23   "all of the securities on the schedules.  We analyzed them and

24   added them up.  And when we added to the other collateral that

25   we understood were transferred to JPMorgan" -- "from JPMorgan

86

1    directly to Barclays got a total value of assets to be

2    transferred that was approximately five billion greater than

3    the number reported in court on the Friday before.  So we

4    raised the issue right then and there to Weil/Lehman.  They

5    said they'd look into it.  Then a couple of hours later, the

6    Lehman guys came back and asked us to come into their breakout

7    room."  Are you again one of the Lehman guys as best you can

8    recall?

9    A.    Again, I'm one of the Lehman guys but I don't recall Brad

10   being one of the committee guys.

11   Q.    Let me continue.  "They went through the deal.  And when

12   it came to making the whole thing balance out, they referred to

13   the draft schedule and said, basically, 'These marks on the

14   draft Schedule A are from the Lehman system.  But they are old.

15   Outdated.  So we had to apply a discount to them.'  It was

16   agreed between a few of our traders and the Barclays guys."  Is

17   this consistent with your advising the committee and its

18   advisors that adjustments were made to those marks through

19   negotiations between Barclays and Lehman to arrive at a market

20   value for the transaction?

21   A.    The theme about the total -- the theme, in total -- excuse

22   me -- is consistent.  The specific quotes -- as I said, I don't

23   recall Brad being there so I don't know how he could -- I think

24   he's making that up.  And he is a good friend of mine who I do

25   respect.  This e-mail -- I'd challenge a number of things that

1    he's written here.  The substance that they knew --

2    Q.   The substance of the e-mail, yes.

3    A.   -- that they knew, that we explained it, that we worked

4    not only in the main room but in a breakout room, that's

5    generally consistent with what I've testified to previously

6    this morning and my recollection.

7    Q.   And from your testimony this morning, they knew your view

8    on this five billion dollar difference Sunday night before

9    closing, correct?

10   A.   They did.  One other point here, I have no recollection

11   nor would I have offered to do a security by security breakout,

12   completely remark this entire book by the next morning.  The

13   deal was closing.

14   Q.   Let me ask you to read the first paragraph with me of this

15   e-mail.

16        MR. SCHILLER:  Your Honor, beginning at the top of Mr.

17   Geer's e-mail to James Tecce.

18   Q.   "The primary issue that we're trying to get to the bottom

19   of is that we believe that the securities that were transferred

20   to BarCap were worth five billion more than both the Lehman and

21   BarCap said they were worth when the securities were

22   transferred.  It's not so much that we think their value

23   changed during the week that the deal was being done but that

24   the Lehman guys, in cahoots with their soon to be

25   bosses/partners at BarCap, negotiated a sweetheart deal that

88

1    camouflaged --

2         (Pause)

3    Q.    -- "the amount value of the securities that were to be

4    transferred."  Do you see that?

5    A.    I do, yes.

6    Q.    Now, there was a lot going on that week, wasn't there?  It

7    was a very busy week.

8    A.    As I testified before, it was quite insane.

9    Q.    Is insane another word for turmoil?

10   A.    There was a significant amount of stress in the markets,

11   in the organization, in the city, within --

12   Q.    Let's focus on Lehman.

13   A.    -- within --

14   Q.    Let's focus on Lehman.  Were there a lot of --

15   A.    I mean -- the organization, I mean Lehman Brothers.

16   Q.    Were there a lot of meetings at Lehman over that week?

17   A.    It was constant.

18   Q.    And you and others were working late with little sleep?

19   A.    Often around the clock.

20   Q.    I take it you don't recall everything that happened that

21   week?

22   A.    I recall a pretty significant amount but I certainly don't

23   recall everything.  It was hectic.

24   Q.    But given how hectic it was, you may have forgotten when

25   you got something, who gave it to you, or whom you gave

89

1    materials to.  Is that fair?

2    A.   It's possible.  If there's a significant event, I

3    generally remember it.  But certainly there's been some things

4    I've been asked about in the last day and a half that I don't

5    recall specifically what happened.

6    Q.   You can't forget whether you were in cahoots with someone

7    from Barclays that week, can you?

8    A.   I can't.  And I'm hoping that Mr. Geer, who, as I said, is

9    a friend of mine, is not referring to me here.  In addition --

10   Q.   Were you?

11   A.   I was not in cahoots with anybody.  I didn't work for

12   Bar -- at that point, I was working for Barclays but I didn't

13   have a deal with Barclays.

14   Q.   Were you aware of any of your colleagues being in cahoots

15   with Barclays?  Was that alleged by anyone during that week?

16   A.   No.  We had one overriding concern.  And that was to try

17   to get a deal done at the best terms we can, preserve the value

18   of that organization, preserve those jobs and try to best

19   stabilize the markets.  This is an organization that the folks

20   that I worked with and myself put a lot of time and effort in

21   over the last ten years.  And it was very upsetting to see it

22   go down so quickly.  And finding a transaction that would

23   preserve those jobs, preserve the opportunities, get as much as

24   we could for the franchise.  And selling Lehman's franchise for

25   250,000 dollars is absolutely ridiculous.  There was no other

90

1    transaction.  We were not in cahoots -- I was not in cahoots

2    with anybody.  And from the time of the close till beyond this

3    e-mail, I spent a lot of time with Brad and with the committee

4    going through all kinds of issues at Lehman Brothers.  My door

5    was open.  The committee made some noise yesterday about me

6    spending time with Boies Schiller.  If they called me, I'd sit

7    down with them.  Not represented by anybody specific here.

8    When they tried to serve me at home, I said, just call me,

9    Susheel.  You don't have to serve me.  I'll come down.

10   Q.    It was a busy week.  It was a hectic week.  It was an

11   exhausting week.

12   A.    It was indeed.  And the idea that I or my partners were in

13   cahoots with anybody is insulting and upsetting.

14   Q.    And the deal that you described Sunday night to the

15   committee when you explained the difference and you explained

16   how it had been arrived at, were you describing a sweetheart

17   deal?

18   A.    It was a great deal for Barclays, no question about it.

19   On the securities side, that really wasn't the focus in

20   terms --

21   Q.    Did Mr. Burian suggest in any way you were doing favors

22   for Barclays, giving gifts to Barclays?

23   A.    Not at all.  I mean, again, they were buying these

24   securities without hedge.  It was their risk or their benefit.

25   Q.    Do you know whether the next day in this courtroom this

91

```
 1    committee said to Judge Peck, this was a sweetheart deal.  Do
 2    not approve this JPMorgan settlement. Lehman were in cahoots
 3    with Barclays.  Don't approve the JPMorgan settlement.  Did
 4    that happen in this courtroom?
 5    A.    Not to my knowledge.  And, by the way, they -- the other
 6    part of the transaction is Barclays is buying the franchise.
 7    So, of course they're hiring people.  I didn't have any
 8    discussions with Barclays about my comp before I got there.
 9    And I got part of a standard package.
10    Q.    If Lehman and the committee are saying to His Honor that
11    they could not, with reasonable diligence, have discovered this
12    five billion dollar difference between the marked value of the
13    repo collateral and the repo loan amount, the forty-five
14    billion, in time to move, to change the sale order by September
15    30th, would you agree with them?
16    A.    No.  I -- excuse me.  As I testified, on Friday, we had
17    discussions about the difference between the forty-five billion
18    they advanced and the face amount of those securities.  On
19    Sunday, we had detailed discussions about the actual package.
20    The markets went up after that.  Subsequently, a number of the
21    markets went down significantly and were deep in the hole by
22    March.  But they knew the difference between the amount
23    advanced and the face amount of those securities.  We didn't
24    know what the market value was.  And I doubt if the securities
25    had gone down in value, we'd be having this hearing.
```

92

1    Q.    Thank you, Mr. Seery.

2            MR. SCHILLER:  Thank you, Your Honor.

3            THE COURT:  It's ten after 12.  Do you want to start

4    with further examination or -- what happens next in your view?

5            MR. WERDER:  We would anticipate a relative lengthy,

6    probably hour or more redirect, Your Honor.  So we just as soon

7    prefer to break now and then pick up after a lunch break, if

8    that's acceptable to the Court.

9            THE COURT:  Why don't we take a lunch break and resume

10   at 1:45.  We're adjourned till then.

11           (Recess from 12:11 p.m. until 1:47 p.m.)

12           THE COURT:  Be seated, please.  Please proceed.

13   REDIRECT EXAMINATION

14   BY MR. WERDER:

15   Q.    Good afternoon, Mr. Seery.

16   A.    Good afternoon.  Excuse me.

17   Q.    Do you recall yesterday when we were talking about Exhibit

18   147 which had your notes on it and about the last page of it,

19   page 70 to your notes?

20   A.    Just tell me which document it is.

21   Q.    Yes, it's -- do you have the binder from yesterday in

22   front of you?

23   A.    I will.

24   Q.    Exhibit 147.

25   A.    Sorry.

93

1    Q.    And I want to direct you --

2    A.    I'm sorry.

3    Q.    -- specifically to the last page.

4    A.    I'm sorry, which exhibit?

5    Q.    1-4-7.

6    A.    Yes, sir.

7    Q.    And we talked about yesterday the 45.5 and the 1.5 billion

8    numbers being your handwriting, correct?

9    A.    45.5 and 1.9.

10   Q.    1.9 billion, right.  And you testified yesterday that you

11   didn't have any reason to think that you didn't put those

12   numbers on that sheet in the timeframe of the morning of

13   September 19, 2008, correct?

14   A.    I -- I thought I testified that I wasn't sure when I put

15   them on.

16   Q.    Well, let me just --

17   A.    I don't have reason to believe that's not true or that

18   that's necessarily true.  It was around that time.

19   Q.    Okay.  And we talked about what the 45.5 billion

20   represented and I believe it was your testimony that you didn't

21   recollect specifically but that you thought it was the general

22   view of the value at that time, do you recall that testimony,

23   sir?

24   A.    I think that's largely consistent with what I said, yes.

25   Q.    Okay.  And at no point in discussing the 45.5 billion

94

1    dollar number yesterday did you offer any testimony that that

2    number reflected a negotiated settlement, did you, sir?

3    A.    I don't recall whether I did or I didn't.  I don't believe

4    I was asked about that number in that context.

5    Q.    In any event, you don't recall testifying yesterday that

6    the 45.5 billion dollar number was a negotiated number or a

7    negotiated settlement, correct?

8    A.    I don't recall specifically, no.

9    Q.    Okay.  And your testimony today, I take it, is that the --

10   very definitively, that the 45.5 billion number was, in fact, a

11   negotiated settlement number, correct?  Those were your words,

12   correct?

13   A.    That's my recollection.  I believe I showed a -- shown

14   a -- an email that Mr. Kirk -- an exchange between Mr. Kirk and

15   myself that evening and as I mentioned, it's not in this binder

16   but the insider folder which you guys have, of that manila

17   folder shows three -- I believe three separate values and I

18   believe that the Barclays value was 43.5.  That's consistent

19   with some notes that I also have.  The face value was about 50

20   and then there's a 45.5 number and I believe that to be the

21   negotiated amount.

22   Q.    And your testimony here today, I take it is that you don't

23   have any doubt in your mind that the 45.5 billion dollar was a

24   negotiated settlement number, correct?

25   A.    That's my testimony is that that's what I believe to be

08-13555-mg   Doc 8917   Filed 05/06/10   Entered 05/07/10 15:13:58   Main Document
Pg 95 of 228

95

1    the negotiated amount, yes.

2    Q.   And that that number was a number that was arrived at

3    pursuant to some sort of a negotiation between Barclays and

4    Lehman, correct?

5    A.   That's what I believe, yes.

6    Q.   And have you known that at all points in time since

7    September 19, 2008?

8    A.   Have I known it or have I recollected it?

9    Q.   Have you known it at all points in time --

10        MR. WERDER:   Well, withdrawn.

11   Q.   Did you know on September 19, 2008 that the 45.5 billion

12   dollar number was a negotiated number between Barclays and

13   Lehman?

14   A.   I believe I did.  I knew during that call that we had

15   reached agreement on value.  This is the call that was outlined

16   in Mr. Burian's notes that we went through.  And then

17   subsequent to that we came to the hearing and I believe at that

18   point I knew that that was the agreed upon value from Mr.

19   Kirk's email.

20   Q.   Well let me take you to a point in time prior to the call

21   with Mr. Burian first or during that call.  Did you know prior

22   to or during the call with Mr. Burian that the 45.5 billion

23   dollar number was the result of some sort of a negotiation

24   between Lehman and Barclays?

25   A.   No, I don't believe I knew that number.  I think the

96

1    values and the exchange was in flux before -- even during that

2    call.  So I didn't know any agreed upon number at that point.

3    Q.   And at some point during the call, did you receive some

4    information that gave you the 45.5 billion number as a new

5    number or some new information associated with the deal?

6    A.   I don't recall if it was specifically during that call and

7    I would have to go back and look at those notes again.  Around

8    that time was when the agreement on the value was reached.

9    Q.   And, in fact, during that call and we'll look at the notes

10   of it in more detail in a moment, but it was during that call

11   that you first presented Mr. Burian with the 45.5 billion

12   dollar number, correct?

13   A.   If I presented it during that call, we'll look at the

14   notes.  Then that would have been the first time, yes.

15   Q.   And when you presented that 45.5 billion number to Mr.

16   Burian, were you aware that the number was the result of a

17   negotiation of some sort between Barclays and Lehman?

18   A.   I believe that would have been, yes.

19   Q.   Okay.  And did you participate in that negotiation?

20   A.   I think I testified earlier that I was in and out of those

21   negotiations.  I was not in the room when the final number was

22   reached, no.

23   Q.   And do you know who was in the room when the final number

24   was reached?

25   A.   I wasn't in the room and I don't have any videotape of it,

97

1    so I don't know who was in the room, no.

2    Q.    Well who was -- were there discussions aimed at reaching

3    this agreement at some point in time when you were in the room?

4    A.    Yes, there were continual discussions and certainly as I

5    mentioned, Mr. Kirk was a part of those and then on the

6    Barclays side, Mr. Keegan and Mr. Ricci but I don't know how

7    the final number was reached.

8    Q.    And was -- from your perspective, was Mr. Kirk the

9    principle negotiator on this particular issue for Lehman?

10   A.    I would say he was probably the lead, yes.

11   Q.    And who else to your knowledge were participants in the

12   negotiations on Lehman's behalf with respect to the specific

13   issue of the negotiation of the 45.5 billion dollars?

14   A.    I think Mr. Kirk, was as I said, the principle lead person

15   on it.  Certainly, Mr. McDade was around the information.  I

16   don't know if he participated in any kind of bid-ask

17   discussion.  And I don't know if anyone else was involved in

18   that part of the discussions.

19   Q.    Okay.

20   A.    And I was in and out, as I said.

21   Q.    At least during the parts that you were in when you were

22   in and out, it was Mr. Kirk and perhaps Mr. McDade?

23   A.    Mr. McDade, I don't recall being in the room at that

24   point.  He was working on other things.  So, it was Mr. Kirk --

25   there was -- you know, certainly there were some junior -- more

98

1    junior folks from Lehman with us but they weren't negotiating.

2    I believe Mr. Shapiro, as I mentioned was in at least one of

3    the meetings but Mr. Kirk was the principle party.

4    Q.    And this negotiation was taking place on Friday morning,

5    the 19th, correct?

6    A.    That's correct.

7    Q.    And it concluded on Friday morning, the 19th, did it not?

8    A.    Some time during that day.  So I don't know if it was

9    still morning if it had become noon or afternoon, I don't know.

10   Q.    And based on your testimony here today then, it was a

11   negotiation in which Mr. Kirk participated with Barclays on the

12   morning of the 19th at which an agreed upon settlement --

13   negotiated settlement value of 45.5 billion dollars was

14   reached, correct?

15   A.    I think that's the way they came to that number, yes.

16   Q.    Okay.  And are you aware of any Lehman traders

17   participating in that negotiation?

18   A.    No, I am not.

19   Q.    Are you aware of any Barclays traders participating in

20   that negotiation?

21   A.    Unless you considered Mr. Keegan and Mr. Ricci traders,

22   no, I am not.

23   Q.    Did you consider them to be traders?

24   A.    Mr. Keegan runs a business that trades.  So I don't

25   consider him to be an on-the-desk trader.  He is responsible or

99

1   at least was responsible at that time for portfolio positions,

2   so, yes.

3   Q.   All right.  Just reviewing your prior testimony in this

4   lawsuit, and we talked about this briefly yesterday, but you

5   gave a deposition in September of 2009, correct?

6   A.   That's correct.

7   Q.   And at no point in your deposition in September of 2009 do

8   you recall testifying that the 45.5 billion number was a

9   negotiated settlement number, do you, sir?

10  A.   I don't recollect the specifics.  If I was asked the

11  question, I didn't recall it, then I didn't recall it.  If I

12  was asked the question and I recalled it, I would have said so.

13  Q.   Okay.  But sitting here today, I don't want to review the

14  entire transcript because it's kind of a negative proposition

15  but do you recall at any point in your deposition in September

16  of 2009, testifying that the 45.5 billion dollar number was a

17  negotiated number?

18  A.   I don't recall the specifics of that testimony.  If you're

19  telling me I didn't represent that, then it would be a question

20  of whether you asked the question.

21  Q.   Okay.  And then after that deposition at some point in

22  time, you had various communications with Barclays counsel that

23  led to your giving a declaration, correct?

24  A.   Yes, I believe the time sequence was that Barclays had

25  contacted me after the deposition.  That's probably around the

100

1    time I mentioned that I had some notes somewhere in that

2    vicinity and they also told me that they had notes from Mr.

3    Burian's deposition that they wanted me to take a look at.

4    Q.   And the declaration that you gave was not based upon your

5    notes but was based upon Mr. Burian's notes, was it not?

6    A.   Yes, that's correct.

7    Q.   In the declaration that you gave in January of 2010, you

8    didn't make any reference to the 45.5 billion dollar number

9    being a negotiated settlement number, did you, sir?

10   A.   I would have to take a look at what I said in paragraph 6

11   and 7.  I don't know if it was a negotiated settlement number

12   but I thought I said something about that being the agreed upon

13   value.

14   Q.   Okay.  We'll get to the declaration in just a moment.  But

15   before we do, is it your present recollection that your

16   declaration communicated that the 45.5 billion dollar number

17   was a negotiated settlement number between Barclays and Lehman?

18   Is that your recollection, sir?

19   A.   I think we'll get to the declaration.  It will say what it

20   says.

21   Q.   Well I want to ask you what your --

22   A.   I just told you --

23   Q.   -- did you have a recollection --

24   A.   -- I don't recollect what paragraph 6 and 7 say

25   specifically with respect to that number.

101

1    Q.   Okay.  And as you're sitting here right now, do you

2    recall, sir, in your March 2010 deposition ever mentioning that

3    the 45.5 billion number represented a negotiated settlement

4    value?

5    A.   This is my second deposition?

6    Q.   Yes.

7    A.   I don't recall the specifics, if that question was asked.

8    If it was asked and I recalled it, I would have said it.

9    Q.   Let me direct your attention if I could to your

10   declaration which is Exhibit 658 (sic).  Are you with me, sir?

11   A.   I don't think that's --

12   Q.   568, I am sorry.  I transposed the numbers.  I apologize

13   for that.  Are you there, sir?

14   A.   Yes.

15   Q.   Okay.  And I just want to review this declaration, a few

16   points of it.  First of all, paragraph 1 indicates you're

17   making this declaration to supplement your September 3, 2009

18   deposition testimony, correct?

19   A.   Yes.

20   Q.   Okay.  And then in paragraph 3, you talk about your

21   communications with the -- your role in the sale transaction

22   between the 16th and the 19th and you talk about the weekend as

23   well, correct?

24   A.   That's what I reference, yes.

25   Q.   Okay.  And then in paragraphs 5, 6 and 7, you discussed a

102

1    particular communication that you had with the committee,

2    correct?

3    A.   I just -- you're asking me about three paragraphs to

4    take --

5    Q.   Take your time.

6    A.   -- over a period --

7    Q.   Take your time.

8         (Pause)

9    A.   Yes, this references the communication that I had with Mr.

10   Burian on that Friday morning that you're --

11   Q.   Okay.  And that's what I really wanted to establish.  It's

12   clear, is it not, sir, that's what's being discussed in

13   paragraphs 5, 6 and 7 here are the Friday phone call that you

14   had with Mr. Burian?

15   A.   That's correct.

16   Q.   And it's not discussing the Sunday meeting that you

17   testified about in response to some of Mr. Schiller's

18   questions, correct?

19   A.   It's clearly referencing the Friday meeting.  There's some

20   discussion about how we consistently had this discussion.  And

21   that's certainly was part of my recollection of Sunday, as

22   well.

23   Q.   All right.  Let me direct your attention, if I could, to

24   Exhibit 1 to your declaration.  Those are the -- those are Mr.

25   Burian's notes that you reviewed in connection with preparing

103

1    the declaration, correct?

2    A.    That's correct.

3    Q.    And is it fair to assume that you reviewed those notes

4    fairly carefully?

5    A.    I certainly reviewed the notes.  They're not all

6    completely legible but I reviewed the notes.  I focused my

7    consideration on the last two pages.

8    Q.    All right.  And -- on the last two pages or the last three

9    pages?

10    A.    The last three pages.

11    Q.    Okay.

12    A.    The last two are really the focal --

13    Q.    And those were the pages that you thought reflected Mr.

14    Burian's notes of the discussion on Friday, correct?

15    A.    They appeared to, yes.

16    Q.    Okay.  And at any point in those notes do you see any

17    reference to Mr. Burian having been advised by you that the

18    45.5 billion dollar number was a negotiated settlement number

19    achieved or arrived at between Barclays and Lehman?

20    A.    I don't see any reference to negotiated, settled, no.

21    Q.    Okay.  And then we can go -- well let me ask you one more

22    question about the notes actually.  On the second last page of

23    the notes --

24    A.    Yes, sir.

25    Q.    -- the one that has 190 in the lower right hand corner.

104

1    A.   Yes.

2    Q.   Can you just -- I am looking at the circled numbers on the

3    right hand side of the page.  Are you with me?

4    A.   No, I am afraid I am not.

5    Q.   All right.  Well there's a reference there to 47.4

6    billion, correct?  Do you see where I am?

7    A.   Yes, they're not circled though.

8    Q.   Oh, I am sorry.  It's circled on my copy.

9    A.   Oh.

10   Q.   And there's a -- so there's a reference to 47.4 and you

11   understood that to be the total assets that were being conveyed

12   to Barclays and that's the number that was actually given to

13   the Court that afternoon, correct?

14   A.   Yeah, this was obviously before the Court.  I don't -- the

15   47.4, I believe is 45.5 and 1.9.

16   Q.   Right.  We'll -- that's right.  And you know that that

17   47.4 billion number was, in fact, presented to the Court that

18   afternoon, correct?

19   A.   I know that now, yes.

20   Q.   And you were at court and heard that number presented, did

21   you not, sir?

22   A.   I think we hit that three times.  I've said yes, I was in

23   court.  I don't have a specific recollection of hearing that

24   number.  I heard everything in court though.

25   Q.   Okay.  Given that this number is contained in Mr. Burian's

105

1    **notes of your communication with him, you don't have any doubt,**

2    **do you --**

3            MR. SCHILLER:  Objection.

4            THE COURT:  Grounds.

5            MR. SCHILLER:  I'm going to objection, Your Honor,

6    that there's no foundation for that on the face of this

7    document.

8            THE COURT:  Well I guess the foundation is your

9    examination.  I don't know if it's -- which page is part of the

10   conversation and which page is not part of the conversation but

11   isn't this the same set of notes that you used in your

12   examination this morning?

13           MR. SCHILLER:  I did, Your Honor.  At page 190, I

14   dealt with the notes above the line in the middle of the page.

15   Counsel's now referring to notes below the line which I didn't

16   examine on and saying they're part of a conversation.  I'm

17   objecting to that characterization.  It's not been his

18   testimony.  It may be if it's asked.

19           THE COURT:  Well, we're dealing with a sophisticated

20   witness who has been examined by you with reference to these

21   notes as if the notes all related to the conversation between

22   the witness and Mr. Burian and he's certainly in a position in

23   the same way as you did with your questions to decipher the

24   notes to the extent he can and to say what he thinks relates to

25   something that he said or didn't say to Mr. Burian.  So I will

106

1    overrule the objection.

2    Q.    And, Mr. Seery, did you in the call that you had with Mr.

3    Burian advise him that given the changes that had occurred in

4    the deal that the assets being conveyed were then being valued

5    at 47.4 billion dollars?

6    A.    I don't recall if I gave him the 47.4 or if I gave him the

7    45 plus the 1.9.  It appears that I gave him the 45 plus the

8    1.9.  I don't see the 1.9 referenced elsewhere.  But on the

9    first page, there's certainly the 45 referenced versus the 50

10   of the mark.  So I don't know how he came up with the 47.4,

11   looking at these.  I just don't have a recollection.  It does

12   equal the 45.5 plus the 1.9 --

13   Q.    And then --

14   A.    -- that are my  notes from Sunday.

15   Q.    Do you see right below that, sir, where it says -- it

16   appears to say "two cure, two employee"?

17   A.    Yes.

18   Q.    And is that information consistent with the information

19   that you gave to Mr. Burian concerning the liabilities that

20   were to be assumed in connection with this transaction?

21   A.    That's roughly consistent, yes.

22   Q.    And so the information that you gave to Mr. Burian on this

23   phone call would have been consistent with the idea that Lehman

24   was transferring 47.4 billion of assets in exchange for having

25   Barclays take on approximately 49.something billion dollars of

107

1  liability, correct?

2  A.   The 45 of the advance plus the two for cure and two for

3  employee, yes.

4  Q.   And so the deal that you described to Mr. Burian in this

5  phone call was a deal in which Lehman was achieving according

6  to the numbers that you presented, a net benefit of in excess

7  of two billion dollars, correct?

8  A.   Walk me through that, what you're doing there.

9  Q.   Well if you've got -- they were assuming the repo

10  liability, correct?

11  A.   Correct.

12  Q.   And that was 45 --

13  A.   They already owned it.

14  Q.   And the part -- the transaction was going to be to convert

15  that into a sale transaction, correct?

16  A.   That's correct.

17  Q.   And so the purchase price was going to be -- that was

18  going to be credited to them as their purchase price, correct?

19  A.   That's correct.

20  Q.   And that was approximately 45 billion dollars, right?

21  A.   Yes.

22  Q.   And then in addition to that, they were going to be

23  assuming this cure and employee liability, correct?

24  A.   That's correct.

25  Q.   And so the deal that you presented to Mr. Burian had them

108

1    taking the -- permanently taking the amount that had been

2    advanced under the repo and also taking on an additional four

3    billion or so of liability, correct?

4    A.    To be clear, they already had the -- they advanced the

5    amount.   They're taking the assets subject to the repo plus

6    they're assuming these two liabilities; a cure liability

7    estimated at two billion and an employee comp liability

8    estimated at two billion.

9    Q.    And the amount of the advance under the repo is being

10   converted into purchase price for purposes of the asset

11   purchase agreement, correct?

12   A.    That's correct but my point is that they had already

13   advanced it.   They're not assuming that liability.

14   Q.    Understood.   Yes, maybe my words were a little bit

15   imprecise.

16        Let me direct you back if I could then, sir, to paragraph

17   6 of your declaration.   And paragraph 6 and paragraph 7

18   described the conversation in some level of detail, do they

19   not, sir?

20   A.    The first sentence describes what I was told about Mr.

21   Burian's testimony.   I did not read it.   The second hits on my

22   recollection.   The third, my memory of stressing this

23   difference which was the basis and the reason for the number of

24   conversations we had.   You know, each sentence has a different

25   piece.   We can go through it.

109

1   Q.   Okay.  Well one of the things that that you communicated

2   to Mr. Burian in this phone call on the 19th was that certain

3   things had changed, correct?

4   A.   Can you say that -- can you ask that question again?  I --

5   Q.   Yes.

6   A.   I jumped around too much.

7   Q.   There had been some changes that had occurred that you

8   wanted to explain to Mr. Burian.

9   A.   It was to explain the whole deal, not just the changes.

10  Q.   Okay.  But in explaining the deal to him, among the things

11  that you explained were the change -- were certain things that

12  had changed from what had been filed with the Court earlier in

13  the week, correct?

14  A.   That's correct.

15  Q.   Okay.  And you say here in the second sentence of

16  paragraph 6, "My recollection is that the primary information

17  that had been -- that had changed was that Lehman's short

18  positions had been closed out," do you see that?

19  A.   Yes, I do.

20  Q.   And is that information that you received in the morning

21  of the 19th or the evening of the 18th?

22  A.   Yes, to be clear, consistent with my prior testimony, the

23  deal had changed.  We went through that.  And then as we were

24  on the call, additional changes were made including that short

25  position change.

110

1    Q.   Okay.  And I didn't mean to cut off the sentence

2    prematurely because what you say is, " My recollection is that

3    the primary information that had been -- that had changed was

4    that Lehman's short positions had been closed out and that the

5    estimated actual value of the Fed repo securities (as opposed

6    to their market value) had shrunk to approximately 45.5

7    billion."  Correct?

8    A.   That's what it says, yes.

9    Q.   And that's the information that you communicated to Mr.

10   Burian according to your sworn declaration, correct?

11   A.   That's what I wrote here, yes.

12   Q.   And the phrase that you used in describing your

13   communication with Mr. Burian was in connection with the 45.5

14   billion, was that that represented the "estimated actual

15   value," correct?

16   A.   That's what's used in this declaration.  Now you're asking

17   me if I used that when I spoke to Mr. Burian?

18   Q.   I'm asking you what's in the -- well that's certainly the

19   words that are in the declaration, are they not, sir?

20   A.   That's what in the declaration, yes.

21   Q.   And the declaration was intended to advise the Court and

22   others interested in this legal proceeding of what you had said

23   to Mr. Burian in that call, correct?

24   A.   I believe that's what the purpose was.  I never really

25   asked.

111

1    Q.    Okay.  And so, when you said here that one of the primary

2    changes that you advised Mr. Burian of was that the estimated

3    actual value of the collateral had shrunk, you meant exactly

4    what you wrote there, didn't you, sir?

5    A.    I did, yes.

6    Q.    And that's what you told Mr. Burian, right?

7    A.    I told Mr. Burian that the value of the collateral was

8    approximately 45.5 and we went through the reasons that it

9    could be 50.6 or it could be less.  So as I previously

10    testified, we talked about value.  The actual value -- again, I

11    say estimated in this declaration -- the actual value, what you

12    could realize for these securities in that market at that time,

13    we didn't have a precise figure.  We had estimated amount.

14    Q.    Well, sir, the words estimated, actual value appear in the

15    declaration that you signed.  Is it now your testimony that

16    those were not the -- that was not the -- those were not the

17    words that you spoke to Mr. Burian in describing the 45.5

18    billion?

19    A.    I don't believe I used those words and I don't believe in

20    this declaration that I said that I actually used those words.

21    So those are a rough approximation of the type of words that --

22    we talked about value, estimated actual value is what the

23    declaration says.

24    Q.    All right.  And the declaration --

25    A.    I didn't say that that's what I said to him.

112

1    Q.   The declaration doesn't say anything about negotiated

2    settlement value, does it, sir?

3    A.   No, it does not.

4    Q.   And there's nothing that's contained anywhere in your

5    description of the conversation that you had with Mr. Burian on

6    the 19th that makes any reference whatsoever to the concept

7    that the value that was the 45.5 billion value that you were

8    giving to him and that later was presented to the Court was a

9    negotiated value, correct?

10   A.   There's nothing in the declaration.  There's some

11   reference to it in his notes.

12   Q.   You're talking about the notes of the Sunday -- the ones

13   that you reviewed the other night?

14   A.   No, the notes that are in the back of this that reference

15   the haircuts.

16   Q.   And they reference a negotiated number there, sir?

17   A.   No, they reference a range.  You asked me about them

18   yesterday.

19   Q.   No, I am asking you, sir, specifically about the concept

20   of negotiated settlement value at this point.

21   A.   There's no reference to negotiated settlement value in

22   this declaration, no.

23   Q.   And there's no reference to a negotiated agreement on the

24   value of those securities -- that's more general than the

25   phrase negotiated settlement value, is there, sir?

113

1    A.    Do you mean in this declaration?  No, there's not.

2    Q.    Okay.  And then let me direct your attention, if I could,

3    sir, to paragraph 7.  Paragraph 7 says in its first sentence,

4    "The notes also refreshed my recollection that Lehman traders

5    independently assessed the value of the Fed repo collateral

6    under the stressed market circumstances at the time and the

7    assets that went to Barclays when Barclays replaced the Fed

8    repo."  Do you see that, sir?

9    A.    I do, yes.

10    Q.    Okay.  Is that information that you conveyed to Mr. Burian

11    and his colleagues in the course of this phone call on the 19th

12    of September?

13    A.    I don't recall if I specifically talked about the traders.

14    Certainly his notes reference those types of haircuts or

15    adjustments.  I believe that when Mr. Burian would ask why 50.6

16    versus 45, that I would have told them, look, Barclays has a

17    lower view and we've done some work and there's challenge to

18    these marks.

19    Q.    And the -- you did make reference then to the notion that

20    your traders had done an independent assessment of the

21    position; is that correct, sir?

22    A.    Yes, I believe so.

23    Q.    And when you described the input that the traders had

24    given, did you talk to Mr. Burian about the fact that the

25    traders had given that input that morning in response to your

114

1    request that they give you liquidation bids for the collateral?

2    A.   I don't believe that I went into -- I would have -- I

3    don't recollect the specific words but I don't believe I would

4    have gone into that level of detail, no.

5    Q.   And Mr. Burian, you've described as a fellow bankruptcy

6    professional, correct?

7    A.   Yes, he is.

8    Q.   And did you tell him that the work that the Lehman traders

9    had done to independently assess the value had been done at

10   your direction for the specific purpose of giving Mr. Ridings

11   what he needed for his testimony that day?

12   A.   I don't recollect whether I told him that or not.

13   Certainly if he had asked, I would have.  I wasn't trying to

14   hide that from him.  That would have been in the normal course

15   of our conversation that we did it to prepare Barry.  He knows

16   Barry well -- personally as well.  But I don't recollect having

17   that conversation, no.

18   Q.   All right.  And you would agree with me, would you not,

19   sir, that paragraph 7 doesn't make any reference, just like

20   paragraph 6 didn't to the 45.5 billion dollar number being a

21   negotiated number?

22   A.   No, it does not.

23   Q.   And the declaration stops there.  It doesn't discuss the

24   meeting on Sunday at Weil, correct?

25   A.   No, it does not.  I just signed it or agreed to have it

115

1    signed from Alta (ph.) and went skiing.

2    Q.    Okay.  Separate and apart from the declaration, sir, would

3    you agree with me that on Friday, the 19th, you did not advise

4    the committee that the 45.5 billion dollar value number was a

5    number that had been achieved through negotiations between

6    Barclays and Lehman and that it represented a negotiated

7    settlement value?

8    A.    I certainly didn't use the words negotiated settlement

9    value.  I believe I told them we had arrived at 45.5 but I

10   don't recollect the exact circumstances.  His notes certainly

11   reference it.  I don't recollect exactly how I came to give him

12   that number.

13   Q.    Well you certainly gave him the 45.5 billion dollar

14   number, correct?

15   A.    I believe I did, yes.

16   Q.    And there's nothing in your sworn statement from January

17   of 2010 that suggests that you associated that number in any

18   way with any sort of a negotiation between Barclays and Lehman,

19   correct?

20   A.    There's nothing in his notes -- there isn't.  And there's

21   nothing in his notes that would have given me that refreshment

22   of my recollection.

23   Q.    And this was a declaration, I think we established

24   yesterday that you worked on with the Barclays lawyers,

25   correct?

116

1   A.   We went through it pretty quickly.  Barclays prepared a

2   draft for me.  I was out of town.  We exchanged notes.  I

3   marked it up.  7:00 in the morning Utah time, I marked it with

4   my secretary on the phone, had her send back a pdf to Barclays

5   and agreed to that.

6   Q.   And when you received the draft from them, sir, do you

7   recall whether in paragraph 6 that draft used the language

8   estimated actual value?

9   A.   I really don't know.

10  Q.   Okay.

11  A.   It would --

12  Q.   I mean --

13  A.   Are you asking me if I put those words in?

14  Q.   Well I am asking -- no, actually what I am asking is if

15  those words were in the draft that you received from Barclays

16  counsel.

17  A.   I have no idea.

18  Q.   Okay.  You just don't remember enough about the back and

19  forth process.

20  A.   No, not at all.

21  Q.   Were there changes that you made to it after you received

22  their draft?

23  A.   There were definitely some changes; some I can recall,

24  some that I don't but I don't recall all of them.

25  Q.   Okay.  But you were fine with the phrase estimated actual

117

1    value, correct?

2    A.    I signed it.  To be frank, I didn't focus on it.

3    Q.    Okay.  And you were fine with the fact that it didn't make

4    any reference to negotiated settlement value or to the 45.5

5    billion dollar number being the result of some sort of a

6    negotiation between Barclays and Lehman, correct?

7    A.    There was nothing in those notes that brought that to

8    mind; negotiated settlement value is your term.  If you like

9    it, we can stick with it.

10   Q.    Okay.  You attended the hearing -- we talked about the

11   hearing and I think you testified in response to Mr. Schiller's

12   questions that you sat right up at the bar right behind the

13   Weil Gotshal lawyers; is that correct?

14   A.    That's correct.

15   Q.    And right next to Mr. McDade?

16   A.    That's correct, yes.

17   Q.    All right.  And you testified, I think that you were maybe

18   kind of in and out for some portions of the hearing but were

19   you in during the portion when Mr. McDade's testimony was

20   proffered and when he took the stand and testified?

21   A.    I was, yes.

22   Q.    Okay.

23   A.    I was in and out and at times, you would lose your seat

24   because it was crowded.

25   Q.    Did you get pushed to the back of the courtroom after you

118

1    left?

2    A.   I don't think I ever ended up too far back but I did lose

3    my seat now and again.  But I was in the room for Mr. McDade's

4    testimony, yes.

5    Q.   Okay.  And you were close enough to communicate with

6    counsel if you felt the need to do so, weren't you, sir?

7    A.   Yes, I was.

8    Q.   All right.  And did you -- since you were here for Mr.

9    McDade's testimony, did you hear him testify about a line by

10   line valuation that existed within Lehman that justified the

11   47.4 billion dollar number that Ms. Fife presented to the

12   Court?

13   A.   If he so testified and you're represented that, then I

14   certainly heard it.

15   Q.   And did it concern you, sir, that when the 47.4 billion

16   number was presented to the Court, it wasn't in any way

17   described as a negotiated settlement value?

18   A.   I don't recall the specifics of the 47.4 number, as I

19   said.  I just don't recollect -- I am sure she said it and I am

20   sure I was here for it.  The line by line reference you make

21   is, I would have thought would have -- if that's what he said,

22   would be the typical review that Lehman normally does and as I

23   described, generally marking its books.  So each one of the

24   lines has a security value for it, whether -- I don't know

25   whether Mr. McDade testified that that was an up to date

119

1    valuation done that day, I just done recollect that.

2    Q.   Well you would agree with me, would you not, sir, that to

3    the extent that the 47.4 billion that was presented to the

4    Court consisted of 45.5 of securities and 1.9 of the

5    unencumbered boxed assets that we talked about yesterday, that

6    the 45.5 was not arrived at pursuant to a line by line

7    valuation of the type that Lehman typically did when it marked

8    its books, correct?

9    A.   I would agree with that, yes.

10   Q.   Okay.  Because you know that that number -- and you knew

11   at the time that that number was, in fact, the result of some

12   sort of a negotiation between Lehman and Barclays, correct?

13   A.   Yes, it's absolutely clear that the face of the securities

14   was 50.6.

15   Q.   And whatever reference was made to line by line valuation

16   by Mr. McDade would not have been intended to reflect a line by

17   line valuation that produced a value of 45.5 billion dollars,

18   correct, sir?

19   A.   You lost me on the second part of your question.

20   Q.   Well I will try it again.  Whatever line by line valuation

21   existed within Lehman with respect to these assets, in fact had

22   a number higher than 45.5 billion, correct?

23   A.   That's correct.  I think I said 50.6.  I think the actual

24   number we looked at was forty-nine and change.

25   Q.   All right.  And when the 47.4 billion dollar number was

120

1    presented and Mr. McDade testified about the valuations that

2    existed within Lehman with respect to the assets and described

3    them as line by line valuations, you knew, did you not, that no

4    line by line valuation existed within Lehman that would support

5    45.5 billion dollars.

6    A.   I don't recollect Mr. McDade's testimony on that specific

7    item.  I knew that that number was a negotiated number by that

8    point.  And that that was the number that was agreed upon.  So

9    it would not have reflected a line by line valuation --

10   Q.   All right.

11   A.   -- done by Lehman's traders, no.

12   Q.   And Mr. McDade was also asked about internal valuations

13   and valuations conducted within Lehman and at no point in time

14   did you suggest to anybody, hey wait a minute, those line by

15   line valuations, those internal valuations, that's not what

16   supports the 45.5 billion dollars, correct, sir?

17   A.   I don't think it came up in that fashion but I certainly

18   did not raise it in that way, no.

19   Q.   All right.  But just to make clear, you were fully aware

20   that the number that was being presented to the Court was not a

21   number that was consistent with or supported by the Lehman

22   internal line by line valuations, correct, sir?

23   A.   I didn't believe it to be.  I did not have the line by

24   line valuations at that point.  I think I testified that I got

25   those on Sunday.

121

Q.   And you knew, did you not, that the number that was

presented to the Court was, in fact, the result of some sort of

negotiation between somebody that you don't -- whose identity

you can't completely identify, correct?

A.   The number was negotiated away from me but I did know it

was a good negotiated number with respect to these securities,

yes.

Q.   At any point in time during the hearing before the Court

on September 19, did it occur to you that perhaps the Court

ought to be advised that the 45.5 billion dollar number was a

negotiated settlement value rather than a number arrived at

pursuant to Lehman's normal mark to market practices?

A.   No, it did not.

Q.   And at any point in time during the hearing on September

19, did it occur to you that the Court ought to be advised that

Barclays had been involved in the process of arriving at these

values rather than having a process that was totally internal

to Lehman?

A.   I'm not exactly sure what you just conflated in that

sentence.  If you're saying did I advise the Court that

Barclays had a view that was different from Lehman's?  No.  Is

that typical, everyday in securities?  Everyday.  There's a bid

and an ask, sir.

Q.   No, the question was slightly different, sir.  The

question was at any point in time, did it occur to you that the

122

1    Court ought to be advised that these valuation numbers that

2    were presented were numbers that were achieved with the

3    participation of Barclays rather than through Lehman's normal

4    process?

5    A.    That they were the negotiated settlement amount?  No, I

6    didn't think that was something I had to advise the Court.  If

7    it had occurred to me, I would have advised the Court.

8    Q.    Okay.  Let's switch our attention then if we could to the

9    Sunday meeting that you had with the committee representatives

10   if we could.  And you could put aside the book I gave you

11   yesterday if you would, sir, and take Mr. Schiller's book.

12       I want to direct your attention first to tab 6, Barclays

13   BCI Exhibit 650.

14   A.    Yes, sir.

15   Q.    And these are your notes, I think we established on Mr.

16   Schiller's examination, correct?

17   A.    Yes, they are.

18   Q.    And my -- I may have missed this but the pages that relate

19   to the Sunday meeting are 66, 67 and -- 66 and 67; is that

20   correct?

21   A.    I think I testified they may all relate to the Sunday

22   meeting but I know for sure -- I don't know that the binder --

23   this manila folder that's copied on the first page was

24   necessarily related to it.  Certainly I had notes inside this

25   binder when I found them or this folder.

123

1       The second page of the folder, the inside flap as I

2   testified, appears to be missing, I am not sure why.  You guys

3   have it.  I produced it to you.

4       The page 66 is clearly from that meeting because Mr.

5   Daniello's name is written up at the top.

6       67 is from that meeting.  It's the numbers we reviewed at

7   the meeting and discussed as the cash with JP where we were

8   talking about it.

9       68, I am not sure.  They're in sequence.  I don't usually

10  do notes out of order but I just -- it doesn't reference

11  anything specific from that meeting.

12      And 69 is from that meeting.

13  Q.   Okay.  So you think that probably all four of those pages

14  related to the -- potentially relate to the meeting.

15  A.   I believe so.  I think that's what I said.

16  Q.   Okay.  And there's nothing in your notes of that meeting

17  on Sunday, is there, sir, that indicates that the assets were

18  being valued based on a negotiated settlement between Barclays

19  and Lehman, right?

20  A.   I don't believe I had ever used those words in my notes.

21  Q.   Okay.  You never used those words in connection with the

22  deal until your testimony here this morning, correct, sir?

23  A.   I think I told Saul that we cut a deal.  So I probably

24  never used negotiated settlement amount. I think those are your

25  words.

124

1    Q.   Okay.  Let me direct your attention if I could to the --

2    there was a big exhibit that Mr. Schiller gave you, Exhibit

3    739.

4    A.   Yes.

5    Q.   Do you have that one?

6    A.   Uh-huh, yes.

7    Q.   Is this a spreadsheet that reflects all of the assets that

8    were in the Fed facility?  Is that your understanding of what

9    it is?

10   A.   It certainly is laid out in spreadsheet type form.  It's

11   obviously not Excel.

12   Q.   And is this a standard --

13   A.   On a system.

14   Q.   And is it a standard form of document that would have been

15   created with then Lehman at the time?

16   A.   This is not the kind of document that would be circulated

17   anywhere in Lehman other than in Treasury.  So I believe it's

18   standard.  I don't really know to be honest with you.  It

19   wouldn't -- you never know how your positions are financed.

20   Q.   Do you have any understanding about how or for what

21   purpose this document was prepared?

22   A.   I believe this document was prepared by Mr. Tonucci or his

23   office to reflect all of the securities that were delivered out

24   of Lehman at the clearing broker's account and into Barclays.

25   Q.   And this document, was this present in one or more of the

VERITEXT REPORTING COMPANY

212-267-6868                                          516-608-2400

125

1   meeting rooms that you were in on Sunday?

2   A.   I think I've testified both yesterday and today that this

3   document was or a form of this document was in those meetings.

4   That my recollection is that it was on larger either legal or

5   ledger size paper, that it wasn't bound -- I don't believe I

6   testified, it wasn't bound like this.  It was just clipped or

7   stapled and it was probably one-sided, not two-sided.

8   Q.   Okay.  And did you first see this document some time on

9   Sunday, the 21st; is that the first time you saw it?

10  A.   In this form, I believe that's the case, yes.

11  Q.   And by this form, do you mean to encompass the larger size

12  that you described it as what you actually thought you saw on

13  Sunday?

14  A.   I'm sorry, as laid out in this format.  In this form, it

15  wasn't exactly in this form as I previously testified.  In this

16  format, this would be the first time I had seen these positions

17  laid out this way.

18  Q.   Okay.  And I think it was your testimony that the

19  committee had access to this document; is that correct?

20  A.   They had copies, yes.

21  Q.   And they were given that on Sunday?

22  A.   Yes.

23  Q.   Okay.  And you would agree would you not, sir, that the

24  committee didn't have any ability to value this portfolio

25  independently on Sunday, September 21, correct?

126

1   A.   I don't think they could have valued this portfolio, no.

2   Q.   Okay.  Then you were asked some questions -- you could put

3   that aside, sir.  I want to direct your attention to tabs 12 to

4   14 of Mr. Schiller's book.

5   A.   Yes.

6   Q.   And you were asked some questions about those documents

7   and the first thing I want to ask you is whether in the -- we

8   talked about yesterday we talked about your preparation

9   sessions on Sunday and Monday.

10  A.   Yes.

11  Q.   Did you see these -- any of these documents in your

12  preparation session on Sunday and Monday?

13  A.   I believe I saw some of them.  I don't know that I saw all

14  of them.

15  Q.   Can you tell me which ones you saw?

16  A.   I may have seen this first part, excuse me, of 12.  I'm

17  pretty sure I saw the second part of 12 which is -- I guess

18  that Milbank 13437 and 8.  I believe I saw 13.  I don't know if

19  I saw 14 and I -- I don't know if I saw the cahoots or just

20  heard the cahoots and seeing it wasn't pleasant.

21  Q.   And so in addition to seeing these documents in your

22  preparation session, did you discuss them with Barclays counsel

23  and how they might be used for purposes of your testimony?

24  A.   A little bit, yes, but frankly I was surprised the way Mr.

25  Schiller actually used them.

127

1    Q.    Let me -- I won't ask you why you were surprised, but let

2    me --

3    A.    If you would like I will tell you.

4    Q.    No, that's okay.  I don't -- I think we can keep that a

5    secret for now.

6          Tab 12, Exhibit 813-A, Barclays Exhibit 813-A.  Let me --

7    I want to direct your attention to the page that -- the part of

8    the document that begins with 13437.  And in particular --

9    A.    Yes.

10   Q.    And that's a document that you think you saw in your

11   preparation session on Sunday or Monday; is that correct?

12   A.    I think I did, yes.

13   Q.    All right.  And let's look at the second page of that

14   document which is part of the exhibit, the one that has 438 as

15   the last three numbers.

16   A.    Yes.

17   Q.    And I want to ask you, sir, in the second full paragraph

18   on that page, there's a statement there that says "We were told

19   that some of the mark shown in schedule A were out of date."

20   Do you see that?

21   A.    I do, yes.

22   Q.    First of all, were you involved in the entirety of the

23   session between Lehman and the committee that's being described

24   in that paragraph?

25   A.    I think I was involved in virtually all of it, the

128

1    entirety.  You phrase it in a way that would indicate that if

2    they left the room, I followed them and if they went to another

3    room, I followed them, no.  There were rooms as I believe I

4    testified, there were a number of conference rooms where folks

5    popped in and out of and even my discussions with the committee

6    took place in at least two conference rooms and sometimes in

7    the hallway.  So for the vast majority, I believe I was but

8    there may have been other discussions.

9    Q.   All right.  All right.  Well just let me just lay a little

10   more context for the paragraph then if I could.  I think you

11   testified in response to Mr. Schiller's question -- one of Mr.

12   Schiller's questions that you don't think that a few hours

13   passed, correct?

14   A.   Yes.

15   Q.   Okay.  And then -- but regardless of how much time passed,

16   this note refers to Lehman came and got us and sat us down to

17   try to show us how things added up and do you associate that

18   phrase, that sentence fragment with a particular meeting that

19   was held with the committee?

20   A.   No, these aren't my statements.

21   Q.   No, I know.  I am just -- I am trying to ask you, sir,

22   whether when whoever wrote these notes said Lehman came and got

23   us and sat us down to try to show us how things added up,

24   whether -- I mean is that what happened?

25   A.   Not exactly, no.

Q. Okay. Was there in response to some set of questions that the committee had raised, a point in time where Lehman came and got the committee, brought them to another room and provided them with some information?

A. The first part of that sentence again just doesn't do justice to the actual setting. After the big meeting broke up, the committee came across -- immediately came to me and we began these discussions. They had the document. They had taken a look. It was consistent with my previous conversation with Mr. Burian. We talked about that difference. They looked at the document and started going through specific numbers on the document.

I can't look at this document and take a particular security and tell you whether that's a good value or a bad value. I couldn't have done it on Sunday night. That's -- those discussions continued several times in different rooms. So the idea that a few hours passed, it seems like the way it's written, they were hidden in some room. Then we came and summoned them and brought them in for their little audience and sent them out, is not at all the way this happened.

Q. Well regardless of what -- how much time passed, who was in what room, was there, in fact, in response to questions raised by the committee some presentation that was made to them that attempted to show us how things -- show them how things added up?

130

1    A.    There was a hearty given and take on those numbers, yes.

2    There wasn't a presentation the way you've described it.

3    Q.    Okay.

4    A.    And the reason I focused previously on whether we went and

5    got them is because that's how you asked the question.

6    Q.    Okay.  And were you the person that -- I mean I know you

7    were involved in the meeting, you testified to that already,

8    but were you the person who was attempting to explain to them

9    how things added up or was that somebody else?

10   A.    That was me, yes.  I had help.

11   Q.    And who helped you?

12   A.    I believe Paolo was with me at the time, Paolo Tonucci.

13   Q.    Anyone else?

14   A.    I don't recollect anyone else.  I think I testified that

15   Klein and Miller came in at some point and Klein went through

16   an analysis of it.

17   Q.    Okay.

18   A.    But Burian and Despins know me and they wanted to talk to

19   me.

20   Q.    And in explaining the situation to them, did you tell them

21   that some of the marks that were shown on schedule A were out

22   of date?

23   A.    Again, I don't recall using the term out of date.  And

24   it's written in quotes.  So I don't recollect that being a term

25   that I used at all.  They were wrong.  They might have been

131

1   described as stale versus the market. I just don't recall the

2   specific terms we used. But the challenge was that Barclays

3   viewed it was lower. We viewed it as higher but we did

4   understand their query with respect to a challenge to the marks

5   that we had and there might have been some legitimacy to some

6   of that.

7   Q. All right. I understand that part of it, sir. I just

8   want to focus on the phrase out of date -- the marks -- some of

9   the marks being out of date.

10   A.   Uh-huh.

11   Q.   And the only question I have is whether it's a situation

12   where you just don't remember one way or another whether you

13   said that or whether to the best of your recollection you

14   didn't say that.

15   A.   I don't think I said it. I don't remember one way or the

16   other but I may have. I just don't know. This is a document

17   written by someone who I have no idea who wrote it. Don't know

18   where it came from. Don't know why it's in quotes. I doubt

19   they were in the meeting.

20   Q.   Okay. And then at the end of that paragraph, there's this

21   discussion here about the parties agreeing to the five billion

22   dollar discount, and the phrase that's on the page there is

23   "the appropriate mark to market adjustment for the securities."

24   Do you see that, sir?

25   A.   I do, yes.

132

1   Q.   And is that -- without focusing on the specific language,

2   is that statement consistent -- is that summary consistent with

3   the information that you and your colleagues provided to the

4   committee on Sunday night?

5   A.   I think it's consistent, the five billion difference

6   between the amount they advanced and the face amount of those

7   securities is consistent.  And if the connotation of that is

8   that we adjusted it as part of that negotiation to get closer

9   to that current market, then that connotation would be correct.

10  Q.   And, sir, the phrase that is written on the exhibit refers

11  to the adjustment being described as the appropriate mark to

12  market adjustment for the securities, do you see that?

13  A.   I see it, yes.

14  Q.   And my question is do you recall one way or another about

15  whether that was, in fact, the way that it was described?

16  A.   I don't recall that one way or the other as being the way

17  I described it, no.

18  Q.   Okay.

19  A.   As I said, it's --

20  Q.   Very good.  At any point in time during this session or

21  this set of sessions on Sunday night, did you tell the

22  committee about the liquidation analysis -- the liquidation bid

23  analysis that you had had performed on Friday morning?

24  A.   I believe there's reference in one of the myriad of

25  document that I have been shown over the last couple of days

1    that some of your clients wrote that actually references the

2    discussion of the traders.  So my supposition is that I did

3    have some discussion there.  I don't have a specific

4    recollection of that, other than we looked at the marks that we

5    had, that our traders checked them, there's definitely some

6    issue.  Barclays thinks they're a lot lower but Barclays is

7    negotiating.  This is the number we came up with.

8    Q.    And when you refer to the document, the notes from the

9    committee, is that -- are you doing anything other than

10   reporting what that document says at this point in time, sir?

11   A.    No.

12   Q.    Just -- it doesn't -- it hasn't created in your mind a

13   present recollection.  It's rather a document that would be,

14   since you're a lawyer, past recollection recorded; is that

15   correct, sir?

16   A.    Well you test my evidence knowledge.  I think the -- what

17   it does -- it doesn't recollect for me or bring back, refresh

18   specific words that I used but that would be part of the

19   discussion.  I do recall having the discussion with them about

20   the values.

21   Q.    Well --

22   A.    This was the central issue that we were discussing.  There

23   wasn't much reason to be hanging out there in the middle of the

24   night if this was straight up forty-five billion for forty-five

25   billion.  There was a difference between where they were marked

134

1    and what they were paying.

2    Q.    And so that we remove the mystery from the issue, sir,

3    what is the document that you are referring to that you say

4    describes the exercise that your traders went through?

5    A.    Well the one that I was referring to actually was just the

6    paragraph below.

7    Q.    Oh, so we're at tab 12, still?

8    A.    Yes, I must -- whoever wrote this, if they had any good

9    summary although there are things I clearly disagree with in

10   this summary, but they certainly reference that somebody told

11   them about an adjustment based on at least to some degree some

12   various traders.  We didn't adjust it based upon the traders'

13   assessment.  It was part of, as we talked about, the negotiated

14   settlement amount in your words.

15   Q.    Okay.  So we started down this line, sir, when I think I

16   asked you about whether you had told the committee about the

17   liquidation bid analysis that you had -- I don't want to

18   glorify it with the word commissioned necessarily but I will

19   use that word on the morning on Friday the 19th.

20   A.    Correct.

21   Q.    That's where -- that was the jumping off point for this

22   and are you suggesting that the -- this third paragraph on

23   Exhibit 813-A is a paragraph that's referencing that

24   litigation -- that liquidation bid analysis?

25   A.    I don't know.  That appears to be the case to me.  Again,

135

1    it's not my document.

2    Q.    Okay.  Let me -- you did direct our attention to that

3    paragraph.  And is it true, sir, that on those -- on Sunday,

4    the 21st, you were unable to tell the committee who at Lehman

5    actually agreed to the adjustment?

6    A.    No, that wouldn't be true.

7    Q.    So is it your testimony that at some point on the evening

8    of the 21st, that the committee was told who negotiated it?

9    A.    I don't recall a discussion about who negotiated it.

10   Certainly if they said well how the -- who came up with this

11   and we used the -- we came up with it, if they said who the

12   heck came up with this; Mr. Kirk and Mr. McDade were there.

13   Q.    Well, sir, the note here says "various traders" was who

14   actually agreed to the adjustment.  And my question to you,

15   sir, is do you have a recollection one way or another about

16   whether the committee was informed in response to their

17   question that "various traders" came up with these numbers?

18   A.    I think I just testified that I don't recall getting the

19   question.  There's two names on this sheet, neither of whom

20   were in any of these meetings that I recall but they reference

21   Lori Fife and Hal Novikoff.  And then you go through a whole

22   section on page 2, you asked me to talk about it, describing me

23   when no one's name is mentioned.  Heck of a meeting.

24   Q.    Well the only question I am asking you, sir, is at any

25   point in time do you recall being asked the question --

136

1    A.    And I said no.

2    Q.    Well, withdrawn.

3          You testified that many times in response to Mr.

4    Schiller's questioning that the committee was told that the

5    number was a negotiated number, correct?

6    A.    I believe so, yes.

7    Q.    Okay.  And at any point in time, do you recall without

8    regard to these notes, do you recall being asked well, who was

9    it that did the negotiation?

10   A.    No, I said we came up with the number which would have

11   included the senior group at Lehman.  As I have told you, I

12   wasn't personally involved with that but if my managers tell me

13   that's the number, that's the number I am going with.

14   Q.    So other than "we", you don't have any more specific

15   recollection of any information that you provided to the

16   committee concerning who it was that conducted this negotiation

17   that you now described?

18   A.    The committee was in the room and came over.  Mr. Kirk was

19   there.  Mr. McDade was there.  Later Mr. Tonucci was there.

20   Nobody ever said which one of you guys actually inked this

21   number?  It was clear that all of us had agreed to that number.

22   Q.    Well you had agreed to that number on Friday, you

23   testified previously, correct, sir?

24   A.    I believe that's right.

25   Q.    The 45.5 billion dollar number was agreed to not on Sunday

VERITEXT REPORTING COMPANY

212-267-6868                                              516-608-2400

137

1   but on Friday, right?

2   A.   I believe that's correct, yes.

3   Q.   Okay.  And so when -- according to your testimony in

4   response to Mr. Schiller's questions, you told the committee

5   that in fact the number was a negotiated number, what do you

6   recall other than we, if anything, about how you responded to

7   the committee when they asked you who did the negotiation?

8   A.   Third time; I don't recall ever being asked who

9   specifically did the negotiation.

10  Q.   So to the extent that this exhibit which Mr. Schiller

11  introduced refers to the response being "various traders" is it

12  your testimony that that's just dead wrong?

13  A.   Yes.

14  Q.   Okay.  And --

15  A.   Just -- just -- it would be absurd for me as a senior

16  person at Lehman Brothers to have someone ask me who negotiated

17  this number and I just come back with various traders and Saul

18  Burian, one of the more aggressive guys I know goes okay,

19  that's a good number.  That's -- I like that answer.  That's

20  acceptable.

21  Q.   So as far as you're concerned, what's written on this

22  email or on this memo is just flat out wrong with respect to

23  the "various traders."

24  A.   Yes, that's correct?

25  Q.   Okay.  And I think you said that as far as you're aware,

138

1    the person who wrote this email -- this memo wasn't in the

2    meeting.  Now where are your --

3    A.   I said I have no idea who wrote this meeting (sic).

4    Q.   Ah, okay.

5    A.   It references things that didn't happen and it doesn't

6    mention anybody's name.  So I doubt they were in the meeting.

7    Q.   Okay.  And other than the response "various traders" and

8    the few hours after we raised the issue, this discussion

9    occurred, what else that's listed -- that's described in his

10   memo never happened, sir?

11   A.   Do you want to go through line by line?

12   Q.   Uhm.

13   A.   We could start at the beginning.

14   Q.   Well --

15   A.   It's not my memo and I have never really read it but if

16   you want me to review every word and that's okay with the

17   Court, we could do that.

18   Q.   I just -- I just want to focus on Sunday night.  Okay?

19   A.   I would have to read the whole thing and check each line.

20   You're asking me what in here don't I agree with it?  Is

21   that -- do you want me to adopt this?

22   Q.   No, I am asking -- you said that a bunch of things in this

23   memo never happened.

24   A.   I gave you -- I gave you two.  Do we need more?

25   Q.   Do you have another one?  Just give me one more and then I

139

1    will be satisfied.

2    A.    We got the few hours.

3    Q.    Got that one.

4    A.    I don't know about the out-of-date.  We got the various

5    traders.

6    Q.    Okay.

7    A.    I can't adopt the third -- the next paragraph at all.  I

8    don't know it.  Should we keep going?

9    Q.    No, I think we're done with Sunday night after that

10   anyways and that's what I wanted to focus your attention on,

11   sir.

12   A.    Okay.

13   Q.    Let me direct your attention if I could to tab 14 of Mr.

14   Schiller's book which is Exhibit Barclays 814.  And I think you

15   said you don't recall Mr. Geer being at the meetings that are

16   referenced on Sunday night, correct?

17   A.    I have a vague recollection that he wasn't there, that he

18   might have gotten called back to Minneapolis.  I don't know why

19   I have that.  It's just one of my recollections.

20   Q.    Okay.  And just a couple of real specific questions.  If

21   we look in the second full paragraph and to the -- there's a

22   sentence, one, two, three, four, five lines up that says, "They

23   went through the deal."  Do you see that, sir?

24   A.    Five lines from the bottom, yes.

25   Q.    They went through the -- "They went through the deal and

140

1    when it came to making the whole thing balance out, they

2    referred to the draft schedule A and said basically that 'these

3    marks on the draft schedule A are from the Lehman system but

4    they're old, outdated.'".  Do you see that?

5    A.    I see it, yes.

6    Q.    And is that, in fact, information that you provided or

7    others at Lehman provided to the committee on Sunday night?

8    A.    Again, Mr. Geer who I do not believe was at the meeting

9    seems to be quoting folks in the meeting.  So you read the

10   quotes and I don't think those to be accurate.  I don't recall

11   the words, "old, outdated."  We did say that the markets had

12   moved and these marks may not be correct and negotiated it.  So

13   what this sentence says to me is on Sunday night, they knew

14   that this was a negotiated amount and it was a five million

15   difference between the -- it actually doesn't reference the

16   dollar amount in that but up above does, between the marked

17   amount and the amount that Barclays was going to pay for those

18   securities.

19   Q.    And, sir, I take it that directing your attention to the

20   portion of the paragraph that says, "It was agreed to between a

21   few of our traders and the Barclays guys," that that's not what

22   to your recollection occurred, correct?

23   A.    No, and I think when you get a memo like Brad did two

24   weeks before or three weeks before, whenever that last memo was

25   done and then that's in quotes and someone wrote that, and then

141

1    he does it in quotes and then two years later you come up to me

2    and tell me that those are the words that were said; can't

3    really tell that anybody who quoted them was in the meetings

4    there.

5    Q.   Okay.

6         MR. WERDER:  May I have a moment, Your Honor?

7         THE COURT:  Absolutely.

8         MR. WERDER:  I don't have any further questions.

9    Thank you very much.

10   RECROSS-EXAMINATION

11   BY MR. TAMBE:

12   Q.   Good afternoon, Mr. Seery.

13   A.   Good afternoon.

14   Q.   My name is Jay Tambe.  I am with Jones Day, special

15   counsel to Lehman Brothers Holdings, Inc.

16        Let me start with one of the documents that you've been

17   asked a couple of questions about.  This is the thick exhibit

18   that Mr. Schiller handed up to you, BCI Exhibit 739.

19   A.   Yes.

20   Q.   This morning from time to time, you have used the word

21   face value in referring to securities.  When you say face value

22   and you've used the word face value this morning, you're

23   talking about the marked value, Lehman's marks, correct?

24   A.   For these purposes, I am talking about the marked value.

25   Face value normally is the amount referenced on the face of the

142

1    security.  The actual value of that security could be higher or

2    lower than the face depending on where it is in the market.

3    Colloquially, I have been using it as just to denominate what

4    is marked on Lehman's books.

5    Q.    All right.  So just to be clear and so the record is clear

6    from this morning, when you've used the word face value, you

7    don't mean to use it in the colloquial sense of par value or

8    nominal value of a security.  You mean market or marked value

9    of the security, correct?

10   A.    That's correct, yes.

11   Q.    Okay.  Do you do that from time to time, sir?  Do you

12   sometimes use face value when you mean to say market value or

13   sometimes use market value when you mean to say marked value?

14   A.    No.

15   Q.    This is the only time you've ever done that is this

16   morning in court?

17   A.    No, we had some notes where I had used it before.  Face --

18   I know what the face value of a security is.

19   Q.    Do you remember when you ever used the phrase face value

20   in any of your conversations with any members of the committee

21   over that weekend from Friday to Sunday, the 19th to the 21st?

22   A.    I don't think I did, no.

23   Q.    Okay.  But you're not sure, are you, sir?

24   A.    No, I am not sure.

25   Q.    Okay.  And just to be clear as to what we're talking

143

1    about, using this exhibit as an example, if you could turn to

2    what is -- I don't know if you have -- do you have a double-

3    sided exhibit?

4    A.   I do, yes.

5    Q.   Yes.  So the second page, that's where the securities

6    listings begin.

7    A.   Yes.

8    Q.   And just taking the first line, you have a number of

9    column headings, do you see that?

10   A.   I do.

11   Q.   Yes.  There's a column titled par value, do you see that?

12   A.   Yes.

13   Q.   And that's a concept that you would equate with face

14   value; is that right?

15   A.   Not necessarily, no.

16   Q.   Okay.  Amount outstanding, principle amount outstanding on

17   that security; is that the way you would see par value?

18   A.   That's greatest. The par value here would include the

19   accrued.

20   Q.   Okay.  But that would be different in your understanding

21   from market value which is the next column over, correct?

22   A.   That's correct, yes.

23   Q.   Okay.  And this document, the market value column, in

24   fact, is the Lehman valuation of those securities, correct?

25   A.   That's what I believe, yes.

144

1    Q.    We talked -- you spoke this morning, I believe, in

2    response to questions from Mr. Schiller about certain complex

3    securities, structured securities.  And you mentioned some

4    names.  Do you remember that testimony generally?

5    A.    I do, yes.

6    Q.    Okay.  And the names, I think you mentioned were RACERS;

7    is that one of them?

8    A.    That's one of them, yes.

9    Q.    Verano?

10   A.    Yes.

11   Q.    Spruce?

12   A.    Yes.

13   Q.    And Pine?

14   A.    That's correct, yes.

15   Q.    And as I recall your testimony from this morning, you

16   received a call in the middle of the night or late at night

17   Thursday night, early Friday morning from Barclays asking you

18   specifically questions with respect to structured products like

19   these; is that right?

20   A.    The one I specifically recall is the one with respect to

21   RACERS.

22   Q.    Okay.  And with respect to RACERS, I believe you testified

23   that you advised Barclays that there were valuation issues with

24   RACERS, correct?

25   A.    I advised them that they may not be an appropriate

145

1    security.  I don't think I gave them a view as to value.

2    Q.   Well your testimony from this morning will speak for

3    itself.  But is your testimony this afternoon that you did not

4    advise them one way or the other about concerns about the value

5    of the RACERS' security?

6    A.   No, that that -- what I just said would include that, yes.

7    It wasn't --

8    Q.   So you --

9    A.   It may not be an appropriate repo security, that's

10   correct.

11   Q.   Okay.  So you advised Barclays that RACERS may not be an

12   appropriate repo security.

13   A.   Right.

14   Q.   Is that right?

15   A.   That's correct.

16   Q.   And at the time you gave Barclays that advice, you were

17   still at Lehman, correct?

18   A.   That's correct, yes.

19   Q.   And as far as you know, RACERS did not end up in the

20   collateral that was transferred ultimately to Barclays,

21   correct?

22   A.   It did not.  That's my understanding.  It was part of that

23   discussion with JPMorgan. I don't know what eventually happened

24   to it.

25   Q.   The other name you mentioned was Verano.  And as far as

146

1    you know, sir, Verano did not end up with Barclays either, did

2    it, sir?

3    A.    I thought Verano did end up with Barclays but I am not

4    sure about that.

5    Q.    You just don't know as you sit here?

6    A.    As I sit here, no, I thought it did.

7    Q.    And it's possible you may have advised Barclays that

8    Verano was not an appropriate Fed repo collateral either,

9    correct?

10   A.    No, I think I liked Pine, Spruce and Verano.

11   Q.    Spruce was another name you mentioned this morning, right?

12   A.    Yes.

13   Q.    Okay.  And as far as you know, Spruce did not end up with

14   Barclays' either, did it, sir?

15   A.    Again, I thought it did.

16   Q.    Was it the case that you were having a discussion with

17   Barclays about particular structured securities, giving them

18   your views or recommendations about those and then Barclays was

19   making a decision as to whether or not to accept one of those

20   securities as part of the collateral?

21   A.    The only one that I recall having that specific discussion

22   with on Thursday night was John Mon regarding RACERS.

23   Q.    You --

24   A.    The others came up in the context of my conversation with

25   Keegan.  That's why I believe they already had them.

147

Q.   Other than the specific discussion you had with Mon about

RACERS and then RACERS is no longer part of the repo

collateral, you don't know one way or the other whether there

are other asset classes and other securities where Barclays was

perhaps talking to people, other people at Lehman about whether

or not those securities would be coming over to Barclays,

correct?

A.   I don't -- I'm not aware that they had any other such

conversations.

Q.   You've testified about your involvement in discussions

with the Fed and familiarity generally with the Fed repo that

became the Barclays repo and I want to ask you a couple of

questions about that.

     Were you aware prior to the hearing on the 19th that the

Barclays repo had been terminated upon the SIPA filing by LBI?

A.   No, I was not aware of that.

          MR. TAMBE:  May I approach the witness, Your Honor?

          THE COURT:  Yes, you may.

Q.   Sir, I've handed you a document marked Movant's Trial

Exhibit 38 in evidence.  If you could take a moment just to

look at that two-paged document and let me know when you're

done.

     (Pause)

A.   Okay.

Q.   Have you seen this document before today, sir?

148

1    A.    I may have seen this at one of my depositions.

2    Q.    Do you have any recollection of having seen this document

3    at the time?  It is dated the 19th of September.  Do you recall

4    seeing it on or about that date?

5    A.    No.

6    Q.    Do you recall any discussions either the 19th, the 20th or

7    the 21st about the fact that the Barclays repo had been

8    terminated on September 19?

9    A.    No, I do not.

10    Q.    Are you aware, sir, that in the clarification letter,

11    there is a paragraph 13 which seeks to rescind not only the

12    repo transaction but rescind the fact of this termination.  Are

13    you aware of that?

14    A.    I am aware of that, yes.

15    Q.    Was the insertion of paragraph 13 a topic that you were

16    involved in in any way?

17    A.    No, I was not.

18    Q.    When did you first become aware that paragraph 13 was

19    inserted in the clarification letter?

20    A.    I think I read your litigation papers.

21    Q.    When you say our litigation papers, do you mean the

22    complaints filed in September or the papers filed more

23    recently?

24    A.    The September ones.

25    Q.    At any point during the week of the 15th through the 22nd,

149

1    were you party to any discussions in which the potential effect

2    of Section 559 of the Bankruptcy Code was discussed with

3    respect to any of the repos that Lehman had in place?

4    A.   No, I was not.

5    Q.   Have you discussed the topic of the 559 or the

6    applicability of Section 559 with anyone after the 22nd of

7    September?

8    A.   With respect to this case, no.

9    Q.   I want to go back over some of the numbers you talked

10   about this morning.  Let's start with your notes.  That's

11   Barclay's Exhibit 650.

12   A.   Do you recall which tab it is?

13   Q.   It would be --

14   A.   6, I got it.

15   Q.   Got it?  It's tab 6 in the thin binder that Mr. Schiller

16   handed you.  And as I understand it, that's only a partial --

17   it's a selection of the documents from your file, correct?

18   A.   I believe that's correct.  That is correct.  I think the

19   ones I had turned over were more voluminous than this.

20   Q.   And turning your attention in particular to page 67 of

21   your notes --

22   A.   Yes.

23   Q.   -- down the left hand side of that set of notes, you've

24   got a forty-nine billion face MV notation, do you see that?

25   A.   Yes.

150

1   Q.   So that's potentially a situation where you have conflated

2   both face value and market value but what you mean by that is

3   the marked value, correct?

4   A.   That's what I mean.  I don't think that's the case.  I

5   think I probably quoted someone else in the meeting.

6   Q.   But you don't disagree that on or about Friday, September

7   19, the marked value off the Fed repo collateral was a total of

8   forty-nine billion dollars according to Lehman's books.

9   A.   I believe that to be the case, yes.

10  Q.   Okay.  And right next to that you've got this seven

11  billion dollar cash number, do you see that?

12  A.   Yes, I do.

13  Q.   Okay.  And that's the cash that as of Friday was at an

14  account at JPM for the benefit of Barclays, correct?

15  A.   That's my understanding.

16  Q.   And looking right above that seven billion dollar number,

17  you've got a 42.9 -- it looks like a five, do you see that?

18  A.   Yes, that's correct.

19  Q.   And that was based on Lehman's books, the value of the

20  securities that had been delivered to Barclays Thursday night

21  into Friday, correct?

22  A.   I'm sorry, can you just repeat that again?

23  Q.   Sure.  42.95, that's the value off the securities

24  according to Lehman's books off the securities delivered to

25  Barclays Thursday night into Friday.

151

1   A.   That's correct, yes.

2   Q.   And then the basic math is the 42.95 plus the seven adds

3   up to the forty-nine billion dollar number just to the right of

4   those two, correct?

5   A.   To the left, yes.

6   Q.   The left side of the page.

7   A.   That's correct.

8   Q.   Okay.  Now you said in -- I believe in response to an

9   examination from Mr. Schiller that the number that appears

10   below the JPM number which is that forty-three billion dollar

11   number, you believe that to be Barclays view of the value of

12   the assets, correct?

13   A.   That's my recollection, yes.

14   Q.   Your notes don't say Barclays value there, do they?

15   A.   I think I testified that the inside cover of this

16   particular folder does say that.

17   Q.   And the forty-three billion value that's listed there,

18   that's a reference to the entirety of the Fed repo collateral

19   that's against the forty-nine billion dollar number; is that

20   correct, sir?

21   A.   I believe that to be the case, yes.

22   Q.   That's not a comparison to the 42.95 above, is it, sir?

23   A.   No, that certainly didn't think it was greater than the

24   marks.

25   Q.   So keeping this document in mind, I want to ask you a

152

1      question about something you were asked about this morning.

2      And go to tab 12 in the thin binder, please.

3      A.    Yes, sir.

4      Q.    And the second page -- and this Barclays Exhibit 813-A.

5      And the second page of that document, your attention was drawn

6      to the fact that this document is a schedule of securities and

7      has the name Alvarez & Marsal on the bottom left, do you see

8      that?

9      A.    Yes, I do.

10     Q.    And this -- the numbers on that page add up to forty-three

11     billion, do you see that?

12     A.    Yes, I do.

13     Q.    And there's a reference to total transferred under repo

14     agreement, do you see that, sir?

15     A.    Yes, I do.

16     Q.    You understand that as a valuation of the securities

17     transferred over to Barclays Thursday night into Friday,

18     correct, sir?

19     A.    I think that's what they're referring to.  This isn't my

20     document, so I don't know for sure.  I think that's what

21     they're referring to.

22     Q.    And you don't see anywhere on this document, any listing

23     for the seven billion dollars of cash that was in the account

24     at JPMorgan as of Friday, the 19th of September, correct?

25     A.    No, I do not.

153

1    Q.   Okay.  So if you wanted to get a total value of the deal

2    based on this document, you would add seven billion to the

3    forty-three, correct?

4    A.   That's correct.

5    Q.   And, in fact, when you are comparing this document to your

6    handwritten notes, going back to page 67, the number you really

7    want to compare that forty-three billion to is the 42.95 that

8    you have in your notes, correct?

9    A.   That's correct.

10   Q.   Okay.  And in each case, you would add on the seven

11   billion in cash to get a total deal value, correct?

12   A.   That's correct.  Just to be clear, my writing is 42.935.

13   Q.   Okay.  Now the assets that came over from -- that came

14   over to Barclays on Thursday night into Friday, you had --

15   where did they end up?  Where physically did those securities

16   end up?  Did they end up in an account somewhere?

17   A.   I'm sorry?

18   Q.   The securities that come over Thursday night into

19   Friday --

20   A.   They get posted to the DTC.

21   Q.   Okay.  They posted to the DTC.  Okay.  Does the cash

22   that's held in the JMP account, does that posted to the DTC as

23   well, sir?

24   A.   No, my understanding is that's part of the litigation

25   between Barclays or a settlement between Barclays and JP.  I

154

1    think Barclays -- JPMorgan froze that cash.

2    Q.   So as of Friday, September 19, that cash certainly wasn't

3    with the DTC?

4    A.   No.  That's my understanding.  It wasn't Lehman's cash.

5    It was Barclays' cash and my understanding is that Barclays was

6    supposed to take securities against that cash and Barclays

7    rejected those securities.

8    Q.   Turning your attention to tab 7 in the thin binder from

9    Mr. Schiller -- are you there?

10   A.   Yes, I am.

11   Q.   It's Barclays Exhibit 679.  This was the email exchange

12   that you have with Mr. Kirk while you were inside or outside of

13   this courtroom on your Blackberry, correct?

14   A.   That is correct.

15   Q.   On the 19th while the hearing's going on, correct?

16   A.   Yes.

17   Q.   And this is where Mr. Kirk tells you the value is 45.5, do

18   you see that?

19   A.   I see that, yes.

20   Q.   All right.  And the question he is responding to from you

21   is what is the value of the collateral that Barclays posted to

22   the DTC today, do you see that?

23   A.   Yes, I do.

24   Q.   All right.  And with respect to that collateral posted by

25   Barclays to the DTC on Friday the 19th, he says that is valued

155

1    at 45.5, do you see that?

2    A.    I do, yes.

3    Q.    And that necessarily would exclude the seven billion

4    dollars of cash sitting in the JPM account, right, sir?

5    A.    That should exclude that cash, yes.

6    Q.    You've testified a couple of times this morning about the

7    risks that Barclays was taking on in entering into the repo

8    transaction, advancing the 45 and getting the collateral in

9    exchange.

10   A.    Yes.

11   Q.    And one of the things I think you said, a couple of times

12   was they had no way to hedge that risk, is that right?

13   A.    I believe I said they didn't have any hedge.  They didn't

14   own it.  You can't really hedge it until you own it.  And they

15   didn't take any shorts with it.  So they had plenty of ways to

16   hedge if they could find the liquidity in the market.

17   Q.    Do you have any personal knowledge, sir, of what Barclays

18   did, if anything, to hedge the risk associated with the

19   securities obtained as part of stepping into the Fed repo?

20   A.    I don't really know how they manage that portfolio, no.

21   Q.    And you have no knowledge as you sit here about any

22   difficulties they encountered in being able to hedge that

23   portfolio, do you, sir?

24   A.    I have no knowledge about how they hedge or did not hedge

25   that portfolio.

156

1    Q.    No one's complained to you from Barclays, hey we're having

2    troubling hedging that portfolio.

3    A.    It wouldn't have been in my purview and so I don't know if

4    they complained to anybody else or not.  They certainly didn't

5    mention it to me.

6    Q.    And you were not privy to any discussions between Barclays

7    and the Federal Reserve about any assurances given by the

8    Federal Reserve to Barclays about financing those securities in

9    the days after September 22, were you, sir?

10   A.    No, I was not.

11   Q.    So as far as you know, you don't know one way or the other

12   whether the Fed provided any such assurances to Barclays?

13   A.    No, I do not.

14   Q.    In terms of valuation and market value, I think you've

15   said -- you've described the Lehman market value of the

16   securities to be in the neighborhood of fifty billion dollars

17   as of September 19, correct?

18   A.    I believe that's correct, yes.

19   Q.    And the Fed had independently assessed the value of the

20   Fed repo collateral, correct?

21   A.    I don't know whether they did or not.

22   Q.    Well the collateral that was posted to the Fed, you've

23   told us before, the Fed was very nervous about being in that

24   situation, correct?

25   A.    That's correct, yes.

157

1   Q.   They were worried about the exposure they were going to

2   face, correct?

3   A.   They didn't complain about the exposure.  They complained

4   about the position.  So I don't know if they were worried about

5   loss, if they were worried about liquidity.  They shouldn't

6   have been.  They were worried about markets.  They were worried

7   about perceptions.  They were nervous about being in the

8   position.  They never told me why.

9   Q.   And so in extending this financing, you would have

10  expected them to be careful in valuing the securities that were

11  being posted by Lehman as collateral, correct, sir?

12  A.   I don't know whether they would have been or not.  They

13  stepped into that position when they were petrified that the

14  repo market would fall apart.  If the repo market had fallen

15  apart, then Morgan Stanley wouldn't have been able to fund that

16  week and they were worried that Goldman wouldn't have been able

17  to fund by the end of the week.

18  Q.   Do you know in the context of this litigation, sir,

19  whether the Fed has submitted any evidence about how the Fed

20  had marked the values of the securities tendered as collateral

21  by Lehman?

22  A.   No, to be clear, I have no knowledge of what the Fed --

23  how the Fed looked at that repo or how they valued it.

24          MR. TAMBE:  Can I just have a moment, Your Honor?

25          THE COURT:  Sure.

158

1        MR. TAMBE:  Can I look at my notes for one second?  I

2   think I am done.

3        (Pause)

4        MR. TAMBE:  No further questions, Your Honor.

5        THE COURT:  Okay.  I have one question in reference to

6   the last question you asked.  Will the movants or will Barclays

7   for that matter be calling anyone from the Fed to answer

8   questions regarding the valuation of the repo while it was at

9   the Fed?

10       MR. TAMBE:  Your Honor, if I may answer that.  There

11  is some evidence in the record already about how the Fed valued

12  the repo.  It was part of the December settlement.  We may or

13  may not, depending on what position Barclays takes, call

14  someone from the Fed about that declaration that was submitted

15  to this court.  I can offer up that exhibit.  It's in evidence.

16       THE COURT:  I'm not asking you to do anything other

17  than tell me whether or not in reference to the question you

18  just asked, there was a contemplation of supplementing the

19  record with information directly from the Fed concerning the

20  repo.

21       MR. GAFFEY:  If I could take the old man privilege and

22  supplant my younger partner for a minute, Your Honor.  We have

23  the affidavit of Ms. Leventhal that is in the record now.

24       THE COURT:  Is there such a thing as an old man

25  privilege?

159

1          MR. GAFFEY:  I'm claiming -- it's taken six days and

2     we agree on something, Your Honor.  I guess the debate is

3     whether I am an old man but I am not going to ask for an

4     opinion.

5          THE COURT:  I'm not going to get into that.

6          MR. GAFFEY:  The declaration of Ms. Leventhal is in

7     the record now in evidence on our case.  There has been the

8     deposition of Shari Leventhal by Barclays.  I expect they will

9     attempt to offer it. We objected to the taking of it as being

10    after the close of discovery.

11         If it is played, we would reserve the right to bring

12    her in for cross-examination before Your Honor.  The reason we

13    were given for the deposition being used to preserve her

14    testimony is that the Assistant General Counsel of the Fed is a

15    busy government official.  We think if she's going to testify,

16    she should come here and testify.  So the state of proof on Ms.

17    Leventhal is we have her declaration in and it may be that in

18    rebuttal at least we'll have her here in person.

19         MR. TAMBE:  And just for the record, as we leave this

20    part of it, there was a second declaration submitted by the Fed

21    in December and that was of Jeffrey Moore, who is an economist

22    at the Fed and that's a declaration that speaks specifically to

23    valuation, the Fed's valuation of that repo.

24         THE COURT:  Okay.  Next time I won't ask.

25         MR. SCHILLER: I would like to offer a young man's

160

1     comment on Shari Leventhal, Your Honor.

2          THE COURT:  Who is going to be doing that?

3          MR. SCHILLER:  A younger man.  We deposed her.  They

4     were there for cross-examination.  It was done expressly to

5     avoid having to subpoena a busy public official.  They're free

6     to do that if they want.  And we do intend to present her for a

7     taped deposition to Your Honor in our case.

8          I have just three quick subjects for Mr. Seery, Your

9     Honor.

10         THE COURT:  Fine.  Proceed.

11    RECROSS-EXAMINATION

12    BY MR. SCHILLER:

13    Q.   Mr. Seery, may I ask you to turn to tab 12 of the book

14    that we provided you and that is Exhibit 813-A in evidence,

15    page 348, the third page of that Milbank email to Luc Despins

16    from his partner.  And at page 438, sir, in the second

17    paragraph someone wrote, "We were told," referring to the night

18    close above, in the first paragraph, do you see that?

19    A.   I do.

20    Q.   "We were told that some of the marks shown on schedule A

21    were out of date and that the parties, Lehman and Barclays had

22    agreed to a five billion dollar discount as the appropriate

23    mark to market adjustment for the securities."

24         Looking at that statement, do you have any doubt that the

25    committee was told that Lehman and Barclays had agreed on

161

1   values of the repo securities?

2   A.   No, no, I don't.  I do just quibble with -- the only thing

3   I was quibbling with before is quotes.  I don't know that I can

4   attribute those to me.

5   Q.   Thank you.  Let me ask you to turn to the next document,

6   tab 13, which you were also questioned about and this is

7   another Houlihan Lokey communication with Mr. Despins, their

8   counsel, dated September 28.  This is from Mr. Geer, who you've

9   commented about.

10      I just want you to look at the second line there and the

11   words, "The amount that was agreed to between Lehman and

12   Barclays."  Do you have any doubt that the committee was told

13   and understood that weekend before the closing that there was

14   such an agreement?

15   A.   No, they clearly knew that.

16   Q.   Let me ask you to open up their book, the movant's book.

17   You've been complaining about my excerpt at tab 6 because you

18   can't find in it something you wrote that you've answered their

19   questions concerning.  And that is you've asked about a cover

20   page which we didn't excerpt for you but they did.  And if you

21   look at tab -- for which I am grateful.  Thank you.  If you

22   look at 147 of their book, it's at the front, Mr. Seery, it's

23   the second tab in their big book.

24   A.   Yes, I see it.

25   Q.   And do you recognize that as a pale reflection of your

162

1    file?

2    A.   Yes, that's my handwriting.

3    Q.   And can you turn to the second page, O-2 of that exhibit

4    and I ask you when you were talking about how Barclays valued

5    these assets in their discussions with you and your colleagues,

6    is this the note that you were referring to?

7    A.   This is my recollection that they had mentioned, you know,

8    their view of value being lower and I knew it --

9    Q.   Would you --

10   A.   I knew it was written somewhere in my notes.

11   Q.   Would you take a minute and describe for Judge Peck what

12   that valuation is by Barclays is that you've testified about

13   this afternoon?

14   A.   My recollection is that their view that the value of the

15   securities wasn't the 50.6 and wasn't the 45.5 -- I think it

16   was actually forty-five that they advanced but was lower.  And

17   I think that's consistent with the notes that we've spent a lot

18   of time going through.

19   Q.   Thank you.  Now you were asked about your communications

20   with the committee and I just want to direct you to a

21   communication at the beginning of the weekend, towards the end

22   of the week concerning through the telephone, concerning a

23   variety of subjects including derivatives.  And do you recall

24   that phone call generally?

25   A.   I don't have enough context.  I'm sorry.

163

1    Q.   Let me provide you with an exhibit.

2         MR. SCHILLER:  I'll just be a minute, Judge.

3         THE COURT:  Fine.

4    Q.   Mr. Seery -- I'm sorry, I'll give you a chance -- this is

5    not your document but it's a reference to a telephone call with

6    you on Thursday.  That was actually September 18, not 19th as

7    dated here.  Do you recall a conversation with them in which

8    these sorts of subjects were reviewed, those listed by bullets

9    below?

10   A.   I had a number of discussions with the committee, some

11   faced -- and by the committee, I mean committee

12   representatives.

13   Q.   Let me ask you to look to the middle of the page where it

14   says "all desks, employees, banking people and equity

15   businesses going over not derivatives owed," do you see that?

16   A.   That's correct, yes.

17   Q.   And several bullets down, "exchange trade derivates don't

18   have cancellation rights, so they go to Barclays," do you see

19   that?

20   A.   Yes.

21   Q.   And then further down it says "losses and derivative books

22   are mostly in LBSS."

23   A.   That should be S-F.

24   Q.   Thank you.  Do you recall generally this discussion?

25   A.   I do.  I don't recall the -- I had several discussions,

VERITEXT REPORTING COMPANY

212-267-6868                                          516-608-2400

164

```
1    some face to face, some by phone with representatives of the

2    committee and these detailed the history, as you see from the

3    first bullet points of our efforts to try to sell Lehman

4    Brothers including back through the summer, to try to sell it

5    to KDB which is Korean Bank to B of A, a lot of detail around

6    that history and then how we finally worked through the issues

7    with Barclays, thought we had a deal and that we lost, as I

8    described yesterday.  And then our effort to try to sell and

9    the transaction that was finally approved by this court.

10   Q.   With regard to the subjects referenced on this call below,

11   is it fair to say that when you discussed the subjects that I

12   identified for you, you were addressing with the committee that

13   you were concerning or discussing over the counter derivatives.

14   When you did that, you used the term derivatives.  And when you

15   were speaking about exchange traded derivatives, you specified

16   that you were speaking about exchange traded derivatives,

17   correct?

18   A.   That's correct.  They're different products.

19   Q.   Now at the time that you were discussing these derivatives

20   and these exchange traded derivatives with the committee over

21   the telephone, was it your understanding concerning -- what was

22   your understanding concerning whether the margin associated

23   with the exchange traded derivatives would be included in the

24   sale to Barclays?

25   A.   My understanding was that Barclays was going to buy
```

165

 1    businesses and those included the exchange traded derivatives

 2    business which would necessarily include the actual positions

 3    and their margin.

 4        With respect to non-exchange traded or over the counter

 5    derivatives, those are generally terminable on bankruptcy.

 6    There's no stay that would benefit the buyer.  So owning those

 7    contracts might not be valuable.

 8    Q.   Lastly, Mr. Seery, I looked at the transcript over lunch

 9    of this morning's examination, and at the end of the

10    examination where I was asking you about whether in that

11    difficult period, in that period of hard work and many meetings

12    and exhaustion, it was possible to make mistakes, whether it

13    was possible not to know where a document came from or where it

14    went, when I asked you whether it was possible to forget

15    whether you were in cahoots with someone, and you replied that

16    you were not, I want to read the question to you and your

17    answer and then ask you a question.

18    "Q.  You can't forget -- "

19        MR. SCHILLER:  And this is from the rough transcript,

20    Your Honor.

21        THE COURT:  So with the understanding this is not the

22    official transcript, if you're framing a question on the basis

23    of what's probably a mostly reliable log note version, you're

24    free to do that in my view.

25        MR. SCHILLER:  Thank you, Judge.

166

1   Q.   Mr. Seery, this rough draft suggests that I asked you:

2   "Q.  You can't forget whether you were in cahoots with someone

3   from Barclays that week, can you?

4   "A.  I can't and I am hoping that Mr. Geer who as I said is a

5   friend of mine is not referring to me here.

6   "Q.  Were you?  Were you in cahoots?

7   "A.  I was not in cahoots with anybody.  At that point --" and

8   this is what the transcript says, "I was working for Barclays

9   but I didn't have a deal with Barclays."

10       At the time of this closing, were you employed by Barclays

11  or Lehman?

12  A.   No, I was working for Lehman Brothers and I would switch

13  over with all of the other employees at close.  And I didn't --

14  had never looked at a deal or nor had signed -- had I signed

15  any deal and I frankly didn't know whether Barclays would be

16  the right fit for me or not at that time.

17  Q.   And through closing, in your work, were your loyalties

18  attached to Lehman or to Barclays?

19  A.   Lehman Brothers.

20  Q.   Thank you very much.  I have no further questions.

21       THE COURT:  Are there any more questions that are

22  prompted by that last little bit?

23       MR. TAMBE:  Just one clean-up, Your Honor.

24       MR. WERDER:  And I have one also, Your Honor.

25       THE COURT:  I'm going to hold you to that.

167

1       MR. TAMBE:  If we could please have Barclays Exhibit 124

2   back up on the screen -- 124, Barclay's 124.

3   RECROSS-EXAMINATION

4   BY MR. TAMBE:

5   Q.   And if we could just go down to the section talking

6   about -- where it says LBSS, those bullet points towards the

7   bottom.

8   A.   Yes, sir.

9   Q.   Mr. Schiller asked you about that line item and you

10  corrected it and you said it shouldn't say LBSS, it should say

11  LBSF as in Frank, correct?

12  A.   That's correct, yes.

13  Q.   And what is LBSF as in Frank?

14  A.   That's Lehman Brothers Special Finance.

15  Q.   And is that the entity that was used by Lehman Brothers

16  Special Financing to enter into over-the-counter derivatives

17  transactions, sir?

18  A.   That's correct, yes.

19  Q.   In fact, exchange traded derivatives transactions would

20  not have been done through LBSF, correct, sir?

21  A.   I don't believe they were.  I don't have a specific

22  recollection but I don't believe they were.

23  Q.   So those discussions about derivatives and guarantees and

24  excess collateral, those all relate to OTC derivatives

25  transacted through LBSF, correct, not exchange traded

168

1    derivates?

2    A.    I'm sorry, you're pointing me to which?

3    Q.    The three bullets that appear below the --

4    A.    Sizable exposure on derivatives reliant on holdings

5    guarantee, Chase is holding eleven billion in excess collateral

6    to cover the derivates.

7    Q.    Those all relate to over-the-counter derivatives.

8    A.    I think that those did relate to that.

9    Q.    And you have no reason to believe that they relate in any

10   way to exchange traded derivatives as you sit here.

11   A.    Not to my knowledge now, no.

12   Q.    Thank you.

13   REDIRECT EXAMINATION

14   BY MR. WERDER:

15   Q.    Mr. Schiller asked you about Exhibit 147.  Do you still

16   have that in front of you?  That was the page --

17   A.    Yes, I do.

18   Q.    -- the mysterious missing page -- page -- are you with me?

19   A.    Yes, sir.

20   Q.    Okay.  And he asked you some questions about page 2 of

21   that document and page 2 of the document does not refer to any

22   meeting with the committee, does it, sir?

23   A.    No, it does not.

24   Q.    Thank you.  No further questions.

25          THE COURT:  Well, Mr. Seery, believe or not when we

169

1    were planning out this week, we thought we were going to finish

2    you last evening and it's now lunch break time on day two.  You

3    are excused and thank you for your time.

4            THE WITNESS:  Thank you, Judge.

5            THE COURT:  Now just a question before we all break.

6    I assume the next witness is Mr. Kobak.

7            MR. TAMBE:  That's right, Your Honor.

8            THE COURT:  All right.  So we'll have Mr. Kobak in 15

9    minutes.  We're adjourned.

10            MR. TAMBE:  Thank you, Judge.

11            MR. WERDER:  Thank you, Judge.

12            (Recess from 3:36 p.m. until 3:53 p.m.)

13            THE COURT:  Be seated, please.  Mr. Kobak, I've given

14    the oath to all witnesses, including people like you and Harvey

15    Miller.  So if you'll raise your right hand.

16            MR. KOBAK:  Good company to be in, Your Honor.

17            THE COURT:  It is good company.

18        (Witness duly sworn)

19            THE COURT:  Please be seated.

20            MR. MAGUIRE:  Your Honor, if I might approach?

21            THE COURT:  Yes.

22        (Pause)

23            MR. MAGUIRE:  If it please the Court, Bill Maguire for

24    the SIPC trustee.

25    DIRECT EXAMINATION

170

BY MR. MAGUIRE:

Q.   Mr. Kobak, you are a partner of the Hughes Hubbard Law Firm?

A.   I am.

Q.   President elect of the New York County Lawyers Association?

A.   I am.

Q.   Can you describe, very briefly sir, your prior experience in SIPC liquidations?

A.   Our firm has done, I think prior to Lehman, I think the number is six SIPC liquidations over the last twenty-five or thirty years and I've had some role to play, minor or more important in each of those and Lehman would be the seventh.

Q.   I'll invite you to cast your mind back to Sunday, September 14, 2008, can you please describe who called you that Sunday when you were driving back to town from the Adirondacks?

A.   Mr. Giddens called me on my cell phone or my BlackBerry phone feature and indicated that there might be a SIPC liquidation involving Lehman -- Lehman Brothers and we would probably be retained.  He would probably be the trustee and we would be retained to represent him if in fact that occurred. It wasn't certain whether it would occur but it was a possibility.

Q.   And who came from SIPC to New York in connection with this possible matter?

171

1    A.   Well, I know that Mr. Caputo came up, I believe, on

2    Monday.  He might have even come up on Sunday night but I know

3    I saw him in our offices Monday.  I believe that Mr. Harback

4    was in New York during much of that week.  He spent a little

5    time in our office but he was off meeting with other parties as

6    well.  And I believe Ms. Lang, the general counsel of SIPC was

7    also in New York for part of the weekend, they weren't

8    necessarily at our offices for much of that time.

9    Q.   Please describe whether you had any role in negotiating

10   the asset purchase agreement that was executed on Tuesday,

11   September 16?

12   A.   No.

13   Q.   When did you first see that agreement?

14   A.   I believe that we saw a version with a lot of

15   interlineations, handwritten interlineations and riders, very

16   hard to follow, on either shortly before or at the hearing on

17   the afternoon of Wednesday, September 17th.

18   Q.   Please open to tab 1 of your binder and I'll show you a

19   document in evidence as Barclay's Exhibit 421, an e-mail you

20   received from Richard Krasnow at the Weil Gotshal law firm on

21   Thursday night, September 18 at 8:30 p.m.  This e-mail was sent

22   to the trustee, Mr. Giddens and two representatives of the

23   Securities and Exchange Commission.  You saw this e-mail that

24   night?

25   A.   Yes, I did.

172

1    Q.   And did you have discussions with Mr. Krasnow concerning

2    the information in this e-mail?

3    A.   Yes, we'd had, and I can't remember -- I think some of

4    these discussions probably took place before we got the e-mail,

5    some may have taken place later but we had a conference call or

6    two, we had actually been trying to get some information

7    about -- and our primary interest was what the entity to be

8    liquidated, the LBI that would be left after any purchase

9    transaction might look like.  Our concern, of course, was doing

10   that liquidation, making sure or at least trying to have some

11   assurance that the assets that should be available for

12   customers, since that's the main concern of the SIPC

13   liquidation, would be available.

14        So we had had some discussions.  I know we had some

15   discussions about the subsidiaries of LBI which eventually we

16   were told would probably be transferred to the holding company

17   in exchange for a note, which is in fact what occurred.  But

18   before that we just had a lot of questions trying to find out

19   what these subsidiaries were, where they were and so forth.

20        We'd been asking Mr. Krasnow if we couldn't get some

21   financial information, at least a balance sheet, he promised

22   he'd provide one.  I think we called a couple of times about

23   it, he -- obviously Weil Gotshal had a million things they were

24   doing and eventually provided this.

25   Q.   If you'd turn to the second page of the document you'll

173

1    see an LBI balance sheet with draft subject to change at the

2    top.  Right under LBI balance sheet you'll see the words in

3    millions.  Did you have any discussion with Mr. Krasnow about

4    that?

5    A.   Yes.  Well, we had a discussion after he sent the balance

6    sheet and he wanted to know -- he told us this was a very rough

7    and ready balance sheet.  It was done by the client, not by

8    Weil Gotshal and it was very rough approximations and estimates

9    of numbers.  And by the way, there was a typo and the typo was

10   that it says in millions in the M and millions should be a B as

11   in billions.

12   Q.   There are three columns beside -- we're down the page

13   after the categories of assets -- one is pretransactions, 17

14   September.  The second is assets being sold and there's a

15   special column for cash received and then post sale.  Do you

16   see that, sir?

17   A.   Yes.

18   Q.   With respect to the first line item on this balance sheet,

19   can you tell us what this indicated to you by way of the cash

20   item, the first item at the top of the balance sheet?

21   A.   Yeah.  Well, there was a very small amount of cash, 400

22   million, remaining or this would indicate that was what was

23   remaining at that time, that was to be sold to Barclays.  There

24   was going to be a payment of 250 million dollars.  Originally

25   it would be ours, later it was used as a guaranteed fund for

174

1    the DTC.

2        And that I'm not quite -- I've never been sure of why the

3    300 was 300.  I think it was just rounding from the 250 in the

4    fourth column.

5    Q.   What was the significance of the 300 million post sale

6    cash to you at that time?

7    A.   Well, it indicated that there really wasn't much cash in

8    the business.  Any cash would be primarily the segregated cash

9    which is right below that, 4.7 billion dollars, which we

10   understood to be cash that would be associated with customers

11   in one way or another.

12   Q.   What did you generally understand about Lehman's ability

13   to pay its customers their property?

14   A.   We had been told -- the trustee had been told, SIPC had

15   been told by the SEC, there were several conversations with

16   them, I wasn't necessarily a party to all of them, that

17   basically, at least until the end, the broker was a real

18   brokerage firm.  It wasn't -- I guess at that point there

19   hadn't been a Madoff case but it wasn't a Madoff situation.

20   The books and records were in pretty good shape, compliance had

21   been good.  There was a lot of property segregated, securities

22   segregated or held in custody for customers.  There didn't seem

23   to be any indications of fraud with respect to customer trading

24   or embezzlement, people walking off with the customer assets.

25   So it seemed as if it was in decent shape.

175

1          When we looked at the balance sheet and saw that there was

2    some segregated cash in a not insignificant amount, that seemed

3    consistent with that.  I think we also took a lot of comfort

4    that there were at least some assets, for instance a lot more

5    in receivables than payables, beyond customer assets leaving at

6    least some small balance in what would become the general

7    estate.  And that was significant because I think if we had

8    seen a big negative number instead of the 2.4 on the right-hand

9    column under post sale for total capital, that would have been

10   kind of a warning system that maybe things weren't as they

11   should be.  And this told us at least there was a possibility

12   there'd be a real estate there, if there were a shortfall, if

13   there had been a failure to segregate property there might at

14   least be some assets that could be looked to to remedy that in

15   a liquidation.

16   Q.   Who coordinated the filing of the SIPC liquidation

17   proceeding?

18   A.   Mr. Caputo and I and a few others in my office spent time

19   on and off during that week, this was the week that ended on

20   the 19th, working on papers.  I think Mr. Caputo had a set of

21   papers; Mr. Caputo's instituted many SIPC liquidations over the

22   years.  So I think he had a set of papers he brought from

23   Washington, which we then tailored to the needs of our

24   proceeding.

25          There were some special provisions that we put in the

176

1    order that the District Court signed, ordinarily everything

2    stops as of the time of the filing, the filing date.  This

3    order provided that there would be some additional couple of

4    days until, I think, 6 o'clock the following Tuesday for trades

5    that were already in process on the 19th to settle.  We built

6    in some special languages about books and records, making sure

7    we had access because we realized, and I don't think we

8    realized initially what the extent of this problem would be,

9    but we did realize that we would have some customer accounts,

10   the books and records would be at Barclays.  We would have a

11   need for access to them so we put in some special language to

12   make sure we had access to things like books and records in

13   electronic form.

14   Q.   And with whom did you coordinate the filing of the

15   proceeding?

16   A.   Well, Mr. Caputo and I, we had many conversations with the

17   parties.  We didn't really know at the beginning of the week

18   whether the proceeding would be necessary, would occur or not.

19   When it was thought that it would occur there were many

20   conversations with many different parties as to when we would

21   file, whether it would be before Friday, after Friday.  It

22   really wasn't until the hearing on the 17th that it was clear

23   that the papers needed to be filed by Friday.

24   Q.   And tell us how you went about filing those papers on

25   Friday.

177

1    A.   Well, we actually had a lot of conversations.  Mr. Caputo

2    and I were of the view that we should get to the District Court

3    as early as possible to make sure we could find a judge, to

4    make sure that the judge didn't have a full calendar or to make

5    sure that there wouldn't be any kind of unnecessary delay in

6    case the Judge had questions about the procedure.

7         I think we've all had experiences where things that you

8    don't expect can go awry.  There was a lot of conversation

9    about that among the parties so we finally agreed that we would

10   go down to the District Court a little bit after noon, which is

11   what we did, and the order got signed at about 1:30, I believe.

12   Q.   And following the filing, you made your way to the

13   Bankruptcy Court?

14   A.   Yes, we did.

15   Q.   What additional financial due diligence did you do prior

16   to the commencement of the sale hearing in this court on

17   Friday, September 19th, beyond what you've told us of your

18   discussions with Weil Gotshal, with various regulators and your

19   review of the balance sheet that you had been provided?

20   A.   I think we looked at a few public documents, 10Ks and

21   things of that nature, some reports about Lehman's business

22   generally in a public media.  And that was, I would say, was

23   really the extent of what we were able to do in that timeframe.

24   Q.   And why was it important for you to be able to rely on the

25   representations that were made by the parties at the sale

178

1    hearing in order to discharge your functions with the trustee?

2    A.    Well our focus, as I've said, was customers and there

3    were, and I'm sure we'll get into this, there were

4    representations about the magnitude of the deal, what would be

5    left behind, what liabilities were being assumed, various other

6    things, a lot of which were quite material, I would say, to

7    what our duties would be to liquidate the brokerage firm.

8    Q.    And was it important for you to be able to rely on the

9    representations that were made to this Court with respect to

10   the values of the assets and the liabilities that were the

11   subject of the sale?

12   A.    Yes.  In fact, we understood that discussions were

13   proceeding and we weren't necessarily part of those

14   discussions.  So we really had no substantial independent

15   information or a way to get information other than what was

16   said in Court.  I mean, we had really only been appointed to

17   represent -- stand in place of the parties an hour or two

18   before the hearing began.

19   Q.    If you'd turn to tab 2 you'll see some excerpts from the

20   transcript of the sale hearing and I'd invite you to turn to

21   page 53 of the transcript which has, starting at line 20, the

22   representation by Ms. Fife of the Weil Gotshal firm who says,

23   starting at line 21, "There was a provision in a deal

24   originally which required the debtors to transfer 700 million

25   dollars in cash to Barclays and that is no longer the case.

179

1    There's no cash that's being transferred to Barclays."

2         And if you'd turn to the next page -- I'm sorry; to page

3    55 of the transcript starting at line 23, the first full

4    sentence starts there, "And just one other thing I wanted to

5    point out to Your Honor, we are keeping approximately twenty

6    million dollars -- twenty billion dollars of assets in LBI that

7    are not being transferred.  So those assets will have value and

8    inure to the benefit of the SIPC estate."

9         And if you'd turn, sir, to page 110 of the transcript, you

10   have an excerpt of the examination, I believe the cross

11   examination of Lehman's president, Bart McDade and starting at

12   line 4, that is as follows:

13   "Q.  And sir, was it the case that at the time of the meeting

14   that took place with the creditors this past Wednesday LBI had

15   approximately -- "

16        And then there's a number of interruptions and the

17   question continues at line 11.

18   "Q.  Am I correct, sir, in understanding that at that time

19   creditors were told that LBI had approximately 1.3 billion

20   dollars in cash?

21   "A.  That's correct.

22   "Q.  Okay.  And at that time the deal was that 700 million of

23   those funds would go to Barclays and the remaining 600 million

24   would stay at LBI?

25   "A.  That's correct.

180

1      "Q.   And what is the cash balance at LBI today?

2      "A.   It's virtually nil.

3      "Q.   Where did it go?

4      "A.   To the CME, liquidation of the CME trades and to all the

5      other clearing banks involved in processing of the transactions

6      this week."

7           And finally sir, if you'd turn to page 241 and going over

8      onto 242 you'll see that Mr. Harvey Miller is addressing the

9      Court.  And at page 242 of the transcript he says, starting at

10     line 11, "Now what we're talking about, Your Honor, is eight

11     billion or five billion, whatever it may be, Your Honor, that

12     was a cash sweep, cash.  We're not transferring any cash to

13     Barclays, that's out of the agreement."

14          Now sir, can you tell us first of all what was the

15     significance to you of the representation that there would be

16     twenty billion dollars of assets left in the estate?

17     A.    It seemed that you were talking about a real estate, as I

18     said with respect to the balance sheet it seemed as if there

19     would be real assets there, it wouldn't be an empty shell.  No

20     one really had a good handle, at that point, on what the size

21     of the customers that were left behind, and there were quite a

22     lot of customers left behind, more than we, I think anyone

23     expected at the beginning.

24          But nevertheless, it seemed consistent with the kind of

25     numbers we'd seen in the balance sheet and the kinds of things

181

1   we'd been told about the -- by the regulators.

2   Q.   And what was the significance to you of the

3   representations that were made about no cash being transferred

4   to Barclays, that there wasn't any cash going to Barclays and

5   Mr. McDade's testimony about what had happened to Lehman's

6   cash?

7   A.   Well, the fact that there was no cash or that there was no

8   longer 1.3 or even 700 million seemed quite consistent,

9   actually, with the balance sheet we'd seen, although that did

10  show a smaller amount of cash remaining.  And the fact that the

11  CME, which I understood to be some kind of clearing

12  organization although I didn't really know details, had

13  actually taken fairly extreme action was also significant.

14  Q.   Can you please explain whether you understood that

15  Barclays would be getting any significant cash in this sale

16  other than customer cash?

17  A.   No.  Our understanding -- there had been extensive

18  testimony or argument about this supposed 8.1 billion dollars

19  from LBIE that had supposedly gone somewhere and been swallowed

20  up by Lehman or by LBI.  It was a real concern and I think the

21  representations were made that there was absolutely no cash,

22  which in part was an answer to that.  It also seemed very

23  consistent with what we'd seen in the balance sheet, that there

24  just really wasn't a lot of cash in the business.

25      We did understand there would be customer cash, cash that

182

1   was associated with customer accounts and that would be

2   transferred with those accounts that went to Barclays.  There

3   were also accounts going to Neuberger Berman so some cash would

4   probably go to those accounts.  But we didn't think that there

5   was any proprietary cash left in the business or that was part

6   of the deal.

7   Q.   And with respect to the customer cash that was being

8   transferred to Barclays, for whose account did you understand

9   that customer cash would be transferred?

10  A.   That would be cash that would be associated with the

11  customer accounts.  It was really in the nature of customer's

12  property.

13  Q.   There were a number of recesses in the course of the sale

14  hearing?

15  A.   I remember, I think, two.

16  Q.   In the course of one of those recesses you were approached

17  by someone who identified themselves as counsel to the Options

18  Clearing Corporation?

19  A.   Yes, I was.  I remember that his name was Alex Rivera.

20  I'd never really seen him before that but yes, he did come up

21  to me.

22  Q.   And what did he say to you?

23  A.   He came up to me.  He had a copy of an agreement, some

24  papers.  He said that he was from Sidley Austin, I believe.

25  That the -- he represented the OCC, that the OCC was prepared

183

1    to liquidate all the positions, both customer and proprietary

2    that Lehman had first thing Monday morning, if not earlier, and

3    were going to require, in order that that not happen, that

4    LBI's position at the -- and accounts -- at the OCC had to be

5    assumed by Barclays in order for them not to liquidate the

6    accounts.

7    Q.   If you'd turn to the next tab, sir, tab 3 is the Movant's

8    Trial Exhibit 455.

9    A.   Yes.

10   Q.   When did you first provided this?

11   A.   When Mr. Rivera came up to me.  It was a very brief

12   conversation.  I think the hearing, you know, resumed a few

13   minutes after we started talking.

14   Q.   And what did you do with respect to this transfer and

15   assumption agreement?

16   A.   I talked to the trustee, I think SIPC, I don't remember --

17   I think it was probably Mr. Caputo, very briefly.  There really

18   wasn't much time to talk.  I think we all thought that if the

19   OCC did what it threatened to do, that would be a disaster as

20   far as transferring customer accounts were concerned.  It would

21   mean that customers that had positions would have no ability to

22   control their own destiny.  There'd be no property that was

23   transferred to them and it was inconsistent with the whole idea

24   of the account transfer, which was really a key reason, from

25   our perspective at least, for this transaction.  So we really

184

1    felt we had -- we also did not take the threat as an idle

2    threat.  We knew that BPC was threatening not to perform

3    transactions unless it was satisfied that it was insulated from

4    risk and we just heard that the CME that had similar concerns

5    had taken fairly drastic action.  So I signed on behalf of the

6    trustee.

7    Q.   If you'd look, sir, at the second to last whereas clause

8    on the first page and you look just three lines up from the

9    bottom of that, you'll see there's a reference to all margin

10   deposits held by the OCC.  Do you see that, sir?

11   A.   Yes, I do.

12   Q.   And there's also a reference to all margin deposits under

13   the transfer, section 1 of the agreement, again three lines or

14   maybe four lines up from the bottom in section 1(a)(ii).

15   A.   Yes, I see that.

16   Q.   With respect to margin, I'm just going to ask you about --

17   and when I say margin I mean Lehman's cash, cash equivalents

18   and government securities used to secure exchange traders

19   derivatives at the Options Clearing Corporation.

20       Did you understand that there was customer cash that had

21   been posted at the OCC?

22   A.   Yes.

23   Q.   Did you know at that time that all of the cash that Lehman

24   had at the OCC was Lehman proprietary cash?

25   A.   No, I did not.

185

1   Q.   Did you have, at the time that you signed this agreement,

2   a concern that there was any material amount of Lehman

3   proprietary cash at the OCC?

4   A.   No, I did not.  I didn't see how there could be.  Well, I

5   must say that I was really focusing on customers and what would

6   happen to customers.  I didn't focus on the possibility that

7   there could be any cash held for Lehman that would essentially

8   be proprietary cash that might go to Barclays, other than in

9   connection with customer positions because it had been

10  represented that there was no cash, because cash of a similar

11  kind at the CME that was going to be transferred couldn't be

12  transferred after the CME liquidation.  So in my mind there

13  couldn't be cash or if there were it would be completely

14  inconsistent with the representations that were made to the

15  Court and to everyone else in the courtroom that evening.

16  Q.   At the time that you signed this agreement, sir, did you

17  have any intent to cause any fundamental change in the

18  economics of the sale or the parameters of the deal that had

19  been described to the Court at the sale hearing?

20  A.   No.

21          MR. BOIES:  Objection, Your honor.

22          THE COURT:  What's the basis of the objection?

23          MR. BOIES:  Unexpressed subjective intent as well.

24          THE COURT:  Well, that's true but I'm quite interested

25  in knowing what Mr. Kobak was thinking at the time he signed

186

1    the agreement.  I'm going to permit an answer to the question

2    and like you, Mr. Boies, Mr. Kobak appears in this court with

3    some frequency and I'm interested in what his thinking was at

4    the time he signed this.  So I'm going to hear from him on

5    that, how much weight I give to it remains to be seen.

6         THE WITNESS:  Fine.  I'm afraid I can't remember the

7    question.

8    Q.   Sir, at the time that you signed this agreement did you

9    have any intent to cause any fundamental change in the

10   economics of the transaction or in the parameters of the sale

11   that had been described to the Court?

12   A.   No.

13   Q.   At the conclusion of the sale hearing where did you?

14   A.   The hearing ended.  We were of the impression that there

15   was going to be a letter, a clarification letter, that would

16   clarify some things along the lines with what Ms. Fife had

17   discussed at some point during the course of the hearing that

18   some final language was being worked out.

19        I think our view was that it would take something like

20   half an hour or forty-five minutes.  I think the Court made

21   some reference to at least wanting to know if it was going to

22   be forty-five minutes -- more than forty-five minutes so there

23   wouldn't be an unnecessary all-nighter.

24        So we were -- we went to our offices, which are right

25   across the street, expecting that in short order we would

187

1    probably get a call from someone saying there was now a final

2    agreement and there could be a closing.

3        We ordered some pizza in.  We waited around for forty-five

4    minutes, an hour maybe, nobody called.  At some point either we

5    called somebody -- I didn't do it myself or somebody called us

6    but we were basically told that there wasn't going to be an

7    agreement that night.  People were tired, there were loose ends

8    to wrap up and people were going to convene some time over the

9    weekend, it really wasn't any point of waiting around.  So

10   eventually we all left.

11       I think the people from SIPC had already left.  Mr. Caputo

12   might have stayed over and left early Monday -- Sunday morning

13   or maybe he stayed here over the weekend, I just can't remember

14   at this point.

15   Q.   At some stage you heard that the closing was going to be

16   sometime Saturday morning?

17   A.   I think we were told over the weekend.  I know I'm jumping

18   ahead but we sent someone on Saturday to Weil Gotshal just to

19   find out -- to, kind of, monitor the situation and see what was

20   happening.

21   Q.   And who did you send to Weil Gotshal?

22   A.   We sent Anson Frielinghausen.

23   Q.   And what did you hear?  Sorry; first of all who is Anson

24   Frielinghausen?

25   A.   He's an associate in our bankruptcy group at Hughes

188

1    Hubbard.

2    Q.    And what did you hear back as to what was going on

3    Saturday at Weil Gotshal?

4    A.    He got there, I think, fairly early in the morning and I'm

5    sure there was activity or one kind or another at Weil Gotshal,

6    there usually is.  But I don't think -- he reported that there

7    really didn't seem to be anything going on with respect to our

8    matter.

9         We told him to stay there if they, you know, would let him

10   have a conference room or something and he was working on

11   finishing up a brief in a pro bono case so I think he spent a

12   lot of the day doing that.

13   Q.    And then what did you hear next of actual progress being

14   made on the clarification order?

15   A.    We heard at some point that parties were going to get

16   together on Sunday, I think around mid-day maybe late morning,

17   maybe early afternoon.

18   Q.    And who did you send to Weil Gotshal Sunday?

19   A.    Well, Mr. Frielinghausen went back and Mr. Kiplok,

20   Christopher Kiplok joined him.

21   Q.    And then did there come a time Sunday when you started

22   receiving drafts of this clarifying letter?

23   A.    Yeah.  We didn't -- I believe the first draft we got was

24   on the evening of Sunday night.

25   Q.    And if you'd turn to the next tab, tab 4, you'll see an e-

189

1    mail from Robert Messineo at the Weil Gotshal firm that was

2    sent to you and others at 7:54 p.m.

3    A.    Yes, that's correct.  I see that.

4    Q.    Is this the first draft that you received of the

5    clarifying letter?

6    A.    It's the first draft that I recall receiving, yes.

7    Q.    We have a couple of drafts that follow so if we could just

8    go through and establish the sequence.  There are three drafts

9    in total that you received, so I'd like to take those in turn

10    and then we'll come back and look at each of them with respect

11    to the disputed aspects.

12        The first draft is 7:54 p.m. on Sunday, correct?

13    A.    Yes.  I was home.  I don't know when I first looked at it

14    on my computer but certainly the time is 7:54.

15    Q.    And that's Movant's Trial Exhibit 629?

16    A.    Yes.

17    Q.    And the next tab is Movant's Trial Exhibit 447 and that

18    next draft was sent from Weil Gotshal at 4:36 a.m. Monday

19    morning?

20    A.    Yes.  That's what the e-mail says.

21    Q.    And the third draft, the last draft that you got is from

22    Cleary Gotlieb and it was sent at 6:03 a.m. Monday morning?

23    A.    Yes.

24    Q.    And that's Movant's Trial Exhibit 448?

25    A.    Right.

190

1   Q.   Now sir, if you'd turn first to the first draft, Exhibit

2   629 at tab 4.

3       (Pause)

4   Q.   Can you tell us, what were you doing when you received

5   this draft at approximately 8 p.m. Sunday night?

6   A.   There was a conference call convened, I think, in the late

7   afternoon, early evening, with a number of people on it.  I was

8   on it; the trustee, Mr. Giddens, was on it; I think Mr. Kiplok

9   was on it; Mr. Caputo was on it; Mr. Harback was on it; Ms.

10  Wang, I think, was on it; Ms. Leventhal of the Fed was on it.

11  I think there were other people on it but I can't remember

12  exactly who they all were.  And the purpose of the call was

13  that we were to be given an update of where the negotiations

14  stood, what the final draft of the clarification letter, at

15  least the essential terms, was and basically where the parties

16  stood.

17      We were on that call for hours and hours.  There was some

18  baseball game and it lasted longer than the baseball game.  I

19  think it was a Yankees playoff game.  And it really wasn't

20  until around midnight or the wee hours, I think, that we

21  finally had somebody come on and some final points were

22  discussed.

23  Q.   What happened on the hours and hours of the conference

24  call before somebody finally came on?

25  A.   Nothing.  It was radio silence.  I mean, occasionally

191

1   somebody would cough, somebody would say is anybody else -- I

2   thought at one point my line had gone dead and other people at

3   other times had similar comments.

4       We did get one or two reports that there were some issues

5   between Barclays and Chase that were being hammered out really

6   between them and occasionally people would say it's going to be

7   done in twenty minutes and then twenty minutes would go by and

8   still nothing had happened.

9   Q.   This e-mail from Mr. Messineo at Weil Gotshal says

10  "Attached please find the most recent version of the so-called

11  clarification letter.  The portions highlighted in yellow

12  concern the points which depend on the resolution of the

13  current discussions."

14      Now, the copy that we have doesn't have color but it does

15  have some highlighting so that you can see generally what those

16  areas are.  If you'd turn to the attachment, in the first page

17  you'll see at the very top it says WGM, Weil Gotshal Revision

18  of September 21 Responding to CGSH, Cleary Gottlieb, comments

19  of September 20, 2008.  Do you see that?

20  A.   Yes.

21  Q.   And then under section 1, purchased assets/excluded

22  assets, at the end of 1(a), the last sentence there before

23  1(a)(i) says "Purchased assets shall include" and then there's

24  subdivisions, (i) and (ii).  And under (ii) it says, "With

25  respect to clauses A, D and E of the definitions of purchased

192

1   assets in the original agreement, instead of the items referred

2   to in such clauses" and then there's an entire section that, I

3   guess, in the original highlighted in yellow, here highlighted

4   in gray.

5   A.   Uh-huh.

6   Q.   If you'd turn to the next page, sir.  Actually, sorry.

7   Before we turn, if you look at the (ii) at the very bottom of

8   that first page you'll see the purchased assets.  The reference

9   under item C, the last line, is to exchange traded derivatives

10  and collateralized short term agreements.  Do you see that,

11  sir?

12  A.   Yes.

13  Q.   And that was part of the language that was subject to

14  discussion.  Now if you turn to the second page, under item D,

15  there's a reference to excluded assets.  And it says, "The

16  excluded assets shall mean the assets of seller and its

17  subsidiaries."  And it goes on at some length.

18       The next sentence begins, "Except as otherwise specified

19  in the definition of purchased assets, excluded assets shall

20  include any cash, cash equivalents, bank deposits or similar

21  cash items of seller and its subsidiaries provided that," and

22  it then follows "an exception to the cash exclusion."  And that

23  exception starts with "Excluded assets shall not include (i)

24  any and all property of any customer."  And (ii) starts "Cash,

25  cash equivalents, bank deposits or similar cash items

1     maintained by or on behalf of LBI pursuant to Rule 15C 3-3 of

2     the Securities Exchange Act of 1934 or otherwise, or by or on

3     behalf of any clearing agency or clearing organization to

4     collateralize, guarantee, secure whether as margin, guarantee

5     funds deposit or in any other form the obligations of LBI or

6     any other person in an account maintained by or on behalf of

7     LBI and for which purchaser shall become responsible as of the

8     closing."  It continues.

9         I emphasize that, sir, just so we keep in mind, as we go

10    through the later drafts, the language specifically referring

11    to margin.  But all of this was part of language that had been

12    highlighted for further discussion by Weil Gotshal.

13    A.   It was all under discussion as we understood.

14    Q.   Right.  And if you turn to page 4 you'll see a section 8

15    that's called the transfer of customer accounts.  This is also

16    an immensely lengthy section.

17        The second sentence in square brackets starts, "All

18    customer accounts of LBI shall be transferred," and continues,

19    "in connection therewith purchaser shall received," and there's

20    a "(i) referring to customer property and then (ii) cash, cash

21    equivalents, bank deposits or similar cash items maintained, A,

22    by or on behalf of LBI pursuant to Rule 15C 3-3 of the

23    Securities Exchange Act of 1934 or otherwise or by or on behalf

24    of any clearing agency or clearing organization to

25    collateralize, guarantee, secure whether as margin, guarantee

194

1    fund deposit or in any other form," and it continues.  And I

2    similarly just want to emphasize that so we can look at what

3    happens to that language in the later drafts.

4         Now sir, can you tell us what did you do with this

5    draft -- this first draft when you go it?

6    A.   Well, I think I had it on my computer screen at home and

7    looked through it.  You know, really I was waiting for some

8    explanation because we were on this call where we were supposed

9    to be told where things stood.

10   Q.   If you'd turn now, sir, to the second draft, that's

11   Movant's Trial Exhibit 447, the 4:36 a.m. draft.

12   A.   Yes.

13   Q.   And turn first, sir, to page 2 to that section of

14   purchased assets, section 1(A)(ii)(C), it's at the top of the

15   page end of the -- no, I'm sorry, it's the second page at the

16   top at the end of the first paragraph.  (C) refers to as

17   purchased assets the same language you saw in the last draft,

18   "Exchange, trade derivatives and collateralized short-term

19   agreements," no change there.

20   A.   Right.

21   Q.   And then if you go to the bottom of the page and to the

22   last six lines on page 2, we'll see that there -- the language

23   about cash margin and guarantee fund has all been stricken by

24   Weil Gotshal.  So all of the language that excluded from the

25   cash exclusion that made an exception for cash, cash

195

1    equivalents, bank deposits or similar cash items with respect

2    to margin was all deleted, right?

3    A.    Yes.

4    Q.    And if you'd turn, sir, to page 5.  This is a carryover of

5    section 8, which is a transfer of customer accounts section.

6    A.    Yeah.

7    Q.    And if we highlight that top paragraph we'll see that the

8    similar cash margin language is also deleted here.  That all of

9    the language that referred to cash or cash equivalents that

10   were maintained by or on behalf of any clearing agency or

11   clearing organization to collateralize guarantee, secure,

12   whether it was margin, guarantee fund, deposit or in any other

13   form has been deleted.

14        Now sir, if you turn to the third draft which is the 6:03

15   a.m. draft, that one was circulated by Mr. Mazzuchi from the

16   Cleary Gottlieb firm, right?

17   A.    Well -- yeah, on -- yeah, I guess.  I mean, it says

18   Michael Mazzuchi on behalf.  I guess that means he distributed

19   it.  Anyway --

20   Q.    I think you can just look down below the --

21   A.    Anyway, I did receive this.

22   Q.    Yeah.  And then if you'd turn, sir, to the section we were

23   looking at which is now at the top of page 2, the end of the

24   first paragraph, that first part that (C).  Again there's no

25   change with respect to this phrase (C) exchange traded

196

1    derivatives and collateral short-term agreements.  Again, that

2    stays exactly the same.

3    A.    That was the same as it had been in the last -- the

4    previous draft.

5    Q.    Okay.  If we now look at section C, the excluded assets

6    section.  It's far too long to go through and compare here but

7    I will represent to you that the cash margin language that we

8    saw deleted by Weil Gotshal in the prior draft does not appear

9    here.  It was deleted and does not appear here.

10        (Pause)

11    Q.    And if you turn to section 8, the transfer of customer

12    accounts --

13    A.    Yeah, that I think is also the same language except that

14    there was -- I believe the other -- the previous version said

15    securities of substantially the same value but might not have

16    said nature or it said the same nature and not value and both

17    those words now appear.

18    Q.    But the cash margin language is gone?

19    A.    The other language was the same.  That was the only

20    change.

21    Q.    Now we'll come back to the drafts but first, sir, I'd like

22    you to turn to the next tab which is Movant's Trial Exhibit 3

23    and is the final, executed clarification letter.

24    A.    Yes.

25    Q.    If you'd turn, sir, to page 2 of that letter and I invite

197

1    you to look at this phrase with C at the top of that page.   Now

2    you will see C reads differently then in the prior drafts.   It

3    now reads, "Exchange traded derivatives (and any property that

4    may be held to secure obligations under such derivatives) and

5    collateralized short-term agreements."   You see that

6    parenthetical has been added.

7         Sir, did anyone tell you about the addition of that

8    parenthetical to the clarification letter?

9    A.   No, and we did not receive any redline draft or anything

10   of that nature that would indicate that change.

11   Q.   Were you provided with any highlighting, any e-mail, any

12   telephone conversation, any notice of any kind that this was

13   being added to the execution version of the clarification

14   letter?

15   A.   No.

16   Q.   Did you have any discussion with anyone from Barclays

17   about Lehman's margin over the weekend?

18   A.   No.

19   Q.   When did you first become aware that this parenthetical

20   existed in the clarification letter?

21   A.   I don't think I became aware of it until I saw a reference

22   to it in some of the correspondence that we had with Jonathan

23   Hughes and Ms. Granfield about our respective positions

24   concerning the issue of proprietary margin.

25   Q.   And that was sometime after the closing?

198

1    A.    Well after the closing.

2    Q.    Now, sir, I'd like to ask you some questions with respect

3    to the drafting of the term of this agreement that concerns the

4    15c3-3 asset.  First of all, between the time that the

5    approximate -- the first draft you got around 8 p.m. Sunday

6    night and the second draft you got around 4:30 a.m., what did

7    you hear from Anson Frelinghuysen and Chris Kiplok as to what

8    issues had been raised by Weil Gotshal or representatives of

9    the creditors' committee with respect to cash?

10   A.    I got a call; I think it was from Anson.  I think it

11   was -- I can't -- I did try to get to sleep for a couple of

12   hours sometime between about 2, 2:30 and 5 o'clock.  I wasn't

13   very successful in sleeping; I was pretty tired and keyed up.

14   So I don't know if it was right before I went to bed or when I

15   got up.  But Anson called, said there were some discussions

16   about the 15c3 account that seemed likely to be something that

17   would affect us and that relates to customer property.  I told

18   him -- I think I told him to get Chris and get -- meaning Mr.

19   Kiplok -- on the phone.  They told me that they had talked to

20   the creditors' committee, which had said that there were

21   discussions about giving Barclays the entirety of the 15c3

22   account, which consisted of about a billion dollars in cash and

23   700 -- I mean, I know now it's 769 million, but at that time

24   it's 700-something million dollars -- of securities, and that

25   there was a heated discussion about that.

199

1        This was something that concerned me, because this is

2    customer property.  And it was true that Barclays was getting

3    many of the accounts and therefore it might be appropriate to

4    transfer some of this to them, but they weren't getting

5    everything and we wanted to make very sure that we would have

6    enough to at least have a good prospect of being able to pay

7    customers a hundred percent.

8    Q.   If you'd turn, sir, to the second draft; that's Movants'

9    Trial Exhibit 447 at tab 5.  And if you'd look, sir, at section

10   8, which begins on page 4 and then carries over onto page 5.

11   A.   Yeah.

12   Q.   And at the top of page 5 section (ii) starts, and that

13   shows the insertion of some language that read, "to the extent

14   permitted by applicable law, and as soon as practicable after

15   the closing, 769 million dollars of securities as held by or on

16   behalf of LBI on the date hereof, pursuant to Rule 15c3-3 of

17   the Securities Exchange Act of 1934, as amended, or securities

18   of substantially the same nature."

19        So you understood that there had been a change that had

20   been made to that statement?

21   A.   I had actually talked to Mr. Kiplok and Mr. Frelinghuysen

22   and said, you know, we've got to have -- we ought to have

23   something in there that protects us.  I don't think a broker

24   could transfer something like this if they would be out of

25   compliance with the SEC rules, but we ought to have something

200

1    that makes that clear or makes it clear that Barclays can only

2    get something to the extent it's needed to satisfy customers.

3        And then I heard around the same time -- and I thought

4    maybe we had suggested the language to others, but I think

5    maybe someone else had suggested it.  But, anyway, the language

6    that appears, "to the extent permitted by applicable law", was

7    exactly the kind of concept I was thinking of, and it gave me a

8    lot of comfort to see that language.

9        There was also language added after (i) for the account of

10   the customer.  And as I said, this was all related to the

11   transfer of customer accounts; that's where it appeared in the

12   agreement.  So that also made it clear that this was only

13   supposed to be going to Barclays because it might be needed for

14   the customers that they were acquiring.

15       And my understanding was that there had been -- I was told

16   that there was a discussion, a pretty heated discussion I

17   believe, at which Mr. Miller had said you can't include cash

18   under any circumstances, you made representations, my firm made

19   representations, I made representations to the Court that

20   there's absolutely no cash in the deal and we can't transfer

21   the securities unless they're excess, meaning that they were

22   excess over what was needed to comply with the SEC regulations

23   and that the regulators agreed with them.

24   Q.   And you'll see, sir, at the end of the paragraph there's

25   also added to the words just at the end of the second to last

201

1    line, "are securities of substantially the same nature".  What

2    did you understand that to be?

3    A.   I -- well, that was later changed to "same nature and

4    value", as I've already testified.  And I understood that to

5    mean, and this made sense to me that Barclays would want this,

6    that you could have securities that redeemed, therefore you'd

7    have cash.  You might want to swap that cash out for

8    securities, you could have securities that for some reason did

9    not have the value they were assumed to have, and I would think

10   then the SEC or FINRA would want you to substitute something

11   else that was similar.  The idea was you would have things; the

12   value would always be 769 million dollars.

13   Q.   Did you at any stage agree, or were you ever even asked to

14   agree, that Barclays would get 769 million dollars pursuant to

15   this Section 8 of the clarification letter unconditionally or

16   absolutely?

17   A.   No.  It was my understanding that this was a very

18   conditional asset.

19   Q.   Over the course of your engagement on this matter, did you

20   come to learn of concerns that existed on the part of the

21   Depository Trust Clearing Corporation, or DTCC?

22   A.   Yes, I did.

23   Q.   And what were the concerns that you learned from DTCC?

24   A.   DTC (sic) had a tremendous amount of property.  I think

25   they had transactions in the order of 300 to 500 billion

202

```
 1    dollars that they were going to have to clear and settle.  They

 2    were very concerned, given the conditions that existed, of what

 3    their liability might be.  They threatened at one point that

 4    they would not accept, and I think they did actually put out a

 5    notice that they wouldn't accept, trades involving LBI, and

 6    that unless they were assured that there would be protection

 7    for them and their members, who are members of the securities

 8    industry, that they would not process transactions over the

 9    weekend or come Monday morning.

10    Q.   With whom from DTCC did you have discussions concerning

11    their exposure to Lehman?

12    A.   I think the first discussions I had were in the courtroom,

13    probably prior to the hearing.  And I believe a woman named

14    Mary Witkin (ph.), who was in the legal department, was one of

15    the people; Shelly Hirshon of Proskauer.  I don't believe Larry

16    Thompson was here.  Isaac Montal might have been; I don't

17    recall.  But I do recall particularly having discussions with

18    Ms. Witkin and Mr. Hirshon.

19    Q.   At the time of the sale hearing, there was an agreement

20    whereby DTCC would have recourse to a holdback of 250 million

21    dollars and also to additional collateral of some residential

22    and mortgage-backed securities.  The Court has heard that over

23    the weekend the residential mortgage-backed securities were no

24    longer available for DTCC.  How sanguine did you understand

25    DTCC to be with respect to its exposure to Lehman?
```

203

1   A.   I did not under --

2        MR. BOIES:  Objection.

3        THE COURT:  I'm assuming the basis for that is that

4   this witness is hardly in a position to comment on how sanguine

5   DTCC is, and that's, I think, a well-founded objection.  You

6   might want to rephrase it in some fashion --

7        MR. MAGUIRE:  Yeah.

8        THE COURT:  -- if you can.

9   Q.   My question, sir, it's only with respect to what DTC said

10  about either issuing a cease-to-act notice or about its

11  concerns about its exposure; what it manifested as opposed to

12  what its own subjective concerns were.

13  A.   Yeah, well, they said they were very concerned.  I

14  actually understood at the end of the hearing that despite the

15  fact that this 250 million dollars was going to be a guarantee,

16  that they were concerned that Barclays wouldn't stand behind

17  anything, except to the extent of that 250 million dollars and,

18  originally, the residential mortgages, although they, you know,

19  eventually turned out to have been pledged to Chase, I believe.

20  But I understood they still had concerns.  They said they

21  wanted to talk over the weekend possibly about exactly how this

22  would be resolved and how we and they might transact --

23  interface with one another come Monday morning.

24  Q.   Ultimately did Barclays enter into a separate letter

25  agreement with DTCC?

204

1    A.   Yes, they did.

2    Q.   And was the trustee a party to that agreement?

3    A.   Yes, we were.  Yes, he was.

4    Q.   If -- I'd ask you to turn to the next tab, 8, Movants'

5    Trial Exhibit 449.  Is that the Barclays letter agreement with

6    the DTCC?

7    A.   Yes, it is.

8    Q.   Can you explain to us, sir, how this agreement protected

9    the Depository Trust Clearance Corporation?

10   A.   Well, my understanding of this agreement was, rather than

11   having Barclays assume LBI's positions with respect to the

12   clearing boxes at DTC, that those boxes were going to stay with

13   LBI.  It does provide for the guarantee and the 250 million

14   dollars that DTC could look to, but DTC also knew that the

15   boxes would remain in LBI or the trustee's possession.

16   Q.   And how did the assets remaining with the trustee help in

17   any way protect DTCC?

18   A.   I think that DTC felt that if there were obligations or

19   liabilities under their rules, that was something that they

20   might be able to look to.

21   Q.   By having recourse to those assets?

22   A.   By having recourse to those assets in LBI's hands -- or in

23   the trustee's hands, where there wouldn't be any limit on what

24   our obligations were with respect to liabilities.

25   Q.   If you turn to the second page of the letter agreement,

205

1    there's a section called "Winding Down of Accounts".

2    A.    Um-hum.   Yes.

3    Q.    And that reads, "Barclays has indicated, and hereby

4    agrees, that all of the accounts of LBI maintained at the

5    Clearing Agency Subsidiaries (the 'Accounts') constitute

6    excluded assets within the meaning of the APA."

7         And you understood that to mean that they were excluded

8    from the sale?

9    A.    Yes.   I thought it was as clear as it could be.

10   Q.    This goes on to say, "Accordingly, pursuant to the

11   authority granted to the Trustee in the orders, the Trustee

12   hereby instructs the Clearing Agency Subsidiaries to close out

13   the pending transactions in the Accounts of the Clearing Agency

14   Subsidiaries, and to use the proceeds in accordance with the

15   rules and procedures of the Clearing Agency Subsidiaries."

16        It then goes on to say, I won't quote it but, this can be

17   done in accordance with the rules of the DTCC in the same

18   manner as it would when it closes out positions of participants

19   for whom it has ceased to act.

20   A.    That's correct.

21   Q.    Then there's a separate paragraph underneath that, and I'd

22   like to invite your attention to that paragraph where it says,

23   "As part of this closeout process, the Trustee hereby

24   authorizes DTC to accept and act upon instructions from NSCC to

25   deliver securities from the DCT LBI account to NSCC's account

206

1    in order to reduce or eliminate LBI's outstanding delivery

2    obligations to NSCC."

3         Sir, if you focus on the term "to deliver securities",

4    whose securities does that refer to?

5    A.    LBI's proprietary securities in the clearance box.

6    Q.    And that was my next question.  Where are the -- in which

7    account are those securities?

8    A.    In the LBI account.  I think it's the 074 account.

9    Q.    And is that what is referred to as the clearance box?

10   A.    Yes.

11   Q.    In the course of reaching resolution with the DTC, did

12   anyone from Barclays disclose or explain that Barclays was

13   drawing a distinction between the accounts at DTC and the

14   contents, the securities that were in those accounts?

15   A.    No.

16   Q.    When did you first hear of that distinction?

17   A.    I believe I had a meeting with Mr. Hughes in December of

18   1908 (sic).  We --

19   Q.    2008.

20   A.    2008.  I'm sorry.  I guess it hasn't been going that long.

21        2008.  We had had some discussions, because it had come to

22   my attention that Barclays' people were asking Deloitte

23   people -- Deloitte, working for the trustee -- to transfer

24   properties, which Ms. Karp (ph.) of Deloitte realized were

25   likely to be proprietary assets rather than customar --

207

1    customer assets.

2        So I'd written an e-mail to Mr. Hu -- to one of the people

3    at Barclays and had a call with Mr. Hughes, saying we shouldn't

4    do things that way, if you're going to make serious claims we

5    should do it by letter from your lawyers to us and we can

6    evaluate that.

7        So we had a meeting on another subject, the transition

8    service agreement, but we agreed we would spend a few minutes

9    after that talking about some of these issues.  And so we had

10   this meeting about the transition service agreement.  And Mr.

11   Caputo was there after the meeting.  Mr. Caputo stayed -- this

12   was at Barclays' conference room outside Jonathan's office --

13   and he told us that Barclays felt it had claims to these

14   assets, and he said that the thought the DTC agreement was in

15   the nature of a temporary agreement that was only supposed to

16   be -- to cover what was going to happen over the weekend and

17   the first few days, and also that they drew a distinction

18   between the accounts in which assets were located and the

19   assets themselves.

20   Q.   And did you agree with this distinction?

21   A.   I respectfully said that I -- if he wanted to write a

22   letter that was fine, this distinction made no real sense to

23   me, I didn't see why DTC would be interested in the accounts

24   with nothing in them, as opposed to the contents of the

25   accounts.

208

1   Q.   At the time that the trustee authorized this DTC letter

2   agreement and his representative signed it over the

3   clarification weekend, were you aware that Barclays had

4   excluded Lehman and Weil from their negotiations with the DTCC?

5   A.   No.

6   Q.   Did you do anything to check whether the Weil Gotshal

7   lawyers had conformed the draft clarification letter that they

8   were working on to this separate letter agreement with the

9   DTCC?

10   A.   No.

11   Q.   You're aware of a document called "Schedule B" to the

12   clarification letter?

13   A.   Yes.

14   Q.   And you're aware now that the securities that are listed

15   on that Schedule B are, at least for the most part, securities

16   that were in the DTC clearance boxes?

17   A.   Some of them at least.  I think a substantial portion of

18   them.  Not all, but many.

19   Q.   Why did you not pick up on that at the time?

20   A.   We were doing a hundred things at once.  We had literally

21   hundreds of requests from Barclays itself to transfer customer

22   property.  It turned out to be a very complicated process.

23   People wouldn't accept our medallions.  There were other things

24   that happened.  We were having trouble having visibility.  We

25   couldn't get direct access to their books and records.  We

209

1    couldn't always get direct access to Chase books and records.

2    Even at first we had trouble getting access to the DTC systems.

3    We had hedge funds calling, e-mailing.  We had to set up

4    separate phone -- special phone systems at my firm to have some

5    kind of triage, because the trustee and me and Mr. Kiplok and

6    anyone else who ever appeared in court whose name came to

7    anyone's attention would just get hundreds, thousands of phone

8    calls.  We were trying to find assets and bank accounts.  We

9    were trying to figure out what to do about real estate.  We

10   were trying to assemble some kind of staff.  We got many calls,

11   other than from the hedge funds, from various kinds of people,

12   employees, customers, all wanting to know where their property

13   was.  And I'm sure there are many, many things.  We had

14   thousands of -- literally hundreds or thousands of executory

15   contracts that we worked with Barclays as to whether they would

16   be assumed or rejected by Barclays.  There were 2004s and

17   adversary proceedings, as the Court knows, that were filed by

18   people in that early period.  So there was an awful lot of

19   other things going on.

20   Q.    Before we leave this subject, I'll just ask you briefly to

21   turn to tab 9, Barclays' Exhibit number 20.  This is a copy of

22   Schedule B.  And this does not show on its face whether any of

23   these securities are at the DTC, isn't that correct?

24   A.    No, that's correct.

25   Q.    Now, over the course of the weekend did you have some

210

1    correspondence, e-mail correspondence, with the OCC?

2    A.    Yes, I did.

3    Q.    If you turn, sir, to the next tab, Barclays' Exhibit

4    number 235 and you look at the first, chronologically -- that's

5    the one at the bottom of the first page -- this is an e-mail

6    from James R. McDaniel of the Sidley firm, sent September 20,

7    2008 at 11:44 a.m.   That's a Saturday of the clarification --

8    A.    Yes.

9    Q.    -- weekend, right?

10   A.    Yes.  I don't think I saw this right way.  I actually went

11   out on a bike ride for an hour or two to clear my head.  So I

12   probably saw it later in the afternoon, 3 or 4 o'clock.

13   Q.    You'll see that the e-mail is addressed to the group and

14   starts, "OCC is seeking to confirm its understanding that the

15   LBI accounts and all positions, cash and securities collateral

16   that are held by OCC in respect of those accounts, are intended

17   to be transferred to Barclays and that Barclays is assuming all

18   obligations with respect to those accounts.  The mechanism by

19   which OCC proposes to accomplish this purpose is to simply

20   rename the LBI accounts as accounts of Barclays, and it would

21   then be Barclays' obligation to make settlement in respect of

22   those accounts on Monday morning."

23        If you'd turn now, sir, to the next page and the first

24   full paragraph there, there's a section that begins "It is our

25   understanding that certain parts of the APA are still being

211

1    negotiated, including an amendment relating to property at DTC

2    which may involve similar issues to those affecting OCC.  OCC

3    circulated yesterday at the hearing a transfer and assumption

4    agreement among OCC, LBI and Barclays relating to these issues,

5    and a proposed agreement dealing with collateral of LBI

6    consisting of government securities held at JPMorgan Chase as

7    custodian.  In addition, OCC is holding nearly one billion

8    dollars in cash for the accounts of LBI."

9         Sir, how did you understand this reference to one -- or

10   nearly one billion dollars in cash for the accounts of LBI?

11   A.   I thought it must be referring to customer-related cash,

12   for reasons that I've already said.  I really didn't see

13   this -- I really saw this correspondence as directed more at

14   Cleary and Barclays than at me because I had essentially

15   already signed the agreement at the hearing.  I was actually

16   surprised that Barclays hadn't signed.

17   Q.   Now, if you go back to the first page of this exhibit

18   you'll see that there's a response from Edward J. Rosen, and it

19   says, "Jim, can you tell us more about the one billion dollars?

20   Is it excess margin?"  Did you see any response to that e-mail?

21   A.   I never saw a response to this.

22   Q.   Did you follow up?

23   A.   No.  Again, I had the understanding I've already testified

24   to.  I also thought that if there were suddenly going to be

25   cash of a material amount that that would be something that at

212

1   some point would be disclosed to us and disclosed to the Court.

2   Q.   And did anyone make such a disclosure?

3   A.   No.

4   Q.   If you turn, sir, to the next tab.  It's Barclays' Exhibit

5   number 262 and it is an e-mail on Sunday September 21, again

6   from Mr. McDaniel.  You were copied on this although it's

7   addressed to Mr. Rosen at the Cleary, Gottlieb firm.  This is

8   an extremely lengthy e-mail but I'd invite you to look to

9   paragraph number two.

10          And this says, "Having heard nothing further from you with

11  respect to cash held by OCC in respect of the LBI accounts and

12  in accordance with the terms of the transfer and purchase

13  agreement, all such cash in the accounts will be transferred to

14  Barclays, assuming that the transaction closes this evening."

15          And the next paragraph goes on to say, "If the transaction

16  does not close tonight, OCC would need to immediately liquidate

17  and close out the LBI accounts and is preparing to do so.

18  These preparations are as a precautionary measure that OCC does

19  not expect to have to use."  Did the transaction in fact close

20  Sunday night, sir?

21  A.   I don't know if it was technically Sunday night or very

22  early Monday morning.

23  Q.   In any event, the OCC did not liquidate all of the

24  positions of LBI?

25  A.   No.

VERITEXT REPORTING COMPANY

213

Q.   And did any of these references to cash suggest to you

that there was any issue concerning any significant or material

amount of Lehman cash at the OCC?

A.   No, it was exactly as I said before, I didn't really see

this as changing anything.  I certainly didn't think this was

directed at me.  I'd already signed.  But it was kind of

surprising to me that Barclays had not signed by that time.

And if they were getting an extra billion dollars or more of

cash you'd think they would have signed.  But that was my

thought process at the time.

Q.   Lehman's customers did post substantial amounts of their

own cash with Lehman, did they not?

A.   Yes.  And I didn't realize at the time that that cash was

posted at a place other than the OCC and then Lehman posted

proprietary cash but really on the customer's behalf.  I just

didn't understand that that's the way that worked at the time.

Q.   With respect to the cash posted by customers, at least for

those customers who had been transferred to Barclays, has the

estate transferred that cash, that customer cash to Barclays?

A.   Yes.

Q.   If you turn to the next tab, sir, it's a document,

Barclays' Exhibit number 353.

       MR. MAGUIRE:  It's not in evidence, Your Honor, but I

would move that it be admitted in evidence.

       MR. BOIES:  Objection, Your Honor.

214

1          THE COURT:  What's the basis for moving it into

2     evidence at this time through this witness?

3          MR. MAGUIRE:  It's a statement, an admission of a

4     party, admissible at any time, Your Honor.  The use for this

5     witness is simply as a reference point because Barclays has

6     compiled an exhibit that shows some 2.2 billion dollars of

7     customer cash that the estate has transferred to Barclays.  So

8     given that it is an admission, it has been prepared by

9     Barclays, I thought this would be a useful time to introduce

10    that.

11         THE COURT:  Well, I don't know that it's an admission

12    without reading it.  I'm not familiar with the document.  If

13    it's in fact an admission of a party I suppose it would be

14    admissible at any time, but I'd like to know in what respect

15    it's an admission.

16         MR. MAGUIRE:  Ms. James is an employee, full-time

17    employee of Barclays, Your Honor, and she says in paragraph 2

18    of her declaration, "Since March 1, 2006 I have been employed

19    as a director in the futures sales department of Barclays

20    Capital, Inc."  This is also a declaration that Barclays has

21    affirmatively submitted to this court in support of its papers

22    and has specifically marked it as an exhibit on its exhibit

23    list.

24         THE COURT:  Well, that's --

25         MR. MAGUIRE:  The only reason it was not already in

215

1  evidence is because we had objected to it, and we obviously now

2  withdraw that objection.

3      MR. BOIES:  Your Honor, I think there is no doubt that

4  there are portions of this that are a party admission, that is,

5  she is speaking within the scope of an authority.  I don't know

6  how it's going to be used with this witness.

7      THE COURT:  That makes two of us.  Why don't we

8  reserve on the question of admission into evidence until we see

9  how it's used.  And since, as counsel for the SIPA Trustee has

10  pointed out, it can be offered into evidence at any time if in

11  fact it is an admission.  You can use it and we can decide how

12  to ultimately treat it after you use it.  That way we'll have

13  context.

14      MR. MAGUIRE:  Very good, Your Honor.

15  BY MR. MAGUIRE:

16  **Q.   Sir, it is a fact that customer cash has been transferred**

17  **to Barclays with respect to accounts transferred to Barclays,**

18  **correct?**

19  **A.   Customer account --**

20  **Q.   Customer cash, yeah.**

21  **A.   Yes.**

22  **Q.   If you turn, sir, to page 5 of the declaration, that is**

23  **where in a footnote 4 Ms. James notes --**

24      MR. MAGUIRE:  And I should add, Your Honor, that Ms.

25  James testified and gave a deposition in this case as a

216

1    Barclays' 30(b)(6) witness on this topic.

2    **Q.    Footnote 4 states, "Exhibit 2 shows the breakout by asset**

3    **type and custodian of the value of the customer's future**

4    **collateral received to date by Barclays excepting any**

5    **collateral held in the 084C account, both in the relevant**

6    **currency and in U.S. dollars using the specified exchange**

7    **rate."**

8    **And then if we turn to her Exhibit 2, it shows the**

9    **customer collateral delivered to date valued as of September**

10   **19, 2000, to date, and that shows money market funds with a**

11   **total in excess of one billion dollars, cash in an amount**

12   **exceeding 870 million dollars, an additional amount with**

13   **foreign brokers and a grand total futures customer collateral**

14   **received that's reflected here as being a little in excess of**

15   **2.2 billion dollars.**

16   MR. MAGUIRE:  I have no questions for the witness on

17   this, Your Honor, I just thought this would be a useful time to

18   bring this to the Court's attention.

19   THE COURT:  Well, I'm not sure I agree.  I can't tell

20   yet.  I also don't -- this is true, by the way, of a number of

21   documents that have come up today, including a declaration of

22   Mr. Seery that was used earlier in the day.  There are

23   declarations that counsel are all very obviously familiar with

24   that I've not seen until I happen to turn the page of a

25   particular book that you've prepared.  And so it's not always

217

```
 1    obvious to me how a document which you're using fits into the

 2    mosaic of the case.

 3             If there's no objection from Mr. Boies as to the

 4    admission of the document now I'm prepared to reconsider the

 5    question.

 6             MR. BOIES:  Your Honor, if this is the purpose that

 7    he's offering it I have not objection.

 8             THE COURT:  It's admitted.

 9    (Declaration of Ms. James was hereby received into evidence as

10    Barclays' Exhibit 353, as of this date.)

11             MR. MAGUIRE:  Thank you, Your Honor.

12    BY MR. MAGUIRE:

13    Q.   Sir, if you could turn to the next tab 13.  You've told us

14    of the -- this is just a demonstrative, it's not an exhibit --

15    but you've told us of the various matters in which you were

16    engaged following the closing.  Was one of the most important

17    ones the transfer of customer property and customer accounts?

18    A.   That's correct.

19    Q.   And this demonstrative indicates, at least approximately,

20    that in the first month of the SIPA liquidation there was

21    something in excess of 72,000 accounts that were transferred to

22    Barclays with something over 34 billion dollars of customer

23    property, and is that your understanding?

24    A.   Yes, this actually refreshes my recollection.  I know we

25    used figures like this in some of our reports.
```

218

1    Q.   And --

2    A.   Roughly half the property was transferred to Barclays, but

3    it's also important to note that roughly half or more was

4    actually transferred to Neuberger Berman.  Barclays took many

5    accounts but they did not in fact take anywhere nearly all of

6    the accounts.

7    Q.   And in the course of this period following the closing

8    were you and your team attempting to work in a cooperative way

9    with Barclays?

10   A.   Yes.

11   Q.   Now, did there come a time, sir, when you received a

12   request from the OCC -- or rather the trustee was asked for

13   authority to transfer some 800 million dollars in government

14   securities to Barclays?

15   A.   I don't remember the exact amount but I do remember a

16   request for a significant transfer.

17   Q.   And if you turn to the next tab, Barclays Exhibit number

18   156, is this your response, dated November 14, 2008, to that

19   request?

20   A.   Yes, we were -- we had become quite concerned, among other

21   things, that all the customer margin and accounts had gone to

22   Barclays, but in fact there were many of those accounts that

23   did not actually transfer, the customer did not transfer.  They

24   only got the PIM accounts.  The PAM accounts, which I've just

25   mentioned, went to Neuberger.  There were also a substantial

1    number of accounts that were left with us, a lot of prime

2    broker accounts, among others.  And there seemed to be problems

3    because Barclays was not -- didn't seem to be necessarily

4    standing behind the accounts that went elsewhere that weren't

5    the Barclays accounts.  And we weren't about to transfer more

6    property which we understood to be customer property until that

7    situation could be rectified.

8    Q.    In the second paragraph of your letter you say, "The

9    trustee is aware of the transfer and assumption agreement dated

10   September 19, 2008, which of course I executed on his behalf,

11   and the trustee fully intends to comply with its terms."  And

12   then you go on to note certain open issues and concerns.

13       In the second paragraph you state, "Our position is that

14   this collateral can be transferred to Barclays and the trustee

15   will gladly consent if Barclays will live up to its bargain and

16   assume the obligations involved for all customers, not just

17   those in the so-called PIM accounts."

18       You go on to note in the next paragraph, "As we understand

19   Barclays' position, it wishes to have all of the collateral

20   transferred but to assume obligations only towards those

21   customers whose accounts have been transferred to Barclays and

22   not those whose accounts have been transferred elsewhere or

23   remain with LBI."

24       And then if you turn the page, the paragraph at the top

25   you note, "Once the trustee and his professionals, including

220

1    Deloitte & Touche, LLP, are provided with clear evidence and an

2    undertaking by Barclays that the deposited securities are in

3    fact collateral for transferred accounts as to which Barclays

4    assumes all related obligations, we will promptly instruct

5    JPMorgan Chase & Co. to transfer the deposited securities to

6    Barclays in accordance with the OCC's instructions.  Otherwise

7    the collateral should be divided in proportion to each entity's

8    responsibilities and obligations towards the customers

9    involved."  Can you explain your reference, sir, to customers

10   there?

11   A.   Yes. I think I tried to say this in my last answer.  It's

12   a little more articulate in the letter.  But we, again, were

13   concerned that Barclays didn't have all the customers.  They

14   did have all the property related to customers at the OCC.  And

15   something had to be done to make sure that they were satisfying

16   obligations to the customers that they didn't take, and there

17   were many customers that they did not take.

18   Q.   At the time you wrote this letter, sir, was it your

19   understanding that the subject here concerned customer

20   collateral?

21   A.   Yes.

22   Q.   And did you understand that at Lehman the collateral that

23   was collateralizing customer accounts was customer property?

24   A.   Yes.

25   Q.   Was it your understanding that any customer collateral

221

1    that was transferred to Barclays would be for the account of

2    customers?

3    A.   Yes.

4    Q.   Did you ever give the OCC the authority it sought here to

5    transfer these government securities?

6    A.   I actually can't remember if we worked out these problems

7    with how the accounts that weren't at Barclays were treated.  I

8    don't believe we ever did resolve that.

9    Q.   Now, the Court has been told that the trustee transferred

10   property to Barclays after the closing of the sale.  And so I'd

11   like to show you some documents on that subject.  The first is

12   at tab 15 which is Barclays' Exhibit number 300.

13          MR. MAGUIRE:  Your Honor, this is a document that is

14   not yet in evidence.

15   Q.   Sir, you were copied on this e-mail on Wednesday,

16   September 24, 2008, is that correct?

17   A.   I can't testify to an actual recollection that it was

18   exactly that date at that time, but I did get -- it certainly

19   indicates that I did get this.  I have no reason to doubt it.

20   I've subsequently seen it.

21   Q.   And you'll see that this e-mail was sent by your

22   colleague, Christopher Kiplok.

23   A.   Yes, it was.

24   Q.   And the subject of this is, "LBI Trustee authorization

25   collateral move".

222

1  A.   That's correct.

2  Q.   If you turn, sir, to the next page you'll see at the top

3  it says "James W. Giddens, as trustee for the SIPA liquidation

4  of Lehman Brothers, authorizes the transfer of the following

5  securities from account G69938 (Lehman Brothers, Inc. customer

6  foreign futures and foreign options secured account) as

7  follows."  At the time that this transfer was authorized, sir,

8  what was your understanding as to who was the owner of these

9  securities?

10  A.   Well, I mean, the name of the account would have suggested

11  to us very strongly that these were customer accounts.  We

12  were, to some extent, dependent on Barclays' personnel because

13  of their knowledge of the accounts.  And our understanding at

14  this time was that all we were transferring, all we certainly

15  ever meant to transfer was customer property.  And this seemed

16  perfectly -- this document seems perfectly consistent with

17  that.

18  Q.   If you turn, sir, to the next document, Barclays' Exhibit

19  number 375.  This is an e-mail dated Friday, September 26, 2008

20  from your colleague Anson Frelinghuysen to a number of people

21  and you are a copied recipient.

22  A.   Yes.

23  Q.   And the subject of this is "LBI transfer instructions,

24  trustee authorization".  If you turn, sir, to the third page of

25  the exhibit, you'll see a number of columns.  The last one is

223

```
1    Lehman market value.  And at the very bottom you will see it

2    gives a total for all of these securities, and that is

3    approximately 270 million dollars.

4    A.   Yes.

5    Q.   Now, if you turn to the last page of the exhibit you'll

6    see the authorization.

7    A.   Yes.

8    Q.   And it says, "James W. Giddens, as trustee for the SIPA

9    liquidation of Lehman Brothers, Inc., authorizes the transfer

10   of collateral referenced in the enclosed spreadsheet in

11   accordance with the wire instructions below on an expedited

12   priority basis as part of the transfer of customer accounts to

13   Barclays."  Was that the understanding in which this transfer

14   was authorized, sir?

15   A.   Yes, it was.

16   Q.   Now, sir, if you could skip to tab 18, Barclays's Exhibit

17   422.  This is an e-mail from Anson Frelinghuysen to a whole

18   group of people on which you are copied, correct?

19   A.   Yes, I see my name.

20   Q.   And this is sent Monday, September 20, 2008?

21   A.   Yes, that's what it says, yes.

22   Q.   The authorization here says, "James W. Giddens, trustee in

23   the securities investor protection liquidation of Lehman

24   Brothers, Inc., authorizes the transfer of the assets detailed

25   in the attached Excel worksheets pursuant to the asset purchase
```

224

1    agreement dated as of September 16, 2008."  And there are two

2    attached spreadsheets that are referred to in the next two

3    paragraphs.  The first one is "Equity 5101" which represents

4    equity collateral.  And the second one is "DTC074", available

5    collateral.  And if you turn to the next page, sir, you will

6    see the equity collateral which totals, on the bottom right,

7    some fifteen million dollars.

8    A.   Yes.

9    Q.   And the next page, sir, you'll see various bonds, the

10   fixed income collateral which totals, again on the bottom

11   right, some 146 million dollars.

12   A.   That's correct.

13   Q.   Now, sir, if you turn to the prior tab.  It's Barclays

14   Exhibit number 517.  You will see a string of e-mails.  And if

15   you go to the earliest one in time, that is from a Neal Ullman

16   at Barclays Capital sent to Anson Frelinghuysen on that same

17   date, Monday, September 29.  And that e-mail says, "Anson, I'm

18   seeking authorization to transfer the securities in the

19   attached spreadsheets as part of the transfer of assets to

20   Barclays Capital," and attaches the two spreadsheets.  See

21   that, sir?

22   A.   Yes, I do.

23   Q.   And then Mr. Frelinghuysen's response is that same day at

24   3:31 p.m., and he says, "Neal, please confirm that the

25   attachments to the e-mail below represent assets of Lehman

225

1      Brothers, Inc. that were sold to Barclays Capital, Inc.,

2      pursuant to the asset purchase agreement dated as of September

3      16, 2008.  Thank you, Anson".  And at the very top of this page

4      there is a response from Mr. Neal Ullman that says,

5      "Confirmed".  And that is sent at 3:50 p.m. on Monday the 29th.

6      You see that, sir?

7      A.    Yes.

8      Q.    And the authorization that is sent by Mr. Anson that is in

9      the next tab, Barclays' Exhibit number 422, is two minutes

10     later at 3:52 p.m. authorizing the transfer that Barclays has

11     requested and confirmed as appropriate, correct?

12     A.    Yes.

13     Q.    Sir, if you turn to the next tab.  It's movant's Exhibit

14     715.

15           THE COURT:  Mr. Maguire, I'm just going to break in to

16     make an inquiry about the likely duration of your direct

17     examination of Mr. Kobak.

18           MR. MAGUIRE:  I would expect, Your Honor, about one

19     hour.

20           THE COURT:  My suggestion then is that we adjourn --

21     it's almost 5:30 -- resuming tomorrow at 9:30.  But while I

22     have these issues in my mind I'd like to ask you about the

23     exhibits that you have identified in the last series of

24     questions, BCI Exhibits 300, 375, 422, and 517.  And you had

25     mentioned that 300 was not in evidence.  I haven't checked if

226

1    the others are.  I don't know whether or not you're seeking to

2    introduce them, with or without objection, at this point.  And

3    if you're planning to introduce them, this is probably a good

4    time to clear that up.

5           MR. MAGUIRE:  Thank you for that reminder, Your Honor.

6    I would ask that they be moved in evidence.  I think that

7    everything here is in evidence already with the exception of

8    the one Barclays' Exhibit 300.  And since that is an e-mail

9    that Mr. Kobak was a recipient on, I believe there's a proper

10   foundation for its admission.

11          THE COURT:  Is there any objection to Exhibit 300?

12          MR. BOIES:  No, Your Honor.

13          THE COURT:  It's admitted.

14   (E-mail from Christopher Kiplok, dated September 24, 2008 was

15   hereby received into evidence as Barclays' Exhibit 300, as of

16   this date.)

17          THE COURT:  I'll see you all again tomorrow at 9:30.

18          (Proceedings concluded at 5:28 PM)

19

20

21

22

23

24

25

227

```
 1

 2                              I N D E X

 3

 4     WITNESS          EXAMINATION BY          PAGE

 5     James Seery    Mr. Schiller              6

 6     James Seery    Mr. Werder               92

 7     James Seery    Mr. Tambe               141

 8     James Seery    Mr. Schiller            160

 9     James Seery    Mr. Tambe               167

10     James Seery    Mr. Werder              168

11     James Kobak    Mr. Maguire             170

12

13                          E X H I B I T S

14     OTHER'S          DESCRIPTION             PAGE

15     BCI-739        Spreadsheet Showing       25

16                    Repo Securities

17     BCI-650        Mr. Seery's               53

18                    Hand-written Notes

19     BCI-353        Declaration of Ms. James 217

20     BCI-300        E-mail from Christopher  226

21                    Kiplok dated September

22                    24, 2008

23

24

25
```

VERITEXT REPORTING COMPANY

212-267-6868                                            516-608-2400

228

1

2

3                    C E R T I F I C A T I O N

4

5      I, Dena Page, certify that the foregoing transcript is a true

6      and accurate record of the proceedings.

7

8      _____

9      Dena Page

10

11     Also transcribed by:

12     Lisa Bar-Leib, AAERT Certified Electronic Transcriber (CET**D-

13     486)

14

15     Veritext

16     200 Old Country Road

17     Suite 580

18     Mineola, NY 11501

19

20     Date:  May 6, 2010

21

22

23

24

25