1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555-jmp

Case No. 08-01420-jmp (SIPA)

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS HOLDINGS INC., et al.

            Debtors.

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS INC.

            Debtor.

- - - - - - - - - - - - - - - - - - - -x

                U.S. Bankruptcy Court

                One Bowling Green

                New York, New York

                May 5, 2010

                9:37 a.m.

B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

2

1

2    EVIDENTIARY HEARING re: 60(b) Motions

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Transcribed by:  Esther Accardi

25

3

1

2   A P P E A R A N C E S :

3   JONES DAY

4        Special Counsel for the Debtors

5        222 East 41st Street

6        New York, New York 10017

7

8   BY:   ROBERT W. GAFFEY, ESQ.

9        JAY TAMBE, ESQ.

10

11

12   QUINN EMMANUEL URQUHART OLIVER & HEDGES, LLP

13        Special Counsel to the Official Committee of Unsecured

14        Creditors

15        51 Madison Avenue

16        New York, New York 10010

17

18   BY:   RICHARD I. WERDER, JR., ESQ.

19

20

21

22

23

24

25

4

1

2   A P P E A R A N C E S : (continued)

3   HUGHES HUBBARD & REED LLP

4       Attorneys for the James W. Giddens, SIPA Trustee

5       One Battery Park Plaza

6       New York, New York 10004

7

8   BY:   WILLIAM R. MAGUIRE, ESQ.

9

10

11   BOIES, SCHILLER & FLEXNER LLP

12       Attorneys for Barclays Capital, Inc.

13       333 Main Street

14       Armonk, New York 10504

15

16   BY:   DAVID BOIES, ESQ.

17

18

19   BOIES, SCHILLER & FLEXNER LLP

20       Attorneys for Barclays Capital, Inc.

21       5301 Wisconsin Avenue, N.W.

22       Washington, DC 20015

23

24   BY:   JONATHAN D. SCHILLER, ESQ.

25

5

1

2    A P P E A R A N C E S : (continued)

3    DEWEY & LEBOEUF LLP

4         Attorneys for CAPCO, Inc.

5         1301 Avenue of the Americas

6         New York, New York 10019

7

8    BY:   ELIZABETH P. SMITH, ESQ.

9         (TELEPHONICALLY)

10

11

12   STUTMAN TREISTER & GLATT

13        Attorneys for Interested Party, Elliott Company

14        1901 Avenue of the Stars, 12th Floor

15        Los Angeles, CA 90067

16

17   BY:   WHITMAN L. HOLT, ESQ.

18        REBECCA S. REVICH, ESQ.

19        MARINA FINEMAN, ESQ.

20        (TELEPHONICALLY)

21

22

23

24

25

6

1                    P R O C E E D I N G S

2           THE COURT:  Be seated, please.

3           MR. MAGUIRE:  If it pleases the Court.  Again, Bill

4    Maguire for the SIPA trustee.

5    RESUMED DIRECT EXAMINATION

6    BY MR. MAGUIRE:

7    Q.   Mr. Kobak, yesterday you were testifying about various

8    transfers of accounts and property to Barclays in the period

9    following the closing of the sale?

10   A.   That's correct.

11   Q.   In that connection, sir, could you turn, please, to Tab 19

12   of your binder.  And that is to Movant's Trial Exhibit 715.  Do

13   you recognize that, sir, as an e-mail exchange that you had

14   with Barclays' Jonathan Hughes?

15   A.   Yes.

16          MR. MAGUIRE:  Your Honor, I do not believe that this

17   exhibit is in evidence.  I'm not aware of any objection.

18          THE COURT:  It sounds like a prelude to a motion to

19   admit the document.  Is there any objection?

20          MR. BOIES:  No, Your Honor.

21          THE COURT:  It's admitted.

22   (E-Mail exchange between Kobak and Hughes was hereby received

23   as Movant's Exhibit 715 for identification, as of this date.)

24          MR. MAGUIRE:  Thank you, Your Honor.

25   Q.   Sir, if you turn, please, to the second to last page of

7

1    the exhibit.  You'll see there an e-mail that you sent December

2    5, 2008 to James Rasca (ph.) and Alastair Blackwell, with

3    copies to a number of people including, at Barclays, Jonathan

4    Hughes.

5    A.    Yes.

6    Q.    In the first sentence of your e-mail you say, "Marlo Karp

7    has forwarded to me some disturbing e-mails in which you appear

8    to be asking her to make property available to Barclays," can

9    you tell us, please, what the subject was that you were

10   addressing here?

11   A.    Yes.  I think I started to testify about this yesterday.

12   Marlo Karp, who's a partner at Deloitte and assists the

13   trustee, had gotten quite perturbed because requests were

14   made -- the e-mail says here, but my recollection is it was

15   actually to people on her staff, including fairly junior

16   accountants, to transfer property.  She was concerned that at

17   least some of those requests were for property that was not

18   customer property, or I believe on occasion there were requests

19   where customer property and proprietary property might be

20   intermixed in the same request.

21        She was quite concerned about that, she thought there was

22   supposed to be a definite channel of communication that people

23   shouldn't just be going to any junior accountant that was

24   involved.  And she thought that if there was a request for

25   something other than customer property she needed, and Deloitte

8

```
 1    needed, a direction from the trustee or counsel, Hughes

 2    Hubbard, that it was appropriate to make that transfer.  And

 3    she was just very concerned, there was this kind of back

 4    channel communication.  And she was very afraid that mistakes

 5    might be made because there were so many requests being made at

 6    this time, it would be easy not to focus on all the details of

 7    one of them.

 8         So that was the prelude.  I wrote what I considered a

 9    rather strongly-worded e-mail to Mr. Rasca.  I had a copy go to

10    Mr. Hughes and Ms. Granfield at Cleary, because one of the

11    points I was making was that if they had claims for property

12    under the agreements or otherwise that were not customer

13    property, they should specify formally what those claims were

14    and we could deal with it in an appropriate manner.

15    Q.   If you turn, sir, to the next tab, Exhibit 20, it's Tab

16    20, Movant's Trial Exhibit 642.  I'm going to switch to another

17    subject.  And that is the settlement that was entered into

18    between Barclays, JPMorgan Chase and the estate in December of

19    2008.

20         When you heard of this potential settlement, did you raise

21    any questions with the New York fed?

22    A.   Yes.  We -- the fed called, said there had been this

23    longstanding dispute about the seven billion dollars between

24    Barclays and Chase.  The fed had wanted to broker a settlement.

25    I think it was Barclays she said had wanted the trustee to get
```

9

1    involved because then it could be approved by court order.  We

2    clearly wanted to know what was involved, she was talking about

3    a lot of money.  And as I recall, she offered to have us come

4    to the fed -- the New York fed.  And she and Tom Baxter, who

5    was the general counsel sat down with us.  I think Mr. Caputo

6    was there, the trustee was there.  And explained what the

7    background was, what the nature of the settlement was.  Why

8    they thought it was in the public interest, and why it wasn't

9    damaging to the estate's interest.  We said all right, we want

10   to study it, we have a lot of questions.  And we did have

11   questions, and, certainly, one question we had was what is --

12   what is the value and how does it correspond.  She was using

13   numbers for what the securities were worth, that was a little

14   higher than the numbers that had been expressed to the Court.

15   I think it was forty-nine something, as opposed to 47.4.  So we

16   wanted to understand what that discrepancy was.  And just make

17   sure that we really thoroughly understood as best we could what

18   was going on.

19   Q.    If you turn to the second page of Exhibit 642.  Is this an

20   e-mail from the trustee to Tom Baxter and Shari Leventhal of

21   the fed including a memo reflecting questions that the trustee

22   and SIPC had about the proposed settlement?

23   A.    Yes.

24   Q.    And if you turn, sir, to the next page, the last two pages

25   of the exhibit, is that the memo attachment containing those

1    questions?

2    A.    Yes, it is.

3    Q.    In the -- if you turn to page 2 of the memorandum.  And

4    look at the last sentence of the top paragraph.  It starts, "We

5    also would like to understand how the fifty billion dollar

6    figure was reached since the description of the transaction to

7    SIPC and the trustee on September 19, and later in open court,

8    referred to securities valued at 47.4 billion, and liabilities

9    of 45.5 billion."  And was that one of the questions that you

10   raised with the New York fed?

11   A.    Definitely.

12   Q.    And what did you understand as a result of your

13   discussions?

14   A.    Well, we had a meeting, I think this refers to a meeting

15   later in the week, with Ms. Leventhal.  I think she came down

16   to our offices.  She didn't have the exact values at hand, but

17   I think she indicated in that meeting and subsequently that the

18   fed might value at least at that time, the actual value of the

19   securities at less than the fifty million dollar figure that

20   had been used at the time.

21   Q.    Did you also receive some financial information from

22   counsel for JPMorgan Chase, Hal Novakoff (ph.)?

23   A.    Yes.  We asked all the parties; Barclays, the fed, Chase

24   for whatever information we had as to valuation.  Mr. Novakoff

25   sent us a -- didn't actually send it to me, I think he sent it

11

1    to Marshal Levinson, who at that time I believe his title was

2    chief liquidating officer, he was someone who was hired by the

3    trustee, with a spreadsheet.

4    Q.   And if you turn to the next tab, Tab 21, that's Movant's

5    Trial Exhibit 431.  Do you recognize that as the e-mail from

6    Mr. Novakoff, that you're referring to?

7    A.   Yes.

8    Q.   That's addressed to Mr. Levinson, and also to Steven

9    Cutler, and to Marlo Karp?

10   A.   That's correct.

11        MR. MAGUIRE:  Your Honor, I believe there is an

12   objection by Barclays to this exhibit.  Although, Barclays has

13   also marked it as its own exhibit, Barclays' Exhibit 444.

14        MR. BOIES:  We do object.

15        THE COURT:  What's the objection?

16        MR. BOIES:  Hearsay.

17        THE COURT:  And that's in reference to which part of

18   the exhibit?

19        MR. BOIES:  I'm sorry, Your Honor?

20        THE COURT:  The hearsay objection relates to which

21   part of the exhibit?

22        MR. BOIES:  This is Exhibit 431, Your Honor.

23        THE COURT:  Well, Exhibit 43 -- I'm just trying to

24   understand if it's the entire exhibit that's the problem.

25        MR. BOIES:  Yes, it is.

12

1          THE COURT:  And why is that?

2          MR. BOIES:  Because it is a declaration of somebody

3    who is not in court, subject to cross-examination, made outside

4    of court.  It is offered, as I understand it, for the truth of

5    the matter asserted.  And it's offered simply for this witness'

6    state of mind.  While we believe that is not a relevant issue,

7    the Court could consider it and give weight as it decides

8    pursuant to a decision the Court made yesterday.

9          THE COURT:  Here's what I'm trying to get at, and I

10   understand what you said, Mr. Boise.  The exhibit as I'm

11   looking at it is an e-mail from Mr. Novakoff to a number of

12   individuals including people at Hughes Hubbard and at JPMorgan.

13   And it attaches a spreadsheet.  I'm simply trying to understand

14   if your objection is to the entire document, to the e-mail

15   portion of the document, or to the spreadsheet portion of the

16   document?

17         MR. BOIES:  It is to the entire document, Your Honor.

18   I'm sorry I wasn't clear.

19         THE COURT:  I'm going to allow the document to be

20   used.  And I'm going to reserve on the hearsay objection until

21   I see how it's used.  Additionally, it seems to me that this is

22   a document that to the extent it relates to marks by JPMorgan

23   can be highly relevant to questions that are before the Court,

24   and that the hearsay aspects of this can be overcome by having

25   a custodian of records from JPMorgan or some other witness from

13

1  JPMorgan confirm the validity of the marks or how the marks

2  were created.  Value is a very key component of the matters in

3  dispute here, and I'm anxious to have before me all relevant

4  information.  This may or may not be relevant.  But to the

5  extent it is, I want to know about it.

6         MR. MAGUIRE:  Thank you, Your Honor.

7         THE COURT:  So I'm reserving.

8  BY MR. MAGUIRE:

9  Q.   Sir, you've identified the attachment to this e-mail as

10 the spreadsheet that you saw that the time, is that right?

11 A.   Yes.  Particularly the second page of the document.

12 Q.   If you turn to that second page, sir, and see at the top

13 of the page the words marked by JPM?

14 A.   Yes.

15 Q.   And there are various categories of assets.  And under the

16 marked by JPM columns there's par remaining, CV remaining and

17 11/3, November 3 JPM value.

18 A.   Yes.

19 Q.   And you see the value there is approximately 2.8 or 2.9

20 billion dollars?

21 A.   That's correct.

22 Q.   What was the significance to you of this spreadsheet in

23 November of 2008?

24 A.   I don't have the exact figures in my mind.  But if you

25 took this figure and added it to the cash or whatever else was

14

1    being transferred, it came out actually well below 47.4.  I

2    think it came out in the mid-forty-sixes.  If you go over a few

3    columns you'll see a column -- three columns from the end

4    unmarked at zero, that's the same value.  So it was clear or

5    our assumption was that JPMorgan was valuing it at zero.  But

6    even if you take -- and then the next column is valuing it at

7    ten percent, rather than zero, shows a slight increase, that

8    would still be way below 37.4.  And the farthest right column

9    3,414,760 something was valuing at 100 percent, didn't seem to

10   us from the very fact that they were only -- that they listed

11   ten percent and zero percent values that even in the best of

12   circumstances it would be unlikely to be valued at anything

13   nearly 100 percent.  But if you take that 3.4 and add it to the

14   other figures, it still comes out at about 47.4, I think a tiny

15   fraction lower than 47.4 actually.

16       Now, I realize these were November values, not the values

17   at the time, but it did at least lead us to think at the time

18   that this was not an inappropriate thing for the trustee to be

19   doing.

20   Q.   Now, if you turn to the next tab I believe we have a

21   demonstrative that just sets forth the math using the JPMorgan

22   values.  And that using the 2.88 billion dollars JPMorgan

23   valued that totals 46.83 billion dollars?

24   A.   Yes.  And as I said even if you took the 100 percent it

25   would still total, I think, just below 47.4.

15

1    Q.   Sir, I would like to ask you now about the last subject

2    that we'll deal with on direct.  And that is your

3    correspondence with Barclays concerning the disputed assets.

4    If you turn, sir, to Tab 23 you'll see Barclays' Exhibit Number

5    734.  And this is a letter that you received from Barclays'

6    counsel at Cleary Gottlieb on or about December 29, 2008, is

7    that correct?

8    A.   Oh, that's correct.

9    Q.   You'll see in the second paragraph this raises issues

10   concerning Barclays' claim to assets in Lehman's clearance

11   boxes?

12   A.   Yes.

13   Q.   And in this letter from Ms. Granfield she refers in the

14   second sentence of this paragraph, "As discussed with Deloitte

15   & Touche by various Barclays' representatives, and as mentioned

16   to you by Jonathan Hughes a couple of weeks ago."  You see that

17   reference, sir?

18   A.   Yes.

19   Q.   Is that the discussion that you testified yesterday about

20   with Mr. Hughes?

21   A.   Yes.

22   Q.   Following the e-mail with my complaint about the way

23   people were being approached to transfer property, I had a

24   meeting that I testified to in my testimony yesterday with Mr.

25   Hughes.  And I understood this to be -- I had said if you're

16

1   going to make a claim we probably will dispute it, but we

2   should see the claim in writing, and so you or your counsel

3   should send a letter formally stating what your position is.

4   And I understood this letter from Ms. Granfield to be that.

5   Q.   And did you respond to Ms. Granfield's letter with the

6   next tab, the next exhibit; Movant's Trial Exhibit 553?

7   A.   Yes.

8   Q.   And that's your letter dated January 20, 2009?

9   A.   Yes, it is.

10          MR. MAGUIRE:  Your Honor, I believe that Barclays has

11   an objection to this document on the basis of lack of

12   foundation, lack of relevance, hearsay and Rule 408.  I also

13   believe the same documents has been marked by Barclays and

14   submitted and received in evidence already as Barclays' Exhibit

15   158.  I don't have 158 with me, but I believe that to be the

16   case.

17          MR. BOIES:  Your Honor, accepting counsel's

18   representation I have no objection to using the document that

19   he has, assuming that it is the same as a document that's

20   already in evidence.

21          THE COURT:  I accept the representation.  And if it

22   turns out that there's some mistake, we can always correct the

23   record later.

24   BY MR. MAGUIRE:

25   Q.   And so this was a start of a long series of correspondence

17

1   between you and representatives of Barclays concerning, not

2   only DTC, but after this other disputed assets?

3   A.   Yes, various things got added.  It seemed that as soon as

4   we'd done the transfer for the seven billion these claims

5   started to be asserted and they more or less escalated as

6   additional things were added.

7        But we did have quite a series of correspondence.

8   Sometimes the correspondence was directly from Barclays,

9   sometimes it was from Ms. Granfield.  Sometimes it was directed

10  to me, sometimes it was directed to the trustee, himself.

11  Q.   And Barclays' counsel, Ms. Granfield, responded to your

12  January 20 letter with the document in the next tab, Movant's

13  Trial Exhibit 603?

14  A.   Yeah, she wrote me back in March.

15  Q.   And her March letter, again, referred to the dispute

16  concerning the assets in the DTC clearance box?

17  A.   That's correct.

18  Q.   And you also received, if you turn to the next tab,

19  Barclays Exhibit Number 164, a separate letter from Barclays'

20  Jonathan Hughes -- I'm sorry, the trustee received a letter

21  from Mr. Hughes on or about March 29, 2009"?

22  A.   That's correct.

23  Q.   And this March 25 letter included, not only a claim with

24  respect to the clearance box assets, but also Barclays' claim

25  with respect to the 769 million in 15(c)(3) securities, and

18

1    also Barclays' claim with respect to Lehman's margin assets?

2    A.    That's correct.

3    Q.    Now, you responded to Ms. Granfield's March 6th letter

4    with the next tab that's being marked as Movant's Trial Exhibit

5    555?

6    A.    Yes.

7          MR. MAGUIRE:  I understand, Your Honor, that Barclays

8    has an objection again for lack of foundation, relevance,

9    hearsay and Rule 408.  I understand that this document has also

10   been marked by Barclays as Exhibit 165, and has been received

11   in evidence.

12         MR. BOIES:  Based on the same representation, Your

13   Honor, we have no objection with him proceeding with this

14   document.

15         THE COURT:  Fine.  This document is then admitted.

16   (Koback letter to Granfield was hereby received as Movant's

17   Exhibit 555 for identification, as of this date.)

18   Q.    Sir, if you turn to the second page of your March 27

19   letter.  I'd like you to focus on the second full paragraph

20   that starts, "One point in your letter particularly troubles me

21   and the trustee."

22   A.    Yes.

23   Q.    So this is your reference at page 2 of the supposed "fact

24   that in the days following the closing of the asset purchase

25   agreement as clarified by the clarification letter, the trustee

19

1    delivered to Barclays a large portion of the 'securities in

2    LBI's clearance boxes' as of the time of closing."  Why did

3    that particularly trouble you?

4    A.    Well, we did not understand that we were certainly

5    intentional delivering such securities.  I was concerned that

6    there might be -- I didn't know what he was talking about,

7    basically.  I didn't know if there were Barclays' people who

8    had made -- somehow managed to make transfers of property that

9    we didn't know about.  I didn't know if these were things that

10   happened before we got appointed, or in the confusing

11   particularly first few days after we appointed.  I didn't know

12   if these were things where Barclays' people had prevailed on

13   our people, you know, unknowingly to deliver property.  But it

14   seemed -- it was very troubling to me and very troubling to the

15   trustee.  And we really did not know what transfers they were

16   talking about.

17   Q.    In the aftermath of the closing, were there certain

18   Barclays' employees who were supposed to be working for the

19   estate?

20   A.    Yes.  Originally, there was a woman named Laura Vecchio,

21   who was basically assigned as the liaison.  I think we even

22   paid for her time, I'm not sure of that.  I think she was

23   supposed to be the liaison, both for us and for LBHI, and we --

24   every request that we had for information had to be funneled

25   through her.  And at the same time, she was dealing, I imagine,

20

1   with many LBHI requests.  It was a completely untenable

2   situation.  Eventually some additional Barclays' people were

3   made available.  But their primary interests was in getting the

4   property for the Barclays' customers transferred to Barclays.

5   They would sometimes deal with the request we had for

6   information, and we had a lot of requests for information.  But

7   they all had to be prioritized.  And as you might expect,

8   Barclays' priorities were probably not always the same as ours.

9   We had no direct access to the Barclays screens.  Any request

10  to look at information for quite a long time had to be funneled

11  through Barclays' people.  I think tickets had to be filled

12  out.  We had many, many discussions about that with Barclays.

13  Eventually we entered an access agreement which the Court

14  approved about a year later.  And very recently we finally

15  worked out the terms of a transition services agreement.  But

16  it was a very difficult situation.  And even when the Deloitte

17  people got involved, they did not have direct access to things.

18  Q.   If you turn, sir, to the next tab, Movant's Trial Exhibit

19  556, is this a response that you sent to Mr. Hughes, response

20  to his March 25 letter to the trustee?

21  A.   Yes.

22  Q.   And then, sir, if you turn to the next tab, Movant's Trial

23  Exhibit 432.  Is this a letter that you sent to Lindsay

24  Granfield on or about April 27, 2009?

25  A.   Yes, it is.

21

1   Q.   You say in the first sentence of your letter, "I refer to

2   my letter of March 27, to which I have never received a reply."

3   And you also enclosed a copy of the letter and you made

4   specific reference to the last two paragraphs, in which you

5   say, "I made two specific requests for information and

6   documentation relating to factual statements and

7   representations in your letter, which are of substantial and

8   immediate concern with the trustee's administration of the LBI

9   liquidation."  And did you mean by that, sir, one of the issues

10  was this factual assertion that the trustee had transferred

11  property to Barclays?

12  A.   Yes.

13  Q.   If you turn, sir, to the next tab, Movant's Trial Exhibit

14  248.  Is this a letter that you received -- I'm sorry, that the

15  trustee received from Barclays' Jonathan Hughes, on or about

16  May 13 of 2009?

17  A.   Yes.  It was sent to Mr. Giddens, I was shown as a cc and

18  I did receive it.

19  Q.   This addresses all of the disputed assets.  But if you

20  turn, in particular, sir, to page 5 of the letter.  And I

21  invite you to turn your attention to the paragraph marked

22  fifth.  And there Mr. Hughes asserts, that while you have taken

23  the position since January 20, 2009 that you are not obligated

24  to transfer any clearance box securities in the weeks following

25  the closing you did, in fact, -- you, in fact, did transfer

22

1    such securities.  In Mr. Kobak's letters of March 27th and

2    April 27th he claims to be unaware of the trustee making any

3    transfers of clearance box securities, and asks for information

4    regarding both transfers Barclays believes have occurred.  In

5    response to that request Barclays identifies the following

6    transfers of clearance box securities.  Now, sir, the first

7    transfer that Barclays identified is something in excess of one

8    billion dollar from DTCC on September 19th.

9    A.    That's correct.  We investigated these.  I think we had

10   Deloitte investigate them.  The first transfer, the bulk of it,

11   the one well over a billion dollars, was actually made the

12   morning of the 19th, I don't remember the exact time, but

13   several hours before we were even appointed.  Didn't have

14   anything to do with the trustee or any of his personnel.

15   Q.    The next three transfers are transfers from DTC on

16   September 29 and September 30, 270 million on September 29 and

17   then two transfers, one for 146 million, and one for fifteen

18   million on September 30.  What did you do when you received

19   this assertion concerning these transfers?

20   A.    Well, as with the first one we investigated -- had

21   Deloitte investigate all four.  I think we saw the e-mails

22   actually yesterday that relates to -- relate to number 3 and

23   number 4 on the list, the 146 and the 15.  There had been

24   request for Barclays to make transfers.  They had been

25   transferred.  But no one understood that they were not

23

1   transfers of customer property.  And I think we did the same

2   thing with what we discovered about the 270 million dollar

3   transfer.

4   Q.   Just for your reference, the 270 million number appears

5   also -- I believe there's a bit approximate to it in Tab 16,

6   which we looked at yesterday, which is Barclays Exhibit Number

7   375.  That involves a transfer that has a Lehman market value

8   of 269,921 dollars.

9   A.   Yes.  And that one was authorized by Mr. Kiplok who said

10   he was authorizing it on the basis that it was part of the

11   transfer of customer accounts to Barclays.

12   Q.   And the other two transfers for 146 million on September

13   30 and for fifteen million, I believe we looked at yesterday in

14   Tab 18, which was Barclays Exhibit 422?

15   A.   That's correct.

16   Q.   Sir, if you turn to the next tab, Movant's Trial Exhibit

17   557.

18   A.   I'm sorry, you got to give me the tab number.

19   Q.   I'm sorry, the tab number is 31.  Did you continue to

20   ask -- to follow-up on these examples -- on these assertions

21   that Mr. Hughes had made about the four transfers from the

22   trustee to Barclays?

23   A.   Yes.

24        MR. MAGUIRE:  Your Honor, I believe that Barclays has

25   an objection to this exhibit.

24

1         THE COURT:  Is it an objection that relates to the

2  fact that it says Rule 408 settlement discussions at the top of

3  it, or is it unrelated to the 408 reference?

4         MR. BOIES:  It is in part a 408 objection, Your Honor.

5  But it also is a hearsay objection.  The witness has not

6  indicated any basis that this should come in as past recollect,

7  recorded, or any of the other exceptions, possible exceptions

8  to the hearsay rule that might be applicable with a different

9  foundation.  As it sits here now it's simply hearsay.

10        MR. MAGUIRE:  Your Honor, I'm not asking that this be

11  admitted for the truth, simply to show that the witness

12  followed up.

13        MR. BOIES:  Then if that's the limited purpose, Your

14  Honor, as far as the hearsay objection is concerned, I

15  withdraw.

16        THE COURT:  All right.  Given the limited purpose for

17  which it's being used, and the fact that the Rule 408 objection

18  seems not to be one that's being pressed at the moment, I'll

19  admit it.

20  (Documents regarding four transfers was hereby received as

21  Movant's Exhibit 557 for identification, as of this date.)

22  BY MR. MAGUIRE:

23  **Q.   At the bottom of your e-mail to Jonathan Hughes, in**

24  **Section 3 you say at the bottom of the page, "You provided four**

25  **examples of such deliveries of securities, but no supporting**

25

 1    documents.  I presume you have confirmed that your core

 2    examples do not relate to the repo transaction, but please

 3    confirm that presumption is correct."  And you go on to say,

 4    "As I requested in my March 27 letter, please provide me with

 5    the documents that support your claim that these and any other

 6    transfers of non-PIM securities were made by the trustee after

 7    the closing."  You go on to say, "My March 27 letter also asks

 8    that Barclays provide documentation to support your claim.

 9    That none of the items that Barclays claims in its schedules

10    could be considered the property of or subject to claims by

11    customers or other Lehman entities including LBIE.  Since your

12    May 13 letter provided no such support I again ask that

13    Barclays please provide this forthwith."  That was the subject

14    of your e-mail, sir.

15    A.   Yes.  We wanted whatever -- as much information as we

16    could, both internally and from Barclays about what they were

17    talking about with respect to these transfers.

18    Q.   If you turn to Tab 32, that's Barclays Exhibit Number 169.

19    This is a letter that you received from Barclays' counsel on or

20    about June 8, 2009.

21    A.   Yes.

22    Q.   And in this Barclays was providing you with certain

23    information?

24    A.   Yes.

25    Q.   In the second paragraph Mr. Hume refers to a disk.  He

26

1    says, "In addition, the disk contains a copy of an LBI internal

2    e-mail that was provided to Barclays during the acquisition

3    negotiations.  This e-mail shows that LBI's 15(c)(3-3) reserved

4    account contained one billion dollars of cash, and 769 million

5    dollars in securities.  And indicates that the SEC had

6    approved transferring up to one billion dollars from this

7    lockup amount."  Sir, let me show you the internal e-mail that

8    was attached to that letter.  And that was the next Tab 33,

9    Barclays' Exhibit Number 221.

10   A.   Yes, I see it.

11   Q.   That's Movant's Trial -- do we -- I guess I can't put it

12   up on the screen because it's Barclays' Exhibit, but you can

13   read from --

14        MR. BOIES:  We can put it up I think.

15        MR. MAGUIRE:  Can we get it up?  Thank you.  Yeah, we

16   have it.  Thank you.  If we can just highlight the center part

17   "customer."

18   Q.   So this showed that there was 769 million dollars in

19   qualified securities in the account, and also one billion

20   dollars in cash at the Wells Fargo bank?

21   A.   That's correct.

22   Q.   And just above -- I'm sorry, just above that it says, "The

23   decrease of one billion dollars in the lockup was approved by

24   the Mike Mackerley (ph.) of the SEC.  You responded to Mr.

25   Hume's letter, did you not, sir?

27

1   A.   Yes, I did.

2   Q.   And that was in the document we marked as -- it's in the

3   next Tab 34, we marked as Movant's Trial Exhibit 558?

4   A.   Yes, that's my response.

5           MR. MAGUIRE:  I understand that Barclays has various

6   objections to this, Your Honor.  I also understand that

7   Barclays has marked this as Exhibit 170, and it has been

8   admitted in evidence.

9           MR. BOIES:  With that representation to them using

10   their version of this document.

11           THE COURT:  Okay, it's admitted then.

12   (Letter from Kobak to Hume was hereby received as Movant's

13   Exhibit 558 for identification, as of this date.)

14   Q.   In the first sentence, sir, you say -- you thank Mr. Hume

15   for his June 8th letter and enclosures which you say, "Provided

16   only partial and minimal information in response to the

17   requests that we have been making for many months."  If you

18   turn two paragraphs down, you refer to the e-mail that we were

19   just looking at?

20   A.   Yes.

21   Q.   And you say, "You provided an internal Lehman e-mail from

22   the morning of September 19 that you say indicates the SEC's

23   approval of the transfer of up to one billion dollars from the

24   15(c)(3-3) reserve fund.  The record is clear that the SEC

25   would not even consider authorizing an actual transfer unless

28

1   there was, in fact, an excess in the 15(c)(3-3) reserve account

2   and customers would be fully protected." Were you satisfied,

3   sir, that there was, in fact, an excess in the 15(c)(3-3)

4   account?

5   A.   No.  We had many conversations with Mr. Mackerley and his

6   staff from the SEC.  When we were doing the account transfers

7   members of the SEC and his staff were present.  They never

8   specifically say they authorize something.  But we wanted them

9   there to make sure that we weren't making a mistake as far as

10  we were concerned.  Mr. Mackerley told us quite clearly that he

11  did not believe he had ever authorized anyone to transfer any

12  excess.  And he basically made it clear that he did not want --

13  he did not know if there was an excess or not.  But he did not

14  believe that any of this should be transferred to Barclays

15  apart from possible use and transfer of customer accounts.

16       MR. BOIES:  Your Honor, I rise because I want to be

17  clear that that is being offered, not for the truth of the

18  matter asserted because it would be hearsay, and I would,

19  therefore, move to strike.  But only for the fact that it was

20  told to this witness and hence the state of mind relevance of

21  the communication.

22       THE COURT:  I accept it as a non-hearsay statement

23  that simply has influenced this witness' state of mind.  Not

24  for the truth of the assertion that has been repeated from the

25  stand.

29

1    Q.   Sir, if you turn to the next Tab 35, Movant's Trial

2    Exhibit 434.  Did you, in fact, have a meeting with Barclays on

3    or about June 12 of 2009?

4    A.   Yes.  We did have a meeting.

5    Q.   At that meeting did you ask for information from Barclays?

6    A.   At that meeting, as I recall, Mr. Hughes and I got into a

7    rather heated exchange.  And it may be that one of the other

8    lawyers actually made the request for information.

9    Q.   Whether through you or through someone else there was a

10   request for information made of Barclays at that meeting?

11   A.   Yes.  I think the tenor was we disagree with many, maybe

12   all your legal conclusions, but if you want to move forward it

13   would be helpful if we had as much information as possible, and

14   we could evaluate your claim, the same way we evaluate other

15   people's claims.  And we asked for information, including some

16   of the information we'd been seeking for a long time.

17   Q.   And did Barclays undertake to consider whether to provide

18   the trustee with the information requested?

19   A.   Yes.  I think Mr. Hughes said he wasn't committing to even

20   provide us information.  He didn't really know that he needed

21   to do anything further.  I think he was very frustrated that we

22   didn't immediately agree with all his legal positions.  So they

23   said they would basically take it up -- the request for

24   information under advisement.

25   Q.   And some six weeks later, on or about July 27, did you

30

1    receive the document in the next Tab 36, Barclays' Exhibit 172,

2    on the same subject of whether Barclays was willing to provide

3    the requested information?

4    A.    Yes, I did.

5    Q.    At the bottom of the page you'll see a paragraph that

6    begins, "You also suggest in your letter that many of the

7    information requests you attach to your letter were requested

8    at the June 12 meeting, were previously requested.  That is not

9    correct.  Most of the information requests attached to your

10   letter were not mentioned at the June 12 meeting and have not

11   been previously requested.  As you recall, we left the June 12

12   meeting in order to consider whether to provide the information

13   requested relating to the clearance box securities.

14   Notwithstanding your statement during the meeting that the

15   trustee refused to acknowledge Barclays' entitlement to any of

16   the undelivered assets referenced above, in contravention of

17   the plain language of the purchase contract."

18        At anytime prior to the July 27th letter, in your six

19   weeks following your June 12 meeting, had Barclays provided you

20   with any of the information requested?

21   A.    No.

22   Q.    In the next paragraph Mr. Hughes refers to information

23   that will be provided in connection with the Lehman Brothers

24   Holding Company, Inc.'s Rule 12 2004 motion.  And did that

25   become a source of information for the estate from that time

31

1    forward?

2    A.   Yes.  I believe at the December hearing on the

3    Barclays/Chase settlement, let's call it, it was made very

4    clear by us, by the creditors' committee, by lawyers for LBHI,

5    I think by the Court, itself, that there were aspects of the

6    sale transaction that needed to be investigated, to be aired

7    publicly.  The parties should work cooperatively to do that.

8    There was a limited amount of cooperation which led to some

9    2004 requests.  And we were part of those 2004 requests as well

10   as the other parties.  And it was really information, in

11   part -- in large part at least information learned I think

12   during that process that leads us to why we're here today.

13   Q.   And just for the record, did you receive all of the

14   information that the trustee needed concerning the disputed

15   assets prior to the commencement of the Rule 2004 process?

16   A.   No.

17   Q.   To conclude, sir, can you please explain the significance

18   of the disputed assets to the trustee's administration of the

19   Lehman estate?

20   A.   Well, the disputed assets, no matter how you value them,

21   are several billion dollars.  At this point we have

22   approximately thirty-five billion dollars of customer claims

23   outstanding.  That includes claims that have been objected to.

24   It includes some claims that we're in the process of

25   determining.  I think it's clear that the amount of claims will

32

1    be lower than thirty-five billion dollars by the time

2    everything is done.  But it is unknown today whether, as I

3    think we made very clear many times, there's a possibility that

4    we could pay 100 percent, that there would be sufficient

5    property to satisfy 100 percent of allowed customer claims.

6    Whether that will happen or not, I don't know.  But one thing I

7    can tell you for sure, is that at best it would be a very close

8    thing.  And if Barclays were to succeed on any of these claims

9    there would clearly be as shortfall of customer property.

10             MR. MAGUIRE:  Your Honor, I have no further questions

11   for the witness.  And would close only by renewing the motion

12   to admit the e-mail from Mr. Novakoff with the chase

13   spreadsheet; Movant's Exhibit 431.  If I understand Mr. Boies,

14   there's no objection to that being admitted for the witness'

15   state of mind.  So I would move that it be admitted at least

16   for that purpose and anything else could be reserved and dealt

17   with again.

18             THE COURT:  The document's admitted.  It's clear from

19   the testimony that Movant's Exhibit 431 was considered by the

20   witness and was used to inform the trustee's business judgment,

21   and it's at least admitted for that purpose.

22   (E-Mail from Novakoff with Chase spreadsheet was hereby

23   received as Movant's Exhibit 431 for identification, as of this

24   date.)

25             MR. MAGUIRE:  Thank you, Your Honor.

33

1          MR. TAMBE:  No questions from Lehman Brothers Holdings

2     Inc., Your Honor.

3          MR. WERDER:  No questions from the committee, Your

4     Honor.

5          THE COURT:  It's cross-examination time.

6          MR. BOIES:  Thank you, Your Honor.

7          Good morning, Mr. Kobak.

8          THE WITNESS:  Good morning, Mr. Boies.

9          MR. BOIES:  We may have met briefly at some point, but

10    I'm David Boies.

11         THE WITNESS:  I think we should both invoke the old

12    man's privilege and not think about how long it might have

13    been.

14         MR. BOIES:  Exactly.

15    CROSS-EXAMINATION

16    BY MR. BOIES:

17    Q.   When did the trustee or any of the trustee's

18    representatives first discuss any of the terms or provisions of

19    the APA or the clarification letter with representatives of

20    Barclays?

21    A.   I don't believe we had any direct discussions with

22    Barclays prior to the sale hearing over the weekend.  I think

23    the only communication was in direct communication which we've

24    seen in e-mails.  I don't think it was until sometime after

25    that, I can't tell you the exact date when that might have

34

1   been.

2   Q.   Just to be clear, do I understand what you're saying is

3   the first direct communications that the trustee or the

4   trustee's representatives had with Barclays was after the

5   closing on September 22nd?

6   A.   I believe so.

7   Q.   Now, I want to focus your attention to the period after

8   the closing then.  One of the issues that you talked about is

9   the 15(c)(3) issue, you recall that?

10   A.   Correct.

11   Q.   When did the trustee -- and by trustee I'm going to be

12   referring to the trustee or any of the trustee's

13   representatives.  Do you understand it that way?

14   A.   I think I'm here as a 30(b)(6) witness.

15   Q.   Yes.

16   A.   As well as in my individual capacity.  I always find that

17   a little metaphysically hard to understand.  But, no, I

18   understand that I'm speaking for the trustee as well as myself.

19   Q.   Okay.  When did the trustee, broadly defined, first raise

20   the 15(c)(3) issue with Barclays?

21   A.   I don't think we raised it with Barclays.  I think they

22   raised it with us.

23   Q.   According to your testimony when did Barclays first raise

24   it with you?

25   A.   We had some discussions with Alastair Blackwell, who is a

35

1    Barclays' employee, I can't remember exactly what his title

2    was.  He was a former Lehman person.  And he was constantly

3    calling and we had some meetings.  Saying that he believed

4    there was an excess in the 15(c)(3) account, and asking us to

5    transfer property.  And we disagreed with him.  We talked to

6    Mr. Mackerley and the SEC about it.  Mr. Mackerley would tells

7    us while Alastair was here he has some numbers that didn't make

8    any sense.  I don't agree that there's an excess.  And as far

9    as I'm concerned you're not authorized to transfer anything to

10   him.

11   Q.   My question, sir, was when?

12   A.   I don't know precisely when those calls began.

13   Q.   Approximately when?

14   A.   I really can't give you an estimate.  It was sometime

15   fairly early on, I would say.

16   Q.   In September of 2008?

17   A.   Probably beginning in late September, yes.

18   Q.   Now, you have said that you interpret the clarification

19   letter as meaning that if for some reason Lehman cannot

20   transfer securities from the 15(c)(3) account they have no

21   obligation to transfer securities of similar nature from some

22   other account?

23   A.   That's correct.

24   Q.   When did you first express that view to Barclays?

25   A.   I don't remember.  I do remember I believe in the

36

```
 1    conversation that I testified to about the conversation I had

 2    with Mr. Hughes, primarily focusing on the DTC box.  I actually

 3    think he mentioned there that they might have claims to the

 4    15(c)(3) account.  And I think he made some reference to even

 5    if there's not an excess, even if there's not enough property

 6    for customers, it doesn't matter because you have to substitute

 7    other assets.  And I said that was not how we interpreted the

 8    language at all.  So I think that's the first discussion that I

 9    can recall about that particular point.

10    Q.    And when was that conversation with Mr. Hughes?

11    A.    That would have been in December of 2008.

12    Q.    Okay.  Now, I want to direct your attention to the

13    clearance box assets.  And you have testified that it was -- it

14    is the trustee's view that the clearance box assets do not have

15    to be transferred to Barclays, correct?

16    A.    That's correct.

17    Q.    When did the trustee first tell Barclays that the trustee

18    believed that the clearance box assets did not have to be

19    transferred to Barclays?

20    A.    Again, I think any conversations were Barclays asking for

21    assets.  I don't think they made any claim to those that I can

22    recall as of kind of a contractual matter.  We have a claim for

23    them under the contract until the meeting that I had with Mr.

24    Hughes.  And even then it was just an oral discussion.  The

25    same meeting with Mr. Hughes in December of 2008.
```

37

1   Q.   Is it your testimony that you did not understand until

2   December of 2008 that Barclays was claiming the assets in the

3   clearance boxes?

4   A.   We didn't know what their position was.

5   Q.   Did you ever ask?

6   A.   We had the assets in our clearance box.

7   Q.   The question is did you ever ask?

8   A.   We had no reason to ask, we did not ask.

9   Q.   Did, as you understand it, Barclays ever request the

10   clearance box assets be transferred to it?

11   A.   As I've testified there were requests which we did not

12   understand to be requests for proprietary clearing -- I assume

13   you're referring to proprietary clearing box assets, not assets

14   that are customer assets.

15   Q.   Let me try to be sure that the record's clear.

16        The clearance box assets included, both assets that

17   belonged to Lehman's customers and assets that belonged to

18   Lehman, correct?

19   A.   Correct.

20   Q.   And the assets that belonged to Lehman you sometimes

21   referred to as Lehman's proprietary assets, correct?

22   A.   That's correct.   Right.

23   Q.   And right from the beginning Barclays was requesting that

24   clearance box assets be delivered to it, correct?

25   A.   Well, as we've seen within a few days there were requests

38

1  that assets be delivered, including -- especially customer

2  assets.  And although we didn't know it at the time, that might

3  have included some proprietary assets.

4  Q.  Now, you say we didn't know it at the time.  In that

5  connection let me ask you to look at a couple of the documents

6  that your counsel showed you earlier.  And would you turn to

7  Tab 17.  And this is Barclays' Exhibit 517.

8  A.  Yes, I have them.

9  Q.  And this was a request that went to your law firm,

10  correct, sir?

11  A.  Oh, yes.  It went to Mr. Frelinghuysen who we've

12  identified earlier.

13  Q.  And you talked about how there were some requests being

14  made to people that you thought were not appropriate.  This is

15  a request that's being made to your law firm, correct?

16  A.  Yes.  This wasn't one of the ones that Ms. Karp -- those

17  were later ones that we didn't act on.

18  Q.  You acted on this request?  This request that is

19  represented by Exhibit 517, you acted on this request, did you

20  not, sir?

21  A.  I believe so.

22  Q.  In fact, if you turn to the next Tab BCI Exhibit 422, you

23  see where your law firm sends an e-mail that says the trustee

24  authorizes the transfer of the assets detailed in the attached

25  Excel worksheets, pursuant to the asset purchase agreement

39

1   dated as of September 16th, 2008, correct?

2   A.    That's what it says.  The date actually seems to be

3   incorrect.  But, yes, that's what it says.

4   Q.    And you knew that these securities that the trustee was

5   authorizing to be transferred to Barclays were securities from

6   the clearance box accounts, correct?

7   A.    That's correct.  But we understood they were customer

8   securities.

9   Q.    You say you understood they were customer securities, is

10  there anything here that says they're customer securities?

11  A.    No.

12  Q.    Who told you that they were customer securities, if

13  anyone?

14  A.    No one told me.  You'll see that Ms. Vecchio is on this e-

15  mail.  She was supposed to be working for us.  So just the way

16  in later months Ms. Karp would realize that there was what

17  appeared to be an inappropriate request.  That's what Ms.

18  Vecchio should have been doing for us, but she didn't.

19  Q.    Perhaps my question wasn't clear, sir.  You said that you

20  believe that this transfer that the trustee authorized was a

21  transfer of customer assets, not of Lehman assets, correct?

22  That's what you told me?

23  A.    That's correct.

24  Q.    And what I'm asking you is did anybody tell you that?

25  A.    No.

40

1    Q.    Did you ever see anything in writing that indicated that?

2    A.    No.

3    Q.    Did you -- who is the person who signs his name Anson,

4    here?

5    A.    Mr. Frelinghuysen.

6    Q.    Mr. Frelinghuysen.  Did you ever ask Mr. Frelinghuysen

7    when these were customer assets or not?

8    A.    I would not have asked him at the time.  We were making,

9    as I think I've testified, many, many transfers of customer

10   property.  I saw many e-mails like this.  And I had no reason,

11   really, to look particularly at this one.  So I didn't have any

12   discussion with him about this one way or the other at the

13   time, that I recall.

14   Q.    But did you ever try to find out after the fact whether

15   Mr. Frelinghuysen believed these were customer assets or

16   proprietary assets?

17   A.    Well, after I got some of the correspondence from Mr.

18   Hughes or Ms. Granfield saying the transfers had occurred, and

19   once we finally got some information, even though Barclays was

20   so slow to provide it, and we saw that this was something that

21   Anson had transferred, of course we talked to him about it.

22   Q.    And when did you talk to him about it, sir?

23   A.    It would have been sometime in 2009.

24   Q.    And what did he tell you?

25   A.    He said that at the time he thought it was a customer

41

1    transfer.

2    Q.    That's what he told you?

3    A.    Yes.

4         MR. BOIES:    May I have just a moment, Your Honor?

5         THE COURT:    Sure.

6    (Pause)

7    Q.    Let me play you a portion of Mr. Frelinghuysen's sworn

8    deposition, sir, and ask you to listen to it and see whether

9    you continue to adhere to the testimony that you've just given.

10        (Begin audio playback)

11   "Q.    Do you recognize that as an e-mail that you wrote to Mr.

12   Blackwell on the 20th of September, 2008?

13   "A.    Yes, I do.

14   "Q.    In your conversation with Mr. Blackwell on the 24th from

15   the time you sent this, was the e-mail on the 25th, you had

16   discussed this with Kobak and Mr. Kiplok, is that right?

17   "A.    That's correct.

18   "Q.    There was a draft letter attached to 671.   In that letter

19   you ask Mr. Blackwell to confirm that the requested assets

20   were, of course, assets that Lehman Brothers Inc. which was

21   sold to Barclays Capital Inc. pursuant to the asset purchase

22   agreement, dates as of December 16th, 2008, as amended, right?

23   "A.    That's a correct reading of the letter.

24   "Q.    And beyond just a correct reading of the letter, that was,

25   in fact, what you were asked to do, right?

42

"A.  I was in fact asked to do, to represent them before assets

under the APA.

"Q.  And you understood they were proprietary assets with LBI

and not customer assets right?

"A.  I understood them to not be customer assets."

     (End audio playback)

          MR. MAGUIRE:  Objection, Your Honor.  I believe that

testimony by Mr. Anson, he was asked and referred to

correspondence on September 25, which would be several days

different from the exhibit that counsel is now providing.  And

he spoke about an Exhibit 671B, which appears to be different

from Exhibit -- Deposition Exhibit 675B, which has been marked

as Barclays' Exhibit number 517.  So I'm not sure that whatever

comparison or application counsel is suggesting is, in fact,

appropriate.

          MR. BOIES:  Your Honor, I would have preferred to have

done this in cross-examination.  However, the point that I was

making was that Mr. Frelinghuysen knew that there were

proprietary assets being transferred.  We can get the specific

exhibits that he's talking about out and go through them with

the witness.  But the point is, this witness testified that

Frelinghuysen told him that there were no proprietary assets

being transferred -- no proprietary assets being transferred at

this time.  And what he has just sworn to is that he knew that

there were proprietary assets being transferred, indeed, before

43

1    the date of this e-mail.  That is, if this had been afterwards,

2    there might be a point to counsel's objection.

3         But the point of this witness' testimony has been that

4    Frelinghuysen told him that there weren't any transfers of

5    proprietary assets.

6         THE COURT:  I'm going to give you a hybrid ruling.

7    The objection is technically correct, because there's lack of

8    parallelism between the question and the segment which is being

9    used for purposes of impeachment.  However, it's also true that

10   we're not dealing with a lay witness nor are we dealing with a

11   lay witness whose deposition was taken.  And the subject matter

12   is clearly comparable.

13        Under the circumstances, I'm going to allow you to ask

14   questions with respect to this witness' understanding of what

15   he was told at the time by Mr. Frelinghuysen in reference to

16   the general subject matter of customer property.

17        MR. MAGUIRE:  Your Honor, I would also object to Mr.

18   Boies' characterization of the testimony of Mr. Frelinghuysen,

19   because --

20        MR. BOIES:  Before he goes, I would ask either that

21   the witness be excused or that -- well, if he's going to

22   discuss his view of the testimony, I would ask that the witness

23   be excused, so that we do not use this as a means of coaching

24   the witness.  He's going to have more than just a simple

25   objection if he's going to try to explain what he views the

44

1    witness' testimony to be.

2         MR. MAGUIRE:  I would refrain.

3         THE COURT:  Now, I'm really anxious to hear what he

4    has to say in this objection.  Let me just -- not that it's

5    because of Mr. Boies' objection, but simply because it's

6    appropriate practice in this court, everyone should refrain

7    from so-called speaking objections that coach witnesses.  And

8    that's true not only in this trial and in every matter which is

9    before the Court.  I'll hear your objection with the confidence

10   that it's not going to be necessary to excuse the witness.

11        MR. MAGUIRE:  Yes, Your Honor.  I will refrain from

12   characterizing in any way Mr. Frelinghuysen's testimony.  I

13   would ask that when we reach an appropriate break, Mr. Boies

14   review the testimony that he just characterized and withdraw

15   the representation that he made to the Court about it.

16        THE COURT:  All right.  We'll take a break at some

17   point before we finish with the cross-examination, so we can at

18   least clarify this point.

19   BY MR. BOIES:

20   **Q.   When, according to your testimony, did Mr. Frelinghuysen**

21   **first tell you he knew that proprietary assets of Lehman**

22   **Brothers were being transferred to Barclays?**

23   **A.   I don't remember him ever telling me that, unless at a**

24   **later time he said I may have inadvertently transferred assets.**

25   **Q.   Well, you say he may have said he inadvertently**

VERITEXT REPORTING COMPANY

45

1    transferred assets.  You don't have any memory of him saying

2    that, do you, sir?

3    A.   I don't have a specific recollection.

4    Q.   Okay.

5    A.   No.

6    Q.   So it's your testimony that other than seeing what he

7    testified to at his deposition, you -- your memory is that he

8    never told you that proprietary assets of Lehman Brothers were

9    being transferred to Barclays, correct?

10   A.   No.  We understood at the time, people were to use

11   superhuman efforts, really, to get property transferred on the

12   assumption that it was customer property.  There were a lot of

13   obstacles to doing that.  And that was -- those were Mr.

14   Frelinghuysen's standing instructions.

15   Q.   I'd like to ask you to focus on my question, sir.  My

16   question is whether it is your testimony that other than seeing

17   what Mr. Frelinghuysen testified to at his deposition that I

18   just played you, it is your memory that he never told you that

19   proprietary assets of Lehman Brothers were being transferred to

20   Barclays, correct?

21   A.   Yeah, I have no recollection of him telling me that.

22   Q.   But you see from that testimony that he knew that

23   proprietary assets were being transferred, correct?

24   A.   Well, I saw what I --

25          MR. MAGUIRE:  Objection.

46

1    A.    -- what he said.

2        THE COURT:  One second.  There's a pending objection.

3    And the objection is?

4        MR. MAGUIRE:  And the objection that that is not what

5    the testimony said, Your Honor.

6        THE COURT:  Well, I thought you were going to say

7    something else entirely, which is that there's no way what this

8    witness can know what somebody else knew.  He can only know

9    what somebody else told him.  He can't know what somebody knew.

10   I sustain the objection you should have made.

11   Q.    Now, Mr. Kobak, you said during your testimony, and I

12   think you've said before, that you didn't get a copy of the

13   clarification letter that dealt with clearance box assets until

14   Sunday night.  Is that correct?

15   A.    Yes.

16   Q.    Um --

17   A.    The first draft I saw would have been Sunday night.

18   Q.    -- you don't mean to imply by that testimony that the

19   trustee and his representatives were not working with Weil

20   Gotshal before then on the terms of the clarification letter,

21   do you?

22   A.    We had representatives there, as I've testified, but

23   essentially they were monitoring what was going on to the

24   extent they could.  They weren't always -- they were very

25   seldom informed of what was being discussed.  They were not

VERITEXT REPORTING COMPANY

212-267-6868                                            516-608-2400

47

1    part of the drafting process.

2    Q.    My question is a little bit different.  Is it your

3    testimony that you and the trustee and the other trustee

4    representatives were or were not kept informed prior to Sunday

5    night about the terms of the clarification letter?

6    A.    I do not think we were given specific information about

7    the terms of the clarification letter until Sunday night.

8    Certainly I wasn't.

9         MR. MAGUIRE:  Let me hand out our document binder.

10        (Pause)

11        UNIDENTIFIED SPEAKER:  Your Honor, may I be excused

12   for a moment?

13        THE COURT:  You may be excused.

14   Q.    Let me ask you to turn to tab 3.  And you recognize this

15   as excerpts from a fee application that your law firm submitted

16   to this Court, correct, sir?

17   A.    Yes.

18   Q.    And if you'd turn to page 26, at the bottom of the page,

19   do you see an entry for Mr. Giddens, who was the trustee, for

20   September 20, 2008?

21   A.    Yes.

22   Q.    And this was Saturday, correct, sir?

23   A.    It says the 20th.

24   Q.    Yes, and September 20, 2008, was a Saturday, correct, sir?

25   A.    Yes.

48

1   Q.   So this is the day, obviously, before the Sunday evening

2   that you've testified to, correct?

3   A.   It appears to be.

4   Q.   And do you see the diary entry that says Mr. Giddens spent

5   sixteen hours on this matter that day?

6   A.   Yes.

7   Q.   And do you see that 9.7 of those hours were spent on "the

8   review of continuing revisions to the APA and the clarification

9   letter and numerous rounds of negotiation with Weil, Cleary and

10  other professionals, re changing terms to sale and timetable

11  for closing and consultations with HHR, SIPC, and SEC teams, re

12  same."  Do you see that?

13  A.   Yes, I do.

14  Q.   Now, were you aware that the trustee was working on the

15  review and continuing revisions to the APA and the

16  clarification letter, and was engaged in numerous rounds of

17  negotiations with Weil Gotshal and other professionals on

18  Saturday?

19  A.   Not specifically, no.

20  Q.   You were and are the 30(b)(6) witness for the trustee,

21  correct?

22  A.   Yes.

23  Q.   In preparation for this testimony and in preparation for

24  the testimony that you gave about how you didn't know anything

25  until Sunday night, did you talk to the trustee about what he

49

1   knew?

2   A.   Yes, I did.  I still don't think -- I still believe that

3   we didn't really see terms of an actual clarification letter

4   with things spelled out and with indications of what was still

5   under discussion and so forth, until that evening -- Sunday

6   evening.

7   Q.   Well, it's clear that the trustee, at least, knew enough

8   about the provisions of the APA and the clarification letter,

9   to be spending quite a bit of time reviewing them.  And the

10  describes them as continuing revisions.  And he talks about

11  numerous rounds of negotiations regarding the changing terms of

12  sale.  Do you see that?

13  A.   Yes.  But also timetable for closing, consultations with

14  HHR, SIPC.  I mean, there are many things mixed in, in this

15  nine hours.

16  Q.   Well, sir, since you mentioned the consultations with HHR

17  and SIPC, and he also mentions the SEC.  Do you see there at

18  the end he says "re same"?  That is, he was having those

19  consultations regarding the changing terms and timetable for

20  closing.  Do you see that?

21  A.   Yes.

22  Q.   Now, you understood that the terms of the sale, to the

23  extent that they were being negotiated, were the terms of the

24  sale reflected in the clarification letter, correct?

25  A.   We knew there was a clarification letter.  I don't think

50

1   we had seen a draft or were shown a draft until Sunday night.

2   Q.   How did Mr. Giddens know what the terms were that he is

3   constantly reviewing and engaging in numerous rounds of

4   negotiations concerning, if he didn't see the draft?

5   A.   Well, I don't know why he couldn't have conversations with

6   people about issues that were coming up.

7   Q.   But who would we have these conversations with?  Because

8   you've told us, haven't you, that the representatives from your

9   team were just sitting around -- sitting on their hands and

10   doing pro bono work over at Weil Gotshal.

11   A.   No, they weren't sitting on their hands.  They were trying

12   to find out information -- it's my recollection that during

13   most of Saturday, anyway, we really were not given a lot of

14   information about what was going on.

15   Q.   So --

16   A.   At least the people at Weil Gotshal weren't given a lot of

17   information and weren't given drafts to review.

18   Q.   -- so if the people that you had at Weil Gotshal weren't

19   getting information, they couldn't have been giving information

20   on to the trustee.  You'll grant that?

21   A.   I don't know what they were doing.

22   Q.   You don't know what your representatives at Weil Gotshal

23   were doing?

24   A.   I know what they told me.  The trustee may well have been

25   having other discussions.  I know there were some discussions

51

1    with the SEC over that weekend.

2    Q.   But you're the 30(b)(6) witness.  You're the person that

3    was supposed to know that was going on.  And didn't you -- did

4    I misunderstand your testimony?  Didn't you tell your counsel

5    in the court yesterday that your representatives over at Weil

6    Gotshal were trying to get information, but weren't successful,

7    and they were mostly spending their time doing pro bono work?

8    Didn't you tell the Court that?

9    A.   I said that Mr. Frelinghuysen was there.  There didn't

10   appear to be much going on, at least at Weil Gotshal.  Yes,

11   that's what I said.

12   Q.   Now, if there wasn't much going on, according to your

13   representatives, how did the trustee find out and engage in

14   these numerous rounds of negotiations that he refers to here?

15   Who is he talking to?

16   A.   You know, I don't know specifically.  I'm sure he had

17   phone calls.  I don't think he was physically present.  In

18   fact, I know he wasn't physically present over the weekend.  I

19   know there were some discussions with SIPC during that time.  I

20   know there were discussions about when is there going to be a

21   document; when is there going to be a closing.  But I really

22   don't discuss -- I don't recall substantial discussions of

23   substance during Saturday, at least that I was part of.

24   Q.   You personally worked on drafts on Saturday, didn't you,

25   sir?

52

1    A.   I don't know.  My records will reflect whatever they

2    reflect.

3    Q.   Yes.  Let's go to the next page where you bill four hours

4    that you describe as "numerous conference calls and drafts

5    throughout day with SIPC trustee, DTC, Weil and banks."  Do you

6    see that?

7    A.   Yes.

8    Q.   What drafts were you referring to?

9    A.   I really don't recall.  I may have seen a draft of the --

10   what became the DTC letter.

11   Q.   You're talking about drafts, plural, here right, sir?

12   A.   Yes.  I hadn't finished my answer.  I think it was over

13   the weekend.  Additional drafts of really the same letter.  The

14   OCC letter that I had signed at the hearing, I think we saw

15   yesterday, there were some e-mails back and forth with copies

16   of that.  So I certainly saw that.  Those are the only drafts I

17   recall seeing that day.

18   Q.   Well, the OCC letter wasn't a draft.  You'd already signed

19   that, correct?

20   A.   Well, it was presented as a draft, because Barclays had

21   never signed it.

22   Q.   But you had signed it --

23   A.   And I believe there were some further changes made to it.

24   Q.   Changes after you signed it?

25   A.   Yes.

53

1    Q.   And were you going over those on Saturday?

2    A.   I can't remember if it was Saturday or Sunday.  It could

3    well have been Saturday.

4    Q.   Is it your testimony to the Court under oath that when you

5    talk about numerous conference calls and drafts that you worked

6    on on Saturday, that none of those drafts were drafts of the

7    clarification letter?

8    A.   I don't recall having seen a draft of the clarification

9    letter.  There were many phone calls about what was going on.

10   I only billed four hours that day, so to me it's very

11   consistent with not having a draft of anything to review -- of

12   any -- a draft of the clarification letter to review.  I don't

13   recall having seen one until Sunday night -- Sunday evening.

14   Q.   Now, you did know on Saturday that there were drafts of

15   the clarification letter, correct?  In fact, you knew that on

16   the previous Friday, correct?

17   A.   Well, we knew there was a draft.  We were under -- at

18   least I was under the impression that it was a clarification

19   letter, not a substantial amendment to the deal that had been

20   described to the Court, and that the scriveners, as I

21   testified, were going to make the necessary changes.  And, you

22   know, our initial reac -- our initial belief was that it would

23   probably be done within a short time after the court hearing

24   ended.  And we didn't really -- at least I didn't understand

25   that the situation was substantially different Saturday.

54

1    Q.    Well, you do see that the trustee knew that there were

2    changing terms to the sale, correct?

3    A.    Well, that's what his timesheet says.

4    Q.    Well, you don't have any reason to believe that his

5    timesheet isn't accurate, do you, sir?

6    A.    No, I do not.

7    Q.    And is it your testimony to the Court as the trustee's

8    30(b)(6) witness that you don't have any idea what he was

9    talking about when he talked about spending 9.7 hours on what

10   he describes here, including changing terms to the sale and

11   numerous rounds of negotiations concerning it?

12   A.    No.  I mean, I know there were discussions with the SEC

13   and certainly with SIPC.  I know there were discussions about

14   timing and what was happening and so forth.  Other than that, I

15   don't really specifically know.  No.

16   Q.    So you don't know anything about the changing terms to the

17   sale that he refers to here?

18   A.    Not --

19   Q.    Is that your testimony?

20   A.    -- specifically, no.

21   Q.    Do you know generally?

22   A.    No.

23   Q.    Okay.  Now, there certainly came a time when the trustee

24   approved the clarification letter, correct?

25   A.    Yes.  It's -- my recollection, after this long telephone

55

1   conversation with the radio silence that I testified to

2   yesterday, sometime -- I guess it would have been early Monday

3   morning, after midnight Sunday, I believe we authorized Mr.

4   Frelinghuysen to sign -- to do signature pages, even though

5   there might be some further changes that were being made to the

6   letter.

7   Q.    Is that a yes to my question?

8   A.    I think so.

9   Q.    Okay.  Now, did the trustee ever try to withdraw its

10  approval of the clarification letter?

11  A.    His approval.

12  Q.    What?

13  A.    His approval, not its approval.  I'm just saying the

14  trustee is a person --

15          THE COURT:  He's modifying your question as it relates

16  to the pronoun.

17          MR. BOIES:  Oh, okay.

18  A.    No.

19          MR. BOIES:  My wife does that all the time, Your

20  Honor.

21  A.    No.

22  Q.    You testified to your counsel about various drafts that

23  you'd seen Sunday night, Monday morning.  Do you recall that?

24  A.    Yes, I did.

25  Q.    And do you recall describing, with respect to the

VERITEXT REPORTING COMPANY

212-267-6868                                                    516-608-2400

56

1   clarification letter, how the language describing exchange-

2   traded derivatives changed?

3   A.   Yes, I recall giving testimony on that subject.

4   Q.   And let me ask you to look at tab 5.  And if you'd go to

5   page 2 up at the top, do you see where exchange-traded

6   derivatives and any property that may be held to secure

7   obligations under such derivatives, is described as one of the

8   purchased assets?

9   A.   Yes, I do.

10  Q.   And you testified about how the drafts up until the last

11  one just referenced exchange-traded derivatives and did not

12  include the parenthetical that follows that says "and any

13  property that may be held to secure obligations under such

14  derivatives," correct?

15  A.   Yes.  I believe there had been one draft that actually had

16  extensive -- more extensive language about margin, and that

17  that had specifically been taken out of the agreement at a

18  later stage.  And then in the last version that we saw that was

19  represented to be the final changes, did not have the language

20  that you're referring to in the parenthetical here.

21  Q.   Let me try to make sure I understand what you're saying.

22  This is the final clarification letter that the trustee signed,

23  correct, that you've got in front of you?

24  A.   Yes.

25  Q.   Okay.  And this final clarification letter does expressly

57

1    include as a purchased asset, any property that may be held to

2    secure obligations under exchange-traded derivatives, correct?

3    A.    Yes, that language appears.  But it hadn't appeared in the

4    previous version which was said to reflect all the changes.

5    Q.    And the trustee read this document, correct?

6    A.    We read it, yes.

7    Q.    Okay.  So the fact that this specific provision relating

8    to any property that may be held to secure obligations under

9    exchange-traded derivatives, you saw, the trustee saw, and knew

10   was in there, correct?

11   A.    I do not know if we knew it was in there when we signed

12   it.  It actually -- as I said, the signatures were authorized

13   before.  We had no reason -- I personally would not think that

14   someone would send you a draft when there'd been a

15   representation that there had been final changes, and include

16   an additional change.

17   Q.    Are you saying, sir, that you think that Weil Gotshal

18   slipped this by you somehow?

19   A.    I don't think it was Weil Gotshal that slipped it by us.

20   Q.    Well, who'd you get this from?

21   A.    I think Weil Gotshal --

22   Q.    Who was doing the draft --

23   A.    -- sent it to us.  I don't know where the language came

24   from.  But I would suspect it came from Barclays.

25   Q.    Yes.  But you don't know where it came from, because you

58

1    didn't have any conversations with Barclays prior to closing?

2    A.   No.  And I would think it would have behooved them to have

3    told us and told the other parties that there was a change such

4    as this in the agreement.

5    Q.   You think Weil Gotshal should have done that?

6    A.   I think Barclays should have done it.

7    Q.   Who did you get this -- who'd you get this document from?

8    A.   I think we probably got it from Weil Gotshal.

9    Q.   And who did you understand was preparing all these drafts

10   and the final version, Barclays or Weil Gotshal?

11   A.   I think Weil Gotshal was tasked with putting together the

12   final documents.  I don't know where this change came from.

13   Q.   And Weil Gotshal was representing Lehman, correct?  You

14   knew that?

15   A.   Well, Weil Gotshal was representing a holding company, and

16   to some extent, it was representing us.  The interests of those

17   parties aren't necessarily totally aligned.

18   Q.   Weil Gotshal was representing both Lehman Brothers Inc.;

19   you, the trustee; and Lehman Brothers Holding Company, correct?

20   A.   Yes.

21   Q.   And you knew that at the time?

22   A.   Yes.

23   Q.   And you didn't object to that, did you?

24   A.   No.

25   Q.   Okay.  And you knew that all of the drafts that you got

59

1    and the final version of the clarification letter, came from

2    Weil Gotshal, correct?

3    A.   Yes.

4    Q.   Did the trustee or any of the many lawyers working for the

5    trustee ever ask Weil Gotshal whether there had been any

6    changes between the last draft that you saw and the final

7    version?

8    A.   I think it's incorrect to say we had many lawyers at that

9    time.  But in any event, no.

10   Q.   Well --

11   A.   Frankly, I don't know why --

12   Q.   -- let's to back to the billing records and see how many

13   lawyers you had at the time.  If you'd turn back to tab 3 and

14   go to page 25, which is -- I'm going to have to go on just

15   Saturday, September 20, 2008.  The first person that's listed

16   there who billed 10.2 hours that day is Mr. Margolin.  Do you

17   see that?

18   A.   Yes.

19   Q.   Is that a lawyer representing the trustee?

20   A.   Yes.

21   Q.   The next person listed there is --

22   A.   But your question -- I don't mean to be argumentative but

23   your question --

24   Q.   -- there is no question pending sir.

25   A.   Well, I thought this went to the many lawyers we

60

1    supposedly had looking at drafts.

2    Q.   I'm just asking the question, sir.

3    A.   Well, Mr. Margolin had nothing to do -- he was dealing

4    with matters of filing in bankruptcy court and so forth.

5         THE COURT:  Well, here's what I think we should do, in

6    the interest of just moving along.  And it's difficult

7    sometimes to be a lawyer who's on the stand.  Mr. Boies is just

8    asking questions to establish his case.  And answer the

9    questions as they're presented, please.

10        THE WITNESS:  That's fine.

11        THE COURT:  It also seems to me that this is perhaps

12   not the worst time for us to consider taking a morning break.

13        MR. BOIES:  Thank you, Your Honor.

14        THE COURT:  And during that break we can resolve any

15   discrepancies that remain with respect to the testimony that

16   was used for impeachment purposes earlier.

17        MR. BOIES:  Thank you, Your Honor.

18        THE COURT:  We'll take a ten-minute break.

19        (Recess from 11:07 a.m. until 11:26 a.m.)

20        THE COURT:  Please be seated.

21   BY MR. BOIES:

22   Q.   Mr. Kobak I want to go back to Exhibits 517 and 422 that

23   your counsel examined you about at tabs 17 and 18 of his

24   volume.  And Barclays' Exhibit 422 is whether -- is where the

25   trustee authorizes the transfer of certain clearance box assets

61

1   to Barclays, correct?

2   A.   Yes.

3   Q.   And you said that you didn't know -- the trustee didn't

4   know at the time the transfer was made, that these were Lehman

5   assets -- LBI assets, as opposed to customer assets, correct?

6   A.   Yes.

7   Q.   And that's important, because your position in this

8   litigation is that you didn't believe that proprietary assets

9   of Lehman as opposed to customer assets, were covered as a

10  purchased asset, correct?

11  A.   I don't know whether it's important or not.  That's for

12  the Court to determine.  But that is our position, yes.

13  Q.   And you recognize that the provision that gave the

14  clearance box assets and -- to Barclays, did not limit it as

15  between proprietary assets or customer assets.  There was no

16  insertion of the word that says "customer assets" before

17  "clearance box," was there?

18  A.   I don't know if that was in the language of the document.

19  I just don't recall.  I don't believe so.

20  Q.   Well, let's go back to the document, then.  The

21  clarification letter, it's Exhibit 5 -- BCI Exhibit 5,

22  conveniently behind tab 5, although that is entirely random.

23  A.   This is in your book?

24  Q.   That we've given you?

25  A.   I've got it.  Okay.

62

1    Q.   And if you look at the bottom of the page, the first

2    page --

3    A.   Um-hum.

4    Q.   -- where it says, "Such securities and other assets held

5    in LBI's clearance boxes as of the time of the closing."  Do

6    you see that?

7    A.   Yes.

8    Q.   And it says that those securities and assets are going to

9    be specified on Schedule B, correct?

10   A.   Yes.

11   Q.   Now, we're going to come back to Schedule B.  But let me

12   just focus on the language where the clearance box assets are

13   described here.  "Such securities and other assets held in

14   LBI's clearance boxes."  And in those clearance boxes there

15   were both LBI assets, that you've sometimes referred to as

16   proprietary assets, and customer assets, correct?

17   A.   That's correct.

18   Q.   And the language of this agreement does not limit the

19   assets that Barclays gets just to the customer assets, does it,

20   by its terms?

21   A.   No, it does not.

22   Q.   And it was your understanding that these terms were to be

23   given their ordinary English meaning in interpreting them,

24   correct?

25   A.   Yes.  As interpreted under the circumstances.

63

1    Q.   Now, following the execution of this agreement, various

2    clearance box assets were transferred, and you understand that

3    Barclays says that for a substantial period of time, the

4    trustee transferred both customer and proprietary assets, knew

5    what it was doing, and that that's relevant to understanding

6    your actual interpretation of this language?  You understand

7    that's our position, even though you disagree with it, correct?

8    A.   I understand your position is that among the many

9    transfers that were made, there were some that involved

10   proprietary assets.  And I think you maintain that that's

11   inconsistent with the way we say we read the agreement.

12   That's, in my -- to my understanding, what your position is.

13   Q.   Okay.  We'll take it.  Now, your position is that the

14   trustee never knowingly authorized the transfer of Lehman

15   assets as opposed to customer assets, correct?

16   A.   That's correct.

17   Q.   Now, if you look at Exhibit 517 that your counsel showed

18   you, and you understand that this is the e-mail that the

19   trustee's lawyer, Mr. Frelinghuysen, sends just before he sends

20   the authorization to transfer the clearance box assets, as

21   represented by Exhibit 422, correct?

22   A.   Yes.

23   Q.   And the trustee's lawyer, Mr. Frelinghuysen, writes to

24   Barclays, "Please confirm that the attachments to the e-mail

25   below," and those attachments list the securities to be

64

1   transferred to Barclays, correct?

2   A.   I believe so, yes.

3   Q.   "Please confirm that the attachments to the e-mail below

4   represent assets of Lehman Brothers that were sold to Barclays

5   Capital."  Do you see that?

6   A.   Yes, I do.

7   Q.   So Mr. Frelinghuysen is not here talking about customer

8   assets, he's talking about assets of Lehman Brothers.  Do you

9   see that?

10          MR. MAGUIRE:  Objection, Your Honor.

11   A.   I see what the language says.

12          THE COURT:  What's the -- one moment, please.  What's

13   the objection?

14          MR. MAGUIRE:  To the extent the witness has been asked

15   what is in Mr. Frelinghuysen's mind.

16          THE COURT:  He was just asked if he saw something.

17   The question was, do you see that.  And the question is either

18   to be answered yes or no.  It's not an improper question.  Your

19   objection is overruled.

20   A.   Yes, I see that.

21   Q.   And did Mr. Frelinghuysen ever tell you that he had

22   discussed with Barclays transferring assets of Lehman Brothers

23   from the clearance boxes?

24   A.   As I testified before, even having seen the clip, I do not

25   recall that.

65

1   Q.   Now, your counsel raised an objection to a portion of the

2   deposition of Mr. Frelinghuysen that I showed you, and I want

3   to put it entirely in context, okay?  And I want to begin by

4   putting up on the screen a page from Mr. Frelinghuysen's time

5   records.  And this is the same document that I've already shown

6   you.  And I'll find the exhibit in just a moment.  It's Exhibit

7   40.

8        And you recall I showed you some excerpts from your and

9   Mr. Giddens' time records from this exhibit earlier?

10  A.   Right.  I think this is tab 3 in your book.  Is that

11  correct?

12  Q.   It's tab 3 in the book, but that book does not have this

13  particular page on it, which is why I put it on the screen.

14  And this was referenced to Mr. Frelinghuysen in his deposition.

15  And the diary entry that we've highlighted is where Mr.

16  Frelinghuysen writes, "Discussion with A. Blackwell re transfer

17  of other LBI assets in relation to asset purchase agreement."

18  Do you see that?

19  A.   Yes, I do.

20  Q.   And now, I want to play a selection from Mr.

21  Frelinghuysen's deposition from page 68 lines 2 through 22.

22        MR. BOIES:  And I previously identified these to

23  counsel for the lawyers.

24        THE COURT:  All right.

25       (Begin audio playback)

66

1    "Q.  And when you wrote about other assets, you're referring to

2    the one billion dollars of other assets that Mr. Blackwell had

3    discussed with you?

4    "A.  Yes.  It appears that conversation was on the 24th.

5    "Q.  And when you write "other assets" that's to distinguish it

6    from the payment prime brokerage assets that were discussed in

7    earlier sections of your time entry.  Is that correct?

8    "A.  Yes.

9    "Q.  Does this refresh your recollection that what you

10   discussed with Mr. Blackwell is the transfer of the remaining

11   clearance box assets, pursuant to the clarification letter?

12   "A.  This just reflects my recollection that Mr. Blackwell is

13   requesting assets -- requesting transfer of noncustomer

14   assets."

15        (End audio playback)

16   **Q.  Now, you see, sir, where Mr. Frelinghuysen says that on**

17   **the 24th, Mr. Blackwell was requesting clearance box assets**

18   **that were noncustomer assets.  You see where Mr. Frelinghuysen**

19   **testified to that?**

20   **A.  I saw his testimony, yes.**

21   **Q.  Now, if you look at tab 30 in the book we gave you, it's**

22   **Barclays Exhibit 514.  And this was Deposition Exhibit 671B,**

23   **and it's dated September 25, 2008.  And you recall that this is**

24   **the document that your counsel identified for the record from**

25   **the deposition.  Do you recall that?**

67

1   A.   I'll take your representation for it.

2   Q.   Okay.  And Mr. Frelinghuysen sends to Mr. Blackwell an

3   e-mail that says, "Please see the enclosed letter which will be

4   necessary before the SIPC trustee can authorize the movement of

5   positions discussed earlier that are due as part of the LBI-

6   Barclays transaction."  Do you see that?

7   A.   Yes, I do.

8   Q.   And then attached is the draft letter that again, Mr.

9   Frelinghuysen referred to in the deposition that I played

10  earlier this morning.  Do you see that?

11  A.   Yes.

12  Q.   And in this draft letter, it again refers to the fact that

13  the assets being transferred are assets of Lehman Brothers.  Do

14  you see that?

15  A.   Well, he describes it as assets of Lehman Brothers.

16  That's what the document says.

17  Q.   Indeed, he describes it as assets of Lehman Brothers which

18  were sold to Barclays, correct?

19  A.   That's the way he describes it in the letter, yes.

20  Q.   And then I want to play another section from Mr.

21  Frelinghuysen's deposition.  This is from page 72, lines 11 to

22  23.

23       MR. BOIES:  And I have identified these for counsel as

24  well.

25       (Begin audio playback)

68

1    "Q.  And you didn't request a similar letter when Mr. Boies

2    asked you to authorized transfer of PIN clients securities, did

3    you?

4    "A.  No.

5    "Q.  Why did you request a letter from Mr. Blackwell in

6    connection with the transfer you discussed with him, but didn't

7    request a similar letter from Mr. Boies in connection with the

8    later transfer?

9    "A.  The nature of the transfer was different."

10          (End audio playback)

11   **Q.  And then, do you recall that I played before the break, a**

12   **portion in which Mr. Blackwell then went on to testify with**

13   **respect to the draft letter that the reason he was doing it was**

14   **because he recognized these were noncustomer assets?  Do you**

15   **recall that testimony?**

16   **A.    Yeah, Mr. Frelinghuysen.**

17   **Q.    Yes.**

18   **A.    I think you misspoke.  Yes, I recall seeing that.**

19   **Q.    You recall seeing Mr. Frelinghuysen testify to that?**

20   **A.    Yes.**

21   **Q.    Now, let me go back to Exhibit 5, which was the**

22   **clarification letter, and to again the first page, where we're**

23   **talking about the clearance box assets.  And I noted before**

24   **that the clarification letter that the trustee signed provided**

25   **that the assets in the clearance boxes that were being**

69

1    transferred or sold to Barclays were going to be specified on

2    Schedule B.  Do you see that?

3    A.    Yes.

4    Q.    And did there come a time when the trustee got a copy of

5    Schedule B?

6    A.    I believe there was.  I believe we did, yes.

7    Q.    And did the Schedule B list all of the assets that were in

8    the clearance boxes?

9    A.    I believe that's what it purported to do.  I couldn't tell

10    you whether it was a hundred percent accurate or not.

11    Q.    It at least purported to list all of the assets in the

12    clearance boxes, whether they were owned by Lehman Brothers or

13    owned by customers, correct?  That's what it purported to do?

14    A.    I thought it purported to list the proprietary assets, but

15    I may be mistaken.

16    Q.    But in any event, Schedule B at least listed the

17    proprietary assets of Lehman Brothers that were in the

18    clearance boxes, correct?

19    A.    Yes.

20    Q.    Okay.  And you understood that what was listed on Schedule

21    B was a purchased asset of Barclays, correct?

22    A.    No.  Because the DTC letter that Barclays signed said

23    specifically it was an excluded asset.

24    Q.    Well, sir, let's take that one step at a time.  Looking at

25    the section that we're looking at here, on the very first page,

70

1    where it says that the purchased assets include securities and

2    other assets held in LBI's clearance boxes as of the time of

3    the closing, which at the close of business on September 21,

4    2008, were specified on Schedule B.  Do you see that?

5    A.   Yes.

6    Q.   Now, you don't have any disagreement that the

7    clarification letter lists this as a purchased asset, correct?

8    A.   No, I don't disagree with that.

9    Q.   Okay.  And you don't disagree that Schedule B, what is

10   listed here as Schedule B or identified here as Schedule B, is

11   meant to list a purchased asset, right?

12   A.   That's correct.

13   Q.   Okay.  And that Schedule B, that was meant, according to

14   this provision, to list a purchased asset, included Lehman

15   proprietary assets that were in the clearance boxes, correct?

16   A.   That's correct.

17   Q.   Now, you mentioned a DTC letter.  Is the DTC letter

18   referred to in the clarification letter?

19   A.   I believe it's referred to in another place in the

20   clarification letter.

21   Q.   Yes.  That is when they were drafting the clarification

22   letter, Exhibit 5, and the clarification letter is part of the

23   asset purchase agreement, correct?

24   A.   The way the documents read, yes.

25   Q.   Okay.  And you understood that at the time, correct?

1    A.    I understood it was a clarification and an amendment to

2    the asset purchase agreement.

3    Q.    And you understood that both the Court in its sale order

4    and the trustee in subsequent briefs, defined the clarification

5    letter as being part of the asset purchase agreement, correct?

6    A.    That's the way it's defined, I believe, in the order.

7    Q.    And not only defined in the Court's order, but that's the

8    way the trustee defined it in its briefs afterwards, correct,

9    sir?

10   A.    Yes.

11   Q.    Okay.  Now, in the clarification letter that's part of the

12   asset purchase agreement, it references the DTC letter,

13   correct?

14   A.    In another portion -- I --

15   Q.    In another portion?

16   A.    Yes.

17   Q.    And would you like to see that portion just for context?

18   A.    I think I -- well, sure.  Yes.

19   Q.    If you look at the third page, is that what you're

20   referring to?

21   A.    Yeah, the last -- the last sentence of paragraph D on page

22   3, does refer to the agreement among LB -- really among the

23   trustee, purchaser and DTC.  That's the agreement I'm referring

24   to, yes.

25   Q.    And this makes clear, does it not, that when the

72

1    clarification letter was being finalized people were aware of

2    the DTC letter?  The DTC letter was already in existence,

3    correct?

4    A.   I don't know which letter preceded which in time.  I do

5    agree that they were executed, more or less, simultaneously.

6    It's my understanding that Weil -- at the time we thought that

7    Weil had been party to the discussions about the DTC letter or

8    at least had seen it.  I think that that -- I think we learned

9    subsequently that that was not the fact and that they had never

10   actually seen the letter.

11        MR. BOIES:  I would move to strike the last portion to

12   the extent that it is -- relates to the truth of the matter

13   asserted or is relating to hearsay.

14        THE COURT:  There's no need to strike it.  It's not

15   being accepted by the fact finder as truth of the matter

16   asserted; it's simply the witness' state of mind.

17        MR. BOIES:  Thank you, Your Honor.

18   Q.   You said your understanding was that these letters were

19   prepared relatively simultaneously, did I hear that right?

20   A.   I can't remember the exact sequence.  I actually -- I

21   actually remember seeing the DTC letter certainly after several

22   of the drafts of the clarification letter.  In other words,

23   probably some time early Monday morning.  I think they were

24   executed at or about the same time.

25   Q.   It is clear to you, is it not, that when it talks about

73

1    the agreement among LBI, purchaser and DTC that is a letter

2    that you're referring to as the DTC letter, correct?

3    A.    Yes.

4    Q.    Okay.  And if they are describing and taking into account

5    the DTC letter, it's clear that the DTC letter was already in

6    existence or otherwise they couldn't be doing this, correct?

7    A.    I don't know.  You could know that there was an agreement

8    and not have seen it.

9    Q.    Yes.  I'm now not asking about whether they saw it or not,

10   we'll come to that.  All I'm saying is that it had to exist,

11   that is it had to exist and they had to know it exists, whether

12   they saw it or not, correct?

13   A.    I agree.  Some kind of agreement, yes.

14   Q.    Okay.  So the letter agreement, whether Weil had seen it

15   or not, the letter agreement had to exist before this language

16   was drafted, correct?

17   A.    Yes.

18   Q.    Okay.

19   A.    It refers to an agreement entered into in connection with

20   the closing.

21   Q.    I'm sorry; say that again.

22   A.    I said it refers to an agreement entered into in

23   connection with the closing.

24   Q.    And that means, and you know it means, that the agreement

25   had to have existed when they drafted this, correct?

74

1    A.    There was an agreement in existence at that time of some

2    kind.  That's what this language says to me.

3    Q.    Yes.  And when you say of some kind you don't mean to

4    imply that the DTC letter agreement was changed after it was

5    executed, do you sir?

6    A.    No, not at all.

7    Q.    Okay.  So when this language was written in the

8    clarification letter the DTC letter, the one and only DTC

9    letter, was in existence, correct?

10   A.    I believe so.  Yes.

11   Q.    Okay.  And it is your interpretation of that DTC letter

12   that that DTC letter somehow gave the proprietary assets of

13   Lehman Brothers that were in the clearance boxes to -- back to

14   Lehman Brothers, is that correct?  That's your contention?

15   A.    Well, it says that they're excluded assets, meaning they

16   weren't part of anything that Barclays purchased.

17   Q.    It says that the Lehman proprietary assets in the

18   clearance boxes are excluded assets, is that your testimony?

19   A.    It says the accounts are excluded assets.

20   Q.    The accounts are excluded but not the assets, right sir?

21   A.    In my view those are the same.  I know that Barclays has a

22   different contention.

23   Q.    Well sir, the accounts included both customer assets and

24   Lehman Brother assets, correct?

25   A.    Yes.

75

1    Q.   And you've already said that the customer assets were

2    purchased assets, correct?

3    A.   I don't know if they're really, technically, purchased

4    assets.  They went with the customer accounts because there are

5    provisions saying that Barclays gets the assets that go with

6    the customers that it acquired or whose accounts it was taking

7    over.

8    Q.   Yes.  Barclays was entitled, under the asset purchase

9    agreement, to the customer assets in the clearance boxes.  You

10   don't have any dispute about that, correct?

11   A.   No.  They got them as part of getting the accounts but

12   they're really the customer's assets not Barclays' assets.

13   Q.   Well you just said they got them as part of getting the

14   accounts but your testimony is the DTC letter means that

15   Barclays doesn't get the accounts, right?

16   A.   No.  My testimony is that the proprietary assets were to

17   remain with the trustee.  That's clearly what DTC wanted.

18   Q.   Well you say that's clearly what DTC wanted, what I'm

19   trying to focus on is what the DTC agreement says, okay sir?

20   A.   Okay.

21   Q.   And the DTC agreement doesn't talk about customer assets

22   or proprietary assets, either one.  It just talks about

23   accounts, correct?

24   A.   Yes, although there is a provision where we authorized

25   some assets to go to NS -- to go to NSCC or NSSC, one of the

76

1    DTC subs in order to satisfy some obligations and that was

2    clearly referring to LBI proprietary assets in the clearance

3    boxes.

4    Q.   The DTC letter was for the protection of the DTC, correct?

5    A.   I think it was the protection of DTC and the trustee, as

6    it turned out.

7    Q.   Well you say as it turned out, the trustee didn't ask for

8    this letter, did it?

9    A.   The DTC asked for this letter.

10   Q.   And the trustee did not, correct?  Sometimes you can have

11   two people asking for a letter, correct, and I just want to be

12   clear that the DTC asked for this letter and the trustee did

13   not, correct?

14   A.   That's correct.

15   Q.   Okay.  And as you understood it, the DTC's only purpose

16   was to protect the DTC, correct?  They weren't trying to

17   protect Lehman, correct?

18   A.   I understood the DTC was very concerned about protecting

19   itself at the time.

20   Q.   And it was only concerned with protecting itself at the

21   time, correct sir?

22   A.   I can't possibly know that.  They expressed concern about

23   protecting themselves and their members at the time.

24   Q.   Did they express concern about protecting anybody else,

25   other than themselves and their members?

77

1   A.   I don't recall any specific discussion along those lines.

2   Q.   Okay.  And when you referred to a provision that permits

3   the DTC to deliver securities to NSCC's account, that is to

4   protect NSCC, correct?

5   A.   Yes.

6   Q.   Now there is nothing in the DTC letter that talks about

7   any assets constituting excluded assets in the meaning of APA,

8   correct?

9   A.   It says the accounts are excluded assets.  We interpret

10  accounts to include the assets in those accounts.

11  Q.   Well but sir, didn't you just tell me that those accounts

12  had customer assets that were not excluded?  Didn't you just

13  tell me that?

14  A.   Those were not assets that were sold to Barclays.  Those

15  were assets that went to Barclays as part of the account

16  transfer.

17  Q.   But if they're excluded assets they're not going to

18  Barclays, right?

19  A.   I think that -- I think that's a completely different

20  concept.

21  Q.   And do you think that based on anything that's in the APA

22  or the clarification letter?

23  A.   If you want to show me something, show me.

24  Q.   No, I'm asking you.  You think there's something that

25  makes it an entirely different concept.  I'm just asking is

1   there anything in the APA or the clarification letter that

2   supports what you just said?

3   A.   I don't remember either way.

4   Q.   You don't remember either way.  All right.  You do

5   understand that this sale agreement had an integration clause,

6   correct?

7   A.   Yes, I do.

8   Q.   And you know what an integration clause is, correct?

9   A.   Yes, I do.

10  Q.   And what is an integration clause?

11  A.   I think it means that the document is the document.

12  You're not supposed to take account of extraneous documents,

13  previous versions of things.

14  Q.   Or oral statements or understandings that are not

15  reflected in the document, correct?

16  A.   Yes if you're talking about an ordinary contract but when

17  representations are made to a court and the document is being

18  approved by the court for specific purposes, I think that might

19  supersede those rules.

20  Q.   So you think the integration clause didn't apply, is that

21  what you're saying?

22  A.   I'm saying it wouldn't supersede any duty that anyone

23  might have to disclose fully something to the Court in order to

24  get a document approved.

25  Q.   Yes.  There may very well be obligations to Court.  But in

79

1      terms of interpreting the agreement, you would agree that the

2      integration clause in the agreement means that you have to look

3      at the document itself and not at extraneous evidence whether

4      it is written or oral, correct?

5      A.    My understanding has been you look at the document but you

6      always interpret it in light of the circumstances and I think

7      that's really a legal question that's probably addressed in

8      your briefs and our briefs and everybody else's briefs.

9      Q.    I'm asking for your understanding and interpretation, sir,

10     because you're the 30(b)(6) witness, right?

11     A.    Yes.

12     Q.    And I'm also asking when you arrived at some of these

13     conclusions because it may be relevant to interpreting some of

14     your actions, you understand that, right?

15     A.    Yes.

16     Q.    Okay.  So let me put it this way, did the trustee ever

17     reach the conclusion, and if so I'd like you to tell me when,

18     that the integration clause meant that you could look beyond

19     the four corners of this document to interpret it?

20     A.    With respect to the DTC letter, which I think is what

21     you're asking about, our position is that that's operative

22     document.

23     Q.    Is there anything in the APA, including the clarification

24     letter, that says the DTC letter is the operative document for

25     determining what's in the clearance boxes?

80

1    A.   No.

2    Q.   Okay.  Incidentally -- let me just stay with this one more

3    minute.  You talked about customer accounts.  Customer accounts

4    are transferred in section 8, correct?

5    A.   Yes, I believe so.

6    Q.   And you didn't need a reference in paragraph 1 to

7    clearance boxes if all you were transferring were the customer

8    assets in those clearance boxes, correct sir?

9    A.   Well yes.  Paragraph 8 says Barclays -- purchaser Barclays

10   is to receive, for the account of the customer, any and all

11   property of that customer.

12   Q.   Right.  And so even if clearance boxes had never been

13   mentioned in paragraph 1, Barclays, under paragraph 8, would

14   have been entitled to the customer assets in the clearance

15   boxes, correct?

16   A.   Yes.  The purpose of the transaction was to transfer

17   customer accounts so customers could continue trading.  That's

18   essentially why Barclays agreed to take them and the other

19   parties agreed to transfer them to Barclays.

20   Q.   Pursuant to paragraph 8, correct?

21   A.   That's correct.

22   Q.   And paragraph 8 was quite important to the trustee,

23   correct?

24   A.   Yes.

25   Q.   The APA itself didn't have a transfer of customer accounts

81

1    provision did it?

2    A.    I don't believe so.

3    Q.    And in this provision in the clarification letter was

4    something that the trustee felt was very important to its

5    mission, correct?

6    A.    Yes.

7    Q.    Did the trustee feel that it was necessary or appropriate

8    to go back to the Court and tell the Court that this paragraph

9    8 had been added?

10   A.    I thought it was very clear at the hearing that one of the

11   purposes of the transaction was to allow the accounts to be

12   transferred to Barclays.  I don't think there was any question

13   about that so the answer is no.

14   Q.    Now at the hearing the Court was told about hundreds and

15   hundreds of thousands of accounts, correct?

16   A.    That's correct.

17   Q.    Was it 800,000 accounts or more, something like that?

18   A.    I think it was a lower number.  I don't remember the

19   number.

20   Q.    But certainly hundreds of thousands of accounts?

21   A.    Yeah.

22   Q.    Now not all of those accounts were transferred to

23   Barclays, correct?

24   A.    No, about -- well it depends on whether you look at

25   accounts in terms of numbers or amount of property but really

82

1    less than half the property was transferred to Barclays.

2    Q.    More than half the accounts but less than half the

3    property, correct?

4    A.    I think that's right.

5    Q.    Did the trustee believe that it was appropriate or

6    necessary to go back to the Court and tell the Court what

7    progress had been made and what progress had not been made in

8    transferring the customer accounts?

9    A.    Well, I think it was well understood --

10   Q.    Sir, that's a yes or no question and you can add an

11   explanation if you need to.

12   A.    No.  The bulk of the accounts were going either to

13   Neubergers or to Barclays.  That was clearly understood, and I

14   believe, explained at the hearing.  I don't think anyone knew,

15   with certainty, what accounts were left behind.  I don't think

16   we knew how significant the accounts were left behind.

17        Ten days after the hearing we got a letter from Barclays

18   saying that they rejected taking the prime broker accounts,

19   which were accounts that they were supposed to take or it was

20   expected they would take under the agreements.  So that really

21   saddled the trustee with an additional burden, which I don't

22   believe was ever disclosed to the Court.

23        But this did not, in our view, change anything that had

24   been told the Court.  I think it was very clear that there was

25   supposed to be a very substantial transfer of accounts to

83

 1  Barclays.

 2  Q.   Let me follow up on what you volunteered about prime

 3  broker accounts, sir.  Did you believe that Barclays had any

 4  obligation to take the prime broker accounts?

 5  A.   We expected they would take them.

 6  Q.   Sir, do you understand the question that I'm asking?

 7  A.   Yes.

 8  Q.   And the question is, did you believe that Barclays had any

 9  obligation to take the prime broker accounts?

10  A.   I did not believe they necessarily had an obligation to

11  take them.

12  Q.   You said you didn't believe they necessarily; did you

13  believe they had any obligation at all to take the prime --

14  A.   No, but it was expected that they would take them.

15  Q.   Expected by you, is that what you're saying?

16  A.   I think they're provided for in the agreement so I would

17  think they'd be expected by everyone, but certainly by us.

18  Q.   Well, they're not provided in the agreement that Barclays

19  has any obligation to take them, right?

20  A.   That's correct.

21  Q.   And you never had any conversations with Barclays at all;

22  the trustee didn't, prior to signing these documents.  That's

23  what you testified to, correct?

24  A.   That's correct.

25  Q.   So you couldn't have had any understanding from Barclays

84

1    that it was going to take these, could you?

2    A.   Before we signed the agreements, no.

3    Q.   Now let me go back to paragraph 8.  Paragraph 8 would have

4    transferred all of the customer assets in the clearance boxes

5    to Barclays without any reference to clearance boxes in

6    paragraph 1, correct sir?

7    A.   I believe so.

8    Q.   Okay.  So if we interpret paragraph 1, which says that

9    Barclays gets such securities and other assets held in LBI's

10   clearance boxes, as being limited to customer assets, this

11   provision is simply redundant to paragraph 8, correct?

12   A.   There'd be no need for it.

13   Q.   No need for it.  Okay, sir.  Now let me turn to the

14   subject of exchange traded derivatives.  And let me begin with

15   the asset purchase agreement and in this case page 2 of the

16   clarification letter.

17   A.   Well in your -- can you tell me what --

18   Q.   Tab 5 in our book.

19   A.   Okay.

20   Q.   It's Exhibit 5.

21   A.   Yes.

22   Q.   At the top it says, "Exchange, trade and derivatives and

23   any property that may be held to secure obligations under such

24   derivatives," do you see that?

25   A.   Yes.

85

1    Q.    And before we got off on another subject, we were talking

2    this morning about when this phrase and any property that may

3    be held to secure obligations under such derivatives was added.

4    And I wanted to be sure that we have it clear on the record

5    when it is your testimony the trustee, including all the

6    trustee's lawyers, were aware of this language.

7    A.    Well, we would have seen the final version.  Whether

8    anyone focused on this language, particularly, at that time I'm

9    unable to say because I don't think we had any reason to think

10   that the language in the final version would be different, in

11   any way, from the previous draft that we'd been shown and

12   looked at.

13   Q.    Do you understand my question?  My question is when did

14   you first understand that this language was included in the

15   APA?

16   A.    I think the first time that we really focused on it was

17   after the exchange of correspondence with Barclays when they

18   finally set forth their positions on various issues and we

19   really focused on what their arguments were.  And then we went

20   back and looked at the -- this version and the final version

21   and the previous versions to, kind of, understand the context.

22   I think that's when we realized that this came in in the final

23   version and not in what was represented to be the final changes

24   that had been agreed upon.

25   Q.    And I still want to press the when.

86

1    A.   Well, this would have been some time in 2009.  I think we

2    saw some of the correspondence.

3    Q.   So you really focused on the fact that this language

4    existed in the September 2008 asset purchase agreement only in

5    2009, is that your testimony?

6    A.   I believe so.

7    Q.   Okay.  Now, you did understand that you were bound by the

8    written terms of the agreement that you'd signed, correct sir?

9    A.   Sounds like a first year exam question.

10   Q.   It is, sir.

11   A.   We signed what we thought was a -- I think what an

12   agreement does is embody what the parties' understanding is and

13   we would be bound by that understanding.

14   Q.   Would you be bound by the objective terms that you signed,

15   according to your understanding?

16   A.   I think terms, as they're defined -- as they're

17   interpreted under all the circumstances.

18   Q.   And is it your testimony, because I want to focus on your

19   use of the words really focused on.  Is it your testimony that

20   until some time in 2009 the trustee and all of its lawyers were

21   unaware that this language existed?

22   A.   He might have made some inquiry earlier but I really don't

23   recall focusing on this specific parenthetical until a later

24   time.

25   Q.   By later time you mean some time in 2009?

87

1    A.    When the dispute arose.

2    Q.    Some time in 2009 you're saying?

3    A.    Yes.

4    Q.    Okay.  Now, again, as you volunteered, you're the 30(b)(6)

5    witness here, correct?

6    A.    That's my understanding.  Yes.

7    Q.    And you knew that this parenthetical was something that

8    was a key part of the arguments in this case, correct sir?

9    A.    A key part of your argument, maybe.  Yes.

10   Q.    And a key part of what you're trying to respond to,

11   correct?

12   A.    Yes.

13   Q.    Okay.  So is it your testimony that as a 30(b)(6) witness

14   knowing that this was a key part of our argument and a key part

15   of what you were responding to, you did not find out when the

16   trustee or any of its lawyers knew that this language was in

17   the agreement?

18   A.    I recall having many discussions about the various

19   Barclays arguments and looking hard at the language of the

20   clarification letter, the asset purchase agreement, the various

21   drafts.  It's my best recollection that that would have

22   occurred, in substantial part, in 2009 when these disputes

23   really ripened, when we got letters from Barclays stating what

24   their position was.

25   Q.    Let me try to be clear.  I'm not asking whether it was in

88

1   substantial part.  I'm not asking even when you really focused

2   on it.  I'm simply asking when did the trustee, including all

3   of its lawyers, first figure out what the actual words in the

4   agreement that he had signed said?

5   A.   I can remember focusing on this particular aspect of it in

6   2009.  We may well have had people look at the documents before

7   that and said something about this language.  But it was

8   certainly my focus in 2009, as I said.

9   Q.   Let me try it this way; the agreement says that the

10   exchange traded derivatives include any property that may be

11   held to secure obligations under such derivatives.  Focusing

12   just on that language, the language that you say was added

13   late, when did the trustee first become aware that this

14   language was in it, regardless of what you think about the

15   meaning of it?  When did you first become aware that the

16   language was there?

17   A.   I don't know.  I know when I started really focusing on it

18   and how it appeared.  I don't know beyond that as I sit here

19   today.

20   Q.   Approximately.

21   A.   I can't really tell you when.

22   Q.   Did somebody actually read this document?

23   A.   People did read the document.

24   Q.   All the way through?

25   A.   I think all the way through.

89

1    Q.    In September of 2008?

2    A.    I don't know.  We thought we knew what was in the final --

3    the version with the final changes.  I think a few days

4    afterwards final copies of the documents came over.  I don't

5    know at what point people would have gone back and looked at

6    specific language on an issue like this; there really wasn't

7    any need to.

8    Q.    Well sir, first of all you say you think copies came over;

9    you know copies came over, correct?

10   A.    Yeah.  I'm saying I'm not exactly sure when they came

11   over.

12   Q.    Well look at Exhibit 820 in our binder and that is -- that

13   should be at tab 9.

14   A.    Yes.

15   Q.    Now this is a notice of filing, is that correct?

16   A.    That's what it appears to be, yes.

17   Q.    And it is a notice of filing of the executed clarification

18   letter, among other documents, correct?

19   A.    Yes.

20   Q.    And copies of this went to your law firm, went to you

21   personally, went to Mr. Kiplok.  Is that correct?

22   A.    Yes.

23   Q.    And that happened in the afternoon around 2:49 p.m. on

24   September 22nd, correct?

25   A.    Yes.  It's my recollection that at some point we got a

90

1    binder of the documents.  I don't know if we copied them from

2    the court record or if Weil or somebody sent them over a day or

3    two later.  I just can't remember.  It would have been a short

4    time after the 22nd, but I can't remember the exact time.

5    Q.   Now, you have testified that the final version was

6    different than the last draft that you saw, correct?

7    A.   Yeah, in this one -- well, it's not on the screen anymore,

8    but, yes, with respect to the parenthetical.

9    Q.   Was it different in any other respect?

10   A.   I don't recall.

11   Q.   Did you ever check?

12   A.   Yes.  I know there was one time.  I think I testified

13   earlier that with respect to the substitution phrase in the

14   15(c)(3) language there had originally been securities of the

15   same value, and the words "and nature" were added to that.  And

16   I don't know if that came in at the same time or if -- I think

17   it was in an earlier draft, but I'm not sure.

18   Q.   My only questions to you, sir, is you've testified about

19   theme, what you refer to as the last draft, and that there was

20   at least one difference between that so-called last draft and

21   the final version, correct?

22   A.   Yes.

23   Q.   And what I'm asking you is were there any other

24   differences?

25   A.   I don't think so, other than the one that I changed, you

91

1    know, the one that I referred to, and I think that change was

2    made before what I've referred to as the final draft.

3    Q.   Now, when did you get what you refer to as the final

4    draft?

5    A.   It was early in the morning.  At least it was e-mailed to

6    me early in the morning of the 22nd, I think, around 6:30.

7    Q.   And at the time it was e-mailed to you did you have any

8    discussions with anybody?  I know you didn't talk to Barclays,

9    but did you have any discussions with anybody from Weil or

10   anybody else as to what that draft represented?

11   A.   I don't -- I didn't -- I don't know if anyone else did.  I

12   don't know.

13   Q.   Did anyone tell you that it wasn't going to change after

14   that draft?  That's a yes or no question.  You can add an

15   explanation if you need to.

16   A.   I don't think anyone told us that specifically, nor did

17   anyone tell us that there had been changes from the last draft

18   when the final draft --

19   Q.   Did you ask anybody whether there'd been any changes?

20   A.   No.  As I said, I would expect someone to tell us there is

21   a change.

22   Q.   Did you tell anybody that you expected them to tell you if

23   there was a change?

24   A.   No.

25   Q.   I want to be sure the record is clear.  You got sent a

92

1    draft around 6 a.m. on the 22nd, correct?

2    A.    Correct.

3    Q.    As you sit here now you don't know whether there was

4    another draft that intervened between that draft and the final

5    draft, correct?

6    A.    I have no reason to think there was one, but, no, I don't

7    know.

8    Q.    And you never asked anybody whether there was an

9    intervening draft, did you?

10    A.    No.

11    Q.    And you never asked anybody whether there were any

12    differences between the final version and the 6 a.m. draft,

13    correct?

14    A.    No, I did not.

15    Q.    And no one ever told you one way or the other whether

16    there were any changes between the final version and the 6 a.m.

17    draft, correct?

18    A.    That's correct, but all the other drafts that we saw where

19    there were changes, for the most part they were redlined so

20    that you could see what the changes were.

21    Q.    You didn't expect to see the final clarification letter

22    redlined, did you?

23    A.    I would have expected to receive a draft with a redline if

24    there was going to be a change, or I would have expected

25    someone to call up and tell us.

93

1    Q.    Do you know if Mr. Frelinghuysen saw an intervening draft,

2    sir?

3    A.    I don't know.  I don't believe so, but I don't know.

4    Q.    Did you ever ask him?

5    A.    I think I've asked him.

6    Q.    What did he say?

7    A.    I think he said that we got the draft and then there was

8    the final version.  I don't even know if he saw the final

9    version while he was there, because the signature pages had

10   actually been done earlier.

11   Q.    Yes.  And let me focus on that for a moment.  Mr.

12   Frelinghuysen signed the signature page around 1 a.m. or 2

13   a.m., correct, sir?

14   A.    Yeah, something like that.  Yes.

15   Q.    Okay.  And at the time he did it was the draft that was

16   then in existence acceptable to the trustee?

17   A.    The draft was still, I believe, being worked on.

18   Q.    It was still being worked on, but that's not my question.

19   My question is whether the draft that was in existence when he

20   signed the signature pages was acceptable to the trustee?

21   A.    The draft that was then in existence was the one with the

22   yellow highlighted language which indicated that issues were

23   still under discussion.  In the long telephone call we had

24   there was, finally, a discussion of what would happen to the

25   250 million dollars, that it would go to DTC to be used as a

94

1    guarantee and so forth.  SIPC signed off on that part.  The

2    trustee signed off on that part.  It was understood that the

3    documents would be worked on, and I believe we and SPIC and

4    maybe others signed documents that would be exchanged and

5    released to the other parties, so to speak, when the documents

6    were finalized.

7    Q.   Do you have my question in mind, sir?

8    A.   I thought I answered it.

9    Q.   My question is whether the draft that was in existence

10   when the trustee signed the signature pages was acceptable to

11   the trustee?  I understand that there were other parties that

12   were talking about it.  What I'm asking you is from the

13   trustee's standpoint, when you signed the document was that

14   draft acceptable?

15   A.   No, there was not a final document at that point.

16   Q.   Was the draft that existed, if it had not been changed,

17   acceptable to the trustee?

18   A.   I don't think we'd made that decision.  I don't think it

19   would have been acceptable.

20   Q.   Now, did the trustee, with respect to the draft that

21   existed at the time the trustee signed the signature pages, did

22   the trustee say what portions of that draft the trustee

23   believed needed to be changed?

24   A.   The trustee wanted us to look carefully at the drafts,

25   whatever ensuing drafts there were, and make sure they were

95

1   consistent with the deal, as consistent as possible with the

2   deal that had been described to us.

3   Q.   My question, sir, is that at some point the trustee, and

4   I'm, by trustee I'm including the trustee's lawyers.  You

5   understand that?

6   A.   Yes, I do.

7   Q.   At some point the trustee signed the signature pages,

8   correct?

9   A.   Yes.

10   Q.   And there was a draft in existence at that time, correct?

11   A.   Yes.

12   Q.   And you've said that that draft was not acceptable to the

13   trustee.  If everybody else had signed off on it it would not

14   have been acceptable to the trustee.

15   A.   Well, I don't know, because nobody else had signed off on

16   it.

17   Q.   Let me put that question to you.  Did the trustee make a

18   judgment one way or the other as to whether, if everybody else

19   signed off on the 1 a.m. or 2 a.m. draft, that the trustee

20   would be okay with that?

21   A.   The trustee wanted me, with Mr. Frelinghuysen and Mr.

22   Kiplok there, to look at the subsequent drafts and make sure

23   they were consistent with what had been described and protected

24   the interests, the trustee's interests, and with that

25   understanding and with the understanding that they would be

96

1    consistent with the deal that was described, sign the

2    documents.  We wouldn't have released the documents if there

3    had been a suddenly, even yet, a further material change that

4    was clearly detrimental to the trustee.  We would have had to

5    discuss that.

6    Q.    Maybe I'm not being clear.  There's a draft that's in

7    existence at the time that the trustee signs the signature

8    pages, correct?

9    A.    Yes.

10   Q.    Okay.  I want to focus on that draft.

11   A.    Okay.

12   Q.    If everybody else had signed off on that draft would that

13   draft have been acceptable to the trustee?

14   A.    I don't know the answer to that question, because it's a

15   hypothetical question.  Everybody hadn't signed off.

16   Q.    Let me put it this way.  Did the trustee ever think about

17   whether that draft was or was not acceptable if everybody had

18   signed off on it?

19   A.    I think we understood what the broad parameters were.  We

20   were waiting for a draft that would embody the final language

21   and the final terms to make sure it seemed appropriate.

22   Q.    Does that mean the answer to my question is no?

23   A.    well, there wasn't a draft.  There was a draft in

24   existence, but it was still a discussion draft.

25   Q.    Does that mean that the answer to my question is no?

97

1    A.    I can't -- forgotten your original question.

2    Q.    Okay.  I thought that might have happened.  My question

3    was whether, if everyone else had signed off on the draft that

4    existed when the trustee signed the signature pages, did the

5    trustee ever think about whether that draft was acceptable to

6    the trustee?

7    A.    I don't believe so.  My thought process was the basic

8    terms of the deal have been described.  We've said that we're

9    probably okay with that.  We want to see the final versions of

10   the document.  The only document that was then in existence

11   that I -- that we had seen was one that clearly had parts that

12   were still being worked on.

13   Q.    At any point in the drafting process did the trustee make

14   any proposals as to additions, deletions or changes to the

15   clarification letter drafts?

16   A.    As I testified yesterday, when the conversation occurred

17   about the 15c3-3 account I thought we might have proposed some

18   language similar to the -- the introductory clause to the

19   extent permitted by law, by applicable law, which we've

20   discussed extensively, but, and that was one area that we

21   focused on specifically.  Aside from that I don't believe so.

22   Q.    Okay.  And with respect to the 15c3 proposal, is it your

23   testimony that you might have done it or you might not have

24   done it?

25   A.    I thought I discussed with my people we should get some

98

1    language.  Then I saw some language that did what I

2    accomplished.  I'd like to give myself credit for making that

3    proposal, but it may well have come from someone else.  I was

4    just happy to see it.

5    Q.    Now, at any point in the drafting process did the trustee,

6    and I'm always including all of the trustee's representatives

7    when I use the word trustee, ever tell anybody that any portion

8    of the draft or of any draft was unacceptable?

9    A.    No.

10   Q.    You were aware that exchange-traded derivative positions

11   existed at the OCC, correct?

12   A.    Yes.

13   Q.    And you, indeed, had conversations with the OCC about the

14   Lehman exchange-traded derivative positions at the OCC,

15   correct?

16   A.    Well, not the way you phrased the question.  I had a brief

17   conversation with Mr. Rivera about a document that he wanted me

18   to sign because otherwise the OCC was going to liquidate all

19   the positions.

20   Q.    And if the OCC had liquidated all of LBI's exchange-traded

21   derivative positions that would have been a disaster for LBI,

22   correct?

23   A.    Well, it would have been a disaster on what I was focusing

24   on, because it would have meant that the customers, and there

25   were a substantial number of customers there, would not have

99

1    been transferred.  They wouldn't have had control of their

2    accounts.  They might have, probably would have, suffered huge

3    losses in many cases.  That's the part I was focusing on.

4    Q.   And you were aware of what had happened when the CME had

5    closed out LBI's positions early in the week, right?

6    A.   Yes, that had been reported in court that everything, all

7    the cash, had evaporated, essentially.

8    Q.   And you understood that if the OCC closed out LBI's

9    position the same thing would happen here, correct, sir?

10   A.   I was focusing on customers, yes.

11   Q.   Well, I know you were focusing on customers.  I'm focusing

12   on your knowledge.  And your knowledge may be limited to

13   customers, but if you've got broader knowledge I'm trying to

14   get at it.

15   A.   Okay.  I didn't believe there was any substantial cash

16   margin at the OCC, proprietary cash margin, something that

17   wasn't associated with the customers that were to be

18   transferred for the reasons that I testified yesterday, which

19   were that there had been specific representations to the Court

20   that no cash of any kind was involved in the deal and because

21   Mr. McDade had said that the last cash that anybody knew about

22   at Lehman had disappeared, in large part because of the actions

23   of the CME.

24   Q.   Well, when they talked about all the cash at Lehman

25   disappearing you knew that that did not include cash margin,

100

1    correct, sir?

2    A.   No, I did not know that.  I thought it included cash

3    mar -- proprietary, if there were proprietary cash margin,

4    because that's the kind of cash, as I understood it, that had

5    already disappeared from the CME.

6    Q.   You understood that there was cash margin at the CME,

7    correct, because you just testified you understood all that

8    cash of the CME evaporated, correct?

9    A.   Well, because Mr. McDade said there had been cash at the

10   CME.  That was a large part of the last 700 million dollars

11   that was left, and when the CME took its action the cash was no

12   longer there.  It was needed to satisfy obligations.

13   Q.   Let me put it this way.  You knew that if the OCC wiped

14   out LBI's positions that whatever collateral that was there,

15   cash or otherwise, was going to be wiped out, correct?

16   A.   I didn't -- I thought -- I thought it would be a disaster

17   for the reasons that I've specified.  I really didn't know what

18   the effect would be.  I didn't think it would be a good effect.

19   Whether it would be all wiped out, whether there was anything

20   there, I didn't know.  I didn't really think there was a lot of

21   proprietary cash there.

22   Q.   Did you ever try to find out what the effect of having the

23   OCC wipe out LBI's positions would be?

24   A.   No.

25   Q.   Okay.

101

1    A.    I mean, I signed the agreement --

2    Q.    Yes.

3    A.    -- during this --

4    Q.    You did sign the agreement.  And I want to come to that

5    agreement.  But either before or after signing that agreement

6    did you try to find out what the effect of OCC's wiping out or

7    closing LBI's positions would have been?

8    A.    I didn't do that.  We might have done it in conjunction,

9    you know, my litigation team may have done it in conjunction

10   with this litigation.  That would be privileged, I think, but

11   apart from that, no.

12   Q.    Did you ever try to do it before 2009?  Did the trustee

13   ever try to do that before 2009?

14   A.    I don't believe so.

15   Q.    Now, let me turn to this agreement that you signed.

16         THE COURT:  Mr. Boies, just before you turn to that

17   agreement I just need to get a sense, for planning purposes,

18   whether you're going to be quite a whole longer or if you're

19   coming toward a conclusion.

20         MR. BOIES:  I think this would be a good time for a

21   luncheon break, Your Honor.

22         THE COURT:  Let's do that, then, and we'll resume at 2

23   o'clock.

24         MR. BOIES:  Thank you, Your Honor.

25         (Recess from 12:35 p.m. until 2:39 p.m.)

102

1              THE COURT:  Be seated, please.  Good afternoon.

2              MR. BOIES:  Thank you, Your Honor.

3     RESUMED CROSS-EXAMINATION

4     BY MR. BOIES:

5     Q.   Good afternoon, Mr. Kobak.  Just before the break I think

6     we were about to go to an agreement that you had signed with

7     the OCC.  Do you recall that, generally?

8     A.   I can't remember where we were, but if that's where you

9     want to start it's fine with me.

10    Q.   Okay.  And I think that at Tab 16 of our book you will see

11    an Exhibit 231-A.

12    A.   Yes.

13    Q.   Is this the agreement that you signed with the OCC on

14    September 19, 2008?

15    A.   I was given two agreements.  There was this agreement and

16    then the transfer and assumption agreement.  I thought I signed

17    them both.  I may have only signed one at that time, but it

18    certainly is one of the documents that I believe I signed then.

19    Q.   Let me be sure you've got both of those in front of you.

20    If you look at Tab 15, Barclays' Exhibit 3, is that the

21    transfer and assumption agreement that you refer to?

22    A.   Yes.

23    Q.   So Exhibit 231-A and Exhibit 3 are both agreements that

24    you signed with the OCC.  Is that correct?

25    A.   Yes.

103

1    Q.    Now, the exhibit that's 231-A was signed on September

2    19th, correct?

3    A.    I -- as I said, I just can't remember if I executed both

4    of them during the hearing.  I may have only executed one.  I

5    think I really meant to execute both at that time.

6    Q.    But at least you executed 231-A during the hearing.

7    A.    Well, I'm not sure if I did or didn't, but I meant to

8    execute it if I didn't execute it.

9    Q.    Do you have a recollection one way or the other when you

10   executed Barclays' Exhibit 3, the transfer and assumption

11   agreement?

12   A.    I know I did a, signed an agreement at the hearing.  I

13   think over the weekend we were e-mailed a draft with a few

14   minor handwritten changes in it, and that may be the -- the

15   version that I signed, I don't think, was countersigned by

16   Barclays, at least, so I think -- this has countersignatures so

17   it may be the later version, but I don't think it's

18   substantially changed from that which I signed.

19   Q.    Let me ask you to look at Exhibit 231, which is also in

20   the same tab as 231-A.  Is this the e-mail that you're

21   referring to, a September 20, 2008 e-mail --

22   A.    I've only got -- you're on tab 16?  I've only got the

23   agreement in this tab.

24   Q.    You don't have Exhibit 231?

25          THE COURT:  It's after the blue piece of paper.

VERITEXT REPORTING COMPANY

212-267-6868                                        516-608-2400

104

1    A.    Oh, I'm sorry.  Yes, I've got it.  I'm sorry.

2    Q.    And is Exhibit 231, Barclays' Exhibit 231, which is an e-

3    mail to you dated September 20, 2008 at 2:32 a.m., the e-mail

4    that you were referring to?

5    A.    Yes.

6    Q.    And this has handwritten changes to the transfer and

7    assumption agreement, correct?

8    A.    Yes.

9    Q.    It also includes an already signed copy of the September

10   19th agreement with the Option Clearing Corporation, correct?

11   A.    Yes.  Yes, signed by me.  Yes.

12   Q.    And does that indicate to you that you signed the

13   agreement that is Exhibit 231-A on the 19th, and you signed the

14   agreement that is Barclays' Exhibit 3 on the 20th?

15   A.    It really doesn't refresh my recollection, but I believe I

16   authorized the signature on the 20th and said that my signature

17   on the original version also applied to the slightly amended

18   version of the TAA.

19   Q.    Now, let me focus first on Exhibit 231-A, and, as a

20   predicate for that, as you understood it in the week prior to

21   the closing on September 22nd, did the OCC accounts that were

22   being transferred to Barclays include customer positions in

23   exchange-traded derivatives?

24   A.    I believe they did, yes.

25   Q.    Did those OCC accounts also include LBI positions in

105

1   exchange-traded derivatives?

2   A.   I believe they did, yes.

3   Q.   Did those OCC accounts include margin or collateral for

4   customer positions?

5   A.   I believe they did, yes.

6   Q.   And did those OCC accounts include margin or collateral

7   for LBI positions?

8   A.   I -- I know now that they did.  I didn't know that then,

9   and, as I've said, I didn't believe there could have been any

10  substantial cash margin for reasons I've already said.

11  Q.   You did understand that OCC was going to require margin or

12  collateral for any exchange-traded derivative positions that it

13  had, correct?

14  A.   My understanding was they wanted the entire accounts and

15  all the positions, obligations, liabilities, everything

16  associated with them, transferred from LBI to Barclays.

17  Q.   Yes.  And I want to come to that.  But prior to the time

18  it was going to be transferred to Barclays, just in the

19  ordinary course of business, you understood that OCC required

20  margin or collateral for exchange-traded derivative positions,

21  correct?

22  A.   I didn't really have a specific understanding of the rules

23  of the OCC or anything of that sort.  It seemed logical to me

24  that there would be some kind of collateral, whatever you want

25  to call it, to support positions.  That's typically what I

106

1    understood what clearing agencies required and one -- they

2    called it different things in one form or another, so I had a

3    general understanding along those lines but no specific

4    understanding of the OCC rules in particular.

5    Q.    Did you make any effort the week preceding the closing on

6    September 22 to find out what OCC's margin or collateral

7    requirements were?

8    A.    No.

9    Q.    Now, you've said that you recognized that the OCC accounts

10   that were transferred to Barclays included LBI positions in

11   exchange-traded derivatives, correct?

12   A.    Yeah, I believe that was true.  Yes.

13   Q.    And if that were true you would have believed that there

14   would have been LBI margin or collateral associated with those

15   exchange-traded derivatives --

16   A.    Well, it seemed logical that there might have been, except

17   that we were told there was no cash.  So there might have been

18   securities.  I did not believe there was any cash margin, so

19   I -- it's not really something I focused on when I was asked to

20   sign these agreements.

21   Q.    Now, you say you were told there was no cash.  Who told

22   you there was no cash?

23   A.    I heard it at the hearing.  Mr. McDade testified.  Mr.

24   Miller may have made a proffer along the same lines.

25   Q.    Other than what you heard at the hearing did anyone tell

107

1    you that there was no cash?

2    A.    I don't believe so.

3    Q.    Now, if there was no cash --

4    A.    I take that back.  It may be in this brief colloquy we had

5    before the hearing began that Mr. Miller said there was no cash

6    in the deal as well as telling us the value went down from 70

7    to 47.4.

8    Q.    He may have said that or he may not have said that.  Is

9    that what you're --

10   A.    I don't recall.  He may have said it, yes.

11   Q.    Now, if there were no cash in these accounts, no LBI cash,

12   then there would have to be LBI securities in those accounts to

13   represent the margin or collateral for the LBI positions,

14   correct?

15   A.    Yes.  I really didn't have any knowledge of what we were

16   talking about in amounts or what was there or not there or even

17   what the extent of the LBI proprietary position was to any

18   great degree.

19   Q.    But to the extent that there were LBI positions then there

20   would have to be some LBI collateral, correct?

21   A.    I don't know if there would have to be.  I would assume

22   there might have been some, yes.

23   Q.    Did you make any effort to find out whether there was LBI

24   collateral there?

25   A.    No.  This wasn't particularly an issue for us until Mr.

108

1    Rivera came up to me during the break.  And, as I've said, I

2    was really focusing on customers at that point.

3    Q.   After he came up to you at the break did the trustee make

4    any effort to find out whether there was LBI collateral in the

5    OCC accounts, and, if so, how much?

6    A.   No.

7    Q.   Now, you've said that you believed, based on what was said

8    at the hearing, that there was no cash.  Now I want to direct

9    your attention to Barclays' Exhibit 231-A that you signed on

10   September 19, 2008.  Do you have that in front of you?

11   A.   Yes, I do.

12   Q.   And do you see where, in the very second sentence, it

13   says, after referring to the transfer of assets and liabilities

14   from LBI to Barclays, it says "In connection with such transfer

15   LBI has assigned to Barclays all rights in securities, cash and

16   other property", the collateral, "pledged by LBI to OCC".  Do

17   you see that?

18   A.   Yes.

19   Q.   And didn't that tell you that there was cash that LBI had

20   pledged to OCC as collateral?

21   A.   Well, it refers to securities, cash and other property, so

22   there might be some collateral.  If there was cash my

23   assumption would have been that that must have been customer

24   cash or, as I later learned, there is some proprietary cash

25   that LBI would post, but the customers would actually give LBI

109

1   cash that was held elsewhere and which Barclay received in the

2   transfer.  I didn't realize that at the time.  I certainly

3   didn't realize there was any proprietary cash.

4   Q.   When did you first realize that there was what you refer

5   to as proprietary cash or LBI cash at the OCC?

6   A.   We had some --

7   Q.   -- again with an answer to that and then --

8   A.   I can't give you --

9   Q.   -- the direct --

10   A.   I can give you a context.  It was probably in October.  We

11   had some correspondence, I believe, from the OCC, asking, or,

12   perhaps, it was from Barclays.  We had these issues that I've

13   talked about, about customers whose accounts didn't go to

14   Barclays but seemed to be having trouble getting the property

15   associated with their positions.  We asked Deloitte, I believe,

16   to look into that and they, I think it was at that time that

17   they reported that there was proprietary cash at the OCC and,

18   indeed, I believe, substantial amounts of proprietary cash that

19   had already been transferred to Barclays.

20   Q.   And this was in October?

21   A.   I believe it was October.

22   Q.   Of 2008?

23   A.   I believe so.

24   Q.   And, so, in October of 2008 you came to learn that there

25   were not -- it was not only substantial amounts of what you

110

1   refer to as proprietary cash and OCC, but a substantial amount

2   of that proprietary cash --

3   A.   I'm not sure how long it took Deloitte to complete its

4   inquiries and when they reported back what they were finding.

5   Q.   You're the 30(b)(6) witness for the trustee here.

6   A.   Yes.  I --

7   Q.   And --

8   A.   I've looked at some documents.

9   Q.   And you looked at this, right?

10   A.   I looked at some documents, and, so, if you've showed me

11   the documents I'd probably be able to nail this down.

12   Q.   You were prepared for this testimony by your counsel,

13   correct?

14   A.   Yes.

15   Q.   And without going into anything of the substance, how many

16   days did that preparation cover?

17   A.   It was -- it wasn't really days.  It was a few hours here,

18   a few hours there, over, maybe, the course of the last, you

19   know, a few -- a couple of days a week over the last couple of

20   weeks, I would say.

21   Q.   And during that time you knew that this document was going

22   to be presented to you, correct?

23   A.   Yes.

24   Q.   And you knew I was going to ask you questions about the

25   task.

111

1    A.    I did look at documents.  That's what I'm trying to say.

2    I just can't remember.  I looked at a lot of documents on a lot

3    of subjects and I can't remember the exact dates of some of

4    these documents.

5    Q.    Do you remember approximately?  What's your best, as the

6    trustee's 30(b)(6) witness, what's your best testimony as to

7    when the trustee discovered that there was a substantial amount

8    of cash in the OCC accounts that you consider proprietary cash

9    of LBI and that that cash had been transferred already to

10   Barclays?

11   A.    I think we began looking into this whole area in October.

12   I know it took Deloitte some time to get back.  It -- they

13   didn't always have the greatest access to records from Barclays

14   and others, as I've testified, and I think it took them several

15   weeks to get back, so that might have made it November, and I

16   just cannot fix the dates, without seeing documents, precisely

17   in my head, but I think it would have been generally in that

18   time frame.

19   Q.    Let me ask you to look at a document that's been marked as

20   Exhibit 235, and that's at Tab 19.  Now, this is a document not

21   from October or November but from September of 2008.  Is that

22   correct?

23   A.    Yeah, it was over the weekend.  Yes.

24   Q     And this has an e-mail from a James R. McDaniel to a

25   number of people, including you and including other lawyers at

112

1   your law firm, correct?

2   A.   Yes.

3   Q.   And it is headed "LBI property at OCC", correct?

4   A.   Yes.

5   Q.   And it goes to you at 11:44 a.m., correct?

6   A.   Well, that's the date.  I think I testified yesterday I

7   might have been -- I might not have seen it until sometime

8   after that.  But that is the date of the e-mail.

9   Q.   But you would have seen it sometime after that on that

10  day, correct?

11  A.   On that day.  It might have been in the afternoon.

12  Q.   Yes.  And it begins by saying "OCC is seeking to confirm

13  its understanding that the LBI accounts and all positions, cash

14  and securities collateral that are held by OCC in respect of

15  those accounts are intended to be transferred to Barclays and

16  that Barclays is assuming all obligations with respect to those

17  accounts".  Do you see that?

18  A.   Yes.

19  Q.   And you read this and understood that at the time,

20  correct?

21  A.   Yes.

22  Q.   Now, go on to the next page, and there's a sentence in the

23  middle or near the bottom of the last paragraph that begins "In

24  addition".  It says "In addition, OCC is holding nearly one

25  billion dollars in cash for the accounts of LBI".  Do you see

113

1    that?

2    A.   Yes.

3    Q.   And you understood that, too?

4    A.   I understand it to be referring to customer accounts.

5    That would be LBI accounts but on behalf of customers.

6    Q.   But, first, it doesn't say --

7    A.   No.

8    Q.    -- customer accounts, does it?

9    A.   No.  It doesn't say that.  It just says accounts of LBI,

10   whatever that means.

11   Q.   Yes.  And no one ever told you that these were customer

12   accounts, correct?

13   A.   No.

14   Q.   And you never asked anybody whether these were customer

15   accounts, correct?

16   A.   Yes, I think I -- well, no, I did not.  I think I've

17   already testified to that.

18   Q.   Now, there is a reply from Ed Rosen at Cleary Gottlieb,

19   correct?

20   A.   Yes.

21   Q.   And that reply is sent same day at 1:09 p.m., correct?

22   A.   Yes.

23   Q.   And this reply goes to you as well as all the other

24   recipients of the earlier e-mail, correct?

25   A.   Yes.

114

1    Q.    And it says "Jim, can you tell us more about the one

2    billion dollars?  Is it excess margin?"  Do you see that?

3    A.    Yes.

4    Q.    Now, your counsel asked you did you ever see a response to

5    that and you said you had not, correct?

6    A.    I did not.

7    Q.    Did you ever seek to get a response to that?

8    A.    No.

9    Q.    Did you ever ask any of the recipients of these e-mails

10   what is this one billion dollars of cash and to whom does it

11   belong?

12   A.    Well, I thought --

13   Q.    The question is did you.

14   A.    I did not, for reasons I've already explained.

15   Q.    Now, you said that there came a time sometime later,

16   perhaps October, perhaps November, when you discovered that

17   there was a substantial amount of cash, LBI cash, in the OCC

18   accounts that had been transferred to Barclays.  Was that cash

19   approximately one billion dollars, sir?

20   A.    I don't remember.  I think the amount that was left at

21   OCC -- I can't remember if it was a little less or a little

22   more, but it might have been in that general range.  And then

23   there was considerably more, I think, that had been

24   transferred.  I don't recall the exact figure without seeing

25   some of the documents, as I sit here today.

115

1   Q.   Within the nearest 500 million dollars.

2   A.   No, I think it was in the range.  It might have been 1.1,

3   1.2.

4   Q.   Okay.

5   A.   It might have been slightly less.

6   Q.   Okay, so it as in the general range of the one billion

7   dollars?

8   A.   That's my recollection, yes.

9   Q.   Let me ask you to go back to the TAA agreement.  Do you

10  have that?  It's Barclays' Exhibit 3.  It's at tab 15.

11  A.   Yeah, I've got it.

12  Q.   Now, this document, which the trustee also signed, in

13  paragraph 1(a) says "For good and valuable consideration, the

14  receipt and sufficiency of which are hereby acknowledged,

15  Lehman hereby sells, assigns, transfers, and sets over to

16  Barclays without recourse or without representation or

17  warranty, other than is expressly provided herein, all of

18  Lehman's rights, title, interest, powers, privileges, remedies,

19  obligations, and duties in or to, under and in respect of the

20  account."  And that account is all of Lehman's OCC accounts,

21  correct?

22  A.   It's the three or four -- I assume it's all of them,

23  including the four that are specifically listed, yes.

24  Q.   And that's the way you understood it when you signed it,

25  sir?

116

1    A.   Yes.

2    Q.   That this was all of OCC's accounts --

3    A.   Yes

4    Q.   -- for Lehman Brothers.  And it goes on to say, that this

5    applies to "all margin deposits held by OCC with respect to the

6    account".  Do you see that?

7    A.   Yes.

8    Q.   And when you signed this, you understood that LBI was

9    transferring all of its OCC accounts to Barclays, correct?

10   A.   Yes.

11   Q.   And you understood that that transfer included all of the

12   margin deposits held by OCC with respect to those accounts,

13   correct?

14   A.   Yes.

15   Q.   And you understood that this transfer was being made

16   without any representation or warranty, correct?

17   A.   By the OCC, that's right.  Yes.

18   Q.   By the OCC or by anybody else, correct?

19   A.   That's what it says, yes.

20   Q.   And that's what you understood, correct?

21   A.   Yes.

22   Q.   And that Lehman, LBI, had given up all of its rights,

23   title, interest, powers, privileges, remedies, obligations,

24   concerning those accounts and the margin deposits, correct?

25   A.   Yeah.

117

1    Q.    You understood that?

2    A.    Yes.

3    Q.    Did there come a time when you got further communications

4    from the OCC with respect to the one billion dollars of cash

5    collateral that was the subject of the September 20 e-mail that

6    I showed you a moment ago.

7    A.    Yes, I believe we did.

8    Q.    Let me ask you, when did that happen?

9    A.    Again, I don't recall.  I thought it was in October some

10   time; it might have been November.  I do think there are some

11   documents that would show that specifically.

12   Q.    Well, first, let me direct your attention to Barclays'

13   Exhibit 262 which is at tab 20.

14   A.    Yes.

15   Q.    And this is an e-mail, not in October or November, but on

16   Sunday, September 21, 2008, correct?

17   A.    Yes.

18   Q.    It's the very next day after the September 20 e-mail

19   talking about the billion dollars of cash collateral in the OCC

20   accounts that we looked at earlier, correct?

21   A.    Yes.

22   Q.    And let me direct your attention to paragraph number 2.

23   It says, "Having heard nothing further from you with respect to

24   cash held by OCC in respect of the LBI accounts, and in

25   accordance with the terms in the transfer and purchase

118

1  agreement, all such cash in the accounts will be transferred to

2  Barclays, assuming that the transaction closes this evening."

3  Do you see that?

4  A.   Yes.

5  Q.   And you got a copy of this at the time, correct, sir

6  A.   Yes.

7  Q.   And so you understood at the time that all of the cash

8  that was in the LBI accounts at the OCC was going to be

9  transferred to Barclays, correct?

10 A.   Yes.

11 Q.   And you understood that that cash was approximately a

12 billion dollars, correct?

13 A.   First of all, I thought it was customer cash, as I've

14 already testified.  I never really saw the answer, any answer,

15 so I didn't know if it was a billion dollars or some different

16 figure.  In any event, I thought it was customer cash, as I've

17 already testified.  This e-mail was directed to Mr. Rosen.  I

18 really thought it was more of a communication to Mr. Rosen.  I

19 had already signed the agreement.  In my mind, there was

20 nothing further for me to sign, and I was surprised that

21 Barclays had not yet signed it.

22 Q.   Well, this doesn't deal with that issue, this paragraph 2,

23 does it, sir?

24 A.   Well, it says "Having heard nothing further from you with

25 respect to cash," and it's directed with Mr. Rosen, so that was

119

1     my interpretation at the time.

2     Q.   Well, it's also directed to you, correct, sir?

3     A.   I got a copy, along with a number of other people.

4     Q.   Right, and you say that, having never heard back, you

5     didn't know how much the cash was.  They told you it was a

6     billion dollars, hadn't they?

7     A.   No.  I never got a response -- I never saw a response as

8     to what it was.  In any event, I didn't think it was anything

9     but customer cash.  I'd already signed the documents.  In my

10    mind, the trustee had already consented to exactly what the OCC

11    was asking; it was Barclays that hadn't at this time.

12    Q.   So you thought that the trustee had already consented to

13    paragraph 2.  Is that correct?

14    A.   I thought I had already signed --

15    Q.   Please, can I get your focus on my question?  Paragraph 2

16    is talking about OCC, if it doesn't hear from you, it hasn't

17    heard from you, it's going to transfer all of the cash in the

18    LBI accounts at the OCC to Barclays.  Do you see that?

19    A.   I -- yes.

20    Q.   Do you see that?

21    A.   Yes.

22    Q.   And my question to you is, did you believe that the

23    trustee had already agreed to that as of the date of this

24    e-mail?

25    A.   Yes, I didn't think, however, that it involved any

120

1    noncustomer-related cash because there was supposed to be no

2    cash in the deal and no cash left at Lehman.  Other than that,

3    I had no doubt that I had assigned the rights -- transferred

4    the rights to the accounts as the agreement said, which is what

5    the OCC had been asking.

6    Q.    Okay, now, let me try to break it down into pieces, and

7    I'd ask you to focus just on the piece I'm asking about.

8    First, you had been told by OCC that there was a billion

9    dollars of cash in the LBI OCC accounts, correct?

10   A.    I'd seen an e-mail where someone had asked for

11   confirmation, and I'd never seen any confirmation.

12   Q.    Well, let me ask you to go back to Exhibit 235.

13   A.    This is what tab?

14   Q.    This is tab 19.  Do you have that?

15   A.    Yes.

16   Q.    Now, first, the e-mail at 11:44 a.m. on the 20th says OCC

17   is holding nearly one billion dollars in cash in the accounts

18   of LBI, correct?

19   A.    Yes.

20   Q.    You didn't have any doubt about the accuracy of that, did

21   you?

22   A.    Well, I didn't know if the number would ultimately be a

23   million -- a billion more or less.  I knew they said they had

24   cash.  It was a question what it was; I never saw an answer.  I

25   knew that there was cash involved.

121

1   Q.   The question that Mr. Rosen asks is whether the one

2   billion dollars is excess margin, correct?

3   A.   Yes.

4   Q.   And that's a question that you never saw an answer to, and

5   you never asked for an answer to, correct?

6   A.   Right.

7   Q.   Okay, now, and when you see the e-mail the next day,

8   September 21st, saying that all of the cash in the LBI accounts

9   is going to be transferred to Barclays, you again do nothing,

10  correct?

11  A.   I did nothing further.  I had already signed an agreement

12  with the understanding I've testified to that transferred

13  things.  So in my mind, there wasn't anything further for me to

14  do.  There might be something for Barclays to do.  They might

15  need to sign the agreement.

16  Q.   Did you think that maybe one of the things that you might

17  do is to contact them and say, I've been assuming that this is

18  all customer cash.  Can you confirm that for me?  Did you think

19  about doing that?

20  A.   No, my assumption would be the opposite, that if somebody

21  was going to say oh, by the way, there's a billion dollars of

22  cash, it turns out, that they would have informed us.  In fact,

23  I think they would have come back and informed the Court of

24  that.

25  Q.   You think OCC would have?

122

1    A.   I don't know what -- I think it would have behooved

2    Barclays to do it, at least.

3    Q.   Well, did you think it behooved you to do it, sir?  You're

4    the trustee, right?

5    A.   No.

6    Q.   You're not the trustee?

7    A.   No, I don't think it behooved me to do it.  I would have

8    done it if I thought it behooved me to do it.

9    Q.   Did you think, as the trustee, that you had an obligation

10   to try to understand how much cash there was here and who it

11   belonged to?

12   A.   I didn't see that it could be anything but customer cash.

13   It was clearly part of the transaction that all the customer

14   cash went to Barclays as part of the account transfer.  It was

15   perfectly logical to me that that was happening.  I didn't see

16   any need to question it.  I would have thought that if somebody

17   was talking about some other kind of cash -- I didn't even

18   focus on the possibility that it could be proprietary cash

19   because there was not supposed to be any cash left at Lehman,

20   and because there had been specific representations in open

21   court with hundreds of people there that there was no cash,

22   whatever, in the deal going to Barclays.

23   Q.   You understood that what was in these OCC accounts, what

24   are referred to as exchange-traded derivatives, correct?

25   A.   Yes.

123

1   Q.   And you understood that the exchange-traded derivative

2   discussion in the APA did not limit the collateral to customer

3   collateral, correct?

4   A.   It just referred, I think, to margin or collateral -- I

5   think in the final version of the clarification it's that

6   language we saw it.  It wasn't limited in any way, no.

7   Q.   Okay.  It said "any property".  It wasn't limited to

8   customer property, correct?

9   A.   It said "any property", yes.

10  Q.   Let me ask you to look next at an e-mail that does come

11  from October.  And that is BCI Exhibit 470, and that's at tab

12  22.

13  A.   Yes, I have that.

14  Q.   Now, this begins with an e-mail on October 2, 2008.  And

15  are you aware that prior to October 2 of 2008, the trustee had

16  been sending OCC consents to transfer collateral from the LBI

17  accounts -- or what had been the LBI accounts, to Barclays?

18  A.   I don't know if I was aware of it before this letter, but

19  that's clearly what the e-mail says.

20  Q.   And what the OCC is saying, that -- and they write to Mr.

21  Kiplok of your firm, correct?

22  A.   Yes.

23  Q.   And what the OCC says to Mr. Kiplok is first they

24  reference a telephone conversation that had been had with Mr.

25  Kiplok previously, correct?

124

1   A.   Yes.

2   Q.   And it says, "To confirm my comments on the phone to you

3   earlier, clearing accounts carried under the number 074 number

4   on OCC's books, that were formerly accounts of LBI, have been

5   transferred to Barclays pursuant to the transfer and assumption

6   agreement."  Do you see that?

7   A.   Yes.

8   Q.   And that account included Lehman proprietary positions and

9   collateral, correct, sir?

10  A.   Yes, the 074, it's the same number that was used on the

11  DTC boxes, and it would include both customer property and

12  proprietary property.

13  Q.   Okay.  And then it says, "Accordingly, OCC believes that

14  there was no need for the consent dated October 1, 2008 that

15  you sent to OCC relating to the transfer of certain positions

16  from the 074 account to a Barclays account."  Do you see that?

17  A.   Yes.

18  Q.   And then Mr. Kiplok replies to that, correct?

19  A.   Yes.

20  Q.   And he says, "I think we are okay with the below,"

21  correct?

22  A.   Yes.

23  Q.   Did you ever have any discussions with Mr. Kiplok about

24  this exchange of e-mails?

25  A.   I believe I did.  Again, I can't recall the timeframe.  I

125

1    can't remember if it was just with Mr. Kiplok.  This whole

2    issue arose around --

3    Q.   Do you have my question in mind, sir?

4    A.   Yes, I'm trying to tell you my best recollection.

5    Q.   My question is, did you ever have any discussions with Mr.

6    Kiplok about this exchange of e-mails?

7    A.   I don't know if I discussed this exchange of e-mails

8    specifically, but we discussed the general subject matter.

9    Q.   Okay.  Now you are aware that the assumption of these

10   accounts at OCC by Barclays had a substantial amount of risk

11   associated with it, correct?

12   A.   It -- I'm not a sophisticated trader or financial person.

13   It was certainly my assumption that there was probably

14   substantial risk with derivative positions, especially during

15   the climate at the time.

16   Q.   And you understand that Barclays was concerned about the

17   risk of assuming these liabilities, correct?

18   A.   I don't think I had any discussion with anyone at

19   Barclays, but I think I would have assumed that they probably

20   had some concern.

21   Q.   And indeed, you believed that everybody was concerned

22   about the risk, including both the OCC and Barclays, correct?

23   A.   Well, I certainly knew that the OCC was.

24   Q.   And you understood, even though you hadn't talked to

25   Barclays, just based on what you knew, you understood that

126

1    Barclays was concerned about the risk too, did you?

2    A.   I assume they probably -- I don't know what they did or

3    didn't do to look into it, whether they'd be net winners or

4    losers.  I would think anyone would be concerned that there

5    could always be some risk in transactions like these.

6    Q.   Let me show you your deposition at page 278, lines 15 to

7    20.  Question -- and this is at tab 1 in the binder.

8    "Q.   You understood that Barclays was concerned about the risk

9    of assuming those liabilities?

10   "A.   Yes, I understood everybody was concerned about the risk.

11   The OCC was concerned about it; and Barclays was concerned

12   about it."

13        Do you see that, sir?

14   A.   Yes.

15   Q.   And is that still your view?

16   A.   Yes.

17   Q.   And you'd never had any conversations with anyone about

18   whether Barclays would be willing to take on this risk without

19   receiving all the margin and collateral associated with the OCC

20   positions, correct?

21   A.   That's correct.  I never had a discussion with Barclays

22   before the fact about this agreement -- any discussion of any

23   kind.

24   Q.   And indeed, you didn't have any discussions with anyone,

25   not Weil Gotshal, not the OCC, not anyone, about whether

127

1    Barclays was or was not prepared to take on the risk of these

2    derivative accounts, without all of the collateral in the

3    accounts, correct?

4    A.    No discussion one way or the other.

5    Q.    You understood that with respect to the customer ETD

6    positions, Barclays was getting the position and the margin for

7    collateral, correct?

8    A.    Any margin or collateral that would associated with those

9    positions, yes.

10   Q.    Now, you also understood that Barclays was taking on the

11   ETD positions of LBI, the proprietary positions, correct?

12   A.    Yes.

13   Q.    And did you believe that Barclays was going to take on

14   those proprietary ETD positions without all of the margin

15   associated with those positions?

16   A.    I don't know what Barclays was going to do.

17   Q.    Did you believe that that's what they were going to do?

18   A.    I believed there was no cash -- proprietary cash margin

19   left, because it hadn't been disclosed to the Court.  It was

20   said that there was no cash to be transferred to Barclays.  It

21   might have been other things in the margin, and I don't know

22   what Barclays' thinking was.

23   Q.    If there were securities that were pledged as collateral

24   for the LBI proprietary positions at OCC, do you agree that

25   Barclays was entitled to that margin?

128

1    A.    All I was focusing on --

2    Q.    Begin with a yes or a no or I don't know or I never

3    thought about it.

4    A.    Well, I don't know actually.  I think that goes to the

5    interpretation of the agreement and the inclusion of margin in

6    the last draft.  But I was really focusing on cash at this

7    point.

8    Q.    I'm now asking you for your interpretation.  And you may

9    say I don't have an interpretation, I never thought about it.

10   And that's an answer.  But my question is, as you understood

11   the purchase agreement when you signed it, if there were

12   collateral other than cash collateral that backed up LBI

13   proprietary positions at the OCC, did Barclays get that LBI

14   proprietary margin or --

15   A.    I thought that had probably come out of the deal in the

16   drafts that we saw, and then that parenthetical referring to

17   margin came in in the final version, which, as I've said, we

18   didn't focus on at the time.

19   Q.    Let me be sure I understand what you're saying.  You're

20   saying that at least one draft, if you interpreted that draft,

21   there would not be any margin, but if you looked at the final

22   signed version, Barclays would be entitled to the margin.  Is

23   that what you're saying?

24   A.    There was a final signed -- final version with a

25   parenthetical that does contain the parenthetical reference to

129

1    margin.

2    Q.    That is true.  Now, my question to you, as the trustee's

3    30(b)(6) witness, is related to your understanding of the APA

4    and clarification letter, as actually signed and filed with

5    this Court.  Okay?  Do you understand what --

6    A.    Yes.

7    Q.    -- my question is?  Did you understand that the APA and

8    clarification letter, as finally filed with this Court, gave

9    Barclays all of the noncash collateral in the OCC accounts that

10   was associated with Barclays' (sic) proprietary positions?

11   A.    No.  Because that change in the agreement had never been

12   disclosed to us.  The clarification itself had never been

13   approved by the Court.  The question of whether they're binding

14   documents, I think, is what this whole litigation is about.

15   Q.    When you say it had never been disclosed to the Court, you

16   do understand that that was filed with the Court, correct?

17   A.    After the fact.

18   Q.    And you do understand that after it was filed with the

19   Court, the trustee put in papers, repeatedly, defending that

20   order and saying that it was binding and valid.  You do

21   understand that, correct?

22   A.    I understand our legal position to be that in -- what we

23   said in the briefs, was that the specific attacks made on the

24   order were -- to a certain extent, were barred by the equitable

25   mootness doctrine because no application -- no stay had been

130

1    granted.  There were due process objections to the sale as a

2    whole.  We've never said, ever, that we didn't think a sale --

3    transaction, as approved by the Court wasn't validly approved.

4    We think that which we were told about and that was explained

5    to the Court and approved by the Court is enforceable.  We've

6    gone to tremendous efforts to make sure that Barclays got

7    anything and everything it could possibly be entitled to under

8    the agreement that was disclosed, including finalizing all the

9    account transfers, doing the transaction which Barclays wanted

10   us to get involved with, with the New York Fed in December and

11   earlier than that, reaching an agreement with DTC and Barclays,

12   concerning the reversed ACATS transactions.  We don't read the

13   agreements as giving Barclays the rights that you're talking

14   about today.

15   Q.   Perhaps my question was unclear.  I'm not asking you

16   simply to repeat all your legal arguments.  I'm asking what you

17   actually did, what the trustee actually did, not in this

18   proceeding, but in the months and months and months after the

19   closing, before this proceeding.  Do you understand the

20   timeframe I'm talking about?

21   A.   Yes.  And I thought I answered your question.

22   Q.   Let me try to put the question.  After the final

23   clarification letter and the final APA was filed with the Court

24   for months after that the trustee continued to assert that the

25   APA, including the clarification letter, was a final binding

131

1    document, correct?  That's what you asserted.

2    A.   We asserted that the sale transaction as approved by the

3    Court should be final as to the parties who were challenging

4    it.

5    Q.   Well, you didn't say it should be final only as to the

6    parties that were challenged, did you, sir?

7    A.   I can't remember the exact words we used.  But that was

8    certainly my intent.

9    Q.   Was it your intent when you filed the brief with the

10   United States District Court in December of 2008 to say the

11   sale order, including the clarification letters, is only valid

12   against these people who are challenging it, it's not valid

13   against the trustee, was that your intent?

14   A.   I think there were specific arguments that were made in

15   that case --

16   Q.   Could -- begin with a yes or no?

17   A.   -- and that's what we were responding to.

18   Q.   Could I get -- begin with a yes or no and then you can

19   give whatever explanation you think is necessary.  But I'd like

20   to get you to focus on my question.

21   A.   You're going to have to repeat your question.

22   Q.   Sure.

23   A.   I'm sorry.

24   Q.   Absolutely.  Was it your intent when you filed your

25   December 2008 brief with United States District Court that the

132

1   sale order, including the clarification letter, was only valid

2   against the people who were challenging it, but was not valid

3   against the trustee?  Was that your intent when you filed that

4   brief?

5   A.   Yes.

6   Q.   Did you think that it might be appropriate to disclose

7   that intent to the United States District Court?

8   A.   Well, I didn't --

9   Q.   Please begin with a yes or no?

10  A.   No, I didn't really think it was relevant to the issues

11  before the Court, which were specific attacks by specific

12  parties, would have gone to unraveling the whole transaction.

13  That's not the position we've ever taken, it's not the position

14  we're taking now.  The position we're taking now is that we're

15  entitled to certain things under certain contracts that were

16  entered, and Barclays is asking for things that in our mind

17  were never approved by the Court.  The clarification letter, as

18  far as I'm aware, was never approved by the Court.

19  Q.   The clarification letter was never approved by the Court,

20  is that what you said?

21  A.   I believe that's correct.  I don't think anyone came to

22  Court after the fact and said we've made changes to the

23  breadth -- to the contract that we've described to Your Honor

24  and here's the clarification letter, and we'd like you to

25  approve that as well.  I don't believe anything like that has

133

1    ever happened.

2    Q.   And did you believe the clarification letter should be

3    approved by the Court after the fact?

4    A.   If I were taking --

5    Q.   No, no, please, answer this question, sir?

6    A.   If I were Barclays, yes.

7    Q.   No, no, please, did you believe it?  You, the trustee?

8    A.   It was not -- I don't think it was particularly a relevant

9    question to us.

10   Q.   No, no, I'm just asking, sir, and, again, the question may

11   be yes, no, or I never thought of it.  But did the trustee

12   believe that the clarification letter needed to be approved by

13   the Court after the September 22nd closing?

14   A.   We thought any party seeking protection under the

15   clarification letter for things not explained to the Court at

16   the approval hearing should have been disclosed by a party

17   seeking that protection.

18   Q.   If I could get you to focus on my question, sir.  My

19   question has not to do with what you think should or should not

20   have been disclosed.  My question has to do with what you

21   thought ought to happen with the Court in terms of having the

22   Court approve the clarification letter after the September 22nd

23   hearing?  And I'm asking you did the trustee believe that the

24   clarification letter should have been approved by the Court

25   after the September 22nd closing?

134

1    A.    A party --

2    Q.    Could I ask, please, that you begin if you possibly can

3    with a yes, no, or I don't know?

4    A.    Yes, by a party seeking the protection of that order for

5    things in the clarification letter that were not in the APA and

6    were not described to the Court.

7    Q.    Did you, the trustee, seek any protection under the

8    clarification letter?

9    A.    No.

10   Q.    Do you want to reconsider that answer?

11   A.    I don't believe so.

12   Q.    Well, sir, didn't you tell us that one of the things that

13   was really important to the trustee was to have the customer

14   accounts assumed by Barclays?

15   A.    Yes.

16   Q.    And that isn't in the APA, is it?

17   A.    But it was fully described in the court --

18   Q.    But it wasn't in the APA, was it, sir?

19   A.    It was not in the APA, it was disclosed to the Court.

20   Q.    It wasn't in the APA, was it, sir?

21   A.    I've said it was not in the APA.

22   Q.    Okay.  And since it's not in the APA the only place you

23   get that protection is from the clarification letter, correct?

24   A.    I don't believe --

25   Q.    Please, again, yes, no?

135

1   A.   No.   Because the Court specifically knew about that, that

2   was clearly one of the goals of the transaction.   It was

3   clearly understood that that would happen.

4   Q.   And is it your view -- is it the trustee's view that if it

5   were mentioned at the Court hearing, but never included in the

6   clarification letter, it would have been a binding obligation?

7   A.   I think it would have been a binding obligation.   There

8   are provisions in SIPA which specifically provide for account

9   transfers which this proceeding was premised on.   We

10  subsequently moved to have all the account transfers approved.

11  That order has been granted, it's final.   So we've clearly had

12  authority under the statute to do account transfers, which is

13  exactly what we've done.

14  Q.   But if you wanted Barclays to be obligated to take those

15  customers, and you did want that, didn't you, sir?

16  A.   I thought Barclays wanted it.

17  Q.   But you also wanted it, didn't you, sir?

18  A.   I thought the public interest demanded it.

19  Q.   The trustee wanted it, correct, sir?   Yes, no, or I have

20  never thought about it?

21  A.   The trustee wanted it, the SEC wanted it, SIPC wanted it,

22  I think the Court wanted it.   Yes.

23  Q.   And I'm not -- I'm not meaning to dispute that other

24  people wanted it.   But I'm just trying to focus on the trustee,

25  you understand that?

136

1    A.   Yes.

2    Q.   Okay.  And I'm simply asking what the trustee wanted.  The

3    trustee wanted Barclays to be obligated to take on those

4    customer accounts?

5    A.   The trustee --

6    Q.   Yes, no, or I don't know?

7    A.   The trustee thought the transaction was in the public

8    interest for the reasons stated at the court hearing with

9    what -- were that Barclays would take the account.  The trustee

10   has authority under SIPA to transfer accounts.

11   Q.   Yes, it has the authority to transfer accounts.  It

12   doesn't have the authority to transfer accounts to somebody who

13   refused to take them, though, correct?

14   A.   That's correct.

15   Q.   Okay.  And you wanted Barclays to take these accounts,

16   correct?

17   A.   I couldn't have cared less if it was Barclays or somebody

18   else.  It was our understanding that Barclays wanted them

19   desperately.

20   Q.   Okay.  So it's your testimony to this Court now that you

21   didn't care one way or the other whether Barclays took these

22   customer accounts or not, is that right?

23   A.   No.  We assumed --

24   Q.   No, please, is that your testimony?

25   A.   We assumed that Barclays would take the accounts.  It's

137

1    one of the things they committed to do, or it was committed

2    that they would do at the hearing.  It was, in our

3    understanding, one of the principal if not the principal

4    purposes of the entire deal.

5    Q.    My question is a simple one.  Did the trustee want

6    Barclays to take the obligation to assume these customer

7    accounts?

8    A.    We thought it was in the public interest that that

9    happened.  Had Barclays not taken it there would have been a

10   SIPA liquidation, the papers had already been filed, the

11   proceeding had already commenced.  If we'd had to we would have

12   transferred the accounts to someone else, or liquidated it

13   among our claims process.

14   Q.    But you knew the SIPC liquidation would have been very

15   disastrous, correct, sir?  That's why you were trying to avoid

16   it.

17   A.    Everyone wanted to avoid it --

18   Q.    Yes, no, I don't know?

19   A.    But we had a SIPA liquidation.

20   Q.    But you didn't want -- yes, you had a proceeding --

21   A.    We wanted there to be an account transfer.  We assumed

22   Barclays wanted that as well.  Yes.

23   Q.    And you -- it may be that you didn't care whether Barclays

24   took the accounts or not.  And, if so, tell me that I'll stop.

25   A.    No, we wanted Barclays to take the account.  If it hadn't

138

1    been Barclays someone else could have taken them.  We wanted

2    the accounts transferred if possible.  We would have like

3    Barclays to take more accounts than they actually did take.

4    Q.   Okay.  So you wanted Barclays to take accounts and you

5    wanted them to take even more than they took, correct?

6    A.   Yes.

7    Q.   And the only way that you could be assured that Barclays

8    would take them, would be for  Barclays to contractually agree

9    to take them, true?

10   A.   He had authority to transfer, I don't know what kind of

11   contract he would need or not need.  I don't think there was

12   any question at the hearing that Barclays was going to take the

13   accounts and we were prepared to transfer them.

14   Q.   Yes, sir.  But my point -- and let me just try to state

15   it, and maybe we could get through this, because this is taking

16   a lot longer than I ever imagined it could.

17   A.   Well, I agree with you there.

18   Q.   Yes, I know.  I know.  And let me try to see if it's

19   possible to get to an answer.  Would I be correct that the

20   trustee wanted Barclays to take the accounts.  The trustee knew

21   that Barclays would only be obligated to take the accounts if

22   Barclays contractually agreed, and the first and only time that

23   Barclays contractually agreed was in the clarification letter?

24   A.   No.

25   Q.   Okay.  Let me take the three elements separately.  Did the

139

1    trustee want Barclays to take customer accounts?

2    A.    Yes.  And we wanted Neuberger Berman to take the accounts

3    they were taking, as well.

4    Q.    Did you believe that Barclays could be required to take

5    those accounts in the absence of a contractual obligation to do

6    so?

7    A.    I think they had to agree that they would take it, whether

8    by formal contract or by course of dealing.  We transferred a

9    lot of accounts to prime brokers.  We didn't have for prime

10   brokers to other firms, including Barclays.  We didn't have

11   specific contracts for that.  But people agreed on an ad hoc

12   basis that they would take the accounts.

13   Q.    But they had to agree, correct, sir?

14   A.    Well, we can't send an account to somebody that doesn't

15   want it, it would probably come back.

16   Q.    And the first time that Barclays contractually agreed to

17   take these accounts was in the clarification letter, correct?

18   A.    Yes, other than representations that I think they made in

19   open court that they were taking them, and to the public that

20   they were taking them.

21   Q.    Now, you wanted this transaction to go through, correct,

22   the sales transaction, the trustee?

23   A.    We supported it.  We thought the transfer of accounts, as

24   I've said, were in the public interest.  We thought there would

25   be enough assets and customer property left to do an orderly

140

1    and fair liquidation for those accounts that were remaining.

2    We thought all of that was in the public interest, and the

3    exact mandate of what a SIPA trustee is supposed to do under

4    SIPA.  And I think SIPC and the SEC felt the same thing.

5    Q.    Is that a yes to my question?

6    A.    Yes.

7    Q.    Okay.  And you knew that the transaction was not going to

8    take place without a clarification letter, correct?

9    A.    Yes, in the sense that I've described what we thought the

10   clarification letter would entail.  Which would be fairly minor

11   clarifications of the type that had been described to the Court

12   to the APA, not substantial amendments to the APA.

13   Q.    And do you believe that the clarification letter made

14   substantial amendments to the APA?

15   A.    Certainly the way Barclays reads it I do.

16   Q.    And when did you first come to that conclusion, sir?

17   A.    When Barclays started to take some of the positions it's

18   taken that led to this litigation, and that would have been --

19   it was really the meeting with Mr. Hughes and some of the

20   correspondence following that, well into 2009, which made clear

21   exactly what they were claiming and what the basis for their

22   position was said to be.

23   Q.    Sir, that was in December of 2008, right?

24   A.    Yes.

25   Q.    Do you recall the exchanges in which Barclays was trying

141

1    to get noncustomer clearance box assets in September and

2    October?  Do you recall that?

3    A.    We just talked about that --

4    Q.    I know we did.

5    A.    -- a short while ago.

6    Q.    And so you must recall it, right?

7    A.    I do recall it.  We didn't understand, at least I didn't

8    understand, I don't think the trustee understood, that they

9    were seeking anything other than customer property.  It was

10   during the period when we were making hundreds of transfers,

11   for Barclays' benefits really, to get the customer account --

12   customer property over to them, as well as making transfers to

13   get Neuberger Berman property over to Neuberger Berman.  We

14   didn't understand at that time Barclays to be taking a position

15   that these are things we were entitled to, because this is our

16   interpretation of something in the clarification letter.

17   Q.    When you say "we didn't", does that include the lawyer at

18   your firm who was delegated to handle this, whose testimony

19   that you saw?

20   A.    He was delegated to make customer transfers.  I don't know

21   what he understood or didn't understood (sic) at the time.  He

22   might have had a mistaken assumption; I don't know.  It

23   certainly was not the trustee's position, it's never been the

24   trustee's position, that Barclays is entitled to those things.

25   And it certainly isn't in the -- in any transaction that was

142

1    approved by the Court.

2    Q.    When I showed you his sworn testimony that he knew he was

3    transferring assets from the clearances boxes that were not

4    customer account assets, was that the first time that you were

5    aware of that testimony?

6            MR. MAGUIRE:  Your Honor, I have a continuing

7    objection to the characterization, which we'll revisit on

8    redirect.  But I will not go into my own characterization; I

9    just object to counsel's characterization of the testimony.

10           THE COURT:  You have that objection, but I'm

11   overruling it.  And you can deal with it on redirect.  We've

12   all heard the testimony.  The witness is in a position to draw

13   his own conclusions as to what he heard.

14   A.    Yeah, I --

15           THE COURT:  You may answer the question.

16           THE WITNESS:  Yeah.

17   A.    I think your question was -- and correct -- maybe you

18   should repeat your question --

19   Q.    Sure.

20   A.    -- just so we're sure.

21   Q.    You heard some testimony from one of your lawyers about

22   these transfers of clearance box assets, correct?

23   A.    Yes.

24   Q.    And you heard some testimony about whether that was or was

25   not customer account assets, correct?

143

1    A.    Right.

2    Q.    Was the first time you were aware of that testimony when I

3    showed it to you in this court?

4    A.    I was shown in preparation for my testimony some clips of

5    Mr. Frelinghuysen's testimony.  I don't know if I saw that one

6    in particular.

7    Q.    Now, in your capacity as a 30(b)(6) witness, you were

8    trying to inform yourself as to what other trustee

9    representatives had said and done, correct?

10   A.    Yes.

11   Q.    In that connection, did you ask Mr. Frelinghuysen what he

12   had said and what he had believed?

13   A.    I've talked about him.  I didn't really want to talk to

14   him about what his testimony was or what mine -- in any way

15   that would influence my testimony, once it was clear that I was

16   going to testify.  So I think I had earlier conversations with

17   him.  And it was my understanding that he understood he was to

18   be transferring customer property.

19   Q.    Is that understanding something that came from something

20   he said to you, or something somebody else said to you?

21   A.    Well, it came from the instructions that I believe he was

22   under at that time, which came from me and from the trustee

23   directly.

24   Q.    Were any of those instructions in writing?

25   A.    I don't believe so.

144

1    Q.   Did you think that, an issue of this importance, it might

2    be useful to put in writing what those instructions were so

3    that there could not be a misunderstanding?

4    A.   We did generally try to have -- and I think you've seen it

5    on some of the documents, even some of the documents that are

6    proprietary transfers -- that there's a very specific legend

7    that this is part of the customer account transfer.  And we did

8    that to try to avoid this kind of mistake, but we had to rely

9    on people from Barclays to know what the property was.

10   Q.   Well, in this particular case the person from Barclays

11   told you it was LBI property, correct?

12   A.   Well, he may have told Mr. -- I mean, the e-mail shows he

13   may have told Mr. Frelinghuysen that.  Maybe Mr. Frelinghuysen

14   made a mistake.  He must have processed hundreds of requests

15   during this period.  We were trying to do these things as fast

16   as we could.  There were a lot of obstacles:  People wouldn't

17   always accept the trustee's authority; Barclays was always

18   pushing us to get more and more property to them.  We did not

19   ever want to be accused of doing anything that would

20   unnecessarily slow up that process.

21        So if you're telling me maybe one out of hundreds of

22   transactions involved proprietary property and Mr.

23   Frelinghuysen may have made a mistake in his instructions in

24   the first couple of days, it's possible; it may have happened.

25   No one said we're perfect.

145

1    Q.    Well, my question's a little different.  You said you'd

2    given instructions to Mr. Frelinghuysen only to transfer

3    customer assets, not proprietary assets.

4    A.    Right.  Yes.

5    Q.    And my question to you -- because you said you didn't put

6    that instruction in writing, correct?

7    A.    Right, except we did have some language that was used --

8    that we talked about with Mr. Frelinghuysen, that was used in

9    transfers in most of the transfers that we made.

10   Q.    Mr. Frelinghuysen used that language in how many

11   transfers, sir?

12   A.    I don't know.  Dozens.  Scores.

13   Q.    Dozens?  Scores?

14   A.    I don't know.  He made a lot -- he was involved in a lot

15   of transfers.

16   Q.    And by "the language", you're talking about the language

17   that says this is being transferred from customer accounts?  Is

18   that the language you're talking about?

19   A.    Language to that effect.

20   Q.    Have you seen as many as three of those?

21   A.    I don't know.  I've seen some.

22   Q.    Now, do you think that this instruction that you say you

23   gave Mr. Frelinghuysen only to transfer customer assets, not

24   proprietary assets, from the clearing boxes, do you think that

25   that is the kind of instruction that the trustee ought to be

146

1   sure was reduced to writing so there could be no

2   misunderstanding?

3   A.   No.   I thought Mr. Frelinghuysen understood it.

4   Q.   As a general practice, do you find that when you've got a

5   number of lawyers working on something and they're going to be

6   transferring hundreds of millions of dollars of assets, that it

7   is a useful thing to have in writing the criteria that they are

8   to use in transferring those assets?

9   A.   I can't say that it's my general practice to be in a

10   situation like that.

11   Q.   Is this the first time you've been in this situation, sir?

12   A.   I don't -- it's the first time I've been in any situation

13   in any way comparable to the liquidation of Lehman Brothers

14   Inc.

15   Q.   Let me ask you to look at another document.   This is

16   Exhibit 335, and it's tab 25.   You see that?

17   A.   Yes, I do.

18   Q.   And did you see this exchange of e-mails at or about the

19   time they were sent?

20   A.   (Pause).   Yes, I believe I did.

21   Q.   And it says, the cover e-mail, which is addressed to Mr.

22   Giddens as well as you and a number of other people at Hughes

23   Hubbard --

24   A.   Yes.

25   Q.   -- that the first document above is a request to LBI and

147

1    the SIPA trustee to direct JPMorgan Chase to transfer to OCC

2    certain securities deposited by LBI as collateral for LBI's

3    obligation in respect of its clearing accounts at OCC.  Do you

4    see that?

5    A.    Yes.

6    Q.    And did you understand that to be referring to LBI

7    proprietary collateral?

8    A.    I believe I was still focusing on customer collateral, and

9    I believe I wrote a letter, you know, setting forth what the

10   trustee's position was with respect to this request, maybe a

11   week or so later.

12   Q.    My question is whether you understood what OCC was

13   referring to as collateral that was LBI's proprietary

14   collateral.

15   A.    Well, I still thought it was cus -- probably customer-

16   related.  I think it was at this point we were having -- or it

17   may be because of this, that we had Deloitte begin to

18   investigate what had happened.  But I understood there was

19   collateral that was LBI collateral that was at the OCC but it

20   still supported customer transactions, the customers having

21   previously or contemporaneously posted their property somewhere

22   else, and that had already gone to Barclays as part of the

23   account transfers.

24   Q.    Are you saying that the customer collateral had already

25   gone to Barclays?

148

1   A.   No, I'm saying that there might have been LBI collateral,

2   but it was customer-related; it was in support of customer

3   transactions for customers of what might have LBI proprietary

4   collateral.  I think that's all explained in our brief --

5   Q.   Was --

6   A.   -- much better, I'm --

7   Q.   Does the --

8   A.   -- sure, than I'm doing it.

9   Q.   Does the collateral that you're referring to here, what

10  you describe as LBI collateral pledged in support of customer

11  accounts, in November of 2008 --

12  A.   No, I -- if I can -- and I don't know if I understood this

13  now -- I mean then, or a little bit later when we looked into

14  it, but I understand that customers pledge or deposit cash to

15  support their trading activities.  That is not posted at the

16  OCC.  LBI, or the broker involved, posts collateral in support

17  of those customer transactions; so that's what the OCC sees on

18  its books.  But it is in support of customer transactions.  So

19  it might have been that kind of collateral.

20       But in any event, I still believe I was focusing on the

21  customer nature of this.

22  Q.   So it's your testimony that when you got this, you thought

23  they were talking about customer collateral?  Is that --

24  A.   Yeah, and I think we wrote -- I think I wrote a letter

25  explaining what our position was, shortly after this if I

149

1   recall.

2   Q.   Is that your Oct -- November 14th letter?

3   A.   I think so.

4   Q.   Let me ask you to look at Exhibit -- it's our Exhibit 156;

5   it's at tab 26.  And I think is a document your counsel used

6   with you.  Is this the letter you're talking about?

7   A.   Yes.  It was in response to the November 9th letter of Mr.

8   McDaniel.

9   Q.   Okay, now, you write in the second paragraph, "Our

10  position is that this collateral ...."  Now, when you refer to

11  "this collateral", you're referring to the collateral that Jim

12  McDaniel, counsel to OCC, had e-mailed you about on November 9,

13  correct?

14  A.   Yes.  I mean, in the previous paragraph I say, referring

15  to that letter, "the deposited securities" and the transfer

16  that they are intended to secure, and that's what I meant by

17  "these" -- "this collateral" in the following paragraph.

18  Q.   And this was approximately 800 million dollars in face

19  value of government securities, correct?

20  A.   That -- somewhere in that area sounds correct, yes.

21  Q.   If you go back to tab 25, Exhibit 335 --

22  A.   You have 795 million -- it was a substantial amount of

23  money.

24  Q.   Yes.  And you say, in Exhibit 156, on November 14th that

25  the trustee's position is that this collateral, the 795 million

150

1    dollars of collateral, can be transferred to Barclays, and the

2    trustee will gladly consent if Barclays will live up to its

3    bargain and assume the obligations involved for all customers,

4    not just those in the so-called PIM accounts.  Do you see that?

5    A.   Yes.

6    Q.   And is that the trustee's position today, sir?

7    A.   Today I may know -- we may know -- in my 30(b)(6)

8    capacity, I may know more about what this collateral actually

9    was, but at the time I thought we were talking about collateral

10   related to customer accounts.  I was concerned -- we were

11   concerned because there were a lot of accounts that didn't go

12   to Barclays, yet Barclays got all the customer positions and

13   related collateral and didn't seem to be taking care of the

14   customers that it had left behind or that had gone to Neuberger

15   Berman.  And I was saying if we can work that out and we can

16   live up to the obligations to the customers if there's

17   remaining customer-related collateral there, we'll be happy to

18   transfer it to you.

19   Q.   My question, sir, was whether or not the position that the

20   trustee states in this paragraph continues to be the trustee's

21   position.

22   A.   We did not believe that there was cash that was not

23   customer-related cash that was being transferred by the TAA.

24   So in that sense, yes, that's our position.

25   Q.   My question, sir, is whether the position that you state

151

1    here continues to be the trustee's position; that is, that the

2    795 million dollars in collateral could be transferred to

3    Barclays, and the trustee will gladly consent if Barclays will

4    assume the obligations involved for all the customers.

5    A.    If it's customer-related, that's our position.  I think,

6    in fact, we've transferred pretty much everything that's

7    customer-related at this point.

8    Q.    You don't say if it's customer-related --

9    A.    I realize that.

10   Q.    -- do you?

11   A.    I'm telling you that was my intent when I wrote the

12   letter.

13   Q.    Well --

14   A.    If you read the letter differently, it does not accurately

15   state our position today.  If you read it the way I'm telling

16   you I meant it to be understood and understood in my own mind,

17   it does set forth our --

18   Q.    Right.

19   A.    -- position today.

20   Q.    So what you're saying is that you meant in your mind to be

21   writing in substance "Our position is that this collateral, to

22   the extent that it is customer collateral, can be transferred,"

23   is that fair?  That's what you really meant in --

24   A.    Well, what I really meant --

25   Q.    -- in your mind?

152

1    A.    -- was let's take care of the customers and then we'll

2    release any more customer collateral to you; if you're not

3    going to use the collateral to take care of the customers, we

4    have a real issue we're going to have to work out.  That was

5    really what this letter was meant to convey.

6    Q.    Would you agree with me that at no time prior to the end

7    of November of 2008 did the trustee ever say in writing that

8    the only collateral that could be transferred was customer

9    collateral from the clearance boxes?

10   A.    I don't recall a communication where we would have said

11   that.

12   Q.    Okay.  Now, you were not actively -- the trustee was not

13   actively involved in negotiating the terms of the clarification

14   letter, correct?

15   A.    That's correct.

16   Q.    Nevertheless, did you receive sufficient reports from Weil

17   Gotshal so that you were in a position to understand what Weil

18   Gotshal's position was with respect to these exchange-traded

19   derivatives?

20   A.    I don't recall having substantial, if any, discussion with

21   Weil Gotshal about the exchange-traded derivatives at the time.

22   Q.    And by "at the time", you mean --

23   A.    Well, I mean --

24   Q.    -- prior to closing?

25   A.    I do recall the sequence of letters, and there had

153

1    originally been a draft with extensive language about margin

2    and other property of that kind that had been taken out; so we

3    understood that it was out of the agreement.  I don't know that

4    we specifically discussed that with Weil Gotshal to any great

5    extent or to any extent at all, because it seemed pretty clear

6    from the agreement and I don't think, as I've said, that the

7    margin concept got back in, except through the parenthetical

8    that we've already discussed.  I don't think we had any

9    extensive, and maybe no, discussion with Weil Gotshal about

10   that.  It seemed fairly clear from the face of the drafts that

11   we saw.

12   Q.    My question to you, sir, is not what seemed clear to you

13   from the drafts, and not even what the drafts said.  My

14   question to you is did you have any discussions at all -- and

15   by "you" I'm referring to the trustee and all the trustee's

16   representatives -- concerning exchange-traded derivatives and

17   what did or did not go with them to Barclays?

18   A.    I don't believe so.

19   Q.    Okay.  Now, after the closing, are you aware what position

20   Weil Gotshal took with respect to the margin associated with

21   exchange-traded derivatives?

22   A.    No.

23   Q.    Let me ask you to look at Barclays' Exhibit 320A.

24   A.    Can you give me an item number?

25   Q.    Yeah, I -- would love to do that, sir.

154

1          MR. BOIES:  I'm going to need a moment of help.

2          THE COURT:  Mr. Boies, while you're searching for that

3    reference, it's about 3:30 at the moment, which is when we

4    traditionally have been breaking for the afternoon break.  Can

5    you give me an estimate as to approximately how much longer you

6    think you're going to be?  If you think you're going to be

7    concluded in a matter of minutes, we'll keep going.  The shake

8    of your head, which I will communicate as an emphatic no --

9          MR. BOIES:  Yes.

10         THE COURT:  -- means that it may be a sensible time

11   for us to take that break.

12         MR. BOIES:  Thank you, Your Honor.

13         THE COURT:  And I'm going to ask counsel for the

14   trustee if he has an estimate as to how much time he's likely

15   to need for redirect at the point that -- I realize this is

16   premature, but at the point that Mr. Boies has concluded his

17   examination, just for estimate purposes.

18         MR. MAGUIRE:  I would estimate about five or ten

19   minutes, Your Honor.

20         THE COURT:  Okay.  Well, that's fine.  What I'm trying

21   to get a sense of is whether, since I see counsel for DTCC in

22   the courtroom, whether it is foreseeable that we're going to be

23   able to get to the next witness today.  If the answer is no, it

24   might be a courtesy to release that witness until tomorrow

25   morning.  And I would just suggest there be some consideration

155

1 to that during the break.

2   MR. BOIES:  Thank you, Your Honor.

3   THE COURT:  We'll break for fifteen minutes, till

4 3:45.

5  (Recess from 3:31 p.m. until 3:50 p.m.)

6   THE COURT:  Be seated, please.  Good afternoon again.

7 I just want to make a comment, which is about the schedule for

8 tomorrow.  I have at 1:30 an argument in connection with a

9 motion for a stay pending appeal.  I don't believe it will take

10 more than a half hour, and it's coming out of my lunch hour,

11 not yours.  However, it's possible that when you return from

12 lunch tomorrow that there may still be some activity here.  And

13 I know that you've been very neat at the end of the day, but be

14 aware that during the lunch break tomorrow you're going to have

15 to move at least some of your things to one side or off counsel

16 table and protect the integrity of your notes and things like

17 that.  But I don't believe it'll take more than about a half

18 hour.

19   MR. BOIES:  Thank you, Your Honor.

20   Have we handed out Exhibit 320A?

21 RESUMED CROSS-EXAMINATION

22 BY MR. BOIES:

23 **Q. And do you have Exhibit 320A up there?**

24 **A. Yes, I do.**

25 **Q. Now, this is a document prepared by Weil Gotshal, and I**

156

1    don't know whether you ever saw this document or not.  I don't

2    think you are listed as an addressee here.

3    A.    No.

4    Q.    Have you seen it --

5    A.    Is that a question?

6    Q.    -- before?

7    A.    I don't recall having seen this.  I'm not listed as an

8    addressee.  I don't believe anyone from my firm is listed as an

9    addressee.  I don't know if at some point it might have gone to

10   someone else at my firm, but I've never seen it, that I recall.

11   Q.    Were you aware that after the transaction closed Weil

12   Gotshal tried to identify what assets went to Barclays and what

13   assets didn't?

14   A.    Not specifically, no.

15   Q.    Did you ever ask anyone to try to prepare a summary of

16   what assets had gone to Barclays and what assets had not?

17   A.    We -- if your question is did we ask anyone at Weil

18   Gotshal, I think the answer generally would be no.  We may have

19   asked them about specific aspects of the agreement as questions

20   came up.  I don't know if your question is meant to be broader

21   than that.

22   Q.    I think that's a useful clarification.  First, did you ask

23   Weil Gotshal to prepare a general identification of what assets

24   went to Barclays and what assets didn't?

25   A.    I don't believe so.

157

1    Q.   Did you ask Weil Gotshal specific questions about whether

2    specific assets went to Barclays or not under the APA?

3    A.   I think from time to time questions came up.  I remember

4    calling Rod Miller, who's a lawyer at Weil, once after we

5    learned of the positions that Barclays was taking with respect

6    to the DTC transaction and its position with the DTC letter

7    relevant -- relative to the APA and the clarification letter.

8    And I just wanted to get his view of what their discussions had

9    been, and as I recall he said that wasn't my department but

10   I'll check around.  And then I think I called him a couple of

11   days later, and he basically said as far as he could tell

12   really no one at Weil Gotshal had had any involvement with that

13   and they really had no specific knowledge of it.

14        So I do remember that instance.  There may have been --

15   we've had a lot of discussions with Weil Gotshal; it's usually

16   more along the lines of whether assets are ours or theirs.  So

17   I don't recall any specific ones, but I can't say there might

18   not have been some.

19   Q.   When did the conversation -- or conversations that you

20   testified that you had with Mr. Miller with respect to DTC take

21   place?

22   A.   I can't recall exactly when that was.

23   Q.   Approximately.

24   A.   I just -- I don't know.  I think, again, it might have

25   been around December of 2008.

158

1   Q.   Other than the conversations with Mr. Miller as the

2   trustee's 30(b)(6) witness, are there any other conversations

3   between the trustee and Weil Gotshal concerning specific

4   questions about whether certain property is or is not included

5   in what goes to Barclays?

6   A.   Well, we did -- when we discussed the repo settlement, the

7   trustee really made it a point that -- to bring Weil Gotshal

8   and LBI and the creditors' committee into those discussions.

9   So to the extent that might be an issue of property that went

10  to Barclays or didn't go to Barclays or should have gone to

11  Barclays or shouldn't have, they were part of that.  I believe

12  we brought them into the DTC discussions, which, again,

13  involved to some extent property that was or wasn't transferred

14  to Barclays.  I don't recall specifically other than those.

15  Q.   And the DTC discussions you're talking about are the

16  discussions that you already identified with Mr. Miller?

17  A.   No, no, no, no.  I'm sorry.  That we had -- when DTC --

18  and I believe it's because they were so concerned about

19  liability -- reversed some ACATS transactions.  And as I

20  understand, their system ACATS is what's used to transfer

21  assets from one brokerage firm to another.  They reversed some

22  of those transactions on the -- afternoon of the 19th of

23  September and, I think, the morning of the 22nd.  It was a huge

24  issue at the time.  And we eventually had a tripartite

25  settlement with your client, the DTC and the trustee which was

159

1    presented to the Court.  But before we did that, we did talk

2    about it with the holding company and with the creditors'

3    committee.

4    Q.    Other than the December conversations with Mr. Miller

5    regarding the DTC, the discussions concerning DTC that you've

6    just described, the weekend of September of 20th and the repo

7    settlement discussions that you referred to, were there any

8    other discussions between the trustee and Weil Gotshal

9    concerning any elements of the APA and what went to Barclays

10   and what did not?

11   A.    I don't believe so, other than what might have arisen in

12   the 2004 investigation and in conjunction with the positions

13   the parties that (sic) were taking in this case.  But that

14   would primarily be the litigation -- my litigation team.

15   Q.    When were the repo settlement discussions that you refer

16   to?

17   A.    They would have been before the transaction was presented

18   to the Court.  So I think that would have been probably in

19   around mid-November of 2008.

20   Q.    Now, let me ask you again to look at Exhibit 320A, and in

21   particular I'm going to direct your attention to the last few

22   pages, the last -- third from last page, which begins a table.

23   And it's headed "The table below indicates the status of

24   assets, products, agreements, businesses and infrastructure

25   after the closing."  Do you see that?

160

1    A.    Yes.

2    Q.    And --

3    A.    Yes, I do.

4    Q.    And one column lists assets and the next column lists

5    "in", and it says "purchased assets".  The next column says

6    "out" and it says "excluded assets".  And the next column says

7    "Barclays may assume or reject for sixty days following the

8    closing."  Do you see that?

9    A.    Yes, I do.

10    Q.    And it shows here that exchange-traded derivatives is one

11    item, and any property that may be held in order to secure

12    obligations under exchange-traded derivatives is a second item,

13    and they are both listed as being "in"; that is, they are

14    listed in the purchased assets column.  Do you see that?

15    A.    Yes, I do.

16    Q.    Were you aware of Weil Gotshal preparing any analysis that

17    in substance said this?

18    A.    No, I was not.

19    Q.    Let me ask you to look next at a document that has been

20    marked as Exhibit 131A, and that is also a document I think we

21    are going to have to hand up to you.

22         (Pause)

23         THE COURT:  Mr. Boies, is the document you just used,

24    320A, a document which is in evidence or not in evidence?

25         MR. BOIES:  320 is, Your Honor.  320A we would offer

161

```
1    in evidence.  It is simply a copy of 320 that is a clearer

2    copy.  It's the same Bates-numbered pages.  It's simply -- it's

3    a better copy than the 320 that we had when we originally

4    marked exhibits.

5              THE COURT:  I assume there's no objection if it's

6    already in evidence?

7              UNIDENTIFIED SPEAKER:  No objection, Your Honor.

8              MR. MAGUIRE:  None, Your Honor.

9              THE COURT:  All right.  Fine.  320A is in evidence.

10   (Clearer copy of Exhibit 320 already in evidence was hereby

11   received into evidence as Exhibit 320A, as of this date.)

12   Q.   Do you have Exhibit 131A in front of you, sir?

13   A.   Yes, I do.

14             MR. BOIES:  And, Your Honor, this is the same

15   situation.  131 is not objected to.  131A is simply a better

16   copy of it.

17             THE COURT:  Okay.

18   Q.   Have you seen this document before, sir?

19   A.   I don't recall having seen it.

20   Q.   Were you aware of a presentation that was made by Alvarez

21   & Marsal in or about October 8th of 2008?

22   A.   I remember one or two presentations that Alvarez, in

23   conjunction with Weil Gotshal, made:  One, I thought, was in

24   the courtroom; one, maybe two, were at a hotel.  I thought the

25   ones that I remember were later in the year than this.  And,
```

162

1    you know, it says on its face it's a report to the unsecured

2    creditors' committee, which wouldn't be us.  I don't know if

3    this was also used in some other report, but I don't recall

4    seeing this.

5    Q.   Let me ask you to look at page 28 where it says "sale of

6    Lehman Brothers Inc. assets purchased"; do you see that?

7    A.   Yes, I do.

8    Q.   And the second asset listed there is 1.9 billion dollars

9    from the unencumbered box; do you see that?

10   A.   Yes, I do.

11   Q.   And you understand that to be the clearance box assets,

12   correct?

13   A.   I would understand that.  Certainly today I understand

14   that.

15   Q.   Now, you have testified that it's the trustee's position

16   that the only assets that went to Barclays from the clearance

17   boxes were customer assets, correct?

18   A.   Yes.

19   Q.   And those obviously wouldn't benefit Barclays because they

20   would belong to customers, correct?

21   A.   I don't really want to quibble.  I know we spent a long

22   time quibbling.  It certainly was a benefit, in my view, that

23   Barclays got these thousands of customer accounts and the

24   property that went with it.  It's a very valuable property to

25   have.  But in terms of a direct financial "Is this my asset",

163

1    no.

2    Q.    Okay.  Now, have you previously seen the direct financial

3    benefit of the clearance box assets having been estimated at

4    1.9 billion dollars?

5    A.    I believe that was in one of the letters.  I believe there

6    was an estimate of that sort that was a Barclays estimate in

7    one of the letters that they wrote to us.

8    Q.    Other than in a letter that Barclays wrote to you, were

9    you aware of anyone who estimated that the value to Barclays,

10   the direct financial benefit to Barclays, of the clearance box

11   assets was going to be 1.9 billion dollars?

12   A.    I really don't recall what value was attributed to them,

13   if any.  I thought I recalled Barclays in one of their letters

14   saying these have a value of 1.9 billion dollars; at least

15   that's what they asserted.

16   Q.    That letter would have been substantially after the

17   closing, correct?

18   A.    Yes, it would have probably been in early/mid/late --

19   summer of 2009, based on the correspondence we've reviewed

20   extensively.

21   Q.    Prior to 2009, was the trustee ever aware of an estimate

22   of 1.9 billion dollars being the estimate of what Barclays

23   would realize -- or the estimated amount that Barclays would

24   realize from the clearance box assets?

25   A.    I don't recall that.

164

1    Q.   By your position, other than the indirect benefit of

2    getting customers, which I agree is a benefit, but other than

3    that indirect benefit, the way the trustee's position comes

4    down is the clearance box assets would not be any direct

5    financial benefit to Barclays, correct?

6    A.   Well, yes, if we kept them and Barclays never got them,

7    they'd be no benefit to Barclays.

8    Q.   And that's your position, correct?

9    A.   Yes.

10   Q.   Your position is the only thing that you don't keep is the

11   customer accounts, the customer accounts belong to the

12   customers, correct?

13   A.   Well, our position is that the DTC letter says that the

14   clearance box accounts, which in our view presupposes assets,

15   are excluded assets under the APA and therefore they remain

16   with the trustee.

17   Q.   Right.  And if I can avoid it -- I don't want to go back

18   to that whole line of questioning that we've gone through, but

19   my question to you now is simply whether you recognize that if

20   the trustee's position were correct, then Barclays would not be

21   realizing any direct financial benefit from the clearance

22   boxes.

23   A.   That's -- unless I'm missing something, that's my

24   understanding; they wouldn't get assets of that value or any

25   value, so they would not get that benefit, that's correct.

165

1    Q.   At any time during September 19th or the weekend of

2    September 20th, were you aware of what has been sometimes

3    referred to as a scramble to identify new assets?

4    A.   No, I think later that evening when we realized and when

5    there was this brief explanation of what the clarification

6    letter would be, I think there was some explanation that there

7    were questions about the values of assets, whether things that

8    had been thought to be available were available and

9    therefore -- and our understanding was that the purpose of the

10   clarification letter was to make things in the order of

11   substitutions for property that didn't have value or that

12   couldn't be located as the circumstances evolved.  That was our

13   general understanding.

14   Q.   And approaching it from that level of generality, was it

15   the trustee's understanding that certain assets that had been

16   identified in the original APA were either no longer available

17   or had declined so much in value that additional or substitute

18   assets had to be identified?

19   A.   It was our understanding that Barclays was looking for

20   what we understood were substitute assets.  Whether that was

21   what they were really doing, I don't know.  I mean, we didn't

22   have any direct knowledge of that at the time.

23   Q.   But did you understand that it was not just Barclays that

24   was trying to identify these assets, that the LBHI and LBI

25   people were trying to identify these assets?

166

1    A.   Yes, I did understand that people were trying to find

2    assets that were still available that had some value.

3    Q.   Okay.  And when you say "some value", you mean some value

4    to Barclays, correct?

5    A.   Yes.

6    Q.   And did you understand that one of the assets that people

7    identified as having some value for Barclays was the clearance

8    box assets?

9    A.   Yes.  I don't know that we attri -- what value was

10   attributed to those assets at the time.  I mean, they were

11   included in the clarification letter, at least until the DTC

12   letter came along.  I don't really know what the circumstances

13   were as to how they found their way in there, or what value

14   was -- if any, was assigned to them for that purpose.

15   Q.   The trustee essentially left the negotiation of the

16   clarification letter to Weil Gotshal, is that fair?

17   A.   Yes.

18   Q.   And I understand that your information is going to be

19   based on what Weil Gotshal told you about what was going on and

20   it's not direct knowledge, but you did have conversations with

21   Weil Gotshal from time to time, correct?

22   A.   Well, not me.  You're talking about me in my figurative

23   capacity?  Yes, we had --

24   Q.   I'm always talking about you as the trustee in the --

25   A.   Yes --

167

1    Q.    -- 30(b)(6) capacity.

2    A.    -- people did have some conversations, I believe, with

3    people at Weil Gotshal to try to find out what was going on, if

4    the deal was changing, how it was changing.

5    Q.    Now, did the trustee learn in any of those conversations

6    that the clearance box assets had been identified as an asset

7    that would provide substantial value, direct financial value,

8    to Barclays?

9    A.    No.  We saw that the assets were going to transfer.  I

10    don't recall what value was attributed to them.  I certainly

11    don't know what value Barclays attributed to them at the time.

12    Q.    Did you make any effort to find out?

13    A.    I don't believe so.

14    Q.    At any time prior to November 30th of 2008, had you ever

15    seen any estimate of what the direct financial benefit was

16    estimated to be for Barclays from the clearance box assets?

17    A.    I don't believe so.

18    Q.    Not ever from anybody under any circumstances prior to

19    November 30, 2008, is that your testimony?

20    A.    Well, yes, we thought that they were our assets.  I can't

21    remember if we tried to get some kind of rough valuation of

22    them.  I think we -- I think that there were some very valuable

23    assets in the box and some things that were of more

24    questionable value.  And I don't think we ever, even for

25    ourselves, got a very thorough estimate.  I think we did get a

168

1   range; I can't remember what it was, because we would put in

2   our trustee's reports assets that were available to the

3   trustee, and I believe these assets would have been listed

4   there.  But I can't recall what the figure was.

5   Q.   Let me be sure my question's clear.  What I'm asking you

6   is whether at any time prior to November 30, 2008 did anyone

7   under any circumstances indicate to the trustee that the

8   clearance box assets transferred to Barclays had a significant

9   direct financial benefit to Barclays?

10  A.   The way you're answering (sic) the question, we didn't

11  think any boxes had been transferred -- we didn't think any

12  assets in the boxes had been transferred.  We didn't know that

13  there had been some transfers.

14  Q.   Can I ask you to listen to my question?

15  A.   Well, I did listen to your question.

16  Q.   Well, sir, what I'm asking you -- what I'm asking you is

17  whether anybody told you something.  Do you understand that?

18  A.   Yes.  I don't recall being told that if those assets had

19  transferred that they had a value of any particular amount to

20  Barclays.

21  Q.   Let me try to state my question again.  At any time prior

22  to November 30th 2008, did anyone under any circumstances

23  communicate to the trustee that the clearance box assets

24  transferred to Barclays were estimated to have a significant

25  value to Barclays?

169

1   A.   The problem I'm having with your question -- I don't want

2   to play lawyer, but you're saying the box is transferred to

3   Barclays.  We don't believe those boxes were transferred to

4   Barclays.

5   Q.   Right.  Let me --

6   A.   So if your question is --

7   Q.   Let me start this way, okay?  You recognize that certain

8   clearance box assets were transferred to Barclays; you say

9   those are the customer assets.  But you recognize at least

10  certain clearance box assets were transferred to Barclays,

11  correct?

12  A.   Yes.

13  Q.   Okay.  At any time prior to November 30, 2008, did anyone

14  under any circumstances communicate to the trustee that the

15  clearance box assets transferred to Barclays, whatever they

16  were, were estimated to have a substantial direct financial

17  benefit to Barclays?

18  A.   No.

19  Q.   Okay.

20  A.   We were -- just so I'm clear, and I don't want to prolong

21  this, believe me, but just so we're clear, to the extent that

22  includes customer assets, we did make estimates; many times we

23  reported them to the Court.  We put them on our Web site as to

24  estimated value of assets that had been transferred to

25  customers for Barclays, and that would include very, very

170

1    substantial amounts from the clearance boxes.  But I would not

2    consider those to Barclays' direct benefit, other than the

3    indirect benefit that we've discussed.

4    Q.    For example, going back to Exhibit 131A, page 28 --

5    A.    Yes.

6    Q.    -- no one prior to November 30, 2008 had ever said

7    anything to the trustee or written anything to the trustee that

8    was anything like the line here that indicates that the

9    clearance box assets have a value to Barclays of 1.9 billion

10   dollars, correct?

11   A.    I don't believe so.

12   Q.    Okay.  And if they had, you would have recognized that

13   that assertion was inconsistent with what you say your position

14   was, correct?

15   A.    Yes.

16   Q.    And we talked about Exhibit -- or Schedule B to the

17   clarification letter; do you recall that generally?

18   A.    Yeah.

19   Q.    And in that connection I'd like to ask you to look at

20   Exhibit 524, which we have as a separate exhibit because it's

21   very large.

22         (Pause)

23         Have you seen this document before, sir?

24   A.    Yeah, is this both Schedule A and Schedule B?

25   Q.    Yes.

171

1    A.    Okay.  Yeah, I believe I've seen them.

2    Q.    And this is an e-mail from Weil Gotshal to a number of

3    people at your law firm, correct?

4    A.    Yes.

5    Q.    Dated September 30, 2008, correct?

6    A.    Yes.

7    Q.    And it attaches the Schedule A and Schedule B to the

8    clarification letter as they had been filed, correct?

9    A.    Well, it says "Here are the filed schedules".

10   Q.    And you know those to be the Schedule A and Schedule B to

11   the clarification letter, right?

12   A.    Yeah, I'm assuming that's what these are, yes.

13   Q.    And if you look at the Bates-numbered page, it'd be --

14   that ends -5140 --

15   A.    (Pause).  Yeah.  Okay.

16   Q.    Do you have that?

17   A.    Yes, I have it.

18   Q.    And do you see that that is the beginning of Schedule B?

19   A.    Yes.

20   Q.    I'm sorry, sir?

21   A.    Yes.  I'm sorry.

22   Q.    And you've previously testified that you were aware that

23   the securities listed on this Schedule B were, or at least

24   included, securities that were proprietary LBI collateral,

25   correct, sir?

172

A.   I don't believe this was collateral.  I believe this was
LBI positions in the clearance boxes as well as some -- as well
as perhaps some other securities.

Q.   Let me put it this way --

A.   I mean securities in other clearing boxes.

Q.   Yeah.  Let me put it this way.  You were --

A.   These were proprietary securities.

Q.   That's my poi --

A.   That was my understanding.

Q.   That's my question.  You understood that Schedule B listed
LBI's securities that you consider to be proprietary and not
customer securities, correct?

A.   That's correct.

Q.   And you were aware that this had been filed with a motion
by the debtors and Barclays, correct, sir, including because
they wanted to put it under seal?

A.   With all that was going on, I don't think I really focused
on this, except that Mr. Wiltenburg or somebody said Barclays
wants to put it under seal.  I said -- you know, and I think
they wanted to put Schedule A under seal, as I recall.  But,
anyway, I said fine, as long as the Court orders it, that's
fine.  I don't really recall focusing on this other than that.
We had a lot of things going on then.

Q.   When you say you don't recall focusing on it, you don't
mean that some representative or lawyer for the trustee didn't

173

1    read this motion, do you?

2    A.    Read the -- well, I don't ha -- I don't recall anyone

3    showing me the e-mail.  Somebody said there's going to be a

4    motion to file it under seal by Barclays, and we agreed to go

5    along with that.  I thought they said that the securities on

6    both schedules, you know, was something they didn't want,

7    really, the public to know.  I think we had -- to the extent we

8    were keeping the securities, we had an interest in keeping it

9    under seal as well.

10   Q.    Let me ask you to look at tab 27, which is Barclays'

11   Exhibit 19.  This is the motion that we've been referring to,

12   correct?

13   A.    I think you gave me the wrong -- what tab?  I'm sorry,

14   what tab number?

15   Q.    It is tab 27.

16   A.    27?  Okay, I've got it.  Thank you.

17   Q.    Okay.  Barclays' Exhibit 19?

18   A.    Yeah.

19   Q.    And this is a motion by Weil Gotshal and by Barclays dated

20   September 29, 2008, is that correct?

21   A.    Yes.

22   Q.    And the trustee received a copy of this motion, correct?

23   A.    I believe so, yes.

24   Q.    And the trustee would have read this motion at the time it

25   received it, correct?

174

1    A.    Somebody would have read it, yes.

2    Q.    Somebody would have read it on behalf of the trustee,

3    correct?

4    A.    Yeah.

5    Q.    And if you turn to page 3, paragraph 7, at the bottom do

6    you see where it says "The clarifying letter clarifies the

7    intention of the parties with respect to certain provisions of

8    the purchase agreement, supplements in certain respects the

9    agreements of the parties under the purchase agreement, amends

10   the purchase agreement in certain respects, and is binding on

11   the parties"?  Do you see that?

12   A.    Yes.

13   Q.    Did the trustee have any disagreement with that as of the

14   end of September 2008?

15   A.    Again, I don't really recall focusing specifically on

16   this -- that particular language.  At that point, Barclays

17   hadn't really taken some of the positions, at least to our

18   knowledge, that it subsequently took.

19   Q.    Sir, my question is not whether you focused on this

20   sentence.  My question is whether as of the end of September

21   the trustee had any disagreement with what this sentence

22   states.

23   A.    I don't think we had an agreement -- a disagreement.  I

24   don't think we focused on it.

25   Q.    At the end of September 2008, did the trustee believe that

175

1    the clarification letter clarified the intention of the parties

2    with respect to certain provisions of the purchase agreement,

3    supplemented in certain respects the agreements of the parties

4    under the purchase agreement, amended the purchase agreement in

5    certain respects, and was binding on the parties?  Did the

6    trustee believe that at the end of September 2008?

7    A.   We certainly agreed with the first three phrases.  I don't

8    think we focused at that time on whether it was binding; I

9    don't think we had any particular reason to at that time.

10   Q.   Let me direct your attention to the next sentence.  It

11   says, "As more fully described in the clarifying letter, the

12   schedules", and they're referring to Schedules A and B, "list

13   securities and trading positions transferred under the purchase

14   agreement."  Do you see that?

15   A.   Yes.

16   Q.   Now, you would agree with me, would you not, that this

17   statement is inconsistent with what you say the trustee's

18   position was as of September 29, 2008?

19   A.   Yes.  I mean, this is what the agreement says, but of

20   course we thought the controlling document was the letter

21   agreement that we had with DTC.

22   Q.   Let me be sure I understand what you're saying.  When you

23   say this is of course what the agreement says, you're talking

24   there about the APA, including the clarification letter, is

25   that correct?

176

1    A.    Yes.

2    Q.    And what you're saying is the APA, including the

3    clarification letter, provides that Schedule B lists securities

4    and trading positions transferred under the purchase agreement

5    to Barclays, correct?

6    A.    Yes.

7    Q.    Now, when you saw this, and by "you" I mean the trustee,

8    did you think that any response to this was appropriate?

9    A.    No.  I read this sentence even today as just declaring

10   what the clarifying letter says.  We certainly weren't taking a

11   position either way.  I don't think we had any reason at that

12   time to know the positions that Barclays might be taking.

13   Q.    Well, sir, you knew --

14   A.    So -- and we had a million things going on, so we didn't

15   focus very particularly on this.  And I'm speaking in my

16   corporate capacity as well as my personal capacity.

17   Q.    You knew, sir, in the end of September 2008 that Barclays

18   and Weil Gotshal had prepared a Schedule B that listed

19   securities that you claimed were proprietary to LBI, correct?

20   A.    Yes.

21   Q.    You knew that Barclays and Weil Gotshal had told the Court

22   that those securities had been transferred to Barclays under

23   the purchase agreement, correct?

24   A.    We saw what's written here.

25   Q.    And you understood that what's written here was both

177

1    Barclays and Weil Gotshal telling the Court that the Schedule B

2    listed securities had been transferred to Barclays under the

3    purchase agreement, correct?

4    A.    Yes.

5    Q.    Okay.  Now, your -- or the trustee's view, as you say it

6    was, was that none of those securities had been transferred to

7    Barclays, correct?  They belonged to you -- LBI?

8    A.    I think there's some that are in other clearing boxes that

9    would have gone -- because that wouldn't be covered by the DTC

10   letter.  But the majority of them, under our position, did

11   not -- have never gone to Barclays and are not Barclays'.

12   Q.    Right.  And in light of those three positions, am I

13   correct that no one from the trustee or representing the

14   trustee ever made any response to this to the Court, to

15   Barclays or to Weil Gotshal?

16   A.    I think all we said was that we had no objection to it

17   being filed under seal as long as there was some provision

18   that -- as I recall, that parties that had or could demonstrate

19   an interest in needing to see the schedules would have the

20   right to sign onto the protective order and see it.

21        These were really statements made by Weil Gotshal and

22   Cleary.  Weil Gotshal files many papers in this court; we don't

23   necessarily agree with every sentence that they say in every

24   paper, nor do we agree with every sentence that Cleary says.

25   And we didn't really take any position on this particular

178

1  document.  And even --

2  Q.   Have you finished?

3  A.   I think I've answered your question.

4  Q.   And am I correct that the answer is that the trustee did

5  not make any response, oral or written, formal or informal, to

6  what is asserted here in the --

7  A.   That's correct.

8  Q.   -- Schedule B which transfers these securities to

9  Barclays?  Is that correct?

10  A.   We didn't comment on that one way or another --

11  Q.   Okay.

12  A.   -- as I recall.

13  Q.   One thing that the trustee did do was to file in the

14  United States District Court -- no, in the bankruptcy court --

15  filed in the bankruptcy court, in the liquidation proceedings,

16  the order that the Court had issued here approving the sale

17  order, correct?

18  A.   Yes.

19  Q.   I'm sorry?

20  A.   Yes.

21  Q.   And if you look at Barclays' Exhibit 17, which is tab 11,

22  is this an order that you submitted to the bankruptcy court,

23  that is, that the trustee submitted to the bankruptcy court,

24  and asked the bankruptcy court to order?

25  A.   Yes, I recall distinctly at the close of the hearing

179

1    having to make somewhat of a pest of myself, I believe, by

2    standing up and saying Your Honor, it was part -- the sale is

3    conditioned on it being accepted in our proceeding, and I have

4    a little order that we drafted to that effect that we've shared

5    with Barclays and the other parties.  And I handed that up

6    early in the morning, I guess technically, on September 20th at

7    the conclusion of the September 19th sale hearing.

8    Q.   And the order that you handed up, that you asked the Court

9    to enter, was an order that incorporated by reference the sale

10   order that the Court had entered approving the APA, correct,

11   sir?

12   A.   Yes.

13   Q.   And that order is Exhibit 16, Barclays' Exhibit 16, at tab

14   6; do you see that?

15   A.   Yes.

16   Q.   And by submitting the order that you submitted to the

17   Court, incorporating by reference Barclays' Exhibit 16, you

18   understood that you were adopting what was stated in Barclays'

19   Exhibit 16, correct, sir?

20   A.   Yes, we understood we were adopting the sale order as it

21   had been described to the Court and approved by the Court, and

22   once it was approved by the Court it was supposed to be entered

23   in our case as well.

24   Q.   And let me just go through this with you, hopefully

25   briefly.  The -- if you look on the first page, in the middle

180

1    of the page, do you see the reference to the asset purchase

2    agreement dated September 16th, 2008?

3    A.    Yes, I do.

4    Q.    And it says that agreement, collectively with the first

5    amended -- amendment clarifying asset purchase agreement dated

6    September 19, 2008 --

7    A.    Yes.

8    Q.    -- and a letter agreement clarifying and supplementing the

9    asset purchase agreement dated September 20th, 2008 --

10    A.    Yes.

11    Q.    -- are referred to collectively as the "Purchase

12    Agreement", do you see that?

13    A.    Yes.

14    Q.    And if you go to page 3, paragraph D, Irreparable Harm, do

15    you see it states "The Debtors' estates will suffer immediate

16    and irreparable harm if the relief requested in the motion is

17    not granted on an expedited basis, consistent with the

18    provisions set forth herein and in the purchase agreement,

19    particularly given the wasting nature of the purchased assets"?

20    Do you see that?

21    A.    Yes.

22    Q.    And the trustee supported that assertion, correct, sir?

23    A.    Yes, with our understanding of what the purchase agreement

24    would be, which was the type of agreement described and

25    approved -- described to and approved by the Court.

181

1    Q.    Well, sir, the purchase agreement is defined as including

2    the APA, the first amendment and the clarifying letter,

3    correct, sir?

4    A.    Yes.  And we understood the clarifying letter would be

5    indeed a clarifying letter that clarified minor -- relatively

6    minor details, as had been described.  And what the

7    significance of this language in a court order is -- with all

8    due respect, I don't think my opinion on that matters one wit.

9    Q.    What I'm asking you, sir, is what the trustee believed at

10   the time that these actions were taking -- being taken.  I'm

11   not asking for you to interpret this legal document; I'm not

12   asking for your legal argument.  I'm simply asking if he

13   understood at the time, do you understand that?

14   A.    Yes.

15   Q.    And at the time that this was going on was it the

16   trustee's understanding that the statement that we just read

17   was accurate?  I'll read it again if you need me to.

18   A.    No, I understand.  I remember.  My memory hasn't gotten

19   that bad.  Yes, we thought it was accurate with the

20   understanding that we, and I believe everyone else had, as to

21   the clarification letter would not substantially change the

22   terms of the deal that had been described to an approved by the

23   Court.

24   Q.    And what --

25   A.    That was our understanding at the time.

182

1   Q.   And when you got the clarification letter and read it,

2   when the trustee did this, did you think it substantially

3   changed the terms?

4   A.   Yes.

5   Q.   Of the way they described to the Court?

6   A.   Yes.  Although, our understanding --

7   Q.   Wait a minute, wait a minute.  Did you say yes?

8   A.   I said yes.

9   Q.   When you got the clarification and read it, when the

10  trustee got the clarification letter and read it did you think

11  it substantially changed the terms that had been described to

12  and approved by the Court?

13  A.   It changed the terms, although it was our understanding

14  that the items that had been substituted, excluded, included,

15  would be consistent with the overall parameters that had been

16  described to the Court.

17  Q.   Is that a yes or no to my question?

18  A.   I think I said yes, and then explained my answer.

19  Q.   And the -- are you saying that you think there were

20  material changes that were done by the clarification letter,

21  but they balanced out, is that what you're saying?

22  A.   We thought that the purport of the clarification letter

23  was to reach the same kind of deal that had been described to

24  the Court.  It was different than what had been described to

25  the Court.

183

1    Q.   All right.  In the trustee's view on September 30, 2008,

2    had the clarification letter materially change the deal that

3    was described to the Court on September 19th?

4    A.   Yes.  I'll amend my answer to say yes.  And as Barclays

5    took various positions under that letter it became clearer and

6    clearer to us that the deal had been very fundamentally

7    changed.

8    Q.   And when was the first time you said to anyone -- the

9    trustee said to anyone we believe that the clarification letter

10   fundamentally changed the deal that was described to and

11   approved by the Court?

12   A.   I believe in some of our correspondence and probably in

13   some of the meetings with Barclays we said the clarification

14   letter was never authorized, as well as disagreeing with

15   Barclays' interpretation of what the clarification letter

16   actually said insofar as it concerns some of the issues as

17   between us and your client.

18   Q.   First, let me try to get an answer to my question.  Then I

19   want to follow-up that answer.  My question was when was the

20   first time you said to anyone -- when the trustee said to

21   anyone that you believed that the clarification letter

22   fundamentally changed the deal that was described to you and

23   approved by the Court?

24   A.   I think it was probably in some of our discussions with

25   Barclays about the claims.  It would have probably started in

184

1    December of 2008 and then run into 2009.

2    Q.   When was the first time that you said in writing that the

3    clarification letter fundamentally changed the deal that was,

4    in your view, described to and approved by the Court?

5    A.   I don't recall.

6    Q.   Approximately?

7    A.   I don't know.  You'd have to show me a writing, I don't

8    recall when the first time we did that would have been.

9    Q.   You're the 30(b)(6) representative of the trustee, and I'm

10   asking you when did you first do it, sir?

11   A.   Well, I'm also a human being.  I did review very

12   thoroughly for this, and I can't recall without seeing the

13   document.

14   Q.   When is the first time that you can recall that happening,

15   even though that may not have been the first time?

16   A.   I think in some of the correspondence that we had with

17   Barclays.

18   Q.   Okay.  Perhaps your counsel will identify that for you on

19   redirect.

20   A.   I also recall that at the time of the approval of the repo

21   settlement we made it very clear to the Court, I thought, and

22   to Barclays, as did LBHI and the creditors' committee, that

23   there were substantial questions about the transaction as a

24   whole, including the clarification letter.  And that's

25   something we thought -- the trustee needed to investigate.

185

Q.   And what you're referring to here is what you filed?

A.   And I believe I made some oral statements to the same

effect.

Q.   To whom?

A.   To the Court.

Q.   Okay.  On the record?

A.   Yes.

Q.   Okay.  I'm just trying to be sure that everything that you

said or wrote is on the record, and we can look it up, is that

correct?

A.   What I'm referring to is what was in our application, what

was in the order, and what I said in open court.

Q.   Now, you said in one of your answers that at some point

you took the position that the clarification letter was "never

authorized," do you recall that?

A.   Never approved by the Court, yes.

Q.   And you were aware that the Court's order included the

clarification letter as part of what was approved, correct?

A.   Yes.  Although, a clarification letter did not actually

exist at that time.

Q.   No.  But you know that the Court said on the record, that

the Court was available for anybody to come back to them if

there was an issue, correct?

A.   Yes.

Q.   You were here when the Court said that, that the Court

186

1    would make itself available at anytime, day or night, for

2    anybody to come back if they had a problem, correct?

3    A.    Yes.  I also recall the Court saying that it would expect

4    to be notified I believe of material changes, and that anything

5    in the order of 500 million dollars would be clearly material.

6    Q.    And did you ever notify the Court prior to what you've

7    identified?

8    A.    No.

9         (Pause)

10   Q.    Let me direct your attention to a time that's a few months

11   later.  The trustee filed a brief in the United States District

12   Court for the Southern District of New York in December of

13   2008, correct?

14   A.    Yes --

15   Q.    December --

16   A.    -- I think I know the brief you're referring to.

17   Q.    December 12, 2008.  And that's Exhibit 34 -- Barclays

18   Exhibit 24 which is a document that we will hand out.

19   A.    Thank you.

20        MR. BOIES:  I'm told it's actually tab 29 in my book.

21        THE COURT:  Well, I have it.

22        MR. BOIES:  I didn't have to hand it out.

23   Q.    And you recognize this as the brief the trustee filed in

24   December?

25   A.    Yes.

187

1   Q.   And in that brief you adopt the brief that LBHI had

2   submitted, correct, sir, the brief that LBHI had submitted that

3   Weil Gotshal had prepared, correct?

4   A.   Yes, I think we referred to it and incorporated it by

5   reference, yes.

6   Q.   So I'd like to ask you to look now at the LBHI Weil

7   Gotshal brief that is Barclays' Exhibit 33 which is tab 28 in

8   the binder.  And this is the LBHI brief prepared by Weil

9   Gotshal that the trustee incorporated by reference in its

10   brief, correct?

11   A.   Yes.

12   Q.   Now, let me ask you to go through this with me.  And this

13   is something that you're telling the Federal District Court in

14   December, correct, sir?

15   A.   I believe that's when we filed our brief, yes.

16   Q.   Now I'd like you to look at the bottom of page 17 and the

17   top of page 18.

18   A.   I don't seem -- the one in this binder goes from page 4 to

19   page 18, so there's no bottom of page 17.

20   Q.   Then use the one that we just handed out then.

21   A.   I thought this was Weil's brief.  Is that --

22   Q.   It is Weil's brief.

23   A.   The one you handed out is our brief, I believe.

24        MR. BOIES:  Excuse me one moment, Your Honor.

25        (Pause)

188

1   Q.   We could read it off -- can you read it off the screen?

2   A.   Yeah, I think so.  My eyes aren't that bad yet.

3   Q.   We will try to get it handed out though, and I apologize

4   for not having all the pages in there.  And I want you to just

5   read that for content because I'm going to ask you some

6   questions going through this.  The next paragraph says at the

7   beginning, "The record demonstrates that Barclays acted in good

8   faith."  Do you see that?

9   A.   No, I don't, actually.

10  Q.   Page 18, first full paragraph.

11  A.   I'll look at it in here.

12  Q.   Okay.

13  A.   This is the first full paragraph on the page?

14  Q.   Yes.

15  A.   Oh, yeah, "Contrary to Bay Harbour's contentions, the

16  record demonstrates that Barclays acted in good faith."  I see

17  it.

18  Q.   And as of the time that the trustee incorporated this

19  brief by reference in its submission to the Federal District

20  Court, was it the trustee's view that the record demonstrates

21  that Barclays acted in good faith?

22  A.   Well, we adopted this brief for whatever that means.

23  Q.   Yes, sir, you've testified that you adopted this brief and

24  incorporated by reference, correct?

25  A.   I mean, there is material that precedes this and follows

189

1   it that explains what this sentence, which is in the nature of

2   a topic sentence, says such as the prospects for a competitive

3   bid were slim; they've been pursuing strategic alternatives;

4   Barclays was the only game in town.  We have not really

5   disputed any of that and we don't dispute it today.  So in that

6   sense they were a good faith purchaser.

7   Q.   And you still don't dispute that, correct?

8   A.   Those statements, yes.

9   Q.   I'm sorry, what did you say?

10  A.   The statements that there weren't competitive bids, that

11  Barclays were the people that were willing to step up, that

12  they were willing to take lots of accounts and so forth.  We've

13  never disputed that.

14  Q.   You've never disputed that Barclays was, as you put it a

15  moment ago, the only game in town, correct?

16  A.   That's what we were led to believe.  I don't -- yes, we

17  don't dispute it.

18  Q.   You don't dispute it today?

19  A.   I don't dispute it today.

20  Q.   Okay.  And you also did not dispute, at least back in

21  December of 2008, that the record demonstrated that Barclays

22  acted in good faith, correct, sir?

23  A.   Yeah, for purposes of meeting these contentions, yes, and

24  we adopted this brief for purposes of -- rather than writing a

25  brief of our own.

190

1    Q.    And you wouldn't have done it if you didn't agree with it,

2    would you, sir?

3    A.    No.

4    Q.    Okay.  Now look on page 23.

5    A.    Yes.

6    Q.    The bottom of the page, the last two lines, where it says,

7    "All relevant facts regarding the sale were disclosed to the

8    bankruptcy court", do you see that?

9    A.    Yes.

10   Q.    And that's what the Federal District Court was told by

11   LBHI and Weil Gotshal, correct?

12   A.    Yes.

13   Q.    And that's what you told the District Court that the

14   trustee was adopting, correct?

15   A.    Yes.

16   Q.    Let me turn briefly, I hope, to two points about exchange

17   traded derivatives that we've talked about before.  You are not

18   aware of any basis for believing that either side to this

19   transaction knew what the value was of the exchange traded

20   derivative positions at the time that the deal was approved or

21   at the time the deal was closed, correct?

22   A.    No, I believe there's been some testimony about that in

23   the depositions in this case but I really don't know what the

24   substance of that is.

25   Q.    At the time, that is, back in September of 2008, the

191

1    trustee did not have any basis for believing or understanding

2    what the value was of the exchange traded derivative positions,

3    correct?

4    A.   Yes, all we had was the balance sheet from September 17th

5    and that, I think, showed a figure of 3.7 billion longs and 1.9

6    short or something like that for derivatives, but we didn't

7    really have any explanation of that or how it had been obtained

8    or what was OCC or what was anything else.  Other than that we

9    had no knowledge at all.  And even that was as of a few days

10   before the 19th, so it could have changed very significantly.

11   Q.   Okay.  And either at the time the deal was approved or at

12   the time the deal was closed, insofar as you knew, no other

13   party to the transaction had any basis for knowing a reasonable

14   estimate of the value of the exchange derivative positions?

15   A.   I don't know one way or another.

16   Q.   Okay.  With respect to the exchange traded derivative

17   positions -- and I want to refine something that we talked

18   about before -- you've testified that Barclays was taking over

19   the exchange traded derivative positions that were LBIs, that

20   is, the LBI proprietary exchange traded derivative positions --

21   A.   Right, yes.

22   Q.   -- correct?

23   A.   Yes.

24   Q.   But you've testified that Barclays was, according to your

25   understanding, not getting the margin or collateral that went

192

1   with it?

2   A.   Right, yes.

3   Q.   If and to the extent that the LBI proprietary exchange

4   traded derivative positions were at a loss the day it closed,

5   did Barclays get exchange traded derivative collateral to match

6   that loss, under your understanding?

7   A.   I'm not sure, under my understanding.  I really didn't

8   focus on it either way at the time.

9   Q.   Have you focused on it since?

10  A.   I know we focused on it in our briefs.

11  Q.   Without asking you to just quote the brief, but as a

12  30(b)(6) witness testifying as a matter of fact, what is the

13  trustee's position today?

14  A.   I believe -- I don't believe we thought that the

15  parenthetical was really part of the deal, and that's the

16  parenthetical that refers to margin.  So that would mean if

17  there was a loss that might be a loss that Barclays might have

18  had to absorb.

19  Q.   Do you have any idea what the amount of that loss is, sir?

20  A.   No.

21  Q.   Did the trustee ever try to figure it out?

22  A.   I'm sure we did in connection with this litigation, but I

23  don't know the answer.  I don't know.

24  Q.   Prior to September of 2009, that is, a year after the

25  transaction closed, had the trustee figured out approximately

193

1    how big a lost Barclays would have taken if it took LBI's

2    exchange traded derivative positions without the collateral?

3    A.    I don't know.  I think that may have been work product

4    that my litigation team did.

5    Q.    As a 30(b)(6) witness I'm asking for the trustee's

6    knowledge.

7    A.    Well, I'm -- I don't really recall discussing this as part

8    of my 30(b)(6) preparation.  Perhaps I'm mistaken, but I wanted

9    to really avoid looking at a lot of the discovery, the

10    depositions and so forth by other witnesses in this case since

11    that might influence my own testimony.

12    Q.    If you don't know you don't know.  I can only ask you what

13    you know.

14    A.    Right.

15    Q.    But I'm asking you whether, based on what you know --

16    A.    I've said I don't know.

17    Q.    You don't know?

18    A.    Right.  Anything we have to say on that is in our papers.

19    Q.    And you don't know what that is?

20    A.    I don't recall, as I sit here today.

21    Q.    You testified on direct examination that you had some -- I

22    wrote down doubts but maybe you may have said concerns about

23    the valuation of some of the assets.  Do you recall that?  You

24    were talking --

25    A.    In what connection?

194

1   Q.   Counsel showed you a demonstrative exhibit that tried to

2   reconcile --

3   A.   Is this the 49. --

4   Q.   Yes.

5   A.   -- the 47.4?   Yes.

6   Q.   Yeah.  And I wasn't sure that I understood what point you

7   were making about that.  You seemed to say to me that based on

8   the discussions that you had had you concluded that the assets

9   were worth less than the 47.4 billion that was described to the

10  Court, is that correct?

11  A.   Yes, if you took this one piece that Chase had valued --

12  they actually hadn't valued it because it was too hard to

13  value.  If you took it at their 11/3 value which was around the

14  time we were having these discussions with them the value was

15  about 2.9 billion dollars of this piece and that meant the

16  total in the repo would have been something like 46.8 billion.

17  Even if you took it at 100 percent, which would have been

18  something around 3.4 or 3.5 billion dollars for that piece, the

19  total would still be slightly under 47.4 which were the figures

20  used in court on the 19th.  That was the point I was trying to

21  make.

22  Q.   Now, other than that -- other than concluding based on the

23  limited analysis that you did -- and this was limited, correct?

24  A.   We tried to do extensive analysis.  Deloitte tried to do

25  extensive analysis.  They had a lot of trouble getting direct

195

1    access to records from either Chase or Barclays or from the Fed

2    for that matter.

3    Q.   Let me be sure I understand what you're saying.  Are you

4    saying that Deloitte tried to value the assets that were

5    transferred to Barclays but were unable to do so?

6    A.   They did try to do it.  They were able -- there were some

7    things that were fairly readily -- you could look at Bloomberg

8    or something, they were fairly easy to value.  I don't know if

9    they looked at those values themselves or looked at what the

10   parties seemed to have valued them on and concluded that was

11   reasonable.  There was a lot of col -- there was some

12   collateral that was very illiquid and hard to value.  They

13   concluded that it would be a huge exercise, very, very

14   expensive and would take a long time, and even then it would

15   have very uncertain value.

16        When we talked to the other parties, essentially they told

17   us the same thing, that they had not been able to value it very

18   precisely and had, at best, estimates.  The estimates were

19   lower than what the face amounts were.  And I believe people

20   didn't give us numbers other than the -- I don't believe people

21   gave us exact numbers other than the Chase piece that I've

22   described.  But I think that was a consistent view that we got

23   from Barclays.  I think we were told that the Barclays traders

24   had tried to value it and thought that the value was

25   substantially below the stated figures.  The Fed told us, in

196

1    substance, the same thing.  And we had those figures from

2    Chase.  And that, essentially, was the information that we had.

3        I believe that in a session with the Court following the

4    hearing Mr. Hughes made some representations along the same

5    lines that Barclays didn't really want it to be publicly

6    disclosed but the securities had a lower value than some of the

7    values that had been used, again, without giving any real

8    figures.

9    Q.   Did you ever have any understanding as to what the

10   components were of the 47.4 billion dollars that was presented

11   to the Court?

12   A.   I think at one time I knew the names of some of the hard

13   to value securities, but I really can't recall that.  We would

14   be given summaries of values such as the one that we saw from

15   Chase.

16   Q.   And that summary of values was less than the 47.4,

17   correct?

18   A.   Yes, as of early November.  And there seemed to be a

19   consistent view that at least it was lower than the 49 -- that

20   49 to 50 that Ms. Leventhal described in her affidavit.

21   Q.   And you understood that the 47.4 number was a number that

22   related to certain securities positions, correct?

23   A.   Well, we were told at the sale hearing that the assets

24   versus liabilities had gone from 70 versus 69 to 47.4 versus

25   45.4.  I'm not sure at what point we knew that what was really

197

1    involved was taking the repo assets and basically transferring

2    them to Barclays.

3    Q.   Well --

4    A.   But we subsequently came to learn that.

5    Q.   You knew that the 47.4 number did not include either the

6    real estate or assets that were used in the business, correct?

7    A.   We knew it did not -- the real estate was separately

8    described.  Assets used in the business, if you're talking

9    about things like furniture, fixtures, systems, that would be

10   additional value.  It didn't seem to us that would be likely

11   to -- it's very important to running the business, we certainly

12   learned that later, but I don't think it would have, in itself,

13   substantial monetary value as something that you could sell for

14   a substantial price to someone else.

15   Q.   It would have substantial value to Barclays if it was

16   going to run a going concern, but it would not have substantial

17   value to LBI, correct?

18   A.   It would have had substantial value to LBI.  It would have

19   made it a lot easier to administer our proceeding if all of the

20   books and records had stayed with us and all of the systems,

21   the 2,700 systems, instead of going to Barclays.  But I don't

22   think it had substantial monetary value to anybody else.

23   Q.   Anybody other than Barclays, you're saying?

24   A.   Yeah, and it's really more, I would say, operational value

25   than monetary value.

198

1   Q.   And those --

2   A.   And it was part and parcel, to a large extent, of the

3   customer business that they were acquiring.

4   Q.   That is, for Barclays to acquire the customer business

5   they had to acquire the infrastructure and the customer lists

6   and the software and the technology and the furnishings and all

7   of the things that went with it, correct?

8   A.   Yes.  And the problem was they got all of that but they

9   didn't get all of the customers and it was needed for other

10  uses.  But that's a separate problem.

11  Q.   And did the trustee ever try to make any estimate of what

12  the value of those assets were that had not been valued as part

13  of the sales process?

14  A.   No.

15  Q.   And the trustee never had a view that there was any cap or

16  limitation on how much money Barclays could make from this

17  transaction, correct?

18  A.   No, not as such.  We did think that the 47.4 and 45.9 were

19  not -- the 45. -- yeah, 45.9 were not picked out of the air;

20  that that was a general economic parameter of what was

21  involved; that the relationship of liabilities and assets were

22  fairly close; that there was supposed to be twenty billion

23  dollars, at least, of assets left in the broker/dealer.  Those,

24  to us, were the economic parameters of the deal that was

25  described.

199

Q.    And the twenty billion dollars that you've referred to,

that was what was going to stay with Barclays --

A.    No, no --

Q.    I mean, stay with Lehman.

A.    With -- well, with the tru --

Q.    With the tru --

A.    What the trustee would have available.

Q.    Let me focus on what Barclays was getting, okay?  And both

in terms of assets and liabilities.  You've talked about the

comparison of the 47.4 billion figure of assets with the 45

billion dollar figure of liabilities, do you recall that?

A.    Yes.

Q.    And you understood that there were liabilities that were

not included in the 45 billion number that Barclays was

assuming, correct?

A.    Yes, there was an estimate of two to two and a half

billion of compensation payments that Barclays was going to

make, and an estimate of, I think, a billion and a half of cure

costs for contracts that would be assumed.  And so we certainly

understood that those were substantial numbers.  To us that was

important because some of those things, had Barclays not

assumed them, would have been claims, in all likelihood, in our

proceeding.

Q.    That is, if Barclays had not assumed these requirements,

those could have been claims against the estate, correct?

200

1    A.   Some of them.  I think some would have been LBHI, some

2    would have been us.

3    Q.   Now, in addition to comp and cure, were there other

4    liabilities that were not identified, as you understood it?

5    A.   That Barclays was assuming?

6    Q.   Yes.

7    A.   I don't recall.  There may have been some.

8    Q.   How about the liabilities with respect to the exchange

9    traded derivatives?  They were assuming those liabilities --

10   A.   Well, they got the positions.

11   Q.   And those positions had liabilities.

12   A.   They got the benefits or the liabilities, whichever way it

13   went.

14   Q.   And you didn't know which way it went, did you?

15   A.   No.

16   Q.   You didn't know at the time and you don't know now,

17   correct?

18   A.   I don't personally know now.  I certainly --

19   Q.   Not personally --

20   A.   I don't think anyone --

21   Q.   -- that the trustee doesn't.

22   A.   I didn't know at the time.  I don't think anyone could

23   have known at the time how it would come out.

24   Q.   And the trustee does not know today, correct?

25   A.   We may know through our litigation team; I don't know.

201

1   Q.   And the 47.4 billion dollar figure for assets, you

2   understood that there were assets that were not included there

3   that Barclays was getting, correct?

4   A.   At the time of the sale hearing, I don't believe so, other

5   than what I've already testified to.

6   Q.   Well, what you've testified to -- I just want to be

7   clear -- is the real estate and assets used in the business, is

8   that correct?

9   A.   Yes, that's correct.

10  Q.   And was there a list of assets used in the business that

11  was included in the APA and the clarification letter?

12  A.   I don't recall.

13  Q.   Was there a list of assets that were included in purchase

14  assets?  Not an exclusive list but a list in the APA?

15  A.   I think there was some kind of list, yes.

16  Q.   And do you recall that there was a list of about, like,

17  nineteen items?

18  A.   I'd have to look at it.  It wasn't an extensive, you know,

19  multi-page list or anything like that.  I do recall that.

20  Q.   Do you recall that the vast majority of those items did

21  not have a value attached to them?

22  A.   Yes.

23        MR. BOIES:  Your Honor, I have no more questions.

24        THE COURT:  All right, thank you.

25        MR. MAGUIRE:  May it please the Court, again, Bill

202

1    Maguire for the SIPA Trustee.

2    REDIRECT EXAMINATION

3    BY MR. MAGUIRE:

4    Q.   Mr. Kobak, if you wouldn't mind turning to the binder that

5    we circulated to you on your direct, and if you could turn to

6    tab 18 and tab 17.  Tab 18 is Barclays Exhibit number 422, and

7    this is a transfer -- two transfers of 146 million and 15

8    million dollars of assets from DTC.  And tab 17 is Barclays

9    Exhibit 517 which is the series of e-mail exchanges between

10   Barclays and the Hughes Hubbard associate, Anson

11   Frelinghuysen --

12   A.   Yes.

13   Q.   -- whose clip Mr. Boies showed you in connection with his

14   examination of you on these two exhibits.

15   A.   Yes.

16   Q.   Now, over my objection, Mr. Boies asked a number of

17   questions with a representation that -- and this I'm reading

18   from page 25, 26 of the rough transcript of today's hearing.

19   Mr. Boies' representation was "that you see from that testimony

20   that he knew" -- "he", I believe, referring to Anson

21   Frelinghuysen -- "he knew that proprietary assets were being

22   transferred."  Sir, with respect to those transfers, I'd like

23   you to see the testimony at the deposition of Mr. Frelinghuysen

24   with respect to that specific transfer if the Court will

25   permit.

203

1          THE COURT:  Sure.

2          MR. MAGUIRE:  And this is from the deposition of Mr.

3    Frelinghuysen  at -- starting at page 94 of the transcript at

4    line 8 through page 95, line 8.

5          (Begin audio playback)

6    "Q.  You were asking Mr. Olman (ph.) -- going back to Exhibit

7    675B, you were asking Mr. Olman to make that same

8    representation in connection with these two transfers, correct?

9    "A.  I asked Mr. Olman to determine if they were transferring

10   customer assets in connection with the APA.

11   "Q.  Where do you see the words "confirm that these were

12   customer assets"?

13   "A.  I know, of course, when dealing with Mr. Olman it's with

14   customer assets.

15   "Q.  But you did not ask Mr. Olman that these were in fact

16   customer assets, did you?

17   "A.  I asked him --

18          UNIDENTIFIED SPEAKER:  "He just said that he did.

19   "Q.  Can you show me where on Exhibit 675B you asked Mr. Olman

20   to confirm that these were customer assets?

21   "A.  I asked if they were being transferred pursuant the asset

22   purchase agreement which I understood to transfer customer

23   assets."

24          (Pause audio playback)

25   **Q.   And with respect to Mr. Anson's testimony concerning his**

204

1    understanding generally of transfers in the first weeks, I'd

2    like to refer you to his testimony starting at page 58 of his

3    transcript at line 14 through line 25.

4         (Resume audio playback)

5    "Q.  And if I understand you correctly, when transfers of

6    customer assets were requested you required that the assets

7    were then Barclays customer assets, is that right?

8    "A.  What I understood is that only customer assets were being

9    transferred.

10   "Q.  Where do you have that understanding from, sir?

11   "A.  That's what I understood the transaction to include.  And

12   certainly that's all I understood to be talking about in

13   this --

14        (Pause audio playback)

15   Q.   Now, finally, sir, I'd like to show you the testimony of

16   Mr. Frelinghuysen  concerning the specific clip that was shown

17   earlier concerned a request, not a transfer, but a discussion

18   by Barclays concerning a transfer of proprietary assets.  And

19   this is where Mr. Frelinghuysen  describes that as a discussion

20   and describes what happened to that.  And this is at page 63 of

21   his transcript starting at line 8 and continuing through line

22   21.

23        (Resume audio playback)

24   "Q.  Do you recall anything else about the approximately one

25   million dollars in other assets that you discussed with

205

1   Barclays?

2   "A.  Well, I do know he asked for the transfer.

3   "Q.  What did he ask you?

4   "A.  He asked me what steps would be necessary to transfer and

5   I said I would get back to him.

6   "Q.  And did you get back to him?

7   "A.  I did.

8   "Q.  And what did you tell him?

9   "A.  I drafted him a representation from him that the assets

10  were ready to transfer, and he never responded."

11      (End audio playback)

12  Q.   And sir, is it your understanding that the trustee never

13  knowingly transferred -- actually knowingly transferred any

14  assets to Barclays from the DTC?

15  A.   Yes, that's definitely our position, and I thought our

16  people understood that as well.

17  Q.   Now let me just ask you briefly about the -- over the

18  weekend that the clarification letter was drafted, was it your

19  understanding that the purpose of the clarification letter was

20  to document the transaction that had been described to the

21  Court at the sale hearing?

22  A.   It was called a clarification letter.  My understanding

23  was it was going to clarify a few points.  I believe Ms. Fife

24  had gotten up at one point during the hearing, said there was a

25  letter that was on its way down to the Court.  That was, I

206

1    think, near the beginning of the hearing.  Later described a

2    few changes of different subsidiaries that weren't -- that were

3    or were not being transferred, and a few other fairly specific

4    things.

5        And I think it was our understanding that there would be a

6    letter making changes like that and a few other clarifying

7    things but not making substantial changes to what had been

8    disclosed and what was already in the APA.  That was our

9    understanding by the close of the hearing.

10   Q.   And today is the trustee seeking to enforce the

11   clarification letter to the extent that it is consistent with

12   the transactions that are described --

13   A.   Yes.

14   Q.   -- by the Court?

15   A.   We've never said that Barclays did not do a good thing in

16   taking the accounts.  We've never said we wanted to go back and

17   redo the whole transaction.  As I've said, we've tried many

18   times to get Barclays things and do things at Barclays' behest

19   which we thought were perfectly appropriate because they were

20   consistent with the representations and disclosures made to the

21   Court.

22       But we have never been willing to give Barclays that to

23   which we don't think they're entitled under an agreement that

24   was never approved and in our language -- and, in our view,

25   under language and interpretations of those agreements that

207

1    isn't the correct interpretation in any case.  And we feel very

2    strongly about it because the property is so necessary in order

3    to protect customers in our proceeding.

4    Q.    And leaving aside the whole question of whether as a

5    result of this transaction Barclays obtained an undisclosed

6    discount with respect to the repo assets, with respect to the

7    contractual issues, the disputed assets, if the Court were to

8    sustain the trustee's position with respect to the disputed

9    assets, in that event, could the clarification letter be

10   enforced consistent with what was described to the Court at the

11   sale hearing on September 19th?

12   A.    Sorry, I lost your question somewhere along the line.  Can

13   you just read it back?

14   Q.    Yeah.  Just leaving aside the whole issue concerning the

15   repo assets, and if we focus simply on the trustee's

16   contractual arguments with respect to the disputed assets, is

17   it the trustee's position that were the trustee to prevail with

18   respect to the disputed assets a clarification letter could be

19   enforced consistently with the Court's sale order?

20   A.    Yes.

21   Q.    Thank you.

22         MR. MAGUIRE:  I have no further questions, Your Honor.

23         THE COURT:  Is there anything more?

24         MR. BOIES:  No, Your Honor.  That's it.

25         THE COURT:  I'm pleased to tell you that you're

208

1    excused.

2            THE WITNESS:  Thank you, Your Honor.

3            THE COURT:  And we are very close to the traditional

4    end of a trial day.  And I think we should declare this the end

5    of this trial day.

6            UNIDENTIFIED SPEAKER:  Can I raise one housekeeping

7    matter, Your Honor?

8            THE COURT:  Well, apparently there are a bunch of

9    people who would love to leave.  So you can certainly raise it

10   and we'll see whether or not they're going to want to leave

11   anyway.

12           UNIDENTIFIED SPEAKER:  Okay.  I'll defer to Mr.

13   Hirshon on that.

14           MR. HIRSHON:  Good morning, Your Honor.

15           THE COURT:  What?  That's your joke?

16           UNIDENTIFIED SPEAKER:  That's my joke.  It's about as

17   much as I could come up with right now.

18           THE COURT:  You can do better than that, I know you

19   can.

20           UNIDENTIFIED SPEAKER:  I know I can't.

21           MR. HIRSHON:  Your Honor, as you know, and I very much

22   appreciate the sensitivity you expressed earlier today about

23   our client being here for his testimony.  And we would be

24   willing, if everyone else was, to continue today as late as you

25   wished to go and start as early tomorrow as possible because we

209

1  had scheduled today expecting to be on today and each of us has

2  to now move our calendars a bit for tomorrow.  But it would be

3  helpful if we could begin tonight and then as early as you wish

4  to begin tomorrow morning.

5        THE COURT:  It's a modest request which I'm going to

6  deny.  While you've been sitting listening passively I've been

7  sitting listening actively, and it's tiring.  This is not an

8  emergency anymore.  We don't have to stay till midnight or 1

9  a.m. to get this done and it needs to be done right.  And the

10  right way to do it is tomorrow morning at 9:30.  And if that

11  provides an inconvenience to anybody that's what happens during

12  trials.

13        MR. HIRSHON:  I appreciate that, Your Honor.  Thank

14  you for considering it.

15        THE COURT:  Okay.  There's more housekeeping.

16        MR. GAFFEY:  Just, Your Honor, we were going to

17  exchange briefs on the -- the mini briefs on the Rule 408 issue

18  with regard to 701 and 705.  And I think we're ready to do that

19  if we can hand them up.

20        THE COURT:  And when are you expecting a decision?

21        MR. GAFFEY:  That's --

22        THE COURT:  Sometime this evening?

23        MR. GAFFEY:  -- entirely up to Your Honor.  It was

24  more a question of when you were expecting a brief.  So --

25        THE COURT:  Okay.

210

1          MR. BOIES:  It is something that I think is not an

2    urgent issue.  It is not this week's issue.

3          MR. GAFFEY:  I think in light of what's happened in

4    terms of witness scheduling, Your Honor, that's right.  Two

5    days ago I would have said it was more important, but given

6    where we are in the witness order we wouldn't be asking for a

7    decision this week.

8          THE COURT:  I'll be happy to take the briefs.  In

9    fact, why don't you hand them to one of my law clerks?

10         And this gets to a question of scheduling.  And I

11   understand Mr. Hirshon's desire to get on with it, but even

12   starting at 5:30 after a break I'm not prepared to have the

13   reporters who are here stay later than 6 o'clock at the

14   outside.  That's not a significant enough advantage that it's

15   worth starting a new witness at this time of day.  But it does

16   raise a question as to how we're going to get through this

17   week.  And we are, based on my review of the revised schedule,

18   now two witnesses behind in Mr. Montal and Mr. Burian simply

19   based upon the way the questioning has gone to this point.  I'm

20   assuming that the questioning of these witnesses may be time

21   consuming but I don't know that.  Assuming we're proceeding on

22   this schedule, we have Mr. Despins, Mr. Ricci, Mr. Cox, and Mr.

23   Diamond which we're clearly not going to complete this week.

24         Is there a revised schedule that parties have in mind

25   or have discussed?

211

1          MR. GAFFEY:  Well, the last schedule that I

2     circulated, Your Honor, was the one that says May 5th at the

3     bottom.  And you'll note too that -- and I believe your deputy

4     had it.  If Your Honor didn't I have a spare.  We are not going

5     to reach those witnesses this week if the length of examination

6     is anything to go by.

7          And Your Honor may have noticed that Mr. Marsal has

8     already dropped off that list because we had to move somebody

9     to make room for Cox, Ricci, Diamond.  The anticipation I had

10    for that was when we do Mr. Varley, the next in-person witness

11    in what we're calling phase 2, we would try and do them all

12    together.

13         What I would suggest, Your Honor, and I haven't had a

14    chance to discuss this Barclays' counsel, is to the extent we

15    do not reach Mr. Cox or Mr. Diamond that we have CEO day.

16    We'll have Mr. Varley and Mr. Diamond and Mr. Marsal all in a

17    segment on a date to be determined by Your Honor or when we

18    resume.

19         I think there are some efficiencies built into the

20    fact and as Your Honor graciously offered us the other day if

21    we can find a day or two here or a day or two there to read in

22    deposition testimony I think what that would mean is from the

23    movants' side, once we finish that up that ought to do it for

24    in-person testimony.  And I don't think the readings are going

25    to be as long as anybody anticipates.  I think we're already in

212

1  the process of trying to figure out what to skip and what to --

2          THE COURT:  Trimming it.

3          MR. GAFFEY:  But my suggestion for this week would be

4  let's stick with the order that we have.  I would like to get

5  to Mr. Ricci, at least, if we can.  So I wouldn't want what I

6  say to mean Mr. Ricci should get on a plane.  I mean, if we can

7  get to Mr. Ricci I would like to do that.

8          THE COURT:  Mr. Boies?

9          MR. BOIES:  Does that mean that we're not going to

10  reach Mr. Diamond this week?

11          MR. GAFFEY:  Well, Your Honor, I'd like to reach them

12  all but it depends on how long cross-examination goes on.

13  That's the point.  And --

14          THE COURT:  Well, I'm not --

15          MR. GAFFEY:  -- I don't mean that as blameworthy, it's

16  just --

17          THE COURT:  Without getting in the middle of your

18  colloquy, I'm simply observing that we have more witnesses than

19  we have days.

20          MR. GAFFEY:  Yes.

21          MR. BOIES:  Right.

22          THE COURT:  And I think it may be sensible for counsel

23  to confer about those witnesses who are on the list who can be

24  released for other business that they might want to have this

25  week or in the future, and that some consideration be given to

213

1    these individuals so that they don't have to be on call, in

2    effect.

3            MR. GAFFEY:  That's what I was trying to suggest, Your

4    Honor, that if I knew we would at least have Mr. Ricci for

5    Friday, right now I could say there's no way we're going to get

6    Cox and Diamond.

7            THE COURT:  Okay.

8            MR. GAFFEY:  You know?  But what I don't know is --

9            MR. BOIES:  We'll try to arrange Ricci on Friday, Your

10   Honor.

11           THE COURT:  Okay.  Now, I have -- just so you can look

12   at your own calendars -- and this is not a convenience for me

13   but these are days that I believe that I can identify for

14   potential future use.  June 14, 15, June 21, 22.

15           One of the problems with June 14, 15 is that I believe

16   June 16 is an existing Lehman omnibus day which means that from

17   my perspective that's one miserable three-day stretch.  And

18   that may mean that the 15th is a day when I will have to end

19   early because what may not be evident as I know how much

20   preparation you do to go through days like this, what you don't

21   know is how much preparation I do to go through an omnibus

22   hearing day.  And so I just -- I need to have some time for

23   that.  And very frequently there are last minute changes,

24   briefs that are filed within a day or two of the hearing that

25   need to be reviewed.  And so if I'm sitting here instead of in

214

1    there I can't prepare for the 16th.

2         So that's not ideal timing for me but those are days I

3    happen to have available on my calendar.  I'm simply giving

4    them to you for consideration, not that I have allocated them

5    to you yet.  And it depends upon the convenience of counsel,

6    the availability of witnesses, and our working together.

7         And my suggestion, as we did last time, is that we use

8    Friday afternoon for scheduling purposes as we did last Friday

9    and spend a little bit of time at the end of the court day.

10   We'll clear the courtroom and just have the lawyers who are

11   involved in the case for purposes of discussing how we can use

12   these days or some other days that I may be able to find.

13        MR. GAFFEY:  Fine, Your Honor.  And whatever days are

14   available, I mean -- I won't take the Court's time now.  We can

15   figure out how to fill those days when we confer on Friday.

16        THE COURT:  Okay, fine.

17        MR. BOIES:  Thank you, Your Honor.

18        THE COURT:  We're adjourned now.  Everybody can stand.

19        (Proceedings concluded at 5:30 p.m.)

20

21

22

23

24

25

215

1

2                              I N D E X

3

4    WITNESS              EXAMINATION BY            PAGE

5    James Kobak          Mr. Maguire              6, 202

6    James Kobak          Mr. Boies                33

7

8

9                          E X H I B I T S

10   MOVANT'S             DESCRIPTION              PAGE

11   715                  E-Mail exchange between  6

12                        Kobak and Hughes

13   555                  Koback letter to Granfield

     18

14   557                  Documents regarding four 24

15                        transfers

16   558                  Letter from Kobak to Hume  27

17   431                  E-Mail from Novakoff with  32

18                        Chase spreadsheet

19   BARCLAYS'

20   320A                 Clearer copy of Exhibit 320  161

21

22

23

24

25

216

1

2                       C E R T I F I C A T I O N

3

4       I, Esther Accardi, certify that the foregoing transcript is a

5       true and accurate record of the proceedings.

6

7       _____

        ESTHER ACCARDI (CET**D-485)

8       AAERT Certified Electronic Transcriber

9

        Also transcribed by:     Sharona Shapiro (CET**D-492)

10                               Clara Rubin (CET**D-491)

11

        Veritext

12

        200 Old Country Road

13

        Suite 580

14

        Mineola, New York 11501

15

16

        Date:  May 7, 2010

17

18

19

20

21

22

23

24

25