1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS HOLDINGS INC., et al.

            Debtors.

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS INC.

            Debtor.

- - - - - - - - - - - - - - - - - - - -x

            United States Bankruptcy Court

            One Bowling Green

            New York, New York


            May 6, 2010

            9:33 AM


B E F O R E :

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

2

1

2    HEARING re Statement of the Securities Investor Protection

3    Corporation in Support of Trustee's Motion for Relief Pursuant

4    to the Sale Orders or, Alternatively, For Certain Limited

5    Relief Under Rule 60(b)

6

7    HEARING re Objection of HWA 555 Owners, LLC to the Motions of

8    Lehman Brothers Holdings Inc., James W. Giddens as Trustee for

9    Lehman Brothers Inc., and the Official Committee of Unsecured

10    Creditors of Lehman Brothers Holdings Inc. to Modify the

11    September 20, 2008 Sale Order and for Other Relief

12

13    HEARING re Statement of the Bank of New York Mellon Trust

14    Company in Support of the Motions for (I) an Order Modifying

15    the September 20, 2008 Sale Order and Granting Other Relief and

16    (II) to Unseal Motions for Relief from September 20, 2008 Sale

17    Order (and Related SIPA Sale Order)

18

19

20

21

22

23

24

25

3

1

2   HEARING re Joint Statement And Reservation of Rights of the

3   Bank Of Tokyo-Mitsubishi UFJ, Ltd. and Lloyds TSB Bank, plc in

4   Connection with (I) Motions of Lehman Brothers Holdings, Inc.,

5   The Official Committee Of Unsecured Creditors, And James W.

6   Giddens, as Trustee For Lehman Brothers, Inc., for Certain

7   Relief Pursuant to the September 20, 2008 Sale Orders; and (II)

8   Motion of Barclays Capital Inc. to Enforce the Sale Orders and

9   Secure Delivery Of Undelivered Assets

10

11   HEARING re Australia & New Zealand Banking Group LTD's Letter

12   Regarding Rule 60 Proceedings

13

14   HEARING re LibertyView's: (A) Joinder to (i) the SIPA Trustee's

15   Motion, (ii) the Committee's Motion; and (iii) LBHI's Motion

16   for Relief from the Sale Orders or, Alternatively, for Certain

17   Limited Relief Under Rule 60(b); and (B) Objection to Barclays

18   Capital Inc.'s Motion to Enforce the Sale Order

19

20   HEARING re Joinder of Newport Global Opportunities to

21   LibertyView's: (A) Joinder to (i) the Trustees' Motion, (ii)

22   the Committee's Motion; and (iii) LBHI's Motion for Relief from

23   the Sale Orders or, Alternatively, for Certain Limited Relief

24   Under Rule 60(b); and (B) Objection to Barclays Capital Inc.'s

25   Motion to Enforce the Sale Order

4

1

2   HEARING re Motion of Debtor to Modify the September 20, 2008

3   Sale Order and Granting Other Relief

4

5   HEARING re Motion of the Trustee for Relief Pursuant to the

6   Sale Orders or, Alternatively, for Certain Limited Relief Under

7   Rule 60(b)

8

9   HEARING re Motion of Official Committee of Unsecured Creditors

10   of Lehman Brothers Holdings Inc., Authorizing and Approving (a)

11   Sale of Purchased Assets Free and Clear of Liens and Other

12   Interests; and (b) Assumption and Assignment of Executory

13   Contracts and Unexpired Leases, Dated September 20, 2008 (and

14   Related SIPA Sale Order) and Joinder in Debtors and SIPA

15   Trustees' Motions for an Order Under Rule 60(b) to Modify Sale

16   Order

17

18   HEARING re Motion of Barclays Capital Inc. to Enforce the Sale

19   Order and Secure Delivery of All Undelivered Assets

20

21   HEARING re Trustee's Adversary Complaint

22

23   HEARING re LBHI's Adversary Complaint

24

25   Transcribed by:  Lisa Bar-Leib

5

1

2    A P P E A R A N C E S :

3    JONES DAY

4        Special Counsel for the Debtors

5        222 East 41st Street

6        New York, NY 10017

7

8    BY:   ROBERT W. GAFFEY, ESQ.

9          JAYANT W. TAMBE, ESQ.

10

11   QUINN EMMANUEL URQUHART OLIVER & HEDGES, LLP

12       Special Counsel to the Official Committee of Unsecured

13        Creditors

14       51 Madison Avenue

15       22nd Floor

16       New York, NY 10010

17

18   BY:   SUSHEEL KIRPALANI, ESQ.

19         JAMES C. TECCE, ESQ.

20         RICHARD I. WERDER, JR., ESQ.

21

22

23

24

25

6

1

2    HUGHES HUBBARD & REED LLP

3         Attorneys for the James W. Giddens, SIPC Trustee

4         One Battery Park Plaza

5         New York, NY 10004

6

7    BY:   WILLIAM R. MAGUIRE, ESQ.

8

9    SECURITIES INVESTOR PROTECTION CORPORATION

10        805 15th Street, N.W.

11        Suite 800

12        Washington, DC 20005

13

14   BY:   KENNETH J. CAPUTO, ESQ.

15

16

17

18

19   BOIES, SCHILLER & FLEXNER LLP

20        Attorneys for Barclays Capital, Inc.

21        333 Main Street

22        Armonk, NY 10504

23

24   BY:   DAVID BOIES, ESQ.

25

1    BOIES, SCHILLER & FLEXNER LLP

2         Attorneys for Barclays Capital, Inc.

3         5301 Wisconsin Avenue, N.W.

4         Washington, DC 20015

5

6    BY:   HAMISH P.M. HUME, ESQ.

7         JONATHAN D. SCHILLER, ESQ.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

8

1              P R O C E E D I N G S

2         THE COURT:  Be seated.  Good morning.

3         MR. MAGUIRE:  Please the Court.  Bill Maguire for the

4    SIPC trustee.  We call Isaac Montal.  Your Honor, may I

5    approach?

6         THE COURT:  Yes.

7    (Pause)

8         THE COURT:  Good morning.  Mr. Montal, please raise

9    your right hand.

10   (Witness duly sworn)

11        THE COURT:  Be seated.

12   DIRECT EXAMINATION

13   BY MR. MAGUIRE:

14   **Q.   Mr. Montal, as you know, I'm Bill Maguire for the SIPC**

15   **trustee.  Can you please tell the Court what is your position**

16   **at the Depository Trust Clearing Corporation.**

17   **A.   I'm a managing director and deputy general counsel.**

18   **Q.   And does that organization -- did I give the name of your**

19   **organization correctly?**

20   **A.   I believe you did.**

21   **Q.   Okay.  And is that sometimes referred to as DTCC?**

22   **A.   Yes.**

23   **Q.   Can you describe briefly what is DTCC?**

24   **A.   DTCC is a holding company and it has a number of regulated**

25   **subsidiaries that provide clearance and settlement services for**

9

1    securities transactions processed throughout all of the markets

2    in the United States.  We have the DTC subsidiary, provides

3    depository services where we essentially house and keep all of

4    the -- or most of the securities certificates which are traded

5    on the markets in the United States instead of every time

6    there's a transaction that needs to be settled, physical

7    certificates haven't been moved, we do that through book entry

8    transfer on behalf of the participants at DTC.  NSCC, which is

9    another one of our regulated subsidiaries, provides the

10    clearance services.  And FICC provides similar services in the

11    fixed income area.

12    Q.    You referred to DTC as a subsidiary of DTCC.

13    A.    Correct.

14    Q.    What is the full name of DTC?

15    A.    The Depository Trust Company.

16    Q.    And what is the full name of NSCC?

17    A.    National Securities Clearing Corporation.

18    Q.    Can you describe, sir, the relationship that DTC and NSCC

19    had with Lehman prior to its bankruptcy?

20    A.    Lehman was a participant of DTC and a member of NSCC.

21    It's essentially the same thing but, for historical reasons,

22    they use different words to describe those.  Membership at DTC

23    and NSCC is not open to the public.  You have to be a bank or a

24    brokerage firm.  And approximately 500 of the larger banks and

25    brokerage firms in the United States are members.

10

1    Q.    And Lehman was one such member or participant.

2    A.    Lehman was a member and a participant and had accounts at

3    both of those.

4    Q.    And can you describe, sir, DTCC's relationship with

5    Barclays?

6    A.    Barclays was in a similar relationship.  It also had

7    accounts and was a member of both of those entities.

8    Q.    And does Barclays also have a representative on the board

9    of DTCC?

10   A.    Yes, they do.

11   Q.    And, sir, the Court has heard reference to the term

12   "clearance box", that Lehman had a clearance box at DTCC.  Can

13   you please explain what that was?

14   A.    That's not actually a phrase that we use or that is common

15   at least in our firm.  But our understanding is that people

16   were using it in a sense of the free account.  I'm not sure if

17   that's accurate as to how people are using it.

18   Q.    And what is a "free account"?

19   A.    It's an account at DTC in which the participant keeps its

20   securities, in which the securities that we have on deposit on

21   behalf of that participant are kept.

22   Q.    And does DTC have certain rights in assets that are in a

23   participant's free account?

24   A.    Yes.  To the extent that they are not designated as

25   customer securities or otherwise segregated or pledged, DTC has

11

1    rights with respect to certain of those securities that are

2    designated each day as NA or net additions.  And with respect

3    to those securities, we have -- those actually represent

4    securities that are in the account but have not yet been paid

5    for by that participant.  And we have ownership rights with

6    respect to those should the participant default at some time

7    during the day.

8        We also, in general, have a right of indemnity with

9    respect to each participant for any losses that may result as a

10   result of their consistent activity.

11   Q.   And with respect to the Lehman assets at DTC, did DTC have

12   rights over certain of those assets as long as those assets

13   remained in the Lehman box free account?

14   A.   Yes.

15   Q.   In the period leading up to the closing of the sale of

16   Lehman to Barclays, was DTCC concerned about the extent to

17   which Barclays would assume Lehman's liabilities to DTCC?

18   A.   We were concerned with Barclays or another participant

19   actually stepping into the shoes of the Lehman account and

20   Lehman's obligations.  Lehman, at that point and weeks leading

21   up to the bankruptcy, was in a pretty precarious financial

22   situation.  And DTCC, in general, was concerned about the

23   continuing obligations that Lehman had and the ability to meet

24   those obligations on an ongoing basis.  The smoothest way to

25   effect a transition of Lehman account to another entity would

12

1    have been for another entity to come in and step into the shoes

2    of Lehman taking all of its assets and assuming all of its

3    obligations.  That is, essentially, what happened in the Bear

4    Stearns situation, for example.

5    Q.    In the lead-up to the sale to Barclays, was DTCC also

6    concerned to protect the rights that it had in the Lehman

7    assets at DTCC?

8    A.    Absolutely.

9    Q.    Over the weekend of September 20 and 21, did you

10   personally participate in various conversations with Barclays

11   concerning Lehman's assets at DTCC?

12   A.    Yes.

13   Q.    Did your discussions include the subject of what assets

14   Barclays was taking from Lehman as part of that sale?

15   A.    Yes.  There were many conversations and phone meetings

16   that took place over that weekend about what assets Barclays

17   wanted to take and actually, earlier in that week, whether

18   Barclays would be willing to step into the shoes of Lehman and

19   assume all of its assets and all of its potential liabilities.

20   We were told by Barclays earlier that week that they were

21   unwilling to do that.

22   Q.    Ultimately, at the conclusion of all of your discussions,

23   what did Barclays tell you -- what assets did they tell you

24   they were taking as part of the sale of Lehman to Barclays?

25   A.    Bottom line, at the end of all of the discussions, we were

13

1    told they weren't taking anything.

2    Q.    And when were you told that by Barclays?

3    A.    It was approximately midnight on the night of Sunday,

4    September 21 going into the morning of September 22.

5    Q.    And is that the subject of your separate letter agreement

6    between DTCC and Barclays and the trustee?

7    A.    The letter agreement was designed to memorialize that

8    understanding.

9    Q.    And the purpose of that letter was to protect DTCC and its

10   rights?

11   A.    Correct.

12   Q.    Now, sir, I'm going to be asking you about a couple of

13   different time frames here.  So let me just tell you the

14   different time frames and then we'll get into specific

15   questions.  First, I'd like you to explain your role in -- with

16   respect to Lehman for the period starting with the bankruptcy

17   filing of the holding company on Monday, September 15, 2008 up

18   through the end of that week, Friday, September 19.  And then

19   through the weekend up to the conference call, the call in

20   which Barclays told you that it wasn't taking anything.  And

21   then I'll ask you some questions your letter agreement with

22   Barclays.  Is that okay?

23   A.    Try to do that.

24   Q.    So we'll start with the first time frame and that's

25   starting with Lehman's bankruptcy on September 15.  Can you

14

1    explain your role that week following the bankruptcy filing,

2    what you were doing with respect to Lehman?

3    A.   Well, as I said, we were, at that point, very concerned

4    about Lehman's financial situation, its ability to continue as

5    a participant of DTC and a member of NSCC.  At that point, we

6    had put Lehman on the highest level of surveillance within our

7    firm.  We had already reduced its debit cap or its ability to

8    receive any additional credit from DTC or NSCC.  And there was

9    constant consideration about whether or not we should cease to

10   act for Lehman on a going forward basis.

11   Q.   You mentioned a debit cap.  What is a debit cap?

12   A.   Debit cap is really the extent of the amount of credit

13   that DTCC, as an organization, is willing to extend to a

14   member.  And it's calculated based on complicated formulas as

15   to how many assets that -- the value of the assets that the

16   participant has on account, past history, lots of other things

17   that go into making that determination.

18   Q.   You also mentioned the highest level of surveillance.  Can

19   you explain what you meant by that/

20   A.   It really means that we are watching very carefully every

21   single trade and keeping close tabs on what that participant is

22   doing to make sure that we, as an entity, are not incurring

23   risk with re -- undue risk with respect to that participant.  I

24   may have neglected to say this earlier, but we, at NSCC,

25   guaranty every trade that a participant enters into should that

15

1    participant default.  On the midnight after the trade, at that

2    point, we have guarantied it.  So that if Lehman or another

3    participant would fail at any point after that, we, as an

4    entity, would be on the hook and responsible for settling those

5    trades whether it's delivering the securities that they had

6    committed to deliver or paying for securities that they had

7    committed to receive.

8    Q.    And were there substantial open trades of Lehman's that

9    had not been settled?

10   A.    Yes, there were.

11   Q.    And was there concern on the part of DTCC that it had

12   substantial exposure, potentially, in closing those trades?

13   A.    Correct.

14   Q.    What is a "cease to act"?

15   A.    A "cease to act" is a decision that we would make to no

16   longer continue to act for that participant.  We would

17   essentially close the account.  There'd be no additional trades

18   coming in.  The owner of the account, the participant or

19   member, would no longer be able to exercise any rights with

20   respect to that account to effectuate transfers.  And unless

21   another participant or member stepped into their shoes, that I

22   explained earlier, to assume all of their assets and

23   liabilities, they would essentially be out of business.

24   Q.    And over the period following Lehman's bankruptcy up

25   through the conference call and your agreement with Barclays on

16

1    the weekend, was DTCC actively considering whether to issue a

2    cease-to-act notice with respect to Lehman?

3    A.    We were.  Given the situation with Lehman, that was

4    something that was under constant serious consideration.

5    Q.    Sir, you should have in front of you a slim black binder.

6    If you wouldn't mind turning to tab 7, it's Movants' Trial

7    Exhibit 450.  And this is excerpts from DTCC's annual report

8    for 2008, is that correct, sir?

9    A.    Yes.

10    Q.    If you could turn, sir, to page 12, you'll see a section

11    with a timeline entitled "Protecting Our Members:  The Lehman

12    Bankruptcy".

13    A.    I see that.

14    Q.    And if you turn, sir, to page 13, there's a section that

15    begins "Nightmare Scenario".

16    A.    I see that.

17    Q.    And that reads "For" -- and, by the way, there's a color

18    copy, I think, behind the black-and-white copy which might be a

19    little more readable.  But that reads:  "For DTCC and its

20    subsidiaries, a nightmare was all too possible.  After all, as

21    central counterparties, they had guaranteed completion of

22    billions of dollars worth of Lehman's trades.  If they incurred

23    substantial losses when winding trades down, they would need to

24    start drawing on clearing funds their customer members

25    maintained with them in the case of defaults.  Never in its

17

1    thirty-five year history had DTCC been forced to do this."

2        Does that nightmare scenario describe, at least in part,

3    DTCC's concerns with respect to its exposure to Lehman?

4    A.    Yes.

5    Q.    Now, you mentioned the stepping into the shoes that had

6    occurred in the case of Bear Stearns.  And that's where

7    JPMorgan Chase assumed all the liabilities of Bear Stearns, is

8    that right?

9    A.    Correct.

10    Q.    In the case of Lehman, what did DTCC want Barclays to do?

11    A.    In the first instance, we discussed with Barclays that

12    they should do the same thing:  step into the shoes of Lehman,

13    take all of the assets and assume all of the liabilities.  In

14    fact, I believe sometime during that week -- it might have been

15    on Tuesday or Wednesday -- we sent them a set of standard form

16    documentation to swing the accounts from Lehman to Barclays and

17    which would have effectuated in the way that I've described.

18    Q.    And did Barclays accept that proposal?

19    A.    Barclays did not want to do that.

20    Q.    Did Barclays propose instead that DTCC should accepted a

21    limited 250 million dollar guaranty?

22    A.    They did.

23    Q.    And was that acceptable to DTCC?

24    A.    It was not.  We felt that, under ordinary circumstances,

25    the guaranties that we had received in the past in similar

18

1   situations had always been unlimited.  We didn't want to accept

2   anything less here.  The potential liabilities with respect to

3   Lehman were unknown.  And we did not think that 250 million

4   would be sufficient.

5   Q.    Sir, if you could turn to tab 2 in your binder.  That's

6   Movants' Trial Exhibit 621.  And this is an e-mail that you

7   received on or about Friday, September 19 at about 7:46 a.m.

8   from counsel for -- at Barclays.  You see that?

9   A.    I do.

10  Q.    And in that, Barclays' counsel says in the -- I'm sorry.

11  This s -- I misspoke.  This is actually from your counsel, Mr.

12  Hirshon, to Barclays' counsel Friday morning.

13  A.    Yes, and responding to the -- on the bottom of the

14  e-mail --

15  Q.    He's responding to Barclays' e-mail that he's received

16  which is at the bottom of page 7.

17  A.    Right.

18  Q.    Turning to your counsel's response, he says in the second

19  sentence, "Your proposal must go before DTCC's board and risk

20  management committee which will be done this morning.  DTCC's

21  management will recommend rejecting the proposal because of the

22  cap on the guaranty.  To be acceptable, the guaranty must be

23  unlimited."  And the proposal that he's referring to is the

24  proposal that is set forth at the bottom of the page in the

25  e-mail that was sent to Mr. Hirshon.  Is that correct?

19

1    A.    Yes.

2    Q.    And that's the proposal that Barclays would provide DTCC

3    with a limited 250 million dollar guaranty.

4    A.    Yes.

5    Q.    By the time of Friday afternoon, when the parties appeared

6    before this Court at the sale hearing, an agreement had been

7    reached whereby DTCC would get not only a limited 250 million

8    dollar guaranty but also additional collateral, some billions

9    of dollars of residential mortgage-backed securities.  And the

10   Court was advised of a modification to that effect.  If you

11   could, sir, turn to tab 3 in your binder.  It's an excerpt from

12   the transcript of the sale hearing where your counsel addressed

13   the Court on the subject of that modification.  And that's at

14   page 52 of the hearing transcript.  Starting at line 14, the

15   Court asked, " So this modification principally is for the

16   benefit of your client?"  And Mr. Hirshon responded, " Correct.

17   And for the transaction because without it, trading would have

18   stopped.  There would be no business to sell because there

19   would have been no -- no trades cleared today.  So it was to

20   facilitate the transaction as a friend to the transaction that

21   this was done so that the business continues to operate today.

22   Now, the arrangement is that the whole six billion dollars of

23   residential mortgages will be there and subject to settlement."

24        Sir, did DTC ever value any of those residential mortgage

25   securities?

20

1    A.    No.  We never received any details with respect to them,

2    CUSIP numbers, description.  We were just told that there would

3    be three billion nominal value in residential mortgage

4    securities that would be available to secure the obligations.

5    Q.    Now, let me ask you about what happened in the period

6    after the sale hearing.  Did there come a time over the weekend

7    when you learned that the residential mortgage securities

8    collateral was not, in fact, available?

9    A.    Yes.  That was on Sunday evening.

10   Q.    And what were your concerns when you learned that that

11   collateral was not available to protect DTCC?

12   A.    Same concerns that we described earlier, which is the risk

13   that the DTCC entities faced with respect to continuing to

14   guaranty the obligations of Lehman for the transactions that

15   were already conducted and which we had guarantied in the past

16   and which we were obligated to settle should Lehman default.

17   We were being asked to refrain from ceasing to act and closing

18   down the Lehman accounts.  And that's not something that we

19   ordinarily would have done in other circumstances.  We were

20   trying to facilitate the transaction.  But we needed to make

21   sure that the -- our other participants and, in fact, the

22   entire clearance and settlement infrastructure would not be put

23   at risk just for this one transaction.

24   Q.    So when you learned that the mortgage securities

25   collateral was not available, what kind of guaranty did DTCC

21

1    want from Barclays?

2    A.    Well, originally, we had -- like I said, we wanted the

3    unlimited guaranty.  We reluctantly agreed to the three billion

4    residential mortgages and the 250 million in cash.  But at the

5    point where we were on Sunday night in trying to get this

6    transaction done and trying to avoid any further turmoil in the

7    financial markets, we were left with the choice of taking the

8    250 million in cash or ceasing to act.  And we made a

9    determination given all of the considerations and all the

10   implications that were involved, to try to get the transaction

11   done and take the 250 million.

12   Q.    And when you made that decision, was that based in part on

13   Barclays' representation that it was not taking any of the

14   assets -- the Lehman assets at DTCC in which you had rights?

15   A.    Correct.

16   Q.    Did DTCC ever tell Barclays that it was prepared to allow

17   Barclays to take all of the Lehman assets without providing

18   DTCC any guaranty beyond that limited 250 million dollars?

19   A.    No.

20   Q.    Did DTCC ever tell Barclays that its concerns regarding

21   its exposure to Lehman had been in any way alleviated?

22   A.    No.

23   Q.    At any point over the weekend following the sale hearing,

24   did DTCC ever conclude that its exposure to Lehman trades was

25   substantially less than it had originally thought?

22

1    A.    No.  The decision to take the 250 was based upon it

2    essentially being the best deal that we can get, taking into

3    consideration what the consequences would be if the deal would

4    not go forward and what kind of additional turmoil that would

5    cause to the markets and everybody else involved.

6    Q.    Over that weekend, did DTCC ever indicate to Barclays that

7    it would release its rights over any assets in Lehman accounts?

8    A.    No.

9    Q.    Did DTCC ever release its rights over any assets in the

10   Lehman accounts?

11   A.    No.  We -- ultimately, we closed them out.

12   Q.    Now, I'd like to ask you, sir, about the events of Sunday,

13   September 21 and, specifically, about your discussions between

14   Barclays and -- your discussions with Barclays on the subject

15   of what assets Barclays was going to take as part of the sale.

16   Can you tell us, first of all, during the day Sunday, what

17   happened in the various calls that you had with representatives

18   of Barclays concerning what assets Barclays was going to take

19   from the Lehman accounts at DTCC?

20   A.    There was a lot of debate during that day about whether

21   there were certain assets and obligations that Barclays might

22   have been willing to assume.  They actually had a team that

23   came in very early on Sunday morning, came to DTCC's offices to

24   inspect all of Lehman's books and records which we had made

25   available, and, I guess, do whatever due diligence they wanted

23

1   to do with respect to those accounts.

2        There were numerous phone calls throughout the afternoon

3   and evening that involved discussions about whether they were

4   going to take certain DTC assets or certain NSCC rights and

5   obligations or assets out of FITC.  And there were various

6   iterations that took place along the way about what assets

7   Barclays was interested in taking.  A lot of those discussions

8   revolved around the fact that we would not agree to allow the

9   assets to be moved out of these accounts without us being

10  provided with adequate collateral in exchange for those assets.

11  And ultimately, it culminated into discussion at around

12  midnight in which we were told that they weren't taking

13  anything.

14  Q.   Now, the discussion at midnight, who led the call from the

15  Barclays side?

16  A.   I believe it was Gerard LaRocca.

17  Q.   And on the subject of what assets Barclays was taking,

18  what did Barclays tell you?

19  A.   On that particular call, they said they weren't taking

20  anything.

21  Q.   And was that important to DTCC in terms of protecting your

22  rights?

23  A.   Yes.  It ensured that the assets would be available in the

24  Lehman accounts to settle the open obligations that existed.

25  Q.   How was Barclays' agreement memorialized between DTCC and

24

1   Barclays?

2   A.   There was a letter agreement that was drafted throughout

3   the night and which was signed in the early hours of Monday

4   morning.

5   Q.   If you turn, sir, to tab 4 in your binder, this is

6   Barclays' Exhibit number 476.   This is an e-mail that you sent

7   to Ed Rosen and others on Monday morning at 3:43 a.m.   Is that

8   right, sir?

9   A.   Correct.

10  Q.   And the subject is "Barclays' Guaranty".   And you say,

11  "Attached is a guaranty revised to reflect the agreement

12  reached earlier this evening."   To what were you referring,

13  sir, when you said "to reflect the agreement reached earlier

14  this evening"?

15  A.   It was that Barclays wasn't taking any assets, that there

16  would be a 250 million dollar cash guaranty and that we would

17  start winding down the accounts of Lehman.

18  Q.   Now, sir, if you'd turn, please to tab 5.   That's -- I'm

19  sorry.   Tab 6.   This is an e-mail on which you were copied from

20  one of Barclays' counsel on Monday, September 28, 2008 at

21  around 8 a.m., Movants' Trial Exhibit 633.   You see that, sir?

22  A.   Yeah.

23  Q.   And that's the executed guaranty?

24  A.   Yes, it is.

25  Q.   If you turn, sir, to the second -- third page of the

25

1    exhibit, second page of the agreement, there's a section that's

2    entitled "Winding Down of Accounts".

3        (Pause)

4    Q.    How long was the process of winding down accounts

5    anticipated to be?

6    A.    Well, I'm not sure what you mean.  The winding down versus

7    ceasing to act -- it was certainly going to take a number of

8    weeks or longer to liquidate the entire position.  But we -- as

9    of Monday morning, we started winding down the accounts.  By

10   sometime on Wednesday after Lehman had failed to settle its

11   obligations on Tuesday, we ceased to act.

12   Q.    You'll see, sir, the first sentence of this section

13   provides:  "Barclays has indicated and hereby agrees that all

14   of the accounts of LBI maintained at the clearing agency's

15   subsidiaries (the "Accounts") constitute the excluded assets

16   within the meaning of the APA.  And you understood that the APA

17   was the asset purchase agreement between Lehman and Barclays

18   that defined what assets Barclays was buying and what assets

19   were excluded from the sale.

20   A.    Yes.

21   Q.    There's a reference to accounts here, sir.  Did you

22   understand that to refer to all of Lehman's accounts at DTC?

23   A.    At the clearing agency's subsidiaries, right, as defined

24   earlier in this document.

25   Q.    And did you understand that to include the contents of

26

1  those accounts, the assets in the accounts?

2  A.   That was our understanding.

3  Q.   Now there follows:  "Accordingly, pursuant to the

4  authority granted to the trustee", and it describes the

5  trustee's instructions to close out the pending transactions.

6  And if you go to the next paragraph, sir, it says, "As part of

7  this closeout process, the trustee hereby authorizes DTC to

8  accept and act upon instructions from NSCC to deliver

9  securities from the DTC LBI account to NSCC's account in order

10  to reduce or eliminate LBI's outstanding delivery obligations

11  to NSCC."

12       Can you tell us what is the significance or importance to

13  DTC -- or DTCC of that paragraph?

14  A.   The outstanding obligations that I described earlier, the

15  transactions that had already been entered into by Lehman

16  existed at NSCC.  That's the entity that does the clearance and

17  settlement.  The securities to be used to settle those

18  transactions are actually held at DTC, the Depository Trust

19  Company.  And typically, we have a standing instruction from

20  each participant to use their DTC positions to satisfy the

21  obligations for the transactions at NSCC.  In this case, the

22  trustee accepting and taking control of Lehman.  And we wanted

23  to be clear that the assets that existed at the -- at Lehman's

24  DTC account were going to be used to satisfy the open

25  obligations at NSCC.  And this paragraph was to memorialize

27

1    that understanding between the three parties.

2    Q.    If you look at the second line of the paragraph, you'll

3    see the words "to deliver securities".

4    A.    Right.

5    Q.    Those are the assets in the account?

6    A.    Yes.

7    Q.    And in what account are these securities?

8    A.    The DTC LBI account.

9    Q.    And who is the owner of those assets?

10   A.    Lehman acting through the trustee.

11   Q.    At any point in your discussions with Barclays on that

12   conference call in which they agreed that they were not taking

13   anything, did anyone from Barclays say or suggest that, as of

14   Monday morning, any of these securities would be owned by

15   Barclays?

16   A.    No.

17   Q.    Did at any point anyone from Barclays suggest that you

18   needed authority from Barclays to deliver assets from the box

19   to NSCC?

20   A.    No.

21   Q.    Did anyone from Barclays suggest to you that there was

22   some distinction in their mind between the accounts and the

23   assets or contents of the accounts?

24   A.    No.

25   Q.    Did anyone suggest to you that, in Barclays' view, this

28

1   transaction would enable Barclays to take all of the assets and

2   leave DTCC with an empty box?

3   A.   No.

4   Q.   Did DTCC ever agree to give up whatever rights it had in

5   Lehman's assets for nothing more than a limited 250 million

6   dollar guaranty?

7   A.   No.

8   Q.   Now, sir, if you turn to the last page of this exhibit,

9   you'll see the signature of Barclays' representative.  That's

10  Mr. LaRocca?

11  A.   I believe that's his signature, yes.

12  Q.   And was he also a member of the board of DTCC at the time?

13  A.   He was.

14  Q.   In this case, he's signing this, however, not as a

15  representative of DTCC but as a representative of Barclays

16  Capital Inc.?

17  A.   Correct.

18  Q.   Now, sir, once you had obtained this agreement with

19  Barclays, what, if anything, did you do to make sure that the

20  clarification letter that the parties to the sale were working

21  on over that weekend was conformed to reflect the details of

22  your letter agreement with Barclays?

23  A.   We did nothing.  We were not a party to that agreement.

24  We weren't a party to the APA.  We didn't believe that we had

25  any obligation or interest as to what was being dealt with

29

1  within the clarification letter.  And, in fact, the reason that

2  we insisted on having this exhibit as a separate document and

3  not be part of a clarification letter or longer document that

4  dealt with the APA was because we had limited interest to make

5  sure that these provisions were in place but did not want to

6  get involved with anything else that might have been negotiated

7  or agreed upon between the parties.

8  Q.   And, sir, in acting as a friend to this transaction and in

9  refraining from issuing a cease-to-act on Lehman's business,

10  did DTCC rely on Barclays' agreement that it was not taking any

11  assets from the Lehman accounts at DTCC?

12  A.   We relied upon the obligations and terms and conditions in

13  this letter in making that decision.

14       MR. MAGUIRE:  Thank you, sir.  I have no further

15  questions.

16       THE COURT:  Anything from the other movants?

17       MR. TAMBE:  Nothing for Lehman --

18       MR. KIRPALANI:  Nothing from the committee, Your

19  Honor.

20       THE COURT:  Cross-examine?

21    (Pause)

22       MR. SHAW:  While they distribute the binders, Your

23  Honor, I'm Jonathan Shaw from the Boies Schiller firm on behalf

24  of Barclays.

25       (Pause)

30

1     THE COURT:  Thank you.

2     CROSS-EXAMINATION

3     BY MR. SHAW:

4     Q.   Good morning, Mr. Montal.  As I just said, my name is

5     Jonathan Shaw.  I'd like to start with what I think will be

6     some fairly uncontroversial propositions and just make sure

7     that we have the same background and understanding.

8          As a practical matter, a broker-dealer in the United

9     States must own a clearing account at the DTC or its

10    subsidiaries to operate, is that right?

11    A.   Or clear through somebody else who has an account with us,

12    yes.

13    Q.   And most major broker-dealers own their own accounts, is

14    that right?

15    A.   Correct.

16    Q.   And those accounts may hold securities that are actually

17    owned by the broker-dealer or by its customers.

18    A.   Correct.

19    Q.   And the individual customers who own the securities in

20    those accounts do not own the accounts themselves, is that

21    correct?

22    A.   Correct.

23    Q.   And so, there is a distinction between owning a DTC

24    account and owning a security held in that account, correct?

25    A.   You can say that.

31

1   Q.   And so, if, for example, Barclays or one of its customers

2   were to sell IBM shares that are resident in Barclays' DTC

3   accounts to either Citibank or one of Citibank's customers,

4   those shares would be transferred by the DTC from the Barclays

5   account to the Citibank account without in any way affecting

6   Barclays' ownership of its DTC account.  Is that right?

7   A.   That's correct.  If we received an instruction from

8   Barclays to transfer securities out of its account, we would do

9   so.

10  Q.   And, in fact, every business day, broker-dealers engage in

11  millions of sales of securities held in their DTC accounts

12  without transferring the DTC accounts themselves, right?

13  A.   Yes, if you want to draw that distinction.

14  Q.   Now, this morning a little earlier, you testified about a

15  conference on the Sunday night before the closing around

16  midnight that resulted in a letter agreement between Barclays,

17  the trustee and the DTC, is that correct?

18  A.   Yes.

19  Q.   And you testified that that was one of the series of calls

20  between the DTC and Barclays that week, is that right?

21  A.   Yes.

22  Q.   And the basic issue underlying the discussions throughout

23  that series of calls from the DTC's perspective was that DTC

24  wanted to limit its exposure to the clearing list presented by

25  Lehman's impending demise, is that right?

32

1   A.   Yes.

2   Q.   I'd like you, if you would, to turn to the document behind

3   tab number 4 in the binder you were just given.  And that is

4   Exhibit 416 which, I believe, has been admitted.  Now, you

5   recognize that document, sir, as an e-mail written by DTC's

6   counsel, Mr. Hirshon, to counsel for the creditors' committee

7   last March?

8   A.   I see that.

9   Q.   Okay.  And you understood him to be responding to a

10   request for information from the creditors' committee, is that

11   correct?

12   A.   I'm actually not that familiar with this document.  So

13   if -- can I --

14   Q.   If you'd take a moment to look at the e-mail he's

15   responding to, that would be fine.

16       (Pause)

17   A.   Okay.

18   Q.   Okay.  And so, again, you understand this e-mail to be a

19   response to a request for information that was received from

20   the creditors' committee, is that right?

21   A.   Yes.

22   Q.   And let's take a look at the first paragraph of that e-

23   mail.  That reads:  "Working from memory, the gist of your

24   request is for documents that record the deal between Lehman

25   and Barclays.  Neither DTCC nor any of its clearing agency

33

1    subsidiaries (collectively, "DTCC") was a party to that deal,

2    participated in the negotiations or have any documents prepared

3    by either side to demonstrate value as assets to be purchase,

4    et cetera."  You see that, sir?

5    A.    I do.

6    Q.    And do you have any disagreement with what your counsel

7    wrote to the creditors' committee in that paragraph?

8    A.    I don't think so.  I think he's referring to the

9    residential mortgages, in particular, because I think that's

10    the focus of the inquiry.

11    Q.    But you don't take issue with anything he said in that

12    paragraph, right?

13    A.    To the extent that it relates to the residential

14    mortgages, I agree with that.

15    Q.    Well, are you taking issue with it to the extent that it

16    does not relate to the residential mortgages?

17    A.    I just don't think that this was necessarily written with

18    respect to the entire deal.  But it's focused on the

19    residential mortgages.

20    Q.    Well, you agree that the DTC was not a party to the entire

21    deal, right?

22    A.    Correct.

23    Q.    And you agree that DTC did not participate in the

24    negotiation of the deal between the Lehman entities and

25    Barclays, right?

34

1    A.    Correct.

2    Q.    Okay.  And I don't, frankly, really care about the rest of

3    that sentence.  So --

4    A.    Then we're in agreement.

5    Q.    Okay.  Now let's look at the third and fourth paragraphs

6    of that letter.  Okay.  You see that the second sentence of the

7    third paragraph begins with the words "For now"?  You see that?

8    A.    Yes.

9    Q.    Okay.  "For now, suffice it to say that each trading day,

10   DTCC and its clearing agency subsidiaries clear and settle

11   nearly all trades done on every exchange in the U.S., about

12   sixty-six million sides a day.  Every trade has a buy side and

13   a sell side."  You don't have any disagreement with what your

14   counsel wrote in that sentence, do you?

15   A.    No.

16   Q.    "It guaranties both sides, that is, it guaranties delivery

17   of the securities sold and payment for the securities bought."

18   No disagreement with that sentence?

19   A.    No.

20   Q.    "If a broker-dealer fails to deliver the securities of the

21   cash, DTCC completes the side and then seeks reimbursement from

22   failing B/D" -- I assume that means broker-dealer?

23   A.    I assume that's what he meant.

24   Q.    And, again, no disagreement with that sentence?

25   A.    Subject to the clarification that when it says that if a

35

1    broker-dealer fails to deliver, that's in the situation of a

2    default.  I'm not talking about -- or I wouldn't agree with

3    this on a day-to-day basis when a broker is supposed to settle

4    a transaction on a T plus three and deliver a hundred shares of

5    IBM and it doesn't deliver it till the next day or the next

6    week, that we actually step in and complete that obligation.

7    We're talking about a default situation.

8    Q.    Okay.  With that clarification, you don't have any

9    disagreement with what your counsel wrote?

10   A.    I do not.

11   Q.    Okay.  "DTCC monitors its risks daily.  In a broker-dealer

12   failure, the DTCC standard procedure is for DTCC to cease to

13   act.  It turns off the failing broker-dealer's access to the

14   markets so the DTCC's risk is limited to trades already in the

15   pipeline."  No disagreement with any of that?

16   A.    No.

17   Q.    "In the Lehman deal, the regulators prevailed on DTCC to

18   hold off on its usual procedures in order to facilitate the

19   transfer of LBI's broker-dealer business to Barclays by keeping

20   LBI alive instead of shutting it down."  You see that?

21   A.    Yes.

22   Q.    Do you have any disagreement with that sentence?

23   A.    Only in the sense that it was more than just the

24   regulators.  I think everybody involved in the transaction was

25   interested in it taking place in that way.

36

1    Q.    Okay.  Which regulators were prevailing on DTCC to not

2    cease to act for Lehman Brothers that week?

3    A.    As I said, I don't think it was just the regulators.  But

4    the conference calls that we were involved in involved every

5    regulator that you can possibly think of, the Fed, the SEC, the

6    Treasury, as well as the parties to the transaction.

7    Q.    Okay.  And what was your understanding of why the Fed

8    wanted the DTCC to facilitate this transaction?

9    A.    I can't speak specifically to the Fed.  I can tell you

10   that the general consensus for everybody involved in those

11   meetings was that it was in the best interest of Lehman.  It

12   was in the best interest of the financial markets, in general,

13   to have this transaction take place as a going concern.

14   Q.    And so that sentiment was expressed by the Fed, by the

15   Treasury, by the SEC, to your recollection?

16   A.    Yes.

17   Q.    And it was also expressed by Lehman itself?

18   A.    Correct.

19   Q.    By other constituencies within the broker-dealer or the

20   clearing community?

21   A.    I don't know about other constituencies within the broker-

22   dealer community.  But I think that Barclays may have been on

23   some of those calls as well.

24   Q.    Okay.  Let's focus for a moment on the concept of ceasing

25   to act.  Fair to say, 'cause I think you've already testified

37

1    this morning, that was something that the DTC would have

2    preferred to avoid entirely, is that right?

3    A.   In this situation, we were trying to avoid that at the

4    request of everybody involved.

5    Q.   Certainly in response to the request of all the regulators

6    and all the parties, but also from DTC's own perspective.  The

7    best result would be if DTC could get Barclays or some other

8    broker-dealer to take the accounts or take the risk, right?

9    A.   Yes.

10   Q.   And basically, throughout the week, I mean, your view that

11   that would be the optimal solution didn't change, right?

12   A.   Yes.  But every day that went by that that did not take

13   place, that risk remained with the DTCC entities.  And that was

14   not something that we were comfortable living with on an

15   ongoing basis.

16   Q.   And DTC, is it fair to say, was concerned that if, for

17   example, by ceasing to act, it derailed this transaction, that

18   might have consequences for the economy at large, for other

19   participants and the like, right?

20   A.   That was one of the considerations, although if we did not

21   cease to act and incurred substantial losses that would flow to

22   our other participants and put the clearance and settlement

23   infrastructure at risk, that would probably have worse

24   implications for the economy at large.

25   Q.   Well, it might or it might not, right?

38

1    A.    Correct.  But those were the considerations that we were

2    balancing during that week.

3    Q.    And you understand that some people have said in

4    connection with this transaction that the alternative to

5    approving this transaction was -- I think the word "Armageddon"

6    has been used.

7    A.    I don't know that I've heard that.

8    Q.    Well, you understand that people were very, very worried

9    that if the Court did not approve this transaction or if this

10   transaction did not close there could have been substantial

11   harm to the economy and you could have seen other banks failing

12   and the like, right?

13   A.    That's correct.  And like I've described, the flip side of

14   it as well.

15   Q.    And that was why the DTC initially came to Barclays when

16   it understood that Barclays was likely to enter into a

17   transaction to purchase Lehman's assets and ask that Barclays

18   take the LBI accounts at DTC, is that right?

19   A.    To the extent that we understood that people were

20   interested in having this sale take place as a going concern,

21   yes, that was something that we were looking for Barclays

22   through them.

23   Q.    And Barclays refused to take those accounts, right?

24   A.    Barclays did not want to provide an unlimited guaranty and

25   step into the shoes of Lehman.

39

1   Q.   Well, it didn't want to take the accounts and the

2   associated liabilities, right?

3   A.   We never spoke about it or thought about it in the context

4   of accounts.  We discussed whether or not Barclays would step

5   into the shoes of Lehman, take all of the assets and

6   liabilities and, I guess, presumably take over the accounts as

7   well.

8   Q.   And Barclays declined to do that, right?

9   A.   Yes.

10   Q.   Let's take another look at Mr. Hirshon's e-mail and,

11   specifically, the second paragraph of that e-mail.  Now you see

12   it says "As for the resi securities, the original deal was for

13   Barclays to secure DTCC's position with a 250 million dollar

14   guaranty and a pledge of one-half of the six billion dollars of

15   the resis that it was to receive in the deal or three billion

16   dollars as was mentioned at the Friday night hearing.  At no

17   time was the deal that DTCC would receive the entire six

18   billion dollars of resis."  Do you see that?

19   A.   Yes.

20   Q.   And that was the deal that was struck on the Friday of the

21   sale hearing, is that right?

22   A.   Yes.

23   Q.   And documented in the first amendment to the transaction

24   or to the APA?

25   A.   I don't know if or where it was documented.  We certainly

40

1    did not enter into any documentation with respect to that.

2    Q.    Now, we can go to the fourth paragraph, please.  And in

3    that paragraph, Mr. Hirshon writes -- and I'm looking now about

4    the middle of the paragraph:  "The idea, as expressed at the

5    hearing, was to deliver the broker-dealer intact and as a going

6    business.  The 250 million dollar Barclays guaranty and the

7    resis were to be provided to protect DTCC from any losses it

8    would incur as a result of not ceasing to act for LBI."  Is

9    that an acc -- do you accept what your lawyer has to say there?

10   A.    I think the 250 million guaranty was there to protect DTCC

11   from any losses relating to the Lehman account.  I wouldn't

12   limit it by saying from any losses it would incur as a result

13   of not ceasing to act.  The terms of the 250 million guaranty

14   are described in the DTC letter that we described earlier.

15   Q.    Sir, you remember you were deposed in this action --

16   A.    Yes.

17   Q.    -- back in February?

18   A.    Yes.

19   Q.    And you'll see behind tab number 1 of your binder, there's

20   a copy of the transcript of your deposition.  And I'd ask you

21   to turn to page 96 of your deposition transcript, sir.  And I

22   would direct your attention to the question beginning on line

23   15 which I'm not going to read back in its entirety because it

24   largely consists of reading the fourth paragraph of Exhibit

25   416, that exhibit from Mr. Hirshon.

41

1    A.    Okay.  And you were asked, "Do you see that?"  And your

2    answer was "I do."  And then you were asked, "Is there any part

3    of what Mr. Hirshon says that you disagree with?"  Do you see

4    that?

5    A.    Yes.

6    Q.    Okay.  And your response was "I'm not sure if I would have

7    characterized it as only the regulators prevailed on DTCC to

8    hold off on its usual procedures, et cetera.  But I believe it

9    was the regulators as well as all the parties involved were

10   interested and had a strong desire to transfer LBI's broker-

11   dealer business to Barclays as a going business.  Other than

12   that, I have no disagreement with anything in that paragraph

13   you read."

14         Was that your answer at the time, sir?

15   A.    That was.  But I probably realize now that I should have

16   read the paragraph a little more carefully.

17   Q.    Now, over the weekend -- you can put the deposition aside

18   now, sir.  Over the weekend, everyone learned that the resis

19   were unavailable, is that right?

20   A.    Yes, late on Sunday.

21   Q.    So the DTC returned to its request that Barclays take the

22   accounts or take the risk by providing full guaranty, right?

23   A.    That was probably discussed very briefly.  But I think it

24   was pretty clear to us from the discussions earlier in the week

25   that that wasn't going to happen.

42

1    Q.    Well, there are efforts made to try to get Barclays

2    comfortable enough with the level of risk that it might be

3    willing to take the accounts or take the risk with a full

4    guaranty, isn't that right?

5    A.    I don't know anything about that.

6    Q.    Well, there was -- DTC made Lehman's books, as you

7    testified this morning, and records relating to these accounts

8    available to Barclays for due diligence teams to inspect,

9    right?

10   A.    That was at Barclays' request to come in and look at the

11   books.    That was not at DTC's request for Barclays to become

12   comfortable to give us an unlimited guaranty.

13   Q.    But ultimately, at the end of the day, Barclays refused to

14   take the accounts, right?

15   A.    Barclays refused to give us the unlimited guaranty and

16   told us they weren't going to take anything.

17   Q.    And they told you they weren't going to take the accounts,

18   right?

19   A.    They didn't say accounts.    They said they weren't going to

20   take anything.    I don't know if you're trying to draw that

21   distinction or not.    I know that's become an issue in this

22   case.    So I'm trying to be careful about how I answer the

23   question.

24   Q.    Well, Barclays refused to take any -- the risk by

25   providing an unlimited guaranty, right?

43

1    A.    Yes.

2    Q.    Okay.  And Barclays refused to take the accounts, right?

3    A.    Yes.

4    Q.    And as we've just mentioned, during this time, DTC was

5    under a great deal of pressure or was subject to a great deal

6    of persuasion not to block this transaction, right?

7    A.    I think we discussed earlier that everybody was interested

8    in having the deal proceed as a going concern.

9    Q.    Okay.  Was there any discussion at DTC about the fact that

10   DTC did not want to be blamed for blocking or causing this

11   transaction to fail?

12   A.    I need to assert attorney/client privilege with respect to

13   any internal DTC discussion that I was part of.

14        (Pause)

15   Q.    Sir --

16        MR. SHAW:  Your Honor, we really ought to be able -- I

17   believe this man is the DTC 30(b)(6) representative.  And we

18   think we're entitled to inquire into what the DTC knew and

19   considered as it made these decisions.

20        THE COURT:  Well, you may be.  I assume that questions

21   were asked during his deposition that may have gotten close to

22   the attorney/client privilege or may have resulted in a claim

23   of attorney/client privilege.  The witness has been asked a

24   question about something that he's refusing to answer on the

25   grounds of privilege.  You can certainly ask him questions to

44

1    his knowledge that do not impinge on the privilege.  You're

2    free to ask other questions.  Just have to ask the right ones.

3         MR. SHAW:  Okay.

4    Q.   Sir, are you aware of any discussions between non-lawyers

5    at the DTC -- and by "non-lawyers", I mean people not operating

6    in a legal capacity as opposed to people without a law degree

7    since there may be a difference -- about whether DTC was

8    concerned that it might be blamed for blocking this deal or

9    causing it to fail?

10   A.   No.

11   Q.   Do you know whether any such discussions -- do you know

12   whether that was a consideration that DTC took into account in

13   reaching the decisions that it did?

14   A.   Any knowledge I would have to answer that question would

15   be based upon attorney/client privilege.

16       (Pause)

17   Q.   Did you yourself believe that there was a risk that DTC

18   would be blamed for causing this deal to fail?

19   A.   Any knowledge I would have with respect to that issue

20   would be based upon privileged conversations and information.

21   Q.   No.  Sir, I don't think so.  I didn't ask if anyone told

22   you that.  I asked if you yourself believed that there was a

23   risk that DTC would be blamed if this deal did not go forward.

24   A.   I still think that any information I have to answer that

25   question would be information that I would have received in an

45

1   attorney/client capacity.  And beyond that, I don't know that I

2   would have an opinion one way or another.

3   Q.   Okay.  And again, I'm not asking you what anybody told

4   you.  I'm asking you as someone who participated in these

5   events whether it crossed your mind at any point that weekend

6   that DTC would be blamed -- ran the risk of being blamed if

7   this deal did not go forward because the DTC interposed itself

8   in some way.

9   A.   Are you asking me to put aside any information I have with

10  respect to attorney/client information and then answer the

11  question?

12  Q.   No.  I'm asking you, sir, to tell me what you yourself

13  were thinking that weekend.

14  A.   I don't know that I thought about that aspect of it.

15  Q.   So if I understand your response correctly, you're saying

16  that the thought that DTC -- that you're saying that you are

17  not sure, as you sit here today, whether the thought that DTC

18  might be blamed crossed your mind over the course of that

19  weekend.

20  A.   Sitting here today, I don't have a specific recollection

21  of thinking about that over that weekend.

22  Q.   And let me ask again, is it your understanding, sir, that

23  that was a concern for the DTC that weekend?

24  A.   Any information I would have to answer that question would

25  be based upon privileged conversations or information.

46

1    Q.    Okay.  Well, you understand that you were designated as

2    the DTC's 30(b)(6) witness, correct?

3    A.    Yes.

4    Q.    And you conducted an investigation to find DTC's best

5    testimony on issues relating to this transaction, right?

6    A.    Yes.

7    Q.    Okay.  And that was with the intent of offering testimony

8    in the DTC's behalf, sir, right?

9    A.    Yes.

10   Q.    And based on your investigation to prepare yourself to

11   become a 30(b)(6) witness on behalf of the DTC, did you learn

12   that the DTC was concerned about the risk that it would be

13   blamed if this transaction cratered as a result of the DTC's

14   actions?

15   A.    I did not learn about any non-privileged conversation or

16   information in connection with that.  And if there was a non-

17   lawyer sitting up here on behalf of DTC, I think you'd get the

18   same response.

19   Q.    How about prior to the weekend?  Did DTC have that concern

20   at any point prior to the weekend?

21   A.    I don't know -- let me answer the question this way which

22   is that we participated in many conversations in which

23   everybody expressed the importance of trying to get this deal

24   done as a going concern.  There was no discussion about blame.

25   Q.    And is that prior to the weekend you're answering with

47

1    respect to?

2    A.   Yes.

3    Q.   Did you participate in any conversation where there was a

4    discussion about blame over the weekend?

5    A.   I don't know that we used those words.

6    Q.   All right.  I'm not concerned about the words at the

7    moment, sir.  What I'd like to know is whether there was a

8    discussion which, in sum or substance, was a concern that the

9    DTC would be blamed if this deal cratered due to the DTC's

10   actions.

11   A.   Any conversation that might have taken place about that

12   was with the lawyers and would be privileged.

13   Q.   Did you have any knowledge, or did DTC have any knowledge

14   or concern, about potential blame?

15   A.   Can you repeat that?

16   Q.   Sure.  Let me rephrase that actually.  In the

17   conversations that DTC had with the regulators who we discussed

18   earlier or with other market participants, did anyone express

19   the view that it would be -- that DTC would be blamed for

20   causing this transaction to crater and all of the consequences

21   that would result therefrom if it did not go forward with it?

22   A.   Not in those terms.  It was expressed as the importance of

23   getting the transaction done as a going concern.

24   Q.   Okay.  Without giving me the content of any privileged

25   communication concerning whether DTC was concerned that it

48

1    would be blamed, sir, if there were any such discussions, tell

2    me who was present for those discussions:  lawyers, nonlawyers.

3    What I'm asking for, sir, is I want to find out the basis for

4    the assertion of privilege.

5    A.    All the internal discussions that happened that weekend

6    were with the presence of counsel, myself, Larry Thompson,

7    who's the general counsel.  At times there were other lawyers,

8    in-house lawyers as well as Mr. Hirshon from Proskauer and some

9    businesspeople.

10   Q.    And who were the nonlawyers who were present for those

11   discussions?

12          MR. MASHBERG:  Your Honor, Gregg Mashberg.  I

13   represent DTCC and I'm just concerned some of these privileged

14   questions --

15          THE COURT:  Why don't you come forward and identify

16   yourself so that the transcript at least reflects who you are

17   and can pick up your words.

18          MR. MASHBERG:  Forgive me for interrupting the

19   examination, Your Honor.  My name is Gregg Mashberg from

20   Proskauer Rose.  I represent DTCC and Mr. Montal.  And I'm

21   concerned, although Mr. Montal has been handling himself, I'm

22   concerned we're at a point now where the implications of his

23   question is going to perhaps reveal privileged information.

24   And if the question were asked, in general, who were the

25   businesspeople who were involved in the discussions overall, I

49

1    don't think there's any privileged implications to that.  But

2    if we're going to be asking questions hypothetically if there

3    was such a conversation who would be the businesspeople who

4    would be involved, I think that that is getting very close to

5    disclosing whether or not there was privileged communication.

6         THE COURT:  I understand your concern.  Why don't you

7    sit down in front of the bar just in case you want to hop up

8    again conveniently at some point during the rest of this

9    examination?  I don't believe that the question which has been

10   asked that prompted your interruption gets to the question of

11   the substance of any communications between the various lawyers

12   who have been identified and the as yet unidentified

13   businesspeople.  All that Mr. Shaw, I believe, is asking at

14   this point is who were the businesspeople who were involved

15   during the weekend when conversations took place that may

16   involve privileged communications.  If the question is asked in

17   the way I've just stated it, is that a source of concern for

18   you?

19        MR. MASHBERG:  So long as the question is broad and

20   doesn't imply that there was such a communication 'cause I do

21   believe if the fact of whether or not that specific subject was

22   discussed would implicate privileged information.  I think a

23   general question like that is okay.  But it just can't imply or

24   assume that there was such a conversation.

25        THE COURT:  I think all that we're doing at this point

50

1   is determining who was present.  And let's proceed on that

2   basis.  And what happens next, we'll see what happens.

3   BY MR. SHAW:

4   Q.   I take it, sir, that you have in mind specific discussions

5   that you are asserting a privilege.  And all I'm trying to do,

6   as His Honor pointed out, is find out who the businesspeople

7   who were involved in those discussions were.

8   A.   I think I started to answer that all of the discussions

9   and meetings that weekend were with the lawyers and the

10  businesspeople.  And I think I've identified some of the

11  lawyers for you.  And amongst the businesspeople who were

12  involved were Don Donahue, Mike Bodson, Tom Costa, Susan

13  Cosgrove.  There were probably others whom I'm not remembering.

14  Q.   And when you say there were probably others whom you're

15  not remembering, are you referring to exclusively employees of

16  the DTC?

17  A.   Yes.

18  Q.   And when did these discussions that you have in mind take

19  place, sir?

20  A.   I said the entire weekend.

21  Q.   And where did these discussions take place?

22  A.   At 55 Water Street.

23  Q.   And the general subject matter of these discussion was

24  whether the DTC should go forward with this trans -- should

25  cease to act or not cease to act on certain terms, is that

51

1    correct?

2    A.   The general subject of the discussions that weekend were

3    the Lehman situation and various aspects of it.

4    Q.   And just so I'm clear, sir, are you claiming privilege

5    with respect to all internal DTC conversations that weekend?

6    A.   Yes, to the extent that the lawyers were present.

7    Q.   And that's true whether or not the issue was the business

8    decision that DTC was going to make or a request for legal

9    advise.  Is that your position, sir?

10   A.   I think that the -- there were no business decisions that

11   didn't implicate legal issues.  I think all of the decisions

12   that we were making had legal aspects to them and business

13   aspects to them.

14   Q.   And so you're, as I understand it, taking the position,

15   that the subject of DTC's deliberations is a closed book under

16   the privilege.  Is that correct, sir?

17   A.   My position is that to the extent that we had

18   conversations with outside parties and had discussions with

19   them, there's certainly no privilege with respect to that.  And

20   I'm happy to answer any questions relating to that.  But with

21   respect to internal discussions in which the lawyers were

22   involved, I think that's privileged.

23   Q.   Now, sir, you testified extensively on direct examination

24   about what you understood DTC to have wanted, right?

25   A.   Yes, which we conveyed to Barclays and which we conveyed

52

1    to the other parties involved.

2    Q.   Okay.  And the source of your information about what DTC

3    wanted is these conversations that we're talking about, right?

4    A.   Like I said, I'm happy to answer conversations -- to

5    answer questions and provide information with respect to

6    conversations that we had with third parties.  And that's what

7    the basis of my answers were.

8    Q.   No, sir.  I'm not talking about conversations with third

9    parties.  I'm talking about when you were asked what did DTC

10   want, what was DTC concerned about, et cetera, that was based

11   on the information that you gleaned during these conversations

12   that you're now saying to me are privileged, right?

13   A.   All of that was conveyed to Barclays, Lehman and the

14   regulators in the discussions that I described in my testimony.

15        MR. SHAW:  Your Honor, we would ask that the witness

16   be directed to respond to the questions that I'm asking about

17   these conversations at DTC.

18        THE COURT:  Why on earth is this relevant?  Why are

19   you even concerned about it?  I've been listening to this for

20   the last twenty minutes and I don't get it.

21        MR. SHAW:  Your Honor, the point that I'm trying to

22   make is that DTC had very strong motivations to proceed with

23   the deal on the terms actually offered by Barclays which was

24   250 million dollars.  That would have overridden --

25        THE COURT:  I'm reminded of an objection that was made

53

1   yesterday by Mr. Boies concerning unexpressed subjective

2   intent.  I don't care --

3         MR. SHAW:  Then I will move on, Your Honor.

4         THE COURT:  -- about what was going on within the

5   halls of 55 Water Street.  I only care what was said and what

6   people did.  And that's all you should care about.

7         MR. SHAW:  Then I will move on, Your Honor.

8         THE COURT:  Please do.

9       (Pause)

10  BY MR. SHAW:

11  Q.   Let's look back at Mr. Hirshon's e-mail, sir,

12  specifically, the last sentence of the fourth paragraph.  That

13  reads, "As I said, the resis were pulled from the deal leaving

14  only the Barclays guaranty.  And after an internal review of

15  the situation, DTCC accepted the revised deal."  You see that,

16  sir?

17  A.   Yes.

18  Q.   Okay.  And that statement by your counsel is one that you

19  would accept as correct, right?

20  A.   Yes.

21  Q.   And just so we're clear, what you understand to be the

22  revised deal, is the deal set forth in the DTCC letter, right?

23  A.   Yes.

24        MR. SHAW:  Your Honor, this might be, if the Court

25  wishes, an opportune time to take a -- the morning recess.

54

1          THE COURT:  Be happy to take a recess.  We'll break

2     for fifteen minutes.

3          (Recess from 10:52 a.m. until 11:17 a.m.)

4          THE COURT:  Be seated.

5     RESUME CROSS-EXAMINATION

6     BY MR. SHAW:

7     Q.   Mr. Montal, we talked earlier today about many calls that

8     took place between Thursday and Sunday with Barclays, is that

9     right?

10    A.   Yes.

11    Q.   Okay.  How many calls were there, sir?

12    A.   I don't know how many.

13    Q.   Were there any in-person meetings with Barclays to discuss

14    these issues?

15    A.   I don't believe so.

16    Q.   And when was the first call?  Thursday?

17    A.   There are certain calls that I have specific recollections

18    about.  There were a lot of events that were taking place

19    during that week and weekend.  And I could not tell you if the

20    first one was on Thursday or Wednesday or Tuesday.  I really

21    don't have a specific recollection about that.

22    Q.   Well, how many calls do you have a specific recollection

23    about, sir?

24    A.   Most clearly, probably around three of them on Sunday

25    evening.

55

1    Q.   Okay.  And of the total number of calls that there were,

2    those three would be about, what, half?  Ten percent?  What?

3    A.   I wouldn't want to guess.  I have no idea.

4    Q.   Can you tell me when the three calls that you have any

5    specific recollection about took place on Sunday?

6    A.   Specifically, on Sunday evening in the discussions about

7    what Lehman -- what Barclays was going to take or not going to

8    take.

9    Q.   No, sir.  Just unclear.  I just want to know the times.

10   Can you tell me when those three calls took place on Sunday.

11   A.   Sunday evening.

12   Q.   And can you give me approximately the time of the first

13   call?

14   A.   No.

15   Q.   Can you give me approximately the time of the second call?

16   A.   No.

17   Q.   And how about the third call?

18   A.   That was around midnight.

19   Q.   Okay.  Can you tell me who was on the first call for the

20   DTCC?

21   A.   I believe it would have been myself, Larry Thompson, Don

22   Donahue, Tom Costa, maybe Mike Bodson.  And I don't remember if

23   there were others.

24   Q.   Okay.  And can you tell me who was on the call from

25   Barclays?

56

1   A.   Excuse me.  I left off Shelly Hirshon.  Sorry about that.

2   Q.   Can you tell me who was on the call from Barclays, sir?

3   A.   I know that Gerard LaRocca was on that call.  And he had a

4   bunch of other folks with him.  I don't remember specifically

5   who they were.

6   Q.   Okay.  Do you recall whether you spoke at all on that

7   call?

8   A.   I don't.

9   Q.   How about Mr. Thompson?  Do you recall him speaking on

10  that call?

11  A.   I don't specifically remember him saying something or not

12  saying something.

13  Q.   Okay.  What about Mr. Donahue or Donahoe.  I'm sorry.

14  I --

15  A.   Yes.  I'm sure he spoke.

16  Q.   Do you recall anything specific that he said during that

17  call?

18  A.   It was a discussion around what Barclays was going to take

19  or not going to take.

20  Q.   Okay.  Do you remember anything that he specifically said,

21  however, during that call?

22  A.   If you're asking me to repeat the words that he spoke, I

23  cannot.

24  Q.   Okay.  Can you remember --

25       MR. SHAW:  Strike that.

57

1   Q.   Mr. Costa -- do you remember anything that he said during

2   that call?

3   A.   Not spe -- if you're asking me to repeat the words he

4   said, no, I could not do that.

5   Q.   Can you tell me anything that Mr. Bodson said during that

6   call?

7   A.   Same answer.

8   Q.   Okay.  And Mr. Hirshon?  Anything that he said that you

9   can recall?

10  A.   No.

11  Q.   Okay.  Can you tell me anything specifically that Mr.

12  LaRocca said during that call?

13  A.   I can tell you the sum and substance of the conversation

14  on both sides.  I can't tell you, with respect to that first

15  call, the specific words that people spoke.

16  Q.   Okay.  Can you recall what anybody said on that call who

17  spoke?

18  A.   I do remember one specific colloquy in which there was --

19  I believe it was Mr. LaRocca who said that they wanted to take

20  certain assets.  And he was interrupted by somebody else on the

21  Barclays side who said no, no, no.  We're not taking that.  And

22  there was some back and forth about that.

23  Q.   Do you --

24  A.   I do remember that specific exchange on the phone.

25  Q.   Okay.  And that was an exchange entirely within the

58

1   Barclays side, is that correct?

2   A.   With us on the phone.

3   Q.   And do you know what specific asset that was?

4   A.   I don't.

5   Q.   Was anyone other than a representative of the DTC or

6   Barclays on that call?

7   A.   Not that I remember, no.

8   Q.   Okay.  Did the trustee or any representative of the

9   trustee participate in any of these three calls?

10   A.   I don't think so.

11   Q.   Did anyone from Lehman participate in any of these three

12   calls?

13   A.   I don't think so.

14   Q.   All right.  Moving on to the second call, do you recall --

15   can you tell me who was on that call?

16   A.   It was myself, Shelly Hirshon and a representative of

17   Barclays whose name I don't remember.

18   Q.   And can you remember anything that was said by any of

19   those people on that call?

20   A.   It was a discussion and a request from the individual from

21   Barclays to take certain specific fixed income assets.

22   Q.   Can you tell me which fixed income assets in particular?

23   A.   I believe it was the book of TBAs.

24   Q.   Anything else you can recall being discussed on that

25   particular call?

59

1    A.    That was the sum and substance and focus of that call.

2    Q.    All right.  Now, the third call, the one around midnight,

3    who was on that call, sir?

4    A.    Mr. LaRocca, other people from Barclays whose names I

5    don't remember, Don Donahue, Larry Thompson, myself, Mr.

6    Hirshon, Tom Costa and there may have been others in the room.

7    I don't remember.

8    Q.    Did the trustee or any representative of Lehman

9    participate in any of the calls prior to the three we've been

10   discussing in the last couple of minutes.

11   A.    They certainly participated in calls on -- prior to the

12   weekend, there were certain calls with them with respect to the

13   entire transaction, yes.

14   Q.    Okay.  But on the weekend, you don't believe that anyone

15   from the trustee or from Lehman participated in any of the

16   calls?

17   A.    There were probably calls earlier in the day in which

18   Lehman participated that related to whether or not JPMorgan

19   Chase was going to continue as a settling bank for the Lehman

20   entities.  There were a couple of other calls that day that

21   didn't focus on what assets Barclays was taking but were

22   focused on some other things related to the Lehman situation in

23   which Lehman, I believe, or its representatives participated.

24   Q.    And just so I'm clear on what you're saying, if I

25   understand you correctly, no representative of Lehman or the

60

1    trustee participated in any discussions concerning what assets

2    Barclays was taking, is that right?

3    A.    Not that I remember.

4    Q.    Now, you've testified, sir, that you recall somebody

5    saying we're not taking anything.  Is that right?

6    A.    Yes.  I believe I said that was Mr. LaRocca.

7    Q.    Now, sir, turn to your deposition, page 119, please.  And

8    if you'll begin at line 16, you were asked, "Referring back to

9    the Sunday night/Monday morning conversation, who from Barclays

10   made a statement during that conversation concerning Barclays

11   not taking anything?  Mr. Maguire asked you a number of

12   questions about somebody saying that Barclays is not taking

13   anything.  And what I'd like to know is who specifically used

14   those words and what did they say."  And then there's a bit of

15   colloquy that I think takes us over onto the next page.  And

16   your response was, "I can't remember with certainty who said

17   that."

18        Was your testimony truthful and accurate at that time,

19   sir?

20   A.    Yes, it was.

21   Q.    So are you now more certain that Mr. LaRocca was the

22   person who said that?

23   A.    Yes.

24   Q.    And what is the basis for your additional certainty, sir?

25   A.    I thought about it some more.  I prepared for this

61

1    testimony.

2    Q.   Well, you prepared for your deposition testimony as a

3    30(b)(6) witness, hadn't you?

4    A.   I had.

5    Q.   Have you subsequently reviewed an additional document or

6    had a conversation with someone to refresh your recollection?

7    A.   I spoke with my lawyers.

8    Q.   And did your lawyers remind you that they thought Mr.

9    LaRocca had spoken?

10   A.   I don't think it was my lawyers reminding me but in the

11   context of preparing for the deposition, I went through the

12   events of that evening and I now believe that it was Mr.

13   LaRocca who said that.

14   Q.   Now, was Mr. LaRocca's statement a response to some

15   particular statement by someone else?

16   A.   It was probably in response to the open question that we

17   were dealing with throughout the course of that evening, which

18   was what assets, if any, was Barclays taking and what

19   collateral would be made available to the DTCC entities to

20   secure it against any attendant risk.

21   Q.   If I understand your response correctly, that's what you

22   think might have happened, but you don't have a recollection

23   one way or the other specifically, right?

24   A.   No.   I -- if you're asking me did the conver -- who

25   started the conversation, who started by saying hello and who

62

1    answered, I couldn't answer that question.  But I -- the

2    conversation specifically was to try to reach resolution on

3    what assets Barclays was taking and what collateral DTCC was

4    getting.

5    Q.   What did you do to prepare for your testimony today, sir?

6    A.   I met with my counsel and I've reviewed documents.

7    Q.   And how long did you meet with your counsel, sir?

8    A.   A couple of days.

9    Q.   Full days?

10   A.   They spanned a full day, but there were lots of

11   interruptions.

12   A.   Take a look at tab 2 of your binder, sir, which is a copy

13   of the DTC letter, BCI number 6, sir.  And I'd like to direct

14   your attention to the second page of that document, in the

15   paragraph numbered 1, and headed "Winding Down of Accounts".

16   And I'd direct your attention to the first sentence of that

17   paragraph which reads, "Barclays has indicated and hereby

18   agrees that all of the accounts of LBI maintained at the

19   clearing agency subsidiaries, the accounts constitute excluded

20   assets within the meaning of the APA."  Do you see that, sir?

21   A.   Yes.

22   Q.   Now, I understand you have your own views about what

23   that -- about how that language should be interpreted, but I

24   take it you would agree with me that that language does not

25   expressly mention the securities in those accounts, does it?

63

1    A.   No.

2    Q.   No, it doesn't mention it, or no, you don't agree with me?

3    A.   No, it doesn't mention it.

4    Q.   Now, still focusing on numbered paragraph 1, I'd like to

5    direct your attention to the remainder of that first paragraph.

6    So now we're on the second sentence, and that says,

7    "Accordingly, pursuant to the authority granted to the trustee

8    and the orders, the trustee hereby instructs the clearing

9    agency subsidiaries to close out the pending transactions in

10   the accounts to clearing agency subsidiaries and to use the

11   proceeds in accordance with the rules and procedures of the

12   clearing agency subsidiaries.  Such liquidation transactions

13   shall be transferred to and closed out by the relevant clearing

14   agency subsidiary in the same manner as it closes out positions

15   of participants, members for whom it has ceased to act.  As

16   part of this closeout process, the trustee hereby authorizes

17   DTC to deliver securities from the DTC LBI account in order to

18   reduce or eliminate LBI's outstanding delivery obligations to

19   NSCC."  Do you see that, sir?

20   A.   Yes.

21   Q.   At that time, there were many outstanding Lehman

22   transactions awaiting settlement.  Is that right?

23   A.   Yes.

24   Q.   And the language I've just read to you was all related to

25   closing out transactions that had begun but had not yet been

64

1   completed, right?

2   A.   Yes.

3   Q.   And as you understood it, the whole point of that language

4   was to allow those trades that were in progress to finish,

5   correct?

6   A.   Could you just read that back again, the question?

7   Q.   Yes.  As you understood it, the whole point of that

8   language was to allow those uncompleted trades that were in

9   progress to finish, right?

10  A.   Well, it was -- that's one of the purposes.  But also to

11  use the proceeds in accordance with the rules and procedures of

12  the clearing agency subsidiaries.

13  Q.   Okay.  And the trustee's authorization for that activity

14  was required because the trustee was the holder of the

15  accounts, right?

16  A.   I don't think -- I don't think that we needed specific

17  written authorization in this document, and we probably could

18  have taken the same steps without it.  But given the

19  negotiations that had gone on and given the questions about who

20  was taking what and -- we wanted to be absolutely clear that

21  everybody understood what we were going to do on a going-

22  forward basis, and get everybody's agreement with respect to

23  that.

24  Q.   Now, the DTCC was -- I think you testified this morning,

25  and I just want to confirm it -- you were not a party to the

65

1    clarification letter, right?

2    A.   Correct.

3    Q.   And in fact, the clarification letter was not something

4    DTCC ever intended to be a party to, and therefore, it was not

5    something that DTCC or its counsel focused on.  Is that right?

6    A.   Correct.

7    Q.   So if the trustee, in the clarification letter, agreed to

8    the transfer of unencumbered clearance box assets to Barclays,

9    that was not DTCC's issue, right?

10   A.   To the extent it was not inconsistent with this DTCC

11   letter.

12   Q.   Okay, sir, I would like you to look at page 123 of your

13   deposition, please.  And specifically beginning at line 19, you

14   were asked:

15   "Q.  So if the trustee in the clarification letter agreed to

16   the transfer of certain assets to Barclays, that was not DTCC's

17   issue, correct?  Or is that correct?"

18        And then after some colloquy, which I think takes us to

19   the next page, you answered, "That's correct, we were relying

20   on Exhibit 52."  And Exhibit 52, I'll represent to you was the

21   same as BCI Exhibit 6, the DTCC letter.

22   A.   The DTC letter?

23   Q.   Yes.  Was that testimony truthful and accurate at the

24   time, sir?

25   A.   Yes.  And I think that's the answer that I just gave you

66

1    as well to your question.

2    Q.   Now, I want to make sure I understand DTC's position that

3    you stated this morning.  Your position is that under the DTC

4    rules, DTC has rights to securities in a participant's free

5    account, only if those securities are designated net additions

6    or NA.  Is that correct?

7    A.   No.

8    Q.   What other rights do you believe there are -- well,

9    actually, strike that for the moment.  Now, after your

10   deposition you submitted an errata sheet.  Is that correct?

11   A.   Yes.

12   Q.   And you'll see, if you turn to tab 1 of your deposition,

13   that your errata sheet is attached to the back of the

14   deposition, sir.  It's behind a -- it should be behind a blue

15   slip.

16   A.   Okay.

17   Q.   And that errata sheet you prepared in consultation with

18   your counsel and with your colleagues at DTCC, right?

19   A.   Yes.

20   Q.   And that's because you wanted to make sure your 30(b)(6)

21   testimony on behalf of DTCC was as accurate as possible, right?

22   A.   Correct.

23   Q.   Now, first, let me just ask you, is the document that you

24   see attached to the back of this deposition, do you recognize

25   that as your errata sheet?

1    A.    I believe it is.

2    Q.    And now look at the first entry on the errata sheet, and

3    which is a correction for the testimony that appeared at page

4    14 lines 10 through 17 of your deposition, in which you were

5    responding to the question, "And did DTC have any rights over

6    the assets in the free account?"

7         In your original answer, you stated, "We have a lien on

8    all of the assets in the accounts."  Right?

9    A.    Yes.

10   Q.    And then your corrected response reads, "Yes, to the

11   extent that securities on deposit in the Lehman 074 account

12   were designated net additions, NA, DTC had the rights of a

13   holder or an owner of those securities.  NA is defined in DTC

14   Rule 1."  Is that correct?

15   A.    Yes.

16   Q.    Now, look at the second entry on your errata sheet which

17   deals with the testimony that appeared in the transcript of

18   your deposition at pages 29 and 30.  At deposition you were

19   asked, "So DTC had a lien on the assets in the free account and

20   was not prepared to release that lien unless there was an

21   adequate substitute collateral that was provided to DTCC?"

22        And your response to that question was, "Correct."  Did I

23   read that correctly?

24   A.    You did.

25   Q.    Then in your errata sheet, you changed that response as

68

1    follows:  "Correct, although it is not properly described as a

2    lien.  Rather, DTC possessed the rights of a holder over the

3    assets in the free account to the extent such assets were

4    designated NA."  Is that correct?

5    A.    Yes.

6    Q.    So in those revised responses, which you had a couple of

7    months to work on, you made clear that DTC had rights to

8    securities in a participant's free account only if those

9    securities were designated net additions or NA, right?

10   A.    The question related to a lien on the assets.  To the

11   extent that they were talking about liens, that is correct,

12   that it applies to the assets designated as NA.  DTC has a

13   general right against all of the assets of any of its

14   participants with respect to losses that may be incurred as a

15   result of the events relating to that participant.

16   Q.    And is that general right one that arises under the DTC

17   rules?

18   A.    Yes.

19   Q.    Which rule, specifically, sir?

20   A.    There are indemnity provisions that are -- exist

21   throughout the rules, including DTC Rule 6, Rule 20.  There may

22   be others as well, but those are the ones that come to mind

23   right now.  But that's different than the lien-type discussion

24   that we were having.

25   Q.    Now, sir, if some of the clearance box securities -- well,

69

1    let me back up a second.  You're aware there's a list of

2    securities that Barclays claims that were in LBI's DTCC

3    clearance boxes as of the closing, right?

4    A.   Can you repeat that?

5    Q.   Yes.  You are aware, sir, that there is a list of

6    securities in LBI's DTCC clearance boxes as of the closing,

7    that Barclays claims in this litigation.  Is that right?

8    A.   Very generally speaking, yes.

9    Q.   Has DTC done any work to analyze that list to determine

10   which, if any, were designated NA as of the time of closing,

11   sir?

12   A.   No.  I don't know that we've ever seen the list.

13   Q.   If -- now a security that's been pledged or segregated

14   cannot be NA, right?

15   A.   Correct.

16   Q.   And in fact, if a security had been pledged to Barclays,

17   then as of the Friday before the closing, that would not be a

18   security that DTC was looking to secure its interests with,

19   right?

20   A.   If it was pledged through our system?

21   Q.   Yes, sir.

22   A.   And designated as such, yes.

23   Q.   And DTC ceased to act for LBI on Wednesday the --

24   September 24, 2008, correct?

25   A.   Yes.

70

1    Q.   And on that date, all securities in the LBI accounts that

2    had been designated NA were swept into a DTC account, right?

3    A.   Yes.

4    Q.   An 1198 account?  Is that the designation?

5    A.   That might be the number.

6    Q.   And so any securities remaining in LBI's accounts and

7    available for delivery after the 24th were not -- were, by

8    definition, not NA securities, right?

9    A.   They were not NA securities, but they were available for

10   settlement of transactions that were pending for the Lehman

11   account.

12   Q.   Sir, my question was, they're not NA securities, right?

13   A.   Correct.

14   Q.   And so any clearance box securities transferred to

15   Barclays on September 29th or 30th, were, by definition, not NA

16   securities, right?

17   A.   Securities transferred out of the Lehman account?

18   Q.   Yes, sir.

19   A.   On the 29th?

20   Q.   29th and 30th?

21   A.   Would not have been NA securities.

22   Q.   Now, looking again at your errata sheet, sir, which is at

23   the back of tab 1, in the second paragraph of your first

24   corrected answer -- or your response to the second question

25   that you correct there, do you see that?

71

1    A.    I'm not sure which one you're referring to.

2    Q.    Yes, sir.  The question:  "What were those rights?"  Do

3    you see that?

4    A.    This is page 14, 10 through 17?

5    Q.    No, this is -- yes, page 14, 10 through 17.  "Question:

6    What were those rights?"

7    A.    Got it.

8    Q.    Okay.  Then you write:  "As a holder or owner of NA

9    designated securities in the members' free account, DTC

10   maintains the right to pledge, repledge, hypothecate, transfer,

11   create a security interest in, or assign such securities to

12   satisfy open obligations owed to it by the member.  These

13   rights are set forth in DTC Rule 4(a) Section 1."  Right?

14   A.    Yes.

15   Q.    Now, if you would take a look behind tab 3 of your binder,

16   sir, that is Movants' Exhibit 675, which is the DTCC rules.  Do

17   you recognize that as the rules and bylaws and organizational

18   certificate of the DTCC?

19   A.    Yes.

20         MR. SHAW:  I would move that that document be

21   admitted, Your Honor.

22         THE COURT:  Is there any objection?

23         MR. MAGUIRE:  No, Your Honor.

24         THE COURT:  It's admitted.

25   (Movants' Exhibit 675, rules and bylaws and organizational

72

1    certificate of the DTCC, was hereby received into evidence as

2    of this date.)

3    A.    I'm assuming this is the most up-to-date version, but I

4    haven't looked at it.

5    Q.    It's the one provided by the movants, in this case, Your

6    Ho -- sir.

7    A.    Okay.  I still can't answer that.

8    Q.    Before I move forward, let me just ask one question.

9    Securities transferred to Barclays after September 23rd would

10   have been securities that DTC had no further claim to.  Is that

11   right?

12   A.    Transferred pursuant to instructions from Lehman?

13   Q.    Yes, sir.

14   A.    Yes.

15   Q.    In fact, going back to Exhibit 675, behind tab number 3 of

16   your binder, sir.  I'd direct your attention to page 38 and

17   ask, does that contain the Rule 4(a) Section 1, that you

18   referred to in your response in the first errata?

19   A.    Yes.

20   Q.    And the language you quoted in your errata sheet, "pledge,

21   repledge, hypothecate, transfer, create a security interest in

22   or assign," that appears in the first sentence of Rule 4(a)

23   Section 1, right?

24   A.    Yes.

25   Q.    And that sentence begins, "In furtherance of the rights of

73

1    the corporation, pursuant to these rules, and for the purpose

2    of securing loans made to the corporation."  Do you see that

3    sir?

4    A.   Yes.

5    Q.   It does not say "to satisfy open obligations owed to DTCC

6    by a member."  Is that right?

7    A.   It does not say that.

8    Q.   Now, that language does appear in your errata, "to satisfy

9    open obligations to DTCC by a member," right?

10   A.   Yes.

11   Q.   But that language does not appear anywhere in Rule 4(a)

12   Section 1, right?

13   A.   I'd have to read this paragraph, but I don't see it right

14   now.  If you want me to go through it, I can look for it.  But

15   I'll take your word for it.

16   Q.   All right.  Now the DTCC received 250 million dollars from

17   Barclays, right?

18   A.   Yes.

19   Q.   And as of November 2009, DTCC's losses charged against

20   that 250 million dollars totaled about 55 million dollars and

21   change.  Is that correct?

22   A.   Yes.

23   Q.   And any part of the 250 million that DTCC does not spend

24   will revert to the trustee at some point, correct?

25   A.   I believe that's the case.

74

1    Q.   And DTCC has incurred costs in connection with this legal

2    proceeding.  Is that right?

3    A.   Yes.

4    Q.   Any estimate of the fees that DTCC has incurred in this

5    legal proceeding so far?

6    A.   I don't know offhand.

7    Q.   In the ballpark of a million dollars?

8    A.   Could be that, could be more, could be less.

9    Q.   And DTCC expects to claim its legal fees against the 250

10   million dollars.  Is that correct?

11   A.   Yes.

12   Q.   And since November of 2009, any losses, essentially, are

13   legal fees related to this case.  Is that right?

14   A.   Legal fees, employee time, relating to administering the

15   Lehman accounts which are still at DTCC.  I don't know if there

16   were any specific claims that came in with respect to

17   securities that we're holding or which may come in in the

18   future.  So, but generally speaking, those are the categories.

19   Q.   Okay.  And the wind-down is, if not formally complete,

20   pretty close to complete, right?

21   A.   Well, we're still holding some very substantial assets in

22   the Lehman accounts at DTCC and administering those pursuant to

23   the instructions of the trustee on an ongoing basis.

24   Q.   But in terms of closing out the outstanding trades and

25   dealing with the clearing liability, that process is

75

1    essentially completed, right?

2    A.   Yes.

3    Q.   And the 250 million dollars, therefore, was more than

4    ample to secure your interests at the end of the day, right?

5    A.   In hindsight, the closeout did not result in a loss to

6    DTCC.  Over the weekend of September 19th through 21, nobody

7    could predict what was going to happen.

8    Q.   I understand it was a time of great uncertainty, right?

9    A.   Correct.

10        MR. SHAW:  I have no further questions.  Thank you,

11   sir.

12        THE COURT:  Is there any redirect?

13   REDIRECT EXAMINATION

14   BY MR. MAGUIRE:

15   Q.   Just one point, sir.  Again, Bill Maguire for the SIPC

16   trustee.  I believe you described in your testimony assets that

17   were -- securities that were NA and securities that were not

18   NA.  And with respect to securities that were not NA, you

19   mentioned that they are still available for transactions

20   pending for the Lehman account.  Can you please describe what

21   you meant by that?

22   A.   The -- this goes back to September 22nd, 23rd, 24th.  The

23   NA securities represent securities that were delivered into the

24   Lehman account and for which Lehman had not yet paid for.  And

25   with respect to those securities, we had specific rights as

76

1    defined in the rules.  With respect to all the other securities

2    in the account, to the extent that they were not designated as

3    exempt, there would be a standing instruction from participants

4    to use those assets in their DTC account to satisfy the open

5    obligations at NSCC -- transactions that had not yet been

6    completed.

7         And so to the extent that there were open transactions at

8    NSCC which had not yet been filled and there were assets

9    available in the participants' DTCC account that were not

10   exempt, for example, customer securities or pledged, those

11   would be used to satisfy the NSCC obligations, and that's what

12   was described in the DTCC letter agreement, that we were

13   getting specific instructions from the trustee in that document

14   for us to be able to do that.

15   Q.    Thank you, sir.

16        MR. MAGUIRE:  No further questions.

17        THE COURT:  I assume that question doesn't prompt

18   additional questioning?

19        MR. SHAW:  No, it does not.

20        THE COURT:  Mr. Montal, you're excused.  Thank you.

21        THE WITNESS:  Thank you, Your Honor.

22        MR. KIRPALANI:  It's still morning.  Good morning,

23   Your Honor.

24        THE COURT:  Still good morning.

25        MR. KIRPALANI:  Susheel Kirpalani from Quinn Emanuel

77

1    on behalf of the committee.  The creditors' committee would

2    like to call Saul Burian.

3           THE COURT:  All right.

4           MR. KIRPALANI:  We do have some witness books, Your

5    Honor.  I think my colleague can just pass those out in the

6    interim.

7           THE COURT:  That would be fine.  Thank you.

8           Those probably should be cleaned up.

9    (Witness duly sworn)

10          THE COURT:  Be seated, please.

11   DIRECT EXAMINATION

12   BY MR. KIRPALANI:

13   Q.   Good morning, Mr. Burian.

14   A.   Good morning.

15   Q.   For the record, can you give us your full name?

16   A.   Saul Elliot Burian.

17   Q.   And by whom are you employed?

18   A.   Houlihan Lokey Howard & Zukin Capital Inc.

19   Q.   And what is your current title?

20   A.   I'm a managing director in the financial restructuring

21   group.

22   Q.   And for how long have you been at Houlihan?

23   A.   About eight years.

24   Q.   And how long have you been providing restructuring

25   advisory services?

78

1    A.   If you include my time as counsel, it's been more than

2    twenty years.

3    Q.   And how long were you an attorney?

4    A.   I graduated in 1988.  Started later that year.  So from

5    then till about eight years ago.

6    Q.   And what was your practice area as a lawyer?

7    A.   I started out specializing in corporate transactions in

8    troubled situations, and then with some kicking and screaming

9    became a full-fledged bankruptcy restructuring attorney.

10   Q.   I've been through that myself.  What would you describe

11   your responsibilities as a managing director at Houlihan?

12   A.   At Houlihan Lokey, I'm one of three managing directors in

13   the New York office.  I work on complicated creditor and

14   company side engagements.  But I also manage our distressed M&A

15   practice, east of the Mississippi.

16   Q.   In that role, do you have significant experience in

17   Section 363 sales?

18   A.   I do.  I mean, obviously I had experience before that

19   role, which is how I got the role.  But essentially, I not only

20   personally work on and supervise distressed M&A activities, but

21   also supervise others who are managing transactions and act as

22   an internal resource for them.

23   Q.   Turning your attention to the Lehman case, when did the

24   creditors' committee select Houlihan as a financial advisor?

25   A.   Sometime Wednesday night after the filing.

79

1   Q.   That would be September 17, 2008?

2   A.   That is correct.

3   Q.   And what was your role specifically from the Houlihan

4   team, initially?

5   A.   Well, our first role was to pitch the matter and win.  And

6   I was one of three managing directors who led that effort.  As

7   part of that presentation, I focused on the Barclays sale

8   transaction that had been filed shortly before that.

9   Q.   And did you have any colleagues at Houlihan at the senior

10   levels that were helping you?

11   A.   Our co-CEO, Jeff Werbalowsky, attended the pitch.  Eric

12   Siegert, managing director out of the Minneapolis office was

13   there.  We had a real estate partner.  I believe that we had

14   Mike Fazio from financial advisory services there.  But that

15   was the main -- the main pitch team was the three of us.

16   Q.   So following the pitch, when you were selected by the

17   committee on Wednesday, September 17th, what did Houlihan start

18   doing as part of its initial assignments?

19   A.   We didn't get retained or told we'd be retained until

20   somewhat late that evening.  And we tried to -- we also were

21   introduced to FTI Consulting, which was retained as our

22   co-advisor as well.  And we immediately set up a meeting for

23   the next day with the company and its counsel and tried to

24   organize ourselves into work teams, so that in a very short

25   period of time we could try to be as productive as possible

80

1    with a minimum of duplication of effort.

2    Q.    Did you have any understanding of a sale effort for

3    Lehman's broker-dealer assets at that time?

4    A.    Oh, yeah.  We were informed that evening that there was a

5    hearing before this Court earlier that day.  The committee had

6    asked for an adjournment -- I don't remember if it was of that

7    hearing or the Friday approval hearing, one of the two, and

8    that that adjournment was denied.  And therefore, it was now

9    Wednesday night, and Friday morning, there was going to be a

10   sale hearing.

11   Q.    And before you had any meetings with Lehman, did you have

12   any understanding as to what the transaction between Lehman and

13   Barclays was supposed to look like?

14   A.    Well, I'd read the asset purchase agreement.  I'd read the

15   motion.  I'd read newspaper articles and the like.  You know,

16   my understanding, you know, was from those sources, generally

17   that Barclays was going to take -- basically Barclays was going

18   to cherry-pick assets that they wanted.  Pre-filing, there was

19   a deal to buy all of Lehman.  There was a view that Lehman had

20   many toxic and other real estate and other assets that were

21   difficult to value or uncertain -- you know, what liabilities

22   went with those assets; and that bankruptcy was being utilized

23   to make sure that Barclays got what they wanted and could leave

24   behind what they didn't want, and could pick up the broker-

25   dealer and the real estate.

81

1   Q.   Using 363 to pick up certain assets and leave others

2   behind, that's fairly common, isn't it?

3   A.   It's not uncommon.  Obviously, in this case there are

4   implications from that.  But yes, it's common to use 363 for a

5   buyer to buy what it wants and leave behind what it doesn't

6   want.

7   Q.   As used in this case, were there any implications of that

8   type of transaction that gave you concerns?

9   A.   Yeah.  We were very worried about -- about it.  Frankly,

10  it was unclear to us what was being taken and what wasn't being

11  taken from whom -- you know, the LBI estates versus what we

12  call the A&M estates, Lehman entities that are managed or

13  controlled by Alvarez & Marsal, for whom we are a fiduciary as

14  well; issues with respect to how the estates would function

15  post-closing; and what implication the Barclays transaction

16  would have on the value and ability to monetize the remaining

17  assets.

18  Q.   Did the timing of the transaction concern you at all in

19  terms of ensuring a fair process?

20  A.   Very much.

21  Q.   Okay.  Let's turn our attention, then, to the next day,

22  and move along.  So the next day was Thursday, September 18th.

23  What did you do to educate yourself further about the details

24  of the Lehman-Barclays transaction?

25  A.   Well, we had organized an all-hands meeting at Weil

82

1    Gotshal to get the inside scoop and download from the debtor

2    and counsel as to what the transaction was and what the

3    transaction wasn't.  I refreshed my recollection with respect

4    to all my issues and questions.  And frankly, we scurried to

5    make sure we had the right people there and not there.  And

6    prior to the commencement of that meeting, my main activities

7    were getting there and getting the right people there.

8    Q.    Who did attend the meeting from the committee side?

9    A.    It was a very large meeting in one of the large Weil

10   Gotshal conference rooms.  Eric Siegert, Brad Geer and I, and I

11   believe Mike Fazio, were the main managing directors, senior

12   people at the meeting.  There were two sides of the FTI firm

13   that was there, one that was more focused on the transition

14   services issues, and then the Mike Eisenband side, that were

15   more focused on general advisory issues.  I don't remember how

16   many people -- I would seven, eight or nine, from that firm.

17   We had the Milbank contingent, you know, Dennis Dunne, Luc

18   Despins, and others.  There was a committee meeting immediately

19   afterwards, but the committee members I don't recall attending

20   the meeting with Weil Gotshal and the company, although it

21   could be that one or more of the co-chairs attended.  I just

22   don't remember.

23   Q.    And what about from the debtors' side?  Was it

24   professionals only, or was it a mix?

25   A.    No, there were people from Lehman there.  The main

83

```
 1     participants at the meeting were Harvey Miller, Tom -- I always
 2     forget his name --
 3     Q.    Roberts?
 4     A.    -- Tom Roberts.  I believe Lori Fife was there.  And there
 5     were a variety of other both corporate and restructuring
 6     attorneys.  And from Lehman there was Mark Shapiro, Jim Seery,
 7     as well as, I believe, a number of others.  I don't remember if
 8     Bart McDade was there or not.
 9     Q.    And was this a meeting that was specifically designed just
10     for committee professionals, or was it a general any-creditor-
11     who-wants-to-come-can-come?
12     A.    Oh, no, no.  This was very clearly a confidential meeting
13     of committee professionals to sit down with us and make -- and
14     explain to us, you know, notwithstanding newspaper articles and
15     rumors, what -- how do we get here, where are they going, and
16     what is the deal.
17     Q.    And was -- when you say "the deal", was that the sale
18     transaction that you're --
19     A.    Yes, yes, yes.
20     Q.    -- okay.
21     A.    What were they proceeding to get authority for the next
22     day -- the next morning.
23     Q.    And how was the sale transaction described to you?
24     A.    The sale transaction was described as something that was,
25     you know, critical and necessary, emergent, you know, no
```

84

1    apology for the timeframe.  They recognized that there was very

2    little that we could do with respect to, you know, diligence in

3    the transaction; a recognition about the absurd circumstances

4    we found ourselves.  There was discussion that there really was

5    no third-party alternative; that the process had been mo --

6    going on for a period of time.  The rumors about Korean bidders

7    or about other potential bidders, that they did not believe

8    that there was any serious opportunity for a third party to

9    move forward.  A lot of discussion, rhetoric, about how, you

10   know, the Fed and the SEC and the government and everyone else,

11   you know, found this to be critical.  A discussion with respect

12   to functioning of the capital markets.  Discussion about the

13   benefits -- the societal benefits.  The fact that by preserving

14   the broker-dealer we were preserving jobs, we were preserving

15   the ability of customers who had faith in Lehman and left their

16   securities in Lehman, that they would have the ability -- avoid

17   the distraction and the difficulties of having to extract the

18   accounts in a liquidating SIPC procedure, and that liberating

19   those accounts had a significant societal, you know, good.

20       I don't mean to minimize any of those things, but we did

21   want to focus on our issues, which we were fiduciary for the

22   debtor estates, what was the benefit or detriment to the Lehman

23   entities from the transaction.  And there was a discussion

24   about, specifically to us, what was the benefit to us.  Not

25   denigrating the other benefits, all things being equal, but for

85

1    employment or for liberating accounts so people can function.

2    But the benefit to us was described as being able to avoid

3    significant potential liabilities.  We too are a creditor of

4    LBI, and therefore, to be able to function there was important.

5         There was a view that there was concern as to the LBHI

6    estate's cash position, and that by selling the real estate at

7    fair value it would provide real cash in our pocket.  There was

8    a recognition that we were getting 250 million dollars for our

9    interest in the broker-dealer.  It was assumed in the room that

10   that number was laughably small as compared to what its true

11   value was, even days or hours earlier; but also a recognition

12   and a discussion that if not sold to Barclays or not finding a

13   home relatively quickly, that while this was an incredibly

14   large bargain for Barclays, it would be worth virtually nothing

15   to us.  And therefore, don't look in their pocket, look in your

16   pocket.  And 250 million is better than nothing.  And that

17   money would go -- would help for the administration of the

18   case.  So the real estate and the sale of the broker-dealer

19   would provide cash in our pockets.

20        And then, of course, there was a discussion about the

21   benefits and detriments of the sale book, the broker-dealer

22   assets, and the pros and cons of selling those assets to

23   Barclays.

24   Q.   What was your understanding of the pros and cons of

25   selling the book as part of the transaction, to Barclays?

1   A.   Well, sitting in that meeting, there were really two

2   critical issues in our minds.  One was what is the book, what

3   are those assets, and what are the implications vis-a-vis the

4   balance of the administration of the Lehman estates.  Do they

5   include LBHI assets?  In the cherry-picking of assets, what was

6   in what was out?  Would there be assets being sold that would

7   hamper our ability, for instance, to sell the investment

8   management division?  I think Your Honor knows that division

9   more under the name Neuberger Berman.  Were there -- you know,

10  what derivatives or nonderivatives were being included?  So the

11  first category of concerns was, what's in and what's not.

12       Second is, what are they being sold for?  Is this fair, is

13  this unfair?  And there, we were given very, very firm

14  assurances, A) this is the trading book; this is the bulk of

15  assets directly related to, and in fact owned by LBI.  These

16  are the assets in the ordinary course the broker-dealer uses in

17  their business; and that these are not, you know, the other

18  assets that people commonly were talking about that may have

19  led to Lehman's demise.  These were the liquid or the more

20  liquid assets that were part of the broker dealer.  And -- so

21  don't be worried about that.

22       And we talked about things like the use of the Lehman

23  name; how we're going to function in foreign jurisdictions.

24  Don't worry, we thought a lot about that.  Those are not the

25  assets that are going.

87

1     Second issue was the value of the assets.  And there we

2   were told -- I know this has been bandied about a lot, you

3   know, about a balanced or matched transaction -- in respect of

4   these assets, it was made very clear to us that we were

5   benefitting, because we were selling assets and liabilities in

6   a balanced transaction in respect of these assets.  These were

7   the more liquid broker-dealer assets, and that in lieu of a

8   wholesale liquidation in which we'd have to take a liquidation

9   value for these assets, and recognizing that at that time, the

10  going-concern value, mark-to-market in the manner in which

11  broker-dealers, usually market these assets -- market these

12  assets, it may be at a low point as compared to where things

13  were six months or a year ago.  But in the context we find

14  ourselves, it was a fair, balanced transaction, and we were

15  avoiding unwinding, selling, dumping these assets and getting a

16  liquidation value for these assets, as opposed to a going-

17  concern.

18  Q.   Did you receive any materials at that meeting at Weil to

19  summarize the transaction?

20  A.   Very little.  We got one page of a balance sheet, that we

21  used --

22  Q.   Let me show you -- let me show you what is marked -- or if

23  you can turn to your tab, it's Movants' Exhibit 2.

24  A.   Am I supposed to look at the book or at this screen or --

25  Q.   Whichever you prefer.  They should hopefully match up.

88

1    A.    Okay.  Yes, I see the balance sheet.

2    Q.    Is that the document that you were referring to that was

3    given to you at the Weil Gotshal meeting on the 19th?

4    A.    If that was what that -- I get confused by dates.  If

5    that's the Thursday meeting, yes.

6    Q.    Yes, that's the Thursday meeting.  And what was the

7    context of the use of this document during that meeting?

8    A.    Oh, this was handed out to us in order to discuss the last

9    item on -- the two issues that we had on the last major

10   conversation that I talked about just a moment ago, which

11   related to what were the assets that were going and what was

12   their value and was it fair.

13   Q.    And how did this document purport to show that it was

14   fair?

15   A.    Well, what they did was they walked us through and said

16   hey, on the left side we have essentially the broker-dealer

17   assets.  And if you look at the bottom, you'll see a lot of

18   zeros.  And they said, you know, don't worry, all these other

19   issues are not going to Barclays.  We're not affecting the

20   issues with respect to intercompany accounts.  We're not, you

21   know, focusing on, you know, receivables.  All of those issues

22   are going to be left behind in the estate.  All we are doing is

23   moving, you know, the issue -- the assets that are directly

24   related to the broker-dealer.

25       You'll notice on the left-hand column, it was pointed out

89

1    to me, that there's no real estate.  You know, Lehman has a

2    huge book of real estate assets.  You'll notice that there

3    isn't here, you know, the private equity book.  There isn't

4    the, you know -- all the stuff I'm spending my life on the last

5    year and half, dealing with the Lehman estate, they're not

6    here.  It's only relating to, you know, these assets that are

7    relatively -- you know, mortgages, commercial paper, government

8    and agency securities, which is the bulk of this, you know, the

9    relatively liquid securities that were used or owned, you know,

10   by the broker-dealer.

11        And then you move to the right side, they said to me --

12   they said to all of us, you know, look at the match.  If you

13   look at this, there's a Fed loan which we need to, you know,

14   repay.  And then there's a variety of contras which is -- the

15   way I understood it was short positions or obligations to

16   deliver securities, so that these were directly related to the

17   assets or liabilities that in the ordinary course of a broker-

18   dealer were moving along with those securities.  And golly gee

19   whiz, they matched up, you know, about thirty-four billion

20   against roughly sixty-three billion of assets.  And then you

21   looked at, again, the collateralized short-term funding was the

22   government loan.  And then you looked at it and said net-net-

23   net, you had roughly 72.5 of assets against roughly 68.4

24   billion of liabilities that Barclays was either assuming or

25   dealing with.

90

1      And then right off -- they told -- we were told, these

2    numbers were right off the books and records of Lehman, but

3    they were also taking roughly four and a quarter billion of

4    liabilities for cure and comp, and therefore, you know, based

5    on the mark to value of book, based on the value of the assets,

6    of the liabilities being picked up, it was a, you know,

7    balanced exchange of exactly 72.65 against 72.65.

8      Now, to be fair, so I don't have to come back and correct

9    my testimony, they did tell us they weren't sure, sitting in

10   the room, that all these assets were really there and that all

11   these liabilities were really there, that there were a lot of

12   issues with respect to closeouts, with respect to repos that

13   didn't come back; and that they would need to reconcile which

14   of these assets and which of these liabilities were really

15   going to show up by the time the closing came.  But don't be

16   worried, you know, it is what it is.  They'd go in tandem.  And

17   therefore, with respect to these assets, we were avoiding

18   liquidation and getting the benefit of a matched exchange.

19   Q.   Did you ask for an opportunity to try and diligence this

20   summary schedule?

21   A.   You know, we started to ask some questions about these

22   securities, but we're talking about, at this point, sometime,

23   you know, late Thursday morning early Thursday afternoon.  You

24   know, we were told that there would be a more, you know,

25   junior-level business discussion at some point on Thursday.

1   We'd be able to get answers to whatever questions we had.  But

2   the context and the clear understanding in the room was, we're

3   moving along on Friday and there's very little diligence you're

4   going to be able to do.  You're going to have to trust us on

5   this.

6   Q.   And did you ask any other questions or raise any other

7   issues with them?

8   A.   Oh, yeah.  You know, those who know me know I'm often not

9   shy.  I tried to ask questions.  For instance, I had a series

10  of questions about the purchase price adjustment.  It seemed

11  very limited, constrained, oddly drafted.  I started to ask Jim

12  Seery and Mark Shapiro about that.  I also, together with

13  others, asked what I think is a fairly typical question for a

14  creditors' committee in a position where you're behind in the

15  game, and that was:  Okay, we have a fairly limited time to

16  ferret out, you know, all the issues.  There must have been, in

17  your dealings over weeks and months with Barclays, a variety of

18  issues that in good faith, the debtor thought they should have

19  gotten from Barclays.  There have got to be issues.  It's such

20  a complicated transaction.  What were the list of things that

21  you, Lehman, you Weil Gotshal, sat in a room and asked for?

22  What were the last-minute grabs by Barclays where you felt you

23  had no choice but to say yes to?  Give us a list.  And let's

24  pound the table today and try to get them for you.  You know,

25  it's not an unusual idea that in exchange for committee

92

1    consent, you know, there's got to be things that we could

2    essentially try to get a double dip from Barclays for.

3    Q.    And was the purchase price adjustment one of those things?

4    A.    When you say one of those things, it was one of the things

5    I would have imagined would have been on their list.  As I

6    discussed earlier, I began to go down the road of asking

7    pointed questions about it.  But it wasn't on their list.

8    Q.    Did they have anything to say at all about the purchase

9    price adjustment?

10    A.    Well, you've got to look at it in the context of the

11    conversation.  They were made to very clear to us, thank you

12    but no thank you, we don't want your help.  We don't have such

13    a list.  There's not going to be a negotiation, and we don't

14    have a list of issues for you to pursue.  The deal is fair.  We

15    worked as hard as we can.  We're going to have enough trouble

16    closing the deal we have.  We think that in light of the

17    circumstances, we've done a very, very good job of protecting

18    the estate in the ways in which I described.  And we're

19    basically not going to give you such a list.

20        I did go down the road of trying to say, well, let's talk

21    about the purchase price adjustment.  I think I got two

22    questions in and then got cut off by Harvey who said, we can

23    cover all of that, you know, in a meeting that's with people

24    less important than the people in the room right now.  But you

25    know, it is what it is.  Jim and Mark did point out to us, in

93

1    the room, that we may not want to spend a lot of time on the

2    purchase price adjustment, because it was unlikely to survive

3    in the final deal anyway.

4    Q.    What was your reaction to the statements by the Lehman

5    folks that the purchase price adjustment feature was likely to

6    be eliminated?

7    A.    You know, it's hard to separate my reaction to that

8    particular statement versus my reaction to everything.  But on

9    that one in particular, you know, it didn't surprise me that

10   much, honestly.  It was so convoluted and constrained, it

11   wasn't worth much anyway.  So it didn't surprise me that if

12   there was continuing give-and-take between Barclays and Lehman,

13   that Barclays would prefer not to have it and that Lehman would

14   ultimately, you know, give in on it.  So it wasn't surprising.

15   I would have preferred them telling me yes, let's work together

16   arm-in-arm to make it better and meaningful.  But it didn't

17   surprise me.

18   Q.    Are you aware that Barclays has characterized this dispute

19   as the committee seeking to retrade the transaction and get a

20   purchase price adjustment through the back door?

21   A.    I am.  I was at the opening argument.  And I've heard that

22   being prominently discussed.

23   Q.    And what's your reaction to that?

24   A.    I just don't know what to say anymore.  I mean, nothing

25   could be further from the truth.  It is completely and

94

1   absolutely not true.  I can tell you categorically that we were

2   pushing for discussion, investigation, reconciliation of this

3   transaction long before the markets recovered.  I could tell

4   you that I've been a primary person at Houlihan Lokey dealing

5   with these issues, and I have never, not once, with anyone, on

6   my side or on the company's side -- I don't really deal with

7   the SIPC trustee much, so I can't account for that -- ever had

8   a conversation regarding ha-ha, market's been up, now is the

9   time to pounce.

10      We've had discussions about, you know, pursuing this.  We

11  had conversations about the timing to pursue.  We've had

12  conversations regarding do we have enough evidence to pursue.

13  Never, have I ever had a conversation about we don't want to do

14  this now because the market's down; now's a good time because

15  the market's up.  And frankly, my understanding of this, and it

16  could be completely wrong, is we're not looking for the benefit

17  of a market move.  I don't understand this dispute as we make

18  more money if the market did better a moment after the sale.

19  My understanding of my part of this is, on the day of the

20  close, did we get a good-faith mark to market as a broker-

21  dealer typically would get, of the value on that date.  And in

22  fact, maybe we'll get to it later, I wrote a memo to the

23  committee that specifically told them this.  And it was clear

24  to me from the beginning.

25      And you know, people can say what they want to say.  I was

95

1    there, they weren't.  And I've been around from day one and

2    throughout.  It's categorically not true.

3    Q.   We will be covering a lot of the things that you

4    mentioned, Mr. Burian.  But turning back, now, to the meeting

5    on the 18th, that's the Thursday, what did you consider

6    Houlihan's critical next steps?

7    A.   Well, it's like drinking from a fire hose.  I mean, we're

8    talking about -- I mean, Barclays is only one of many, many,

9    many issues that were of great concern.  So if you're asking me

10   about Barclays, or are you asking about generally, you know --

11   they're two different answers.  With respect to Barclays it

12   was, as best we can, you know, let's figure out with the

13   committee what we're going to do on Friday, in fact -- if in

14   fact that's going forward; and what we could do to get a better

15   handle on what the transaction is.  And more broadly, we're

16   talking about the largest, most complicated bankruptcy ever,

17   when we're dropped into this cold turkey, and we needed to

18   figure out where we could add value, what was going on, how do

19   we preserve, protect and maximize value.

20   Q.   Staying on Thursday, did you have any or arrange any other

21   information sessions, either by phone or in person with the

22   Lehman side?

23   A.   Well, we did two things.  First we had a very long

24   creditor -- committee call to try to update them of what was

25   going on, try to get some direction.  When it came to diligence

96

1    and work we did two things.  We understood just how hard the

2    Lehman team were working.  I mean, it's hard to describe the

3    body language in the room.  We were also trying to be sensitive

4    to the devastation of their personal, you know, circumstances.

5    There were people in the room -- I mean, Jim Seery looked

6    terrible, I mean, Mark Shapiro certainly wasn't happy.  These

7    are people I've known for years, they lost personal wealth.  It

8    was a very, very difficult time.

9         And we told them that we know how hard they're working.

10   We know how many nights they haven't slept.  They need to talk

11   to us.  We need to get some diligence.  We need to get an

12   update.  And it was left that at some point that afternoon into

13   that evening, that night, they would get back to us and have a

14   meeting or a conference call to tell us what they could in

15   advance of the hearing.

16        At the same time, I reached out to Steve Berkenfeld who

17   was represented to me to be a former lawyer, a person who was a

18   senior person on their risk committee, very active throughout

19   the whole Lehman enterprise, in order to sit down with him and

20   his team to get as much of the download as I could about

21   everything else that was going on and about some of the

22   background.  It was felt a lot of pressure.  We weren't sure

23   who was still going to be around after Friday or Monday and who

24   was still going to be an employee of Lehman after Friday or

25   Monday as compared to Barclays.  And I really wanted to sit

97

1    down with him in particular to get a feel for what was I going

2    to do for the next two, three years of my life.

3    Q.    Okay.  So again, staying on Thursday, did Houlihan

4    actually have a follow-up diligence-type call to understand

5    where the Barclays transaction stood by that night?

6    A.    Yeah.  Both of those things were set up.  I met with Mr.

7    Berkenfeld, you may get that later, over at Lehman.  And the

8    rest of my team, at some point that evening, that night, had a

9    diligence call led by Jim Seery on the Lehman side.

10    Q.    And what's your understanding of what updates there were

11    to give on the Barclays-Lehman transaction, as of Thursday

12    night?

13    A.    For the most part, it was an update with respect to what

14    was said earlier in the other Thursday meeting.  Mr. Seery made

15    very, very clear that things were very much in tumult over at

16    Lehman; there they're very distressed by the amount of

17    closeouts, the fact that they cannot truly account for a large

18    portion of their securities, and we should not be surprised if

19    the numbers changed dramatically because of -- you know, there

20    won't be sixty-two some-odd billion of assets.  Some of those

21    assets have not reappeared in the Lehman accounts.

22        There was a discussion about the sale process, the Koreans

23    and others, and the fact that this was a very active sale

24    process under extreme circumstances, and there really is no one

25    else.  A discussion that the markets were moving away from them

1    and that they're concerned that the value of the portfolio has

2    dropped in value.  Sitting here, I honestly don't remember

3    every detail.  As you know, there were detail notes taken of

4    that meeting.  And I reviewed those notes then and I reviewed

5    those notes when it was put in front of me at my deposition.

6    Q.   So turning, then to Friday, this is the day of the sale

7    hearing, Mr. Burian.  Did you have any further calls with any

8    Lehman people as of Friday morning?

9    A.   I did.  Thursday -- I mean, at the end of Thursday, you

10   know, the call basically -- that call did not really uncover

11   new information.  We were not given, you know, an update of

12   what the estate was actually going to come to court with.  And

13   in light of travel and other schedules, I was the point person

14   for Lehman to call and say okay, what's going on.  Some

15   point -- at the time, by the way, we thought there was a ten

16   o'clock hearing before Your Honor.  And I got a phone call

17   telling me, no, no, no, no, that call's going to be

18   adjourned -- meeting was going to be adjourned -- the hearing

19   was going to be adjourned and moved off.  They're having

20   substantial problems figuring out what assets were still in or

21   out of the deal.  They're having all sorts of problems with

22   JPMorgan, DTC and others, and in fact, Barclays is threatening

23   not to close, because it was no longer a balanced transaction,

24   and that they needed to find -- I don't remember if it was

25   exactly of which conversation of Friday, but at some point it

99

1    **was communicated to me that there was scrambling to find**

2    **additional assets in order to balance the transaction.**

3           MR. KIRPALANI:  Your Honor, the -- I would like to

4    show Mr. Burian some of his notes from that conversation, but I

5    realize that we're just about up to your traditional lunch

6    hour.

7           THE COURT:  This would be a good time to stop, then.

8    And let me remind everybody that I have a 1:30 argument in a

9    Lehman-related matter, but it has nothing to do with this

10   dispute.  So that if you have papers at counsel table, you

11   should at least put them in some relatively secure pile.

12          And I'm assuming that the argument will run from

13   roughly 1:30 to approximately two o'clock.  And for that

14   reason, we'll probably take a break at the end of that argument

15   to give everybody a chance to reassemble.  But you're certainly

16   welcome to come in and listen if you have any interest or to

17   take a longer lunch, which is fine.

18          So for purposes of the Court, we're adjourned till

19   1:30.  For purposes of this hearing, we're adjourned until

20   sometime shortly after two.

21          MR. KIRPALANI:  Okay.  Thank you, Your Honor.

22       (Recess from 12:28 p.m. to 2:15 p.m.)

23          THE COURT:  Be seated, please.

24          MR. KIRPALANI:  May I proceed, Your Honor?

25          THE COURT:  Please do.

100

1          MR. KIRPALANI:  Thank you.

2     BY MR. KIRPALANI:

3     Q.   Good afternoon, Mr. Burian.  I think before the lunch

4     break we were just starting to talk about a telephone

5     conference or several conferences that you were having with

6     Lehman representatives on the morning of the sale hearing.  So

7     if we can just get right back into that.  First let me just ask

8     you, did the conversations consist of more than one phone call

9     or was it one phone call?

10    A.   It was more than one.

11    Q.   Okay.  How many calls do you think it was?

12    A.   I believe it was two, but one of them was quite long with

13    many, many interruptions -- quite long -- was longer than the

14    other one and had many interruptions.  There was -- either I

15    was put on hold or sort of muffled the receiver or -- it was a

16    longer conversation with two parts to it.

17    Q.   And who was on the call from the Lehman side?

18    A.   The main speaker was Jim Seery, but I believe Mark Shapiro

19    was on.  I think -- there were certainly other people in the

20    background.  I don't think they were talking to me or listening

21    to me.  I think they were all yelling and screaming at each

22    other.  But there was other noises in the background.

23    Q.   And who was on the call with you?

24    A.   Just me.

25    Q.   Just you, okay.

101

1    A.    The first one, for a portion, Mike Fazio may have been on.

2    But the primary person was me.

3    Q.    Did you take any notes during this call?

4    A.    I did.

5    Q.    I'd like to refer you to -- it's in your binder there, but

6    hopefully we can get it on the screen as well -- Movants'

7    Exhibit 380.

8    A.    Yes, I see my notes.

9    Q.    There's several pages here.  I'd like you to walk through

10    them.  I'm not sure all of them relate to this conference.

11    Could you just start with the first page and just flip through

12    and let the Court know what these notes relate to, and then we

13    can come back and talk about specifics?

14    A.    The first and second page, Your Honor, relate to my

15    conversations and meetings with Steve Berkenfeld and his team

16    regarding -- I mean, tangentially relating to Barclays, because

17    in some respects, what wasn't going to Barclays relates to what

18    Barclays -- for the most part related to the Neuberger Berman

19    division and a variety of other assets for potential lawsuits,

20    and asset classes, not directly talking about the Barclays

21    sale.

22        If you turn to the third page, I guess, 189, the top of

23    the page, you know, until the box that's crossed out, is a

24    continuation of that conversation.  The 40 -- 4.69, 3.61, 512,

25    is a summary tally by me trying to keep track of some of the

102

1    things Steve was telling me or maybe that happened the next

2    morning.  My conversations with Jim Seery and with Mark Shapiro

3    start where it says, "LBSB" and there's a large box and cross-

4    out.

5    Q.   Okay.  Let's stop there.  Could you recount for the Court

6    the sum and substance of your conversation with Mr. Seery and

7    Mr. Shapiro?  And feel free to refer to your notes if it helps

8    you with your recollection of that conversation.

9    A.   Sure.  They called and they told me that they're not ready

10    to go forward, that it's going to be adjourned.  I had been

11    calling saying, you know, I got to get down to court and the

12    committee wants to know what's going on, you'd said there'd be

13    changes.  They called and said to me -- and said, okay, the

14    deal is changing.  We're not going to have roughly the seventy

15    billion matching transaction anymore; a lot of assets haven't

16    shown up.  And he started to very, very quickly, in a

17    clearly -- my impression was that Jim and Mark were --

18    understood the need to talk to me, but I wasn't their most

19    important conversation of that morning, and therefore they were

20    trying to race through this and then go back to what they were

21    doing.  And it was a garbled conversation.  I started to take,

22    you know, quick notes, roughly speaking, 50.64 billion of

23    assets, a portion of which related to agencies -- you know

24    equities and corporates.

25        I tried to get down the sum and substance with respect to

103

1    the deal as opposed to focusing on how the assets were divided.

2    You see here that he tells me that they took out all the Fed

3    securities.  This is when I found out that Barclays had stepped

4    into the shoes of the Fed, were now the repo participants.  I

5    was told they borrowed forty-five and a half billion dollars,

6    and there may be a five billion dollar difference between those

7    assets and the Fed loan.  Cure payments, there's no difference.

8    Goodwill payment no difference.  They're still taking comp and

9    severance.

10        This is when he told me that there may be -- the real

11   estate may be 110 million dollars shy -- lower than expected.

12   And also that we in fact have lost the upside in the portfolio.

13   And this is, again, my recollection of a very quick

14   conversation that quickly became irrelevant.

15   Q.   So let me just clarify one thing that when I first got

16   involved in this case, I was confused by.  The seventy billion

17   that was talked about originally, you testified, and then now

18   it's more like fifty.  Did you understand that at that time or

19   today to be a loss of value of twenty billion dollars?  I think

20   you referred to assets not showing up.  Can you just describe

21   how numbers were explained to you to go from seventy to fifty

22   in the first place?

23   A.   Yeah, you're going to hear a consistent theme from me, and

24   that is, we were hearing two strains of thought.  One was

25   assets just weren't showing up.  DTC, JPMorgan, counterparties,

104

1  repos that -- they just didn't know what they -- Lehman just

2  didn't know what they had, what they could transfer, what

3  they'd be permitted to transfer, and therefore the corpus of

4  assets, it was unclear what would go, which obviously affects

5  value.  If you don't have it you can't transfer it and it can't

6  be set off against a liability.  And we kept on hearing a

7  constant refrain that the markets were doing poorly, that the

8  Lehman assets being transferred to Barclays were -- I think the

9  phrase was "cratering", and that therefore Barclays was

10  extremely upset that they weren't getting the value they were

11  promised.

12          So whenever we talk about what is going to Barclays as

13  part of this matched transaction, both of those things are

14  running through my head.  Some of it was, it's just not there.

15  Some of it is, what's there is worth less -- not worthless,

16  worth less.

17  Q.   Got it.  Thank you for that clarification.  Can I ask you

18  what the significance of the X through this portion of your

19  notes is?

20  A.   Yeah.  It was a conversation, a lot of noise in the

21  background.  Seery was clearly under pressure, talking quickly.

22  And he goes -- and I was asking some questions.  And he goes,

23  you know something, scratch that.  That's all wrong.  Let me

24  go -- let me give it to you again and not confuse you.  And I

25  said fine, and I crossed it all out, and I turned the page.

105

1    Q.    Okay.  Before we turn the page, is it your testimony here,

2    sir, that you crossed this out at the time of that conversation

3    as opposed to sometime later?

4    A.    I crossed -- this conversation was maybe six to seven

5    minutes.  I was writing as quickly as I humanly could to keep

6    up with him, who was racing to give me information.  And I was

7    confused by some of the information.  You'll see a note on the

8    side.  And I started to say slow down.  He was disturbed by

9    somebody else.  He said, okay, forget it, that's all wrong,

10   scratch that.  And I xed it right there and then and turned the

11   page.

12   Q.    Okay.  So what'd he tell you next?

13   A.    There was a delay of some time.  I don't know if it was

14   thirty seconds or four minutes, honestly.  I was on hold or on

15   mute -- I don't think I was on hold because I heard all sorts

16   of activity in the background.  He then came up and said, let

17   me give it to you straight, let me tell you what's going on.

18   This is what we're going to the judge with.  And then he

19   started talking -- as you'll hear in a minute, part of what he

20   was telling me was relating to subsequent modifications that I

21   didn't know about.  And some of it was, you know, directed to

22   what was going to come to court in the next few hours.

23          So he said to me, we only have forty-five and a half

24   billion dollars of long positions left.  That all the shorts

25   were closed out.  My shorthand shorts, we understood also meant

1    all the contras all the liabilities, that basically Lehman was

2    only transferring assets not liabilities.  So now -- that's all

3    that was left.  The loan -- the Fed loan that came from

4    Barclays was also forty-five and a half billion dollars.  The

5    real estate, we're losing a hundred million dollars.  Comp and

6    severance was fine.  Again, reiterating a loss in the upside of

7    the market -- the upside of the portfolio, the purchase price

8    adjustment.  There'd be no cash in the deal.  If you remember,

9    the balance sheet had about 0.7 of cash going to Barclays.  No

10   cash in the deal whatsoever.

11         A little longer conversation about the PIM brokers.

12   The PIM brokers were -- I forget the exact acronym, but I

13   believe it was the principal investment managers.  Essentially

14   there was a lot of confusion in my mind as to how this sale

15   would encroach on our ability to sell the investment management

16   division or as Your Honor has heard about the division,

17   Neuberger Berman.  And to the extent that there were brokers at

18   Lehman vis-a-vis at the Neuberger Berman division, the

19   committee wanted me to be careful that Barclays was not taking

20   assets that would unduly, you know, inhibit our ability to get

21   full value for that division.

22         Jim was trying to point out to me -- it was clearly

23   not his division or his expertise -- but explain to me that 350

24   brokers were going; that that number had shrunk because of

25   losses of people; that these were people historically at the

1    Lehman business even before Neuberger Berman was bought; they

2    were not integral to the business but more focused on selling

3    broker -- doing trades with the broker-dealer; and we shouldn't

4    be concerned.  And that's what the confusion was about these

5    parties.

6          He then started going very quickly into DTC's giving

7    them a very hard time.  They don't know what's, you know, going

8    to happen.   Trade closings are just coming through.  A lot

9    of -- FX stands for foreign exchange -- currency swaps, that

10   twenty to thirty billion our stuff closed out.  They've lost

11   more than two -- again, I've heard -- my problem is what I

12   thought then and what I thought now.  I've heard different

13   interpretations of these numbers.  At the believe, at the time

14   when I was writing this I thought they've lost five to ten

15   percent of the corporates, lost three to five percent of their

16   pass-throughs.  I've now learned my understanding may be

17   mistaken.  But at the time I believe that's what I was writing.

18         He was trying to give me comfort that in fact they cut

19   a deal on the Lehman name, that we could actually use the

20   Lehman name in foreign jurisdictions, as I -- for two years, in

21   order to have the ability to liquidate.  Again, my focus was,

22   what were the issues that would affect me -- me -- the estate

23   and my ability to maximize value for the estate going forward?

24   And he was pointing out that there was a deal vis-a-vis the

25   Lehman name.

1       I don't remember what "contract" stands for.  It could

2  be a number, I think, I just don't remember.  Your Honor, I can

3  guess, if you like, but I don't honestly fully remember.  There

4  were a number of issues relating to contracts that would not

5  directly relate to the contracts in cure that Barclays was

6  taking.

7       And here was an important comment that, you know, no

8  resis.  If you remember, in the asset purchase agreement, there

9  was this idea that Barclays was getting fifty percent of the

10 resis, we were getting fifty -- we were keeping fifty percent.

11 Now, he was telling me that no residential mortgages, I believe

12 he was saying, were being retained; that we need to include

13 residential mortgages to Barclays because of the loss of assets

14 and the deterioration of the market value of those assets, to

15 make them comfortable they were getting the balanced benefit of

16 the bargain transaction --

17 Q.    What --

18 A.    -- as I said -- I'm sorry?

19 Q.    -- I'm just saying, what's the -- the handwriting is

20 hard -- the two words on the right, starts with a "P", under

21 that line, that curve?

22 A.    I believe what it says is "position movement."  The

23 positions are moving around and changing.  He then said to me,

24 hey, we have 47.4 billion of assets against 45.5 billion of

25 liabilities, plus the cure and the employees is roughly 4

1   billion.  So, you know, the estate is 2 billion dollars ahead.

2   I frankly, at this point, was thoroughly confused in a sense of

3   I wasn't sure, you know, the 20 to 30 billion, where it came

4   from; how the 47 just matched up with the 45.5 longs; and how

5   the resis fit in.  And I'm not proud of this, but I was -- I

6   did get a little annoyed.  And I did say to him, you know

7   something, you're talking to me -- you know, as if I know

8   what's going on in your head and is what deal you thought was

9   happening this morning and how it changed from last night.  I

10   know what you told us last night.  I know what the deal was

11   Wednesday and where we were Thursday.  Can you just give it to

12   me simple?

13       And I turned the page and a little aggressively, he might

14   say -- obnoxiously said, just start from the beginning and go

15   to the end.  What was filed on Wednesday, what has changed?  I

16   don't want to hear about any interim things.  I just want to

17   know what is different from what you told the judge, not from

18   where you thought you were going to be etcetera.  I turned the

19   page, and at this point it was getting late.  I had the

20   committee on hold, and I said to him, I just need to know where

21   we stand.  We turned the page -- I turned the page, and I think

22   Mark Shapiro was on the phone at the time, I can't swear to

23   that, but Jim took a deep breath and said fine.

24       We had 72 billion dollars of assets and 68 billion of

25   liabilities as of what we told the judge, the way it was in the

110

1    contract.  That's no longer true.  We now have 47.4 billion of

2    assets and 45.5 billion of liabilities.  These liabilities are

3    no longer third-party liabilities or shorts or derivatives,

4    these are now essentially money we owe Barclays.  So we have a

5    net difference of assets to liabilities of 2.4 billion, in my

6    mind, matching up -- you know, all talking book value of

7    assets.  The cure, it was 2.25 billion, it's now 2.25 billion.

8    I now know he misspoke.  As Ms. Fife made clear to the Court,

9    it was really 1.75 or something like that, but it was -- you

10   know, he told me nothing had changed.  Employee comp and

11   severance, no change, 2 billion, 2 billion.  Goodwill, no

12   change, 250-250.

13        You can see, the center column are the issues I cared

14   about that I wanted him to tell me what changed.  745 Seventh

15   Avenue which was, you know, the headquarter building in Times

16   Square, essentially no change.  New Jersey data, we thought it

17   was 450 -- I didn't write down the number, I don't know why, I

18   was probably writing the rest of my list of what I wanted to

19   ask him next, but we know it was 100 million change.  Profit

20   sharing -- that was my shorthand for purchase price adjustment,

21   we talked about earlier.  Yes, it was in the prior deal; no

22   it's not in the current deal.

23        DTC settlements -- this is some of the confusion from the

24   prior page.  Before, Barclays was not helping us -- was not

25   guaranteeing or providing funds in order to allow for -- again,

1    this is my understanding -- that to the extent that customers

2    had trades within the broker dealer that had not closed prior

3    to our closing, DTC had raised issues regarding who was going

4    to guarantee those trades.  And in business shorthand, Barclays

5    was not stepping to the plate or providing any comfort in the

6    old deal, now they were stepping up and solving that issue.  I

7    found out later about negotiations around that issue, but as of

8    that afternoon, all I know is yes, Barclays was assuming the

9    liability or solving that issue.

10        Purchased assets.  Were they taking more?  Were they

11   grabbing more?  Do I have to worry about the integrity of the

12   estate going forward?  No, no, no.  The PIM business, which

13   relates to those brokers, is in LB -- I honestly don't even

14   know what this is -- student -- I don't know, or LB Canada --

15   maybe that's LB Uruguay.  That basically, there was some

16   entities they needed to take in order to get those assets, but

17   I shouldn't worry about them because they're not -- you know,

18   that's a technical issue as to who the employer is on some of

19   these brokers, but it didn't matter.

20        Yes, we now have a two-year license for Lehman -- again, I

21   don't remember if that was a change from the APA or an open

22   issue in the APA -- but again, part of my concern about going

23   forward business.  For purposes of the IMD, business --

24   perpetual license to use the name, because, again, we needed to

25   make sure we had what to sell.

112

1          No sharing residential mortgages.  They would not buy

2    Eagle Energy.  I don't remember why this was a hot button, but

3    there were rumors in the marketplace that Barclays was stealing

4    Eagle Energy assets, and they confirmed that no Eagle Energy,

5    just like all the other Lehman private equity investments, was

6    not part of the sale; and also that the exchange-traded

7    derivatives were not being taken.  All the derivative book and

8    all the over-the-counter exchange-traded derivatives were

9    remaining behind.

10   Q.   Okay.  Mr. Burian, just flip the page back to the

11   conversation where you said you got frustrated.  At the top you

12   wrote "45.5 long," and I understood that to be the value of the

13   long positions, correct?

14   A.   Yeah, my -- when I was scribbling this, I thought he was

15   talking about the broker-dealer book that was -- you know, that

16   was the more liquid book that was subject to the Fed -- the

17   federal government's repo transaction.

18   Q.   Okay.  And then two lines down, "loan is at 45.5."  and

19   that would be the repurchase agreement or the Fed/Barclays

20   repo?  Is that what you mean?

21   A.   That is correct.

22   Q.   Okay.  So given your experience, you understand, don't

23   you, that typically repos have some cushion built into them?

24   A.   I understand that when you lend money, you don't lend at a

25   hundred percent of value, you take what's called a haircut or a

113

1    cushion or a reserve on the assets being borrowed against or

2    lent against.

3    Q.   Okay.  Did it raise any issue with you at that time that

4    the long positions were valued by Lehman at exactly the amount

5    of the extended amount through the repo?

6    A.   Well, as I said earlier, this whole conversation didn't

7    fully add up, which is why I got a little more aggressive and

8    demanded a more fuller explanation.  But no, the idea of that,

9    what the fed government lent and which Barclays stepped into

10   the shoes of, didn't match what actually showed up at Lehman,

11   which did not surprise me in the least.  Usually haircuts are

12   relatively modest, and frankly, with all of the -- what I was

13   told -- deterioration in the marketplace and loss of assets

14   that were included or not included, I would have been shocked,

15   frankly, if the loan did not exceed the assets.

16   Q.   Okay.  During the conversation, what did you understand

17   the basis of the valuation when the number was 47.4 versus 72

18   on the last page of your notes there?

19   A.   Where there was a 45.5 on page 189 -- 190 or the 47.4 on

20   191, at all times, it was very clear to me they were being

21   provided to me in a manner consistent with every conversation

22   we'd had about the topic, which is, as a going concern, mark-

23   to-market, in a manner in which any reasonable broker-dealer

24   would do at the close of business of every single day.

25   Q.   Did anyone tell you during that conversation that the

114

1   methodology had changed since they had reported to the Court or

2   filed the APA with the Court?

3   A.   No.

4   Q.   Did anyone tell you during that conversation that they

5   were ascribing liquidation values to arrive at that either 45.5

6   or 47.4 number?

7   A.   At no time did anyone ever tell me that the deal had

8   changed and that we weren't getting going-concern value, but

9   there was a liquidation discount or liquidation methodology

10  being realized.

11  Q.   And I believe you testified that you had the creditors'

12  committee on hold while you were trying to get this

13  information, correct?

14  A.   Yes.  People were very interested to find out what was

15  going to happen next, you know, hour or so, before the Court.

16  Q.   So if Mr. Seery had told you that they were ascribing

17  liquidation values to the long positions, is that something

18  that would have mattered to you, or in your experience, to your

19  client?

20  A.   It would have mattered very much.  The client kept on

21  asking the question of, you know, value.  And also, remember,

22  from the LBHI perspective, ignoring societal benefits and

23  ignoring that, you know, the Fed or someone else may have

24  wanted this to happen, and acknowledging that reduction in

25  claims, helping customers and all these things are very

115

important, as a fiduciary of LBHI and its debtors, excluding

LBI, the broker-dealer, we weren't getting much.  And the idea

was we gained 250 million for the broker-dealer; we were

getting, you know, the buildings which we weren't all that

concerned would lose value precipitously.

        The main essence that we were getting was the ability --

together with the broker-dealer -- was the ability to sell

these assets to a party who would be able to use them in the

ordinary course of business, who had a reason for wanting to

own them, who had cherry-picked and requested them, in a manner

that would allow us to avoid a liquidation and dumping those on

the market, which directly or indirectly, would have come back

to haunt us, whether because we were a creditor of the LBI

estate or because customers and third parties would have

guarantee or other claims against us.

        So the idea was, the only way to maximize value for these

assets was ignoring whether we were happy with going-concern

market value on that date.  One could argue selling them

earlier or later -- you know, that wasn't the decision that was

being made.  The decision was, was it better or worse to risk

liquidation or to get the benefit of a going-concern sale and,

you know, again, your question was, would it have mattered?  It

would have mattered enormously.

Q.    So did anyone during that call with Mr. Seery and/or Mr.

Shapiro tell you that even when the number had been seventy-two

116

1    billion dollars, there had always been some pre-negotiated five

2    billion dollar discount for Barclays?

3    A.    No.

4    Q.    Did anyone tell you during that call that Barclays had

5    insisted on getting an immediate actual gain in the value of

6    the book?

7    A.    No.

8    Q.    Did they discuss during this call whether the changes that

9    had materialized since Wednesday to now Friday were favorable,

10    unfavorable, neutral?

11    A.    Yes.

12    Q.    And what did they tell you about that?

13    A.    They told me again, it's the same story, that you can't

14    believe the complexity, you can't believe, you know, dealing

15    with, you know, JPMorgan, who they had not very kind words for

16    generally, and that we, you know -- they did it to us

17    prepetition, they're doing it to us again.  We don't really

18    have control over what we're providing.  Markets are moving

19    against us.  People are closing us out.  You know,

20    unfortunately, this is what we have.

21        I do believe, although -- everything I've told you,

22    absolutely firm recollection as if it was yesterday.  This last

23    point I can't be positive about.  I do believe that he also

24    told me at the time that they were having to scrounge for

25    assets and look for additional assets to make Barclays

117

1  comfortable, because with the volume of assets that were no

2  longer included, that were lost, taken, withheld, and with the

3  market price dropping, they had to include additional assets.

4  And that process was ongoing.

5  Q.    There's been some testimony in this trial, Mr. Burian,

6  that given the tumultuous state of the markets, that market

7  value as of that period was actually converging with

8  liquidation value.  Was that your understanding of that period,

9  you having lived through it as well?

10  A.    No.

11  Q.    What did you understand there to be a difference?

12  A.    You know, later, as I'm sure you're going to ask me, we'll

13  talk about the assets in particular.  But at the time, our

14  understanding was, this was the most liquid portion of the

15  Lehman book.  These were the cherry-picked assets, the agency,

16  the Fed securities and other items.  Clearly, if someone turns

17  around and says I'm going to sell fifty billion dollars of

18  assets in the next X period of time, any market would move and

19  there would be a discount applied to that market.  But if

20  you're asking me whether or not someone can hold a portfolio, I

21  think twenty to twenty-five, twenty-seven billion of this were

22  government securities, agencies and other -- and the like,

23  anyone can say, if I'm going to hold these in the going-

24  concern, sell and buy, which is what broker-dealers do, over

25  the course of a reasonable period of time, would I have a

118

1   significant difference between the going concern value and

2   dumping it in the market?  I would have expected to see a

3   significant difference and, you know, not the conversions.

4        And frankly, you know, at the time we're conversing,

5   governments and a lot of these securities hike on up in price.

6   There was a flight to quality.  And I'm sure other experts will

7   testify about graphs and so on.  But over the five days, Monday

8   through Friday of the fire-link, a lot of these assets had

9   ticked up in value.  So we're talking about a time when I

10  didn't know what some of these assets were.  We had the balance

11  sheet open before and we talked about some of the

12  categorizations that were there.  I had no way of diligencing

13  or confirming our scrivener.  I was trusting Jim and the rest

14  of the team that it is what it was.

15  Q.   At this point in time, did you have a schedule of the

16  assets that comprised this 47.4 billion dollars of value?

17  A.   No.

18  Q.   Okay.  What did you do after the call with Mr. Seery

19  and/or Mr. Shapiro?

20  A.   I hope I gave a coherent review to the committee.  Made a

21  few phone calls and ran around a bit and then ran down to court

22  to make sure I wasn't late.

23  Q.   At that time, at the conclusion of the committee

24  conference call, prior to the sale hearing -- immediately prior

25  to the sale hearing, were you in a position to make a

1    recommendation to the committee as to the propriety of the sale

2    to Barclays?

3    A.    I know that there's privilege issues, so I'm just going to

4    talk, and you'll stop me if I'm not saying the right thing.

5    But --

6    Q.    I think at this point His Honor has stated he wants to

7    hear what the committee was doing, what the committee was

8    thinking.

9           MR. KIRPALANI:  Mr. Burian has been deposed again,

10   Your Honor, on the basis of privileged information that we

11   gave.  And I think for the most part he was able to answer most

12   of those questions without interruption.

13   A.    Okay, I'll talk freely.

14          THE COURT:  Please.

15   A.    We were very upset.  We were in a bind.  I was a major

16   spokesman for Houlihan Lokey, giving advice to the committee.

17   I already said that I was embarrassed that all my years of

18   practice, there was a major transaction and I can't express a

19   view.  I could tell you that we understand what's happening.

20   It seems to make sense.  We do believe the company that there

21   is no viable alternative to buy as a going concern.  We do

22   believe the company that 250 million for the broker-dealer is

23   better than getting nothing, no matter how difficult it is to

24   swallow that an engine that produced billions of profits and

25   continued to produce billions of profits, now for Barclays, was

1      being transferred.

2          I told them that there was no way of knowing whether

3      anything was going on on the real estate appraisals, but that

4      the company appeared to be on top of it.  There appeared to be

5      a third party and that, you know, we have to assume that that

6      was fair.  And on the securities, like it or not, our choices

7      were:  try to blow this thing up and take the risk of

8      liquidation, keeping in mind that now we found out that

9      Barclays controlled the repo.  My understanding of bankruptcy

10     law is that the automatic stay may not apply, so if we blew

11     this thing up and there was no transaction, Barclays could try

12     to grab those securities and then try to monetize their loan,

13     which is exactly the liquidation we were trying to avoid.

14         It was a very, very gutsy move to walk into this Court and

15     say we think now is a bad time to sell, you know, that we were

16     going to guess the market.  And on balance, what we said was we

17     think that we should essentially allow this to happen, and we

18     should not consent, we should not decline, we shouldn't object.

19     We don't know enough to be able to say yes we agree, but we

20     knew enough to be able to say we can't in good faith stand up

21     and object.  And therefore on balance, I was instructed,

22     Milbank was instructed to make it clear to the judge what

23     impairments we were operating under, to be diligent in trying

24     to make sure we understood and that we were protecting the

25     company to the extent we could, but not to take an aggressive

1    position against, but not to help the company much forward.

2    Q.    Okay.  If you had had what you deemed to be a sufficient

3    time to diligence the sale as it was represented to you, and if

4    you had concluded that what was represented to you was indeed

5    what was happening, would you have recommended to the committee

6    to support the sale?

7    A.    That's a very, very tough question, because of the

8    hypothetical.  It greatly concerned me, certainly in

9    retrospect, the fact that a large portion of the book should

10   have gone up in value not down.  But remember, at the time,

11   there was a huge percentage of privates in there that we had no

12   idea, and I still don't know what the values are.  So net-net-

13   net, it think our advice would have been yes, some of the

14   assets appear to have gone up in value, some of the assets

15   probably have gone down in value.  We're not going to guess the

16   market.  We're getting benefits here, including the benefit

17   that I mentioned earlier before the break, that we were told by

18   the estate that they were desperately short of cash and

19   therefore this was a way for avoiding the need for a DIP

20   financing, this was a way of protecting all sorts of other

21   assets, having the billion-plus in the real estate in this.

22   And I think that net-net-net, if what was described to us were

23   true, we -- and our diligence had confirmed it, we probably

24   would have supported the transaction.

25   Q.    After your call with Mr. Seery and Mr. Shapiro, and after

122

1    your update to the committee, what did you do next?

2    A.   Well, as I mentioned earlier, I essentially came down to

3    court.

4    Q.   Do you recall a breakout session during the sale hearing

5    where the debtors' counsel updated the audience before the

6    hearing actually started?

7    A.   Well, what happened was, my impression is, I basically was

8    informed by Mark Shapiro and by Jim Seery, you know, as things

9    were happening, in a phone call.  It didn't take more than an

10   hour or so to get down to court.  But most of the people had

11   been in court since earlier or were not given the opportunity

12   to get that update, including people that were integrally

13   involved in the transaction.  When I got to court or shortly

14   thereafter, there was sort of a scrum.  There were people

15   standing over here in front of the bench.  And I believe Ms.

16   Fife was quickly walking through what she was about to inform

17   the court and what the modifications were to the transaction.

18   Q.   And did Ms. Fife's comments to the audience seem to you to

19   be consistent with your conversation with Mr. Seery and Mr.

20   Shapiro?

21   A.   Yeah.  I don't want to sound too nerdy about it, but I was

22   standing there with my notebook in hand, and I had this list --

23   the last page of my notes with the before and after, and I was

24   sort of going through with my finger making sure it matched up.

25   I don't remember if Ms. Fife mentioned that the cure estimate

123

1   was now lower as she did later in court.  I frankly don't think

2   she did.  But basically, everything Jim and Mark told me --

3   well, she didn't go into as much detail like the PIM brokers

4   and all that stuff.  The whole LB Canada thing wasn't

5   discussed.  But everything else was reviewed by Ms. Fife with

6   the group.

7   Q.   Was there any discussion by Ms. Fife of some substantial

8   disagreement between Lehman and Barclays over how aggressively

9   Lehman had been marking its book or anything like that?

10  A.   No.  She mentioned -- I believe she mentioned that value

11  had gone down; that they had to include -- I don't have a firm

12  recollection of whether she mentioned the 1.9 billion of box

13  assets, hammer and nails, whatever it's called.  I don't

14  remember that exactly.  But there was no conversation -- what

15  was the question again?  Sorry.

16  Q.   Whether there was any specific discussion about a

17  disagreement between Barclays and Lehman that necessitated

18  Lehman marking down its books to appease Barclays?

19  A.   No, no, no, no.  Not at all.  There may have been a

20  conversation about the fact that there weren't enough assets to

21  give to Barclays.  We may have to gross some up with some other

22  assets.  But no conversation whatsoever about, you know, a

23  change in the valuation or a huge fight.  Just that the market

24  value had gone down and the corpus of assets was no longer

25  available to be transferred.

124

1   Q.   Did you have any discussions with anyone in the courtroom

2   about liquidation values or hypothetical liquidation values for

3   any of the assets?

4   A.   No.

5   Q.   What about with Lazard --

6   A.   Whoa, whoa, whoa.  There was a conversation about, you

7   know, as is typical in these sales, if you don't do this,

8   something else might happen, and the idea that a going-concern

9   sale is better than a disaster or liquidation.  But nothing

10  about in this transaction we were moving to a liquidation sale.

11  Q.   Did you have any discussions with Mr. Ridings in the

12  courtroom?

13  A.   You know, Mr. Ridings -- Barry -- was there.  He did pull

14  me aside during that and say, you know, the committee's got to

15  get on board or it's going to be a disaster.  I'm telling you,

16  there's no one else out there who's going to buy these assets.

17  I don't want you to look at what a liquidation looks like.  I'm

18  not exactly quoting.  I'm trying to give the nature of the

19  conversation.  I know Mr. Ridings a long time.  We sort of

20  speak freely.  It wasn't a stilted, formal conversation.  It

21  was just, you know, the committee's got to be there for us.

22       And I don't remember if I told him or didn't tell him

23  exactly where the committee was, but I sort of gave him the

24  impression we're not going to do any harm.  We may not help you

25  much.

125

1    Q.    Did you stay for the entire hearing, Mr. Burian?

2    A.    No.  At some point I left.  I stayed for, you know, a very

3    good portion of it.

4    Q.    Did you stay long enough to hear the debtors' presentation

5    to the Court of the transaction that they were seeking approval

6    for?

7    A.    I stayed all the way through the case in chief.  I left

8    when some of the objectors were given their day in court.

9    Q.    And was that presentation to the Court consistent with

10   your discussions with the Lehman representatives, Mr. Seery and

11   Mr. Shapiro?

12   A.    Again, reading the transcript, I now see the differential

13   between the cure estimate.  But other than that, it was

14   essentially the same.  You know, market deterioration,

15   etcetera, etcetera.

16   Q.    Okay, let's turn your attention, then, to the period

17   following the Court's entry of the sale order.  Did you

18   participate in any way during the closing weekend?

19   A.    I did, very much.

20   Q.    And so what happened during the closing weekend?  Can you

21   let us know your participation and involvement there?

22   A.    Well, Saturday night I went to Weil Gotshal and spent a

23   lot of time there.  I was there a good portion of the night.

24   Went home, showered and changed, and went back on Sunday, and

25   was there Sunday through three, four in the morning, and left

126

1   about a couple hours before, I'm told, the technical signing of

2   the agreements.

3   Q.   Okay.  So let's break it down.  You mentioned you went

4   Saturday evening, obviously.  But were other members of your

5   team there at Weil Gotshal during the day on Saturday?

6   A.   Yes, they were.

7   Q.   Did Houlihan request any further details on the assets

8   that were being transferred, when it arrived on Saturday?

9   A.   I can't say exactly when we arrived on Saturday, but the

10  answer is yes, we were -- we asked -- like a broken record, as

11  you'll hear, throughout the weekend, we wanted to get a

12  breakdown of what exactly was going and how they were marked.

13  Q.   And you viewed that as part of your job, is that right?

14  A.   Yeah.  The -- we wanted to keep up to date on what was

15  happening and make sure it fit within the court order and all

16  that stuff.

17  Q.   What response did Houlihan get when it asked for this

18  information on Saturday?

19  A.   We were told that things were worse than we even could

20  imagine.  It was very, very difficult.  The Friday -- Friday

21  was very disappointing in what assets showed up and didn't show

22  up.  I don't remember if it was Saturday or Sunday, but the

23  comment of we need to send people down to DTC to find the

24  assets and figure out what's in our name and what's not in our

25  name.  I remember joking about how do you go down and

127

1   physically count what is an electronic transfer, but no one

2   thought I was being funny.  And we had the whole idea that we

3   honestly just don't know yet what was going on.

4       A lot of huffing and puffing about, you know, JPM forced

5   us into bankruptcy and now they're doing it to us again, and

6   that we just don't know what JPM is going to do.  And a lot of

7   concern about DTC.  And a lot of hoopla about, you know, are we

8   going to be able to close before the markets open.  We'll get

9   to you when we get to you.  We don't have a closing balance,

10   and when we do, you'll be the first to know.

11   Q.   Did you participate in any of the negotiations or meetings

12   that were going on on Saturday between Barclays and Lehman?

13   A.   Well, Saturday when I got there, no.  No, we were in a

14   room on our own.  We wandered around.  But Saturday, to the

15   best of my knowledge, no participation in any negotiation

16   whatsoever.  Just waiting around hoping to get information.

17   Q.   Let me -- I'd like you to take a minute and just describe

18   what you understand the word participate to mean.  I had filed

19   a brief in this Court, it talked about Houlihan being

20   intimately involved.  There was a lot to say about that.  Can

21   you just let the record be pretty clear, what was the extent of

22   Houlihan's involvement, the committee's involvement, Milbank's

23   involvement, in discussions, negotiations, etcetera, not just

24   Saturday, during the closing weekend?

25   A.   Wow.  How much time do I have?

128

1    Q.   I'll stop you.

2    A.   The place was very active.  There must have been, I don't

3    know, ten, twenty, thirty, forty Weil Gotshal lawyers, people

4    all over the place.  We were at best an annoyance, at worst

5    something else.  We had the mantra of what's going on, tell us

6    what's going on.  I don't ascribe negative, you know, motives,

7    but we were for the most part ignored and excluded from almost

8    every single substantive conversation, to the extent that, you

9    know, it got quite frustrating.

10        I recognize that we didn't support and that we took no

11   position.  I recognize that, you know, we weren't a movant, but

12   we do our fiduciary duties, and we -- every once in a while I'd

13   catch someone in the hallway, in the bathroom, you know,

14   getting coffee, you know, what's going on?  I'd see people

15   going back and forth.  Very often we'd see the junior guys at

16   Lehman or Jim Seery huffing and puffing and running in and out,

17   hey, what happened, are you back from DTC?  You back from JPM?

18   Informa -- you know, what's going on?  But nothing like what I

19   am used to, which is the debtor sitting down and saying, okay,

20   committee, here's the list of the thirty issues we're worried

21   about; here's what Barclays is worried about; this is what's

22   going on; here's the positions we're taking.  Nothing like that

23   whatsoever.  I mean, at best, dropping off a draft of the

24   clarification letter, you know, go figure it out yourself.

25   Q.   Just to be clear, because it's not always clear when

129

1    you're telling the story.  To confirm, you're not ascribing any

2    ill will to anyone that they were treating you kind of like the

3    younger brother?

4    A.    As you'll hear in a moment, I don't like being treated

5    that way, and I did get a little testy towards a later portion

6    of the evening and did assert myself.  But here we are,

7    billions and billions trading hands on the most significant

8    event, you know, ever in bankruptcy, and it was very

9    frustrating and became frankly less and less believable that

10   they were closing at some period of time, and no one knew what

11   was being transferred.  No one could describe to us what the

12   deal was.  No one could describe to us what the huffing,

13   puffing, yelling and screaming and documents being traded and

14   conference calls were.  You know, they had to be arguing about

15   something.

16        Now, we had, honestly, some inkling.  I have long-term

17   relationships with many of the people that were there that

18   night and that day.  You do pull people aside and say hey,

19   what's going on or where it is.  But when you talk about as a

20   committee, being briefed, negotiating, participating, being

21   asked for input in these things, zero.

22        There was a time on Sunday where in one of the -- not long

23   narrow, but very large square rooms on the twenty-fifth floor,

24   there appeared to be the locus of operations.  And you could

25   hear, you know, like the voice of God -- you hear people on the

130

1    conference call coming through the ceiling.  And there were

2    many, many people in the room.  And what would happen was,

3    people would gather.  JPM seemed to be the focus with their

4    Wachtel lawyers and the rest.  Michael Klein I was introduced

5    to at one point from Barclays and their whole team; Lehman,

6    different portions of their senior management team; the senior

7    people who were running the transaction on behalf of Weil,

8    would congregate there.  There'd be a meeting behind closed

9    doors, and then they would break up and all go into other

10   conference rooms, have calls, shuttle diplomacy, and go back in

11   the room.

12       So it didn't take a genius to figure out that's where the

13   action is.  So at one of the breaks in the meeting, being the

14   kind of person I am, without being invited, I walked in and sat

15   on the windowsill.  And when they all filed back in, no one

16   asked me to leave.  So I sat there.  And they then had this

17   long conversation and debate.  No one asked me my view.  They

18   broke up again.  And the next time they broke, I was a little

19   uncomfortable on the windowsill, I sat in someone's chair, you

20   know, moved up to the big boys' table and sat there for an hour

21   or two.  They then got back together.  And this was going on

22   for a little while where I was sort of eavesdropping on their

23   conversations.  I mean, eavesdropping is a little on a stretch.

24   They knew who I was.  But no one asked me to leave so I stayed.

25   Q.   Were you able to glean what this big meeting was about?

1    A.    Yeah.  Basically, there appeared to the SEC on the phone,

2    they had governors on the phone, and all sorts of other people.

3    It appeared to be a huge fight about which Lehman had little to

4    do.  At one point during one of the breaks one of the Lehman

5    people were like -- this doesn't really affect us any -- a big

6    fight between JPM, Barclays and DTC and maybe some other

7    authorities who are active in the transferring of securities

8    about what was transferred, where it was transferred, would it

9    be transferred.

10        It appeared to have two different components.  One

11   component was Lehman assets that were either supposed to be in

12   the repo or out of the repo, that didn't make it over to where

13   it was supposed to be, and that JPM was refusing to give to

14   whoever was supposed to own it.  And the other side of it was

15   non-Lehman assets that it either held in trust for others or

16   that was a trading asset -- trading issues, where there was a

17   trade put in by a customer on Wednesday and hadn't closed yet.

18   It was somewhere in this labyrinth of problems and someone had

19   to guarantee to somebody else on how it would close.

20        It was a very testy conversation.  A couple of times

21   people would say things like, if this is going to close we have

22   to resolve it, you know, and all that stuff.  But it didn't --

23   none of the issues that seemed to consume most of Sunday or at

24   least what I knew of, didn't really have any dollar and cents

25   impact on the Lehman estate.  But I could be misunderstanding

132

1   those issues.  I'm not an expert in them.  I sat there as an

2   uninvited guest and I tried to listen carefully.

3   Q.   Okay.  I'd like, to turn your attention --

4   A.   By the way, when I moved up to the table, I did run out

5   and ask Mike Fazio, and he, at one point joined and sat on the

6   windowsill.  Maybe he also moved to the table at one point.

7   But you know, it was like during breaks of the meeting, we

8   tried to get better real estate.

9   Q.   Gotcha.  Turning you attention to the subject of --

10  A.   But that's not the extent of our negotiation or

11  involvement.  Obviously --

12  Q.   We're going to talk about other meetings, you know, in a

13  minute.

14  A.   Okay.

15  Q.   But I just want to turn your attention for a moment to the

16  clarification letter itself.  Were you -- was Houlihan aware

17  that there were ongoing discussions on a yet-to-be-finalized

18  clarification letter that weekend?

19  A.   We got a draft on Saturday.  I can't tell you we were

20  aware that people were negotiating it.  We asked about it.  We

21  said we'd like to be at a negotiation.  I can't swear this,

22  because I wasn't part of it.  The appearance was that Saturday

23  and Sunday were mostly consumed with figuring out what assets

24  were there and where were they going and all those issues.  At

25  some point on Sunday real focus turned to, okay, now we know

there's a deal to be had, let's finish up this clarification and negotiate it, because Tom Roberts was running around with a markup. There seemed to be meetings about it. I know that at one point in my presence someone said, listen, we need to finalize our position; we're going to go in and have a meeting with Barclays. And I asked if I could join; I was told no. So obviously at some point on Sunday, they turned to the clarification letter. But I can't tell you exactly when or how focused it was. It revved up. Clearly it revved up later on Sunday.

Q. More than anything, what I want you to tell the Court is, was your understanding of the clarification letter that it was designed to make substantive changes or plumbing changes to the transaction that was described?

A. We were concerned about the former and hoped for the latter in the sense of we understood the Court had made very, very clear that the Court was around. If there were changes come back. That the Court had even tied the hands of the committee, that if the committee wanted to consent to something, and I apologize, Your Honor, we didn't know what to do with this -- it was sort of only we could consent to only nonmaterial changes. So there was sort of very narrow leeway. So the clarification, by its nature, I assumed, had to do with how to ultimately achieve what was described to the Court. It couldn't make material changes to the deal.

134

```
 1        My view was, I didn't think the Court cared how Barclays
 2    got what it got, you know, whether it was directly, indirectly,
 3    but that what it got was important.  That was a distinction I
 4    made in my head.  But my understanding of the clarification
 5    letter was to confirm that.  And by the way, there were
 6    substantive changes that were described on the record that were
 7    never papered over.  And it was also my understanding that the
 8    clarification letter was intended to do that as well, which was
 9    to document, you know, the number of changes that were
10    described in court.
11    Q.    Okay.  I understand that -- appreciate describing all of
12    your efforts during the weekend, but I just want to fix it in
13    time a little bit more clearly so we can go a little slower on
14    a couple of meetings that we want to talk about.  On Saturday,
15    how late did you and your team stay at Weil Gotshal?
16    A.    We were doing nothing.  I think -- at some point, I think,
17    three in the morning, two in the morning, four in the --
18    somewhere between two and four, I don't know exactly.  It
19    was -- there was -- they weren't ready for us.  It made no
20    sense to stay.
21    Q.    What did you expect would happen when you returned on
22    Sunday?
23    A.    I expected that there would be -- you know, we figured out
24    what we got.  Here's a, you know, schedule that's going to be
25    attached to a purchase agreement and what they're getting.
```

135

1    We're going to make you comfortable as to what assets are being

2    transferred.  I expected there would be a clarification letter

3    that was -- you know, had a list of issues that were -- that

4    would be described to us, and that if there were any open

5    issues, hopefully they were relatively narrow.  And they would

6    tell us what the bid and ask was, or what the issues were.  It

7    would be like every other significant transaction where there's

8    some -- at some point at least, there's order to the chaos, and

9    we would be treated like a committee should be, which is, as a

10   necessary evil, you know, to an appropriate functioning of a

11   bankruptcy case.

12   Q.    I resent that, Mr. Burian.

13   A.    Sorry?

14   Q.    I resent that.  What did in fact happen on Sunday morning.

15   A.    I started to describe the fact that I hung around for a

16   long time and ate starchy foods.  Sat down in that larger

17   meeting.  Was briefed by Milbank about what a 15c3 account was,

18   because there was reference in the clarification letter, and I

19   honestly didn't even know what it was.  Walked through the

20   letter with Milbank, spent some time doing that.  The team had

21   a quick conversation with Jim Seery that we really had to get

22   the list of assets.  And as you know, we did get a draft,

23   preliminary, old list of assets there.

24   Q.    Let me stop you there, because I want to put it up on the

25   screen.  Can you take a look in your binder --

136

```
 1              MR. KIRPALANI:  And if we can put it up.  It's

 2     Movants' Trial Exhibit 381.

 3     Q.   This is an e-mail from -- I think from someone at Weil

 4     Gotshal to an associate at Milbank, 11:30 --

 5     A.   It's actually from Milbank.

 6     Q.   Oh, I'm sorry.  It's from Milbank to Houlihan, is that

 7     right?

 8     A.   Correct.

 9     Q.   Okay.  11:34 a.m.  And the subject line is "BarCap".  And

10     then if you turn the page to page 2, there's a summary page.

11              MR. KIRPALANI:  Could you just blow that up?

12     Q.   And then you don't have to turn to this on the screen, but

13     there seems to be a ream of paper behind that, it's double-

14     sided in these binders, which looks like backup to that

15     schedule.  Is this the schedule that you were finally given on

16     Sunday?

17     A.   I personally was not given this schedule.  This was

18     e-mailed to us from Milbank, having been given it by Weil

19     Gotshal, of a list of assets that at some point in time was the

20     list that would be distributed to Barclays.  The numbers were

21     marks as of some date between Monday and Friday.

22     Q.   Okay.  And did Houlihan do anything with this schedule on

23     Sunday after it had gotten it around 11:30 in the morning?

24     A.   Well, Brad Geer buttonholed Jim Seery and said hey, we

25     just got this through Milbank.  It says 49.9 -- it's 50 billion
```

137

1    dollars.  You had told the judge 47.4, you know, of that -- if

2    this is supposed to be the repo stuff, that was only supposed

3    to be 45.5 billion.  You know, what's going on?  And he was

4    told, you know, whatever schedule you're looking at, it is what

5    it is.  I can't tell you when the marks were.  I'm not even

6    sure these are the assets that are going.  We're still trying

7    to reconcile the books.  You know, look, when we know, you'll

8    know.

9    Q.    So --

10   A.    And Mr. Geer -- again, I think I'm here not only for

11   myself but for Houlihan -- is that right?

12   Q.    You can speak about your knowledge if you're the senior

13   most person --

14   A.    To my knowledge --

15   Q.    -- at Houlihan.

16   A.    So, to my knowledge, the focus on that conversation was

17   more the issue with respect to the integrity, is this the

18   corpus of assets -- I'm sorry.  The focus was more on things

19   have dropped in value and all the sorts of problems; less of an

20   emphasis on is it the corpus of assets.  Remember, we were a

21   different side of the house.  We're sitting in the rooms all

22   day, Sunday, at this time, knowing that huge disputes about

23   assets not showing up, and therefore the two of us put that one

24   together.

25   Q.    And did you ask anyone back at your office to try and

1   start diligence in this schedule?

2   A.   Well, here we are, it's sometime -- I mean, it's 11:30,

3   12:00 in the afternoon on Sunday.  The largest asset purchase

4   agreement in bankruptcy ever is about to close.  We don't know

5   what assets are going.  We're told they've dropped tremendously

6   in value.  So we did -- we didn't know if this was the assets,

7   but under instructions to do the best we can, we basically sent

8   out an APB and pulled in associates and analysts, and while I

9   know it sounds crazy, but we basically split this list up and

10  said to our associates and analysts go find out what we can

11  know about the value of these assets, you know, go CUSIP by

12  CUSIP.  I mean, look at this list.  Go CUSIP by CUSIP and just

13  find as many Bloomberg machines as you can.  If you have to go

14  to Yahoo Finance, just plug it in and get the quotes.  And try

15  to find someone to do an Excel spreadsheet to compare how the

16  quotes add up to these numbers.  Maybe we could back in to when

17  this was marked as of, maybe we can get a feel for what things

18  dropped in value.  Maybe we could actually get ahead of the

19  curve for a change and not be behind the curve.  Now, to be

20  honest, I didn't know how complicated this was when I said all

21  this stuff, sent the associates to work, but the goal was what

22  can we fathom from these documents.

23  Q.   And did you ultimately get any feedback from your team?

24  A.   Again, I was doing a lot of other things at the time, but

25  the team did get feedback which was then related to me in

139

1    summary fashion.

2    Q.    And what did they relate to you?

3    A.    Well, what was related to me is, as we would have

4    expected, a lot of these assets were the cherry-picked, most

5    liquid, broker/dealer assets that would be used in the ordinary

6    course of business.  These were the assets that a large portion

7    of them -- like, if you look at the schedule, the twenty-eight

8    and a half billion called Fed collateral, a lot of that were

9    agencies, government securities, which in fact, given enough

10   time, you can find quotes for.

11        There was a large portion of assets for which we had no

12   idea -- I mean, in retrospect, you know, there are numbers here

13   and CUSIP numbers we couldn't find anything about.  I mean,

14   virtually -- for instance, one of them turns out to be a senior

15   note in the Pine structure vehicle which I now know too much

16   about, but at that point in time Pine to me was a tree.  You

17   know, there was no knowledge.  And that in fact if you grouped

18   them into different areas I believe the groupings were agencies

19   and federal securities like T-bills, and you grouped them in

20   corporate so we can get quick quotes on.

21        Net, net, net, it looked like one category went down

22   roughly 300 million in value.  If you look at the three days

23   from Wednesday to Friday, for the other category it had gone up

24   400 million in value.  So net, net, net, of the assets that we

25   could value, it wasn't perfect, not exact, done by essentially

140

1    kids doing the best they could in a very limited time, it

2    looked like the assets had gone up 100 million bucks.

3         No firm conclusion as to what date these were marked as

4    of.  It appeared that the marks didn't correlate to any

5    specific date which, by the way, didn't surprise us, in light

6    of the -- you know, the description in the document was hey,

7    here's a list that was pulled together.  It may or may not be

8    accurate, you know, we're not sure what date it's through.

9    Q.   So at that time even though you were diligencing (sic)

10   this list, just so that the record's clear, you weren't sure

11   that this in fact is the list of securities that's going over?

12   A.   I was neither sure that it was the list of the securities

13   nor did I have any real idea of what the true value was because

14   a large portion of the securities were impossible to find

15   quotes on --

16   Q.   Okay.

17   A.   -- through our limited systems.

18   Q.   Okay.  You mentioned a few minutes ago the 15c3 lesson

19   that you got.  And I think you also mentioned that that wasn't

20   the only meeting you attended or that wasn't the only

21   negotiation that you had some role in.  Did there come a time

22   when you had a role in the negotiation over the 15c3 issue?

23   A.   Yeah.  I mean, time is passing, it's getting later.  I

24   found out this information somewhere between 11:30 at night and

25   1 o'clock in the morning, you know, the idea that what we

141

1    couldn't value was -- may have been worth more.  I'm getting a

2    little more agitated as time goes on.  I mean, things are

3    moving on and I'm, like, stomping around trying to find someone

4    to talk to me.

5        And I passed by a group of people standing by, I don't

6    know, the secretary's station outside of one of the conference

7    rooms, 25b or c -- c or d, on the Weil Gotshal conference

8    floor.  And Harvey Miller was there, Tom Roberts was there.

9    And I basically picked up a conversation about we really got to

10   solve the regulatory capital issue, 15c3 issue.

11       I'm not exactly shy.  I sort of poke into the middle and

12   say, "Hey, what's going on there?"  And they go, "Oh, Barclays

13   is giving us a big headache.  They're threatening to close.

14   You know, they're concerned about the amount of transactions,

15   and we're going to have to compromise on this issue."  And I

16   was, like, yeah, I don't want to give -- when you say

17   participate or negotiate, we're not, like, sitting in chairs,

18   you know, "What do you think?".  We are literally standing by a

19   printer where I happened to walk by.

20       And I say, "Well, what's the issue?"  And they say this

21   and that.  And I say, "Wait a minute, Milbank had told me about

22   this.  It doesn't make any sense to me.  I mean, a deposit's a

23   deposit.  Cash is cash.  What's the ambiguity?  You can't let

24   Barclays just push you around."  Hey, in my role as the

25   committee I'm supposed to give the debtor backbone in dealing

142

1    with third parties who want to take advantage.  And at which

2    point in time, I think it was Tom Rob -- I'm pretty sure it was

3    Tom Roberts said to me -- well, not in that conversation, that

4    comes later.

5        In that conversation I think it was more or less left that

6    I basically said to them "Enough is enough.  You know and I

7    know they're going to close.  They're not going to walk away.

8    Egg is on their face as much as ours.  You've got to be firm on

9    these issues.  Whatever the issues are you've got to be firm.

10   On this one it looks even more clear.  There are securities

11   there but it's also cash.  Cash is cash as defined.  Lori told

12   the judge -- Ms. Fife told the judge no cash is going.  Just

13   tell them no."

14       A little later on I believe Tom Roberts came up to me and

15   said, "We've really thought about this issue.  It's 2.2, 2.3

16   billion.  We're going to split the baby and make this issue go

17   away."

18   Q.   I'm sorry, 2.2, 2.3 billion, that's the cash?

19   A.   No, 2.2 to 2.3 billion of total assets, roughly 760

20   million of which were securities, the balance were in cash.

21   Tom -- again, this is all hallway talk -- you know, we're

22   negotiating the letter now and we're going to recommend that

23   we -- I don't remember if he said we're going to offer or we

24   have offered that we're going to split the issue, they'll get

25   roughly 1.1, we'll get 1.1 billion dollars of value.  And you

143

1   know, in light of the ambiguity, you know, that's fair.

2   Q.   What was your reaction to that.

3   A.   I -- I went a little ballistic.  Well, ballistic is too

4   much, I'll save that for later in the evening.  I got agitated.

5   I basically got on my high horse and said to him, "You know

6   something Tom, when you're talking about billions, fifty-fifty

7   splits and splitting the baby just doesn't cut it.  We're

8   talking about hundreds and hundreds of millions of dollars, and

9   you don't just say there's ambiguity in the document, golly,

10  gee whiz, you know, it could be this, it could be that, we'll

11  split it.  That's a billion dollars."  In retrospect I probably

12  shouldn't have said the next phrase, but I also said to him, "I

13  could understand if you really think there's ambiguity, in

14  splitting the securities or even giving them the securities,

15  but how do you settle a black and white issue on cash?  Is

16  there any word more clear than cash?  You know, what are you

17  doing?  What are you doing?"

18  Q.   And what was Mr. Roberts' reaction to that?

19  A.   He was exasperated with me.  I think he confirmed his

20  judgment to probably leave us out of all the negotiations of

21  the clarification letter over the last day or so.  I think he

22  felt that, you know, I don't really understand or I don't

23  appreciate the pressure they're under.  Tom is a very good

24  lawyer and I think he felt that sometimes in life you've got

25  compromise issues and move on and there's a greater good and I

144

1   was being narrow or didactic.  But at the same time I represent

2   a committee, I've had input into one issue and on that one

3   issue we seemed to be right.  And I made it very clear to him I

4   thought they were being weak-kneed about the whole thing and,

5   you know, they shouldn't be going into the view of just because

6   Barclays raises an issue you split the baby.  I actually

7   somewhat obnoxiously said to him, "What else are you

8   splitting?"  But that didn't get a response.

9   Q.   And did anyone from Lehman or Weil tell you that night how

10  the issue was going to be resolved or how it was ultimately

11  resolved?

12  A.   No.  I -- again, maybe they did and maybe they didn't.  I

13  have no recollection of ever being included in any other

14  conversation about these issues.  I don't know how you want to

15  call the morning, but later on about 6, 7, 8, 9 in the morning

16  I did get on my BlackBerry a -- I don't remember if it was a

17  PDF of the clarification letter or someone at Milbank typed for

18  me that paragraph and e-mailed it to me, but it sounds like

19  they went back and fought with Barclays about the issue and in

20  fact had a deal that on the 15c3 issues, when that money gets

21  released, Barclays would get the securities and we would keep

22  all the cash.  It's not an insignificant benefit to the estate

23  and I did take a little credit in that savings.  But you know,

24  that was the first time I can recollect hearing about the

25  issue.

145

1    Q.   Okay.  Turning back now to the issue of having your team

2    try to make sense of the schedules of the assets that were

3    going to be transferred.  You testified that the schedule you

4    got at around 11:30 in the morning on Sunday was clearly not

5    the final schedule or the precise schedule.  You did with it

6    what you could, but did you let anyone at Lehman know that

7    there's some deadline under which you're operating that you

8    need to see something by any particular time that day?

9    A.   We had a very active committee.  We have Japanese

10    participants, time zone issue, drive you nuts.  We went to

11    Lehman, you know, Harvey Miller, in particular and Lori and

12    others quite often and said we're running out of time.  If

13    there's anything you need from the committee you've got to tell

14    us.

15         And we had, I think, a committee call scheduled at 12.  It

16    got bumped to 2, it bumped to 4, it bumped to 6, bumped to 8.

17    I think we even had a committee call at 11 or 11:30 which was

18    already was the next -- don't get me on time zones.  And we

19    said, "It's Sunday night, this is beyond rude, if there's

20    something you need from us we need to know."

21         And at some point before the last call I went to them and

22    said to them, "You know, we're not going to have another call

23    at 2 in the morning.  There really is very little we can do.

24    You don't seem to need us for anything.  If there is something

25    you want us to go to the committee on, you need to tell us."

146

1    Okay.  And they were, like, "Do what you can.  I'm assuming you

2    have phone numbers for your co-chairs, you know, if people

3    aren't available they're not available."

4    Q.    And so did you participate in a committee conference call

5    that Sunday night?

6    A.    I did.

7    Q.    Okay.  And what was --

8    A.    Well, Monday morning at that point.

9    Q.    Yes.  What was the purpose of that call?

10   A.    You know, it wasn't a very pretty call.  We knew less than

11   we thought we knew on Friday.  We discussed with them the fact

12   that we were extremely concerned about the split of the

13   residential mortgages.  You may remember that Ms. Fife informed

14   the judge that there was going to be -- some residences were in

15   the deal, some residences were out of the deal.  Mr. Hirshon

16   stood up at the meeting and spoke about how some of the

17   residences were going into the DTCC but then they would come

18   back to the estate if trading liabilities were worth less.

19        I had no update as to exactly where that deal was being

20   cut.  We explained to the committee that we had a five billion

21   dollar issue that we can't account for, that we have marks as

22   of a certain date.  We have no -- we can't advise them that in

23   fact the market value on the issues that we have done.  We

24   described to them the somewhat haphazard exercise we went

25   under, the results of which were just coming in after 11

147

1     o'clock at night and that was the best we can do and that we

2     were waiting for an explanation from the debtor with respect to

3     and the privates and the assets really moving over.

4         I did pooh-pooh the issue and say things like, sure,

5     there's an explanation that these assets are not the assets and

6     that, you know, we'll find market value moves in the assets we

7     have not been able to value.  There was -- we talked about the

8     regulatory capital issues, and in fact that we were, you know,

9     exercised about them and thought that here were assets that we

10    didn't know we had but that technically we believe we should

11    get and that we were trying to give the debtor strength to just

12    say no.  So we talked about those three issues.  We probably

13    talked about all sorts of other issues.

14        There was a big conversation about what could we possibly

15    do and the answer was nothing, we have to wait and see what

16    they do, I'm sure they're going to come back to us and tell us

17    what's going on, and we'll just do the best we can.  I think we

18    scheduled a meeting with the committee for 10 o'clock the next

19    morning.  And I'm sure some committee members said call me any

20    time and wake me up and other committee members said, you know,

21    I'm done with this.  It really was not a very satisfying call.

22    Q.   And were you able to get any instructions or authority

23    from the committee to consent to the transaction as you

24    understood it at that point?

25    A.   Very direct and significant conversations.  We were

148

1    informed directly and bluntly that we were to observe, we were

2    to participate, we were not to consent.  We are not advising

3    the committee that we had any ability or knowledge base to

4    consent.  We had taken no position of authority at the hearing

5    other than we had asked for an adjournment and that nothing

6    material had changed in that time frame and that we had no

7    ability to exercise discretion and all of a sudden support or

8    approve.

9    Q.    Okay.  So after the committee conference call on Sunday

10   night did you make any further efforts with Lehman or Barclays

11   to get information about the assets being conveyed?

12   A.    Well again, at some point during this we had a whole 15c3

13   conversation, but as time went on and I hear guys from my team

14   telling me, "Oh my God, you know, we've got to get an

15   explanation of this."  I'm hearing that they're trying to

16   resolve the clarification issues to proceed to a closing.  It

17   just becomes, you know, impossible to believe that people don't

18   know what they're transferring.  I mean, at some point you have

19   to resolve the JPM issue.  At some point DTC knows a lot of

20   money is changing hands.  Although it could be it doesn't

21   matter what the assets are, Barclays is closing and moving on

22   and taking a loss.  But no one had said that to me.  So at one

23   point in time I started getting very, very agitated that things

24   were happening and I had no way to explain any of it to my

25   committee.

149

1    Q.    About what time was this?

2    A.    Sometime between 1 and 3 in the morning.

3    Q.    Okay.  And so what did you do?

4    A.    Besides stomping around and getting coffee and, you know,

5    complaining loudly to anyone who would have listened to me, the

6    most effective thing I did was again I walked up to the area

7    outside of the conference rooms where the clarification letter

8    was being negotiated.  I waited for people to come in and out.

9    At one point Harvey was standing there.  I think Lori was

10    standing there, Tom Roberts was there, Michael Klein was there

11    talking to his client.

12        And I pulled Harvey's elbow and said, "This is ridiculous.

13    You're telling me you're about to close the largest transaction

14    ever and you don't even know what you're transferring and that

15    you're too busy to tell the committee what you're doing?  Don't

16    you think, Harvey, maybe you know what's going on?  Maybe not.

17    Don't you think at least you should get an explanation and I

18    can listen and hear it?  We've got to talk about" -- I didn't

19    use these exact words, but in a very agitated aggressive

20    manner, it's time to tell us where we are.  If you're not done,

21    fine, I need to know where we are.

22    Q.    And what did Mr. Miller do?

23    A.    You know, I think Harvey had some sympathy.  He sort of

24    turned to me and said wait here a minute, you know, we're going

25    to get you an answer.  And he walked four, five, six feet over

150

1  and sort of yanked at Michael Klein's shoulder and sort of

2  whispered in his ear pointing at me, at which point they all

3  motioned to me, move into a conference room.

4  Q.   And I'd actually like to ask you to refer to Movants'

5  Exhibit 410 in your binder.

6          THE COURT:  It's just about the time that we would

7  ordinarily take an afternoon break, so maybe we can make this

8  the transition point --

9          MR. KIRPALANI:  Of course.

10         THE COURT:  -- and take ten minutes.  We're adjourned.

11    (Recess from 3:34 p.m. until 3:47 p.m.)

12         THE COURT:  Be seated, please.

13         MR. KIRPALANI:  Mr. Burian --

14         THE COURT:  Just for planning purposes, I need to

15  break today at about 5:20--

16         MR. KIRPALANI:  Okay.

17         THE COURT:  -- so hopefully we'll be able to at least

18  conclude the direct that we're in the middle of now.

19         MR. KIRPALANI:  That's my expectation.

20         THE COURT:  Great.

21  RESUME DIRECT EXAMINATION

22  BY MR. KIRPALANI:

23  Q.   Mr. Burian, you were mentioning the meeting -- just to

24  give some context -- with Mr.  Miller and he went and got Mr.

25  Klein to talk with you and you went into a conference room.  I

151

1    **was asking you to take a look at Movants' Exhibit 410 in your**

2    **binder.**

3              MR. KIRPALANI:  Put it on the screen.  Actually, Your

4    Honor, this is the original manila folder that's been talked

5    about a lot.  If it's okay with --

6              THE COURT:  Oh, I'd love to see it.

7              MR. KIRPALANI:  -- the parties, I'd like to mark it

8    as -- I've been carrying it around for a year wondering what to

9    do with it.  I'd finally like to just --

10             THE WITNESS:  Could we go off the record for a second?

11             MR. KIRPALANI:  -- give it to someone else.  May I

12   approach, Your Honor?

13             THE COURT:  You may, but Mr. Burian has asked to go

14   off the record.

15             MR. KIRPALANI:  This isn't a deposition, Mr. Burian.

16             THE WITNESS:  I was promised the original back if you

17   can bring it to my office at some point.

18             THE COURT:  All right. Fine.

19             MR. KIRPALANI:  Okay.

20             THE WITNESS:  Thank you.

21             THE COURT:  And it will later appear on eBay perhaps.

22             UNIDENTIFIED SPEAKER:  It will have one bidder.

23   (Movants' Exhibit 410A, manila folder, was hereby marked for

24   identification as of this date.)

25             MR. KIRPALANI:  So we've marked that 410A.

152

1          THE COURT:  Okay.  Shall I give it to --

2          MR. KIRPALANI:  It was 410 --

3          THE COURT:  Shall I give it to Mr. Burian?

4          MR. KIRPALANI:  I think you can keep it.  He has the

5     copy.  I think he's familiar enough --

6          THE COURT:  Okay.  This can be --

7          MR. KIRPALANI:  -- with the copy.  That'll be our

8     original --

9          THE COURT:  This can be up here just for a minute.

10    BY MR. KIRPALANI:

11    Q.   Can you walk through what you recall being discussed in

12    the meeting with Mr. Klein and Mr. Miller, and to the extent it

13    helps to refer to Exhibit 410, feel free to do so.

14    A.   It was a very rushed conversation.  It was clear that Mr.

15    Klein was being put upon to have to explain the transaction to

16    us.  Harvey clearly had pulled him into the room and said

17    "You've got to do this."  I was sitting there, Mike Fazio was

18    to my left, Lori Fife at the head of the table on the right, I

19    believe, though she wasn't there the whole time.  Mr. Klein,

20    half sitting, half standing, was caddy corner on the corner.

21    Harvey Miller was across from me and Tom Roberts was to his

22    right, to my left.

23         And Mr. Klein basically started talking.  He understood

24    the purpose of the meeting, obviously.  And he grabbed from the

25    credenza or from somewhere on the table a manila folder, turned

153

1    it over with a marker, I believe, or a pen, and starts

2    scribbling.  And he said, "Listen, this is where we are and

3    this is what the transaction is.  We've had all these problems

4    with DTC and with JPMorgan, but it's really not that

5    complicated."

6         I'm not giving you exact quotes but I'm trying to give you

7    tonality and sort of, you know, a feel for the room.  He said

8    to me, you know, "This is where we are.  Originally it was

9    seventy-two million -- billion against sixty-eight billion and

10   that's no longer true.  We thought we were getting pre-mark at

11   49.9"  Actually, it may be 49.4, now that I look at it --

12   roughly fifty billion dollars pre-mark.  Pre-mark, it was clear

13   in the room was old value.  Post-mark, we're sitting here

14   today, post-mark they are now worth forty-four to forty-five

15   billion dollars.  You know, differences of view about this

16   stuff but Barclays is going to accept forty-five billion.

17   They'll cut us a break, forty-five billion of value, add the

18   box securities which was the additional securities that was

19   going around and voila it's 1.9 billion.

20        So all in -- actually, can I make a comment?  Everything

21   on this page is Mr. Klein except for that little box where it

22   looks like it says "Regis" but it really says "resis" and

23   there's a 2.5 and a 3.5.  That's my chicken scratch.

24   Q.   Okay.

25   A.   When I go through this you'll see the difference.  So all

154

1    in we're closing, we're getting 47 billion of assets and the

2    Fed liability's 45.5.  Now I know it was only 45, but it's

3    45.5.  We're taking on extra liabilities and carrying over the

4    same mistake everyone was making with respect to the cure

5    payments of 4.25 and you know, you guys are now selling 47

6    billion of assets for 49 plus -- 49 and a half billion of

7    liabilities, and net, net, net, ignoring the fact that we are

8    accepting 45 billion and not 44 billion, you guys are doing two

9    plus billion better than you ever thought and you should be

10   thanking us and not causing trouble.  I mean, essentially the

11   conversation, in other words.  You see these two lines across

12   the --

13   Q.   Yeah.

14   A.   He used that to denote -- he goes, "Okay, that is the

15   transaction that is closing.  All that's been going on here is

16   figuring out how to get there."

17   Q.   Okay.

18   A.   One --

19   Q.   Just so the record's clear because it's hard to sometimes

20   follow with the two lines.  In the center of the exhibit there

21   are two horizontal lines, and you're referring to the top of

22   the -- what's above that double line versus what's below that

23   double line, is that correct?

24   A.   Correct.

25   Q.   Okay.

155

1    A.    The top above the double line was viewed as, "Let me tell

2    you the substantive impact of what we're getting and what we're

3    not getting."  And below the line was, "Let me explain to you

4    what this whole weekend has been about and the complexity of

5    how we're getting it."

6    Q.    Okay.  And so what did you understand the below the --

7    actually, before I get to below the line, what's the resis box

8    that you testified is your handwriting?

9    A.    That came after -- you want it chronologically or you want

10   me to just jump there.  I mean, this was -- I took this folder

11   from him.  Later on you'll hear that we tried to ask some

12   questions.  One of my about the resis and I jotted a note down

13   about his answer.

14   Q.    Okay.  No, sorry then, stay with it the way you feel it's

15   most relatable.  Did you discuss what's below the line then?

16   A.    Again, this is more of a monologue than a conversation,

17   but Mr. Klein then said to me, "Okay, how are we getting the

18   pre-mark fifty billion dollars of assets?  Well, Friday we got

19   forty-one to forty-two billion transfers from BarCap to JPM --

20   to BarCap from JPM but eight and a half billion was held up.

21   We got -- on the 8 and a half billion we got about 7.4 billion

22   of cash."  If you remember, on this big schedule there's 7

23   billion of cash listed.  "And what we're going to do is somehow

24   or another we're going to reverse that trade and ultimately the

25   goal is we're going to get those securities back and we're

156

1      going to give them, you know, their cash back," or something to

2      that effect.  The plumbing issues just weren't all that

3      interesting to me.

4      Q.    Okay.  Staying on top, now, of the double lien, the

5      substantive issues, as you described them.  Did you ask any

6      questions regarding pre-mark, post-mark, as of when, what

7      methodology, anything about that?

8      A.    The meaning was obvious in the room.  I mean, he said pre-

9      mark.  We're talking about Lehman's books and records.  The 49

10     point whatever billion was pre-mark, post-mark.  I mean, mark

11     means -- you know, a broker/dealer, my understanding, has a

12     clear understanding of what mark means.  You know, going

13     concern, mark to market in a manner in which every other

14     broker/dealer might market a book.  It's not -- there was no

15     specific conversation other than the fact that Barclays had an

16     issue between -- it could be between forty-four and forty-five

17     and was giving us the benefit of the doubt and making it forty-

18     five.

19     Q.    Okay.  And can you just --

20     A.    But there was no discussion about the manner.

21     Q.    But can you just refer back to Movants' Exhibit 381.

22            MR. KIRPALANI:  Can we get that on the screen?  If you

23     can flip the page to the second page of this exhibit and

24     enlarge that.

25     Q.    So was it your understanding that this was the 49.9 pre-

157

1    mark number, that it coincided with that?

2    A.    Not necessarily.  My suspicion, but frankly I had no way

3    of knowing if that was or wasn't, you know, what exactly --

4    what corporates of assets were showing up after all the weekend

5    events.  I didn't have any clear understanding of --

6    Q.    Did you ask --

7            MR. KIRPALANI:  We can go back to Exhibit 410.

8    Q.    Did you ask Mr. Klein, or did Mr. Fazio ask Mr. Klein when

9    this decline in market value occurred?

10   A.    In a more leading way than that.  I mean, Mike jumped in

11   and said, "Wait a minute, what's going on here?  Some of these

12   government security issues have gone up in value."  Like, what

13   do you mean pre-mark and post-mark, you know, the market has

14   dropped?

15   Q.    And what did either Mr. Klein or Mr. Miller -- what did

16   anybody say to you?

17   A.    Mr. Klein sort of made a face, you know, as if do we not

18   understand what's going on in the world, you know.  But I don't

19   know what he was really thinking.  Harvey jumped in and said,

20   "We're here to tell you what the deal is that we're closing.

21   We're not here" -- I don't remember his exact words, but

22   basically, "You can get whatever information you want, we're

23   not here to answer your questions."  You know, it is what it

24   is.  But we raised the issue and I'm positive that Mr. Klein

25   several times during that meeting used the word "market value".

158

1    Q.    Was there any mention during that meeting of Lehman or

2    Barclays using the liquidation value or a hypothetical

3    liquidation value to arrive at this post-mark number?

4    A.    Absolutely not.

5    Q.    Was there any discussion of agreeing to the forty-four or

6    forty-five billion dollar post-mark value in order to

7    facilitate a day one gain to Barclays?

8    A.    No, the word "agreement" did come up in the sense that

9    they said, "We've agreed that we're going to round it up to

10   forty-five."  But in a context there was no discussion of any

11   of the other items you mentioned.

12   Q.    So how did you respond to all of this?

13   A.    The information I'm getting does coincide or foot with

14   some of the information that I received.  I had no way of

15   diligencing this.  Michael Klein got up and was actually

16   standing at the time anyway and he left the room pretty

17   quickly.  Harvey had to go around the table and across to leave

18   the room.  And I stood up and I turned to Harvey Miller and

19   said, "There's nothing I can do about this, there's no

20   diligence, you know, I've got to trust you on this."

21   Q.    Okay.  And staying away from what's below the double line,

22   staying away from the plumbing for a moment --

23   A.    Oh, wait, I'm sorry --

24   Q.    Um-hum.

25   A.    -- it's not true.  I did ask a question and got one

159

1    answer.

2    Q.    Okay.

3    A.    Mike Fazio jumped in after me, and that was the resis

4    thing that I mentioned earlier.  I'm sorry.

5    Q.    No, so go ahead, just tell the Court about that.

6    A.    Yeah, as I mentioned earlier, one of the committee issues

7    is what's happening with the roughly six billion or resis,

8    who's getting them, who's not?  I said, "Okay, are these

9    numbers net or gross?  You know, are they including the resis,

10   not including the resis?  Who's getting the resis?"  You know,

11   I probably didn't say all that.  I probably said, "What's up

12   with the resis?" or something equally intelligent.  And what

13   Mr. Klein said to me is, "It's very simple.  Barclays is

14   getting two and a half billion of the resis and that's already

15   in the forty-five billion dollar number.  You are getting three

16   and a half, but that three and a half is going to DTC.  If they

17   have liabilities they'll take it from there.  If they don't

18   have liabilities you'll get them back."  And that's why I sort

19   of straddled there and put two and a half on the left and three

20   and a half on the right.

21   Q.    Okay.

22   A.    Again, that's the only time that my writing appears on

23   this piece of paper.

24   Q.    All right.  So just moving along, avoiding what's below

25   the double line for a minute and just focusing on what you

160

1    testified was the substance of the changes, substance of the

2    transaction, at that time did you understand this transaction

3    to be basically the transaction that was described to the

4    Court?

5    A.   Yeah.  I mean, there are some rounded things, 47.4 versus

6    47 but he was speaking quickly and I'm sure it was -- you know,

7    it was rounding.  But essentially this is very, very similar to

8    what Jim Seery told me before the court hearing, very similar

9    to what Lori briefed people, you know, in a little scrum before

10   the hearing started, and you know, very similar to what Weil

11   Gotshal represented to the Court would be the transaction.  And

12   it made sense -- now, this does not include 15c3, all the other

13   issues that were being separately negotiated, but on this

14   topic, other than the plumbing of how it got effectuated, this

15   is, you know, pretty close or dead on to what we were -- I was

16   expecting to hear.

17   Q.   Okay.  And how did the meeting with Mr. Klein end?

18   A.   Well, he walked out and I then made the comment to Harvey,

19   admittedly somewhat thankful to him, you know, "Thank you for

20   doing this, but what am I supposed to do with this

21   information?"  Remember this is on the heels -- the meeting

22   broke up after Mike Fazio, I'm sure in their view, rudely said

23   something like, "How could have market value dropped in light

24   of the fact that some of the governments had gone up?", which

25   they refused to answer and Harvey broke up the meeting.  They

161

1    had other things to do.  I turned to him and said, "There's

2    nothing I can do about this.  It is what it is.  I've got to

3    trust you on this."

4    Q.   Did you advise Mr. Miller that you were accepting Mr.

5    Klein's representations or his representations or --

6    A.   Accepting in the sense of I hear it, I understand it,

7    you're closing on that basis, yes.  Accepting in that that's

8    the final word?  No, we told them that we'll reconcile

9    afterwards and get printouts to these numbers.

10   Q.   At any point, Mr. Burian, during this discussion, did you

11   think about going back to the judge to explain the changes that

12   were just described to you?

13   A.   No.  I mean, any point during the evening or any point

14   after hearing this?

15   Q.   Well, first, with respect to this -- this particular

16   conversation.

17   A.   This was -- I was relieved to hear this.  I kind of turned

18   to other people around and said, "You see, there's no problem."

19   Q.   And what about at other points in the evening, was there

20   anything that you witnessed or that you observed that caused

21   you to think about perhaps going back to the judge?

22   A.   I wondered aloud at the time whether or not the

23   clarification letter was a clarification or modifications, you

24   know, what was going on there.  I didn't understand enough

25   about some of the disputes to make a decision, but we did

162

1   wonder whether they were really going to close before the

2   market opened or present a letter to the judge, and as people

3   have heard I had a quick conversation with Harvey about the

4   topic -- Mr. Miller, sorry, about the topic, but other than

5   that, no.

6   Q.   What was the substance of that conversation with Mr.

7   Miller?

8   A.   You know, you're standing in the hallway, you have this

9   feeling of majesty of the moment and you're making history, and

10  everyone's running around and there's not much for me to do.

11  And I found myself standing next to Mr. Miller.  It's already

12  late.  We have no committee anymore.  I've got this explanation

13  tucked away in the manila envelope in my briefcase.  And I

14  turned to Mr. Miller and said, "Do you need us?  Do you need

15  me?"  And he, partly in jest, partly seriously said, "You know,

16  Saul, I never need you."  And I said, "Okay."  You know, and

17  again, we're looking at a long hallway at Weil Gotshal with

18  lawyers running in and out of conference rooms.  And I said to

19  him, "Are you okay with all this?"  He said, "Yeah, I'm fine.

20  We're closing before the market opens."  And I said, "If that's

21  okay with you it's okay with me."  And that's --

22  Q.   What did you mean by that statement?

23  A.   It was clear from the context that what I was saying --

24          MR. BOIES:  Objection, Your Honor.

25          THE COURT:  What's the objection?

163

1          MR. BOIES:  This is unexpressed intent.

2          THE COURT:  This is what?

3          MR. BOIES:  The unexpressed intent, subjective intent,

4    what did you mean by that?

5          THE COURT:  Well, that was my overruling of what you

6    were trying to do this morning.

7          MR. BOIES:  Right, exactly.

8          THE COURT:  This has been stream of consciousness

9    testimony from the beginning of the afternoon to this moment,

10   so I think your objection's too late.  We'll hear what he has

11   to say.

12   A.   It was very clear.  I know what I meant.  I know what I

13   said.  I know the context of it, following the meeting which I

14   told them we had to reconcile and we couldn't express a view,

15   it was like, you know, I don't even know what's fully going on,

16   you're Harvey Miller and I'm not, and if you're comfortable

17   moving forward, if it's okay with you it's okay with me.  I

18   mean, the last thing I was going to do as the investment banker

19   in the deal was tell Harvey Miller that he had to get court

20   approval about a transaction that we weren't even consenting

21   to.  Right?  So I mean, you have to understand the context.  I

22   stood there for a few minutes and I said, "You know, we're

23   going to go."  And he had no objection to us leaving.

24   Q.   And what time, approximately, was this?

25   A.   You know, it's -- I've tried to be clear when I have a

164

1    firm recollection and when I don't.  This is somewhere between

2    3 and 4:30 in the morning.

3    Q.   This is Monday morning then?

4    A.   Monday morning.

5    Q.   Okay.  So after you left early Monday morning did you try

6    to take any efforts to update the committee about what you had

7    learned over the weekend?

8    A.   We had a big day Monday and I tried to get a few hours of

9    sleep and get to the office early.  And I wrote a memo to the

10   committee about what had happened on Sunday.

11   Q.   Okay.

12        MR. KIRPALANI:  Can we take a look at Movants' Exhibit

13   713?

14   Q.   If you turn to the second page of this e-mail.

15   A.   Okay.

16   Q.   I'm looking at the page, it's page 2 on the bottom and on

17   the top it says, "Per Luke's instructions, please forward this

18   e-mail to the committee.  When forwarding please keep in mind

19   that it has an attachment."  And it's entitled "To committee of

20   Lehman unsecured creditors from Saul Burian."  Mr. Burian, is

21   this the e-mail update or the memo that you were referring to?

22   A.   Yeah, I wanted to be clear.  I didn't want things to go

23   from me to counsel to the committee and then have a whole

24   committee call generate to a telephone exercise, so I typed out

25   these notes in a memo to the committee and asked -- I believe

165

1    it was Mr. O'Donnell at Milbank to forward it, you know,

2    verbatim to the committee.

3    Q.   Okay.  Is the most contemporaneous and comprehensive notes

4    that you have of the events?

5    A.   Other than the manila folder it's the only notes I have.

6    Q.   Okay.  I'd like to focus your attention in the first

7    paragraph, it looks like the third sentence that starts,

8    "Following our committee call" and then all the way to the end

9    of that paragraph.

10          MR. BOIES:  Objection, Your Honor.  The document's not

11   in evidence.  We do have an objection to the document.  If he's

12   going to start reading from the document I think we ought to

13   address the objection to the document.

14          THE COURT:  Well, we've established that Mr. Burian is

15   on the stand and he's confirmed that these are his reasonably

16   contemporaneous statements to his client.  I have no problem

17   with hearing a question that includes a reference to the

18   document even if the document is not in evidence.  And in fact,

19   I believe that this witness could say all these things.  So I'm

20   going to overrule the objection but the document is not in

21   evidence unless and until there's a motion to admit it, and if

22   an objection is raised I overrule it.  Right now it's just a

23   piece of paper that Mr. Burian has identified as his.

24   BY MR. KIRPALANI:

25   Q.   Mr. Burian, if you could take a look again at the last two

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

1    sentences of your memo to the official creditors' committee,

2    and if you could just read those two sentences out for the

3    Court?

4    A.   "Following our committee call and the resolution of the

5    multibillion dollar trading and clearing issues, we

6    participated in discussions/explanations regarding our critical

7    open issues and questions.  The resolution was MUCH BETTER THAN

8    WE EXPECTED.  Nevertheless, to preserve all rights, we did not

9    'consent'."

10   Q.   Mr. Burian, I'm particularly interested in your state of

11   mind at the time.  This is several hours after you left Weil

12   Gotshal.  It's your memo to your client.  And I know you've

13   been asked questions about this in depositions, but what were

14   the critical open issues and questions that you felt the

15   committee was concerned about?

16   A.   You'll see them summarized in my memo.  There were three

17   critical issues.  The committee wanted to understand what was

18   happening with the regulatory accounts, deposits.  I think in

19   this courtroom it's now called 15c3 issues.  The committee

20   wanted to understand who is getting the residential mortgages.

21   The concern was it may be thrown in as a freebie to Barclays.

22   And was there or was there not a five billion dollar issue

23   which was the disconnect between the old and cold schedule we

24   had received, our analysis that some of these assets had gone

25   up, some had gone down, but net/net those we were able to value

167

1    were worth more, and you know, what Barclays was taking in

2    that.  And those were the three critical issues the committee

3    wanted an update on.

4    Q.   Okay.

5    A.   Or that was my understanding of the three critical issues

6    I was supposed to report to my client about.

7    Q.   Okay.  I think we've already covered the resolution of the

8    regulatory accounts and the resis.  If we could just highlight

9    paragraph 3, and in particular the phrase, "There is no five

10   billion dollar issues".  What did you mean by that?

11   A.   Ignoring the grammar, the typo mistake.  Basically we laid

12   out to the committee at the call, the last call as we had, you

13   know, we had done the analysis that I described to the judge,

14   to the Court here.  You know, we could not reconcile this draft

15   schedule or this list of assets to any closing, that we were

16   never given any information, that there appears to be a five

17   billion dollar disconnect between the two, and you know, I

18   repeated the representations I got from Barclays and from

19   Lehman that in fact there was no five billion dollar issue,

20   that the assets were worth forty-four to forty-five billion,

21   and if anything they were being rounded up in value as opposed

22   to being rounded down.

23   Q.   Okay.  Now, if we can just take a look at the second to

24   last paragraph, starting bottom line, "Netting appears to the

25   following".  Could you just read this out also for the Court?

168

1    A.    Yeah, I mean, the other paragraph I described the plumbing

2    and then I said, "Bottom line, netting appears to be the

3    following" -- "appears to the following" -- sorry for the typo,

4    I had not gotten much sleep.  "The total purchase assets were

5    booked at approximately 49.4 billion but dropped in value to

6    about 44 to 45 billion.  Barclays was then given an additional

7    assets of 1.9 billion to be included in the deal (prior to the

8    Friday hearing).  As noted earlier, the 8.55 billion coming

9    from the JPMorgan is included in these numbers, all in

10   approximate value of 47 billion.  They are forgiving the Fed

11   loan of 45.5 billion and assuming liabilities of 4.25 billion

12   for a total of 49 plus billion dollars.  Depending on how they

13   do liquidating the book they will make or lose money."

14   Q.    Okay.  And what did you mean by "Depending on how they do

15   liquidating they will make or lose money"?  Why did you think

16   that was important to tell the committee?

17   A.    You know, there were a lot of conversations with the

18   committee about the fact that there was no longer a purchase

19   price adjustment in the deal.  And I was pointing out again,

20   you know, the benefit of the bargain, what we're doing, you

21   know, we're selling these assets -- or, you know, good faith,

22   going concern, marked value, in a way that any other

23   broker/dealer would.  And you may not like the fact that today

24   it has the value that it's got but we're avoiding the

25   liquidation, which is the upside, by doing this transaction,

1    but don't come back and complain to Houlihan if these things go

2    up in value or go down in value.  I was being defensive a

3    little bit that it is what it is and they'll make money or

4    they'll lost money.  It's not -- that is what the deal is.

5    Q.    Okay.  And the last thing with this document is just if

6    you can focus on the last paragraph there.  This is your

7    closing remarks to your client summarizing the closing weekend.

8    Could you just read that out as well?

9    A.    I said, "We did NOT" -- all caps -- "NOT consent.  We

10   said" -- italics -- "we understand" -- stop italics" -- "what

11   they are telling us and expect to see computer runs of all

12   transfers at some point in connection with the closing

13   documentation.  If this is a deal, sounds consistent with the

14   court proceeding.  If it is not what actually happens they'll

15   be hearing from us or from the LBI estate.  All in all, a very

16   good result."

17   Q.    Okay.

18         MR. KIRPALANI:  Your Honor, I would like to seek to

19   move this document into evidence.

20         THE COURT:  Is there an objection?

21         MR. BOIES:  Yes, there is, Your Honor.  I also, in

22   addition to the hearsay objection, I'm not sure this is a

23   complete document.  This does not bear a Bates stamp.  There is

24   a document that has been produced previously that does bear a

25   Bates stamp that has additional pages to it.  So I'm not even

170

1    sure that this is the complete document.

2            THE COURT:  Okay.

3            MR. BOIES:  But that is a secondary objection to

4    our --

5            THE COURT:  Well, if it's not a complete document I'm

6    sure that can be cured with a substitute version of the

7    document.  But I do have a question about the timing of

8    production.  Is this one of the documents that was produced as

9    a result of the granting of the Barclays motion last week?

10           MR. BOIES:  That is our understanding, Your Honor.

11           MR. KIRPALANI:  Yes, it is, Your Honor.

12           THE COURT:  I understand the hearsay objection which I

13   think is of limited value in connection with the document where

14   the author of the document is on the stand and everything that

15   he has written in the document is subject to cross-examination.

16   Furthermore, the principal reason that Barclays was successful

17   in this aspect of its discovery motion, albeit a motion that

18   was brought very late in the day, literally on the eve of

19   trial, is that I was as interested as Barclays was in knowing

20   what the committee saw.  That's a theme of the committee's

21   case.  This is exactly what the committee saw.  This is Mr.

22   Burian's memo to the members of the committee.  It's clearly

23   something that for our purposes is highly probative of what the

24   committee knew at the time because the committee can only

25   function, as we discussed earlier, through its retained

1    advisors.  Whether or not it's true is irrelevant.  And for

2    that reason I think the hearsay objection is not well taken.

3    What is relevant is what Mr. Burian believed to be true and

4    what he told the committee members at the time.  It goes to his

5    state of mind and it goes to the state of mind of the

6    committee.  And I think for that reason, despite Mr. Boies'

7    shake of the head, that I'm going to admit it.

8         MR. BOIES:  The shake of the head, Your Honor, relates

9    only to whether it's being admitted for the truth of the matter

10   asserted.

11        THE COURT:  I didn't say it was being admitted for the

12   truth of the matter asserted and I can't believe that it's

13   being offered for the truth of the matter asserted.

14        MR. KIRPALANI:  I attempted to elicit exactly -- it's

15   his state of mind that I was asking about.

16        THE COURT:  Exactly.  And indeed, it's an operative

17   document that was not only created more or less

18   contemporaneously, but it's entirely consistent with the oral

19   testimony of Mr. Burian.

20        MR. BOIES:  I agree with that, Your Honor.  I agree

21   with that completely.  If it's coming in only for state of

22   mind, I've tried to make clear that the hearsay objection only

23   goes to something that's being admitted for the truth of the

24   matter asserted and that when they're only offering it for

25   state of mind I have not objected to it coming in as state of

172

1   mind.  I was objecting because it was being offered without any

2   limitation.  That's the only point I'm making.

3          MR. KIRPALANI:  My mistake.  It's being offered for a

4   state of mind.

5          THE COURT:  Okay.  In that case it's admitted.

6   (Movants' Exhibit 713, e-mail to Lehman creditors' committee

7   from Saul Burian, was hereby received into evidence as of this

8   date.)

9          MR. KIRPALANI:  Thank you, Your Honor.

10          Thank you, Mr. Boies.

11  BY MR. KIRPALANI:

12  **Q.   Let's turn your attention, Mr. Burian, to after the**

13  **closing, after the committee memo that you wrote, did there**

14  **come a time where Houlihan received updated schedules to help**

15  **you reconcile what assets had been transferred?**

16  **A.   Yes.**

17  **Q.   Okay.  I'd like you to look at Movants' Exhibit 394.**

18          MR. KIRPALANI:  If we can look at the second page

19  there -- it may be the third page -- third page.  If you can

20  blow that up.

21  **Q.   This, again, is the summary of a ream of paper that**

22  **follows this exhibit.  Are these the schedules that Houlihan**

23  **received?**

24  **A.   I don't remember exactly when, either Wednesday or**

25  **Thursday after the closing, after requests to get schedule A**

173

1   assets, the schedule B assets -- schedule A being the repo

2   collateral and schedule B being the 1.9 billion of additional

3   box assets.  This came across from Weil Gotshal.

4   Q.   Okay.  And --

5   A.   Well, it came to me from Milbank.  It came across.

6   Q.   Right, and just for the record and for the sake of

7   completeness, if you look at the first page, I think it

8   indicated how it was transmitted.  It looks like an e-mail from

9   Mr. Murgio at Weil Gotshal to Bob Moore at Milbank, and then

10  your understanding that you subsequently received it?

11  A.   Correct.

12  Q.   Okay.  And did Houlihan do any analysis of the September

13  25th schedules?

14  A.   We opened it.  We were surprised to see that it was

15  identical in every respect to what we had been given on Sunday

16  which was told old and cold and wrong and all that stuff.  And

17  we were told by Milbank that Weil had said it was still being

18  updated and reconciled and we put it aside.

19  Q.   Did you expect to see that the market values would be

20  updated in this schedule when you finally received it?

21  A.   Not updated.  I would have -- what we expected to see was

22  a simple list of all the assets that Barclays was getting with

23  the marks at which they were transferred.

24  Q.   Um-hum.

25  A.   I mean, not that complicated.

174

1    Q.    Did this document satisfy that request?

2    A.    No.

3    Q.    Okay.  Turning your attention now to the clearly post-

4    closing period from and after the closing, during the months of

5    September up through early October, did Houlihan attempt to

6    obtain a reconciliation from Lehman?

7    A.    During the periods of time we attempted to follow up to

8    reconcile the closing and get, you know, a closing statement,

9    you know, balance sheet, you know, what happened and what

10   didn't happen, and made that request, for the most part,

11   through Milbank.

12   Q.    And do you have an understanding as to whether the Lehman

13   estates had physical access to those records?

14   A.    You asked me a relatively narrow period of time.

15   Q.    You can extend it to move this along if it helps in

16   explaining the situation.

17   A.    I think of this in time periods of closing through

18   December --

19   Q.    Okay.

20   A.    -- and then December to March or April.  During the first

21   period of time, it became clear that Lehman's eyes were shut by

22   Barclays' control of all their system and there were

23   significant issues and squabbles regarding the TSA and a

24   complete inability -- not a complete, that may be too much --

25   major issues concerning the ability to access systems, get

175

1    information, and operate the remaining Lehman business and we

2    made the request, made the request, but ultimately were not

3    able to get them.

4    Q.   Okay.  I'd like to ask you to take a look at Movants'

5    Exhibit 712.  This is the Alvarez & Marsal that I think the

6    Court has seen quite a bit of.

7         MR. KIRPALANI:  We'll put it on the screen.

8    Q.   And if you could turn to page 28 of that document or you

9    can look on the screen there.  Okay.

10        MR. KIRPALANI:  I'd like you to highlight the first

11   sub-bullet, forty-three billion -- actually make it that whole

12   assets purchased down through those bullets there, yeah.

13   Q.   Have you seen this document before?

14   A.   I have.  I was there when it was handed out to the

15   committee.

16   Q.   Okay.  And what was the purpose of that October 8th

17   meeting with Lehman?

18   A.   Does the Court have the whole --

19   Q.   Yes.

20   A.   -- document?

21   Q.   Yes.  You want to turn back to a page?

22   A.   No, no --

23   Q.   Okay.

24   A.   -- I think if you look at that whole document it gives an

25   impression -- or it gives an accurate impression of just how

176

1    much was going on at the time and the issues that Lehman,

2    Alvarez & Marsal, and the committee and its professionals were

3    grappling with at the time.  And this was intended to be a

4    summary of where things stand, to reset the clock and then try

5    to be productive going forward, to figure out what we can --

6    you know, what has to happen and, you know, what the next steps

7    are in the case.

8    Q.    Let me just stop you there.  What was A&M's role, if any,

9    in the Barclays sale?

10   A.    To the best of my knowledge, none.

11   Q.    None.  So I'm sorry, I interrupted you, you were saying --

12   A.    Actually -- actually, you can stand up now and say hearsay

13   if you like, my understanding is that at some point we

14   consulted Bryan Marsal -- we, the committee, the debtor, there

15   was some consultation with him about negotiating the TSA and

16   trying to get a feel for operating the business on a go-forward

17   basis.  I don't know the extent of those conversations but

18   outside the TSA discussions, my understanding is none.

19   Q.    Okay.  So just taking a look at --

20         MR. BOIES:  May I assume this is all for state of

21   mind, Your Honor?

22         THE COURT:  I'm not sure -- I think it's an aside of

23   the witness attempting to be as complete as possible in

24   response to the question that was before him.  So it's his

25   state of mind, and as a minor qualification of the assertion

177

1    that A&M had little to do or nothing to do with the sale.

2    Q.    Okay.  I mean, I can ask another question just to complete

3    that.  You were present during the entire closing, correct?

4    A.    No.

5    Q.    Okay.  Well, you were present -- during the time that you

6    were present at the closing, were representatives of Alvarez &

7    Marsal intimately involved in that?

8    A.    I never had any substantive interaction with Alvarez &

9    Marsal on the Barclays purchase of these assets until after the

10   closing.

11   Q.    Okay.  And so when you saw this slide presented by Alvarez

12   & Marsal, what was your understanding as to the basis of their

13   knowledge?

14   A.    When I first saw this slide I didn't have any

15   understanding.

16   Q.    Okay.  I'd like to direct your attention to the first sub-

17   bullet.  It says 43.1 billion dollar repo assets, book value

18   per Lehman stale marks, negotiated a five billion dollar

19   reduction . Do you recall seeing that during the meeting?

20   A.    I do.

21   Q.    And what was your reaction to it?

22   A.    Confusion and concern.

23   Q.    Okay.  Staying with the first part, 43.1 billion repo

24   assets, was it your understanding that that was net of the

25   seven billion of cash?

178

1   A.   I wasn't sure, but I suspected as much.

2   Q.   Okay.  And the book value per Lehman stale marks, what was

3   your reaction to that?

4   A.   Well, to the extent the 43.1 meant 43.1 plus seven billion

5   was fifty billion, which is what -- you know, my conversation

6   with Mr. Klein was about, then the rest of that comment made

7   sense, but I wasn't sure.

8   Q.   And what about the last phrase, negotiated a five billion

9   dollar reduction?

10  A.   Again, I didn't know what that meant.  If it was an

11  inarticulate use of words, have meant something nefarious, it

12  was I can do the math of fifty billion less five billion is

13  forty-five billion.  So, yes, I see a reduction of five

14  billion.  I didn't know what negotiated meant in that context,

15  other than people reasonably should be discussing how to

16  properly mark a book consistent with the way a broker-dealer

17  would.  And Mr. Klein had told me forty-four to forty-five, you

18  round it up to forty-five.  But I just wasn't sure, it was a

19  compilation of bunch of things, and I wasn't sure.

20  Q.   Did you do anything after seeing this slide, after getting

21  this presentation?  Did you do anything in respect of trying to

22  get to the bottom of these issues?

23  A.   Again, during -- after the closing through this -- getting

24  this presentation we never stopped the asking for the

25  reconciliation.  When we got this we raised the issue again to

179

1    Brian and his team that we needed to get a reconciliation.  In

2    the committee meeting subsequent to this, the way the committee

3    works, Your Honor, is very often will have updates with Lehman

4    personnel and Alvarez & Marsal personnel and after they leave

5    continue to have discussions, we reminded the committee that

6    this had to be an issue to be looked into, and the committee

7    reminded us they were expecting us to write a report and move

8    on and get the reconciliation.  And then a flurry of activity

9    was set off because, you know, Milbank was doing a lot of

10   things at the time.  They asked us to make sure they were fully

11   educated and exactly what they were supposed to ask for again.

12   You know, to make sure they were getting what we needed.

13   Q.    Okay.  I want to take you back a little bit to the week

14   following the closing.

15          MR. KIRPALANI:  If we can put up Movants' Trial

16   Exhibit 707.

17   Q.    If you can take a look at 707, Mr. Burian.

18   A.    I've been following you on the screen, if I can

19   continue --

20   Q.    Yeah, yeah, sure.

21          MR. KIRPALANI:  And can we just blow up the actual e-

22   mails, we don't need the IRS circular.

23          Thanks.  Great.

24   Q.    I recognize that you are not cc'd on this e-mail, Mr.

25   Burian.  However, your partner is sending an e-mail to my

180

```
 1    former partner.  This is a -- I'll represent to you this is
 2    another one of the privileged documents that we produced to
 3    Barclays at the Court's direction.  And the e-mail starts from
 4    Mr. Despins to Mr. Geer and Mr. Fazio, indicates, "That we just
 5    received these revised schedules, did Houlihan get them?"  And
 6    the last sentence says, "They should be audited now.  Because
 7    if there is an issue with them we need to speak up now before
 8    the trail gets cold."  Mr. Despins will be here tomorrow and he
 9    can explain what he meant by that, I'm not going to ask you
10    about that.  But with respect to the top part, if you can take
11    a look at Mr. Geer's summary back to Mr. Despins, is that
12    consistent with your understanding of what you knew at the
13    time, from the closing?
14    A.   Yeah.  I mean, it's not written beautifully, but I --
15    yeah, Mr. Geer is updating Luc and telling him the schedule
16    we'd got is the same schedule and we've -- were told that there
17    were decreases in value, we couldn't verify it because while we
18    were able to look at net went up in value and they told us
19    "that although the details in Schedule A total to access is
20    really not worth why in the aggregate."
21    Q.   Okay.  There are two clauses or two phrases in Mr. Geer's
22    e-mail that I want to ask you about because it relates to
23    something that you just talked about as well.  The first is in
24    the second line, "The amount that was agreed to between Lehman
25    and Barclays," you see that?
```

181

1    A.    Yes.

2    Q.    Okay.  It uses the word agreed between Lehman and

3    Barclays, is that consistent with your understanding of how the

4    amounts were determined?

5    A.    Yeah, I know there's been a whole hullabaloo about what

6    the word negotiated means, but, yeah, I mean, they had to

7    get -- what we thought at the time was someone had to pick a

8    number as to the appropriate mark to market for broker-dealer.

9    And as Mr. Klein said to me it was somewhere between forty-four

10   and forty-five billion, and they agreed to use forty-five

11   billion.

12   Q.    Okay.  And two lines down from that the phrase "the

13   negotiated mark in the deal" is there, same answer?

14   A.    Same answer.

15   Q.    Okay.  I'd like to turn your attention to another one of

16   those privileged documents.  It's Exhibit 709.  Once again -- I

17   mean you're really here as the representative of Houlihan and

18   the committee's financial advisor, although you're not on the

19   cover e-mail, which is from your partner Brad Geer to a Milbank

20   corporate partner, Crayton Bell, and your other partner Michael

21   Fazio, this is an update that was drafted by Houlihan it

22   appears on October 10th two days after the Alvarez & Marsal

23   presentation.  If you could turn to the third page of this

24   document, it's entitled LBI sale value of assets transferred to

25   Barclays.  And just -- what's your understanding as to why

182

1    Houlihan was preparing this document from Milbank?

2    A.   Coming out of the committee meeting and having promised we

3    would get to the bottom of what happened or didn't happen, you

4    know, it seems to be a flurry of activity between people on the

5    deal to better educate Milbank about what our suspicions were

6    and what our concerns were.  So they can better represent us in

7    dealing with Weil Gotshal at the time.  As you know, everything

8    changed.  You got involved and Jones Day got involved.  But at

9    the time we were dealing with Milbank, you know, telling them

10   what our concerns were.

11   Q.   Okay.  And if you look at the next page which --

12        MR. KIRPALANI:  Can we blow up just the text a little

13   bit so it's legible.  Great.

14   Q.   If you can look at the first paragraph there it states,

15   "The night of the close of the transaction we told Lehman/Weil

16   that the pieces of the transaction that were being described to

17   us added up to fifty-two to fifty-three billion, rather than

18   the approximately forty-seven billion that had been described

19   in Court the Friday before."  Is that consistent with your

20   understanding?

21   A.   It's exactly what I said earlier.  If you look at the

22   assets -- it's a little exaggerated because we couldn't say

23   with specificity fifty-two to fifty-three because we couldn't

24   value a large slug of these assets.  But expressing our concern

25   that what we could value is more not less.  And, therefore, is

183

1    you look at the -- you take that schedule at fifty billion,

2    plus the 1.9 billion of additional assets that's fifty-two to

3    fifty-three billion, you know, were confused.

4    Q.   Okay.  And in the next paragraph --

5         MR. KIRPALANI:  You can shrink that back.

6    Q.   If I could just ask you to take a look at the next

7    paragraph.  "A few hours after we raised the issue Lehman came

8    and got us and sat down to try and show us how things added up.

9    We were told that some of the marks shown on Schedule A were

10   'out of date' and that the parties, Lehman and Barclays, had

11   agreed to a five billion dollar discount as the appropriate

12   mark to market adjustment for the securities."  Is that also

13   consistent with your understanding?

14   A.   Yeah, that's a layman's summary of what happened in the

15   Klein meeting, that he got from either me and Fazio.

16   Q.   Okay.

17   A.   Me and Michael Fazio.

18   Q.   Okay.  Rather than belabor the entire document, I'm sure

19   you'd be asked about this on cross-examination.  Why don't we

20   just move down two/three paragraphs.  That's the paragraph that

21   starts "additionally."  I want you to look at the second

22   sentence there.  I'll read it out for the record.  "The story

23   that we were given the night of the close that some of the

24   marks on Schedule A were out of date and needed to be written

25   down, five billion dollars is implausible," do you see that

184

1    language?

2    A.   I do.

3    Q.   Had Houlihan reached that conclusion as of October 10th,

4    2008 that the story you were given was implausible?

5    A.   Mr. Geer's referring to the fact that based on the assets

6    we could value, if, in fact, these were the corpus of assets

7    that were transferred you would need a very, very large

8    discount, over -- you would need -- you know, to value the

9    remaining privates at sixty to sixty-five percent to get to

10   five billion.  Now, that could be accurate or not, I personally

11   didn't share Brad's conclusion or thoughts it was implausible

12   because I didn't know, nor did he what the privates were or

13   were not.  He's also making the assumption that the Schedule A

14   is what actually was transferred.  But, yeah, I mean, is it his

15   view that Schedule A was transferred, this story is not -- may

16   not fully foot.  But what I told the committee was that, you

17   know, this -- I'm not sure Barclays even knows what they got

18   yet.  And what we need to do is figure out what really happened

19   and reconcile.  And I did say it's probably going to be fine.

20   You know, we got to figure it out and see where it is.

21   Q.   If at that time, two days after the A&M presentation, your

22   partner was indicating to committee counsel that this story is

23   implausible, why didn't the committee go running into Court

24   with their hair on fire, to use your phrase?

25   A.   You have to understand what was going on at the time.  And

185

1    also that no one seemed remotely interested in this other than

2    me, Brad Geer, Michael Fazio and committee members who we had

3    talked to.  You have this closing, people feel good about

4    themselves, they saved the world.  And you have gadfly saying

5    what really happened.  It was viewed as being ministerial, it

6    was viewed as being picayune, and we were exercising ourselves

7    to get firm to demand the information.

8        I personally did not believe that I would sit in a room

9    with Harvey Miller and others and be represented to as to what

10   a transaction of this nature was.  And that it would turn out

11   to be not true.  I still have trouble reconciling those

12   misrepresentations by Mr. Klein.

13       I believe that in all the confusion, which I was right

14   about, right.  I mean, you saw the settlement agreement coming

15   in December, we saw how confused all the transfers were, that

16   someone quickly sent us a schedule that did not reflect what

17   really went over to Barclays, and that our job was to keep it

18   on the radar screen, collect evidence if there was any

19   evidence.  Ultimately had some junior person right a report.

20   They would reconcile what Barclays actually got and total it up

21   neatly to 47.4, you know, and move on in life.  At this point

22   in time I didn't have, and I did not convey to the committee

23   that I thought there was a -- that we were misrepresented to.

24   Q.   Okay.  You mentioned the December settlement, I'd like to

25   turn your attention to that.  Did there come a time in December

186

1    of 2008 when Houlihan intensified its records to pursue a

2    reconciliation?

3    A.    You know, we went through a very active period.  We pushed

4    Milbank to get information.  Weil Gotshal pushed back and said

5    leave us alone.  We tried to go directly to Alvarez & Marsal,

6    they didn't have the information.  So much was going on in the

7    case at that point in time, that reconciliation just wasn't the

8    most important thing.  We kept it hot or warm, but didn't push.

9    At some point in my inbox a motion came in, I think it was from

10   Jamie Tecce or someone else, about a JPM settlement with the

11   SIPC trustee, that had to do with the Barclays' closing, and

12   could I review it.  And, you know, I put it on the to do list

13   and left it alone.

14        Sometime that next weekend, I finally had time to do it.

15   I started reading that and I actually began to get more

16   concerned than I ever was before.  On one hand it confirmed my

17   suspicion that there was enormous confusion as to what Barclays

18   got, what they were getting or when they were getting it.  On

19   the other hand, it was just -- the numbers were just all off.

20   Q.    Okay.  Can you take a look at what's Movants' Trial

21   Exhibit 359.

22        MR. KIRPALANI:  And to anticipate Mr. Boies'

23   objection, I'm not using this for the truth of what's asserted

24   in Mr. Burian's declaration, which was filed with the Court in

25   connection with the December settlement, but rather to show

187

1   what the committee's state of mind was as of December 19th,

2   2008.

3   A.   I see --

4            MR. BOIES:  That's the date of the declaration?

5            MR. KIRPALANI:  That's the date of the declaration.

6            MR. BOIES:  On that grounds I have no objection, Your

7   Honor.

8   A.   I --

9            MR. KIRPALANI:  I'm getting better.

10   A.   I see the document.

11   Q.   Okay.  Is that your signature on page 4, Mr. Burian?

12   A.   Could we turn to page 4?

13   Q.   Oh, sure.  Here we go.

14   A.   That is my signature.

15   Q.   Okay.  And if you could take a look at paragraph 12, right

16   there above your signature.  And, again, I'm going to read it

17   just to ask you to confirm that, in fact, your state of mind is

18   consistent with this at that time.  "My understanding is that

19   following the closing of the transaction on September 22nd, and

20   on various occasions since then, professionals retained by the

21   creditors' committee have requested from LBHI or its retained

22   professionals final reconciliations of the assets transferred

23   and liabilities assumed in connection with the sale transaction

24   in sufficient detail, so that we can confirm the accuracy of

25   the representations we received that Monday morning.  To date,

188

1    the creditors' committee has not received this information."

2    Do you see that?

3    A.    I do.

4    Q.    Okay.  Were you -- Mr. Burian, were you involved at all in

5    the committee's decision, through my firm, to object to the

6    December settlement?

7    A.    I think it was my recommendation.

8    Q.    Okay.  And why did you make that recommendation?

9    A.    As the Court knows, a lot was going on in Lehman and a lot

10    we were working on.  And I felt concerned that the

11    reconciliation  had fallen through the cracks and just wasn't

12    happening.  I was concerned that the numbers weren't adding up.

13    And I was concerned that if we didn't speak we'd be viewed as

14    having not spoken.  And that that would be a negative -- I know

15    I'm not using legal phrases, and I apologize, I'm giving you my

16    understanding.  I was afraid that if this continued much

17    further we'd now have court documents that directly contradict

18    what the committee acted upon.  We were told that that was

19    going to be a problem one day.  And I spoke to you and to

20    committee members about the need not to object to the

21    settlement but to try to get to the bottom of what really

22    happened now that it appears several months later people were

23    finally reconciling and getting to the bottom of where the

24    transfers were and what they weren't.

25    Q.    And what's your understanding of what happened during the

189

1    settlement hearing?  Did you come to the settlement hearing,

2    actually?

3    A.    I did.

4    Q.    Okay.  And what's your understanding of what happened --

5    or what did you observe happening regarding the committee's

6    limited objection?

7    A.    I was satisfied.  I know technically the objection was

8    overruled, but practically speaking we got exactly what we

9    wanted.

10   Q.    Which was what?

11   A.    My understanding is that Judge Peck made two comments at

12   the end of the hearing.  One comment was we understand where

13   the committee is and this settlement is not waiving any rights

14   or otherwise affecting any issues the committee may be looking

15   at.  And, secondly -- I'm not sure if directing is the right

16   phrase, but strongly suggested that Barclays cooperate with us

17   in satisfying our information requests.

18   Q.    Okay.

19   A.    And --

20   Q.    Did the committee seek to obtain information from Barclays

21   informally?

22   A.    This is when I finally started getting really concerned.

23   Because did they go to a meeting, go respond, yes.  Did they

24   help us reconcile, no.

25   Q.    What was your understanding with respect to the

190

1    committee's -- you said your understanding.  What were some of

2    your efforts in terms of talking to Barclays' professionals to

3    try to get a reconciliation?

4    A.    I think we were asked to put our -- directly or indirectly

5    to put our concerns in writing.  I remember participating in at

6    least two calls about what we were really trying to get, what

7    we weren't trying to get.  I remember being very frustrated on

8    those calls, and, frankly, not really participating much.  It

9    was more your firm sparring with -- oh, my, I'm having a senior

10   moment, Cleary -- Lindsee Granfield's firm is Cleary or

11   Cadwalader?

12   Q.    Yes, it's Cleary

13   A.    Cleary, I'm sorry.  With Cleary.  I remember being rude at

14   one point and breaking in and saying to Lindsee on the call

15   "will you stop this nonsense, this is not discovery, this is

16   not technical stuff.  I just want to write my stupid" -- I was

17   told not to curse on the stand.

18   Q.    Stupid's okay.

19   A.    "Blankety-blank report and get this over with.  Please get

20   for me whoever you can get it from what you got, what it was

21   marked for, what it was done, I'm smart enough to add it up and

22   we can be done."  Because there was an enormous amount of back

23   and forth about are we entitled to this?  Should this come from

24   the debtor?  Should this come from Barclays?  Who from

25   Barclays?  We're not going to create documents for you, only

191

1   going to give you documents that already exist. I think

2   someone made the comment well, you're a public companies you

3   had to book these things at some point. You know, just give us

4   the work papers that were booked at, which may have been a

5   stretch to ask for. And I was just -- that is probably a

6   turning point in my mental process. I got off that phone and I

7   said I'm not going to get the information.

8   Q.   And do you recall ever having an in-person meeting with

9   Barclays?

10   A.   I don't remember before or after these calls. But at one

11   point Brad Geer and I, you and maybe some others from Quinn

12   Emanuel did go over to Boies Schiller and meet with three

13   Barclays' people. And we were given an opportunity to ask

14   questions and get answers.

15   Q.   Were these Barclays' people were they the people that were

16   involved in the sale transaction that weekend when you were

17   there?

18   A.   None of them were at Weil Gotshal when I was there.

19   Q.   Did you feel that they had the ability to answer the

20   questions that you had?

21   A.   They were very nice guys. And they clearly were experts

22   in their fields and they clearly were active from the Barclays

23   in the transaction. My memory is not perfect, but one of them

24   I think was in London, was called in to value -- told me, told

25   us, he was called in to figure out how to hedge the book and

192

1    make sure there weren't losses and to figure out the positions.

2    One was a relatively senior guy in operations whose job it was

3    to figure out what the transfers were and what they weren't.

4    And another guy was also active in trying to analyze what was

5    in, what was not in the fed repo.  And, you know, what assets

6    were coming from JPMorgan and Lehman.

7    Q.   Following the meeting at Boies Schiller with the three

8    Barclays' executives, did you take it upon yourself to talk to

9    Alvarez & Marsal further about the debtors' need to intervene

10   at some point?

11   A.   I believe that meeting ended.  We got some information

12   which was an interesting color, we still weren't getting a

13   basic item that I wanted to go hand to a junior person and

14   write a report.  And it was sort of frustrating.  And we spoke

15   as a committee level, we spoke to Milbank, we spoke to you, we

16   spoke to Alvarez.  Weil did not really participate that much at

17   that point in time.  I think they had mentioned by then there

18   were conflict issues or something.  And we said, you know, the

19   committee thinks its important.  It is important to you or it's

20   not important to you.  You have to sort of move this forward.

21   It was more exasperation than, you know, conversations.  And I

22   wasn't as active then, I sort of stepped away at this point,

23   and the machinery and moved forward.  We were active in

24   recommending that special counsel get retained; Jones Day.  And

25   after that it was in the lawyers' hands, and not mine.

1   Q.   Okay, Mr. Burian, I think we're almost done.  If you could

2   just turn back to Exhibit 410, which the one in evidence if I

3   didn't state it, I'd like it to be 410A, that's the original of

4   the manila folder.

5          THE COURT:  Do you want this back?  I don't want it.

6          MR. KIRPALANI:  Okay, we'll give it to Mr. Burian

7   until we're done.

8   Q.   Mr. Burian, focusing on the phrase postmark 44 and 45,

9   "Sitting here today do you have an understanding of whether the

10  market value of the securities transferred as of the closing on

11  the Lehman seller's books was, in fact, between forty-four and

12  forty-five billion dollars?"

13  A.   My understanding is they were marked higher than that.

14  Q.   Did you ever here or advise the committee that there was a

15  block discount of five billion dollars imbedded in the

16  transaction for Barclays?

17  A.   Never heard it, never advised the committee that there was

18  one.

19  Q.   Mr. Burian, in your view why is the committee here seeking

20  relief from the Court?

21  A.   I think we started with this at the beginning of my

22  testimony.  And I'm not going to talk about all the technical

23  issues with respect to, you know, all the other assets.  But I

24  think from my perspective it's just basic fairness and justice

25  in the sense of, you know, the Judge, the Court, creditors and

194

1    the creditors' committee were told that there was going to be a

2    transaction and how it was going to be treated.  And it now

3    appears not only was that not what happened, but some of the

4    parties never intended that to happen.  And that's very

5    disconcerting to me.  We're not looking in any, way, shape or

6    form for market upside, we're not looking to take advantage of

7    gaining the system.  And, you know, I'm sure someone's going to

8    yell at me when I go off the stand.  I'm not even all that --

9    don't care even that much about the mechanics and whether it

10   came through JPM or not, you know, all I want is to know that

11   we got the benefit of the bargain that was promised to us.  We

12   sold assets in a manner that was booked as a going concern the

13   way any other broker dealer would have.  And that we got

14   liabilities forgiven and assets paid in an equal amount with

15   respect to these assets, you know, keeping in mind that we were

16   told that the cures -- not the cures.  We were told that the

17   comp numbers were off the Lehman books.  And, frankly, I found

18   out at the oral argument that the comp numbers were written up

19   several days before that Thursday meeting.  So to the extent

20   that those are wrong we should get the money back.  But, you

21   know, we were told it was going to be a balanced exchange.

22   What I'm hearing about is it just completely wasn't.

23        If after spending all this time and money someone wants to

24   sit me down and show me there was a balanced exchange I'm not

25   sure I would be here.

195

1    Q.    Well, and to that point, Mr. Burian, looking again a the

2    manila folder, if the deal is ultimately shown to be as was

3    represented to you on that folder, would the committee still be

4    seeking relief?

5    A.    I know there were all sorts of other issues that I'm not

6    up to speed on in this litigation.  I can tell you from a big

7    picture perspective as the committee advisor if we sold at a

8    fair mark of going concern value in a manner consistent with

9    the way a broker dealer as operating as a going concern was

10    marking their books at the time, forty-five billion of assets,

11    plus the 1.9 billion marked the same way, and we were getting

12    an equal or a greater amount of liabilities forgiven or

13    assumed, we wouldn't be here.

14            MR. KIRPALANI:  I have nothing further, Your Honor.

15            MR. GAFFEY:  No questions from the debtor, Your Honor.

16            MR. MAGUIRE:  No questions from the trustee.

17            THE COURT:  Mr. Boies, here's the question about

18    process.  I need to leave in about twenty minutes.  And

19    obviously you want to complete the witness, but I'm guessing

20    we're not going to complete him in twenty minutes.

21            MR. BOIES:  That's true, Your Honor.

22            THE COURT:  So this is really a question for you.  I'm

23    happy to have you start now, I'm also happy to stop and start

24    tomorrow morning.  But I don't want to badly affect the

25    schedule.

196

 1          MR. BOIES:  Can I just consult with counsel for the

 2     other side for a moment?

 3          THE COURT:  Sure.

 4        (Pause)

 5          MR. BOIES:  Your Honor, I think we're going to try --

 6     movants want to try to put Mr. Ricci on tomorrow, and it's very

 7     important, obviously, that he get off tomorrow.  So I think

 8     with the Court's indulgence I will us the twenty minutes just

 9     to shorten the amount of time that I need.

10          THE COURT:  We can also start early tomorrow.

11          MR. KIRPALANI:  And just also for completeness we -- I

12     will let Mr. Despins know that he should not go tomorrow, we

13     will put him at a different phase because Mr. Ricci is deemed

14     to be a more critical witness based on his knowledge.

15          THE COURT:  Okay.  So the understanding is that we're

16     going to finish with Mr. Burian and then start with and

17     complete Mr. Ricci tomorrow.

18          MR. KIRPALANI:  Well, I hope we can complete him

19     tomorrow, Your Honor.  I said I have about two -- maybe a

20     little over of two hours of direct for him.  But I think if the

21     morning is --

22          MR. BOIES:  Your Honor --

23          THE COURT:  We're going to schedule the day so we

24     finish Mr. Ricci tomorrow even if we have to stay past the

25     ordinary stopping time.

197

1      MR. KIRPALANI:  That would work.

2      THE COURT:  If it means staying to -- I'm used to

3  staying late on Friday nights.  If it means staying -- assuming

4  we have reporters willing to stay till 7 o'clock, that's not a

5  problem.

6      MR. KIRPALANI:  Thank you, Your Honor.

7      THE COURT:  I'm not staying till midnight.

8  CROSS-EXAMINATION

9  BY MR. BOIES:

10 Q.   Good afternoon, Mr. Burian.  We haven't met but my name is

11 David Boies, and I think you know that I represent Barclays.

12 A.   I do.

13 Q.   You were asked whether you believe that the marks on the

14 securities that Barclays ultimately got were between forty-four

15 and forty-five billion dollars.  And you said you thought they

16 were higher, do you recall that?

17 A.   I do.

18 Q.   As you now understand it, sitting here today, what was the

19 total market value of the securities that Barclays acquired in

20 the sale transaction?

21 A.   I don't know.

22 Q.   Approximately?

23 A.   I don't know.

24 Q.   Approximately, sir?

25 A.   Honestly, Mr. Boies, I know that BONY marked these higher,

198

1    which was a basis of my comment.  But we had never -- Houlihan

2    Lokey has never gone through each and every one of the

3    securities nor received a complete list of what Barclays

4    received.  So I don't know what the market value was.

5    Q.    You understand you're here as a representative of the

6    committee?

7    A.    I do.

8    Q.    And is it your testimony that today the committee does not

9    have any estimate, even an approximate estimate of what the

10   actual market value was of the securities that Barclays

11   acquired?

12   A.    I believe that there were several experts that were

13   retained.  I was talking about Houlihan's knowledge, now you're

14   expanding the question to committee.  I've not read those

15   reports myself.  And so -- I would be venturing a guess as to

16   what they say.

17   Q.    You've not read the report yourself, correct?

18   A.    I don't even think anyone at Houlihan Lokey has the expert

19   reports with respect to valuation.

20   Q.    All I asked is whether you read them yourself.  You said

21   no.  And no one's ever described to you the results of those

22   reports, that's your testimony?

23   A.    Well, it's not what I said but I'll think about the

24   question now.  I believe a lawyer for Quinn Emanuel did

25   describe generally one of the reports sometime last week to me.

199

1   Q.   And did that general description include what the

2   estimated market value was of the securities that Barclays

3   acquired in this transaction?

4   A.   I may be mixing up the two issues of what BoNY's marks

5   were, as compared to what our expert witness said, or was going

6   to say.  But the conversation -- there was a conversation

7   about, you know, what the assets were worth.

8   Q.   What the assets were worth.  And what were the assets

9   worth, as you understand?

10  A.   I'll give you a range because I don't remember exactly.

11  But I think including the cash, somewhere between fifty and

12  fifty-two billion dollars.

13  Q.   And it is your testimony that this is what they were worth

14  on September 22nd, 2008?

15  A.   Mr. Boies, can we have an understanding that when you say

16  worth --

17  Q.   Market value?

18  A.   Well, when you say market value that what you mean is they

19  marked to market value in a manner consistent with the way a

20  broker dealer would mark their books to arrive at market value?

21  Q.   Well, let me ask you, sir, what is your definition of

22  market value?

23  A.   For these purposes my definition is what the duties of a

24  broker-dealer would be at that point in time, which is to

25  derive as a going concern what a reasonable market value would

200

1    be consistent with the way broker-dealers often do -- always

2    do.

3    Q.    Now, you do understand that Lehman Brothers the week of

4    the September 15th was not a going concern, correct?  That's a

5    yes or not question.

6    A.    No, I don't understand that.

7    Q.    You don't understand that.  All right.  Did you believe

8    that during the week of September 15th, 2008 Lehman Brothers

9    was a going concern?  Again, a yes or no question.

10   A.    I believe portions were and portions weren't.

11   Q.    All right.  Was the broker-dealer portion of Lehman

12   Brothers a going concern?

13   A.    The idea was -- again, a yes or no.  You can give an

14   explanation afterwards.  But I would like you to begin with a

15   yes or no.

16   Q.    Yes, depending on how you define going concern.  I

17   understood that the idea that we were engaged in was to save

18   the broker dealer as a going concern so to continue to service

19   customers and to provide Barclays the benefit of a functioning

20   operating broker-dealer business that would then derive

21   significant profits.  So was it those days, was it buying and

22   selling, probably not, but were we engaged in a job to sell the

23   going concern and to protect it, yes.  So define the term and

24   I'll answer your question.

25   Q.    Let me try to use your terminology.  You realize that the

201

1    broker-dealer was not engaged in the normal broker-dealer

2    operations the week of September 15th, correct?

3    A.    Yes.

4    Q.    You realize that the broker-dealer was either going to

5    have to engage in the sales transaction or be liquidation,

6    correct?

7    A.    I took that on faith from what I was represented, that

8    there was no other buyer to buy as a going concern, and the

9    choices were this or liquidation.

10   Q.    Right.  And you've never had any reason to question that

11   assumption, have you, sir?

12   A.    Correct.

13   Q.    Now, what is at as you sit here now the committee's best

14   estimate of what the book value was of the assets that were

15   transferred to Barclays?

16   A.    I don't have anything more than what I told you, Mr.

17   Boies.  I think that if these truly were the corpus of assets

18   then they were subject to some perhaps marked to market on the

19   illiquid.  They'd be worth somewhere between -- you know,

20   somewhere around the fifty billion on the page of the mark I

21   had.  The only mark I have is the fifty billion.  I just don't

22   know.

23   Q.    I need to follow-up on that just a little bit, sir.  Did

24   you have an understanding that the securities that were

25   transferred to Barclays were the securities that were

1    identified on the exhibit that your counsel showed you?  That

2    big thick document that listed all those securities.  Is that

3    what you understood were transferred to Barclays?

4    A.    No.

5    Q.    You thought those were not transferred to Barclays?

6    A.    Also, no.  I mean --

7    Q.    Let me be sure I've got the right document, sir.  Your

8    counsel showed you a document, it's Movants' Exhibit 394, you

9    have that?

10    A.    Yes.

11    Q.    And this is the document to Milbank from Weil Gotshal

12    dated September 25, 2008, correct?

13    A.    Correct.

14    Q.    And it purports to give you schedules A and B of the

15    clarification letter, correct?

16    A.    It provides us, not necessarily the final or reconciled

17    list of what went over to Barclays, but it's -- you know, it's

18    clear on the face of the document, sir.

19    Q.    I'm sorry, what, sir?

20    A.    You're asking me is this the doc -- something that was

21    sent to us that shows assets that went to Barclays.  And I'm

22    pointing out to you is the e-mail said they were not

23    necessarily the final reconciled lists.  And you also have a

24    settlement agreement that walks through in detail about all the

25    problems of transferring securities and what went do or do go.

203

1   And you have your failure to give me a reconciled list of

2   securities.  So if you're asking me do I know if these are the

3   assets that went to Barclays, my answer remains no.

4   Q.   My question was did you understand when this was sent to

5   you that it purported to be a list of what went to Barclays,

6   did you understand that, sir?

7   A.   When I first read this --

8   Q.   That's a yes or no question.  You can give an answer --

9   you can give a qualification, but I'd like you to begin with a

10   yes or no answer?

11   A.   No.

12   Q.   You did not understand that.  Did you understand that it

13   purported to be a very close list of what had gone to Barclays?

14   A.   Yes.

15   Q.   And am I to understand it is your testimony that you do

16   not believe it was a very close list of what went to Barclays,

17   is that correct?

18   A.   What I said was I don't know --

19   Q.   Yes or no?

20   A.   No, that's not correct.

21   Q.   Okay.  Do you believe that this actually is a very close

22   list of what actually went to Barclays?

23         THE WITNESS:  Your Honor, am I allowed to answer yes

24   or no, or do I have to say yes or no?

25         MR. BOIES:  No, you can say I don't know.

204

1          THE COURT:  Oh, absolutely.  One of the problems, and

2     you're not having been here for some of Mr. Boies' earlier

3     exhibits of his cross-examination skills is that he has in the

4     past asked witnesses to first answer yes or no, and that

5     included I don't know, I never thought about it, things of that

6     sort.  All he's really looking for is -- and it's perfectly

7     proper questioning.  All he's looking for is an answer to the

8     question which can include an I don't know, followed by

9     whatever explanation you wish to add.

10          THE WITNESS:  Okay, so I have three options.

11          MR. BOIES:  Exactly.  And I apologize.  I usually say

12     yes, no, I don't know.

13          THE COURT:  You actually have a fourth option which is

14     I never thought about it.

15          MR. BOIES:  Exactly.  Any one of those four.  Let me

16     put the question again.

17          THE WITNESS:  Thank you, Your Honor

18     BY MR. BOIES:

19     **Q.   Did you understand that this Exhibit 394 was actually a**

20     **very close list of what actually went to Barclays?**

21     **A.   I understood it was purported to be that.  I didn't**

22     **believe it.**

23     **Q.   Okay.  And did you have the belief that you've just**

24     **testified to, which is that this list was not what it purported**

25     **to be at the time that you received it?**

205

1    A.   I don't want to be too hypothetical, Mr. Boies.  I had

2    that belief, and I had an analyst open it and tell me what it

3    said.  So when I received it I had no believe.  But once

4    someone told me what was in it I had the belief -- I did not

5    believe that this list could be accurate.

6    Q.   Okay.  And when did you have somebody open it and tell you

7    what it was?

8    A.   I don't remember exactly.  Shortly after it came in.

9    Q.   Okay.  Shortly after it came in, correct?

10   A.   Correct.

11   Q.   And did you tell anybody at that time that what Weil

12   Gotshal had sent Milbank Tweed was in your view not what it

13   purported to be?

14   A.   We discussed that issue with counsel.

15   Q.   Is that a yes, no or I don't know?

16   A.   Oh, sorry.  Yes.

17   Q.   Okay.  And I take it that your testimony is that you told

18   counsel that this was not, in your opinion, what it purported

19   to be, correct?

20   A.   Yes.

21   Q.   Okay.

22   A.   We told them that we were -- we'd be surprised if this was

23   the actual list.

24   Q.   And you told them that at or about the end of September of

25   2008, correct?

206

1    A.   Yes.

2    Q.   Did you ever ask anyone from Barclays for a list of what

3    had actually been delivered to Barclays?

4    A.   Yes, because we asked the estate repeatedly for it.  And

5    my understanding is that Barclays controlled the information

6    flow to the estate.

7    Q.   Let me be sure of what I'm hearing.  Did you or Houlihan,

8    or insofar as you know, the committee, ever directly ask

9    Barclays for a list of what Barclays had actually received in

10   the transaction?

11   A.   In this timeframe, no.

12   Q.   And by in this timeframe you mean what period of time,

13   sir?

14   A.   I think your question was in late September.

15   Q.   Okay.  When was the first time that the committee asked

16   Barclays for a list or identification of the securities that

17   Barclays had actually obtained in the transaction?

18   A.   I don't recall exactly when the first time was.

19   Q.   Approximately, sir?

20   A.   I can tell you that I was involved in those request

21   following the December settlement motion.  I don't know if

22   Milbank or someone else may have made those requests earlier.

23   The focus at that time was from the debtor to get a

24   reconciliation.  We didn't think -- I didn't participate in

25   discussions directly with Barclays.

207

1   Q.   Okay.  And the first effort that you know of, of the

2   committee, to get something directly from Barclays recognizing

3   that there may be something you don't know about -- the first

4   that you know about is after the December hearing, is that

5   correct?

6   A.   Probably.  I don't know if there was a conversation

7   leading up to the hearing when we filed our objection, but it

8   began in earnest after the judge's direction for cooperation.

9   Q.   Okay.  At the time that the transaction closed, the

10  morning of September 22nd, did you have an estimate of what the

11  total market value was of the assets Barclays was acquiring,

12  all the assets?

13  A.   Are you including just the broker-dealer book, or you're

14  including the goodwill, all the other assets that are listed in

15  the purchase agreement?

16  Q.   For this question I'm including all the assets that

17  Barclays was acquiring in the transaction, not merely the

18  broker-dealer book.

19  A.   Oh, no, we did not.

20  Q.   Did you have any approximate estimate of the total value

21  of all of the assets Barclays was acquiring?

22  A.   No.

23  Q.   Do you know if anyone tried to make such an estimate?

24  A.   We didn't.  I don't know what others did.

25  Q.   Did you have an estimate as of the time of the closing in

208

1   September of 2008 of what the total value of the liabilities

2   were that Barclays was taking on or assuming in connection with

3   the transaction?

4   A.   Yes.

5   Q.   And what was that value?

6   A.   What I knew at the time was -- what I thought at the time

7   was 45.5 billion of the repo, which is forgiving the Barclays'

8   loan.  And assuming obligations in respect of our compensation

9   for Lehman employees.  And having to pay the cure amounts and

10  all contracts that were needed to operate the broker-dealer or

11  otherwise were wanted by Barclays.  I also knew that Barclays

12  had assumed liabilities arising -- relating to certain trading

13  obligations, but those issues were more fuzzy.  I was not fully

14  briefed on those.

15  Q.   And you didn't have any estimate of what those other

16  liabilities were, what you say is the liabilities relating to

17  the assumption of certain trading activities, is that correct?

18  A.   Correct.

19  Q.   Do you have any approximate estimate of what those

20  liabilities were?

21  A.   I -- only what's been said in Court this morning.  During

22  the DTC cross-examination, but generally, no.

23  Q.   Have you finished your answer?

24  A.   No.

25       MR. BOIES:  Your Honor, I think we're at a convenient

209

1   time to break.

2          THE COURT:  Fine.  Let's do that.  And let me just ask

3   a question about the plan for tomorrow.  Is it desirable to

4   start just a little bit early in order to make sure that we're

5   able to fit in Mr. Ricci and complete what we need to complete

6   tomorrow.

7          And I'm just going to ask the reporter if 9:15 is a

8   problem?  That's fine.

9          The extra fifteen minutes may help.  We could also

10  start at 9, but I find that burdensome, personally.  I could do

11  it.  But if we're going to be starting early and staying late

12  at the end of a two-week uninterrupted trial that for me has

13  also included some other matters, I think it would be, frankly,

14  tough for me, although I'm finding this all fascinating.

15         I also wanted to have time at the end of the day if we

16  could reserve it for a chambers conference discussion.  If that

17  doesn't work out because of the need to complete the testimony

18  and it's just too late in the day, and it's time to move on, we

19  could schedule such a conference at the convenience of counsel

20  sometime within the next couple of weeks.

21         MR. BOIES:  Thank you, Your Honor.

22         THE COURT:  Does that work for everybody?  Fine, so

23  I'll see you tomorrow morning at 9:15.

24         MR. BOIES:  Thank you, Your Honor.

25         (Whereupon these proceedings were concluded at 5:29 p.m.)

210

I N D E X


T E S T I M O N Y

| WITNESS | EXAM BY | PAGE | LINE |
|---------|---------|------|------|
| Isaac Montal | Mr. Maguire | 8 | 12 |
| Isaac Montal | Mr. Shaw | 30 | 2 |
| Isaac Montal | Mr. Maguire | 75 | 13 |
| Saul Burian | Mr. Kirpalani | 77 | 11 |
| Saul Burian | Mr. Boies | 197 | 7 |


E X H I B I T S

| NO. | DESCRIPTION | ID. | EVID. |
|-----|-------------|-----|-------|
| M-675 | Rules and bylaws and organizational certificate of the DTCC | | 71 |
| M-410A | Manila folder | 151 | |
| M-713 | E-mail to Lehman creditors' committee from Saul Burian | | 172 |

211

1

2                            C E R T I F I C A T I O N

3

4        I, Lisa Bar-Leib, certify that the foregoing transcript is a

5        true and accurate record of the proceedings.

6

7        _____

8        LISA BAR-LEIB

9        AAERT Certified Electronic Transcriber (CET**D-486)

10

11       Veritext

12       200 Old Country Road

13       Suite 580

14       Mineola, NY 11501

15

16       Date:  May 10, 2010

17

18

19

20

21

22

23

24

25