Hearing Date and Time:  June 16, 2010 at 10:00 a.m. (Prevailing Eastern Time)
Objection Date and Time:  June 9, 2010 at 4:00 p.m.(Prevailing Eastern Time)

WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas  77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Alfredo R. Pérez

Attorneys for Debtors
and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                              :
In re                                         :      Chapter 11
                                              :
LEHMAN BROTHERS HOLDINGS INC., et al.,        :      Case No. 08-13555 (JMP)
                                              :
                    Debtors.                  :      (Jointly Administered)
                                              :
---------------------------------------------------------------x

### NOTICE OF MOTION OF LEHMAN BROTHERS HOLDINGS INC. AND LEHMAN COMMERCIAL PAPER INC. PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE AND RULE 9019(a) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE FOR AUTHORITY TO ENTER INTO SETTLEMENT AGREEMENT AND PARTICIPATION AGREEMENT WITH STATE STREET BANK AND TRUST COMPANY REGARDING A CERTAIN 340 MADISON LOAN AND TO PAY FUNDS AS CONTEMPLATED THEREBY

PLEASE TAKE NOTICE that a hearing on the annexed motion (the "Motion") of

Lehman Brothers Holdings Inc. ("LBHI") and Lehman Commercial Paper Inc. ("LCPI"), and

their affiliated debtors in the above-referenced chapter 11 cases, as debtors and debtors in

possession (collectively, the "Debtors") for an order pursuant to section 363 of title 11 of the

United States Code (the "Bankruptcy Code") and Rule 9019(a) of the Federal Rules of

Bankruptcy Procedures authorizing entry into a settlement agreement and participation with

State Street Bank and Trust Company regarding a certain 340 Madison loan and to pay funds as

contemplated thereby, will be held before the Honorable James M. Peck, United States

Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House,

Courtroom 601, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on

**June 16, 2010 at 10:00 a.m. (prevailing Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall

be in writing, shall conform to the Bankruptcy Rules and the Local Rules of the Bankruptcy

Court for the Southern District of New York, shall set forth the name of the objecting party, the

basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court

electronically in accordance with General Order M-242 (which can be found at

www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and by

all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF),

WordPerfect, or any other Windows-based word processing format (with two hard copies

delivered directly to Chambers), and shall be served upon: (i) the chambers of the Honorable

James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; (ii) Weil,

Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Alfredo R.

Perez, Esq., counsel to the Debtors; (iii) the Office of the United States Trustee for the Southern

District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Andy

Velez-Rivera, Esq., Paul Schwartzberg, Esq., Brian Masumoto, Esq., Linda Riffkin, Esq., and

Tracy Hope Davis; Esq., (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan

Plaza, New York, New York 10005, Attn: Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and

Evan Fleck, Esq., counsel to the official committee of unsecured creditors appointed in these

cases, and (v) all parties who have requested notice in these chapter 11 cases, so as to be so filed

and received by no later than June 9, 2010 at 4:00 p.m. (prevailing Eastern Time) (the "Objection

Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not

received by the Objection Deadline, the relief requested shall be deemed unopposed, and the

Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend

the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: May 25, 2010
       New York, New York

      /s/ Alfredo R. Pérez
Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas  77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

Attorneys for Debtors
and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas  77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Alfredo R. Pérez

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
                                               :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.,* | : | **08-13555 (JMP)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

-------------------------------------------------------------------x

**MOTION OF LEHMAN BROTHERS HOLDINGS INC. AND**
**LEHMAN COMMERCIAL PAPER INC. PURSUANT TO SECTION 363 OF THE**
**BANKRUPTCY CODE AND RULE 9019(a) OF THE FEDERAL RULES OF**
**BANKRUPTCY PROCEDURE FOR AUTHORITY TO ENTER INTO**
**SETTLEMENT AGREEMENT AND PARTICIPATION AGREEMENT WITH**
**STATE STREET BANK AND TRUST COMPANY REGARDING A CERTAIN**
**340 MADISON LOAN AND TO PAY FUNDS AS CONTEMPLATED THEREBY**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

            Lehman Brothers Holdings Inc. ("LBHI") and its wholly-owned subsidiary

Lehman Commercial Paper Inc. ("LCPI"), as debtors and debtors in possession (together with

their affiliated debtors in the above-referenced chapter 11 cases, the "Debtors" and, collectively

with their non-debtor affiliates, "Lehman"), respectfully represent:

**Relief Requested**

            1.      By this Motion, pursuant to section 363 of title 11 of the United States

Code (the "Bankruptcy Code") and rule 9019(a) of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"), LBHI and LCPI seek authority to enter into the Settlement Agreement

(as defined below) and the related Participation Agreement (as defined below) with State Street

Bank and Trust Company ("State Street" and, together with LBHI and LCPI, the "Parties").

## Jurisdiction

2.    This Court has subject matter jurisdiction to consider and determine this

matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## The Debtors' Chapter 11 Cases

3.    Commencing on September 15, 2008, and periodically thereafter (as

applicable, the "Commencement Date"), the Debtors commenced with this Court voluntary cases

(the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy

Code").  The Debtors' Chapter 11 Cases have been consolidated for procedural purposes only

and are being jointly administered pursuant to Bankruptcy Rule 1015(b).  The Debtors are

authorized to operate their businesses and manage their properties as debtors in possession

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.    On September 17, 2008, the United States Trustee for the Southern of

New York (the "U.S. Trustee") appointed the statutory committee of unsecured creditors

pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

5.    On September 19, 2008, a proceeding was commenced under the

Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc.

("LBI").  A trustee appointed under SIPA is administering LBI's estate.

6.    On January 19, 2009, with the support of the Debtors, the U.S. Trustee

appointed Anton R. Valukas as examiner in the Chapter 11 Cases (the "Examiner") and by order,

dated January 20, 2009 [Docket No. 2583] the Court approved the U.S. Trustee's appointment of

the Examiner.  The Examiner issued a report at his investigation pursuant to section 1106 of the

Bankruptcy Code on March 11, 2010 [Docket No. 7531].

7.      On April 14, 2010, the Debtors filed a revised joint chapter 11 plan and

disclosure statement [Docket Now. 8330 and 8332].

## Lehman's Business

8.      Prior to the events leading up to these chapter 11 cases, Lehman was the

fourth largest investment bank in the United States.  For more than 150 years, Lehman had been

a leader in the global financial markets by serving the financial needs of corporations,

governmental units, institutional clients and individuals worldwide.

9.      Additional information regarding the Debtors' businesses, capital

structures, and the circumstances leading to the commencement of these chapter 11 cases is

contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy

Rules for the Southern District of New York in Support of First-Day Motions and Applications,

filed on September 15, 2008 [Docket No. 2].

## The Adversary Proceeding with State Street

10.     On November 19, 2008 State Street filed an adversary proceeding

captioned *State Street Bank & Trust Company v. Lehman Commercial Paper Inc.* Adversary

Proceeding No. 08-01743-JMP (the "Adversary Proceeding"), which is part of the Chapter 11

Cases.  The Adversary Proceeding relates to that certain Master Repurchase Agreement dated

May 1, 2007 between LCPI and State Street and for which LBHI acts as guarantor of the

obligations of LCPI thereunder (as amended, supplemented or otherwise modified from time to

time, together with all related documents, exhibits, schedules, confirmations and agreements

entered into in connection therewith, the "Repo Agreement").

11.    In the Adversary Proceeding, State Street has asserted, *inter alia*, certain claims (the "340 Madison Adversary Proceeding Claims") seeking declaratory and other relief regarding State Street's rights under the Repo Agreement to ownership of a loan relating to a property located at 340 Madison Avenue in New York City (the "340 Madison Loan").  LBHI and LCPI have asserted that State Street has no ownership interest in the 340 Madison Loan. The current outstanding principal balance of the 340 Madison Loan is approximately $31.2 million.

12.    State Street has filed, in the Chapter 11 Cases, proofs of claim (the "Proofs of Claim") in connection with its rights under the Repo Agreement, and has asserted in the Proofs of Claim, among other things, an *in rem* claim to ownership of the 340 Madison Loan (the "*In Rem* Claim" and, together with the 340 Madison Adversary Proceeding Claims, the "340 Madison Ownership Claims") and, in the alternative, in the event that State Street were determined not to be the owner of the 340 Madison Loan, a claim to increased monetary damages resulting from LCPI's failure to repurchase the other loans sold to State Street under the Repo Agreement (the "340 Madison Damage Claim" and together with the 340 Madison Ownership Claims, the "340 Madison Claims").

### The Settlement Agreement

13.    The Parties have engaged in extensive settlement negotiations relating to the Adversary Proceeding and the 340 Madison Ownership Claims, the result of which is a settlement agreement (the "Settlement Agreement") substantially in the form attached as Exhibit A hereto.

14.     The salient terms of the Settlement Agreement are as follows:[1]

| | |
|---|---|
| ***Disposition of the 340 Madison Loan*** | Simultaneously with the execution of the Settlement Agreement and on the date of execution thereof ("Effective Date"), LBHI and State Street shall execute a participation agreement (the "Participation Agreement"), substantially in the form attached hereto as Exhibit B. The Participation Agreement sets forth the terms and conditions of LBHI's and State Street's respective ownership interests in the 340 Madison Loan.<br><br>Pursuant to the Participation Agreement, LBHI will assign to State Street effective as of September 17, 2008 (the "Deemed Transfer Date") an undivided 50% participation interest in the 340 Madison Loan (the "State Street Ownership Interest"), which assignment shall be deemed to have occurred on and as of the Deemed Transfer Date and shall further be deemed to have occurred pursuant to the terms of the Repo Agreement. |
| ***Payment to State Street*** | On the Effective Date, LBHI or LCPI shall wire to State Street payment (the "Prior Payment Share") in immediately available funds representing (a) 50% of all payments of, or on account of, principal, interest, default interest, prepayment penalties, additional interest, late charges, prepayment fees, exit fees, proceeds of any so-called "equity kickers" or participations in proceeds of the sale of the collateral securing the 340 Madison Loan or the sale of the Property (as defined in the Participation Agreement) from whatever source derived, received by LBHI or LCPI in respect of the 340 Madison Loan during the period beginning on the Deemed Transfer Date[2] through and including the Effective Date, less (b) 50% of all costs and expenses (including, without limitation, servicing fees) incurred and/or paid by LBHI or LCPI in respect of the 340 Madison Loan during the period beginning on the Deemed Transfer Date through and including the Effective Date. |
| ***Dismissal of Adversary Proceeding*** | Within five business days following the Effective Date, State Street and LCPI will file a joint stipulation of dismissal of the 340 Madison Claims with prejudice (exclusive of State Street's rights under the Participation Agreement) and without costs or fees to any party. |
| ***Proof of Claim Modification*** | Within ten business days following the Effective Date, State Street will (a) withdraw its Proof of Claim No. 32,696 and, except as hereinafter provided regarding amendments to Proof of Claim Nos. 32,695 and 32,697, will not file any further Proofs of Claim regarding the 340 Madison Loan, and (b) will file amended versions of Proofs of Claim Nos. 32,695 and 32,697 that assert no claim that State Street owns any portion of the 340 Madison Loan other than the State Street Ownership Interest set forth in the Settlement Agreement and in the Participation Agreement, and (ii) reflect the parties' agreement, in computing State Street's "shortfall" claim under the Repo Agreement, that State Street |

---

[1] The terms listed below are provided as a summary of the terms of the Settlement Agreement. In the case of an inconsistency between the terms set forth in the summary and the terms of the Settlement Agreement, the terms of the Settlement Agreement shall control.

[2] LBHI or LCPI have received approximately $6.5 million in total from September 2008 through May 2010.

| | |
|---|---|
| | has received the State Street Ownership Interest effective as of the Deemed Transfer Date and that State Street's shortfall claim will be reduced by the value of the State Street Ownership Interest as of the Deemed Transfer Date from what the claim would have been had State Street received nothing of value in respect of the 340 Madison Loan. |
| *Mutual Limited Releases* | Each party releases each other party from any and all liabilities in respect of the 340 Madison Claims to the extent provided in the Settlement Agreement, provided, however, that such release shall not, in any manner, be deemed a release (i) of or by any party with respect to any matters arising under the Participation Agreement, the Repo Agreement (except as expressly provided in the Settlement Agreement) or the Settlement Agreement, (ii) by State Street of its claims referred to in the amended Proofs of Claim contemplated above, or (iii) by State Street of any claim that it may have against any person otherwise released pursuant to the release given by State Street as a result of a third party asserting a claim against State Street or any successor or assign or affiliate of State Street on account of any act or omission of that person in respect of the 340 Madison Loan. |

## **The Participation Agreement**

15.     The Settlement Agreement contemplates LBHI's entry into the

Participation Agreement, which, generally, will set forth the terms and conditions of LBHI's and

State Street's respective ownership interests in the 340 Madison Loan.

16.     The salient terms of the Participation Agreement are as follows:[3]

| | |
|---|---|
| *Participation of 340 Madison Loan* | On the Effective Date, LBHI ("Lender") will assign to State Street ("Participant") an undivided fifty percent (50%) participation interest in the 340 Madison Loan and in all documents and collateral evidencing and securing the same. The assignment shall be deemed to have occurred on and as of the Deemed Transfer Date and shall further be deemed to have occurred pursuant to the terms of the Repo Agreement. The interests of Lender and Participant in the 340 Madison Loan shall be pari passu and of equal priority with each other in proportion to their respective percentage interests in the 340 Madison Loan. |
| *Distributions of Payments* | All payments received by Lender with respect to the 340 Madison Loan shall be distributed as follows:     first, for the payment of unpaid costs (as specified in the |

[3] The terms listed below are provided as a summary of the terms of the Participation Agreement. In the case of an inconsistency between the terms set forth in the summary and the terms of the Participation Agreement, the terms of the Participation Agreement shall control.

| | |
|---|---|
| | Participation Agreement) due and owing to Lender; <u>second</u>, to Lender and/or Participant for Priority Protective Advances (as defined in the Participation Agreement) not reimbursed by the borrower, together with interest thereon; and <u>third</u>, to Lender and Participant <u>pari passu</u> in accordance with their percentage interests in the 340 Madison Loan. |
| ***Administration of Loan*** | Subject to Participant's approval right with respect to any Lender Decision/Action (as defined in the Participation Agreement), and except as otherwise provided in the Participation Agreement, Lender shall administer and service the 340 Madison Loan or cause the 340 Madison Loan to be administered and serviced by a servicer selected by the Lender with the prior written approval of the Participant (not to be unreasonably withheld, conditioned or delayed), in accordance with the standards more particularly described in the Participation Agreement.<br><br>If LBHI or an affiliate thereof no longer holds a majority of the Lender's interest in the 340 Madison Loan or if LBHI fails to perform its obligations under the Participation Agreement and such failure to perform is not cured within 30 days following written notice by the Participant, then in either case, Participant shall have the right to require that LBHI (a) assign legal title to the 340 Madison Loan to Participant or its designee (and substitute the Participant or such designee as agent under the 340 Madison Loan) such that the Participant or designee shall become the "Lender" and LBHI or its affiliate or successor or assign shall become the "Participant" provided that all conditions and requirements set forth in the loan documents and intercreditor agreements relating to the assignment of the 340 Madison Loan and/or the substitution of the agent are complied with by the Participant, and (b) replace the servicer with a new servicer selected by the Participant and reasonably approved by LBHI provided, among other things, that the new servicer is a Qualified Replacement Servicer (as defined in the Participation Agreement). |
| ***Lender Decision/Action*** | Lender shall not, without the prior written consent of the Participant, take any action constituting a Lender Decision/Action. |
| ***Protective Advances and Priority Protective Advances*** | If Lender determines that a protective advance needs to be made and Participant grants its approval thereof, Lender and Participant are required to fund their proportionate shares of the protective advance. If either party fails to fund its proportionate share within five (5) business days following Lender's notice of the protective advance, then the other party may make such protective advance (a "<u>Priority Protective Advance</u>") on behalf of the non-funding party which shall accrue interest at the rate of sixteen percent (16%) per annum. Notwithstanding the |

| | |
|---|---|
| | foregoing, if Lender determines in its reasonable discretion that special emergency circumstances exist requiring that a protective advance be made immediately to preserve and protect the interest of the Lender and Participant, Lender may fund such protective advance without Participant's prior approval and Participant shall have the obligation to reimburse to Lender the Participant's proportionate share of such protective advance within 2 business days following Lender's written request therefor.  If Participant fails to reimburse Lender for its applicable proportionate share, such amount shall be deemed a Priority Protective Advance. |
| ***Acquisition of Mortgage Loan, Senior Mezz Loan or Property*** | Lender and Participant agree that they shall not purchase the senior mortgage loan, senior mezzanine loan or the property except as set forth in the Participation Agreement nor will they allow the fee owner, senior mezzanine borrower, junior mezzanine borrower, guarantor or any affiliate thereof or any other person acting for the direct or indirect benefit, or at the direction or request, of any of the foregoing to purchase any interest in the 340 Madison Loan.<br><br>If either Lender or Participant concludes that the senior mortgage loan or senior mezzanine loan must be acquired to protect their respective interest in the 340 Madison Loan and if both parties approve such purchase, then the Lender will purchase the applicable loan for the benefit of both parties.  If one of the parties does not approve the purchase of the applicable loan, then the other party shall have the right to purchase the applicable loan for its own account; provided that if the purchasing party is the Participant, the parties agree to have the Lender purchase the applicable loan on behalf of the Participant and then assign the loan to the Participant provided that the conditions and requirements set forth in the Participation Agreement are complied with. |
| ***Ownership of Equity Interests and Property*** | In the event of a foreclosure sale in which equity interests or the underlying property is transferred to satisfy the 340 Madison Loan, then, to the extent permitted by the intercreditor agreements, Lender and Participant shall negotiate and form an ownership entity to take title to the applicable equity interests or the underlying property.  Such entity shall, among other items specified in the Participation Agreement, provide for the same economic interests as such parties have in the 340 Madison Loan and further provide that each of Lender and Participant shall be co-managers of the entity. |
| ***Right of First Offer*** | If either Lender or Participant proposes to sell, assign or transfer its interests in the 340 Madison Loan, it shall first give notice to the other party which shall have a right of first offer with respect to the acquisition of such interests as provided in the Participation Agreement. |

**Entry into the Settlement Agreement and the Participation Agreement,
And the Transfer of Funds as Contemplated Thereby, Should Be Approved**

**A. Rule 9019 Requires that the Settlement Agreement Is
Within the Acceptable Range of Reasonableness**

17.    Rule 9019 of the Bankruptcy Rules governs the procedural requirements
to be followed before a compromise or settlement may be approved.  Bankruptcy Rule 9019
provides, in pertinent part, that "[o]n motion by the [debtor-in-possession] and after notice and a
hearing, the court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a).  This
rule empowers bankruptcy courts to approve settlements "if they are in the best interests of the
estate."  Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert
Group, Inc.), 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991); see also Protective Comm. for Indep.
Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968); Fisher v.
Pereira (In re 47-49 Charles St., Inc.), 209 B.R. 618, 620 (S.D.N.Y. 1997); In re Ionosphere
Clubs, Inc., 156 B.R. 414, 426 (S.D.N.Y. 1993), aff'd, 17 F.3d 600 (2d Cir. 1994).  A decision to
accept or reject a compromise or settlement is within the sound discretion of the Court.  Drexel
Burnham Lambert Group, 134 B.R. at 505; see also 9 Collier on Bankruptcy ¶ 9019.02 (15th ed.
rev. 2001).  The settlement need not result in the best possible outcome for the debtor, but must
not "fall below the lowest point in the range of reasonableness."  Drexel Burnham Lambert
Group, 134 B.R. at 505 (internal citations omitted); see also Cosoff v. Rodman (In re W.T. Grant
Co.), 699 F.2d 599, 608 (2d Cir. 1983); In re Spielfogel, 211 B.R. 133, 143-44 (Bankr. E.D.N.Y.
1997).  Indeed, courts have long considered compromises to be "a normal part of the process of
reorganization."  TMT Trailer Ferry, 390 U.S. at 424 (quoting Case v. Los Angeles Lumber
Prods. Co., 308 U.S. 106, 130 (1939).

18.     The decision to approve a particular compromise lies within the sound

discretion of the bankruptcy court.  Nellis v. Shugrue, 165 B.R. 115, 123 (S.D.N.Y. 1994).

Additionally, a court may exercise its discretion "in light of the general public policy favoring

settlements."  In re Hibbard Brown & Co., Inc., 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998).

However, the analysis must focus on the question of whether a particular compromise is "fair

and equitable, . . . and [ ] in the best interest of the estate."  In re Best Products Co., 168 B.R. 35,

50 (Bankr. S.D.N.Y. 1994) (internal citations omitted).

19.     While a court must evaluate "all . . . factors relevant to a full and fair

assessment of the wisdom of the proposed compromise," TMT Trailer Ferry, 390 U.S. at 424, a

court need not conduct a "mini-trial" of the merits of the claims being settled, or conduct a full

independent investigation.  Drexel Burnham Lambert Group, 134 B.R. at 505.  "The bankruptcy

judge does not have to decide the numerous questions of law and fact. . . . The court need only

canvass the settlement to determine whether it is within the acceptable range of reasonableness."

Nellis, 165 B.R. at 123 (internal citations omitted).

20.     The court may give weight to the "informed judgments of the . . . debtor-

in-possession and their counsel that a compromise is fair and equitable, and consider the

competency and experience of counsel who support the compromise."  Drexel Burnham Lambert

Group, 134 B.R. at 505 (internal citations omitted); see also In re Purofied Down Prods. Corp.,

150 B.R. 519, 522-23 (S.D.N.Y. 1993); accord In re Ashford Hotels, Ltd., 226 B.R. 797, 802

(Bankr. S.D.N.Y. 1998) ("Significantly, that test does not contemplate that I substitute my

judgment for the Trustee's, but only that I test his choice for reasonableness. . . .  If the Trustee

chooses one of two reasonable choices, I must approve that choice, even if, all things being

equal, I would have selected the other.") (internal citations omitted).

21.     Significantly, there is no requirement that "the value of the compromise . . . be dollar-for-dollar the equivalent of the claim." Ionosphere Clubs, Inc., 156 B.R. at 427. Instead, "there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." Id. at 427-28 (quoting City of Detroit v. Grinnell Corp., 495 F.2d 448, 455 n.2 (2nd Cir. 1974)).

**B. Section 363 Requires that Entry into the Participation Agreement
And Payment of the Funds Contemplated Thereby are an Exercise
Of Sound Business Judgment of the Debtors**

22.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." Id. § 363(b)(1).  When considering a transaction outside the ordinary course of business, courts in the Second Circuit, and others, require that such transaction be based upon the sound business judgment of the debtor. Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983); accord In re Chateaugay Corp., 973 F.2d 141, 143 (2d Cir. 1992); In re Martin, 91 F.3d 389, 395 (3d Cir. 1996) (citing Fulton State Bank v. Schipper (In Re Schipper), 933 F.2d 513, 515 (7th Cir. 1991)); Institutional Creditors of Cont'l Airlines, Inc. v. Cont'l Airlines, Inc. (In re Cont'l Airlines, Inc.), 780 F.2d 1223, 1226 (5th Cir. 1986).

23.     It is generally understood that "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." In re Johns-Manville Corp., 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  If a valid business justification exists, there is a strong presumption that "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488

A.2d 858, 872 (Del. 1985)), <u>appeal dismissed</u>, 3 F.3d 49 (2d Cir. 1993).  The burden of rebutting

this presumption falls to parties opposing the proposed exercise of a debtor's business judgment.

<u>Id.</u> (citing <u>Aronson v. Lewis</u>, 473 A.2d 805, 812 (Del. 1984)).

**C.  Entry into the Settlement Agreement and the
Participation Agreement, and the Payment of Funds
Contemplated Thereby Meets the Standards for Approval
Under Rule 9019 and Section 363**

24.      LBHI's and LCPI's entry into the Settlement Agreement is in the best

interests of their respective estates and creditors.  The Settlement Agreement is the product of

extensive good-faith, arms'-length negotiation with State Street and provides a compromise to

the Adversary Proceeding that is beneficial to LBHI, LCPI, and their respective creditors.  Not

only is LBHI able to retain the legal interest and a 50% beneficial interest in the 340 Madison

Loan, but the Settlement Agreement enables LCPI and LBHI to avoid the costs and risks

associated with a protracted litigation on these issues.

25.      The Debtors regularly enter into participation agreements in their ordinary

course of business.  Nonetheless, because entry into the Participation Agreement is in settlement

of an adversary proceeding claim, and because the Participation Agreement and Settlement

Agreement call for the payment of funds to State Street retroactive to September 17, 2008, the

Debtors are seeking Court approval.

26.      Entry into the Participation Agreement and the transfer of funds as

contemplated thereby is a sound exercise of the Debtors' business judgment.  The Participation

Agreement and the transfer of the funds are key aspects of the Settlement Agreement, which, as

discussed above, provides a settlement to the Adversary Proceeding that is beneficial to LBHI,

LCPI, and their respective creditors.  As such, the Settlement Agreement and the Participation

Agreement, and the transfer of funds as contemplated thereby, should be approved.

## Reservation of Rights and Further Assurances

27.     The purpose of this Motion is to compromise a controversy between LBHI and LCPI, on the one hand, and State Street, on the other hand.  Nothing contained herein shall be deemed to be a waiver or the relinquishment of any rights, claims, interests, obligations, benefits or remedies of LCPI or LBHI or, except as otherwise expressly provided in this Motion, that any of the Debtors may have or choose to assert on behalf of their respective estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including against each other or third parties.  Furthermore, the parties may execute such further documents as necessary to reflect this reservation of rights between LBHI and LCPI.  Except as provided with respect to the 340 Madison Loan in the Settlement Agreement, the Repo Agreement is not affected by this Motion or the Settlement Agreement.  Each of State Street, LCPI and LBHI otherwise retain all of its respective rights, remedies, claims and defenses, available at law or in equity, and under, related to, or in connection with, the Repo Ageement.

## Notice

28.     No trustee has been appointed in these chapter 11 cases.  The Debtors have served notice of this Motion in accordance with the procedures set forth in the amended order entered on February 13, 2009 governing case management and administrative procedures for these cases [Docket No. 2837] on (i) the Office of the United States Trustee for the Southern District of New York; (ii) the attorneys for the Statutory Committee of Unsecured Creditors appointed in these cases; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; and (vi) all parties who have requested notice in these chapter 11 cases.  No other or further notice need be provided.

29.    No previous request for the relief sought herein has been made by the

Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief

requested herein and such other and further relief as is just.

Dated: May 25, 2009
       New York, New York

      /s/ Alfredo R. Pérez
Alfredo R. Pérez

WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, TX 77002
Telephone: (713) 546-5040
Facsimile: (713) 224-9511

Attorneys for Debtors
and Debtors in Possession

## Exhibit A

**(Form of Settlement Agreement)**

**WGM DRAFT 5/25/10**

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (this "**Agreement**") is entered into as of _____ __, 2010 (the "**Effective Date**") by and among STATE STREET BANK AND TRUST COMPANY ("**State Street**"), LEHMAN COMMERCIAL PAPER INC. ("**LCPI**"), and LEHMAN BROTHERS HOLDINGS INC. ("**LBHI**").  State Street, LCPI and LBHI are referred to herein collectively as the "**Parties**" and each individually as a "**Party**".

### R E C I T A L S

WHEREAS, LBHI and LCPI are debtors and debtors in possession in Chapter 11 bankruptcy cases *In re Lehman Brothers Holdings Inc.*, Bankruptcy Case No. 08-13555 and No. 08-13900 (the "**Bankruptcy Proceedings**"), United States District Court for the Southern District of New York (the "**Bankruptcy Court**");

WHEREAS, State Street filed an adversary proceeding captioned *State Street Bank & Trust Company v. Lehman Commercial Paper Inc.*, Adversary Proceeding No. 08-01743-JMP (the "**Adversary Proceeding**"), which is part of the Bankruptcy Proceedings;

WHEREAS, the Adversary Proceeding related to that certain Master Repurchase Agreement dated May 1, 2007 between LCPI and State Street and for which LBHI acts as guarantor of the obligations of LCPI thereunder (as amended, supplemented and otherwise modified from time to time, together with all related documents, exhibits, schedules  and agreements entered into in connection therewith, the "**Repo Agreement**");

WHEREAS, a dispute has arisen between the Parties under the Repo Agreement concerning the so-called "340 Madison Ave. Mezz" loan relating to a property located at 340 Madison Avenue in New York City, New York (the "**340 Madison Loan**");

WHEREAS, State Street asserted in the Adversary Proceeding, among other claims, certain claims seeking declaratory and other relief regarding State Street's rights under the Repo Agreement to ownership of the 340 Madison Loan (the ownership claims to the 340 Madison Loan asserted by State Street in the Adversary Proceeding being hereinafter referred to as the "**340 Madison Adversary Proceedings Claims**"), and LCPI and LBHI have asserted that State Street has no ownership interest in the 340 Madison Loan;

WHEREAS, State Street has filed in the Bankruptcy Proceedings Proofs of Claim Nos. 32,695, 32,696 and 32,697 (the "**Proofs of Claim**") in connection with its rights under the Repo Agreement;

WHEREAS, in furtherance of the 340 Madison Adversary Proceedings Claims, State Street has asserted in the Proofs of Claim, among other claims, an *in rem* claim to ownership of the 340 Madison Loan (the "***In Rem* Claim**" and, together with the 340 Madison Adversary Proceedings Claims, the "**340 Madison Ownership Claims**") and, in the alternative, in the event that State Street were determined not to be the owner of the 340 Madison Loan, a claim to

increased monetary damages resulting from LCPI's failure to repurchase the other loans sold to State Street under the Repo Agreement (the "**340 Madison Damage Claim**" and together with the 340 Madison Ownership Claims, the "**340 Madison Claims**");

**WHEREAS,** the Parties desire to resolve any and all disputes among and between the Parties concerning the 340 Madison Claims, all subject to the terms and conditions hereinafter set forth;

**WHEREAS**, LBHI and LCPI have obtained entry of a final order by the Bankruptcy Court allowing a motion to approve this Agreement and the Participation Agreement (as defined below), which order is no longer subject to appeal and has not been stayed;

**NOW, THEREFORE,** for good and valuable consideration, the receipt of which is hereby acknowledged, the parties agree as follows:

1.    **Disposition of the 340 Madison Loan.**  Simultaneously herewith on the Effective Date, LBHI and State Street shall execute a Participation Agreement substantially in the form of EXHIBIT A attached hereto (the "**Participation Agreement**"), pursuant to which LBHI will assign to State Street and State Street will accept from LBHI, effective as of September 17, 2008 (the "**Deemed Transfer Date**"), an undivided fifty percent (50%) participation interest in the 340 Madison Loan (the "**State Street Ownership Interest**") which assignment and acceptance shall be deemed to have occurred on and as of the Deemed Transfer Date and shall further be deemed to have occurred pursuant to the terms of the Repo Agreement.  The Participation Agreement sets forth the terms and conditions of LBHI's and State Street's respective ownership interests in the 340 Madison Loan.

2.    **Payment to State Street**.   On the Effective Date, LBHI or LCPI shall wire to State Street payment of $_____  (the "**Prior Payment Share**") in immediately available funds representing (a) 50% of all payments of, or on account of, principal, interest, default interest, prepayment penalties, additional interest, late charges, prepayment fees, exit fees, proceeds of any so-called "equity kickers" or participations in proceeds of the sale of the collateral securing the 340 Madison Loan or the sale of the Property (as said term is defined in the Participation Agreement), from whatever source derived, received by LBHI or LCPI in respect of the 340 Madison Loan during the period beginning on September 17, 2008 through and including the Effective Date (collectively, the "**340 Madison Receipts**"), less (b) 50% of all costs and expenses (including, without limitation, servicing fees) incurred and/or paid by LBHI or LCPI in respect of the 340 Madison Loan during the period beginning on September 17, 2008 through and including the Effective Date (collectively, the "**340 Madison Expenses**").  LBHI and LCPI hereby represent and warrant to State Street that attached hereto as SCHEDULE A is a true, correct and complete accounting of all 340 Madison Receipts and all 340 Madison Expenses.

3.    **Litigation Dismissal.**  Within five (5) business days following the Effective Date, State Street and LCPI will file a joint stipulation dismissing the 340 Madison Claims with prejudice (exclusive of State Street's rights under the Participation Agreement) and without costs or fees to any Party.

     **4.**    <u>**Proof of Claim Modification.**</u>  Within ten (10) business days following the Effective Date, State Street will (a) withdraw its Proof of Claim No. 32,696 and, except as hereinafter provided regarding amendments to Proofs of Claim Nos. 32,695 and 32,697, will not file any further Proofs of Claim regarding the 340 Madison Loan, and (b) will file amended versions of Proofs of Claim Nos. 32,695 and 32,697 that (i) assert no claim that State Street owns any portion of the 340 Madison Loan other than the State Street Ownership Interest set forth herein and in the Participation Agreement, and (ii) reflect the parties' agreement, in computing State Street's "shortfall" claim under the Repo Agreement, that State Street has received the State Street Ownership Interest effective as of the Deemed Transfer Date and that State Street's shortfall claim will be reduced by the value of the State Street Ownership Interest as of the Deemed Transfer Date from what the claim would have been had State Street received nothing of value in respect of the 340 Madison Loan.

     **5.**    <u>**Mutual Releases.**</u>  Each Party intends, by this mutual release, to effect a release of each other Party from any and all liabilities in respect of the 340 Madison Claims to the extent provided below, provided, however, that this release shall not in any manner be deemed a release (i) of or by any Party with respect to any matters arising under the Participation Agreement, the Repo Agreement (except as expressly provided below) or this Agreement, (ii) by State Street of its claims referred to in the amended Proofs of Claim contemplated by Section 4 above or (iii) by State Street of any claim that it may have against any person otherwise released under clause (a) below as a result of a third party asserting a claim against State Street or any successor or assign or affiliate of State Street on account of any act or omission of that person in respect of the 340 Madison Loan.

     (a)  State Street, on behalf of itself, its successors and assigns, past, current and future affiliates, guarantors, sureties, and all of their respective subsidiaries and affiliates, hereby irrevocably and unconditionally waives, releases and discharges with prejudice LCPI and LBHI and their respective successors, assigns, past, current and future affiliates, parent companies, subsidiaries, directors, trustees, officers, shareholders, members, attorneys, employees, sureties and agents from any and all claims, liens, causes of action or suits at law or in equity, damages, liabilities, demands, grievances, losses and costs (including all costs of suit and attorneys fees and expenses), existing or contingent, known or unknown, and whether arising by statute, common law or otherwise, of whatsoever kind or nature, that it has or might have, from the beginning of time to the Effective Date that have been or could have been asserted in connection with the 340 Madison Loan including, without limitation, the 340 Madison Claims, and any claims based on or arising from any act or omission of LBHI or LCPI in respect of the 340 Madison Loan which act or omission occurred prior to the Effective Date.

     (b)  Each of LBHI and LCPI, on behalf of itself, its respective successors and assigns, past, current and future affiliates, guarantors, sureties, and all of their respective subsidiaries and affiliates, hereby irrevocably and unconditionally waives, releases and discharges with prejudice State Street and its successors, assigns, past, current and future affiliates, parent companies, subsidiaries, directors, trustees, officers, shareholders, members, attorneys, employees, sureties and agents from any and all claims, liens, causes of action or suits at law or in equity, damages, liabilities, demands, grievances, losses and costs (including all costs of suit and attorneys fees and expenses), existing or contingent, known or unknown, and

whether arising by statute, common law or otherwise, of whatsoever kind or nature, that it has or might have, from the beginning of time to the Effective Date that have been or could have been asserted in connection with the 340 Madison Loan or that could be asserted to limit, reduce, avoid or modify the State Street Ownership Interest (except to the extent the same arise under the Participation Agreement).

6.    **Governing Law.**    The Parties agree that this Agreement shall be governed by the laws of the State of New York without giving effect to any provision thereof that would require reference to or the application of the laws of any other jurisdiction.

7.    **Counterparts.**    This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.

8.    **Representation by Counsel.**    Each Party acknowledges and agrees that it has been represented by counsel during the negotiation of the settlement contemplated hereby and the execution of this Agreement. Each Party further acknowledges and agrees that it understands and accepts the effect of all of the terms of this Agreement and willingly agrees to be bound thereby.

9.    **Enforceability.**    This Agreement shall be binding upon and enforceable by and against, the Parties and their respective successors, assignees and legal representatives, and there shall be no third party beneficiaries hereof.

10.    **Severability.**    If any provision of this Agreement, or its application to any person or circumstance, shall be found invalid, illegal or unenforceable to any extent, the remainder of this Agreement and its application shall not be affected and shall remain enforceable to the fullest extent permitted by law. If the absence of the part that is held to be invalid, illegal or unenforceable substantially deprives a Party of the economic benefit of this Agreement, the Parties shall negotiate reasonable and valid provisions to restore the economic benefit to the Party deprived or to balance the Parties' obligations consistent with the intent reflected in this Agreement.

11.    **Headings.**    Section headings, titles or captions of paragraphs or subparagraphs contained in this Agreement are inserted only as a matter of convenience and for reference only, and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provisions hereof. For the avoidance of doubt, all dollar amounts set forth herein shall refer to U.S. dollars.

12.    **Compromise.**    This Agreement is the result of compromise and settlement, taking into account costs of defense and other matters, and shall not, at any time or for any purpose, be considered an admission of liability or responsibility on the part of any Party; each Party continues to deny such liability and disclaim such responsibility.

13.    **Entire Agreement.**    This Agreement supersedes all prior negotiations and agreements between the Parties as to this Agreement and constitutes their entire agreement and

WGM DRAFT 5/25/10

understanding with respect to the express subject matter contained herein.  This Agreement may not be modified except by a writing signed by all Parties subsequent to this Agreement.  No delay or failure to exercise a right resulting from a breach of this Agreement shall impair such right or shall be construed to be a waiver thereof, but such right may be exercised from time to time and as often as may be deemed expedient.

14.    **Joint Effort.**    The Parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

15.    **Expenses**.    The fees and expenses incurred by each Party hereto (including the fees of any lawyers, accountants, investment bankers or others engaged by such Party) in connection with this Agreement, the Participation Agreement and the transactions contemplated hereby and thereby will be paid by such Party.

16.    **Notices**.    All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given:  (a) upon personal delivery to the party to be notified, (b) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient, and if not so confirmed, then on the next business day, (c) three (3) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt.  All communications shall be sent:

> To LCPI or LBHI at:
>
> Lehman Brothers Holdings Inc.
> 1271 Avenue of the Americas, 39th Floor
> New York, New York 10020
> Attn:   Joelle Halperin, Esq.
> Telephone: (646) 285-9066
> Facsimile: (646) 834-0874

**WGM DRAFT 5/25/10**

With a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Attn:   W. Michael Bond, Esq.
Telephone: (212) 310-8035
Facsimile: (212) 310-8007

To State Street at:

State Street Bank and Trust Company
1 Lincoln Street, SFC9
Boston, MA 02111
Attention: Q. Sophie Yang, Senior Portfolio Manager
Telephone: (617) 664-2896
Facsimile:  (617) 664-3555

With copies to:

State Street Bank and Trust Company
100 Huntington Avenue
Boston, MA 02116
Attention: Bruce M. Denneen, Vice President and Senior Counsel
Telephone: (617) 937-9865
Facsimile:  (617)  664-5650

and

Bingham McCutchen LLP
2020 K Street, NW
Washington, D.C. 20006
Attn:   Kenneth Lore, Esq.
Telephone: (202) 373-6281
Facsimile: (202) 373-6438

or to such other address as may have been furnished by a party to each of the other parties by notice given in accordance with the requirements set forth above.

**17.    Repo Agreement**.  Except as expressly provided herein, nothing contained herein shall constitute a waiver of or alteration, modification, limitation or amendment of or to the Repo Agreement and the parties' respective rights thereunder.  In addition, except for the matters subject to the release set forth in Section 5 above, each of the Parties hereby otherwise reserves all of its respective rights, remedies, claims and defenses, available at law or in equity, and under, related to, or in connection with, the Repo Agreement and the Adversary Proceeding.

BALANCE OF PAGE INTENTIONALLY LEFT BLANK

**IN WITNESS WHEREOF**, the duly authorized officers of the Parties hereto have executed this Agreement, all as of the date first set forth above.

**STATE STREET BANK AND TRUST COMPANY**

By: _____
Its:
Dated:

**LEHMAN COMMERCIAL PAPER INC.,** a New York corporation, as debtor and debtor in possession in its Chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13900 (JMP)

By: _____
Its:
Dated:

**LEHMAN BROTHERS HOLDINGS INC.,** a Delaware corporation, as debtor and debtor in possession in its Chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Its:
Dated:

SCHEDULE A

340 Madison Receipts and 340 Madison Expenses

**<u>Exhibit B</u>**

**(Form of Participation Agreement)**

## PARTICIPATION AGREEMENT

**THIS PARTICIPATION AGREEMENT** (this **"Agreement"**) made as of the _____ day of _____, 2010 (the "**Effective Date**"), by and among **LEHMAN BROTHERS HOLDINGS INC.**, a Delaware corporation, having an office at 1271 Avenue of the Americas, 39th Floor, New York, New York 10020 (**"LBHI"**), and **STATE STREET BANK AND TRUST COMPANY**, having an office at 1 Lincoln Street, SFC9, Boston, Massachusetts 02111 ("**State Street**" or **"Participant"**).

## W I T N E S S E T H

**WHEREAS,** pursuant to that certain Junior Mezzanine Loan Agreement, dated as of March 9, 2007 (together with all amendments thereto entered into after the date hereof in accordance with the terms of this Agreement, the **"Junior Mezz Loan Agreement"**), among Broadway 340 Madison Junior Mezz LLC, a Delaware limited liability company ("**Junior Mezz A**") and Broadway 340 Madison Junior Mezz Operator LLC, a Delaware limited liability company ("**Junior Mezz B**", and together with Junior Mezz A, collectively, the **"Junior Mezz Borrower"**) and LBHI, as Agent and as sole lender, LBHI (together with its successors and permitted assigns as owner and holder of the Junior Mezz Loan (as defined herein), the "**Lender**") made the Junior Mezz Loan (as defined herein) to the Junior Mezz Borrower;

**WHEREAS**, Junior Mezz A is the sole member of Broadway 340 Madison Mezz LLC, a Delaware limited liability company ("**Senior Mezz A"**), who is the sole member of Broadway 340 Madison Fee LLC, a Delaware limited liability company (the "**Fee Owner**");

**WHEREAS**, Junior Mezz B is the sole member of Broadway 340 Madison Mezz Operator LLC, a Delaware limited liability company ("**Senior Mezz B"** , and together with Senior Mezz A, collectively, the "**Senior Mezz Borrower**"), who is the sole member of Broadway 340 Madison Operator LLC, a Delaware limited liability company (the "**Lease Owner**", and together with the Fee Owner, collectively, the "**Project Owner**");

**WHEREAS**, certain disputes previously arose among LBHI, Lehman Commercial Paper Inc., a New York corporation ("**LCPI**") and State Street concerning ownership of the Junior Mezz Loan and whether or not the Junior Mezz Loan had been transferred to State Street pursuant to the terms of the Repo Agreement (as defined in the Settlement Agreement (as defined below));

**WHEREAS,** LBHI, LCPI and Participant have entered into that certain Settlement Agreement, dated of even date herewith (the "**Settlement Agreement**"), pursuant to which LBHI, LCPI and State Street have resolved certain disputes regarding the ownership of the Junior Mezz Loan and, in accordance with the terms of the Settlement Agreement, have agreed that Lender and Participant would execute and deliver this Agreement in order to evidence and effectuate the granting to the Participant

of ownership of a participation interest in the Junior Mezz Loan on the terms and conditions set forth herein.

NOW THEREFORE, in consideration of the mutual covenants herein contained, and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Lender and Participant hereby covenant and agree with each other as follows:

### 1. Definitions.

Capitalized terms used herein without definition shall have the respective meanings attributed to such terms in the Junior Mezz Loan Agreement. As used in this Agreement, the following capitalized terms shall have the respective meanings set forth below:

"**Affiliate**" shall mean, with respect to any party, any Person directly controlling, controlled by or under common control with such party. For purposes hereof, "control" means, when used with respect to any specified Person, the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract, relation to individuals or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing. No Person shall be deemed an Affiliate of another solely by virtue of being a participant in the Junior Mezz Loan hereunder.

"**Borrower Party**" means the Junior Mezz Borrower, the Guarantor and any other Person liable, whether primarily or as a guarantor or otherwise, with respect to the Junior Mezz Loan or any part thereof, or any of the Junior Mezz Loan Documents.

"**Business Day**" shall have the meaning set forth in the Junior Mezz Loan Agreement.

"**Collateral**" means the Equity Interests and all other assets, instruments, documents, security interests, liens, claims, endorsements and guaranties of whatever nature given to secure, or obtained in connection with, the Junior Mezz Loan or any part thereof, together with the proceeds thereof.

"**Collections**" means any and all payments, receipts, collections and recoveries of any kind or nature whatsoever actually received by Lender in connection with the Junior Mezz Loan and relating to the period commencing on the Effective Date, including, without limitation, payments of principal and interest, late fees, default interest, Prepayment Fees, exit fees, additional interest, proceeds of any so-called "equity kicker" or participations in proceeds of the sale of the Property, or similar sums payable under the Junior Mezz Loan Documents, from whatever source derived, and including, without limitation, all sums of money or other property realized from any insurance (including, without limitation, any title insurance proceeds), casualty or condemnation proceeds relating to the Property or from any Collateral or from any Person owning the

Property or from any Borrower Party, or from the exercise by Lender, Participant or any other person on behalf of any such party of any lien or right of setoff with respect to any deposit balance or other property of any Borrower Party (but excluding for purposes of this definition any payments hereafter made by any Borrower Party to Lender such as reimbursements of Lender's out-of-pocket due diligence costs, or similar reimbursements or payments).

"**Costs**" shall mean all costs, fees, expenses, disbursements, advances, payments, losses, liabilities and/or judgments reasonably suffered or incurred or paid or to be paid by Lender pursuant to or in connection with the Junior Mezz Loan Documents, the Property, this Agreement or otherwise in connection with the servicing, administration and/or enforcement of the Junior Mezz Loan, including, without limitation, Servicing Expenses and reasonable attorneys' fees and disbursements; provided, however, that Costs shall not include any amounts suffered or incurred by Lender or LCPI arising out of any act or omission of Lender or LCPI or any of their respective agents occurring or arising on or after the Deemed Transfer Date but prior to the Effective Date except for such Costs identified on <u>Schedule A</u> attached hereto and made a part hereof.

"**Deemed Transfer Date**" shall have the meaning set forth in Section 2(a) hereof.

"**Default Rate**" shall have the meaning set forth in the Junior Mezz Loan Agreement.

"**Eligible Assignee**" means any Person that, as of the time that such determination is made, is both a Qualified Transferee as defined in and for purposes of the Mezz Intercreditor Agreement and a Qualified Transferee as defined in and for purposes of the Tri-Party Intercreditor Agreement.

"**Enforcement Action**" means any action or remedy available to Lender at law, equity or otherwise (including, without limitation, under the Junior Mezz Loan Documents) to enforce the terms and conditions of the Junior Mezz Loan Documents, including, without limitation, accelerating the Junior Mezz Loan, commencing a foreclosure, exercising any power of sale or otherwise seeking to realize upon any Collateral, conducting a sale (whether pursuant to the UCC or other applicable law) of the Equity Interests or other Collateral, and commencing appropriate legal action to enforce any of the Junior Mezz Loan Documents.

"**Equity Interests**" means the equity interests in the Senior Mezz Borrower in which Lender has been granted a security interest pursuant to the Pledge Documents.

"**Escrow Agent**" means any of First American Title Insurance Company, Chicago Title Insurance Company, Fidelity National Title Insurance Company, Commonwealth Land Title Insurance Company, Lawyers Title Insurance Company, or

any authorized agent thereof (provided one of such title insurance companies has issued an "insured closing letter" to Lender and Participant pursuant to which such title insurance company has agreed to be responsible for any misappropriation of funds by such authorized agent) as selected by the Other Party.

**"Escrows"** shall have the meaning set forth in Section 4(a) hereof.

**"Event of Default"** shall have the meaning set forth in the Junior Mezz Loan Agreement.

**"Guarantor"** shall have the meaning set forth in the Junior Mezz Loan Agreement.

**"Intercreditor Agreement"** and **"Intercreditor Agreements"** shall mean, individually and collectively, respectively, the Mezz Intercreditor Agreement and the Tri-Party Intercreditor Agreement.

**"Junior Mezz Loan"** means the Loan, as defined in the Junior Mezz Loan Agreement.

**"Junior Mezz Loan Documents"** means the Loan Documents, as defined in the Junior Mezz Loan Agreement.

**"Lender Decision/Action"** means any approval, consent, waiver or other affirmative decision that Lender is entitled, but not compelled, required or obligated, to make and any action that Lender is entitled, but not compelled, required or obligated, to take (including, without limitation, any Enforcement Action) under the terms of the Junior Mezz Loan Documents or any Intercreditor Agreement (as any such approval, consent, waiver, decision or action may be qualified, limited or restricted pursuant to the terms of the Junior Mezz Loan Documents or any Intercreditor Agreement; provided, that the fact that Lender must comply with any standard of reasonableness or any similar standard in considering any approval, consent, waiver, decision or action shall not cause or result in such approval, consent, waiver, decision or action to not be deemed a Lender Decision/Action unless such standard effectively compels, requires or obligates Lender to grant such approval, consent or waiver or otherwise make any such decision or take any such action, in which case such approval, consent, waiver, decision or action in a particular instance or particular way shall not be a Lender Decision/Action) or otherwise under applicable law as the holder of the Junior Mezz Loan; provided, that there shall be excluded from the foregoing any approvals, consents, waivers, decisions or actions which Lender is compelled, required or obligated to make or take under the terms of the Junior Mezz Loan Documents or Intercreditor Agreements or under applicable law.

**"Lender Decision/Action Notice"** shall have the meaning set forth in Section 6(a) hereof.

**"Lender's Interest"** shall mean the interest in the Junior Mezz Loan retained by Lender, as set forth on <u>Exhibit A</u> attached hereto.

**"Loan Pledge"** shall have the meaning set forth in Section 14(a) hereof.

**"Loan Pledgee"** shall have the meaning set forth in Section 14(a) hereof.

**"Loan Pledgor"** shall have the meaning set forth in Section 14(a) hereof.

**"Loan Sale Notice"** shall have the meaning set forth in Section 13(e) hereof.

**"Mezz Intercreditor Agreement"** means that certain Intercreditor Agreement, dated as of March 19, 2007, by and between Lender and Senior Mezz Lender, and relating to the Senior Mezz Loan and the Junior Mezz Loan, as the same may be amended from time to time in accordance with the terms of this Agreement.

**"Mortgage Lender"** shall have the meaning set forth in the Junior Mezz Loan Agreement.

**"Mortgage Loan"** shall have the meaning set forth in the Junior Mezz Loan Agreement.

**"Mortgage Loan Documents"** shall have the meaning set forth in the Junior Mezz Loan Agreement.

**"Negotiating Party"** shall have the meaning set forth in Section 13(e) hereof.

**"Non-Exempt Person"** shall have the meaning set forth in Section 17(b) hereof.

**"Non-Purchasing Party"** shall have the meaning set forth in Section 9(c) hereof.

**"Offered Interest"** shall have the meaning set forth in Section 13(b) hereof.

**"Other Party"** shall have the meaning set forth in Section 13(b) hereof.

**"Owning Entity"** means a Delaware limited liability company that may be established by Lender and Participant pursuant to Section 8 of this Agreement upon the occurrence of the events or circumstances described therein.

**"Participation Interest"** means, as to Participant, the interest in the Junior Mezz Loan of Participant acquired pursuant to this Agreement, as set forth on <u>Exhibit A</u> attached hereto and made a part hereof.

"**Participation Transfer**" shall have the meaning set forth in Section 2(a) hereof.

"**Percentage Interests**" means the percentage interests of Lender and Participant in the Junior Mezz Loan as set forth on Exhibit A attached hereto and made a part hereof.

"**Person**" shall mean any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof which is recognized by any applicable law as an existing entity.

"**Pledge Documents**" means, collectively, the Pledge Agreement (as defined in the Junior Mezz Loan Agreement), together with all other documents, instruments and agreements (including, without limitation, stock powers, assignment instruments and similar documents) executed and delivered to Lender to evidence or perfect the interest of Lender in the Equity Interests.

"**Prepayment Fee**" means any yield maintenance charge, prepayment premium, breakage costs or other compensation that may, from time to time, be payable under the Junior Mezz Loan Documents in compensation for Lender accepting a payment of all or any part of the principal amount of the Junior Mezz Loan prior to the due date thereof.

"**Priority Protective Advance**" shall have the meaning set forth in Section 5 hereof.

"**Priority Protective Advance Interest**" means interest accrued and outstanding on a Priority Protective Advance calculated at the Priority Protective Advance Rate.

"**Priority Protective Advance Rate**" means an interest rate of sixteen percent (16%) per annum, compounded quarterly.

"**Property**" shall have the meaning set forth in the Junior Mezz Loan Agreement.

"**Proportionate Share**" of any party hereto as to any given amount shall mean the product obtained by multiplying such given amount by the Percentage Interest of such party.

"**Protective Advances**" means any protective or similar advance made by Lender (or Participant in accordance with the terms of this Agreement) pursuant to the Junior Mezz Loan Documents and constituting a protective advance thereunder, such as (a) for payment of property taxes, assessments or insurance premiums, (b) for payment of rent and other charges under the Ground Lease (as defined in the Junior Mezz Loan

Agreement), (c) to pay sums due and payable by (i) Project Owner under the Mortgage Loan Documents (other than the payment in full of the Mortgage Loan at the maturity of the Mortgage Loan, whether by acceleration or otherwise, or the purchase of the Mortgage Loan pursuant to the Tri-Party Intercreditor Agreement or otherwise), including, without limitation, extension fees or similar payments payable to Mortgage Lender, or (ii) Senior Mezz Borrower under the Senior Mezz Loan Documents (other than the payment in full of the Senior Mezz Loan at the maturity of the Senior Mezz Loan, whether by acceleration or otherwise, or the purchase of the Senior Mezz Loan pursuant to the Mezz Intercreditor Agreement or otherwise), including, without limitation, extension fees or similar payments payable to Senior Mezz Lender, or (d) otherwise as necessary to preserve and protect the interests of Lender and Participant under the Junior Mezz Loan Documents and in the Collateral.

"**Purchase Request Notice**" shall have the meaning set forth in Section 9(b) hereof.

"**Purchasing Party**" shall have the meaning set forth in Section 9(c) hereof.

"**Qualified Replacement Servicer**" shall mean a servicer who has at least 10 years experience servicing commercial real estate loans for the account of third parties and who is otherwise reasonably acceptable to Lender and Participant.

"**Redirection Notice**" shall have the meaning set forth in Section 14(a) hereof.

"**Repo Agreement**" shall have the meaning set forth in the Settlement Agreement.

"**Responding Party**" shall have the meaning set forth in Section 13(e) hereof.

"**ROFO Deposit**" shall have the meaning set forth in Section 13(b) hereof.

"**Sale Notice**" shall have the meaning set forth in Section 13(b) hereof.

"**Sale Price**" shall have the meaning set forth in Section 13(b) hereof.

"**Sale Response Date**" shall have the meaning set forth in Section 13(b) hereof.

"**Sale Response Notice**" shall have the meaning set forth in Section 13(b) hereof.

"**Securities Act**" shall have the meaning set forth in Section 2(d) hereof.

"**Selling Party**" shall have the meaning set forth in Section 13(b) hereof.

"**Senior Mezz Lender**" means AIG Annuity Insurance Company, as the sole holder of the Senior Mezz Loan, together with its successors and assigns.

"**Senior Mezz Loan**" means the Senior Mezzanine Loan, as defined in the Junior Mezz Loan Agreement.

"**Senior Mezz Loan Documents**" means the Senior Mezzanine Loan Documents, as defined in the Junior Mezz Loan Agreement.

"**Servicer**" means TriMont Real Estate Advisors, Inc., a Georgia corporation, or such replacement servicer as Lender shall select and engage from time to time with the prior written approval of the Participant (which approval shall not be unreasonably withheld, conditioned or delayed), to service and administer the Junior Mezz Loan.

"**Servicing Expenses**" means all servicing fees and reimbursable costs and expenses payable by Lender to Servicer in connection with the servicing of the Junior Mezz Loan pursuant to the loan servicing and asset management between Lender and Servicer.

"**Supplemental Notice**" shall have the meaning set forth in Section 13(b) hereof.

"**Supplemental Response Notice**" shall have the meaning set forth in Section 13(b) hereof.

"**Tag-Along Right**" shall have the meaning set forth in Section 13(d) hereof.

"**Taxes**" shall have the meaning set forth in Section 17(b) hereof.

"**Tri-Party Intercreditor Agreement**" means that certain Intercreditor Agreement, dated as of March 19, 2007, by and among the Mortgage Lender, the Senior Mezz Lender and the Lender, as the same may be amended from time to time.

"**UCC**" means the Uniform Commercial Code as adopted and in effect from time to time in the jurisdiction the laws of which govern the Junior Mezz Loan Documents.

"**UCC Sale**" means any public or private sale of the Equity Interests under the UCC following a default under the Junior Mezz Loan.

2.      **Assignment of Participation Interest**.

(a)      Subject to the terms and conditions of this Agreement and in accordance with the terms of the Settlement Agreement, Lender hereby assigns to Participant and the Participant hereby accepts from Lender (collectively, the

"**Participation Transfer**"), effective as of the Deemed Transfer Date, without recourse to the Lender (except for breach of any representation made by Lender herein or breach of any of Lender's covenants herein, any claims for which shall however be subject to the exculpatory provisions of Section 31 hereof), an undivided fifty percent (50%) participation interest in the Junior Mezz Loan, all of the Junior Mezz Loan Documents and in all Collateral. Notwithstanding the foregoing or anything to the contrary contained herein, the Participation Transfer shall be deemed to have occurred on and as of September 17, 2008 (the "**Deemed Transfer Date**") and shall further be deemed to have occurred pursuant to the terms of the Repo Agreement.

(b)     The interests of Lender and Participant in the Junior Mezz Loan, the Junior Mezz Loan Documents and the Collateral, subject to the terms and conditions of this Agreement, shall be <u>pari</u> <u>passu</u> and of equal priority with each other in proportion to their respective Percentage Interests.

(c)     Lender's delivery of an executed counterpart of this Agreement to Participant constitutes Lender's representation to Participant that, as of the Effective Date, (i) Lender owns the Junior Mezz Loan and all of the Junior Mezz Loan Documents free and clear of all liens, claims, participation interests, security interests or encumbrances; (ii) the outstanding principal balance of the Junior Mezz Loan is $_____ and accrued interest thereon has been paid through _____, 2010, and (iii) Lender has full power and authority and has taken all necessary action to authorize it to enter into and perform its obligations under this Agreement and all other documents or instruments contemplated hereby.

(d)     Participant's delivery of an executed counterpart of this Agreement to Lender constitutes such Participant's representation to Lender that, as of the Effective Date, Participant (i) has full power and authority and has taken all necessary action to authorize it to enter into and perform its obligations under this Agreement and all other documents or instruments contemplated hereby; (ii) is an Eligible Assignee; (iii) has acquired the Participation Interest for its own account and without the intent to distribute such interest; (iv) is a sophisticated investor having knowledge and experience in business and financial matters such that Participant is capable of evaluating the merits and risks of the investment, (v) is an "accredited investor" within the meaning of Rule 501(a) promulgated under the Securities Act of 1933, as amended (the "**Securities Act**"), (vi) is able to bear the economic risk of holding the Participation Interest, and (vii) agrees that the Participation Interest may not be sold, transferred, offered for sale, pledged, hypothecated or otherwise disposed of without registration under the Securities Act, except pursuant to an exemption from such registration available under the Securities Act.

### 3.     Distribution of Payments on the Junior Mezz Loan.

(a)     Lender shall instruct the Junior Mezz Borrower to remit all payments in respect of, or otherwise in connection with, the Junior Mezz Loan directly to Lender. All Collections received by Lender shall be received and held in trust for the

benefit of Lender and Participant. Lender shall distribute all Collections within two (2) Business Days of Lender's receipt thereof <u>first</u> in payment of any unpaid Costs then due and owing to Lender, and <u>second,</u> in repayment to Lender and/or Participant, as applicable, of any Priority Protective Advances not reimbursed by Junior Mezz Borrower, together with interest thereon at the Priority Protective Advance Rate on all outstanding Priority Protective Advances made by such party, from the date such Priority Protective Advance was made (and if such Collections are inadequate to repay all then outstanding Priority Protective Advances, together with Priority Protective Advance Interest, as of the date of such distribution of Collections, such Collections shall be applied first to pay any Priority Protective Advance Interest (pro rata based on the amount of Priority Protective Advance Interest owed to each party) in accordance with the foregoing, and then any outstanding Priority Protective Advances, in the order in which such Priority Protective Advances were made), and <u>third</u>, to Lender and Participant in accordance with Section 3(b).

(b)    All Collections remaining after making the payments referenced in Section 3(a) above shall be distributed by Lender, <u>pari passu</u>, to Lender and Participant in accordance with their Percentage Interests.

(c)    All distributions to Participant pursuant to paragraphs (a) and (b) above shall be made by Lender by wire transfer of immediately available funds to an account therefor specified by Participant in writing from time to time and shall be accompanied by an accounting thereof.

(d)    If a court of competent jurisdiction orders, at any time, that any Collections distributed to Lender or Participant pursuant to this Agreement must, pursuant to any insolvency bankruptcy, fraudulent conveyance, preference or similar law, be returned to any Borrower Party or any other Person, or be paid to the Mortgage Lender, Senior Mezz Lender or any other Person, then, notwithstanding any other provision of this Agreement, Lender shall not be required to distribute any portion thereof to Participant (unless otherwise so directed by such court), and, to the extent necessary to comply with such court order, Participant shall promptly on demand by Lender repay to Lender any portion of any such amounts that Lender shall have theretofore distributed to Participant, together with interest thereon from the date of receipt by Participant of such amount at such rate, if any, as Lender shall be required to pay to the Junior Mezz Borrower, the Mortgage Lender, the Senior Mezz Lender or such other Person with respect thereto as required by such court order. If, for any reason, Lender makes any payment to Participant before Lender has received the corresponding payment from any applicable Borrower Party (it being understood that Lender is under no obligation to do so), and Lender does not receive the corresponding payment from such Borrower Party within five (5) Business Days of its payment to Participant, or Lender makes a payment to Participant prior to receipt of good and collected funds from any Borrower Party with respect to such distribution to Participant (such as if Junior Mezz Borrower makes a payment by returned check) and such funds are not collected by Lender, then Participant shall, at Lender's request, promptly return such payment to Lender. Participant agrees that if at any time it shall receive from any sources whatsoever (other than pursuant to

this Agreement) any payment on account of the Junior Mezz Loan or Collateral, it shall promptly remit such amount to Lender for distribution pursuant to this Agreement; provided, that if any amounts payable to Participant hereunder as of the date of Participant's receipt of any such payment have not been previously received by Participant, then Participant shall have such setoff rights with respect to such funds collected by Participant as may be provided at law or in equity.

### 4.    Administration of the Junior Mezzanine Loan.

(a)    Subject to Participant's approval right with respect to any Lender Decision/Action, Lender shall, at all times during the term of the Junior Mezz Loan, except as otherwise provided herein, administer and service the Junior Mezz Loan, or cause the Junior Mezz Loan to be administered and serviced, and shall be responsible for the administration and enforcement of the Junior Mezz Loan Documents, all in accordance with the standard of care set forth in Section 4(b) below.  Subject to Participant's approval rights with respect to all Lender Decision/Action and subject further to the express limitations set forth in this Agreement, including, without limitation, Section 6 below, Lender (i) shall have the power and authority to make all decisions relating to the servicing and administration of the Junior Mezz Loan; (ii) may exercise or refrain from exercising or otherwise waive any and all rights and powers that Lender may have under the Junior Mezz Loan Documents; and (iii) shall (A) hold the Junior Mezz Loan Documents for the equal and ratable benefit of both Lender and Participant in accordance with this Agreement, (B) deliver statements of account to the Junior Mezz Borrower to the extent required under the Junior Mezz Loan Documents and provide Participant copies thereof, (C) receive financial statements and other information and documentation required to be delivered by the Junior Mezz Borrower or any other Borrower Party under the Junior Mezz Loan Documents and provide Participant copies thereof promptly upon receipt, (D) determine interest calculations in accordance with the Junior Mezz Loan Documents, (E) collect, and distribute as set forth in this Agreement, all Collections, (F) receive, and distribute as required by the Junior Mezz Loan Documents, all escrows, if any, for insurance premiums, real estate taxes, ground lease rents, water and sewer rents, assessments and related charges and for any other purpose required pursuant to the terms of the Junior Mezz Loan Documents (collectively, the **"Escrows"**), (G) promptly deliver or cause to be delivered to the Participant, copies of all notices, demands, third party reports and other correspondence and documentation received or sent by Lender or Servicer in respect of the Junior Mezz Loan and (H) take such other actions as required or necessary to administer the Junior Mezz Loan, including, without limitation, taking one or more Enforcement Actions from time to time. Notwithstanding anything to the contrary contained herein, Lender shall not be required to take any action with respect to the Junior Mezz Loan which constitutes a Lender Decision/Action except as expressly provided herein or except as may be jointly agreed upon by Lender and Participant.

(b)    Lender shall exercise the same care, skill, prudence and diligence in servicing, administering and enforcing the Junior Mezz Loan as Lender exercises with respect to loans which are held solely by Lender for its own account (but

in no case may Lender exercise a lower level of care than that customarily exercised by reputable institutional servicers of similar commercial mezzanine loans) acting in accordance with applicable law and with a view towards the best interests of Lender and Participant as a collective whole.  Lender, with respect to the performance of its responsibilities in servicing, administering and enforcing the Junior Mezz Loan, shall have no responsibility to Participant other than to exercise the aforementioned standard of care or as expressly set forth herein.  In furtherance of and not in limitation of the foregoing, Lender shall have no liability for any error in judgment or for any action or omission of Lender, except in each case to the extent of Lender's gross negligence or willful misconduct.  Without limiting the foregoing, when reasonably necessary, Lender may, in connection with its servicing, administration and enforcement of the Junior Mezz Loan, retain and consult with legal counsel, accountants and other experts selected by Lender.  The fees and expenses reasonably incurred by Lender in connection therewith shall constitute Costs.  Absent manifest error, Lender may reasonably rely on the advice of such legal counsel, accountants and other experts, and shall not be liable for any action taken or omitted to be taken by Lender in accordance with the advice of any such legal counsel, accountants and/or other experts, or in reliance upon any notice, consent or other communication or writing which Lender in good faith believes to be genuine.

(c)     Subject to the terms of the proviso in the last sentence of Section 3(d), if Participant receives any moneys, documents, instruments, agreements, payments or other items which, pursuant to the terms hereof, were to have been delivered to, held by or otherwise obtained by Lender,  Participant shall promptly deliver same to Lender for application or distribution pursuant to this Agreement.  Subject to the Intercreditor Agreements, all of the Escrows shall be retained by Lender or any Servicer in accordance with and pursuant to the Junior Mezz Loan Agreement and Lender may, in its sole and absolute discretion (but pursuant to the Junior Mezz Loan Documents), apply the Escrows on account of the charges for which same were collected as and when such charges become due and payable.  All other moneys received by Lender and constituting Collections shall be applied by Lender in accordance with Section 3 of this Agreement.

(d)     Participant hereby acknowledges that, except as expressly set forth in this Agreement and, with respect to LCPI or LBHI, in the Repo Agreement (as defined in the Settlement Agreement), Lender has not made any representations or warranties with respect to the Junior Mezz Loan, the Junior Mezz Loan Documents, the Collateral, the Junior Mezz Borrower or other Borrower Parties, the Project Owner, the Senior Mezz Loan Borrower, the Mortgage Loan, the Senior Mezz Loan, the Property or any Guarantor or other person or entity liable in whole or in part for the payment of the Junior Mezz Loan or the Junior Mezz Borrower's observance and performance of the terms of the Junior Mezz Loan Documents and that Lender shall not have any responsibility for (i) the collectability of the Junior Mezz Loan, (ii) the validity, enforceability, sufficiency, genuineness, perfection, priority, due execution or legal effect of the Junior Mezz Loan Documents, (iii) the validity, sufficiency or effectiveness of any title insurance, casualty insurance, liability insurance and/or other insurance policy obtained in connection with the Junior Mezz Loan, (iv) the validity, sufficiency or

effectiveness of the lien created or to be created by the Junior Mezz Loan Documents, or (v) the solvency or financial condition of the Junior Mezz Borrower or any Guarantor or other Borrower Party or the accuracy of any information supplied by or to be supplied in connection with the Borrower Parties, any Guarantor, the Property or otherwise with respect to the Junior Mezz Loan or the collateral therefor.

(e)    Participant acknowledges and agrees that Lender shall be entitled to engage Servicer to act as loan servicer on behalf of Lender with respect to all matters relating to the Junior Mezz Loan and may cause all duties and obligations of Lender relating to the servicing of the Junior Mezz Loan and the administration of this Agreement to be performed by Servicer provided that the foregoing shall not release Lender from any of its obligations hereunder.    Nothing contained in the servicing agreement between Lender and Servicer shall affect Participant's rights hereunder including, without limitation, Participant's right to consent to or approve any Lender Decision/Action.

(f)    In the event Lender has under consideration or review any matter that would constitute a Lender Decision/Action, Lender shall advise Participant promptly of the facts and circumstances thereof and Participant shall have the right to approve, consent or object to any such Lender Decision/Action in accordance with Section 6 hereof.

(g)    If LBHI or an Affiliate thereof no longer holds a majority of the Lender's Interest or if LBHI fails to perform its obligations hereunder in any material respect and such failure to perform is not cured within thirty (30) days following written notice by the Participant to LBHI of such failure to perform, then in either case, Participant shall have the right to require that LBHI (a) assign legal title in the Junior Mezz Loan to Participant or to its designee who is an Eligible Assignee (and substitute Participant or such designee as agent under the Junior Mezz Loan), such that Participant or such designee shall become the "Lender" hereunder and LBHI or its Affiliate or the successor or assign thereof shall become the "Participant" hereunder, as of the date of the assignment; provided, however, that such assignment shall occur only if Participant fully complies with all conditions and requirements set forth in the Junior Mezz Loan Documents and the Intercreditor Agreements relating to the assignment of the Junior Mezz Loan and/or the substitution of the agent for the Junior Mezz Loan, and (b) replace the Servicer with a new servicer to be selected by Participant and reasonably approved by LBHI provided that (i) the then existing servicing agreement between LBHI and the Servicer permits such replacement, (ii) any replacement Servicer selected by Participant is a Qualified Replacement Servicer, and (iii) Participant, in its capacity as the new Lender and agent under the Junior Mezz Loan, and the Qualified Replacement Servicer enter into a servicing agreement mutually acceptable to each party.

5.    **Protective Advances and Priority Protective Advances**.

If Lender determines that a Protective Advance needs to be made, then Lender shall seek Participant's approval of the making of any such Protective Advance as

a Lender Decision/Action in accordance with the provisions of Section 6 hereof. Provided that Participant has consented to the making of the same, Lender shall send written notice to the Participant indicating the amount of any such approved Protective Advance, the portion thereof payable by Lender and by Participant (which shall be each party's Proportionate Share of such Protective Advance) and the date (which shall be not less than five (5) Business Days' after such notice unless special emergency circumstances exists in which case the funding date shall be not less than two (2) Business Days after such notice (subject to Lender's right to fund and seek reimbursement as provided below)) on which each of Lender and Participant shall fund its Proportionate Share thereof. If Lender or Participant fails to fund its Proportionate Share of any such Protective Advance when due, then the party having funded its share of such Protective Advance may, but without any obligation to do so, on notice to the other party hereto that has not funded its Proportionate Share within five (5) Business Days (or, if applicable, two (2) Business Days) following the notice from Lender described above, make an additional Protective Advance equal to the amount of the Protective Advance which was not timely made by the other party hereto (any such additional Protective Advance being herein referred to as a **"Priority Protective Advance"**). Notwithstanding the foregoing or anything to the contrary contained herein, if Lender shall determine in its reasonable discretion that special emergency circumstances exist requiring that a Protective Advance needs to be made immediately to preserve and protect the interests of Lender and Participant, Lender may, but without any obligation to do so, fund such full Protective Advance without the prior approval of the Participant and Participant shall reimburse to Lender Participant's Proportionate Share of such Protective Advance within two (2) Business Days following Lender's written request therefor describing in reasonable detail the purpose of such Protective Advance. In the event Participant shall fail to reimburse Lender in accordance with foregoing, the Proportionate Share of Participant of such Protective Advance as funded by Lender shall be deemed a Priority Protective Advance by Lender.

## 6.    Lender Decision/Action.

Notwithstanding anything contained herein to the contrary, except with respect to the funding of Protective Advances under emergency situations pursuant to Section 5 above, Lender shall not, without the prior written consent of the Participant, take any action constituting a Lender Decision/Action. Any request by Lender for approval of any Lender Decision/Action shall be in writing to Participant and shall be accompanied by information reasonably sufficient to enable Participant to fully evaluate such request (a **"Lender Decision/Action Notice"**). Each notice to Participant shall contain the following language in bold faced print, "**NOTE: THIS REQUEST FOR CONSENT REQUIRES IMMEDIATE ACTION. FAILURE TO RESPOND TO THIS REQUEST FOR CONSENT TO A LENDER DECISION/ACTION MAY BE DEEMED APPROVAL OF SUCH LENDER DECISION/ACTION**". If Participant does not respond to such first notice within ten (10) Business Days of such request, Lender shall deliver a second notice containing the following language in bold faced print, "**NOTE: THIS SECOND REQUEST FOR CONSENT REQUIRES**

**IMMEDIATE ACTION. FAILURE TO RESPOND TO THIS REQUEST FOR CONSENT TO A LENDER DECISION/ACTION MAY BE DEEMED APPROVAL OF SUCH LENDER DECISION/ACTION**". If Lender shall request the consent of Participant to any Lender Decision/Action and not receive such consent or denial thereof in writing from Participant within ten (10) Business Days of such second request (or within such lesser time period as may be reasonably specified by Lender in its written request for approval if emergency or exigent circumstances reasonably require a shorter time period or, if a shorter time period is provided in the Junior Mezz Loan Documents or any Intercreditor Agreement, within such shorter time period), Participant shall be deemed to have granted its consent to such Lender Decision/Action as described in such written request by Lender; provided, however, that notwithstanding anything herein to the contrary, in the event the request for consent identifies a proposed course of action following a default or Event of Default under the Junior Mezz Loan Documents, if Participant shall fail to respond within the time period set forth above, Participant shall be deemed to have denied its consent to such Lender Decision/Action.

### 7.    Default by the Borrower.

(a)    Upon Lender's acquiring actual knowledge that a default or Event of Default under the Junior Mezz Loan Documents has occurred, Lender shall notify Participant in writing within five (5) Business Days after obtaining such knowledge of the existence and nature of such default or Event of Default. Following such notice to Participant, Lender shall propose a course of action that Lender has determined ought to be taken as a result of such default or Event of Default (including, without limitation, any Enforcement Action) and, provided that Participant approves such course of action as a Lender Decision/Action, Lender may proceed to take such course of action. Nothing contained herein shall preclude Participant from proposing a different course of action for approval by Lender. Lender and Participant agree that if they agree upon Lender commencing an Enforcement Action, Lender shall be authorized without further consent of the Participant but, if time permits, upon prior written notice to Participant to take all administrative and ministerial actions in pursuit of such action consistent with Lender's standard of care under Section 4(b) hereof, including by way of example and not by limitation, decisions regarding details of advertising a UCC Sale, the location of such a sale and similar matters provided that the amount and terms of any bid shall be deemed a Lender Decision/Action. In the event that Lender and Participant agree that a sale of the Equity Interests or other Collateral is to be instituted, absent an agreement to the contrary by Lender and Participant, the bid amount shall be the full outstanding principal balance of the Junior Mezz Loan, all accrued and unpaid interest at the Default Rate, all late charges and other amounts payable under the Junior Mezz Loan.

(b)    In the event that any Enforcement Action is instituted, Lender shall keep Participant reasonably informed as to the progress thereof and Participant shall have the right to meet with and consult with Lender with respect to such Enforcement Action and Event of Default. In the event Lender proposes to discontinue or modify in any material respect any such Enforcement Action, the same shall constitute a Lender Decision/Action requiring the prior written consent of Participant.

**8.      Ownership of Junior Mezz Borrower, the Property and/or the Senior Mezz Loan or Mortgage Loan**.

(a)      In the event that a foreclosure sale is initiated by Lender, or any Enforcement Action is undertaken by Lender by which the Equity Interests or the Property is or may be transferred in full or partial satisfaction of the Junior Mezz Loan, including, without limitation, a UCC Sale, then to the extent permitted by the Intercreditor Agreements, Lender and Participant shall form the Owning Entity and, prior to the exercise of such remedy by Lender, the Junior Mezz Loan shall be transferred and assigned to such Owning Entity, or if such transfer of the Junior Mezz Loan is not permitted by either Intercreditor Agreement, in any event, title to the Equity Interests or the Property, as applicable, shall be taken in the Owning Entity in accordance with this Section 8.  In the event any UCC Sale shall be conducted by Lender, subject to the requirement that Participant's prior written consent be obtained for any Lender Decision/Action including the amount and other terms of any bid, Lender shall have the right to bid on behalf of the Owning Entity at the sale, as holder of the Junior Mezz Loan. If such bid is the successful bid, Lender shall cause the instrument or instruments conveying title to the Equity Interests or other Collateral sold thereby to be issued to the Owning Entity, which shall hold title subject to the terms and conditions of this Agreement.

(b)      Lender and Participant acknowledge and agree that it is not practicable in connection with the execution and delivery of this Agreement to prepare the form of operating agreement for the Owning Entity and, accordingly, further acknowledge and agree that such form shall be prepared by Lender with advice of counsel and shall be negotiated and agreed to by Lender and Participant during the period following the decision hereunder to proceed to a UCC Sale or to accept an assignment in lieu of foreclosure and prior to completion of the UCC Sale or acceptance of an assignment in lieu of foreclosure, if and when required as contemplated by this Section 8. Lender and Participant agree to act reasonably in such decision and negotiations of the form of operating agreement of the Owning Entity.  The legal fees and expenses of both Lender and Participant in negotiating and agreeing to such form of operating agreement shall be borne by Lender and Participant in accordance with their Percentage Interests. Lender and Participant acknowledge and agree, however, that such form of operating agreement shall provide, among other things, that: (a) Lender and Participant shall have the same economic interests in Owning Entity as each of them have in the Junior Mezz Loan as of the date of execution and delivery by them of such operating agreement; and (b) Lender and Participant shall be "Co-Managers" of the Owning Entity and all decisions shall be made jointly by Lender and Participant.  The operating agreement shall further provide that (i) in the event that Lender and Participant shall fail to agree on certain decisions or courses of action, either of them shall be entitled to effectuate a buy-sell right with respect to their membership interest in the Owning Entity pursuant to such procedures as the parties may reasonably agree upon; and (ii) in the event either Lender or Participant desires or intends to transfer, or convey its membership interest in the Owning Entity, the other party shall be entitled to a "right of first offer" and "tag-along"

right pursuant to provisions substantially similar to Section 13 of this Agreement, as appropriately modified for purposes of the operating agreement.  The parties agree to conduct the negotiation of the foregoing operating agreement in good faith.

(c)    Lender and Participant acknowledge that, if title to the Equity Interests (or any other collateral given to secure the Junior Mezz Loan) or to the Property (pursuant to the exercise of Lender's right under the Mezz Intercreditor Agreement to acquire the Senior Mezz Loan or under the Tri-Party Intercreditor Agreement to acquire the Mortgage Loan and the exercise of the remedies under the Senior Mezz Loan Documents or Mortgage Loan Documents, respectively, or otherwise) is obtained by Lender on behalf of Lender and Participant, or by the Owning Entity, such asset will not be held as a permanent investment and shall be held, operated and developed in a manner intended to yield the highest return to Lender and Participant, which may or may not include any immediate or prompt disposition of such acquired assets to a third party, and may require the investment of additional capital by Lender and Participant, which investments shall be a major decision under the operating agreement of the Owning Entity requiring unanimous approval.  Accordingly, provided such expenditures have been so approved under the operating agreement of the Owning Entity (or otherwise constitute emergency expenses in the nature of Protective Advances), Lender and Participant shall, upon demand therefor from time to time, contribute their respective pro rata share, in accordance with their Percentage Interests, of all costs, fees and expenses (including, without limitation, attorneys' fees and disbursements) suffered or incurred by Lender or the Owning Entity in connection with the operation, management, maintenance, leasing and/or sale of all or any part of the Equity Interests, or such other collateral, or the Property, including, without limitation, funds necessary to make all payments due from time to time under the Senior Mezz Loan Documents and/or Mortgage Loan Documents, and funds necessary to operate, lease and manage the Property.  Funds received from the ownership, operation or sale of the Equity Interests or the Property (net of operating expenses or transaction costs in connection with such ownership, operation or sale), or such other collateral, shall constitute Collections and shall be applied first, to reimburse Lender for any Costs not yet reimbursed, and thereafter, in accordance with Section 3 of this Agreement.

9.    **Restrictions on Acquisition of the Mortgage Loan, Senior Mezz Loan and the Property**.

(a)    Each of Lender and Participant hereby covenants and agrees that it shall not cause, or allow any of its Affiliates, to purchase the Mortgage Loan or Senior Mezz Loan (or any interest therein) or the Property (or any interest therein) except as set forth and as permitted in this Section 9, or allow Fee Owner, Senior Mezz Borrower, Junior Mezz Borrower, Guarantor, any Affiliate of any of the foregoing or any other person acting for the direct or indirect benefit, or at the direction or request, of any of the foregoing to purchase any interest in the Junior Mezz Loan.

(b)    If either Lender or Participant concludes that the Mortgage Loan or Senior Mezz Loan must be acquired to protect their respective interests in the

Junior Mezz Loan (including, without limitation, by reason of the exercise of Lender's rights under either of the Intercreditor Agreements), such party shall give notice thereof (a **"Purchase Request Notice"**) to the other party. The Purchase Request Notice shall specify the terms of such acquisition in reasonable detail, provide any other information reasonably deemed relevant thereto, and request that the recipient of the Purchase Request Notice consent to do so. If Lender and Participant approve the acquisition of the Mortgage Loan or Senior Mezz Loan, the Mortgage Loan or Senior Mezz Loan, as applicable, shall be purchased by Lender for the benefit of Lender and Participant proportionate to the Percentage Interests and each of Lender and Participant shall irrevocably be committed to contribute its Proportionate Share of the purchase price for the Mortgage Loan or Senior Mezz Loan, as applicable. If Lender and Participant do not approve the acquisition of the Mortgage Loan or Senior Mezz Loan, as applicable, by Lender as aforesaid within ten (10) Business Days of the Purchase Request Notice (or such lesser time period as may be specified as necessary to avoid a possible deed in lieu of foreclosure being delivered by the Project Owner to Mortgage Lender in accordance with the terms of the Tri-Party Intercreditor Agreement or to avoid a possible assignment in lieu of foreclosure being delivered by the Senior Mezz Borrower to Senior Mezz Lender in accordance with the terms of the Mezz Intercreditor Agreement), such request shall be deemed to have been denied and no party shall be obligated to contribute as aforesaid.

(c)    If a purchase of the Mortgage Loan or Senior Mezz Loan, as applicable, as described in Section 9(b) does not occur following a Purchase Request Notice, either because the party to whom the Purchase Request Notice was delivered (the "**Non-Purchasing Party**") does not approve such purchase or because the Non-Purchasing Party fails to fund its Proportionate Share of the purchase price of the Mortgage Loan or Senior Mezz Loan, as applicable, within the time period specified therein, the party who delivered the Purchase Request Notice (the "**Purchasing Party**") (or any Affiliate of the Purchasing Party) shall have the right, but not the obligation, to acquire the Mortgage Loan or Senior Mezz Loan, as applicable, for its own account, on the terms and conditions specified in the Purchase Request Notice at any time within ten (10) Business Days after the Purchase Request Notice shall have been deemed to have been denied or the Non-Purchasing Party shall have failed to so fund its share of the purchase price; provided, that if the Purchasing Party is the Participant, Lender shall purchase the Mortgage Loan or Senior Mezz Loan, as applicable, on behalf of and for the account of the Participant (provided that such purchase can be effectuated in compliance with the terms of the applicable loan document and the Intercreditor Agreements) if and provided that, prior to Lender's exercise of any right to purchase the Mortgage Loan or Senior Mezz Loan, as applicable, under the terms of the Intercreditor Agreements, each of the following conditions shall have been satisfied: (i) Participant shall have deposited with the Lender (or with an escrow agent mutually acceptable to each party) 100% of the applicable purchase price for the Mortgage Loan or Senior Mezz Loan, as applicable, under a mutually satisfactory escrow arrangement, (ii) Participant shall have satisfied and/or shall have caused to have been satisfied all conditions and requirements applicable to any such purchase, (iii) Participant shall have reimbursed or shall have provided for

reimbursement to Lender for any and all out-of-pocket costs and expenses (including, without limitation, reasonable legal fees and expenses) incurred by Lender in connection with the purchase, and (iv) Participant shall have agreed to indemnify Lender for any expenses, losses, claims, damages, or liabilities arising as a result of, or caused directly or indirectly by, Lender's purchase, ownership, administration or servicing of the Mortgage Loan or Senior Mezz Loan, as applicable; provided, further, that upon acquisition of the Mortgage Loan or Senior Mezz Loan, as applicable, by the Lender on behalf of and for the account of the Participant, Lender shall, as soon as practicable, further assign the Mortgage Loan or Senior Mezz Loan, as applicable, to the Participant provided that (1) such assignment can be and is otherwise effectuated in accordance with the terms of the applicable loan documents and the Intercreditor Agreements, (2) such assignment shall be made without recourse, representation or warranty on the part of the Lender other than a representation that the Lender owns the applicable loan free and clear of any liens, claims or encumbrances, (3) Participant shall have satisfied and/or shall have caused to have been satisfied all conditions and requirements applicable to any such assignment, (4) without duplication of amounts payable under clause (iii) above, Participant shall have reimbursed or shall have provided for reimbursement to Lender for any and all out-of-pocket costs and expenses (including, without limitation, reasonable legal fees and expenses) incurred by Lender in connection with such assignment, and (5) Participant shall have agreed to indemnify Lender for any expenses, losses, claims, damages, or liabilities arising as a result of, or caused directly or indirectly by, the transfer of the Mortgage Loan or Senior Mezz Loan, as applicable, by Lender to Participant pursuant to the foregoing provisions.  Subject to each of the provisos in the immediately preceding sentence, any purchase of the Mortgage Loan or Senior Mezz Loan, as applicable, or any interest therein by the Purchasing Party following any such denial or failure to fund by the Non-Purchasing Party, shall be solely for the account of the Purchasing Party and shall not be subject to any rights of the Non-Purchasing Party; provided, however, that the Tri-Party Intercreditor Agreement and/or Mezz Intercreditor Agreement, and any and all other agreements between or among Mortgage Lender, Senior Mezz Lender and Lender shall remain in full force and effect following such purchase and Lender shall continue to act in the best economic interests of the holder of the Junior Mezz Loan in exercising its Lender Decision/Action rights hereunder.

(d)    Either Lender or Participant, or any Affiliate of Lender or Participant may purchase the Property or any direct or indirect interest in the Mortgage Borrower at any time upon notice to, but without requiring the consent of the other party, only if the Junior Mezzanine Loan, including, without limitation, any Prepayment Fee and all other charges under the Junior Mezzanine Loan, are paid in full in connection with such purchase of the Property or any direct or indirect interest in the Mortgage Borrower.  Any other purchase of the Property or any direct or indirect interest in the Mortgage Borrower by either Lender or Participant or an Affiliate of Lender or Participant shall require the consent and approval by each of Lender and Participant, which approval may be granted or withheld in such party's sole and absolute discretion. The provisions of this Section 9(d) shall not impair any prohibition, if any, on prepayment of the Junior Mezz Loan contained in the Junior Mezz Loan Documents.

Should Lender acquire the Mortgage Loan or Senior Mezz Loan pursuant to the exercise of its rights under either Intercreditor Agreement or otherwise for the benefit of Lender and Participant as set forth in Section 9(b) above following the delivery by Lender and approval by Participant of a Purchase Request Notice, then Lender shall administer, enforce and service the Mortgage Loan or Senior Mezz Loan in the same manner as Lender is authorized and obligated, pursuant to this Agreement, to administer, enforce and service the Junior Mezz Loan, and all relevant provisions of this Agreement shall apply, <u>mutatis mutandis</u>, to the administration and servicing of the Mortgage Loan or Senior Mezz Loan, as applicable.

### 10.    Costs of Collection.

In the event that Lender or Participant shall be sued or threatened with suit by any person (other than the other) in connection with the Junior Mezz Loan, any monies paid by Lender or Participant in defense of such suit, claim, action or demand, and any costs, fees and expenses, including, without limitation, attorneys' fees and disbursements paid in connection therewith shall be considered and treated as Costs of the collection of the Junior Mezz Loan, and shall be borne by Lender and Participant in accordance with their Percentage Interests, except to the extent that such suit, claim, action or demand results or arises from (a) the gross negligence or willful misconduct by Lender or Participant in which event the party which committed such act shall bear all such Costs or (b) any third party claims asserted against Lender or LCPI as holder of the Junior Mezz Loan with respect to acts or omissions of Lender or LCPI occurring after the Deemed Transfer Date and prior to the Effective Date in which event Lender shall bear all such costs.  Each of Lender and Participant agree to consult with the other, and to give due consideration to the other party's views (without being bound thereby) with respect to the disposition of any such suit claim, action or demand.

### 11.    Participant's Receipt of Mortgage Loan Documents, Senior Mezz Loan Documents and Junior Mezz Loan Documents; Review of Books and Records.

Participant acknowledges that it has received and reviewed the Mortgage Loan Documents, the Senior Mezz Loan Documents and the Junior Mezz Loan Documents.  Lender shall hold the executed originals of all of the Junior Mezz Loan Documents for the benefit of the Lender and Participant and shall, upon request, furnish to Participant a copy of such Junior Mezz Loan Documents.  Lender represents and warrants to Participant that it has possession of the original Note.  Lender agrees to maintain appropriate accounting records reflecting the Lender's Interest and the Participant's Participation Interest in the Junior Mezz Loan and shall report to Participant thereon at such reasonable times as may reasonably be requested by Participant. Participant shall be permitted at reasonable times and upon reasonable prior written notice to Lender to examine and make copies of or take extracts from Lender's books and records relating to the Junior Mezz Loan, at Participant's expense.  Furthermore, upon reasonable prior request from Participant, Lender shall request that Junior Mezz Borrower cause the Senior Mezz Borrower to cause the Project Owner to grant

Participant access to the Property and to the books and records of the Junior Mezz Borrower, Senior Mezz Borrower and Project Owner to the fullest extent permitted pursuant to the Junior Mezz Loan Documents.

## 12.     No Representations by Lender or Servicer.

(a)     Participant acknowledges and agrees that, except for any representations and warranties expressly made by Lender in this Agreement, none of Lender, Servicer or any accountant, advisor, agent, attorney or employee of Lender or Servicer, has made any representations or warranties, express or implied, with respect to any aspect of Participant's acquisition of its Participation Interest, including, without limitation, (i) the existing or future solvency or financial condition or responsibility of the Junior Mezz Borrower, Senior Mezz Borrower or the Project Owner, or any person or entity with an interest in any of them, (ii) the payment or collectability of the Junior Mezzanine Loan, Senior Mezz Loan or the Mortgage Loan, (iii) the validity, enforceability or legal effect of any of the Junior Mezz Loan Documents, the Senior Mezz Loan Documents or the Mortgage Loan Documents, or any document, instrument, agreement or insurance policy delivered in connection with any of them, (iv) the validity, effectiveness or completeness of the permits and approvals for the Property, or (v) the validity, effectiveness, value or adequacy of the liens and security interests created by the Junior Mezz Loan Documents, the Senior Mezz Loan Documents or the Mortgage Loan Documents. Participant further acknowledges and agrees that it shall have no recourse to Lender, Servicer or any such other Persons on account of any such matters; provided, however, that the foregoing shall not limit Lender's liability for a breach of this Agreement or any representation or warranty expressly made by Lender herein.

(b)     Notwithstanding anything to the contrary contained herein, Participant acknowledges that in entering into this Agreement and accepting the Participation Interest it is not relying upon Lender (except for specific representations expressly set forth in this Agreement) for any credit analysis, information or with respect to any other matters relating to the Property, the Project Owner, the Senior Mezz Borrower, the Junior Mezz Borrower or any persons or entities having an interest in the Junior Mezz Borrower, the Senior Mezz Borrower and/or the Project Owner (including their creditworthiness).     Participant acknowledges that Lender has not made any representations or warranties, oral or written (except for specific representations expressly set forth in this Agreement), upon which Participant has relied or is entitled to rely, and Participant has not relied in any manner upon any materials which may have been made available to such Participant by Lender, or upon any judgment, determination or statements of Lender not expressly contained herein in entering into this Agreement or participating in the Junior Mezz Loan.

## 13.     Sale of Lender's Interest or Participation Interest; Assignment of Junior Mezz Loan.

(a)     Except as set forth in paragraphs (b)-(d) inclusive of this Section 13 and except for a pledge to an Eligible Assignee in compliance with Section 14

hereinbelow, neither Lender nor Participant shall sell, assign, transfer (including through subparticipation interests) or pledge its interest in the Junior Mezz Loan or any part thereof without the prior written consent of the other in each instance.  Notwithstanding the foregoing, Lender and Participant shall each have the right to assign and transfer its respective interest in the Junior Mezz Loan or any part thereof to their respective Affiliate(s) without the consent or approval of the other party and without the application of the provisions set forth in paragraphs (b)-(d) inclusive of this Section 13.   Any permitted buyer, assignee or transferee shall thereupon become the holder of the sold, transferred and assigned interest in the Junior Mezz Loan, subject to all of the terms and provisions of this Agreement.

(b)     (i)     If at any time either Lender or Participant proposes to sell, assign or transfer its interest in the Junior Mezz Loan (including through subparticipation interests) (such interest in the Junior Mezz Loan to be sold or transferred by such party being the "**Offered Interest**"), then the party so proposing to sell and transfer the Offered Interest (the "**Selling Party**") shall give written notice (a "**Sale Notice**") to the other party (the "**Other Party**"), which notice shall state the proposed sales price ("**Sale Price**") and all other material terms and conditions pursuant to which Selling Party proposes to sell the Offered Interest.

(ii)     Other Party shall have thirty (30) days from the date of the Sale Notice ("**Sale Response Date**") to provide written notice ("**Sale Response Notice**") to Selling Party stating Other Party's election to either (x) purchase the Offered Interest for the sales price and on the terms and conditions set forth in the Sale Notice (subject to no condition or other contingency not set forth in the Sale Notice other than Selling Party's right and authority to sell and ability to transfer good title to the Offered Interest free and clear of liens and encumbrances), (y) exercise its Tag-Along Right if applicable pursuant to Section 13(d) below or (z) decline to purchase such Offered Interest or exercise such Tag-Along Right.  Any election by Other Party that, in violation of the foregoing, contains a condition or contingency not permitted hereinabove shall be deemed to be an election by Other Party declining to purchase the Offered Interest or exercise its Tag-Along Right.  In addition, Other Party shall not have the right to elect to purchase the Offered Interest if it is not an Eligible Assignee.

(iii)     If Other Party properly elects to purchase the Offered Interest as described above in Section 13(b)(ii), then (i) its Sale Response Notice shall constitute its legally binding acceptance of the Sale Notice and its obligation to complete the purchase of the Offered  Interest as described in this Section 13(b), (ii) the Sale Response Notice shall not be effective unless and until a required deposit in immediately available funds (the "**ROFO Deposit**") is delivered to the Escrow Agent on or prior to the Sale Response Date in an amount equal to five percent (5%) of the amount payable by Other Party pursuant to this Section 13(b), and (iii) the ROFO Deposit shall be held by the Escrow Agent pursuant to an escrow agreement in form reasonably satisfactory to all parties.

(iv)    If Other Party either (i) fails to respond to the Sale Notice by the Sale Response Date, (ii) fails to pay the ROFO Deposit in accordance with the terms and conditions of this Section 13, (iii) notifies the Selling Party that it does not wish to purchase such Offered Interest or exercise its Tag-Along Right hereunder, or (iv) adds conditions or contingencies to its Sale Response Notice not permitted by this Section 13, then (A) the Selling Party shall be entitled to enter into a contract of sale for the Offered Interest at not less than ninety-five (95.0%) of the Sales Price and to close such sale within ninety (90) days after the earlier to occur of the events described in Sections 13(b) (i), (ii), (iii), or (iv) hereinabove, and (B) Other Party shall not have the right to invoke any "first offer" rights under this Section unless a Supplemental Notice is issued.  Selling Party shall be obligated to provide Other Party with a further written notice (a "**Supplemental Notice**"), if a contract of sale or conveyancing documents are to be entered into (or amended after being entered into) to provide for a purchase price for the Offered Interest which is less than ninety-five (95.0%) of the original Sales Price or any terms and conditions materially more favorable to the purchaser than those described in the Sales Notice are to be contained in such contract (or any such amendment to any contract) or conveyancing documents.  Other Party shall have twenty (20) Business Days from the date of Supplemental Notice to elect by written notice given to Selling Party (a "**Supplemental Response Notice**") to purchase the Offered Interest at the reduced purchase price and modified terms stated in the Supplemental Notice and on the other terms and conditions stated in the Sale Notice, the Supplemental Notice and in this Section 13.

(v)    If Other Party properly elects to purchase the Offered Interest as described in Section 13(b)(iii) or (iv), Other Party shall fix a Closing Date, which must be a Business Day not later than thirty (30) days following the date of the Sale Response Notice or the Supplemental Response Notice.  Other Party shall notify the Selling Party in writing of the Closing Date not less than ten (10) days prior thereto. If Other Party does not fix the Closing Date within thirty (20) days following the date of the Sale Response Notice or Supplemental Response Notice, then the Closing Date shall automatically be the thirtieth (30th) day following the date of the Sale Response Notice or Supplemental Response Notice; provided, however, that if that date is not a Business Day, then the Closing Date shall be the Business Day next following such date.

(vi)    On the Closing Date, Other Party shall pay to the Selling Party the Sale Price stated in the Sale Notice or the Supplemental Notice and satisfy all other terms and conditions applicable to such purchase as provided in this Section 13.

(vii)    If Other Party delivers the ROFO Deposit to the Escrow Agent but thereafter defaults in its obligation to complete the purchase of the Offered Interest by the Closing Date, the Selling Party shall have the right, in its sole and absolute discretion, (i) as its sole and exclusive remedy for such default to retain the full amount of the ROFO Deposit as liquidated damages, which the Parties acknowledge to be a fair calculation of the damages suffered by the Selling Party as a result of Other Party's default, in lieu of any other legal or equitable remedies, and (ii) to sell the Offered

Interest at any price and on any other terms and conditions acceptable to the Selling Party and without any time limit or obligation to offer Other Party the right of first offer and free of any Tag-Along Rights of Other Party hereunder.

(viii)    If the Selling Party defaults in its obligation to complete the sale of the Offered Interest by the Closing Date, Other Party shall have the right in its sole and absolute discretion (i) to the immediate return of the ROFO Deposit (together with interest thereon) and (ii) to obtain specific performance of the Selling Party's obligation to complete the sale of the Offered Interest on the terms described in the Sale Notice or Supplemental Notice.

(ix)    Any purported sale, assignment or transfer of any interest (including subparticipations or beneficial interests) in the Junior Mezz Loan by either Lender or Participant that is not permitted or authorized pursuant to this Agreement or otherwise consented to in writing by the non-transferring party shall be null and void *ab initio* and of no effect whatsoever and shall not relieve the purported transferor of any of its rights or obligations under this Agreement and such purported transferor shall indemnify and hold the other party harmless from and against any expenses, losses, claims, damages, or liabilities arising as a result of, or caused directly or indirectly by, such purported transfer.  Such transferee shall have no right to any distributions or information under this Agreement.

(x)    At the closing of any permitted sale or transfer of the Offered Interest by Selling Party, other than to Other Party, Selling Party shall execute and deliver a certificate in form and substance acceptable to Other Party certifying that the transferor has complied with the applicable requirements of this Section 13 and the transferee is an Eligible Assignee.

(c)    No sale, assignment or transfer referenced in this Section 13 hereof shall be effective: (i) unless such sale, assignment or transfer is for the entire interest held by the transferor in the Junior Mezz Loan, (ii) until the buyer, assignee or transferee represents (for the benefit of the transferor and of Lender) that it is an Eligible Assignee and assumes by written instrument delivered to the other party to this Agreement all of the obligations of the transferring party under this Agreement arising with respect to the sold, assigned or transferred interest on or after the effective time of such sale, assignment or transfer, the transferring party and its buyer, assignee or transferee being and remaining jointly and severally liable for the transferring party's obligations under this Agreement until execution and delivery of such instrument; (iii) unless (A) registration is not required under the Securities Act, in respect of such transaction and (B) such transfer does not violate any applicable federal or state securities or comparable laws (with the party not transferring such interest in the Junior Mezz Loan being entitled prior to any such transfer to require an opinion of counsel in customary substance and form, with respect to such matters); (iv) if such transfer would result in a default or event of default under the Mortgage Loan Documents or Senior Mezz Loan Documents (unless the debt under the Mortgage Loan Documents and/or Senior Mezz Loan Documents is being repaid contemporaneously with the transfer); (v) if the sale and

transfer would violate the provisions of either of the Intercreditor Agreements; and (vi) unless such transfer complies with the terms of each of the Intercreditor Agreements. In addition, the buyer, assignee or transferee shall deliver to Lender (in the case of a sale or other transfer by Participant) or Participant (in the case of a sale or other transfer by Lender) such documentary evidence as Lender or Participant, as the case may be, may require to confirm that such party meets all of the requirements of an Eligible Assignee. Upon compliance with the foregoing requirements, including execution and the delivery of the instrument provided in clause (ii) above and *provided* that the sale, assignment or transfer is otherwise permitted hereunder, the transferring party shall be released from its obligations hereunder arising with respect to the sold, assigned or transferred interest on or after the effective time of such sale, assignment or transfer, but not as to previously existing obligations.

(d)    If Selling Party shall provide a Sale Notice to Other Party as provided in Section 13(b) above, Other Party may elect in its Sale Response Notice to require Selling Party to include in its proposed sale or transfer (and to require the purchaser to acquire) all of Other Party's interest in the Junior Mezz Loan (the "**Tag-Along Right**") for the same sales price (pro-rated proportionately) and on the same terms and conditions as are applicable to Selling Party's interest being sold or transferred.

(e)    Subject to the terms of this Section 13(e), either Lender or Participant (the "**Negotiating Party**") shall have the right to negotiate the sale of the entire Junior Mezz Loan and enter in a binding agreement for the sale of the entire Junior Mezz Loan.  Upon entry of the Negotiating Party into any such binding agreement, it shall give written notice of same and the terms thereof (the "**Loan Sale Notice**") to the other party (the "**Responding Party**") who may then either agree to such sale (and to include its interest in the Junior Mezz Loan in such sale) or elect to purchase the Negotiating Party's interest in the Junior Mezz Loan at the price, pro rated as to the Negotiating Party's interest, set forth in any such binding agreement.  If the Responding Party desires to purchase the Negotiating Party's interest pursuant to this Section 13(e), then the Responding Party shall send written notice of such election to the Negotiating Party within thirty (30) days following the Responding Party's receipt of the Loan Sale Notice.  The closing of the purchase of the Negotiating Party's interest in the Junior Mezz Loan pursuant to this Section 13(e) shall occur within thirty (30) days of the Responding Party's written notice of its election to purchase the Negotiating Party's interest in the Junior Mezz Loan and in a manner consistent with the provisions above relating to the purchase of an Offered Interest including, without limitation, the deposit by the Responding Party to the Escrow Agent of a deposit in an amount equal to five percent (5%) of the amount payable by the Responding Party pursuant to this Section 13(e).  In the event Participant is the Negotiating Party and Lender does not elect to purchase Participant's interest in the Junior Mezz Loan pursuant to this Section 13(e), Lender shall cooperate and take such actions as may be required to consummate the sale of the entire Junior Mezz Loan as contemplated hereunder.

(f)    Lender and Participant agree that in any dispute as to whether a party is an Eligible Assignee, the determination of Mortgage Lender and/or Senior Mezz Lender shall be dispositive as between Lender and Participant.

## 14.    **Pledge of Interests**.

(a)    Subject to paragraph (b) below, Lender and Participant shall each have the right to pledge (a "**Loan Pledge**") its interest in the Junior Mezz Loan to any entity which has extended a credit facility to such party and that is an Eligible Assignee (a "**Loan Pledgee**"), on the terms and conditions set forth in this Section 14. The party who is pledging its interest (the "**Loan Pledgor**") shall provide written notice to the other party prior to the effective date of the Loan Pledge which shall identify the Loan Pledgee.   Any Loan Pledge which does not comply with the requirements of this Section 14 shall be void *ab initio*. Upon written notice by Participant to Lender that a Loan Pledge has been effected by Participant, Lender agrees to acknowledge receipt of such notice and thereafter agrees: (a) to give Loan Pledgee written notice of any default by Participant under this Agreement of which default Lender has actual knowledge; (b) that no amendment, modification, waiver or termination of this Agreement shall be effective against Loan Pledgee without the written consent of Loan Pledgee, which consent shall not be unreasonably withheld, conditioned or delayed; (c) that Lender shall give to Loan Pledgee copies of any default notice relating to a default by Participant under this Agreement simultaneously with the giving of same to the Participant and accept any cure thereof by Loan Pledgee made in accordance with the provisions of this Agreement as if such cure were made by the Participant; and (d) that, upon written notice (a "**Redirection Notice**") to Lender by Loan Pledgee that Participant is in default, beyond applicable cure periods, under Participant's obligations to Loan Pledgee pursuant to the applicable credit agreement between Participant and Loan Pledgee (which notice need not be joined in or confirmed by Participant), and until such Redirection Notice is withdrawn or rescinded by Loan Pledgee, Lender shall remit to Loan Pledgee and not to Participant, any payments that Lender would otherwise be obligated to pay to Participant from time to time pursuant to this Agreement or any other agreement between Lender and Participant that relates to the Junior Mezz Loan.  Participant hereby unconditionally and absolutely releases Lender from any liability to Participant on account of Lender's compliance with any Redirection Notice believed by Lender to have been delivered by Loan Pledgee. Loan Pledgee shall be permitted to fully exercise its rights and remedies against Loan Pledgor, and realize on any and all collateral granted by Loan Pledgor to Loan Pledgee (and accept an assignment in lieu of foreclosure as to such collateral), in accordance with applicable law, provided such Loan Pledgee is an Eligible Assignee and otherwise complies with the terms of the Intercreditor Agreements.   In the event Participant is the Loan Pledgor, Lender shall recognize Loan Pledgee (and any transferee which is also an Eligible Assignee at any foreclosure or similar sale held by Loan Pledgee or any transfer in lieu of such foreclosure), and its successors and assigns who qualify as an Eligible Assignee, as the successor to Participant's rights, remedies and obligations under this Agreement and any such Loan Pledgee or Eligible Assignee shall assume in writing the obligations of the Participant hereunder accruing from and after

such transfer and agrees to be bound by the terms and provisions hereof. In the event Lender is the Loan Pledgor, Participant shall recognize Loan Pledgee (and any transferee which is also an Eligible Assignee at any foreclosure or similar sale held by Loan Pledgee or any transfer in lieu of such foreclosure), and its successors and assigns who qualify as an Eligible Assignee, as the successor to Lender's rights, remedies and obligations under this Agreement and any such Loan Pledgee or Eligible Assignee shall assume in writing the obligations of the Lender hereunder accruing from and after such transfer and agrees to be bound by the terms and provisions hereof. The rights of Loan Pledgee under this Section 14 shall remain effective unless and until Loan Pledgee shall have notified the Lender or Participant, as applicable, in writing that its interest in the other party's interest in the Junior Mezz Loan has terminated.

(b)    The pledge documentation evidencing such pledge shall contain a release mechanism pursuant to which the Loan Pledgee agrees that it shall release any and all lien and claim to the pledged interest in the Junior Mezz Loan upon payment to such Loan Pledgee of an amount equal to the Sale Price payable in the event of the effectuation of the right of first offer or tag-along procedures set forth in Section 13 of this Agreement. The Loan Pledgor shall deliver evidence reasonably satisfactory to the other party hereunder that the Loan Pledgee is an Eligible Assignee and that the pledge documentation provides for a release mechanism as required pursuant to the preceding sentence.

## 15.    Conflicts with Intercreditor Agreement.

Lender and Participant acknowledge and agree that the terms of this Agreement are subject to all of the terms, conditions and provisions of each of the Intercreditor Agreements and that in the case of any conflict between this Agreement and either of the Intercreditor Agreements, the terms of the applicable Intercreditor Agreement shall control. If the performance by either Lender or Participant of a covenant or obligation hereunder would constitute a default under or violate the provisions of either of the Intercreditor Agreements, such party shall not be in default hereunder for its failure to perform such covenant or obligation provided that notice of such non-performance is promptly delivered to the other party. In addition, the terms of this Agreement do not in any way alter, modify, limit or amend any of the terms, conditions and provisions under the Junior Mezz Loan Documents and nothing herein will increase or decrease the rights and obligations of the holder of the Junior Mezz Loan with respect to the Junior Mezz Borrower or otherwise require any party hereto to take any action or perform any obligation hereunder that would violate the terms of the Junior Mezz Loan Documents.

## 16.    Costs and Expenses of Lender.

If Lender hereafter incurs any Costs in accordance herewith that Junior Mezz Borrower is required to reimburse or pay to Lender pursuant to the Junior Mezz Loan Documents, Lender shall promptly demand that Junior Mezz Borrower remit payment thereof to Lender in accordance with the Junior Mezz Loan Documents. If

Junior Mezz Borrower has not remitted the amount of such Costs as set forth in the Junior Mezz Loan Documents to Lender within the time that Junior Mezz Borrower is required to do so, Participant shall, promptly upon request by Lender (which shall include a statement of such Costs in reasonable detail), pay to Lender its respective pro rata share of such Costs (based on Participant's Percentage Interest).   If Participant fails to remit to Lender is pro rata share of such Costs within twenty (20) days after demand therefor, Participant shall be obligated to pay such amount together with interest thereon at the Priority Protective Advance Rate from the date that such reimbursement request was made through and including the date of payment thereof to Lender in immediately available funds.   Any and all amounts required to be paid by Participant to Lender pursuant to this Section 16 or otherwise under this Agreement shall be in immediately available funds and shall be made without any offset, abatement, withholding or reduction of any kind whatsoever.   If Participant fails to remit to Lender its pro rata share of such Costs within twenty (20) days after written demand therefor, then Lender may, from time to time and at Lender's option, deduct from the amounts otherwise due to Participant in accordance with the provisions of this Agreement such Participant's share of such Costs.   Any Costs which are reimbursed to Lender by Participant and which are subsequently recovered by Lender from Junior Mezz Borrower or any other obligor (together with any interest paid thereon) shall be returned to Participant.   The parties acknowledge that the Servicer's servicing fee is intended to accrue and be paid from Collections pursuant to Section 3(a) hereof.

## 17.    **Withholding Taxes**.

(a)    In the event that Lender or the Junior Mezz Borrower shall be required by law to deduct and withhold Taxes from interest, fees or other amounts payable to Participant with respect to the Junior Mezz Loan as a result of Participant constituting or becoming a Non-Exempt Person, Lender shall be entitled to do so with respect to Participant's interest in such payment (all withheld amounts being deemed paid to Participant), provided that Lender shall furnish Participant with a statement setting forth the amount of Taxes withheld, the applicable rate and other information which may reasonably be requested for the purposes of assisting Participant to seek any allowable credits or deductions for the Taxes so withheld in each jurisdiction in which such party is subject to tax.

(b)    A "**Non-Exempt Person**" is any Person other than a Person who is either (i) a United States Person or (ii) has on file with Lender for the relevant year such duly-executed forms or statements which may, from time to time, be prescribed by law and which, pursuant to applicable provisions of (A) any income tax treaty between the United States and the country of residence of such Person, (B) the United States Internal Revenue Code of 1986, as amended from time to time or (C) any applicable rules or regulations in effect under clauses (A) or (B) above, permit Lender to make such payments free of any obligation or liability for withholding.   For the purposes of this Section, "**Taxes**" shall mean any income or other taxes, levies, imposts, duties, fees, assessments or other charges of whatever nature, now or hereafter imposed by any

jurisdiction or by any department, agency, state or other political subdivision thereof or therein.

(c)    Participant shall and hereby agrees to severally (but not jointly) indemnify Lender against and hold Lender harmless from and against any Taxes, interest, penalties and attorneys' fees and disbursements arising or resulting from any failure of Lender to withhold Taxes from payments made to Participant in reliance upon any representation, certificate, statement, document or instrument made or provided by Participant to Lender in connection with the obligation of Lender or the Borrower to withhold Taxes from payments made to Participant, it being expressly understood and agreed that (i) Lender shall be absolutely and unconditionally entitled to accept any such representation, certificate, statement, document or instrument as being true and correct in all respects and to fully rely thereon without any obligation or responsibility to investigate or to make any inquiries with respect to the accuracy, veracity, conclusory correctness or validity of the same and (ii) Participant shall, upon request of Lender and at the sole cost and expense of Participant, defend any claim or action relating to the foregoing indemnification by counsel reasonably approved by Lender.

(d)    Lender and Participant each respectively represents to the other that it is not a Non-Exempt Person.  From time to time as necessary during the term of this Agreement, Participant shall deliver to Lender evidence satisfactory to Lender substantiating that Participant is not a Non-Exempt Person and that Lender is not obligated under applicable law to withhold Taxes on sums paid to Participant with respect to the Junior Mezz Loan or otherwise under this Agreement.  Without limiting the effect of the foregoing, if Participant is not created or organized under the laws of the United States or any state thereof, and if the payment of interest or other amounts by the Junior Mezz Borrower is treated for United States income tax purposes as derived in whole or part from sources within the United States, Participant shall furnish to Internal Revenue Service Form 4224 or Form 1001 to Lender, or such other forms, certifications, statements or documents as may be required from time to time, duly executed by Participant, as evidence of Participant's exemption from the withholding of United States tax with respect thereto and Lender shall not be obligated to make any payments hereunder to Participant until Participant shall have furnished to Lender the requested forms, certificates, statements or documents.

### 18.    Relationship; Not a Security.

The relationship between the Lender and Participant is not intended by the parties hereto to create, and shall not create, any trust, fiduciary, joint venture, association, debtor-creditor or partnership relationship among them.  The relationship between Lender and Participant is solely that of assignor and assignee of a participation interest in a loan, and shall be governed by and in accordance with the terms of this Agreement.  Participant's ownership of its Participation Interest shall not, and shall not be deemed to, give Participant privity of contract with Junior Mezz Borrower or with any party to any of the Junior Mezz Loan Documents other than Lender.  This Agreement shall not be deemed to represent a pledge of any interest in the Junior Mezz Loan or in

any collateral therefor, or a loan from Participant to Lender.  Participant, in its capacity as a participant hereunder, shall have no legal title in any collateral taken as security for the Junior Mezz Loan, provided that Participant shall be deemed to have a beneficial interest in accordance with its interest hereunder in such collateral and the right to receive the proceeds thereof as set forth herein and to hold beneficial interests in the Owning Entity if and when it acquires any collateral.  Without limiting the foregoing, Participant hereby waives any provisions of any applicable law that would purport to give Participant any right to enforce the Junior Mezz Loan Documents; any right to partition the Property, the Junior Mezz Loan or any collateral therefor; or any right to convey its Participation Interest; in each case except as expressly set forth in this Agreement.  The Participation Interest created hereby shall not be deemed to be a "security" within the meaning of the Securities Act or the Securities Exchange Act of 1934, as amended from time to time.

## 19.    **Right to Transact Other Business**.

Subject to Section 9 above, each of Lender and Participant, and any of their respective Affiliates, may engage in any kind of business with Project Owner, Junior Mezz Borrower, Senior Mezz Borrower, Guarantor or any principals, partners, shareholders, officers, directors and Affiliates thereof, notwithstanding the existence of the Junior Mezz Loan or this Agreement.  Notwithstanding the foregoing, Participant will not initiate direct communications with Project Owner, Junior Mezz Borrower, Senior Mezz Borrower, Guarantor or any principals, partners, shareholders, officers, directors or Affiliates thereof concerning the Junior Mezz Loan; provided, that, upon request of the Participant, Lender will initiate a communication between any of the aforementioned persons and the Participant and Lender shall have the right to participate in any such communication.

## 20.    **Governing Law**.

(a)    THIS AGREEMENT SHALL BE DEEMED TO BE A CONTRACT ENTERED INTO PURSUANT TO THE LAWS OF THE STATE OF NEW YORK AND SHALL IN ALL RESPECTS BE GOVERNED, CONSTRUED, APPLIED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS).

(b)    WITH RESPECT TO ANY CLAIM OR ACTION ARISING HEREUNDER OR UNDER THIS AGREEMENT, EACH OF LENDER AND PARTICIPANT HEREBY (A) IRREVOCABLY SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK AND THE UNITED STATES DISTRICT COURT LOCATED IN THE BOROUGH OF MANHATTAN IN NEW YORK, NEW YORK, AND APPELLATE COURTS FROM ANY THEREOF, AND (B) IRREVOCABLY WAIVES ANY OBJECTION WHICH IT MAY HAVE AT ANY TIME TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, BROUGHT IN ANY SUCH COURT, IRREVOCABLY WAIVES

ANY CLAIM THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. NOTHING IN THIS AGREEMENT WILL BE DEEMED TO PRECLUDE ANY PARTY FROM BRINGING AN ACTION OR PROCEEDING IN RESPECT OF THIS AGREEMENT IN ANY OTHER JURISDICTION IF NECESSARY IN ORDER TO ENFORCE ITS RIGHTS UNDER THIS AGREEMENT IF THE FOREGOING COURTS DO NOT HAVE THE NECESSARY JURISDICTION.

> 21.  **Notices**.

(a)  Any notice, other than requests for funds which may be made by telecopy provided a second notice is sent by an additional delivery method provided below, which any party hereto may be required or may desire to give hereunder shall be in writing and shall be sent either (a) by certified mail, return receipt requested, postage prepaid, (b) by hand delivery, or (c) by nationally recognized overnight courier, charges prepaid, in each case addressed to such party at its address as set forth below. All notices sent via certified mail shall be effective three (3) Business Days after mailing; all notices sent by hand delivery shall be effective upon the earlier to occur of receipt or refusal; all notices sent by overnight courier shall be effective one (1) Business Day after delivery to the courier service.  Copies of notices shall be sent to the parties at the addresses provided below:

> If to Lender:
>
> > Lehman Brothers Holdings Inc.
> > 1271 Avenue of the Americas
> > 39th Floor
> > New York, New York 10020
> > Attention:  Joelle Halperin, Esq.
> > Fax :  (646) 834-0874
>
> With copies to:
>
> > TriMont Real Estate Advisors, Inc.
> > 3424 Peachtree Road NE
> > Suite 2200
> > Atlanta, Georgia 30326
> > Attn:  J. Gregory Winchester
> > Fax:  (404) 420-2556
> >
> > Weil Gotshal & Manges LLP
> > 767 Fifth Avenue
> > New York, New York 10153
> > Attention: W. Michael Bond, Esq.
> > Fax:  (212) 310-8007

If to Participant:

> State Street Bank and Trust Company
> 1 Lincoln Street, SFC9
> Boston, Massachusetts 02111
> Attention: Q. Sophie Yang, Senior Portfolio Manager
> Fax: (617) 664-3555

With copies to:

> State Street Bank and Trust Company
> 100 Huntington Avenue
> Boston, MA 02116
> Attention: Bruce M. Denneen, Vice President and Senior Counsel
> Fax:  (617) 664-5650
>
> Bingham McCutchen LLP
> 2020 K Street, NW
> Washington, D.C. 20006
> Attention:  Kenneth G. Lore, Esq.
> Fax:  (202) 373-6001

Any party may, by notice furnished in accordance with this Section 21, change its address for notice purposes under this Agreement; any such change in address will become effective ten (10) Business Days after notice thereof.

(b)     **Any such notice requesting a consent or approval or offering any opportunity under circumstances such that failure to reply within a period of time is deemed a consent or approval or a waiver of or other loss of the opportunity shall (i) contain a bold print legend at the top of such notice indicating that such notice is delivered pursuant to such a provision of this Agreement and that a failure to respond within the relevant period (specifying such period) shall be deemed a consent or approval or constitute a waiver of or other loss of opportunity, and (ii) be sent by two methods of delivery, one of which shall be by hand delivery or nationally recognized overnight courier.**

### 22.    No Modification.

No modification, amendment or change of this Agreement shall be valid unless the same is in writing and signed by all of the parties hereto.  This Agreement contains the entire agreement among the parties relating to the transaction contemplated hereby and all prior or contemporaneous agreements, understandings and statements, oral or written, are merged herein.

23.      **Authority to Perform**.

Lender warrants and represents that it had and presently has full power and authority to enter into this Agreement and to perform its obligations hereunder, and that this Agreement has been duly executed and delivered by Lender and constitutes the binding and enforceable obligation of Lender in accordance with its terms.  Participant represents and warrants that it has full power and authority to enter into this Agreement and perform all of its obligations hereunder, and that this Agreement has been duly executed and delivered by Participant and constitutes the binding and enforceable obligation of Participant in accordance with its terms.

24.      **Waiver of Trial By Jury**.

LENDER AND PARTICIPANT EACH HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

25.      **Captions**.

The titles and headings of the Sections of this Agreement have been inserted for convenience of reference only and are not intended to summarize or otherwise describe the subject matter of such Sections and shall not be given any consideration in the construction of this Agreement.

26.      **Severability**.

If any term, covenant or provision of this Agreement shall be held to be invalid, illegal or unenforceable in any respect, this Agreement shall be construed without such term, covenant or provision to the extent of such invalidity, illegality or unenforceability.

27.      **Confidentiality**.

Participant agrees to maintain the confidentiality of (and agrees not to disclose the same except (i) to its attorneys, accountants, auditors and other consultants and advisors as required in the course of their professional services, (ii) in connection with legal proceedings to enforce its rights hereunder, (iii) to a prospective permitted purchaser or pledgee of such Participant's Interest, (iv) to its direct or indirect fund investors, or (v) as otherwise may be required by law) any non-public information about the Project Owner, the Senior Mezz Borrower, the Junior Mezz Borrower, their respective stockholders, partners, members, officers, directors, managers, agents or constituent entities, or any guarantor of the Junior Mezz Borrower's, Senior Mezz Borrower's or Project Owner's obligations under the Junior Mezz Loan, Senior Mezz Loan or the Mortgage Loan, respectively, or the Property, or the business practices of any

of them, in accordance with the terms of the Junior Mezz Loan Documents and/or pursuant to confidentiality standards generally adhered to by commercial real estate lenders and/or which are generally applicable in commercial real estate lending industry.

### 28.    Repo Agreement.

Notwithstanding anything contained herein to the contrary, except as expressly provided in the Settlement Agreement, nothing contained in this Agreement shall constitute a waiver of or alteration, modification, limitation or amendment of or to any of the terms or provisions of the Repo Agreement and the parties' respective rights thereunder.

### 29.    Successors and Assigns; Third Party Beneficiaries.

Subject to and without impairing or modifying any limitations on transfer set forth in this Agreement, this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and/or permitted assigns.  None of the provisions of this Agreement shall inure to the benefit of any third party including, without limitation, the Project Owner, the Senior Mezz Borrower or the Junior Mezz Borrower.

### 30.    Further Assurances.

Participant shall, from time to time, upon written request of Lender, execute and deliver such documents and instruments as may be reasonably necessary to enable Lender to effectively service, administer and enforce the Junior Mezz Loan Documents, and the rights of Lender under the Junior Mezz Loan Documents, in the manner contemplated by and in accordance with the terms and conditions of this Agreement.

### 31.    Counterparts.

This Agreement may be executed in any number of counterparts, all of which, taken together, shall be deemed one instrument, binding upon a party hereto upon its execution and delivery of any one counterpart.  Any counterpart shall be binding upon the party executing such counterpart upon delivery to any other party or its counsel either in the original or via facsimile.

### 32.    Limited Recourse.

Except in the case of fraud, bad faith, a breach of the transfer restrictions or misappropriation of funds hereunder by Lender or any of its Affiliates, Participant agrees that any judgment in any action or proceeding brought by Participant against Lender hereunder or in connection with the Junior Mezz Loan shall be enforceable against Lender only to the extent of Lender's interest in the Junior Mezz Loan and the proceeds thereof, provided that upon any sale or other transfer by Lender of its interest

hereunder, such judgment may be enforceable against Lender only to the extent of the value of its interest immediately prior to such sale.  Except in the case of fraud, bad faith, a breach of the transfer restrictions or misappropriation of funds hereunder by Participant or any of its Affiliates, Lender agrees that any judgment in any action or proceeding brought by Lender against Participant hereunder or in connection with the Junior Mezz Loan shall be enforceable against Participant only to the extent of Participant's interest in the Junior Mezz Loan and the proceeds thereof, provided that upon any sale or other transfer by Participant of its interest hereunder, such judgment may be enforceable against Participant only to the extent of the value of its interest immediately prior to such sale.  Notwithstanding anything herein to the contrary, in no event shall Lender or Participant have any liability to the other on account of any failure to agree on the taking of any action or course of action which constitutes a Lender Decision/Action.

### 33.    **True Sale**.

This Agreement is intended to effectuate a "true sale" of the Participation Interest contemplated hereby.  In no event shall the transactions contemplated hereby be deemed a financing or other extension of credit.  The parties hereto shall in all respects account for the transactions contemplated hereby in a manner consistent with the preceding sentence.

### 34.    **Agreement Between Parties**.

This Agreement is intended to constitute the entire agreement between the parties hereto.  In the event of any conflict between the terms and conditions of this Agreement and Article IX of the Junior Mezz Loan Agreement with respect to the rights and obligations of the parties hereto, this Agreement shall control.

### [Signature page follows]

 

 

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year first above written.

LENDER:                                        LEHMAN BROTHERS HOLDINGS INC.,
                                               a Delaware corporation, as debtor and debtor
                                               in possession in its chapter 11 case in the
                                               United States Bankruptcy Court for the
                                               Southern District of New York, Case No.
                                               08-13555 (JMP)

 

 

By: _____
    Name:
    Title:

 

 

PARTICIPANT:                                   STATE STREET BANK AND TRUST
                                               COMPANY

 

 

By: _____
    Name: _____
    Title: _____

**EXHIBIT A**

**PERCENTAGE INTERESTS**

**Lender:**

Percentage Interest:    Fifty Percent (50%)
Address:                1271 Avenue of the Americas
                        39th Floor
                        New York, New York  10020
                        Attention: Joelle Halperin, Esq.

**Participant:**

Percentage Interest:    Fifty Percent (50%)
Address:                1 Lincoln Street, SFC9
                        Boston, Massachusetts 02111
                        Attention: Q. Sophie Yang, Senior Portfolio Manager

## SCHEDULE A

Schedule of Permitted Costs

## **Annex A**

### **(Proposed Order)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------x
:
In re                                          :        **Chapter 11 Case No.**
:
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*   :        **08-13555 (JMP)**
:
                          **Debtors.**         :        **(Jointly Administered)**
:
---------------------------------------------------------------------x

### ORDER PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE AND RULE 9019(a) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AUTHORIZING LBHI AND LCPI TO ENTER INTO SETTLEMENT AGREEMENT AND PARTICIPATION AGREEMENT WITH STATE STREET BANK AND TRUST COMPANY REGARDING A CERTAIN 340 MADISON LOAN AND TO PAY FUNDS AS CONTEMPLATED THEREBY

Upon the motion, dated May 25, 2010 (the "Motion"),[1] of Lehman

Brothers Holdings Inc., as debtor in possession ("LBHI," and together with its affiliated

debtors in the above-referenced chapter 11 cases, the "Debtors"), for an order pursuant to

section 363 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9019

of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") authorizing,

LBHI and LCPI to enter into the Settlement Agreement and the Participation Agreement,

and the transfer of funds as contemplated thereby, all as more fully described in the

Motion; and the Court having jurisdiction to consider the Motion and the relief requested

therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61

Referring to Bankruptcy Judges for the Southern District of New York Any and All

Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration

of the Motion and the relief requested therein being a core proceeding pursuant to 28

---
[1] Capitalized terms used, but not defined herein shall have the meaning ascribed to such term in the Motion.

U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408

and 1409; and due and proper notice of the Motion having been provided in accordance

with the procedures set forth in the amended order entered February 13, 2009 governing

case management and administrative procedures [Docket No. 2837]; and the Court

having found and determined that the relief sought in the Motion is in the best interests of

LBHI and LCPI, their respective estates and creditors, and all parties in interest and that

the legal and factual bases set forth in the Motion establish just cause for the relief

granted herein; and after due deliberation and sufficient cause appearing therefor, it is

        ORDERED that the Motion is granted; and it is further

        ORDERED that all objections, if any, to the Motion and the relief

requested therein that have not been withdrawn, waived, or settled, and all reservations of

rights included therein, are denied and overruled on the merits with prejudice; and it is

further

        ORDERED that, pursuant to Bankruptcy Rule 9019 LBHI and LCPI are

authorized and empowered to enter into the Settlement Agreement, substantially in the

form attached as Exhibit A to the Motion, and are authorized, but not directed, to execute,

deliver, implement, and perform any and all obligations, instruments, documents and

papers, and to take all corporate and other actions that may be necessary or appropriate to

consummate all of the transactions contemplated by the Settlement Agreement without

the necessity or requirement of further court proceedings or approval;  and it is further

        ORDERED that, pursuant to Section 363 of the Bankruptcy Code, LBHI

is authorized and empowered to enter into the Participation Agreement substantially in

the form attached as Exhibit B to the Motion and convey and assign the State Street

Ownership Interest (as defined in the Motion), and is authorized, but not directed, to

execute, deliver, implement, and perform any and all obligations, instruments, documents

and papers, and to take all corporate and other actions that may be necessary or

appropriate to consummate all of the transactions contemplated by the Participation

Agreement without the necessity or requirement of further court proceedings or approval;

and it is further

ORDERED that the conveyance and assignment of the State Street

Ownership Interest to State Street (as defined in the Motion) shall be free and clear of all

liens, claims, interests and encumbrances and that once the payment of the Prior Share

Payment (as defined in the Motion) is made and the State Street Ownership Interest is

assigned and conveyed to State Street, neither the Prior Share Payment nor the State

Street Ownership Interest shall be subject to avoidance under chapter 5 or any other

avoidance provisions of the Bankruptcy Code; and it is further

ORDERED that LBHI and LCPI are authorized to transfer the Prior

Payment Share to State Street, as set forth in the Settlement Agreement, and are

authorized, but not directed, to make any further payments to State Street as

contemplated by the Settlement Agreement or the Participation Agreement; and it is

further

ORDERED that notice of the Motion as provided therein shall be deemed

good and sufficient notice of such Motion; and it is further

ORDERED that nothing contained herein shall be deemed to be a waiver

or the relinquishment of any rights, claims, interests, obligations, benefits or remedies of

LCPI or LBHI or, except as otherwise expressly provided in the Motion, that the Debtors

may have or choose to assert on behalf of their respective estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including against each other or third parties, and the Debtors are herby authorized and directed to execute such further documents to evidence these reservations, and it is further

ORDERED that except as provided with respect to the 340 Madison Loan (as defined in the Motion) in the Settlement Agreement, the Repo Agreement (as defined in the Motion) is not affected by this Order or the Settlement Agreement and that each of State Street, LCPI and LBHI otherwise retain all of its respective rights, remedies, claims and defenses, available at law or in equity, and under, related to, or in connection with the Repo Agreement; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation and/or interpretation of this Order.

Dated: June ___, 2009
        New York, New York

_____
HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE