**WINTHROP COUCHOT**
**PROFESSIONAL CORPORATION**
660 Newport Center Drive, Fourth Floor
Newport Beach, CA 92660
Telephone: (949) 720-4100
Facsimile: (949) 720-4111
Sean A. O'Keefe – NY Bar No. 1980853, CA Bar No. 122417
Paul J. Couchot – CA Bar No. 131934
Counsel for the SunCal Voluntary Debtors

**MILLER BARONDESS, LLP**
1999 Avenue of the Stars, Suite 1000
Los Angeles, CA 90067
Telephone: (310) 552-4400
Facsimile: (310) 552-8400
Louis R. Miller – CA Bar No. 54141
Martin H. Pritikin -- CA Bar No. 210845
Special Litigation Counsel for SunCal Debtors


## UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF NEW YORK


| | |
|---|---|
| In re | **Chapter 11** |
| | **Case No. 08-13555 (JMP)** |
| **LEHMAN BROTHERS HOLDINGS INC, et al.,** | **Jointly Administered** |
| Debtors. | |


**SUNCAL APPELLANTS' MEMORANDUM OF LAW PURSUANT TO**
**FED. R. BANKR. P. 8005 FOR STAY PENDING APPEAL OF ORDER APPROVING**
**DEBTORS' MOTION PURSUANT TO BANKRUPTCY RULE 9019 FOR AUTHORITY**
**TO COMPROMISE CONTROVERSY IN CONNECTION WITH A REPURCHASE**
**TRANSACTION WITH FENWAY CAPITAL, LLC AND A COMMERCIAL PAPER**
**PROGRAM WITH FENWAY FUNDING, LLC *AND* FOR STAY PENDING APPEAL OF**
**ORDER DENYING MOTION OF THE SUNCAL DEBTORS FOR AN ORDER**
**DETERMINING THAT THE AUTOMATIC STAY DOESNOT APPLY; OR, IN THE**
**ALTERNATIVE, GRANTING RELIEF FROM STAY AND NOTICE OF APPEAL**

**TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT ............................................................. 1

II.   REVIEW OF MATERIAL FACTS.................................................. 4
      A.    The SunCal Appellants. ................................................... 4
      B.    The SunCal Debtors' Chapter 11 Filings..................................... 5
      C.    LCPI's First Ownership Misrepresentation. ............................... 5
      D.    LCPI 's Relief From Stay Motions.......................................... 6
      E.    The SunCal Debtors' Adversary Proceeding Against Non-Debtor
            Lehman Entities. ......................................................... 6
      F.    The SunCal Debtors' Discovery of Fenway's Ownership of the Loans........ 6
      G.    The SunCal Debtors' Motion to Strike...................................... 7
      H.    Fenway's Inclusion In The Equitable Subordination Action.............. 8
      I.    The Ninth Circuit BAP Reverses The Stay Finding. ..................... 8
      J.    The Compromise Motion Filed By LCPI and LBHI. ....................... 8
      K.    The SunCal Appellants' Relief From Stay Motion.  ..................... 10
      L.    The SunCal Appellants Appeal............................................. 11
      M.    Stay Pending Appeal...................................................... 11

III.  ANALYSIS OF FACTORS BEARING ON ISSUANCE OF A STAY
      OF COMPROMISE ORDER ................................................... 11
      A.    Substantial Possibility of Success On Appeal. ......................... 12
            1.    The Compromise Motion Was The Result of A Collusive Effort
                  To Achieve An Improper Purpose. ................................ 12
            2.    The Court Failed To Apply The Proper Standard When Reviewing
                  The Compromise Motion........................................... 14
            3.    The Compromise Motion and The Compromise Order Violated
                  The SunCal Appellants' Automatic Stay........................... 15
      B.    The Risk Of Irreparable Injury To Movants Absent A Stay.............. 18
      C.    No Harm Will Result To The Lehman Entities If The Motion Is Granted.... 19
      D.    The Public Interest Factor Support Granting The Motion. ............. 19

IV.   ANALYSIS OF FACTORS BEARING ON THE ISSUANCE OF STAY
      OF THE RFS ORDER ........................................................ 19
      A.    Possibility of Success On Appeal. ...................................... 19
            1.    The Court Did Not Use Or Correctly Apply The Applicable
                  Legal Standard. ................................................ 20
            2.    Relief From Stay Was Justified Under The Balance of The
                  Harms.  ........................................................ 21
            3.    The Court Ruling That The Stay Applied To The ES Action Was
                  In Error........................................................ 23
      B.    The Risk Of Irreparable Injury To Movants Absent A Stay.............. 25
      C.    No Harm Will Result To The Lehman Entities If The Motion Is Granted.... 25
      D.    The Public Interest Factor Support Granting The Motion. ............. 25

V.    CONCLUSION................................................................ 25

# TABLE OF AUTHORITIES

## Cases

*In re Adell*
  325 B.R. 883 (Bankr.M.D.Fla.2005) ........................................................................ 14
*AP Indus., Inc. v. SN Phelps & Co. (In re AP Indus., Inc.)*
  117 B.R. 789, 798 (Bankr.S.D.N.Y.1990) ............................................................... 18
*Bohack Corp. v. Borden, Inc.*
  599 F.2d 1160, 1168 (2nd Cir. 1979) ...................................................................... 12
*Celotex Corporation v. Edward*
  514 U.S. 300 (1995) ...................................................................................................... 8
*In re Colonial Realty Co.*
  980 F.2d 125, 137 (2d Cir.1992) .............................................................................. 18
*Donovan v. Robbins*
  752 F.2d 1170, 1176 (7th Cir.1985) ........................................................................ 14
*Eastern Refractories Co., Inc. v. Forty Eight Insulations Inc.*
  157 F.3d 169, 172 (2d Cir.1998) .............................................................................. 18
*In re Enron*
  2003 WL 23965467 (Bankr, S.D.N.Y.  Jan. 13, 2003) (the "Enron Case") ................ 24
In re Financial News Network, Inc.
  *158 B.R. 570 (S.D.N.Y.1993)* .................................................................................. 24
*In re Govola*
  306 B.R. 733, 736 (Bankr.D.Conn.2004) ................................................................ 18
*In re Great Barrington Fair and Amusement, Inc.*
  53 B.R. 237 (Bankr. D. Mass. 1985). ...................................................................... 12
*In re Greene*
  50 B.R. 785, 787 (S.D.N.Y. 1985) ........................................................................... 17
*In re HBA East, Inc.*
  87 B.R. 248, 260 (Bankr.E.D.N.Y.1988) ................................................................ 14
*In re Howley*
  38 B.R. 314 (Bankr. Minn. 1984) ............................................................................ 12
*In re Jandous Elec. Const. Corp.*
  106 B.R. 48, 50 (Bankr.S.D.N.Y.1989) ................................................................... 12
*In re Le*
  2, 2007 WL 4197515 (Bankr.S.D.Tex.2007) ............................................................ 6
*Lehman Commercial Paper, Inc. v. Palmdale Hills Pro., LLC (In re Palmdale Hills Prop., LLC)*
  423 B.R. 655 (9th Cir. BAP 2009) ............................................................................. 8
*In re Marine Pollution Service, Inc.*
  99 B.R. 210, 217 (Bankr.S.D.N.Y.1989) ................................................................. 18
*Matter of McKanders*
  42 B.R. 108, 109 (Bankr.N.D.Ga.1984) ................................................................. 18
*In re Masters Mates & Pilots Pension Plan and IRAP Litigation*
  957 F.2d 1020, 1025 (2d Cir. 1992) ......................................................................... 14
In re Meade
  *1999 WL 33496001, n. 1 (E.D.Pa. 1999)* ............................................................... 24
In re Metiom, Inc.

*301 B.R. 634, 638-639 (Bankr.S.D.N.Y. 2003)* ........................................................................... 24

*Montoya v. Vigil (In re Vigil)*
250 B.R. 394, 396 n. 2 (Bankr.D.N.M.2000) ............................................................................ 6

*National Tax Credit Partners, L.P. v. Havlik*
20 F.3d 705, 707-708 (7th Cir. 1994) ................................................................................... 18

*In re Neisner Bros., Inc.*
10 B.R. 299 (Bankr. SD.N.Y. 1981) ........................................................................................ 12

*In re Poindexter*,
2004 WL 3019347 (Bankr.M.D.N.C. 2004) ........................................................................... 14

*Rexnord Holdings, Inc. v. Bidermann*
21 F.3d 522, 527 (2d Cir.1994) .............................................................................................. 18

*In re Saxon Indus., Inc.*
43 B.R. 64, 67 (Bankr. S.D.N.Y. 1984) .................................................................................. 12

*In re Sonnax Industries, Inc.*
907 F.2d 1280 (2nd Cir. 1990) ................................................................................... 20, 21, 23

*In re Suprema Specialties, Inc.*
330 B.R. 93 (S.D.N.Y. 2005) ............................................................................................. 3, 12

*In re Wedtech Corp.*
87 B.R. 279, 289 (Bankr. S.D.N.Y. 1988) .............................................................................. 12

*In re Wilkerson Enter., Inc.*
95 B.R. 213, 215 (Bankr.N.D.Okla.1989) ................................................................................. 6

*Teachers Ins. and Annuity Ass'n of America v. Butler*
803 F.2d 61, 66 (2nd Cir. 1986) ......................................................................................... 5, 7

*Weinberger v. Kendrick*
698 F.2d 61, 73 (2d Cir.1982), *cert. denied,*
464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983) ................................................................ 14

**Statutes**

11 U.S.C. § 362(a) ............................................................................................................. 15, 18
11 U.S.C. § 362(a)(1) ......................................................................................................... 15, 18
11 U.S.C. § 362(a)(3) ............................................................................................................... 15
11 U.S.C. § 362(a)(4) ............................................................................................................... 15
11 U.S.C. § 362(a)(6) ............................................................................................................... 15
11 U.S.C. § 510(c) ............................................................................................................... 6, 24

SunCal Communities I LLC, SunCal Communities III LLC, SCC/Palmdale LLC, Acton Estates LLC, SunCal Beaumont Heights LLC, SunCal Emerald Meadows LLC, SunCal Johansson Ranch LLC, SunCal Bickford Ranch LLC, SunCal Summit Valley LLC, Seven Brothers LLC, Kirby Estates LLC, SJD Partners Ltd., SJD Development Corp., SCC Communities LLC, North Orange Del Rio Land LLC and Tesoro SF LLC, the debtors and debtors-in-possession (collectively, the "SunCal Appellants" or the "Appellants"), by and through their undersigned counsel, file this motion ("Motion") pursuant to Federal Rule of Bankruptcy Procedure ("FRBP") Rule 8005 for a stay pending appeal of that certain *Order Approving Debtors' Motion Pursuant To Bankruptcy Rule 9019 For Authority To Compromise Controversy In Connection With A Repurchase Transaction With Fenway Capital, LLC And A Commercial Paper Program With Fenway Funding, LLC* (the "Compromise Order") entered by this Court on May 13, 2010 (Docket No. 9030) and that certain *Order Denying Motion Of The SunCal Debtors For An Order Determining That The Automatic Stay Does Not Apply; Or, In The Alternative, Granting Relief From Stay* (the "RFS Order") entered by this Court on May 17, 2010 (Docket No. 9059).[1]

# I

# **PRELIMINARY STATEMENT**

For the past year, the SunCal Appellants have been pursuing an equitable subordination action (the "ES Action") in the United States Bankruptcy Court Central District of California (the "California Bankruptcy Court"). This action seeks a judgment equitably subordinating certain claims (the "Disputed Claims") owned by Fenway Capital, LLC ("Fenway") and Lehman Ali, Inc. ("Lehman Ali"), _two non-debtors_. In April of 2009, Lehman Commercial Paper, Inc. ("LCPI") and Lehman Brothers Holdings, Inc ("LBHI") filed that certain *Motion Pursuant To Bankruptcy Rule 9019 For Authority To Compromise Controversy In Connection With A Repurchase Transaction With Fenway Capital, LLC And A Commercial Paper Program With Fenway Funding, LLC* (the "Compromise Motion"). This motion sought approval of a transaction (the "Claims Transaction")

---

[1] References to the O'Keefe Decl. are to the Declaration of Sean A. O'Keefe filed in support of the SunCal Appellants' Motion for Relief From Stay. References to the Second O'Keefe Decl. are to the declaration attached hereto.

that was specifically designed to enable LCPI and LBHI to thwart the continued pursuit of the ES Action.

In summary, the transaction described in the Compromise Motion allows LCPI to acquire the Disputed Claims from Fenway and Lehman Ali, and to thereafter insist that the continued pursuit of the ES Action against LCPI's newly acquired assets is barred by LCPI's automatic stay. LBHI's role in this scheme is to provide a failsafe: If for any reason LCPI's automatic stay fails to thwart the ES Action, LBHI will contend that its stay bars the action, based upon the lien that it claims to be acquiring against the Disputed Claims pursuant to the transaction.

Since the ES Action is of central importance to the SunCal Appellants' reorganization effort, they filed an opposition to the Compromise Motion (the "Opposition"), wherein they argued that the motion was filed to achieve a bad faith objective. They also filed a motion seeking a determination that even if the Compromise Motion was approved, LCPI's and LBHI's stay would not apply to, or bar the pursuit of, the ES Action (the "RFS Motion"). In the alternative, the RFS Motion sought an order granting relief from any applicable stay. At the conclusion of the hearing held on the Compromise Motion and the RFS Motion, this Court granted the Compromise Motion, overruled the Opposition and denied the RFS Motion.

The order granting the Compromise Motion – the Compromise Order – was entered on May 15, 2010. The order denying the RFS Motion – the RFS Order – was entered on May 18, 2010. On May 27, 2010, the SunCal Appellants filed appeals with respect to the both orders seeking review in the United States District Court Southern District of New York.

The concurrently filed motion seeks an order staying the implementation of any part of the Claims Transaction that has the effect of enabling either LCPI or LBHI to acquire or take any interest in the Disputed Claims under conditions that would result in the stay of the ES Action, and staying this Court's determination that the automatic stay would apply to the ES Action after the Claims Transaction closes, pending the conclusion of the appeals. Alternatively, the motion seeks a stay of thirty days to allow the District Court an opportunity to hear and rule upon a stay pending appeal.

The merits of a motion for stay pending appeal are weighed based upon the following four criteria: (1) whether there is a substantial possibility of success on appeal, (2) the risk of irreparable injury to movants absent a stay, (3) the lack of substantial harm to the appellee if a stay is granted, and (4) the public interests that may be affected. *In re Suprema Specialties, Inc.,* 330 B.R. 93 (S.D.N.Y. 2005) (granting stay of pending appeal). Here, all of the relevant factors militate in favor of granting the limited stay prayed for herein as to both the Compromise Order and the RFS Order. First, there is a substantial possibility of success. The Compromise Order was granted without due consideration of the bad faith objectives underlying the Claims Transaction or the effect of this transaction will have on the SunCal Appellants' cases - an effect that violates the SunCal Appellants' automatic stay rendering the order void.[2]

In the case of the RFS Order, the Court erred in its conclusion that the automatic stay bars one Chapter 11 debtor from seeking to subordinate claims filed by a second Chapter 11 debtor in the first debtor's proceeding. It is well established in this Circuit that an action to completely disallow a claim filed by one debtor, in the Chapter 11 case of another, is not barred by the stay. Accordingly, an action that seeks a lesser remedy against this same claim, *and which limits the relief to the claim itself*, is necessarily not subject to the stay under these authorities. In ruling on the prayer for relief from stay in the RFS Motion, to the extent it applied, the Court erred by failing to use or correctly apply the relevant *Sonnax* factors. Relief under this standard should have been granted based upon the evidence.

---

[2] The California Bankruptcy Court held exclusive jurisdiction over the properties owned by the SunCal Appellants prior to the entry of the Compromise Order. 28 U.S.C. § 1334(e). That court also had the right to address the priority of all liens against these properties, as "core proceedings." 28 U.S.C. § 157(b)(2)(K). In contrast, prior to the entry of the Compromise Order *this Court did not have this jurisdictional power*, since the Lehman Entities did not own any interest in the Sold Loans. *See Gallucci v. Grant (In re Gallucci)* , 931 F.2d 738, 743 - 44 (11th Cir. 1991). The Compromise Order assumed jurisdictional power that did not exist and used this power to effectively enjoin 17 other Chapter 11 cases. This was error. This Court did not hold this power and no settlement, no matter how artfully crafted, could convey this power. *See, Id.; Feld v. Zale Corp. (In re Matter of Zale Corp.),* 62 F.3d 746, 754-755 (5th Cir. 1995).

A stay pending appeal should also be granted here due to irreparable harm the SunCal Appellants will suffer if an interim stay is not granted: Without a stay, their reorganization efforts will be seriously and unjustly impaired. Conversely, the Lehman Entities will suffer little if any harm if such relief is granted—in fact, they will benefit from a stay and the consequent expeditious resolution of litigation regarding their claims in California. Finally, the public interest favors a stay pending appeal, as these are important issues that affect not only the rights of the SunCal Appellants, but the rights of creditors. If the SunCal Appellants are correct in their contention that the Lehman Entities are using their stay as a sword, denying stay pending appeal would largely moot their ability to do anything about that. Neither fairness nor efficiency would be promoted by such a result.

## II

## REVIEW OF MATERIAL FACTS

**A.**    **The SunCal Appellants.** The sixteen SunCal Appellants and the seven other related entities (collectively the "SunCal Debtors") operating under the protection of Chapter 11 are part of integrated network of residential development entities operating under the common dba "the SunCal Companies" or "SunCal." The SunCal Debtors were formed as part of a joint venture with affiliates of LBHI, including, most importantly, LCPI and non-debtor affiliate Lehman ALI, to develop a series of large residential real estate projects (the "Projects"). (Cook Dec., ¶¶ 4-5).

Between 2005 and 2007, Lehman ALI and LCPI (together the "Lehman Entities") made a series of loans to the SunCal Debtors. Twelve of these loans, totaling approximately $1.5 billion, are relevant to this motion (collectively the "Lehman Loans"). Three of Lehman Loans were made by LCPI: The SunCal Communities I loan in the approximate amount of $343 million (the "SunCal I Loan"), the Ritter Ranch Loan in the approximate amount of $287 million (the "Ritter Ranch Loan"), and the SCC Palmdale Loan in the approximate amount of $95 million (the "SCC Palmdale Loan"). Seven loans were made by Lehman ALI (the "Lehman ALI Loans") and two loans (one each) were made by Lehman non-debtor affiliates Northlake Holdings, LLC ("Northlake") and OVC Holdings, LLC ("OVC"). All of the Lehman Loans are secured by large

residential real estate tracts that have substantial value, except the SCC Palmdale Loan. The latter loan is secured by equity interests, which the parties agree have no value.

The initial joint venture projects that SunCal entered into with Lehman Entities were profitable. However, as market conditions slowed in 2007, cash flow problems arose. In an effort to mitigate these problems, the SunCal Debtors recommended closing several of the Projects and reducing the pace of work on others. The Lehman entities rejected this recommendation. They insisted that development continue apace and they promised to pay the vendor bills being incurred at the projects. They also insisted upon exercising more and more control over decisions made by the SunCal Debtors. The Lehman Entities later reneged on their promises of payment, and instead attempted to foreclose on the Projects. If this stratagem had succeeded, the hundreds of unsecured creditors who contributed over $100 million of goods and services to the Projects would have been left with nothing.

**B.** **The SunCal Debtors' Chapter 11 Filings**. In November of 2008, the SunCal Debtors filed Chapter 11 proceedings in the California Bankruptcy Court to stay the Lehman Entities' foreclosure proceedings and to obtain time to reorganize their business affairs.

**C**. **LCPI's First Ownership Misrepresentation**. After the SunCal Debtors filed their Chapter 11 cases, LCPI represented to the SunCal Debtors that it continued to own the SunCal I Loan and the Ritter Ranch Loans. On the basis of this ownership interest, LCPI contended that any effort to use or otherwise affect the property subject to the liens securing these loans would violate the automatic stay in LCPI's Chapter 11 case. In fact, it was later discovered that LCPI's claim of ownership was a misrepresentation: All right, title and interest in the SunCal I Loan and the Ritter Ranch Loan were sold to Fenway as of August 22, 2008, one month before LCPI filed Chapter 11, and two months before the SunCal Debtors filed Chapter 11.

Faced with LCPI's ownership claim and automatic stay threats, the SunCal Debtors filed a motion before this Court (the "2008 RFS Motion") wherein they sought relief from any stay applicable in LCPI's case to the extent necessary to proceed with the SunCal Appellants' own reorganization effort. LCPI opposed this motion and falsely represented to this Court that it owned

the SunCal I Loan and the Ritter Ranch Loan. It further misrepresented that it would suffer harm if the 2008 RFS Motion was granted. On the basis of these falsehoods, this Court denied the 2008 RFS Motion.

Had the SunCal Appellants realized that Fenway, not LCPI, held ownership of the SunCal I Loan and the Ritter Ranch Loan in November of 2008, they would not have filed the 2008 RFS Motion, since relief would have been unnecessary. *See Teachers Insurance and Annuity Ass'n v. Butler*, 803 F.2d 61, 65 (2d Cir.1986) ("It is well-established that stays pursuant to § 362(a) are limited to debtors and do not encompass non-bankrupt co-defendants."); *see also*, *In re Le* 2, 2007 WL 4197515 (Bankr.S.D.Tex.2007) ("However, the automatic stay does not apply to property that is not "property of the estate." "); *Montoya v. Vigil (In re Vigil)*, 250 B.R. 394, 396 n. 2 (Bankr.D.N.M.2000) (recognizing that, "[a]s a general matter, the automatic stay does not apply to property which is not property of the estate"); *In re Wilkerson Enter., Inc.*, 95 B.R. 213, 215 (Bankr.N.D.Okla.1989) (same).

**D.    LCPI 's Relief From Stay Motions.** In January of 2009, LCPI filed six motions for relief from stay in the California Bankruptcy Court (the "Lehman RFS Motions") wherein LCPI again misrepresented that it owned the SunCal I Loan and the Ritter Ranch Loan. On the basis of this misrepresentation of fact, LCPI argued that relief from the SunCal Appellants' automatic stay should be granted, since the SunCal Appellants' reorganization plan provided for the subordination of LCPI's claims, and this effort was barred by LCPI's automatic stay. The California Bankruptcy Court denied the Lehman RFS Motions. In the order denying relief, the California Bankruptcy Court held that LCPI's automatic stay argument was in error: An action to equitably subordinate a claim was "defensive" and hence did not violate the claimant's automatic stay (the "Stay Ruling").

**E.    The SunCal Debtors' Adversary Proceeding Against Non-Debtor Lehman Entities.** On January 6, 2009, the SunCal Appellants filed a complaint against various non-bankrupt Lehman-affiliates, including Lehman ALI and its successors seeking the equitable subordination of their claims under 11 U.S.C. § 510(c) (the "ES Action"). The SunCal Appellants initially did not name LCPI as a defendant in the ES Action, due to its status as a debtor. However,

in reliance on the Stay Finding, the complaint in the ES Action was amended in March 2009 to add

LCPI as a defendant in connection with what the SunCal Debtors mistakenly believed were the

three LCPI-owned loans.  The SunCal Debtors did not seek any damages from LCPI in the ES

Action. Rather, consistent with the Stay Finding, they sought only to equitably subordinate the

claims that LCPI filed against the SunCal Debtors, and to void and/or transfer to the estates the

liens associated with those claims.

**F.**    **The SunCal Debtors' Discovery of Fenway's Ownership of the Loans.** In May

of 2009, after the RFS Motions were denied, the SunCal Debtors discovered that two of the three

loans that LCPI claimed to own (the Ritter Ranch Loan and the SunCal I Loan), two of the loans

that Lehman ALI claimed to own, and the two loans held by OVC and Northlake (collectively the

"Sold Loans") had been sold to Fenway pursuant to that certain Master Repurchase Agreement

dated August 22, 2008 (the "MRA"). Accordingly, from August 22, 2008 through the date of this

pleading, neither LCPI nor LBHI owned any interest in the Sold Loans, and every statement or

pleading that affirmatively represented a contrary position was a misrepresentation.

**G.**    **The SunCal Debtors' Motion to Strike.** After the SunCal Debtors discovered that

LCPI did not own any interest in the Sold Loans, they filed a motion (the "Motion To Strike") to

strike the POCs filed with respect to these claims (the "Disputed Claims"). (O'Keefe Decl., Ex. B,

P. 11). At the June 30, 2009 hearing on the Motion to Strike, the California Bankruptcy Court

found that the Lehman Entities had transferred *their entire interest* in the Sold Loans to Fenway,

(O'Keefe Decl., Ex. B, P. 14). and that the Lehman Entities had made a "misrepresentation" when

they asserted in the POCs that they, alone, were the creditors who owned the Sold Loans.[3]

(O'Keefe Decl., Ex. B, P. 15).

These rulings were later incorporated into a series of findings (the "Claims Findings)

(O'Keefe Decl., Ex. B) and an order (the "Claims Order"). (O'Keefe Decl., Ex. A, P. 15). These

---

[3] "The Lehman Entities could not properly file the Proofs of Claim as 'creditors.'  When they
listed themselves as the "creditors" on the Proofs of Claims, this was a misrepresentation."  Claims
Finding 2.5 (O'Keefe Decl., Exh. B).

findings are entitled to issue preclusion in this proceeding. Moreover, as LCPI has acknowledged, by filing an appeal with respect to the Claims Finding before the Bankruptcy Appellate Panel for the Ninth Circuit, any effort to attack these findings must be made in the Ninth Circuit through direct appeal. *See Teachers Ins. and Annuity Ass'n of America v. Butler*, 803 F.2d 61, 66 (2nd Cir. 1986) ("Thus, the bankruptcy court should not permit the partnership to relitigate issues already decided by Judge Weinfeld, for to allow the partnership to do so, when it knew of the judgment before it filed for bankruptcy, would result in its slipping arguments through the backdoor that had already been turned away at the frontdoor."); *see also, Celotex Corporation v. Edward*, 514 U.S. 300 (1995).

      **H.**      **Fenway's Inclusion In The Equitable Subordination Action.** In reliance on the Claims Order, the SunCal Debtors filed an amended complaint in the ES Action naming Fenway as a defendant, in recognition of the fact it was the holder of the Sold Loans.

      **I.**      **The Ninth Circuit BAP Reverses The Stay Finding.** On December 15, 2009, a divided two-to-one Ninth Circuit Bankruptcy Appellate Panel issued a ruling regarding LCPI's appeal of the Stay Finding (the "BAP Order").[4] In summary, the BAP reversed the Stay Finding. The BAP ruling had minimal impact on the SunCal Appellants, since at that point they knew that the claims they sought to subordinate were held by non-bankrupt Lehman Entities and Fenway. These entities were clearly not protected by LCPI's stay.

      In March of 2010, the California Bankruptcy Court dismissed LCPI from the ES Action on the basis of the BAP Order. (O'Keefe Decl., Ex. O). This not only eliminated any possible LCPI stay issues, it effectively removed this party from the SunCal Appellants' Chapter 11 cases.

      **J.**      **The Compromise Motion Filed By LCPI and LBHI.** In April of 2010, LCPI and LBHI filed the Compromise Motion. In this motion LCPI and LBHI represented that they were "compromising" various issues and relationships arising out of the repurchase transaction

---

[4] *Lehman Commercial Paper, Inc. v. Palmdale Hills Pro., LLC (In re Palmdale Hills Prop., LLC)*, 423 B.R. 655 (9th Cir. BAP 2009) (hereinafter, "BAP Ruling").

described in the MRA (the "Repo"). Before addressing this compromise, a review of the Repo and its relationship to other sequential transactions related thereto is in order, since the Compromise Motion affects all of the contracts in this chain.

Pursuant to the MRA, all right, title and interest in the Sold Loans was transferred to Fenway Capital.[5] (O'Keefe Decl., Ex. B, ¶ 1.9). Upon receipt of the Sold Loans, Fenway Capital issued a Variable Funding Note (the "VFN Note") to Fenway Funding, LLC ("Fenway Funding"), a related entity. (Comp. Motion, ¶¶ 10-11). The VFN Note was backed by the Sold Loans. In reliance upon the VFN Note, Fenway Funding issued commercial paper notes (the "CP Notes"), which were acquired by LBHI. LBHI then pledged the CP Notes to JP Morgan Chase ("JP Morgan"), its primary lender. *Id.*

There is no evidence in the record that LBHI paid a penny for the CP Notes acquired from Fenway Funding. (See Comp. Motion, ¶¶ 10-11). The only party that appears to have advanced any real money or credit in this chain was JP Morgan. (See Comp. Motion, ¶ 17).[6] Accordingly, JP Morgan is the party who has always held the real "economic interest" in the Sold Loans, since these loans "ultimately" serve as collateral for the repayment of the CP Notes. This conclusion is buttressed by the facts stated in that certain *Motion Pursuant To Section 363 Of The Bankruptcy Code And Bankruptcy Rule 6004 For Approval Of Collateral Disposition Agreement With JPMorgan Chase Bank, N.A., et al.*, which appears as Docket No. 7269 (the JPM Motion") (the "JPM Motion")[7] (See, Second O'Keefe Decl., Ex. B). The JPM Compromise motion describes a transaction pursuant to which LBHI paid JP Morgan over $500 million to obtain various benefits, including the release of the CP Notes. *Id.* Once this occurred, LBHI and LCPI were free to buy the Sold Loans back from Fenway Capital through the transaction described in the Compromise Motion.

---

[5] LCPI was obligated to repurchase the Sold Loans at the conclusion of the repurchase period for a sum in excess of $1.0 billion dollars, payable in "immediately available funds."

[6] (See Comp. Motion, ¶¶ 10-11).

[7] This motion is cited in the Compromise Motion and consequently should be in the record.

The transaction described in the Compromise Motion (the "Claims Transaction") includes the following material terms:

1. LBHI will return the CP Notes to Fenway Funding;

2. Fenway Funding will cancel the CP Notes;

3. Fenway Funding will cancel the VFN Note issued by Fenway Capital that backs the CP Notes;

4. Fenway Capital will transfer title to the Sold Loans to LCPI;

5. The MRA will be terminated; and

6. The guarantee of performance that LBHI issued in favor of Fenway Capital to secure LCPI's repurchase obligation under the MRA (the "Guarantee") will be terminated.

On its face the Claims Transaction leaves LCPI holding the Sold Loans and LBHI with no guarantee obligation and no interest in the Sold Loans.  (Comp. Motion, P. 9-10).[8]  In later pleadings, LBHI and LCPI added a new wrinkle to this transaction. They represented to the Court that Fenway Capital was transferring to LBHI the lien that Fenway Capital held on the Sold Loans under the terms of the MRA. This lien was purportedly being granted to secure LBHI's obligations under the Guarantee. This last minute addition was obviously thrown together to give LBHI the right to argue that its automatic stay would block any effort by the SunCal Appellants to subordinate the Sold Loans, even if LCPI transferred title to the loans formerly owned by Lehman Ali, OVC and Northlake back to these non-debtor entities.

There were two fatal defects in this last minute contrivance. First, per the Compromise Motion, the MRA, which is the instrument that LBHI is purportedly relying upon for its new lien rights, and the Guarantee, are being terminated. To fix this inconvenient and fatal defect, the Lehman Entities rely upon a "notwithstanding" clause in their pleadings that effectively reads "ignore the facts and accept our legal conclusions." Viewed in historical context, the Compromise

---

[8] "Fenway Capital will assign to LCPI all of the Repo Assets ***and the parties will terminate the MRA and the guaranty provided by LBHI with respect thereto***." Comp. Motion. P 9-10 (emphasis added).

Motion was filed to accomplish what LCPI's misrepresentations earlier in the case failed to accomplish – the improper use of the automatic stay as a sword to stay the ES Action and the SunCal Appellants' plan.

      **K.**    **The SunCal Appellants' Relief From Stay Motion.**  In the face of LCPI and LBHI's disclosed intent to buy the Sold Loans and then attempt to offensively use their automatic stays to bar the ES Action[9], the SunCal Appellants filed an opposition (the "Opposition") to the Claims Transaction and a related motion (the "RFS Motion"). In the Opposition, the SunCal Appellants asked this Court to bar the acquisition of the Sold Loans, *to the extent necessary to prevent the Lehman Entities from using the transaction as means of interfering with the SunCal Appellants' Chapter 11 cases through the assertion of the automatic stay*. In the RFS Motion, the SunCal Appellants sought a ruling holding that any stay applicable on account of the Lehman Entities' post-petition acquisition of the Sold Loans did not bar the ES Action, or alternatively an order granting relief from any stay that did arise on account of this transaction.

      At the hearing on the Compromise Motion and the RFS Motion, this Court overruled the Opposition to the Claims Transaction and denied the RFS Motion. (Second O'Keefe Decl., Ex. A). The order approving the Compromise Motion (the Compromise Order") was entered by the Court on May 13, 2010. The order denying the RFS Motion (the "RFS Order") was entered on May 17, 2010.

      **L.**    **The SunCal Appellants Appeal.** The SunCal Appellants filed notices of appeal with respect to both the Compromise Order and the RFS Order with the United States District Court for the Southern District of New York on May 27, 2010.

      **M.**    **Stay Pending Appeal.** The SunCal Appellants seek a stay of the Compromise Order and the RFS Order pending the conclusion of the appeals. Alternatively, the SunCal

---

[9] "If the CP Notes had not been pledged to JPM such that JPM's consent was required to return the pledged CP Notes to Fenway Funding as part of a repurchase of the SunCal Loans, LCPI could have repurchased the SunCal Loans from Fenway Capital long ago and likely avoided much of the Fenway-related litigation in the SunCal Cases.", Comp. Motion, ¶ 17.

Appellants seek a stay of thirty days in order to enable the District Court to receive and rule upon a stay pending appeal.

### III

### ANALYSIS OF FACTORS BEARING ON ISSUANCE
### OF A STAY OF COMPROMISE ORDER

The courts weigh the following four criteria when assessing the merits of a motion for stay pending appeal: (1) Whether there is a substantial possibility of success on appeal, (2) the risk of irreparable injury to movants absent a stay, (3) the lack of substantial harm to the appellee if a stay is granted, and (4) the public interests that may be affected. *In re Suprema Specialties, Inc.,* 330 B.R. 93 (S.D.N.Y. 2005) (granting stay of pending appeal). These factors are not necessarily accorded equal weight. *In re Great Barrington Fair and Amusement, Inc.* , 53 B.R. 237 (Bankr. D. Mass. 1985). Instead the factors are considered "in light of the importance of the right of appeal and preservation of the *status quo* during the appeal," *In re Howley,* 38 B.R. 314 (Bankr. Minn. 1984), and protecting "the rights of all parties in interest," *In re Neisner Bros., Inc.,* 10 B.R. 299 (Bankr. SD.N.Y. 1981) (granting a stay pending appeal where "payment of monies ... might, albeit improbably, cause harm").

A)    **Substantial Possibility of Success On Appeal.** The Compromise Order suffers from a number of fatal infirmities that justify reversal and thus the imposition of a stay, including the following:

1.    The Compromise Motion Was The Result of A Collusive Effort To Achieve An Improper Purpose. The Claims Transaction described in the Compromise Motion was designed to achieve an objective that is barred by a well established body of law in the Second Circuit: The use of the automatic stay as sword to obtain an unfair litigation objective. *See Bohack Corp. v. Borden, Inc.*, 599 F.2d 1160, 1168 (2nd Cir. 1979) ("[We] must be cautious to avoid a decision which could convert [the automatic stay] from a shield into a weapon."); *In re Jandous Elec. Const. Corp.,* 106 B.R. 48, 50 (Bankr.S.D.N.Y.1989) ("The purpose of the stay is the protection of

the debtor, *but when the debtor is in the position of the assailant*, rather than the defendant, it would be inequitable to invoke the stay against the defendant's counterclaim, or to permit the debtor to use the stay as a basis for extending the time to remove the state court action to the bankruptcy court.") (emphasis added); *In re Saxon Indus., Inc.*, 43 B.R. 64, 67 (Bankr. S.D.N.Y. 1984) ("In light of the litigation initiated by Saxon, it would clearly be inequitable to allow Saxon to use § 362 to prevent Fox from pressing counterclaims."); *In re Wedtech Corp.*, 87 B.R. 279, 289 (Bankr. S.D.N.Y. 1988) ("Here, were the stay not to be lifted in the adversary proceeding for all purposes, [counter-claimant] would never be able to fix its claim, a result which is highly inequitable in light of [debtor's] suit against [counter-claimant].")

The automatic stay was intended to serve as a shield, not as a litigation sword, or worse, a collection mechanism. The evidence in this case (including the frank admissions of the Lehman Entities) establishes that the Compromise Motion and the Claims Transaction described therein were designed to drag assets acquired post-petition within the stay's umbrella. This design was implemented to achieve the following improper purposes:

   a. *To Obtain An Unfair Litigation Leverage In The ES Action*. The Lehman Entities wanted to bar the continued pursuit of the ES Action and through this interference to achieve unjustified settlement leverage[10]; and

   b. *To Obtain An Unfair Advantage In The Plan Contest*. The Lehman Entities and the SunCal Appellants are in the midst of a plan confirmation contest pursuant

---

[10] Compromise Motion, ¶ 17 ("If the CP Notes had not been pledged to JPM such that JPM's consent was required to return the pledged CP Notes to Fenway Funding as part of a repurchase of the SunCal Loans, LCPI could have repurchased the SunCal Loans from Fenway Capital long ago *and likely avoided much of the Fenway-related litigation in the SunCal Cases*."); Lehman Response to opposition to compromise Motion ("Lehman Response"), ¶ 17 ("Instead, they argue that, to the extent LCPI intends to "invoke its automatic stay to block pending litigation . . . relief should be denied." Opposition at 5.15 *But this argument ignores a key fact – LCPI's automatic stay will attach to the property it receives as part of the Transaction as a matter of law, regardless of LCPI's intent*.") These statements confirm that the objective of the transaction is to stay the action and reorganization effort that is ongoing in California

to which both parties have filed competing plans of reorganization.[11] The Claims

Transaction was filed to bar the SunCal Appellants' from moving forward with their plan

of reorganization, since this plan includes a provision subordinating the Disputed Claims.

        c. *To Collect On The Disputed Claims.* The Lehman Entities are purchasing

the Disputed Claims *as a post-petition for-profit investment.*[12] The Compromise

Transaction was designed to convey upon the Lehman Entities litigation leverage that

would advance their collection efforts.

The Compromise Order effectively authorizes a bad faith transaction designed to achieve

improper purposes, through improper means. This ruling was in error. *See generally*, *In re*

*Poindexter*, 2004 WL 3019347 (Bankr.M.D.N.C. 2004) ("The requirement of good faith is

intended to prevent abuse of the bankruptcy process by debtors who invoke bankruptcy to achieve

an improper purpose or to take unfair advantage of their creditors."); *In re HBA East, Inc.*, 87 B.R.

248, 260 (Bankr.E.D.N.Y.1988) ("As a general rule where, as here, the timing of the filing of a

Chapter 11 petition is such that there can be no doubt that the primary, if not sole, purpose of the

filing was a litigation tactic, the petition may be dismissed as not being filed in good faith."); *In re*

*Adell*, 325 B.R. 883 (Bankr.M.D.Fla.2005) ("Thus, if the court finds that the Plan purposed by the

debtor was filed to achieve an improper purpose and it was an abuse and a misuse of the protective

provisions of the Chapter, the debtor's Plan cannot be confirmed.").

        2.    <u>The Court Failed To Apply The Proper Standard When Reviewing The</u>

<u>Compromise Motion</u>. A court can endorse a settlement only if "the compromise is fair, reasonable

and adequate." *Weinberger v. Kendrick,* 698 F.2d 61, 73 (2d Cir.1982), *cert. denied,* 464 U.S. 818,

---

[11] See, Exhibits N and Z to O'Keefe Decl.

[12] Second O'Keefe Decl., Ex. B, "After such application, the remaining Collateral will consist of assets that are largely illiquid in the current economic environment or whose disposition at this time would result in substantially diminished returns. Such assets would benefit from long-term, active and effective management. The Debtors believe that the Agreement will provide the Debtors with a means of administering such remaining illiquid Collateral in the manner most conducive to enhancing recoveries.")

104 S.Ct. 77, 78 L.Ed.2d 89 (1983). When a collusive settlement, such as the Claims Transaction,

damages the rights of third parties, by design, the court cannot, as here, simply brush aside this

impact. *See In re Masters Mates & Pilots Pension Plan and IRAP Litigation*, 957 F.2d 1020, 1025

(2d Cir. 1992) ("Moreover, if third parties complain to a judge that a "decree will be inequitable

because it will harm them unjustly, he cannot just brush their complaints aside." *Donovan,* 752

F.2d at 1176"). The rights of third parties are a material factor in the approval process. *See In re*

*Masters Mates & Pilots Pension Plan and IRAP Litigation*, 957 F.2d 1020, 1025 (2d Cir. 1992)

("In other words, where the rights of one who is not a party to a settlement are at stake, the fairness

of the settlement to the settling parties is not enough to earn the judicial stamp of approval."); *see*

*also Donovan v. Robbins,* 752 F.2d 1170, 1176 (7th Cir.1985) ("Even if no third party complains,

the judge has to consider whether the decree he is being asked to sign is lawful and reasonable as

every judicial act must be."). Here the Court did not follow this standard, but instead looked solely

to what was alleged to be in the best interests of the Lehman Entities. This failure was reversible

error.

       3.      <u>The Compromise Motion and The Compromise Order Violated The SunCal</u>

<u>Appellants' Automatic Stay</u>. LCPI and LBHI have admitted in prior pleadings that they are

acquiring the Disputed Claims from Fenway, post-petition, in order to capitalize on what they

perceive to be the long term profit potential in these assets. (Second O'Keefe Decl., Ex. B).[13] Since

the Disputed Claims constitute *prepetition* claims against the SunCal Appellants, any party

acquiring the same is subject to the automatic stay applicable in the SunCal Appellants Chapter 11

cases. 11 U.S.C. § 362(a). Section 11 U.S.C. § 362(a)(1) bars "the issuance or employment of a

judicial administrative, or other action or proceeding against the debtor that was or could have

been commenced" against the SunCal Appellants prepetition. Section 362(a)(3) bars any act "to

---

[13] The SunCal Appellants quite frankly do not understand why a defunct New York investment
house, in the midst of it own liquidation, would invest hundreds of millions of estate dollars, post-
petition, in residential development loans that have been in default for almost two years.
Apparently the professional liquidators in New York City know more about California real estate
than the SunCal Appellants, who have been in the business of developing land in California for
half a century.

exercise control over property of" the SunCal Appellants' estates. Finally, Section 362(a)(4) and

(a)(6) bar any act to "enforce any lien against the property of the estate" or "any act to collect,

assess or recover a claim against" the SunCal Appellants' prepetition.

A review of the Compromise Motion and the statements made by LCPI and LBHI in the

pleadings filed in support thereof lead to only one conclusion: The Claims Transaction is clearly an

"act to recover" the Disputed Claims against the SunCal Appellants, and the Compromise Order is

the "employment of … any action or proceeding against the debtor" that "could have been

commenced" by the holders of the Disputed Claims prepetition. 11 U.S.C. § 362(a)(1). These stay

violations were undertaken to aid LCPI and LBHI in the collection of their newly acquired assets.

The evidence in support of these conclusions is the following:

> a.    The Lehman Entities did not own the Disputed Claims prior to the
> Claims Transaction (O'Keefe Decl., Ex. B);

> b.    The Lehman Entities have admitted that they are acquiring the
> Disputed Claims to realize the long term profit potential in these assets (Second O'Keefe
> Decl., Ex. B);

> c.    The Lehman Entities knew the Disputed Claims were in the process
> of being subordinated through the SunCal Appellants Plan and the ES Action when they
> made the decision to acquire these claims (O'Keefe Decl., Ex. Y);

> d.    The Lehman Entities designed the Claims Transaction to stay the
> Plan and the ES Action, and they knew that this action was the first and most important
> step in enforcing the Disputed Claims. [14]

> e.    The Lehman Entities could have used any one of a number of non-
> debtor Lehman Entities to acquire the Disputed Claims, since these assets were being

---

[14] Compromise Motion, ¶ 17; Lehman Response, ¶ 17 ("Instead, they argue that, to the extent
LCPI intends to "invoke its automatic stay to block pending litigation . . . relief should be denied."
Opposition at 5. 15 *But this argument ignores a key fact – LCPI's automatic stay will attach to the
property it receives as part of the Transaction as a matter of law, regardless of LCPI's intent.*")

acquired in a entirely new transaction outside the parameters of the MRA. However, they selected LCPI as the buyer, in order to create the best enforcement mechanism possible – the automatic stay in LCPI's case;

f.      In order to insure that they had a back-up enforcement mechanism, the Lehman Entities worked LBHI into the Claims Transaction—even after the Compromise Motion was originally filed—through the purported transfer to this entity of a non-existent lien. (Lehman Response, ¶ 24). The purpose of this ruse was to bring a second enforcement mechanism into play – LBHI's automatic stay; and

g.      Since the Lehman Entities' purchase of the Disputed Claims is by their own admission a post-petition investment, (Second O'Keefe Decl., Ex. B), the obvious underlying objective of the foregoing design was to facilitate the collection of the Disputed Claims.

In sum, the Claims Transaction was designed to drag the disputed the Disputed Claims within the reach of LCPI and LBHI's stay, in order to "enjoin" the SunCal Appellants' reorganization effort, and to thereby facilitate the enforcement and collection of the Disputed Claims. This action violated the SunCal Appellants' stay.

Even if the Claims Transaction had some independent economic merit, which is questionable[15], this would not change the fact that a part of the Claims Transaction was designed to

---

[15] The Lehman Entities attempt characterize their actions as merely bringing former "debtor" assets into the estate for liquidation, is contrary to the facts and the frank admissions in their own pleadings. Consider the evidence: a) *The "Economic Interest Argument."* LBHI has vociferously contended that it held, at all times, the "economic interest" in the Disputed Claims. The evidence is the to the contrary. The repurchase obligation in the MRA, to the extent it survives at all, was $500 million out of the money. Accordingly, this obligation was never an "economic interest," it was a massive liability. One hundred percent of the "economic interest" in the Disputed Claims was held by JP Morgan, the bank that the Lehman Entities flim-flammed through the Repo; b) *The Lehman Entities We Are Simply Limiting Their Indemnity Exposure To Fenway Argument.* Any indemnity rights held by Fenway constitute unsecured claims against the Lehman Entities. Instead of leaving these claims in this category, the Claims Transaction grants these claims administrative status. Converting an unsecured indemnity obligation into an administrative expense only makes economic sense if sufficient "profit" is deemed to exist in the Disputed Claims being acquired from Fenway; and c) *The Purported Elimination of Litigation Over The Status of the Repo*

use the automatic stay as a sword to interfere with the SunCal Appellants case in a clear violation of the automatic stay in the SunCal Appellants' cases. *See In re Greene*, 50 B.R. 785, 787 (S.D.N.Y. 1985) ("The automatic stay proscribes the commencement or continuance of actions, including the issuance of process, to recover prepetition claims against debtors.); *AP Indus., Inc. v. SN Phelps & Co. (In re AP Indus., Inc.),* 117 B.R. 789, 798 (Bankr.S.D.N.Y.1990); *see also, National Tax Credit Partners, L.P. v. Havlik,* 20 F.3d 705, 707-708 (7th Cir. 1994) (Issuance of injunction by district court that interferes with property of the estate violates the automatic stay); *see also Matter of McKanders,* 42 B.R. 108, 109 (Bankr.N.D.Ga.1984) ("The automatic stay which is issued when initiating a new case may not be used to abuse or thwart prior proper orders of the court in a prior case."). **This part of the Claims Transaction, and the Compromise Order approving the same are void.** *Eastern Refractories Co., Inc. v. Forty Eight Insulations Inc.,* 157 F.3d 169, 172 (2d Cir.1998) (automatic stay is effective immediately upon filing of bankruptcy petition, and any subsequent proceedings against debtor or debtor entities are void); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 527 (2d Cir.1994) (automatic stay is effective upon the filing of the petition and any proceedings described in section 362(a)(1) are void and without vitality if they occur thereafter); *In re Colonial Realty Co.,* 980 F.2d 125, 137 (2d Cir.1992)("stay imposed by § 362(a) is automatically applicable to all entities without any need for intervention of any court or ruling"); *In re Govola,* 306 B.R. 733, 736 (Bankr.D.Conn.2004) ("[i]n the Second Circuit, court and other actions which violate the automatic stay are void and without effect"); *In re Marine Pollution Service, Inc.,* 99 B.R. 210, 217 (Bankr.S.D.N.Y.1989) (action in violation of automatic stay is void even when there is no actual notice of existence of stay).

---

*Argument*. The litigation over the status of the Repo *has already occurred*. The findings made by California Bankruptcy Court are final. These findings can only be attacked, and in fact are being attacked, through direct appeal. This litigation will continue. The Claims Transaction merely imposes the burden of paying for this appeal on the Lehman Entities, giving Fenway a free ride. In summary, the purported "benefits" and "collateral objectives" cited by the Lehman Entities in support of the Claims Transaction are illusory. The objective of the Claims Transaction was designed to enable the Lehman Entities to acquire the Disputed Claims and to use their automatic stays as the means of enforcing the collection of the same.

**B)**     **The Risk Of Irreparable Injury To Movants Absent A Stay**. If this motion is denied and the Claims Transaction closes, the ES Action could be stayed; the SunCal Appellants' Chapter 11 cases will be stayed; the Lehman Entities will obtain an unfair advantage in the ongoing plan confirmation fight; thousands of acres of land will be frozen in a state of stasis; the rights of hundreds of creditors who are looking to the SunCal Appellants case for payments will be materially and possibly irreparably harmed; and the SunCal Appellants' estates will suffer hundreds of thousands of dollars in additional cost and expense while they await a ruling by the Ninth Circuit, or future decision by this Court to reconsider its denial of the automatic stay. Individually and collectively, these facts establish a showing of irreparable injury.

**C)**     **No Harm Will Result To The Lehman Entities If The Motion Is Granted**. In contrast to these facts, no harm will be suffered by the Lehman Entities if a stay is granted. The Lehman Entities can simply transfer the loans previously owned by Lehman Ali, Northlake and OVC, all non-debtors, directly to these entities, *instead of walking these assets through LCPI to achieve a litigation advantage in the form of the automatic stay*. As for the remaining three loans that were purportedly owned by LCPI prior to Repo, these loans also can also be transferred to Lehman Ali, LCPI's parent. This will have the same economic affect. [16]

**D)**     **The Public Interest Factor Support Granting The Motion**. As more fully explained above, the automatic stay cannot be employed as a sword. Yet this is exactly how it is being used in the Claims Transaction. Granting the Motion will only stay this bad faith aspect of the transaction. The public interest also favors allowing the SunCal Appellants to proceed with their reorganization effort. This will allow this landowner to manage and mitigate the problems that their projects are causing to the surrounding communities. Finally, the public interest supports

---

[16] Insofar as LBHI's claim that it is obtaining a lien against the Sold Loans as part of the Claims Transaction is concerned, a contention that is directly contrary to the facts, this is unnecessary. Since LBHI presumably owns Lehman Ali and will receive any benefit obtained from the Sold Loans in any event, it has no need to protect itself from an entity that it controls. Alternatively, the Lehman Entities should simply stipulate to relief from stay thereby eliminating the negative impact upon the SunCal Appellants.

allowing the bankruptcy system to operate as intended, with each bankruptcy estate having the

right to proceed with its own case, and to address the claims filed against the same, without

interference by other debtors.

## IV

## ANALYSIS OF FACTORS BEARING ON THE

## ISSUANCE OF STAY OF THE RFS ORDER

**A)**    **Possibility of Success On Appeal.** The RFS Order suffers from a number of fatal

infirmities that justify reversal and thus the imposition of a stay, including the following:

1.    The Court Did Not Use Or Correctly Apply The Applicable Legal Standard.

In denying the RFS Motion, the Court stated that it was relying upon the "balance of the harms"

factor cited by the Second Circuit *In re Sonnax Industries, Inc.*, 907 F.2d 1280 (2nd Cir. 1990).[17]

However, a review of the record confirms that the Court did not, in fact, use or apply this criteria

in its decision. The following section of the transcript makes this crystal clear:

> Ultimately, the question of whether or not I should grant relief from the automatic
> stay is driven by my application of the Sonnax factors. And both parties appear to
> be focused most heavily on the balance of harms factor. That's convenient
> because I prefer to focus on that one myself. One of the reasons I have a difficult
> time finding that there is any material harm to the SunCal debtors in not granting
> their motion for stay relief is that they did not bring it until now. The SunCal
> debtors have scrupulously avoided coming into this court from November of 2008
> until today. And have managed to deal with their litigation requests in the
> bankruptcy court and beyond apparently without material impairment in those
> efforts. In effect, they've elected their remedy. They have chosen to proceed with
> litigation in their home court. And when they suffered a reversal at the BAP level
> at the end of last year then had to review their strategy again. Having gone to the
> Ninth Circuit, I believe the Ninth circuit is the place for this question to be
> decided. And I'm going to defer my decision with respect to stay relief until after
> the Ninth Circuit has acted.

(O'Keefe Decl., Ex. A, Transcript P. 73). In essence the Court ruled that since the SunCal

Appellants ostensibly had chosen to determine the applicability of the LCPI's automatic stay in the

---

[17] This factor requires the court to weigh the facts to determine the relative *harm* that each party
will suffer if the stay remains in place, or is lifted.

Ninth Circuit, they should be forced to await a ruling in that Circuit, before they had a right to a ruling in this Court. This analysis neither uses nor applies the correct standard – the relative harm to the parties of maintaining or lifting the stay.  It was simply a punitive measure.  This is clear error.

Moreover, the Court's analysis was premised upon a misunderstanding of the relevant facts. The SunCal Appellants did not seek relief regarding the scope and reach of LCPI's stay in the Ninth Circuit in the first instance. *LCPI sought this relief* by filing a motion for relief from stay in the California Bankruptcy Court and insisting therein that the California Bankruptcy Court rule upon the scope of its stay. Faced with this demand for a ruling, the California Bankruptcy Court granted LCPI's wish, and held that in a claimant's automatic stay did not bar an effort by second Chapter 11 debtor to subordinate a claim filed by such claimant in the second debtor's chapter 11 case.

Having received what it demanded—a ruling on its automatic, albeit not one to its liking— *LCPI then appealed this order to the Bankruptcy Appellate Panel for Ninth Circuit Court of Appeals*. When the BAP reversed the California Bankruptcy Court's ruling, the SunCal Appellants appealed this ruling to the Ninth Circuit, which was their right. In sum, LCPI, not the SunCal Appellants set the proverbial "venue table."  Accordingly, the implicit rebuke to the SunCal Appellants in the Court's ruling is unjustified.[18]

2.    <u>Relief From Stay Was Justified Under The Balance of The Harms</u>.  The evidence relevant to the balance of the harms *Sonnax* factor established that the SunCal Appellants

---

[18] The Court's suggestion that the SunCal Appellants came to this Court for relief due to adverse ruling from the Bankruptcy Appellant Panel on the issue of LCPI's stay is also not accurate. The BAP ruling was largely academic. At the time that it was entered, it had already been established by a judicial ruling that the LCPI did not own any interest in the loans being subordinated. Accordingly, LCPI' stay did not affect the ES Action.  The SunCal Appellants sought relief in this Court because LCPI was attempting to buy back the loans through the Compromise Motion and thereafter to assert the automatic stay based upon this newly acquired post-petition ownership. But for this motion, LCPI and LBHI's stays would be irrelevant, since neither party was a defendant in the ES Action, and the relief sought in this action would not have been against their property.

would suffer the following harms if the Compromise Motion was granted and the RFS Motion denied:

        a.      A failure to modify to the stay would allow LCPI and LBHI to buy into the ES Action and Plan confirmation and to use their automatic stays to delay the same (Lehman Response, ¶ 17);

        b.      A failure to modify the stay would stay seventeen in-process reorganization efforts (O'Keefe Decl., Ex. Z);

        c.      A failure to modify the stay would stay a litigation matter that is central to the SunCal Appellants' reorganization efforts (O'Keefe Decl., Ex. Y & Z);

        d.      A failure to modify the stay would allow the Lehman Entities to obtain an unfair advantage in the plan confirmation dispute, since the Lehman Entities' plan could proceed, but the SunCal Appellants could not (O'Keefe Decl., Ex. X & Z);

        e.      A failure to modify the stay would hold thousand of acres of real property under development in California in stasis resulting in the hundreds of thousands, if not millions of dollars in additional costs;

        f.      A failure to modify the stay would allow a the Lehman Entities to buy a series of disputed claims in search of a profit, and then use its automatic stay to leverage the collection of  these claims (Lehman Response, ¶ 23-24); (Second O'Keefe Decl., Ex. B); and

        g.      A failure to modify the stay would impair the rights of the hundreds of creditors holding, collectively, over $100 million in claims against the SunCal Appellants.

In contrast to these harms, the evidence established that the Lehman Entities would suffer little if any harm if relief were granted:

        a.      The Lehman Entities participated in the ES Action for over a year without complaining about the purported "harm" associated with this participation, and in

fact they affirmatively advised the California Bankruptcy Court that their stay was not an issue;

   b. The Lehman Entities' cases are liquidations and the professional liquidators managing this process will not be inconvenienced by the lawsuit;

   c. The Lehman Entities are represented by the two largest Chapter 11 firms in the world, Weil Gotshal & Manges, LLP and Pachulski, Stang, Ziehl, Jones & Weintraub, LLP. Accordingly, they have more than sufficient resources to defend the ES Action, particularly since the attorneys involved in this ES Action have no involvement in the Lehman Entities' Chapter 11 work;

   d. LCPI is voluntarily re-joining the ES Action after being dismissed out sixty days ago. Accordingly, it comes to this action as willing participant seeking a profit;

   e. LBHI never had any interest in the property at issue in the ES Action. It also comes to this dispute as party seeking to enforce a claim for profit;

   f. There is no evidence whatsoever that either the ES Action or the SunCal Appellants plan will have any affect, adverse or otherwise, on the Lehman Entities' ongoing liquidation effort; and

   g. The California Bankruptcy Court has exclusive jurisdiction over the property subject to any liens asserted by the Lehman Entities and any distributions payable from the proceeds of these assets. Accordingly, the Lehman Entities actually benefit from expeditious resolution of the litigation in California.

When the balance of the harms required under the *Sonnax* case is applied to these facts, relief from stay was justified. This Court's ruling to the contrary was clear error.

   3. <u>The Court Ruling That The Stay Applied To The ES Action Was In Error</u>. The Lehman Entities failed to include in the written RFS Order a critical ruling made by the Court that is the subject of the SunCal Appellants appeal; The Court held that the Lehman Entities'

automatic stay would apply to the ES Action after the Claims Transaction closed.[19] This ruling was based upon the unpublished opinion *In re Enron*, 2003 WL 23965467 (Bankr, S.D.N.Y.  Jan. 13, 2003) (the "Enron Case"). The Appellants would respectfully submit that this position is error.

The Court in the Enron Case ruled that an action to subordinate a claim under 11 U.S.C. § 510(c) is not "defensive" and hence violates the automatic stay. This ruling was premised upon the contention that an action under Section 510(c) seeks to subordinate a claim, not to disallow it. According to the Enron Case, had the plaintiff in that case sought to completely disallow Enron's claim, through a claims objection, instead of merely seeking the less draconian remedy of subordination, this would not have violated the stay.  In essence, the Enron Court considered the form of the action and the theory of the action more relevant in the offensive/defensive characterization than *the actual impact* the relief sought would have on the debtor's estate. The SunCal Appellants would respectfully submit this analysis is unsound.

The determination of whether or not the stay applies to an action against a claim filed by a debtor, under the defensive/offensive dichotomy, must focus on *the impact* that the relief sought will have upon the estate, not the means through which this result is effectuated, or the legal theory employed. If an "action" (however designated) that seeks the complete disallowance of a claim, is deemed "defensive" and hence not violative of the stay, an action under a different name that seeks to merely subordinate the same claim is logically even more "defensive." This is particularly true given the context of the analysis: The purpose of the stay is *to preserve* the estate assets. An analytical framework that designates an action that merely subordinates a claim, and hence leaves recovery for potential for the estate, "offensive", while designating an action that eliminates any recovery for the estate—disallowance—defensive, ignores the purpose of the automatic stay.

---

[19] Mr. O'Keefe: So the Court--is the Court finding that the stay applies and the motion is denied?

The Court: The stay applies and the motion is denied. …And let me be really clear, the law in the Southern District of New York as stated by Judge Gonzalez in the *Enron* case, and I chose to follow his reasoning, is that litigation brought by a party against a debtor seeking to equitably subordinate claims of that debtor constitutes a violation of the automatic stay. To the extent that there are debtors or debtor property implicated by your litigation I am saying the stay applies.

-24-

The rulings in *In re Metiom, Inc.,* 301 B.R. 634, 638-639 (Bankr.S.D.N.Y. 2003); *In re Financial News Network, Inc.*, 158 B.R. 570 (S.D.N.Y.1993) and *In re Meade*, 1999 WL 33496001, n. 1 (E.D.Pa. 1999) (concluding that an objection to a lender's secured mortgage claim would not violate the lender's automatic stay) offer a more reasoned analysis of the issue than the Enron Case. *Instead of employing the logically unsustainable metric used in the Enron Case, the above cases allow relief up to the amount of the claim filed by the claimant.* The form or designation of the relief is not the dispositive: The key determinant in these cases is whether the relief sought *seeks relief against the party outside the claim filed*. As long as the relief prayed for only acts against the claim itself, it is inherently defensive and not subject to the stay.  Here, the relief in the ES Action merely acts against the claim itself and hence does not violate the stay. Respectfully, this Court's ruling to the contrary is error.

   B)  __The Risk Of Irreparable Injury To Movants Absent A Stay__. The irreparable injury analysis set forth above with respect to the denial of a stay relating to the Compromise Motion applies equally to the RFS Order.

   C)  __No Harm Will Result To The Lehman Entities If The Motion Is Granted__. As explained above in the corresponding section relating to the Compromise Order, the Lehman Entities will not suffer any material harm if this motion is granted.

   D)  __The Public Interest Factor Support Granting The Motion__. The same public interest arguments set forth above in support of the stay of the Compromise Order apply in the case of the RFS Order.

# V

## **CONCLUSION**

For the reasons prayed the SunCal Appellants would respectfully pray that the Court grant the relief prayed for herein.

Dated: May 27, 2010                     Respectfully submitted,

     /s/  Sean A O'Keefe
Sean A O'Keefe
Paul J. Couchot
WINTHROP COUCHOT, P.C.
660 Newport Center Drive, Fourth Floor
Newport Beach, CA 92660
Telephone: (949) 720-4100
Facsimile: (949) 720-4111

     /s/  Louis R. Miller
Louis R. Miller
MILLER BARONDESS, LLP
1999 Avenue of the Stars, Suite 1000
LOS ANGELES, CA 90067
Telephone: (310) 552-4400
Facsimile: (310) 552-8400

*Attorneys for the SunCal Appellants*