**WINTHROP COUCHOT**
**PROFESSIONAL CORPORATION**
660 Newport Center Drive, Fourth Floor
Newport Beach, CA 92660
Telephone: (949) 720-4100
Facsimile: (949) 720-4111
Sean A. O'Keefe – NY Bar No. 1980853, CA Bar No. 122417
Paul J. Couchot – CA Bar No. 131934
Counsel for the SunCal Voluntary Debtors

**MILLER BARONDESS, LLP**
1999 Avenue of the Stars, Suite 1000
Los Angeles, CA 90067
Telephone: (310) 552-4400
Facsimile: (310) 552-8400
Louis R. Miller – CA Bar No. 54141
Martin H. Pritikin -- CA Bar No. 210845
Special Litigation Counsel for SunCal Debtors

## UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>**LEHMAN BROTHERS HOLDINGS INC, et al.,**<br><br>                 **Debtors.** | **Chapter 11**<br>**Case No. 08-13555 (JMP)**<br>**Jointly Administered** |

**DECLARATION OF SEAN A. O'KEEFE IN SUPPORT
OF SUNCAL APPELLANTS' MOTION FOR STAY PENDING
APPEAL PURSUANT TO FED. R. BANKR. P. 8005 RE ORDER
APPROVING DEBTORS' MOTION PURSUANT TO BANKRUPTCY
RULE 9019 FOR AUTHORITY TO COMPROMISE CONTROVERSY
IN CONNECTION WITH A REPURCHASE TRANSACTION WITH
FENWAY CAPITAL, LLC AND A COMMERCIAL PAPER PROGRAM
WITH FENWAY FUNDING, LLC *AND* ORDER DENYING MOTION
OF THE SUNCAL DEBTORS FOR AN ORDER DETERMINING THAT
THE AUTOMATIC STAY DOESNOT APPLY; OR, IN THE ALTERNATIVE,
GRANTING RELIEF FROM STAY AND NOTICE OF APPEAL**

## DECLARATION OF SEAN A. O'KEEFE

I, Sean A. O'Keefe, declare and state as follows:

1.      I am over the age of eighteen years. The facts stated within this declaration are within my personal knowledge, except where otherwise noted, and if called upon to testify to the same I could and would testify competently thereto.

2.      Attached hereto as Exhibit A is a true and correct copy of the transcript of the hearings held before this Court on that certain *Motion Pursuant To Bankruptcy Rule 9019 For Authority To Compromise Controversy In Connection With A Repurchase Transaction With Fenway Capital, LLC And A Commercial Paper Program With Fenway Funding, LLC* (the "Compromise Motion") and that certain *Motion Of The SunCal Debtors For An Order Determining That The Automatic Stay Does Not Apply; Or, In The Alternative, Granting Relief From Stay* (the "RFS Motion").

3.      Attached hereto as Exhibit B are true and correct copy of that certain *Motion Pursuant To Section 363 Of The Bankruptcy Code And Bankruptcy Rule 6004 For Approval Of Collateral Disposition Agreement With JPMorgan Chase Bank, N.A., et al.*, which appears as Docket No. 7269 (the JPM Motion").

4.      Attached hereto as Exhibit C is a true and correct copy of that certain *Notice Of Appeal Of Order Approving Debtors' Motion Pursuant To Bankruptcy Rule 9019 For Authority To Compromise Controversy In Connection With A Repurchase Transaction With Fenway Capital, LLC And A Commercial Paper Program With Fenway Funding, LLC* filed on May 27, 2010.

5.      Attached hereto as Exhibit D is a true and correct copy of that certain *Notice Of Appeal Of Order Denying Motion Of The Suncal Debtors For An Order Determining That The*

///

///

///

Doc.#146495

*Automatic Stay Doesnot Apply; Or, In The Alternative, Granting Relief From Stay* filed on

May 27, 2010.

I declare that the foregoing is true and correct under the penalty of perjury.

Executed this 27th day of May, 2010, in Orange County, California.

/s/ Sean A. O'Keefe

_____

Sean A. O'Keefe

Doc.#146495

**EXHIBIT A**

000004

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS HOLDINGS INC., et al.

          Debtors.

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS INC.

          Debtor.

- - - - - - - - - - - - - - - - - - - -x

          United States Bankruptcy Court

          One Bowling Green

          New York, New York


          May 12, 2010

          10:07 AM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

17

1   and we overcome the hurdles.  The mediators are working hard.

2   The creditors committee and we are getting along well.  And I

3   see no gross inefficiencies whatever.  I think that maybe over

4   the next six months I can report more fully but there's no

5   complaints out of any court from anyone.

6         THE COURT:  Good.  I appreciate that.  Is there anyone

7   else who wishes to be heard on this subject?  Fine.

8         MR. GRUENBERGER:  Thank you.

9         THE COURT:  Let's move on to the next part.  And, Mr.

10  Gruenberger, if you wish to be excused, you may be; if you wish

11  to stay, you're welcome to stay.

12        MR. GRUENBERGER:  Thank you, Your Honor.

13        MR. PEREZ:  Good morning, Your Honor.  Alfredo Perez

14  on behalf of the debtors.  And I'm here on the debtors' motion

15  for authority to compromise with Fenway, docket number 7831.

16  May I proceed?

17        THE COURT:  Sure.

18        MR. PEREZ:  Your Honor, this is a 9019 motion in which

19  LCPI and LBHI seek -- on the one hand, seek to compromise and,

20  basically, do away with the Fenway structure.  And it involves

21  a settlement with Fenway, Fenway Funding -- Fenway Capital and

22  Fenway Funding, Hudson Castle and the trustee or the

23  administrator which is Deutsche Bank.

24        Your Honor, we have received one objection to it from

25  the SunCal debtors.  Both the unsecured creditors' committee

18

1    has filed statements in support as has Fenway.

2         Your Honor, last night, we received and was filed on

3    the record a withdrawal of the objection on behalf of the

4    SunCal involuntary debtors.  I don't know if the Court's aware

5    of that.

6         THE COURT:  I'm aware of it but I'm not sure if it was

7    a withdrawal on behalf of the SunCal voluntary debtors or the

8    trustee.

9         MR. PEREZ:  The trustee, Your Honor.  It's the -

10        THE COURT:  It was from Lobel.

11        MR. PEREZ:  From Mr. Lobel.  It's on behalf of the

12   trustee.

13        THE COURT:  I didn't understand it because it was a

14   withdrawal without prejudice.  I don't know what that means.

15        MR. PEREZ:  Well, Your Honor, I think what that means

16   is that the debtors and the trustee are in the process of

17   documenting a settlement that would resolve all the disputes

18   between the Lehman debtors and the trustee.  And the key fact

19   about that, Your Honor, is that the property which the trustee

20   controls is about seventy-five percent of the value of the

21   SunCal debtors.  So we're talking about we're on the verge of

22   finalizing and documenting a settlement with the party that has

23   the vast majority of the SunCal assets.

24        THE COURT:  All right.

25        MR. PEREZ:  So -- and not --

19

```
 1            THE COURT:  Let me just ask if the trustee is
 2   represented in court today or on the telephone.
 3        (Pause)
 4            THE COURT:  Apparently, yes.
 5            MR. O'KEEFE:  Actually, Your Honor, I represent the
 6   voluntary SunCal debtors.
 7            THE COURT:  You represent --
 8            MR. O'KEEFE:  The voluntary SunCal debtors not the
 9   involuntary debtors, although I could speak to the issue from a
10   knowledge perspective but not on behalf of the trustee.
11            THE COURT:  All right.  So there's no one here acting
12   as local counsel for Mr. Lobel and Mr. Lobel is not on the
13   phone?
14            MR. O'KEEFE:  Not to my knowledge, Your Honor.
15            THE COURT:  Okay.  Why don't you proceed?
16            MR. PEREZ:  Thank you, Your Honor.  So, Your Honor, I
17   think this is a key development not only as it relates to this
18   motion but, absolutely, as it relates to the motion of lift
19   stay because they've also withdrawn their request on the motion
20   to lift stay.
21            So, Your Honor, what we have is a situation where --
22   and Fenway has obviously been the subject of a lot of scrutiny
23   recently.  But it's a structure whereby LCPI repo'd certain
24   assets to Fenway.  Fenway then, in turn, issued a commercial
25   paper note that was purchased by LBHI.  I have a chart.  It's
```

20

1    similar to the chart that was attached to one of the pleadings,

2    Your Honor.  If I may approach?

3              THE COURT:  Sure.  Thank you.

4              MR. PEREZ:  But, in essence, Your Honor, it's a very

5    simple chart.  LCPI repo'd the assets to Fenway Capital.

6    Fenway Capital issued a variable funding note to Fenway

7    Funding.  Fenway Funding then issued commercial paper.  That

8    commercial paper was purchased by LBHI.  Approximately three

9    billion dollars.  Those -- that commercial paper was pledged to

10   JPMorgan.  And, Your Honor, the reason we can undo the

11   structure currently is because as a result of the JPM

12   agreement, the CDA, we now have -- LBHI now has that commercial

13   paper.

14             So the goal, Your Honor, is to reduce the cost

15   associated with the Fenway structure, be able to deal with the

16   assets directly.  SunCal is about half of the three billion in

17   Fenway assets.  In connection with that, there are other

18   assets, some of them not even real estate related, that sit in

19   the Fenway structure that LCPI and LBHI need to deal with.

20             THE COURT:  What's the Hudson Castle involvement with

21   this?

22             MR. PEREZ:  Your Honor, Hudson Castle -- and Ms.

23   Goldstein is here and could address this.  But Hudson Castle is

24   basically the manager of the Fenway structure, Your Honor.

25             So, to some extent, what we've done here is just a

VERITEXT REPORTING COMPANY

212-267-6868                                              516-608-2400

000009

21

1  plain vanilla motion which seeks to not only undo the structure

2  but, very critically, maintain the status quo among the

3  debtors.  That's a critical importance.  As the Court is aware,

4  we filed twenty-three separate plans.  I mean, one document but

5  twenty-three separate plans.  The recovery percentages for the

6  LBHI creditors are different than the recovery percentages for

7  the LCPI creditors.  So we do not want to, in any way, shape or

8  form, affect what the recovery balances would be.  And in

9  connection with that, in the motion as filed, we indicated that

10  LBHI would be tendering the commercial paper notes as the

11  quarantor, 'cause LBHI was on both sides, not only did it buy

12  the commercial paper but it also guarantied LCPI's obligations

13  under the Master Repurchase Agreement.  So they tendered as the

14  guarantor.  They tendered the notes as the guarantor.  And

15  there was a full reservation of rights as between the debtors

16  to make sure that we could allocate the value as was indicated.

17  Subsequent to that, there were -- this was filed on March --

18  mid-March.  The JPMorgan agreement was approved, I think,

19  either shortly thereafter or right around the time we filed it

20  at the March hearing.  Since that time, a bunch of time has

21  passed.  We have further refined the reservation of rights to

22  make sure that we maintain the rights as between the parties.

23  So we filed the supplemental order, the revised order, which

24  made sure that everybody maintained their rights.  And then we

25  also filed a supplement to the motion.  And basically, what the

22

1    supplement did was, at the time that we originally structured

2    the transaction, Fenway and Hudson Castle were getting limited

3    releases.  Deutsche Bank was getting a full release.  Through

4    the supplement to the motion, those releases were further

5    scaled back -- the releases that Fenway and Hudson Castle were

6    getting were further scaled back.  So that's the purpose of

7    those two motions.

8          Now, Your Honor, as I read -- and there's been a lot

9    of paper filed.  But as I read the papers, there's really no

10   objection to the debtors' business judgment in doing this

11   transaction.  I mean, we're going to be saving costs, we're

12   getting rid of structure.  We're going to be able to deal with

13   the assets directly.  I think the objections go to other

14   things, not really related to the business judgment.

15         I have Mr. Fitts here who could talk to the business

16   judgment.  I don't think that's really necessary to put him on

17   because we just really -- there's no allegation that there is

18   any -- that we're not exercising our business judgment.

19         The focus is whether this is being done somehow in bad

20   faith.  And, Your Honor, I submit there's absolutely no

21   evidence that this is being done in bad faith.  I --

22         THE COURT:  Well, consistent with the fact that we

23   have a contested hearing still on this, you might want to

24   proffer the testimony that you have available, both as it

25   relates to the purpose of the transaction and the good faith of

23

1    the transaction and why it's being done now.

2           MR. PEREZ:  Yes, Your Honor.  I could certainly do

3    that.  Your Honor, Mr. Fitts is in the courtroom.  I believe

4    he's testified before.  As the Court is aware, Mr. Fitts is a

5    managing director with Alvarez & Marsal.  He is the co-head of

6    the real estate group at Lehman and he's familiar with this

7    transaction.  He was managing director at GE and was formerly

8    in Citibank's workout group where he had extensive experience

9    since approximately 1988.

10          He's been assigned to the representation of Lehman

11   since September of 2008.  In connection with the Fenway repo

12   and the Fenway commercial paper program, he has reviewed the

13   motion and informed himself of the relevant transaction as

14   embodied in the various documents.

15          He would testify that the assets were repo'd to Fenway

16   and that the goal of this motion is to be able to save the

17   money that's associated with maintaining the structure; that in

18   September of 2008, Fenway Funding issued commercial paper notes

19   to LBHI and that LBHI is the current holder of those notes;

20   that the proposed actions are intended to eliminate the expense

21   and time delay associating with maintaining the programs;

22   eliminating the administrative fees to Deutsche Bank, Hudson

23   Castle and other third parties in connection with maintaining

24   the repo and the commercial program; and enabling LBHI to

25   access certain funds that are currently held at the Fenway

24

1  structure in approximately a little over a million dollars.

2      He would testify that the transaction is done on the

3  basis of arm's length negotiation with Fenway and that the goal

4  would be to put LCPI in the position that it was prior to the

5  time of the funding of the repo maintaining LBHI's interest in

6  the notes.

7      Additionally, Your Honor, Mr. Fitts would testify that

8  as a result of the transaction with JPMorgan Chase that we're

9  able to undo the structure and that there are several other

10  structures that hold real estate assets that now, as a result

11  of the JPMorgan transaction are in the process of being

12  unwound.

13      Mr. Fitts would further testify that this is a

14  reasonable exercise of the debtors' business judgment to

15  alleviate the expense and time delay associated with

16  maintaining both the repo and the commercial paper program;

17  that it was done -- that the transaction is fair and reasonable

18  to the debtors under the circumstances; and that it was the

19  product of protracted arm's length negotiation.

20      LBHI would indemnify Fenway and Hudson Castle with

21  respect to certain activities related to the assets as modified

22  by the supplement to the carve-out of the indemnity and the

23  guaranty.  In addition, they would pay approximately a million

24  six in attorneys' fees to Fenway in connection with the amounts

25  of money that they have expended.

25

1         Mr. Fitts would further testify that the concessions

2    that have been made by LBHI and LCPI are far outweighed by the

3    benefits that LBHI and LCPI would receive as a result of

4    undoing the structure.

5         Your Honor, I don't think -- that would be the

6    conclusion of his testimony.

7         THE COURT:  Is there any objection to my receiving the

8    proffer in evidence in support of the motion?

9         MR. O'KEEFE:  Good morning, Your Honor.  Sean O'Keefe

10   appearing on behalf of the voluntary SunCal debtors.  My only

11   objection is to the extent that the testimony, counsel's

12   characterization of testimony is inconsistent with what is

13   reflected in the motion then I would seek the right to cross-

14   examine Mr. Fitts because the characterization by counsel of

15   certain elements of that transaction is directly contrary to

16   what is reflected in the motion.  And if that's the testimony

17   then I would respectfully ask the Court to have Mr. Fitts take

18   the stand on those limited issues.

19        THE COURT:  If you wish to cross-examine, that's your

20   right.

21        MR. O'KEEFE:  Then I would ask the Court to call him

22   to the stand.

23        MR. PEREZ:  Your Honor, I'm not sure that anything in

24   his testimony contradicted what's in the motion or what's in

25   the transaction.  And, frankly, Your Honor, this is a common

26

1    theme in their objection which I, frankly, don't understand.

2    It's our motion with Fenway.  We can basically file a motion

3    requesting for the Court to do various things.  I'm not sure I

4    understand what the objection is.  I think we've clearly

5    reflected what we want the motion to do, that we want it to

6    preserve the integrity as between LCPI and LBHI.  So I'm not

7    sure what the nature of the objection is.

8           MR. O'KEEFE:  Your Honor --

9           THE COURT:  Well, at the moment, we're dealing with a

10   very limited question which is whether the proffer of Mr.

11   Fitts' testimony is to be accepted as is or whether or not you

12   want the right to cross-examine.  You have the right to cross-

13   examine as an objector regardless of your rationale.  And if

14   you want to have Mr. Fitts on the stand, ask him some

15   questions, he's here.  So we can have him come to the stand.

16   We don't have to have an argument about whether or not you have

17   some basic right to object.  You do.  It doesn't matter what

18   your objection is.  You're a party in interest; you're

19   objecting.  I think I know what your objection's about.  It's

20   about having these loans come into the estate and be subject to

21   the automatic stay and the SunCal litigation in California.

22   Isn't that right?

23          MR. O'KEEFE:  Your Honor, certainly that is our

24   primary concern.  And just to respond to counsel's comment, I,

25   in no way, want to interfere with this transaction except in

27

1    the following limited respect.  I understand --

2         THE COURT:  Well, that means you do want to interfere

3    the transaction.

4         MR. O'KEEFE:  Well, Your Honor, not as stated in the

5    motion.  Not as stated in the motion.  The motion states, "The

6    parties will terminate the MRA".  So the MRA is terminated.  So

7    this contention that a terminated contract can somehow give

8    rise to liens which are provided for therein, that would be my

9    issue.  So if they're saying it's not terminated, that's not

10   what' s in their motion.  They say the guaranty will be

11   terminated.  So we would simply ask them to acknowledge the

12   guaranty is terminated.  And that's the basis for their claims

13   against LCPI.  They also state the CP notes are terminated.

14   That's right here in front of me on page 10.  "The CP notes are

15   terminated."  This exchange, they state, is in full payment of

16   the purchase price under the MRA.  So that transaction is done;

17   it's over.  I think we can all agree you can't have a lien if

18   there's no claim.  You can't have a lien if there's no

19   underlying lien documents.

20        THE COURT:  Well, we're not arguing your objection

21   right now.  We're dealing with, as I said, a very narrow

22   question.  Do you want to examine Mr. Fitts?  If so, we'll call

23   him to the stand now.  If you want to accept the proffer, we

24   can accept the proffer with your rights reserved in terms of

25   what you're arguing about and we can reserve that to argument.

28

1   But that's what's currently in front of me.

2          MR. O'KEEFE:   Well --

3          THE COURT:   It's binary.  We either have Mr. Fitts or

4   we don't have Mr. Fitts as a witness.

5          MR. O'KEEFE:   Your Honor, then we would -- we would

6   reserve our rights.  The only issue is I have a material

7   concern about Your Honor making findings based upon that

8   characterization of the testimony as opposed to what is before

9   us in terms of their motion.

10          THE COURT:   Well, you can certainly argue whatever you

11   want to argue about the reasonable conclusions to be drawn from

12   the record.  And you're also free, if you wish, to call Mr.

13   Fitts to the stand and ask him as many direct questions as you

14   wish.

15          MR. O'KEEFE:   Your Honor --

16          THE COURT:   If you want to simply reserve this to

17   argument, that's fine, too.  It's up to you.

18          MR. O'KEEFE:   We will reserve it, Your Honor.  We

19   understand the standard.  I agree they have a lot of

20   discretion.  And we're certainly not here to interfere with

21   this transaction.  We're not a claimant in this case.  So we

22   haven't asserted standing to get into the issue of the merits.

23          THE COURT:   Oh.  Then why don't you just sit down?

24          MR. O'KEEFE:   I will, Your Honor.

25          THE COURT:   If you acknowledge you don't have

29

1   standing --

2        MR. O'KEEFE:  Only in terms of the issue of their

3   discretion and that transaction.  But to the extent that

4   those -- the assertion of those findings relative to the

5   characterization of the transaction could affect my client then

6   I did have concerns.  And Your Honor is saying that you're

7   inclined to approve the transaction, as I understand it,

8   without making those findings.

9        THE COURT:  No.  I didn't say that.  What I said was

10  that if you have a concern about the proffer and wish to

11  examine the witness in order to make a record that you view to

12  be either more consistent with your understanding of the facts

13  or more helpful to you in the argument you wish to make when we

14  get into the legal argument phase of this, you're free to call

15  the witness.  That's the only thing we're talking about now.

16       MR. O'KEEFE:  Very well, Your Honor.  We will reserve

17  the right for the following motion.

18       THE COURT:  All right.  So I take that as you're not

19  calling Mr. Fitts.  I don't have any questions of Mr. Fitts.  I

20  accept the proffer with such conclusions to be drawn from the

21  proffer as will be determined following argument.

22       MR. O'KEEFE:  Thank you, Your Honor.

23       THE COURT:  Okay.

24       MR. PEREZ:  Your Honor, I'm glad Mr. O'Keefe brought

25  up the question of standing.  And the only reason I raise it is

30

1   because I did -- I'm kind of a newcomer to this whole

2   situation.  So I did look up to see if there had been any

3   proofs of claim filed.  I couldn't find any proofs of claim

4   that had been filed by any of the SunCal debtors one way or

5   another.  So obviously, they filed a motion to lift stay.  But

6   I haven't been able to determine, in fact, what their standing

7   is.  And they certainly haven't filed a proof of claim in this

8   proceeding.

9        (Pause)

10       MR. PEREZ:  Just to continue, Your Honor, as it

11  relates to the indication of bad faith, the committee has

12  reviewed this transaction, has reviewed this transaction

13  extensively.  They have filed two documents in support of the

14  transaction.  There's no indication that there's bad faith.

15  The testimony is that this has been subject of a long

16  negotiation, arm's length negotiation with Fenway.

17       So, Your Honor, the main issue that has been raised by

18  SunCal and what I think they simply ignore at every turn and

19  for some reason it's a little bit of "gotcha" lawyering is that

20  LCPI has always had the right to repurchase the loans.  LBHI

21  has always been the guarantor of the loans.  LBHI has always

22  held the commercial paper which is the economic -- which is

23  part of the economic interest in the loan.  Now that it's not

24  subject to the JPMorgan pledge, they can deal with it.  There

25  has -- Fenway has consistently taken the position -- and I

31

1    think there are five instances that were cited in the papers

2    where they've said we're just the middleman in this.  We really

3    don't have an economic interest because you have LCPI and LBHI

4    on one side and LBHI on the other side.

5          So, Your Honor, when you boil this down to its

6    essence, two things are happening.  We're doing away with a

7    costly structure, that is Fenway.  We're doing away with that

8    and it's not the only one that we're going to be doing away

9    with because there were several of these.  Second, we are doing

10    everything possible, as is our fiduciary obligation in

11    connection with the representation of twenty-three separate

12    estates to maintain the economics of each -- the integrity of

13    the economics of each debtor.  And in this case, LBHI paid for

14    the commercial paper.  They're the holder of the commercial

15    paper.  And they clearly will have an interest in those assets

16    because those assets form part of the recovery in their estate.

17          So, Your Honor, I would request that the Court approve

18    the motion.  There's really been no -- no challenge to the

19    debtors' business judgment.  And I don't think there can be any

20    real challenge to any bad faith associated with undoing this

21    transaction.  This has been going on for a long time.  We have

22    e-mails from Ms. Goldstein going back to January saying they've

23    been wanting to get out -- and earlier, saying they've been

24    wanting to get out of this.  I mean, much longer, saying that

25    they've been wanting to get out of the transaction.  This is a

32

1  cost saving measure and it effectively allows the debtors to

2  deal with the assets.  And half of the loans in Fenway have

3  nothing to do with SunCal, Your Honor.

4       THE COURT:  Mr. Perez, you said a little earlier in

5  your presentation that you're new to this.

6       MR. PEREZ:  Correct.

7       THE COURT:  Now, you're not new to the bankruptcy case

8  itself, obviously.  You've been involved from the very

9  beginning.

10      MR. PEREZ:  I have, Your Honor.

11      THE COURT:  When you say you're new to this, do you

12  mean you're new to the ongoing hostilities between the SunCal

13  debtors and the Lehman estates?

14      MR. PEREZ:  Correct, Your Honor.

15      THE COURT:  All right.  To the extent that there is an

16  allegation of bad faith in this transaction, it seems to me

17  that it relates to the following.  There is the suggestion by

18  the SunCal debtors that one of the motivations for this

19  transactions is to bring assets into the debtors' estates that

20  are not now within the estate directly by virtue of the Fenway

21  structure, and as a result, to have those assets subject to the

22  automatic stay which would, in their view -- and I'm

23  characterizing their view -- materially interfere with the

24  prosecution of equitable subordination litigation pending in

25  the bankruptcy court in Santa Ana, California.  That's my

33

1   understanding of their view as to why this transaction may be

2   suspect.  What's your response to that?

3         MR. PEREZ:  Your Honor, I have several responses to

4   that.  First of all, that is based on what I believe to be a

5   false premise.  LCPI has always had rights to those assets

6   through the repurchase agreement.  They've always had that

7   right.  If the Court looks at the Palmdale decision while the

8   BAP panel never reached that issue because, remember, Your

9   Honor, there are loans that LCPI has that are not in Fenway,

10  that are SunCal loans.  So we'll get to the issue of the

11  automatic stay at the next hearing.  But there are loans in

12  SunCal -- SunCal loans that are not in Fenway.  So while the

13  BAP never reached that decision, it did say that LCPI might

14  likely have an interest through the repurchase agreement.

15  That's number one.

16        Number two, I think that the examiner's report is

17  fully replete with references to the fact that these repo

18  agreements were financings, that they were not sales.  I mean,

19  that Lehman used the repo transaction in order to provide

20  financings.

21        Third, Your Honor, LBHI has always had an interest.

22  They're the ones that paid three billion dollars.  They've

23  always had an interest in these assets.  They've never not had

24  that interest.

25        THE COURT:  I understand all that and I accept that

34

1   argument.  But they're saying that this is, in part, an effort

2   to expand the scope of the automatic stay and the SunCal

3   litigation to these assets.  And they say that various

4   statements were made on the record that ignore the Fenway

5   structure.  It was, if I'm understanding it correctly,

6   representations made that there was property of the estate in

7   the SunCal bankruptcy cases when, in fact, some of loans were

8   within the Fenway structure.  And to the extent that that's

9   true, and I'm not saying that it is true because I don't know

10  those facts, but undoing the structure is a way to cure that

11  defect.

12       MR. PEREZ:  Well, Your Honor, I'm not sure that I

13  agree with that premise.  I believe that -- and I haven't gone

14  back and read every single transcript.  I've certainly read

15  most of the stuff that's been filed.  But, Your Honor, to the

16  extent that Lehman held these assets as loans on their books,

17  even though they were repo'd to Fenway then I think that they

18  would have every right to do that.  And every indication based

19  on the examiner's report, that's, in fact, what they did.  So

20  I'm not sure that there is any real deception that went on

21  there.

22       Furthermore, Your Honor, let me make two other points.

23  The principal objector with seventy-five percent of the value

24  has now stopped objecting.  So we're really talking only about

25  the smaller part of the claims.  And, Your Honor, to the extent

35

1  that the Court somehow believes that there's some merit to that

2  argument, which I don't believe there is --

3          THE COURT:  I'm not suggesting --

4          MR. PEREZ:  Okay.

5          THE COURT:  -- that there is or there isn't.  All I'm

6  saying is that you're trying to get over the hurdle of this is

7  in good faith.  And one of the issues that you haven't really

8  dealt with directly is what I've been talking about which is my

9  characterization -- and I may have it wrong, by the way -- my

10  characterization of what I believe to be embedded in the SunCal

11  papers, namely, this is a device to improve Lehman's litigation

12  position in California and that that may be one of the

13  principal motivations for doing this deal.

14          MR. PEREZ:  Your Honor, if as a result -- let me put

15  it this way.  If as a result of undoing the structure, the

16  ownership of the assets is cleared up, then I think that's a

17  salutary effect.  I can't believe that would be in bad faith.

18          THE COURT:  Okay.

19          MR. PEREZ:  I mean, if as a result of doing the

20  structure it's cleaned up, I can't understand why that would be

21  in bad faith.  What is it that it's in bad faith about?  That's

22  what I don't seem to understand.

23          THE COURT:  All right.  I think it's time to hear from

24  the SunCal debtors and understand exactly from them what the

25  problem is, if any.

36

1    And you speak softly and we have a fairly crowded

2    courtroom.  If you could -- you're close to me and I can hear

3    you but please speak up so that everybody can hear you.

4    MR. O'KEEFE:  Yes, Your Honor.  Let me deal briefly

5    with a few of counsel's comments.  As far as Article III

6    standing, you don't have to file a claim to have Article III

7    standing.  The reality is to the extent that what they're doing

8    has an adverse effect on our case then we have standing to make

9    an objection.  Now, we have limited our issue to that part that

10   affects our case.

11   And let me just tell you the sequence of events here

12   that led us to the conclusion.  And each sequential filing in

13   this case has confirmed that fact.  The transaction before the

14   Court specifically states that the MRA, the master repurchase

15   agreement, is being terminated.  And just to step back from

16   that, every repo from an economic perspective is, in effect, a

17   secured transaction.  It's a buy and sell that generates a

18   yield between the buyer and seller.  But the simple fact is

19   that is an incredibly important market.  That's how we move M1

20   and M2 on the money supply.  So decisions were made twenty

21   years ago that when they say it's a true sale, no matter what

22   it looks like, it's a true sale.  And this particular contract

23   says it is a true sale.  And there's twenty years of case law

24   that says no matter what it looks like it's a true sale because

25   that market says it's a true sale --

37

1          THE COURT:  We are not arguing in the context of this

2     motion to unwind the Fenway structure whether or not repos that

3     function as financings are true sales.  And the question that

4     you are asserting has not been decided in this case and is not

5     being decided now.

6          MR. O'KEEFE:  Well, let me just deal with the issue of

7     this transaction.  The transaction in the motion says that the

8     master repurchase agreement is being terminated.  That's where

9     the backup lien rights were vested in Fenway.  And basically,

10    the contract says this is a true sale but if for any reason

11    it's broken, we continue to have a lien right to protect

12    ourselves in the same way as you have a lessor saying that in a

13    lease.

14         But the contract before Your Honor -- the motion

15    before Your Honor says that contract is being extinguished.  It

16    says the guaranty that Lehman Brothers issued in favor of LCPI

17    to back up their repurchase obligation is being extinguished.

18    It says that the CP notes are being extinguished.  It says that

19    the VFN, or the variable funding note, is being extinguished.

20    Every element of that transaction is being extinguished.  And

21    it says this is in full performance.

22         Now, we then see in the pleading and in subsequent

23    pleadings, the development of the following argument.

24    Notwithstanding the fact that the guaranty goes away, there's a

25    subrogation based upon an extinguished guaranty.

38

1   Notwithstanding the fact that the MRA is gone, we say there's a

2   lien that they're taking based on the MRA against the sold

3   loans that are being acquired by LCPI.  Transactionally, it

4   doesn't make any sense.  We then point out in our papers, wait

5   a minute here.  There is no reference to a financing -- a 364

6   financing in this motion.  But you're referencing debt that

7   LCPI is purporting incurring and liens that it's purporting

8   giving to secure a debt which is not referenced in the motion.

9   So when you see the sequence of events, they then file a

10  supplement and said, oh well, notwithstanding the fact what we

11  said in the motion, we're reserving rights and somehow or

12  another there are these follow on liens which weren't discussed

13  or could survive under the transaction that we've enunciated

14  before the Court.

15       So at that point, it confirmed what was initially a

16  suspicion.  And now they've admitted that they will assert that

17  Lehman Brothers stay a party that has -- doesn't own the loans,

18  has never owned the loans, has never had a lien on the loans,

19  will now acquire a lien based upon an extinguished contract,

20  based upon a guaranty that's extinguished, based upon a

21  transaction that is fully performed and paid.

22       So when we look at that sequence of events, we see

23  that there appears to be an underlying objective to insert LBHI

24  into a transaction and to create lien rights that really can

25  have no existence under the transaction that they presented

39

1    before the Court.

2          So SunCal's objective is simply to do its own

3    reorganization.  And I'll address this in the next motion.  We

4    don't, in any way, want to get involved in Lehman's case.  We

5    haven't filed a claim.  We haven't appeared here except as

6    necessary.  But when someone files a motion that presents what

7    appears to be a clear --

8          THE COURT:  By the way, one of the issues here is that

9    you haven't appeared here enough, that you chose to absent

10   yourself in Santa Ana taking actions that were, as confirmed by

11   the BAP panel, in violation of the stay.  So maybe one of the

12   problems is you haven't been here enough.

13         MR. O'KEEFE:  Well, Your Honor, I'm more than willing

14   to address that, Your Honor.

15         THE COURT:  No.  You don't need to.  It's an aside.

16   But I'm not going to let an aside like that go without comment.

17   Just finish your argument.

18         MR. O'KEEFE:  My point, Your Honor, is the motion

19   describes a transaction for the extinguishment of the MRA, for

20   the extinguishment of the underlying transaction so that there

21   would be no basis for a follow on lien by LBHI.  So our concern

22   was they were designing this to get back into the SunCal cases

23   in California.  And on that basis, we objected.

24         Insofar as the issue of counsel's characterization of

25   a tentative settlement that's reached with the trustee debtors,

40

1    seventy-five percent of the value, obviously, there's no

2    evidence before the Court with respect to that. What I would

3    say --

4            THE COURT: The evidence is the withdrawal of their

5    objection. They've withdrawn their objection and did so last

6    evening. And I accept the representation of counsel that

7    discussions are underway. Those are not before the Court. The

8    only thing that's happened is that you're now the lone

9    objector.

10           MR. O'KEEFE: Well, Your Honor, it's -- I think

11   it's -- the voluntary debtors are the loan objectors. And as

12   we'll deal with in the next motion, the reason why that

13   settlement was possible is because of the pursuit of litigation

14   in California, but for that --

15           THE COURT: That's not before me right now. The

16   question before me -- and I understand some of what you're

17   arguing. But I will tell you that some of what you've said I

18   find confusing. I don't believe that there is anything in the

19   motion before me that requires me to make any findings as to

20   the consequences in the SunCal bankruptcy of my unwinding the

21   structure. So part of what I don't understand is why you're

22   spending all this time arguing about those consequences.

23           MR. O'KEEFE: Your Honor, with that characterization,

24   I'm more than willing to sit down. I just wanted to make sure,

25   Your Honor, that in connection with the next motion, I didn't

41

1    prejudice any rights in this motion.  Otherwise, I wouldn't

2    have said anything.  But I appreciate Your Honor's

3    clarification in that regard.

4         THE COURT:  Okay.  I might -- let me ask Mr. Perez,

5    have I said it correctly?  Is it correct that there's nothing

6    about my unwinding the Fenway structure in accordance with the

7    amended order that you have proposed that necessarily impacts

8    the characterization of anything in the SunCal bankruptcy case?

9         MR. PEREZ:  Your Honor, I think that's correct, Your

10   Honor.  I believe the -- once the transaction is unwound, we'll

11   be in a position -- we'll be in the position that we find

12   ourselves.  But I don't think you're making any finding with

13   respect to the SunCal and what our position is in the SunCal

14   case.

15        THE COURT:  All right.  With that clarification, maybe

16   the objection for the time being fades away.  And I think it's

17   time to hear from the creditors' committee particularly as it

18   relates to their review of the transaction and their

19   reservation of rights with respect to certain parties, notably,

20   Hudson Castle and the Fenway parties.

21        MR. O'DONNELL:  Yes, Your Honor.  Dennis O'Donnell,

22   Milbank Tweed Hadley & McCloy on behalf of the official

23   creditors' committee.  Your Honor, as Mr. Perez said, we have

24   spent a lot of time with this motion on several different

25   levels.  Just as a preliminary matter, in terms of business

42

1    judgment, we think that -- we're totally convinced that the

2    business judgment of the debtors here makes sense.

3            There are, I think, two business purposes.  One is to

4    simply making the management of the loans easier.  I mean, we

5    can speak to that from the context of transactions we've been

6    involved in with respect to Fenway loans where the extra level

7    of having Fenway involved made things much more complicated and

8    time consuming.  So there is that business purpose.

9            The second business purpose is simply to confirm the

10   ownership of these loans in LCPI which is significant for lots

11   of purposes, one of which might have some consequence in the

12   SunCal proceeding, but it has other purposes as well.  So to

13   the extent we're looking for a business purpose here, there are

14   several fairly compelling business purposes separate and apart

15   from whatever the SunCal debtors have to say.

16           We did look at the motion on other levels as well.

17   And our particular focus from the get-go was on the actual

18   nature and structure of the transaction and the parties

19   involved.  And specifically, the involvement of Hudson Castle.

20   Even before the audit call that appeared in the Times a few

21   weeks ago appeared, we had been asking questions about the

22   nature of the transaction, the intents of the transaction, how

23   it was put together, how it unfolded.  That article provoked us

24   to look even harder at that relationship.  And subsequent to

25   that, we spent a two-week period talking to the debtors and

43

1    talking directly to Hudson Castle and its counsel trying to get

2    a better understanding of the relationship between Hudson

3    Castle and Lehman and precisely how the Fenway structure was

4    put together and modified over the summer of '08.

5            That investigation is ongoing.  We haven't had all our

6    questions answered yet.  But the ones we have answered have

7    convinced us that we have no reason to oppose the current

8    motion.  And that's the case because the releases provided to

9    Fenway and Hudson Castle in this motion are very limited.  We

10   had already started the process of limiting those releases.

11   But subsequent to further investigation, we narrowed them

12   further.  And all that's getting released at this point is any

13   claims arising out of -- and Ms. Goldstein can correct me if

14   I'm incorrect on this -- but, basically speaking, not the

15   specific language, any claims arising out of the administration

16   or management or origination of the underlying loan

17   collateral -- which we believe Hudson Castle likely had nothing

18   to do with.  All claims relating to the actual structure of the

19   Fenway transaction and Hudson Castle's involvement in it are

20   being preserved for future investigation.  And with that

21   understanding and our understanding and acceptance of the

22   business judgment here, we believe the motion should be granted

23   by the Court.

24           THE COURT:  All right.  Thank you.  Is there anyone

25   else who wishes to be heard in connection with this?

44

1          MR. MILLER:  Good morning, Your Honor.  I'll be very

2     brief.  My name is Skip Miller.  I'm the litigation attorney

3     for the SunCal debtors.  I, obviously -- and I'm not a

4     bankruptcy lawyer.  I obviously don't want my lawsuit, my

5     equitable subordination lawsuit encumbered or made any more

6     difficult than it already is by virtue of this compromise

7     motion.  That's my only concern.  The exact questions that Your

8     Honor asked at the beginning of the hearing are my concerns as

9     well.  Other than that, we don't have any objection or

10    reservation.

11         This tentative settlement from the trustee's side, Mr.

12    Lobel's side, is great news to us.  If it sticks, if it's

13    good -- I don't know the details of it.  But this is obviously

14    something that has grown out of my lawsuit, my equitable

15    subordination lawsuit.  And I want to just be able to continue

16    with it in Santa Ana before Judge Smith not in any way, shape

17    or form intruding on the stay or the jurisdiction of this

18    Court.  And that's our position.

19         THE COURT:  Let me just ask you one question.

20         MR. MILLER:  Sure.

21         THE COURT:  Who do you represent in that litigation?

22         MR. MILLER:  I represent all of the debtors, the

23    voluntary and involuntary debtors -- the trustee debtors and

24    the voluntary debtors as special litigation counsel.

25         THE COURT:  And as special litigation counsel, you

45

1    heard for the first time this morning that the trustee has

2    worked out something that may result in a settlement of at

3    least that party a lawsuit, is that correct?

4           MR. MILLER:  No.  I spoke to Mr. Lobel about it last

5    Friday.  And we've been discussing it.  But I have not seen the

6    term sheet yet and I don't know the nitty gritty of the details

7    of it.  So -- but he called me on Friday and we had a

8    conversation about it.

9           THE COURT:  I don't want to get into the specifics of

10   it.  It will either, as you say, stick or it won't.

11   Presumably, it will stick.  And at least that part of the

12   litigation goes away.

13          MR. MILLER:  I mean, what I heard sounded okay.  I

14   just need to see -- you know, the devil is in the details.

15   And, you know, it's about half the case.  It's the involuntary

16   debtors, the trustee debtors.  We still have to deal with the

17   other half of the case.  And we're working hard on it.  And my

18   lawsuit, quite frankly, is the driver of all of it.

19          THE COURT:  Well, I know that's your perspective.  I

20   don't know if it's true or not.  And I'm not approving your fee

21   so it doesn't matter.

22          MR. MILLER:  Thank you, Your Honor.

23          THE COURT:  All right.

24          MR. MILLER:  Appreciate it.

25          MR. PEREZ:  If the opposition is withdrawn, I'll sit

46

1   down, Your Honor.  Otherwise, I've got a couple of comments to

2   make.

3          THE COURT:  I think there's no one -- well, let me

4   find out.  Is there anyone else who has a comment about this

5   pending motion?  Apparently not.  Mr. Perez?

6          MR. PEREZ:  Yeah.  Just a couple, three comments, Your

7   Honor.  Number one, one of our exhibits is a letter going back

8   to January of this year where we informed the SunCal debtors

9   that LBHI had an interest in these assets through the CP notes.

10  I mean, there's no question about it.  The record is clear.

11  This is not anything new or different.

12         And furthermore, Your Honor, our motion clearly

13  contained a full reservation of rights of the debtor so that we

14  wouldn't affect the distribution among the various debtors'

15  estates.  And that's precisely what we're trying to do.  Thank

16  you, Your Honor.

17         THE COURT:  Okay.  Having heard the argument presented

18  by the debtors, the support of the creditors' committee and the

19  opposition by the SunCal voluntary debtors, which appears to

20  the Court to have been more in the nature of a reservation of

21  right as to the potential consequences in the SunCal bankruptcy

22  case in California to approval of the unwinding of the

23  structure, I am satisfied that sufficient business

24  justification has been presented to approve the motion and that

25  the undoing of the structure results in a number of claimed

47

1    benefits to the estate including the elimination of certain

2    costs and the preservation of the rights of separate debtors so

3    that the distribution rights of those creditors looking to

4    particular members of the Lehman corporate family will

5    unaffected by the approval of a settlement.

6         I'll entertain an appropriate order.

7         MR. PEREZ:   Thank you, Your Honor.   Should I tender

8    the order now or --

9         THE COURT:   At the end of the hearing.

10        MR. PEREZ:   Okay.   Thank you, Your Honor.   Your Honor,

11   the next matter on the docket is the motion to lift stay.

12        (Pause)

13        MR. O'KEEFE:   Good morning again, Your Honor.   Sean

14   O'Keefe appearing on behalf of the SunCal debtors, the

15   voluntary debtors.   Your Honor, I'm a Chapter 11 reorganization

16   lawyer and my objective is simply to reorganize the cases that

17   I have been assigned to.   In the current context in California,

18   it's an inherently difficult process because this is a large

19   land case and we are facing the largest property value of the

20   clients since 1930.   We also have a substantial secured

21   creditor.   The overlaying variable on that is that there is a

22   litigation ongoing with that secured creditor.   But our

23   objective is not in any way to do anything other than to

24   reorganize under Chapter 11 in our case.   And I can't emphasize

25   that enough.

48

1          Insofar as the characteriz --

2          THE COURT:  Can I break in and ask a question?

3          MR. O'KEEFE:  Yes, Your Honor.

4          THE COURT:  Are you personally involved in the appeal

5    of the BAP decision to the Ninth Circuit?

6          MR. O'KEEFE:  Yes, I am.  I'm the principal lawyer,

7    Your Honor.

8          THE COURT:  Are you the lawyer of record?

9          MR. O'KEEFE:  Yes.

10         THE COURT:  And what's the time horizon of briefing

11   and adjudication in the Ninth Circuit?

12         MR. O'KEEFE:  Your Honor, my recollection now is

13   briefing is complete.  But they don't tell you when they will

14   set oral argument or if they're going to have oral argument.

15   It's entirely possible that could take months or as much as

16   nine months.  So I just finished two appeals.  And as a general

17   rule, it takes a significant period of time.  So I don't

18   exactly know when they're going to set oral argument or whether

19   they're going to rule simply on the papers.  But they haven't

20   provided us that.

21         THE COURT:  Now, I take it that it's your position on

22   behalf of the voluntary SunCal debtors that the BAP panel got

23   it wrong when the BAP concluded that the SunCal debtors needed

24   to come to this court to obtain stay relief in order to

25   prosecute the equitable subordination litigation in the

49

1    bankruptcy court in California.  Is that right?

2            MR. O'KEEFE:  No, Your Honor.  That -- there is no

3    question in my mind that the home bankruptcy court determines

4    the scope and application of the stay, as the BAP said, in the

5    final resolution.  So, for example, there was just a case, it's

6    a published decision, where the Supreme Court in New York made

7    a decision regarding whether or not the stay applied in that

8    particular case.  Every Court that confronts the stay has to

9    make a determination does the stay apply on these facts.

10           THE COURT:  Yeah.  But I'm trying to understand

11   whether or not in appealing the BAP decision, you're arguing

12   that the BAP got it wrong when the BAP concluded that Judge

13   Smith got it wrong when she concluded that you could properly

14   prosecute equitable subordination litigation against the Lehman

15   debtors without first obtaining stay relief here.

16           MR. O'KEEFE:  Not the procedural issue but the

17   substantive issue.  Basically, our position is -- is consistent

18   with what we read to be the law in this circuit.  And in the

19   Ninth Circuit, but for that one case, that the pursuit of an

20   equitable subordination action whether through a contested

21   matter or through an adversary proceeding is deemed defensive

22   and consequently that does not violate the stay.

23           The second issue as to who gets the final say on

24   whether the stay applies, we absolutely agree that the home

25   bankruptcy court makes that decision.  So now we have a

50

1    circumstance, we believe -- and we have absolute confidence

2    that the BAP will be reversed.  We think Judge Markell's

3    decision states the law.

4           THE COURT:  Are you saying you have absolute

5    confidence that the BAP will be reversed?

6           MR. O'KEEFE:  Yes, Your Honor.  Yes, Your Honor.  I

7    just think that --

8           THE COURT:  That's an unbelievable statement to make

9    on the public record.

10          MR. O'KEEFE:  Your Honor, the -- it is a decision

11   which we think is directly contrary to the authorities of that

12   circuit and we don't think that it will stand both

13   jurisdictionally and substantively.

14          But we agree -- we agree, Your Honor, that if the

15   determination of whether the stay applies in the final

16   determination -- and that's what the BAP said.  And the final

17   determination is Your Honor.  So we absolutely agree.  So, for

18   example, Lehman had the right to come back here and say there's

19   this determination and we think it's in error.  And had Your

20   Honor said I think so, too, then that's it.  We're stumped.

21   There's no question there.  We operated from that point going

22   forward because Lehman raised the issue -- Lehman raised the

23   issue with Judge Smith.  Lehman filed the motion for relief

24   from stay and said, Judge, we're making a motion under (d)(2)

25   and (d)(3) that says this reorganization automatically fails

51

1    because our stay prevents them from subordinating our claims.

2    Faced with that argument, Judge Smith said, well, that's not

3    the law in this circuit.  And also we have the Meddium (ph.)

4    decision and Your Honor's decision in Shinsei.  And maybe we

5    are misreading that.  But --

6              THE COURT:  I think you are reading the Shinsei

7    decision.

8              MR. O'KEEFE:  And that's entirely possible, Your

9    Honor.  But I do believe that Judge Smith's decision based on

10   their argument, and it was in response to their argument, she

11   said I see, under (d)(2), an ability to reorganize pursuant to

12   which they can seek to subordinate your claims.  And on that

13   basis, we proceeded.  So they raised the issue and she ruled on

14   it.

15             Now the BAP took that issue up -- and they didn't seek

16   to set aside the order denying motion for relief from stay.

17   They appealed just that narrow ruling, that issue of law, as to

18   whether or not the stay was affected by an equitable

19   subordination action, whether that was offensive or defensive.

20   Prior to that point in time, we believe the law was clear that

21   it was defensive.  They view it, the BAP did, as offensive.

22             But --

23             THE COURT:  That's consistent with Judge Gonzalez'

24   decision in the Enron case as well.

25             MR. O'KEEFE:  Your Honor, I think the correct

52

1    statement of the law is what was stated in the Meddium decision

2    because I think what the Court is saying is, look, if you come

3    to a case, we have to be able to determine the priority of your

4    claim.  And that's really what's going on here.  Integral to

5    our reorganization effort, we have to deal with the claims that

6    they filed in our case.  Conceptually, I think we can all agree

7    that we could have objected to their claim, raised an unclean

8    hands defense and a recoupment defense and, on the basis of

9    those equitable affirmative defenses, sought subordination.

10            THE COURT:  I understand --

11            MR. O'KEEFE:  It's just that --

12            THE COURT:  I understand your position on that.  But

13    one of the issues here is that through other counsel, in

14    November of 2008, the SunCal debtors brought a motion for stay

15    relief here which I denied without prejudice.  It was very

16    obvious, I think, to anybody who was present in court,

17    including your partner, that one of the problems with the

18    original motion was that overly broad, it didn't seek

19    particularized relief.  And from the very beginning of the

20    SunCal bankruptcy, it was apparent that SunCal needed to deal

21    with Lehman Brothers.  I made it very clear that I would

22    entertain other motions for stay relief or stipulations that

23    the parties might enter into relating to stay relief.

24            But nothing happened.  Except in January of 2009, I

25    was involved in an emergency hearing, I believe it was on a

53

1    Friday afternoon, New York time, seeking to enforce the stay

2    because, in effect, your debtors were treating this Court as if

3    it had no say in the matter.  Ultimately, I made some

4    threatening noises on the record, and the record speaks for

5    itself, that there might well be sanctions for a willful

6    violation of the automatic stay.  And until now, the SunCal

7    debtors have absented themselves from this court.  That's one

8    of the reasons why I interjected earlier in your argument on

9    the Fenway motion about your not having been here except when

10   you needed to be here.  I think you needed to be here a lot

11   sooner.  And I'd like an explanation as to why you haven't been

12   here sooner.

13        MR. O'KEEFE:  The first thing is, Your Honor, to the

14   extent that we have engaged in any course of conduct that was

15   offensive to this Court or that affected the stay, we sincerely

16   apologize.  That was not our point.  To the contrary, I've been

17   practicing bankruptcy law in twenty-five years -- for twenty-

18   five years and nobody has ever accused me of violating the

19   stay.

20        What happened in this circumstance was, Your Honor, we

21   moved for -- the circumstance you're referencing -- and I'll

22   just go back.  Twenty years ago, I had a case, and it was only

23   one in my whole career, where we had two cases, two debtors,

24   who were looking at each other saying well, my stay applies and

25   your stay applies.  And we went to Mr. Klee (ph.) and Mr.

54

1    Tweester (ph.) because there were no cases anywhere on the

2    issue that confronted that circumstance and said well, what

3    happens, who has primacy.  And their response was the Code

4    doesn't work very well under those circumstances.

5         Well, since then, we've had more input from the case

6    law.  But the truth of the matter is, Your Honor, we've never

7    run into this circumstance before.  And insofar as that hearing

8    you're referring to, we moved the use of cash collateral in

9    that case and that was the issue that Your Honor is speaking

10   to.  And Your Honor told us I think that violates the stay and

11   we withdrew that motion.  The reason why we filed that motion

12   is because there was another pending Lehman case, LB Rep,

13   something or other, and it was represented by the same counsel.

14   And the trustee in that case moved for the use of cash

15   collateral and there was no stay assertion.

16        Now, going all the way back to the first motion for

17   relief from stay, Your Honor is absolutely correct.  And I

18   wasn't involved in that.  That motion was early in this case.

19   And it basically was this blanket prayer for relief.  I don't

20   really understand why that motion was filed in that structure

21   particularly given the fact that this was early in this case.

22   It was going to be denied.  It should have been more focused

23   and Your Honor made that clear.

24        But insofar as that particular issue, the motion for

25   use of cash collateral, Your Honor made your thoughts clear on

55

1     that and we withdrew the motion.  And that was very difficult

2     in a Chapter 11 to operate without the use of cash collateral

3     particularly since the party who controlled the cash collateral

4     or alleged that they controlled it was trying to crush our

5     case.  The next thing that happened in time, Your Honor, is

6     they raised the issue before Judge Smith.  They filed the

7     motion for relief from stay saying our stay thwarts their case.

8     You cannot succeed.  You might as well give us relief from stay

9     to foreclose on everything because they can't reorganize,

10    period, because of our stay.  That was the argument.  It was a

11    (d)(2) and a (d)(3) argument.

12          In response to that, we presented -- and in response

13    to that, we presented our arguments and our case law saying

14    that the stay didn't apply, that this was a defensive act and

15    we could subordinate their claims.  And the claims objection in

16    priority determinations are traditionally to the extent they

17    just affect the claim deemed defensive.  And Judge Smith

18    specifically ruled on that.  It was only within the protection

19    of that ruling that we proceeded.  Now, Your Honor, they had

20    the option to come to you and say, look, we think this is

21    wrong.  And whatever Your Honor said, that's the law.  That's

22    it.  We agree.  There's no dispute.  But they didn't do that.

23    In fact, thereafter, they affirmatively represented to Judge

24    Smith over and over again the stay doesn't apply.  In fact, I

25    will tell you that I went to court once to complain that the

56

1    motion -- the agreement we entered into -- because when Your

2    Honor said we couldn't move for the use of cash collateral, we

3    had to enter into a very onerous financing agreement.  And what

4    was discovered after the fact is that they didn't hold the lien

5    or even the claim.  And so, when we went in again, I said you

6    know, there's something unfair about this.  They invoked the

7    stay with respect to a loan and a lien they don't hold and now

8    I'm stuck with this onerous financing agreement which they

9    should never have had in the first place because that's not

10   their lien.

11        At that point, Mr. Pachulski, an exceptional lawyer,

12   jumps up and scolds me in front of Judge Smith and says that

13   stay has not been an issue in this case for months.  And that's

14   in their disclosure statement.

15        So maybe it was incorrect for us to rely on Judge

16   Smith's ruling.  But they invoked that issue.  And she

17   responded and ruled.  And we, in reliance on that, went

18   forward.  And they could have come to Your Honor and said Your

19   Honor has the final say and we agree.  There's no dispute.  But

20   they didn't do that.  They said the stay does not apply over

21   and over again.  And it's in their own pleadings.

22        So to the extent that we have proceeded in a manner

23   that's procedurally inappropriate, we apologize.  That was not

24   our intent.  We thought we were doing the right thing.  And I

25   have to tell you, Your Honor, I'm a debtor moving for relief

57

1    from stay.  That just seems -- I mean, it's just a new thing

2    for me and for everybody out there.  There just isn't a lot of

3    case law on this.

4          THE COURT:  Mr. O'Keefe, I understand your position.

5    But here's the concern that I have and it's actually the

6    flipside of the argument that you were making in the context of

7    the unwinding of the Fenway Capital commercial paper program.

8    And that's the question of good faith.  I couldn't have been

9    clearer in January of 2009 that this was the Court that you

10   needed to come to for purposes of getting stay relief, in that

11   instance, relating to the use of cash collateral.

12          But it's now May of 2010.  It's quite a long while

13   after that.  And one of the concerns I have is that Judge Smith

14   and I are players in a cross-country game of gaming the system,

15   of using courts to your particular purpose in order to gain

16   strategic advantage.  And speaking for myself, I don't like

17   that.  I suspect that Judge Smith would say the same thing if

18   she were here.

19          MR. O'KEEFE:  Your Honor, all I can do is apologize.

20   The reality is there was a ruling; we did rely on that.  They

21   did have their procedural remedies.  Maybe in retrospect that

22   was not the right thing to do but rather to take that and

23   immediately come back here.  And in retrospect, given Your

24   Honor's insight, that's what I would do.

25          THE COURT:  Let me ask you a question.  Assuming that

58

1    you are successful in the Ninth Circuit whenever that happens,

2    what's the consequence of that successful prosecution of the

3    appeal of the BAP decision to the Ninth Circuit?  What happens

4    then?  Does it moot my need to decide the pending motion?

5         MR. O'KEEFE:  Your Honor, I don't think it does.  And

6    this is just my analysis of the law.  Essentially, the BAP was

7    correct in one respect, that, procedurally, to the extent that

8    there is a final determination who trumps everybody insofar as

9    the determination relative to the scope and application of the

10   stay, it is the home bankruptcy court.  So if you make a

11   determination with respect to that issue, then our only

12   recourse is to appeal.  That's it.  That's the only option we

13   have.

14        The mechanical -- the effect of the BAP being

15   overruled is there is a case in the Ninth Circuit which

16   determines that a particular course of action in isolation --

17   and again, they didn't appeal the merits of the order denying

18   the motion for relief from stay.  And subsequently, we brought

19   to them they didn't even own these loans so the motion

20   shouldn't have been brought in the first place.  So that's our

21   jurisdictional issue.  But if -- and we believe the Ninth

22   Circuit will reverse this, even if just on jurisdictional

23   grounds to say why are you here.  The motion shouldn't have

24   been brought, the appeal wasn't valid.  It's all vacated.

25        But what we think will happen is we'll clarify the law

59

1    in our circuit.  And that's really, at this point, what we're

2    trying to do.  Insofar as your determination, the reality

3    issue, Your Honor, we have no dispute that to the extent the

4    stay applies, the home bankruptcy court gets to say it applies.

5    And you trump everybody else.  And at that point it's solely --

6         THE COURT:  I'm asking you a slightly different

7    question.  And you may have answered it and I just didn't fully

8    understand the answer.  If you are successful in the Ninth

9    Circuit, would you be able to prosecute the litigation against

10   the Lehman debtors for equitable subordination in the

11   bankruptcy court in Santa Ana without obtaining stay relief

12   here?  That's a yes or no question.

13        MR. O'KEEFE:  Under Baldwin-United, yes, Your Honor --

14        THE COURT:  In that case --

15        MR. O'KEEFE:  -- unless --

16        THE COURT:  -- then the Ninth Circuit adjudication

17   could moot the pending motion here, correct?

18        MR. O'KEEFE:  If Your Honor --

19        THE COURT:  That's a yes or no question.

20        MR. O'KEEFE:  It would depend upon the ruling, Your

21   Honor.

22        THE COURT:  That's a yes, no or I don't know.

23        MR. O'KEEFE:  I would say yes, if it's before the

24   ruling.  Yes, because if they decide that the BAP is overruled,

25   then at this point, Judge Smith's ruling with concurrent

60

1    jurisdiction, but not final -- Your Honor gets the trumper, we

2    agree with that -- every Court has the right to determine

3    whether the stay applies.  So if she determines the stay

4    doesn't apply and nobody comes back here then that's the law of

5    our case and we proceed on that basis.

6        The -- so it would be a timing issue.  Now, on the

7    other hand, if Your Honor were to determine the stay doesn't

8    apply, okay, then the Ninth Circuit would potentially --

9    someone could argue it's an Amwell (ph.), maybe that moots that

10   issue because the home bankruptcy court has ruled it doesn't

11   apply.  We were not -- we want that decision vacated for a lot

12   of reasons.

13       But I think that would be the result.  So I think it's

14   a timing issue.  And I don't mean to be evasive, Your Honor,

15   but -- I mean, the bottom line is we do need a resolution and

16   we're looking to Your Honor to give us that.

17       I would note that subordination -- basically, dealing

18   with these claims, a lien priority dispute, is integral to the

19   plan of reorganization.  It's going to be very difficult for us

20   to reorganize without resolving the claims against the estate.

21   At this point, Your Honor, all the folks, the defendants, are

22   all nondebtors, all nondebtors.  This motion -- this

23   transaction is bringing them, they believe, back into that

24   case.  Now, what Judge Smith did was say, okay.  I agree.  The

25   BAP controls; LCPI has to leave.  So she dismissed them;

VERITEXT REPORTING COMPANY

61

1   they're gone.  There are no debtors in the litigation.  The

2   issue is do they get, through this transaction, to just come

3   right around and buy a claim, in effect, go right back to Judge

4   Smith and say I'm sorry, we're here again.  We still get to

5   thwart the litigation which has a material adverse effect on my

6   ability to confirm a Chapter 11 plan.  And that's really in our

7   mind what's going on here because they're all nondebtors.

8          Now, the whole argument, Your Honor, that we're the

9   aggressor in this -- Your Honor, there's only ten lawyers at

10  Winthrop Couchot.  And only two and a half, on a good day, can

11  work on this case.  These folks have hundreds of them.  These

12  are the two largest bankruptcy firms in the United States.  I'm

13  working seven days a week, get up at 6:00 on a Saturday morning

14  and they have unlimited resources.  So if the concept is that

15  I'm kicking them around like a can, that's not happening.  It

16  is absolutely to the vice versa.

17         THE COURT:  You can put this on your website, it's

18  good for marketing.

19         MR. O'KEEFE:  Your Honor, the merits of the claim that

20  LBHI stay will apply premised upon the contention that they're

21  going to attach a lien to the loans.  And I've already gone

22  through that.  They stated in their motion, the MRA is gone,

23  and that's the basis for the lien.  They state that the

24  guarantee is terminated.  They state that the CP notes are

25  terminated.  So this is some sort of leap-springing lien that I

62

1  don't understand.  And it's a lender of a lender.  That is too

2  indirect for the stay to apply.

3       And, also, to the extent that that's their design.

4  You shouldn't be able to buy into a piece of litigation that's

5  going on in a bankruptcy court and ten stand up and say you

6  know what, I knew it was happening, but I'm here and you're

7  stayed.  That's just something wrong with that.

8       Your Honor, we've had a back and forth relative to

9  whether or not a subordination action is subject to the

10  automatic stay.  We can all agree that a claim objection is not

11  subject to automatic stay.  And a claim objection can

12  effectuate the complete disallowance of a claim.  If the claim

13  is disallowed the lien goes away.

14       What we're trying to do is to subordinate to the

15  extent necessary to deal with the creditors who they've created

16  by authorizing work.  We don't think that is subject to the

17  stay.  Your Honor may have a different opinion.  But if that's

18  the case, I would simply say to Your Honor that it's very

19  difficult to do a reorganization if you can't deal with claims

20  and liens against your estate.

21       So conceptually both cases should be able to proceed.

22  And Your Honor should be able to fashion, and I note that the

23  creditors' committee, although they object to this, say as a

24  secondary position that Your Honor could have a reporting

25  system or other controls that would assure that your case was

63

1    not affected.  But it can be that a grader or a framer in

2    California doesn't get paid and the creditors in this case gets

3    paid.  There has to be a medium where they both can proceed.

4         The problem that we have from a balance of the harms

5    perspective, and basically our orientation under Sonnax was,

6    these huge properties are sitting there.  Every weekend I drive

7    passed one.  And it is this giant expanse of land with dust

8    blowing around in the midst of a city.  And there are fire

9    issues, there are flood issues, there are dust issues.  We

10   can't solve that problem until we deal with this claim.  So

11   delay has a material affect on our asset and theirs.  Nobody

12   gains by delay.  This is not a solution, it is simply a -- in

13   our estimation an issue of litigation leverage.  The pricing of

14   a future settlement, and that's not a basis -- that is not a

15   harm for them.  But it is a severe harm for us.  I don't know

16   that we don't have relief from stay.

17        THE COURT:  All right.  Let me just see if we can

18   accelerate through the rest of your argument.  Because we've

19   been going at this for a long time, and we have a very full

20   courtroom still.

21        MR. O'KEEFE:  I apologize, Your Honor.

22        THE COURT:  No, you have nothing to apologize for.

23   But as you point out you're not exactly a party-in-interest

24   here.

25        MR. O'KEEFE:  Well --

64

1    THE COURT:  You're a party-in-interest, representing

2 the interest of the SunCal debtors and I appreciate that.  But

3 I think we need to move it along.

4    MR. O'KEEFE:  Then I would simply submit to the Court

5 as we've gone through in our briefs, that to the extent the

6 stay applies, to the extent that Your Honor determines that it

7 does apply, Your Honor should lift the stay to the extent

8 necessary to allow the action to proceed.

9    One of the points that Mr. Miller made was there is a

10 settlement.  Your Honor, this case will settle.  I can't

11 guarantee that for sure.  But the reality is there is a dynamic

12 here, the parties where they initially weren't talking, now

13 they are talking.  The truth of the matter is, the stay will

14 just cause delay, it will shift litigation leverage and it

15 isn't a solution.

16    So we have addressed the Sonnax factors, we are asking

17 for limited relief from stay.  To the extent that we've

18 offended the Court I sincerely apologize, that was certainly

19 not our intent.  We thought we were doing the right thing.

20    THE COURT:  Okay.

21    MR. O'KEEFE:  Thank you, Your Honor.

22    THE COURT:  Apparently Mr. Miller is going to be

23 brief.

24    MR. MILLER:  Be very brief.  Learning more about

25 bankruptcy law and bankruptcy stays than I ever knew before.

65

1          Your Honor, I just want to very briefly, because I

2   think it's been well addressed.  I just want to answer Your

3   Honor's question about, you know, why didn't you come back

4   sooner?  And this is from my perspective as a trial lawyer, a

5   litigation lawyer, not a bankruptcy lawyer.

6          In March of '09, Judge Smith -- I was there, they

7   moved for relief from stay so they could foreclose.  And Judge

8   Smith in her order, I'm quoting, says "that her court has

9   concurrent jurisdiction to determine the scope or applicability

10  of the automatic stay under 11 U.S.C. 362(a)."  And she said

11  "the automatic stay arising from the bankruptcy case of Lehman

12  Commercial Paper does not apply to any proceeding to

13  subordinate the claim of Lehman Commercial Paper and/or to the

14  transfer of the lien," so forth and so on.

15         So, you know, we won, we thought we were golden, and

16  to the extent we should have come back here -- this is my take

17  on it, we should have come back here with this order since I

18  gather from my lesson this morning this Court has the final say

19  on the debtor before this Court's stay.  We probably should

20  have come back here with this order.  And to the extent we

21  didn't, we're sorry.

22         The BAP then reversed at the end of the year.  And

23  when the BAP reversed we had this ruling from Judge Smith that

24  LCPI had sold the loans to Fenway, all of them.  So it didn't

25  seem like LCPI was part of the case anymore, or that the stay

66

1   was implicated.

2        Then we get this compromise motion, and we say whoa,

3   this compromise motion brings LCPI and Lehman entities back

4   into the picture, we better fire up our motion for relief from

5   stay.  So here we are, okay.  Here we are.  And to the extent

6   we should have done it sooner, we should have done it sooner.

7   But there was no intent, at least from my perspective, to ever

8   avoid or evade the jurisdiction of Your Honor, and, Your Honor,

9   the stay in this court.  Okay, so that's number one.

10       Number two, very briefly.  My ultimate -- I'm

11  representing the debtors, but my ultimate clients are, like Mr.

12  O'Keefe said; the grading contractor, the drywall, the guy that

13  does the sidewalks, the retaining walls, they're all in

14  California, all the documents are in California.  We filed our

15  lawsuit in January of '09.  We've virtually completed document

16  discovery.  Mr. Lobel's been working real hard, and I'm hoping

17  this settlement sticks for part of the estates, frankly.  I'm

18  hoping it seeps over to the other estates, if we can work that

19  through.  I'm working with him and with his office, and it's

20  going to take a lot more work, but I don't want to change the

21  playing field.  And that's why we're here, Your Honor.  We want

22  to be able to maintain the playing field as it is right now.

23  I've got my lawsuit, we're litigating equitable subordination.

24  I'm beginning to think they think we have a pretty good case

25  based on what I'm hearing on this settlement that Mr. Lobel's

67

1   been negotiating, but, you know, I'll put that on my website or

2   something.

3           THE COURT:  No, I suggest you don't do that.

4           MR. MILLER:  I just want to be able to keep it going

5   and not have to go back to California and say well, we're going

6   to try the case there against the nondebtors, because there's

7   no stay implicated.  But then we've got to take some of the

8   same creditors and come back to Your Honor, and basically retry

9   the same case and do it twice.  And that's exactly -- I was

10  reading the papers on the plane, in a footnote that's exactly

11  what they say they -- that's exactly what they suggest.  They

12  suggest that they could have requested that the entire

13  equitable subordination be tried before this Court, but they're

14  not.  They just want the LCPI piece here and I guess the

15  nondebtor piece in California.  That doesn't make any sense.

16  That is -- I think that's gaming the system.  That's just a

17  litigation tactic, it's clever, very smart lawyers.  But it's

18  just repetitious, duplicative.

19          I'm sure this Court is, you know, very, very busy.  I

20  know Judge Smith is very busy, because I've spent half of my

21  life there over the last year.  And I would just request Your

22  Honor to enter relief to the extent it's necessary so that we

23  can do it all in California.

24          THE COURT:  All right.

25          MR. MILLER:  Thank you, Your Honor.

VERITEXT REPORTING COMPANY

68

1            MR. PEREZ:  Your Honor, Alfredo Perez.  A couple of

2      comments.

3            I hear counsel saying that they believe that the home

4      court has the last say on the automatic stay.  Unfortunately, I

5      believe that their actions really don't support that.

6            And, in fact, Your Honor, if the Court looks at the

7      equitable subordination claim, one of the predicate acts, if

8      you will, to the liability for equitable subordination is --

9      are improper attempt to enforce the automatic stay before this

10     Court.  So it's completely -- this pleading completely belies

11     the mea culpas that we've heard this morning.

12           Second, Your Honor, as it relates to whether the stay

13     apply, I don't believe that there's any question but that the

14     stay does apply.  The BAP found that the stay applies, in

15     connection with their equitable subordination claim.  I mean,

16     what they really want to do, is they really want to strip our

17     lien.  It's not the situation that you had before Judge Drain,

18     where you're reordering priorities.  And I read Shinsei three

19     times and the Court basically says under these circumstances

20     involving Japanese law, it's limited to these facts.  I don't

21     think that's a broad ruling that equitable subordination is

22     defensive in every ruling.  Judge Gonzalez's ruling in Enron

23     says it's affirmative.  So I don't believe that there's any

24     question about the fact that the stay does apply.

25           Now, let me address what I believe is the key Sonnax

69

1    factors, and that is balancing of the harm.  Your Honor, at

2    this point -- and we could have, by the way, I'll take up Mr.

3    Miller's point.  I mean, we could have requested that the whole

4    thing be moved here.  And as a practical matter, we didn't

5    think that was appropriate because, first of all, in view of

6    this Court's docket and the fact that it's basically their

7    claim.  So we didn't think that was appropriate.

8         But we also don't think it's appropriate for the stay

9    to be lifted at this time.  There may be an appropriate time

10   for the stay to be lifted.  But there are probably three or

11   four -- what I think are very compelling reasons why the stay

12   shouldn't be lifted.

13        The first one is, Your Honor, we need to see the

14   settlement through.  We need to see what ends up at the end of

15   the day.  Now, there are -- there has been LCPI loans that

16   weren't in Fenway, that have always been the subject of the

17   stay regardless of the Fenway deal.  So we really need to see

18   that settlement through.

19        We also need to see what the BAP does.  I mean -- and

20   I think the Court's --

21        THE COURT:  I think you mean what the Ninth Circuit

22   does.

23        MR. PEREZ:  What the Ninth Circuit does, I think

24   you're -- and I think Your Honor's play was absolutely upright.

25   And, frankly, if I was in Mr. O'Keefe's shoes I probably would

70

1    have done the same top dance in response to your question.

2    Because I think the answer based on their papers is yes.  It

3    would moot it.  I mean, that's basically what they were telling

4    you.  Yes, if you read their papers, that's what they said.

5    That's number one.

6         Number three, Your Honor, I mean we are regardless of

7    whatever anybody says, at a critical time in this case.  I

8    mean, filed a plan, we filed a disclosure statement, going to

9    file the motion to approve the disclosure statement hopefully

10   this Friday.  That's one of the things I'm going to do when I

11   get back.  And we're going to prosecute the plan.  And it's

12   going to take a while, but we're affirmatively going to

13   prosecute the plan.

14        And to the extent that we are able to resolve the

15   thing with seventy-five percent of the value, I think that's --

16   that's going to instruct a lot better as to how the balance

17   gets resolved.  And continuing to litigate in my mind

18   doesn't -- I mean, it's great for Mr. Miller to come up here

19   and take credit, you know, for something that he learned about

20   on Friday, that's terrific.  But the fact of the matter is is

21   that despite those efforts, I mean we are trying to reach

22   resolution.  We're trying to reach a resolution with all our

23   constituencies, that's not something that we take lightly.

24        I mean, if our goal was to litigate, Your Honor, as

25   the Court well knows, you know we could be here 24/7, you know,

71

1   until we're both very old.  And that's not our goal.  I mean,

2   our goal is to try to resolve these matters as expeditiously as

3   possible.  And I think we are making progress.

4         So, Your Honor, at a very minimum I would request that

5   the Court defer the stay.  I think the Court should deny at

6   this time, without prejudice, and let them resurge their

7   motion.

8         And, by the way, Your Honor, the thought that they

9   can't craft a plan that they do come back here and say this is

10  our plan, we'll set up a litigation trust, we'll do whatever.

11  I mean, that's what people -- that's what people normally do.

12  And come to Your Honor and say you know, we'll -- we want the

13  stay lifted so we can prosecute this plan, this sets up the

14  litigation trust.  I don't see any reason why something -- and

15  basically the Court had invited them to do that.  And they

16  haven't done it.

17        So for all those reasons, Your Honor, we think the

18  motion should be denied.

19        THE COURT:  Is there anything more?

20        MR. O'KEEFE:  Your Honor, just one minute.  Counsel's

21  comparative with a balance of harms is that they need

22  apparently an allocation of resources relative to filing their

23  plan.  Certainly, they have more than sufficient resources

24  between the firms that they have working on this, and they also

25  have a professional firm managing the debtors' liquidation.

72

1          In contrast, the balance of the harms, the delay on

2     our part, is the properties, Your Honor.  These are huge pieces

3     of property that probably stretch from here to the Hudson.

4     So -- I mean, some of these are ten thousand acres.  They're in

5     the midst of cities, there are material issues that we have

6     addressed.  So there is a fundamental difference, the balance

7     of the harms tip sharply in our favor.

8          Insofar as the concept of settlement should delay the

9     litigation, certainly Your Honor has participated in this

10    process on both sides of this to see that litigation, if there

11    is a stay, the settlement might go away, or alternatively it

12    will change.  Certainly, the litigation is a driver for

13    settlement and it will expedite that process to our mutual

14    benefit.  Thank you, Your Honor.

15          THE COURT:  All right.  This took quite a bit longer

16    than I anticipated.  And it's a complicated question.  One of

17    the things that I believe complicates it is the fact that there

18    is an appeal currently pending before the Ninth Circuit court

19    of appeals from the decision of the Ninth Circuit Bankruptcy

20    Appellate Panel.  And I believe, but don't know, that it is

21    more likely than not that successful prosecution of the appeal

22    in the Ninth Circuit by the SunCal debtors in fact will moot

23    the motion which is before me.

24          There's a corollary, however, which is my granting the

25    pending motion may to some extent moot the appeal.  This is

73

1    another example of what we've been colloquially calling gaming

2    the system, in effect, using litigation to gain tactical

3    advantages.  In this instance, litigation which has gone all

4    the way to the Court of Appeals level in the Ninth Circuit and

5    litigation which was not brought here for stay relief that

6    could have been brought earlier.

7           Ultimately, the question of whether or not I should

8    grant relief from the automatic stay is driven by my

9    application of the Sonnax factors.  And both parties appear to

10   be focused most heavily on the balance of harms factor.  That's

11   convenient because I prefer to focus on that one myself.

12          One of the reasons I have a difficult time finding

13   that there is any material harm to the SunCal debtors in not

14   granting their motion for stay relief is that they did not

15   bring it until now.  The SunCal debtors have scrupulously

16   avoided coming into this court from November of 2008 until

17   today.  And have managed to deal with their litigation requests

18   in the bankruptcy court and beyond apparently without material

19   impairment in those efforts.  In effect, they've elected their

20   remedy.  They have chosen to proceed with litigation in their

21   home court.  And when they suffered a reversal at the BAP level

22   at the end of last year then had to review their strategy

23   again.

24          Having gone to the Ninth Circuit, I believe the Ninth

25   circuit is the place for this question to be decided.  And I'm

74

1    going to defer my decision with respect to stay relief until

2    after the Ninth Circuit has acted.

3          Moreover, and I think this is a very significant

4    point, the existence of the stay is not inconsistent with the

5    pursuit of negotiations that could lead to a resolution of this

6    ongoing dispute.  The fact that the involuntary debtors,

7    through their trustee, appeared to have reached an agreement in

8    principle resolving many, if not all, of the same issues that

9    are set forth in the equitable subordination complaint,

10   demonstrates that it's possible for the parties to engage in

11   potentially productive discussions, notwithstanding the fact

12   that they stay remains in effect.

13         To the extent that the existence of the stay is viewed

14   as an impediment of any sort to meaningful dialogue, I want to

15   be absolutely clear in saying that I do not believe the stay

16   impacts in any adverse way the ability of the parties to meet

17   and confer -- to mediate or to otherwise seek a constructive

18   resolution of the matters that are currently before the

19   bankruptcy court in the Central District of California.

20         As to active litigation, the motion is denied without

21   prejudice to being reconsidered at some later time in the case,

22   either before or after the Ninth Circuit has acted.

23         And I will consider an appropriate order consistent

24   with what I've just said.

25         MR. PEREZ:  Your Honor, we'll prepare one and submit

75

1    it to counsel.

2            THE COURT:  Fine.

3            MR. O'KEEFE:  Your Honor, can I ask a few clarifying

4    questions?

5            THE COURT:  You can ask.

6            MR. O'KEEFE:  Is the Court --

7            THE COURT:  The motion's denied.  I want to be really

8    clear on that.  Your motion is denied.

9            MR. O'KEEFE:  And I'm not rearguing the motion, Your

10   Honor.

11           THE COURT:  Fine.

12           MR. O'KEEFE:  So the Court -- is the Court finding the

13   stay applies and the motion is denied?

14           THE COURT:  The stay applies and the motion is denied.

15           MR. O'KEEFE:  Is the Court finding that insofar as

16   LBHI -- what is the Court's finding with respect to the

17   application of their stay?

18           THE COURT:  I'm not making any particularized

19   findings.  And let me be really clear, the law in the Southern

20   District of New York as stated by Judge Gonzalez in the Enron

21   case, and I choose to follow his reasoning, is that litigation

22   brought by a party against a debtor seeking to equitably

23   subordinate claims of that debtor constitutes a violation of

24   the automatic stay.  To the extent that there are debtors or

25   debtor property implicated by your litigation I am saying the

76

1    stay applies.  And I'm not going to say more than that.  And I

2    think it's a good time for you to sit down.

3        MR. O'KEEFE:  Very well, Your Honor.  We appreciate

4    the Court's time and consideration.

5        THE COURT:  Sure.

6        MR. MILLER:  I just wanted to thank the Court for the

7    pro hac vice admission, and for hearing me this morning.  Thank

8    you.

9        THE COURT:  No problem at all.  And then just so it's

10   clear what my view is of the Shinsei case because that has been

11   liberally misquoted in papers, my ruling with respect to the

12   Shinsei case speaks for itself.  But I view actions taken

13   pursuant to principles of Japanese bankruptcy law which would

14   have the effect of subordinating claims, not to be covered by

15   the principal announced by Judge Gonzalez in the Enron case

16   because under Japanese law active litigation comparable to an

17   adversary proceeding is not involved.  And in that case the

18   action taken by Shinsei Bank was not self executing and

19   involved actions to be taken by a quasi judicial figure, a

20   supervisor, who would be determining whether and when a

21   competing plan would be circulated to creditors.  It was

22   incredibly fact specific, and is not subject to broad

23   application in the U.S.

24       MR. PEREZ:  Thank you, Your Honor.  May I be excused,

25   Your Honor?

77

1      THE COURT:  Yes.

2      MR. PEREZ:  I believe, Your Honor, the balance of the

3  matters on the docket are not being handled by our firm, Your

4  Honor.

5      (Pause)

6      MR. TAMBE:  Good morning, Your Honor.

7      THE COURT:  Good morning.

8      MR. TAMBE:  Jay Tambe from Jones Day, counsel for the

9  debtors.

10      I'm addressing items 4 and 5 on this morning's agenda.

11      Number 4 is the motion of the debtors for an entry of

12  order to consolidate certain proceedings.  And the proceedings

13  we are seeking to consolidate are basically three.  There are

14  two adversary complaints, one each against Nomura International

15  and Nomura Securities.  And also we are seeking to consolidate

16  an objection with respect to Nomura GFP.

17      We've had some developments, I think we've resolved

18  part of the motion, and we're seeking to adjourn part of the

19  motion.  I can address those issues if the Court would like.

20      THE COURT:  I'd be delighted to hear about the

21  resolution.

22      MR. TAMBE:  With respect to International and

23  Securities, those two entities did put in a response to the

24  motion to consolidate.  And those two entities have expressed

25  concerns about consolidation off an evidentiary hearing or

**EXHIBIT B**

000067

Hearing Date and Time: March 17, 2010 at 10:00 a.m. (Prevailing Eastern Time)
Objection Date and Time: March 10, 2010 at 4:00 p.m. (Prevailing Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Harvey R. Miller
Shai Y. Waisman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                        :
In re                                   :    Chapter 11 Case No.
                                        :
LEHMAN BROTHERS HOLDINGS INC., et al.,  :    08-13555 (JMP)
                                        :
                    Debtors.            :    (Jointly Administered)
                                        :
------------------------------------------------------------x
```

## NOTICE OF DEBTORS' MOTION PURSUANT
## TO SECTION 363 OF THE BANKRUPTCY CODE AND
## BANKRUPTCY RULE 6004 FOR APPROVAL OF COLLATERAL
## DISPOSITION AGREEMENT WITH JPMORGAN CHASE BANK, N.A., ET AL.

PLEASE TAKE NOTICE that a hearing on the annexed Motion of Lehman

Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11

cases (together, the "Debtors") for approval of a collateral disposition agreement with JPMorgan

Chase Bank, N.A. and certain of its affiliates, subsidiaries or related entities (collectively,

"JPMorgan"), all as more fully described in the Motion, will be held before the Honorable James

M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander

Hamilton Customs House, Courtroom 601, One Bowling Green, New York, New York 10004

(the "Bankruptcy Court"), on **March 17, 2010 at 10:00 a.m. (Prevailing Eastern Time)** (the

"Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall

be in writing, shall conform to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") and the Local Rules of the Bankruptcy Court for the Southern District of New York,

shall set forth the name of the objecting party, the basis for the objection and the specific grounds

thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order

M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy

Court's case filing system and by all other parties-in-interest, on a 3.5 inch disk, preferably in

Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing

format (with two hard copies delivered directly to Chambers), and shall be served upon: (i) the

chambers of the Honorable James M. Peck, United States Bankruptcy Judge, One Bowling

Green, New York, New York 10004, Courtroom 601; (ii) Weil, Gotshal & Manges LLP, 767

Fifth Avenue, New York, New York 10153, Att: Harvey R. Miller, Shai Y. Waisman and

Brennan Hackett, attorneys for the Debtors; (iii) Wachtell, Lipton, Rosen & Katz, 51 West 52nd

Street, New York, New York 10019, Att: Harold S. Novikoff and Amy R. Wolf, attorneys for

JPMorgan; (iv) the Office of the United States Trustee for the Southern District of New York

(the "U.S. Trustee"), 33 Whitehall Street, 21st Floor, New York, New York 10004, Att: Andy

Velez-Rivera, Esq. and (v) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza,

New York, New York 10005, Att: Dennis F. Dunne, Dennis O'Donnell and Evan Fleck,

attorneys for the Official Committee of Unsecured Creditors, on or before **March 10, 2010 at**

**4:00 p.m. (prevailing Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not

received by the Objection Deadline, the relief requested shall be deemed unopposed, and the

Bankruptcy Court may enter an order granting the relief sought without a hearing.

C:\NRPORTBL\US_ACTIVE\HACKETTB\43295877_15.DOC          2

PLEASE TAKE FURTHER NOTICE that objecting parties, if any, are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: February 24, 2010
New York, New York

/s/ Shai Y. Waisman
Harvey R. Miller
Shai Y. Waisman

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

000070

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Harvey R. Miller
Shai Y. Waisman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
                                              :
**In re**                                     :    **Chapter 11 Case No.**
                                              :
**LEHMAN BROTHERS HOLDINGS INC., et al.,**    :    **08-13555 (JMP)**
                                              :
                       **Debtors.**           :    **(Jointly Administered)**
                                              :
-----------------------------------------------------------------x

### DEBTORS' MOTION PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 6004 FOR APPROVAL OF COLLATERAL DISPOSITION AGREEMENT WITH JPMORGAN CHASE BANK, N.A., ET AL.

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as debtors and debtors in possession (together, the "Debtors" and, collectively with their non-debtor affiliates, "Lehman"), move for approval of the Agreement (as defined below) with JPMorgan Chase Bank, N.A. ("JPMorgan Bank") and certain of its affiliates, subsidiaries, and related entities (collectively with JPMorgan Bank, "JPMorgan") and respectfully represent:

## Preliminary Statement

1.      In an effort to transfer management of certain illiquid securities held as collateral by JPMorgan back to certain of the Debtors, the Debtors and JPMorgan have reached agreement upon a Collateral Disposition Agreement (the "Agreement") in the form annexed hereto as Exhibit A.[1] The purpose of this agreement is twofold. First, it provides the Debtors with the means of recovering and administering, in a manner most conducive to enhancing their value, illiquid securities with an aggregate face value in the billions of dollars. Second, it allows JPMorgan to apply cash and cash equivalents it is currently holding to provisionally satisfy its claims against the Debtors, while reserving the rights of all parties with respect to the propriety of such claims. Upon a further cash payment to JPMorgan by the Debtors in the amount of the unpaid claims balance remaining after application of the cash and cash equivalents, JPMorgan will transfer the illiquid securities to certain of the Debtors, with all parties reserving their respective rights.

2.      Prior to the commencement of these chapter 11 cases, JPMorgan Bank served as Lehman's primary bank, depository institution, clearing bank and intermediary for third-party intraday loans and tripartite repurchase transactions. JPMorgan Bank provided such services to LBHI's primary broker/dealer subsidiary, Lehman Brothers Inc. ("LBI"), a regulated broker/dealer under the Securities and Exchange Act of 1934.[2] During the course of that

---

[1] The amounts of the Unpaid Designated Claims Balance and the Designated Claims Balance (each as used and defined in the Agreement) currently set forth in the Agreement are based upon JPMorgan's current calculations, which have yet to be verified by the Debtors. The Debtors and JPMorgan expect to reconcile such figures in the near term and, thereafter, execute the Agreement. The Debtors will file the executed Agreement on the docket of these cases prior to the hearing on this Motion. As set forth in the Agreement, the Unpaid Designated Claims Balance, the Designated Claims Balance and the Annexes will be subject to adjustments agreed by the Debtors and JPMorgan to reflect corrections, reconciliations and transactions through the effective date of the Agreement.

[2] On September 19, 2008, a proceeding was commenced against LBI in the United States District Court for the Southern District of New York under the Securities Investor Protection Act of 1970, as amended, 15 U.S.C. §§ 78aaa et seq. ("SIPA"). James L. Giddens, Esq. was appointed as the trustee under SIPA (the "SIPA Trustee") and is administering LBI's estate.

C:\NRPORTBL\US_ACTIVE\HACKETTB\43295877 15.DOC          2

000072

relationship, JPMorgan Bank required LBI to deposit collateral security for clearing and

settlement services performed by JPMorgan Bank. During the summer of 2008, JPMorgan Bank

required LBHI to execute a guaranty dated as of August 26, 2008, covering certain of LBI's

obligations to JPMorgan Bank and post collateral securing such guaranty. Although the

collateral posted by LBHI had a face value in the billions of dollars, it consisted of illiquid

securities whose actual value was difficult to ascertain.

     3.     In September 2008, LBHI executed (i) a guaranty in favor of JPMorgan

Bank, its subsidiaries and its affiliates covering the obligations of all Lehman entities to such

JPMorgan entities and (ii) a security agreement securing such guaranty with the collateral

previously deposited by the Lehman entities, as well as additional collateral. Between

September 9, 2008 and September 12, 2008, LBHI posted an estimated $8.57 billion in cash and

money market funds as additional collateral security.

     4.     JPMorgan has filed proofs of claim against LBHI, the other Debtors and

LBI in their respective cases asserting claims exceeding $29 billion in the aggregate as of

October 2008 (the "Claims"). JPMorgan has asserted that the Claims are secured by the

collateral deposited by LBI and LBHI, including the collateral described above (the

"Collateral"). JPMorgan has advised the Debtors that it setoff against the Claims certain

Collateral deposited by certain of the Debtors after September 15, 2008. In addition, from time

to time, JPMorgan applied portions of the Collateral to reduce the amount of the outstanding

Claims, although it has not applied any illiquid Collateral.

     5.     The parties have engaged in extensive and arms'-length negotiations to

come to an agreement under which JPMorgan, without prejudicing the claims or defenses that

the Debtors, LBI and JPMorgan may have against one another, could provisionally apply the

000073

cash Collateral and transfer control of the illiquid Collateral to LBHI to permit it to administer

the illiquid Collateral as a subrogee of JPMorgan's Claims against LBI and other parties. As a

result of these negotiations, JPMorgan, LBHI and the other Debtors executed the Agreement.

      6.     After giving effect to the application of Collateral to date (including from

the receipt of proceeds received from the disposition of Collateral), the current outstanding

amount of the Claims asserted by JPMorgan (including estimated accruals of interest and fees

through March 31, 2010) is approximately $7.68 billion. After the application of the remaining

liquid Collateral (the "Cash Collateral") pursuant to the Agreement, the balance of the asserted

Claims will be approximately $557 million. After such application, the remaining Collateral will

consist of assets that are largely illiquid in the current economic environment or whose

disposition at this time would result in substantially diminished returns. Such assets would

benefit from long-term, active and effective management. The Debtors believe that the

Agreement will provide the Debtors with a means of administering such remaining illiquid

Collateral in the manner most conducive to enhancing recoveries. Specifically, pursuant to the

Agreement:

- JPMorgan will reduce its remaining aggregate Claim balance from approximately $7.68 billion to approximately $557 million through application of the Cash Collateral consisting of certain cash, cash proceeds of securities and money market funds all posted by the Debtors and LBI.

- JPMorgan will transfer the remaining illiquid Collateral to LBHI.

- LBHI will make a one time cash payment to JPMorgan in an amount of approximately $557 million, equal to the aggregate unpaid balance of JPMorgan's Claims.

- LBHI will step into the shoes of JPMorgan as a secured creditor of LBI and the guaranteed Debtors as a subrogee of JPMorgan without any prejudice or impairment of any and all rights of LBI or the other Debtors as to the validity or enforceability of such claims and without any waiver of any further rights of any parties-in-interest.

- Each Lehman entity reserves any and all rights and remedies it may have under applicable law, contract or otherwise, including, without limitation, the right to

contest the validity and enforceability of any such provisionally allowed secured or other Claim and/or to avoid or contest such Claims, any alleged guarantee thereof and any alleged security therefor.

7.      By providing LBHI with the ability to directly manage the remaining Collateral, LBHI believes the Agreement will result in substantially greater recoveries to more than offset the cash payment under the Agreement. The Debtors' decision to enter into the Agreement represents a reasonable exercise of business judgment and is in the best interests of their respective estates and creditors and all economic stakeholders.

### Relief Requested

8.      By this Motion, pursuant to section 363 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Debtors seek approval of the Agreement and authorization to consummate the transactions contemplated thereby.

### Jurisdiction

9.      This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

### Lehman's Business

10.     Prior to the events leading up to these chapter 11 cases, Lehman was the fourth largest investment bank in the United States. For more than 150 years, Lehman had been a leader in the global financial markets by serving the financial needs of corporations, governmental units, institutional clients and individuals worldwide.

11.     Additional information regarding the Debtors' businesses, capital structures, and the circumstances leading to the commencement of these chapter 11 cases is contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy

C:\NRPORTBL\US_ACTIVE\HACKETTB\43295877_15.DOC          5

Rules for the Southern District of New York in Support of First-Day Motions and Applications,

filed on September 15, 2008 [Docket No. 2].

**Background**

12.    Commencing on September 15, 2008 and periodically thereafter (as

applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with

this Court voluntary cases under chapter 11 of the Bankruptcy Code. The Debtors' chapter 11

cases have been consolidated for procedural purposes only and are being jointly administered

pursuant to Bankruptcy Rule 1015(b). The Debtors are authorized to operate their businesses

and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of

the Bankruptcy Code.

13.    On September 17, 2008, the United States Trustee for the Southern

District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured

creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

14.    On September 19, 2008, a proceeding was commenced against LBI in the

United States District Court for the Southern District of New York under SIPA. James L.

Giddens, Esq. was appointed as the SIPA Trustee. The case commenced against LBI under

SIPA was subsequently referred to this Court and is being administered as a companion

proceeding with the Debtors' chapter 11 cases.

15.    Prior to the commencement of its SIPA proceeding, LBI was LBHI's

primary registered broker-dealer, derivatives dealer and investment adviser subsidiary. As such,

LBI was charged with the trading of securities for Lehman's own account and on behalf of its

customers and served as a crucial component of LBHI's financial services business.

000076

A.    **The Asserted Bases for JPMorgan's Claimed Liens and Security Interests**

16.    As of 2008, JPMorgan Bank was Lehman's primary bank, depository institution, clearing bank and intermediary for third-party intraday loans and tripartite repurchase transactions. As such, JPMorgan Bank was clearing agent for LBI. Pursuant to a Clearance Agreement, dated June 7, 2000 (the "Initial Clearance Agreement"), JPMorgan Bank acted as LBI's primary clearing bank, facilitating LBI's settlement of securities transactions, including by extending credit to LBI to facilitate the clearance of such transactions.

17.    The parties operated under the Initial Clearance Agreement through at least the beginning of 2008. Prior to 2008, JPMorgan Bank was secured by the collateral held in LBI's accounts. Beginning in 2008, JPMorgan Bank advised LBI that it would require a more substantial haircut on the assets it was financing. LBHI determined that LBI was unable to provide the additional collateral sought by JPMorgan Bank and that it would be posted by LBHI or other Lehman entities. Between June and August 2008, Lehman Commercial Paper Inc. ("LCPI") and LBHI deposited various securities to serve as supplemental collateral in connection with the Initial Clearance Agreement. As of early September 2008, the face amount of the collateral posted by LBHI was approximately $6.2 billion.

18.    During the Summer of 2008, JPMorgan Bank required that the Initial Clearance Agreement be amended (the "August 2008 Amendment") to include all Lehman entities that engaged in clearing activies as counterparties. JPMorgan Bank also required a guaranty of LBI's obligations under the Initial Clearance Agreement and a security agreement to grant JPMorgan Bank a security interest in cash and securities accounts of LBHI maintained with JPMorgan Bank.

000077

19. On September 9, 2008, LBHI entered into a further amendment of the Initial Clearance Agreement (the "September 2008 Amendment" and, together with the Initial Clearance Agreement and the August 2008 Amendment, the "Clearance Agreement"). In connection with the execution of the September 2008 Amendment, LBHI also entered into an additional security agreement and guaranty agreement in favor of JPMorgan Bank, its subsidiaries and its affiliates covering the obligations of all Lehman entities to such JPMorgan entities. Between September 9, 2008 and September 12, 2008, LBHI posted approximately $8.57 billion in cash and money market funds as additional collateral security.

**B.    JPMorgan's Asserted Secured Claims**

20. JPMorgan has filed Claims against LBHI, the other Debtors and LBI asserting that the aggregate debts and liabilities to JPMorgan exceed $29 billion prior to application of the proceeds of Collateral and setoffs. The Claims relate to, among other things:

- the clearance and settlement of securities transactions, and the extension of credit with respect thereto, by JPMorgan to LBI under the Clearance Agreement;
- derivatives transactions between various LBHI subsidiaries (Debtors and non-Debtors) and JPMorgan entities;
- securities lending transactions, including transactions under which JPMorgan acted as principal and transactions under which JPMorgan acted as agent;
- securities options;
- repurchase and reverse repurchase agreements;
- distributions agreements;
- account overdrafts;
- a loan to a Japanese subsidiary of LBHI;
- alleged defaults by LCPI under a participation agreement;
- unremitted underwriting and placement fees;
- claims in favor of mutual funds, commingled funds and other investment vehicles allegedly affiliated with JPMorgan, including customer claims, derivative claims, securities lending claims and claims arising from securities issued or guaranteed by LBHI or subsidiaries;

- service contract, account charges and other fees; and
- LBHI guaranties of the foregoing.

## C.    The Current Status and Composition of the Collateral

21.    As of the Commencement Date, JPMorgan Bank held Collateral consisting of illiquid securities with an aggregate face value in the billions of dollars, but of unknown actual value, and approximately $9 billion in cash and cash equivalents. The largely illiquid Collateral that remains in JPMorgan Bank's possession consists of securities posted by the Debtors and LBI (the "Securities Collateral"). These in turn consist of, among other things, credit derivatives and convertible bonds, preferred stock, structured debt and securitizations, including collateralized debt obligations secured by mortgage loans and corporate loans.[3] The Securities Collateral requires long-term, active and effective management. LBHI believes that in the current poor economic environment, a forced liquidation of the illiquid Collateral would result in highly diminished recoveries to the detriment of all parties. Conversely, if the Securities Collateral is effectively managed, the potential recovery value will materially increase.

22.    The Collateral also includes the Cash Collateral, which consists of certain unapplied cash Collateral, cash proceeds of securities Collateral and money market fund Collateral largely deposited by LBHI as set forth on Annex A of the Agreement. JPMorgan has advised the Debtors that it currently holds Cash Collateral in the aggregate amount of approximately $7.12 billion. JPMorgan has advised the Debtors that, after application of Collateral proceeds to the Claims through the date of the Agreement and prior to the proposed

---

[3] The Securities Collateral is comprised of the assets listed on Annex B of the Agreement. Annex B of the Agreement has been redacted to protect the commercially sensitive nature of information regarding such assets, disclosure of which could significantly impair the ability of LBHI's estate to maximize the value of such assets in the open market, or JPMorgan's ability to maximize the value of such assets if this motion is denied. Annex B of the Agreement, as has and will be revised, has been and will be provided to the Creditors' Committee. The final version of Annex B of the Agreement will be made available for *in camera* review by the Court.

application of Cash Collateral pursuant to the Agreement ("Prior Payments"), the balance of the

Claims asserted by JPMorgan is approximately $7.68 billion.

## The Agreement

23.    Following months of extensive arms'-length negotiations among LBHI,

the Debtors and JPMorgan, an Agreement has been reached as to the disposition of the remaining

Collateral and the satisfaction of the Claims on a provisional basis without prejudice to the

rights, claims or defenses of any economic stakeholders, including the SIPA Trustee, or any

other party, including JPMorgan.[4]  The Agreement provides that:

- the Claims of JPMorgan, to the extent of the Collateral applied and the Cash Payment paid by LBHI pursuant to the Agreement, are provisionally allowed;

- JPMorgan will promptly apply the Cash Collateral of approximately $7.12 billion to the Claims to reduce the Designated Claims Balance from approximately $7.68 billion to approximately $557 million;[5]

- JPMorgan will transfer the Securities Collateral to LBHI, and thereafter, LBHI will administer and manage the disposition of such Collateral;

- in consideration of the application of the Collateral deposited by LBHI (including amounts heretofore applied) and the payment of the cash payment of approximately $557 million, LBHI shall be subrogated to the Claims of JPMorgan as a secured creditor of LBI and other Lehman entities, without any waiver of any rights of or prejudice to any parties-in-interest, including JPMorgan and LBI; and

- each Lehman entity reserves any and all rights and remedies it may have under applicable law, contract or otherwise, including, without limitation, the right to contest the validity and enforceability of any such provisionally allowed secured or other Claim and/or to avoid or contest such Claims, any alleged guarantee thereof and any alleged security therefore.

---

[4] The Collateral includes assets that were allegedly pledged as security to JPMorgan by LBI.  While the SIPA Trustee is not party to the Agreement, as stated in the Agreement and in this motion, nothing in the Agreement is intended to prejudice or waive any claims, counterclaims, defenses, rights of setoff, debt, liens, losses, demands, damages, costs and causes of action of whatever nature, whether asserted or unasserted, known or unknown, in contract or tort, unsecured, secured priority administrative or otherwise of LBI, the Debtors or JPMorgan with respect to the Collateral and the Claims.

[5] The Agreement contemplates that the Designated Claims Balance shall be adjusted prior to the effective date of the Agreement.

000080

24.    The salient terms of the Agreement are as follows:[6]

*Application of Cash Collateral*

The parties agree that, within five business days after the effective date of the Agreement (the "Effective Date"), JPMorgan Bank or its affiliates or subsidiaries or related entities which are signatories to the Agreement (JPMorgan Bank and each such entity, a "JPMC Entity") will apply the Cash Collateral to payment of the Designated Claims Balance on a dollar-for-dollar basis (the "Cash Collateral Application").

*Cash Payment*

Simultaneously with the Cash Collateral Application, LBHI agrees to pay JPMorgan Bank, on behalf of itself and any other relevant JPMC Entities, an amount equal to the Designated Claims Balance remaining unpaid after the Cash Collateral Application (the "Cash Payment"), currently estimated to be approximately $557,000,000. The amount of the Cash Payment is subject to adjustment by the parties prior to the Effective Date.

Within ten business days after the Effective Date, JPMorgan Bank shall deliver to LBHI a report specifying in reasonable detail the Claims against which any portions of the Cash Collateral or the Cash Payment are applied and the entity applying such amounts.

*Subrogation and Assignment*

The agreement provides that LBHI will become a subrogee of JPMorgan's Claims against LBI and others. Specifically:

(a) Simultaneously with the payment of the Cash Payment, LBHI shall be fully subrogated to the Claims of the relevant JPMC Entities against LBI and such other subsidiaries to the full extent of the payments made by LBHI or applied from its property (the "Subrogated Claims") to such Claims; and

(b) Simultaneously with the payment of the Cash Payment, LBHI shall succeed to any and all alleged liens of the relevant JPMC Entities against all of the Securities Collateral (in the same priorities as held by the relevant JPMC Entities), which liens shall be assigned and transferred to LBHI by the relevant JPMC Entities and which Securities Collateral shall be assigned and

---

[5] This summary of the Agreement (this "Summary") is qualified in its entirety by the provisions of the Agreement. This Summary is intended to be used for information purposes only and shall not, in any way, affect the meaning or interpretation of the Agreement. Capitalized terms used, but not otherwise defined herein, have the meanings ascribed to such terms in the Agreement. Nothing contained in the Summary or this motion shall constitute an admission or a waiver of any of rights to assert claims or defenses of the Debtors, JPMorgan or the SIPA Trustee. Furthermore, this Summary and this motion contain statements of legal positions taken or which may be taken by the Debtors and nothing contained in this Summary or this motion shall be deemed an admission by JPMorgan or the SIPA Trustee or signify JPMorgan's or the SIPA Trustee's agreement with such positions.

000081

transferred to LBHI by the relevant JPMC Entities.

The Agreement provides that the Subrogated Claims do not include any claims (the "Excluded Claims") held by JPMC Entities against LBI and other subsidiaries of LBHI that have not been paid by LBHI or applied from LBHI's property, as further specified in the Agreement.

Each relevant JPMC Entity agrees to unconditionally and irrevocably transfer and assign to LBHI all of its right, title, interest in, or to, the Subrogated Claims simultaneously with the payment of the Cash Payment.

The parties agree that, as between the Debtors and JPMorgan, each JPMC Entity shall be entitled to retain each Excluded Claim (including any Claim which becomes an Excluded Claim) and all distributions and recoveries received thereon.

|  |  |
|---|---|
| *Future Distributions* | The Agreement provides that all principal, interest, distributions on and other proceeds of the Collateral that have been received by any relevant Debtor or non-Debtor entity controlled by a Debtor prior to the payment of the Cash Payment shall be retained by such entity free and clear of all liens. In addition, if any principal, interest or other distributions on the Securities Collateral is received by any JPMC Entity after the payment of the Cash Payment, such JPMC Entity shall promptly remit such amount to the relevant Debtor or non-Debtor entity controlled by a Debtor. |
|  | In the event that, notwithstanding any of the other provisions of the Agreement, any Debtor receives any payment, distribution or other property which, in accordance with the Agreement, should have been paid or transferred to a JPMC Entity, such Debtor shall hold such payment, distribution or other property in trust for such JPMC Entity and promptly pay or transfer such payment, distribution or other property to such JPMC Entity. Similarly, in the event that, notwithstanding any of the other provisions of the Agreement, any JPMC Entity receives any payment, distribution or other property which, in accordance with the Agreement, should have been paid or transferred to a Debtor, such JPMC Entity shall hold such payment, distribution or other property in trust for such Debtor and promptly pay or transfer such payment, distribution or other property to such Debtor. |
| *LBI Prime Brokerage Collateral* | The Agreement provides that the Securities Collateral and the Cash Collateral do not include the cash and securities (and the principal, interest and other distributions on such cash and securities) held in |

000082

the accounts asserted by the SIPA Trustee to be prime brokerage accounts nor the cash provided by the SIPA Trustee to JPMorgan Bank in substitution for certain of such securities (the "LBI Prime Brokerage Collateral"), and the Agreement generally transfers no interest in or to the LBI Prime Brokerage Collateral to the Debtors unless it is determined by a binding judicial determination or settlement that any of the LBI Prime Brokerage Collateral consists of Collateral and such Collateral has not been applied to Claims. As between the Debtors and JPMorgan Bank, JPMorgan Bank shall be entitled to continue to litigate or enter into any settlement with respect to its disputed security interest without the Debtors' consent.

|  |  |
|---|---|
| ***Provisional Allowance of Claims; Reallocation of Payments*** | The parties agree that the Claims shall, to the extent of the amounts to be applied and paid in accordance with the Cash Collateral Application and the Cash Payment, be deemed to be provisionally allowed secured Claims of the relevant JPMC Entities against each of the Debtors against which such Claims have been asserted so as to facilitate the application of the Cash Collateral and the Cash Payment to such Claims, subject to the reservations of rights set forth in the Agreement. |
|  | Any Collateral, Prior Payment, Cash Payment or any exercise of alleged setoff rights, account activity, account adjustments or other payments and reductions of the Claims on or after the date of the Agreement (collectively, "Applied Property") (i) that has been applied to a Claim which is thereafter disallowed, avoided, invalidated or deemed unsecured pursuant to a binding judicial determination or settlement, (ii) the application of which to a Claim has been avoided or invalidated pursuant to a binding judicial determination or settlement or (iii) that, in lieu of being applied to the particular Claim to which it has been applied, JPMorgan Bank determines should be applied instead to another unpaid Claim, may be reallocated and applied by a JPMC Entity to an unpaid Claim (including, without limitation, an Excluded Claim) that has not been disallowed, avoided or invalidated; provided, however, that such Applied Property may be reallocated and applied only to an unpaid Claim that would have been secured by such Applied Property, as further specified in the Agreement. Upon any such reallocation and application JPMorgan shall promptly provide LBHI with written notice describing such reallocation and application in reasonable detail. |
| ***Reservation of Rights*** | The Agreement provides for the clear reservation of rights among the parties. In addition, the parties agree to request that the Court provide in any order approving the Agreement specified language reserving and preserving the rights of all parties, specifically |

including the Debtors, LBI and JPMorgan.

***Post-Effective Date***
***Adjustments***

The Agreement provides for certain post-Effective Date adjustments to true up the amount of all allowed unpaid secured Claims (as further defined in the Agreement, "Allowed Unpaid Secured Claims") and amounts otherwise to be paid, repaid or disgorged to the Debtors (as further defined in the agreement, "Disgorgement Amounts"). As further specified in the Agreement, within five business days after all binding judicial determinations or settlements necessary to determine the amount of all Allowed Unpaid Secured Claims and Disgorgement Amounts with respect to any Debtor:

(a) JPMorgan Bank shall pay to such Debtor (or its successor) the amount (the "JPMC Adjustment Amount"), if any, by which the Disgorgement Amounts with respect to such Debtor exceed the Allowed Unpaid Secured Claims with respect to such Debtor; and

(b) such Debtor shall pay to JPMorgan Bank the amount (the "Debtor Adjustment Amount") by which the Allowed Unpaid Secured Claims with respect to such Debtor exceed the Disgorgement Amounts with respect to such Debtor.

If, at any time before JPMorgan Bank pays the JPMC Adjustment Amount on behalf of a JPMC Entity, such JPMC Entity has been determined to owe a Disgorgement Amount to such Debtor, then such JPMC Entity shall deposit such Disgorgement Amount in a segregated interest-earning cash collateral account with JPMorgan Bank or certain other qualified banks to secure its obligations to pay the JPMC Adjustment Amount, all as further specified in the Agreement.

If, at any time before a Debtor pays its Debtor Adjustment Amount to one or more JPMC Entities, such Debtor is to make a general distribution of its assets under a chapter 11 plan or otherwise, then before it makes such distribution such Debtor shall deposit in a segregated interest-earning cash collateral account with a qualified bank to secure its obligations to pay such amount, an amount agreed to in good faith by JPMorgan Bank and such Debtor (or in the absence of such agreement, a judicial determination of the maximum amount that such Debtor could be required to pay to the relevant JPMC Entity), all as further specified in the Agreement.

***Recovered Payments,***
***Debtor Paid Claim***
***Disallowed Amounts***
***and Debtor Paid Claim***

The Debtors agree to condition their requests for relief with respect to any Recovered Payment, Debtor Paid Claim Disallowed Amount or Debtor Paid Claim Unsecured Amount (each as defined below) to provide that:

000084

***Unsecured Amounts***

(a) no JPMC Entity shall be required to pay, repay or otherwise disgorge such Recovered Payment, Debtor Paid Claim Disallowed Amount or Debtor Paid Claim Unsecured Amount to the Debtors, except as specified in the Agreement, and

(b) sections 502(d), 541 and 542 of the Bankruptcy Code (and any other provisions that would otherwise require the turnover of such amounts or impose adverse consequences for failing to turnover such amounts) shall not apply with respect to any failure on the part of any JPMC Entity to pay, repay or otherwise disgorge a Recovered Payment, Debtor Paid Claim Disallowed Amount or Debtor Paid Claim Unsecured Amount to the Debtors before the date, if any, that JPMorgan Bank is required to do so pursuant to the Agreement.

The Agreement provides that Recovered Payments, Debtor Paid Claim Disallowed Amounts, Debtor Paid Claim Unsecured Amounts, and certain other amounts, as further specified in the Agreement, will be calculated and applied separately with respect to each Debtor, without aggregation in any way as among the Debtors unless otherwise provided by a binding judicial determination or settlement.

"Recovered Payment" means any Prior Payment or any other payment of a Claim that has been avoided, rescinded, invalidated or recovered pursuant to a binding judicial determination or settlement, except to the extent that such determination or settlement gave rise to a Debtor Paid Claim Disallowed Amount or Debtor Paid Claim Unsecured Amount with respect to the same underlying Claim (or any portion thereof).

"Debtor Paid Claim" means any Claim that has been paid through application of Cash Collateral posted by a Debtor, application of the Cash Payment, a Prior Payment from a Debtor or from its property or any other payment by a Debtor or from its property.

"Debtor Paid Claim Disallowed Amount" means the amount of any Debtor Paid Claim that is determined by a binding judicial determination or settlement to have been invalid at the time of its payment because such Claim was then subject to avoidance, disallowance, release, dismissal or reduction, as further specified in the Agreement.

"Debtor Paid Claim Unsecured Amount" means the amount of any Debtor Paid Claim that is determined by a binding judicial

000085

| | |
|---|---|
| | determination or settlement to have been an unsecured claim at the time of its payment because a lien securing such Claim was then subject to avoidance, disallowance, release, dismissal, reduction or limitation, as further specified in the Agreement. |
| ***Actions with Respect to Subrogated Claims*** | The parties have agreed to provide each other with prompt notice of certain actions that may implicate their respective obligations under the Agreement, including the commencement of an objection, counterclaim, crossclaim or other action against LBHI in a court or other tribunal with respect to any Subrogated Claim, lien securing a Claim, or Collateral, as further specified in the Agreement. Subject to the terms of the Agreement, under certain circumstances JPMorgan may, at its election and at its own expense participate in or assume the defense of any such action. |
| ***Value of Collateral*** | The parties shall agree upon the means, effective date and methodology to determine the value of the Collateral or any relevant part thereof. If the parties are unable to agree upon such valuation issues, then the Bankruptcy Court will determine such issues.<br><br>The Agreement further sets forth certain ongoing disclosure obligations of the Debtors to JPMorgan regarding the Securities Collateral to enable JPMorgan to value such Collateral. |
| ***Automatic Stay*** | To the extent that the automatic stay and any other stays entered in these chapter 11 cases are applicable to any actions expressly contemplated to be taken by JPMorgan pursuant to the Agreement, the entry of the order by the Court approving the Agreement shall modify such stays to the extent necessary to permit JPMorgan to take such actions. |

### The Agreement is An Appropriate Exercise of the Debtors' Business Judgment is in the Best Interests of All Economic Stakeholders

25.    Ample authority exists for approval of the Agreement. Section 363 of the

Bankruptcy Code provides, in relevant part, "[t]he trustee, after notice and a hearing, may use,

sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. §

363(b)(1). The Debtors are seeking approval of the Agreement under section 363 of the

Bankruptcy Code insofar as the Agreement contemplates the use of the Collateral and the Cash

Payment.

26.    While section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale, disposition or other use of a debtor's assets, courts in the Second Circuit and others, in applying this section, have required that it be based upon the sound business judgment of the debtor. *See in re Global Crossing, Ltd.,* 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003) ("In evaluating whether a sound business purpose justifies the use, sale or lease of property under section 363(b), courts consider a variety of factors, which essentially represents the 'business judgment test'.") (quoting *In re Montgomery Ward Holding Corp.,* 242 B.R. 147, 153 (D. Del. 1999)); *see, e.g. In re Delphi Corp.,* 2009 WL 637315, at * 9 (Bankr. S.D.N.Y. Mar. 10, 2009) (applying the business judgment rule). The business judgment rule is "a strong presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc.,* 147 B.R. 650, 656 (S.D.N.Y. 1992) (internal citations and quotations omitted). Courts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest or gross negligence. *Id.* Further, parties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity. *Id.* (quotation omitted).

27.    LBHI has determined, in the sound exercise of its business judgment, that the Agreement provides the best framework for maximizing the realizable value of the Collateral. The Securities Collateral is illiquid and requires long-term management to enhance recoveries. LBHI and the Debtors are best equipped to fulfill this objective. The Debtors expect the value to increase over an extended period. The Agreement provides the Debtors with the requisite time to recover values.

000087

28.     The Agreement and contemplated transactions are necessary for a more efficient and beneficial management of the Securities Collateral that will yield higher returns than a fire sale of illiquid assets into a depressed market. The Agreement also will minimize any negative spread as to JPMorgan's Claims by providing for the immediate application of the liquid Cash Collateral and the Cash Payment against such Claims. While JPMorgan's Claims will be provisionally allowed and satisfied, all rights of all parties are reserved. The Agreement provides a mechanism for dealing with the dispute of any Claims as well as preserves JPMorgan's rights to defend its Claims.

29.     The Agreement results in the combined benefits of (i) reducing the incurrence of interest on the Claims, (ii) enhancing the potential value of the Securities Collateral, and (iii) subrogating LBHI to JPMorgan's Claims against LBI and other Lehman entities. Importantly, the transactions contemplated by the Agreement will not prejudice any rights of the SIPA Trustee or any other party to assert claims vis-à-vis the Collateral and LBHI's right to retain such assets.

30.     Approval will not affect the rights of any party-in-interest. The Agreement is in the best interests of LBHI, the other Debtors and all economic stakeholders and should be approved.

### Relief Under Bankruptcy Rule 6004(h)

31.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." FED. R. BANKR. P. 6004(h). The Debtors wish to consummate the transactions contemplated under the Agreement as promptly as possible to quickly realize the benefits of exercising control over the management of the Securities Collateral. Accordingly, the

000088

Debtors respectfully request that any order be effective immediately by providing that the 14-day
stay is inapplicable.

## Notice

32.     No trustee has been appointed in these chapter 11 cases. The Debtors
have served notice of this Motion in accordance with the procedures set forth in the amended
order entered on February 13, 2009 governing case management and administrative procedures
for these cases [Docket No. 2837] on (i) the U.S. Trustee; (ii) the attorneys for the Creditors'
Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service;
(v) the United States Attorney for the Southern District of New York; (vi) the attorneys for
JPMorgan; (vii) the attorneys for the SIPA Trustee; and (viii) all parties who have requested
notice in these chapter 11 cases. No other or further notice need be provided.

*[the remainder of this page is intentionally left blank]*

33.    No previous request for the relief sought herein has been made by LBHI or the other Debtors to this or any other court.

WHEREFORE LBHI and the other Debtors respectfully request that the Court approve the Agreement and grant the relief requested herein and such other and further relief as is just.

Dated:  February 24, 2010
        New York, New York

/s/ Shai Y. Waisman
Harvey R. Miller
Shai Y. Waisman

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**EXHIBIT A**

LEHMAN BROTHERS HOLDINGS INC.
1271 Avenue of the Americas
New York, New York 10020

February [    ], 2010

JPMorgan Chase Bank, N.A.
270 Park Avenue
New York, New York 10017

     Re:    Lehman Brothers Holdings Inc., et al. – JPMorgan Chase Bank, N.A., et al.
            <u>Collateral Disposition Agreement</u>

Ladies and Gentlemen:

        This is to confirm our Agreement as to the disposition of certain collateral security that is currently claimed and held by JPMorgan Chase Bank, N.A. ("<u>JPMCB</u>") or its affiliates or subsidiaries or related entities which are signatories hereto (JPMCB and each such entity, a "<u>JPMC Entity</u>" and, collectively, "<u>JPMC</u>") in connection with the claims that JPMC has asserted against Lehman Brothers Holdings Inc. ("<u>LBHI</u>") and its subsidiaries (LBHI, together with all of its subsidiaries, "<u>Lehman</u>"), including Lehman Brothers Inc. ("<u>LBI</u>"). LBHI and certain of its subsidiaries (LBHI, together with such subsidiaries, expressly excluding LBI, the "<u>Debtors</u>") have commenced cases under chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). JPMCB has provided LBHI with copies of all proofs of claim filed by JPMC Entities against the Debtors and LBI, and has provided LBHI with certain additional information about the claims previously asserted by JPMC Entities against Lehman. All of the claims of JPMC against Lehman, including, without limitation, any and all liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, unsecured, known, unknown, pre-petition and post-petition rights to payment, are hereinafter referred to collectively as the "<u>Claims</u>." JPMC asserts that LBHI is a guarantor of all of the Claims. JPMC asserts that the payment and satisfaction of the Claims (including the Excluded Claims, as defined herein) was and is secured by a pledge, mortgage, security interest or other lien (collectively, a "<u>Lien</u>") in, to or against certain property of Lehman (including the proceeds thereof, the "<u>Collateral</u>"). The defined term "<u>Lien</u>" shall include any interest of a JPMC Entity in any securities purported to have been purchased by it in a repurchase agreement, and such securities shall constitute "<u>Collateral</u>" for purposes of this Agreement; provided, however, that all parties reserve their rights as to the proper characterization of such interest and securities.

        JPMC has advised the Debtors that, after giving effect to the application of Collateral (including from the receipt of proceeds received from the disposition of Collateral),

C:\DOCUMENTS AND SETTINGS\HACKETTH\LOCAL SETTINGS\TEMPORARY INTERNET
FILES\CONTENT.OUTLOOK\8GCO3QG6\US_ACTIVE_COLLATERAL DISPOSITION AGMT_43303102_12 (3).DOC

000091

exercise of alleged setoff rights, account activity, account adjustments and other payments and reductions of the Claims before the date hereof (the "Prior Payments"), the current outstanding amount of the Claims is no less than $[7,679,488,724] (as the same shall be adjusted by agreement of JPMCB and LBHI on or before the Effective Date referred to below to reflect agreed corrections, reconciliations and transactions after the date hereof, the "Designated Claims Balance"). Such amount does not include, among others, certain asserted contingent Claims, post-petition Claims and unliquidated Claims. Examples of such Claims include contingent Claims relating to letters of credit issued by a JPMC Entity and post-petition claims for interest to the extent not reflected in the Designated Claims Balance set forth above. JPMC has further advised the Debtors that it is currently holding (a) the cash Collateral, cash proceeds of securities Collateral and money market fund Collateral posted by the Debtors and LBI set forth on Annex A (including any cash proceeds of securities Collateral not reflected in Annex A but received by JPMC before the Effective Date referred to below and not applied, the "Cash Collateral"), and (b) the securities posted by the Debtors and LBI as Collateral, including such securities set forth on Annex B (including the principal, interest and other distributions received by JPMCB set forth on Annex B, but excluding any such securities sold before the Effective Date, the sale proceeds of which are included in the Cash Collateral, the "Securities Collateral"), which include securities that are largely illiquid. For the avoidance of doubt, the principal, interest and other distributions described in clause (b) of the immediately preceding sentence are Securities Collateral and not Cash Collateral. Annex A and Annex B shall be revised by agreement of JPMCB and LBHI on or before the Effective Date to reflect agreed corrections, reconciliations and transactions after the date hereof.

JPMC and the Debtors desire to enter into this Agreement (a) to reduce the incurrence of interest on the secured Claims (with respect to which Lehman expressly reserves all rights concerning the allowability, accuracy or enforceability of such interest calculation as provided by JPMC) by providing for the prompt application of the Cash Collateral to reduce the Designated Claims Balance and (b) to avoid the loss of potential value with respect to the Securities Collateral by providing for the Cash Payment (as defined below) without the need for JPMC to liquidate the Securities Collateral, all subject to and in accordance with the terms and conditions set forth below:

    1.    Application of Cash Collateral. Within five business days after the Effective Date (as defined below), each of the relevant JPMC Entities shall apply the Cash Collateral to payment of the Designated Claims Balance on a dollar-for-dollar basis. The amount of the Designated Claims Balance remaining unpaid after such application is $[557,062,474] (as the same shall be adjusted by agreement of JPMCB and LBHI on or before the Effective Date referred to below to reflect agreed corrections, reconciliations and transactions after the date hereof, the "Unpaid Designated Claims Balance"). To the extent that the automatic stay and any other stays entered in the Debtors' chapter 11 cases are applicable to any actions expressly contemplated to be taken by JPMC pursuant to this Agreement, the entry of the Approval Order (as defined below) shall modify such stays to the extent necessary to permit JPMC to take such actions.

    2.    Cash Payment. Simultaneously with the application of the Cash Collateral as provided in Paragraph 1, LBHI shall pay JPMCB, on behalf of itself and any other relevant JPMC Entities, the amount of the Unpaid Designated Claims Balance in

C:\DOCUMENTS AND SETTINGS\HACKETTB\LOCAL SETTINGS\TEMPORARY INTERNET
FILES\CONTENT.OUTLOOK\8GCO3QG6\US_ACTIVE_COLLATERAL DISPOSITION AGMT 43303102_12 (3).DOC

2

000092

immediately available funds (the "Cash Payment"). JPMCB and such JPMC Entities shall apply the Cash Payment to the Unpaid Designated Claims Balance. Within 10 business days after the Effective Date, JPMCB shall deliver to LBHI a report specifying in reasonable detail the Claims against which any portions of the Cash Collateral and/or the Cash Payment are applied and the JPMC Entity applying such amounts.

       3.    Subrogation and Assignment. (a) In consideration of (i) the Cash Payment made by LBHI with respect to Claims against LBI and other subsidiaries of LBHI, (ii) the application pursuant to Paragraph 1 of Cash Collateral posted by LBHI to the payment of Claims against LBI and other subsidiaries of LBHI, and (iii) Prior Payments of Collateral posted by LBHI to the payment of Claims against LBI and other subsidiaries of LBHI, simultaneously with the payment of the Cash Payment and as described in more detail in this Agreement:

       (1)    LBHI shall be subrogated to the claims of the relevant JPMC Entities against LBI and such other subsidiaries to the full extent of the payments made by LBHI or applied from its property (the "Subrogated Claims") to such Claims; and

       (2)    LBHI shall succeed to any and all alleged Liens of the relevant JPMC Entities against all of the Securities Collateral (in the same priorities as held by the relevant JPMC Entities), which Liens shall be assigned and transferred to LBHI by the relevant JPMC Entities and which Securities Collateral shall be assigned and transferred to LBHI by the relevant JPMC Entities.

       (b) The parties agree that the Subrogated Claims shall not include any Claims (the "Excluded Claims") held by JPMC Entities against LBI and other subsidiaries of LBHI that have not been paid by LBHI or applied from LBHI's property, including, without limitation, contingent claims, unliquidated claims and any Claims arising after the date of this Agreement as a result of Recovered Payments (as defined below), post-petition accruals or otherwise. For the avoidance of doubt, the parties further agree that (x) Claims paid pursuant to Paragraph 5(b) shall constitute Subrogated Claims and not Excluded Claims, and (y) Subrogated Claims that are or become unsecured as a result of a Binding Determination shall thereafter constitute Excluded Claims and not Subrogated Claims to the extent of the Debtor Paid Claim Unsecured Amount (as defined below), if any, with respect to such Claims. For the avoidance of doubt, the Securities Collateral and the Cash Collateral shall not include the cash and securities (and the principal, interest and other distributions on such cash and securities) held in prime brokerage accounts nor the cash provided by the LBI trustee to JPMCB in substitution for certain of such securities (the "LBI Prime Brokerage Collateral"), and this Agreement transfers no interest in or to the LBI Prime Brokerage Collateral to the Debtors. As between the Debtors and JPMCB, JPMCB shall be entitled to continue to (i) hold the LBI Prime Brokerage Collateral to secure the Excluded Claims and (ii) litigate or enter into any settlement with respect to its disputed security interest (including, without limitation, a settlement that compromises or releases all or a portion of such security interest) without any involvement or consent by or from any of the Debtors (it being understood that Paragraph 6(c) is inapplicable to any such settlement or compromise). If (A) it is determined by a Binding Determination or any settlement or compromise between

JPMCB and LBI of the kind described in clause (ii) of the immediately preceding sentence that any of the LBI Prime Brokerage Collateral constitutes Collateral, (B) after such Binding Determination or the performance of such settlement or compromise, as the case may be, any of the LBI Prime Brokerage Collateral which has been so determined to constitute Collateral remains in the possession of JPMCB and has not been applied against the Claims, and (C) the Excluded Claims shall have been paid in full, then JPMCB shall transfer the Lien on such LBI Prime Brokerage Collateral to LBHI and, in connection therewith, transfer such LBI Prime Brokerage Collateral to LBHI.

(c)  Simultaneously with the payment of the Cash Payment, each relevant JPMC Entity shall unconditionally and irrevocably transfer and assign to LBHI all of its right, title, interest in, or to, the Subrogated Claims, including, without limitation, the proofs of claim filed with respect to the Subrogated Claims in the proceeding commenced under the Securities Investor Protection Act of 1970 ("SIPA") as to LBI, Case #08-01420(JMP) SIPA, which proceeding is now pending in the Bankruptcy Court. The Claims transferred pursuant to this Paragraph 3 shall include all rights to receive all interest, penalties and fees, if any, which may be paid with respect to such Claims, together with voting and all other rights and benefits arising from, under or relating to any of the foregoing, and all cash, securities, instruments and other property which may be paid or issued by LBI or such other subsidiary in satisfaction of such Claims. The transfer of Claims, Liens and Collateral by each JPMC Entity to LBHI under this Agreement is on an "as is, where is" basis, without recourse, representations or warranties of any kind whatsoever, except that each JPMC Entity represents and warrants that (x) it has the full corporate or other entity power and authority to assign such Claims, Liens and Collateral to LBHI and has not assigned such Claims, Liens and Collateral to any other entity and (y) it has provided to LBHI complete and accurate information as of January 31, 2010 with respect to any principal, interest and other distributions on the Securities Collateral that were received by such JPMC Entity (it being understood that the sole remedy of LBHI and such JPMC Entity in the event that such information is incorrect shall be to promptly adjust the payments and remittances hereunder in accordance with the corrected information). Notwithstanding the subrogation and assignment of the Subrogated Claims and the transfer of the Securities Collateral and Liens to LBHI as provided in this Agreement, the JPMC Entities shall have rights as if they continued to be secured (or oversecured) creditors as set forth in this Agreement, including, without limitation, Paragraphs 3(b), 5(b) and 6 hereof; provided, that (i) such rights are subject to Lehman's reservation of its right to contest such claims and/or security as provided in this Agreement, and (ii) each JPMC Entity hereby waives, effective on the Effective Date, any right of consent that it may have, pursuant to any agreement by which it acquired any Lien or other interest in the Securities Collateral, with respect to any sale, disposition, disaggregation, modification or like transaction by LBHI, any other Debtor or any entity controlled by a Debtor with respect to the Securities Collateral, any assets underlying the Securities Collateral or any issuer of the Securities Collateral.

(d)  As between the Debtors and JPMC, each JPMC Entity shall be entitled to retain each Excluded Claim (including any Claim which becomes an Excluded Claim) and all distributions and recoveries received thereon, including any recoveries on

C:\DOCUMENTS AND SETTINGS\HACKETTB\LOCAL SETTINGS\TEMPORARY INTERNET
FILES\CONTENT.OUTLOOK\8GCO3QG6\US_ACTIVE_COLLATERAL DISPOSITION AGMT_43303102_12 (3).DOC

4

000094

the Excluded Claims derived from the LBI Prime Brokerage Collateral. With respect to any unsecured Excluded Claims held by a JPMC Entity against a Lehman entity that have not been disallowed by a Binding Determination and are guaranteed by LBHI, such JPMC Entity shall be entitled to receive payment in full of such unsecured Excluded Claims against such Lehman entity prior to any receipt or retention by LBHI of any recovery on (i) any unsecured Subrogated Claims against such Lehman entity acquired from such JPMC Entity or (ii) any unsecured reimbursement right or similar claim against such Lehman entity arising in favor of LBHI as a result of LBHI's payment to such JPMC Entity of any Subrogated Claims against such Lehman entity.

(e) For the avoidance of doubt, the parties agree that all principal, interest, distributions on and other proceeds of the Collateral that have been received by any Debtor or non-Debtor entity controlled by a Debtor prior to the payment of the Cash Payment as provided in Paragraph 2 shall be retained by such Debtor or non-Debtor entity controlled by a Debtor free and clear of all Liens in favor of JPMC. In addition, if any principal, interest or other distributions on the Securities Collateral is received by any JPMC Entity after the payment of the Cash Payment as provided in Paragraph 2, such JPMC Entity shall promptly remit such amount to the relevant Debtor or non-Debtor entity controlled by a Debtor.

(f) In the event that, notwithstanding any of the other provisions of this Agreement, any Debtor receives any payment, distribution or other property which, in accordance with the provisions of this Agreement, should have been paid or transferred to a JPMC Entity, such Debtor shall hold such payment, distribution or other property in trust for such JPMC Entity and promptly pay or transfer such payment, distribution or other property to such JPMC Entity. In the event that, notwithstanding any of the other provisions of this Agreement, any JPMC Entity receives any payment, distribution or other property which, in accordance with the provisions of this Agreement, should have been paid or transferred to a Debtor, such JPMC Entity shall hold such payment, distribution or other property in trust for such Debtor and promptly pay or transfer such payment, distribution or other property to such Debtor.

(g) LBHI agrees to comply with the Uniform Commercial Code and other similar commercial laws, to the extent applicable, in disposing of the Securities Collateral.

4.      Further Assurances. To the extent that any Securities Collateral, Lien, Subrogated Claims or other interest related thereto intended to be transferred is not validly transferred to LBHI simultaneously with the payment of the Cash Payment as described in Paragraph 3(a), each relevant JPMC Entity shall cooperate with LBHI, at LBHI's expense, to take all reasonable acts requested by LBHI to effectuate the transfer of the interest of such JPMC Entity in the Securities Collateral, the delivery of any certificated securities constituting Securities Collateral, and the assignment of the interest of such JPMC Entity in the Subrogated Claims, the Liens against the Securities Collateral and any other rights transferred pursuant to Paragraph 3 in accordance with applicable law, including, without limitation, the execution and delivery of all appropriate stock and bond powers and other evidences of transfer. Each relevant JPMC Entity also agrees to

C:\DOCUMENTS AND SETTINGS\HACKFTTB\LOCAL SETTINGS\TEMPORARY INTERNET
FILES\CONTENT.OUTLOOK\8GCO3QG6\US  ACTIVE: COLLATERAL DISPOSITION AGMT_43303102_12 (3).DOC

5

000095

deliver to LBHI immediately after the Effective Date, at LBHI's expense, appropriate
notifications to the trustees of the Securities Collateral known as Fenway, Spruce,
Verano, Kingfisher, RACERS, Pine and SASCO informing such trustees of the transfer
effected pursuant to this Agreement, and LBHI is hereby authorized to deliver such
notifications to such trustees.

      5.    Provisional Allowance of Claims; Reallocation of Payments.  (a)
The Claims shall, to the extent of the amounts to be applied and paid in accordance with
Paragraphs 1 and 2, be deemed to be provisionally allowed secured Claims of the
relevant JPMC Entities against each of the Debtors against which such claims have been
asserted so as to facilitate the application of the Cash Collateral and the Cash Payment to
such Claims; provided, however, that nothing in this Agreement shall constitute or be
deemed any waiver of any rights, remedies, claims or causes of action on the part of any
Lehman entity with respect to, and each Lehman entity expressly reserves, any and all
rights and remedies it may have under applicable law, contract or otherwise, including,
without limitation, rights and remedies in connection with any such provisionally allowed
secured or other Claim (including, without limitation, Excluded Claims) of each such
JPMC Entity and any alleged guarantee thereof or security therefor, including, without
limitation, the right to contest the validity and enforceability of any such provisionally
allowed secured or other Claim and/or to avoid or contest such Claims, any alleged
guarantee thereof and any alleged security therefor, including, without limitation, any
property alleged by JPMC to constitute Collateral or a Lien on or ownership of any
Lehman assets. For the avoidance of doubt, the parties agree that the rights and remedies
reserved by each Lehman entity include, without limitation, claims or potential claims
that the Collateral suffered a diminution in value as a result of conduct of any JPMC
Entity (other than any diminution in value arising from the entry into this Agreement and
the performance of the terms hereof). The parties hereto further agree that it is the intent
of such parties that the provisions of this Agreement shall not expand or reduce the rights
and entitlements of any such party with respect to the Collateral and Liens beyond those
rights and entitlements which such party would have if this Agreement had not been
entered into.

      (b)  Any Collateral, Prior Payment or Cash Payment, or any exercise of
alleged setoff rights, account activity, account adjustments or other payments and
reductions of the Claims on or after the date hereof (any of the foregoing including,
without limitation, a Debtor Recovered Payment, "Applied Property") (i) that has been
applied to a Claim which is thereafter disallowed, avoided, invalidated or deemed
unsecured pursuant to a Binding Determination, (ii) the application of which to a Claim
has been avoided or invalidated pursuant to a Binding Determination, or (iii) that, in lieu
of being applied to the particular Claim to which it has been applied, JPMCB determines
should be applied instead to another unpaid Claim, may be reallocated and applied by a
JPMC Entity to an unpaid Claim (including, without limitation, an Excluded Claim) that
has not been disallowed, avoided or invalidated; provided, however, that such Applied
Property may be reallocated and applied only to an unpaid Claim that would have been
secured by such Applied Property (or, in the case of a Debtor Recovered Payment, would
have been secured by or eligible to be validly paid from the Collateral, setoff right,
account activity, account adjustment or other payment or reduction of Claims giving rise

C:\DOCUMENTS AND SETTINGS\HACKETTB\LOCAL SETTINGS\TEMPORARY INTERNET
FILES\CONTENT.OUTLOOK\RGC03QG6\US_ACTIVE_COLLATERAL DISPOSITION AGMT_43303102_12 (3).DOC

6

000096

to such Debtor Recovered Payment) had it not been used to pay such disallowed, avoided, invalidated or unsecured Claim. It is understood and agreed that upon any such reallocation and application JPMC shall promptly provide LBHI with written notice describing such reallocation and application in reasonable detail. Each JPMC Entity expressly reserves any and all rights and remedies it may have under applicable law, agreements or otherwise to defend or otherwise resist any claims asserted and/or proceedings initiated by or on behalf of Lehman to disallow, avoid or otherwise invalidate any Claims or Liens or to seek any other relief against JPMC.

      6.     Post-Effective Date Adjustments. (a) The parties agree that amounts under each definition referred to below shall be calculated and applied separately with respect to each Debtor, without aggregation in any way as among the Debtors unless otherwise provided by a Binding Determination (it being understood that, in so calculating and applying such definitions, a Claim for which more than one Debtor is liable is to be treated as a Claim against each such Debtor in the full amount thereof without estimation or reduction on account of any payment not theretofore received); provided, however, that a Binding Determination with respect to a Claim against a particular Debtor shall not affect the rights of a JPMC Entity to reallocate and apply any Collateral or Cash Payment to a Claim against another Debtor in accordance with Paragraph 5(b):

      "Allowed Unpaid Secured Claims" means all unpaid Claims (including, without limitation, any Excluded Claims) asserted by each JPMC Entity that are determined by a Binding Determination to be allowed secured claims against any Debtor. The amount of any Allowed Unpaid Secured Claims shall be determined after giving effect to any payment of such Claims received by such JPMC Entity from all sources permitted to be so applied by a Binding Determination (including any reallocation and application pursuant to Paragraph 5(b) above, but excluding any payment pursuant to Paragraph 6(b) below) and any reversal or rescission of any payments or recoveries on such Claims (including, without limitation, any such reversal or rescission resulting from a JPMC Entity's payment, repayment or other disgorgement, or requirement to pay, repay or otherwise disgorge, any Debtor Recovered Payments or Other Recovered Payment). Such Claim's secured status for each JPMC Entity shall be determined as if such JPMC Entity had (i) retained its Lien, if any, against all of the Transferred Collateral (rather than transferring or releasing such Lien pursuant to this Agreement), and (ii) realized at the time of the Cash Payment proceeds from the sale of the Securities Collateral equal in amount to the portion of the Cash Payment received by such JPMC Entity, it being understood that the transfer of the Cash Payment does not increase the value of the Collateral for purposes of determining which claims are allowed secured claims.

      "Binding Determination" means (i) a final and non-appealable order of a court of competent jurisdiction, (ii) a written settlement agreement that has become effective to which (x) each of the JPMC Entities holding a Claim

C:\DOCUMENTS AND SETTINGS\HACKETTB\LOCAL SETTINGS\TEMPORARY INTERNET
FILES\CONTENT.OUTLOOK\8GCO3QG6\US_ACTIVE_COLLATERAL DISPOSITION AGMT_43303102_12 (3).DOC

7

000097

purported to be affected thereby is a party and (y) in the case of such a Claim asserted against one or more Debtors, each such Debtor is a party or (iii) in the case of allowance of a Claim with respect to which an objection has not been filed, the expiration of time to object to the proof of claim (or equivalent) in which such Claim is asserted.

"Debtor Paid Claim" means any Claim that has been paid through application of Cash Collateral posted by a Debtor, application of the Cash Payment, a Prior Payment from a Debtor or from its property or any other payment by a Debtor or from its property.

"Debtor Paid Claim Disallowed Amount" means the amount of any Debtor Paid Claim that is determined by a Binding Determination to have been invalid at the time of its payment because such Claim was then subject to avoidance, disallowance, release, dismissal or reduction. For the avoidance of doubt, a Debtor Paid Claim shall be deemed to have been subject to such a reduction to any extent that a Binding Determination determines that the reduction in the amount of such Claim as a result of the realization against Collateral held in respect thereof should have been greater than the reduction that resulted from the application of the actual proceeds of the realization against such Collateral.

"Debtor Paid Claim Unsecured Amount" means the amount of any Debtor Paid Claim that is determined by a Binding Determination to have been an unsecured claim at the time of its payment because a Lien securing such Claim was then subject to avoidance, disallowance, release, dismissal, reduction or limitation (but only to the extent that there did not then exist other Collateral of sufficient value subject to a valid Lien in favor of the relevant JPMC Entity securing such Claim).

"Disgorgement Amount" means the aggregate amount of (i) any Debtor Paid Claim Disallowed Amounts and any Debtor Paid Claim Unsecured Amounts, less any portions thereof that have been reallocated and applied pursuant to Paragraph 5(b), and (ii) any Debtor Recovered Payments not theretofore paid, repaid or otherwise disgorged to a Debtor and not reallocated and applied pursuant to Paragraph 5(b) above.

"Recovered Payment" means any Prior Payment or any other payment of a Claim (including, without limitation, any payment pursuant to the provisions of this Agreement) that, in any case, has been avoided, rescinded, invalidated or recovered pursuant to a Binding Determination, except to the extent that such Binding Determination gave rise to a Debtor Paid Claim Disallowed Amount or Debtor Paid Claim Unsecured Amount with respect to the same underlying Claim (or portion thereof). A "Debtor Recovered Payment" is a Recovered Payment payable or repayable by JPMC to a Debtor; an "Other Recovered Payment" is a Recovered Payment paid, repaid or otherwise disgorged (or required to be paid,

C:\DOCUMENTS AND SETTINGS\HACKETTB\LOCAL SETTINGS\TEMPORARY INTERNET
FILES\CONTENT.OUTLOOK\8GCO3QG6\US_ACTIVE  COLLATERAL DISPOSITION AGMT 43303102_12 (3).DOC

8
000098

repaid or otherwise disgorged) by JPMC to an entity (including LBI) that is not a Debtor.

"Transferred Collateral" means (i) the Securities Collateral, (ii) all distributions on and other proceeds of the Collateral that have been or may be received by Lehman entities or a servicer, trustee, agent or other person acting in a similar capacity with respect to a security or instrument constituting Collateral and not remitted to any JPMC Entity, or (iii) all distributions and other proceeds of the Collateral received by a JPMC Entity and remitted to a Lehman entity, including, without limitation, any amounts remitted by JPMC Entities pursuant to Paragraph 3(e) and (f) above.

(b)  The Debtors shall condition their requests for relief with respect to any and all matters that may give rise to a Recovered Payment, Debtor Paid Claim Disallowed Amount or Debtor Paid Claim Unsecured Amount to provide that (i) no JPMC Entity shall be required to pay, repay or otherwise disgorge such Recovered Payment, Debtor Paid Claim Disallowed Amount or Debtor Paid Claim Unsecured Amount to the Debtors, except at such time and to such extent as may be required by the following provisions of this Paragraph 6(b), and (ii) Bankruptcy Code §§ 502(d), 541 and 542 (and any other provisions that would otherwise require the turnover of such amounts or impose adverse consequences for failing to turnover such amounts) shall not apply with respect to any failure on the part of any JPMC Entity to pay, repay or otherwise disgorge a Recovered Payment, Debtor Paid Claim Disallowed Amount or Debtor Paid Claim Unsecured Amount to the Debtors before the date, if any, that JPMC is required to do so pursuant to the following provisions of this Paragraph 6(b).  In the event that any court order or judgment is inconsistent with the foregoing, the Debtors shall not enforce it to the extent of such inconsistency, and will cooperate with any efforts by the affected JPMC Entities to obtain a modification or correction to remove the inconsistency. Notwithstanding anything to the contrary in the foregoing, the parties hereto agree that neither a JPMC Entity nor a Lehman entity is waiving any right to receive pre-judgment interest that may be available under applicable law. Within five business days after all Binding Determinations necessary to make a final determination of the amount of all Allowed Unpaid Secured Claims and Disgorgement Amounts with respect to any Debtor have occurred, which shall occur only after resolution by Binding Determination of all asserted and potential actions, proceedings and challenges with respect to the Claims, the Collateral and payments on the Claims (or, if earlier with respect to any such potential actions, proceedings and challenges, the expiration of all statutes of limitation with respect thereto) with respect to such Debtor:

(1)  JPMCB, on behalf of the relevant JPMC Entities, shall pay to such Debtor (or its successor) the amount (the "JPMC Adjustment Amount"), if any, by which the Disgorgement Amounts with respect to such Debtor exceed the Allowed Unpaid Secured Claims with respect to such Debtor; and

C:\DOCUMENTS AND SETTINGS\HACKFTTB\LOCAL SETTINGS\TEMPORARY INTERNET
FILES\CONTENT.OUTLOOK\8GCO3QG6\US ACTIVE COLLATERAL DISPOSITION AGMT 43303102_12 (3).DOC

9

000099

(2) such Debtor shall pay to JPMCB, on behalf of the relevant JPMC Entities, the amount (the "Debtor Adjustment Amount"), if any, by which the Allowed Unpaid Secured Claims with respect to such Debtor exceed the Disgorgement Amounts with respect to such Debtor.

(x) Simultaneously with the effectiveness of any Binding Determination that results in a Disgorgement Amount, LBHI shall transfer to the relevant JPMC Entity the Subrogated Claim (or portion thereof) that gave rise to such Disgorgement Amount, except to the extent that such Subrogated Claim (or portion thereof) has been disallowed by a Binding Determination, and (y) upon the payment of any JPMC Adjustment Amount or Debtor Adjustment Amount pursuant to this Paragraph 6(b), LBHI shall pay (in the case of non-cash property, in kind) to the relevant JPMC Entity any distribution received by LBHI with respect to such Subrogated Claim (or portion thereof). LBHI shall not, prior to the transfer to the relevant JPMC Entity of a Subrogated Claim pursuant to the immediately preceding sentence, act or fail to act with respect to such Subrogated Claim in a manner less favorable (from the perspective of a holder of such Subrogated Claim) than LBHI would act or fail to act with respect to similar claims in which LBHI has a continuing economic interest.

If, at any time before JPMCB pays the JPMC Adjustment Amount on behalf of a JPMC Entity to a Debtor, such JPMC Entity has been determined to owe a Disgorgement Amount to such Debtor, then such JPMC Entity shall deposit (a "JPMC Deposit") such Disgorgement Amount in a segregated interest-earning cash collateral account with JPMCB (or if JPMCB is not then a Qualified Bank (as defined below), another Qualified Bank) to secure its obligations to pay the JPMC Adjustment Amount (and, if such JPMC Entity is not JPMCB, such JPMC Entity's obligations to JPMCB to reimburse JPMCB for any JPMC Adjustment Amount paid under this Paragraph 6(b) on its behalf). All amounts in such account shall remain available for reallocation and application pursuant to Paragraph 5(b) above. Any portion of such deposit remaining after JPMCB has paid such JPMC Adjustment Amount shall be promptly remitted by JPMCB to such JPMC Entity. The applicable Debtor and JPMC Entity shall be entitled to the interest earned in such account proportionally to the principal amount payable to each of them.

If, at any time before a Debtor pays its Debtor Adjustment Amount to one or more JPMC Entities, such Debtor is to make a general distribution of its assets under a chapter 11 plan or otherwise, then before it makes such distribution such Debtor (or its successor) shall deposit (a "Debtor Deposit") for each such JPMC Entity in a segregated interest-earning cash collateral account with a Qualified Bank (as defined below), to secure its obligations to pay such Debtor Adjustment Amount to such JPMC Entity, an amount agreed to in good faith by JPMCB and such Debtor as representing the maximum Debtor Adjustment Amount potentially payable by such Debtor to such JPMC Entity based on the then known facts. If JPMCB and such Debtor fail to reach agreement on the amount of such Debtor Deposit, the amount of the Debtor Deposit shall be established by a Binding Determination, which shall calculate the maximum amount that such Debtor could be required to pay to such JPMC Entity. Any portion of the Debtor Deposit and interest thereon remaining after the obligations of the relevant Debtor have been satisfied

C:\DOCUMENTS AND SETTINGS\HACKETTB\LOCAL SETTINGS\TEMPORARY INTERNET
FILES\CONTENT.OUTLOOK\8GCO3QG6\US_ACTIVE_COLLATERAL DISPOSITION AGMT_43303102_12 (3).DOC

10

000100

shall be promptly remitted to such Debtor (or its successor), to an account or accounts as directed by such Debtor. The relevant Debtor and JPMC Entity shall be entitled to the interest earned in such account proportionally to the principal amount payable to each of them. A "Qualified Bank" is a nationally chartered bank unaffiliated with Lehman whose capital and surplus exceed $10 billion and whose rating with respect to its long term unsecured unsubordinated indebtedness is at least A by Standard & Poor's Ratings Group (or its successor) and A2 by Moody's Investors Service, Inc. (or its successor) or any other bank that the parties mutually agree upon.

To the extent that the amount of a JPMC Deposit or Debtor Deposit is materially in excess of the maximum potential amount of the obligations secured thereby (in the case of a JPMC Deposit, after taking into consideration the maximum amount of such JPMC Deposit as may be required for reallocation and application in accordance with Paragraph 5(b) above) based on the then known facts, then JPMCB or the relevant Debtor, as the case may be, may seek the return of the excess amount of the deposit by agreement with the other or by obtaining a Binding Determination as to such amount.

(c)  If any entity (including a Debtor) commences any objection, counterclaim, crossclaim or other action against LBHI in a court or other tribunal with respect to any Subrogated Claim, Lien or Collateral (including, without limitation, the valuation thereof) that could result in a Debtor Paid Claim Disallowed Amount, a Debtor Paid Claim Unsecured Amount, a Recovered Payment or a reduction in the amount of an Allowed Unpaid Secured Claim (any such objection, counterclaim, crossclaim or action, an "Action") and serves notice of such Action on LBHI, LBHI shall promptly notify JPMCB of such Action in writing (the "Action Notice"), and in any event provide the Action Notice within 10 days of being served with notice of such Action. JPMCB or any JPMC Entity which would be liable for any JPMC Adjustment Amount payable under Paragraph 6(b) that could increase as a result of the Action, or would be the payee of a Debtor Adjustment Amount payable under Paragraph 6(b) that could be reduced as a result of the Action (the "Relevant JPMC Entity" and, if it elects to assume the defense of such Action, the "Defending Entity") may, at its election and at its own expense and without limiting its rights or obligations under Paragraph 6(b), participate in or assume the defense of such Action with counsel selected by it, by providing LBHI with written notice of such decision within 30 days of JPMCB's receipt of the Action Notice. Notwithstanding anything to the contrary in this Agreement, if LBHI fails to provide JPMCB with the Action Notice within 10 days of being served with notice of such Action and as a result of such failure the Relevant JMPC Entity has fewer than 14 days to file an answer or response in such Action and LBHI has not filed an answer or response, which adequately protects the interests of such Relevant JPMC Entity to the extent reasonably possible through such a pleading, then the JPMC Adjustment Amount payable under Paragraph 6(b) shall not be increased, and the Debtor Adjustment Amount payable under Paragraph 6(b) shall not be reduced, with respect to the results of such Action (and the calculation pursuant to Paragraph 6(b) of the Debtor Adjustment Amount and/or the JPMC Adjustment Amount, as the case may be, shall be adjusted accordingly). Notwithstanding anything to the contrary in this Paragraph 6(c), prior to any assumption of an Action by the Relevant JMPC Entity, LBHI maintains the right to file an answer or

C:\DOCUMENTS AND SETTINGS\HACKETTB\LOCAL SETTINGS\TEMPORARY INTERNET
FILES\CONTENT.OUTLOOK\8GCO3QG6\US_ACTIVE COLLATERAL DISPOSITION AGMT_43303102_12 (3).DOC

11

000101

response in such Action if a prompt answer or response is necessary to preserve any right of LBHI and/or the Relevant JMPC Entity in such Action.

If the Defending Entity assumes the defense of the Action and if the Action has not been commenced by a Debtor or an entity whose economic interests with respect to the Action are aligned with LBHI, (i) subject to the execution and the terms of a mutually satisfactory joint defense and confidentiality agreement, the Defending Entity shall consult with LBHI, at LBHI's request, regarding the Action on an ongoing basis; provided that the Defending Entity shall have the right to determine all aspects of the defense of the Action (except as contemplated in clause (v) of this sentence), (ii) LBHI may participate in such defense at its own expense (but not in any way that conflicts with or otherwise adversely affects the defense by the Defending Entity (except as contemplated in clause (v) of this sentence)) and, in any event, except as contemplated in clause (v) of this sentence, LBHI shall cooperate, at the request and expense of the Defending Entity, with the Defending Entity in all respects reasonably required or desirable (including, without limitation, the execution and filing of pleadings) to enable the Defending Entity to assume and prosecute the defense of the Action, (iii) subject to the execution and the terms of a mutually satisfactory joint defense and confidentiality agreement, the Defending Entity shall provide LBHI on a confidential basis with drafts of all notices, pleadings, and other papers to be filed or served in such Action by JPMC (and allow LBHI a reasonable opportunity to comment on such drafts before filing or serving such drafts), (iv) the Defending Entity shall promptly provide copies to LBHI of all notices, pleadings, and other papers filed or served in such Action, and (v) LBHI shall maintain the right to conduct the defense of any aspect of such Action that could have an adverse effect on LBHI, other than an adverse effect that gives rise to a corresponding increase in the JPMC Adjustment Amount payable under Paragraph 6(b) or corresponding reduction in the Debtor Adjustment Amount payable under Paragraph 6(b). In the event that clause (v) of the immediately preceding sentence is applicable with respect to any Action, the Defending Entity and LBHI shall cooperate in good faith and coordinate their actions to preserve and protect each other's interests to the full extent reasonably possible except to the extent inconsistent with their respective interests.

If the Relevant JPMC Entity does not elect to assume the defense of the Action as described above, (i) subject to the execution and the terms of a mutually satisfactory joint defense and confidentiality agreement, LBHI shall consult with the Relevant JPMC Entity, at the Relevant JPMC Entity's request, regarding the Action on an ongoing basis; provided that LBHI shall have the right to determine all aspects of the defense of the Action, (ii) the Relevant JPMC Entity may participate in such defense at its own expense (but not in any way that conflicts with or otherwise adversely affects the defense by LBHI) and, in any event, the Relevant JPMC Entity shall cooperate, at the request and expense of LBHI, with LBHI in all respects reasonably required or desirable (including, without limitation, the execution and filing of pleadings) to enable LBHI to assume and prosecute the defense of the Action, (iii) subject to the execution and the terms of a mutually satisfactory joint defense and confidentiality agreement, LBHI shall provide the Relevant JPMC Entity on a confidential basis with drafts of all notices, pleadings, and other papers to be filed or served in such Action by LBHI (and allow the Relevant JPMC Entity a reasonable opportunity to comment on such drafts before filing

C:\DOCUMENTS AND SETTINGS\HACKETTB\LOCAL SETTINGS\TEMPORARY INTERNET
FILES\CONTENT.OUTLOOK\8GCO3QG6\US_ACTIVE_COLLATERAL DISPOSITION AGMT 43303102 12 (3).DOC

12

000102

or serving such drafts), and (iv) LBHI shall promptly provide copies to the Relevant
JPMC Entity of all notices, pleadings, and other papers filed or served in such Action.

Nothwithstanding anything to the contrary in this Agreement:

(i) LBHI shall not settle or adjust, or enter into any other agreement, stipulation
or other arrangement with respect to the disposition of any Action, any issues
therein, any matter that would constitute an Action upon the commencement of an
objection, counterclaim, crossclaim or action with respect thereto, or any other
matter that could affect the amount of a JPMC Adjustment Amount or Debtor
Adjustment Amount (any of the foregoing, a "Settlement") without the consent of
the Relevant JPMC Entity (which may be withheld in the sole discretion of the
Relevant JPMC Entity) if such Settlement could result in an increase in a JPMC
Adjustment Amount payable under Paragraph 6(b) or a reduction in a Debtor
Adjustment Amount payable under Paragraph 6(b);

(ii) the JPMC Adjustment Amount payable under Paragraph 6(b) shall not be
increased, and the Debtor Adjustment Amount payable under Paragraph 6(b) shall
not be reduced, as a result of any Settlement in violation of immediately
preceding clause (i) (and the calculation pursuant to Paragraph 6(b) of the Debtor
Adjustment Amount and/or the JPMC Adjustment Amount, as the case may be,
shall be adjusted accordingly);

(iii) the Relevant JPMC Entity shall not enter into any Settlement without the
consent of LBHI (which may be withheld in the sole discretion of LBHI) if such
Settlement could result in a reduction in a JPMC Adjustment Amount payable
under Paragraph 6(b) or an increase in a Debtor Adjustment Amount payable
under Paragraph 6(b); and

(iv) the JPMC Adjustment Amount payable under Paragraph 6(b) shall not be
reduced, and the Debtor Adjustment Amount payable under Paragraph 6(b) shall
not be increased, as a result of any Settlement in violation of the immediately
preceding clause (iii) (and the calculation pursuant to Paragraph 6(b) of the
Debtor Adjustment Amount and/or the JPMC Adjustment Amount, as the case
may be, shall be adjusted accordingly).

If the Relevant JPMC Entity elects to assume the defense of an Action in
accordance with Paragraph 6(c) above, the Relevant JPMC Entity may enter into a
Settlement of such Action without the consent of LBHI unless such Settlement could
have an adverse effect on LBHI (other than an adverse effect that gives rise to a
corresponding increase in the JPMC Adjustment Amount payable under Paragraph 6(b)
or corresponding reduction in the Debtor Adjustment Amount payable under Paragraph
6(b)), in which case LBHI's consent is required and may be withheld in LBHI's sole
discretion; provided that, if requested by the Relevant JPMC Entity, LBHI shall consent
to any such Settlement (which consent shall not be unreasonably withheld or delayed) if
such Settlement does not have an adverse effect on LBHI (other than an adverse effect
that gives rise to a corresponding increase in the JPMC Adjustment Amount payable

C:\DOCUMENTS AND SETTINGS\HACKETTB\LOCAL SETTINGS\TEMPORARY INTERNET
FILES\CONTENT.OUTLOOK\R6CO3QG6\US_ACTIVE_COLLATERAL DISPOSITION AGMT_43303102_12 (3).DOC

13
000103

under Paragraph 6(b) or corresponding reduction in the Debtor Adjustment Amount payable under Paragraph 6(b)). Any Settlement that could give rise to an increase in the Debtor Adjustment Amount payable under Paragraph 6(b) or a reduction in the JPMC Adjustment Amount payable under Paragraph 6(b) is deemed to have an adverse effect on LBHI.

If the Relevant JPMC Entity does not elect to assume the defense of an Action in accordance with Paragraph 6(c) above, LBHI may enter into a Settlement of such Action without the consent of the Relevant JPMC Entity unless such Settlement could have an adverse effect on the Relevant JPMC Entity (other than an adverse effect that gives rise to a corresponding increase in the Debtor Adjustment Amount payable under Paragraph 6(b) or corresponding reduction in JPMC Adjustment Amount payable under Paragraph 6(b)), in which case the Relevant JPMC Entity's consent is required and may be withheld in the Relevant JPMC Entity's sole discretion; provided that, if requested by LBHI, the Relevant JPMC Entity shall consent to any such Settlement (which consent shall not be unreasonably withheld or delayed) if such Settlement has no adverse effect on the Relevant JPMC Entity (other than an adverse effect that gives rise to a corresponding increase in the Debtor Adjustment Amount payable under Paragraph 6(b) or corresponding reduction in the JPMC Adjustment Amount payable under Paragraph 6(b)). Any Settlement that could give rise to a reduction in the Debtor Adjustment Amount payable under Paragraph 6(b) or increase in the JPMC Adjustment Amount payable under Paragraph 6(b) is deemed to have an adverse effect on the Relevant JPMC Entity.

7.    Value of Collateral; Information as to Securities Collateral. (a) At such time as it may become appropriate in the enforcement and performance of the terms and provisions of this Agreement (including, without limitation, Paragraph 6 above), the parties shall agree upon the means, effective date and methodology to determine the value of the Collateral or any relevant part thereof. If the parties are unable to agree upon such means, effective date and methodology, then the Bankruptcy Court shall determine any such valuation issues.

(b) JPMCB may request from the Debtors on a quarterly basis (or on a more frequent, reasonable basis with respect to Securities Collateral that is the subject of an active dispute), and the Debtors shall promptly provide to JPMCB the following with respect to the loans, participations and other property (the "Underlying Assets") which backed securities and instruments constituting Securities Collateral as of the Effective Date (the "Transferred Securities"): (1) with respect to the Transferred Securities known as Fenway, Spruce and Verano and the real estate assets in RACERS, (i) the principal, interest and other distributions received with respect to such Transferred Securities and Underlying Assets, (ii) a schedule of sales or other dispositions of such Transferred Securities and the Underlying Assets, including any amount by which the proceeds realized differed from the notional balance of the asset disposed of, and (iii) a summary of any material actions taken by the Debtors with respect to such Transferred Securities and Underlying Assets (including, without limitation, any settlements, restructurings, disaggregations or recapitalizations of such Transferred Securities and Underlying Assets), which summary shall include relevant legal documents, identification of other

C:\DOCUMENTS AND SETTINGS\HACKETTB\LOCAL SETTINGS\TEMPORARY INTERNET
FILES\CONTENT.OUTLOOK\8GCO3QG6\US_ACTIVE_COLLATERAL DISPOSITION AGMT_43303102_12 (3).DOC

14

000104

interests of Lehman entities (or their successors) in the entities or financial structures related to such Transferred Securities and Underlying Assets, and, in the case of a disaggregation of any of such Transferred Security, an identification of the Underlying Assets which backed such Transferred Security prior to its disaggregation, and (2) with respect to the other Transferred Securities and Underlying Assets, JPMCB and the Debtors agree to work together in good faith to develop and refine reporting forms and procedures to enable the information described in clauses (i)-(iii) of this Paragraph 7(b) to be provided to JPMCB, to the full extent such information is available to the Debtors and applicable to such other Transferred Securities and Underlying Assets, while imposing as small a burden on the Debtors as reasonably possible. The parties agree that, from and after the Effective Date, satisfaction by the Debtors of the reporting obligations set forth in this Paragraph 7(b) with respect to the Transferred Securities known as Kingfisher shall satisfy any reporting obligation owed to any JPMC Entity by any Debtor under any other agreement with any JPMC Entity with respect to such Transferred Securities or the Underlying Assets thereof.

(c) Each JPMC Entity agrees to use the information (the "Information") furnished to it pursuant to Paragraph 7(b) solely for purposes related to valuation of the Securities Collateral and to maintain the confidentiality of the Information, except that the Information may be disclosed by such JPMC Entity (i) on a need-to-know basis, to another JPMC Entity and to its and their directors, officers, investment advisors, employees and agents (including accountants, attorneys and other advisors); provided, that, any Information concerning the Transferred Securities known as Kingfisher and/or the Underlying Assets thereof may be disclosed only to U.S.-based, U.K.-based or Hong Kong-based directors, officers, investment advisors, employees and agents (including accountants, attorneys and other advisors) of a U.S.-based, U.K.-based or Hong Kong-based JMPC Entity (it being understood that the persons to whom such disclosure is made under this clause (i) will be informed of the confidential nature of such Information and instructed to keep such Information confidential and that JPMC shall be liable for any breach of this Paragraph 7(c) (and any unauthorized disclosure of Information) by such persons), (ii) to the extent requested by any regulatory authority with responsibility for the activities of any JPMC Entity or its subsidiaries, parents and affiliates, (iii) to the extent required by applicable laws or regulations or by a subpoena or similar legal process (provided, however, that in the case of this clause (iii), any JPMC Entity that is subject to such requirement or subpoena shall provide LBHI with prompt written notice of such requirement or subpoena so that LBHI may seek a protective order or other appropriate remedy and JPMC shall fully cooperate with LBHI's efforts to obtain the same, at LBHI's sole expense), (iv) in connection with the exercise or enforcement of any rights or remedies under this Agreement, the defense of any Action, or any matter contemplated by Paragraph 7(a) above relating to this Agreement or the Claims, whether involving a JPMC Entity or its directors, officers, investment advisors, employees and agents, including accountants, attorneys and other advisors (provided, however, that (A) in the case of pleadings, petitions, motions, objections, responses, or similar filings in a legal proceeding or arbitration or oral argument in connection therewith, the relevant JPMC Entity shall provide LBHI with prompt written notice of the filing thereof or the calendaring of such oral argument so that LBHI may seek a protective order or other appropriate remedy and JPMC shall fully cooperate with LBHI's efforts to obtain the

C:\DOCUMENTS AND SETTINGS\HACKETTB\LOCAL SETTINGS\TEMPORARY INTERNET
FILES\CONTENT.OUTLOOK\8GCO3QG6\US_ACTIVE_COLLATERAL DISPOSITION AGMT_43303102_12 (3).DOC

15

000105

same, at LBHI's sole expense and (B) such disclosure other than in filings shall be limited to JPMC's directors, officers, investment advisors, employees and agents (including accountants, attorneys and other advisors) who, if the Information is related to the Transferred Securities known as Kingfisher and/or the Underlying Assets thereof, shall be U.S.-based, U.K.-based or Hong Kong-based directors, officers, investment advisors, employees and agents of a U.S.-based, U.K.-based or Hong Kong-based JMPC Entity), (v) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Paragraph 7(c) or (y) becomes available to such JPMC Entity on a nonconfidential basis from a source other than the Debtors that was not known by JPMC to be prohibited from disclosing such Information to JPMC by a contractual, legal or fiduciary obligation, or (vi) with LBHI's consent (which may be withheld in LBHI's sole discretion).

8.    Effective Date; Payments. (a) This Agreement shall become effective at such time (the "Effective Date") as it has been executed and delivered by all of the parties hereto and it has been approved by an order of the Bankruptcy Court (the "Approval Order"), in form and substance satisfactory to JPMC and the Debtors, which order shall have become final and non-appealable. JPMCB and LBHI may, in their sole discretion, mutually agree that an earlier date (but, in any event, not before the entry of the Approval Order or during the pendency of a stay of the Approval Order) shall be the Effective Date. The Debtors shall promptly request approval of the Agreement by the Bankruptcy Court, and shall reasonably endeavor to obtain such approval. Each JPMC Entity shall cooperate with the Debtors in seeking such approval. All payments under this Agreement shall be made by wire transfer of immediately available funds to an account designated by the relevant Debtor, in the case of a payment to any of the Debtors, or by JPMCB or the relevant JPMC Entity, in the case of a payment to any JPMC Entity.

(b)    The parties agree that they shall request that the Approval Order contain the following language (the defined terms used in such language shall have the same meaning ascribed to such terms in this Agreement):

"Nothing in the Agreement is intended, and the Agreement shall not be construed, to impair any right, remedy or obligation of LBI; and the rights and remedies of LBI against the JPMC Entities and the Debtors and the rights and remedies of the JPMC Entities and the Debtors against LBI shall be not be prejudiced or otherwise impaired in any way by the Agreement. Without limiting the generality of the foregoing, and notwithstanding any other provisions of the Agreement, LBI shall not be bound (absent further court order) by (i) any determination among the JPMC Entities and the Debtors of the value of any Collateral or any methodology for valuing Collateral established pursuant to the Agreement, or (ii) any determination among the JPMC Entities and the Debtors of the secured status of any Claim pursuant to the Agreement. LBI retains any and all rights it may have in the Collateral transferred pursuant to the Agreement, and retains any and all rights it may have under any agreement pursuant to which any JPMC Entity acquired any Lien or other interest in any Collateral. In addition, the provisions of the Agreement shall not expand or reduce any rights and entitlements that LBI may otherwise have against any Debtor or any JPMC Entity with respect to the

C:\DOCUMENTS AND SETTINGS\HACKETTR\LOCAL SETTINGS\TEMPORARY INTERNET
FILES\CONTENT.OUTLOOK\8GCO3QG6\US_ACTIVE COLLATERAL DISPOSITION AGMT 43303102 12(3).DOC

16
000106

Collateral or any rights and entitlements that any Debtor or any JPMC Entity may otherwise have against LBI with respect to the Collateral. The Agreement and the entry by the Debtors and the JPMC Entities into the Agreement shall not create any liabilities or causes of action in favor of LBI against any Debtor or any JPMC Entity or in favor of any Debtor or JPMC Entity against LBI."

9.    Full Power and Authority. Each of the undersigned parties represents that it has full power and authority to enter into this Agreement.

10.    Entire Agreement; No Effect if Not Approved. This Agreement constitutes the entire Agreement of the undersigned parties and supersedes any and all prior agreements or understandings among such parties with respect to the subject matter of this Agreement. If this Agreement is not approved by the Bankruptcy Court or the Effective Date does not occur as contemplated by Paragraph 8, this Agreement shall be deemed null and void and of no force and effect and shall not be referenced by any party for any purpose whatsoever in any proceeding or otherwise, except for this Paragraph 10.

11.    Counterparts; Governing Law; Headings. This Agreement may be executed in counterparts and shall be governed by the laws of the State of New York. Paragraph and other headings are for purposes of convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

12.    Jurisdiction. Each of the undersigned parties submits to the exclusive jurisdiction of the Bankruptcy Court as to any dispute arising out of or under this Agreement. The Bankruptcy Court shall have and retain exclusive jurisdiction to enforce the terms of this Agreement and to determine any claims or disputes which may arise or result from, or be connected with, this Agreement, including, without limitation, any claim of breach or default hereunder.

13.    Amendments. Prior to the issuance of the Approval Order and after confirmation of the LBHI chapter 11 plan, this Agreement may be changed, amended, modified, or altered only in a writing executed by each of the parties hereto. After the issuance of the Approval Order and prior to the confirmation of the LBHI chapter 11 plan, this Agreement may be changed, amended, modified, or altered only in a writing executed by each of the parties hereto and approved by the Bankruptcy Court (other than immaterial modifications or amendments, which shall not require Bankruptcy Court approval).

14.    Binding Effect; Successors. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns (including any successors to the Debtors under a chapter 11 plan and any successors or assignees of the Subrogated Claims). Nothing in this Agreement, express or implied, shall be construed to confer upon any person (other than the parties hereto and their respective successors and assigns) any legal or equitable right, remedy or claim under or by reason of this Agreement.

C:\DOCUMENTS AND SETTINGS\HACKETTB\LOCAL SETTINGS\TEMPORARY INTERNET
FILES\CONTENT.OUTLOOK\8CCO3QG6\US_ACTIVE  COLLATERAL DISPOSITION AGMT_43303102_12(3).DOC

17
000107

15.    Notices. All notices and other communications hereunder shall be in writing and shall be deemed given and received (i) if delivered in person, on the date delivered, (ii) if transmitted by telecopy or electronic mail (provided, in each case, that receipt is confirmed by telephone), on the date sent or (iii) if delivered by an express courier, on the second business day after mailing, to the parties hereto at the following addresses (or at such other address for a party as shall be specified by like notice):

If to any JPMC Entity to:

JPMorgan Chase Bank, N.A.
245 Park Avenue
12th Floor, NY 1-Q653
New York, NY 10017
Telecopy: (646) 534-6399
Email: kevin.c.kelley@chase.com
Attention: Kevin C. Kelley

and

JPMorgan Chase Bank, N.A.
383 Madison Avenue, 23rd Floor
New York, NY 10179
Telecopy: (212) 622-4556
Email: ann.kurinskas@jpmorgan.com
Attention: Ann C. Kurinskas

with a copy (which shall not constitute notice) to:

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
Telecopy: (212) 735-2000
Email: hsnovikoff@wlrk.com and arwolf@wlrk.com
Attention: Harold S. Novikoff and Amy R. Wolf

C:\DOCUMENTS AND SETTINGS\HACKETTB\LOCAL SETTINGS\TEMPORARY INTERNET
FILES\CONTENT.OUTLOOK\8GCO3QG6\US ACTIVE_COLLATERAL DISPOSITION AGMT_43303102_12 (3).DOC

18
000108

If to any Debtor:

c/o Lehman Brothers Holdings Inc.
1271 Avenue of the Americas
New York, NY 10020
Email: william.olshan@lehmanholdings.com
Attention: William Olshan

with a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Telecopy: (212) 310-8007
Email: harvey.miller@weil.com and michael.lubowitz@weil.com
Attention: Harvey Miller and Michael Lubowitz

C:\DOCUMENTS AND SETTINGS\HACKETTB\LOCAL SETTINGS\TEMPORARY INTERNET
FILES\CONTENT.OUTLOOK\0CO3QG6\US_ACTIVE_COLLATERAL DISPOSITION AGMT_43303102_12 (3).DOC

19
000109

Please evidence your acceptance of, and agreement to, the terms and conditions of this letter agreement by executing and returning an executed copy of this letter agreement to the address first written above, with a copy to Weil, Gotshal & Manges, LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Harvey R. Miller, as soon as practicable.

Very truly yours,

LEHMAN BROTHERS HOLDINGS INC.

By: _____

Name:

Title:

LB 745 LLC

By: _____

Name:

Title:

PAMI STATLER ARMS LLC

By: _____

Name:

Title:

LEHMAN BROTHERS COMMODITY
SERVICES INC.

By: _____

Name:

Title:

LEHMAN BROTHERS SPECIAL FINANCING
INC.

By: _____

Name:

Title:

[Signature Page to Collateral Disposition Agreement]

LEHMAN BROTHERS OTC DERIVATIVES
INC.


By: _____
Name:
Title:


LEHMAN BROTHERS DERIVATIVE
PRODUCTS INC.


By: _____
Name:
Title:


LEHMAN COMMERCIAL PAPER INC.


By: _____
Name:
Title:


LEHMAN BROTHERS COMMERCIAL
CORPORATION


By: _____
Name:
Title:


LEHMAN BROTHERS FINANCIAL PRODUCTS
INC.


By: _____
Name:
Title:


[Signature Page to Collateral Disposition Agreement]

LEHMAN SCOTTISH FINANCE L.P.

By: _____
Name:
Title:


CES AVIATION LLC

By: _____
Name:
Title:


CES AVIATION V LLC

By: _____
Name:
Title:


CES AVIATION IX LLC

By: _____
Name:
Title:


EAST DOVER LIMITED

By: _____
Name:
Title:


LUXEMBOURG RESIDENTIAL PROPERTIES
LOAN FINANCE S.A.R.L.

By: _____
Name:
Title:


[Signature Page to Collateral Disposition Agreement]

BNC MORTGAGE LLC

By: _____
Name:
Title:


STRUCTURED ASSET SECURITIES
CORPORATION

By: _____
Name:
Title:


LB ROSE RANCH LLC

By: _____
Name:
Title:


LB 2080 KALAKAUA OWNERS LLC

By: _____
Name:
Title:


MERIT LLC

By: _____
Name:
Title:


LB SOMERSET LLC

By: _____
Name:
Title:


[Signature Page to Collateral Disposition Agreement]

**LB PREFERRED SOMERSET LLC**

By: _____
Name:
Title:

*ACCEPTED AND AGREED AS OF THE DATE OF THIS AGREEMENT:*

JPMORGAN CHASE BANK, N.A.

By: _____
Name:
Title:

J.P. MORGAN BANK DUBLIN PLC

By: _____
Name:
Title:

JPMORGAN CHASE FUNDING INC.

By: _____
Name:
Title:

J.P. MORGAN CLEARING CORP.

By: _____
Name:
Title:

[Signature Page to Collateral Disposition Agreement]

J.P. MORGAN INTERNATIONAL BANK LIMITED

By: _____
Name:
Title:


J.P. MORGAN MARKETS LIMITED

By: _____
Name:
Title:


J.P. MORGAN SECURITIES INC.

By: _____
Name:
Title:


JPMORGAN SECURITIES JAPAN CO., LTD.

By: _____
Name:
Title:


J.P. MORGAN SECURITIES LTD.

By: _____
Name:
Title:


[Signature Page to Collateral Disposition Agreement]

J.P. MORGAN (SUISSE) SA


By: _____
Name:
Title:


J.P. MORGAN VENTURES ENERGY CORPORATION


By: _____
Name:
Title:


JPMORGAN CHASE BANK, N.A.


_____
Abigail J. Feder
Managing Director, JPMorgan Chase Bank, N.A.
In its capacity as investment manager and agent for each of the Commingled Pension Trust
Funds listed in Part A of the attached Schedule I


JPMORGAN MUTUAL FUNDS


_____
Patricia A. Maleski
Vice President, Chief Administrative Officer & Treasurer
On behalf of each of the JPMorgan Mutual Funds listed in Part B of the attached Schedule I


J.P. MORGAN INVESTMENT MANAGEMENT INC.


_____
Abigail J. Feder
Managing Director, J.P. Morgan Investment Management Inc.


[Signature Page to Collateral Disposition Agreement]

In its capacity as investment manager and agent for each of the investment funds listed in Part C of the attached Schedule I


JF ASSET MANAGEMENT LIMITED


_____   _____

Robert Hepper
Managing Director & Chief Operating Officer, JF Asset Management Limited
In its capacity as investment manager and agent for each of the investment funds listed in Part D of the attached Schedule I


JPMORGAN ASSET MANAGEMENT (JAPAN) LIMITED


_____   _____

David Tse
Client Business Chief Operating Officer, JPMorgan Asset Management (Japan) Limited
In its capacity as investment manager for each of the investment funds listed in Part E of the attached Schedule I


JPMORGAN ASSET MANAGEMENT (UK) LIMITED


_____   _____

Campbell David Fleming
Managing Director, JPMorgan Asset Management (UK) Limited
In its capacity as investment manager and agent for each of the investment funds listed in Part F of the attached Schedule I


HIGHBRIDGE ASIA OPPORTUNITIES MASTER FUND, L.P.

By: Highbridge Capital Management, LLC, as Trading Manager

By: _____   _____
Name:
Title:


[Signature Page to Collateral Disposition Agreement]

COBRA LLC

By: Highbridge Capital Management, LLC, as Trading Manager

By: _____
Name:
Title:

CONTRARIAN VALUE, L.P.

By: Highbridge Capital Management, LLC, as Trading Manager

By: _____
Name:
Title:

HIGHBRIDGE CONVERTIBLE ARBITRAGE MASTER FUND, L.P.

By: Highbridge Capital Management, LLC, as Trading Manager

By: _____
Name:
Title:

HIGHBRIDGE INTERNATIONAL LLC

By: Highbridge Capital Management, LLC, as Trading Manager

By: _____
Name:
Title:

SMITHFIELD FIDUCIARY LLC

By: Highbridge Capital Management, LLC, as Trading Manager

By: _____
Name:
Title:

[Signature Page to Collateral Disposition Agreement]

HIGHBRIDGE STATISTICALLY ENHANCED EQUITY MASTER FUND - EUROPE, L.P.

By: Highbridge Capital Management, LLC, as Trading Manager

By: _____

Name:

Title:


HB QUANTITATIVE EQUITY STRATEGIES LIMITED

By: Highbridge Capital Management, LLC, as Investment Adviser

By: _____

Name:

Title:


[Signature Page to Collateral Disposition Agreement]

Schedule I

## Part A – JPMorgan Chase Bank, N.A.

Commingled Pension Trust Fund (Core Bond) of JPMorgan Chase Bank, N.A.
Commingled Pension Trust Fund (Corporate High Yield) of JPMorgan Chase Bank, N.A.
Commingled Pension Trust Fund (Emerging Markets-Fixed Income) of JPMorgan Chase Bank, N.A.
Commingled Pension Trust Fund (Emerging Markets Opportunity-Fixed Income) of JPMorgan Chase Bank, N.A.
Commingled Pension Trust Fund (Enhanced Cash) of JPMorgan Chase Bank, N.A.
Commingled Pension Trust Fund (Extended Duration) of JPMorgan Chase Bank, N.A.
Commingled Pension Trust Fund (Fixed Income Relative Value 4% VAR) of JPMorgan Chase Bank, N.A.
Commingled Pension Trust Fund (Intermediate Bond) of JPMorgan Chase Bank, N.A.
Commingled Pension Trust Fund (Intermediate Credit) of JPMorgan Chase Bank, N.A.
Commingled Pension Trust Fund (Intermediate Public Bond) of JPMorgan Chase Bank, N.A.
Commingled Pension Trust Fund (Long Credit) of JPMorgan Chase Bank, N.A.
Commingled Pension Trust Fund (Long Duration Investment Grade) of JPMorgan Chase Bank, N.A.
Commingled Pension Trust Fund (Long Duration Plus) of JPMorgan Chase Bank, N.A.
Commingled Pension Trust Fund (Market Plus Bond) of JPMorgan Chase Bank, N.A.
Commingled Pension Trust Fund (Mortgage Private Placement) of JPMorgan Chase Bank, N.A.
Commingled Pension Trust Fund (Public Bond) of JPMorgan Chase Bank, N.A.
Commingled Pension Trust Fund (Subadvised Fixed Income - W) of JPMorgan Chase Bank, N.A.

## Part B – JPMorgan Mutual Funds

JPMorgan Core Bond Fund, a series of JPMorgan Trust II
JPMorgan Core Bond Trust, a series of JPMorgan Institutional Trust
JPMorgan Core Plus Bond Fund, a series of JPMorgan Trust II
JPMorgan Diversified Fund, a series of JPMorgan Trust I
JPMorgan Emerging Markets Debt Fund, a series of JPMorgan Trust I
JPMorgan Insurance Trust Balanced Portfolio, a series of JPMorgan Insurance Trust
JPMorgan Insurance Trust Core Bond Portfolio, a series of JPMorgan Insurance Trust
JPMorgan Intermediate Bond Trust, a series of JPMorgan Institutional Trust
JPMorgan Limited Duration Bond Fund (formerly known as JPMorgan Ultra Short Duration Bond Fund), a series of
JPMorgan Trust II
JPMorgan Real Return Fund, a series of JPMorgan Trust I
JPMorgan Short Duration Bond Fund, a series of JPMorgan Trust II
JPMorgan Short Term Bond Fund II, a series of J.P. Morgan Mutual Fund Group
JPMorgan Total Return Fund, a series of JPMorgan Trust I

## Part C – J.P. Morgan Investment Management Inc.

JPMorgan Absolute Return Credit Master Fund Ltd.
JPMorgan Distressed Debt Master Fund, Ltd.
JPMorgan Fixed Income Opportunity Institutional Fund, Ltd.
JPMorgan Fixed Income Opportunity Master Fund, L.P.
JPMorgan Mortgage-Backed Securities Fund Trust
JPMorgan Funds - Emerging Markets Debt Fund
JPMorgan Funds - US Aggregate Bond Fund
JPMorgan Investment Funds - Highbridge Statistical Market Neutral Fund
JPMorgan Investment Funds - US Bond Fund
J.P. Morgan Tokyo Fund - JPM Japan GTA Fund
JPMorgan Investment Funds - Income Opportunity Fund
JPM Emerging Sovereign Open Mother Fund

## Part D – JF Asset Management Limited (Hong Kong)

JPMorgan Fund ICVC - JPM Institutional Japan Fund
JF Japan Technology Fund
JF SAR Japan Fund
JPMorgan Fleming Japanese Smaller Companies Investment Trust Plc
JPMorgan Funds - JF Japan Equity Fund
JPMorgan Funds - JF Japan Small Cap Fund

## Part E – JP Morgan Asset Management (Japan) Limited

JF E - Frontier Open Fund
JF Japan Discovery Fund
JF Japan Open
JF Japan Small Stock Open
JF Japan Tactical Investment Mother Fund
JPM Japan Active Bond Mother Fund
JF Pension Fund - Japanese Bond Portfolio
JF Pension Mother Fund - Japanese Equity Portfolio
JF Smaller Co. Equity Open
JF The Japan

## Part F – JPMorgan Asset Management (UK) Limited

JPMorgan Investment Funds - Europe Short Duration Fund
JPMorgan Funds - Global Convertibles Fund (EUR)
JPMorgan Investment Funds - Global Capital Preservation Fund (EUR)
JP Morgan Europe Aggregate Plus Bond Fund
JPMorgan Funds - Global Aggregate Bond Fund
JPMorgan Investment Funds - Global Bond Fund (EUR)
JPMorgan Investment Funds - Global Bond Fund (USD)
JPMorgan Investment Funds - Global Enhanced Bond Fund

C:\DOCUMENTS AND SETTINGS\HACKETTH\LOCAL SETTINGS\TEMPORARY INTERNET
FILES\CONTENT.OUTLOOK\8GCO3QG6\US_ACTIVE_CO_LATERAL DISPOSITION AGMT 43303102_12 (5).DOC

31
000121

**<u>Annex A</u>**

**Cash Collateral**

(See Attached)

LBHI and LBI Cash Collateral as of January 31, 2010

### ANNEX A

| Account Name | Acct # | Cash Collateral as of 1/31/2010 | |
|---|---|---|---|
| | | Balances 1/31/10 | |
| LBHI Cash Collateral | NA | $5,071,950,665.49 | |
| **DDAs** | | | |
| LBI Proceeds Account | 806001657 | $ 34,262,392.47 | Excludes Prime Brokerage cash |
| LBHI P&I - Cash Collateral | 8440 00158 | $ 183,943,759.38 | |
| Pre-petition Cash Collateral | 7864 17360 | $ 142,476,437.00 | Excludes mis-directed wires |
| **Money Markets** | | | |
| Waterferry | 5015137 | 753,560,547.21 | Includes interest thru 2/1/10 |
| LBHI UK Branch | ILF0001952 | 876,100,634.84 | Includes interest thru 2/1/10 |
| | | 1,629,661,182.05 | |
| LBHI Cash Collateral for LBHJ Facility | 2900113594 | 60,131,813.83 | |
| **Cash and Money Market Total** | | $ 7,122,426,250.22 | |

Cash Collateral - Certain

000123

## Annex B

### Securities Collateral

(See Attached)

(Redacted)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
                            :

In re                            :      **Chapter 11 Case No.**

                            :

**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,  :     **08-13555 (JMP)**

                            :

              **Debtors.**       :      **(Jointly Administered)**

                            :

-------------------------------------------------------------------x

## ORDER PURSUANT TO SECTIONS 363 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 6004 APPROVING COLLATERAL DISPOSITION AGREEMENT AMONG THE DEBTORS AND JPMORGAN CHASE BANK, N.A., ET AL.

Upon the motion, dated February 24, 2010 (the "Motion"), of Lehman Brothers

Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as

debtors and debtors-in-possession (collectively, the "Debtors" and, together with their non-

debtor affiliates, "Lehman"), pursuant to section 363 of title 11 of the United States Code (the

"Bankruptcy Code") and Rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules") for approval of that certain Collateral Disposition Agreement among the

Debtors and JPMorgan Chase Bank N.A. and certain of its affiliates, subsidiaries or related

entities (collectively "JPMorgan"), annexed to the Motion as Exhibit A (the "Agreement"),[1] all

as more fully described in the Motion; and the Court having jurisdiction to consider the Motion

and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing

Order M-61 Referring to Bankruptcy Judges for the Southern District of New York Any and All

Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the

Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b);

and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and

---

[1]  Capitalized terms not otherwise defined herein should have the meaning ascribed to them in the Agreement.

proper notice of the Motion having been provided in accordance with the procedures set forth in the amended order entered February 13, 2009 governing case management and administrative procedures [Docket No. 2837] to (i) the United States Trustee for the Southern District of New York; (ii) the attorneys for the Official Committee of Unsecured Creditors; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; (vi) the attorneys for JPMorgan; (vii) the attorneys for James W. Giddens, as Trustee (the "SIPA Trustee") for Lehman Brothers Inc. ("LBI"); and (viii) all parties who have requested notice in these chapter 11 cases, and it appearing that no other or further notice need be provided; and a hearing (the "Hearing") having been held to consider the relief requested in the Motion; and the Court having found and determined that the relief sought in the Motion is in the best interests of LBHI and the other Debtors and all economic stakeholders; and after due deliberation and sufficient cause appearing therefor, it is
ORDERED AND ADJUDGED:

      1.      The Motion is GRANTED.

      2.      Objections to the Motion, if any, that have not otherwise been withdrawn or resolved are overruled.

      3.      The proposed transactions set forth in the Agreement are in the best interests of LBHI and the other Debtors and all economic stakeholders.

      4.      Pursuant to section 363(b) of the Bankruptcy Code, the Agreement is approved and LBHI and the other Debtors are authorized to implement and consummate the Agreement and any actions taken by LBHI and the Debtors or their affiliates may be taken without the necessity of any further Court proceedings or approval and shall be conclusive and binding in all respects on all parties-in-interest in these cases.

5.     The Claims as contemplated by the Agreement are provisionally allowed against the respective Debtors without prejudice to any and all rights of all parties-in-interest and subject to the reservations of rights set forth in the Agreement, concurrently with the application of the Cash Collateral and the Cash Payment.

6.     As and to the full extent provided in the Agreement, LBHI is fully subrogated to the Claims of the relevant JPMC Entities against LBI and such other Lehman subsidiaries to the full extent of the payments made by LBHI, and LBHI shall succeed to any and all Liens asserted by the relevant JPMC Entities in or against all of the Securities Collateral (in the same priorities as held by such relevant JPMC Entities), which Liens shall be assigned and transferred to LBIII by such relevant JPMC Entities and which Securities Collateral shall be assigned and transferred by such relevant JPMC Entities to LBHI or as otherwise directed by LBHI.

7.     The Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, *provided* that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

8.     Except for the effect on the rights of the parties to the Agreement as expressly provided therein, nothing in the Agreement or the failure to raise any objection with respect to the Motion seeking the entry of this Order approving such Agreement is intended to or shall in any manner prejudice or affect the rights, remedies, actions, defenses, and claims of any kind whatsoever under applicable law or principles of equity of JPMorgan Chase Bank, N.A. or its affiliates or subsidiaries or related entities or the SIPA Trustee.

000128

9.      The Agreement is without prejudice to any rights, remedies, claims or

causes of action on the part of any Lehman entity with respect to, and each Lehman entity

expressly reserves, any and all rights and remedies it may have under applicable law, contract or

otherwise, including, without limitation, rights and remedies in connection with any such

provisionally allowed secured or other Claim of each such JPMC Entity and any alleged

guarantee thereof or security therefor, including, without limitation, the right to contest the

validity and enforceability of any such provisionally allowed secured or other Claim and/or to

avoid or contest such Claims, any alleged guarantee thereof and any alleged security therefor,

including, without limitation, any property alleged by JPMorgan to constitute Collateral or a

Lien on or ownership of any Lehman assets, such rights and remedies reserved by each Lehman

entity to include, without limitation, claims or potential claims that the Collateral suffered a

diminution in value as a result of conduct of any JPMC Entity (other than any diminution in

value arising from the entry into the Agreement and the performance of the terms thereof).

10.      The Agreement does not expand or reduce the rights and entitlements of

any party with respect to the Collateral and Liens beyond those rights and entitlements that such

party would have if the Agreement had not been entered into by the parties thereto.

11.      Nothing in the Agreement is intended, and the Agreement shall not be

construed, to impair any right, remedy or obligation of LBI; and the rights and remedies of LBI

against the JPMC Entities and the Debtors and the rights and remedies of the JPMC Entities and

the Debtors against LBI shall be not be prejudiced or otherwise impaired in any way by the

Agreement.  Without limiting the generality of the foregoing, and notwithstanding any other

provisions of the Agreement, LBI shall not be bound (absent further court order) by (i) any

determination among the JPMC Entities and the Debtors of the value of any Collateral or any

C:\NRPORTBL\US_ACTIVE\HACKETTB\43295877_15.DOC          4

methodology for valuing Collateral established pursuant to the Agreement, or (ii) any determination among the JPMC Entities and the Debtors of the secured status of any Claim pursuant to the Agreement. LBI retains any and all rights it may have in the Collateral transferred pursuant to the Agreement, and retains any and all rights it may have under any agreement pursuant to which any JPMC Entity acquired any Lien or other interest in any Collateral. In addition, the provisions of the Agreement shall not expand or reduce any rights and entitlements that LBI may otherwise have against any Debtor or any JPMC Entity with respect to the Collateral or any rights and entitlements that any Debtor or any JPMC Entity may otherwise have against LBI with respect to the Collateral. The Agreement and the entry by the Debtors and the JPMC Entities into the Agreement shall not create any liabilities or causes of action in favor of LBI against any Debtor or any JPMC Entity or in favor of any Debtor or JPMC Entity against LBI.

12.    To the extent that the automatic stay or any other stay entered in the Debtors' chapter 11 cases are applicable to any actions expressly contemplated to be taken by any JPMC Entity pursuant to the Agreement, such stay is hereby modified to the extent necessary to permit such JPMC Entity to take such actions.

13.    The requirements of Bankruptcy Rule 6004(h) are waived and the terms of this Order shall be immediately effective and enforceable upon its entry.

000130

14. The Court retains jurisdiction with respect to all matters arising from or
related to the implementation of this Order and consummation of the Agreement.

Dated: March ___, 2010
      New York, New York

                                          _____
                                          UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT C**

000132

**WINTHROP COUCHOT**
**PROFESSIONAL CORPORATION**
660 Newport Center Drive, Fourth Floor
Newport Beach, CA 92660
Telephone: (949) 720-4100
Facsimile: (949) 720-4111
Sean A. O'Keefe – NY Bar No. 1980853, CA Bar No. 122417
Paul J. Couchot – CA Bar No. 131934
General Insolvency Counsel for the SunCal Appellants

**MILLER BARONDESS, LLP**
1999 Avenue of the Stars, Suite 1000
Los Angeles, CA 90067
Telephone: (310) 552-4400
Facsimile: (310) 552-8400
Louis R. Miller – CA Bar No. 54141
Martin H. Pritikin -- CA Bar No. 210845
Special Litigation Counsel for SunCal Appellants

# UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | **Chapter 11** |
| | **Case No. 08-13555 (JMP)** |
| **LEHMAN BROTHERS HOLDINGS INC, et al.,** | **Jointly Administered** |
| Debtors. | |

**NOTICE OF APPEAL OF ORDER APPROVING DEBTORS' MOTION PURSUANT TO BANKRUPTCY RULE 9019 FOR AUTHORITY TO COMPROMISE CONTROVERSY IN CONNECTION WITH A REPURCHASE TRANSACTION WITH FENWAY CAPITAL, LLC AND A COMMERCIAL PAPER PROGRAM WITH FENWAY FUNDING, LLC**

PLEASE TAKE NOTICE that SunCal Communities I LLC, SunCal Communities III LLC, SCC/Palmdale LLC, Acton Estates LLC, SunCal Beaumont Heights LLC, SunCal Emerald Meadows LLC, SunCal Johansson Ranch LLC, SunCal Bickford Ranch LLC, SunCal Summit Valley LLC, Seven Brothers LLC, Kirby Estates LLC, SJD Partners Ltd., SJD Development Corp., SCC Communities LLC, North Orange Del Rio Land LLC and Tesoro SF LLC, the debtors and debtors-in-possession (collectively, the "SunCal Appellants") hereby appeal to the United States District Court Southern District of New York, pursuant to 28 U.S.C. § 158(a), from that certain *Order Approving Debtors' Motion Pursuant To Bankruptcy Rule 9019 For Authority To Compromise Controversy In Connection With A Repurchase Transaction With Fenway Capital, LLC And A Commercial Paper Program With Fenway Funding, LLC* (the "Order") entered by the United States Bankruptcy Court on May 13, 2010 (Docket No. 9030). Attached hereto as Exhibit "1" is a true and correct copy of the Order that is the subject of this appeal. The names of all parties to the Order and the names, addresses and their telephone numbers are listed below:

**Appellants:**
SunCal Appellants

**Attorneys For Appellants:**
Winthrop Couchot, P.C.
Paul J. Couchot
Sean A. O'Keefe
660 Newport Center Drive, Suite 400
Newport Beach, CA 92660
Tel: 949.720.4100

Miller Barondess, LLP
Louis R. Miller
Martin H. Pritikin
1999 Avenue of the Stars, Suite 1000
Los Angeles, CA 90067
Telephone: (310) 552-4400

**Appellees:**
Lehman Commercial Paper, Inc.
Lehman Brothers Holdings, Inc.

**Attorneys for Appellees:**
Weil Gotshal & Manges, LLP
Alfred Perez
767 Fifth Avenue
New York, NY 10153
Tel: 212.310.8000

2

**Other Parties To The Order:**
Official Committee of Unsecured Creditors

**Attorneys for Other Parties:**
Milbank, Tweed, Hadley & McCloy, LLP
Dennis F. Dunne
Evan R. Fleck
Dennis C. O'Donnell
One Chase Manhattan Plaza
New York, NY 10005
Tel: 212.530.5000

Dated: May 27, 2010                   Respectfully submitted,

   /s/  Sean A O'Keefe
Sean A O'Keefe
Paul J. Couchot
WINTHROP COUCHOT, P.C.
660 Newport Center Drive, Fourth Floor
Newport Beach, CA 92660
Telephone: (949) 720-4100
Facsimile: (949) 720-4111

   /s/  Louis R. Miller
Louis R. Miller
MILLER BARONDESS, LLP
1999 Avenue of the Stars, Suite 1000
LOS ANGELES, CA 90067
Telephone: (310) 552-4400
Facsimile: (310) 552-8400

*Attorneys for the SunCal Appellants*

Doc.#009185

**EXHIBIT "1"**

000136

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                                             :
In re                                                        :        Chapter 11 Case No.
                                                             :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,    :        08-13555 (JMP)
                                                             :
                    Debtors.                                 :        (Jointly Administered)
                                                             :
-------------------------------------------------------------x

### ORDER APPROVING DEBTORS' MOTION PURSUANT TO BANKRUPTCY RULE 9019 FOR AUTHORITY TO COMPROMISE CONTROVERSY IN CONNECTION WITH A REPURCHASE TRANSACTION WITH FENWAY CAPITAL, LLC AND A COMMERCIAL PAPER PROGRAM WITH FENWAY FUNDING, LLC

Upon the motion, dated March 25, 2010 (the "Motion")[1], of Lehman Brothers

Holdings Inc. ("LBHI") and its affiliated debtors, including Lehman Commercial Paper Inc.

("LCPI"), in the above-referenced chapter 11 cases (together, the "Debtors") pursuant to Rule

9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") authorizing LBHI

and LCPI to compromise controversy in connection with a repurchase transaction with Fenway

Capital, LLC and a commercial paper program with Fenway Funding, LLC, all as more fully

described in the Motion; and the Court having jurisdiction to consider the Motion and the relief

requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61

Referring to Bankruptcy Judges for the Southern District of New York Any and All Proceedings

Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the

relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of

the Motion having been provided in accordance with the procedures set forth in the amended

order entered February 13, 2009 governing case management and administrative procedures

---

[1] Capitalized terms not otherwise defined herein should have the meaning ascribed to them in the Motion.

[Docket No. 2837] to (i) the United States Trustee for the Southern District of New York; (ii) the attorneys for the Official Committee of Unsecured Creditors; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; (vi) the attorneys for JPMorgan; (vii) the attorneys for James W. Giddens, as Trustee (the "SIPA Trustee") for Lehman Brothers Inc. ("LBI"); (viii) the attorneys for Fenway and Hudson; (ix) the attorneys for DBTCA; and (x) all parties who have requested notice in these chapter 11 cases, and it appearing that no other or further notice need be provided; and a hearing (the "Hearing") having been held to consider the relief requested in the Motion; and the Court having found and determined that the relief sought in the Motion is in the best interests of LBHI, LCPI and the other Debtors and all economic stakeholders; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that, pursuant to Bankruptcy Rule 9019, LBHI and LCPI are duly authorized to enter into the Transaction consistent with the terms described in the Transaction Summary; and it is further

ORDERED that upon the closing of the Transaction, LCPI will have repurchased the Repo Assets pursuant to the MRA and will be the sole owner of the Repo Assets subject to the rights of the other Debtors and non-Debtors with respect to the Repo Assets; and it is further

ORDERED that (a) LBHI and LCPI are duly authorized and empowered to execute, deliver, implement and fully perform any and all obligations, instruments, documents, and papers that may be necessary or appropriate to consummate the Transaction substantially in accordance with the terms described in the Transaction Summary; (b) LBHI and LCPI are duly authorized and empowered to take all other and further actions as may be necessary to implement the Transaction in accordance with the terms described in the Transaction Summary;

2

(c) LBHI and LCPI shall have the right both in connection with and following consummation of the Transaction to consent to any amendment, restatement, waiver, supplement or other modification of the Transaction; and (d) to the full extent provided under the Fenway Documents, the LBHI guaranty with respect to the MRA and applicable law, LBHI is fully subrogated to the claims of Fenway against LCPI to the full extent of any payment by LBHI in respect of such claims, and LBHI shall succeed to any and all liens and security interests with respect to the Repo Assets and any interest therein asserted by Fenway under the Fenway Repo and/or the Fenway Documents (which liens and security interests shall remain in effect notwithstanding any subsequent transfer by LCPI of any of the Repo Assets or any interest therein), in the same priorities as held by Fenway Capital or Fenway Funding, to secure LBHI's subrogated claims, which liens and security interests shall hereby be deemed assigned and transferred by Fenway Capital and Fenway Funding to LBHI; provided, that the Debtors are hereby authorized and directed to execute such further documents and take all other and further actions to effectuate and implement the provisions and intent of clause (d) above. Any actions described in clauses (a), (b), (c) or (d) taken by LBHI or LCPI or their affiliates may be taken without the necessity (x) of further court proceedings or approval or (y) of any consent of any party other than LBHI and LCPI, and shall be conclusive and binding in all respects on all parties in interest in these cases other than LBHI and LCPI; and it is further

ORDERED that nothing contained herein shall be deemed to be a waiver or the relinquishment of any rights, claims, interests, obligations, benefits or remedies of LCPI or LBHI or, except as otherwise expressly provided in this Motion, that the Debtors may have or choose to assert on behalf of their respective estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including against each other or third parties and the Debtors are

3

5/27

hereby authorized and directed to execute such further documents to evidence these reservations;

and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to the implementation and/or interpretation of this Order.

Dated: New York, New York
May 13, 2010

_s/ James M. Peck_
UNITED STATES BANKRUPTCY JUDGE

4

Exhibit "1", Page 7

000140

**EXHIBIT D**

**WINTHROP COUCHOT**
**PROFESSIONAL CORPORATION**
660 Newport Center Drive, Fourth Floor
Newport Beach, CA 92660
Telephone: (949) 720-4100
Facsimile: (949) 720-4111
Sean A. O'Keefe   NY Bar No. 1980853, CA Bar No. 122417
Paul J. Couchot – CA Bar No. 131934
Counsel for the SunCal Appellants

**MILLER BARONDESS, LLP**
1999 Avenue of the Stars, Suite 1000
Los Angeles, CA 90067
Telephone: (310) 552-4400
Facsimile: (310) 552-8400
Louis R. Miller – CA Bar No. 54141
Martin H. Pritikin -- CA Bar No. 210845
Special Litigation Counsel for the SunCal Appellants

## UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | **Chapter 11** |
| | **Case No. 08-13555 (JMP)** |
| **LEHMAN BROTHERS HOLDINGS** | **Jointly Administered** |
| **INC, et al.,** | |
| Debtors. | |

**NOTICE OF APPEAL OF ORDER DENYING MOTION OF THE**
**SUNCAL DEBTORS FOR AN ORDER DETERMINING**
**THAT THE AUTOMATIC STAY DOES NOT APPLY;**
**OR, IN THE ALTERNATIVE, GRANTING RELIEF FROM STAY**

PLEASE TAKE NOTICE that SunCal Communities I LLC, SunCal Communities III LLC, SCC/Palmdale LLC, Acton Estates LLC, SunCal Beaumont Heights LLC, SunCal Emerald Meadows LLC, SunCal Johansson Ranch LLC, SunCal Bickford Ranch LLC, SunCal Summit Valley LLC, Seven Brothers LLC, Kirby Estates LLC, SJD Partners Ltd., SJD Development Corp., SCC Communities LLC, North Orange Del Rio Land LLC and Tesoro SF LLC, the debtors and debtors-in-possession (collectively, the "SunCal Appellants") hereby appeal to the United States District Court Southern District of New York, pursuant to 28 U.S.C. § 158(a), from that certain *Order Denying Motion Of The SunCal Debtors For An Order Determining That The Automatic Stay Does Not Apply; Or, In The Alternative, Granting Relief From Stay* (the "Order") entered by the United States Bankruptcy Court on May 13, 2010 (Docket No. 9059). Attached hereto as Exhibit "1" is a true and correct copy of the Order that is the subject of this appeal.. The names of all parties to the Order and the names, addresses and their telephone numbers are listed below:

**Appellants:**
SunCal Appellants

**Attorneys For Appellants:**
Winthrop Couchot, P.C.
Paul J. Couchot
Sean A. O'Keefe
660 Newport Center Drive, Suite 400
Newport Beach, CA 92660
Tel: 949.720.4100

Miller Barondess, LLP
Louis R. Miller
Martin H. Pritikin
1999 Avenue of the Stars, Suite 1000
Los Angeles, CA 90067
Telephone: (310) 552-4400

**Appellees:**
Lehman Commercial Paper, Inc.
Lehman Brothers Holdings, Inc.

**Attorneys for Appellees:**
Weil Gotshal & Manges, LLP
Alfred Perez
767 Fifth Avenue
New York, NY 10153
Tel: 212.310.8000

2

**Other Parties To The Order:**
Official Committee of Unsecured Creditors

**Attorneys for Other Parties:**
Milbank, Tweed, Hadley & McCloy, LLP
Dennis F. Dunne
Evan R. Fleck
Dennis C. O'Donnell
One Chase Manhattan Plaza
New York, NY 10005
Tel: 212.530.5000

Dated: May 27, 2010                    Respectfully submitted,


  /s/ Sean A O'Keefe
Sean A O'Keefe
Paul J. Couchot
WINTHROP COUCHOT, P.C.
660 Newport Center Drive, Fourth Floor
Newport Beach, CA 92660
Telephone: (949) 720-4100
Facsimile: (949) 720-4111


  /s/ Louis R. Miller
Louis R. Miller
MILLER BARONDESS, LLP
1999 Avenue of the Stars, Suite 1000
LOS ANGELES, CA 90067
Telephone: (310) 552-4400
Facsimile: (310) 552-8400

*Attorneys for the SunCal Appellants*

3

**EXHIBIT "1"**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
---------------------------------------------------------------------x
                                      :
In re                                 :        Chapter 11 Case No.
                                      :
LEHMAN BROTHERS HOLDINGS INC., et al.,:        08-13555 (JMP)
                                      :
                Debtors.              :        (Jointly Administered)
                                      :
                                      :
---------------------------------------------------------------------x
```

### ORDER DENYING MOTION OF THE SUNCAL DEBTORS FOR AN ORDER DETERMINING THAT THE AUTOMATIC STAY DOES NOT APPLY; OR, IN THE ALTERNATIVE, GRANTING RELIEF FROM STAY

Upon consideration of the motion of the SunCal Debtors for an Order

Determining that the Automatic Stay Does Not Apply; or in the Alternative, Granting Relief

From Stay, filed April 21, 2010 [Docket No. 8539] (the "Motion"),[1] filed by the SunCal Debtors[2]

seeking a determination that the automatic stay provisions of 11 U.S.C. section 362 do not apply,

or in the alternative, an order modifying the automatic stay with respect to Lehman Commercial

Paper, Inc. ("LCPI") and Lehman Brothers Holdings, Inc. ("LBHI" and, together with LCPI, the

"Debtors") to enable the SunCal Debtors' pursuit of their equitable subordination litigation

pending before the Honorable Erithe Smith, Bankruptcy Court for the Central District of

California; the Debtor having timely objected to the Motion on May 5, 2010, and a hearing

having been held before this Court on May 12, 2010; and it appearing that the SunCal Debtors

---

[1]    Capitalized terms utilized but not defined herein shall have the meaning ascribed to them in the Motion.

[2] In the Reply re: Motion of the SunCal Debtors for an Order Determining that the Automatic Stay Does Not Apply; or in the Alternative, Granting Relief From Stay, filed May 10, 2010 [Docket No. 8949], the Trustee indicated in a footnote, that he would be withdrawing as a moving party, pursuant to a tentative settlement reached between the Trustee and the Debtors regarding the Trustee's claims in the California Adversary Proceeding.

have not established cause for obtaining relief from the automatic stay pursuant to the Motion;

and for the reasons stated on the record; now, therefore, it is hereby

ORDERED that the Motion is denied.


Dated: New York, New York
       May 17, 2010

                                        _____s/ James M. Peck_____
                                        HONORABLE JAMES M. PECK
                                        UNITED STATES BANKRUPTCY JUDGE


2

Exhibit 1, Page 5