WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas 77027
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Alfredo R. Pérez

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
:
**In re** : **Chapter 11 Case No.**
:
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, : **08-13555 (JMP)**
:
**Debtors.** : **(Jointly Administered)**
:
------------------------------------------------------------------x

**DEBTORS' RESPONSE TO SUNCAL DEBTORS'**
**MOTION AND MEMORANDUM OF LAW PURSUANT**
**TO FED R. BANKR P. 8005 FOR STAY PENDING APPEAL OF ORDER APPROVING**
**DEBTORS' MOTION PURSUANT TO BANKRUPTCY RULE 9019 FOR AUTHORITY**
**TO COMPROMISE CONTROVERSY IN CONNECTION WITH A REPURCHASE**
**TRANSACTION WITH FENWAY CAPITAL, LLC AND A COMMERCIAL PAPER**
**PROGRAM WITH FENWAY FUNDING, LLC AND FOR STAY PENDING**
**APPEAL OF ORDER DENYING MOTION OF THE SUNCAL DEBTORS FOR AN**
**ORDER DETERMINING THAT THE AUTOMATIC STAY DOES NOT APPLY; OR, IN**
**THE ALTERNATIVE, GRANTING RELIEF FROM STAY AND NOTICE OF APPEAL**

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-

referenced chapter 11 cases, including Lehman Commercial Paper Inc. ("LCPI"), as debtors and

debtors in possession (together, the "Debtors" and, collectively with their non-debtor affiliates,

"Lehman"), hereby submit their response ("Response") to the *SunCal Debtors' Motion and*

*Memorandum of Law Pursuant to Fed R. Bankr P. 8005 for Stay Pending Appeal of Order*

*Approving Debtors' Motion Pursuant to Bankruptcy Rule 9019 for Authority to Compromise*

*Controversy in Connection With a Repurchase Transaction with Fenway Capital, LLC and a Commercial Paper Program With Fenway Funding, LLC and for Stay Pending Appeal of Order Denying Motion of the SunCal Debtors for an Order Determining that the Automatic Stay Does Not Apply; Or, in the Alternative, Granting Relief From Stay and Notice of Appeal* [Docket Nos. 9327 and 9329] (collectively, the "Stay Pending Appeal Motion") and respectfully represent:

## I.     PRELIMINARY STATEMENT

1.     Dissatisfied with this Court's entry of the 9019 Order[1] and the Stay Relief Order[2] (collectively, the "Orders"), notwithstanding their ostensible assent to the entry of the 9019 Order, the SunCal Debtors[3] have appealed both Orders and now ask the Court for the extraordinary relief of a stay of the Orders pending their appeals in their latest attempt to continue to litigate the ownership of the Repo Assets[4].  In the Stay Pending Appeal Motion, the SunCal Debtors reargue their positions on each of the Motions (as defined below) and raise new arguments that were neither raised by the SunCal Debtors in their initial pleadings or before this

---

[1] "9019 Order" shall mean the *Order Approving Debtors' Motion Pursuant to Bankruptcy Rule 9019 for Authority to Compromise Controversy In Connection With a Repurchase Transaction With Fenway Capital LLC and a Commercial Paper Program with Fenway Funding, LLC.,* dated May 13, 2010 [Docket No. 9030].

[2] "Stay Relief Order" shall mean the *Order Denying Motion of the SunCal Debtors for an Order Determining that the Automatic Stay Does Not Apply; or, in the Alternative, Granting Relief from Stay,* dated May 17, 2010 [Docket No. 9059].

[3] For the purposes of this Response, the SunCal Debtors are: (i) SunCal Communities I LLC, (ii) SunCal Communities III LLC, (iii) SCC/Palmdale LLC, (iv) Acton Estates, LLC, (v) SunCal Beaumont Heights, LLC, (vi) Suncal Emerald Meadows LLC, (vii) SunCal Johansson Ranch LLC, (viii) SunCal Bickford Ranch LLC, (ix) SunCal Summit Valley LLC, (x) Seven Brothers LLC, (xi) Kirby Estates LLC, (xii) SJD Partners Ltd., (xiii) SJD Development Corp.,  (xiv) SCC Communities LLC, (xv) North Orange Del Rio Land LLC and (xvi) Tesoro SF LLC.

[4] Capitalized terms used, but not otherwise defined, herein shall have the meanings ascribed to them in the Motions, as applicable.

Court at the hearing on the Motions (the "<u>Hearing</u>"). They nevertheless fail to meet the heavy burden required under the law to justify a stay of the 9019 Order and the Stay Relief Order.

<u>The 9019 Order</u>

2.     The SunCal Debtors cannot show cause to warrant a stay of the 9019 Order. First, they cannot demonstrate that they will suffer *actual and imminent* harm through the entry of the 9019 Order where they conceded they lacked standing to object to the merits of the Transaction and where the 9019 Order lacks any findings as to its effect on the SunCal Debtors or the California Cases. The list of prospective harms alleged by the SunCal Debtors is similarly unavailing as the SunCal Debtors already face many of the problems they attempt to attribute to the after-effects of the 9019 Order. And, to the extent the SunCal Debtors believe that the Debtors ***may*** make certain arguments in the California Cases following the closing of the Transaction, such speculation does not constitute the demonstrable imminent and actual harm necessary to warrant a stay of the 9019 Order – particularly where the SunCal Debtors' rights in respect of those alleged arguments have not been prejudiced by the 9019 Order. More than mere conjecture is necessary to show irreparable harm.

3.     The SunCal Debtors also cannot show that there is a substantial probability that they will prevail on appeal. A decision to approve a settlement under Rule 9019 is within a court's sound discretion and is reviewed for abuse thereof. Here, the 9019 Order was entered after this Court considered the pleadings filed by the Debtors and the SunCal Debtors (including the related declarations), the Debtors' ***unopposed*** testimony concerning the reasonableness of the Transaction and the attendant benefits to the Debtors' estates, and the Creditors' Committee support of the Transaction. Though the SunCal Debtors alleged in the 9019 Opposition that the Transaction was negotiated in bad faith, they never prosecuted this

allegation, presented no evidence at the Hearing in support thereof, and did not refute evidence of good faith presented by the Debtors. Indeed, at the Hearing the SunCal Debtors retreated from their objections to the Transaction and literally "sat down." Their failure to press the issue below prevents them from pursuing it on appeal. Nonetheless, even assuming the SunCal Debtors could now reargue the allegations of bad faith they made in the 9019 Opposition but did not prosecute at the Hearing, the ample evidence presented to this Court demonstrates the Debtors' above-board behavior and lack of bad faith in negotiating the Transaction. Consequently, the SunCal Debtors' chances of prevailing on appeal are not substantially probable – they are unlikely, at best.

        4.      The SunCal Debtors cannot establish that the Debtors would not be harmed by a stay of the 9019 Order and that the public interest favors a stay. The SunCal Debtors' attempt to diffuse the harm that the Debtors would suffer if the 9019 Order were stayed by arguing that the Debtors could pursue an alternative transaction reveals the SunCal Debtors' fundamental misunderstanding of the Transaction. As explained further below, LCPI is the only Debtor party to the Fenway Repo and, therefore, is the only Debtor with the contractual right to obtain a retransfer of the Repo Assets.

        5.      Indeed, a stay of the 9019 Order would likely cause substantial harm to the Debtors, their creditors, and Fenway and would not further the public interest. A stay of the 9019 Order would (i) significantly impair the ability of the Debtors to implement the Transaction and manage assets that, indisputably, ***have nothing to do with SunCal***,[5] (ii) force the Debtors and Fenway to continue to adhere to a repo structure that all of them believe is onerous and

---

[5] As noted in the 9019 Motion (as defined below), the Repo Assets include loans and other assets than the SunCal Loans. *See* 9019 Motion at 5, 7.

unnecessary, and (iii) prevent the Debtors from realizing the economic and other savings associated with entering into the Transaction. The Debtors' cost savings inure to the benefit of their creditors, who, likewise, supported the Court's entry of the 9019 Order. Surely, a stay of the 9019 Order would harm the Debtors, their creditors, and the public interest.

6. Finally, the SunCal Debtors do not show that the public interest would be served by a stay. They argue that a stay of the 9019 Order will enable them to proceed with their Chapter 11 Cases. But the status quo that existed before the ruling by this Court, which the SunCal Debtors are now appealing, would not be altered by the stay the SunCal Debtors now seek. Consequently, the SunCal Debtors fail to articulate a basis for staying the 9019 Order.

The Stay Relief Order

7. The SunCal Debtors likewise do not meet the requirements necessary to warrant a stay of the Stay Relief Order. First, the SunCal Debtors' bare bones contention they will be irreparably harmed if the Stay Relief Order is not stayed defies logic. The Stay Relief Order merely denied the Stay Relief Motion, leaving the SunCal Debtors in the *same position* as if the Stay Relief Order had not been entered in the first place. Just as the SunCal Debtors could not proceed to litigate in their California Cases against LCPI prior to filing the Stay Relief Motion, so too do they not have stay relief now. The SunCal Debtors will not suffer "irreparable harm" if an order that does nothing to change the preexisting status quo is not stayed.

8. Second, the SunCal Debtors have not shown a substantial probability that they will prevail on appeal of the Stay Relief Order and that stay relief will be granted. Stay relief orders are reviewed for abuse of discretion. The SunCal Debtors argue that the Court

misapplied a *Sonnax*[6] factor – the balance of harms. However, at the Hearing, in arguing that the

balance of harms tilted in their favor, the SunCal Debtors cited two chief reasons: (a) the

potential hazards on the SunCal Debtors' land (Hr'g Tr., 63, May 12, 2010.[7]) and (b) a desire to

"maintain the playing field as it is right now" and to "keep [the California Cases' litigation]

going." (Hr'g Tr. 66-67.) This Court, in weighing that *Sonnax* factor and considering the

arguments raised by the SunCal Debtors, cited the SunCal Debtors' delay in bringing the Stay

Relief Motion for over a year, not to penalize the SunCal Debtors, but instead to discredit their

argument that harm to the SunCal Debtors were imminent if stay relief were not granted. (Hr'g

Tr. 73.) As to the SunCal Debtors' professed desire for assistance in "maintain[ing] the playing

field," the Court noted that because the SunCal Debtors had through that point managed to deal

with their litigation without "impairment in those efforts," this alleged reason likewise could not

justify the relief. (*See* Hr'g Tr. 73.) The alleged "harms" articulated by the SunCal Debtors

weighed against those expressed by the Debtors justified this Court's sound discretion in denying

the requested stay relief.

        9.      In arguing that the Stay Relief Order will be reversed, the SunCal Debtors

also appear to make much of the fact that the Court held that the "[automatic] stay applies" and

expound for pages in the Stay Pending Appeal Motion on whether it should or should not apply.

They cite the failure to include this language in the Stay Relief Order as a critical failure, but

appear to appeal the excluded language nonetheless. However, the failure to include an express

finding that the "stay applies," stems not as a result of "critical failure," but rather because, as

---

[6] *In re Sonnax Indus., Inc.,* 907 F.2d 1280 (2d Cir. 1990)

[7] A copy of the May 12, 2010 Hearing Transcript is attached hereto as Exhibit "A." All references to the May 12, 2010 Hearing Transcript are noted as "Hr'g Tr."

this Court acknowledged in the several minutes of colloquy that preceded its statement that the automatic stay applies, the Bankruptcy Appellate Panel in the Ninth Circuit (the "BAP") already had ruled the stay applies to the equitable subordination action against LCPI ("BAP Order"). Citing the existence of the BAP Order and the pendency of its appeal to the United States Court of Appeals of the Ninth Circuit (the "Ninth Circuit") by the SunCal Debtors, the Court noted that the successful prosecution by the SunCal Debtors of the Ninth Circuit appeal likely would moot the Stay Relief Motion. (Hr'g Tr. 72.) It *then* expressed concern that granting the SunCal Debtors' stay relief motion would moot the appeal thus "gaming the system." (Hr'g Tr. 73.) This Court chose not to participate in the "game" and opted to deny the requested relief. (Hr'g Tr. 73-74.) It never made any express findings concerning whether the automatic stay "would apply to the ES Action after the Claims Transaction closed." (Stay Pending Appeal Motion at 23-24.) On the contrary, this Court could not have been more clear in its expressed statement that it was not making any particularized findings. (Hr'g Tr. 75.) The Court did nothing other than state a Bankruptcy Code principle – namely that a litigation that proceeds against debtor's property is subject to the automatic stay. This does not constitute reversible error. Consequently, it is unlikely the SunCal Debtors will prevail on appeal.

10. Furthermore, the SunCal Debtors fail to establish that a stay of the Stay Relief Order will not harm the creditors. The SunCal Debtors, again, contend that the Debtors are able to pursue an alternate transaction. But the Stay Relief Order has nothing to with whether the Debtors have authority to effectuate the Transaction. Consequently, the SunCal Debtors' argument is inapposite and fails.

11. Finally, the SunCal Debtors similarly fail to justify why the public interest favors a stay of an order that merely preserves the status quo. As with the 9019 Order, the

SunCal Debtors contend that a stay of the Stay Relief Order will enable them to proceed with their Chapter 11 Cases. However, nothing in the Stay Relief Order prohibits the SunCal Debtors from proceeding with their Chapter 11 Cases. Accordingly, this argument likewise is unavailing.

12. The Stay Relief Order accomplishes only one thing – it clarifies that the SunCal Debtors do not have stay relief to litigate against a Debtor. The public interest is served by certainty. There is no justifiable reason to stay the Stay Relief Order.

13. For the foregoing reasons, the SunCal Debtors are unable to overcome any, let alone all, of the factors relevant to the issuance of a stay pending appeal, and the Stay Pending Appeal Motion should be denied.

## II.  RESPONSE TO SUMMARY OF MATERIAL FACTS

14. In its most simple formulation, the 9019 Order authorizes the Debtors to unwind a complicated and burdensome repo structure and thus (a) enable the parties to the Fenway Documents to fulfill the obligations originally contemplated by the such documents, (b) restore the rights of LCPI and LBHI also as originally contemplated by the Fenway Documents, (c) save the Debtors' estates (and thus their constituents and creditors) the economic and administrative burdens of continuing to maintain the onerous repo structure, and (d) extricate Fenway from the uncoveted position of being the "middleman" in a structure in which it never claimed to have an economic interest. The Transaction addresses many Repo Assets, which include assets that are indisputably unrelated to the SunCal Debtors or the California Cases.

15. The 9019 Motion. The Debtors sought the entry of the 9019 Order through the *Debtors' Motion Pursuant to Bankruptcy Rule 9019 for Authority to Compromise Controversy in Connection with a Repurchase Transaction with Fenway Capital, LLC and a*

*Commercial Paper Program with Fenway Funding, LLC,* dated March 25, 2010  [Docket No. 7831] (the "Original 9019 Motion").

16.     On April 7, 2010, the SunCal Debtors (along with certain debtor affiliates of the SunCal Debtors (collectively, the "Trustee Debtors")) filed the *SunCal Debtors' Joint Opposition to Motion Pursuant to Bankruptcy Rule 9019 for Authority to Compromise Controversy in Connection with a Repurchase Transaction with Fenway Capital, LLC and a Commercial Paper Program with Fenway Funding, LLC* [Docket No. 8105] (the "9019 Opposition"), and on April 12, 2010, the Debtors filed their response to the 9019 Opposition and Declaration of Robert Roesch in support [Docket Nos. 8260 and 8261] (the "9019 Reply").

17.     On May 7, 2010, the Debtors filed the *Supplement to Debtors Motion Pursuant to Bankruptcy Rule 9019 for Authority to Compromise Controversy in Connection with a Respurchase Transaction with Fenway Capital, LLC and a Commercial Paper Program with Fenway Funding, LLC* [Docket No. 8916] (the "Supplemental 9019 Motion," together with the "Original 9019 Motion," the "9019 Motion").

18.     The Stay Relief Motion.  On April 21, 2010, the SunCal Debtors and the Trustee Debtors filed the *Motion of the SunCal Debtors for an Order Determining that the Automatic Stay Does Not Apply; Or, in the Alternative, Granting Relief From Stay* [Docket No. 8539] (the "Stay Relief Motion" and together with the 9019 Motion, the "Motions").

19.     On  May 5, 2010, the Debtors filed their *Objection to the Motion of the SunCal Debtors for an Order Determining that the Automatic Stay Does Not Apply; Or, in the Alternative, Granting Relief From Stay* [Docket No. 8811] (the "Stay Relief Objection").  And

on May 10, 2010, the SunCal Debtors[8] filed their *Reply RE: Motion of the SunCal Debtors for an Order Determining that the Automatic Stay Does Not Apply; Or, in the Alternative, Granting Relief From Stay,* [Docket No. 8949].

20. This Court conducted a hearing on the Stay Relief Motion and the 9019 Motion on May 12, 2010 (the "<u>Hearing</u>"), following which it denied the Stay Relief Motion and approved the 9019 Motion. The SunCal Debtors have since appealed the Orders and, relatedly, now seek from this Court a stay of the Orders pending resolution of the appeals.

21. The Debtors refute the facts alleged in the Stay Relief Motion to the extent they contradict the record on the Stay Relief Motion and the 9019 Motion. The Debtors, thus, respectfully ask this Court to rely on the facts presented by the Debtors in their pleadings relating to the Stay Relief Motion and the 9019 Motion (and other documents submitted by the Debtors in support thereof), as well as the evidence adduced at the Hearing for the purposes of evaluating the request made by the SunCal Debtors in the Stay Pending Appeal Motion. Nonetheless, and although the Debtors reserve their rights to correct any misstatements made by the SunCal Debtors in any pleading filed by the SunCal Debtors, the Debtors believe it is incumbent upon them to correct, at this juncture, certain inaccurate representations concerning the Debtors the SunCal Debtors continue to make in their pleadings. Those allegations are summarized and corrected below:

22. The SunCal Debtors repeatedly allege in the Stay Pending Appeal Motion that LCPI "misrepresented" their ownership of the SunCal I Loan and the Ritter Ranch Loans,

---

[8] At the time the Stay Relief Reply was filed, the Trustee Debtors indicated they would be withdrawing the Stay Relief Motion. Accordingly, they were not parties to the Stay Relief Reply.

and thus had no basis to assert their automatic stay or file the proofs of claim with respect to those loans. (Stay Pending Appeal Motion at 5-7.)

23. They argue that LCPI sold "all right, title and interest in the SunCal I Loan and the Ritter Ranch Loan . . . to Fenway as of August 22, 2008." (Stay Pending Appeal Motion at 5.) However, this argument is misleading, if not altogether wrong. Contrary to SunCal's purported summary of material facts, LCPI did not sell the entirety of the so-called "Sold Loans" to Fenway.

24. With respect to five of the seven "Sold Loans" identified by the SunCal Debtors, two separate loans were made to the SunCal Debtors – a term loan and a revolver loan, each of which was represented by a separate promissory note or otherwise separately identified under the applicable loan documents.[9] In connection with the Fenway Repo and as contemplated under the MRA, LCPI generated written confirmations describing the loans and other assets that were transferred to Fenway Capital under the MRA (the "<u>Repo Confirms</u>"). The Repo Confirms clearly demonstrate that only the term components of the SunCal Loans at issue were transferred to Fenway Capital. Those very same Repo Confirms were filed by the SunCal Debtors with the California Bankruptcy Court in May 2009.[10] Indeed, although the California Bankruptcy Court found that the transfers under the MRA were sales as opposed to transfers for security, on February 11, 2010, the California Bankruptcy Court stated that it "always understood that there

---

[9] Those loans are the Ritter Ranch Loan, SunCal Marblehead/Heartland Loan, SunCal PSV Loan, SunCal Oak Valley Loan and SunCal Northlake Loan. *See* 9019 Reply, Declaration of R. Roesch [D.E. 8261] at Exhibits "5"-"9."

[10] *See* 9019 Reply, Declaration of R. Roesch at Exhibit "10."

were sold and there were unsold loans."[11]  Finally, the BAP held that, notwithstanding the

purported "sale" of certain loans pursuant to the MRA, LCPI still had "an interest in at least one

of the loans to [the SunCal] Debtors." *Lehman Commercial Paper, Inc. v. Palmdale Hills Prop.,*

*LLC (In re Palmdale Hills Prop., LLC)*, 423 B.R. 655, 662 (B.A.P. 9th Cir. 2009).  As a result,

the SunCal Debtors knew that their summary of the "Sold Loans" as well as their contention that

the "California Bankruptcy Court found that the Lehman Entities had transferred their *entire*

*interest* in the Sold Loans to Fenway" was misleading.  (Stay Pending Appeal Motion at 7)  Yet,

the SunCal Debtors continue to perpetuate these misstatements.

       25.     Not only did LCPI retain the revolver portion of the Ritter Ranch Loans as

demonstrated by the Repo Confirms, but LCPI was also acting as agent under both the SunCal I

Loan and the Ritter Ranch Loans. Indeed, the California Bankruptcy Court's ruling on

November 5, 2009 and March 8, 2010 as well as the BAP's December 15, 2009 ruling make it

absolutely clear that LCPI was either a creditor, lender, or agent for the lenders under those loans

when they filed the proofs of claim.

       26.     Thus, the SunCal Debtors' repeated allegation that LCPI "misrepresented"

its ownership of the loans is unfounded.  Further, the SunCal Debtors' continued assertion that

the California Bankruptcy Court found that LCPI had transferred its *entire* interest in the "Sold

Loans" to Fenway ignores not only the very evidence the SunCal Debtors submitted to the

California Bankruptcy Court, which included the Repo Confirms, but also the California

Bankruptcy Court's statement regarding the unsold loans.  It has been made abundantly clear that

LCPI retained an interest in both the SunCal Comm I Loan and the Ritter Ranch Loan and had a

---

[11]     (Hr'g Tr. 187:14-15, February 11, 2010, a copy of which is attached as Exhibit "11" to the Declaration of R. Roesch in support of the 9019 Reply).

legitimate basis to assert its automatic stay as well as file proofs of claim for those loans. The SunCal Debtors' latest accusations are unfounded, directly contradict three separate rulings, and only serve as yet another attempt to mislead this Court.

## III.  ARGUMENT

**The SunCal Debtors Do Not Meet the Criteria to Warrant a Stay Pending Appeal**

27.     As set forth in more detail below, the SunCal Debtors have not shown that a stay of either Order, pending the appeal thereof, is warranted. To prevail in a motion for stay pending appeal, the SunCal Debtors must overcome an exacting burden. Rule 8005 of the Bankruptcy Rules governs an application for a motion to stay a bankruptcy court order pending its appeal to the district court. Rule 8005 states in pertinent part:

> A motion for a stay of the judgment, order, or decree of a
> bankruptcy judge, for approval of a supersedeas bond, or for other
> relief pending appeal must ordinarily be presented to the
> bankruptcy judge in the first instance . . . the bankruptcy judge
> may suspend or order the continuation of other proceedings in the
> case under the Code or make any other appropriate order during
> the pendency of an appeal on such terms as will protect the rights
> of all parties in interest.

Fed. R. Bankr. P. 8005. The decision of whether to grant a stay of an order pending appeal is within the sound discretion of the bankruptcy court. *See In re General Motors Corp.*, 409 B.R. 24, 30 (Bankr. S.D.N.Y. 2009); *see also In re Overmyer,* 53 B.R. 952, 955 (Bankr. S.D.N.Y. 1985) ("A motion for stay pending appeal, as authorized under Bankruptcy Rule 8005, is discretionary").

28.     It is well-established in the Second Circuit that the party seeking such extraordinary relief bears the burden to demonstrate that:

(1) it would suffer irreparable injury if a stay were denied;

(2) there is a substantial possibility, although less than a likelihood, of success on the merits of the movant's appeal;

(3) other parties would suffer no substantial injury if the stay were granted; and

(4) the public interest favors a stay.

*In re General Motors*, 409 B.R. at 30; *see also Hirschfeld v. Bd. of Elections*, 984 F.2d 35, 39 (2d Cir. 1993); *In re DJK Residential, LLC*, No. 08-10375 (JMP), 2008 WL 650389, at *2 (S.D.N.Y. Mar. 7, 2008); *In re Calpine Corp*., No. 05-60200, 2008 WL 207841, at *4 (Bankr. S.D.N.Y. Jan. 24, 2008); *In re Tower Automotive, Inc*., No. 05-10578 (ALG), 2006 WL 2583624, at * 1 (Bankr. S.D.N.Y. June 28, 2006), *aff'd*, 241 F.R.D. 162 (S.D.N.Y. 2006). The movant's burden to establish these factors is a "heavy" one. *In re General Motors*, 409 B.R. at 30; *see also U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 44 F.3d 1082, 1084 (2d Cir. 1995) ("A party seeking a stay of a lower court's order bears a difficult burden"); *In re DJK Residential*, 2008 WL 650389, at *2 ("The burden on the movant is a 'heavy' one").

      29.    To be successful, the SunCal Debtors must "show satisfactory evidence" demonstrating each of the four criteria. *In re General Motors*, 409 B.R. at 30; *In re DJK Residential*, 2008 WL 650389, at *2. "Failure to satisfy one prong of this standard for granting a stay will doom the motion." *In re Turner*, 207 B.R. 373, 375 (2d Cir. B.A.P. 1997).[12]

_____

[12] *See also Bijan-Sara Corp. v. Fed. Deposit Ins. Corp.*, 203 B.R. 358, 360 (2d Cir. B.A.P. 1996) ("Movant's failure to satisfy one prong of the standard for granting a stay pending appeal dooms his motion"); *In re DJK Residential*, 2008 WL 650389 at *2 ("Failure to satisfy one prong of this standard ... will doom the motion"); *In re Tower Automotive*, 2006 WL 2583624, at *1 ("A court can grant a stay only if the moving party has satisfied each of the [four] requirements . . . ."). While there is some disagreement among the courts in this Circuit with respect to whether all four factors must be satisfied or whether there should be a weighing of factors, the Stay Motion should be denied because it fails under either standard. *See In re General Motors*, 409 B.R. at 30 (recognizing split in the Circuit and that some cases "have engaged in a balancing process with respect to the four factors" while other cases have held that "failure to satisfy any prong of the 4-part test 'will doom the motion'"); *In re Smith*, No. 09-508,

**A.      There is No Basis to Stay the 9019 Order**

**(1)      The SunCal Debtors Will Not Be
Irreparably Harmed If the 9019 Order is Not Stayed**

30.      Although the SunCal Debtors devote a significant portion of the Stay Pending Appeal Motion to rehashing their old arguments and raising new ones, they fail to address the critical factor this Court must examine in determining whether to issue a stay. The courts in this Circuit are clear, "A showing of irreparable harm is the '*principal prerequisite* for the issuance' of a stay under Bankruptcy Rule 8005." *In re Calpine*, 2008 WL 207841, at *4 (quoting *In re Adelphia Commc'n Corp*., 361 B.R. 337, 347 (S.D.N.Y. 2007)) (emphasis added). Indeed, this Court has recognized that "the factor that most warrants consideration in whether to issue a stay is whether the party seeking the stay will suffer irreparable injury." *See* Transcript of 10/23/09 Omnibus Hearing regarding, *inter alia*, Metavante Corporation's motion for a stay [Docket No. 5631] at 40, attached hereto as Exhibit "B." The irreparable injury necessary to establish the right to a stay pending appeal cannot be "remote nor speculative." *In re Calpine*, 2008 WL 207841, at *4 (quoting *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005)). Rather, the alleged harm must be "actual and imminent." *Id.*

31.      The SunCal Debtors cannot show actual and imminent irreparable harm for three reasons: (i) they, admittedly, are not parties in interest who could object to the merits of the transaction in the first instance, (ii) the 9019 Order does not contain any finding concerning the SunCal Debtors or the California Cases, and (iii) even if the foregoing were completely disregarded, the prospective harms alleged by the SunCal Debtors are either already faced by the SunCal Debtors or the product of conjecture.

2009 WL 366577, at *2 (E.D.N.Y. Feb. 12, 2009) ("The Second Circuit has yet to expressly rule on whether all four elements must be satisfied, and Courts in this Circuit have ruled both ways").

32.     First, the SunCal Debtors have asked this Court to stay an order approving a Transaction that they admittedly had no standing to question.  In their 9019 Opposition and at the Hearing, the SunCal Debtors expressly stated that they did not oppose the merits of the Transaction.  (*See* 9019 Opposition at 4 (stating "[t]he proposed transfer of the Sold Loans from Fenway to LCPI is not necessarily objectionable on its face."); Hr'g Tr. 28 (statement by the SunCal Debtors' counsel, "We will reserve it, Your Honor.  We understand the standard.  I agree [the Debtors] have a lot of discretion.  And we're certainly not here to interfere with this transaction.  We're not a claimant in this case.  So we haven't asserted standing to get into the issue of the merits."))  Indeed, the ***sole*** concern raised by the SunCal Debtors at the Hearing was whether the 9019 Order would contain any findings concerning the SunCal Debtors or the California Cases.[13]  This Court assuaged the SunCal Debtors' concern in the following colloquy:

> THE COURT:  I don't believe that there is anything in the motion before me that requires me to make any findings as to the consequences in the SunCal bankruptcy of my unwinding the structure.  So part of what I don't understand is why you're spending all this time arguing about those consequences.

> MR. O'KEEFE:  Your honor, with that characterization, I'm more than willing to sit down.  I just wanted to make sure, Your Honor, that in connection with the next motion, I didn't prejudice any rights in this motion.  Otherwise, I wouldn't have said anything. But I appreciate Your Honor's clarification in that regard.

(Hr'g Tr. 40-41.)

---

[13] Although the SunCal Debtors initially contended in the 9019 Opposition that the Transaction evinced the Debtors' alleged bad faith as an attempt to end run the litigation pending in the California Cases, (*see* 9019 Opposition at 4-5), ample and uncontroverted evidence both in the record and at the Hearing clearly showed that, among other things,  the Transaction was negotiated at arm's length, was contemplated for many months, effectuates legal obligations and rights that the Debtors always possessed, and will relieve the Debtors of the administrative and economic burdens associated with maintaining the existing repo structure.  The SunCal Debtors did not refute the testimony proffered at the Hearing, and presented no evidence supporting their allegation of bad faith.

33.     The 9019 Order does not contain any finding with respect to the SunCal Debtors' California Cases, and the SunCal Debtors do not establish how an order that lacks such findings can cause them irreparable harm. Indeed, the SunCal Debtors already face many of the alleged "irreparable harms" that will supposedly result in the future from the 9019 Order. The SunCal Debtors' creditors (which include the Debtors) are *already* waiting repayment of their claims. The acres of land owned by the SunCal Debtors are *already* in a "frozen state of stasis" (although DIP loans made by the certain non-debtor affiliates of the Debtors and cash collateral stipulations entered into by the Debtors have enabled the SunCal Debtors to obtain the liquidity necessary to maintain such land). And the 9019 Order does not affect the timing of the Ninth Circuit appeal.[14] The other ills alleged by the SunCal Debtors are speculative – whether the Debtors *might* obtain an unfair litigation advantage or whether the Debtors *might* raise certain arguments in the litigation pending in the California Cases constitutes mere conjecture and does not constitute an imminent, irreparable harm.

34.     In light of the foregoing, the Debtors respectfully submit that the SunCal Debtors have not met, and cannot meet, their burden of showing that, absent a stay of the 9019 Order, they will be exposed to actual and imminent harm. Thus, a stay of the 9019 Order is not warranted.

   **(ii)**    **There is No Substantial Possibility that**
           **the SunCal Debtors Will Succeed on Appeal**

35.     The SunCal Debtors state that they will likely succeed on appeal of the 9019 Order because the Court did not consider the alleged "bad faith" objectives of the Debtors

---

[14] In making this assertion, the SunCal Debtors appear to confirm precisely the suspicion raised by the Court in considering the SunCal Debtors' motion for relief from stay – namely that the SunCal Debtors were gaming the system in an attempt to moot an appeal of the BAP Order to the Ninth Circuit.

in granting the 9019 Order.  Further, they advance new arguments never raised in their initial pleadings that the Transaction was designed as the Debtors' collusive effort to achieve an improper purpose – to violate the SunCal Debtors' automatic stay.  (Stay Pending Appeal Motion at 17.)  Despite these bold assertions, the SunCal Debtors' projections as to their success on appeal are merely meritless posturing and will not withstand appellate review – particularly where (a) the Suncal Debtors admitted they had no standing to question the merits of the Transaction and ostensibly withdrew their opposition, (b) the Court correctly approved the Transaction after considering the ample evidence and record, (c) even if the SunCal Debtors had standing to challenge the Transaction, there was no evidence of the bad faith alleged by the SunCal Debtors and (d) the remainder of the arguments raised by the SunCal Debtors (*i.e.*, that the Transaction violates the SunCal Debtors' automatic stay) were raised *for the first time* in the Stay Pending Appeal Motion,  cannot be raised on appeal and, in any event, are inaccurate.

> a.    The SunCal Debtors Admittedly Lacked
>        Standing to Challenge the Transaction

36.    To withstand appellate review, the SunCal Debtors must show that they are able to appeal an order approving a transaction they (i) admittedly lacked the standing to challenge in the first place[15] and (ii) ultimately, did not oppose.[16]  Given that the SunCal Debtors

---

[15] MR. O'KEEFE:      We will reserve it, Your Honor.  We understand the standard.  I agree they have a lot of discretion.  And we're certainly not here to interfere with this transaction.  We're not a claimant in this case.  **So we haven't asserted standing to get into the issue of the merits.**

(Hr'g Tr. 28.) (emphasis added).

[16] Having been advised that the 9019 Order would not contain any findings regarding their Chapter 11 Cases, the SunCal Debtors, again, noted that they would not continue to object to the Transaction.  (*See* Hr'g Tr. 40 (statement by the SunCal Debtors' counsel that "with that characterization, I am more than willing to sit down.")).

voluntarily retreated from their positions, it is well established that they cannot now appeal an order to which they did not ultimately object. The purpose of an appellate court is ***not*** to enable an appellant a second bite at the apple but to determine whether the lower court properly applied the facts and law. *See Wal-Mart Stores, Inc.,* 396 F.3d 96, 124 n. 29 (2d Cir. 2005) ("The law in this Circuit is clear that where a party has shifted his position on appeal and advances arguments available but not pressed below, waiver will bar raising the issue on appeal.") (internal quotation marks and citation omitted).[17] Though the SunCal Debtors had the opportunity to advance the old and new arguments they now make in the Stay Pending Motion, they failed to make them at the critical juncture, the Hearing. This error significantly diminishes the likelihood they will prevail on appeal.

    b.  Even if the SunCal Debtors Could Reargue the Merits of the 9019 Motion on Appeal, the Transaction Was Negotiated in Good Faith

    37.  Even if the SunCal Debtors were able to overcome the procedural hurdle they face in appealing an order to which they ultimately did not object, the 9019 Order would still withstand appellate scrutiny. As more fully discussed in the 9019 Motion, Rule 9019 empowers bankruptcy courts to approve settlements between parties if they are in the "best interests of the estate." *Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)* 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991).[18] The settlement need not

---

[17] Although the court may exercise discretion to consider waived arguments where necessary to avoid a manifest injustice, "the circumstances normally do not militate in favor of an exercise of discretion to address . . . new arguments on appeal where those arguments were available to the [parties] below and they proffer no reason for their failure to raise the arguments below." *Id.* at 132 (citing *Bogle-Assegai*, 470 F.3d at 504) (internal quotation marks and citations omitted).

[18] *See also Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *Fisher v. Pereira (In re 47-49 Charles St., Inc.)*, 209 B.R. 618, 620 (S.D.N.Y. 1997); *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 426 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994).

result in the best possible outcome for the debtor but must not "fall below the lowest point in the range of reasonableness." *In re Drexel Burnham Lambert Group*, 134 B.R. at 505. A decision to accept or reject a compromise or settlement is within the sound discretion of the Court. *See In re Iridium Operating LLC,* 478 F.3d 452, 461 n.13 (2d Cir. 2007) (citing *In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 292 (2d Cir. 1992)).

38.     There is no question that the 9019 Order implemented a compromise that was in the best interests of the Debtors' estates and did not fall below the lowest point in the range of reasonableness. As outlined above, one of the Debtors' primary goals in entering into the transaction was to do away with the time delay and costs associated with the maintenance of the Fenway Repo and the CP Program. Ample *and uncontroverted* evidence was presented on the record to show that the terms of the Transaction are fair and equitable, do not fall below the lowest point in the range of reasonableness, were the product of protracted, arm's-length negotiations between the Debtors and all interested parties to the Transaction, and provided unequivocal benefits to the Debtors' estates.

39.     Despite the evidence of the benefits and merits of the Transaction, the SunCal Debtors persist in their misguided insistence that the Transaction was negotiated in bad faith and was merely "designed to drag assets acquired post-petition within the stay's umbrella." (Stay Pending Appeal Motion 13). The SunCal Debtors also claim, *for the first time,* that the Transaction is in violation of *their* automatic stay because it was designed to enable the Debtors to impede the SunCal Debtors' reorganization efforts, and accordingly the 9019 Order is allegedly void. (Stay Pending Appeal Motion at 15-18.) The SunCal Debtors did not raise this argument in the 9019 Opposition, nor did they introduce it at the Hearing. As noted above, having failed to introduce this argument below, the SunCal Debtors are now estopped from

raising them on appeal. *See In re Nortel Networks Corp. Sec. Lit.*, 539 F.3d 129, 132 (2d Cir. 2008) (citing *Bogle-Assegai v. Connecticut,* 470 F.3d 498, 504 (2d Cir. 2006) ("'[I]t is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal.'"). Nonetheless, this argument similarly fails on its merits.[19]

40.     Furthermore, as the Debtors made clear in both their 9019 Reply and at the Hearing, the Transaction simply fulfills obligations and rights that LCPI *always* had:

> LCPI has *always* had the right to repurchase the loans.  LBHI has *always* been the guarantor of the loans.  LBHI has *always* held the commercial paper which is the economic – which is part of the economic interest in the loan.

(Hr'g Tr. 30 (Emphasis added)).  The Debtors further stated:

> And in this case, LBHI paid for the commercial paper.  They're the holder of the commercial paper.  And they clearly will have an interest in those assets because those assets form part of the recovery in their estate.

(Hr'g Tr. 31).  The record also shows Fenway had, for a long time, requested to be extricated from the onerous repo structure.[20]  Indeed, the SunCal Debtors did not present, and have not presented, any evidence to support their unfounded allegations of bad faith or collusive motives by the Debtors.  By contrast, the record is replete with evidence of the Debtors' legitimate reasons for pursuing the Transaction.

41.     Because the Court is afforded such great discretion in granting a compromise motion, and because the Debtors have sound and legitimate business reasons to

---

[19] The SunCal Debtors' arguments in this regard are not supported by fact or law and are collateral to these proceedings.  The Debtors reserve the right to respond to them should this Court deem them relevant to its evaluation of the Stay Pending Appeal Motion.

[20] *See* Declaration of R. Roesch in support of 9019 Motion at Ex. "14" (Declaration of Irena Goldstein, ¶ ¶ 3,6, Ex. B).

support entry into the Transactions, it is improbable that the SunCal Debtors could successfully appeal the 9019 Order.

### (iii)   The Debtors and the Public Interest Would be Substantially Harmed by a Stay of the 9019 Order

42.     The SunCal Debtors argue, again without support, that the Debtors will not suffer any harm if the 9019 Order is stayed because the Debtors can, instead of effectuating the Transaction, transfer the loans previously owned by non-debtors back to those non-debtors and that as to the loans previously owned by LCPI, those loans can be transferred to Lehman ALI (LCPI's parent) with the "same economic effect." (Stay Pending Appeal Motion at 19.). This argument reveals a fundamental misunderstanding concerning the Transaction. The only Debtor that can obtain a retransfer of the Repo Assets is LCPI.[21]  Thus the SunCal Debtors' proposed work-around is not plausible. More importantly, staying the 9019 Order will harm the Debtors, preventing them from effectuating the Transaction and will force the Debtors and Fenway to continue to adhere to the existing expensive and burdensome repo structure.

43.     The public interest, the SunCal Debtors argue, is served by the stay because "the automatic stay cannot be employed as a sword," and the SunCal Debtors should be able to "proceed with their reorganization effort" and to "manage and mitigate the problems that their projects are causing to the surrounding communities."  (Stay Pending Appeal Motion, at 19) The SunCal Debtors' public interest argument is equally ineffective.  Though the SunCal

---

[21] The Transaction is a repurchase of the Repo Assets that were transferred to Fenway Capital under the terms of the MRA. The parties to the Fenway Repo are LCPI and Fenway Capital. Consequently, those are the only two parties who hold contractual rights under the Fenway Repo.  LCPI is thus the only entity who has the ability to repurchase the Repo Assets from Fenway Capital.  Contrary to the SunCal Debtors' sinister implications, the Debtors are not "walking these assets through LCPI to achieve a litigation advantage in the form of the automatic stay."  (Stay Pending Appeal Motion at 19.)  LCPI is contractually obligated to repurchase the Repo Assets; no other Debtor entity can do so.

Debtors appear to be confused on this point, the 9019 Order has nothing to do with the automatic stay. Indeed, the words "automatic stay" do not appear anywhere in the 9019 Order. If the SunCal Debtors fear that the 9019 Order somehow prevents them from "manag[ing] and mitigat[ing] the problems that their projects are causing the surrounding communities" or impedes the "bankruptcy system from operat[ing] as intended,"[22] the SunCal Debtors' concerns are, again, easily allayed by a review of the 9019 Order itself. Nowhere does the order address the SunCal Debtors or the problems their estates are causing to their surrounding communities, and certainly the 9019 Order does not prevent "the bankruptcy system from operating as intended" or the SunCal Debtors from addressing the claims filed against them. Thus, the SunCal Debtors have not shown how staying the 9019 Order would further the public interest.

44.     In sum, because the SunCal Debtors have not provided any justification warranting the stay of the 9019 Order, their request for a stay should be denied.

**B.     The Stay Relief Order Should Not Be Stayed**

**(i)     The SunCal Debtors Will Not Be Harmed
        Irreparably Absent a Stay of the Stay Relief Order**

45.     The SunCal Debtors' analysis of the factors bearing on a stay of the Stay Relief Order relies entirely on the possibility of success on appeal and is completely dismissive of the factor that should predominate the stay analysis – whether the SunCal Debtors will be injured irreparably absent a stay.

46.     The SunCal Debtors gloss over whether they will suffer irreparable harm absent a stay of the Stay Relief Order; however, a "showing of irreparable harm is the *principal prerequisite* for the issuance of a stay under Bankruptcy Rule 8005." *In re Calpine*, 2008 WL

---

[22] (Stay Pending Appeal Motion at 19-20.)

207841, at *4 (quoting *In re Adelphia Commc'n Corp.*, 361 B.R. 337, 347 (S.D.N.Y 2007)) (emphasis added). Indeed, in these cases this Court has recognized that "the factor that most warrants consideration in deciding whether to issue a stay is whether the party seeking the stay will suffer irreparable injury." (Transcript of 10/23/09 Omnibus Hearing at 40.) The irreparable injury necessary to establish the right to a stay pending appeal cannot be "remote nor speculative." *In re Calpine*, 2008 WL 207841, at *4 (quoting *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005)). Rather the alleged harm must be "actual and imminent." *Id.*

47. The purported irreparable injury faced by the SunCal Debtors is neither actual nor imminent because it simply does not exist. There is no valid argument that the SunCal Debtors face irreparable harm absent a stay of the Stay Relief Order. The SunCal Debtors simply incorporate by reference their analysis of irreparable harm with respect to the 9019 Order, despite that such analysis is entirely inapplicable to the Stay Relief Order. No irreparable harm can result from an order that leaves the SunCal Debtors in the *same position* as if the Stay Relief Order had not been entered in the first place. A stay of the Stay Relief Order would neither affirmatively grant the SunCal Debtors relief from the automatic stay, nor result in a determination that the stay is inapplicable. [23]

---

[23] In passing the Bankruptcy Reform Act of 1978, Congress was explicit as to its intent behind section 362(e) of the Bankruptcy Code, the provision that provides the procedure for motions requesting relief from the stay. The legislative history of section 362(e) indicates that Congress equated an automatic stay and a subsequent motion for stay relief to the stages of an injunction in an ordinary civil case. *See In re Chateaugay Corp.*, 880 F.2d 1509, 1512 (2d Cir. 1989). That is, "the filing of a petition in bankruptcy is equivalent to a temporary restraining order, the preliminary hearing on a motion for relief from the stay is similar to a hearing on a preliminary injunction, and the decision as a result of the final hearing on the motion for relief is equivalent to a permanent injunction." *Id.* The House and Senate reports noted: "the stay is essentially an injunction . . . . The main difference lies in which party must bring the issue before the court. While in the injunction setting, the party seeking the injunction must prosecute the action, in proceedings for relief from the automatic stay, the enjoined party must move." *Id.* (quoting S. Rep. No. 95-989, 95th Cong., 2d Sess. 53 (1978), reprinted in 1978 U. S. Code Cong. & Admin. News 5787, 5839; H. R. Rep. No. 595, 95th Cong., 1st Sess. 344 (1977), reprinted in 1978 U. S. Code Cong. & Admin.

48.     Furthermore, with or without the stay of the Stay Relief Order, the SunCal Debtors already must address issues concerning the acres of land they own and the creditors who have filed claims against them, and they still cannot prosecute their claims against the Debtors and still face the appeal to the Ninth Circuit of the BAP's decision.  A stay of the Stay Relief Order would not change that. As a result, the SunCal Debtors have not shown that irreparable harm will result absent a stay of the Stay Relief Order.

**(ii)     There is No Substantial Possibility
        That the SunCal Debtors Will Be Successful on Appeal**

49.     The SunCal Debtors also fail to establish a substantial likelihood of success of an appeal of the Stay Relief Motion.  Bankruptcy judges have wide discretion in determining whether to lift the automatic stay or to deny such a motion.  *In re Boodrow,* 126 F.3d 43, 47 (2d Cir. 1997).  The ultimate determination on whether to lift a stay "depends upon the facts underlying a given motion."  *In re Bogdanovich,* 292 F.3d 104, 110 (2d Cir. 2002).  As a result, the bankruptcy court's grant or denial of a motion to lift an automatic stay is reviewed for "abuse of discretion."  *In re Sonnax Indus., Inc.,* 907 F.2d at 1286 ("[W]e may overturn a denial of a motion to lift the automatic stay only upon a showing of abuse of discretion") (internal citation omitted).  A bankruptcy court abuses its discretion when its decision is based either on an erroneous view of the law or by making clearly erroneous factual findings.  *Sears, Roebuck & Co. v. Spivey,* 265 B.R. 357, 364 (E.D.N.Y. 2001) (internal citation omitted).

---

News 5787, 6300).  Thus, absent an affirmative finding to the contrary, the automatic stay enjoins the SunCal Debtors from taking action against the Debtors' estates.  Accordingly, staying the Stay Relief Order would merely maintain the status quo and the absence of such a stay would not result in any irreparable harm to the SunCal Debtors.

a.      The Court Did Not Abuse Its Discretion
        By Finding that Cause did not Exist to Lift the Automatic Stay

50.     The SunCal Debtors argue that the Court abused its discretion by erroneously applying one of the factors set forth in *In re Sonnax Indus., Inc.*, the balance of harms. *See* 907 F.2d at 1286. Seemingly shocked at the notion that the Court could reject their position, to challenge the Court's decision, the SunCal Debtors now simply restate the so-called harms that would result absent stay relief, despite previously presenting some of the same arguments in the Stay Relief Motion and at the Hearing. In arguing that the balance of harms tilted in their favor, the SunCal Debtors focused on several points. First, they described the potential hazards on their land, hazards where "delay has a material [e]ffect on our asset". (Hr'g Tr. 63.) Second, they cited their desire to "maintain the playing field as it is right now" and to "keep [the California Cases' litigation] going." (Hr'g Tr. 66-67.) However, the Court rejected these arguments, stating:

> One of the reasons I have a difficult time finding that there is any material harm to the SunCal debtors in not granting their motion for stay relief is that they did not bring it until now. The SunCal debtors have scrupulously avoided coming into this court from November of 2008 until today. And have managed to deal with their litigation requests in the bankruptcy court and beyond apparently without material impairment in those efforts.

(Hr'g Tr. 73)

51.     While the SunCal Debtors acknowledge in the Stay Pending Appeal Motion the Court's statements, they adopt a strained reading of the record, and incorrectly assume the Court's reference to the SunCal Debtors' delay in filing the Stay Relief Motion was a punitive measure. (Stay Pending Appeal Motion at 21.) However, the Court noted the SunCal Debtors' delay not to penalize them, but to discredit their contention that immediate relief was necessary to redress their alleged "harms."

52.     In contrast, lifting the automatic stay to allow the SunCal Debtors to prosecute an equitable subordination action against LCPI would immediately harm the Debtors and deprive them of one of the primary intended benefits of chapter 11, a breathing spell to permit a debtor to maximize the value of its properties by making rational choices regarding their disposition.  In fact, the Debtors' estates have already suffered harm as a result of the resources expended to fight the SunCal Debtors' continued violations of the automatic stay.   In short, the alleged "harms" articulated by the SunCal Debtors  were outweighed by those expressed by the Debtors, justifying this Court's sound discretion in denying the requested stay relief.

b.     The Court Did Not Abuse Its Discretion By Refusing to Hold that the Automatic Stay Does Not Apply to the Equitable Subordination Action

53.     In arguing that the Stay Relief Order will be reversed, the SunCal Debtors spend several pages rehashing their argument that the automatic stay does not apply.  The SunCal Debtors erroneously conclude that the Court made a specific finding as to the effect of the automatic stay on the equitable subordination action pending in the California Bankruptcy Court and, thus, challenge the Court's application of the decision, *In re Enron Corp.*, 2003 WL 23965467, 2003 Bankr.LEXIS 2261.[24]

54.     The SunCal Debtors, again, challenge the characterization of equitable subordination as an offensive action (Stay Pending Appeal Motion at 24-25), raising the same arguments they previously made to the BAP, claiming that "because [LCPI] initiated the litigation by filing the Stay Relief Motion or a proof of claim against [the SunCal] Debtors,

---

[24] The SunCal Debtors further argue that the Court failed to find that the stay is inapplicable based on an erroneous application of law in the Southern District of New York, despite that such law has not been overturned and was, in part, the basis for the BAP's decision that the equitable subordination action is in violation of the stay. *Lehman Commercial Paper, Inc. v. Palmdale Hills Prop., LLC (In re Palmdale Hills Prop., LLC)*, 423 B.R. 655, 664 (BAP 9th Cir. 2009) (citing *In re Enron Corp.*, 2003 WL 23965467, 2003 Bankr. LEXIS 2261, at *23 (Bankr. S.D.N.Y. Jan. 13, 2003)).

[LCPI's] automatic stay does not prevent [the SunCal] Debtors from prosecuting their equitable subordination claim." *In re Palmdale Hills Prop., LLC*, 423 B.R. at 664. The BAP rejected the SunCal Debtors' characterization of their Equitable Subordination Action as defensive. *Id.* at 665. It held that "[t]he adjudication of [the SunCal] Debtors' equitable subordination action seeks affirmative relief, and therefore, violates [LCPI's] automatic stay." *Id.* (citing *In re Enron Corp.*, 2003 WL 23965467, 2003 Bankr. LEXIS 2261, at *23 (Bankr. S.D.N.Y. Jan. 13, 2003)).

55.     This is just another example of the SunCal Debtors' repeated and impermissible attempts to relitigate issues that have already been decided against them. They claim that equitable subordination is just a defense to a claim that does not implicate the automatic stay. (*See* Stay Relief Motion ¶¶ 79, 80, 82, 120; Stay Pending Appeal Motion at 24.) They also claim they are not seeking affirmative claims or relief against LCPI's estate. (Stay Relief Motion ¶¶ 106, 109, 112, 113; Stay Pending Appeal Motion at 25.) The BAP has already held their equitable subordination claim "seeks affirmative relief." *In re Palmdale Hills,* 423 B.R. at 665.

56.     But the SunCal Debtors' arguments miss the point. Nothing in the transcript of the Hearing supports the SunCal Debtors' conclusion that the Court made specific findings as to the California Cases. Notwithstanding the Suncal Debtors' insistence, this Court took great pains to clarify that it was not making any particularized findings. It clearly stated, "I'm not making any particularized findings." (Hr'g Tr. 75.) The Court further stated, "[t]o the extent there are debtors or debtor property implicated by your litigation, I am saying the stay applies. And I'm not going to say more than that." (Hr'g Tr. 75.) In essence, this Court did nothing more than explain basic bankruptcy principles to the SunCal Debtors. *See* 11 U.S.C. §

362(a)(3) (staying any act to obtain control over property of the debtor's estate).  Simply stated, the Court's statements on the record of the Hearing do not constitute reversible error.

### (iii) The Debtors and the Public Interest Will be Harmed If the Stay Relief Order is Stayed

57.     The SunCal Debtors present no arguments (other than citing to the arguments they made in connection with their request for a stay of the 9019 Order) let alone evidence that the Debtors will not be harmed if the Stay Relief Order is stayed or that the public interest is served by staying the Stay Relief Order.

58.     In support of their argument that no harm will result to the Debtors if the Stay Relief Order is stayed, the SunCal Debtors direct the Court to review the corresponding argument with respect to the 9019 Order.  There, the Suncal Debtors had argued that the Debtors would suffer no harm because there was an alternative transaction vis a vis the Repo Assets that the Debtors could pursue. In the context of the Stay Relief Order (as in the context of the 9019 Order in which this argument was initially raised), this argument fails.  The stay of the Stay Relief Order has nothing to do with the Transaction or the hypothetical transaction proposed by the SunCal Debtors.   Thus, the SunCal Debtors do not establish that the Debtors will not be harmed if the Stay Relief Order is stayed.

59.     Arguing that the public interest is served by staying the Stay Relief Order, the SunCal Debtors, again, direct the Court to view the corresponding arguments made with respect to the 9019 Order.  In the context of the Stay Relief Order, these arguments likewise are not supportable. If the SunCal Debtors intend to suggest that a stay of the Stay Relief Order will enable them to "proceed with their reorganization effort" and "manage and mitigate the problems that their projects are causing to the surrounding communities," or, alternatively, to address and

resolve claims in their chapter 11 cases, they are misguided. Staying the Stay Relief Order, does not alter the preexisting status quo. The Stay Relief Order only reinforces that the SunCal Debtors lack the stay relief necessary to litigate. In short the SunCal Debtors have not articulated how the public interest is served by staying the Stay Relief Order. Consequently, and for the all of the foregoing reasons, the request to stay the Stay Relief Order must be denied.

## IV.    CONCLUSION

WHEREFORE, the Debtors respectfully request an order denying the Stay Pending Appeal Motion and granting such other and further relief as is just.

Dated: June 4, 2010
      Houston, Texas

<div style="margin-left:40%">

/s/ Alfredo R. Pérez
Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas 77027
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511

Attorneys for Debtors
and Debtors in Possession

</div>

<u>Exhibit A</u>

Transcript Dated May 12, 2010

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS HOLDINGS INC., et al.

       Debtors.

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS INC.

       Debtor.

- - - - - - - - - - - - - - - - - - - -x

       United States Bankruptcy Court

       One Bowling Green

       New York, New York


       May 12, 2010

       10:07 AM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

1

2  HEARING re Conference re: Alternative Dispute Resolution

3  Procedures for Affirmative Claims of Debtors Under Derivatives

4  Contracts

5

6  HEARING re Debtors' Motion for Authority to Compromise

7  Controversy in Connection with a Repurchase Transaction with

8  Fenway Capital, LLC and a Commercial Paper Program with Fenway

9  Funding, LLC

10

11  HEARING re Motion of the SunCal Debtors for Order Determining

12  that Automatic Stay Does Not Apply; or, in the Alternative,

13  Relief from the Automatic Stay

14

15  HEARING re Motion of Debtors and Debtors in Possession for

16  Entry of an Order to Consolidate Certain Proceedings and

17  Establish Related Procedures

18

19  HEARING re Debtors' Motion to Compel Performance by Norton Gold

20  Fields Limited of its Obligations Under an Executory Contract

21  and to Enforce the Automatic Stay

22

23

24

25

1

2   HEARING re LBSF v. BNY Corporate Trustee Services Ltd. [Adv.

3   Case No. 09-01242] - Status Conference re Motion and Memorandum

4   of Law of Defendant BNY Corporate Trustee Services Limited in

5   Support of its Motion for Entry of an Order, or, Alternatively,

6   to Reopen and Reargue the Parties' Cross-Motions for Summary

7   Judgment

8

9   HEARING re Neuberger Berman v. PNC Bank, NA, et al. [Case No.

10  09-01258] - Status Conference re COMPLAINT FOR INTERPLEADER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  Transcribed by:  Lisa Bar-Leib

A P P E A R A N C E S :

WEIL, GOTSHAL & MANGES LLP

    Attorneys for Debtor and Debtors-in-Possession

    767 Fifth Avenue

    New York, NY 10153

BY:  PETER GRUENBERGER, ESQ.

    RICHARD W. SLACK, ESQ.

WEIL, GOTSHAL & MANGES LLP

    Attorneys for Debtor and Debtors-in-Possession

    700 Louisiana

    Suite 1600

    Houston, TX 77002

BY:  ALFREDO R. PEREZ, ESQ.

```
 1
 2    WEIL, GOTSHAL & MANGES LLP
 3          Attorneys for Debtor and Debtors-in-Possession
 4          1300 Eye Street, N.W.
 5          Suite 900
 6          Washington, DC 20005
 7
 8    BY:   RALPH I. MILLER, ESQ.
 9
10    JONES DAY
11          Special Counsel for the Debtors
12          222 East 41st Street
13          New York, NY 10017
14
15    BY:   JAYANT W. TAMBE, ESQ.
16          AVIVA W. SISITSKY, ESQ.
17
18    MILBANK, TWEED, HADLEY & MCCLOY LLP
19          Attorneys for Official Committee of Unsecured Creditors
20          One Chase Manhattan Plaza
21          New York, NY 10005
22
23    BY:   EVAN R. FLECK, ESQ.
24          DENNIS C. O'DONNELL, ESQ.
25
```

1

2    MILBANK, TWEED, HADLEY & MCCLOY LLP

3         Attorneys for Official Committee of Unsecured Creditors

4         International Square Building

5         1850 K Street, NW

6         Washington, DC 20006

7

8    BY:   DAVID S. COHEN, ESQ.

9         WILBUR FOSTER, ESQ.

10

11   HUGHES HUBBARD & REED LLP

12        Attorneys for SIPA Trustee

13        One Battery Park Place

14        New York, NY 10004

15

16   BY:   JEFFREY S. MARGOLIN, ESQ.

17

18   U.S. DEPARTMENT OF JUSTICE

19        Office of the United States Trustee

20        33 Whitehall Street

21        21st Floor

22        New York, NY 10004

23

24   BY:   ANDREW D. VELEZ-RIVERO, ESQ.

25

1

2    BUCHANAN INGERSOLL & ROONEY PC

3           Attorneys for PNC Bank, National Association

4           One Oxford Centre

5           20th Floor

6           301 Grant Street

7           Pittsburgh, PA 15219

8

9    BY:   KATHLEEN J. GOLDMAN, ESQ.

10

11   DEWEY & LEBOEUF LLP

12          Attorneys for Fenway Capital and Fenway Funds

13          1301 Avenue of the Americas

14          New York, NY 10019

15

16   BY:   RICHARD W. REINTHALER, ESQ.

17         IRENA M. GOLDSTEIN, ESQ.

18

19   GIBSON DUNN & CRUTCHER LLP

20          Attorneys for BNY Corporate Trustee Services Limited

21          200 Park Avenue

22          4th Floor

23          New York, NY 10166

24

25   BY:   RANDY M. MASTRO, ESQ.

1

2    MILLER BARONDESS, LLP

3         Special Litigation Counsel for SunCal Debtors

4         1999 Avenue of the Stars

5         Suite 1000

6         Los Angeles, CA 90067

7

8    BY:   LOUIS R. MILLER, ESQ.

9         MARTIN H. PRITIKIN, ESQ.

10

11   REED SMITH LLP

12        Attorneys for BNY Corporate Trustee Services Limited

13        599 Lexington Avenue

14        New York, NY 10022

15

16   BY:   ERIC A. SCHAFFER, ESQ.

17

18

19

20

21

22

23

24

25

1

2     SHEARMAN & STERLING LLP

3          Attorneys for Nomura International plc and Nomura

4           Securities Co., Ltd.

5          599 Lexington Avenue

6          New York, NY 10022

7

8     BY:   DOUGLAS P. BARTNER, ESQ.

9           SOLOMON J. NOH, ESQ.

10          DANIEL LEWIS, ESQ.

11

12    SHEPPARD MULLIN RICHTER & HAMPTON, LLP

13          Attorneys for Norton Gold Fields Limited

14          30 Rockefeller Plaza

15          24th Floor

16          New York, NY 10112

17

18    BY:   EDWARD H. TILLINGHAST, III, ESQ.

19          BLANKA K. WOLFE, ESQ.

20

21

22

23

24

25

STROOCK & STROOCK & LAVAL LLP

     Attorneys for Neuberger Berman Management, LLC

     180 Maiden Lane

     New York, NY 10038


BY:   BENJAMIN I. RUBINSTEIN, ESQ.


WHITE & CASE LLP

     Attorneys for the Ad Hoc Group of Lehman Brothers

      Creditors

     1155 Avenue of the Americas

     New York, NY 10036


BY:   GERARD UZZI, ESQ.


WINTHROP COUCHOT PROFESSIONAL CORPORATION

     Attorneys for the SunCal Voluntary Debtors

     660 Newport Center Drive

     Fourth Floor

     Newport Beach, CA 92660


BY:   SEAN A. O'KEEFE, ESQ.

     PAUL J. COUCHOT, ESQ. (TELEPHONICALLY)

1

2  BROWN RUDNICK LLP

3       Attorneys for Ad Hoc Group of Lehman Brothers Creditors

4       One Financial Center

5       Boston, MA 02111

6

7  BY:   ANGELO THALASSINOS, ESQ.

8       (TELEPHONICALLY)

9

10  CHAPMAN & CUTLER LLP

11       Attorneys for U.S. Bank

12       111 West Monroe Street

13       Chicago, IL 60603

14

15  BY:   JAMES HEISER, ESQ.

16       FRANKLIN H. TOP III, ESQ.

17       (TELEPHONICALLY)

18

19

20

21

22

23

24

25

1

2    CLEARY GOTTLIEB STEEN & HAMILTON LLP

3         Attorneys for Goldman Sachs Bank, USA and Goldman Sachs

4          International

5         2000 Pennsylvania Avenue, NW

6         Washington, DC 20006

7

8    BY:   BENJAMIN MEEKS, ESQ.

9         (TELEPHONICALLY)

10

11   IRELL & MANELLA LLP

12        Attorneys for Official Committee of Unsecured Creditors

13        840 Newport Center Drive

14        Suite 400

15        Newport Beach, CA 92660

16

17   BY:   ALAN J. FRIEDMAN, ESQ.

18        (TELEPHONICALLY)

19

20

21

22

23

24

25

```
1
2    LEO & WEBER, P.C.
3         Attorneys for Liberty Mutual
4         One N. LaSalle Street
5         Suite 3600
6         Chicago, IL 60602
7
8    BY:   T. SCOTT LEO, ESQ.
9         (TELEPHONICALLY)
10
11   MILLER STARR & REGALIA PLC
12        Attorneys for Miller Starr & Regalia
13        1331 North California Boulevard
14        Walnut Creek, CA 94596
15
16   BY:   TARA C. NARAYANAN, ESQ.
17        (TELEPHONICALLY)
18
19
20
21
22
23
24
25
```

1

2    PACHULSKI STANG ZIEHL & JONES LLP

3         Special Counsel to the Debtors and Debtors-in-Possession

4         10100 Santa Monica Boulevard

5         11th Floor

6         Los Angeles, CA 90067

7

8    BY:   DEAN A. ZIEHL, ESQ.

9         (TELEPHONICALLY)

10

11   STUTMAN TREISTER & GLATT LLP

12        Attorneys for Perry Capital

13        1901 Avenue of the Stars

14        12th Floor

15        Los Angeles, CA 90067

16

17   BY:   MARINA FINEMAN, ESQ.

18        JEFFREY H. DAVIDSON, ESQ.

19        WHITMAN L. HOLT, ESQ.

20        (TELEPHONICALLY)

21

22

23

24

25

1          P R O C E E D I N G S

2          THE COURT:  Be seated, please.  Well, you're in the

3    position to give a report.

4          MR. GRUENBERGER:  Yes, Your Honor.  Good morning.

5          THE COURT:  Good morning.

6          MR. GRUENBERGER:  Peter Gruenberger, Weil Gotshal &

7    Manges for the debtors.  May it please the Court.  I'll be very

8    brief.  We are here today regarding Your Honor's ADR procedures

9    order that governs debtors' affirmative claims under

10   derivatives contracts with counterparties.  And particularly,

11   paragraph 10 of that order which requires that a monthly report

12   be submitted to Your Honor giving a scorecard of how we're

13   doing.

14         Your Honor issued that order on September 17, 2009.

15   It took a few weeks to get going but we've been in full swing

16   now for about six months.  We and the creditors' committee

17   concurred that with this six-monthly report that I submitted

18   yesterday, we would put it on the docket so all interested

19   parties could see the progress that we were making in this

20   effort.

21         As the report to you demonstrates, the process is very

22   much alive and healthy as we both predicted back in September

23   when you signed the order.  As of yesterday, forty-five ADR

24   notices were served on seventy-one different counterparties.

25   We had achieved as of yesterday ten settlements, four after-

1    mediations and six pre-mediations in the ADR process.  Had I

2    waited two more hours, we could have added another success to

3    that scorecard because the fifth mediation came through with a

4    settlement.  So now we're batting one thousand, five of five in

5    mediations and have eleven settlements involving fifteen

6    counterparties.

7            So we have added to date thirty-nine million new

8    dollars to the treasury of the debtors' estates for the benefit

9    of all creditors.  And we are going strong.  We have eight more

10   mediations scheduled over the next six weeks.  And we will

11   report monthly.  And I would hope that we could, every six

12   months perhaps, post the status report on the docket and make a

13   report to Your Honor, if that's okay.

14           THE COURT:  I appreciate that.  Let me just ask you

15   this question.

16           MR. GRUENBERGER:  Certainly.

17           THE COURT:  Obviously, the successful outcomes speak

18   for themselves.  But in terms of procedure, is the ADR

19   procedure working well in terms of efficiency and are there any

20   areas needing improvement?

21           MR. GRUENBERGER:  I would say, overall, it's very

22   efficient.  There are some bumpy spots where parties,

23   especially parties in different parts of the world cannot

24   communicate as quickly as one would like in a perfect world,

25   but it's not a perfect world.  And so we ride with those bumps.

1    and we overcome the hurdles.  The mediators are working hard.

2    The creditors committee and we are getting along well.  And I

3    see no gross inefficiencies whatever.  I think that maybe over

4    the next six months I can report more fully but there's no

5    complaints out of any court from anyone.

6         THE COURT:  Good.  I appreciate that.  Is there anyone

7    else who wishes to be heard on this subject?  Fine.

8         MR. GRUENBERGER:  Thank you.

9         THE COURT:  Let's move on to the next part.  And, Mr.

10   Gruenberger, if you wish to be excused, you may be; if you wish

11   to stay, you're welcome to stay.

12        MR. GRUENBERGER:  Thank you, Your Honor.

13        MR. PEREZ:  Good morning, Your Honor.  Alfredo Perez

14   on behalf of the debtors.  And I'm here on the debtors' motion

15   for authority to compromise with Fenway, docket number 7831.

16   May I proceed?

17        THE COURT:  Sure.

18        MR. PEREZ:  Your Honor, this is a 9019 motion in which

19   LCPI and LBHI seek -- on the one hand, seek to compromise and,

20   basically, do away with the Fenway structure.  And it involves

21   a settlement with Fenway, Fenway Funding -- Fenway Capital and

22   Fenway Funding, Hudson Castle and the trustee or the

23   administrator which is Deutsche Bank.

24        Your Honor, we have received one objection to it from

25   the SunCal debtors.  Both the unsecured creditors' committee

1    has filed statements in support as has Fenway.

2        Your Honor, last night, we received and was filed on

3    the record a withdrawal of the objection on behalf of the

4    SunCal involuntary debtors.  I don't know if the Court's aware

5    of that.

6        THE COURT:  I'm aware of it but I'm not sure if it was

7    a withdrawal on behalf of the SunCal voluntary debtors or the

8    trustee.

9        MR. PEREZ:  The trustee, Your Honor.  It's the -

10       THE COURT:  It was from Lobel.

11       MR. PEREZ:  From Mr. Lobel.  It's on behalf of the

12   trustee.

13       THE COURT:  I didn't understand it because it was a

14   withdrawal without prejudice.  I don't know what that means.

15       MR. PEREZ:  Well, Your Honor, I think what that means

16   is that the debtors and the trustee are in the process of

17   documenting a settlement that would resolve all the disputes

18   between the Lehman debtors and the trustee.  And the key fact

19   about that, Your Honor, is that the property which the trustee

20   controls is about seventy-five percent of the value of the

21   SunCal debtors.  So we're talking about we're on the verge of

22   finalizing and documenting a settlement with the party that has

23   the vast majority of the SunCal assets.

24       THE COURT:  All right.

25       MR. PEREZ:  So -- and not --

1          THE COURT:  Let me just ask if the trustee is

2     represented in court today or on the telephone.

3          (Pause)

4          THE COURT:  Apparently, yes.

5          MR. O'KEEFE:  Actually, Your Honor, I represent the

6     voluntary SunCal debtors.

7          THE COURT:  You represent --

8          MR. O'KEEFE:  The voluntary SunCal debtors not the

9     involuntary debtors, although I could speak to the issue from a

10    knowledge perspective but not on behalf of the trustee.

11         THE COURT:  All right.  So there's no one here acting

12    as local counsel for Mr. Lobel and Mr. Lobel is not on the

13    phone?

14         MR. O'KEEFE:  Not to my knowledge, Your Honor.

15         THE COURT:  Okay.  Why don't you proceed?

16         MR. PEREZ:  Thank you, Your Honor.  So, Your Honor, I

17    think this is a key development not only as it relates to this

18    motion but, absolutely, as it relates to the motion of lift

19    stay because they've also withdrawn their request on the motion

20    to lift stay.

21         So, Your Honor, what we have is a situation where --

22    and Fenway has obviously been the subject of a lot of scrutiny

23    recently.  But it's a structure whereby LCPI repo'd certain

24    assets to Fenway.  Fenway then, in turn, issued a commercial

25    paper note that was purchased by LBHI.  I have a chart.  It's

1    similar to the chart that was attached to one of the pleadings,

2    Your Honor.  If I may approach?

3           THE COURT:  Sure.  Thank you.

4           MR. PEREZ:  But, in essence, Your Honor, it's a very

5    simple chart.  LCPI repo'd the assets to Fenway Capital.

6    Fenway Capital issued a variable funding note to Fenway

7    Funding.  Fenway Funding then issued commercial paper.  That

8    commercial paper was purchased by LBHI.  Approximately three

9    billion dollars.  Those -- that commercial paper was pledged to

10   JPMorgan.  And, Your Honor, the reason we can undo the

11   structure currently is because as a result of the JPM

12   agreement, the CDA, we now have -- LBHI now has that commercial

13   paper.

14          So the goal, Your Honor, is to reduce the cost

15   associated with the Fenway structure, be able to deal with the

16   assets directly.  SunCal is about half of the three billion in

17   Fenway assets.  In connection with that, there are other

18   assets, some of them not even real estate related, that sit in

19   the Fenway structure that LCPI and LBHI need to deal with.

20          THE COURT:  What's the Hudson Castle involvement with

21   this?

22          MR. PEREZ:  Your Honor, Hudson Castle -- and Ms.

23   Goldstein is here and could address this.  But Hudson Castle is

24   basically the manager of the Fenway structure, Your Honor.

25          So, to some extent, what we've done here is just a

1    plain vanilla motion which seeks to not only undo the structure

2    but, very critically, maintain the status quo among the

3    debtors.  That's a critical importance.  As the Court is aware,

4    we filed twenty-three separate plans.  I mean, one document but

5    twenty-three separate plans.  The recovery percentages for the

6    LBHI creditors are different than the recovery percentages for

7    the LCPI creditors.  So we do not want to, in any way, shape or

8    form, affect what the recovery balances would be.  And in

9    connection with that, in the motion as filed, we indicated that

10   LBHI would be tendering the commercial paper notes as the

11   guarantor, 'cause LBHI was on both sides, not only did it buy

12   the commercial paper but it also guarantied LCPI's obligations

13   under the Master Repurchase Agreement.  So they tendered as the

14   guarantor.  They tendered the notes as the guarantor.  And

15   there was a full reservation of rights as between the debtors

16   to make sure that we could allocate the value as was indicated.

17   Subsequent to that, there were -- this was filed on March --

18   mid-March.  The JPMorgan agreement was approved, I think,

19   either shortly thereafter or right around the time we filed it

20   at the March hearing.  Since that time, a bunch of time has

21   passed.  We have further refined the reservation of rights to

22   make sure that we maintain the rights as between the parties.

23   So we filed the supplemental order, the revised order, which

24   made sure that everybody maintained their rights.  And then we

25   also filed a supplement to the motion.  And basically, what the

1   supplement did was, at the time that we originally structured

2   the transaction, Fenway and Hudson Castle were getting limited

3   releases.  Deutsche Bank was getting a full release.  Through

4   the supplement to the motion, those releases were further

5   scaled back -- the releases that Fenway and Hudson Castle were

6   getting were further scaled back.  So that's the purpose of

7   those two motions.

8          Now, Your Honor, as I read -- and there's been a lot

9   of paper filed.  But as I read the papers, there's really no

10  objection to the debtors' business judgment in doing this

11  transaction.  I mean, we're going to be saving costs, we're

12  getting rid of structure.  We're going to be able to deal with

13  the assets directly.  I think the objections go to other

14  things, not really related to the business judgment.

15         I have Mr. Fitts here who could talk to the business

16  judgment.  I don't think that's really necessary to put him on

17  because we just really -- there's no allegation that there is

18  any -- that we're not exercising our business judgment.

19         The focus is whether this is being done somehow in bad

20  faith.  And, Your Honor, I submit there's absolutely no

21  evidence that this is being done in bad faith.  I --

22         THE COURT:  Well, consistent with the fact that we

23  have a contested hearing still on this, you might want to

24  proffer the testimony that you have available, both as it

25  relates to the purpose of the transaction and the good faith of

1    the transaction and why it's being done now.

2         MR. PEREZ:  Yes, Your Honor.  I could certainly do

3    that.  Your Honor, Mr. Fitts is in the courtroom.  I believe

4    he's testified before.  As the Court is aware, Mr. Fitts is a

5    managing director with Alvarez & Marsal.  He is the co-head of

6    the real estate group at Lehman and he's familiar with this

7    transaction.  He was managing director at GE and was formerly

8    in Citibank's workout group where he had extensive experience

9    since approximately 1988.

10        He's been assigned to the representation of Lehman

11   since September of 2008.  In connection with the Fenway repo

12   and the Fenway commercial paper program, he has reviewed the

13   motion and informed himself of the relevant transaction as

14   embodied in the various documents.

15        He would testify that the assets were repo'd to Fenway

16   and that the goal of this motion is to be able to save the

17   money that's associated with maintaining the structure; that in

18   September of 2008, Fenway Funding issued commercial paper notes

19   to LBHI and that LBHI is the current holder of those notes;

20   that the proposed actions are intended to eliminate the expense

21   and time delay associating with maintaining the programs;

22   eliminating the administrative fees to Deutsche Bank, Hudson

23   Castle and other third parties in connection with maintaining

24   the repo and the commercial program; and enabling LBHI to

25   access certain funds that are currently held at the Fenway

1    structure in approximately a little over a million dollars.

2           He would testify that the transaction is done on the

3    basis of arm's length negotiation with Fenway and that the goal

4    would be to put LCPI in the position that it was prior to the

5    time of the funding of the repo maintaining LBHI's interest in

6    the notes.

7           Additionally, Your Honor, Mr. Fitts would testify that

8    as a result of the transaction with JPMorgan Chase that we're

9    able to undo the structure and that there are several other

10   structures that hold real estate assets that now, as a result

11   of the JPMorgan transaction are in the process of being

12   unwound.

13          Mr. Fitts would further testify that this is a

14   reasonable exercise of the debtors' business judgment to

15   alleviate the expense and time delay associated with

16   maintaining both the repo and the commercial paper program;

17   that it was done -- that the transaction is fair and reasonable

18   to the debtors under the circumstances; and that it was the

19   product of protracted arm's length negotiation.

20          LBHI would indemnify Fenway and Hudson Castle with

21   respect to certain activities related to the assets as modified

22   by the supplement to the carve-out of the indemnity and the

23   guaranty.  In addition, they would pay approximately a million

24   six in attorneys' fees to Fenway in connection with the amounts

25   of money that they have expended.

1    Mr. Fitts would further testify that the concessions

2  that have been made by LBHI and LCPI are far outweighed by the

3  benefits that LBHI and LCPI would receive as a result of

4  undoing the structure.

5      Your Honor, I don't think -- that would be the

6  conclusion of his testimony.

7      THE COURT:  Is there any objection to my receiving the

8  proffer in evidence in support of the motion?

9      MR. O'KEEFE:  Good morning, Your Honor.  Sean O'Keefe

10  appearing on behalf of the voluntary SunCal debtors.  My only

11  objection is to the extent that the testimony, counsel's

12  characterization of testimony is inconsistent with what is

13  reflected in the motion then I would seek the right to cross-

14  examine Mr. Fitts because the characterization by counsel of

15  certain elements of that transaction is directly contrary to

16  what is reflected in the motion.  And if that's the testimony

17  then I would respectfully ask the Court to have Mr. Fitts take

18  the stand on those limited issues.

19      THE COURT:  If you wish to cross-examine, that's your

20  right.

21      MR. O'KEEFE:  Then I would ask the Court to call him

22  to the stand.

23      MR. PEREZ:  Your Honor, I'm not sure that anything in

24  his testimony contradicted what's in the motion or what's in

25  the transaction.  And, frankly, Your Honor, this is a common

1  theme in their objection which I, frankly, don't understand.

2  It's our motion with Fenway.  We can basically file a motion

3  requesting for the Court to do various things.  I'm not sure I

4  understand what the objection is.  I think we've clearly

5  reflected what we want the motion to do, that we want it to

6  preserve the integrity as between LCPI and LBHI.  So I'm not

7  sure what the nature of the objection is.

8          MR. O'KEEFE:  Your Honor --

9          THE COURT:  Well, at the moment, we're dealing with a

10  very limited question which is whether the proffer of Mr.

11  Fitts' testimony is to be accepted as is or whether or not you

12  want the right to cross-examine.  You have the right to cross-

13  examine as an objector regardless of your rationale.  And if

14  you want to have Mr. Fitts on the stand, ask him some

15  questions, he's here.  So we can have him come to the stand.

16  We don't have to have an argument about whether or not you have

17  some basic right to object.  You do.  It doesn't matter what

18  your objection is.  You're a party in interest; you're

19  objecting.  I think I know what your objection's about.  It's

20  about having these loans come into the estate and be subject to

21  the automatic stay and the SunCal litigation in California.

22  Isn't that right?

23          MR. O'KEEFE:  Your Honor, certainly that is our

24  primary concern.  And just to respond to counsel's comment, I,

25  in no way, want to interfere with this transaction except in

1    the following limited respect.  I understand --

2        THE COURT:  Well, that means you do want to interfere

3    the transaction.

4        MR. O'KEEFE:  Well, Your Honor, not as stated in the

5    motion.  Not as stated in the motion.  The motion states, "The

6    parties will terminate the MRA".  So the MRA is terminated.  So

7    this contention that a terminated contract can somehow give

8    rise to liens which are provided for therein, that would be my

9    issue.  So if they're saying it's not terminated, that's not

10    what' s in their motion.  They say the guaranty will be

11    terminated.  So we would simply ask them to acknowledge the

12    guaranty is terminated.  And that's the basis for their claims

13    against LCPI.  They also state the CP notes are terminated.

14    That's right here in front of me on page 10.  "The CP notes are

15    terminated."  This exchange, they state, is in full payment of

16    the purchase price under the MRA.  So that transaction is done;

17    it's over.  I think we can all agree you can't have a lien if

18    there's no claim.  You can't have a lien if there's no

19    underlying lien documents.

20        THE COURT:  Well, we're not arguing your objection

21    right now.  We're dealing with, as I said, a very narrow

22    question.  Do you want to examine Mr. Fitts?  If so, we'll call

23    him to the stand now.  If you want to accept the proffer, we

24    can accept the proffer with your rights reserved in terms of

25    what you're arguing about and we can reserve that to argument.

1    But that's what's currently in front of me.

2            MR. O'KEEFE:  Well --

3            THE COURT:  It's binary.  We either have Mr. Fitts or

4    we don't have Mr. Fitts as a witness.

5            MR. O'KEEFE:  Your Honor, then we would -- we would

6    reserve our rights.  The only issue is I have a material

7    concern about Your Honor making findings based upon that

8    characterization of the testimony as opposed to what is before

9    us in terms of their motion.

10           THE COURT:  Well, you can certainly argue whatever you

11   want to argue about the reasonable conclusions to be drawn from

12   the record.  And you're also free, if you wish, to call Mr.

13   Fitts to the stand and ask him as many direct questions as you

14   wish.

15           MR. O'KEEFE:  Your Honor --

16           THE COURT:  If you want to simply reserve this to

17   argument, that's fine, too.  It's up to you.

18           MR. O'KEEFE:  We will reserve it, Your Honor.  We

19   understand the standard.  I agree they have a lot of

20   discretion.  And we're certainly not here to interfere with

21   this transaction.  We're not a claimant in this case.  So we

22   haven't asserted standing to get into the issue of the merits.

23           THE COURT:  Oh.  Then why don't you just sit down?

24           MR. O'KEEFE:  I will, Your Honor.

25           THE COURT:  If you acknowledge you don't have

1  standing --

2      MR. O'KEEFE:  Only in terms of the issue of their

3  discretion and that transaction.  But to the extent that

4  those -- the assertion of those findings relative to the

5  characterization of the transaction could affect my client then

6  I did have concerns.  And Your Honor is saying that you're

7  inclined to approve the transaction, as I understand it,

8  without making those findings.

9      THE COURT:  No.  I didn't say that.  What I said was

10  that if you have a concern about the proffer and wish to

11  examine the witness in order to make a record that you view to

12  be either more consistent with your understanding of the facts

13  or more helpful to you in the argument you wish to make when we

14  get into the legal argument phase of this, you're free to call

15  the witness.  That's the only thing we're talking about now.

16      MR. O'KEEFE:  Very well, Your Honor.  We will reserve

17  the right for the following motion.

18      THE COURT:  All right.  So I take that as you're not

19  calling Mr. Fitts.  I don't have any questions of Mr. Fitts.  I

20  accept the proffer with such conclusions to be drawn from the

21  proffer as will be determined following argument.

22      MR. O'KEEFE:  Thank you, Your Honor.

23      THE COURT:  Okay.

24      MR. PEREZ:  Your Honor, I'm glad Mr. O'Keefe brought

25  up the question of standing.  And the only reason I raise it is

1    because I did -- I'm kind of a newcomer to this whole

2    situation.  So I did look up to see if there had been any

3    proofs of claim filed.  I couldn't find any proofs of claim

4    that had been filed by any of the SunCal debtors one way or

5    another.  So obviously, they filed a motion to lift stay.  But

6    I haven't been able to determine, in fact, what their standing

7    is.  And they certainly haven't filed a proof of claim in this

8    proceeding.

9        (Pause)

10           MR. PEREZ:  Just to continue, Your Honor, as it

11   relates to the indication of bad faith, the committee has

12   reviewed this transaction, has reviewed this transaction

13   extensively.  They have filed two documents in support of the

14   transaction.  There's no indication that there's bad faith.

15   The testimony is that this has been subject of a long

16   negotiation, arm's length negotiation with Fenway.

17           So, Your Honor, the main issue that has been raised by

18   SunCal and what I think they simply ignore at every turn and

19   for some reason it's a little bit of "gotcha" lawyering is that

20   LCPI has always had the right to repurchase the loans.  LBHI

21   has always been the guarantor of the loans.  LBHI has always

22   held the commercial paper which is the economic -- which is

23   part of the economic interest in the loan.  Now that it's not

24   subject to the JPMorgan pledge, they can deal with it.  There

25   has -- Fenway has consistently taken the position -- and I

1    think there are five instances that were cited in the papers

2    where they've said we're just the middleman in this.  We really

3    don't have an economic interest because you have LCPI and LBHI

4    on one side and LBHI on the other side.

5          So, Your Honor, when you boil this down to its

6    essence, two things are happening.  We're doing away with a

7    costly structure, that is Fenway.  We're doing away with that

8    and it's not the only one that we're going to be doing away

9    with because there were several of these.  Second, we are doing

10   everything possible, as is our fiduciary obligation in

11   connection with the representation of twenty-three separate

12   estates to maintain the economics of each -- the integrity of

13   the economics of each debtor.  And in this case, LBHI paid for

14   the commercial paper.  They're the holder of the commercial

15   paper.  And they clearly will have an interest in those assets

16   because those assets form part of the recovery in their estate.

17         So, Your Honor, I would request that the Court approve

18   the motion.  There's really been no -- no challenge to the

19   debtors' business judgment.  And I don't think there can be any

20   real challenge to any bad faith associated with undoing this

21   transaction.  This has been going on for a long time.  We have

22   e-mails from Ms. Goldstein going back to January saying they've

23   been wanting to get out -- and earlier, saying they've been

24   wanting to get out of this.  I mean, much longer, saying that

25   they've been wanting to get out of the transaction.  This is a

1    cost saving measure and it effectively allows the debtors to

2    deal with the assets.  And half of the loans in Fenway have

3    nothing to do with SunCal, Your Honor.

4          THE COURT:  Mr. Perez, you said a little earlier in

5    your presentation that you're new to this.

6          MR. PEREZ:  Correct.

7          THE COURT:  Now, you're not new to the bankruptcy case

8    itself, obviously.  You've been involved from the very

9    beginning.

10         MR. PEREZ:  I have, Your Honor.

11         THE COURT:  When you say you're new to this, do you

12   mean you're new to the ongoing hostilities between the SunCal

13   debtors and the Lehman estates?

14         MR. PEREZ:  Correct, Your Honor.

15         THE COURT:  All right.  To the extent that there is an

16   allegation of bad faith in this transaction, it seems to me

17   that it relates to the following.  There is the suggestion by

18   the SunCal debtors that one of the motivations for this

19   transactions is to bring assets into the debtors' estates that

20   are not now within the estate directly by virtue of the Fenway

21   structure, and as a result, to have those assets subject to the

22   automatic stay which would, in their view -- and I'm

23   characterizing their view -- materially interfere with the

24   prosecution of equitable subordination litigation pending in

25   the bankruptcy court in Santa Ana, California.  That's my

1    understanding of their view as to why this transaction may be

2    suspect.  What's your response to that?

3         MR. PEREZ:  Your Honor, I have several responses to

4    that.  First of all, that is based on what I believe to be a

5    false premise.  LCPI has always had rights to those assets

6    through the repurchase agreement.  They've always had that

7    right.  If the Court looks at the Palmdale decision while the

8    BAP panel never reached that issue because, remember, Your

9    Honor, there are loans that LCPI has that are not in Fenway,

10   that are SunCal loans.  So we'll get to the issue of the

11   automatic stay at the next hearing.  But there are loans in

12   SunCal -- SunCal loans that are not in Fenway.  So while the

13   BAP never reached that decision, it did say that LCPI might

14   likely have an interest through the repurchase agreement.

15   That's number one.

16        Number two, I think that the examiner's report is

17   fully replete with references to the fact that these repo

18   agreements were financings, that they were not sales.  I mean,

19   that Lehman used the repo transaction in order to provide

20   financings.

21        Third, Your Honor, LBHI has always had an interest.

22   They're the ones that paid three billion dollars.  They've

23   always had an interest in these assets.  They've never not had

24   that interest.

25        THE COURT:  I understand all that and I accept that

1    argument.  But they're saying that this is, in part, an effort

2    to expand the scope of the automatic stay and the SunCal

3    litigation to these assets.  And they say that various

4    statements were made on the record that ignore the Fenway

5    structure.  It was, if I'm understanding it correctly,

6    representations made that there was property of the estate in

7    the SunCal bankruptcy cases when, in fact, some of loans were

8    within the Fenway structure.  And to the extent that that's

9    true, and I'm not saying that it is true because I don't know

10   those facts, but undoing the structure is a way to cure that

11   defect.

12       MR. PEREZ:  Well, Your Honor, I'm not sure that I

13   agree with that premise.  I believe that -- and I haven't gone

14   back and read every single transcript.  I've certainly read

15   most of the stuff that's been filed.  But, Your Honor, to the

16   extent that Lehman held these assets as loans on their books,

17   even though they were repo'd to Fenway then I think that they

18   would have every right to do that.  And every indication based

19   on the examiner's report, that's, in fact, what they did.  So

20   I'm not sure that there is any real deception that went on

21   there.

22       Furthermore, Your Honor, let me make two other points.

23   The principal objector with seventy-five percent of the value

24   has now stopped objecting.  So we're really talking only about

25   the smaller part of the claims.  And, Your Honor, to the extent

1    that the Court somehow believes that there's some merit to that

2    argument, which I don't believe there is --

3              THE COURT:  I'm not suggesting --

4              MR. PEREZ:  Okay.

5              THE COURT:  -- that there is or there isn't.  All I'm

6    saying is that you're trying to get over the hurdle of this is

7    in good faith.  And one of the issues that you haven't really

8    dealt with directly is what I've been talking about which is my

9    characterization -- and I may have it wrong, by the way -- my

10   characterization of what I believe to be embedded in the SunCal

11   papers, namely, this is a device to improve Lehman's litigation

12   position in California and that that may be one of the

13   principal motivations for doing this deal.

14             MR. PEREZ:  Your Honor, if as a result -- let me put

15   it this way.  If as a result of undoing the structure, the

16   ownership of the assets is cleared up, then I think that's a

17   salutary effect.  I can't believe that would be in bad faith.

18             THE COURT:  Okay.

19             MR. PEREZ:  I mean, if as a result of doing the

20   structure it's cleaned up, I can't understand why that would be

21   in bad faith.  What is it that it's in bad faith about?  That's

22   what I don't seem to understand.

23             THE COURT:  All right.  I think it's time to hear from

24   the SunCal debtors and understand exactly from them what the

25   problem is, if any.

1    And you speak softly and we have a fairly crowded

2    courtroom.  If you could -- you're close to me and I can hear

3    you but please speak up so that everybody can hear you.

4         MR. O'KEEFE:  Yes, Your Honor.  Let me deal briefly

5    with a few of counsel's comments.  As far as Article III

6    standing, you don't have to file a claim to have Article III

7    standing.  The reality is to the extent that what they're doing

8    has an adverse effect on our case then we have standing to make

9    an objection.  Now, we have limited our issue to that part that

10   affects our case.

11        And let me just tell you the sequence of events here

12   that led us to the conclusion.  And each sequential filing in

13   this case has confirmed that fact.  The transaction before the

14   Court specifically states that the MRA, the master repurchase

15   agreement, is being terminated.  And just to step back from

16   that, every repo from an economic perspective is, in effect, a

17   secured transaction.  It's a buy and sell that generates a

18   yield between the buyer and seller.  But the simple fact is

19   that is an incredibly important market.  That's how we move M1

20   and M2 on the money supply.  So decisions were made twenty

21   years ago that when they say it's a true sale, no matter what

22   it looks like, it's a true sale.  And this particular contract

23   says it is a true sale.  And there's twenty years of case law

24   that says no matter what it looks like it's a true sale because

25   that market says it's a true sale --

1       THE COURT:  We are not arguing in the context of this

2  motion to unwind the Fenway structure whether or not repos that

3  function as financings are true sales.  And the question that

4  you are asserting has not been decided in this case and is not

5  being decided now.

6       MR. O'KEEFE:  Well, let me just deal with the issue of

7  this transaction.  The transaction in the motion says that the

8  master repurchase agreement is being terminated.  That's where

9  the backup lien rights were vested in Fenway.  And basically,

10  the contract says this is a true sale but if for any reason

11  it's broken, we continue to have a lien right to protect

12  ourselves in the same way as you have a lessor saying that in a

13  lease.

14       But the contract before Your Honor -- the motion

15  before Your Honor says that contract is being extinguished.  It

16  says the guaranty that Lehman Brothers issued in favor of LCPI

17  to back up their repurchase obligation is being extinguished.

18  It says that the CP notes are being extinguished.  It says that

19  the VFN, or the variable funding note, is being extinguished.

20  Every element of that transaction is being extinguished.  And

21  it says this is in full performance.

22       Now, we then see in the pleading and in subsequent

23  pleadings, the development of the following argument.

24  Notwithstanding the fact that the guaranty goes away, there's a

25  subrogation based upon an extinguished guaranty.

1    Notwithstanding the fact that the MRA is gone, we say there's a

2    lien that they're taking based on the MRA against the sold

3    loans that are being acquired by LCPI.  Transactionally, it

4    doesn't make any sense.  We then point out in our papers, wait

5    a minute here.  There is no reference to a financing -- a 364

6    financing in this motion.  But you're referencing debt that

7    LCPI is purporting incurring and liens that it's purporting

8    giving to secure a debt which is not referenced in the motion.

9    So when you see the sequence of events, they then file a

10    supplement and said, oh well, notwithstanding the fact what we

11    said in the motion, we're reserving rights and somehow or

12    another there are these follow on liens which weren't discussed

13    or could survive under the transaction that we've enunciated

14    before the Court.

15    So at that point, it confirmed what was initially a

16    suspicion.  And now they've admitted that they will assert that

17    Lehman Brothers stay a party that has -- doesn't own the loans,

18    has never owned the loans, has never had a lien on the loans,

19    will now acquire a lien based upon an extinguished contract,

20    based upon a guaranty that's extinguished, based upon a

21    transaction that is fully performed and paid.

22    So when we look at that sequence of events, we see

23    that there appears to be an underlying objective to insert LBHI

24    into a transaction and to create lien rights that really can

25    have no existence under the transaction that they presented

1    before the Court.

2         So SunCal's objective is simply to do its own

3    reorganization.  And I'll address this in the next motion.  We

4    don't, in any way, want to get involved in Lehman's case.  We

5    haven't filed a claim.  We haven't appeared here except as

6    necessary.  But when someone files a motion that presents what

7    appears to be a clear --

8         THE COURT:  By the way, one of the issues here is that

9    you haven't appeared here enough, that you chose to absent

10   yourself in Santa Ana taking actions that were, as confirmed by

11   the BAP panel, in violation of the stay.  So maybe one of the

12   problems is you haven't been here enough.

13        MR. O'KEEFE:  Well, Your Honor, I'm more than willing

14   to address that, Your Honor.

15        THE COURT:  No.  You don't need to.  It's an aside.

16   But I'm not going to let an aside like that go without comment.

17   Just finish your argument.

18        MR. O'KEEFE:  My point, Your Honor, is the motion

19   describes a transaction for the extinguishment of the MRA, for

20   the extinguishment of the underlying transaction so that there

21   would be no basis for a follow on lien by LBHI.  So our concern

22   was they were designing this to get back into the SunCal cases

23   in California.  And on that basis, we objected.

24        Insofar as the issue of counsel's characterization of

25   a tentative settlement that's reached with the trustee debtors,

1    seventy-five percent of the value, obviously, there's no

2    evidence before the Court with respect to that.  What I would

3    say --

4         THE COURT:  The evidence is the withdrawal of their

5    objection.  They've withdrawn their objection and did so last

6    evening.  And I accept the representation of counsel that

7    discussions are underway.  Those are not before the Court.  The

8    only thing that's happened is that you're now the lone

9    objector.

10        MR. O'KEEFE:  Well, Your Honor, it's -- I think

11   it's -- the voluntary debtors are the loan objectors.  And as

12   we'll deal with in the next motion, the reason why that

13   settlement was possible is because of the pursuit of litigation

14   in California, but for that --

15        THE COURT:  That's not before me right now.  The

16   question before me -- and I understand some of what you're

17   arguing.  But I will tell you that some of what you've said I

18   find confusing.  I don't believe that there is anything in the

19   motion before me that requires me to make any findings as to

20   the consequences in the SunCal bankruptcy of my unwinding the

21   structure.  So part of what I don't understand is why you're

22   spending all this time arguing about those consequences.

23        MR. O'KEEFE:  Your Honor, with that characterization,

24   I'm more than willing to sit down.  I just wanted to make sure,

25   Your Honor, that in connection with the next motion, I didn't

1    prejudice any rights in this motion.  Otherwise, I wouldn't

2    have said anything.  But I appreciate Your Honor's

3    clarification in that regard.

4         THE COURT:  Okay.  I might -- let me ask Mr. Perez,

5    have I said it correctly?  Is it correct that there's nothing

6    about my unwinding the Fenway structure in accordance with the

7    amended order that you have proposed that necessarily impacts

8    the characterization of anything in the SunCal bankruptcy case?

9         MR. PEREZ:  Your Honor, I think that's correct, Your

10   Honor.  I believe the -- once the transaction is unwound, we'll

11   be in a position -- we'll be in the position that we find

12   ourselves.  But I don't think you're making any finding with

13   respect to the SunCal and what our position is in the SunCal

14   case.

15        THE COURT:  All right.  With that clarification, maybe

16   the objection for the time being fades away.  And I think it's

17   time to hear from the creditors' committee particularly as it

18   relates to their review of the transaction and their

19   reservation of rights with respect to certain parties, notably,

20   Hudson Castle and the Fenway parties.

21        MR. O'DONNELL:  Yes, Your Honor.  Dennis O'Donnell,

22   Milbank Tweed Hadley & McCloy on behalf of the official

23   creditors' committee.  Your Honor, as Mr. Perez said, we have

24   spent a lot of time with this motion on several different

25   levels.  Just as a preliminary matter, in terms of business

1    judgment, we think that -- we're totally convinced that the

2    business judgment of the debtors here makes sense.

3         There are, I think, two business purposes.  One is to

4    simply making the management of the loans easier.  I mean, we

5    can speak to that from the context of transactions we've been

6    involved in with respect to Fenway loans where the extra level

7    of having Fenway involved made things much more complicated and

8    time consuming.  So there is that business purpose.

9         The second business purpose is simply to confirm the

10   ownership of these loans in LCPI which is significant for lots

11   of purposes, one of which might have some consequence in the

12   SunCal proceeding, but it has other purposes as well.  So to

13   the extent we're looking for a business purpose here, there are

14   several fairly compelling business purposes separate and apart

15   from whatever the SunCal debtors have to say.

16        We did look at the motion on other levels as well.

17   And our particular focus from the get-go was on the actual

18   nature and structure of the transaction and the parties

19   involved.  And specifically, the involvement of Hudson Castle.

20   Even before the audit call that appeared in the Times a few

21   weeks ago appeared, we had been asking questions about the

22   nature of the transaction, the intents of the transaction, how

23   it was put together, how it unfolded.  That article provoked us

24   to look even harder at that relationship.  And subsequent to

25   that, we spent a two-week period talking to the debtors and

1    talking directly to Hudson Castle and its counsel trying to get

2    a better understanding of the relationship between Hudson

3    Castle and Lehman and precisely how the Fenway structure was

4    put together and modified over the summer of '08.

5              That investigation is ongoing.  We haven't had all our

6    questions answered yet.  But the ones we have answered have

7    convinced us that we have no reason to oppose the current

8    motion.  And that's the case because the releases provided to

9    Fenway and Hudson Castle in this motion are very limited.  We

10   had already started the process of limiting those releases.

11   But subsequent to further investigation, we narrowed them

12   further.  And all that's getting released at this point is any

13   claims arising out of -- and Ms. Goldstein can correct me if

14   I'm incorrect on this -- but, basically speaking, not the

15   specific language, any claims arising out of the administration

16   or management or origination of the underlying loan

17   collateral -- which we believe Hudson Castle likely had nothing

18   to do with.  All claims relating to the actual structure of the

19   Fenway transaction and Hudson Castle's involvement in it are

20   being preserved for future investigation.  And with that

21   understanding and our understanding and acceptance of the

22   business judgment here, we believe the motion should be granted

23   by the Court.

24              THE COURT:  All right.  Thank you.  Is there anyone

25   else who wishes to be heard in connection with this?

1      MR. MILLER:  Good morning, Your Honor.  I'll be very

2   brief.  My name is Skip Miller.  I'm the litigation attorney

3   for the SunCal debtors.  I, obviously -- and I'm not a

4   bankruptcy lawyer.  I obviously don't want my lawsuit, my

5   equitable subordination lawsuit encumbered or made any more

6   difficult than it already is by virtue of this compromise

7   motion.  That's my only concern.  The exact questions that Your

8   Honor asked at the beginning of the hearing are my concerns as

9   well.  Other than that, we don't have any objection or

10   reservation.

11      This tentative settlement from the trustee's side, Mr.

12   Lobel's side, is great news to us.  If it sticks, if it's

13   good -- I don't know the details of it.  But this is obviously

14   something that has grown out of my lawsuit, my equitable

15   subordination lawsuit.  And I want to just be able to continue

16   with it in Santa Ana before Judge Smith not in any way, shape

17   or form intruding on the stay or the jurisdiction of this

18   Court.  And that's our position.

19      THE COURT:  Let me just ask you one question.

20      MR. MILLER:  Sure.

21      THE COURT:  Who do you represent in that litigation?

22      MR. MILLER:  I represent all of the debtors, the

23   voluntary and involuntary debtors -- the trustee debtors and

24   the voluntary debtors as special litigation counsel.

25      THE COURT:  And as special litigation counsel, you

1  heard for the first time this morning that the trustee has

2  worked out something that may result in a settlement of at

3  least that party a lawsuit, is that correct?

4       MR. MILLER:  No.  I spoke to Mr. Lobel about it last

5  Friday.  And we've been discussing it.  But I have not seen the

6  term sheet yet and I don't know the nitty gritty of the details

7  of it.  So -- but he called me on Friday and we had a

8  conversation about it.

9       THE COURT:  I don't want to get into the specifics of

10  it.  It will either, as you say, stick or it won't.

11  Presumably, it will stick.  And at least that part of the

12  litigation goes away.

13       MR. MILLER:  I mean, what I heard sounded okay.  I

14  just need to see -- you know, the devil is in the details.

15  And, you know, it's about half the case.  It's the involuntary

16  debtors, the trustee debtors.  We still have to deal with the

17  other half of the case.  And we're working hard on it.  And my

18  lawsuit, quite frankly, is the driver of all of it.

19       THE COURT:  Well, I know that's your perspective.  I

20  don't know if it's true or not.  And I'm not approving your fee

21  so it doesn't matter.

22       MR. MILLER:  Thank you, Your Honor.

23       THE COURT:  All right.

24       MR. MILLER:  Appreciate it.

25       MR. PEREZ:  If the opposition is withdrawn, I'll sit

1    down, Your Honor.  Otherwise, I've got a couple of comments to

2    make.

3          THE COURT:  I think there's no one -- well, let me

4    find out.  Is there anyone else who has a comment about this

5    pending motion?  Apparently not.  Mr. Perez?

6          MR. PEREZ:  Yeah.  Just a couple, three comments, Your

7    Honor.  Number one, one of our exhibits is a letter going back

8    to January of this year where we informed the SunCal debtors

9    that LBHI had an interest in these assets through the CP notes.

10    I mean, there's no question about it.  The record is clear.

11    This is not anything new or different.

12          And furthermore, Your Honor, our motion clearly

13    contained a full reservation of rights of the debtor so that we

14    wouldn't affect the distribution among the various debtors'

15    estates.  And that's precisely what we're trying to do.  Thank

16    you, Your Honor.

17          THE COURT:  Okay.  Having heard the argument presented

18    by the debtors, the support of the creditors' committee and the

19    opposition by the SunCal voluntary debtors, which appears to

20    the Court to have been more in the nature of a reservation of

21    right as to the potential consequences in the SunCal bankruptcy

22    case in California to approval of the unwinding of the

23    structure, I am satisfied that sufficient business

24    justification has been presented to approve the motion and that

25    the undoing of the structure results in a number of claimed

benefits to the estate including the elimination of certain

costs and the preservation of the rights of separate debtors so

that the distribution rights of those creditors looking to

particular members of the Lehman corporate family will

unaffected by the approval of a settlement.

I'll entertain an appropriate order.

MR. PEREZ:  Thank you, Your Honor.  Should I tender

the order now or --

THE COURT:  At the end of the hearing.

MR. PEREZ:  Okay.  Thank you, Your Honor.  Your Honor,

the next matter on the docket is the motion to lift stay.

(Pause)

MR. O'KEEFE:  Good morning again, Your Honor.  Sean

O'Keefe appearing on behalf of the SunCal debtors, the

voluntary debtors.  Your Honor, I'm a Chapter 11 reorganization

lawyer and my objective is simply to reorganize the cases that

I have been assigned to.  In the current context in California,

it's an inherently difficult process because this is a large

land case and we are facing the largest property value of the

clients since 1930.  We also have a substantial secured

creditor.  The overlaying variable on that is that there is a

litigation ongoing with that secured creditor.  But our

objective is not in any way to do anything other than to

reorganize under Chapter 11 in our case.  And I can't emphasize

that enough.

1            Insofar as the characteriz --

2            THE COURT:  Can I break in and ask a question?

3            MR. O'KEEFE:  Yes, Your Honor.

4            THE COURT:  Are you personally involved in the appeal

5      of the BAP decision to the Ninth Circuit?

6            MR. O'KEEFE:  Yes, I am.  I'm the principal lawyer,

7      Your Honor.

8            THE COURT:  Are you the lawyer of record?

9            MR. O'KEEFE:  Yes.

10           THE COURT:  And what's the time horizon of briefing

11     and adjudication in the Ninth Circuit?

12           MR. O'KEEFE:  Your Honor, my recollection now is

13     briefing is complete.  But they don't tell you when they will

14     set oral argument or if they're going to have oral argument.

15     It's entirely possible that could take months or as much as

16     nine months.  So I just finished two appeals.  And as a general

17     rule, it takes a significant period of time.  So I don't

18     exactly know when they're going to set oral argument or whether

19     they're going to rule simply on the papers.  But they haven't

20     provided us that.

21           THE COURT:  Now, I take it that it's your position on

22     behalf of the voluntary SunCal debtors that the BAP panel got

23     it wrong when the BAP concluded that the SunCal debtors needed

24     to come to this court to obtain stay relief in order to

25     prosecute the equitable subordination litigation in the

bankruptcy court in California. Is that right?

MR. O'KEEFE: No, Your Honor. That -- there is no question in my mind that the home bankruptcy court determines the scope and application of the stay, as the BAP said, in the final resolution. So, for example, there was just a case, it's a published decision, where the Supreme Court in New York made a decision regarding whether or not the stay applied in that particular case. Every Court that confronts the stay has to make a determination does the stay apply on these facts.

THE COURT: Yeah. But I'm trying to understand whether or not in appealing the BAP decision, you're arguing that the BAP got it wrong when the BAP concluded that Judge Smith got it wrong when she concluded that you could properly prosecute equitable subordination litigation against the Lehman debtors without first obtaining stay relief here.

MR. O'KEEFE: Not the procedural issue but the substantive issue. Basically, our position is -- is consistent with what we read to be the law in this circuit. And in the Ninth Circuit, but for that one case, that the pursuit of an equitable subordination action whether through a contested matter or through an adversary proceeding is deemed defensive and consequently that does not violate the stay.

The second issue as to who gets the final say on whether the stay applies, we absolutely agree that the home bankruptcy court makes that decision. So now we have a

1   circumstance, we believe -- and we have absolute confidence

2   that the BAP will be reversed.  We think Judge Markell's

3   decision states the law.

4         THE COURT:  Are you saying you have absolute

5   confidence that the BAP will be reversed?

6         MR. O'KEEFE:  Yes, Your Honor.  Yes, Your Honor.  I

7   just think that --

8         THE COURT:  That's an unbelievable statement to make

9   on the public record.

10        MR. O'KEEFE:  Your Honor, the -- it is a decision

11  which we think is directly contrary to the authorities of that

12  circuit and we don't think that it will stand both

13  jurisdictionally and substantively.

14        But we agree -- we agree, Your Honor, that if the

15  determination of whether the stay applies in the final

16  determination -- and that's what the BAP said.  And the final

17  determination is Your Honor.  So we absolutely agree.  So, for

18  example, Lehman had the right to come back here and say there's

19  this determination and we think it's in error.  And had Your

20  Honor said I think so, too, then that's it.  We're stumped.

21  There's no question there.  We operated from that point going

22  forward because Lehman raised the issue -- Lehman raised the

23  issue with Judge Smith.  Lehman filed the motion for relief

24  from stay and said, Judge, we're making a motion under (d)(2)

25  and (d)(3) that says this reorganization automatically fails

1   because our stay prevents them from subordinating our claims.

2   Faced with that argument, Judge Smith said, well, that's not

3   the law in this circuit.  And also we have the Meddium (ph.)

4   decision and Your Honor's decision in Shinsei.  And maybe we

5   are misreading that.  But --

6        THE COURT:  I think you are reading the Shinsei

7   decision.

8        MR. O'KEEFE:  And that's entirely possible, Your

9   Honor.  But I do believe that Judge Smith's decision based on

10  their argument, and it was in response to their argument, she

11  said I see, under (d)(2), an ability to reorganize pursuant to

12  which they can seek to subordinate your claims.  And on that

13  basis, we proceeded.  So they raised the issue and she ruled on

14  it.

15       Now the BAP took that issue up -- and they didn't seek

16  to set aside the order denying motion for relief from stay.

17  They appealed just that narrow ruling, that issue of law, as to

18  whether or not the stay was affected by an equitable

19  subordination action, whether that was offensive or defensive.

20  Prior to that point in time, we believe the law was clear that

21  it was defensive.  They view it, the BAP did, as offensive.

22       But --

23       THE COURT:  That's consistent with Judge Gonzalez'

24  decision in the Enron case as well.

25       MR. O'KEEFE:  Your Honor, I think the correct

1   statement of the law is what was stated in the Meddium decision

2   because I think what the Court is saying is, look, if you come

3   to a case, we have to be able to determine the priority of your

4   claim.  And that's really what's going on here.  Integral to

5   our reorganization effort, we have to deal with the claims that

6   they filed in our case.  Conceptually, I think we can all agree

7   that we could have objected to their claim, raised an unclean

8   hands defense and a recoupment defense and, on the basis of

9   those equitable affirmative defenses, sought subordination.

10          THE COURT:  I understand --

11          MR. O'KEEFE:  It's just that --

12          THE COURT:  I understand your position on that.  But

13  one of the issues here is that through other counsel, in

14  November of 2008, the SunCal debtors brought a motion for stay

15  relief here which I denied without prejudice.  It was very

16  obvious, I think, to anybody who was present in court,

17  including your partner, that one of the problems with the

18  original motion was that overly broad, it didn't seek

19  particularized relief.  And from the very beginning of the

20  SunCal bankruptcy, it was apparent that SunCal needed to deal

21  with Lehman Brothers.  I made it very clear that I would

22  entertain other motions for stay relief or stipulations that

23  the parties might enter into relating to stay relief.

24          But nothing happened.  Except in January of 2009, I

25  was involved in an emergency hearing, I believe it was on a

1   Friday afternoon, New York time, seeking to enforce the stay

2   because, in effect, your debtors were treating this Court as if

3   it had no say in the matter.  Ultimately, I made some

4   threatening noises on the record, and the record speaks for

5   itself, that there might well be sanctions for a willful

6   violation of the automatic stay.  And until now, the SunCal

7   debtors have absented themselves from this court.  That's one

8   of the reasons why I interjected earlier in your argument on

9   the Fenway motion about your not having been here except when

10  you needed to be here.  I think you needed to be here a lot

11  sooner.  And I'd like an explanation as to why you haven't been

12  here sooner.

13      MR. O'KEEFE:  The first thing is, Your Honor, to the

14  extent that we have engaged in any course of conduct that was

15  offensive to this Court or that affected the stay, we sincerely

16  apologize.  That was not our point.  To the contrary, I've been

17  practicing bankruptcy law in twenty-five years -- for twenty-

18  five years and nobody has ever accused me of violating the

19  stay.

20      What happened in this circumstance was, Your Honor, we

21  moved for -- the circumstance you're referencing -- and I'll

22  just go back.  Twenty years ago, I had a case, and it was only

23  one in my whole career, where we had two cases, two debtors,

24  who were looking at each other saying well, my stay applies and

25  your stay applies.  And we went to Mr. Klee (ph.) and Mr.

1   Tweester (ph.) because there were no cases anywhere on the

2   issue that confronted that circumstance and said well, what

3   happens, who has primacy.  And their response was the Code

4   doesn't work very well under those circumstances.

5        Well, since then, we've had more input from the case

6   law.  But the truth of the matter is, Your Honor, we've never

7   run into this circumstance before.  And insofar as that hearing

8   you're referring to, we moved the use of cash collateral in

9   that case and that was the issue that Your Honor is speaking

10  to.  And Your Honor told us I think that violates the stay and

11  we withdrew that motion.  The reason why we filed that motion

12  is because there was another pending Lehman case, LB Rep,

13  something or other, and it was represented by the same counsel.

14  And the trustee in that case moved for the use of cash

15  collateral and there was no stay assertion.

16       Now, going all the way back to the first motion for

17  relief from stay, Your Honor is absolutely correct.  And I

18  wasn't involved in that.  That motion was early in this case.

19  And it basically was this blanket prayer for relief.  I don't

20  really understand why that motion was filed in that structure

21  particularly given the fact that this was early in this case.

22  It was going to be denied.  It should have been more focused

23  and Your Honor made that clear.

24       But insofar as that particular issue, the motion for

25  use of cash collateral, Your Honor made your thoughts clear on

1    that and we withdrew the motion.  And that was very difficult

2    in a Chapter 11 to operate without the use of cash collateral

3    particularly since the party who controlled the cash collateral

4    or alleged that they controlled it was trying to crush our

5    case.  The next thing that happened in time, Your Honor, is

6    they raised the issue before Judge Smith.  They filed the

7    motion for relief from stay saying our stay thwarts their case.

8    You cannot succeed.  You might as well give us relief from stay

9    to foreclose on everything because they can't reorganize,

10   period, because of our stay.  That was the argument.  It was a

11   (d)(2) and a (d)(3) argument.

12        In response to that, we presented -- and in response

13   to that, we presented our arguments and our case law saying

14   that the stay didn't apply, that this was a defensive act and

15   we could subordinate their claims.  And the claims objection in

16   priority determinations are traditionally to the extent they

17   just affect the claim deemed defensive.  And Judge Smith

18   specifically ruled on that.  It was only within the protection

19   of that ruling that we proceeded.  Now, Your Honor, they had

20   the option to come to you and say, look, we think this is

21   wrong.  And whatever Your Honor said, that's the law.  That's

22   it.  We agree.  There's no dispute.  But they didn't do that.

23   In fact, thereafter, they affirmatively represented to Judge

24   Smith over and over again the stay doesn't apply.  In fact, I

25   will tell you that I went to court once to complain that the

1    motion -- the agreement we entered into -- because when Your

2    Honor said we couldn't move for the use of cash collateral, we

3    had to enter into a very onerous financing agreement.  And what

4    was discovered after the fact is that they didn't hold the lien

5    or even the claim.  And so, when we went in again, I said you

6    know, there's something unfair about this.  They invoked the

7    stay with respect to a loan and a lien they don't hold and now

8    I'm stuck with this onerous financing agreement which they

9    should never have had in the first place because that's not

10   their lien.

11        At that point, Mr. Pachulski, an exceptional lawyer,

12   jumps up and scolds me in front of Judge Smith and says that

13   stay has not been an issue in this case for months.  And that's

14   in their disclosure statement.

15        So maybe it was incorrect for us to rely on Judge

16   Smith's ruling.  But they invoked that issue.  And she

17   responded and ruled.  And we, in reliance on that, went

18   forward.  And they could have come to Your Honor and said Your

19   Honor has the final say and we agree.  There's no dispute.  But

20   they didn't do that.  They said the stay does not apply over

21   and over again.  And it's in their own pleadings.

22        So to the extent that we have proceeded in a manner

23   that's procedurally inappropriate, we apologize.  That was not

24   our intent.  We thought we were doing the right thing.  And I

25   have to tell you, Your Honor, I'm a debtor moving for relief

1    from stay.  That just seems -- I mean, it's just a new thing

2    for me and for everybody out there.  There just isn't a lot of

3    case law on this.

4         THE COURT:  Mr. O'Keefe, I understand your position.

5    But here's the concern that I have and it's actually the

6    flipside of the argument that you were making in the context of

7    the unwinding of the Fenway Capital commercial paper program.

8    And that's the question of good faith.  I couldn't have been

9    clearer in January of 2009 that this was the Court that you

10   needed to come to for purposes of getting stay relief, in that

11   instance, relating to the use of cash collateral.

12        But it's now May of 2010.  It's quite a long while

13   after that.  And one of the concerns I have is that Judge Smith

14   and I are players in a cross-country game of gaming the system,

15   of using courts to your particular purpose in order to gain

16   strategic advantage.  And speaking for myself, I don't like

17   that.  I suspect that Judge Smith would say the same thing if

18   she were here.

19        MR. O'KEEFE:  Your Honor, all I can do is apologize.

20   The reality is there was a ruling; we did rely on that.  They

21   did have their procedural remedies.  Maybe in retrospect that

22   was not the right thing to do but rather to take that and

23   immediately come back here.  And in retrospect, given Your

24   Honor's insight, that's what I would do.

25        THE COURT:  Let me ask you a question.  Assuming that

1    you are successful in the Ninth Circuit whenever that happens,

2    what's the consequence of that successful prosecution of the

3    appeal of the BAP decision to the Ninth Circuit?  What happens

4    then?  Does it moot my need to decide the pending motion?

5         MR. O'KEEFE:  Your Honor, I don't think it does.  And

6    this is just my analysis of the law.  Essentially, the BAP was

7    correct in one respect, that, procedurally, to the extent that

8    there is a final determination who trumps everybody insofar as

9    the determination relative to the scope and application of the

10   stay, it is the home bankruptcy court.  So if you make a

11   determination with respect to that issue, then our only

12   recourse is to appeal.  That's it.  That's the only option we

13   have.

14        The mechanical -- the effect of the BAP being

15   overruled is there is a case in the Ninth Circuit which

16   determines that a particular course of action in isolation --

17   and again, they didn't appeal the merits of the order denying

18   the motion for relief from stay.  And subsequently, we brought

19   to them they didn't even own these loans so the motion

20   shouldn't have been brought in the first place.  So that's our

21   jurisdictional issue.  But if -- and we believe the Ninth

22   Circuit will reverse this, even if just on jurisdictional

23   grounds to say why are you here.  The motion shouldn't have

24   been brought, the appeal wasn't valid.  It's all vacated.

25        But what we think will happen is we'll clarify the law

1    in our circuit.  And that's really, at this point, what we're

2    trying to do.  Insofar as your determination, the reality

3    issue, Your Honor, we have no dispute that to the extent the

4    stay applies, the home bankruptcy court gets to say it applies.

5    And you trump everybody else.  And at that point it's solely --

6         THE COURT:  I'm asking you a slightly different

7    question.  And you may have answered it and I just didn't fully

8    understand the answer.  If you are successful in the Ninth

9    Circuit, would you be able to prosecute the litigation against

10   the Lehman debtors for equitable subordination in the

11   bankruptcy court in Santa Ana without obtaining stay relief

12   here?  That's a yes or no question.

13        MR. O'KEEFE:  Under Baldwin-United, yes, Your Honor --

14        THE COURT:  In that case --

15        MR. O'KEEFE:  -- unless --

16        THE COURT:  -- then the Ninth Circuit adjudication

17   could moot the pending motion here, correct?

18        MR. O'KEEFE:  If Your Honor --

19        THE COURT:  That's a yes or no question.

20        MR. O'KEEFE:  It would depend upon the ruling, Your

21   Honor.

22        THE COURT:  That's a yes, no or I don't know.

23        MR. O'KEEFE:  I would say yes, if it's before the

24   ruling.  Yes, because if they decide that the BAP is overruled,

25   then at this point, Judge Smith's ruling with concurrent

1    jurisdiction, but not final -- Your Honor gets the trumper, we

2    agree with that -- every Court has the right to determine

3    whether the stay applies.  So if she determines the stay

4    doesn't apply and nobody comes back here then that's the law of

5    our case and we proceed on that basis.

6         The -- so it would be a timing issue.  Now, on the

7    other hand, if Your Honor were to determine the stay doesn't

8    apply, okay, then the Ninth Circuit would potentially --

9    someone could argue it's an Amwell (ph.), maybe that moots that

10   issue because the home bankruptcy court has ruled it doesn't

11   apply.  We were not -- we want that decision vacated for a lot

12   of reasons.

13        But I think that would be the result. So I think it's

14   a timing issue.  And I don't mean to be evasive, Your Honor,

15   but -- I mean, the bottom line is we do need a resolution and

16   we're looking to Your Honor to give us that.

17        I would note that subordination -- basically, dealing

18   with these claims, a lien priority dispute, is integral to the

19   plan of reorganization.  It's going to be very difficult for us

20   to reorganize without resolving the claims against the estate.

21   At this point, Your Honor, all the folks, the defendants, are

22   all nondebtors, all nondebtors.  This motion -- this

23   transaction is bringing them, they believe, back into that

24   case.  Now, what Judge Smith did was say, okay.  I agree.  The

25   BAP controls; LCPI has to leave.  So she dismissed them;

1    they're gone.  There are no debtors in the litigation.  The

2    issue is do they get, through this transaction, to just come

3    right around and buy a claim, in effect, go right back to Judge

4    Smith and say I'm sorry, we're here again.  We still get to

5    thwart the litigation which has a material adverse effect on my

6    ability to confirm a Chapter 11 plan.  And that's really in our

7    mind what's going on here because they're all nondebtors.

8          Now, the whole argument, Your Honor, that we're the

9    aggressor in this -- Your Honor, there's only ten lawyers at

10    Winthrop Couchot.  And only two and a half, on a good day, can

11    work on this case.  These folks have hundreds of them.  These

12    are the two largest bankruptcy firms in the United States.  I'm

13    working seven days a week, get up at 6:00 on a Saturday morning

14    and they have unlimited resources.  So if the concept is that

15    I'm kicking them around like a can, that's not happening.  It

16    is absolutely to the vice versa.

17          THE COURT:  You can put this on your website, it's

18    good for marketing.

19          MR. O'KEEFE:  Your Honor, the merits of the claim that

20    LBHI stay will apply premised upon the contention that they're

21    going to attach a lien to the loans.  And I've already gone

22    through that.  They stated in their motion, the MRA is gone,

23    and that's the basis for the lien.  They state that the

24    guarantee is terminated.  They state that the CP notes are

25    terminated.  So this is some sort of leap-springing lien that I

1    don't understand.  And it's a lender of a lender.  That is too

2    indirect for the stay to apply.

3         And, also, to the extent that that's their design.

4    You shouldn't be able to buy into a piece of litigation that's

5    going on in a bankruptcy court and ten stand up and say you

6    know what, I knew it was happening, but I'm here and you're

7    stayed.  That's just something wrong with that.

8         Your Honor, we've had a back and forth relative to

9    whether or not a subordination action is subject to the

10   automatic stay.  We can all agree that a claim objection is not

11   subject to automatic stay.  And a claim objection can

12   effectuate the complete disallowance of a claim.  If the claim

13   is disallowed the lien goes away.

14        What we're trying to do is to subordinate to the

15   extent necessary to deal with the creditors who they've created

16   by authorizing work.  We don't think that is subject to the

17   stay.  Your Honor may have a different opinion.  But if that's

18   the case, I would simply say to Your Honor that it's very

19   difficult to do a reorganization if you can't deal with claims

20   and liens against your estate.

21        So conceptually both cases should be able to proceed.

22   And Your Honor should be able to fashion, and I note that the

23   creditors' committee, although they object to this, say as a

24   secondary position that Your Honor could have a reporting

25   system or other controls that would assure that your case was

1   not affected.  But it can be that a grader or a framer in

2   California doesn't get paid and the creditors in this case gets

3   paid.  There has to be a medium where they both can proceed.

4        The problem that we have from a balance of the harms

5   perspective, and basically our orientation under Sonnax was,

6   these huge properties are sitting there.  Every weekend I drive

7   passed one.  And it is this giant expanse of land with dust

8   blowing around in the midst of a city.  And there are fire

9   issues, there are flood issues, there are dust issues.  We

10  can't solve that problem until we deal with this claim.  So

11  delay has a material affect on our asset and theirs.  Nobody

12  gains by delay.  This is not a solution, it is simply a -- in

13  our estimation an issue of litigation leverage.  The pricing of

14  a future settlement, and that's not a basis -- that is not a

15  harm for them.  But it is a severe harm for us.  I don't know

16  that we don't have relief from stay.

17       THE COURT:  All right.  Let me just see if we can

18  accelerate through the rest of your argument.  Because we've

19  been going at this for a long time, and we have a very full

20  courtroom still.

21       MR. O'KEEFE:  I apologize, Your Honor.

22       THE COURT:  No, you have nothing to apologize for.

23  But as you point out you're not exactly a party-in-interest

24  here.

25       MR. O'KEEFE:  Well --

1          THE COURT:  You're a party-in-interest, representing

2     the interest of the SunCal debtors and I appreciate that.  But

3     I think we need to move it along.

4          MR. O'KEEFE:  Then I would simply submit to the Court

5     as we've gone through in our briefs, that to the extent the

6     stay applies, to the extent that Your Honor determines that it

7     does apply, Your Honor should lift the stay to the extent

8     necessary to allow the action to proceed.

9          One of the points that Mr. Miller made was there is a

10    settlement.  Your Honor, this case will settle.  I can't

11    guarantee that for sure.  But the reality is there is a dynamic

12    here, the parties where they initially weren't talking, now

13    they are talking.  The truth of the matter is, the stay will

14    just cause delay, it will shift litigation leverage and it

15    isn't a solution.

16         So we have addressed the Sonnax factors, we are asking

17    for limited relief from stay.  To the extent that we've

18    offended the Court I sincerely apologize, that was certainly

19    not our intent.  We thought we were doing the right thing.

20         THE COURT:  Okay.

21         MR. O'KEEFE:  Thank you, Your Honor.

22         THE COURT:  Apparently Mr. Miller is going to be

23    brief.

24         MR. MILLER:  Be very brief.  Learning more about

25    bankruptcy law and bankruptcy stays than I ever knew before.

1          Your Honor, I just want to very briefly, because I

2     think it's been well addressed.  I just want to answer Your

3     Honor's question about, you know, why didn't you come back

4     sooner?  And this is from my perspective as a trial lawyer, a

5     litigation lawyer, not a bankruptcy lawyer.

6          In March of '09, Judge Smith -- I was there, they

7     moved for relief from stay so they could foreclose.  And Judge

8     Smith in her order, I'm quoting, says "that her court has

9     concurrent jurisdiction to determine the scope or applicability

10    of the automatic stay under 11 U.S.C. 362(a)."  And she said

11    "the automatic stay arising from the bankruptcy case of Lehman

12    Commercial Paper does not apply to any proceeding to

13    subordinate the claim of Lehman Commercial Paper and/or to the

14    transfer of the lien," so forth and so on.

15         So, you know, we won, we thought we were golden, and

16    to the extent we should have come back here -- this is my take

17    on it, we should have come back here with this order since I

18    gather from my lesson this morning this Court has the final say

19    on the debtor before this Court's stay.  We probably should

20    have come back here with this order.  And to the extent we

21    didn't, we're sorry.

22         The BAP then reversed at the end of the year.  And

23    when the BAP reversed we had this ruling from Judge Smith that

24    LCPI had sold the loans to Fenway, all of them.  So it didn't

25    seem like LCPI was part of the case anymore, or that the stay

1    was implicated.

2         Then we get this compromise motion, and we say whoa,

3    this compromise motion brings LCPI and Lehman entities back

4    into the picture, we better fire up our motion for relief from

5    stay.  So here we are, okay.  Here we are.  And to the extent

6    we should have done it sooner, we should have done it sooner.

7    But there was no intent, at least from my perspective, to ever

8    avoid or evade the jurisdiction of Your Honor, and, Your Honor,

9    the stay in this court.  Okay, so that's number one.

10        Number two, very briefly.  My ultimate -- I'm

11   representing the debtors, but my ultimate clients are, like Mr.

12   O'Keefe said; the grading contractor, the drywall, the guy that

13   does the sidewalks, the retaining walls, they're all in

14   California, all the documents are in California.  We filed our

15   lawsuit in January of '09.  We've virtually completed document

16   discovery.  Mr. Lobel's been working real hard, and I'm hoping

17   this settlement sticks for part of the estates, frankly.  I'm

18   hoping it seeps over to the other estates, if we can work that

19   through.  I'm working with him and with his office, and it's

20   going to take a lot more work, but I don't want to change the

21   playing field.  And that's why we're here, Your Honor.  We want

22   to be able to maintain the playing field as it is right now.

23   I've got my lawsuit, we're litigating equitable subordination.

24   I'm beginning to think they think we have a pretty good case

25   based on what I'm hearing on this settlement that Mr. Lobel's

1    been negotiating, but, you know, I'll put that on my website or

2    something.

3            THE COURT:  No, I suggest you don't do that.

4            MR. MILLER:  I just want to be able to keep it going

5    and not have to go back to California and say well, we're going

6    to try the case there against the nondebtors, because there's

7    no stay implicated.  But then we've got to take some of the

8    same creditors and come back to Your Honor, and basically retry

9    the same case and do it twice.  And that's exactly -- I was

10   reading the papers on the plane, in a footnote that's exactly

11   what they say they -- that's exactly what they suggest.  They

12   suggest that they could have requested that the entire

13   equitable subordination be tried before this Court, but they're

14   not.  They just want the LCPI piece here and I guess the

15   nondebtor piece in California.  That doesn't make any sense.

16   That is -- I think that's gaming the system.  That's just a

17   litigation tactic, it's clever, very smart lawyers.  But it's

18   just repetitious, duplicative.

19           I'm sure this Court is, you know, very, very busy.  I

20   know Judge Smith is very busy, because I've spent half of my

21   life there over the last year.  And I would just request Your

22   Honor to enter relief to the extent it's necessary so that we

23   can do it all in California.

24           THE COURT:  All right.

25           MR. MILLER:  Thank you, Your Honor.

1        MR. PEREZ:  Your Honor, Alfredo Perez.  A couple of

2    comments.

3        I hear counsel saying that they believe that the home

4    court has the last say on the automatic stay.  Unfortunately, I

5    believe that their actions really don't support that.

6        And, in fact, Your Honor, if the Court looks at the

7    equitable subordination claim, one of the predicate acts, if

8    you will, to the liability for equitable subordination is --

9    are improper attempt to enforce the automatic stay before this

10   Court.  So it's completely -- this pleading completely belies

11   the mea culpas that we've heard this morning.

12       Second, Your Honor, as it relates to whether the stay

13   apply, I don't believe that there's any question but that the

14   stay does apply.  The BAP found that the stay applies, in

15   connection with their equitable subordination claim.  I mean,

16   what they really want to do, is they really want to strip our

17   lien.  It's not the situation that you had before Judge Drain,

18   where you're reordering priorities.  And I read Shinsei three

19   times and the Court basically says under these circumstances

20   involving Japanese law, it's limited to these facts.  I don't

21   think that's a broad ruling that equitable subordination is

22   defensive in every ruling.  Judge Gonzalez's ruling in Enron

23   says it's affirmative.  So I don't believe that there's any

24   question about the fact that the stay does apply.

25       Now, let me address what I believe is the key Sonnax

1    factors, and that is balancing of the harm.  Your Honor, at

2    this point -- and we could have, by the way, I'll take up Mr.

3    Miller's point.  I mean, we could have requested that the whole

4    thing be moved here.  And as a practical matter, we didn't

5    think that was appropriate because, first of all, in view of

6    this Court's docket and the fact that it's basically their

7    claim.  So we didn't think that was appropriate.

8         But we also don't think it's appropriate for the stay

9    to be lifted at this time.  There may be an appropriate time

10   for the stay to be lifted.   But there are probably three or

11   four -- what I think are very compelling reasons why the stay

12   shouldn't be lifted.

13        The first one is, Your Honor, we need to see the

14   settlement through.  We need to see what ends up at the end of

15   the day.  Now, there are -- there has been LCPI loans that

16   weren't in Fenway, that have always been the subject of the

17   stay regardless of the Fenway deal.  So we really need to see

18   that settlement through.

19        We also need to see what the BAP does.  I mean -- and

20   I think the Court's --

21        THE COURT:  I think you mean what the Ninth Circuit

22   does.

23        MR. PEREZ:  What the Ninth Circuit does, I think

24   you're -- and I think Your Honor's play was absolutely upright.

25   And, frankly, if I was in Mr. O'Keefe's shoes I probably would

1    have done the same top dance in response to your question.

2    Because I think the answer based on their papers is yes.  It

3    would moot it.  I mean, that's basically what they were telling

4    you.  Yes, if you read their papers, that's what they said.

5    That's number one.

6          Number three, Your Honor, I mean we are regardless of

7    whatever anybody says, at a critical time in this case.  I

8    mean, filed a plan, we filed a disclosure statement, going to

9    file the motion to approve the disclosure statement hopefully

10    this Friday.  That's one of the things I'm going to do when I

11    get back.  And we're going to prosecute the plan.  And it's

12    going to take a while, but we're affirmatively going to

13    prosecute the plan.

14          And to the extent that we are able to resolve the

15    thing with seventy-five percent of the value, I think that's --

16    that's going to instruct a lot better as to how the balance

17    gets resolved.  And continuing to litigate in my mind

18    doesn't -- I mean, it's great for Mr. Miller to come up here

19    and take credit, you know, for something that he learned about

20    on Friday, that's terrific.  But the fact of the matter is is

21    that despite those efforts, I mean we are trying to reach

22    resolution.  We're trying to reach a resolution with all our

23    constituencies, that's not something that we take lightly.

24          I mean, if our goal was to litigate, Your Honor, as

25    the Court well knows, you know we could be here 24/7, you know,

1    until we're both very old.  And that's not our goal.  I mean,

2    our goal is to try to resolve these matters as expeditiously as

3    possible.  And I think we are making progress.

4          So, Your Honor, at a very minimum I would request that

5    the Court defer the stay.  I think the Court should deny at

6    this time, without prejudice, and let them resurge their

7    motion.

8          And, by the way, Your Honor, the thought that they

9    can't craft a plan that they do come back here and say this is

10   our plan, we'll set up a litigation trust, we'll do whatever.

11   I mean, that's what people -- that's what people normally do.

12   And come to Your Honor and say you know, we'll -- we want the

13   stay lifted so we can prosecute this plan, this sets up the

14   litigation trust.  I don't see any reason why something -- and

15   basically the Court had invited them to do that.  And they

16   haven't done it.

17         So for all those reasons, Your Honor, we think the

18   motion should be denied.

19         THE COURT:  Is there anything more?

20         MR. O'KEEFE:  Your Honor, just one minute.  Counsel's

21   comparative with a balance of harms is that they need

22   apparently an allocation of resources relative to filing their

23   plan.  Certainly, they have more than sufficient resources

24   between the firms that they have working on this, and they also

25   have a professional firm managing the debtors' liquidation.

1    In contrast, the balance of the harms, the delay on

2    our part, is the properties, Your Honor.  These are huge pieces

3    of property that probably stretch from here to the Hudson.

4    So -- I mean, some of these are ten thousand acres.  They're in

5    the midst of cities, there are material issues that we have

6    addressed.  So there is a fundamental difference, the balance

7    of the harms tip sharply in our favor.

8    Insofar as the concept of settlement should delay the

9    litigation, certainly Your Honor has participated in this

10   process on both sides of this to see that litigation, if there

11   is a stay, the settlement might go away, or alternatively it

12   will change.  Certainly, the litigation is a driver for

13   settlement and it will expedite that process to our mutual

14   benefit.  Thank you, Your Honor.

15   THE COURT:  All right.  This took quite a bit longer

16   than I anticipated.  And it's a complicated question.  One of

17   the things that I believe complicates it is the fact that there

18   is an appeal currently pending before the Ninth Circuit court

19   of appeals from the decision of the Ninth Circuit Bankruptcy

20   Appellate Panel.  And I believe, but don't know, that it is

21   more likely than not that successful prosecution of the appeal

22   in the Ninth Circuit by the SunCal debtors in fact will moot

23   the motion which is before me.

24   There's a corollary, however, which is my granting the

25   pending motion may to some extent moot the appeal.  This is

1    another example of what we've been colloquially calling gaming

2    the system, in effect, using litigation to gain tactical

3    advantages.  In this instance, litigation which has gone all

4    the way to the Court of Appeals level in the Ninth Circuit and

5    litigation which was not brought here for stay relief that

6    could have been brought earlier.

7         Ultimately, the question of whether or not I should

8    grant relief from the automatic stay is driven by my

9    application of the Sonnax factors.  And both parties appear to

10   be focused most heavily on the balance of harms factor.  That's

11   convenient because I prefer to focus on that one myself.

12        One of the reasons I have a difficult time finding

13   that there is any material harm to the SunCal debtors in not

14   granting their motion for stay relief is that they did not

15   bring it until now.  The SunCal debtors have scrupulously

16   avoided coming into this court from November of 2008 until

17   today.  And have managed to deal with their litigation requests

18   in the bankruptcy court and beyond apparently without material

19   impairment in those efforts.  In effect, they've elected their

20   remedy.  They have chosen to proceed with litigation in their

21   home court.  And when they suffered a reversal at the BAP level

22   at the end of last year then had to review their strategy

23   again.

24        Having gone to the Ninth Circuit, I believe the Ninth

25   circuit is the place for this question to be decided.  And I'm

1    going to defer my decision with respect to stay relief until

2    after the Ninth Circuit has acted.

3         Moreover, and I think this is a very significant

4    point, the existence of the stay is not inconsistent with the

5    pursuit of negotiations that could lead to a resolution of this

6    ongoing dispute.  The fact that the involuntary debtors,

7    through their trustee, appeared to have reached an agreement in

8    principle resolving many, if not all, of the same issues that

9    are set forth in the equitable subordination complaint,

10   demonstrates that it's possible for the parties to engage in

11   potentially productive discussions, notwithstanding the fact

12   that they stay remains in effect.

13        To the extent that the existence of the stay is viewed

14   as an impediment of any sort to meaningful dialogue, I want to

15   be absolutely clear in saying that I do not believe the stay

16   impacts in any adverse way the ability of the parties to meet

17   and confer -- to mediate or to otherwise seek a constructive

18   resolution of the matters that are currently before the

19   bankruptcy court in the Central District of California.

20        As to active litigation, the motion is denied without

21   prejudice to being reconsidered at some later time in the case,

22   either before or after the Ninth Circuit has acted.

23        And I will consider an appropriate order consistent

24   with what I've just said.

25        MR. PEREZ:  Your Honor, we'll prepare one and submit

1    it to counsel.

2            THE COURT:  Fine.

3            MR. O'KEEFE:  Your Honor, can I ask a few clarifying

4    questions?

5            THE COURT:  You can ask.

6            MR. O'KEEFE:  Is the Court --

7            THE COURT:  The motion's denied.  I want to be really

8    clear on that.  Your motion is denied.

9            MR. O'KEEFE:  And I'm not rearguing the motion, Your

10   Honor.

11           THE COURT:  Fine.

12           MR. O'KEEFE:  So the Court -- is the Court finding the

13   stay applies and the motion is denied?

14           THE COURT:  The stay applies and the motion is denied.

15           MR. O'KEEFE:  Is the Court finding that insofar as

16   LBHI -- what is the Court's finding with respect to the

17   application of their stay?

18           THE COURT:  I'm not making any particularized

19   findings.  And let me be really clear, the law in the Southern

20   District of New York as stated by Judge Gonzalez in the Enron

21   case, and I choose to follow his reasoning, is that litigation

22   brought by a party against a debtor seeking to equitably

23   subordinate claims of that debtor constitutes a violation of

24   the automatic stay.  To the extent that there are debtors or

25   debtor property implicated by your litigation I am saying the

1    stay applies.  And I'm not going to say more than that.  And I

2    think it's a good time for you to sit down.

3            MR. O'KEEFE:  Very well, Your Honor.  We appreciate

4    the Court's time and consideration.

5            THE COURT:  Sure.

6            MR. MILLER:  I just wanted to thank the Court for the

7    pro hac vice admission, and for hearing me this morning.  Thank

8    you.

9            THE COURT:  No problem at all.  And then just so it's

10   clear what my view is of the Shinsei case because that has been

11   liberally misquoted in papers, my ruling with respect to the

12   Shinsei case speaks for itself.  But I view actions taken

13   pursuant to principles of Japanese bankruptcy law which would

14   have the effect of subordinating claims, not to be covered by

15   the principal announced by Judge Gonzalez in the Enron case

16   because under Japanese law active litigation comparable to an

17   adversary proceeding is not involved.  And in that case the

18   action taken by Shinsei Bank was not self executing and

19   involved actions to be taken by a quasi judicial figure, a

20   supervisor, who would be determining whether and when a

21   competing plan would be circulated to creditors.  It was

22   incredibly fact specific, and is not subject to broad

23   application in the U.S.

24           MR. PEREZ:  Thank you, Your Honor.  May I be excused,

25   Your Honor?

1          THE COURT:  Yes.

2          MR. PEREZ:  I believe, Your Honor, the balance of the

3    matters on the docket are not being handled by our firm, Your

4    Honor.

5          (Pause)

6          MR. TAMBE:  Good morning, Your Honor.

7          THE COURT:  Good morning.

8          MR. TAMBE:  Jay Tambe from Jones Day, counsel for the

9    debtors.

10         I'm addressing items 4 and 5 on this morning's agenda.

11         Number 4 is the motion of the debtors for an entry of

12   order to consolidate certain proceedings.  And the proceedings

13   we are seeking to consolidate are basically three.  There are

14   two adversary complaints, one each against Nomura International

15   and Nomura Securities.  And also we are seeking to consolidate

16   an objection with respect to Nomura GFP.

17         We've had some developments, I think we've resolved

18   part of the motion, and we're seeking to adjourn part of the

19   motion.  I can address those issues if the Court would like.

20         THE COURT:  I'd be delighted to hear about the

21   resolution.

22         MR. TAMBE:  With respect to International and

23   Securities, those two entities did put in a response to the

24   motion to consolidate.  And those two entities have expressed

25   concerns about consolidation off an evidentiary hearing or

1    trial.  They have not expressed concerns, and I believe are in

2    agreement with us, that for pretrial purposes; discovery, fact

3    discovery, expert discovery, and in our view, dispositive

4    motions, those two adversary complaints, one each against

5    International and Nomura Securities should be consolidated for

6    pretrial purposes.  And we are prepared to hand up this

7    afternoon, after we've discussed with counsel, a proposed order

8    that would set out that agreement and the consolidation for

9    pretrial purposes.

10        With respect to Nomura GFP we have had some

11   discussions with Nomura GFP.  We have granted them a brief

12   extension of time to respond to the motion to consolidate.  And

13   with respect to whether or not GFP should also be consolidated

14   for pretrial purposes, we've adjourned that part of the motion

15   until the next omnibus hearing.

16        THE COURT:  Okay.  Does that resolve -- Mr. Bartner,

17   do you wish to speak?

18        MR. BARTNER:  Your Honor, Douglas Bartner from Sherman

19   & Sterling for Nomura International, Nomura Securities, and

20   Nomura GFP.

21        Just to confirm what Mr. Tambe had said, that's

22   accurate.

23        THE COURT:  Okay.

24        MR. BARTNER:  Thank you.

25        THE COURT:  Does that resolve item 4?

1    MR. TAMBE:  That resolves item number 4, Your Honor.

2    THE COURT:  Okay.

3    MR. BARTNER:  May I be excused, Your Honor?

4    THE COURT:  You may be excused.

5    MR. BARNTER:  Thank you.

6    THE COURT:  Item 5 is the motion to compel performance

7    by Norton Gold Fields Limited.

8    MR. TAMBE:  Good morning, Your Honor, Jay Tambe from

9    Jones Day for the debtors, on item number 5 on the agenda.

10   This, the debtors' motion, the motion of LBCC and

11   LBHI, to compel performance by Norton Gold Fields Limited of

12   its obligations under an executory swap contract, and to

13   enforce the automatic stay.

14   There are several arguments that are made by Norton,

15   some are unique to this situation, others are common to matters

16   that the Court has resolved on other swap contracts that have

17   come before the Court.  We are prepared to proceed, unless the

18   court has specific questions.  I will address the issues that

19   are unique to this arrangement.

20   THE COURT:  I'm going to give you a chance to do that

21   in a moment.  I just have a number of procedural questions,

22   which, frankly, could be answered by both you and counsel for

23   Norton Gold Fields.

24   One is why did it take so long for this matter to come

25   to the agenda.  The motion was originally filed in November for

1  a hearing in December of 2009.  It's been almost a six-month

2  delay, highly unusual.  So one question is what's the reason

3  for the delay?

4  Two, is certain of the papers filed by Norton Gold

5  Fields make a passing reference to alternative dispute

6  resolution procedures being requested.  I'm not sure by whom,

7  I'm not sure if the request was rebutted.  I don't know why

8  this isn't going to ADR.

9  So question one is why so long?  Question two, why not

10  ADR?

11  MR. TAMBE:  The answer to both question is the

12  following:  There have been principle to principle meetings,

13  several of them.  And which began, in fact, before the motion

14  was filed, continued in fits and starts over the course of the

15  last six months.  And there were times when it appeared there

16  might, in fact, be a consensual resolution in the making that

17  was a change in management.  I don't want to go into the

18  details --

19  THE COURT:  I don't want the details.

20  MR. TAMBE:  -- but it was discussed.  But the parties

21  were in discussion.  And that's, in fact, why the motion was

22  adjourned from time-to-time.

23  I can address their reference to ADR.  This is a case

24  where there certainly has been no shortage of an open

25  communication corridor for principals to discuss a potential

1    consensual resolution.  That has not been achieved and that's

2    why we're going forward today, Your Honor.

3          THE COURT:  Okay.  Before getting into your

4    affirmative case, I just want to give counsel for Norton Fields

5    an opportunity to just deal with the question of ADR, and

6    whether ADR has been formally requested.  And if not, why not?

7          MR. TILLINGHAST:  Your Honor, Edward Tillinghast from

8    Sheppard Mullin on behalf of Norton Gold Fields.

9          First, just to briefly address the Court's first

10   question about delay.  Counsel for the debtor is correct, there

11   have been negotiations that are going on going back to November

12   of 2008.  And a number of meetings in person and otherwise,

13   that have not let to settlement at this point.  Although, we

14   thought we were close at different points.

15         With respect to ADR, obviously there was the

16   application to utilize ADR that was approved by Your Honor

17   sometime ago.  We were, frankly, expecting to go to ADR and be

18   part of that process.  And then they served the motion and

19   wanted to proceed with a motion.  So we have no objection to

20   going to ADR.

21         THE COURT:  Okay.  I'd like to know, and it's great

22   that Mr. Gruenberger's here, because you're so proud of the

23   consequences of the ADR program.  Jones Day is handling this so

24   this isn't a question for Mr. Gruenberger, it's a question for

25   Mr. Tambe.

1           Why isn't this going to ADR?  I looked at papers in

2    this case that the initial Norton Gold response was sixty-seven

3    pages long.  It's one of the longest pleadings I've seen in a

4    contested matter.  And that's not a compliment.  I mean, the

5    papers were well done, but they appeared designed to obfuscate

6    and overly complicate and create leverage through density.  Why

7    isn't this going to ADR?

8           MR. TAMBE:  I think two responses, Your Honor.  There

9    was some reference made in the Norton papers, that there was

10   some request or conversation that was had requesting ADR as

11   initiated by their side, and the request may have been to Weil.

12   We have conferred with folks at Weil, we don't believe any such

13   request was made.

14          But, secondarily, there have been active hands on

15   face-to-face meetings preceding to the last six months.

16          THE COURT:  But if it's, in fact, true what Mr.

17   Tillinghast says, and I have no reason to doubt it, that at

18   various times the parties have been close to a resolution,

19   isn't this just an enormous waste of your time and mine to be

20   litigating this issue now?  Because I'm inclined to suggest

21   that is this isn't resolved by ADR based upon my review of the

22   papers, there's a need for evidentiary hearing.  There was a

23   request in the initial response for an evidentiary hearing,

24   some argument about whether or not this should or should not be

25   by means of adversary proceeding, which I view as more of a

1    request for an evidentiary hearing, than a request that you

2    change the form of your relief.  But there are lots of fact

3    questions that appear to be in dispute.

4         So one of the things I'd like you to focus on in your

5    argument, in addition to why we're here, is whether or not we,

6    in fact, do need an evidentiary hearing.  And if not, why not?

7         MR. TAMBE:  Let me start with the ADR process.  I

8    mean, certainly we have looked very carefully now for proposals

9    and counterproposals, and we agree with Your Honor, we agree

10   with the enormous effort that has gone into setting up the ADR

11   process, and how successful the ADR process has been.

12        And, yes, there was a point in time when the parties

13   were making progress.  That is no longer the case.  In fact,

14   without again going into details, I would suggest that things

15   have moved in the wrong direction in the last set of

16   negotiations.  I won't characterize it beyond that.

17        In terms of the evidentiary hearing, I will address

18   that.  I will address that as I go through the argument with

19   respect to what they claim are factual issues that implicate

20   potential factual disputes that would require to be resolved by

21   evidentiary hearing.  And I think with respect to each of those

22   supposed factual issues, the very documents they've put before

23   Your Honor, the very legal issues that spring from those

24   documents, and the arguments they want to draw based on those

25   documents and e-mails, they're all dead-ends.  I mean, you

1    could resolve those factual issues right now in their favor,

2    and they would still not be entitled to avoid performance under

3    the contract.  So while they may want an evidentiary hearing,

4    while there may be all sorts of interesting facts that they

5    want to discover, as a practical matter for what's relevant to

6    resolve the relief requested by the debtors, those are all

7    immaterial facts.  As a matter of law they fail.

8         THE COURT:  Why don't you proceed with your argument

9    recognizing that one consequence after we're all done is that I

10   may persuade both sides to spend time between the conclusion of

11   any argument and any ruling in an ADR proceeding.  Which raises

12   a question as to whether you want to go through the process of

13   arguing it, or whether you want to meet and confer about the

14   desirability of ADR.  It may or may not be helpful to the

15   process to have a record which includes interaction with me as

16   to how I view various arguments; like repudiation and

17   promissory estoppel.  And whether or not this is or is not like

18   Metavante.

19        MR. TAMBE:  I'm detecting a strong hint, Your Honor,

20   but maybe I should confer with my client briefly about the

21   suggestions made by Your Honor.

22        THE COURT:  I think it would be a good idea for us to

23   take a five-minute break since this is the last item on the

24   morning calendar.  And for you to confer with your client, and

25   also to confer with your adversary to see if ADR may not be the

1  way to go before getting into the merits.

2      MR. TAMBE:  We appreciate that, Your Honor.

3      THE COURT:  Because I've read the paper, I have some

4  views, but it may be better to the ADR process for me to keep

5  my views to myself for a while.

6      MR. TAMBE:  We'll certainly have those conversations.

7  Thank you, Your Honor.

8      THE COURT:  Okay.  Let's take a five-minute break.

9      (Recess from 12:00 p.m. until 12:12 p.m.)

10     THE COURT:  Be seated, please.

11     MR. TAMBE:  Your Honor, we had a chance to consult

12  with the client, and with opposing counsel.  What we would

13  propose is the following -- what we've agreed to is the

14  following:

15     Which is to adjourn the motion for sixty days.  The

16  parties will jointly submit the matter for mediation before a

17  neutral -- we won't strictly follow the mediation procedures,

18  because the issues have been briefed to such great extent.  I

19  think we can use those briefs as our mediation submissions.

20     THE COURT:  Right.

21     MR. TAMBE:  And try to, in an expedited way, get a

22  neutral involved in maybe facilitating discussions between the

23  parties.

24     We'd like to have the motion adjourned for sixty days.

25  In the event we're not successful, we will be back before Your

1    Honor.  But we are hoping that we do get the consensual

2    resolution.

3            THE COURT:  I think that's a very good and workable

4    approach, and I encourage both parties to work in good faith

5    toward a resolution.  And if you can't at least I don't have to

6    read the papers again, I just have to remind myself as to what

7    they say.  So that's fine.

8            MR. TAMBE:  Thank you, Your Honor.

9            MR. TILLINGHAST:  Yes, that's acceptable.  And thank

10   you for your time.

11           THE COURT:  Okay.  Is there anything more -- I think

12   this morning has been concluded --

13           MR. TAMBE:  I think that was the last item on the

14   agenda for this morning.

15           THE COURT:  Fine.  We're adjourned then until the 2

16   o'clock calendar to deal with adversary proceedings.

17       (Recess from 12:13 p.m. until 2:02 p.m.)

18           THE COURT:  Please be seated.

19           MR. MILLER:  Good morning, Your Honor -- good

20   afternoon.

21           THE COURT:  Good afternoon.

22           MR. MILLER:  Good afternoon, Your Honor.  I'm Ralph

23   Miller here from Weil Gotshal & Manges on behalf of debtor,

24   Lehman Brothers Special Financing Inc., known as LBSF, on the

25   first item on the afternoon agenda, number 6, which is a status

conference in adversary proceeding number 09-01242.

I believe there are two matters of housekeeping that we'd like to deal with to report to the Court, and there is one issue that we may need to discuss with the Court, which has been to schedule our motion that's been filed, BNY Corporate Trustee Services.

First, as a matter of continuing to keep the Court informed of developments in the United Kingdom, we have received notice that the Supreme Court of the United Kingdom has tentatively set argument on the appeal in the Perpetual and Belmont cases, which the Court's familiar with, for the time period from March the 1st through March the 3rd of 2011. We understand this may change, but it is likely to go later if it moves at all. It is only a tentative argument setting.

Second, we have noted that we're not certain that all the letters between the courts are in the docket. And we've conferred with Mr. Mastro and Mr. Schaffer and I think we're all in agreement that if there are any of those letters that have not been entered on the docket, they should be entered on the docket. We'd request the Court's permission to check the docket if any of the letters are missing, to go ahead and put them in the docket, so they're in the record.

THE COURT: That's fine. Absolutely.

MR. MILLER: The third matter, Your Honor, has to do with the motion for entry of an order, alternatively to open

1    and reargue the parties' cross-motions for summary judgment.

2    It has been filed by BNY Corporate Trustee Services.  There's

3    been a good bit of conferring about this.  And I think we have

4    reached agreement that if this is going to be heard under the

5    case management order regular schedule that it is eligible for

6    setting -- all parties agree its eligible for setting for the

7    June 16th omnibus hearing date.  However, we recognize, Your

8    Honor, on behalf of LBSF that the Court declined to set a

9    briefing schedule the last time we were together, and we

10   certainly do not presume to want to set a briefing schedule if

11   the Court does not wish to do so.

12          We would point out to the Court that this is a case in

13   which LBSF is the plaintiff and is seeking money.  And LBSF is

14   in no hurry to try to move this forward faster than the

15   coordination between the courts would require.  And we believe

16   that, in fact, there has been a exchange of correspondence

17   which supports the fact that this Court has given assurances,

18   and in which the Court has given requests that there be an

19   effort to coordinate these matters.  We would point out to the

20   Court that BNY does not have any of its own money involved, it

21   is the trustee and the parties who do have their money

22   involved, have not come to the Court and asked for any

23   expedition.

24          So we don't really understand that there's any party

25   withstanding who is in a hurry to try to rush the process or

1  basically deviate from the understanding between the courts.

2      We also point out, as I think the Court knows, that

3  there are many ways that the developments in the U.K. could

4  make this moot.  It's a classic interlocutory situation in

5  which there may be no need for appellate time, for example, to

6  be spent, because if the English court agrees with essentially

7  the outcome of this ruling, although it's under the anti-

8  deprivation principle as the Court know, which is not exactly

9  the same doctrine, but if it reaches the same direction of its

10  result then that may make this decision moot.  If it does not

11  then it's certainly possible that that my open some other

12  opportunities for resolution.  And it's also possible Perpetual

13  might choose to appear in this case at some point, depending

14  upon what happens there.

15      So for various reasons LBSF does not believe there's

16  any need to enter an order and there certainly is no urgency,

17  we believe, in reopening the parties' cross-motions for summary

18  judgment.  So we would suggest that this motion is not one that

19  needs to be heard on any sort of an expedited basis.

20      We have talked with Mr. Mastro, he's going to ask, I

21  believe, for an expedited briefing and hearing schedule.  And

22  we've given him the earliest date that LBSF believes it could

23  prepare a response, that we would point out that is going to

24  get relatively limited time for a reply, and relatively limited

25  time for a review of the completed papers before the courts

1  would have to hear the matter.  And, also, we would note a

2  couple of scheduling items.  And then I'll let Mr. Mastro talk

3  about his motion.

4       First of all, we all note that the Memorial Day

5  holiday is in the middle of this scheduling period, it's

6  Monday, May the 31st.  And as a matter of just personal

7  disclosure to the Court I have either a large mediation in this

8  matter, and then I have a trustee motion set for two days in

9  bankruptcy court in Delaware that occupies the period between

10  June the 8th and June the 15th.  So that particular time I

11  happen to be personally conflicted.

12       However, there are ways to set up a briefing schedule,

13  we believe as early as June the 7th, which is a Monday or -- or

14  June the 4th, if the Courts wanted expedited briefing.  But,

15  again, that's not what LBSF is asking for, we're just trying to

16  cooperate.

17       So with that, Your Honor, I believe Mr. Mastro wants

18  to discuss his motion with the Court.

19       THE COURT:  Sure.

20       MR. MASTRO:  First, let me thank Your Honor for seeing

21  us today.  I had asked Mr. Miller to please afford us this

22  opportunity, and I really appreciate the Court seeing us.

23       And as Mr. Miller pointed out --

24       THE COURT:  It's not a problem.  The adversary docket

25  this afternoon is light, so it's perfectly fine.

1    MR. MASTRO:  Thank you, Your Honor.  It had, in fact,

2    originally been our intention as we discussed at the last

3    conference in April, when Your Honor said if we concluded that

4    we think it was something appropriate to bring on to the Court,

5    you're free to do it and we'll have it on the next regular date

6    for hearing matters in adversary proceedings.  We had tried to

7    get this on for today.  Mr. Miller and his team, for a variety

8    of reasons, requested more time and we extended that

9    professional courtesy to move it over to June the 16th.  But I

10   did want to ask Your Honor -- so in that regard we have agreed

11   to a schedule.  If it goes forward with the parties

12   understanding for it to be on for the omnibus calendar for June

13   the 16th.  But I wanted to ask Your Honor if it might be

14   possible, and I know how busy Your Honor has been, I know how

15   demanding these cases are, I read everyday the important

16   matters that Your Honor is dealing with and the ongoing hearing

17   that Your Honor is having right now.  If there were any

18   possibility of us being seen earlier, I think Mr. Miller

19   described that June 4th or June 7th would be possible dates, if

20   the Court would entertain us.

21        But in any event, we're pleased to be back here on

22   June 16th if that's the case.

23        I just also wanted to point out one other thing, Your

24   Honor.  That without getting into the merits now, there is a

25   schedule in England with the Supreme Court which takes this out

1　to at least March of 2011.  A decision sometime thereafter.  So

2　there are opportunities now for us to address some of the

3　issues, since in England this has progressed to the highest

4　appellate level.  To address some of the issues here that we

5　seek to raise with this Court, or potentially others.

6　　　　So I really appreciate the Court's consideration.  And

7　as always, I'm grateful to be before the Court.

8　　　　THE COURT:  What's the argument in favor of expediting

9　this?

10　　　　MR. MASTRO:  Your Honor, I think as Your Honor pointed

11　out at the time you issued your original memorandum decision.

12　Just to correct, Mr. Miller in one respect, we're a trustee

13　with indemnification, so we are left vulnerable in that sense.

14　And I did not understand the adversary proceeding to be that he

15　was seeking money for his client, I understood it to be a

16　declaratory judgment action, where Your Honor has already,

17　through a memorandum decision, addressed the issues relating to

18　declaratory judgment, without addressing remedy.

19　　　　Your Honor, we see the expedition issue here being one

20　where we do, as we made clear to Your Honor before and now in

21　these motion papers, we have reviewed with our client our

22　client's desire to be in a position to advance this case.

23　　　　We see the larger ramifications.  As Your Honor

24　pointed out in his own opinion originally back in January that

25　this is unprecedented in certain respects, that it covers new

1   ground, it is unique.  And as the parties have acknowledged

2   with Your Honor, the ramifications of this decision are

3   significant not only for this case, but in other cases.  This

4   has far larger ramifications than this one case which is,

5   itself, a very important case.  So, Your Honor, we think that

6   under all these circumstances, the ability to advance this

7   case, especially with all the time that will now exist in

8   England to advance review, we see it as -- Mr. Miller looks at

9   it as well maybe what happens a year from now in England will

10  moot the issue.

11          Correspondingly, Your Honor, there are appellate

12  issues here that may change the dynamic in a way that relieves

13  the conflict that exists between the English courts and this

14  Court's decision.  And we don't see it as at all inconsistent,

15  Your Honor, with what you and the chancellor have said in

16  exchanged letters, because there is nothing about Your Honor

17  deciding this motion or, as we've requested, entering an order

18  memorializing the memorandum decision, that would be at all

19  inconsistent with what the chancellor has asked, which is

20  simply that you take no action that would preclude entry of a

21  judgment in England eventually.

22          So, Your Honor, for all those reasons, because of the

23  larger ramifications, because we now are several months after

24  your original decision and there is that opportunity for us to

25  not only ask the Court to potentially reopen, but just as

1  importantly, in the first instance, for Your Honor to enter an

2  order so that there would be a chance for review.  There's no

3  time like the present to do that, Your Honor.  We would really

4  appreciate the opportunity to do that.  Thank you, Your Honor.

5          THE COURT:  One more question.

6          MR. MASTRO:  Certainly, Your Honor.

7          THE COURT:  Are you making the request that this be

8  expedited at the direction expressed or implied at perpetual?

9          MR. MASTRO:  No, Your Honor.  It is at the direction

10  of my own client, a trustee without indemnification, who sees

11  the profound ramifications for itself in this one instance, and

12  also sees the profound ramifications in a lot of cases right

13  now, where the decision that Your Honor issued that broke new

14  ground, by all accounts, is now something that is having far-

15  ranging ramifications.  So my client feels very strongly about

16  being able to take this at an appellate posture as soon as it

17  can, now that so many months have passed.

18          THE COURT:  Have you advised Perpetual that this is

19  what you're doing?

20          MR. MASTRO:  Your Honor, we have advised Perpetual of

21  the motion that we filed, yes.

22          THE COURT:  And has Perpetual encouraged you to

23  prosecute this on an expedited basis?

24          MR. MASTRO:  Your Honor, Perpetual has not given us a

25  direction to do that.  It has not given us a direction.

1          THE COURT:  I'm not saying a direction, have they

2     encouraged you?  Do you have communication with them?  Are you

3     doing what you're doing on their behalf and with their, either

4     tacit or express support?

5          MR. MASTRO:  Your Honor, we're not doing it with their

6     tacit or express support, we're doing it at our client's

7     direction because our client perceives as a trustee of that

8     indemnification that this is what our client should be doing.

9          THE COURT:  I understand.  But you're not directly

10    answering my question either.

11         MR. MASTRO:  I --

12         THE COURT:  My question is to what extent -- I'll try

13    it another way.  Are you doing this with the knowledge that

14    this is what Perpetual wants you to do?

15         MR. MASTRO:  We are not doing it with the knowledge

16    that this is what Perpetual wants us to do.

17         THE COURT:  But are you doing it with the knowledge

18    that Perpetual, while sitting on its hands, is, in fact,

19    quietly encouraging this behavior?

20         MR. MASTRO:  Your Honor, I want to be as clear as I

21    can.  They're not encouraging, they're not tacitly or expressly

22    encouraging, and they've given us no direction.  I don't know

23    how to be any clearer than that, Your Honor.  This is not --

24         THE COURT:  Are you in regular communication with

25    Perpetual regarding your strategy?

1       MR. MASTRO:  Your Honor, as a trustee we advised them

2    that we're doing this.  And their response, Your Honor, they

3    did not give us any directions or encouragement at all.

4    Absolutely not.  And I say that to Your Honor as an officer of

5    the Court.

6       THE COURT:  Okay, thank you.

7       MR. MASTRO:  Thank you, Your Honor.

8       MR. MILLER:  Your Honor, very quickly, I'd like to

9    clarify a couple of points if I might.

10       First, Mr. Mastro suggested that LBSF is not seeking

11    money.  The Court is aware of the history and is aware of the

12    fact that the English courts requested that the only issue to

13    be placed before this Court at this stage, was an issue of

14    declaratory judgment.  But as we've said before on a number of

15    occasions, LBSF envisions that if this matter does not become

16    moot, it will ultimately need a remedy, and that remedy will

17    certainly include a directive for disposition of funds.  It's

18    the position of LBSF that the money being held is property of

19    the estate, and should be under the control of the estate.

20       However, there's certainly no way that BNY is going to

21    get money paid to it as an entity.  It's a question of where

22    that money is going to go.  It is a stakeholder.  So in that

23    sense, LBSF is the plaintiff.

24       We also believe, Your Honor, there is no conflict now

25    with the English courts, because you have interpreted U.S.

1    Bankruptcy law and they are looking at English law.  There may

2    well be a conflict or there may never be a conflict.  But Mr.

3    Mastro's suggestion that appellate activity here might resolve

4    a conflict, we don't believe there's any conflict that exists

5    at this stage.

6         We would also point out, Your Honor, that we believe

7    the best way to avoid the risk of conflict, is for this Court

8    to retain control of the matter.  Because this Court has the

9    history of communications, and this Court understands the

10   options that are available.  And it is a bankruptcy court

11   familiar with this entire estate and what its needs are.

12        We think that once it moves through the appellate

13   process here that control is lost.  There's really more

14   potential for conflict to develop in an appellate court ruling

15   of some kind, than in the present posture that this case finds

16   itself in.

17        And, finally, Your Honor, this comment about he is a

18   trustee without indemnification.  I'm not an expert in the

19   English proceeding.  But my understanding is that the English

20   Court has said there is an indemnification.  But the scope of

21   that indemnification is not yet to find.  So we don't

22   understand that BNY is without any assurance that there will be

23   some kind of indemnification.  Exactly what it will it will

24   extend to and how it's going to be applied is something that

25   that's still has to be defined.  That is yet another way, Your

1    Honor, that this might become moot.  It may be that BNY gets

2    the indemnification, which we certainly believe they're

3    entitled to.  And if that's the case, then their concern will

4    be alleviated.

5            So we do not believe that there is any need for

6    expedition.  And we believe that the Court's commitment to

7    coordination, which it has already made and which has been

8    requested by the English courts is the best way for this kind

9    of a cross-border bankruptcy to be handled.  Thank you, Your

10   Honor.

11           THE COURT:  Is there anything more?

12           MR. MASTRO:  No, Your Honor.  Thank you very much,

13   Your Honor.  I really appreciate it.

14           THE COURT:  I see no reason to expedite this before

15   the June 16th hearing.  And for reasons that my calendar would

16   actually propose that his be specially listed sometime after

17   June 16 on a date to be determined in consultation with my

18   chambers.

19           As Mr. Mastro alluded in his remarks, I'm involved in

20   a fairly demanding litigation associated with the Barclays

21   acquisition and we just completed the first two weeks of trial

22   last week.  That has been widely reported.  What has not been

23   widely reported is we are identifying a number of additional

24   trial days in the month of June, and two of those days that

25   have been identified but not yet formally scooped up by the

1    parties, but I expect these days will be, are the 14th and 15th

2    of June.  Which puts extra pressure on the Court in connection

3    with preparing for all aspects of the June 16 omnibus hearing.

4    This is not limited to Perpetual, this just relates to case

5    management considerations.  Additionally, and for reasons

6    unrelated to mediations and proceedings in Delaware, I'm going

7    to be overseas the week immediately before that hearing.  Which

8    will make it more difficult for me to prepare, I'm

9    participating in an international insolvency conference in

10   Italy.  Everybody has to be somewhere.  And for that reason the

11   week before is problematic for me in terms of preparation.

12        So with that explanation having been put on the

13   record, I would hope that the parties can identify some days

14   that are available on my calendar in June after the 16th.

15   Recognizing that I have already dedicated almost every

16   available day to the Barclays' litigation. So my calendar is

17   extraordinarily tight in June.

18        It's conceivable as a result that this could slip into

19   July, but I will request that my courtroom deputy endeavor to

20   accommodate this matter, perhaps on an afternoon when I already

21   have a morning calendar.

22        Now, one of my concerns here involves the coordination

23   with the courts in the United Kingdom.  As indicated by Mr.

24   Miller correspondence has been exchanged.  I believe the

25   parties have received copies of the correspondence.  And the

1    most recent letter arrived about a week ago on very attractive

2    blue stationery, which appears to be the trademark of the high

3    court.

4         The request as characterized by Mr. Miller is that in

5    effect I do nothing that may be open to interpretation.  I do

6    not consider it inconsistent with the request for cooperation

7    from the high court that I hold a hearing in connection with

8    the motion brought by BNY.  Whether or not action in connection

9    with the motion is deemed to be inconsistent with that request

10   is something that I would like the parties to address at

11   argument, in addition to the substance of the motion.  And

12   we'll deal with scheduling once you've had a chance to

13   coordinate with my chambers.

14        Now, to the extent that the date for argument is later

15   than the May 16th date, and it's possible to accommodate some

16   of the scheduling concerns that Mr. Miller has identified that

17   represent potentially a personal burden for him, I would hope

18   that you would make appropriate accommodations to the briefing

19   schedule, that also allows sufficient time for any reply papers

20   that BNY might with to put in.

21        MR. MASTRO:  Of course, Your Honor, we and we've tried

22   to do that by saying we agreed to the 16th as a date for it as

23   well.

24        And just so it's crystal clear, I'll be here whenever

25   the Court can see us.

1          THE COURT:  Fine.

2          MR. MASTRO:  So hopefully it can be worked out more

3   easily because I'll be here.

4          THE COURT:  Fine.  We'll endeavor to accommodate you

5   on a special day, but I don't think it's going to be the 16th.

6   It can be as close to the 16th as we can make it, but not that

7   day.  All right.

8          MR. MASTRO:  Thank you, Your Honor.

9          MR. MILLER:  Thank you, Your Honor.  May the people

10  who were involved with this first matter be excused?

11         THE COURT:  Yes.

12         IN UNISON:  Thank you for your time, Your Honor.

13     (Pause)

14         MR. SLACK:  Good afternoon, Your Honor.

15         THE COURT:  Good afternoon.

16         MR. SLACK:  Richard Slack for the debtors.

17         The next matter on the calendar is the adversary

18  proceeding brought by Neuberger Berman, which is case number

19  09-01258.  And we're here for a status conference.

20         THE COURT:  I've read the correspondence.

21         MR. SLACK:  Okay.  Your Honor, moving then if you've

22  had the opportunity to do that, the status is essentially that

23  the parties have had discussions about a scheduling order.  We

24  have proposed to the Court what I think is a fairly typical,

25  yet aggressive, scheduling order that would provide for initial

1    disclosures to be filed within twelve days of today.  Shortly

2    after that it would provide, I would imagine, that the parties

3    would serve written discovery, and then there would be

4    approximately a three and a half month period for discovery.

5         PNC has opposed that.  Has said, essentially, that

6    they want a two-month period for discovery.  And that's I think

7    the nub of our communication.  We proposed something slightly

8    less than what we originally did.  We thought five months was

9    what we thought the appropriate amount was.  At the beginning

10   we were willing to come down and try to compromise.  PNC has

11   never sort of moved off their two-month period.  We don't think

12   that's an appropriate amount in this case.

13        And just two seconds on that, Your Honor.  This case

14   is really in some ways at its infancy.  And that's because, as

15   Your Honor is aware, just recently Your Honor approved the

16   assignment between LBI and LBCC, which clarified the position

17   of the debtors.  At this point, Your Honor, we think it's

18   appropriate for the case to move quickly.  We think the

19   schedule we've put in place does.  There has not been initial

20   disclosures.

21        The only discovery that's been provided so far, Your

22   Honor, if Your Honor will recall at a previous hearing, we

23   offered voluntarily to provide the transaction documents that

24   show the back-to-back between Neuberger to Lehman, Lehman to

25   PNC.  That's been done.  At that time we asked PNC to sign a

1    confidentiality agreement.  We haven't heard back, that was in

2    December of '09.  We haven't heard back on that.  But all of

3    those matters are going to have to be done.  We think the

4    schedule gives plenty of time for the parties to do discovery

5    and then move on to experts, and then summary judgment.  And,

6    frankly, the schedule has us completing all this up till trial

7    by essentially the end of the year.

8            THE COURT:  I have a couple of questions.  One is has

9    any discovery taken place in the interval while everybody's

10   been arguing about how much time should be available for

11   discovery?

12           MR. SLACK:  The only thing that was done, Your Honor,

13   was a number of months ago PNC served discovery requests.  We

14   said that we thought the parties should have a Rule 26

15   conference.  We've said that we're prepared to do that and then

16   move to discovery.  For whatever reason, PNC has been unwilling

17   to have that Rule 26 conference.  And there hasn't been --

18   again, other than us producing the transaction documents, there

19   hasn't been any other discovery.

20           THE COURT:  All right.  Two more questions.  One is

21   are you aware, and PNC can answer this question itself

22   directly, but this goes to you Mr. Slack.  Are you aware of any

23   timing issues affecting PNC in the litigation pending in the

24   Western District of Pennsylvania?  That's question one.

25           Question two is I may be missing something as a result

1  of my review of the complaint, but this seems like a fairly

2  simple matter.  What discovery is really needed since either

3  LBCC is or is not properly in the middle of this transaction?

4       MR. SLACK:  The answer to the first question, Your

5  Honor, is we're not aware of any scheduling matter.  I know

6  only what I've read in the prior pleadings from, frankly, last

7  year, and nothing further, whether there's any other -- any

8  other activity in that action, we don't know and we haven't

9  been told by PNC.

10      With respect to the second, Your Honor, it is very

11  possible that this is going to be a very simple matter.  And I

12  can tell you that from LBCC's standpoint, we believe it should

13  be a very simple matter.  We have provided the transaction

14  documents.  We think that the transaction documents show Lehman

15  in the middle.  I would point out, for example, that paragraph

16  13 of the interpleader complaint by Neuberger Berman says that

17  Lehman is in the middle of this transaction.  So we do believe

18  that it's likely to be simple.  And, frankly, we haven't seen

19  the defense since the transaction documents were provided,

20  we haven't seen any discovery.  We don't know what PNC's

21  defense of this is going to be.  Are they going to claim that

22  there are -- that there are other agreements, that those

23  agreements don't say what they mean, that they're ambiguous.

24  We have, at this point, no idea.

25      What I am worried about, Your Honor, is that it's

1  clear that we are going to have written discovery requests that

2  go out.  Those -- assuming we get the initial discovery out in

3  two weeks, let's say, or twelve days, and then we can look at

4  whatever comes in and get our written discovery out in the next

5  ten days, two weeks, we're still talking about not getting the

6  written discovery in in a normal situation, from about two

7  months from now.  And then you're going to have at least a

8  handful of depositions.  Assuming there's any issue at all with

9  the Court, a three-month, three and a half month period, is a

10  very expedited -- even without a lot of discovery occurring.

11       But I think the quick answer is, Your Honor, is the

12  way we see this case is that this is a simple case, and that

13  the words mean what they mean, and that the transaction

14  documents mean what they mean.  And that Neuberger's right in

15  their complaint, and we're in the middle.

16       THE COURT:  Okay.  I'll hear what PNC has to say.

17       MS. GOLDMAN:  Thank you, Your Honor.  I'm Kathleen

18  Goldman.  I'm here today on behalf of PNC.

19       If I may I'd like to address some of the

20  representations that Mr. Slack made with regard to the status

21  of exchange of information in this case.

22       In September of 2009 we provided Weil and LBCC with

23  all of the documents that PNC had relative to this trade.

24  Neuberger Berman at that time also provided those documents.

25  As far as PNC's concerned, we provided what we have.  And so

1    when the parties were before the Court in November, and that

2    was the first time that anyone mentioned any interest that

3    Lehman may have in the trade between PNC and Neuberger Berman,

4    we asked LBCC to actually provide those documents demonstrating

5    this interest.  At that time we also sent out the written

6    discovery that Mr. Slack mentioned.

7         We did receive some documents which, quite frankly, we

8    see no correlation between the documents provided and the trade

9    at issue.  But we did not get responses to our discovery.  So

10   we don't know if they have more documents or not.  And LBCC's

11   refused to respond to discovery saying that we need to have the

12   pleadings closed, and we need to enter into a formal scheduling

13   order.  And that's all well and good, but the problem is this

14   has been hanging out here now almost a year.  It will be the

15   anniversary, the filing of this action.  I believe it was filed

16   in the beginning of June of 2009.

17        And we were kind of stalled by LBCC's failure to

18   recognize whether they, in fact, had a claim in this action.

19   And the Court, in fact, retained jurisdiction simply because

20   the representations of Mr. Slack at the previous hearing in

21   November that they had a dog in this fight.

22        So as far as we're concerned all the documents have

23   been exchanged, unless there's something else that LBCC has.

24   And we believe that we would need three depositions, at most,

25   which would be the corporate designees of the respective

1    parties, and that would be all that's really required.

2         What was missing from the letter that was sent to you

3    last evening was the scheduling order that we provided in

4    response to the scheduling order proposed by LBCC.  In that

5    scheduling order we asked for a discovery cutoff of factual

6    discovery by July 15th.  And then the exchange of expert

7    witness information on July 15th and July 30th, respectively.

8    And a close of expert witness discovery of August 30th.  That

9    way we'd be able to step this matter up for summary judgment,

10   or an evidentiary hearing before this Court hopefully, and get

11   this matter resolved, finally, by the end of the year.

12        I think in light of the fact that we've been

13   stonewalled, essentially, since June of 2009, you know, we'd

14   like to get this moving now.  And the Court when we were before

15   you last had asked us, you know, to cooperate with each other

16   and see if we can start to sort out these very simple issues

17   through cooperative action.  And we've tried to do that and

18   it's just not getting us anywhere, which is why we're here

19   trying to get an order from the Court to get this thing finally

20   off of center.

21        With regard to your question of Mr. Slack pertaining

22   to where we are in the Western District action, the court there

23   recently requested that we provide -- we being Neuberger Berman

24   and PNC a status report.  Unfortunately, the status report is

25   that we're stuck in limbo here in the interpleader action.  So

1    the court is anxious in the Western District for us to move

2    this matter forward.  And that's where we stand.

3            THE COURT:  Okay.  Do you wish to be heard on behalf

4    of Neuberger Berman?

5            MR. RUBINSTEIN:  Yes, Your Honor.  Benjamin Rubinstein

6    for Stroock & Stroock & Lavan, Neuberger Berman.

7            We just want to say that we also view this as a very

8    simple matter.  We'd like whatever discovery needs to be

9    conducted to be concluded as quickly as possible.  The longer

10   we spend on this matter the more resources get burned through

11   in our eyes.  The most quickly this matter can be set for

12   discovery is what Neuberger Berman would like.  And in that

13   sense we support PNC's proposal.

14           THE COURT:  Okay.  Mr. Slack.

15           MR. SLACK:  I just have a couple of points.

16           My recollection, Your Honor, is that the only

17   documents we received were the ones that were attached to the

18   pleadings in the Western District.  So we haven't received any

19   other documents other than that.

20           With respect to the discovery I'm at a loss as to why

21   we haven't heard back from PNC on the confidentiality order we

22   sent in December.  I have no idea why PNC has not agreed to

23   have a 26(f) conference that we've been asking for for months.

24   And I think the characterization of us as stonewalling is not

25   only inaccurate it's wrong.  And we want this case to be

1    moving, and it's just a question of given that we're at ground

2    zero, essentially, how much time is -- how much minimum time do

3    we need to still have a very quick discovery period.  So we

4    agree that this case should move fast.  And I think our

5    schedule does that, Your Honor.

6              THE COURT:  I appreciate the positions that have been

7    expressed here.

8              Let me state that, from my perspective, I'm both

9    surprised and disappointed that the parties have been unable to

10   work this out on their own.  It seemed to me that just looking

11   at the essential nature of this case that the issues are

12   relatively simple, about as simple as anything that has been

13   presented to me yet in the entire Lehman bankruptcy.

14             And the fact that this has not yet produced even an

15   agreement on ordinary course pretrial order for is, frankly, a

16   surprise.

17             I think that the schedule proposed by PNC is a little

18   too aggressive.  But probably in the right ballpark, that is

19   the summer of 2010.  Instead of July 15 I think August 15 would

20   be a reasonable deadline for completing fact discovery.

21             You can make necessary adjustments to the schedule

22   with that date in mind, perhaps bringing expert discovery into

23   mid-September or a little bit later to take into account the

24   Labor Day holiday.  And you can be in a position then to either

25   reach a settlement, present dispositive motions, or if there

1  are material issues of fact in dispute we can have a trial

2  date.  Now, when that trial date would be is another matter.

3       Recognize that just because you get through with

4  discovery doesn't mean that you get here, assuming you haven't

5  been able to otherwise resolve those.

6       So my direction is that the parties meet and confer

7  with these dates as guidelines, and come up with what I think I

8  have in each of my other adversaries in the Lehman cases, which

9  is a relatively standard form of pretrial order.  And Mr. Slack

10 certainly knows the form for that.  Is there anything more?

11      MR. SLACK:  That's it, Your Honor.  Thank you very

12 much.

13      THE COURT:  Okay.  Then we're adjourned.

14      (Whereupon these proceedings were concluded at 2:41 p.m.)

15

16

17

18

19

20

21

22

23

24

25

I N D E X

R U L I N G S

| DESCRIPTION | PAGE | LINE |
|---|---|---|
| Debtor's motion for authority to compromise | 46 | 24 |
| controversy in connection with repurchase | | |
| transaction with Fenway Capital, LLC and a | | |
| commercial paper program with Fenway | | |
| Funding, LLC granted | | |
| Motion of the SunCal debtors for relief from | 74 | 20 |
| the automatic stay denied without prejudice | | |
| as to the active litigation | | |

C E R T I F I C A T I O N

I, Lisa Bar-Leib, certify that the foregoing transcript is a true and accurate record of the proceedings.

_____

LISA BAR-LEIB

AAERT Certified Electronic Transcriber (CET**D-486)

Veritext

200 Old Country Road

Suite 580

Mineola, NY 11501

Date:  May 13, 2010

Exhibit B

Transcript Dated October 23, 2009, Page No. 40

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555(JMP)


- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS HOLDINGS, INC., et al.


        Debtors.

- - - - - - - - - - - - - - - - - - - -x


        United States Bankruptcy Court

        One Bowling Green

        New York, New York


        October 23, 2009

        10:07 AM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

1    time dealing with how to bond, most appropriately, a stay

2    pending appeal assuming the Court were to issue such a stay.

3    That whole subject matter becomes irrelevant because I see

4    absolutely no basis for staying any appeal that might be filed

5    by Metavante.  I note that procedurally no appeal has yet been

6    filed although both Metavante and the debtors assume that such

7    an appeal will be filed promptly after the disposition of the

8    motion to alter or amend so I assume that will happen in the

9    next several days.

10          Metavante's motion appropriately identifies the

11   standards generally applicable to a bankruptcy court's

12   consideration of a motion for a stay pending appeal.  And I

13   address these factors notwithstanding the fact that there is no

14   appeal currently pending.  The four factors are the likelihood

15   of success on the merits; whether the moving party will suffer

16   irreparable injury; whether other parties will suffer

17   substantial harm; and whether there will be harm to the public

18   interest.

19          Metavante assumes for purposes of its motion that the

20   last factor in this quartet, that involving harm to the public

21   interest, is not applicable.  Both the creditors' committee and

22   the debtors assert they should prevail on all four.

23   Ordinarily, the factor that most warrants consideration in

24   deciding whether to issue a stay is whether the party seeking

25   the stay will suffer irreparable injury.  In this instance, I