**WINTHROP COUCHOT**
**PROFESSIONAL CORPORATION**
660 Newport Center Drive, Fourth Floor
Newport Beach, CA 92660
Telephone: (949) 720-4100
Facsimile: (949) 720-4111
Sean A. O'Keefe – NY Bar No. 1980853, CA Bar No. 122417
Paul J. Couchot – CA Bar No. 131934
Counsel for the SunCal Appellants

**Hearing Date: June 16, 2010 at 10:00 a.m. (EST)**

**MILLER BARONDESS, LLP**
1999 Avenue of the Stars, Suite 1000
Los Angeles, CA 90067
Telephone: (310) 552-4400
Facsimile: (310) 552-8400
Louis R. Miller – CA Bar No. 54141
Martin H. Pritikin -- CA Bar No. 210845
Special Litigation Counsel for SunCal Appellants

## UNITED STATES BANKRUPTCY COURT

### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>**LEHMAN BROTHERS HOLDINGS INC, et al.,**<br><br>        **Debtors.** | **Chapter 11**<br>**Case No. 08-13555 (JMP)**<br>**Jointly Administered** |

**SUNCAL APPELLANTS' REPLY TO OPPOSITION TO MOTION FOR
STAY PENDING APPEAL OF ORDER APPROVING COMPROMISE
CONTROVERSY IN CONNECTION WITH A REPURCHASE
TRANSACTION WITH FENWAY CAPITAL, LLC AND A COMMERCIAL
PAPER PROGRAM WITH FENWAY FUNDING, LLC *AND* FOR STAY
PENDING APPEAL OF ORDER DENYING MOTION OF THE SUNCAL
DEBTORS FOR AN ORDER DETERMINING THAT THE AUTOMATIC
STAY DOESNOT APPLY; OR, IN THE ALTERNATIVE, GRANTING
RELIEF FROM STAY AND NOTICE OF APPEAL**

SunCal Communities I LLC, SunCal Communities III LLC, SCC/Palmdale LLC, Acton Estates LLC, SunCal Beaumont Heights LLC, SunCal Emerald Meadows LLC, SunCal Johansson Ranch LLC, SunCal Bickford Ranch LLC, SunCal Summit Valley LLC, Seven Brothers LLC, Kirby Estates LLC, SJD Partners Ltd., SJD Development Corp., SCC Communities LLC, North Orange Del Rio Land LLC and Tesoro SF LLC, the debtors and debtors-in-possession (collectively, the "SunCal Appellants" or the "Appellants") hereby submit the following *Reply* to the *Response* filed by Lehman Commercial Paper, Inc. ("LCPI") and Lehman Brothers Holdings, Inc. ("LBHI") (together the "Lehman Entities") to the SunCal Appellants' *Motion For A Stay Pending Appeal* (the "Motion") relating to that certain *Order Approving Debtors' Motion Pursuant To Bankruptcy Rule 9019 For Authority To Compromise Controversy In Connection With A Repurchase Transaction With Fenway Capital, LLC And A Commercial Paper Program With Fenway Funding, LLC Debtors' Motion Pursuant To Bankruptcy Rule 9019 For Authority To Compromise Controversy In Connection With A Repurchase Transaction With Fenway Capital, LLC And A Commercial Paper Program With Fenway Funding, LLC*[1] (the "Compromise Order") entered by this Court on May 13, 2010 (Docket No. 9030) and that certain *Order Denying Motion Of The SunCal Debtors For An Order Determining That The Automatic Stay Does Not Apply; Or, In The Alternative, Granting Relief From Stay* (the "RFS Order") entered by this Court on May 17, 2010 (Docket No. 9059) (together the "Orders").

# I

## PRELIMINARY STATEMENT

For the last five decades, this circuit has required a party seeking a stay to show (a) irreparable harm and (b) either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and the balance of hardships tips decidedly in the party's favor. *Citigroup Global Markets, Inc. v. VCG Special*

---

[1] The *Debtors' Motion Pursuant To Bankruptcy Rule 9019 For Authority To Compromise Controversy In Connection With A Repurchase Transaction With Fenway Capital, LLC And A Commercial Paper Program With Fenway Funding, LLC* is referred to herein as the "Claims Transaction Motion").

*Opportunities Master Fund Ltd.,* 598 F.3d 30 (2nd Cir. 2010). The SunCal Appellants would respectfully submit this burden has been satisfied in this case.

      **A)**    **Irreparable Harm Exists**. The SunCal Appellants are in the midst of an ongoing reorganization effort in the Central District of California.  Their joint plan of reorganization (the "Plan") will enable hundreds of creditors holding hundreds of millions of dollars of claims, who were victimized by the prepetition acts of the Lehman Entities, to receive a substantial mitigating dividend. The completion of the ongoing equitable subordination action (the "ES Action"), which has been pending in California for over a year, is central to this reorganization effort.  If the claims transaction contemplated in the Compromise Order ("Claims Transaction") closes and the stay is allow to be invoked, it will threaten to materially impair, and threaten to ultimately destroy, this reorganization effort, by barring the SunCal Appellants from resolving a critical priority dispute that affects the bulk of the claims filed against their estates. This impairment satisfies the irreparable harm standard. *In re Alert Holdings, Inc.*, 148 B.R. 194 (Bankr. S.D.N.Y. 2007).[2]

      Although the Lehman Entities contend in the Response that the foregoing harm is "speculative," their most recent filing in the California Bankruptcy Court belies this position. On June 3, 2010, the day before they filed their Response in this Court, the Lehman Entities filed a Supplement to Unilateral Status Report ("Lehman Status Report") in the California Bankruptcy Court. In this report, the Lehman Entities represent to the California Bankruptcy Court that the ES Action has been affirmatively stayed by the Orders entered by this Court, and that all discovery in the ES Action must, as a consequence, be stayed for the indefinite future.[3]

---

[2] "Case law in this district has established a limited exception to the irreparable harm requirement for issuance of a preliminary injunction in the bankruptcy context *where the action to be enjoined is one that threatens the reorganization process or which would impair the court's jurisdiction with respect to a case before it.*" *Alert Holdings,* 148 B.R. at 200 (emphasis added); *see also* In re *Singer Co. N.V.*, 2000 WL 33716976 (Bankr. S.D.N.Y. 2000); *In re Carabetta Enterprises,* 162 B.R. 399, 407 (Bankr.D.Conn. 1993).

[3] The following averments appear in this pleading which are attached to the Supplemental Declaration of Sean O'Keefe filed concurrently herewith ("Supplemental Okeefe Declaration") as Exhibit "C":

In essence, the Lehman Entities have asserted the requisite irreparable harms cited in the Motion by their submission of the status conference report filed in California. If they prevail in this position, the Claims Transaction will immunize the Disputed Claims, which comprise eighty percent (80%) [4] of the claims filed against the SunCal Appellants' bankruptcy estates, from being reprioritized through the claims allowance/disallowance process for the indefinite future, and the Claims Transaction will deprive the California Bankruptcy Court of the ability to exercise a core and essential statutory power. *See S.G. Phillips Constructors v. City of Burlington,* 45 F.3d 707, 705 (2nd Cir. 1995) ("Nothing is more directly at the core of bankruptcy administration ... than the quantification of all liabilities of the debtor."). Together, this combination freezes in place sixteen in-process reorganization efforts, through a what amounts to a de facto post-petition injunction issued outside the bounds of 11 U.S.C. § 105 and Federal Rule of Civil Procedure 65. This harm is unquestionably irreparable under the law of this circuit. Further, the assertion that such harm is "speculative" - made one day after making the exact contrary argument in a pleading before the California Bankruptcy Court - should not go unnoticed.

In weighing the issue of irreparable harm, the SunCal Appellants would respectfully ask the Court to put the proverbial shoe on the other foot. If the SunCal Appellants purchased JP Morgan Chase's secured claims – claims which are secured by substantially every asset of the Lehman Entities' cases – and then obtained an order from the Bankruptcy Court in California

---

- "The remaining claims, those asserted by the Voluntary Debtors, are largely stayed as a result of two rulings made by Judge Peck on May 12, 2010." Lehman Status Report, 3:4-5.
- "Judge Peck also ruled that the Debtors' equitable subordination claims are subject to the stay protecting both LCPI's and LBHI's interests in the liens" Lehman Status Report, 3:4-5.
- "Based on the foregoing, the Lehman Defendants submit that discovery should be stayed, at least until the outcome of plan confirmation proceedings." Lehman Status Report, 3:21-22.
- "[Nearly all claims in the AP [ES Action] are stayed in any event." Lehman Status Report at 3:23-24.
- "Discovery should be stayed, at least until after plan confirmation. First, LCPI's and LBHI's automatic stays cannot be ignored based on 'efficiency.'… It would be wasteful to allow the litigation to proceed independently only as to four loans that have so little bearing on the AP." Lehman Status Report, 4:22-27.
- "At the time of the status conference, however, discovery activity should be ordered ceased until the stay is lifted." Lehman Status Report, 5:17-19.

[4] This is the percentage of the total claims base that these claims compromise.

barring the Lehman Entities from disputing these claims, and barring this Court from adjudicating these claims, *where this resolution was both ongoing and of central importance to the Lehman Entities' case, would this constitute "irreparable harm" in the Lehman cases?* The SunCal Appellants' would submit the answer to this inquiry would be in the affirmative.

At the hearing held on May 12, 2010, this Court dismissed the merits of the SunCal Appellants' irreparable harm showing based upon the contention that the SunCal Appellants' past delay in seeking relief from the stay in this Court indicated a lack of irreparable harm.[5] This statement reflects a misunderstanding of the facts. ***The SunCal Appellants did not seek relief from the stay in this Court until after the Claims Transaction Motion was filed, because no stay existed barring the pursuit of either the ES Action or the Plan. No stay will exist until the Claims Transaction closes.***

Although the Lehman Entities have suggested that, in fact, a stay already exists as against the SunCal Appellants, this argument fails in the face of the Ownership Finding made by the California Bankruptcy Court in October 2009. Per this finding, it is an adjudicated fact that LCPI does not own the loans or the claims at issue in the ES Action.[6] Further, after the Ownership Finding, LCPI's counsel made multiple representations to the California Court that LCPI's stay was no longer an issue in the SunCal Appellants Chapter 11 cases.[7] LCPI is also not a defendant in the ES Action. Additionally, LCPI agreed not to assert its stay on the only loan that it retained

---

[5] At the May 12,2010 hearing, the Court stated:

> "One of the reasons I have a difficult time finding that there is any material harm to the SunCal debtors in not granting their motion for stay relief is that they did not bring it until now. The SunCal debtors have scrupulously avoided coming into this court from November of 2008 until today. And have managed to deal with their litigation requests in the bankruptcy court and beyond apparently without material impairment in those efforts."

See 5/12/10 Hearing Transcript, attached to Lehman's Response, at, 73:12 - 73:19.

[6] See Declaration of Sean Okeefe filed on April 21, 201 (Docket Entry 8541 ("4/21/10 Okeefe Declaration") Exhibits A and B.

[7] *See* 5/10/10 Couchot Declaration ¶ 43, and 5/12/10 Hearing Transcript, 56:11-14.

pursuant to a negotiated compromise of a motion pursuant to 506(d).[8]  On these facts, LCPI's

automatic stay has no present application to the SunCal Appellants, other than prospectively as to

the Claims Transaction.

As explained in the Motion, it is the present *lack* of any stay that motivated Fenway and

LCPI to engineer the Claims Transaction. The Claims Transaction was designed to create the claim

of ownership necessary to enable LCPI and LBHI to use their automatic stays as a sword to bar the

ES Action.  In sum, the SunCal Appellants have never been dilatory. When they were faced with

the threat of these stays, by virtue of the Claims Transaction, the SunCal Appellants timely and

vigorously opposed this injunctive relief before this Court.[9]

At the hearing held on May 12, 2010, the Court also suggested that there appeared to be no

harm to the SunCal Appellants because the SunCal Appellants chose to litigate the stay issue in

California and delayed in returning to New York until a reversal by the Ninth Circuit BAP.[10]

However, the "stay" litigation in California arose from LCPI's forum of choice, not the SunCal

Appellants' forum.  The Claims Transaction motivated the return to New York as opposed to the

reversal on appeal.  LCPI misrepresented itself as the sole owner of two of the three loans that

encompassed six of the seven motions for relief from stay that LCPI filed in California.[11]  LCPI

---

[8] See Declaration of Paul J. Couchot, ¶¶ 40-41, and Exhibit 13 thereto filed on May 10, 2010 (Docket Entry 8960) ("5/10/10 Couchot Declaration"); Lehman's First Amended Disclosure Statement, section 4.2, page 41, filed on October 13, 2009 with the California Bankruptcy Court.

[9] The SunCal Appellants' filed their first motion for relief from stay in this Court 27 days after they filed Chapter 11, when they mistakenly believed that LCPI's stay applied – based upon LCPI ownership misrepresentation. Although this motion should never have been filed, since no stay existed, it is clear evidence that the SunCal Appellants have a history of moving with alacrity when they are faced with a stay.

[10] See 5/12/10 Hearing Transcript, at, 73:12 - 73:23.

[11] At the June 30, 2009 hearing, the California Bankruptcy Court characterized Lehman's failure to disclose the repo and their misrepresentations as to their status as "creditors," as follows:

> "[T]his isn't a matter of...'this didn't happen until after the proof of claim was filed,' or 'we didn't know about it'; everybody--*you* knew about it...and so, if one was looking at the proof of claim, *it does look like you're being purposely vague*, okay, *not to have mentioned that the repurchase transaction took place.*"

See June 30, 2009 hearing transcript, 40:14-22, attached to Supplemental Okeefe Declaration as Exhibit A.

raised the assertion that the SunCal Appellants could not reorganize because of the alleged

implication of its automatic stay thereby placing the stay at issue.[12]  Having raised and lost the stay

issue before the California Bankruptcy Court, LCPI chose to appeal to the Ninth Circuit BAP,

which reversed the California Bankruptcy Court in December 2009.[13]

Once the Ninth Circuit BAP reversed the "stay" issue as to LCPI in December 2009, and

LCPI was dismissed from the Adversary Proceeding[14], thereafter there was no need to obtain relief

from stay in New York because the California Bankruptcy Court previously deemed Fenway to be

the owners of the loans pursuant to the Ownership Findings in October 2009.

In contrast, the SunCal Appellants' most recent motion for relief from stay ("RFS Motion")

was filed within 27 days of the filing of the Claims Transaction Motion, along with a request to

---

It wasn't until Danske came forward, in the midst of the litigation..., that any of this came to light.  And so, yeah, *it causes me to wonder what's going on with Lehman when you've got the documents*.

Id. at 41:10-13.

"And that's part of the problem that I'm having with this entire scenario....[Y]ou knew that these transactions had happened, and...it almost seems as if: 'Well, if we don't say anything about it, and no one says anything, then, you know, we'll just sort of *slide through the cracks*.' You may never get to a determination one way or another. Was it a true sale or was it...a security transfer?  *We never get there because it wasn't initially disclosed at all*.  That cannot be blamed on the SunCal or Palmdale entities, because *this was information that was known exclusively by the Lehman entities.*"

Id. at 41:21-42:7) (all emphasis added).

...[Y]ou knew that document [the repurchase agreement] said on its face that it was a sale...and that that was the intent of the parties to accomplish that. You knew that the day that you filed the first motion for relief from stay....You knew that when you filed the proof of claim....

Id. at 42:12-20.

"I don't know what other firm in this country files as many or as big cases, bankruptcy cases, as the Weill Gotshal firm.... [I]t was tremendously perplexing to me why this information had to come out the way that it did. I mean, why not, from the very beginning, just be straightforward."

Id. at 43:4-6, 13-16.

[12] See 5/10/10 Couchot Declaration, ¶¶ 25 - 26.

[13] See 5/10/10 Couchot Declaration, ¶¶ 29 - 30.

[14] see 5/10/10 Couchot Declaration, ¶48.

adjourn the Claims Transaction Motion so that the two motions could be heard together because of their interrelationship.

This Court further suggested at the May 12, 2010 hearing that since the Trustee Debtors (who are in related proceeding pending before the California Bankruptcy Court) were able to reach a settlement with the Lehman Entities, notwithstanding the existence of a "stay," no harm would result if a stay remained in effect upon the SunCal Appellants.[15]  Here again, the Court's understanding of the facts is in error. LCPI, which is the only Lehman Entity with a potentially applicable automatic stay against the SunCal Debtors, *did not file a claim* and *did not hold a lien against any of the projects owned by the Trustee Debtors*.[16]  In other words, the Trustee Debtors filed the RFS Motion for the same reason as the SunCal Appellants - the threat of the stay that would be asserted through the proposed Claims Transaction.  Accordingly, the Trustee Debtors, like the SunCal Appellants, have never been subject to the stay.[17]  In sum, the correlation made by the Court cited above was unfounded.

  **B)** **The Serious Questions Element Is Satisfied**. At the hearing on the RFS Motion, this Court stated that the automatic stay in LCPI's case would bar the pursuit of the ES Action against the claims being purchased by LCPI through the Claims Transaction. In support of this ruling, the Court cited Judge Gonzalez's unpublished ruling in *In re Enron*, 2003 WL

---

[15] At the May 12th hearing, the Court stated:

  "I think this is a very significant point, the existence of the stay is not inconsistent with the pursuit of negotiations that could lead to a resolution of this ongoing dispute. The fact that the involuntary debtors, through their trustee, appeared to have reached an agreement in principle resolving many, if not all, of the same issues that are set forth in the equitable subordination complaint, demonstrates that it's possible for the parties to engage in potentially productive discussions, notwithstanding the fact that the stay remains in effect."

5/12/10 Hearing Transcript, pg 72, lines 3-12.

[16] See 5/10/10 Couchot Declaration, ¶ 4; Supplemental Okeefe Declaration, ¶ 7.

[17] In reality the purported settlement referenced by the Court, was motivated by two facts, both of which are clear in the record. First, the Trustee Debtors have been actively involved in the ES Action as plaintiffs, and the Lehman Entities do not want this action to be tried on the merits. Second, the Trustee Debtors own the properties with the most value. Accordingly, fear and economics drove the purported settlement. The automatic stay had nothing to do with it, since again, it never existed.

-8-

23965467 (Bankr, S.D.N.Y.  Jan. 13, 2003) (the "Enron Case").  Although the SunCal Appellants

believe the ruling in *Enron* is distinguishable on the facts given that the instant situations involve

prior concealment of Sold Loans and the post-petition acquisition of the Sold Loans in order to

offensively invoke the stay, they do not dispute this case could be broadly interpreted as

supporting this Court's position. Based upon this broad interpretation, a direct conflict exists

between this case and Judge Drain's published ruling in *In re Metiom, Inc.,* 301 B.R. 634

(Bankr.S.D.N.Y.2003). In *Metiom*, Judge Drain held that an action under 11 U.S.C. § 510(c) that

seeks only subordination is defensive, and not subject to the creditor's automatic stay. 301 B.R.

637-38. The SunCal Appellants would submit that the existence of a direct conflict between two

cases within the same district, over the same issue, necessarily establishes that there are serious

questions going to the merits.

           C)        **The Balance of The  Hardships Tips Decidedly In Favor of The SunCal**

**Appellants**. The hardships that the SunCal Appellants will suffer if a stay is not granted are laid

out in the irreparable harms section above. These include:

1. The potential imposition of a stay against the ES Action, which is central to their
   ongoing reorganization effort as proven by LCPI's current efforts in California;

2. The potential imposition of a stay that bars the SunCal Appellants from resolving a
   priority dispute relating to eighty percent of the claims against their estate as proven by
   LCPI's current efforts in California;

3. The potential imposition of a stay that could be interpreted as barring the SunCal
   Appellants from pursuing their  plan of reorganization, while allowing the Lehman
   Entities the right to pursue their competing plan of reorganization in the same cases as
   proven by LCPI's current efforts in California; and

    4.   The imposition of a stay that will cost the estates substantial additional sums of money in maintaining thousands of acres of property.[18]

As indicated above, although the Lehman Entities disingenuously assert in this case these hardships are "speculative."[19] However, they have concurrently represented to the California Bankruptcy Court that these hardships are realities.[20]  The latter representation is the truth, the former is false. The impact upon the SunCal Appellants will be very damaging – exactly as the Lehman Entities intended.[21]

In contrast to the harm the SunCal Appellants will suffer if relief is denied, the Lehman Entities will suffer no harm through a stay for the following reasons:

    1.   Neither LCPI nor LBHI is a defendant in the ES Action;

    2.   Neither LCPI nor LBHI currently own an interest in the loans at issue in the ES Action;

---

[18] *See* Declaration of Robert Starkman filed concurrently herewith ("Starkman Declaration").  On June 9, 2010, the Ninth Circuit denied the SunCal Appellants' motion to expedite the appeal.  See Supplemental Okeefe Declaration, ex. E.  Accordingly, a delay until the resolution of the Ninth Circuit appeal will cause irreparable harm to the SunCal estates.

[19] Lehman Response, p. 3, ¶ 2, and p. 17, ¶ 33.

[20] *See* Lehman Status Report attached as exhibit C to Supplemental Okeefe Declaration.

[21] LCPI has made contradictory representations to this Court and the California Bankruptcy Court.  Lehman's Response states that this Court made no particularized findings as to the applicability of LCPI and LBHI's stay:

> It never made any express findings concerning whether the automatic stay "would apply to the ES Action after the Claims Transaction closed." (Stay Pending Appeal Motion at 23-24.) On the contrary, this Court could not have been more clear in its expressed statement that it was not making any particularized findings. (Hr'g Tr. 75.) The Court did nothing other than state a Bankruptcy Code principle – namely that a litigation that proceeds against debtor's property is subject to the automatic stay.

Lehman Response, p. 7, ¶ 9.  However, in Lehman's Status Report filed with the California Bankruptcy Court, LCPI asserts that this Court did make a *particularized* findings:

> Judge Peck also ruled that the Debtors' equitable subordination claims are subject to the stay protecting both LCPI's and LBHI's interests in the liens, and that he would await a ruling by the Ninth Circuit on the Voluntary Debtors' appeal of the BAP ruling before entertaining a renewed motion for relief from stay. That could take at least six months, effectively putting a hold on the AP.

Lehman Status Report, 3:4-7, attached as exhibit C to Supplemental Okeefe Declaration.  These contradictory assertions exemplify LCPI's lack of candor.

3.  The existing defendants in the ES Action, Fenway and the non-debtor Lehman Entities, have been participating in this action for a year and they are well represented. Allowing the status quo to continue will impose little or no harm on these non-debtor parties and their harm is irrelevant in any event; and

4.  The Lehman Entities can resolve the contested issue by simply transferring the loans to Lehman ALI, the party that held title to the loans in May of 2008 immediately prior to the Fenway Repo or simply stipulate to relief from stay.

In summary, the evidence establishes that the balance of the harms factor tips decidedly, if not completely, in favor of the SunCal Appellants.

**D)**    **A Likelihood of Success Exists.** The Court does not have to find a likelihood of success to grant the Motion. As explained in the *Citigroup Global,* 598 F.3d 30 (2nd Cir. 2010), where irreparable harm exists, as here, the existence of "serious questions going to the merits," coupled with a showing that the balance of hardships tips decidedly in favor of the movant, is sufficient. However, the SunCal Appellants would submit that here, the likelihood of success element is also satisfied.

The Court's conclusion that the automatic stay bars an equitable subordination action that seeks relief *only against claims filed against a debtor's estate* is not only contrary to the ruling in *In re Metiom*, it is contrary to established precedent in this Circuit. *See Olick v. Parker & Parsley Petroleum Co.*, 145 F.3d 513, 516 (2nd Cir. 1998); *In re Financial News Networ*k Inc.158 B.R. 570, 573 (S.D.N.Y. 1993); *Vitranschart, Inc. v. Levy*, 2000 WL 1239081 (S.D.N.Y.2000). These cases hold that the automatic stay does no bar a court from resolving objections and counterclaims that seek recourse only against the claims asserted by the debtor-claimant.

This Court's ruling on the application of the stay also ignores the fact that the ES Action is a post-petition action. It is not be subject to the stay in 11 U.S.C. § 362(a)(1). *In re Continental Air Lines, Inc.*, 61 B.R. 758 (S.D.Tex.1986); *In re Chateaugay Corp.,* 86 B.R. 33, 37-38 (S.D.N.Y. 1987) (automatic stay does not apply to claims that arise post-petition). *Vitranschart*, 2000 WL

1239081 ("Nor does the stay apply to Mac Truong's third-party complaint, cross-claims, or counterclaims, since the automatic stay provision applies only to claims 'against the debtor' and not to claims brought by the debtor against other parties."). Moreover, since the ES Action does not seek to "obtain" property of the estate, but only to address the priority of liens asserted against the SunCal Appellants estate, it is not barred by 11 U.S.C. § 362(a)(3). *Id.*

This Court's ruling on the application of stay is also based upon an unsound premise: The concept that the subordination of a claim is "offensive," and hence violative of the automatic stay, whereas an action *that completely disallows the same claim* (and thereby voids the underlying lien as a matter of law) is "defensive", and hence not subject to the stay, is logically untenable.[22] This premise also ignores contrary Supreme Court and Second Circuit precedent defining the parameters of the claims allowance/disallowance process. *See Katchen v. Landy*, 382 U.S. 323 (1966); *Langenkamp v. Culp,* 498 U.S. 42 (1990); *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33 (1989); *CBI Holding Co., Inc.*, 529 F.3d 432 (2nd Cir. 2008). **Under *Katchen* and its progeny, the claims allowance and disallowance process encompasses any and all counterclaims ,whether legal or equitable, in whatever form, that seek relief with respect to a claim filed against the estate**. *See Granfinanciera*, 492 U.S. at 59 n.14 ("As *Katchen* makes clear, however, by submitting a claim against the bankruptcy estate, creditors subject themselves to the court's equitable power to disallow those claims, e*ven though the debtor's opposing counterclaims are legal in nature* and the Seventh Amendment would have entitled creditors to a jury trial had they not tendered claims against the estate.") (emphasis added). *As long as these counterclaims fall within the claims disallowance/process,* i.e., they seek recourse only against the claims filed*, they are "defensive" and not barred by the automatic stay. Olick*, 145 F.3d at 516; *Financial News Networ*k, .158 B.R. at 573; *Vitranschart*, 2000 WL 1239081; *Metiom,*301 B.R. at 638-639; *In re PRS Ins. Group*, 331 B.R. 580, 584 (Bankr.D.Del. 2005).

---

[22] The purpose of the stay is "preserve" value for the affected estate. Viewed through this prism, the disallowance of a claim cannot be deemed "defensive", where the lesser remedy of subordination is deemed "offensive."

E)      **Public Interest Element Militates In Favor of The Motion.**  The Lehman Entities fail to make any affirmative argument in support of the public interest element of the stay analysis. Instead, they facetiously argue that since the Claims Transaction Motion and Compromise Order fail to reference the automatic stay, the SunCal Appellants' contention that the stay is being used as sword has no foundation. This argument ignores the obvious. Prior to the entry of the Compromise Order, the SunCal Appellants were free to pursue the ES Action and the Plan. Once this transaction closes, per this court's ruling in the integrally related RFS Order, the ES Action will be enjoined - exactly as intended.

As stated in the Motion, the Second Circuit has prohibited the use of the stay as a sword. Here the stay is being used, with judicial sanction, to vitiate the statutory powers of another court and to thwart sixteen pending Chapter 11 cases, all in the furtherance of a grand debt collection effort. This is not in the public interest. To the contrary, the public interest favors comity as between courts of equal dignity. *See W. Gulf Maritime Assoc. v. ILA Deep Sea Local 24,* 751 F.2d 721, 728 (5th Cir.1985) ("The federal courts have long recognized that the principle of comity requires federal district courts-courts of coordinate jurisdiction and equal rank-to exercise care to avoid interference with each other's affairs.").

Given the irreparable harm that will result if a stay is not granted, the serious issues going to the merits presented in this appeal and the balance of the hardships, at a minimum, this Court should afford the SunCal Appellants the opportunity to seek a stay from a higher court.

## II

## THE LEHMAN ENTITIES' RESPONSE MISTATES THE FACTS
## AND SEEKS TO SUBORN A PREEXISTING ADJUDICATION

Much of the Lehman Entities' Response is premised upon factual positions that they know are contrary to the evidence or contrary to prior binding adjudications. These fallacies are addressed below.

A)      **"The Automatic Stay Already Bars The ES Action" Fallacy**. The Lehman Entities contend that the SunCal Appellants will suffer no irreparable harm through the injunctive

relief being granted by this Court, because the automatic stay already bars the ES Action and presumably the pursuit of their Plan as well. This contention is based upon three erroneous assumptions. The first assumption is that LCPI still owns an interest in the "revolver" part of the Ritter Ranch Loan. [23] Although the Ritter Ranch Loan does have a revolver component (which is only ten percent of the total), the California Bankruptcy Court ruled in October 2009 that *all* of LCPI's right, title and interest in this loan was sold to Fenway.[24] However, since the Lehman Entities insist on misrepresenting the record regarding this ruling, the relevant sections from the record are quoted below:

### FINDING 1.9 FROM OCTOBER 2, 2009 ORDER

1.9. The following loans (the "Sold Loans") were sold to Fenway Capital pursuant to the MRA on August 22, 2008:

| Loan | Claimant | Proof of Claim No. (collectively, the "Claims") |
|---|---|---|
| SunCal Communities I Loan | Lehman Commercial | 1, 2, 6, 7, 12, 16 |
| ***Ritter Ranch Loan*** | ***Lehman Commercial*** | ***65*** |
| SunCal PSV Loan | Lehman ALI | 12 |
| SunCal Delta Coves Loan | Lehman ALI | 21 |
| SunCal Marblehead/ Heartland Loan | Lehman ALI | 9, 21 |
| Sun Cal Oak Valley Loan | OVC Holdings, LLC | 16 |
| SunCal Northlake Loan | Northlake Holdings, LLC | 6 |

(Emphasis added).

---

[23] The third LCPI loan—the Ritter Ranch Mezz Loan—was not part of the repo with Fenway, but is admittedly out of the money and so not at issue in the ES Action. In September 2009, LCPI stipulation that LCPI's automatic stay was not applicable to certain loans held by the Lehman Entities in which the underlying collateral for such liens had zero value, including the Bickford Second Lien Loan and the Mezz Loan. See 5/10/10 Couchot Declaration , ¶¶ 39-41.

[24] The Lehman Entities had continuously represented to the California Bankruptcy Court that they are "creditors" of the SunCal Debtors pursuant to the terms of the various loans. The SunCal Debtors had no reason to question the veracity of the Lehman Entities' representations until Danske Bank appeared before the California Bankruptcy Court on March 25, 2009 and represented that it held all right, title and interest in the $120 million loan secured by the property owned by SunCal Century City, pursuant to a 1999 repurchase agreement. Prior to this appearance, the Lehman Entities had been contending that they were the holders of this loan. Based upon this disclosure, the SunCal Debtors conducted discovery. It was not until J.P. Morgan produced documents in response to the SunCal Debtors' subpoena on April 28, 2009 that the SunCal Debtors obtained confirmation that the Lehman Entities relinquished all right, title and interest in the seven Sold Loans pursuant to the August 2008 Master Repurchase Agreement.

-14-

Below is a copy of the relevant paragraphs from Claim No. 65—the claim referenced in Finding 1.9 above—describing what loans are included within the claim on the Ritter Ranch Loan:

## EXCERPT FROM CLAIM 65

The liability of Palmdale Hills Property, LLC (the *"Debtor")* arises under the Loan Documents with respect to which the following amounts were, and still are, due and owing under the Loan Documents. The liability against the Debtor arises because the Debtor is the borrower under the Credit Agreement and a guarantor under that certain Guarantee and Collateral Agreement, dated as of February 8, 2007 (as amended and/or supplemented, the *"Collateral Agreement')*. Such amounts are summarized as follows:

| Facility | Description | Amount |
|---|---|---|
| Term Loan | Principal | $208,477,500.00 |
| | Interest Owing | $33,047,549.92 |
| | Exit Fee | $2,090,000.00 |
| **Revolver** | Principal | $38,033,844.07 |
| | Interest Owing | $4,984,859.13 |
| | Non-use Fee | $68,343.19 |
| | Exit Fee | $550,000.00 |
| **TOTAL** | | $287,252,096.31 |



The record is clear. The California Bankruptcy Court ruled that the Ritter Ranch Loan, *inclusive of the revolver loan*, was sold to Fenway in August of 2008.[25] Accordingly, until the Claims Transaction closes, LCPI's stay does not bar the subordination of this non-estate asset. *See Teachers Insurance and Annuity Ass'n v. Butler*, 803 F.2d 61, 65 (2d Cir.1986) ("It is well-established that stays pursuant to § 362(a) are limited to debtors and do not encompass non-bankrupt co-defendants."); *see also In re Le* 2, 2007 WL 4197515 (Bankr.S.D.Tex.2007) ("[T]he automatic stay does not apply to property that is not 'property of the estate.'"").  This is the reason why LCPI is taking title to the Sold Loan: To enable LCPI to use the stay as a sword—a sword that will inflict irreparable harm upon the SunCal Appellants.

---

[25] Although the ownership finding made by the California Bankruptcy Court is on appeal, it remains binding. LCPI' s implicit suggestion that this Court has the right to second-guess the California Bankruptcy Court's ruling on this matter is ill-founded. *See Teachers Ins. and Annuity Ass'n of America v. Butler*, 803 F.2d 61, 66 (2nd Cir. 1986) ("Thus, the bankruptcy court should not permit the partnership to relitigate issues already decided by Judge Weinfeld, for to allow the partnership to do so, when it knew of the judgment before it filed for bankruptcy, would result in its slipping arguments through the backdoor that had already been turned away at the frontdoor."); *see also Celotex Corp. v. Edward*, 514 U.S. 300 (1995).

The second assumption is that the BAP somehow validated its interest in the revolver component of the Ritter Ranch Loan, and hence its stay bars the ES Action at present. This is also false. The comments made by the BAP related to whether or not LCPI's unsubstantiated claim of an ownership interest *was sufficient basis to claim Article III appellate standing*. The BAP never ruled that LCP in fact owned such an interest, since that was not before the BAP on appeal. The relevant section of the *Palmdale* opinion makes this clear:

> Debtors argue that Lehman Commercial does not own any interest in the Fenway Capital Loans, and therefore, the automatic stay could not bar subordination of such loans. As a result, Debtors argue the appeals are moot and that Lehman Commercial lacks standing. Lehman Commercial contends that a portion of at least one of the loans was not part of any sale or transfer to Fenway Capital. ..An appeal is moot if events have occurred that "prevent an appellate court from granting effective relief." (citations omitted). ... However, we find that effective relief could be granted to Lehman Commercial, since it is not clear that all the loans Lehman Commercial made to the Debtors were the subject of the October Order. Moreover, Lehman Commercial has filed a motion for clarification of the October Order and the bankruptcy court's findings. Thus, no final order regarding the ownership of the loans has yet been entered (and Lehman Commercial has stated that it will appeal the final order after it is entered).
>
> For similar reasons, we find that Lehman Commercial has standing to appeal the Denial Orders. The Ninth Circuit has adopted the "person aggrieved" test as the standard for determining whether a party possesses standing in a bankruptcy appeal. *See, e.g., Fondiller v. Robertson (In re Fondiller* ), 707 F.2d 441, 442-43 (9th Cir.1983). The test limits appellate standing to "those persons who are directly and adversely affected pecuniarily by an order of the bankruptcy court." *Id.* at 442. Even if Lehman Commercial has no interest in the Fenway Capital Loans, it has an interest in at least one of the loans to Debtors, and furthermore, may possibly have an interest in the Fenway Capital Loans under a contractual repurchase obligation. Lehman Commercial also has an interest if and when the October Order becomes final and is successfully appealed. Therefore, Lehman Commercial has standing to appeal the Denial Orders despite the October Order.

*In re Palmdale Hills*, 423 at 664-65. In sum, the BAP did not validate or otherwise make any findings regarding what LCPI owned or did not own. That issue was not before that court. In contrast, that specific issue *was* determined by the California Bankruptcy Court, as established above, and this ownership finding remains binding.

The third assumption is that LCPI's mere status as "agent" for Fenway is sufficient to convey an interest that is protected by the stay.[26] This position is in error. Sections 541(b)(1) and 541(d) effectively exclude the Sold Loans from Lehman Commercial's estate. Accordingly, when a debtor (here, LCPI) acts in the capacity of an agent, pursuant to Section 541(b)(1), the property relating to the agency is not property of the debtor's estate. *See In re Boyer,* 104 B.R. 497, 499 (Bankr.S.D.Fla. 1989) ("In essence, the Debtor's relationship to this fund is nothing more than that of an agent appointed to carry out specific tasks. Under this set of circumstances, even assuming that the property somehow became part of the estate, the property would be excluded under § 541(b)(1)."); *In re Warde Elec. Contracting, Inc.,* 308 B.R. 659, 664 (S.D.N.Y. 2004) (citing 11 U.S.C. § 541(b)(1) - "Property held by a debtor merely as a bailee or an agent for a third-party is not property of the estate within the meaning of § 541(a)(1). Property of the estate also does not include 'power that the debtor may exercise solely for the benefit of an entity other than the debtor.'"). LCPI's automatic stay is clearly only applicable to loans which are property of its estate. See 11 U.S.C. § 362(a)(3) ("a petition …operates as a stay, applicable to all entities, of -- (3) any act to obtain possession of *property of the estate* or of property from the estate or to exercise control over *property of the estate*"); *In re Kiesewetter,* 337 B.R. 75, 78 (Bankr. W.D.Pa. 2006) (footnotes omitted). *See also Marathon Home Loans, supra* 101 B.R. at 220-221; *In re Brown*, 168 B.R. 331, 335-336 (Bankr.N.D.Ill. 1994) (where debtor only held bare legal title to pension fund under §541(d), pension fund was not property of the estate and not protected by the automatic stay); *In re Tucker,* 181 B.R. 595, 598 fn 5 (Bankr. N.D.Ala. 1995).

**B)**   **The "We Have No Choice But To Vest Title In LCPI" Fallacy**. LCPI contends in the Response that since LCPI was the opposite party to the MRA, only LCPI can acquire title to the Sold Loans under this agreement. This argument is based upon the false premise that LCPI is acquiring title to the Sold Loans "pursuant to the MRA." A purchase of the Sold Loans "pursuant

---

[26] In paragraphs 25 and 26 of the Lehman's Response, LCPI contends that it is "acting as agent under both the SunCal I Loan and the Ritter Ranch Loan" and therefore "LCPI retained an interest in both the SunCal Comm I Loan and the Ritter Ranch Loan and had a legitimate basis to assert its automatic stay."

to" the MRA would require LCPI to make a payment Fenway Capital of over one billion dollars in immediately available funds, in 2008. Needless to say, this is not happening. To the contrary, the Transaction approved by this Court *is an entirely new transaction* that was designed *to avoid* the MRA's terms. Accordingly, the parties could have structured this deal in a way that placed title to the Sold Loans in any one of a number of entities, including non-debtor entities. Instead, they "parked" the Sold Loans in debtor LCPI to create a basis for asserting the stay.

Confirmation of the "injunction by contract" design of the Claims Transaction is evident from several facts. First, the Lehman Entities effectively admit this is an objective in their Response pleadings. Second, in May of 2008, three months before the repo closed, all of the Sold Loans were owned by Lehman Ali, Inc., a non-debtor. LCPI was just a convenient way station through which they passed on their way to Fenway Capital. The Claims Transaction could readily have been structured to return the loans to Lehman Ali, a non-debtor. Third, the Lehman Entities admitted in their reply brief on the Claims Transaction Motion (at pp. 14-15 ¶ 27) that they anticipated transferring title to the Sold Loans to the originating entities once the Claims Transaction closed— three of whom are non-debtors. However, shortly after this admission occurred, the Lehman Entities tried to retract the same, since they belatedly realized that this would leave these other defendants active in the ES Action. Respectfully, the injunction-by-design structure of the Compromise Transaction is all too obvious.

C)      **The "You Did Not Oppose The Motion" Fallacy.** The Lehman Entities contend in the Response that the SunCal Appellants' did not oppose the Claims Transaction Motion and lacked standing to oppose the motion in any event. Both positions are in error. The SunCal Appellants' opposition pleadings speak for themselves, and they were never withdrawn.

The SunCal Appellants' decision to limit their *oral opposition* to the Claims Transaction Motion at the hearing was based upon the Court's statement that it was going to defer any decision regarding *the effect* of the transaction until the immediately following hearing. Until this determination was made, the SunCal Appellants' could not determine whether the Claims Transaction Motion would in fact inflict irreparable harm on their cases. However, the record is

crystal clear regarding their position in this regard: *If this transaction would have the effect of enjoining the ES Action, then it a) should be denied as in bad faith, since it converts the stay into an unlawful sword, and b) this effect would irreparably damage the SunCal Appellants' reorganization effort*. When the Court later disclosed to the SunCal Appellants, in the immediately following hearing, that the Lehman Entities injunction-by-design transaction would indeed stay the ES Action, the SunCal Appellants again reiterated their opposition to the entire transaction.

To the extent the Lehman Entities are condemning the SunCal Appellants for failing to have the requisite clairvoyance to realize that the Lehman Entities' "stealth injunction" scheme was going to succeed, they acknowledge this deficiency. When the SunCal Appellants made their objections to the stealth injunction woven into the transaction, they assumed that the Court would either: a) decline to approve a transaction that included this provision; b) approve the transaction based upon the conclusion that the stay would be ineffective as against the ES Action, in reliance upon *In re Metiom, Inc.,* 301 B.R. 634 (Bankr.S.D.N.Y.2003); or c) approve the transaction but vitiate its injunctive effect by granting relief from stay. This did not occur. Instead the Court approved the transaction, inclusive of its injunction inherent therein, and then validated its injunctive effect through the RFS Order. As more fully explained in the SunCal Appellants' Statement of Issues on Appeal, they firmly believe that the Court's failure to consider the severe impact that this injunction will have the on the SunCal Appellants in the approval analysis, was an error of law.

The Lehman Entities' suggestion that a party facing the threat of an injunction lacks standing to oppose the same is absurd. Standing requires a showing that the party will suffer a distinct and palpable injury if the relief being sought is granted. *See Warth v. Seldin*, 422 U.S. 490, 501, 505 (1975); *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 179 F.3d 107 (4th Cir. 1999). Prior to the entry of the Orders, the SunCal Appellants were free to pursue the ES Action and the Plan, both of which are central to reorganization effort. After the entry of these orders, per this Court's comments on the record, these rights are now forfeit. It is difficult to perceive a more distinct, palpable harm than this.

## III

## <u>THE IRREPARABLE HARM ELEMENT IS SATISFIED</u>

The Lehman Entities' contention that the irreparable harm element was not satisfied in the Motion misstates the applicable standard of law and relies upon the erroneous factual premises addressed above.

A)    <u>The Lehman Entities Ignored The Applicable Legal Standard</u>. The irreparable harm standard applicable in the bankruptcy context is set forth *In re Alert Holdings, Inc.*, 148 B.R. 194 (Bankr. S.D.N.Y. 2007), a decision cited with approval by the *Calpine* decision cited by the Lehman Entities:

> Case law in this district has established a limited exception to the irreparable harm requirement for issuance of a preliminary injunction in the bankruptcy context *where the action to be enjoined is one that threatens the reorganization process or which would impair the court's jurisdiction with respect to a case before it*.

148 B.R. at 200 (emphasis added); *see also In re Singer Co. N.V*., 2000 WL 33716976 (Bankr. S.D.N.Y. 2000) ("Singer falls within the exception to the irreparable harm requirement under Federal Rule 65 because Groz's actions threaten the Debtors' reorganization and impair this Court's jurisdiction with respect to the Debtors' chapter 11 cases."); *In re Carabetta Enterprises, Inc.,* 162 B.R. 399, 407 (Bankr.D.Conn. 1993); *In re G-1 Holdings Inc.*, 420 B.R. 216, 281 (D.N.J.2009) (irreparable harm means "irreparable harm to the Debtor's ability to reorganize without the requested relief").  The severe disruption inflicted upon the SunCal Appellants' reorganization effort is sufficient to constitute irreparable harm. *In re Calpine*, 365 B.R. at 409-410 ("Because I find that the Bankruptcy Court's finding of irreparable harm on the third harm, namely the burden and distraction of the restructuring effort, is not clearly erroneous, I need not address Nevada Power's contention that the remaining two irreparable harms are, as a matter of law, insufficient to constitute irreparable harm.")

When tested under the above standard, the relief granted by this Court unquestionably inflicts "irreparable harm" on the SunCal Appellants. This Court's ruling deprives the SunCal Appellants of the ability to employ the claims allowance process to resolve a body of disputed

-20-

claims that comprise eighty percent of their claims base.  Respectfully, what Chapter 11 case move

forward, never mind succeed when hobbled with this kind of crippling judicial impairment? As the

Second Circuit noted in *S.G. Phillips Constructors,* 45 F.3d 707, 705 (2nd Cir. 1995): "Nothing is

more directly at the core of bankruptcy administration ... than the quantification of all liabilities of

the debtor." A ruling that deprives debtors of recourse to this power, as to eighty percent of the

claims filed against their estates, constitutes irreparable harm as a matter of law.

Irreparable harm is also established on the facts due to the open-ended delay imposed by

the Orders. The legislative purpose of Chapter 11 is to allow the debtor the opportunity to pursue a

*speedy* and efficient rehabilitation. *In re 312 West 91st Street Co. Inc.,* 35 B.R. 346, 347 (Bankr.

S.D.N.Y.1983) ("'The legislative purpose of Chapter 11 is the speedy rehabilitation of financially

troubled businesses."). The issuance of an injunction, without any term limit, barring the claims

resolution process from proceeding in the SunCal Appellants' cases thwarts this legislative

objective. It also inflicts immediate and irreparable harm on the SunCal Appellants in the form of

higher costs, a decline in reputation, and community reprobation, since the debtors' real estate

projects will remain unfinished eye sores for an indeterminate period. The Chapter 11 system was

designed to prevent exactly this kind of interference and delay. H.R.Rep. No. 95-595, 95th Cong.,

1st Sess. 229 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6189. ("[T]he patient may

die on the operating table while the lawyers are diagnosing.").

**B)      The Factual Premises Underlying The Lehman Entities' Arguments Are
Erroneous**. As explained above, the Lehman Entities' contention that the stay somehow already

bars the ES Action, and hence no harm could result from the latest injunction, is nonsense.  No

stay currently exists. It was the threat of the stay designed into the transaction at issue in the

Claims Transaction Motion that forced the SunCal Appellants to come to this jurisdiction to

defend their interests. But for this transaction, their cases would be proceeding apace against the

non-debtors.

**C)      The Lehman Entities' Suggestion That The Possibility of Settlement
Mitigates The SunCal Appellants Irreparable Harm Is Erroneous**. At the hearing on the

Claims Transaction Motion, the Court stated that the mere possibility of a future settlement between the SunCal Appellants and the Lehman Entities somehow mitigated the irreparable harm that will be imposed upon the SunCal Appellants' cases by the Court's rulings. Respectfully, this statement ignores litigation realities. Once this Court barred the SunCal Appellants from opposing the claims filed against their estates through the ES Action—which, again, only attacks disputed claims— *the Court effectively eliminated the possibility of settlement.* No litigant settles after the court delivers them a winning hand. To the extent the Court was inclined to promote settlement, it should have denied the injunctive aspect of Claims Transaction, since this would have kept the litigation pressure on all parties. It is this pressure that promotes settlement, not a unilateral litigation stay that benefits only one side.

## IV

## <u>RELIEF IS APPROPRIATE BASED UPON THE</u>

## <u>THE STANDARD EMPLOYED IN THE SECOND CIRCUIT</u>

In the recent case of *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.,*598 F.3d 30 (2nd Cir. 2010), the Second Circuit set forth the standard governing injunctive relief:

> For the last five decades, this circuit has required a party seeking a preliminary injunction to show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." The "serious questions" standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction. Because the moving party must not only show that there are "serious questions" going to the merits, but must additionally establish that "the balance of hardships tips *decidedly*" in its favor, its overall burden is no lighter than the one it bears under the "likelihood of success" standard.

598 F. 3d at 35 (citations and quotations omitted).

The SunCal Appellants addressed above the "irreparable harm" element under the standard applicable to Chapter 11 debtors. This leaves two remaining elements under the

"serious questions" standard of review: 1) Whether "serious questions" have been raised going to the merits and 2) whether the balance of the hardships tips decidedly in the SunCal Appellants' favor. Both elements are satisfied here.

**A)     A Serious Question Going To The Merits Exists Since Two Judges Within The Same District Disagree On The Legal Issue In Contest**. At the hearing on the RFS Motion, this Court stated that the automatic stay in LCPI's case would bar the pursuit of the ES Action against the claims being purchased by LCPI through the Claims Transaction.  In support of this ruling, the Court cited Judge Gonzalez's unpublished ruling in *In re Enron*, 2003 WL 23965467 (Bankr, S.D.N.Y.  Jan. 13, 2003) (the "Enron Case"). Although the SunCal Appellants believe this case is distinguishable on the facts (since it included claims seeking monetary recovery that were only withdrawn at the hearing seeking to enforce the stay), they concede that this case could be interpreted as being supportive of the Court's position. Based upon this interpretation, a direct conflict exists between this case and Judge Drain's published ruling in *In re Metiom, Inc.,* 301 B.R. 634 (Bankr.S.D.N.Y.2003). In *Metiom*, Judge Drain held that an action under 11 U.S.C. § 510(c) that seeks only subordination is defensive, and not subject to the automatic stay. 301 B.R. 637-38. The SunCal Appellants would submit that the direct conflict between two cases within the same district, over the same issue, necessarily establishes that there are serious questions going to merits.

**B)     Serious Questions Going To The Merits Exist Given Other Contrary Precedent.** The Court's ruling on the application of the stay to the ES Action is also contrary to clear precedent in this Circuit regarding the applicability of the automatic stay to defenses raised against a bankrupt creditor's claims. *See Olick v. Parker & Parsley Petroleum Co.*, 145 F.3d 513, 516 (2nd Cir. 1998); *In re Financial News Networ*k Inc.158 B.R. 570, 573 (S.D.N.Y. 1993); *Vitranschart, Inc. v. Levy*, 2000 WL 1239081 (S.D.N.Y. 2000). The similarities between the facts in the instant case and the *Financial News* case in particular are striking. Here, the SunCal Appellants filed the ES Action in response to the Disputed Claims filed by the Lehman Entities. Their action seeks subordination; no affirmative recovery is sought against the claimants.

Similarly, in *Financial News*, Kaypro, a Chapter 11 debtor whose claim was pending in the United

States Bankruptcy Court for the Southern District of California, filed claim in Financial News

Network's Chapter 11 case. The latter case was pending in this district. When Kaypro's claim was

disallowed by the bankruptcy court in *Financial News,* Kaypro appealed, contending that this relief

was barred by its automatic stay. The District Court rejected this position, stating:

> In objecting to Kaypro's proof of claim filed in the New York Bankruptcy Court,
> FNN acted in a defensive manner to protect its own legal rights and its own
> bankrupt estate. *See Martin-Trigona,* 892 F.2d at 577. FNN asserted no claim
> against Kaypro which could be construed as an active attempt to recover property
> from Kaypro or an act seeking to gain control or possession of any contract cause of
> action by Kaypro against FNN. This case is therefore to be distinguished from cases
> in which creditors of the bankrupt estate or other third parties initiate judicial
> proceedings or adversary proceedings in an active attempt to circumvent the
> automatic stay and control the property of the bankrupt estate. *See, e.g., Maritime
> Elec.,* 959 F.2d at 1206 (conversion claim filed against debtor in district court
> subject to automatic stay, but debtor's counterclaims and third party claims against
> non-bankrupt held not subject to automatic stay); *In re MCEG Productions, Inc.,*
> 133 B.R. 232, 233-35 (Bankr.C.D.Cal.1991) (creditor's filing of petition in state
> court for damages and injunctive relief to enjoin sale, transfer or acquisition of
> debtor was "thinly disguised attempt[ ] to circumvent the automatic stay").

> In sum, both the language and purpose of section 362 indicate that the automatic
> stay in effect in the Bankruptcy Court for the Southern District of California did not
> preclude the New York Bankruptcy Court from sustaining FNN's objection to
> Kaypro's proof of claim filed in New York Bankruptcy Court. Accordingly, the
> Court finds that the order of the Bankruptcy Court for the Southern District of New
> York sustaining the objection to Kaypro's proof of claim was not a violation of the
> automatic stay in place in the Bankruptcy Court for the Southern District of
> California, and the Bankruptcy Court in New York exercised its appropriate
> jurisdiction to disallow Kaypro's proof of claim.

*Financial News*, 158 B.R. at 573.

The Second Circuit's ruling in *Olick v. Parker & Parsley Petroleum Co.*, 145 F.3d 513,

516 (2nd Cir. 1998) is also factually on point and contrary to this Court's ruling. In *Olick*, a Chapter

13 debtor filed a claim in the district court seeking payment from a class action settlement for

services rendered. The debtor in Olick also objected to the fees sought by counsel to the class and

sought a stay of distributions from the settlement fund until an adversary proceeding that he was

pursuing in bankruptcy court was resolved. The district court overruled Olick's objection to class

counsel's fees, denied his request for a stay and partially denied Olick's fee request. Olick

appealed this ruling and argued that the district court violated his automatic stay by denying his

motion to stay the distribution, since this would necessarily reduce Olick's distribution from that

pot. The Second Circuit rejected this contention stating:

> The district court did not err in denying Olick's motion to stay the proceedings. As
> the district court correctly pointed out, the automatic stay pursuant to 11 U.S.C.
> § 362 enjoins actions "*against* the debtor" (emphasis supplied). It prevents the
> commencement or continuation, after a bankruptcy petition has been filed, of
> lawsuits and proceedings to recover a claim against the debtor that arose before the
> filing of the petition. 11 U.S.C. § 362(a); *Koolik v. Markowitz,* 40 F.3d 567 (2d
> Cir.1994) (per curiam). In the case at bar, the opposite occurred: No party sought to
> recover a claim "against" Olick; rather, Olick sought to recover from the settlement
> fund.

145 F.3d 513, 516.

Here, as in the *Olick* case, LCPI comes to the SunCal Appellants' cases as a *claimant*

seeking payment through the assertion of claims. The SunCal Appellants have responded to these

payment demands by objecting to the same and seeking an order subordinating them in the form of

the ES Action. This action, like the action in *Olick*, seeks relief against the claims only. On these

facts, section 362(a)(1) has no application.

The district court in *Washington Muual, Inc. v. F.D.I.C.*, 659 F.Supp.2d 152 (D.D.C.2009)

reached essentially the same result as *Olick* on different facts.  In *Washington Mutual*, There,

Washington Mutual's assets were sold by the FDIC, acting as receiver for the bank, to JP Morgan

Chase ("JPMC"). The day after this sale, Washington Mutual, Inc. and Washington Mutual,

Investors (together "WMI"), filed Chapter 11. After these filings, WMI filed claims in the FDIC

receivership wherein WMI, like LCPI, contended that it owned an interest in the assets that the

FDIC sold to JPMC. The FDIC denied these claims and litigation ensued. JPMC later intervened in

the action and asserted counterclaims wherein it claimed ownership of the property claimed by

WMI.

WMI argued that JPMC was barred from responding to its claims with counterclaims by

WMI's automatic stay. The district court in Washington Mutual rejected this contention, citing the

ruling in *Financial News Network*. The court's ruling was based upon two grounds. First, the court held that a third party who opposes a claim asserted by a Chapter 11 debtor does not violate the stay, since the third party is not seeking to take possession of the claim, but rather is reacting to and opposing the claim. Second, since JPMC was opposing a claim filed by WMI, its action was necessarily a post-petition action not subject to the stay. *See also, In re Continental Air Lines, Inc.,* 61 B.R. 758 (S.D.Tex.1986); *In re Chateaugay Corp.,* 86 B.R. 33, 37-38 (S.D.N.Y.1987) (finding that automatic stay does not apply to claims that arise post-petition); *Vitranschart, Inc. v. Levy*, 2000 WL 1239081 (S.D.N.Y.2000) ("Nor does the stay apply to Mac Truong's third-party complaint, cross-claims, or counterclaims, since the automatic stay provision applies only to claims 'against the debtor' and not to claims brought by the debtor against other parties."). Accordingly, the ES Action should have been allowed to proceed under 11 U.S.C. § 362(a)(1). *See United States v. Inslaw, Inc.,* 932 F.2d 1467, 1473 (D.C.Cir.1991) (The stay does not force a Chapter 11 debtor to capitulate to the claims filed by another Chapter 11 debtor).

At bottom, this Court's ruling is premised upon the assumption that one particular type of counterclaim/objection—an action under 11 U.S.C.§ 510(c)—falls outside the claims allowance/disallowance process and consequently is barred by the stay as "offensive." This conclusion is contrary to precedent. Both the Supreme Court and Second Circuit have held that counterclaims filed in response to claims, which seeks recourse against those claims, whether in the form of an adversary proceeding or otherwise, fall within the claims allowance/disallowance process. *See Katchen v. Landy*, 382 U.S. 323 (1966); *Langenkamp v. Culp,* 498 U.S. 42 (1990); *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989); *Callaway v. Benton*, 336 U.S. 132 (1949) ("The bankruptcy power unquestionably gives the Commission and court, working within the framework of the Act, full and complete power not only over the debtor and its property, but also, as a corollary, over any rights that may be asserted against it. These rights may be altered in any way thought necessary to achieve sound financial and operating conditions for the reorganized company, subject to the requirements of the Act."); *CBI Holding Co., Inc.*, 529 F.3d 432 (2nd Cir. 2008); *see also In re Danbury Square Associates, Ltd. Partnership*, 150 B.R. 544, 547 (Bankr.

S.D.N.Y.1993) ("[A] trustee's objection to a lien or claim bottomed on the concept of equitable

subordination pursuant to 11 U.S.C. § 510(c) does implicate the process of allowance or

disallowance of claims which is expressly described as a core proceeding under 28 U.S.C. §

157(b)(2)(B)."); *In re Iridium*, 285 B.R. 822 (S.D.N.Y.2002); *In re 9281 Shore Road Owners

Corp.*, 187 B.R. 837, 854 (E.D.N.Y. 1995) ("In this case, the Debtor has been summarily deprived

of the right to try its equitable subordination claim on the merits in the only available forum, the

Bankruptcy Court. This resulted in the deprivation of a significant right on behalf of the Debtor.

The right to equitable subordination in a bankruptcy proceeding is so important that it has been

adjudicated as a defense to a motion for relief from the automatic stay**.**")

> **C)      Serious Questions Going To The Merits Exist Due To Extraordinary**
**Nature Of The Relief And The Manner In Which The Relief Was Granted.** Prior to the

adoption of the 1984 amendments to the bankruptcy code, the bankruptcy courts lacked the power

to enjoin another court. *Celotex Corporation v. Edwards*, 514 U.S. 300, 328, 115 S.Ct. 1493, 1508

(1995) ("Thus, for well over 50 years prior to the adoption of the 1984 amendments to the

Bankruptcy Code, it was clear that Congress intended to deny bankruptcy judges the power to

enjoin other courts."). Although the bankruptcy court's are now afforded this power under 11

U.S.C. § 105, this power can only be exercised to enforce another substantive right provided for in

the Bankruptcy Code, and then only in compliance with the procedural requirements in

Fed.R.Civ.P. 65. *In re Luis Elec. Contracting Corp.*, 917 F.2d 713, 716 (2nd Cir. 1990).

In this case, a "stealth" injunction was designed by the Lehman Entities and Fenway

Capital into a contractual arrangement. Upon the closing of this contractual exchange, an

injunction will go into effect that will bar another court from performing a core statutory function,

*S.G. Phillips Constructors v. City of Burlington,* 45 F.3d 707, 705 (2nd Cir. 1995) ("Nothing is

more directly at the core of bankruptcy administration ... than the quantification of all liabilities of

the debtor."), and it will freeze in place sixteen Chapter 11 cases. Although the Lehman Entities

contend that that this injunction will arise "by operation of law," this claim is untenable and

disingenuous. The injunction approved by this Court was the result of carefully designed

contractual artifice cooked up by the Lehman Entities and Fenway Capital. Although the Lehman Entities dragged the road over to roadblock, instead of vice versa, the legal result is the same— the SunCal Appellants' Chapter 11 cases and the powers of another court are enjoined.

An injunction is an extraordinary remedy and will be only be granted upon strong showing that satisfies the procedural requisites and offers the enjoined party the requite protections. *See Reynolds v. Giuliani*, 506 F.3d 183 (2nd Cir. 2007) ("The authority to issue an injunction is an extraordinary and powerful one that is to be used sparingly and cautiously and only in a "clear and plain" case."); Fed.R.Civ.P. 65.  Here, this standard was not applied and none of the requirements necessary for injunctive relief were satisfied. This was clear error. *See Commonwealth Oil Ref. Co. v. U.S.E.P.A. (In re Commonwealth Oil Ref. Co.),* 805 F.2d 1175, 1188-89 (5th Cir.1986) ("[T]he legislative history of § 105 makes clear that stays under that section are granted only under the usual rules for the issuance of an injunction."), *cert. denied,* 483 U.S. 1005, 107 S.Ct. 3228, 97 L.Ed.2d 734 (1987); *In re Eagle-Picher Indus., Inc.,* 963 F.2d 855,  858 (6th Cir. 1992) ("When issuing a preliminary injunction pursuant to its powers set forth in section 105(a), a bankruptcy court must consider the traditional factors governing preliminary injunctions issued pursuant to Federal Rule of Civil Procedure 65.").

      **D)**    <u>**The Balance of The Hardships Tips Decidedly In Favor of The SunCal Appellants**</u>. If the relief granted by this Court is not stayed, the SunCal Appellants will be deprived of the ability to resolve a priority dispute that impacts eighty percent of the claims filed against their estates. This relief effectively enjoins their in-process reorganization efforts, while at the same time allowing the Lehman Entities to pursue their competing plan efforts in the same cases. In effect, the Orders turn the SunCal Appellants into the Lehman Entities' punching bag for the foreseeable future, without any ability to seek recourse. In contrast to the harm inflicted upon the SunCal Appellants, if the Motion is granted, the Lehman Entities will suffer no discernable detriment, *since they are not even defendants in the ES Action*. The only parties who might suffer are Fenway Capital and the non-debtor Lehman Entities, and their detriment is irrelevant. On these facts, the hardships tip decidedly in favor of the SunCal Appellants.

      **E)**      <u>**The Public Interest Favors A Stay.**</u> The Claims Transaction described in the Claims Transaction Motion was designed to achieve an objective that is barred by a well-established body of law in the Second Circuit: The use of the automatic stay as sword to obtain an unfair litigation objective. *See Bohack Corp. v. Borden, Inc.*, 599 F.2d 1160, 1168 (2nd Cir. 1979) ("[We] must be cautious to avoid a decision which could convert [the automatic stay] from a shield into a weapon."); *In re Jandous Elec. Const. Corp.,* 106 B.R. 48, 50 (Bankr.S.D.N.Y.1989) ("The purpose of the stay is the protection of the debtor, ***but when the debtor is in the position of the assailant***, rather than the defendant, it would be inequitable to invoke the stay against the defendant's counterclaim, or to permit the debtor to use the stay as a basis for extending the time to remove the state court action to the bankruptcy court.") (emphasis added); *In re Saxon Indus., Inc.*, 43 B.R. 64, 67 (Bankr. S.D.N.Y. 1984) ("In light of the litigation initiated by Saxon, it would clearly be inequitable to allow Saxon to use § 362 to prevent Fox from pressing counterclaims."); *In re Wedtech Corp.*, 87 B.R. 279, 289 (Bankr. S.D.N.Y. 1988) ("Here, were the stay not to be lifted in the adversary proceeding for all purposes, [counter-claimant] would never be able to fix its claim, a result which is highly inequitable in light of [debtor's] suit against [counter-claimant]."); *In re Brannan*, 40 B.R. 20, 24-25 (Bankr. N.D. Ga. 1984) (an attempt to "shield a property interest under the automatic stay by conveying the property interest to" the debtor's estate during the pendency of the bankruptcy "*would be an abuse of the bankruptcy process*.").

      The automatic stay was intended to serve as a shield, not as a litigation sword, or worse, a collection mechanism. The evidence in this case (including the frank admissions of the Lehman Entities) establishes that the Claims Transaction Motion and the Claims Transaction described therein were designed to drag assets acquired post-petition within the stay's umbrella. If this stratagem proceeds, sixteen reorganizations cases will be stayed and core powers vested in another court by Congress  will be impaired. In contrast, if a stay is granted, the Lehman Entities liquidation will proceed and the SunCal Appellants will be able to pursue their reorganization efforts. On these facts, the public interest favors the issuance of a stay pending appeal of the Court's rulings.

# V

## <u>CONCLUSION</u>

For the reasons prayed the SunCal Appellants would respectfully pray that the Court grant the relief prayed for in the Motion.

Dated: June 10, 2010                  Respectfully submitted,

                                         /s/  Sean A O'Keefe
                                    Sean A O'Keefe
                                    Paul J. Couchot
                                    WINTHROP COUCHOT, P.C.
                                    660 Newport Center Drive, Fourth Floor
                                    Newport Beach, CA 92660
                                    Telephone: (949) 720-4100
                                    Facsimile: (949) 720-4111

                                         /s/  Louis R. Miller
                                    Louis R. Miller
                                    MILLER BARONDESS, LLP
                                    1999 Avenue of the Stars, Suite 1000
                                    LOS ANGELES, CA 90067
                                    Telephone: (310) 552-4400
                                    Facsimile: (310) 552-8400

                                    *Attorneys for the SunCal Appellants*