and, if there are ultra vires acts or acts that conflict with the Company Code, provided such acts are specifically mentioned in the notice of the meeting.

Within thirty days of the approval of the annual accounts by the Shareholders' Meeting, the Board of Directors shall deposit the annual accounts, the management report as well as the other documents listed in Articles 98 and 100 of the Company Code, with the "Nationale Bank van Belgie".

### Article 37    Distributions

Five per cent (5%) of the annual net profits shown in the annual accounts shall be transferred to a reserve account required by law. This retention shall be compulsory until the reserve reaches ten per cent (10%) of the subscribed capital of the Company.

Upon proposal of the Board of Directors, the Shareholders shall decide on the allocation of the balance remaining of the net profits in accordance with the limits imposed by Article 617 of the Company Code.

### Article 38    Payment of Dividends

Dividends shall be paid at the time and place determined by the Board of Directors.

The holders of registered shares shall be barred from claiming dividends which have not been claimed during a period of five years from the due date of payment.

### Article 39    Interim Dividends

The Board of Directors shall be authorised to pay interim dividends within the limits of Article 618 of the Company Code.

## TITLE VI. DISSOLUTION - LIQUIDATION

### Article 40    Voluntary Liquidation

If, as a result of losses, the net assets of the Company have been reduced to less than half of its subscribed capital, the Board of Directors must submit the question of the liquidation of the Company and any other possible measures to the Shareholders' Meeting which shall discuss such matters in accordance with Article 633 of the Company Code.

If, as a result of losses, the net assets of the Company are less than one quarter of the subscribed capital, the liquidation of the Company may be decided by twenty-five per cent (25%) of the votes cast at the meeting.

If the net assets of the Company are less than the statutory minimum, each interested party may request the court to dissolve the Company. The court may grant the Company time to regularise its situation.

### Article 41    Liquidation

In the event of the dissolution and liquidation of the Company, whenever and for whatever reason, the liquidation of the Company shall be carried out by liquidators appointed by the Shareholders' Meeting, or, failing such appointment, by the Board of Directors acting as a liquidation committee. The liquidators shall act jointly unless otherwise decided. In this respect, the liquidators shall have the broadest powers granted by Article 186 and following of the Company Code, except as restricted by the Shareholders' Meeting.

The Shareholders Meeting shall determine the remuneration of the liquidators.

### Article 42    Distribution

The net asset balance remaining after payment of all debts, liabilities and liquidation costs, or reservation of the necessary amounts to cover these debts, liabilities and costs, shall first be used to reimburse in cash or in kind the paid-in capital not yet reimbursed to the shareholders. The balance remaining, if any, shall be divided equally among all shares.

## TITLE VII. GENERAL PROVISIONS

### Article 43    Election of Residence

All directors, managers and liquidators residing abroad shall for the duration of their term of office elect residence at the registered office of the Company, where all summons and notices with respect to corporate matters and the liability of the said persons for their management may be validly served on them, with the exception of notices of meetings in compliance with these Articles of Association.

The holders of registered shares must notify the Company of any change of residence. Failing such notice, they shall be deemed to have elected domicile at their prior residence.

**Article 44    Legal Provisions Reproduced in the Articles**

The provisions hereof which are literal reproductions of legal provisions of the Company Code, are set out herein for information purposes only.

**Article 45    Shareholders' agreement**

All or some of the shareholders of the Company may enter into shareholders' agreements relating to their participation in the Company.

# EASDAQ NV

Lei 19, bus 11, 3000 Leuven, België

RPR Leuven 0455.240.893

(de "**Vennootschap**")

---

**GECOMBINEERD BIJZONDER VERSLAG VAN DE RAAD VAN BESTUUR OVEREENKOMSTIG:**

**(I)** DE ARTIKELEN 582, 596 EN 598 VAN HET WETBOEK VAN VENOOTSCHAPPEN ("W. VENN.") MET BETREKKING TOT DE UITGIFTE VAN NIEUWE AANDELEN BENEDEN DE FRACTIEWAARDE VAN DE BESTAANDE AANDELEN EN MET OPHEFFING VAN HET VOORKEURRECHT TEN GUNSTE VAN KNIGHT CAPITAL GROUP INC. ("KNIGHT");

**(II)** DE ARTIKELEN 582 EN 602 W. VENN. MET BETREKKING TOT DE UITGIFTE VAN NIEUWE AANDELEN BENEDEN DE FRACTIEWAARDE VAN DE BESTAANDE AANDELEN AAN BORSE BERLIN AG ("BSX") DOOR EEN INBRENG IN NATURA VAN (DE GEHELE OF EEN DEEL VAN) DE IP TRANSFER CONSIDERATION OF (HET GEHEEL OF EEN DEEL VAN) DE HOOFDSOM OF VERWORVEN INTERESTEN ONDER DE 2009 LENINGSOVEREENKOMST;

**(III)** DE ARTIKELEN 582, 583, 596 EN 598 W. VENN. MET BETREKKING TOT DE UITGIFTE VAN WARRANTS TEN GUNSTE VAN KNIGHT MET EEN UITOEFENPRIJS DIE LAGER IS DAN DE FRACTIEWAARDE VAN DE BESTAANDE AANDELEN EN MET OPHEFFING VAN HET VOORKEURRECHT; EN

**(IV)** DE ARTIKELEN 582, 583, 596, 598 EN 602 W. VENN. MET BETREKKING TOT DE UITGIFTE VAN WARRANTS TEN GUNSTE VAN BSX MET EEN UITOEFENPRIJS DIE LAGER IS DAN DE FRACTIEWAARDE VAN DE BESTAANDE AANDELEN, UITOEFENBAAR OFWEL (A) IN GELD, MET OPHEFFING VAN HET VOORKEURRECHT, OFWEL (B) IN NATURA, DOOR DE INBRENG VAN HET SALDO (IN VOORKOMEND GEVAL) VAN DE IP TRANSFER CONSIDERATION EN/OF DE INBRENG VAN HET SALDO (IN VOORKOMEND GEVAL) VAN HET KAPITAAL EN VERWORVEN INTEREST ONDER DE 2009 LENINGSOVEREENKOMST

*Raad van Bestuur van 7 juni 2010*
*Bijzonder verslag van de Raad van Bestuur 582, 583, 596, 598 en 602 W.Venn.*

De Raad van Bestuur (de **"Raad"**) legt hierbij aan de buitengewone algemene vergadering van aandeelhouders van de Vennootschap (de **"BAV"**) zijn gecombineerd bijzonder verslag voor overeenkomstig (i) de artikelen 582, 596 en 598 van het Wetboek van vennootschappen (**"W.Venn."**) met betrekking tot de uitgifte van nieuwe aandelen beneden de fractiewaarde van de bestaande aandelen met opheffing van het voorkeurrecht ten gunste van Knight Capital Group, Inc. (**"Knight"**); (ii) de artikelen 582 en 602 W. Venn. met betrekking tot de uitgifte van nieuwe aandelen beneden de fractiewaarde van de bestaande aandelen dooreen inbreng in natura van een (de gehele of een deel van) de IP Transfer Consideration of (het geheel of een deel van) de hoofdsom en verworven interesten onder de 2009 Leningsovereenkomst, ten gunste van Börse Berlin AG (**"BSX"**); (iii) de artikelen 582, 583, 596 en 598 W.Venn. met betrekking tot de uitgifte van warrants aan Knight met een uitoefenprijs beneden de fractiewaarde van de bestaande aandelen en met opheffing van het voorkeurrecht; en (iv) de artikelen 582, 583, 596, 598 en 602 W. Venn. met betrekking tot de uitgifte van warrants aan BSX, met een uitoefenprijs beneden de fractiewaarde van de bestaande aandelen, uitoefenbaar ofwel (a) in geld, met opheffing van het voorkeurrecht, ofwel (b) in natura, door een inbreng van het saldo (in voorkomend geval) van de IP Transfer Consideration en/of inbreng van het saldo (in voorkomend geval) van het kapitaal en verworven interest onder de 2009 Leningsovereenkomst.

Overeenkomstig de artikelen 582, 583, 596, 598 en 602 W.Venn. beschrijft de Raad in dit verslag het doel van en de rechtvaardiging voor de uitgifte van nieuwe aandelen en warrants (werkelijk, respectievelijk mogelijk) beneden de fractiewaarde van de bestaande aandelen en de opheffing van het voorkeurrecht ten gunste van bepaalde begunstigden (zoals deze in dit verslag worden geïdentificeerd), de inbreng in natura in het kapitaal van de Vennootschap van (de gehele of een deel van) de IP Transfer Consideration (zoals verder gedefinieerd hieronder) en (de gehele of een deel van) de hoofdsom en verworven interesten onder de leningsovereenkomst van 7 augustus 2009 (zoals verder gedefinieerd hieronder), de uitgifteprijs en de (financiële) gevolgen van deze verrichtingen voor de bestaande aandeelhouders en warranthouders (ook in verhouding tot hun deelname in het maatschappelijk kapitaal en de winst van de Vennootschap). De uitgifte van aandelen en warrants is een gevolg van de afschaffing van alle bestaande klassen van aandelen van de Vennootschap, wat in een afzonderlijk bijzonder verslag van de Raad van dezelfde datum als onderhavig bijzonder verslag wordt gerechtvaardigd en dat samen moet worden gelezen met dit verslag.

De Raad heeft de commissaris van de Vennootschap verzocht een verslag op te stellen overeenkomstig de artikelen 582, 596, 598 en 602 W. Venn. met betrekking tot de uitgifte van de aandelen en de warrants beneden de fractiewaarde van de bestaande aandelen en met opheffing van het voorkeurrecht van de bestaande aandeelhouders, respectievelijk de inbreng(en) in natura.

*Raad van Bestuur van 7 juni 2010*
*Bijzonder verslag van de Raad van Bestuur 582, 583, 596, 598 en 602 W.Venn.*

# I.  UITGIFTE VAN AANDELEN

## 1.1.  DOEL EN RECHTVAARDIGING VAN DE KAPITAALVERHOGING

De Vennootschap heeft in Knight een strategische partner gevonden die haar in staat zal stellen om haar activiteiten van het aanbieden van diensten aan effectenbeurzen en handelsplatformen verder te ontwikkelen. Als onderdeel van deze strategische samenwerking zal Knight inschrijven op een kapitaalverhoging van de Vennootschap ten belope van een bedrag gelijk aan USD 5.000.000 omgezet in euro aan een redelijke wisselkoers (de wisselkoers voor omzetting van US dollars in euro zoals van toepassing op het tijdstip van de conversie, de "**Omzettingskoers**") (de "**Knight Inschrijvingsprijs**"), dewelke verwacht wordt plaats te vinden op of rond 10 juni 2010. De Knight Inschrijvingsprijs zou bij wijze van voorbeeld EUR 4.060.450 bedragen, indien berekend aan de wisselkoers per 31 mei 2010. Naar verwachting zal deze inbreng in kapitaal de Vennootschap de nodige tijd geven om haar huidige activiteiten verder te laten groeien en om haar productaanbod uit te breiden.

De uitgifteprijs per aandeel is vastgelegd op een bedrag gelijk aan de Knight Inschrijvingsprijs gedeeld door de 8.735.111 uit te geven nieuwe gewone aandelen (de "**Uitgifteprijs**"), dewelke bijvoorbeeld zou neerkomen op ongeveer EUR 0.46 per aandeel, wanneer berekend aan de wisselkoers van 31 mei 2010 en waarvan de Raad ervan overtuigd is dat deze uitgifteprijs minstens gelijk is aan de intrinsieke waarde (en de netto-actiefwaarde) van de Vennootschap op het einde van het laatste boekjaar en op datum van dit verslag (zie hieronder, onder punt 1.3.). Om twijfel te vermijden wordt er gespecificeerd dat de exacte uitgifteprijs per aandeel slechts gekend zal zijn bij de berekening van de Knight Inschrijvingsprijs (en zal afhangen van de wisselkoers van toepassing op de dag van berekening).

Gelet op het bedrag van deze investering zal Knight, op het ogenblik dat deze verrichting wordt voltooid, ongeveer 15,38% (met inbegrip van Knights huidig aandeelhouderschap van 292.901 aandelen Klasse B, vóór het voltooien van de kapitaalverhoging) van het kapitaal van de Vennootschap houden (waarbij de voltooiing normaliter zal plaatsvinden op dezelfde datum als de buitengewone algemene vergadering) of ongeveer 14,99% (met inbegrip van Knights huidig aandeelhouderschap van 292.901 aandelen Klasse B, vóór het voltooien van de kapitaalverhoging) op een volledig verwaterde basis (exclusief de warrants uit te geven aan Knight en BSX op de BAV, maar met inbegrip van de aandelen uit te geven aan BSX op de BAV).

De Vennootschap en BSX zullen hun samenwerking als partners verder zetten om het gezamenlijk doel te bereiken een leefbaar pan-Europees marktsegment voor Europese liquide financiële instrumenten te creëren, in overeenstemming met een

*Raad van Bestuur van 7 juni 2010*
*Bijzonder verslag van de Raad van Bestuur 582, 583, 596, 598 en 602 W.Venn.*

business plan dat dient aangenomen te worden door de Vennootschap. Als deel van deze verder gezette samenwerking, en om BSX toe te staan om haar huidig belang van 10% (bij benadering) in de Vennootschap te behouden binnen het kader van de investering door Knight, zal BSX inschrijven op 888.298 aandelen door middel van een kapitaalverhoging in natura door de inbreng van een of meer schuldvorderingen van BSX ten aanzien van de Vennootschap ten belope van een bedrag in hoofdsom (of interest) gelijk aan de BSX Inschrijvingsprijs (zoals hieronder gedefinieerd). De aldus in te brengen schuldvorderingen zullen bestaan uit: (i) de vordering van BSX op de betaling door de Vennootschap van de schuld van EUR 500.000 betaalbaar door de Vennootschap aan BSX voor de overdracht van bepaalde intellectuele eigendomsrechten, waaronder onder andere een Trademark Assignment (de **"IP Transfer Consideration"**) onder de investeringsovereenkomst afgesloten op 20 juli 2009 tussen de Vennootschap, Citadel Tactical Investments LLC (**"Citadel"**), BSX en Dr. Jos B. Peeters, en (ii) voor zover de IP Transfer Consideration niet voldoende is om de BSX Inschrijvingsprijs volledig te volstorten, een vordering van BSX tot terugbetaling van een deel van de bestaande uitstaande lening tussen BSX en de Vennootschap (m.n. de leningsovereenkomst van 7 augustus 2009 tussen BSX, Dr. Jos B. Peeters en de Vennootschap (de **"2009 Leningsovereenkomst"**)), voor een bedrag (bestaande voor een deel uit het bedrag in hoofdsom (EUR 3.244.126,94) met de interesten daarop verworven) gelijk aan het saldo van de BSX Inschrijvingsprijs dat aldus nog volgestort dient te worden.

Gelet op het bedrag van deze investering zal BSX, op het tijdstip dat deze verrichting wordt beëindigd, ongeveer 9,90% (met inbegrip van BSX's huidig aandeelhouderschap van 4.925.916 aandelen Klasse B, vóór het voltooien van de kapitaalverhoging en met inbegrip van de aandelen uitgegeven aan Knight op de BAV) van het kapitaal van de Vennootschap aanhouden of ongeveer 9,65% op een volledig verwaterde basis (exclusief de warrants uit te geven aan Knight en BSX op de BAV, maar inbegrip van de aandelen uit te geven aan Knight op de BAV).

## 1.2.   UITGIFTE VAN AANDELEN EN DE AARD VAN DE UITGEGEVEN AANDELEN

In het licht van deze verrichting zal de Vennootschap 8.735.111 nieuwe aandelen uitgeven aan Knight en 888.298 nieuwe aandelen aan BSX, i.e., een totaal van 9.623.409 nieuwe aandelen (de **"Aandelen"**). De aandelen zullen volledig worden volgestort bij de kapitaalverhoging.

De aandelen zullen geboekt worden als volgestort, met de rechten daaraan verbonden overeenkomstig de gewijzigde statuten van de Vennootschap, als gevolg van de uitgifte van de Aandelen, en zullen zich *pari passu* verhouden in alle opzichten met alle bestaande aandelen van de Vennootschap.

*Raad van Bestuur van 7 juni 2010*
*Bijzonder verslag van de Raad van Bestuur 582, 583, 596, 598 en 602 W.Venn.*

1.3.   UITGIFTE VAN AANDELEN AAN KNIGHT AAN EEN UITGIFTEPRIJS DIE MINSTENS GELIJK IS
AAN DE INTRINSIEKE WAARDE MAAR LAGER DAN DE FRACTIEWAARDE VAN DE BESTAANDE
AANDELEN (ARTIKELEN 582, 596 EN 598 W.VENN.)

Het geplaatst kapitaal van de Vennootschap bedraagt momenteel EUR
128.526.848,90, vertegenwoordigd door 49.077.487 aandelen, wat resulteert in
een fractiewaarde van ongeveer EUR 2,62 per aandeel.

De voorgestelde Uitgifteprijs (ongeveer EUR 0.46 gebaseerd op de wisselkoers
van 31 mei 2010) zal daarom lager zijn dan de huidige fractiewaarde van de
aandelen.

De Uitgifteprijs is echter minstens gelijk aan de intrinsieke waarde van de
bestaande aandelen, ook wanneer de intrinsieke waarde wordt berekend op basis
van de jaarrekening van 31 december 2009 (goed te keuren op de AV). Het
maatschappelijk kapitaal (of de netto-actiefwaarde of **"NAW"**) van de
Vennootschap, zoals uiteengezet in de geauditeerde jaarrekening van 31
december 2009, bedroeg EUR -498.394,58. Dit bedrag houdt evenwel geen
rekening met het bedrag van EUR 10.000.000, hetwelk nog niet was betaald door
Citadel ten tijde van de kapitaalverhoging van 2009 en dat door de Raad nog niet
werd opgevraagd op datum van 31 december 2010 (er dient echter opgemerkt te
worden dat een bedrag ten belope van EUR 5.000.000 van het niet-volgestorte
kapitaal in april 2010 is opgevraagd en is volgestort). Met de bedoeling de NAW
te berekenen, werd dit bedrag toegevoegd. De intrinsieke waarde, indien
berekend als een NAW, is daarom gelijk aan (EUR -498.394,58 + EUR
10.000.000)/ 49.077.487 aandelen of ongeveer EUR 0,19 per aandeel. De
Uitgifteprijs (ongeveer EUR 0.46 gebaseerd op de wisselkoers van 31 mei 2010)
zal daarom hoger zijn dan de NAW van de aandelen van de Vennootschop op 31
december 2009. Daarenboven heeft de Vennootschap sedert de afsluiting van het
laatste boekjaar verliezen blijven oplopen, waardoor de NAW sedert die datum
verder is gedaald, zodat de Uitgifteprijs ook hoger zal zijn dan de NAW zoals
toepasbaar op de datum van de BAV. De Raad is er in zijn zoektocht naar
alternatieve financieringsbronnen of mogelijke vormen van samenwerking met
derde partijen op dit moment niet in geslaagd potentiële inschrijvers te vinden die
bereid zouden zijn geweest deel te nemen aan een kapitaalverhoging voor
gelijkaarde bedragen, tegen betere voorwaarden.

Daarom is de Raad van mening dat de Uitgifteprijs (ongeveer EUR 0.46 gebaseerd
op de wisselkoers van 31 mei 2010) minstens gelijk is aan de huidige intrinsieke
waarde van de aandelen van de Vennootschap.

De kapitaalverhoging zal een weerslag hebben op de vermogensrechten (m. n.,
onder andere, dividendrechten en rechten op liquidatieopbrengsten) en
lidmaatschapsrechten (m. n., onder andere, stem- en voorkeurrechten) die aan
de bestaande aandelen zijn verbonden.

*Raad van Bestuur van 7 juni 2010*
*Bijzonder verslag van de Raad van Bestuur 582, 583, 596, 598 en 602 W.Venn.*

Dit vloeit voort uit het feit dat (i) de kapitaalvertegenwoordigende waarde van alle (bestaande en nieuwe) aandelen na de kapitaalverhoging zou worden gelijkgeschakeld; en (ii) bepaalde bijzondere rechten zullen worden toegewezen aan bepaalde specifieke aandeelhouders overeenkomstig de statuten (er wordt verwezen naar het bijzonder verslag van de Raad overeenkomst art. 560 W. Venn. van dezelfde datum als onderhavig verslag)

De samenwerking met Knight en de verder gezette samenwerking met BSX zal de Vennootschap toestaan haar activiteiten van het aanbieden van diensten aan effectenbeurzen en handelsplatformen verder te ontwikkelen. De voorgestelde investering door Knight en BSX, aan de voorgestelde Uitgifteprijs, is volgens de Raad daarom in het belang van de Vennootschap.

### 1.4.    OPHEFFING VAN HET VOORKEURRECHT MET BETREKKING TOT DE UITGIFTE VAN NIEUWE AANDELEN TEN GUNSTE VAN KNIGHT (ARTIKELEN 596 EN 598 W. VENN.)

Met betrekking tot de voorgestelde uitgifte van aandelen aan Knight stelt de Raad voor om het voorkeurrecht van de huidige aandeelhouders op te heffen.

De begunstigde van de opheffing van het voorkeurrecht is Knight, een kapitaalmarktenonderneming die toegang tot de markt en diensten voor de uitvoering van transacties aanbiedt in diverse activaklassen aan de koopzijde, verkoopzijde en aan corporate emittenten-cliënten. Er wordt voorgesteld om 8.735.111 nieuwe aandelen aan Knight uit te geven, waardoor het totale aantal aandelen van 49.077.487 tot 57.812.598 zou stijgen (en tot 58.700.896 aandelen wanneer de nieuwe aandelen aan BSX meegerekend worden).

Wat de uitgifteprijs, de rechtvaardiging ervan en de financiële gevolgen van de verrichting voor de huidige aandeelhouders betreft, wordt verwezen naar de bovenstaande delen 1.1 en 1.3, met inbegrip van het feit dat de aandelen die uitgegeven zullen worden aan Knight, uitgegeven zullen worden beneden de fractiewaarde van de bestaande aandelen maar aan een Uitgifteprijs dewelke minstens gelijk is aan de intrinsieke waarde van de aandelen ‘van de Vennootschap en de dilutie veroorzaakt door de uitgifte van de aandelen aan Knight.

### 1.5.    UITGIFTE VAN AANDELEN AAN BSX IN RUIL VOOR EEN INBRENG IN NATURA DOOR BSX VAN DE IP TRANSFER CONSIDERATION EN LOAN CONSIDERATION (ARTIKEL 602 W.VENN.)

*1.5.1 Beschrijving van de inbreng in natura.*

De inbreng in natura bestaat uit de inbreng door BSX in het kapitaal van de Vennootschap van (i) (de gehele of een deel van) de IP Transfer Consideration, *i.e.,* (de gehele of een deel van) de schuld van de Vennootschap aan BSX ten gevolge van de IP transfer onder de Citadel Investeringsovereenkomst ten belope

van het bedrag van EUR 5.000.000, en (ii) indien de IP Transfer Consideration niet voldoende is om de BSX Inschrijvingsprijs volledig te volstorten, het recht van BSX op de terugbetaling van de gehele of een deel van de bestaande lening uitstaande tussen BSX en de Vennootschap (i.e. de leningsovereenkomst van 7 augustus 2009 tussen BSX, Dr. Jos B. Peeters en de Vennootschap (de "**2009 Leningsovereenkomst**")), ten belope van een bedrag (bestaande uit het gehele of een deel van de hoofdsom (EUR 3.244.126,94) met de daarop verworven interest ("**Verworven Interest**"; naar de hoofsom van de 2009 Leningsovereenkomst en de Verworven Interest wordt samen verwezen als de "**Loan Consideration**")) gelijk aan het saldo van de BSX Inschrijvingsprijs die nog aldus dient te worden volgestort.

De rente onder de 2009 Leningsovereenkomst is EURIBOR +2% per jaar. Ter informatie wordt er gespecificeerd dat op 31 mei 2010, de Verworven Interest EUR 88.648,04 bedraagt. Het kapitaal en de verworven interest onder de 2009 Leningsovereenkomst moeten in principe betaald worden op de *Termination Date* (dewelke, afhankelijk van de omstandigheden, een datum zal zijn tussen 1 januari en 31 december 2012). Echter, na kennisgeving door BSX, kan BSX volgens de 2009 Leningsovereenkomst de verworven maar onbetaalde interesten onder de 2009 Leningsovereenkomst gebruiken om, in bepaalde omstandigheden, in te schrijven op aandelen van de Vennootschap. BSX zal ook gerechtigd zijn het kapitaal onder de 2009 Leningsovereenkomst te gebruiken om in te schrijven op de aandelen van de Vennootschap op de BAV en/of onder de BSX Warrant.

Het exacte bedrag van de IP Transfer Consideration dat zal ingebracht worden in het kapitaal van de Vennootschap zal gelijk zijn aan de finale Uitgifteprijs (dewelke afhangt van de Omzettingskoers dewelke geweten zal zijn op of rond 10 juni 2010) vermenigvuldigd met de 888.298 aandelen in het kapitaal van de Vennootschap die uitgegeven zullen worden aan BSX (de "**BSX Inschrijvingsprijs**"). Gebaseerd op de geschatte Uitgifteprijs (ongeveer EUR 0.46 gebaseerd op de wisselkoers van 31 mei 2010) zou dit neerkomen, bij wijze van voorbeeld, op een inbreng van de IP Transfer Consideration voor een bedrag van EUR 408.617,08.

Het exacte bedrag van de Loan Consideration dat zal worden ingebracht in het kapitaal van de Vennootschap zal gelijk zijn aan het positieve verschil (in voorkomend geval) tussen de BSX Inschrijvingsprijs en de IP Transfer Consideration (wat, om twijfel te vermijden, impliceert dat de BSX Inschrijvingsprijs hoger is dan de IP Transfer Consideration). Gebaseerd op de inbreng van de IP Transfer Consideration voor een geschat bedrag van EUR 408.617,08, zoals beschreven in de vorige paragraaf, zou BSX geen deel van de Loan Consideration dienen in te brengen in het voorbeeld beschreven in dit verslag.

## 1.5.2 Waardering en vergoeding van de inbreng in natura

1.5.2.1 Waardering van de inbreng in natura

De waardering van de IP Transfer Consideration en de Loan Consideration is gebaseerd op de nominale waarde van de IP Transfer Consideration en de Loan Consideration.

Overeenkomstig de normale waarderingsregels, wordt een claim *vis-à-vis* de Vennootschap die wordt ingebracht in het kapitaal van de Vennootschap, gewaardeerd aan nominale waarde, i.e., EUR 500.000, resp. EUR 3.224.126,94 in hoofdsom onder de 2009 Leningsovereenkomst en het werkelijke bedrag van de Verworven Interesten, van tijd tot tijd. Om twijfel te vermijden wordt gepreciseerd dat deze waarderingsmethode eveneens zal worden toegepast op het werkelijke deel van de IP Transfer Consideration, resp. Loan Consideration, dat werkelijk zal ingebracht worden in het kapitaal van de Vennootschap (EUR 408.617,08 voor de IP Transfer Consideration in het voorbeeld hierboven beschreven).

1.5.2.2 Vergoeding van de inbreng in natura

*1.5.2.2.1. Kapitaalverhoging*

Het kapitaal van de Vennootschap zal worden verhoogd door inbreng in natura van de (gehele of een deel van de) IP Transfer Consideration of de (gehele of een deel van de) Loan Consideration in het kapitaal van de Vennootschap, met een bedrag gelijk aan de BSX Inschrijvingsprijs, met als resultaat dat een totaal aantal van 888.298 gewone aandelen op naam, zonder nominale waarde, zouden worden uitgeven, aan de Uitgifteprijs.

*1.5.2.2.2 Waardering van de aandelen van de Vennootschap*

Er werd vastgesteld, op basis van een interne beoordeling, dat de waarde van de aandelen die zullen worden uitgegeven ter vergoeding van de inbreng in natura gelijk is aan de Uitgifteprijs, gelet op het feit dat Knight bereid is in te schrijven aan deze prijs en gelet op de bepaling van de intrinsieke waarde van de aandelen van de Vennootschap zoals beschreven onder 1.3 hierboven.

1.5.3 Belang van de inbreng in natura van de (gehele of een deel van de) IP Transfer Consideration en de (gehele of een deel van de) Loan Consideration en van de daaruit volgende kapitaalverhoging

De inbreng gedaan door BSX en de verder gezette samenwerking met BSX zal, in aanvulling op de investering door Knight, de Vennootschap ertoe in staat stellen

*Raad van Bestuur van 7 juni 2010*
*Bijzonder verslag van de Raad van Bestuur 582, 583, 596, 598 en 602 W.Venn.*

om haar activiteiten van het aanbieden van diensten aan effectenbeurzen en handelsplatformen verder te ontwikkelen.

De voorgestelde inbreng in natura aan de voorgestelde uitgifteprijs en de daaruit volgende kapitaalverhoging is in het belang van de Vennootschap, aangezien het relevante deel van de schuld van de Vennootschap *vis-à-vis* BSX ten belope van het bedrag van de IP Transfer Consideration, resp. Loan Consideration, zal wegvallen ten gevolge van de bijdrage van BSX in het kapitaal van de Vennootschap (door schuldvermenging), en gezien BSX de wil geuit heeft om haar samenwerking met de Vennootschap verder te zetten.

Er wordt verwezen naar 1.1 hierboven voor de verwatering veroorzaakt door de beoogde uitgifte van aandelen aan BSX.

2.2. Conclusies van de commissaris

Overeenkomstig artikel 602 W.Venn. heeft de Raad de commissaris van de Vennootschap verzocht een verslag op te stellen met betrekking tot de inbreng in natura beschreven in dit bijzonder verslag van de Raad.

De ontwerpconclusie van de commissaris is (wat betreft de beschrijving van de inbreng in natura, de waarderingsmethode en de vergoeding voor de inbreng in natura) de volgende:

*"Dat de verrichting werd nagezien overeenkomstig de normen uitgevaardigd door het Instituut van de Bedrijfsrevisoren inzake inbreng in natura en dat de raad van bestuur van de Vennootschap verantwoordelijk is voor de waardering van de ingebrachte bestanddelen en voor de bepaling van het aantal door de Vennootschap uit te geven aandelen ter vergoeding van de inbreng in natura*

*Dat de beschrijving van de inbreng in natura beantwoordt aan de normale vereisten van nauwkeurigheid en duidelijkheid*

*Dat de door de partijen weerhouden methoden van waardering bedrijfseconomisch verantwoord zijn*

*Dat de toegepaste waarderingsmethoden leiden tot inbrengwaarden die tenminste overeenkomen met het aantal en de intrinsieke waarde van de tegen de inbreng uit te geven aandelen*

*Dat de inbrengwaarden niet overeenkomen met het aantal en de fractiewaarde van de huidige aandelen; de verklaring en verantwoording van de uitgifte van aandelen beneden fractiewaarde wordt duidelijk omschreven in het bijgevoegd bijzonder verslag van de raad van bestuur*

*Raad van Bestuur van 7 juni 2010*
*Bijzonder verslag van de Raad van Bestuur 582, 583, 596, 598 en 602 W.Venn.*

*[...]*

*Wij willen er tenslotte aan herinneren dat onze opdracht er niet in bestaat een uitspraak te doen betreffende de rechtmatigheid en billijkheid van de verrichting of, met andere woorden, dat ons verslag geen fairness opinion inhoudt."*

De Raad wijkt niet af van deze conclusie.

*Raad van Bestuur van 7 juni 2010*
*Bijzonder verslag van de Raad van Bestuur 582, 583, 596, 598 en 602 W.Venn.*

## 2  UITGIFTE VAN WARRANTS

2.1.    DOEL VAN EN RECHTVAARDIGING VOOR DE UITGIFTE VAN WARRANTS

De uitgifte van de Warrants (zoals hieronder gedefinieerd) is een essentieel element van de verrichting, gericht op de kapitalisering van de Vennootschap en op het veiligstellen van haar leefbaarheid op lange termijn (zoals hierboven uiteengezet in deel 1.1) en is daarom in het belang van de Vennootschap.

De Knight Warrant zal worden uitgegeven aan Knight als deel van, en als voorwaarde voor, de investering van Knight in de Vennootschap. De Knight Warrant wordt uitgegeven aan Knight als deel van de compensatie van Knight voor haar *venture* investering in het actief van de Vennootschap.

De BSX Warrant zal worden uitgegeven aan BSX als deel van de beoogde transactie en om hun samenwerking als partners verder te zetten om het gezamenlijk doel te bereiken als leefbaar pan-Europees marktsegment voor Europese liquide financiële instrumenten te creëren. Als deel van deze verdergezette samenwerking, en om BSX toe te staan om haar huidig belang van 10% (bij benadering) in de Vennootschap te behouden in het geval Knight haar Warrant uitoefent, zal de hieronder beschreven Warrant aan BSX uitgegeven worden.

2.2.    DEFINITIES

| | |
|---|---|
| **"Aanpassingsgebeurtenis"** | de uitgifte door de Vennootschap van gewone aandelen (of effecten converteerbaar in gewone aandelen of effecten die recht geven om in te schrijven op gewone aandelen) tegen een uitoefeningsprijs of uitgifteprijs die minder bedraagt dan de Knight Uitoefenprijs |
| **"BSX Nieuwe Gewone Aandelen"** | Betekent het aantal nieuwe gewone aandelen gelijk aan X in de volgende formule:<br><br>$X=(Y*(100/90)) - Y$<br><br>Waarbij Y gelijk is aan het aantal Knight Warrant Aandelen, uitgegeven ingevolge de Knight Warrant. |
| **"BSX Warrant"** | Heeft de betekenis zoals bepaald in paragraaf 2.3 |
| **"BSX Warrant Uitoefenperiode"** | Heeft de betekenis zoals bepaald in paragraaf |

*Raad van Bestuur van 7 juni 2010*
*Bijzonder verslag van de Raad van Bestuur 582, 583, 596, 598 en 602 W.Venn.*

2.3.3

| | |
|---|---|
| **"BSX Warrant Vergoeding"** | Heeft de betekenis zoals bepaald in paragraaf 2.3.5.2 |
| **"Controle"** | Heeft de betekenis zoals bepaald in de artikelen 5-9 W. Venn. |
| **"Inschrijvingsdatum"** | Heeft de betekenis zoals bepaald in paragraaf 2.3.7.1 B |
| **"Investeringsovereenkomst"** | Betekent de investeringsovereenkomst afgesloten tussen, onder andere, Knight en de Vennootschap op of rond 7 juni 2010; |
| **"Kennisgeving"** | Heeft de betekenis zoals bepaald in paragraaf 2.3.7.1 A; |
| **"Knight"** | Betekent Knight Capital Group, Inc., een vennootschap naar behoren opgericht en bestaande onder de wetten van de Staat Delaware, Verenigde Staten van Amerike, met maatschappelijke zetel te 545 Washington Boulevard, Jersey City, New Jersey 07310, Verenigde Staten van Amerika: |
| **"Knight Uitoefenprijs"** | Betekent de uitgifteprijs per aandeel in euro van de Knight Warrant Aandelen; |
| **"Knight Warrant"** | Betekent de warrant om in te schrijven op de Knight Warrant Aandelen in ruil voor de Knight Warrant Vergoeding, uitoefenbaar (overeenkomstig haar voorwaarden) gedurende de Knight Warrant Termijn en (indien van toepassing) de Knight Warrant Verlengingstermijn: |
| **"Knight Warrant Aandelen"** | Heeft de betekenis zoals beschreven in punt 2.3.2: |
| **"Knight Warrant Termijn"** | Betekent zes maanden vanaf de Voltooiingsdatum: |
| **"Knight Warrant Vergoeding"** | Heeft de betekenis zoals beschreven in punt 2.3.5.1 |

*Raad van Bestuur van 7 juni 2010*
*Bijzonder verslag van de Raad van Bestuur 582, 583, 596, 598 en 602 W.Venn.*

| | |
|---|---|
| "Knight                    Warrant Verlengingstermijn" | Betekent zes maanden na de vervaldatum van de Knight Warrant Termijn; |
| "2009 Leningsovereenkomst" | Betekent de leningsovereenkomst van 7 augustus 2009 tussen BSX, Dr. Jos B. Peeters en de Vennootschap; |
| *"Minimum Performance Threshold"* | Betekent dat in de 30 dagen voor het verval van de Knight Warrant Termijn, Knight of andere leden van haar groep op het *Easdaq Trading System* meer hebben verhandeld dan het laagste van: |

    (A) 2% van het gemiddelde dagelijks volume van het *Easdaq Trading System*

    (B) een dagelijkse gemiddelde waarde van EUR 100 miljoen;

| | |
|---|---|
| "Raad" | Betekent de Raad van Bestuur van de Vennootschap; |
| "Verbonden Vennootschap" | heeft de betekenis zoals bepaald in artikel 11,1° W.Venn. |
| "Verkoop" | Betekent, ten gevolge van een verkoop of overdracht of een toekenning van aandelen, elke persoon (die geen aandeelhouder van de Vennootschap of een Verbonden Vennootschap van zulk een aandeelhouder is, op de Voltooiingsdatum) die Controle verwerft over de Vennootschap; |
| "Volledig Verwaterd Kapitaal" | Betekent, op elk ogenblik, het totale aantal uitgegeven aandelen in het kapitaal van de Vennootschap en zulk maximum aantal aandelen in het kapitaal van de Vennootschap dewelke uitgegeven kunnen worden overeenkomstig de uitoefening van enig conversierecht of inschrijvingsrecht uitgegeven door de Vennootschap (met inbegrip van enige warrants en, in het geval van een nieuwe uitgifte van aandelen of warrants, met inbegrip van de nieuwe aandelen of warrants voorgesteld om uit te geven), ongeacht of de voorwaarden voor zulk een uitoefening, conversie of inschrijving |

*Raad van Bestuur van 7 juni 2010*
*Bijzonder verslag van de Raad van Bestuur 582, 583, 596, 598 en 602 W.Venn.*

voldaan zijn op het moment van de toepassing van deze definitie, en op voorwaarde dat het relevante maximum berekend zal worden overeenkomstig de omstandigheden zoals bestaande op het tijdstip van uitoefening van de Knight Warrant;

| | |
|---|---|
| **" Voltooiingsdatum"** | Betekent de datum van de buitengewone algemene aandeel-houdersvergadering dewelke zal besluiten over de uitgifte van de Warrants en die is gepland om plaats te vinden op of rond 24 juni 2010; |
| **"Warrants"** | Betekent de Knight Warrant en de BSX Warrant samengenomen; |
| **"Werkdag"** | Betekent een dag (andere dan een zaterdag of zondag) waarop de banken in de London en in Brussel geopend zijn voor gewone activiteiten; en |
| **"W. Venn."** | Betekent het Belgisch Wetboek van vennootschappen van 7 mei 1999 (zoals van tijd tot tijd gewijzigd). |

## 2.3    UITGIFTE VAN WARRANTS EN AARD VAN DE UITGEGEVEN WARRANTS (ARTIKEL 583 W. VENN.)

De Vennootschap stelt voor om één (1) warrant aan Knight uit te geven (de **"Knight Warrant"**) en één (1) warrant aan BSX (de **"BSX Warrant"**), kosteloos, met de uitoefenvoorwaarden zoals hieronder beschreven.

### 2.3.1    *Uitoefenperiode van toepassing op de Knight Warrant*

Knight zal gerechtigd zijn haar warrant uit te oefenen ofwel:

(i)     gedurende de Knight Warrant Termijn; of

(ii)    op voorwaarde dat: (a) de Knight Warrant niet is uitgeoefend gedurende de Knight Warrant Termijn; en (b) de *Minimum Performance Threshold* is bereikt, gedurende de Knight Warrant Verlengingstermijn.

Om twijfel te vermijden, de betaling van de Knight Warrant Vergoeding kan plaatsvinden na het verval van de Knight Warrant Termijn of de Knight Warrant Verlengingstermijn (zoals van toepassing).

*Raad van Bestuur van 7 juni 2010*
*Bijzonder verslag van de Raad van Bestuur 582, 583, 596, 598 en 602 W.Venn.*

### 2.3.2  Aandelen waar de houder van de Knight Warrant toe gerechtigd is

De Knight Warrant zal aanleiding geven tot een aantal nieuwe gewone aandelen als volgt:

- (A) gedurende de Knight Warrant Termijn, zulk aantal nieuwe gewone aandelen dewelke, onmiddellijk na hun uitgifte samen 11 procent van het Volledig Verwaterde Kapitaal vertegenwoordigen; en
- (B) gedurende de Knight Warrant Verlengingstermijn, zulk aantal nieuwe gewone aandelen dewelke, onmiddellijk na hun uitgifte samen 9 procent van het Volledig Verwaterde Kapitaal vertegenwoordigen (samen, de **"Knight Warrant Aandelen"**);

### 2.3.3  Uitoefenperiode van toepassing op de BSX Warrant

BSX zal gerechtigd zijn de BSX Warrant uit te oefenen, in één of meerdere keren, gedurende een periode die aanvangt op de uitoefendatum van de Knight Warrant en die eindigt op de datum drie jaar na deze uitoefening (de **"BSX Warrant Uitoefenperiode"**).

### 2.3.4  Aandelen waartoe de houder van de BSX Warrant is gerechtigd

De BSX Warrant zal recht geven op de BSX Nieuwe Gewone Aandelen.

### 2.3.5  Uitgifteprijs en Uitoefenprijs

De Knight Warrant en de BSX Warant zullen kosteloos aangeboden worden aan Knight, respectievelijk BSX.

**2.3.5.1 Uitoefenprijs van de Knight Warrant -** Uitgifte van warrants aan een uitoefeningsprijs die mogelijk lager is dan de fractiewaarde van de bestaande aandelen (artikelen 582, 583, 596 en 598 W.Venn.)

De uitoefenprijs van de Knight Warrant bedraagt het equivalent in euro van USD 5.000.000 omgezet aan de Omzettingskoers (de **"Knight Warrant Vergoeding"**) (dewelke gelijk zal zijn aan het bedrag van de Knight Inschrijvingsprijs zoals gedefinieerd onder 1.1).

De Knight Warrant zal uitoefenbaar zijn tegen een betaling in euro van de Knight Warrant Vergoeding. De kapitaalverhoging die voortvloeit uit de uitoefening van de Knight Warrant zal gelijk zijn aan de Knight Warrant Vergoeding. Indien de inschrijvingsprijs voor elk nieuw gewoon aandeel hoger is dan de fractiewaarde op het moment van de uitgifte, zal het gedeelte tot aan de fractiewaarde betaald worden als kapitaal en zal het overblijvende deel betaald worden als uitgiftepremie. Onmiddellijk na zulk een kapitaalverhoging zal de

kapitaalvertegenwoordigende waarde van alle aandelen van de Vennootschap
worden gelijkgeschakeld zodat alle aandelen van de Vennootschap vanaf dan
dezelfde kapitaalvertegenwoordigende waarde hebben.

2.3.5.2 **Uitoefenprijs van de BSX Warrant** - Uitgifte van warrants aan een
uitoefenprijs die mogelijk lager is dan de fractiewaarde van de bestaande
aandelen (artikelen 582, 583, 596, 598 en 602 W.Venn.)

De uitoefenprijs van de BSX Warrant is gelijk aan de Knight Uitoefenprijs
vermenigvuldigd met het aantal BSX Nieuwe Gewone Aandelen uit te geven bij
uitoefening van de BSX Warrant ("**BSX Warrant Vergoeding**"), onmiddellijk en
volledig te volstorten bij uitoefening van de Warrant met betrekking tot het aantal
BSX Nieuwe Gewone Aandelen die verworven zullen worden bij iedere
uitoefening. Naargelang de keuze van de houder van de BSX Warrant, kan de
betaling gebeuren: (i) door een inbreng in geld; (ii) door kapitalisatie, door
inbreng in natura, van het saldo (in voorkomend geval) van de Loan
Consideration (gewaardeerd aan nominale waarde); of (iii) door kapitalisatie,
door inbreng in natura, van het saldo (in voorkomend geval) van de IP Transfer
Consideration (gewaardeerd aan nominale waarde); of (iv) door een combinatie
van de methodes vermeld onder (i) tot (iii). De kapitaalverhoging die voortvloeit
uit de uitoefening van (het relevante deel van) de BSX Warrant zal gelijk zijn aan
(het relevante deel van) de BSX Warrant Vergoeding betaald bij elke uitoefening
van de BSX Warrant. Onmiddellijk na dergelijke kapitaalverhoging zal de
kapitaalvertegenwoordigende waarde van alle aandelen van de vennootschap
worden gelijkgeschakeld zodat alle aandelen van de vennootschap voortaan
dezelfde kapitaalvertegenwoordigende waarde hebben.

2.3.5.2.1 Beschrijving van de inbreng in natura

Indien BSX (een deel van) de BSX Warrant zou uitoefenen door een inbreng in
natura, zou zulke inbreng in natura bestaan uit de inbreng door BSX van het
saldo (in voorkomend geval) van de IP Transfer Consideration en/of het saldo (in
voorkomend geval) van de Loan Consideration, in het kapitaal van de
Vennootschap.

Er wordt verwezen naar de inbreng in natura door BSX op de BAV, zoals
uiteengezet onder punt 1.5 hierboven, met betrekking tot de beschrijving van de
IP Transfer Consideration en de Loan Consideration.

2.3.5.2.2 Waardering en vergoeding van de inbreng in natura

2.3.5.2.2.1 Waardering van de inbreng in natura

Met betrekking tot de waardering van de IP Transfer Consideration en de Loan
Consideration wordt verwezen naar de inbreng in natura door BSX, zoals
uiteengezet onder punt 1.5.2.1 hierboven.

*Raad van Bestuur van 7 juni 2010*
*Bijzonder verslag van de Raad van Bestuur 582, 583, 596, 598 en 602 W.Venn.*

Overeenkomstig de normale waarderingsregels, wordt een claim *vis-à-vis* de Vennootschap die wordt ingebracht in het kapitaal van de Vennootschap, gewaardeerd aan nominale waarde. De waarde van (het deel van) de IP Transfer Consideration, resp. Loan Consideration, dat zou worden ingebracht in natura in het kapitaal van de Vennootschap zal daarom altijd gelijk zijn aan haar nominale waarde op het relevante tijdstip.

2.3.5.2.2.2 Vergoeding van de inbreng in natura

2.3.5.2.2.2.1. Kapitaalverhoging

Het kapitaal van de Vennootschap zal worden verhoogd, door een inbreng in natura van het saldo (in voorkomend geval) van de IP Transfer Consideration en/of de Loan Consideration in het kapitaal van de Vennootschap, met een bedrag gelijk aan (in het geval van een gedeeltelijke uitoefening van de BSX Warrant, een deel van) de BSX Warrant Vergoeding, met als gevolg dat (in het geval van een gedeeltelijke uitoefening van de BSX Warrant, een deel van) de BSX Nieuwe Gewone Aandelen zouden worden uitgegeven (afhankelijk van het aantal BSX Nieuwe Gewone Aandelen dat BSX wenst te verwerven bij elke uitoefening van de BSX Warrant). De uitgifteprijs per BSX Nieuw Gewoon Aandeel zal gelijk zijn aan de BSX Warrant Vergoeding gedeeld door het (totale) aantal BSX Nieuwe Gewone Aandelen.

*2.3.5.2.2.2.2. Waardering van de aandelen van de Vennootschap*

De waarde van de BSX Nieuwe Gewone aandelen uit te geven in ruil voor de inbreng in natura is op dit ogenblik gelijk aan de uiteindelijke Uitgifteprijs (die zal worden bepaald op of rond 10 juni 2010 aan de hand van de dan van toepassing zijnde Omzettingskoers) (zie hierboven onder punt 1.1)

2.3.5.2.3 Belang van de inbreng in natura van het saldo van de IP Transfer Consideration en/of de Loan Consideration en van de daaruit volgende kapitaalverhoging

De inbreng in natura gedaan door BSX bij uitoefening van de BSX Warrant en de verder gezette samenwerking met BSX zal, in aanvulling van de investering door Knight op de BAV en bij uitoefening van de Knight Warrant, de Vennootschap ertoe in staat stellen om haar activiteiten van het aanbieden van diensten aan effectenbeurzen en handelsplatformen verder te ontwikkelen.

De mogelijke inbreng in natura aan de voorgestelde uitgifteprijs en de daaruit volgende kapitaalverhoging zouden in het belang van de Vennootschap zijn, gezien het relevante deel van de schuld van de Vennootschap *vis-à-vis* BSX ten belope van het bedrag van de IP Tranfer Consideration respectievelijk Loan

*Raad van Bestuur van 7 juni 2010*
*Bijzonder verslag van de Raad van Bestuur 582, 583, 596, 598 en 602 W.Venn.*

Consideration (welke Loan Consideration anders het voorwerp zou uitmaken van
een terugbetaling in geld door de Vennootschap op de beëindigingsdatum van de
2009 Leningsovereenkomst) zal wegvallen ten gevolge van de bijdrage van BSX
in het kapitaal van de Vennootschap (door schuldvermenging), en gezien BSX de
wil geuit heeft om haar samenwerking met de Vennootschap verder te zetten.

2.3.5.2.4. Conclusies van de commissaris

Overeenkomstig artikel 602 W.Venn. heeft de Raad de commissaris van de
Vennootschap verzocht een verslag op te stellen met betrekking tot de mogelijke
inbreng in natura beschreven in dit bijzonder verslag van de Raad.

De ontwerpconclusie van de commissaris is (wat betreft de beschrijving van de
inbreng in natura, de waarderingsmethode en de vergoeding voor de inbreng in
natura) de volgende:

*"Dat de verrichting werd nagezien overeenkomstig de normen uitgevaardigd door
het Instituut van de Bedrijfsrevisoren inzake inbreng in natura en dat de raad van
bestuur van de Vennootschap verantwoordelijk is voor de waardering van de
ingebrachte bestanddelen en voor de bepaling van het aantal door de
Vennootschap uit te geven aandelen ter vergoeding van de inbreng in natura*

*Dat de beschrijving van de inbreng in natura beantwoordt aan de normale
vereisten van nauwkeurigheid en duidelijkheid*

*Dat de door de partijen weerhouden methoden van waardering
bedrijfseconomisch verantwoord zijn*

*Dat de toegepaste waarderingsmethoden leiden tot inbrengwaarden die tenminste
overeenkomen met het aantal en de intrinsieke waarde van de tegen de inbreng
uit te geven aandelen*

*Dat de inbrengwaarden niet overeenkomen met het aantal en de fractiewaarde
van de huidige aandelen; de verklaring en verantwoording van de uitgifte van
aandelen beneden fractiewaarde wordt duidelijk omschreven in het bijgevoegd
bijzonder verslag van de raad van bestuur*

*De inbreng in natura met betrekking tot de warrant werd enkel geverifieerd op het
moment van de uitgifte van de warrant en niet op het moment van mogelijke
uitoefening.*

*Wij willen er tenslotte aan herinneren dat onze opdracht er niet in bestaat een
uitspraak te doen betreffende de rechtmatigheid en billijkheid van de verrichting
of, met andere woorden, dat ons verslag geen fairness opinion inhoudt."*

*Raad van Bestuur van 7 juni 2010*
*Bijzonder verslag van de Raad van Bestuur 582, 583, 596, 598 en 602 W.Venn.*

De Raad wijkt niet af van deze conclusie.

### 2.3.6  Opheffing van het voorkeurrecht met betrekking tot de uitgifte van de Warrants ten gunste van Knight en BSX (artikelen 596 en 598 W.Venn.) en gevolgen van de uitgifte van de Warrants voor de bestaande aandeelhouders en warranthouders

De uitgifte van de Knight Warrant is voorbehouden aan Knight. De uitgifte van de BSX Warrant is voorbehouden aan BSX.

Er wordt verwezen naar het doel en de rechtvaardiging van de uitgifte van de Warrants op zich (zie punt 2.1 hierboven).

Met het oog op het beoordelen van de mogelijke impact van de uitgifte van de Warrants op de bestaande aandeelhouders en warranthouders, is een goed begrip van het Warrants mechanisme noodzakelijk, zoals uiteengezet hieronder:

- De Knight Warrant zal bij uitoefening aanleiding geven tot een aantal nieuwe nieuwe gewone aandelen dewelke samen, onmiddellijk na hun uitgifte (i) 11% van het Volledig Verwaterde Kapitaal (indien uitgeoefend tijdens de Knight Warrant Termijn); en (ii) 9% van het Volledig Verwaterde Kapitaal (indien uitgeoefend tijdens de Knight Warrant Verlengingstermijn) (zie punt 2.3.2 hierboven) vertegenwoordigen;

- De BSX Warrant zal recht geven op een aantal nieuwe gewone aandelen dat gelijk is aan X in de formule: $X = (Y*(100/90)) - Y$; waarbij Y het aantal Knight Warrant Aandelen is die zijn uitgegeven overeenkomstig de Knight Warrant;

- De uitoefenprijs van de Knight Warrant is gelijk aan het equivalent in euro van USD 5.000.000 omgezet aan de Omzettingskoers (i.e. de "Knight Warrant Vergoeding") (dewelke bijvoorbeeld ongeveer EUR 4.060.450 zou bedragen, wanneer berekend aan de wisselkoers van 31 mei 2010) (zie punt 1.1 hierboven).

- Overeenkomstig artikel 598 W. Venn. kan de Knight Warrant niet worden uitgeoefend aan een uitoefenprijs per aandeel die beneden de huidige intrinsieke waarde (op het ogenblik van de uitgifte van de Knight Warrant) zou liggen, i.e. de Uitgifteprijs, dewelke bijvoorbeeld ongeveer EUR 0.46 per aandeel zou bedragen, wanneer berekend aan de wisselkoers van 31 mei 2010.

- De uitoefenprijs van de Knight Warrant kan bijgevolg (in het voorbeeld waarbij de wisselkoers van 31 mei 2010 wordt gehanteerd) nooit resulteren in de uitgifte van meer dan 8.735.111 aandelen (i.e. EUR 4.060.450 gedeeld door ongeveer EUR 0.46, in dit voorbeeld (er moet opgemerkt worden dat EUR 0.46 een afgerond bedrag is en dat de exacte wisselkoers van 31 mei 2010 gebruikt is om het aantal van 8.735.111

*Raad van Bestuur van 7 juni 2010*
*Bijzonder verslag van de Raad van Bestuur 582, 583, 596, 598 en 602 W.Venn.*

aandelen te berekenen – welk getal vanzelfsprekend gelijk is aan het
aantal aandelen uitgegeven aan Knight op de BAV));

- Gebaseerd op zulk maximum aantal van 8.735.111 aandelen, zou de BSX
Warrant bij uitoefening aanleiding geven tot de uitgifte van ongeveer
970.657 aandelen;

- Het aantal Knight Warrant Aandelen (i.e. 11%, respectievelijk 9% van het
Volledig Verwaterde Kapitaal) is gebaseerd op de veronderstelling dat een
aandelenoptieplan voor werknemers (i.e. een *employee incentive plan*, of
**"EIP"**) bestaande uit warrants converteerbaar in 4.322.234 aandelen zou
geïmplementeerd worden voorafgaand aan de uitoefening van de Knight
Warrant (er moet opgemerkt worden dat geen eigenlijke beslissing, hoe
dan ook, is genomen of is voorgesteld met betrekking tot zulk een EIP);

- In het kader van zulk een EIP, zou BSX (overeenkomstig de
aandeelhoudersovereenkomst tussen Citadel, Knight, BSX en JBP zijn deze
partijen overeengekomen zich sterk te maken dat de Vennootschap BSX
zou toelaten haar huidig belang van 10% in de Vennootschap te
behouden) een bijkomend aantal warrants verkrijgen, converteerbaar in
480.248 aandelen;

- Het aantal Knight Warrant Aandelen zal ook rekening houden met latere
aandelenuitgiftes en uitgiftes van andere effecten door de Vennootschap,
met het oog op het bekomen van 11% respectievelijk 9% van het Volledig
Verwaterde Kapitaal (zoals gedefinieerd) op het tijdstip van de uitoefening.

Het Warrants mechanisme hierboven beschreven toepassend, en gebruik makend
van de wisselkoers van 31 mei 2010 bij wijze van voorbeeld, is het maximum
aantal nieuwe gewone aandelen dat zou kunnen uitgegeven worden bij
uitoefening van de Knight Warrant, zonder inbreuk op art. 598 W. Venn.,
8.735.111 aandelen. In de veronderstelling dat de Knight Warrant zou worden
uitgeoefend tijdens de Knight Warrant Termijn (derhalve Knight recht gevende op
11% van het Volledig Verwaterde Kapitaal), zou het maximum totale aantal van
(mogelijke) aandelen uitstaand op het moment van (en na) de uitoefening van de
Knight Warrant ongeveer 79.410.000 aandelen bedragen.

Dit betekent dat de Vennootschap in de toekomst (tot verval of tenietgaan van de
Knight Warrant) een *standstill* zal moeten toepassen (waartoe ze zich hierbij
verbindt, op voorwaarde van de voltooiing van de Knight transactie plaatsvindend
op de BAV) met betrekking tot uitgiftes van aandelen en andere effecten. In ons
voorbeeld zou dit betekenen dat (in de veronderstelling van de volledige
implementatie van het EIP, en de corresponderende uitgifte van warrants aan
BSX, voorafgaand aan de uitoefening van de Knight Warrant) de Vennootschap
een *standstill* zou toepassen boven de bijkomende uitgifte van 4.659.798
(mogelijke) aandelen. Dit maximale aantal is het resultaat van de volgende
berekening:

79.410.00 aandelen
Verminderd met:

- 58.700.896 uitgegeven aandelen ten gevolge van de kapitaalverhoging
- 1.541.246 mogelijke aandelen onder de bestaande warrants (in de veronderstelling dat geen dilutieve ronde plaatsvindt voor de uitoefening van de Knight Warrant, zie de voorwaarden van de bestaande warrants);
- 8.735.111 mogelijke aandelen die uitgegeven kunnen worden ten gevolge van de Knight Warrant zonder inbreuk op art. 598 W. Venn.;
- 970.567 mogelijke aandelen uit te geven ten gevolge van de BSX Warrant;
- 4.322.234 mogelijke aandelen die kunnen uitgegeven worden onder het EIP;
- 480.248 mogelijke aandelen die worden uitgegeven aan BSX in het geval het EIP volledig wordt geïmplementeerd;

= maximum 4.659.798 (mogelijke) aandelen bijkomend uit te geven zolang de Knight Warrant uitoefenbaar is.

Door de uitgifte van de Warrants kan, bij de uitoefening van de Warrants, een maximum van 9.705.678 nieuwe aandelen worden uitgegeven (rekening houdend met de beperking van art. 598 W. Venn., de kapitaalverhoging op de BAV, en de veronderstelling dat een EIP zou worden geïmplementeerd voor 4.322.234 mogelijke aandelen en 480.248 mogelijke aandelen zouden daaropvolgend worden uitgegeven aan BSX), wat een verdere verwatering van 13.92% tot gevolg zou hebben.

Zoals hierboven uiteengezet, gezien de aandelen uit te geven bij de uitoefening van de Knight Warrant niet uitgegeven kunnen worden aan een uitgifteprijs beneden de huidige intrinsieke waarde van de aandelen van de Vennootschap, zou de Vennootschap verplicht zijn een *standstill* te eerbiedigen zolang de Knight Warrant uitoefenbaar is, met als resultaat, en in de veronderstelling van de uitgifte van warrants in het kader van het EIP zoals hierboven beschreven, dat de Vennootschap enkel een maximum aantal van 4.659.798 aandelen zou kunnen uitgeven (berekend aan de wisselkoers van 31 mei 2010).

Hoewel het hierboven beschreven Warrants mechanisme leidt tot een gedeeltelijke *standstill*, is de Raad van mening dat dit op zich in het belang van de Vennootschap is, gezien het een voorwaarde voor de transactie met Knight uitmaakt, dewelke noodzakelijk is voor, en in het belang is van, de Vennootschap, voor de redenen uiteengezet in dit bijzonder verslag van de Raad.

*Raad van Bestuur van 7 juni 2010*
*Bijzonder verslag van de Raad van Bestuur 582, 583, 596, 598 en 602 W.Venn.*

### 2.3.7. Overige voorwaarden

### 2.3.7.1. Uitoefenprocedure

A. Om de Knight Warrant, respectievelijk de BSX Warrant, te kunnen uitoefenen, dient Knight, resp. BSX, tijdens de Knight Warrant Termijn, of, indien van toepassing, de Knight Warrant Verlengingstermijn, resp. de BSX Warrant Uitoefentermijn, een kennisgeving betreffende de uitoefening (de **"Kennisgeving"**) te ondertekenen en te bezorgen aan de Raad, door middel van een aangetekende brief of een brief die persoonlijk wordt overhandigd en wordt getekend voor ontvangst door een vertegenwoordiger van de Raad, waarin de Raad in kennis wordt gesteld van de uitoefening van de Knight Warrant, resp. BSX Warrant

B. Bij ontvangst van de Kennisgeving, en indien BSX de BSX Warrant Vergoeding zal betalen in geld, zal de Raad, indien hij dit nog niet heeft gedaan, Knight, resp. BSX, binnen de vijf Werkdagen informeren over de details van de bijzondere geblokkeerde rekening geopend in naam van de Vennootschap waarop de Knight Warrant Vergoeding, resp. BSX Warrant Vergoeding (of, in geval van gedeeltelijke uitoefening van de BSX Warrant, het relevante deel van de BSX Warrant Vergoeding), dient te worden gestort door Knight, resp. BSX, en waarvan de referenties door de Vennootschap zullen worden medegedeeld aan Knight, resp. BSX. Knight, resp. BSX, zal, binnen vijf Werkdagen na ontvangst van de referenties de Knight Warrant Vergoeding, resp. (in geval van gedeeltelijke uitoefening van de BSX Warrant, het relevante deel van ) de BSX Warrant Vergoeding storten op de betrokken rekening.

Om twijfel te vermijden, indien de Kennisgeving is gedaan gedurende de Knight Warrant Termijn, resp. BSX Warrant Termijn, of, in het geval van Knight, (indien van toepassing) de Knight Warrant Verlengingstermijn, mag de betaling van de Knight Warrant Vergoeding plaatsvinden na het verval van de Knight Warrant Termijn of de Knight Warrant Verlengingstermijn (indien van toepassing) en mag betaling van de BSX Warrant Vergoeding plaatsvinden na verval van de BSX Uitoefenperiode.

C. De nieuwe gewone aandelen, resp. de uit te geven BSX Nieuwe Gewone Aandelen, zullen worden uitgegeven (i) (met betrekking tot BSX, indien (in geval van gedeeltelijke uitoefening, het relevante deel van) de BSX Warrant Vergoeding in geld wordt betaald) binnen de twee weken na de datum van de overdracht van de Knight Warrant Vergoeding, resp. (of, in geval van gedeeltelijke uitoefeningen, het relevante deel van) de BSX Warrant Vergoeding, op de betrokken rekening; (ii) (enkel met betrekking tot BSX) indien (in geval van gedeeltelijke uitoefening, het relevante deel van) de BSX Warrant Vergoeding wordt betaald op

*Raad van Bestuur van 7 juni 2010*
*Bijzonder verslag van de Raad van Bestuur 582, 583, 596, 598 en 602 W.Venn.*

andere wijze dan in geld, binnen de twee weken na de datum van de Kennisgeving; of (iii) indien de Kennisgeving plaatsvond na een mededeling gedaan aan Knight, resp. BSX, op basis van subparagraaf 2.3.7.6.1 A van deze voorwaarden en modaliteiten, onmiddellijk, op voorwaarde van betaling van de Knight Warrant Vergoeding, resp. (in geval van gedeeltelijke uitoefening, het relevante deel van) de BSX Warrant vergoeding, voorafgaand aan de voltrekking van een Verkoop, (de **"Inschrijvingsdatum"**);

D.     Eens afgeleverd, zal een Kennisgeving onherroepelijk zijn, behoudens (i) met de toestemming van de Vennootschap of (ii) indien de Kennisgeving werd gedaan na een mededeling aan Knight, resp. BSX, op basis van subparagraaf 2.3.7.6.1 A van deze voorwaarden en modaliteiten en de voorgenomen Verkoop waarnaar wordt verwezen in die mededeling niet plaatsvindt of niet plaatsvindt binnen zes maanden, zoals verder verduidelijkt in paragraaf 2.3.7.6.1 A.

2.3.7.2. Toewijzing

Nieuwe gewone aandelen uitgegeven ingevolge de uitoefening van de Knight Warrant, resp. BSX Warrant, zullen worden toegewezen op de Inschrijvingsdatum. Een bewijs van de inschrijving in het aandelenregister van de Vennootschap van de aandelen op naam die worden uitgegeven naar aanleiding van de uitoefening van de Knight Warrant, resp. BSX Warrant, zal gratis worden verzonden naar Knight, resp. BSX, ten laatste op de vijfde Werkdag na de Inschrijvingsdatum.

2.3.7.3 Gedeeltelijke uitoefening van de BSX Warrant

De BSX Warrant is uitoefenbaar in één of meerdere keren, zodat na uitoefening ten aanzien van een deel van de BSX Nieuwe Gewone Aandelen, de BSX Warrant uitstaande blijft ten aanzien van de overblijvende BSX Nieuwe Gewone Aandelen en uitoefenbaar blijft.

2.3.7.4 Tenietgaan van de Knight Warrant

De Knight Warrant zal niet uitoefenbaar zijn en zal tenietgaan in de volgende omstandigheden:

(A) Indien de Minimum Performance Threshold niet bereikt is, onmiddellijk volgend op het verlopen van de Knight Warrant Termijn;

(B) Onmiddellijk volgend op het aflopen van de Knight Warrant Verlengingstermijn;

(C) Onmiddellijk, bij een *Drag Offer, i.e.,* een aanbod dat wordt beoogd door een *Drag Notice*, zoals gedefinieerd in een aandeelhoudersovereenkomst onder bepaalde aandeelhouders, en dat wordt voltrekken in

*Raad van Bestuur van 7 juni 2010*
*Bijzonder verslag van de Raad van Bestuur 582, 583, 596, 598 en 602 W.Venn.*

overeenstemming     met     de     voorwaarden     van     zulke
aandeelhoudersovereenkomst; en

(D) Overeenkomstig paragrafen 2.3.7.6.1.C en 2.3.7.6.2.

## 2.3.7.5 Tenietgaan van de BSX Warrant

Tenzij reeds uitgeoefend, zullen de Warrants niet uitoefenbaar zijn en vervallen in volgende omstandigheden:

(A)    onmiddellijk volgend op het verval van de Knight Warrant;

(B)    onmiddellijk volgend op het aflopen van de BSX Warrant Uitoefenperiode;

(C)    onmiddellijk bij een *Drag Offer*, *i.e.*, een aanbod dat wordt beoogd door een *Drag Notice*, zoals gedefinieerd in een aandeelhoudersovereenkomst onder bepaalde aandeelhouders, en dat wordt voltrokken in overeenstemming met de voorwaarden van zulke aandeelhoudersovereenkomst;

(D)    in overeenstemming met paragraaf 2.3.7.6.1 C;

(E)    een uitgifte van vervangende warrants onder artikel 2.3.7.6.1 D; of

(F,)    in overeenstemming met paragraaf 2.3.7.6.2.

## 2.3.7.6 Beperkingen en vereisten

2.3.7.6.1      Zo lang de Knight Warrant, resp. BSX Warrant, uitoefenbaar blijft, zal de vennootschap de volgende beperkingen en vereisten naleven:

(A) *Exits:* indien de Vennootschap kennis krijgt van het feit dat een Verkoop een realistische waarschijnlijkheid is, zal de vennootschap Knight en BSX onmiddellijk in kennis stellen van dit feit, alsook van de bijkomende details betreffende de prijs en andere wezenlijke modaliteiten van de Verkoop die Knight, resp. BSX, redelijkerwijze zou eisen in verband met haar evaluatie van de voorgestelde Verkoop en (i) Knight zal zijn gerechtigd, op elk ogenblik voorafgaand aan, en onder voorwaarde van zulk een Verkoop, de Knight Warrant uit te oefenen, en (ii) BSX zal zijn gerechtigd, op elk ogenblik voorafgaand aan, en onder voorwaarde van: (a) de uitoefening door Knight van de Knight Warrant; en (b), zulk een Verkoop, de BSX Warrant uit te oefenen. De vennootschap zal Knight en BSX in kennis stellen van de voorgenomen Verkoop, ten minste 15 Werkdagen voordat de betrokken partijen een definitieve overeenkomst sluiten met betrekking tot de implementatie van de Verkoop. Indien de voorgenomen Verkoop wordt ingetrokken of beëindigd, zal de Vennootschap Knight en BSX hier onmiddellijk van op de hoogte brengen (en in dit geval zal de kennisgeving van de voorgenomen Verkoop worden geacht nooit te hebben plaatsgevonden);

(B) *Inkoop van aandelen:* indien op gelijk welk ogenblik een aanbod of uitnodiging wordt gedaan door de Vennootschap aan alle houders van

*Raad van Bestuur van 7 juni 2010*
*Bijzonder verslag van de Raad van Bestuur 582, 583, 596, 598 en 602 W.Venn.*

aandelen in het kapitaal van de Vennootschap voor de inkoop door de Vennootschap van deze aandelen, zal de Vennootschap Knight en BSX hiervan in kennis stellen, en (i) Knight zal gerechtigd zijn om, op elk ogenblik dat dit aanbod of deze uitnodiging openstaat voor aanvaarding, de Knight Warrant uit te oefenen en (ii) BSX zal gerechtigd zijn om, op elk ogenblik dat dit aanbod of deze uitnodiging openstaat voor aanvaarding en op voorwaarde dat Knight de Knight Warrant heeft uitgeoefend, de BSX Warrant uit te oefenen, en alle aandelen uitgegeven ingevolge de vereiste Kennisgeving gedaan vóór de datum waarop die aanvaardingsperiode eindigt, zullen in dit aanbod worden begrepen en zij zullen geacht worden te hebben ingestemd met dit aanbod of deze uitnodiging onder dezelfde voorwaarden en modaliteiten als voor de andere houders van aandelen.

(C) *Ontbinding:* indien een bevel wordt gedaan of een beslissing wordt genomen voor de ontbinding van de vennootschap (behalve ingeval van een ontbinding zonder vereffening), zullen Knight en BSX (indien, bij die ontbinding en in de veronderstelling dat de nog onuitgeoefende Knight Warrant, resp. (deel van de) BSX Warrant, volledig werden uitgeoefend en dat de Knight Warrant Vergoeding, resp. (in geval van gedeeltelijke uitoefeninge(n), het relevante deel van de) BSX Warrant Vergoeding daarvoor volledig zou zijn ontvangen door de Vennootschap, er een overschot beschikbaar zou zijn voor verdeling onder de houders van aandelen in het kapitaal van de Vennootschap dat, in die veronderstelling, met betrekking tot ieder aandeel een bedrag gelijk aan de Knight Warrant Vergoeding, resp. (in geval van gedeeltelijke uitoefeninge(n), het relevante deel van de) BSX Warrant Vergoeding, zou overschrijden) worden behandeld alsof de Knight Warrant, resp. (in geval van gedeeltelijke uitoefeninge(n), het overblijvende deel van de) BSX Warrant, onmiddellijk voorafgaand aan de datum van dergelijk bevel of beslissing volledig is uitgeoefend, en zal dienovereenkomstig het recht hebben om uit de activa, beschikbaar in de vereffening, pari passu met de houders van gewone aandelen, een bedrag te ontvangen gelijk aan de som waarop Knight, resp. BSX, gerechtigd zou zijn geworden krachtens die inschrijving na aftrek van een som gelijk aan de Knight Warrant Vergoeding, resp. (in geval van gedeeltelijke uitoefeninge(n), het overblijvende deel van de) BSX Warrant Vergoeding. Onder voorbehoud van het voorgaande zullen de Knight Warrant en resp. BSX Warrant vervallen bij aanvang van de ontbinding van de Vennootschap (behalve in geval van een ontbinding zonder vereffening).

(D) *Aanpassingsgebeurtenis:* In geval van een Aanpassingsgebeurtenis zal de Vennootschap, voor zover dit wettelijk toegelaten is (en Citadel, Knight en JPB hebben zich in een aandeelhoudersovereenkomst sterkgemaakt jegens BSX dat de Vennootschap hierotte zal overgaan), ter vervanging van de BSX Warrant die dienovereenkomstig zal komen te vervallen,

page 25/27

*Raad van Bestuur van 7 juni 2010*
*Bijzonder verslag van de Raad van Bestuur 582, 583, 596, 598 en 602 W.Venn.*

(een) nieuwe warrant(s) uitgeven aan BSX met dezelfde voorwaarden en modaliteiten als de BSX Warrant, behalve met betrekking tot de uitoefenprijs die gelijk zal zijn aan de uitgifteprijs of uitoefenprijs onder de Aanpassingsgebeurtenis.

2.3.7.6.2    Aandelen voor aandelen aanbiedingen: indien een aanbod wordt gedaan zoals vermeld onder bovenstaande subparagraaf 2.3.7.6.1. A waarbij de vergoeding de uitgifte omvat van gewone aandelen van de aanbieder en de aanbieder een aanbod van warrants beschikbaar stelt om in te schrijven op gewone aandelen van de aanbieder in ruil voor de Knight Warrant, resp. BSX Warrant, die de financiële adviseurs van de Vennootschap volgens hun mening als fair en redelijk beschouwen (schriftelijk gegeven en bestemd voor en afgeleverd aan Knight, resp. BSX) (met betrekking tot de voorwaarden van het aanbod en enige andere omstandigheden die relevant lijken voor de financiële adviseurs), dan zal elke bestuurder van de Vennootschap gemachtigd zijn als volmachthouder van Knight, resp. BSX, (1) om daarvan een overdracht te volbrengen ten gunste van de aanbieder in ruil voor de uitgifte van warrants om in te schrijven op gewone aandelen van de aanbieder zoals voormeld, waarbij de Knight Warrant, en BSX Warrant zullen vervallen; en (2) om die handelingen en zaken te stellen die nodig of gepast zouden zijn in dit verband, afhankelijk, in geval van zowel (1) als (2) als voormeld, en in alle omstandigheden, van het volledig onvoorwaardelijk worden of volledig onvoorwaardelijk verklaard worden van het aanbod van de aanbieder zoals voormeld, en dat die warrants worden uitgegeven door de aanbieder.

2.3.7.6.3 Elke wijziging aan de voorwaarden van de Knight Warrant, behalve indien anders overeengekomen door BSX, (i) die nadelig is voor de positie van de houder van de BSX Warrant onder de voorwaarden en modaliteiten van de BSX Warrant, zal geen effect hebben op de voorwaarden van de BSX Warrant en (ii) die de positie van de houder van de Knight Warrant verbetert of die voordelig is voor de positie van de houder van de Knight Warrant, zou *mutatis mutandis* ook moeten toegepast worden op de voorwaarden van de BSX Warrant.

Zonder afbreuk te doen aan de toepasselijke wet, mag de BSX Warrant gedeeltelijk worden overgedragen ten opzichte van een deel van de BSX Nieuwe Gewone Aandelen. De Vennootschap stelt BSX in kennis van de uitoefening van de Knight Warrant zo snel als redelijkerwijze mogelijk volgend op dergelijke uitoefening.

2.3.7.7 Algemeen

A. De Knight Warrant en de BSX Warrant worden beheerst en geïnterpreteerd door het Belgisch recht.
B. De Knight Warrant en de BSX Warrant zijn en blijven warrants op naam.

*Raad van Bestuur van 7 juni 2010*
*Bijzonder verslag van de Raad van Bestuur 582, 583, 596, 598 en 602 W.Venn.*

C. Verwijzingen in deze voorwaarden en modaliteiten naar een wettelijke bepaling zullen geacht worden elke wijziging of herziening van dergelijke wettelijke bepaling te bevatten.

D. De eigendom van de Knight Warrant en de BSX Warrant vloeit exclusief voort uit de inschrijving van Knight, resp. BSX, als houder van de Knight Warrant, resp. BSX Warrant, in het register van warranthouders op naam van de Vennootschap.

E. Kennisgevingen aan Knight en BSX mogen verzonden worden naar het adres zoals bepaald in artikel 17 van de Investeringsovereenkomst, of zoals gewijzigd in overeenstemming met de bepalingen van dat artikel.

F. In afwijking van artikel 501 van het Wetboek van vennootschappen en zonder afbreuk te doen aan de wettelijke uitzonderingen of indien anders bepaald in deze voorwaarden en modaliteiten, behoudt de Vennootschap zich het recht voor om alle beslissingen te nemen die zij nodig acht met betrekking tot haar kapitaal, haar statuten of haar beheer. Deze beslissingen kunnen betrekking hebben op, zonder hiertoe beperkt te zijn: een kapitaalvermindering met of zonder terugbetaling aan de aandeelhouders, een kapitaalverhoging door incorporatie van reserves waarbij al dan niet nieuwe aandelen worden gecreëerd, een kapitaalverhoging door inbreng in natura, een kapitaalverhoging door inbreng in geld waarbij het voorkeurrecht van de bestaande aandeelhouders al dan niet wordt beperkt of opgeheven, een uitgifte van aandelen van een nieuwe soort, een uitgifte van winstbewijzen, van converteerbare obligaties, van bevoorrechte aandelen, van obligaties *cum warrant*, van gewone obligaties of van warrants, een statutenwijziging met betrekking tot de winstverdeling of de (netto) liquidatiebonus of andere rechten verbonden aan de aandelen, een aandelensplitsing, een uitkering van aandelendividenden, een ontbinding van de Vennootschap, een fusie, een splitsing of een inbreng of overdracht van een algemeenheid of van een bedrijfstak al dan niet gepaard met de uitwisseling van aandelen. De Vennootschap mag dergelijke beslissingen nemen zelfs indien deze (zouden kunnen) leiden tot een vermindering van de voordelen die de voorwaarden en uitgifte en uitoefening van de Knight Warrant en/of de BSX Warrant, en de wet toekennen aan de houder van de Knight Warrant, resp. BSX Warrant, tenzij een dergelijke vermindering overduidelijk de enige reden van die beslissing is.

G. Alle kosten die verband houden met een kapitaalverhoging als gevolg van de uitoefening van de Knight Warrant en de BSX Warrant zullen worden gedragen door de Vennootschap.

7 juni 2010

Namens de Raad van Bestuur,

Artur Fischer
Voorzitter

*Board of Directors of 7 June 2010*
*Special Board Report 582, 583, 596, 598 and 602 BCC*

# EASDAQ NV
Lei 19 Box 11, B-3000 Leuven, Belgium
RPR Leuven 0455.240.893

(the "**Company**" or the "**Issuer**")

---

*FREE TRANSLATION OF A DUTCH ORIGINAL*
*FOR INFORMATION PURPOSES ONLY*

---

**COMBINED SPECIAL REPORT OF THE BOARD OF DIRECTORS PURSUANT TO:**

**(I) SECTIONS 582, 596 AND 598 OF THE BELGIAN COMPANIES CODE ("BCC") REGARDING THE ISSUANCE OF NEW SHARES BELOW THE FRACTIONAL VALUE OF THE EXISTING SHARES, WITH CANCELLATION OF THE PREFERENTIAL SUBSCRIPTION RIGHTS FOR THE BENEFIT OF KNIGHT CAPITAL GROUP, INC. ("KNIGHT");**

**(II) SECTIONS 582 AND 602 BCC REGARDING THE ISSUANCE OF NEW SHARES BELOW THE FRACTIONAL VALUE OF THE EXISTING SHARES TO BÖRSE BERLIN AG ("BSX"), BY WAY OF CONTRIBUTION IN KIND OF (ALL OR A PORTION OF) THE IP TRANSFER CONSIDERATION OR (ALL OR A PORTION OF) THE PRINCIPAL OR ACCRUED INTEREST UNDER THE 2009 LOAN AGREEMENT;**

**(III) SECTIONS 582, 583, 596 AND 598 BCC REGARDING THE ISSUANCE OF WARRANTS TO KNIGHT WITH AN EXERCISE PRICE BELOW THE FRACTIONAL VALUE OF THE EXISTING SHARES AND WITH CANCELLATION OF THE PREFERENTIAL SUBSCRIPTION RIGHTS; AND**

**(IV) SECTIONS 582, 583, 596, 598 AND 602 BCC REGARDING THE ISSUANCE OF WARRANTS TO BSX WITH AN EXERCISE PRICE BELOW THE FRACTIONAL VALUE OF THE EXISTING SHARES, EXERCISABLE EITHER (A) IN CASH, WITH CANCELLATION OF THE PREFERENTIAL SUBSCRIPTION RIGHTS, OR (B) IN KIND, BY WAY OF THE CONTRIBUTION OF THE BALANCE (IF ANY) OF THE IP TRANSFER CONSIDERATION AND/OR THE CONTRIBUTION OF THE BALANCE (IF ANY) OF THE PRINCIPAL AND ACCRUED INTEREST UNDER THE 2009 LOAN AGREEMENT**

*Board of Directors of 7 June 2010*
*Special Board Report 582, 583, 596, 598 and 602 BCC*

The Board of Directors (the **"Board"**) hereby presents to the extraordinary general meeting of shareholders of the Company (the **"EGM"**) its combined special report pursuant to: (i) sections 582, 596 and 598 of the Belgian Companies Code (**"BCC"**) regarding the issuance of new shares below the fractional value of the existing shares, with cancellation of the preferential subscription rights for the benefit of Knight Capital Group, Inc. (**"Knight"**); (ii) sections 582 and 602 BCC regarding the issuance of new shares below the fractional value of the existing shares to Börse Berlin AG (**"BSX"**), by way of contribution in kind of (all or a portion of) the IP Transfer Consideration or (all or a portion of) the principal or accrued interest under the 2009 Loan Agreement; (iii) sections 582, 583, 596 and 598 BCC regarding the issuance of warrants to Knight with an exercise price below the fractional value of the existing shares and with cancellation of the preferential subscription rights; and (iv) sections 582, 583, 596, 598 and 602 BCC regarding the issuance of warrants to BSX with an exercise price below the fractional value of the existing shares, exercisable either (a) in cash, with cancellation of the preferential subscription rights, or (b) in kind, by way of the contribution of the balance (if any) of the IP Transfer Consideration and/or the contribution of the balance (if any) of the principal and accrued interest under the 2009 Loan Agreement.

In accordance with sections 582, 583, 596, 598 and 602 BCC, the Board describes in this report the purpose and justification for the issuance of new shares and warrants (actually resp. possibly) below the fractional value of the existing shares and the cancellation of the preferential subscription rights in connection therewith for the benefit of certain beneficiaries (as identified in this report), the contribution in kind into the Company's capital of (all or part of) the IP Transfer Consideration (as further defined below) and (all or part of) the principal or accrued interests under the loan agreement dated 7 August 2009 (as further defined below), the issue price and the (financial) consequences of these transactions for the existing shareholders and warrantholders (including in respect of their participation in the profits and the Company's equity). The issue of shares and warrants follows the cancellation of all existing classes of shares, which is justified in a separate Special Report of the Board of even date herewith, with which this report should be read together.

The Board has requested the Company's statutory auditor to prepare a report in accordance with Article 582, 596, 598 and 602 BCC regarding the issue of the shares and warrants below fractional value of the existing shares and with cancellation of the preferential rights of the existing shareholders respectively contribution(s) in kind.

## 1   ISSUE OF SHARES

### 1.1   PURPOSE AND JUSTIFICATION FOR THE CAPITAL INCREASE

The Company has found in Knight a strategic partner that will enable the Company to further develop its business in providing services to investment exchanges and platforms. As part of this strategic partnership, Knight will subscribe for a capital increase of an amount equal to USD 5,000,000 converted into euro at a reasonable market rate (the exchange rate from conversion of US dollars into euro applicable at the time of conversion, the **"Conversion Rate"**) (the **"Knight Subscription Price"**), which is expected to occur on or about 10 June 2010, in the Company. The Knight Subscription Price would for example amount to approximately EUR 4,060,450, when calculated at the exchange rate as per 31 May 2010. This capital contribution is expected to allow the Company the time to grow its current business and expand its product offering.

The issue price per share is set at an amount equal to the Knight Subscription Price divided by the 8,735,111 new ordinary shares to be issued (the **"Issue Price"**), which would for example amount to approximately EUR 0.46 per share, when calculated at the exchange rate as per 31 May 2010, and which the Board believes is at least equal to the intrinsic value (and net asset value) of the Company at the end of the last accounting period and at the date of this report (see below, under point 1.3). For the avoidance of doubt, it is specified that the exact issue price per share will only be known upon calculation of the Knight Subscription Price (and will depend on the exchange rate prevailing on the calculation date).

In view of the amount of the investment, Knight will hold approximately 15.38% (including Knight's current holding of 292,901 B shares prior to completion of the capital increase, and including the shares issued to BSX upon completion of the capital increase) of the Company's share capital upon completion of this transaction (which is scheduled to occur on the same date as the EGM), or approximately 14.99% (including Knight's current holding of 292,901 B shares prior to completion of the capital increase) on a fully diluted basis (excluding the warrants to be issued to Knight and BSX at the EGM, but including the shares to be issued to BSX at the EGM).

The Issuer and BSX will continue their co-operation as partners to achieve the joint purpose of creating a viable pan-European market segment for European liquid financial instruments in accordance with a business plan to be adopted by the Issuer. As part of this continued partnership, and so as to allow BSX to (approximately) retain its current 10% interest in the Company in the framework of the investment by Knight, BSX will subscribe for 888,298 new shares by way of a capital increase in kind by way of a contribution of one or more receivables of BSX due by the Company in an amount in principal (or interest) equal to the BSX

*Board of Directors of 7 June 2010*
*Special Board Report 582, 583, 596, 598 and 602 BCC*

Subscription Price (as defined below). The receivables to be so contributed shall consist of: (i) the claim of BSX to the payment by the Issuer of the debt of EUR 500,000 payable by the Company to BSX for the transfer of certain intellectual property rights, amongst other things by way of a Trademark Assignment (the **"IP Transfer Consideration"**) under the investment agreement entered into on 20 July 2009 between the Company, Citadel Tactical Investments LLC (**"Citadel"**), BSX and Dr. Jos B. Peeters, and (ii) to the extent the IP Transfer Consideration is not sufficient to pay up the BSX Subscription Price in full, a claim of BSX to the repayment of all or part of the existing loan outstanding between BSX and the Company (i.e., the loan agreement dated 7 August 2009 between BSX, Dr. Peeters and the Company (the **"2009 Loan Agreement"**)), in an amount (consisting of all or a part of the principal amount (EUR 3,244,126.94) with interest accrued thereon) equal to the balance of the BSX Subscription Price that remains to be so paid-up.

In view of the amount of the investment, BSX will hold approximately 9.90% (including BSX's current holding of 4,925,916 B shares prior to completion of the capital increase and including the shares issued to Knight at the EGM) of the Company's share capital upon completion at the closing of this transaction, or approximately 9.65% on a fully diluted basis (excluding the warrants to be issued to Knight and BSX at the EGM, but including the shares to be issued to Knight at the EGM).

### 1.2   ISSUE OF SHARES AND NATURE OF SHARES ISSUED

In relation to this transaction, the Company will issue 8,735,111 new shares to Knight and 888,298 new shares to BSX, *i.e.*, an aggregate of 9,623,409 new shares (the **"Shares"**). The Shares will be fully paid up at the time of the capital increase.

The Shares shall be credited as fully paid, with the rights attached thereto pursuant to the restated Articles of Association of the Company following the issue of the Shares and ranking pari passu in all respects with all existing shares of the Issuer.

### 1.3   ISSUE OF SHARES TO KNIGHT AT A SUBSCRIPTION PRICE WHICH IS AT LEAST AS HIGH AS THE INTRINSIC VALUE BUT LOWER THAN THE FRACTIONAL VALUE OF THE CURRENT SHARES (SECTIONS 582, 596 AND 598 BCC)

Currently, the subscribed capital of the Company amounts to EUR 128,526,848.90, represented by 49,077,487 shares, resulting in a fractional value of approximately EUR 2.62 per share.

The proposed Issue Price (approximately EUR 0.46 based on the conversion rate as at 31 May 2010) will therefore be lower than the current fractional value of the shares.

The Issue Price is however at least as high as the intrinsic value of the existing shares, including when calculated by reference to the annual accounts as per 31 December 2009 (to be approved at the AGM). The equity (or net asset value, or **"NAV"**) of the Company, as set out in the audited annual accounts as per 31 December 2009, amounted to EUR -498.394,58. Such amount, however, does not take into account the amount of EUR 10,000,000 which was not yet paid by Citadel at the occasion of the 2009 capital increase and not yet called by the Board as at 31 December 2009 (it should be noted, however, that in April 2010, an amount of EUR 5,000,000 in unpaid capital was called and paid up). For the purposes of calculating the NAV, this amount is added. The intrinsic value, when calculated as a NAV, is therefore as per 31 December 2009 equal to (EUR -498.394,58 + EUR 10,000,000)/ 49,077,487 shares or approximately EUR 0.19 per share. The Issue Price (approximately EUR 0.46 based on the conversion rate as at 31 May 2010) will therefore be higher than the NAV of the Company's shares as at 31 December 2009. Moreover, the Company has continued to incur losses since the last accounts date, meaning that the NAV has continued to decline since that date, so that the Issue Price will also be higher than the NAV applicable at the date of the EGM. Also, the Board, in its search for alternative sources of funding or potential forms of co-operation with third parties, at this time has not been able to identify potential subscribers that would have been prepared to participate in a capital increase for similar amounts on better terms.

The Board therefore believes that the Issue Price (approximately EUR 0.46 based on the conversion rate as at 31 May 2010) will be at least equal to the current intrinsic value of the Company's shares.

The capital increase will have an impact on the financial rights (*i.e.*, amongst other things, dividend rights and rights to liquidation proceeds) and membership rights (*i.e.*, amongst other things, voting rights and preferential subscription rights) that are attached to the existing shares.

This results from the fact that (i) the capital representative value of all shares (existing and new) would be equalized after the capital increase; and (ii) that certain specific rights shall be granted to certain specific shareholders pursuant to the articles of association (reference is made to the Special Board Report pursuant to 560 BCC of even date herewith).

The co-operation with Knight and continued co-operation with BSX will enable the Company to further develop its business in providing services to investment exchanges and platforms. The proposed investment by Knight and BSX at the

*Board of Directors of 7 June 2010*
*Special Board Report 582, 583, 596, 598 and 602 BCC*

proposed Issue Price is therefore believed by the Board to be in the interest of the
Company.

### 1.4   CANCELLATION OF THE PREFERENTIAL SUBSCRIPTION RIGHTS IN CONNECTION WITH THE ISSUANCE OF NEW SHARES FOR THE BENEFIT OF KNIGHT (SECTIONS 596 AND 598 BCC)

In connection with the proposed issue of shares to Knight, the Board proposes to
cancel the preferential subscription rights of the current shareholders.

The beneficiary of the cancellation of the preferential subscription rights is Knight,
a capital markets firm providing market access and trade execution services
across multiple asset classes to buy-side, sell-side and corporate issuer clients. It
is proposed to issue 8,735,111 new shares to Knight, as a result of which the
total number of shares would increase from 49,077,487 to 57,812,598 shares
(and to 58,700,896 shares when including the issue of new shares to BSX).

Reference is made to chapters 1.1 and 1.3 above regarding the subscription
price, its justification and the financial impact of the transaction on existing
shareholders, including the fact that the shares to be issued to Knight will be
issued below the fractional value of the current shares but for an Issue Price
which is at least as high as the intrinsic value of the Company's shares and the
dilution caused by the issue of shares to Knight.

### 1.5   ISSUE OF SHARES TO BSX IN CONSIDERATION FOR A CONTRIBUTION IN KIND BY BSX OF THE IP TRANSFER CONSIDERATION AND LOAN CONSIDERATION (SECTION 602 BCC)

#### 1.5.1  Description of the contribution in kind

The contribution in kind consists of the contribution by BSX into the Company's
capital of (i) (all or a part of) the IP Transfer Consideration, *i.e.*, (all or a part of)
the Company's debt towards BSX further to the IP transfer under the Citadel
Investment Agreement in the amount of EUR 5,000,000, and (ii) to the extent the
IP Transfer Consideration is not sufficient to pay up the BSX Subscription Price in
full, a claim of BSX to the repayment of all or part of the existing loan outstanding
between BSX and the Company (i.e., the loan agreement dated 7 August 2009
between BSX, Dr. Peeters and the Company (the **"2009 Loan Agreement"**)), in
an amount (consisting of all or a part of the principal amount (EUR 3,244,126.94)
with interest accrued thereon (**"Accrued Interest"**; the principal of the 2009
Loan Agreement and the Accrued Interest together being referred to as the
**"Loan Consideration"**)) equal to the balance of the BSX Subscription Price that
remains to be so paid-up.

The interest rate under the 2009 Loan Agreement is EURIBOR + 2% per annum.
For information purposes, it is specified that as at 31 May 2010, the Accrued

Interest amounted to EUR 88.648,04. The principal amount and the interest accrued under the 2009 Loan Agreement in principle must be repaid on the Termination Date (which, depending on the circumstances, will be a date between 1 January and 31 December 2012). However, upon notification of BSX, BSX under the 2009 Loan Agreement may use the accrued but unpaid interest under the 2009 Loan Agreement to, in certain circumstances, subscribe for the Company's shares. BSX will also be entitled to use the principal under the 2009 Loan Agreement to subscribe for the Company's shares at the EGM and/or under the BSX Warrant.

The exact amount of the IP Transfer Consideration that will be contributed into the Company's capital, will be equal to the final Issue Price (which depends on the Conversion Rate which will be known on or about 10 June 2010) multiplied by the 888,298 shares to be issued to BSX into the capital of the Company (the "**BSX Subscription Price**"). Based on the estimated Issue Price (approximately EUR 0.46 based on the conversion rate as at 31 May 2010), this would result, by way of example, in a contribution of the IP Transfer Consideration for an amount of EUR 408,617.08.

The exact amount of the Loan Consideration that will be contributed into the Company's capital, will be equal to the positive difference (if any), between the BSX Subscription Price and the IP Transfer Consideration (which implies, for the avoidance of doubt, that the BSX Subscription Price exceeds the IP Transfer Consideration). Based on the contribution of the IP Transfer Consideration for an estimated amount of EUR 408,617.08, as described in the previous paragraph, BSX would not need to contribute any part of the Loan Consideration in the example described in this report.

### 1.5.2  Valuation of and consideration for the contribution in kind

1.5.2.1  Valuation of the contribution in kind

The valuation of the IP Transfer Consideration and the Loan Consideration is based on the nominal value of the IP Transfer Consideration and the Loan Consideration.

In accordance with normal valuation rules, a claim *vis-à-vis* the Company, which is contributed into the Company's capital, is valued at nominal value, *i.e.*, EUR 500,000, resp. EUR 3,224,126.94 in principal under the 2009 Loan Agreement and actual amount of the Accrued Interests from time to times. For the avoidance of doubt, this valuation method equally applies to the actual portion of the IP Transfer Consideration, resp. Loan Consideration, that will actually be contributed into the Company's capital (EUR 408,617.08 for the IP Transfer Consideration in the example described above).

*Board of Directors of 7 June 2010*
*Special Board Report 582, 583, 596, 598 and 602 BCC*

1.5.2.2 Consideration for the contribution in kind

1.5.2.2.1 Capital increase

The Company's capital will be increased, by way of a contribution in kind of (all or part of) the IP Transfer Consideration or (all or part of) the Loan Consideration into the Company's capital, by an amount equal to the BSX Subscription Price, as a result of which an aggregate number of 888,298 registered ordinary shares without nominal value would be issued, at the Issue Price.

1.5.2.2.2 Valuation of the Company's shares

The value of the shares to be issued in consideration for the contribution in kind is, on the basis of an internal assessment, determined to be equal to the Issue Price, in view of the fact that Knight is willing to subscribe at such price and in view of the determination of the intrinsic value of the Company's shares as described under 1.3 above.

*1.5.3  Interest of the contribution in kind of (all or part of) the IP Transfer Consideration and (all or part of) the Loan Consideration and of the resulting capital increase*

The contribution made by BSX and the continued partnership with BSX will, in addition to the investment by Knight, enable the Company to further develop its business in providing services to investment exchanges and platforms.

The proposed contribution in kind at the proposed issue price and the resulting capital increase is in the interest of the Company, as the relevant portion of the Company's debt *vis-à-vis* BSX for the amount of the IP Transfer Consideration, resp. Loan Consideration, will fall away upon its contribution into the Company's capital (by way of amalgamation ("*schuldvermenging*")) and as BSX has expressed the willingness to continue its partnership with the Company.

For the dilution caused by the contemplated issue of shares to BSX, reference is made to 1.1 above.

*1.5.4  Conclusions of the statutory auditor*

Pursuant to Article 602 BCC, the Board has requested the Company's statutory auditor to prepare a report regarding the contribution in kind described in this special board report.

*Board of Directors of 7 June 2010*
*Special Board Report 582, 583, 596, 598 and 602 BCC*

The draft conclusions of the statutory auditor's report are (in respect of the description of the contribution in kind, the method of valuation and the consideration for the contribution in kind) as follows:

*"The transaction has been reviewed in accordance with the standards of the Belgian Instituut van de Bedrijfsrevisoren regarding contributions in kind; the Board of Directors is responsible for the valuation of the assets contributed and for the determination of the number of shares issued as remuneration for the contribution in kind*

*The description of the contribution in kind meets normal requirements of precision and clarity*

*The valuation methods retained by the parties to the transactions are economically justified*

*The applied valuation methods lead to contribution values that correspond at least to the number and the intrinsic value of the issued shares*

*The contribution values do not correspond to the number of shares and the fractional value of the existing shares; the explanation and justification of this issuance of shares below fractional value is clearly described in the attached special report of the Board of Directors.*

*[...]*

*Finally, we would like to point out that our engagement does not consist in expressing an opinion on the legitimacy and fairness of the transaction or, in other words, our report does not include a fairness opinion."*

The Board does not deviate from these conclusions.

*Board of Directors of 7 June 2010*
*Special Board Report 582, 583, 596, 598 and 602 BCC*

## 2   ISSUE OF WARRANTS

### 2.1   PURPOSE OF AND JUSTIFICATION FOR THE WARRANTS ISSUE

The issuance of the Warrants (as defined below) is an essential element of the transaction aimed at capitalising the Company and securing its longer term viability (as set forth under part 1.1 above) and is therefore in the interests of the Company.

The Knight Warrant is to be issued to Knight as part of, and as a condition for, the investment by Knight in the Company. The Knight Warrant is issued to Knight as part of the compensation for Knight for its equity venture investment in the Company.

The BSX Warrant is to be issued to BSX as part of the envisaged transaction and to further its continued co-operation as the Company's partner to achieve the joint purpose of creating a viable pan-European market segment for European liquid financial instruments. As part of this continued partnership, and so as to allow BSX to (approximately) retain its current 10% interest in the Company in case Knight exercises its Warrant, BSX will be issued the BSX Warrant described below.

### 2.2   DEFINITIONS

| | |
|---|---|
| **"Adjustment Event"** | means the issuance by the Issuer of ordinary shares (or securities convertible into ordinary shares or which give the right to subscribe for ordinary shares) at an issue price or exercise price of less than the Knight Exercise Price; |
| **"Affiliate"** | has the meaning set out in Article 11, 1° of the BCC; |
| **"BCC"** | means the Belgian Companies Code of 7 May 1999 (as amended from time to time); |
| **"Board"** | means the board of directors of the Issuer; |
| **"BSX New Ordinary Shares"** | means the number of new ordinary shares equal to X in the formula: $X = (Y*(100/90)) - Y$ where Y is the number of Knight Warrant Shares issued pursuant to the Knight Warrant; |
| **"BSX Warrant"** | has the meaning as set out in paragraph 2.3 |
| **"BSX Warrant Consideration"** | has the meaning set out in paragraph 2.3.5.2; |
| **"BSX Warrant Exercise Period"** | has the meaning set out in paragraph 2.3.3; |

*Board of Directors of 7 June 2010*
*Special Board Report 582, 583, 596, 598 and 602 BCC*

**"Business Day"**        means a day (other than a Saturday or Sunday) on which banks in the City of London and in Brussels are open for general business

**"Completion Date"**        means the date of the extraordinary shareholders meeting which will resolve upon the Warrants issue, which is scheduled to be held on or about 24 June 2010;

**"Control"**        has the meaning set out in sections 5 - 9 BCC;

**"Exercise Notice"**        has the meaning set out paragraph 2.3.7.1 A;

**"Fully Diluted Share Capital"**

means, at any time, the aggregate number of shares in the capital of the Company which are actually in issue and such maximum number of shares in the capital of the Company which may be issued pursuant to the exercise of any rights of conversion or subscription issued by the Issuer (including any warrants, and, in the case of new issues of shares or warrants, including the new shares or warrants proposed to be issued), irrespective of whether the conditions for such exercise, conversion or subscription are fulfilled at the time of application of this definition, and provided that the relevant maximum shall be calculated by reference to the circumstances existing at the time of the exercise of the Knight Warrant ;

**"Investment Agreement"** means the investment agreement between, amongst others, Knight and the Issuer dated on or about 7 June 2010;

**"Knight"**        means Knight Capital Group, Inc., a company duly organized and existing under the laws of the State of Delaware, United States of America, whose registered office is at 545 Washington Boulevard, Jersey City, New Jersey 07310, Unites States of America;

**"Knight Exercise Price"**    means the issue price per share in euro of the Knight Warrant Shares;

**"Knight Warrant"**      means the warrant to subscribe for the Knight Warrant Shares in return for the Knight Warrant Consideration, exercisable (subject to its terms) during the Knight Warrant Period and (if applicable), the Knight Warrant Extension Period;

**"Knight Warrant Consideration"**

as described in point 2.3.5.1;

**"Knight Warrant Extension Period"**

means six months from the date of expiry of the Knight Warrant Period;

**"Knight Warrant Period"** means six months from the Completion Date;

**"Knight Warrant Shares"** as described in point 2.3.2;

**"2009 Loan Agreement"** means the loan agreement dated 7 August 2009 between BSX, Dr. Peeters and the Issuer;

**"Minimum Performance Threshold"**

means that in the 30 days prior to the expiry of the Knight Warrant Period, Knight or other members of Knight's group have traded on the Easdaq Trading System at least the lower of:

(A)    a 2% average daily volume of the Easdaq Trading System; or

(B)    a EUR 100m daily average value;

**"Sale"** means, on a sale or transfer or an allotment of any shares, any person (who is not a shareholder of the Issuer or an Affiliate of such shareholder, on the Completion Date) obtaining Control over the Issuer;

**"Subscription Date"** has the meaning set out in paragraph 2.3.7.1 B; and

**"Warrants"** means the Knight Warrant and the BSX Warrant taken together.

2.3    <u>I</u>SSUE OF <u>W</u>ARRANTS AND NATURE OF <u>W</u>ARRANTS ISSUED (SECTION 583 BCC)

The Company proposes to issue one (1) warrant to Knight (the **"Knight Warrant"**) and one (1) warrant to BSX (the **"BSX Warrant"**), free of charge, with the exercise conditions described hereunder.

*2.3.1  Exercise period applicable to the Knight Warrant*

Knight shall be entitled to exercise its warrant either:

(i)     during the Knight Warrant Period; or

(ii)    provided that: (a) the Knight Warrant has not been exercised during the Knight Warrant Period; and (b) the Minimum Performance Threshold has been met, during the Knight Warrant Extension Period.

For the avoidance of doubt, payment of the Knight Warrant Consideration may take place after expiry of the Knight Warrant Period or the Knight Warrant Extension Period (as applicable).

*2.3.2  Shares to which the holder of the Knight Warrant is entitled*

The Knight Warrant shall give rise to a number of new ordinary shares as follows:

(A)     during the Knight Warrant Period, such number of new ordinary shares which, immediately after their issue together represent 11 per cent of the Fully Diluted Share Capital; and

(B)     during the Knight Warrant Extension Period, such number of new ordinary shares which, immediately after their issue together represent 9 per cent of the Fully Diluted Share Capital (together, the **"Knight Warrant Shares"**);

### 2.3.3 Exercise period applicable to the BSX Warrant

BSX shall be entitled to exercise the BSX Warrant, in one or several times, during a period beginning on the date of exercise of the Knight Warrant and ending on the date which is three years after such exercise (the **"BSX Warrant Exercise Period"**).

### 2.3.4 Shares to which the holder of the BSX Warrant is entitled

The BSX Warrant shall give right to the BSX New Ordinary Shares.

### 2.3.5 Issue price and Exercise Price

The Knight Warrant and the BSX Warrant will be offered to Knight, resp. BSX free of charge.

2.3.5.1 **Exercise price of the Knight Warrant** - Issue of shares at a subscription price which is possibly lower than the fractional value of the current shares (sections 582, 583, 596 and 598 BCC)

The exercise price of the Knight Warrant is equal to the euro equivalent of USD 5,000,000 converted at the Conversion Rate (the **"Knight Warrant Consideration"**) (which will be equal to the amount of the Knight Subscription Price as defined under 1.1).

The Knight Warrant will be exercisable against payment in euro of the Knight Warrant Consideration. The capital increase resulting from the exercise of the Knight Warrant will be equal to the Knight Warrant Consideration. If the subscription price for each new ordinary share is higher than the fractional value ("*fractiewaarde*") at the time of issuance, the portion up to the fractional value shall be paid as share capital and the remaining portion shall be paid as issuance premium ("*uitgiftepremie*"). Immediately after such capital increase, the capital representative value of all shares of the Issuer will be equalized so that each of the Issuer's shares will henceforth have the same capital representative value.

2.3.5.2 **Exercise price of the BSX Warrant** - Issue of shares by way of a contribution in cash and/or in kind at a subscription price which is possibly lower than the fractional value of the current shares (sections 582, 583, 596, 598 and 602 BCC)

13

The exercise price of the BSX Warrant is equal to the Knight Exercise Price, multiplied by the number of BSX New Ordinary Shares issuable upon the exercise of the BSX Warrant ("**BSX Warrant Consideration**"), to be immediately and fully paid up upon each exercise of the BSX Warrant in respect of the number of BSX New Ordinary Shares to be acquired upon each exercise of the BSX Warrant. At the choice of the holder of the BSX Warrant, the exercise price can by paid: (i) by means of a payment in cash; (ii) by capitalizing, through a contribution in kind, the balance (if any) of the Loan Consideration (valued at face value); or (iii) by capitalizing, through a contribution in kind, the balance (if any) of the IP Transfer Consideration (valued at face value), or (iv) by means of a combination of the methods referred to in (i) to (iii). The capital increase resulting from the exercise of the (relevant part of the) BSX Warrant will be equal to the (relevant part of the) BSX Warrant Consideration paid-up upon each exercise of the BSX Warrant. Immediately after such capital increase, the capital representative value of all shares of the Issuer will be equalized so that each of the Issuer's shares will henceforth have the same capital representative value.

### 2.3.5.2.1 Description of the contribution in kind

If BSX would exercise (part of) the BSX Warrant by way of a contribution in kind, such contribution in kind would consist of the contribution by BSX into the Company's capital of the balance (if any) of the IP Transfer Consideration and/or the balance (if any) of the Loan Consideration.

With regard to the description of the IP Transfer Consideration and the Loan Consideration, reference is made to the contribution in kind by BSX at the EGM, as set out under point 1.5 above.

### 2.3.5.2.2 Valuation of and consideration for the contribution in kind

### 2.3.5.2.2.1 Valuation of the contribution in kind

With regard to the valuation of the IP Transfer Consideration and the Loan Consideration, reference is made to the contribution in kind by BSX, as set out under point 1.5.2.1 above.

In accordance with normal valuation rules, a claim *vis-à-vis* the Company, which is contributed into the Company's capital, is valued at nominal value. The value of the (part of the) IP Transfer Consideration, resp. Loan Consideration that would be contributed in kind into the Company's capital will therefore always be equal to its face value at the relevant time.

2.3.5.2.2.2 Consideration for the contribution in kind

2.3.5.2.2.2.1 Capital increase

The Company's capital will be increased, by way of a contribution in kind of the balance (if any) of the IP Transfer Consideration and/or the Loan Consideration into the Company's capital, by an amount equal to (in case of the partial exercise of the BSX Warrant, a part of) the BSX Warrant Consideration, as a result of which the (in case of the partial exercise of the BSX Warrant, a part of the) BSX New Ordinary Shares would be issued (depending on the number of BSX New Ordinary Shares BSX wishes to obtain upon each exercise of the BSX Warrant). The issue price per BSX New Ordinary Share will be equal to the BSX Warrant Consideration divided by the (aggregate) number of BSX New Ordinary Shares.

2.3.5.2.2.2.2 Valuation of the Company's shares

The value of the BSX New Ordinary Shares to be issued in consideration for the contribution in kind is currently equal to the final Issue Price (that will be determined on or about 10 June 2010 using the then applicable Conversion Rate) (see above under point 1.1).

2.3.5.2.3 Interest of the contribution in kind of the balance of the IP Transfer Consideration and/or the Loan Consideration and of the resulting capital increase

The contribution to be made by BSX upon exercise of the BSX Warrant and the continued partnership with BSX is, in addition to the investment by Knight made at the EGM and upon the exercise of the Knight Warrant, expected to enable the Company at the time of exercise to further develop its business in providing services to investment exchanges and platforms.

The potential contribution in kind at the proposed issue price and the resulting capital increase would be in the interests of the Company, as the relevant portion of the Company's debt vis-à-vis BSX for the amount of the IP Transfer Consideration respectively Loan Consideration (which Loan Consideration would otherwise be subject to a cash reimbursement by the Company upon the termination date of the 2009 Loan Agreement) will fall away upon its contribution into the Company's capital (by way of amalgamation ("*schuldvermenging*")) and as BSX has expressed the willingness to continue its partnership with the Company.

2.3.5.2.4 Conclusions of the statutory auditor

Pursuant to Article 602 BCC, the Board has requested the Company's statutory auditor to prepare a report regarding the potential contribution in kind described in this special board report.

Board of Directors of 7 June 2010
Special Board Report 582, 583, 596, 598 and 602 BCC

The draft conclusions of the statutory auditor's report are (in respect of the description of the contribution in kind, the method of valuation and the consideration for the contribution in kind) as follows:

"*The transaction has been reviewed in accordance with the standards of the Belgian Instituut van de Bedrijfsrevisoren regarding contributions in kind; the Board of Directors is responsible for the valuation of the assets contributed and for the determination of the number of shares issued as remuneration for the contribution in kind*

*The description of the contribution in kind meets normal requirements of precision and clarity*

*The valuation methods retained by the parties to the transactions are economically justified*

*The applied valuation methods lead to contribution values that correspond at least to the number and the intrinsic value of the issued shares*

*The contribution values do not correspond to the number of shares and the fractional value of the existing shares; the explanation and justification of this issuance of shares below fractional value is clearly described in the attached special report of the Board of Directors.*

*The contribution in kind related to the warrant has only been verified at the moment of the issuance of the warrant and not at the moment of potential exercise.*

*Finally, we would like to point out that our engagement does not consist in expressing an opinion on the legitimacy and fairness of the transaction or, in other words, our report does not include a fairness opinion.*"

The Board does not deviate from these conclusions.

2.3.6   *Cancellation of the preferential subscription rights in connection with the issuance of the Warrants for the benefit of Knight and BSX (sections 596 and 598 BCC) and consequences of the issue of the Warrants for the existing shareholders and warrantholders*

The issue of the Knight Warrant is reserved to Knight. The issue of the BSX Warrant is reserved to BSX.

Reference is made to the purpose of and justification for the Warrants issue as such (see point 2.1 above).

*Board of Directors of 7 June 2010*
*Special Board Report 582, 583, 596, 598 and 602 BCC*

With a view to assessing the potential impact of the issue of the Warrants on the existing shareholders and warrantholders, a proper understanding of the Warrants mechanism is required, as set out hereunder:

- The Knight Warrant will upon exercise give rise to a number of new ordinary shares which, immediately after their issue together represent (i) 11% of the Fully Diluted Share Capital (if exercised during the Knight Warrant Period); and (ii) 9% of the Fully Diluted Share Capital (if exercised during the Knight Warrant Extension Period) (see point 2.3.2 above);

- The BSX Warrant shall give right to a number of new ordinary shares equal to X in the formula: $X= (Y*(100/90)) - Y$;
  where Y is the number of Knight Warrant Shares issued pursuant to the Knight Warrant;

- The exercise price of the Knight Warrant is equal to the euro equivalent of USD 5,000,000 converted at the Conversion Rate (i.e., the "Knight Warrant Consideration") (which would for example amount to approximately EUR 4,060,450, when calculated at the exchange rate as per 31 May 2010) (see point 1.1 above).

- In accordance with Article 598 BCC, the Knight Warrant cannot be exercised at an exercise price per share which would be below the current intrinsic value (at the time of the issuance of the Knight Warrant), *i.e.* the Issue Price, which would for example amount to approximately EUR 0.46 per share, when calculated at the exchange rate as per 31 May 2010.

- The exercise of the Knight Warrant could therefore (in the example using the exchange rate as per 31 May 2010), never result in the issuance of more than 8,735,111 shares (i.e., EUR 4,060,450 divided by approximately EUR 0.46 in this example (it should be noted that EUR 0.46 is a rounded off amount, and that the exact conversion rate as at 31 May 2010 has been used to calculate the number of 8,735,111 shares – which number is of course equal to the number of shares issued to Knight at the EGM);

- Based on such maximum number of 8.735.111 shares, the BSX Warrant would then upon exercise give rise to the issuance of approximately 970,567 shares;

- The number of Knight Warrant Shares (*i.e.*, 11% resp. 9% of the Fully Diluted Share Capital) is based on the assumption that an employee incentive plan ("**EIP**") consisting of warrants convertible into 4,322,234 shares would be implemented prior to the exercise of the Knight Warrant (it should be noted that no actual decision whatsoever has been taken or is proposed in respect of such EIP);

- In the framework of such EIP, BSX (in accordance with the shareholders agreement among Citadel, Knight, BSX and JBP, such parties have agreed to cause the Company to allow BSX to retain its current 10% interest in the Company) would receive an additional number of warrants convertible into 480,248 shares;

- The number of Knight Warrant Shares will also take into account subsequent share issues and issues of other securities by the Company, in view of the entitlement to 11% respectively 9% of the "Fully Diluted Share Capital" (as defined) at the time of exercise.

Applying the Warrants mechanism described above, and using the exchange rate as per 31 May 2010 by way of example, the maximum number of new ordinary shares that could be issued upon exercise of the Knight Warrant without violation of Article 598 BCC, is 8,735,111 shares. Assuming the Knight Warrant would be exercised during the Knight Warrant Period (therefore entitling Knight to 11% of the Fully Diluted Share Capital), the maximum total number of (potential) shares outstanding at the time of (and after) exercise of the Knight Warrant, would amount to approximately 79,410,100 shares.

This means that the Company in the future (until expiry or lapse of the Knight Warrant) will need to apply a standstill (to which it hereby commits, subject to completion of the Knight transaction occurring at the EGM) with regard to issues of shares and other securities. In our example, this would mean that (assuming the implementation in full of the EIP, and the corresponding issuance of warrants to BSX, prior to the exercise of the Knight Warrant), the Company would apply a standstill beyond the additional issue of 4,659,798 (potential) shares. This maximum number results from the following calculation:

79,410,100 shares
Reduced by:
- 58,700,896 shares in issue following the capital increase;
- 1,541,246 potential shares under existing warrants (assuming no downround occurs before exercise of the Knight Warrant, see the terms and conditions of the existing warrants);
- 8,735,111 potential shares that may be issued under the Knight Warrant without violation of Article 598 BCC;
- 970,567 potential shares to be issued under the BSX Warrant;
- 4,322,234 potential shares that may be issued under the EIP;
- 480,248 potential shares to be issued to BSX in case the EIP would be fully implemented;
= maximum 4,659,798 (potential) shares to be additionally issued as long as the Knight Warrant is exercisable.

Under the Warrants issuance, a maximum of 9,705,678 new shares can be issued upon exercise of the Warrants (taking into account the limitation of Article 598 BCC, the capital increase at the EGM, and the assumption that an EIP would be

implemented for 4,322,234 potential shares and 480,248 potential shares would thereupon be issued to BSX), which would cause a further dilution of 13.92%.

As noted above, as the shares to be issued upon exercise of the Knight Warrant cannot be issued at an issue price below the current intrinsic value of the Company's shares, the Company would be obliged to respect a standstill as long as the Knight Warrant is exercisable, as a result of which, and assuming the issue of warrants in the framework of the EIP as described above, the Company could only issue a maximum number of 4,659,798 shares (calculated at the exchange rate as per 31 May 2010).

Although the Warrants mechanism described above leads to a partial standstill, it is believed by the Board to be in the interest of the Company as such, as it constitutes a condition for the transaction with Knight, which is necessary for, and in the interest of, the Company, for the reasons set out in this special Board report.

### 2.3.7  Other terms and conditions

2.3.7.1  Exercise procedure:

A. In order to exercise the Knight Warrant, resp. the BSX Warrant, Knight, resp. BSX, must within the Knight Warrant Period or, if applicable, the Knight Warrant Extension Period, resp. the BSX Warrant Exercise Period, execute and deliver an exercise notice (the **"Exercise Notice"**) to the Board, by way of a registered letter or letter delivered by hand signed for acknowledgement of receipt by a representative of the Board, notifying the Board of the exercise of the Knight Warrant, resp. BSX Warrant.

B. Upon receipt of the Exercise Notice, and if BSX intends to pay the BSX Warrant Consideration in cash, the Board shall, if it has not already done so, and within five Business Days inform Knight, resp. BSX, of the details of the special blocked account opened in the name of the Issuer into which the Knight Warrant Consideration, resp. the BSX Warrant Consideration (or, in case of partial exercise of the BSX Warrant, the relevant part of the BSX Warrant Consideration) must be transferred by Knight, resp. BSX and the references of which will be communicated by the Issuer to Knight, resp. BSX. Knight, resp. BSX shall, within five Business Days of receipt of the references, transfer the Knight Warrant Consideration, resp. (in case of partial exercises, the relevant part of the) BSX Warrant Consideration into the relevant account.

For the avoidance of doubt, provided that the Exercise Notice is served during the Knight Warrant Period, resp. BSX Warrant Period,

or, with regard to Knight, (if applicable) the Knight Warrant
Extension Period, payment of the Knight Warrant Consideration may
take place after expiry of the Knight Warrant Period or the Knight
Warrant Extension Period (as applicable) and payment of the BSX
Warrant Consideration may take place after expiry of the BSX
Warrant Exercise Period.

C. The new ordinary shares, resp. BSX New Ordinary Shares to be
issued shall be issued (with regard to BSX, where the (in case of
partial exercises, relevant part of the) BSX Warrant Consideration is
paid in cash), within two weeks after the date of the transfer of the
Knight Warrant Consideration, resp. (or, in case of partial exercises,
the relevant part of the) BSX Warrant Consideration, into the
relevant account; (ii) (only with regard to BSX) where the (in case of
partial exercises, relevant part of the) BSX Warrant Consideration is
to be paid otherwise than in cash, within two weeks of the date the
Exercise Notice was served; or (iii) where the Exercise Notice was
issued after a notification made to Knight, resp. BSX pursuant to sub
paragraph 2.3.7.6.1 A of these terms and conditions, immediately,
subject to the payment of the Knight Warrant Consideration, resp. (in
case of previous partial exercises, relevant part of the) BSX Warrant
Consideration, prior to a Sale being completed (the "**Subscription
Date**").

D. Once delivered, an Exercise Notice shall be irrevocable, save (i) with
the consent of the Issuer or (ii) where the Exercise Notice was issued
after a notification made to Knight, resp. BSX pursuant to sub-
paragraph 2.3.7.6.1 A of these terms and conditions and the
proposed Sale referred to in such notice does not occur or does not
occur within six months, as further specified in subparagraph
2.3.7.6.1 A.

### 2.3.7.2 Allotment:

New ordinary shares issued pursuant to the exercise of the Knight Warrant, resp.
BSX Warrant will be allotted on the Subscription Date. Evidence of the recordation
in the Issuer's share register in respect of the registered new ordinary shares,
resp. BSX New Ordinary Shares arising on the exercise of the Knight Warrant,
resp. BSX Warrant, will be dispatched to Knight, resp. BSX, free of charge, not
later than the fifth Business Day after the Subscription Date.

### 2.3.7.3 Partial exercise of the BSX Warrant

The BSX Warrant shall be capable of exercise on more than one occasion, so that
after exercise in respect of some of the BSX New Ordinary Shares, the BSX
Warrant will remain outstanding in respect of the remaining BSX New Ordinary
Shares and will continue to be exercisable.

### 2.3.7.4 Lapsing of the Knight Warrant

The Knight Warrant shall not be exercisable and shall lapse in the following circumstances:

A. if the Minimum Performance Threshold has not been met, immediately following the expiry of the Knight Warrant Period;

B. immediately following the expiry of the Knight Warrant Extension Period;

C. immediately on a *Drag offer*, *i e.*, the offer contemplated by a *Drag Notice*, as defined in a shareholders' agreement among certain shareholders, and being completed in accordance with the terms of such shareholders' agreement; and

D. in accordance with paragraphs 2.3.7.6.1 C and 2.3.7.6.2.

### 2.3.7.5 Lapsing of the BSX Warrant

Unless already exercised, the BSX Warrant shall not be exercisable and shall lapse in the following circumstances:

A. immediately following the lapse of the Knight Warrant;

B. immediately following the expiry of the BSX Warrant Exercise Period;

C. immediately on a *Drag-Offer*, *i e.*, the offer contemplated by a *Drag Notice*, as defined in a shareholders' agreement among certain shareholders, and being completed in accordance with the terms of such shareholders' agreement;

D. in accordance with paragraph 2.3.7.6.1 C;

E. an issue of replacement warrants under clause 2.3.7.6.1 D; or

F. in accordance with paragraph 2.3.7.6.2.

### 2.3.7.6 Restrictions and requirements

2.3.7.6.1 So long as the Knight Warrant respectively BSX Warrant remains exercisable, the Issuer shall observe the following restrictions and requirements:

A. *Exits*: if at any time after the EGM, the Issuer becomes aware that a Sale is a realistic likelihood, the Issuer shall promptly notify Knight and BSX of such fact together with such additional details as to price and other material terms as Knight, resp. BSX, might reasonably request in connection with its evaluation of the proposed Sale and (i) Knight shall be entitled, at any time prior to, and conditionally on, such Sale to exercise the Knight Warrant, and (ii) BSX shall be entitled, at any time prior to, and conditionally on: (a) the exercise by Knight of the Knight Warrant; and (b) such Sale, to exercise the BSX Warrant. The Issuer shall give Knight and BSX not less than 15 Business Days' notice prior to the relevant parties entering into a

definitive agreement for the implementation of a Sale. If the proposed Sale is withdrawn or terminates then the Issuer shall promptly notify Knight and BSX of such fact (and in such event the notification of the proposed Sale shall be deemed never to have been given);

B. *Repurchase of shares:* if at any time an offer or invitation is made by the Issuer to all the holders of shares in the capital of the Issuer for the purchase by the Issuer of any of such shares, the Issuer shall give notice thereof to Knight and BSX, and (i) Knight shall be entitled, at any time while such offer or invitation is open for acceptance, to exercise the Knight Warrant and (ii) BSX shall be entitled, at any time while such offer or invitation is open for acceptance and subject to the exercise by Knight of the Knight Warrant, to exercise the BSX Warrant, and any shares issued pursuant to the requisite Exercise Notice served before the date on which such acceptance period closes will be included in, and shall be deemed to have assented to, such offer or invitation on the same terms and conditions as to other holders of shares;

C. *Winding up:* if an order is made or an effective resolution is passed for winding up the Issuer (except in case of a dissolution without liquidation), Knight and BSX will (if, in such winding up and on the basis that the Knight Warrant, resp. (part of the) BSX Warrant then unexercised had been exercised in full and the Knight Warrant Consideration, resp. (in case of previous partial exercise(s), the relevant part of the) BSX Warrant Consideration had been received in full by the Issuer, there would be a surplus available for distribution among the holders of the shares in the capital of the Issuer which, on such basis, would exceed in respect of each such share a sum equal to the Knight Warrant Consideration, resp. (in case of partial exercise, the remaining part of the) BSX Warrant Consideration) be treated as if immediately before the date of such order or resolution the Knight Warrant, resp. (in case of previous partial exercise(s), the remaining part of) BSX Warrant had been exercised in full, and shall accordingly be entitled to receive out of the assets available in the liquidation pari passu with the holders of the ordinary shares an amount equal to the sum to which Knight, resp. BSX would have become entitled by virtue of such subscription after deducting a sum equal to the Knight Warrant Consideration respectively (in case of previous partial exercise(s), the remaining part of) the BSX Warrant Consideration. Subject to the foregoing the Knight Warrant and the BSX Warrant shall lapse on the commencement of the winding-up of the Issuer (except in case of a dissolution without liquidation);

D. *Adjustment Events:* in case of an Adjustment Event, the Issuer, to the extent legally permitted, shall issue (and Citadel, Knight and JBP have committed towards BSX in a shareholders agreement to cause

the Issuer to), in replacement of the BSX Warrant which shall lapse accordingly, issue (a) new warrant(s) to BSX with the same terms and conditions as the BSX Warrant except for the exercise price which shall be equal to the issue price or exercise price under the Adjustment Event.

2.3.7.6.2 Share for share offers:

If an offer is made as referred to in sub paragraph 2.3.7.6.1 A above whereunder the consideration includes the issue of ordinary shares of the offeror and the offeror makes available an offer of warrants to subscribe for ordinary shares of the offeror in exchange for the Knight Warrant, resp. the BSX Warrant, which the financial advisers to the Issuer consider in their opinion (to be rendered in writing and addressed and delivered to Knight, resp. BSX) is fair and reasonable (having regard to the terms of the offer and any other circumstances which may appear to the financial advisers to be relevant), then any director of the Issuer shall be authorised as attorney for Knight, resp. BSX, (1) to exercise a transfer thereof in favour of the offeror in consideration of the issue of warrants to subscribe for ordinary shares of the offeror as aforesaid whereupon the Knight Warrant and the BSX Warrant shall lapse; and (2) to do such acts and things as may be necessary or appropriate in connection therewith, subject in the case of both (1) and (2) aforesaid and in all circumstances to the offer by the offeror as aforesaid becoming or being declared wholly unconditional and such warrants being issued by the offeror.

2.3.7.6.3 Unless otherwise agreed by BSX, any amendment to the terms of the Knight Warrant (i) that is adverse to the position of the holder of the BSX Warrant under the terms and conditions of the BSX Warrant shall not affect the terms of the BSX Warrant and (ii) that improves or is beneficial to the position of the holder of the Knight Warrant should also *mutatis mutandis* be applied to the terms of the BSX Warrant.

Subject to applicable law, the BSX Warrant may be partially transferred in respect of some of the BSX New Ordinary Shares. The Issuer undertakes to notify BSX of the exercise of the Knight Warrant as soon as reasonably practicable following such exercise.

2.3.7.7 General

A. The Knight Warrant and the BSX Warrant will be governed by and construed in accordance with Belgian law.
B. The Knight Warrant and the BSX Warrant will be and remain registered warrants.
C. References in these terms and conditions to any statutory provision shall be deemed to include any statutory modification or re-enactment thereof.

D. The ownership of the Knight Warrant and the BSX Warrant exclusively results from the registration of Knight, resp. BSX as holder of the Knight Warrant, resp. BSX Warrant, in the register of registered warrantholders of the Issuer.

E. Notices to Knight and BSX may be sent to its address set out in clause 17 of the Investment Agreement or as amended in accordance with the terms of that clause.

F. By way of deviation from Article 501 of the BCC and without prejudice to the exceptions provided by law or as otherwise provided in these terms and conditions, the Issuer reserves the right to adopt any resolution that it deems necessary with respect to its capital, its Articles of Association or its management. Such resolutions may include, amongst other things: a capital decrease whether or not with repayment to the shareholders, a capital increase by way of incorporation of reserves whether or not combined with the creation of new shares, a capital increase in kind, a capital increase in cash whether or not with limitation or cancellation of the shareholders' preferential subscription right, an issue of shares of a new category, an issue of profit certificates, of convertible bonds, of preferential shares, of bonds *cum* warrant, of ordinary bonds or of warrants, an amendment to the provisions of the Issuer's Articles of Association regarding the distribution of profits or the (net) proceeds of liquidation or other rights attached to the shares, a stock split, a distribution of stock dividend, a dissolution of the Issuer, a legal merger, a legal de-merger or a contribution or transfer of a universality or of a branch of activity whether or not combined with the exchange of shares. The Issuer may adopt such resolutions even if they (could) imply a reduction in the benefits conferred to the holder of the Knight Warrant and/or the BSX Warrant by the issue and exercise conditions of the Knight Warrant, resp. BSX Warrant or the law, unless such a reduction is obviously the only purpose of such resolution.

G. All costs in relation to a capital increase resulting from the exercise of the Knight Warrant and BSX Warrant will be borne by the Issuer.

---

Chairman EASDAQ NV.