**EXHIBIT A**

$10,000,000

CREDIT AGREEMENT

among

GREENBRIER MINERALS, LLC,

as Borrower,

The Several Lenders

from Time to Time Parties Hereto,

LEHMAN BROTHERS INC.,

as Sole Arranger

LEHMAN COMMERCIAL PAPER INC.,

as Syndication Agent

and

LEHMAN COMMERCIAL PAPER INC.,

as Administrative Agent

Dated as of December 9, 2005

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS ....................................................................................... 1
    1.1    Defined Terms ....................................................................................... 1
    1.2    Other Definitional Provisions ............................................................. 18
    1.3    Computation of Time Periods ............................................................. 19

ARTICLE II AMOUNT AND TERMS OF COMMITMENTS ............................... 19
    2.1    Commitments ....................................................................................... 19
    2.2    Procedure for Borrowing ..................................................................... 19
    2.3    Maturity Date ....................................................................................... 21
    2.4    Repayment of Loans; Evidence of Debt ............................................. 21
    2.5    Fees ....................................................................................................... 22
    2.6    Optional Prepayments ......................................................................... 22
    2.7    Mandatory Prepayments ...................................................................... 22
    2.8    Interest Rates, Payment Dates and Computation of Interest and Fees ... 23
    2.9    Application of Payments ...................................................................... 23
    2.10   Requirements of Law ........................................................................... 25
    2.11   Taxes .................................................................................................... 26
    2.12   Indemnity ............................................................................................. 28
    2.13   Change of Lending Office .................................................................... 28

ARTICLE III REPRESENTATIONS AND WARRANTIES ................................. 28
    3.1    Financial Condition ............................................................................. 29
    3.2    No Change ............................................................................................ 29
    3.3    Company Existence; Compliance with Law ....................................... 29
    3.4    Power; Authorization; Enforceable Obligations ................................. 29
    3.5    No Legal Bar ........................................................................................ 30
    3.6    No Material Litigation ......................................................................... 30
    3.7    No Default ............................................................................................ 30
    3.8    Existing Indebtedness ......................................................................... 30
    3.9    Ownership and Maintenance of Property ........................................... 31
    3.10   Insurance .............................................................................................. 31
    3.11   Intellectual Property ............................................................................ 31
    3.12   Taxes .................................................................................................... 31
    3.13   Federal Regulations ............................................................................. 32
    3.14   Labor Matters ...................................................................................... 32
    3.15   ERISA .................................................................................................. 33
    3.16   Regulations .......................................................................................... 33
    3.17   Ownership of Borrower; Subsidiaries ................................................ 33
    3.18   Use of Proceeds ................................................................................... 34
    3.19   Environmental Matters ........................................................................ 34
    3.20   Accuracy of Information, Etc .............................................................. 35
    3.21   Security Documents ............................................................................. 35
    3.22   Solvency .............................................................................................. 36
    3.23   Hedging Agreements ........................................................................... 36

|       |                                                                 |    |
|-------|-----------------------------------------------------------------|----|
| 3.24  | Reserve Reports                                                  | 36 |
| 3.25  | Contingent Obligations                                          | 37 |
| 3.26  | Bank Accounts                                                   | 37 |
| 3.27  | Customers and Suppliers                                         | 37 |
| 3.28  | Account Receivable                                             | 37 |
| 3.29  | Material Agreements                                             | 37 |
| 3.30  | Coal Act; Black Lung Act                                       | 37 |

ARTICLE IV CONDITIONS PRECEDENT ....................................................38
| 4.1   | Conditions Precedent to the Extension of the Loan              | 38 |
| 4.2   | Deemed Fulfilled Conditions                                     | 40 |

ARTICLE V AFFIRMATIVE COVENANTS ...............................................40
| 5.1   | Financial Reporting                                            | 40 |
| 5.2   | Collateral Reporting                                           | 41 |
| 5.3   | Certificates; Other Information                                | 42 |
| 5.4   | Payment of Obligations                                         | 43 |
| 5.5   | Conduct of Business and Maintenance of Existence, Etc          | 43 |
| 5.6   | Operation and Maintenance of Property; Insurance              | 44 |
| 5.7   | Inspection of Property; Books and Records; Discussions         | 45 |
| 5.8   | Notices                                                        | 46 |
| 5.9   | Environmental Laws                                             | 47 |
| 5.10  | Additional Collateral, Etc                                     | 48 |
| 5.11  | Further Assurances                                             | 49 |
| 5.12  | Warrants                                                       | 49 |
| 5.13  | Royalty Interest                                               | 50 |
| 5.14  | Post-Closing Deliverables                                      | 51 |

ARTICLE VI NEGATIVE COVENANTS .......................................................51
| 6.1   | Indebtedness                                                   | 51 |
| 6.2   | Liens                                                          | 52 |
| 6.3   | Fundamental Changes                                            | 53 |
| 6.4   | Disposition of Property                                        | 53 |
| 6.5   | Restricted Payments                                            | 54 |
| 6.6   | Capital Expenditures                                           | 54 |
| 6.7   | Investments                                                    | 54 |
| 6.8   | New Subsidiaries                                               | 55 |
| 6.9   | Amendments to Certain Documents                                | 55 |
| 6.10  | Transactions with Affiliates                                   | 55 |
| 6.11  | Sales and Leaseback Transactions                               | 55 |
| 6.12  | Negative Pledge Clauses                                        | 55 |
| 6.13  | Restrictions on Subsidiary Distributions                       | 56 |
| 6.14  | Lines of Business                                              | 56 |
| 6.15  | Hedging Agreements                                             | 56 |
| 6.16  | Changes in Fiscal Periods                                      | 56 |
| 6.17  | Use of Proceeds                                                | 56 |
| 6.18  | Bank Accounts                                                  | 56 |

6.19    Disqualified Stock................................................................................56

ARTICLE VII EVENTS OF DEFAULT ...................................................................56

ARTICLE VIII THE AGENTS .................................................................................59
    8.1    Appointment ..............................................................................59
    8.2    Delegation of Duties ..................................................................59
    8.3    Exculpatory Provisions ..............................................................59
    8.4    Reliance by Agents ....................................................................60
    8.5    Notice of Default .......................................................................60
    8.6    Non Reliance on Agents and Other Lenders...............................60
    8.7    Indemnification .........................................................................61
    8.8    Agent in Its Individual Capacity ................................................61
    8.9    Successor Administrative Agent .................................................62
    8.10   Authorization to Release Liens and Guarantees .........................62
    8.11   The Arranger; the Syndication Agent ........................................62

ARTICLE IX MISCELLANEOUS .............................................................................62
    9.1    Amendments and Waivers ..........................................................62
    9.2    Notices ......................................................................................63
    9.3    No Waiver; Cumulative Remedies ..............................................64
    9.4    Survival of Representations and Warranties................................64
    9.5    Payment of Expenses .................................................................65
    9.6    Successors and Assigns; Participations and Assignments ...........66
    9.7    Adjustments; Set off ..................................................................69
    9.8    Counterparts...............................................................................69
    9.9    Severability ...............................................................................69
    9.10   Integration .................................................................................70
    9.11   GOVERNING LAW....................................................................70
    9.12   Submission To Jurisdiction; Waivers .........................................70
    9.13   Acknowledgments......................................................................70
    9.14   Confidentiality ..........................................................................71
    9.15   Release of Collateral and Guarantee Obligations .......................71
    9.16   Accounting Changes...................................................................72
    9.17   WAIVERS OF JURY TRIAL ......................................................72
    9.18   Customer Identification – USA PATRIOT Act Notice.................72

SCHEDULES:

| | |
|---|---|
| 1.1 | Coal Lands |
| 1.2 | Commitments |
| 3.4 | Consents, Authorizations, Filings and Notices |
| 3.9(a) | Real Property |
| 3.9(b) | Coal Leases |
| 3.17(a) | Capital Stock Ownership |
| 3.19 | Pending Permits |
| 3.21(a)-1 | Security Agreement UCC Filing Jurisdictions |
| 3.21(a)-2 | UCC Financing Statements to Remain on File |
| 3.21(a)-3 | UCC Financing Statements to be Terminated |
| 3.21(b) | Mortgage Filing Jurisdictions |
| 3.26 | Bank Accounts |
| 3.27 | Coal Marketing Contracts |
| 3.29 | Material Agreements |

EXHIBITS:

| | |
|---|---|
| A | Form of Borrowing Notice |
| B | Form of Compliance Certificate |
| C-1 | Form of Deposit Account Control Agreement (Loan Proceeds Account) |
| C-2 | Form of Deposit Account Control Agreement (Operating Account) |
| D | Form of Guarantee and Security Agreement |
| E | Form of Mortgage |
| F | Form of Note |
| G | Form of Exemption Certificate |
| H | Form of Closing Certificate |
| I | Form of Assignment and Acceptance |

This CREDIT AGREEMENT, dated as of December 9, 2005, is by and among GREENBRIER MINERALS, LLC, a Delaware limited liability company ("*Borrower*"), the several banks and other financial institutions or entities from time to time parties to this Agreement (the "*Lenders*"), LEHMAN BROTHERS INC., as sole arranger and sole bookrunner (in such capacity, the "*Arranger*"), and LEHMAN COMMERCIAL PAPER INC., as the syndication agent (in such capacity, the "*Syndication Agent*") and as the administrative agent (in such capacity, the "*Administrative Agent*").

## WITNESSETH:

WHEREAS, Borrower has requested that the Lenders make term loans to Borrower in the aggregate principal amount of $10,000,000; and

WHEREAS, the Lenders are willing to make term loans to Borrower on the terms and conditions of this Agreement;

NOW, THEREFORE, in consideration of the premises and the agreements hereinafter set forth, the parties hereto hereby agree as follows:

## ARTICLE I
## DEFINITIONS

**1.1    Defined Terms**. As used in this Agreement, the terms listed in this Section 1.1 shall have the respective meanings set forth in this Section 1.1.

*Accounting Change*:  as defined in Section 9.16.

*Act*:  as defined in Section 9.18.

*Administrative Agent*:  as defined in the preamble hereto.

*Affiliate*:  as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, *control* of a Person means the power, directly or indirectly, either to (a) vote 10% or more of the securities having ordinary voting power for the election of directors (or persons performing similar functions) of such Person or (b) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise. Notwithstanding the foregoing, no Lender shall be deemed to be an Affiliate of the Loan Parties.

*Agents*:  the collective reference to the Syndication Agent, the Arranger and the Administrative Agent.

*Aggregate Exposure*:  with respect to any Lender at any time, an amount equal to the sum of the aggregate unpaid principal amount of the Loans of such Lender.

*Aggregate Exposure Percentage*:  with respect to any Lender at any time, the ratio (expressed as a percentage) of such Lender's Aggregate Exposure at such time to the sum of the Aggregate Exposures of all Lenders at such time.

*Agreement*:  this Credit Agreement, as amended, supplemented or otherwise modified from time to time.

*Arranger*:  as defined in the preamble hereto.

*Asset Sale*:  any Disposition of Property or series of related Dispositions of Property (excluding any such Disposition permitted by Section 6.4, other than clauses 6.4(a), (b), 6.4(c) and 6.4(h) thereof) which yield(s) aggregate gross proceeds to any Loan Party (valued at the initial principal amount thereof in the case of non-cash proceeds consisting of notes or other debt securities and valued at fair market value in the case of other non-cash proceeds) in excess of $100,000 during any period of twelve consecutive calendar months.

*Assignee*:  as defined in Section 9.6(c).

*Assignment and Acceptance*:  as defined in Section 9.6(c).

*Assignor*:  as defined in Section 9.6(c).

*Benefited Lender*:  as defined in Section 9.7(a).

*Benefit Plan*:  at a particular time, any employee benefit plan that is covered by ERISA and in respect of which Borrower or a Commonly Controlled Entity is (or, if such Benefit Plan were terminated at such time, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

*Black Lung Act*:  together, the Black Lung Benefits Revenue Act of 1977, as amended, and the Black Lung Benefits Reform Act of 1977, as amended.

*Board*:  the Board of Governors of the Federal Reserve System of the United States (or any successor).

*Borrower*:  as defined in the preamble hereto.

*Borrowing Notice*:  with respect to any request for borrowing of Loans hereunder, a notice from Borrower, substantially in the form of, and containing the information prescribed by, Exhibit A, delivered to the Administrative Agent.

*Business Day*:  a day other than a Saturday, Sunday or other day on which commercial banks in New York, New York or Houston, Texas, are authorized or required by law to close.

*Capital Expenditures*:  for any period, with respect to any Person, the aggregate of all expenditures by such Person for the acquisition or leasing (pursuant to a Capital Lease) of fixed or capital assets or additions to equipment (including replacements, capitalized repairs and improvements during such period) which are required to be capitalized under GAAP on a balance sheet of such Person; *provided* that Capital Expenditures shall exclude expenditures made with any portion of any Reinvestment Deferred Amount relating to any Recovery Event in compliance with Sections 2.7(b) and 6.6.

2

*Capital Lease*: any lease (or other arrangement conveying the right to use) of a Person with respect to any Property or a combination thereof, the obligations under which are required to be classified and accounted for as a capital lease on a balance sheet of such Person under GAAP.

*Capital Lease Obligations*: with respect to any Person, the obligations of such Person to pay rent or other amounts under any Capital Lease and, for the purposes of this Agreement, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

*Capital Stock*: any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent membership, partnership or other ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

*Cash Equivalents*: (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition; (b) certificates of deposit, time deposits, Eurodollar time deposits or overnight bank deposits having maturities of six months or less from the date of acquisition issued by any Lender or by any commercial bank organized under the laws of the United States of America or any state thereof having combined capital and surplus of not less than $500,000,000; (c) commercial paper of an issuer rated at least A-2 by S&P or P-2 by Moody's, or carrying an equivalent rating by a "nationally recognized statistical rating organization" (within the meaning of proposed rule 3b-10 promulgated by the SEC under the Exchange Act) if both of the two named rating agencies cease publishing ratings of commercial paper issuers generally, and maturing within six months from the date of acquisition; (d) repurchase obligations of any Lender or of any commercial bank satisfying the requirements of clause (b) of this definition, having a term of not more than 30 days and relating to securities issued or fully guaranteed or insured by the United States government; (e) securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States or by any political subdivision or taxing authority of any such state, commonwealth or territory, the securities of which state, commonwealth, territory, political subdivision or taxing authority (as the case may be) are rated at least A by S&P or A by Moody's; (f) securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of clause (b) of this definition; and (g) shares of money market mutual or similar funds which invest exclusively in assets satisfying the requirements of clauses (a) through (f) of this definition.

*Change of Control*: (a) the Principal Equityholders shall cease to beneficially own, hold of record and have the power to vote or direct the voting of, at least 50.01%, on a fully diluted basis, of the membership interests and other Capital Stock of Borrower; (b) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act), excluding the Principal Equityholders, shall become, or obtain rights (whether by means or warrants, options or otherwise) to become, the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act), directly or indirectly, of more than 35%, on a fully diluted basis, of the membership interests and other Capital Stock of Borrower; or (c) Borrower shall cease to own, directly or indirectly, 100% of each class of outstanding Capital Stock of each of its Subsidiaries.

3

***Closing Date***:  the date on which the conditions precedent set forth in Section 4.1 shall have been satisfied, which date shall be not later than December 9, 2005.

***Coal***:  all coal, including without limitation, bituminous and sub-bituminous coal and lignite and all solid components derived therefrom, including synfuel products.

***Coal Act***:  the Coal Industry Retiree Health Benefits Act of 1992, as amended.

***Coal Leases***:  collectively, and individually, (i) coal lands described in Schedule 1.1 and (ii) any and all other coal leases from time to time entered into by Borrower or its Subsidiaries after the Closing Date covering all or any portion of the Real Property or conferring any property interest other than a fee interest.

***Coal Properties***:  (a) all of the Coal Leases, (b) all Coal in place in, under and which may be produced from the Coal Leases and the Real Property, (c) the Real Property and all fixtures, machinery, equipment and other Property associated therewith, (d) all rents, issues, profits, proceeds, products, revenues and other income from or attributable to the Coal, Coal Leases and Real Property, (e) all tenements, hereditaments, appurtenances and Properties in any manner appertaining, belonging, affixed or incidental to the Coal, Coal Leases and Real Property and (f) all Properties, rights, titles, interests and estates described or referred to above, including any Property, Real, personal or mixed, now owned or hereafter acquired and situated upon, used, held for use or useful in connection with the operating, working or development of any such Coal, Coal Leases or Real Property or Property including all mining equipment, fixtures, machinery and parts, engines, boilers, meters, apparatus, equipment, appliances, tools, implements, cables, wires, shaft equipment, elevators, buildings, leases, rights-of-way, rail tracks and related equipment, easements, servitudes together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing.

***Code***:  the Internal Revenue Code of 1986, as amended from time to time, the regulations thereunder and publicly available interpretations thereof.

***Collateral***:  all Property of the Loan Parties, now owned or hereafter acquired, upon which a Lien is purported to be created by any Security Document (including Liens on all of their Coal, Coal Leases, Real Property and Coal Properties) other than the Excluded Property.

***Commitment***:  as to any Lender, the obligation of such Lender to make Loans to Borrower hereunder on the Closing Date in an aggregate principal amount not to exceed the amount set forth under the heading "*Commitment*" opposite such Lender's name on Schedule 1.2 hereto, or, as the case may be, in the Assignment and Acceptance pursuant to which such Lender became a party hereto, as the same may be changed from time to time pursuant to the terms hereof.  The aggregate amount of the Commitments is $10,000,000.

***Commonly Controlled Entity***:  an entity, whether or not incorporated, that is under common control with Borrower within the meaning of Section 4001 of ERISA or is part of a group that includes Borrower and that is treated as a single employer under Section 414 of the Code.

***Compliance Certificate***:  a certificate duly executed by a Responsible Officer, substantially in the form of Exhibit B.

4

***Constituent Documents***: with respect to any Person, (a) the articles or certificate of incorporation, certificate of formation or partnership, articles of organization, limited liability company agreement or agreement of limited partnership (or the equivalent organizational documents) of such Person, (b) the by-laws (or the equivalent governing documents) of such Person and (c) any document setting forth the manner of election and duties of the directors or managing members of such Person (if any) and the designation, amount or relative rights, limitations and preferences of any class or series of such Person's Capital Stock.

***Contingent Obligation***: of a Person, any agreement, undertaking or arrangement by which such Person assumes, guarantees, endorses, contingently agrees to purchase or provide funds for the payment of, or otherwise becomes or is contingently liable upon, the obligation or liability of any other Person, or agrees to maintain the net worth or working capital or other financial condition of any other Person, or otherwise assures any creditor of such other Person against loss, including any comfort letter, operating agreement, take or pay contract or the obligations of any such Person as general partner of a partnership with respect to the liabilities of the partnership.

***Contractual Obligation***: as to any Person, any term, condition or provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its Property is bound.

***Control Investment Affiliate***: as to any Person, any other Person that (a) directly or indirectly, is in control of, is controlled by, or is under common control with, such Person and (b) is organized by such Person primarily for the purpose of making equity or debt investments in one or more companies. For purposes of this definition, "*control*" of a Person means the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

***Default***: any of the events specified in Article VII, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

***Default Rate***: as defined in Section 2.8(b).

***Defensible Title***: good and indefeasible title, free and clear of all Liens other than Permitted Liens.

***Deposit Account Control Agreement (Loan Proceeds Account)***: the Deposit Account Control Agreement to be executed among Borrower, the Administrative Agent and Lehman Brothers Bank, FSB, relating to the Loan Proceeds Account, substantially in the form of Exhibit C-1, as amended, restated, supplemented or otherwise modified from time to time.

***Deposit Account Control Agreement (Operating Account)***: a Deposit Account Control Agreement to be executed among Borrower, the Administrative Agent and each bank with whom any Loan Party maintains an account, each substantially in the form of Exhibit C-2, as amended, restated, supplemented or otherwise modified from time to time.

***Derivatives Counterparty***: as defined in Section 6.5.

***Disbursement Amount***: as defined in Section 2.2(b).

5

***Disbursement Date***:  as defined in Section 2.2(b).

***Disbursement Request***:  as defined in Section 2.2(b).

***Disposition***:  with respect to any Property, any sale, lease, Sale and Leaseback Transaction, assignment, conveyance, transfer or other disposition (including by way of merger or consolidation) of such Property or any interest therein (excluding any Permitted Lien on such Property) or the entering into any agreement to do any of the foregoing; and, the terms "Dispose" and "Disposed of" shall have correlative meanings.

***Disqualified Stock***:  as to any Person, any Capital Stock of such Person that by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable) or otherwise (including upon the occurrence of an event) requires the payment of dividends (other than dividends payable solely in Capital Stock which does not otherwise constitute Disqualified Stock) or matures or is required to be redeemed (pursuant to any sinking fund obligation or otherwise) or is convertible into or exchangeable for Indebtedness or is redeemable at the option of the holder thereof, in whole or in part, at any time on or prior to the date six months after the Maturity Date.

***Dofasco Purchase Agreements***:  each of the purchase orders and other agreements by or between Dofasco Inc. and any Loan Party with respect to the purchase of Coal.

***Dollars*** and ***$***:  lawful currency of the United States of America.

***Environmental Claim***:  any material notice of violation, claim, action, suit, proceeding, demand, abatement order or other order or directive (conditional or otherwise) by any Governmental Authority or any other Person arising (a) pursuant to or in connection with any actual or alleged violation of any Environmental Law; (b) in connection with any Regulated Substance or any actual or alleged Regulated Substances Activity; (c) in connection with any alleged damage, injury, threat or harm to natural resources or the environment; (d) in connection with the Reclamation, or alleged need for Reclamation, of any future, current or former mines; or (e) in connection with any violation of Environmental or Mining Law. "Environmental Claims" also includes, without limitation, any such material claims alleging liability for fines, penalties, criminal sanctions or other costs related to any item in the proceeding sentence.

***Environmental Laws***:  any and all applicable laws (including all Mining Laws), rules, orders, regulations, statutes, ordinances, codes, decrees or other legally enforceable requirements (including common law) regulating, relating to or imposing liability or standards of conduct concerning  protection of the environment, natural resources or of human health, release or threatened release of Regulated Substances or employee health and safety, as has been, is now, or may at any time hereafter be, in effect, including the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 *et seq.*, the Hazardous Materials Transportation Act, 49 U.S.C. § 5101 *et seq.*, the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*, the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, the Toxic Substances Control Act, 15 U.S.C. § 2601 *et seq.*, the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136 *et seq.*, the Occupational Safety and Health Act, 29 U.S.C. § 651 *et seq.*, the Mine Safety and Health Act, 30 U.S.C. § 801 *et seq.*, the Surface Mining Control and Reclamation Act 30 U.S.C. § 1201 *et seq.*, the Atomic Energy Act, 42 U.S.C. § 2011 *et seq.*, the National Historic Preservation Act, 16 U.S.C. § 470 *et seq.*, the Endangered Species Act, 16 U.S.C.

6

§ 1531 *et seq.*, the Wild and Scenic Rivers Act, 16 U.S.C. §§ 1271-1278, and the regulations promulgated pursuant thereto, and all analogous state or local statutes and regulations.

**Environmental or Mining Permits**: any and all Permits required by a Governmental Authority regulating the mining of Coal, providing for the reclamation of land subjected to Coal mining, and controlling the adverse environmental effects of Coal mining.

**ERISA**: the Employee Retirement Income Security Act of 1974, as amended from time to time and the rules and regulations promulgated thereunder.

**Estoppel Certificate**: an estoppel certificate to be executed and delivered by Meadwestvaco Corporation in favor of the Administrative Agent in form and substance reasonably acceptable to the Administrative Agent.

**Event of Default**: any of the events specified in Article VII, *provided* that any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

**Exchange Act**: the Securities Exchange Act of 1934, as amended.

**Excluded Property**: (i) all personal property of any Loan Party that is subject to a lease including, without limitation, all right in and to equipment leased to the Loan Parties pursuant to the Orix Documentation, which expressly prohibits the granting by the Loan Parties of a security interest in such property (but only to the extent prohibited), (ii) all of the Loan Parties' contract rights to purchase equipment upon assignment thereof to Orix Financial Services, Inc. in connection with the leasing of equipment pursuant to the Orix Documentation, and (iii) Real Property purchased by Borrower or any other Loan Party and designated by written notice to the Administrative Agent at least five Business Days prior to the purchase thereof that is contributed to, or exchanged with, the State of West Virginia in connection with the Loan Parties obtaining one or more Permits, provided that the purchase price for such Real Property does not exceed $400,000.

**Existing Indebtedness**: (i) the Midland Debt, (ii) Indebtedness evidenced by the Orix Documentation, (iii) that certain Term Note dated June 21, 2004 made by Powhatan Mid-Vol Coal Sales, L.L.C. to Crown Coal & Coke Company in the aggregate principal amount of $300,000, (iv) that certain Promissory Note, dated August 19, 2005, made by Greenbrier Smokeless Coal Mining, LLC to National Bank of Blacksburg in the aggregate principal amount of $90,874.56, (v) that certain Promissory Note, dated August 19, 2005, made by Greenbrier Smokeless Coal Mining, LLC to National Bank of Blacksburg in the aggregate principal amount of $70,962.64, and (vi) Indebtedness in the aggregate amount of $38,323.52 outstanding pursuant to that certain Commercial Premium Finance Agreement, dated September 2, 2005, between Acordia Specialty and Greenbrier Smokeless Coal Mining, LLC.

**Federal Funds Effective Rate**: for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for the day of such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.

**Financial Statements**: as defined in Section 3.1(a).

***Funding Office***: the office specified from time to time by the Administrative Agent as its funding office by notice to Borrower and the Lenders.

***GAAP***: generally accepted accounting principles in the United States of America as in effect from time to time, applied in a consistent manner.

***Governmental Authority***: any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, any province, commonwealth, territory, possession, county, parish, town, township, village or municipality, whether now or hereafter constituted or existing.

***Granting Lender***: as defined in Section 9.6(g).

***Guarantee and Security Agreement***: the Guarantee and Security Agreement to be executed and delivered by each Subsidiary, if any, substantially in the form of Exhibit D, as the same may be amended, replaced, restated, supplemented or otherwise modified from time to time.

***Guarantee Obligation***: as to any Person (the "*guaranteeing person*"), any obligation of (a) the guaranteeing person or (b) another Person (including any bank under any letter of credit), if to induce the creation of such obligation of such other Person, the guaranteeing person has issued a reimbursement, counterindemnity or similar obligation, in either case guaranteeing or in effect guaranteeing any Indebtedness, leases, dividends or other obligations (the "*primary obligations*") of any other third Person (the "*primary obligor*") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (a) to purchase any such primary obligation or any Property constituting direct or indirect security therefor, (b) to advance or supply funds (i) for the purchase or payment of any such primary obligation or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (c) to purchase Property, securities or services, in each case, primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (d) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; *provided* that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (x) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (y) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by Borrower in good faith.

***Guarantor***: each Person who is a party to a Guarantee and Security Agreement.

***Hedging Agreements***: with respect to any Person, all interest rate or currency swaps, caps or collar agreements, foreign exchange agreements, commodity contracts or similar arrangements entered into by such Person providing for protection against fluctuations in interest rates, currency

exchange rates, commodity prices or the exchange of nominal interest obligations, either generally or under specific contingencies.

*Indebtedness*: of any Person at any date, without duplication (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of Property or services (other than trade payables incurred in the ordinary course of such Person's business), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to Property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such Property), (e) all Capital Lease Obligations of such Person, (f) all obligations of such Person, contingent or otherwise, as an account party or applicant under acceptance, letter of credit or similar facilities, (g) all obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Capital Stock of such Person, (h) all Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (g) above; (i) all obligations of the kind referred to in clauses (a) through (h) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on Property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation; and (j) all obligations (netted, to the extent provided for therein) of such Person in respect of Hedging Agreements (including obligations and liabilities arising in connection with or as a result of early or premature termination of a Hedging Agreement, whether or not occurring as a result of a default thereunder). The Indebtedness of a Person shall include the Indebtedness of any other Person (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor.

*Indemnified Liabilities*: as defined in Section 9.5.

*Indemnitee*: as defined in Section 9.5.

*Independent Accountant*: such independent certified public accountants reasonably acceptable to the Administrative Agent.

*Insolvency*: with respect to any Multiemployer Plan, the condition that such Benefit Plan is insolvent within the meaning of Section 4245 of ERISA.

*Insolvent*: pertaining to a condition of Insolvency.

*Intellectual Property*: the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including copyrights, copyright licenses, patents, patent licenses, trademarks, trademark licenses, technology, know-how and processes, licenses or rights to use databases, geological data, geophysical data, engineering data, seismic data, maps, interpretations and other technical information and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

*Interest Margin*: 6.00%.

*Interest Payment Date*:  June 30, 2006.

*Interest Rate*: subject to Section 2.10, for each LIBOR Period, a rate per annum equal to the LIBOR Rate *plus* the Interest Margin.

*LBI*:  Lehman Brothers Inc.

*LCPI*:  Lehman Commercial Paper Inc.

*Lehman Entity*:  any of Lehman Commercial Paper Inc. or any of its Affiliates.

*Lenders*:  as defined in the preamble hereto.

*Letter Agreement*:  that certain letter agreement dated as of the date hereof by and among Borrower, Lehman Brothers Inc. and Lehman Commercial Paper Inc.

*LIBOR Business Day*: a Business Day on which banks in the city of London, England are generally open for interbank or foreign exchange transactions.

*LIBOR Period*:  each period commencing on a LIBOR Business Day and ending three months thereafter; *provided* that:

(a)  the first LIBOR Period shall begin on the Closing Date and each successive LIBOR Period shall begin on the last LIBOR Business Day of the immediately preceding LIBOR Period;

(b)  if any LIBOR Period would otherwise end on a day that is not a LIBOR Business Day, such LIBOR Period shall be extended to the next succeeding LIBOR Business Day unless the result of such extension would be to carry such LIBOR Period into another calendar month in which event such LIBOR Period shall end on the immediately preceding LIBOR Business Day; and

(c)  any LIBOR Period that begins on the last LIBOR Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such LIBOR Period) shall end on the last LIBOR Business Day of a calendar month.

*LIBOR*: for each LIBOR Period, a rate of interest determined by the Administrative Agent equal to:

(a)  the offered rate for deposits in United States Dollars for the applicable LIBOR Period that appears on Telerate Page 3750 as of 11:00 a.m. (London time) on the second full LIBOR Business Day preceding the first day of each LIBOR Period (unless such date is not a Business Day, in which event the next succeeding Business Day will be used); *divided by*

(b)  a number equal to 1.0 *minus* the aggregate (but without duplication) of the rates (expressed as a decimal fraction) of reserve requirements in effect on the day that is two LIBOR Business Days prior to the beginning of such LIBOR Period (including basic, supplemental, marginal and emergency reserves under any regulations of the Board or other Governmental Authority having jurisdiction with respect thereto, as now and from time to time in effect) for Eurocurrency funding (currently referred to as "*Eurocurrency Liabilities*" in Regulation D of the Board) that are required to be maintained by a member bank of the Federal Reserve System.

If such interest rates shall cease to be available from Telerate News Service, the LIBOR
Rate shall be determined from such comparable publicly available financial reporting service for
displaying Eurodollar rates as shall be selected by the Administrative Agent.

*Lien*: any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance,
lien (statutory or other), charge or other security interest or any preference, priority or other security
agreement or preferential arrangement of any kind or nature whatsoever intended to assure payment
or performance of any Indebtedness or other obligation (including any conditional sale or other title
retention agreement, the interest of a lessor under a Capital Lease, any financing lease having
substantially the same economic effect as any of the foregoing and the filing of any financing
statement under the Uniform Commercial Code or comparable law of any jurisdiction naming the
owner of the asset to which such Lien relates as debtor).

*Loan Documents*: this Agreement, the Security Documents, the Notes, the Subordination
Agreement, the Letter Agreement and each certificate, agreement, waiver, consent or document
executed by a Loan Party and delivered to the Administrative Agent or any Lender in connection
with or pursuant to any of the foregoing, if any.

*Loan Parties*: Borrower, each Guarantor and each Subsidiary of Borrower that is party to
any Loan Document.

*Loan Percentage*: as to any Lender at any time, (i) if at such time the Commitments have
not been reduced to zero, the percentage which such Lender's Commitment then constitutes of the
aggregate Commitments of all Lenders at such time or (ii) if at such time the Commitments have
been reduced to zero, the Aggregate Exposure Percentage of such Lender at such time.

*Loan Proceeds Account*: as specified in Section 2.2(a).

*Loans*: as defined in Section 2.1.

*Material Adverse Change*: a material adverse change in any of (a) the financial condition,
business, performance, operations or properties of the Loan Parties, taken as a whole, (b) the
legality, validity or enforceability of this Agreement or any of the other Transaction Documents or
the rights or remedies of the Agents or the Lenders hereunder or thereunder, (c) the perfection or
priority of the Liens granted pursuant to the Security Documents or (d) the ability of Borrower to
repay the Obligations or of the Loan Parties to perform their obligations under the Transaction
Documents.

*Material Adverse Effect*: an effect that results in or causes, or could reasonably be expected
to result in or cause, a Material Adverse Change.

*Material Agreement*: each of the agreements set forth on Schedule 3.29 together with any
construction agreement entered into between any Loan Party and Sedgman, LLC.

*Maturity Date*: as defined in Section 2.3.

*Midland Debt*: the Indebtedness outstanding under that certain Term Note dated September
30, 2005 made by the Borrower to Midland Trail Resource, LLC in the aggregate principal amount

11

of $1,000,000 and that certain Term Note dated November 29, 2005 made by the Borrower to
Midland Trail Resources, LLC in the aggregate principal amount of $150,000.

*Mine*: any excavation or opening into the earth now and hereafter made from which coal is
or can be extracted on or from any of the properties owned or leased by the Borrower or any
Subsidiary, together with all appurtenances, fixtures, structures, improvements and assets in
connection therewith.

*Mining Law*: all treaties, laws, rules, regulations, codes, ordinances, orders, decrees,
judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any
Governmental Authority, relating in any way to mining operations and activities, including the
Federal Coal Leasing Amendments Act, the Surface Mining Control and Reclamation Act, the
Federal Coal Mine Health and Safety Act, the Black Lung Act and the Coal Act, in each case as
amended.

*Monarch Engagement Letter*: that certain Agreement for Advising Services, dated March
22, 2004, between Borrower and Monarch Financial Corporation.

*Moody's*: Moody's Investors Service, Inc.

*Mortgaged Properties*: the Real Properties (including the Coal Properties) which Borrower
or any Subsidiary may hereafter acquire, in each case as to which the Administrative Agent for the
benefit of the Secured Parties shall be granted a Lien pursuant to one or more Mortgages.

*Mortgages*: each of the mortgages and deeds of trust made by any Loan Party in favor of, or
for the benefit of, the Administrative Agent for the benefit of the Secured Parties, substantially in
the form of <u>Exhibit E</u> (with such changes thereto as shall be advisable under the law of the
jurisdiction in which such mortgage or deed of trust is to be recorded), as the same may be
amended, restated, replaced, supplemented or otherwise modified from time to time.

*Multiemployer Plan*: a Benefit Plan that is a multiemployer plan as defined in Section
4001(a)(3) of ERISA.

*Net Cash Proceeds*: (a) in connection with any Asset Sale or any Recovery Event, the
proceeds thereof in the form of cash and Cash Equivalents (including any such proceeds received by
way of deferred payment of principal pursuant to a note or installment receivable or purchase price
adjustment receivable or otherwise, but only as and when received) of such Asset Sale or Recovery
Event, net of (i) amounts required to be applied to the repayment of Indebtedness secured by a Lien
expressly permitted hereunder on any asset that is the subject of such Asset Sale or Recovery Event
(other than any Lien pursuant to a Security Document), (ii) in the case of an Asset Sale, attorneys'
fees, accountants' fees, investment bank fees, or other customary fees and expenses actually
incurred in connection therewith and (iii) taxes paid or reasonably estimated to be payable as a
result thereof (after taking into account any available tax credits or deductions and any tax sharing
arrangements); *provided* that the evidence of each of (i), (ii) and (iii) is provided to the
Administrative Agent in form and substance reasonably satisfactory to it, and (b) in connection with
any issuance or sale of Capital Stock or debt securities or instruments or the incurrence of
Indebtedness for borrowed money, the cash proceeds received from such issuance, sale or
incurrence, net of attorneys' fees, investment banking fees, accountants' fees, underwriting
discounts and commissions and other customary fees and expenses actually incurred in connection

therewith; *provided, however*, that in the case of this clause (b) evidence of such costs is provided to the Administrative Agent in form and substance reasonably satisfactory to it.

*Non-Excluded Taxes*: as defined in Section 2.11(a).

*Non-U.S. Lender*: as defined in Section 2.11(d).

*Note*: as defined in Section 2.4(e).

*Obligations*: the unpaid principal of and interest on (including interest accruing after the maturity of the Loans and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to any Loan Party, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) the Loans and all other obligations and liabilities of any Loan Party to the Administrative Agent or to any Lender, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, any other Loan Document or any other document made, delivered or given in connection herewith or therewith, whether on account of principal, interest, fees, indemnities, costs, expenses (including all fees, charges and disbursements of counsel to the Administrative Agent or to any Lender that are required to be paid by any Loan Party pursuant hereto) or otherwise.

*Operating Cost*: all costs (net to Borrower and its Subsidiaries) associated with the direct operation of Borrower's and its Subsidiaries' Coal Properties.

*ORI*: as defined in Section 5.13.

*Orix Documentation*: that certain Master Lease Agreement by and between Greenbrier Smokeless Coal Mining, L.L.C. and Orix Financial Services, Inc. dated as of July 8, 2005, together with all schedules, exhibits and ancillary documents related thereto, as the same may be amended or modified to allow for the inclusion of additional equipment under such lease.

*Other Taxes*: any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

*Participant*: as defined in Section 9.6(b).

*Payment Office*: the office in New York, New York specified from time to time by the Administrative Agent as its payment office by notice to Borrower and the Lenders.

*PBGC*: the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor).

*Pending Permits*: as defined in Section 3.19(a).

*Permitted Indebtedness*: as defined in Section 6.1.

*Permitted Liens*: as defined in Section 6.2.

13

*Permitted Sale and Leaseback Transaction*: any sale/leaseback transaction involving (a) the Disposition by a Loan Party of Real Property (including an option to purchase Real Property) and any preparation plant that may be located on Real Property and the related lease by a Loan Party of the preparation plant situated on or to be constructed on such Real Property; *provided*, that (i) the applicable Loan Party Disposes of such Real Property (or such option) at a purchase price equal to or greater than the aggregate price at which any Loan Party acquired such Real Property, (ii) 100% of the purchase price for such Real Property (or such option) is in the form of cash, (iii) such transaction is upon terms and subject to conditions no less favorable to such Loan Party than would be obtained in a comparable arm's length transaction with a Person that is not an Affiliate, (iv) Borrower provides the Administrative Agent with at least five Business Days' prior written notice of such transaction and (v) to the extent that any Loan proceeds are used directly or indirectly in connection with the acquisition by a Loan Party of such Real Property (including any option to purchase Real Property) or the construction of the related preparation plant, an amount of the purchase price for such Disposition of Real Property equal to the Loan proceeds so expended is applied as a prepayment of the Loans in accordance with Section 2.7 or (b) the Disposition by Borrower to Orix Financial Services, Inc. of the Oldenburg Stamler Continuous Haulage System, serial number 70215, purchased from Oldenburg Group, Inc. pursuant to purchase order 412554; *provided*, that (x) such Disposition is made for a cash purchase price equal to not less than 90% of the price originally paid by Borrower for such equipment and (y) 100% of the proceeds received by any Loan Party as a result of such Disposition be deposited in the Loan Proceeds Account on the same day received.

*Permits*:  any and all franchises, licenses, leases, permits, approvals, notifications, certifications, registrations, authorizations, exemptions, qualifications, easements, and rights of way.

*Person*:  an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

*Premium*:  as defined in Section 2.6.

*Prepayment Date*:  (a) with respect to any mandatory prepayment pursuant to Section 2.7, the date of such mandatory prepayment and (b) with respect to any optional prepayment pursuant to Section 2.6, the date of such optional prepayment.

*Principal Equityholders*: collectively, Joseph C. Turley, III and Raymond M. McCormick.

*Pro Forma Balance Sheet*: as defined in Section 3.1(b).

*Property*:  any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, including Capital Stock, Intellectual Property and Coal Properties.

*Purchase Price Refund*:  any amount received by any Loan Party as a result of a purchase price adjustment or similar event in connection with any acquisition of Property by such Loan Party.

*Qualified Investment*: expenditures incurred to acquire or repair similar assets owned (or to be owned) by Borrower or any Guarantor of the same type as those subject to such Reinvestment Event or equipment or Properties owned (or to be owned) by and useful in the business of Borrower or any Guarantor.

*Real Property*: the surface, subsurface, Coal and mineral rights and interests owned, leased or otherwise held by Borrower or its Subsidiaries.

*Reclamation*: the reclamation and restoration of land, water and any future, current or former mines, and any other environment affected by such mines, as required pursuant to any Mining Law.

*Reclamation Bonds*: all bonds required by any Governmental Authority in connection with the conduct or contemplated conduct of mining operations, including, without limitation, all performance, Reclamation and similar bonds required in connection with the mining permits for the Coal Properties.

*Recovery Event*: any settlement of or payment in respect of any property or casualty insurance claim or any condemnation proceeding (or proceeding in lieu thereof) relating to any asset of any Loan Party or Subsidiary.

*Register*: as defined in Section 9.6(d).

*Regulated Substances*: without limitation, any substance, material or waste, regardless of its form or nature, defined under Environmental Laws as a "hazardous substance," "pollutant," "pollution," "contaminant," "hazardous or toxic substance," "extremely hazardous substance," "toxic chemical," "toxic substance," "toxic waste," "hazardous waste," "special handling waste," "industrial waste," "residual waste," "solid waste," "municipal waste," "mixed waste," "infectious waste," "chemotherapeutic waste," "medical waste," or "regulated substance" or any other material, substance or waste, regardless of its form or nature, which is regulated by the Environmental Laws due to its radioactive, ignitable, corrosive, reactive, explosive, toxic, carcinogenic or infectious properties or nature, or which otherwise is regulated by any applicable Environmental Laws including, without limitation, Coal and other minerals, Coal refuse, run-of-mine coal, acid mine drainage, petroleum and petroleum products (including crude oil and any fractions thereof), natural gas, coalbed methane gas, synthetic gas and any mixtures thereof, asbestos, urea formaldehyde, polychlorinated biphenyls, mercury, radioactive substances, mine tailings and mine drainage.

*Regulated Substances Activity*: any past, current, proposed or threatened activity, event or occurrence involving any Regulated Substances, including the use, manufacture, possession, storage, holding, presence, existence, location, release, threatened release, discharge placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of, or exposure to, any Regulated Substances, and any corrective action or response action with respect to any of the foregoing.

*Regulation U*: Regulation U of the Board as now and from time to time hereafter in effect.

*Regulation X*: Regulation X of the Board as now and from time to time hereafter in effect.

*Reinvestment Deferred Amount*: the aggregate Net Cash Proceeds received by a Loan Party in connection with a Reinvestment Event that are duly specified in a Reinvestment Notice as

15

not being required to be initially applied to prepay the Loans pursuant to Section 2.7(b) as a result of the delivery of such Reinvestment Notice.

*Reinvestment Event*: any Purchase Price Refund or Recovery Event in respect of which Borrower has delivered a Reinvestment Notice

*Reinvestment Notice*: a written notice executed by Borrower stating that no Default or Event of Default has occurred and is continuing and stating that Borrower (directly or indirectly through a Guarantor) intends and expects to use all or a specified portion of the Net Cash Proceeds of a Reinvestment Event specified in such notice to make a Qualified Investment.

*Reinvestment Prepayment Amount*: with respect to any Reinvestment Event, the Reinvestment Deferred Amount relating thereto less the portion, if any, thereof expended prior to the relevant Reinvestment Prepayment Date to make a Qualified Investment.

*Reinvestment Prepayment Date*: with respect to any Reinvestment Event, the earlier of (a) the date occurring one month after such Reinvestment Event and (b) the date on which Borrower shall have determined not to make a Qualified Investment with all or any portion of the relevant Reinvestment Deferred Amount.

*Related Fund*: with respect to any Lender, any fund that (a) invests in commercial loans and (b) is managed or advised by the same investment advisor as such Lender, by such Lender or an Affiliate of such Lender.

*Reorganization*: with respect to any Multiemployer Plan, the condition that such Benefit Plan is in reorganization within the meaning of Section 4241 of ERISA.

*Reportable Event*: any of the events set forth in Section 4043(c) of ERISA, other than those events as to which the thirty day notice period is waived under subsections .27, .28, .29, .30, .31, .32, .34 or .35 of PBGC Reg. § 4043.

*Required Lenders*: at any time, the holders of 66⅔% or more of the Aggregate Exposures of all Lenders.

*Requirement of Law*: as to any Person, the Constituent Documents of such Person, and any law, treaty, rule, order, statute, ordinance, code, decree, regulation, or other legally enforceable requirements (including common law) or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject, including all Mining Laws.

*Reserve Report*: as defined in Section 3.24.

*Responsible Officer*: with respect to any Person, such Person's Chief Executive Officer or President.

*Restricted Payments*: as defined in Section 6.5.

*Royalty Documentation*: as defined in Section 5.13.

**S&P**:  Standard & Poor's Ratings Services, a division of McGraw-Hill Companies, Inc.

**Sale and Leaseback Transaction**: any sale or other transfer of Property by any Person with the intent to lease such Property as lessee.

**SEC**:  the Securities and Exchange Commission.

**Secured Parties**:  collectively, the Administrative Agent and any Lender.

**Securities Act**:  the Securities Act of 1933, as amended.

**Security Documents**:  the collective reference to the Guarantee and Security Agreement, the Mortgages, the Deposit Account Control Agreement (Loan Proceeds Account), each Deposit Account Control Agreement (Operating Account) and all other security documents, statements and instruments hereafter delivered to the Administrative Agent granting a Lien on or perfecting a security interest in any Property of any Person to secure any of the Obligations.

**Series A Warrants**:  as defined in Section 5.12.

**Series B Warrants**:  as defined in Section 5.12.

**Single Employer Plan**:  any Benefit Plan that is covered by Title IV of ERISA, but which is not a Multiemployer Plan.

**Solvent**:  with respect to any Person, as of any date of determination, (a) the amount of the "present fair saleable value" of the assets of such Person will, as of such date, exceed the amount of all "liabilities of such Person, contingent or otherwise", as of such date, as such quoted terms are determined in accordance with applicable federal and state laws governing determinations of the insolvency of debtors, (b) the present fair saleable value of the assets of such Person will, as of such date, be greater than the amount that will be required to pay the liability of such Person on its debts as such debts become absolute and matured, (c) such Person will not have, as of such date, an unreasonably small amount of capital with which to conduct its business, and (d) such Person will be able to pay its debts as they mature.  For purposes of this definition (i) "*debt*" means liability on a "*claim*", and (ii) "*claim*" means any (x) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or (y) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured or unmatured, disputed, undisputed, secured or unsecured.

**SPC**: as defined in Section 9.6(g).

**Specified Expenditures**:  as defined in Section 2.2(b).

**Subordination Agreement**:  a subordination agreement among Borrower, the Administrative Agent and Midland Trail Resources, LLC, with respect to subordination of the Midland Debt, which agreement shall be in form and substance acceptable to the Administrative Agent.

17

*Subsidiary*:  as to any Person, a corporation, partnership, limited liability company or other entity of which shares or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership, limited liability company or other entity are at the time owned, or the management of which is otherwise controlled, in each case directly or indirectly through one or more intermediaries, or both, by such Person.  Unless otherwise qualified, all references to a Subsidiary or to Subsidiaries in this Agreement shall refer to a Subsidiary or Subsidiaries of Borrower.

*Syndication Agent*:  as defined in the preamble hereto.

*Tax Affiliate*:  with respect to any Person, (a) any Subsidiary of such Person, and (b) any Affiliate of such Person with which such Person files or is eligible to file consolidated, combined or unitary tax returns.

*Tax Return*:  as defined in Section 3.12.

*Transaction Documents*:  collectively, the Loan Documents, the Warrants and the Royalty Documentation.

*Transferee*:  as defined in Section 9.14.

*UCC*:  the Uniform Commercial Code as from time to time in effect in the State of New York.

*Warrants*:  as defined in Section·5.12.

**1.2     Other Definitional Provisions**

(a)     Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)     As used herein and in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, accounting terms relating to Borrower and its Subsidiaries not defined in Section 1.1 and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under GAAP; *provided* any non-cash items arising under FAS 133, 142, 143 or 144 shall be excluded from the relevant calculation.

(c)     The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(d)     The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(e)     Each agreement defined in this Article I shall include all appendices, exhibits and schedules thereto, and references thereto shall be to such agreement as amended, restated, replaced, supplemented or otherwise modified; *provided* that if the prior written consent of the Required Lenders is required hereunder for an amendment, restatement, replacement, supplement or other modification to any such agreement and such consent is obtained, references in this Agreement to such agreement shall be to such agreement as so amended, restated, replaced, supplemented or modified.

(f)     References in this Agreement to any statute shall be to such statute as amended or modified and in effect at the time any such reference is operative.

(g)     The term "including" when used in any Loan Document means "including without limitation" except when used in the computation of time periods.

(h)     The term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or".

(i)     The terms "Lender" and "Administrative Agent" include their respective successors.

(j)     The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Capital Stock, securities (as such term is defined in the Securities Act), revenues, accounts, leasehold interests and contract rights.

(k)     Each reference to "Loan Party" in Article III shall include any Subsidiary of Borrower that is or, pursuant to Section 6.8, is required to be a Guarantor.

**1.3     Computation of Time Periods.**  In this Agreement, in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding" and the word "through" means "to and including."

**ARTICLE II**
**AMOUNT AND TERMS OF COMMITMENTS**

**2.1     Commitments.**

(a)     Subject to the terms and conditions hereof, each of the Lenders severally agrees to make a term loan to Borrower on the Closing Date having a principal amount equal to such Lender's Commitment (the "***Loans***").

(b)     The Commitment of any Lender shall be reduced on the date of funding of the Loans pursuant to Section 2.1(a) by the principal amount of the Loans funded.

**2.2     Procedure for Borrowing.**

(a)     Borrower shall deliver to the Administrative Agent a Borrowing Notice (which Borrowing Notice must be received by the Administrative Agent prior to 12:00 Noon, New York City time, one Business Day prior to the Closing Date) requesting that the Lenders make the Loans

on the Closing Date.  Upon receipt of such Borrowing Notice, the Administrative Agent shall promptly notify each Lender thereof.  Not later than 12:00 Noon, New York City time, on the Closing Date, each Lender shall make available to the Administrative Agent at the Funding Office an amount in immediately available funds equal to the Loan or Loans to be made by such Lender. The Administrative Agent shall make available to Borrower the aggregate of the amounts made available to the Administrative Agent by the Lenders, in like funds as received by the Administrative Agent, by wire or interbank transfer of funds to the deposit account (Account No. 508000153090) in the name of Borrower maintained at Lehman Brothers Bank, FSB (the "*Loan Proceeds Account*").

(b)    Borrower shall not, and shall not be entitled to, withdraw funds from the Loan Proceeds Account unless:

(i)    at least two Business Days prior to the date of a disbursement from the Loan Proceeds Account ("*Disbursement Date*"), Borrower has delivered to the Administrative Agent a request (a "*Disbursement Request*") designating the amount of funds to be withdrawn from the Loan Proceeds Account (the "*Disbursement Amount*") and the proposed Specified Expenditures to be paid with the Disbursement Amount;

(ii)    if other than the initial Disbursement Request, such Disbursement Request is accompanied by invoices and other supporting documentation substantiating that the aggregate amount of the next preceding Disbursement Amount has been used solely for the Specified Expenditures set forth in the next preceding Disbursement Request, which documentation shall be in form and substance reasonably satisfactory to the Administrative Agent;

(iii)    such Disbursement Amount is used solely to pay for expenditures included as a line item in a budget approved by the Administrative Agent and otherwise generally consistent with the business plan and budget of Borrower and its Subsidiaries or such other expenditures as are approved by the Administrative Agent in writing (such expenditures, the "*Specified Expenditures*");

(iv)    unless otherwise approved by the Administrative Agent in writing, such Specified Expenditures represent no more than one month's anticipated expenditures and are otherwise permitted to be incurred under the Loan Documents;

(v)    no Event of Default has occurred and is continuing on such Disbursement Date or after giving effect to the withdrawal of such Disbursement Amount requested to be made on such Disbursement Date;

(vi)    each of the representations and warranties made by the Loan Parties in or pursuant to the Transaction Documents shall be true and correct on and as of such Disbursement Date as if made on and as of such Disbursement Date, or, with respect to any representations and warranties that are by their express terms made as of a specified earlier date, on and as of such earlier date; and

(vii)    each of the covenants contained in Section 5.14 shall have been satisfied in full.

The Borrower shall cause the Deposit Account Control Agreement (Loan Proceeds Account) to provide that no withdrawal therefrom of any Disbursement Amount may occur without the prior consent of the Administrative Agent (the Administrative Agent hereby agreeing not to withhold or delay any such consent with respect to any Disbursement Amount if the conditions specified in clauses (i) through (v) above have been satisfied in respect of such Disbursement Amount).

**2.3   Maturity Date**. The Loan of each Lender shall mature on June 30, 2006 (the "*Maturity Date*").

**2.4   Repayment of Loans; Evidence of Debt**.

(a)   Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of the appropriate Lender the entire unpaid principal amount of each Loan of such Lender on the Maturity Date or on such date on which the Loans become due and payable pursuant to Sections 2.6 or 2.7 or Article VII. Borrower hereby further agrees to pay interest on the unpaid principal amount of the Loans from time to time outstanding from the date hereof until payment in full thereof at the rates per annum, and on the dates, set forth in Section 2.8.

(b)   Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing Indebtedness of Borrower to such Lender resulting from each Loan of such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c)   The Administrative Agent, on behalf of Borrower, shall maintain the Register pursuant to Section 9.6(d), and a subaccount therein for each Lender, in which shall be recorded (i) the amount of each Loan made hereunder and any Note evidencing such Loan, (ii) the amount of any principal or interest due and payable or to become due and payable from Borrower to each Lender hereunder and (iii) both the amount of any sum received by the Administrative Agent hereunder from Borrower and each Lender's share thereof.

(d)   The entries made in the Register and the accounts of each Lender maintained pursuant to Section 2.4(b) shall, to the extent permitted by applicable law, be *prima facie* evidence of the existence and amounts of the obligations of Borrower therein recorded; *provided* that the failure of any Lender or the Administrative Agent to maintain the Register or any such account, or any error therein, shall not in any manner affect the obligation of Borrower to repay (with applicable interest) the Loans made to Borrower by such Lender in accordance with the terms of this Agreement or Borrower's entitlement to credit for any payment of principal or interest on the Loans.

(e)   Borrower agrees that upon the request to the Administrative Agent by any Lender, Borrower will promptly execute and deliver to such Lender a promissory note of Borrower evidencing any Loans of such Lender, substantially in the form of Exhibit F (a "*Note*"), with appropriate insertions as to date and principal amount; *provided*, that delivery of Notes shall not be a condition precedent to the occurrence of the Closing Date or the making of the Loans thereon.

**2.5   Fees**.

(a)   On the Closing Date, Borrower shall pay the Administrative Agent for the account of each Lender an upfront fee equal to 5.0% of the aggregate Commitments of such Lender immediately prior to funding of the Loans on the Closing Date.

(b)   If any part of any of the Loans are outstanding on the Maturity Date, Borrower shall pay to the Administrative Agent for the account of the Lenders a termination fee in an amount equal to 5.0% of the aggregate amount of Loans outstanding immediately prior to the Maturity Date.

**2.6   Optional Prepayments**.  Subject to the concurrent payment by Borrower to the Administrative Agent for the benefit of the Lenders of a cash amount equal to 5.0% of the principal amount of the Loans being prepaid (the "***Premium***"), Borrower may, upon at least three Business Days' prior notice to the Administrative Agent stating the Prepayment Date and aggregate principal amount of the prepayment, prepay the outstanding principal amount of the Loans, in whole or in part, at Borrower's option together with accrued interest through the date of such prepayment on the principal amount prepaid; *provided* that (i) each partial prepayment shall be in an aggregate amount not less than $1,000,000 or integral multiples of $1,000,000 in excess thereof and (ii) any such prepayment must be accompanied by payment of Agent's and each Lender's out-of-pocket expenses and payment of any LIBOR funding breakage costs in accordance with Section 2.12. Upon the giving of such notice of prepayment, the principal amount of the Loans specified to be prepaid, together with the accrued interest and Premium thereon through the Prepayment Date shall become due and payable on the Prepayment Date.  Borrower shall be permitted to use the monies held in the Loan Proceeds Account to pay any amounts due in connection with a prepayment in full of all principal of and interest on and all other amounts owing in respect of the Loans.

**2.7   Mandatory Prepayments**.

(a)   If any Indebtedness shall be incurred by Borrower or any of its Subsidiaries (excluding any Indebtedness incurred in accordance with Section 6.1), then on the date of such incurrence, the Borrower shall prepay the principal amount of the Loans in an amount equal to the amount of the Net Cash Proceeds of such incurrence.  The provisions of this Section 2.7(a) do not constitute a consent to the incurrence of any Indebtedness by Borrower or any of its Subsidiaries.

(b)   Unless the Required Lenders shall otherwise agree, if on any date Borrower or any of its Subsidiaries shall receive Net Cash Proceeds from any Asset Sale or Recovery Event or a Purchase Price Refund then, on the date of receipt by such Person of such Net Cash Proceeds or such Purchase Price Refund, the Borrower shall prepay the principal amount of the Loans in an amount equal to the amount of such Net Cash Proceeds or such Purchase Price Refund; *provided, however*, that in the case of any Net Cash Proceeds constituting the Reinvestment Deferred Amount with respect to a Reinvestment Event, Borrower shall prepay the Loans in an amount equal to the Reinvestment Prepayment Amount applicable to such Reinvestment Event, if any, on the Reinvestment Prepayment Date with respect to such Reinvestment Event; *provided further* that the aggregate Net Cash Proceeds of Reinvestment Events that may be specified as Reinvestment Deferred Amounts in one or more Reinvestment Notices shall not exceed $250,000 in the case of any Reinvestment Event and $1,000,000 in the aggregate in the case of all Reinvestment Events. Notwithstanding anything contained herein to the contrary, the Loan Parties shall not be required to prepay the Loans under this Section 2.7 with the proceeds received from any Disposition of Real

22

Property as part of a Permitted Sale and Leaseback Transaction except to the extent of the amount of the proceeds of Loans used directly or indirectly by a Loan Party in connection with the acquisition by a Loan Party of Real Property (including any option to purchase Real Property) construction of the related preparation plant which, in either case, is subject to such Permitted Sale and Leaseback Transaction.

(c)      Upon the occurrence of a Change of Control, the Required Lenders, at their sole discretion, may require Borrower to immediately prepay the outstanding principal amount of the Loans, together with all other amounts owing under this Agreement or any Loan Document including, without limitation, any fees and expenses then due and payable under any Loan Document.

(d)      Each prepayment of the Loans pursuant to this Section 2.7 shall be applied in accordance with Section 2.9 below and shall be accompanied by payment of accrued interest thereon and a concurrent payment of Premium thereon to the date of prepayment on the principal amount prepaid.

**2.8     Interest Rates, Payment Dates and Computation of Interest and Fees**.

(a)      Each Loan shall bear interest for each day on which it is outstanding at the Interest Rate.

(b)      (i) If all or a portion of the principal amount of any Loan shall not be paid when due (whether at the stated maturity, by acceleration or otherwise) or there shall occur and be continuing any other Event of Default, all outstanding Loans (whether or not overdue) (to the extent legally permitted) shall bear interest at a rate per annum that is equal to the Interest Rate *plus* 2.0% (the "***Default Rate***"), from the date of such nonpayment of principal or occurrence of such Event of Default, respectively, until such amount of principal is paid in full (after as well as before judgment) or until such Event of Default is no longer continuing, respectively, and (ii) if all or a portion of any interest payable on any Loan or any fee or other amount payable hereunder shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall bear interest at a rate per annum equal to the Default Rate, from the date of such non payment until such amount is paid in full (after as well as before judgment).

(c)      Subject to Sections 2.7(d) and 2.9(g), interest shall be payable in arrears on the Interest Payment Date, *provided* that interest accruing pursuant to Section 2.8(b) shall be payable from time to time on demand.

(d)      Interest, fees and commissions payable pursuant hereto shall be calculated on the basis of a year of 360 days.

**2.9     Application of Payments**.

(a)      The borrowing by Borrower from the Lenders hereunder, any reduction of the Commitments of the Lenders and, subject to Section 2.9(c), each payment by Borrower on account of any fee, shall be made *pro rata* according to the Loan Percentages of the relevant Lenders. Amounts prepaid on account of the Loans may not be reborrowed.

(b)     So long as no Event of Default shall have occurred and be continuing, each payment (including each prepayment) of the Loans outstanding shall be allocated among the Lenders holding such Loans *pro rata* based on the principal amount of such Loans held by such Lenders.

(c)     After the occurrence and during the continuance of any Event of Default, each payment in respect of principal or interest in respect of the Loans and each payment in respect of fees payable hereunder and any proceeds of Collateral and any Net Cash Proceeds of insurance policies shall be applied in the following order:

(i)     *first*, to the payment or reimbursement of the Administrative Agent for all costs, expenses, disbursements and losses incurred by the Administrative Agent and which Borrower is required to pay or reimburse pursuant to the Loan Documents;

(ii)     *second*, to the payment or reimbursement of the Lenders for all costs, expenses, disbursements and losses incurred by such Persons and which any Loan Party is required to pay or reimburse pursuant to the Loan Documents;

(iii)     *third*, to the payment or prepayment to the Lenders of all Obligations; and

(iv)     *fourth*, to whomsoever shall be legally entitled thereto.

If any Lender owes payments to the Administrative Agent hereunder, any amounts otherwise distributable under this Section 2.9(c) to such Lender shall be deemed to belong to the Administrative Agent to the extent of such unpaid payments, and the Administrative Agent shall apply such amounts to make such unpaid payments rather than distribute such amounts to such Lender. All distributions of amounts described in paragraphs *second* and *third* above shall be made by the Administrative Agent to each Lender on a pro rata basis determined by the amount the Obligations owed to such Lender represent of the aggregate amount of all Obligations.

(d)     All payments (including prepayments) to be made by Borrower hereunder, whether on account of principal, interest, premium, fees or otherwise, shall be made without setoff or counterclaim and shall be made prior to 12:00 Noon, New York City time, on the due date thereof to the Administrative Agent, for the account of the relevant Lenders, at the Payment Office, in Dollars and in immediately available funds. Any payment made by Borrower after 12:00 Noon, New York City time, on any Business Day shall be deemed to have been made on the next following Business Day. The Administrative Agent shall distribute such payments to the Lenders promptly upon receipt in like funds as received. If any payment hereunder becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day. In the case of any extension of any payment of principal pursuant to the preceding sentence, interest thereon shall be payable at the then-applicable rate during such extension.

(e)     Unless the Administrative Agent shall have been notified in writing by any Lender prior to the borrowing that such Lender will not make the amount that would constitute its share of such borrowing available to the Administrative Agent, the Administrative Agent may assume that such Lender is making such amount available to the Administrative Agent, and the Administrative Agent may, in reliance upon such assumption, make available to Borrower a corresponding amount. If such amount is not made available to the Administrative Agent by the required time on the Closing Date, such Lender shall pay to the Administrative Agent, on demand, such amount with interest thereon at a rate equal to the daily average Federal Funds Effective Rate for the period until

such Lender makes such amount immediately available to the Administrative Agent. A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this Section 2.9(e) shall be conclusive in the absence of manifest error. If such Lender's share of such borrowing is not made available to the Administrative Agent by such Lender within three Business Days after the Closing Date, the Administrative Agent shall also be entitled to recover such amount with interest thereon at the Interest Rate, on demand, from Borrower.

(f)     Unless the Administrative Agent shall have been notified in writing by Borrower prior to the date of any payment due to be made by Borrower hereunder that Borrower will not make such payment to the Administrative Agent, the Administrative Agent may assume that Borrower is making such payment, and the Administrative Agent may, but shall not be required to, in reliance upon such assumption, make available to the Lenders their respective *pro rata* shares of a corresponding amount. If such payment is not made to the Administrative Agent by Borrower within three Business Days after such due date, the Administrative Agent shall be entitled to recover, on demand, from each Lender to which any amount which was made available pursuant to the preceding sentence, such amount with interest thereon at the rate per annum equal to the daily average Federal Funds Effective Rate. Nothing herein shall be deemed to limit the rights of the Administrative Agent or any Lender against Borrower.

(g)     Each payment of the Loans shall be accompanied by accrued interest to the date of such payment on the amount paid.

### 2.10     Requirements of Law.

(a)     If (i) the adoption of or any change in any Requirement of Law or in the interpretation or application thereof or compliance by any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the date hereof (A) shall subject any Lender to any tax of any kind whatsoever with respect to this Agreement or any Loan made by it, or change the basis of taxation of payments to such Lender in respect thereof (except for Non-Excluded Taxes covered by Section 2.11 and changes in the rate of tax on the overall net income of such Lender); (B) shall impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances, loans or other extensions of credit by, or any other acquisition of funds by, any office of such Lender that is not otherwise included in the determination of the LIBOR Rate hereunder; or (C) shall impose on such Lender any other condition; and (ii) the result of any of the foregoing is to increase the cost to such Lender, by an amount which such Lender deems to be material, of making, continuing or maintaining Loans bearing interest by reference to the LIBOR Rate, or to reduce any amount receivable hereunder in respect thereof, then, in any such case, Borrower shall promptly pay such Lender, upon its demand, any additional amounts necessary to compensate such Lender for such increased cost or reduced amount receivable. If any Lender becomes entitled to claim any additional amounts pursuant to this Section 2.10, it shall promptly notify Borrower (with a copy to the Administrative Agent) of the event by reason of which it has become so entitled.

(b)     If any Lender shall have determined that the adoption of or any change in any Requirement of Law regarding capital adequacy, reserve requirements or similar requirements or in the interpretation or application thereof or compliance by such Lender or any corporation controlling such Lender with any request or directive regarding capital adequacy, reserve

requirements or similar requirements (whether or not having the force of law) from any Governmental Authority made subsequent to the date hereof shall have the effect of reducing the rate of return on such Lender's or such corporation's capital as a consequence of its obligations hereunder to a level below that which such Lender or such corporation could have achieved but for such adoption, change or compliance (taking into consideration such Lender's or such corporation's policies with respect to capital adequacy) by an amount deemed by such Lender to be material, then from time to time, after submission by such Lender to Borrower (with a copy to the Administrative Agent) of a written request therefor, Borrower shall promptly pay to such Lender such additional amount or amounts as will compensate such Lender or such corporation for such reduction.

(c)     A certificate as to any additional amounts payable pursuant to this Section 2.10 submitted by any Lender to Borrower (with a copy to the Administrative Agent) shall be conclusive in the absence of manifest error.  The obligations of Borrower pursuant to this Section 2.10 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

(d)     Notwithstanding anything to the contrary contained herein, if the introduction of or any change in any law or regulation (or any change in the interpretation thereof) shall make it unlawful, or any central bank or other Governmental Authority shall assert that it is unlawful, for any Lender to agree to make or to make or to continue to fund or maintain any Loan bearing interest by reference to the LIBOR Rate, then, unless that Lender is able to make or to continue to fund or to maintain such Loan at another branch or office of that Lender without, in that Lender's opinion, adversely affecting it or its Loans or the income obtained therefrom, on notice thereof and demand therefor by such Lender to Borrower through the Administrative Agent, (i) the obligation of such Lender to agree to make or to make or to continue to fund or maintain Loans bearing interest by reference to the LIBOR Rate shall terminate, and (ii) all of such Lender's Loans shall automatically convert at the end of the then-current LIBOR Period with respect thereto or sooner, if required by such law, regulation or interpretation, into Loans bearing interest with respect to such Lender from and after the date of such conversion at a rate per annum equal to the sum of (x) the Federal Funds Effective Rate in effect from time to time *plus* 0.50% and (y) the Interest Margin.

**2.11   Taxes.**

(a)     All payments made by Borrower under this Agreement shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, excluding net income taxes and franchise taxes (imposed in lieu of net income taxes) imposed on any Agent or any Lender as a result of a present or former connection between such Agent or such Lender and the jurisdiction of the Governmental Authority imposing such tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from such Agent's or such Lender's having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement or any other Loan Document).  If any such non-excluded taxes, levies, imposts, duties, charges, fees, deductions or withholdings ("***Non-Excluded Taxes***") or any Other Taxes are required to be withheld from any amounts payable to any Agent or any Lender hereunder, the amounts so payable to such Agent or such Lender shall be increased to the extent necessary to yield to such Agent or such Lender (after payment of all Non-Excluded Taxes and Other Taxes) interest or any such other amounts payable hereunder at the rates or in the amounts specified in this

Agreement; *provided* that Borrower shall not be required to increase any such amounts payable to any Lender with respect to any Non-Excluded Taxes (i) that are attributable to such Lender's failure to comply with the requirements of Section 2.11(d) or (e) or (ii) that are United States withholding taxes imposed on amounts payable to such Lender at the time such Lender becomes a party to this Agreement, except to the extent that such Lender's assignor (if any) was entitled, at the time of assignment, to receive additional amounts from Borrower with respect to such Non-Excluded Taxes pursuant to this Section 2.11(a).

(b)    In addition, Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)    Whenever any Non-Excluded Taxes or Other Taxes are payable by Borrower, as promptly as possible thereafter Borrower shall send to the Administrative Agent for the account of the relevant Agent or Lender, as the case may be, a certified copy of an original official receipt received by Borrower showing payment thereof.  If Borrower fails to pay any Non-Excluded Taxes or Other Taxes when due to the appropriate taxing authority or fails to remit to the Administrative Agent the required receipts or other required documentary evidence, Borrower shall indemnify the Agents and the Lenders for any incremental taxes, interest or penalties that may become payable by any Agent or any Lender as a result of any such failure.  The agreements in this Section 2.11 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

(d)    Each Lender (or Transferee) that is not a citizen or resident of the United States of America, a corporation, partnership or other entity created or organized in or under the laws of the United States of America (or any jurisdiction thereof), or any estate or trust that is subject to federal income taxation regardless of the source of its income (a *"Non-U.S. Lender"*) shall deliver to Borrower and the Administrative Agent (or, in the case of a Participant, to the Lender from which the related participation shall have been purchased) two copies of either U.S. Internal Revenue Service Form W-8BEN or Form W-8ECI, or, in the case of a Non-U.S. Lender claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest" a statement substantially in the form of Exhibit G and a Form W-8BEN, or any subsequent versions thereof or successors thereto properly completed and duly executed by such Non-U.S. Lender claiming complete exemption from, or a reduced rate of, U.S. federal withholding tax on all payments by Borrower under this Agreement and the other Loan Documents.  Such forms shall be delivered by each Non-U.S. Lender on or before the date it becomes a party to this Agreement (or, in the case of any Participant, on or before the date such Participant purchases the related participation).  In addition, each Non-U.S. Lender shall deliver such forms promptly upon the obsolescence or invalidity of any form previously delivered by such Non-U.S. Lender.  Each Non-U.S. Lender shall promptly notify Borrower at any time it determines that it is no longer in a position to provide any previously delivered certificate to Borrower (or any other form of certification adopted by the U.S. taxing authorities for such purpose). Notwithstanding any other provision of this Section 2.11(d), a Non-U.S. Lender shall not be required to deliver any form pursuant to this Section 2.11(d) that such Non-U.S. Lender is not legally able to deliver.

(e)    A Lender that is entitled to an exemption from or reduction of non-U.S. withholding tax under the law of the jurisdiction in which Borrower is located, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall deliver to Borrower

27

(with a copy to the Administrative Agent), at the time or times prescribed by applicable law or reasonably requested by Borrower, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate, *provided* that such Lender is legally entitled to complete, execute and deliver such documentation and in such Lender's reasonable judgment such completion, execution or submission would not materially prejudice the legal position of such Lender.

2.12   **Indemnity**. Borrower agrees to indemnify each Lender for, and to hold each Lender harmless from, any loss or expense that such Lender may sustain or incur as a consequence of (a) the failure to make any prepayment of a Loan after Borrower has given a notice thereof in accordance with the provisions of this Agreement; (b) the repayment of any Loans that are repaid in whole or in part prior to the last day of a LIBOR Period (whether such repayment is made pursuant to any provision of this Agreement or any other Loan Document or occurs as a result of acceleration, mandatory prepayment, by operation of law or otherwise); (c) a default in payment when due of the principal amount of, or interest or Premium on or other amount due hereunder in respect of, any Loan or otherwise due under any Transaction Document; or (d) a default in making any borrowing of Loans after Borrower has given notice requesting the same in accordance herewith. Such indemnification shall include any loss (including loss of margin) or expense arising from the reemployment of funds obtained by it or from fees payable to terminate deposits from which such funds were obtained. For the purpose of calculating amounts payable to a Lender under this Section 2.12, each Lender shall be deemed to have actually funded its relevant Loan through the purchase of a deposit bearing interest at the LIBOR Rate in an amount equal to the amount of that Loan and having a maturity comparable to the LIBOR Period; *provided* that each Lender may fund each of its Loans in any manner it sees fit, and the foregoing assumption shall be utilized only for the calculation of amounts payable under this Section 2.12. A certificate as to any amounts payable pursuant to this Section 2.12 submitted to Borrower by any Lender shall be conclusive in the absence of manifest error. This covenant shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.13   **Change of Lending Office**. Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Sections 2.10 or 2.11(a) with respect to such Lender, it will, if requested by Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event with the object of avoiding the consequences of such event; *provided* that such designation is made on terms that, in the sole judgment of such Lender, cause such Lender and its lending office(s) to suffer no economic, legal or regulatory disadvantage, and *provided further* that nothing in this Section 2.13 shall affect or postpone any of the obligations of Borrower or the rights of any Lender pursuant to Sections 2.10 or 2.11(a).

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

To induce the Agents and the Lenders to enter into this Agreement and to make the Loans, Borrower represents and warrants to each Agent and each Lender that on and as of the Closing Date:

### 3.1   Financial Condition.

(a)   Borrower has heretofore furnished to the Lenders its consolidated unaudited balance sheet and consolidated statements of income, stockholders' equity and cash flows (i) as of and for the fiscal year ended December 31, 2004, reported on by its Independent Accountants and (ii) as of and for the three, six and nine month fiscal periods ended March 31, 2005, June 30, 2005 and September 30, 2005, certified by a Responsible Officer. Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of the Borrower and the Subsidiaries as of such dates and for such periods in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes in the case of the statements referred to in clause (ii) above (collectively, (i) and (ii) are the "*Financial Statements*").

(b)   The unaudited *pro forma* consolidated balance sheet of Borrower and its consolidated Subsidiaries as at the Closing Date (including the notes thereto) (the "*Pro Forma Balance Sheet*"), a copy of which has heretofore been furnished to the Administrative Agent, has been prepared giving effect (as if such events had occurred on such date) to (i) the Loans to be made on the Closing Date and the use of proceeds thereof and (ii) the payment of fees and expenses in connection with the foregoing and has been prepared in accordance with GAAP. The Pro Forma Balance Sheet has been prepared based on the best information available to Borrower as of the date of delivery thereof, and presents fairly on a *pro forma* basis the estimated financial position of Borrower and its consolidated Subsidiaries as at the Closing Date, assuming that the events specified in the preceding sentence had actually occurred at such date.

(c)   Borrower and its Subsidiaries have no material Guarantee Obligations, contingent liabilities or liabilities for taxes, or any long term leases or unusual forward or long term commitments, including any interest rate or foreign currency swap or exchange transaction or other Hedging Agreement or other obligation in respect of derivatives, that are not reflected in the Pro Forma Balance Sheet.

### 3.2   No Change.
Since September 30, 2005, there has been no Material Adverse Change and there have been no developments or events that in the aggregate have had or reasonably could be expected to have a Material Adverse Effect.

### 3.3   Company Existence; Compliance with Law.
Each of the Loan Parties (i) is duly incorporated, organized or formed, as applicable, validly existing and (if relevant) in good standing under the laws of the jurisdiction of its incorporation, organization or formation, as the case may be, (ii) has the corporate, company or partnership power and authority, as applicable, and the legal right, to own and operate its Property, to lease the Property it operates as lessee and to conduct the business in which it is currently engaged, (iii) is duly qualified as a foreign corporation, company or partnership, as applicable, and (if relevant) in good standing under the laws of each jurisdiction where its ownership, lease or operation of Property or the conduct of its business requires such qualification, (iv) is in compliance with its Constituent Documents and (v) is in compliance with all Requirements of Law except, solely in the case of clauses (iii) and (v), to the extent that the failure to comply therewith could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

### 3.4   Power; Authorization; Enforceable Obligations.
Each Loan Party has the corporate, company or partnership power and authority, as applicable, and the legal right, to make,

deliver and perform each of the Transaction Documents to which it is a party, and, in the case of Borrower, to borrow hereunder. Each Loan Party has taken all necessary partnership, company, corporate or other entity action to authorize the execution, delivery and performance of each of the Transaction Documents to which it is a party and, in the case of Borrower, to authorize the borrowings on the terms and conditions of this Agreement. No consent or authorization of, filing with, notice to or other act by or in respect of, any Governmental Authority or any other Person is required to be obtained by a Loan Party in connection with the effectiveness of the consummation of the borrowings hereunder or the execution, delivery, performance, validity or enforceability of this Agreement, or any of the other Transaction Documents, except (i) consents, authorizations, filings and notices described in Schedule 3.4, which consents, authorizations, filings and notices have been obtained or made and are in full force and effect except as set forth therein and (ii) the filings referred to in Section 3.21. Each Transaction Document has been duly executed and delivered on behalf of each Loan Party that is a party thereto. This Agreement constitutes, and each of the other Transaction Documents upon execution and delivery will constitute, a legal, valid and binding obligation of each Loan Party that is a party thereto, enforceable against each such Loan Party in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

       3.5    **No Legal Bar**. The execution, delivery and performance of this Agreement and the other Transaction Documents, the borrowings hereunder, and the use of the proceeds thereof will not result in a violation by any Loan Party of any Requirement of Law or any Contractual Obligation of any Loan Party and will not result in, or require, the creation or imposition of any Lien on any of its Properties or revenues pursuant to any Requirement of Law or any such Contractual Obligation (other than the Liens created by the Security Documents). No Requirement of Law, Constituent Document or Contractual Obligation applicable to the Loan Parties could reasonably be expected to have a Material Adverse Effect. No performance of a Contractual Obligation by any Loan Party, either unconditionally or upon the happening of an event, would result in the creation of a Lien (other than a Permitted Lien) on the Property or Capital Stock of any such Person.

       3.6    **No Material Litigation**. There is no litigation, action, suit, claim, dispute, investigation or proceeding at law or in equity, whether judicial or administrative, in or before any arbitrator, court or other Governmental Authority that is pending or, to the knowledge of the Loan Parties after due and diligent investigation, threatened, against or affecting the Loan Parties or against any of their respective Properties or revenues that constitutes a Material Adverse Effect.

       3.7    **No Default**. No Loan Party is in default under or with respect to any of its Contractual Obligations in any respect that constitutes a Material Adverse Effect. No Default nor Event of Default has occurred and is continuing.

       3.8    **Existing Indebtedness**. Other than the Existing Indebtedness, as of the Closing Date, no Loan Party has any Indebtedness except pursuant to this Agreement and the other Loan Documents.

### 3.9     Ownership and Maintenance of Property.

(a)     Schedule 3.9(a) sets forth a complete and accurate list of all Real Property in which the Loan Parties hold title in fee simple.  The Loan Parties possess Defensible Title to all such Real Property and all of their other Property, and none of such Property is subject to any Lien other than Permitted Liens.

(b)     Schedule 3.9(b) sets forth a complete and accurate list of all Coal Leases as of the Closing Date which Real Property, together with the Real Property described on Schedule 3.9(a), constitutes all of the Real Property held by the Loan Parties.  Each Loan Party has a valid leasehold interest in all of its Coal Leases, and none of such Coal Leases is subject to any Lien other than Permitted Liens.

(c)     Upon receipt by the Loan Parties of the Pending Permits, all Permits required to have been issued or appropriate to enable all Real Property (including its Coal Properties) leased by any Loan Party to be lawfully occupied and used for all of the purposes for which such Property is or will be occupied and used, including operation of all applicable Mines, will have been lawfully issued and will be in full force and effect, except where such failure would not reasonably be expected to result in a Material Adverse Change.

(d)     The Coal Properties operated by any Loan Party and, to the knowledge of Borrower, Coal Properties operated by a Person other than Borrower or a Subsidiary, have been maintained, operated and developed in a good and workmanlike manner and in conformity in all material respects with all Requirements of Law and in conformity in all material respects with the provisions of all leases, subleases or other contracts comprising a part of the Coal Leases and other contracts and agreements forming a part of Coal Properties, except, in the case of Coal Properties operated by a Person other than Borrower or a Subsidiary, to the extent that the failure thereof could not reasonably be expected to result in liabilities to any Loan Party in excess of $250,000.

**3.10     Insurance.**  All policies of insurance of any kind or nature of the Loan Parties, including policies of fire, theft, product liability, public liability, property damage, other casualty, employee fidelity, workers' compensation and employee health and welfare insurance, are in full force and effect and are of a nature and provide such coverage as is sufficient and as is customarily carried by businesses of the size and character of the Loan Parties.  None of the Loan Parties has been refused insurance for any coverage for which it had applied or had any policy of insurance terminated (other than at its request).

**3.11     Intellectual Property.**  Each of the Loan Parties owns, or is licensed to use, all material Intellectual Property necessary for the conduct of its business as currently conducted.  No material claim has been asserted and is pending by any Person challenging or questioning the use by a Loan Party of any Intellectual Property or the validity or effectiveness of any Intellectual Property, nor does any Loan Party know of any valid basis for any such claim.  The use of Intellectual Property by the Loan Parties does not infringe on the rights of any Person in any material respect.

**3.12     Taxes.**  Each Loan Party has filed or caused to be filed all federal, state and other material tax returns, reports and statements (collectively, "***Tax Returns***") that are required to be filed by any Loan Party or any of its Tax Affiliates with the appropriate Governmental Authorities

31

in all jurisdictions in which such Tax Returns are required to be filed; all such Tax Returns are true and correct in all material respects and correctly reflect the facts regarding the income, business, assets, operations, activities, status or other matters of the Loan Party and any other information required to be shown thereon; each Loan Party has paid, prior to the date on which any fine, penalty, interest, late charge or loss may be added thereto for non-payment thereof, all taxes shown to be due and payable on said returns or on any assessments made against it or any of its Property and all other taxes, fees or other charges imposed on it or any of its Property by or otherwise due and payable to any Governmental Authority (other than any the amount or validity of which are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of such Loan Party); no tax Lien has been filed against the Property of any Loan Party; and, to the best knowledge of Borrower, no claim is being asserted, with respect to any such tax, fee or other charge. No Tax Return is under audit or examination by any Governmental Authority and no notice of such an audit or examination or any assertion of any claim for taxes has been given or made by any Governmental Authority. Proper and accurate amounts have been withheld by each Loan Party and each of its Tax Affiliates from their respective employees for all periods in full and complete compliance with the tax, social security and unemployment withholding provisions of applicable Requirements of Law and such withholdings have been timely paid to the respective Governmental Authorities.

3.13    **Federal Regulations**.  No part of the proceeds of any Loans will be used for "purchasing" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U or for any purpose that violates the provisions of any regulations of the Board.  No Loan Party owns any "margin stock."

3.14    **Labor Matters**.

(a)    There are no strikes or other labor disputes against any Loan Party pending or, to the knowledge of Borrower, threatened.  Hours worked by and payments made to employees of the Loan Parties and each labor and employment contracts entered into by a Loan Party have not been in violation of the Fair Labor Standards Act of 1938, as amended, or any other applicable Requirement of Law dealing with such matters.  All payments due from any Loan Party on account of employee health and welfare insurance have been paid or accrued as a liability on the books of a Loan Party.

(b)    There is no organizing activity involving the Borrower or any Subsidiary pending or, to the knowledge of the Borrower or any Subsidiary, threatened by any labor union or group of employees.  There are no representation proceedings pending or, to the knowledge of the Borrower or any Subsidiary, threatened with the National Mediation Board, and no labor organization or group of employees of the Borrower or any Subsidiary has made a pending demand for recognition. There are no material complaints or charges against the Borrower or any Subsidiary pending or, to the knowledge of the Borrower or any Subsidiary, threatened to be filed with any Governmental Authority or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment by the Borrower or any Subsidiary of any individual. The consummation of the transactions contemplated by the Transaction Documents will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which the Borrower or any Subsidiary is bound.

3.15   **ERISA.** Neither a Reportable Event nor an "accumulated funding deficiency" (within the meaning of Section 412 of the Code or Section 302 of ERISA) has occurred during the five-year period prior to the date on which this representation is made or deemed made with respect to any Benefit Plan, and each Benefit Plan has complied in all material respects with the applicable provisions of ERISA and the Code. No termination of a Single Employer Plan has occurred, and no Lien in favor of the PBGC or a Benefit Plan has arisen, during such five-year period. The present value of all accrued benefits under each Single Employer Plan (based on those assumptions used to fund such Benefit Plans) did not, as of the last annual valuation date prior to the date on which this representation is made or deemed made, exceed the value of the assets of such Benefit Plan allocable to such accrued benefits by a material amount. Neither the Loan Parties nor any Commonly Controlled Entity has had a complete or partial withdrawal from any Multiemployer Plan that has resulted or could reasonably be expected to result in a material liability under ERISA, and neither the Loan Parties nor any Commonly Controlled Entity would become subject to any material liability under ERISA if such Loan Party or any such Commonly Controlled Entity were to withdraw completely from all Multiemployer Plans as of the valuation date most closely preceding the date on which this representation is made or deemed made. No such Multiemployer Plan is in Reorganization or Insolvent.

3.16   **Regulations**.

(a)   No Loan Party is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended. No Loan Party is subject to regulation under any Requirement of Law (other than Regulation X) which limits its ability to incur Indebtedness.

(b)   No Loan Party is a "holding company" or a "subsidiary company" of a "holding company", or an "affiliate" of a "holding company" or of a "subsidiary company" of a "holding company", within the meaning of the Public Utility Holding Company Act of 1935, as amended.

3.17   **Ownership of Borrower; Subsidiaries**.

(a)   Borrower has no direct or indirect Subsidiaries except as listed on Schedule 3.17(a). Schedule 3.17(a) sets forth the ownership of all limited liability company interests and other Capital Stock issued by Borrower, 100% of which is issued and outstanding. No Loan Party has any equity investments in any other Person except as listed on Schedule 3.17(a). Schedule 3.17(a) sets forth the name and jurisdiction of organization or formation, as applicable, of each Subsidiary and, as to each Subsidiary, the number of shares of each class of Capital Stock authorized (if applicable) and the number outstanding. All of the outstanding Capital Stock of each Subsidiary has been duly and validly issued, is fully paid and non-assessable and is owned beneficially and of record by Borrower or another Subsidiary, free and clear of all Liens other than the Lien in favor of the Secured Parties created by the Security Documents.

(b)   There are no outstanding subscriptions, options, warrants, calls, rights, agreements or understandings restricting the transfer or hypothecation of any such Capital Stock or other agreements, understandings or commitments of any nature relating to any Capital Stock of the Loan Parties except for the Warrants or as otherwise created by the Loan Documents.

**3.18   Use of Proceeds**. The proceeds of the Loans shall be used solely for the Specified Expenditures or prepayment in full of all principal of and interest on and all other amounts owing in respect of the Loans.

**3.19   Environmental Matters**.

(a)      Set forth on Schedule 3.19 is a list of each of the material Environmental or Mining Permits (such Permits and authorizations, collectively, the "*Pending Permits*") necessary as of the date hereof for the Loan Parties' to conduct mining operations on their Coal Properties as projected in their business plan through December 31, 2006.  Borrower has filed or cause to be filed applications for each of the Pending Permits with the applicable Governmental Authority.  Neither Borrower nor any of its Subsidiaries, nor, to the Borrower's knowledge, any Person operating any of the Coal Properties, (i) has received any notice (written or oral) denying any of the Pending Permits or (ii) is currently barred from receiving surface mining or underground mining permits pursuant to the permit block provisions of the Surface Mining Control and Reclamation Act, 30 U.S.C. §§ 1201 *et seq.*, and the regulations promulgated thereunder, or any corresponding state laws or regulations.  Each of the Loan Parties will have, prior to commencement of mining operations, in the amounts and forms required pursuant to Mining Law or by a Governmental Authority, obtained all Reclamation Bonds, surety bonds or escrow agreements and will have made any payment or prepayments with respect to, or certificates of deposit or other sums or assets required to be posted by, any Loan Party under Mining Law for Reclamation or otherwise.

(b)      With respect to each of the Loan Party's Coal Properties currently in production, Borrower has, and to Borrower's knowledge, each Person other than any Loan Party operating any Coal Properties of any of the Loan Parties, if any, has all material Permits necessary to lawfully conduct such activities, and the Loan Parties are, and to Borrower's knowledge, each Person other than any Loan Party operating any such Coal Properties, if any, is, in compliance in all material respects with the terms and conditions of all such Permits, all of which are in full force and effect.

(c)      Each of the Loan Parties: (i) is, and within the period of all applicable statutes of limitation has been, in compliance with all applicable Environmental Laws and Mining Laws except for such noncompliance as could not reasonably be expected to result in a Material Adverse Change; (ii) is, and within the period of all applicable statutes of limitations has been, in compliance with such Environmental or Mining Permits; and (iii) reasonably believes that each of its Environmental or Mining Permits will be timely renewed and complied with, and, with respect to the Pending Permits, will be timely obtained; that any additional Environmental or Mining Permits that may be required by any of them will be timely obtained and complied with; and that compliance with any Environmental Law or Mining Law that is or is expected to become applicable to it will be timely attained and maintained without material expense.

(d)      There has been no Regulated Substances Activity by any Loan Party at, on or from any Property now or formerly owned, leased or operated by any Loan Party, or at any other location (including any location to which Regulated Substances have been sent for re-use or recycling or for treatment, storage, or disposal), which could reasonably be expected to (i) give rise to any material liability under any applicable Environmental Law or Mining Law or otherwise result in any material costs to any Loan Party other than such costs incurred in the ordinary course of business; or (ii) materially interfere with continued operations of the business of the Loan Parties.