(e)     There is no pending or, to the knowledge of the Loan Parties threatened Environmental Claims related to any Loan Party and, to the knowledge of Borrower, there are no actions, activities, circumstances, conditions, events or incidents that could form the basis of any such Environmental Claim, except for such Environmental Claims which could not, individually or in the aggregate, result in a Material Adverse Change.

(f)     No Loan Party has been notified by any Governmental Authority that it is a potentially responsible party or otherwise liable under or relating to the federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, or, any similar Environmental Law.

(g)     Except as otherwise may be required pursuant to any Environmental Law or Mining Law as a condition to obtaining any Permit necessary for the operation of the Coal Properties or pursuant to the Coal Leases, no Loan Party is obligated pursuant to any law, order, decree, judgment or agreement by which it is bound, to conduct, perform or finance any action or otherwise incur, nor has any Loan Party assumed or retained, any material expense or other liabilities of any kind, fixed or contingent, known or unknown, under any Environmental Law or Mining Law or with respect to any Regulated Substances.

(h)     Borrower has provided the Administrative Agent and the Lenders copies of all significant reports, correspondence and other documents in its possession, custody or control regarding its and its Subsidiaries compliance with or potential liability under Environmental Laws, Mining Laws or Environmental or Mining Permits or with respect to Regulated Substances.

(i)     No Lien has been recorded or, to the knowledge of Borrower, threatened under any Environmental Law with respect to any Real Property or assets of the Loan Parties.

(j)     The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby will not require any notification, registration, filing reporting, disclosure, investigation, response, remediation or cleanup pursuant to any Environmental Law or Mining Law.

**3.20    Accuracy of Information, Etc**.  No statement or information contained in this Agreement, any other Loan Document or any other document, certificate or statement furnished to the Administrative Agent and the Lenders or any of them, by or on behalf of any Loan Party for use in connection with the transactions contemplated by this Agreement or the other Transaction Documents, contained as of the date such statement, information, document or certificate was so furnished, any untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements contained herein or therein not misleading, in each case taken as a whole.  There is no fact known to any Loan Party that could reasonably be expected to have a Material Adverse Effect that has not been expressly disclosed herein, in the other Transaction Documents or in any other documents, certificates or statements furnished to the Agents and the Lenders for use in connection with the transactions contemplated hereby and by the other Transaction Documents.

**3.21    Security Documents**.

(a)     The Guarantee and Security Agreement is effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security

interest in the Collateral described therein and proceeds thereof. When financing statements in appropriate form are filed in the offices specified on Schedule 3.21(a)-1 (which financing statements have been duly completed and delivered to the Administrative Agent) and such other filings and actions as are specified on Schedule 2 to the Guarantee and Security Agreement have been completed (all of which filings have been duly completed), the Guarantee and Security Agreement shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in such Collateral and the proceeds thereof, as security for the Obligations, in each case prior and superior in right to any other Person (except, in the case of Collateral other than securities pledged by the Loan Parties, Permitted Liens). Schedule 3.21(a)-2 lists each Uniform Commercial Code financing statement that (i) names any Loan Party as debtor and (ii) will remain on file after the Closing Date. Schedule 3.21(a)-3 lists each Uniform Commercial Code financing statement that (i) names any Loan Party as debtor and (ii) will be terminated on or prior to the Closing Date; and on or prior to the Closing Date, Borrower will have delivered to the Administrative Agent, or caused to be filed, duly completed Uniform Commercial Code termination statements, authorized by the relevant secured party, in respect of each Uniform Commercial Code financing statement listed in Schedule 3.21(a)-3.

(b)     Each of the Mortgages covering the Mortgaged Properties is effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid and enforceable Lien on the Mortgaged Properties described therein and the proceeds thereof; and upon the filing of such Mortgages in the office specified on Schedule 3.21(b), each such Mortgage shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in the Properties described therein and the proceeds thereof, as security for the Obligations, in each case prior and superior in right to any other Person (other than Persons holding Liens or other encumbrances or rights permitted by the relevant Mortgage), and upon the filing of such Mortgages, the Administrative Agent will have received currently, effective, duly executed Mortgages and other Transaction Documents.

(c)     Borrower owns, directly or indirectly through other Subsidiaries, all of the outstanding Capital Stock of each of its Subsidiaries, and each of its Subsidiaries is a party to a Guarantee and Security Agreement.

**3.22     Solvency**. Each Loan Party is, and after giving effect to the incurrence of all Indebtedness, Obligations, the transactions contemplated by the Transaction Documents and other obligations and commitments being incurred in connection herewith and therewith will be, and will continue to be, Solvent.

**3.23     Hedging Agreements**. Neither Borrower nor any Subsidiary is party to, or is directly or indirectly obligated under or with respect to, any Hedging Agreement.

**3.24     Reserve Reports**.

(a)     All information furnished by any Loan Party for use in the preparation of that certain reserve report prepared by John T. Boyd dated April 2004 with respect to the Coal Properties (the "***Reserve Report***") was accurate at the time furnished.

(b)     The Reserve Report does not omit any statement or information necessary to cause the same not to be misleading to the Administrative Agent and the Lenders in any material respect.

**3.25   Contingent Obligations**. No Loan Party has any existing material Contingent Obligations.

**3.26   Bank Accounts**. Schedule 3.26 lists all accounts maintained by or for the benefit of any Loan Party with any bank or financial institution.

**3.27   Customers and Suppliers**. As of the Closing Date, there exists no actual or threatened termination, cancellation or limitation of, or modification to or change the business relationship between (a) any Loan Party, on the one hand, and any customer or any group thereof, on the other hand, whose agreements with such Loan Party is individually or in the aggregate material to the business or operations of the Loan Parties, or (b) any Loan Party, on the one hand, and any material supplier thereof, on the other hand; and there exists no present state of facts of circumstances that could give rise to or result in any such termination, cancellation, limitation, modification or change. No Person providing any materials or services to any Loan Party has filed, or threatened to file, a Lien on any Properties of any Loan Party. Schedule 3.27 includes a list of all Coal marketing contracts in effect on the Closing Date relating to any Loan Party or any of the Coal Properties. All Coal sold by any Loan Party from its Coal Properties (other than Coal being sold pursuant to a Material Agreement) is being sold at prices and terms comparable to the market prices and on terms generally available at the time such prices and terms were negotiated for Coal production from producing areas situated near such Coal Properties, and none of the proceeds of any such sale are currently being held in suspense by such purchaser or any other Person.

**3.28   Account Receivable**. The accounts and notes receivable of the Loan Parties reflected on the Pro Forma Balance Sheet and the Financial Statements, and all accounts and notes receivable arising subsequent to such date, (a) arose from bona fide sales transactions in the ordinary course of business consistent with past practice and are payable on ordinary trade terms, (b) to the knowledge of Borrower, are legal, valid and binding obligations of the respective debtors enforceable in accordance with their respective terms, and (c) to the knowledge of Borrower, are not subject to any valid set-off or counterclaim.

**3.29   Material Agreements**. Set forth on Schedule 3.29 hereto is a complete and correct list, as of the Closing Date, of all agreements of each Loan Party setting forth each counterparty thereto (other than the Loan Documents) relating to the purchase, transportation, processing, marketing, development, sale and supply of Coal, operating agreements or contract operating agreements and copies of such documents have been provided to the Administrative Agent. All such agreements are in full force and effect and no party thereto (or any of its predecessors) is in default thereunder, nor has any material item of such agreements been altered since the Closing Date without the prior written consent of the Lenders and all rents, royalties and other payments due and payable thereunder have been properly and timely paid.

**3.30   Coal Act; Black Lung Act**. Each of Borrower and the Subsidiaries and each of their respective "related persons" (as defined in the Coal Act) are in material compliance with the Coal Act and none of the Borrower, the Subsidiaries and their respective related persons has any liability under the Coal Act except with respect to premiums or other payments required thereunder that have been paid when due. Each of the Borrower and the Subsidiaries is in compliance with the Black Lung Act, and neither the Borrower nor any of the Subsidiaries has any liability under the Black Lung Act except with respect to premiums, contributions or other payments required thereunder that have been paid when due.

## ARTICLE IV
## CONDITIONS PRECEDENT

**4.1    Conditions Precedent to the Extension of the Loan**. The agreement of each Lender to make the Loans requested to be made by it hereunder is subject to the satisfaction, prior to or concurrently with the making of such Loans on the Closing Date, of the following conditions precedent:

(a)    Loan Documents. The Administrative Agent shall have received the following documents, in each case executed and delivered by a Responsible Officer of each of the Loan Parties: (i) this Agreement, (ii) the Guarantee and Security Agreement, (iii) Mortgages covering each of the Mortgaged Properties, (iv) the Deposit Account Control Agreement (Loan Proceeds Account), (v) the Letter Agreement, and (vi) the Subordination Agreement.

(b)    Constituent Documents. All documents establishing or implementing the ownership, capital and corporate, organizational, tax and legal structure of each Loan Party shall be reasonably satisfactory to the Administrative Agent.

(c)    Projections, Financial Statements. The Administrative Agent shall have received projections, the Financial Statements and a business plan and a budget for Borrower and its Subsidiaries for fiscal years 2006 through 2009 satisfactory to the Administrative Agent in its sole discretion.

(d)    Pro Forma Balance Sheet. The Lenders shall have received the Pro Forma Balance Sheet.

(e)    Approvals; Denial of Permits. (i) All Permits or other approvals necessary to be obtained by a Loan Party in connection with the execution, delivery and performance of the Loan Documents shall have been obtained and be in full force and effect; and (ii) no Loan Party shall have received any notice (written or oral) denying any of the Pending Permits or otherwise rejecting the application for any Pending Permit.

(f)    Solvency. The Lenders shall have received a satisfactory solvency certificate and analysis of the Chief Financial Officer of Borrower which shall document the solvency of Borrower and the Subsidiaries after giving effect to the borrowings under this Agreement.

(g)    Fees. The Lenders, the Agents and the Arranger shall have received all fees required to be paid, and all expenses for which invoices have been presented (including reasonable fees, disbursements and other charges of counsel to the Agents), on or before the Closing Date. All such amounts will be paid with proceeds of Loans made on the Closing Date and will be reflected in the funding instructions given by Borrower to the Administrative Agent on or before the Closing Date.

(h)    Lien Searches. The Administrative Agent shall have received the results of a recent lien search in each of the jurisdictions in which Uniform Commercial Code financing statements or other filings or recordations should be made to evidence or perfect security interests in all assets of the Loan Parties, and such search shall reveal no Liens other than Permitted Liens on any of the Property of the Loan Parties or Liens that were terminated, released or otherwise discharged on or prior to the Closing Date.

(i)    <u>Environmental Matters</u>.  The Lenders shall have received a satisfactory
environmental review from Marshall Miller & Associates, Inc. with respect to any Real Property
(including the Coal Properties) owned or leased by Borrower and its Subsidiaries.

(j)    <u>Closing Certificate</u>.  The Administrative Agent shall have received a certificate of
each Loan Party, dated the Closing Date, substantially in the form of <u>Exhibit H</u>, with appropriate
insertions and attachments.

(k)    <u>Legal Opinions</u>.  The Administrative Agent  shall have received the following
executed legal opinions from:  (i) Buchanan Ingersoll PC, counsel to the Loan Parties, with respect
to such matters and in form and substance satisfactory to the Administrative Agent, and (ii) local
counsel in the State of West Virginia reasonably acceptable to the Administrative Agent with
respect to the Liens created by the Mortgages with respect thereto and such other matters as may be
required by the Administrative Agent.  Each such legal opinion shall be addressed to the
Administrative Agent as agent for the Lenders and shall cover such other matters incident to the
transactions contemplated by this Agreement as the Administrative Agent may reasonably request.

(l)    <u>No Material Adverse Effect</u>.  Since September 30, 2005, no event or circumstance
having a Material Adverse Effect shall have occurred and shall be continuing.

(m)    <u>Filings, Registrations and Recordings</u>.  Each document (including any Uniform
Commercial Code financing statement) required by the Security Documents or under law or
reasonably requested by the Administrative Agent to be filed, registered or recorded in order to
create in favor of the Administrative Agent, for the benefit of the Secured Parties, a perfected Lien
on the Collateral described therein, prior and superior in right to any other Person (other than with
respect to Permitted Liens), shall have been filed, registered or recorded or shall have been
delivered to the Administrative Agent in proper form for filing, registration or recordation.

(n)    <u>Insurance</u>.  The Administrative Agent shall have received a summary of the
insurance carried in respect of each Loan Party and its Properties (which insurance shall be for such
amounts, against such risk, covering such liabilities and with such deductibles or self-insured
retentions as are acceptable to the Administrative Agent) and certificates of insurance, reasonably
satisfactory to the Administrative Agent, naming the Administrative Agent, for the ratable benefit of
the Lenders, as "loss payee" under its property loss policies and as "additional insured" on its
comprehensive and general policies and a "lender's loss payable endorsement" or a "union
Mortgagee Clause" (or a "New York Mortgagee Clause").

(o)    <u>Representations and Warranties</u>.  Each of the representations and warranties made by
any Loan Party in or pursuant to any Transaction Document shall have been true and correct on and
as of the date first made and on and as of the Closing Date.

(p)    <u>No Default</u>.  No Default or Event of Default shall have occurred and be continuing
on such date or after giving effect to the extensions of credit requested to be made on such date.

(q)    <u>Due Diligence</u>.  The Lenders shall have completed a satisfactory due diligence
review of the business prospects of Borrower and its Subsidiaries, including tax, legal and
accounting issues.

(r)     Pledged Securities; Stock Powers; Acknowledgment and Consent.  The Administrative Agent shall have received (i) certificates representing the shares of Capital Stock pledged pursuant to the Guarantee and Security Agreement, together with an undated stock power for each such certificate executed in blank by a duly authorized officer of the pledgor thereof or (ii) in the case of Capital Stock not evidenced by a certificate, an Instructions Agreement, substantially in the form of Annex I to the Guarantee and Security Agreement, duly executed by any issuer of Capital Stock pledged pursuant to the Guarantee and Security Agreement.

(s)     Material Agreements.  The Administrative Agent shall have received a true, correct and complete copy, certified as to such by a Responsible Officer of the applicable Loan Parties, of each Material Agreement.

(t)     Amendment to Monarch Engagement Letter.  The Administrative Agent shall have received a true, correct and complete copy, certified as to such by a Responsible Officer of Borrower, of the Monarch Engagement Letter together with a waiver or amendment which (i) shall provide that no fee shall be due or payable by any Loan Party thereunder until such time as all Obligations shall have been paid in full in cash and (ii) otherwise be in form and substance acceptable to the Administrative Agent.

(u)     Additional Documentation.  The Administrative Agent and the Lenders shall have received such additional approvals, opinions and documents as such Persons may request.

**4.2     Deemed Fulfilled Conditions**.  Except to the extent that Borrower has disclosed in the Borrowing Notice that an applicable condition specified in Section 4.1 will not be fulfilled as of the requested time for the making of the Loans, Borrower shall be deemed to have made a representation and warranty as of such time that the conditions specified in Section 4.1 have been fulfilled.  No such disclosure by Borrower that a condition specified in Section 4.1 will not be fulfilled as of the requested time for the making of the requested Loans shall affect the right of each Lender not to make the Loans requested to be made by it if such condition has not been fulfilled at such time.

### ARTICLE V
### AFFIRMATIVE COVENANTS

Borrower hereby agrees that, so long as the Commitments remain in effect or any Loan or other amount is owing to any Lender or any Agent hereunder, Borrower shall, and shall cause each of its Subsidiaries to:

**5.1     Financial Reporting**.  Furnish to the Administrative Agent:

(a)     as soon as available, but in any event within 90 days after the end of each fiscal year of Borrower, a copy of the unaudited consolidated balance sheet of Borrower and its consolidated Subsidiaries as at the end of such year and the related audited consolidated statements of income and cash flows for such year, setting forth in each case in comparative form the figures as of the end of and for the previous year, reported on without a "going concern" or like qualification or exception, or qualification arising out of the scope of the audit, by the Independent Accountants;

(b)     as soon as available, but in any event not later than 45 days after the end of each of the quarterly periods of each fiscal year of Borrower, the unaudited consolidated balance sheet of

Borrower and its consolidated Subsidiaries as at the end of such quarter and the related unaudited
consolidated statements of income and cash flows for such quarter, certified by a Responsible
Officer as being fairly stated in all material respects (subject to normal year end audit adjustments);

(c)     as soon as available, but in any event not later than 20 days after the end of each
month occurring during each fiscal year of Borrower (other than the third, sixth, ninth and twelfth
such month), the unaudited consolidated balance sheets of Borrower and its consolidated
Subsidiaries as at the end of such month and the related unaudited statements of income and of cash
flows for such month and the portion of the fiscal year through the end of such month, setting forth
in each case in comparative form the figures as of the end of and for the corresponding period in the
previous year, certified by a Responsible Officer as being fairly stated in all material respects
(subject to normal year-end audit adjustment);

(d)     as soon as available, but in any event not later than 20 days after the end of each
month a schedule, certified by a Responsible Officer, estimating the amount of Capital Expenditures
made by Borrower and its Subsidiaries during such month; and

(e)     such other information as the Administrative Agent or any Lender may from time to
time request.

All such financial statements are to be complete and correct in all material respects and are
to be prepared in reasonable detail and in accordance with GAAP applied consistently throughout
the periods reflected therein and with prior periods (except as approved by the Independent
Accountants or officer, as the case may be, and disclosed therein).

**5.2     Collateral Reporting.** Furnish to the Administrative Agent:

(a)     to the extent not previously disclosed to the Administrative Agent, promptly upon
the acquisition thereof, a listing of any Real Property acquired by any Loan Party at a purchase
price in excess of $1,000,000 and a listing of any Intellectual Property acquired by any Loan Party
at a purchase price in excess of $250,000 and a listing of all Coal Leases, in each case since the date
of the most recent list delivered pursuant to this Section 5.2(a) (or, in the case of the first such list so
delivered, since the Closing Date);

(b)     reports, certifications, engineering studies, environmental assessments or other
written material or data requested by, and in form, scope and substance reasonably satisfactory to,
the Administrative Agent or the Required Lenders, in the event that Administrative Agent or the
Required Lenders at any time have a reasonable basis to believe that there may be a material
violation of any Environmental Law or a condition at any Property owned, operated or leased by
any Loan Party that could reasonably give rise to a Material Adverse Effect, or if an Event of
Default occurs;

(c)     upon reasonable request by the Administrative Agent, such other reports as to the
Coal Properties, the other Collateral or the financial condition of Borrower or any of its Subsidiaries
as may be so requested;

(d)     prior to any Asset Sale, a notice (i) describing such Asset Sale or the nature and
material terms and conditions of such transaction and (ii) stating the estimated Net Cash Proceeds
anticipated to be received by any Loan Party;

(e)  as soon as is practicable following the written request of the Administrative Agent and in any event within 60 days after the end of each fiscal year, (i) a report in form and substance satisfactory to the Administrative Agent and the Lenders outlining all material insurance coverage maintained as of the date of such report by each Loan Party and the duration of such coverage and (ii) an insurance broker's statement that all premiums then due and payable with respect to such coverage have been paid and confirming that the Administrative Agent has been named as loss payee or additional insured, as applicable; and

(f)  within 20 days after the end of each calendar month, (i) a report setting forth, for such calendar month on a Mine by Mine basis, the volume of production and sales attributable to production (and the prices at which such sales were made and the revenues derived from such sales) for such calendar month from the Coal Properties, and setting forth the related ad valorem, severance and production taxes and lease and operating expenses attributable thereto and incurred for such calendar month setting forth in each case a comparison to the projections for the comparative period and (ii) a production schedule for the next 180 days for all Coal Properties which Borrower or any Subsidiary owns or controls or in which Borrower or any Subsidiary participates.

**5.3    Certificates; Other Information**.  Furnish to the Administrative Agent:

(a)  concurrently with the delivery of any financial statements pursuant to Section 5.1, (i) a certificate of a Responsible Officer stating that, to the best of such Responsible Officer's knowledge, each Loan Party during such period has observed or performed all of its covenants and other agreements, and satisfied every condition, contained in this Agreement and the other Transaction Documents to which it is a party to be observed, performed or satisfied by it, and that such Responsible Officer has obtained no knowledge of any Default or Event of Default, except as specified in such certificate and (ii) in the case of quarterly or annual financial statements, (A) a Compliance Certificate containing all information and calculations necessary for determining compliance by Borrower and its Subsidiaries with the provisions of this Agreement referred to therein as of the last day of the fiscal quarter or fiscal year of Borrower, as the case may be, (B) to the extent not previously disclosed to the Administrative Agent, an updated listing of any material Real Property (including Coal Properties) or Intellectual Property acquired by any Loan Party or with respect to which any Loan Party shall acquire a right to earn, purchase or otherwise acquire, since the date of the most recent list delivered pursuant to this clause (B) (or, in the case of the first such list so delivered, since the Closing Date) and (C) authorization of the filing of any Uniform Commercial Code financing statements or other filings specified in such Compliance Certificate as being required to be filed;

(b)  as soon as possible and in any event within five days of obtaining knowledge thereof:  written notice of (i) any development, event, or condition that, individually or in the aggregate with other developments, events or conditions, could reasonably be expected to result in liability pursuant to any Environmental Law or Mining Law (other than in the ordinary course of business by Borrower or its Subsidiaries) in excess of $100,000; and (ii) any notice that any Governmental Authority has denied or is reasonably likely to deny any application for an Environmental or Mining Permit sought by, or revoke, modify or refuse to renew any Environmental or Mining Permit held by, any Loan Party or any Subsidiary or other operator of any Coal Properties if the effect of such action could reasonably give rise to a Material Adverse Effect;

(c)     upon the request of the Administrative Agent or any Lender, immediate access to all geological, engineering and related data contained in Borrower's or its Subsidiaries' files or readily accessible to Borrower or its Subsidiaries relating to its Mortgaged Properties, subject to and as may be limited by any confidentiality agreements to which such Loan Party is a party or by which any such data is bound;

(d)     promptly after becoming aware of the same, written notice of (i) any material labor dispute to which either Loan Party is or may become a party, including any strikes, lockouts or other disputes relating to any of such Person's plants and other facilities, and (ii) any Worker Adjustment and Retraining Notification Act or related liability incurred with respect to the closing of any plant or other facility of any of such Person that would reasonably be expected to have a Material Adverse Effect;

(e)     upon the written request of the Administrative Agent, copies of all Tax Returns filed by each Loan Party in respect of taxes measured by income (excluding sales, use and like taxes); and

(f)     promptly, such additional financial and other information as the Administrative Agent or any Lender may from time to time reasonably request.

**5.4     Payment of Obligations**.  Pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all its material obligations of whatever nature, including all lawful environmental claims, taxes, assessments, charges and levies, except where the amount or validity thereof is currently being contested in good faith by appropriate proceedings and reserves in conformity with GAAP with respect thereto have been provided on the books of Borrower or its Subsidiaries, as the case may be.

**5.5     Conduct of Business and Maintenance of Existence, Etc.**

(a)     (i) Preserve, renew and keep in full force and effect its partnership, limited liability company, corporate or other existence and (ii) take all reasonable action to maintain all rights, privileges and franchises necessary or desirable in the normal conduct of its business, except, in each case, as otherwise permitted by Section 6.3.

(b)     Comply with all Contractual Obligations, Constituent Documents, Permits, Environmental or Mining Permits and Requirements of Law, and use its reasonable efforts to cause all employees, crew members, agents, contractors and subcontractors Borrower and its Subsidiaries to comply with all Environmental or Mining Permits, Permits and Requirements of Law as may be necessary or appropriate to enable Borrower and its Subsidiaries to so comply, except, in the case of Contractual Obligations, Permits and Requirements of Law, where the failure to comply could not reasonably be expected to result in a Material Adverse Change.

(c)     Comply with all leases, agreements and documents pertaining to or affecting the Coal Property during the term of this Agreement, except where the failure to comply could not reasonably be expected to result in a Material Adverse Change.

(d)     (i) Take all commercially reasonable efforts to ensure that all of their respective tenants, subtenants, contractors, subcontractors, and invitees comply in with all applicable Mining Laws, and obtain, comply and maintain any and all Permits, applicable to any of them and (ii)

43

conduct and complete all investigations, studies, sampling and testing, and all remedial, removal and other actions in each case required under applicable Mining Laws and promptly comply in all respects with all lawful orders and directives of any Governmental Authority in respect of applicable Mining Laws, except where the failure to comply could not reasonably be expected to result in a Material Adverse Change.

### 5.6   Operation and Maintenance of Property; Insurance.

(a)     Keep, preserve and maintain all Property and systems, including all improvements, personal property and equipment, useful and necessary in its business in good working order and condition in accordance with the general practice of other businesses of similar character and size (ordinary wear and tear excepted) and make all necessary repairs, renewals and replacements so that its business may be property conducted at all times.

(b)     Cure, to the satisfaction of Administrative Agent in its discretion, any title defects to any of the Properties which is material in value, in the reasonable opinion of the Administrative Agent, within 30 days after becoming aware of the same and, in the event any such title defects are not cured in a timely manner, pay all related costs and fees reasonably incurred by the Administrative Agent to do so.

(c)     Keep and continue all Material Agreements in full force and effect in accordance with the terms thereof, and not permit the same to lapse or otherwise become impaired for failure to comply with the obligations thereof, whether express or implied.

(d)     Maintain with financially sound and reputable insurance companies insurance on all its Property in at least such amounts and against at least such risks (but including in any event general liability) as are usually insured against in the same general area by companies engaged in the same or a similar business, with such deductibles as are reasonably acceptable to the Administrative Agent.

(e)     Name the Administrative Agent, for the ratable benefit of the Secured Parties, as "loss payee" under its casualty loss policies and the Administrative Agent as "additional insured" on its comprehensive and general liability policies, and cause each insurance policy that is so maintained and that covers all or any portion of a Mortgaged Property, Mine, or Coal Lease to contain a "lender's loss payable endorsement" or a "union Mortgagee Clause" (or a "New York Mortgagee Clause"), as applicable, in form and substance reasonably satisfactory to the Administrative Agent. The Borrower will furnish to the Lenders, upon request of the Administrative Agent, information in reasonable detail as to the insurance so maintained and flood zone determination forms for all enclosed structures owned by any Loan Party that is contained in the Mortgaged Property. Such casualty loss policies shall be reasonably satisfactory to the Administrative Agent in all respects and shall not be canceled, amended or changed without at least 30 days' (ten days for nonpayment) written notice to the Administrative Agent. So long as no Event of Default has occurred and is continuing, Net Cash Proceeds of any insurance policies shall be applied in accordance with Section 2.7(b).

(f)     Renew all insurance policies referred to in this Section 5.6 on terms no less favorable to the Administrative Agent for the ratable benefit of the Secured Parties during the term of this

Agreement. Any substitute underwriter shall be, in Borrower's reasonable opinion, as financially sound as Borrower's existing underwriters.

     (g)    Operate its Coal Properties and other material Properties or cause such Coal Properties and other material Properties to be operated in a careful and efficient manner in accordance with the practices of the industry and in compliance with all applicable contracts and agreements and in compliance with all Requirements of Law, including, without limitation, applicable proration requirements and Environmental Laws, and all applicable laws, rules and regulations of every other Governmental Authority from time to time constituted to regulate the development and operation of its Coal Properties and the production and sale of Coal and other minerals therefrom, except where the failure to do so could not reasonably be expected to result in a Material Adverse Change.

     (h)    Promptly pay and discharge, or make reasonable and customary efforts to cause to be paid and discharged, all rentals, royalties, expenses and indebtedness accruing under the leases or other agreements affecting or pertaining to its Properties and will do all other things necessary to keep unimpaired their rights with respect thereto and prevent any forfeiture thereof or default thereunder.

     (i)    Promptly perform or make reasonable and customary efforts to cause to be performed, in accordance with industry standards, the obligations required by each and all of the assignments, deeds, leases, sub-leases, contracts and agreements affecting its interests in its Properties.

     (j)    To the extent the Borrower is not the operator of any Property, use its best efforts to cause the operator to comply with this Section 5.6.

     (k)    Prior to the commencement of any mining operations, Borrower shall obtain the leasehold interest mining rights necessary for the operation of the applicable Mine that will be operated on such parcel, and each of its rights under the applicable lease, contracts, rights-of-way and easements necessary for the operation of such Mine shall be in full force and effect and no default shall exist thereunder.

    **5.7**    **Inspection of Property; Books and Records; Discussions**.

     (a)    Keep proper books of records and account in which full, true and correct entries in conformity with GAAP and all Requirements of Law shall be made of all dealings and transactions in relation to its business and activities; and

     (b)    Permit the Administrative Agent and the Lenders, or any agents or representatives thereof, from time to time during Borrower's normal business hours, as often as may be reasonably requested and upon two Business Days notice (except that, during the continuance of an Event of Default, no such notice shall be required) to (i) go upon, examine, inspect and remain on the Properties of the Loan Parties, (ii) during any such visit, inspect and verify the amount, character and condition of any of the Property of the Loan Parties, (iii) during any such visit, examine and, at Borrower's cost and expense, make copies of and abstracts from the records and books of account of the Loan Parties, and (iv) discuss the affairs, finances and accounts of the Loan Parties with any of their respective officers, directors, employees or Independent Accountants. Except as otherwise stated in clause (iii) above, the Administrative Agent and each Lender will pay the costs and

expenses incurred by it in exercising its rights under this Section 5.7(b); *provided* that after the occurrence of an Event of Default, Borrower shall reimburse the Administrative Agent and each Lender promptly after a request therefor for the reasonable costs and expenses incurred by it in connection with the exercise of its rights under this Section 5.7(b).

(c)     Authorize Borrower's Independent Accountants to disclose to the Administrative Agent or any Lender any and all financial statements and other information of any kind, as the Administrative Agent or any Lender reasonably requests from Borrower and which the Independent Accountants may have with respect to the business, financial condition, results of operations or other affairs of the Loan Parties.

**5.8    Notices.** Promptly, and in any event within three Business Days after knowledge thereof, give notice to the Administrative Agent and each Lender of:

(a)     the occurrence of any Default or Event of Default;

(b)     any (i) default or event of default under any Material Agreement or other agreement a default under which could reasonably be expected to result in a Material Adverse Change or (ii) investigation (which is not in the ordinary course and which, if adversely determined, could reasonably be expected to result in a Material Adverse Effect), litigation or proceeding which may exist at any time between any Loan Party and any Governmental Authority;

(c)     any litigation or proceeding against any Loan Party or any Subsidiary in which the amount involved is $100,000 or more and not covered by insurance or in which injunctive or similar relief is sought;

(d)     (i) the occurrence of any Reportable Event with respect to any Benefit Plan, a failure to make any required contribution to a Benefit Plan, the creation of any Lien in favor of the PBGC or a Benefit Plan or any withdrawal from, or the termination, Reorganization or Insolvency of, any Multiemployer Plan, (ii) the institution of proceedings or the taking of any other action by the PBGC or any Loan Party or any Commonly Controlled Entity or any Multiemployer Plan with respect to the withdrawal from, or the termination, Reorganization or Insolvency of, any Benefit Plan or (iii) proceedings that have been instituted pursuant to Section 515 of ERISA to collect a delinquent contribution to a Benefit Plan, that Borrower or any Commonly Controlled Entity will or may incur any material liability (including any indirect, contingent or secondary liability) to or on account of a termination or withdrawal from a Benefit Plan under Title IV of ERISA or with respect to a Benefit Plan under Section 401(a)(29) or 4971, 4975, or 4980 of the Code or Section 409, 502(i) or 503(l) of ERISA or with respect to a group health plan (as defined in Section 607(1) of ERISA or Section 4980B of the Code) under Section 4890B of the Code, or that Borrower or a Commonly Controlled Entity will incur any material liability pursuant to an employee welfare benefit plan that provides benefits to retired employees or former employees (other than as required under Section 601 of ERISA) or any Benefit Plan;

(e)     any development or event (including notice of any claim or condition arising under or related to any Environmental Law) that constitutes a Material Adverse Effect;

(f)     the audit or examination of any Tax Return by any Governmental Authority, the receipt by Borrower or any Subsidiary of notice of any such audit or examination or the assertion of any claim for taxes against Borrower or any Subsidiary by any Governmental Authority; and

(g)     simultaneously with the date that the Borrower or any Subsidiary (i) commences or terminates negotiations with any collective bargaining agent for the purpose of materially changing any collective bargaining agreement, (ii) reaches an agreement with any collective bargaining agent prior to ratification for the purpose of materially changing any collective bargaining agreement, (iii) ratifies any agreement reached with a collective bargaining agent for the purpose of materially changing any collective bargaining agreement or (iv) becomes subject to a "cooling off period" under the auspices of the National Mediation Board, the commencement or termination of such negotiations or the receipt of such agreement or notice of a "cooling off period" (including a copy of such agreement or notice), as the case may be.

Each notice pursuant to this Section 5.8 shall be accompanied by a statement of a Responsible Officer setting forth details of the occurrence referred to therein and stating what action Borrower or the relevant Subsidiary proposes to take with respect thereto.

        **5.9    Environmental Laws.** At Borrower's own expense:

(a)     Comply in all material respects with, and ensure compliance in all material respects at any Property owned, leased or operated by Borrower or any Subsidiary by all tenants, subtenants, lessees, sub-lessees and contractors, if any, with all applicable Environmental Laws, and obtain and comply in all material respects with and maintain, and cause all tenants, subtenants, lessees, sub lessees and contractors to obtain and comply in all material respects with and maintain, any and all material Environmental or Mining Permits required by applicable Environmental Laws or Mining Laws with respect to any Property owned or leased by Borrower or any Subsidiary;

(b)     Conduct and complete all investigations, studies, sampling and testing, and all reporting, investigative, remedial, removal and other actions required under Environmental Laws, and promptly comply in all material respects with all lawful orders and directives of all Governmental Authorities regarding Environmental Laws;

(c)     As soon as available, and in any case within five Business Days prior to the closing of any acquisition of Properties by a Loan Party for which Borrower reasonably believes that its liability for environmental remediation potentially associated with the ownership or operation of all such Properties is expected to exceed $1,000,000 for preexisting conditions, deliver to the Administrative Agent an environmental report covering such Properties to be acquired, in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders;

(d)     Not dispose of or otherwise release any Regulated Substances on, under, about or from any of the Borrower's or its Subsidiaries' Properties or any other Property to the extent caused by Borrower's or any of their Subsidiaries' operations except in compliance with applicable Environmental Laws;

(e)     Diligently pursue the attainment of all Environmental or Mining Permits necessary or appropriate for the operation or use of Borrower's or their Subsidiaries' Properties generally in accordance with its business plans;

(f)     Promptly commence and diligently prosecute to completion any assessment, evaluation, investigation, monitoring, containment, cleanup, removal, repair, restoration, remediation or other remedial obligations required or reasonably necessary under applicable Environmental Laws because of or in connection with the actual or suspected past, present or future

disposal or other release of any Regulated Substances on, under, about or from any of Borrower's or their Subsidiaries' Properties, which failure to commence and diligently prosecute to completion could reasonably be expected to result in the incurrence of any material liability or in a material increase in any existing liability;

(g)     Promptly, but in no event later than five days of the occurrence of a triggering event, notify the Administrative Agent in writing of any threatened action, investigation or inquiry by any Governmental Authority or any demand or threatened lawsuit by any landowner or other third party against Borrower or its Subsidiaries or their Properties of which Borrower has knowledge in connection with any Environmental Laws (excluding routine testing and corrective action) if Borrower reasonably anticipates that such action may result in liability (whether individually or in the aggregate) in excess of $100,000; and

(h)     Establish and implement such procedures as may be necessary to continuously determine and assure that Borrower's and their Subsidiaries' obligations under this Section 5.9 are timely and fully satisfied.

**5.10    Additional Collateral, Etc.**

(a)     With respect to any Property (other than Excluded Property) acquired after the Closing Date by Borrower or any of its Subsidiaries as to which the Administrative Agent, for the benefit of the Secured Parties, does not have a perfected Lien and security interest, promptly and, in any event, within five Business Days, (i) execute and deliver to the Administrative Agent such Security Documents or such amendments to such Security Documents as the Administrative Agent deems necessary or advisable to grant to the Administrative Agent, for the benefit of the Secured Parties, a first priority Lien and security interest in such Property, subject only to Permitted Liens, (ii) take all actions necessary or advisable to grant to the Administrative Agent, for the benefit of the Secured Parties, a perfected first priority Lien and security interest on such Property (subject only to Permitted Liens), including the filing of Mortgages and Uniform Commercial Code financing statements in such jurisdictions as may be required by the Security Documents or by law or as may be requested by the Administrative Agent and (iii) deliver to the Administrative Agent such legal opinions relating to the matters described in clauses (i) and (ii) immediately preceding for which the Administrative Agent may reasonably request, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent.

(b)     With respect to any fee interest in any Real Property (other than Excluded Property) acquired after the Closing Date by Borrower or any of its Subsidiaries, promptly and, in any event, within five Business Days (i) execute and deliver a first priority Mortgage (subject only to Permitted Liens) in favor of the Administrative Agent, for the benefit of the Secured Parties, covering such Real Property, and (ii) if reasonably requested by the Administrative Agent, provide the Administrative Agent with (A) title and extended coverage insurance covering such Real Property in an amount at least equal to the purchase price of such Real Property (or such other amount as shall be reasonably specified by the Administrative Agent) as well as a current ALTA or survey thereof, together with a surveyor's certificate, (B) any consents or estoppels reasonably deemed necessary or advisable by the Administrative Agent in connection with such Mortgage, each of the foregoing in form and substance reasonably satisfactory to the Administrative Agent and (C) legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent.

(c)     With respect to any new Subsidiary created or acquired after the Closing Date by
Borrower or any of its Subsidiaries, concurrently with such creation or acquisition, (i) execute and
deliver to the Administrative Agent such amendments to the Security Documents as the
Administrative Agent deems necessary or advisable to grant to the Administrative Agent, for the
benefit of the Secured Parties, a perfected first priority Lien and security interest in the Capital
Stock of such new Subsidiary, (ii) deliver to the Administrative Agent (A) the certificates (if any)
representing such Capital Stock, together with undated powers, in blank, executed and delivered by
a duly authorized officer of Borrower or a Subsidiary, as the case may be and (B) in the case of a
Subsidiary whose Capital Stock is a security that is not evidenced by a certificate, an
Acknowledgment and Consent, substantially in the form of Annex I to the Guarantee and Security
Agreement, duly executed by any issuer of Capital Stock pledged pursuant to such Guarantee and
Security Agreement, (iii) cause such new Subsidiary (A) to become a party to the applicable
Security Documents and (B) to take such actions necessary or advisable to grant to the
Administrative Agent for the benefit of the Secured Parties a perfected first priority Lien and
security interest on the Collateral described in the Guarantee and Security Agreement and pursuant
to a duly executed Mortgage, such Lien on all Properties of such new Subsidiary, subject in each
case to Permitted Liens, including, without limitation, the filing of Uniform Commercial Code
financing statements in such jurisdictions as may be required by the Guarantee and Security
Agreement, the filing of any Mortgages in appropriate filing offices and other filings required by
law or as may be requested by the Administrative Agent, and (iv) if requested by the Administrative
Agent, deliver to the Administrative Agent such legal opinions, relating to the matters described
above as the Administrative Agent may request, which opinions shall be in form and substance, and
from counsel, satisfactory to the Administrative Agent.

**5.11    Further Assurances**.

(a)     From time to time execute and deliver, or cause to be executed and delivered, such
additional instruments, certificates or documents, and take such actions, as the Administrative
Agent may reasonably request for the purposes of implementing or effectuating the provisions of
this Agreement and the other Transaction Documents, or of more fully perfecting or renewing the
rights of the Administrative Agent and the Secured Parties with respect to the Collateral (or with
respect to any additions thereto or replacements or proceeds thereof or with respect to any other
Property hereafter acquired by Borrower or any Subsidiary which may be deemed to be part of the
Collateral) pursuant hereto or thereto.

(b)     Upon the exercise by the Administrative Agent or any Lender of any power, right,
privilege or remedy pursuant to this Agreement or the other Transaction Documents which requires
any consent, approval, recording, qualification or authorization of any Governmental Authority,
execute and deliver, or will cause the execution and delivery of, all applications, certifications,
instruments and other documents and papers that the Administrative Agent or such Lender may be
required to obtain from Borrower or any Subsidiary for such governmental consent, approval,
recording, qualification or authorization.

**5.12    Warrants**. Within 30 days after the Closing Date, execute and deliver to the
Administrative Agent, (a) warrants to purchase 10% of the outstanding membership interests of
Borrower (on a fully diluted basis (including as diluted by the membership interests receivable
under the Series B Warrants)) on the exercise date exercisable at an aggregate exercise price of $.10
for all such membership interests (the "**_Series A Warrants_**") and (b) warrants to purchase 15% of

the outstanding membership interests of Borrower (on a fully diluted basis (including as diluted by the membership interests receivable under the Series A Warrants)) on the exercise date at an aggregate exercise price of $15,000,000 for all such membership interests (the "**Series B Warrants**" and, together with the Series A Warrants, the "**Warrants**"), in each case, in form and substance satisfactory to the Administrative Agent and the Lenders. The Warrants shall be exercisable at any time on or after June 30, 2006 if (i) on June 30, 2006, any Obligations (other than contingent indemnification or expense reimbursement Obligations not due and payable) remain unsatisfied on such date, (ii) LCPI shall have exercised its option under the Letter Agreement to provide Borrower additional financing on terms substantially as set forth therein and (iii) LBI and LCPI shall have performed their obligations under the Letter Agreement in all material respects (including the duty to negotiate in good faith). In connection with the execution and delivery of the Warrants, Borrower shall deliver to the Administrative Agent such legal opinions, relating to the matters described in this Section 5.12 as the Administrative Agent may reasonably request, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent. The Warrants shall expire in the event that (x) the Obligations (other than contingent indemnification or expense reimbursement Obligations not then due and payable) are repaid on or before June 30, 2006, (y) LCPI shall fail to elect under the Letter Agreement to provide Borrower additional financing on terms substantially as set forth therein or (z) LBI or LCPI shall not have performed their obligations under the Letter Agreement in all material respects (including the duty to negotiate in good faith).

    **5.13**    **Royalty Interest**. Within 30 days after the Closing Date, execute and deliver to the Administrative Agent documentation (the "*Royalty Documentation*") granting to the Administrative Agent, for the benefit of the Lenders, an overriding royalty interest (the "*ORI*") in the revenues generated from the mining operations of Borrower and its Subsidiaries as described in the Letter Agreement, which documentation shall be in form and substance satisfactory to the Administrative Agent and the Lenders. The Royalty Documentation shall convey the ORI to the Administrative Agent, for the benefit of the Lenders, on June 30, 2006, if (i) any Obligations (other than contingent indemnification or expense reimbursement Obligations not then due and payable) remain unsatisfied on such date, (ii) LCPI shall have exercised its option under the Letter Agreement to provide Borrower additional financing on terms substantially as set forth therein and (iii) LBI and LCPI shall have performed their obligations under the Letter Agreement in all material respects including the duty to negotiate in good faith). In connection with the execution and delivery of the Royalty Documentation, Borrower shall deliver to the Administrative Agent such legal opinions, relating to the matters described in this Section 5.13 as the Administrative Agent may request, which opinions shall be in form and substance, and from counsel, satisfactory to the Administrative Agent. The ORI shall cease to be effective in the event that (x) the Obligations (other than contingent indemnification or expense reimbursement Obligations not then due and payable) are repaid on or before June 30, 2006, (y) LCPI shall fail to elect under the Letter Agreement to provide Borrower additional financing on terms substantially as set forth therein or (z) LBI or LCPI shall not have performed their obligations under the Letter Agreement in all material respects (including the duty to negotiate in good faith). The Administrative Agent shall have the right to cause the Royalty Documentation to be filed of record and to take, or to cause Borrower to take, such other actions as may be reasonably required to provide effective notice of the ORI to third parties once the ORI becomes effective, unless such filing or the taking of such action violates the terms of the Coal Leases, as in effect on the Closing Date; *provided, however*, that, if the ORI becomes effective, Borrower shall use its best efforts to obtain consent from the lessor under such Coal Leases to such filing or other action.

**5.14    Post-Closing Deliverables.**

(a)     On or prior to the date 30 days after the date hereof, Borrower shall:

(i)     deliver or cause to be delivered to the Administrative Agent opinions of counsel in the State of West Virginia reasonably acceptable to the Administrative Agent covering title to the Coal Properties and the Real Property acquired by Greenbrier Smokeless Coal Mining, L.L.C from Meadwestvaco Corporation pursuant to that certain Deed, dated as of July 19, 2005 and filed of record in Greenbrier County, West Virginia, which opinions shall be addressed to the Administrative Agent, as agent for the Lenders, and in form and substance reasonably acceptable to the Administrative Agent; and

(ii)     (x) deliver or cause to be delivered a Deposit Account Control Agreement (Operating Account) with respect to each account maintained for the benefit of any Loan Party at Branch Banking and Trust Company and City National Bank or (y) close all bank accounts maintained with Branch Banking and Trust Company and City National Bank, establish one or more checking accounts for the benefit of the Loan Parties with a bank reasonably acceptable to the Administrative Agent and deliver a Deposit Account Control Agreement (Operating Account) with respect to each such new account.

(b)     Borrower shall use its best efforts to deliver or cause to be delivered to the Administrative Agent on or prior to the date 30 days after the date hereof each of the following:

(i)     the Estoppel Certificate; and

(ii)     the written consent of Dofasco Inc. to the collateral assignment by Powhatan Mid-Vol Coal Sales, L.L.C. of all of its rights under and to the Dofasco Purchase Agreements to the Administrative Agent for the benefit of the Lenders, which consent shall be in form and substance reasonably acceptable to the Administrative Agent.

**ARTICLE VI**
**NEGATIVE COVENANTS**

Borrower hereby agrees that, so long as the Commitments remain in effect or any Loan or other amount is owing to any Lender or any Agent hereunder, Borrower shall not, and shall not permit any of its respective Subsidiaries to, directly or indirectly:

**6.1    Indebtedness.**  Create, incur, issue, assume, guaranty or suffer to exist any Indebtedness, except for the following (collectively, "*Permitted Indebtedness*"):

(a)     Indebtedness of any Loan Party under any Loan Document;

(b)     Indebtedness of Borrower to any Guarantor or of any Guarantor to Borrower or any other Guarantor;

(c)     Indebtedness under any Hedging Agreement approved by the Administrative Agent in accordance with Section 6.15;

(d)     Indebtedness of Borrower and its Subsidiaries (including Capital Lease Obligations other than Capital Lease Obligations incurred in connection with Permitted Sale and Leaseback Transactions) secured by Liens permitted by Section 6.2(j) in an aggregate principal amount not to exceed $50,000 at any one time outstanding;

(e)     Existing Indebtedness; and

(f)     Capital Lease Obligations incurred in connection with Permitted Sale and Leaseback Transactions.

**6.2**     **Liens.**  Create, incur, assume or suffer to exist any Lien upon any of its Property, whether now owned or hereafter acquired, except for the following (collectively, ***"Permitted Liens"***):

(a)     Liens for taxes not yet due or which are being contested in good faith by appropriate proceedings, *provided* that adequate reserves with respect thereto are maintained on the books of the applicable Loan Party, as the case may be, in conformity with GAAP;

(b)     carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business which are not overdue for a period of more than 30 days or that are being contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP shall have been set aside on its books;

(c)     Liens of landlords securing obligations to pay lease obligations that are not yet due and payable or in default;

(d)     pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation;

(e)     deposits (i) as required by any Governmental Authority in connection with obtaining any Permits in lieu of bonding or securing bonding provided to such Governmental Authority for such purpose or (ii) to secure performance of bids, trade contracts (other than for borrowed money), leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(f)     Liens and deposits now in existence and those hereafter made in connection with the Orix Documentation (including Liens arising with respect to additional equipment to be financed thereunder);

(g)     cash deposits in existence or hereafter paid by the Loan Parties to equipment manufacturers to secure purchases of equipment by the Loan Parties;

(h)     Liens arising from precautionary UCC financing statement filings regarding operating leases entered into in the ordinary course of business;

(i)     Liens created pursuant to the Security Documents; and

(j)     Liens on fixed or capital assets acquired, constructed or improved by Borrower or its Subsidiaries; *provided*, that (A) such Liens secure Indebtedness permitted under Section 6.1(d), (B)

such Liens and the Indebtedness secured thereby are incurred substantially simultaneously with the acquisition, construction or improvement of such fixed or capital assets, (C) such Liens do not at any time encumber any Property other than the Property financed by such Indebtedness and (D) the amount of Indebtedness secured thereby is not more than 100% of the purchase price.

   **6.3     Fundamental Changes**. Enter into any merger, consolidation, restructuring, reorganization or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), Dispose of all or substantially all of its Property or business or amend, modify or otherwise change its name, jurisdiction of organization, organizational number, identification number or FEIN, except that, if no Default shall have occurred and be continuing:

   (a)     any Subsidiary may be merged or consolidated with or into Borrower (*provided* that Borrower shall be the continuing or surviving entity) or with or into any other Guarantor;

   (b)     any Subsidiary may Dispose of any or all of its assets (upon voluntary liquidation or otherwise) to Borrower or any other Guarantor; and

   (c)     the Capital Stock of any Subsidiary may be transferred to Borrower or any other Guarantor.

   **6.4     Disposition of Property**. Dispose of any of its Property (including receivables and leasehold interests), whether now owned or hereafter acquired, or, in the case of any Subsidiary, issue or sell any shares of such Subsidiary's Capital Stock or, in the case of the Borrower, issue any shares of the Borrower's Capital Stock (including, in each case, pursuant to any merger, consolidation, recapitalization or other transaction) to any Person, except:

   (a)     subject to compliance with Section 2.7, the Disposition of assets for which Borrower receives consideration at the time of such Disposition at least equal to the fair market value of such assets and 90% of such consideration is in the form of cash;

   (b)     subject to compliance with Section 2.7, the Disposition of assets in the ordinary course of business which are no longer necessary or required in the conduct of such Loan Party's business;

   (c)     any Recovery Event; *provided* that the requirements of Section 2.7 are complied with in connection therewith;

   (d)     Dispositions of inventory in the ordinary course of business;

   (e)     the issuance of, or the issuance of Capital Stock of Borrower pursuant to the exercise of, any of the Warrants;

   (f)     Dispositions solely among the Loan Parties;

   (g)     any merger, consolidation, Disposition or transfer of Capital Stock specified in and permitted under clauses (a), (b) or (c) of Section 6.3;

   (h)     Permitted Sale and Leaseback Transactions; and

(i)    a sublease to Oxford Mining Company of rights under the applicable Coal Lease required for the surface operation by Oxford Mining Company of that certain Mine known as the Buck Lilly.

**6.5    Restricted Payments.**  Declare or pay any dividend on, or make any payment or distribution on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement, conversion into or other acquisition of, any Capital Stock of Borrower or any Subsidiary, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of Borrower or any Subsidiary; or enter into any derivatives or other transaction with any financial institution, commodities or stock exchange or clearinghouse (a *"Derivatives Counterparty"*) obligating Borrower or any Subsidiary to make payments to such Derivatives Counterparty as a result of any change in market value of any such Capital Stock; or make or offer to make any optional or voluntary payments, prepayment, repurchase or redemption of, or otherwise voluntarily or optionally defease, any Indebtedness (other than the Loans) or make any payment or prepayment of principal, premium (if any), interest, fees (including fees to obtain any waiver or consent) or other charges on, or redemption, purchase, retirement, defeasance, sinking fund or similar payment with respect to, any Indebtedness of Borrower or any Subsidiary (other than payments on account of the Obligations) (collectively, *"Restricted Payments"*), except that:

(a)    any Subsidiary may make Restricted Payments to Borrower or any Guarantor;

(b)    Borrower may issue Capital Stock upon exercise of any of the Warrants as described in Section 6.4(d);

(c)    any Loan Party may make regularly scheduled payments of principal and interest on any Permitted Indebtedness other than the Midland Debt; and

(d)    Borrower may make partial payments on the Midland Debt provided that (i) such payments do not exceed $600,000 in the aggregate, (ii) 100% of the proceeds of such prepayments are applied to secure Reclamation Bonds, surety bonds or certificates of deposit required to be posted by Midland Trail Resources, LLC under applicable Mining Law for Reclamation or otherwise and Midland has provided the Administrative Agent documentation or other information with respect to such use of proceeds satisfactory to the Administrative Agent, (iii) the Administrative Agent receives not less than five Business Days' written notice of such Restricted Payment and the proposed use therefor.

**6.6    Capital Expenditures.**  Permit the aggregate amount of all amounts paid or expenditures incurred or reasonably expected to be incurred to commence mining operations in the Greenbrier Mountain #1 Mine, the Mountain Pocahontas #1 Deep Mine, the Pocahontas #2 Mine and Mine 64A to exceed $80,000,000 in the aggregate.

**6.7    Investments.**  Make any advance, loan, extension of credit (by way of guaranty or otherwise) or capital contribution to, or purchase any Capital Stock, bonds, notes, debentures or other debt securities of, or any Property constituting an ongoing business from, or make any other investment in, any other Person (all of the foregoing, *"Investments"*), except:

(a)    extensions of trade credit in the ordinary course of business;

54

(b)     Investments in Cash Equivalents;

(c)     Investments by Borrower or any of its Subsidiaries in a Guarantor or Borrower;

(d)     Hedging Agreements permitted by Section 6.15;

(e)     with respect to deposits and pledges securing Permits, deposits of cash, certificates of deposit or other securities required by and acceptable to the applicable Governmental Authority;

(f)     subject to the provisions of Section 2.7(b), Qualified Investments made with the portion of any Reinvestment Deferred Amount; and

(g)     Investments received by Borrower or any Subsidiary in connection with workouts with, or bankruptcy, insolvency or other similar proceedings with respect to, customers, working interest owners, other industry partners or any other Person.

**6.8    New Subsidiaries**. Acquire, form, incorporate or organize any Subsidiary or permit to exist any Subsidiary (i) having any Capital Stock that is not owned by Borrower directly or through other Subsidiaries or (ii) that is not a Guarantor.

**6.9    Amendments to Certain Documents**. Amend, modify or otherwise change, or permit any amendment, modification or other change to (in either case, pursuant to a waiver or otherwise) (a) any Constituent Document or any other Transaction Document, including, by the filing or modification of any certificate of designation, or any agreement or arrangement entered into by it, with respect to any of its Capital Stock (including any shareholders' agreement), or enter into any new agreement with respect to any of its Capital Stock, except any such amendments, modifications or changes or any such new agreements or arrangements that do not adversely affect any right, privilege or interest of the Administrative Agent or the Lenders under the Loan Documents or any of the other Transaction Documents or in the Collateral, (b) any notes, agreement, instruments or other documents relating to the Existing Indebtedness, (c) any Material Agreement or (c) the Monarch Engagement Letter, as amended.

**6.10    Transactions with Affiliates**. Enter into any agreement or effect any transaction, including any purchase, sale, lease or exchange of Property, the rendering of any service or the payment of any management, advisory or similar fees, with any Affiliate (other than with any Loan Party) unless such transaction is (a) otherwise permitted under this Agreement, (b) in the ordinary course of business of the applicable Persons, and (c) upon fair and reasonable terms no less favorable to Borrower or any Subsidiary, as the case may be, than it would obtain in a comparable arm's length transaction with a Person that is not an Affiliate; *provided, however,* that no Loan Party shall make any payment to or enter into any agreement or otherwise effect any transaction with Midland Trail Resources LLC or Monarch Financial Corporation without the prior written consent of the Administrative Agent.

**6.11    Sales and Leaseback Transactions**. Enter into any Sale and Leaseback Transaction other than a Permitted Sale and Leaseback Transaction.

**6.12    Negative Pledge Clauses**. Enter into or suffer to exist or become effective any agreement that prohibits or limits the ability of any Loan Party to create, incur, assume or suffer to exist any Lien upon any of its Property or revenues, whether now owned or hereafter acquired, to

secure the Obligations or, in the case of any Guarantor, its obligations under the Guarantee and
Security Agreement, other than (a) pursuant to this Agreement and the other Loan Documents; (b)
in the case of Borrower or any of its Subsidiaries, any agreements governing any purchase money
Liens or Capital Lease Obligations otherwise permitted hereby (in which case, any prohibition or
limitation shall only be effective against the assets financed thereby); and (c) Liens granted in
connection with Hedging Agreements approved by the Administrative Agent in accordance with
Section 6.15; *provided*, that each such Lien permitted by this Section 6.12(c) is *pari passu* with the
Liens granted to the Secured Parties under the Loan Documents.

      **6.13**    **Restrictions on Subsidiary Distributions.** Enter into or suffer to exist or become
effective any consensual encumbrance or restriction on the ability of any Subsidiary to (a) make
Restricted Payments in respect of any Capital Stock of such Subsidiary held by, or pay any
Indebtedness owed to, any Loan Party, (b) make Investments in any Loan Party or (c) transfer any
of its assets to any Loan Party, except for such encumbrances or restrictions existing under or by
reason of any restrictions existing under the Loan Documents.

      **6.14**    **Lines of Business.** Enter into any business, either directly or through any
Subsidiary, except for those businesses in which the Loan Parties are engaged on the date of this
Agreement or disclosed to the Administrative Agent and the Lenders in writing prior to the date
hereof.

      **6.15**    **Hedging Agreements.** Enter into, or suffer to exist, any Hedging Agreement unless
approved in advance in writing by the Administrative Agent.

      **6.16**    **Changes in Fiscal Periods.** Permit the fiscal year of Borrower or any Subsidiary to
end on a day other than December 31 or change Borrower's method of determining its fiscal year.

      **6.17**    **Use of Proceeds.** Use or permit the use of all or any portion of the proceeds of the
Loans for any purpose other than Specified Expenditures or for prepayment in full of the Loans.

      **6.18**    **Bank Accounts.** Open or otherwise establish or, beginning on the date 30 days after
the date hereof, maintain any bank account in the name or otherwise for the benefit of Borrower or
any Subsidiary unless the Administrative Agent shall have received a Deposit Account Control
Agreement (Operating Account) with respect to such bank account.

      **6.19**    **Disqualified Stock.** Issue any Disqualified Stock.

## ARTICLE VII
## EVENTS OF DEFAULT

      If any of the following events shall occur and be continuing:

      (a)     Borrower shall fail to pay when due and payable or when declared due and payable
(in each case whether at the stated maturity, by acceleration or otherwise), including, pursuant to
Section 2.7, all or any portion of the Obligations (whether of principal, interest, fees and charges
due to the Lenders or other amounts constituting Obligations); or

      (b)     Any representation or warranty made or deemed made by any Loan Party herein or
in any other Transaction Document or that is contained in any certificate, document or financial or

other statement furnished by it at any time under or in connection with this Agreement or any such other Transaction Document shall prove to have been inaccurate in any material respect on or as of the date made or deemed made or furnished; or

(c)     Any Loan Party shall default in the observance or performance of any agreement contained in Sections 2.2(b), 5.5(a), 5.6(d), (e) or (f), 5.8(a), 5.10, 5.12, 5.13, 5.14 or Article VI, or any default under any Security Document shall have occurred and be continuing; or

(d)     Any Loan Party shall default in the observance or performance of any other agreement contained in this Agreement or any other Transaction Document (other than as provided in paragraphs (a) through (c) of this Article), and such default shall continue unremedied for a period of 20 days; or

(e)     Any Loan Party shall (i) default in making any payment of any principal of or interest on any Indebtedness (including any Guarantee Obligation, but excluding the Loans) beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness was created; or (ii) default in the observance or performance of any other agreement or condition relating to any Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto (including any Guarantee Obligation), or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or beneficiary of such Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, with the giving of notice if required, such Indebtedness to become due prior to its stated maturity or to become subject to a mandatory purchase offer by the obligor thereunder or (in the case of any such Indebtedness constituting a Guarantee Obligation) to become payable; *provided* that a default, event or condition described in clause (i) or (ii) of this paragraph (e) shall not at any time constitute an Event of Default unless, at such time, one or more defaults, events or conditions of the type described in clauses (i) and (ii) of this paragraph (e) shall have occurred and be continuing with respect to Indebtedness described in this paragraph (e), the outstanding principal amount of which exceeds in the aggregate $300,000; or

(f)     (i) Any Loan Party shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or such Loan Party shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against any Loan Party any case, proceeding or other action of a nature referred to in clause (i) above that (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of 60 days; or (iii) there shall be commenced against any Loan Party any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets that results in the entry of an order for any such relief that shall not have been vacated, discharged, or stayed or bonded pending appeal within 30 days from the entry thereof; or (iv) any Loan Party shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; or (v) any Loan Party shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due; or

57

(g)     (i) Any Person shall engage in any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Benefit Plan, (ii) any "accumulated funding deficiency" (as defined in Section 302 of ERISA), whether or not waived, shall exist with respect to any Benefit Plan, or any Lien in favor of the PBGC or a Benefit Plan shall arise on the assets of any Loan Party or any Commonly Controlled Entity, (iii) a Reportable Event shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Single Employer Plan, which Reportable Event or commencement of proceedings or appointment of a trustee is, in the reasonable opinion of the Required Lenders, likely to result in the termination of such Benefit Plan for purposes of Title IV of ERISA, (iv) any Single Employer Plan shall terminate for purposes of Title IV of ERISA, (v) any Loan Party or any Commonly Controlled Entity shall, or in the reasonable opinion of the Required Lenders shall be likely to, incur any liability in connection with a withdrawal from, or the Insolvency or Reorganization of, a Multiemployer Plan or (vi) any other event or condition shall occur or exist with respect to a Benefit Plan; and in each case in clauses (i) through (vi) above, such event or condition, together with all other such events or conditions, if any, could, in the sole judgment of the Required Lenders, reasonably be expected to have a Material Adverse Effect; or

(h)     One or more judgments or decrees shall be entered against any Loan Party involving, for the Loan Parties taken as a whole, a liability (not paid or fully covered by insurance as to which the relevant insurance company has acknowledged coverage) of $100,000 or more, and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within 30 days from the entry thereof; or

(i)     Any of the Security Documents shall cease, for any reason (other than by reason of the express release thereof pursuant to Section 9.15), to be in full force and effect, or any Loan Party or any Affiliate of any Loan Party shall so assert, or any Lien created by any of the Security Documents shall cease to be enforceable and of the same effect and priority purported to be created thereby; or

(j)     Any Guarantor shall fail to comply with any terms or provisions of any Guarantee and Security Agreement to which it is a party which failure is not remedied within five days after written notice from the Administrative Agent of such failure; any action shall be taken to discontinue or to assert the invalidity or unenforceability of any such guarantee; or any Guarantor shall deny that it has any further liability under any Guarantee and Security Agreement to which it is a party, or shall give notice to such effect; or

(k)     Any Loan Party shall be enjoined, restrained or in any way prevented by court order from continuing to conduct all or any material part of its business affairs; or

(l)     There shall occur a Material Adverse Change or any event or circumstance which would have a Material Adverse Effect; or

(m)     Any provision of any Transaction Document shall at any time for any reason by declared to be null and void, or the validity or enforceability thereof shall be contested by any Loan Party, or a proceeding shall be commenced by any Loan Party or by any Governmental Authority having jurisdiction over any Loan Party, seeking to establish the invalidity or unenforceability thereof, or any Loan Party shall deny that any Loan Party has any liability or obligation purported to be created under any Transaction Document; or

(n)     Any Change of Control shall occur; or

(o)     (i) (x) Any Material Agreement shall be terminated other than at the end of its term (end of primary term) or any other period of time provided for therein (end of any evergreen period); (y) default by any Person in the performance or observance of any term of any Material Agreement which is not cured within the applicable cure period specified in such Material Agreement, if such default results in any party to such Material Agreement being entitled to terminate such Material Agreement, to liquidated damages thereunder or to require the posting of any bond in connection therewith; or (z) any event or condition occurs or exists which in the reasonable opinion of the Administrative Agent is reasonably likely to have an adverse effect on the ability of any Loan Party or any counterparty to such Material Agreement to perform its obligations under a Material Agreement;

then, and in any such event, (A) if such event is an Event of Default specified in paragraph (f) above, automatically the Commitments shall immediately terminate and the Loans hereunder (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents shall immediately become due and payable, and (B) if such event is any other Event of Default, with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice to Borrower, declare that all or any portion of the Commitments to be terminated, whereupon the obligation of each Lender to make any Loan shall immediately terminate, or the Loans hereunder (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents to be due and payable forthwith, whereupon the same shall immediately become due and payable.

## ARTICLE VIII
## THE AGENTS

**8.1     Appointment**. Each Lender hereby irrevocably designates and appoints the Agents as the agents of such Lender under this Agreement and the other Loan Documents, and each Lender irrevocably authorizes each Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to such Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto. Notwithstanding any provision to the contrary elsewhere in this Agreement, no Agent shall have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against any Agent.

**8.2     Delegation of Duties**. Each Agent may execute any of its duties under this Agreement and the other Loan Documents by or through agents or attorneys in fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. No Agent shall be responsible for the negligence or misconduct of any agents or attorneys-in fact selected by it with reasonable care.

**8.3     Exculpatory Provisions**. Neither any Agent nor any of its officers, directors, employees, agents, attorneys in fact or Affiliates shall be (a) liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other

Loan Document (except to the extent that any of the foregoing are found by a final and
nonappealable decision of a court of competent jurisdiction to have resulted from its or such
Person's own gross negligence or willful misconduct) or (b) responsible in any manner to any of the
Lenders for any recitals, statements, representations or warranties made by any Loan Party or any
officer thereof contained in this Agreement or any other Loan Document or in any certificate,
report, statement or other document referred to or provided for in, or received by the Agents under
or in connection with, this Agreement or any other Loan Document or for the value, validity,
effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan
Document or for any failure of any Loan Party to perform its obligations hereunder or thereunder.
The Agents shall not be under any obligation to any Lender to ascertain or to inquire as to the
observance or performance of any of the agreements contained in, or conditions of, this Agreement
or any other Loan Document, or to inspect the properties, books or records of any Loan Party.

   **8.4** **Reliance by Agents.** Each Agent shall be entitled to rely, and shall be fully
protected in relying, upon any instrument, writing, resolution, notice, consent, certificate, affidavit,
letter, telecopy, telex or teletype message, statement, order or other document or conversation
believed by it to be genuine and correct and to have been signed, sent or made by the proper Person
or Persons and upon advice and statements of legal counsel (including counsel to the Loan Parties),
independent accountants and other experts selected by such Agent. The Agents may deem and treat
the payee of any Note as the owner thereof for all purposes unless such Note shall have been
transferred in accordance with Section 9.6 and all actions required by such Section in connection
with such transfer shall have been taken. Each Agent shall be fully justified in failing or refusing to
take any action under this Agreement or any other Loan Document unless it shall first receive such
advice or concurrence of the Required Lenders (or, if so specified by this Agreement, all Lenders or
any other instructing group of Lenders specified by this Agreement) as it deems appropriate or it
shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense
that may be incurred by it by reason of taking or continuing to take any such action. Each Agent
shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and
the other Loan Documents in accordance with a request of the Required Lenders (or, if so specified
by this Agreement, all Lenders or any other instructing group of Lenders specified by this
Agreement), and such request and any action taken or failure to act pursuant thereto shall be binding
upon all the Lenders and all future holders of the Loans.

   **8.5** **Notice of Default.** No Agent shall be deemed to have knowledge or notice of the
occurrence of any Default or Event of Default hereunder unless such Agent shall have received
notice from a Lender or Borrower referring to this Agreement, describing such Default or Event of
Default and stating that such notice is a "notice of default". In the event that the Administrative
Agent shall receive such a notice of default, the Administrative Agent shall give notice thereof to
the Lenders. The Administrative Agent shall take such action with respect to such Default or Event
of Default as shall be reasonably directed by the Required Lenders (or, if so specified by this
Agreement, all Lenders or any other instructing group of Lenders specified by this Agreement);
*provided* that unless and until the Administrative Agent shall have received such directions, the
Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking
such action, with respect to such Default or Event of Default as it shall deem advisable in the best
interests of the Lenders.

   **8.6** **Non Reliance on Agents and Other Lenders.** Each Lender expressly
acknowledges that neither any of the Agents nor any of their respective officers, directors,

employees, agents, attorneys in fact or Affiliates have made any representations or warranties to it and that no act by any Agent hereafter taken, including any review of the affairs of a Loan Party or any Affiliate of a Loan Party, shall be deemed to constitute any representation or warranty by any Agent to any Lender. Each Lender represents to the Agents that it has, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their Affiliates and made its own decision to make its Loans hereunder and enter into this Agreement. Each Lender also represents that it will, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their Affiliates. Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder, no Agent shall have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of any Loan Party or any Affiliate of a Loan Party that may come into the possession of such Agent or any of its officers, directors, employees, agents, attorneys in fact or Affiliates.

8.7    **Indemnification**. The Lenders agree to indemnify each Agent in its capacity as such (to the extent not reimbursed by Borrower and without limiting the obligation of Borrower to do so), ratably according to their respective Aggregate Exposure Percentages in effect on the date on which indemnification is sought under this Section 8.7 (or, if indemnification is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with such Aggregate Exposure Percentages immediately prior to such date), for, and to save each Agent harmless from and against, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever including attorneys' fees and consultants' fees that may at any time (including, without limitation, at any time following the payment of the Loans) be imposed on, incurred by or asserted against such Agent in any way relating to or arising out of, the Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent under or in connection with any of the foregoing, including liability under Environmental Laws; *provided* that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from such Agent's gross negligence or willful misconduct. The agreements in this Section 8.7 shall survive the payment of the Loans and all other amounts payable hereunder.

8.8    **Agent in Its Individual Capacity**. Each Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with any Loan Party as though such Agent were not an Agent. With respect to its Loans made or renewed by it, each Agent shall have the same rights and powers under this Agreement and the other Loan Documents as any Lender and may exercise the same as though it were not an Agent, and the terms "Lender" and "Lenders" shall include each Agent in its individual capacity.

**8.9    Successor Administrative Agent**. The Administrative Agent may resign as Administrative Agent upon ten days' notice to the Lenders and Borrower.  If the Administrative Agent shall resign as Administrative Agent under this Agreement and the other Loan Documents, then the Required Lenders shall appoint from among the Lenders a successor agent for the Lenders, which successor agent shall (unless an Event of Default with respect to Borrower shall have occurred and be continuing) be subject to approval by Borrower (which approval shall not be unreasonably withheld, conditioned or delayed), whereupon such successor agent shall succeed to the rights, powers and duties of the Administrative Agent, and the term "***Administrative Agent***" shall mean such successor agent effective upon such appointment and approval, and the former Administrative Agent's rights, powers and duties as Administrative Agent shall be terminated, without any other or further act or deed on the part of such former Administrative Agent or any of the parties to this Agreement or any holders of the Loans.  If no successor agent has accepted appointment as Administrative Agent by the date that is ten days following a retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective, and the Lenders shall assume and perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above. The Syndication Agent may, at any time, by notice to the Lenders and the Administrative Agent, resign as Syndication Agent hereunder, whereupon the duties, rights, obligations and responsibilities of the Syndication Agent hereunder shall automatically be assumed by, and inure to the benefit of, the Administrative Agent, without any further act by the Syndication Agent, the Administrative Agent or any Lender. After any retiring Agent's resignation as Agent, the provisions of this Article VIII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was an Agent under this Agreement and the other Loan Documents.

**8.10    Authorization to Release Liens and Guarantees**. The Administrative Agent is hereby irrevocably authorized by each of the Lenders to effect any release, or cause the release, of Liens or guarantee obligations contemplated by Section 9.15.  If requested by the Loan Parties, the Administrative Agent shall provide the Loan Parties with reasonable assurances that the Excluded Property is not subject to a Lien in favor of the Lenders.

**8.11    The Arranger; the Syndication Agent**. Neither the Arranger nor the Syndication Agent, in their respective capacities as such, shall have any duties or responsibilities, or shall incur any liability, under this Agreement and the other Loan Documents.

**ARTICLE IX
MISCELLANEOUS**

**9.1    Amendments and Waivers**. Neither this Agreement nor any other Loan Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this Section 9.1. The Required Lenders and each Loan Party to the relevant Loan Document may, or (with the written consent of the Required Lenders) the Administrative Agent and each Loan Party to the relevant Loan Document may, from time to time, (a) enter into written amendments, supplements or modifications hereto and to the other Loan Documents (including amendments and restatements hereof or thereof) for the purpose of adding any provisions to this Agreement or the other Loan Documents or changing in any manner the rights of the Lenders or of the Loan Parties hereunder or thereunder or (b) waive, on such terms and conditions as may be specified in the instrument of waiver, any of the requirements of this Agreement or the other Loan

Documents or any Default or Event of Default and its consequences; *provided* that no such waiver and no such amendment, supplement or modification shall:

(a)     forgive the principal amount or extend the final scheduled date of maturity of any Loan, reduce the stated rate of any interest or fee payable hereunder or extend the scheduled date of any payment thereof, or increase the amount or extend the stated expiration date of any Commitment of any Lender, in each case without the consent of each Lender directly affected thereby;

(b)     amend, modify or waive any provision of this Section 9.1, consent to the assignment or transfer by Borrower of any of its rights and obligations under this Agreement and the other Loan Documents, permit the release of all or substantially all of the Collateral or the release all or substantially all of the Guarantors from their Guarantee Obligations under the Guarantee and Security Agreement, in each case without the consent of all Lenders (except as permitted by Section 9.15);

(c)     reduce the percentage specified in the definition of Required Lenders without the written consent of all Lenders;

(d)     amend, modify or waive any provision of Article VIII without the consent of each Agent directly affected thereby; or

(e)     amend, modify or waive any provision of Section 2.9 without the consent of each Lender directly affected thereby.

Any such waiver and any such amendment, supplement or modification shall apply equally to each of the Lenders and shall be binding upon the Loan Parties, the Lenders, the Agents and all future holders of the Loans. In the case of any waiver, the Loan Parties, the Lenders and the Agents shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon. Any such waiver, amendment, supplement or modification shall be effected by a written instrument signed by the parties required to sign pursuant to the foregoing provisions of this Section 9.1; *provided* that delivery of an executed signature page of any such instrument by facsimile transmission shall be effective as delivery of a manually executed counterpart thereof.

9.2     **Notices.**  All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered, or three Business Days after being deposited in the mail, postage prepaid, or, in the case of telecopy notice, when received, addressed (a) to Borrower at the address set forth below, (b) in the case of the Agents, to the Administrative Agent at the address set forth below, (c) in the case of the Lenders, at the address set forth on Schedule 1 or, in the case of a Lender which becomes a party to this Agreement pursuant to an Assignment and Acceptance, in such Assignment and Acceptance or (d) in the case of any party, to such other address as such party may hereafter notify to the other parties hereto:

| | |
|---|---|
| Borrower: | Greenbrier Minerals, LLC<br>P.O. Box G<br>Rupert, West Virginia 25984<br>Attention: Joseph C. Turley, III<br>Facsimile: (304) 392-9000 |
| With a copy to: | Buchanan Ingersoll, PC<br>301 Grant Street One Oxford Centre<br>20th Floor<br>Pittsburgh, Pennsylvania 15219<br>Attention: Donald E. Malecki<br>Facsimile: (412) 562-1041 |
| Administrative Agent: | Lehman Commercial Paper Inc.<br>745 Seventh Avenue<br>New York, New York 10019<br>Attention: Michelle Rosolinsky<br>Facsimile: (646) 758-5015 |
| with a copy to: | Lehman Brothers Inc.<br>600 Travis Street, Suite 7200<br>Houston, Texas 77002<br>Attention: J. Robert Chambers<br>Facsimile: (713) 236-3912 |
| with a copy to: | Akin Gump Strauss Hauer & Feld LLP<br>1111 Louisiana Street, Suite 4400<br>Houston, Texas 77002<br>Attention: J. Michael Chambers<br>Facsimile: (713) 236-0822 |

*provided* that any notice, request or demand to or upon the any Agent or any Lender shall not be effective until received.

**9.3** **No Waiver; Cumulative Remedies**. No failure to exercise and no delay in exercising, on the part of any Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

**9.4** **Survival of Representations and Warranties**. All representations and warranties made herein, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans and other extensions of credit hereunder.

**9.5    Payment of Expenses**.  Borrower agrees (a) to pay or reimburse the Agents and the
Arranger for all their reasonable out-of-pocket costs and expenses incurred in connection with the
syndication of the Loans and the development, preparation and execution of, and any amendment,
supplement or modification to, this Agreement and the other Transaction Documents and any other
documents prepared in connection herewith or therewith, and the consummation and administration
of the transactions contemplated hereby and thereby, including the reasonable fees and
disbursements and other charges of counsel and consultants to the Administrative Agent and the
charges of Intralinks, (b) to pay or reimburse each Lender and the Agents for all their out-of-pocket
costs and expenses incurred in connection with the enforcement or preservation of any rights under
this Agreement, the other Transaction Documents and any other documents prepared in connection
herewith or therewith, including the fees and disbursements of counsel to each Lender and of
counsel to the Agents, (c) to pay, indemnify, or reimburse each Lender, the Arranger and the Agents
for, and hold each Lender, the Arranger and the Agents harmless from, any and all recording and
filing fees and any and all liabilities with respect to, or resulting from any delay in paying, stamp,
excise and other taxes, if any, which may be payable or determined to be payable in connection with
the execution and delivery of, or consummation or administration of any of the transactions
contemplated by, or any amendment, supplement or modification of, or any waiver or consent under
or in respect of, this Agreement, the other Transaction Documents and any such other documents,
and (d) TO PAY, INDEMNIFY OR REIMBURSE EACH LENDER, THE ARRANGER, EACH
AGENT, THEIR RESPECTIVE AFFILIATES, AND THEIR RESPECTIVE OFFICERS,
DIRECTORS, TRUSTEES, EMPLOYEES, ADVISORS, AGENTS AND CONTROLLING
PERSONS (EACH, AN "*INDEMNITEE*") FOR, AND HOLD EACH INDEMNITEE
HARMLESS FROM AND AGAINST ANY AND ALL OTHER LIABILITIES, OBLIGATIONS,
LOSSES, DAMAGES, PENALTIES, ACTIONS, JUDGMENTS, SUITS, COSTS, EXPENSES OR
DISBURSEMENTS OF ANY KIND OR NATURE WHATSOEVER WITH RESPECT TO THE
EXECUTION, DELIVERY, ENFORCEMENT PERFORMANCE AND ADMINISTRATION OF
THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS AND ANY SUCH OTHER
DOCUMENTS, INCLUDING ANY OF THE FOREGOING RELATING TO THE USE OF
PROCEEDS OF THE LOANS OR THE VIOLATION OF, NONCOMPLIANCE WITH OR
LIABILITY UNDER, ANY ENVIRONMENTAL LAW APPLICABLE TO THE OWNERSHIP
OF OR OPERATIONS OF THE BORROWER OR ANY OF ITS SUBSIDIARIES OR RELATED
TO ANY OF THE PROPERTIES OR THE USE BY UNAUTHORIZED PERSONS OF
INFORMATION OR OTHER MATERIALS SENT THROUGH ELECTRONIC,
TELECOMMUNICATIONS OR OTHER INFORMATION TRANSMISSION SYSTEMS THAT
ARE INTERCEPTED BY SUCH PERSONS AND THE FEES AND DISBURSEMENTS AND
OTHER CHARGES OF LEGAL COUNSEL IN CONNECTION WITH CLAIMS, ACTIONS OR
PROCEEDINGS BY ANY INDEMNITEE AGAINST THEM HEREUNDER (ALL THE
FOREGOING IN THIS CLAUSE (D), COLLECTIVELY, THE "*INDEMNIFIED
LIABILITIES*"), *PROVIDED* THAT THE BORROWER SHALL HAVE NO OBLIGATION
HEREUNDER TO ANY INDEMNITEE WITH RESPECT TO INDEMNIFIED LIABILITIES TO
THE EXTENT SUCH INDEMNIFIED LIABILITIES ARE FOUND BY A FINAL AND
NONAPPEALABLE DECISION OF A COURT OF COMPETENT JURISDICTION TO HAVE
RESULTED FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH
INDEMNITEE. No Indemnitee shall be liable for any damages arising from the use by
unauthorized persons of information or other materials sent through electronic, telecommunications
or other information transmission systems that are intercepted by such persons or for any special,
indirect, consequential or punitive damages in connection with the Loans. Without limiting the
foregoing, and to the extent permitted by applicable law, the Loan Parties agree not to assert and to

65

cause their respective Subsidiaries not to assert, and hereby waive and agree to cause their respective Subsidiaries so to waive, all rights for contribution or any other rights of recovery with respect to all claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature, under or related to Environmental Laws, that any of them might have by statute or otherwise against any Indemnitee. All amounts due under this Section 9.5 shall be payable not later than ten days after written demand therefore. Statements payable by Borrower pursuant to this Section 9.5 shall be submitted to Borrower to the attention of the Person specified in the address of Borrower set forth in Section 9.2, or to such other Person or address as may be hereafter designated by Borrower in a notice to the Administrative Agent. The agreements in this Section 9.5 shall survive repayment of the Loans and all other amounts payable hereunder.

### 9.6    Successors and Assigns; Participations and Assignments.

(a)    This Agreement shall be binding upon, and inure to the benefit of, Borrower, the Lenders, the Agents, all future holders of the Loans and their respective successors and assigns, except that Borrower may not assign or transfer any of its rights or obligations under this Agreement without the prior written consent of the Agents and each Lender.

(b)    Any Lender may, without the consent of any Loan Party, in accordance with applicable law, at any time sell to one or more banks, financial institutions or other entities (each, a "*Participant*") participating interests in any Loan owing to such Lender, any Commitment of such Lender or any other interest of such Lender hereunder and under the other Loan Documents; *provided* that each such sale shall include an aggregate principal amount of not less than $5,000,000; and *provided further* that no such sale shall result in a Lender holding less than $5,000,000 in aggregate principal amount of the Loans (other than in the case of a sale of all of a Lender's interests under this Agreement). In the event of any such sale by a Lender of a participating interest to a Participant, such Lender's obligations under this Agreement to the other parties to this Agreement shall remain unchanged, such Lender shall remain solely responsible for the performance thereof, such Lender shall remain the holder of any such Loan for all purposes under this Agreement and the other Loan Documents, and Borrower and the Agents shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and the other Loan Documents. In no event shall any Participant under any such participation have any right to approve any amendment or waiver of any provision of any Loan Document, or any consent to any departure by any Loan Party therefrom, except to the extent that such amendment, waiver or consent would require the consent of all Lenders pursuant to Section 9.1. Borrower agrees that if amounts outstanding under this Agreement and the Loans are due or unpaid, or shall have been declared or shall have become due and payable upon the occurrence of an Event of Default, each Participant shall, to the maximum extent permitted by applicable law, be deemed to have the right of setoff in respect of its participating interest in amounts owing under this Agreement to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement, *provided* that, in purchasing such participating interest, such Participant shall be deemed to have agreed to share with the Lenders the proceeds thereof as provided in Section 9.7(a) as fully as if such Participant were a Lender hereunder. Borrower also agrees that each Participant shall be entitled to the benefits of Sections 2.10, 2.11 and 2.12 with respect to its participation in the Commitments and the Loans outstanding from time to time as if such Participant were a Lender; *provided* that, in the case of Section 2.11, such Participant shall have complied with the requirements thereof, and *provided further* that no Participant shall be entitled to receive any greater amount pursuant to any such Section than the transferor Lender

would have been entitled to receive in respect of the amount of the participation transferred by such transferor Lender to such Participant had no such transfer occurred.

(c)     Any Lender (an "*Assignor*") may, without the consent of any Loan Party, in accordance with applicable law and upon written notice to the Administrative Agent, at any time and from time to time assign to any Lender or any Affiliate, Related Fund or Control Investment Affiliate thereof or, except if the Assignor is the Administrative Agent, with the consent of the Administrative Agent (which, in each case, shall not be unreasonably withheld, conditioned or delayed), to an additional bank, financial institution or other entity (an "*Assignee*") all or any part of its rights and obligations under this Agreement pursuant to an Assignment and Acceptance, substantially in the form of Exhibit I (an "*Assignment and Acceptance*"), executed by such Assignee, such Assignor and, where the consent of the Administrative Agent is required pursuant to the foregoing provisions, by the Administrative Agent, and delivered to the Administrative Agent for its acceptance and recording in the Register; *provided* that (i) each such assignment to an Assignee (other than any Lender or any Affiliate thereof) shall include an assignment of not less than $5,000,000 in aggregate principal amount and (ii) no such assignment shall result in an Assignor holding less than $5,000,000 in aggregate principal amount of the Loans (other than in the case of an assignment of all of a Lender's interests under this Agreement). Upon such execution, delivery, acceptance and recording, from and after the effective date determined pursuant to such Assignment and Acceptance, (x) the Assignee thereunder shall be a party hereto and, to the extent provided in such Assignment and Acceptance, have the rights and obligations of a Lender hereunder with Commitments or Loans as set forth therein, and (y) the Assignor thereunder shall, to the extent provided in such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of an Assignor's rights and obligations under this Agreement, such Assignor shall cease to be a party hereto, except as to Sections 2.10, 2.11 and 9.5 in respect of the period prior to such effective date). For purposes of the minimum assignment amounts set forth in this Section 9.6(c), multiple assignments by two or more Related Funds shall be aggregated.

(d)     The Administrative Agent shall, on behalf of Borrower, maintain at its address referred to in Section 9.2 a copy of each Assignment and Acceptance delivered to it and a register (the "*Register*") for the recordation of the names and addresses of the Lenders and the Commitment of, and principal amount of the Loans owing to each Lender from time to time. The entries in the Register shall be conclusive, in the absence of manifest error, and Borrower, each Agent and the Lenders shall treat each Person whose name is recorded in the Register as the owner of the Loans and any Note evidencing such Loans recorded therein for all purposes of this Agreement. Any assignment of any Loan, whether or not evidenced by a Note, shall be effective only upon appropriate entries with respect thereto being made in the Register (and each Note, if any, shall expressly so provide). Any assignment or transfer of all or part of a Loan evidenced by a Note shall be registered in the Register only upon surrender for registration of assignment or transfer of the Note evidencing such Loan, accompanied by a duly executed Assignment and Acceptance; thereupon one or more new Notes in the same aggregate principal amount shall be issued to the designated Assignee, and the old Notes shall be returned by the Administrative Agent to Borrower marked "canceled". The Register shall be available for inspection by Borrower or any Lender (with respect to any entry relating to such Lender's Loans) at any reasonable time and from time to time upon reasonable prior notice.

(e)      Upon its receipt of an Assignment and Acceptance executed by an Assignor and an
Assignee (and, in any case where the consent of any other Person is required by Section 9.6(c), by
each such other Person) together with payment by the Assignor or Assignee (as they may decide) to
the Administrative Agent of a registration and processing fee of $3,500 (treating multiple,
simultaneous assignments by or to two or more Related Funds as a single assignment) (except that
no such registration and processing fee shall be payable (i) in connection with an assignment by or
to a Lehman Entity or (ii) in the case of an Assignee which is already a Lender or is an Affiliate or
Related Fund of a Lender or a Person under common management with a Lender), the
Administrative Agent shall (x) promptly accept such Assignment and Acceptance and (y) on the
effective date determined pursuant thereto record the information contained therein in the Register
and give notice of such acceptance and recordation to Borrower. On or prior to such effective date,
Borrower, at its own expense, upon request, shall execute and deliver to the Administrative Agent
(in exchange for the applicable Note, if any, of the assigning Lender) a new Note to the order of
such Assignee in an amount equal to the Loan assumed or acquired by it pursuant to such
Assignment and Acceptance and, if the Assignor has retained any Loans, as the case may be, upon
request, a new Note to the order of the Assignor in an amount equal to the Loans retained by it
hereunder. Such new Note shall be dated the Closing Date and shall otherwise be in the form of the
Note replaced thereby.

(f)      For avoidance of doubt, the parties to this Agreement acknowledge that the
provisions of this Section concerning assignments of Loans and Notes relate only to absolute
assignments and that such provisions do not prohibit assignments creating security interests in
Loans and Notes, including any pledge or assignment by a Lender of any Loan or Note to any
Federal Reserve Bank in accordance with applicable law.

(g)      Notwithstanding anything to the contrary contained herein, any Lender (a "***Granting
Lender***") may grant to a special purpose funding vehicle (an "***SPC***"), identified as such in writing
from time to time by the Granting Lender to the Administrative Agent and Borrower, the option to
provide to Borrower all or any part of any Loan that such Granting Lender would otherwise be
obligated to make to Borrower pursuant to this Agreement; *provided* that (i) nothing herein shall
constitute a commitment by any SPC to make any Loan and (ii) if an SPC elects not to exercise
such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be
obligated to make such Loan pursuant to the terms hereof. The making of a Loan by an SPC
hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such
Loan were made by such Granting Lender. Each party hereto hereby agrees that no SPC shall be
liable for any indemnity or similar payment obligation under this Agreement (all liability for which
shall remain with the Granting Lender). In furtherance of the foregoing, each party hereto agrees
(which agreement shall survive the termination of this Agreement) that, prior to the date that is one
year and one day after the payment in full of all outstanding commercial paper or other
indebtedness of any SPC, it will not institute against, or join any other person in instituting against,
such SPC any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under
the laws of the United States or any state thereof. In addition, notwithstanding anything to the
contrary in this Section 9.6(g), any SPC may (x) with notice to, but without the prior written
consent of, Borrower and the Administrative Agent and without paying any processing fee
therefore, assign all or a portion of its interests in any Loans to the Granting Lender, or with the
prior written consent of Borrower and the Administrative Agent (which consent shall not be
unreasonably withheld), to any financial institutions providing liquidity or credit support to or for
the account of such SPC to support the funding or maintenance of Loans, and (y) disclose on a

confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPC; *provided* that non-public information with respect to Borrower may be disclosed only with Borrower's consent, which will not be unreasonably withheld, conditioned or delayed. This Section 9.6(g) may not be amended without the written consent of any SPC with Loans outstanding at the time of such proposed amendment.

9.7    **Adjustments; Set off.**

(a)    Except to the extent that this Agreement provides for payments to be allocated to a particular Lender, if any Lender (a "***Benefited Lender***") shall at any time receive any payment of all or part of the Obligations owing to it, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set off, pursuant to events or proceedings of the nature referred to in Article VII(f), or otherwise), in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of such other Lender's Obligations, such Benefited Lender shall purchase for cash from the other Lenders a participating interest in such portion of each such other Lender's Obligations, or shall provide such other Lenders with the benefits of any such collateral, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such collateral ratably with each of the Lenders; *provided* that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest.

(b)    In addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right, without prior notice to Borrower, any such notice being expressly waived by such parties to the extent permitted by applicable law, upon any amount becoming due and payable by Borrower hereunder (whether at the stated maturity, by acceleration or otherwise), to set off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch or agency thereof to or for the credit or the account of Borrower. Each Lender agrees promptly to notify Borrower and the Administrative Agent after any such setoff and application made by such Lender, *provided* that the failure to give such notice shall not affect the validity of such setoff and application.

9.8    **Counterparts**. This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Agreement by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof. A set of the copies of this Agreement signed by all the parties shall be lodged with Borrower and the Administrative Agent.

9.9    **Severability**. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

9.10   **Integration**. This Agreement and the other Transaction Documents represent the entire agreement of Borrower, the Agents, the Arranger and the Lenders with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Arranger, any Agent or any Lender relative to the subject matter hereof not expressly set forth or referred to herein or in the other Transaction Documents.

9.11   **GOVERNING LAW**. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

9.12   **Submission To Jurisdiction; Waivers**. Borrower hereby knowingly, voluntarily and intentionally irrevocably and unconditionally:

(a)     submits for itself and its Property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party (whether for claims sounding in contract or in tort), or for recognition and enforcement of any judgment in respect thereof, to the non exclusive general jurisdiction of the courts of the State of New York, the courts of the United States of America for the Southern District of New York, and appellate courts from any thereof;

(b)     consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)     agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to Borrower at its address set forth in Section 9.2 or at such other address of which the Administrative Agent shall have been notified pursuant thereto;

(d)     agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction; and

(e)     WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY LEGAL ACTION OR PROCEEDING REFERRED TO IN THIS SECTION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES.

9.13   **Acknowledgments**. Borrower hereby acknowledges that:

(a)     it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)     neither the Arranger, any Agent nor any Lender has any fiduciary relationship with or duty to Borrower arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Arranger, the Agents and the Lenders, on the one hand, and Borrower, on the other hand, in connection herewith or therewith is solely that of creditor and debtor; and

(c)     no joint venture is created hereby or by the other Transaction Documents or otherwise exists by virtue of the transactions contemplated hereby among the Arranger, the Agents and the Lenders or among Borrower and the Lenders.

**9.14     Confidentiality**. Each of the Agents and the Lenders agrees to keep confidential all non-public information provided to it by any Loan Party pursuant to this Agreement that is designated by such Loan Party as confidential; *provided* that nothing herein shall prevent any Agent or any Lender from disclosing any such information (a) to the Arranger, any Agent, any other Lender or any Affiliate of any thereof, (b) to any Participant or Assignee (each, a "***Transferee***") or prospective Transferee that agrees to comply with the provisions of this Section 9.14 or substantially equivalent provisions, (c) to any of its employees, directors, agents, attorneys, accountants and other professional advisors, (d) to any financial institution that is a direct or indirect contractual counterparty in swap agreements or such contractual counterparty's professional advisor (so long as such contractual counterparty or professional advisor to such contractual counterparty agrees to be bound by the provisions of this Section 9.14), (e) upon the request or demand of any Governmental Authority having jurisdiction over it, (f) in response to any order of any court or other Governmental Authority or as may otherwise be required pursuant to any Requirement of Law, (g) in connection with any litigation or similar proceeding, (h) that has been publicly disclosed other than in breach of this Section 9.14, (i) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized statistical organization that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender or (j) in connection with the exercise of any remedy hereunder or under any other Transaction Document.  Notwithstanding anything in this Agreement to the contrary, the Agents and each Lender may disclose without limitation of any kind, any information with respect to the "tax treatment" and "tax structure" (in each case, within the meaning of Treasury Regulation Section 1.6011-4) of the transactions contemplated hereby and all materials of any kind (including opinions or other tax analyses) that are provided to the Agents or such Lender relating to such tax treatment and tax structure; *provided* that, with respect to any document or similar item that in either case contains information concerning the tax treatment or tax structure of the transaction as well as other information, this sentence shall only apply to such portions of the document or similar item that relate to the tax treatment or tax structure of the Loans and transactions contemplated hereby.

**9.15     Release of Collateral and Guarantee Obligations**.

(a)     Notwithstanding anything to the contrary contained herein or in any other Loan Document, upon request of Borrower in connection with any Disposition of Property permitted by the Loan Documents, the Administrative Agent shall (without notice to, or vote or consent of, any Lender or any Lender or affiliate) take such actions as shall be required to release (i) its Liens on any Collateral being Disposed of in such Disposition and (ii) any Guarantee Obligations under any Loan Document of any Person being Disposed of in such Disposition to the extent necessary to permit consummation of such Disposition in accordance with the Loan Documents.

(b)     Notwithstanding anything to the contrary contained herein or any other Loan Document, when all Obligations (other than Obligations which by the terms hereof survive termination of this Agreement) have been paid in full, all Commitments have terminated or expired, upon request of Borrower, the Administrative Agent shall (without notice to, or vote or consent of, any Lender) take such actions as shall be required to release its Liens on, or cause the

Administrative Agent to release its Liens on, all Collateral and to release (or to cause the release of) all Guarantee Obligations under any Loan Document. Any such release of Guarantee Obligations shall be deemed subject to the provision that such Guarantee Obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, Borrower or any Guarantor or any substantial part of its Property, or otherwise, all as though such payment had not been made.

      **9.16    Accounting Changes.** In the event that any "Accounting Change" (as defined below) shall occur and such change results in a change in the method of calculation of financial covenants, standards or terms in this Agreement, then Borrower and the Administrative Agent agree to enter into negotiations in order to amend such provisions of this Agreement so as to equitably reflect such Accounting Change with the desired result that the criteria for evaluating Borrower's financial condition shall be the same after such Accounting Change as if such Accounting Change had not been made. Until such time as such an amendment shall have been executed and delivered by Borrower, the Administrative Agent and the Required Lenders, all financial covenants, standards and terms in this Agreement shall continue to be calculated or construed as if such Accounting Change had not occurred. For purposes of this Agreement, "*Accounting Change*" refers to any change in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants or, if applicable, the SEC.

      **9.17    WAIVERS OF JURY TRIAL.** THE BORROWER, THE AGENTS AND THE LENDERS HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN (IN EACH CASE, WHETHER FOR CLAIMS SOUNDING IN CONTRACT OR IN TORT).

      **9.18    Customer Identification – USA PATRIOT Act Notice.** The Administrative Agent (for itself and not on behalf of any other party), the Syndication Agent (for itself and not on behalf of any other party) and each Lender hereby notifies the Loan Parties that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56, signed into law October 26, 2001 (the "*Act*"), it is required to obtain, verify and record information that identifies the Loan Parties, which information includes the name and address of the Loan Parties and other information that will allow the Administrative Agent, the Syndication Agent or such Lender, as applicable, to identify the Loan Parties in accordance with the Act.

*[Signature Page to Follow]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

GREENBRIER MINERALS, LLC, as Borrower

By: _____
Joseph C. Turley, III
President & Treasurer

LEHMAN BROTHERS INC., as Arranger

By: _____
J. Robert Chambers
Managing Director

LEHMAN COMMERCIAL PAPER INC.,
as Administrative Agent, Syndication Agent
and as a Lender

By: _____
J. Robert Chambers
Authorized Signatory

[Signature Page]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

GREENBRIER MINERALS, LLC, as Borrower

By: _____
    Name:
    Title:

LEHMAN BROTHERS INC., as Arranger

By: _____
    J. Robert Chambers
    Managing Director

LEHMAN COMMERCIAL PAPER INC.,
as Administrative Agent, Syndication Agent
and as a Lender

By: _____
    J. Robert Chambers
    Authorized Signatory

[Signature Page]