**<u>EXHIBIT B</u>**

EXECUTION VERSION

$94,000,000

# AMENDED AND RESTATED CREDIT AGREEMENT

among

## GREENBRIER MINERALS, LLC,

as Borrower,

**The Several Lenders
from Time to Time Parties Hereto,**

## LEHMAN BROTHERS INC.,

as Arranger

## LEHMAN COMMERCIAL PAPER INC.,
as Syndication Agent

and

## LEHMAN COMMERCIAL PAPER INC.,
as Administrative Agent

**Dated as of May 1, 2007**

TABLE OF CONTENTS

Page

ARTICLE I. DEFINITIONS ...................................................................................2

    1.1    Defined Terms ............................................................................2
    1.2    Other Definitional Provisions ...................................................31
    1.3    Computation of Time Periods ..................................................32

ARTICLE II. AMOUNTS, TERMS AND REPAYMENT OF LOANS AND
COMMITMENTS..............................................................................32

    2.1    Term Loan Commitments........................................................32
    2.2    Repayment of Term Loans.......................................................32
    2.3    Revolving Credit Commitments ...............................................33
    2.4    Procedures for Borrowings......................................................33
    2.5    Repayment of Loans; Evidence of Debt ..................................33
    2.6    Fees .........................................................................................34
    2.7    Termination or Reduction of Commitments.............................35
    2.8    Optional Prepayments..............................................................35
    2.9    Mandatory Prepayments and Commitment Reductions ...........36
    2.10    Interest Rates, Payment Dates and Computation of Interest and Fees .................38
    2.11    Application and Pro Rata Treatment of Payments....................39
    2.12    Requirements of Law ...............................................................41
    2.13    Taxes.......................................................................................42
    2.14    Indemnity ................................................................................44
    2.15    Illegality .................................................................................45
    2.16    Change of Lending Office ........................................................45

ARTICLE III. REPRESENTATIONS AND WARRANTIES.....................................45

    3.1    Financial Condition..................................................................45
    3.2    No Change ...............................................................................46
    3.3    Company Existence; Compliance with Law ..............................46
    3.4    Power; Authorization; Enforceable Obligations.......................46
    3.5    No Legal Bar............................................................................47
    3.6    No Material Litigation .............................................................47
    3.7    No Default................................................................................47
    3.8    Government Approvals; Government Rules................................47
    3.9    Existing Indebtedness ..............................................................48
    3.10    Ownership and Maintenance of Property .................................48
    3.11    Insurance.................................................................................49
    3.12    Intellectual Property................................................................49
    3.13    Taxes.......................................................................................49
    3.14    Federal Regulations .................................................................50
    3.15    Labor Matters..........................................................................50
    3.16    ERISA ....................................................................................50

3.17    Regulations ................................................................................................51
3.18    Ownership of Borrower; Subsidiaries.......................................................51
3.19    Use of Proceeds..........................................................................................51
3.20    Environmental Matters................................................................................52
3.21    Accuracy of Information, Etc .....................................................................53
3.22    Security Documents ....................................................................................54
3.23    Solvency......................................................................................................54
3.24    Hedging Agreements ..................................................................................54
3.25    Reserve Reports ..........................................................................................55
3.26    Contingent Obligations...............................................................................55
3.27    Bank Accounts ............................................................................................55
3.28    Customers and Suppliers.............................................................................55
3.29    Account Receivable. ...................................................................................55
3.30    Material Agreements...................................................................................55
3.31    Coal Act; Black Lung Act...........................................................................56

ARTICLE IV. CONDITIONS PRECEDENT .................................................................56

4.1    Conditions to Extension of Loans on the Closing Date...............................56
4.2    Conditions to Each Additional Extension of Credit ...................................58
4.3    Conditions Deemed Fulfilled.......................................................................59

ARTICLE V. AFFIRMATIVE COVENANTS.................................................................59

5.1    Financial and Other Reporting Requirements.............................................59
5.2    Collateral Reporting....................................................................................60
5.3    Certificates; Other Information...................................................................61
5.4    Payment of Obligations...............................................................................62
5.5    Conduct of Business and Maintenance of Existence, Etc............................63
5.6    Operation and Maintenance of Property; Insurance ...................................63
5.7    Inspection of Property; Books and Records; Discussions ...........................65
5.8    Notices ........................................................................................................65
5.9    Environmental Laws ...................................................................................67
5.10    Additional Collateral, Etc .........................................................................68
5.11    Mining Activities .......................................................................................69
5.12    Chief Financial Officer ..............................................................................69
5.13    Patriot Act Compliance..............................................................................70
5.14    Further Assurances.....................................................................................70

ARTICLE VI. NEGATIVE COVENANTS .....................................................................70

6.1    Financial Covenants....................................................................................70
6.2    Indebtedness................................................................................................72
6.3    Liens............................................................................................................73
6.4    Fundamental Changes..................................................................................74
6.5    Disposition of Property................................................................................74
6.6    Restricted Payments....................................................................................75

6.7     Investments ...................................................................................................76
6.8     Subsidiaries ..................................................................................................76
6.9     Amendments to Certain Documents ............................................................77
6.10    Transactions with Affiliates .........................................................................77
6.11    Equipment Sales and Leaseback Transactions ............................................77
6.12    Negative Pledge Clauses ..............................................................................77
6.13    Restrictions on Subsidiary Distributions ....................................................78
6.14    Lines of Business .........................................................................................78
6.15    Hedging Agreements ....................................................................................78
6.16    Changes in Fiscal Periods ............................................................................78
6.17    Use of Proceeds ...........................................................................................78
6.18    Bank Accounts .............................................................................................78
6.19    Disqualified Stock ........................................................................................78

ARTICLE VII. EVENTS OF DEFAULT ............................................................................78

ARTICLE VIII. THE AGENTS ...........................................................................................82

8.1     Appointment .................................................................................................82
8.2     Delegation of Duties .....................................................................................82
8.3     Exculpatory Provisions .................................................................................82
8.4     Reliance by Agents .......................................................................................83
8.5     Notice of Default ..........................................................................................83
8.6     Non-Reliance on the Agents and Other Lenders ..........................................83
8.7     Indemnification .............................................................................................84
8.8     Agent in their Individual Capacities .............................................................84
8.9     Successor Administrative Agent ...................................................................84
8.10    Authorization to Release Liens and Guarantees ..........................................85
8.11    The Agent; the Syndication Agent ...............................................................85
8.12    Withholding Tax ...........................................................................................85

ARTICLE IX. MISCELLANEOUS ......................................................................................86

9.1     Amendments and Waivers ............................................................................86
9.2     Notices ..........................................................................................................87
9.3     No Waiver; Cumulative Remedies ...............................................................88
9.4     Survival of Representations and Warranties ................................................88
9.5     Payment of Expenses ...................................................................................89
9.6     Successors and Assigns; Participations and Assignments ...........................90
9.7     Adjustments; Set-off .....................................................................................93
9.8     Counterparts ..................................................................................................93
9.9     Severability ...................................................................................................94
9.10    Integration ....................................................................................................94
9.11    GOVERNING LAW ......................................................................................94
9.12    Submission To Jurisdiction; Waivers ...........................................................94
9.13    Acknowledgments .........................................................................................94

9.14    Confidentiality ...................................................................................95
9.15    Release of Collateral and Guarantee Obligations ..............................95
9.16    Accounting Changes ............................................................................96
9.17    WAIVERS OF JURY TRIAL ...............................................................97
9.18    Customer Identification – USA PATRIOT Act Notice .......................97
9.19    Affirmation of Obligations ..................................................................97

ANNEXES:

I     Commitments

SCHEDULES:

| | |
|---|---|
| 1.1(a) | Coal Leases |
| 1.1(b) | Existing Indebtedness |
| 1.1(c) | Mortgaged Property |
| 3.4 | Consents, Authorizations, Filings and Notices |
| 3.8(a) | Government Approvals – Closing Date |
| 3.8(b) | Government Approvals – Post-Closing Date |
| 3.10(a) | Real Property –Owned |
| 3.10(b) | Real Property – Leased |
| 3.18(a) | Subsidiaries |
| 3.20(a) | Environmental and Mining Permits |
| 3.27 | Bank Accounts |
| 3.28 | Coal Marketing Contracts |
| 3.30 | Material Agreements |
| 5.6(a) | Mines |
| 7(h)(i) | Required Payments to Employee Welfare Benefits Plans |
| 7(h)(ii) | Required Payments to Multiemployer Plans |

EXHIBITS:

| | |
|---|---|
| A | Project Description |
| B | Form of Borrowing Notice |
| C | Form of Compliance Certificate |
| D | Form of Construction Budget and Schedule |
| E | Form of Deposit Account Control Agreement |
| F | Form of Final Completion Certificate |
| G-1 | Form of Guarantee and Security Agreement |
| G-2 | Form of Midland Guarantee and Security Agreement |
| H | Material Project Documents |
| I | Form of Milestone Schedule |
| J | Form of Mortgage |
| K | Form of Performance Test |
| L-1 | Form of Term A Note |
| L-2 | Form of Term B Note |
| L-3 | Form of Revolving Credit Note |
| M | Form of Exemption Certificate |
| N | Form of Closing Certificate |
| O | Form of Assignment and Acceptance |

This AMENDED AND RESTATED CREDIT AGREEMENT, dated as of May 1, 2007, by and among GREENBRIER MINERALS, LLC a Delaware limited liability company ("***Borrower***"), the several banks and other financial institutions or entities from time to time parties to this Agreement (the "***Lenders***"), LEHMAN BROTHERS INC., as arranger, sole lead agent and sole bookrunner (in such capacity, the "***Arranger***"), and LEHMAN COMMERCIAL PAPER INC., as syndication agent (in such capacity, the "***Syndication Agent***"), and as administrative agent (in such capacity, the "***Administrative Agent***").

## W I T N E S S E T H:

WHEREAS, Borrower, Guarantors (as defined below), WestLB AG, New York Branch, as agent (the "***Original Agent***, and the lenders party thereto (the "***Original Lenders***") entered into that certain Credit Agreement, dated as of July 25, 2006, as amended by Amendment No. 1 to Credit Agreement, dated September 8, 2006 (as amended, the "***Original Credit Agreement***"), pursuant to which the Original Lenders extended credit to Borrower;

WHEREAS, pursuant to a Master Assignment, dated as of January 19, 2007 (the "***Assignment***"), the Original Agent and the Original Lenders have assigned to the Administrative Agent and the Lenders, and the Administrative Agent and the Lenders have assumed, the loans outstanding under the Original Credit Agreement, all of the Original Agent's and the Original Lenders' respective rights, title and interest in and to the Original Credit Agreement, the deeds of trust, mortgages, security agreement and other instruments executed or delivered pursuant thereto;

WHEREAS, each of the parties to the Original Credit Agreement desires to amend and restate the Original Credit Agreement and the other Original Loan Documents on the terms and conditions set forth herein;

WHEREAS, in connection with such amendment and restatement, Borrower has requested that the Lenders extend additional revolving credit loans and additional term loans for the purposes permitted hereunder, including for the prepayment in full of the existing term loans and other obligations outstanding under that certain Term Loan Agreement, dated August 29, 2006 (the "***Second Lien Term Loan***"), among, *inter alios*, Greenbrier Minerals, LLC and Lehman Brothers Commercial Paper Inc., as administrative agent and a lender thereunder; and for these purposes, Lenders are willing to make and continue certain loans and other extensions of credit to Borrowers on the terms and conditions set forth herein; and

WHEREAS, it is the intent of the parties hereto that this Agreement not constitute a novation of the obligations and liabilities existing under the Original Credit Agreement and other Original Loan Documents or evidence payment of all or any of such obligations and liabilities; that this Agreement amend and restate in its entirety the Original Credit Agreement and renew and extend the loans under the Original Credit Agreement, as so amended and restated;

NOW, THEREFORE, in consideration of the premises and the agreements hereinafter set forth, the parties hereto hereby agree as follows:

## ARTICLE I.
## DEFINITIONS

**1.1    Defined Terms**. Capitalized terms used in this Agreement shall have the respective meanings set forth in this Section 1.1.

*Accounting Change*: as defined in Section 9.16

*Additional Extensions of Credit*: as defined in Section 9.1.

*Additional Mining Facilities*: the development of coal mining production facilities (other than the Mining Facilities) by Borrower or any Borrower Subsidiary, including, as further described in Exhibit A, Sewell, Pocahontas 8, Buck Lilly (to the extent pursued by any Credit Party) and the Beckley seam mine (Cherry Knoll).

*Additional Project Document*: any contract or agreement entered into by any Credit Party, or by an agent on behalf of such Credit Party, subsequent to the Closing Date (other than Non-Material Project Documents).

*Administrative Agent*: as defined in the preamble hereto.

*Affiliate*: as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (a) vote 10% or more of the securities having ordinary voting power for the election of directors (or persons performing similar functions) of such Person or (b) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise. Notwithstanding the foregoing, no Lender shall be deemed to be an Affiliate of the Credit Parties.

*Agents*: the collective reference to the Syndication Agent and the Administrative Agent.

*Aggregate Commitment*: with respect to any Lender, the sum of such Lender's Term A Commitment, Term B Commitment and the Revolving Credit Commitment.

*Aggregate Exposure*: with respect to any Lender at any time, an amount equal to (a) until the Closing Date, such Lender's Aggregate Commitment at such time and (b) thereafter, the sum of (i) the aggregate then unpaid principal amount of such Lender's Term A Loans, (ii) such Lender's Term A Commitment, (iii) the aggregate then unpaid principal amount of such Lender's Term B Loans and (iv) the amount of such Lender's Revolving Credit Commitment then in effect or, if the Revolving Credit Commitments have been terminated, the aggregate then unpaid principal amount of such Lender's Revolving Credit Loans then outstanding.

*Aggregate Exposure Percentage*: with respect to any Lender at any time, the ratio (expressed as a percentage) of such Lender's Aggregate Exposure at such time to the sum of the Aggregate Exposures of all Lenders at such time.

*Agreement*: this Amended and Restated Credit Agreement, as amended, restated, replaced, supplemented or otherwise modified from time to time.

*Applicable Interest Rate*: for each Loan under each Facility, subject to Section 2.10(b), a rate per annum equal to LIBOR *plus* the Applicable Margin for such Facility.

*Applicable Margin*:  for each Loan under each Facility, the rate per annum set forth opposite such Facility:

| | |
|---|---|
| Revolving Credit Facilities | 5.00% |
| Term A Loan Facilities | 5.00% |
| Term B Loan Facilities | 9.00% |

*Appurtenant Rights*: with respect to any parcel of Real Property, (a) all agreements, easements, rights of way or use, rights of ingress or egress, privileges, appurtenances, tenements, hereditaments and other rights and benefits at any time belonging or pertaining to such parcel, including, without limitation, the use of any streets, ways, alleys, vaults or strips of land adjoining, abutting, adjacent or contiguous to such parcel and (b) all permits, licenses and rights, whether or not of record, appurtenant to such parcel.

*Arranger*: as defined in the preamble hereto.

*Asset Sale*:  any Disposition of Property or series of related Dispositions of Property (excluding any such Disposition permitted by clause (d), (e), (f), (h), (i) or (j) of Section 6.5) which yield(s) gross proceeds to any Credit Party (valued at the initial principal amount thereof in the case of non-cash proceeds consisting of notes or other debt securities and valued at fair market value in the case of other non-cash proceeds) in excess of $100,000 during any period of twelve consecutive calendar months.

*Assignee*: as defined in Section 9.6(b).

*Assignment*: as defined in the recitals hereto.

*Assignment and Acceptance*:  as defined in Section 9.6(b).

*Assignor*: as defined in Section 9.6(b).

*Benefited Lender*: as defined in Section 9.7(a).

*Black Lung Act*:  together, the Black Lung Benefits Revenue Act of 1977, as amended, and the Black Lung Benefits Reform Act of 1977, as amended.

*Board*:  the Board of Governors of the Federal Reserve System of the United States (or any successor).

*Borrower*: as defined in the preamble hereto.

*Borrowing Date*:  any Business Day specified by Borrower as a date on which Borrower requests the relevant Lenders to make Loans hereunder.

**Borrowing Notice**: with respect to any request for borrowing of Loans hereunder, a notice from Borrower, substantially in the form of, and containing the information prescribed by, Exhibit B, delivered to the Administrative Agent.

**Business Day**: a day other than a Saturday, Sunday or other day on which commercial banks in New York, New York or Houston, Texas are authorized or required by law to close.

**Capital Expenditures**: for any period, with respect to any Person, the aggregate of all expenditures by such Person for the acquisition or leasing (pursuant to a Capital Lease) of fixed or capital assets or additions to equipment (including replacements, capitalized repairs and improvements during such period) which are required to be capitalized under GAAP on a balance sheet of such Person *provided* that Capital Expenditures shall exclude expenditures made with any portion of any Reinvestment Deferred Amount relating to any Recovery Event in compliance with Sections 2.9(a)(ii).

**Capital Lease**: any lease (or other arrangement conveying the right to use) of a Person with respect to any Property or a combination thereof, the obligations under which are required to be classified and accounted for as a capital lease on a balance sheet of such Person under GAAP.

**Capital Lease Obligations**: with respect to any Person, the obligations of such Person to pay rent or other amounts under any Capital Lease and, for the purposes of this Agreement, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

**Capital Stock**: any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

**Cash Equivalents**: (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition; (b) certificates of deposit, time deposits, eurodollar time deposits or overnight bank deposits having maturities of six months or less from the date of acquisition issued by any Lender or by any commercial bank organized under the laws of the United States of America or any state thereof having combined capital and surplus of not less than $500,000,000; (c) commercial paper of an issuer rated at least A-2 by Standard & Poor's Ratings Services ("*S&P*") or P-2 by Moody's Investors Service, Inc. ("*Moody's*"), or carrying an equivalent rating by a nationally recognized rating agency, if both of the two named rating agencies cease publishing ratings of commercial paper issuers generally, and maturing within six months from the date of acquisition; (d) repurchase obligations of any Lender or of any commercial bank satisfying the requirements of clause (b) of this definition, having a term of not more than 30 days with respect to securities issued or fully guaranteed or insured by the United States government; (e) securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory, the securities of which state, commonwealth, territory, political subdivision, taxing authority (as the case may be) are rated at least A by S&P or A by Moody's; (f) securities with maturities of six months or less from the date of acquisition backed

by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of clause (b) of this definition; and (g) shares of money market mutual or similar funds which invest exclusively in assets satisfying the requirements of clauses (a) through (f) of this definition.

**Change of Control**: (a) the Principal Equityholders shall cease to beneficially own, hold of record and have the power to vote or direct the voting of, at least 30%, on a fully diluted basis, of the membership interests and other Capital Stock of Parent (or such lesser amount resulting from the issuance and sale of Capital Stock pursuant to a Permitted Equity Sale); (b) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act), excluding the Principal Equityholders or any Lender, shall become, or obtain rights (whether by means or warrants, options or otherwise) to become, the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act), directly or indirectly, of more than 35%, on a fully diluted basis, of the membership interests and other Capital Stock of Parent; (c) Parent shall cease to beneficially own, hold of record and have the power to vote or direct the voting of 100% of the membership interests and other Capital Stock of Borrower; or (d) Borrower shall cease to own, directly or indirectly, 100% of each class of outstanding Capital Stock of each of its Subsidiaries.

**Closing Date**: the date on which the conditions precedent set forth in Section 4.1 shall have been satisfied, which date shall be not later than May 1, 2007.

**Coal**: all coal, including without limitation, bituminous and sub-bituminous coal and lignite and all solid components derived therefrom, including synfuel products.

**Coal Act**: the Coal Industry Retiree Health Benefits Act of 1992, as amended.

**Coal Lands**: collectively, the coal lands described on Schedule 1.1(a).

**Coal Leases**: collectively, and individually, (i) the Coal Lands and (ii) any and all other coal leases from time to time entered into by Borrower or its Subsidiaries after the Closing Date covering all or any portion of the Real Property or conferring any property interest other than a fee interest.

**Coal Properties**: (a) all of the Coal Leases, (b) all Coal in place in, under and which may be produced from the Coal Leases and the Real Property, (c) the Real Property and all fixtures, machinery, equipment and other Property associated therewith, (d) all rents, issues, profits, proceeds, products, revenues and other income from or attributable to the Coal, Coal Leases and Real Property, (e) all tenements, hereditaments, appurtenances and Properties in any manner appertaining, belonging, affixed or incidental to the Coal, Coal Leases and Real Property and (f) all Properties, rights, titles, interests and estates described or referred to above, including any Property, Real, personal or mixed, now owned or hereafter acquired and situated upon, used, held for use or useful in connection with the operating, working or development of any such Coal, Coal Leases or Real Property or Property including all mining equipment, fixtures, machinery and parts, engines, boilers, meters, apparatus, equipment, appliances, tools, implements, cables, wires, shaft equipment, elevators, buildings, leases, rights-of-way, rail tracks and related equipment, easements, servitudes together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing.

***Coal Supply Contracts***: the coal supply contracts in full force and effect as of the Closing Date, as set forth in Schedule 3.30, and each other Additional Project Document in respect of sales of coal supply entered into after the Closing Date by any Credit Party.

***Code***: the Internal Revenue Code of 1986, as amended from time to time, the regulations thereunder and publicly available interpretations thereof.

***Collateral***: all Property of the Credit Parties, now owned or hereafter acquired, upon which a Lien is purported to be created by any Security Document (including Liens on all of the Coal, Coal Leases, Real Property and Coal Properties of any Credit Parties) other than the Excluded Property.

***Commonly Controlled Entity***: an entity, whether or not incorporated, that is under common control with Borrower within the meaning of Section 4001 of ERISA or is part of a group that includes Borrower and that is treated as a single employer under Section 414 of the Code.

***Compliance Certificate***: a certificate duly executed by a Responsible Officer, substantially in the form of Exhibit C.

***Consolidated EBITDA***: for any period, the sum (without duplication) for any period and determined on a consolidated basis without duplication in accordance with GAAP, of: (a) net operating income (or net operating loss) (determined without giving effect to any extraordinary gains or extraordinary losses) of Borrower and its Subsidiaries *plus* (b) Consolidated Interest Expense of Borrower and its Subsidiaries after taking into account the financial effect of Permitted Swap Agreements *plus* (c) depletion, depreciation and amortization expense of Borrower and its Subsidiaries (to the extent deducted in determining net operating income) *plus* (c) Taxes paid by Borrower and its Subsidiaries (to the extent deducted in determining net operating income).

***Consolidated Fixed Charges***: for any period, the sum (without duplication) of: (a) all amounts payable by Borrower and its Subsidiaries in respect of scheduled payments of principal of Indebtedness for such period *plus* (b) all net amounts payable by Borrower and its Subsidiaries in respect of Consolidated Interest Expense for such period after taking into account the financial effect of Permitted Swap Agreements *plus* (c) all commitment fees, agency fees, trustee fees or other fees and expenses payable in connection with the Indebtedness referred to in clause (a) above during such period *plus* (d) all amounts, if any, due and payable under Hedging Agreements which constitute Permitted Swap Agreements (without duplication for amounts included in clause (b) above).

***Consolidated Fixed Charges Coverage Ratio***: for any period, the ratio of (a) the excess (if any) of (i) Project Revenues for such period *less* (ii) Operation and Maintenance Expenses for such period *over* (b) the Consolidated Fixed Charges for such period.

***Consolidated Interest Expense***: of any Person for any period, the sum, computed without duplication, of the following: (a) all interest in respect of all outstanding Indebtedness accrued or capitalized during such period (whether or not actually paid during such period) *plus* (b) the net amounts payable (or *minus* the net amounts receivable) under Hedging Agreements accrued during such period (whether or not actually paid or received during such period).

***Consolidated Leverage Ratio***: at any date, the ratio of (a) the aggregate principal amount of all Indebtedness of Borrower and its Subsidiaries at such date (other than Indebtedness permitted under Section 6.2(e) to (b) Consolidated EBITDA for the preceding four calendar quarters then ended, all as determined on a consolidated basis in accordance with GAAP.

***Consolidated Net Income***: for any period, the consolidated net income (or loss) of Borrower and its Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP; *provided*, that in calculating Consolidated Net Income of Borrower and its consolidated Subsidiaries for any period, there shall be excluded (a) the income (or deficit) of any Person accrued prior to the date it becomes a Subsidiary of Borrower or is merged into or consolidated with Borrower or any of its Subsidiaries, (b) the income (or deficit) of any Person (other than a Subsidiary of Borrower) in which Borrower or any of its Subsidiaries has an ownership interest, except to the extent that any such income is actually received by Borrower or such Subsidiary in the form of dividends or similar distributions and (c) the undistributed earnings of any Subsidiary of Borrower to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary is not at the time permitted by the terms of any contractual obligation (other than under any Loan Document) or Requirement of Law applicable to such Subsidiary.

***Consolidated Working Capital***: at any date, the difference of (a) the sum of all amounts (other than cash and Cash Equivalents) that would, in conformity with GAAP, be set forth opposite the caption "total current assets" (or any like caption) on a consolidated balance sheet of Borrower and its Subsidiaries at such date *less* (b) the sum of all amounts that would, in conformity with GAAP, be set forth opposite the caption "total current liabilities" (or any like caption) on a consolidated balance sheet of Borrower and its Subsidiaries at such date, but excluding, with respect to Borrower, (i) the current portion of any Loans and (ii), without duplication of clause (i) above, all Indebtedness consisting of Revolving Credit Loans to the extent otherwise included therein.

***Constituent Documents***: with respect to any Person, (a) the articles or certificate of incorporation, certificate of formation or partnership, articles of organization (or the equivalent organizational documents) of such Person, (b) the by-laws, limited liability company agreement or agreement of limited partnership (or the equivalent governing documents) of such Person and (c) any document setting forth the manner of election and duties of the directors or managing members of such Person (if any) and the designation, amount or relative rights, limitations and preferences of any class or series of such Person's Capital Stock.

***Construction Budget and Schedule***: (a) a budget setting forth, on a quarterly basis, the timing and amount of all projected payments of Project Costs from the Closing Date through the projected date of Final Completion and (b) a schedule setting forth the proposed engineering, procurement, construction and Milestone Schedule for the Project's Development through the projected date of Final Completion, as certified by Borrower, consistent with the requirements of the Loan Documents, reviewed and approved by the Independent Engineer, in form and substance acceptable to the Lenders and in substantially the form attached hereto as <u>Exhibit D</u>.

***Construction Contractors***: collectively, each Person party to a Construction Contract (other than any Credit Party).

***Construction Contracts***: each contract for the engineering, procurement or construction of the Project in full force and effect as of the Closing Date as set forth in Schedule 3.30 and each other Additional Project Document for the engineering, procurement or construction of the Project entered into after the Closing Date by any Credit Party.

***Contingent Obligation***: of a Person, any agreement, undertaking or arrangement by which such Person assumes, guarantees, endorses, contingently agrees to purchase or provide funds for the payment of, or otherwise becomes or is contingently liable upon, the obligation or liability of any other Person, or agrees to maintain the net worth or working capital or other financial condition of any other Person, or otherwise assures any creditor of such other Person against loss, including any comfort letter, operating agreement, take or pay contract or the obligations of any such Person as general partner of a partnership with respect to the liabilities of the partnership.

***Contingent Interest***: as defined in Section 2.10(e).

***Contractual Obligation***: with respect to any Person, any term, condition or provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its Property is bound.

***Control Investment Affiliate***: with respect to any Person, any other Person that (a) directly or indirectly, is in control of, is controlled by, or is under common control with, such Person and (b) is organized by such Person primarily for the purpose of making equity or debt investments in one or more companies. For purposes of this definition, "control" of a Person means the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

***Covered Tax Liabilities***: for any calendar quarter, the amount of dividends or other distributions payable by Borrower to Parent at the time and in the amounts necessary to enable Parent to pay to the holders of record of its Capital Stock the Tax Liability Deficiencies in accordance with the Parent Operating Agreement as in effect on the Closing Date; *provided, however*, that for purposes of calculating such holder's Tax Liability Deficiency, in the case of a Person that was not a holder of record of Parent's Capital Stock on the Closing Date, losses, deductions or credits previously allocated to the Capital Stock held by such holder's predecessor as of the Closing Date for taxable periods beginning after the Closing Date shall be taken into account. For the avoidance of doubt, the Tax Liability Deficiency of a holder of Parent's Capital Stock shall be determined after application of any federal taxable losses not previously used to offset taxable income allocable to such member from Borrower for purposes of this definition.

***Credit Parties***: Borrower, Parent and each Guarantor.

***Current Ratio***: at any time, the ratio of (i) current assets of Borrower to (ii) current liabilities of Borrower (but excluding Indebtedness incurred under Sections 6.2(a) and (h)), in each case, on a consolidated basis and in conformity with GAAP.

***Default***: any of the events specified in Article VII, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

***Default Rate***: as defined in Section 2.10(b).

***Defensible Title***: good and indefeasible title, free and clear of all Liens other than Permitted Liens.

***Deposit Account Control Agreements***: a deposit account control agreement substantially in the form of Exhibit E.

***Derivatives Counterparty***: as defined in Section 6.6.

***Determination Date***: as defined in Section 6.6.

***Development***: the development, construction and operation of the Mining Facilities, the scope and cost of which shall be set forth in the Construction Budget and Schedule.

***Disposition***: with respect to any Property, any Sale and Leaseback Transaction, assignment, conveyance, transfer or other disposition (including by way of merger or consolidation) of such Property or any interest therein (excluding any Permitted Lien on such Property) or the entering into any agreement to do any of the foregoing; and the terms ***"Dispose"*** and ***"Disposed of"*** shall have correlative meanings.

***Disqualified Stock***: as to any Person, any Capital Stock of such Person that by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable) or otherwise (including upon the occurrence of an event) requires the payment of dividends (other than dividends payable solely in Capital Stock which does not otherwise constitute Disqualified Stock) or matures or is required to be redeemed (pursuant to any sinking fund obligation or otherwise) or is convertible into or exchangeable for Indebtedness or is redeemable at the option of the holder thereof, in whole or in part, at any time prior to June 30, 2012.

***Dollars*** and ***$***: lawful currency of the United States of America.

***Easement Properties***: all of the licenses, easements and rights of way which are necessary to enable the Development.

***Environmental Claim***: any material notice of violation, claim, action, suit, proceeding, demand, abatement order or other order or directive (conditional or otherwise) by any Governmental Authority or any other Person arising (a) pursuant to or in connection with any actual or alleged violation of any Environmental Law; (b)in connection with any Regulated Substance or any actual or alleged Regulated Substances Activity; (c) in connection with any alleged damage, injury, threat or harm to natural resources or the environment; (d) in connection with the Reclamation, or alleged need for Reclamation, of any future, current or former mines; or (e) in connection with any violation of Environmental or Mining Law. "Environmental Claims" also includes, without limitation, any such material claims alleging liability for fines, penalties, criminal sanctions or other costs related to any item in the proceeding sentence.

***Environmental Laws***: any and all applicable laws (including all Mining Laws), rules, orders, regulations, statutes, ordinances, codes, decrees or other legally enforceable requirements (including common law) regulating, relating to or imposing liability or standards of conduct concerning protection of the environment, natural resources or of human health, release or threatened release of Regulated Substances or employee health and safety, as has been, is now, or

may at any time hereafter be, in effect, including the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 *et seq.*, the Hazardous Materials Transportation Act, 49 U.S.C. § 5101 *et seq.*, the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*, the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, the Toxic Substances Control Act, 15 U.S.C. § 2601 *et seq.*, the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136 *et seq.*, the Occupational Safety and Health Act, 29 U.S.C. § 651 *et seq.*, the Mine Safety and Health Act, 30 U.S.C. § 801 *et seq.*, the Surface Mining Control and Reclamation Act 30 U.S.C. § 1201 *et seq.*, the Atomic Energy Act, 42 U.S.C. § 2011 *et seq.*, the National Historic Preservation Act, 16 U.S.C. § 470 *et seq.*, the Endangered Species Act, 16 U.S.C. § 1531 *et seq.*, the Wild and Scenic Rivers Act, 16 U.S.C. §§ 1271-1278, and the regulations promulgated pursuant thereto, and all analogous state or local statutes and regulations.

*Environmental or Mining Permits*: any and all Permits required by a Governmental Authority regulating the mining of Coal, providing for the reclamation of land subjected to Coal mining, and controlling the adverse environmental effects of Coal mining.

*ERISA*: the Employee Retirement Income Security Act of 1974, as amended from time to time and the rules and regulations promulgated thereunder.

*Event of Default*: any of the events specified in Article VII, *provided* that any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

*Excess Cash Flow*: for any period, the excess, if any, of (a) the sum, without duplication, of (i) Consolidated Net Income of Borrower and its Subsidiaries for such period, (ii) the amount of all non-cash charges (including depreciation and amortization) deducted in arriving at such Consolidated Net Income, (iii) the amount of the decrease, if any, in Consolidated Working Capital for such period and (iv) the aggregate net amount of non-cash loss on the Disposition of Property by Borrower and its Subsidiaries during such period (other than sales of inventory in the ordinary course of business), to the extent deducted in arriving at such Consolidated Net Income *minus* (b) the sum, without duplication, of (i) the amount of any Tax Distribution Amount for such period, (ii) the amount of all non-cash credits included in arriving at such Consolidated Net Income, (iii) the aggregate amount actually paid by Borrower and its Subsidiaries in cash during such period on account of Capital Expenditures (*minus* the principal amount of Indebtedness incurred in connection with such expenditures and *minus* the amount of any such expenditures financed with the proceeds of any Reinvestment Deferred Amount), (iv) the aggregate amount of all prepayments of Revolving Credit Loans during such period to the extent accompanying permanent optional reductions of the Revolving Credit Commitments and all optional prepayments of the Term Loans during such period, (v) the aggregate amount of all regularly scheduled principal payments of Loans of Borrower and its Subsidiaries made during such period (other than in respect of any Revolving Credit Loans to the extent there is not an equivalent permanent reduction in Revolving Credit Commitments), (vi) the amount of the increase, if any, in Consolidated Working Capital for such period, (vii) the aggregate net amount of non-cash gain on the Disposition of Property by Holdings, Borrower and its Subsidiaries during such period (other than sales of inventory in the ordinary course of business), to the extent included in arriving at such Consolidated Net Income and (viii) the net decrease during such period (if any) in deferred tax accounts of Borrower.

***Excess Cash Flow Application Date***: as defined in Section 2.9(a)(vii).

***Exchange Act***: Securities Exchange Act of 1934, as amended.

***Excluded Property***: (i) all personal property of any Credit Party that is subject to a lease including, without limitation, all right in and to equipment leased to the Credit Parties pursuant to the Orix Lease, which expressly prohibits the granting by the Credit Parties of a security interest in such property (but only to the extent prohibited), (ii) all of the Credit Parties' contract rights to purchase equipment upon assignment thereof to Orix Financial Services, Inc. in connection with the leasing of equipment pursuant to the Orix Lease, and (iii) Real Property purchased by Borrower or any other Credit Party and designated by written notice to the Administrative Agent at least five Business Days prior to the purchase thereof that is contributed to, or exchanged with, the State of West Virginia in connection with the Credit Parties obtaining one or more Permits, *provided* that the purchase price for such Real Property does not exceed $400,000.

***Existing Indebtedness***: the Indebtedness described on Schedule 1.1(b).

***Existing Loans***: as defined in Section 2.1(a).

***Extraordinary Receipt***: any amount received by a Credit Party or any of its Subsidiaries in respect of the termination of or liquidation payments received pursuant to any of the agreements listed on Schedule 3.30.

***Facility***: each of the Term A Facility, the Term B Facility and the Revolving Credit Facility.

***Federal Funds Effective Rate***: for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for the day of such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by the Administrative Agent.

***Final Completion***: the satisfaction of the following conditions, in each case in form and substance satisfactory to the Required Lenders (unless, in each case, waived by the Required Lenders):

(a)    the Project shall have passed the Performance Test, all construction activities contemplated to have been completed in the Construction Budget and Schedule shall have been completed (other than punch list items contemplated in the Construction Budget and Schedule) and all milestones set forth in the Milestone Schedule have been achieved;

(b)    (i) Borrower shall have delivered to the Administrative Agent and the Independent Engineer the Final Completion Certificate and (ii) the Independent Engineer shall have delivered to the Administrative Agent the Independent Engineer's Final Completion Certificate;

(c)     all expenses necessary for the completion of construction in accordance with the Construction Budget and Schedule shall have been paid, except those amounts which are in dispute as of such date or are not yet due and payable;

(d)     certificates of insurance with respect to the insurance policies required by Section 5.6, together with evidence of the payment of all premiums therefor, shall have been delivered;

(e)     all Government Approvals required for the Development shall have been validly issued, duly obtained and are in full force and effect, and held in the name of a Credit Party or such third party as is specified with respect to such Government Approval on Schedule 3.8(a) or Schedule 3.8(b) (*provided*, that having such Government Approval held by or in the name of such third party could not reasonably be expected to have a Material Adverse Effect) and are free from conditions or requirements compliance with which could reasonably be expected to have a Material Adverse Effect or which the Credit Party or third party, as the case may be, has not satisfied, except to the extent that a failure to so satisfy such condition or requirement could not reasonably be expected to have a Material Adverse Effect;

(f)     (i) each Credit Party and the Project shall be and have been in compliance in all material respects with all Government Approvals and all Government Rules, in each case applicable to such Credit Party and the Project, (ii) no Credit Party has received written notice from (or on behalf of) the Governmental Authority having jurisdiction that any of the foregoing is subject to appeal, modification or revocation except if such appeal, modification or revocation could not reasonably be expected to cause a Material Adverse Effect and (iii) to Borrower's knowledge, the Material Project Parties have been operating and continue to operate in material compliance with all Government Approvals and all Government Rules, in each case applicable or related to the Project; and

(g)     there shall not exist (i) any Default or Event of Default hereunder and (ii) any material default under any Material Project Document by any Material Project Party or any Credit Party party to such agreements.

**Final Completion Certificate**: a Final Completion Certificate and related attachments and certifications, substantially in the form of Exhibit F hereto, executed by a Responsible Officer of Borrower and otherwise duly completed.

**Financial Statements**: as defined in Section 3.1(a).

**Funding Office**: the office specified from time to time by the Administrative Agent as its funding office by notice to Borrower and the Lenders.

**GAAP**: generally accepted accounting principles in the United States of America as in effect from time to time, applied in a consistent manner.

**Government Approval**: (a) any authorization, consent, approval, license, lease, ruling, permit, certification, waiver, exemption, filing, variance, claim, order, judgment or decree of, by or with, (b) any required notice to, (c) any declaration of or with or (d) any registration by or with, any Government Authority, in each case relating to the Development to the extent (i) not routine,

(ii) not ministerial in nature or (iii) not otherwise immaterial to the Development or a Credit Party's compliance with any Government Rule or obtaining or maintaining any Government Approval.

*Governmental Authority*: any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, any province, commonwealth, territory, possession, county, parish, town, township, village or municipality, whether now or hereafter constituted or existing.

*Government Rule*: any statute, law, regulation, ordinance, rule, judgment, order, decree, permit, concession, grant, franchise, license, agreement, directive, requirement of, or other governmental restriction or any similar binding form of decision of or determination by, or any binding interpretation or administration of any of the foregoing by, any Government Authority, including all common law, whether now or hereafter in effect.

*Granting Lender*: as defined in Section 9.6(f).

*Greenbrier Smokeless*: Greenbrier Smokeless Coal Mining, L.L.C., a Delaware limited liability company.

*Guarantee and Security Agreement*: that certain Amended and Restated Guarantee and Security Agreement to be executed and delivered by Borrower, Parent and each of Borrower's Subsidiaries, substantially in the form of Exhibit G-1, as amended, restated, supplemented or otherwise modified from time to time.

*Guarantee Obligation*: with respect to any Person (the "*guaranteeing person*"), any obligation of (a) the guaranteeing person or (b) another Person (including any bank under any letter of credit), if to induce the creation of which the guaranteeing person has issued a reimbursement, counterindemnity or similar obligation, in either case guaranteeing or in effect guaranteeing any Indebtedness, leases, dividends or other obligations (the "*primary obligations*") of any other third Person (the "*primary obligor*") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any Property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase Property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; *provided, however*, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing

person's maximum reasonably anticipated liability in respect thereof as determined by Borrower in good faith.

*Guarantor*:  Parent and each Subsidiary of Borrower.

*Hedging Agreements*:  with respect to any Person, all interest rate or currency swaps, caps or collar agreements, foreign exchange agreements, commodity contracts or similar arrangements entered into by such Person providing for protection against fluctuations in interest rates, currency exchange rates, commodity prices or the exchange of nominal interest obligations, either generally or under specific contingencies.

*Indebtedness*:  of any Person at any date, without duplication (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of Property or services (other than trade payables incurred in the ordinary course of such Person's business and not more than 90 days overdue), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to Property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such Property), (e) all Capital Lease Obligations of such Person, (f) all obligations of such Person, contingent or otherwise, as an account party or applicant under acceptance, letter of credit or similar facilities, (g) all obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Capital Stock of such Person, (h) all Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (g) above; (i) all obligations of the kind referred to in clauses (a) through (h) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on Property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation and (j) for the purposes of Article VII(f) only, all obligations (netted, to the extent provided for therein) of such Person (including but not limited to obligations and liabilities arising in connection with or as a result of early or premature termination of a Hedging Agreement, whether or not occurring as a result of a default thereunder) under Hedging Agreements.  The Indebtedness of any Person shall include the Indebtedness of any other Person (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor.

*Indemnified Liabilities*:  as defined in Section 9.5.

*Indemnitee*:  as defined in Section 9.5.

*Independent Accountant*:  such independent certified public accountants reasonably acceptable to the Administrative Agent.

*Independent Engineer*:  Doug Blackburn or such other Person  reasonably acceptable to the Administrative Agent.

*Independent Engineer Report*:  a report from the Independent Engineer reviewing the technical and economic feasibility of the proposed project and the related environmental compliance, permitting and other environmental risks and such other matters as the Administrative Agent may request.

*Insolvency*:  with respect to any Multiemployer Plan, the condition that such Plan is insolvent within the meaning of Section 4245 of ERISA.

*Insolvent*:  pertaining to a condition of Insolvency.

*Intellectual Property*:  the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, state, multinational or foreign laws or otherwise, including copyrights, copyright licenses, patents, patent licenses, trademarks, trademark licenses, service-marks, technology, know-how and processes, licenses or rights to use databases, geological data, geophysical data, engineering data, seismic data, maps, interpretations and other technical information, recipes, formulas, trade secrets, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

*Interest Payment Date*:  (a) the last Business Day of each March, June, September and December and (b) the date of any repayment or prepayment made in respect thereof.

*Interest Rate Protection Agreement*:  for any Person, any interest rate swap, cap or collar agreement or similar arrangement between such Person and one or more financial institutions providing for the transfer or mitigation of interest rate risks either generally or under specific contingencies.

*Investment*:  for any Person (a) the acquisition (whether for cash, Property of such Person, services or securities or otherwise) of Capital Stock, bonds, notes, debentures, partnership or other ownership interests or other securities of any other Person or any agreement to make any such acquisition (including any "short sale" or any other sale of any securities at a time when such securities are not owned by the Person entering into such sale), (b) the making of any deposit with, or advance, loan or other extension of credit to, any other Person (including the purchase of Property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such Property to such Person, but excluding any such advance, loan or extension of credit having a term not exceeding 90 days representing the purchase price of inventory or supplies sold in the ordinary course of business), and (c) the entering into of any Guarantee of, or other contingent obligation with respect to, Indebtedness or other liability of any other Person.

*Lehman Entity*:  any of Lehman Commercial Paper Inc. or any of its Affiliates.

*Lenders*:  as defined in the preamble hereto.

*LIBOR*:  for each LIBOR Period, a rate of interest determined by the Administrative Agent equal to:

(a)      the offered rate for three month deposits in  Dollars that appears on Telerate Page 3750 as of 11:00 a.m. (London time) on the second full LIBOR Business Day preceding the first

day of each LIBOR Period (unless such date is not a Business Day, in which event the next
succeeding Business Day will be used); divided by

(b)    a number equal to 1.0 minus the aggregate (but without duplication) of the rates
(expressed as a decimal fraction) of reserve requirements in effect on the day that is two LIBOR
Business Days prior to the beginning of such LIBOR Period (including basic, supplemental,
marginal and emergency reserves under any regulations of the Board or other Governmental
Authority having jurisdiction with respect thereto, as now and from time to time in effect) for
Eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the
Board) that are required to be maintained by a member bank of the Federal Reserve System.

If such interest rates shall cease to be available from Telerate News Service, LIBOR shall
be determined from such comparable publicly available financial reporting service for displaying
any Eurodollar rates as shall be selected by the Administrative Agent.

*LIBOR Business Day*: a Business Day on which banks in the city of London, England are
generally open for interbank or foreign exchange transactions.

*LIBOR Period*: each period commencing on a LIBOR Business Day and ending on the last
Business Day of each March, June, September and December; *provided* that the first LIBOR
Period shall begin on the Closing Date, and each successive LIBOR Period shall begin on the last
LIBOR Business Day of the immediately preceding LIBOR Period

*Lien*: any mortgage, pledge, hypothecation, assignment, deposit arrangement,
encumbrance, lien (statutory or other), charge or other security interest or any preference, priority
or other security agreement or preferential arrangement of any kind or nature whatsoever intended
to assure payment or performance of any Indebtedness or other obligation (including any
conditional sale or other title retention agreement, the interest of a lessor under a Capital Lease,
any financing having substantially the same economic effect as any of the foregoing and the filing
of any financing statement under the UCC or comparable law of any jurisdiction naming the
owner of the asset to which such Lien relates as debtor).

*LLC Agreement*: that certain Operating Agreement of Borrower dated April 5, 2005, as
amended and restated as of July 25, 2006, by and among Borrower's members, as amended,
supplemented or otherwise modified in accordance with the provisions of the Loan Documents.

*Loan*: any Term A Loan, Term B Loan or Revolving Credit Loan made by any Lender
pursuant to this Agreement.

*Loan Documents*: this Agreement, the Security Documents, the Notes and each
certificate, agreement, waiver, consent or document executed by a Credit Party and delivered to
the Administrative Agent or any Lender in connection with or pursuant to any of the foregoing.

*Loan Percentage*: with respect to any Lender, such Lender's Revolving Credit
Percentage, Term A Loan Percentage and Term B Loan Percentage.

*Material Adverse Change*: a material adverse change in any of (a) the financial condition,
business, performance, operations or properties of the Credit Parties, taken as a whole, or the value

of the Collateral (except when such value is affected by then-current market conditions), (b) the legality, validity or enforceability of this Agreement or any of the other Loan Documents or the rights or remedies of the Agents or the Lenders hereunder or thereunder, (c) the perfection or priority of the Liens granted pursuant to the Security Documents or (d) the ability of Borrower to repay the Obligations or of the Credit Parties to perform their obligations under the Loan Documents.

**Material Adverse Effect**: an effect that results in or causes, or could reasonably be expected to result in or cause, a Material Adverse Change.

**Material Agreement**: (a) each of the agreements set forth on <u>Schedule 3.30</u>, and (b) any construction agreement entered into between any Credit Party and Taggart.

**Material Project Documents**: other than Non-Material Project Documents, each Construction Contract, each Operating Agreement, the Coal Supply Contracts, the Midland Project Documents, the Midland Promissory Note, the Orix Leases, the Meadwestvaco Lease, each Project Document with an Affiliate of Borrower or any Borrower Subsidiary as set forth on <u>Exhibit H</u>, each Additional Project Document, each employment contract with a member of senior management of any Credit Party, each lease or other agreement with respect to Easement Properties and each credit support instrument provided in connection with any of the foregoing (and any replacement of any of the foregoing).

**Material Project Parties**: United States Steel Corporation, Indiana Harbor Coke Company, L.P., Sun Coke Company, Dofasco Inc., Taggart, Far East Processing, LLC, Parent, Meadwestvaco, Orix Financial Services, Inc., each Person party to a credit support instrument provided in connection with any Material Project Document and each other Person (other than Midland and any Credit Party) party to a Material Project Document (specifically excluding all Sales Agency Agreements).

**Matoaka**: Matoaka Land Company, LLC, a Delaware limited liability company.

**Maturity Date**: December 31, 2011.

**Meadwestvaco Lease**: the Lease dated as of May 5, 2005 between Meadwestvaco Corporation and Matoaka.

**Midland**: Midland Trail Resources, LLC, a West Virginia limited liability company.

**Midland Administrative Services Agreement**: that certain Administrative Services and Equipment Agreement, dated as of July 20, 2006, by and between Midland and Borrower.

**Midland Coal Processing Agreement**: that certain Coal Processing Agreement, dated as of July 20, 2006, by and between Midland and Greenbrier Smokeless.

**Midland Contract Mining Agreement**: that certain Contract Mining Agreement, dated as of July 20, 2006, by and between Midland and Greenbrier Smokeless.

***Midland Documents***: collectively, the Midland Supply Agreement, the Midland Administrative Services Agreement, the Midland Coal Processing Agreement, the Midland Contract Mining Agreement and the Midland Loan Documents.

***Midland Guarantee and Security Agreement***: that certain Guarantee and Security Agreement to be executed and delivered by Midland, substantially in the form of Exhibit G-2, as amended, restated, supplemented or otherwise modified from time to time.

***Midland Loans***: the Indebtedness evidenced by (i) that certain Amended and Restated Promissory Note, dated June 22, 2006, from Midland made to the order of Borrower in the principal amount of $4,000,000 and (ii) that certain Note, dated September 8, 2006, from Midland made to the order of Borrower in the principal amount of $1,000,000.

***Midland Loan Documents***: all documents and instruments evidencing the Midland Loans or securing the obligations thereunder, including, without limitation, any security agreement, security deposit agreement and mortgage.

***Midland Project Documents***: collectively, the Midland Coal Supply Agreement, the Midland Coal Processing Agreement, the Midland Administrative Services Agreement and the Midland Contract Mining Agreement.

***Midland Supply Agreement***: that certain Coal Supply Agreement, dated as of July 20, 2006, by and between Midland and Powhatan.

***Milestone Schedule***: the schedule of construction milestones required to reach Final Completion prepared by Borrower, reviewed and approved by the Independent Engineer, in form and substance satisfactory to the Lenders and in substantially the form attached hereto as Exhibit I.

***Mine***: any excavation or opening into the earth now and hereafter made from which coal is or can be extracted on or from any of the properties owned or leased by Borrower or any Subsidiary, together with all appurtenances, fixtures, structures, improvements and assets in connection therewith.

***Mining Facilities***: Matoaka's reserve base which shall be accessed through the Mountaineer Pocahontas #1, Mountaineer Pocahontas #2 and Mountaineer Pocahontas #3 mines, as well as the Preparation and Related Facilities associated therewith, in each case as described in Exhibit A.

***Mining Law***: all treaties, laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to mining operations and activities, including the Federal Coal Leasing Amendments Act, the Surface Mining Control and Reclamation Act, the Federal Coal Mine Health and Safety Act, the Black Lung Act and the Coal Act, in each case as amended.

***Mining Site***: each parcel of real property described on Exhibits A and B of the Mortgage and all Appurtenant Rights attached thereto.

***Monarch Agreement***: that certain Agreement for Advisory Services, dated
March 22, 2004, as amended by that certain Amendment No. 1, dated as of March 22, 2006, by
and between Borrower and Monarch Financial Corporation, a corporation incorporated under the
laws of the Commonwealth of Pennsylvania, as in effect on the date hereof.

***Monarch Subordinated Debt***: as defined in Section 6.2(i).

***Mortgaged Properties***: the Real Properties (including the Coal Properties) which
properties are described on Schedule 1.1(c), together with such other Real Property which
Borrower or any Subsidiary may hereafter acquire, in each case as to which the Administrative
Agent for the benefit of the Secured Parties shall be granted a Lien pursuant to one or more
Mortgages.

***Mortgages***: those certain Amended and Restated Mortgages dated as of the date hereof,
together with all other mortgages and deeds of trust (other than that certain Leasehold Credit Line
Deed of Trust, Financing Statement on As Extracted Minerals, Assignment of Leases and Rents
and Fixture Filing as to Midland Trail Resources, LLC, dated as of August 22, 2006), made by any
Credit Party in favor of, or for the benefit of, the Administrative Agent for the benefit of the
Secured Parties, substantially in the form of Exhibit J (with such changes thereto as shall be
advisable under the law of the jurisdiction in which such mortgage or deed of trust is to be
recorded), as the same may be amended, restated, supplemented, replaced or otherwise modified
from time to time.

***Multiemployer Plan***: a Plan that is a multiemployer plan as defined in Section 4001(a)(3)
of ERISA.

***Net Cash Proceeds***: (a) in connection with any Asset Sale or any Recovery Event, the
proceeds thereof in the form of cash and Cash Equivalents (including any such proceeds received
by way of deferred payment of principal pursuant to a note or installment receivable or purchase
price adjustment receivable or otherwise, but only as and when received) of such Asset Sale or
Recovery Event, net of reasonable and customary attorneys' fees, accountants' fees, investment
banking fees, amounts required to be applied to the repayment of Indebtedness secured by a Lien
expressly permitted hereunder on any asset which is the subject of such Asset Sale or Recovery
Event (other than any Lien pursuant to a Security Document) and other reasonable and customary
fees and expenses actually incurred in connection therewith and net of taxes paid or reasonably
estimated to be payable as a result thereof (after taking into account any available tax credits or
deductions and any tax sharing arrangements), (b) in connection with any issuance or sale of
Capital Stock or debt securities or instruments or the incurrence of Indebtedness for borrowed
money, the cash proceeds received from such issuance, sale or incurrence, net of attorneys' fees,
investment banking fees, accountants' fees, underwriting discounts and commissions and other
customary fees and expenses actually incurred in connection therewith and (c) in connection with
any Purchase Price Refund, the cash amount thereof, net of any reasonable and customary
expenses incurred in the collection thereof; *provided, however*, that in each case, the evidence of
such foregoing deductions are provided to the Administrative Agent in form and substance
reasonably satisfactory to it.

***Non-Excluded Taxes***: as defined in Section 2.13.

***Non-Material Project Documents***: (a) contracts or agreements entered into by a Credit Party, or by an agent on behalf of such Credit Party, in the ordinary course of its business in connection with the Development under which such Credit Party could not reasonably be expected to have aggregate obligations or liabilities in excess of $1,500,000 (in a single contract or a series of contracts), (b) contracts or agreements that are used in connection with the acquisition and/or disposition of Permitted Investments (c) Coal Supply Contracts with a tonnage not to exceed 50,000 tons per year and a term not to exceed one year, (d) trucking contracts, with aggregate obligations for each such contract which could not reasonably be expected to exceed $5,000,000 in any calendar year, (e) contracts or agreements entered into by a Credit Party with respect to spot sales of coal and (f) contracts or agreements entered into by a Credit Party in the ordinary course of its business for legal, accounting, engineering, environmental consulting or other professional services in connection with the Development (other than to the extent such are Material Project Documents or contracts or agreements in substitution of any Material Project Document) in accordance with the Construction Budget and Schedule or the then current Operating and Capital Budget, as the case may be.

***Non-U.S. Lender***: as defined in Section 2.13.

***Note***: as defined in Section 2.5(e).

***Obligations***: the unpaid principal of and interest on (including interest accruing after the maturity of the Loans and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to any Credit Party, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) the Loans and all other obligations and liabilities of any Credit Party to the Administrative Agent or to any Lender or any Qualified Counterparty, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, any other Loan Document, any Specified Hedge Agreement or any other document made, delivered or given in connection herewith or therewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including all fees, charges and disbursements of counsel to the Administrative Agent, to the Agents or to any Lender that are required to be paid by Borrower pursuant hereto) or otherwise; *provided*, that (i) obligations of Borrower or any Subsidiary under any Specified Hedge Agreement shall be secured and guaranteed pursuant to the Security Documents only to the extent that, and for so long as, the other Obligations are so secured and guaranteed and (ii) any release of Collateral or Guarantors effected in the manner permitted by this Agreement shall not require the consent of holders of obligations under Specified Hedge Agreements.

***Operating Agreement***: the operating agreement, by-laws or other organizational document, as applicable, of each Credit Party.

***Operating and Capital Budget***: a budget, prepared and certified by Borrower of Operation and Maintenance Expenses and Permitted Capital Expenditures expected to be incurred by Borrower and Borrower Subsidiaries during the relevant fiscal year to which such budget applies, commencing with the fiscal year beginning January 1, 2007.

***Operation and Maintenance Expenses***: for any period, the sum, computed without duplication, of the following: (a) general and administrative expenses *plus* (b) expenses for

operating the Project and maintaining it in good repair and operating condition payable during such period (including any deposits required to Project Parties) *plus* (c) insurance costs payable during such period *plus* (d) applicable sales and excise taxes (if any) payable by a Credit Party with respect to sales of coal generated by the Project during such period *plus* (e) franchise taxes payable by a Credit Party during such period *plus* (f) property taxes payable by a Credit Party during such period *plus* (g) costs and fees and collateral attendant to obtaining and maintaining in effect the Government Approvals payable during such period *plus* (h) legal, accounting and other professional fees attendant to any of the foregoing items payable during such period *plus* (i) any fees and expenses of the Secured Parties during such period not included in Debt Service *plus* (j) any Permitted Capital Expenditures incurred during such period in accordance with the then-current Operating and Capital Budget *plus* (k) payments for the purchase of coal (including coal purchased under the Midland Coal Supply Agreement) *plus* (l) scheduled payments to Far East Processing, LLC under that certain Remote Monitoring and Technical Services Agreement. Operation and Maintenance Expenses shall exclude, to the extent included: (i) payments of any kind with respect to Restricted Payments during such period, (ii) depreciation, amortization and depletion for such period, (iii) any Capital Expenditures except Permitted Capital Expenditures made during such period that are properly chargeable to fixed capital accounts for such period in accordance with GAAP and (iv) any expenditures made with any Reinvestment Deferred Amount relating to a Recovery Event during such period. Notwithstanding the foregoing, for the purpose of calculating the Consolidated Fixed Charges Coverage Ratio, Operation and Maintenance Expenses shall not include the actual cash expenditures for clauses (c), (e) and (f) above, but shall instead include the appropriate accrual for such items to the extent the same are reflected as accrual items in the Operating and Capital Budget.

*Original Agent*: as defined in the recitals hereto.

*Original Closing Date*: July 25, 2006.

*Original Credit Agreement*: as defined in the recitals hereto.

*Original Guarantee and Security Agreement*: that certain Borrower Subsidiary Guarantee and Security Agreement dated as of August 29, 2006 by Matoaka, Powhatan and Greenbrier Smokeless in favor of JPMorgan Chase Bank, N.A., as collateral agent.

*Original Lenders*: as defined in the recitals hereto.

*Original Loan Documents*: the Original Credit Agreement, the Original Security Documents and each certificate, agreement, waiver, consent or document executed by a Credit Party and delivered to the Administrative Agent or any Lender in connection with or pursuant to any of the foregoing.

*Original Midland Security Documents*: collectively, that certain (i) Midland Guarantee Agreement dated as of September 8, 2006 by Midland in favor of JPMorgan Chase Bank, N.A., as collateral agent, and (ii) Midland Security Agreement dated as of August 29, 2006 between Midland and JPMorgan Chase Bank, N.A., as collateral agent.

*Original Mortgages*: collectively, that certain (i) Fee and Leasehold Credit Line Deed of Trust, Financing Statement on as Extracted Minerals, Assignments of Leases, Rents and Fixture

Filings dated as of August 22, 2006 and effective August 29, 2006, given by Matoaka in favor of Ann R. Starcher and J. Thomas Clark, as trustees, for JPMorgan Chase Bank, N.A., as collateral agent, and (ii) A Credit Line Deed of Trust, Assignment of Leases and Rents and Fixture Filing, dated as of August 22, 2006 and effective August 29, 2006, given by Matoaka in favor of Ann R. Starcher and J. Thomas Clark, as trustees, for JPMorgan Chase Bank, N.A., as collateral agent.

*Original Borrower Pledge and Security Agreement*: that certain First-Lien Pledge and Security Agreement dated as of August 29, 2006 between Borrower and JPMorgan Chase Bank, N.A., as collateral agent.

*Original Parent Pledge and Security Agreement*: that certain First-Lien Pledge and Security Agreement dated as of August 29, 2006 between Parent and JPMorgan Chase Bank, N.A., as collateral agent.

*Original Security Documents*: the Original Mortgages, Original Guarantee and Security Agreement, the Original Parent Pledge Agreement and Security Agreement and the Original Borrower Pledge and Security Agreement.

*Orix Lease*: those certain leases entered into under that certain Master Lease Agreement by and between Greenbrier Smokeless and Orix Financial Services, Inc. dated as of July 8, 2005, together with all schedules, exhibits and ancillary documents related thereto, as the same may be amended or modified to allow for the inclusion of additional equipment under such lease.

*Other Taxes*: any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

*Parent*: Greenbrier Minerals Holdings, LLC, a Delaware limited liability company.

*Parent Operating Agreement*: that certain Operating Agreement of Parent dated as of July 26, 2006, as amended by that certain amendment effective as of the date hereof.

*Participant*: as defined in Section 9.6(a).

*Patriot Act*: as defined in Section 9.18.

*Payment Office*: the office in New York City, New York specified from time to time by the Administrative Agent as its payment office by notice to Borrower and the Lenders.

*PBGC*: the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor).

*Pending Permits*: as defined in Section 3.20(a).

*Performance Test*: the completion test protocol addressing the continuous performance, duration and capacity of the Mining Facilities, as set forth in Exhibit K.

***Permit***: any permit, approval, license, franchise, registration, notification, exemption, variance, permission or other authorization required from a Governmental Authority under an applicable Requirement of Law.

***Permitted Capital Expenditures***: Capital Expenditures that are specified for such purpose in the applicable Operating and Capital Budget.

***Permitted Equipment Sale and Leaseback Transaction***: that certain Equipment Sale and Leaseback Transaction involving the Disposition by Borrower to Orix Financial Services, Inc. of the Oldenburg Stamler Continuous Haulage System, serial number 70215, purchased from Oldenburg Group, Inc. pursuant to purchase order 412554.

***Permitted Equity Sale***: the issuance and sale for cash of common equity securities of Borrower or Parent, provided, (i) such issuance and sale shall be on terms and subject to conditions, and shall be to investors, reasonably acceptable to the Administrative Agent, (ii) in the case of any such issuance and sale by Parent, all of the Net Cash Proceeds are contributed to the capital of Borrower and (iii) all of the Net Cash Proceeds of such issuance and sale are used to finance Capital Expenditures or operating costs with respect to the Mining Facilities or the Additional Mining Facilities in accordance with the Operating and Capital Budget.

***Permitted Indebtedness***: as defined in Section 6.2.

***Permitted Liens***: as defined in Section 6.3.

***Permitted Swap Agreement***: any Interest Rate Protection Agreement between Borrower and any Permitted Swap Provider.

***Permits***: any and all franchises, licenses, leases, permits, approvals, notifications, certifications, registrations, authorizations, exemptions, qualifications, easements, and rights of way.

***Person***: an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

***Plan***: at a particular time, any employee benefit plan that is covered by ERISA and in respect of which Borrower or a Commonly Controlled Entity is (or, if such plan were terminated at such time, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

***Pledged Stock***: as defined in the Guarantee and Security Agreement.

***Powhatan***: Powhatan Mid-Vol Coal Sales, L.L.C., a Delaware limited liability company.

***Premium***: as defined in Section 2.8(b).

***Prepayment Date***: (a) with respect to any mandatory prepayment pursuant to Section 2.9, the date of such mandatory prepayment and (b) with respect to any optional prepayment pursuant to Section 2.8, the date of such optional prepayment.

*Principal Equityholders*: collectively, Joseph C. Turley, III and Raymond M. McCormick.

*Project*: the Mining Facilities, Additional Mining Facilities and Mining Site, as described more fully on Exhibit A.

*Project Costs*: all costs incurred by the Credit Parties to achieve Final Completion with respect to the Development in the manner contemplated by (and consistent with) the Loan Documents (and as set forth in the Construction Budget and Schedule) or otherwise approved by the Required Lenders, in consultation with the Independent Engineer, which costs include: (a) costs directly related to the site preparation, construction, development and operation of the medium – volatile metallurgical coal mining facilities; (b) fees and expenses incurred by or on behalf of the Credit Parties in respect of the Development, including financial, accounting, legal, surveying and consulting fees, and the costs of preliminary engineering studies required for site preparation; (c) interest Expense, fees and expenses under the Loan Documents and Permitted Swap Agreements incurred until the earlier to occur of (x) Final Completion and (y) the June 30, 2008; (d) insurance required for the Development as set forth in Section 5.6(e); and (e) costs of conducting the Performance Tests for, and operation of, the Project prior to Final Completion.

*Project Documents*: each Material Project Document, Non-Material Project Document and Additional Project Document.

*Project Party*: each Person from time to time party to a Project Document.

*Project Revenues*: for any period, all cash revenues (without duplication) received by any Credit Party during such period from: (a) the sales of Coal, (b) the proceeds of any business interruption insurance and other payments received for interruption of operations and (c) all other income or revenue, however earned or received, by the Credit Parties during such period, but excluding: (i) net amounts receivable under Permitted Swap Agreements, (ii) the Net Cash Proceeds received as a result of any Recovery Event, (iii) proceeds of Permitted Indebtedness and (iv) contributions to and returns to capital of any Credit Party.

*Property*: any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

*Purchase Price Refund*: any amount received by Borrower or any Subsidiary as a result of a purchase price adjustment or similar event in connection with any acquisition of Property by Borrower or any Subsidiary.

*Qualified Counterparty*: with respect to any Specified Hedge Agreement, any counterparty thereto that, at the time such Specified Hedge Agreement was entered into, was a Lender or an Affiliate of a Lender.

*Qualified DEP Account*: a single bank account maintained solely for purposes of providing payments by any Credit Party to the West Virginia Department of Environmental Protection, *provided* that at no time does such account contain funds in excess of the lesser of

(a) the amount required to meet the Credit Parties' current obligations to the West Virginia Department of Environmental Protection and (b) $250,000.

**Qualified Investment**: expenditures incurred to acquire or repair similar assets owned (or to be owned) by Borrower or any Guarantor of the same type as those subject to such Reinvestment Event or equipment or Properties owned (or to be owned) by and useful in the business of Borrower or any Guarantor.

**Qualified Payroll Account**: a single bank account maintained solely for purposes of providing payroll for employees of any Credit Party, *provided* that at no time does such account contain funds in excess of the lesser of (a) the amount required to meet the Credit Parties' current payroll obligations and (b) $250,000.

**Real Property**: the surface, subsurface, Coal and mineral rights and interests owned, leased or otherwise held by Borrower or its Subsidiaries.

**Reclamation**: the reclamation and restoration of land, water and any future, current or former mines, and any other environment affected by such mines, as required pursuant to any Mining Law.

**Reclamation Bonds**: all bonds required by any Governmental Authority in connection with the conduct or contemplated conduct of mining operations, including, without limitation, all performance, Reclamation and similar bonds required in connection with the mining permits for the Coal Properties.

**Recovery Event**: any settlement of or payment in respect of any property or casualty insurance claim or any condemnation proceeding (or proceeding in lieu thereof) relating to any asset of Borrower or any of its Subsidiaries.

**Regulated Substances**: without limitation, any substance, material or waste, regardless of its form or nature, defined under Environmental Laws as a "hazardous substance," "pollutant," "pollution," "contaminant," "hazardous or toxic substance," "extremely hazardous substance," "toxic chemical," "toxic substance," "toxic waste," "hazardous waste," "special handling waste," "industrial waste," "residual waste," "solid waste," "municipal waste," "mixed waste," "infectious waste," "chemotherapeutic waste," "medical waste," or "regulated substance" or any other material, substance or waste, regardless of its form or nature, which is regulated by the Environmental Laws due to its radioactive, ignitable, corrosive, reactive, explosive, toxic, carcinogenic or infectious properties or nature, or which otherwise is regulated by any applicable Environmental Laws including, without limitation, Coal and other minerals, Coal refuse, run-of-mine coal, acid mine drainage, petroleum and petroleum products (including crude oil and any fractions thereof), natural gas, coalbed methane gas, synthetic gas and any mixtures thereof, asbestos, urea formaldehyde, polychlorinated biphenyls, mercury, radioactive substances, mine tailings and mine drainage.

**Regulated Substances Activity**: any past, current, proposed or threatened activity, event or occurrence involving any Regulated Substances, including the use, manufacture, possession, storage, holding, presence, existence, location, release, threatened release, discharge placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation,

disposal, disposition or handling of, or exposure to, any Regulated Substances, and any corrective action or response action with respect to any of the foregoing.

*Register*:  as defined in Section 9.6(c).

*Regulation H*:  Regulation H of the Board as in effect from time to time.

*Regulation U*:  Regulation U of the Board as in effect from time to time.

*Regulation X*:  Regulation X of the Board as in effect from time to time.

*Reinvestment Deferred Amount*:  with respect to any Reinvestment Event, the aggregate Net Cash Proceeds received by Borrower or any of its Subsidiaries in connection therewith that are duly specified in a Reinvestment Notice as not being required to be initially applied to prepay the Term Loans or reduce the Revolving Credit Commitments pursuant to Section 2.7 as a result of the delivery of a Reinvestment Notice.

*Reinvestment Event*:  any Asset Sale, Purchase Price Refund or Recovery Event in respect of which Borrower has delivered a Reinvestment Notice.

*Reinvestment Notice*:  a written notice executed by a Responsible Officer of Borrower stating that no Default or Event of Default has occurred and is continuing and that Borrower (directly or indirectly through a wholly owned Guarantor) intends and expects to use all or a specified portion of the Net Cash Proceeds of a Reinvestment Event specified in such notice to make a Qualified Investment.

*Reinvestment Prepayment Amount*:  with respect to any Reinvestment Event, the Reinvestment Deferred Amount relating thereto less the portion, if any, thereof expended prior to the relevant Reinvestment Prepayment Date to make a Qualified Investment.

*Reinvestment Prepayment Date*:  with respect to any Reinvestment Event, the earlier of (a) the date occurring one month after such Reinvestment Event and (b) the date on which Borrower shall have determined not to make a Qualified Investment with all or any portion of the relevant Reinvestment Deferred Amount.

*Related Fund*:  with respect to any Lender, any fund that (x) invests in commercial loans and (y) is managed or advised by the same investment advisor as such Lender, by such Lender or an Affiliate of such Lender.

*Reorganization*:  with respect to any Multiemployer Plan, the condition that such plan is in reorganization within the meaning of Section 4241 of ERISA.

*Reportable Event*:  any of the events set forth in Section 4043(c) of ERISA, other than those events as to which the thirty day notice period is waived under subsections .27, .28, .29, .30, .31, .32, .34 or .35 of PBGC Reg. § 4043.

*Required Lenders*:  at any time, the holders of more than 66 2/3% of (a) until the Closing Date, the Aggregate Commitments and (b) thereafter, the sum of (i) the aggregate unpaid principal amount of the Term Loans then outstanding and (ii) the Total Revolving Credit Commitments

then in effect or, if the Revolving Credit Commitments have been terminated, the aggregate then unpaid principal amount of Revolving Credit Loans then outstanding.

*Requirement of Law*: as to any Person, the Constituent Documents of such Person, and any law, treaty, rule, order, statute, ordinance, code, decree, regulation, or other legally enforceable requirements (including common law) or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject, including all Mining Laws.

*Reserve Report*: as defined in Section 3.25.

*Responsible Officer*: as to any Person, the chief executive officer, president or chief financial officer of such Person, but in any event, with respect to financial matters, the chief financial officer of such Person. Unless otherwise qualified, all references to a "Responsible Officer" shall refer to a Responsible Officer of Borrower.

*Restricted Payments*: as defined in Section 6.6.

*Revolving Credit Commitment*: as to any Lender, the obligation of such Lender, if any, to make Revolving Credit Loans in an aggregate principal and/or face amount not to exceed the amount set forth in the Assignment and Acceptance pursuant to which such Lender became a party hereto, as the same may be changed from time to time pursuant to the terms hereof. The original aggregate amount of the Total Revolving Credit Commitments is $5,000,000.

*Revolving Credit Commitment Fee*: as defined in Section 2.6(b).

*Revolving Credit Commitment Period*: the period from and including the Closing Date to the Revolving Credit Termination Date.

*Revolving Credit Facility*: the Revolving Credit Commitment and the Revolving Credit Loans thereunder.

*Revolving Credit Lender*: each Lender that has a Revolving Credit Commitment or that is the holder of Revolving Credit Loans.

*Revolving Credit Loans*: as defined in Section 2.4.

*Revolving Credit Note*: as defined in Section 2.5(e).

*Revolving Credit Percentage*: as to any Revolving Credit Lender at any time, the percentage which such Lender's Revolving Credit Commitment then constitutes of the Total Revolving Credit Commitments (or, at any time after the Revolving Credit Commitments shall have expired or terminated, the percentage which the aggregate unpaid principal amount of such Lender's Revolving Credit Loans then outstanding constitutes the amount of the Total Revolving Credit Loans then outstanding).

*Revolving Credit Termination Date*: December 31, 2010.

**Sale and Leaseback Transaction**: any sale or other transfer of Property by any Person with the intent to lease such Property as lessee.

**Second Lien Obligations**: all "Obligations" as such term is defined in the Second Lien Term Loan.

**Second Lien Term Loan**: as defined in the recitals hereto.

**Secured Parties**: collectively, the Administrative Agent and any Lender.

**Secured Obligations**: in the case of Borrower, the Obligations, and, in the case of any other Credit Party, the obligations of such Credit Party to the Administrative Agent or to any Lender under the Loan Documents to which such Credit Party is a party.

**Securities Act**: as defined in Section 2(a)(1) of the Securities Act of 1933, as amended.

**Security Documents**: the collective reference to the Guarantee and Security Agreement, the Midland Guarantee and Security Agreement, the Mortgages, the Deposit Account Control Agreements any intellectual property security agreements or control agreements required to be delivered pursuant to the Guarantee and Security Agreement or any other Loan Document and all other security documents hereafter delivered to the Administrative Agent granting a Lien on or perfecting a security interest in any Property of any Person to secure Obligations.

**Single Employer Plan**: any Plan that is covered by Title IV of ERISA, but which is not a Multiemployer Plan.

**Solvent**: with respect to any Person, as of any date of determination, (a) the amount of the "present fair saleable value" of the assets of such Person will, as of such date, exceed the amount of all "liabilities of such Person, contingent or otherwise", as of such date, as such quoted terms are determined in accordance with applicable federal and state laws governing determinations of the insolvency of debtors, (b) the present fair saleable value of the assets of such Person will, as of such date, be greater than the amount that will be required to pay the liability of such Person on its debts as such debts become absolute and matured, (c) such Person will not have, as of such date, an unreasonably small amount of capital with which to conduct its business, (d) such Person will be able to pay its debts as they mature and (e) such Person is not insolvent within the meaning of any applicable Requirements of Law. For purposes of this definition, (i) "debt" means liability on a "claim", and (ii) "claim" means any (x) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or (y) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured or unmatured, disputed, undisputed, secured or unsecured.

**SPC**: as defined in Section 9.6(f).

**Specified Hedge Agreement**: any Hedge Agreement entered into by Borrower or any Guarantor and any Qualified Counterparty.

***Subsidiary***: as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership, limited liability company or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of Borrower.

***Syndication Agent***: as defined in the preamble hereto.

***Synthetic Lease Obligations***: all monetary obligations of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property creating obligations which do not appear on the balance sheet of such Person but which, upon the insolvency or bankruptcy of such Person, would be characterized as the Indebtedness of such Person (without regard to accounting treatment).

***Taggart***: Taggart Global, LLC, a Pennsylvania limited liability company.

***Tangible Net Worth***: as of any date, the amount by which the total consolidated assets of Borrower and its Subsidiaries at such date exceeds all liabilities of Borrower and its Subsidiaries at such date, in each case, calculated in conformity with GAAP.

***Tax Affiliate***: with respect to any Person, (a) any Subsidiary of such Person, and (b) any Affiliate of such Person with which such Person files or is eligible to file consolidated, combined or unitary tax returns.

***Tax Distribution Amount***: for any calendar quarter (a) the projected Covered Tax Liabilities for such calendar quarter *plus* (b) except to the extent previously credited, any underestimation of the Covered Tax Liabilities for any preceding calendar quarter (or calendar month thereof) for which the relevant information is available *minus* (c) except to the extent previously debited, any overestimation of the Covered Tax Liabilities for any preceding calendar quarter (or calendar month thereof) for which the relevant information is available.

***Tax Liability Deficiency***: as defined in the Parent Operating Agreement as in effect on the Closing Date.

***Taxes***: with respect to any Person, all taxes, assessments, imposts, duties, withholdings, or other governmental charges or levies imposed directly or indirectly on such Person or its income, profits, sales or Property by any Governmental Authority.

***Tax Return***: as defined in Section 3.13.

***Term A Commitment***: as to any Lender, the obligation of such Lender, if any, to make a Term A Loan to Borrower hereunder in a principal amount not to exceed the amount set forth under the heading "Term A Commitment" opposite such Lender's name on Annex I hereto, or, as the case may be, in the Assignment and Acceptance pursuant to which such Lender became a party hereto, as the same may be changed from time to time pursuant to the terms hereof. The

original aggregate amount of the Term A Commitments is $60,000,000, and after giving effect to the conversion and continuation on the date hereof of the Existing Loans is $17,750,000.

*Term A Commitment Fee*: as defined in Section 2.6.

*Term A Loans*: as defined in Section 2.1(a).

*Term A Loan Facility*: the Term A Commitments and the Term A Loans thereunder.

*Term A Lender*: each Lender that has a Term A Commitment or is the holder of a Term A Loan.

*Term A Loan Percentage*: as to any Term A Lender at any time, the percentage which such Lender's Term A Commitment then constitutes of the aggregate Term A Commitments (or, at any time after the Closing Date, the percentage which the aggregate principal amount of such Lender's Term A Loans then outstanding constitutes of the aggregate principal amount of the Term A Loans then outstanding).

*Term B Commitment*: as to any Lender, the obligation of such Lender, if any, to make a Term B Loan to Borrower hereunder in a principal amount not to exceed the amount set forth under the heading "Term B Commitment" opposite such Lender's name on Annex I hereto, or, as the case may be, in the Assignment and Acceptance pursuant to which such Lender became a party hereto, as the same may be changed from time to time pursuant to the terms hereof. The original aggregate amount of the Term B Commitments is $29,000,000, and after giving effect to the borrowing of Term B Loans on the date hereof is zero.

*Term B Loans*: as defined in Section 2.1(b).

*Term B Loan Facility*: the Term B Commitments and the Term B Loans made thereunder.

*Term B Lender*: each Lender that has a Term B Commitment or is the holder of a Term B Loan.

*Term B Loan Percentage*: as to any Term B Lender at any time, the percentage which such Lender's Term B Commitment then constitutes of the aggregate Term B Commitments (or, at any time after the Closing Date, the percentage which the aggregate principal amount of such Lender's Term B Loans then outstanding constitutes of the aggregate principal amount of the Term B Loans then outstanding).

*Term Loan Facilities*: the collective reference to the Term A Loan Facility and the Term B Loan Facility.

*Term Lenders*: the collective reference to the Term A Lenders and the Term B Lenders.

*Term Loans*: the collective reference to the Term A Loans and Term B Loans.

*Term Notes*: as defined in Section 2.5(e).

*Total Revolving Credit Commitments*: at any time, the aggregate amount of the Revolving Credit Commitments then in effect.

*Transferee*: as defined in Section 9.14.

*UCC*: the Uniform Commercial Code, as in effect from time to time in any jurisdiction.

### 1.2    Other Definitional Provisions.

(a)    Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)    As used herein and in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, accounting terms relating to Borrower and its Subsidiaries not defined in Section 1.1 and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under GAAP; provided any non-cash items arising under FAS 133, 142, 143 or 144 shall be excluded from the relevant calculation.

(c)    The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(d)    The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(e)    Each agreement defined in this Article I shall include all appendices, exhibits and schedules thereto, and references thereto shall be to such agreement as amended, restated, replaced, supplemented or otherwise modified; provided that if the prior written consent of the Required Lenders is required hereunder for an amendment, restatement, replacement, supplement or other modification to any such agreement and such consent is obtained, references in this Agreement to such agreement shall be to such agreement as so amended, restated, replaced, supplemented or modified.

(f)    References in this Agreement to any statute shall be to such statute as amended or modified and in effect at the time any such reference is operative.

(g)    The term "including" when used in any Loan Document means "including without limitation" except when used in the computation of time periods.

(h)    The term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or."

(i)    The terms "Lender" and "Administrative Agent" include their respective successors.

(j)     The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Capital Stock, securities (as such term is defined in the Securities Act), revenues, accounts, leasehold interests and contract rights.

(k)     Each reference to "Credit Party" in Article III shall include any Subsidiary of Borrower that is or, pursuant to Section 6.9, is required to be a Guarantor.

**1.3     Computation of Time Periods**.  In this Agreement, in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding" and the word "through" means "to and including."

ARTICLE II.
AMOUNTS, TERMS AND REPAYMENT OF LOANS AND COMMITMENTS

**2.1     Term Loan Commitments**.

(a)     The Credit Parties acknowledge and agree that as of the Closing Date the aggregate principal amount of all loans outstanding under the Original Credit Agreement equals $41,250,000 (the "***Existing Loans***") and that, subject to Section 4.1, such outstanding loans are hereby converted into and continued as term loans hereunder (such loans, "***Term A Loans***").  Notwithstanding anything set forth herein to the contrary, in order to effect the continuation of the Existing Loans as Term A Loans as contemplated by the preceding sentence, the amount to be funded on by each Lender hereunder in respect of its Term A Commitment shall be reduced by the principal amount of such Lender's Existing Loans under the Original Credit Agreement outstanding on the Closing Date. Once repaid, Term A Loans may not be reborrowed and the Term A Commitment, once terminated or reduced, may not be reinstated.

(b)     Subject to the terms and conditions hereof, each Lender severally agrees to make term loans to Borrower on the Closing Date in an aggregate principal amount not to exceed such Lender's Term B Commitment (the "***Term B Loans***").  Once repaid, Term B Loans may not be reborrowed and the Term B Commitment, once terminated or reduced, may not be reinstated.

**2.2     Repayment of Term Loans**

(a)     The Term A Loans of each Term A Loan Lender shall mature in 10 consecutive quarterly installments, commencing on September 30, 2008, each of which shall be in an amount equal to such Lender's Term A Loan Percentage multiplied by the amount set forth below opposite such installment:

| Installment | Principal Amount |
| --- | --- |
| September 30, 2008 | $ 2,000,000 |
| December 31, 2008 | $ 3,000,000 |
| March 31, 2009 | $ 5,000,000 |
| June 30, 2009 | $ 5,000,000 |

| Installment | Principal Amount |
|---|---|
| September 30, 2009 | $ 5,000,000 |
| December 31, 2009 | $ 5,000,000 |
| March 31, 2010 | $ 5,000,000 |
| June 30, 2010 | $ 5,000,000 |
| September 30, 2010 | $10,000,000 |
| December 31, 2010 | $15,000,000 |

(b)    The Term B Loan of each Term B Loan Lender shall mature, and be due and payable in full in immediately available funds on the Maturity Date, if not sooner repaid.

## 2.3    Revolving Credit Commitments

(a)    Subject to the terms and conditions hereof, the Revolving Credit Lenders severally agree to make revolving credit loans ("***Revolving Credit Loans***") to Borrower from time to time in an aggregate principal amount at any one time outstanding for each Revolving Credit Lender which does not exceed the amount of such Lender's Revolving Credit Commitment.  During the Revolving Credit Commitment Period Borrower may use the Revolving Credit Commitments by borrowing, prepaying the Revolving Credit Loans in whole or in part, and reborrowing, all in accordance with the terms and conditions hereof.

(b)    Borrower shall repay all outstanding Revolving Credit Loans in full in immediately available funds on the Revolving Credit Termination Date, if not sooner repaid.

## 2.4    Procedures for Borrowings.

(a)    For all Loans, Borrower shall deliver to the Administrative Agent a Borrowing Notice requesting that the Lenders make the Loans on the requested Borrowing Date for such Loans.  Such Borrowing Notice must be received by the Administrative Agent prior to 12:00 Noon, New York City time, three Business Days prior to the requested date of each Loan. Upon receipt of such Borrowing Notice, the Administrative Agent shall promptly notify each of the applicable Lenders thereof.  Not later than 12:00 Noon, New York City time, on the Borrowing Date specified for Loans hereunder, each of the applicable Lenders shall make available to the Administrative Agent at the Funding Office an amount in immediately available funds equal to the Loan or Loans to be made by such Lender; *provided* that Borrower shall not deliver a Borrowing Notice, and no Lender shall be under any obligation to make available any funds, for Loans in an aggregate amount for all Lenders less than $1,000,000 unless the remaining unborrowed amount of the Commitments is less than $1,000,000. The Administrative Agent shall make available to Borrower the aggregate of the amounts made available to the Administrative Agent by the Lenders, in like funds as received by the Administrative Agent.

(b)    Borrower shall not request borrowings of Loans more frequently than once a month and all requests for borrowings during the term of this Agreement shall be deemed to constitute requests for Term A Loans until such time as the Term A Commitments are reduced to zero and thereafter for Revolving Credit Loans.

## 2.5    Repayment of Loans; Evidence of Debt.

(a)     Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of the appropriate Revolving Credit Lender or Term Loan Lender, as the case may be, (i) the then unpaid principal amount of each Revolving Credit Loan of such Revolving Credit Lender on the Revolving Credit Termination Date (or on such earlier date on which the Revolving Credit Loans become due and payable pursuant to Article VII), (ii) the principal amount of each Term A Loan of such Term A Lender in installments according to the amortization schedule set forth in Section 2.2 (or on such earlier date on which the Term A Loans become due and payable pursuant to Article VII) and (iii) the then unpaid principal amount of each Term B Loan of such Term B Lender on the Maturity Date.  Borrower hereby further agrees to pay interest on the unpaid principal amount of the Loans from time to time outstanding from the date hereof until payment in full thereof at the rates per annum, and on the dates, set forth in Section 2.10.

(b)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing Indebtedness of Borrower to such Lender resulting from each Loan of such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c)     The Administrative Agent, on behalf of Borrower, shall maintain the Register pursuant to Section 9.6(c), and a subaccount therein for each Lender, in which shall be recorded (i) the amount of each Loan made hereunder and any Note evidencing such Loan, (ii) the amount of any principal or interest due and payable or to become due and payable from Borrower to each Lender hereunder and (iii) both the amount of any sum received by the Administrative Agent hereunder from Borrower and each Lender's share thereof.

(d)     The entries made in the Register and the accounts of each Lender maintained pursuant to Section 2.5(c) shall, to the extent permitted by applicable law, be *prima facie* evidence of the existence and amounts of the obligations of Borrower therein recorded; *provided, however*, that the failure of any Lender or the Administrative Agent to maintain the Register or any such account, or any error therein, shall not in any manner affect the obligation of Borrower to repay (with applicable interest) the Loans made to Borrower by such Lender in accordance with the terms of this Agreement or Borrower's entitlements to credit for any payment of principal or interest on the Loans.

(e)     Borrower agrees that, upon the request to the Administrative Agent by any Lender, Borrower will promptly execute and deliver to such Lender a promissory note of Borrower evidencing any Term Loans or Revolving Credit Loans, as the case may be, of such Lender, substantially in the forms of Exhibits L-1, L-2 or L-3, respectively (a *"Term A Note,"* *"Term B Note,"* or *"Revolving Credit Note,"* respectively, and collectively, *"Notes"*), with appropriate insertions as to date and principal amount; *provided*, that delivery of Notes shall not be a condition precedent to the occurrence of the Closing Date or the making of the Loans on the Closing Date.

**2.6    Fees.**

(a)     Borrower shall pay to the Administrative Agent for the account of each Term A Lender a commitment fee (the *"Term A Commitment Fee"*), on the daily average unused amount of such Lender's Term A Commitment, at a rate per annum equal to 0.50%, for

the period from and including the Closing Date to but not including the date the Term A Commitments are reduced to zero. The accrued Term A Commitment Fee shall be payable in arrears on each Interest Payment Date.

(b)    Borrower shall pay to the Administrative Agent for the account of each Revolving Credit Lender a commitment fee (the "*Revolving Credit Commitment Fee*"), on the daily average unused amount of such Lender's Revolving Credit Loan Commitment, at a rate per annum equal to .50%, for the period from and including the Closing Date to but not including the date the Revolving Credit Loan Commitments are reduced to zero. The accrued Revolving Credit Commitment Fee shall be payable in arrears on each Interest Payment Date.

(c)    Borrower shall pay to the Administrative Agent for its own account an annual nonrefundable administration fee equal to $25,000, such fee to be paid in advance on the Closing Date and thereafter on each anniversary of the Closing Date (or, if such date is not a Business Day, on the first Business Day thereafter)

**2.7    Termination or Reduction of Commitments**. Borrower shall have the right, upon not less than three Business Days' notice to the Administrative Agent, to terminate the Revolving Credit Commitments or the Term A Commitments or, from time to time, to reduce the aggregate amount of the Revolving Credit Commitments or Term A Commitments; *provided* that no such termination or reduction of Revolving Credit Commitments shall be permitted if, after giving effect thereto and to any prepayments of the Revolving Credit Loans made on the effective date thereof, the aggregate principal amount of the Revolving Credit Loans then outstanding would exceed the Total Revolving Credit Commitments. Any such reduction shall be in an amount equal to $1,000,000, or a whole multiple thereof, and shall reduce permanently the Revolving Credit Commitments then in effect. The Commitment of any Lender shall be reduced on the date of funding of any Loan pursuant to Section 2.4 by the principal amount of the Loan funded.

**2.8    Optional Prepayments**.

(a)    Subject to the concurrent payment of the Premium, Borrower may, upon at least three Business Days' prior notice to the Administrative Agent stating the Prepayment Date and aggregate principal amount of the prepayment, prepay the outstanding principal amount of Loans, on or after August 29, 2007, in whole or in part, at Borrower's option, and from time to time, together with accrued interest through the Prepayment Date on the principal amount prepaid.

(b)    For purposes hereof, the "*Premium*" shall be a cash amount equal to:

(i)    the percentages of principal amount of the Term A Loans being prepaid set forth below:

If prepaid on or before August 29, 2008 ................................................. 2.0%

If prepaid after August 29, 2008 but
prior to August 29, 2009 ...................................................................... 1.5%

If prepaid on or after August 29, 2009,
but prior to August 29, 2010 ................................................................. 1.0%

If prepaid on or at any time after August 29, 2010 ................................. 0.0%;
and

        (ii)     the percentages of principal amount of the Term B Loans being
prepaid set forth below:

If prepaid on or before August 29, 2008 ................................................. 5.0%

If prepaid after August 29, 2008 but
prior to August 29, 2009 ........................................................................ 2.0%

If prepaid on or after August 29, 2009,
but prior to August 29, 2010 ................................................................. 1.0%

If prepaid on or at any time after August 29, 2010 ................................. 0.0%.

        (c)     Any optional prepayment under this Section 2.8 shall be applied to the
Loans as set forth in Section 2.11.

        (d)     Each partial prepayment shall be in an aggregate amount not less than
$1,000,000 or integral multiples of $1,000,000 in excess thereof and any such prepayment
must be accompanied by payment of Agent's and each Lender's out-of-pocket expenses and
payment of any LIBOR funding breakage costs in accordance with Section 2.12. Upon the
giving of such notice of prepayment, the principal amount of the Loans specified to be prepaid,
together with the accrued interest through the Prepayment Date and (if required pursuant to
Section 2.8(a) Premium thereon shall become due and payable on the Prepayment Date.

**2.9**    **Mandatory Prepayments and Commitment Reductions**.

        (a)     Unless the Required Lenders shall otherwise agree:

        (i)     If Borrower or any of its Subsidiaries shall issue any Capital Stock
(other than a Permitted Equity Sale) or incur any Indebtedness (other than Permitted
Indebtedness), then on the date of such issuance or incurrence, Borrower shall prepay the
principal amount of Term Loans then outstanding and thereafter, to the extent any such Net
Cash Proceeds remain, the Revolving Credit Commitments shall be reduced, by an amount
equal to the amount of the Net Cash Proceeds of such issuance or incurrence, as set forth in
Section 2.11(a) and (b).

        (ii)     If Borrower or any of its Subsidiaries shall receive Net Cash
Proceeds from any Asset Sale or Recovery Event or a Purchase Price Refund, then, on the
date of receipt by such Person of such Net Cash Proceeds or such Purchase Price Refund,
Borrower shall prepay the principal amount of Term Loans then outstanding and thereafter,
to the extent any such Net Cash Proceeds remain, the Revolving Credit Commitments shall
be reduced, by an amount equal to the amount of such Net Cash Proceeds or such Purchase
Price Refund, as set forth in Section 2.11(b); *provided, however*, that in the case of any Net

Cash Proceeds constituting the Reinvestment Deferred Amount with respect to a
Reinvestment Event, Borrower shall prepay the Loans and reduce the Revolving Credit
Commitments in an amount equal to the Reinvestment Prepayment Amount applicable to
such Reinvestment Event, if any, on the Reinvestment Prepayment Date with respect to
such Reinvestment Event; *provided further* that the aggregate Net Cash Proceeds of
Reinvestment Events that may be specified as Reinvestment Deferred Amounts in one or
more Reinvestment Notices shall not exceed $250,000 in the case of any Reinvestment
Event and $1,000,000 in the aggregate in the case of all Reinvestment Events.
Notwithstanding anything contained herein to the contrary, the Credit Parties shall not be
required to prepay the Loans under this Section 2.9 with the proceeds received from any
Disposition of property as part of a Permitted Sale and Leaseback Transaction;

      (iii)    Upon the receipt by a Credit Party of any Extraordinary Receipt, the
Required Lenders, at their sole discretion, may require Borrower to immediately prepay
outstanding principal amount of the Term Loans and thereafter, to the extent any such Net
Cash Proceeds remain, and reduce the Revolving Credit Commitments by an amount equal
to the amount of any such Extraordinary Receipt, as set forth in Sections 2.11(a) and (b);

      (iv)    Upon the occurrence of a Change of Control, the Required Lenders,
at their sole discretion, may require Borrower to immediately prepay the outstanding
principal amount of the Loans, and satisfy, in full and in cash, all other Obligations then
due and payable under any Loan Document including, without limitation, any fees and
expenses then due and payable under any Loan Document, and reduce the Aggregate
Commitments to zero;

      (v)    If Borrower or any of its Subsidiaries shall receive any payments in
excess of $10,000 from any Material Project Parties in connection with any of termination
thereof or for liquidated damages payments thereunder, then, on the date of receipt by such
Person of such payments, Borrower shall prepay the principal amount of the Term Loans
and the Revolving Credit Commitments shall be reduced, by an amount equal to the
amount of such payments, as set forth in Sections 2.11(a) and (b);

      (vi)    If Borrower or any of its Subsidiaries shall receive any payments
from Midland under the Midland Promissory Note then, on the date of receipt by Borrower
of such payments, Borrower shall prepay the principal amount of the Term Loans, and the
Revolving Credit Commitments shall be reduced, by an amount equal to the amount of
such payments, as set forth in Sections 2.11(a) and (b); and

      (vii)    for each fiscal quarter period of Borrower ending
December 31, 2007, March 31, 2008 and June 30, 2008, if there shall be Excess Cash
Flow, then, on the relevant Excess Cash Flow Application Date, the Term Loans shall be
prepaid by an amount equal to 90% of such Excess Cash Flow, as set forth in
Section 2.11(a) and (b). Each such prepayment shall be made on a date (an "*Excess Cash
Flow Application Date*") no later than five days after the earlier of (i) the date on which
the financial statements of Borrower referred to in Section 5.1(a) or (b), as applicable, for
the fiscal period with respect to which such prepayment is made, are required to be
delivered to the Lenders and (ii) the date such financial statements are actually delivered.

(b)    The provisions of Section 2.9(a) do not constitute a consent to the issuance of any Capital Stock by any Person whose Capital Stock is pledged pursuant to any Security Document, the Disposition of any Assets or a consent to the incurrence of any Indebtedness by Borrower or any of its Subsidiaries.

(c)    Each prepayment of the Loans pursuant to this Section 2.9 shall be applied in accordance with Section 2.11 below and shall be accompanied by payment of accrued interest thereon to the date of prepayment and, except in the case of prepayments made under Section 2.9(a)(iv), (vi) or (vii), a concurrent payment of Premium; *provided*, that in the case of prepayment under Section 2.9(a)(iv), such prepayment shall be accompanied by a concurrent payment of a premium equal to 1.0% of the aggregate principal amounts of the Term B Loans being repaid.

**2.10    Interest Rates, Payment Dates and Computation of Interest and Fees.**

(a)    Each Loan shall bear interest for each day on which it is outstanding at the Applicable Interest Rate.

(b)    (i) If all or a portion of the principal amount of any Loan shall not be paid when due (whether at the stated maturity, by acceleration or otherwise) or there shall occur and be continuing any other Event of Default, all outstanding Loans (whether or not overdue) (to the extent legally permitted) shall bear interest at a rate per annum that is equal to the Applicable Interest Rate plus 2.0% (the "*Default Rate*"), from the date of such nonpayment of principal or occurrence of such Event of Default, respectively, until such amount of principal is paid in full (after as well as before judgment) or until such Event of Default is no longer continuing, respectively, and (ii) if all or a portion of any interest payable on any Loan or any fee or other amount payable hereunder shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall bear interest at a rate per annum equal to the Default Rate, from the date of such non payment until such amount is paid in full (after as well as before judgment).

(c)    Subject to Section 2.9(c), interest shall be payable in arrears on the Interest Payment Date, *provided* that interest accruing pursuant to Section 2.10(b) shall be payable from time to time on demand.

(d)    Interest, fees and commissions payable pursuant hereto shall be calculated on the basis of a year of 360 days for the actual days elapsed. Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall be conclusive and binding on Borrower and the Lenders in the absence of manifest error.

(e)    In the event that the Consolidated EBITDA for periods set forth below is less than the amount set forth below opposite such period:

| Fiscal Quarter | Minimum Consolidated EBITDA |
|---|---|
| For the fiscal quarter ending March 31, 2007 | $3,600,000 |
| For the two-fiscal quarter period ending June 30, 2007 | $12,150,000 |
| For the three-fiscal quarter period ending September 30, 2007 | $22,500,000 |
| For the four-fiscal quarter period ending December 31, 2007 | $33,390,000 |
| For each four-fiscal quarter period ending on March 31st, June 30th, September 30 and December 31st at any time thereafter | $36,000,000 |

then, in any such case, Borrower shall pay to the Lenders an amount ("***Contingent Interest***") equal to 0.25% of the aggregate principal amount of the Term B Loans outstanding at the close of business on the last day of such period. Any Contingent Interest payable pursuant to this Section 2.10(e), with respect to any period ending on or after the Closing Date, shall be payable on the next Interest Payment Date immediately following the last day of such fiscal quarter.

### 2.11    Application and Pro Rata Treatment of Payments.

(a)    The borrowing by Borrower from the Lenders hereunder, any reduction of the Commitments of the Lenders and, subject to Sections 2.9(b) and (c), each payment by Borrower on account of any fee, shall be made *pro rata* according to the applicable Loan Percentages of the relevant Lenders. Amounts prepaid on account of the Term Loans may not be reborrowed.

(b)    So long as no Event of Default shall have occurred and be continuing, each payment (including each prepayment) of the Loans outstanding shall be applied:

*first*, to the prepayment of Term A Loans until repaid in full;

*second*, to the prepayment of Term B Loans until repaid in full; and

*third*, to the repayment of Revolving Credit Loans and thereafter to reduce permanently the Revolving Credit Commitments.

Any reduction of the Revolving Credit Commitments shall be accompanied by prepayment of the Revolving Credit Loans to the extent, if any, that the Revolving Credit Loans exceed the amount of the Revolving Credit Commitments as so reduced.

(c)    After the occurrence and during the continuance of any Event of Default, each payment in respect of principal or interest in respect of the Loans and each payment in respect of fees payable hereunder and any proceeds of Collateral and any Net Cash Proceeds of insurance policies shall be applied in the following order:

*first*, to the payment or reimbursement of the Administrative Agent for all costs, expenses, disbursements and losses incurred by the Administrative Agent and which Borrower is required to pay or reimburse pursuant to the Loan Documents;

*second,* to the payment or reimbursement of the Lenders for all costs, expenses, disbursements and losses incurred by such Persons and which any Credit Party is required to pay or reimburse pursuant to the Loan Documents;

*third,* to the payment or prepayment to the Lenders of all Obligations on a *pro rata* basis in accordance with their respective Aggregate Exposure Percentages in effect on such date; and

*fourth,* to whomsoever shall be legally entitled thereto.

If any Lender owes payments to the Administrative Agent hereunder, any amounts otherwise distributable under this Section 2.11(c) to such Lender shall be deemed to belong to the Administrative Agent to the extent of such unpaid payments, and the Administrative Agent shall apply such amounts to make such unpaid payments rather than distribute such amounts to such Lender. All distributions of amounts described in paragraphs *second* and *third* above shall be made by the Administrative Agent to each Lender on a pro rata basis determined by the amount the Obligations owed to such Lender represent of the aggregate amount of all Obligations.

(d)    All payments (including prepayments) to be made by Borrower hereunder, whether on account of principal, interest, premium, fees or otherwise, shall be made without setoff or counterclaim and shall be made prior to 12:00 Noon, New York City time, on the due date thereof to the Administrative Agent, for the account of the relevant Lenders, at the Payment Office, in Dollars and in immediately available funds. Any payment made by Borrower after 12:00 Noon, New York City time, on any Business Day shall be deemed to have been on the next following Business Day. The Administrative Agent shall distribute such payments to the Lenders promptly upon receipt in like funds as received. If any payment hereunder becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day. In the case of any extension of any payment of principal pursuant to the preceding sentence, interest thereon shall be payable at the then applicable rate during such extension.

(e)    Unless the Administrative Agent shall have been notified in writing by any Lender prior to a borrowing that such Lender will not make the amount that would constitute its share of such borrowing available to the Administrative Agent, the Administrative Agent may assume that such Lender is making such amount available to the Administrative Agent, and the Administrative Agent may, in reliance upon such assumption, make available to Borrower a corresponding amount. If such amount is not made available to the Administrative Agent by the required time on the Borrowing Date therefor, such Lender shall pay to the Administrative Agent, on demand, such amount with interest thereon at a rate equal to the daily average Federal Funds Effective Rate for the period until such Lender makes such amount immediately available to the Administrative Agent. A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this Section 2.11(e) shall be conclusive in the absence of manifest error. If such Lender's share of such borrowing is not made available to the Administrative Agent by such Lender within three Business Days after such Borrowing Date, the Administrative Agent shall also be entitled to recover such amount with interest thereon at the rate per annum the Applicable Interest Rate for such borrowings, on demand, from Borrower.

(f)      Unless the Administrative Agent shall have been notified in writing by Borrower prior to the date of any payment due to be made by Borrower hereunder that Borrower will not make such payment to the Administrative Agent, the Administrative Agent may assume that Borrower is making such payment, and the Administrative Agent may, but shall not be required to, in reliance upon such assumption, make available to the Lenders their respective pro rata shares of a corresponding amount.  If such payment is not made to the Administrative Agent by Borrower within three Business Days after such due date, the Administrative Agent shall be entitled to recover, on demand, from each Lender to which any amount which was made available pursuant to the preceding sentence, such amount with interest thereon at the rate per annum equal to the daily average Federal Funds Effective Rate. Nothing herein shall be deemed to limit the rights of the Administrative Agent or any Lender against Borrower.

(g)      Each payment of the Loans shall be accompanied by accrued interest to the date of such payment on the amount paid.

(h)      Each payment (including each prepayment) of the Term A Loans outstanding under the Term A Facility shall be allocated among the Term A Lenders holding such Term A Loans *pro rata* based on the principal amount of such Term A Loans held by such Term A Lenders, and shall be applied to the installments of such Term A Loans *pro rata* based on the remaining outstanding principal amount of such installments. Each payment (including each prepayment) of the Term B Loans outstanding under the Term B Facility shall be allocated among the Term B Lenders holding such Term B Loans *pro rata* based on the principal amount of such Term B Loans held by such Term B Lenders. Each payment (including each prepayment) by Borrower on account of principal of and interest on the Revolving Credit Loans shall be made *pro rata* according to the respective outstanding principal amounts of the Revolving Credit Loans then held by the Revolving Credit Lenders.

(i)      Each borrowing by Borrower from the Lenders hereunder, each payment by Borrower on account of any commitment fee, and any reduction of the Commitments of the Lenders, shall be made *pro rata* according to the respective Loan Percentages, of the relevant Lenders.

**2.12    Requirements of Law.**

(a)      If the adoption of or any change in any Requirement of Law or in the interpretation or application thereof or compliance by any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the date hereof:

(i)      shall subject any Lender to any tax of any kind whatsoever with respect to this Agreement, or any Loan made by it, or change the basis of taxation of payments to such Lender in respect thereof (except for Non-Excluded Taxes covered by Section 2.13 and changes in the rate of tax on the overall net income of such Lender);

(ii)      shall impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances, loans or other extensions of credit by, or any other

acquisition of funds by, any office of such Lender that is not otherwise included in the determination of LIBOR hereunder; or

(iii)   shall impose on such Lender any other condition;

and the result of any of the foregoing is to increase the cost to such Lender, by an amount which such Lender deems to be material, of making, converting into, continuing or maintaining Loans bearing interest by reference to LIBOR, or to reduce any amount receivable hereunder in respect thereof, then, in any such case, Borrower shall promptly pay such Lender, upon its demand, any additional amounts necessary to compensate such Lender for such increased cost or reduced amount receivable.  If any Lender becomes entitled to claim any additional amounts pursuant to this Section, it shall promptly notify Borrower (with a copy to the Administrative Agent) of the event by reason of which it has become so entitled.

(b)   If any Lender shall have determined that the adoption of or any change in any Requirement of Law regarding capital adequacy, reserve requirements or similar requirements or in the interpretation or application thereof or compliance by such Lender or any corporation controlling such Lender with any request or directive regarding capital adequacy, reserve requirements or similar requirements (whether or not having the force of law) from any Governmental Authority made subsequent to the date hereof shall have the effect of reducing the rate of return on such Lender's or such corporation's capital as a consequence of its obligations hereunder to a level below that which such Lender or such corporation could have achieved but for such adoption, change or compliance (taking into consideration such Lender's or such corporation's policies with respect to capital adequacy) by an amount deemed by such Lender to be material, then from time to time, after submission by such Lender to Borrower (with a copy to the Administrative Agent) of a written request therefor, Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such corporation for such reduction.

(c)   A certificate as to any additional amounts payable pursuant to this Section submitted by any Lender to Borrower (with a copy to the Administrative Agent) shall be conclusive in the absence of manifest error.  The obligations of Borrower pursuant to this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

## 2.13   Taxes.

(a)   All payments made by Borrower under this Agreement or any other Loan Documents shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, excluding net income taxes and franchise taxes (imposed in lieu of net income taxes) imposed on any Agent or any Lender as a result of a present or former connection between such Agent or such Lender and the jurisdiction of the Governmental Authority imposing such tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from such Agent's or such Lender's having executed, delivered or performed its obligations or received a payment under,

or enforced, this Agreement or any other Loan Document). If any such non-excluded taxes, levies, imposts, duties, charges, fees, deductions or withholdings ("**Non-Excluded Taxes**") or any Other Taxes are required to be withheld from any amounts payable to any Agent or any Lender hereunder, the amounts so payable to such Agent or such Lender shall be increased to the extent necessary to yield to such Agent or such Lender (after payment of all Non-Excluded Taxes and Other Taxes) interest or any such other amounts payable hereunder at the rates or in the amounts specified in this Agreement; *provided, however*, that Borrower or any Guarantor shall not be required to increase any such amounts payable to any Agent or any Lender with respect to any Non-Excluded Taxes (i) that are attributable to such Agent's or such Lender's failure to comply with the requirements of paragraph (d) or (e) of this Section or (ii) in the case of any Non-U.S. Lender, that are United States withholding taxes imposed on amounts payable to such Agent or such Lender at the time such Agent or such Lender becomes a party to this Agreement, except to the extent that such Agent's or such Lender's assignor (if any) was entitled, at the time of assignment, to receive additional amounts from Borrower with respect to such Non-Excluded Taxes pursuant to this Section 2.13(a). Borrower or the applicable Guarantor shall make any required withholding and pay the full amount withheld to the relevant tax authority or other Governmental Authority in accordance with applicable Requirements of Law.

(b)     In addition, Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)     Whenever any Non-Excluded Taxes or Other Taxes are payable by Borrower, as promptly as possible thereafter Borrower shall send to the Administrative Agent for the account of the relevant Agent or Lender, as the case may be, a certified copy of an original official receipt received by Borrower showing payment thereof. If Borrower fails to pay any Non-Excluded Taxes or Other Taxes when due to the appropriate taxing authority or fails to remit to the Administrative Agent the required receipts or other required documentary evidence, Borrower shall indemnify the Agents and the Lenders for any incremental taxes, interest or penalties that may become payable by any Agent or any Lender as a result of any such failure. The agreements in this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

(d)     Each Lender (or Transferee) that is not a citizen or resident of the United States of America, a corporation, partnership or other entity created or organized in or under the laws of the United States of America (or any jurisdiction thereof), or any estate or trust that is subject to federal income taxation regardless of the source of its income (a "**Non-U.S. Lender**") shall deliver to Borrower and the Administrative Agent (or, in the case of a Participant, to the Lender from which the related participation shall have been purchased) two copies of either U.S. Internal Revenue Service Form W-8BEN or Form W-8ECI, or, in the case of a Non-U.S. Lender claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest" a statement substantially in the form of Exhibit M to the effect that such Lender is eligible for a complete exemption from withholding of U.S. taxes under Section 871(h) or 881(c) of the Code and a Form W-8BEN, or any subsequent versions thereof or successors thereto properly completed and duly executed by such Non-U.S. Lender claiming complete exemption from, or a reduced rate of, U.S. federal withholding tax on all payments by Borrower under this

Agreement and the other Loan Documents. Such forms shall be delivered by each Non-U.S. Lender on or before the date it becomes a party to this Agreement (and in the case of any Participant, on or before the date such Participant purchases the related participation). In addition, each Non-U.S. Lender shall deliver such forms promptly upon the obsolescence or invalidity of any form previously delivered by such Non-U.S. Lender. Each Non-U.S. Lender shall promptly notify Borrower at any time it determines that it is no longer in a position to provide any previously delivered certificate to Borrower (or any other form of certification adopted by the U.S. taxing authorities for such purpose). Notwithstanding any other provision of this Section 2.13(d), a Non-U.S. Lender shall not be required to deliver any form pursuant to this Section 2.13(d) that such Non-U.S. Lender is not legally able to deliver.

(e)    A Lender that is entitled to an exemption from or reduction of non-U.S. withholding tax under the law of the jurisdiction in which Borrower is located, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall deliver to Borrower (with a copy to the Administrative Agent), at the time or times prescribed by applicable law or reasonably requested by Borrower, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate, *provided* that such Lender is legally entitled to complete, execute and deliver such documentation and in such Lender's reasonable judgment such completion, execution or submission would not materially prejudice the legal position of such Lender.

2.14    **Indemnity.** Borrower agrees to indemnify each Lender for, and to hold each Lender harmless from, any loss or expense that such Lender may sustain or incur as a consequence of (a) any default by Borrower in making a borrowing of Loans after Borrower has given a notice requesting the same in accordance with the provisions of this Agreement, (b) any default by Borrower in making any prepayment after Borrower has given a notice thereof in accordance with the provisions of this Agreement, (c) the repayment of any Loans that are repaid in whole or in part prior to the last day of a LIBOR Period (whether such repayment is made pursuant to any provision of this Agreement or any other Loan Document or occurs as a result of acceleration, mandatory prepayment, by operation of law or otherwise); or (d) a default in making any borrowing of Loans after Borrower has given notice requesting the same in accordance herewith. Such indemnification shall include any loss (including loss of margin) or expense arising from the reemployment of funds obtained by it or from fees payable to terminate deposits from which such funds were obtained. For the purpose of calculating amounts payable to a Lender under this Section 2.14, each Lender shall be deemed to have actually funded its relevant Loan through the purchase of a deposit bearing interest at LIBOR in an amount equal to the amount of that Loan and having a maturity comparable to the LIBOR Period; *provided* that each Lender may fund each of its Loans in any manner it sees fit, and the foregoing assumption shall be utilized only for the calculation of amounts payable under this Section 2.14. Such indemnification may include an amount equal to the excess, if any, of (i) the amount of interest that would have accrued on the amount so prepaid, or not so borrowed, converted or continued, for the period from the date of such prepayment or of such failure to borrow, convert or continue to the last day of such Interest Period (or, in the case of a failure to borrow, convert or continue, the Interest Period that would have commenced on the date of such failure) in each case at the applicable rate of interest for such Loans provided for herein (excluding, however, the Applicable Margin included therein, if any) *over* (ii) the amount of interest (as reasonably determined by such Lender) that would have

accrued to such Lender on such amount by placing such amount on deposit for a comparable period with leading banks in the interbank Eurodollar market. A certificate as to any amounts payable pursuant to this Section submitted to Borrower by any Lender shall be conclusive in the absence of manifest error. This covenant shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

**2.15   Illegality**. Notwithstanding anything to the contrary contained herein, if the introduction of or any change in any law or regulation (or any change in the interpretation thereof) shall make it unlawful, or any central bank or other Governmental Authority shall assert that it is unlawful, for any Lender to agree to make or to make or to continue to fund or maintain any Loan bearing interest by reference to LIBOR, then, unless that Lender is able to make or to continue to fund or to maintain such Loan at another branch or office of that Lender without, in that Lender's opinion, adversely affecting it or its Loans or the income obtained therefrom, on notice thereof and demand therefor by such Lender to Borrower through the Administrative Agent, (i) the obligation of such Lender to agree to make or to make or to continue to fund or maintain Loans bearing interest by reference to LIBOR shall terminate, and (ii) all of such Lender's Loans shall automatically convert at the end of the then-current LIBOR Period with respect thereto or sooner, if required by such law, regulation or interpretation, into Loans bearing interest with respect to such Lender from and after the date of such conversion at a rate per annum equal to the sum of (x) the Federal Funds Effective Rate in effect from time to time *plus* 0.50% and (y) the Applicable Interest Margin.

**2.16   Change of Lending Office**. Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 2.12 or 2.13(a) with respect to such Lender, it will, if requested by Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event with the object of avoiding the consequences of such event; *provided*, that such designation is made on terms that, in the sole judgment of such Lender, cause such Lender and its lending office(s) to suffer no economic, legal or regulatory disadvantage, and *provided, further*, that nothing in this Section 2.16 shall affect or postpone any of the obligations of any Borrower or the rights of any Lender pursuant to Sections 2.12 or 2.13(a).

ARTICLE III.
REPRESENTATIONS AND WARRANTIES

To induce the Agents and the Lenders to enter into this Agreement and to make the Loans, Borrower represents and warrants to each Agent and each Lender that on and as of the Closing Date:

**3.1   Financial Condition**.

(a)   Borrower has heretofore furnished to the Lenders its consolidated balance sheet and consolidated statements of income, stockholders' equity and cash flows (i) as of and for the fiscal year ended December 31, 2006, in each case reported on by its Independent Accountants. Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of Borrower and the Subsidiaries as of such dates and for such periods in accordance with GAAP consistently applied, subject to normal

year-end audit adjustments and the absence of footnotes in the case of the statements referred to in clause (ii) above (collectively, (i) and (ii) are the *"Financial Statements"*).

(b)    Borrower and its Subsidiaries have no material Guarantee Obligations, contingent liabilities or liabilities for taxes, or any long term leases or unusual forward or long term commitments, including any interest rate or foreign currency swap or exchange transaction or other Hedging Agreement or other obligation in respect of derivatives, that are not reflected in the Financial Statements.

**3.2    No Change.**  Since December 31, 2006, there has been no Material Adverse Change and there have been no developments or events that in the aggregate have had or reasonably could be expected to have a Material Adverse Effect, except for such developments and events disclosed in writing to the Administrative Agent prior to the date hereof.

**3.3    Company Existence; Compliance with Law.**  Each of the Credit Parties (i) is duly incorporated, organized or formed, as applicable, validly existing and (if relevant) in good standing under the laws of the jurisdiction of its incorporation, organization or formation, as the case may be, (ii) has the corporate, company or partnership power and authority, as applicable, and the legal right, to own and operate its Property, to lease the Property it operates as lessee and to conduct the business in which it is currently engaged, (iii) is duly qualified as a foreign corporation, company or partnership, as applicable, and (if relevant) in good standing under the laws of each jurisdiction where its ownership, lease or operation of Property or the conduct of its business requires such qualification, (iv) is in compliance with its Constituent Documents and (v) is in compliance with all Requirements of Law except, solely in the case of clauses (iii) and (v), to the extent that the failure to comply therewith could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

**3.4    Power; Authorization; Enforceable Obligations.**  Each Credit Party has the corporate, company or partnership power and authority, as applicable, and the legal right, to make, deliver and perform each of the Loan Documents to which it is a party, and, in the case of Borrower, to borrow hereunder. Each Credit Party has taken all necessary partnership, company, corporate or other entity action to authorize the execution, delivery and performance of each of the Loan Documents to which it is a party and, in the case of Borrower, to authorize the borrowings on the terms and conditions of this Agreement. No consent or authorization of, filing with, notice to or other act by or in respect of, any Governmental Authority or any other Person is required to be obtained by a Credit Party in connection with the effectiveness of the consummation of the borrowings hereunder or the execution, delivery, performance, validity or enforceability of this Agreement, or any of the other Loan Documents, except (i) consents, authorizations, filings and notices described in <u>Schedule 3.4</u>, which consents, authorizations, filings and notices , except as described in <u>Schedule 3.4</u>, have been obtained or made and are in full force and effect except as set forth therein and (ii) the filings referred to in Section 3.22. Each Loan Document has been duly executed and delivered on behalf of each Credit Party that is a party thereto. This Agreement constitutes, and each of the other  Loan Documents upon execution and delivery will constitute, a legal, valid and binding obligation of each Credit Party that is a party thereto, enforceable against each such Credit Party in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).