**3.5     No Legal Bar**. The execution, delivery and performance of this Agreement and the other Loan Documents, the borrowings hereunder, and the use of the proceeds thereof will not result in a violation by any Credit Party of any Requirement of Law or any Contractual Obligation of any Credit Party and will not result in, or require, the creation or imposition of any Lien on any of its Properties or revenues pursuant to any Requirement of Law or any such Contractual Obligation (other than the Liens created by the Security Documents). No Requirement of Law, Constituent Document or Contractual Obligation applicable to the Credit Parties could reasonably be expected to have a Material Adverse Effect. No performance of a Contractual Obligation by any Credit Party, either unconditionally or upon the happening of an event, would result in the creation of a Lien (other than a Permitted Lien) on the Property or Capital Stock of any such Person.

**3.6     No Material Litigation**. There is (a) no litigation, action, suit, claim, dispute, investigation or proceeding at law or in equity, whether judicial or administrative, in or before any arbitrator, court or other Governmental Authority that is pending or, to the knowledge of any Credit Party after due and diligent investigation, threatened, against or affecting any Credit Party, against any of their respective Properties or revenues, or with respect to any Material Agreement and (b) no existing default by any Credit Party under any applicable order, writ, injunction or decree of any Governmental Authority or arbitral tribunal, which, in the case of clause (a) or (b), could reasonably be expected to have a Material Adverse Effect.

**3.7     No Default**. No Credit Party is in default under or with respect to any of its Contractual Obligations in any respect that constitutes a Material Adverse Effect. No Default nor Event of Default has occurred and is continuing.

**3.8     Government Approvals; Government Rules**.

(a)     All material Government Approvals for the current stage of Development (including for the sale of coal by the Project, if applicable) that have been obtained by a Credit Party or by third parties for the benefit of the Project as of the Closing Date are set forth on Schedule 3.8(a). Except as otherwise noted on Schedule 3.8(a), all Government Approvals set forth on Schedule 3.8(a) have been duly obtained, were validly issued, are in full force and effect, and are not the subject of any pending appeal and all applicable appeal periods have expired (except Government Approvals which do not have limits on appeal periods under Government Rules or appeals which could not reasonably be expected to have a Material Adverse Effect), are held in the name of a Credit Party or such third party as indicated on such Schedule 3.8(a) and are free from conditions or requirements which (i) could reasonably be expected to have a Material Adverse Effect or (ii) the Credit Party or such third party (as applicable) does not expect to be able to satisfy on or prior to the commencement of the relevant stage of Development, except to the extent that a failure to so satisfy such condition or requirement could not reasonably be expected to have a Material Adverse Effect. No Material Adverse Effect could reasonably be expected to result from any such Government Approvals being held by or in the name of Persons other than a Credit Party.

(b)     All material Government Approvals not obtained as of the Closing Date but necessary for the Development (including the sale of coal by the Project) to be obtained by a Credit Party or by third parties for the benefit of the Project after the Closing Date are set forth on Schedule 3.8(b). No Material Adverse Effect could reasonably be expected to result from

any such Government Approvals being obtained in the name of Persons other than a Credit Party.

(c)    All material Government Approvals required to be held by a Credit Party or the third party indicated on Schedule 3.8(b) for the current stage of Development (as identified by the dates on Schedule 3.8(b) for which such Government Approvals are reasonably projected to be required), have been duly obtained and validly issued, are in full force and effect, are not the subject of any pending or threatened appeal (except appeals which, to Borrower's knowledge, could not reasonably be expected to have a Material Adverse Effect), are held in the name of a Credit Party or such third party and are free from conditions or requirements which (i) could reasonably be expected to have a Material Adverse Effect or (ii) the Credit Party or such third party (as applicable) does not expect to be able to satisfy on or prior to the commencement of the relevant stage of Development, except to the extent that a failure to so satisfy such condition or requirement could not reasonably be expected to have a Material Adverse Effect.

(d)    Borrower has no reason to believe that any material Government Approvals which have not been obtained by a Credit Party or the relevant third party as of the Closing Date, but which shall be required to be obtained in the future by such Credit Party or such third party for the Development, shall not be obtained in due course on or prior to the commencement of the appropriate stage of Development for which such Government Approval would be required or shall contain any condition or requirements, the compliance with which could reasonably be expected to result in a Material Adverse Effect or which such Credit Party or the relevant third party (as the case may be) does not expect to satisfy on or prior to the commencement of the appropriate stage of Development, except to the extent that a failure to so satisfy such condition or requirement could not reasonably be expected to have a Material Adverse Effect.  The Project, if constructed in accordance with the Construction Budget and Schedule and otherwise Developed as contemplated by the Material Project Documents, will conform to and comply with all covenants, conditions, restrictions and reservations in the applicable Government Approvals and all applicable Government Rules, except to the extent that a failure to so conform or comply could not reasonably be expected to have a Material Adverse Effect.

(e)    No Credit Party is in violation of, and not in compliance in all material respects with, any Government Rule or Government Approval the violation of or the non-compliance with which could reasonably be expected to result in a Material Adverse Effect.

**3.9    Existing Indebtedness**.  Other than the Existing Indebtedness, as of the Closing Date and after giving effect to the use of proceeds of the Loans in accordance herewith, no Credit Party has any Indebtedness except pursuant to this Agreement and the other Loan Documents.

**3.10    Ownership and Maintenance of Property**.

(a)    Schedule 3.10(a) sets forth a complete and accurate list of all Real Property in which the Credit Parties hold title in fee simple.  The Credit Parties possess Defensible Title to all such Real Property and all of their other Property, and none of such Property is subject to any Lien other than Permitted Liens.

(b)     Schedule 3.10(b) sets forth a complete and accurate list of all Coal Leases as of the Closing Date which Real Property, together with the Real Property described on Schedule 3.10(a), constitutes all of the Real Property held by the Credit Parties. Each Credit Party has a valid leasehold interest in all of its Coal Leases, and none of such Coal Leases is subject to any Lien other than Permitted Liens.

(c)     Upon receipt by the Credit Parties of the Pending Permits, all Permits required to have been issued or appropriate to enable all Real Property (including its Coal Properties) leased by any Credit Party to be lawfully occupied and used for all of the purposes for which such Property is or will be occupied and used, including operation of all applicable Mines, will have been lawfully issued and will be in full force and effect, except where such failure would not reasonably be expected to result in a Material Adverse Change.

(d)     The Coal Properties operated by any Credit Party and, to the knowledge of Borrower, Coal Properties operated by a Person other than Borrower or a Subsidiary, have been maintained, operated and developed in a good and workmanlike manner and in conformity in all material respects with all Requirements of Law and in conformity in all material respects with the provisions of all leases, subleases or other contracts comprising a part of the Coal Leases and other contracts and agreements forming a part of Coal Properties, except, in the case of Coal Properties operated by a Person other than Borrower or a Subsidiary, to the extent that the failure thereof could not reasonably be expected to result in liabilities to any Credit Party in excess of $250,000.

**3.11  Insurance**. All policies of insurance of any kind or nature of the Credit Parties, including policies of fire, theft, product liability, public liability, property damage, other casualty, employee fidelity, workers' compensation and employee health and welfare insurance, are in full force and effect and are of a nature and provide such coverage as is sufficient and as is customarily carried by businesses of the size and character of the Credit Parties. None of the Credit Parties has been refused insurance for any coverage for which it had applied or had any policy of insurance terminated (other than at its request).

**3.12  Intellectual Property**. Each of the Credit Parties owns, or is licensed to use, all material Intellectual Property necessary for the conduct of its business as currently conducted. No material claim has been asserted and is pending by any Person challenging or questioning the use by a Credit Party of any Intellectual Property or the validity or effectiveness of any Intellectual Property, nor does any Credit Party know of any valid basis for any such claim. The use of Intellectual Property by the Credit Parties does not infringe on the rights of any Person in any material respect.

**3.13  Taxes**. Each Credit Party has filed or caused to be filed all federal, state and other material tax returns, reports and statements (collectively, "*Tax Returns*") that are required to be filed by any Credit Party or any of its Tax Affiliates with the appropriate Governmental Authorities in all jurisdictions in which such Tax Returns are required to be filed; all such Tax Returns are true and correct in all material respects and correctly reflect the facts regarding the income, business, assets, operations, activities, status or other matters of the Credit Party and any other information required to be shown thereon; each Credit Party has paid, prior to the date on which any fine, penalty, interest, late charge or loss may be added thereto for non-payment thereof, all taxes shown to be due and payable on said returns or on any assessments made against

it or any of its Property and all other taxes, fees or other charges imposed on it or any of its Property by or otherwise due and payable to any Governmental Authority (other than any the amount or validity of which are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of such Credit Party); no tax Lien has been filed against the Property of any Credit Party; and, to the best knowledge of Borrower, no claim is being asserted, with respect to any such tax, fee or other charge. No Tax Return is under audit or examination by any Governmental Authority and no notice of such an audit or examination or any assertion of any claim for taxes has been given or made by any Governmental Authority. Proper and accurate amounts have been withheld by each Credit Party and each of its Tax Affiliates from their respective employees for all periods in full and complete compliance with the tax, social security and unemployment withholding provisions of applicable Requirements of Law and such withholdings have been timely paid to the respective Governmental Authorities.

**3.14  Federal Regulations**.  No part of the proceeds of any Loans will be used for "purchasing" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U or for any purpose that violates the provisions of any regulations of the Board. No Credit Party owns any "margin stock."

**3.15  Labor Matters**.

(a)    There are no strikes or other labor disputes against any Credit Party pending or, to the knowledge of Borrower, threatened. Hours worked by and payments made to employees of the Credit Parties and each labor and employment contracts entered into by a Credit Party have not been in violation of the Fair Labor Standards Act of 1938, as amended, or any other applicable Requirement of Law dealing with such matters. All payments due from any Credit Party on account of employee health and welfare insurance have been paid or accrued as a liability on the books of a Credit Party.

(b)    There is no organizing activity involving Borrower or any Subsidiary pending or, to the knowledge of Borrower or any Subsidiary, threatened by any labor union or group of employees. There are no representation proceedings pending or, to the knowledge of Borrower or any Subsidiary, threatened with the National Mediation Board, and no labor organization or group of employees of Borrower or any Subsidiary has made a pending demand for recognition. There are no material complaints or charges against Borrower or any Subsidiary pending or, to the knowledge of Borrower or any Subsidiary, threatened to be filed with any Governmental Authority or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment by Borrower or any Subsidiary of any individual. The consummation of the transactions contemplated by the Loan Documents will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which Borrower or any Subsidiary is bound.

**3.16  ERISA**.  Neither a Reportable Event nor an "accumulated funding deficiency" (within the meaning of Section 412 of the Code or Section 302 of ERISA) has occurred during the five-year period prior to the date on which this representation is made or deemed made with respect to any Benefit Plan, and each Benefit Plan has complied in all material respects with the applicable provisions of ERISA and the Code. No termination of a Single Employer Plan has

occurred, and no Lien in favor of the PBGC or a Benefit Plan has arisen, during such five-year period. The present value of all accrued benefits under each Single Employer Plan (based on those assumptions used to fund such Benefit Plans) did not, as of the last annual valuation date prior to the date on which this representation is made or deemed made, exceed the value of the assets of such Benefit Plan allocable to such accrued benefits by a material amount. Neither the Credit Parties nor any Commonly Controlled Entity has had a complete or partial withdrawal from any Multiemployer Plan that has resulted or could reasonably be expected to result in a material liability under ERISA, and neither the Credit Parties nor any Commonly Controlled Entity would become subject to any material liability under ERISA if such Credit Party or any such Commonly Controlled Entity were to withdraw completely from all Multiemployer Plans as of the valuation date most closely preceding the date on which this representation is made or deemed made. No such Multiemployer Plan is in Reorganization or Insolvent.

**3.17   Regulations.**

(a)     No Credit Party is an "investment company," or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended. No Credit Party is subject to regulation under any Requirement of Law (other than Regulation X) which limits its ability to incur Indebtedness.

(b)     No Credit Party is a "holding company" or a "subsidiary company" of a "holding company," or an "affiliate" of a "holding company" or of a "subsidiary company" of a "holding company," within the meaning of the Public Utility Holding Company Act of 1935, as amended.

**3.18   Ownership of Borrower; Subsidiaries.**

(a)     Borrower has no direct or indirect Subsidiaries except as listed on Schedule 3.18(a). Schedule 3.18(a) sets forth the ownership of all limited liability company interests and other Capital Stock issued by Borrower, 100% of which is issued and outstanding. No Credit Party has any equity investments in any other Person except as listed on Schedule 3.18(a). Schedule 3.18(a) sets forth the name and jurisdiction of organization or formation, as applicable, of each Subsidiary and, as to each Subsidiary, the number of shares of each class of Capital Stock authorized (if applicable) and the number outstanding. All of the outstanding Capital Stock of each Subsidiary has been duly and validly issued, is fully paid and non-assessable and is owned beneficially and of record by Borrower or another Subsidiary, free and clear of all Liens other than the Liens created by the Security Documents.

(b)     There are no outstanding subscriptions, options, warrants, calls, rights, agreements or understandings restricting the transfer or hypothecation of any such Capital Stock or other agreements, understandings or commitments of any nature relating to any Capital Stock of the Credit Parties except as otherwise created by the Loan Documents.

**3.19   Use of Proceeds.** The proceeds of the Loans shall be used solely for the purposes set forth in Section 6.17.

### 3.20 **Environmental Matters**.

(a)     Set forth on <u>Schedule 3.20(a)</u> is a list of each of the material Environmental or Mining Permits necessary as of the date hereof for the Credit Parties' to conduct mining operations on their Coal Properties as projected in their business plan through the Maturity Date.  Borrower has obtained each such permit except as otherwise disclosed on <u>Schedule 3.20(a)</u> (such Permits and authorizations, collectively, the "***Pending Permits***").  Borrower has filed or cause to be filed applications for each Pending Permit with the applicable Governmental Authority.  Neither Borrower nor any of its Subsidiaries, nor, to Borrower's knowledge, any Person operating any of the Coal Properties, (i) has received any notice (written or oral) denying any of the Pending Permits or (ii) is currently barred from receiving surface mining or underground mining permits pursuant to the permit block provisions of the Surface Mining Control and Reclamation Act, 30 U.S.C. §§ 1201 *et seq*., and the regulations promulgated thereunder, or any corresponding state laws or regulations.  Each of the Credit Parties will have, prior to commencement of mining operations, in the amounts and forms required pursuant to Mining Law or by a Governmental Authority, obtained all Reclamation Bonds, surety bonds or escrow agreements and will have made any payment or prepayments with respect to, or certificates of deposit or other sums or assets required to be posted by, any Credit Party under Mining Law for Reclamation or otherwise.

(b)     With respect to each of the Credit Party's Coal Properties currently in production, Borrower has, and to Borrower's knowledge, each Person other than any Credit Party operating any Coal Properties of any of the Credit Parties, if any, has all material Permits necessary to lawfully conduct such activities, and the Credit Parties are, and to Borrower's knowledge, each Person other than any Credit Party operating any such Coal Properties, if any, is, in compliance in all material respects with the terms and conditions of all such Permits, all of which are in full force and effect.

(c)     Each of the Credit Parties: (i) is, and within the period of all applicable statutes of limitation has been, in compliance with all applicable Environmental Laws and Mining Laws except for such noncompliance as could not reasonably be expected to result in a Material Adverse Change; (ii) is, and within the period of all applicable statutes of limitations has been, in compliance with such Environmental or Mining Permits; and (iii) reasonably believes that each of its Environmental or Mining Permits will be timely renewed and complied with, and, with respect to the Pending Permits, will be timely obtained; that any additional Environmental or Mining Permits that may be required by any of them will be timely obtained and complied with; and that compliance with any Environmental Law or Mining Law that is or is expected to become applicable to it will be timely attained and maintained without material expense.

(d)     There has been no Regulated Substances Activity by any Credit Party at, on or from any Property now or formerly owned, leased or operated by any Credit Party, or at any other location (including any location to which Regulated Substances have been sent for re-use or recycling or for treatment, storage, or disposal), which could reasonably be expected to (i) give rise to any material liability under any applicable Environmental Law or Mining Law or otherwise result in any material costs to any Credit Party other than such costs incurred in the ordinary course of business; or (ii) materially interfere with continued operations of the business of the Credit Parties.

(e)     There is no pending or, to the knowledge of the Credit Parties threatened Environmental Claims related to any Credit Party and, to the knowledge of Borrower, there are no actions, activities, circumstances, conditions, events or incidents that could form the basis of any such Environmental Claim, except for such Environmental Claims which could not, individually or in the aggregate, result in a Material Adverse Change.

(f)     No Credit Party has been notified by any Governmental Authority that it is a potentially responsible party or otherwise liable under or relating to the federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, or, any similar Environmental Law.

(g)     Except as otherwise may be required pursuant to any Environmental Law or Mining Law as a condition to obtaining any Permit necessary for the operation of the Coal Properties or pursuant to the Coal Leases, no Credit Party is obligated pursuant to any law, order, decree, judgment or agreement by which it is bound, to conduct, perform or finance any action or otherwise incur, nor has any Credit Party assumed or retained, any material expense or other liabilities of any kind, fixed or contingent, known or unknown, under any Environmental Law or Mining Law or with respect to any Regulated Substances.

(h)     Borrower has provided the Administrative Agent and the Lenders copies of all significant reports, correspondence and other documents in its possession, custody or control regarding its and its Subsidiaries compliance with or potential liability under Environmental Laws, Mining Laws or Environmental or Mining Permits or with respect to Regulated Substances.

(i)     No Lien has been recorded or, to the knowledge of Borrower, threatened under any Environmental Law with respect to any Real Property or assets of the Credit Parties.

(j)     The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by the Loan Documents will not require any notification, registration, filing reporting, disclosure, investigation, response, remediation or cleanup pursuant to any Environmental Law or Mining Law.

    **3.21  Accuracy of Information, Etc**.  No statement or information contained in this Agreement, any other Loan Document or any other document, certificate or statement furnished to the Administrative Agent or the Lenders or any of them, by or on behalf of any Credit Party for use in connection with the transactions contemplated by this Agreement or the other Loan Documents, contained as of the date such statement, information, document or certificate was so furnished, any untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements contained herein or therein not misleading, in each case taken as a whole.  There is no fact known to any Credit Party that could reasonably be expected to have a Material Adverse Effect that has not been expressly disclosed herein, in the other Loan Documents or in any other documents, certificates or statements furnished to the Agents and the Lenders for use in connection with the transactions contemplated hereby and by the other Loan Documents.

**3.22  Security Documents**.

(a)    The Original Guarantee and Security Agreement, as amended and restated by the Amended and Restated Guarantee and Security Agreement, has created in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral described therein and proceeds thereof, and the Guarantee and Security Agreement is effective to continue such security interest in such Collateral and the proceeds thereof. The Original Guarantee and Security Agreement, as amended and restated by the Guarantee and Security Agreement, constitutes a fully perfected Lien on, and security interest in, all right, title and interest of the Credit Parties in the Collateral described therein and the proceeds thereof, as security for the Obligations, in each case prior and superior in right to any other Person except for Permitted Liens.

(b)    The Original Midland Security Documents, as replaced by the Midland Guarantee and Security Agreement, have created in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral described therein and proceeds thereof, and the Guarantee and Security Agreement is effective to continue such security interest in such Collateral and the proceeds thereof. The Original Midland Security Documents, as replaced by the Midland Guarantee and Security Agreement, constitute a fully perfected Lien (except with respect to those certain leasehold rights identified therein) on, and security interest in, all right, title and interest of Midland in the Collateral described therein and the proceeds thereof, as security for the Obligations, in each case prior and superior in right to any other Person except for Permitted Liens.

(c)    Each of the Original Mortgages, as amended and restated by the Amended and Restated Mortgages, covering the Mortgaged Properties has created in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in the Mortgaged Properties described therein and the proceeds thereof, and each of the Mortgages covering the Mortgaged Properties dated as of the date hereof is effective to continue such security interest in such Mortgaged Properties and the proceeds thereof. The Original Mortgages, as amended and restated by the Mortgages, constitutes a fully perfected Lien on, and security interest in, all right, title and interest of the Credit Parties in the Properties described therein and the proceeds thereof, as security for the Obligations, in each case prior and superior in right to any other Person (other than Persons holding Liens or other encumbrances or rights permitted by the relevant Mortgage).

(d)    Borrower owns, directly or indirectly through other Subsidiaries, all of the outstanding Capital Stock of each of its Subsidiaries, and each of its Subsidiaries is a party to a Guarantee and Security Agreement. The only direct Subsidiary of Parent is Borrower.

**3.23    Solvency**. Each Credit Party is, and after giving effect to the incurrence of all Indebtedness, Obligations, the transactions contemplated by the Loan Documents and other obligations and commitments being incurred in connection herewith and therewith will be, and will continue to be, Solvent.

**3.24    Hedging Agreements**. Neither Borrower nor any Subsidiary is party to, or is directly or indirectly obligated under or with respect to, any Hedging Agreement.

**3.25    Reserve Reports**. All information furnished by any Loan Party for use in the preparation of that certain reserve report prepared by John T. Boyd dated April 2004 with respect to the Coal Properties (the "***Reserve Report***") was accurate at the time furnished.

**3.26    Contingent Obligations**. Except for those contained in, or in respect of, the Project Documents, the Original Loan Documents or the Loan Documents, no Credit Party has any existing material Contingent Obligations.

**3.27    Bank Accounts**. Schedule 3.27 lists all accounts maintained by or for the benefit of any Credit Party with any bank or financial institution.

**3.28    Customers and Suppliers**. As of the Closing Date, there exists no actual or threatened termination, cancellation or limitation of, or modification to or change the business relationship between (a) any Credit Party, on the one hand, and any customer or any group thereof, on the other hand, whose agreements with such Credit Party is individually or in the aggregate material to the business or operations of the Credit Parties, or (b) any Credit Party, on the one hand, and any material supplier thereof, on the other hand; and there exists no present state of facts of circumstances that could give rise to or result in any such termination, cancellation, limitation, modification or change. No Person providing any materials or services to any Credit Party has filed, or threatened to file, a Lien on any Properties of any Credit Party. Schedule 3.28 includes a list of all Coal marketing contracts in effect on the Closing Date relating to any Credit Party or any of the Coal Properties. All Coal sold by any Credit Party from its Coal Properties (other than Coal being sold pursuant to a Material Agreement) is being sold at prices and terms comparable to the market prices and on terms generally available at the time such prices and terms were negotiated for Coal production from producing areas situated near such Coal Properties, and none of the proceeds of any such sale are currently being held in suspense by such purchaser or any other Person.

**3.29    Account Receivable**. The accounts and notes receivable of the Credit Parties reflected on the Financial Statements, and all accounts and notes receivable arising subsequent to such date, (a) arose from bona fide sales transactions in the ordinary course of business consistent with past practice and are payable on ordinary trade terms, (b) to the knowledge of Borrower, are legal, valid and binding obligations of the respective debtors enforceable in accordance with their respective terms, and (c) to the knowledge of Borrower, are not subject to any valid set-off or counterclaim.

**3.30    Material Agreements**. Set forth on Schedule 3.30 hereto is a complete and correct list, as of the Closing Date, of all material agreements and construction contracts of each Credit Party setting forth each counterparty thereto (other than the Loan Documents) relating to the purchase, transportation, processing, marketing, development, sale and supply of Coal, operating agreements or contract operating agreements and copies of such documents have been provided to the Administrative Agent. All such agreements are in full force and effect and, to Borrower's knowledge, no party thereto (or any of its predecessors) is in default thereunder in any material respect, nor has any material item of such agreements been altered since the Closing Date without the prior written consent of the Lenders and all rents, royalties and other payments due and payable thereunder have been properly and timely paid.

**3.31    Coal Act; Black Lung Act.** Each of Borrower and the Subsidiaries and each of their respective "related persons" (as defined in the Coal Act) are in material compliance with the Coal Act and none of Borrower, the Subsidiaries and their respective related persons has any liability under the Coal Act except with respect to premiums or other payments required thereunder that have been paid when due. Each of Borrower and the Subsidiaries is in compliance with the Black Lung Act, and neither Borrower nor any of the Subsidiaries has any liability under the Black Lung Act except with respect to premiums, contributions or other payments required thereunder that have been paid when due.

ARTICLE IV.
CONDITIONS PRECEDENT

**4.1    Conditions to Extension of Loans on the Closing Date.** The agreement of each Lender to the conversion and continuation of the Existing Loans as Term A Loans, and the making of Term B Loans to be made by it hereunder is subject to the satisfaction, prior to or concurrently with the making of such extension of credit on the Closing Date, of the following conditions precedent:

(a)    Loan Documents. The Administrative Agent shall have received documents, in each case executed and delivered by a Responsible Officer of each of the applicable Credit Parties, (i) this Agreement, (ii) the Guarantee and Security Agreement, (iii) the Midland Guarantee and Security Agreement, (iv) a Mortgage covering each of the Mortgaged Properties described on Schedule 1.1(c), and (v) the Deposit Account Control Agreements with respect to each bank account listed on Schedule 3.27, other than any Qualified Payroll Account and the Qualified DEP Account.

(b)    Constituent Documents. All documents establishing or implementing the ownership, capital and corporate, organizational, tax and legal structure of each Credit Party shall be reasonably satisfactory to the Administrative Agent.

(c)    Projections. The Lenders shall have received projections and a business plan for Borrower and its Subsidiaries for fiscal years 2007 through 2011 satisfactory to the Administrative Agent in its sole discretion.

(d)    Financial Statements. The Lenders shall have received the Financial Statements, which shall be satisfactory to the Administrative Agent in its sole discretion.

(e)    Approvals; Denial of Permits. (i) All Permits or other approvals necessary to be obtained by a Credit Party in connection with the execution, delivery and performance of the Loan Documents shall have been obtained and be in full force and effect; and (ii) no Credit Party shall have received any notice (written or oral) denying any of the Pending Permits or otherwise rejecting the application for any Pending Permit.

(f)    [Intentionally Omitted]

(g)    Fees. The Lenders and the Agents shall have received all fees required to be paid, and all expenses for which invoices have been presented (including reasonable fees, disbursements and other charges of counsel to the Agents), on or before the Closing Date. All

such amounts will be paid with proceeds of Loans made on the Closing Date and will be reflected in the funding instructions given by Borrower to the Administrative Agent on or before the Closing Date.

(h)    Lien Search.  The Administrative Agent shall have received the results of a recent lien search in each of the jurisdictions in which UCC financing statements or other filings or recordations should be made to evidence or perfect security interests in all assets of the Credit Parties, and such search shall reveal no Liens other than Permitted Liens on any of the Property of the Credit Parties or Liens that were terminated, released or otherwise discharged on or prior to the Closing Date.

(i)    Closing Certificate.  The Administrative Agent shall have received a certificate of each Credit Party, dated the Closing Date, substantially in the form of Exhibit N, with appropriate insertions and attachments.

(j)    Legal Opinions.  The Administrative Agent  shall have received the following executed legal opinions from:

(i)    Buchanan Ingersoll & Rooney, PC, counsel to the Credit Parties, with respect to such matters as may be required by and in form and substance satisfactory to the Administrative Agent; and

(ii)    Spilman, Thomas and Battle PLLC, West Virginia counsel to the Credit Parties, with respect to the Liens created by the Mortgages filed on the Closing Date and such other matters as may be required by, and in form and substance satisfactory to, the Administrative Agent.

Each such legal opinion shall be addressed to the Administrative Agent as agent for the Lenders and shall cover such other matters incident to the transactions contemplated by this Agreement as the Administrative Agent may reasonably require.

(k)    Material Adverse Effect.  Since December 31, 2006, no event or circumstance having a Material Adverse Effect shall have occurred and be continuing.

(l)    Insurance.  The Administrative Agent shall have received a summary of the insurance carried in respect of each Credit Party and its Properties, including copies of all relevant insurance policies (which insurance shall be for such amounts, against such risk, covering such liabilities and with such deductibles or self-insured retentions as are acceptable to the Administrative Agent) and certificates of insurance, reasonably satisfactory to the Administrative Agent, naming the Administrative Agent, for the ratable benefit of the Secured Parties, as *"lender loss payee"* under its property loss policies and as *"additional insured"* on its comprehensive and general policies and a "lender's loss payable endorsement" or a "union Mortgagee Clause" (or a *"New York Mortgagee Clause"*).

(m)    Representations and Warranties.  Each of the representations and warranties made by any Credit Party in or pursuant to any Loan Document shall have been true and correct on and as of the date first made and on and as of the Closing Date.

(n)    No Default.  No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the extensions of credit requested to be made under this Agreement and, except for any such Default or Event of Default under the Original Credit Agreement of which the Administrative Agent has actual knowledge as of the date hereof.

(o)    Due Diligence.  The Lenders shall have completed a satisfactory due diligence review of the business prospects of Borrower and its Subsidiaries, including tax, legal and accounting issues.

(p)    Pledged Securities; Stock Powers; Acknowledgment and Consent.  The Administrative Agent shall have received (i) certificates representing the shares of Capital Stock pledged pursuant to the Guarantee and Security Agreement, together with an undated stock power for each such certificate executed in blank by a duly authorized officer of the pledgor thereof or (ii) in the case of Capital Stock not evidenced by a certificate, an Instructions Agreement, substantially in the form of Annex I to the Guarantee and Security Agreement, duly executed by any issuer of Capital Stock pledged pursuant to the Guarantee and Security Agreement.

(q)    Instructions Agreement.  The Administrative Agent shall have received, in the case of Capital Stock not evidenced by a certificate, an instructions agreement, substantially in the form of Annex I to the Guarantee and Security Agreement, duly executed by any issuer of Capital Stock pledged pursuant to the Guarantee and Security Agreement.

(r)    Material Agreements.  The Administrative Agent shall have received a true, correct and complete copy, certified as to such by a Responsible Officer of the applicable Credit Parties, of each Material Agreement.

(s)    Management.  The Administrative Agent and the Lenders shall be satisfied with the adequacy of the management team of the Credit Parties.

(t)    Independent Engineer Report.  If requested, the Administrative Agent shall have received an Independent Engineer Report satisfactory to the Administrative Agent in its sole discretion.

(u)    Miscellaneous.  The Administrative Agent and the Lenders shall have received such additional approvals, opinions and documents as such Persons may request.

    4.2    **Conditions to Each Additional Extension of Credit**.  The agreement of each Lender to make additional Term A Loans and to make any Revolving Credit Loans to be made by it hereunder on any date is subject to the satisfaction in full, prior to or concurrently with the making of such loans of the following conditions precedent:

(a)    Representations and Warranties.  Each of the representations and warranties made by any Credit Party in or pursuant to the Loan Documents shall be true and correct on and as of such date as if made on and as of such date, except for representations and warranties expressly stated to relate to a specific earlier date, in which case such representations and warranties shall be true and correct as of such earlier date.

(b)     No Default.  No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the extensions of credit requested to be made on such date

(c)     Use of Proceeds Statement.  Borrower shall have provided to the Administrative Agent (i) a statement detailing the proposed use of proceeds of such Loans and (ii) a reconciliation of the projected use of proceeds to the most recently preceding borrowings made under this Section 4.2 to the actual application thereof, which reconciliation shall include such invoices and other such documentation evidencing such application of proceeds or as the Administrative Agent may otherwise request, in each case, reasonably satisfactory to the Administrative Agent.

**4.3     Conditions Deemed Fulfilled.**  Except to the extent that Borrower has disclosed in the Borrowing Notice that an applicable condition specified in Section 4.1 or 4.2, as applicable, will not be fulfilled as of the requested time for the making of any Loan, Borrower shall be deemed to have made a representation and warranty as of such time that the conditions specified in Section 4.1 or 4.2, as applicable, have been fulfilled.  No such disclosure by Borrower that a condition specified in Section 4.1 or 4.2 will not be fulfilled as of the requested time for the making of the requested Loans shall affect the right of each Lender not to make the Loans requested to be made by it if such condition has not been fulfilled at such time.

ARTICLE V.
AFFIRMATIVE COVENANTS

Borrower hereby agrees that, so long as the Commitments remain in effect or any Loan or other amount is owing to any Lender or any Agent hereunder, Borrower shall, and shall cause each of its Subsidiaries to:

**5.1     Financial and Other Reporting Requirements.**  Borrower shall deliver to the Administrative Agent (in sufficient numbers for the Administrative Agent and each of the Lenders), commencing after the end of the first fiscal quarter after the Closing Date (except in the case of paragraphs (e) through (i) below, which notices shall be delivered as stated therein):

(a)     as soon as available and in any event within 90 days after the end of each fiscal year of Borrower, (i) audited statements of income, members' equity and cash flows of Borrower (on a consolidated basis) for such year and the related balance sheets as at the end of such year, setting forth in each case, in comparative form the corresponding figures for the preceding fiscal year and (ii) a calculation of the financial covenants set forth in Section 6.1 and Tax Distribution Amount for the fourth quarterly fiscal period and the preceding fiscal year, and accompanied by an opinion of the Independent Accountant, which opinion shall state that (x) such financial statements fairly present in all material respects the financial condition and results of operations of Borrower and its Subsidiaries as at the end of, and for, such fiscal year in accordance with GAAP and (y) such Tax Distribution Amount accurately reflect the Covered Tax Liabilities that would accrue for the account of the Parent;

(b)     as soon as available and in any event within 60 days after the end of each of the first three quarterly fiscal periods of each fiscal year of Borrower, (i) unaudited statements of income and cash flows of Borrower (on a consolidated basis) for such period and for the

period from the beginning of the respective fiscal year to the end of such period, (ii) the related balance sheet as at the end of such period, setting forth in each case in comparative form the corresponding figures for the preceding fiscal year and (iii) a calculation of the financial covenants set forth in Section 6.1 and Tax Distribution Amount for such period, accompanied by a certificate of a Responsible Officer of Borrower, which certificate shall state that such financial statements fairly present in all material respects the financial condition and results of operations of Borrower (on a consolidated basis), in accordance with GAAP, consistently applied, as at the end of, and for, such period (subject to normal year-end audit adjustments);

(c)     as soon as available, but in any event not later than 20 days after the end of each month occurring during each fiscal year of Borrower (other than the third, sixth, ninth and twelfth such month), the unaudited consolidated balance sheets of Borrower and its consolidated Subsidiaries as at the end of such month and the related unaudited statements of income and of cash flows for such month and the portion of the fiscal year through the end of such month, setting forth in each case in comparative form the figures as of the end of and for the corresponding period in the previous year, certified by a Responsible Officer as being fairly stated in all material respects (subject to normal year-end audit adjustment);

(d)     as soon as available, but in any event not later than 20 days after the end of each month a schedule, certified by a Responsible Officer, estimating the amount of Capital Expenditures made by Borrower and its Subsidiaries during such month;

(e)     at the time it furnishes each set of financial statements pursuant to Sections 5.1(a) or (b) above, a certificate of a Responsible Officer of Borrower to the effect that no Default has occurred and is continuing (or, if any Default has occurred and is continuing, describing the same in reasonable detail and describing the action that Borrower has taken and proposes to take with respect to such Default); and

(f)     such other information as the Administrative Agent or any Lender may from time to time request.

All such financial statements are to be complete and correct in all material respects and are to be prepared in reasonable detail and in accordance with GAAP applied consistently throughout the periods reflected therein and with prior periods (except as approved by the Independent Accountants or officer, as the case may be, and disclosed therein).

5.2    **Collateral Reporting**.  Furnish to the Administrative Agent:

(a)     to the extent not previously disclosed to the Administrative Agent, promptly upon the acquisition thereof, a listing of any Real Property acquired by any Credit Party at a purchase price in excess of $1,000,000 and a listing of any Intellectual Property acquired by any Credit Party at a purchase price in excess of $250,000 and a listing of all Coal Leases, in each case since the date of the most recent list delivered pursuant to this Section 5.2(a) (or, in the case of the first such list so delivered, since the Closing Date);

(b)     reports, certifications, engineering studies, environmental assessments or other written material or data requested by, and in form, scope and substance reasonably satisfactory to, the Administrative Agent or the Required Lenders, in the event that

Administrative Agent or the Required Lenders at any time have a reasonable basis to believe that there may be a material violation of any Environmental Law or a condition at any Property owned, operated or leased by any Credit Party that could reasonably give rise to a Material Adverse Effect, or if an Event of Default occurs;

(c)      upon reasonable request by the Administrative Agent, such other reports as to the Coal Properties, the other Collateral or the financial condition of Borrower or any of its Subsidiaries as may be so requested;

(d)      prior to any Asset Sale, a notice (i) describing such Asset Sale or the nature and material terms and conditions of such transaction and (ii) stating the estimated Net Cash Proceeds anticipated to be received by any Credit Party;

(e)      as soon as is practicable following the written request of the Administrative Agent and in any event within 60 days after the end of each fiscal year, (i) a report in form and substance satisfactory to the Administrative Agent and the Lenders outlining all material insurance coverage maintained as of the date of such report by each Credit Party and the duration of such coverage and (ii) an insurance broker's statement that all premiums then due and payable with respect to such coverage have been paid and confirming that the Administrative Agent has been named as loss payee or additional insured, as applicable;

(f)      within 20 days after the end of each calendar month, (i) a report setting forth, for such calendar month on a Mine by Mine basis, the volume of production and sales attributable to production (and the prices at which such sales were made and the revenues derived from such sales) for such calendar month from the Coal Properties, and setting forth the related ad valorem, severance and production taxes and lease and operating expenses attributable thereto and incurred for such calendar month setting forth in each case a comparison to the projections for the comparative period and (ii) a production schedule for the next 180 days for all Coal Properties which Borrower or any Subsidiary owns or controls or in which Borrower or any Subsidiary participates; and

(g)      prior notice of any Midland Loan, or the execution and delivery or amendment, waiver or modification of any Midland Loan Documents.

**5.3    Certificates; Other Information**. Furnish to the Administrative Agent:

(a)      concurrently with the delivery of any financial statements pursuant to Section 5.1, (i) a certificate of a Responsible Officer stating that, to the best of such Responsible Officer's knowledge, each Credit Party during such period has observed or performed all of its covenants and other agreements, and satisfied every condition, contained in this Agreement and the other Loan Documents to which it is a party to be observed, performed or satisfied by it, and that such Responsible Officer has obtained no knowledge of any Default or Event of Default, except as specified in such certificate and (ii) in the case of quarterly or annual financial statements, (A) a Compliance Certificate containing all information and calculations necessary for determining compliance by Borrower and its Subsidiaries with the provisions of this Agreement as of the last day of the fiscal quarter or fiscal year of Borrower, as the case may be, (B) to the extent not previously disclosed to the Administrative Agent, an updated listing of any material Real Property (including Coal

Properties) or Intellectual Property acquired by any Credit Party or with respect to which any Credit Party shall acquire a right to earn, purchase or otherwise acquire, since the date of the most recent list delivered pursuant to this clause (B) (or, in the case of the first such list so delivered, since the Closing Date) and (C) authorization of the filing of any UCC financing statements or other filings specified in such Compliance Certificate as being required to be filed;

(b)    as soon as possible and in any event within five days of obtaining knowledge thereof: written notice of (i) any development, event, or condition that, individually or in the aggregate with other developments, events or conditions, could reasonably be expected to result in liability pursuant to any Environmental Law or Mining Law (other than in the ordinary course of business by Borrower or its Subsidiaries) in excess of $500,000; and (ii) any notice that any Governmental Authority has denied or is reasonably likely to deny any application for an Environmental or Mining Permit sought by, or revoke, modify or refuse to renew any Environmental or Mining Permit held by, any Credit Party or any Subsidiary or other operator of any Coal Properties if the effect of such action could reasonably give rise to a Material Adverse Effect;

(c)    upon the request of the Administrative Agent or any Lender, immediate access to all geological, engineering and related data contained in Borrower's or its Subsidiaries' files or readily accessible to Borrower or its Subsidiaries relating to its Mortgaged Properties, subject to and as may be limited by any confidentiality agreements to which such Credit Party is a party or by which any such data is bound;

(d)    promptly after becoming aware of the same, written notice of (i) any material labor dispute to which either Credit Party is or may become a party, including any strikes, lockouts or other disputes relating to any of such Person's plants and other facilities, and (ii) any Worker Adjustment and Retraining Notification Act or related liability incurred with respect to the closing of any plant or other facility of any of such Person that would reasonably be expected to have a Material Adverse Effect;

(e)    upon the written request of the Administrative Agent, copies of all Tax Returns filed by each Credit Party in respect of taxes measured by income (excluding sales, use and like taxes); and

(f)    promptly, such additional financial and other information as the Administrative Agent or any Lender may from time to time reasonably request.

**5.4    Payment of Obligations.**  Pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all its material obligations of whatever nature, including all lawful environmental claims, taxes, assessments, charges and levies, except where the amount or validity thereof is currently being contested in good faith by appropriate proceedings and reserves in conformity with GAAP with respect thereto have been provided on the books of Borrower or its Subsidiaries, as the case may be.

### 5.5    Conduct of Business and Maintenance of Existence, Etc.

(a)    (i) Preserve, renew and keep in full force and effect its existence as a
Delaware limited liability company and (ii) take all reasonable action to maintain all rights,
privileges and franchises necessary or desirable in the normal conduct of its business, except,
in each case, as otherwise permitted by Section 6.4.

(b)    Comply with all (i) Contractual Obligations and Constituent Documents and
(ii) Permits, Environmental or Mining Permits and Requirements of Law, and use its
reasonable efforts to cause all employees, crew members, agents, contractors and
subcontractors Borrower and its Subsidiaries to comply with all Environmental or Mining
Permits, Permits and Requirements of Law as may be necessary or appropriate to enable
Borrower and its Subsidiaries to so comply, except, in the case of Contractual Obligations,
Permits and Requirements of Law, where the failure to comply could not reasonably be
expected to result in a Material Adverse Change.

(c)    Comply with all leases, agreements and documents pertaining to or
affecting the Coal Property during the term of this Agreement, except where the failure to
comply could not reasonably be expected to result in a Material Adverse Change.

(d)    (i) Take all commercially reasonable efforts to ensure that all of their
respective tenants, subtenants, contractors, subcontractors, and invitees comply in with all
applicable Mining Laws, and obtain, comply and maintain any and all Permits, applicable to
any of them and (ii) conduct and complete all investigations, studies, sampling and testing, and
all remedial, removal and other actions in each case required under applicable Mining Laws
and promptly comply in all respects with all lawful orders and directives of any Governmental
Authority in respect of applicable Mining Laws, except where the failure to comply could not
reasonably be expected to result in a Material Adverse Change.

(e)    Cause the Administrative Agent and the Lender to be reasonably satisfied
that each Person that is a part of the management team of the Credit Parties generally has
sufficient availability of time necessary to competently manage the business and operations of
the Credit Parties.

### 5.6    Operation and Maintenance of Property; Insurance.

(a)    Cause the development of each of the Mines listed on Schedule 5.6(a) to be,
in the reasonable opinion of the Administrative Agent, in compliance with the Milestone
Schedule.

(b)    Keep, preserve and maintain all Property and systems, including all
improvements, personal property and equipment, useful and necessary in its business in good
working order and condition in accordance with the general practice of other businesses of
similar character and size (ordinary wear and tear excepted) and make all necessary repairs,
renewals and replacements so that its business may be property conducted at all times.

(c)    Cure, to the satisfaction of Administrative Agent in its discretion, any title
defects to any of the Properties which is material in value, in the reasonable opinion of the

Administrative Agent, within 30 days after becoming aware of the same and, in the event any such title defects are not cured in a timely manner, pay all related costs and fees reasonably incurred by the Administrative Agent to do so.

(d)     Keep and continue all Material Agreements in full force and effect in accordance with the terms thereof, and not permit the same to lapse or otherwise become impaired for failure to comply with the obligations thereof, whether express or implied.

(e)     Maintain with financially sound and reputable insurance companies insurance on all its Property in at least such amounts and against at least such risks (but including in any event general liability) as are usually insured against in the same general area by companies engaged in the same or a similar business, with such deductibles as are reasonably acceptable to the Administrative Agent.

(f)     Name the Administrative Agent, for the ratable benefit of the Secured Parties, as "loss payee" under its casualty loss policies and the Administrative Agent as "additional insured" on its comprehensive and general liability policies, and cause each insurance policy that is so maintained and that covers all or any portion of a Mortgaged Property, Mine, or Coal Lease to contain a "lender's loss payable endorsement" or a "union Mortgagee Clause" (or a "*New York Mortgagee Clause*"), as applicable, in form and substance reasonably satisfactory to the Administrative Agent.  Borrower will furnish to the Lenders, upon request of the Administrative Agent, information in reasonable detail as to the insurance so maintained and flood zone determination forms for all enclosed structures owned by any Credit Party that is contained in the Mortgaged Property.  Such casualty loss policies shall be reasonably satisfactory to the Administrative Agent in all respects and shall not be canceled, amended or changed without at least 30 days' (ten days for nonpayment) written notice to the Administrative Agent.  So long as no Event of Default has occurred and is continuing, Net Cash Proceeds of any insurance policies shall be applied in accordance with Section 2.11(a).

(g)     Renew all insurance policies referred to in this Section 5.6 on terms no less favorable to the Administrative Agent for the ratable benefit of the Secured Parties during the term of this Agreement.  Any substitute underwriter shall be, in Borrower's reasonable opinion, as financially sound as Borrower's existing underwriters.

(h)     Operate its Coal Properties and other material Properties or cause such Coal Properties and other material Properties to be operated in a careful and efficient manner in accordance with the practices of the industry and in compliance with all applicable contracts and agreements and in compliance with all Requirements of Law, including, without limitation, applicable proration requirements and Environmental Laws, and all applicable laws, rules and regulations of every other Governmental Authority from time to time constituted to regulate the development and operation of its Coal Properties and the production and sale of Coal and other minerals therefrom, except where the failure to do so could not reasonably be expected to result in a Material Adverse Change.

(i)     Promptly pay and discharge, or make reasonable and customary efforts to cause to be paid and discharged, all rentals, royalties, expenses and indebtedness accruing under the leases or other agreements affecting or pertaining to its Properties and will do all

other things necessary to keep unimpaired their rights with respect thereto and prevent any forfeiture thereof or default thereunder.

(j)     Promptly perform or make reasonable and customary efforts to cause to be performed, in accordance with industry standards, the obligations required by each and all of the assignments, deeds, leases, sub-leases, contracts and agreements affecting its interests in its Properties.

(k)     To the extent Borrower is not the operator of any Property, use its best efforts to cause the operator to comply with this Section 5.6.

(l)     Prior to the commencement of any mining operations, Borrower shall obtain the leasehold interest mining rights necessary for the operation of the applicable Mine that will be operated on such parcel, and each of its rights under the applicable lease, contracts, rights-of-way and easements necessary for the operation of such Mine shall be in full force and effect and no default shall exist thereunder.

### 5.7    Inspection of Property; Books and Records; Discussions.

(a)     Keep proper books of records and account in which full, true and correct entries in conformity with GAAP and all Requirements of Law shall be made of all dealings and transactions in relation to its business and activities; and

(b)     Permit the Administrative Agent and the Lenders, or any agents or representatives thereof, from time to time during Borrower's normal business hours, as often as may be reasonably requested and upon two Business Days notice (except that, during the continuance of an Event of Default, no such notice shall be required) to (i) go upon, examine, inspect and remain on the Properties of the Credit Parties, (ii) during any such visit, inspect and verify the amount, character and condition of any of the Property of the Credit Parties, (iii) during any such visit, examine and, at Borrower's cost and expense, make copies of and abstracts from the records and books of account of the Credit Parties, and (iv) discuss the affairs, finances and accounts of the Credit Parties with any of their respective officers, directors, employees or Independent Accountants.  Except as otherwise stated in clause (iii) above, the Administrative Agent and each Lender will pay the costs and expenses incurred by it in exercising its rights under this Section 5.7(b); *provided* that after the occurrence of an Event of Default, Borrower shall reimburse the Administrative Agent and each Lender promptly after a request therefor for the reasonable costs and expenses incurred by it in connection with the exercise of its rights under this Section 5.7(b).

(c)     Authorize Borrower's Independent Accountants to disclose to the Administrative Agent or any Lender any and all financial statements and other information of any kind, as the Administrative Agent or any Lender reasonably requests from Borrower and which the Independent Accountants may have with respect to the business, financial condition, results of operations or other affairs of the Credit Parties.

### 5.8    Notices.  Promptly, and in any event within three Business Days after knowledge thereof, give notice to the Administrative Agent and each Lender of:

(a)     the occurrence of any Default or Event of Default;

(b)     any (i) default or event of default under any Material Agreement or other agreement a default under which could reasonably be expected to result in a Material Adverse Change or (ii) investigation (which is not in the ordinary course and which, if adversely determined, could reasonably be expected to result in a Material Adverse Effect), litigation or proceeding which may exist at any time between any Credit Party and any Governmental Authority;

(c)     any litigation or proceeding against any Credit Party or any Subsidiary in which the amount involved is $500,000 or more and not covered by insurance or in which injunctive or similar relief is sought;

(d)     (i) the occurrence of any Reportable Event with respect to any Benefit Plan, a failure to make any required contribution to a Benefit Plan, the creation of any Lien in favor of the PBGC or a Benefit Plan or a withdrawal from, or the termination, Reorganization or Insolvency of, any Multiemployer Plan, (ii) the institution of proceedings or the taking of any other action by the PBGC or any Credit Party or any Commonly Controlled Entity or any Multiemployer Plan with respect to the withdrawal from, or the termination, Reorganization or Insolvency of, any Benefit Plan or (iii) proceedings that have been instituted pursuant to Section 515 of ERISA to collect a delinquent contribution to a Benefit Plan, that Borrower or any Commonly Controlled Entity will or may incur any material liability (including any indirect, contingent or secondary liability) to or on account of a termination or withdrawal from a Benefit Plan under Title IV of ERISA or with respect to a Benefit Plan under Section 401(a)(29) or 4971, 4975, or 4980 of the Code or Section 409, 502(i) or 503(l) of ERISA or with respect to a group health plan (as defined in Section 607(1) of ERISA or Section 4980B of the Code) under Section 4890B of the Code, or that Borrower or a Commonly Controlled Entity will incur any material liability pursuant to an employee welfare benefit plan that provides benefits to retired employees or former employees (other than as required under Section 601 of ERISA) or any Benefit Plan;

(e)     any development or event (including notice of any claim or condition arising under or related to any Environmental Law) that constitutes a Material Adverse Effect;

(f)     promptly upon (i) delivery to another Material Project Party pursuant to a Material Project Document, copies of all material notices or other material documents delivered to such Material Project Party by any Credit Party and (ii) such documents becoming available, copies of all material notices or other material documents received by any Credit Party pursuant to any Material Project Document (such as any notice or other document relating to a failure by any Credit Party to perform any of its covenants or obligations under such Material Project Document, termination of a Material Project Document or a force majeure event under a Material Project Document, but excluding any notice provided in the ordinary course of business);

(g)     the commencement of any audit or examination of any Tax Return by any Governmental Authority, the receipt by Borrower or any Subsidiary of notice of any such audit or examination or the assertion of any claim for taxes against Borrower or any Subsidiary by any Governmental Authority; and

(h)      simultaneously with the date that Borrower or any Subsidiary
(i) commences or terminates negotiations with any collective bargaining agent for the purpose
of materially changing any collective bargaining agreement, (ii) reaches an agreement with
any collective bargaining agent prior to ratification for the purpose of materially changing any
collective bargaining agreement, (iii) ratifies any agreement reached with a collective
bargaining agent for the purpose of materially changing any collective bargaining agreement
or (iv) becomes subject to a "cooling off period" under the auspices of the National Mediation
Board, the commencement or termination of such negotiations or the receipt of such agreement
or notice of a "cooling off period" (including a copy of such agreement or notice), as the case
may be.

Each notice pursuant to this Section 5.8 shall be accompanied by a statement of a
Responsible Officer setting forth details of the occurrence referred to therein and stating what
action Borrower or the relevant Subsidiary proposes to take with respect thereto.

**5.9    Environmental Laws**. At Borrower's own expense:

(a)      except where the failure to do so could not result in a Material Adverse
Effect:

(i)      Comply in all respects with, and ensure compliance in all material
respects at any Property owned, leased or operated by Borrower or any Subsidiary by all
tenants, subtenants, lessees, sub-lessees and contractors, if any, with all applicable
Environmental Laws, and obtain and comply in all respects with and maintain, and cause
all tenants, subtenants, lessees, sub lessees and contractors to obtain and comply in all
respects with and maintain, any and all material Environmental or Mining Permits required
by applicable Environmental Laws or Mining Laws with respect to any Property owned or
leased by Borrower or any Subsidiary;

(ii)      Conduct and complete all investigations, studies, sampling and
testing, and all reporting, investigative, remedial, removal and other actions required under
Environmental Laws, and promptly comply in all respects with all lawful orders and
directives of all Governmental Authorities regarding Environmental Laws;

(iii)      Not dispose of or otherwise release any Regulated Substances on,
under, about or from any of Borrower's or its Subsidiaries' Properties or any other
Property to the extent caused by Borrower's or any of their Subsidiaries' operations except
in compliance with applicable Environmental Laws;

(b)      As soon as available, and in any case within five Business Days prior to the
closing of any acquisition of Properties by a Credit Party for which Borrower reasonably
believes that its liability for environmental remediation potentially associated with the
ownership or operation of all such Properties is expected to exceed $1,000,000 for preexisting
conditions, deliver to the Administrative Agent an environmental report covering such
Properties to be acquired, in form and substance reasonably satisfactory to the Administrative
Agent and the Required Lenders;

(c)     Diligently pursue the attainment of all Environmental or Mining Permits necessary or appropriate for the operation or use of Borrower's or their Subsidiaries' Properties generally in accordance with its business plans;

(d)     Promptly commence and diligently prosecute to completion any assessment, evaluation, investigation, monitoring, containment, cleanup, removal, repair, restoration, remediation or other remedial obligations required or reasonably necessary under applicable Environmental Laws because of or in connection with the actual or suspected past, present or future disposal or other release of any Regulated Substances on, under, about or from any of Borrower's or their Subsidiaries' Properties, which failure to commence and diligently prosecute to completion could reasonably be expected to result in the incurrence of any material liability or in a material increase in any existing liability;

(e)     Promptly, but in no event later than five days of the occurrence of a triggering event, notify the Administrative Agent in writing of any threatened action, investigation or inquiry by any Governmental Authority or any demand or threatened lawsuit by any landowner or other third party against Borrower or its Subsidiaries or their Properties of which Borrower has knowledge in connection with any Environmental Laws (excluding routine testing and corrective action) if Borrower reasonably anticipates that such action may result in liability (whether individually or in the aggregate) in excess of $100,000; and

(f)     Establish and implement such procedures as may be necessary to continuously determine and assure that Borrower's and their Subsidiaries' obligations under this Section 5.9 are timely and fully satisfied.

**5.10     Additional Collateral, Etc.**

(a)     With respect to any Property (other than Excluded Property) acquired after the Closing Date by Borrower or any of its Subsidiaries as to which the Administrative Agent, for the benefit of the Secured Parties, does not have a perfected Lien and security interest, promptly and, in any event, within 10 Business Days, (i) execute and deliver to the Administrative Agent such Security Documents or such amendments to such Security Documents as the Administrative Agent deems necessary or advisable to grant to the Administrative Agent, for the benefit of the Secured Parties, a fully perfected Lien and security interest in such Property prior and superior in right to any other Person, subject only to Permitted Liens, (ii) take all actions necessary or advisable to grant to the Administrative Agent, for the benefit of the Secured Parties, a fully perfected Lien and security interest on such Property prior and superior in right to any other Person (subject only to Permitted Liens), including the filing of Mortgages and UCC financing statements in such jurisdictions as may be required by the Security Documents or by law or as may be requested by the Administrative Agent and (iii) deliver to the Administrative Agent such legal opinions relating to the matters described in clauses (i) and (ii) immediately preceding for which the Administrative Agent may reasonably request, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent.

(b)     With respect to any fee interest in any Real Property (other than Excluded Property) acquired after the Closing Date by Borrower or any of its Subsidiaries, promptly and, in any event, within 10 Business Days (i) execute and deliver a fully perfected Mortgage

prior and superior in right to any other Person (subject only to Permitted Liens) in favor of the
Administrative Agent, for the benefit of the Secured Parties, covering such Real Property, and
(ii) if reasonably requested by the Administrative Agent, provide the Administrative Agent
with (A) title and extended coverage insurance covering such Real Property in an amount at
least equal to the purchase price of such Real Property (or such other amount as shall be
reasonably specified by the Administrative Agent) as well as a current ALTA or survey
thereof, together with a surveyor's certificate, (B) any consents or estoppels reasonably
deemed necessary or advisable by the Administrative Agent in connection with such
Mortgage, each of the foregoing in form and substance reasonably satisfactory to the
Administrative Agent and (C) legal opinions relating to the matters described above, which
opinions shall be in form and substance, and from counsel, reasonably satisfactory to the
Administrative Agent.

(c)    With respect to any new Subsidiary created or acquired after the Closing
Date by Borrower or any of its Subsidiaries, concurrently with such creation or acquisition,
(i) execute and deliver to the Administrative Agent such amendments to the Security
Documents as the Administrative Agent deems necessary or advisable to grant to the
Administrative Agent, for the benefit of the Secured Parties, a fully perfected Lien and security
interest in the Capital Stock of such new Subsidiary prior and superior in right to any other
Person (subject only to Permitted Liens), (ii) deliver to  the Administrative Agent (or its
bailee) for the benefit of the Secured Parties, (A) the certificates (if any) representing such
Capital Stock, together with undated powers, in blank, executed and delivered by a duly
authorized officer of Borrower or a Subsidiary, as the case may be and (B) in the case of a
Subsidiary whose Capital Stock is a security that is not evidenced by a certificate, the
Administrative Agent an Acknowledgment and Consent, substantially in the form of Annex I
to the Guarantee and Security Agreement, duly executed by any issuer of Capital Stock
pledged pursuant to such Guarantee and Security Agreement, (iii) cause such new Subsidiary
(A) to become a party to the applicable Security Documents and (B) to take such actions
necessary or advisable to grant to the Administrative Agent for the benefit of the Secured
Parties a fully perfected Lien and security interest on the Collateral described in the Guarantee
and Security Agreement and pursuant to a duly executed Mortgage, such Lien on all Properties
of such new Subsidiary, subject in each case to Permitted Liens, including, without limitation,
the filing of UCC financing statements in such jurisdictions as may be required by the
Guarantee and Security Agreement, the filing of any Mortgages in appropriate filing offices
and other filings required by law or as may be requested by the Administrative Agent, and
(iv) if requested by the Administrative Agent, deliver to the Administrative Agent such legal
opinions, relating to the matters described above as the Administrative Agent may request,
which opinions shall be in form and substance, and from counsel, satisfactory to the
Administrative Agent.

**5.11**    **Mining Activities**. Maintain at all times a minimum metallurgical coal base of
16 million in-place tons except with the consent of the Administrative Agent at the direction of the
Required Lenders and in consultation with the Independent Engineer acting on behalf of the
Lenders.

**5.12**    **Chief Financial Officer**. Within 120 days after the Closing Date, hire and
maintain the employment at all times thereafter of a sufficiently qualified and experienced chief

financial officer or financial consultant, as such may be determined by the Company and approved by the Administrative Agent.

**5.13    Patriot Act Compliance**. The Credit Parties shall provide such information and take such actions as are reasonably required by the Agents or any Lender in order to assist the Agents and Lenders with compliance with the Patriot Act

**5.14    Further Assurances**.

(a)    From time to time execute and deliver, or cause to be executed and delivered, such additional instruments, certificates or documents, and take such actions, as the Administrative Agent may reasonably request for the purposes of implementing or effectuating the provisions of this Agreement and the other Loan Documents, or of more fully perfecting or renewing the rights of the Administrative Agent and the Secured Parties with respect to the Collateral (or with respect to any additions thereto or replacements or proceeds thereof or with respect to any other Property hereafter acquired by Borrower or any Subsidiary which may be deemed to be part of the Collateral) pursuant hereto or thereto.

(b)    Upon the exercise by the Administrative Agent or any Lender of any power, right, privilege or remedy pursuant to this Agreement or the other Loan Documents which requires any consent, approval, recording, qualification or authorization of any Governmental Authority, execute and deliver, or will cause the execution and delivery of, all applications, certifications, instruments and other documents and papers that the Administrative Agent or such Lender may be required to obtain from Borrower or any Subsidiary for such governmental consent, approval, recording, qualification or authorization.

ARTICLE VI.
NEGATIVE COVENANTS

Borrower hereby agrees that, so long as the Commitments remain in effect or any Loan or other amount is owing to any Lender or any Agent hereunder, Borrower shall not, and shall not permit any of its respective Subsidiaries to, directly or indirectly

**6.1    Financial Covenants**.

(a)    <u>Consolidated Fixed Charges Coverage Ratio</u>. Permit the Consolidated Fixed Charges Coverage Ratio to be less than 1.0 to 1.0 as at the last day of any calendar quarter of Borrower commencing April 1, 2008, as measured for the four most recent consecutive calendar quarters immediately preceding the measurement of such ratio; *provided* that, notwithstanding the foregoing, for the first three fiscal quarters commencing April 1, 2008, the calculation of the components of Consolidated Fixed Charges Coverage Ratio consisting of "Project Revenues" and "Operation and Maintenance Expenses" shall be determined on an annualized basis so that (i) for the fiscal quarter ending June 30, 2008 such components shall be determined for such fiscal quarter shall be multiplied by four, (ii) for the fiscal quarter ending September 30, 2008, such components shall be determined for the two fiscal quarters ending September 30, 2008, and multiplied by two, and (iii) for the fiscal quarter ending December 31, 2008, such components shall be determined for the three fiscal quarters ending December 31, 2008 and multiplied by four-thirds (4/3s).

(b)    Consolidated Leverage Ratio . Permit the Consolidated Leverage Ratio as of the last day of any period of four consecutive calendar quarters, commencing April 1, 2008, to exceed the following respective ratio for the following respective periods; *provided* that, notwithstanding the foregoing, for the first three fiscal quarters commencing April 1, 2008, the calculation of Consolidated EBITDA shall be calculated on an annualized basis so that (i) for the fiscal quarter ending June 30, 2008, Consolidated EBITDA shall be determined for the fiscal quarter ending June 30, 2008, and multiplied by four, (ii) for the fiscal quarter ending September 30, 2008, Consolidated EBITDA shall be determined for the two fiscal quarters ending September 30, 2008, and multiplied by two, and (iii) for the fiscal quarter ending December 31, 2008, Consolidated EBITDA shall be determined for the three fiscal quarters ending December 31, 2008 and multiplied by four-thirds:

| Period | Ratio |
|---|---|
| From April 1, 2008 through June 30, 2008 | 4.25 to 1.00 |
| From July1, 2008 through September 30, 2008 | 4.00 to 1.00 |
| From October 1, 2008 through December 31, 2008 | 3.00 to 1.00 |
| From January 1, 2009 through December 31, 2009 | 2.50 to 1.0 |
| From January 1, 2010 and thereafter | 2.00 to 1.0 |

(c)    Minimum Tangible Net Worth.  At any time after December 31, 2007 permit the Tangible Net Worth of Borrower to fall below the sum of $1,000,000 plus 50% of the difference of (1) consolidated net income of Borrower and its subsidiaries for each fiscal quarter in which net income was earned (as opposed to a net loss) less (2) Covered Tax Liabilities in respect of such net income through the date of determination.

(d)    Minimum Current Ratio.  At any time during the period commencing on January 1, 2008 and ending on December 31, 2008, permit the Current Ratio to be less than 1.25 to 1.0; and on or at any time after January 1, 2009 permit the Current Ratio to be less than 1.75 to 1.0.

(e)    Maximum Capital Expenditures.  At any time, permit the aggregate amount of Capital Expenditures expended by Borrower (including Project Costs that are considered capital expenses in accordance with GAAP) and its Subsidiaries to exceed Permitted Capital Expenditures as set forth below, which Permitted Capital Expenditures shall not exceed the following respective amounts for the following respective periods (with carry-over amounts from year 2007 permitted), unless such excess has been approved by the enders in writing and included in the applicable Operating and Capital Budget:

| Period | Amount |
|---|---|
| From January 1, 2007 through December 31, 2007 | $65,000,000 |

| From January 1, 2007 through December 31, 2008 | $76,500,000 |
| From January 1, 2007 through December 31, 2011 | $89,500,000 |

**6.2    Indebtedness**.   Create, incur, issue, assume, guaranty or suffer to exist any Indebtedness, except for the following (collectively, "***Permitted Indebtedness***"):

(a)    Indebtedness of any Credit Party under any Loan Document;

(b)    accounts payable (other than for borrowed money) arising, and accrued expenses incurred, in the ordinary course of business so long as such accounts payable are payable within 90 days of the date the respective goods are delivered or the respective services are rendered and (unless such accounts payable are being contested in good faith and by appropriate legal, administrative or other proceedings diligently conducted and so long as adequate reserves have been established with respect thereto in accordance with GAAP, and only if the failure to pay such accounts payable could not reasonably be expected to have a Material Adverse Effect) are not more than 90 days past due;

(c)    purchase money or lease obligations (including Capital Lease Obligations and equipment rental agreement obligations) to the extent incurred in the ordinary course of business to finance the acquisition or licensing of intellectual property or items of equipment (and Indebtedness incurred to finance any such obligations); *provided*, that (A) if such obligations are secured, they are secured only by Liens upon the equipment or intellectual property being financed (other than the cash deposits securing the Orix Lease as of the Closing Date) and (B) the aggregate principal amount and the capitalized portion of such obligations (including in regards to any equipment rental agreement) do not at any time exceed $5,000,000 in the aggregate;

(d)    Indebtedness under any Hedging Agreement (i) approved by the Administrative Agent in accordance with Section 6.15 or (ii) in the case of any interest rate swap, constituting a Permitted Swap Agreement;

(e)    Indebtedness of Borrower to any Guarantor or of any Guarantor to Borrower or any other Guarantor which is subordinated to the Obligations on terms and provisions reasonably acceptable to the Administrative Agent;

(f)    other unsecured Indebtedness for borrowed money, incurred for working capital purposes, and subordinated to the Obligations on terms, and set forth in a written instrument in form and substance, acceptable to the Administrative Agent;

(g)    Existing Indebtedness *provided* that such Indebtedness shall be included in the aggregate limit in clause (c) above, classified as purchase money or lease obligations;

(h)    Indebtedness of any Credit Party in connection with an insurance premium funding arrangement for insurance to be maintained pursuant to Section 5.6; and

(i)      Indebtedness representing amounts due under the Monarch Agreement, *provided* that such Indebtedness shall be subordinated to the Obligations on terms and provisions reasonably acceptable to the Administrative Agent (the "***Monarch Subordinated Debt***").

**6.3    Liens.**  Create, incur, assume or suffer to exist any Lien upon any of its Property, whether now owned or hereafter acquired, except for the following (collectively, "***Permitted Liens***"):

(a)      Liens for taxes not yet due or which are being contested in good faith by appropriate proceedings, *provided* that adequate reserves with respect thereto are maintained on the books of the applicable Credit Party, as the case may be, in conformity with GAAP;

(b)      carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business in respect of obligations (i) which are not yet due or (ii) that are being contested in good faith by appropriate proceedings, for which adequate reserves in accordance with GAAP shall have been set aside on its books and which do not and will not result in a Material Adverse Effect;

(c)      Liens of landlords securing obligations to pay lease obligations that are not yet due and payable or in default;

(d)      Liens, pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation (other than ERISA);

(e)      deposits (i) as required by any Governmental Authority in connection with obtaining any Permits in lieu of bonding or securing bonding provided to such Governmental Authority for such purpose or (ii) to secure performance of bids, trade contracts (other than for borrowed money), leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(f)      Liens and deposits in existence on the Closing Date and those hereafter made in connection with the Orix Documentation (including Liens arising with respect to additional equipment to be financed thereunder);

(g)      cash deposits in existence or hereafter paid by the Credit Parties to equipment manufacturers to secure purchases of equipment by the Credit Parties;

(h)      Liens arising from precautionary UCC financing statement filings regarding operating leases entered into in the ordinary course of business;

(i)      Liens created pursuant to the Security Documents;

(j)      Liens on fixed or capital assets acquired, constructed or improved by Borrower or its Subsidiaries; *provided*, that (i) such Liens secure Indebtedness permitted under Section 6.2(c), (ii) such Liens and the Indebtedness secured thereby are incurred substantially simultaneously with the acquisition, construction or improvement of such fixed or capital assets, (iii) such Liens do not at any time encumber any Property other than the Property

financed by such Indebtedness, (iv) the amount of Indebtedness secured thereby is not increased, and (iv) the amount of Indebtedness secured thereby is not more than 100% of the purchase price;

(k)     defects, easements, rights-of-way, restrictions and other similar encumbrances incurred in the ordinary course of business and encumbrances, licenses, restrictions on the use of property or imperfections in title that, in each case, do not materially impair the property affected thereby for the purpose for which title was acquired or interfere with the operation of any Credit Party's business and that individually or in the aggregate could not reasonably be expected to result in a Material Adverse Effect;

(l)     judgment Liens not to exceed $100,000 that do not involve any reasonable risk of forfeiture of any material Property or the termination of any Material Agreement and which, within 10 days after entry thereof, are being contested in good faith by appropriate proceedings;

(m)     Liens granted in connection with Hedging Agreements (i) approved by the Administrative Agent in accordance with Section 6.15; *provided*, that each such Lien is *pari passu* with the Liens granted to the Secured Parties under the Loan Documents and (ii) constituting a Permitted Swap Agreement; and

(n)     Liens securing mining leases not to exceed $500,000 or created in respect of collateral pledged to Government Authorities in lieu of performance bonds.

**6.4     Fundamental Changes**. Enter into any merger, consolidation, restructuring, reorganization or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), Dispose of all or substantially all of its Property or business or amend, modify or otherwise change its name, jurisdiction of organization, organizational number, identification number or FEIN, except that, if no Default shall have occurred and be continuing:

(a)     any Subsidiary may be merged or consolidated with or into Borrower (*provided* that Borrower shall be the continuing or surviving entity) or with or into any wholly owned Guarantor;

(b)     any Subsidiary may Dispose of any or all of its assets (upon voluntary liquidation or otherwise) to Borrower or any Guarantor; and

(c)     the Capital Stock of any Subsidiary may be transferred to Borrower or any Guarantor.

**6.5     Disposition of Property**. Dispose of any of its Property (including receivables and leasehold interests), whether now owned or hereafter acquired, or, in the case of any Subsidiary, issue or sell any shares of such Subsidiary's Capital Stock or, in the case of Borrower, issue any shares of Borrower's Capital Stock (including, in each case, pursuant to any merger, consolidation, recapitalization or other transaction) to any Person, except:

(a)    subject to compliance with Section 2.9, the Disposition of assets for which Borrower receives consideration at the time of such Disposition at least equal to the fair market value of such assets and 90% of such consideration is in the form of cash;

(b)    subject to compliance with Section 2.9, the Disposition of assets in the ordinary course of business which are no longer necessary or required in the conduct of such Credit Party's business;

(c)    any Recovery Event; *provided* that the requirements of Section 2.9 are complied with in connection therewith;

(d)    Dispositions of inventory in the ordinary course of business;

(e)    Dispositions solely among Guarantors or from a Guarantor to Borrower;

(f)    any merger, consolidation, Disposition or transfer of Capital Stock specified in and permitted under clauses (a), (b) or (c) of Section 6.4;

(g)    Permitted Sale and Leaseback Transactions;

(h)    a sublease to Oxford Mining Company or another mining company acceptable to Administrative Agent of rights under the applicable Coal Lease required for the surface operation by Oxford Mining Company or another mining company acceptable to the Administrative Agent of that certain Mine known as the Buck Lilly;

(i)    any trade-in of Property in connection with obtaining substitute Property used or useful in connection with any Credit Party's business; *provided*, that such substitute Property shall have a value greater or equivalent to that traded-in; and

(j)    the Disposition of the Oldenburg Stamler Continuous Haulage System, serial number 70215.

**6.6    Restricted Payments.** Declare or pay any dividend on, or make any payment or distribution on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement, conversion into or other acquisition of, any Capital Stock of Borrower or any Subsidiary, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of Borrower or any Subsidiary; or enter into any derivatives or other transaction with any financial institution, commodities or stock exchange or clearinghouse (a "***Derivatives Counterparty***") obligating Borrower or any Subsidiary to make payments to such Derivatives Counterparty as a result of any change in market value of any such Capital Stock; or make or offer to make any optional or voluntary payments, prepayment, repurchase or redemption of, or otherwise voluntarily or optionally defease, any Indebtedness (other than accounts payable arising from the purchase of goods or services or the Loans) or make any payment or prepayment of principal, premium (if any), interest, fees (including fees to obtain any waiver or consent) or other charges on, or redemption, purchase, retirement, defeasance, sinking fund or similar payment with respect to, any Indebtedness of Borrower or any Subsidiary (collectively, "***Restricted Payments***"), except that:

(a)     any Subsidiary may make Restricted Payments to Borrower or any Guarantor;

(b)     any Credit Party may make any required payment, prepayment, redemption, retirement, purchase or other payment of other Permitted Indebtedness, in each case to the extent required to be made by the terms thereof and permitted by such terms after giving effect to any applicable subordination provisions;

(c)     any Credit Party may make prepayments of Capital Leases or purchase money financing comprising Permitted Indebtedness upon the sale or exchange of the equipment subject thereto; and

(d)     Borrower may make dividends or other distributions to Parent equal to the Tax Distribution Amount; *provided* that prior to making any such dividend or distribution Borrower shall deliver to the Administrative Agent a certificate, in a form acceptable to the Administrative Agent, from the Independent Accountant computing the Tax Distribution Amount for each Member;

*provided, however*, that the Restricted Payments described in clauses (b), (c) and (d) above shall not be permitted if a Default or Event of Default shall have occurred and be continuing at the date of declaration or payment thereof or would result therefrom.

6.7     **Investments**. Make, or permit to exist, any Investment, other than:

(a)     extensions of trade credit in the ordinary course of business;

(b)     Investments in Cash Equivalents;

(c)     Investments by Borrower or any of its Subsidiaries in a Guarantor or Borrower;

(d)     Hedging Agreements permitted by Section 6.15;

(e)     with respect to deposits and pledges securing Permits, deposits of cash, certificates of deposit or other securities required by and acceptable to the applicable Governmental Authority;

(f)     subject to the provisions of Section 2.9, Qualified Investments made with the portion of any Reinvestment Deferred Amount;

(g)     Investments received by Borrower or any Subsidiary in connection with workouts with, or bankruptcy, insolvency or other similar proceedings with respect to, customers, working interest owners, other industry partners or any other Person; and

(h)     the Midland Loans.

6.8     **Subsidiaries**. Acquire, form, incorporate, organize or suffer to exist any Subsidiary (i) having any Capital Stock that is not owned by Borrower directly or through other Subsidiaries or (ii) that is not a Guarantor.

**6.9   Amendments to Certain Documents**.  Amend, modify or otherwise change, or permit any amendment, modification or other change to (in either case, pursuant to a waiver or otherwise) (a) any Constituent Document, Midland Document or Loan Document, including, by the filing or modification of any certificate of designation, or any agreement or arrangement entered into by it, with respect to any of its Capital Stock (including any shareholders' agreement), or enter into any new agreement with respect to any of its Capital Stock, except any such amendments, modifications or changes or any such new agreements or arrangements that do not adversely affect any right, privilege or interest of the Administrative Agent or the Lenders under the Loan Documents or any of the other Loan Documents or in the Collateral, (b) any notes, agreement, instruments or other documents relating to the Existing Indebtedness or (c) any Material Agreement.

**6.10   Transactions with Affiliates**.  Enter into any agreement or effect any transaction, including any purchase, sale, lease or exchange of Property, the rendering of any service or the payment of any management, advisory or similar fees, with any Affiliate (other than with any Credit Party) other than:

(a)   transactions on fair and reasonable terms and which are no less favorable to Borrower or any Subsidiary, as the case may be, than could be obtained in a comparable arm's length transaction with a Person that is not an Affiliate (other than terms set forth in the Midland Administrative Services Agreement as in effect on the date hereof); *provided,* that prior to entering into any such agreement with an Affiliate, each applicable Credit Party shall have delivered to the Administrative Agent a certificate of a Responsible Officer of such Credit Party describing such transaction in reasonable detail and certifying as to the satisfaction of conditions set forth in this Section 6.10;

(b)   the exercise of rights and the performance of obligations under any Midland Documents as in effect on the date hereof;

(c)   the engagement of Monarch Financial Corporation, a corporation incorporated under the laws of the Commonwealth of Pennsylvania, pursuant to that an Agreement for Advisory Services to be entered into between Borrower and Monarch Financial Corporation, on terms and conditions acceptable to the Administrative Agent in its sole discretion; and

(d)   a letter agreement between Monarch Financial Corporation and the Borrower, with respect to the payment of certain finders fees, on terms and conditions acceptable to the Administrative Agent in its sole discretion.

*provided* in all cases, that the aggregate amount of all Indebtedness (including any accounts receivable and the Midland Loans payable to Borrower by any of its Affiliates (other than the Credit Parties) shall not exceed $12,000,000.

**6.11   Equipment Sales and Leaseback Transactions**.  Enter into any Equipment Sale and Leaseback Transaction other than a Permitted Equipment Sale and Leaseback Transaction.

**6.12   Negative Pledge Clauses**.  Enter into or suffer to exist or become effective any agreement that prohibits or limits the ability of any Credit Party to create, incur, assume or suffer

to exist any Lien upon any of its Property or revenues, whether now owned or hereafter acquired, to secure the Obligations or, in the case of any Guarantor, its obligations under the Guarantee and Security Agreement, other than (a) this Agreement and the other Loan Documents; or (b) in the case of Borrower or any of its Subsidiaries, any agreements governing any purchase money Liens or Capital Lease Obligations otherwise permitted hereby (in which case, any prohibition or limitation shall only be effective against the assets financed thereby).

**6.13   Restrictions on Subsidiary Distributions**. Enter into or suffer to exist or become effective any consensual encumbrance or restriction on the ability of any Subsidiary to (a) make Restricted Payments in respect of any Capital Stock of such Subsidiary held by, or pay any Indebtedness owed to, any Specified Credit Party, (b) make Investments in any Specified Credit Party or (c) transfer any of its assets to any Specified Credit Party, except for such encumbrances or restrictions existing under or by reason of any restrictions existing under the Loan Documents.

**6.14   Lines of Business**. Enter into any business, either directly or through any Subsidiary, except for those businesses in which the Credit Parties are engaged on the date of this Agreement or disclosed to the Administrative Agent and the Lenders in writing prior to the date hereof.

**6.15   Hedging Agreements**. Enter into, or suffer to exist, any Hedging Agreement unless such agreement (a) is approved in advance in writing by the Administrative Agent or (b) in the case of any interest rate swap, constituting a Permitted Swap Agreement.

**6.16   Changes in Fiscal Periods**. Permit the fiscal year of Borrower or any Subsidiary to end on a day other than December 31 or change Borrower's method of determining its fiscal year.

**6.17   Use of Proceeds**. Borrower shall (i) use the proceeds from the borrowing of Term A Loans on the Closing Date to pay transaction costs for the Closing, including Lender costs and expenses to pay for working capital and general corporate needs of the Credit Parties, (ii) use Term A Loan proceeds and Revolving Credit Loan proceeds to pay for, directly or indirectly through Borrower Subsidiaries, Project Costs in respect of the Development of the Project in accordance with the Construction Budget and Schedule, and (iii) use Term B Loan proceeds to pay in full the Second Lien Obligations.

**6.18   Bank Accounts**. Open or otherwise establish or maintain any bank account in the name or otherwise for the benefit of Borrower or any Subsidiary, other than a single Qualified Payroll Account and a single Qualified DEP Account, unless, concurrently therewith, Borrower shall have delivered a Security Deposit Control Agreement with respect to such account in form and substance acceptable to the Administrative Agent.

**6.19   Disqualified Stock**. Issue any Disqualified Stock.

ARTICLE VII.
EVENTS OF DEFAULT

If any of the following events shall occur and be continuing:

(a)    Borrower shall fail to pay when due and payable or when declared due and payable (in each case whether at the stated maturity, by acceleration or otherwise), including, pursuant to Section 2.9, all or any portion of the Obligations (whether of principal, interest, fees and charges due to the Lenders or other amounts constituting Obligations); or

(b)    Any representation or warranty made or deemed made by any Credit Party herein or by any Credit Party or Midland in any other Loan Document or that is contained in any certificate, document or financial or other statement furnished by it at any time under or in connection with this Agreement or any such other Loan Document shall prove to have been inaccurate in any material respect on or as of the date made or deemed made or furnished; or

(c)    Any Credit Party shall default in the observance or performance of any agreement contained Sections 5.5(a) or (b), 5.6(e), (f) or (g), 5.7(b) or (c), 5.8(a)or (e), 5.10, 5.11, 5.12, 5.14(a) or Article VI, or any default under any Security Document shall have occurred and be continuing; or

(d)    Any Credit Party shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of this Article VII), and such default shall continue unremedied for a period of 30 days after the date of occurrence; *provided*, that in the case of a default which could not reasonably be expected to result in a Material Adverse Effect, such period shall commence on the date of written notice of such default to Borrower from the Administrative Agent; or

(e)    Midland shall fail to pay when due and payable or when declared due and payable (in each case whether at the stated maturity, by acceleration or otherwise) all or any portion of any Midland Loan; or

(f)    Borrower or any of its Subsidiaries shall (i) default in making any payment of any principal of any Indebtedness (including any Guarantee Obligation, but excluding the Loans) on the scheduled or original due date with respect thereto; or (ii) default in making any payment of any interest on any such Indebtedness beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness was created; or (iii) default in the observance or performance of any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or beneficiary of such Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, with the giving of notice if required, such Indebtedness to become due prior to its stated maturity or to become subject to a mandatory offer to purchase by the obligor thereunder or (in the case of any such Indebtedness constituting a Guarantee Obligation) to become payable; *provided*, that a default, event or condition described in clause (i), (ii) or (iii) of this paragraph (f) shall not at any time constitute an Event of Default unless, at such time, one or more defaults, events or conditions of the type described in clauses (i), (ii) and (iii) of this paragraph (f) shall have occurred and be continuing with respect to Indebtedness described in this paragraph (f), the outstanding principal amount of which exceeds in the aggregate $500,000; or

(g)    (i) Borrower or any of its Subsidiaries shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or Borrower or any of its Subsidiaries shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against Borrower or any of its Subsidiaries any case, proceeding or other action of a nature referred to in clause (i) above that (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of 60 days; or (iii) there shall be commenced against Borrower or any of its Subsidiaries any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets that results in the entry of an order for any such relief that shall not have been vacated, discharged, or stayed or bonded pending appeal within 60 days from the entry thereof; or (iv) Borrower or any of its Subsidiaries shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; or (v) Borrower or any of its Subsidiaries shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due; or

(h)    (i) Any Person shall engage in any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Plan, (ii) any "accumulated funding deficiency" (as defined in Section 302 of ERISA), whether or not waived, shall exist with respect to any Plan, or any Lien in favor of the PBGC or a Plan shall arise on the assets of Borrower or any Commonly Controlled Entity, (iii) a Reportable Event shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Single Employer Plan, which Reportable Event or commencement of proceedings or appointment of a trustee is, in the reasonable opinion of the Required Lenders, likely to result in the termination of such Plan for purposes of Title IV of ERISA, (iv) any Single Employer Plan shall terminate for purposes of Title IV of ERISA, (v) Borrower or any Commonly Controlled Entity shall, or in the reasonable opinion of the Required Lenders shall be likely to, incur any liability in connection with a withdrawal from, or the Insolvency or Reorganization of, a Multiemployer Plan or (vi) Borrower, or any of its Subsidiaries or any Commonly Controlled Entity shall be required to make during any fiscal year of Borrower payments pursuant to any employee welfare benefit plan (as defined in Section 3.1 of ERISA) that provides benefits to retired employees (or their dependents) that, in the aggregate, exceed the amount set forth on Schedule 7(h)(i) with respect to such fiscal year, (vii) Borrower, or any of its Subsidiaries or any Commonly Controlled Entity shall be required to make during any fiscal year of Borrower contributions to any defined benefit pension plan subject to Title IV of ERISA (including any Multiemployer Plan) that, in the aggregate, exceed the amount set forth on Schedule 7(h)(ii) with respect to such fiscal year or (viii) any other similar event or condition shall occur or exist with respect to a Plan; and in each case in clauses (i) through (viii) above, such event or condition, together with all other such events or conditions, if any, could, in the sole judgment of the Required Lenders, reasonably be expected to have a Material Adverse Effect; or

(i)     One or more final judgments for the payment of money or decrees shall be entered against Borrower or any of its Subsidiaries involving for Borrower and its Subsidiaries taken as a whole a liability (not paid or fully covered by insurance as to which the relevant insurance company has acknowledged coverage) of $500,000 or more, and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within 30 days from the entry thereof; or

(j)     Any of the Security Documents shall cease, for any reason (other than by reason of the express release thereof pursuant to Section 9.15), to be in full force and effect, or any Credit Party, Midland or any their respective Affiliates shall so assert, or any Lien created by any of the Security Documents shall cease to be enforceable and of the same effect and priority purported to be created thereby; or

(k)     Any Guarantor or Midland shall fail to comply with any terms or provisions of the Guarantee and Security Agreement or the Midland Guarantee and Security Agreement, as applicable, which failure is not remedied within five days after written notice from the Administrative Agent of such failure; any action shall be taken to discontinue or to assert the invalidity or unenforceability of any such guarantee; or any Guarantor or Midland shall deny that it has any further liability under the Guarantee and Security Agreement or the Midland Guarantee and Security Agreement, as applicable, or shall give notice to such effect; *provided*, with respect to actions or inactions by Midland, such failure shall adversely affect the perfection or priority of the Lien granted under the Midland Guarantee and Security Agreement or the validity or enforceability of such agreement; or

(l)     Any Credit Party shall be enjoined, restrained or in any way prevented by court order from continuing to conduct all or any material part of its business affairs; or

(m)     There shall occur a Material Adverse Change or any event or circumstance which would have a Material Adverse Effect; or

(n)     Any provision of any Loan Document shall at any time for any reason by declared to be null and void, or the validity or enforceability thereof shall be contested by any Credit Party or Midland, or a proceeding shall be commenced by any Credit Party, Midland or by any Governmental Authority having jurisdiction over any Credit Party or Midland, seeking to establish the invalidity or unenforceability thereof, or any Credit Party or Midland shall deny that any Credit Party or Midland has any liability or obligation purported to be created under any Loan Document; or

(o)     Any Change of Control shall occur; or

(p)     (x) Any Material Agreement shall be terminated other than at the end of its term (end of primary term) or any other period of time provided for therein (end of any evergreen period); (y) default by any Person in the performance or observance of any term of any Material Agreement which is not cured within the applicable cure period specified in such Material Agreement, if such default results in any party to such Material Agreement being entitled to terminate such Material Agreement, to liquidated damages thereunder or to require the posting of any bond in connection therewith; or (z) any event or condition occurs or exists which in the reasonable opinion of the Administrative Agent is reasonably likely to have an

adverse effect on the ability of any Credit Party or any counterparty to such Material Agreement to perform its obligations under a Material Agreement; or

then, and in any such event, (A) if such event is an Event of Default specified in clause (i) or (ii) of paragraph (f) above with respect to Borrower, automatically the Commitments shall immediately terminate and the Loans hereunder (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents shall immediately become due and payable, and (B) if such event is any other Event of Default, either or both of the following actions may be taken: (i) with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice to Borrower declare the Revolving Credit Commitments to be terminated forthwith, whereupon the Revolving Credit Commitments shall immediately terminate; and (ii) with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice to Borrower, declare the Loans hereunder (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents to be due and payable forthwith, whereupon the same shall immediately become due and payable.

ARTICLE VIII.
THE AGENTS

**8.1     Appointment.** Each Lender hereby irrevocably designates and appoints the Agents as the agents of such Lender under this Agreement and the other Loan Documents, and each Lender irrevocably authorizes each Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to such Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto. Notwithstanding any provision to the contrary elsewhere in this Agreement, no Agent shall have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against any Agent.

**8.2     Delegation of Duties.** Each Agent may execute any of its duties under this Agreement and the other Loan Documents by or through agents or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. No Agent shall be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care.

**8.3     Exculpatory Provisions.** No Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates shall be (i) liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Loan Document (except to the extent that any of the foregoing are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted solely and proximately from its or such Person's own gross negligence or willful misconduct) or (ii) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by any Credit Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the

Agents under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of any Credit Party to perform its obligations hereunder or thereunder. The Agents shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Credit Party.

8.4    **Reliance by Agents**. Each Agent shall be entitled to rely, and shall be fully protected in relying, upon any instrument, writing, resolution, notice, consent, certificate, affidavit, letter, telecopy, telex or teletype message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to the Credit Parties), independent accountants and other experts selected by such Agent. The Agents may deem and treat the payee of any Note as the owner thereof for all purposes unless such Note shall have been transferred in accordance with Section 9.6 and all actions required by such Section in connection with such transfer shall have been taken. Each Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders (or, if so specified by this Agreement, all Lenders or any other instructing group of Lenders specified by this Agreement) as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. Each Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders (or, if so specified by this Agreement, all Lenders or any other instructing group of Lenders specified by this Agreement), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans.

8.5    **Notice of Default**. No Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder unless such Agent shall have received notice from a Lender or Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that the Administrative Agent shall receive such a notice, the Administrative Agent shall give notice thereof to the Lenders. The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (or, if so specified by this Agreement, all Lenders or any other instructing group of Lenders specified by this Agreement); provided that unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

8.6    **Non-Reliance on the Agents and Other Lenders**. Each Lender expressly acknowledges that neither the Agents nor any of their respective officers, directors, employees, agents, attorneys and other advisors, partners, attorneys-in-fact or Affiliates have made any representations or warranties to it and that no act by any Agent hereafter taken, including any review of the affairs of a Credit Party or any Affiliate of a Credit Party, shall be deemed to constitute any representation or warranty by any Agent to any Lender. Each Lender represents to

the Agents that it has, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Credit Parties and their Affiliates and made its own decision to make its Loans hereunder and enter into this Agreement. Each Lender also represents that it will, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Credit Parties and their Affiliates. Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder, no Agent shall have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of any Credit Party or any Affiliate of a Credit Party that may come into the possession of the Agent or any of its officers, directors, employees, agents, attorneys and other advisors, partners, attorneys-in-fact or Affiliates.

**8.7     Indemnification.** The Lenders agree to indemnify each Agent in its capacity as such (to the extent not reimbursed by Borrower and without limiting the obligation of Borrower to do so), ratably according to their respective Aggregate Exposure Percentages in effect on the date on which indemnification is sought under this Section (or, if indemnification is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with such Aggregate Exposure Percentages immediately prior to such date), for, and to save each Agent harmless from and against, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (including at any time following the payment of the Loans) be imposed on, incurred by or asserted against the Agent in any way relating to or arising out of, the Commitments, this Agreement, any of the other Loan Documents, or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by the Agent under or in connection with any of the foregoing; provided that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted solely and proximately from the Agent's gross negligence or willful misconduct. The agreements in this Section shall survive the payment of the Loans and all other amounts payable hereunder.

**8.8     Agent in their Individual Capacities.** Each Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with any Credit Party as though such Agent were not an Agent. With respect to its Loans made or renewed by it, each Agent shall have the same rights and powers under this Agreement and the other Loan Documents as any Lender and may exercise the same as though it were not an Agent, and the terms "Lender" and "Lenders" shall include the Agent in their individual capacities.

**8.9     Successor Administrative Agent.** The Administrative Agent may resign as Administrative Agent upon 10 days' notice to the Lenders and Borrower. If the Administrative Agent shall resign as Administrative Agent under this Agreement and the other Loan Documents,

then the Required Lenders shall appoint from among the Lenders a successor agent for the Lenders, which successor agent shall (unless an Event of Default under Section 7(a) or Section 7(g) with respect to Borrower shall have occurred and be continuing) be subject to approval by Borrower (which approval shall not be unreasonably withheld or delayed), whereupon such successor agent shall succeed to the rights, powers and duties of the Administrative Agent, and the term "Administrative Agent" shall mean such successor agent effective upon such appointment and approval, and the former Administrative Agent's rights, powers and duties as Administrative Agent shall be terminated, without any other or further act or deed on the part of such former Administrative Agent or any of the parties to this Agreement or any holders of the Loans. If no successor agent has accepted appointment as Administrative Agent by the date that is 10 days following a retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective, and the Lenders shall assume and perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above. The Syndication Agent may, at any time, by notice to the Lenders and the Administrative Agent, resign as Syndication Agent hereunder, whereupon the duties, rights, obligations and responsibilities of the Syndication Agent hereunder shall automatically be assumed by, and inure to the benefit of, the Administrative Agent, without any further act by the Agent or any Lender. After any retiring Agent's resignation as Agent, the provisions of this Article VIII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement and the other Loan Documents.

**8.10    Authorization to Release Liens and Guarantees**. The Administrative Agent is hereby irrevocably authorized by each of the Lenders to effect any release of Liens or guarantee obligations contemplated by Section 9.15.

**8.11    The Agent; the Syndication Agent**. The Agent and the Syndication Agent, in their respective capacities as such, shall have no duties or responsibilities, and shall incur no liability, under this Agreement and the other Loan Documents.

**8.12    Withholding Tax**. (a) To the extent required by any applicable law, the Administrative Agent may withhold from any interest payment to any Lender an amount equivalent to any applicable withholding tax. If the forms or other documentation required by Section 2.13 are not delivered to the Administrative Agent, then the Administrative Agent may withhold from any interest payment to any Lender not providing such forms or other documentation, a maximum amount of the applicable withholding tax.

(b)    If the Internal Revenue Service or any authority of the United States or other jurisdiction asserts a claim that the Administrative Agent did not properly withhold tax from amounts paid to or for the account of any Lender (because the appropriate form was not delivered, was not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstances which rendered the exemption from, or reduction of, withholding tax ineffective, or for any other reason), such Lender shall indemnify the Administrative Agent fully for all amounts paid, directly or indirectly, by the Administrative Agent as tax or otherwise, including penalties and interest, together with all expenses incurred, including legal expenses, allocated staff costs and any out of pocket expenses.

(c)    If any Lender sells, assigns, grants a participation in, or otherwise transfers its rights under this Agreement, the purchaser, assignee, participant or transferee, as applicable, shall comply and be bound by the terms of Sections 2.13 and 8.12; *provided* that with respect to any Participant, as set forth in Section 9.6(a), such Participant shall only be required to comply with the requirements of Sections 8.12 if such Participant seeks to obtain the benefits of Section 2.13.

ARTICLE IX.
MISCELLANEOUS

**9.1    Amendments and Waivers.**  Neither this Agreement or any other Loan Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this Section 9.1.  The Required Lenders and each Credit Party party to the relevant Loan Document may, or (with the written consent of the Required Lenders) the Administrative Agent and each Credit Party party to the relevant Loan Document may, from time to time, (a) enter into written amendments, supplements or modifications hereto and to the other Loan Documents (including amendments and restatements hereof or thereof) for the purpose of adding any provisions to this Agreement or the other Loan Documents or changing in any manner the rights of the Lenders or of the Credit Parties hereunder or thereunder or (b) waive, on such terms and conditions as may be specified in the instrument of waiver, any of the requirements of this Agreement or the other Loan Documents or any Default or Event of Default and its consequences; *provided, however,* that no such waiver and no such amendment, supplement or modification shall:

(i)    forgive the principal amount or extend the final scheduled date of maturity of any Loan, extend the scheduled date of any amortization payment in respect of any Term Loan, reduce the stated rate of any interest or fee payable hereunder or extend the scheduled date of any payment thereof, or increase the amount or extend the expiration date of any Commitment of any Lender, in each case without the consent of each Lender directly affected thereby;

(ii)    amend, modify or waive any provision of this Section or reduce any percentage specified in the definition of Required Lenders, consent to the assignment or transfer by Borrower of any of its rights and obligations under this Agreement and the other Loan Documents, release all or substantially all of the Collateral or release all or substantially all of the Guarantors from their guarantee obligations under the Guarantee and Security Agreement, in each case without the consent of all Lenders;

(iii)    amend, modify or waive any condition precedent to any extension of credit set forth in Section 4.2 (including the waiver of an existing Default or Event of Default required to be waived in order for such extension of credit to be made) without the consent of the Required Lenders;

(iv)    reduce the percentage specified in the definition of Required Lenders without the written consent of all Lenders;

(v)    amend, modify or waive any provision of Article VIII or any other provision affecting the rights, duties and obligations of any Agent without the consent of the Agent directly affected thereby;

(vi)    amend, modify or waive the pro rata provisions of Section 2.11 without the consent of each Lender directly affected thereby;

(vii)    impose restrictions on assignments and participations that are more restrictive than, or additional to, those set forth in Section 9.6.

Any such waiver and any such amendment, supplement or modification shall apply equally to each of the Lenders and shall be binding upon the Credit Parties, the Lenders, the Agents and all future holders of the Loans.  In the case of any waiver, the Credit Parties, the Lenders, the Agents shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.  Any such waiver, amendment, supplement or modification shall be effected by a written instrument signed by the parties required to sign pursuant to the foregoing provisions of this Section; *provided*, that delivery of an executed signature page of any such instrument by facsimile transmission shall be effective as delivery of a manually executed counterpart thereof.

Notwithstanding the foregoing, this Agreement and any other Loan Document may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and each Credit Party party to each relevant Loan Document (x) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof (collectively, the "*Additional Extensions of Credit*") to share ratably in the benefits of this Agreement and the other Loan Documents with the Term Loans and Revolving Credit Loans and the accrued interest and fees in respect thereof and (y) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders.

**9.2    Notices**.  All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by facsimile), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered, or three Business Days after being deposited in the mail, postage prepaid, or, in the case of facsimile notice, when received, addressed (a) in the case of Borrower, the Agents, as follows and (b) in the case of the Lenders, as set forth in an administrative questionnaire delivered to the Administrative Agent or, in the case of a Lender which becomes a party to this Agreement pursuant to an Assignment and Acceptance, in such Assignment and Acceptance or (c) in the case of any party, to such other address as such party may hereafter notify to the other parties hereto:

| | |
|---|---|
| Borrower: | Greenbrier Minerals, LLC<br>P.O. Box G<br>Rupert, West Virginia 25984<br>Attention:  Joseph C. Turley, III<br>Facsimile:  (304) 392-9000 |
| With a copy to: | Buchanan Ingersoll Rooney, PC<br>301 Grant Street One Oxford Centre<br>20th Floor<br>Pittsburgh, Pennsylvania 15219<br>Attention: Donald E. Malecki<br>Facsimile: (412) 562-1041 |
| Administrative Agent: | Lehman Commercial Paper Inc.<br>745 Seventh Avenue<br>New York, New York 10019<br>Attention:  Michelle Rosolinsky<br>Facsimile:  (646) 758-5015 |
| with a copy to: | Lehman Brothers Inc.<br>600 Travis Street, Suite 7200<br>Houston, Texas 77002<br>Attention:  J. Robert Chambers<br>Facsimile:  (713) 236-3912 |
| with a copy to:: | Akin Gump Strauss Hauer & Feld LLP<br>1111 Louisiana Street, Suite 4400<br>Houston, Texas 77002<br>Attention:  J. Michael Chambers<br>Facsimile:  (713) 236-0822 |

*provided* that any notice, request or demand to or upon the Agent or any Lender shall not be effective until received.

**9.3     No Waiver; Cumulative Remedies**.  No failure to exercise and no delay in exercising, on the part of  any Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

**9.4     Survival of Representations and Warranties**.  All representations and warranties made herein, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans and other extensions of credit hereunder.

**9.5** **Payment of Expenses**. Borrower agrees (a) to pay or reimburse the Agents for all their reasonable out-of-pocket costs and expenses incurred in connection with the syndication of the Facilities (other than fees payable to syndicate members) and the development, preparation and execution of, and any amendment, supplement or modification to, this Agreement and the other Loan Documents and any other documents prepared in connection herewith or therewith, and the consummation and administration of the transactions contemplated hereby and thereby, including the reasonable fees and disbursements and other charges of counsel to the Administrative Agent and the charges of Intralinks, (b) to pay or reimburse each Lender and the Agents for all their costs and expenses incurred in connection with the enforcement or preservation of any rights under this Agreement, the other Loan Documents and any other documents prepared in connection herewith or therewith, including the fees and disbursements of counsel (including the allocated fees and disbursements and other charges of in-house counsel) to each Lender and of counsel to the Agents, (c) to pay, indemnify, or reimburse each Lender, and the Agents for, and hold each Lender, and the Agents harmless from, any and all recording and filing fees and any and all liabilities with respect to, or resulting from any delay in paying, stamp, excise and other taxes, if any, which may be payable or determined to be payable in connection with the execution and delivery of, or consummation or administration of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Agreement, the other Loan Documents and any such other documents, and (d) to pay, indemnify or reimburse each Lender, each Agent, their respective Affiliates, and their respective officers, directors, trustees, employees, Affiliates, shareholders, attorneys and other advisors, agents and controlling persons (each, an "***Indemnitee***") for, and hold each Indemnitee harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement, the other Loan Documents and any such other documents, including any of the foregoing relating to the use of proceeds of the Loans or the violation of, noncompliance with or liability under, any Environmental Law applicable to the operations of Borrower any of its Subsidiaries or any of the Properties or the use by unauthorized persons of information or other materials sent through electronic, telecommunications or other information transmission systems that are intercepted by such persons and the fees and disbursements and other charges of legal counsel in connection with claims, actions or proceedings by any Indemnitee against Borrower hereunder (all the foregoing in this clause (d), collectively, the "***Indemnified Liabilities***"), *provided*, that Borrower shall have no obligation hereunder to any Indemnitee with respect to Indemnified Liabilities to the extent such Indemnified Liabilities are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted solely and proximately from the gross negligence or willful misconduct of such Indemnitee. No Indemnitee shall be liable for any damages arising from the use by unauthorized persons of information or other materials sent through electronic, telecommunications or other information transmission systems that are intercepted by such persons or for any special, indirect, consequential or punitive damages in connection with the Facilities. Without limiting the foregoing, and to the extent permitted by applicable law, Borrower agrees not to assert and to cause its Subsidiaries not to assert, and hereby waives and agrees to cause its Subsidiaries so to waive, all rights for contribution or any other rights of recovery with respect to all claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature, under or related to Environmental Laws, that any of them might have by statute or otherwise against any Indemnitee. All amounts due under this Section shall be payable not later than 30 days after written demand therefor. Statements payable by

Borrower pursuant to this Section shall be submitted to the address of Borrower set forth in Section 9.2, or to such other Person or address as may be hereafter designated by Borrower in a notice to the Administrative Agent. The agreements in this Section shall survive repayment of the Loans and all other amounts payable hereunder.

9.6     **Successors and Assigns; Participations and Assignments**. This Agreement shall be binding upon and inure to the benefit of Borrower, the Lenders, the Agents, all future holders of the Loans and their respective successors and assigns, except that Borrower may not assign or transfer any of their respective rights or obligations under this Agreement without the prior written consent of the Agents and each Lender.

(a)     Any Lender may, without the consent of Borrower or any other Person, in accordance with applicable law, at any time sell to one or more banks, financial institutions or other entities (each, a "*Participant*") participating interests in any Loan owing to such Lender, any Commitment of such Lender or any other interest of such Lender hereunder and under the other Loan Documents. In the event of any such sale by a Lender of a participating interest to a Participant, such Lender's obligations under this Agreement to the other parties to this Agreement shall remain unchanged, such Lender shall remain solely responsible for the performance thereof, such Lender shall remain the holder of any such Loan for all purposes under this Agreement and the other Loan Documents, and Borrower and the Agents shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and the other Loan Documents. In no event shall any Participant under any such participation have any right to approve any amendment or waiver of any provision of any Loan Document, or any consent to any departure by any Credit Party therefrom, except to the extent that such amendment, waiver or consent would require the consent of all Lenders pursuant to·Section 9.1. Borrower agrees that if amounts outstanding under this Agreement and the Loans are due or unpaid, or shall have been declared or shall have become due and payable upon the occurrence of an Event of Default, each Participant shall, to the maximum extent permitted by applicable law, be deemed to have the right of setoff in respect of its participating interest in amounts owing under this Agreement to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement, *provided* that, in purchasing such participating interest, such Participant shall be deemed to have agreed to share with the Lenders the proceeds thereof as provided in Section 9.7(a) as fully as if such Participant were a Lender hereunder. Borrower also agrees that each Participant shall be entitled to the benefits of Sections 2.12, 2.13 and 2.14 with respect to its participation in the Commitments and the Loans outstanding from time to time as if such Participant were a Lender; *provided* that, in the case of Section 2.13 such Participant shall have complied with the requirements of said Section and Section 8.12, and *provided, further*, that no Participant shall be entitled to receive any greater amount pursuant to any such Section than the transferor Lender would have been entitled to receive in respect of the amount of the participation transferred by such transferor Lender to such Participant had no such transfer occurred.

(b)     Any Lender (an "*Assignor*") may, in accordance with applicable law and upon written notice to the Administrative Agent, at any time and from time to time assign to any Lender or any Affiliate, Related Fund or Control Investment Affiliate thereof or, with the consent of Borrower and the Agents (provided (x) that no such consent need be obtained by

the Administrative Agent or its Affiliates and (y) the consent of Borrower need not be obtained with respect to any assignment of Term Loans), to an additional bank, financial institution or other entity (an "*Assignee*") all or any part of its rights and obligations under this Agreement pursuant to an Assignment and Acceptance, substantially in the form of Exhibit O (an "*Assignment and Acceptance*"), executed by such Assignee and such Assignor (and, where the consent of Borrower, the Administrative Agent is required pursuant to the foregoing provisions, by Borrower and such other Persons) and delivered to the Administrative Agent for its acceptance and recording in the Register; *provided* that no such assignment to an Assignee (other than any Lender or any Affiliate thereof) shall be in an aggregate principal amount of less than $1,000,000 (with respect to Term Loans) and $1,000,000 with respect to the Revolving Credit Facility (other than, in each case, in the case of an assignment of all of a Lender's interests under this Agreement), unless otherwise agreed by Borrower and the Administrative Agent. Any such assignment need not be ratable as among the Facilities. Upon such execution, delivery, acceptance and recording, from and after the effective date determined pursuant to such Assignment and Acceptance, (x) the Assignee thereunder shall be a party hereto and, to the extent provided in such Assignment and Acceptance, have the rights and obligations of a Lender hereunder with Commitments and/or Loans as set forth therein, and (y) the Assignor thereunder shall, to the extent provided in such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of an Assignor's rights and obligations under this Agreement, such Assignor shall cease to be a party hereto, except as to Sections 2.12, 2.13, 8.12 and 9.5 in respect of the period prior to such effective date). Notwithstanding any provision of this Section, the consent of Borrower shall not be required for any assignment that occurs at any time when any Event of Default shall have occurred and be continuing. For purposes of the minimum assignment amounts set forth in this paragraph, multiple assignments by two or more Related Funds shall be aggregated.

(c)     The Administrative Agent shall, on behalf of Borrower, maintain at its address referred to in Section 9.2 a copy of each Assignment and Acceptance delivered to it and a register (the "*Register*") for the recordation of the names and addresses of the Lenders and the Commitment of, and principal amount of the Loans owing to, each Lender from time to time. The entries in the Register shall be conclusive, in the absence of manifest error, and Borrower, each Agent and the Lenders shall treat each Person whose name is recorded in the Register as the owner of the Loans and any Notes evidencing such Loans recorded therein for all purposes of this Agreement. Any assignment of any Loan, whether or not evidenced by a Note, shall be effective only upon appropriate entries with respect thereto being made in the Register (and each Note shall expressly so provide). Any assignment or transfer of all or part of a Loan evidenced by a Note shall be registered on the Register only upon surrender for registration of assignment or transfer of the Note evidencing such Loan, accompanied by a duly executed Assignment and Acceptance; thereupon one or more new Notes in the same aggregate principal amount shall be issued to the designated Assignee, and the old Notes shall be returned by the Administrative Agent to Borrower marked "canceled." The Register shall be available for inspection by Borrower or any Lender (with respect to any entry relating to such Lender's Loans) at any reasonable time and from time to time upon reasonable prior notice.

(d)     Upon its receipt of an Assignment and Acceptance executed by an Assignor and an Assignee (and, in any case where the consent of any other Person is required by Section 9.6(b), by each such other Person) together with payment to the Administrative Agent of a registration and processing fee of $3,500 (treating multiple, simultaneous assignments by or to two or more Related Funds as a single assignment) (except that no such registration and processing fee shall be payable in the case of an Assignee which is already a Lender or is an Affiliate or Related Fund of a Lender or a Person under common management with a Lender), the Administrative Agent shall (i) promptly accept such Assignment and Acceptance and (ii) on the effective date determined pursuant thereto record the information contained therein in the Register and give notice of such acceptance and recordation to Borrower.  On or prior to such effective date, Borrower, at its own expense, upon request, shall execute and deliver to the Administrative Agent (in exchange for the Revolving Credit Note and/or applicable Term Notes, as the case may be, of the assigning Lender) a new Revolving Credit Note and/or applicable Term Notes, as the case may be, to the order of such Assignee in an amount equal to the Revolving Credit Commitment and/or applicable Term Loans, as the case may be, assumed or acquired by it pursuant to such Assignment and Acceptance and, if the Assignor has retained a Revolving Credit Commitment and/or Term Loans, as the case may be, upon request, a new Revolving Credit Note and/or Term Notes, as the case may be, to the order of the Assignor in an amount equal to the Revolving Credit Commitment and/or applicable Term Loans, as the case may be, retained by it hereunder.  Such new Note or Notes shall be dated the Closing Date and shall otherwise be in the form of the Note or Notes replaced thereby.

(e)     For the avoidance of doubt, the parties to this Agreement acknowledge that the provisions of this Section concerning assignments of Loans and Notes relate only to absolute assignments and that such provisions do not prohibit assignments creating security interests in Loans and Notes, including any pledge or assignment by a Lender of any Loan or Note to any Federal Reserve Bank in accordance with applicable law.

(f)     Notwithstanding anything to the contrary contained herein, any Lender (a "*Granting Lender*") may grant to a special purpose funding vehicle (an "*SPC*"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and Borrower, the option to provide to Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make to Borrower pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPC to make any Loan and (ii) if an SPC elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof.  The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender.  Each party hereto hereby agrees that no SPC shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender).  In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other indebtedness of any SPC, it will not institute against, or join any other person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any state thereof.  In addition, notwithstanding anything to the contrary in this Section 9.6(f), any SPC may (A) with notice

to, but without the prior written consent of, Borrower and the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender, or with the prior written consent of Borrower and the Administrative Agent (which consent shall not be unreasonably withheld) to any financial institutions providing liquidity and/or credit support to or for the account of such SPC to support the funding or maintenance of Loans, and (B) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPC; *provided* that non-public information with respect to Borrower may be disclosed only with Borrower's consent which will not be unreasonably withheld. This paragraph (g) may not be amended without the written consent of any SPC with Loans outstanding at the time of such proposed amendment.

   **9.7    Adjustments; Set-off.**  (a) Except to the extent that this Agreement provides for payments to be allocated to a particular Lender or to the Lenders under a particular Facility, if any Lender (a "***Benefited Lender***") shall at any time receive any payment of all or part of the Obligations owing to it, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set-off, pursuant to events or proceedings of the nature referred to in Section 8(f), or otherwise), in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of such other Lender's Obligations, such Benefited Lender shall purchase for cash from the other Lenders a participating interest in such portion of each such other Lender's Obligations, or shall provide such other Lenders with the benefits of any such collateral, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such collateral ratably with each of the Lenders; *provided, however,* that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest.

        (b)    In addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right, without prior notice to Borrower, any such notice being expressly waived by Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by Borrower hereunder (whether at the stated maturity, by acceleration or otherwise), to set off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch or agency thereof to or for the credit or the account of Borrower. Each Lender agrees to notify promptly Borrower and the Administrative Agent after any such setoff and application made by such Lender, *provided* that the failure to give such notice shall not affect the validity of such setoff and application.

   **9.8    Counterparts.**  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Agreement or of an Assignment and Acceptance by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof. A set of the copies of this Agreement signed by all the parties shall be lodged with Borrower and the Administrative Agent.

**9.9    Severability**.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**9.10    Integration**.  This Agreement and the other Loan Documents represent the entire agreement of Borrower, the Agents and the Lenders with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by any Agent or any Lender relative to the subject matter hereof not expressly set forth or referred to herein or in the other Loan Documents.

**9.11    GOVERNING LAW**.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

**9.12    Submission To Jurisdiction; Waivers**.  Borrower hereby irrevocably and unconditionally:

(a)    submits for itself and its Property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of the courts of the State of New York located in the County of New York, the courts of the United States of America for the Southern District of New York, and appellate courts from any thereof;

(b)    consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)    agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to Borrower at its address set forth in Section 9.2 or at such other address of which the Administrative Agent shall have been notified pursuant thereto;

(d)    agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction; and

(e)    waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section any special, exemplary, punitive or consequential damages.

**9.13    Acknowledgments**.  Borrower hereby acknowledges that:

(a)    it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)    no Agent nor any Lender has any fiduciary relationship with or duty to Borrower arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Agents and the Lenders, on one hand, and Borrower, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)    no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Agents and the Lenders or between Borrower and the Lenders.

**9.14    Confidentiality**.  Each Agent and the Lenders agrees to keep confidential all non-public information provided to it by any Credit Party pursuant to this Agreement that is designated by such Credit Party as confidential; *provided* that nothing herein shall prevent any Agent or any Lender from disclosing any such information (a) to any Agent, any other Lender or any Affiliate of any thereof, (b) to any Participant or Assignee (each, a "***Transferee***") or prospective Transferee that agrees to comply with the provisions of this Section or substantially equivalent provisions, (c) to any of its employees, directors, agents, attorneys, accountants and other professional advisors, (d) to any financial institution that is a direct or indirect contractual counterparty in swap agreements or such contractual counterparty's professional advisor (so long as such contractual counterparty or professional advisor to such contractual counterparty agrees to be bound by the provisions of this Section 9.14), (e) upon the request or demand of any Governmental Authority having jurisdiction over it, (f) in response to any order of any court or other Governmental Authority or as may otherwise be required pursuant to any Requirement of Law, (g) if requested or required to do so in connection with any litigation or similar proceeding, (h) that has been publicly disclosed other than in breach of this Section, (i) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender or (j) in connection with the exercise of any remedy hereunder or under any other Loan Document.  Notwithstanding anything to the contrary in the foregoing sentence or any other express or implied agreement, arrangement or understanding, the parties hereto hereby agree that, from the commencement of discussions with respect to the financing provided hereunder, any party hereto (and each of its employees, representatives, or agents) is permitted to disclose to any and all persons, without limitation of any kind, the tax structure and tax aspects of the transactions contemplated hereby, and all materials of any kind (including opinions or other tax analyses) related to such tax structure and tax aspects.

**9.15    Release of Collateral and Guarantee Obligations**.

(a)    Notwithstanding anything to the contrary contained herein or in any other Loan Document, upon request of Borrower in connection with any Disposition of Property permitted by the Loan Documents, the Administrative Agent shall (without notice to, or vote or consent of, any Lender, or any Affiliate of any Lender that is a party to any Specified Hedge Agreement) take such actions as shall be required to release its Liens on any Collateral being Disposed of in such Disposition, and to release any guarantee obligations under any Loan Document of any Person being Disposed of in such Disposition, to the extent necessary to

permit consummation of such Disposition in accordance with the Loan Documents; *provided* that Borrower shall have delivered to the Administrative Agent, at least ten Business Days prior to the date of the proposed release (or such shorter period agreed to by the Administrative Agent), a written request for release identifying the relevant Collateral being Disposed of in such Disposition and the terms of such Disposition in reasonable detail, including the date thereof, the price thereof and any expenses in connection therewith, together with a certification by Borrower stating that such transaction is in compliance with this Agreement and the other Loan Documents and that the proceeds of such Disposition will be applied in accordance with this Agreement and the other Loan Documents.

(b)     Notwithstanding anything to the contrary contained herein or any other Loan Document, when all Obligations (other than obligations which by the terms hereof survive termination of this Agreement) have been paid in full, all Commitments have terminated or expired, upon request of Borrower, the Administrative Agent shall (without notice to, or vote or consent of, any Lender, or any Affiliate of any Lender that is a party to any Specified Hedge Agreement) take such actions as shall be required to release its Liens on all Collateral, and to release all guarantee obligations provided for in any Loan Document, whether or not on the date of such release there may be outstanding Obligations in respect of Specified Hedge Agreements.   Any such release of guarantee obligations shall be deemed subject to the provision that such guarantee obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, Borrower or any Guarantor or any substantial part of its property, or otherwise, all as though such payment had not been made.   The foregoing notwithstanding, upon Final Completion and the repayment of all obligations owing from Midland to the Credit Parties, the Administrative Agent shall (without notice to, or vote or consent of, any Lender), take such actions as shall be required to terminate the Midland Guarantee and Security Agreement and release of all Liens on property of Midland that secure the Obligations) and the Liens arising under the Midland Guarantee and Security Agreement and to release all guarantee obligations thereunder, all of which shall not be subject to reinstatement as provided above.

**9.16   Accounting Changes**.  In the event that any "Accounting Change" (as defined below) shall occur and such change results in a change in the method of calculation of financial covenants, standards or terms in this Agreement, then Borrower and the Administrative Agent agree to enter into negotiations in order to amend such provisions of this Agreement so as to equitably reflect such Accounting Change with the desired result that the criteria for evaluating Borrower's financial condition shall be the same after such Accounting Change as if such Accounting Change had not been made.  Until such time as such an amendment shall have been executed and delivered by Borrower, the Administrative Agent and the Required Lenders, all financial covenants, standards and terms in this Agreement shall continue to be calculated or construed as if such Accounting Change had not occurred.  "*Accounting Change*" refers to any change in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants or, if applicable, the SEC.

**9.17    WAIVERS OF JURY TRIAL.** THE BORROWER, THE AGENTS AND THE LENDERS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

**9.18    Customer Identification – USA PATRIOT Act Notice.** The Administrative Agent (for itself and not on behalf of any other party), the Syndication Agent (for itself and not on behalf of any other party) and each Lender hereby notifies the Credit Parties that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56, signed into law October 26, 2001 (the "*Patriot Act*"), it is required to obtain, verify and record information that identifies the Credit Parties, which information includes the name and address of the Credit Parties and other information that will allow the Administrative Agent, the Syndication Agent or such Lender, as applicable, to identify the Credit Parties in accordance with the Patriot Act.

**9.19    Affirmation of Obligations.** From and after the Closing Date, (a) the terms and conditions of the Original Credit Agreement shall be amended as set forth herein and, subject to clause (c) below, as so amended shall be restated in their entirety; (b) this Agreement shall not in any way release or impair the rights, duties, "Obligations" or "Liens" (as such terms are defined in the Original Credit Agreement) created pursuant to the Original Credit Agreement or any other Original Loan Document or affect the relative priorities thereof, in each case to the extent in force and effect thereunder as of the Closing Date and except as modified hereby or by documents, instruments and agreements executed and delivered in connection herewith, and all of such rights, duties, Obligations and Liens are assumed, ratified and affirmed by each of the Credit Parties; (c) all indemnification obligations of the Credit Parties under the Original Credit Agreement and any other Original Loan Documents shall survive the execution and delivery of this Agreement and shall continue in full force and effect for the benefit of the Lenders, the Agents, and any other Person indemnified under the Original Credit Agreement or any other Original Loan Document at any time prior to the Closing Date; (d) the Obligations incurred under the Original Credit Agreement shall, to the extent outstanding on the Closing Date, continue outstanding under this Agreement and shall not be deemed to be paid, released, discharged or otherwise satisfied by the execution of this Agreement, and this Agreement shall not constitute a refinancing, substitution or novation of such Obligations or any of the other rights, duties and obligations of the parties hereunder, and the term "Obligations" as such terms are used in Original Loan Documents shall include the Obligations as increased, amended and restated under this Agreement; (e) the execution, delivery and effectiveness of this Agreement shall not operate as a waiver of any Default or Event of Default which has occurred and is continuing under the Original Credit Agreement immediately prior to the Closing Date, except for such Defaults or Events of Default of which the Administrative Agent has actual knowledge or which, individually or in the aggregate would not reasonably be expected to result in a Material Adverse Effect on the Credit Parties taken as a whole; and (f) the Liens granted pursuant to the Original Security Documents to which each of the Credit Parties is a party shall continue without any diminution thereof and shall remain in full force and effect on and after the Closing Date.

**[Signature Page Follows]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

GREENBRIER MINERALS, LLC, as Borrower

By: _____
      Joseph C. Turley, III
      President

LEHMAN BROTHERS INC.,
as Agent

By: _____
      J. Robert Chambers
      Managing Director

LEHMAN COMMERCIAL PAPER INC.,
as Administrative Agent, Syndication Agent and a Lender

By: _____
      J. Robert Chambers
      Authorized Signatory

[Signature Page to Credit Agreement]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

GREENBRIER MINERALS, LLC, as Borrower

By: _____
     Joseph C. Turley, III
     President

LEHMAN BROTHERS INC.,
as Agent

By: _____
     J. Robert Chambers
     Managing Director

LEHMAN COMMERCIAL PAPER INC.,
as Administrative Agent, Syndication Agent and a Lender

By: _____
     J. Robert Chambers
     Authorized Signatory

[Signature Page to Credit Agreement]

Annex I

Commitments

| Lender | Revolving Credit Commitment | Term A Commitment | Term B Commitment |
|---|---|---|---|
| Lehman Commercial Paper Inc.<br>745 Seventh Avenue<br>New York, New York 10019<br>Attention:  Michelle Rosolinsky<br>Facsimile:  (646) 758-5015 | $5,000,000 | $60,000,000 | $29,000,000 |