**<u>EXHIBIT C</u>**

EXECUTION COPY

## AMENDED AND RESTATED

## OPERATING AGREEMENT

## OF

## GREENBRIER MINERALS HOLDINGS, LLC

**(a Manager-managed Delaware limited liability company)**

**March 12, 2008**

**THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE'S SECURITIES ACT, AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS AND UNTIL REGISTERED UNDER THE ACTS OR UNLESS AN OPINION OF COUNSEL IN FORM AND SUBSTANCE SATISFACTORY TO THE COMPANY TO THE EFFECT THAT AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE. IN ADDITION, ANY OFFER, SALE, TRANSFER, PLEDGE OR HYPOTHECATION IS SUBJECT TO CERTAIN RESTRICTIONS AS PROVIDED IN THE OPERATING AGREEMENT.**

# TABLE OF CONTENTS

**ARTICLE 1 DEFINITIONS**...................................................................................**1**

    1.1    Definitions...........................................................................................1

**ARTICLE 2 FORMATION AND PURPOSE**.......................................................**11**

    2.1    Formation...........................................................................................11
    2.2    Name..................................................................................................11
    2.3    Registered Office/Agent....................................................................11
    2.4    Purposes............................................................................................11
    2.5    Execution and Filing of the Certificate.............................................13
    2.6    Governing Act...................................................................................13
    2.7    Other Qualifications..........................................................................14
    2.8    Names, Addresses, Units and Sharing Ratios of Members. .................14

**ARTICLE 3 CAPITAL CONTRIBUTIONS** ........................................................**15**

    3.1    Capital Contributions of Members.....................................................15
    3.2    Capital Accounts................................................................................15
    3.3    No Return of or Interest on Capital; No Partition................................16
    3.4    Issuance of Additional Units; Additional Members. ...........................16
    3.5    Ownership Interests. .........................................................................17

**ARTICLE 4 DISTRIBUTIONS TO MEMBERS AND ALLOCATIONS OF
           PROFITS AND LOSSES** .......................................................**17**

    4.1    Profits and Losses. ............................................................................17
    4.2    Distributions......................................................................................18
    4.3    Special Allocations. ..........................................................................18
    4.4    Curative Allocations. ........................................................................20
    4.5    Tax Allocations:  Code Section 704(c)...............................................21
    4.6    Miscellaneous. ..................................................................................21
    4.7    Establishment of Reserve...................................................................22
    4.8    Amounts Withheld.............................................................................22
    4.9    Distributions and Allocations in Respect to Transferred Interests. .......22
    4.10   Valuation...........................................................................................22

**ARTICLE 5 MANAGEMENT** .............................................................................**23**

    5.1    Management by Board of Managers.....................................................23
    5.2    Number and Term of Office of Managers; Qualifications....................25
    5.3    Officers; Delegation of Duties............................................................26
    5.4    Vacancies; Removal; Resignation. .....................................................27
    5.5    Meetings of Board of Managers. ........................................................27
    5.6    Action by Consent or Remote Conference. .........................................28

5.7     Compensation of Managers. ....................................................28
5.8     Conflicts of Interest..............................................................28
5.9     Limitation on Duties of Managers. ........................................29
5.10    Exculpation and Indemnification...........................................30
5.11    Duties and Responsibilities....................................................31
5.12    Loans.....................................................................................32
5.13    Annual Budget. .....................................................................32

**ARTICLE 6 RIGHTS AND OBLIGATIONS OF MEMBERS ..............................................33**

6.1     Liability of Members. ...........................................................33
6.2     Voting Rights. .......................................................................33
6.3     Meetings of Members............................................................33
6.4     Proxies...................................................................................34
6.5     Conduct of Meetings..............................................................35
6.6     Action by Consent or Remote Participation. ..........................35
6.7     Voting by Joint Holders of Units. ..........................................35
6.8     Reserved.................................................................................36
6.9     Voting on Amendments. ........................................................36
6.10    Resignation/Withdrawal. .......................................................36
6.11    Other Business Activities; Non-Solicitation of Customers and Employees .........36
6.12    Reserved.................................................................................37
6.13    Actions by Subsidiaries..........................................................37

**ARTICLE 7 ACCOUNTING..............................................................................................38**

7.1     Books and Records. ...............................................................38
7.2     Fiscal Year. ...........................................................................38
7.3     Tax and Financial Reports. ....................................................38
7.4     Company's Accountant...........................................................39
7.5     Tax Matters Partner................................................................39
7.6     Federal Income Tax Elections. ..............................................39

**ARTICLE 8 TERM AND DISSOLUTION ........................................................................39**

8.1     Term.......................................................................................39
8.2     Events Causing Termination...................................................39
8.3     Actions, Death, etc., of Members; Waiver..............................40
8.4     Distribution in Case of Termination. .....................................40
8.5     Rights of Members on Liquidation. ........................................41

**ARTICLE 9 TRANSFER OF COMPANY INTERESTS....................................................41**

9.1     Transfer of Interests Generally. .............................................41
9.2     Permissible Transfers.............................................................41
9.3     Acquisition of an Interest Conveyed to Another Without Authority....................42
9.4     Additional Members and Substitutions...................................43

9.5      Indemnity. ..............................................................................43
9.6      Reserved. ...............................................................................43
9.7      Repurchase of Affected Company Interests. .......................................43
9.8      Reserved. ...............................................................................44
9.9      Reserved. ...............................................................................44
9.10     Tag-Along. .............................................................................44
9.11     Right to Initiate a Company Sale. ....................................................45
9.12     Reserved. ...............................................................................45
9.13     Reserved. ...............................................................................45
9.14     Legend. ..................................................................................45

**ARTICLE 10 REPRESENTATIONS, WARRANTIES, COVENANTS AND
          AGREEMENTS OF MEMBERS** ..............................................**46**

10.1     Representations and Warranties. ......................................................46
10.2     Other Covenants. ......................................................................48

**ARTICLE 11 GENERAL PROVISIONS** .......................................................**48**

11.1     Binding Effect and Benefit of This Agreement. ...................................48
11.2     Certificates, etc. ......................................................................48
11.3     Notices, etc. ...........................................................................48
11.4     Integration. ............................................................................49
11.5     Governing Law and Waiver of Jury Trial. ..........................................49
11.6     Counterparts. ..........................................................................49
11.7     Severability of Provisions. ...........................................................49
11.8     Creditors. ...............................................................................50
11.9     Disclosure. .............................................................................50
11.10    Confidential Information. .............................................................50
11.11    Further Assurances. ...................................................................51

**ARTICLE 12 ALTERNATIVE DISPUTE RESOLUTION** ...............................**51**

12.1     Agreement to Use Procedure. ........................................................51
12.2     Initiation of Procedure. ...............................................................51
12.3     Direct Negotiations. ...................................................................51
12.4     Selection of Mediator. .................................................................52
12.5     Time and Place of Mediation. ........................................................52
12.6     Exchange of Information. .............................................................52
12.7     Summary of Views. ...................................................................52
12.8     Parties to Be Represented. ...........................................................53
12.9     Conduct of Mediation. ................................................................53
12.10    Termination of Procedure. ...........................................................53
12.11    Other Proceedings. ....................................................................53
12.12    Fees of Mediation; Disqualification. ................................................54
12.13    Confidentiality. ........................................................................54

12.14   Equitable Relief. ..................................................................................................54

**SCHEDULE A**  -- Members Units

# AMENDED AND RESTATED
# OPERATING AGREEMENT
## OF
# GREENBRIER MINERALS HOLDINGS, LLC

THIS AMENDED AND RESTATED OPERATING AGREEMENT is made effective as of March 12, 2008 by and among those persons or entities executing this Agreement, who shall be referred to herein as the "Members" and individually as a "Member," and anyone else admitted as a Member in accordance with the terms of this Agreement, and shall govern the operations of the Company and the rights, duties and obligations of the Members.

## WITNESSETH:

WHEREAS, the Members formed a limited liability company under the name Greenbrier Minerals Holdings, LLC (the "Company") by filing the required Certificate of Formation pursuant to the Delaware Limited Liability Company Act, as amended, with the Delaware Secretary of State;

WHEREAS, the business of the Company shall be: (i) the mining, processing and sale of coal produced by it, (ii) the operating of bulk materials handling and coal processing facilities, (iii) the domestic and international trading of coal, including the purchase and resale of coal produced by others, (iv) acquisition, operation and management of mining properties and interests and (v) any other lawful business approved by the Board of Managers of the Company and permitted by the Act or laws of any jurisdiction in which the Company may do business (the "Business");

WHEREAS, the Members have previously executed that certain Operating Agreement of Greenbrier Minerals Holdings, LLC, dated as of July 25, 2006, as amended (the "Original Operating Agreement"); and

WHEREAS, pursuant to this Agreement the Members desire to amend and restate the Original Operating Agreement as set forth herein;

NOW, THEREFORE, in consideration of the mutual promises and covenants herein and intending to be legally bound, the Members hereby agree to be bound by the following:

## ARTICLE 1

## DEFINITIONS

1.1    <u>Definitions</u>.

For purposes of this Agreement, the following terms shall have the meanings set forth below, except as otherwise specified or as the context may otherwise require:

1

"Act" shall mean the Delaware Limited Liability Company Act, as amended from time to time.

"Adjusted Capital Account Deficit" shall mean, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:  (i) credit to such Capital Account any amounts which such Member is obligated to restore (pursuant to the terms of such Member's promissory note or otherwise) or is deemed to be obligated to restore pursuant to Treasury Regulation Sections 1.704-2(g)(1) and 1.704-2(i)(5); and (ii) debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6) of the Regulations.  The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

"Affiliate" of a specified Person shall mean any other Person who directly or indirectly Controls, is Controlled by, or is under common Control with such specified Person.

"Agreement" shall mean this Amended and Restated Operating Agreement of Greenbrier Minerals Holdings, LLC, as further amended, restated, supplemented or otherwise modified from time to time.

"Bankruptcy" shall mean (i) the entry of a decree or order for relief by a court having jurisdiction in respect of a Person in an involuntary proceeding under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of a Person or for any substantial part of such Person's property or the entry of an order for the winding up or liquidation of its affairs, which decree or order remains unstayed and in effect for a period of ninety (90) consecutive days; (ii) the commencement by a Person of a voluntary proceeding under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or consent to the entry of an order for relief in an involuntary case under any such law, or consent to the appointment or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of a Person or for any substantial part of its property, or any general assignment by a Person for the benefit of creditors; or (iii) the attachment by a creditor of a Person's interest in the Company, which attachment is not discharged or vacated within ninety (90) days from the date it becomes effective.

"Board of Managers" shall mean those Managers elected in accordance with the provisions of this Agreement to manage the business and affairs of the Company, all as more specifically set forth in this Agreement.

"Business" shall have the meaning given to it in the recitals to this Agreement.

"Capital Account(s)" shall mean the individual account(s) maintained by the Company with respect to each Member as provided in <u>Section 3.2</u> of this Agreement.

2

"Capital Contribution(s)" shall mean the amount of cash or the agreed value of the property or services (as determined by the Members and the Company) contributed by each Member to the Company as provided in Article 3 of this Agreement.

"Certificate" shall mean the Certificate of Formation of the Company filed with the Secretary of State of Delaware on July 19, 2006, as amended by that certain Certificate of Amendment filed with the Secretary of State of Delaware on July 20, 2006, as the same may be further amended, restated, supplemented or otherwise modified from time to time.

"Class A Manager" shall mean a Manager appointed by the Class A Members in accordance with Section 5.2(c).

"Class A Member" shall mean any Member that holds Class A Units. Solely for purposes of the allocation, Distribution and transfer provisions of this Agreement (and any definitions relating thereto), a Class A Member shall also be deemed to include an assignee or transferee of a Class A Unit who has not been admitted to the Company as a Class A Member. "Class A Members" means all such Persons.

"Class A Sharing Ratio" shall mean (i) twenty-eight percent (28%) in the case of the Class A Members' aggregate percentage share in Profits and Losses and Distributions and (ii) with respect to any individual Class A Member, such Member's pro rata portion of the aggregate Class A Sharing Ratio determined by dividing the number of Class A Units held by such Class A Member at the time of any determination by the total number of then outstanding Class A Units.

"Class A Units" shall mean those Units of the Company designated as Class A Units and issued to the Persons identified on Schedule A.

"Class A Voting Ratio" shall mean (i) thirty-nine percent (39%) in the case of the Class A Members' aggregate percentage of votes that may be cast in any vote of the Members and (ii) with respect to any individual Class A Member, such Member's pro rata portion of the aggregate Class A Voting Ratio determined by dividing the number of Class A Units held by such Class A Member at the time of any determination by the total number of then outstanding Class A Units.

"Class B Manager" shall mean a Manager appointed by the Class B Members in accordance with Section 5.2(d).

"Class B Member" shall mean any Member that holds Class B Units. Solely for purposes of the allocation, Distribution and transfer provisions of this Agreement (and any definitions relating thereto), a Class B Member shall also be deemed to include an assignee or transferee of a Class B Unit who has not been admitted to the Company as a Class B Member. "Class B Members" means all such Persons.

"Class B Sharing Ratio" shall mean (i) twelve percent (12%) in the case of the Class B Members' aggregate percentage share in Profits and Losses and Distributions and (ii) with respect to any individual Class B Member, such Member's pro rata portion of the aggregate

Class B Sharing Ratio determined by dividing the number of Class B Units held by such Class B Member at the time of any determination by the total number of then outstanding Class B Units.

"Class B Unit" shall mean those Units of the Company designated as Class B Units and issued to the Persons identified on <u>Schedule A</u>.

"Class B Voting Ratio" shall mean (i) twelve percent (12%) in the case of the Class B Members' aggregate percentage of votes that may be cast in any vote of the Members and (ii) with respect to any individual Class B Member, such Member's pro rata portion of the aggregate Class B Voting Ratio determined by dividing the number of Class B Units held by such Class B Member at the time of any determination by the total number of then outstanding Class B Units.

"Class C Member" shall mean any Member that holds Class C Units. Solely for purposes of the allocation, Distribution and transfer provisions of this Agreement (and any definitions relating thereto), a Class C Member shall also be deemed to include an assignee or transferee of a Class C Unit who has not been admitted to the Company as a Class C Member. "Class C Members" means all such Persons.

"Class C Sharing Ratio" shall mean (i) eleven percent (11%) in the case of the Class C Members' aggregate percentage share in Profits and Losses and Distributions and (ii) with respect to any individual Class C Member, such Member's pro rata portion of the aggregate Class C Sharing Ratio determined by dividing the number of Class C Units held by such Class C Member at the time of any determination by the total number of then outstanding Class C Units.

"Class C Unit" shall mean those Units of the Company designated as Class C Units and issued to the Persons identified on <u>Schedule A</u>.  Class C shall be a non-voting class except for the specific voting rights given to such Members under <u>Section 6.9(b)</u>.

 "Class C Voting Ratio" shall mean zero percent (0%).

"Class D Manager" shall mean a Manager appointed by the Class D Members in accordance with <u>Section 5.2(e)</u>.

"Class D Member" shall mean any Member that holds Class D Units. Solely for purposes of the allocation, Distribution and transfer provisions of this Agreement (and any definitions relating thereto), a Class D Member shall also be deemed to include an assignee or transferee of a Class D Unit who has not been admitted to the Company as a Class D Member. "Class D Members" means all such Persons.

"Class D Sharing Ratio" shall mean (i) forty-nine percent (49%) in the case of the Class D Members' aggregate percentage share in Profits and Losses and Distributions and (ii) with respect to any individual Class D Member, such Member's pro rata portion of the aggregate Class D Sharing Ratio determined by dividing the number of Class D Units held by such Class D Member at the time of any determination by the total number of then outstanding Class D Units.

"Class D Unit" shall mean those Units of the Company designated as Class D Units and issued to the Persons identified on <u>Schedule A</u>.

"Class D Voting Ratio" shall mean (i) forty-nine percent (49%) in the case of the Class D Members' aggregate percentage of votes that may be cast in any vote of the Members and (ii) with respect to any individual Class D Member, such Member's pro rata portion of the aggregate Class D Voting Ratio determined by dividing the number of Class D Units held by such Class D Member at the time of any determination by the total number of then outstanding Class D Units.

"Code" shall mean the Internal Revenue Code of 1986, as amended.  All references to the Code or any regulations adopted thereunder, including Treasury Regulations or Temporary Treasury Regulations are references to the Code or such regulations as they are in effect on the date hereof or any successor provisions.

"Company" shall mean Greenbrier Minerals Holdings, LLC, a Delaware limited liability company.

"Company Minimum Gain" shall have the same meaning as partnership minimum gain set forth in Treasury Regulation Sections 1.704-2(b)(2) and 1.704-2(d).

"Company Sale" shall mean any Transfer to any one or more Persons of all or substantially all of the assets of the Company, merger, combination or consolidation of the Company with or into any other Person or liquidation of the Company.

"Control" shall mean, with respect to a Person, possession, directly or indirectly (through one or more intermediaries), of the power to direct or cause the direction of management and policies of such Person through ownership of voting securities (or other ownership interests), contract, voting trust or otherwise.

"Credit Agreement" shall have the meaning ascribed to such term in <u>Section 12.1</u> herein.

"Depreciation" shall mean, for each fiscal year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for Federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the Federal income tax depreciation, amortization, or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; provided, however, that if the Federal income tax depreciation, amortization, or other cost recovery deduction for such year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the President.

"Disability" shall mean the physical or mental impairment of a Person that, as determined by a physician or psychiatrist, renders such Person unable to perform his duties on a full-time basis for a period of at least 180 consecutive calendar days.

"Distributions" shall have the meaning ascribed to such term in <u>Section 4.2</u> herein.

"Governmental Person" shall mean any governmental, quasi-governmental, judicial, public or statutory instrumentality, authority, agency, bureau, department, court, body or entity of the United States of America, or of any state, county, municipality or other political subdivision located therein.

"Governmental Rule" shall mean any law (including common law), statute, rule, regulation, ordinance, code, order, writ, judgment, injunction, decree, guideline, directive or decision of any Governmental Person, whether now or hereafter existing, as any of the same may be amended.

"Gross Asset Value" with respect to any asset shall mean the asset's adjusted basis for Federal income tax purposes, except as follows:

(i)    The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the contributing Member and the Board of Managers;

(ii)    The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Board of Managers, as of the following times:

(a)    upon the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution;

(b)    the distribution by the Company to a Member of more than a <u>de</u> <u>minimis</u> amount of Company property other than money as consideration for an interest in the Company; and

(c)    the liquidation of the Company for Federal income tax purposes within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(g); provided, however, that the adjustments pursuant to clauses (a) and (b) above shall be made only if the Board of Managers reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(iii)    The Gross Asset Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution;

(iv)    The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulation Section 1.704-1(b)(2)(iv)(m) and subparagraph (vi) of the definition of "Profits and Losses" of

this Agreement or pursuant to Section 4.3(g) hereof; provided, however, that Gross Asset Values shall not be adjusted pursuant to this subparagraph (iv) to the extent the Board of Managers determines that an adjustment pursuant to subparagraph (ii) hereof is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (iv); and

       (v)     If the Gross Asset Value of an asset has been determined pursuant to subparagraphs (i), (ii) or (iv) hereof, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

"Indebtedness" of any Person at any date, shall mean, without duplication (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of Property or services (other than trade payables incurred in the ordinary course of such Person's business), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to Property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such Property), (e) all capital lease obligations of such Person (other than rentals of equipment on a month to month basis or shorter renewable term), and (f) all obligations of such Person, contingent or otherwise, as an account party or applicant under acceptance, letter of credit or similar facilities.

"Independent Manager" shall mean a Manager who is nominated and accepted in accordance with the provisions of Section 5.2(g) herein and who, at time of election and at all times during the term of his or her service as Manager, meets the following qualifications: (i) has significant experience in the coal industry, whether purchasing, producing, financing, consulting or otherwise, (ii) is not an employee or Affiliate of the Company, Joseph C. Turley, III, Raymond M. McCormick or any other Class A Manager or Class A Member, and (iii) is not related by blood, marriage or adoption to Joseph C. Turley, III, Raymond M. McCormick, or any other Class A Manager or Class A Member.

"Lehman" shall mean Lehman Commercial Paper Inc., a New York corporation.

"Majority-In-Interest" shall mean the Members possessing more than fifty percent (50%) of the Units of the applicable Class.

"Manager" shall mean any Person serving at the time as a manager of the Company as provided in this Agreement. The Managers collectively constitute the Board of Managers.

"McCormick Group" shall mean Raymond McCormick and all Persons who have received Class A Units in the Company, directly or indirectly, as a transferee from Raymond McCormick after the date of this Agreement and who have been admitted to the Company as Class A Members.

"Member" shall have the meaning given to it in the Preamble.   The term "Members" shall mean all such persons.

"Member Nonrecourse Debt" shall have the same meaning as partner nonrecourse debt set forth in Sections 1.704-2(b)(4) and 1.704-2(i) of the Treasury Regulations.

"Member Nonrecourse Debt Minimum Gain" shall have the same meaning as partner nonrecourse debt minimum gain set forth in Treasury Regulation Section 1.704-2(i) and shall be determined in accordance with the principles of such Section of the Treasury Regulations.

"Member Nonrecourse Deductions" shall have the same meaning as partner nonrecourse deductions set forth in Sections 1.704-2(i)(1) and 1.704-(2)(i)(2) of the Treasury Regulations.

"Membership Interest" means, as to each Member, all of the interest of such Member in the Company, including such Member's (i) right to an allocable share of the income, gain, losses, and deductions of the Company in accordance herewith, (ii) right to a distributive share of the Company's assets, (iii) obligations as a Member, and (iv) rights with respect to the management of the business and affairs of the Company, if any, including any voting rights as may be provided in this Agreement.

"Net Cash Flow" shall mean (on the cash receipts and disbursements basis of accounting) all cash of the Company on hand and available for distribution, including distributions from entities owned by the Company, cash from investments of the Company, and proceeds from the sale or other disposition of Company assets; but excluding capital contributions of the Members, proceeds of any loans made to the Company (except to the extent of excess cash from a Company refinancing), funds that the Board of Managers, in its sole discretion but taking into account its fiduciary duties to the Members, elects to reinvest on behalf of the Company, and reserves deemed reasonably sufficient, in the sole discretion of the Board of Managers for (A) the working capital needs of the Company, (B) the payment of liabilities (including loans made to the Company by any one or more Members) incurred or expected to arise in the reasonably foreseeable future in connection with the operations of the Company, and (C) capital expenditures, capital investments, and contribution obligations incurred by the Company or expected to arise in the reasonably foreseeable future in the course of the Company's operations and in furtherance of the purposes of the Company.

"Nonrecourse Deductions" shall mean deductions having the meaning set forth in Sections 1.704-2(b)(1) and 1.704-2(c) of the Treasury Regulations.

"Original Operating Agreement" shall have the meaning given to it in the recitals to this Agreement.

"Person" shall mean any individual, partnership, corporation, trust or other entity.

"Profits and Losses" shall mean, for each fiscal year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance

with Code Section 703(a) (for these purposes, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

> (i) Any income of the Company that is exempt from Federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to the foregoing shall be added to such taxable income or loss;

> (ii) Any expenditures of the Company described in Code Section 705(a)(2)(B) or that are treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Profits or Losses pursuant to the foregoing shall be subtracted from such taxable income or loss;

> (iii) In the event the Gross Asset Value of any Company asset is adjusted pursuant to subparagraph (ii) or (iii) of the definition of Gross Asset Value, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

> (iv) Gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for Federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

> (v) In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such fiscal year or other period, computed in accordance with the definition of Depreciation under this Agreement;

> (vi) To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses; and

> (vii) Notwithstanding the above, any items which are specially allocated pursuant to Sections 4.3 or 4.4 hereof shall not be taken into account in computing Profits and Losses.

The amounts of the items of Company income, gain, loss, or deduction available to be specially allocated pursuant to Sections 4.3 and 4.4 hereof shall be determined by applying rules analogous to those set forth in subparagraphs (i) through (vi) of this definition of Profits and Losses.

"Sharing Ratios" shall mean, in the aggregate, the Class A Sharing Ratio, the Class B Sharing Ratio, the Class C Sharing Ratio and the Class D Sharing Ratio.

"Super-Majority Board Approval" shall mean the affirmative consent or approval by Managers holding at least nine (9) votes; provided however, if a Manager resigns, dies, becomes mentally incapacitated or removed from office and a replacement Manager has not been appointed, the affirmative consent or approval by Managers holding at least seventy-five percent (75%) of the votes held by the remaining Managers.

"Tax Liability Deficiency" means, with respect to any Member, the excess, if any, of (A) the product of (i) such Member's Taxable Income Allocations with respect to the Membership Interest in question for the applicable period multiplied by (ii) 0.40 over (B) the cumulative amount of cash distributed to such Member with respect to such Membership Interest pursuant to Section 4.2 for the applicable period.

"Taxable Income Allocation" means the cumulative allocations, pursuant to Article 4, of the Company's federal taxable income (net of federal taxable losses) made to a Member with respect to the Membership Interest in question.

"Transfer" shall mean any sale, assignment, transfer, conveyance, gift, pledge, distribution, hypothecation or other encumbrance or any other disposition, whether voluntary, involuntary or by operation of law, whether effected directly or indirectly, which shall include, without limitation, the sale, assignment, transfer, conveyance, gift, pledge, hypothecation or other encumbrance or any other disposition, whether voluntary, involuntary or by operation of law of stock, limited liability company interests, partnership interest, or other equity interests in or from a person who owns a Unit or other securities of the Company.

"Turley Group" shall mean Joseph C. Turley, III and all Persons who have received Class A Units in the Company, directly or indirectly, as a transferee from Joseph C. Turley, III after the date of this Agreement and who have been admitted to the Company as Class A Members.

"Unit" means a Membership Interest in the Company expressed in terms of measurement as a unit. Any Unit issued by the Company shall have the relative rights, duties and obligations as may be set forth in this Agreement. Subject to the limitations and restrictions set forth in this Agreement, additional Units may be issued at any time with such relative rights, duties and obligations as may be determined by the Board of Managers. Units, unless otherwise provided, shall mean all outstanding Units of the Company, irrespective of whether any particular Unit is entitled to voting rights.

"Voting Ratios" means, in the aggregate, the Class A Voting Ratio, Class B Voting Ratio, Class C Voting Ratio and the Class D Voting Ratio.

ARTICLE 2

FORMATION AND PURPOSE

2.1    Formation.

The Members have formed, or caused to be formed, the Company pursuant to the Act.

2.2    Name.

The name of the Company shall be "Greenbrier Minerals Holdings, LLC." The Company may do business under such other names as may be chosen from time to time by the Board of Managers.

2.3    Registered Office/Agent.

The registered agent and registered office of the Company shall be at such place as the Board of Managers may from time to time determine. The principal office of the Company shall be located at Rupert, West Virginia. The Company shall maintain such other business offices as the Board of Managers shall determine. The registered office and registered agent may be changed from time to time by filing the address of the new registered office and/or the name of the new registered agent with the State of Delaware as required by the Act.

2.4    Purposes.

The purposes of the Company shall be (i) to engage in the Business, (ii) to develop and dispose of such assets or businesses or any portion thereof, (iii) to make, enter into and perform any contracts and other undertakings, and to engage in any activities and transactions as may be ancillary to or necessary or advisable to carry out the foregoing purposes, and (iv) to engage in such other business and activities as the Board of Managers may determine.

(a)    To accomplish the Company's purposes, the Company has, but is not limited to, the following authority:

(i)    to acquire, own, hold, develop, and operate mining properties, either as operator, managing agent, principal, agent, partner, member, stockholder, syndicate member, associate, joint venturer, participant, or otherwise; invest in and raise funds for mining operations; purchase, construct, acquire, own, develop, operate, lease, mortgage, pledge, sell or otherwise dispose of mining facilities, buildings, fixtures, and improvements; and do anything necessary or incident to the coal business;

(ii)    to invest Company property or carry on a trade or business, form all types of business entities or trusts; or acquire general or limited partnership interests in a partnership, membership interests in a limited liability company or a

11

joint venture, shares in a corporation, or interests in any syndication, in each case as may be in furtherance of the authority granted in paragraph (i) above;

(iii)    to guarantee the financial transactions of others, with or without charging a fee;

(iv)    to borrow and lend money; and, unless prohibited, allow a Member to lend money to and transact other business with the Company or Members;

(v)    to purchase, lease, acquire, hold, operate, sell, lease or dispose of full or fractional interests in improved or unimproved real and personal property, in each case as may be in furtherance of paragraph (i) above;

(vi)    to borrow or raise money by the issuance, acceptance, endorsement or execution of notes, drafts, bills of exchange, warrants, bonds, debentures, instruments or evidences of indebtedness, securing the indebtedness by mortgage, pledge, transfer or assignment in trust of all or any part of the Company's property; and by selling, pledging or disposing of obligations of the Company;

(vii)    to carry insurance as the Board of Managers may deem necessary and appropriate;

(viii)    to purchase life insurance insuring the life of any person in which the Company or any Member has an insurable interest; to enter into any form of split-dollar arrangement with respect to such insurance (including a split-dollar arrangement with a trust of which any Member is acting as a trustee, notwithstanding that such arrangement may constitute an act of self-dealing); to exercise with respect to any such insurance policy held hereunder from time to time all options, rights, elections and privileges exercisable with respect to said policies, including, but not limited to, the right to demand and collect from the company or companies issuing said policies all such proceeds as shall be payable to the Company; to designate and change the beneficiaries thereunder; to modify, exchange, surrender or cancel any such policies of insurance; to borrow upon and pledge any said policy in connection with a loan; to direct the disposition of dividends or surpluses; to convert said policies into different forms of insurance and to elect methods of settlement with respect thereto.  No insurance company or any other person or entity shall have any duty to inquire into the terms of this Agreement or see to the application of any policy proceeds or other funds payable to the Company.  Upon the death of any insured or the earlier maturity of any policy of insurance which designates the Company as beneficiary, the Board of Managers or any officer of the Company shall collect the proceeds thereof on behalf of the Company.  The Company is authorized to take such actions as the Company deems best to collect the proceeds and benefits and, if necessary, to institute proceedings at law or in equity to enforce the payment thereof.  The Company is further authorized to compromise and settle claims arising out of any

policy on such terms and conditions as the Company deems advisable, and the decision of the Company shall be binding on all interested parties; and

(ix)    to make, enter into, deliver and perform all contracts, agreements or undertakings, pay all costs and expenses and perform all acts deemed appropriate by the Board of Managers to carry out the Company's purposes.

(x)    to create from time to time one or more subsidiaries or Affiliates and operate and engage in the Business and otherwise accomplish the Company's purpose through or otherwise in conjunction with such subsidiaries and/or Affiliates as may be determined by the Board of Managers.

(xi)    Notwithstanding any other provision of this Agreement to the contrary, if the Company shall own any life insurance policy insuring the life of any Member or Person, or possess any incident of ownership with respect to any such policy, the insured Member or Person shall have no right or power, directly or indirectly to exercise or to otherwise participate in the exercise, either alone or in conjunction with any other Member or Person, of any of the incidents of ownership with respect to such policy, including, but not limited to, the right to borrow from the insurance company or any other Person using such policy as collateral, to change or to prevent any change in the beneficiary designation under such policy, and to surrender the policy or any portion thereof for its cash surrender value or to cancel or terminate any such policy.  Any exercise of any incident of ownership in any such policy shall be exercised only by a majority of the Board of Managers, other than the insured Member or Person participating in any way in such decision.  Any decision of the Company to acquire or dispose of a life insurance policy insuring the life of any Member or Person shall be made by a majority of the Board of Managers other than the insured Member or Person and without any participation by the insured Member or Person, either alone or in conjunction with any other Member or Person.

2.5    Execution and Filing of the Certificate.

The Certificate has been filed with the State of Delaware.  Whenever it is necessary or appropriate to amend or restate the Certificate, subject to Section 5.1(b), the Board of Managers may timely file an amended Certificate, and the Board of Managers shall do and continue to do all other things as may be required or advisable to maintain the Company as a limited liability company existing pursuant to Delaware law and as provided herein.  Subject to Section 5.1(b), each Member hereby authorizes the Board of Managers to prepare, execute and deliver the Certificate and any such amendments thereto on their behalf as their attorney-in-fact and to file or record the Certificate and such other documents as may be required or advisable.

2.6    Governing Act.

The Company under this Agreement shall be organized pursuant to the Act as it may be amended from time to time.

2.7    Other Qualifications.

The Company shall exist under the laws of the State of Delaware and, to the extent that the Business of the Company is conducted in any jurisdiction other than Delaware, under the laws of such other jurisdiction to the extent necessary or desirable to do business in such jurisdiction, as determined by the Board of Managers.  The Members hereby authorize and empower (i) the Board of Managers to execute on their behalf any documents and to take any other action which may be necessary or desirable in order to permit the Company to do business (or facilitate the doing of business) in any such jurisdiction and (ii) the Managers, and each of them, to take such action as may be necessary or desirable in order to permit the Company to do business in the State of West Virginia.

2.8    Names, Addresses, Units and Sharing Ratios of Members.

(a)    The names, addresses, number of Units, class of Units, Sharing Ratios and Voting Ratios of the Members are set forth on Schedule A hereto.  The Board of Managers shall promptly amend Schedule A from time to time to reflect the admission or withdrawal of Members; a transfer of a Membership Interest; a change in a Member's address; the sale, grant, issuance or redemption of Units; or the receipt of additional Capital Contributions; and any such amendment shall be effective as of the date of the event necessitating such amendment.

(b)    Evidence of Units.  The Units may (but need not) be represented by certificates.

(c)    Procedure.  Transfers of Units shall be made on the Unit register of the Company.  A transfer of Units represented by a certificate shall be made upon surrender of the certificate, endorsed or accompanied by a power executed by the person named in the certificate or by an attorney lawfully constituted in writing.  If a Unit is certificated it is expressly to be considered a security governed by Article 8 of the Uniform Commercial Code as adopted in Delaware from time to time (the "UCC").

(d)    Unit Certificates.  Unit certificates, if any, shall be in such form as approved by the Board of Managers, and shall state that the Company is organized under the laws of Delaware, the name of the person to whom issued, and the number and class of Units and the designation of the series (if any) that the certificate represents.  The Unit certificates shall be numbered and registered in the records of the Company as they are issued, and shall be signed by two officers of the Company.  Each Certificate shall include a legend to the effect that a transferee will not become a Member of the Company except in accordance with the terms of this Agreement.

(e)    Lost, Destroyed or Mutilated Certificates.  The holder of any Unit certificate shall immediately notify the Company of any loss, destruction or mutilation of the certificate, and the Board of Managers may, in its discretion, cause a new certificate to be issued to the holder, in accordance with § 8-405 of the UCC.

ARTICLE 3

CAPITAL CONTRIBUTIONS

3.1    <u>Capital Contributions of Members</u>.

Each Member shall contribute, or cause to be contributed, cash and/or other property to the Company in exchange for the acquisition of its Units, unless such Units were awarded as compensation.   No Member shall be bound to make any additional capital contribution to the Company without the express written consent of such Member.

3.2    <u>Capital Accounts</u>.

A separate Capital Account shall be established and maintained for each Member in accordance with Code Section 704 and Treasury Regulation Section 1.704-1(b) and the following provisions:

(i)    Generally, the Capital Account of a Member shall consist of the Member's initial Capital Contribution increased by:   (a) any additional Capital Contributions in cash; (b) the fair market value of any Capital Contribution of property in kind (net of liabilities securing such contributed property that the Company is considered to assume or take subject to, under Section 752 of the Code); and (c) such Member's share of the Company's Profits (or items thereof allocated pursuant to <u>Article 4</u>), if any, including income and gain exempt from tax, and decreased by (w) distributions in cash to such Member; (x) the fair market value of property distributed in kind to such Member (net of liabilities securing such distributed property that such Member is considered to assume or take subject to, under Section 752 of the Code); (y) such Member's share of the Company's Losses allocated pursuant to <u>Article 4</u>, if any; and (z) such Member's share of expenditures of the Company described or treated as described in Section 705(a)(2)(B) of the Code.

(ii)    If any interest in the Company, or a portion thereof, is transferred in accordance with this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

(iii)    The foregoing provisions and other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulation Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Regulations.   If the Board of Managers determines that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto are computed to comply with such Regulations, the Board of Managers may make such modification, provided that it is not likely to have a material effect on the amounts distributable to any Member pursuant to <u>Articles 4</u> and <u>8</u> hereof.   The Board of Managers also may make any appropriate modifications if unanticipated events might otherwise cause this Agreement not to comply with Treasury Regulation Section 1.704-1(b).

15

3.3    <u>No Return of or Interest on Capital; No Partition</u>.

Except as specifically provided in this Agreement, no Member may withdraw any amount from his Capital Account or be paid interest on his Capital Contributions or his Capital Account. No Member shall have any personal liability for the repayment of any Capital Contributions of any other Member. Each Member waives any right to partition Company property. The foregoing shall not constitute a waiver of any Member's rights upon dissolution of the Company.

3.4    <u>Issuance of Additional Units; Additional Members</u>.

(a)    Subject to Section 5.1(b) and the other provisions of this Agreement, and except as otherwise provided in Section 3.4(c), the Board of Managers may authorize one or more additional classes of Units and may authorize and cause the Company to issue and sell additional Units, from to time to time, to such Persons as it deems appropriate, including Persons who are not currently Members. Upon satisfying such conditions as the Board of Managers may impose, each such Person may purchase the additional Units shall be admitted as Members ("Additional Members") with all the rights, duties and obligations thereof as provided herein (as this Agreement may be amended and restated with the requisite approvals of the Board of Managers).

(b)    Without the prior written approval of the majority of the outstanding Units of such class:

(i)    the Company shall not authorize or issue any of the following (i) additional Class A Units; or (ii) any other class or series of Membership Interest with economic rights (including without limitation rights relating to profit and loss allocations, distributions, liquidation, redemption, tag-along or drag-along rights or rights of first refusal) senior to the rights of the Class A Units in any respect. Notwithstanding anything in this Agreement to the contrary, in no event shall the Class A Sharing Ratio be reduced below 28.0%.

(ii)    the Company shall not authorize or issue any of the following: (i) additional Class B Units; or (ii) any other class or series of Membership Interest with economic rights (including without limitation rights relating to profit and loss allocations, distributions, liquidation, redemption, tag-along or drag-along rights or rights of first refusal) senior to the rights of the Class B Units in any respect. Notwithstanding anything in this Agreement to the contrary, in no event shall the Class B Sharing Ratio be reduced below 12.0%.

(iii)    the Company shall not authorize or issue any of the following: (i) additional Class C Units; or (ii) any other class or series of Membership Interest with economic rights (including without limitation rights relating to profit and loss allocations, distributions, liquidation, redemption, tag-along or drag-along rights or rights of first refusal) senior to the rights of the Class C Units in any respect. Notwithstanding

anything in this Agreement to the contrary, in no event shall the Class C Sharing Ratio be reduced below 11.0%.

(iv)    the Company shall not authorize or issue any of the following: (i) additional Class D Units; or (ii) any other class or series of Membership Interest with economic rights (including without limitation rights relating to profit and loss allocations, distributions, liquidation, redemption, tag-along or drag-along rights or rights of first refusal) senior to the rights of the Class D Units in any respect.   Notwithstanding anything in this Agreement to the contrary, in no event shall the Class D Sharing Ratio be reduced below 49.0%.

(c)    The foregoing Section 3.4(b) notwithstanding, with the prior written approval of (i) the Board of Managers pursuant to Section 5.1(b) and (ii) the holders of Units then entitled to 90% or more of the aggregate Sharing Ratio, the Board may authorize, and the Company shall be permitted to issue and sell, Units which result in a reduction in the aggregate Sharing Ratio to which any class of Units is entitled or otherwise affects the economic rights of the holders of any Class of Units (including without respect to profit and loss allocations, distributions, liquidation, redemption, tag-along or drag-along rights or rights of first refusal) provided that no class of Units (without the express consent of a majority of the holders of such class of Units) is disproportionately affected by such issuance and sale.

3.5    Ownership Interests.

The interests of the Members in the Company shall be personal property for all purposes.

ARTICLE 4

DISTRIBUTIONS TO MEMBERS AND ALLOCATIONS
OF PROFITS AND LOSSES

4.1    Profits and Losses.

(a)    After giving effect to the special allocations set forth in Sections 4.3 and 4.4 hereof, Profits and Losses for any fiscal year shall be allocated among the Class A Members, the Class B Members, the Class C Members and the Class D Members in accordance with their respective Sharing Ratios.

(b)    Notwithstanding the foregoing and after application of Treasury Regulation Section 1.704-1(b)(2)(ii)(d), no such Losses shall be allocated to a Member which would cause such Member to have an Adjusted Capital Account Deficit at the end of any fiscal year.   Any Losses not allocated to a Member due to the foregoing limitation shall be specially allocated to the Members with positive Capital Account balances in proportion to such Capital Account balances until all such Capital Account balances have been reduced to zero and any remainder shall be allocated to the Members in accordance with their respective Sharing Ratios.

4.2     Distributions.

(a)     Subject to Section 5.1(b) and paragraph (b) below, and except as otherwise provided in Section 8.4, the Board of Managers in its sole discretion may from time to time authorize the Company to make distributions of Net Cash Flow to the Members (each a "Distribution" and collectively, the "Distributions").     Each Annual Budget approved in accordance with Section 5.13 shall include a projected schedule for Distributions of Net Cash Flow (if any) during the period covered by such Annual Budget.     All Distributions, other than liquidating distributions, shall be allocated among the Members in accordance with their respective Sharing Ratios as of the date of the Distribution.     It is the duty of the Board of Managers, in determining the Net Cash Flow for Distribution, to take into account the needs of the Company in its business and the Company's investment objectives.     To this end, the Board of Managers shall consider the amount of funds necessary in the operation of the Company's business until the income from future operations is available, the amounts of its debts, the necessity or advisability of paying its debts, or at least reducing them within the limits of the Company's credit, the preservation of its capital for the protection of its creditors, and the character of any surplus property.     The Members acknowledge and agree that, subject to Section 5.1(b), the Board of Managers may authorize, in accordance with Section 5.8, certain payments to be made to the Members for services rendered in furtherance of the Company's business. Properly authorized payments to any such Members for services rendered shall not represent Distributions subject to Section 4.2, but instead shall be considered to be expense payments in the computation of Profits and Losses.     Anything in this Section 4.2 to the contrary notwithstanding, no Distribution shall be made to any Member if, and to the extent that, such Distribution would not be permitted under the Act or under agreements by which the Company is bound.

(b)     To the extent that the Company has funds legally available for distribution pursuant to the Act and applicable law, the Company shall make Distributions to the Members at least quarterly in an amount equal to the Tax Liability Deficiency of each Member for such quarter.     Such Distributions shall be made to the Members pro rata in accordance with their relative Tax Liability Deficiencies, if any, with respect to the Membership Interests held by such Member until each Member has received Distributions pursuant to this Section 4.2(b) equal to such Member's Tax Liability Deficiency.     Notwithstanding the above or anything contained in this Agreement to the contrary, Members shall receive Distributions for Tax Liability Deficiencies only to the extent such Member's cumulative Taxable Income Allocation exceeds the amount of cumulative prior Losses allocated to such Member.

4.3     Special Allocations.

The following special allocations shall be made in the following order:

(a)     Minimum Gain Chargeback.     Notwithstanding any other provision of this Article 4, if there is a net decrease in Company Minimum Gain during any Company taxable year, each Member shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in accordance with Treasury Regulation Section 1.704-2(f).     Allocations pursuant to

18

the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Section 1.704-2(f) of the Treasury Regulations. This <u>Section 4.3(a)</u> is intended to comply with the minimum gain chargeback requirement in such Section of the Regulations and shall be interpreted consistently therewith.

(b)    <u>Member Minimum Gain Chargeback</u>. Notwithstanding any other provision of this <u>Article 4</u> except <u>Section 4.3(a)</u>, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Company fiscal year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Treasury Regulation Section 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in accordance with Treasury Regulation Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Section 1.704-2(i)(4) of the Treasury Regulations. This <u>Section 4.3(b)</u> is intended to comply with the minimum gain chargeback requirement in such Section of the Regulations and shall be interpreted consistently therewith.

(c)    <u>Qualified Income Offset</u>. In the event any Member who is not obligated (or treated as obligated) to restore a deficit balance in his or her Capital Account unexpectedly receives any adjustments, allocations, or distributions described in Regulation Section 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) or 1.704-1(b)(2)(ii)(d)(6), items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this <u>Section 4.3(c)</u> shall be made if and only to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this <u>Article 4</u> have been tentatively made as if this <u>Section 4.3(c)</u> were not in the Agreement.

(d)    <u>Gross Income Allocation</u>. In the event any Member has a deficit Capital Account at the end of any Company fiscal year that is in excess of the sum of (i) the amount such Member is obligated to restore, and (ii) the amount such Member is deemed to be obligated to restore pursuant to Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Treasury Regulations, each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this <u>Section 4.3(d))</u> shall be made if and only to the extent that such Member would have a deficit Capital Account balance in excess of such sum after all other

allocations provided for in this Article 4 have been tentatively made as if Section 4.3(c) hereof and this Section 4.3(d) were not in the Agreement.

(e)    Nonrecourse Deductions.  Nonrecourse Deductions for any taxable year or other period shall be allocated among the Members in proportion to their respective Sharing Ratios.

(f)    Member Nonrecourse Deductions.    Any Member Nonrecourse Deductions for any fiscal year or other period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Treasury Regulation Section 1.704-2(i).

(g)    Section 754 Adjustment.    To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(2) or Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of his or her interest, in the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in accordance with their interests in the Company in the event Regulation Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Member to whom such distribution was made in the event Regulation Section 1.704-1(b)(2)(iv)(m)(4) applies.

4.4    Curative Allocations.

The allocations set forth in Section 4.1(b) hereof and in Section 4.3 hereof (the "Regulatory Allocations") are intended to comply with certain requirements of Treasury Regulation Section 1.704-1(b).  It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss or deduction pursuant to this Section 4.4.  Therefore, notwithstanding any other provision of this Article 4 (other than the Regulatory Allocations), the Board of Managers shall make such offsetting special allocations of Company income, gain, loss and deduction in whatever manner the Board of Managers determines appropriate so that, after such offsetting allocations are made, each Members' Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Section 4.1(a) hereof.  In exercising its discretion under this Section 4.4, the Board of Managers shall take into account future Regulatory Allocations under Sections 4.3(a) and 4.3(b) that, although not yet made, are likely to offset other Regulatory Allocations previously made under Sections 4.3(e) and 4.3(f).

4.5    <u>Tax Allocations:  Code Section 704(c)</u>.

(a)    In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for Federal income tax purposes and its initial Gross Asset Value.

(b)    In the event the Gross Asset Value of any Company asset is adjusted pursuant to subparagraph (ii) of the definition of Gross Asset Value, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for Federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations thereunder.

(c)    Any elections or other decisions relating to  allocations pursuant to this <u>Section 4.5</u> shall be made by the Board of Managers in any manner that reasonably reflects the purpose and intention of this Agreement.  Allocations pursuant to this <u>Section 4.5</u> are solely for purposes of Federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits and Losses, other items or Distributions pursuant to any provision of this Agreement.

(d)    Notwithstanding anything to the contrary herein, the Members agree to use the traditional method described in Regulations Section 1.704-3(b) with respect to any Section 704(c) allocations or any reverse Section 704(c) allocations required with respect to the assets owned by the Company as of the date of this Agreement, and to make curative allocations of gain from the sale of such assets (as permitted by Regulations Section 1.704-3(c)(3)(iii)(B)) to the Members (or their successors, transferees, or assignors) who held Units in the Company immediately prior to the date of this Agreement at the time such assets are disposed of to offset the effect of the ceiling rule limitation with respect to such assets.

4.6    <u>Miscellaneous</u>.

(a)    Except as otherwise provided in this Agreement, for Federal, state and local income tax reporting purposes, all items of Company income, gain, loss, deduction, and any other allocations not otherwise provided for shall be divided among the Members in the same proportions as they share Profits or Losses, as the case may be, for the year.

(b)    The Members are aware of the income tax consequences of the allocations made by this <u>Article 4</u> and hereby agree to be bound by the provisions of this <u>Article 4</u> in reporting their shares of Company income or loss for income tax purposes.

(c)    Solely for the purpose of determining each Member's share of excess nonrecourse liabilities pursuant to Treasury Regulation Section 1.752-3(a)(3), and solely for such purpose, each Member's interest in the Company's Profits is hereby specified to be such Member's Sharing Ratio.

4.7    <u>Establishment of Reserve</u>.

The Board of Managers shall have the right and obligation to establish reasonable reserves based on generally accepted accounting principles for maintenance, improvements, acquisitions, capital expenditures and other contingencies, such reserves to be funded with such portion of the operating revenues of the Company for any fiscal year as the Board of Managers may deem necessary or appropriate for that purpose.

4.8    <u>Amounts Withheld</u>.

All amounts withheld pursuant to the Code or any provision of any state or local tax law with respect to any payment, distribution or allocation to the Company or the Members shall be treated as amounts distributed to the Members pursuant to this <u>Article 4</u> for all purposes under this Agreement.  The Board of Managers is authorized to withhold from distributions, or with respect to allocations, to the Members and to pay over to any Federal, state or local government any amounts required to be so withheld pursuant to Code or any provision of any other Federal, state or local law and shall allocate any such amounts to the Members with respect to which such amount was withheld.

4.9    <u>Distributions and Allocations in Respect to Transferred Interests</u>.

If there is a transfer of all or any portion of a Membership Interest during any taxable year or portion thereof, Profits and Losses, taxable income, gain, deduction and credit, each item thereof and all other items attributable to such Membership Interest for such period shall be divided and allocated between the transferor and the transferee by accounting for their varying interests during such period in accordance with Section 706(d) of the Code.  All Distributions on or before the date of transfer of the Membership Interest shall be made to the transferor, and all Distributions after the date of transfer shall be made to the transferee.  Solely for purposes of making such allocations and Distributions, the Company shall recognize the transfer of a Membership Interest as of the end of the calendar quarter during which it receives written notice of such transfer together with such other information as the Board of Managers may reasonably require; provided, however, that if such convention is not then permitted by law, allocation may be made utilizing any conventions permitted by law and selected by the Board of Managers in its reasonable discretion after consultation with the transferor and the transferee. The Board of Managers and the Company shall incur no liability for making allocations and Distributions in accordance with the provisions of this <u>Section 4.9</u>, whether or not the Board of Managers or the Company have knowledge of any transfer or attempted transfer of ownership of any Membership Interest.

4.10    <u>Valuation</u>.

For purposes of determining the value of the Company assets and Profit and Losses:

(a)    Securities for which market quotations are readily available will be valued at their current values in the principal market in which such securities are normally traded. These values will normally be determined by (i) the last sale price on the date of determination,

if the principal market is the New York Stock Exchange or other securities exchange including the National Association of Securities Dealers Automated Quotations, Inc., National Market List (or the mean between the closing bid and asked prices therefore if there have been no sales on such exchange on that date), or (ii) the most recent bid price, if the principal market is not an exchange.  Securities for which market quotations are not readily available will be valued at their fair value as determined in good faith under procedures established by and under the general supervision of the Board of Managers.

(b)    All value shall be converted into U.S. dollars at the average interbank currency exchange rate at the close of business on the valuation day, and

(c)    All other securities or investments and assets of the Company, as well as those securities where no market value can be determined shall be assigned such fair value as the Board of Managers shall determine in good faith to reflect their fair market value.  All matters concerning the valuation of assets of the Company, and the allocation of Profits and Losses, taxable income, gain, deduction and credit and other matters among the Members including taxes thereon, and accounting procedures not expressly provided for by the terms of this Agreement shall be determined by the Board of Managers, whose determination shall be final and conclusive as to all of the Members.

ARTICLE 5

MANAGEMENT

5.1    Management by Board of Managers.

(a)    The management of the Business and affairs of the Company shall be the sole and complete responsibility of the Board of Managers.  A Member, as such, shall not take part in, or interfere in any manner with, the management, conduct or control of the Business and affairs of the Company, and shall not have any right or authority to act for or bind the Company. The Company may act only by actions taken by or under the direction of the Board of Managers in accordance with this Agreement including, specifically, in accordance with Sections 5.2(c) and 5.2(e).

(b)    Notwithstanding any other provision of this Agreement to the contrary, and in addition to any other matters under applicable law that require the approval of the Board of Managers, no Manager, Member, employee, agent or other representative of the Company shall approve or take any of the following actions with respect to the Company without a Super-Majority Board Approval:

(i)    obligate or cause the Company or any of its Subsidiaries to enter into, amend, restate, supplement or otherwise modify any agreement governing the Indebtedness of the Company or any of its Subsidiaries other than the Credit Agreement, or to otherwise incur any Indebtedness other than Indebtedness incurred under the Credit Agreement;

(ii)    obligate or cause the Company or any of its Subsidiaries to enter into, amend, restate, supplement or otherwise modify any agreement involving aggregate consideration the fair market value of which exceeds $1,000,000 other than with respect to the purchase of equipment of the type used by the Company in the ordinary course of its business (any such agreement, a "Material Contract");

(iii)    obligate or cause the Company or any of its Subsidiaries to guarantee the payment of money or performance of any obligation by any other Person except for (A) guarantees of Indebtedness outstanding under the Credit Agreement or other Indebtedness incurred pursuant to clause (i) above, (B) guarantees by the Company of any of its Subsidiaries of the obligations of a Subsidiary pursuant to a Material Contract approved pursuant to clause (ii) above and (C) guarantees by the Company or any of its Subsidiaries of the obligations of a Subsidiary pursuant to any agreement not constituting a Material Agreement and which was entered into in the ordinary course of business for such Subsidiary;

(iv)    obligate or cause the Company to (A) issue, redeem or repurchase any Units or other Membership Interests or any options or other rights to acquire any Units or other Membership Interests; (B) repurchase, defease, redeem or optionally prepay an Indebtedness (other than pursuant to the Credit Agreement) or debt securities to recapitalize the Company; or (C) restructure or reorganize the Company;

(v)    except in accordance with Section 9.11, obligate or cause the Company to be a party to any merger, exchange, combination or consolidation;

(vi)    obligate or cause the Company to make any Distributions other than pursuant to Section 4.2(b), and to make any Distribution of assets other than cash except as provided in Article 8;

(vii)    obligate, cause or permit the Company to enter into or engage in any transaction, contract, agreement or arrangement (other than the Credit Agreement) with a Member, Manager, officer or employee of the Company or an Affiliate of any of the foregoing, in each case involving aggregate consideration the fair market value of which exceeds $250,000 in any one (1) year;

(viii)    amend, restate, supplement or otherwise modify the Certificate;

(ix)    obligate or cause the Company to wind up or liquidate; or

(x)    obligate or cause the Company to initiate any material litigation.

(c)    The Managers may act only collectively as a board and by resolution duly adopted.  Any power not specifically delineated in this Agreement shall, notwithstanding the failure to expressly delineate such power, remain with the Board of Managers.  Individual Managers shall only have such authority and perform such duties as may be expressly delegated to such Managers by the Board of Managers and reflected in the minutes of the Board of

Managers.  The Members may not vote on any matters, except as specifically set forth in this Agreement, or as required under applicable law.

(d)    Unless the context expressly provides otherwise or as provided in <u>Section 5.1(b)</u>, any matter subject to the approval of, or requiring action or a determination by, the Board of Managers shall require the affirmative vote of Managers holding at least six (6) votes out of the eleven (11) total votes held by the Board of Managers.  Unless the context expressly provides otherwise, any matter subject to the approval of, or requiring action or a determination by, the disinterested portion of the Board of Managers shall require the affirmative vote of Managers holding a majority of the total votes held by all disinterested Managers.  Notwithstanding anything contained in this Section 5.1 to the contrary, a Company Sale shall be approved only in accordance with the provisions of Section 9.11.

(e)    The Managers need not devote services to the Company on a substantially full time basis and need only devote so much time to the Company's activities as the Board of Managers determines to be necessary for the efficient conduct thereof, except to the extent otherwise required in a Manager's role as an employee or officer of the Company.

5.2    <u>Number and Term of Office of Managers; Qualifications</u>.

(a)    The Managers shall be elected annually by the Members of each class of Units, except for those classes specifically identified herein as a non-voting class.  Nominees for election as Managers receiving the highest number of votes by such class, up to the number of Managers to be elected by such class, shall be elected as Managers.

(b)    The Board of Managers shall consist of a maximum of seven Managers. The total number of votes held by the Board of Managers is eleven (11) votes; such votes shall be allocated among the Managers as set forth in this Section 5.2.  No Manager shall hold a fractional vote.

(c)    The Class A Members shall have the right to appoint two (2) Managers (in each case, the "Class A Managers"), one of which shall be appointed by the McCormick Group and one of which shall be appointed by the Turley Group.  Each Class A Manager shall have one (1) vote.

(d)    The Class B Members shall have the right to appoint one Manager (the "Class B Manager").  The Class B Manager shall at all times hold two (2) votes.

(e)    The Class D Members shall have the right to appoint one Manager (the "Class D Manager").  The Class D Manager shall at all times hold five (5) votes.

(f)    The Class A Members, Class B Members and Class D Members shall jointly appoint at least one, and as many as two, Independent Managers, in each case in accordance with the procedure set forth in paragraph (g) below. The Independent Manager(s) shall hold an aggregate of two (2) votes.  If two Independent Managers are appointed, each Independent Manager shall hold one (1) vote.

25

(g)    In connection with each appointment of an Independent Manager, the following procedure shall apply.  First, the Class A Members and the Class D Members shall present to the Class B Members the names of at least three candidates to fill the Independent Manager vacancy (the "Candidate Notice").  Second, the Class A Members and the Class D Members shall submit the Candidate Notice to obtain the Investor Approval (as defined below). If the Class A Members and the Class D Members cannot obtain the Investor Approval, then the Class A Members and the Class D Members shall resubmit a different list of at least three candidates in a new Investor Approval.  If such Members are not able to appoint a mutually agreeable Independent Manager within twenty (20) business days of the delivery of the initial Candidate Notice, the appointment of the Independent Manager shall be selected from a list of three candidates (each of whom must have been presented on either the initial or secondary Candidate Notice) submitted by the Class A Members or the Class D Members to the mediator and the mediator shall select the Independent Manager after following the mediation procedure set forth in Article 12; provided, further, that solely for the purpose of resolving a dispute regarding a vacancy for Independent Manager pursuant to this paragraph (g), the decision of the mediator shall be final and binding on the Members, and no party shall have the authority to terminate the mediation prior to the mediator's decision regarding the candidate to be appointed to the Independent Manager vacancy.  For the purposes of this Agreement, "Investor Approval" shall mean the written approval of a Majority-In-Interest of the Class B Units. In the event that the Members holding Class B Units fail to respond, within ten (10) business days, either approving or rejecting the candidates listed in the Candidate Notice, such Member shall be deemed to have voted his or her Units in approval of the candidates.

(h)    For purposes of this Agreement, it is acknowledged and agreed by all Members that William G. Karis is an appropriate candidate to serve as Independent Manager, and shall not be required to be submitted for Investor Approval in accordance with the foregoing mechanisms.

(i)    Each Manager shall hold office until the next annual meeting of Members and until his or her successor shall have been elected and qualified, or until his or her earlier death, resignation or removal in accordance with this Agreement.  Managers need not be residents of the State of Delaware and need not be Members of the Company.  Cumulative voting for the appointment of Managers shall be prohibited.

5.3    Officers; Delegation of Duties.

The Company shall have such officers as shall be necessary or desirable to conduct its business.  The Board of Managers may elect a Member, Manager or other Person to serve as an officer of the Company.  The Board of Managers may assign titles to the officers they elect.  Unless the Board of Managers decides otherwise, if the title is one commonly used for officers of a business corporation, the assignment of that title shall constitute the delegation of the authority and duties that are normally associated with that office, subject to any specific delegation of authority and duties made by the Board of Managers.  Any number of offices may be held by the same Person.  The salaries or other compensation, if any, of the officers and agents of the Company shall be fixed from time to time by the Board of Managers.

5.4     <u>Vacancies; Removal; Resignation</u>.

(a)     Any vacancy occurring in the Board of Managers may be filled by (i) election at an annual or special meeting, called for that purpose, of Members of the class entitled to appoint such Manager pursuant to Section 5.2 or (ii) if such class only has one Member, by a Person designated by such Member.  A Manager appointed to fill a vacancy shall be appointed for the unexpired term of his predecessor in office.  Any vacancy in an Independent Manager seat shall be filled in accordance with the procedure set forth in <u>Section 5.2(g)</u>.

(b)     At any meeting of Members of a class of Units at which a quorum of Members of such class is present called expressly for that purpose, or pursuant to a written consent adopted pursuant to this Agreement, any Manager previously elected to represent such class of Units may be removed, with or without cause, by vote of the Members of such class constituting a Majority-In-Interest of the class present at such meeting.  The removal of an Independent Manager shall require the prior written consent of a Majority-In-Interest of the Class A Members and a Majority-In-Interest of the Class D Members.  The Class A Members and the Class D Members agree that an Independent Manager may not be removed by the Class A Members and the Class D Members because of such Independent Manager's failure to vote or align himself or herself with the other Managers elected by the Class A Managers or the Class D Manager.

(c)     Any Manager may resign at any time.  A resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the remaining Managers or, in the case of the resignation of the last Manager, by the Members.  The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.

5.5     <u>Meetings of Board of Managers</u>.

(a)     Unless otherwise provided in this Agreement, the Managers in office, who collectively have the right to vote more than six (6) votes, shall constitute a quorum for the transaction of business by the Board of Managers.  A Manager who is present at a meeting of the Board of Managers at which action on any matter is taken shall be presumed to have affirmatively assented to the action unless his dissent is entered in the minutes of the meeting or unless he files his written dissent to the action with the secretary of the meeting before the adjournment thereof or delivers the dissent to the Company immediately after the adjournment of the meeting.  The right to dissent shall not apply to a Manager who voted in favor of the action.

(b)     Meetings of the Board of Managers may be held at such place or places as shall be determined from time to time by the Board of Managers.

(c)     A waiver of notice of a meeting signed by the Manager entitled to the notice, whether before or after the meeting, shall be deemed equivalent to the giving of the notice.  Attendance of a Manager at a meeting constitutes a waiver of notice of the meeting, except where a Manager attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(d)     Regular meetings of the Board of Managers shall be held at such times and places as shall be designated from time to time by the Board of Managers, but in any case, not less than once per calendar quarter.  The Company shall give each Manager at least five (5) business days' notice of regular meetings of the Board of Managers.

(e)     Special meetings of the Board of Managers may be called upon the written request of any Manager, upon at least twenty-four (24) hours' notice to each other Manager.  The notice shall state the purpose or purposes of, and the business to be transacted at, the meeting.

(f)     If the Class B Manager is unable to attend any regular or special meeting of the Board of Managers, the Class B Manager may designate any one Person to attend as an observer.  The Company shall furnish the observer with a copy of all written material given to Managers in connection with such meeting at the same time such materials and information are given to the Managers.

5.6     Action by Consent or Remote Conference.

(a)     Any action required or permitted to be taken at a meeting of the Board of Managers may be taken without a meeting if, prior or subsequent to the action, a consent or consents thereto by all of the Managers in office is filed with the records of the Company.  The consents shall be in writing or in electronic form.

(b)     One or more Managers may participate in a meeting of the Board of Managers by means of conference telephone or other electronic technology by means of which all Persons participating in the meeting can hear each other.  Participation in a meeting pursuant to this subsection shall constitute presence in person at the meeting.

5.7     Compensation of Managers.

Managers shall receive such compensation, if any, for their services as Managers as may be designated from time to time by the Board of Managers.  In addition, Managers shall be entitled to be reimbursed for out-of-pocket costs and expenses incurred in the course of their service as Managers.

5.8     Conflicts of Interest.

No contract or transaction between the Company and a Related Party (as defined below), shall be void or voidable solely for that reason, or solely because the Related Party (or the Manager related to or associated with the Related Party) is present at or participates in the meeting of the Board of Managers that authorizes the contract or transaction, or solely because the vote of the Related Party (or the Manager related to or associated with the Related Party) is counted for that purpose, so long as:

(i)     the material facts as to the relationship or interest and as to the transaction are disclosed or known to the Board of Managers and the Board of Managers authorizes the contract or transaction by the affirmative votes of a majority of the

disinterested Managers (even though the disinterested Managers are less than a quorum); or

(ii)    the material facts as to the relationship or interest and as to the transaction are disclosed or known to the disinterested Members entitled to vote thereon and the contract or transaction is specifically approved in good faith by vote of those disinterested Members.

Notwithstanding the foregoing, each Manager, who is also an officer or employee of the Company, shall be permitted to participate in and vote at any Board of Managers meetings setting such Manager's compensation.

For the purposes of this Agreement, "Related Party" means (i) any Manager, Member or officer of the Company; (ii) any Affiliate of any Manager, Member or officer of the Company; (iii) any entity, joint venture or other domestic or foreign association or arrangement in which any Manager, Member or officer has a management role or a direct or indirect financial interest.

5.9    Limitation on Duties of Managers.

(a)    Except as otherwise provided herein to the contrary, to the fullest extent permitted by the Act, a Person, in performing his duties and obligations as a Manager under this Agreement, shall be entitled to act or omit to act at the direction of the Member(s) that designated such Person to serve on the Board of Managers, considering only such factors, including the separate interests of the designating Member(s), as such Manager or Member(s) choose to consider, and any action of a Manager or failure to act, taken or omitted in good faith and without willful misconduct shall not, as between the Company and the other Member(s), on the one hand, and the Manager or Member(s) designating such Manager, on the other hand, constitute a breach of any duty (including any fiduciary or other similar duty, to the extent such exists under the Act or any other applicable law, rule or regulation) on the part of such Manager or Member(s) to the Company or any other Manager or Member of the Company.

(b)    The Members (and the Members on behalf of the Company) hereby:

(i)    agree that (A) the terms of this Section 5.9, to the extent that they modify or limit a duty or other obligation, if any, that a Manager may have to the Company or any other Member under the Act or other applicable law, rule or regulation, are reasonable in form, scope and content; and (B) the terms of this Section 5.9 shall control to the fullest extent possible if it is in conflict with a duty, if any, that a Manager may have to the Company or another Member, under the Act or any other applicable law, rule or regulation; and

(ii)    waive to the fullest extent permitted by the Act any duty or other obligation, if any, that a Member may have to the Company or another Member, pursuant to the Act or any other applicable law, rule or regulation, to the extent necessary to give effect to the terms of this Section 5.9.

5.10    Exculpation and Indemnification.

(a)    Generally.  Except as provided in the last sentence of this Section 5.10(a), the Managers, officers and agents of the Company (hereinafter collectively referred to as the "Indemnitees"), when acting in such capacity, shall not have any liability, responsibility or accountability in or for damages or otherwise, to any Member, the Company, its receiver or trustee (in the event there is one), and the Company (or its receiver or trustee, as the case may be) agrees to indemnify, pay, protect and hold harmless each Indemnitee (on the demand of such Indemnitee) from and against any liabilities, obligations, losses, damages, penalties, actions, claims, judgments, settlements, proceedings, costs, expenses and disbursements of any kind or nature whatsoever, including all reasonable attorneys' fees, costs and expenses of defense, appeal, and settlement of any suits, actions or proceedings instituted against such Indemnitee or the Company and all costs of investigation in connection therewith (hereinafter in this Section collectively referred to as "liabilities") that may be imposed on, incurred by, or asserted against an Indemnitee or the Company, that is in any way related to or arises out of, or alleged to relate to or arise out of, any action or inaction on the part of the Company or an Indemnitee acting on behalf of the Company.    Notwithstanding the foregoing, each Indemnitee shall be liable, responsible, and accountable, and neither the Company, nor, if applicable, its receiver or trustee, shall be liable to any such Indemnitee for any portion of such liabilities, that resulted from such Indemnitee's own fraud, bad faith, willful misconduct (meaning such acts or omissions that the Indemnitee knew at the time thereof that such acts or omissions were clearly in conflict with the interests of the Company, but shall not include such acts of the Members approved pursuant to Section 5.8), recklessness, gross negligence, transactions from which such Indemnitee derived an improper personal benefit (which shall not include any benefit derived pursuant to any activity or investment approved pursuant to Section 5.8 of this Agreement with respect to such Indemnitee) or other acts or failures to act for which the Act or other applicable law does not permit such Indemnitee to be exculpated or indemnified.

(b)    Advance Payment.  The right to indemnification conferred by this Section shall include the right to be paid or reimbursed by the Company the reasonable expenses of the type entitled to be indemnified under this Section (including the right to employ, at the expense of the Company, separate counsel of the Indemnitee's choice in any such action, suit or proceeding described in Section 5.10(a)) incurred by an Indemnitee who was, is, or is threatened to be made a named defendant or respondent in a proceeding in advance of the final disposition of the proceeding and without any determination as to the Indemnitee's ultimate entitlement to indemnification; provided, that, the payment of such expenses incurred by any such Indemnitee in advance of the final disposition of a proceeding shall be made upon delivery to the Company of a written affirmation by such Indemnitee of such Indemnitee's good faith belief that he has met the standard of conduct necessary for indemnification under this Section and a written undertaking, by or on behalf of such Indemnitee, to repay all amounts so advanced if it shall ultimately be determined that such indemnified Person is not entitled to be indemnified under this Section or otherwise.  For the purposes of this Section, the determination that the action or omission of any Person constitutes fraud, bad faith, willful misconduct, recklessness, gross negligence, a transaction from which such Indemnitee derived an improper personal benefit, or other acts or failures to act for which the Act or other applicable law does not permit such Indemnitee to be exculpated or indemnified shall be made by a court of competent jurisdiction or

other body before which the relevant action, proceeding or investigation is pending.  In the absence of a determination by such court or other body, such determination may be made by legal counsel to the Company in a written legal opinion to the Company.

(c)    <u>Indemnification Rights Limited to Company Assets</u>.  The satisfaction of the obligations of the Company (or its receiver or trustee, as the case may be) under Sections <u>5.10(a)</u> and <u>5.10(b)</u> above shall be from and limited to the assets of the Company and no Member shall have any personal liability on account thereof.

(d)    <u>Nonexclusivity of Rights</u>.    The right to indemnification and the advancement and payment of expenses conferred by this Section shall be cumulative of, and in addition to, any other right which an Indemnitee may otherwise be entitled by contract or as a matter of law or equity and shall extend to such Indemnified Person's successors, assigns and legal representatives.

(e)    <u>Insurance</u>.  The Board of Managers may cause the Company to purchase and maintain insurance or furnish similar protection, including, but not limited to, trust funds, letters of credit or self-insurance, at the Company's expense, to protect the Company and any Person that may be indemnified under this <u>Section 5.10</u>.

5.11    <u>Duties and Responsibilities</u>.

(a)    Any Member or any director, trustee or officer of any Member serving on behalf of the Company, and any Manager, officer or employee of the Company in the performance of his, her or its duties, is entitled to rely in good faith on information, opinions, reports or statements presented to the Company by any of its other Managers, Members, officers, employees or committees of the Company, or by any other Person, as to matters the Members or Managers reasonably believe are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which Distributions to Members might properly be paid.

(b)    Each Member hereby waives, for itself and on behalf of its Affiliates, any claim or cause of action against (i) another Member and its Affiliates or (ii) any Manager appointed by any other Member, for any breach of fiduciary duty to the Company as a result of any conflict of interest between the Company and the Member or its Affiliate(s) that appointed or directed the appointment of such Manager.  Each Member, for itself and on behalf of its Affiliates, acknowledges and agrees that in the event of any such conflict of interest, each such Manager may, in the absence of bad faith, act in the best interests of the Member (or Affiliate of the Member) that appointed or directed the appointment of such Manager.  No Manager shall be obligated to reveal confidential or proprietary information belonging to any Member (or Affiliate of any Member) without the consent of the owner of the information.  No Manager will be obligated to recommend or take any action in his capacity as a Manager that favors the interests of the Company over the interests of a Member or its Affiliates.  Nothing in this <u>Section 5.11</u> will or is intended to supersede (x) any obligation of any Member expressly provided in this

Agreement, or (y) any provision in this Agreement that is expressly contrary (including, without limitation, the definition of "Net Cash Flow").

5.12    Loans.

Any person may, with the consent of the Board of Managers, lend or advance money to the Company.  If any Member shall make any loan or loans to the Company or advance money on his, her or its behalf, the amount of any such loan or advance shall not be treated as a Capital Contribution but shall be a debt due from the Company.  The amount of any such loan or advance by a lending Member shall be repayable out of the Company's cash and shall bear interest at such rate as the Board of Managers and the lending Member shall agree but not in excess of the maximum rate permitted by law.  None of the Members shall be obligated to make any loan or advance to the Company.

5.13    Annual Budget.

On or prior to December 1 of the preceding year, the President shall submit an annual budget for the Company for approval by the Board of Managers (the "Annual Budget"), which budget shall include the Company's anticipated revenues, costs and expenses, capital expenditures, reasonable contingencies and other items as determined by the President of the Company or requested by the Board of Managers.  At each regular board meeting, the Board of Managers shall discuss the Annual Budget, the Company's performance to date, any proposed revisions suggested by the Company and approve, reject or make such revisions to the Annual Budget as the Board of Managers may agree to be necessary and proper.  Upon approval, the Annual Budget shall be deemed thereafter to constitute the "Approved Budget" for all purposes hereof, subject to amendment or replacement from time to time by the Board of Managers.  Each Approved Budget shall supersede all prior Approved Budgets.  A budget may be approved only by the Board of Managers in accordance with Section 5.1(b).  So long as the President follows the Approved Budget, he will be deemed to be acting reasonably and no Person shall be permitted to question or challenge expenditures authorized by the President in furtherance of such approved budget.  Each Annual Budget shall include a schedule of projected Distributions for the period covered by such Annual Budget.  A meeting of the Board of Managers shall be held between December 1 and December 31 of the preceding year, so that the Board of Managers may discuss the proposed Annual Budget with Company management, request such revisions as the Board of Managers determines are appropriate, and finalize such Annual Budget prior to the commencement of the period covered by such Annual Budget; provided that for the 2008 fiscal year, the foregoing process shall commence as soon as reasonably practical after the date of execution of this Agreement.

ARTICLE 6

RIGHTS AND OBLIGATIONS OF MEMBERS

6.1     Liability of Members.

(a)     No Member shall have any personal liability with respect to the liabilities or obligations of the Company, except to the extent that he, she or it expressly and voluntarily assumes in writing any obligations of the Company; and

(b)     No Member shall be personally liable or obligated, except as otherwise required by the Act, either (1) to pay to the Company, any other Member or any creditor of the Company any deficiency in his, her or its Capital Account, or (2) to return to the Company or to pay any creditor or any other Member the amount of any return of his, her or its Capital Contribution to him, her or it or other distribution made to him, her or it.

6.2     Voting Rights.

(a)     Each Unit shall entitle the holder thereof to one vote on each action to be voted on by the Members of such class of Units.  Except as expressly set forth in Section 6.9(b) or as otherwise required under the Act or applicable law, the Class C Units shall be non-voting.

(b)     Except as otherwise provided in the Act or this Agreement, whenever any action is to be taken by vote of the Members, it shall be authorized upon receiving the affirmative vote of Members holding a majority of the Voting Ratios unless Class C is entitled to vote on such matter, in which case, upon a majority of the votes cast by all Members entitled to vote thereon.  Recording the fact of abstention does not constitute casting a vote.

6.3     Meetings of Members.

(a)     A meeting of the Members shall not be organized for the transaction of business unless a quorum is present.  The presence of Members entitled to cast at least a majority of the votes that all Members are entitled to cast on a particular matter to be acted upon at the meeting shall constitute a quorum for the purposes of consideration and action on the matter. The Members present at a duly organized meeting can continue to do business until adjournment notwithstanding the withdrawal of enough Members to leave less than a quorum.  If a meeting cannot be organized because a quorum has not attended, the Members present may adjourn the meeting to such time and place as they may determine.

(b)     All meetings of the Members shall be held at the principal place of business of the Company or at such other place as shall be specified or fixed in the notice thereof.

(c)     The chairman of the meeting or the Members present and entitled to vote shall have the power to adjourn a meeting from time to time, without any notice other than announcement at the meeting of the time and place at which the adjourned meeting will be held.

(d)    An annual meeting of the Members, for the election of the Managers and for the transaction of such other business as may properly come before the meeting, shall be held on such date and at such time as the Board of Managers shall fix and set forth in the notice of the meeting, which date shall be within 13 months subsequent to the effective date of this Agreement or the last annual meeting of Members, whichever most recently occurred.  If an annual meeting is not called and held within six months after the time required by the previous sentence, any Member may call the meeting at any time thereafter.

(e)    Special meetings of the Members for any proper purpose or purposes may be called at any time by any Manager, or by Members entitled to cast at least fifty percent (50%) of the votes that all Members are entitled to cast at the particular meeting.  Only business within the purpose or purposes described in the notice of the meeting may be conducted at a special meeting of the Members.

(f)    Notice of a meeting of Members shall be given to the Members either personally or by sending a copy thereof:

(i)    By first class or express mail, postage prepaid, or courier service, charges prepaid, to the postal address of each Member appearing on the books of the Company.  Notice pursuant to this paragraph shall be deemed to have been given when deposited in the United States mail or with the courier service.

(ii)    By facsimile transmission, e-mail or other electronic communication to the facsimile number or address for e-mail or other electronic communications supplied by a Member to the Company for the purpose of notice.  Notice pursuant to this paragraph shall be deemed to have been given when sent.

(g)    A waiver of notice of a meeting signed by the Member entitled to the notice, whether before or after the meeting, shall be deemed equivalent to the giving of the notice.  Attendance of a Member at a meeting constitutes a waiver of notice of the meeting, except where a Member attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

6.4    Proxies.

(a)    Every Member entitled to vote at a meeting of the Members or to express consent or dissent without a meeting may authorize another Person to act for the Member by proxy.  The presence of, or vote or other action at a meeting of Members by, or the expression of consent or dissent by, a proxy of a Member shall constitute the presence of, or vote or action by, or consent or dissent of the Member.

(b)    Every proxy shall be executed by the Member or by the duly authorized attorney-in-fact of the Member and filed with the Board of Managers.  An electronic transmission by the Member, or a photographic, photostatic, facsimile or similar reproduction of a writing executed by the Member shall be treated as properly executed for purposes of this section if it sets forth a confidential and unique identification number or other mark furnished by the Company to the Member for the purposes of a particular meeting or transaction.

34

(c)    A proxy, unless coupled with an interest, shall be revocable at will, notwithstanding any other agreement or any provision in the proxy to the contrary, but the revocation of a proxy shall not be effective until written notice thereof has been given to the Board of Managers.  An unrevoked proxy shall not be valid after three years from the date of its execution unless a longer time is expressly provided in the proxy.  A proxy shall not be revoked by the death or incapacity of the maker unless, before the vote is counted or the authority is exercised, written notice of the death or incapacity is given to the Board of Managers.

6.5    <u>Conduct of Meetings</u>.

All meetings of the Members shall be presided over by the chairman of the meeting, who shall be designated by the Board of Managers.  The chairman of any meeting of Members shall determine the order of business and the procedure at the meeting, including such regulation of the manner of voting and the conduct of discussion as seem to him or her fair to the Members.

6.6    <u>Action by Consent or Remote Participation</u>.

(a)    Any action required or permitted to be taken at a meeting of Members may be taken without a meeting, without prior notice, and without a vote, upon the consent of Members who would have been entitled to cast the minimum number of votes that would be necessary to authorize the action at a meeting at which all Members entitled to vote thereon were present and voting.  The consents shall be in writing or in electronic form and shall be filed with the Board of Managers.  An action taken by less than unanimous consent of the Members shall not become effective until after at least ten days' written notice of the action has been given to each Member entitled to vote thereon who has not consented thereto.

(b)    The presence or participation, including voting and taking other action, at a meeting of Members, by conference telephone or other electronic means, including without limitation the Internet, shall constitute the presence of, or vote or action by, the Member.

6.7    <u>Voting by Joint Holders of Units</u>.

Where Units are held in any form of joint or common ownership by two or more Persons:

(i)    if less than all of those Persons are present in person or by proxy at a meeting of the Members, all of the Units held in joint or common ownership shall be deemed to be represented at the meeting and the Company shall accept as the vote of all the Units the vote cast by a majority of those Persons present; and

(ii)    if the Persons are equally divided upon whether the Units held by them shall be voted or upon the manner of voting the Units, the voting of the Units shall be divided equally among the Persons without prejudice to the rights of those Persons among themselves.

35

6.8     Reserved.

6.9     Voting on Amendments.

(a)     Amendments to this Agreement may be proposed (i) by Managers holding at least two votes on the Board of Managers, (ii) by Class A Members holding one hundred percent (100%) of the outstanding Class A Units or (iii) by Class D Members holding a Majority-In-Interest of the outstanding Class D Units. Following such proposal, the Board of Managers shall submit to the Members a verbatim statement of any proposed amendment, providing that counsel for the Company shall have approved of the same in writing as to form, and the Board of Managers shall include in any such submission a recommendation as to the proposed amendment. The Board of Managers shall seek the written vote of the Members on the proposed amendment or shall call a meeting to vote thereon and to transact any other business that he or she may deem appropriate. Subject to Sections 6.9(b) and 6.9(c) below, a proposed amendment shall be adopted and be effective as an amendment hereto if it receives the affirmative vote of a Majority-In-Interest of each Class of Membership Interests then outstanding (except for Class C Members, which shall be entitled to vote only pursuant to Section 6.9(b) and (c) below).

(b)     Notwithstanding Section 6.9(a) hereof, this Agreement shall not be amended without the consent of each Member adversely affected if such amendment would (i) modify the limited liability of a Member, or (ii) alter the interest of a Member in Profits, Losses, other items of income, gain, loss, deduction or credit or any Distributions in a manner differently than such amendment alters such rights for the entire Class. If an amendment proposes to amend Section 6.9 or modify the interest of Class C in Profits, Losses, other items of income, gain, loss, deduction or credit or any Distributions, then such amendment shall be approved by a Majority-In-Interest of the Class C Members.

(c)     Notwithstanding Section 6.9(a) hereof, and subject to Section 6.9(b), the Board of Managers may approve certain amendments to this Agreement, in connection with its approval and issuance of additional Units to new equity investors pursuant to Section 3.4.

Notwithstanding anything contained in this Section 6.9 to the contrary, this Section 6.9 shall remain subject to Sections 3.43.4**Error! Reference source not found.** in all respects.

6.10    Resignation/Withdrawal.

No Member may resign or withdraw from the Company prior to the end of the term of the Company provided for herein. The death of any Member shall not cause a dissolution of the Company and shall not represent a withdrawal from the Company.

6.11    Other Business Activities; Non-Solicitation of Customers and Employees .

(a)     The Members and Managers shall devote such time, effort and skill to the business and affairs of the Company as may be reasonable and necessary or appropriate for the welfare and success of the Company. Additionally, the Members and Managers, and present and future Affiliates of the Members and Managers, may engage in or possess interests in other

businesses or ventures of any nature and description, independently or with others. Neither the Company, nor any other Member will have any right by virtue of this Agreement in such independent ventures. Each Member, by the execution of this Agreement, acknowledges that each other Member and Manager, and each future Member and Manager, and present and future Affiliates of each of the foregoing, are or may be engaged in other business ventures and agrees that none of such Persons will have any duty to present to the Company any opportunity, or to account to the Company or share with the Company any profits from any such business or venture, and for all purposes related to the foregoing shall be treated as if each such Person were not a Member or Manager, or an Affiliate of same. Without limiting the foregoing, any Member or Manager, and any Affiliate of same, may enter into agreements with third parties on such terms and conditions as they may decide, and no such agreement will be considered by the Company or any other Member to be a violation by such Member or Manager of any duty or obligation owed to the Company or such other Member under this Agreement.

(b)    Notwithstanding the foregoing paragraph (a), no Member or Manager shall, directly or indirectly, by or for himself or itself, or as an agent for another, or through any Affiliate or others as his or its agents, or by and through any joint venture, partnership, limited liability company, limited liability partnership, corporation, or other person or business entity in which he or it has a direct or indirect interest (i) solicit or induce, or in any manner attempt to solicit or induce, any person employed by, or engaged as a contractor or consultant by, the Company or any of its subsidiaries or affiliated entities, to terminate his or her employment or engagement with the Company or any of its subsidiaries or affiliated entities; (ii) bring about, promote, facilitate, or encourage the cessation, interruption or reduction of any customer, supplier, vendor or marketing partner relationship of the Company or its subsidiaries or affiliated entities.

(c)    Notwithstanding the foregoing paragraph (a), the Members, on behalf of themselves and their Affiliates, acknowledge and agree that each Member will not usurp or in any way compete with Company's potential development of mining properties generally referred to by the Members as the Buck Lilly, Fire Creek, Hickory Patch, Beckley, Pocohantas No. 8 and Pollock Knob mines, together with all ancillary facilities referred to in the Company's Offering Memorandum delivered to the Members prior to the date of this Agreement.

6.12    Reserved.

6.13    Actions by Subsidiaries.

Each Member or Manager agrees to cooperate to carry out the full intent of this Operating Agreement through any subsidiaries of the Company. Each of the Members shall perform further acts as may be reasonably necessary or appropriate to cause any subsidiary of the Company to carry out the purposes and intent of this Operating Agreement. Any directly or indirectly wholly-owned subsidiaries of the Company shall remain directly or indirectly wholly-owned subsidiaries unless otherwise approved by a majority vote of each Class of Members entitled to vote thereon.

ARTICLE 7

ACCOUNTING

7.1    <u>Books and Records</u>.

The Board of Managers shall keep, or cause to be kept, true, exact and complete books of account of the Company's affairs, in which shall be entered fully and accurately each transaction of the Company and of each entity which it controls.  The books of account shall be kept on a basis as determined by the Board of Managers.  Such books of account, together with all correspondence, papers and other documents, shall be kept at the principal office of the Company and shall be, at all reasonable times, open to the examination of any of the Members or their duly authorized representatives.  Copies of documents may be provided to the requesting Member at such Member's expense.  Except as otherwise provided herein, all financial books and records of the Company and of each entity which it controls shall be kept, and all financial statements furnished to the Members hereunder shall be prepared, in accordance with generally accepted accounting principles consistently applied or such other basis as the Board of Managers may determine.

7.2    <u>Fiscal Year</u>.

The fiscal year and the taxable year of the Company shall end as of December 31 of each calendar year.

7.3    <u>Tax and Financial Reports</u>.

(a)    Not later than March 1 after the end of each fiscal year, or as soon thereafter as is practicable, each Member shall be provided with an information letter with respect to his, her or its distributive share of income, gain, deduction, losses and credits, as the case may be, for income tax reporting purposes for the previous fiscal year, together with any other information concerning the Company necessary for the preparation of a Member's income tax return, including Form K-1 for the Company.

(b)    The Board of Managers shall prepare or cause to be prepared all Federal, state and local tax returns of the Company for each year for which such returns are required to be filed.  No federal tax return shall be filed without the prior written consent of Lehman, which consent shall not be unreasonably withheld.  The "tax matters partner" designated in <u>Section 7.5</u> shall promptly notify all other Members of any Company audits by the Internal Revenue Service or any state or local taxing authority.

(c)    The Board of Managers shall prepare or cause to be prepared all reports, audits and statements required in connection with the indebtedness of the Company.

(d)    The Board of Managers shall cause to be distributed to the Members, (i) not later than March 1 after the end of each fiscal year, or as soon thereafter as is practicable, a audited balance sheet and income statement for the prior fiscal year, prepared in accordance with generally accepted accounting principles consistently applied; and (ii) no later than 30 days

following the end of each fiscal quarter, or as soon thereafter as is practicable, an unaudited balance sheet and income statement for the prior fiscal quarter, prepared in accordance with generally accepted accounting principles consistently applied.

7.4    Company's Accountant.

The Company's accountant shall be such firm of independent certified public accountants as the Board of Managers may determine from time to time.

7.5    Tax Matters Partner.

If necessary under the Code, the Board of Managers shall designated one of the Managers as the "tax matters partner" in accordance with Section 6231(a)(7) of the Code and, in connection therewith and in addition to all other powers given thereunder, shall have all other powers needed to perform fully hereunder, including, without limitation, the power to retain all attorneys and accountants of his or her choice. The tax matters partner shall give notice to each other Member of a Company audit. The designation made in this Section 7.5 is hereby expressly consented to by each Member as an express condition to becoming a Member.

7.6    Federal Income Tax Elections.

In the event of a distribution of property to a Member or the transfer of an interest in the Company by sale, exchange, gift or upon the death of a Member, the Board of Managers may, in its discretion, cause the Company to file an election under Section 754 of the Code in accordance with the Regulations promulgated thereunder to adjust the basis of Company property in the manner provided in Sections 734 and 743 of the Code. All other elections required or permitted to be made by the Company under the Code shall be made by the Board of Managers in such manner as in his or her reasonable judgment will be most advantageous to the Members.

ARTICLE 8

TERM AND DISSOLUTION

8.1    Term.

The term of the Company shall commence as of the date of this Agreement and shall continue until termination pursuant to the provisions hereof.

8.2    Events Causing Termination.

Except as otherwise provided herein, the Company shall be dissolved and shall terminate, and its affairs shall be wound up, upon the occurrence of any of the following:

(i)    the Bankruptcy of the Company;

(ii)    the affirmative vote of a majority of the Voting Ratios together with the affirmative approval of Managers holding at least nine (9) votes of the Board of Managers;

(iii)    the sale or other disposition of all or substantially all of the assets of the Company;

(iv)    December 31, 2045.

8.3    Actions, Death, etc., of Members; Waiver.

No action of or event affecting a Member, including the death, disability or expulsion of a Member, shall dissolve or terminate the Company unless specifically provided in Section 8.2 of this Agreement.  The Members hereby agree to waive the ability to obtain a judicial dissolution of the Company under the Act.

8.4    Distribution in Case of Termination.

Upon the termination of the Company, the Board of Managers, or such liquidating agent as the Board of Managers may appoint, shall proceed to wind up the affairs of the Company, liquidate the assets and apply and distribute the proceeds, unless within ninety (90) days after such event all of the remaining Members agree in writing to continue the Company, in the following order of priority:

(a)    To the payment of the debts and liabilities of the Company and the expenses of liquidation in the order of priority as provided by law, and to the establishment of any reserves which the Board of Managers or liquidating agent shall deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company.  Said reserves may be paid over by the Board of Managers or liquidating agent to a bank or an attorney-at-law to be held in escrow for the purpose of paying any such contingent or unforeseen liabilities or obligations, and at the expiration of such period as the Board of Managers or liquidating agent shall deem advisable, such reserves shall be distributed to the Members or their assigns in the order of priority provided in this Section 8.4;

(b)    Then, to the Members in an amount equal to the credit balance in each of their Capital Accounts, after giving effect to all contributions, distributions and allocations for all periods.

Liquidation shall be conducted in accordance with Section 1.704-1(b)(2) of the Treasury Regulations.  The Company shall terminate when all property owned by Company shall have been disposed of and the net proceeds, after satisfaction of liabilities to creditors, shall have been distributed among the Members as aforesaid.  The establishment of any reserves in accordance with the provisions of subsection 8.4(a) shall not have the effect of extending the term of the Company.

8.5     Rights of Members on Liquidation.

Except as otherwise provided in this Agreement, (i) each Member shall look solely to the assets of the Company for the return of his or her Capital Contributions and shall have no right or power to demand or receive property other than cash from the Company and (ii) no Member shall have priority over any other Member as to the return of his or her Capital Contributions, distributions or allocations.

ARTICLE 9

TRANSFER OF COMPANY INTERESTS

9.1     Transfer of Interests Generally.

(a)     The Members agree that no Member shall Transfer, or permit to be Transferred, all or any portion of his record title or beneficial interest in the Company, whether now or hereafter acquired, except in accordance with the terms of this Agreement

(b)     Any attempted Transfer of any Company interest not in accordance with this Article 9 and the terms of this Agreement shall be null and void and shall not be reflected on the Company's books; provided, however, that, if the Company is required to recognize a Transfer that is not otherwise permitted, then, unless the transferee is made a substitute Member as provided in this Agreement, the Membership Interest so Transferred shall be strictly limited to the transferor's economic rights to distributions and allocations of income, gain, loss, deduction or credit as provided by this Agreement with respect to the Transferred Membership Interest, which distributions and allocations may be applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts, obligations or liabilities for damages that the transferor or transferee of such interest may have to the Company.

(c)     Each Member hereby acknowledges the reasonableness of the restrictions on Transfer imposed by this Agreement in view of the Company purposes and the relationship of the Members.  Accordingly, the restrictions on Transfer contained herein shall be specifically enforceable.

9.2     Permissible Transfers.

A Member may Transfer all or any part of its Membership Interest to any Person; provided, that any such Transfer shall be null and void ab initio (i) if, following the proposed Transfer, the Company would constitute a "publicly traded partnership" for purposes of Section 7704 of the Internal Revenue Code, (ii) if, other than in connection with a Transfer pursuant to Sections 9.11, the transferee fails to deliver to the Company all documents required pursuant to Section 9.4, or (iii) such Transfer would result in the violation of any applicable federal or state securities laws.

9.3     Acquisition of an Interest Conveyed to Another Without Authority.

(a)     The Company shall not be required to recognize the interest of any assignee or transferee who has obtained a purported Membership Interest as the result of a Transfer that is not a Permissable Transfer.   If there is any doubt as to ownership of a Membership Interest or who is entitled to any distribution of cash or liquidating proceeds by the Company, the Company shall accumulate the cash or liquidating proceeds until the issue is resolved to the satisfaction of the Board of Managers.

(b)     If any Person acquires or purports to acquire a Membership Interest or becomes an assignee in a transaction other than a Permissable Transfer, whether as a result of an order of a court which the Company is required by law to recognize or otherwise, the Company (in addition to any other rights or remedies it may have to oppose such purported Transfer) shall have the unilateral option to acquire the Membership Interest of the transferee or assignee, or any fraction or part thereof, upon the following terms and conditions:

(i)     The Company shall have the option to acquire the Membership Interest by giving notice to the transferee or assignee of its intent to purchase within ninety (90) days from the date it is finally determined that the Company is required to recognize the Transfer.

(ii)     The valuation date for the determination of the purchase price of the Membership Interest shall be the first day of the month following the month in which notice is delivered.

(iii)     Unless the Company and the transferee or assignee agree otherwise, the purchase price for the Membership Interest, or any fraction to be acquired by the Company, shall be its fair market value as determined by a qualified appraiser selected by the President, taking into account all discounts for lack of control, lack of marketability and other relevant valuation factors that would be applicable to a sale of the applicable Membership Interest to an unrelated purchaser.

(iv)     Closing of the sale shall occur at the principal office of the Company at 10 o'clock a.m. on the first Tuesday of the month following the month in which the appraisal described above is rendered.

(v)     In order to reduce the burden upon the resources of the Company, the Company shall have the option, to be exercised in writing delivered at closing, to pay its purchase money obligation in twelve (12) equal annual installments with interest payable at the applicable federal rate for long-term obligations published by the United States Treasury Department.   The first installment shall be due and payable on the first day of the calendar year following closing, and subsequent annual installments, with accrued interest, shall be due and payable on the first day of each succeeding calendar year until the entire amount of the

42

obligation is paid.  The Company shall have the right to prepay all or any part of the purchase money obligation at any time without penalty.

9.4    Additional Members and Substitutions.

(a)    Additional Members may be admitted to the Company in accordance with the terms of this Agreement.

(b)    In no event shall the transferee of a Membership Interest be substituted as a Member unless the assignee or transferee shall have:

(i)    acquired the Membership Interest with respect to which the transferee is being admitted in compliance with the terms of this Agreement;

(ii)    signed, accepted and assumed, in form satisfactory to the Board of Managers, all the terms and provisions of this Agreement;

(iii)    executed such other documents or instruments, or provided such other opinions of counsel, as the Board of Managers may require to effect the admission of such assignee or transferee as a substituted Member;

(iv)    if requested by the Company, furnished to the Company an opinion of counsel, which counsel and opinion shall be satisfactory to the Board of Managers, that the permitted Transfer will comply with the Securities Act of 1933 and all applicable state securities laws; and

(v)    paid, as requested by the Company, all legal, accounting, filing and other expenses the Company may incur in connection with such substitution.

9.5    Indemnity.

If a Member shall, or shall attempt to, Transfer its Membership Interest (except in a Permissable Transfer), such Member shall indemnify and hold harmless the other Members and the Company against and from any and all liabilities, obligations, costs and expenses the other Members or the Company may incur as a result of such Transfer or attempted Transfer.

9.6    Reserved.

9.7    Repurchase of Affected Company Interests.

(a)    At the election of the Company within three months after the Company becomes aware of the Affected Company Interest, the Affected Company Interest may be purchased and liquidated by the Company, and the Member owning the Affected Company Interest shall surrender the Affected Company Interest in exchange for the Liquidation Value of the Affected Company Interest.

(b)    For purposes of this <u>Section 9.7</u>, the term "Affected Company Interests" shall include the Membership Interests of a Member upon (i) the Bankruptcy of such Member, (ii) the divorce of such Member in the event such Member fails to retain record and beneficial ownership of his or her entire Membership Interest (provided that nothing in this section 9.7 shall prevent a Member involved in a divorce proceeding from transferring his or her Membership Interest prior to the issuance of a final divorce decree) and (iii) upon the death of such Member.

(c)    For purposes of this <u>Section 9.7</u>, the term "Liquidation Value" as used herein shall mean an amount equal to the fair market value of the interest on the date of liquidation.  The fair market value of an interest shall be an amount determined by an appraiser selected by the Board of Managers.

9.8    <u>Reserved</u>.

9.9    <u>Reserved</u>.

9.10    <u>Tag-Along</u>.

(a)    If any Member or Members  (collectively, a "Selling Group") intend to sell or exchange all or a portion of their Units in the Company to one or more Persons who are not Affiliates of the Selling Group pursuant to a private sale or exchange or a series of related private sales or exchanges, and the Units to be sold or exchanged (when aggregated with all other Units previously sold or exchanged by the Selling Group) equal Units with an aggregate Sharing Ratio equal to or greater than 20.0%, the Selling Group shall first notify all other Members in writing (the "Tag-Along Notice") of such intended Transfer.  Within thirty (30) days of a Tag-Along Notice, each other Member shall be permitted to provide written notice that such Member elects to Transfer a portion of such Member's Membership Interest on the same terms and conditions and in the same proportion as the Selling Group.  The Tag-Along Notice shall contain all of the terms of the Transfer including, without limitation, the name and address of the prospective purchaser(s), the purchase price and other terms and conditions of payment (or the basis for determining the purchase price and other terms and conditions), including all agreements or arrangements regarding fixed or contingent compensation or other payments involving any Manager or Member of the Company (or any Affiliate thereof) in connection with such Transfer, and the date on or about which such sale is to be consummated.

(b)    On the date set forth in the Tag-Along Notice, the Selling Group shall cause to be purchased from the other Members electing to participate (along with the Units of the Selling Group) the Units provided for in <u>Section 9.10(a)</u> hereof.  At the date set forth in the Tag-Along Notice, the other Members selling their Membership Interests shall, provided such sale is in accordance with all applicable securities laws and is not in violation of any Act or other applicable order, law or regulation, deliver such executed certificates or other documentation to the Selling Group at such place as the Selling Group shall designate, and the Selling Group shall cause the purchase price to be paid to the other participating Members computed in accordance with the last sentence of <u>Section 9.10(a)</u> above.

(c)    Any Transfer by an other participating Member pursuant to this Section 9.10 will be on the same terms and conditions as the Transfer by the Selling Group which is the subject matter of the Tag-Along Notice.  The closing of all Transfers by other participating Members pursuant to this Section 9.10 will occur simultaneous with the closing of the sale of the Selling Group Members' sale of their Units.

(d)    The costs and expenses of any Transfer pursuant to this Section 9.10 will be borne by all Members participating in the transaction pro rata with the value of the Membership Interests sold.

9.11    Right to Initiate a Company Sale.

Prior to December 31, 2009, each Member or any group of Members who collectively hold Units with an aggregate Sharing Ratio of at least sixty-six and two-thirds percent (66.67%), and after December 31, 2009, each Member or any group of Members who collectively hold Units with an aggregate Sharing Ratio of at least fifty percent (50%) shall have the right, exercisable by delivery of written notice to the Board of Managers (a "Company Sale Notice"), to initiate a Company Sale.  Upon receipt of any Company Sale Notice, each of the Members agree to cooperate in good faith to effect a Company Sale as soon as reasonable practicable.  Each Member (whether in his, her or its capacity as a Member, or otherwise) shall consent to or vote in favor of, and raise no objections against, such Company Sale, and each Member shall agree, and hereby does agree, to sell all of his, her or its Membership Interests on the terms and conditions approved by a majority vote of the Board of Managers; provided, that upon the consummation of such sale of the Membership Interests, all of the Members shall receive the same form and amount of consideration in such amounts as if the Company had disposed of all of its assets and liabilities in a sale to the purchaser for the sale price paid by the third party (including all fixed or contingent payments paid or to be paid to any Manager or Member, or any Affiliate thereof, other than reasonable market rates for services actually performed by such Persons post-closing) and, thereafter, the Company had liquidated and distributed the remaining sale proceeds to the Members pursuant to Section 8.4 of this Agreement.

9.12    Reserved.

9.13    Reserved.

9.14    Legend.

Each Member hereby agrees that the following legend may be placed upon any counterpart of this Agreement, the certificate, or any other document or instrument evidencing ownership of a Unit:

The Units represented by this document have not been registered under any securities laws and the transferability of such Units is restricted by both the securities laws and that certain Amended and Restated Operating Agreement of Greenbrier Minerals Holdings, LLC.  A Unit may not be sold, assigned or transferred, nor will any

assignee, vendee, transferee or endorsee thereof be recognized as having acquired any such Unit by the issuer for any purposes, unless (1) a registration statement under the Securities Act of 1933, as amended, with respect to such Unit will then be in effect and such transfer has been qualified under all applicable state securities laws, or (2) the availability of an exemption from such registration and qualification will be established to the reasonable satisfaction of counsel to Greenbrier Minerals Holdings, LLC.

ARTICLE 10

REPRESENTATIONS, WARRANTIES, COVENANTS AND AGREEMENTS OF MEMBERS

10.1    <u>Representations and Warranties</u>.

The undersigned Members understand: (a) that the Membership Interests evidenced by this Agreement have not been registered under the Securities Act, or any state securities laws (the "Securities Acts") because the issuance of the Membership Interests is in reliance upon the exemptions from the registration requirements of the Securities Acts providing for issuance of securities not involving a public offering; (b) that the Company has relied upon the fact that the Membership Interests are to be held by each Member for investment; and (c) that exemption from registration under the Securities Acts would not be available if the Membership Interests were acquired by a Member with a view to distribution.

Accordingly, each Member hereby confirms to the Company that such Member is acquiring the Membership Interest for such Member's account, for investment and not with a view to the resale or distribution thereof.  Each Member agrees not to transfer, sell or offer for sale any portion of the Membership Interest unless there is an effective registration or other qualification relating thereto under the Securities Acts or unless the holder of Membership Interest delivers to the Company an opinion of counsel, satisfactory to the Company, that such registration or other qualification under such Securities Acts is not required in connection with such transfer, offer or sale.  Each Member understands that the Company is under no obligation to register the Membership Interests or to assist such Member in complying with any exemption from registration under the Securities Acts if such Member should at a later date wish to dispose of the Membership Interest.  Furthermore, each Member realizes that the Membership Interests are unlikely to qualify for disposition under Rule 144 of the Securities and Exchange Commission unless such Member is not an "affiliate" of the Company and the Membership Interest has been beneficially owned and fully paid for by such Member for at least two (2) years.

Prior to acquiring the Membership Interests, each Member has made an investigation of the Company and its business and the Company has made available to each such Member all information with respect thereto which such Member needed to make an informed decision to acquire the Membership Interest.  Each Member considers himself to be a person possessing experience and sophistication in financial and business matters and as an investor

which are adequate for the evaluation of the merits and risks of such Member's investment in the Company.

Each Member executing this Agreement hereby makes for the benefit of each other Member each and every representation and warranty made by such Member in the subscription agreement, if any, pursuant to which such Member subscribed for its interest in the Company, as fully as though the same were set forth at length herein.  Further, each Member represents, warrants, agrees and acknowledges that:

(i)    it has all requisite power and authority to enter into this Agreement, to acquire and hold its interest and to perform its obligations hereunder;

(ii)    this Agreement is a binding agreement on the part of such Member enforceable in accordance with its terms against such Member;

(iii)    each Member represents that it is acquiring its interest for its own account for investment purposes only and not with a view to the distribution or resale thereof, in whole or in part, and agrees that it will not Transfer all or any part of its interest, or solicit offers to buy from or otherwise approach or negotiate in respect thereof with any Person or Persons whomsoever, all or any portion of its interest in any manner that would violate or cause the Company to violate applicable federal or state securities laws;

(iv)    if it is a corporation, a limited liability company or partnership, as the case may be, it is duly organized or formed and validly existing and in good standing under the laws of the state of its organization or formation; it has all requisite power and authority to enter into this Agreement, to acquire and hold its interest and to perform its obligations hereunder; and the execution, delivery and performance of this Agreement has been duly authorized;

(v)    its execution and delivery of this Agreement and the performance of its obligations hereunder will not conflict with, result in a breach of or constitute a default (or any event that, with notice or lapse of time, or both, would constitute a default) or result in the acceleration of any obligation under any of the terms, conditions or provisions of any other agreement or instrument to which it is a party or by which it is bound or to which any of its property or assets are subject, conflict with or violate any of the provisions of its organizational documents, or violate any statute or any order, rule or regulation of any court or governmental or regulatory agency, body or official, that would materially and adversely affect the performance of its duties hereunder; and that such Member has obtained any consent, approval, authorization or order of any court or governmental agency or body required for the execution, delivery and performance by such Member of its obligations hereunder; and

(vi)    there is no action, suit or proceeding pending against such Member, or contract or other agreement to which such Member is a party or is otherwise subject, or to its knowledge, no action, suit or proceeding threatened in any court or by or before any other governmental agency or instrumentality which would prohibit its entering into or performing its obligations under this Agreement.

10.2    Other Covenants.

Each Member executing this Agreement hereby covenants and agrees to refrain from purchasing or otherwise acquiring any ownership interest in any partnership, corporation or other entity which would cause the Company to be in violation of any federal or state law with respect to the Company's operations.  In the event that any Member's ownership interest in business activity adversely affects the ability of the Company or its subsidiaries to obtain or maintain any governmental permit or license, such Member may be compelled by the Board of Managers to immediately transfer its Membership Interest to another Person designated by the Board of Managers in exchange for the fair market value of such Membership Interest, which shall be paid by the Company to such Member promptly upon an independent appraiser (selected by the Board of Managers) determining the fair market value of such Membership Interests at such time.  Each Member agrees to promptly provide the Company with the names, addresses and other information of all Persons holding a direct or indirect interest in the Company.

ARTICLE 11

GENERAL PROVISIONS

11.1    Binding Effect and Benefit of This Agreement.

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, successors and permitted assigns, as the case may be.

11.2    Certificates, etc.

At the expense of the Company, the Board of Managers shall promptly have prepared, executed and filed or recorded all legally required fictitious name or other applications, registrations, publications, certificates and affidavits for filing with the proper governmental authorities and have arranged for the proper advertisement, publication and filing of record thereof.

11.3    Notices, etc.

Except as otherwise expressly provided herein, all notices, requests, demands and other communications under this Agreement must be in writing and will be deemed duly given, unless otherwise expressly indicated to the contrary in this Agreement, (a) when personally delivered, (b) three (3) days after having been deposited in the United States mail, certified or registered, return receipt requested, postage prepaid, or (c) one (1) business day after having

48

been dispatched by a nationally recognized overnight courier service, addressed to the parties or their permitted assigns with an acknowledgment of receipt requested at the following addresses:

> (i)    If to the Company, to the Company's principal office address set forth in <u>Section 2.3</u> hereof, and

> (ii)    If to a Member, to the address set forth on <u>Schedule A</u> to this Agreement.

Any Person may from time to time specify a different address by written notice to the Company.

11.4    <u>Integration</u>.

This Agreement represents the entire understanding of the parties with respect to the subject matter hereof and supercedes all prior agreements, express or implied, oral or written, with respect thereto.  The express terms of this Agreement control and supercede any course of performance or usage of trade inconsistent with any of the terms hereof.

11.5    <u>Governing Law and Waiver of Jury Trial</u>.

(a)    This Agreement shall be interpreted and construed in accordance with the laws of the State of Delaware without regard to its conflicts of laws provisions, but shall not be construed against the drafter of this Agreement.  As used in this Agreement, the neuter, masculine and/or feminine gender shall include the neuter, masculine or feminine gender as required by the context of the sentence and the plural shall include the singular wherever appropriate.  The titles of the Articles and Sections herein have been inserted as a matter of convenience of reference only and shall not control or affect the meaning or construction of any of the terms or provisions hereof;

(b)    TO THE FULLEST EXTENT PERMITTED BY LAW, EACH MEMBER WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS OR REMEDIES ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT.

11.6    <u>Counterparts</u>.

The parties hereto may execute this Agreement in any number of counterparts, each of which, when executed and delivered, shall be an original; but all such counterparts shall constitute one and the same instrument.

11.7    <u>Severability of Provisions</u>.

Each provision of this Agreement shall be considered severable.  If for any reason any provision or provisions hereof are determined to be illegal or invalid, such illegality or invalidity shall not impair the operation of or affect those portions of this Agreement that are valid and this Agreement shall be construed in all respects as if such invalid or illegal provision was omitted.

11.8    Creditors.

None of the provisions of the Agreement shall be for the benefit of or enforceable by any creditor of the Company or other third party, provided, that nothing shall prevent Lehman from exercising any right hereunder in its capacity as a Member of the Company notwithstanding its relationship as a creditor of the Company.

11.9    Disclosure.

Each of the Members acknowledges that he, she or it (i) was urged in advance by the attorney who prepared this Agreement to secure separate independent counsel in connection with signing and making this Agreement and its effect upon each of them and their property; (ii) has carefully read and understood the provisions of this Agreement; (iii) understands that his, her or its rights in property may be adversely affected by this Agreement; (iv) is signing and making this Agreement voluntarily; (v) has been provided a fair and reasonable disclosure of the property and financial obligations of the other Members; and (vi) hereby voluntarily and expressly waives in this writing any right to disclosure of the financial obligations of the other Members beyond the disclosure provided.

11.10    Confidential Information.

(a)    General.  In the course of negotiations prior to the execution of this Agreement and during the term of the Company, each Member may have made or may make available to the Company or another Member, and the Company may have made or may make available to the Members, in each case directly or to their Affiliates, agents or employees, certain information, including information relating to the disclosing Person's engineering data, specifications, processes, business methods and plans, and documentation related to planning, finance, selling, marketing, market research, promotional plans, and other information of a similar nature, which may include information in which the disclosing Person or its Affiliates have proprietary interests (collectively "Confidential Information").  Each Member who receives such Confidential Information shall ensure that such Confidential Information shall be held in the strictest confidence and shall be used by the Member only in the performance of its obligations under this Agreement and other agreements contemplated hereunder.  This obligation shall survive the Transfer of any Member's Membership Interest in the Company and termination of this Agreement indefinitely.

(b)    Destruction of Confidential Information.  Upon termination of this Agreement or the Transfer of a Member's entire Membership Interest in the Company, whichever occurs sooner, each Member shall promptly return to the Company or, if so requested by the Company, destroy all Confidential Information disclosed to or obtained by such Member, and all magnetic, computer-resident, photostatic, or other copies or derivatives thereof and represent in writing that all such Confidential Information has been returned and/or destroyed.

(c)    Equitable Relief.  It is further understood and agreed that money damages would not be a sufficient remedy for any breach of this Section 11.10 and that the Company and/or a nonbreaching Member, subject to applicable law, shall be entitled to equitable relief,

including temporary and permanent injunctions, against any actual or threatened breach of this Section 11.10, without the need to post any bond or other security and without having to demonstrate special or unique damages.

11.11    Further Assurances.

The parties shall from time to time do and perform such additional acts and execute and deliver such additional documents and instruments as may be required by applicable Governmental Rules or reasonably requested by any party to establish, maintain or protect its rights and remedies or to effect the intents and purposes of this Agreement.

ARTICLE 12

ALTERNATIVE DISPUTE RESOLUTION

12.1    Agreement to Use Procedure.

The Members have entered into this Agreement in good faith and in the belief that it is mutually advantageous to them.  It is with that same spirit of cooperation that they pledge to attempt to resolve any dispute amicably without the necessity of litigation.  Accordingly, except with respect to disputes relating to Sections 4.2, 6.11, 6.12, 9.9, 9.10, and 11.10 of this Agreement, they agree if any dispute arises between them relating to this Agreement (the "Dispute"), they will first utilize the procedures specified in this Article (the "Procedure") prior to any additional proceedings.  The foregoing to the contrary notwithstanding, neither Lehman nor any of its Affiliates shall be required to submit any dispute with any Member arising under or otherwise in connection with that certain Amended and Restated Credit Agreement, dated as of May 1, 2007, between, among others, the Company and Lehman, as the same may be amended, restated, supplemented or otherwise modified from time to time (the "Credit Agreement").

12.2    Initiation of Procedure.

The party seeking to initiate the Procedure (the "Initiating Member") shall give written notice to the Board of Managers and the other Members, describing in general terms the nature of the Dispute, the Initiating Member's claim for relief and identifying one or more individuals with authority to settle the Dispute on such Member's behalf.  The party receiving such notice (the "Responding Member") shall have ten (10) business days within which to designate by written notice to the Initiating Member, one or more individuals with authority to settle the Dispute on such Member's behalf.  The individuals so designated shall be known as the "Authorized Individuals."  The Initiating Member and the Responding Member shall collectively be referred as the "Disputing Members" or individually "Disputing Member."

12.3    Direct Negotiations.

The Authorized Individuals shall be entitled to make such investigation of the Dispute as they deem appropriate, but agree to promptly, and in no event later than ten (10) business days from the date of the Initiating Member's written notice, meet to discuss resolution

51

of the Dispute.  The Authorized Individuals shall meet at such times and places and with such frequency as they may agree.  If the Dispute has not been resolved within thirty (30) days from the date of their initial meeting, the Disputing Members shall cease direct negotiations and shall submit the Dispute to mediation in accordance with the following procedure.

12.4    Selection of Mediator.

The Authorized Individuals shall have ten (10) business days from the date they cease direct negotiations to submit to each other a written list of acceptable qualified attorney-mediators not Affiliated with any of the Members or the Company.  Within ten (10) business days from the date of receipt of such list, the Authorized Individuals shall rank the mediators in numerical order of preference and exchange such rankings.  If one or more names are on both lists, the highest ranking person shall be designated as the mediator.  If no mediator has been selected under this procedure, the Disputing Members agree jointly to request a State or Federal District Judge of their choosing (or if they cannot agree, the Local Administrative Judge for the county in which the principal office of the Company is located) to supply within ten (10) business days a list of potential qualified attorney-mediators.  Within ten (10) business days of receipt of the list, the Authorized Individuals shall again rank the proposed mediators in numerical order of preference and shall simultaneously exchange such list and shall select as the mediator the individual receiving the highest combined ranking.  If such mediator is not available to serve, they shall proceed to contact the mediator who was next highest in ranking until they are able to select a mediator.

12.5    Time and Place of Mediation.

In consultation with the mediator selected, the Authorized Individuals shall promptly designate a mutually convenient time and place within the State of West Virginia, for the mediation, and unless circumstances require otherwise, such time to be not later than sixty (60) days after selection of the mediator.

12.6    Exchange of Information.

In the event any Disputing Member to this Agreement has substantial need for information in the possession of another Disputing Member to this Agreement in order to prepare for the mediation, all Disputing Members shall attempt in good faith to agree to procedures for the expeditious exchange of such information, with the help of the mediator if required.

12.7    Summary of Views.

At least seven (7) days prior to the first scheduled session of the mediation, each Disputing Member shall deliver to the mediator and to the other Disputing Members a concise written summary of its views on the matter in Dispute, and such other matters required by the mediator.  The mediator may also request that a confidential issue paper be submitted by each Disputing Member to him.

12.8     Parties to Be Represented.

In the mediation, each Disputing Member shall be represented by an Authorized Individual and may be represented by counsel.  In addition, each Disputing Member may, with permission of the mediator, bring such additional Persons as needed to respond to questions, contribute information, and participate in the negotiations.

12.9     Conduct of Mediation.

The mediator shall determine the format for the meetings, designed to assure that both the mediator and the Authorized Individuals have an opportunity to hear an oral presentation of each Disputing Member's views on the matter in dispute, and that the authorized parties attempt to negotiate a resolution of the matter in dispute, with or without the assistance of counsel or others, but with the assistance of the mediator.  To this end, the mediator is authorized to conduct both joint meetings and separate private caucuses with the Disputing Members.  The mediation session shall be private.  The mediator will keep confidential all information learned in private caucus with any Disputing Member unless specifically authorized by such Disputing Member to make disclosure of the information to the other Disputing Member.  The Disputing Members commit to participate in the proceedings in good faith with the intention of resolving the Dispute if at all possible.

12.10    Termination of Procedure.

The Disputing Members agree to participate in the mediation procedure to its conclusion.  The mediation shall be terminated (1) by the execution of a settlement agreement by the Disputing Members, (2) by a declaration of the mediator that the mediation is terminated, or (3) by a written declaration of a Disputing Member to the effect that the mediation process is terminated at the conclusion of one full day's mediation session.  Even if the mediation is terminated without a resolution of the Dispute, the Disputing Members agree (subject to Section 12.14) not to terminate negotiations and not to commence any additional proceedings prior to the expiration of five (5) days following the mediation.

12.11    Other Proceedings.

The parties agree to participate in good faith in the Procedure to its conclusion.  If the Disputing Members are not successful in resolving the dispute through the Procedure, then the Disputing Members shall settle the dispute by binding arbitration pursuant to the rules of the American Arbitration Association ("AAA").    The arbitration will be governed by the Commercial Arbitration Rules of the AAA and the arbitrators shall apply the substantive law of the State of Delaware (without regard to its conflicts of laws or choice of laws principles) to the determination of the dispute.  If the Disputing Members cannot jointly select a single arbitrator to determine the matter, one arbitrator shall be chosen by each of the Initiating Member(s) and the Responding Member(s) (or, if a party fails to make a choice, by the American Arbitration Association on behalf of such party) and the two arbitrators so chose will select a third.  The decision of the single arbitrator jointly selected by the Disputing Members, or if three arbitrators are selected, the decision of any two of them, will be final and binding upon the parties and the

judgment of a court of competent jurisdiction may be entered thereon. Fees of the arbitrators and costs of arbitration (including legal fees) shall be borne by Disputing Members in such manner as shall be determined by the arbitrator or arbitrators.

12.12    Fees of Mediation; Disqualification.

The fees and expenses of the mediator, exclusive of attorneys' fees, shall be shared equally by the Disputing Members. The mediator shall be disqualified as a witness, consultant, expert or counsel for any Disputing Member with respect to the Dispute and any related matters.

12.13    Confidentiality.

Mediation is a compromise negotiation for purposes of federal and state rules of evidence and constitutes privileged communication under Delaware law. The entire mediation process is confidential, and no stenographic, visual or audio record shall be made. All conduct, statements, promises, offers, views and opinions, whether oral or written, made in the course of the mediation by any Disputing Member, their agents, employees, representatives or other invitees and by the mediator are confidential and shall, in addition and where appropriate, be deemed privileged. Such conduct, statements, promises, offers, views and opinions shall not be discoverable or admissible for any purpose, including impeachment, in any litigation or other proceeding involving the parties, and shall not be disclosed to anyone not an agent, employee, expert, witness, or representative of any of the Members; provided, however, that evidence otherwise discoverable or admissible is not excluded from discovery or admission as a result of its use in the mediation.

12.14    Equitable Relief.

Nothing in this Article 12 or in any other provision of this Agreement shall prevent or limit any Member's ability to commence litigation at any time in order to request equitable relief, including, without limitation, an injunction to prevent irreparable harm.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**[SIGNATURE PAGE TO THE OPERATING AGREEMENT 1/4]**

IN WITNESS WHEREOF, the Members have caused this Operating Agreement to be executed as of the day and year first above written.

CLASS A MEMBERS:

_____
Raymond McCormick

_____
Joseph C. Turley III

**[SIGNATURE PAGE TO THE OPERATING AGREEMENT 1/4]**

IN WITNESS WHEREOF, the Members have caused this Operating Agreement to be executed as of the day and year first above written.

CLASS A MEMBERS:

_____

Raymond McCormick

_____

Joseph C. Turley III

**[SIGNATURE PAGE TO THE OPERATING AGREEMENT 2/4]**

CLASS B MEMBER:

Greenbrier Equity Opportunity, LP

By:  MHM Greenbrier, LP, its General Partner

By:  MHM Coal Ventures, LLC, its General
Partner

By:  _____
Michael McConnell
President

[SIGNATURE PAGE TO THE OPERATING AGREEMENT 3/4]

CLASS C MEMBERS:

_____
Robert Heuler

_____
Frank Stacy

_____
Clarence Hodge

Greenbrier Investments, L.P.,
By: Greenbrier Investments, LLC

By: _____
William A. Ladie, President

_____
William G. Karis

**[SIGNATURE PAGE TO THE OPERATING AGREEMENT 3/4]**

CLASS C MEMBERS:

_____
Robert Heuler

_____
Frank Stacy

_____
Clarence Hodge

Greenbrier Investments, L.P.,
By: Greenbrier Investments, LLC

By: _____
William A. Ladie, President

_____
William G. Karis

**[SIGNATURE PAGE TO THE OPERATING AGREEMENT 3/4]**

CLASS C MEMBERS:

_____
Robert Heuler

_____
Frank Stacy

_____
Clarence Hodge

Greenbrier Investments, L.P.,
By: Greenbrier Investments, LLC

By: _____
William A. Ladie, President

_____
William G. Karis

**[SIGNATURE PAGE TO THE OPERATING AGREEMENT 3/4]**

CLASS C MEMBERS:

_____
Robert Heuler

_____
Frank Stacy

_____
Clarence Hodge

Greenbrier Investments, L.P.,
By: Greenbrier Investments, LLC

By _____
    William A. Ladie, President

_____
William G. Karis

**[SIGNATURE PAGE TO THE OPERATING AGREEMENT 4/4]**

CLASS D MEMBER:

Lehman Commercial Paper Inc.

By: _____

J. Robert Chambers
Authorized Signatory

## SCHEDULE A

### (Amended as of March 12, 2008)

| MEMBERS | VOTING RATIO | SHARING RATIO | UNITS |
|---|---|---|---|
| Joseph C. Turley, III<br>Anjean Road, P.O. Box T<br>Rupert, WV 25984 | 20.89% | 15.00% (Class A) | 15,000 (Class A) |
| Raymond McCormick<br>1013 Tall Trees Drive<br>Pittsburgh, PA  15241 | 18.11% | 13.00% (Class A) | 13,000 (Class A) |
| Greenbrier Equity Opportunity, LP<br>c/o Michael McConnell<br>601 Jefferson, Suite 3600<br>Houston, TX 77002 | 12.00% | 12.00% (Class B) | 12,000 (Class B) |
| Robert Heuler<br>319 Marshall Road<br>Bethel Park, PA 15102 | 0.00% | 4.00% (Class C) | 4,000 (Class C) |
| Frank Stacy<br>PO Box 11027<br>Blacksburg, Virginia   24062 | 0.00% | 2.00% (Class C) | 2,000 (Class C) |
| Clarence Hodge<br>123 Circle Drive<br>Lewisburg, West Virginia   24901 | 0.00% | 2.00% (Class C) | 2,000 (Class C) |
| Greenbrier Investments, L.P.<br>132 Harriet Drive<br>Lower Burrell, PA 15068<br>Attention: William A. Ladie | 0.00% | 2.00% (Class C) | 2,000 (Class C) |
| William G. Karis<br>1251 Turnberry Drive<br>Pittsburgh, PA 15241 | 0.00% | 1.00% (Class C) | 1,000 (Class C) |
| Lehman Commercial Paper, Inc.<br>745 Seventh Avenue<br>New York, NY 10019 | 49.00% | 49.00% (Class D) | 49,000 (Class D) |

**<u>EXHIBIT D</u>**

# BOARD MINUTES

# APRIL 29, 2009

A meeting of the Board of Managers of Greenbrier Minerals Holdings, LLC was held on Wednesday April 29, 2009 at the offices of Don Malecki (Buchanan Ingersoll) in Pittsburgh, Pennsylvania. Board members present were Bill Karis, Jack McCarthy, Michael McConnell, Ray McCormick and Joe Turley. Also present at the invitation of the Board was legal counsel Don Malecki, Secretary-Treasurer Clarence Hodge, and General Manager Frank Stacy. Lehman representative Eric Salzman and Bob Heuler were also present.

The meeting was called to order at approximately 9:10 AM. Mr. Turley served as Chairman of the meeting. After introductions, Eric Salzman updated the Board on Lehman's bankruptcy and its position regarding Greenbrier. Mr. Salzman stressed that Lehman was not planning to be rash in selling its loan in Greenbrier. Rather, Lehman plans to take a longer range view (perhaps, a few years) so that the asset is stabilized and is not being sold into a down market.

The Board began a review of twenty three various agenda exhibits. The first four issues were all related to coal shipments. Exhibits presented outlined coal tonnages shipped, coal quality, and April and May shipping schedules.

The Board engaged in a lengthy discussion about the relationship and structure of WV Mine Power (labor contractor), Midland Trail, and Greenbrier. The Board discussed whether Midland's financial condition could affect Greenbrier's labor force since the two companies both use WV Mine Power. The need to separate the work forces of Midland and Greenbrier was discussed, without resolution however. Further discussion on this issue was postponed to later.

Mr. Turley explained an exhibit showing the cost to mine the Buck Lilly reserve based on discussions with Vecellio-Grogan, the potential contractor. The Board was informed that documentation has been commenced and is ongoing. Further, the Board was informed that a significant amount of money (approximately $3,000,000 or more) would be needed to commence the Buck Lilly operations.

An email was reviewed showing the specifics of the proposed ArcelorMittal sales agreement. A draft of the contract is being worked on with the goal of signing it by May 15th. Both Mr. Turley and Mr. Karis expressed the difficulty in working with ArcelorMittal representatives to achieve the proposed agreement.

Audit issues resulting from the 2008 external audit were reviewed. A reclass entry will be made by McLeod to move approximately $4 million from mine development on the balance sheet to the income statement. A motion was made, seconded and approved by the Board to reserve the entire Midland related party balance (and it was noted that this reserve was not a forgiveness of debt), except for $1. Lehman representatives expressed their willingness to restructure the Loan and to provide necessary information to McLeod addressing Greenbrier violations under the loan agreement. The Board discussed a potential forbearance agreement between Greenbrier and Lehman.

The Board of Managers reviewed the cash position, accounts receivable, coal inventories, and the Monthly and First Quarter, 2009 Cost Statement and the resulting P&L. After discussion, the Board requested that Equipment Rentals be moved from the G&A Section of the cost statement to a separate line item after Supplies and Repairs in the Mining Cost section of the financial presentation.

Mr. Turley presented an exhibit to the Board showing the financial impact to Midland of related party coal sales at various sales price levels, if they were going to provide the needed low sulphur and lower volatile surface mined coal that was needed to "blend down" the Greenbrier coal.  After discussion the Board approved paying $160 per clean ton for this surface mined coal from Midland.  Payments for the coal will be made weekly. Any Midland coal processed at Greenbrier is to be charged at $10 per **clean** ton. The Board requested that Midland supply financial information to support a $22.58 G&A cost per ton shown in the $160 analysis, as well as a balance sheet and income statement.

The Board ended the meeting discussing a request by Lehman to use outside consultants in assessing the operational, structural and financial position of the company. Bill Karis was strongly opposed to the use of Alvarez and Marsal, suggested by Lehman, to perform a study of Greenbrier.  He felt there were other consultants with  better knowledge of the coal industry than A&M and would provide names of consultants to Lehman.  In order to control costs he recommended a scope of work be defined and a budget be established for the study and the completion of the unfinished A&M study of the Greenbrier/Midland relationship.


_____

Clarence W. Hodge
Secretary

# BOARD MINUTES

# JUNE 16, 2009

A meeting of the Board of Managers of Greenbrier Minerals Holdings, LLC was held on Tuesday June 16, 2009 at the offices of Don Malecki (Buchanan Ingersoll & Rooney) in Pittsburgh, Pennsylvania. Board members present were Bill Karis, Jack McCarthy, Michael McConnell, Ray McCormick and Joe Turley. Also present at the invitation of the Board was legal counsel Don Malecki, Secretary-Treasurer Clarence Hodge, and General Manager Frank Stacy. Lehman representative Eric Salzman, Midland Trail Resources CFO Tom Brewer, Midland Accounting Manager Kevin Morgan and shareholder Bob Heuler were also present.

The meeting was called to order at approximately 9:40 AM. Mr. Turley served as Chairman of the meeting. The Board reviewed a daily report prepared by the Greenbrier Director of Coal Preparation showing the current clean coal inventory at the Plant/Loadout. The Board also reviewed the remainder of June and the July shipping schedules.

Mr. Turley then updated the Board on the status of special projects at the Greenbrier operation. A second air shaft needed for the Mountaineer No. 1 mining operation was moved forward in the mining projection to a new location, thereby delaying a $5 million capital expenditure for the shaft until next year. This new shaft will also be used as a portal. Pictures were presented to the Board showing the status of the concrete project for the slope. This will enable men and supplies to be moved more quickly. The project should be finished in approximately 30 days.

A new drilling program adding seven additional holes was started by LJ Hughes Drilling to further define the Mountaineer No. 1 reserve. The drilling could add approximately six million tons to this coal reserve. Another Poca 6 reserve that contains approximately four million tons has been identified near Mountaineer No. 1. This reserve may require a slope to gain access. Mr. Turley informed the Board that he would attempt to meet with MeadWestvaco officials sometime in July to acquire options to lease the additional Mountaineer No. 1 reserve, the new Poca 6 reserve, the Duo Firecreek reserve, and the Sewell Trap Ridge reserve. The acquisition of these additional reserves should greatly enhance the value of the company.

Mr. Turley and Mr. Malecki then updated the Board on the status of Taggart Final Acceptance of the Preparation Plant and Loadout. Mr. Turley explained there remained several items that Taggart needed to correct before Greenbrier would take Final Acceptance. Mr. Malecki explained that Taggart needed to correct the problems, as opposed to Greenbrier accepting the plant and pursuing the issues under warranty. Mr. Turley also informed the Board he was meeting with CSX representatives to extend the rail track agreement for another five years.

The Board then reviewed a bi-weekly report requested by Lehman showing actual and projected shipments, actual and projected production, actual and projected inventories, and actual and projected cash balances, expenditures and receipts.

Mr. Karis and Mr. Turley expressed the continuing difficulty in working with ArcelorMittal representatives to achieve a Coal Sales Agreement. The current version of the agreement has been greatly changed from the original points agreed to by both parties at the beginning. The Board agreed to continue to pursue a sales agreement but also recognized that as long as Indiana Harbor/Arcellor/Dofasco were taking and paying for their coal shipments, to proceed cautiously with the market showing positive increases.

Mr. McCarthy then spoke to the Board of the Alvarez report and its findings regarding The Greenbrier/Midland relationship. Their report was given to the Board along with their suggested areas of continued review of this relationship. Mr. Karis asked that management prepare a brief written response to each of the points listed in the completed portion of the Alvarez report.

The Board then began a discussion of recruiting from several potential consultants, a firm to evaluate the company's value. Mr. Turley said he had been in touch with three candidates and one of them had already agreed to review the Greenbrier project. He suggested that potential firms come and visit the property and then give their proposal for an evaluation to the Board in August at the Greenbrier offices. Lehman representatives gave assurances that they would not "deal around" the Board on a possible sale.

Mr. Turley informed the Board that he had met with Crown Coal & Coke representatives to discuss the overpayment of commissions. Powhatan had paid a $2.50 commission to Crown on all tons shipped and should have been paying on Greenbrier produced tons only. The overpayment on purchased coal resulted in a credit of $1.2 million due to Powhatan. After crediting Powhatan accounts for accruals and unpaid invoices received, Powhatan will have a $572,363 credit still due from Crown and will be able to ship approximately 228,945 tons without paying a commission to Crown. After discussion, the Board agreed to credit Midland an additional $2.50 per ton on the tonnages purchased at $69, since the commission was used in calculating the price paid per ton to Midland. No cash will be paid, but the Midland receivable related party account will be credited for the amount due Midland.

Finally, after expressing his concern of the viability of Midland and its ability to supply the needed blend coal to Greenbrier, Mr. Salzman suggested giving priority to discussing Midland's financial stability at the Board meeting in August. Mr. McCormick asked that Midland supply current financial statements to the Greenbrier Board with an explanation of the $22.58 G&A costs presented when the Board approved a $160 per ton price to Midland for surface mined coal, unless it had already been provided.

_____
Clarence W. Hodge
Secretary

# BOARD MINUTES

# OCTOBER 13, 2009

A conference call was held by the Board of Managers of Greenbrier Minerals Holdings, LLC on Tuesday, October 13, 2009 beginning at 10:00 AM. Board members participating were Bill Karis, Jack McCarthy, Michael McConnell, Ray McCormick, and Joe Turley. Also participating in the call was: Tom Brewer, Don Malecki, Eric Salzman and Clarence Hodge.

Mr. Turley informed the Board that Indiana Harbor had presented a draft of a mutual release. Indiana Harbor also offered a draft of a new sales agreement. After a brief discussion, the Board unanimously approved a resolution to accept the mutual release only.

The Board was updated on the status of additional drill holes to further establish the Pocahontas No. 6 coal reserve, locate a new airshaft and further define potential mining conditions for the next five years.

Mr. Turley reported that the drilling information had been given to MeadWestvaco along with a proposed lease amendment to add additional coal reserves to the existing Matoaka coal lease. Proposals for acquisition of additional land for the coal refuse area and the freshwater pond were also submitted. A response from MeadWestvaco should be available within thirty days.

The Board was also informed and discussed the following items:

1. The Craig & Associates appraisal report should be available in ten days.
2. The final issue with Taggart, which required additional steel supports for the prep plant, is almost finished.
3. Installation of the liner and back-fill of the slope has been engineered. Installation should begin within seven days.
4. An approved forty foot cut mining plan will hopefully be available for Mountaineer No. 1 in the coming days. All requirements to obtain the plan have been met.
5. A Sharing Agreement among the various parties needs to be finalized in the next couple of weeks.

_____
Secretary

# BOARD MINUTES

# DECEMBER 22, 2009

A meeting of the Board of Managers of Greenbrier Minerals Holdings, LLC was held on Tuesday December 22, 2009 at the offices of Don Malecki (Buchanan Ingersoll & Rooney) in Pittsburgh, Pennsylvania. Board members present were Bill Karis, Jack McCarthy, Michael McConnell, Ray McCormick and Joe Turley. Also present at the invitation of the Board was legal counsel Don Malecki and Secretary-Treasurer Clarence Hodge, Lehman representative Eric Salzman and Midland Trail Resources CFO Tom Brewer. Shareholder Bob Heuler was also present.

The meeting was called to order by Mr. Turley at approximately 10:05 AM. The Board approved the minutes from the last formal meeting of August 19th.

Mr. Turley updated the Board on the status of the slope back-fill project , the acquisition of a new diesel tractor, and the approval of a 40 foot cut plan, which should be obtained in the coming days.

The Board reviewed a daily report showing the current clean coal inventory at the Plant/Loadout and the shipping schedule for January, 2010. Two Dofasco unit trains were scheduled in January through the efforts of Mr. Turley. These two shipments should postpone a potential cash shortage in January.

There was a lengthy discussion by the Board about the blending of Midland and Greenbrier coals to quality specifications for Greenbrier's customers. The "homogeneous" pile of coal created with the blending of Greenbrier and Midland coals was reviewed and the procedures in place for purchasing the Midland coal.

The Board then reviewed an updated map of the Mountaineer No. 1 additional reserves requested from MeadWestvaco. Coal quality obtained from the new drill hole information was also discussed.

Mr. Turley reported to the Board that Taggart Final Acceptance of the Preparation Plant and Loadout was finalized on December 9th. Quarterly payments of $250,000 to Taggart would begin by March 9th. This quarterly payment represents Taggart's profit on constructing the plant.

The Board discussed the proposed sharing arrangement, if Greenbrier and Midland were sold, that had been presented prior to the meeting by Greenbrier's management. Mr. McCarthy and Mr. Salzman presented an alternative Lehman proposal in summary and were to present a detailed worksheet, in a similar format as the Greenbrier proposal, to the Board members in early January.

Turley, Hodge, Brewer and Heuler were excused from the meeting at this point, while the Board discussed and approved 2009 bonuses. Mr. Turley's expiring employment contract was also discussed by the Board without resolution in the meeting. Mr. McCarthy was designated to analyze and propose a compensation package to the Board of Managers for Mr. Turley.

Clarence W. Hodge
Secretary

# BOARD MINUTES

# APRIL 6, 2010

A meeting of the Board of Managers of Greenbrier Minerals Holdings, LLC was held on Tuesday April 6, 2010 at the offices of (Buchanan Ingersoll & Rooney) in Pittsburgh, Pennsylvania. Board members present were Bill Karis, Jack McCarthy, Michael McConnell, Ray McCormick and Joe Turley. Also present at the invitation of the Board was Greenbrier legal counsel Don Malecki and Secretary-Treasurer Clarence Hodge, Lehman representative Eric Salzman, Lehman counsel Brett Barragate and Midland Trail Resources CFO Tom Brewer.

The meeting was called to order by Mr. Turley at approximately 9:05 AM. The Board approved the minutes from the last formal meeting of December 22, 2009.

Mr. Turley updated the Board and maps were used in showing the proposed acquisition of additional land from MeadWestvaco for the refuse area, the site for a second airshaft, projected location of a third section and the addition of approximately ten million tons in place of coal reserves to the Mountaineer No. 1 mine. Also used in the update were pictures showing the location of an additional stacking tube necessary for dust control at the preparation plant.

The Board then discussed the increased coal shipments in March which had resulted in the take down of coal inventories. Clarence Hodge was asked to prepare a thirteen week cash projection, as some Board members expressed their concern for the cash required to fund a third section and other capital expenditures, as well as the mining operations.

There was a lengthy discussion by the Board about the proposed Lehman Standstill Agreement and various issues presented by Mr. Salzman from the Lehman perspective. The entire Agreement was reviewed with Mr. Malecki presenting the items that were of concern to the non-Lehman Stakeholders. After the review, Mr. Malecki was asked to prepare a "markup" of the items discussed for possible changes.

Mr. Karis presented the non-Lehman Stakeholders' evaluation of the current Lehman proposed Sharing Agreement. The consensus was that the non-Lehman shareholders were represented reasonably on the lower sale price increments but were unfairly represented on the higher incremental sales prices. Mr. Karis proposed a "50-50" split to the Lehman representatives of the differences at the higher sales price levels as shown in the Lehman model and those in the proposed model by the non-Lehman Stakeholders. Mr. Salzman presented Lehman's reasoning behind their current offering.

The Board also discussed the following items:
  (1) Mr. Turley's employment agreement (without resolution)
  (2) The scope, timing and budget of the third party engineering firm
      in the Standstill Agreement
  (3) Status of UBS as the financial advisor for a potential sale
The Board meeting adjourned at 1:35 PM.


_____
Clarence W. Hodge
Secretary

**<u>EXHIBIT E</u>**

# LEHMAN COMMERCIAL PAPER INC.

**NOTICE OF DEFAULT**

May 20, 2009

GREENBRIER MINERALS, LLC
P.O. BOX G
3180 Porter Drive
Rupert, West Virginia 25984
Attention: Joseph C. Turley, III
Facsimile Number: (304) 392-9000

Reference is made to that certain Amended and Restated Credit Agreement, dated as of May 1, 2007 (as amended, modified or supplemented from time to time in accordance with its terms, the "*Credit Agreement*"), among GREENBRIER MINERALS, LLC, the other Credit Parties party thereto, the several banks and other financial institutions or entities party to the Credit Agreement as Lenders and LEHMAN COMMERCIAL PAPER INC., as Administrative Agent and a Lender. Capitalized terms used herein without definition shall have the meanings ascribed to them in the Credit Agreement.

This letter constitutes notice to you that an Event of Default has occurred pursuant to Article VII of the Credit Agreement. We will update you as we continue to analyze these events.

Please do not hesitate to contact us if you have any questions or comments.

Very truly yours,

Lehman Commercial Paper Inc.

By:
Name:
Title:

cc -   Buchanan Ingersoll Rooney, PC
301 Grant Street One Oxford Centre
20th Floor
Pittsburgh, Pennsylvania 15219
Attention: Donald E. Malecki
Facsimile Number: (412) 562-1041