**<u>EXHIBIT F</u>**

United States Bankruptcy Court/Southern District of New York
Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

## PROOF OF CLAIM

| In Re: | Chapter 11 |
|---|---|
| Lehman Brothers Holdings Inc., et al. | Case No. 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |
| Name of Debtor Against Which Claim is Held | Case No. of Debtor |
| Lehman Commercial Paper, Inc. | 08-13900 |

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)       0000023710

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Program Securities (See definition on reverse side.)

**THIS SPACE IS FOR COURT USE ONLY**

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

Greenbrier Minerals, LLC
P.O. Box G
Rupert, West Virginia 25984
with a copy to:
Buchanan Ingersoll & Rooney PC, Attn: Timothy Palmer, Esq.
301 Grant Street, 20th Floor, Pittsburgh, PA 15219

Telephone number: 412-562-8413          Email Address:

☐ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number: _____
*(If known)*

Filed on: _____

Name and address where payment should be sent (if different from above)

Telephone number:          Email Address:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

---

**1.   Amount of Claim as of Date Case Filed: $** Unliquidated

If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.

☐ Check this box if all or part of your claim is based on a Derivative Contract.*
☐ Check this box if all or part of your claim is based on a Guarantee.*

***IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.**

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee.

**2.   Basis for Claim:** Debtor's breaches under the Amended and Restated Credit Agreement dated 05/01/07
(See instruction #2 on reverse side.)

**3.   Last four digits of any number by which creditor identifies debtor:** _____

**3a.** Debtor may have scheduled account as: _____
(See instruction #3a on reverse side.)

**4.   Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

Nature of property or right of setoff:  ☐ Real Estate   ☐ Motor Vehicle   ☐ Other

Describe: _____

Value of Property: $_____  Annual Interest Rate _____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$_____  Basis for perfection: _____

**Amount of Secured Claim: $**_____  **Amount Unsecured: $**_____

**6.   Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9): $**_____
(See instruction #6 on reverse side.)

**7.   Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
**8.   Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. *(See definition of "redacted" on reverse side.)* If the documents are voluminous, attach a summary.
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

**5.   Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).
☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).
☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

**Amount entitled to priority:**

$_____

**FOR COURT USE ONLY**

**FILED / RECEIVED**

SEP 2 1 2009

**EPIQ BANKRUPTCY SOLUTIONS, LLC**

| Date: | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. |
|---|---|
| 09/16/09 | Joseph C. Turley, III   President & CEO |

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

# INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules.*

## Items to be completed in Proof of Claim form

**Name of Debtor, and Case Number:**
YOU MUST INDICATE THE SPECIFIC DEBTOR AGAINST WHICH YOUR CLAIM IS ASSERTED, INCLUDING THE THE NAME OF THE DEBTOR AND THE RELATED CASE NUMBER (DEBTORS AND CASE NUMBERS LISTED BELOW), IN THE SPACE ALLOTTED AT THE TOP OF THE CLAIM FORM.

| | | | |
|---|---|---|---|
| 08-13555 | Lehman Brothers Holdings Inc. | 08-13905 | CES Aviation LLC |
| 08-13600 | LB 745 LLC | 08-13906 | CES Aviation V LLC |
| 08-13885 | Lehman Brothers Commodity Services Inc. | 08-13907 | CES Aviation IX LLC |
| 08-13888 | Lehman Brothers Special Financing Inc. | 08-13908 | East Dover Limited |
| 08-13893 | Lehman Brothers OTC Derivatives Inc. | 09-10108 | Luxembourg Residential Properties Loan Finance S.a.r.l. |
| 08-13899 | Lehman Brothers Derivative Products Inc. | 09-10137 | BNC Mortgage LLC |
| 08-13900 | Lehman Commercial Paper Inc. | 09-10558 | Structured Asset Securities Corporation |
| 08-13901 | Lehman Brothers Commercial Corporation | 09-10560 | LB Rose Ranch LLC |
| 08-13902 | Lehman Brothers Financial Products Inc. | 09-12516 | LB 2080 Kalakaua Owners LLC |
| 08-13904 | Lehman Scottish Finance L.P. | 08-13664 | PAMI Statler Arms LLC |

If your Claim is against multiple Debtors, complete a separate form for each Debtor.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the Bankruptcy filing. Follow the instructions concerning whether to complete items 4, 5 and 6. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**
Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See DEFINITIONS, below.) State the type and the value of property that secures the claim, attach copies of lien documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority. (See DEFINITIONS, below.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):**
State the value of any goods received by the debtor within 20 days before the date of commencement in which the goods have been sold to the debtor in the ordinary course of the debtor's business.

**7. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**8. Documents:**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2), authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

---

## DEFINITIONS

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is the person, corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing.

**Claim**
A claim is the creditor's right to receive payment on a debt that was owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the Claims Agent at the following address:
**Lehman Brothers Holdings Claims Processing**
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, PO Box 5076
New York, NY 10150- 5076

**Secured Claim Under 11 U.S.C. §506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. §507(a)**
Priority claims are certain categories of unsecured Claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's tax identification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

**Derivative Contract**
A contract that is any of (i) a "swap agreement" as such term is defined in section 101(53B) of the Bankruptcy Code or (ii) a "forward contract" as such term is defined in section 101(25) of the Bankruptcy Code. A cash-market purchase or sale of a security or loan (i.e. any purchase or sale of a security or loan for settlement within the standard settlement cycle for the relevant market), exchange-traded future or option, securities loan transaction, repurchase agreement in respect of securities or loans, and any guarantee or reimbursement obligations which would otherwise be included in the definition of such terms in the Bankruptcy Code shall not be considered a Derivative Contract for the purposes of this definition nor shall any notes, bonds, or other securities issued by the Debtors or their affiliates (including, but not limited to, Lehman Brothers Holdings Inc., Lehman Brothers Treasury Co. B.V., Lehman Brothers Bankhaus AG, Lehman Brothers Holdings plc, Lehman Brothers Securities N.V., and Lehman Brothers (Luxembourg) Equity Finance S.A.).

**Guarantee**
A promise, representation or agreement to answer for the payment of some debt or the performance of some duty in case of the failure of another person or entity who is liable in the first instance.

**Lehman Programs Securities**
Lehman Programs Securities means those securities included on the Lehman Programs Securities list available on http://www.lehman-docket.com as of July 27, 2009.

---

## INFORMATION

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim, or you may access the Claims Agent's system (http://www.lehman-docket.com) to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court.

## ADDENDUM TO PROOF OF CLAIM OF
## (Greenbrier Minerals, LLC)

Greenbrier Minerals, LLC ("Greenbrier") files this Proof of Claim against Lehman
Commercial Paper, Inc. (the "Debtor") and in support of thereof, states as follows:

On or about May 1, 2007, Debtor and Greenbrier entered into a certain Amended and
Restated Credit Agreement, (as amended, restated or otherwise modified from time to time, the
"Credit Agreement"), whereby Debtor agreed to make various loans to Greenbrier in the original
principal amount of $94,000,000. A true and correct copy of the Credit Agreement is attached
hereto as Exhibit "A". The Credit Agreement was subsequently amended seven times from July
27, 2007 to June 3, 2008 resulting in a maximum principal loan amount of $206,000,000 (the
"Commitment"). A true and correct copy of the latest amendment, Amendment No. 7 to the
Credit Agreement, is attached hereto as Exhibit "B".

On or about September 18, 2008, Greenbrier requested Debtor to fund $10,000,000 of the
Commitment, pursuant to the terms of the Credit Agreement, to be paid directly to Greenbrier
Smokeless Coal Mining, LLC for services rendered to Greenbrier. On that same day, Debtor
approved but failed to fund the $10,000,000 payment to Greenbrier Smokeless Coal Mining,
LLC. Further, there is currently $39,000,000 remaining under the Commitment and the Debtor
has informed Greenbrier that it will not fund additional advances under the Commitment. The
Debtor's failure to fund up to the Commitment in accordance with the terms of the Credit
Agreement, constitutes a breach of its obligations under the Credit Agreement, which has caused
Greenbrier to suffer damages in amounts that have yet to be liquidated.

Greenbrier files this proof of claim for damages incurred as a result of the Debtor's
breaches under the Credit Agreement, including without limitation, compensatory, consequential
and incidental damages, together with attorneys fees and other recoverable fees and expenses as
allowed under the Credit Agreement and other applicable law. Greenbrier reserves the right to

amend or supplement its Proof of Claim, and/or file additional proofs of claim for additional claims or interests at any time, either before or after any date established by the Court.

Greenbrier fully preserves all of its rights to setoff, recoupment, and all similar such rights, and nothing herein shall be construed as a waiver thereof.

Nothing contained in this Proof of Claim shall be construed as limiting the rights, remedies and interests of Greenbrier.

The filing of this Proof of Claim is not (i) a waiver or release of the rights of Greenbrier against any person, entity or property; (ii) a consent by Greenbrier to the jurisdiction of this Court with respect to the subject matter of this claim, any objection or other proceeding commenced in this case against or otherwise involving Greenbrier; (iii) a waiver of the right to move to withdraw the reference, or otherwise to challenge the jurisdiction of this Court, with respect to the subject matter of this claim, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in this case against or otherwise involving Greenbrier, or to assert that the reference has already been withdrawn with respect to the subject matter of this claim, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in this case against or otherwise involving Greenbrier; (iv) an election of remedy; or (v) a waiver of any past, present or future defaults or events of default. Greenbrier specifically preserves all of its procedural and substantive defenses and rights with respect to any claim that may be asserted against it by the Debtor or by any trustee for the Debtor's estate.

**Exhibit "A"**

EXECUTION VERSION

**$94,000,000**

**AMENDED AND RESTATED CREDIT AGREEMENT**

**among**

**GREENBRIER MINERALS, LLC,**

**as Borrower,**

**The Several Lenders
from Time to Time Parties Hereto,**

**LEHMAN BROTHERS INC.,**

**as Arranger**

**LEHMAN COMMERCIAL PAPER INC.,
as Syndication Agent**

**and**

**LEHMAN COMMERCIAL PAPER INC.,
as Administrative Agent**

**Dated as of May 1, 2007**

# TABLE OF CONTENTS

Page

ARTICLE I. DEFINITIONS ..................................................................................................2

    1.1   Defined Terms .......................................................................................2
    1.2   Other Definitional Provisions .............................................................31
    1.3   Computation of Time Periods .............................................................32

ARTICLE II. AMOUNTS, TERMS AND REPAYMENT OF LOANS AND
COMMITMENTS...........................................................................................32

    2.1   Term Loan Commitments....................................................................32
    2.2   Repayment of Term Loans..................................................................32
    2.3   Revolving Credit Commitments .........................................................33
    2.4   Procedures for Borrowings .................................................................33
    2.5   Repayment of Loans; Evidence of Debt .............................................33
    2.6   Fees ....................................................................................................34
    2.7   Termination or Reduction of Commitments .......................................35
    2.8   Optional Prepayments........................................................................35
    2.9   Mandatory Prepayments and Commitment Reductions .......................36
    2.10  Interest Rates, Payment Dates and Computation of Interest and Fees .......38
    2.11  Application and Pro Rata Treatment of Payments................................39
    2.12  Requirements of Law .........................................................................41
    2.13  Taxes..................................................................................................42
    2.14  Indemnity ...........................................................................................44
    2.15  Illegality ............................................................................................45
    2.16  Change of Lending Office ..................................................................45

ARTICLE III. REPRESENTATIONS AND WARRANTIES.........................................45

    3.1   Financial Condition............................................................................45
    3.2   No Change .........................................................................................46
    3.3   Company Existence; Compliance with Law........................................46
    3.4   Power; Authorization; Enforceable Obligations.................................46
    3.5   No Legal Bar......................................................................................47
    3.6   No Material Litigation ........................................................................47
    3.7   No Default..........................................................................................47
    3.8   Government Approvals; Government Rules.........................................47
    3.9   Existing Indebtedness ........................................................................48
    3.10  Ownership and Maintenance of Property ...........................................48
    3.11  Insurance ...........................................................................................49
    3.12  Intellectual Property...........................................................................49
    3.13  Taxes..................................................................................................49
    3.14  Federal Regulations ...........................................................................50
    3.15  Labor Matters.....................................................................................50
    3.16  ERISA ................................................................................................50

3.17   Regulations ................................................................................51
3.18   Ownership of Borrower; Subsidiaries................................................51
3.19   Use of Proceeds............................................................................51
3.20   Environmental Matters..................................................................52
3.21   Accuracy of Information, Etc .........................................................53
3.22   Security Documents .....................................................................54
3.23   Solvency.....................................................................................54
3.24   Hedging Agreements ...................................................................54
3.25   Reserve Reports ..........................................................................55
3.26   Contingent Obligations ................................................................55
3.27   Bank Accounts ............................................................................55
3.28   Customers and Suppliers...............................................................55
3.29   Account Receivable. .....................................................................55
3.30   Material Agreements.....................................................................55
3.31   Coal Act; Black Lung Act..............................................................56

ARTICLE IV. CONDITIONS PRECEDENT ..........................................................56

4.1   Conditions to Extension of Loans on the Closing Date.....................56
4.2   Conditions to Each Additional Extension of Credit .........................58
4.3   Conditions Deemed Fulfilled. .......................................................59

ARTICLE V. AFFIRMATIVE COVENANTS...........................................................59

5.1   Financial and Other Reporting Requirements...................................59
5.2   Collateral Reporting.....................................................................60
5.3   Certificates; Other Information.......................................................61
5.4   Payment of Obligations.................................................................62
5.5   Conduct of Business and Maintenance of Existence, Etc...................63
5.6   Operation and Maintenance of Property; Insurance .........................63
5.7   Inspection of Property; Books and Records; Discussions ..................65
5.8   Notices ......................................................................................65
5.9   Environmental Laws.....................................................................67
5.10   Additional Collateral, Etc ............................................................68
5.11   Mining Activities ........................................................................69
5.12   Chief Financial Officer ................................................................69
5.13   Patriot Act Compliance.................................................................70
5.14   Further Assurances......................................................................70

ARTICLE VI. NEGATIVE COVENANTS ..............................................................70

6.1   Financial Covenants.....................................................................70
6.2   Indebtedness................................................................................72
6.3   Liens ..........................................................................................73
6.4   Fundamental Changes...................................................................74
6.5   Disposition of Property.................................................................74
6.6   Restricted Payments.....................................................................75

| | | |
|---|---|---:|
| 6.7 | Investments | 76 |
| 6.8 | Subsidiaries | 76 |
| 6.9 | Amendments to Certain Documents | 77 |
| 6.10 | Transactions with Affiliates | 77 |
| 6.11 | Equipment Sales and Leaseback Transactions | 77 |
| 6.12 | Negative Pledge Clauses | 77 |
| 6.13 | Restrictions on Subsidiary Distributions | 78 |
| 6.14 | Lines of Business | 78 |
| 6.15 | Hedging Agreements | 78 |
| 6.16 | Changes in Fiscal Periods | 78 |
| 6.17 | Use of Proceeds | 78 |
| 6.18 | Bank Accounts | 78 |
| 6.19 | Disqualified Stock | 78 |

ARTICLE VII. EVENTS OF DEFAULT ......................................................78

ARTICLE VIII. THE AGENTS ......................................................82

| | | |
|---|---|---:|
| 8.1 | Appointment | 82 |
| 8.2 | Delegation of Duties | 82 |
| 8.3 | Exculpatory Provisions | 82 |
| 8.4 | Reliance by Agents | 83 |
| 8.5 | Notice of Default | 83 |
| 8.6 | Non-Reliance on the Agents and Other Lenders | 83 |
| 8.7 | Indemnification | 84 |
| 8.8 | Agent in their Individual Capacities | 84 |
| 8.9 | Successor Administrative Agent | 84 |
| 8.10 | Authorization to Release Liens and Guarantees | 85 |
| 8.11 | The Agent; the Syndication Agent | 85 |
| 8.12 | Withholding Tax | 85 |

ARTICLE IX. MISCELLANEOUS ......................................................86

| | | |
|---|---|---:|
| 9.1 | Amendments and Waivers | 86 |
| 9.2 | Notices | 87 |
| 9.3 | No Waiver; Cumulative Remedies | 88 |
| 9.4 | Survival of Representations and Warranties | 88 |
| 9.5 | Payment of Expenses | 89 |
| 9.6 | Successors and Assigns; Participations and Assignments | 90 |
| 9.7 | Adjustments; Set-off | 93 |
| 9.8 | Counterparts | 93 |
| 9.9 | Severability | 94 |
| 9.10 | Integration | 94 |
| 9.11 | GOVERNING LAW | 94 |
| 9.12 | Submission To Jurisdiction; Waivers | 94 |
| 9.13 | Acknowledgments | 94 |

9.14    Confidentiality ...............................................................................................95
9.15    Release of Collateral and Guarantee Obligations ...................................95
9.16    Accounting Changes........................................................................................96
9.17    WAIVERS OF JURY TRIAL ......................................................................97
9.18    Customer Identification – USA PATRIOT Act Notice.........................97
9.19    Affirmation of Obligations ...........................................................................97

ANNEXES:

I            Commitments

SCHEDULES:

| | |
|---|---|
| 1.1(a) | Coal Leases |
| 1.1(b) | Existing Indebtedness |
| 1.1(c) | Mortgaged Property |
| 3.4 | Consents, Authorizations, Filings and Notices |
| 3.8(a) | Government Approvals – Closing Date |
| 3.8(b) | Government Approvals – Post-Closing Date |
| 3.10(a) | Real Property –Owned |
| 3.10(b) | Real Property – Leased |
| 3.18(a) | Subsidiaries |
| 3.20(a) | Environmental and Mining Permits |
| 3.27 | Bank Accounts |
| 3.28 | Coal Marketing Contracts |
| 3.30 | Material Agreements |
| 5.6(a) | Mines |
| 7(h)(i) | Required Payments to Employee Welfare Benefits Plans |
| 7(h)(ii) | Required Payments to Multiemployer Plans |

EXHIBITS:

| | |
|---|---|
| A | Project Description |
| B | Form of Borrowing Notice |
| C | Form of Compliance Certificate |
| D | Form of Construction Budget and Schedule |
| E | Form of Deposit Account Control Agreement |
| F | Form of Final Completion Certificate |
| G-1 | Form of Guarantee and Security Agreement |
| G-2 | Form of Midland Guarantee and Security Agreement |
| H | Material Project Documents |
| I | Form of Milestone Schedule |
| J | Form of Mortgage |
| K | Form of Performance Test |
| L-1 | Form of Term A Note |
| L-2 | Form of Term B Note |
| L-3 | Form of Revolving Credit Note |
| M | Form of Exemption Certificate |
| N | Form of Closing Certificate |
| O | Form of Assignment and Acceptance |

This AMENDED AND RESTATED CREDIT AGREEMENT, dated as of May 1, 2007, by and among GREENBRIER MINERALS, LLC a Delaware limited liability company ("**Borrower**"), the several banks and other financial institutions or entities from time to time parties to this Agreement (the "**Lenders**"), LEHMAN BROTHERS INC., as arranger, sole lead agent and sole bookrunner (in such capacity, the "**Arranger**"), and LEHMAN COMMERCIAL PAPER INC., as syndication agent (in such capacity, the "**Syndication Agent**"), and as administrative agent (in such capacity, the "**Administrative Agent**").

## W I T N E S S E T H:

WHEREAS, Borrower, Guarantors (as defined below), WestLB AG, New York Branch, as agent (the "**Original Agent**, and the lenders party thereto (the "**Original Lenders**") entered into that certain Credit Agreement, dated as of July 25, 2006, as amended by Amendment No. 1 to Credit Agreement, dated September 8, 2006 (as amended, the "**Original Credit Agreement**"), pursuant to which the Original Lenders extended credit to Borrower;

WHEREAS, pursuant to a Master Assignment, dated as of January 19, 2007 (the "**Assignment**"), the Original Agent and the Original Lenders have assigned to the Administrative Agent and the Lenders, and the Administrative Agent and the Lenders have assumed, the loans outstanding under the Original Credit Agreement, all of the Original Agent's and the Original Lenders' respective rights, title and interest in and to the Original Credit Agreement, the deeds of trust, mortgages, security agreement and other instruments executed or delivered pursuant thereto;

WHEREAS, each of the parties to the Original Credit Agreement desires to amend and restate the Original Credit Agreement and the other Original Loan Documents on the terms and conditions set forth herein;

WHEREAS, in connection with such amendment and restatement, Borrower has requested that the Lenders extend additional revolving credit loans and additional term loans for the purposes permitted hereunder, including for the prepayment in full of the existing term loans and other obligations outstanding under that certain Term Loan Agreement, dated August 29, 2006 (the "**Second Lien Term Loan**"), among, *inter alios*, Greenbrier Minerals, LLC and Lehman Brothers Commercial Paper Inc., as administrative agent and a lender thereunder; and for these purposes, Lenders are willing to make and continue certain loans and other extensions of credit to Borrowers on the terms and conditions set forth herein; and

WHEREAS, it is the intent of the parties hereto that this Agreement not constitute a novation of the obligations and liabilities existing under the Original Credit Agreement and other Original Loan Documents or evidence payment of all or any of such obligations and liabilities; that this Agreement amend and restate in its entirety the Original Credit Agreement and renew and extend the loans under the Original Credit Agreement, as so amended and restated;

NOW, THEREFORE, in consideration of the premises and the agreements hereinafter set forth, the parties hereto hereby agree as follows:

# ARTICLE I.
## DEFINITIONS

**1.1    Defined Terms.** Capitalized terms used in this Agreement shall have the respective meanings set forth in this Section 1.1.

*Accounting Change*: as defined in Section 9.16

*Additional Extensions of Credit*: as defined in Section 9.1.

*Additional Mining Facilities*: the development of coal mining production facilities (other than the Mining Facilities) by Borrower or any Borrower Subsidiary, including, as further described in Exhibit A, Sewell, Pocahontas 8, Buck Lilly (to the extent pursued by any Credit Party) and the Beckley seam mine (Cherry Knoll).

*Additional Project Document*: any contract or agreement entered into by any Credit Party, or by an agent on behalf of such Credit Party, subsequent to the Closing Date (other than Non-Material Project Documents).

*Administrative Agent*: as defined in the preamble hereto.

*Affiliate*: as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (a) vote 10% or more of the securities having ordinary voting power for the election of directors (or persons performing similar functions) of such Person or (b) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise. Notwithstanding the foregoing, no Lender shall be deemed to be an Affiliate of the Credit Parties.

*Agents*: the collective reference to the Syndication Agent and the Administrative Agent.

*Aggregate Commitment*: with respect to any Lender, the sum of such Lender's Term A Commitment, Term B Commitment and the Revolving Credit Commitment.

*Aggregate Exposure*: with respect to any Lender at any time, an amount equal to (a) until the Closing Date, such Lender's Aggregate Commitment at such time and (b) thereafter, the sum of (i) the aggregate then unpaid principal amount of such Lender's Term A Loans, (ii) such Lender's Term A Commitment, (iii) the aggregate then unpaid principal amount of such Lender's Term B Loans and (iv) the amount of such Lender's Revolving Credit Commitment then in effect or, if the Revolving Credit Commitments have been terminated, the aggregate then unpaid principal amount of such Lender's Revolving Credit Loans then outstanding.

*Aggregate Exposure Percentage*: with respect to any Lender at any time, the ratio (expressed as a percentage) of such Lender's Aggregate Exposure at such time to the sum of the Aggregate Exposures of all Lenders at such time.

*Agreement*: this Amended and Restated Credit Agreement, as amended, restated, replaced, supplemented or otherwise modified from time to time.

*Applicable Interest Rate*: for each Loan under each Facility, subject to Section 2.10(b), a rate per annum equal to LIBOR *plus* the Applicable Margin for such Facility.

*Applicable Margin*:  for each Loan under each Facility, the rate per annum set forth opposite such Facility:

| | |
|---|---|
| Revolving Credit Facilities | 5.00% |
| Term A Loan Facilities | 5.00% |
| Term B Loan Facilities | 9.00% |

*Appurtenant Rights*: with respect to any parcel of Real Property, (a) all agreements, easements, rights of way or use, rights of ingress or egress, privileges, appurtenances, tenements, hereditaments and other rights and benefits at any time belonging or pertaining to such parcel, including, without limitation, the use of any streets, ways, alleys, vaults or strips of land adjoining, abutting, adjacent or contiguous to such parcel and (b) all permits, licenses and rights, whether or not of record, appurtenant to such parcel.

*Arranger*: as defined in the preamble hereto.

*Asset Sale*:  any Disposition of Property or series of related Dispositions of Property (excluding any such Disposition permitted by clause (d), (e), (f), (h), (i) or (j) of Section 6.5) which yield(s) gross proceeds to any Credit Party (valued at the initial principal amount thereof in the case of non-cash proceeds consisting of notes or other debt securities and valued at fair market value in the case of other non-cash proceeds) in excess of $100,000 during any period of twelve consecutive calendar months.

*Assignee*:  as defined in Section 9.6(b).

*Assignment*: as defined in the recitals hereto.

*Assignment and Acceptance*:  as defined in Section 9.6(b).

*Assignor*:  as defined in Section 9.6(b).

*Benefited Lender*: as defined in Section 9.7(a).

*Black Lung Act*:  together, the Black Lung Benefits Revenue Act of 1977, as amended, and the Black Lung Benefits Reform Act of 1977, as amended.

*Board*:  the Board of Governors of the Federal Reserve System of the United States (or any successor).

*Borrower*: as defined in the preamble hereto.

*Borrowing Date*:  any Business Day specified by Borrower as a date on which Borrower requests the relevant Lenders to make Loans hereunder.

*Borrowing Notice*: with respect to any request for borrowing of Loans hereunder, a notice from Borrower, substantially in the form of, and containing the information prescribed by, <u>Exhibit B</u>, delivered to the Administrative Agent.

*Business Day*: a day other than a Saturday, Sunday or other day on which commercial banks in New York, New York or Houston, Texas are authorized or required by law to close.

*Capital Expenditures*: for any period, with respect to any Person, the aggregate of all expenditures by such Person for the acquisition or leasing (pursuant to a Capital Lease) of fixed or capital assets or additions to equipment (including replacements, capitalized repairs and improvements during such period) which are required to be capitalized under GAAP on a balance sheet of such Person *provided* that Capital Expenditures shall exclude expenditures made with any portion of any Reinvestment Deferred Amount relating to any Recovery Event in compliance with Sections 2.9(a)(ii).

*Capital Lease*: any lease (or other arrangement conveying the right to use) of a Person with respect to any Property or a combination thereof, the obligations under which are required to be classified and accounted for as a capital lease on a balance sheet of such Person under GAAP.

*Capital Lease Obligations*: with respect to any Person, the obligations of such Person to pay rent or other amounts under any Capital Lease and, for the purposes of this Agreement, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

*Capital Stock*: any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

*Cash Equivalents*: (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition; (b) certificates of deposit, time deposits, eurodollar time deposits or overnight bank deposits having maturities of six months or less from the date of acquisition issued by any Lender or by any commercial bank organized under the laws of the United States of America or any state thereof having combined capital and surplus of not less than $500,000,000; (c) commercial paper of an issuer rated at least A-2 by Standard & Poor's Ratings Services ("*S&P*") or P-2 by Moody's Investors Service, Inc. ("*Moody's*"), or carrying an equivalent rating by a nationally recognized rating agency, if both of the two named rating agencies cease publishing ratings of commercial paper issuers generally, and maturing within six months from the date of acquisition; (d) repurchase obligations of any Lender or of any commercial bank satisfying the requirements of clause (b) of this definition, having a term of not more than 30 days with respect to securities issued or fully guaranteed or insured by the United States government; (e) securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory, the securities of which state, commonwealth, territory, political subdivision, taxing authority (as the case may be) are rated at least A by S&P or A by Moody's; (f) securities with maturities of six months or less from the date of acquisition backed

by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of clause (b) of this definition; and (g) shares of money market mutual or similar funds which invest exclusively in assets satisfying the requirements of clauses (a) through (f) of this definition.

*Change of Control*: (a) the Principal Equityholders shall cease to beneficially own, hold of record and have the power to vote or direct the voting of, at least 30%, on a fully diluted basis, of the membership interests and other Capital Stock of Parent (or such lesser amount resulting from the issuance and sale of Capital Stock pursuant to a Permitted Equity Sale); (b) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act), excluding the Principal Equityholders or any Lender, shall become, or obtain rights (whether by means or warrants, options or otherwise) to become, the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act), directly or indirectly, of more than 35%, on a fully diluted basis, of the membership interests and other Capital Stock of Parent; (c) Parent shall cease to beneficially own, hold of record and have the power to vote or direct the voting of 100% of the membership interests and other Capital Stock of Borrower; or (d) Borrower shall cease to own, directly or indirectly, 100% of each class of outstanding Capital Stock of each of its Subsidiaries.

*Closing Date*: the date on which the conditions precedent set forth in Section 4.1 shall have been satisfied, which date shall be not later than May 1, 2007.

*Coal*: all coal, including without limitation, bituminous and sub-bituminous coal and lignite and all solid components derived therefrom, including synfuel products.

*Coal Act*: the Coal Industry Retiree Health Benefits Act of 1992, as amended.

*Coal Lands*: collectively, the coal lands described on Schedule 1.1(a).

*Coal Leases*: collectively, and individually, (i) the Coal Lands and (ii) any and all other coal leases from time to time entered into by Borrower or its Subsidiaries after the Closing Date covering all or any portion of the Real Property or conferring any property interest other than a fee interest.

*Coal Properties*: (a) all of the Coal Leases, (b) all Coal in place in, under and which may be produced from the Coal Leases and the Real Property, (c) the Real Property and all fixtures, machinery, equipment and other Property associated therewith, (d) all rents, issues, profits, proceeds, products, revenues and other income from or attributable to the Coal, Coal Leases and Real Property, (e) all tenements, hereditaments, appurtenances and Properties in any manner appertaining, belonging, affixed or incidental to the Coal, Coal Leases and Real Property and (f) all Properties, rights, titles, interests and estates described or referred to above, including any Property, Real, personal or mixed, now owned or hereafter acquired and situated upon, used, held for use or useful in connection with the operating, working or development of any such Coal, Coal Leases or Real Property or Property including all mining equipment, fixtures, machinery and parts, engines, boilers, meters, apparatus, equipment, appliances, tools, implements, cables, wires, shaft equipment, elevators, buildings, leases, rights-of-way, rail tracks and related equipment, easements, servitudes together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing.

*Coal Supply Contracts*: the coal supply contracts in full force and effect as of the Closing Date, as set forth in Schedule 3.30, and each other Additional Project Document in respect of sales of coal supply entered into after the Closing Date by any Credit Party.

*Code*: the Internal Revenue Code of 1986, as amended from time to time, the regulations thereunder and publicly available interpretations thereof.

*Collateral*: all Property of the Credit Parties, now owned or hereafter acquired, upon which a Lien is purported to be created by any Security Document (including Liens on all of the Coal, Coal Leases, Real Property and Coal Properties of any Credit Parties) other than the Excluded Property.

*Commonly Controlled Entity*: an entity, whether or not incorporated, that is under common control with Borrower within the meaning of Section 4001 of ERISA or is part of a group that includes Borrower and that is treated as a single employer under Section 414 of the Code.

*Compliance Certificate*: a certificate duly executed by a Responsible Officer, substantially in the form of Exhibit C.

*Consolidated EBITDA*: for any period, the sum (without duplication) for any period and determined on a consolidated basis without duplication in accordance with GAAP, of: (a) net operating income (or net operating loss) (determined without giving effect to any extraordinary gains or extraordinary losses) of Borrower and its Subsidiaries *plus* (b) Consolidated Interest Expense of Borrower and its Subsidiaries after taking into account the financial effect of Permitted Swap Agreements *plus* (c) depletion, depreciation and amortization expense of Borrower and its Subsidiaries (to the extent deducted in determining net operating income) *plus* (c) Taxes paid by Borrower and its Subsidiaries (to the extent deducted in determining net operating income).

*Consolidated Fixed Charges*: for any period, the sum (without duplication) of: (a) all amounts payable by Borrower and its Subsidiaries in respect of scheduled payments of principal of Indebtedness for such period *plus* (b) all net amounts payable by Borrower and its Subsidiaries in respect of Consolidated Interest Expense for such period after taking into account the financial effect of Permitted Swap Agreements *plus* (c) all commitment fees, agency fees, trustee fees or other fees and expenses payable in connection with the Indebtedness referred to in clause (a) above during such period *plus* (d) all amounts, if any, due and payable under Hedging Agreements which constitute Permitted Swap Agreements (without duplication for amounts included in clause (b) above).

*Consolidated Fixed Charges Coverage Ratio*: for any period, the ratio of (a) the excess (if any) of (i) Project Revenues for such period *less* (ii) Operation and Maintenance Expenses for such period *over* (b) the Consolidated Fixed Charges for such period.

*Consolidated Interest Expense*: of any Person for any period, the sum, computed without duplication, of the following: (a) all interest in respect of all outstanding Indebtedness accrued or capitalized during such period (whether or not actually paid during such period) *plus* (b) the net amounts payable (or *minus* the net amounts receivable) under Hedging Agreements accrued during such period (whether or not actually paid or received during such period).

***Consolidated Leverage Ratio***:  at any date, the ratio of (a) the aggregate principal amount of all Indebtedness of Borrower and its Subsidiaries at such date (other than Indebtedness permitted under Section 6.2(e) to (b) Consolidated EBITDA for the preceding four calendar quarters then ended, all as determined on a consolidated basis in accordance with GAAP.

***Consolidated Net Income***:  for any period, the consolidated net income (or loss) of Borrower and its Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP; *provided*, that in calculating Consolidated Net Income of Borrower and its consolidated Subsidiaries for any period, there shall be excluded (a) the income (or deficit) of any Person accrued prior to the date it becomes a Subsidiary of Borrower or is merged into or consolidated with Borrower or any of its Subsidiaries, (b) the income (or deficit) of any Person (other than a Subsidiary of Borrower) in which Borrower or any of its Subsidiaries has an ownership interest, except to the extent that any such income is actually received by Borrower or such Subsidiary in the form of dividends or similar distributions and (c) the undistributed earnings of any Subsidiary of Borrower to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary is not at the time permitted by the terms of any contractual obligation (other than under any Loan Document) or Requirement of Law applicable to such Subsidiary.

***Consolidated Working Capital***:  at any date, the difference of (a) the sum of all amounts (other than cash and Cash Equivalents) that would, in conformity with GAAP, be set forth opposite the caption "total current assets" (or any like caption) on a consolidated balance sheet of Borrower and its Subsidiaries at such date *less* (b) the sum of all amounts that would, in conformity with GAAP, be set forth opposite the caption "total current liabilities" (or any like caption) on a consolidated balance sheet of Borrower and its Subsidiaries at such date, but excluding, with respect to Borrower, (i) the current portion of any Loans and (ii), without duplication of clause (i) above, all Indebtedness consisting of Revolving Credit Loans to the extent otherwise included therein.

***Constituent Documents***:  with respect to any Person, (a) the articles or certificate of incorporation, certificate of formation or partnership, articles of organization (or the equivalent organizational documents) of such Person, (b) the by-laws, limited liability company agreement or agreement of limited partnership (or the equivalent governing documents) of such Person and (c) any document setting forth the manner of election and duties of the directors or managing members of such Person (if any) and the designation, amount or relative rights, limitations and preferences of any class or series of such Person's Capital Stock.

***Construction Budget and Schedule***:  (a) a budget setting forth, on a quarterly basis, the timing and amount of all projected payments of Project Costs from the Closing Date through the projected date of Final Completion and (b) a schedule setting forth the proposed engineering, procurement, construction and Milestone Schedule for the Project's Development through the projected date of Final Completion, as certified by Borrower, consistent with the requirements of the Loan Documents, reviewed and approved by the Independent Engineer, in form and substance acceptable to the Lenders and in substantially the form attached hereto as <u>Exhibit D</u>.

***Construction Contractors***:  collectively, each Person party to a Construction Contract (other than any Credit Party).

*Construction Contracts*: each contract for the engineering, procurement or construction of the Project in full force and effect as of the Closing Date as set forth in Schedule 3.30 and each other Additional Project Document for the engineering, procurement or construction of the Project entered into after the Closing Date by any Credit Party.

*Contingent Obligation*: of a Person, any agreement, undertaking or arrangement by which such Person assumes, guarantees, endorses, contingently agrees to purchase or provide funds for the payment of, or otherwise becomes or is contingently liable upon, the obligation or liability of any other Person, or agrees to maintain the net worth or working capital or other financial condition of any other Person, or otherwise assures any creditor of such other Person against loss, including any comfort letter, operating agreement, take or pay contract or the obligations of any such Person as general partner of a partnership with respect to the liabilities of the partnership.

*Contingent Interest*:  as defined in Section 2.10(e).

*Contractual Obligation*:  with respect to any Person, any term, condition or provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its Property is bound.

*Control Investment Affiliate*:  with respect to any Person, any other Person that (a) directly or indirectly, is in control of, is controlled by, or is under common control with, such Person and (b) is organized by such Person primarily for the purpose of making equity or debt investments in one or more companies.  For purposes of this definition, "control" of a Person means the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

*Covered Tax Liabilities*: for any calendar quarter, the amount of dividends or other distributions payable by Borrower to Parent at the time and in the amounts necessary to enable Parent to pay to the holders of record of its Capital Stock the Tax Liability Deficiencies in accordance with the Parent Operating Agreement as in effect on the Closing Date; *provided, however*, that for purposes of calculating such holder's Tax Liability Deficiency, in the case of a Person that was not a holder of record of Parent's Capital Stock on the Closing Date, losses, deductions or credits previously allocated to the Capital Stock held by such holder's predecessor as of the Closing Date for taxable periods beginning after the Closing Date shall be taken into account.  For the avoidance of doubt, the Tax Liability Deficiency of a holder of Parent's Capital Stock shall be determined after application of any federal taxable losses not previously used to offset taxable income allocable to such member from Borrower for purposes of this definition.

*Credit Parties*:  Borrower, Parent and each Guarantor.

*Current Ratio*: at any time, the ratio of (i) current assets of Borrower to (ii) current liabilities of Borrower (but excluding Indebtedness incurred under Sections 6.2(a) and (h)), in each case, on a consolidated basis and in conformity with GAAP.

*Default*: any of the events specified in Article VII, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

*Default Rate*: as defined in Section 2.10(b).

*Defensible Title*:  good and indefeasible title, free and clear of all Liens other than
Permitted Liens.

*Deposit Account Control Agreements*:  a deposit account control agreement substantially
in the form of Exhibit E.

*Derivatives Counterparty*: as defined in Section 6.6.

*Determination Date*: as defined in Section 6.6.

*Development*: the development, construction and operation of the Mining Facilities, the
scope and cost of which shall be set forth in the Construction Budget and Schedule.

*Disposition*:  with respect to any Property, any Sale and Leaseback Transaction,
assignment, conveyance, transfer or other disposition (including by way of merger or
consolidation) of such Property or any interest therein (excluding any Permitted Lien on such
Property) or the entering into any agreement to do any of the foregoing; and the terms *"Dispose"*
and *"Disposed of"* shall have correlative meanings.

*Disqualified Stock*:  as to any Person, any Capital Stock of such Person that by its terms
(or by the terms of any security into which it is convertible or for which it is exchangeable) or
otherwise (including upon the occurrence of an event) requires the payment of dividends (other
than dividends payable solely in Capital Stock which does not otherwise constitute Disqualified
Stock) or matures or is required to be redeemed (pursuant to any sinking fund obligation or
otherwise) or is convertible into or exchangeable for Indebtedness or is redeemable at the option
of the holder thereof, in whole or in part, at any time prior to June 30, 2012.

*Dollars* and *$*:  lawful currency of the United States of America.

*Easement Properties*: all of the licenses, easements and rights of way which are necessary
to enable the Development.

*Environmental Claim*: any material notice of violation, claim, action, suit, proceeding,
demand, abatement order or other order or directive (conditional or otherwise) by any
Governmental Authority or any other Person arising (a) pursuant to or in connection with any
actual or alleged violation of any Environmental Law; (b)in connection with any Regulated
Substance or any actual or alleged Regulated Substances Activity; (c) in connection with any
alleged damage, injury, threat or harm to natural resources or the environment; (d) in connection
with the Reclamation, or alleged need for Reclamation, of any future, current or former mines; or
(e) in connection with any violation of Environmental or Mining Law.  "Environmental Claims"
also includes, without limitation, any such material claims alleging liability for fines, penalties,
criminal sanctions or other costs related to any item in the proceeding sentence.

*Environmental Laws*: any and all applicable laws (including all Mining Laws), rules,
orders, regulations, statutes, ordinances, codes, decrees or other legally enforceable requirements
(including common law) regulating, relating to or imposing liability or standards of conduct
concerning  protection of the environment, natural resources or of human health, release or
threatened release of Regulated Substances or employee health and safety, as has been, is now, or

may at any time hereafter be, in effect, including the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 *et seq.*, the Hazardous Materials Transportation Act, 49 U.S.C. § 5101 *et seq.*, the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*, the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, the Toxic Substances Control Act, 15 U.S.C. § 2601 *et seq.*, the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136 *et seq.*, the Occupational Safety and Health Act, 29 U.S.C. § 651 *et seq.*, the Mine Safety and Health Act, 30 U.S.C. § 801 *et seq.*, the Surface Mining Control and Reclamation Act 30 U.S.C. § 1201 *et seq.*, the Atomic Energy Act, 42 U.S.C. § 2011 *et seq.*, the National Historic Preservation Act, 16 U.S.C. § 470 *et seq.*, the Endangered Species Act, 16 U.S.C. § 1531 *et seq.*, the Wild and Scenic Rivers Act, 16 U.S.C. §§ 1271-1278, and the regulations promulgated pursuant thereto, and all analogous state or local statutes and regulations.

*Environmental or Mining Permits*:  any and all Permits required by a Governmental Authority regulating the mining of Coal, providing for the reclamation of land subjected to Coal mining, and controlling the adverse environmental effects of Coal mining.

*ERISA*:  the Employee Retirement Income Security Act of 1974, as amended from time to time and the rules and regulations promulgated thereunder.

*Event of Default*:  any of the events specified in Article VII, *provided* that any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

*Excess Cash Flow*:  for any period, the excess, if any, of (a) the sum, without duplication, of (i) Consolidated Net Income of Borrower and its Subsidiaries for such period, (ii) the amount of all non-cash charges (including depreciation and amortization) deducted in arriving at such Consolidated Net Income, (iii) the amount of the decrease, if any, in Consolidated Working Capital for such period and (iv) the aggregate net amount of non-cash loss on the Disposition of Property by Borrower and its Subsidiaries during such period (other than sales of inventory in the ordinary course of business), to the extent deducted in arriving at such Consolidated Net Income *minus* (b) the sum, without duplication, of (i) the amount of any Tax Distribution Amount for such period, (ii) the amount of all non-cash credits included in arriving at such Consolidated Net Income, (iii) the aggregate amount actually paid by Borrower and its Subsidiaries in cash during such period on account of Capital Expenditures (*minus* the principal amount of Indebtedness incurred in connection with such expenditures and *minus* the amount of any such expenditures financed with the proceeds of any Reinvestment Deferred Amount), (iv) the aggregate amount of all prepayments of Revolving Credit Loans during such period to the extent accompanying permanent optional reductions of the Revolving Credit Commitments and all optional prepayments of the Term Loans during such period, (v) the aggregate amount of all regularly scheduled principal payments of Loans of Borrower and its Subsidiaries made during such period (other than in respect of any Revolving Credit Loans to the extent there is not an equivalent permanent reduction in Revolving Credit Commitments), (vi) the amount of the increase, if any, in Consolidated Working Capital for such period, (vii) the aggregate net amount of non-cash gain on the Disposition of Property by Holdings, Borrower and its Subsidiaries during such period (other than sales of inventory in the ordinary course of business), to the extent included in arriving at such Consolidated Net Income and (viii) the net decrease during such period (if any) in deferred tax accounts of Borrower.

*Excess Cash Flow Application Date*:  as defined in Section 2.9(a)(vii).

*Exchange Act*:  Securities Exchange Act of 1934, as amended.

*Excluded Property*:  (i) all personal property of any Credit Party that is subject to a lease including, without limitation, all right in and to equipment leased to the Credit Parties pursuant to the Orix Lease, which expressly prohibits the granting by the Credit Parties of a security interest in such property (but only to the extent prohibited), (ii) all of the Credit Parties' contract rights to purchase equipment upon assignment thereof to Orix Financial Services, Inc. in connection with the leasing of equipment pursuant to the Orix Lease, and (iii) Real Property purchased by Borrower or any other Credit Party and designated by written notice to the Administrative Agent at least five Business Days prior to the purchase thereof that is contributed to, or exchanged with, the State of West Virginia in connection with the Credit Parties obtaining one or more Permits, *provided* that the purchase price for such Real Property does not exceed $400,000.

*Existing Indebtedness*:  the Indebtedness described on <u>Schedule 1.1(b)</u>.

*Existing Loans*:  as defined in Section 2.1(a).

*Extraordinary Receipt*:  any amount received by a Credit Party or any of its Subsidiaries in respect of the termination of or liquidation payments received pursuant to any of the agreements listed on <u>Schedule 3.30</u>.

*Facility*:  each of the Term A Facility, the Term B Facility and the Revolving Credit Facility.

*Federal Funds Effective Rate*:  for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for the day of such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by the Administrative Agent.

*Final Completion*:  the satisfaction of the following conditions, in each case in form and substance satisfactory to the Required Lenders (unless, in each case, waived by the Required Lenders):

(a)      the Project shall have passed the Performance Test, all construction activities contemplated to have been completed in the Construction Budget and Schedule shall have been completed (other than punch list items contemplated in the Construction Budget and Schedule) and all milestones set forth in the Milestone Schedule have been achieved;

(b)      (i) Borrower shall have delivered to the Administrative Agent and the Independent Engineer the Final Completion Certificate and (ii) the Independent Engineer shall have delivered to the Administrative Agent the Independent Engineer's Final Completion Certificate;

(c)     all expenses necessary for the completion of construction in accordance with the Construction Budget and Schedule shall have been paid, except those amounts which are in dispute as of such date or are not yet due and payable;

(d)     certificates of insurance with respect to the insurance policies required by Section 5.6, together with evidence of the payment of all premiums therefor, shall have been delivered;

(e)     all Government Approvals required for the Development shall have been validly issued, duly obtained and are in full force and effect, and held in the name of a Credit Party or such third party as is specified with respect to such Government Approval on Schedule 3.8(a) or Schedule 3.8(b) (*provided*, that having such Government Approval held by or in the name of such third party could not reasonably be expected to have a Material Adverse Effect) and are free from conditions or requirements compliance with which could reasonably be expected to have a Material Adverse Effect or which the Credit Party or third party, as the case may be, has not satisfied, except to the extent that a failure to so satisfy such condition or requirement could not reasonably be expected to have a Material Adverse Effect;

(f)     (i) each Credit Party and the Project shall be and have been in compliance in all material respects with all Government Approvals and all Government Rules, in each case applicable to such Credit Party and the Project, (ii) no Credit Party has received written notice from (or on behalf of) the Governmental Authority having jurisdiction that any of the foregoing is subject to appeal, modification or revocation except if such appeal, modification or revocation could not reasonably be expected to cause a Material Adverse Effect and (iii) to Borrower's knowledge, the Material Project Parties have been operating and continue to operate in material compliance with all Government Approvals and all Government Rules, in each case applicable or related to the Project; and

(g)     there shall not exist (i) any Default or Event of Default hereunder and (ii) any material default under any Material Project Document by any Material Project Party or any Credit Party party to such agreements.

**Final Completion Certificate**: a Final Completion Certificate and related attachments and certifications, substantially in the form of Exhibit F hereto, executed by a Responsible Officer of Borrower and otherwise duly completed.

**Financial Statements**: as defined in Section 3.1(a).

**Funding Office**: the office specified from time to time by the Administrative Agent as its funding office by notice to Borrower and the Lenders.

**GAAP**: generally accepted accounting principles in the United States of America as in effect from time to time, applied in a consistent manner.

**Government Approval**: (a) any authorization, consent, approval, license, lease, ruling, permit, certification, waiver, exemption, filing, variance, claim, order, judgment or decree of, by or with, (b) any required notice to, (c) any declaration of or with or (d) any registration by or with, any Government Authority, in each case relating to the Development to the extent (i) not routine,

(ii) not ministerial in nature or (iii) not otherwise immaterial to the Development or a Credit Party's compliance with any Government Rule or obtaining or maintaining any Government Approval.

*Governmental Authority*: any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, any province, commonwealth, territory, possession, county, parish, town, township, village or municipality, whether now or hereafter constituted or existing.

*Government Rule*: any statute, law, regulation, ordinance, rule, judgment, order, decree, permit, concession, grant, franchise, license, agreement, directive, requirement of, or other governmental restriction or any similar binding form of decision of or determination by, or any binding interpretation or administration of any of the foregoing by, any Government Authority, including all common law, whether now or hereafter in effect.

*Granting Lender*: as defined in Section 9.6(f).

*Greenbrier Smokeless*: Greenbrier Smokeless Coal Mining, L.L.C., a Delaware limited liability company.

*Guarantee and Security Agreement*: that certain Amended and Restated Guarantee and Security Agreement to be executed and delivered by Borrower, Parent and each of Borrower's Subsidiaries, substantially in the form of Exhibit G-1, as amended, restated, supplemented or otherwise modified from time to time.

*Guarantee Obligation*: with respect to any Person (the "*guaranteeing person*"), any obligation of (a) the guaranteeing person or (b) another Person (including any bank under any letter of credit), if to induce the creation of which the guaranteeing person has issued a reimbursement, counterindemnity or similar obligation, in either case guaranteeing or in effect guaranteeing any Indebtedness, leases, dividends or other obligations (the "*primary obligations*") of any other third Person (the "*primary obligor*") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any Property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase Property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; *provided, however*, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing

person's maximum reasonably anticipated liability in respect thereof as determined by Borrower in good faith.

*Guarantor*:  Parent and each Subsidiary of Borrower.

*Hedging Agreements*:  with respect to any Person, all interest rate or currency swaps, caps or collar agreements, foreign exchange agreements, commodity contracts or similar arrangements entered into by such Person providing for protection against fluctuations in interest rates, currency exchange rates, commodity prices or the exchange of nominal interest obligations, either generally or under specific contingencies.

*Indebtedness*:  of any Person at any date, without duplication (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of Property or services (other than trade payables incurred in the ordinary course of such Person's business and not more than 90 days overdue), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to Property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such Property), (e) all Capital Lease Obligations of such Person, (f) all obligations of such Person, contingent or otherwise, as an account party or applicant under acceptance, letter of credit or similar facilities, (g) all obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Capital Stock of such Person, (h) all Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (g) above; (i) all obligations of the kind referred to in clauses (a) through (h) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on Property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation and (j) for the purposes of Article VII(f) only, all obligations (netted, to the extent provided for therein) of such Person (including but not limited to obligations and liabilities arising in connection with or as a result of early or premature termination of a Hedging Agreement, whether or not occurring as a result of a default thereunder) under Hedging Agreements.  The Indebtedness of any Person shall include the Indebtedness of any other Person (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor.

*Indemnified Liabilities*:  as defined in Section 9.5.

*Indemnitee*:  as defined in Section 9.5.

*Independent Accountant*:  such independent certified public accountants reasonably acceptable to the Administrative Agent.

*Independent Engineer*:  Doug Blackburn or such other Person  reasonably acceptable to the Administrative Agent.

*Independent Engineer Report*: a report from the Independent Engineer reviewing the technical and economic feasibility of the proposed project and the related environmental compliance, permitting and other environmental risks and such other matters as the Administrative Agent may request.

*Insolvency*: with respect to any Multiemployer Plan, the condition that such Plan is insolvent within the meaning of Section 4245 of ERISA.

*Insolvent*: pertaining to a condition of Insolvency.

*Intellectual Property*: the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, state, multinational or foreign laws or otherwise, including copyrights, copyright licenses, patents, patent licenses, trademarks, trademark licenses, service-marks, technology, know-how and processes, licenses or rights to use databases, geological data, geophysical data, engineering data, seismic data, maps, interpretations and other technical information, recipes, formulas, trade secrets, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

*Interest Payment Date*: (a) the last Business Day of each March, June, September and December and (b) the date of any repayment or prepayment made in respect thereof.

*Interest Rate Protection Agreement*: for any Person, any interest rate swap, cap or collar agreement or similar arrangement between such Person and one or more financial institutions providing for the transfer or mitigation of interest rate risks either generally or under specific contingencies.

*Investment*: for any Person (a) the acquisition (whether for cash, Property of such Person, services or securities or otherwise) of Capital Stock, bonds, notes, debentures, partnership or other ownership interests or other securities of any other Person or any agreement to make any such acquisition (including any "short sale" or any other sale of any securities at a time when such securities are not owned by the Person entering into such sale), (b) the making of any deposit with, or advance, loan or other extension of credit to, any other Person (including the purchase of Property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such Property to such Person, but excluding any such advance, loan or extension of credit having a term not exceeding 90 days representing the purchase price of inventory or supplies sold in the ordinary course of business), and (c) the entering into of any Guarantee of, or other contingent obligation with respect to, Indebtedness or other liability of any other Person.

*Lehman Entity*: any of Lehman Commercial Paper Inc. or any of its Affiliates.

*Lenders*: as defined in the preamble hereto.

*LIBOR*: for each LIBOR Period, a rate of interest determined by the Administrative Agent equal to:

(a)    the offered rate for three month deposits in Dollars that appears on Telerate Page 3750 as of 11:00 a.m. (London time) on the second full LIBOR Business Day preceding the first

day of each LIBOR Period (unless such date is not a Business Day, in which event the next succeeding Business Day will be used); divided by

(b)      a number equal to 1.0 minus the aggregate (but without duplication) of the rates (expressed as a decimal fraction) of reserve requirements in effect on the day that is two LIBOR Business Days prior to the beginning of such LIBOR Period (including basic, supplemental, marginal and emergency reserves under any regulations of the Board or other Governmental Authority having jurisdiction with respect thereto, as now and from time to time in effect) for Eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board) that are required to be maintained by a member bank of the Federal Reserve System.

If such interest rates shall cease to be available from Telerate News Service, LIBOR shall be determined from such comparable publicly available financial reporting service for displaying any Eurodollar rates as shall be selected by the Administrative Agent.

*LIBOR Business Day*: a Business Day on which banks in the city of London, England are generally open for interbank or foreign exchange transactions.

*LIBOR Period*: each period commencing on a LIBOR Business Day and ending on the last Business Day of each March, June, September and December; *provided* that the first LIBOR Period shall begin on the Closing Date, and each successive LIBOR Period shall begin on the last LIBOR Business Day of the immediately preceding LIBOR Period

*Lien*: any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever intended to assure payment or performance of any Indebtedness or other obligation (including any conditional sale or other title retention agreement, the interest of a lessor under a Capital Lease, any financing having substantially the same economic effect as any of the foregoing and the filing of any financing statement under the UCC or comparable law of any jurisdiction naming the owner of the asset to which such Lien relates as debtor).

*LLC Agreement*: that certain Operating Agreement of Borrower dated April 5, 2005, as amended and restated as of July 25, 2006, by and among Borrower's members, as amended, supplemented or otherwise modified in accordance with the provisions of the Loan Documents.

*Loan*: any Term A Loan, Term B Loan or Revolving Credit Loan made by any Lender pursuant to this Agreement.

*Loan Documents*: this Agreement, the Security Documents, the Notes and each certificate, agreement, waiver, consent or document executed by a Credit Party and delivered to the Administrative Agent or any Lender in connection with or pursuant to any of the foregoing.

*Loan Percentage*: with respect to any Lender, such Lender's Revolving Credit Percentage, Term A Loan Percentage and Term B Loan Percentage.

*Material Adverse Change*: a material adverse change in any of (a) the financial condition, business, performance, operations or properties of the Credit Parties, taken as a whole, or the value

of the Collateral (except when such value is affected by then-current market conditions), (b) the legality, validity or enforceability of this Agreement or any of the other Loan Documents or the rights or remedies of the Agents or the Lenders hereunder or thereunder, (c) the perfection or priority of the Liens granted pursuant to the Security Documents or (d) the ability of Borrower to repay the Obligations or of the Credit Parties to perform their obligations under the Loan Documents.

*Material Adverse Effect*: an effect that results in or causes, or could reasonably be expected to result in or cause, a Material Adverse Change.

*Material Agreement*: (a) each of the agreements set forth on Schedule 3.30, and (b) any construction agreement entered into between any Credit Party and Taggart.

*Material Project Documents*: other than Non-Material Project Documents, each Construction Contract, each Operating Agreement, the Coal Supply Contracts, the Midland Project Documents, the Midland Promissory Note, the Orix Leases, the Meadwestvaco Lease, each Project Document with an Affiliate of Borrower or any Borrower Subsidiary as set forth on Exhibit H, each Additional Project Document, each employment contract with a member of senior management of any Credit Party, each lease or other agreement with respect to Easement Properties and each credit support instrument provided in connection with any of the foregoing (and any replacement of any of the foregoing).

*Material Project Parties*: United States Steel Corporation, Indiana Harbor Coke Company, L.P., Sun Coke Company, Dofasco Inc., Taggart, Far East Processing, LLC, Parent, Meadwestvaco, Orix Financial Services, Inc., each Person party to a credit support instrument provided in connection with any Material Project Document and each other Person (other than Midland and any Credit Party) party to a Material Project Document (specifically excluding all Sales Agency Agreements).

*Matoaka*: Matoaka Land Company, LLC, a Delaware limited liability company.

*Maturity Date*: December 31, 2011.

*Meadwestvaco Lease*: the Lease dated as of May 5, 2005 between Meadwestvaco Corporation and Matoaka.

*Midland*: Midland Trail Resources, LLC, a West Virginia limited liability company.

*Midland Administrative Services Agreement*: that certain Administrative Services and Equipment Agreement, dated as of July 20, 2006, by and between Midland and Borrower.

*Midland Coal Processing Agreement*: that certain Coal Processing Agreement, dated as of July 20, 2006, by and between Midland and Greenbrier Smokeless.

*Midland Contract Mining Agreement*: that certain Contract Mining Agreement, dated as of July 20, 2006, by and between Midland and Greenbrier Smokeless.

***Midland Documents***: collectively, the Midland Supply Agreement, the Midland Administrative Services Agreement, the Midland Coal Processing Agreement, the Midland Contract Mining Agreement and the Midland Loan Documents.

***Midland Guarantee and Security Agreement***: that certain Guarantee and Security Agreement to be executed and delivered by Midland, substantially in the form of <u>Exhibit G-2</u>, as amended, restated, supplemented or otherwise modified from time to time.

***Midland Loans***: the Indebtedness evidenced by (i) that certain Amended and Restated Promissory Note, dated June 22, 2006, from Midland made to the order of Borrower in the principal amount of $4,000,000 and (ii) that certain Note, dated September 8, 2006, from Midland made to the order of Borrower in the principal amount of $1,000,000.

***Midland Loan Documents***: all documents and instruments evidencing the Midland Loans or securing the obligations thereunder, including, without limitation, any security agreement, security deposit agreement and mortgage.

***Midland Project Documents***: collectively, the Midland Coal Supply Agreement, the Midland Coal Processing Agreement, the Midland Administrative Services Agreement and the Midland Contract Mining Agreement.

***Midland Supply Agreement***: that certain Coal Supply Agreement, dated as of July 20, 2006, by and between Midland and Powhatan.

***Milestone Schedule***: the schedule of construction milestones required to reach Final Completion prepared by Borrower, reviewed and approved by the Independent Engineer, in form and substance satisfactory to the Lenders and in substantially the form attached hereto as <u>Exhibit I</u>.

***Mine***: any excavation or opening into the earth now and hereafter made from which coal is or can be extracted on or from any of the properties owned or leased by Borrower or any Subsidiary, together with all appurtenances, fixtures, structures, improvements and assets in connection therewith.

***Mining Facilities***: Matoaka's reserve base which shall be accessed through the Mountaineer Pocahontas #1, Mountaineer Pocahontas #2 and Mountaineer Pocahontas #3 mines, as well as the Preparation and Related Facilities associated therewith, in each case as described in <u>Exhibit A</u>.

***Mining Law***: all treaties, laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to mining operations and activities, including the Federal Coal Leasing Amendments Act, the Surface Mining Control and Reclamation Act, the Federal Coal Mine Health and Safety Act, the Black Lung Act and the Coal Act, in each case as amended.

***Mining Site***: each parcel of real property described on Exhibits A and B of the Mortgage and all Appurtenant Rights attached thereto.

*Monarch Agreement*: that certain Agreement for Advisory Services, dated March 22, 2004, as amended by that certain Amendment No. 1, dated as of March 22, 2006, by and between Borrower and Monarch Financial Corporation, a corporation incorporated under the laws of the Commonwealth of Pennsylvania, as in effect on the date hereof.

*Monarch Subordinated Debt*: as defined in Section 6.2(i).

*Mortgaged Properties*: the Real Properties (including the Coal Properties) which properties are described on Schedule 1.1(c), together with such other Real Property which Borrower or any Subsidiary may hereafter acquire, in each case as to which the Administrative Agent for the benefit of the Secured Parties shall be granted a Lien pursuant to one or more Mortgages.

*Mortgages*: those certain Amended and Restated Mortgages dated as of the date hereof, together with all other mortgages and deeds of trust (other than that certain Leasehold Credit Line Deed of Trust, Financing Statement on As Extracted Minerals, Assignment of Leases and Rents and Fixture Filing as to Midland Trail Resources, LLC, dated as of August 22, 2006), made by any Credit Party in favor of, or for the benefit of, the Administrative Agent for the benefit of the Secured Parties, substantially in the form of Exhibit J (with such changes thereto as shall be advisable under the law of the jurisdiction in which such mortgage or deed of trust is to be recorded), as the same may be amended, restated, supplemented, replaced or otherwise modified from time to time.

*Multiemployer Plan*: a Plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

*Net Cash Proceeds*: (a) in connection with any Asset Sale or any Recovery Event, the proceeds thereof in the form of cash and Cash Equivalents (including any such proceeds received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but only as and when received) of such Asset Sale or Recovery Event, net of reasonable and customary attorneys' fees, accountants' fees, investment banking fees, amounts required to be applied to the repayment of Indebtedness secured by a Lien expressly permitted hereunder on any asset which is the subject of such Asset Sale or Recovery Event (other than any Lien pursuant to a Security Document) and other reasonable and customary fees and expenses actually incurred in connection therewith and net of taxes paid or reasonably estimated to be payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements), (b) in connection with any issuance or sale of Capital Stock or debt securities or instruments or the incurrence of Indebtedness for borrowed money, the cash proceeds received from such issuance, sale or incurrence, net of attorneys' fees, investment banking fees, accountants' fees, underwriting discounts and commissions and other customary fees and expenses actually incurred in connection therewith and (c) in connection with any Purchase Price Refund, the cash amount thereof, net of any reasonable and customary expenses incurred in the collection thereof; *provided, however*, that in each case, the evidence of such foregoing deductions are provided to the Administrative Agent in form and substance reasonably satisfactory to it.

*Non-Excluded Taxes*: as defined in Section 2.13.

*Non-Material Project Documents*: (a) contracts or agreements entered into by a Credit Party, or by an agent on behalf of such Credit Party, in the ordinary course of its business in connection with the Development under which such Credit Party could not reasonably be expected to have aggregate obligations or liabilities in excess of $1,500,000 (in a single contract or a series of contracts), (b) contracts or agreements that are used in connection with the acquisition and/or disposition of Permitted Investments (c) Coal Supply Contracts with a tonnage not to exceed 50,000 tons per year and a term not to exceed one year, (d) trucking contracts, with aggregate obligations for each such contract which could not reasonably be expected to exceed $5,000,000 in any calendar year, (e) contracts or agreements entered into by a Credit Party with respect to spot sales of coal and (f) contracts or agreements entered into by a Credit Party in the ordinary course of its business for legal, accounting, engineering, environmental consulting or other professional services in connection with the Development (other than to the extent such are Material Project Documents or contracts or agreements in substitution of any Material Project Document) in accordance with the Construction Budget and Schedule or the then current Operating and Capital Budget, as the case may be.

*Non-U.S. Lender*: as defined in Section 2.13.

*Note*: as defined in Section 2.5(e).

*Obligations*: the unpaid principal of and interest on (including interest accruing after the maturity of the Loans and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to any Credit Party, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) the Loans and all other obligations and liabilities of any Credit Party to the Administrative Agent or to any Lender or any Qualified Counterparty, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, any other Loan Document, any Specified Hedge Agreement or any other document made, delivered or given in connection herewith or therewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including all fees, charges and disbursements of counsel to the Administrative Agent, to the Agents or to any Lender that are required to be paid by Borrower pursuant hereto) or otherwise; *provided*, that (i) obligations of Borrower or any Subsidiary under any Specified Hedge Agreement shall be secured and guaranteed pursuant to the Security Documents only to the extent that, and for so long as, the other Obligations are so secured and guaranteed and (ii) any release of Collateral or Guarantors effected in the manner permitted by this Agreement shall not require the consent of holders of obligations under Specified Hedge Agreements.

*Operating Agreement*: the operating agreement, by-laws or other organizational document, as applicable, of each Credit Party.

*Operating and Capital Budget*: a budget, prepared and certified by Borrower of Operation and Maintenance Expenses and Permitted Capital Expenditures expected to be incurred by Borrower and Borrower Subsidiaries during the relevant fiscal year to which such budget applies, commencing with the fiscal year beginning January 1, 2007.

*Operation and Maintenance Expenses*: for any period, the sum, computed without duplication, of the following: (a) general and administrative expenses *plus* (b) expenses for

operating the Project and maintaining it in good repair and operating condition payable during such period (including any deposits required to Project Parties) *plus* (c) insurance costs payable during such period *plus* (d) applicable sales and excise taxes (if any) payable by a Credit Party with respect to sales of coal generated by the Project during such period *plus* (e) franchise taxes payable by a Credit Party during such period *plus* (f) property taxes payable by a Credit Party during such period *plus* (g) costs and fees and collateral attendant to obtaining and maintaining in effect the Government Approvals payable during such period *plus* (h) legal, accounting and other professional fees attendant to any of the foregoing items payable during such period *plus* (i) any fees and expenses of the Secured Parties during such period not included in Debt Service *plus* (j) any Permitted Capital Expenditures incurred during such period in accordance with the then-current Operating and Capital Budget *plus* (k) payments for the purchase of coal (including coal purchased under the Midland Coal Supply Agreement) *plus* (l) scheduled payments to Far East Processing, LLC under that certain Remote Monitoring and Technical Services Agreement. Operation and Maintenance Expenses shall exclude, to the extent included: (i) payments of any kind with respect to Restricted Payments during such period, (ii) depreciation, amortization and depletion for such period, (iii) any Capital Expenditures except Permitted Capital Expenditures made during such period that are properly chargeable to fixed capital accounts for such period in accordance with GAAP and (iv) any expenditures made with any Reinvestment Deferred Amount relating to a Recovery Event during such period. Notwithstanding the foregoing, for the purpose of calculating the Consolidated Fixed Charges Coverage Ratio, Operation and Maintenance Expenses shall not include the actual cash expenditures for clauses (c), (e) and (f) above, but shall instead include the appropriate accrual for such items to the extent the same are reflected as accrual items in the Operating and Capital Budget.

> *Original Agent*: as defined in the recitals hereto.

> *Original Closing Date*: July 25, 2006.

> *Original Credit Agreement*: as defined in the recitals hereto.

> *Original Guarantee and Security Agreement*: that certain Borrower Subsidiary Guarantee and Security Agreement dated as of August 29, 2006 by Matoaka, Powhatan and Greenbrier Smokeless in favor of JPMorgan Chase Bank, N.A., as collateral agent.

> *Original Lenders*: as defined in the recitals hereto.

> *Original Loan Documents*: the Original Credit Agreement, the Original Security Documents and each certificate, agreement, waiver, consent or document executed by a Credit Party and delivered to the Administrative Agent or any Lender in connection with or pursuant to any of the foregoing.

> *Original Midland Security Documents*: collectively, that certain (i) Midland Guarantee Agreement dated as of September 8, 2006 by Midland in favor of JPMorgan Chase Bank, N.A., as collateral agent, and (ii) Midland Security Agreement dated as of August 29, 2006 between Midland and JPMorgan Chase Bank, N.A., as collateral agent.

> *Original Mortgages*: collectively, that certain (i) Fee and Leasehold Credit Line Deed of Trust, Financing Statement on as Extracted Minerals, Assignments of Leases, Rents and Fixture

Filings dated as of August 22, 2006 and effective August 29, 2006, given by Matoaka in favor of Ann R. Starcher and J. Thomas Clark, as trustees, for JPMorgan Chase Bank, N.A., as collateral agent, and (ii) A Credit Line Deed of Trust, Assignment of Leases and Rents and Fixture Filing, dated as of August 22, 2006 and effective August 29, 2006, given by Matoaka in favor of Ann R. Starcher and J. Thomas Clark, as trustees, for JPMorgan Chase Bank, N.A., as collateral agent.

*Original Borrower Pledge and Security Agreement*:  that certain First-Lien Pledge and Security Agreement dated as of August 29, 2006 between Borrower and JPMorgan Chase Bank, N.A., as collateral agent.

*Original Parent Pledge and Security Agreement*: that certain First-Lien Pledge and Security Agreement dated as of August 29, 2006 between Parent and JPMorgan Chase Bank, N.A., as collateral agent.

*Original Security Documents*: the Original Mortgages, Original Guarantee and Security Agreement, the Original Parent Pledge Agreement and Security Agreement and the Original Borrower Pledge and Security Agreement.

*Orix Lease:*  those certain leases entered into under that certain Master Lease Agreement by and between Greenbrier Smokeless and Orix Financial Services, Inc. dated as of July 8, 2005, together with all schedules, exhibits and ancillary documents related thereto, as the same may be amended or modified to allow for the inclusion of additional equipment under such lease.

*Other Taxes*:  any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

*Parent*:  Greenbrier Minerals Holdings, LLC, a Delaware limited liability company.

*Parent Operating Agreement*: that certain Operating Agreement of Parent dated as of July 26, 2006, as amended by that certain amendment effective as of the date hereof.

*Participant*:  as defined in Section 9.6(a).

*Patriot Act*:  as defined in Section 9.18.

*Payment Office*:  the office in New York City, New York specified from time to time by the Administrative Agent as its payment office by notice to Borrower and the Lenders.

*PBGC*:  the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor).

*Pending Permits*:  as defined in Section 3.20(a).

*Performance Test*: the completion test protocol addressing the continuous performance, duration and capacity of the Mining Facilities, as set forth in Exhibit K.

*Permit*:  any permit, approval, license, franchise, registration, notification, exemption, variance, permission or other authorization required from a Governmental Authority under an applicable Requirement of Law.

*Permitted Capital Expenditures*: Capital Expenditures that are specified for such purpose in the applicable Operating and Capital Budget.

*Permitted Equipment Sale and Leaseback Transaction*: that certain Equipment Sale and Leaseback Transaction involving the Disposition by Borrower to Orix Financial Services, Inc. of the Oldenburg Stamler Continuous Haulage System, serial number 70215, purchased from Oldenburg Group, Inc. pursuant to purchase order 412554.

*Permitted Equity Sale*:  the issuance and sale for cash of common equity securities of Borrower or Parent, provided, (i) such issuance and sale shall be on terms and subject to conditions, and shall be to investors, reasonably acceptable to the Administrative Agent, (ii) in the case of any such issuance and sale by Parent, all of the Net Cash Proceeds are contributed to the capital of Borrower and (iii) all of the Net Cash Proceeds of such issuance and sale are used to finance Capital Expenditures or operating costs with respect to the Mining Facilities or the Additional Mining Facilities in accordance with the Operating and Capital Budget.

*Permitted Indebtedness*:  as defined in Section 6.2.

*Permitted Liens*:  as defined in Section 6.3.

*Permitted Swap Agreement*:  any Interest Rate Protection Agreement between Borrower and any Permitted Swap Provider.

*Permits*:  any and all franchises, licenses, leases, permits, approvals, notifications, certifications, registrations, authorizations, exemptions, qualifications, easements, and rights of way.

*Person*:  an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

*Plan*:  at a particular time, any employee benefit plan that is covered by ERISA and in respect of which Borrower or a Commonly Controlled Entity is (or, if such plan were terminated at such time, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

*Pledged Stock*: as defined in the Guarantee and Security Agreement.

*Powhatan*: Powhatan Mid-Vol Coal Sales, L.L.C., a Delaware limited liability company.

*Premium*: as defined in Section 2.8(b).

*Prepayment Date*:  (a) with respect to any mandatory prepayment pursuant to Section 2.9, the date of such mandatory prepayment and (b) with respect to any optional prepayment pursuant to Section 2.8, the date of such optional prepayment.

*Principal Equityholders*: collectively, Joseph C. Turley, III and Raymond M. McCormick.

*Project*: the Mining Facilities, Additional Mining Facilities and Mining Site, as described more fully on Exhibit A.

*Project Costs*: all costs incurred by the Credit Parties to achieve Final Completion with respect to the Development in the manner contemplated by (and consistent with) the Loan Documents (and as set forth in the Construction Budget and Schedule) or otherwise approved by the Required Lenders, in consultation with the Independent Engineer, which costs include: (a) costs directly related to the site preparation, construction, development and operation of the medium – volatile metallurgical coal mining facilities; (b) fees and expenses incurred by or on behalf of the Credit Parties in respect of the Development, including financial, accounting, legal, surveying and consulting fees, and the costs of preliminary engineering studies required for site preparation; (c) interest Expense, fees and expenses under the Loan Documents and Permitted Swap Agreements incurred until the earlier to occur of (x) Final Completion and (y) the June 30, 2008; (d) insurance required for the Development as set forth in Section 5.6(e); and (e) costs of conducting the Performance Tests for, and operation of, the Project prior to Final Completion.

*Project Documents*: each Material Project Document, Non-Material Project Document and Additional Project Document.

*Project Party*: each Person from time to time party to a Project Document.

*Project Revenues*: for any period, all cash revenues (without duplication) received by any Credit Party during such period from: (a) the sales of Coal, (b) the proceeds of any business interruption insurance and other payments received for interruption of operations and (c) all other income or revenue, however earned or received, by the Credit Parties during such period, but excluding: (i) net amounts receivable under Permitted Swap Agreements, (ii) the Net Cash Proceeds received as a result of any Recovery Event, (iii) proceeds of Permitted Indebtedness and (iv) contributions to and returns to capital of any Credit Party.

*Property*: any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

*Purchase Price Refund*: any amount received by Borrower or any Subsidiary as a result of a purchase price adjustment or similar event in connection with any acquisition of Property by Borrower or any Subsidiary.

*Qualified Counterparty*: with respect to any Specified Hedge Agreement, any counterparty thereto that, at the time such Specified Hedge Agreement was entered into, was a Lender or an Affiliate of a Lender.

*Qualified DEP Account*: a single bank account maintained solely for purposes of providing payments by any Credit Party to the West Virginia Department of Environmental Protection, *provided* that at no time does such account contain funds in excess of the lesser of

(a) the amount required to meet the Credit Parties' current obligations to the West Virginia
Department of Environmental Protection and (b) $250,000.

*Qualified Investment*: expenditures incurred to acquire or repair similar assets owned (or
to be owned) by Borrower or any Guarantor of the same type as those subject to such
Reinvestment Event or equipment or Properties owned (or to be owned) by and useful in the
business of Borrower or any Guarantor.

*Qualified Payroll Account*: a single bank account maintained solely for purposes of
providing payroll for employees of any Credit Party, *provided* that at no time does such account
contain funds in excess of the lesser of (a) the amount required to meet the Credit Parties' current
payroll obligations and (b) $250,000.

*Real Property*: the surface, subsurface, Coal and mineral rights and interests owned,
leased or otherwise held by Borrower or its Subsidiaries.

*Reclamation*: the reclamation and restoration of land, water and any future, current or
former mines, and any other environment affected by such mines, as required pursuant to any
Mining Law.

*Reclamation Bonds*: all bonds required by any Governmental Authority in connection
with the conduct or contemplated conduct of mining operations, including, without limitation, all
performance, Reclamation and similar bonds required in connection with the mining permits for
the Coal Properties.

*Recovery Event*: any settlement of or payment in respect of any property or casualty
insurance claim or any condemnation proceeding (or proceeding in lieu thereof) relating to any
asset of Borrower or any of its Subsidiaries.

*Regulated Substances*: without limitation, any substance, material or waste, regardless of
its form or nature, defined under Environmental Laws as a "hazardous substance," "pollutant,"
"pollution," "contaminant," "hazardous or toxic substance," "extremely hazardous substance,"
"toxic chemical," "toxic substance," "toxic waste," "hazardous waste," "special handling waste,"
"industrial waste," "residual waste," "solid waste," "municipal waste," "mixed waste," "infectious
waste," "chemotherapeutic waste," "medical waste," or "regulated substance" or any other
material, substance or waste, regardless of its form or nature, which is regulated by the
Environmental Laws due to its radioactive, ignitable, corrosive, reactive, explosive, toxic,
carcinogenic or infectious properties or nature, or which otherwise is regulated by any applicable
Environmental Laws including, without limitation, Coal and other minerals, Coal refuse, run-of-
mine coal, acid mine drainage, petroleum and petroleum products (including crude oil and any
fractions thereof), natural gas, coalbed methane gas, synthetic gas and any mixtures thereof,
asbestos, urea formaldehyde, polychlorinated biphenyls, mercury, radioactive substances, mine
tailings and mine drainage.

*Regulated Substances Activity*: any past, current, proposed or threatened activity, event or
occurrence involving any Regulated Substances, including the use, manufacture, possession,
storage, holding, presence, existence, location, release, threatened release, discharge placement,
generation, transportation, processing, construction, treatment, abatement, removal, remediation,

disposal, disposition or handling of, or exposure to, any Regulated Substances, and any corrective action or response action with respect to any of the foregoing.

*Register*: as defined in Section 9.6(c).

*Regulation H*: Regulation H of the Board as in effect from time to time.

*Regulation U*: Regulation U of the Board as in effect from time to time.

*Regulation X*: Regulation X of the Board as in effect from time to time.

*Reinvestment Deferred Amount*: with respect to any Reinvestment Event, the aggregate Net Cash Proceeds received by Borrower or any of its Subsidiaries in connection therewith that are duly specified in a Reinvestment Notice as not being required to be initially applied to prepay the Term Loans or reduce the Revolving Credit Commitments pursuant to Section 2.7 as a result of the delivery of a Reinvestment Notice.

*Reinvestment Event*: any Asset Sale, Purchase Price Refund or Recovery Event in respect of which Borrower has delivered a Reinvestment Notice.

*Reinvestment Notice*: a written notice executed by a Responsible Officer of Borrower stating that no Default or Event of Default has occurred and is continuing and that Borrower (directly or indirectly through a wholly owned Guarantor) intends and expects to use all or a specified portion of the Net Cash Proceeds of a Reinvestment Event specified in such notice to make a Qualified Investment.

*Reinvestment Prepayment Amount*: with respect to any Reinvestment Event, the Reinvestment Deferred Amount relating thereto less the portion, if any, thereof expended prior to the relevant Reinvestment Prepayment Date to make a Qualified Investment.

*Reinvestment Prepayment Date*: with respect to any Reinvestment Event, the earlier of (a) the date occurring one month after such Reinvestment Event and (b) the date on which Borrower shall have determined not to make a Qualified Investment with all or any portion of the relevant Reinvestment Deferred Amount.

*Related Fund*: with respect to any Lender, any fund that (x) invests in commercial loans and (y) is managed or advised by the same investment advisor as such Lender, by such Lender or an Affiliate of such Lender.

*Reorganization*: with respect to any Multiemployer Plan, the condition that such plan is in reorganization within the meaning of Section 4241 of ERISA.

*Reportable Event*: any of the events set forth in Section 4043(c) of ERISA, other than those events as to which the thirty day notice period is waived under subsections .27, .28, .29, .30, .31, .32, .34 or .35 of PBGC Reg. § 4043.

*Required Lenders*: at any time, the holders of more than 66 2/3% of (a) until the Closing Date, the Aggregate Commitments and (b) thereafter, the sum of (i) the aggregate unpaid principal amount of the Term Loans then outstanding and (ii) the Total Revolving Credit Commitments

then in effect or, if the Revolving Credit Commitments have been terminated, the aggregate then unpaid principal amount of Revolving Credit Loans then outstanding.

*Requirement of Law*: as to any Person, the Constituent Documents of such Person, and any law, treaty, rule, order, statute, ordinance, code, decree, regulation, or other legally enforceable requirements (including common law) or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject, including all Mining Laws.

*Reserve Report*: as defined in Section 3.25.

*Responsible Officer*: as to any Person, the chief executive officer, president or chief financial officer of such Person, but in any event, with respect to financial matters, the chief financial officer of such Person. Unless otherwise qualified, all references to a "Responsible Officer" shall refer to a Responsible Officer of Borrower.

*Restricted Payments*: as defined in Section 6.6.

*Revolving Credit Commitment*: as to any Lender, the obligation of such Lender, if any, to make Revolving Credit Loans in an aggregate principal and/or face amount not to exceed the amount set forth in the Assignment and Acceptance pursuant to which such Lender became a party hereto, as the same may be changed from time to time pursuant to the terms hereof. The original aggregate amount of the Total Revolving Credit Commitments is $5,000,000.

*Revolving Credit Commitment Fee*: as defined in Section 2.6(b).

*Revolving Credit Commitment Period*: the period from and including the Closing Date to the Revolving Credit Termination Date.

*Revolving Credit Facility*: the Revolving Credit Commitment and the Revolving Credit Loans thereunder.

*Revolving Credit Lender*: each Lender that has a Revolving Credit Commitment or that is the holder of Revolving Credit Loans.

*Revolving Credit Loans*: as defined in Section 2.4.

*Revolving Credit Note*: as defined in Section 2.5(e).

*Revolving Credit Percentage*: as to any Revolving Credit Lender at any time, the percentage which such Lender's Revolving Credit Commitment then constitutes of the Total Revolving Credit Commitments (or, at any time after the Revolving Credit Commitments shall have expired or terminated, the percentage which the aggregate unpaid principal amount of such Lender's Revolving Credit Loans then outstanding constitutes the amount of the Total Revolving Credit Loans then outstanding).

*Revolving Credit Termination Date*: December 31, 2010.

*Sale and Leaseback Transaction*: any sale or other transfer of Property by any Person with the intent to lease such Property as lessee.

*Second Lien Obligations*: all "Obligations" as such term is defined in the Second Lien Term Loan.

*Second Lien Term Loan*: as defined in the recitals hereto.

*Secured Parties*: collectively, the Administrative Agent and any Lender.

*Secured Obligations*: in the case of Borrower, the Obligations, and, in the case of any other Credit Party, the obligations of such Credit Party to the Administrative Agent or to any Lender under the Loan Documents to which such Credit Party is a party.

*Securities Act*: as defined in Section 2(a)(1) of the Securities Act of 1933, as amended.

*Security Documents*: the collective reference to the Guarantee and Security Agreement, the Midland Guarantee and Security Agreement, the Mortgages, the Deposit Account Control Agreements any intellectual property security agreements or control agreements required to be delivered pursuant to the Guarantee and Security Agreement or any other Loan Document and all other security documents hereafter delivered to the Administrative Agent granting a Lien on or perfecting a security interest in any Property of any Person to secure Obligations.

*Single Employer Plan*: any Plan that is covered by Title IV of ERISA, but which is not a Multiemployer Plan.

*Solvent*: with respect to any Person, as of any date of determination, (a) the amount of the "present fair saleable value" of the assets of such Person will, as of such date, exceed the amount of all "liabilities of such Person, contingent or otherwise", as of such date, as such quoted terms are determined in accordance with applicable federal and state laws governing determinations of the insolvency of debtors, (b) the present fair saleable value of the assets of such Person will, as of such date, be greater than the amount that will be required to pay the liability of such Person on its debts as such debts become absolute and matured, (c) such Person will not have, as of such date, an unreasonably small amount of capital with which to conduct its business, (d) such Person will be able to pay its debts as they mature and (e) such Person is not insolvent within the meaning of any applicable Requirements of Law. For purposes of this definition, (i) "debt" means liability on a "claim", and (ii) "claim" means any (x) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or (y) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured or unmatured, disputed, undisputed, secured or unsecured.

*SPC*: as defined in Section 9.6(f).

*Specified Hedge Agreement*: any Hedge Agreement entered into by Borrower or any Guarantor and any Qualified Counterparty.

*Subsidiary*:  as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership, limited liability company or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person.  Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of Borrower.

*Syndication Agent*:  as defined in the preamble hereto.

*Synthetic Lease Obligations*:  all monetary obligations of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property creating obligations which do not appear on the balance sheet of such Person but which, upon the insolvency or bankruptcy of such Person, would be characterized as the Indebtedness of such Person (without regard to accounting treatment).

*Taggart*:  Taggart Global, LLC, a Pennsylvania limited liability company.

*Tangible Net Worth*: as of any date, the amount by which the total consolidated assets of Borrower and its Subsidiaries at such date exceeds all liabilities of Borrower and its Subsidiaries at such date, in each case, calculated  in conformity with GAAP.

*Tax Affiliate*:  with respect to any Person, (a) any Subsidiary of such Person, and (b) any Affiliate of such Person with which such Person files or is eligible to file consolidated, combined or unitary tax returns.

*Tax Distribution Amount*:  for any calendar quarter (a) the projected Covered Tax Liabilities for such calendar quarter *plus* (b) except to the extent previously credited, any underestimation of the Covered Tax Liabilities for any preceding calendar quarter (or calendar month thereof) for which the relevant information is available *minus* (c) except to the extent previously debited, any overestimation of the Covered Tax Liabilities for any preceding calendar quarter (or calendar month thereof) for which the relevant information is available.

*Tax Liability Deficiency*:  as defined in the Parent Operating Agreement as in effect on the Closing Date.

*Taxes*: with respect to any Person, all taxes, assessments, imposts, duties, withholdings, or other governmental charges or levies imposed directly or indirectly on such Person or its income, profits, sales or Property by any Governmental Authority.

*Tax Return*: as defined in Section 3.13.

*Term A Commitment*:  as to any Lender, the obligation of such Lender, if any, to make a Term A Loan to Borrower hereunder in a principal amount not to exceed the amount set forth under the heading "Term A Commitment" opposite such Lender's name on Annex I hereto, or, as the case may be, in the Assignment and Acceptance pursuant to which such Lender became a party hereto, as the same may be changed from time to time pursuant to the terms hereof.  The

original aggregate amount of the Term A Commitments is $60,000,000, and after giving effect to the conversion and continuation on the date hereof of the Existing Loans is $17,750,000.

*Term A Commitment Fee*: as defined in Section 2.6.

*Term A Loans*:  as defined in Section 2.1(a).

*Term A Loan Facility*:  the Term A Commitments and the Term A Loans thereunder.

*Term A Lender*:  each Lender that has a Term A Commitment or is the holder of a Term A Loan.

*Term A Loan Percentage*:  as to any Term A Lender at any time, the percentage which such Lender's Term A Commitment then constitutes of the aggregate Term A Commitments (or, at any time after the Closing Date, the percentage which the aggregate principal amount of such Lender's Term A Loans then outstanding constitutes of the aggregate principal amount of the Term A Loans then outstanding).

*Term B Commitment*:  as to any Lender, the obligation of such Lender, if any, to make a Term B Loan to Borrower hereunder in a principal amount not to exceed the amount set forth under the heading "Term B Commitment" opposite such Lender's name on Annex I hereto, or, as the case may be, in the Assignment and Acceptance pursuant to which such Lender became a party hereto, as the same may be changed from time to time pursuant to the terms hereof.  The original aggregate amount of the Term B Commitments is $29,000,000, and after giving effect to the borrowing of Term B Loans on the date hereof is zero.

*Term B Loans*:  as defined in Section 2.1(b).

*Term B Loan Facility*:  the Term B Commitments and the Term B Loans made thereunder.

*Term B Lender*:  each Lender that has a Term B Commitment or is the holder of a Term B Loan.

*Term B Loan Percentage*:  as to any Term B Lender at any time, the percentage which such Lender's Term B Commitment then constitutes of the aggregate Term B Commitments (or, at any time after the Closing Date, the percentage which the aggregate principal amount of such Lender's Term B Loans then outstanding constitutes of the aggregate principal amount of the Term B Loans then outstanding).

*Term Loan Facilities*:  the collective reference to the Term A Loan Facility and the Term B Loan Facility.

*Term Lenders*:  the collective reference to the Term A Lenders and the Term B Lenders.

*Term Loans*:  the collective reference to the Term A Loans and Term B Loans.

*Term Notes*:  as defined in Section 2.5(e).