*Total Revolving Credit Commitments*: at any time, the aggregate amount of the Revolving Credit Commitments then in effect.

*Transferee*: as defined in Section 9.14.

*UCC*: the Uniform Commercial Code, as in effect from time to time in any jurisdiction.

**1.2    Other Definitional Provisions.**

(a)    Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)    As used herein and in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, accounting terms relating to Borrower and its Subsidiaries not defined in Section 1.1 and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under GAAP; provided any non-cash items arising under FAS 133, 142, 143 or 144 shall be excluded from the relevant calculation.

(c)    The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(d)    The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(e)    Each agreement defined in this Article I shall include all appendices, exhibits and schedules thereto, and references thereto shall be to such agreement as amended, restated, replaced, supplemented or otherwise modified; provided that if the prior written consent of the Required Lenders is required hereunder for an amendment, restatement, replacement, supplement or other modification to any such agreement and such consent is obtained, references in this Agreement to such agreement shall be to such agreement as so amended, restated, replaced, supplemented or modified.

(f)    References in this Agreement to any statute shall be to such statute as amended or modified and in effect at the time any such reference is operative.

(g)    The term "including" when used in any Loan Document means "including without limitation" except when used in the computation of time periods.

(h)    The term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or."

(i)    The terms "Lender" and "Administrative Agent" include their respective successors.

(j)     The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Capital Stock, securities (as such term is defined in the Securities Act), revenues, accounts, leasehold interests and contract rights.

(k)     Each reference to "Credit Party" in Article III shall include any Subsidiary of Borrower that is or, pursuant to Section 6.9, is required to be a Guarantor.

**1.3**    **Computation of Time Periods**. In this Agreement, in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding" and the word "through" means "to and including."

## ARTICLE II.
### AMOUNTS, TERMS AND REPAYMENT OF LOANS AND COMMITMENTS

**2.1**    **Term Loan Commitments**.

(a)     The Credit Parties acknowledge and agree that as of the Closing Date the aggregate principal amount of all loans outstanding under the Original Credit Agreement equals $41,250,000 (the "*Existing Loans*") and that, subject to Section 4.1, such outstanding loans are hereby converted into and continued as term loans hereunder (such loans, "*Term A Loans*"). Notwithstanding anything set forth herein to the contrary, in order to effect the continuation of the Existing Loans as Term A Loans as contemplated by the preceding sentence, the amount to be funded on by each Lender hereunder in respect of its Term A Commitment shall be reduced by the principal amount of such Lender's Existing Loans under the Original Credit Agreement outstanding on the Closing Date. Once repaid, Term A Loans may not be reborrowed and the Term A Commitment, once terminated or reduced, may not be reinstated.

(b)     Subject to the terms and conditions hereof, each Lender severally agrees to make term loans to Borrower on the Closing Date in an aggregate principal amount not to exceed such Lender's Term B Commitment (the "*Term B Loans*"). Once repaid, Term B Loans may not be reborrowed and the Term B Commitment, once terminated or reduced, may not be reinstated.

**2.2**    **Repayment of Term Loans**

(a)     The Term A Loans of each Term A Loan Lender shall mature in 10 consecutive quarterly installments, commencing on September 30, 2008, each of which shall be in an amount equal to such Lender's Term A Loan Percentage multiplied by the amount set forth below opposite such installment:

| Installment | Principal Amount |
| --- | --- |
| September 30, 2008 | $ 2,000,000 |
| December 31, 2008 | $ 3,000,000 |
| March 31, 2009 | $ 5,000,000 |
| June 30, 2009 | $ 5,000,000 |

| Installment | Principal Amount |
| --- | --- |
| September 30, 2009 | $ 5,000,000 |
| December 31, 2009 | $ 5,000,000 |
| March 31, 2010 | $ 5,000,000 |
| June 30, 2010 | $ 5,000,000 |
| September 30, 2010 | $10,000,000 |
| December 31, 2010 | $15,000,000 |

(b)     The Term B Loan of each Term B Loan Lender shall mature, and be due
and payable in full in immediately available funds on the Maturity Date, if not sooner repaid.

### 2.3    Revolving Credit Commitments

(a)     Subject to the terms and conditions hereof, the Revolving Credit Lenders
severally agree to make revolving credit loans (**"*Revolving Credit Loans*"**) to Borrower from
time to time in an aggregate principal amount at any one time outstanding for each Revolving
Credit Lender which does not exceed the amount of such Lender's Revolving Credit
Commitment. During the Revolving Credit Commitment Period Borrower may use the
Revolving Credit Commitments by borrowing, prepaying the Revolving Credit Loans in whole
or in part, and reborrowing, all in accordance with the terms and conditions hereof.

(b)     Borrower shall repay all outstanding Revolving Credit Loans in full in
immediately available funds on the Revolving Credit Termination Date, if not sooner repaid.

### 2.4    Procedures for Borrowings.

(a)     For all Loans, Borrower shall deliver to the Administrative Agent a
Borrowing Notice requesting that the Lenders make the Loans on the requested Borrowing
Date for such Loans.  Such Borrowing Notice must be received by the Administrative Agent
prior to 12:00 Noon, New York City time, three Business Days prior to the requested date of
each Loan. Upon receipt of such Borrowing Notice, the Administrative Agent shall promptly
notify each of the applicable Lenders thereof. Not later than 12:00 Noon, New York City
time, on the Borrowing Date specified for Loans hereunder, each of the applicable Lenders
shall make available to the Administrative Agent at the Funding Office an amount in
immediately available funds equal to the Loan or Loans to be made by such Lender; *provided*
that Borrower shall not deliver a Borrowing Notice, and no Lender shall be under any
obligation to make available any funds, for Loans in an aggregate amount for all Lenders less
than $1,000,000 unless the remaining unborrowed amount of the Commitments is less than
$1,000,000. The Administrative Agent shall make available to Borrower the aggregate of the
amounts made available to the Administrative Agent by the Lenders, in like funds as received
by the Administrative Agent.

(b)     Borrower shall not request borrowings of Loans more frequently than once
a month and all requests for borrowings during the term of this Agreement shall be deemed to
constitute requests for Term A Loans until such time as the Term A Commitments are reduced
to zero and thereafter for Revolving Credit Loans.

### 2.5    Repayment of Loans; Evidence of Debt.

(a)     Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of the appropriate Revolving Credit Lender or Term Loan Lender, as the case may be, (i) the then unpaid principal amount of each Revolving Credit Loan of such Revolving Credit Lender on the Revolving Credit Termination Date (or on such earlier date on which the Revolving Credit Loans become due and payable pursuant to Article VII), (ii) the principal amount of each Term A Loan of such Term A Lender in installments according to the amortization schedule set forth in Section 2.2 (or on such earlier date on which the Term A Loans become due and payable pursuant to Article VII) and (iii) the then unpaid principal amount of each Term B Loan of such Term B Lender on the Maturity Date.  Borrower hereby further agrees to pay interest on the unpaid principal amount of the Loans from time to time outstanding from the date hereof until payment in full thereof at the rates per annum, and on the dates, set forth in Section 2.10.

(b)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing Indebtedness of Borrower to such Lender resulting from each Loan of such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c)     The Administrative Agent, on behalf of Borrower, shall maintain the Register pursuant to Section 9.6(c), and a subaccount therein for each Lender, in which shall be recorded (i) the amount of each Loan made hereunder and any Note evidencing such Loan, (ii) the amount of any principal or interest due and payable or to become due and payable from Borrower to each Lender hereunder and (iii) both the amount of any sum received by the Administrative Agent hereunder from Borrower and each Lender's share thereof.

(d)     The entries made in the Register and the accounts of each Lender maintained pursuant to Section 2.5(c) shall, to the extent permitted by applicable law, be *prima facie* evidence of the existence and amounts of the obligations of Borrower therein recorded; *provided, however,* that the failure of any Lender or the Administrative Agent to maintain the Register or any such account, or any error therein, shall not in any manner affect the obligation of Borrower to repay (with applicable interest) the Loans made to Borrower by such Lender in accordance with the terms of this Agreement or Borrower's entitlements to credit for any payment of principal or interest on the Loans.

(e)     Borrower agrees that, upon the request to the Administrative Agent by any Lender, Borrower will promptly execute and deliver to such Lender a promissory note of Borrower evidencing any Term Loans or Revolving Credit Loans, as the case may be, of such Lender, substantially in the forms of Exhibits L-1, L-2 or L-3, respectively (a *"Term A Note,"* *"Term B Note,"* or *"Revolving Credit Note,"* respectively, and collectively, *"Notes"*), with appropriate insertions as to date and principal amount; *provided,* that delivery of Notes shall not be a condition precedent to the occurrence of the Closing Date or the making of the Loans on the Closing Date.

**2.6     Fees.**

(a)     Borrower shall pay to the Administrative Agent for the account of each Term A Lender a commitment fee (the *"Term A Commitment Fee"*), on the daily average unused amount of such Lender's Term A Commitment, at a rate per annum equal to 0.50%, for

the period from and including the Closing Date to but not including the date the Term A Commitments are reduced to zero. The accrued Term A Commitment Fee shall be payable in arrears on each Interest Payment Date.

(b)    Borrower shall pay to the Administrative Agent for the account of each Revolving Credit Lender a commitment fee (the "***Revolving Credit Commitment Fee***"), on the daily average unused amount of such Lender's Revolving Credit Loan Commitment, at a rate per annum equal to .50%, for the period from and including the Closing Date to but not including the date the Revolving Credit Loan Commitments are reduced to zero. The accrued Revolving Credit Commitment Fee shall be payable in arrears on each Interest Payment Date.

(c)    Borrower shall pay to the Administrative Agent for its own account an annual nonrefundable administration fee equal to $25,000, such fee to be paid in advance on the Closing Date and thereafter on each anniversary of the Closing Date (or, if such date is not a Business Day, on the first Business Day thereafter)

**2.7    Termination or Reduction of Commitments.** Borrower shall have the right, upon not less than three Business Days' notice to the Administrative Agent, to terminate the Revolving Credit Commitments or the Term A Commitments or, from time to time, to reduce the aggregate amount of the Revolving Credit Commitments or Term A Commitments; *provided* that no such termination or reduction of Revolving Credit Commitments shall be permitted if, after giving effect thereto and to any prepayments of the Revolving Credit Loans made on the effective date thereof, the aggregate principal amount of the Revolving Credit Loans then outstanding would exceed the Total Revolving Credit Commitments. Any such reduction shall be in an amount equal to $1,000,000, or a whole multiple thereof, and shall reduce permanently the Revolving Credit Commitments then in effect. The Commitment of any Lender shall be reduced on the date of funding of any Loan pursuant to Section 2.4 by the principal amount of the Loan funded.

**2.8    Optional Prepayments.**

(a)    Subject to the concurrent payment of the Premium, Borrower may, upon at least three Business Days' prior notice to the Administrative Agent stating the Prepayment Date and aggregate principal amount of the prepayment, prepay the outstanding principal amount of Loans, on or after August 29, 2007, in whole or in part, at Borrower's option, and from time to time, together with accrued interest through the Prepayment Date on the principal amount prepaid.

(b)    For purposes hereof, the "***Premium***" shall be a cash amount equal to:

(i)    the percentages of principal amount of the Term A Loans being prepaid set forth below:

If prepaid on or before August 29, 2008 ................................................ 2.0%

If prepaid after August 29, 2008 but
prior to August 29, 2009 .......................................................... 1.5%

If prepaid on or after August 29, 2009,
but prior to August 29, 2010 ......................................................... 1.0%

If prepaid on or at any time after August 29, 2010 ................................ 0.0%;
and

(ii)    the percentages of principal amount of the Term B Loans being
prepaid set forth below:

If prepaid on or before August 29, 2008 ................................................ 5.0%

If prepaid after August 29, 2008 but
prior to August 29, 2009 ......................................................................... 2.0%

If prepaid on or after August 29, 2009,
but prior to August 29, 2010 ................................................................. 1.0%

If prepaid on or at any time after August 29, 2010 ................................ 0.0%.

(c)    Any optional prepayment under this Section 2.8 shall be applied to the
Loans as set forth in Section 2.11.

(d)    Each partial prepayment shall be in an aggregate amount not less than
$1,000,000 or integral multiples of $1,000,000 in excess thereof and any such prepayment
must be accompanied by payment of Agent's and each Lender's out-of-pocket expenses and
payment of any LIBOR funding breakage costs in accordance with Section 2.12.  Upon the
giving of such notice of prepayment, the principal amount of the Loans specified to be prepaid,
together with the accrued interest through the Prepayment Date and (if required pursuant to
Section 2.8(a) Premium thereon shall become due and payable on the Prepayment Date.

**2.9    Mandatory Prepayments and Commitment Reductions.**

(a)    Unless the Required Lenders shall otherwise agree:

(i)    If Borrower or any of its Subsidiaries shall issue any Capital Stock
(other than a Permitted Equity Sale) or incur any Indebtedness (other than Permitted
Indebtedness), then on the date of such issuance or incurrence, Borrower shall prepay the
principal amount of Term Loans then outstanding and thereafter, to the extent any such Net
Cash Proceeds remain, the Revolving Credit Commitments shall be reduced, by an amount
equal to the amount of the Net Cash Proceeds of such issuance or incurrence, as set forth in
Section 2.11(a) and (b).

(ii)    If Borrower or any of its Subsidiaries shall receive Net Cash
Proceeds from any Asset Sale or Recovery Event or a Purchase Price Refund, then, on the
date of receipt by such Person of such Net Cash Proceeds or such Purchase Price Refund,
Borrower shall prepay the principal amount of Term Loans then outstanding and thereafter,
to the extent any such Net Cash Proceeds remain, the Revolving Credit Commitments shall
be reduced, by an amount equal to the amount of such Net Cash Proceeds or such Purchase
Price Refund, as set forth in Section 2.11(b); *provided, however,* that in the case of any Net

Cash Proceeds constituting the Reinvestment Deferred Amount with respect to a Reinvestment Event, Borrower shall prepay the Loans and reduce the Revolving Credit Commitments in an amount equal to the Reinvestment Prepayment Amount applicable to such Reinvestment Event, if any, on the Reinvestment Prepayment Date with respect to such Reinvestment Event; *provided further* that the aggregate Net Cash Proceeds of Reinvestment Events that may be specified as Reinvestment Deferred Amounts in one or more Reinvestment Notices shall not exceed $250,000 in the case of any Reinvestment Event and $1,000,000 in the aggregate in the case of all Reinvestment Events. Notwithstanding anything contained herein to the contrary, the Credit Parties shall not be required to prepay the Loans under this Section 2.9 with the proceeds received from any Disposition of property as part of a Permitted Sale and Leaseback Transaction;

(iii)     Upon the receipt by a Credit Party of any Extraordinary Receipt, the Required Lenders, at their sole discretion, may require Borrower to immediately prepay outstanding principal amount of the Term Loans and thereafter, to the extent any such Net Cash Proceeds remain, and reduce the Revolving Credit Commitments by an amount equal to the amount of any such Extraordinary Receipt, as set forth in Sections 2.11(a) and (b);

(iv)     Upon the occurrence of a Change of Control, the Required Lenders, at their sole discretion, may require Borrower to immediately prepay the outstanding principal amount of the Loans, and satisfy, in full and in cash, all other Obligations then due and payable under any Loan Document including, without limitation, any fees and expenses then due and payable under any Loan Document, and reduce the Aggregate Commitments to zero;

(v)     If Borrower or any of its Subsidiaries shall receive any payments in excess of $10,000 from any Material Project Parties in connection with any of termination thereof or for liquidated damages payments thereunder, then, on the date of receipt by such Person of such payments, Borrower shall prepay the principal amount of the Term Loans and the Revolving Credit Commitments shall be reduced, by an amount equal to the amount of such payments, as set forth in Sections 2.11(a) and (b);

(vi)     If Borrower or any of its Subsidiaries shall receive any payments from Midland under the Midland Promissory Note then, on the date of receipt by Borrower of such payments, Borrower shall prepay the principal amount of the Term Loans, and the Revolving Credit Commitments shall be reduced, by an amount equal to the amount of such payments, as set forth in Sections 2.11(a) and (b); and

(vii)     for each fiscal quarter period of Borrower ending December 31, 2007, March 31, 2008 and June 30, 2008, if there shall be Excess Cash Flow, then, on the relevant Excess Cash Flow Application Date, the Term Loans shall be prepaid by an amount equal to 90% of such Excess Cash Flow, as set forth in Section 2.11(a) and (b). Each such prepayment shall be made on a date (an "***Excess Cash Flow Application Date***") no later than five days after the earlier of (i) the date on which the financial statements of Borrower referred to in Section 5.1(a) or (b), as applicable, for the fiscal period with respect to which such prepayment is made, are required to be delivered to the Lenders and (ii) the date such financial statements are actually delivered.

(b)    The provisions of Section 2.9(a) do not constitute a consent to the issuance of any Capital Stock by any Person whose Capital Stock is pledged pursuant to any Security Document, the Disposition of any Assets or a consent to the incurrence of any Indebtedness by Borrower or any of its Subsidiaries.

(c)    Each prepayment of the Loans pursuant to this Section 2.9 shall be applied in accordance with Section 2.11 below and shall be accompanied by payment of accrued interest thereon to the date of prepayment and, except in the case of prepayments made under Section 2.9(a)(iv), (vi) or (vii), a concurrent payment of Premium; *provided*, that in the case of prepayment under Section 2.9(a)(iv), such prepayment shall be accompanied by a concurrent payment of a premium equal to 1.0% of the aggregate principal amounts of the Term B Loans being repaid.

### 2.10    Interest Rates, Payment Dates and Computation of Interest and Fees.

(a)    Each Loan shall bear interest for each day on which it is outstanding at the Applicable Interest Rate.

(b)    (i) If all or a portion of the principal amount of any Loan shall not be paid when due (whether at the stated maturity, by acceleration or otherwise) or there shall occur and be continuing any other Event of Default, all outstanding Loans (whether or not overdue) (to the extent legally permitted) shall bear interest at a rate per annum that is equal to the Applicable Interest Rate plus 2.0% (the "***Default Rate***"), from the date of such nonpayment of principal or occurrence of such Event of Default, respectively, until such amount of principal is paid in full (after as well as before judgment) or until such Event of Default is no longer continuing, respectively, and (ii) if all or a portion of any interest payable on any Loan or any fee or other amount payable hereunder shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall bear interest at a rate per annum equal to the Default Rate, from the date of such non payment until such amount is paid in full (after as well as before judgment).

(c)    Subject to Section 2.9(c), interest shall be payable in arrears on the Interest Payment Date, *provided* that interest accruing pursuant to Section 2.10(b) shall be payable from time to time on demand.

(d)    Interest, fees and commissions payable pursuant hereto shall be calculated on the basis of a year of 360 days for the actual days elapsed. Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall be conclusive and binding on Borrower and the Lenders in the absence of manifest error.

(e)    In the event that the Consolidated EBITDA for periods set forth below is less than the amount set forth below opposite such period:

| Fiscal Quarter | Minimum Consolidated EBITDA |
|---|---|
| For the fiscal quarter ending March 31, 2007 | $3,600,000 |
| For the two-fiscal quarter period ending June 30, 2007 | $12,150,000 |
| For the three-fiscal quarter period ending September 30, 2007 | $22,500,000 |
| For the four-fiscal quarter period ending December 31, 2007 | $33,390,000 |
| For each four-fiscal quarter period ending on March 31st, June 30th, September 30 and December 31st at any time thereafter | $36,000,000 |

then, in any such case, Borrower shall pay to the Lenders an amount ("***Contingent Interest***") equal to 0.25% of the aggregate principal amount of the Term B Loans outstanding at the close of business on the last day of such period. Any Contingent Interest payable pursuant to this Section 2.10(e), with respect to any period ending on or after the Closing Date, shall be payable on the next Interest Payment Date immediately following the last day of such fiscal quarter.

**2.11    Application and Pro Rata Treatment of Payments.**

(a)    The borrowing by Borrower from the Lenders hereunder, any reduction of the Commitments of the Lenders and, subject to Sections 2.9(b) and (c), each payment by Borrower on account of any fee, shall be made *pro rata* according to the applicable Loan Percentages of the relevant Lenders. Amounts prepaid on account of the Term Loans may not be reborrowed.

(b)    So long as no Event of Default shall have occurred and be continuing, each payment (including each prepayment) of the Loans outstanding shall be applied:

*first*, to the prepayment of Term A Loans until repaid in full;

*second*, to the prepayment of Term B Loans until repaid in full; and

*third*, to the repayment of Revolving Credit Loans and thereafter to reduce permanently the Revolving Credit Commitments.

Any reduction of the Revolving Credit Commitments shall be accompanied by prepayment of the Revolving Credit Loans to the extent, if any, that the Revolving Credit Loans exceed the amount of the Revolving Credit Commitments as so reduced.

(c)    After the occurrence and during the continuance of any Event of Default, each payment in respect of principal or interest in respect of the Loans and each payment in respect of fees payable hereunder and any proceeds of Collateral and any Net Cash Proceeds of insurance policies shall be applied in the following order:

*first*, to the payment or reimbursement of the Administrative Agent for all costs, expenses, disbursements and losses incurred by the Administrative Agent and which Borrower is required to pay or reimburse pursuant to the Loan Documents;

*second*, to the payment or reimbursement of the Lenders for all costs, expenses, disbursements and losses incurred by such Persons and which any Credit Party is required to pay or reimburse pursuant to the Loan Documents;

*third*, to the payment or prepayment to the Lenders of all Obligations on a *pro rata* basis in accordance with their respective Aggregate Exposure Percentages in effect on such date; and

*fourth*, to whomsoever shall be legally entitled thereto.

If any Lender owes payments to the Administrative Agent hereunder, any amounts otherwise distributable under this Section 2.11(c) to such Lender shall be deemed to belong to the Administrative Agent to the extent of such unpaid payments, and the Administrative Agent shall apply such amounts to make such unpaid payments rather than distribute such amounts to such Lender. All distributions of amounts described in paragraphs *second* and *third* above shall be made by the Administrative Agent to each Lender on a pro rata basis determined by the amount the Obligations owed to such Lender represent of the aggregate amount of all Obligations.

(d)    All payments (including prepayments) to be made by Borrower hereunder, whether on account of principal, interest, premium, fees or otherwise, shall be made without setoff or counterclaim and shall be made prior to 12:00 Noon, New York City time, on the due date thereof to the Administrative Agent, for the account of the relevant Lenders, at the Payment Office, in Dollars and in immediately available funds. Any payment made by Borrower after 12:00 Noon, New York City time, on any Business Day shall be deemed to have been on the next following Business Day. The Administrative Agent shall distribute such payments to the Lenders promptly upon receipt in like funds as received. If any payment hereunder becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day. In the case of any extension of any payment of principal pursuant to the preceding sentence, interest thereon shall be payable at the then applicable rate during such extension.

(e)    Unless the Administrative Agent shall have been notified in writing by any Lender prior to a borrowing that such Lender will not make the amount that would constitute its share of such borrowing available to the Administrative Agent, the Administrative Agent may assume that such Lender is making such amount available to the Administrative Agent, and the Administrative Agent may, in reliance upon such assumption, make available to Borrower a corresponding amount. If such amount is not made available to the Administrative Agent by the required time on the Borrowing Date therefor, such Lender shall pay to the Administrative Agent, on demand, such amount with interest thereon at a rate equal to the daily average Federal Funds Effective Rate for the period until such Lender makes such amount immediately available to the Administrative Agent. A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this Section 2.11(e) shall be conclusive in the absence of manifest error. If such Lender's share of such borrowing is not made available to the Administrative Agent by such Lender within three Business Days after such Borrowing Date, the Administrative Agent shall also be entitled to recover such amount with interest thereon at the rate per annum the Applicable Interest Rate for such borrowings, on demand, from Borrower.

(f)    Unless the Administrative Agent shall have been notified in writing by Borrower prior to the date of any payment due to be made by Borrower hereunder that Borrower will not make such payment to the Administrative Agent, the Administrative Agent may assume that Borrower is making such payment, and the Administrative Agent may, but shall not be required to, in reliance upon such assumption, make available to the Lenders their respective pro rata shares of a corresponding amount.  If such payment is not made to the Administrative Agent by Borrower within three Business Days after such due date, the Administrative Agent shall be entitled to recover, on demand, from each Lender to which any amount which was made available pursuant to the preceding sentence, such amount with interest thereon at the rate per annum equal to the daily average Federal Funds Effective Rate. Nothing herein shall be deemed to limit the rights of the Administrative Agent or any Lender against Borrower.

(g)    Each payment of the Loans shall be accompanied by accrued interest to the date of such payment on the amount paid.

(h)    Each payment (including each prepayment) of the Term A Loans outstanding under the Term A Facility shall be allocated among the Term A Lenders holding such Term A Loans *pro rata* based on the principal amount of such Term A Loans held by such Term A Lenders, and shall be applied to the installments of such Term A Loans *pro rata* based on the remaining outstanding principal amount of such installments. Each payment (including each prepayment) of the Term B Loans outstanding under the Term B Facility shall be allocated among the Term B Lenders holding such Term B Loans *pro rata* based on the principal amount of such Term B Loans held by such Term B Lenders. Each payment (including each prepayment) by Borrower on account of principal of and interest on the Revolving Credit Loans shall be made *pro rata* according to the respective outstanding principal amounts of the Revolving Credit Loans then held by the Revolving Credit Lenders.

(i)    Each borrowing by Borrower from the Lenders hereunder, each payment by Borrower on account of any commitment fee, and any reduction of the Commitments of the Lenders, shall be made *pro rata* according to the respective Loan Percentages, of the relevant Lenders.

### 2.12    Requirements of Law.

(a)    If the adoption of or any change in any Requirement of Law or in the interpretation or application thereof or compliance by any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the date hereof:

(i)    shall subject any Lender to any tax of any kind whatsoever with respect to this Agreement, or any Loan made by it, or change the basis of taxation of payments to such Lender in respect thereof (except for Non-Excluded Taxes covered by Section 2.13 and changes in the rate of tax on the overall net income of such Lender);

(ii)    shall impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances, loans or other extensions of credit by, or any other

acquisition of funds by, any office of such Lender that is not otherwise included in the determination of LIBOR hereunder; or

> (iii)    shall impose on such Lender any other condition;

and the result of any of the foregoing is to increase the cost to such Lender, by an amount which such Lender deems to be material, of making, converting into, continuing or maintaining Loans bearing interest by reference to LIBOR, or to reduce any amount receivable hereunder in respect thereof, then, in any such case, Borrower shall promptly pay such Lender, upon its demand, any additional amounts necessary to compensate such Lender for such increased cost or reduced amount receivable. If any Lender becomes entitled to claim any additional amounts pursuant to this Section, it shall promptly notify Borrower (with a copy to the Administrative Agent) of the event by reason of which it has become so entitled.

> (b)    If any Lender shall have determined that the adoption of or any change in any Requirement of Law regarding capital adequacy, reserve requirements or similar requirements or in the interpretation or application thereof or compliance by such Lender or any corporation controlling such Lender with any request or directive regarding capital adequacy, reserve requirements or similar requirements (whether or not having the force of law) from any Governmental Authority made subsequent to the date hereof shall have the effect of reducing the rate of return on such Lender's or such corporation's capital as a consequence of its obligations hereunder to a level below that which such Lender or such corporation could have achieved but for such adoption, change or compliance (taking into consideration such Lender's or such corporation's policies with respect to capital adequacy) by an amount deemed by such Lender to be material, then from time to time, after submission by such Lender to Borrower (with a copy to the Administrative Agent) of a written request therefor, Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such corporation for such reduction.

> (c)    A certificate as to any additional amounts payable pursuant to this Section submitted by any Lender to Borrower (with a copy to the Administrative Agent) shall be conclusive in the absence of manifest error. The obligations of Borrower pursuant to this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

**2.13    Taxes.**

> (a)    All payments made by Borrower under this Agreement or any other Loan Documents shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, excluding net income taxes and franchise taxes (imposed in lieu of net income taxes) imposed on any Agent or any Lender as a result of a present or former connection between such Agent or such Lender and the jurisdiction of the Governmental Authority imposing such tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from such Agent's or such Lender's having executed, delivered or performed its obligations or received a payment under,

or enforced, this Agreement or any other Loan Document). If any such non-excluded taxes, levies, imposts, duties, charges, fees, deductions or withholdings (*"Non-Excluded Taxes"*) or any Other Taxes are required to be withheld from any amounts payable to any Agent or any Lender hereunder, the amounts so payable to such Agent or such Lender shall be increased to the extent necessary to yield to such Agent or such Lender (after payment of all Non-Excluded Taxes and Other Taxes) interest or any such other amounts payable hereunder at the rates or in the amounts specified in this Agreement; *provided, however,* that Borrower or any Guarantor shall not be required to increase any such amounts payable to any Agent or any Lender with respect to any Non-Excluded Taxes (i) that are attributable to such Agent's or such Lender's failure to comply with the requirements of paragraph (d) or (e) of this Section or (ii) in the case of any Non-U.S. Lender, that are United States withholding taxes imposed on amounts payable to such Agent or such Lender at the time such Agent or such Lender becomes a party to this Agreement, except to the extent that such Agent's or such Lender's assignor (if any) was entitled, at the time of assignment, to receive additional amounts from Borrower with respect to such Non-Excluded Taxes pursuant to this Section 2.13(a). Borrower or the applicable Guarantor shall make any required withholding and pay the full amount withheld to the relevant tax authority or other Governmental Authority in accordance with applicable Requirements of Law.

(b)    In addition, Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)    Whenever any Non-Excluded Taxes or Other Taxes are payable by Borrower, as promptly as possible thereafter Borrower shall send to the Administrative Agent for the account of the relevant Agent or Lender, as the case may be, a certified copy of an original official receipt received by Borrower showing payment thereof. If Borrower fails to pay any Non-Excluded Taxes or Other Taxes when due to the appropriate taxing authority or fails to remit to the Administrative Agent the required receipts or other required documentary evidence, Borrower shall indemnify the Agents and the Lenders for any incremental taxes, interest or penalties that may become payable by any Agent or any Lender as a result of any such failure. The agreements in this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

(d)    Each Lender (or Transferee) that is not a citizen or resident of the United States of America, a corporation, partnership or other entity created or organized in or under the laws of the United States of America (or any jurisdiction thereof), or any estate or trust that is subject to federal income taxation regardless of the source of its income (a *"Non-U.S. Lender"*) shall deliver to Borrower and the Administrative Agent (or, in the case of a Participant, to the Lender from which the related participation shall have been purchased) two copies of either U.S. Internal Revenue Service Form W-8BEN or Form W-8ECI, or, in the case of a Non-U.S. Lender claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest" a statement substantially in the form of Exhibit M to the effect that such Lender is eligible for a complete exemption from withholding of U.S. taxes under Section 871(h) or 881(c) of the Code and a Form W-8BEN, or any subsequent versions thereof or successors thereto properly completed and duly executed by such Non-U.S. Lender claiming complete exemption from, or a reduced rate of, U.S. federal withholding tax on all payments by Borrower under this

Agreement and the other Loan Documents. Such forms shall be delivered by each Non-U.S. Lender on or before the date it becomes a party to this Agreement (and in the case of any Participant, on or before the date such Participant purchases the related participation). In addition, each Non-U.S. Lender shall deliver such forms promptly upon the obsolescence or invalidity of any form previously delivered by such Non-U.S. Lender. Each Non-U.S. Lender shall promptly notify Borrower at any time it determines that it is no longer in a position to provide any previously delivered certificate to Borrower (or any other form of certification adopted by the U.S. taxing authorities for such purpose). Notwithstanding any other provision of this Section 2.13(d), a Non-U.S. Lender shall not be required to deliver any form pursuant to this Section 2.13(d) that such Non-U.S. Lender is not legally able to deliver.

(e)    A Lender that is entitled to an exemption from or reduction of non-U.S. withholding tax under the law of the jurisdiction in which Borrower is located, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall deliver to Borrower (with a copy to the Administrative Agent), at the time or times prescribed by applicable law or reasonably requested by Borrower, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate, *provided* that such Lender is legally entitled to complete, execute and deliver such documentation and in such Lender's reasonable judgment such completion, execution or submission would not materially prejudice the legal position of such Lender.

**2.14    Indemnity.** Borrower agrees to indemnify each Lender for, and to hold each Lender harmless from, any loss or expense that such Lender may sustain or incur as a consequence of (a) any default by Borrower in making a borrowing of Loans after Borrower has given a notice requesting the same in accordance with the provisions of this Agreement, (b) any default by Borrower in making any prepayment after Borrower has given a notice thereof in accordance with the provisions of this Agreement, (c) the repayment of any Loans that are repaid in whole or in part prior to the last day of a LIBOR Period (whether such repayment is made pursuant to any provision of this Agreement or any other Loan Document or occurs as a result of acceleration, mandatory prepayment, by operation of law or otherwise); or (d) a default in making any borrowing of Loans after Borrower has given notice requesting the same in accordance herewith. Such indemnification shall include any loss (including loss of margin) or expense arising from the reemployment of funds obtained by it or from fees payable to terminate deposits from which such funds were obtained. For the purpose of calculating amounts payable to a Lender under this Section 2.14, each Lender shall be deemed to have actually funded its relevant Loan through the purchase of a deposit bearing interest at LIBOR in an amount equal to the amount of that Loan and having a maturity comparable to the LIBOR Period; *provided* that each Lender may fund each of its Loans in any manner it sees fit, and the foregoing assumption shall be utilized only for the calculation of amounts payable under this Section 2.14. Such indemnification may include an amount equal to the excess, if any, of (i) the amount of interest that would have accrued on the amount so prepaid, or not so borrowed, converted or continued, for the period from the date of such prepayment or of such failure to borrow, convert or continue to the last day of such Interest Period (or, in the case of a failure to borrow, convert or continue, the Interest Period that would have commenced on the date of such failure) in each case at the applicable rate of interest for such Loans provided for herein (excluding, however, the Applicable Margin included therein, if any) *over* (ii) the amount of interest (as reasonably determined by such Lender) that would have

accrued to such Lender on such amount by placing such amount on deposit for a comparable period with leading banks in the interbank Eurodollar market. A certificate as to any amounts payable pursuant to this Section submitted to Borrower by any Lender shall be conclusive in the absence of manifest error. This covenant shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

**2.15    Illegality.** Notwithstanding anything to the contrary contained herein, if the introduction of or any change in any law or regulation (or any change in the interpretation thereof) shall make it unlawful, or any central bank or other Governmental Authority shall assert that it is unlawful, for any Lender to agree to make or to make or to continue to fund or maintain any Loan bearing interest by reference to LIBOR, then, unless that Lender is able to make or to continue to fund or to maintain such Loan at another branch or office of that Lender without, in that Lender's opinion, adversely affecting it or its Loans or the income obtained therefrom, on notice thereof and demand therefor by such Lender to Borrower through the Administrative Agent, (i) the obligation of such Lender to agree to make or to make or to continue to fund or maintain Loans bearing interest by reference to LIBOR shall terminate, and (ii) all of such Lender's Loans shall automatically convert at the end of the then-current LIBOR Period with respect thereto or sooner, if required by such law, regulation or interpretation, into Loans bearing interest with respect to such Lender from and after the date of such conversion at a rate per annum equal to the sum of (x) the Federal Funds Effective Rate in effect from time to time *plus* 0.50% and (y) the Applicable Interest Margin.

**2.16    Change of Lending Office.** Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 2.12 or 2.13(a) with respect to such Lender, it will, if requested by Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event with the object of avoiding the consequences of such event; *provided*, that such designation is made on terms that, in the sole judgment of such Lender, cause such Lender and its lending office(s) to suffer no economic, legal or regulatory disadvantage, and *provided, further*, that nothing in this Section 2.16 shall affect or postpone any of the obligations of any Borrower or the rights of any Lender pursuant to Sections 2.12 or 2.13(a).

## ARTICLE III.
## REPRESENTATIONS AND WARRANTIES

To induce the Agents and the Lenders to enter into this Agreement and to make the Loans, Borrower represents and warrants to each Agent and each Lender that on and as of the Closing Date:

**3.1    Financial Condition.**

(a)    Borrower has heretofore furnished to the Lenders its consolidated balance sheet and consolidated statements of income, stockholders' equity and cash flows (i) as of and for the fiscal year ended December 31, 2006, in each case reported on by its Independent Accountants. Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of Borrower and the Subsidiaries as of such dates and for such periods in accordance with GAAP consistently applied, subject to normal

year-end audit adjustments and the absence of footnotes in the case of the statements referred to in clause (ii) above (collectively, (i) and (ii) are the "*Financial Statements*").

(b)    Borrower and its Subsidiaries have no material Guarantee Obligations, contingent liabilities or liabilities for taxes, or any long term leases or unusual forward or long term commitments, including any interest rate or foreign currency swap or exchange transaction or other Hedging Agreement or other obligation in respect of derivatives, that are not reflected in the Financial Statements.

3.2    **No Change.** Since December 31, 2006, there has been no Material Adverse Change and there have been no developments or events that in the aggregate have had or reasonably could be expected to have a Material Adverse Effect, except for such developments and events disclosed in writing to the Administrative Agent prior to the date hereof.

3.3    **Company Existence; Compliance with Law.** Each of the Credit Parties (i) is duly incorporated, organized or formed, as applicable, validly existing and (if relevant) in good standing under the laws of the jurisdiction of its incorporation, organization or formation, as the case may be, (ii) has the corporate, company or partnership power and authority, as applicable, and the legal right, to own and operate its Property, to lease the Property it operates as lessee and to conduct the business in which it is currently engaged, (iii) is duly qualified as a foreign corporation, company or partnership, as applicable, and (if relevant) in good standing under the laws of each jurisdiction where its ownership, lease or operation of Property or the conduct of its business requires such qualification, (iv) is in compliance with its Constituent Documents and (v) is in compliance with all Requirements of Law except, solely in the case of clauses (iii) and (v), to the extent that the failure to comply therewith could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.4    **Power; Authorization; Enforceable Obligations.** Each Credit Party has the corporate, company or partnership power and authority, as applicable, and the legal right, to make, deliver and perform each of the Loan Documents to which it is a party, and, in the case of Borrower, to borrow hereunder. Each Credit Party has taken all necessary partnership, company, corporate or other entity action to authorize the execution, delivery and performance of each of the Loan Documents to which it is a party and, in the case of Borrower, to authorize the borrowings on the terms and conditions of this Agreement. No consent or authorization of, filing with, notice to or other act by or in respect of, any Governmental Authority or any other Person is required to be obtained by a Credit Party in connection with the effectiveness of the consummation of the borrowings hereunder or the execution, delivery, performance, validity or enforceability of this Agreement, or any of the other Loan Documents, except (i) consents, authorizations, filings and notices described in Schedule 3.4, which consents, authorizations, filings and notices , except as described in Schedule 3.4, have been obtained or made and are in full force and effect except as set forth therein and (ii) the filings referred to in Section 3.22. Each Loan Document has been duly executed and delivered on behalf of each Credit Party that is a party thereto. This Agreement constitutes, and each of the other Loan Documents upon execution and delivery will constitute, a legal, valid and binding obligation of each Credit Party that is a party thereto, enforceable against each such Credit Party in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

**3.5    No Legal Bar.**  The execution, delivery and performance of this Agreement and the other Loan Documents, the borrowings hereunder, and the use of the proceeds thereof will not result in a violation by any Credit Party of any Requirement of Law or any Contractual Obligation of any Credit Party and will not result in, or require, the creation or imposition of any Lien on any of its Properties or revenues pursuant to any Requirement of Law or any such Contractual Obligation (other than the Liens created by the Security Documents).  No Requirement of Law, Constituent Document or Contractual Obligation applicable to the Credit Parties could reasonably be expected to have a Material Adverse Effect.  No performance of a Contractual Obligation by any Credit Party, either unconditionally or upon the happening of an event, would result in the creation of a Lien (other than a Permitted Lien) on the Property or Capital Stock of any such Person.

**3.6    No Material Litigation.**  There is (a) no litigation, action, suit, claim, dispute, investigation or proceeding at law or in equity, whether judicial or administrative, in or before any arbitrator, court or other Governmental Authority that is pending or, to the knowledge of any Credit Party after due and diligent investigation, threatened, against or affecting any Credit Party, against any of their respective Properties or revenues, or with respect to any Material Agreement and (b) no existing default by any Credit Party under any applicable order, writ, injunction or decree of any Governmental Authority or arbitral tribunal, which, in the case of clause (a) or (b), could reasonably be expected to have a Material Adverse Effect.

**3.7    No Default.**  No Credit Party is in default under or with respect to any of its Contractual Obligations in any respect that constitutes a Material Adverse Effect.  No Default nor Event of Default has occurred and is continuing.

**3.8    Government Approvals; Government Rules.**

(a)    All material Government Approvals for the current stage of Development (including for the sale of coal by the Project, if applicable) that have been obtained by a Credit Party or by third parties for the benefit of the Project as of the Closing Date are set forth on Schedule 3.8(a).  Except as otherwise noted on Schedule 3.8(a), all Government Approvals set forth on Schedule 3.8(a) have been duly obtained, were validly issued, are in full force and effect, and are not the subject of any pending appeal and all applicable appeal periods have expired (except Government Approvals which do not have limits on appeal periods under Government Rules or appeals which could not reasonably be expected to have a Material Adverse Effect), are held in the name of a Credit Party or such third party as indicated on such Schedule 3.8(a) and are free from conditions or requirements which (i) could reasonably be expected to have a Material Adverse Effect or (ii) the Credit Party or such third party (as applicable) does not expect to be able to satisfy on or prior to the commencement of the relevant stage of Development, except to the extent that a failure to so satisfy such condition or requirement could not reasonably be expected to have a Material Adverse Effect.  No Material Adverse Effect could reasonably be expected to result from any such Government Approvals being held by or in the name of Persons other than a Credit Party.

(b)    All material Government Approvals not obtained as of the Closing Date but necessary for the Development (including the sale of coal by the Project) to be obtained by a Credit Party or by third parties for the benefit of the Project after the Closing Date are set forth on Schedule 3.8(b).  No Material Adverse Effect could reasonably be expected to result from

any such Government Approvals being obtained in the name of Persons other than a Credit Party.

(c)    All material Government Approvals required to be held by a Credit Party or the third party indicated on Schedule 3.8(b) for the current stage of Development (as identified by the dates on Schedule 3.8(b) for which such Government Approvals are reasonably projected to be required), have been duly obtained and validly issued, are in full force and effect, are not the subject of any pending or threatened appeal (except appeals which, to Borrower's knowledge, could not reasonably be expected to have a Material Adverse Effect), are held in the name of a Credit Party or such third party and are free from conditions or requirements which (i) could reasonably be expected to have a Material Adverse Effect or (ii) the Credit Party or such third party (as applicable) does not expect to be able to satisfy on or prior to the commencement of the relevant stage of Development, except to the extent that a failure to so satisfy such condition or requirement could not reasonably be expected to have a Material Adverse Effect.

(d)    Borrower has no reason to believe that any material Government Approvals which have not been obtained by a Credit Party or the relevant third party as of the Closing Date, but which shall be required to be obtained in the future by such Credit Party or such third party for the Development, shall not be obtained in due course on or prior to the commencement of the appropriate stage of Development for which such Government Approval would be required or shall contain any condition or requirements, the compliance with which could reasonably be expected to result in a Material Adverse Effect or which such Credit Party or the relevant third party (as the case may be) does not expect to satisfy on or prior to the commencement of the appropriate stage of Development, except to the extent that a failure to so satisfy such condition or requirement could not reasonably be expected to have a Material Adverse Effect. The Project, if constructed in accordance with the Construction Budget and Schedule and otherwise Developed as contemplated by the Material Project Documents, will conform to and comply with all covenants, conditions, restrictions and reservations in the applicable Government Approvals and all applicable Government Rules, except to the extent that a failure to so conform or comply could not reasonably be expected to have a Material Adverse Effect.

(e)    No Credit Party is in violation of, and not in compliance in all material respects with, any Government Rule or Government Approval the violation of or the non-compliance with which could reasonably be expected to result in a Material Adverse Effect.

3.9    **Existing Indebtedness.** Other than the Existing Indebtedness, as of the Closing Date and after giving effect to the use of proceeds of the Loans in accordance herewith, no Credit Party has any Indebtedness except pursuant to this Agreement and the other Loan Documents.

3.10  **Ownership and Maintenance of Property.**

(a)    Schedule 3.10(a) sets forth a complete and accurate list of all Real Property in which the Credit Parties hold title in fee simple. The Credit Parties possess Defensible Title to all such Real Property and all of their other Property, and none of such Property is subject to any Lien other than Permitted Liens.

(b)    Schedule 3.10(b) sets forth a complete and accurate list of all Coal Leases as of the Closing Date which Real Property, together with the Real Property described on Schedule 3.10(a), constitutes all of the Real Property held by the Credit Parties. Each Credit Party has a valid leasehold interest in all of its Coal Leases, and none of such Coal Leases is subject to any Lien other than Permitted Liens.

(c)    Upon receipt by the Credit Parties of the Pending Permits, all Permits required to have been issued or appropriate to enable all Real Property (including its Coal Properties) leased by any Credit Party to be lawfully occupied and used for all of the purposes for which such Property is or will be occupied and used, including operation of all applicable Mines, will have been lawfully issued and will be in full force and effect, except where such failure would not reasonably be expected to result in a Material Adverse Change.

(d)    The Coal Properties operated by any Credit Party and, to the knowledge of Borrower, Coal Properties operated by a Person other than Borrower or a Subsidiary, have been maintained, operated and developed in a good and workmanlike manner and in conformity in all material respects with all Requirements of Law and in conformity in all material respects with the provisions of all leases, subleases or other contracts comprising a part of the Coal Leases and other contracts and agreements forming a part of Coal Properties, except, in the case of Coal Properties operated by a Person other than Borrower or a Subsidiary, to the extent that the failure thereof could not reasonably be expected to result in liabilities to any Credit Party in excess of $250,000.

**3.11  Insurance.** All policies of insurance of any kind or nature of the Credit Parties, including policies of fire, theft, product liability, public liability, property damage, other casualty, employee fidelity, workers' compensation and employee health and welfare insurance, are in full force and effect and are of a nature and provide such coverage as is sufficient and as is customarily carried by businesses of the size and character of the Credit Parties. None of the Credit Parties has been refused insurance for any coverage for which it had applied or had any policy of insurance terminated (other than at its request).

**3.12  Intellectual Property.** Each of the Credit Parties owns, or is licensed to use, all material Intellectual Property necessary for the conduct of its business as currently conducted. No material claim has been asserted and is pending by any Person challenging or questioning the use by a Credit Party of any Intellectual Property or the validity or effectiveness of any Intellectual Property, nor does any Credit Party know of any valid basis for any such claim. The use of Intellectual Property by the Credit Parties does not infringe on the rights of any Person in any material respect.

**3.13  Taxes.** Each Credit Party has filed or caused to be filed all federal, state and other material tax returns, reports and statements (collectively, "*Tax Returns*") that are required to be filed by any Credit Party or any of its Tax Affiliates with the appropriate Governmental Authorities in all jurisdictions in which such Tax Returns are required to be filed; all such Tax Returns are true and correct in all material respects and correctly reflect the facts regarding the income, business, assets, operations, activities, status or other matters of the Credit Party and any other information required to be shown thereon; each Credit Party has paid, prior to the date on which any fine, penalty, interest, late charge or loss may be added thereto for non-payment thereof, all taxes shown to be due and payable on said returns or on any assessments made against

it or any of its Property and all other taxes, fees or other charges imposed on it or any of its Property by or otherwise due and payable to any Governmental Authority (other than any the amount or validity of which are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of such Credit Party); no tax Lien has been filed against the Property of any Credit Party; and, to the best knowledge of Borrower, no claim is being asserted, with respect to any such tax, fee or other charge. No Tax Return is under audit or examination by any Governmental Authority and no notice of such an audit or examination or any assertion of any claim for taxes has been given or made by any Governmental Authority. Proper and accurate amounts have been withheld by each Credit Party and each of its Tax Affiliates from their respective employees for all periods in full and complete compliance with the tax, social security and unemployment withholding provisions of applicable Requirements of Law and such withholdings have been timely paid to the respective Governmental Authorities.

**3.14    Federal Regulations.** No part of the proceeds of any Loans will be used for "purchasing" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U or for any purpose that violates the provisions of any regulations of the Board. No Credit Party owns any "margin stock."

**3.15    Labor Matters.**

(a)    There are no strikes or other labor disputes against any Credit Party pending or, to the knowledge of Borrower, threatened. Hours worked by and payments made to employees of the Credit Parties and each labor and employment contracts entered into by a Credit Party have not been in violation of the Fair Labor Standards Act of 1938, as amended, or any other applicable Requirement of Law dealing with such matters. All payments due from any Credit Party on account of employee health and welfare insurance have been paid or accrued as a liability on the books of a Credit Party.

(b)    There is no organizing activity involving Borrower or any Subsidiary pending or, to the knowledge of Borrower or any Subsidiary, threatened by any labor union or group of employees. There are no representation proceedings pending or, to the knowledge of Borrower or any Subsidiary, threatened with the National Mediation Board, and no labor organization or group of employees of Borrower or any Subsidiary has made a pending demand for recognition. There are no material complaints or charges against Borrower or any Subsidiary pending or, to the knowledge of Borrower or any Subsidiary, threatened to be filed with any Governmental Authority or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment by Borrower or any Subsidiary of any individual. The consummation of the transactions contemplated by the Loan Documents will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which Borrower or any Subsidiary is bound.

**3.16    ERISA.** Neither a Reportable Event nor an "accumulated funding deficiency" (within the meaning of Section 412 of the Code or Section 302 of ERISA) has occurred during the five-year period prior to the date on which this representation is made or deemed made with respect to any Benefit Plan, and each Benefit Plan has complied in all material respects with the applicable provisions of ERISA and the Code. No termination of a Single Employer Plan has

occurred, and no Lien in favor of the PBGC or a Benefit Plan has arisen, during such five-year period. The present value of all accrued benefits under each Single Employer Plan (based on those assumptions used to fund such Benefit Plans) did not, as of the last annual valuation date prior to the date on which this representation is made or deemed made, exceed the value of the assets of such Benefit Plan allocable to such accrued benefits by a material amount. Neither the Credit Parties nor any Commonly Controlled Entity has had a complete or partial withdrawal from any Multiemployer Plan that has resulted or could reasonably be expected to result in a material liability under ERISA, and neither the Credit Parties nor any Commonly Controlled Entity would become subject to any material liability under ERISA if such Credit Party or any such Commonly Controlled Entity were to withdraw completely from all Multiemployer Plans as of the valuation date most closely preceding the date on which this representation is made or deemed made. No such Multiemployer Plan is in Reorganization or Insolvent.

### 3.17  Regulations.

(a)    No Credit Party is an "investment company," or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended. No Credit Party is subject to regulation under any Requirement of Law (other than Regulation X) which limits its ability to incur Indebtedness.

(b)    No Credit Party is a "holding company" or a "subsidiary company" of a "holding company," or an "affiliate" of a "holding company" or of a "subsidiary company" of a "holding company," within the meaning of the Public Utility Holding Company Act of 1935, as amended.

### 3.18  Ownership of Borrower; Subsidiaries.

(a)    Borrower has no direct or indirect Subsidiaries except as listed on Schedule 3.18(a). Schedule 3.18(a) sets forth the ownership of all limited liability company interests and other Capital Stock issued by Borrower, 100% of which is issued and outstanding. No Credit Party has any equity investments in any other Person except as listed on Schedule 3.18(a). Schedule 3.18(a) sets forth the name and jurisdiction of organization or formation, as applicable, of each Subsidiary and, as to each Subsidiary, the number of shares of each class of Capital Stock authorized (if applicable) and the number outstanding. All of the outstanding Capital Stock of each Subsidiary has been duly and validly issued, is fully paid and non-assessable and is owned beneficially and of record by Borrower or another Subsidiary, free and clear of all Liens other than the Liens created by the Security Documents.

(b)    There are no outstanding subscriptions, options, warrants, calls, rights, agreements or understandings restricting the transfer or hypothecation of any such Capital Stock or other agreements, understandings or commitments of any nature relating to any Capital Stock of the Credit Parties except as otherwise created by the Loan Documents.

### 3.19  Use of Proceeds. The proceeds of the Loans shall be used solely for the purposes set forth in Section 6.17.

### 3.20 Environmental Matters.

(a)    Set forth on Schedule 3.20(a) is a list of each of the material Environmental or Mining Permits necessary as of the date hereof for the Credit Parties' to conduct mining operations on their Coal Properties as projected in their business plan through the Maturity Date.  Borrower has obtained each such permit except as otherwise disclosed on Schedule 3.20(a) (such Permits and authorizations, collectively, the "*Pending Permits*").  Borrower has filed or cause to be filed applications for each Pending Permit with the applicable Governmental Authority.  Neither Borrower nor any of its Subsidiaries, nor, to Borrower's knowledge, any Person operating any of the Coal Properties, (i) has received any notice (written or oral) denying any of the Pending Permits or (ii) is currently barred from receiving surface mining or underground mining permits pursuant to the permit block provisions of the Surface Mining Control and Reclamation Act, 30 U.S.C. §§ 1201 *et seq.*, and the regulations promulgated thereunder, or any corresponding state laws or regulations.  Each of the Credit Parties will have, prior to commencement of mining operations, in the amounts and forms required pursuant to Mining Law or by a Governmental Authority, obtained all Reclamation Bonds, surety bonds or escrow agreements and will have made any payment or prepayments with respect to, or certificates of deposit or other sums or assets required to be posted by, any Credit Party under Mining Law for Reclamation or otherwise.

(b)    With respect to each of the Credit Party's Coal Properties currently in production, Borrower has, and to Borrower's knowledge, each Person other than any Credit Party operating any Coal Properties of any of the Credit Parties, if any, has all material Permits necessary to lawfully conduct such activities, and the Credit Parties are, and to Borrower's knowledge, each Person other than any Credit Party operating any such Coal Properties, if any, is, in compliance in all material respects with the terms and conditions of all such Permits, all of which are in full force and effect.

(c)    Each of the Credit Parties: (i) is, and within the period of all applicable statutes of limitation has been, in compliance with all applicable Environmental Laws and Mining Laws except for such noncompliance as could not reasonably be expected to result in a Material Adverse Change; (ii) is, and within the period of all applicable statutes of limitations has been, in compliance with such Environmental or Mining Permits; and (iii) reasonably believes that each of its Environmental or Mining Permits will be timely renewed and complied with, and, with respect to the Pending Permits, will be timely obtained; that any additional Environmental or Mining Permits that may be required by any of them will be timely obtained and complied with; and that compliance with any Environmental Law or Mining Law that is or is expected to become applicable to it will be timely attained and maintained without material expense.

(d)    There has been no Regulated Substances Activity by any Credit Party at, on or from any Property now or formerly owned, leased or operated by any Credit Party, or at any other location (including any location to which Regulated Substances have been sent for re-use or recycling or for treatment, storage, or disposal), which could reasonably be expected to (i) give rise to any material liability under any applicable Environmental Law or Mining Law or otherwise result in any material costs to any Credit Party other than such costs incurred in the ordinary course of business; or (ii) materially interfere with continued operations of the business of the Credit Parties.

(e)     There is no pending or, to the knowledge of the Credit Parties threatened Environmental Claims related to any Credit Party and, to the knowledge of Borrower, there are no actions, activities, circumstances, conditions, events or incidents that could form the basis of any such Environmental Claim, except for such Environmental Claims which could not, individually or in the aggregate, result in a Material Adverse Change.

(f)     No Credit Party has been notified by any Governmental Authority that it is a potentially responsible party or otherwise liable under or relating to the federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, or, any similar Environmental Law.

(g)     Except as otherwise may be required pursuant to any Environmental Law or Mining Law as a condition to obtaining any Permit necessary for the operation of the Coal Properties or pursuant to the Coal Leases, no Credit Party is obligated pursuant to any law, order, decree, judgment or agreement by which it is bound, to conduct, perform or finance any action or otherwise incur, nor has any Credit Party assumed or retained, any material expense or other liabilities of any kind, fixed or contingent, known or unknown, under any Environmental Law or Mining Law or with respect to any Regulated Substances.

(h)     Borrower has provided the Administrative Agent and the Lenders copies of all significant reports, correspondence and other documents in its possession, custody or control regarding its and its Subsidiaries compliance with or potential liability under Environmental Laws, Mining Laws or Environmental or Mining Permits or with respect to Regulated Substances.

(i)     No Lien has been recorded or, to the knowledge of Borrower, threatened under any Environmental Law with respect to any Real Property or assets of the Credit Parties.

(j)     The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by the Loan Documents will not require any notification, registration, filing reporting, disclosure, investigation, response, remediation or cleanup pursuant to any Environmental Law or Mining Law.

**3.21  Accuracy of Information, Etc.** No statement or information contained in this Agreement, any other Loan Document or any other document, certificate or statement furnished to the Administrative Agent or the Lenders or any of them, by or on behalf of any Credit Party for use in connection with the transactions contemplated by this Agreement or the other Loan Documents, contained as of the date such statement, information, document or certificate was so furnished, any untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements contained herein or therein not misleading, in each case taken as a whole. There is no fact known to any Credit Party that could reasonably be expected to have a Material Adverse Effect that has not been expressly disclosed herein, in the other Loan Documents or in any other documents, certificates or statements furnished to the Agents and the Lenders for use in connection with the transactions contemplated hereby and by the other Loan Documents.

### 3.22  Security Documents.

(a)      The Original Guarantee and Security Agreement, as amended and restated by the Amended and Restated Guarantee and Security Agreement, has created in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral described therein and proceeds thereof, and the Guarantee and Security Agreement is effective to continue such security interest in such Collateral and the proceeds thereof.  The Original Guarantee and Security Agreement, as amended and restated by the Guarantee and Security Agreement, constitutes a fully perfected Lien on, and security interest in, all right, title and interest of the Credit Parties in the Collateral described therein and the proceeds thereof, as security for the Obligations, in each case prior and superior in right to any other Person except for Permitted Liens.

(b)      The Original Midland Security Documents, as replaced by the Midland Guarantee and Security Agreement, have created in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral described therein and proceeds thereof, and the Guarantee and Security Agreement is effective to continue such security interest in such Collateral and the proceeds thereof.  The Original Midland Security Documents, as replaced by the Midland Guarantee and Security Agreement, constitute a fully perfected Lien (except with respect to those certain leasehold rights identified therein) on, and security interest in, all right, title and interest of Midland in the Collateral described therein and the proceeds thereof, as security for the Obligations, in each case prior and superior in right to any other Person except for Permitted Liens.

(c)      Each of the Original Mortgages, as amended and restated by the Amended and Restated Mortgages, covering the Mortgaged Properties has created in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in the Mortgaged Properties described therein and the proceeds thereof, and each of the Mortgages covering the Mortgaged Properties dated as of the date hereof is effective to continue such security interest in such Mortgaged Properties and the proceeds thereof.  The Original Mortgages, as amended and restated by the Mortgages, constitutes a fully perfected Lien on, and security interest in, all right, title and interest of the Credit Parties in the Properties described therein and the proceeds thereof, as security for the Obligations, in each case prior and superior in right to any other Person (other than Persons holding Liens or other encumbrances or rights permitted by the relevant Mortgage).

(d)      Borrower owns, directly or indirectly through other Subsidiaries, all of the outstanding Capital Stock of each of its Subsidiaries, and each of its Subsidiaries is a party to a Guarantee and Security Agreement.  The only direct Subsidiary of Parent is Borrower.

**3.23    Solvency.**  Each Credit Party is, and after giving effect to the incurrence of all Indebtedness, Obligations, the transactions contemplated by the Loan Documents and other obligations and commitments being incurred in connection herewith and therewith will be, and will continue to be, Solvent.

**3.24    Hedging Agreements.**  Neither Borrower nor any Subsidiary is party to, or is directly or indirectly obligated under or with respect to, any Hedging Agreement.

**3.25    Reserve Reports.** All information furnished by any Loan Party for use in the preparation of that certain reserve report prepared by John T. Boyd dated April 2004 with respect to the Coal Properties (the "***Reserve Report***") was accurate at the time furnished.

**3.26    Contingent Obligations.** Except for those contained in, or in respect of, the Project Documents, the Original Loan Documents or the Loan Documents, no Credit Party has any existing material Contingent Obligations.

**3.27    Bank Accounts.** Schedule 3.27 lists all accounts maintained by or for the benefit of any Credit Party with any bank or financial institution.

**3.28    Customers and Suppliers.** As of the Closing Date, there exists no actual or threatened termination, cancellation or limitation of, or modification to or change the business relationship between (a) any Credit Party, on the one hand, and any customer or any group thereof, on the other hand, whose agreements with such Credit Party is individually or in the aggregate material to the business or operations of the Credit Parties, or (b) any Credit Party, on the one hand, and any material supplier thereof, on the other hand; and there exists no present state of facts or circumstances that could give rise to or result in any such termination, cancellation, limitation, modification or change. No Person providing any materials or services to any Credit Party has filed, or threatened to file, a Lien on any Properties of any Credit Party. Schedule 3.28 includes a list of all Coal marketing contracts in effect on the Closing Date relating to any Credit Party or any of the Coal Properties. All Coal sold by any Credit Party from its Coal Properties (other than Coal being sold pursuant to a Material Agreement) is being sold at prices and terms comparable to the market prices and on terms generally available at the time such prices and terms were negotiated for Coal production from producing areas situated near such Coal Properties, and none of the proceeds of any such sale are currently being held in suspense by such purchaser or any other Person.

**3.29    Account Receivable.** The accounts and notes receivable of the Credit Parties reflected on the Financial Statements, and all accounts and notes receivable arising subsequent to such date, (a) arose from bona fide sales transactions in the ordinary course of business consistent with past practice and are payable on ordinary trade terms, (b) to the knowledge of Borrower, are legal, valid and binding obligations of the respective debtors enforceable in accordance with their respective terms, and (c) to the knowledge of Borrower, are not subject to any valid set-off or counterclaim.

**3.30    Material Agreements.** Set forth on Schedule 3.30 hereto is a complete and correct list, as of the Closing Date, of all material agreements and construction contracts of each Credit Party setting forth each counterparty thereto (other than the Loan Documents) relating to the purchase, transportation, processing, marketing, development, sale and supply of Coal, operating agreements or contract operating agreements and copies of such documents have been provided to the Administrative Agent. All such agreements are in full force and effect and, to Borrower's knowledge, no party thereto (or any of its predecessors) is in default thereunder in any material respect, nor has any material item of such agreements been altered since the Closing Date without the prior written consent of the Lenders and all rents, royalties and other payments due and payable thereunder have been properly and timely paid.

**3.31    Coal Act; Black Lung Act**. Each of Borrower and the Subsidiaries and each of their respective "related persons" (as defined in the Coal Act) are in material compliance with the Coal Act and none of Borrower, the Subsidiaries and their respective related persons has any liability under the Coal Act except with respect to premiums or other payments required thereunder that have been paid when due. Each of Borrower and the Subsidiaries is in compliance with the Black Lung Act, and neither Borrower nor any of the Subsidiaries has any liability under the Black Lung Act except with respect to premiums, contributions or other payments required thereunder that have been paid when due.

ARTICLE IV.
CONDITIONS PRECEDENT

**4.1    Conditions to Extension of Loans on the Closing Date**. The agreement of each Lender to the conversion and continuation of the Existing Loans as Term A Loans, and the making of Term B Loans to be made by it hereunder is subject to the satisfaction, prior to or concurrently with the making of such extension of credit on the Closing Date, of the following conditions precedent:

(a)    Loan Documents. The Administrative Agent shall have received documents, in each case executed and delivered by a Responsible Officer of each of the applicable Credit Parties, (i) this Agreement, (ii) the Guarantee and Security Agreement, (iii) the Midland Guarantee and Security Agreement, (iv) a Mortgage covering each of the Mortgaged Properties described on Schedule 1.1(c), and (v) the Deposit Account Control Agreements with respect to each bank account listed on Schedule 3.27, other than any Qualified Payroll Account and the Qualified DEP Account.

(b)    Constituent Documents. All documents establishing or implementing the ownership, capital and corporate, organizational, tax and legal structure of each Credit Party shall be reasonably satisfactory to the Administrative Agent.

(c)    Projections. The Lenders shall have received projections and a business plan for Borrower and its Subsidiaries for fiscal years 2007 through 2011 satisfactory to the Administrative Agent in its sole discretion.

(d)    Financial Statements. The Lenders shall have received the Financial Statements, which shall be satisfactory to the Administrative Agent in its sole discretion.

(e)    Approvals; Denial of Permits. (i) All Permits or other approvals necessary to be obtained by a Credit Party in connection with the execution, delivery and performance of the Loan Documents shall have been obtained and be in full force and effect; and (ii) no Credit Party shall have received any notice (written or oral) denying any of the Pending Permits or otherwise rejecting the application for any Pending Permit.

(f)    [Intentionally Omitted]

(g)    Fees. The Lenders and the Agents shall have received all fees required to be paid, and all expenses for which invoices have been presented (including reasonable fees, disbursements and other charges of counsel to the Agents), on or before the Closing Date. All

such amounts will be paid with proceeds of Loans made on the Closing Date and will be reflected in the funding instructions given by Borrower to the Administrative Agent on or before the Closing Date.

(h)    Lien Search. The Administrative Agent shall have received the results of a recent lien search in each of the jurisdictions in which UCC financing statements or other filings or recordations should be made to evidence or perfect security interests in all assets of the Credit Parties, and such search shall reveal no Liens other than Permitted Liens on any of the Property of the Credit Parties or Liens that were terminated, released or otherwise discharged on or prior to the Closing Date.

(i)    Closing Certificate. The Administrative Agent shall have received a certificate of each Credit Party, dated the Closing Date, substantially in the form of Exhibit N, with appropriate insertions and attachments.

(j)    Legal Opinions. The Administrative Agent shall have received the following executed legal opinions from:

(i)    Buchanan Ingersoll & Rooney, PC, counsel to the Credit Parties, with respect to such matters as may be required by and in form and substance satisfactory to the Administrative Agent; and

(ii)    Spilman, Thomas and Battle PLLC, West Virginia counsel to the Credit Parties, with respect to the Liens created by the Mortgages filed on the Closing Date and such other matters as may be required by, and in form and substance satisfactory to, the Administrative Agent.

Each such legal opinion shall be addressed to the Administrative Agent as agent for the Lenders and shall cover such other matters incident to the transactions contemplated by this Agreement as the Administrative Agent may reasonably require.

(k)    Material Adverse Effect. Since December 31, 2006, no event or circumstance having a Material Adverse Effect shall have occurred and be continuing.

(l)    Insurance. The Administrative Agent shall have received a summary of the insurance carried in respect of each Credit Party and its Properties, including copies of all relevant insurance policies (which insurance shall be for such amounts, against such risk, covering such liabilities and with such deductibles or self-insured retentions as are acceptable to the Administrative Agent) and certificates of insurance, reasonably satisfactory to the Administrative Agent, naming the Administrative Agent, for the ratable benefit of the Secured Parties, as "*lender loss payee*" under its property loss policies and as "*additional insured*" on its comprehensive and general policies and a "lender's loss payable endorsement" or a "union Mortgagee Clause" (or a "*New York Mortgagee Clause*").

(m)    Representations and Warranties. Each of the representations and warranties made by any Credit Party in or pursuant to any Loan Document shall have been true and correct on and as of the date first made and on and as of the Closing Date.

(n)     No Default.  No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the extensions of credit requested to be made under this Agreement and, except for any such Default or Event of Default under the Original Credit Agreement of which the Administrative Agent has actual knowledge as of the date hereof.

(o)     Due Diligence.  The Lenders shall have completed a satisfactory due diligence review of the business prospects of Borrower and its Subsidiaries, including tax, legal and accounting issues.

(p)     Pledged Securities; Stock Powers; Acknowledgment and Consent.  The Administrative Agent shall have received (i) certificates representing the shares of Capital Stock pledged pursuant to the Guarantee and Security Agreement, together with an undated stock power for each such certificate executed in blank by a duly authorized officer of the pledgor thereof or (ii) in the case of Capital Stock not evidenced by a certificate, an Instructions Agreement, substantially in the form of Annex I to the Guarantee and Security Agreement, duly executed by any issuer of Capital Stock pledged pursuant to the Guarantee and Security Agreement.

(q)     Instructions Agreement.  The Administrative Agent shall have received, in the case of Capital Stock not evidenced by a certificate, an instructions agreement, substantially in the form of Annex I to the Guarantee and Security Agreement, duly executed by any issuer of Capital Stock pledged pursuant to the Guarantee and Security Agreement.

(r)     Material Agreements.  The Administrative Agent shall have received a true, correct and complete copy, certified as to such by a Responsible Officer of the applicable Credit Parties, of each Material Agreement.

(s)     Management.  The Administrative Agent and the Lenders shall be satisfied with the adequacy of the management team of the Credit Parties.

(t)     Independent Engineer Report.  If requested, the Administrative Agent shall have received an Independent Engineer Report satisfactory to the Administrative Agent in its sole discretion.

(u)     Miscellaneous.  The Administrative Agent and the Lenders shall have received such additional approvals, opinions and documents as such Persons may request.

**4.2     Conditions to Each Additional Extension of Credit.**  The agreement of each Lender to make additional Term A Loans and to make any Revolving Credit Loans to be made by it hereunder on any date is subject to the satisfaction in full, prior to or concurrently with the making of such loans of the following conditions precedent:

(a)     Representations and Warranties.  Each of the representations and warranties made by any Credit Party in or pursuant to the Loan Documents shall be true and correct on and as of such date as if made on and as of such date, except for representations and warranties expressly stated to relate to a specific earlier date, in which case such representations and warranties shall be true and correct as of such earlier date.

(b)    No Default. No Default or Event of Default shall have occurred and be
continuing on such date or after giving effect to the extensions of credit requested to be made
on such date

(c)    Use of Proceeds Statement. Borrower shall have provided to the
Administrative Agent (i) a statement detailing the proposed use of proceeds of such Loans and
(ii) a reconciliation of the projected use of proceeds to the most recently preceding borrowings
made under this Section 4.2 to the actual application thereof, which reconciliation shall include
such invoices and other such documentation evidencing such application of proceeds or as the
Administrative Agent may otherwise request, in each case, reasonably satisfactory to the
Administrative Agent.

**4.3    Conditions Deemed Fulfilled.** Except to the extent that Borrower has disclosed in
the Borrowing Notice that an applicable condition specified in Section 4.1 or 4.2, as applicable,
will not be fulfilled as of the requested time for the making of any Loan, Borrower shall be
deemed to have made a representation and warranty as of such time that the conditions specified in
Section 4.1 or 4.2, as applicable, have been fulfilled. No such disclosure by Borrower that a
condition specified in Section 4.1 or 4.2 will not be fulfilled as of the requested time for the
making of the requested Loans shall affect the right of each Lender not to make the Loans
requested to be made by it if such condition has not been fulfilled at such time.

ARTICLE V.
AFFIRMATIVE COVENANTS

Borrower hereby agrees that, so long as the Commitments remain in effect or any Loan or
other amount is owing to any Lender or any Agent hereunder, Borrower shall, and shall cause each
of its Subsidiaries to:

**5.1    Financial and Other Reporting Requirements.** Borrower shall deliver to the
Administrative Agent (in sufficient numbers for the Administrative Agent and each of the
Lenders), commencing after the end of the first fiscal quarter after the Closing Date (except in the
case of paragraphs (e) through (i) below, which notices shall be delivered as stated therein):

(a)    as soon as available and in any event within 90 days after the end of each
fiscal year of Borrower, (i) audited statements of income, members' equity and cash flows of
Borrower (on a consolidated basis) for such year and the related balance sheets as at the end of
such year, setting forth in each case, in comparative form the corresponding figures for the
preceding fiscal year and (ii) a calculation of the financial covenants set forth in Section 6.1
and Tax Distribution Amount for the fourth quarterly fiscal period and the preceding fiscal
year, and accompanied by an opinion of the Independent Accountant, which opinion shall state
that (x) such financial statements fairly present in all material respects the financial condition
and results of operations of Borrower and its Subsidiaries as at the end of, and for, such fiscal
year in accordance with GAAP and (y) such Tax Distribution Amount accurately reflect the
Covered Tax Liabilities that would accrue for the account of the Parent;

(b)    as soon as available and in any event within 60 days after the end of each of
the first three quarterly fiscal periods of each fiscal year of Borrower, (i) unaudited statements
of income and cash flows of Borrower (on a consolidated basis) for such period and for the

period from the beginning of the respective fiscal year to the end of such period, (ii) the related balance sheet as at the end of such period, setting forth in each case in comparative form the corresponding figures for the preceding fiscal year and (iii) a calculation of the financial covenants set forth in Section 6.1 and Tax Distribution Amount for such period, accompanied by a certificate of a Responsible Officer of Borrower, which certificate shall state that such financial statements fairly present in all material respects the financial condition and results of operations of Borrower (on a consolidated basis), in accordance with GAAP, consistently applied, as at the end of, and for, such period (subject to normal year-end audit adjustments);

(c)     as soon as available, but in any event not later than 20 days after the end of each month occurring during each fiscal year of Borrower (other than the third, sixth, ninth and twelfth such month), the unaudited consolidated balance sheets of Borrower and its consolidated Subsidiaries as at the end of such month and the related unaudited statements of income and of cash flows for such month and the portion of the fiscal year through the end of such month, setting forth in each case in comparative form the figures as of the end of and for the corresponding period in the previous year, certified by a Responsible Officer as being fairly stated in all material respects (subject to normal year-end audit adjustment);

(d)     as soon as available, but in any event not later than 20 days after the end of each month a schedule, certified by a Responsible Officer, estimating the amount of Capital Expenditures made by Borrower and its Subsidiaries during such month;

(e)     at the time it furnishes each set of financial statements pursuant to Sections 5.1(a) or (b) above, a certificate of a Responsible Officer of Borrower to the effect that no Default has occurred and is continuing (or, if any Default has occurred and is continuing, describing the same in reasonable detail and describing the action that Borrower has taken and proposes to take with respect to such Default); and

(f)     such other information as the Administrative Agent or any Lender may from time to time request.

All such financial statements are to be complete and correct in all material respects and are to be prepared in reasonable detail and in accordance with GAAP applied consistently throughout the periods reflected therein and with prior periods (except as approved by the Independent Accountants or officer, as the case may be, and disclosed therein).

5.2    **Collateral Reporting**.  Furnish to the Administrative Agent:

(a)     to the extent not previously disclosed to the Administrative Agent, promptly upon the acquisition thereof, a listing of any Real Property acquired by any Credit Party at a purchase price in excess of $1,000,000 and a listing of any Intellectual Property acquired by any Credit Party at a purchase price in excess of $250,000 and a listing of all Coal Leases, in each case since the date of the most recent list delivered pursuant to this Section 5.2(a) (or, in the case of the first such list so delivered, since the Closing Date);

(b)     reports, certifications, engineering studies, environmental assessments or other written material or data requested by, and in form, scope and substance reasonably satisfactory to, the Administrative Agent or the Required Lenders, in the event that

Administrative Agent or the Required Lenders at any time have a reasonable basis to believe that there may be a material violation of any Environmental Law or a condition at any Property owned, operated or leased by any Credit Party that could reasonably give rise to a Material Adverse Effect, or if an Event of Default occurs;

(c)    upon reasonable request by the Administrative Agent, such other reports as to the Coal Properties, the other Collateral or the financial condition of Borrower or any of its Subsidiaries as may be so requested;

(d)    prior to any Asset Sale, a notice (i) describing such Asset Sale or the nature and material terms and conditions of such transaction and (ii) stating the estimated Net Cash Proceeds anticipated to be received by any Credit Party;

(e)    as soon as is practicable following the written request of the Administrative Agent and in any event within 60 days after the end of each fiscal year, (i) a report in form and substance satisfactory to the Administrative Agent and the Lenders outlining all material insurance coverage maintained as of the date of such report by each Credit Party and the duration of such coverage and (ii) an insurance broker's statement that all premiums then due and payable with respect to such coverage have been paid and confirming that the Administrative Agent has been named as loss payee or additional insured, as applicable;

(f)    within 20 days after the end of each calendar month, (i) a report setting forth, for such calendar month on a Mine by Mine basis, the volume of production and sales attributable to production (and the prices at which such sales were made and the revenues derived from such sales) for such calendar month from the Coal Properties, and setting forth the related ad valorem, severance and production taxes and lease and operating expenses attributable thereto and incurred for such calendar month setting forth in each case a comparison to the projections for the comparative period and (ii) a production schedule for the next 180 days for all Coal Properties which Borrower or any Subsidiary owns or controls or in which Borrower or any Subsidiary participates; and

(g)    prior notice of any Midland Loan, or the execution and delivery or amendment, waiver or modification of any Midland Loan Documents.

5.3    **Certificates; Other Information**. Furnish to the Administrative Agent:

(a)    concurrently with the delivery of any financial statements pursuant to Section 5.1, (i) a certificate of a Responsible Officer stating that, to the best of such Responsible Officer's knowledge, each Credit Party during such period has observed or performed all of its covenants and other agreements, and satisfied every condition, contained in this Agreement and the other Loan Documents to which it is a party to be observed, performed or satisfied by it, and that such Responsible Officer has obtained no knowledge of any Default or Event of Default, except as specified in such certificate and (ii) in the case of quarterly or annual financial statements, (A) a Compliance Certificate containing all information and calculations necessary for determining compliance by Borrower and its Subsidiaries with the provisions of this Agreement as of the last day of the fiscal quarter or fiscal year of Borrower, as the case may be, (B) to the extent not previously disclosed to the Administrative Agent, an updated listing of any material Real Property (including Coal

Properties) or Intellectual Property acquired by any Credit Party or with respect to which any Credit Party shall acquire a right to earn, purchase or otherwise acquire, since the date of the most recent list delivered pursuant to this clause (B) (or, in the case of the first such list so delivered, since the Closing Date) and (C) authorization of the filing of any UCC financing statements or other filings specified in such Compliance Certificate as being required to be filed;

(b)     as soon as possible and in any event within five days of obtaining knowledge thereof: written notice of (i) any development, event, or condition that, individually or in the aggregate with other developments, events or conditions, could reasonably be expected to result in liability pursuant to any Environmental Law or Mining Law (other than in the ordinary course of business by Borrower or its Subsidiaries) in excess of $500,000; and (ii) any notice that any Governmental Authority has denied or is reasonably likely to deny any application for an Environmental or Mining Permit sought by, or revoke, modify or refuse to renew any Environmental or Mining Permit held by, any Credit Party or any Subsidiary or other operator of any Coal Properties if the effect of such action could reasonably give rise to a Material Adverse Effect;

(c)     upon the request of the Administrative Agent or any Lender, immediate access to all geological, engineering and related data contained in Borrower's or its Subsidiaries' files or readily accessible to Borrower or its Subsidiaries relating to its Mortgaged Properties, subject to and as may be limited by any confidentiality agreements to which such Credit Party is a party or by which any such data is bound;

(d)     promptly after becoming aware of the same, written notice of (i) any material labor dispute to which either Credit Party is or may become a party, including any strikes, lockouts or other disputes relating to any of such Person's plants and other facilities, and (ii) any Worker Adjustment and Retraining Notification Act or related liability incurred with respect to the closing of any plant or other facility of any of such Person that would reasonably be expected to have a Material Adverse Effect;

(e)     upon the written request of the Administrative Agent, copies of all Tax Returns filed by each Credit Party in respect of taxes measured by income (excluding sales, use and like taxes); and

(f)     promptly, such additional financial and other information as the Administrative Agent or any Lender may from time to time reasonably request.

5.4   **Payment of Obligations.**  Pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all its material obligations of whatever nature, including all lawful environmental claims, taxes, assessments, charges and levies, except where the amount or validity thereof is currently being contested in good faith by appropriate proceedings and reserves in conformity with GAAP with respect thereto have been provided on the books of Borrower or its Subsidiaries, as the case may be.

**5.5    Conduct of Business and Maintenance of Existence, Etc.**

(a)    (i) Preserve, renew and keep in full force and effect its existence as a
Delaware limited liability company and (ii) take all reasonable action to maintain all rights,
privileges and franchises necessary or desirable in the normal conduct of its business, except,
in each case, as otherwise permitted by Section 6.4.

(b)    Comply with all (i) Contractual Obligations and Constituent Documents and
(ii) Permits, Environmental or Mining Permits and Requirements of Law, and use its
reasonable efforts to cause all employees, crew members, agents, contractors and
subcontractors Borrower and its Subsidiaries to comply with all Environmental or Mining
Permits, Permits and Requirements of Law as may be necessary or appropriate to enable
Borrower and its Subsidiaries to so comply, except, in the case of Contractual Obligations,
Permits and Requirements of Law, where the failure to comply could not reasonably be
expected to result in a Material Adverse Change.

(c)    Comply with all leases, agreements and documents pertaining to or
affecting the Coal Property during the term of this Agreement, except where the failure to
comply could not reasonably be expected to result in a Material Adverse Change.

(d)    (i) Take all commercially reasonable efforts to ensure that all of their
respective tenants, subtenants, contractors, subcontractors, and invitees comply in with all
applicable Mining Laws, and obtain, comply and maintain any and all Permits, applicable to
any of them and (ii) conduct and complete all investigations, studies, sampling and testing, and
all remedial, removal and other actions in each case required under applicable Mining Laws
and promptly comply in all respects with all lawful orders and directives of any Governmental
Authority in respect of applicable Mining Laws, except where the failure to comply could not
reasonably be expected to result in a Material Adverse Change.

(e)    Cause the Administrative Agent and the Lender to be reasonably satisfied
that each Person that is a part of the management team of the Credit Parties generally has
sufficient availability of time necessary to competently manage the business and operations of
the Credit Parties.

**5.6    Operation and Maintenance of Property; Insurance.**

(a)    Cause the development of each of the Mines listed on <u>Schedule 5.6(a)</u> to be,
in the reasonable opinion of the Administrative Agent, in compliance with the Milestone
Schedule.

(b)    Keep, preserve and maintain all Property and systems, including all
improvements, personal property and equipment, useful and necessary in its business in good
working order and condition in accordance with the general practice of other businesses of
similar character and size (ordinary wear and tear excepted) and make all necessary repairs,
renewals and replacements so that its business may be property conducted at all times.

(c)    Cure, to the satisfaction of Administrative Agent in its discretion, any title
defects to any of the Properties which is material in value, in the reasonable opinion of the

Administrative Agent, within 30 days after becoming aware of the same and, in the event any such title defects are not cured in a timely manner, pay all related costs and fees reasonably incurred by the Administrative Agent to do so.

(d)    Keep and continue all Material Agreements in full force and effect in accordance with the terms thereof, and not permit the same to lapse or otherwise become impaired for failure to comply with the obligations thereof, whether express or implied.

(e)    Maintain with financially sound and reputable insurance companies insurance on all its Property in at least such amounts and against at least such risks (but including in any event general liability) as are usually insured against in the same general area by companies engaged in the same or a similar business, with such deductibles as are reasonably acceptable to the Administrative Agent.

(f)    Name the Administrative Agent, for the ratable benefit of the Secured Parties, as "loss payee" under its casualty loss policies and the Administrative Agent as "additional insured" on its comprehensive and general liability policies, and cause each insurance policy that is so maintained and that covers all or any portion of a Mortgaged Property, Mine, or Coal Lease to contain a "lender's loss payable endorsement" or a "union Mortgagee Clause" (or a *New York Mortgagee Clause*"), as applicable, in form and substance reasonably satisfactory to the Administrative Agent. Borrower will furnish to the Lenders, upon request of the Administrative Agent, information in reasonable detail as to the insurance so maintained and flood zone determination forms for all enclosed structures owned by any Credit Party that is contained in the Mortgaged Property. Such casualty loss policies shall be reasonably satisfactory to the Administrative Agent in all respects and shall not be canceled, amended or changed without at least 30 days' (ten days for nonpayment) written notice to the Administrative Agent. So long as no Event of Default has occurred and is continuing, Net Cash Proceeds of any insurance policies shall be applied in accordance with Section 2.11(a).

(g)    Renew all insurance policies referred to in this Section 5.6 on terms no less favorable to the Administrative Agent for the ratable benefit of the Secured Parties during the term of this Agreement. Any substitute underwriter shall be, in Borrower's reasonable opinion, as financially sound as Borrower's existing underwriters.

(h)    Operate its Coal Properties and other material Properties or cause such Coal Properties and other material Properties to be operated in a careful and efficient manner in accordance with the practices of the industry and in compliance with all applicable contracts and agreements and in compliance with all Requirements of Law, including, without limitation, applicable proration requirements and Environmental Laws, and all applicable laws, rules and regulations of every other Governmental Authority from time to time constituted to regulate the development and operation of its Coal Properties and the production and sale of Coal and other minerals therefrom, except where the failure to do so could not reasonably be expected to result in a Material Adverse Change.

(i)    Promptly pay and discharge, or make reasonable and customary efforts to cause to be paid and discharged, all rentals, royalties, expenses and indebtedness accruing under the leases or other agreements affecting or pertaining to its Properties and will do all

other things necessary to keep unimpaired their rights with respect thereto and prevent any forfeiture thereof or default thereunder.

(j)    Promptly perform or make reasonable and customary efforts to cause to be performed, in accordance with industry standards, the obligations required by each and all of the assignments, deeds, leases, sub-leases, contracts and agreements affecting its interests in its Properties.

(k)    To the extent Borrower is not the operator of any Property, use its best efforts to cause the operator to comply with this Section 5.6.

(l)    Prior to the commencement of any mining operations, Borrower shall obtain the leasehold interest mining rights necessary for the operation of the applicable Mine that will be operated on such parcel, and each of its rights under the applicable lease, contracts, rights-of-way and easements necessary for the operation of such Mine shall be in full force and effect and no default shall exist thereunder.

### 5.7    Inspection of Property; Books and Records; Discussions.

(a)    Keep proper books of records and account in which full, true and correct entries in conformity with GAAP and all Requirements of Law shall be made of all dealings and transactions in relation to its business and activities; and

(b)    Permit the Administrative Agent and the Lenders, or any agents or representatives thereof, from time to time during Borrower's normal business hours, as often as may be reasonably requested and upon two Business Days notice (except that, during the continuance of an Event of Default, no such notice shall be required) to (i) go upon, examine, inspect and remain on the Properties of the Credit Parties, (ii) during any such visit, inspect and verify the amount, character and condition of any of the Property of the Credit Parties, (iii) during any such visit, examine and, at Borrower's cost and expense, make copies of and abstracts from the records and books of account of the Credit Parties, and (iv) discuss the affairs, finances and accounts of the Credit Parties with any of their respective officers, directors, employees or Independent Accountants. Except as otherwise stated in clause (iii) above, the Administrative Agent and each Lender will pay the costs and expenses incurred by it in exercising its rights under this Section 5.7(b); *provided* that after the occurrence of an Event of Default, Borrower shall reimburse the Administrative Agent and each Lender promptly after a request therefor for the reasonable costs and expenses incurred by it in connection with the exercise of its rights under this Section 5.7(b).

(c)    Authorize Borrower's Independent Accountants to disclose to the Administrative Agent or any Lender any and all financial statements and other information of any kind, as the Administrative Agent or any Lender reasonably requests from Borrower and which the Independent Accountants may have with respect to the business, financial condition, results of operations or other affairs of the Credit Parties.

### 5.8    Notices. Promptly, and in any event within three Business Days after knowledge thereof, give notice to the Administrative Agent and each Lender of:

(a)     the occurrence of any Default or Event of Default;

(b)     any (i) default or event of default under any Material Agreement or other agreement a default under which could reasonably be expected to result in a Material Adverse Change or (ii) investigation (which is not in the ordinary course and which, if adversely determined, could reasonably be expected to result in a Material Adverse Effect), litigation or proceeding which may exist at any time between any Credit Party and any Governmental Authority;

(c)     any litigation or proceeding against any Credit Party or any Subsidiary in which the amount involved is $500,000 or more and not covered by insurance or in which injunctive or similar relief is sought;

(d)     (i) the occurrence of any Reportable Event with respect to any Benefit Plan, a failure to make any required contribution to a Benefit Plan, the creation of any Lien in favor of the PBGC or a Benefit Plan or any withdrawal from, or the termination, Reorganization or Insolvency of, any Multiemployer Plan, (ii) the institution of proceedings or the taking of any other action by the PBGC or any Credit Party or any Commonly Controlled Entity or any Multiemployer Plan with respect to the withdrawal from, or the termination, Reorganization or Insolvency of, any Benefit Plan or (iii) proceedings that have been instituted pursuant to Section 515 of ERISA to collect a delinquent contribution to a Benefit Plan, that Borrower or any Commonly Controlled Entity will or may incur any material liability (including any indirect, contingent or secondary liability) to or on account of a termination or withdrawal from a Benefit Plan under Title IV of ERISA or with respect to a Benefit Plan under Section 401(a)(29) or 4971, 4975, or 4980 of the Code or Section 409, 502(i) or 503(l) of ERISA or with respect to a group health plan (as defined in Section 607(1) of ERISA or Section 4980B of the Code) under Section 4890B of the Code, or that Borrower or a Commonly Controlled Entity will incur any material liability pursuant to an employee welfare benefit plan that provides benefits to retired employees or former employees (other than as required under Section 601 of ERISA) or any Benefit Plan;

(e)     any development or event (including notice of any claim or condition arising under or related to any Environmental Law) that constitutes a Material Adverse Effect;

(f)     promptly upon (i) delivery to another Material Project Party pursuant to a Material Project Document, copies of all material notices or other material documents delivered to such Material Project Party by any Credit Party and (ii) such documents becoming available, copies of all material notices or other material documents received by any Credit Party pursuant to any Material Project Document (such as any notice or other document relating to a failure by any Credit Party to perform any of its covenants or obligations under such Material Project Document, termination of a Material Project Document or a force majeure event under a Material Project Document, but excluding any notice provided in the ordinary course of business);

(g)     the commencement of any audit or examination of any Tax Return by any Governmental Authority, the receipt by Borrower or any Subsidiary of notice of any such audit or examination or the assertion of any claim for taxes against Borrower or any Subsidiary by any Governmental Authority; and

(h)      simultaneously with the date that Borrower or any Subsidiary (i) commences or terminates negotiations with any collective bargaining agent for the purpose of materially changing any collective bargaining agreement, (ii) reaches an agreement with any collective bargaining agent prior to ratification for the purpose of materially changing any collective bargaining agreement, (iii) ratifies any agreement reached with a collective bargaining agent for the purpose of materially changing any collective bargaining agreement or (iv) becomes subject to a "cooling off period" under the auspices of the National Mediation Board, the commencement or termination of such negotiations or the receipt of such agreement or notice of a "cooling off period" (including a copy of such agreement or notice), as the case may be.

Each notice pursuant to this Section 5.8 shall be accompanied by a statement of a Responsible Officer setting forth details of the occurrence referred to therein and stating what action Borrower or the relevant Subsidiary proposes to take with respect thereto.

5.9     **Environmental Laws.**  At Borrower's own expense:

(a)      except where the failure to do so could not result in a Material Adverse Effect:

(i)      Comply in all respects with, and ensure compliance in all material respects at any Property owned, leased or operated by Borrower or any Subsidiary by all tenants, subtenants, lessees, sub-lessees and contractors, if any, with all applicable Environmental Laws, and obtain and comply in all respects with and maintain, and cause all tenants, subtenants, lessees, sub lessees and contractors to obtain and comply in all respects with and maintain, any and all material Environmental or Mining Permits required by applicable Environmental Laws or Mining Laws with respect to any Property owned or leased by Borrower or any Subsidiary;

(ii)      Conduct and complete all investigations, studies, sampling and testing, and all reporting, investigative, remedial, removal and other actions required under Environmental Laws, and promptly comply in all respects with all lawful orders and directives of all Governmental Authorities regarding Environmental Laws;

(iii)      Not dispose of or otherwise release any Regulated Substances on, under, about or from any of Borrower's or its Subsidiaries' Properties or any other Property to the extent caused by Borrower's or any of their Subsidiaries' operations except in compliance with applicable Environmental Laws;

(b)      As soon as available, and in any case within five Business Days prior to the closing of any acquisition of Properties by a Credit Party for which Borrower reasonably believes that its liability for environmental remediation potentially associated with the ownership or operation of all such Properties is expected to exceed $1,000,000 for preexisting conditions, deliver to the Administrative Agent an environmental report covering such Properties to be acquired, in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders;

(c)     Diligently pursue the attainment of all Environmental or Mining Permits necessary or appropriate for the operation or use of Borrower's or their Subsidiaries' Properties generally in accordance with its business plans;

(d)     Promptly commence and diligently prosecute to completion any assessment, evaluation, investigation, monitoring, containment, cleanup, removal, repair, restoration, remediation or other remedial obligations required or reasonably necessary under applicable Environmental Laws because of or in connection with the actual or suspected past, present or future disposal or other release of any Regulated Substances on, under, about or from any of Borrower's or their Subsidiaries' Properties, which failure to commence and diligently prosecute to completion could reasonably be expected to result in the incurrence of any material liability or in a material increase in any existing liability;

(e)     Promptly, but in no event later than five days of the occurrence of a triggering event, notify the Administrative Agent in writing of any threatened action, investigation or inquiry by any Governmental Authority or any demand or threatened lawsuit by any landowner or other third party against Borrower or its Subsidiaries or their Properties of which Borrower has knowledge in connection with any Environmental Laws (excluding routine testing and corrective action) if Borrower reasonably anticipates that such action may result in liability (whether individually or in the aggregate) in excess of $100,000; and

(f)     Establish and implement such procedures as may be necessary to continuously determine and assure that Borrower's and their Subsidiaries' obligations under this Section 5.9 are timely and fully satisfied.

**5.10    Additional Collateral, Etc.**

(a)     With respect to any Property (other than Excluded Property) acquired after the Closing Date by Borrower or any of its Subsidiaries as to which the Administrative Agent, for the benefit of the Secured Parties, does not have a perfected Lien and security interest, promptly and, in any event, within 10 Business Days, (i) execute and deliver to the Administrative Agent such Security Documents or such amendments to such Security Documents as the Administrative Agent deems necessary or advisable to grant to the Administrative Agent, for the benefit of the Secured Parties, a fully perfected Lien and security interest in such Property prior and superior in right to any other Person, subject only to Permitted Liens, (ii) take all actions necessary or advisable to grant to the Administrative Agent, for the benefit of the Secured Parties, a fully perfected Lien and security interest on such Property prior and superior in right to any other Person (subject only to Permitted Liens), including the filing of Mortgages and UCC financing statements in such jurisdictions as may be required by the Security Documents or by law or as may be requested by the Administrative Agent and (iii) deliver to the Administrative Agent such legal opinions relating to the matters described in clauses (i) and (ii) immediately preceding for which the Administrative Agent may reasonably request, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent.

(b)     With respect to any fee interest in any Real Property (other than Excluded Property) acquired after the Closing Date by Borrower or any of its Subsidiaries, promptly and, in any event, within 10 Business Days (i) execute and deliver a fully perfected Mortgage

prior and superior in right to any other Person (subject only to Permitted Liens) in favor of the
Administrative Agent, for the benefit of the Secured Parties, covering such Real Property, and
(ii) if reasonably requested by the Administrative Agent, provide the Administrative Agent
with (A) title and extended coverage insurance covering such Real Property in an amount at
least equal to the purchase price of such Real Property (or such other amount as shall be
reasonably specified by the Administrative Agent) as well as a current ALTA or survey
thereof, together with a surveyor's certificate, (B) any consents or estoppels reasonably
deemed necessary or advisable by the Administrative Agent in connection with such
Mortgage, each of the foregoing in form and substance reasonably satisfactory to the
Administrative Agent and (C) legal opinions relating to the matters described above, which
opinions shall be in form and substance, and from counsel, reasonably satisfactory to the
Administrative Agent.

      (c)      With respect to any new Subsidiary created or acquired after the Closing
Date by Borrower or any of its Subsidiaries, concurrently with such creation or acquisition,
(i) execute and deliver to the Administrative Agent such amendments to the Security
Documents as the Administrative Agent deems necessary or advisable to grant to the
Administrative Agent, for the benefit of the Secured Parties, a fully perfected Lien and security
interest in the Capital Stock of such new Subsidiary prior and superior in right to any other
Person (subject only to Permitted Liens), (ii) deliver to the Administrative Agent (or its
bailee) for the benefit of the Secured Parties, (A) the certificates (if any) representing such
Capital Stock, together with undated powers, in blank, executed and delivered by a duly
authorized officer of Borrower or a Subsidiary, as the case may be and (B) in the case of a
Subsidiary whose Capital Stock is a security that is not evidenced by a certificate, the
Administrative Agent an Acknowledgment and Consent, substantially in the form of Annex I
to the Guarantee and Security Agreement, duly executed by any issuer of Capital Stock
pledged pursuant to such Guarantee and Security Agreement, (iii) cause such new Subsidiary
(A) to become a party to the applicable Security Documents and (B) to take such actions
necessary or advisable to grant to the Administrative Agent for the benefit of the Secured
Parties a fully perfected Lien and security interest on the Collateral described in the Guarantee
and Security Agreement and pursuant to a duly executed Mortgage, such Lien on all Properties
of such new Subsidiary, subject in each case to Permitted Liens, including, without limitation,
the filing of UCC financing statements in such jurisdictions as may be required by the
Guarantee and Security Agreement, the filing of any Mortgages in appropriate filing offices
and other filings required by law or as may be requested by the Administrative Agent, and
(iv) if requested by the Administrative Agent, deliver to the Administrative Agent such legal
opinions, relating to the matters described above as the Administrative Agent may request,
which opinions shall be in form and substance, and from counsel, satisfactory to the
Administrative Agent.

     **5.11**    **Mining Activities**. Maintain at all times a minimum metallurgical coal base of
16 million in-place tons except with the consent of the Administrative Agent at the direction of the
Required Lenders and in consultation with the Independent Engineer acting on behalf of the
Lenders.

     **5.12**    **Chief Financial Officer**. Within 120 days after the Closing Date, hire and
maintain the employment at all times thereafter of a sufficiently qualified and experienced chief

financial officer or financial consultant, as such may be determined by the Company and approved by the Administrative Agent.

**5.13    Patriot Act Compliance.**  The Credit Parties shall provide such information and take such actions as are reasonably required by the Agents or any Lender in order to assist the Agents and Lenders with compliance with the Patriot Act

**5.14    Further Assurances.**

(a)    From time to time execute and deliver, or cause to be executed and delivered, such additional instruments, certificates or documents, and take such actions, as the Administrative Agent may reasonably request for the purposes of implementing or effectuating the provisions of this Agreement and the other Loan Documents, or of more fully perfecting or renewing the rights of the Administrative Agent and the Secured Parties with respect to the Collateral (or with respect to any additions thereto or replacements or proceeds thereof or with respect to any other Property hereafter acquired by Borrower or any Subsidiary which may be deemed to be part of the Collateral) pursuant hereto or thereto.

(b)    Upon the exercise by the Administrative Agent or any Lender of any power, right, privilege or remedy pursuant to this Agreement or the other Loan Documents which requires any consent, approval, recording, qualification or authorization of any Governmental Authority, execute and deliver, or will cause the execution and delivery of, all applications, certifications, instruments and other documents and papers that the Administrative Agent or such Lender may be required to obtain from Borrower or any Subsidiary for such governmental consent, approval, recording, qualification or authorization.

ARTICLE VI.
NEGATIVE COVENANTS

Borrower hereby agrees that, so long as the Commitments remain in effect or any Loan or other amount is owing to any Lender or any Agent hereunder, Borrower shall not, and shall not permit any of its respective Subsidiaries to, directly or indirectly

**6.1    Financial Covenants.**

(a)    <u>Consolidated Fixed Charges Coverage Ratio.</u>  Permit the Consolidated Fixed Charges Coverage Ratio to be less than 1.0 to 1.0 as at the last day of any calendar quarter of Borrower commencing April 1, 2008, as measured for the four most recent consecutive calendar quarters immediately preceding the measurement of such ratio; *provided* that, notwithstanding the foregoing, for the first three fiscal quarters commencing April 1, 2008, the calculation of the components of Consolidated Fixed Charges Coverage Ratio consisting of "Project Revenues" and "Operation and Maintenance Expenses" shall be determined on an annualized basis so that (i) for the fiscal quarter ending June 30, 2008 such components shall be determined for such fiscal quarter shall be multiplied by four, (ii) for the fiscal quarter ending September 30, 2008, such components shall be determined for the two fiscal quarters ending September 30, 2008, and multiplied by two, and (iii) for the fiscal quarter ending December 31, 2008, such components shall be determined for the three fiscal quarters ending December 31, 2008 and multiplied by four-thirds (4/3s).

(b)    <u>Consolidated Leverage Ratio</u> . Permit the Consolidated Leverage Ratio as of the last day of any period of four consecutive calendar quarters, commencing April 1, 2008, to exceed the following respective ratio for the following respective periods; *provided* that, notwithstanding the foregoing, for the first three fiscal quarters commencing April 1, 2008, the calculation of Consolidated EBITDA shall be calculated on an annualized basis so that (i) for the fiscal quarter ending June 30, 2008, Consolidated EBITDA shall be determined for the fiscal quarter ending June 30, 2008, and multiplied by four, (ii) for the fiscal quarter ending September 30, 2008, Consolidated EBITDA shall be determined for the two fiscal quarters ending September 30, 2008, and multiplied by two, and (iii) for the fiscal quarter ending December 31, 2008, Consolidated EBITDA shall be determined for the three fiscal quarters ending December 31, 2008 and multiplied by four-thirds:

| Period | Ratio |
|---|---|
| From April 1, 2008 through June 30, 2008 | 4.25 to 1.00 |
| From July1, 2008 through September 30, 2008 | 4.00 to 1.00 |
| From October 1, 2008 through December 31, 2008 | 3.00 to 1.00 |
| From January 1, 2009 through December 31, 2009 | 2.50 to 1.0 |
| From January 1, 2010 and thereafter | 2.00 to 1.0 |

(c)    <u>Minimum Tangible Net Worth</u>. At any time after December 31, 2007 permit the Tangible Net Worth of Borrower to fall below the sum of $1,000,000 plus 50% of the difference of (1) consolidated net income of Borrower and its subsidiaries for each fiscal quarter in which net income was earned (as opposed to a net loss) less (2) Covered Tax Liabilities in respect of such net income through the date of determination.

(d)    <u>Minimum Current Ratio</u>. At any time during the period commencing on January 1, 2008 and ending on December 31, 2008, permit the Current Ratio to be less than 1.25 to 1.0; and on or at any time after January 1, 2009 permit the Current Ratio to be less than 1.75 to 1.0.

(e)    <u>Maximum Capital Expenditures</u>. At any time, permit the aggregate amount of Capital Expenditures expended by Borrower (including Project Costs that are considered capital expenses in accordance with GAAP) and its Subsidiaries to exceed Permitted Capital Expenditures as set forth below, which Permitted Capital Expenditures shall not exceed the following respective amounts for the following respective periods (with carry-over amounts from year 2007 permitted), unless such excess has been approved by the enders in writing and included in the applicable Operating and Capital Budget:

| Period | Amount |
|---|---|
| From January 1, 2007 through December 31, 2007 | $65,000,000 |

| From January 1, 2007 through December 31, 2008 | $76,500,000 |
| From January 1, 2007 through December 31, 2011 | $89,500,000 |

**6.2    Indebtedness.** Create, incur, issue, assume, guaranty or suffer to exist any Indebtedness, except for the following (collectively, "***Permitted Indebtedness***"):

(a)    Indebtedness of any Credit Party under any Loan Document;

(b)    accounts payable (other than for borrowed money) arising, and accrued expenses incurred, in the ordinary course of business so long as such accounts payable are payable within 90 days of the date the respective goods are delivered or the respective services are rendered and (unless such accounts payable are being contested in good faith and by appropriate legal, administrative or other proceedings diligently conducted and so long as adequate reserves have been established with respect thereto in accordance with GAAP, and only if the failure to pay such accounts payable could not reasonably be expected to have a Material Adverse Effect) are not more than 90 days past due;

(c)    purchase money or lease obligations (including Capital Lease Obligations and equipment rental agreement obligations) to the extent incurred in the ordinary course of business to finance the acquisition or licensing of intellectual property or items of equipment (and Indebtedness incurred to finance any such obligations); *provided*, that (A) if such obligations are secured, they are secured only by Liens upon the equipment or intellectual property being financed (other than the cash deposits securing the Orix Lease as of the Closing Date) and (B) the aggregate principal amount and the capitalized portion of such obligations (including in regards to any equipment rental agreement) do not at any time exceed $5,000,000 in the aggregate;

(d)    Indebtedness under any Hedging Agreement (i) approved by the Administrative Agent in accordance with Section 6.15 or (ii) in the case of any interest rate swap, constituting a Permitted Swap Agreement;

(e)    Indebtedness of Borrower to any Guarantor or of any Guarantor to Borrower or any other Guarantor which is subordinated to the Obligations on terms and provisions reasonably acceptable to the Administrative Agent;

(f)    other unsecured Indebtedness for borrowed money, incurred for working capital purposes, and subordinated to the Obligations on terms, and set forth in a written instrument in form and substance, acceptable to the Administrative Agent;

(g)    Existing Indebtedness *provided* that such Indebtedness shall be included in the aggregate limit in clause (c) above, classified as purchase money or lease obligations;

(h)    Indebtedness of any Credit Party in connection with an insurance premium funding arrangement for insurance to be maintained pursuant to Section 5.6; and