(i)    Indebtedness representing amounts due under the Monarch Agreement, *provided* that such Indebtedness shall be subordinated to the Obligations on terms and provisions reasonably acceptable to the Administrative Agent (the "*Monarch Subordinated Debt*").

    **6.3    Liens.**  Create, incur, assume or suffer to exist any Lien upon any of its Property, whether now owned or hereafter acquired, except for the following (collectively, "*Permitted Liens*"):

(a)    Liens for taxes not yet due or which are being contested in good faith by appropriate proceedings, *provided* that adequate reserves with respect thereto are maintained on the books of the applicable Credit Party, as the case may be, in conformity with GAAP;

(b)    carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business in respect of obligations (i) which are not yet due or (ii) that are being contested in good faith by appropriate proceedings, for which adequate reserves in accordance with GAAP shall have been set aside on its books and which do not and will not result in a Material Adverse Effect;

(c)    Liens of landlords securing obligations to pay lease obligations that are not yet due and payable or in default;

(d)    Liens, pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation (other than ERISA);

(e)    deposits (i) as required by any Governmental Authority in connection with obtaining any Permits in lieu of bonding or securing bonding provided to such Governmental Authority for such purpose or (ii) to secure performance of bids, trade contracts (other than for borrowed money), leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(f)    Liens and deposits in existence on the Closing Date and those hereafter made in connection with the Orix Documentation (including Liens arising with respect to additional equipment to be financed thereunder);

(g)    cash deposits in existence or hereafter paid by the Credit Parties to equipment manufacturers to secure purchases of equipment by the Credit Parties;

(h)    Liens arising from precautionary UCC financing statement filings regarding operating leases entered into in the ordinary course of business;

(i)    Liens created pursuant to the Security Documents;

(j)    Liens on fixed or capital assets acquired, constructed or improved by Borrower or its Subsidiaries; *provided,* that (i) such Liens secure Indebtedness permitted under Section 6.2(c), (ii) such Liens and the Indebtedness secured thereby are incurred substantially simultaneously with the acquisition, construction or improvement of such fixed or capital assets, (iii) such Liens do not at any time encumber any Property other than the Property

financed by such Indebtedness, (iv) the amount of Indebtedness secured thereby is not
increased, and (iv) the amount of Indebtedness secured thereby is not more than 100% of the
purchase price;

(k)     defects, easements, rights-of-way, restrictions and other similar
encumbrances incurred in the ordinary course of business and encumbrances, licenses,
restrictions on the use of property or imperfections in title that, in each case, do not materially
impair the property affected thereby for the purpose for which title was acquired or interfere
with the operation of any Credit Party's business and that individually or in the aggregate
could not reasonably be expected to result in a Material Adverse Effect;

(l)     judgment Liens not to exceed $100,000 that do not involve any reasonable
risk of forfeiture of any material Property or the termination of any Material Agreement and
which, within 10 days after entry thereof, are being contested in good faith by appropriate
proceedings;

(m)     Liens granted in connection with Hedging Agreements (i) approved by the
Administrative Agent in accordance with Section 6.15; *provided*, that each such Lien is *pari
passu* with the Liens granted to the Secured Parties under the Loan Documents and
(ii) constituting a Permitted Swap Agreement; and

(n)     Liens securing mining leases not to exceed $500,000 or created in respect of
collateral pledged to Government Authorities in lieu of performance bonds.

**6.4    Fundamental Changes.**  Enter into any merger, consolidation, restructuring,
reorganization or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation
or dissolution), Dispose of all or substantially all of its Property or business or amend, modify or
otherwise change its name, jurisdiction of organization, organizational number, identification
number or FEIN, except that, if no Default shall have occurred and be continuing:

(a)     any Subsidiary may be merged or consolidated with or into Borrower
(*provided* that Borrower shall be the continuing or surviving entity) or with or into any wholly
owned Guarantor;

(b)     any Subsidiary may Dispose of any or all of its assets (upon voluntary
liquidation or otherwise) to Borrower or any Guarantor; and

(c)     the Capital Stock of any Subsidiary may be transferred to Borrower or any
Guarantor.

**6.5    Disposition of Property.**  Dispose of any of its Property (including receivables and
leasehold interests), whether now owned or hereafter acquired, or, in the case of any Subsidiary,
issue or sell any shares of such Subsidiary's Capital Stock or, in the case of Borrower, issue any
shares of Borrower's Capital Stock (including, in each case, pursuant to any merger,
consolidation, recapitalization or other transaction) to any Person, except:

(a)    subject to compliance with Section 2.9, the Disposition of assets for which Borrower receives consideration at the time of such Disposition at least equal to the fair market value of such assets and 90% of such consideration is in the form of cash;

(b)    subject to compliance with Section 2.9, the Disposition of assets in the ordinary course of business which are no longer necessary or required in the conduct of such Credit Party's business;

(c)    any Recovery Event; *provided* that the requirements of Section 2.9 are complied with in connection therewith;

(d)    Dispositions of inventory in the ordinary course of business;

(e)    Dispositions solely among Guarantors or from a Guarantor to Borrower;

(f)    any merger, consolidation, Disposition or transfer of Capital Stock specified in and permitted under clauses (a), (b) or (c) of Section 6.4;

(g)    Permitted Sale and Leaseback Transactions;

(h)    a sublease to Oxford Mining Company or another mining company acceptable to Administrative Agent of rights under the applicable Coal Lease required for the surface operation by Oxford Mining Company or another mining company acceptable to the Administrative Agent of that certain Mine known as the Buck Lilly;

(i)    any trade-in of Property in connection with obtaining substitute Property used or useful in connection with any Credit Party's business; *provided*, that such substitute Property shall have a value greater or equivalent to that traded-in; and

(j)    the Disposition of the Oldenburg Stamler Continuous Haulage System, serial number 70215.

**6.6    Restricted Payments.** Declare or pay any dividend on, or make any payment or distribution on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement, conversion into or other acquisition of, any Capital Stock of Borrower or any Subsidiary, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of Borrower or any Subsidiary; or enter into any derivatives or other transaction with any financial institution, commodities or stock exchange or clearinghouse (a "***Derivatives Counterparty***") obligating Borrower or any Subsidiary to make payments to such Derivatives Counterparty as a result of any change in market value of any such Capital Stock; or make or offer to make any optional or voluntary payments, prepayment, repurchase or redemption of, or otherwise voluntarily or optionally defease, any Indebtedness (other than accounts payable arising from the purchase of goods or services or the Loans) or make any payment or prepayment of principal, premium (if any), interest, fees (including fees to obtain any waiver or consent) or other charges on, or redemption, purchase, retirement, defeasance, sinking fund or similar payment with respect to, any Indebtedness of Borrower or any Subsidiary (collectively, "***Restricted Payments***"), except that:

(a)  any Subsidiary may make Restricted Payments to Borrower or any Guarantor;

(b)  any Credit Party may make any required payment, prepayment, redemption, retirement, purchase or other payment of other Permitted Indebtedness, in each case to the extent required to be made by the terms thereof and permitted by such terms after giving effect to any applicable subordination provisions;

(c)  any Credit Party may make prepayments of Capital Leases or purchase money financing comprising Permitted Indebtedness upon the sale or exchange of the equipment subject thereto; and

(d)  Borrower may make dividends or other distributions to Parent equal to the Tax Distribution Amount; *provided* that prior to making any such dividend or distribution Borrower shall deliver to the Administrative Agent a certificate, in a form acceptable to the Administrative Agent, from the Independent Accountant computing the Tax Distribution Amount for each Member;

*provided, however*, that the Restricted Payments described in clauses (b), (c) and (d) above shall not be permitted if a Default or Event of Default shall have occurred and be continuing at the date of declaration or payment thereof or would result therefrom.

6.7  **Investments**. Make, or permit to exist, any Investment, other than:

(a)  extensions of trade credit in the ordinary course of business;

(b)  Investments in Cash Equivalents;

(c)  Investments by Borrower or any of its Subsidiaries in a Guarantor or Borrower;

(d)  Hedging Agreements permitted by Section 6.15;

(e)  with respect to deposits and pledges securing Permits, deposits of cash, certificates of deposit or other securities required by and acceptable to the applicable Governmental Authority;

(f)  subject to the provisions of Section 2.9, Qualified Investments made with the portion of any Reinvestment Deferred Amount;

(g)  Investments received by Borrower or any Subsidiary in connection with workouts with, or bankruptcy, insolvency or other similar proceedings with respect to, customers, working interest owners, other industry partners or any other Person; and

(h)  the Midland Loans.

6.8  **Subsidiaries**. Acquire, form, incorporate, organize or suffer to exist any Subsidiary (i) having any Capital Stock that is not owned by Borrower directly or through other Subsidiaries or (ii) that is not a Guarantor.

**6.9    Amendments to Certain Documents.** Amend, modify or otherwise change, or permit any amendment, modification or other change to (in either case, pursuant to a waiver or otherwise) (a) any Constituent Document, Midland Document or Loan Document, including, by the filing or modification of any certificate of designation, or any agreement or arrangement entered into by it, with respect to any of its Capital Stock (including any shareholders' agreement), or enter into any new agreement with respect to any of its Capital Stock, except any such amendments, modifications or changes or any such new agreements or arrangements that do not adversely affect any right, privilege or interest of the Administrative Agent or the Lenders under the Loan Documents or any of the other Loan Documents or in the Collateral, (b) any notes, agreement, instruments or other documents relating to the Existing Indebtedness or (c) any Material Agreement.

**6.10    Transactions with Affiliates.** Enter into any agreement or effect any transaction, including any purchase, sale, lease or exchange of Property, the rendering of any service or the payment of any management, advisory or similar fees, with any Affiliate (other than with any Credit Party) other than:

(a)    transactions on fair and reasonable terms and which are no less favorable to Borrower or any Subsidiary, as the case may be, than could be obtained in a comparable arm's length transaction with a Person that is not an Affiliate (other than terms set forth in the Midland Administrative Services Agreement as in effect on the date hereof); *provided,* that prior to entering into any such agreement with an Affiliate, each applicable Credit Party shall have delivered to the Administrative Agent a certificate of a Responsible Officer of such Credit Party describing such transaction in reasonable detail and certifying as to the satisfaction of conditions set forth in this Section 6.10;

(b)    the exercise of rights and the performance of obligations under any Midland Documents as in effect on the date hereof;

(c)    the engagement of Monarch Financial Corporation, a corporation incorporated under the laws of the Commonwealth of Pennsylvania, pursuant to that an Agreement for Advisory Services to be entered into between Borrower and Monarch Financial Corporation, on terms and conditions acceptable to the Administrative Agent in its sole discretion; and

(d)    a letter agreement between Monarch Financial Corporation and the Borrower, with respect to the payment of certain finders fees, on terms and conditions acceptable to the Administrative Agent in its sole discretion.

*provided* in all cases, that the aggregate amount of all Indebtedness (including any accounts receivable and the Midland Loans payable to Borrower by any of its Affiliates (other than the Credit Parties) shall not exceed $12,000,000.

**6.11    Equipment Sales and Leaseback Transactions.** Enter into any Equipment Sale and Leaseback Transaction other than a Permitted Equipment Sale and Leaseback Transaction.

**6.12    Negative Pledge Clauses.** Enter into or suffer to exist or become effective any agreement that prohibits or limits the ability of any Credit Party to create, incur, assume or suffer

to exist any Lien upon any of its Property or revenues, whether now owned or hereafter acquired, to secure the Obligations or, in the case of any Guarantor, its obligations under the Guarantee and Security Agreement, other than (a) this Agreement and the other Loan Documents; or (b) in the case of Borrower or any of its Subsidiaries, any agreements governing any purchase money Liens or Capital Lease Obligations otherwise permitted hereby (in which case, any prohibition or limitation shall only be effective against the assets financed thereby).

**6.13  Restrictions on Subsidiary Distributions.** Enter into or suffer to exist or become effective any consensual encumbrance or restriction on the ability of any Subsidiary to (a) make Restricted Payments in respect of any Capital Stock of such Subsidiary held by, or pay any Indebtedness owed to, any Specified Credit Party, (b) make Investments in any Specified Credit Party or (c) transfer any of its assets to any Specified Credit Party, except for such encumbrances or restrictions existing under or by reason of any restrictions existing under the Loan Documents.

**6.14  Lines of Business.** Enter into any business, either directly or through any Subsidiary, except for those businesses in which the Credit Parties are engaged on the date of this Agreement or disclosed to the Administrative Agent and the Lenders in writing prior to the date hereof.

**6.15  Hedging Agreements.** Enter into, or suffer to exist, any Hedging Agreement unless such agreement (a) is approved in advance in writing by the Administrative Agent or (b) in the case of any interest rate swap, constituting a Permitted Swap Agreement.

**6.16  Changes in Fiscal Periods.** Permit the fiscal year of Borrower or any Subsidiary to end on a day other than December 31 or change Borrower's method of determining its fiscal year.

**6.17  Use of Proceeds.** Borrower shall (i) use the proceeds from the borrowing of Term A Loans on the Closing Date to pay transaction costs for the Closing, including Lender costs and expenses to pay for working capital and general corporate needs of the Credit Parties, (ii) use Term A Loan proceeds and Revolving Credit Loan proceeds to pay for, directly or indirectly through Borrower Subsidiaries, Project Costs in respect of the Development of the Project in accordance with the Construction Budget and Schedule, and (iii) use Term B Loan proceeds to pay in full the Second Lien Obligations.

**6.18  Bank Accounts.** Open or otherwise establish or maintain any bank account in the name or otherwise for the benefit of Borrower or any Subsidiary, other than a single Qualified Payroll Account and a single Qualified DEP Account, unless, concurrently therewith, Borrower shall have delivered a Security Deposit Control Agreement with respect to such account in form and substance acceptable to the Administrative Agent.

**6.19  Disqualified Stock.** Issue any Disqualified Stock.

ARTICLE VII.
EVENTS OF DEFAULT

If any of the following events shall occur and be continuing:

(a)      Borrower shall fail to pay when due and payable or when declared due and payable (in each case whether at the stated maturity, by acceleration or otherwise), including, pursuant to Section 2.9, all or any portion of the Obligations (whether of principal, interest, fees and charges due to the Lenders or other amounts constituting Obligations); or

(b)      Any representation or warranty made or deemed made by any Credit Party herein or by any Credit Party or Midland in any other Loan Document or that is contained in any certificate, document or financial or other statement furnished by it at any time under or in connection with this Agreement or any such other Loan Document shall prove to have been inaccurate in any material respect on or as of the date made or deemed made or furnished; or

(c)      Any Credit Party shall default in the observance or performance of any agreement contained Sections 5.5(a) or (b), 5.6(e), (f) or (g), 5.7(b) or (c), 5.8(a)or (e), 5.10, 5.11, 5.12, 5.14(a) or Article VI, or any default under any Security Document shall have occurred and be continuing; or

(d)      Any Credit Party shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of this Article VII), and such default shall continue unremedied for a period of 30 days after the date of occurrence; *provided,* that in the case of a default which could not reasonably be expected to result in a Material Adverse Effect, such period shall commence on the date of written notice of such default to Borrower from the Administrative Agent; or

(e)      Midland shall fail to pay when due and payable or when declared due and payable (in each case whether at the stated maturity, by acceleration or otherwise) all or any portion of any Midland Loan; or

(f)      Borrower or any of its Subsidiaries shall (i) default in making any payment of any principal of any Indebtedness (including any Guarantee Obligation, but excluding the Loans) on the scheduled or original due date with respect thereto; or (ii) default in making any payment of any interest on any such Indebtedness beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness was created; or (iii) default in the observance or performance of any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or beneficiary of such Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, with the giving of notice if required, such Indebtedness to become due prior to its stated maturity or to become subject to a mandatory offer to purchase by the obligor thereunder or (in the case of any such Indebtedness constituting a Guarantee Obligation) to become payable; *provided,* that a default, event or condition described in clause (i), (ii) or (iii) of this paragraph (f) shall not at any time constitute an Event of Default unless, at such time, one or more defaults, events or conditions of the type described in clauses (i), (ii) and (iii) of this paragraph (f) shall have occurred and be continuing with respect to Indebtedness described in this paragraph (f), the outstanding principal amount of which exceeds in the aggregate $500,000; or

(g)      (i) Borrower or any of its Subsidiaries shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or Borrower or any of its Subsidiaries shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against Borrower or any of its Subsidiaries any case, proceeding or other action of a nature referred to in clause (i) above that (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of 60 days; or (iii) there shall be commenced against Borrower or any of its Subsidiaries any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets that results in the entry of an order for any such relief that shall not have been vacated, discharged, or stayed or bonded pending appeal within 60 days from the entry thereof; or (iv) Borrower or any of its Subsidiaries shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; or (v) Borrower or any of its Subsidiaries shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due; or

(h)      (i) Any Person shall engage in any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Plan, (ii) any "accumulated funding deficiency" (as defined in Section 302 of ERISA), whether or not waived, shall exist with respect to any Plan, or any Lien in favor of the PBGC or a Plan shall arise on the assets of Borrower or any Commonly Controlled Entity, (iii) a Reportable Event shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Single Employer Plan, which Reportable Event or commencement of proceedings or appointment of a trustee is, in the reasonable opinion of the Required Lenders, likely to result in the termination of such Plan for purposes of Title IV of ERISA, (iv) any Single Employer Plan shall terminate for purposes of Title IV of ERISA, (v) Borrower or any Commonly Controlled Entity shall, or in the reasonable opinion of the Required Lenders shall be likely to, incur any liability in connection with a withdrawal from, or the Insolvency or Reorganization of, a Multiemployer Plan or (vi) Borrower, or any of its Subsidiaries or any Commonly Controlled Entity shall be required to make during any fiscal year of Borrower payments pursuant to any employee welfare benefit plan (as defined in Section 3.1 of ERISA) that provides benefits to retired employees (or their dependents) that, in the aggregate, exceed the amount set forth on Schedule 7(h)(i) with respect to such fiscal year, (vii) Borrower, or any of its Subsidiaries or any Commonly Controlled Entity shall be required to make during any fiscal year of Borrower contributions to any defined benefit pension plan subject to Title IV of ERISA (including any Multiemployer Plan) that, in the aggregate, exceed the amount set forth on Schedule 7(h)(ii) with respect to such fiscal year or (viii) any other similar event or condition shall occur or exist with respect to a Plan; and in each case in clauses (i) through (viii) above, such event or condition, together with all other such events or conditions, if any, could, in the sole judgment of the Required Lenders, reasonably be expected to have a Material Adverse Effect; or

(i)      One or more final judgments for the payment of money or decrees shall be entered against Borrower or any of its Subsidiaries involving for Borrower and its Subsidiaries taken as a whole a liability (not paid or fully covered by insurance as to which the relevant insurance company has acknowledged coverage) of $500,000 or more, and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within 30 days from the entry thereof; or

(j)      Any of the Security Documents shall cease, for any reason (other than by reason of the express release thereof pursuant to Section 9.15), to be in full force and effect, or any Credit Party, Midland or any their respective Affiliates shall so assert, or any Lien created by any of the Security Documents shall cease to be enforceable and of the same effect and priority purported to be created thereby; or

(k)      Any Guarantor or Midland shall fail to comply with any terms or provisions of the Guarantee and Security Agreement or the Midland Guarantee and Security Agreement, as applicable, which failure is not remedied within five days after written notice from the Administrative Agent of such failure; any action shall be taken to discontinue or to assert the invalidity or unenforceability of any such guarantee; or any Guarantor or Midland shall deny that it has any further liability under the Guarantee and Security Agreement or the Midland Guarantee and Security Agreement, as applicable, or shall give notice to such effect; *provided*, with respect to actions or inactions by Midland, such failure shall adversely affect the perfection or priority of the Lien granted under the Midland Guarantee and Security Agreement or the validity or enforceability of such agreement; or

(l)      Any Credit Party shall be enjoined, restrained or in any way prevented by court order from continuing to conduct all or any material part of its business affairs; or

(m)      There shall occur a Material Adverse Change or any event or circumstance which would have a Material Adverse Effect; or

(n)      Any provision of any Loan Document shall at any time for any reason by declared to be null and void, or the validity or enforceability thereof shall be contested by any Credit Party or Midland, or a proceeding shall be commenced by any Credit Party, Midland or by any Governmental Authority having jurisdiction over any Credit Party or Midland, seeking to establish the invalidity or unenforceability thereof, or any Credit Party or Midland shall deny that any Credit Party or Midland has any liability or obligation purported to be created under any Loan Document; or

(o)      Any Change of Control shall occur; or

(p)      (x) Any Material Agreement shall be terminated other than at the end of its term (end of primary term) or any other period of time provided for therein (end of any evergreen period); (y) default by any Person in the performance or observance of any term of any Material Agreement which is not cured within the applicable cure period specified in such Material Agreement, if such default results in any party to such Material Agreement being entitled to terminate such Material Agreement, to liquidated damages thereunder or to require the posting of any bond in connection therewith; or (z) any event or condition occurs or exists which in the reasonable opinion of the Administrative Agent is reasonably likely to have an

adverse effect on the ability of any Credit Party or any counterparty to such Material
Agreement to perform its obligations under a Material Agreement; or

then, and in any such event, (A) if such event is an Event of Default specified in clause (i) or (ii)
of paragraph (f) above with respect to Borrower, automatically the Commitments shall
immediately terminate and the Loans hereunder (with accrued interest thereon) and all other
amounts owing under this Agreement and the other Loan Documents shall immediately become
due and payable, and (B) if such event is any other Event of Default, either or both of the
following actions may be taken: (i) with the consent of the Required Lenders, the Administrative
Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice
to Borrower declare the Revolving Credit Commitments to be terminated forthwith, whereupon
the Revolving Credit Commitments shall immediately terminate; and (ii) with the consent of the
Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders,
the Administrative Agent shall, by notice to Borrower, declare the Loans hereunder (with accrued
interest thereon) and all other amounts owing under this Agreement and the other Loan
Documents to be due and payable forthwith, whereupon the same shall immediately become due
and payable.

## ARTICLE VIII.
## THE AGENTS

**8.1     Appointment.** Each Lender hereby irrevocably designates and appoints the Agents
as the agents of such Lender under this Agreement and the other Loan Documents, and each
Lender irrevocably authorizes each Agent, in such capacity, to take such action on its behalf under
the provisions of this Agreement and the other Loan Documents and to exercise such powers and
perform such duties as are expressly delegated to such Agent by the terms of this Agreement and
the other Loan Documents, together with such other powers as are reasonably incidental thereto.
Notwithstanding any provision to the contrary elsewhere in this Agreement, no Agent shall have
any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship
with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or
liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against
any Agent.

**8.2     Delegation of Duties.** Each Agent may execute any of its duties under this
Agreement and the other Loan Documents by or through agents or attorneys-in-fact and shall be
entitled to advice of counsel concerning all matters pertaining to such duties. No Agent shall be
responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it with
reasonable care.

**8.3     Exculpatory Provisions.** No Agent nor any of its officers, directors, employees,
agents, attorneys-in-fact or Affiliates shall be (i) liable for any action lawfully taken or omitted to
be taken by it or such Person under or in connection with this Agreement or any other Loan
Document (except to the extent that any of the foregoing are found by a final and nonappealable
decision of a court of competent jurisdiction to have resulted solely and proximately from its or
such Person's own gross negligence or willful misconduct) or (ii) responsible in any manner to
any of the Lenders for any recitals, statements, representations or warranties made by any Credit
Party or any officer thereof contained in this Agreement or any other Loan Document or in any
certificate, report, statement or other document referred to or provided for in, or received by the

Agents under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of any Credit Party to perform its obligations hereunder or thereunder. The Agents shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Credit Party.

8.4    **Reliance by Agents**. Each Agent shall be entitled to rely, and shall be fully protected in relying, upon any instrument, writing, resolution, notice, consent, certificate, affidavit, letter, telecopy, telex or teletype message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to the Credit Parties), independent accountants and other experts selected by such Agent. The Agents may deem and treat the payee of any Note as the owner thereof for all purposes unless such Note shall have been transferred in accordance with Section 9.6 and all actions required by such Section in connection with such transfer shall have been taken. Each Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders (or, if so specified by this Agreement, all Lenders or any other instructing group of Lenders specified by this Agreement) as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. Each Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders (or, if so specified by this Agreement, all Lenders or any other instructing group of Lenders specified by this Agreement), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans.

8.5    **Notice of Default**. No Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder unless such Agent shall have received notice from a Lender or Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that the Administrative Agent shall receive such a notice, the Administrative Agent shall give notice thereof to the Lenders. The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (or, if so specified by this Agreement, all Lenders or any other instructing group of Lenders specified by this Agreement); provided that unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

8.6    **Non-Reliance on the Agents and Other Lenders**. Each Lender expressly acknowledges that neither the Agents nor any of their respective officers, directors, employees, agents, attorneys and other advisors, partners, attorneys-in-fact or Affiliates have made any representations or warranties to it and that no act by any Agent hereafter taken, including any review of the affairs of a Credit Party or any Affiliate of a Credit Party, shall be deemed to constitute any representation or warranty by any Agent to any Lender. Each Lender represents to

the Agents that it has, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Credit Parties and their Affiliates and made its own decision to make its Loans hereunder and enter into this Agreement. Each Lender also represents that it will, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Credit Parties and their Affiliates. Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder, no Agent shall have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of any Credit Party or any Affiliate of a Credit Party that may come into the possession of the Agent or any of its officers, directors, employees, agents, attorneys and other advisors, partners, attorneys-in-fact or Affiliates.

**8.7    Indemnification.** The Lenders agree to indemnify each Agent in its capacity as such (to the extent not reimbursed by Borrower and without limiting the obligation of Borrower to do so), ratably according to their respective Aggregate Exposure Percentages in effect on the date on which indemnification is sought under this Section (or, if indemnification is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with such Aggregate Exposure Percentages immediately prior to such date), for, and to save each Agent harmless from and against, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (including at any time following the payment of the Loans) be imposed on, incurred by or asserted against the Agent in any way relating to or arising out of, the Commitments, this Agreement, any of the other Loan Documents, or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by the Agent under or in connection with any of the foregoing; provided that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted solely and proximately from the Agent's gross negligence or willful misconduct. The agreements in this Section shall survive the payment of the Loans and all other amounts payable hereunder.

**8.8    Agent in their Individual Capacities.** Each Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with any Credit Party as though such Agent were not an Agent. With respect to its Loans made or renewed by it, each Agent shall have the same rights and powers under this Agreement and the other Loan Documents as any Lender and may exercise the same as though it were not an Agent, and the terms "Lender" and "Lenders" shall include the Agent in their individual capacities.

**8.9    Successor Administrative Agent.** The Administrative Agent may resign as Administrative Agent upon 10 days' notice to the Lenders and Borrower. If the Administrative Agent shall resign as Administrative Agent under this Agreement and the other Loan Documents,

then the Required Lenders shall appoint from among the Lenders a successor agent for the Lenders, which successor agent shall (unless an Event of Default under Section 7(a) or Section 7(g) with respect to Borrower shall have occurred and be continuing) be subject to approval by Borrower (which approval shall not be unreasonably withheld or delayed), whereupon such successor agent shall succeed to the rights, powers and duties of the Administrative Agent, and the term "Administrative Agent" shall mean such successor agent effective upon such appointment and approval, and the former Administrative Agent's rights, powers and duties as Administrative Agent shall be terminated, without any other or further act or deed on the part of such former Administrative Agent or any of the parties to this Agreement or any holders of the Loans. If no successor agent has accepted appointment as Administrative Agent by the date that is 10 days following a retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective, and the Lenders shall assume and perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above. The Syndication Agent may, at any time, by notice to the Lenders and the Administrative Agent, resign as Syndication Agent hereunder, whereupon the duties, rights, obligations and responsibilities of the Syndication Agent hereunder shall automatically be assumed by, and inure to the benefit of, the Administrative Agent, without any further act by the Agent or any Lender. After any retiring Agent's resignation as Agent, the provisions of this Article VIII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement and the other Loan Documents.

     **8.10    Authorization to Release Liens and Guarantees.** The Administrative Agent is hereby irrevocably authorized by each of the Lenders to effect any release of Liens or guarantee obligations contemplated by Section 9.15.

     **8.11    The Agent; the Syndication Agent.** The Agent and the Syndication Agent, in their respective capacities as such, shall have no duties or responsibilities, and shall incur no liability, under this Agreement and the other Loan Documents.

     **8.12    Withholding Tax.** (a) To the extent required by any applicable law, the Administrative Agent may withhold from any interest payment to any Lender an amount equivalent to any applicable withholding tax. If the forms or other documentation required by Section 2.13 are not delivered to the Administrative Agent, then the Administrative Agent may withhold from any interest payment to any Lender not providing such forms or other documentation, a maximum amount of the applicable withholding tax.

         (b)    If the Internal Revenue Service or any authority of the United States or other jurisdiction asserts a claim that the Administrative Agent did not properly withhold tax from amounts paid to or for the account of any Lender (because the appropriate form was not delivered, was not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstances which rendered the exemption from, or reduction of, withholding tax ineffective, or for any other reason), such Lender shall indemnify the Administrative Agent fully for all amounts paid, directly or indirectly, by the Administrative Agent as tax or otherwise, including penalties and interest, together with all expenses incurred, including legal expenses, allocated staff costs and any out of pocket expenses.

(c)    If any Lender sells, assigns, grants a participation in, or otherwise transfers its rights under this Agreement, the purchaser, assignee, participant or transferee, as applicable, shall comply and be bound by the terms of Sections 2.13 and 8.12; *provided* that with respect to any Participant, as set forth in Section 9.6(a), such Participant shall only be required to comply with the requirements of Sections 8.12 if such Participant seeks to obtain the benefits of Section 2.13.

ARTICLE IX.
MISCELLANEOUS

**9.1    Amendments and Waivers.**  Neither this Agreement or any other Loan Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this Section 9.1.  The Required Lenders and each Credit Party party to the relevant Loan Document may, or (with the written consent of the Required Lenders) the Administrative Agent and each Credit Party party to the relevant Loan Document may, from time to time, (a) enter into written amendments, supplements or modifications hereto and to the other Loan Documents (including amendments and restatements hereof or thereof) for the purpose of adding any provisions to this Agreement or the other Loan Documents or changing in any manner the rights of the Lenders or of the Credit Parties hereunder or thereunder or (b) waive, on such terms and conditions as may be specified in the instrument of waiver, any of the requirements of this Agreement or the other Loan Documents or any Default or Event of Default and its consequences; *provided, however*, that no such waiver and no such amendment, supplement or modification shall:

(i)    forgive the principal amount or extend the final scheduled date of maturity of any Loan, extend the scheduled date of any amortization payment in respect of any Term Loan, reduce the stated rate of any interest or fee payable hereunder or extend the scheduled date of any payment thereof, or increase the amount or extend the expiration date of any Commitment of any Lender, in each case without the consent of each Lender directly affected thereby;

(ii)    amend, modify or waive any provision of this Section or reduce any percentage specified in the definition of Required Lenders, consent to the assignment or transfer by Borrower of any of its rights and obligations under this Agreement and the other Loan Documents, release all or substantially all of the Collateral or release all or substantially all of the Guarantors from their guarantee obligations under the Guarantee and Security Agreement, in each case without the consent of all Lenders;

(iii)    amend, modify or waive any condition precedent to any extension of credit set forth in Section 4.2 (including the waiver of an existing Default or Event of Default required to be waived in order for such extension of credit to be made) without the consent of the Required Lenders;

(iv)    reduce the percentage specified in the definition of Required Lenders without the written consent of all Lenders;

(v)    amend, modify or waive any provision of Article VIII or any other provision affecting the rights, duties and obligations of any Agent without the consent of the Agent directly affected thereby;

(vi)    amend, modify or waive the pro rata provisions of Section 2.11 without the consent of each Lender directly affected thereby;

(vii)    impose restrictions on assignments and participations that are more restrictive than, or additional to, those set forth in Section 9.6.

Any such waiver and any such amendment, supplement or modification shall apply equally to each of the Lenders and shall be binding upon the Credit Parties, the Lenders, the Agents and all future holders of the Loans. In the case of any waiver, the Credit Parties, the Lenders, the Agents shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon. Any such waiver, amendment, supplement or modification shall be effected by a written instrument signed by the parties required to sign pursuant to the foregoing provisions of this Section; *provided*, that delivery of an executed signature page of any such instrument by facsimile transmission shall be effective as delivery of a manually executed counterpart thereof.

Notwithstanding the foregoing, this Agreement and any other Loan Document may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and each Credit Party party to each relevant Loan Document (x) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof (collectively, the "*Additional Extensions of Credit*") to share ratably in the benefits of this Agreement and the other Loan Documents with the Term Loans and Revolving Credit Loans and the accrued interest and fees in respect thereof and (y) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders.

9.2    **Notices.** All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by facsimile), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered, or three Business Days after being deposited in the mail, postage prepaid, or, in the case of facsimile notice, when received, addressed (a) in the case of Borrower, the Agents, as follows and (b) in the case of the Lenders, as set forth in an administrative questionnaire delivered to the Administrative Agent or, in the case of a Lender which becomes a party to this Agreement pursuant to an Assignment and Acceptance, in such Assignment and Acceptance or (c) in the case of any party, to such other address as such party may hereafter notify to the other parties hereto:

| | |
|---|---|
| Borrower: | Greenbrier Minerals, LLC<br>P.O. Box G<br>Rupert, West Virginia 25984<br>Attention: Joseph C. Turley, III<br>Facsimile: (304) 392-9000 |
| With a copy to: | Buchanan Ingersoll Rooney, PC<br>301 Grant Street One Oxford Centre<br>20th Floor<br>Pittsburgh, Pennsylvania 15219<br>Attention: Donald E. Malecki<br>Facsimile: (412) 562-1041 |
| Administrative Agent: | Lehman Commercial Paper Inc.<br>745 Seventh Avenue<br>New York, New York 10019<br>Attention: Michelle Rosolinsky<br>Facsimile: (646) 758-5015 |
| with a copy to: | Lehman Brothers Inc.<br>600 Travis Street, Suite 7200<br>Houston, Texas 77002<br>Attention: J. Robert Chambers<br>Facsimile: (713) 236-3912 |
| with a copy to:: | Akin Gump Strauss Hauer & Feld LLP<br>1111 Louisiana Street, Suite 4400<br>Houston, Texas 77002<br>Attention: J. Michael Chambers<br>Facsimile: (713) 236-0822 |

*provided* that any notice, request or demand to or upon the Agent or any Lender shall not be effective until received.

**9.3    No Waiver; Cumulative Remedies.** No failure to exercise and no delay in exercising, on the part of any Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

**9.4    Survival of Representations and Warranties.** All representations and warranties made herein, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans and other extensions of credit hereunder.

**9.5**    **Payment of Expenses**. Borrower agrees (a) to pay or reimburse the Agents for all
their reasonable out-of-pocket costs and expenses incurred in connection with the syndication of
the Facilities (other than fees payable to syndicate members) and the development, preparation and
execution of, and any amendment, supplement or modification to, this Agreement and the other
Loan Documents and any other documents prepared in connection herewith or therewith, and the
consummation and administration of the transactions contemplated hereby and thereby, including
the reasonable fees and disbursements and other charges of counsel to the Administrative Agent
and the charges of Intralinks, (b) to pay or reimburse each Lender and the Agents for all their costs
and expenses incurred in connection with the enforcement or preservation of any rights under this
Agreement, the other Loan Documents and any other documents prepared in connection herewith
or therewith, including the fees and disbursements of counsel (including the allocated fees and
disbursements and other charges of in-house counsel) to each Lender and of counsel to the Agents,
(c) to pay, indemnify, or reimburse each Lender, and the Agents for, and hold each Lender, and
the Agents harmless from, any and all recording and filing fees and any and all liabilities with
respect to, or resulting from any delay in paying, stamp, excise and other taxes, if any, which may
be payable or determined to be payable in connection with the execution and delivery of, or
consummation or administration of any of the transactions contemplated by, or any amendment,
supplement or modification of, or any waiver or consent under or in respect of, this Agreement,
the other Loan Documents and any such other documents, and (d) to pay, indemnify or reimburse
each Lender, each Agent, their respective Affiliates, and their respective officers, directors,
trustees, employees, Affiliates, shareholders, attorneys and other advisors, agents and controlling
persons (each, an "*Indemnitee*") for, and hold each Indemnitee harmless from and against any and
all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs,
expenses or disbursements of any kind or nature whatsoever with respect to the execution,
delivery, enforcement, performance and administration of this Agreement, the other Loan
Documents and any such other documents, including any of the foregoing relating to the use of
proceeds of the Loans or the violation of, noncompliance with or liability under, any
Environmental Law applicable to the operations of Borrower any of its Subsidiaries or any of the
Properties or the use by unauthorized persons of information or other materials sent through
electronic, telecommunications or other information transmission systems that are intercepted by
such persons and the fees and disbursements and other charges of legal counsel in connection with
claims, actions or proceedings by any Indemnitee against Borrower hereunder (all the foregoing in
this clause (d), collectively, the "*Indemnified Liabilities*"), *provided*, that Borrower shall have no
obligation hereunder to any Indemnitee with respect to Indemnified Liabilities to the extent such
Indemnified Liabilities are found by a final and nonappealable decision of a court of competent
jurisdiction to have resulted solely and proximately from the gross negligence or willful
misconduct of such Indemnitee. No Indemnitee shall be liable for any damages arising from the
use by unauthorized persons of information or other materials sent through electronic,
telecommunications or other information transmission systems that are intercepted by such
persons or for any special, indirect, consequential or punitive damages in connection with the
Facilities. Without limiting the foregoing, and to the extent permitted by applicable law, Borrower
agrees not to assert and to cause its Subsidiaries not to assert, and hereby waives and agrees to
cause its Subsidiaries so to waive, all rights for contribution or any other rights of recovery with
respect to all claims, demands, penalties, fines, liabilities, settlements, damages, costs and
expenses of whatever kind or nature, under or related to Environmental Laws, that any of them
might have by statute or otherwise against any Indemnitee. All amounts due under this Section
shall be payable not later than 30 days after written demand therefor. Statements payable by

Borrower pursuant to this Section shall be submitted to the address of Borrower set forth in
Section 9.2, or to such other Person or address as may be hereafter designated by Borrower in a
notice to the Administrative Agent. The agreements in this Section shall survive repayment of the
Loans and all other amounts payable hereunder.

    **9.6**    **Successors and Assigns; Participations and Assignments.** This Agreement shall
be binding upon and inure to the benefit of Borrower, the Lenders, the Agents, all future holders
of the Loans and their respective successors and assigns, except that Borrower may not assign or
transfer any of their respective rights or obligations under this Agreement without the prior written
consent of the Agents and each Lender.

    (a)    Any Lender may, without the consent of Borrower or any other Person, in
accordance with applicable law, at any time sell to one or more banks, financial institutions or
other entities (each, a *"Participant"*) participating interests in any Loan owing to such Lender,
any Commitment of such Lender or any other interest of such Lender hereunder and under the
other Loan Documents. In the event of any such sale by a Lender of a participating interest to
a Participant, such Lender's obligations under this Agreement to the other parties to this
Agreement shall remain unchanged, such Lender shall remain solely responsible for the
performance thereof, such Lender shall remain the holder of any such Loan for all purposes
under this Agreement and the other Loan Documents, and Borrower and the Agents shall
continue to deal solely and directly with such Lender in connection with such Lender's rights
and obligations under this Agreement and the other Loan Documents. In no event shall any
Participant under any such participation have any right to approve any amendment or waiver
of any provision of any Loan Document, or any consent to any departure by any Credit Party
therefrom, except to the extent that such amendment, waiver or consent would require the
consent of all Lenders pursuant to Section 9.1. Borrower agrees that if amounts outstanding
under this Agreement and the Loans are due or unpaid, or shall have been declared or shall
have become due and payable upon the occurrence of an Event of Default, each Participant
shall, to the maximum extent permitted by applicable law, be deemed to have the right of
setoff in respect of its participating interest in amounts owing under this Agreement to the
same extent as if the amount of its participating interest were owing directly to it as a Lender
under this Agreement, *provided* that, in purchasing such participating interest, such Participant
shall be deemed to have agreed to share with the Lenders the proceeds thereof as provided in
Section 9.7(a) as fully as if such Participant were a Lender hereunder. Borrower also agrees
that each Participant shall be entitled to the benefits of Sections 2.12, 2.13 and 2.14 with
respect to its participation in the Commitments and the Loans outstanding from time to time as
if such Participant were a Lender; *provided* that, in the case of Section 2.13 such Participant
shall have complied with the requirements of said Section and Section 8.12, and *provided,
further,* that no Participant shall be entitled to receive any greater amount pursuant to any such
Section than the transferor Lender would have been entitled to receive in respect of the amount
of the participation transferred by such transferor Lender to such Participant had no such
transfer occurred.

    (b)    Any Lender (an *"Assignor"*) may, in accordance with applicable law and
upon written notice to the Administrative Agent, at any time and from time to time assign to
any Lender or any Affiliate, Related Fund or Control Investment Affiliate thereof or, with the
consent of Borrower and the Agents (provided (x) that no such consent need be obtained by

the Administrative Agent or its Affiliates and (y) the consent of Borrower need not be obtained with respect to any assignment of Term Loans), to an additional bank, financial institution or other entity (an "*Assignee*") all or any part of its rights and obligations under this Agreement pursuant to an Assignment and Acceptance, substantially in the form of Exhibit O (an "*Assignment and Acceptance*"), executed by such Assignee and such Assignor (and, where the consent of Borrower, the Administrative Agent is required pursuant to the foregoing provisions, by Borrower and such other Persons) and delivered to the Administrative Agent for its acceptance and recording in the Register; *provided* that no such assignment to an Assignee (other than any Lender or any Affiliate thereof) shall be in an aggregate principal amount of less than $1,000,000 (with respect to Term Loans) and $1,000,000 with respect to the Revolving Credit Facility (other than, in each case, in the case of an assignment of all of a Lender's interests under this Agreement), unless otherwise agreed by Borrower and the Administrative Agent. Any such assignment need not be ratable as among the Facilities. Upon such execution, delivery, acceptance and recording, from and after the effective date determined pursuant to such Assignment and Acceptance, (x) the Assignee thereunder shall be a party hereto and, to the extent provided in such Assignment and Acceptance, have the rights and obligations of a Lender hereunder with Commitments and/or Loans as set forth therein, and (y) the Assignor thereunder shall, to the extent provided in such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of an Assignor's rights and obligations under this Agreement, such Assignor shall cease to be a party hereto, except as to Sections 2.12, 2.13, 8.12 and 9.5 in respect of the period prior to such effective date). Notwithstanding any provision of this Section, the consent of Borrower shall not be required for any assignment that occurs at any time when any Event of Default shall have occurred and be continuing. For purposes of the minimum assignment amounts set forth in this paragraph, multiple assignments by two or more Related Funds shall be aggregated.

(c)     The Administrative Agent shall, on behalf of Borrower, maintain at its address referred to in Section 9.2 a copy of each Assignment and Acceptance delivered to it and a register (the "*Register*") for the recordation of the names and addresses of the Lenders and the Commitment of, and principal amount of the Loans owing to, each Lender from time to time. The entries in the Register shall be conclusive, in the absence of manifest error, and Borrower, each Agent and the Lenders shall treat each Person whose name is recorded in the Register as the owner of the Loans and any Notes evidencing such Loans recorded therein for all purposes of this Agreement. Any assignment of any Loan, whether or not evidenced by a Note, shall be effective only upon appropriate entries with respect thereto being made in the Register (and each Note shall expressly so provide). Any assignment or transfer of all or part of a Loan evidenced by a Note shall be registered on the Register only upon surrender for registration of assignment or transfer of the Note evidencing such Loan, accompanied by a duly executed Assignment and Acceptance; thereupon one or more new Notes in the same aggregate principal amount shall be issued to the designated Assignee, and the old Notes shall be returned by the Administrative Agent to Borrower marked "canceled." The Register shall be available for inspection by Borrower or any Lender (with respect to any entry relating to such Lender's Loans) at any reasonable time and from time to time upon reasonable prior notice.

(d)      Upon its receipt of an Assignment and Acceptance executed by an Assignor and an Assignee (and, in any case where the consent of any other Person is required by Section 9.6(b), by each such other Person) together with payment to the Administrative Agent of a registration and processing fee of $3,500 (treating multiple, simultaneous assignments by or to two or more Related Funds as a single assignment) (except that no such registration and processing fee shall be payable in the case of an Assignee which is already a Lender or is an Affiliate or Related Fund of a Lender or a Person under common management with a Lender), the Administrative Agent shall (i) promptly accept such Assignment and Acceptance and (ii) on the effective date determined pursuant thereto record the information contained therein in the Register and give notice of such acceptance and recordation to Borrower.  On or prior to such effective date, Borrower, at its own expense, upon request, shall execute and deliver to the Administrative Agent (in exchange for the Revolving Credit Note and/or applicable Term Notes, as the case may be, of the assigning Lender) a new Revolving Credit Note and/or applicable Term Notes, as the case may be, to the order of such Assignee in an amount equal to the Revolving Credit Commitment and/or applicable Term Loans, as the case may be, assumed or acquired by it pursuant to such Assignment and Acceptance and, if the Assignor has retained a Revolving Credit Commitment and/or Term Loans, as the case may be, upon request, a new Revolving Credit Note and/or Term Notes, as the case may be, to the order of the Assignor in an amount equal to the Revolving Credit Commitment and/or applicable Term Loans, as the case may be, retained by it hereunder.  Such new Note or Notes shall be dated the Closing Date and shall otherwise be in the form of the Note or Notes replaced thereby.

(e)      For the avoidance of doubt, the parties to this Agreement acknowledge that the provisions of this Section concerning assignments of Loans and Notes relate only to absolute assignments and that such provisions do not prohibit assignments creating security interests in Loans and Notes, including any pledge or assignment by a Lender of any Loan or Note to any Federal Reserve Bank in accordance with applicable law.

(f)      Notwithstanding anything to the contrary contained herein, any Lender (a "*Granting Lender*") may grant to a special purpose funding vehicle (an "*SPC*"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and Borrower, the option to provide to Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make to Borrower pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPC to make any Loan and (ii) if an SPC elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof.  The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Each party hereto hereby agrees that no SPC shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender).  In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other indebtedness of any SPC, it will not institute against, or join any other person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any state thereof.  In addition, notwithstanding anything to the contrary in this Section 9.6(f), any SPC may (A) with notice

to, but without the prior written consent of, Borrower and the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender, or with the prior written consent of Borrower and the Administrative Agent (which consent shall not be unreasonably withheld) to any financial institutions providing liquidity and/or credit support to or for the account of such SPC to support the funding or maintenance of Loans, and (B) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPC; *provided* that non-public information with respect to Borrower may be disclosed only with Borrower's consent which will not be unreasonably withheld. This paragraph (g) may not be amended without the written consent of any SPC with Loans outstanding at the time of such proposed amendment.

    9.7    **Adjustments; Set-off.** (a) Except to the extent that this Agreement provides for payments to be allocated to a particular Lender or to the Lenders under a particular Facility, if any Lender (a "*Benefited Lender*") shall at any time receive any payment of all or part of the Obligations owing to it, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set-off, pursuant to events or proceedings of the nature referred to in Section 8(f), or otherwise), in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of such other Lender's Obligations, such Benefited Lender shall purchase for cash from the other Lenders a participating interest in such portion of each such other Lender's Obligations, or shall provide such other Lenders with the benefits of any such collateral, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such collateral ratably with each of the Lenders; *provided, however,* that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest.

        (b)    In addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right, without prior notice to Borrower, any such notice being expressly waived by Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by Borrower hereunder (whether at the stated maturity, by acceleration or otherwise), to set off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch or agency thereof to or for the credit or the account of Borrower. Each Lender agrees to notify promptly Borrower and the Administrative Agent after any such setoff and application made by such Lender, *provided* that the failure to give such notice shall not affect the validity of such setoff and application.

    9.8    **Counterparts.** This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Agreement or of an Assignment and Acceptance by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof. A set of the copies of this Agreement signed by all the parties shall be lodged with Borrower and the Administrative Agent.

**9.9   Severability.** Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**9.10   Integration.** This Agreement and the other Loan Documents represent the entire agreement of Borrower, the Agents and the Lenders with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by any Agent or any Lender relative to the subject matter hereof not expressly set forth or referred to herein or in the other Loan Documents.

**9.11   GOVERNING LAW.** THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

**9.12   Submission To Jurisdiction; Waivers.** Borrower hereby irrevocably and unconditionally:

(a)   submits for itself and its Property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of the courts of the State of New York located in the County of New York, the courts of the United States of America for the Southern District of New York, and appellate courts from any thereof;

(b)   consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)   agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to Borrower at its address set forth in Section 9.2 or at such other address of which the Administrative Agent shall have been notified pursuant thereto;

(d)   agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction; and

(e)   waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section any special, exemplary, punitive or consequential damages.

**9.13   Acknowledgments.** Borrower hereby acknowledges that:

(a)    it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)    no Agent nor any Lender has any fiduciary relationship with or duty to Borrower arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Agents and the Lenders, on one hand, and Borrower, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)    no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Agents and the Lenders or between Borrower and the Lenders.

**9.14    Confidentiality**. Each Agent and the Lenders agrees to keep confidential all non-public information provided to it by any Credit Party pursuant to this Agreement that is designated by such Credit Party as confidential; *provided* that nothing herein shall prevent any Agent or any Lender from disclosing any such information (a) to any Agent, any other Lender or any Affiliate of any thereof, (b) to any Participant or Assignee (each, a "*Transferee*") or prospective Transferee that agrees to comply with the provisions of this Section or substantially equivalent provisions, (c) to any of its employees, directors, agents, attorneys, accountants and other professional advisors, (d) to any financial institution that is a direct or indirect contractual counterparty in swap agreements or such contractual counterparty's professional advisor (so long as such contractual counterparty or professional advisor to such contractual counterparty agrees to be bound by the provisions of this Section 9.14), (e) upon the request or demand of any Governmental Authority having jurisdiction over it, (f) in response to any order of any court or other Governmental Authority or as may otherwise be required pursuant to any Requirement of Law, (g) if requested or required to do so in connection with any litigation or similar proceeding, (h) that has been publicly disclosed other than in breach of this Section, (i) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender or (j) in connection with the exercise of any remedy hereunder or under any other Loan Document. Notwithstanding anything to the contrary in the foregoing sentence or any other express or implied agreement, arrangement or understanding, the parties hereto hereby agree that, from the commencement of discussions with respect to the financing provided hereunder, any party hereto (and each of its employees, representatives, or agents) is permitted to disclose to any and all persons, without limitation of any kind, the tax structure and tax aspects of the transactions contemplated hereby, and all materials of any kind (including opinions or other tax analyses) related to such tax structure and tax aspects.

**9.15    Release of Collateral and Guarantee Obligations**.

(a)    Notwithstanding anything to the contrary contained herein or in any other Loan Document, upon request of Borrower in connection with any Disposition of Property permitted by the Loan Documents, the Administrative Agent shall (without notice to, or vote or consent of, any Lender, or any Affiliate of any Lender that is a party to any Specified Hedge Agreement) take such actions as shall be required to release its Liens on any Collateral being Disposed of in such Disposition, and to release any guarantee obligations under any Loan Document of any Person being Disposed of in such Disposition, to the extent necessary to

permit consummation of such Disposition in accordance with the Loan Documents; *provided* that Borrower shall have delivered to the Administrative Agent, at least ten Business Days prior to the date of the proposed release (or such shorter period agreed to by the Administrative Agent), a written request for release identifying the relevant Collateral being Disposed of in such Disposition and the terms of such Disposition in reasonable detail, including the date thereof, the price thereof and any expenses in connection therewith, together with a certification by Borrower stating that such transaction is in compliance with this Agreement and the other Loan Documents and that the proceeds of such Disposition will be applied in accordance with this Agreement and the other Loan Documents.

(b)      Notwithstanding anything to the contrary contained herein or any other Loan Document, when all Obligations (other than obligations which by the terms hereof survive termination of this Agreement) have been paid in full, all Commitments have terminated or expired, upon request of Borrower, the Administrative Agent shall (without notice to, or vote or consent of, any Lender, or any Affiliate of any Lender that is a party to any Specified Hedge Agreement) take such actions as shall be required to release its Liens on all Collateral, and to release all guarantee obligations provided for in any Loan Document, whether or not on the date of such release there may be outstanding Obligations in respect of Specified Hedge Agreements.  Any such release of guarantee obligations shall be deemed subject to the provision that such guarantee obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, Borrower or any Guarantor or any substantial part of its property, or otherwise, all as though such payment had not been made.  The foregoing notwithstanding, upon Final Completion and the repayment of all obligations owing from Midland to the Credit Parties, the Administrative Agent shall (without notice to, or vote or consent of, any Lender), take such actions as shall be required to terminate the Midland Guarantee and Security Agreement and release of all Liens on property of Midland that secure the Obligations) and the Liens arising under the Midland Guarantee and Security Agreement and to release all guarantee obligations thereunder, all of which shall not be subject to reinstatement as provided above.

**9.16    Accounting Changes.**  In the event that any "Accounting Change" (as defined below) shall occur and such change results in a change in the method of calculation of financial covenants, standards or terms in this Agreement, then Borrower and the Administrative Agent agree to enter into negotiations in order to amend such provisions of this Agreement so as to equitably reflect such Accounting Change with the desired result that the criteria for evaluating Borrower's financial condition shall be the same after such Accounting Change as if such Accounting Change had not been made.  Until such time as such an amendment shall have been executed and delivered by Borrower, the Administrative Agent and the Required Lenders, all financial covenants, standards and terms in this Agreement shall continue to be calculated or construed as if such Accounting Change had not occurred.  *"Accounting Change"* refers to any change in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants or, if applicable, the SEC.

**9.17    WAIVERS OF JURY TRIAL.** THE BORROWER, THE AGENTS AND THE LENDERS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

**9.18    Customer Identification – USA PATRIOT Act Notice.** The Administrative Agent (for itself and not on behalf of any other party), the Syndication Agent (for itself and not on behalf of any other party) and each Lender hereby notifies the Credit Parties that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56, signed into law October 26, 2001 (the "*Patriot Act*"), it is required to obtain, verify and record information that identifies the Credit Parties, which information includes the name and address of the Credit Parties and other information that will allow the Administrative Agent, the Syndication Agent or such Lender, as applicable, to identify the Credit Parties in accordance with the Patriot Act.

**9.19    Affirmation of Obligations.** From and after the Closing Date, (a) the terms and conditions of the Original Credit Agreement shall be amended as set forth herein and, subject to clause (c) below, as so amended shall be restated in their entirety; (b) this Agreement shall not in any way release or impair the rights, duties, "Obligations" or "Liens" (as such terms are defined in the Original Credit Agreement) created pursuant to the Original Credit Agreement or any other Original Loan Document or affect the relative priorities thereof, in each case to the extent in force and effect thereunder as of the Closing Date and except as modified hereby or by documents, instruments and agreements executed and delivered in connection herewith, and all of such rights, duties, Obligations and Liens are assumed, ratified and affirmed by each of the Credit Parties; (c) all indemnification obligations of the Credit Parties under the Original Credit Agreement and any other Original Loan Documents shall survive the execution and delivery of this Agreement and shall continue in full force and effect for the benefit of the Lenders, the Agents, and any other Person indemnified under the Original Credit Agreement or any other Original Loan Document at any time prior to the Closing Date; (d) the Obligations incurred under the Original Credit Agreement shall, to the extent outstanding on the Closing Date, continue outstanding under this Agreement and shall not be deemed to be paid, released, discharged or otherwise satisfied by the execution of this Agreement, and this Agreement shall not constitute a refinancing, substitution or novation of such Obligations or any of the other rights, duties and obligations of the parties hereunder, and the term "Obligations" as such terms are used in Original Loan Documents shall include the Obligations as increased, amended and restated under this Agreement; (e) the execution, delivery and effectiveness of this Agreement shall not operate as a waiver of any Default or Event of Default which has occurred and is continuing under the Original Credit Agreement immediately prior to the Closing Date, except for such Defaults or Events of Default of which the Administrative Agent has actual knowledge or which, individually or in the aggregate would not reasonably be expected to result in a Material Adverse Effect on the Credit Parties taken as a whole; and (f) the Liens granted pursuant to the Original Security Documents to which each of the Credit Parties is a party shall continue without any diminution thereof and shall remain in full force and effect on and after the Closing Date.

**[Signature Page Follows]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

GREENBRIER MINERALS, LLC, as Borrower

By: _____
      Joseph C. Turley, III
      President

LEHMAN BROTHERS INC.,
as Agent

By: _____
      J. Robert Chambers
      Managing Director

LEHMAN COMMERCIAL PAPER INC.,
as Administrative Agent, Syndication Agent and a Lender

By: _____
      J. Robert Chambers
      Authorized Signatory

[Signature Page to Credit Agreement]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

GREENBRIER MINERALS, LLC, as Borrower

By: _____

Joseph C. Turley, III
President

LEHMAN BROTHERS INC.,
as Agent

By: _____

J. Robert Chambers
Managing Director

LEHMAN COMMERCIAL PAPER INC.,
as Administrative Agent, Syndication Agent and a Lender

By: _____

J. Robert Chambers
Authorized Signatory

[Signature Page to Credit Agreement]

Annex I

Commitments

| Lender | Revolving Credit Commitment | Term A Commitment | Term B Commitment |
|---|---|---|---|
| Lehman Commercial Paper Inc.<br>745 Seventh Avenue<br>New York, New York 10019<br>Attention: Michelle Rosolinsky<br>Facsimile: (646) 758-5015 | $5,000,000 | $60,000,000 | $29,000,000 |

EXHIBIT A

## PROJECT DESCRIPTION

1.  <u>Facilities</u>:  Greenbrier Minerals, LLC and related entities were established for the purpose of developing and operating coal mining operations, coal sales and related activities in a reserve base of approximately 42 million tons.  The reserves, located on Pollock Knob, in Greenbrier County West Virginia, are being leased from MeadWestvaco Corporation. This coal possesses the qualities of a premium quality medium-volatile coking coal. These operations and activities at any time involve any one or more of the following mining locations generally referred to as:

   a.   <u>Mountaineer Pocahontas #1</u> — Depicted on the map separately delivered to the Independent Engineer.

   b.   <u>Mountaineer Pocahontas #2</u> — Depicted on the map separately delivered to the Independent Engineer.

   c.   <u>Pollock Knob</u> — Constitutes a reserve base accessed through the mine Facilities described at Item 1.a. above.

   In addition, these operations include preparation and related facilities consisting of a 600 ton per hour coal preparation plant, loading facility and a unit train loadout.

2.  <u>Additional Facilities</u>:  Greenbrier Minerals, LLC and related entities may develop and operate coal mining operations, coal sales and related activities at any time involving one or more of other mining locations, including without limitation at the mining locations generally referred to as Sewell, Pocahontas 6, Pocahontas 7, Pocahontas 8, Firecreek, Buck Lilly, Beckley Seam Mine (Cherry Knoll), and Midland's Fire Creek reserves located under Midland's No.1 mine if Sewell reserves are not made available to them on or prior to December 31, 2008, and any preparation and related facilities.

3.  <u>Facility Site</u>:  That certain parcel of land of approximately 200 acres acquired in the Brown Creek drainage area located at Pollock Knob on State Route 1, Anjean, West Virginia.

EXHIBIT B

## FORM OF BORROWING NOTICE

To:    Lehman Commercial Paper Inc.,
        as Administrative Agent
        745 Seventh Avenue
        New York, New York 10019
        Attention: Michelle Rosolinsky
        Telecopy: (212) 526-6643

Reference is hereby made to that certain Amended and Restated Credit Agreement, dated as of May 1, 2007 (as amended, restated, supplemented or otherwise modified from time to time, the "*Credit Agreement*"), among GREENBRIER MINERALS, LLC, a Delaware limited liability company ("*Borrower*"), the several banks and other financial institutions or entities from time to time parties thereto, LEHMAN BROTHERS INC., as Arranger, and LEHMAN COMMERCIAL PAPER INC., as Syndication Agent and Administrative Agent.  Terms not otherwise defined herein shall have the meanings given to them in the Credit Agreement.

Borrower hereby requests that the Loans be made on the date indicated below in the aggregate amount indicated below:

| Aggregate Amount of Loans | Type of Loan | Date of Loans |
|---|---|---|
| | Term A Loan | |
| | Term B Loan | |
| | Revolving Credit Loan | |

Borrower hereby requests that the proceeds of the Loans described in this Borrowing Notice be made available to Borrower as set forth in Section 2.4 of the Credit Agreement.

Borrower hereby certifies that all conditions contained in the Credit Agreement to the making of the requested Loans have been met and satisfied in full.

GREENBRIER MINERALS, LLC

By: _____
Title:

Date: _____, _____

EXHIBIT C

## FORM OF COMPLIANCE CERTIFICATE

This Compliance Certificate (this "*Compliance Certificate*") is delivered pursuant to Section 5.3(a)(i) and (ii) of that certain Amended and Restated Credit Agreement, dated as of May 1, 2007 (as amended, restated, supplemented or otherwise modified from time to time, the "*Credit Agreement*"), among GREENBRIER MINERALS, LLC, a Delaware limited liability company ("*Borrower*"), the several banks and other financial institutions or entities from time to time party thereto, LEHMAN BROTHERS INC., as Arranger, and LEHMAN COMMERCIAL PAPER INC., as Syndication Agent and Administrative Agent. Terms not otherwise defined herein shall have the meanings given to them in the Credit Agreement.

The undersigned hereby certifies to the Administrative Agent and the Lenders as follows:

1.     I am the duly elected, qualified and acting President of Borrower.

2.     I have reviewed and am familiar with the contents of this Compliance Certificate.

3.     I have reviewed the terms of the Credit Agreement and each of the other Loan Documents and have made, or caused to be made under my supervision, a review in reasonable detail of the transactions and condition of the Credit Parties during the accounting period covered by the Financial Statements (as defined below).

4.     To the best of my knowledge, each of the Credit Parties, during the period covered by the financial statements attached hereto as <u>Attachment 1</u> (the "*Financial Statements*"), has observed or performed all of its covenants and other agreements, and satisfied every condition, contained in the Credit Agreement and the other Loan Documents to which it is a party to be observed, performed or satisfied by it[, except as set forth below].

5.     I have no, and have not obtained any, knowledge, as of the date of this Compliance Certificate, of any Default or Event of Default [, except as set forth below].

6.     Attached hereto as <u>Attachment 2</u> are all information and calculations necessary for determining compliance by the Credit Parties with the provisions of the Credit Agreement referred to on such attachment as of the last day of the fiscal [quarter] [year] of Borrower.

7.     To the extent not previously disclosed to the Administrative Agent, since [the Closing Date][the date of the most recent list delivered pursuant to Section 5.3(a)(ii)(B)]:

(a)     No Credit Party has acquired any Real Property (including any Coal Properties) (or purchased any option for the acquisition of any Real Property (including any Coal Properties)) [, except as set forth below]; and

(b)     No Credit Party has acquired any Intellectual Property (or purchased any option for the acquisition of any Intellectual Property) [, except as set forth below].

8.    Attached on <u>Attachment 3</u> are all of the UCC financing statements or other filings required to be delivered herewith.  The Administrative Agent is hereby authorized to file all such financing statements and filings.

**[Signature Page Follows]**

IN WITNESS WHEREOF, the undersigned has executed this Compliance Certificate for Borrower as of the date set forth below.

By:    Joseph C. Turley
Title:  President

Date:    _____, _____

**ATTACHMENT 1**

**Financial Statements**

**[See attached]**

**ATTACHMENT 2**

**Information and Calculations**

The information described herein is as of _____, _____, and pertains to the period from _____, _____ to _____, _____.

[Set Forth Information and Calculations for Each Specified Covenant]

**ATTACHMENT 3**

**Financing Statements and Filings**

**[See attached]**

**CAPX 3-19-07**

| Mountaineer # 1  Capx | Year Ended December 31, 2007 | | | | |
|---|---|---|---|---|---|
|  | **1Qtr** | **2Qtr** | **3Qtr** | **4Qtr** | **Total** |
| Miners 12CM12 | 0 | 0 | 0 | 0 | 0 |
| Miners 14CM10AA | 1.355.000 | 0 | 0 | 0 | 1,355,000 |
| BH 10 Haulers | 0 | 0 | 1.775,740 | 0 | 1,775.740 |
| 10 SC32 Shuttle cars | 300,000 | 0 | 0 | 0 | 300.000 |
| CRR II Bolters | 374,001 | 0 | 374,001 | 0 | 748,002 |
| Stamler Feeder BF17 | 0 | 0 | 325,360 | 0 | 325,360 |
| Scoops | 300,000 | 0 | 300,000 | 0 | 600,000 |
| Locomotive | 0 | 0 | 285,000 | 0 | 285,000 |
| Mantrips | 0 | 0 | 220,000 | 110,000 | 330,000 |
| Jeeps | 0 | 0 | 120,000 | 0 | 120,000 |
| Coal Production (unit 1) | 0 | 0 | 0 | 0 | 0 |
| Coal Production (unit 2) | 0 | 0 | 0 | 0 | 0 |
| Coal Production (unit 3) |  |  |  |  |  |
| **2/0 Cable for drive Mains** | 0 | 0 | 49,760 | 46,650 | 96,410 |
| Mine Power Cable Mains | 0 | 35,866 | 0 | 57,496 | 93,362 |
| Mine Power Cable Panels | 0 | 0 | 0 | 53,783 | 53,783 |
| Water Mains/ coupling 6" | 0 | 37,001 | 0 | 59,316 | 96,317 |
| Water Panels/ coupling 4" | 0 | 0 | 0 | 28,934 | 28,934 |
| Drain Line / Coupling Mains 10" | 15,600 | 15,600 | 31,200 | 7,800 | 70,200 |
| 60" Main Drives Slope | 0 | 0 | 1,195,000 | 0 | 1,195,000 |
| 60" Main Drives | 0 | 0 | 478,500 | 478,500 | 957.000 |
| 60" Belting Mains Slope | 0 | 0 | 250,000 | 0 | 250,000 |
| 60" Belting Mains | 0 | 0 | 0 | 291,120 | 291,120 |
| 60" Belt structure Outside | 0 | 0 | 0 | 0 | 0 |
| 60"  Rigid Rail  Mains | 0 | 159,785 | 0 | 256,149 | 415,935 |
| 48" Panel Drive | 0 | 0 | 648,000 | 324,000 | 972,000 |
| 48" Belting Panels Unit #1 | 0 | 136,200 | 0 | 148.740 | 284,940 |
| 48" Rigid Rail Panel Unit #1 | 0 | 0 | 0 | 108,184 | 108,184 |
| 48" Belting Panels Unit #2 | 0 | 0 | 0 | 55,500 | 55,500 |
| 48" Rigid Rail Panel Unit #2 | 0 | 0 | 0 | 40,367 | 40,367 |
| Track Materials per ft price | 0 | 86,419 | 0 | 268,127 | 354,546 |
| Canopies | 0 | 0 | 0 | 0 | 0 |
| 12 MVA Substation | 60,000 | 240,000 | 0 | 0 | 300.000 |
| 5 MVA Substation | 90,000 | 0 | 90,000 | 0 | 180,000 |
| 2500 KVA power center | 0 | 160,000 | 0 | 160,000 | 320.000 |
| 500 KVA belt starter | 70.000 | 0 | 140,000 | 70,000 | 280,000 |
| 750 KVA belt starters | 0 | 0 | 75,000 | 75,000 | 150,000 |
| 2500 KVA power center | 0 | 0 | 130,000 | 0 | 130,000 |
| HV section splitter dual | 0 | 0 | 38,000 | 38,000 | 76.000 |
| Mine Fan | 0 | 0 | 0 | 0 | 0 |
| Transmission Line 69 KV | 0 | 0 | 0 | 0 | 0 |
| Transmission Line 34 KV | 0 | 0 | 0 | 0 | 0 |
| Breaker Mine Station | 0 | 0 | 0 | 0 | 0 |
| Slope Development | 0 | 5,162,500 | 0 | 0 | 5,162,500 |
| Air Shaft | 625,695 | 2.500,243 | 1,837,322 | 0 | 4,963,259 |
| Outside Facility Shop        Bathhouse |  |  |  |  |  |
| Warehouse | 0 | 100,000 | 100,000 | 0 | 200.000 |
| Mine Development | 0 | 0 | 0 | 0 | 0 |

**CAPX 3-19-07**

| | Year Ended December 31, 2007 | | | | |
|---|---|---|---|---|---|
| | **1Qtr** | **2Qtr** | **3Qtr** | **4Qtr** | **Total** |
| **Mountaineer # 2  Capx** | 0 | 0 | 0 | 0 | 0 |
| Miners 14CM10AA | 1,355,000 | 0 | 0 | 0 | 1,355,000 |
| BH 10 Haulers | 0 | 0 | 0 | 0 | 0 |
| CRR II Bolters | 374,001 | 0 | 0 | 0 | 374,001 |
| Stamler Feeder BF17 | 0 | 0 | 0 | 0 | 0 |
| Scoops | 0 | 0 | 0 | 0 | 0 |
| Locomotive | 0 | 125,000 | 0 | 0 | 125,000 |
| Mantrips | 110,000 | 110,000 | 0 | 0 | 220,000 |
| Jeeps | 40,000 | 40,000 | 0 | 0 | 80,000 |
| Coal Production (unit 1) | 0 | 0 | 0 | 0 | 0 |
| Coal Production (unit 2) | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 |
| Mine Power Cable Mains | 22,859 | 29,934 | 35,376 | 21.226 | 109,394 |
| Mine Power Cable Panels | 0 | 35.392 | 30,968 | 10,507 | 76,867 |
| Water Mains/ coupling  6" | 0 | 0 | 0 | 0 | 0 |
| Water Panels/ coupling 4" | 12,495 | 35,403 | 35,998 | 17,255 | 101,150 |
| | 0 | 0 | 0 | 0 | 0 |
| 48" Main Drive | 0 | 0 | 0 | 0 | 0 |
| 48" Conveyor Belting Mains | 88,200 | 115,500 | 136,500 | 81,900 | 422,100 |
| 48" Belt structure Main | 64,151 | 84,007 | 99,281 | 59,569 | 307,007 |
| 48" Drive Panel | 0 | 0 | 0 | 0 | 0 |
| 48" Belting Panel | 0 | 134,400 | 117,600 | 39,900 | 291,900 |
| 48" Rigid Rail Panel | 0 | 97,754 | 85,534 | 29,021 | 212,309 |
| | 0 | 0 | 0 | 0 | 0 |
| Track Materials per ft price | 0 | 63,387 | 161,226 | 77,282 | 301.895 |
| Canopies | 0 | 0 | 0 | 0 | 0 |
| 5 MVA Substation | 0 | 0 | 0 | 0 | 0 |
| 2500 KVA power center | 178,000 | 0 | 0 | 0 | 178,000 |
| 500 KVA power center | 70,000 | 70,000 | 0 | 0 | 140,000 |
| HV section splitter single | 0 | 10,000 | 0 | 0 | 10,000 |
| HV section splitter duals | 0 | 38,000 | 0 | 0 | 38,000 |
| Mine Fan | 0 | 0 | 0 | 0 | 0 |
| Transmission Line | 0 | 0 | 0 | 0 | 0 |
| Mine Development | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 |
| **Mountaineer # 3  Capx** | | | | | |
| Stamler Feeder BF17 | 0 | 325,360 | 0 | 0 | 325.360 |
| Scoops | 325,000 | 0 | 0 | 0 | 325,000 |
| Locomotive | 0 | 125,000 | 0 | 0 | 125,000 |
| Mantrips | 0 | 110,000 | 0 | 0 | 110.000 |
| Jeeps | 0 | 60,000 | 0 | 0 | 60,000 |
| Mine Power Cable Mains | 0 | 56,627 | 49,549 | 0 | 106.176 |
| Water Mains/ coupling  6" | 0 | 0 | 0 | 0 | 0 |
| Water Panels/ coupling 4" | 0 | 30,464 | 26,656 | 0 | 57,120 |
| | 0 | 0 | 0 | 0 | 0 |
| 48" Main Drive | 324,000 | 0 | 0 | 0 | 324,000 |
| 48" Conveyor Belting Mains | 0 | 215,040 | 188,160 | 0 | 403,200 |
| 48" Belt structure Main | 0 | 156,406 | 136,855 | 0 | 293,261 |
| 48" Drive Panel | 0 | 324,000 | 0 | 0 | 324,000 |
| Canopies | 32,000 | 0 | 0 | 0 | 32,000 |
| Track Materials per ft price | 0 | 136,443 | 119,388 | 0 | 255,830 |
| 5 MVA Substation | 150,000 | 0 | 0 | 0 | 150,000 |
| 2500 KVA power center | 130,000 | 0 | 0 | 0 | 130.000 |
| 500 KVA power center | 50,000 | 100,000 | 0 | 0 | 150.000 |
| Mine Development | 250,000 | 250,000 | 0 | 0 | 500.000 |

**CAPX 3-19-07**

| Support Equipment | Year Ended December 31, 2007 | | | | |
|---|---|---|---|---|---|
|  | 1Qtr | 2Qtr | 3Qtr | 4Qtr | Total |
| Volvo Loader | 0 | 0 | 0 | 0 | 0 |
| 980 H Endloader | 0 | 395,000 | 0 | 0 | 395,000 |
| 966 G Endloader | 0 | 200,000 | 0 | 0 | 200,000 |
| 16 G Motor Grader | 0 | 0 | 0 | 0 | 0 |
| 4 Wheel Drive Backhoe | 100,000 | 0 | 0 | 0 | 100,000 |
| 330 C L Excavator | 0 | 0 | 0 | 0 | 0 |
| D8T with coal blade plant | 0 | 460,000 | 0 | 0 | 460,000 |
| D10T with coal blade load out | 0 | 675,000 | 0 | 0 | 675,000 |
| Forklift | 150,000 | 0 | 0 | 0 | 150,000 |
| Mechanic trucks | 65,000 | 0 | 0 | 0 | 65,000 |
| Railroad Rehab | 262,500 | 262,500 | 0 | 0 | 525,000 |
| Exploration Drilling | 0 | 0 | 0 | 0 | 0 |
| Bucket truck | 0 | 90,000 | 0 | 0 | 90,000 |
| Mine Permitting | 150,000 | 0 | 0 | 0 | 150,000 |
|  |  |  |  |  |  |
| Refuse Site Development | 0 | 300,000 | 100,000 | 0 | 400,000 |
| D8 wide track dozer/refuse | 0 | 475,000 | 0 | 0 | 475,000 |
| Bobcat for plant | 0 | 25,000 | 0 | 0 | 25,000 |
|  |  |  |  |  |  |
| Prep Plant Site Excavation | 0 | 0 | 0 | 0 | 0 |
| Prep Plant | 3,277,336 | 9,897,253 | 6,971,583 | 0 | 20,146,173 |
| Caissons | 291,500 | 0 | 0 | 0 | 291,500 |

**CAPX 3-19-07**

| | Year Ended December 31, 2007 | | | | |
|---|---|---|---|---|---|
| | 1Qtr | 2Qtr | 3Qtr | 4Qtr | Total |
| **Additional items not in original** | | | | | |
| Beckley Scalping Screen Structure | 0 | 125,000 | 0 | 0 | 125,000 |
| Beckley Scalping Screen | 0 | 95,000 | 0 | 0 | 95,000 |
| Beckley Raw coal conveyor | 0 | 375,000 | 0 | 0 | 375,000 |
| Plus Size rejects Conveyor | 0 | 726,000 | 0 | 0 | 726,000 |
| Beckley Electrical | 0 | 50,000 | 0 | 0 | 50,000 |
| Beckley concrete foundations | 0 | 40,000 | 0 | 0 | 40,000 |
| Prepare supply yard (IBR) | 185,000 | 0 | 0 | 0 | 185,000 |
| Additional Opening and Permitting | 0 | 0 | 150,000 | 0 | 150,000 |
| Fan and Fan House | 0 | 25,000 | 0 | 0 | 25,000 |
| 48" Panel Belts | 0 | 0 | 324,000 | 324,000 | 648,000 |
| Plant site back fill site prep | 0 | 350,000 | 0 | 0 | 350,000 |
| 10" water line pond to plant 1500' | 0 | 21,750 | 0 | 0 | 21,750 |
| Pond Construction | 0 | 120,000 | 0 | 0 | 120,000 |
| Thickener Prep | 0 | 15,000 | 0 | 0 | 15,000 |
| Overland conveyor site prep | 0 | 360,000 | 0 | 0 | 360,000 |
| Site prep refuse conveyor | 0 | 50,000 | 0 | 0 | 50,000 |
| Plant Substation and Electrics | 45,000 | 405,000 | 0 | 0 | 450,000 |
| Pond Construction Fresh Water | 0 | 50,000 | 0 | 0 | 50,000 |
| Anhydrous Ammonia Station | 0 | 0 | 75,000 | 0 | 75,000 |
| Alkaline Amendment Bin | 0 | 100,000 | 0 | 0 | 100,000 |
| Truck Dump Site Prep | 0 | 100,000 | 0 | 0 | 100,000 |
| Unit train coal storage site prep | 0 | 250,000 | 0 | 0 | 250,000 |
| 34 5 Power Line | 0 | 228,000 | 0 | 0 | 228,000 |
| 34 5 Switch Gear | 0 | 28,000 | 0 | 0 | 28,000 |
| Finish expansion of # 1 haul road | 0 | 20,000 | 0 | 0 | 20,000 |
| Gravel Haul road # 1 | 0 | 200,000 | 0 | 0 | 200,000 |
| Haul road Anjean to Cherry Knoll | 0 | 400,000 | 0 | 0 | 400,000 |
| Construct haul road to refuse site | 0 | 60,000 | 0 | 0 | 60,000 |
| Haul road Construction slope to plant | 0 | 75,000 | 0 | 0 | 75,000 |
| 12-12 miner drum and brake add | 93,900 | 0 | 0 | 0 | 93,900 |
| Vertical Turbine Pump | 0 | 0 | 50,000 | 0 | 50,000 |
| Shaft Elevator | 0 | 0 | 100,000 | 0 | 100,000 |
| Shaft Construction Company Support | 66,300 | 42,900 | 20,800 | 0 | 130,000 |
| Equipment Components | 0 | 112,500 | 37,500 | 0 | 150,000 |
| Hydro seeding | 0 | 100,000 | 0 | 0 | 100,000 |
| Exploration Drilling | 0 | 300,000 | 0 | 0 | 300,000 |
| Power line upgrade for Mountaineer 2 | 0 | 0 | 184,000 | 0 | 184,000 |
| 34 5 Power line to Shaft | 0 | 0 | 60,000 | 0 | 60,000 |
| Direct ship system load out | 0 | 730,000 | 0 | 0 | 730,000 |
| Direct ship site prep | 0 | 100,000 | 0 | 0 | 100,000 |
| Safety Requirements | 192,000 | 153,000 | 324,000 | 0 | 669,000 |
| Company Radios and Tower | 0 | 44,000 | 0 | 0 | 44,000 |
| Mine Communication and Locator | 128,000 | 102,000 | 216,000 | 0 | 446,000 |
| Safety Rescue Chambers | 75,000 | 150,000 | 225,000 | 0 | 450,000 |
| | 11,847,538 | 30,394,632 | 18,523,857 | 3,338,325 | 64,104,352 |

**CAPX 3-19-07**

| | Year Ended December 31, 2008 | | | | |
|---|---|---|---|---|---|
| | 1Qtr | 2Qtr | 3Qtr | 4Qtr | Total |
| **Mountaineer # 1  Capx** | | | | | |
| Miners 12CM12 | 0 | 0 | 0 | 0 | 0 |
| Miners 14CM10AA | 0 | 0 | 0 | 0 | 0 |
| BH 10 Haulers | 0 | 0 | 0 | 0 | 0 |
| 10 SC32 Shuttle cars | 0 | 0 | 0 | 0 | 0 |
| CRR II Bolters | 0 | 0 | 0 | 0 | 0 |
| Stamler Feeder BF17 | 0 | 0 | 0 | 0 | 0 |
| Scoops | 0 | 0 | 0 | 0 | 0 |
| Locomotive | 0 | 0 | 0 | 0 | 0 |
| Mantrips | 0 | 0 | 0 | 0 | 0 |
| Jeeps | 0 | 0 | 0 | 0 | 0 |
| Coal Production (unit 1) | 0 | 0 | 0 | 0 | 0 |
| Coal Production (unit 2) | 0 | 0 | 0 | 0 | 0 |
| Coal Production (unit 3) | | | | | |
| **2/0 Cable for drive Mains** | 46,650 | 46,650 | 46,650 | 15,550 | 155,500 |
| Mine Power Cable Mains | 57,781 | 59,455 | 45,994 | 39,168 | 202,398 |
| Mine Power Cable Panels | 47,874 | 37,541 | 0 | 0 | 85,415 |
| Water Mains/ coupling 6" | 59,609 | 61,337 | 47,449 | 40,408 | 208,803 |
| Water Panels/ coupling 4" | 25.755 | 20,196 | 0 | 0 | 45,951 |
| Drain Line / Coupling Mains 10" | 0 | 0 | 15,600 | 15,600 | 31,200 |
| 60" Main Drives Slope | 0 | 0 | 0 | 0 | 0 |
| 60" Main Drives | 0 | 478,500 | 478,500 | 0 | 957,000 |
| 60" Belting Mains Slope | 0 | 0 | 0 | 0 | 0 |
| 60" Belting Mains | 292,560 | 301,040 | 232,880 | 198,320 | 1,024,800 |
| 60" Belt structure Outside | 0 | 0 | 0 | 0 | 0 |
| 60"  Rigid Rail  Mains | 257,416 | 264,878 | 204,905 | 174,497 | 901,696 |
| 48" Panel Drive | 0 | 0 | 324,000 | 0 | 324,000 |
| 48" Belting Panels Unit #1 | 77,460 | 36,000 | 0 | 0 | 113,460 |
| 48" Rigid Rail Panel Unit #1 | 56,339 | 26,184 | 0 | 0 | 82,523 |
| 48" Belting Panels Unit #2 | 104,340 | 106.560 | 0 | 0 | 210,900 |
| 48" Rigid Rail Panel Unit #2 | 75,890 | 77,505 | 0 | 0 | 153,395 |
| Track Materials per ft price | 254,574 | 233,712 | 110,822 | 94,376 | 693,483 |
| Canopies | 0 | 0 | 0 | 0 | 0 |
| 12 MVA Substation | 0 | 0 | 0 | 0 | 0 |
| 5 MVA Substation | 0 | 0 | 0 | 0 | 0 |
| 2500 KVA power center | 160,000 | 0 | 0 | 0 | 160,000 |
| 500 KVA belt starter | 0 | 0 | 70,000 | 0 | 70,000 |
| 750 KVA belt starters | 0 | 75,000 | 75,000 | 0 | 150,000 |
| 2500 KVA power center | 0 | 0 | 0 | 0 | 0 |
| HV section splitter dual | 38,000 | 0 | 0 | 0 | 38,000 |
| Mine Fan | 600,000 | 0 | 0 | 0 | 600,000 |
| Transmission Line 69 KV | 0 | 0 | 0 | 0 | 0 |
| Transmission Line 34 KV | 0 | 0 | 0 | 0 | 0 |
| Breaker Mine Station | 0 | 0 | 0 | 0 | 0 |
| Slope Development | 0 | 0 | 0 | 0 | 0 |
| Air Shaft | 0 | 0 | 2,610,000 | 0 | 2,610,000 |
| Outside Facility Shop        Bathhouse | | | | | |
| Warehouse | 0 | 0 | 0 | 0 | 0 |
| Mine Development | 0 | 0 | 0 | 0 | 0 |

**CAPX 3-19-07**

| | Year Ended December 31, 2008 | | | | |
|---|---|---|---|---|---|
| | **1Qtr** | **2Qtr** | **3Qtr** | **4Qtr** | **Total** |
| **Mountaineer # 2  Capx** | 0 | 0 | 0 | 0 | 0 |
| Miners 14CM10AA | 0 | 0 | 0 | 0 | 0 |
| BH 10 Haulers | 0 | 0 | 0 | 0 | 0 |
| CRR II Bolters | 0 | 0 | 0 | 0 | 0 |
| Stamler Feeder BF 17 | 0 | 0 | 0 | 0 | 0 |
| Scoops | 0 | 0 | 0 | 0 | 0 |
| Locomotive | 0 | 0 | 0 | 0 | 0 |
| Mantrips | 0 | 0 | 0 | 0 | 0 |
| Jeeps | 0 | 0 | 0 | 0 | 0 |
| Coal Production (unit 1) | 0 | 0 | 0 | 0 | 0 |
| Coal Production (unit 2) | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 |
| Mine Power Cable Mains | 0 | 0 | 0 | 0 | 0 |
| Mine Power Cable Panels | 0 | 0 | 0 | 0 | 0 |
| Water Mains/ coupling  6" | 0 | 0 | 0 | 0 | 0 |
| Water Panels/ coupling 4" | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 |
| 48" Main Drive | 0 | 0 | 0 | 0 | 0 |
| 48" Conveyor Belting Mains | 0 | 0 | 0 | 0 | 0 |
| 48" Belt structure Main | 0 | 0 | 0 | 0 | 0 |
| 48" Drive Panel | 0 | 0 | 0 | 0 | 0 |
| 48" Belting Panel | 0 | 0 | 0 | 0 | 0 |
| 48" Rigid Rail Panel | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 |
| Track Materials per ft price | 0 | 0 | 0 | 0 | 0 |
| Canopies | 0 | 0 | 0 | 0 | 0 |
| 5 MVA Substation | 0 | 0 | 0 | 0 | 0 |
| 2500 KVA power center | 0 | 0 | 0 | 0 | 0 |
| 500 KVA power center | 0 | 0 | 0 | 0 | 0 |
| HV section splitter single | 0 | 0 | 0 | 0 | 0 |
| HV section splitter duals | 0 | 0 | 0 | 0 | 0 |
| Mine Fan | 0 | 0 | 0 | 0 | 0 |
| Transmission Line | 0 | 0 | 0 | 0 | 0 |
| Mine Development | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 |
| **Mountaineer # 3  Capx** | | | | | |
| Stamler Feeder BF 17 | 0 | 0 | 0 | 0 | 0 |
| Scoops | 0 | 0 | 0 | 0 | 0 |
| Locomotive | 0 | 0 | 0 | 0 | 0 |
| Mantrips | 0 | 0 | 0 | 0 | 0 |
| Jeeps | 0 | 0 | 0 | 0 | 0 |
| Mine Power Cable Mains | 0 | 0 | 0 | 0 | 0 |
| Water Mains/ coupling  6" | 0 | 0 | 0 | 0 | 0 |
| Water Panels/ coupling 4" | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 |
| 48" Main Drive | 0 | 0 | 0 | 0 | 0 |
| 48" Conveyor Belting Mains | 0 | 0 | 0 | 0 | 0 |
| 48" Belt structure Main | 0 | 0 | 0 | 0 | 0 |
| 48" Drive Panel | 0 | 0 | 0 | 0 | 0 |
| Canopies | 0 | 0 | 0 | 0 | 0 |
| Track Materials per ft price | 0 | 0 | 0 | 0 | 0 |
| 5 MVA Substation | 0 | 0 | 0 | 0 | 0 |
| 2500 KVA power center | 0 | 0 | 0 | 0 | 0 |
| 500 KVA power center | 0 | 0 | 0 | 0 | 0 |
| Mine Development | 0 | 0 | 0 | 0 | 0 |

**CAPX 3-19-07**

| Support Equipment | Year Ended December 31, 2008 | | | | |
|---|---|---|---|---|---|
| | 1Qtr | 2Qtr | 3Qtr | 4Qtr | Total |
| Volvo Loader | 0 | 0 | 0 | 0 | 0 |
| 980 H Endloader | 0 | 0 | 0 | 0 | 0 |
| 966 G Endloader | 0 | 0 | 0 | 0 | 0 |
| 16 G Motor Grader | 0 | 0 | 0 | 0 | 0 |
| 4 Wheel Drive Backhoe | 0 | 0 | 0 | 0 | 0 |
| 330 C L Excavator | 0 | 0 | 0 | 0 | 0 |
| D8T with coal blade plant | 0 | 0 | 0 | 0 | 0 |
| D10T with coal blade load out | 0 | 0 | 0 | 0 | 0 |
| Forklift | 0 | 0 | 0 | 0 | 0 |
| Mechanic trucks | 0 | 0 | 0 | 0 | 0 |
| Railroad Rehab | 0 | 0 | 0 | 0 | 0 |
| Exploration Drilling | 0 | 0 | 0 | 0 | 0 |
| Bucket truck | 0 | 0 | 0 | 0 | 0 |
| Mine Permitting | 0 | 0 | 0 | 0 | 0 |
| | | | | | |
| Refuse Site Development | 0 | 0 | 0 | 0 | 0 |
| D8 wide track dozer/refuse | 0 | 0 | 0 | 0 | 0 |
| Bobcat for plant | 0 | 0 | 0 | 0 | 0 |
| | | | | | |
| Prep Plant Site Excavation | 0 | 0 | 0 | 0 | 0 |
| Prep Plant | 0 | 0 | 0 | 0 | 0 |
| Caissons | 0 | 0 | 0 | 0 | 0 |

**CAPX 3-19-07**

| | Year Ended December 31, 2008 | | | | |
|---|---|---|---|---|---|
| | **1Qtr** | **2Qtr** | **3Qtr** | **4Qtr** | **Total** |
| **Additional items not in original** | | | | | |
| Beckley Scalping Screen Structure | 0 | 0 | 0 | 0 | 0 |
| Beckley Scalping Screen | 0 | 0 | 0 | 0 | 0 |
| Beckley Raw coal conveyor | 0 | 0 | 0 | 0 | 0 |
| Plus Size rejects Conveyor | 0 | 0 | 0 | 0 | 0 |
| Beckley Electrical | 0 | 0 | 0 | 0 | 0 |
| Beckley concrete foundations | 0 | 0 | 0 | 0 | 0 |
| Prepare supply yard (IBR) | 0 | 0 | 0 | 0 | 0 |
| Additional Opening and Permitting | 0 | 0 | 0 | 0 | 0 |
| Fan and Fan House | 0 | 0 | 0 | 0 | 0 |
| 48" Panel Belts | 0 | 0 | 0 | 0 | 0 |
| Plant site back fill site prep | 0 | 0 | 0 | 0 | 0 |
| 10" water line pond to plant 1500' | 0 | 0 | 0 | 0 | 0 |
| Pond Construction | 0 | 0 | 0 | 0 | 0 |
| Thickener Prep | 0 | 0 | 0 | 0 | 0 |
| Overland conveyor site prep | 0 | 0 | 0 | 0 | 0 |
| Site prep refuse conveyor | 0 | 0 | 0 | 0 | 0 |
| Plant Substation and Electrics | 0 | 0 | 0 | 0 | 0 |
| Pond Construction Fresh Water | 0 | 0 | 0 | 0 | 0 |
| Anhydrous Ammonia Station | 0 | 0 | 0 | 0 | 0 |
| Alkaline Amendment Bin | 0 | 0 | 0 | 0 | 0 |
| Truck Dump Site Prep | 0 | 0 | 0 | 0 | 0 |
| Unit train coal storage site prep | 0 | 0 | 0 | 0 | 0 |
| 34 5 Power Line | 0 | 0 | 0 | 0 | 0 |
| 34.5 Switch Gear | 0 | 0 | 0 | 0 | 0 |
| Finish expansion of # 1 haul road | 0 | 0 | 0 | 0 | 0 |
| Gravel Haul road # 1 | 0 | 0 | 0 | 0 | 0 |
| Haul road Anjean to Cherry Knoll | 0 | 0 | 0 | 0 | 0 |
| Construct haul road to refuse site | 0 | 0 | 0 | 0 | 0 |
| Haul road Construction slope to plant | 0 | 0 | 0 | 0 | 0 |
| 12-12 miner drum and brake add | 0 | 0 | 0 | 0 | 0 |
| Vertical Turbine Pump | 0 | 0 | 0 | 0 | 0 |
| Shaft Elevator | 0 | 0 | 0 | 0 | 0 |
| Shaft Construction Company Support | 0 | 0 | 0 | 0 | 0 |
| Equipment Components | 0 | 0 | 0 | 0 | 0 |
| Hydro seeding | 0 | 0 | 0 | 0 | 0 |
| Exploration Drilling | 0 | 0 | 0 | 0 | 0 |
| Power line upgrade for Mountaineer 2 | 0 | 0 | 0 | 0 | 0 |
| 34 5 Power line to Shaft | 0 | 0 | 0 | 0 | 0 |
| Direct ship system load out | 0 | 0 | 0 | 0 | 0 |
| Direct ship site prep | 0 | 0 | 0 | 0 | 0 |
| Safety Requirements | 0 | 30,000 | 0 | 0 | 30,000 |
| Company Radios and Tower | 0 | 0 | 0 | 0 | 0 |
| Mine Communication and Locator | 0 | 20,000 | 0 | 0 | 20,000 |
| Safety Rescue Chambers | 0 | 0 | 0 | 0 | 0 |
| | 2,154,248 | 1,874.557 | 4.261,800 | 577,918 | 8,868,524 |

CAPX 3-19-07

| | Year Ended December 31, 2009 | | | | |
|---|---|---|---|---|---|
| | 1Qtr | 2Qtr | 3Qtr | 4Qtr | Total |
| **Mountaineer # 1  Capx** | | | | | |
| Miners 12CM12 | 0 | 0 | 0 | 0 | 0 |
| Miners 14CM10AA | 0 | 0 | 0 | 0 | 0 |
| BH 10 Haulers | 0 | 0 | 0 | 0 | 0 |
| 10 SC32 Shuttle cars | 0 | 0 | 0 | 0 | 0 |
| CRR II Bolters | 0 | 0 | 0 | 0 | 0 |
| Stamler Feeder BF17 | 0 | 0 | 0 | 0 | 0 |
| Scoops | 0 | 0 | 0 | 0 | 0 |
| Locomotive | 0 | 0 | 0 | 0 | 0 |
| Mantrips | 0 | 0 | 0 | 0 | 0 |
| Jeeps | 0 | 0 | 0 | 0 | 0 |
| Coal Production (unit 1) | 0 | 0 | 0 | 0 | 0 |
| Coal Production (unit 2) | 0 | 0 | 0 | 0 | 0 |
| Coal Production (unit 3) | | | | | |
| **2/0 Cable for drive Mains** | 0 | 0 | 0 | 0 | 0 |
| Mine Power Cable Mains | 40,337 | 41,507 | 41,507 | 0 | 123,351 |
| Mine Power Cable Panels | 26,892 | 14,030 | 26,892 | 32,896 | 100.709 |
| Water Mains/ coupling 6" | 41.614 | 42,820 | 42,820 | 0 | 127,254 |
| Water Panels/ coupling 4" | 14,467 | 7,548 | 14,467 | 17,697 | 54,179 |
| Drain Line / Coupling Mains 10" | 15,600 | 0 | 0 | 0 | 15,600 |
| 60" Main Drives Slope | 0 | 0 | 0 | 0 | 0 |
| 60" Main Drives | 478,500 | 0 | 478,500 | 0 | 957,000 |
| 60" Belting Mains Slope | 0 | 0 | 0 | 0 | 0 |
| 60" Belting Mains | 204,240 | 210,160 | 210,160 | 0 | 624,560 |
| 60" Belt structure Outside | 0 | 0 | 0 | 0 | 0 |
| 60"  Rigid Rail  Mains | 179,706 | 184,915 | 184,915 | 0 | 549,535 |
| 48" Panel Drive | 0 | 648,000 | 0 | 0 | 648,000 |
| 48" Belting Panels Unit #1 | 102,120 | 53,280 | 102,120 | 124,920 | 382,440 |
| 48" Rigid Rail Panel Unit #1 | 74,275 | 38,752 | 74,275 | 90,858 | 278,161 |
| 48" Belting Panels Unit #2 | 0 | 0 | 0 | 0 | 0 |
| 48" Rigid Rail Panel Unit #2 | 0 | 0 | 0 | 0 | 0 |
| Track Materials per ft price | 161,988 | 133,816 | 164,805 | 79,262 | 539,871 |
| Canopies | 0 | 0 | 0 | 0 | 0 |
| 12 MVA Substation | 0 | 0 | 0 | 0 | 0 |
| 5 MVA Substation | 0 | 0 | 0 | 0 | 0 |
| 2500 KVA power center | 0 | 0 | 0 | 0 | 0 |
| 500 KVA belt starter | 0 | 140,000 | 0 | 0 | 140,000 |
| 750 KVA belt starters | 75,000 | 0 | 75,000 | 0 | 150.000 |
| 2500 KVA power center | 0 | 0 | 0 | 0 | 0 |
| HV section splitter dual | 0 | 0 | 0 | 0 | 0 |
| Mine Fan | 0 | 0 | 0 | 0 | 0 |
| Transmission Line 69 KV | 0 | 0 | 0 | 0 | 0 |
| Transmission Line 34 KV | 0 | 0 | 0 | 0 | 0 |
| Breaker Mine Station | 0 | 0 | 0 | 0 | 0 |
| Slope Development | 0 | 0 | 0 | 0 | 0 |
| Air Shaft | 0 | 0 | 0 | 0 | 0 |
| Outside Facility Shop     Bathhouse Warehouse | 0 | 0 | 0 | 0 | 0 |
| Mine Development | 0 | 0 | 0 | 0 | 0 |

**CAPX 3-19-07**

| | Year Ended December 31, 2009 | | | | |
|---|---|---|---|---|---|
| | 1Qtr | 2Qtr | 3Qtr | 4Qtr | Total |
| **Mountaineer # 2  Capx** | 0 | 0 | 0 | 0 | 0 |
| Miners 14CM10AA | 0 | 0 | 0 | 0 | 0 |
| BH 10 Haulers | 0 | 0 | 0 | 0 | 0 |
| CRR II Bolters | 0 | 0 | 0 | 0 | 0 |
| Stamler Feeder BF17 | 0 | 0 | 0 | 0 | 0 |
| Scoops | 0 | 0 | 0 | 0 | 0 |
| Locomotive | 0 | 0 | 0 | 0 | 0 |
| Mantrips | 0 | 0 | 0 | 0 | 0 |
| Jeeps | 0 | 0 | 0 | 0 | 0 |
| Coal Production (unit 1) | 0 | 0 | 0 | 0 | 0 |
| Coal Production (unit 2) | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 |
| Mine Power Cable Mains | 0 | 0 | 0 | 0 | 0 |
| Mine Power Cable Panels | 0 | 0 | 0 | 0 | 0 |
| Water Mains/ coupling  6" | 0 | 0 | 0 | 0 | 0 |
| Water Panels/ coupling 4" | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 |
| 48" Main Drive | 0 | 0 | 0 | 0 | 0 |
| 48" Conveyor Belting Mains | 0 | 0 | 0 | 0 | 0 |
| 48" Belt structure Main | 0 | 0 | 0 | 0 | 0 |
| 48" Drive Panel | 0 | 0 | 0 | 0 | 0 |
| 48" Belting Panel | 0 | 0 | 0 | 0 | 0 |
| 48" Rigid Rail Panel | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 |
| Track Materials per ft price | 0 | 0 | 0 | 0 | 0 |
| Canopies | 0 | 0 | 0 | 0 | 0 |
| 5 MVA Substation | 0 | 0 | 0 | 0 | 0 |
| 2500 KVA power center | 0 | 0 | 0 | 0 | 0 |
| 500 KVA power center | 0 | 0 | 0 | 0 | 0 |
| HV section splitter single | 0 | 0 | 0 | 0 | 0 |
| HV section splitter duals | 0 | 0 | 0 | 0 | 0 |
| Mine Fan | 0 | 0 | 0 | 0 | 0 |
| Transmission Line | 0 | 0 | 0 | 0 | 0 |
| Mine Development | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 |
| **Mountaineer # 3  Capx** | | | | | |
| Stamler Feeder BF17 | 0 | 0 | 0 | 0 | 0 |
| Scoops | 0 | 0 | 0 | 0 | 0 |
| Locomotive | 0 | 0 | 0 | 0 | 0 |
| Mantrips | 0 | 0 | 0 | 0 | 0 |
| Jeeps | 0 | 0 | 0 | 0 | 0 |
| Mine Power Cable Mains | 0 | 0 | 0 | 0 | 0 |
| Water Mains/ coupling  6" | 0 | 0 | 0 | 0 | 0 |
| Water Panels/ coupling 4" | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 |
| 48" Main Drive | 0 | 0 | 0 | 0 | 0 |
| 48" Conveyor Belting Mains | 0 | 0 | 0 | 0 | 0 |
| 48" Belt structure Main | 0 | 0 | 0 | 0 | 0 |
| 48" Drive Panel | 0 | 0 | 0 | 0 | 0 |
| Canopies | 0 | 0 | 0 | 0 | 0 |
| Track Materials per ft price | 0 | 0 | 0 | 0 | 0 |
| 5 MVA Substation | 0 | 0 | 0 | 0 | 0 |
| 2500 KVA power center | 0 | 0 | 0 | 0 | 0 |
| 500 KVA power center | 0 | 0 | 0 | 0 | 0 |
| Mine Development | 0 | 0 | 0 | 0 | 0 |

**CAPX 3-19-07**

| | Year Ended December 31, 2009 | | | | |
|---|---|---|---|---|---|
| | 1Qtr | 2Qtr | 3Qtr | 4Qtr | Total |
| **Support Equipment** | | | | | |
| Volvo Loader | 0 | 0 | 0 | 0 | 0 |
| 980 H Endloader | 0 | 0 | 0 | 0 | 0 |
| 966 G Endloader | 0 | 0 | 0 | 0 | 0 |
| 16 G Motor Grader | 0 | 0 | 0 | 0 | 0 |
| 4 Wheel Drive Backhoe | 0 | 0 | 0 | 0 | 0 |
| 330 C L Excavator | 0 | 0 | 0 | 0 | 0 |
| D8T with coal blade plant | 0 | 0 | 0 | 0 | 0 |
| D10T with coal blade load out | 0 | 0 | 0 | 0 | 0 |
| Forklift | 0 | 0 | 0 | 0 | 0 |
| Mechanic trucks | 0 | 0 | 0 | 0 | 0 |
| Railroad Rehab | 0 | 0 | 0 | 0 | 0 |
| Exploration Drilling | 0 | 0 | 0 | 0 | 0 |
| Bucket truck | 0 | 0 | 0 | 0 | 0 |
| Mine Permitting | 0 | 0 | 0 | 0 | 0 |
| | | | | | |
| Refuse Site Development | 0 | 0 | 0 | 0 | 0 |
| D8 wide track dozer/refuse | 0 | 0 | 0 | 0 | 0 |
| Bobcat for plant | 0 | 0 | 0 | 0 | 0 |
| | | | | | |
| Prep Plant Site Excavation | 0 | 0 | 0 | 0 | 0 |
| Prep Plant | 0 | 0 | 0 | 0 | 0 |
| Caissons | 0 | 0 | 0 | 0 | 0 |

**CAPX 3-19-07**

| | Year Ended December 31, 2009 | | | | |
|---|---|---|---|---|---|
| | **1Qtr** | **2Qtr** | **3Qtr** | **4Qtr** | **Total** |
| **Additional items not in original** | | | | | |
| Beckley Scalping Screen Structure | 0 | 0 | 0 | 0 | 0 |
| Beckley Scalping Screen | 0 | 0 | 0 | 0 | 0 |
| Beckley Raw coal conveyor | 0 | 0 | 0 | 0 | 0 |
| Plus Size rejects Conveyor | 0 | 0 | 0 | 0 | 0 |
| Beckley Electrical | 0 | 0 | 0 | 0 | 0 |
| Beckley concrete foundations | 0 | 0 | 0 | 0 | 0 |
| Prepare supply yard (IBR) | 0 | 0 | 0 | 0 | 0 |
| Additional Opening and Permitting | 0 | 0 | 0 | 0 | 0 |
| Fan and Fan House | 0 | 0 | 0 | 0 | 0 |
| 48" Panel Belts | 0 | 0 | 0 | 0 | 0 |
| Plant site back fill site prep | 0 | 0 | 0 | 0 | 0 |
| 10" water line pond to plant 1500' | 0 | 0 | 0 | 0 | 0 |
| Pond Construction | 0 | 0 | 0 | 0 | 0 |
| Thickener Prep | 0 | 0 | 0 | 0 | 0 |
| Overland conveyor site prep | 0 | 0 | 0 | 0 | 0 |
| Site prep refuse conveyor | 0 | 0 | 0 | 0 | 0 |
| Plant Substation and Electrics | 0 | 0 | 0 | 0 | 0 |
| Pond Construction Fresh Water | 0 | 0 | 0 | 0 | 0 |
| Anhydrous Ammonia Station | 0 | 0 | 0 | 0 | 0 |
| Alkaline Amendment Bin | 0 | 0 | 0 | 0 | 0 |
| Truck Dump Site Prep | 0 | 0 | 0 | 0 | 0 |
| Unit train coal storage site prep | 0 | 0 | 0 | 0 | 0 |
| 34 5 Power Line | 0 | 0 | 0 | 0 | 0 |
| 34 5 Switch Gear | 0 | 0 | 0 | 0 | 0 |
| Finish expansion of # 1 haul road | 0 | 0 | 0 | 0 | 0 |
| Gravel Haul road # 1 | 0 | 0 | 0 | 0 | 0 |
| Haul road Anjean to Cherry Knoll | 0 | 0 | 0 | 0 | 0 |
| Construct haul road to refuse site | 0 | 0 | 0 | 0 | 0 |
| Haul road Construction slope to plant | 0 | 0 | 0 | 0 | 0 |
| 12-12 miner drum and brake add | 0 | 0 | 0 | 0 | 0 |
| Vertical Turbine Pump | 0 | 0 | 0 | 0 | 0 |
| Shaft Elevator | 0 | 0 | 0 | 0 | 0 |
| Shaft Construction Company Support | 0 | 0 | 0 | 0 | 0 |
| Equipment Components | 0 | 0 | 0 | 0 | 0 |
| Hydro seeding | 0 | 0 | 0 | 0 | 0 |
| Exploration Drilling | 0 | 0 | 0 | 0 | 0 |
| Power line upgrade for Mountaineer 2 | 0 | 0 | 0 | 0 | 0 |
| 34 5 Power line to Shaft | 0 | 0 | 0 | 0 | 0 |
| Direct ship system load out | 0 | 0 | 0 | 0 | 0 |
| Direct ship site prep | 0 | 0 | 0 | 0 | 0 |
| Safety Requirements | 0 | 0 | 0 | 0 | 0 |
| Company Radios and Tower | 0 | 0 | 0 | 0 | 0 |
| Mine Communication and Locator | 0 | 0 | 0 | 0 | 0 |
| Safety Rescue Chambers | 0 | 0 | 0 | 0 | 0 |
| | 1,414,739 | 1,514.828 | 1,415,460 | 345,633 | 4.690,660 |

**CAPX 3-19-07**

| | Year Ended December 31, 2010 | | | | |
|---|---|---|---|---|---|
| | **1Qtr** | **2Qtr** | **3Qtr** | **4Qtr** | **Total** |
| **Mountaineer # 1  Capx** | | | | | |
| Miners 12CM12 | 0 | 0 | 0 | 0 | 0 |
| Miners 14CM10AA | 0 | 0 | 0 | 0 | 0 |
| BH 10 Haulers | 0 | 0 | 0 | 0 | 0 |
| 10 SC32 Shuttle cars | 0 | 0 | 0 | 0 | 0 |
| CRR II Bolters | 0 | 0 | 0 | 0 | 0 |
| Stamler Feeder BF17 | 0 | 0 | 0 | 0 | 0 |
| Scoops | 0 | 0 | 0 | 0 | 0 |
| Locomotive | 0 | 0 | 0 | 0 | 0 |
| Mantrips | 0 | 0 | 0 | 0 | 0 |
| Jeeps | 0 | 0 | 0 | 0 | 0 |
| Coal Production (unit 1) | 0 | 0 | 0 | 0 | 0 |
| Coal Production (unit 2) | 0 | 0 | 0 | 0 | 0 |
| Coal Production (unit 3) | | | | | |
| **2/0 Cable for drive Mains** | 0 | 0 | 0 | 0 | 0 |
| Mine Power Cable Mains | 0 | 0 | 0 | 0 | 0 |
| Mine Power Cable Panels | 27,476 | 82.429 | 37,541 | 0 | 147,446 |
| Water Mains/ coupling 6" | 0 | 0 | 0 | 0 | 0 |
| Water Panels/ coupling 4" | 14,782 | 44,345 | 20,196 | 0 | 79,322 |
| Drain Line / Coupling Mains 10" | 0 | 0 | 0 | 0 | 0 |
| 60" Main Drives Slope | 0 | 0 | 0 | 0 | 0 |
| 60" Main Drives | 0 | 0 | 0 | 0 | 0 |
| 60" Belting Mains Slope | 0 | 0 | 0 | 0 | 0 |
| 60" Belting Mains | 0 | 0 | 0 | 0 | 0 |
| 60" Belt structure Outside | 0 | 0 | 0 | 0 | 0 |
| 60" Rigid Rail  Mains | 0 | 0 | 0 | 0 | 0 |
| 48" Panel Drive | 324,000 | 0 | 324,000 | 0 | 648,000 |
| 48" Belting Panels Unit #1 | 104,340 | 157,620 | 91,500 | 0 | 353,460 |
| 48" Rigid Rail Panel Unit #1 | 75,890 | 114,642 | 66,551 | 0 | 257,083 |
| 48" Belting Panels Unit #2 | 0 | 155,400 | 51,060 | 0 | 206,460 |
| 48" Rigid Rail Panel Unit #2 | 0 | 113.028 | 37,138 | 0 | 150,165 |
| Track Materials per ft price | 66.204 | 198.611 | 90,454 | 0 | 355,269 |
| Canopies | 0 | 0 | 0 | 0 | 0 |
| 12 MVA Substation | 0 | 0 | 0 | 0 | 0 |
| 5 MVA Substation | 0 | 0 | 0 | 0 | 0 |
| 2500 KVA power center | 0 | 0 | 0 | 0 | 0 |
| 500 KVA belt starter | 70,000 | 0 | 70,000 | 0 | 140.000 |
| 750 KVA belt starters | 0 | 0 | 0 | 0 | 0 |
| 2500 KVA power center | 0 | 0 | 0 | 0 | 0 |
| HV section splitter dual | 0 | 0 | 0 | 0 | 0 |
| Mine Fan | 0 | 0 | 0 | 0 | 0 |
| Transmission Line 69 KV | 0 | 0 | 0 | 0 | 0 |
| Transmission Line 34 KV | 0 | 0 | 0 | 0 | 0 |
| Breaker Mine Station | 0 | 0 | 0 | 0 | 0 |
| Slope Development | 0 | 0 | 0 | 0 | 0 |
| Air Shaft | 0 | 0 | 0 | 0 | 0 |
| Outside Facility Shop        Bathhouse | | | | | |
| Warehouse | 0 | 0 | 0 | 0 | 0 |
| Mine Development | 0 | 0 | 0 | 0 | 0 |

**CAPX 3-19-07**

| | Year Ended December 31, 2010 | | | | |
|---|---|---|---|---|---|
| | **1Qtr** | **2Qtr** | **3Qtr** | **4Qtr** | **Total** |
| **Mountaineer # 2  Capx** | 0 | 0 | 0 | 0 | 0 |
| Miners 14CM10AA | 0 | 0 | 0 | 0 | 0 |
| BH 10 Haulers | 0 | 0 | 0 | 0 | 0 |
| CRR II Bolters | 0 | 0 | 0 | 0 | 0 |
| Stamler Feeder BF17 | 0 | 0 | 0 | 0 | 0 |
| Scoops | 0 | 0 | 0 | 0 | 0 |
| Locomotive | 0 | 0 | 0 | 0 | 0 |
| Mantrips | 0 | 0 | 0 | 0 | 0 |
| Jeeps | 0 | 0 | 0 | 0 | 0 |
| Coal Production (unit 1) | 0 | 0 | 0 | 0 | 0 |
| Coal Production (unit 2) | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 |
| Mine Power Cable Mains | 0 | 0 | 0 | 0 | 0 |
| Mine Power Cable Panels | 0 | 0 | 0 | 0 | 0 |
| Water Mains/ coupling  6" | 0 | 0 | 0 | 0 | 0 |
| Water Panels/ coupling 4" | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 |
| 48" Main Drive | 0 | 0 | 0 | 0 | 0 |
| 48" Conveyor Belting Mains | 0 | 0 | 0 | 0 | 0 |
| 48" Belt structure Main | 0 | 0 | 0 | 0 | 0 |
| 48" Drive Panel | 0 | 0 | 0 | 0 | 0 |
| 48" Belting Panel | 0 | 0 | 0 | 0 | 0 |
| 48" Rigid Rail Panel | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 |
| Track Materials per ft price | 0 | 0 | 0 | 0 | 0 |
| Canopies | 0 | 0 | 0 | 0 | 0 |
| 5 MVA Substation | 0 | 0 | 0 | 0 | 0 |
| 2500 KVA power center | 0 | 0 | 0 | 0 | 0 |
| 500 KVA power center | 0 | 0 | 0 | 0 | 0 |
| HV section splitter single | 0 | 0 | 0 | 0 | 0 |
| HV section splitter duals | 0 | 0 | 0 | 0 | 0 |
| Mine Fan | 0 | 0 | 0 | 0 | 0 |
| Transmission Line | 0 | 0 | 0 | 0 | 0 |
| Mine Development | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 |
| **Mountaineer # 3  Capx** | | | | | |
| Stamler Feeder BF17 | 0 | 0 | 0 | 0 | 0 |
| Scoops | 0 | 0 | 0 | 0 | 0 |
| Locomotive | 0 | 0 | 0 | 0 | 0 |
| Mantrips | 0 | 0 | 0 | 0 | 0 |
| Jeeps | 0 | 0 | 0 | 0 | 0 |
| Mine Power Cable Mains | 0 | 0 | 0 | 0 | 0 |
| Water Mains/ coupling  6" | 0 | 0 | 0 | 0 | 0 |
| Water Panels/ coupling 4" | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 |
| 48" Main Drive | 0 | 0 | 0 | 0 | 0 |
| 48" Conveyor Belting Mains | 0 | 0 | 0 | 0 | 0 |
| 48" Belt structure Main | 0 | 0 | 0 | 0 | 0 |
| 48" Drive Panel | 0 | 0 | 0 | 0 | 0 |
| Canopies | 0 | 0 | 0 | 0 | 0 |
| Track Materials per ft price | 0 | 0 | 0 | 0 | 0 |
| 5 MVA Substation | 0 | 0 | 0 | 0 | 0 |
| 2500 KVA power center | 0 | 0 | 0 | 0 | 0 |
| 500 KVA power center | 0 | 0 | 0 | 0 | 0 |
| Mine Development | 0 | 0 | 0 | 0 | 0 |

**CAPX 3-19-07**

| | Year Ended December 31, 2010 | | | | |
|---|---|---|---|---|---|
| | 1Qtr | 2Qtr | 3Qtr | 4Qtr | Total |
| **Support Equipment** | | | | | |
| Volvo Loader | 0 | 0 | 0 | 0 | 0 |
| 980 H Endloader | 0 | 0 | 0 | 0 | 0 |
| 966 G Endloader | 0 | 0 | 0 | 0 | 0 |
| 16 G Motor Grader | 0 | 0 | 0 | 0 | 0 |
| 4 Wheel Drive Backhoe | 0 | 0 | 0 | 0 | 0 |
| 330 C L Excavator | 0 | 0 | 0 | 0 | 0 |
| D8T with coal blade plant | 0 | 0 | 0 | 0 | 0 |
| D10T with coal blade load out | 0 | 0 | 0 | 0 | 0 |
| Forklift | 0 | 0 | 0 | 0 | 0 |
| Mechanic trucks | 0 | 0 | 0 | 0 | 0 |
| Railroad Rehab | 0 | 0 | 0 | 0 | 0 |
| Exploration Drilling | 0 | 0 | 0 | 0 | 0 |
| Bucket truck | 0 | 0 | 0 | 0 | 0 |
| Mine Permitting | 0 | 0 | 0 | 0 | 0 |
| | | | | | |
| Refuse Site Development | 0 | 0 | 0 | 0 | 0 |
| D8 wide track dozer/refuse | 0 | 0 | 0 | 0 | 0 |
| Bobcat for plant | 0 | 0 | 0 | 0 | 0 |
| | | | | | |
| Prep Plant Site Excavation | 0 | 0 | 0 | 0 | 0 |
| Prep Plant | 0 | 0 | 0 | 0 | 0 |
| Caissons | 0 | 0 | 0 | 0 | 0 |

**CAPX 3-19-07**

| | Year Ended December 31, 2010 | | | | |
|---|---|---|---|---|---|
| | **1Qtr** | **2Qtr** | **3Qtr** | **4Qtr** | **Total** |
| **Additional items not in original** | | | | | |
| Beckley Scalping Screen Structure | 0 | 0 | 0 | 0 | 0 |
| Beckley Scalping Screen | 0 | 0 | 0 | 0 | 0 |
| Beckley Raw coal conveyor | 0 | 0 | 0 | 0 | 0 |
| Plus Size rejects Conveyor | 0 | 0 | 0 | 0 | 0 |
| Beckley Electrical | 0 | 0 | 0 | 0 | 0 |
| Beckley concrete foundations | 0 | 0 | 0 | 0 | 0 |
| Prepare supply yard (IBR) | 0 | 0 | 0 | 0 | 0 |
| Additional Opening and Permitting | 0 | 0 | 0 | 0 | 0 |
| Fan and Fan House | 0 | 0 | 0 | 0 | 0 |
| 48" Panel Belts | 0 | 0 | 0 | 0 | 0 |
| Plant site back fill site prep | 0 | 0 | 0 | 0 | 0 |
| 10" water line pond to plant 1500' | 0 | 0 | 0 | 0 | 0 |
| Pond Construction | 0 | 0 | 0 | 0 | 0 |
| Thickener Prep | 0 | 0 | 0 | 0 | 0 |
| Overland conveyor site prep | 0 | 0 | 0 | 0 | 0 |
| Site prep refuse conveyor | 0 | 0 | 0 | 0 | 0 |
| Plant Substation and Electrics | 0 | 0 | 0 | 0 | 0 |
| Pond Construction Fresh Water | 0 | 0 | 0 | 0 | 0 |
| Anhydrous Ammonia Station | 0 | 0 | 0 | 0 | 0 |
| Alkaline Amendment Bin | 0 | 0 | 0 | 0 | 0 |
| Truck Dump Site Prep | 0 | 0 | 0 | 0 | 0 |
| Unit train coal storage site prep | 0 | 0 | 0 | 0 | 0 |
| 34.5 Power Line | 0 | 0 | 0 | 0 | 0 |
| 34.5 Switch Gear | 0 | 0 | 0 | 0 | 0 |
| Finish expansion of # 1 haul road | 0 | 0 | 0 | 0 | 0 |
| Gravel Haul road # 1 | 0 | 0 | 0 | 0 | 0 |
| Haul road Anjean to Cherry Knoll | 0 | 0 | 0 | 0 | 0 |
| Construct haul road to refuse site | 0 | 0 | 0 | 0 | 0 |
| Haul road Construction slope to plant | 0 | 0 | 0 | 0 | 0 |
| 12-12 miner drum and brake add | 0 | 0 | 0 | 0 | 0 |
| Vertical Turbine Pump | 0 | 0 | 0 | 0 | 0 |
| Shaft Elevator | 0 | 0 | 0 | 0 | 0 |
| Shaft Construction Company Support | 0 | 0 | 0 | 0 | 0 |
| Equipment Components | 0 | 0 | 0 | 0 | 0 |
| Hydro seeding | 0 | 0 | 0 | 0 | 0 |
| Exploration Drilling | 0 | 0 | 0 | 0 | 0 |
| Power line upgrade for Mountaineer 2 | 0 | 0 | 0 | 0 | 0 |
| 34.5 Power line to Shaft | 0 | 0 | 0 | 0 | 0 |
| Direct ship system load out | 0 | 0 | 0 | 0 | 0 |
| Direct ship site prep | 0 | 0 | 0 | 0 | 0 |
| Safety Requirements | 0 | 0 | 0 | 0 | 0 |
| Company Radios and Tower | 0 | 0 | 0 | 0 | 0 |
| Mine Communication and Locator | 0 | 0 | 0 | 0 | 0 |
| Safety Rescue Chambers | 0 | 0 | 0 | 0 | 0 |
| | 682,691 | 866,074 | 788,440 | 0 | 2,337,205 |

**CAPX 3-19-07**

| | Year Ended December 31, 2011 | | | | |
|---|---|---|---|---|---|
| | 1Qtr | 2Qtr | 3Qtr | 4Qtr | Total |
| **Mountaineer # 1  Capx** | | | | | |
| Miners 12CM12 | 0 | 0 | 0 | 0 | 0 |
| Miners 14CM10AA | 0 | 0 | 0 | 0 | 0 |
| BH 10 Haulers | 0 | 0 | 0 | 0 | 0 |
| 10 SC32 Shuttle cars | 0 | 0 | 0 | 0 | 0 |
| CRR II Bolters | 0 | 0 | 0 | 0 | 0 |
| Stamler Feeder BF17 | 0 | 0 | 0 | 0 | 0 |
| Scoops | 0 | 0 | 0 | 0 | 0 |
| Locomotive | 0 | 0 | 0 | 0 | 0 |
| Mantrips | 0 | 0 | 0 | 0 | 0 |
| Jeeps | 0 | 0 | 0 | 0 | 0 |
| Coal Production (unit 1) | 0 | 0 | 0 | 0 | 0 |
| Coal Production (unit 2) | 0 | 0 | 0 | 0 | 0 |
| Coal Production (unit 3) | | | | | |
| **2/0 Cable for drive Mains** | 0 | 0 | 0 | 0 | 0 |
| Mine Power Cable Mains | 0 | 0 | 0 | 0 | 0 |
| Mine Power Cable Panels | 0 | 0 | 0 | 0 | 0 |
| Water Mains/ coupling 6" | 0 | 0 | 0 | 0 | 0 |
| Water Panels/ coupling 4" | 0 | 0 | 0 | 0 | 0 |
| Drain Line / Coupling Mains 10" | 0 | 0 | 0 | 0 | 0 |
| 60" Main Drives Slope | 0 | 0 | 0 | 0 | 0 |
| 60" Main Drives | 0 | 0 | 0 | 0 | 0 |
| 60" Belting Mains Slope | 0 | 0 | 0 | 0 | 0 |
| 60" Belting Mains | 0 | 0 | 0 | 0 | 0 |
| 60" Belt structure Outside | 0 | 0 | 0 | 0 | 0 |
| 60"  Rigid Rail  Mains | 0 | 0 | 0 | 0 | 0 |
| 48" Panel Drive | 0 | 0 | 0 | 0 | 0 |
| 48" Belting Panels Unit #1 | 0 | 0 | 0 | 0 | 0 |
| 48" Rigid Rail Panel Unit #1 | 0 | 0 | 0 | 0 | 0 |
| 48" Belting Panels Unit #2 | 0 | 0 | 0 | 0 | 0 |
| 48" Rigid Rail Panel Unit #2 | 0 | 0 | 0 | 0 | 0 |
| Track Materials per ft price | 0 | 0 | 0 | 0 | 0 |
| Canopies | 0 | 0 | 0 | 0 | 0 |
| 12 MVA Substation | 0 | 0 | 0 | 0 | 0 |
| 5 MVA Substation | 0 | 0 | 0 | 0 | 0 |
| 2500 KVA power center | 0 | 0 | 0 | 0 | 0 |
| 500 KVA belt starter | 0 | 0 | 0 | 0 | 0 |
| 750 KVA belt starters | 0 | 0 | 0 | 0 | 0 |
| 2500 KVA power center | 0 | 0 | 0 | 0 | 0 |
| HV section splitter dual | 0 | 0 | 0 | 0 | 0 |
| Mine Fan | 0 | 0 | 0 | 0 | 0 |
| Transmission Line 69 KV | 0 | 0 | 0 | 0 | 0 |
| Transmission Line 34 KV | 0 | 0 | 0 | 0 | 0 |
| Breaker Mine Station | 0 | 0 | 0 | 0 | 0 |
| Slope Development | 0 | 0 | 0 | 0 | 0 |
| Air Shaft | 0 | 0 | 0 | 0 | 0 |
| Outside Facility Shop         Bathhouse | | | | | |
| Warehouse | 0 | 0 | 0 | 0 | 0 |
| Mine Development | 0 | 0 | 0 | 0 | 0 |

**CAPX 3-19-07**

| | Year Ended December 31, 2011 | | | | |
|---|---|---|---|---|---|
| | 1Qtr | 2Qtr | 3Qtr | 4Qtr | Total |
| **Mountaineer # 2  Capx** | 0 | 0 | 0 | 0 | 0 |
| Miners 14CM10AA | 0 | 0 | 0 | 0 | 0 |
| BH 10 Haulers | 0 | 0 | 0 | 0 | 0 |
| CRR II Bolters | 0 | 0 | 0 | 0 | 0 |
| Stamler Feeder BF17 | 0 | 0 | 0 | 0 | 0 |
| Scoops | 0 | 0 | 0 | 0 | 0 |
| Locomotive | 0 | 0 | 0 | 0 | 0 |
| Mantrips | 0 | 0 | 0 | 0 | 0 |
| Jeeps | 0 | 0 | 0 | 0 | 0 |
| Coal Production (unit 1) | 0 | 0 | 0 | 0 | 0 |
| Coal Production (unit 2) | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 |
| Mine Power Cable Mains | 0 | 0 | 0 | 0 | 0 |
| Mine Power Cable Panels | 0 | 0 | 0 | 0 | 0 |
| Water Mains/ coupling  6" | 0 | 0 | 0 | 0 | 0 |
| Water Panels/ coupling 4" | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 |
| 48" Main Drive | 0 | 0 | 0 | 0 | 0 |
| 48" Conveyor Belting Mains | 0 | 0 | 0 | 0 | 0 |
| 48" Belt structure Main | 0 | 0 | 0 | 0 | 0 |
| 48" Drive Panel | 0 | 0 | 0 | 0 | 0 |
| 48" Belting Panel | 0 | 0 | 0 | 0 | 0 |
| 48" Rigid Rail Panel | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 |
| Track Materials per ft price | 0 | 0 | 0 | 0 | 0 |
| Canopies | 0 | 0 | 0 | 0 | 0 |
| 5 MVA Substation | 0 | 0 | 0 | 0 | 0 |
| 2500 KVA power center | 0 | 0 | 0 | 0 | 0 |
| 500 KVA power center | 0 | 0 | 0 | 0 | 0 |
| HV section splitter single | 0 | 0 | 0 | 0 | 0 |
| HV section splitter duals | 0 | 0 | 0 | 0 | 0 |
| Mine Fan | 0 | 0 | 0 | 0 | 0 |
| Transmission Line | 0 | 0 | 0 | 0 | 0 |
| Mine Development | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 |
| **Mountaineer # 3  Capx** | | | | | |
| Stamler Feeder BF17 | 0 | 0 | 0 | 0 | 0 |
| Scoops | 0 | 0 | 0 | 0 | 0 |
| Locomotive | 0 | 0 | 0 | 0 | 0 |
| Mantrips | 0 | 0 | 0 | 0 | 0 |
| Jeeps | 0 | 0 | 0 | 0 | 0 |
| Mine Power Cable Mains | 0 | 0 | 0 | 0 | 0 |
| Water Mains/ coupling  6" | 0 | 0 | 0 | 0 | 0 |
| Water Panels/ coupling 4" | 0 | 0 | 0 | 0 | 0 |
| | 0 | 0 | 0 | 0 | 0 |
| 48" Main Drive | 0 | 0 | 0 | 0 | 0 |
| 48" Conveyor Belting Mains | 0 | 0 | 0 | 0 | 0 |
| 48" Belt structure Main | 0 | 0 | 0 | 0 | 0 |
| 48" Drive Panel | 0 | 0 | 0 | 0 | 0 |
| Canopies | 0 | 0 | 0 | 0 | 0 |
| Track Materials per ft price | 0 | 0 | 0 | 0 | 0 |
| 5 MVA Substation | 0 | 0 | 0 | 0 | 0 |
| 2500 KVA power center | 0 | 0 | 0 | 0 | 0 |
| 500 KVA power center | 0 | 0 | 0 | 0 | 0 |
| Mine Development | 0 | 0 | 0 | 0 | 0 |

**CAPX 3-19-07**

| | Year Ended December 31, 2011 | | | | |
|---|---|---|---|---|---|
| | **1Qtr** | **2Qtr** | **3Qtr** | **4Qtr** | **Total** |
| **Support Equipment** | | | | | |
| Volvo Loader | 0 | 0 | 0 | 0 | 0 |
| 980 H Endloader | 0 | 0 | 0 | 0 | 0 |
| 966 G Endloader | 0 | 0 | 0 | 0 | 0 |
| 16 G Motor Grader | 0 | 0 | 0 | 0 | 0 |
| 4 Wheel Drive Backhoe | 0 | 0 | 0 | 0 | 0 |
| 330 C L Excavator | 0 | 0 | 0 | 0 | 0 |
| D8T with coal blade plant | 0 | 0 | 0 | 0 | 0 |
| D10T with coal blade load out | 0 | 0 | 0 | 0 | 0 |
| Forklift | 0 | 0 | 0 | 0 | 0 |
| Mechanic trucks | 0 | 0 | 0 | 0 | 0 |
| Railroad Rehab | 0 | 0 | 0 | 0 | 0 |
| Exploration Drilling | 0 | 0 | 0 | 0 | 0 |
| Bucket truck | 0 | 0 | 0 | 0 | 0 |
| Mine Permitting | 0 | 0 | 0 | 0 | 0 |
| | | | | | |
| Refuse Site Development | 0 | 0 | 0 | 0 | 0 |
| D8 wide track dozer/refuse | 0 | 0 | 0 | 0 | 0 |
| Bobcat for plant | 0 | 0 | 0 | 0 | 0 |
| | | | | | |
| Prep Plant Site Excavation | 0 | 0 | 0 | 0 | 0 |
| Prep Plant | 0 | 0 | 0 | 0 | 0 |
| Caissons | 0 | 0 | 0 | 0 | 0 |

**CAPX 3-19-07**

| | Year Ended December 31, 2011 | | | | |
|---|---|---|---|---|---|
| | 1Qtr | 2Qtr | 3Qtr | 4Qtr | Total |

**Additional items not in original**

| | 1Qtr | 2Qtr | 3Qtr | 4Qtr | Total |
|---|---|---|---|---|---|
| Beckley Scalping Screen Structure | 0 | 0 | 0 | 0 | 0 |
| Beckley Scalping Screen | 0 | 0 | 0 | 0 | 0 |
| Beckley Raw coal conveyor | 0 | 0 | 0 | 0 | 0 |
| Plus Size rejects Conveyor | 0 | 0 | 0 | 0 | 0 |
| Beckley Electrical | 0 | 0 | 0 | 0 | 0 |
| Beckley concrete foundations | 0 | 0 | 0 | 0 | 0 |
| Prepare supply yard (IBR) | 0 | 0 | 0 | 0 | 0 |
| Additional Opening and Permitting | 0 | 0 | 0 | 0 | 0 |
| Fan and Fan House | 0 | 0 | 0 | 0 | 0 |
| 48" Panel Belts | 0 | 0 | 0 | 0 | 0 |
| | | | | | |
| Plant site back fill site prep | 0 | 0 | 0 | 0 | 0 |
| 10" water line pond to plant 1500' | 0 | 0 | 0 | 0 | 0 |
| Pond Construction | 0 | 0 | 0 | 0 | 0 |
| Thickener Prep | 0 | 0 | 0 | 0 | 0 |
| Overland conveyor site prep | 0 | 0 | 0 | 0 | 0 |
| Site prep refuse conveyor | 0 | 0 | 0 | 0 | 0 |
| Plant Substation and Electrics | 0 | 0 | 0 | 0 | 0 |
| Pond Construction Fresh Water | 0 | 0 | 0 | 0 | 0 |
| Anhydrous Ammonia Station | 0 | 0 | 0 | 0 | 0 |
| Alkaline Amendment Bin | 0 | 0 | 0 | 0 | 0 |
| Truck Dump Site Prep | 0 | 0 | 0 | 0 | 0 |
| | | | | | |
| Unit train coal storage site prep | 0 | 0 | 0 | 0 | 0 |
| 34 5 Power Line | 0 | 0 | 0 | 0 | 0 |
| 34 5 Switch Gear | 0 | 0 | 0 | 0 | 0 |
| | | | | | |
| Finish expansion of # 1 haul road | 0 | 0 | 0 | 0 | 0 |
| Gravel Haul road # 1 | 0 | 0 | 0 | 0 | 0 |
| Haul road Anjean to Cherry Knoll | 0 | 0 | 0 | 0 | 0 |
| Construct haul road to refuse site | 0 | 0 | 0 | 0 | 0 |
| | | | | | |
| Haul road Construction slope to plant | 0 | 0 | 0 | 0 | 0 |
| 12-12 miner drum and brake add | 0 | 0 | 0 | 0 | 0 |
| Vertical Turbine Pump | 0 | 0 | 0 | 0 | 0 |
| Shaft Elevator | 0 | 0 | 0 | 0 | 0 |
| Shaft Construction Company Support | 0 | 0 | 0 | 0 | 0 |
| Equipment Components | 0 | 0 | 0 | 0 | 0 |
| | | | | | |
| Hydro seeding | 0 | 0 | 0 | 0 | 0 |
| Exploration Drilling | 0 | 0 | 0 | 0 | 0 |
| | | | | | |
| Power line upgrade for Mountaineer 2 | 0 | 0 | 0 | 0 | 0 |
| 34 5 Power line to Shaft | 0 | 0 | 0 | 0 | 0 |
| | | | | | |
| Direct ship system load out | 0 | 0 | 0 | 0 | 0 |
| Direct ship site prep | 0 | 0 | 0 | 0 | 0 |
| | | | | | |
| Safety Requirements | 0 | 0 | 0 | 0 | 0 |
| Company Radios and Tower | 0 | 0 | 0 | 0 | 0 |
| Mine Communication and Locator | 0 | 0 | 0 | 0 | 0 |
| Safety Rescue Chambers | 0 | 0 | 0 | 0 | 0 |
| | | | | | |
| | 0 | 0 | 0 | 0 | 0 |

| CAPX 3-19-07 | Total '07 - '11 |
|---|---|
| **Mountaineer # 1  Capx** | |
| Miners 12CM12 | 0 |
| Miners 14CM10AA | 1,355,000 |
| BH 10 Haulers | 1,775,740 |
| 10 SC32 Shuttle cars | 300,000 |
| CRR II Bolters | 748,002 |
| Stamler Feeder BF17 | 325,360 |
| Scoops | 600,000 |
| Locomotive | 285,000 |
| Mantrips | 330,000 |
| Jeeps | 120,000 |
| Coal Production (unit 1) | 0 |
| Coal Production (unit 2) | 0 |
| Coal Production (unit 3) | |
| **2/0 Cable for drive Mains** | 251,910 |
| Mine Power Cable Mains | 419.111 |
| Mine Power Cable Panels | 387,353 |
| Water Mains/ coupling 6" | 432,374 |
| Water Panels/ coupling 4" | 208,386 |
| Drain Line / Coupling Mains 10" | 117,000 |
| 60" Main Drives Slope | 1,195,000 |
| 60" Main Drives | 2,871,000 |
| 60" Belting Mains Slope | 250,000 |
| 60" Belting Mains | 1,940,480 |
| 60" Belt structure Outside | 0 |
| 60"  Rigid Rail  Mains | 1,867,165 |
| 48" Panel Drive | 2,592,000 |
| 48" Belting Panels Unit #1 | 1,134,300 |
| 48" Rigid Rail Panel Unit #1 | 725,951 |
| 48" Belting Panels Unit #2 | 472,860 |
| 48" Rigid Rail Panel Unit #2 | 343,927 |
| Track Materials per ft price | 1,943,169 |
| Canopies | 0 |
| 12 MVA Substation | 300,000 |
| 5 MVA Substation | 180,000 |
| 2500 KVA power center | 480,000 |
| 500 KVA belt starter | 630,000 |
| 750 KVA belt starters | 450,000 |
| 2500 KVA power center | 130,000 |
| HV section splitter dual | 114,000 |
| Mine Fan | 600.000 |
| Transmission Line 69 KV | 0 |
| Transmission Line 34 KV | 0 |
| Breaker Mine Station | 0 |
| Slope Development | 5,162,500 |
| Air Shaft | 7.573,259 |
| Outside Facility Shop        Bathhouse | |
| Warehouse | 200.000 |
| Mine Development | 0 |

| CAPX 3-19-07 | Total<br>'07 - '11 |
|---|---|
| **Mountaineer # 2  Capx** | 0 |
| Miners 14CM10AA | 1,355,000 |
| BH 10 Haulers | 0 |
| CRR II Bolters | 374,001 |
| Stamler Feeder BF17 | 0 |
| Scoops | 0 |
| Locomotive | 125,000 |
| Mantrips | 220,000 |
| Jeeps | 80,000 |
| Coal Production (unit 1) | 0 |
| Coal Production (unit 2) | 0 |
|  | 0 |
| Mine Power Cable Mains | 109,394 |
| Mine Power Cable Panels | 76,867 |
| Water Mains/ coupling  6" | 0 |
| Water Panels/ coupling 4" | 101,150 |
|  | 0 |
| 48" Main Drive | 0 |
| 48" Conveyor Belting Mains | 422.100 |
| 48" Belt structure Main | 307,007 |
| 48" Drive Panel | 0 |
| 48" Belting Panel | 291,900 |
| 48" Rigid Rail Panel | 212,309 |
|  | 0 |
| Track Materials per ft price | 301.895 |
| Canopies | 0 |
| 5 MVA Substation | 0 |
| 2500 KVA power center | 178,000 |
| 500 KVA power center | 140,000 |
| HV section splitter single | 10,000 |
| HV section splitter duals | 38,000 |
| Mine Fan | 0 |
| Transmission Line | 0 |
| Mine Development | 0 |
|  | 0 |
| **Mountaineer # 3  Capx** |  |
| Stamler Feeder BF17 | 325,360 |
| Scoops | 325,000 |
| Locomotive | 125,000 |
| Mantrips | 110,000 |
| Jeeps | 60,000 |
| Mine Power Cable Mains | 108,176 |
| Water Mains/ coupling 6" | 0 |
| Water Panels/ coupling 4" | 57,120 |
|  | 0 |
| 48" Main Drive | 324,000 |
| 48" Conveyor Belting Mains | 403,200 |
| 48" Belt structure Main | 293,261 |
| 48" Drive Panel | 324,000 |
| Canopies | 32,000 |
| Track Materials per ft price | 255,830 |
| 5 MVA Substation | 150,000 |
| 2500 KVA power center | 130,000 |
| 500 KVA power center | 150,000 |
| Mine Development | 500,000 |

| CAPX 3-19-07 | Total<br>'07 - '11 |
|---|---|
| **Support Equipment** | |
| Volvo Loader | 0 |
| 980 H Endloader | 395,000 |
| 966 G Endloader | 200,000 |
| 16 G Motor Grader | 0 |
| 4 Wheel Drive Backhoe | 100,000 |
| 330 C L Excavator | 0 |
| D8T with coal blade plant | 460,000 |
| D10T with coal blade load out | 675,000 |
| Forklift | 150,000 |
| Mechanic trucks | 65,000 |
| Railroad Rehab | 525,000 |
| Exploration Drilling | 0 |
| Bucket truck | 90,000 |
| Mine Permitting | 150,000 |
| | |
| Refuse Site Development | 400,000 |
| D8 wide track dozer/refuse | 475,000 |
| Bobcat for plant | 25,000 |
| | |
| Prep Plant Site Excavation | 0 |
| Prep Plant | 20,146,173 |
| Caissons | 291,500 |

**CAPX 3-19-07**

Total
'07 - '11

**Additional Items not In original**

| | |
|---|---:|
| Beckley Scalping Screen Structure | 125,000 |
| Beckley Scalping Screen | 95,000 |
| Beckley Raw  coal conveyor | 375,000 |
| Plus Size rejects Conveyor | 726,000 |
| Beckley Electrical | 50,000 |
| Beckley concrete foundations | 40,000 |
| Prepare supply yard (IBR) | 185,000 |
| Additional Opening and Permitting | 150,000 |
| Fan and Fan House | 25,000 |
| 48" Panel Belts | 648,000 |
| | |
| Plant site back fill site prep | 350,000 |
| 10" water line pond to plant 1500' | 21,750 |
| Pond Construction | 120,000 |
| Thickener Prep | 15,000 |
| Overland conveyor site prep | 360,000 |
| Site prep refuse conveyor | 50,000 |
| Plant Substation and Electrics | 450,000 |
| Pond Construction Fresh Water | 50,000 |
| Anhydrous Ammonia Station | 75,000 |
| Alkaline Amendment Bin | 100,000 |
| Truck Dump Site Prep | 100,000 |
| | |
| Unit train coal storage site prep | 250,000 |
| 34 5 Power Line | 228,000 |
| 34 5 Switch Gear | 28.000 |
| | |
| Finish expansion of # 1 haul road | 20,000 |
| Gravel Haul road # 1 | 200,000 |
| Haul road Anjean to Cherry Knoll | 400,000 |
| Construct haul road to refuse site | 60,000 |
| | |
| Haul road Construction slope to plant | 75,000 |
| 12-12 miner drum and brake add | 93,900 |
| Vertical Turbine Pump | 50,000 |
| Shaft Elevator | 100,000 |
| Shaft Construction Company Support | 130,000 |
| Equipment Components | 150,000 |
| | |
| Hydro seeding | 100,000 |
| Exploration Drilling | 300,000 |
| | |
| Power line upgrade for Mountaineer 2 | 184,000 |
| 34 5 Power line to Shaft | 60,000 |
| | |
| Direct ship system load out | 730,000 |
| Direct ship site prep | 100,000 |
| | |
| Safety Requirements | 699,000 |
| Company Radios and Tower | 44,000 |
| Mine Communication and Locator | 456,000 |
| Safety Rescue Chambers | 450,000 |
| | |
| | 80,000,740 |

EXHIBIT E

## FORM OF
## BLOCKED ACCOUNT CONTROL AGREEMENT
### ("Shifting Control")

This BLOCKED ACCOUNT CONTROL AGREEMENT dated as of May 1, 2007 (this "*Agreement*") among _____, (the "*Company*"), LEHMAN COMMERCIAL PAPER INC., in its capacity as administrative agent for the Lenders (in such capacity, the "*Administrative Agent*") and _____, the depositary bank (in such capacity, the "*Depositary*").

The Company has entered into that certain Amended and Restated Credit Agreement, dated as of May 1, 2007 (as amended, restated, supplemented or otherwise modified from time to time, the "*Credit Agreement*"), among the Company, the several lenders from time to time parties thereto (collectively, the "*Lenders*") and the Administrative Agent, and, in connection therewith, the Company and certain of its subsidiaries and other affiliates entered into the related Loan Documents to which such Persons are party.

It is a condition precedent of the Lenders to make loans to the Company pursuant to the Credit Agreement that the Company shall have executed and delivered this Agreement to each of the other parties hereto.

Any capitalized term used, but not defined, herein shall have the meaning given to such term in the Credit Agreement.

NOW THEREFORE, in consideration of the foregoing and the mutual agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement refer to Account No. _____ in the name of the Company maintained at the Depositary (the "*Account*") and hereby agree as follows:

1.    The Company and the Administrative Agent hereby notify the Depositary that pursuant to the Security Documents the Company has granted the Administrative Agent a security interest in the Account and all funds on deposit from time to time therein. The Depositary acknowledges being so notified. It is the intent of the parties to this Agreement that the Administrative Agent have control of the Account within the meaning of Section 9-104 of the New York Uniform Commercial Code, as amended.

2.    Prior to the Effective Time (as hereinafter defined) of each Shifting Control Notice (as hereinafter defined), the Depositary shall honor all withdrawal, payment, transfer or other fund disposition or other instructions which the Company is entitled to give under the Account Documentation (as hereinafter defined) (collectively, "*instructions*") received from the Company (but not those from the Administrative Agent) concerning the Account. On and after the Effective Time of each Shifting Control Notice (and without the Company's consent), the Depositary shall honor all instructions received from the Administrative Agent (but not those from the Company) concerning the Account and the Company shall have no right or ability to access or withdraw or transfer funds from the Account.

For the purposes hereof, the "*Effective Time*" shall be as soon as practicable but not later than the opening of business on the second business day after the business day on which a notice purporting to be signed by the Administrative Agent in substantially the form of <u>Exhibit A</u>, attached hereto, with a copy of this Agreement attached thereto (a "*Shifting Control Notice*"), is actually received by one of the individual employees of the Depositary to whom the Shifting Control Notice is required to be addressed; *provided, however*, that if any such notice is so received after 12:00 noon, New York City time, on any business day, the "Effective Time" shall be the opening of business on the third business day after the business day on which such receipt occurs; and *provided, further*, that a "business day" is any day other than a Saturday, Sunday or other day on which Depositary is or is authorized or required by law to be closed.

Notwithstanding the foregoing: (i) all transactions involving or resulting in a transaction involving the Account duly commenced by the Depositary or any affiliate thereof prior to the Effective Time and so consummated or processed thereafter shall be deemed not to constitute a violation of this Agreement and (ii) the Depositary and/or any affiliate thereof may (at its discretion and without any obligation to do so) (a) cease honoring the Company's instructions and commence honoring solely the Administrative Agent's instructions concerning the Account at any time or from time to time after it becomes aware that the Administrative Agent has sent to it a Shifting Control Notice but prior to the Effective Time therefor (including, without limitation, halting, reversing or redirecting any transaction referred to in clause (i) above), or (b) deem a Shifting Control Notice to be received by it for purposes of the foregoing paragraph prior to any specified individual's actual receipt of such Shifting Control Notice if otherwise actually received by the Depositary (or if such Shifting Control Notice contains minor mistakes or other irregularities but otherwise substantially complies with the form attached hereto as <u>Exhibit A</u> or does not attach an appropriate copy of this Agreement), with no liability whatsoever to the Company or any other party for doing so.

3.    This Agreement supplements, rather than replaces, Depositary's deposit account agreement, terms and conditions and other standard documentation in effect from time to time with respect to the Account or services provided in connection with the Account (the "*Account Documentation*"), which Account Documentation will continue to apply to the Account and such services, and the respective rights, powers, duties, obligations, liabilities and responsibilities of the parties thereto and hereto, to the extent not expressly conflicting with the provisions of this Agreement; *provided, however*, in the event of any such conflict, the provisions of this Agreement shall control.  Prior to issuing any instructions on or after the Effective Time, the Administrative Agent shall provide the Depositary with such Account Documentation as the Depositary may reasonably request to establish the identity and authority of the individuals issuing instructions on behalf of the Administrative Agent.  The Administrative Agent may request the Depositary to provide other services (such as automatic daily transfers) with respect to the Account on or after the Effective Time; *provided, however*, if such services are not authorized or otherwise covered under the Account Documentation, the Depositary's decision to provide any such services shall be made in its sole discretion (including, without limitation, being subject to Company and/or the Administrative Agent executing such Account Documentation or other documentation as the Depositary may reasonably require in connection therewith).

4.      The Depositary agrees not to exercise or claim any right of offset, banker's lien or other like right against the Account for so long as this Agreement is in effect except with respect to (i) returned or charged-back items, (ii) reversals or cancellations of payment orders and other electronic fund transfers, (iii) the Depositary's charges, fees and expenses with respect to the Account or the services provided hereunder or (iv) overdrafts in the Account.

5.      Notwithstanding anything to the contrary in this Agreement: (i) the Depositary shall have only the duties and responsibilities with respect to the matters set forth herein as is expressly set forth in writing herein and shall not be deemed to be an agent, bailee or fiduciary for any party hereto; (ii) the Depositary shall be fully protected in acting or refraining from acting in good faith without investigation on any notice (including, without limitation, a Shifting Control Notice), instruction or request purportedly furnished to it by the Company or the Administrative Agent (in accordance with the terms hereof, in which case the parties hereto agree that the Depositary has no duty to make any further inquiry whatsoever); (iii) it is hereby acknowledged and agreed that the Depositary has no knowledge of (and is not required to know) the terms and provisions of the Credit Agreement or any other Financing Document referred to above or any other related documentation or whether any actions by the Administrative Agent (including, without limitation, the sending of a Shifting Control Notice), the Company or any other person or entity are permitted or a breach thereunder or consistent or inconsistent therewith, (iv) the Depositary shall not be liable to any party hereto or any other person for any action or failure to act under or in connection with this Agreement except to the extent such conduct constitutes its own willful misconduct or gross negligence (and to the maximum extent permitted by law, shall under no circumstances be liable for any incidental, indirect, special, consequential or punitive damages); and (v) the Depositary shall not be liable for losses or delays caused by force majeure, interruption or malfunction of computer, transmission or communications facilities, labor difficulties, court order or decree, the commencement of bankruptcy or other similar proceedings or other matters beyond the Depositary's reasonable control.

6.      The Depositary hereby confirms and agrees that it has not entered into any agreement with any other Person relating to the Account or any funds credited thereto pursuant to which it has agreed to comply with instructions originated by such Person.

7.      The Company hereby agrees to indemnify, defend and save harmless the Depositary against any loss, liability or expense (including reasonable fees and disbursements of counsel who may be an employee of the Depositary) (collectively, "***Covered Items***") incurred in connection with this Agreement or the Account (except to the extent due to the Depositary's willful misconduct or gross negligence) or any interpleader proceeding relating thereto or incurred at the Company's direction or instruction.

8.      The Depositary may terminate this Agreement (i) upon the sending of at least 60 days' advance written notice to the other parties hereto or (ii) because of a material breach by the Company or the Administrative Agent of any of the terms of this Agreement or the Account Documentation, upon the sending of at least 10 days' advance written notice to the other parties hereto. Following termination of this Agreement pursuant to material breach, but prior to the expiry of the 40 day period, the Depositary shall hold all moneys in the Account in trust for the Administrative Agent. Any other termination, amendment or waiver of this Agreement shall be

effected solely by an instrument in writing executed by all the parties hereto. The provisions of paragraphs 5 and 7 above shall survive any such termination.

Notwithstanding any other provision of this Agreement or the Account Documentation, the parties to this Agreement hereby acknowledge and agree that the "bank's jurisdiction" of the Depositary for purposes of this Agreement and the purposes of the Uniform Commercial Code of any applicable jurisdiction is the State of New York.

9.    This Agreement cannot be assigned without the prior written approval of the parties hereto.

10.    This Agreement: (i) may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument; (ii) shall become effective when counterparts hereof have been signed and delivered by the parties hereto; and (iii) **shall be governed by and construed in accordance with the laws of the State of New York. All parties hereby waive all rights to a trial by jury in any action or proceeding relating to the Account or this Agreement.** All notices under this Agreement shall be in writing and sent (including via facsimile transmission) to the parties hereto at their respective addresses or fax numbers set forth below (or to such other address or fax number as any such party shall designate in writing to the other parties from time to time).

11.    The Depositary shall, on a monthly basis within 15 days after the end of each month and at such other times as the Administrative Agent or the Company may from time to time reasonably request, provide to the Administrative Agent and the Company, fund balance statements in respect of the Account and amounts segregated in the Account. Such balance statement shall also include deposits, withdrawals and transfers from and to the Account and the net investment income or gain received and collected in the Account. The Depositary shall maintain records of all receipts, disbursements, and investments of funds with respect to the Account until the third anniversary of the date of the payment in full of all Obligations and the termination or expiration of all Commitments. Within 90 days after the end of each year, the Depositary shall furnish to the Administrative Agent, with a copy to the Company, a report setting forth in reasonable detail the account balance, receipts, disbursements, transfers, investment transactions and accruals to the Account during such year. The Depositary shall give notice to the Administrative Agent and the Company of the location of the Account.

**[Signature Page Follows]**

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first written above.

[COMPANY NAME]


By: _____
     Name:
     Title:


LEHMAN COMMERCIAL PAPER INC.
(in its capacity as Administrative Agent)


By: _____
     Name:
     Title:


[BANK NAME]


By: _____
     Name:
     Title:

**EXHIBIT A**

[to be placed on Administrative Agent letterhead]

**BLOCKED ACCOUNT AGREEMENT**

**SHIFTING CONTROL NOTICE**

_____, \_\_\_\_\_

[BANK NAME]
[BANK ADDRESS]
Attention: _____

    Re:    Blocked Account Control Agreement dated as of May 1, 2007 (the "*Agreement*")
by and among [Company], Lehman Commercial Paper Inc., in its capacity as
Administrative Agent and [Bank], as Depositary.

Ladies and Gentlemen:

    This constitutes a Shifting Control Notice as referred to in paragraph 2 of the Agreement,
a copy of which is attached hereto.

LEHMAN COMMERCIAL PAPER INC.

By: _____
       Signature

     _____
       Name:

     _____
       Title:

EXHIBIT F

## FORM OF FINAL COMPLETION CERTIFICATE

Reference is hereby made to that certain Amended and Restated Credit Agreement, dated as of May 1, 2007 (as amended, restated, supplemented or otherwise modified from time to time, the "*Credit Agreement*"), among GREENBRIER MINERALS, LLC, a Delaware limited liability company (the "*Borrower*"), the several banks and other financial institutions or entities from time to time parties thereto (the "*Lenders*"), LEHMAN BROTHERS INC., as Arranger, and LEHMAN COMMERCIAL PAPER INC., as Syndication Agent and Administrative Agent (the "*Administrative Agent*"). Terms not otherwise defined herein shall have the meanings given to them in the Credit Agreement.

This Final Completion Certificate (this "*Certificate*") is being delivered by the Borrower in connection with the Credit Agreement.

The Borrower hereby certifies, after due inquiry and to induce the Administrative Agent and the Lenders to take action in reliance hereon, that:

1.  The Project has achieved Mechanical Completion and has passed the Performance Test, and all construction activities contemplated to have been completed in the Construction Budget and Schedule have been completed (other than punch list items for which (a) the Borrower has cash on hand sufficient to pay such items pursuant to the Construction Budget and Schedule or (b) the then-available Revolving Commitment is sufficient (and will be used) to fund such items).

2.  All expenses necessary for the completion of the construction in accordance with the Construction Budget and Schedule have been paid, except those amounts which are in dispute as of such date or are not yet due and payable.

3.  All Government Approvals required for the Development of the Project have been validly issued, duly obtained and are in full force and effect, and held in the name of a Credit Party or such third party as is specified with respect to such Government Approval on Schedule 3.8(a) or 3.8(b) of the Credit Agreement (*provided*, that having such Government Approval held by or in the name of such third party could not reasonably be expected to have a Material Adverse Effect) and free from conditions or requirements compliance with which could reasonably be expected to have a Material Adverse Effect or which the Credit Party or third party, as the case may be, has not satisfied, except to the extent that a failure to so satisfy such condition or requirement could not reasonably be expected to have a Material Adverse Effect.

4.  (a) Each Credit Party and the Project have been and are now in compliance in all material respects with all Government Approvals and all Government Rules, in each case applicable to such Credit Party and the Project, (b) no Credit Party has received written notice from (or on behalf of) the Governmental Authority having jurisdiction that any of the foregoing is subject to appeal, modification or revocation except if such appeal, modification or revocation could not reasonably be expected to cause a Material Adverse Effect and (c) to the Borrower's

F-1

knowledge, the Material Project Parties have been operating and continue to operate in material compliance with all Governmental Approvals and all Government Rules, in each case applicable or related to the Project.

5.    There exists no Default or Event of Default under the Credit Agreement and no default under any Material Project Document by any Material Project Party or any Credit Party to such agreements.

The Borrower hereby certifies, after due inquiry, that the facts stated in this Certificate are true and complete.

**[Signature Page Follows]**

IN WITNESS WHEREOF, the undersigned has executed this Certificate this ___ day of
_____, _____.

GREENBRIER MINERALS, LLC

By: _____
    Name:
    Title:

EXHIBIT G-1

FORM OF GUARANTEE AND SECURITY AGREEMENT

See Tab 10

EXHIBIT G-2

FORM OF MIDLAND GUARANTEE AND SECURITY AGREEMENT

See Tab 11

EXHIBIT H

MATERIAL PROJECT DOCUMENTS

(Each of the documents listed below have been previously delivered to the Administrative Agent on July 25, 2006 unless otherwise designated by a "*", in which case such document is attached to the Closing Certificate)

## MATERIAL PROJECT DOCUMENTS – FUNDING DATE

A.    Construction Contracts

| Description | Date |
| --- | --- |
| 1.    Design and Construction Agreement between Greenbrier Smokeless Coal Mining, L.L.C., a Delaware limited liability company, and Sedgman, LLC, a Pennsylvania limited liability company | June 29, 2006 |
| 2.    Remote Monitoring and Technical Services Agreement between Greenbrier Smokeless Coal Mining, L.L.C., a Delaware limited liability company, and Far East Processing, LLC, a Pennsylvania limited liability company | June 29, 2006 |
| 3.    * Thyssen Mining Construction of Canada Ltd. Ventilation Shaft Construction | April 18, 2007 |
| 4.    * Atlas Railroad Construction Co. for: CSX Track Rehab Crossings Rehab Loadout Track Construction CSX Track Rehab Extension | Various |

B.    Operating Agreements

| Description | Date |
| --- | --- |
| 1.    Certificate of Formation of Greenbrier Minerals, LLC, as amended, as certified by the Delaware Secretary of State | Certified August 11, 2006 |
| 2.    Operating Agreement for Greenbrier Minerals, LLC | July 25, 2006 |
| 3.    Certificate of Formation of Greenbrier Smokeless Coal Mining, L.L.C., as amended, as certified by the Delaware Secretary of State | Certified August 11, 2006 |
| 4.    Amended and Restated Operating Agreement for Greenbrier Smokeless Coal Mining, L.L.C. by Greenbrier Minerals, LLC | July 25, 2006 |
| 5.    Certificate of Formation of Matoaka Land Company, LLC as certified by the Delaware Secretary of State | Certified August 11, 2006 |
| 6.    Amended and Restated Operating Agreement for Matoaka Land Company, | July 25, |

| Description | Date |
|---|---|
| LLC by Greenbrier Minerals, LLC | 2006 |
| 7. Certificate of Formation of POWHATAN MID-VOL COAL SALES, L.L.C., as amended, as certified by the Delaware Secretary of State | Certified August 11, 2006 |
| 8. Amended and Restated Operating Agreement for POWHATAN MID-VOL COAL SALES, L.L.C. by Greenbrier Minerals, LLC | July 25, 2006 |
| 9. Certificate of Formation of Greenbrier Minerals Holdings, LLC as certified by the Delaware Secretary of State | Certified August 11, 2006 |
| 10. *Amended and Restated Operating Agreement for Greenbrier Minerals Holdings, LLC | July 25, 2006, as amended May 1, 2007 |

C.    Coal Supply Contracts

| Description | Date |
|---|---|
| 1. Dofasco Coal Sales Agreement, Purchase Order Z00006368-16 between POWHATAN MID-VOL COAL SALES, L.L.C. and Dofasco Inc., and Attachment 1 thereto | June 20, 2005 |
| 2. Coal Sales Agreement between POWHATAN MID-VOL COAL SALES, L.L.C. and Indiana Harbor Coke Company, L.P. | April 1, 2006 |
| Guaranty of Buyer's Obligations by Sun Coke Company | [undated] |
| Guaranty [of] Seller's Obligations by Greenbrier Minerals, LLC | [undated] |
| 3. Coal Supply Agreement between POWHATAN MID-VOL COAL SALES, L.L.C. and United States Steel Corporation and joined by Greenbrier Minerals, L.L.C. [sic] | September 9, 2005 |
| 4. Coal Supplier Standard Terms and Conditions between POWHATAN MID-VOL COAL SALES, L.L.C. and United States Steel Corporation, and joined by Greenbrier Minerals, L.L.C. [sic] | September 14, 2005 |

D.    Orix Leases

| Description | Date |
|---|---|
| 1. Master Lease Agreement between Greenbrier Smokeless Coal Mining, L.L.C. and ORIX Financial Services, Inc. together with the following: | |
|    (a) Equipment Schedule No. 1, together with all Exhibits and Riders attached thereto, and in addition, the following: | July 12, 2005 |
| | Acceptance Date July 14, 2005 |
|       (i). Certificate of Acceptance of Greenbrier Smokeless Coal Mining, LLC | July 12, 2005 |
|    (b) Limited Liability Company Certificates and Agreements of Greenbrier Minerals, LLC individually and on behalf of each of the following: | |
|       (i). Greenbrier Smokeless Coal Mining, L.L.C. | July 12, 2005 |
|       (ii). POWHATAN MID-VOL COAL SALES, L.L.C. | July 12, 2005 |
|       (iii). Matoaka Land Company, LLC | July 12, 2005 |
|    (c) Guaranty of Matoaka Land Company, LLC in favor of ORIX Financial Services, Inc. | July 12, 2005 |
|    (d) Guaranty of Greenbrier Smokeless Coal Mining LLC in favor of ORIX Financial Services, Inc. | July 12, 2005 |
|    (e) Equipment Schedule No. 2, together with all Exhibits and Riders attached thereto, and in addition, the following: | July 22, 2005 |
| | Acceptance Date July 22, 2005 |
|       (i). Certificate of Acceptance of Greenbrier Smokeless Coal Mining, L.L.C. | July 22, 2005 |

| Description | Date |
|---|---|
| (f) Equipment Schedule No. 3, together with all Exhibits and Riders attached thereto, and in addition, the following: | August 19, 2005 |
| | Acceptance Date August 19, 2005 |
|    (i).    Certificate of Acceptance of Greenbrier Smokeless Coal Mining, L.L.C. | August 19, 2005 |
| (g) Equipment Schedule No. 4, together with all Exhibits and Riders attached thereto, and in addition, the following: | September 30, 2005 |
| | Acceptance Date September 30, 2005 |
|    (i).    Certificate of Acceptance of Greenbrier Smokeless Coal Mining, L.L.C. | September 29, 2005 |
| (h) Equipment Schedule No. 5, together with all Exhibits and Riders attached thereto, and in addition, the following: | October 18, 2005 |
| | Acceptance Date October 18, 2005 |
|    (i).    Certificate of Acceptance of Greenbrier Smokeless Coal Mining, L.L.C. | October 18, 2005 |
| (i) Equipment Schedule No. 6, together with all Exhibits and Riders attached thereto, and in addition, the following: | November 1 6, 2005 |
| | Acceptance Date [Undated], 2005 |
|    (i).    Certificate of Acceptance of Greenbrier Smokeless Coal Mining, L.L.C. | November 16, 2005 |

| Description | Date |
| --- | --- |
| (j) Equipment Schedule No. 7, together with all Exhibits and Riders attached thereto, and in addition, the following: | December 9, 2005 |
| | Acceptance Date December 9, 2005 |
|     (i). Certificate of Acceptance of Greenbrier Smokeless Coal Mining, L.L.C. | December 8, 2005 |
| (k) Equipment Schedule No. 8, together with all Exhibits and Riders attached thereto, and in addition, the following: | December 13, 2005 |
| | Acceptance Date December 12, 2005 |
|     (i). Certificate of Acceptance of Greenbrier Smokeless Coal Mining, L.L.C. | December 12, 2005 |
| (l) Rider X to Master Lease Agreement, dated as of July 8, 2005: | December 12, 2005 |

E.    Midland Project Documents

| | Description | Date |
| --- | --- | --- |
| 1. | Coal Processing Agreement between Midland Trail Resources, LLC and Greenbrier Smokeless Coal Mining, L.L.C. | July 20, 2006 |
| 2. | Administrative Services and Equipment Agreement between Midland Trail Resources, LLC and Greenbrier Minerals, LLC | July 20, 2006 |
| 3. | Contract Mining Agreement between Greenbrier Smokeless Coal Mining, L.L.C. and Midland Trail Resources, LLC | July 20, 2006 |
| 4. | * Coal Sales Agreement between Powhatan Mid-Vol Coal Sales, L.L.C. and Midland Trail Resources, LLC | July 20, 2006, as amended January 29, 2007 |

5. \* Midland Undertaking Agreement between Midland Trail Resources, LLC   May 1, 2007
   and Greenbrier Minerals, LLC

F.   Project Documents with an Affiliate of the Borrower or any Borrower Subsidiary

| | Description | Date |
|---|---|---|
| 1. | Agreement for Advising Services between Greenbrier Minerals, LLC and Monarch Financial Corporation, as amended | March 22, 2004, as amended as of March 22, 2006 |
| 2. | Coal Processing Agreement between Midland Trail Resources, LLC and Greenbrier Smokeless Coal Mining, L.L.C. | July 20, 2006 |
| 3. | Administrative Services and Equipment Agreement between Midland Trail Resources, LLC and Greenbrier Minerals, LLC | July 20, 2006 |
| 4. | Coal Sales Agreement between Powhatan Mid-Vol Coal Sales, L.L.C. and Midland Trail Resources, LLC | July 20, 2006 |
| 5. | Contract Mining Agreement between Greenbrier Smokeless Coal Mining, L.L.C. and Midland Trail Resources, LLC | July 20, 2006 |
| 6. | $4,000,000 Promissory Note of Midland Trail Resources, LLC payable to Greenbrier Minerals, LLC | June 22, 2006 |
| 7. | $1,000,000 Promissory Note of Midland Trail Resources, LLC payable to Greenbrier Minerals, LLC | August 17, 2006 |

G.   Leases or Other Agreement with Respect to Easement Properties

| | Description | Date |
|---|---|---|
| 1. | Lease between MeadWestvaco Corporation, as Lessor, and Matoaka Land Company, LLC, as Lessee, as amended by Amendment No. 1 dated June 18, 2006 | October 15, 2004 |
| 2. | Lease between MeadWestvaco Corporation, as Lessor, and Matoaka Land Company, LLC, as Lessee | May 5, 2005 |
| 3. | Lease between MeadWestvaco Corporation, as Lessor, and Matoaka Land Company, LLC, as Lessee | July 1, 2006 |

| | | |
|---|---|---|
| 4. | Agreement between MeadWestvaco Corporation and Matoaka Land Company, LLC pertaining to $200,000 escrow | July 1, 2006 |

H.    Other Credit Support Instruments

Disclosed elsewhere in this Schedule 3.30, in addition the following:

| | Description | Date |
|---|---|---|
| 1. | Guaranty of Indianan Harbor Coke Company, L.P.'s obligations to POWHATAN MID-VOL COAL SALES, L.L.C. by Sun Coke Company | undated but delivered in connection with the April 1, 2006 Coal Sales Agreement |
| 2. | Guaranty of POWHATAN MID-VOL COAL SALES, L.L.C.'s obligations to Indianan Harbor Coke Company, by Greenbrier Minerals, LLC | undated but delivered in connection with the April 1, 2006 Coal Sales Agreement |

I. Other Agreements

| | | |
|---|---|---|
| 1. | * Tatum, L.L.C. Financial Consulting with Greenbrier Minerals, L.L.C. | April 17, 2007 |
| 2. | * Security Agreement by and between Midland Trail Resources, LLC and Greenbrier Minerals, L.L.C., POWHATAN MID-VOL COAL SALES, L.L.C., Matoaka Land Company, L.L.C. and Greenbrier Smokeless Coal Mining, L.L.C. | May 1, 2007 |