# **EXHIBIT G**

----- Message from Bill Karis <wkaris@comcast.net> on Thu, 17 Dec 2009 09:50:47 -0800 -----

**To:** <Jack McCarthy <jack@jackmccarthy.net>, "Salzman, Eric" <eric.salzman@lamcollc.com>

**cc:** jcturley <jturley@greenbriersmokelesscoal.com>, Ray McCormick "ray.mccormick@monarchfc.com", "McConnell, Michael H> <Mh.Mcconnell@morganstanley.com>, Donald Malecki <donald.malecki@bipc.com>

**Subject:** Response to Lehman Comments on Greenbrier Proposal dated 11-23-2009

Jack,

The non-Lehman managers of Greenbrier have reviewed your response and wanted to provide you with a reply in advance of our scheduled meeting next Tuesday. There appears to be a disconnect as to the proposed model under the Joint Sale and Sharing Arrangement ("Model"). The Model provides for an alignment and sharing among the parties that starts at a modest sales price and continues to keep all parties aligned and benefiting as the sales price increases. The Model was designed as a reasonable compromise for all the parties, taking into account the synergies of the parties working together to achieve the optimum sale price and the strength of the claims that the various parties have against each other.

As you are aware, Greenbrier filed a claim in Lehman's bankruptcy based upon Lehman's failure to make loans in clear violation of its loan agreement with Greenbrier. To date, we have been focusing on the positive attributes of a joint sale of Greenbrier and Midland and have not discussed in detail Greenbrier's claims against Lehman because we did not feel its was constructive to do so. However, in view of the unreasonableness of your proposal, we feel that it is important that you recognize that Greenbrier has strong claims against Lehman with respect to both its secured loan and equity position and that our original proposal was an attempt to achieve a compromise among the parties.

Lehman's proposal incorrectly assumes that Lehman has a secured claim for approximately $180mm and also owns a 49% equity interest in Greenbrier. Your proposal leaves minimal value for Greenbrier's non-Lehman equity holders. In summary, Lehman has proposed (1) being paid $150mm of its debt before any sharing, then (2) sharing 49% in all equity distributions until Lehman is paid $180mm; then (3) providing for a catch up provision so that Lehman receives the full benefit of a 49% equity interest and finally (4) receiving all additional equity distributions at a 49% level. The result of Lehman's proposal is to receive all of its debt (without any adjustment for damages caused to Greenbrier) and full payment on 49% of the equity in Greenbrier, except for the narrow band when distributions to Lehman are between $150mm and $180mm in which

case the non-Lehman Greenbrier equity is entitled to share with Lehman 51% to 49%, respectively.

The proposed sharing by Lehman is unreasonable on a fundamental basis. When we began discussions about a potential sale back in May, we clearly stated that if Lehman was expecting to leave a minimal amount (i.e. "leakage") for non-Lehman equity holders that it was not worth pursuing a joint sale and compromise among the parties. We were assured that Lehman was open to exploring a compromise that would align all interests in a joint sale and would provide for a reasonable sharing with non-Lehman equity holders.

Lehman's proposal improperly ignores Greenbrier's significant claims against Lehman. As described in more detail below, Lehman does not have a valid secured claim for $180mm and is not entitled to retain its 49% equity in Greenbrier.

Greenbrier's Loan Agreement commits Lehman to provide loans of up to $206 mm in the aggregate. To date, Lehman has only funded $167 mm of loans to Greenbrier. Prior to Lehman's bankruptcy, Greenbrier requested an advance under its Loan Agreement to fund numerous capital expenditures. The advance was approved by Lehman, but never funded despite several assurances that the wire was being sent to Greenbrier. Later, without any justification whatsoever, Lehman informed Greenbrier that it was not making the approved advance and would not be making further advances to Greenbrier. Obviously, a lender's improper refusal to make loans gives rise to what is casually referred to as lender liability.

Lehman's failure to fund its loans has caused Greenbrier to have inadequate capital to properly develop its operations. For example, Greenbrier did not have the capital to fund the development of the new surface mine, known as Buck Lilly. If Greenbrier had developed the Buck Lilly mine as planned, Greenbrier would not be in the precarious operating situation that it currently finds itself. Buck Lilly would have provided low sulfur coal to Greenbrier for blending purposes, which would have eliminated the need for Greenbrier's purchase of coal from Midland at high prices and the need to have a joint sale of Midland and Greenbrier.

Lehman has caused tens of millions of dollars of damage to Greenbrier through its failure to fund in accordance with the Loan Agreement. Numerous additional causes of action can, and will be, asserted with respect to Lehman's purported secured claim of $180mm, including without limitation, breach of contract, equitable subordination, debt recharacterization, etc. Presently, Greenbrier is working to achieve a reasonable arrangement with Lehman on its colorable secured claim. Lehman is now acting commercially unreasonable and in bad faith and is not justified in demanding that it be repaid the entire $180mm loan balance on a first priority secured basis -- and share as a 49% equity owner in Greenbrier.

Greenbrier is a Delaware limited liability company. Under Delaware law, upon commencing its bankruptcy, Lehman automatically ceased to be a member of Greenbrier as a matter of law. In particular, Delaware's Limited Liability Company Act provides:

> " A person ceases to be a member of a limited liability company upon the happening of

any of the following events:

* * *

(b) Files a voluntary petition in bankruptcy . . . ."

6 Del. C. § 18-304 (a copy of the statute is attached for your reference). Although the statute is unequivocal in stating that Lehman is no longer a member of Greenbrier and represents Delaware's public policy, we recognize that certain judges have from time to time modified various statutes based upon bankruptcy law and the equities of the situation.

Even when considering the equities of the present situation, Lehman should not be permitted to retain its 49% ownership interest in Greenbrier. Since neither you nor Eric were working with Greenbrier prior to Lehman's bankruptcy, we believe that a bit of history is appropriate.

Lehman did not pay any material consideration for this equity. Rather, the equity was provided to Lehman for nominal consideration in connection with Lehman's agreement to continue funding Greenbrier through its full development, including Buck Lilly. This arrangement was specifically negotiated when Greenbrier was considering whether to continue its financing with Lehman or refinance with Sankaty. Greenbrier selected Lehman over Sankaty based upon the specific funding assurances given by Lehman -- even though Lehman demanded more equity than would have been required under a Sankaty financing. Clearly, Lehman has not made the additional advances that were mandated in connection with the granting of the equity in Greenbrier and is not entitled to retain its equity interests.

In summary, Lehman does not have a secured claim for $180 mm and is not entitled to share as a 49% equity owner in Greenbrier. To reiterate, one of the important facets of the Term Sheet for the Joint Sale and Sharing Arrangement, as originally proposed, was a settlement of all claims among the parties. The proposed treatment of Lehman in the Model is exceedingly fair and reasonable and, in fact, some people have argued even too generous. In the event that Lehman is unwilling to accept a reasonable sharing of sale proceeds, Greenbrier will be compelled to commence pursuing all legal and equitable claims in Lehman's bankruptcy proceeding as well as seeking relief from stay to pursue state proceedings. Our goal and hope is to avoid the distraction and expense of these lawsuits via a reasonable sharing arrangement.

With regard to your specific points, see the comments inserted in red below.

Bill

# **EXHIBIT H**

# Buchanan Ingersoll
**PROFESSIONAL CORPORATION**

### MEMORANDUM

To:  Greenbrier Minerals Holdings, LLC

From:  Donald E. Malecki
Elliot Dater

Date:  May 29, 2010

Re:  Board of Managers -- Quorum Issues



We have recently reviewed the Amended and Restated Operating Agreement ("Operating Agreement"), dated March 12, 2008, of Greenbrier Minerals Holdings, LLC ("Greenbrier ") with regard to Board of Managers' ("Board") governance principles and protocols. During our review, we determined that a fundamental problem exists under the Operating Agreement.

Greenbrier is presently unable to have a quorum available to transact business. The Operating Agreement provides "the Managers in office, who collectively have the right to vote more than six (6) votes, shall constitute a quorum for the transaction of business by the Board of Managers." See Operating Agreement Section 5.5(a).

As the Board is aware, in light of Lehman's voluntary bankruptcy, there are certain effects on Lehman's equity interests in Greenbrier. The relevant Delaware statute (governing limited liability companies) provides as follows:

*"§ 18-304. Events of bankruptcy.*

*A person ceases to be a member of a limited liability company upon the happening of any of the following events:*

*(1) Unless otherwise provided in a limited liability company agreement, or with the written consent of all members, a member:*

*a. Makes an assignment for the benefit of creditors;*

*b. Files a voluntary petition in bankruptcy;*

*c. Is adjudged a bankrupt or insolvent, or has entered against the member an order for relief, in any bankruptcy or insolvency proceeding;*

> *d. Files a petition or answer seeking for the member any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation;*
>
> *e. Files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the member in any proceeding of this nature;*
>
> *f. Seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the member or of all or any substantial part of the member's properties; or*
>
> *(2) Unless otherwise provided in a limited liability company agreement, or with the written consent of all members, 120 days after the commencement of any proceeding against the member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, if the proceeding has not been dismissed, or if within 90 days after the appointment without the member's consent or acquiescence of a trustee, receiver or liquidator of the member or of all or any substantial part of the member's properties, the appointment is not vacated or stayed, or within 90 days after the expiration of any such stay, the appointment is not vacated."*

A person ceases to be a member automatically upon a voluntary bankruptcy. No affirmative action is required by the company, to effectuate it. In accordance with the statute, there are only two ways that a member can remain as a member after a voluntary bankruptcy. First, a member can remain as a member after a bankruptcy if the Operating Agreement provides that they remain as a member. The Operating Agreement does not have such a provision. Second, a member can remain a member with the written consent of all members, which has not occurred. Accordingly, Lehman ceased, as a matter of law, to be a member of Greenbrier immediately upon its voluntary bankruptcy.[1] This conclusion is purely the literal legal reading of the statute and is not the result of any action taken by Greenbrier or any other person.

     Since Lehman ceased to be a member automatically upon bankruptcy, it could not legally take any action as a member of Greenbrier after such event. Lehman's action of electing Jack McCarthy as a Manager of Greenbrier after its bankruptcy is therefore legally deficient. Since Lehman did not have a member on the Board at the time of its bankruptcy, there is no Class D Manager.[2]

     Without Lehman being able to legally (under Delaware law) nominate a Manager, the Board only consists of six (6) votes. In summary, Greenbrier's Board is legally incapable, as it

---

[1] Lehman has maintained that its bankruptcy has not resulted in a loss of the membership interest in Greenbrier. There are two interests, typically, held by members in a limited liability company. One is the economic interest. The other interest is its right to vote and take actions as a member. Ignoring whether or not there is any impact on Lehman economic interest in Greenbrier, the legal import of the Delaware statute clearly affects Lehman's voting rights since it is no longer a member.

[2] Jack's participation and attendance at Board meetings and in discussions does not change the legal issues surrounding his election. It should also be noted that neither the Board nor Greenbrier change or waive the requirements of the Delaware statute either by their actions or inactions.

presently stands, of obtaining the more than six (6) vote requirement to achieve a quorum of Managers to transaction business.

Any actions taken by the Board, without a quorum present, are legally deficient. Unless and until the Operating Agreement is amended to remedy this situation, Greenbrier's Board is legally incapable of conducting its business.

Amendments to the Operating Agreement are permitted in accordance with Section 6.9 of the Operating Agreement.[3] To remedy the current Board situation, an amendment will need to be proposed and approved by the requisite members, all in accordance with the Operating Agreement.

---

[3] 6.9 <u>Voting on Amendments</u>.

(a)   Amendments to this Agreement may be proposed (i) by Managers holding at least two votes on the Board of Managers, (ii) by Class A Members holding one hundred percent (100%) of the outstanding Class A Units or (iii) by Class D Members holding a Majority-in-Interest of the outstanding Class D Units. Following such proposal, the Board of Managers shall submit to the Members a verbatim statement of any proposed amendment, providing that counsel for the Company shall have approved of the same in writing as to form, and the Board of Managers shall include in any such submission a recommendation as to the proposed amendment. The Board of Managers shall seek the written vote of the Members on the proposed amendment or shall call a meeting to vote thereon and to transact any other business that he or she may deem appropriate. Subject to <u>Sections **Error! Reference source not found.**(b)</u> and **Error! Reference source not found.** below, a proposed amendment shall be adopted and be effective as an amendment hereto if it receives the affirmative vote of a Majority-In-Interest of each Class of Membership Interests then outstanding (except for Class C Members, which shall be entitled to vote only pursuant to <u>Section **Error! Reference source not found.** and (c)</u> below); provided that any amendment to <u>Section 6.9</u> shall require the affirmative vote of a Majority-in-Interest of the Class C Members.

(b)   Notwithstanding <u>Section **Error! Reference source not found.**</u> hereof, this Agreement shall not be amended without the consent of each Member adversely affected if such amendment would (i) modify the limited liability of a Member, or (ii) alter the interest of a Member in Profits, Losses, other items of income, gain, loss, deduction or credit or any Distributions in a manner differently than such amendment alters such rights for the entire Class. If an amendment proposes to modify the interest of Class C in Profits, Losses, other items of income, gain, loss, deduction or credit or any Distributions, then such amendment shall be approved by a Majority-in-Interest of the Class C Members.

(c)   Notwithstanding <u>Section **Error! Reference source not found.**</u> hereof, and subject to <u>Section **Error! Reference source not found.**</u>, the Board of Managers may approve certain amendments to this Agreement, in connection with its approval and issuance of additional Units to new equity investors pursuant to <u>Section **Error! Reference source not found.**</u>.

Notwithstanding anything contained in this <u>Section **Error! Reference source not found.**</u> to the contrary, this <u>Section **Error! Reference source not found.**</u> shall remain subject to <u>Sections **Error! Reference source not found.**, (c) and (d)</u> in all respects.

## **EXHIBIT I**

# JONES DAY

222 EAST 41ST STREET • NEW YORK, NEW YORK 10017-6702

TELEPHONE: 212-326-3939 • FACSIMILE: 212-755-7306

Direct Number: (212) 326-3446
bpbarragate@jonesday.com

June 2, 2010

**VIA OVERNIGHT MAIL &**
**ELECTRONIC MAIL (DONALD.MALECKI@BIPC.COM)**

Donald E. Malecki, Esq.
Buchanan Ingersoll & Rooney PC
One Oxford Centre
301 Grant Street, 20th Floor
Pittsburgh, PA 15219-1410

Re:    Greenbrier Minerals Holdings, LLC

Dear Don:

As you are aware, we represent Lehman Commercial Paper Inc. ("LCPI"). We have been provided with a copy of your Memorandum to Greenbrier Minerals Holdings, LLC ("Greenbrier"), dated May 29, 2010, regarding "Board of Managers - Quorum Issues" and specifically the impact of LCPI's commencement of a chapter 11 case under title 11 of the United States Code (the "Bankruptcy Code") on its continuing membership interests in Greenbrier, and LCPI's ability to act with respect to those interests pursuant to the rights afforded to it under Greenbrier's Amended and Restated Operating Agreement, dated March 12, 2008 (the "Operating Agreement").

Pursuant to the Memorandum, you contend that LCPI's interests in Greenbrier automatically ceased upon its bankruptcy filing under Section 18-304 of the Delaware Limited Liability Company Act (the "Act"). This bankruptcy filing occurred in October of 2008. Greenbrier's Board of Managers (including LCPI) has continuously conducted company business subsequent to the filing and neither you nor any of the Board of Managers has formally raised the issues currently set forth in the Memoranda regarding the propriety of such actions. The position you have taken in your memorandum is legally incorrect and we believe it is being raised at this time, and more than a year after the filing of the LCPI bankruptcy, opportunistically because a member of the Board of Managers is unhappy with an action properly taken by the Board.

Delaware law provides that a limited liability company's operating agreement is a document of primacy and only where the agreement is silent or patently ambiguous with regard to an issue should guidance be sought in the provisions of the Act. See 6 Del. C. § 18-1101(b)

NYI-4283029v4

JONES DAY

June 2, 2010
Page 2

("It is the policy of this chapter to give the maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements."); see also, Elf Atochem North America, Inc. v. Jaffari, 727 A.2d 286 (Del. Supr. 1999); R&R Capital, LLC v. Buck & Doe Run Valley Farms, LLC, 2008 WL 3846318 (Del. Ch. 2008). In keeping with this rule, the Act states, in relevant part, that the Operating Agreement may provide an exception to the default rule that a bankruptcy of a limited liability company member terminates such member's interests in the company. Indeed, the Act provides that "*unless otherwise provided in a limited liability company agreement*" a person ceases to be a member of a liability company upon filing a voluntary petition in bankruptcy.

Section 9.7(a) of the Operating Agreement expressly addresses Greenbrier's and its members' rights upon a member's bankruptcy filing, providing that

> [a]t the election of the Company within three months after the Company becomes aware of an Affected Company Interest [which includes an interest held by a member that has sought bankruptcy relief], the Affected Company Interest may be purchased and liquidated by the Company, and the Member owning the Affected Company Interest shall surrender the Affected Company Interest in exchange for the Liquidation Value of the Affected Company Interest.

Operating Agreement, § 9.7(a). This provision unambiguously addresses the issue of what becomes of a member's interest upon a bankruptcy filing. The provision would serve no purpose in the Operating Agreement if a member would lose its membership interest upon a bankruptcy filing, because Greenbrier would never pay for a membership interest that would be lost if Greenbrier elects to do nothing. Because Greenbrier did not purchase LCPI's membership interests in accordance with the terms of Section 9.7(a) of the Operating Agreement, LCPI retained those interests notwithstanding its bankruptcy filing. Accordingly, LCPI's membership interests in Greenbrier are property of its bankruptcy estate pursuant to section 541 of the Bankruptcy Code.

As you are aware, section 362(a)(3) of the Bankruptcy Code operates as a stay against "any act to . . . exercise control over property of the estate." Please be advised that any attempt to deny LCPI of its membership interests in Greenbrier or the rights afforded to it under the Operating Agreement with respect to those interests would constitute a willful violation of the automatic stay in LCPI's chapter 11 case currently pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). LCPI reserves the right to pursue any and all available remedies with respect to enforcement of the stay in the Bankruptcy Court, including, but not limited to, the imposition of sanctions (including costs, fees and/or actual and punitive damages) pursuant to section 362(k) of the Bankruptcy Code.

NYI-4283029v4

JONES DAY

June 2, 2010
Page 3

      We would also note that the issue regarding the validity of LCPI's membership interests was not formally raised by Buchanan Ingersoll as counsel to Greenbrier in connection with any previous action taken by the Board of Managers since the LCPI bankruptcy filing. Decisions were continuously made by the Board of Managers and Greenbrier was permitted to conduct business with third parties without any formal assertion that these actions were some how invalid. The issue was referred to as part of settlement discussions, but not formally raised until the Board of Managers made a decision that, although proper and supported by a majority of the members of the Board of Managers, was not supported by a minority of Board. The raising of this issue at this juncture seems that it is not as a result of a sudden appreciation for Delaware law, but is motivated by other factors.

      Please do not hesitate to contact me at your earliest opportunity with any questions that you may have with respect to this letter.

                    Very truly yours,

                    Brett P. Barragate

cc:    Eric Salzman
       Jack McCarthy
       William G. Karis
       Joseph C. Turley III
       Raymond McCormick
       Michael H. McConnell

NYI-4283029v4

**Exhibit J**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                              :
In re:                                        :   Chapter 11
                                              :
LEHMAN BROTHERS HOLDINGS INC., et al.,        :   Case No. 08-13555 (JMP)
                                              :
                  Debtors.                    :   (Jointly Administered)
                                              :
------------------------------------------------------------x
```

### ORDER PURSUANT TO SECTIONS 105(a) AND 362 OF THE BANKRUPTCY CODE ENFORCING THE AUTOMATIC STAY

Upon the motion, dated June 22, 2010, of Debtor and Debtor In Possession Lehman Commercial Paper Inc. (together, with Lehman Brothers Holdings Inc. and its affiliated debtors in the above-referenced chapter 11 cases, the "Debtors")[1] pursuant to sections 105(a) and 362 of the Bankruptcy Code for an Order Enforcing the Automatic Stay (the "Motion"), all as more fully set forth in the Motion; and upon the Declaration of Jack McCarthy, Sr., dated June 22, 2010, in support of the Motion; and the Court having reviewed the Motion and having considered the statements of counsel before the Court (the "Hearing"); and the Court having found that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Standing Order of Referral of Cases to Bankruptcy Court Judges of the District Court for the Southern District of New York, dated July 19, 1984 (Ward, Acting C.J.); (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b); (c) venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and (d) due and proper notice of the Motion was provided to the Notice Parties and that no other or further notice need be provided; and the Court having determined that the relief sought in the Motion is in the best interest of the Debtors, its creditors and all parties in interest

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

and that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein;

        IT IS HEREBY ORDERED THAT:

    1.      The Motion is GRANTED in its entirety;

    2.      Greenbrier shall perform its obligations under the Operating Agreement, honor all actions taken by the Board, including the May 25th Vote and all future actions taken in accordance with the Operating Agreement, and shall not otherwise prevent LCPI from exercising nor deprive LCPI the benefit of its Membership Interests, including, but not limited to, its voting interests under the Operating Agreement.

Dated: New York, New York
          _____, 2010

          _____
          UNITED STATES BANKRUPTCY JUDGE